# COMPOSITE EXHIBIT C

A.   I'll say the Bartle group, so Bartle and all of his entities and whatnot.

Q.   So you remember John Bartle --

A.   Yes.

Q.   -- generally?  All right.  So let's see. Did you ever have any direct communication with anybody at the Florida Office of Insurance Regulation?

A.   I don't recollect, no.

Q.   I'll just mention some names and see if they seem familiar.  Christopher Struk, S-t-r-u-k?

A.   I just don't recall.

Q.   I'm just asking if you recall.  And Leanne Chosenowski?

A.   I don't recall ever speaking to anyone there, so I just don't recall.

Q.   I got you.  Destiny Wilson, does that name ring a bell at all?

A.   No.

Q.   Okay.  So let's go back to the letter. This letter gets sent to the Office of Insurance Regulation.  I'll represent to you that they acknowledge they received it.  Did you ever receive any response to this letter?

A.   Not that I remember.

Q.   Okay.  No objection to this at all?

A.   Not that I'm aware of, no.

Q.   Okay.  Are you aware that there was ever any response or objection made to this letter maybe to Ms. Hungate-Noland?

A.   I'm not aware of any response ever.

Q.   Okay.  And so I'll show you what we'll mark as 2.

MR. LOFTON:  Is this in the book?

MR. WHITSON:  No, I made this copy on my own.

MR. LOFTON:  Does Mr. Appleby have this?

MS. WHITSON:  This is the loan closing statement on the CPIF transaction.  Was this e-mailed to you, Keith?

MR. APPLEBY:  Let me make sure.  I believe so.

MR. WHITSON:  Okay.  That's what we're on now, just so you can follow along.

(Rabke Exhibit No. 2 was marked for identification.)

BY MR. WHITSON:

Q.   This is Exhibit 2.  Mr. Rabke, do you recognize this document?

A.   I mean, I recognize it from the cover, but otherwise, it looks like a closing statement that I've

Q.   Then Horizon at line 7 on the following page of the closing statement.

What does line 8 mean, POC?

A.   This isn't a document that I would have -- this is not my world, so I don't have any idea.

Q.   Okay.  I wasn't sure who drafted it or how it was negotiated, so I just wanted to ask the question.

A.   This is usually a bank document.

Q.   It was signed by Mr. Angelis on behalf of BHMSUNI.  Was that your client as well?

A.   I mean, yes.  As I mentioned when we started, BSHM Investments was my client.

Q.   Gotcha.  So going back to the letter that was sent, the initial exhibit to your deposition, sort of revisiting the text of that letter, was it ever the intent or design to ever mislead the Office of Insurance Regulation?

A.   No.  That's why the letter was sent immediately upon closing.

Q.   And, again, you've never received any response from the OIR to this letter?

A.   Not that I recall.

Q.   From your perspective, as you recollect, were all these negotiations with the bank, Mr. Price,

the other parties, all conducted in good faith, as you understand that term to mean?

A. As far as I know.

Q. Was it an arms-length commercially reasonable negotiated transaction?

A. As far as I know, yes.

Q. And did all parties have the belief that it was appropriate to use the funds?

A. I can't speak to what all parties thought.

Q. Your client, then?

A. I think this letter speaks for itself.

Q. Right. But you thought -- your client thought it was appropriate to pledge the $3 million from the bank and also have it constitute also part of the minimum liquid reserve account?

A. Since that's what happened and notice was provided, I guess the answer would be yes.

Q. Okay.

MS. WHITSON: Mr. Lofton, I can let Mr. Appleby ask questions, turn the witness over, if I can reserve maybe five minutes to call my team and make sure I've asked everything they wanted me to ask, sort of a clean-up call. I think I'm pretty much finished with my questions. But my team may say you forgot to ask X, Y and Z so I may have to do that, but

transferred amount) representing a portion of the MLR escrow amount from Regions Bank to USAmeriBank."  Do you know whether the MLR statutes have any requirements regarding notice and timing of letters like this?

A.   Off the top of my head, I don't have any idea.  We have the statute here, but I'd have to read it.

Q.   The last paragraph states "The transferred account shall continue to be considered a portion of the MLR escrow pursuant to Section 1(b) of the MLR statute."  Do you know whether the funds that were transferred over to USAmeriBank, do you know whether they continued to be subject to the regulatory actions of the Florida OIR, or Office of Insurance Regulation?

A.   That was the intent.

Q.   If could mark Plaintiff's Exhibit 33.  And at the top of that page, Mr. Rabke, it's an e-mail from you to Jay Price.

MR. WHITSON:  One second, Keith.  Robert is still that handing it out.

MR. APPLEBY:  Okay, sorry.

Q.   At the top of that e-mail, Mr. Rabke, it's an e-mail from you to Mr. Price copying Beth Hungate-Noland.  And your text says "Jay, we have

e-mail.  Based on prior e-mails that you had me just read, I think we're probably talking about 3 million of the total of 4.2 million, so that would make sense, referring to the cleanly about 3 million.

Q.   Do you know whether, once that transaction was made, whether those 3 million funds would still be subject to the Florida OIR MLR requirements?

A.   That was certainly -- again, the recitals speak for themselves and the cash account agreement.

Q.   Okay.  If I could direct you to Plaintiff's Exhibit 36.  Mr. Rabke, I'm just going to ask you, have you seen this e-mail before or recall this e-mail?

A.   No.  I don't know -- I don't recollect, and I don't know why I would have.

Q.   Okay.

MR. LOFTON:  Mr. Appleby, just so the record is clear, is Mr. Rabke on this e-mail?  I don't see him.

MR. APPLEBY:  No, he is not.  And, again, I appreciate that.

Q.   I'm going to just direct you to the bottom. At the bottom of this there is an e-mail from Trey Korhn, who was a USAmeriBank loan officer, to Jay Price, who is counsel for the bank.  It seems this is

Friday, March 28, 2014, a few days before the closing early in the morning.  And Mr. Korhn says to Mr. Price, "I hate to question this but just want to sleep well at night.  Can you double-check the statute," it goes on, and ends with, essentially, "I know you verified, but if the rights to those funds are ever disputed, I'd be looking for a job."

At the top of the e-mail Mr. Price responds to Mr. Korhn.  Again, he states that he has looked at it, and it does not provide any rights in the State. I believe what he's referring to there is saying this $3 million, once it becomes part of the cash collateral account held at USAmeriBank that it's no longer subject to rights under the State.  Do you -- from your recollection or experience from this transaction, do you know whether that's an accurate statement?

A.   You've just asked me that question twice, and I told you my opinion was the intention was it would be under the MLR.

Q.   Thank you.  Could you read that second paragraph to yourself, please?

A.   Yes.

Q.   Referring to, again, the top e-mail from Mr. Price to Mr. Korhn.  In that portion there's a lot

Page 94

for you to point me anywhere in this loan agreement that references the MLR requirements on this loan?

A.   Not without reading it, I wouldn't have any way to do that quickly.

Q.   Okay.  Looking into the middle of the loan document there's at section 7.6, not numbered, so I'll just wait for you to get to it.  Under the "Notice" section it refers to notices, "Any notice or communication required should be given," and it includes the Williams Mullen law firm.  I believe we've already established Ms. Hungate-Noland is one of the healthcare partners at Williams Mullen?

A.   Correct.

Q.   Thank you.

I'd like to direct you to Plaintiff's Exhibit 23.  I believe this was also defendant's Exhibit 7.  Let me make sure.  I apologize. Defendant's Exhibit 7 was a red line version.  This is the clean version that is signed and notarized.

Mr. Rabke, do you recall whether you would have had a role in drafting this document?

A.   I would have been part of the negotiation, yes.

Q.   Okay.  At paragraph C it says, on the first page there, "The cash collateral funds (as defined

below) deposited by pledgor hereunder shall be included in the pledgor's reserve requirements as required under Section 651.035 of the Florida statutes (MLR statute).  As such attached cash collateral funds meet the statutory uses allowed under Section 1(b) of the MLR statute."  At this juncture can you tell me whether you know if the cash collateral funds did meet the requirement?

MR. LOFTON:  Hold on one second. Mr. Appleby, when you say "at this juncture," what are you talking about?

MR. APPLEBY:  I apologize.  Thank you.

Q.   I mean at the juncture of the transaction, as of March 31, 2014.

A.   Yes.  Again, that would have been a point of my letter to the OIR upon closing.

Q.   Okay.  And the next paragraph D says "The MRI statutes provides that the Office of Insurance Regulation of the State of Florida shall have information rights regarding cash collateral funds." Do you know what information rights means or refers to?

A.   From prior questions -- I don't remember whose question it was -- there was language added in the Section 11 and 14 of this document referencing

information rights to the Department.

Q.   Okay.  If you would flip to the next page, at paragraph 3, if you don't mind, just read that paragraph to yourself.  It's the paragraph captioned number 3, "Control and Use of Cash Collateral Funds"?

A.   Okay.  What's your question?

Q.   It clearly states, "The deposit collateral account shall be under the lender's control.  Pledgor shall have no access to and shall not be permitted to make any withdrawals of cash collateral funds from the deposit collateral account without lender's prior consent."  Do you know whether the MLR had any rights to access these funds?

MR. WHITSON:  Object to form.

A.   Well, the MLR doesn't have rights.  The MLR is a reserve.

Q.   Okay.

A.   I mean, we've already covered this.  The intention was for those funds to comply with the MLR statute.

Q.   Okay.  At paragraph 5 it refers to Payment Upon Certain Defaults.  Once again there, it's pretty clear that if there's any default, the bank can apply those funds directly toward its debt.  Do you know if that actually took place?