# COMPOSITE EXHIBIT D

Q.   Okay.  Thank you.

A.   "H" floats.  It's in --

Q.   Well, that's -- yeah.  Unfortunately, I think I've put it back and forward a few times, so I wanted to make sure I had it right going forward.

Is it pronounced Korhn?

A.   Korhn, yes.

Q.   Okay.  Mr. Korhn, what's your current occupation and employer?

A.   I am the Commercial Real Estate Division Head for Valley National Bank.

Q.   And how long have you been with Valley National Bank?

A.   I have been with Valley and its predecessor since 2008.

Q.   Has your role been the same role since you started with them?

A.   I have been in the Commercial Real Estate Division originally as a loan officer and eventually moving on to the management side.

Q.   Okay.  Would you tell me what your primary responsibilities are as a commercial real estate -- I'm sorry.  Once again, what was --

A.   Sure.  Division Head.

Q.   Okay.



would cause some concern.

Q.   And what did those press releases say?

A.   You know, I don't recall in detail, but the regulatory agencies are -- you know, come to the properties.  But I don't remember the details of the article.

Q.   What regulatory agencies do you recall?

A.   I believe AHCA came to, you know, our facility we had a mortgage on and the OIR to the other property across the street.

Q.   Did you ever have any concerns about the $3 million that was deposited with the bank?

MR. WHITSON:  Object to the form.

A.   Concern in what regard?

BY MR. APPLEBY:

Q.   Did you ever have any concerns?

A.   Yeah.  I mean, I think it's clear that -- you know, I asked -- excuse me -- asked our counsel to verify that that is our collateral and collateral for the loan.

Q.   Okay.  And is it your position that the funds were not subject to any other liens?

MR. WHITSON:  Object to form.

A.   Yes, that it was subject solely to our pledge agreement.



BY MR. APPLEBY:

Q.   Are you familiar with the term minimum liquid reserves?

A.   I have heard it throughout the -- you know, as part of this transaction, yes.

Q.   Okay.  Tell me what your understanding of -- what is a minimum liquid reserve?

A.   I don't --

MR. WHITSON:  Object to form.

A.   Yeah.  I don't know in detail.  Again, it was a requirement, you know, by a regulatory agency.  But I don't have familiarity with the statute and, again, asked counsel to advise and confirm, you know, that we were in compliance with any -- or the transaction was in compliance and that that $3 million was our collateral.

BY MR. APPLEBY:

Q.   Did counsel give you any form of an opinion, whether it be written or, you know, some type of correspondence that says, The bank doesn't need to be concerned about this money because it's the bank's money?

A.   Yes.  Counsel provided the bank certainty that we needed to proceed with the transaction or otherwise we would not have, if they -- and our



reliance was on them.

Q.   You mentioned they gave you a certainty. What -- can you explain that?

A.   Yes, that the -- you know, the money in our account is collateral per the pledge agreement and --

Q.   Okay.  Are you aware whether the bank was involved with discussions with OIR or the Office of Insurance Regulation after the closing regarding the $3 million and whether it was still part of the minimum liquid reserves required of Westport Holdings?

MR. WHITSON:  Object to the form.

A.   So can you clarify, were we in conversation with or -- or repeat it.

BY MR. APPLEBY:

Q.   Well -- yeah.  Was -- tell me about your understanding of the bank's involvement and communication with OIR after closing regarding the $3 million and whether or not that $3 million was part of the minimum liquid reserves required of Westport Holdings.

A.   So --

MR. WHITSON:  Object to form.

A.   I do know our counsel, you know -- whether they had a conversation or otherwise, I don't know -- but they wrote a letter or -- they had some

