# COMPOSITE EXHIBIT E

101

IN UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

IN RE:

WESTPORT HOLDINGS TAMPA,          Case No.: 8:16-bk-08167-CED
LIMITED PARTNERSHIP,              Chapter 11

WESTPORT HOLDINGS TAMPA II,  Case No.: 8:16-bk-08168-CED
LIMITED PARTNERSHIP,

                                  Jointly Administered Under
          Debtors.               Case No.: 8:16-bk-08167-CED
_____/

JEFFREY W. WARREN, LIQUIDATING          VOLUME II
TRUSTEE FOR WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP and
WESTPORT HOLDINGS II, LIMITED
PARTNERSHIP,

          Plaintiff,             Adv. Pro. No.:
v.                               8:20-ap-00007-CPM

VALLEY NATIONAL BANK, principal
subsidiary to VALLEY NATIONAL
BANKCORP, a New Jersey domestic
profit corporation, as successor
by merger to USAMERIBANK,

          Defendant.
_____/

CONTINUED
DEPOSITION OF:     VERNON F. KORHN, III

DATE:              April 7, 2023

TIME:              10:07 a.m. to 12:21 p.m.
                    1:17 p.m. to  2:52 p.m.

PLACE:             Bush Ross
                   1801 North Highland Avenue
                   Tampa, Florida 33602

REPORTED BY:       Jean M. Wilkes, RPR-CP
                   Notary Public
                   State of Florida at Large

102

**APPEARANCES:**

**KEITH T. APPLEBY, ESQUIRE**
**Appleby Law, P.A.**
**4916 West Melrose Avenue South**
**Tampa, Florida 33629-5420**
**(813) 435-0396 PHONE**
**keithtappleby@icloud.com**
        **Attorney for Plaintiffs**


**EDMUND S. WHITSON, III, ESQUIRE**
**McGlinchey Stafford, PLLC**
**100 South Ashley Drive**
**Suite 600**
**Tampa, Florida 33602**
**(813) 310-0733 PHONE**
**(904) 212-1465 FAX**
**ewhitson@mcglinchey.com**
        **Attorney for Defendant**

**ADINA L. POLLAN, ESQUIRE**
**(via speakerphone)**
            **- and -**
**KIM H. ISRAEL, ESQUIRE**
**(via speakerphone)**
**McGlinchey Stafford, PLLC**
**10407 Centurion Parkway North**
**Suite 200**
**Jacksonville, Florida 32256**
**(904) 224-4485 PHONE**
**(904) 224-4486 PHONE**
**(904) 212-1465 FAX**
**apollan@mcglinchey.com**
**nreid@mcglinchey.com**
**kisrael@mcglinchey.com**
**cgipson@mcglinchey.com**
        **Attorney for Defendant**

**ALSO PRESENT:**

**JEFFREY W. WARREN, ESQUIRE**
**Bush Ross**
**1801 North Highland Avenue**
**Tampa, Florida 33602**
**(813) 224-9255 PHONE**
**(813) 204-6423 DIRECT**
**(813) 223-9620 FAX**
**jwarren@bushross.com**

103

**I N D E X**

**VERNON F. KORHN, III**                                      **PAGE**

**Further Direct Examination by Mr. Appleby**       110

**CERTIFICATE OF OATH**                              185

**CERTIFICATE OF REPORTER**                          186

**SIGNATURE PAGE/ERRATA SHEET**                      187

104

**PLAINTIFF'S EXHIBITS (continued)**

**DESCRIPTION**

**EXHIBIT**                                                                        **PAGE**

**Number 26**   **Email dated March 27, 2014, from**
**Wilhelm Rabke to Trey Korhn and**
**Jay Price, Bates Number VNB_070836**
**and VNB_070837**                                                        **110**


**Number 27**   **Letter dated March 2014 from**
**W. Wilhelm Rabke To Whom It May**
**Concern, Bates Numbers VNB_070838**
**and VNB_070839**                                                        **114**


**Number 28**   **Email dated March 27, 2014, from**
**Jay Price to W. Wilhelm Rabke and**
**Trey Korhn, Bates Numbers**
**VNB_072196 and VNB_072197**                                   **117**


**Number 29**   **Email dated March 27, 2014,**
**from Jay Price to W. Wilhelm Rabke**
**Bates Numbers VNB_071167 through**
**VNB_071169**                                                                **120**


**Number 30**   **Letter dated March 2014 to Office**
**of Insurance Regulation of the**
**State of Florida, Bates Number**
**VNB_071170**                                                                **120**


**Number 31**   **Email from W. Wilhelm Rabke to**
**Jay Price dated March 27, 2014,**
**Bates Numbers VNB_070985 through**
**VNB_070988**                                                                **121**


**Number 32**   **Email dated March 27, 2014,**
**from W. Wilhelm Rabke to**
**Jay Price and Trey Korhn**
**Bates Numbers VNB_072198**
**through VNB_072201**                                                   **122**

105

**PLAINTIFF'S EXHIBITS (continued)**

**EXHIBIT**                          **DESCRIPTION**                          **PAGE**

Number 33    Email dated March 28, 2014, from
W. Wilhelm Rabke to Jay Price
Bates Numbers VNB_070989
through VNB_070991                          124


Number 34    Letter dated March 28, 2014, from
W. Wilhelm Rabke to Office of
Insurance Regulation, Bates
Numbers VNB_070992 through
VNB_070994                          125


Number 35    Email dated March 28, 2014,
from Trey Korhn to Jay Price,
Bates Number VNB_070833                          126


Number 36    Email dated March 28, 2014,
from Jay Price to Trey Korhn
Bates Numbers VNB_071725
and VNB_071726                          128


Number 37    Email dated March 28, 2014,
from Jay Price to Healthcare
Nursing Homes and Long Term
Care Industry Team, Bates
Number VNB_071123                          131


Number 38    Email dated March 28, 2014,
from Ty Roofner to Jay Price
Bates Number VNB_070875                          132


Number 39    Email dated March 28, 2014,
from Jay Price to Ty Roofner,
Bates Number VNB_071141                          134

**PLAINTIFF'S EXHIBITS (continued)**

|  | DESCRIPTION |  |
|---|---|---|
| **EXHIBIT** |  | **PAGE** |
| Number 40 | Email dated March 28, 2014, from Jay Price to Wilhelm Rabke, Bates Number VNB_071128 | 136 |
| Number 41 | Email dated March 28, 2014 from Wilhelm Rabke to Jay Price, Bates Number VNB_070955 through Bates Number VNB_070958 | 137 |
| Number 42 | Email dated March 28, 2014, from Jay Price to Wilhelm Rabke Bates Numbers VNB_071159 through VNB_071162 | 139 |
| Number 43 | Email dated March 28, 2014, from Wilhelm Rabke to Jay Price Bates Numbers VNB_070899 through VNB_070900 | 141 |
| Number 44 | Email from Wilhelm Rabke to Jay Price dated March 20, 2014 Bates Numbers VNB_070870 and VNB_070871 | 143 |
| Number 45 | Email from Wilhelm Rabke to Jay Price dated March 20, 2014 Bates Numbers VNB_070872 through VNB_070874 | 144 |
| Number 46 | Email from Trey Korhn to Kevin Angelis dated March 20, 2014 Bates Numbers VNB_072334 through VNB_072335 | 146 |

**PLAINTIFF'S EXHIBITS** (continued)

**DESCRIPTION**

| **EXHIBIT** | | **PAGE** |
|---|---|---|
| Number 47 | Email from Kevin Angelis to Wilhelm Rabke and Trey Korhn Bates Numbers VNB_072210 through VNB_072212 | 149 |
| Number 48 | Email from Jay Price to Trey Korhn Dated March 21, 2014; Bates Numbers VNB_071711 and VNB_071712 | 152 |
| Number 49 | Email from Wilhelm Rabke to Trey Korhn dated March 21, 2014 Bates Numbers VNB_072213 through VNB_072215 | 153 |
| Number 50 | Email from Jay Price to Beth Hungate-Noland dated March 22, 2014; Bates Numbers VNB_072179 through VNB_072182 | 154 |
| Number 51 | Email from Wilhelm Rabke to Trey Korhn dated March 24, 2014 Bates Numbers VNB_071001 through VNB_071004 | 155 |
| Number 52 | Email from Trey Korhn to Jay Price dated March 27, 2014; Bates Numbers VNB_070972 through VNB_070974 | 158 |
| Number 53 | Loan Closing Statement dated March 31, 2014; Bates Numbers VNB_071904 through VNB_071911 | 158 |
| Number 54 | Letter dated March 31, 2014, from Taft Stettinius & Hollister, LLP to USAmeriBank | 162 |
| Number 55 | Letter dated June 29, 2015 from John Bartle/Eli Freiden/ BVM Management, Inc., to Trey Korhn Bates Number VNB_070804 | 164 |

**PLAINTIFF'S EXHIBITS (continued)**

**DESCRIPTION**

| EXHIBIT | | PAGE |
|---|---|---|
| Number 56 | Amendment to Loan Agreement executed August 14, 2015 | 165 |
| Number 57 | Respondent's Motion For Final Summary Judgment on Claim of Statutory Immunity From Receivership IN RE: State of Florida, Department of Financial Services vs. Westport Holdings Tampa | 167 |
| Number 58 | Email from Kevin Angelis to Jay Price, Wilhelm Rabke, John Bartle and Beth Hungate-Noland dated March 17, 2014; Bates Numbers VNB_078594 through VNB_078596 | 170 |
| Number 59 | USAmeriBank Business Loan Application for Westport Nursing Tampa, LLC; Bates Number VNB_078597 through VNB_078598 | 170 |
| Number 60 | Letter dated March 31, 2014, from Gary, Dytrych & Ryan to CPIF Lending, LLC, with attachments; Bates Numbers CPIF_ADV_0008561 through CPIF_ADV_0008586 | 171 |
| Number 61 | CPIF Adveresary Document USAmeriBank/Allant Bank Authorization Request for Modifications to Approved CARS Bates Numbers Valley National Bank/SDT Response-000097 through Valley National Bank/ SDT Response-000144 | 172 |

**PLAINTIFF'S EXHIBITS (continued)**

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Number 62 | Complaint For Declaratory Relief and Damages; IN RE:  Horizon LP UV Lender, LLC vs. BVM University Village, LLC and BVM Management | 175 |
| Number 63 | Email dated February 18, 2014 from Kevin Angelis to Trey Korhn, Jay Price and Shari Smith Bates Number VNB_072231 | 177 |
| Number 64 | Email dated March 13, 2014, from Jay Price to Trey Korhn; Bates Number VNB_072059 | 178 |
| Number 65 | Email dated March 21, 2014, from Wilhelm Rabke to Jay Price Bates Number VNB_072420 and VNB_072421 | 179 |
| Number 66 | Email dated March 29, 2014, from Trey Korhn to Jay Price; Bates Numbers VNB_070929 through VNB_070932 | 180 |
| Number 67 | Email dated March 30, 2014, from Jay Price to Trey Korhn, Bates Number VNB_071156 | 182 |

**P R O C E E D I N G S**

(The deposition is continued from Volume I at page 97.)

VERNON F. KORHN, III, being previously duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. APPLEBY:

Q.   Good morning, Mr. Korhn.  I'm Keith Appleby. I represent the Liquidating Trustee, Jeff Warren, in this case.

Today we're here to continue your deposition from March 31st, 2023, last Friday.  But, before we begin, I want to remind you that you're under oath. You understand that you're still under oath and are required to tell the truth today?

A.   I do.

Q.   Okay.

Mr. Korhn, I'm handing you a document that I've numbered 26.

(The document was marked as Plaintiff's Exhibit Number 26 for identification.)

MR. WHITSON:  Oh, wait a minute.  We need to get Adina and Kim on the line.  I apologize.

Is there a number we can call in?

(Discussion off the record.)

MR. APPLEBY:  All right.  We'll come back on.

I'll just state for you on the phone, we've -- this is Keith -- reminded Mr. Korhn that he's still under oath and I was getting ready to talk about a document.

MS. ISRAEL:  Sounds good.  Thank you.

THE COURT REPORTER:  You need to identify yourself when you speak.  This is the court reporter.  Who was that?

MS. ISRAEL:  Yes.  I apologize.  This is Kim Israel with McGlinchey Stafford.

THE COURT REPORTER:  Thank you.

MS. ISRAEL:  I am attending on behalf of the Defendant and I will identify myself again if I speak, although I don't expect to do much talking, but my apologizes for that.

THE COURT REPORTER:  Sorry.  I have to have it in the transcript.

MS. ISRAEL:  Of course.  No worries.

MS. POLLAN:  And this is Adina Pollan; same as Kim.  I will not be speaking unless absolutely necessary.

THE COURT REPORTER:  Thank you.

BY MR. APPLEBY:

Q. All right. Mr. Korhn, I handed you a document a moment ago. It's an email dated March 27 from 2014. Do you recognize this document?

A. I've seen -- yeah. I mean, I've seen the emails, yes.

Q. Okay. In the document it refers to a *first draft on an MLR Notice Letter*.

Can you tell me what your recollection of the notice letter would be?

MR. WHITSON: Object to the form.

A. No, not without seeing it.

BY MR. APPLEBY:

Q. And could you tell me when you became aware that the borrower had any issue regarding an MLR or a minimum liquid reserve with the State?

MR. WHITSON: Object to the form.

A. Can you clarify both *borrower,* one; and, two, *issue*?

BY MR. APPLEBY:

Q. I'm sorry. I didn't -- I didn't understand.

A. Can you clarify, when you reference *borrower*, what -- who you're speaking to?

Q. Westport Nursing.

A. Okay. And then the second part of that? What

was the second part?

Q.   Well, this email refers to -- the subject line is:  *Westport_MLR_OIR_Notice_Letter*.  So what my line of questioning is, is: What is this referring to, from your recollection?

A.   Do --

MR. WHITSON:  I'm objecting to the form.

A.   Do you have a copy of that letter?

BY MR. APPLEBY:

Q.   We may.

A.   Okay.

MR. WHITSON:  Well, I mean, if you're going to ask him about a letter, I'd just object, that you show him the letter.

BY MR. APPLEBY:

Q    .Well, right now I just want to see if you recall this email and can tell me about the subject matter.

A.   Not without seeing the document.

Q.   Okay.  As far as you can tell, is this email a true and accurate copy of the email that was exchanged on March 27, 2014?

A.   I mean, as far as I can tell, yes.

Q.   Okay.  Mr. Korhn, this is the attachment. This is the letter that was referenced in the prior

email that we were discussing.  Do you recognize this document?

MR. WHITSON:  I'm sorry, Keith.  Are we marking this as an exhibit number?

MR. APPLEBY:  Well, yes.

MR. WHITSON:  Okay.

MR. APPLEBY:  I'll mark this as Exhibit 27.

(The document was marked as Plaintiff's Exhibit Number 27 for identification.)

THE WITNESS:  So -- and what was the question?

BY MR. APPLEBY:

Q.   Do you recognize this document?

A.   Yes.  I've seen -- I've seen it.

Q.   Okay.  In the prior exhibit, 26, the email refers to the *attached first draft of the MLR Notice Letter*.  And the statement is:  *Jay, Trey and Kevin have discussed this*.

I'm assuming that you're the *Trey* that is referenced in the email?  Do you have any reason to believe it would be someone other than yourself that was referenced in this email?

A.   No.

Q.   Okay.  Can you tell me what discussions you had regarding this letter that was drafted and addressed to the Office of Insurance Regulation?

MR. WHITSON:  Object to the form.

A.   Yeah.  No, I can't -- no, I can't.  It's, you know, been quite a while and I can't recall any specific conversation, no.

BY MR. APPLEBY:

Q.   When did you first become aware that there was an issue with Florida's OIR regarding the minimum liquid reserve account?

MR. WHITSON:  Object to the form.

A.   Can you clarify what you mean by *issue*?

BY MR. APPLEBY:

Q.   When you -- as loan officer, did you ever have concerns about a $3 million deposit that was made in conjunction with making this loan?

MR. WHITSON:  Object to the form.

A.   So I would have asked my counsel to handle this, frankly, and review these requests on my behalf.

BY MR. APPLEBY:

Q.   In the draft letter, did you -- do you recall whether you played a role in actually writing this letter?

MR. WHITSON:  Object to the form.

A.   I did not.

BY MR. APPLEBY:

Q.   The middle paragraph of the letter that went

to OIR refers to an MLR Escrow that was held by Regions Bank.  It then subsequently says, and I'll read from it.

It says, *The Provider is hereby providing notice as required by the MLR Statute, that it is moving $3 million (the "transferred amount"), representing a portion of MLR Escrow, from Regions Bank to USAmeriBank.*

Was the borrower, Westport Nursing, a provider?

MR. WHITSON:  Object to the form.

A.   So I think the first part is, I don't think we have any -- and this is an unsigned letter, so I don't know if this was delivered to the OIR.  The question said that it was sent to the OIR, one.  And, two -- what was the second -- second part of the question?

BY MR. APPLEBY:

Q.   I'm not sure which portion you're referring to.

A.   Can you --

Q.   I just read from the letter.

A.   But there was a question.  Can you repeat the question?

Q.   Well, that was whether your borrower, Westport Nursing, was a provider.

A.   No.   Westport Nursing was a company that owned real estate.

Q.   The subject line of this letter is: *University Village MLR Escrow Transfer*.  Is Westport Nursing part of University Village?

A.   Westport Nursing, again, was an entity that owned real estate.

Q.   So you're not sure why $3 million of an MLR escrow account would be transferred to the bank as it related to your loan?

MR. WHITSON:  Object to the form.

A.   My loan required 3 million in cash collateral and -- you know, that's what it required and that's what was provided.  And anything associated with this letter, I would have relied on my counsel to handle, as their expertise on such subject matters would be relied upon.

BY MR. APPLEBY:

Q.   Okay.  Mr. Korhn, I've marked this document as Exhibit 28.

(The document was marked as Plaintiff's Exhibit Number 28 for identification.)

BY MR. APPLEBY:

Q.   This is an email dated March 27, 2014, from Jay Price with you copied on it as a -- as a copy.  Can you confirm whether you recognize this document?

A.   Yes.  I recognize it.

Q.   Okay.  Can you tell me about the discussions here that are encompassed in this email?

MR. WHITSON:  Object to the form.

A.   Specifically, what are you asking as far as *discussions*?

BY MR. APPLEBY:

Q.   Well, I'll just read it again.  In the beginning, Mr. Price, who was, as I understand it, counsel for the bank -- the second sentence says, *I thought this MLR account had something to do with funds other than the $3 million that was being pledged by the borrower to the bank as cash collateral.*

Was your understanding that the bank was -- excuse me -- that the borrower was supplying or bringing in $3 million from a source other than the MLR escrow account?

A.   Repeat that, please.  My understanding what?

Q.   Was your understanding that your borrower was going to supply the cash collateral, the $3 million, from -- well, let me -- excuse me.  Let me just ask the question differently.

What was your understanding of where the $3 million that your borrower was required to deposit as cash collateral?  What was -- what was your

understanding of what the source of those funds were?

A.   Okay.   There was a lot of discussion around various options, so -- again, at the end of the day, I needed 3 million in cash collateral for our loan. So this is conversation between my counsel and I believe borrower's counsel on various accounts, but --

Q.   Well, this email is addressed to Wilhelm Rabke and also to you.   But the initial line says, *I want to make sure we're on the same page.*   It appears that it's a discussion with you.

A.   Right.   That was written by my counsel, who, while I may have been copied, was handling these discussions with borrower's counsel.

Q.   Okay.   In the middle -- in the middle of the email paragraph it says, *I want to make sure this is not some joint account where the State has certain special requirements or any interest therein.*

Did you have any concerns about the source of this $3 million?

MR. WHITSON:   Object to the form.

A.   No.   I mean, I think that's pretty clear. My counsel wanted to make sure that our cash collateral was -- no one had any interest in, other than the bank.

BY MR. APPLEBY:

Q.   Right.   So I'll repeat what I asked.

Did you have any concerns about this $3 million being claimed or that the State might have some interest in it?

MR. WHITSON:  Objection.  Asked and answered.

A.   I wanted to have my counsel verify that I had a $3 million cash collateral account that no one else had a right to other than the bank.

BY MR. APPLEBY:

Q.   Mr. Korhn, I'm going to hand you what I've marked as Exhibit 29.

(The document was marked as Plaintiff's Exhibit Number 29 for identification.)

BY MR. APPLEBY:

Q.   Let me skip part of a step.  I'll -- I'm also going to hand you what I'm marking as Exhibit 30.

(The document was marked as Plaintiff's Exhibit Number 30 for identification.)

BY MR. APPLEBY:

Q.   Mr. Korhn, what I've marked as Exhibit 29 is an email dated March 27, 2014.  It's from Jay Price to Wilhelm Rabke.  You're not copied on this email.

Do you recall whether you have ever seen this email?

A.   I believe I have, but I can't say with 100 percent certainty.

121

Q.   And if you'll look at Exhibit 30 that I've marked, that is what was the attachment to this email. The attachment was -- it is a marked-up copy of the letter that we were looking at a moment ago, the letter addressed to the Office of Insurance Regulation, State of Florida.

From the email, it indicates that your counsel made these mark-ups.  Did you have discussions with your counsel regarding this letter?

MR. WHITSON:  Object to the form.

A.   I don't recall specifically.

BY MR. APPLEBY:

Q.   Do you know why counsel would have made these edits that are on this page that are handwritten?

MR. WHITSON:  Object to the form.

A.   No.  I would think you would need to ask -- ask them.

BY MR. APPLEBY:

Q.   Mr. Korhn, I'm going to hand to you what I've marked as Exhibit 31.

(The document was marked as Plaintiff's Exhibit Number 31 for identification.)

BY MR. APPLEBY:

Q.   This is an email dated March 27, 2014. In this email Mr. Rabke indicates that Mr. Price's

edits that we just looked at were fine.  Do you recall seeing this -- do you recall seeing this email before?

A.   I can't recall specifically, no.

Q.   This email references that Mr. Rabke's understanding of the statute is that only certain -- well, excuse me.  Strike that.

Mr. Korhn, I'm going to hand you what I've marked as Exhibit 32.

(The document was marked as Plaintiff's Exhibit Number 32 for identification.)

BY MR. APPLEBY:

Q.   Again, this is an email dated March 27, 2014.  And the subject line of this is:  *Westport MLR OIR Notice Letter*, which, again, is referring back to the letter that we've been looking at.

If you look to the second page, there's an email from you directed to Jay Price and Wilhelm Rabke.  And the comment refers to -- or your comment is, *You definitely need to have separation between the two accounts*.  It says, *My* -- this is your email -- that your *understanding is the same, that the MLR account is for the funds over and above the $3 million in cash collateral held in a separate account for which this separate agreement will apply*.

Can you tell me what you were -- the context

of what you were referring to?

MR. WHITSON:  Object to the form.

A.    Yeah.  I think it's pretty clear that we needed 3 million in cash collateral and anything else would need to be separate.

BY MR. APPLEBY:

Q.    Was it your understanding that the State had no -- the State of Florida OIR had no interest in the $3 million that we're talking about?

A.    That's correct.  We -- it would -- the bank would have the only interest in the 3 million in cash collateral.  And, again, that's why we are represented by counsel, to protect our interest.

Q.    So why would -- why would the bank need to have these letters going to OIR and discussions about the $3 million if it was not an issue?

MR. WHITSON:  Object to the form.  You're mischaracterizing.

MR. APPLEBY:  No, I -- well, let me re-ask the question a different way.

BY MR. APPLEBY:

Q.    Why was the bank involved in a letter going to the OIR if the bank's position is that these funds are not subject to any claim by the State?

A.    That is the bank's position, that we had

required 3 million in cash collateral that was separate for -- that no one else had any rights to.

Can you repeat the balance of the question or repeat the question?

Q.   That's okay.  We can move on.

MR. WHITSON:  Thank you.  33?

MR. APPLEBY:  Yes.

(The document was marked as Plaintiff's Exhibit Number 33 for identification.)

BY MR. APPLEBY:

Q.   Mr. Rabke, I've just -- or, excuse me.

Mr. Korhn, I've just handed you what I've marked as Exhibit 33, which is an email from Mr. Rabke to Mr. Price.  And in this letter, it's -- again, Mr. Rabke states to Mr. Price that *the $3 million will come into your client's account cleanly related to your borrower*.  Can you tell me what that means?

MR. WHITSON:  Object to the form.

A.   I do not know what -- I didn't write it. So I can't tell you what that means.

BY MR. APPLEBY:

Q.   Okay.  When the bank requires cash collateral to come in, does it ever have restrictions on the source of those funds?

MR. WHITSON:  Object to the form.

A.    Not that I'm aware of, no.

BY MR. APPLEBY:

Q.    This email has an attachment included with it. I've marked the attachment as Exhibit 34.

(The document was marked as Plaintiff's Exhibit Number 34 for identification.)

BY MR. APPLEBY:

Q.    Do you recall whether you've ever seen this email and this attachment?

A.    I may have.  I can't say with certainty.

Q.    I note in the third line of this email it references the borrower, *Westport Nursing Tampa, L.L.C.,* and defines them as *Provider, LLC,* and they -- you've told me before, but is it your understanding that Westport Nursing was a provider?

MR. WHITSON:  Object to the form.

A.    No.  Westport Nursing Tampa was an owner of real estate.

BY MR. APPLEBY:

Q.    The last sentence of the first paragraph says, *Upon completion of restructuring, each of the -- each of the Provider LP and the Provider LLC will maintain separate MLR escrows under the MLR Statute.*

MR. WHITSON:  I'm sorry, Keith.  Where are you reading from?

MR. APPLEBY:  The last sentence of the first paragraph in the OIR letter.

MR. WHITSON:  *The transferred amount is a requirement*?  Oh.  Is that where you were?

MR. APPLEBY:  The first -- no, the first paragraph.

MR. WHITSON:  Oh, the first paragraph.  Okay.

BY MR. APPLEBY:

Q.  Do you see that sentence, Mr. Korhn?

A.  Yes.

Q.  So, once again, I'm asking:  What do you know about why this would require, as you've said, a real estate borrower to hold funds under the MLR Statute?

MR. WHITSON:  Object to the form.

A.  I do not -- I mean, this is a draft document with a bunch of edits and, you know, I'm not an attorney or know the statute; and relied on my attorney to, you know, handle this issue with the borrower.

BY MR. APPLEBY:

Q.  Do you know whether this letter or a final version was ever mailed to the OIR?

A.  I do not know.

Q.  Mr. Korhn, I'm handing you a document that I've labeled as Exhibit 35.

(The document was marked as Plaintiff's

127

Exhibit Number 35 for identification.)

BY MR. APPLEBY:

Q.   It is an email from you to the bank's attorney, Jay Price, dated March 28th, 2014, just a few days before the loan closing.  Can you read this email for the record?

A.   *Jay, I hate to question this but just want to sleep well at night.  Can you double check that statute they referenced in the collateral account agreement just to be certain that the state has no rights to it and that it is merely for reporting?  I know you verified but if the rights to those funds were ever disputed, I'd be looking for a new job.*

Q.   Do you recall sending this email?

A.   Yeah.

Q.   Okay.  Can you tell me what was -- what was the issue that was causing you to lose sleep over this loan?

MR. WHITSON:  Object to the form.

A.   I think it's pretty clear that I was asking my counsel to verify that nobody had rights to the collateral account other than the bank.

BY MR. APPLEBY:

Q.   But why did you -- why did you have any concern that someone else might have claims or rights

against those funds?

MR. WHITSON:  Object to the form.

A.   I wanted to be sure that nobody else did.

BY MR. APPLEBY:

Q.   Do you typically get concerned when you make a loan that someone might have a claim to cash collateral?

MR. WHITSON:  Object to the form.

A.   No.  Again, that is why I'm asking my counsel to verify that.

BY MR. APPLEBY:

Q.   Right.  What I'm asking you is:  Why -- what specifically about this loan caused concern?

MR. WHITSON:  Object to the form.

A.   Repeat that.

BY MR. APPLEBY:

Q.   What specifically about this loan gave you concern, as the loan officer, that was causing you to lose sleep?

A.   I -- you know, I don't -- I don't know what specifically.  I mean, it was an unfamiliar -- I'm not an expert on, you know, all of the MLR and statute and otherwise.  I just wanted to be clear.

Q.   Mr. Korhn, I'm handing you what I've marked as Exhibit 36.

(The document was marked as Plaintiff's

Exhibit Number 36 for identification.)

BY MR. APPLEBY:

Q. This appears to be a response from Mr. Price to the email that we were just discussing. Do you recall seeing this email?

A. Yes.

Q. Okay. In this email Mr. Price goes on to say -- the second sentence -- *My question, though, to them* -- and I'm assuming he's referring to the borrower -- *is whether they can use this fund as they are using due to the fact that there are different entities.*

What different entities are being referred to?

MR. WHITSON: Object to the form.

A. Yeah. I don't know for sure.

BY MR. APPLEBY:

Q. Well, were the funds -- were the $3 million that came in, were they held in an account that was owned by Westport Nursing or were those funds held by a different entity?

MR. WHITSON: Object to the form.

A. Those funds -- repeat the first part of the question, please.

BY MR. APPLEBY:

Q. The $3 million that came into the bank at closing, were those funds -- did they come from an

account that was owned by Westport Nursing?

A.    They came from the title company.

Q.    Okay.  Where did the title company get those funds from?

MR. WHITSON:  Object to the form.

A.    Yeah, I have no idea.

BY MR. APPLEBY:

Q.    Okay.  Well, in here there's a discussion where clearly there was a concern about where the funds were coming from and which entities.  This email is between you and Mr. Price.  I would assume, if you didn't understand what he was referring to, you would have asked a question.  So I'm asking you now:  What entities is this email referring to?

MR. WHITSON:  Object to the form.

A.    I think we need to ask Jay Price.

BY MR. APPLEBY:

Q.    Okay.  Farther down he -- Mr. Price says, *To me, they are sort of reaching across projects*.  Do you know what that means or what he was referring to?

MR. WHITSON:  Object to the form.

A.    No.  This is -- he was having conversations with their counsel.  And, again, I asked him to confirm that we have $3 million in cash collateral that nobody has rights to but us and he did that.

131

BY MR. APPLEBY:

Q.   In the second paragraph of his email, he says, *Generally, though, we have to clamp down on them if we are going to close this thing*.

Were there concerns -- again, this email is dated March 28.  Were there concerns that you were not going to be able to close on the 31st, the following Monday?

MR. WHITSON:  Object to the form.

A.   No.  What I recall is that -- I mean, we're days before a scheduled closing and still a lot left to do.

BY MR. APPLEBY:

Q.   But were there concerns that the loan might not close the following Monday?

MR. WHITSON:  Object to the form.

A.   I don't recall any concerns.  I recall that there was still a lot to do.

BY MR. APPLEBY:

Q.   Mr. Korhn, I'm going to give you, again, another email that I've marked as Exhibit 37.

(The document was marked as Plaintiff's Exhibit Number 37 for identification.)

BY MR. APPLEBY:

`    Q.   Do you know whether you've seen this email

before?

A.   Yes.  I've seen this.

Q.   Okay.  This email was sent from Mr. Price to what appears to be a healthcare group within Burr Forman on Friday, March 28th, 2014.

You indicated a minute ago that your law firm, they were the experts on these MLR issues.  If Mr. Price -- do you consider Mr. Price as being one of those experts?

MR. WHITSON:  Object to the form.

A.   Yes.  The bank relied on he and his firm's expertise.

BY MR. APPLEBY:

Q.   I'm handing you what I have marked as Exhibit 38.

(The document was marked as Plaintiff's Exhibit Number 38 for identification.)

BY MR. APPLEBY:

Q.   This appears to be an email between two attorneys at Burr Forman, Ty Roofner and Jay Price.  Do you recall whether you've seen this email before?

MR. WHITSON:  I'm going to object to the form.

A.   Yeah.  I may have; but, you know, again, I'm not party to it.

133

BY MR. APPLEBY:

Q.   Okay.   There's a reference in the email that indicates -- this is Mr. Roofner responding to a question from Mr. Price.

And it just says, *On all the deals we finance with bonds, the underwriter's criteria are greater than what the statute requires.*

Do you know what Mr. Roofner might have been referring to as far as the statute is concerned?

MR. WHITSON:   Object to the form.

A.   I have no idea.

BY MR. APPLEBY:

Q.   Do you have any experience as an underwriter?

A.   I mean, that's -- *underwriter* is a broad term. Can you specifically --

Q.   As it relates to this particular loan, did you play any role in the underwriting?

MR. WHITSON:   Object to the form.

A.   In underwriting -- what do you mean?   Just explain.   Underwriting what?

BY MR. APPLEBY:

Q.   Well, let me -- let me ask you that same question.   What does *underwriting* mean?

MR. WHITSON:   Object to the form.

A.   In what scenario?   Again, that's a broad

word.

BY MR. APPLEBY:

Q.   Underwriting this particular loan.  What would an underwriter do for the loan that Valley National Bank made to Westport Nursing?

A.   I mean, there's a lot that an underwriter does.

Q.   Tell me what you mean by that.

A.   They analyze and evaluate the opportunity.

Q.   Okay.  The statement that *an underwriter's criteria are greater than what a statute requires*, is -- have you ever heard that type of statement made before?

MR. WHITSON:  Object to the form.

A.   I have not.

BY MR. APPLEBY:

Q.   Mr. Korhn, I've marked this as Exhibit 39.

(The document was marked as Plaintiff's Exhibit Number 39 for identification.)

BY MR. APPLEBY:

Q.   But before we discuss this email, what was your basic understanding of the length or -- pardon me.  How long was the term for this loan that was made to Westport Nursing?

A.   I do not recall without seeing the note.

Q.   Well,  you refer to it as a -- essentially,

*a real estate deal.*  Do you recall whether this was sort of a standard 30-year mortgage or was it a shorter term?

MR. WHITSON:  Object to the form.

A.    I don't recall specifically without seeing the note, but we don't provide 30-year commercial loans.

BY MR. APPLEBY:

Q.    Do you recall whether this would have been sort of termed as a *bridge loan*?

MR. WHITSON:  Object to the form.

A.    Not without seeing the note, no.

BY MR. APPLEBY:

Q.    Okay.  What I've marked as Exhibit 39 is an email, again, between Mr. Price and Mr. Roofner dated March 28th.  There's a discussion in here that, *The way we fund* -- it's midway down the first paragraph -- *The way we fund arguably gives them more flexibility on the HUD take-out that is expected down the road.*

Do you know what Mr. Price was referring to here as far as a *HUD take-out*?

A.    Yes.  That was the -- you know, the plan was to refinance with HUD down the road.

Q.    Okay.  And who is HUD?

A.    Permanent loan -- permanent lender.

Q.    The last sentence of this first paragraph says, *Borrower's counsel is suddenly all about*

*"MLR compliance" and providing letter to the State saying the 3 million counts towards their requirements.*

Following that, there is a -- several bullet points. The middle bullet point references *default. If there were default, we* -- meaning the bank -- *might pull the entire cash collateral account and pay down the loan*. He indicates that he has to be sure that the bank can do that.

Again, if these funds were not subject to the State's claims, why was Mr. Price or the bank concerned about any claims against it?

MR. WHITSON:  Object to the form.

A.    I mean, I -- this is a correspondence between Jay Price and somebody I don't know.  So they would need to answer what they're referring to in this correspondence.

BY MR. APPLEBY:

Q.    Okay.  I've marked this as Exhibit 40.

(The document was marked as Plaintiff's Exhibit Number 40 for identification.)

BY MR. APPLEBY:

Q.    It's an email between Mr. Price and Mr. Rabke.  The context of the email is that -- and I'll just quote what Mr. Price said -- *The lender is becoming increasingly concerned about this account given how the*

*account seems to be allocated across the projects or with different operators.*

What is your recollection of the bank becoming increasingly concerned as of, again, March 28, 2014, just a few days before the loan closing?

MR. WHITSON:  Object to the form.

A.   I mean, I don't recall, you know, where in all of these ongoing conversations this was sent.  But, again, with all of the back and forth, the concern was that my counsel sort through this and confirm that we have $3 million in cash collateral that were required for our loan with no rights but, you know, ours.

BY MR. APPLEBY:

Q.   Well, it goes on to indicate, *Someone is going to give to give an opinion or otherwise comfort to the bank.*

Do you know whether anyone ever gave an opinion other than your counsel?

MR. WHITSON:  Object to the form.

A.   Yeah.  I do not know and my reliance was on the opinion of my counsel.

BY MR. APPLEBY:

Q.   Mr. Korhn, I've marked this as Exhibit 41. Again, it's an email between Mr. Price and Mr. Rabke.

(The document was marked as Plaintiff's

Exhibit Number 41 for identification.)

BY MR. APPLEBY:

Q.   The first paragraph there is -- again, this is the response from Mr. Rabke to Mr. Price.

One second, please.

This -- there's a string of emails here. I'm going to give you a moment, if you wouldn't mind just reading through those.  If you start at the back and read towards the front, it may be helpful.

A.   Okay.

Q.   In the prior -- at the bottom of the first page there's an exchange between Mr. Price and Mr. Rabke from what looks to be around 11:12 a.m. The discussion, here again, comes with concerns about the source of the funds for the cash collateral and whether those will be coming through an MLR account subject to the statute.

At the top, Mr. Rabke's response, the last paragraph, says, *Our client is looking for alternative sources of the $3 million*.  It then goes on to say, *Am I correct that the issue disappears if the $3 million stays where it is and USAmeriBank gets the $3 million under the original form of the Cash Collateral Account agreement*?

Do you know whether the source of the funds,

the $3 million cash collateral, came through that MLR account or did they locate -- the borrower locate alternative sources for the $3 million?

MR. WHITSON:  Object to the form.

A.   I do not know with certainty.  You know, again, as stated, it was sent to the closing agent/ title agent, who sent it to us and now --

BY MR. APPLEBY:

Q.   I've marked this as Exhibit 42.

(The document was marked as Plaintiff's Exhibit Number 42 for identification.)

BY MR. APPLEBY:

Q.   Again, this is an email that follows the one we just went through.  And the statement at the top from Mr. Price to the borrower -- or borrower's counsel -- is, *This issue goes away if we get 3 million for cash collateral and my client -- meaning the bank -- is not worried about the effects of using it for State MLR compliance.*

I recognize you were not copied on this email. Have you seen this email before?

A.   I don't know if I have or not.

Q.   As of March 28th, 2014, again, just a few days before the loan closing, who at USAmeriBank would have been involved in the negotiation of the outstanding

terms for closing this loan?

MR. WHITSON:  Object to the form.

A.   Can you clarify what you mean by *outstanding* -- *outstanding terms*?

BY MR. APPLEBY:

Q.   Well, earlier we discussed that, prior to the loan closing, there's lots of things that had to take place, lots of issues.  So I guess my question is:  For those issues that needed to be resolved prior to closing on the following Monday, who at the bank -- not attorneys -- but who at the bank was involved?

A.   It primarily would have been me.

Q.   Okay.  Well, Mr. Price, as counsel for you and the bank, indicates that this was a very -- this MLR issue was a very big issue.  So for you -- you're saying that -- was this an issue for the bank or was it an issue for your counsel?

MR. WHITSON:  Object to the form.

A.   Yeah.  Where -- where did he say that?

BY MR. APPLEBY:

Q.   I'm sorry?

A.   Where did he say, *It's a very big issue*?

Q.   No.  I'm using the term *a big issue* because it seems, from these correspondence that we're talking about, that this $3 million and MLR compliance is a

concern that may prohibit this loan from closing on Monday.

MR. WHITSON:  Object to the form.

A.   Yes.  I don't understand what you're asking.

BY MR. APPLEBY:

Q.   What I'm asking is, there was a concern about MLR requirements.  Who was concerned about it, the bank or your counsel?

A.   The bank's concern was that we had 3 million in cash collateral that only we had rights to.

Q.   Okay.  I've handed you, again, an email from March 28th.

(The document was marked as Plaintiff's Exhibit Number 43 for identification.)

BY MR. APPLEBY:

Q.   Again, this is -- appears to be a continuation of the exchange between Mr. Price and Mr. Rabke.  And the subject line of it is:  *MLR issue*.

In the middle of that first page it references -- or, excuse me.  I mean, it's an email from Mr. Price to Mr. Rabke on the MLR issue.  His comment is, *Let's move forward as we have docs currently.  I have comforted the lender, I believe*.

Can you tell me about any conversation you had with Mr. Price regarding what he told you to make the

bank comfortable on the MLR issue?

A.   Not specifically a conversation.  Again, I --

Q.   Well --

A.   The bank engages counsel to verify that our loan closes and is in compliance with dollars approved, and we rely on their expertise to be sure that's the case.

Q.   If the loan goes into default, do you refer back to counsel as being the contributing source of any default issues?

MR. WHITSON:  Object to the form.

A.   I mean, they don't -- no.  I mean, I don't understand what you're asking.

BY MR. APPLEBY:

Q.   Well, it sounds that you're saying that it was the counsel's decision on whether or not this loan closed, on whether the bank was comfortable.  So is -- clarify.  Is that what you're telling me, that this loan was dependent on whether it would close based on your counsel's decision?

MR. WHITSON:  Object to the form.

A.   It is based on, yes, that they have protected the bank and our rights.  Absolutely.

MR. APPLEBY:  Would you mind if we took just a few-minute break?  I need to use the

restroom.

MR. WHITSON:  Sure.

THE WITNESS:  Yeah, absolutely.

(There was a recess.)

BY MR. APPLEBY:

Q.   Okay.  Mr. Korhn, I'm going to hand you what I've marked as Exhibit 44.  As you might expect, it's an email exchange.

(The document was marked as Plaintiff's Exhibit Number 44 for identification.)

BY MR. APPLEBY:

Q.   This is a little earlier, dated March 20th, 2014, roughly 11 days prior to the loan closing.  The gist of this exchange between Mr. Price and Mr. Rabke has to do with setting up an escrow account.

Aside from the cash collateral that we've talked about, were there any requirements that you were aware of that the borrower was -- that the borrower had which required the borrower to open up escrow accounts?

A.   No, not that I recall.

Q.   In these exchanges, Mr. Rabke seems to be asking several times for a form Escrow Agreement from the bank.  Do you know -- do you recall any of those discussions, whether you were part of any of those discussions?

A.    Ancillarily.

Q.    Do you know what -- do you have any recollection or knowledge about why Mr. Rabke wanted to open a separate escrow account?

MR. WHITSON:  Object to the form.

A.    Yeah, I mean, I don't -- no.  I don't know what he's referencing here.

(The document was marked as Plaintiff's Exhibit Number 45 for identification.)

BY MR. APPLEBY:

Q.    Mr. Korhn, again, this is several email exchanges between Mr. Price and Mr. Rabke.  If you review the middle of the first page, again, there's discussion between Mr. Price and Mr. Rabke and this is an email from Mr. Price on March 20, 2014.

And there's, again, a line of discussion about an Escrow Agreement and the $3 million versus a pledge account.  Do you recall any discussions with the borrower that would differentiate an escrow account from a pledge account?

MR. WHITSON:  Just to interpose a comment.  I think the witness needs to read the whole thing because there's a lot in here.  So, I mean, if you can answer the question, fine, but --

Do you want him just to focus on that middle,

the March 20 at 9:56 a.m.?

MR. APPLEBY:  Yes.

MR. WHITSON:  Okay.

BY MR. APPLEBY:

Q.   And the question's a little more open, in general.  It's, *What would be the difference between an escrow account and a pledge account*?

A.   Okay.  So what's the -- what's the question?

Q.   What's the difference between an escrow account and a pledge account?

MR. WHITSON:  Object to the form.

A.   I mean, I don't know if there is.  Without seeing two agreements -- they're not static.  Without seeing them, I can't tell you if there's a difference.

BY MR. APPLEBY:

Q.   Do you recall whether the bank ever opened an escrow account for the borrower?  Or was there only the cash collateral pledged account?

A.   I mean -- I mean, *escrow* is -- *escrow account* is a broad term, really based on, you know, what is in the agreement itself.  I mean, what I recall is that we had 3 million, you know, in a pledged account for the -- for the loan documents.  I don't recall if there was any other accounts outside of that.

Q.   Okay.  Well, in this top email from Mr. Rabke

to Mr. Price, it indicates that, *Let's go with 3 million going into the pledge account as described below and, separately, 1.2 million (or so) being placed in an escrow account.*

Do you know what account they're referring to for that escrow account or $1.2 million?

A.   No.

Q.   Do you know whether the bank ever opened an account holding an additional $1.2 million?

A.   No, not -- not that I recall without, you know, going and looking at records and history.  No, I don't.

Q.   I'm handing you what I've marked as Exhibit 46.

(The document was marked as Plaintiff's Exhibit Number 46 for identification.)

BY MR. APPLEBY:

Q.   I'll give you a moment if you'd like to read these as well.

A.   Okay.

Q.   The -- there's a string of emails.  But at the bottom of the first page, it's an email from you to Kevin Angelis and John Bartle dated March 20, 2014.  You asked about the size of the loan and indicate that the bank could do anything between $15 and $20 million with

the cash flow -- excuse me -- cash escrow offsetting the overall loan amount to result in net $12 million.

Can you tell me, what did you mean by that?

A.   I mean, the note amount could be up to 20 million, offset by cash collateral, for a net loan amount of 12 million.

Q.   Again, that's what I'm trying to understand. So, meaning that, as long as the borrower puts enough cash in the bank in a cash collateral account, it would be completely restricted by the bank?  The bank could do any loan amount between 15 and 20 million?

A.   That's correct.  The note amount less pledged cash collateral had to be 12 million.

Q.   So, in this one, again, assuming the $20 million loan were the number, what's the benefit to the borrower for a larger loan if they have to put up significantly more cash collateral?

MR. WHITSON:  Object to the form.

A.   I'm not an expert on it, but my understanding is that HUD can only refinance funded debt at closing.

BY MR. APPLEBY:

Q.   Okay.  So, in that context, is -- meaning, if they wanted to -- if a borrower wanted to refinance more debt with HUD, then they would need to have a prior loan with a larger outstanding amount owed for -- at least at

the time of closing?

MR. WHITSON:  Object to the form.

A.   Yeah.  Again, not, you know, being an expert in the HUD world; but, yes, that is what I recall being the reasoning for the various sizings.  But at the end of the day, the bank's primary concern was that we had a net loan amount of 12 million.

BY MR. APPLEBY:

Q.   Would the bank's fees and income from this loan, would they have been the same if the loan were 15 million -- or 12 million, 15 million or 20 million?

MR. WHITSON:  Object to the form.

A.   Yeah.  I mean, I don't recall if there was any pricing structure or otherwise differences.

BY MR. APPLEBY:

Q.   Was there typically any benefit to the bank for making larger loans rather than smaller loans?

MR. WHITSON:  Object to the form.

A.   What -- can you repeat that?

BY MR. APPLEBY:

Q.   Is -- what's the benefit to the bank for making a larger loan?

MR. WHITSON:  Same objection.

A.   I mean, it depends on loan terms.

BY MR. APPLEBY:

Q.    In this loan, if the loan were 20 million or 12 million or 15 million, the terms were always the same?

A.    I don't -- that's what -- I don't recall.

Q.    In the middle section there's an email from Kevin Angelis to you.  He indicates -- well, he references that he's out of the country but goes on that *John Bartle is* -- I'm assuming *John* is Bartle.  And then he references a *Lou*.  Who is Lou?

A.    It says, *John's colleague*, but I don't -- I don't know.

Q.    Did you ever -- you don't recall ever interacting with someone named Lou in this loan?

A.    Not offhand, no.

Q.    Okay.  I've handed you what I've marked as Exhibit 47.

(The document was marked as Plaintiff's Exhibit Number 47 for identification.)

BY MR. APPLEBY:

Q.    Again, this is an email string.  If you wouldn't mind, take a moment and read through that.

MR. APPLEBY:  Sir, while you're doing that, can we go off for just a second?

THE COURT REPORTER:  Sure.

(Discussion off the record.)

BY MR. APPLEBY:

Q.   Again, what I've handed you I've marked as Exhibit 47.  It's an email string.

Mr. Korhn, have you had an opportunity to look through that?

A.   Yes.

Q.   The second page of the exhibit -- again, there's a discussion that goes back and forth regarding escrow accounts and --

(Discussion off the record.)

BY MR. APPLEBY:

Q.   Again, Mr. Korhn, there's a discussion on the second page regarding, again, some issues stating that an escrow account was necessary.

So, back on the first page, there's an email from Mr. Rabke to you where he indicates, *There's currently over -- just over $4 million in an escrow with Regions Bank.*

Do you recall any discussions with Mr. Rabke related to that $4 million?

A.   I mean, not offhand, no, I mean, other than what's in the email.

Q.   Well, his second sentence says, *Portions of that amount are related to amounts required to be held in escrow by the State to show the cash reserves of the*

*operation*, and then indicates that the 3 million you need under the Account Control Agreement will come to the bank from the escrow at Regions.

A.   Where are you -- where are you reading from? I was on -- you said *page 2*.  Is this on page 1?

Q.   No, I'm sorry.  I was -- page 1, the email at the bottom of the page from Mr. Rabke to you dated March 21st, 2014, 11:47 A.M.

A.   Okay.

Q.   I apologize.  If you would, just re-read that first paragraph there.

A.   *Sure thing.  There is currently just over $4 million in escrow with Regions Bank.  I believe the balance is about 4.2.  Portions of that amount are related to amounts required to be held in escrow by the State to show the cash reserves of the operation. The $3 million that you need under the Account Control Agreement will come into the bank from this escrow at Regions, and we want the separate escrow account to catch the rest.  The escrow agreement is where we will address the regulatory references.*

Q.   So can you tell me about discussions you had with Mr. Rabke regarding this escrow account and this $4 million?

A.   I mean, no.  I don't recall discussions, you

know. We needed 3 million in cash collateral for our loan. What other accounts they had or were required to have or otherwise was not imperative or, you know, party to us, I mean.

Q. Again, when you say *they*, are you referring to Westport Nursing?

A. Yeah, I'm -- what I'm referring to is whatever other accounts are needed, generally speaking. I, you know, have no knowledge nor, you know, frankly, care of. I needed $3 million for collateral for my loan and that's what was required. And where they did their other banking, or what-have-you, is -- do it where they want.

Q. Okay. I've handed you what I've marked as Exhibit 48.

(The document was marked as Plaintiff's Exhibit Number 48 for identification.)

BY MR. APPLEBY:

Q. This is, again, exchanges of email following the email -- well, on the first page, partially down, is an email that you had exchanged with Mr. Rabke. And then above that it's a response from Mr. Price directly to you and no one else on that email.

In this, there seems to be some confusion about the $3 million, and I'll read what Mr. Price

says, *My understanding was that they pledged 3 million now and otherwise they were setting up accounts.  If this account has nothing to do with the loan, then I don't know what it is or what kind of escrow he wants.  I don't know what the escrow is for or what our role is.*

Do you know if there was a separate $3 million that was out there that was distinct and separate from the $3 million that went into the Valley Bank pledge account?

MR. WHITSON:  Object to the form.

A.   I don't know if there's, I mean, *out there*.  I have no idea where -- you know, all I know is we had 3 million pledged to us per our pledge agreement as collateral.  I don't know if there was anything else out there.

BY MR. APPLEBY:

Q.   I handed you an exhibit that I've marked as Exhibit 49 which, once again, it's an email exchange.

(The document was marked as Plaintiff's Exhibit Number 49 for identification.)

BY MR. APPLEBY:

Q.   The top email is from Mr. Rabke to you, whereby he indicates that there's 4 million in escrow

with Regions Bank.  He goes on to say that the 3 million you need under the Account Control Agreement will come into the bank from this escrow at Regions and he wanted to set up -- or needed to set up a separate escrow account to catch the rest.

He mentions, *The escrow agreement is where we will address the regulatory references*.

What was Mr. Rabke referring to there when he referenced *regulatory references*?

MR. WHITSON:  Object to the form.

A.   I have no idea.  You have to ask him.

BY MR. APPLEBY:

Q.   Do you know whether you responded to this email?

A.   I do not recall.

BY MR. APPLEBY

Q.   Mr. Korhn, what I've handed you is an exhibit I've marked as Exhibit 50.

(The document was marked as Plaintiff's Exhibit Number 50 for identification.)

BY MR. APPLEBY:

Q.   It's an email from Mr. Price to a group of people.

Do you know who Beth Hungate-Noland is?  It appears she's with Williams & Mullen or Williams Mullen.

155

A.   Not specifically, no.

Q.   Okay.  In Mr. Price's email, the second sentence says, *I was told we were funding the 3 million direct and the borrower would not put money in* -- or *would not put in the money.*

Do you know -- can you tell me what Mr. Price was referring to there?

MR. WHITSON:  Object to the form.

A.   I mean, not specifically, no.

BY MR. APPLEBY:

Q.   Okay.  Mr. Korhn, I've handed you what I've marked as Exhibit 51.

(The document was marked as Plaintiff's Exhibit Number 51 for identification.)

BY MR. APPLEBY:

Q.   Again, it's an email string.  At the bottom of the first page -- this is the email from you to Mr. Rabke dated March 24, 2014.  Excuse me.  Let me go below that.

At the very bottom of the page there is a line.  On March 24, 2014, Mr. Rabke wrote to you by email.  And, again, there's a discussion from -- I believe it's referring to the cash collateral agreement from Section 1, from deposit account to escrow deposit account, and indicating whether or

not that change could be made throughout the agreement to align with the State's expectation.

What is Mr. Rabke referring to as far as the State's expectation?

MR. WHITSON:  Object to the form.

A.   I have no idea.  I mean, again, I can't speak to what he was referring to.

BY MR. APPLEBY:

Q.   Okay.  But right above that is your email in response to him that says, *That should be fine.  Do you have to add any other language or just the definition change*?

So what does your response mean?

MR. WHITSON:  Object to the form.

A.   I don't have a document that this is even in reference to.  How can I answer that without --

BY MR. APPLEBY:

Q.   Well, the subject line is the *Westport Nursing Cash Collateral Agreement* and it references Section 1. And I'm assuming that this is in a window of time where you were still working on the terms.  So my question still relates to him making reference that it needs to align -- the agreement needs to align with the State's expectation.  You responded to that but what are you -- what are you responding to?  What's your

157

understanding of any expectation by the State?

A.   Again, without seeing the document form definition that it's referring to, I have no idea. I've got to see it and that may --

Q.   Okay.  I would note that this email did not have an attachment.  So I don't know --

A.   Yes, I know.  And I don't recall what it would be referencing.

MR. WARREN:  Maybe -- since lunch is here, maybe this is a good time to break for lunch. Does that make sense to you --

MR. APPLEBY:  Yeah.

MR. WARREN:  -- unless you want to finish something?

MR. APPLEBY:  No.  That was it.  I think -- I think it's a good spot.  We can come back to this.

MR. WARREN:  Okay.  We'll go off the record.

(There was a recess from 12:21 p.m. to 1:17 p.m.)

BY MR. APPLEBY:

Q.   Mr. Korhn, we're back from lunch.  Thank you again for your patience.

I'm going to hand you what I've marked as

Exhibit 52.

(The document was marked as Plaintiff's Exhibit Number 52 for identification.)

BY MR. APPLEBY:

Q.   Again, this is a string of emails but --

At the top of this is an email from you to Mr. Price where you reference, again, concerns -- well, what I presume is concerns about the MLR and an OIR letter.  Do you recall sending this email?

A.   I mean -- no.

Q.   I'm sorry?  No?

A.   So, I mean, I -- I mean, by virtue of seeing it, sure.

Q.   What I'm handing you is what I've marked as Exhibit 53.

(The document was marked as Plaintiff's Exhibit Number 53 for identification.)

BY MR. APPLEBY:

Q.   Mr. Korhn, do you recognize this document?

A.   Yeah.  It looks like a closing statement.

Q.   Okay.  If you would, could you flip over -- at the bottom there's a Bates number for VNB_071904.  If you could flip to the page that ends in 909.

A.   Okay.

Q.   Can you tell me whether that's your signature

on this closing statement?

A.   Yes.   That appears to be.

Q.   Do you have any reason to believe this is not the closing statement that actually was executed on March 31st, 2014?

A.   No.

Q.   On the first page of the Loan Closing Statement under -- there's a numbered paragraph, Number 1, that says, *USAmeriBank*.   There's -- at Line (a) it's a commitment fee for $150,000.   Can you tell me what that represents?

A.   Sure.   So -- I mean, that's origination fee, which is, you know, standard on most, if not all, commercial loan transactions.

Q.   So, again, that's just a fee that goes to the bank for making the loan?

A.   Right.   It's an origination fee, yes.

Q.   If this loan hadn't closed on March 31st, 2014, or at any point, would the bank be entitled to any fees or revenue related to the work that it had done on this loan?

MR. WHITSON:   Object to the form.

A.   You know, without reviewing the commitment letter or any, you know, binding legal document outlining how that would be handled in such an instance,

I can't answer.

BY MR. APPLEBY:

Q.   Is a commitment fee typically refundable or returned if the loan doesn't close?

MR. WHITSON:  Object to form.

A.   It varies per transaction.

BY MR. APPLEBY:

Q.   Is it more common or more often that the bank keeps the commitment fee or would return it in the event a loan didn't close?

MR. WHITSON:  Object to form.

A.   Yeah.  I mean, I can't say with certainty, you know, if it's more common.

BY MR. APPLEBY:

Q.   In your experience, when you had loans that have gotten very close to closing but don't close, does the bank typically keep its commitment fee?

MR. WHITSON:  Object to form.

A.   Again, governed by whatever the commitment was -- the agreement was.

BY MR. APPLEBY:

Q.   Okay.  How common would it be, Mr. Korhn, for the bank to keep the commitment fee?

MR. WHITSON:  Object to form.  Asked and answered.

161

THE WITNESS:  What was the second part?
Sorry.

MR. WHITSON:  Asked and answered.

THE WITNESS:  So repeat -- repeat your
question.

BY MR. APPLEBY:

Q.   How common is it for the bank to keep
a commitment fee on a loan that does not close?

A.   I would say most loans do.  And, generally,
the bank pays any third-party out-of-pocket costs and
refunds anything over and above that unless stated
otherwise in a formal binding agreement.

Q.   Did you receive a commission or an award
of any type from the bank for closing this loan?

MR. WHITSON:  Object to form.

A.   No.  Loan officers are not incented
on a per-loan basis.

BY MR. APPLEBY:

Q.   Okay.  So how are loan officers given
incentives to obtain loans?

MR. WHITSON:  Object to form.

A.   I mean, I can only speak to how our bank,
you know, incents loan officers but not loan officers
in general.

BY MR. APPLEBY:

Q.   Could you tell me how your bank, at the time of this loan, compensated its loan officers?

MR. WHITSON:  Object to form.

A.   I mean, generally speaking, you have a set of production goals over the course of a year that -- of which one component is loan production, amongst numerous other things.  And it's formula-driven based on those targets.

BY MR. APPLEBY:

Q.   Okay.  Is that formula related to -- well, the total portfolio of loans that the bank made or the fees that -- the fees and revenue from those loans?

A.   There's --

MR. WHITSON:  Object to form.

A.   -- a number of components, of which loans and fees and deposits and cross-sells and many other items are included.

(The document was marked as Plaintiff's Exhibit Number 54 for identification.)

BY MR. APPLEBY:

Q.   I just handed you a document that was -- appears to be written or drafted by Taft and sent to USAmeriBank.  Do you recall ever seeing this document before?

MR. WHITSON:  Keith, I notice this doesn't

have a VNB Bates number on it.  Was this produced by the bank?

MR. APPLEBY:  Well, that's -- that's a concern because I don't know where this document came from.

MR. WHITSON:  Yeah.  I don't think I've seen it.

THE WITNESS:  Yeah, and I can't recall if I've ever seen it.  I don't remember seeing it.

MR. WARREN:  Keith, for the record, I'll find the source of that document, which I believe was from the bank's production to us or maybe from the data room, which may or may not have been given some sort of a Bates number, but you had gotten all of those documents.  But I'll find out.  You know, we have several that are in that same category. I didn't try to take the time to go generate the source of them.

MR. WHITSON:  I just don't recall seeing that legal opinion before.

BY MR. APPLEBY:

Q.   I'm going to ask a favor, if we can share a document for a second.

(Discussion off the record.)

BY MR. APPLEBY:

Q.   Mr. Korhn, what I've handed you I've

marked as Exhibit 55.

(The document was marked as Plaintiff's Exhibit Number 55 for identification.)

BY MR. APPLEBY:

Q.   This document is a letter that appears to be from BVM Management, Inc., addressed to you.  Can you confirm whether you recognize this document?

A.   I mean, it looks familiar.

Q.   Okay.  This letter doesn't have a signature block.  Do you know if this would have come from an individual or who it would have come from?

A.   No.  I can't say with certainty.

Q.   Do you -- well, tell me what you recall about this document.  What is this?

MR. WHITSON:  Object to the form.

A.   Yeah.  I mean, I, you know, don't know, other than it looks familiar, that I may have read it.  But I don't know, without speculating, who it came from or, you know, otherwise.

BY MR. APPLEBY:

Q.   Well, I guess -- if it came in an email form -- at the top it indicates it's from John Bartle and Eli Freiden.  But below that it sort of has what appears to be a title for the document.  It says, *Loan Agreement Amendment*.

Was the loan between the bank and Westport Nursing ever amended?

A.   Yeah, I believe -- I believe it was, yes.

Q.   Do you know why it would have been amended or what the amendment changed?

A.   Well, can we have what the amendment -- can we read the amendment?  Do we have the amendment?

Q.   Well, in this document, there's a paragraph in the middle that appears to be what the amendment is.  So at this juncture what I'm trying to see if you recall is whether the language that's referenced in the middle of this document is what you recall the amendment to be.

A.   I mean, I don't know if that's what the amendment -- you know, what was -- that is proposed or how it was amended.  I don't know without seeing the amendment.

Q.   I have only one extra copy, if you can share it for just a moment.

A.   Sure.

Q.   I've handed you what I've marked as Exhibit 56.

(The document was marked as Plaintiff's Exhibit Number 56 for identification.)

BY MR. APPLEBY:

Q.   This is titled *Amendment to Loan Agreement*

166

and this document was filed -- actually, recorded in the Official Records of Hillsborough County, Florida.

Do you recognize this document, Mr. Korhn?

A.   Yes.

Q.   Okay.  And why was this -- why was this loan amended?

MR. WHITSON:  Object to form.

A.   This is an amendment that was unilaterally executed and recorded without the bank party to it.

BY MR. APPLEBY:

Q.   When did the bank find out that this had been, well, again, unilaterally prepared and recorded?

A.   The bank did not sign, execute or agree to this amendment.

Q.   Did the bank ever agree to this amendment?

A.   I believe there was an amendment done later and I don't know if it is identical or not.  I would need to see that.

Q.   What was the -- what steps did the bank take after they learned that this document had been recorded unilaterally in official records?

MR. WHITSON:  Object to the form.

A.   Yeah.  I do not recall in detail.  I'd probably have to --

BY MR. APPLEBY:

Q.   How did the bank learn that this had been recorded?

A.   I do not recall.

Q.   I apologize.  Once again, I've got only one copy, but --

I have marked this as Exhibit 57.

(The document was marked as Plaintiff's Exhibit Number 57 for identification.)

BY MR. APPLEBY:

Q.   This is a pleading that was filed in the case State of Florida versus -- well, excuse me -- State of Florida, Department of Financial Services against Westport Holdings Tampa and University Village or d/b/a University Village.  This was a Leon County case, 2015-CA-0585.  And this is the Respondent's Motion For Final Summary Judgment on Claim of Statutory Immunity From Receivership.

Mr. Korhn, have you ever seen this document before?

A.   Not that I recall, no.

Q.   Basically, the last three pages of this document -- at the very back there is a document that is titled Amendment to Loan Agreement.  It's Exhibit 2 to the pleading.  I think flip back a couple more pages.

A.   What's the number on the bottom?

Q.   Well, there's a -- that's probably a document tracking number for whoever drafted the document.

A.   But 3324 v4 is the page we're referencing?

Q.   Well, correct.  The page -- the page that you're looking at, I'll state for the record, is the first page of a document named *Amendment to Loan Agreement*, and the page just before this designates this as Exhibit 2 to this pleading.

A.   Okay.

Q.   So this *Amendment to Loan Agreement*, if you would, take a moment, look at that and let me know, do you recognize this document?

A.   Yeah.  This looks like the amendment that the bank was party to.

Q.   Do you recall why there was an amendment to the loan?

A.   Yeah.  My -- my recollection is that, in an effort to -- for the other entity that's working on a resolution to their issues with the OIR, that this would, you know, help facilitate that, is what I recall.

Q.   And who is the other entity?

A.   The entity that owned the independent living facility, not the borrower -- not our borrowing entity.

Q.   Okay.  If you look at paragraph 2, there's an indented section, and I'll just read:

*As set forth above, upon an Event of Default, the Lender shall have exclusive rights and remedies ...*

Then, skipping down . . . *provided, however, in the course of the exercise of any such remedies, the rights of the residents under a continuing care or continuing care at home contract will be honored and will not be disturbed by a foreclosure or conveyance in lieu thereof as long as the resident . . .*

And there are some conditions.  But was the bank going to accept responsibility for the care of the residents if there were events of default?

MR. WHITSON:  Object to the form.

A.    I'm sorry.  Repeat or say that again.

BY MR. APPLEBY:

Q.    Well, this -- to me, it seems that the bank is saying that the bank will honor the rights of the residents under the continuing care or continuing care at home contracts.  Those -- those will be honored and not disturbed by a foreclosure or conveyance.

So, in the event of a foreclosure or conveyance, was the bank going to step in and take over the commitment to those residents?

MR. WHITSON:  Object to the form.

A.    Yeah.  I mean, this speaks to rights under a contract that, you know, I don't have to review what the

rights under that contract would be.  So I can't speak specifically, you know, without having those specific contracts to reference.  And, secondly to that, this was an amendment that, again, as I've noted, I would rely on my counsel to negotiate, prove or provide the comfort we need that this amendment is -- you know, protects the bank.

BY MR. APPLEBY:

Q.   Can you flip to the very last page.  Is that your notarized signature?

A.   Yes.  It appears to be.

Q.   Actually, I'm trying not to be repetitive.

Bear with me a moment.  I'm actually going to give you two documents that I've marked as exhibits and skip a little bit here and save some time.

The first document is an email string that I've marked as Exhibit 58.  And that email string had an attachment to the email that I've marked as Exhibit 59.

(The documents were marked as Plaintiff's Exhibit Numbers 58 and 59 for identification.)

BY MR. APPLEBY:

Q.   Mr. Korhn, could you look at these two documents and let me know if you recognize them.

A.   Okay.

171

Q.   Exhibit 58, the email chain, references that one of the attachments is a Business Customer Application.

Exhibit 59 appears to be Business Loan Application.  Could you tell me whether this is the -- whether this is the loan application from the borrower or if there were other loan applications?

A.   I can't say with certainty.  This one references it.

Q.   Does the bank typically require a Business Loan Application on all loans?

A.   Yeah, generally on -- generally.

Q.   Could you tell me, on the Business Loan Application, what is listed for the planned purpose of loaned funds?

A.   Purchase money for a 230-bed ALF/SNF.

Q.   Mr. Korhn, I've handed you what I've marked as Exhibit 60.

(The document was marked as Plaintiff's Exhibit Number 60 for identification.)

BY MR. APPLEBY:

Q.   This appears to be a statement related to a loan made by CPIF Lending, LLC, to Westport Holdings Tampa, Westport Holdings Tampa II, Limited Partnerships, referencing the independent living facility.

Do you recall whether any other loans closed at the same time -- well, let me say -- whether any loans to affiliates closed on March 31st, 2014?

MR. WHITSON:  Object to form.

A.   I was not -- we were not -- the bank was not party to CPIF Lending or any associated loans.

BY MR. APPLEBY:

Q.   Were you aware that there was a loan by CPIF that closed at the same time as the loan from USAmeriBank?

A.   We were aware that there was another loan transaction that would satisfy or partially, you know, satisfy whatever was owed.  But I can't tell you with certainty when it was closed or if it was at the same time or otherwise.

(The document was marked as Plaintiff's Exhibit Number 61 for identification.)

BY MR. APPLEBY:

Q.   Mr. Korhn, do you recognize the document that I just handed you that I've marked as Exhibit 61?

A.   This looks like our loan approval package.

Q.   Okay.  Do you recognize this as a true and accurate copy of the loan approval package for Westport Nursing Tampa, LLC?

A.   It appears to be, yes.

Q.   Okay.  At the bottom there, the Bates label begins on the first page with Valley National Bank/ SDT Response-97.  Can you flip to page 104?

A.   Okay.

Q.   On page 104 of this -- it's a *Verification of Liquidity Form*.  It indicates in the middle this loan requires a $3 million deposit that will be held at USAmeriBank.  Is that accurate?

MR. WHITSON:  I'm sorry.  What page are you on?

MR. APPLEBY:  The Bates label, page 104.

THE WITNESS:  And what is the question?

BY MR. APPLEBY:

Q.   Well, in the middle it indicates that *Deposits held at USAmeriBank on March 31st, 2014; Amount Verified, $3 million*.

A.   Okay.

Q.   Is that accurate?

A.   I mean, it seems so, yeah.

Q.   Okay.  Below those sections there's a note -- or a *Note* section.  It says, *A signed PFS is not a verifiable source of liquidity.  Bank statements are required to verify deposits held at other banks.  Copies of brokerage statements are required for verification of money market funds and marketable securities.*

*Statements need to be titled in the names of the above Guarantors and Borrowers.  Joint statements where the spouse is not a Guarantor or Borrower are not acceptable.  Business Accounts are only acceptable if that business is a Guarantor or a Borrower.*

Did the bank ever verify through bank statements the source of this $3 million?

MR. WHITSON:  Object to form.

A.    Well, this verification was based off of the money held in the bank, our bank.

BY MR. APPLEBY:

Q.    I'm sorry.  What did you call this package a moment ago?

A.    The full thing?

Q.    Yes, sir.

A.    Loan approval package.

Q.    Is the loan approval package generally prepared before loan closing or after the loan closing?

A.    Oh, it's prepared before loan closing.

Q.    How would the bank have verified deposits from March 31st of 2014 if this were prepared prior to loan closing?

MR. WHITSON:  Object to form.

A.    What page are we looking at again?

BY MR. APPLEBY:

Q.   104.

A.   Yeah.   So Verification of Liquidity Form, you know, that's done as part of or, you know, closing; not package preparation.

Q.   Okay.   This document was provided to us -- to the Plaintiff by Valley National Bank.   If you could flip back to the very first page, 97, it has a date in the top left corner.   Could you tell me that date?

A.   February 4th, '14.

Q.   Okay.   What I've just handed you I've marked as Exhibit 62.

(The document was marked as Plaintiff's Exhibit Number 62 for identification.)

BY MR. APPLEBY;

Q.   This is a Complaint For Declaratory Relief and Damages filed by Horizon LP UV Lender, LLC, against BVM University Village, LLC, and BVM Management, Inc.

Mr. Korhn, have you -- do you recognize this document?

A.   No, I don't.

Q.   You don't think you've seen this before?

A.   I don't know if I have.   I don't recognize it.

Q.   Okay.   Prior to USAmeriBank making its loan, do you know -- or did you ever review the deed in lieu, the deed in lieu that had been provided by

BVM University Village and BVM Management to Horizon LP?

MR. WHITSON:  Object to form.

A.   No.  I don't know if I ever even saw it and don't recall reviewing it.  And it would have been -- you know, if it was something that we were provided, it would have been reviewed by bank counsel.

BY MR. APPLEBY:

Q.   Do you recall whether Horizon LP UV Lender would have been a creditor of Westport Village -- Nursing?  Excuse me.

MR. WHITSON:  Object to -- object to form.

A.   I don't know, you know, who was party to their agreement, no.

MR. APPLEBY:  Can we take just a brief five-minute break and --

MR. WHITSON:  Sure.

(There was a recess.)

MR. WARREN:  Just for the record, previously there was an exhibit that was marked and there was a question -- it was the Taft opinion, Exhibit 54. And it did not have an identifying notation on it. So the inquiry was, you know, Where was it obtained from?

And I had my office check and there's three places where that document was found.  It was in

the Sub_Landry_00000128 to 134 Bates number.

It was also in the VNB_001751 to 1757.

And it was also in the LIQ_TT_1617841 to 1617847.

Those were the three places where that document was.

(Discussion off the record.)

BY MR. APPLEBY:

Q.   Mr. Korhn, I've marked this as Exhibit 63.

(The document was marked as Plaintiff's Exhibit Number 63 for identification.)

BY MR. APPLEBY:

Q.   This is an email from Kevin Angelis to you dated February 18, 2014.  Do you recognize this email?

A.   I mean, not specifically, but I'm copied on it.

Q.   Could you read the first paragraph -- the first sentence of the first paragraph below the numbered section?

A.   Below the numbered section?

Q.   Yes.  It begins with, By way of background.

A.   *By way of background, as I believe you know, at closing, BVM will take control of the current operator's entity (via the Board of Directors) that runs the Health Center.*

Q.   What was your understanding of how the

entities and the affiliates were related prior to the closing of the USAmeriBank loan?

MR. WHITSON:   Object to form.

A.   Which entities or affiliates are you referencing?

BY MR. APPLEBY:

Q.   Well, I guess, were they -- was Westport Nursing a wholly-owned subsidiary or was it an equal partner?  What is your understanding of their relationship with the other entities?

A.   I don't recall what -- other than it's common ownership, I don't recall what the legal structure was.

Q.   I'm handing you what I've marked as Exhibit 64.

(The document was marked as Plaintiff's Exhibit 64 for identification.)

BY MR. APPLEBY:

Q.   This is an email from Jay Price to you, Mr. Korhn, dated March 13, 2014.  Could you read that -- can you read the email, first paragraph, please?

A.   *My paralegal just got me the attached complaint of Horizon in federal court.  This case is still active.  You can take the facts and allegations with a grain of salt, but this has more information on*

*what they are alleging.  I have not been able to review in detail.*

Q.   Okay.  So this is when you became aware of the Horizon lawsuit.  Is that correct?

MR. WHITSON:  Object to form.

A.   Yeah.  I don't know if this is when or not.

MR. APPLEBY:  I'm sorry.  I'm trying to skip through some so I don't repeat what we've already talked to.

MR. WHITSON:  No, please.  I applaud that effort.

(Discussion off the record.)

BY MR. APPLEBY:

Q.   Okay.  Mr. Korhn, I've marked this as Exhibit 65.

(The document was marked as Plaintiff's Exhibit Number 65 for identification.)

BY MR. APPLEBY:

Q.   This is an email that you were copied on.  It references that there was a change -- and, by the way, let me say, the date of this is March 21st, 2014, so pre closing.

And there was an attachment to this email called *University Village Post-Closing Org. Chart.* But, specifically, here the question is:  There's

a reference from Mr. Price to Mr. Rabke and it says, *There has been a small change of ownership among the borrower and both Limited Partnerships.*

Do you recall what those changes were?

A.   No idea.

MR. WHITSON:   Object to form.

A.   No idea.

(Discussion off the record.)

BY MR. APPLEBY:

Q.   I just marked an email as Exhibit 66.

(The document was marked as Plaintiff's Exhibit Number 66 for identification.)

BY MR. APPLEBY:

Q.   This is an email from you, Mr. Korhn, to Mr. Price dated March 29, 2014.  Can you take a moment and review this?

A.   Are you just referencing the first paragraph?

Q.   Well, there's a few pages here.  If you don't mind, just look through the whole thing, just for context of --

A.   Okay.

Q.   Can you tell me what -- essentially, what do you remember about this email exchange?

MR. WHITSON:   Object to form.

A.   It looks like some back and forth on items

181

needed to get closed.

BY MR. APPLEBY:

Q.   Okay.   There's a reference at the bottom of the first page that discusses a management agreement between the tenant, the not for profit with a board who holds the licenses and an entity that provides for operational controls at the property level.

That seems to be a -- that was a concern for the bank, that a management agreement was not in place. Can you tell me, was a management agreement ever drafted?

MR. WHITSON:   Object to form.

A.   I don't -- I don't recall, you know, if there was one drafted or not.   I'd have to go back and look.

BY MR. APPLEBY:

Q.   At the very top of this, your comment, second line, is, *Very frustrating*.   Again, I note this is a couple of days before -- on the Saturday, in fact, a couple of days before the loan closing.   Is it typical to have a lot of required documents, that would have been required for closing, to be scouring for those at the last minute over a weekend?

MR. WHITSON:   Object to form.

A.   I wouldn't say it's uncommon.   It happens.

BY MR. APPLEBY:

Q.   I've marked this email exchange as Exhibit 67.

(The document was marked as Plaintiff's Exhibit Number 67 for identification.)

BY MR. APPLEBY:

Q.   It's an email from you -- or, excuse me -- from Mr. Price to you.  And then below that there's an email from you that goes to Shari Smith and Mr. Price.

In the email at the bottom of the page, there's a reference that *They* -- and I'm just reading the sentence -- *They are no longer going to send the $3 million directly to us.  They are sending it to the title agent who will simultaneously send it to us when they're ready to release funds*.

Can you tell me why there was a change in the borrower originally if the plan was to wire the $3 million directly to the bank?  What changed that --

MR. WHITSON:  Object to form.

BY MR. APPLEBY:

Q.   -- that caused them to wire the money to the title company?

A.   I don't know if anything changed other than -- I mean, to satisfy the sources and uses on the closing

statement so the title agent had the dollars needed to meet the closing conditions.

(Discussion off the record.)

MR. APPLEBY:  We've gone through -- what I'd like to do, again, if we can take just a five-minute break where I can talk to my client real quick and see if there's -- you know, if we're close to getting done with the individual.  I think the remainder of this will go fairly quickly.

THE WITNESS:  Okay.

(There was a recess.)

MR. APPLEBY:  Mr. Korhn, I don't have any more questions for you at this time.  You'll -- I think we established the other day that you'll read and review as far as the transcript.

Mr. Whitson, did you have any Redirect that you'd like to go through?

MR. WHITSON:  No.

We will read.

THE COURT REPORTER:  And he's going to read.

MR. WHITSON:  Yeah, we'll read.  Definitely.

THE COURT REPORTER:  Are you going to

184

order it, then, Keith?

MR. APPLEBY:  Yes.

THE COURT REPORTER:  Yes.  And do you want a copy, Ed?

MR. WHITSON:  I'll take a copy, please.

THE COURT REPORTER:  Okay.  Thank you.

(The deposition was adjourned at 2:52 p.m.)

185

<u>**CERTIFICATE OF OATH**</u>

**STATE OF FLORIDA            )**

**COUNTY OF HILLSBOROUGH   )**

I, Jean M. Wilkes, RPR-CP, Court Reporter, Notary Public, State of Florida at Large, certify that VERNON F. KORHN, III, personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 19th day of April, 2023.

_____
**JEAN M. WILKES, RPR-CP**
**NOTARY PUBLIC AT LARGE**
**STATE OF FLORIDA**
**My Commission No.  GG 977171**
**Expires:  April 8, 2024**

186

**CERTIFICATE OF REPORTER**

**STATE OF FLORIDA          )**

**COUNTY OF HILLSBOROUGH )**

**I, Jean M. Wilkes, RPR-CP, Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition of VERNON F. KORHN, III, and that the transcript is a true record of the testimony given by the witness.**

**I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.**

**Dated this 19th day of April, 2023.**

_____
**JEAN M. WILKES, RPR-CP**

187

<u>SIGNATURE PAGE/ERRATA SHEET</u>

IN RE:   Westport Holdings Tampa; Westport Holdings
         Tampa II - Debtors
                    * * * * *
         Jeffrey W. Warren vs. Valley National Bank
                    <u>VOLUME II</u>

        I, VERNON F. KORHN, III, do hereby certify
that I have read the preceding pages and that they are
correct, to the best of my knowledge, with the following
exceptions:
<u>PAGE NO.</u>  <u>LINE NO.</u>  <u>CHANGE</u>            <u>REASON</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

                    _____
                    VERNON F. KORHN, III            DATE

## Concordance

**< Dates >**
**April 7, 2023** 101:38
**April 8, 2024** 185:23
**April, 2023.** 185:14, 186:18
**August 14, 2015          165**
     108:6
**February 18, 2014** 109:11,
     177:13
**February 4th, '14.** 175:9
**June 29, 2015** 107:41
**March 13, 2014** 109:18, 178:20
**March 17, 2014** 108:20
**March 20** 145:1
**March 20, 2014** 106:30, 106:36,
     106:42, 146:23
**March 20, 2014.** 144:15
**March 2014** 104:11, 104:29
**March 21, 2014** 107:11, 107:15,
     109:23
**March 21st, 2014** 179:21
**March 21st, 2014, 11:47** 151:8
**March 22, 2014** 107:21
**March 24, 2014** 107:25, 155:18,
     155:21
**March 27** 112:3, 122:12
**March 27, 2014** 104:5, 104:17,
     104:23, 104:36, 104:41,
     107:30, 113:22, 117:23,
     120:20
**March 27, 2014.** 121:24
**March 28** 131:6
**March 28, 2014** 105:5, 105:11,
     105:18, 105:23, 105:29,
     105:37, 105:43, 106:6, 106:11,
     106:17, 106:23, 137:4
**March 28th** 135:14
**March 28th, 2014** 127:4, 139:23
**March 28th, 2014.** 132:5
**March 28th.** 141:12
**March 29, 2014** 109:29, 180:15
**March 30, 2014** 109:36
**March 31, 2014** 107:34, 107:37,
     108:33
**March 31st** 159:18, 174:21
**March 31st, 2014** 159:5, 172:3,
     173:15
**March 31st, 2023** 110:14
**may.** 113:10
**$1.2** 146:6, 146:9
**$12** 147:2

**$15** 146:25
**$150,000.** 159:10
**$20** 146:25, 147:15
**$4** 150:17, 150:20, 151:13,
     151:24
**.well** 113:16


**< 1 >**
**1** 151:5, 151:6, 155:24, 159:9
**1.** 156:19
**1.2** 146:3
**100** 102:14, 120:25
**104** 173:3, 173:5
**104.** 173:11, 175:1
**10407** 102:28
**10:07** 101:40
**11** 101:9, 143:13
**110** 103:3, 104:8
**114** 104:14
**117** 104:20
**11:12** 138:13
**12** 147:6, 147:13, 148:7, 148:11,
     149:2
**120** 104:26, 104:32
**121** 104:38
**122** 104:45
**124** 105:8
**125** 105:15
**126** 105:20
**128** 105:26
**12:21** 101:40, 157:20
**131** 105:33
**132** 105:39
**134** 105:45, 177:1
**136** 106:8
**137** 106:14
**139** 106:20
**141** 106:26
**143** 106:32
**144** 106:38
**146** 106:44
**149** 107:8
**15** 147:11, 148:11, 149:2
**152** 107:12
**153** 107:17
**154** 107:22
**155** 107:27
**158** 107:31, 107:35
**16-bk-08167-ced** 101:8, 101:14

**16-bk-08168-ced** 101:11
**1617847.** 177:3
**162** 107:39
**164** 107:44
**167** 108:14
**170** 108:22, 108:29
**171** 108:38
**172** 108:48
**175** 109:8
**1757.** 177:2
**177** 109:14
**178** 109:20
**179** 109:26
**180** 109:32
**1801** 101:44, 102:44
**182** 109:38
**185** 103:4
**186** 103:5
**187** 103:6
**19th** 185:14, 186:18
**1:17** 101:41, 157:21


**< 2 >**
**2** 167:23, 168:8, 168:24
**2.** 151:5
**20** 147:5, 147:11, 148:11, 149:1
**20-ap-00007-cpm** 101:24
**200** 102:29
**2014** 143:13, 159:19, 174:21
**2014.** 112:3, 122:13
**2015-CA-0585** 167:15
**204-6423** 102:47
**20th** 143:12
**212-1465** 102:18, 102:33
**223-9620** 102:48
**224-4485** 102:31
**224-4486** 102:32
**224-9255** 102:46
**230-bed** 171:16
**26** 104:5, 110:23, 114:14
**26.** 110:21
**27** 104:11, 114:9
**27.** 114:7
**28** 104:17, 117:21
**28.** 117:19
**29** 104:23, 120:12, 120:19
**29.** 120:10
**2:52** 101:41, 184:8

**Concordance**

**< 3 >**
**3** 117:12, 119:4, 123:4, 123:11,
    124:1, 136:2, 139:16, 141:9,
    145:22, 146:1, 151:1, 152:1,
    153:1, 153:14, 154:1, 155:3
**30** 104:29, 120:17, 121:1
**30-year** 135:2, 135:5
**30.** 120:15
**31** 104:35, 121:22
**31.** 121:20
**310-0733** 102:17
**31st** 131:7
**32** 104:41, 122:10
**32.** 122:8
**32256** 102:30
**33** 105:5, 124:6, 124:9, 124:13
**3324** 168:3
**33602** 101:45, 102:16, 102:45
**33629-5420** 102:6
**34** 105:11, 125:6
**34.** 125:4
**35** 105:18, 127:1
**35.** 126:24
**36** 105:23, 129:1
**36.** 128:24
**37** 105:29, 131:23
**37.** 131:21
**38** 105:37, 132:17
**38.** 132:15
**39** 105:43, 134:18, 135:12
**39.** 134:16

**< 4 >**
**4** 153:25
**4.2.** 151:14
**40** 106:6, 136:20
**40.** 136:18
**41** 106:11, 138:1
**41.** 137:23
**42** 106:17, 139:11
**42.** 139:9
**43** 106:23, 141:14
**435-0396** 102:7
**44** 106:29, 143:10
**44.** 143:7
**45** 106:35, 144:9
**46** 106:41, 146:16
**46.** 146:14

**47** 107:5, 149:18
**47.** 149:16, 150:3
**48** 107:10, 152:17
**48.** 152:15
**49** 107:14, 153:19, 153:22
**4916** 102:5

**< 5 >**
**50** 107:19, 154:20
**50.** 154:18
**51** 107:24, 155:14
**51.** 155:12
**52** 107:29, 158:3
**52.** 158:1
**53** 107:33, 158:17
**53.** 158:15
**54** 107:37, 162:19
**54.** 176:20
**55** 107:41, 164:3
**55.** 164:1
**56** 108:5, 165:23
**56.** 165:21
**57** 108:9, 167:8
**57.** 167:6
**58** 108:17, 170:21, 171:1
**58.** 170:17
**59** 108:25, 170:21, 171:4
**59.** 170:19

**< 6 >**
**60** 108:33, 171:20
**60.** 171:18
**600** 102:15
**61** 108:41, 172:17, 172:20
**62** 109:5, 175:13
**62.** 175:11
**63** 109:11, 177:10
**63.** 177:8
**64** 109:18, 178:17
**64.** 178:15
**65** 109:23, 179:17
**65.** 179:15
**66** 109:29, 180:12
**66.** 180:10
**67** 109:36, 182:5
**67.** 182:3

**< 8 >**
**813** 102:7, 102:17, 102:46,
    102:47, 102:48
**8:** 101:8, 101:11, 101:14, 101:24

**< 9 >**
**904** 102:18, 102:31, 102:32,
    102:33
**909.** 158:23
**97** 175:7
**97.** 110:3
**977171** 185:22
**9:56** 145:1

**< A >**
**A.M.** 101:40, 138:13, 145:1,
    151:8
**able** 131:7, 179:1
**above** 122:22, 152:22, 156:9,
    161:11, 169:1, 174:2
**Absolutely** 111:23, 142:23, 143:3
**accept** 169:10
**acceptable** 174:4
**Accounts** 119:6, 122:20, 143:19,
    145:24, 150:9, 152:2, 152:8,
    153:2, 174:4
**accurate** 113:21, 172:23, 173:8,
    173:18
**across** 130:19, 137:1
**action** 186:15, 186:16
**active** 178:24
**Actually** 115:20, 159:4, 166:1,
    170:12, 170:13
**add** 156:11
**additional** 146:9
**address** 151:21, 154:7
**addressed** 114:24, 119:7, 121:5,
    164:6
**Adina** 102:22, 110:25, 111:22
**adjourned** 184:7
**Administered** 101:13
**Adv** 101:23
**Adveresary** 108:41
**affiliates** 172:3, 178:1, 178:4
**agent** 139:7, 182:15, 183:1
**agent/** 139:6
**ago** 112:3, 121:4, 132:6, 174:13
**agree** 166:13, 166:15

**Concordance**

**Agreement** 108:5, 122:24, 127:9, 138:24, 143:22, 144:17, 145:21, 151:2, 151:18, 151:20, 153:14, 154:2, 154:6, 155:24, 156:1, 156:19, 156:23, 160:20, 161:12, 164:24, 165:25, 167:23, 168:7, 168:10, 176:13, 181:4, 181:9, 181:10
**agreements** 145:13
**ALF/SNF** 171:16
**align** 156:2, 156:23
**allegations** 178:24
**alleging** 179:1
**allocated** 137:1
**already** 179:8
**alternative** 138:19, 139:3
**although** 111:17
**amended** 165:2, 165:4, 165:15, 166:6
**Amendment** 108:5, 164:25, 165:5, 165:6, 165:7, 165:9, 165:12, 165:14, 165:16, 165:25, 166:8, 166:14, 166:15, 166:16, 167:23, 168:6, 168:10, 168:13, 168:15, 170:4, 170:6
**among** 180:2
**amongst** 162:6
**Amount** 126:3, 147:2, 147:4, 147:6, 147:11, 147:12, 147:25, 148:7, 150:24, 151:14, 173:16
**amount"** 116:6
**amounts** 150:24, 151:15
**analyze** 134:9
**Ancillarily** 144:1
**Angelis** 106:42, 107:5, 108:17, 109:12, 146:23, 149:6, 177:12
**answer** 136:15, 144:24, 156:16, 160:1
**answered** 120:4, 160:25, 161:3
**apollan@mcglinchey.com** 102:34
**apologize** 110:25, 111:12, 151:10, 167:4
**apologizes** 111:18
**APPEARANCES** 102:1
**appeared** 185:10
**appears** 119:10, 129:3, 132:4,

132:19, 141:16, 154:25, 159:2, 162:22, 164:5, 164:23, 165:9, 170:11, 171:4, 171:22, 172:25
**applaud** 179:10
**Application** 108:26, 171:3, 171:5, 171:6, 171:11, 171:14
**applications** 171:7
**apply** 122:24
**approval** 172:21, 172:23, 174:16, 174:17
**Approved** 108:44, 142:5
**arguably** 135:16
**around** 119:2, 138:13
**Ashley** 102:14
**Aside** 143:16
**associated** 117:14, 172:6
**assume** 130:11
**assuming** 114:18, 129:9, 147:14, 149:8, 156:20
**attached** 114:15, 178:22
**attachment** 113:24, 121:2, 121:3, 125:3, 125:4, 125:9, 157:6, 170:18, 179:23
**attachments** 108:36, 171:2
**attending** 111:15
**Attorney** 102:9, 102:20, 102:38, 126:16, 126:17, 127:4, 186:13
**attorneys** 132:20, 140:11, 186:15
**Authorization** 108:43
**authorized** 186:7
**Avenue** 101:44, 102:5, 102:44
**award** 161:13
**aware** 112:14, 115:6, 125:1, 143:18, 172:8, 172:11, 179:3
**away** 139:16

**< B >**
**back** 111:3, 122:15, 137:9, 138:9, 142:9, 150:8, 150:15, 157:16, 157:23, 167:22, 167:24, 175:7, 180:25, 181:14
**background** 177:20, 177:21
**balance** 124:3, 151:14
**Bank/** 108:47, 173:2
**Bank/sdt** 108:46
**BANKCORP** 101:28
**banking** 152:12
**BANKRUPTCY** 101:1

**banks** 173:23
**Bartle** 108:19, 146:23, 149:8, 164:22
**Bartle/eli** 107:42
**based** 142:19, 142:22, 145:20, 162:7, 174:9
**basic** 134:21
**Basically** 167:21
**basis** 161:17
**Bear** 170:13
**became** 112:14, 179:3
**become** 115:6
**becoming** 136:24, 137:3
**begin** 110:15
**beginning** 118:9
**begins** 173:2, 177:20
**behalf** 111:15, 115:17
**believe** 114:20, 119:6, 120:24, 141:23, 151:13, 155:23, 159:3, 163:10, 165:3, 166:16, 177:21
**Below** 146:2, 155:19, 164:23, 173:20, 177:17, 177:19, 182:8
**benefit** 147:15, 148:16, 148:21
**best** 187:10
**Beth** 107:20, 108:19, 154:24
**big** 140:15, 140:22, 140:23
**binding** 159:24, 161:12
**bit** 170:15
**block** 164:10
**Board** 177:23, 181:5
**bonds** 133:6
**Borrowers** 174:2
**borrowing** 168:23
**bottom** 138:11, 146:22, 151:7, 155:16, 155:20, 158:22, 167:25, 173:1, 181:3, 182:11
**break** 142:25, 157:10, 176:15, 183:6
**bridge** 135:8
**brief** 176:14
**bringing** 118:15
**broad** 133:14, 133:25, 145:20
**brokerage** 173:24
**bullet** 136:4
**bunch** 126:16
**Burr** 132:5, 132:20
**Bush** 101:43, 102:43
**Business** 108:25, 171:2, 171:4, 171:10, 171:13, 174:4, 174:5

**Concordance**

**BVM** 107:43, 109:7, 109:8, 164:6, 175:17, 176:1, 177:22

**< C >**
**call** 111:1, 174:12
**called** 179:24
**Care** 105:32, 152:9, 169:5, 169:6, 169:10, 169:17, 169:18
**CARS** 108:44
**Case** 101:8, 101:11, 101:14, 110:12, 142:7, 167:10, 167:14, 178:23
**catch** 151:20, 154:5
**category** 163:15
**caused** 128:12, 182:22
**causing** 127:17, 128:17
**Center** 177:24
**Centurion** 102:28
**certain** 119:16, 122:5, 127:10
**certainty** 120:25, 125:10, 139:5, 160:12, 164:12, 171:8, 172:14
**CERTIFICATE** 103:4, 103:5, 185:1, 186:1
**certify** 185:9, 186:7, 186:12, 187:8
**cgipson@mcglinchey.com** 102:37
**chain** 171:1
**CHANGE** 156:1, 156:12, 179:20, 180:2, 182:17, 187:12
**changed** 165:5, 182:19, 182:24
**changes** 180:4
**Chapter** 101:9
**Chart** 179:24
**check** 127:8, 176:24
**Claim** 108:10, 123:24, 128:6, 167:16
**claimed** 120:2
**claims** 127:25, 136:10, 136:11
**clamp** 131:3
**clarify** 112:18, 112:22, 115:10, 140:3, 142:18
**cleanly** 124:16
**clear** 119:21, 123:3, 127:20, 128:22
**clearly** 130:9
**client** 124:16, 138:19, 139:17, 183:6
**close** 131:4, 131:7, 131:15,

142:19, 160:4, 160:10, 160:16, 161:8, 183:8
**closed** 142:17, 159:18, 172:1, 172:3, 172:9, 172:14, 181:1
**closes** 142:5
**colleague** 149:10
**comes** 138:14
**comfort** 137:15, 170:5
**comfortable** 142:1, 142:17
**comforted** 141:23
**coming** 130:10, 138:16
**comment** 122:18, 141:21, 144:21, 181:17
**commercial** 135:5, 159:14
**Commission** 161:13, 185:22
**commitment** 159:10, 159:23, 160:3, 160:9, 160:17, 160:19, 160:23, 161:8, 169:22
**common** 160:8, 160:13, 160:22, 161:7, 178:12
**company** 117:1, 130:2, 130:3, 182:23
**compensated** 162:2
**Complaint** 109:5, 175:15, 178:23
**completely** 147:10
**completion** 125:21
**compliance** 136:1, 139:19, 140:25, 142:5
**component** 162:6
**components** 162:15
**Concern** 104:13, 127:25, 128:12, 128:17, 130:9, 137:9, 141:1, 141:6, 141:9, 148:6, 163:3, 181:8
**concerned** 128:5, 133:9, 136:10, 136:25, 137:4, 141:7
**concerns** 115:13, 119:18, 120:1, 131:5, 131:6, 131:14, 131:17, 138:14, 158:7, 158:8
**conditions** 169:9, 183:2
**confirm** 117:25, 130:23, 137:10, 164:7
**confusion** 152:24
**conjunction** 115:14
**connected** 186:15
**consider** 132:8
**context** 122:25, 136:23, 147:22, 180:20
**continuation** 141:16
**continue** 110:13

**CONTINUED** 101:35, 104:1, 105:1, 106:1, 107:1, 108:1, 109:1, 110:2
**continuing** 169:5, 169:6, 169:17
**contract** 169:6, 169:25, 170:1
**contracts** 169:18, 170:3
**contributing** 142:9
**Control** 151:2, 151:17, 154:2, 177:22
**controls** 181:7
**conversation** 115:4, 119:5, 141:24, 142:2
**conversations** 130:22, 137:8
**conveyance** 169:7, 169:19, 169:21
**copied** 117:24, 119:12, 120:21, 139:20, 177:14, 179:19
**Copies** 173:23
**copy** 113:8, 113:21, 117:24, 121:3, 165:17, 167:5, 172:23, 184:4, 184:5
**corner** 175:8
**corporation** 101:29
**correct** 123:10, 138:21, 147:12, 168:4, 179:4, 187:10
**correspondence** 136:13, 136:16, 140:24
**costs** 161:10
**country** 149:7
**counts** 136:2
**COUNTY** 166:2, 167:14, 185:4, 186:4
**couple** 167:24, 181:19, 181:20
**course** 111:21, 162:5, 169:4
**Court** 101:1, 111:9, 111:10, 111:14, 111:19, 111:25, 149:24, 178:23, 183:21, 183:25, 184:3, 184:6, 185:8, 186:6
**CPIF** 108:35, 108:41, 171:23, 172:6, 172:9
**CPIF_ADV_0008561** 108:37
**CPIF_ADV_0008586** 108:38
**creditor** 176:9
**criteria** 133:6, 134:11
**cross-sells** 162:16
**current** 177:22
**currently** 141:22, 150:17, 151:12
**Customer** 171:2

**Concordance**

**< D >**
**d/b/a** 167:14
**Damages** 109:6, 175:16
**data** 163:12
**DATE** 101:38, 175:7, 175:8, 179:21, 187:31
**day** 119:3, 148:6, 183:15, 185:14, 186:18
**days** 127:5, 131:11, 137:5, 139:23, 143:13, 181:19, 181:20
**deal** 135:1
**deals** 133:5
**debt** 147:20, 147:24
**Debtors** 101:14, 187:3
**decision** 142:16, 142:20
**Declaratory** 109:5, 175:15
**declare** 187:26
**deed** 175:24, 175:25
**Default** 136:5, 142:8, 142:10, 169:1, 169:11
**Defendant** 101:32, 102:20, 102:38, 111:16
**defines** 125:13
**Definitely** 122:19, 183:24
**definition** 156:11, 157:3
**delivered** 116:14
**Department** 108:12, 167:12
**dependent** 142:19
**depends** 148:24
**deposit** 115:13, 118:24, 155:24, 155:25, 173:7
**DEPOSITION** 101:36, 110:2, 110:13, 184:7, 186:8
**Deposits** 162:16, 173:15, 173:23, 174:20
**described** 146:2
**DESCRIPTION** 104:2, 105:2, 106:2, 107:2, 108:2, 109:2
**designates** 168:7
**detail** 166:23, 179:2
**difference** 145:6, 145:9, 145:14
**differences** 148:14
**different** 123:20, 129:11, 129:12, 129:19, 137:2
**differentiate** 144:19
**differently** 118:22
**DIRECT** 102:47, 103:3, 110:8, 155:4

**directed** 122:17
**directly** 152:22, 182:14, 182:19
**Directors** 177:23
**disappears** 138:21
**discuss** 134:20
**discussed** 114:17, 140:6
**discusses** 181:4
**discussing** 114:1, 129:4
**Discussion** 111:2, 119:2, 119:10, 130:8, 135:14, 138:14, 144:14, 144:16, 149:25, 150:8, 150:10, 150:12, 155:22, 163:23, 177:6, 179:12, 180:8, 183:3
**discussions** 114:23, 118:2, 118:6, 119:13, 121:8, 123:15, 143:24, 143:25, 144:18, 150:19, 151:22, 151:25
**disputed** 127:12
**distinct** 153:8
**DISTRICT** 101:2
**disturbed** 169:7, 169:19
**DIVISION** 101:3
**docs** 141:22
**documents** 145:23, 163:14, 170:14, 170:20, 170:24, 181:21
**doing** 149:22
**dollars** 142:5, 183:1
**domestic** 101:28
**done** 159:20, 166:16, 175:3, 183:8
**double** 127:8
**down** 130:18, 131:3, 135:15, 135:17, 135:21, 136:7, 152:20, 169:3
**draft** 112:8, 114:15, 115:19, 126:15
**drafted** 114:24, 162:22, 168:2, 181:11, 181:14
**Drive** 102:14
**due** 129:10
**duly** 110:5, 185:11
**Dytrych** 108:34

**< E >**
**earlier** 140:6, 143:12
**Ed** 184:4
**edits** 121:14, 122:1, 126:16

**EDMUND** 102:12
**effects** 139:18
**effort** 168:18, 179:11
**Eli** 164:23
**emails** 112:6, 138:6, 146:21, 158:5
**employee** 186:13, 186:14
**encompassed** 118:3
**end** 119:3, 148:5
**ends** 158:23
**engages** 142:4
**enough** 147:8
**entire** 136:6
**entities** 129:11, 129:12, 130:10, 130:14, 178:1, 178:4, 178:10
**entitled** 159:19
**entity** 117:6, 129:19, 168:18, 168:21, 168:22, 168:23, 177:23, 181:6
**equal** 178:8
**escrows** 125:23
**ESQUIRE** 102:3, 102:12, 102:22, 102:25, 102:42
**essentially** 134:25, 180:22
**established** 183:15
**estate** 117:2, 117:7, 125:18, 126:13, 135:1
**evaluate** 134:9
**Event** 160:9, 169:1, 169:20
**events** 169:11
**ewhitson@mcglinchey.com** 102:19
**EXAMINATION** 103:3, 110:8
**examined** 110:6
**exceptions** 187:11
**exchange** 138:12, 141:17, 143:8, 143:14, 153:20, 180:23, 182:2
**exchanged** 113:21, 152:21
**exchanges** 143:21, 144:12, 152:19
**exclusive** 169:2
**Excuse** 118:15, 118:21, 122:6, 124:11, 141:20, 147:1, 155:18, 167:11, 176:10, 182:7
**execute** 166:13
**executed** 108:6, 159:4, 166:9
**exercise** 169:4
**EXHIBITS** 104:1, 105:1, 106:1, 107:1, 108:1, 109:1, 170:14
**expect** 111:17, 143:7

**expectation** 156:2, 156:4, 156:24, 157:1
**expected** 135:17
**experience** 133:13, 160:15
**expert** 128:21, 147:19, 148:3
**expertise** 117:16, 132:12, 142:6
**experts** 132:7, 132:9
**Expires** 185:23
**explain** 133:20
**extra** 165:17

**< F >**
**F.** 101:36, 103:2, 110:4, 185:10, 186:9, 187:8, 187:31
**facilitate** 168:20
**facility** 168:23, 171:25
**fact** 129:11, 181:19
**facts** 178:24, 187:27
**fairly** 183:9
**familiar** 164:8, 164:17
**far** 113:20, 113:23, 118:5, 133:9, 135:19, 156:3, 183:16
**Farther** 130:18
**favor** 163:21
**FAX** 102:18, 102:33, 102:48
**federal** 178:23
**fee** 159:10, 159:13, 159:15, 159:17, 160:3, 160:9, 160:17, 160:23, 161:8
**fees** 148:9, 159:20, 162:11, 162:12, 162:16
**few** 127:5, 137:5, 139:23, 180:18
**few-minute** 142:25
**filed** 166:1, 167:10, 175:16
**Final** 108:9, 126:20, 167:16
**finance** 133:5
**Financial** 108:13, 167:12
**financially** 186:16
**find** 163:10, 163:14, 166:11
**fine** 122:1, 144:24, 156:10
**finish** 157:13
**firm** 132:7, 132:11
**first** 112:7, 114:15, 115:6, 116:12, 125:20, 126:1, 126:5, 126:7, 129:21, 135:15, 135:24, 138:3, 138:12, 141:19, 144:13, 146:22, 150:15, 151:11, 152:20, 155:17, 159:7, 168:6, 170:16, 173:2, 175:7,

177:16, 177:17, 178:21, 180:17, 181:4
**five-** 183:5
**five-minute** 176:15
**flexibility** 135:16
**flip** 158:21, 158:23, 167:24, 170:9, 173:3, 175:7
**FLORIDA** 101:2, 101:45, 101:49, 102:6, 102:16, 102:30, 102:45, 104:31, 108:12, 115:7, 121:6, 123:8, 166:2, 167:11, 167:12, 185:3, 185:9, 185:21, 186:3
**flow** 147:1
**focus** 144:25
**Following** 131:7, 131:15, 136:3, 140:10, 152:19, 187:10
**follows** 110:7, 139:13
**foreclosure** 169:7, 169:19, 169:20
**foregoing** 186:8, 187:27
**formal** 161:12
**Forman** 132:5, 132:20
**formula** 162:10
**formula-driven** 162:7
**forth** 137:9, 150:8, 169:1, 180:25
**forward** 141:22
**found** 176:25
**frankly** 115:17, 152:9
**Freiden** 164:23
**Freiden/** 107:42
**Friday** 110:14, 132:5
**front** 138:9
**frustrating** 181:18
**full** 174:14
**fund** 129:10, 135:15, 135:16
**funded** 147:20
**funding** 155:3
**funds** 118:11, 119:1, 122:22, 123:23, 124:24, 126:13, 127:12, 128:1, 129:16, 129:18, 129:21, 129:25, 130:4, 130:9, 136:9, 138:15, 138:25, 171:15, 173:25, 182:16

**< G >**
**Gary** 108:34
**gave** 128:16, 137:17

**general** 145:6, 161:24
**Generally** 131:3, 152:8, 161:9, 162:4, 171:12, 174:17
**generate** 163:16
**gets** 138:22
**getting** 111:6, 183:8
**GG** 185:22
**gist** 143:14
**give** 131:20, 137:15, 138:7, 146:18, 170:14
**given** 136:25, 161:19, 163:12, 186:10
**gives** 135:16
**goals** 162:5
**gotten** 160:16, 163:13
**governed** 160:19
**grain** 178:25
**greater** 133:6, 134:11
**group** 132:4, 154:23
**Guarantor** 174:3, 174:5
**Guarantors** 174:2
**guess** 140:8, 164:21, 178:7

**< H >**
**H.** 102:25
**hand** 120:9, 120:15, 121:19, 122:7, 143:6, 157:25, 185:13
**handed** 112:2, 124:12, 141:11, 149:15, 150:2, 152:14, 153:18, 154:17, 155:11, 162:21, 163:25, 165:20, 171:17, 172:20, 175:10
**handing** 110:20, 126:23, 128:23, 132:14, 146:13, 158:14, 178:14
**handle** 115:16, 117:15, 126:18
**handled** 159:25
**handling** 119:12
**handwritten** 121:14
**happens** 181:25
**hate** 127:7
**Health** 177:24
**Healthcare** 105:30, 132:4
**heard** 134:12
**held** 116:1, 122:23, 129:17, 129:18, 150:24, 151:15, 173:7, 173:15, 173:23, 174:10
**help** 168:20
**helpful** 138:9

**Concordance**

**hereby** 116:4, 187:8
**Highland** 101:44, 102:44
**HILLSBOROUGH** 166:2, 185:4, 186:4
**history** 146:11
**hold** 126:13
**holding** 146:9
**Holdings** 101:8, 101:11, 101:18, 101:20, 108:14, 167:13, 171:23, 171:24, 187:2
**holds** 181:6
**Hollister** 107:38
**home** 169:6, 169:18
**Homes** 105:31
**honor** 169:16
**honored** 169:6, 169:18
**Horizon** 109:6, 175:16, 176:1, 176:8, 178:23, 179:4
**HUD** 135:17, 135:19, 135:21, 135:22, 147:20, 147:24, 148:4
**Hungate-noland** 107:20, 108:19, 154:24

**< I >**
**idea** 130:6, 133:11, 153:13, 154:11, 156:6, 157:3, 180:5, 180:7
**identical** 166:17
**identify** 111:9, 111:16
**identifying** 176:21
**II** 101:11, 101:17, 101:20, 171:24, 187:3, 187:6
**III** 101:36, 102:12, 103:2, 110:4, 185:10, 186:9, 187:8, 187:31
**Immunity** 108:11, 167:16
**imperative** 152:3
**Inc.** 107:43, 164:6, 175:17
**incented** 161:16
**incentives** 161:20
**incents** 161:23
**included** 125:3, 162:17
**income** 148:9
**increasingly** 136:25, 137:4
**indented** 168:25
**independent** 168:22, 171:25
**indicate** 137:14, 146:24
**indicated** 132:6
**indicates** 121:7, 121:25, 133:3, 136:7, 140:14, 146:1, 149:6,

150:16, 151:1, 153:25, 164:22, 173:6, 173:14
**indicating** 155:25
**individual** 164:11, 183:8
**Industry** 105:32
**information** 178:25
**initial** 119:8
**inquiry** 176:22
**instance** 159:25
**Insurance** 104:30, 105:13, 114:25, 121:5
**interacting** 149:13
**interest** 119:17, 119:23, 120:2, 123:8, 123:11, 123:13
**interested** 186:16
**interpose** 144:21
**involved** 123:22, 139:25, 140:11
**ISRAEL** 102:25, 111:8, 111:12, 111:13, 111:15, 111:21
**issue** 112:15, 112:19, 115:7, 115:10, 123:16, 126:18, 127:17, 138:21, 139:16, 140:15, 140:16, 140:17, 140:22, 140:23, 141:18, 141:21, 142:1
**issues** 132:7, 140:8, 140:9, 142:10, 150:13, 168:19
**items** 162:16, 180:25
**itself** 145:21

**< J >**
**Jacksonville** 102:30
**JEAN** 101:47, 185:8, 185:19, 186:6, 186:22
**Jeff** 110:11
**Jeffrey** 101:17, 102:42, 187:5
**Jersey** 101:28
**job** 127:13
**John** 107:42, 108:18, 146:23, 149:8, 149:10, 164:22
**Joint** 119:16, 174:2
**Jointly** 101:13
**Judgment** 108:10, 167:16
**juncture** 165:10
**jwarren@bushross.com** 102:49

**< K >**
**keep** 160:17, 160:23, 161:7

**keeps** 160:9
**Keith** 102:3, 110:10, 111:5, 114:3, 125:24, 162:25, 163:9, 184:1
**keithtappleby@icloud.com** 102:8
**Kevin** 106:41, 107:5, 108:17, 109:12, 114:16, 146:23, 149:6, 177:12
**Kim** 102:25, 110:25, 111:13, 111:23
**kind** 153:4
**kisrael@mcglinchey.com** 102:36
**knowledge** 144:3, 152:9, 187:10

**< L >**
**L.** 102:22
**label** 173:1, 173:11
**labeled** 126:24
**language** 156:11, 165:11
**LARGE** 101:49, 185:9, 185:20
**larger** 147:16, 147:25, 148:17, 148:22
**last** 110:14, 125:20, 126:1, 135:24, 138:18, 167:21, 170:9, 181:23
**later** 166:16
**Law** 102:4, 132:6
**lawsuit** 179:4
**learn** 167:1
**learned** 166:20
**least** 147:25
**left** 131:11, 175:8
**legal** 159:24, 163:19, 178:12
**Lender** 109:7, 135:23, 136:24, 141:23, 169:2, 175:16, 176:8
**Lending** 108:35, 171:23, 172:6
**length** 134:21
**Leon** 167:14
**less** 147:12
**letters** 123:15
**level** 181:7
**licenses** 181:6
**lieu** 169:8, 175:25
**Limited** 101:9, 101:12, 101:19, 101:20, 171:24, 180:3
**LINE** 110:25, 113:2, 113:3, 117:3, 119:8, 122:13, 125:11, 141:18, 144:16, 155:21, 156:18,

**Concordance**

159:10, 181:18, 187:12
**LIQ_TT_1617841** 177:3
**liquid** 112:16, 115:7
**Liquidating** 101:17, 110:11
**Liquidity** 173:6, 173:22, 175:2
**listed** 171:14
**little** 143:12, 145:5, 170:15
**living** 168:22, 171:25
**LLC** 108:27, 108:35, 109:7, 109:8, 125:13, 125:22, 171:23, 172:24, 175:16, 175:17
**LLP** 107:38
**loaned** 171:15
**loans** 135:5, 148:17, 160:15, 161:9, 161:20, 162:11, 162:12, 162:15, 171:11, 172:1, 172:3, 172:6
**locate** 139:2
**Long** 105:31, 134:22, 147:8, 169:8
**longer** 182:13
**look** 121:1, 122:16, 150:5, 168:11, 168:24, 170:23, 180:19, 181:15
**looked** 122:1
**looking** 121:4, 122:15, 127:13, 138:19, 146:11, 168:5, 174:24
**looks** 138:13, 158:20, 164:8, 164:17, 168:13, 172:21, 180:25
**lose** 127:17, 128:18
**lot** 119:2, 131:11, 131:18, 134:6, 144:23, 181:21
**lots** 140:7, 140:8
**Lou** 149:9, 149:13
**LP** 109:6, 125:22, 175:16, 176:1, 176:8
**lunch** 157:9, 157:10, 157:23

**< M >**
**M.** 101:47, 185:8, 185:19, 186:6, 186:22
**mailed** 126:21
**maintain** 125:22
**Management** 107:43, 109:8, 164:6, 175:17, 176:1, 181:4, 181:9, 181:10
**March** 143:12

**mark** 114:7
**mark-ups** 121:8
**marked-up** 121:3
**market** 173:25
**marketable** 173:25
**marking** 114:4, 120:15
**matter** 113:18
**matters** 117:16
**Mcglinchey** 102:13, 102:27, 111:13
**meaning** 136:5, 139:17, 147:8, 147:22
**means** 124:17, 124:20, 130:20
**meet** 183:2
**Melrose** 102:5
**mentions** 154:6
**merely** 127:11
**merger** 101:30
**MIDDLE** 101:2, 115:25, 119:14, 136:4, 141:19, 144:13, 144:25, 149:5, 165:9, 165:11, 173:6, 173:14
**midway** 135:15
**mind** 138:8, 142:24, 149:21, 180:19
**minimum** 112:16, 115:7
**minute** 110:24, 132:6, 181:23, 183:6
**mischaracterizing** 123:18
**MLR** 112:8, 112:15, 114:15, 116:1, 116:5, 116:7, 117:4, 117:9, 118:11, 118:16, 122:14, 122:21, 125:23, 126:13, 128:21, 132:7, 136:1, 138:16, 139:2, 139:18, 140:14, 140:25, 141:7, 141:18, 141:21, 142:1, 158:8
**Modifications** 108:44
**moment** 112:3, 121:4, 138:7, 146:18, 149:21, 165:18, 168:11, 170:13, 174:13, 180:15
**Monday** 131:8, 131:15, 140:10, 141:2
**money** 155:4, 155:5, 171:16, 173:25, 174:10, 182:22
**morning** 110:10
**mortgage** 135:2
**Motion** 108:9, 167:15
**move** 124:5, 141:22

**moving** 116:5
**MS** 111:8, 111:12, 111:15, 111:21, 111:22
**Mullen** 154:25
**myself** 111:16

**< N >**
**named** 149:13, 168:6
**names** 174:1
**National** 101:26, 101:27, 108:45, 108:47, 134:4, 173:2, 175:6, 187:5
**necessary** 111:24, 150:14
**need** 110:24, 111:9, 121:16, 122:19, 123:5, 123:14, 130:16, 136:15, 142:25, 147:24, 151:2, 151:17, 154:2, 166:18, 170:6, 174:1
**needed** 119:4, 123:4, 140:9, 152:1, 152:8, 152:10, 154:4, 181:1, 183:1
**needs** 144:22, 156:22, 156:23
**negotiate** 170:5
**negotiation** 139:25
**net** 147:2, 147:5, 148:7
**New** 101:28, 127:13
**night** 127:8
**nobody** 127:21, 128:3, 130:24
**nor** 152:9, 186:14, 186:15
**North** 101:44, 102:28, 102:44
**notarized** 170:10
**NOTARY** 101:48, 185:9, 185:20
**notation** 176:21
**Note** 125:11, 134:24, 135:5, 135:10, 147:4, 147:12, 157:5, 173:20, 173:21, 181:18
**noted** 170:4
**nothing** 110:6, 153:3
**Notice** 112:8, 112:10, 114:15, 116:5, 122:14, 162:25
**nreid@mcglinchey.com** 102:35
**numbered** 110:21, 159:8, 177:17, 177:19
**Numbers** 104:13, 104:19, 104:25, 104:37, 104:44, 105:7, 105:14, 105:25, 106:19, 106:25, 106:31, 106:37, 106:43, 107:7, 107:11, 107:16, 107:21, 107:26,

**Concordance**

107:30, 107:34, 108:21, 108:36, 108:45, 109:31, 170:21
**numerous** 162:6
**Nursing** 105:31, 108:27, 112:24, 116:9, 116:25, 117:1, 117:5, 117:6, 125:12, 125:15, 125:17, 129:18, 130:1, 134:5, 134:23, 152:6, 156:18, 165:2, 172:24, 176:10, 178:8

**< O >**
**OATH** 103:4, 110:15, 110:16, 111:6, 185:1
**objecting** 113:7
**Objection** 120:4, 148:23
**obtain** 161:20
**obtained** 176:22
**offhand** 149:14, 150:21
**Office** 104:29, 105:12, 114:25, 121:5, 176:24
**officer** 115:12, 128:17
**officers** 161:16, 161:19, 161:23, 162:2
**Official** 166:2, 166:21, 185:13
**offset** 147:5
**offsetting** 147:1
**often** 160:8
**OIR** 115:7, 116:1, 116:14, 116:15, 122:14, 123:8, 123:15, 123:23, 126:2, 126:21, 158:9, 168:19
**Once** 126:11, 153:19, 167:4
**One** 112:18, 119:23, 120:6, 124:2, 132:8, 138:5, 139:13, 147:14, 152:23, 162:6, 165:17, 167:4, 171:2, 171:8, 181:14
**one.** 116:15
**ongoing** 137:8
**open** 143:19, 144:4, 145:5
**opened** 145:16, 146:8
**operation** 151:1, 151:16
**operational** 181:7
**operator** 177:23
**operators** 137:2
**opinion** 137:15, 137:18, 137:21, 163:19, 176:20
**opportunity** 134:9, 150:4

**options** 119:3
**order** 184:1
**Org.** 179:24
**original** 138:23
**originally** 182:18
**origination** 159:12, 159:17
**otherwise** 128:22, 137:15, 148:14, 152:3, 153:2, 161:12, 164:19, 172:15
**out-of-pocket** 161:10
**outlining** 159:25
**outside** 145:24
**outstanding** 139:25, 140:3, 140:4, 147:25
**overall** 147:2
**owed** 147:25, 172:13
**owned** 117:2, 117:7, 129:18, 130:1, 168:22
**owner** 125:17
**ownership** 178:12, 180:2

**< P >**
**p.m.** 101:40, 101:41, 157:20, 157:21, 184:8
**package** 172:21, 172:23, 174:12, 174:16, 174:17, 175:4
**PAGE/ERRATA** 103:6, 187:1
**pages** 167:21, 167:24, 180:18, 187:9
**paragraph** 115:25, 119:15, 125:20, 126:2, 126:6, 126:7, 131:2, 135:15, 135:24, 138:3, 138:19, 151:11, 159:8, 165:8, 168:24, 177:16, 177:17, 178:21, 180:17
**paralegal** 178:22
**pardon** 134:21
**Parkway** 102:28
**part** 112:25, 113:1, 116:12, 116:16, 117:5, 120:14, 129:21, 143:24, 161:1, 175:3
**partially** 152:20, 172:12
**particular** 133:16, 134:3
**parties** 186:13, 186:14
**partner** 178:9
**PARTNERSHIP** 101:9, 101:12, 101:19, 101:21
**Partnerships** 171:24, 180:3
**party** 132:25, 152:3, 166:9,

168:14, 172:6, 176:12
**patience** 157:24
**pay** 136:7
**pays** 161:10
**penalties** 187:26
**people** 154:23
**per** 153:14, 160:6
**per-loan** 161:17
**percent** 120:25
**perjury** 187:26
**Permanent** 135:23
**personally** 185:10
**PFS** 173:21
**PHONE** 102:7, 102:17, 102:31, 102:32, 102:46, 111:4
**PLACE** 101:43, 140:8, 181:9
**placed** 146:3
**places** 176:25, 177:4
**PLAINTIFF'S** 104:1, 105:1, 106:1, 107:1, 108:1, 109:1
**Plaintiffs** 102:9
**plan** 135:20, 182:18
**planned** 171:14
**play** 133:17
**played** 115:20
**pleading** 167:10, 167:24, 168:8
**please** 118:18, 129:22, 138:5, 178:21, 179:10, 184:5
**pledge** 144:18, 144:20, 145:7, 145:10, 146:2, 153:9, 153:14
**pledged** 118:12, 145:18, 145:22, 147:12, 153:1, 153:14
**PLLC** 102:13, 102:27
**point** 136:4, 159:19
**points** 136:4
**Pollan** 102:22, 111:22
**portfolio** 162:11
**portion** 116:7, 116:18
**Portions** 150:23, 151:14
**position** 123:23, 123:25
**Post-closing** 179:24
**pre** 179:22
**preceding** 187:9
**preparation** 175:4
**prepared** 166:12, 174:18, 174:19, 174:21
**PRESENT** 102:40
**presume** 158:8
**pretty** 119:21, 123:3, 127:20
**previously** 110:5, 176:18

**Concordance**

**pricing** 148:14
**primarily** 140:12
**primary** 148:6
**principal** 101:26
**Prior** 113:25, 114:14, 138:11,
    140:6, 140:9, 143:13, 147:24,
    174:21, 175:23, 178:1
**Pro** 101:23
**probably** 166:24, 168:1
**produced** 163:1
**production** 162:5, 162:6, 163:11
**profit** 101:29, 181:5
**prohibit** 141:1
**projects** 130:19, 137:1
**property** 181:7
**proposed** 165:14
**protect** 123:13
**protected** 142:22
**protects** 170:6
**prove** 170:5
**provide** 135:5, 170:5
**provided** 117:14, 169:3, 175:5,
    175:25, 176:5
**Provider** 116:4, 116:10, 116:25,
    125:13, 125:15, 125:22
**provides** 181:6
**providing** 116:4, 136:1
**PUBLIC** 101:48, 185:9, 185:20
**pull** 136:6
**Purchase** 171:16
**purpose** 171:14
**put** 147:16, 155:4, 155:5
**puts** 147:8

**< Q >**
**question** 114:10, 116:14, 116:16,
    116:22, 116:23, 118:22,
    123:20, 124:3, 124:4, 127:7,
    129:8, 129:22, 130:13, 133:4,
    133:23, 140:8, 144:24, 145:5,
    145:8, 156:21, 161:5, 173:12,
    176:20, 179:25
**questioning** 113:4
**questions** 183:14
**quick** 183:7
**quickly** 183:10
**quite** 115:3
**quote** 136:24

**< R >**
**rather** 148:17
**RE** 101:6, 108:12, 109:6, 187:2
**re-ask** 123:20
**re-read** 151:10
**reaching** 130:19
**read** 116:2, 116:21, 118:8, 127:5,
    138:9, 144:22, 146:18,
    149:21, 152:25, 164:17,
    165:7, 168:25, 177:16,
    178:20, 178:21, 183:16,
    183:20, 183:22, 183:23,
    187:9, 187:26
**reading** 125:25, 138:8, 151:4,
    182:12
**ready** 111:6, 182:16
**real** 117:2, 117:7, 125:18, 126:12,
    135:1, 183:6
**really** 145:20
**REASON** 114:19, 159:3, 187:12
**reasoning** 148:5
**receive** 161:13
**Receivership** 108:11, 167:17
**recess** 157:20
**recess.** 143:4, 176:17, 183:12
**recognize** 112:4, 114:1, 114:12,
    117:25, 118:1, 139:20, 158:19,
    164:7, 166:3, 168:12, 170:24,
    172:19, 172:22, 175:18,
    175:22, 177:13
**recollection** 112:9, 113:5, 137:3,
    144:3, 168:17
**record** 127:6, 157:19, 163:9,
    168:5, 176:18, 186:10
**record.** 111:2, 149:25, 150:10,
    163:23, 177:6, 179:12, 180:8,
    183:3
**recorded** 166:1, 166:9, 166:12,
    166:20, 167:2
**Records** 146:11, 166:2, 166:21
**Redirect** 183:17
**refer** 134:25, 142:8
**reference** 112:22, 133:2, 156:16,
    156:22, 158:7, 170:3, 180:1,
    181:3, 182:12
**referenced** 113:25, 114:19,
    114:21, 127:9, 154:9, 165:11
**references** 122:4, 125:12, 136:4,
    141:19, 149:7, 149:9, 151:21,

154:7, 154:9, 156:19, 171:1,
    171:9, 179:20
**referencing** 144:7, 157:8, 168:3,
    171:25, 178:5, 180:17
**referred** 129:12
**referring** 113:4, 116:18, 122:14,
    123:1, 129:9, 130:12, 130:14,
    130:20, 133:9, 135:18,
    136:15, 146:5, 152:5, 152:7,
    154:8, 155:7, 155:23, 156:3,
    156:7, 157:3
**refers** 112:7, 113:2, 114:15,
    116:1, 122:18
**refinance** 135:21, 147:20, 147:23
**refundable** 160:3
**refunds** 161:11
**regarding** 112:15, 114:24, 115:7,
    121:9, 141:25, 150:8, 150:13,
    151:23
**Regions** 116:1, 116:7, 150:18,
    151:3, 151:13, 151:19, 154:1,
    154:3
**Regulation** 104:30, 105:13,
    114:25, 121:5
**regulatory** 151:21, 154:7, 154:9
**related** 117:10, 124:16, 150:20,
    150:24, 151:15, 159:20,
    162:10, 171:22, 178:1
**relates** 133:16, 156:22
**relationship** 178:10
**relative** 186:12, 186:14
**release** 182:16
**reliance** 137:20
**relied** 117:15, 117:16, 126:17,
    132:11
**Relief** 109:5, 175:15
**rely** 142:6, 170:4
**remainder** 183:9
**remedies** 169:2, 169:4
**remember** 163:8, 180:23
**remind** 110:15
**reminded** 111:5
**Repeat** 116:22, 118:18, 119:25,
    124:3, 124:4, 128:14, 129:21,
    148:19, 161:4, 169:13, 179:8
**repetitive** 170:12
**report** 186:8
**REPORTED** 101:47
**Reporter** 103:5, 111:9, 111:11,
    111:14, 111:19, 111:25,

**Concordance**

149:24, 183:21, 183:25, 184:3, 184:6, 185:8, 186:1, 186:7
**reporting** 127:11
**represent** 110:11
**represented** 123:12
**representing** 116:6
**represents** 159:11
**Request** 108:43
**requests** 115:17
**require** 126:12, 171:10
**required** 110:17, 116:5, 117:12, 117:13, 118:24, 124:1, 137:11, 143:19, 150:24, 151:15, 152:2, 152:11, 173:23, 173:24, 181:21, 181:22
**requirement** 126:4
**requirements** 119:17, 136:2, 141:7, 143:17
**requires** 124:22, 133:7, 134:11, 173:7
**reserve** 112:16, 115:8
**reserves** 150:25, 151:16
**resident** 169:8
**residents** 169:5, 169:11, 169:17, 169:22
**resolution** 168:19
**resolved** 140:9
**responded** 154:13, 156:24
**Respondent** 108:9, 167:15
**responding** 133:3, 156:25
**response** 129:3, 138:4, 138:18, 152:22, 156:10, 156:13
**Response-000097** 108:46
**Response-000144** 108:48
**Response-97** 173:3
**responsibility** 169:10
**rest** 151:20, 154:5
**restricted** 147:10
**restrictions** 124:23
**restroom** 143:1
**restructuring** 125:21
**result** 147:2
**return** 160:9
**returned** 160:4
**revenue** 159:20, 162:12
**review** 115:17, 144:13, 169:25, 175:24, 179:1, 180:16, 183:16
**reviewed** 176:6
**reviewing** 159:23, 176:4

**rights** 124:2, 127:10, 127:12, 127:21, 127:25, 130:25, 137:12, 141:10, 142:23, 169:2, 169:5, 169:16, 169:24, 170:1
**road** 135:17, 135:21
**role** 115:20, 133:17, 153:5
**Roofner** 105:38, 105:44, 132:20, 133:3, 133:8, 135:13
**room** 163:12
**Ross** 101:43, 102:43
**roughly** 143:13
**RPR-CP** 101:47, 185:8, 185:19, 186:6, 186:22
**runs** 177:23
**Ryan** 108:34

**< S >**
**S.** 102:12
**salt** 178:25
**satisfy** 172:12, 172:13, 182:25
**Saturday** 181:19
**save** 170:15
**saw** 176:3
**saying** 136:2, 140:15, 142:15, 169:16
**says** 116:2, 116:4, 118:10, 119:9, 119:15, 122:20, 125:20, 130:19, 131:2, 133:5, 135:25, 138:19, 149:10, 150:23, 153:1, 155:3, 156:10, 159:9, 164:24, 173:21, 180:1
**scenario** 133:25
**scheduled** 131:11
**scouring** 181:22
**SDT** 108:48, 173:3
**seal** 185:13
**second** 112:25, 113:1, 116:16, 118:10, 122:16, 129:8, 131:2, 138:5, 149:23, 150:7, 150:13, 150:23, 155:2, 161:1, 163:22, 181:17
**secondly** 170:3
**Section** 149:5, 155:24, 156:19, 168:25, 173:21, 177:18, 177:19
**sections** 173:20
**securities** 173:25
**seeing** 112:12, 113:19, 122:2,

129:5, 134:24, 135:4, 135:10, 145:13, 145:14, 157:2, 158:12, 162:23, 163:8, 163:18, 165:15
**seems** 137:1, 140:24, 143:21, 152:24, 169:15, 173:19, 181:8
**seen** 112:5, 114:13, 120:22, 125:8, 131:25, 132:2, 132:21, 139:21, 163:5, 163:8, 167:18, 175:21
**send** 182:13, 182:15
**sending** 127:14, 158:9, 182:14
**sense** 157:11
**sent** 116:15, 132:3, 137:8, 139:6, 139:7, 162:22
**sentence** 118:10, 125:20, 126:1, 126:9, 129:8, 135:24, 150:23, 155:3, 177:17, 182:13
**separate** 122:23, 122:24, 123:5, 124:1, 125:23, 144:4, 151:19, 153:7, 153:8, 154:4
**separately** 146:3
**separation** 122:19
**Services** 108:13, 167:12
**set** 154:4, 162:4, 169:1
**setting** 143:15, 153:2
**several** 136:3, 143:22, 144:11, 163:15
**shall** 169:2
**share** 163:21, 165:17
**Shari** 109:13, 182:9
**SHEET** 103:6, 187:1
**shorter** 135:2
**show** 113:14, 150:25, 151:16
**sign** 166:13
**SIGNATURE** 103:6, 158:25, 164:9, 170:10, 187:1
**signed** 173:21
**significantly** 147:17
**simultaneously** 182:15
**Sir** 149:22, 174:15
**size** 146:24
**sizings** 148:5
**skip** 120:14, 170:15, 179:7
**skipping** 169:3
**sleep** 127:8, 127:17, 128:18
**small** 180:2
**smaller** 148:17
**Smith** 109:13, 182:9
**somebody** 136:14

# Concordance

**Someone** 114:20, 127:25, 128:6, 137:14, 149:13
**Sorry** 111:19, 112:21, 114:3, 125:24, 140:21, 151:6, 158:11, 161:2, 169:13, 173:9, 174:12, 179:7
**sort** 130:19, 135:1, 135:8, 137:10, 163:13, 164:23
**Sounds** 111:8, 142:15
**source** 118:16, 119:1, 119:18, 124:23, 138:15, 138:25, 142:9, 163:10, 163:17, 173:22, 174:7
**sources** 138:20, 139:3, 182:25
**South** 102:5, 102:14
**speakerphone** 102:23, 102:26
**speaking** 111:23, 112:23, 152:8, 162:4
**speaks** 169:24
**special** 119:16
**specific** 115:4, 170:2
**Specifically** 118:5, 121:11, 122:3, 128:12, 128:16, 128:20, 133:15, 135:4, 142:2, 155:1, 155:9, 170:2, 177:14, 179:25
**speculating** 164:18
**spot** 157:16
**spouse** 174:3
**Stafford** 102:13, 102:27, 111:13
**standard** 135:2, 159:13
**start** 138:8
**STATE** 101:49, 104:31, 108:12, 111:4, 112:16, 119:16, 120:2, 121:6, 123:7, 123:8, 123:24, 127:10, 136:1, 136:10, 139:18, 150:25, 151:16, 156:2, 156:4, 156:23, 157:1, 167:11, 168:5, 185:3, 185:9, 185:21, 186:3
**stated** 139:6, 161:11, 187:27
**Statement** 107:33, 114:16, 134:10, 134:12, 139:14, 158:20, 159:1, 159:4, 159:8, 171:22, 183:1
**Statements** 173:22, 173:24, 174:1, 174:2, 174:7
**STATES** 101:1, 124:15
**static** 145:13
**stating** 150:13

**Statute** 116:5, 122:5, 125:23, 126:13, 126:17, 127:8, 128:21, 133:7, 133:9, 134:11, 138:17
**Statutory** 108:11, 167:16
**stays** 138:22
**stenographically** 186:8
**step** 120:14, 169:21
**steps** 166:19
**Stettinius** 107:38
**Strike** 122:6
**string** 138:6, 146:21, 149:20, 150:3, 155:16, 158:5, 170:16, 170:17
**structure** 148:14, 178:13
**Sub_landry_00000128** 177:1
**subject** 113:2, 113:17, 117:3, 117:16, 122:13, 123:24, 136:9, 138:17, 141:18, 156:18
**subsequently** 116:2
**subsidiary** 101:27, 178:8
**successor** 101:29
**suddenly** 135:25
**Suite** 102:15, 102:29
**Summary** 108:10, 167:16
**supply** 118:20
**supplying** 118:15
**sworn** 110:5, 185:11

**< T >**
**T.** 102:3
**Taft** 107:38, 162:22, 176:20
**take-out** 135:17, 135:19
**talked** 143:17, 179:9
**Tampa** 101:3, 101:8, 101:11, 101:19, 101:45, 102:6, 102:16, 102:45, 108:14, 108:27, 125:12, 125:17, 167:13, 171:24, 172:24, 187:2, 187:3
**targets** 162:8
**Team** 105:32
**tenant** 181:5
**Term** 105:31, 133:14, 134:22, 135:2, 140:23, 145:20
**termed** 135:8
**terms** 140:1, 140:4, 148:24, 149:2, 156:21
**testified** 110:7

**testify** 110:5
**testimony** 186:10
**therein** 119:17
**thereof** 169:8
**third** 125:11
**third-party** 161:10
**though** 129:8, 131:3
**three** 167:21, 176:24, 177:4
**throughout** 156:1
**title** 130:2, 130:3, 139:7, 164:24, 182:15, 182:23, 183:1
**titled** 165:25, 167:23, 174:1
**Today** 110:13, 110:17
**took** 142:24
**top** 138:18, 139:14, 145:25, 153:24, 158:6, 164:22, 175:8, 181:17
**total** 162:11
**towards** 136:2, 138:9
**tracking** 168:2
**transaction** 160:6, 172:12
**transactions** 159:14
**transcript** 111:20, 183:16, 186:9
**Transfer** 117:4
**transferred** 116:6, 117:9, 126:3
**Trey** 104:6, 104:19, 104:43, 105:19, 105:24, 106:41, 107:6, 107:10, 107:15, 107:25, 107:29, 107:43, 109:12, 109:19, 109:30, 109:37, 114:16, 114:18
**true** 113:21, 172:22, 186:10, 187:28
**Trustee** 101:18, 110:11
**truth** 110:5, 110:6, 110:17
**try** 163:16
**trying** 147:7, 165:10, 170:12, 179:7
**two** 112:18, 116:15, 122:19, 132:19, 145:13, 170:14, 170:23
**Ty** 105:38, 105:44, 132:20
**type** 134:12, 161:14
**typical** 181:20
**typically** 128:5, 148:16, 160:3, 160:17, 171:10

**< U >**
**uncommon** 181:25

**Concordance**

**understand** 110:16, 112:21, 118:9, 130:12, 141:4, 142:13, 147:7
**understanding** 118:14, 118:18, 118:19, 118:23, 119:1, 122:5, 122:21, 123:7, 125:14, 134:21, 147:19, 153:1, 157:1, 177:25, 178:9
**underwriter** 133:6, 133:13, 133:14, 134:4, 134:6, 134:10
**Underwriting** 133:17, 133:19, 133:20, 133:23, 134:3
**unfamiliar** 128:20
**unilaterally** 166:8, 166:12, 166:21
**UNITED** 101:1
**University** 109:7, 117:4, 117:5, 167:13, 167:14, 175:17, 176:1, 179:24
**unless** 111:23, 157:13, 161:11
**unsigned** 116:13
**Usameribank** 101:30, 107:39, 108:25, 116:8, 138:22, 139:24, 159:9, 162:23, 172:10, 173:8, 173:15, 175:23, 178:2
**Usameribank/allant** 108:42
**uses** 182:25
**using** 129:10, 139:18, 140:23
**UV** 109:6, 175:16, 176:8


**< V >**
**v.** 101:24
**v4** 168:3
**Valley** 101:26, 101:27, 108:45, 108:47, 134:4, 153:9, 173:2, 175:6, 187:5
**varies** 160:6
**various** 119:3, 119:6, 148:5
**verifiable** 173:22
**Verification** 173:5, 173:24, 174:9, 175:2
**Verified** 127:11, 173:16, 174:20
**verify** 120:5, 127:21, 128:9, 142:4, 173:23, 174:6
**VERNON** 101:36, 103:2, 110:4, 185:10, 186:9, 187:8, 187:31
**version** 126:21
**versus** 144:17, 167:11
**via** 102:23, 102:26, 177:23

**Village** 109:8, 117:4, 117:5, 167:13, 167:14, 175:17, 176:1, 176:9, 179:24
**virtue** 158:12
**VNB** 163:1
**VNB_001751** 177:2
**VNB_070804** 107:44
**VNB_070833** 105:20
**VNB_070836** 104:7
**VNB_070837** 104:8
**VNB_070838** 104:13
**VNB_070839** 104:14
**VNB_070870** 106:31
**VNB_070871** 106:32
**VNB_070872** 106:37
**VNB_070874** 106:38
**VNB_070875** 105:39
**VNB_070899** 106:25
**VNB_070900** 106:26
**VNB_070929** 109:31
**VNB_070932** 109:32
**VNB_070955** 106:13
**VNB_070958** 106:14
**VNB_070972** 107:31
**VNB_070974** 107:31
**VNB_070985** 104:37
**VNB_070988** 104:38
**VNB_070989** 105:7
**VNB_070991** 105:8
**VNB_070992** 105:14
**VNB_070994** 105:15
**VNB_071001** 107:26
**VNB_071004** 107:27
**VNB_071123** 105:33
**VNB_071128** 106:8
**VNB_071141** 105:45
**VNB_071156** 109:38
**VNB_071159** 106:19
**VNB_071162** 106:20
**VNB_071167** 104:25
**VNB_071169** 104:26
**VNB_071170** 104:32
**VNB_071711** 107:12
**VNB_071712** 107:12
**VNB_071725** 105:25
**VNB_071726** 105:26
**VNB_071904** 107:35, 158:22
**VNB_071911** 107:35
**VNB_072059** 109:20
**VNB_072179** 107:22

**VNB_072182** 107:22
**VNB_072196** 104:20
**VNB_072197** 104:20
**VNB_072198** 104:44
**VNB_072201** 104:45
**VNB_072210** 107:7
**VNB_072212** 107:8
**VNB_072213** 107:16
**VNB_072215** 107:17
**VNB_072231** 109:14
**VNB_072334** 106:43
**VNB_072335** 106:44
**VNB_072420** 109:25
**VNB_072421** 109:26
**VNB_078594** 108:21
**VNB_078596** 108:22
**VNB_078597** 108:28
**VNB_078598** 108:29
**VOLUME** 101:17, 110:3, 187:6
**vs** 108:13, 109:7, 187:5


**< W >**
**W.** 101:17, 102:42, 104:12, 104:18, 104:24, 104:35, 104:42, 105:6, 105:12, 187:5
**wait** 110:24
**wanted** 119:22, 120:5, 128:3, 128:22, 144:3, 147:23, 154:3
**wants** 153:4
**Warren** 101:17, 102:42, 110:11, 157:9, 157:13, 157:18, 163:9, 176:18, 187:5
**weekend** 181:23
**West** 102:5
**Westport** 101:8, 101:11, 101:18, 101:20, 108:13, 108:26, 112:24, 116:9, 116:25, 117:1, 117:5, 117:6, 122:13, 125:12, 125:15, 125:17, 129:18, 130:1, 134:5, 134:23, 152:6, 156:18, 165:1, 167:13, 171:23, 171:24, 172:24, 176:9, 178:7, 187:2
**Westport_mlr_oir_notice_letter** 113:3
**what-have-you** 152:12
**whatever** 152:7, 160:19, 172:13
**whereby** 153:25
**whether** 115:20, 116:24, 117:25,

**Concordance**

120:22, 125:8, 126:20,
129:10, 131:25, 132:21,
135:1, 135:7, 137:17, 138:16,
138:25, 142:16, 142:17,
142:19, 143:24, 145:16,
146:8, 154:13, 155:25,
158:25, 164:7, 165:11, 171:5,
171:6, 172:1, 172:2, 176:8
**whoever** 168:2
**whole** 110:6, 144:22, 180:19
**wholly-owned** 178:8
**Whom** 104:12
**Wilhelm** 104:6, 104:12, 104:18,
104:24, 104:35, 104:42,
105:6, 105:12, 106:7, 106:12,
106:18, 106:24, 106:29,
106:35, 107:6, 107:14,
107:24, 108:18, 109:24, 119:8,
120:21, 122:17
**WILKES** 101:47, 185:8, 185:19,
186:6, 186:22
**will** 111:16, 111:23, 122:24,
124:15, 125:22, 138:16,
151:2, 151:18, 151:20, 154:2,
154:7, 169:6, 169:7, 169:16,
169:18, 173:7, 177:22,
182:15, 183:9, 183:20
**Williams** 154:25
**window** 156:20
**wire** 182:18, 182:22
**within** 132:4
**Without** 112:12, 113:19, 134:24,
135:4, 135:10, 145:12,
145:13, 146:10, 156:16,
157:2, 159:23, 164:18,
165:15, 166:9, 170:2
**WITNESS** 114:10, 143:3, 144:22,
161:1, 161:4, 163:7, 173:12,
183:11, 185:13, 186:10
**word** 134:1
**work** 159:20
**working** 156:21, 168:18
**world** 148:4
**worried** 139:18
**worries** 111:21
**write** 124:19
**writing** 115:20
**written** 119:11, 162:22
**wrote** 155:21
**www.flmb.uscourts.gov** 101:4

**< Y >**
**year** 162:5
**yourself** 111:10, 114:20