COMPOSITE EXHIBIT F

building, you have the tower and you have the villas; correct?

A.    Correct.

Q.    And there's -- sort of to enter the CCRC of, the residents purchased a live care contract; correct?

A.    Correct.

Q.    Okay.  And the life care contract sort of guarantees them a spot as an ALF; right.

A.    Anywhere, within any level of care.

Q.    Correct.  So as -- so in terms of what we call or what it's called in CCRC parlance, the continuum of care; are you familiar with that phrase?

A.    Yes.

Q.    What does that phrase mean to you?  Again, not a memory test?

A.    That means we take care of them for life, no matter what kind of care, what level of care they need; even if they run out of assets they will stay within the community.

Q.    That's exactly what you said in your deposition, by the way, so that's entirely consistent.

So when so let's describe how you would normally describe the continuum of care, if you will.  I understand broadly a resident, if they needed more or a higher level of care, they could then move to the ALF;

Page 25

right?

A.   Correct.

Q.   And if they needed treatment or any extended care, they would move to the skilled nursing facility; is that accurate?

A.   Yes.

Q.   And that was part of the life care contract agreement; is that fair to say?

A.   Yes.

Q.   So that was the situation prior to 2014.  Was there any change in that situation after 2014 or did it still function the same way?

A.   It changed somewhat that before 2014 the money was one big pool of money.  After 2014, it changed, separate money had to change hands.  So if a resident went from IL to AL, ran out of money, the independent living side had to pay Westport Nursing funds for that whereas that didn't happen before.

And if we needed if Westport Nursing funds were doing well prior to 2014, you could use those funds to help pay any bills within any of the whole campus.  That changed after 2014 and March when the new ownership came in.

Q.   All right.  So, okay.  So then we talked about the initial entry deposits; right?  And then you've got

sort of functionally how this operates.  We talk about in your deposition the refund obligations, right?  So if a resident deceases or moves, they're entitled, depending what the contract says, to a certain percentage of the refund back; correct?

A.   Corrected.

Q.   If you look at page 40 of your deposition, page 39 at the bottom, you talk a little bit about that. It starts on the prior page where there were -- I also look at page 38, there was an entrance fee, certain percent refundable.  Look at line 16.

A.   I'm sorry, what page?

Q.   Page 38 of your deposition transcript, page 37 at the bottom.

A.   Okay.

Q.   When you say on line 17:  "Part of that entrance fee is refundable to them based on whatever plan they have chosen."  Okay.  "Some were 90 percent refundable contracts, some were 40, some were 50." Right?

A.   Correct.

Q.   And then the next page on line 7, it talks about, you're asked about how do you come up with the money?

And you say:  "Well, yeah, we get to use

that..." meaning the initial entry deposit, "... for operations.  I don't have to reserve any of that money. And then once the refunds are going out typically you pay them by money coming in."  Right?

A.    That's correct.

Q.    So it's fair to say that in order to fund the refund obligation, the person going out, if you will, to use the words in the deposition, you have to have money coming in in the form of a new resident coming in with an entry deposit; right?

A.    Right.

Q.    Okay.  So you're just -- like you say, "I don't have to reserve any of that money," you say that in your deposition.  So it's not like you sort of bank, if you will, or reserve?

A.    That's correct.

Q.    It really depends on that, you know, in order to pay that money going out, you have to have money coming in; is it fair to say?

A.    Yes.

Q.    It really depends on that, in order to pay that money going out you have to have some money coming in, is that fair to say?

A.    Yes.

Q.    So, even after the sale, March 31, 2014, that

was still the situation in terms of the refund obligations, correct? That part didn't change?

A. It didn't change, right.

Q. And so going back to -- let me see if I can find the financial performance of University Village in 2014. Do you recall how -- what the year was like for 2014?

A. I don't know specifics. So are you asking -- Can you rephrase your question for me?

Q. Well, I want to make sure. Look at page 45, line 14, page 44 at the bottom, and it's line 14. You were asked:

"Okay. What has been over the past year since April 1st of 2014..."

Sort of the day after the sale; right?

A. "What has been the general trend? There's been a change of University Village's cash position?"

And your answer there is: "We did well in 2014."

Do you recall that?

A. Well, not exactly, but okay. I thought we were still, like, we were paying our bills, but I always remember money being tight. So maybe we had a good year so I just don't recall that.

Q. Then as you said you don't recall, would your

testimony in your deposition be true and accurate --

A.   Yes.

Q.   -- and probably more reflective of what you recalled at the time?

A.   Yes.

Q.   Okay.  But you do recall that?  So, I mean, line 21, you say, "So we had a good year."  Do you see that there?

A.   Yeah.

Q.   So is it fair to say that as of March 31, 2014 that University Village is able to pay its debts as they became due?

A.   Yes.

Q.   And later on in your deposition you talk about the effect of the OIR coming.  Do you recall that timeframe sort of in the middle, beginning of 2015?

A.   Yes.

Q.   All right.  And when you say once the -- you were talking about the PIP program, but if you look at page 47 -- I'm sorry, page 46, page 45 at the bottom, do you see that there?  It begins, "There was a big flood in January and February."

A.   I'm on -- we're on page 46?

Q.   Page 45 at the bottom but page 46 of your transcript.

Q.   And I'll show you, do you recall what happened in sort of that January/February timeframe of 2015?

A.   Do I recall what happened?

MR. WHITSON:  Well, let me strike that.

I'll go ahead and show you what we'll mark this as Exhibit 3.

(Defendant's Exhibit Number 3 was marked for identification.)

Q.   Ms. Burkholder, I'm showing you what's been marked as Exhibit 3 to your deposition.  It's a document entitled Initial Order of Suspension, filed February 13, 2015; do you see that there?

A.   I do.

Q.   Do you recall, have you ever seen this document before?

A.   I've seen it, yes.

Q.   And do you recall what the effect of this initial order of suspension was if you knew at the time?

A.   (No response)

Q.   Did it prevent your ability to sell life care contracts?

A.   Yes, for a time period.  Yes.

Q.   I'll show you a newspaper article that came out around the same time, Exhibit 4.

(Defendant's Exhibit Number 4 was marked for

identification.)

This is an article from Tampa Bay Times, dated February 13, 2015.  Do you see that there?

A.   I see it, yes.

Q.   Have you ever seen this article before?  Have you heard about this article?

A.   No, I don't recall.

Q.   Okay.  It says there, the first paragraph, "State fraud investigators have issued an order barring University Village Retirement Community from signing up new tenants and made a wide-ranging inquiry into alleged financial irregularities."

A.   Yes.

Q.   Is that statement correct, as you recall it?

A.   Yes.

Q.   "The Office of Insurance Regulation issued an initial order of suspension Friday after investigator received a tip January 21 that the community reserve account had been under-funded by $370,000, $370,324; right?

A.   Yes.

Q.   Okay.  And then there's a quote two paragraphs down from Florida Insurance Commissioner Kevin McCarty where he says:  "The order I signed today ..."

I think the order would be Exhibit 3 that I

showed you.

"... begins a process of stopping new enrollment.  The ultimate goal is finding a management team as qualified under Florida law and make sure the current and future residents of University Village are well cared for."

Do you see that there?

A.   Yes.

Q.   And then at the bottom, it says, the paragraph that begins -- I guess one paragraph, two paragraphs up from the bottom:  "Although barred..." do you see that there?

A.   Yes.

Q.   "... from signing new tenants, the 160-employee company continues to operate and remains open for business Friday afternoon."

Is that statement correct?

A.   So I don't recall if we were taking on contracts at that point; but, we were open, people lived there, so yes.

Q.   Right.  Are any of the statements I just read in this article, are they accurate?

A.   I believe it they're accurate.

Q.   Now, did the OIR actually come on site at University Village?

the late '90s, maybe '96, '97.  I don't recall the exact time.

Q.    But University Village started in 1986 or --

A.    For the management company, Southern Management.  And I worked there for ten years before I went out to University Village.

Q.    I gotcha.  I understand now.  Thank you for clarifying that.

And then you sort of on line 20 that same page, you talk about how the calculation is performed.  Do you see that there?

A.    Yeah.  Three years of history?

Q.    Yeah.

A.    Okay.

Q.    Okay.  Now, after the March 31, 2014 transaction, the, quote, unquote, "sale," as we refer to it, what was your understanding of before that sale, the amount of the MLR, and then any changes to that that occurred in connection with that transaction, if you recall?

A.    What I recall is they, Bartle and a couple of other parties, took the MLR and wanted it to be a dual role with USAmeriBank as to cover their debt service reserve.  I cautioned them that I didn't think the OIR would accept that, and they told me that they'd already

run it by the OIR and that it was approved.

Q.    Did they tell you who at the OIR approved it?

A.    They did not.

Q.    Okay.  Was Mr. Landry involved in these conversations with you at all about the OIR?

A.    I don't recall if he was in the meeting.

Q.    Okay.

A.    I'm not sure.

Q.    All right.  Was Mr. -- but prior to March 31, 2014, Mr. Landry was the general partner still in control of Westport Holdings and University Village; right?

A.    Prior to March of 2014, yes.

Q.    And after March of 31 of 2014, Mr. Landry was still a general partner, was he not?

A.    I don't recall exactly but I believe he was for a while.

Q.    Right.  So he was essentially still in charge; right?

A.    Yes.

Q.    Okay.  So was Mr. Landry aware of the pledging of -- I'll just call it the pledging of the $3 million of the MIR?

A.    I don't recall if he was aware or not.  I don't want to state one way or the other.

Q.   Okay.  That's fine.  Let me just know what you know.  I'm not asking you to guess or speculate.

A.   Right.

Q.   Now, you say -- lower down, as you cross into page 49 of the transcript, still on page 47 of the document, you're asked:

"Okay.  What is the -- what is your calculation what the minimum liquid reserve should be for the continuing care retirement community known as University Village at this point in time?"

And you say:  "How I had done the calculation, I included Westport Nursing as part of the calculation, part of the continuing care.  That was discussed."

So this is after the $3 million has been transferred over, right, to Westport Nursing; correct?

A.   Correct.

Q.   Okay.  "Everyone agreed that we should include Westport Nursing with Westport Holdings."  Right?

A.   Yes.

Q.   Okay.  "Even the OIR, because I had contacted them about making sure how to report this."

So you say there in your testimony that the OIR, you had contacted OIR and they had personally told you to include the Westport Nursing $3 million as part of the MLR calculation; correct?

A. Correct.

Q. And you say: "Should I combine the two entities?"

The answer was, "Yes." Right?

A. I'm looking at this, and that's bringing back that I recall that, yes.

Q. All right. Do you recall who at the OIR you spoke to about this?

A. No.

Q. And when I say this, I mean combining Westport Nursing with the Westport Holdings.

A. I just call a phone call in, so I have no idea who I spoke to.

Q. That's fine. That's fine. I want to be clear, my question was a little vague so I wanted to make sure I was very specific, so --

Now, if you'll look at page 49 at the bottom, page 50 of your transcript, this kind of goes back to the question I asked you earlier.

And, again, this is not a memory test. This is not a gotcha. Maybe this might refresh your recollection. Because some of the testimony in the transcript jumps around and I know I'm jumping around with it, so I know it's difficult to follow and I apologize for that. I'm just trying to make sure that I

Page 40

cover these things.

A.   Okay.

Q.   It says on line 17 there:

"You mentioned that the nursing facility was holding $3 million of the MLR money?"

A.   Yes.

Q.   You say, "Um-hum."  That um-hum would be a yes, right?

A.   That is correct.

Q.   And it says:  "How can you explain why they were or how that came to be?"

And you say very clearly, your answer there is:  "After the refinancing took place in April of 2014, I was told by Larry Landry and John Bartle."

Does that refresh your recollection?

A.   If it's here, that was correct.

Q.   That 3 million of the money in the Regions Bank MLR needed to be transferred to USAmeriBank, and that they would be holding part of the money and that was a requirement of getting a loan with USAmeriBank? Do you see that there?

A.   Yes.

Q.   Is that still your answer today as you recall it?

A.   Yes.

Q.   Did you have any contact with Regions Bank about transferring the $3 million out of that account, the MLR account?

A.   I'm sure I would have.

Q.   Okay.  And do you recall who at Regions Bank you spoke with about that?  Who was your contact person at Regions?

A.   It's so long ago, I would only -- Rebecca's coming into mind but that's all I got.

Q.   Okay.  That's fine.

(Brief recess taken)

MR. WHITSON:  During the break there was a discussion between Mr. Warren and the witness about the length of time that her deposition would continue.  And just let the record reflect that Mr. Appleby brought in a dolly full of boxes, banker boxes full of documents.

For the record, Valley Bank is objecting to any questions outside the scope of what Valley is asking.  Because even though it was cross-noticed, Mr. Warren, before his retention of Mr. Appleby, opposed the taking of deposition of Ms. Burkholder and was only allowed after the judge ordered it and found he had previously agreed to it.  So we object to any lengthy deposition of Ms. Burkholder beyond,

Page 46

of this exhibit, there's Save/Submit?

A.   That's great.

Q.   Again, I'm not familiar with this.  Certainly you would be much more familiar than I am.  But if you'll look at that, this session was filed on May 1, 2014?

A.   Oh, I take back what I had said now that I look at this.  It was due by May 1st of the year for the annual report.

Q.   Of the following year?

A.   Correct.

Q.   So do you recall when you might have prepared this, roughly?  If you don't recall, I understand.

A.   I would have done it before May 1st.  That's all I would recall.

Q.   All right.  And as I look through this report, if you'll turn to page 6 of 23.

A.   Okay.

Q.   You check the box:  Are all debt payments current for this period?  You checked yes.  Do you see that there?

A.   Yes.  I see it.

Q.   If you look at page 14 of 23, there's a list of non-current assets?

A.   Okay.

Page 47

Q. And it shows the required minimum liquid reserve, and there's a Schedule B of $4,445,769. Do you see that there?

A. Yes.

Q. So these statements, all the statements here are true and accurate; correct?

A. To my knowledge, yes.

Q. All right. I show you what we'll mark as Exhibit 6.

(Defendant's Exhibit Number 6 was marked for identification.)

Q. This is a loan closing statement for the loan from USAmeriBank to Westport Nursing Tampa, L.L.C.; do you see that there?

A. Yes.

Q. It's a similar type of document, not the information, but I showed you with respect to the CPIF loan earlier.

A. Okay.

Q. This shows a total loan amount of $15 million. Do you see that there?

A. Yes.

Q. And again just to refresh your recollection, what was the amount of the Horizon note that was owed by --

BY MR. WHITSON:

Q.   Ms. Burkholder, have you seen a document, that document or similar document to Exhibit 7 to your deposition, the Regions Bank account statement?

A.   I'm sorry.  What was your question?

Q.   Have you seen that document before or one like it?

A.   Yes.

Q.   Could you describe what that is?

A.   This is the minimum liquid reserve account with Regions Bank.

Q.   Right.  And do you recall anyone other than perhaps Rebecca that you dealt with at Regions Bank in terms of getting these statements or --

A.   I don't recall.

Q.   Okay.  And you provided these statements to the OIR or were they part of what the information that you --

A.   I don't recall if I sent those along or not.

Q.   Okay.

A.   I don't know if it was a requirement.  So if it was, I would have sent it, but I just don't recall.

Q.   All right.  And this is going to be 8.

(Defendant's Exhibit Number 8 was marked for identification.)