# COMPOSITE EXHIBIT G

as --  651.125, Criminal penalties; injunctive relief. Do you see that there?  Are you familiar with this section?

A.   I am.

Q.   All right.  So if I'm -- the operative language of 651.125 (1) -- "A person who maintains, enters into, or as manager or officer or in any other administrative capacity, assists in entering into, maintaining, or performing any continuing care or continuing care at-home contract subject to this chapter without doing so in pursuance of a valid certificate of authority or renewal thereof, as contemplated by or provided in this chapter, or who otherwise violates any provision of this chapter or rule adopted in pursuance of this chapter, commits a felony of the third degree, punishable as provided in section 775.082..."

Have you ever had occasion to be involved with a case where there was any allegation or referral to the State Attorney for violation of Chapter 651?

A.   I have not.

Q.   All right.  So from the -- if the MLR for Westport had been pledged as collateral, I think you said what the department would have done is issue some sort of notice or respond to it if they had seen that. But would they have considered that to be a crime or a

third degree felony or a violation of the statute to this extent?

A.   I know of no case where we treated a shortfall of the minimum liquid reserve like that.

(Defendant's Exhibit No. 23 was marked for identification.)

BY MR. WHITSON:

Q.   Mr. Struk, I'm showing what we've marked as Exhibit 23.   It's Section 651.13.   "Civil action -- Any resident injured by a violation of this chapter may bring an action for the recovery of damages plus reasonable attorney's fees."

In the opinion of the department, what type of injuries or violations would fall under this?   Or have you ever had occasion to see this statute employed?

A.   I don't believe I've ever seen it employed.

Q.   Okay.   Now, the residents are entitled to have a statutory residents council and things of that nature; correct?

A.   Correct.

Q.   The residents are very involved in sort of over seeing resident life and statutory compliance.   I mean, we've seen today communications from Mr. Hood who is sort of an active resident member of the council; is that fair to say?

it fair to say that she reported -- that that report, the MLR report that we looked at earlier -- annual report -- was prepared consistent with the testimony she gave here with Mr. Newhall?

A.   I don't know what the expenses were all included.  It appeared that the debt portion was done consistently with that.

Q.   Okay.  So if she didn't contact you, who could she have been in contact with regarding the calculation of the MLR in that time period that we're talking about here?

A.   The reason why I'm saying it was not me is you had earlier brought up that it was done as -- University and University Tampa were two separate entities.  And that predated this transaction.  It may have predated it for -- I don't know -- eight, ten years.  She may have gotten that advice long before 2014.

Q.   But she's saying here -- this sort of in the context of this testimony -- post closing.  Prior to March 31, 2014, Westport Nursing wasn't separate.

A.   If she had asked about it at that time, it is likely that I would have been involved in giving the answer, even if wasn't the one that gave the answer. Say they reached out to their analyst --

Q.   Mr. Wilson perhaps?

A.   Perhaps.  And then my opinion would have been asked.  But my guess is that was consistent with how they were doing it before.  But, again, that's more of a supposition that they probably always did it that way.

Q.   Okay.  Now, going back to the issue that you identified when we were going over the MLR calculation about the encumbrance issue.  Describe for me the procedure -- say the analyst having seen the loan documents -- you know, because they were disclosed to the OIR -- and looking at the MLR calculation concluded that, you know, there is an assignment in the deposit account agreement.  So it's collateral.

What would have been the process if that issue had been identified when the MLR calculation was reviewed?

A.   Certainly we've -- I do not remember this specific incidence or really any specific incidents.  But it has happened where providers had the wrong funds in the wrong account for encumbrance purposes.  It was always our -- hey, we got a letter going out to the provider saying -- you know, we would send them conformation of the calculation saying you need this much unencumbered account.  You know, we can allow up to this much in an encumbered account.  If you have more than that, it won't count to meet your requirement.  But

any funds in your encumbered account up to this x amount of dollars will count.  If you don't have that, you know, our notification would say generally it has to be funded by I July 1st.

Rarely did we get a facility that didn't comply with that.  They would put the funds in and say, "Yeah. We're aware of it."

If we didn't get compliance then -- like, just say July 2nd rolled around and they hadn't done it -- we would probably be starting some sort of notice for a suspension type situation that you're not in compliance with statute.

Q.   Okay.  So are you aware that any such notice was ever sent to Westport Holdings, Ms. Burkholder, or --

A.   I am not aware of such a instance.  Although you had the order of suspension that you showed me.

Q.   That wasn't about the MLR.

A.   Yeah.

Q.   Okay.  So, anyway -- so, all right.  So then this has happened before though.  There have been instances where encumbered funds were being used to satisfy the MLR requirement or wrong funds in the wrong department.

A.   No.  The calculation is due May 1st.  But the

funding is not till July 1st.  So while we get a new calculation that changes the amount of the requirement -- you know, and let's just say it's June 1st, in between.  So they might not have the balances right.  But they're not due to be correct until July 1st.

Q.   Okay.

A.   So, like, you showed me the report, and it showed balances before the due date as far as funding it up.

Q.   Right.  And I think you noticed in a matter of seconds that the MLR was underfunded just by looking at that.

A.   Yes.  Obviously, one of the first things that our examiner would look at.  Again, it was on the checklist of things -- here's the new requirement; do the have enough money in the account?

Q.   Right.

A.   Because that's one of our prime duties as an analyst -- is to make sure they have the required amount of reserve funds.  But, again, they're not required as of the filing; they're required at the later date.

Q.   Okay.  So then the process would be that, you know, if someone such as yourself or someone in your role had looked at that report as you did -- and you

noticed it was immediately underfunded -- regardless of the other issues you identified there would have been that letter that you mentioned sent out to have compliance by July; is that fair to say?

A.   Yes.

Q.   Okay.  And then that letter would have identified any other corrective measures that needed to be taken.

A.   Yeah.  There would always be what we call a clarification letter sent with the annual report asking any questions.  And part of that report -- or part of that clarification letter would also say you need to fund out your minimum liquid reserve by July 1st.

Q.   And you're not aware that any such letter was ever sent in response to the MLR calculation that I showed you earlier.

A.   No.  I wouldn't know of one that would -- I wasn't there to know of one, and I do not know of one.

MR. WHITSON:  Okay.  All right.  Give me one minute.  Sorry.

(Brief recess.)

MR. WHITSON:  All right.  I'll tend the witness.  No further questions at this time.  I reserve the right to redirect.  Go ahead.

MR. APPLEBY:  Okay.  Since we've gone through a