IN UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

IN RE:

WESTPORT HOLDINGS TAMPA,          Case No.: 8:16-bk-08167-CED
LIMITED PARTNERSHIP,              Chapter 11

WESTPORT HOLDINGS TAMPA II,       Case No.: 8:16-bk-08168-CED
LIMITED PARTNERSHIP,

                                  Jointly Administered Under
          Debtors.               Case No.: 8:16-bk-08167-CED
                                       /

JEFFREY W. WARREN, LIQUIDATING           VOLUME I
TRUSTEE FOR WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP and
WESTPORT HOLDINGS II, LIMITED
PARTNERSHIP,

          Plaintiff,             Adv. Pro. No.:
v.                               8:20-ap-00007-CPM

VALLEY NATIONAL BANK, principal
subsidiary to VALLEY NATIONAL
BANKCORP, a New Jersey domestic
profit corporation, as successor
by merger to USAMERIBANK,

          Defendant.                          /


DEPOSITION OF:      VERNON F. KORHN, III

DATE:               March 31, 2023

TIME:               11:18 a.m. to 12:23 p.m.
                     1:05 p.m. to  3:27 p.m.

PLACE:              Bush Ross
                    1801 North Highland Avenue
                    Tampa, Florida 33602

REPORTED BY:        Jean M. Wilkes, RPR-CP
                    Notary Public
                    State of Florida at Large



APPEARANCES:

KEITH T. APPLEBY, ESQUIRE
Appleby Law, P.A.
4916 West Melrose Avenue South
Tampa, Florida 33629-5420
(813) 435-0396 PHONE
keithtappleby@icloud.com
        Attorney for Plaintiffs

EDMUND S. WHITSON, III, ESQUIRE
McGlinchey Stafford, PLLC
100 South Ashley Drive
Suite 600
Tampa, Florida 33602
(813) 310-0733 PHONE
(904) 212-1465 FAX
ewhitson@mcglinchey.com
        Attorney for Defendant

ADINA L. POLLAN, ESQUIRE
(via speakerphone)
McGlinchey Stafford, PLLC
10407 Centurion Parkway North
Suite 200
Jacksonville, Florida 32256
(904) 224-4486 PHONE
(904) 212-1465 FAX
apollan@mcglinchey.com
nreid@mcglinchey.com
        Attorney for Defendant


ALSO PRESENT:

JEFFREY W. WARREN, ESQUIRE
Bush Ross
1801 North Highland Avenue
Tampa, Florida 33602
(813) 224-9255 PHONE
(813) 204-6423 DIRECT
(813) 223-9620 FAX
jwarren@bushross.com



I N D E X

VERNON F. KORHN, III                                        PAGE

Direct Examination by Mr. Appleby                             5

CERTIFICATE OF OATH                                         98

CERTIFICATE OF REPORTER                                     99

SIGNATURE PAGE/ERRATA SHEET                                100



PLAINTIFF'S EXHIBITS

DESCRIPTION

EXHIBIT                                                    PAGE

Number 23    Assignment and Pledge of Deposit
             Account (Cash Collateral Account)
             Bates Numbers Sub_Landry_00018879
             through Sub_Landry_00018883              76


Number 24    Loan Agreement dated March 31, 2014,
             between Westport Nursing Tampa, LLC,
             and USAmeriBank, Bates Numbers
             Sub_Landry_00018789 through
             Sub_Landry_00018840                      81


Number 25    Letter dated February 5, 2014, from
             Trey Korhn to Robert Rynard, Bates
             Numbers VNB_071082 through
             VNB_071089                               93



P R O C E E D I N G S

THE COURT REPORTER:  Would you raise your right hand?

Do you solemnly swear the testimony you're about to give in this cause will be the truth, the whole truth, and nothing but the truth?

MR. KORHN:  I do.

THE COURT REPORTER:  Thank you.

VERNON F. KORHN, III,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. APPLEBY:

Q.   Good morning.  My name is Keith Appleby. I'm with Appleby Law.  I'm representing the Liquidating Trustee in this matter, Jeff Warren. I believe you're somewhat familiar with everything, of course, but --

If you would, would you please state your full name for the record?

A.   Yes.  Vernon F. Korhn, III.

Q.   And could you spell your last name, just so I make sure I've got it right?

A.   Sure.  K-o-r-h-n.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   Okay.  Thank you.

A.   "H" floats.  It's in --

Q.   Well, that's -- yeah.  Unfortunately, I think I've put it back and forward a few times, so I wanted to make sure I had it right going forward.

Is it pronounced Korhn?

A.   Korhn, yes.

Q.   Okay.  Mr. Korhn, what's your current occupation and employer?

A.   I am the Commercial Real Estate Division Head for Valley National Bank.

Q.   And how long have you been with Valley National Bank?

A.   I have been with Valley and its predecessor since 2008.

Q.   Has your role been the same role since you started with them?

A.   I have been in the Commercial Real Estate Division originally as a loan officer and eventually moving on to the management side.

Q.   Okay.  Would you tell me what your primary responsibilities are as a commercial real estate -- I'm sorry.  Once again, what was --

A.   Sure.  Division Head.

Q.   Okay.



A.   Sure.  So, primarily, I manage a team of lenders that source and produce commercial real estate investment, commercial real estate loan transactions.

Q.   What is your educational background?

A.   So I have a degree from Florida State University, undergraduate degree, as well as a couple of masters degrees from University of South Florida.

Q.   Okay.  What are those in?

A.   I have an MS in Information Systems and an MBA.

Q.   Okay.  And what was your major at FSU?

A.   Finance and Marketing.

Q.   Okay.  What year did you graduate undergrad?

A.   '99.

Q.   Okay.  Have you worked at other financial institutions prior to --

A.   One, yes.  Colonial Bank, 2004 through 2007.

Q.   What was your role at Colonial Bank?

A.   I was also a commercial real estate lender at Colonial Bank.

Q.   Okay.  Did you -- so that's the only other financial institution you've worked at since graduating undergrad?

A.   So Valley National Bank's predecessor was USAmeriBank.  So I worked there from '08 till the



acquisition/merger on January 1st of '18.

Q.   Okay.  Prior to this case that we're here for today, have you ever been involved in any other bankruptcy proceeding?  When I say you, let me clarify as well.

The deposition that we're taking right now is you in your individual capacity.  It's my understanding that you also -- later we're going to take a separate deposition of Valley Bank, which you'll also be the corporate representative.  But for the purposes of my questions right now, I just want to make sure you understand --

A.   Sure.

Q.   -- I'm asking you as an individual.

A.   Sure.

Q.   So I apologize.  Let me -- let me go backwards with my question.  Have you ever had any involvement in any bankruptcy case prior to this case?

A.   I have not.

Q.   Okay.  Are you familiar -- do you feel that you're familiar with bankruptcy laws and procedures?

MR. WHITSON:  Objection to form.

A.   I have -- no.  I rely on counsel.

BY MR. APPLEBY:

Q.   Okay.  Have you reviewed any documents related



to the bankruptcy case in preparation for today's hearing?

A.   Yes.  I've been through several with counsel and otherwise.

Q.   Okay.  Without telling me anything you would discuss with counsel, could you tell me what you've reviewed?

MR. WHITSON:  Well, let me just pause real quick.  In his individual capacity or in the 30(b)(6) capacity?

MR. APPLEBY:  Individual capacity.

MR. WHITSON:  Okay.

A.   To be honest, what those documents are -- you know, what they're titled, I, you know, can't say.  I've just been refamiliarizing myself with the goings-on.

BY MR. APPLEBY:

Q.   Okay.  Did you review any of the loan documents?

A.   Yes, I have.

Q.   Okay.  What loan documents have you reviewed?

A.   Primarily, loan agreement.

Q.   Can you tell me what the loan agreement consists of?

A.    It's substantial; but, really, the structure and governance and, you know, remedies and otherwise,



you know, surrounding the transaction.

Q.   Okay.  Can you confirm today that the information you're going to provide will be truthful and accurate, to the best of your knowledge?

A.   Yes.

Q.   As it relates to a deposition, are -- have you been advised of your rights and obligation as a deponent?

A.   No.

Q.   Okay.  Now, I guess the most important thing I would say on this is that, as a deponent, your obligation includes telling the truth, as we said. You are under oath and we'd ask that you give complete and accurate answers to any questions that I ask.

If I ask a question that you aren't real sure what I'm -- what my question means, feel free to let me know that.

You know, if your counsel directs you to things, of course. you should listen to your counsel. And we'd just ask, again, that we'll try to keep this as professional and friendly as possible.  So if there -- if you have any issues, if you need to take a break, use the restroom, anything like that, just let me know.

A.   Okay.

Q.   I have to ask this question, but are you under



the influence of any drugs or alcohol or medication or anything that would affect your -- or impair your ability to provide accurate testimony?

A.   No.

Q.   Do you have any personal or professional relationships with any of the parties in this case?

A.   Can you explain what you're -- when -- parties, what you're -- who or what --

Q.   Do you have any professional or personal relationship with any of the borrowers in this case?

A.   Currently?  Currently, no.  From the transaction, obviously, of course --

Q.   Have you had that in the past?

A.   During the transaction, sure.

Q.   Okay.  And who are you referring to when --

A.   Well, the people -- when we talk about the individuals that -- Kevin Angelis and John Bartle and Eli Frieden, anybody I would have interacted with over the course of the transaction.

Q.   Okay.  As it relates to the loan that was originally made by USAmeriBank or Valley Bank now, what was your role in the events or circumstances that led to making that loan?

A.   Sure.  So I -- you know, I was introduced to this group and, you know, had initial contact with them



and, you know, discussed their needs and what they were looking for, and that was the original entry into the bank, and then took it through my normal evaluation, underwriting and otherwise, processes.

Q.   Okay.  When you mentioned being introduced to this group, were you introduced to this group by a third party?

A.   Yes.

Q.   And --

A.   The third party was somebody at another bank, a friend of mine that had apparently done some business with them in the past.  And this isn't something that they did at their bank, so he made the introduction.

Q.   Okay.  And when -- the introduction, was it made with an individual or who was the introduction made to?

A.   I don't recall.  I believe it was an email intro.  I don't recall the person's name, but I believe it was -- there was a Jeff -- I think it was -- I believe it was Jeff.

Q.   And do you know who Jeff was with?

A.   He was representing -- he was a broker representing the -- you know, the ownership group.

Q.   Now, after the introduction, did you continue



to work with Jeff, the broker, or did you begin only directly working with the ownership group?

A.    Some with Jeff on the front end.  But then, you know, it's not our MO to -- you know, we want to meet our -- you know, the people behind the transaction.

Q.    Okay.  A moment ago you mentioned a few names, but tell me the -- when you refer to the people behind the transaction --

A.    Sure.

Q.    -- who are we talking about?

A.    So Kevin Angelis, John Bartle and then later Eli Frieden were the primary points of contact.

Q.    And Kevin Angelis, what was his role with the borrower?

A.    So he -- he was more on the equity side, I mean, more on the overall deal structure, equity sourcing, corporate structure type of role.

Q.    Do you know what Kevin's background was prior to -- or as it relates to this transaction?

A.    Yeah.  So I can't say for certain.  I believe it was in private equity.  He had his own equity firm up there, investments firm.

Q.    And, again, when you say up there, where do you mean?

A.    Oh, he's in New York, or was.



Q.   Okay.  And you mentioned John Bartle.  Tell me what you recall about who John Bartle was at the time you met him.

A.   Yeah.  So John was more involved on, you know, the operational piece and/or -- you know, he indicated that he, you know, had an experience in getting in and taking over facilities such as this that were, you know, struggling a little bit.  And once got the proper infrastructure in place, that, you know, he moved on and went to the next one, leaving it operationally to be run by, you know, tenants in place, in our instance, and obviously facility staff.

Q.   Okay.  And who was Eli?

A.   Eli -- you know, my recollection was that he didn't -- he was involved a little bit on the front end but was more later in the transaction.  He didn't have a prevalent role from -- you know, again, Kevin handled more the capital side and Bartle operationally, and Eli was a bit in the background and didn't have much of a prominent role with me and our, you know, need on the front end.  He did provide some, you know, financial statements and stuff like that when asked.  But --

Q.   Do you know what Eli's title or role was with the borrower?

A.   I don't.  I mean, he had a -- he had an entity



that was -- had an ownership in, but, you know, I don't know if there was a specific title associated with, you know, his role.

Q. Okay. When did you become aware that bankruptcy cases had been filed?

A. I honestly can't say for sure, whether it was -- I don't know if it was '15 of '16. I can't say for certain.

Q. Okay.

A. At that point, I was not involved in the day-to-day handling of the transaction.

Q. Do you recall when this loan was made?

A. March 31st of 2014, I believe.

Q. Were you aware that there was a foreclosure action that had been filed on certain real estate?

A. Yes. There was a deed in lieu that had been negotiated by the seller with the current lender.

Q. If you would, could you sort of tell me what you know about that? How did that transaction take place?

A. I honestly --

MR. WHITSON: Objection to form.

A. Yeah. I honestly don't know a whole lot about the details other than there was a need to refinance the debt by that date or else it was subject to a negotiated



deed in lieu.

BY MR. APPLEBY:

Q.   Do you know the Liquidating Trustee in this case, Mr. Warren, who is sitting next to me?

A.   I have met him, yes.

Q.   Okay.  Do you know what his -- or do you understand what his role is in a bankruptcy case?

A.   No, I -- that is not something that I would have gotten involved with.  I leave that to counsel.

Q.   Do you know if the bank was paid back for its loan that was made?

A.   Yes.  I believe the bank's principal and potentially some of our interest was repaid.

Q.   Do you recall how the bank was repaid?

A.   I'm -- I believe -- again, I was out of the transaction, for the most part, during this time.  I believe we either sold our note and/or our summary judgment or -- I'm not sure what the legal term is but sold our position.

Q.   Do you know who it would have been sold to?

A.   I do not.

Q.   Were you still involved with the loan when the bankruptcy took place?

A.   No.

Q.   Do you know what a CCRC is?



MR. WHITSON:  Object to the form.

A.   Generally speaking, yes.

BY MR. APPLEBY:

Q.   Okay.  If you would, tell me what a CCRC is.

A.   Sure.  It's a campus whereby residents of the ILF side purchase a care contract that provides them a level of care for their life as they age and become less independent, at which time they would move to more of an assisted.

Q.   Do you know what the acronym, the CCRC, do you know what it stands for?

A.   Continuing Care Retirement Community.

Q.   Okay.  And you also mentioned ILF.  If you would, tell me what that means.

A.   It's Independent Living Facility.

Q.   Do you know how -- or could you tell me how a CCRC, how that generates revenue?

MR. WHITSON:  Object to the form.

A.   I can tell you how the assisted living and/or skilled nursing, you know, aspect of it and, you know, through traditional rental revenue, you know, from residents and/or reimbursements from those that were part of the life care contract.

BY MR. APPLEBY:

Q.   Okay.  And the life care contracts, who would



those have been made with?

A.   Individual residents or --

Q.   Okay.  And the individual residents would contract with who?

A.   To be honest, I don't know who the actual obligor is under that contract, but I would assume it is the owner of that facility.

Q.   And just so I'm clear, when you say, the owner of the facility, was the owner of the facility your borrower at the bank?

A.   No.

Q.   Okay.  So who was -- what would you know about the owner at the facility?

MR. WHITSON:  I'll object to the form.

A.   So I believe the owner was -- I think it's Westport Holdings or Westport Holdings I, Westport Holdings II, which was different from our borrower.

BY MR. APPLEBY:

Q.   Okay.  And who was your borrower?

A.   Westport Nursing Tampa.

MR. WHITSON:  Can I just make the record a little clearer?  You keep using the word facility.  What do you mean by facility?  Will you clarify that?  Because the structure here is a little bit more complicated than just a facility.



MR. APPLEBY:  Going forward, I'll try to be more clear.

MR. WHITSON:  Okay.  I'm just -- I just -- because there's different parts to all of this.

MR. APPLEBY:  I understand.

MR. WHITSON:  Okay.

BY MR. APPLEBY:

Q.   What did Westport Nursing do?  What was their line of business?

A.   They owned real estate that housed the assisted living and skilled nursing facility, the physical assets.

Q.   Prior to this loan, had you been involved in making loans to other CCRCs?

A.   So this loan was really a real estate loan just on an assisted living and a skilled nursing facility and not a CCRC campus in totality, but, no. Otherwise, no.

Q.   Do you know whether -- do you know whether Westport Nursing was required to report to any governmental agency?

MR. WHITSON:  Object to the form.

A.   I -- I mean, Westport Nursing was merely a real estate -- company that owned real estate. So I would suspect that Westport Nursing would have

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

no obligation to report to a governmental agency.

BY MR. APPLEBY:

Q.    Why would you feel that why?

MR. WHITSON:  Objection.

BY MR. APPLEBY:

Q.    Why would you -- why would you think that they don't need to report?

A.    They just own physical assets.  So, as an entity, I do not know or think that they would be required to report to a governmental agency.

Q.    At the time of making the loan, how was Westport Nursing expected to repay the loan?

MR. WHITSON:  Object to the form.

A.    So through lease income they generated from the tenants.

BY MR. APPLEBY:

Q.    Since the time that you made this -- or not that you made.  But at the time this loan was made, do you have any experience in making loans or being involved in loans to providers that would be subject to governmental regulation?

MR. WHITSON:  Object to the form.

A.    Yes.  We have made senior housing loans prior to, sure.

BY MR. APPLEBY:



Q.   Do you know whether Westport Nursing held a certificate to operate as a CCRC?

MR. WHITSON:  Object to the form.

A.   No.  Westport Nursing, again, was just merely an entity that owned real estate, that leased its facility.

BY MR. APPLEBY:

Q.   Are you familiar with Westport Holdings Tampa?

A.   I know the name.  I do not know much about Westport Holdings Tampa.

Q.   For the residents of the property owned by Westport Nursing, do you know who provided care for them?

MR. WHITSON:  Object to the form.

A.   Yes.  The two tenants of that property provided the care and had the licenses.

BY MR. APPLEBY:

Q.   What type of licenses?

A.   One was for an assisted living license and one for skilled nursing.

Q.   And do you know what the difference between those licenses are?

MR. WHITSON:  Object to the form.

A.   Generally speaking, my understanding it's a different level of care.



BY MR. APPLEBY:

Q.   If you can, tell me about your experience making loans to assisted living facilities.

A.   I mean, over the years, I've made, you know, several individually.  I don't know what, from experience -- maybe you could clarify a little bit. Have I made senior housing loans in the past?  Yes.

Q.   Okay.  Can you tell me whether the criteria for making a loan, just purely a residential loan, if the criteria is different when underwriting that type of loan versus an assisted living facility?

MR. WHITSON:  Object to the form.

A.   Residential meaning, like --

BY MR. APPLEBY:

Q.   Meaning, like, Westport Nursing.

A.   So I'm not understanding.  So not residential like a home loan?

Q.   Well, an assisted living facility -- well, you mentioned this was purely a real estate loan.  I apologize and thank you for holding me to clarification.

When you're involved in making a loan that's, as you termed it, purely a residential -- or, excuse me -- a real estate loan versus a loan to an assisted living facility, what types of things go into those loans?



MR. WHITSON:  Object to the form.

A.  Sure.  So, from an underwriting perspective, you know, which is pretty common when you have a borrowing entity that owns the real estate that has been leased to a tenant, you know, the primary analysis involves whether or not that lease is sufficient enough to repay the debt service.  Beyond that, there is due diligence done on the operator/third party, you know, the tenants, their management company, loan guarantors, or otherwise, not dissimilar to, you know, a retail office, or otherwise, type of property that's leased to a tenant or multiple tenants.

BY MR. APPLEBY:

Q.  Okay.  How is that different when the loan's being made to an assisted living facility?

A.  You know, not dissimilar.  The lease cash flow is -- whether it's an operator of an assisted living facility or a retail office or otherwise, it's a lease. So that's the primary driver of the financial aspects.

There's always due diligence done on the tenants themselves, obviously, to be sure they're proper -- properly licensed and, you know, that they can operate and that sort of thing.  So it's -- there's always a level of due diligence done on any type of real estate transaction leased to understand

who is operating whatever type of property it is, and it's just -- it depends on the asset class what that additional due diligence is.

Q.   Well, you mentioned one of the items of due diligence being reviewing the licenses or ensuring that they do have licenses.  Was anything of that nature done on this loan?

A.   Oh, absolutely.  So, you know, we engaged counsel and obviously asked them to be sure that we have proper licensing or -- the applications and that sort of thing in place and that, you know, the transaction is -- and the tenants are qualified or licensed.

Q.   Do you recall -- again, I think you've said this, but I just want to make sure I'm understanding. Do you recall whether Westport Nursing was required to have any type of license?

A.   No, I don't believe so, as just the real estate owner.

Q.   Okay.  And, again, I understand that you're telling me just because it's a real estate deal.  But what would you have relied on or why would you -- why do you think that they didn't need a license?

MR. WHITSON:  Object to the form.

A.   Solely because they -- you know, they were the owner of, you know, hard assets and weren't providing



that care as an entity, just the tenants.

BY MR. APPLEBY:

Q.    For other loans that you've been involved with that have involved an assisted living facility, what type of licenses are you familiar with that might be required in a different --

A.    Yes.  So, generally speaking, AHCA provides a license to operate and provide certain levels of care and a certain number of beds per facility.

Q.    Okay.  What -- can you tell me what AHCA is?

A.    Agency for Health Care Administration, I believe.

Q.    And -- I'm sorry.  You mentioned this but tell me more.  What does AHCA actually regulate and oversee?

MR. WHITSON:  Object to the form.

A.    Yeah.  I mean, the level of care and, you know, and services provided to the residents, is my understanding.

BY MR. APPLEBY:

Q.    What other licensing organizations or regulatory organizations are you familiar with?

A.    From an assisted living and skilled nursing perspective, that is the only one that I'm familiar with.



Q.   Have you ever been involved in any loans that would have required involvement of the Office of Insurance Regulation?

A.   No.

Q.   Are you familiar with the Office of Insurance Regulation and what they do?

MR. WHITSON:  Object to the form.

A.   Only through this transaction and when -- you know, but not overly familiar, no.

BY MR. APPLEBY:

Q.   Okay.  And how are they involved in this transaction?

A.   They -- my understanding is that they, you know, regulated the -- those care contracts that were sold by the independent living facility owner.

Q.   And -- so tell me how that involved this loan.

A.   In --

MR. WHITSON:  Object to the form.

A.   Can you clarify in what regard or --

BY MR. APPLEBY:

Q.   What -- well, tell me about OIR's involvement with the bank as it relates to this loan.

A.   So OIR was not involved with our loan.  They were -- you know, whatever their responsibility is



on the independent living care contracts was their involvement.  And then those residents would then, at whatever time they needed, would come to the assisted living facility and skilled nursing facility for their -- for their care.

Q.   When the bank made its underwriting decision, did it consider those individual lessee or tenants that were going to be housed at Westport Nursing?

MR. WHITSON:  Object to the form.

A.   So, when you say tenants, the tenants at Westport were the operating --

BY MR. APPLEBY:

Q.   Okay.

A.   -- the operating entities.  Can you clarify what --

Q.   Well, the -- I appreciate your question.

The tenants being the operating entity, the bank -- as I understood from your earlier testimony, the bank looked at those leases in its due diligence to determine whether or not the loan could be paid back. So what -- what were the sources of the funds that would pay the tenant that could then pay the bank?

A.   Sure.  So -- yeah.  So either reimbursements from the -- whatever the arrangement is in the life care contract.  They pay for the residents' care at the



assisted living facility or third-party residents that would come from the outside would either pay privately or through insurance reimbursement.

Q.   Did the bank conduct any review of those individual patients or --

A.   No.

Q.   Did the bank look at any of the contracts that the tenant would have had with the residents?

MR. WHITSON:  Object to the form.

A.   I do not recall if a sample contract or otherwise was provided, but I -- you know, I don't think there was a, you know, full audit of those because, again, they were on the other facility.

BY MR. APPLEBY:

Q.   Were you aware that Westport Nursing did not have a license for operating skilled nursing beds but could only do that as part of a CCRC?

MR. WHITSON:  Object to the form.

A.   That is not my -- you know, was not my understanding, no.  Again, I asked counsel to thoroughly review the licensing aspects.

BY MR. APPLEBY:

Q.   What is your experience in making loans to skilled nursing facilities?

A.   I -- so we have, but it is less frequent in



what we do.  It's primarily assisted living, independent living and memory care.

Q.   Have you been involved in making loans to skilled nursing facilities?

A.   Not that I can recall, no.

Q.   Can you tell me the difference between an assisted living facility and a skilled nursing facility?

MR. WHITSON:  Object to the form.

A.   Again, my understanding that it's just another level of care, a higher level of care.

BY MR. APPLEBY:

Q.   For the loan that we've been discussing between USAmeriBank/Valley Bank and the borrower, Westport Nursing, were you the primary decisionmaker for underwriting the loan?

A.   No.  You know, like with any loan, it goes through an underwriting process and then eventually to a loan committee for decisioning.

Q.   Can you describe for me what the underwriting process is for a loan like this?

A.   Sure.  I mean, we have a team of credit analysts who will gather the property-specific information they need:  leases, financial statements, otherwise; you know, get some history and background on, you know, the players, the summary of the overall



transaction, the physical collateral, discuss the leases, run a cash flow analysis, you know, based on those leases from the tenants, to validate there's plenty of cash flow to service the debt, and analyze the guarantors.

And once that is put together, it is circulated to the various levels of approvers needed; ultimately, at that time, going to the full loan committee.

Q.   So is the underwriting process -- essentially, does it support making a loan prior to it being circulated to the loan committee?

MR. WHITSON:   Object to the form.

A.   Supported in what regard, I guess?

BY MR. APPLEBY:

Q.   Oh.   If a loan were -- if the underwriting process was not favorable to making a loan, would it ever go to a loan committee?

A.   I mean, I can't say never.  When you say not favorable, I'm assuming that you're meaning that it was cash flow not supported from the, you know, lease or otherwise.  But, generally speaking, it may not even make it to the credit analysis piece of it.  And, if it does, in most instances, if it wasn't favorable and it didn't meet our requirements from a cash flow



perspective, then, no, it wouldn't -- it wouldn't get that far.

Q.   In your experience, do -- pardon me.  Let me backtrack for just a second.  In the underwriting process, is that several individuals or -- again, explain to me or, if you would, describe to me the underwriting, who, sort of, has a role in that process.

A.   Sure.  So, generally, you'll have one primary credit analyst that is analyzing it and putting that physical loan package together.  And then, depending on what level -- it will generally then be reviewed by, you know, their manager or other authorized person on the credit department that can ask questions or provide feedback or suggestions.

And then, if deemed acceptable, they would forward it on to whatever the approval authority would be.  But it goes through several -- one primary credit analyst.  And then there could be one or many more to review thereafter for decisioning.

Q.   What is the process for getting a loan application to underwriting?

A.   I mean, it's not a formal application.  Generally, the loan officer or whoever sourced that opportunity will negotiate general terms with a borrower to see if they're acceptable before submitting it for



underwriting.  Oftentimes that will involve somebody from the credit side as well.  But, once that has been evaluated and pertinent information collected, reviewed and otherwise, then it would go to the credit team to do the formal detailed analysis.

Q.  For the loan that we are discussing made to Westport Nursing, who was the individual or individuals that would have brought this loan package or application to underwriting?

A.  Oh, I would have.  I would have done that.

Q.  Okay.  Was there anyone else involved in that preliminary stage?

A.  At one point, one of our -- I don't remember what his role was at that time.  He's now our credit department manager.  But he -- he was involved in meeting with John Bartle and there was one other individual.  I don't know if he was involved on the front end or not.

Q.  Do you recall the name of the person you're talking about?

A.  Sure.  Mike Weimer.

Q.  And now Mr. Weimer is a credit manager, you said, or --

A.  Yeah.  Um-hum.

Q.  Is that -- you mentioned in the underwriting


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

process that the credit analyst typically takes something to the manager.  Would that be a credit manager like Mr. Weimer or --

A.    In his current role, yes.  I don't recall what his role was at that time.  But, yes, he would be -- he and/or -- our structure currently is different than what it was back then because of, you know, the acquisition and otherwise.  But, generally speaking, yes, he or, you know, one of his dedicated folks.

Q.    And, again, as it relates to the loan that we've been discussing, once it went through underwriting, this loan would have then been presented to a loan committee?

A.    Um-hum.

Q.    And who does that?  Tell me that process for how it's presented to the committee.

A.    Sure.  Back then, it was just a physical meeting in the board room of our loan committee members, which I would guess was, you know, ten-plus people.  I don't recall exact numbers.  And a loan officer presents the opportunity.

The loan committee's been provided with the package prior to for review.  They summarize the transaction that -- you know, the loan committee gets to ask any questions on -- you know, pertinent



questions they may have; discuss it.  And eventually, if someone were to make a motion to approve, then it's -- a formal vote's held.

Q.   Did you make that presentation to the loan committee for this loan?

A.   Yes.  Um-hum.

Q.   Okay.  Were there any questions by the loan committee at the time you made that presentation?

A.   I do not recall.  I'd assume so.  I mean, I do not recall but my assumption is -- as there are generally questions on most loans, my assumption is --

Q.   Okay.  What types of questions do they ask?

A.   It really depends on the loan.

Q.   Okay.  For a loan similar to this, what types of questions would a loan committee ask?

A.   That's hard to say.  I mean, they'd ask about the, you know, the property, ask who the operators are, ask about the, you know, lease income.  But it's generally -- it's hard to say specifically what somebody would ask.

Q.   Do you recall if -- well, if someone on the loan committee had asked you about the owners, do you recall what you would have told them?

MR. WHITSON:  Object to form.

A.   I don't recall what I would have told



them.  I had lots of information about them and their experience and track record and otherwise, you know, a resume or snapshot of them, if you will, references, and that sort of thing.

BY MR. APPLEBY:

Q.   Okay.  With -- and with this loan, was there a package that went to the loan committee to review this client --

A.   Yes.

Q.   -- or this borrower?

When gathering this information for the -- again, I'm referring to the package that would have been presented to the committee and you started telling me a little bit.  But what, typically, is in a package?

A.   Again, deal specific.  Not every deal is the same.  But, generally, there's history and background, relationship summary, collateral analysis, property-specific cash flow analysis.

At times there is, you know, analysis on individual tenants.  There's analyses on guarantors and it's -- whether it's -- sometimes there's references; there's -- it's per deal, whether that be senior housing or otherwise.  It can vary.  But from a high level, those are your main general, you know, categories.

Q.   And who puts this package together?



A.   Credit analyst.

Q.   Okay.  Does the loan officer -- in this situation, I guess, were you the loan officer?

A.   Yes.

Q.   Is that a fair description?

Would the loan officer have played a role in putting that presentation together?

A.   They would provide information or answering questions, or that sort of thing, but not handling the nuts and bolts of running cash flows and that sort of thing.  It's a -- from a regulatory perspective, it has to be separated, you know, so that's the analyst's function.  But they do get -- they do get loan officer input.

Q.   Okay.  And mentioning from a regulatory standpoint, why is that?

MR. WHITSON:  Object to the form.

A.   You know, my understanding would be so that the loan officer that's proposing the loan isn't involved in the decisionmaking on whether it gets made.

BY MR. APPLEBY:

Q.   So, for the loan made to Westport Nursing, you wouldn't have had a role in making the decision on whether or not to make that loan?

A.   I proposed it and, you know, supported it



by virtue of proposing it, but I had no decisionmaking authority, no.

Q.   What was the time frame between when you met -- well, I guess when you learned about this prospective or potential loan to the point at which the loan was being made or approved?

A.   I met this group in late 2013.

Q.   So late 2013 would have been when you would have met --

A.   Learned about the transaction.

Q.   Okay.  Did you meet Kevin Angelis and John Bartle in late 2013?

A.   I would -- I mean, physically, not -- I don't think I met Kevin in person in 2013.  That would have been down the road.  John, either late 2013 or early 2014, electronically or via the phone, yes.

Q.   What was the timeline between, essentially, them formally asking -- the owners or, you know, the individuals, the borrower -- asking for the funds?  What was the timeline between when they started that loan process to when the loan actually closed?

A.   100, 120 days.

Q.   Is that typical, a typical time frame?

A.   I mean, I can tell you anywhere from 30 t0 90, and that will vary depending on cycle and how busy the



bank is and/or, you know, the ancillary third parties we rely on.

Q.   Do you recall this loan taking longer or about average to close?

MR. WHITSON:  Object to the form.

A.   When you say close, meaning from the time of approval to closing or --

BY MR. APPLEBY:

Q.   How about from the time of application to closing?

A.   I mean, 100 to 120 days is -- I mean, it's a -- it was, at the time, a bigger loan.  But, I mean, that's not out of the ordinary.

Q.   Do you recall whether there were any specific concerns or issues with this loan?

MR. WHITSON:  Object to the form.

A.   I don't recall.

BY MR. APPLEBY:

Q.   I think you've already told me but just to make sure.  Do you recall when this loan was -- when it was made, when it was closed?

A.   Closed?  I believe it was March 31st of 2014.

Q.   Do you recall the amount of the loan?

A.   The note amount was $15 million.

Q.   At closing, where did the funds go?  How were



the funds distributed?

          MR. WHITSON:   Object to the form.

     A.    So we would send our funds to the title company handling the closing, as would, you know, the borrower.  And then, once the title company confirmed they had all of the funds necessary to close, then they would break closing.  I'm sure, if we had any fees, or what-have-you, we would just withhold our fees.  But the bulk of everything runs through the title company, who disburses as the closing agent.

BY MR. APPLEBY:

     Q.    Do you recall whether any other lenders were paid off?

     A.    I don't remember the name of the lender; but, yes, we -- the purpose of our loan was to refinance the debt that -- you know, the bad situation with the deed in lieu if they didn't get the lender refinanced.

     Q.    Okay.  Do you know the interest rate on this loan, what it was?

     A.    I have no idea.

     Q.    Do you recall -- or could you tell me what the repayment terms were?

     A.    Not specifically, no, I mean, without reviewing the note.

     Q.    Okay.



A.   It's been too long.

Q.   Could you tell me what collateral was pledged?

A.   Yes.  We had the physical real estate and all associated assets, the assignments of leases.  I'm sure we had UCC filings and otherwise and then we had $3 million in cash collateral.

Q.   And what was the source of that $3 million?

MR. WHITSON:  Object to the form.

A.   It was from the borrowers and it went to the title company.  There was no statement to where it came from but borrower equity.

BY MR. APPLEBY:

Q.   And the borrower equity, that $3 million, what happened with that money?

MR. WHITSON:  Object to the form.

A.   It went to the title company.  The title company confirmed they received the money and disbursed appropriately.

BY MR. APPLEBY:

Q.   Who was it disbursed to?

A.   I mean, they're holding, you know, our money and their money.  So, I mean, it's just a pool of money. They paid off the other lender and sent us three million, is what I recall.

Q.   Okay.  So USAmeriBank received three million



at the closing?

A.   That's what I recall, yes.

Q.   Were there any restrictions on those funds?

MR. WHITSON:  Object to the form.

A.   I mean, yes, it was fully restricted as collateral for the loan.

BY MR. APPLEBY:

Q.   When you say fully restricted, what do you mean?

A.   It was pledged via a pledge agreement and it could be used for nothing other than collateral.

Q.   Were the funds held in just a deposit account or what type of account was it held in?

A.   It was just a deposit account.

Q.   Was it an interest-bearing account?

A.   I do not recall.

Q.   So your recollection was that it was not in an investment account but it was a deposit account that the funds were held in?

A.   That's correct.  It was in a deposit account.

MR. APPLEBY:  Can we take a quick break?

(There was a recess from 12:23 p.m. until 1:05 p.m.)

BY MR. APPLEBY:

Q.   Okay.  I appreciate it.  We took a little



lunch break, a little longer than I guess we originally expected, but thank you for your patience.

Mr. Korhn, at the time that the loan was made, what was your understanding of the ownership of Westport Nursing?

MR. WHITSON:  Object to the form.

A.    It was a partnership with the various, you know, entities owned by a number of those players involved with, you know, a general partner, a managing member.

BY MR. APPLEBY:

Q.    And who were those other players or --

A.    So what I recall is there was a BVM Management related entity, an Eli Frieden related entity, a Kevin Angelis related entity or his company, and I don't know if there are any other -- recall if there are any other players than that.

Q.    And that's your understanding of who owned Westport Nursing?

A.    Westport Nursing, correct.

Q.    Were you aware that Westport Nursing was a fully-owned subsidiary of Westport Holdings Tampa?

A.    I don't recall.  My understanding was that it was an affiliate with common ownership or control but not a subsidiary, so I -- no, I don't recall that.



Q.   At the very onset of the loan process --
again, you mentioned earlier there was no formal,
just application.

But, from your first recollection of the
request to make this loan, was it always for only
Westport Nursing, or was it -- or did it include any
other entities?

A.   No.  It was just -- the borrower was always
structured as a property company with an operating
company, leased, PropCo/OpCo structure, for the assisted
living facility and the skilled nursing facility.

Q.   Do you know whether the bank had any
requirements regarding separation of ownership between
Westport Nursing and any other entity such as Westport
Holdings Tampa?

A.   Clarify, or if you could explain what you
mean, requirements or --

Q.   Well, did the bank require that Westport
Nursing separate itself from any other entity,
such as Westport Holdings Tampa?

A.   No.  We didn't require anything.  That --
the request was proposed, you know, by them.  It was
-- that's how it was proposed to us, was a PropCo/OpCo
structure.  And I would have had -- obviously, counsel
would have reviewed ownership and otherwise on our



behalf.

Q.   So your recollection was that the bank didn't require any type of separation of ownership?

A.   No.  My recollection is that that was proposed by this group, the ownership group, the structure.

Q.   Do you know why they proposed that?

MR. WHITSON:  Object to the form.

A.   I do not.

BY MR. APPLEBY:

Q.   Do you know who would have had liability concerning the life care contracts for the residents that lived at University Village?

MR. WHITSON:  Object to the form.

A.   Would you explain liability?

BY MR. APPLEBY:

Q.   Well, earlier you -- I think you explained to me that the tenants or the residents at the real property location -- again, I don't want to use facility but here talking about the buildings that were owned by Westport Nursing that had tenants that were contracted with Westport Holdings, as I understand it, they had life care contracts; the residents did.  Who was liable to provide those services?

MR. WHITSON:  Object to the form.

A.   So when you say -- the services on which, at



the property owned by Westport Nursing Tampa who the --

BY MR. APPLEBY:

Q.   Yes.

A.   -- who would provide services to the residents at Westport Nursing Tampa?

Q.   Yes.

A.   The two tenants.

Q.   Okay.  And, once again, the two tenants were?

A.   Oh, the two tenants:  TRS&F and TALF.

Q.   And could you tell me who those entities were?

MR. WHITSON:  Object to the form.

A.   Yeah.  I do not recall who owned, or what-have-you, the tenants.

BY MR. APPLEBY:

Q.   Okay.  But those entities, did they have contracts with the residents of the people who lived at Westport Nursing?

A.   I --

MR. WHITSON:  Object to form.

A.   Yeah, I have no idea if they had contracts with.  They were just a tenant of our borrower and I do not know relationship contractually with residents or otherwise.

BY MR. APPLEBY:

Q.   So, in the loan underwriting process, we've



talked about due diligence in looking over documents or looking over the leases and contracts that Westport Nursing would have had to show cash flow, to show the ability to repay the loan.  Can you tell me what was reviewed?  What did the bank look at to determine whether there was going to be cash flow to pay the loan back?

A.   So, obviously, we looked at the leases and then historical and projected financial statements of the two tenants.

Q.   And the two tenants, TRS&F and TALF --

A.   Um-hum.

Q.   -- those -- there were contracts or leases that were reviewed by the bank?

A.   Yes, leases with Westport Nursing Tampa.

Q.   Okay.  Would the residents of Westport Nursing, the individuals who lived in the real property, who would they have paid for their rent or life care services?

MR. WHITSON:  Object to the form.

A.   I -- who would they have paid?  Like, written a check to?

BY MR. APPLEBY:

Q.   Yes.

A.   I guess it depends on --



Q.   For living there.

A.   Yeah.  If it was insurance reimbursed or private pay or otherwise?  My assumption would be they paid the tenant, but I don't know, you know, who -- if that's who they wrote a check to or what-have-you, but -- and when I say tenant, I mean the two tenants leasing Westport-Nursing-Tampa-owned property.

Q.   Okay.  I maybe got a little sideways here, but explain to me again who Westport Holdings Tampa is.

MR. WHITSON:  Object to form.

A.   Yeah.  I believe they were the owner of the independent living facility at that time, but they were not party to my transaction -- our transaction.

BY MR. APPLEBY:

Q.   Do you know who owned Westport Holdings Tampa at the time?

A.   I do not know with 100 percent certainty. My understanding, that it was -- there was some common ownership, but I do not know with certainty.

Q.   At the time the loan closed, do you know how much money was owed by Westport Nursing to Westport Holdings?

MR. WHITSON:  Object to the form.

A.   I do not.

BY MR. APPLEBY:



Q.   Do you know if any funds were owed by Westport Nursing to Westport Holdings?

MR. WHITSON:  Object to the form.

A.   I do not, no.

BY MR. APPLEBY:

Q.   At the time of closing, do you know anyone or any entity that Westport Nursing owed money to?

A.   I --

MR. WHITSON:  Same objection.

Go ahead.  I'm sorry.

THE WITNESS:  Yeah.

A.   No, not that I recall.  I do not.

BY MR. APPLEBY:

Q.   At closing for the loan, monies were paid out to, ostensibly, creditors of Westport Nursing?

A.   Yeah.

Q.   Okay.

A.   Well, I don't -- I mean, I don't recall who the -- I don't know what the -- who the borrower -- I wasn't privy to the loan structure, as to what entity it is.

Q.   Okay.  Why would you have not been privy to the loan structure?

A.   Well, because that wasn't our loan.  I didn't see those loan documents, I guess, is my point.



Q.   Okay.  Well, I mean, just to make sure we're all on the same page, which loan documents are you referring to?

A.   I'm sorry.  It's the loan documents of the debt that was being paid off.

Q.   Okay.  Once the loan closed, was USAmeriBank/Valley Bank -- were they the first position lender for all debt of Westport Nursing?

MR. WHITSON:  Object to form.

A.   We had, yeah, a senior first mortgage on the physical assets of Westport Nursing.  I do not believe there was any other debt, no.

BY MR. APPLEBY:

Q.   Were you -- can you tell me about the loan closing?  Was it a closing where all the parties sat around a table and actually signed documents or what the process was?

A.   No.  It was an electronic or -- it wasn't physical, in-person closing, no.

Q.   Were you personally involved in the closing?

A.   Yes.

Q.   Do you know whether there were -- there was anyone or any entity that would have been paid in front of USAmeriBank or Valley Bank post closing on this loan?

MR. WHITSON:  Object to form.



A.   Can you clarify in front of or --

BY MR. APPLEBY:

Q.   Well, was there any creditor who was in a superior position against Westport Nursing than the bank?

MR. WHITSON:   Same objection.

A.   I mean, I -- to the extent there was a mortgage or other, you know, lien that was required to be satisfied, you know, to warrant clean title insurance on the property, those would have to be, you know, satisfied.

BY MR. APPLEBY:

Q.   Do you know if there were any other liens against any assets of Westport Nursing?

A.   No.  I would have -- I would have relied on counsel to handle -- you know, make sure I have clean title policy and, you know, that I'm in -- the bank is in first lien position.

Q.   Do you know whether Westport Holdings was ever paid for any debt that was owed by Westport Nursing?

MR. WHITSON:   Object to the form.

A.   I do -- re --

BY MR. APPLEBY:

Q.   And I'm specifically referring to at the time of the loan closing.



A.   I mean, I do not know.  The funds flow, at the time of closing, would be based on the closing statement outlining, you know, the transaction.

Q.   Did you review the loan closing statement?

A.   I'm sure I looked at it.  But, again, counsel is representing us and handling the closing, so --

Q.   Okay.  Again, without asking what counsel would have said, did counsel to the bank play a role in the underwriting process?

A.   No.  Counsel would have been engaged post loan approval.

Q.   Was counsel ever engaged prior to loan approval?

A.   Not in this transaction, no.

Q.   Okay.  Tell me what you know about the Horizon loan.

MR. WHITSON:  Object to form.

A.   I believe that Horizon was the -- whoever had the loan that was subject to a deed in lieu if it wasn't refinanced.

BY MR. APPLEBY:

Q.   Do you know what Horizon's lien would have been against?

A.   No.

Q.   Prior to making loan, would the bank have



reviewed -- in their underwriting process, would they have reviewed what the -- what loans -- or, excuse me -- what liens would have been outstanding against Westport Nursing?

MR. WHITSON:  Object to the form.

A.   No.  That would have been done by counsel as part of the closing process.

BY MR. APPLEBY:

Q.   The process where the -- prior -- again, prior to this loan -- we've mentioned the deed in lieu of foreclosure.  Can you tell me what you know about that transaction or that process?

MR. WHITSON:  Object to the form.

A.   No, other than if the conditions -- in this instance, my understanding, that if the loan wasn't refinanced by whatever time period, that the lender, or whoever was the party of that deed in lieu, would get the, you know, the property or whatever they're due per that agreement.

BY MR. APPLEBY:

Q.   Do you know whether there was a default on that prior agreement?

A.   I --

MR. WHITSON:  Object to form.

A.   I did not review it, no.



BY MR. APPLEBY:

Q.   Are you aware that when residents live in a facility like Westport Holdings Tampa or, you know, any of these entities, do you -- are you aware that they have certain protections established under state law?

MR. WHITSON:  Object to form.

A.   Which -- to explain, you said an entity in --

BY MR. APPLEBY:

Q.   Well, the residents that live there and have paid some monies, whether it be in advance for life care or assisted living, do you know -- do you know what types of protections they would have in a situation where there were a forbearance agreement or a deed in lieu program?

A.   No.

MR. WHITSON:  Object to form.

BY MR. APPLEBY:

Q.   What do you know about Life Care Services being brought in to operate the CCRC?

MR. WHITSON:  Object to form.

A.   Can you clarify Life Care Services, who -- what that is or --

BY MR. APPLEBY:

Q.   Well, at this point I'm asking whether you know what that is.



A.    I don't recall the name Life Care Services.

Q.    When did you become aware that there was litigation between Bartle and Landry entities regarding the Equity Purchase Agreement?

MR. WHITSON:  Object to the form.

A.    I had no idea, frankly.

BY MR. APPLEBY:

Q.    Did you know that there was litigation between Bartle and Landry?

A.    Not that I recall, no.

Q.    Do you know how Bartle's group became involved with these Florida entities?

MR. WHITSON:  Object to the form.

A.    No.  When we were introduced to them, they were already -- you know, the transaction was already in the -- in the works.

BY MR. APPLEBY:

Q.    Do you know who Landry is?

A.    I --

MR. WHITSON:  I'll object to the form.

Go ahead.

THE WITNESS:  Yeah.

A.    I mean, I know he was involved.  You know, I don't remember what his role is but he was involved historically.  And I think he left at one point or was



bought out, but I don't recall the details.

BY MR. APPLEBY:

Q.   Would that have been before or after the loan closing?

A.   Again, I don't recall the timeline, but I remember the name and that he was involved but don't remember the scope.

Q.   What can you tell me about the CPIF loan to Westport Holdings?

MR. WHITSON:  Object to the form.

A.   I was not party to CPIF, you know, loan or details, so --

BY MR. APPLEBY:

Q.   After this loan closed, were you ever personally worried about this loan?

A.   After it closed?  Yes, once -- you know, down the road.  And I don't know what time period that -- yeah, there were some slow payments and otherwise, sure.

Q.   Did you ever lose sleep over this loan?

A.   I'm sure I did.

Q.   You mentioned slow payments.  Were there any other concerns that you had regarding this loan?

A.   I mean, a while after closing when -- and there's some negative press releases.  Of course, that



would cause some concern.

Q.   And what did those press releases say?

A.   You know, I don't recall in detail, but the regulatory agencies are -- you know, come to the properties.  But I don't remember the details of the article.

Q.   What regulatory agencies do you recall?

A.   I believe AHCA came to, you know, our facility we had a mortgage on and the OIR to the other property across the street.

Q.   Did you ever have any concerns about the $3 million that was deposited with the bank?

MR. WHITSON:  Object to the form.

A.   Concern in what regard?

BY MR. APPLEBY:

Q.   Did you ever have any concerns?

A.   Yeah.  I mean, I think it's clear that -- you know, I asked -- excuse me -- asked our counsel to verify that that is our collateral and collateral for the loan.

Q.   Okay.  And is it your position that the funds were not subject to any other liens?

MR. WHITSON:  Object to form.

A.   Yes, that it was subject solely to our pledge agreement.



BY MR. APPLEBY:

Q.   Are you familiar with the term minimum liquid reserves?

A.   I have heard it throughout the -- you know, as part of this transaction, yes.

Q.   Okay.  Tell me what your understanding of -- what is a minimum liquid reserve?

A.   I don't --

MR. WHITSON:  Object to form.

A.   Yeah.  I don't know in detail.  Again, it was a requirement, you know, by a regulatory agency.  But I don't have familiarity with the statute and, again, asked counsel to advise and confirm, you know, that we were in compliance with any -- or the transaction was in compliance and that that $3 million was our collateral.

BY MR. APPLEBY:

Q.   Did counsel give you any form of an opinion, whether it be written or, you know, some type of correspondence that says, The bank doesn't need to be concerned about this money because it's the bank's money?

A.   Yes.  Counsel provided the bank certainty that we needed to proceed with the transaction or otherwise we would not have, if they -- and our



reliance was on them.

Q.   You mentioned they gave you a certainty. What -- can you explain that?

A.   Yes, that the -- you know, the money in our account is collateral per the pledge agreement and --

Q.   Okay.  Are you aware whether the bank was involved with discussions with OIR or the Office of Insurance Regulation after the closing regarding the $3 million and whether it was still part of the minimum liquid reserves required of Westport Holdings?

MR. WHITSON:  Object to the form.

A.   So can you clarify, were we in conversation with or -- or repeat it.

BY MR. APPLEBY:

Q.   Well -- yeah.  Was -- tell me about your understanding of the bank's involvement and communication with OIR after closing regarding the $3 million and whether or not that $3 million was part of the minimum liquid reserves required of Westport Holdings.

A.   So --

MR. WHITSON:  Object to form.

A.   I do know our counsel, you know -- whether they had a conversation or otherwise, I don't know -- but they wrote a letter or -- they had some



communication with the OIR.  As to who that was in reference to, was it was Holdings or otherwise,  I don't recall, but -- you know, again, I'd have to go back and look at those specific communications.

BY MR. APPLEBY:

Q.   Is it your recollection this was post closing?

A.   Yes.

Q.   Do you recall whether that same conversation would have ever taken place pre-closing?

MR. WHITSON:  Object to form.

A.   No.

BY MR. APPLEBY:

Q.   Did anyone other than the bank have any rights or interest in that $3 million?

MR. WHITSON:  Object to the form.

A.   Just what other rights are outside -- outlined in the, you know, the pledge agreement.  I believe there was informational rights but only what was in the agreement.

BY MR. APPLEBY:

Q.   Can you recall what the source of those funds were?  Well, let me back up a second.

At the time that the closing took place, $3 million was deposited with the bank.



MR. WHITSON:  Object to the form.

BY MR. APPLEBY:

Q.   Is --

A.   So ask that -- are you asking if it was?

Q.   Yes.  Was $3 million deposited with USAmeriBank at closing?

A.   So, yes, at closing the title company would have disbursed funds, of which that was, you know, 3 million that --

Q.   Do you know where those -- that $3 million came from, where it originated?

A.   No, outside of coming from the title company. I believe it came from Regions.  But if you're asking if I ever saw any backup for that, no, it came from the title company, which is standard.

Q.   Okay.  Does the title company -- does the title company typically, I guess, gather the funds in advance of closing?

MR. WHITSON:  Object to the form.

A.   That's correct.  And, typically, a combination of loan proceeds and required equity to close the transaction are sent to the title company, who then, as the fiduciary, disburses those to various parties that they are due per closing statement and/or instruction letter.



BY MR. APPLEBY:

Q.   Was USAmeriBank concerned about the source of those funds?

MR. WHITSON:  Object to the form.

A.   You know, again, I don't think -- the source, no.  But the concern that -- we had our counsel -- was that those are -- it's our collateral per our loan agreement and our pledge agreement.  That was our concern.

BY MR. APPLEBY:

Q.   Okay.  So the loan was for $15 million?

A.   The note amount, correct.

Q.   Okay.  And I appreciate that you're sort of being very specific and I want to understand, why are you being -- not Why are you being specific?  But tell me what the difference is from what I'm saying.  When I say, The loan was 15 million and you're saying, The note is 15 million, what is different about what we're saying?

MR. WHITSON:  Object to the form.

A.   There's not.  There's not much -- there's not a difference, loan amount and note amount.

BY MR. APPLEBY:

Q.   Okay.  So, at the time of closing, $15 million would have been held by the title company, the title



agent, and those funds at closing were disbursed to various creditors of Westshore Nursing -- or, excuse me.  I apologize.  Not Westshore but --

MR. WARREN:  Westport.

MR. APPLEBY:  Westport.  I'm sorry.  I live off Westshore, so I've got my mind there.  I got locked on.

BY MR. APPLEBY:

Q.  So at the time of the closing of the Westport Nursing loan, the title company would have had $15 million to disburse.  And, of that 15 million, if I'm understanding, 12 million came over from the bank to pay prior creditors and 3 million came back to the bank?

MR. WHITSON:  Object to form.

A.  So, you know, without pulling the funds flow -- without pulling the closing statement, I can't recall, you know, in detail.  But the total source of funds was 15 million in a loan and 3 million in equity from the borrowers -- 18 million -- the sources of which 15 would have been used for the uses on the closing statement and 3 as cash collateral for the -- for the loan.

BY MR. APPLEBY:

Q.  But the bank was not concerned with the source of the $3 million?  They were just -- it was acceptable




because that was part of the requirement to make the loan, was that $3 million be deposited by Westport Nursing?

MR. WHITSON:  Object to form.

A.   Yes.  Our concern was that we had $3 million in cash collateral.

BY MR. APPLEBY:

Q.   With that cash collateral, did Westport Nursing have any rights to use that money?

MR. WHITSON:  Object to the form.

A.   Not -- no, not -- you know, the only rights were in the pledge agreement.

BY MR. APPLEBY:

Q.   What was the outcome of the dispute between the OIR regarding the $3 million with the bank?

MR. WHITSON:  Object to form.

A.   Can you clarify what you mean about dispute?

BY MR. APPLEBY:

Q.   Are you aware that the OIR claimed -- or their position through various administrative hearings was that the $3 million was part of the minimum liquid reserves required under Westport Holdings?

A.   I mean, no, I don't recall being party to -- or being involved over a dispute or, I guess -- I can't say -- answer what a resolution was.



Q.   Okay.  Are you aware that there were various claims in administrative hearings regarding that $3 million?

MR. WHITSON:  Object to form.

A.   I was not involved in those -- in any of those, no.

BY MR. APPLEBY:

Q.   Okay.  As the loan officer on this loan, once the loan has closed, do your responsibilities continue with that client?

MR. WHITSON:  Object to form.

A.   Yes.  But at some point this was turned over to, you know, somebody else, our Special Assets Department.  So I don't know -- you know, I didn't go to any hearings or otherwise.  So I don't know the timeline that you're speaking to.

BY MR. APPLEBY:

Q.   When -- do you recall when -- or can you tell me when this loan would have been turned over to the Special Assets Department?

A.   I can't tell you the date or -- it would be a guess.

Q.   Do you know whether it was in twenty -- was it 2014?  When did we make the loan?

MR. WHITSON:  Object to form.



A.   Yeah, '14.  I don't -- I can't say with certainty, no.

BY MR. APPLEBY:

Q.   Could anyone other than the bank direct the transfer of the $3 million once it was in the escrow account?

MR. WHITSON:  Object to the form.

A.   Once it was in our collateral account, no, it was, you know, only rights -- transfer rights were with the bank, you know, per the -- per the agreement.

BY MR. APPLEBY:

Q.   So Westport Nursing had no direct rights or transfer rights against the funds?  Is that your understanding?

MR. WHITSON:  Object to the form.

A.   Yeah.  Again, refer to the pledge agreement. But, no, if they had any other informational rights, I don't recall; but as far as access to, no.

BY MR. APPLEBY:

Q.   Do you know whether Landry was a general partner or a limited partner of the --

MR. WHITSON:  Go ahead.  I'm sorry.  I want to let you finish the question.  I'm going to object, but he started to answer, so I'm just --



BY MR. APPLEBY:

Q.   Okay.  Do you know whether Landry was a general partner or a limited partner of Westport Nursing?

MR. WHITSON:  Object to form.

A.   No.  I do not recall.

BY MR. APPLEBY:

Q.   Do you know whether he had any interest -- any ownership interest in Westport Nursing?

MR. WHITSON:  Object to form.

A.   No.  I do not recall the specific ownership.

BY MR. APPLEBY:

Q.   Do you know who at Westport Nursing would have approved the transfer of the $3 million to the bank?

MR. WHITSON:  Object to form.

A.   I have no idea what the control of those funds requires.

BY MR. APPLEBY:

Q.   Do you know who would have -- who did profit from the closing of the loan with USAmeriBank?

MR. WHITSON:  Object to form.

A.   Can -- I mean, if you can explain.  When you say profit, in what regard?

BY MR. APPLEBY:



Q.   Well, who benefited from that loan being closed?

MR. WHITSON:   Object to form.

A.   Who personally benefited?  I mean --

BY MR. APPLEBY:

Q.   Well, personally or an entity.  Do you know who would have benefited because the loan closed?

MR. WHITSON:   Same objection.

A.   I mean, the entity -- $15 million in debt that was subject to a deed in lieu was refinanced on market terms.  So borrowing entities, you know, through debt retiree financing benefited.

BY MR. APPLEBY;

Q.   Do you know if those creditors were paid in full for their debt?

MR. WHITSON:   Object to form.

A.   I do not know anything about their debt.

BY MR. APPLEBY:

Q.   Do you know whether Westport Holdings received any funds at closing of the loan?

A.   I do not know.  I mean, the use of funds would have been on -- you know, per the closing statement.

Q.   I had mentioned that the $3 million was held in an escrow account.  Do you know how that account would have been titled?



MR. WHITSON:  Object to form.

A.   Meaning the account at USAmeriBank/Valley Bank?

BY MR. APPLEBY:

Q.   Yes.

A.   I mean, I don't remember specifically. Generally, it would have been in the -- well, I don't remember specifically what the account actual title is. I mean --

Q.   Do you know whether it was labeled as an escrow account or just simply as a deposit account?

MR. WHITSON:  Object to form.

A.   When you say labeled, meaning, like, in our system or --

BY MR. APPLEBY:

Q.   Yes, in your system, the title for the account.

A.   I don't know if our system differentiates. It was a deposit account subject to a pledge agreement.

Q.   Do you know if there were more than -- if there were only one escrow account or if there were multiple escrow accounts?

MR. WHITSON:  Object to the form.

A.   There was one pledged account and then there was, you know, ancillary operating accounts or



what-have-you.

BY MR. APPLEBY:

Q.   Okay.  For the pledged account?  And there were -- I think we agree we're talking about the $3 million account.

Did Valley Bank or USAmeriBank report that account to anyone -- anyone other than Westport Nursing?

MR. WHITSON:  Object to the form.

A.   Yes.  There was informational rights for -- and I think OIR had a -- there was -- there was somebody that I had been asked to send statements to; but, yeah, they've got viewing rights in the pledge agreement.

BY MR. APPLEBY:

Q.   Why would -- why would OIR have had any rights to view that account?

MR. WHITSON:  Object to form.

A.   They were given rights per the -- you know, per the agreement.

BY MR. APPLEBY:

Q.   Which agreement?

A.   Per the pledge agreement.

Q.   What role did you have in drafting the pledge agreement?

A.   The pledge agreement was drafted by my counsel.



Q.   And do you recall who that counsel was?

A.   Yes, Jay Price.

Q.   Do you know why the bank would have been asked to report to OIR?

MR. WHITSON:  Object to form.

A.   I do not recall that we were required to report to OIR.  I would, again, have to review the pledge agreement.  But when the request was made to allow informational rights, that's when, you know, I asked my counsel to get involved and handle negotiating that document or protecting the bank.

BY MR. APPLEBY:

Q.   With -- well, you mentioned informational rights.  Do you have -- are you familiar with other loans that you've been part of as requiring disclosure through informational rights to entities such as OIR?

MR. WHITSON:  Object to form.

A.   I am familiar with other loans with informational rights, yes.

BY MR. APPLEBY:

Q.   Okay.  Could you tell me, what is informational rights?  What is -- what does that mean?

A.   Well, generally, that they have the ability to view statements or, you know, view balances but not, you know, transactional rights.



Q.   But if OIR had no claims against Westport Nursing and no claims against that account, why would they get informational rights?

MR. WHITSON:  Object to form.

A.   Anybody can give anybody or entity informational rights.

BY MR. APPLEBY:

Q.   I understand.  But why would they do that?

MR. WHITSON:  Object to form.

A.   I do not recall what -- why the ask was; that they asked and, you know, my counsel, you know, got involved.  And I, again, relied on counsel to make sure we were protected.

BY MR. APPLEBY:

Q.   With those statements, the escrow statements, how often were they distributed to the borrower, Westport Nursing or OIR?

MR. WHITSON:  Object to form.

A.   I don't know specifically how often. Generally -- generally, quarterly, I believe, is standard at the time, unless there was specific asked for something more frequent.

BY MR. APPLEBY:

Q.   Do you know if that detail would be included in the pledge agreement?



A.   I do not.

Q.   Do you recall when the OIR challenged the change of control of the MLR, minimum liquidated reserves, that were held by the bank?

MR. WHITSON:  Object to form.

A.   I do not.

BY MR. APPLEBY:

Q.   Do you recall whether that would have been -- do you recall that happening?

MR. WHITSON:  Object to form.

A.   I mean, I recall that -- yes, that we got a letter.  I believe my counsel received a letter in regards to the collateral account and, you know, the MLR, but I don't remember -- recall a timeline.

BY MR. APPLEBY:

Q.   Do you -- do you know whether it would have been soon after the loan had been made or perhaps more than six months or even a year?

A.   I believe it was -- what I recall is it was after.  I just don't know if it was, you know, three months, six months, eighteen months.

Q.   Do you know whether the bank participated in any of the administrative proceedings related to the challenge by OIR?

MR. WHITSON:  Object to form.



A.   I do not recall.  I mean, I did not.

BY MR. APPLEBY:

Q.   Do you know what the bank's response would have been to OIR's challenge?

MR. WHITSON:  Object to form.

A.   I -- without understanding the challenge, I -- you know, the specific challenge details, I do not.

BY MR. APPLEBY:

Q.   Are you aware of any lawsuits caused -- well, let me change the word caused -- but any lawsuits that followed closing this loan against Westport Nursing?

MR. WHITSON:  Object to form.

A.   Against Westport Nursing?  No, I do not.

BY MR. APPLEBY:

Q.   Do you know whether Westport Nursing had any lawsuits against any other entities after this loan was closed?

MR. WHITSON:  Object to form.

A.   I do not.

BY MR. APPLEBY:

Q.   Do you know what, if anything, the bank did to help Bartle get control of operations of Westport Nursing?

MR. WHITSON:  Object to the form.



A.   Explain what you mean, help.

BY MR. APPLEBY:

Q.   Well, that's really my question to you.

A.   The bank made a real estate loan, you know, secured by a piece of property with some tenants that we did not help, other than -- I mean, that's -- that was the transaction side.  I guess I'm not clear on help.

Q.   Well, earlier when -- I'm sorry.  I didn't --

A.   No, go ahead.

Q.   Earlier when I asked you about Mr. Bartle, you mentioned that you met him during this process and that -- and, again, I won't recall the exact words you used, but that he was very knowledgeable in this type of industry, whether we're talking about assisted living facilities or ILFs.  Was the bank's position that Mr. Bartle was vital to making this loan a success with his knowledge of operations of these types of facilities?

MR. WHITSON:  Object to the form.

A.   There are a lot of factors that go into it. I mean, experience, by operators or otherwise, is part of it.  But I don't know if vital is -- you know, we didn't make a loan because of John Bartle, you know. We made a properly secured real estate loan with tenants



and cash flow.

BY MR. APPLEBY:

Q.   How was your relationship with Mr. Bartle throughout the loan origination process?

MR. WHITSON:  Object to form.

A.   How was it?

BY MR. APPLEBY:

Q.   Yes, sir.

A.   It was fine.

Q.   Would you consider him a friend?

MR. WHITSON:  Object to form.

A.   No.

BY MR. APPLEBY:

Q.   Are you still in contact with Mr. Bartle?

A.   No.

MR. APPLEBY:  If we could, I'd like to take a quick break because I'm going to get into some documents.

MR. WHITSON:  Okay.

MR. APPLEBY:  I just want to get those together.

(There was a recess.)

BY MR. APPLEBY:

Q.   I'm going to try to go through a few documents before we get done today, but I think all of them are



things we've discussed at length a little bit at this point.

MR. APPLEBY:  I'll mark the first document as Plaintiff's Exhibit 23.  We've had some other depositions.  So we're trying to just keep in line with what's already been numbered.

(The document was marked as Plaintiff's Exhibit Number 23 for identification.)

BY MR. APPLEBY:

Q.   Mr. Korhn, if you wouldn't mind, do you recognize this document?

A.   Yes.

Q.   Can you tell me what this document is?

A.   This is the deposit/pledge agreement for the cash collateral.

Q.   Okay.  And then we've -- I guess several times we've referred in conversation to the pledge.  Is this the document that you were referring to when you have used the term pledge?

A.   Correct.  The pledge agreement, yes.

Q.   On the last page of this document, there is a signature page for the lender, USAmeriBank.  Do you recognize the signature on that page?

A.   Yes.

Q.   Is that your signature?



A.   Yes.

Q.   And coming back just specifically to the document, can you tell me what this type of document is used for?

A.   Yes, to pledge cash collateral.

Q.   Okay.  And was the cash collateral -- this $3 million that's referenced in this document, was this a condition for making the loan?

A.   Yes.

Q.   How did the bank determine what amount needed to be pledged on this loan?

A.   The -- so that the net loan amount --

MR. WHITSON:  I'm sorry.  One second.

Is Adina still on the line?  It just occurred to me -- did we --

Adina, are you there?

MR. APPLEBY:  She might be on mute, but her phone shows that it's still open.

MR. WHITSON:  Okay then.  I just want to make sure.

I'll object to the form.  I was thinking about that.  But go ahead.

MR. WARREN:  Do you want me to send her a note?  I mean, that's easy for me to do.

MR. WHITSON:  Well, if her line's still open,



I mean, she --

I'm sorry.  Go ahead.

Would you mind repeating the question?

THE WITNESS:  Yes, sir.

BY MR. APPLEBY:

Q.    Yeah.  The question was:  How did -- how did USAmeriBank determine the number of $3 million to be the pledge amount?

A.    So that our net loan amount, net of the cash collateral, was $12 million.

Q.    And what's significant about $12 million?

A.    My recollection is that was the net amount that the bank was comfortable approving based on, you know, its credit criteria.

Q.    Under the Recitals section at paragraph D, can you read to me or tell me what that -- what paragraph D says?

A.    Read it verbatim?

Q.    Yes, sir.

A.    The MLR Statute provides that the Office of Insurance Regulation of the State of Florida (the "Department") shall have information rights regarding the Cash Collateral Funds.

Q.    Okay.  And then right above that, at paragraph C, could you read that paragraph as well, please?



A.   The Cash Collateral Funds (as defined below) deposited by Pledgor hereunder shall be included in the Pledgor's reserve requirements as required under Section 651.035 of the Florida Statutes (the "MLR Statute"), as such Cash Collateral Funds meet the statutory uses allowed under Section 1(b) of the MLR Statute.

Q.   Okay.  You've indicated that you are familiar with this document.  Did you draft this document?

A.   No, I did not.

Q.   Who would have drafted this document?

A.   My counsel, the bank's counsel.

Q.   Okay.  And does the bank's counsel always determine what the terms are in this document?  Who determines what the terms are?

MR. WHITSON:  Object to form.

A.   The bank counsel, yes, would have negotiated the terms of this on the bank's behalf.

BY MR. APPLEBY:

Q.   Okay.  So why would this document require that the Office of Insurance Regulation have information rights regarding these funds?

MR. WHITSON:  Object to form.

A.   Yeah, that, we'd have to ask bank counsel. Again, our reliance was, if somebody wants information rights, it's up to bank counsel to decide whether



they're comfortable with it.

BY MR. APPLEBY:

Q.   Okay.  So that's totally a decision made outside the bank's control, meaning it's made solely by counsel and the bank doesn't play a role in negotiating the terms?

MR. WHITSON:  Object to form.

A.   No.  So when the request was made to provide these rights, then at that point the bank asked counsel to review and confirm whether that was acceptable.

BY MR. APPLEBY:

Q.   Who would have made that request?

A.   The -- which request?  The request to allow those rights?

Q.   Yes.  The request that provided that the Office of Insurance Regulation receive information rights.

A.   That request, I believe, was made by counsel for the borrower.

Q.   Okay.

(Discussion off the record.)

MR. APPLEBY:  I guess I should state for the record, too, for you --

THE COURT REPORTER:  Oh, okay.  State for the record?



MR. APPLEBY:  Yes, that the document, the pledge agreement that we just looked at, has been marked as Plaintiff's Exhibit 23.

BY MR. APPLEBY:

Q.   Mr. Korhn, do you recognize the document that I've just handed you?

A.   Yeah.  It looks like the loan agreement.

Q.   Okay.  So good.

MR. APPLEBY:  I'm going to mark the loan agreement as Plaintiff's Exhibit 24.

(The document was marked as Plaintiff's Exhibit Number 24 for identification.)

BY MR. APPLEBY:

Q.   At the bottom right of that piece of paper there's a reference for just a Bates label.  It says, Sub_Landry, and then 00018789.  Do you see that?

A.   Yes.

Q.   If you could go all the way to where the last digits are, 18831.

A.   Okay.

Q.   That's a signature page.  Do you recognize the signature on this page?

A.   Yes.

Q.   Whose signature is that?



A.   That's mine.

Q.   Do you recall signing this document?

A.   It's been a long time.  I don't recall.  But that's my signature and notarized, so . . .

Q.   Okay.  So this is the loan agreement.  If you would, tell me generally what does a loan agreement encompass?

MR. WHITSON:  Object to the form.

A.   It's the main governing -- one of the main governing documents of the -- outlining the transaction.

BY MR. APPLEBY:

Q.   Okay.  And this references -- under Recitals, it references that the bank or the lender -- the bank -- has made a loan to borrower in the amount of $15 million.  Is that correct?

A.   Correct.

Q.   On the second page -- well, the second page, which is at the bottom right corner, again, 18790, there's a reference.  The third defined term is, Assignment of Licenses.

Are you aware of whether any licenses were assigned to the bank at the time of closing?

A.   I don't recall if -- no, I don't recall.

Q.   Do you know offhand whether this loan was ever amended?



A.   Yeah.  I think it was -- when you say loan, can you clarify what aspects of the transaction --

Q.   Well, I'm just -- I guess my question:  Is this the version that is still effective or has there been modifications or amendments to this loan agreement?

A.   I believe there was a modification to the loan agreement at one point.  I don't recall if there are any other modifications to any other documents.

Q.   Okay.  I apologize.  On the second page of this document there is a defined term for borrower. Could you tell me who the borrower is?

A.   Westport Nursing Tampa LLC.

Q.   And it goes on to say that that's a -- it's a Florida limited liability company.

A.   Correct.

Q.   Do you know if Westport Nursing Tampa, LLC, has ever held itself out to be a non-profit?

MR. WHITSON:  Object to the form.

A.   I do not know.

BY MR. APPLEBY:

Q.   Does the bank -- have you had any experience making loans to non-profit organizations?

A.   I do not recall that I have.

Q.   Do you know whether the bank would accept a non-profit as a guarantor on a loan?



MR. WHITSON:  Object to form.

A.   I don't -- I don't see why not.

BY MR. APPLEBY:

Q.   Several pages in -- again, the last digits, at page 18792, there's a defined term, Guarantor.  Could you read that to me, please?

A.   "Guarantor" means BVM Management, Inc., an Indiana nonprofit corporation.

Q.   Does the bank treat or evaluate the creditworthiness of a company any differently when it's a for-profit corporation versus a non-profit?

MR. WHITSON:  Object to form.

A.   No.

BY MR. APPLEBY:

Q.   Have you made loans to -- direct loans to non-profits as the borrower, that you can recall?

A.   I have not personally, that I can recall, no.

Q.   Can you recall any other time where you would have had a lending relationship where a non-profit was the guarantor?

A.   Not that I can recall, no.

Q.   Can you tell me what the purpose of this loan was for?

MR. WHITSON:  Object to form.

A.   Sure.  To refinance the real estate debt



secured by that facility.

BY MR. APPLEBY:

Q.   Okay.  And to make sure I'm understanding, it was to refinance the debt, or is this related to a purchase of the property?

MR. WHITSON:  Object to form.

A.   Yeah.  I mean, the -- I'd really have to go back and look at the transaction in detail because I know there was -- I just don't remember the detail offhand.

BY MR. APPLEBY:

Q.   On the page number that ends 18797, at the top -- or near the top, there's a definition for Subordinate Seller Note that indicates that as of -- there was a Seller Promissory Note dated March 31, 2014, by borrower to BVM Management, Inc., in the principal amount of $1 million.  Do you -- can you tell me what that million dollars -- what that is?

A.   No, I can't.

Q.   Do you know whether that $1 million would have been distributed out of closing -- at closing to BVM Management, Inc.?

MR. WHITSON:  Object to the form.

A.   No, not without seeing the -- you know, the closing statement that would, you know, outline these



funds.

BY MR. APPLEBY:

Q.   At page that ends in 18801, at the top, it references that, The current effective capacity of the facility as set forth in Exhibit G, which is the very last page of this document --

MR. WHITSON:  I'm sorry, Keith.  Okay. Are you reading from the top there?

MR. APPLEBY:  Yes.

MR. WHITSON:  Okay.

BY MR. APPLEBY:

Q.   It references the effective capacity of this -- well, the building; they say the real property -- as 110 Assisted Living Beds and 120 Skilled Nursing Beds.

A.   Okay.

Q.   Last -- the last word on the third sentence starts with Borrower.  Can you read that sentence to me?

A.   Which sentence, again?

Q.   It's section (a), at the very top.  The third sentence, the last word on the far right begins with Borrower.

A.   Borrower and Lessees are in compliance in all material aspects with the applicable provisions of assisted living and skilled nursing facility laws,



rules, regulations and published interpretations to which the Facility is subject.

Q. In this document, this would be the borrower affirming these things to the bank. Is that an accurate statement?

A. Yes. Article III is the Borrower's Representations and Warranties.

Q. Can you tell me what -- what, if anything, the bank does to confirm that the borrower has complied with these provisions?

MR. WHITSON: Object to form.

A. Again, we asked our counsel to validate the licensing and compliance. But, really, that is a representation by the borrower.

BY MR. APPLEBY:

Q. But my question was: Does the bank do anything to verify this?

MR. WHITSON: Object to form.

A. No. Again, our reliance is on counsel.

BY MR. APPLEBY:

Q. At page ending 18802, Section 3.11, it says, Location of Chief Executive Offices. At the very -- well, again, towards the back, at 18834, is Exhibit B, Borrower's Principal Places of Business and Chief Executive Offices.



The principal place of business was 12250 North 22nd Street, Tampa, Florida, 33612, with the Chief Executive Office located at 152 West 57th Street, 46th Floor, in New York, New York 10019.

Are you aware if those addresses ever changed during the pendency of this loan?

MR. WHITSON:  Object to form.

A.   Not that I'm aware of.  No, I'm not aware if either of those changed.

BY MR. APPLEBY:

Q.   At page 18804, Section 3.22, the title of this section is Fraudulent Conveyances.  Could you read the first sentence, please?

A.   Borrower (a) has not entered into this Agreement or any of the other Loan Documents with the actual intent to hinder, delay, or defraud any creditor, and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents.

Q.   Do you know whether all creditors of Westport Nursing were paid at closing of this loan?

MR. WHITSON:  Object to form.

A.   No.

BY MR. APPLEBY:

Q.   No, you do not know if all creditors were paid?



A.    No.   I don't know what, you know, all the -- the creditors are.

Q.    Okay.   Do you know whether Westport Holdings was a creditor of Westport Nursing?

A.    No, I do not.

Q.    Do you know whether Westport Holdings II Tampa -- and I should end with the word Tampa on both of those -- whether Westport Holdings Tampa II was a creditor of Westport Nursing?

A.    No, I do not.

Q.    There's a -- there in the middle of the document there are a lot of requirements that the borrower provide the bank with certain documents, such as insurance policies.   Do you know whether the borrower provided all required documents to the bank following the closing of this loan?

MR. WHITSON:   Object to form.

A.    I mean, I think I need to understand what you're asking for specifically.   Insurance was provided.

BY MR. APPLEBY:

Q.    Whose responsibility at the bank would it be to confirm that documents, like insurance policies, are turned over to the bank?

A.    We have a service that tracks insurance policies.



Q.   At page 188.12 or -- I'm saying point -- but 18812, paragraph (f) indicates that each quarter a statement with the number of beds available and the actual patient days for the facility would be turned over to the bank showing the patient mix and it indicates that private Medicare, Medicaid and V.A., to the extent applicable, and the averages for the end of such quarter.

Why would the bank require information about individual patients or residents if their lease was only with the two tenants?

MR. WHITSON:  Object to form.

A.   So could -- ask that -- I'm sorry.  Ask that again, please.

BY MR. APPLEBY:

Q.   Well, the bank asks for very specific information about each patient, meaning whether they were -- whether they were paying privately, through Medicare or Medicaid, or V.A., or whatever is applicable.  Why would the bank require that information to be turned over if their analysis and due diligence for making this loan only related to the tenants?

MR. WHITSON:  Object to form.

A.   Because monies are paid to the tenant.

BY MR. APPLEBY:



Q.   So when this loan was being made, were things such as Medicaid -- the rates that Medicaid paid and the number of Medicaid/Medicare/V.A. patients, was that considered in the underwriting process?

A.   I don't recall to -- in what detail.  But senior housing, sure, you always consider source of payment.

Q.   At page 18816, Section 4.2, Cash Collateral Account.

A.   Okay.

Q.   It indicates, Withdrawals -- midway through that paragraph, it says, Withdrawals from the Cash Collateral Account shall not be permitted without Lender's prior consent, which may be given or withheld in Lender's sole discretion.

Do you know whether the Cash Collateral Account was ever -- whether consent was even given or permitted by the bank to be withdrawn?

MR. WHITSON:  Object to form.

A.   It was not.

BY MR. APPLEBY:

Q.   Did the bank ultimately capture that Cash Collateral Account and apply it towards the loan?

MR. WHITSON:  Object to the form.

A.   Yes.  Ultimately, we applied our collateral to



reduce the debt balance.

BY MR. APPLEBY:

Q.   Would that have taken place after the loan had gone to Special Assets or while you were still involved in management?

MR. WHITSON:  Object to form.

A.   That was after it had been transferred to Special Assets.

BY MR. APPLEBY:

Q.   If a borrower, such as Westport Nursing, falls into default, what is the process that the bank uses to evaluate the default?  What are the steps that the bank takes?

MR. WHITSON:  Object to form.

A.   I mean, there's a lot of different avenues, depending on what type of default.

BY MR. APPLEBY:

Q.   Do you recall what type of default Westport Nursing -- what was the default the first time that you knew of a default?

MR. WHITSON:  Object to form.

A.   No.  I don't recall what the first -- first default was, no.

BY MR. APPLEBY:

Q.   Do you recall what any of the defaults were?



A.    I believe we had a maturity default.

Q.    Had payments been made timely prior to the maturity default?

A.    I don't recall, you know, leading up to the maturity default, if payments were current or not.

Q.    When you're the loan officer on a loan like this, at what point does it get transferred to Special Assets?

MR. WHITSON:  Object to form.

A.    There's no written protocol.  If it's become, you know, deteriorated to a point where Special Assets officers deemed more fit to handle it going forward, then it's transferred over.

BY MR. APPLEBY:

Q.    Once it gets transferred to Special Assets, do you play any role or is it completely removed from your purview?

MR. WHITSON:  Object to form.

A.    Yeah.  I didn't have any role unless, you know, asked a question or needed.  But, effectively, no, I'm not in the decisionmaking process.

BY MR. APPLEBY:

Q.    Mr. Korhn, I'm going to hand you what I have marked as Plaintiff's Exhibit 25.

(The document was marked as Plaintiff's



Exhibit Number 25 for identification.)

BY MR. APPLEBY:

Q.   Could you take a look at this and let me know if you recognize this document?

A.   It looks like a form of commitment, unexecuted by the borrower.

Q.   Can you tell me, what is the purpose of this document?

MR. WHITSON:   Object to form.

A.   It's a commitment letter that outlines the terms and conditions in which the bank would make the loan.

BY MR. APPLEBY:

Q.   Okay.  And so with this commitment letter -- it's dated February 5th, 2014.  Did you draft this commitment letter?

A.   I don't know who drafted this, if this was internal or attorney prepared it.

Q.   Okay.  It's addressed to Mr. Robert Rynard, R-y-n-a-r-d, Sr.  Who is Mr. Rynard?

A.   I don't recall what his title was or if it was asked to be addressed to him or if he had signing authority.  I don't recall.

Q.   Do you recall whether he was one of -- someone that you would have negotiated the terms of this loan



with?

A.   He may have been involved.  I mean, I'd have to be able to look at term sheets or otherwise, who was -- who executed those term sheets, but I don't recall.

Q.   And on the front page of this it references a loan amount of $20 million.  What changed between this loan commitment and the loan that was closed to cause it to decrease from 20 million to 15 million?

MR. WHITSON:  Object to form.

A.   So the borrower had requested a couple levels of the loan amounts as it related to eventually refinancing the property with HUD.  So -- and the bank's position was always that the net loan amount, net of cash collateral, would be 12 million.  So, in this instance, the $20 million note and 8 million in cash collateral, netting 12.

BY MR. APPLEBY:

Q.   Okay.  And the ultimate loan that closed was 15 million with 3 million in cash collateral, still netting 12.  Is that correct?

A.   That's correct.

Q.   And do you know -- do you know specifically the reason why the amounts changed?

A.   I do not know specifically, no, but --

Q.   Do you know whether the borrower was able



to come up with the $8 million to deposit as cash collateral?

A.   No.

MR. WHITSON:   Object to form.

A.   No.  It never got to that point.  It was merely driven by, you know, HUD take-out sizing.

BY MR. APPLEBY:

Q.   As pre conditions to this loan -- or to this -- I'm sorry.  What's the term used to refer to this document, commitment letter or --

A.   Yeah, commitment letter.

Q.   As pre conditions -- at paragraph number 9, under Pre Conditions, it references, Tenant Estoppels on all tenants.  Can you tell me what that means?

A.   Yeah.  So estoppels from tenants in the -- occupying the building, securing the loan.

Q.   In laymen's terms, can you tell me what -- what an estoppel is?

A.   Yeah.  I mean, both 8 and 9 are common in most leased real estate transactions; effectively, a confirmation by the tenants that the leases are, you know, valid and the landlord's not in default and that sort of thing.

Q.   Do you know whether that would have any significance in this particular loan as compared to



a strip mall or a shopping center?  Would there be any difference with the tenants because of these being tenants in either an assisted living facility or otherwise?

A.   No.   It's still a leased tenant.  They just do something different than what a tenant in a strip mall does.

Q.   Do you know whether that -- that this SDNA on all tenants or the tenant estoppels would have included the actual residents of Westport Nursing?

A.   No, it would not, because they -- they didn't lease the facility.

Q.   Do you know whether any other commitment letter was presented to the borrower, Westport Nursing Tampa, LLC, prior to the loan that was closed?

A.   I do not recall if there was any others.

MR. APPLEBY:  Off the record for just a second.

(The deposition was adjourned at 3:27 p.m. and is continued in Volume II at page 113.)



CERTIFICATE OF OATH


STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH    )




        I, Jean M. Wilkes, RPR-CP, Court Reporter,

Notary Public, State of Florida at Large, certify that

VERNON F. KORHN, III, personally appeared before me and

was duly sworn.


        WITNESS my hand and official seal this

13th day of April, 2023.




_____
JEAN M. WILKES, RPR-CP
NOTARY PUBLIC AT LARGE
STATE OF FLORIDA
My Commission No.  GG 977171
Expires:  April 8, 2024



CERTIFICATE OF REPORTER


STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH )


          I, Jean M. Wilkes, RPR-CP, Court

Reporter, certify that I was authorized to and did

stenographically report the foregoing deposition of

VERNON F. KORHN, III, and that the transcript is a

true record of the testimony given by the witness.


          I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorneys or counsel connected with the action, nor am I

financially interested in the action.


          Dated this 13th day of April, 2023.



_Jean M. Wilkes_
_____
JEAN M. WILKES, RPR-CP



SIGNATURE PAGE/ERRATA SHEET

IN RE:  Westport Holdings Tampa; Westport Holdings
        Tampa II - Debtors
                   * * * * *
        Jeffrey W. Warren vs. Valley National Bank
                   VOLUME I

        I, VERNON F. KORHN, III, do hereby certify
that I have read the preceding pages and that they are
correct, to the best of my knowledge, with the following
exceptions:
PAGE NO.  LINE NO.  CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

                    _____
                    VERNON F. KORHN, III              DATE

