UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

WESTPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP,

WESTPORT HOLDINGS TAMPA II,
LIMITED PARTNERSHIP,

    Debtors.

_____/

JEFFREY WARREN, as LIQUIDATING
TRUSTEE for WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP AND
WESTPORT HOLDINGS TAMPA II, LIMITED
PARTNERSHIP,

    Plaintiff,

v.

BVM MANAGEMENT, INC., BVM
UNIVERSITY VILLAGE, LLC, IMH
HEALTHCARE, LLC, WESTPORT
NURSING TAMPA, LLC, TR&SNF, INC.,
TALF, INC., JOHN BARTLE, REBECCA
BARTLE, ELI FREIDEN, KASSIDY
MCCOWAN, and JARED MCCOWAN,

    Defendants.

_____/

Case No.:  8:16-bk-08167-MGW

Chapter 11

Adv. Pro. No.:_____

## COMPLAINT

Plaintiff, Jeffrey W. Warren, as Liquidating Trustee for Westport Holdings Tampa, Limited Partnership ("Westport") and Westport Holdings Tampa II, Limited Partnership ("Westport II" and collectively with Westport, the "Debtors"), by his undersigned counsel, sues


DEFENDANT'S EXHIBIT
Warren #5
4·24·23 DK
PENGAD 800-631-6989

the Defendants, BVM Management, Inc. ("BVM Management"), BVM University Village, LLC ("BVMUV"), IMH Healthcare, LLC ("IMH"), Westport Nursing Tampa, LLC ("WNT"), TR&SNF, Inc. ("TR&SNF"), TALF, Inc. ("TALF"), John Bartle ("Bartle"), Rebecca Bartle ("Rebecca Bartle"), Eli Freiden ("Freiden"), Kassidy McCowan ("Kassidy McCowan"), and Jared McCowan ("Jared McCowan") and alleges:

**JURISDICTION AND VENUE**

1. The Liquidating Trustee brings this adversary proceedings pursuant to this Court's *Order (a) Confirming First Amended and Restated Mediated Joint Plan of Liquidating Under Chapter 11 of the United States Bankruptcy Code, as Modified, Pursuant to 11 U.S.C. § 1129, and (b) Approving Disclosure Statement for First Amended and Restated Mediated Joint Plan of Liquidating Under Chapter 11 of the United States Bankruptcy Code, on a Final Basis, Pursuant to 11 U.S.C. § 1125*, which authorizes the Liquidating Trustee to pursue the Debtors' Causes of Action, as defined in Section 1.30 of the *First Amended and Restated Mediated Joint Plan of Liquidating Under Chapter 11 of the United States Bankruptcy Code, as Modified.* (Doc. Nos. 1012, 1016.)

2. This is an adversary proceeding brought pursuant to Rules 6009 and 7001 of the Federal Rules of Bankruptcy Procedure, Sections 105, 542, 544, and 550 of Title 11 of the United States Code (the "Bankruptcy Code"), and Sections 726.105(1)(a) and (b) of the Florida Statutes.

3. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

6.     The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 22, 2016.

7.     The Debtors are Delaware limited partnerships. The Debtors operate the University Village continuing care retirement community (CCRC) in Hillsborough County, Florida ("University Village").

8.     Defendant BVM Management is an Indiana nonprofit corporation. Defendant Jared McCowan is its registered agent in Florida, and Bartle and Rebecca Bartle are officers.

9.     Defendant BVMUV is a Florida limited liability company. Since March 31, 2014, BVMUV has been a limited partner of the Debtors.

10.     Defendant IMH is a Delaware limited liability company. Since March 31, 2014, IMH has been a limited partner of the Debtors, and since March 2, 2015, IMH has been the general partner of the Debtors.

11.     Defendant Kassidy McCowan is a resident of Florida, and is the daughter of Bartle.

12.     Defendant Jared McCowan is a resident of Florida, and is the son-in-law of Bartle.

13.     Defendant WNT is a Florida limited liability company. As of June 2015, WNT's members are BVMUV, IMH, and JFC Consultants, LLC ("JFC"), and IMH is its managing member.

14.     Defendant TR&SNF is a Florida nonprofit corporation.

15.     Defendant TALF is a Florida nonprofit corporation.

3

16. Defendant Bartle is a resident of Indiana, and does or has acted as the authorized representative and president for BVM Management, and the authorized representative for BVM Bridges, and BVM Coral Landing, which are defined below.

17. Defendant Rebecca Bartle is a resident of Indiana, and is or was the managing member of Compliance Concepts, the secretary of BVMUV, and a member of the Board of Managers for WNT.

18. Defendant Freiden is a resident of Florida, and is the sole member of IMH.

19. At all times material hereto, the Debtors and WNT have been under common management and control.

**A.** **BVM Management / Bartle**

20. BVM Management, and its president, Bartle, have been extensively engaged in the operations of University Village, starting with BVM Management's mid-2013 interest in acquiring the Debtors, to its guarantee of loans to buy the Debtors' 99% limited partnership interest, and extending to Bartle's participation as a representative of the acquiring entities in meetings with OIR.

21. Beginning in April 2014 and extending through October 2014, BVM Management engaged in merger discussions with Westport's designated facility manager, AgeWell Senior Living, LLC ("AgeWell"), a Florida limited liability company within the family of entities controlled directly or indirectly by Landry. During that period, much of the work being done on the campus was coordinated between AgeWell and BVM Management.

22. AgeWell had the management contract, but BVM Management was participating in the plan of finance and the rehabilitation of the facility. During that period, AgeWell personnel and BVM Management personnel were working in tandem on several projects.

4

23.     Bartle attended Westport board meetings, finance committee meetings, and made presentations for the health center and its financial condition.

24.     Because of Bartle's ongoing involvement with the operations of University Village, and BVM Management's substantial financial ties as guarantor for the two loans, OIR sought background information on Bartle as a person indirectly involved with the management of an acquiring entity. Bartle did not provide the requested information.

25.     Bartle exercised his control over the Debtors, WNT, TR&SNF, and TALF to transfer money to himself, to entities under his control, and to his family members including payments to BMV Management, which employed Bartle, Kassidy McCowan, and Jared McCowan;  transfers from TR&SNF to Kassidy McCowan and Jared McCowan; distributions from WNT to its members, including BVMUV; and transfers from Westport and TALF to BVMUV.

26.     Bartle exercised his control over WNT, TR&SNF, and TALF to execute a new lease of the University Village health center which required an additional million dollars in annual rent payments in the first year and by the third year an additional $2.5 million. Excess cash received from payments under the new lease was distributed to the members of WNT.

27.     In September 2014, Bartle caused BVM Management to open a line of credit with SCM Specialty Finance Opportunities Fund for payment of the general obligations of BVM Management. The line of credit was secured by Medicare receivables of TR&SNF and TALF that were paid to a lockbox account. In April 2016, after significant defaults under the credit agreement, Frieden caused Westport to guaranty the indebtedness which was then approximately $1 million dollars.

B.      *IMH / Freiden*

28.     IMH was formed on March 24, 2014, one week before it acquired its limited partnership interest in Westport. IMH has no financial investment in University Village.

29.     Freiden is IMH's sole and managing member. IMH has no employees.

30.     Freiden studied Talmudic law at Neveh Zion Talmudic University in Israel and biology and business management at Touro College in Brooklyn, New York.

31.     Freiden did not obtain a degree from Touro College, or elsewhere. Freiden has no specific education, expertise, or formal training in insurance, or in CCRCs. He has never applied for an insurance license or a license in the healthcare field. He is not a healthcare professional. Mr. Freiden had no experience with operating a CCRC prior to his involvement at University Village beginning in March 2015.

32.     Frieden exercised his control over the Debtors to transfer substantial sums from Westport to IMH.

## GENERAL ALLEGATIONS

### A.    *Overview of CCRCs*

33.     Continuing care retirement communities ("CCRC") offer a combination of long-term care and housing to retirees and senior citizens. Initially, CCRC residents live in apartment or condominium style units located in a residential complex, often referred to as an independent living facility ("ILF"). As residents' needs progress, they are entitled to move into an assisted living facility and, if necessary, eventually into a skilled nursing facility, where they can receive more intensive and specialized care.

34.     Generally, to join a CCRC, a resident is required to pay a substantial up-front entrance fee, sometimes referred to as an initial entry deposit ("Initial Entry Deposit" or "IED"), and enter into a continuing care contract ("Life-Care Contract"). A typical Life-Care Contract between a resident and Westport generally provides a "Refundable" portion of the IED, a small

6

balance being non-Refundable. The Life-Care Contract allows the CCRC to periodically deduct funds from the resident's Refundable Initial Entry Deposit through a "healthcare line of credit" to supplement and provide for the resident's living and long-term care expenses when the time comes for the resident to need additional care in the assisted living facility ("ALF") or the skilled nursing facility ("SNF").

35. Residents who require care at the ALF or the SNF for a long period of time, or who necessitate significant long-term care expenses that are provided under the Life-Care Contract, may incur costs that equal or exceed the Refundable balance of their IED. When this occurs, Life-Care Contracts function much like long-term care insurance policies, allowing the resident to remain at the CCRC indefinitely and for no additional charge under the terms of the Life-Care Contract. If, on the other hand, a resident voluntarily leaves the CCRC or passes away prior to the exhaustion of their Refundable Initial Entry Deposit through application of the healthcare line of credit, the resident or the resident's estate is entitled to a refund of the unused portion of their Refundable Initial Entry Deposit.

36. Given the substantial living and long-term care services provided by CCRCs, residents' IEDs can range from $75,000 to in excess of $400,000. As a result, many residents sell their primary residence or otherwise deplete their personal resources and use the proceeds to finance their IEDs.

37. CCRCs are not a static environment. Residents continually move between the ILF, the ALF, and the SNF. To attract new residents and, by extension, safeguard the long-term viability of the community, CCRCs must continually make capital expenditures to maintain and improve their facilities. These capital expenditures are typically funded, in most or in part, from the sale of new Life-Care Contracts and the new IEDs generated thereby, and through sources such as external financing and cash flow generated by the operations of the associated ALF and

SNF. If the necessary capital improvements do not occur, CCRCs are less able to attract new residents and, by extension, the IEDs necessary to offset facility maintenance and the long-term care expenses of existing residents. If this process continues, CCRCs can face financial challenges and, eventually, become insolvent.

38.     A person seeking to acquire an ownership interest in a CCRC with an existing certificate of authority that requires OIR's approval must file an application for acquisition under section 628.4615, Florida Statutes. The application is subject to review under statutory criteria designed to ensure the protection of the residents and the public.

39.     The owner or operator of a CCRC is required to maintain a minimum liquid reserve ("MLR") in an escrowed account to cover expenses of the CCRC in the event of financial difficulties. The MLR consists of an amount equal to principal and interest payments due during the next 12 months on any mortgage loan or other long-term financing of the facility, including property taxes; an operating reserve equal to 15 percent of the total annual operating expenses; and a renewal and replacement reserve equal to 15 percent of the facility's average operating expenses for the past three fiscal years.

**B.     The University Village CCRC**

40.     Westport holds a certificate of authority from the Florida Office of Insurance Regulation ("OIR") to operate the University Village CCRC pursuant to chapter 651, Florida Statutes.

41.     University Village has entered into Life-Care Contracts with senior citizens and retirees in the Tampa Bay area.

42.     The University Village CCRC includes ILFs comprising 446 apartments in two multi-story apartment buildings known as the Towers, and 46 patio homes known as the Villas, an ALF and a SNF (which includes a memory care facility). The ALF and SNF are housed in a

three-story facility, generally known as the "health center," located across the street from the ILF. The SNF, containing 120 beds, is located on the first floor, with the remaining 110 ALF units located on the second and third floors.

43. Debtors each have two partnership percentage interests: a 99% limited partnership interest and a 1% general partnership interest.

44. By 2013, OIR had become concerned with the financial condition of University Village, including the amount maintained in reserve to catch up on deferred maintenance to the University Village buildings and for the payment of IED refunds.

45. In early to mid-2013, Bartle became interested in acquiring the University Village. Bartle engaged in negotiations for the purchase of University Village on the behalf of BVM Management and BVMUV.

46. By that time, OIR was very engaged in the status of University Village, monitoring its operations on an almost monthly basis.

47. On December 15, 2013, after multiple agreed extensions, the Debtors' secured loans of approximately $20,000,000 matured. The Debtors were unable to satisfy the debt.

48. Prior to March 31, 2014, the organizational and operational structure of Westport and Westport II was as follows:

a) Westport Holdings University Village, LLC ("WHUV"), a Delaware limited liability company, was the 1% general partner interest in Westport, and managed and operated the ILF at University Village;

b) Westport Holdings Hidden Springs, LLC ("WHHS"), a Delaware limited liability company, held the 1% general partnership interest in Westport II;

c) Lawrence Landry ("Landry"), the president and sole manager of Westport and Westport II, controlled both WHUV and WHHS, the general partners of

9

Westport and Westport II, respectively, through a separate entity, Westport Advisors, Ltd., as manager;

d) Westport Senior Living Investment Fund, L.P. ("WSLIF"), a Delaware limited partnership, held the 99% limited partnership interest in Westport and Westport II;

e) TALF was the designated licensee and operator for the ALF at University Village;

f) TR&SNF was the designated licensee and operator of the SNF at University Village;

g) WEMAMM I, LLC ("WEMAMM"), a Florida for-profit limited liability company, was the managing member of TALF and TR&SNF, and provided management services under a management contract with TALF and TR&SNF for the operations of the ALF and the SNF;

h) Westport owned 100% of the membership interests in WNT, which owned the property housing the ALF and the SNF at University Village, making WNT a wholly owned subsidiary of Westport; and

i) Prior to March 31, 2014, Westport, Westport II, and WNT's primary secured lender was Horizon LP UV Lender, LLC ("Horizon"), which held mortgages totaling approximately $20,000,000 secured by Westport, Westport II, and WNT's property.

49. OIR had approved WHUV to act as general partner of Westport as required by section 628.4615, Florida Statutes. Management of University Village was performed by AgeWell.

50.     Bartle, Rebecca Bartle, and Freiden used the following entities, which they directly or indirectly own or control, to facilitate the leveraged buyout of University Village:

a)      BVMUV was used to acquire a 39.6% limited partnership interest in the Debtors, and a 40% membership interest in WNT;

b)      BVM Management was initially used to attempt to acquire the 99% limited partnership interest in University Village, and is a guarantor of the loan transactions described below;

c)      IMH was used to acquire the 1% general partnership interest in Debtors, a 19.8% limited partnership interest in the Debtors, a 20% membership interest in WNT, and the managing member position for WNT;

d)      BVM The Bridges, LLC ("BVM Bridges"), whose sole member is BVM Management and whose authorized representative is Bartle, is a Florida limited liability company formed to acquire a retirement facility known as "The Bridges" in Riverview, Florida; and

e)      BVM Coral Landing, LLC ("BVM Coral Landing"), whose sole member is BVM Management and whose authorized representative is Bartle, is a Florida limited liability company formed to acquire a retirement facility known as "Coral Landing" in St. Augustine, Florida.

C.      *The Leveraged Buyout of University Village*

51.     Bartle recruited IMH and JFC to participate in purchasing Westport's 99% limited partnership interest.

52.     In August or September 2013, BVM Management/Westport Holdings, L.P. ("BVMMWH") and WSLIF entered into a Limited Partnership Purchase Agreement pursuant to

11

which BVMMWH agreed to purchase the 99% limited partnership interest in Westport and Westport II from WSLIF for total consideration of $2,500,000.

53. The only portion of the purchase price funded with equity was $500,000, which was contributed by JFC.

54. On March 11, 2014, BVMMWH and WSLIF entered into a Reinstatement and Amendment Agreement (the "Reinstatement") which amended and restated the terms upon which the 99% limited partnership interest in Westport and Westport II would be sold by WSLIF to BVMMWH.

55. On March 29, 2014, BVMUV, as maker, executed and delivered to WSLIF a promissory note in the original principal amount of $1,000,000 representing a portion of the purchase price for the 99% limited partnership interest in Westport and Westport II due under the Reinstatement.

56. On March 31, 2014, BVMMWH and WSLIF executed a closing agreement. Shortly thereafter, BVMUV replaced the BVMMWH as the buyer in the closing agreement.

57. On March 31, 2014, WHUV, as the Debtors' general partner, consented to the sale of the 99% limited partnership interest in the Debtors by WSLIF to BVMUV. WHUV retrained its 1% general partnership interest in the Debtors.

58. On March 31, 2014, the Debtors' limited partnership agreements were amended to document that WSLIF had sold and conveyed its 99% limited partnership interest to BVMUV, and that BVMUV then transferred a portion of its 99% limited partnership interest as part of the same transaction so that the limited partnership interests were held, as of March 31,

12

2014, as follows: BVMUV held 39.6%, BHMSILF, LLC ("BHMSILF") held 26.4%[1], IMH held 19.8%, and JFC held 13.2%.

59.    Also during this time, BVMUV acquired all of the membership interests in WNT from Westport, and, as set forth in WNT's March 28, 2014 Amended and Restated Limited Liability Company Agreement, transferred a portion of these membership interests so that, as of that date, WNT's membership interests were owned as follows: BVMUV owned 40%, BHMSUNI, LLC ("BHMSUNI") owned 26.67%,[2] IMH owned 20%, and JFC owned 13.33%.

60.    Thus, WNT was "spun off" from being a wholly owned subsidiary of Westport to being owned by BVMUV, IMH, BHMSILF, and JFC.

61.    On March 31, 2014, the new limited partners of the Debtors authorized the Debtors to enter into a loan agreement with CPIF to borrow $9,500,000, secured by a mortgage on the ILF. The loan had an annual interest rate of 11% and a maturity date of September 30, 2015. Loan proceeds were earmarked as follows:

a)    $5,600,000 were used to retire a portion of the existing mortgage debt to Horizon;

b)    $1,750,000 was transferred to or held by CPIF, and in any event not disbursed to the Debtors, purportedly to fund a capital improvement reserve for University Village ("CapEx Reserve");

c)    $1,000,000 was transferred to WSILF or WSILF's equity holders in exchange for the 99% limited partnership interests in the Debtors;

---

[1]In June 2015, BHMSILF transferred its limited partnership interests in the Debtors to JFC, so that, since June 2015, the Debtors' limited partnership interests are held as follows: BVMUV holds 39.6%, IMH holds 19.8%, and JFC holds 39.6%.

[2]In June 2015, BHMSUNI transferred its membership interests in WNT to JFC, so that, since June 2015, WNT's membership interests are held as follows: BVMUV holds 40%, IMH holds 20%, and JFC holds 40%.

d)  $300,000 was transferred to WEMAMM, purportedly for "Transaction Management Expenses" but, in reality, to obtain the resignation of the then-members of the boards of directors of TALF and TR&SNF, to install Bartle and affiliates as the directors of the not-for-profit entities, and to obtain control of WEMAMM's for-profit management contracts with TALF and TR&SNF and all related cash flow; and

e)  $431,813.53 was transferred to the trust account of the law firm representing the Debtors, BVMUV, IMH, JFC, and other affiliated entities. More than $300,000 was disbursed as partial repayment of the capital contribution.

62.  WNT, controlled by the same principals as the Debtors' new limited partners (BVMUV, BHMSUNI, IMH, and JFC), closed on a loan on March 31, 2014 with USAB in the amount of $15,000,000.  The loan is secured by the ALF and SNF properties.

63.  At closing, $150,000 of the loan proceeds were disbursed to an entity affiliated with Freiden.

64.  As part of the loan process, $3,000,000 of Westport's statutory required MLR held in a Westport bank account maintained at Regions Bank was transferred to WNT's escrow account at USAB and improperly pledged as collateral to secure USAB's loan to WNT.

65.  BVM Management was required to guaranty the CPIF Loan and the USAB Loan.

66.  Neither the CPIF loan nor the USAB loan involved any contribution or investment of cash or equity by the Debtors' new limited partners, WNT's members, or BVM Management.

67.  As a result of the CPIF loan and the USAB loan, bank accounts that were reported as containing University Village's MLR were improperly transferred to other entities and pledged as collateral to secure the obligations under loan agreements.

14

68.     Prior to 2014, the Debtors' primary secured creditor was Horizon.

69.     Thus, prior to the March 31, 2014 closing, the total mortgage debt secured by the ILF, SNF, and ALF real estate was approximately $20,000,000; after the March 31, 2014 closing, the total mortgage debt was approximately $24,500,000.

70.     Also on March 31, 2014, BVM Management, TALF, and TR&SNF entered into management agreements (the "Side Letter Agreements") with WEMAMM whereby WEMAMM agreed to manage operations of the Health Center in exchange for enumerated compensation from BVM Management: $300,000 within one business day of closing the transaction, $450,000 within sixty days of the closing, and, beginning April 1, 2014, estimated management fees of $50,000 per month for TR&SNF and $14,000 per month for TALF.

71.     The $300,000 cash payment from BVM Management to WEMAMM came directly from the CPIF loan proceeds (Westport proceeds), to pay a "transition management expense" debt of BVM Management, which allowed BVM Management to gain control of TALF and TR&SNF.

72.     Pursuant to Side Letter Agreements, WEMAMM transferred the management agreements to BVM Management, all the prior board members of TALF and TR&SNF appointed by WEMAMM were replaced with board members selected by Bartle, and Bartle was an officer and director for both TALF and TR&SNF.

73.     Thereafter, Bartle took on an active role in the operations of University Village and acted as a spokesperson. BVM Management oversaw construction and renovation of the ILF, prepared compliance reports to lenders, approved contracts, and participated in marketing and press releases.

74.    The Debtors' limited partners failed to seek and obtain the required regulatory pre-approval for the changes in ownership consummated via the leveraged buyout, which placed University Village (and its residents) at an extraordinary and intolerable risk of the Debtors being placed under regulatory supervision, and ultimately being the subject of a delinquency proceeding and possible receivership, and potential shut-down by state authorities, including OIR.

75.    In the months that would follow, OIR and the Florida Department of Financial Services (the "DFS") did undertake a review of the March 31, 2014 leveraged buyout and commenced delinquency proceedings against the Debtors. These proceedings were pending for approximately 18 months, and ultimately resulted in the Debtors seeking bankruptcy protection.

**D.    Improper Use of the Debtors' $1.75 million CapEx Reserve**

76.    On August 25, 2014, CPIF and the Debtors executed Amendment No. 1 to the CPIF Loan Agreement, which authorized Westport to pledge $1,000,000 of the loan proceeds held in the Cap Ex Reserve as additional collateral for a loan to BVM The Bridges, LLC, and BVM Coral Landing, LLC to allow them to acquire two retirement facilities unrelated to University Village. BVM Management is the sole member of both of these companies, and Bartle has acted as their Authorized Representative.

77.    The Debtors thus drew $1,000,000 from the Cap Ex Reserve and loaned the money to BVM The Bridges, LLC ("BVM Bridges").

78.    The use of the Debtors' Cap Ex Reserve to fund the acquisition of additional retirement communities by Bartle and his companies provided no discernable benefit to the Debtors, University Village, or its residents. To the contrary, Bartle essentially used $1,000,000 of the Debtors' $1,750,000 capital improvement reserve, which the Debtors were required to pay interest on at 11% per annum, to fund the expansion of his retirement community empire.

16

During this timeframe, the funds that had been advanced by CPIF and reserved for capital improvements were not used for that purpose.

E.      *Resignation of the Debtors' General Partner*

79.     On December 29, 2014, Landry resigned as the general partner of the Debtors, thus leaving University Village without a controlling general partner.

80.     On January 31, 2015, AgeWell's contract expired and was not renewed.

81.     On January 31, 2015, Rebecca Bartle, as a managing director of Compliance Concepts, sent notice to the employees of University Village, advising them that "effective January 26, 2015, Compliance Concepts, LLC is the General Partner for Westport Holdings Tampa, LP and Westport Holdings Tampa II, LP." As of January 31, 2015, Compliance Concepts had not submitted an application for approval as general partner of Westport, as required by sections 628.4615 and 651.024, Florida Statutes.

82.     On February 9, 2015, Compliance Concepts, LLC belatedly submitted an application to OIR, requesting approval to acquire the controlling interest in University Village. Section 628.4615, Florida Statute, required the application submitted by Compliance Concepts to submit detailed background information on "each partner, owner, manager, or joint venture, or other persons performing duties similar to those of persons in the aforementioned positions."

83.     The February 9, 2015 application submitted by Compliance Concepts was grossly inadequate, and, on February 20, 2015, OIR wrote to Compliance Concepts detailing the additional information required by OIR before the application could be considered. In response to OIR's request for additional information, the limited partners of Westport once again amended the organizational structure to assert IMH as the general partner.

84.     On February 13, 2015, OIR issued an initial order of suspension of Westport's Certificate of Authority pursuant to Section 651.105, Florida Statutes, determining, among other things, "the persons in charge of providing continuing care for UNIVERSITY VILLAGE, John and Rebecca Bartle, have not provided evidence of being reputable and of responsible character," that Bartle and Rebecca Bartle "demonstrated a lack of fitness and trustworthiness," "[n]o person exercising control over UNIVERSITY VILLAGE has been approved by the OFFICE," and that the MLR was underfunded and encumbered.

85.     On or about March 6, 2015, IMH submitted to OIR an application to for approval of IMH as Westport's 1% general partnership.

86.     On or about March 27, 2015, OIR denied IMH's application.

87.     IMH is currently listed as the manager of the Debtors and WNT in the Florida Department of State's Division of Corporations records.

## COUNT I
### Breach of Fiduciary Duties by Bartle, Rebecca Bartle, BVMUV, BVM Management, and IMH

88.     The Liquidating Trustee re-alleges and incorporates herein paragraphs 1 through 87 as if fully set forth herein.

89.     Upon acquiring control over the University Village CCRC, Bartle, Rebecca Bartle, BVMUV, BVM Management, and IMH owed the Debtors and the University Village residents fiduciary duties.

90.     The Debtors' partners and their principals breached their fiduciary duties by, among other things and without limitation:

   a)     Authorizing and allowing the substitution of the Debtors' limited and general partners without first obtaining required regulatory approval or

18

provisional authority, despite having knowledge of the regulatory requirements attendant to the operation of CCRCs in the State of Florida, which resulted in the commencement of delinquency proceedings by Florida regulators that jeopardized the Debtors' ability to continue as a going concern;

b) Authorizing and allowing Bartle and his company BVM Management to use $1,000,000 from the Debtors' Cap Ex Reserve as an interest free loan to acquire additional retirement facilities with full knowledge of the Debtors' precarious financial condition and loan obligations to CPIF and USAB;

c) Authorizing and allowing payment of $199,409.24 in "management fees" to IMH in the year prior to the bankruptcy petition;

d) Authorizing and allowing payment of $300,000 to WEMAMM to obtain the resignation of the then-members of the boards of directors of TALF and TR&SNF in order to allow Bartle to be installed as a director of the not-for-profit entities, and to obtain control of WEMAMM's management contracts with TALF and TR&SNF and all related cash flow;

e) Authorizing and allowing approximately $3,000,000 of Westport's MLR to be taken from the existing escrow account where the MLR was maintained and improperly pledged as collateral to secure USAB's loan to WNT;

f) Authorizing and allowing payments to family members and affiliates, including distributions to the limited partner; and

19

g)  Removing WNT from being a wholly owned subsidiary of Westport.

91.  As a direct and proximate result of the partners' and their principals' breaches of fiduciary duties to the Debtors, Debtors have suffered damages as described in this complaint.

92.  As a result of the partners' and their principals' lack of good faith, lack of loyalty, lack of due care, and lack of good faith and fair dealing, and conflicts of interest, the business judgment rule provides no protection and/or defense to the claims set forth in this Count of the Complaint.

WHEREFORE, the Liquidating Trustee respectfully requests this Court enter an order (1) finding the partners and their principals in breach of their fiduciary duties to the Debtors, (2) awarding the Liquidating Trustee damages, including his reasonable attorney's fees and costs, and (3) granting such other and further relief as the Court deems just and proper.

## COUNT II
### Civil Conspiracy by Bartle, Freiden, BVM Management, BVMUV, and IMH

93.  The Liquidating Trustee re-alleges and incorporates herein paragraphs 1 through 87 as if fully set forth herein.

94.  Beginning on or before March 31, 2014 and continuing through the present, Bartle, through BVM Management and his wife's entity BVMUM, and Eli Freiden, through IMH, entered in oral and written agreements to obtain control of the Debtors and WNT in order to use the Debtors' assets for their own interests and adverse to the Debtors' best interests.

95.  The foregoing agreements contemplated one or more unlawful acts, namely the systematic dissipation of the Debtors' and the residents of University Village's assets through the transactions described in this complaint, and the transfer of Westport's general partnership interests in violation of State laws and regulations, all of which is described above.

96.     Alternatively, the foregoing agreement contemplated the commission of lawful acts by unlawful means.

97.     Bartle, BVM Management, BVMUV, Freiden, and IMH committed and participated in one or more overt acts in furtherance of the conspiracy, namely by structuring, enabling, and participating in the transactions described above.

98.     As a direct and proximate cause of this conduct, the Liquidating Trustee has suffered damages as described in this complaint.

WHEREFORE, the Liquidating Trustee respectfully requests this Court enter an order (1) finding the partners and their principals in breach of their fiduciary duties to the Debtors, (2) awarding the Liquidating Trustee damages, including his reasonable attorney's fees and costs, and (3) granting such other and further relief as the Court deems just and proper.

### COUNT III
**Negligence by Bartle, Rebecca Bartle,
BVM Management, BVMUV, Freiden and IMH**

99.     The Liquidating Trustee re-alleges and incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

100.    By conducting the business of a financially distressed retirement community, Defendants owed the Debtors and the University Village residents a duty of reasonable care to refrain from self-dealing and non-arms' lengths transactions that could proximately result in the dissipation of the Debtors' assets and revocation of the Debtors' ability to conduct business as a CCRC in the State of Florida.

101.    Defendants breached these duties of care by engaging in self-dealing and non-arms' length transactions with one another that, among other things:

a)      Caused the Debtors to incur debts beyond their ability to repay;

b) Resulted in the commencement of delinquency proceedings by Florida regulators that jeopardized the Debtors' ability to continue as a going concern; and

c) Ultimately deepened the insolvency of the Debtors and caused the Debtors to seek bankruptcy protection under disadvantageous circumstances.

102. As a direct and proximate cause of Defendants' conduct, the Debtors and the University Village residents have suffered damages as described in this complaint.

WHEREFORE, the Liquidating Trustee respectfully requests this Court enter an order (1) finding Defendants negligent, (2) awarding the Liquidating Trustee damages, including his reasonable attorney's fees and costs, and (3) granting such other and further relief as the Court deems just and proper.

## COUNT IV
**Deepening Insolvency by Bartle,
Rebecca Bartle, BVM Management, BVMUV, Freiden and IMH**

103. The Liquidating Trustee re-alleges and incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

104. Defendants, as a result of the foregoing conduct, enabled the Debtors to expand their debts beyond, and under terms less favorable than, the debts owed to Horizon.

105. As a result of the foregoing conduct, the Debtors' insolvency was prolonged and deepened, resulting in additional and unnecessary harm to the residents of University Village, including:

a) The permanent loss of the residents' entitlement to the Refundable portion of their Initial Entry Deposit and consequent inability to move to another CCRC;

b) The necessitation and incurrence of millions of dollars in professional fees that have adversely affected the Debtors' ability to reorganize, and

c) The incurrence of interest, fees, and other payments over and above what would have been necessary to retire the Horizon debt under the terms of the deed-in-lieu agreement with Horizon.

WHEREFORE, the Liquidating Trustee respectfully requests this Court enter an order (1) finding Defendants liable for the tort of deepening insolvency, (2) awarding the Liquidating Trustee damages, including his reasonable attorney's fees and costs, and (3) granting such other and further relief as the Court deems just and proper.

## COUNT V
### Avoidance of Fraudulent Transfer (Actual Fraud)
### Fla. Stat. § 726.105(1)(a)
### All Defendants

106. The Liquidating Trustee re-alleges and incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

107. Section 544(b) of the Bankruptcy Code authorizes a trustee to bring an action pursuant to Section 726.105(1)(a) of the Florida Statutes, and Section 1107 of the Bankruptcy Code vests a debtor-in-possession with the same rights as the trustee in bankruptcy. Thus, the Liquidating Trustee is authorized to bring an action under Section 726.105(1)(a) of the Florida Statutes.

108. Defendants received a transfer or transfers of the Debtors' assets that were fraudulent pursuant to the provisions of 11 U.S.C. § 548 and Florida Statute § 726.105, and which transfer or transfers are avoidable herein.

Case 8:18-ap-00465-MGW Doc 1 Filed 09/21/18 Page 24 of 29

109. The purpose of these transfers was to insulate and conceal WNT and its assets from creditors of the Debtors and to use the Debtors' funds for the benefit of insiders and non-debtor entities.

110. The transfer or transfers of the Debtors' assets to the Defendants were made with the actual intent to hinder, delay, or defraud the Debtors' existing and future creditors in making the transfers. This actual intent is evident by the following:

f) The transfers or obligation was made to an insider;

g) The Debtors were undercapitalized;

h) Prior to the transfers, the Debtors were insolvent or close to insolvency and had been threatened with litigation or actually sued by creditors;

i) The Debtors removed assets.

WHEREFORE, the Liquidating Trustee respectfully requests that this Court enter an order avoiding the transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes, requiring the Defendants to return the assets or funds improperly diverted from the Debtors, plus interest accruing from the date this action was filed, and granting such other and further relief as is just and proper.

### COUNT VI
**Avoidance of Fraudulent Transfer**
**(Constructive Fraud) – Fla. Stat. § 726.105(1)(b)**
**All Defendants**

111. The Liquidating Trustee re-alleges and incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

112. Section 544(b) of the Bankruptcy Code authorizes a trustee to bring an action pursuant to Section 726.105(1)(b) of the Florida Statutes, and Section 1107 of the Bankruptcy Code vests a debtor-in-possession with the same rights as the trustee in bankruptcy. Thus, the

Liquidating Trustee is authorized to bring an action under Section 726.105(1)(b) of the Florida Statutes.

113.    The Debtors made the transfers identified in the complaint that removed assets from the Debtors' estates.

114.    The Debtors did not receive reasonably equivalent value for the transfers.

115.    The Debtors believed, or reasonably should have believed, that the Debtors were insolvent or were about to be made insolvent as a result of the transfers.  Moreover, at the time of the transfers, the Debtors were incurring debts beyond the Debtors' ability to pay as the debts became due.

116.    There is at least one holder of a claim that is allowable against the Debtors who would have standing to assert a claim for relief under § 726.105(1)(b) of the Florida Statutes.

117.    The Liquidating Trustee is entitled to recover either the property constituting the transfers, or the value of such property from Defendants.

WHEREFORE, the Liquidating Trustee respectfully requests that this Court enter an order avoiding the transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(b) of the Florida Statutes, and granting such other and further relief as is just and proper.

## COUNT VII
### Fraudulent Transfer of Property – 11 U.S.C. § 544 and
### Sections 726.106(1) and 726.106(1)(a) of the Florida Statutes
### All Defendants

118.    The Liquidating Trustee re-alleges and incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

119. The Liquidating Trustee seeks to avoid and recover the transfers identified in the complaint pursuant to Sections 544 and 550 of the Bankruptcy Code and Sections 726.106(1) and 726.108(1)(a) of the Florida Statutes.

120. The transfers constitute the transfers of property owned by the Debtors pre-petition to insiders and/or equity holders for less than reasonably equivalent value.

121. The Debtors did not receive reasonably equivalent value in exchange for the transfers, and the transfers diminished the value of the Debtors' estate.

122. At the time of the transfers, the Debtors were insolvent or later became insolvent as a result of the transfers.

123. There is at least one holder of a claim that is allowable against the Debtors who would have standing to assert a claim for relief under Section 726.106(1) of the Florida Statutes.

124. The transfers should be avoided pursuant to Section 544(b) of the Bankruptcy Code and Sections 726.106(1) and 726.108(a)(1) of the Florida Statutes.

125. The Liquidating Trustee is entitled to recover either the property constituting the transfers or the value of such property from the Defendants.

126. The Defendants are the initial transferees of the transfers, or the entities for whose benefit such transfers were made, and should have to disgorge the transferred property or pay the value thereof to the Debtors' estates.

127. Alternatively, the Defendants are the immediate or mediate transferees of the transfers, and should have to disgorge the transferred property or pay the value thereof to the Westport bankruptcy estates.

128. The unsecured creditors will benefit from the recovery of the transfers.

129.    The transfers should be recovered pursuant to Section 550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trustee respectfully requests that this Court enter a final judgment (i) avoiding the transfers, (ii) for damages in the amount of the transfers, plus interest, against the Defendants, and/or (iii) requiring the Defendants to disgorge the transfers, or the value thereof, and granting any other and further relief this Court deems just and proper.

## COUNT VIII
### Recovery of Avoided Transfers – 11 U.S.C. § 550
### All Defendants

130.    The Liquidating Trustee re-alleges and incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

131.    This is an action under Section 550 of the Bankruptcy Code for recovery of transfers avoided under Section 726.105(1) of the Florida Statutes.

132.    Pursuant to Count V, the transfers are avoidable under Section 726.105(1)(a) for actual fraud and, pursuant to Count VI, the transfers are avoidable under Section 726.105(1)(b) for constructive fraud.

133.    The Liquidating Trustee is entitled to recover for the benefit of the Debtors' estates either the property constituting the transfers or the value of such property transferred plus interest.

134.    Defendants are initial transferees of the transfers and should have to disgorge the transferred property or pay the value thereof to the Debtors' estates.

135.    Alternatively, Defendants are immediate or mediate transferees of the transfers and should have to disgorge the transferred property or pay the value thereof to the Debtors' estates.

136. The Debtors' estates and the creditors of the Debtors' estates will benefit from the recovery of the transfers.

WHEREFORE, the Liquidating Trustee respectfully requests this Court enter a final judgment against Defendants (i) for damages in the amount of the transfers plus interest or (ii) requiring Defendants to disgorge the transfers or the value thereof, and (iii) granting any other and further relief as is just and proper.

## COUNT IX
### Unjust Enrichment
### All Defendants

137. The Liquidating Trustee re-alleges and incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

138. This unjust enrichment claim is asserted in the alternative, in the event the statutory remedies asserted in counts V, VI, VII, and VIII do not provide an adequate remedy at law.

139. The Defendants received a benefit when the Debtors wrongfully made a transfer or transfers to them.

140. The Defendants knowingly and voluntarily accepted and retained the benefit from the use of the transfer or transfers.

141. The circumstances alleged in this complaint render the Defendants' retention of that benefit inequitable and unjust, so the Defendants must pay the Liquidating Trustee the value of the benefit.

142. The Defendants have been unjustly enriched at the expense of the Debtors and the residents of university Village in the amount received by the Defendants from the Debtors, directly or indirectly, and the Liquidating Trustee is entitled to judgment in that amount.

143. The Liquidating Trustee is entitled to the return of the transfer or transfers through disgorgement or any applicable remedy.

144. All conditions precedent to this cause of action have occurred, been satisfied, or have been waived.

WHEREFORE, the Liquidating Trustee respectfully requests this Court enter a final judgment against Defendants (i) for damages in the amount of the transfers plus interest or (ii) requiring Defendants to disgorge the transfers or the value thereof, and (iii) granting any other and further relief as is just and proper.

Dated: Tampa, Florida
     September 21, 2018

BUSH ROSS, P.A.
Post Office Box 3913
Tampa, Florida 33601-3913
(813) 224-9255 (telephone)
(813) 223-9620 (fax)
*Counsel for Plaintiff Jeffrey Warren, as Liquidating Trustee for Westport Holdings Tampa, Limited Partnership and Westport Holdings Tampa II, Limited Partnership*

By:   /s/ Karen Cox
     Karen Cox
     Florida Bar No. 0456667
     kcox@bushross.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 21, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

          /s/ Karen Cox
          ATTORNEY

68P064007.DOCX