Page 1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

WESTPORT HOLDINGS TAMPA         Case No.: 8:16-bk-08167-MGW
LIMITED PARTNERSHIP,            Chapter 11

WESTPORT HOLDINGS TAMPA II,   Case No.: 8:16-bk-08168-MGW

        Debtors,               Jointly Administered Under
                               Case No. 8:16-bk-08167-MGWW
_____

JEFFREY W. WARREN, LIQUIDATING
TRUSTEE FOR WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP
and WESTPORT HOLDINGS, II,
LIMITED PARTNERSHIP,

        Plaintiffs,

vs.

VALLEY NATIONAL BANK, principal
subsidiary to VALLEY NATIONAL
BANKCORP, a New Jersey domestic
profit corporation, as successor
by merger to USAMERIBANK,

        Defendant.
_____/

DEPOSITION OF:        LISL A. UNTERHOLZNER

TAKEN BY:             The Defendant

DATE TAKEN:           Wednesday, August 9, 2023

TIME:                 10:56 a.m. - 4:16 p.m.

PLACE:                Bush Ross, P.A.
                      1801 North Highland Avenue
                      Tampa, Florida 33602

REPORTED BY:          Tonya H. Magee, Registered
                      Professional Reporter and Notary
                      Public, State of Florida at Large

A P P E A R A N C E S:


KEITH T. APPLEBY, ESQUIRE
OF:   Appleby Law P.A.
      4916 West Melrose Avenue South
      Tampa, Florida 33629
      (813) 435-0396
      keithtappleby@icloud.com


      APPEARING ON BEHALF OF THE PLAINTIFFS



EDMUND S. WHITSON, III, ESQUIRE
CHANTEL C. WONDER, ESQUIRE
OF:   McGlinchey Stafford
      10407 Centurion Pkwy North, Suite 200
      Jacksonville, Florida 32256
      (904) 224-4486
      ewhitson@mcglinchey.com
      cwonder@mcglinchey.com
      APPEARING ON BEHALF OF THE DEFENDANT

ALSO PRESENT:
Stan Murphy, Ankura Consulting

I N D E X

TESTIMONY OF LISL A. UNTERHOLZNER:

Direct Examination by Mr. Whitson.............  4

CERTIFICATE OF OATH................................ 110

CERTIFICATE OF REPORTER............................ 111

READ AND SIGN NOTIFICATION LETTER.................. 112

ERRATA SHEET....................................... 113

- - - - -

E X H I B I T S

DEFENDANT'S
EXHIBIT              DESCRIPTION                     PAGE

Exhibit 1 - 4/17/23 Oscher Consulting Expert Report.  10
Exhibit 2 - Oscher Consulting invoices.............  30
Exhibit 3 - Horizon v. University Village Complaint.  35
Exhibit 4 - 3/6/14 Cushman & Wakefield Appraisal of
            the Going Concern, University Village...  51
Exhibit 4B- Excerpt from the Cushman & Wakefield
            Appraisal............................... 64
Exhibit 5 - 7/7/23 Oscher Consulting Rebuttal
            Expert Report.......................... 90

- - - - -

S T I P U L A T I O N S

It is hereby agreed and so stipulated by and between the parties hereto, through their respective counsel, that the reading and signing of the transcript are expressly reserved by the Deponent.

- - - - -

P R O C E E D I N G S

*********

THE COURT REPORTER:  Do you solemnly swear or affirm the testimony you're going to give in this cause today will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  I do.

LISL A. UNTERHOLZNER, having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. WHITSON:

Q.   Good morning.  Would you please state your full name for the record.

A.   Lisl Alden Unterholzner.

Q.   And where are you employed?

A.   Oscher Consulting.

Q.   How long have you been employed there?

A.   Approximately ten years.

Q.   I know we have your CV attached to your expert report, but why don't you briefly recite your educational background.

A.   Sure.  I attended Rice University.  I studied architecture and French studies.  After that I went into the wrong business for about 12 years and then I went

back to the University of South Florida, graduated with a Bachelor of Science in accounting.

Q. What year was that?

A. 2012.

Q. And what did you do after graduating in 2012?

A. I studied for and took the CPA exam and then I started working for Oscher Consulting.

Q. And you are a CPA, correct?

A. Yes.

Q. So is that roughly 2013, 2014?

A. 2013.

Q. So during your employment with Oscher Consulting, what types of matters have you worked on?

A. Basically, all types of economic damages, lost profits, contract-related dispute, intellectual property, bankruptcy matters, business valuation, shareholder disputes.

Q. Well, let's slow down. So you have economic damages. What types of cases have you worked on where you did calculations? Have you ever testified as an expert on economic damages?

A. Yes.

Q. All right. How many times?

A. My testimony was -- it's around seven or ten times in total and basically everything there -- well,

it's not all lost profits, for example, but there's maybe three or so general accounting matters or accounting damages.

Q.   Okay.  And you mentioned -- I don't want to ask you to repeat, but you mentioned intellectual property and other types of cases.  Could you just kind of slowly go back to that, because I want to ask specifically what you did for those type of matters?

A.   We have had trademark infringement cases. We've had copyright infringement.  We've had patent infringement.  And some cases we have calculated the use of royalties.  In other cases we've looked at lost profits and the factors that may apply.  We have had some issues of consumer confusion.  That -- that sort of overlaps with the trademark infringement.

Does that answer your question?

Q.   I think so, yeah.

I mean, as far as the IT that you discussed, so you're looking at essentially lost profits, royalties, that type of stuff.  Economic damages type of issues.

You mentioned bankruptcy, in general.  What types of bankruptcy businesses have you worked on and what you've done in connection with those cases?

A.   Sure.  There have been issues of fraudulent

transfer, preferences, solvency analyses.  I'm trying to think if there's anything beyond that.  Most of it is going to deal with solvency and fraudulent transfers.

Q.   Okay.  And how many cases have you worked on involving fraudulent transfers?

A.   Only four or five.

Q.   Do you recall -- you say there's only four or five -- the names of those cases?

A.   Sure.  There was the Mongelluzzi case with Regions Bank.  There was another Regions Bank matter that dealt with -- G3 was the debtor.  There have been a couple of cases that involved a company called Teltronics.  There have been -- there was another one that I don't remember if it was fraudulent transfer or not, but the company was called, Adane, A-d-a-n-e.

And I think there may be a few others.  Those are the ones that come to mind.

Q.   Okay.  So more than four or five?

A.   Perhaps more than four or five.

Q.   Okay.  And in the Teletronics case, what specifically was your task there?

A.   So there were two Teletronics cases.  The first one had to do with whether there was director and officer liability for whether dividends were paid, whether the company was insolvent at the time that the

dividends were paid.

And the other one involved the sale of -- it had to do with the right of first refusal, actually, and whether Teletronics had the right to purchase certain intellectual property that was -- I don't remember exactly how it worked.  Harris Corporation was -- had acquired certain patents and whether or not Teletronics had the right of first refusal to acquire those patents.

Q.   What was the scope of your opinion in connection with that issue?

A.   So I did not issue an opinion.  That was Steve Oscher's report.  But that was whether or not Teletronics was insolvent at the time that the intellectual property was transferred.  So they were both solvency opinions, just different fact patterns.

Q.   Right.  And were you the author of any of the opinions involving fraudulent transfer or were they Mr. Oscher's opinions that you just listed?

A.   They were Mr. Oscher's opinions.

Q.   In this case, the opinions of Oscher Consulting was authored by -- and I mean the instant case.  And I'll actually introduce myself, actually.  I'm too familiar with you.  I know you too well.  But my name is Ed Whitson.  I represent Valley National Bank, the defendant in this case.

In this case, are you the author of the opinion?

A.   I am.

Q.   All right.  How many opinions have you personally individually authored?

A.   I don't know off the top of my head.  I'm going to say ten to 15.

Q.   How many of those opinions are solvency opinions?

A.   This would be the first solvency opinion.

Q.   First solvency opinion?

A.   Yes.

Q.   What opinions for the other, say, nine to 14 matters that you have issued individually?

A.   They are going to be rather varied.  I've gotten employment matters.  There was an arbitration.  There were two reports done earlier this year.

Q.   What type of cases were they, when you say, "arbitration"?

A.   That particular one was an employment matter and whether or not somebody who left violated a non-compete and what damages might result from that non-compete -- alleged non-compete violation, rather.

Q.   Gotcha.

A.   I would have to review my prior testimony to

give you a little bit more detail.  I just don't

remember sitting here all the different opinions.

Q.   And I don't want this to be a memory contest.

So why don't we go ahead and show you -- by the way, I

don't know if Adina and Kim are going to attend this.

MR. WHITSON:  Are they, do you know?

MS. WONDER:  No.

(Discussion off the record.)

Q.  (BY MR. WHITSON)  So -- I was going to show you

your report.

A.   Okay.

Q.   I believe it's tab No. 1 is your initial

report --

MR. WHITSON:  And I will make that Exhibit 1.

(Exhibit No. 1 was marked for identification.)

MR. WHITSON:  And I know you've requested

numbering on your exhibits, if you want -- I'll

just keep this discrete, if that's okay with you?

MR. APPLEBY:  That's fine.

Q.  (BY MR. WHITSON)  Ms. Unterholzner, I show you

what we have marked Exhibit 1.  It's your report dated

April 17, 2023.  And I believe it's your testimony that

you were the sole author of this report?

A.   Yes.

Q.   And if you look at the prior case history

portion of the report and help refresh your recollection, which is marked as Exhibit II.

A.   Yes.

Q.   And we were, again, focusing on cases in which you were the sole author of the opinion.  So which of these here were you the sole author of?

A.   There was a valuation report for Lindsey -- the first four did not have a report.  They were testimony only.  And on the second page, Community Care Health Network, there was a report in that one.  There's sort of an abbreviated report for Buccaneer Landscape. The other two did not have a report.

Some other reports I've authored recently were -- but they are not on here because I haven't been depositioned.  I think there's been one or two more.  At least one or two more, but I don't recall sitting here today what they were.

Q.   Okay.  But they're not listed on here?

A.   They're not listed on it.

Q.   And if we go back to, say, the Teltronics case, that would be the most prominent you worked on. And the solvency issues there in terms of the stock issue, I guess, or that there was insolvent time issues, dividends, and the right of first refusal.  I guess, were they eligible to exercise the right of first

refusal if they were not solvent, I guess that was the issue there.  Is that --

A.    (Nods head affirmatively.)

Q.    You're nodding your head.  I need you to give me verbal responses.

A.    The issue there was that the trustee was alleging that Teletronics -- that the IP had a value of something north of $12 million and the right of first refusal was around 1,900,000 or something under 2 million, and whether or not Teletronics was insolvent at that point in time had some bearing on whether or not they could have transferred these rights.  I'm not specifically remembering the details, but the trustee expert opined that they were insolvent and --

Q.    Were you the counter-expert in that case, the opposing expert?

A.    Yes.  We were -- I believe we were engaged on behalf of Harris Corporation that obtained the patent.  And our opinion was that Teletronics was solvent at the time, but I think that they were not in a position to exercise those rights even if they -- even if they were solvent.  They didn't have the available cash flow to do it.

Q.    Did the Court make a finding in that case?

A.    The Court made a finding that they were -- the

trustee did not prove an insolvency.

Q.   So it was fail to meet and carry the burden. Is that fair to say?

A.   Yes.

Q.   Okay.  Did the Court credit your opinion in that case or simply that the trustee failed to meet their burden?

A.   My recollection is that the opinions did credit his testimony as being more credible than that of Mr. Martinell's (phonetic) examination.

Q.   And when you were preparing the solvency opinion, I guess, in the Teletronics case, describe the scope of your activities and how did you begin that task and what steps did you take in coming up with that solvency opinion.

A.   We would have started from the financial statement.  I believe their financial statements were audited, if I remember correctly.  And then we went -- basically examined that balance sheet and the balance that was on it to see what assets and what liabilities might not be reflected at their fair market value; and additionally, whether there were any other assets or liabilities that should be considered specifically for solvency.

          And in that case, it hinged on certain

Page 14

contracts that existed that were long-standing contracts.  Teletronics provided phone systems and they had contracts with the Federal Bureau of Prisons and a couple other government agencies.  I think there was another -- I think there was another prison system.  But it was another long-standing government contract, which were the recurring cash flows that would have kept this business going.  They were not on the balance sheet and we thought that they should be considered for solvency purposes.

They were clearly reflected in ranging activity that was occurring.  They were a basis for -- I think it was Wells Fargo at the time to continue lending to Teletronics.  And so our opinion was that they should be considered for purposes of solvency and we considered that Teltronics was not insolvent.

Q.   So if I can just sort of summarize, and please correct me if I'm mistaken, that you took the financial statements that were available, audited, perhaps, as you recall, and then made adjustments to those financial statements?

A.   Correct.

Q.   You sort of independently -- for lack of a better word, you tested some of the items on that balance sheet to see if it was complete and accurate.

Would that be fair to say?

A.   I don't know if I would use the word "tested," but we certainly analyzed the different elements to see if there was any reason to believe that they might have a different value than what was on the financial statements.

Q.   But you did more than that, though.  You went beyond what was on the financial statements and you added to the financial statements items that were not on the financial statements.  Is that fair to say?

A.   That's correct.

Q.   So what other steps did you take in order to determine solvency in the Teletronics case?

A.   Like I said, we would have gone line by line on the balance sheet to look at whether there were any adjustments to be made to the assets or to the liabilities.  We would have done inquiries to whether there were any reasons where they weren't making their obligations when their obligations became due.  That's what I recall.

Q.   All right.  Did you accept any other figures on the financial statements at face value?

A.   I'm sure we accepted cash at face value.  We probably accepted the long-term debt at face value.  Beyond that I don't recall.

Q.   Okay.  So did you sort of look behind those financial statements to make sure that those values were correct, if you will?

A.   To the extent that we could.  I'm really not remembering what all was available to us beyond the financial statements as I sit here today.

Q.   All right.  Do you recall asking for information about the preparation of financial statements?  Did you ask for the work papers from the auditors and that type of thing?

A.   I did not.

Q.   And that would be the same for the insolvency opinion in both context for the D and O liability issue as well as the right of first refusal issue?

A.   Generally, that would have been the procedure, yes.  It would have been -- there were different time frames involved.  So there may have been some additional information that applied to one analysis that did not apply to the other.  I don't recall.

Q.   All right.  Describe typically your process when you're either doing an insolvency opinion or a solvency opinion.  Do you approach those tasks from any different steps or perspectives?

A.   I think those are the main perspectives, whether or not -- you know, I look at the balance sheet

and consider the -- whether debts are being paid as they become due or just remain with the solvency.

Q.   And you sort of, again, just test some of the statements or the trail of the financial statements, right?  You look at whether or not -- as in Teletronics, whether or not certain assets were excluded.  You're looking sort of just beyond the financial statements themselves, right, I'm assuming from what you've described about Teletronics?

A.   The financial statements are a starting point. And then absolutely, you would look to consider whether there were any other contingent liabilities or contingent assets or any other possible factors that would be included in solvency that would not be included in a financial statement.

Q.   So beyond looking at just the financial statements, what else do you do when you are rendering an opinion on solvency or insolvency?  And do you equate those the same, by the way, solvency opinion versus insolvency opinion?  Is it the same process and methodology opinion you employ for both?

A.   It is the same methodology, yes.

Q.   Okay.

A.   I think any analysis -- there's certain things that may appear on a balance sheet that we suspect are

not going to be at fair market value.  Things like real estate that have a historical acquisition cost, they're very unlikely to be reported on a balance sheet at their fair market value.  So it is a line-by-line analysis of whether or not value reported requires further work, further sources, further support or not.

Q.   What other values on a financial statement would you -- would draw a specific scrutiny like real estate, an example that you had pointed out, for the financial statements you've reviewed for you to drill down a little bit more on?

A.   It really depends on the nature of the entity being analyzed, but goodwill is certainly one that is unlikely to have -- it is something that comes up historically that may not have a value for solvency purposes.

Q.   How do you make adjustments for goodwill?  I was going to ask you that specifically.

A.   So goodwill really has no transferable value. Goodwill is something that arises from historical transactions, but it could generally be either disregarded completely or there may be a reason to -- for some ongoing intangible value, there may be -- there are different ways to consider whether or not an entity has any ongoing goodwill value.

It's definitely a very specific analysis. Certain -- I mean, basically anything -- any intellectual property and any intangible asset value is what is your economic benefit you can derive from it.

Q.   How do you determine that value?

A.   Generally, you would look to see what sort of cash flows you can generate above and beyond the tangible assets and look to discount that asset at an appropriate discount rate to a present value.

Q.   So you use a discounted cash flow on that basis?

A.   Yes.

Q.   Do you do any other methods in determining value?

A.   I don't think for goodwill, specifically, you would, because nobody is going to come along and say, I'm going to buy your goodwill.  But if you were talking about some other intangible asset like potentially a trademark or a patent, there might be a market value for that.  There might be historical transactions that have occurred.

Q.   When you say, "historical transactions," are you looking at -- and correct me if I'm wrong, you look at what something was purchased for versus what you objectively feel it was worth, and if there is a

difference between what -- you pay more than what it might have been worth, that's attributable to goodwill or how would you iterate that figure?

A.   I was really more thinking about whether there had been transactions for whatever asset you're talking about.  So whatever you might think that it's worth, but are there quantifiable other actual historical transactions that you can look at that might give you some input as to what the value is.  And not necessarily, you know, transactions with each specific asset, but maybe to similar assets.  Is there a market that you could look at to see what is the value of whatever we're talking about.

Q.   Right.  And I know that you possess an ABV, right?

A.   Right.

Q.   Can you state for the record that is?

A.   I'm accredited in business valuation by the AICPA.

Q.   And when did you receive that?

A.   I'd say 2016.

Q.   And describe the process, how you did obtain that certification.

A.   Sure.  There is -- I took a two-part exam and there was a work requirement and education, a certain

number of professional education hours.

Q.   Okay.  And what is the testing on?

A.   There are three parts.  There's a theoretical part, there's a practical part, and case studies.  So it's a mixture of multiple choice questions and case study questions that deal with different elements of business valuation.

Q.   Any of those elements deal with solvency or insolvency?

A.   Not that I recall, no.

Q.   Okay.  So in your opinion, does a valuation of a company have any bearing on solvency or insolvency?

A.   It can.  I don't think that every solvency opinion is a valuation and certainly not every valuation is a solvency opinion.

Q.   Where would those differ?  When you say it can, but not every one, how would you distinguish?

A.   It would depend on the circumstances of the case.  I mean, you could have a company that has a balance sheet value because it's got a lot of cash that maybe doesn't have a whole lot of income.  So if you're doing a business valuation, you might look at -- any business valuation, you're going to look at balance sheet.  In an asset-based approach, it's going to consider an income approach and it's going to consider a

market approach.

Whereas, a solvency opinion is generally going to be more focused on the balance sheet and whether or not the assets of the company exceed its liabilities.

Q.   So I guess what I'm driving at in terms of -- how would you come up with a solvency opinion without knowing the value of the entity itself when you're talking about -- by "entity itself," I mean, like Teletronics, was Teletronics solvent?

A.   Well, we didn't have to do a whole valuation of the company.  We were specifically looking at the balance sheet and whether or not value of their assets exceeded the value of their liability.

Q.   So, in other words, when you look at solvency, you're really looking at the two -- regarding the two legal tasks, whether or not assets exceed liability and whether or not debts are going to be paid.  Is that fair?

A.   That's correct.

Q.   That's all you look at?

A.   Specifically to determine solvency, yes, that's what we look at.

Q.   So have you rendered a solvency/insolvency opinion when you've done a business valuation?

A.   Not that I recall, no.

Q.   Okay.  On what basis do you do a business valuation?

A.   Could be a shareholder dispute, could be a marital dissolution.  Could be just a valuation for purposes of somebody wants to sell their company and wants to know what it's worth, not strictly litigation.  Sometimes there might be -- destruction of a business would have a valuation component.  Those are the ones I can think of.

Q.   Okay.  There was a -- getting back to Teltronics.  Essentially, wasn't that kind of a valuation type of analysis when you went off the balance sheet to look for other assets or other apportions of value to the company that weren't necessarily accounted for in the financial statements?

A.   I would not consider that to be a valuation, no.

Q.   All right.  When you do a valuation, what do you look at?

A.   When you do a valuation, you look at an asset-based approach, which would be whether the assets and liability of the company adjusted to their fair market value.  You would do an income approach, typically, if it's an income-producing entity and not a holding company or something like that.

Q.   And that would be discounted cash flow?

A.   That could be discounted cash flow.  That could be a single-carry capitalization.  And generally, assuming -- as I stated, you look at the market approach to see what have similar companies in that industry sold for.  And you could look at a couple of different metrics with -- relative to revenue, relative to EBD or EBIDTA.  It depends on what sources of data are available.

Q.   All right.  And are there any standards issued by the AICPA or any other entities in your field that talk about the steps you should take when you render a solvency or insolvency opinion?

A.   I am not aware of professional standards that best define how to do a solvency opinion.  There is a practice aid.  There are standards for forensic services, but they're general.  They don't get into the details of a solvency opinion.  So, no, I'm not aware of any professional standards that specifically address solvency opinions.

Q.   So coming back to this case, right, what day were you retained?

A.   It would have been either January or February -- I don't remember specifically -- of this year, 2023.

Q.   Okay.  And who retained you?

A.   Mr. Warren.

Q.   And when you were engaged, did Mr. Warren outline to you the scope of your engagement?

A.   I'm sure we talked about it, yes.

Q.   And what did he say?

A.   That I recall, I was asked to provide a solvency opinion as to whether or not Westport Holdings was insolvent on March 31, 2014.

Q.   Anything else?

A.   Not that I recall.

Q.   Okay.  And was that contact with you directly or you and Mr. Oscher, or who was involved?

A.   I don't know whether -- I think that the first contact would have predated the engagement by several months.  I think that Mr. Warren and Mr. Oscher had spoken, it could have been a year, year and a half or something like that, in advance of when we were actually retained.  And then the retention was closer to late January or early February.

I don't recall whether there was a phone call that preceded it.  There may have been, but Mr. Warren came to our office and we talked about the nature of the engagement, what was required, the history between the parties.  And I believe that's when the formal

engagement would have taken place.

Q.   All right.   When Mr. Warren described the history between the parties, what, the best as you recall, did that involve?

A.   I remember a discussion about Mr. Landry, the way that the CCRC had operated historically.   The lender, Horizon, how the CCRC had been marketed for sale, had been available for several years.   How Mr. Bartle and his group were the only registered parties and how they structured the deal that resulted in spinning off Westport Nursing and moving the MLR reserves to Valley.

Q.   And what do you recall Mr. Warren telling you about the structure of the deal?

A.   That Westport Nursing was spun off and that the MLR reserves that were part of Westport Holdings's operations were moved to Valley as cash collateral for the new lending that was put in place to take out Horizon.

Q.   What was Valley?

A.   It was USAmeribank.

Q.   Anything else Mr. Warren told you about that?

A.   Not that I recall.

Q.   Okay.   Did you execute a specific engagement letter defining the scope of your engagement with

Mr. Warren?

A.    I believe we did.  That is our typical practice.

Q.    Right.  If we take a break would it be difficult to find that engagement letter?

A.    I certainly don't have it with me, but I could see if the office could email it.

Q.    Thank you.  All right.  So let's keep moving through.

So in connection with the opinion that you rendered in the initial report, Exhibit 1, did you conduct the business valuation?

A.    I did not.

Q.    Why not?

A.    I didn't think it was necessary in this case.

Q.    Okay.  Why wasn't it necessary?

A.    Because the -- I did the same process that I described to you before.  I went to the audited financial statements and went asset by asset and liability by liability to consider whether or not they reflected their fair market value and then looked for evidence/support for adjusting those values.

Q.    Okay.  What financial statement did you look at?

A.    I looked at the audited financial statements

from -- the most recent one was 2013, and we went back to 2006, I think.  2006, 2008, somewhere in there.  So I looked as far as back as I could for audited financial statements, and then I also looked at the report that was submitted to the Office of Insurance Regulation that was done on a quarterly basis.

Q.   I think those are actually outlined.  You said, "Information Considered," on Exhibit III.  You look at declarations regarding self-authentication of records?

A.   That was something that Mr. Warren prepared. I don't remember exactly what was covered in that declaration now.  It may have been an overview of the history that preceded this transaction.  I don't recall right now.

Q.   Well, self-authentication of records is usually business records, though, right?

A.   I think so.  I'm not recalling as I sit here today exactly what was in that declaration.

Q.   Okay.  Was that declaration of records that were authenticated pursuant to the declaration, were they significant to your opinion?

A.   They may have been.  I don't recall what records they covered.  So...

Q.   You said the Regions March 2014 statement.

What's that?

A.   I believe that that's a bank statement that would show the MLR funds that were transferred out of Westport Holdings's MLR account.

Q.   How did you know it was an MLR account?

A.   Perhaps by the balance compared to what was on the financial statements as identified as MLR funds.  I don't recall right now.

Q.   Did Mr. Warren tell you it was an MLR account?

A.   Perhaps.

Q.   It says, "University Village, DFS, deposition transcript Kathleen Burkholder."

What deposition transcript is that?

A.   It was a deposition from, I believe, late in 2014 or early 2015 that Ms. Burkholder gave to the -- it had to do with the OIR action to -- which resulted in the suspension of Westport's license to operate.

Q.   When did that suspension occur?

A.   March of -- I think that was March of 2016, but I could be off.  It could be 2015.

Q.   Is that suspension material to your opinion?

A.   Most of my opinion dealt with the earlier period.  So I think that was a data point, but I'm not sure that would be significant.

Q.   Would not the suspension of the ability to

conduct business or issue contracts be material to value?

A.   It would absolutely be material to value, yes.

Q.   Would it be material to solvency?

A.   Yes.

Q.   And to your recollection, that occurred in 2016?

A.   That's where I'm doubting my memory.  I know that there's a document.  So I don't recall.

Q.   Right.  And I know there are some invoices and we'll get to those in a minute.  A large part of your activities was document review, especially the February 14 invoice, which would have been for January time, I assume.  I'll get to these.  I don't want to jump out going through your report -- well, I'll go ahead.

MR. WHITSON:  This is Exhibit 2, Composite Exhibit 2, the invoices.

(Composite Exhibit No. 2 was marked for identification.)

Q.   (BY MR. WHITSON)  So this tells us that on January 12, 2023, you had -- well, I guess Mr. Oscher had a meeting with Mr. Warren, one and a half hours?

A.   I was present at that meeting as well.

Q.   And then the next day, Mr. Oscher conducted a document review, as did you, for a total of two hours.

What documents did you review the day after the meeting?

A.   I don't know.

Q.   Did Mr. Warren bring you documents to the meeting?

A.   I believe he did.

Q.   Do you recall what he brought?

A.   No.

Q.   So do you recall what documents you reviewed that corresponds to these entries on the February 14 invoice?  I meant to say on Composite Exhibit 2.  I didn't say that right.

A.   I would say that generally it would be some of the documents on the information considered.  It would be things like there was a hard drive that was provided by Mr. Warren.  And I don't recall whether he brought it with him or whether it was sent over from his office, but we had a hard drive of records from the University Village.  We had a number of the appraisal reports.

Q.   Which appraisals did you have?

A.   The Cushman Wakefield appraisal.  The IRR appraisal.

Q.   Integra?

A.   Integra.

There was a Health Trust appraisal that was performed later, I think in 2016.  There may have been

an earlier appraisal.  I want to say that there was like a 2011 appraisal, but it was prepared in connection with trying to sell the CCRC.  I'm certain there were some emails.  There were some deposition transcripts.  There were some documents related to the USAmeriBank and the CPIF, I believe.

Q.   Anything else?

A.   That's what I recall.

Q.   That's fine.  You mentioned the USAmeriBank CPIF transaction.  What's your understanding of that?

A.   That USAmeriBank lent $15 million to Westport Nursing to retire a certain Horizon debt and CPIF lent approximately nine and a half million to Westport Holdings to retire other Horizon debt.

Q.   And that was on March 31, 2014?

A.   Correct.

Q.   And that's the transaction that's really sort of the heart of this case.  Is that your understanding?

A.   That's my understanding.

Q.   And prior to that, what's your understanding of the debt structure of University Village/Westport Holdings?

A.   That Horizon, WHUV lender or something to that effect, was the primary lender and they had debt of about $20 million at the time.

Q. You don't remember the exact amount?

A. No.

Q. But it was $20 million?

A. Approximately.

Q. Okay. And had that debt matured?

A. Yes.

Q. And what was your understanding about the situation surrounding the maturity of the Horizon debt?

A. It had matured in January of 2013. There had been some -- I believe there were forbearance agreements or other attempts to find a new lender to retire the Horizon debt. There had been -- I think the final -- there had been more activities September of 2013 and then --

Q. What activity was in 2013?

A. I believe that there was an attempt by Mr. Bartle and people affiliated with him to close earlier in the year and there was another attempt to get it closed before the end of the year, in September of 2013, and those whatever proposed transactions did not occur.

Q. Were those financing transactions?

A. I really don't -- I don't recall the specifics of -- I don't recall the specifics; simply that they did not occur and that Horizon was going to execute a deed

in lieu of foreclosure to satisfy the debt and take over the operations of University Village.

Q. What's your understanding of the deed in lieu you just mentioned?

A. The deed in lieu was that -- basically, that Mr. Landry would turn over all of the assets and liabilities to Horizon and that that would extinguish the debt of up to $20 million.

Q. And have you reviewed any documents that evidence this deed in lieu?

A. I have.

Q. What did you review?

A. I know that there was a complaint that was filed by Horizon that had several documents attached to it and -- I'm not recalling the specifics.

Q. Perhaps I can help. I will show what we will mark --

MR. WHITSON: Do you have a copy of this with you, Keith?

MR. APPLEBY: I don't have a copy of anything with me.

Q. (BY MR. WHITSON) I'll just have you identify this, and we can make copies of it if we need to talk about it, but I will show you what we will mark as Exhibit 3 to your deposition, Ms. Unterholzner.

(Exhibit No. 3 was marked for identification.)

Q. (BY MR. WHITSON) Is that the document you recall looking at, the complaint you mentioned?

A. Yes.

Q. All right. And where did you get a copy of Exhibit 3?

A. I believe that was among the materials provided by Mr. Warren.

Q. Mr. Warren specifically mentioned this Exhibit 3 or was it just something you found by going through the hard drive?

A. No, it was not something that I found going through the hard drive. I believe it was part of a number of other materials provided by him.

Q. So in addition to your review of documents, you mentioned the hard drive and things that were sent over from Mr. Warren's office, but Mr. Warren specifically handed you and showed Mr. Oscher a set of documents that he wanted you to focus on or that he specifically outlined or highlighted?

A. I don't recall him directing us to particular documents.

Q. What about Exhibit 3?

A. I believe that that was part of the set of materials that were put together for a review following

the discussion about the nature of the action and the history and who the parties were.

Q.   Who put that together?

A.   It was either -- and this is what I'm not recalling.  It was whether we would have received it electronically from Mr. Warren's office or if it was something that he brought over or was it physically on a thumb drive.  I'm just not recalling.  I believe it was Mr. Warren or his office.

Q.   Was there a thumb drive in addition to the hard drive or is that the same?

A.   I'm just not recalling exactly how we got documents from them.

Q.   Well, you mentioned to me it was earlier this year, correct?

A.   Yes.  I specifically remember the hard drive. I don't recall whether there was a thumb drive or a link to download documents or the mechanics of how we received the documents.

MR. WHITSON:  Okay.  All right.  Well, maybe we can proceed, unless you want to make copies of this before we talk about it.  I mean, I was just going to ask the witness --

Q.   (BY MR. WHITSON)  You mentioned that your understanding of the agreement that was attached to this

complaint provided for a deed in lieu in satisfaction of all the Horizon debt?

A.   That's my recollection.

Q.   And what other aspects of this do you recall, specifically the agreement attached to it?

A.   I think it recounts some of the history, the date the Horizon debt would have matured.  What efforts were made to --

Q.   And you can look at this.  I'm sorry, I didn't want to take it back from you.

MR. APPLEBY:  If you're going to refer to it, can I just get copies made?

MR. WHITSON:  I was just trying to move it along, but why don't we do that.

MR. APPLEBY:  Let's go off the record for a few minutes.

(Brief recess from 11:54 a.m. to 12:26 p.m.)

Q.   (BY MR. WHITSON)  Ms. Unterholzner, before we broke we were looking at Exhibit 3, the complaint for declaratory relief --

MR. APPLEBY:  I'm sorry, the copy I got is cut off at the bottom, but it's fine.

Q.   (BY MR. WHITSON)  You mentioned that you reviewed this document in connection with the preparation of your initial report; is that correct?

A.   Yes.

Q.   Where on Exhibit III to your report does this document appear?

A.   I don't see it here.

Q.   Are there any other documents that you reviewed in connection with the initial report that are not listed on Exhibit III, other than this Exhibit 3 to your deposition today?

A.   I don't know.  I don't know.  I would say that this is the most important document.  So it's possible that there's something else that did not appear on this.

Q.   Was Exhibit 3 -- and again, I'm referring to the Horizon complaint -- not important to your opinion?

A.   I think it was more background information.

Q.   Well, given that this document wasn't on Exhibit III, it's possible, then, that the -- all the documents that you reviewed in forming your opinions are not on Exhibit III.

MR. WHITSON:  Could you provide us a copy of all the documents not included?

MR. APPLEBY:  One, I think I can explain where the document came from.  In Exhibit III it suggests a review of testimony of Burkholder and Bartle and this was an exhibit to both of those.

MR. WHITSON:  Well, again, if there are more

specific documents captured other than general descriptions, can we just get a copy of everything she reviewed?

MR. APPLEBY:  Sure.

MR. WHITSON:  Okay.

Q.  (BY MR. WHITSON)  I mean, is that your recollection, Ms. Unterholzner?

A.  I don't recall.

Q.  All right.  Well, let's look at Exhibit 3.  So we've now taken the time to get it copied.  If you'll look, it's double-sided, but as an exhibit to this complaint is an Exhibit A, and that Exhibit A is a document entitled, "Loan Extension Agreement."

A.  Yes.

Q.  Have you reviewed this document, Loan Extension Agreement?

A.  I believe so.

Q.  All right.  And I think in your testimony earlier this morning, you mentioned that -- your understanding of this document, there would be a deed in lieu given by Westport Holdings Tampa.  And I believe Westport Nursing Tampa is also a party to this document as well as Westport Senior Living and Westport Holdings Tampa II.  That a deed in lieu would be given to Horizon in satisfaction of all Horizon debt, correct?

A.   That is my recollection.

Q.   Then did you also not testify earlier this morning that there was also an understanding that Horizon would assume the liability for the resident contracts?

A.   Yes.  I know that that was my testimony that they would assume all of the liabilities, which would include the liabilities to the residents.

Q.   Okay.  You're saying that Horizon would assume all the liabilities of the parties -- all the parties to the loan extension agreement, which is Exhibit A to Exhibit 3?

A.   That they would assume the operations of Westport Holdings Tampa, Westport Holdings Tampa II, and Westport Nursing, and that there were both assets and liabilities consistent with those operations.

Q.   Okay.  And where in this document, if you can point to me -- I see paragraph 7 says deed in lieu, but where in the document is the test that you're relying upon for the second conclusion that you drew from this document, that Horizon would be assuming all of the assets and liabilities for the operation of University Village including resident contracts?

A.   It's definitely in paragraph 21 of the complaint, Horizon agreed to assume all liabilities --

Page 41

all obligations to the senior living -- for the seniors living at University Village.  So I'm not certain where exactly in this loan extension agreement that comes to be found, but I believe that there's in there somewhere.

Q.   I agree with you that that's what the complaint says, but I would submit that I reviewed Exhibit A and I didn't see where that was laid out.

So did you rely upon just what the complaint says or did you rely upon some description as given to you by Mr. Warren as to what this agreement included? But in terms of the actual review of this agreement, I did not see where that term was expressly included and I may have missed it.  So that's why when you say that, I'm just saying I'm legitimately interested in knowing what you were looking at, because I didn't see it.

A.   It may be covered in paragraph 7 of the deed in lieu where it talks about -- "a deed in lieu of foreclosure in the form approved by the parties, (the deed in lieu,) the bill of sale and assignment, an assignment and assumption of leases and rent, and an assignment and assumption of licenses, rent, and contracts."

To the extent that those contracts might include the life care contracts, which have obligations to refundable deposits, I would assume that it would be.

Page 42

Q.   And I did see that language too when I reviewed it, but this document itself, is it your opinion that this creates an obligation or is that going to be pursuant to another document that would be executed in some point in the future?

A.   It does seem to provide for another document to be executed in the future.

Q.   So let me -- now, looking back at Exhibit II, litigation background to your opinion, I think we covered this.  I think you said in some of these cases no report was done, and it's similar in state court where no report is required, but these were you personally testified in all of these cases?

A.   Yes, this is all my personal testimony.

Q.   Gotcha.

And in which of these cases did you actually create a report?

A.   Certainly, the last one on the first page and the --

Q.   Is that the Polk County case?

A.   The Polk County case, Lindsey Crowley.  And on the second page, Community Care Health Network, the second from the top, was a full report.  And it was somewhat of an abbreviated report for Buccaneer Landscaping Corporation.

Q.   In Community Care Health Network, what was your work in that case?

A.   So that's a case where Community Care Health Network acquired an entity called Matrix Medical Network, and Matrix was providing mobile screening for health screens, ultrasounds and things in a bus.  And the sellers had not disclosed certain material information that was part of whether or not certain contracts were truly ongoing as part of the recurring revenue or not.

And they had also -- there's two parts to that and one specific part had to do with a misrepresentation of travel and payroll expenses associated with these mobile buses.  Basically, they were -- they were not paying their employees who were hourly employees an hourly wage for air travel, but they were for travel by car.  So you might have a nurse practitioner based in Orlando that's doing a health fair in Colorado, say, and they were not reimbursing these employees for their travel time to get to these events.

So when you take into account all of the travel, there were -- the expenses were higher, the net income was lower and so the EBIDTA calculation for that purchase price would have been based on a lower amount.

Q.   And what was the conclusion and the opinion

that you reached in that case?

A.   It was a different -- I quantified the difference if they had considered all of the hours spent for travel.

Q.   So it was a valuation case, essentially?

A.   I wouldn't strictly call it a valuation case because really it was a question about the basis for a multiple, an agreed multiple that was applied, but it was not a straight up valuation.

Q.   Okay.  So you were trying to determine what the accurate amount of earnings were to determine the purchase price based on a multiple?

A.   Correct.

Q.   And I'm backing up.

All right.  That was Mr. Oscher's opinion, correct?

A.   Correct.

Q.   And you've made adjustments to financial statements?

A.   Yes.

Q.   All right.  Now, when you adjust financial statements, do you -- is there any particular, if you will -- if you made adjustments to those financial statements, were those audited financial statements?

A.   I believe they were.

Q.    Is it necessary for financial statements to be audited before you would use those in terms of your valuation?

A.    It is not necessary, but financial statements that have been audited have a greater degree of reliability that you might assign to them.

Q.    But in Teletronics there were audited financial statements that you recall and they still left off all the revenue from these contracts that that you added back in, which essentially impacted the solvency analysis ultimately; is that correct?

A.    I think that they appropriately left off these contracts because for audited financial statements, they were prepared on a GAAP basis.  And when you consider solvency, it's my understanding that a court considers things that would not appear on a GAAP financial statement.

We talked a little bit before about what might be appropriate under GAAP, for example, a historic purchase price for real estate might, you know, be appropriate under GAAP, but might be considered differently for solvency.  And that was a -- the value of these contracts were similarly something that would be not reported under GAAP, but we thought should be considered for solvency.

Q.   Okay.  And does a GAAP balance sheet include any sort of line items or consideration of business enterprise value?

A.   That would not be a line item on a debt balance sheet, no.

Q.   Is that a factor that we could draw from a balance sheet under GAAP?

A.   You could consider the net worth, which would be the assets to liabilities from a GAAP balance sheet. I would not consider it indicative of value in a very general sense.  It might be a starting point, but we would do additional work to determine value beyond that point.

Q.   What about any sort of accounting for goodwill on a balance sheet?

A.   Goodwill would -- can appear on a GAAP-basis balance sheet.  That's not surprising.  There are requirements for how that should be reflected, reported on a GAAP balance sheet.

Q.   And you consider that an asset?

A.   That's an asset.

Q.   All right.  Now, were the 2014 financial statements available to you in this case, in Westport?

A.   I believe that there was -- my understanding is that there had been a draft of the audited financial

statements for 2014 that was prepared by Clifton and --
I recall hearing that.  I don't recall whether I looked
at them or not.

My understanding is that there was not an
audited financial statement prepared for 2014 within the
normal time frame, in the spring of 2015, that that did
not occur, but that there was a subsequent -- during the
bankruptcy or later in 2016 or even later than that,
that somebody had attempted to go back and do a 2014
audited financial statement, but I don't recall -- I
don't recall if that was just conversation or if that
was something I looked at.

Q.   And since you mentioned that, when someone
goes back and tries to do that sort of analysis, from
2016 to a 2014 analysis, how reliable would you consider
that?

A.   It really depends on what sort of information
they were working from, because audited financial
statements are primarily -- first and foremost, they're
management's representation of the financial conditions
and an auditor then goes back and verifies.  So it's
really hard to say one way or the other whether it would
have been reliable in 2016 or not.  It really depends
what they were looking at and what information was
available for them to verify the financial statement.

Q.   And would you agree with me that as a primary source, that management's view of a financial condition would be significant or would be a starting point for any analysis?  Would it be most important for you, to begin with?

A.   There are management financial statements that an auditor then expresses an opinion on.  So it is management's opinion.  It's not the auditor's opinion.  It is the management's opinion.

Q.   And the auditor is simply just verifying and testing the numbers on those statements.  Is that fair to say?

A.   They are testing and they're assessing.  There might be analytical procedures.  They might be looking both at a big-picture level and at a detailed level to assess the reliability of a financial statement.

Q.   And if you're in 2016 and you're looking at trying to go back and create a 2014 statement, which I think was our hypothetical -- or your understanding of what may have occurred in the bankruptcy case.  I know you're simply going from recollection, but going just looking at that context, would any sort of perspective that existed in 2016 be relevant to going back and doing those statements in 2014?

A.   It's possible.  I don't know.

Q.   Does a GAAP-based balance sheet generally reflect assets at fair market value?

A.   It depends on the asset.  I would expect cash would be at fair market value.

Q.   What else, what other types of assets -- classifications of asset types would be at fair market value?

A.   It depends on the industry.  It depends on the entity.  If their AR is simply correctable, then that's probably pretty close to fair market value.  Some entities have inventory, some don't.  So it really depends.  There's a lot of factors that go into it.

Anything that's purchased with cash or closer purchased to be turned into cash is probably going to be closer to being at fair market value.  Things that are harder to measure either because they're intangible or because, you know, there might be concerns of inventory, for example, that might or might not be a fair market value.

Q.   Okay.  So you reviewed the 2013 financial statement?  I think that's on your Exhibit III.

A.   Yes.

Q.   And I think they're actually attached to your report, as I recall.  I thought I saw a balance sheet in here.  Yes, do you see Exhibit IV?

Page 50

A.   Uh-huh.

Q.   Is that the balance sheet that you looked at?

A.   We produced into our exhibit, but, yes, this is -- these numbers all tie directly to the December 31, 2013, audited financial statement.

Q.   All right.  And can you show me where on this balance sheet that the enterprise value of Westport Holdings is indicated?

A.   I would not say that the enterprise value is reflected on this balance on sheet.

Q.   At all?

A.   At all.

Q.   Is there any way you could look at this balance sheet and make a determination of the enterprise value?

A.   No.  I think you would have to make -- you could do -- this could be the starting point for your adjusted net assets analysis, which puts all of the assets and liabilities and their fair market value and then comes to the conclusion using an asset-based approach for the enterprise value, but it's not currently in that form.

Q.   Did you make any determination of goodwill value in this case?

A.   This schedule just reflects what is on the

audited financial statement.  It does not reflect any framework.

Q.    I agree with you.  I understand that, but did you personally make a determination of goodwill value in this case for Westport Holdings?

A.    I did not do a direct valuation of the goodwill.  What I did is I looked for sources that existed at the time of the transaction that would tend to indicate what the goodwill value was.  One of the sources that I used was the Cushman & Wakefield appraisal and the Integra appraisal.

Q.    Okay.  Any other sources that you looked at?

A.    Those were the ones that I relied on for my analysis.

Q.    When you say you relied upon them, what do you mean by that?  I've got the Cushman.  For example, let's just go ahead and go to Cushman & Wakefield.  I think we already made copies of those.  I don't know why it's marked original, but here you go.  So I've handed you what we'll mark as Exhibit 4 to the deposition.

(Exhibit No. 4 was marked for identification.)

Q.    (BY MR. WHITSON)  It's identified as the "Appraisal of the Going Concern, University Village," dated March 6, 2014, prepared for BVM Management, Inc., by Cushman & Wakefield Regional, Inc.  Is this the

Page 52

Cushman & Wakefield appraisal that you referred to in your testimony?

A.   Yes.

Q.   And is this the appraisal that's referenced on Exhibit III to your report?

A.   Yes.

Q.   So you list both the Integra appraisal and the Cushman & Wakefield appraisal on Exhibit III?

A.   Yes.

Q.   All right.  So this says, "Appraisal of the Going Concern," correct?

A.   Yes.

Q.   And what information from this appraisal did you include as part of your solvency analysis?

A.   Well, if you look specifically at -- this is not a complete report.

Q.   Exhibit 4 is not complete?

A.   It is not complete.  If you notice, it starts on page 63 with the valuation process.

Q.   Oh, yeah.  This is what I had.  Is what you looked at as part of your solvency analysis contained within the pages that I've given you or in other pages?

A.   What is missing -- this is part of what I looked at, but there's approximately 62 more pages that come before this that are not just the income approach

which was used, but also summarizing the conclusions, laying out some definitions as to exactly what they valued and how they valued it.

Ultimately, there were three parts.  There was a valuation and appraisal of the real estate, of the furniture, fixtures, and equipment, and -- Integra and Cushman & Wakefield use slightly different terms, but they both are generally talking about intangible assets that they valued.  And so there are three components that roll up into their conclusions and there's two parts, there's an as-is value and then a stabilized value.  I used the as-is value and --

Q.   What's the difference between the two?

A.   I believe I made some assumptions that there could have been some cost savings, perhaps some additional -- what I'm recalling is that the cost associated with revenue was slightly different in the as-stabilized than they were in the as-is.  The as-stabilized had a small amount of capital expenditures that went along with it.

Q.   So why did you choose as-is as opposed to as-stabilized?

A.   Well, because this is a report that was -- it was prepared at the request of BVM Management in the relevant time frame for the value of these assets very

close to the transaction date.  So this is information that would have been available to what is listed at that moment in time.  So that's why I used the as-is, because that was the current condition of the assets.

Q.   Okay.

A.   So I used those numbers to make adjustments to the land, buildings, and equipment net and to the intangible assets.

Q.   And you're now looking to --

A.   I'm referring to Exhibit VIII to my report.

Q.   All right.  Could you walk us through Exhibit VIII as it relates to information that you would have used from the Cushman & Wakefield appraisal, Exhibit 4 to your deposition?

A.   So I am specifically looking at -- walking through this analysis, the first column is the audited financial statement, the balance sheet as of December 31, 2013.  There is an adjustment based on the March 31, 2014, OIR filing.

Q.   What's that mean?

A.   So I'm trying to assess solvency on March 31st of 2014.  So I know that, for example, there were current assets of in this case 3.19 million on December 31st.  By the time of the OIR filing on March 31st, the value of those current assets had

declined by 544,000.  So I'm taking the 2013 December balance and adjusting it based on what we recorded in the OIR filing.

Q.   Where is that?  I mean, is that negative 544,708?  Is that -- or is that just an adjustment?

A.   That's an adjustment.

Q.   An adjustment of, like, half a million dollars.  Is that what you're saying?

A.   Yes.

Q.   Okay.  Where is that?  Is that from this reconciliation that precedes this exhibit to your report?

A.   Yes.  Exhibit V is the reconciliation.  So Exhibit V shows that the value reported the OIR on March 31st was 2.6 million.  And the far right column is that adjustment to between December 31, 2013, and March 31, 2014.

Q.   Were the numbers reported to the OIR accounted on the same basis as the audited financial statements?

A.   I believe they were, because that was the -- the purpose of this analysis is I have compared in the first three columns, the -- the first column is the audited financial statement, the third column is the OIR reporting.  And you'll see that there are some minor differences, but they are substantially the same numbers

in terms of total assets and total liabilities.

Q. Are you aware of any differences in the methodology the OIR requires and, like, state statutory accounting versus GAAP?

A. I suspect that that may be what's going on. For example, the first adjustment between the audited financials and the OIR reporting is for 29,252, and that is where OIR apparently required -- or Westport Holdings reported 29,000 as being excess of minimum liquid reserve funds. So I assume that that is a statutory requirement that they report it that way. The differences are fairly slight and it's been reconciled here.

Q. Okay. So I'm sorry, I stopped you. Go ahead.

A. So you asked about the adjustment -- so on Exhibit VIII, the first column is the audited financial statement. The second column are these adjustments to roll these balances forward to March 31st of 2014. The third column is that they are value adjusted and that's where I've used the Cushman & Wakefield and the Integra reports to make adjustment to the value of the land, buildings and equipment, and the intangible assets based on those two reports.

So if you were to look at the Integra and the Cushman & Wakefield reports, you would have a certain

amount on both for real estate and for furniture, fixtures, and equipment.  I added those four numbers up, compared them to the 31,149,278, actually after the adjustment for the roll forward to March 31st.  So the fair value adjustment would just be the difference between what was reported on the balance sheet and the two appraisal reports and making adjustments based on the difference between the two.

Q.   Did you make any adjustment for the fact that Westport Holdings is no longer liable for its guaranty for $20 million?

A.   So if I look at the fourth column over, there is an adjustment for the assets that were transferred to Westport Nursing.

Q.   I see that, there's a $39 million adjustment to tangible assets the middle of the column.

A.   Right.  So what that is, is -- as I mentioned, Cushman & Wakefield and Integra both reported an intangible value and that intangible value I thought most closely corresponded to goodwill.  That would be things like the fact that you're not just selling -- in the case of a hypothetical sale, there's the real estate, which is the buildings.  There's furniture, fixtures, and equipment would be things like desks and beds and things that were inside the building.  And then

there's an intangible value to things like assembled workforce and a reputation in the market.

These are things that could conceivably transfer to a buyer, but they're not buildings or furniture. So they consider that to be an intangible asset and I thought that that most closely corresponded to goodwill.

So rather than the $42 million that was reported on the December 31, 2013, I adjusted to the intangible value from Cushman & Wakefield and from Integra, which was around 3,100,000 and -- here, the Westport Nursing column has the breakdown of the three components that Integra found: 13.5 million in building and 2.89 million in intangible.

So they still offered some component in this adjustment for the intangible component from Cushman & Wakefield. And then further down, there's the 15 million advance by USAmeriBank that is transferred off of Westport Holdings's balance sheet in the spinoff of Westport Nursing.

Q.   It wasn't the $20 million before the transaction?

A.   Yes, there was -- there was -- it's already up in current liabilities, because it was -- it was no longer a long-term liability. It was in less than a

year.

So what you see is that in the adjustments to the OIR filings, that 22 million has -- or the current liabilities have been reduced by 22 million, some component of that would be the Horizon debt.  And then 15 million is transferred out to Westport Nursing so that you end up on the adjusted balance sheet with roughly 9 and a half million of long-term debt, and that would be the CPIF lending.

Q.   Okay.  What information did you take from the Cushman & Wakefield appraisal?  What about taking just -- anything else?

A.   I think it is described a little bit more fully in the body of my report beginning on page 16.

Q.   It caught my eye when you say in the middle of the paragraph there in the appraisal reports, the IRR which is the Integra report, "considers the value of skilled nursing and assisted living facility owned by Westport Nursing.  IRR valued all assets of the business enterprise including real property."

So IRR, Integra, did a valuation.  Is that fair to say?

A.   IRR did a real estate appraisal.

Q.   Okay.

A.   And they valued if you were to transfer this

piece of property to a buyer, you would be transferring a building, you would be transferring furniture, fixtures, and equipment. And then they assumed that it would be sold as an operating business and that there would be an intangible value to the assembled workforce, to the reputation in the marketplace, things like that. But they're still valuing a piece of property. These are real estate appraisals. They're not business valuators.

Q. It just says, "this value."

A. Right, because when you transfer an operating business, there will be some component of intangible value that transfers if it continues to operate.

Q. Okay. I'm sorry. I cut you off.

A. That's it. I'm done.

Q. Okay. What about any kind of discounted cash flow analysis, did you pull any information from the Cushman & Wakefield appraisal in connection with your calculation based on that? Did you see that?

A. I certainly reviewed what they did and how they did it. I did not take the information from that appraisal and do anything subsequent with it. I used the values that they determined on my balance sheet analysis, as we just discussed.

Q. Going back to the Teletronics case. Did you

take any effort to sort of test, if you will, or examine the reasonableness of the Cushman & Wakefield calculations?

A.   I certainly looked at what they did, compared it to the historical information that was available and the assumptions that they made.

Q.   And did you find it to be valid?

A.   I thought that they were probably a little bit optimistic.  They were, after all, engaged by BVM and this was being used for lending.  So, if anything, I thought that it was probably indicating more.  If they had to come down one way or the other, I think they probably would have come down on the side of more value rather than less.

Q.   So are you suggesting that the person who retains the expert somehow influences which way the appraisal might go or evaluation may go?

A.   Evaluations and appraisals are subjective. And I think that it's also human nature, if you were hired by somebody, you want to provide a product that they're going to be satisfied with.  So I'm not saying that it's right.  I'm not saying it's wrong.  I'm just saying that all things being equal, they are more likely to come out on the high side than the low side.

Q.   What about any adjustment did you make to the

discounted cash flow analysis that Cushman & Wakefield performed?

A.   I did not adjust their discounted cash flow analysis.

Q.   You didn't take any additional deductions or alter their discounted cash flow analysis?

A.   No.

MR. WHITSON:   It's ten after 1:00.   It might be a good time to break.   Is that okay with everybody?

MR. APPLEBY:   Sure.

(Luncheon recess from 1:14 p.m. to 2:24 p.m.)

Q.   (BY MR. WHITSON)   Before we broke for lunch, Ms. Unterholzner, we were looking at Exhibit 4 to your deposition, which is the Cushman & Wakefield appraisal. Would you mind turning to page 86 of that document?

A.   Okay.

Q.   And it says, "Net Resales," revenue.   Do you see that there?

A.   Yes.

Q.   Now, this was part of the income capitalization approach that Cushman used in order to come up with an appraised value of the assets; is that correct?

A.   Yes.

Q.   And did you use the values on page 86?  I think you said it was prepared on a stabilized and as-is basis?

A.   I don't know.  I didn't directly use this sheet, but this would be part of the income approach that they used to determine the value of the real estate and the other assets.

Q.   Do you recall whether you used a determination that was made by Cushman & Wakefield on an as-is basis or on a stabilized basis?

A.   As-is.

Q.   Do you recall the difference between, I think -- you did testify that there were some adjustments made, but what -- were there any differences between the stabilized numbers that were used by Cushman and the as-is numbers?

A.   What I remember is the revenue in the analysis was the same, but the assumptions about the expenses were different and that the stabilized included a provision for some capital expenditures that was not present in the as-is.

Q.   So your recollection was that there was no difference in all the revenues between as-is and stabilized as far as the Cushman report went?

A.   That is my recollection.  But as I said

before, this is an incomplete portion of the appraisal report.  So I don't know for certain.

Q.   Yeah.  We tried to just copy the more relevant sections.  So if I'm looking at -- we'll call this Exhibit 4B.  It's another excerpt from the Cushman & Wakefield.

MR. APPLEBY:  I want to state on the record. I want to object that you're giving a portion of a document.  You're asking questions and directing certain questions for portions of the document, the appraisal, that aren't there.  Keep asking your questions, but I just want to get my objection clear on the record.

MR. WHITSON:  I understand.

(Exhibit No. 4B was marked for identification.)

Q.   (BY MR. WHITSON)  So if you'd look at page 103 on Exhibit 4B, the excerpt I just handed you, we're looking at discounted cash flow calculations, correct?

A.   Uh-huh -- yes.

Q.   And if I look at 103, it says the effective gross income year one, $12,188,505, right?

A.   Yes.

Q.   And then it says total income is the same figure below the line?

A.   Yes.

Q.   But if I look at page 104, it says effective gross income 12,188,505, the same figure as on 103, but then it adds in $442,035 revenue, do you see that there, investment income for a total income number of 12,669,540.  Do you see where I'm referring to?

A.   I do.

Q.   And you said the revenue was the same under both the as-is and stabilized approaches, but that appears to be different, right?  I mean, you're adding in revenue of 442,035, which I believe corresponds to where we were on page 86 of Exhibit 4, which is also the Cushman & Wakefield report.  Let me know when you're there.  Are you with me?

A.   Yeah.

Q.   Where it says net resales of 432.035.  Do you see that there?

A.   I do.

Q.   And that seems to carry to page 104 as a revenue item.  Would you agree with me?

A.   Yes.

Q.   All right.  So which -- so the revenues are different.  So which revenues did you use in calculating your solvency analysis?

A.   I used the as-is value.  And from my

recollection, it matches what's on page 103.

Q.   Okay.   So you didn't have any inclusion at all for any net resale or the contract sales in your projections at all in your analysis?

A.   The amount that I used, to my recollection, was this 22,700,000.

Q.   Okay.   But you'll agree with me that in contrast to what you testified to a minute ago, the revenue's not the same under both approaches, right?

A.   Give me a moment to look at that.

Q.   That's fine.

So going back to Exhibit VIII.   So going back to Exhibit VIII of your report.

A.   Yes.

Q.   And the column to the far right has a balance sheet of Westport and Westport II as of March 31, 2014. How did you come up with the adjusted balance sheet values in that column?

A.   I think we talked about this earlier.   I started from the left column, which is the audited financial statement.   I rolled them forward based on the OIR adjustment -- based on the OIR report of March 31st, and that's the second column.

The fair value adjustments are to adjust the buildings, furniture, fixtures, and equipment, and

intangible assets to the values -- the combined values of the Cushman & Wakefield and the Integra reports. Again, subtracted out the assets that were transferred to Westport Nursing and the remainder is what is in that right-hand column, adjusted balance sheet as of March 31, 2014.

Q.   Right, I recall you saying that.

So your starting point was you audited 2014 -- sorry, 2013 statements, correct?

A.   Correct.

Q.   Were there not internal management-generated financial statements for the March 31, 2014, available to you?

A.   I believe that there were internal financial reports contained within the hard drive, yes.

Q.   And why didn't you use those, since they're prepared for that date rather than requiring adjustments?

A.   Well, these numbers didn't require any adjustments either.  They were based on what was reported to the OIR, which I felt would have an additional level of scrutiny from what was just contained in the management records.

Q.   But you had statements that were prepared for March 31, 2014, available to you, correct?

A.   Yes, there were internal statements from March 31, 2014, some of which were prepared on what was called an audit basis.  And those could be, in some cases, matched back to the audit, but in some cases there were some differences.  So I thought that the amounts that were reported to third parties were more reliable.

Q.   Okay.  So you disregarded the international management report for March 31, 2014, the financial statements?

A.   I wouldn't say that I disregarded them, but I chose to use the OIR filings.  I thought they were more reliable.

Q.   The ones you had to adjust?

A.   I didn't have to adjust the OIR filings.  I rolled forward the audited financial statements to March 31, 2014, based on the OIR filings because I wanted to have it basically on the same basis.

Q.   Okay.  Now, you deducted under non-current liabilities the due to affiliates, correct?

A.   I did not deduct.  There was a change in the balance between December 31, 2013, and March 31, 2014. So that's what's captured in that 499,000 adjustment in the second column over.

Q.   Well, wasn't that all written off as part of

the spinoff of Westport Nursing Tampa?

A.   No.   It still appeared on the OIR filings as of March 31, 2014.

Q.   But internally wasn't it written off?

A.   Perhaps eventually.   It was not -- I don't know.   I don't think so.   At least not right away.

Q.   And the deferred revenue and entrance fees, you deducted that amount, correct?

A.   There was a change between December 31st and March 31st, but I included the March 31, 2014, value on my adjusted balance sheet.

Q.   I'm sorry.   I don't follow your answer.   You deducted an amount of $16,039,980 from value for deferred revenue from entrance fees, correct?

A.   Deducted from what?

Q.   Sorry?

A.   That was a liability that existed on the balance sheet as of that point in time.   I don't know that I deducted it from anything.   I'm a little confused by --

Q.   Where would the liability show, on which balance sheet?

A.   It was 15,817,000 on the 12/31/13 balance sheet and then it was 16,039,980 as of March 31, 2014.

Q.   What about any internal statements?

A.   I don't know.

Q.   You didn't look at the internal statements?

A.   I looked at them, but I don't know as we're sitting here right now what they would have said.  There are also different versions of those internal statements.  So I'm really not certain what statement you're referring to.

Q.   Why is it deferred revenue a liability?

A.   Deferred revenue is a liability because that is how the -- I believe that this is an OIR thing, that they are only allowed to record revenue on a certain percentage basis for every month that a resident lives at Westport, at the -- in the assisted living under a life care contract.  But I think that the idea is to recognize that they pay a large upfront entrance fee and that some portion of that goes to their care on a monthly basis going forward.

Q.   But why -- if that's deferred revenue, revenue is an asset item, correct?

A.   No, revenue is not an asset.

Q.   Well, it's an income?

A.   Yes.

Q.   Okay.  So if they can't recognize all income immediately, why is that a liability?

A.   It is a liability because they have taken cash

before they have provided services and they will be required to provide services into the future.  So as they provide services, they're allowed to recognize revenue.

Q.   Right.  So it amortizes out, right?

A.   I wouldn't necessarily use that term, but yes.

Q.   Okay.  And you have a deduction for refundable entrance fees of 27,562,356, correct?

A.   I'm not certain why you call it a deduction. It's a liability.

Q.   It's a liability, right.

In terms of coming up with your solvency analysis, right, you're deducting from value the amount of refundable entrance fees, right?

A.   Refundable entrance fees are a liability on the balance sheet, and when you do a balance sheet test you subtract the liabilities from the assets.

Q.   Okay.  But when you use the discounted cash flow numbers from the Cushman & Wakefield appraisal, they didn't include -- they already took the entrance fee revenue out pre-capitalization, didn't they?

A.   They projected a future cash flow.  And I think we talked about the fact that the cash flow was the -- the income was based on what they would get from monthly fees and from other sources, but just because

you're projecting, you know, future cash flow doesn't mean that this liability goes away.

Q.   Well, I mean, what I'm saying is you -- there were two cash flows that were created that we just looked at on pages 103 and 104 of the report.  One included revenue from contract sales, right, and one did not, and that was a delta of about $442,035 plus there's some investment income that was included on the stabilized basis, but you used the as-is basis, which did not include contract sales.  But then you're deducting from the value that was based upon the non-contract revenue number being capitalized, you're then deducting the refundable entrance fees.  Aren't you double counting?

A.   No.

Q.   You're not giving them credit for the revenue in terms of capitalized value, but then you're recognizing it as a liability to be deducted from assets.  Why am I not following you?

A.   Cushman & Wakefield did a real estate appraisal.  They valued a building and some furniture and some associated goodwill and intangible value associated with the building.  So I've used that appraisal for the values of those assets on their balance sheet.

Just because they did an income approach in order to determine the value of that real estate and those other assets doesn't mean that the liability that existed on the balance sheet somehow goes away.

Q. It didn't go away. But if you're going to use the revenue, there are two bases, right? One is as-is, doesn't include contract revenue, and then there is stabilized, which does. Would you agree with me on that, page 103 and 104, looking at those charts?

A. Page 103, the revenue is based on --

Q. As-is?

A. -- as-is. It's based on the fees that would be generated, the monthly fees that would be generated.

Q. And look at 104.

A. 104 has two other elements. The one that says revenue, I suppose that may be these resales. It's not particularly clear. It just says revenue.

Q. That's what I'm saying, they wipe the contracts, right?

A. Well, I don't know. I think so, but it's really not very clear.

Q. Let's assume --

A. But either way, I don't think it makes a difference. I mean, they have -- I've used the value for the real estate and --

Q.   Well, the value of the real estate was determined by capitalizing the cash flow, right?

A.   Yeah.

Q.   Okay.  So if the cash flow number that you used or Cushman used, right, does not include contract revenues, then aren't you -- and that value is determined based upon discounting that cash flow without the contract revenue, but then you're showing the deferred revenue -- I'm sorry, the refundable entrance fees due under the contracts as a liability, you're not giving any benefit to that revenue in terms of the valuation side, the asset side, but you're deducting the full amount of it on the liability side?  In other words, if you capitalize that the revenue including the contract sales and then deducted the entrance fees just without anything being considered, the methodology -- well, let's look at page 86.  It's kind of laid out more.

That shows you the entrance fees and everything else there.  And I'm kind of jumping around. Do you see where it says, "year one existing resales," on page 86 of the Cushman report?

A.   Yes.

Q.   Okay.  The entrance fees collected, 4,420,349, correct?

Page 75

A.   Yes.

Q.   Number of refunds, 35.7.  So there's entrance fees refunded of 3,978,315.  That comes up with a net resale number of 442.  So the Cushman numbers already calculate, even on a stabilized basis, the refund amount that you're deducting as a separate liability line item on your Exhibit VIII to your report; isn't that correct?

A.   No.  What I've done is I've used the Cushman & Wakefield report to value certain assets.  Just because -- this is a capitalized cash flow.  Just because this uses an income approach to project future cash flows to determine the value of the assets, I don't think that has any impact on the 27 million that was owed to residents on March 31st of 2014.  The two things are unrelated in my mind.

And even if they were related, if you are saying that I should have used the as-stabilized value of 26 million, it wouldn't have affected me.  My value would be approximately 4 million higher on Exhibit VIII, but the 27 million would not change.  This is still a liability that was owed to residents based on existing life care contracts.

Q.   I understand that, but would you -- I guess you disagree with me, but it appears to me, from looking at page 86, that that refund liability is already taken

out on the discounted cash flow calculation.

A.    These are future refunds that will be paid. These aren't the amounts that, you know, were existing. That's what I'm saying, these are amounts that will be paid into the future.  They are not the amount that was the current liability on March 31st of 2014.

Q.    But isn't that what Cushman's doing is they're basically amortizing out that liability in their projects to come up with that annual number there, that resale at 442?  So you're aggregating all that in terms of all being due as of March 31, 2014, by using the capitalization of the income to determine value above.

So I'm trying to understand how we can use a revenue number to determine the asset value on a discounted cash flow basis that already includes a deduction for refund liability and then deduct -- you add in a refund liability below that.  Do you follow what I'm saying?

A.    Cushman & Wakefield did a real estate appraisal.  They forecasted cash flows associated with the operation of the facility to say that the value of this building, its fixtures, and certain intangible assets was some amount.  That's what I have put on the adjusted balance sheet.  None of that changes the facts that Westport Holdings has existing life care contracts

that represented amounts owed to residents for the refundable portion of their entrance fees.

I disagree that a real estate appraisal, regardless, it could be a market basis, it could be -- there are three different approaches to valuing real estate. The fact that they used an income approach, that is, you know, a choice that they made, but I don't think any of that impacts the fact that there were still liabilities on the balance sheet that belong on the balance sheet that represents claims on the assets by those residents.

Q. But isn't it -- by using the discounted cash flow method, which is the way they value the real estate, correct?

A. Uh-huh.

Q. And that's the value you took as well, correct?

A. Yes.

Q. Okay. And by deducting from that discounted cash flow analysis the amount of refund liability owed, then doesn't that valuation method in terms of on the asset side already include essentially that contract asset, if you will, of the refund liability and then you capitalize it? That's how you come up with value, but then you don't also deduct it below as a liability

because you've already taken it out of the calculation of value.

A.   No.   I understand what you're saying, but I disagree.   The liability still exists regardless of the method that you use to value the real estate.

Q.   Isn't liability counted for in valuation?

A.   No.

Q.   Why not?

A.   Because they could use three different approaches to value the real estate.   They could use a market approach.   They could use an asset or cost approach.   They could use an income approach.   They are still valuing a building, furniture, and some intangible assets.   Regardless of the methods that they use to value the real estate, it has no bearing on the liability that was owed for existing life care contracts.

Q.   I agree with you on that, but what I'm saying is if you're going to use a discounted cash flow method, right, the income approach to valuation and you're already going to deduct the refund liability from the income that you're capitalizing to come up with the value based on the income approach, then is it still proper to deduct the full amount of that liability after it's already been taken out of the capitalization

calculation as a separate liability below?

A.   The capitalization is future inflows and future outflows.  It's not what exists on the balance sheet at that date.  You are projecting future people buying and future people getting refunds.  So they're two separate things.

Q.   Let's drop back a little bit more.  How much experience have you had in your field with continued care retirement communities, CCRCs?

A.   This is the second one I've worked on.

Q.   What was the first?

A.   The first is a facility out in Arizona in the Phoenix area called Freedom Plaza.

Q.   And what was your work for Freedom Plaza?

A.   We were valuing the ownership interest for the parent company that held 99 percent.  It was a very convoluted thing, but basically it was a valuation of interest in an entity that operated the CCRC.

Q.   Did that have anything to do with the particular nuances of running a CCRC under Arizona law?

A.   I don't think there were any particular nuances to Arizona law.  I think that they had slightly lower minimum reserves required.  And similarly, we were dealing with real estate appraisers and disagreements over the value of the CCRC.

Q.   So you're -- I understood your answer.  It sounds like it was a little attenuated in terms of the actual value of the CCRC like we're dealing with here with Westport.  You're talking about the value of an interest of an interest of an interest, right?

A.   So it was sort of a mix of things.  The CCRC was the operating entity and it was actually three different -- three different separate entities that rolled up to one entity.  And then there was a 90 percent interest and a 10 percent interest and the 90 percent interest was held by a holding company and then 100 percent of that company was owned by another company.  And then ultimately, it went up to the parent, which held 100 percent interest of the entity that held the 90 percent interest.

So it was somewhat attenuated, but at the end of the day it was similar in the sense that we had real estate appraisals that had been done for -- again, it was a CCRC.  So there were three different properties and the ownership of the three different campuses.  They were similar.  They collected entrance fees.  They did refunds.  So all of the issues that we're dealing with were the same issues.

Q.   Did you deduct the valuation of the CCRC itself?

A.    No.

Q.    And did you rely upon a valuation of performance of the CCRC itself?

A.    We used the real estate appraisal that had been done for the CCRC in order to value the 90 percent interest that was held by one of the companies, and then we were going to roll that -- and then we rolled that up to the interest on the balance sheet of the ultimate owner.

Q.    Did you come up with a final opinion of value in that case?

A.    I think it settled before we got there.  It did, it settled before we finalized our report.  We were pretty close.

Q.    Was that in connection with litigation or was that just a dispute?

A.    It was in connection with litigation.  It was a shareholder dispute involving the -- the ultimate owner, the ultimate parent company is called CIG, California Investment Group.  And so one of their shareholders was disputing a transfer of -- 100 percent of Freedom Group Arizona was transferred to a third party in satisfaction of debt and whether that -- was it a reasonable value given to that transfer.

Q.    Okay.  And who did the appraisal in the

Freedom case?

A.    Our side had retained a guy named Craig Smith. And the other side -- I don't recall the appraiser's name.  He was with CDG, I believe.

Q.    And what was the basis that the appraiser and you relied upon to perform an appraiser valuation?

A.    Both did an income approach.

Q.    Income approach?

A.    Yes.

Q.    And was it similar to the income approaches that was employed by Cushman --

A.    Yes.

Q.    -- in Exhibit 4?

Was it different in any way?

A.    I can't recall any differences.  Both appraisers considered the income expenses of the operation.  They considered the entrance fees and the refunds.  I don't believe they were different in any significant way.

Q.    Okay.  So you'll agree with me that the law regulating CCRCs differ from state to state, correct?

A.    Correct.

Q.    And what is your understanding of the business model with CCRCs in Florida with respect to relationship between entrance fees and the deposits on life care

contracts and the payment of refund obligations?

A.   Okay.   What's your question?

Q.   What is your understanding of the relationship from a business model standpoint of the payment of entrance fees, if you will, or the deposits on the life care contracts and then the refund obligations owed to residents who either, you know, have some refund owing on their life care contracts, maybe they're deceased or decide to leave the CCRC?

A.   Right.   So each contract is going to be slightly different.   They will be either more or less refundable.   As in the case of Westport Nursing, some of their plans were 40 percent refundable, some were 90 refundable.   A lower percentage of refundable -- a lower refundable percentage generally corresponds to, I believe, a lower monthly assessment.   So a more refundable entrance fee that you're going to pay on a month-to-month basis.

When a resident decides to move out or if they die, depending on the amount of time that they've been there, there will be some portion of that initial entrance fee that is refundable to them and payable to them as to their estate.

Q.   Right.   And where is it, then, commonly paid out, that liability?

A.    It comes out with the operating.  Certainly in the case of Westport Nursing, they'll pay that out of their operating account.

Q.    But that means they took in the deposits as part of operating revenue, right?  I mean, isn't it fair to say -- and I've heard people with the OIR describe it at the CCRC as a legalized Ponzi scheme whereby the money comes in over the time is actually what funds ultimately the refund obligation of the resident that's leaving?

A.    If they have not created reserves, then, yes, that is what happens.

Q.    Okay.  So were any reserves created for Westport?

A.    Well, there were the minimum reserves, the MLR, but I'm not aware of anything --

Q.    But no specific reserve for refund obligations, right?

A.    No, there's no specific reserve for refund obligations.

Q.    And are you aware if there's any CCRC in Florida that has a specific reserve for refund obligations?

A.    Well, I don't know.  I mean, they certainly were not particularly well capitalized.  I mean, their

Page 85

auditors were talking about insignificant capital for years prior to this transaction. And when they looked at some of the ratios for accredited CCRCs, they had stronger balance sheets with better cash positions. But whether or not they had specific reserve accounts for refunds, I don't know.

Q. Right. I mean, that's just sort of the business model that's permitted under Chapter 651 and the OIR regulations, correct?

A. Yes.

Q. Okay. So going back to page 86 of the Cushman report. So is it your opinion, then, that the refunds paid -- you see there on page 86, right, under existing resales?

A. Uh-huh.

Q. Under DCF, do not include repayments to any residents included in the 27 million on Exhibit VIII to your report?

A. I don't know who these refunds would be payable to. I have no opinion as to whether it's part of this 27 million or not.

Q. So you have no opinion whether there's any relationship at all to the refund obligations that are shown on page 86?

A. I have no way of knowing. I don't believe

that this was done with any specificity to whether they were current residents or later residents.  I have no way of telling that.

Q.   Right, I said that.  The refund entrance fee obligation on Exhibit VIII is 27 million, right?  Oh, I'm sorry.  Okay.  I'm trying to compare the DCF analysis on page 86 to your Exhibit VIII.  Did you follow my question or did I --

A.   I have no idea.

Q.   Okay.  So what I'm saying is -- wait a minute, let me repeat the question.  Refunds paid in two or three years -- which is what this is forecasting, right, page 86, the refund obligation going forward?

A.   They are forecasting that there will be refunds in the future.

Q.   Right.  That those do not include repayments to the residents included in the 27 million under Exhibit -- in other words, isn't this just a forecasted repayment of the 27 million on Exhibit VIII?

A.   I don't know that.  It could be some of the people that are -- whose refunds are part of the 27 million.  It could be people that moved out a year later.  There's no way to differentiate, you know, who these repayments are going to go to.  They're just repayments into the future at some point for unspecified

residents.

Q.   But those repayments on an ongoing basis are going to terminate because they're going to be paid from the deposits coming in, correct?

A.   Those deposits -- those refunds -- cash is fungible.  So, yes, there will be money coming in and money going out.  I don't -- there will be future refunds, there will be future cash coming in.

Q.   Right.

A.   That's what discounted cash flow is.

Q.   Right.  Isn't that what the Cushman report seems to try to reconcile?  This goes back to the DCF analysis that we were talking earlier where you're including a number --

A.   I mean, basically they're projecting 35.7 resales and 35.7 refunds.  You know, all of these refunds could be the people who moved in that year, none of them could be the people who moved in that year.  There's no specificity.  It's just cash in the future discounted back to a present value.  I have no way of knowing if any of these future repayments are part of this 27 million or if they're all new inflows.

Q.   Isn't that the disconnection in terms of your Exhibit VIII in the sense that you're relying upon Cushman's calculations, right, to come up with the asset

value in real estate?  In your words, right?  It's a DCF analysis and it only includes a reduction for the refund obligations which is already laid out here under DCF.

You're taking that value, which includes, you know, a projected forecast of refunds already documented from the cash flow.  You're capitalizing that cash flow number to come to a value and then you're using that value, but then you're deducting the full amount of that liability on Exhibit VIII, 27 million?

A.   Yes.

MR. WHITSON:  Let's step outside.

(Brief recess from 3:07 p.m. to 3:16 p.m.)

Q.   (BY MR. WHITSON)  Let's fast-forward.  Let me clarify one point about the deferred revenue.  What is your understanding about the concept of deferred revenue?  And you may have said this earlier, but I just want to be clear about it.  What is that amount attributable to?

A.   Deferred revenue, when the CCRC accepts an entrance fee, there's some portion that's refundable and some portion that's non-refundable.  The non-refundable is taken into deferred revenue; meaning, that's cash up front as they haven't provided services yet.  As services are provided on a monthly basis, some portions of those non-refundable entrance fees will be recorded

as revenue and that will decrease the deferred revenue liability.

Q.   And I called it amortizing and you said you wouldn't use that phrase, but, you know, generally you have it -- there's sort of a reduction over time that the amount is reduced, right, because you're defining the services and things like that?

A.   For one specific contract, yes, but, of course, you have new contracts coming in so that balance will change.  It will also increase as new people come in and there are new non-refundable portions that increase that balance, and they will also be reduced by the monthly usage of services.

Q.   How do you quantify that, then?

A.   Well, that will be done within the accounting system by the management of University Village.  So it would be specific to each contract, and that's why they keep rent rolls and they have to keep track of that on a by-resident basis.

Q.   And that's kept on internally maintained financial reporting at University Village, right?

A.   I assume so.  I don't know the specifics of whether that would be part of their accounting system or whether they would have maintained basically rent rolls or tenant rolls in some other format.  You could do an

Excel spreadsheet, for example.  I don't know exactly how they did it.

Q.   But you used their figures, the internally generated sort of management figures for those numbers, correct?

A.   I used the audited financial statements, which would be management numbers to which the auditors have applied a level testing for liability.

Q.   Okay.

A.   And I believe OIR also looks at those numbers and provides oversight to make sure that they're being calculated properly.

Q.   Right.

(Exhibit No. 5 was marked for identification.)

Q.   (BY MR. WHITSON)  All right.  In your rebuttal report, which I believe we've marked as Exhibit 5, you take issue with Ankura's opinion on solvency on page 8, right?

A.   Yes.

Q.   You say in the last sentence of the middle paragraph right underneath that subject heading, "I noted that the starting point for both Mr. Murphy's March 31, 2014, analyses was an internal financial statement which does not agree to the quarterly report filed with OIR as of March 31, 2014."

You have a footnote there where you say, "Total liabilities reported to the OIR were 92,365,064, while the statement used by Mr. Murphy includes 79,298,917 in total liabilities, a difference of $13 million."

Do you see that there?

A.   Yes.

Q.   You're saying that there's a potential overstatement of net worth prior to the adjustment.  So are you saying that Mr. Murphy's off by $13 million?

A.   I'm saying that the internal financial statement that he used does not match what was filed with the OIR, and so that raises questions to me about the reliability of what he used.

Q.   Okay.  On the next page, page 9, you say "Mr. Murphy identified a ten-year budget for 2014 - 2023, prepared by Kathleen Burkholder, the former director of accounting and chief financial officer of University Village as the basis for his discounted cash flow analysis reflected in Exhibit 5 to his report.  I have analyzed the ten-year projections utilized by Mr. Murphy, and I noted that it is based on the assumption that the debtors and Westport Nursing would continue to operate in the same manner they had before Westport Nursing was spun off.  Since 2002, Westport

Nursing operated as a landlord," and it goes on.

What specific issues do you note with respect to the ten-year budget that was prepared by Ms. Burkholder?

A.   Well, I think that there are -- some of the issues are described later in the report.  She has prepared ten-year projections.  Those projections assume an increase in the occupancy, and increase in occupancy would increase the revenue.  She has assumed that Westport Nursing would continue -- the rents received by Westport Nursing would continue to be made available to the consolidated entity, which no longer existed once Westport Nursing was spun off.

I mean, ultimately, these are projections.  They differ from the way that Westport had operated historically.  They show cash flows increasing on a year-over-year basis, where historically they had lost money over the past eight years.  So I had some problems with the ten-year projections because I don't think that they were reasonably achievable.  They required certain capital expenses in order to prepare units for sale so that they could increase occupancy.  And Ms. Burkholder testified that the money needed for those capital expenditures was not made available as it should have been.

Page 93

Q.   What testimony are you referring to?

A.   I think I quoted it on page 13 of my report. That would be testimony in the OIR, Department of Financial Services transcript from April of 2015, where she said that CPIF was supposed to have made 1,750,000 available.  She was able to draw down 250,000 and then had to stop and reserve some funds, and then she was allowed to draw some more and then Mr. Bartle took a million and used it for unrelated purposes.

So out of 1,750,000 that was supposed to be available, only 380,000 was available to use.  I think those cash flow projections call for something in the neighborhood of 1,800,000 on an annual basis.

Q.   Okay.  And do you note anything else?  I mean, you'll agree with me, though, that there's a difference between cash flow and profitability?  The two are not the same?

A.   They are not necessarily the same.

Q.   Okay.  Then you next note that the trustee, I guess according to your initial report, and Mr. Murphy's and Ankura's report engaged Meredith Benedict to opine reasonableness of the ten-year projections.  Are you incorporating Ms. Benedict's work into your opinion?

A.   I think my opinion stands on its own without relying on her opinion, but I think that she has

experience in this industry and I think that she has some comments to make on the reasonableness of these projections.

Q.   And you incorporate those in your report, right, on page 10?

A.   I certainly refer to what she said on page 10, but I think that she goes into greater detail.  These are my own observations about the ten-year projection, the increase in occupancy.

Q.   Would the ten-year projections prepared by Ms. Burkholder be aware of those when you did your initial report?  Were they part of the documents that were provided to you by the trustee?

A.   I don't know.  I think that it's possible that they were part of that production.  They may have been on the hard drive.  I don't recall looking at them before I did my initial report.

Q.   Okay.  A projection is something you normally would consider in doing a valuation; whether you rely upon them, would you at least consider them?

A.   Yeah, absolutely I would consider them.

Q.   And have you ever worked with Ms. Benedict before or Forvis, LLP?

A.   No.

Q.   Do you have any knowledge or any opinion about

your reliance on her work at all?

A.   Well, like I said, I think my report stands on its own.  I don't think that there's any part of our report that relies on -- or that stands or falls based on what she said, but I think that what she says helps to affirm the fact that these ten-year projections were not reasonable.

Q.   Okay.  You say that on page 10, the last paragraph there, "In concluding that the debtors are solvent, Mr. Murphy has excluded several significant liabilities from his balance sheet analysis including refundable entrance fees, 32.7 million as of March 31 2014, which represents cash owed to residents, or their estates, who move out or pass away, and deferred revenue from entrance fees, 15.8 million as of March 31, 2014, which represents the cost of future care for residents."

Is that really the cost of future care for residents deferred revenue?

A.   So there will continue -- you receive a whole bunch of money in the future and you're not going to get any more entrance fees, but you're going to continue to have expenses associated with the medical care of the -- of these residents.  My understanding is that there was a component of the CCRC agreement which gave them -- I think it was a capped benefit.

Q. Are you talking about the life care contract?

A. I'm talking about the life care contract. So, yes, the deferred revenue. There is a contribution or a capped contribution for the skilled nursing or the assisted living portion that would be paid out of those non-refundable deposits.

Q. Now, you incorporate in reference to -- on page 12, on the capital adequacy issues to CARF International.

A. Yes.

Q. All right. And what is CARF stand for?

A. It is the Centers on Aging Rehabilitation Facility, I believe.

Q. The what now?

A. Centers on Aging and Rehabilitative Facility.

Q. Could it be Commission on Accreditation of Rehabilitative Facilities?

A. Absolutely.

Q. And have you -- and the rehabilitative facilities of CARF, those included addiction treatments centers and other types of non-age-related management facilities; does it not? Correct?

A. I believe it does.

Q. Right. And in looking at these ratio analyses, would you agree with me that CARF not only

includes non-Florida entities, right, entities outside the state of Florida; would you agree?

A.   CARF accredited facilities nationwide, yes.

Q.   Okay.  So Florida and non-Florida entities?

A.   Okay.

Q.   Which we've already discussed and we know are regulated by state-specific statutes and various agencies such as the OIR as may exist in other states as well, right?

A.   Yes, other states with specific rules versus CRCC.

Q.   You're talking regulatory scheme --

A.   Yeah.

Q.   -- and their requirements?

You said that in Arizona, the reserve requirements are actually less than those in Florida, right --

A.   To the best of my recollection, yes.

Q.   Okay.  So when you look at the capitalization requirement going forward, what value, then, are the CARF figures if it includes facilities that are not just CCRCs and are outside -- include entities that are outside the state of Florida, subject to different regulatory schemes and different reserve requirements and all types of different issues that impact liquidity

and capital structure.  Do you agree with me?

A.    No.

Q.    Okay.

A.    For starters, these ratios are specific to CCRC.  CARF may accredit other facilities, but they publish CCRC-specific ratios.

Q.    Nationwide?

A.    Nationwide they have single-site CCRCs and multisite CCRCs and they publish separate ratios for whether a provider is a single-site CCRC or a multisite CCRC.  So I looked at the single-site CCRC ratios.  I believe that there were 79 of them nationwide and they are based all on audited financial statements.

Their report is very detailed, in fact, as to -- they specifically recommend that not just CCRCs, but the patients -- people and their families who are interested in doing a CCRC be able to run these ratios themselves.  So they give you very detailed guidance on how to take audited financial statements and work line items to include or not, and consideration for where there might be some gray areas.

So I thought that there were very good, quality ratios that were specific to CCRC and, you know, I think that they also indicate that these accredited facilities are operating with larger cash cushions, that

they have more cash on hand, that they are better able to meet their debt than Westport.

Q.   Right, but I may have more reserves theoretically on a national average basis, what have you, doesn't mean that it's insolvent, right?  If they have all reserves that, you know, maybe this nationwide average would suggest, you know, would be optimal doesn't mean it's insolvent or about to become insolvent, does it?

A.   Well, this is about capital adequacy and so I was looking for industry benchmarks to assess whether or not Westport -- how Westport compared to other CCRCs and what these ratios would indicate is that it was undercapitalized compared to the industry.

Q.   Just because there are national averages which may or may not have some application, given the differences that we're talking about in terms of regulator schemes and geographic locations, you know, that type of thing.  Just because they don't have necessarily as much capital reserve, even theoretically speaking, as another or an average doesn't mean that it's undercapitalized, correct?  That's not -- these aren't -- you're not establishing minimum ratios or minimum reserves.  You're talking about averages, right?

A.   You're talking about averages based on the

audited financial statements of similar organizations around the country.  You are looking at the industry to say how is this entity compared to its industry.

And I don't think that it's apples and oranges.  I don't think that the regulatory scheme is going to be so different in another state that it wouldn't be comparable.  Otherwise, they wouldn't be putting out these ratios for specifically that purpose.

Q.   But if you already acknowledged that Arizona has a lower reserve requirement than Florida, doesn't that impact adequacy?

A.   Yes.  Lower reserves are going to probably have fewer days cash on hand, but this is a nationwide.  And out of this industry, out of this accredited facilities we find that the median CCRC has 317 days cash on hand, Westport Nursing had 24.

Q.   And have you ever used CARF before?

A.   No, I have not.

Q.   How did you find out about CARF?

A.   I was doing research, looking specifically for ratios specific to CCRC.

Q.   Why didn't you do that research in your initial report?

A.   My initial report was on solvency and whether or not Westport Nursing was insolvent at the time of the

transaction. When I was asked to rebut Mr. Murphy's opinion, he had a section on capital adequacy. So I did my own research.

I feel like I already addressed this in looking at the audited financial statements for Westport Nursing, the auditor's note about a working capital deficiency going back to 2006, but I wanted to have that industry perspective because he had specifically said he had adequate capital and I disagreed.

Q. Why didn't you address capital adequacy in your initial report? Isn't that part of a solvency analysis?

A. Well, it can be, but it's not -- I was simply asked to opine as to whether or not they were solvent.

Q. And who asked you that?

A. Mr. Warren.

Q. So on March 31, 2014, Westport University Village was operating in -- as a going concern in the ordinary course, correct?

A. Yes.

Q. All right. And are you aware that Ms. Burkholder was deposed in this case?

A. I heard that she was deposed in this case, yes.

Q. Have you reviewed her transcript of the

deposition in this case?

A. I have not.

Q. Have you been told anything about what she testified to in this case?

A. I don't recall any specifics. No, I don't recall what her testimony was.

Q. All right. In your initial report or in your rebuttal report, did you offer any opinion as to whether or not Westport Holdings was able to pay its obligations as they became due?

A. I recall that there was something in the OIR about whether or not they were paying refunds within a timely -- there's a requirement to pay them, I think, within 120 days and I think there may have been some question about that at some point. I'm not certain at the time of that. I haven't seen anything definitive on that.

Q. Other than that -- and you'll agree with me that being able to pay debts as they become due is one of the tests of solvency as recognized in both federal and state court, correct?

A. That is one of the tests of solvency, yes.

Q. All right. Other than what you just said, calling something in an OIR and running a report, did you make any finding or come to any opinion about

whether or not Westport was able to pay its debts as they became due?

A. I do not have an opinion on that.

Q. Do you have all information available to you and did you have it available to you at the time you printed your initial -- any of your reports to render such an opinion as to whether or not Westport was able to pay its debts as they became due?

A. I don't know. There's a tremendous volume of information on the hard drive and I don't know if there's information on there to shed light on that one.

Q. Based on the invoices that are prepared -- I'm sorry, produced before your deposition this morning, you spent about approximately 93 hours on this report, on the initial and the rebuttal report?

A. If that's what the math is.

Q. Did you have access to the hard drive and all the information that was provided to you by Mr. Warren throughout this -- since January of 2023?

A. I certainly had the hard drive early on. I may have gotten some information later, but, yeah, there's been a lot of information that I've had since the beginning.

Q. Okay. And are you aware that Mr. Stellar, former counsel for the OIR, was deposed in this case?

A.   Yes, I did hear that.

Q.   Have you read the transcript from his deposition?

A.   I have not.

Q.   Have you heard about anything Mr. Stellar testified to?

A.   Not that I recall.

Q.   Okay.  In your opinion, does working capital, cash on hand, if you will, deficit or -- automatically indicate solvency?

A.   Automatically, no.

Q.   Did you make any inquiry of CARF as to whether or not there capped any state-specific ratios or a specific value for Florida?

A.   No.

Q.   Why didn't you?

A.   I didn't think that they would be able to provide something like that.  I did reach out and communicate to somebody at CARF just to confirm points about which year corresponded to which audited financial statement, but I did not expect them to provide physically the nuts and bolts behind their report.  That's not something I would expect them to do.

Q.   Who did you speak to at CARF?

A.   Her name was, I think -- I emailed with her.

So I have it in my emails.  Laurie Orlovski, I believe is her name.  O-r-l-o-v-s-k-i, I think.

Q.   Where are her offices located?

A.   Maybe D.C.  I don't remember.

Q.   Following the March 31, 2014, transaction including CPIF loan and repayment of the Horizon debt, was there not less secured debt on Westport Holdings?

A.   Yes, there was less secured debt on Westport Holdings.

Q.   It went from 12 million to 9.5 million, correct?

A.   It went from -- it went from over 20 million to 9.5 million -- oh, yes, just Westport Holdings was, yeah, approximately 12 million.

Q.   And Westport Holdings was no longer a guarantor of the Westport Nursing Tampa debt following March 31, 2014, right?

A.   I believe that's right.  It would be in the documents.

Q.   And I think you said earlier you're familiar with the way that CCRC operates.  So generally, and tell me if you disagree, that the condition of operating a CCRC under Chapter 651 is that you have to offer the independent living facility, but also provide the medical care and treatment, skilled nursing facilities,

assisted living facilities as part of this campus that would constitute the CCRC.  That's sort of the bargain under the life care contract in the context of a statutory CCRC; is it not?

A.   If everything is -- I don't know they have to be on the same campus because I understand that University Village, even though it's now separated from Westport Nursing, that they have contracts with other providers for the assisted living/skilled nursing portion now and I don't necessarily know that they're on the same campus.

Q.   Right, but for a CCRC to properly operate, those sources have to be available to the residents of an independent living facility, correct?

A.   Correct.

Q.   Okay.  So would you agree with me there is a benefit to the residents of the independent living facility to having those services available to them in the same geographic location rather than having to go somewhere else or to leave the campus itself to provide those services?  It's better for them to have it available to them within walking distance than it is to be transported to receive those services?

A.   I don't know that proximity I'd attribute a value as opposed to the quality of the care.

Q.   Assuming the quality of the care is the same.

A.   Assuming the quality of care is the same, it would probably be preferrable to be close, but I don't know that it's necessary.

Q.   You don't think it's better for them?

A.   I don't know.

Q.   It's not better to be able to walk across the street to be able to receive medical services rather than to be transported miles away to get the services?

A.   Well, if you're talking about somebody in a skilled nursing facility, they're not necessarily walking anyway.

Q.   Right.  So if you're going to be transported in a non-ambulatory fashion, wouldn't it be better just to go a few yards than it is to be loaded into a car and then transported down the road?

A.   Yeah, sure.  If the quality of the care is the same, that would be better, but I don't know that it's necessary.

Q.   So it's better?

A.   It's better.

Q.   It's a benefit, correct?

A.   If the quality of the care is the same, it's a benefit.

Q.   Now, you say in your report that, "Together,

Westport Holdings would have benefited as much, if not more, if Horizon had completed the transaction."

Is that correct?

A.   It's a possibility, yes.

Q.   It's a possibility.

Have you made any determination in your opinion as to any causal link or any causation between the financial condition of Westport Holdings, say, over a year after March 31, 2014, attributable to the March 31, 2014, transaction itself?  In other words, did the March 31, 2014, transaction in any way adversely impact the financial condition of Westport Holdings after that date?

A.   Are you asking me if I'm offering an opinion?

Q.   Yes, anything at all.

A.   I'm not offering an opinion on that.

Q.   Okay.  Have you performed any work in connection with such an opinion?

A.   I wouldn't say I performed anything specifically with the objective of providing an opinion.

Q.   Do you intend to offer any testimony in that regard?

A.   Not as I sit here today.

MR. WHITSON:  Do you want to give us five minutes?

MR. APPLEBY:  Sure.

(Brief recess from 3:56 p.m. to 4:15 p.m.)

MR. WHITSON:  I just want to make sure we're clear.  You're going to give me a copy of all the documents that Ms. Unterholzner used?

MR. APPLEBY:  Yeah.

MR. WHITSON:  Especially the CARF, because we didn't find anything that was CCRC specific.  I looked and I didn't see anything about that.  So if you could show me what you looked at, that would be very helpful.

THE DEPONENT:  It was just the report.

MR. WHITSON:  And thank you very much for appearing here today.  Thank you for your time, and that's all we have for today.

THE DEPONENT:  Thank you.

MR. APPLEBY:  We'll read.

THE COURT REPORTER:  Are you ordering?

MR. WHITSON:  Yeah.

THE COURT REPORTER:  Copy?

MR. APPLEBY:  Yes, please.

(Signature was reserved.)

(The deposition concluded at 4:16 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA:

COUNTY OF HILLSBOROUGH:

I, Tonya H. Magee, Registered Professional Reporter, Notary Public, State of Florida, certify that LISL A. UNTERHOLZNER personally appeared before me on August 8, 2023, and was duly sworn.

Witness my hand and official seal this 21st day of August 2023.

Tonya H. Magee,
Registered Professional Reporter
Notary Public, State of Florida
My Commission No. GG 947928
Expires:  March 8, 2024

Personally known ___X___

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF HILLSBOROUGH:

I, Tonya H. Magee, Registered Professional Reporter, Court Reporter, and Notary Public, certify that I was authorized to and did stenographically report the deposition of LISL A. UNTERHOLZNER; that a review of the transcript was requested; and that the foregoing transcript, pages 4 through 109, is a true and accurate record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 21st day of August 2023.

_Tonya H. Magee_

Tonya H. Magee, RPR

Keith T. Appleby, Esquire
Appleby Law P.A.
4916 West Melrose Avenue South
Tampa, Florida 33629
keithtappleby@icloud.com

August 9, 2023

Re:  Jeffrey W. Warren, Liquidating Trustee for Westport
     Holdings Tampa, Limited Partnership and Westport
     Holdings, II, Limited Partnership vs. Valley
     National Bank
     8/9/23 deposition of Lisl A. Unterholzner
     Job No. 6039319

     The above-referenced transcript is available for review.
     THE WITNESS should read the testimony to verify its accuracy.  If there are any changes, THE WITNESS should note those with the reason on the attached Errata Sheet.
     THE WITNESS should, please, date and sign the Errata Sheet and email to the deposing attorney as well as Veritext at transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

     It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.
     If the witness fails to do so, the transcript may be used as if signed.

                              Yours,


                              Veritext Legal Solutions




*Federal Civil Procedure Rule 30(e)/Florida Civil
Procedure Rule 1.310(e's)

Jeffrey W. Warren, Liquidating Trustee for Westport Holdings Tampa, Limited Partnership and Westport Holdings, II, Limited Partnership vs. Valley National Bank

8/9/23 deposition of Lisl A. Unterholzner

E R R A T A   S H E E T

PAGE_____ LINE_____   CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

        Under penalties of perjury, I declare that I have read the foregoing document and the facts stated are true.

_____    _____

LISL A. UNTERHOLZNER          DATE

**[& - 2:24]**                                                                 Page 114

| & | | 2 | |
|---|---|---|---|
| **&**  3:14,15 51:10 51:17,25 52:1,8 53:7 54:13 56:20,25 57:18 58:10,16 59:11 60:18 61:2 62:1 62:15 63:9 64:5 65:13 67:2 71:19 72:20 75:8 76:19 | **10:56**  1:21 **11**  1:4 **110**  3:4 **111**  3:5 **112**  3:6 **113**  3:7 **11:54**  37:17 **12**  4:25 12:8 30:21 96:8 105:10,14 | **2**  3:13 12:10 30:16,17,18 31:10 **2.6**  55:15 **2.89**  58:14 **20**  32:25 33:3 34:8 57:11 58:21 105:12 **200**  2:10 | 105:5,17 108:9 108:10,11 **2015**  29:15,20 47:6 93:4 **2016**  20:21 29:19 30:7 31:25 47:8,15 47:23 48:17,23 **2023**  1:20 10:22 24:25 30:21 |

**0**

**08167**  1:4,7
**08168**  1:5

**12,188,505** 64:22 65:3
**12,669,540**  65:6
**12/31/13**  69:23
**120**  102:14
**12:26**  37:17

**2002**  91:25
**2006**  28:2,2 101:7
**2008**  28:2
**2011**  32:2

91:17 103:19
110:8,11 111:18
112:4
**2024**  110:18
**21**  40:24
**21st**  110:10
111:18

**1**

**1**  3:12 10:12,14
10:15,21 27:11
**1,750,000**  93:5
93:10
**1,800,000**  93:13
**1,900,000**  12:9
**1.310**  112:25
**10**  3:12 80:10
94:5,6 95:8
**100**  80:12,14
81:21
**103**  64:17,21
65:3 66:1 72:5
73:9,10
**104**  65:2,19 72:5
73:9,14,15
**10407**  2:10
**109**  111:10

**13**  91:5,10 93:2
**13.5**  58:13
**14**  9:13 30:13
31:9
**15**  9:7 32:11
58:18 59:6
**15,817,000** 69:23
**15.8**  95:15
**16**  59:14
**16,039,980** 69:13,24
**17**  10:22
**1801**  1:23
**1:00**  62:8
**1:14**  62:12

**2012**  5:4,5
**2013**  5:10,11
28:1 33:9,13,15
33:20 49:20
50:5 54:18 55:1
55:16 58:9 67:9
68:22
**2014**  5:10 25:9
28:25 29:15
32:15 46:22
47:1,5,9,15
48:18,24 51:24
54:19,22 55:17
56:18 66:16
67:6,8,12,25
68:2,9,17,22
69:3,10,24
75:14 76:6,11
90:23,25 91:16
95:13,15 101:17

**22**  59:3,4
**22,700,000**  66:6
**224-4486**  2:11
**22674**  110:15
111:23
**24**  100:16
**250,000**  93:6
**26**  75:18
**27**  75:13,20
85:17,21 86:5
86:17,19,22
87:22 88:9
**27,562,356**  71:8
**29,000**  56:9
**29,252**  56:7
**2:24**  62:12

**3**

**3** 3:13 34:25 35:1,6,10,23 37:19 38:7,12 39:9 40:12
**3,100,000** 58:11
**3,978,315** 75:3
**3.19** 54:23
**3/6/14** 3:14
**30** 3:13 112:15 112:24
**31** 25:9 32:15 50:4 54:18,19 55:16,17 58:9 66:16 67:6,12 67:25 68:2,9,17 68:22,22 69:3 69:10,24 76:11 90:23,25 95:12 95:15 101:17 105:5,17 108:9 108:10,11
**31,149,278** 57:3
**317** 100:15
**31st** 54:21,24,25 55:15 56:18 57:4 66:22 69:9 69:10 75:14 76:6
**32.7** 95:12
**32256** 2:10
**33602** 1:23
**33629** 2:4 112:2
**35** 3:13

**35.7** 87:15,16
**35.7.** 75:2
**380,000** 93:11
**39** 57:15
**3:07** 88:12
**3:16** 88:12
**3:56** 109:2

**4**

**4** 3:3,14 51:20 51:21 52:17 54:14 62:14 65:12 75:19 82:13 111:10
**4,420,349** 74:24
**4/17/23** 3:12
**40** 83:13
**42** 58:8
**432.035.** 65:16
**435-0396** 2:5
**442** 75:4 76:10
**442,035** 65:4,11 72:7
**4916** 2:4 112:2
**499,000** 68:23
**4:15** 109:2
**4:16** 1:21 109:23
**4b** 3:15 64:5,15 64:18

**5**

**5** 3:16 90:14,16 91:20
**51** 3:14

**544,000** 55:1
**544,708** 55:5

**6**

**6** 51:24
**6039319** 112:7
**62** 52:24
**63** 52:19
**64** 3:15
**651** 85:8 105:23

**7**

**7** 40:18 41:16
**7/7/23** 3:16
**79** 98:12
**79,298,917** 91:4

**8**

**8** 90:17 110:8,18
**8/9/23** 112:7 113:3
**813** 2:5
**86** 62:16 63:1 65:12 74:17,22 75:25 85:11,13 85:24 86:7,13
**8:16** 1:4,5,7

**9**

**9** 1:20 59:8 91:15 112:4
**9.5** 105:10,13
**90** 3:16 80:10,11 80:15 81:5 83:13
**904** 2:11
**92,365,064** 91:2

**93** 103:14
**947928** 110:17
**99** 79:16

**a**

**a.m.** 1:21 37:17
**abbreviated** 11:11 42:24
**ability** 29:25
**able** 93:6 98:17 99:1 102:9,19 103:1,7 104:17 107:7,8
**above** 19:7 76:12 112:8
**absolutely** 17:11 30:3 94:21 96:18
**abv** 20:14
**accept** 15:21
**accepted** 15:23 15:24
**accepts** 88:19
**access** 103:17
**account** 29:4,5 29:9 43:21 84:3
**accounted** 23:14 55:18
**accounting** 5:2 6:2,3 46:14 56:4 89:15,23 91:18
**accounts** 85:5
**accredit** 98:5
**accreditation** 96:16

**accredited**
  20:18 85:3 97:3
  98:24 100:14
**accuracy** 112:10
**accurate** 14:25
  44:11 111:10
**achievable**
  92:20
**acknowledged**
  100:9
**acquire** 8:8
**acquired** 8:7
  43:4
**acquisition** 18:2
**action** 29:16
  36:1 111:15,16
**activities** 13:13
  30:12 33:13
**activity** 14:12
  33:15
**actual** 20:7
  41:11 80:3
**actually** 8:3,22
  8:22 25:18 28:7
  42:16 49:23
  57:3 80:7 84:8
  97:16
**adane** 7:15
**add** 76:17
**added** 15:9
  45:10 57:2
**addiction** 96:20
**adding** 65:10
**addition** 35:15
  36:10

**additional**
  16:17 46:12
  53:16 62:5
  67:22
**additionally**
  13:22
**address** 24:19
  101:10
**addressed** 101:4
**adds** 65:4
**adequacy** 96:8
  99:10 100:11
  101:2,10
**adequate** 101:9
**adina** 10:5
**adjust** 44:21
  62:3 66:24
  68:14,15
**adjusted** 23:22
  50:18 56:19
  58:9 59:7 66:17
  67:5 69:11
  76:24
**adjusting** 27:22
  55:2
**adjustment**
  54:18 55:5,6,7
  55:16 56:6,15
  56:21 57:4,5,9
  57:13,15 58:16
  61:25 66:22
  68:23 91:9
**adjustments**
  14:20 15:16
  18:17 44:18,23

  54:6 56:17 57:7
  59:2 63:14
  66:24 67:18,20
**administered**
  1:6
**advance** 25:18
  58:18
**adversely**
  108:11
**affected** 75:18
**affiliated** 33:17
**affiliates** 68:20
**affirm** 4:4 95:6
**affirmatively**
  12:3
**age** 96:21
**agencies** 14:4
  97:8
**aggregating**
  76:10
**aging** 96:12,15
**ago** 66:8
**agree** 41:5 48:1
  51:3 65:20 66:7
  73:8 78:18
  82:20 90:24
  93:15 96:25
  97:2 98:1
  102:18 106:16
**agreed** 3:21
  40:25 44:8
**agreement**
  36:25 37:5
  39:13,16 40:11
  41:3,10,11

  95:24
**agreements**
  33:10
**ahead** 10:4
  30:15 51:17
  56:14
**aicpa** 20:19
  24:11
**aid** 24:16
**air** 43:16
**alden** 4:15
**alleged** 9:23
**alleging** 12:7
**allowed** 70:11
  71:3 93:8
**alter** 62:6
**ambulatory**
  107:14
**amortizes** 71:5
**amortizing** 76:8
  89:3
**amount** 33:1
  43:24 44:11
  53:19 57:1 66:5
  69:8,13 71:13
  74:13 75:5 76:5
  76:23 77:20
  78:24 83:20
  88:8,17 89:6
**amounts** 68:6
  76:3,4 77:1
**analyses** 7:1
  90:23 96:25
**analysis** 16:18
  17:24 18:4 19:1

23:12 45:11
47:14,15 48:4
50:18 51:14
52:14,21 54:16
55:21 60:17,24
62:1,4,6 63:17
65:24 66:4
71:13 77:20
86:7 87:13 88:2
91:20 95:11
101:12
**analytical** 48:14
**analyzed** 15:3
18:13 91:21
**ankura** 2:16
**ankura's** 90:17
93:21
**annual** 76:9
93:13
**answer** 6:16
69:12 80:1
**anyway** 107:12
**apparently** 56:8
**appear** 17:25
38:3,11 45:16
46:16
**appeared** 69:2
110:7
**appearing** 2:6
2:13 109:14
**appears** 65:10
75:24
**appleby** 2:3,3
10:19 34:20
37:11,15,21

38:21 39:4
62:11 64:7
109:1,6,17,21
112:1,1
**apples** 100:4
**application**
99:16
**applied** 16:18
44:8 90:8
**apply** 6:13
16:19
**apportions**
23:13
**appraisal** 3:14
3:15 31:18,20
31:21,24 32:1,2
51:11,11,23
52:1,4,7,8,10,13
53:5 54:13 57:7
59:11,16,23
60:18,22 61:17
62:15 64:1,11
71:19 72:21,24
76:20 77:3 81:4
81:25
**appraisals**
31:19 60:8
61:18 80:18
**appraised** 62:23
**appraiser** 82:5
82:6
**appraiser's** 82:3
**appraisers**
79:24 82:16

**approach** 16:22
21:24,25 22:1
23:21,23 24:4
50:21 52:25
62:22 63:5 73:1
75:11 77:6
78:11,12,12,20
78:23 82:7,8
**approaches**
65:9 66:9 77:5
78:10 82:10
**appropriate**
19:9 45:19,21
**appropriately**
45:12
**approved** 41:18
**approximately**
4:19 32:13 33:4
52:24 75:19
103:14 105:14
**april** 10:22 93:4
**ar** 49:9
**arbitration** 9:16
9:19
**architecture**
4:24
**area** 79:13
**areas** 98:21
**arises** 18:20
**arizona** 79:12
79:20,22 81:22
97:15 100:9
**asked** 25:7
56:15 101:1,14
101:15

**asking** 16:7 64:9
64:11 108:14
**aspects** 37:4
**assembled** 58:1
60:5
**assess** 48:16
54:21 99:11
**assessing** 48:13
**assessment**
83:16
**asset** 19:3,8,18
20:5,11 21:24
23:21 27:19,19
46:20,21 49:3,6
50:20 58:6
70:19,20 74:12
76:14 77:22,23
78:11 87:25
**assets** 13:20,22
15:16 17:6,13
19:8 20:11 22:4
22:12,16 23:13
23:21 34:6
40:15,22 46:9
49:2,5 50:18,19
53:8,25 54:4,8
54:23,25 56:1
56:22 57:13,16
59:19 62:23
63:7 67:1,3
71:17 72:19,24
73:3 75:9,12
76:23 77:10
78:14

assign 45:6

assignment 41:19,20,21

assisted 59:18 70:13 96:5 106:1,9

associated 43:13 53:17 72:22,23 76:20 95:22

assume 30:14 40:4,7,9,13,25 41:25 56:10 73:22 89:22 92:7

assumed 60:3 92:9

assuming 17:8 24:4 40:21 107:1,2

assumption 41:20,21 91:23

assumptions 53:14 61:6 63:18

attached 4:20 34:14 36:25 37:5 49:23 112:11

attempt 33:16 33:18

attempted 47:9

attempts 33:11

attend 10:5

attended 4:23

attenuated 80:2 80:16

attorney 111:13 111:15 112:12

attributable 20:2 88:18 108:9

attribute 106:24

audit 68:3,4

audited 13:18 14:19 27:18,25 28:3 44:24 45:2 45:5,7,13 46:25 47:5,10,18 50:5 51:1 54:16 55:19,23 56:6 56:16 66:20 67:8 68:16 90:6 98:13,19 100:1 101:5 104:20

auditor 47:21 48:7,10

auditor's 48:8 101:6

auditors 16:10 85:1 90:7

august 1:20 110:8,11 111:18 112:4

authenticated 28:21

authentication 28:9,16

author 8:16 9:1 10:23 11:5,6

authored 8:21 9:5 11:13

authorized 111:7

automatically 104:9,11

available 12:22 14:19 16:5 24:9 26:8 46:23 47:25 54:2 61:5 67:12,25 92:11 92:24 93:6,11 93:11 103:4,5 106:13,18,22 112:8

avenue 1:23 2:4 112:2

average 99:4,7 99:21

averages 99:15 99:24,25

aware 24:14,18 56:2 84:16,21 94:11 101:21 103:24

**b**

b 3:10

bachelor 5:2

back 5:1 6:7 11:20 23:10 24:21 28:1,3 37:10 42:8 45:10 47:9,14

47:21 48:18,23 60:25 66:12,12 68:4 79:7 85:11 87:12,20 101:7

background 4:22 38:14 42:9

backing 44:14

balance 13:19 13:19 14:8,25 15:15 16:25 17:25 18:3 21:20,23 22:3 22:12 23:12 29:6 46:1,5,7,9 46:15,17,19 49:1,24 50:2,7 50:10,14 54:17 55:2 57:6 58:19 59:7 60:23 66:15,17 67:5 68:22 69:11,18 69:22,23 71:16 71:16 72:25 73:4 76:24 77:9 77:10 79:3 81:8 85:4 89:9,12 95:11

balances 56:18

bank 1:13 7:10 7:10 8:24 29:2 112:6 113:2

bankcorp 1:14

bankruptcy 1:1 5:16 6:22,23 47:8 48:20

**[bargain - calculate]** Page 119

**bargain** 106:2
**bartle** 26:9
33:17 38:23
93:8
**based** 21:24
23:21 43:17,24
44:12 49:1
50:20 54:18
55:2 56:22 57:7
60:19 66:21,22
67:20 68:17
71:24 72:11
73:10,12 74:7
75:21 78:23
91:22 95:4
98:13 99:25
103:12
**bases** 73:6
**basically** 5:14
5:25 13:19 19:2
34:5 43:14
68:18 76:8
79:17 87:15
89:24
**basis** 14:12
19:11 23:1 28:6
44:7 45:14
46:16 55:19
63:3,9,10 68:3
68:18 70:12,17
72:9,9 75:5
76:15 77:4 82:5
83:18 87:2
88:24 89:19
91:19 92:17

93:13 99:4
**bearing** 12:11
21:12 78:15
**beds** 57:25
**beginning** 59:14
103:23
**behalf** 2:6,13
12:18
**believe** 10:12,22
12:17 13:17
15:4 25:25 27:2
29:2,14 31:5
32:6 33:10,16
35:7,13,24 36:8
39:17,21 41:4
44:25 46:24
53:14 55:20
65:11 67:14
70:10 82:4,18
83:16 85:25
90:10,16 96:13
96:23 98:12
105:1,18
**belong** 77:9
**benchmarks**
99:11
**benedict** 93:21
94:22
**benedict's** 93:23
**benefit** 19:4
74:11 95:25
106:17 107:22
107:24
**benefited** 108:1

**best** 24:15 26:3
97:18
**better** 14:24
85:4 99:1
106:21 107:5,7
107:14,18,20,21
**beyond** 7:2 15:8
15:25 16:5 17:7
17:16 19:7
46:12
**big** 48:15
**bill** 41:19
**bit** 10:1 18:11
45:18 59:13
61:8 79:7
**bk** 1:4,5,7
**body** 59:14
**bolts** 104:22
**bottom** 37:22
**break** 27:4 62:9
**breakdown**
58:12
**brief** 37:17
88:12 109:2
**briefly** 4:21
**bring** 31:3
**broke** 37:19
62:13
**brought** 31:6,15
36:7
**buccaneer**
11:11 42:24
**budget** 91:16
92:3

**building** 57:25
58:13 60:2
72:21,23 76:22
78:13
**buildings** 54:7
56:22 57:23
58:4 66:25
**bunch** 95:20
**burden** 13:2,7
**bureau** 14:3
**burkholder**
29:12,15 38:23
91:17 92:4,22
94:11 101:22
**bus** 43:6
**buses** 43:14
**bush** 1:22
**business** 4:25
5:16 14:8 20:18
21:7,22,23
22:24 23:1,7
27:12 28:17
30:1 46:2 59:19
60:4,8,12 82:23
83:4 85:8
**businesses** 6:23
**buy** 19:17
**buyer** 58:4 60:1
**buying** 79:5
**bvm** 51:24
53:24 61:9

| c |
|---|

**c** 2:1,9 4:1
**calculate** 75:5

**calculated** 6:11 90:12

**calculating** 65:23

**calculation** 43:23 60:19 76:1 78:1 79:1

**calculations** 5:20 61:3 64:19 87:25

**california** 81:20

**call** 25:21 44:6 64:4 71:9 93:12

**called** 7:12,15 43:4 68:3 79:13 81:19 89:3

**calling** 102:24

**campus** 106:1,6 106:11,20

**campuses** 80:20

**capital** 53:19 63:20 85:1 92:21,23 96:8 98:1 99:10,20 101:2,6,9,10 104:8

**capitalization** 24:3 62:22 71:21 76:12 78:25 79:2 97:19

**capitalize** 74:14 77:24

**capitalized** 72:12,17 75:10

84:25

**capitalizing** 74:2 78:22 88:6

**capped** 95:25 96:4 104:13

**captured** 39:1 68:23

**car** 43:17 107:15

**care** 11:9 41:24 42:22 43:1,3 70:14,16 75:22 76:25 78:16 79:9 82:25 83:6 83:8 95:16,17 95:22 96:1,2 105:25 106:3,25 107:1,2,17,23

**carf** 96:8,11,20 96:25 97:3,21 98:5 100:17,19 104:12,19,24 109:7

**carry** 13:2 24:3 65:19

**case** 1:4,5,7 7:9 7:20 8:20,22,25 9:1 10:25 11:21 12:15,24 13:6 13:12,25 15:13 21:4,5,19 24:21 27:15 32:18 42:20,21 43:2,3 44:1,5,6 46:23 48:20 50:24

51:5 54:23 57:22 60:25 81:11 82:1 83:12 84:2 101:22,23 102:1 102:4 103:25

**cases** 5:19 6:6,9 6:11,12,24 7:4,8 7:12,22 9:18 11:4 42:10,13 42:16 68:4,4

**cash** 12:22 14:7 15:23 19:7,10 21:20 24:1,2 26:17 49:3,13 49:14 60:16 62:1,3,6 64:19 70:25 71:18,22 71:23 72:1,4 74:2,4,7 75:10 75:12 76:1,15 76:20 77:12,20 78:19 85:4 87:5 87:8,10,19 88:6 88:6,22 91:19 92:16 93:12,16 95:13 98:25 99:1 100:13,16 104:9

**caught** 59:15

**causal** 108:7

**causation** 108:7

**cause** 4:5

**ccrc** 26:6,7 32:3 79:18,20,25

80:3,6,19,24 81:3,5 83:9 84:7 84:21 88:19 95:24 98:5,6,10 98:11,11,17,23 100:15,21 105:21,23 106:2 106:4,12 109:8

**ccrcs** 79:9 82:21 82:24 85:3 97:22 98:8,9,15 99:12

**cdg** 82:4

**centers** 96:12,15 96:21

**centurion** 2:10

**certain** 8:4,7 13:25 17:6,24 19:2 20:25 32:3 32:12 41:2 43:7 43:8 56:25 64:2 64:10 70:6,11 71:9 75:9 76:22 92:20 102:15

**certainly** 15:3 18:13 21:14 27:6 42:18 60:20 61:4 84:1 84:24 94:6 103:20

**certificate** 3:4,5 110:1 111:1

**certification** 20:23

**certify** 110:6
  111:6,12
**change** 68:21
  69:9 75:20
  89:10 113:5,8
  113:11,14,17,20
**changes** 76:24
  112:10
**chantel** 2:9
**chapter** 1:4 85:8
  105:23
**charts** 73:9
**chief** 91:18
**choice** 21:5 77:7
**choose** 53:21
**chose** 68:12
**cig** 81:19
**circumstances**
  21:18
**civil** 112:24,24
**claims** 77:10
**clarify** 88:14
**classifications**
  49:6
**clear** 64:13
  73:17,21 88:17
  109:4
**clearly** 14:11
**clifton** 47:1
**close** 33:17
  49:10 54:1
  81:14 107:3
**closed** 33:19
**closely** 57:20
  58:6

**closer** 25:19
  49:13,15
**collateral** 26:17
**collected** 74:24
  80:21
**colorado** 43:18
**column** 54:16
  55:15,22,23
  56:16,17,19
  57:12,16 58:12
  66:15,18,20,23
  67:5 68:24
**columns** 55:22
**combined** 67:1
**come** 7:17 19:16
  22:6 52:25
  61:12,13,24
  62:23 66:17
  76:9 77:24
  78:22 81:10
  87:25 88:7
  89:10 102:25
**comes** 18:14
  41:3 50:20 75:3
  84:1,8
**coming** 13:14
  24:21 71:12
  87:4,6,8 89:9
**comments** 94:2
**commission**
  96:16 110:17
**commonly**
  83:24
**communicate**
  104:19

**communities**
  79:9
**community** 11:9
  42:22 43:1,3
**companies** 24:5
  81:6
**company** 7:12
  7:15,25 21:12
  21:19 22:4,11
  23:5,14,22,25
  79:16 80:11,12
  80:13 81:19
**comparable**
  100:7
**compare** 86:6
**compared** 29:6
  55:21 57:3 61:4
  99:12,14 100:3
**compete** 9:22,23
  9:23
**complaint** 3:13
  34:13 35:3 37:1
  37:19 38:13
  39:12 40:25
  41:6,8
**complete** 14:25
  52:16,17,18
**completed**
  108:2 112:14
**completely**
  18:22
**component** 23:8
  58:15,16 59:5
  60:12 95:24

**components**
  53:9 58:13
**composite** 30:16
  30:18 31:10
**conceivably**
  58:3
**concept** 88:15
**concern** 3:14
  51:23 52:11
  101:18
**concerns** 49:17
**concluded**
  109:23
**concluding** 95:9
**conclusion**
  40:20 43:25
  50:20
**conclusions**
  53:1,10
**condition** 48:2
  54:4 105:22
  108:8,12
**conditions**
  47:20
**conduct** 27:12
  30:1
**conducted**
  30:24
**confirm** 104:19
**confused** 69:19
**confusion** 6:14
**connected**
  111:15
**connection** 6:24
  8:10 27:10 32:2

37:24 38:6
60:18 81:15,17
108:18
**consider** 17:1
17:11 18:24
21:25,25 23:16
27:20 45:14
46:8,10,20
47:15 58:5
94:19,20,21
**consideration**
46:2 98:20
**considered**
13:23 14:9,15
14:15 28:8
31:13 44:3
45:21,25 74:16
82:16,17 112:15
**considers** 45:15
59:17
**consistent** 40:16
**consolidated**
92:12
**constitute** 106:2
**consulting** 2:16
3:12,13,16 4:17
5:7,13 8:21
**consumer** 6:14
**contact** 25:12
25:15
**contained** 52:21
67:15,23
**contest** 10:3
**context** 16:13
48:22 106:3

**contingent**
17:12,13
**continue** 14:13
91:24 92:10,11
95:19,21
**continued** 79:8
**continues** 60:13
**contract** 5:15
14:6 66:3 70:14
72:6,10,12 73:7
74:5,8,15 77:22
83:10 89:8,17
96:1,2 106:3
**contracts** 14:1,2
14:3 30:1 40:5
40:23 41:22,23
41:24 43:9 45:9
45:13,23 73:19
74:10 75:22
76:25 78:17
83:1,6,8 89:9
106:8
**contrast** 66:8
**contribution**
96:3,4
**conversation**
47:11
**convoluted**
79:17
**copied** 39:10
**copies** 34:23
36:21 37:12
51:18 112:13
**copy** 34:18,20
35:5 37:21

38:19 39:2 64:3
109:4,20
**copyright** 6:10
**corporation**
1:15 8:6 12:18
42:25
**correct** 5:8
14:18,22 15:11
16:3 19:23
22:19 32:16
36:15 37:25
39:25 44:13,16
44:17 45:11
52:11 62:24
64:19 67:9,10
67:25 68:20
69:8,14 70:19
71:8 74:25 75:7
77:14,17 82:21
82:22 85:9 87:4
90:5 96:22
99:22 101:19
102:21 105:11
106:14,15
107:22 108:3
**correctable** 49:9
**correctly** 13:18
**corresponded**
57:20 58:6
104:20
**corresponds**
31:9 65:11
83:15
**cost** 18:2 53:15
53:16 78:11

95:16,17
**counsel** 3:22
103:25 111:13
111:15
**counted** 78:6
**counter** 12:15
**counting** 72:14
**country** 100:2
**county** 42:20,21
110:3 111:3
**couple** 7:12 14:4
24:6
**course** 89:9
101:19
**court** 1:1 4:3
12:24,25 13:5
42:11 45:15
102:21 109:18
109:20 111:6
**covered** 28:12
28:24 41:16
42:10
**cpa** 5:6,8
**cpif** 32:6,10,12
59:9 93:5 105:6
**craig** 82:2
**crcc** 97:11
**create** 42:17
48:18
**created** 72:4
84:11,13
**creates** 42:3
**credible** 13:9
**credit** 13:5,9
72:16

**[crowley - deposition]**                                    Page 123

**crowley** 42:21
**current** 54:4,23
  54:25 58:24
  59:3 68:19 76:6
  86:2
**currently** 50:22
**cushions** 98:25
**cushman** 3:14
  3:15 31:20
  51:10,16,17,25
  52:1,8 53:7
  54:13 56:20,25
  57:18 58:10,16
  59:11 60:18
  61:2 62:1,15,22
  63:9,15,24 64:5
  65:13 67:2
  71:19 72:20
  74:5,22 75:4,8
  76:19 82:11
  85:11 87:11
**cushman's** 76:7
  87:25
**cut** 37:21 60:14
**cv** 4:20
**cwonder** 2:12

**d**

**d** 3:1 4:1 7:15
  16:13
**d.c.** 105:4
**damages** 5:14
  5:19,21 6:3,20
  9:22
**data** 24:8 29:23

**date** 1:20 37:7
  54:1 67:17 79:4
  108:13 112:12
  113:25
**dated** 10:21
  51:24 111:18
**day** 24:21 30:24
  31:1 80:17
  110:11 111:18
**days** 100:13,15
  102:14 112:15
**dcf** 85:16 86:6
  87:12 88:1,3
**deal** 7:3 21:6,8
  26:10,14
**dealing** 79:24
  80:3,22
**dealt** 7:11 29:22
**debt** 15:24
  32:12,14,21,24
  33:5,8,12 34:1,8
  37:2,7 39:25
  46:4 59:5,8
  81:23 99:2
  105:6,7,8,16
**debtor** 7:11
**debtors** 1:6
  91:23 95:9
**debts** 17:1 22:17
  102:19 103:1,8
**deceased** 83:8
**december** 50:4
  54:18,24 55:1
  55:16 58:9
  68:22 69:9

**decide** 83:9
**decides** 83:19
**declaration**
  28:13,19,20,21
**declarations**
  28:9
**declaratory**
  37:20
**declare** 113:23
**declined** 55:1
**decrease** 89:1
**deduct** 68:21
  76:16 77:25
  78:21,24 80:24
**deducted** 68:19
  69:8,13,15,19
  72:18 74:15
**deducting** 71:13
  72:11,13 74:12
  75:6 77:19 88:8
**deduction** 71:7
  71:9 76:16
**deductions** 62:5
**deed** 33:25 34:3
  34:5,10 37:1
  39:20,24 40:18
  41:16,17,19
**defendant** 1:16
  1:19 2:13 8:25
**defendant's**
  3:11
**deferred** 69:7
  69:14 70:8,9,18
  74:9 88:14,15
  88:19,22 89:1

  95:14,18 96:3
**deficiency** 101:7
**deficit** 104:9
**define** 24:15
**defining** 26:25
  89:6
**definitely** 19:1
  40:24
**definitions** 53:2
**definitive**
  102:16
**degree** 45:5
**delta** 72:7
**department**
  93:3
**depend** 21:18
**depending**
  83:20
**depends** 18:12
  24:8 47:17,23
  49:3,8,8,12
**deponent** 3:23
  4:7 109:12,16
**deposed** 101:22
  101:23 103:25
**deposing** 112:12
**deposition** 1:18
  29:11,13,14
  32:4 34:25 38:8
  51:20 54:14
  62:15 102:1
  103:13 104:3
  109:23 111:8
  112:7 113:3

depositioned 11:15

deposits 41:25 82:25 83:5 84:4 87:4,5 96:6

derive 19:4

describe 13:12 16:20 20:22 84:6

described 17:9 26:2 27:18 59:13 92:6

description 3:11 41:9

descriptions 39:2

desks 57:24

destruction 23:7

detail 10:1 94:7

detailed 48:15 98:14,18

details 12:13 24:18

determination 50:14,23 51:4 63:8 108:6

determine 15:13 19:5 22:21 44:10,11 46:12 63:6 73:2 75:12 76:12,14

determined 60:23 74:2,7

determining 19:13

dfs 29:11

die 83:20

differ 21:16 82:21 92:15

difference 20:1 44:3 53:13 57:5 57:8 63:12,23 73:24 91:4 93:15

differences 55:25 56:2,12 63:14 68:5 82:15 99:17

different 8:15 10:2 15:3,5 16:16,23 18:24 21:6 24:6 44:2 53:7,17 63:19 65:10,23 70:5 77:5 78:9 80:8,8 80:19,20 82:14 82:18 83:11 97:23,24,25 100:6

differentiate 86:23

differently 45:22

difficult 27:5

direct 3:3 4:11 51:6

directing 35:21 64:9

directly 25:12 50:4 63:4

director 7:23 91:18

disagree 75:24 77:3 78:4 105:22

disagreed 101:9

disagreements 79:24

disclosed 43:7

disconnection 87:23

discount 19:8,9

discounted 19:10 24:1,2 60:16 62:1,3,6 64:19 71:18 76:1,15 77:12 77:19 78:19 87:10,20 91:19

discounting 74:7

discrete 10:18

discussed 6:18 60:24 97:6

discussion 10:8 26:5 36:1

dispute 5:15 23:3 81:16,18

disputes 5:17

disputing 81:21

disregarded 18:22 68:8,11

dissolution 23:4

distance 106:22

distinguish 21:17

district 1:1

dividends 7:24 8:1 11:24

division 1:2

document 30:9 30:12,25 35:2 37:24 38:3,10 38:15,22 39:13 39:15,20,22 40:17,19,21 42:2,4,6 62:16 64:9,10 113:23

documented 88:5

documents 31:1 31:3,8,13 32:5 34:9,14 35:15 35:19,22 36:13 36:18,19 38:5 38:17,20 39:1 94:12 105:19 109:5

doing 16:21 21:22 43:18 48:23 76:7 94:19 98:17 100:20

dollars 55:8

domestic 1:14

double 39:11 72:14

**doubting** 30:8
**download** 36:18
**draft** 46:25
**draw** 18:8 46:6
  93:6,8
**drew** 40:20
**drill** 18:10
**drive** 31:14,17
  35:11,13,16
  36:8,10,11,16
  36:17 67:15
  94:16 103:10,17
  103:20
**driving** 22:5
**drop** 79:7
**due** 15:19 17:2
  68:20 74:10
  76:11 102:10,19
  103:2,8
**duly** 4:9 110:8

**e**

**e** 2:1,1 3:1,10
  4:1,1 7:15
  112:24 113:4,4
  113:4
**e's** 112:25
**earlier** 9:17
  29:22 32:1
  33:18 36:14
  39:19 40:2
  66:19 87:13
  88:16 105:20
**early** 25:20
  29:15 103:20

**earnings** 44:11
**ebd** 24:7
**ebidta** 24:8
  43:23
**economic** 5:14
  5:18,21 6:20
  19:4
**ed** 8:24
**edmund** 2:8
**education** 20:25
  21:1
**educational**
  4:22
**effect** 32:24
**effective** 64:21
  65:2
**effort** 61:1
**efforts** 37:7
**eight** 92:18
**either** 16:21
  18:21 24:23
  36:4 49:16
  67:20 73:23
  83:7,11
**electronically**
  36:6
**elements** 15:3
  21:6,8 73:15
**eligible** 11:25
**email** 27:7
  112:12
**emailed** 104:25
  112:13
**emails** 32:4
  105:1

**employ** 17:21
**employed** 4:16
  4:18 82:11
**employee**
  111:13,14
**employees**
  43:15,15,19
**employment**
  5:12 9:16,20
**engaged** 12:17
  25:3 61:9 93:21
**engagement**
  25:4,15,24 26:1
  26:24,25 27:5
**enterprise** 46:3
  50:7,9,14,21
  59:20
**entities** 24:11
  49:11 80:8 97:1
  97:1,4,22
**entitled** 39:13
**entity** 18:12,24
  22:7,8 23:24
  43:4 49:9 79:18
  80:7,9,14 92:12
  100:3
**entrance** 69:7
  69:14 70:15
  71:8,14,15,20
  72:13 74:9,15
  74:19,24 75:2
  77:2 80:21
  82:17,25 83:5
  83:17,22 86:4
  88:20,25 95:12

  95:15,21
**entries** 31:9
**equal** 61:23
**equate** 17:18
**equipment** 53:6
  54:7 56:22 57:2
  57:24 60:3
  66:25
**errata** 3:7
  112:11,12,14
**especially** 30:12
  109:7
**esquire** 2:3,8,9
  112:1
**essentially** 6:19
  23:11 44:5
  45:10 77:22
**establishing**
  99:23
**estate** 18:2,9
  45:20 53:5 57:1
  57:23 59:23
  60:8 63:6 72:20
  73:2,25 74:1
  76:19 77:3,6,14
  78:5,10,15
  79:24 80:18
  81:4 83:23 88:1
**estates** 95:14
**evaluation**
  61:17
**evaluations**
  61:18
**events** 43:20

**[eventually - february]** Page 126

**eventually** 69:5
**everybody**
  62:10
**evidence** 27:22
  34:10
**ewhitson** 2:11
**exact** 33:1
**exactly** 8:6
  28:12,19 36:12
  41:3 53:2 90:1
**exam** 5:6 20:24
**examination** 3:3
  4:11 13:10
**examine** 61:1
**examined** 13:19
**example** 6:1
  18:9 45:19
  49:18 51:16
  54:22 56:6 90:1
**exceed** 22:4,16
**exceeded** 22:13
**excel** 90:1
**excerpt** 3:15
  64:5,18
**excess** 56:9
**excluded** 17:6
  95:10
**execute** 26:24
  33:25
**executed** 42:5,7
**exercise** 11:25
  12:21
**exhibit** 3:11,12
  3:13,13,14,15
  3:16 10:14,15

10:21 11:2
27:11 28:8
30:16,17,18
31:10 34:25
35:1,6,10,23
37:19 38:2,7,7
38:12,16,18,22
38:24 39:9,11
39:12,12 40:11
40:12 41:7 42:8
49:21,25 50:3
51:20,21 52:5,8
52:17 54:10,12
54:14 55:11,13
55:14 56:16
62:14 64:5,15
64:18 65:12
66:12,13 75:7
75:19 82:13
85:17 86:5,7,18
86:19 87:24
88:9 90:14,16
91:20
**exhibits** 10:17
**exist** 97:8
**existed** 14:1
  48:23 51:8
  69:17 73:4
  92:12
**existing** 74:21
  75:21 76:3,25
  78:16 85:13
**exists** 78:4 79:3
**expect** 49:3
  104:21,23

**expenditures**
  53:19 63:20
  92:24
**expenses** 43:13
  43:22 63:18
  82:16 92:21
  95:22
**experience** 79:8
  94:1
**expert** 3:12,16
  4:20 5:21 12:14
  12:15,16 61:16
**expires** 110:18
**explain** 38:21
**expresses** 48:7
**expressly** 3:22
  41:12
**extension** 39:13
  39:16 40:11
  41:3
**extent** 16:4
  41:23
**extinguish** 34:7
**eye** 59:15

**f**

**face** 15:22,23,24
**facilities** 96:17
  96:20,22 97:3
  97:21 98:5,25
  100:15 105:25
  106:1
**facility** 59:18
  76:21 79:12
  96:13,15 105:24
  106:14,18

107:11
**fact** 8:15 57:9
  57:21 71:23
  77:6,8 95:6
  98:14
**factor** 46:6
**factors** 6:13
  17:13 49:12
**facts** 76:24
  113:23
**fail** 13:2
**failed** 13:6
**fails** 112:17
**fair** 13:3,21
  15:1,10 18:1,4
  22:18 23:22
  27:21 43:18
  48:11 49:2,4,6
  49:10,15,18
  50:19 57:5
  59:22 66:24
  84:5
**fairly** 56:12
**falls** 95:4
**familiar** 8:23
  105:20
**families** 98:16
**far** 6:18 28:3
  55:15 63:24
  66:15
**fargo** 14:13
**fashion** 107:14
**fast** 88:13
**february** 24:24
  25:20 30:12

31:9
**federal** 14:3
  102:20 112:15
  112:24
**fee** 70:15 71:21
  83:17,22 86:4
  88:20
**feel** 19:25 101:4
**fees** 69:7,14
  71:8,14,15,25
  72:13 73:12,13
  74:10,15,19,24
  75:3 77:2 80:21
  82:17,25 83:5
  88:25 95:12,15
  95:21
**felt** 67:21
**fewer** 100:13
**field** 24:11 79:8
**figure** 20:3
  64:25 65:3
**figures** 15:21
  90:3,4 97:21
**filed** 34:14
  90:25 91:12
**filing** 54:19,24
  55:3
**filings** 59:3
  68:12,15,17
  69:2
**final** 33:12
  81:10
**finalized** 81:13
**financial** 13:16
  13:17 14:18,20

15:5,8,9,10,22
16:2,6,8 17:4,7
17:10,15,16
18:7,10 23:15
27:19,23,25
28:3 29:7 44:18
44:21,23,24
45:1,4,8,13,16
46:22,25 47:5
47:10,18,20,25
48:2,6,16 49:20
50:5 51:1 54:17
55:19,23 56:16
66:21 67:12,14
68:9,16 89:21
90:6,23 91:11
91:18 93:4
98:13,19 100:1
101:5 104:20
108:8,12
**financially**
  111:16
**financials** 56:7
**financing** 33:22
**find** 27:5 33:11
  61:7 100:15,19
  109:8
**finding** 12:24,25
  102:25
**fine** 10:19 32:9
  37:22 66:11
**first** 4:9 7:23
  8:3,8 9:10,11
  11:8,24,25 12:8
  16:14 25:14

42:18 47:19
54:16 55:22,22
56:6,16 79:11
79:12
**five** 7:6,8,18,19
  108:24
**fixtures** 53:6
  57:2,24 60:3
  66:25 76:22
**fl** 112:13
**florida** 1:1,23
  1:25 2:4,10 5:1
  82:24 84:22
  97:1,2,4,4,16,23
  100:10 104:14
  110:2,6,17
  111:2 112:2,16
  112:24
**flow** 12:22
  19:10 24:1,2
  60:17 62:1,3,6
  64:19 71:19,22
  71:23 72:1 74:2
  74:4,7 75:10
  76:1,15 77:13
  77:20 78:19
  87:10 88:6,6
  91:20 93:12,16
**flows** 14:7 19:7
  72:4 75:12
  76:20 92:16
**focus** 35:19
**focused** 22:3
**focusing** 11:4

**follow** 69:12
  76:17 86:8
**following** 35:25
  72:19 105:5,16
**follows** 4:10
**footnote** 91:1
**forbearance**
  33:10
**forecast** 88:5
**forecasted**
  76:20 86:18
**forecasting**
  86:12,14
**foreclosure** 34:1
  41:18
**foregoing** 111:9
  113:23
**foremost** 47:19
**forensic** 24:16
**form** 41:18
  50:22
**formal** 25:25
**format** 89:25
**former** 91:17
  103:25
**forming** 38:17
**forvis** 94:23
**forward** 56:18
  57:4 66:21
  68:16 70:17
  86:13 88:13
  97:20
**found** 35:10,12
  41:4 58:13

**four** 7:6,7,18,19 11:8 57:2
**fourth** 57:12
**frame** 47:6 53:25
**frames** 16:17
**framework** 51:2
**fraudulent** 6:25 7:3,5,14 8:17
**freedom** 79:13 79:14 81:22 82:1
**french** 4:24
**front** 88:23
**full** 4:14 42:23 74:13 78:24 88:8
**fully** 59:14
**funds** 29:3,7 56:10 84:8 93:7
**fungible** 87:6
**furniture** 53:6 57:1,23 58:5 60:2 66:25 72:21 78:13
**further** 18:5,6,6 58:17 111:12
**future** 42:5,7 71:2,22 72:1 75:11 76:2,5 79:2,3,4,5 86:15 86:25 87:7,8,19 87:21 95:16,17 95:20

**g**

**g** 4:1
**g3** 7:11
**gaap** 45:14,16 45:19,21,24 46:1,7,9,16,19 49:1 56:4
**general** 6:2,22 24:17 39:1 46:11
**generally** 16:15 18:21 19:6 22:2 24:3 31:12 49:1 53:8 83:15 89:4 105:21
**generate** 19:7
**generated** 67:11 73:13,13 90:4
**geographic** 99:18 106:19
**getting** 23:10 79:5
**gg** 110:17
**give** 4:4 10:1 12:4 20:8 66:10 98:18 108:24 109:4
**given** 38:15 39:21,24 41:9 52:22 81:24 99:16
**giving** 64:8 72:16 74:11
**go** 6:7 10:4 11:20 30:15

37:15 47:9 48:18 49:12 51:17,17,19 56:14 61:17,17 73:5 86:24 106:19 107:15
**goes** 47:14,21 70:16 72:2 73:4 87:12 92:1 94:7
**going** 3:14 4:4 7:3 9:7,15 10:5 10:9 14:8 18:1 18:18 19:16,17 21:23,24,25 22:2,17 30:15 33:25 35:10,12 36:23 37:11 42:3 48:21,21 48:23 49:14 51:23 52:11 56:5 60:25 61:21 66:12,12 70:17 73:5 78:19,21 81:7 83:10,17 85:11 86:13,24 87:3,3 87:7 95:20,21 97:20 100:6,12 101:7,18 107:13 109:4
**good** 4:13 62:9 98:22
**goodwill** 18:13 18:17,19,20,25 19:15,17 20:2

46:14,16 50:23 51:4,7,9 57:20 58:7 72:22
**gotcha** 9:24 42:15
**gotten** 9:16 103:21
**government** 14:4,6
**graduated** 5:1
**graduating** 5:5
**gray** 98:21
**greater** 45:5 94:7
**gross** 64:22 65:3
**group** 26:9 81:20,22
**guarantor** 105:16
**guaranty** 57:10
**guess** 11:23,24 12:1 13:12 22:5 30:21 75:23 93:20
**guidance** 98:18
**guy** 82:2

**h**

**h** 1:24 3:10 110:5,16 111:5 111:24 113:4
**half** 25:17 30:22 32:13 55:7 59:8
**hand** 67:5 99:1 100:13,16 104:9 110:10

**[handed - incomplete]** Page 129

**handed** 35:18 51:19 64:18
**happens** 84:12
**hard** 31:14,17 35:11,13,16 36:11,16 47:22 67:15 94:16 103:10,17,20
**harder** 49:16
**harris** 8:6 12:18
**head** 9:6 12:3,4
**heading** 90:21
**health** 11:10 31:24 42:22 43:1,3,6,18
**hear** 104:1
**heard** 84:6 101:23 104:5
**hearing** 47:2
**heart** 32:18
**held** 79:16 80:11,14,14 81:6
**help** 11:1 34:16
**helpful** 109:11
**helps** 95:5
**hereto** 3:21
**high** 61:24
**higher** 43:22 75:19
**highland** 1:23
**highlighted** 35:20
**hillsborough** 110:3 111:3

**hinged** 13:25
**hired** 61:20
**historic** 45:19
**historical** 18:2 18:20 19:20,22 20:7 61:5
**historically** 18:15 26:6 92:16,17
**history** 10:25 25:24 26:3 28:14 36:2 37:6
**holding** 23:25 80:11
**holdings** 1:4,5,9 1:10 25:8 32:14 32:22 39:21,23 40:14,14 50:8 51:5 56:8 57:10 76:25 102:9 105:7,9,13,15 108:1,8,12 112:5,6 113:1,2
**holdings's** 26:16 29:4 58:19
**horizon** 3:13 26:7,19 32:12 32:14,23 33:8 33:12,25 34:7 34:14 37:2,7 38:13 39:24,25 40:4,9,21,25 59:5 105:6 108:2

**hourly** 43:15,16
**hours** 21:1 30:22,25 44:3 103:14
**huh** 50:1 64:20 77:15 85:15
**human** 61:19
**hypothetical** 48:19 57:22

**i**

**icloud.com** 2:5 112:3
**idea** 70:14 86:9
**identification** 10:15 30:19 35:1 51:21 64:16 90:14
**identified** 29:7 51:22 91:16
**identify** 34:22
**ii** 1:5,10 11:2 39:24 40:14 42:8 66:16 112:6 113:2
**iii** 2:8 28:8 38:2 38:7,16,18,22 49:21 52:5,8
**immediately** 70:24
**impact** 75:13 97:25 100:11 108:12
**impacted** 45:10
**impacts** 77:8

**important** 38:10 38:13 48:4
**include** 40:8 41:24 46:1 52:14 71:20 72:10 73:7 74:5 77:22 85:16 86:16 97:22 98:20
**included** 17:14 17:14 38:20 41:10,12 63:19 69:10 72:6,8 85:17 86:17 96:20
**includes** 76:15 88:2,4 91:3 97:1 97:21
**including** 40:23 59:20 74:14 87:14 95:11 105:6
**inclusion** 66:2
**income** 21:21,25 23:23,24 43:23 52:25 62:21 63:5 64:22,24 65:3,5,5 70:21 70:23 71:24 72:8 73:1 75:11 76:12 77:6 78:12,20,22,23 82:7,8,10,16
**incomplete** 64:1

**[incorporate - jumping]**

**incorporate** 94:4 96:7

**incorporating** 93:23

**increase** 89:10 89:12 92:8,8,9 92:22 94:9

**increasing** 92:16

**independent** 105:24 106:14 106:17

**independently** 14:23

**indicate** 51:9 98:24 99:13 104:10

**indicated** 50:8

**indicating** 61:11

**indicative** 46:10

**individually** 9:5 9:14

**industry** 24:5 49:8 94:1 99:11 99:14 100:2,3 100:14 101:8

**inflows** 79:2 87:22

**influences** 61:16

**information** 16:8,18 28:8 31:13 38:14 43:8 47:17,24 52:13 54:1,12 59:10 60:17,21

61:5 103:4,10 103:11,18,21,22

**infringement** 6:9,10,11,15

**initial** 10:12 27:11 37:25 38:6 83:21 93:20 94:12,17 100:23,24 101:11 102:7 103:6,15

**input** 20:9

**inquiries** 15:17

**inquiry** 104:12

**inside** 57:25

**insignificant** 85:1

**insolvency** 13:1 16:12,21 17:18 17:20 21:9,12 22:23 24:13

**insolvent** 7:25 8:13 11:23 12:10,14 14:16 25:9 99:5,8,9 100:25

**instant** 8:21

**insurance** 28:5

**intangible** 18:23 19:3,18 49:16 53:8 54:8 56:22 57:19,19 58:1,5 58:10,14,16 60:5,12 67:1 72:22 76:22

78:13

**integra** 31:22,23 51:11 52:7 53:6 56:20,24 57:18 58:11,13 59:17 59:21 67:2

**intellectual** 5:15 6:5 8:5,14 19:3

**intend** 108:21

**interest** 79:15 79:18 80:5,5,5 80:10,10,11,14 80:15 81:6,8

**interested** 41:14 98:17 111:16

**internal** 67:11 67:14 68:1 69:25 70:2,5 90:23 91:11

**internally** 69:4 89:20 90:3

**international** 68:8 96:9

**introduce** 8:22

**inventory** 49:11 49:17

**investment** 65:5 72:8 81:20

**invoice** 30:13 31:10

**invoices** 3:13 30:10,17 103:12

**involve** 26:4

**involved** 7:12 8:2 16:17 25:13

**involving** 7:5 8:17 81:18

**ip** 12:7

**irr** 31:20 59:16 59:19,21,23

**issue** 8:10,11 11:23 12:2,6 16:13,14 30:1 90:17

**issued** 9:14 24:10

**issues** 6:14,21 6:25 11:22,23 80:22,23 92:2,6 96:8 97:25

**item** 46:4 65:20 70:19 75:6

**items** 14:24 15:9 46:2 98:20

**iterate** 20:3

**iv** 49:25

**j**

**jacksonville** 2:10

**january** 24:23 25:20 30:13,21 33:9 103:19

**jeffrey** 1:8 112:5 113:1

**jersey** 1:14

**job** 112:7

**jointly** 1:6

**jump** 30:14

**jumping** 74:20

**k**

**k** 105:2
**kathleen** 29:12 91:17
**keep** 10:18 27:8 64:11 89:18,18
**keith** 2:3 34:19 112:1
**keithtappleby** 2:5 112:3
**kept** 14:7 89:20
**kim** 10:5
**kind** 6:6 23:11 60:16 74:17,20
**know** 4:20 8:23 9:6 10:5,6,16 15:2 16:25 20:10,14 23:6 25:14 29:5 30:8 30:10 31:2 34:13 38:9,9 40:6 45:20 48:20,25 49:17 51:18 54:22 63:4 64:2 65:13 69:6,18 70:1,3 72:1 73:20 76:3 77:7 83:7 84:24 85:6,19 86:20 86:23 87:16 88:5 89:4,22 90:1 94:14 97:6 98:23 99:6,7,18 103:9,10 106:5 106:10,24 107:4

107:6,18
**knowing** 22:7 41:14 85:25 87:21
**knowledge** 94:25
**known** 110:20

**l**

**l** 3:20 105:2
**lack** 14:23
**laid** 41:7 74:17 88:3
**land** 54:7 56:21
**landlord** 92:1
**landry** 26:5 34:6
**landscape** 11:11
**landscaping** 42:25
**language** 42:1
**large** 1:25 30:11 70:15
**larger** 98:25
**late** 25:19 29:14
**laurie** 105:1
**law** 2:3 79:20,22 82:20 112:1
**laying** 53:2
**leases** 41:20
**leave** 83:9 106:20
**leaving** 84:10
**left** 9:21 45:8,12 66:20

**legal** 22:16 112:21
**legalized** 84:7
**legitimately** 41:14
**lender** 26:7 32:23,24 33:11
**lending** 14:13 26:18 59:9 61:10
**lent** 32:11,12
**letter** 3:6 26:25 27:5
**level** 48:15,15 67:22 90:8
**liabilities** 13:20 13:23 15:17 17:12 22:4 34:7 40:7,8,10,16,22 40:25 46:9 50:19 56:1 58:24 59:4 68:20 71:17 77:9 91:2,4 95:11
**liability** 7:24 16:13 22:13,16 23:22 27:20,20 40:4 58:25 69:17,21 70:8,9 70:24,25 71:10 71:11,15 72:2 72:18 73:3 74:10,13 75:6 75:21,25 76:6,8

76:16,17 77:20 77:23,25 78:4,6 78:16,21,24 79:1 83:25 88:9 89:2 90:8
**liable** 57:10
**license** 29:17
**licenses** 41:21
**lieu** 34:1,3,5,10 37:1 39:21,24 40:18 41:17,17 41:19
**life** 41:24 70:14 75:22 76:25 78:16 82:25 83:5,8 96:1,2 106:3
**light** 103:11
**likely** 61:23
**limited** 1:4,9,10 112:5,6 113:1,2
**lindsey** 11:7 42:21
**line** 15:14,14 18:4,4 46:2,4 64:25 75:6 98:19 113:5,8 113:11,14,17,20
**link** 36:17 108:7
**liquid** 56:9
**liquidating** 1:8 112:5 113:1
**liquidity** 97:25
**lisl** 1:18 3:2 4:8 4:15 110:7

**[lisl - market]**

111:8 112:7 113:3,25

**list** 52:7

**listed** 8:18 11:18 11:19 38:7 54:2

**litigation** 23:6 42:9 81:15,17

**little** 10:1 18:11 45:18 59:13 61:8 69:19 79:7 80:2

**lives** 70:12

**living** 39:23 41:1,2 59:18 70:13 96:5 105:24 106:1,9 106:14,17

**llp** 94:23

**loaded** 107:15

**loan** 39:13,15 40:11 41:3 105:6

**located** 105:3

**location** 106:19

**locations** 99:18

**long** 4:18 14:1,6 15:24 58:25 59:8

**longer** 57:10 58:25 92:12 105:15

**look** 10:25 15:15 16:1,25 17:5,11 19:6,8 19:23 20:8,12

21:22,23 22:14 22:20,22 23:13 23:19,20 24:4,6 27:23 28:9 37:9 39:9,11 50:13 52:15 56:24 57:12 64:17,21 65:2 66:10 70:2 73:14 74:17 97:19

**looked** 6:12 27:21,25 28:3,4 47:2,12 50:2 51:7,12 52:21 52:24 61:4 70:3 72:5 85:2 98:11 109:9,10

**looking** 6:19 17:7,16 19:23 22:11,15 35:3 37:19 41:15 42:8 47:24 48:14,17,22 54:9,15 62:14 64:4,19 73:9 75:24 94:16 96:24 99:11 100:2,20 101:5

**looks** 90:10

**lost** 5:14 6:1,12 6:19 92:17

**lot** 21:20,21 49:12 103:22

**low** 61:24

**lower** 43:23,24 79:23 83:14,14 83:16 100:10,12

**lunch** 62:13

**luncheon** 62:12

**m**

**made** 12:25 14:20 15:16 37:8,12 44:18 44:23 51:18 53:14 61:6 63:9 63:14 77:7 92:11,24 93:5 108:6

**magee** 1:24 110:5,16 111:5 111:24

**main** 16:24

**maintained** 89:20,24

**make** 10:14 12:24 16:2 18:17 34:23 36:21 50:14,16 50:23 51:4 54:6 56:21 57:9 61:25 90:11 94:2 102:25 104:12 109:3

**makes** 73:23

**making** 15:18 57:7

**management** 48:6 51:24 53:24 67:11,23

68:9 89:16 90:4 90:7 96:21

**management's** 47:20 48:2,8,9

**manner** 91:24

**march** 25:9 28:25 29:19,19 32:15 51:24 54:19,21,25 55:15,17 56:18 57:4 66:16,22 67:6,12,25 68:2 68:9,17,22 69:3 69:10,10,24 75:14 76:6,11 90:23,25 95:12 95:15 101:17 105:5,17 108:9 108:10,11 110:18

**marital** 23:4

**mark** 34:17,24 51:20

**marked** 10:15 10:21 11:2 30:18 35:1 51:19,21 64:15 90:14,16

**market** 13:21 18:1,4 19:19 20:11 22:1 23:23 24:4 27:21 49:2,4,6 49:10,15,18 50:19 58:2 77:4

78:11
**marketed** 26:7
**marketplace** 60:6
**martinell's** 13:10
**match** 91:12
**matched** 68:4
**matches** 66:1
**material** 29:21 30:1,3,4 43:7
**materials** 35:7 35:14,25
**math** 103:16
**matrix** 43:4,5
**matter** 7:10 9:20
**matters** 5:13,16 6:2,8 9:14,16
**matured** 33:5,9 37:7
**maturity** 33:8
**mcglinchey** 2:9
**mcglinchey.c...** 2:11,12
**mean** 6:18 8:21 19:2 21:19 22:8 36:22 39:6 51:16 54:20 55:4 65:10 72:2 72:3 73:3,24 84:5,24,25 85:7 87:15 92:14 93:14 99:5,8,21

**meaning** 88:22
**means** 84:4
**meant** 31:10
**measure** 49:16
**mechanics** 36:18
**median** 100:15
**medical** 43:4 95:22 105:25 107:8
**meet** 13:2,6 99:2
**meeting** 30:22 30:23 31:1,4
**melrose** 2:4 112:2
**memory** 10:3 30:8
**mentioned** 6:4,5 6:22 32:9 34:4 35:3,9,16 36:14 36:24 37:23 39:19 47:13 57:17
**meredith** 93:21
**merger** 1:15
**method** 77:13 77:21 78:5,19
**methodology** 17:21,22 56:3 74:16
**methods** 19:13 78:14
**metrics** 24:7
**mgw** 1:4,5

**mgww** 1:7
**middle** 1:1 57:16 59:15 90:20
**miles** 107:9
**million** 12:8,10 32:11,13,25 33:3 34:8 54:23 55:7,15 57:11 57:15 58:8,13 58:14,18,21 59:3,4,6,8 75:13 75:18,19,20 85:17,21 86:5 86:17,19,22 87:22 88:9 91:5 91:10 93:9 95:12,15 105:10 105:10,12,13,14
**mind** 7:17 62:16 75:15
**minimum** 56:9 79:23 84:15 99:23,24
**minor** 55:24
**minute** 30:11 66:8 86:10
**minutes** 37:16 108:25
**misrepresenta...** 43:12
**missed** 41:13
**missing** 52:23
**mistaken** 14:18

**mix** 80:6
**mixture** 21:5
**mlr** 26:11,16 29:3,4,5,7,9 84:16
**mobile** 43:5,14
**model** 82:24 83:4 85:8
**moment** 54:3 66:10
**money** 84:8 87:6,7 92:18,23 95:20
**mongelluzzi** 7:9
**month** 70:12 83:18,18
**monthly** 70:17 71:25 73:13 83:16 88:24 89:13
**months** 25:16
**morning** 4:13 39:19 40:3 103:13
**move** 37:13 83:19 95:14
**moved** 26:17 86:22 87:17,18
**moving** 26:11 27:8
**multiple** 21:5 44:8,8,12
**multisite** 98:9 98:10

**[murphy - oh]**

**murphy** 2:16 91:3,16,22 95:10
**murphy's** 90:22 91:10 93:20 101:1

**n**

**n** 2:1 3:1,20 4:1 7:15
**name** 4:14 8:24 82:4 104:25 105:2
**named** 82:2
**names** 7:8
**national** 1:13,14 8:24 99:4,15 112:6 113:2
**nationwide** 97:3 98:7,8,12 99:6 100:13
**nature** 18:12 25:23 36:1 61:19
**necessarily** 20:10 23:14 71:6 93:18 99:20 106:10 107:11
**necessary** 27:15 27:16 45:1,4 107:4,19
**need** 12:4 34:23
**needed** 92:23
**negative** 55:4

**neighborhood** 93:13
**net** 43:22 46:8 50:18 54:7 62:18 65:16 66:3 75:3 91:9
**network** 11:10 42:22 43:1,4,5
**new** 1:14 26:18 33:11 87:22 89:9,10,11
**nine** 9:13 32:13
**nodding** 12:4
**nods** 12:3
**non** 9:22,23,23 68:19 72:12 88:21,21,25 89:11 96:6,21 97:1,4 107:14
**normal** 47:6
**normally** 94:18
**north** 1:23 2:10 12:8
**notary** 1:25 110:6,17 111:6
**note** 92:2 93:14 93:19 101:6 112:11
**noted** 90:22 91:22
**notes** 111:11
**notice** 52:18
**notification** 3:6
**nuances** 79:20 79:22

**number** 21:1 31:18 35:14 65:5 72:12 74:4 75:2,4 76:9,14 87:14 88:7
**numbering** 10:17
**numbers** 48:11 50:4 54:6 55:18 55:25 57:2 63:15,16 67:19 71:19 75:4 90:4 90:7,10
**nurse** 43:17
**nursing** 26:11 26:15 32:12 39:22 40:15 57:14 58:12,20 59:6,18,19 67:4 69:1 83:12 84:2 91:23,25 92:1 92:10,11,13 96:4 100:16,25 101:6 105:16,25 106:8,9 107:11
**nuts** 104:22

**o**

**o** 3:20 4:1 16:13 105:2,2
**oath** 3:4 4:9 110:1
**object** 64:8
**objection** 64:12
**objective** 108:20

**objectively** 19:25
**obligation** 42:3 84:9 86:5,13
**obligations** 15:19,19 41:1 41:24 83:1,6 84:18,20,23 85:23 88:3 102:9
**observations** 94:8
**obtain** 20:22
**obtained** 12:18
**occupancy** 92:8 92:8,22 94:9
**occur** 29:18 33:21,25 47:7
**occurred** 19:21 30:6 48:20
**occurring** 14:12
**offer** 102:8 105:23 108:21
**offered** 58:15
**offering** 108:14 108:16
**office** 25:23 27:7 28:5 31:16 35:17 36:6,9
**officer** 7:24 91:18
**offices** 105:3
**official** 110:10
**oh** 52:20 86:5 105:13

**oir** 29:16 54:19
54:24 55:3,14
55:18,23 56:3,7
56:8 59:3 66:22
66:22 67:21
68:12,15,17
69:2 70:10 84:6
85:9 90:10,25
91:2,13 93:3
97:8 102:11,24
103:25
**okay** 6:4 7:4,18
7:20 10:11,18
11:18 13:5 16:1
17:23 21:2,11
23:1,10 25:1,12
26:24 27:16,23
28:20 33:5
36:20 39:5 40:9
40:17 44:10
46:1 49:20
51:12 54:5
55:10 56:14
59:10,24 60:14
60:16 62:9,17
66:2,7 68:8,19
70:23 71:7,18
74:4,24 77:19
81:25 82:20
83:2 84:13
85:11 86:6,10
90:9 91:15
93:14,19 94:18
95:8 97:4,5,19
98:3 103:24

104:8 106:16
108:17
**once** 92:12
**ones** 7:17 23:8
51:13 68:14
**ongoing** 18:23
18:25 43:9 87:2
**operate** 29:17
60:13 91:24
106:12
**operated** 26:6
79:18 92:1,15
**operates** 105:21
**operating** 60:4
60:11 80:7 84:1
84:3,5 98:25
101:18 105:22
**operation** 40:22
76:21 82:17
**operations**
26:17 34:2
40:13,16
**opine** 93:21
101:14
**opined** 12:14
**opinion** 8:9,11
9:2,10,11 11:5
12:19 13:5,12
13:15 14:14
16:13,21,22
17:18,19,20,21
21:11,14,15
22:2,6,24 24:13
24:15,18 25:8
27:10 28:22

29:21,22 38:13
42:3,9 43:25
44:15 48:7,8,8,9
81:10 85:12,20
85:22 90:17
93:23,24,25
94:25 101:2
102:8,25 103:3
103:7 104:8
108:7,14,16,18
108:20
**opinions** 8:15
8:17,18,19,20
9:4,8,9,13 10:2
13:8 24:20
38:17
**opposed** 53:21
106:25
**opposing** 12:16
**optimal** 99:7
**optimistic** 61:9
**oranges** 100:5
**order** 15:12
62:22 73:2 81:5
92:21
**ordering** 109:18
112:13
**ordinary** 101:19
**organizations**
100:1
**original** 51:19
**orlando** 43:18
**orlovski** 105:1
**oscher** 3:12,13
3:16 4:17 5:7,12

8:20 25:13,16
30:21,24 35:18
**oscher's** 8:12,18
8:19 44:15
**outflows** 79:3
**outline** 25:4
**outlined** 28:7
35:20
**outside** 88:11
97:1,22,23
**overlaps** 6:15
**oversight** 90:11
**overstatement**
91:9
**overview** 28:13
**owed** 75:14,21
77:1,20 78:16
83:6 95:13
**owing** 83:7
**own** 93:24 94:8
95:3 101:3
**owned** 59:18
80:12
**owner** 81:9,19
**ownership**
79:15 80:20

| p | | |
|---|---|---|

**p** 2:1,1 3:20 4:1
**p.a.** 1:22 2:3
112:1
**p.m.** 1:21 37:17
62:12,12 88:12
88:12 109:2,2
109:23

**[page - portion]**

**page** 3:11 11:9 42:18,22 52:19 59:14 62:16 63:1 64:17 65:2 65:12,19 66:1 73:9,10 74:17 74:22 75:25 85:11,13,24 86:7,13 90:17 91:15,15 93:2 94:5,6 95:8 96:8 113:5,8,11,14 113:17,20

**pages** 52:22,22 52:24 72:5 111:10

**paid** 7:24 8:1 17:1 22:17 76:2 76:5 83:24 85:13 86:11 87:3 96:5

**papers** 16:9

**paragraph** 40:18,24 41:16 59:16 90:21 95:9

**parent** 79:16 80:13 81:19

**part** 20:24 21:4 21:4 26:16 30:11 35:13,24 43:8,9,12 52:14 52:21,23 62:21 63:5 68:25 84:5 85:20 86:21

87:21 89:23 94:12,15 95:3 101:11 106:1

**particular** 9:20 35:21 44:22 79:20,21

**particularly** 73:17 84:25

**parties** 3:21 25:25 26:3,10 36:2 40:10,10 41:18 68:6 111:13,14 112:13

**partnership** 1:4 1:9,10 112:5,6 113:1,2

**parts** 21:3 43:11 53:4,11

**party** 39:22 81:23

**pass** 95:14

**past** 92:18

**patent** 6:10 12:18 19:19

**patents** 8:7,8

**patients** 98:16

**patterns** 8:15

**pay** 20:1 70:15 83:17 84:2 102:9,13,19 103:1,8

**payable** 83:22 85:20

**paying** 43:15 102:12

**payment** 83:1,4

**payroll** 43:13

**penalties** 113:23

**people** 33:17 79:4,5 84:6 86:21,22 87:17 87:18 89:10 98:16

**percent** 79:16 80:10,10,11,12 80:14,15 81:5 81:21 83:13

**percentage** 70:12 83:14,15

**perform** 82:6

**performance** 81:3

**performed** 31:25 62:2 108:17,19

**period** 29:23

**perjury** 113:23

**permitted** 85:8

**person** 61:15

**personal** 42:14

**personally** 9:5 42:13 51:4 110:7,20

**perspective** 48:22 101:8

**perspectives** 16:23,24

**phoenix** 79:13

**phone** 14:2 25:21

**phonetic** 13:10

**phrase** 89:4

**physically** 36:7 104:22

**picture** 48:15

**piece** 60:1,7

**pkwy** 2:10

**place** 1:22 26:1 26:18

**plaintiffs** 1:11 2:6

**plans** 83:13

**plaza** 79:13,14

**please** 4:13 14:17 109:21 112:12

**plus** 72:7

**point** 12:11 17:10 29:23 40:18 42:5 46:11,13 48:3 50:17 67:8 69:18 86:25 88:14 90:22 102:15

**pointed** 18:9

**points** 104:19

**polk** 42:20,21

**ponzi** 84:7

**portion** 11:1 64:1,8 70:16 77:2 83:21

88:20,21 96:5
106:10
**portions** 64:10
88:24 89:11
**position** 12:20
**positions** 85:4
**possess** 20:14
**possibility**
108:4,5
**possible** 17:13
38:10,16 48:25
94:14
**potential** 91:8
**potentially**
19:18
**practical** 21:4
**practice** 24:16
27:3
**practitioner**
43:17
**pre** 71:21
**preceded** 25:22
28:14
**precedes** 55:11
**predated** 25:15
**preferences** 7:1
**preferrable**
107:3
**preparation**
16:8 37:25
**prepare** 92:21
**prepared** 28:11
32:2 45:14 47:1
47:5 51:24
53:24 63:2

67:17,24 68:2
91:17 92:3,7
94:10 103:12
**preparing** 13:11
**present** 2:15
19:9 30:23
63:21 87:20
**pretty** 49:10
81:14
**price** 43:24
44:12 45:20
**primarily** 47:19
**primary** 32:24
48:1
**principal** 1:13
**printed** 103:6
**prior** 9:25 10:25
32:20 85:2 91:9
**prison** 14:5
**prisons** 14:3
**probably** 15:24
49:10,14 61:8
61:11,13 100:12
107:3
**problems** 92:18
**procedure**
16:15 112:24,25
**procedures**
48:14
**proceed** 36:21
**process** 16:20
17:20 20:22
27:17 52:19
**produced** 50:3
103:13

**producing**
23:24
**product** 61:20
**production**
94:15
**professional**
1:25 21:1 24:14
24:19 110:5,16
111:5
**profit** 1:15
**profitability**
93:16
**profits** 5:15 6:1
6:13,19
**project** 75:11
**projected** 71:22
88:5
**projecting** 72:1
79:4 87:15
**projection** 94:8
94:18
**projections** 66:4
91:21 92:7,7,14
92:19 93:12,22
94:3,10 95:6
**projects** 76:9
**prominent**
11:21
**proper** 78:24
**properly** 90:12
106:12
**properties**
80:19
**property** 5:16
6:6 8:5,14 19:3

59:20 60:1,7
**proposed** 33:20
**prove** 13:1
**provide** 25:7
38:19 42:6
61:20 71:2,3
104:18,21
105:24 106:20
**provided** 14:2
31:14 35:8,14
37:1 71:1 88:23
88:24 94:13
103:18
**provider** 98:10
**providers** 106:9
**provides** 90:11
**providing** 43:5
108:20
**provision** 63:20
**proximity**
106:24
**public** 1:25
110:6,17 111:6
**publish** 98:6,9
**pull** 60:17
**purchase** 8:4
43:24 44:12
45:20
**purchased**
19:24 49:13,14
**purpose** 55:21
100:8
**purposes** 14:10
14:15 18:16
23:5 93:9

**pursuant** 28:21
42:4
**put** 26:18 35:25
36:3 76:23
**puts** 50:18
**putting** 100:8

## q

**quality** 98:23
106:25 107:1,2
107:17,23
**quantifiable**
20:7
**quantified** 44:2
**quantify** 89:14
**quarterly** 28:6
90:24
**question** 6:16
44:7 83:2 86:8
86:11 102:15
**questions** 21:5,6
64:9,10,12
91:13
**quoted** 93:2

## r

**r** 2:1 4:1 105:2
113:4,4
**raises** 91:13
**ranging** 14:11
**rate** 19:9
**rather** 9:15,23
58:8 61:14
67:17 106:19
107:8

**ratio** 96:24
**ratios** 85:3 98:4
98:6,9,11,17,23
99:13,23 100:8
100:21 104:13
**reach** 104:18
**reached** 44:1
**read** 3:6 104:2
109:17 112:10
113:23
**reading** 3:22
**real** 18:1,8
45:20 53:5 57:1
57:22 59:20,23
60:8 63:6 72:20
73:2,25 74:1
76:19 77:3,5,13
78:5,10,15
79:24 80:17
81:4 88:1
**really** 16:4
18:12,19 20:4
22:15 32:17
33:23 44:7
47:17,22,23
49:11 70:6
73:21 95:17
**reason** 15:4
18:22 112:11
113:7,10,13,16
113:19,22
**reasonable**
81:24 95:7
112:15

**reasonableness**
61:2 93:22 94:2
**reasonably**
92:20
**reasons** 15:18
**rebut** 101:1
**rebuttal** 3:16
90:15 102:8
103:15
**recall** 7:7 11:16
14:20 15:20,25
16:7,19 21:10
22:25 25:7,11
25:21 26:4,13
26:23 28:14,23
29:8 30:9 31:6,8
31:15 32:8
33:23,24 35:3
35:21 36:17
37:4 39:8 45:8
47:2,2,10,11
49:24 63:8,12
67:7 82:3,15
94:16 102:5,6
102:11 104:7
**recalling** 28:18
34:15 36:5,8,12
53:16
**receipt** 112:15
**receive** 20:20
95:19 106:23
107:8
**received** 36:5,19
92:10

**recent** 28:1
**recently** 11:13
**recess** 37:17
62:12 88:12
109:2
**recite** 4:21
**recognize** 70:15
70:23 71:3
**recognized**
102:20
**recognizing**
72:18
**recollection**
11:2 13:8 30:6
37:3 39:7 40:1
48:21 63:22,25
66:1,5 97:18
**recommend**
98:15
**reconcile** 87:12
**reconciled**
56:12
**reconciliation**
55:11,13
**record** 4:14
10:8 20:17
37:15 64:7,13
70:11 111:11
**recorded** 55:2
88:25
**records** 28:10
28:16,17,20,24
31:17 67:23
**recounts** 37:6

**recurring**  14:7
  43:9
**reduced**  59:4
  89:6,12
**reduction**  88:2
  89:5
**refer**  37:11 94:6
**reference**  96:7
**referenced**  52:4
  112:8
**referred**  52:1
**referring**  38:12
  54:10 65:6 70:7
  93:1
**reflect**  49:2 51:1
**reflected**  13:21
  14:11 27:21
  46:18 50:10
  91:20
**reflects**  50:25
**refresh**  11:1
**refund**  75:5,25
  76:16,17 77:20
  77:23 78:21
  83:1,6,7 84:9,17
  84:19,22 85:23
  86:4,13 88:2
**refundable**
  41:25 71:7,14
  71:15 72:13
  74:9 77:2 83:12
  83:13,14,14,15
  83:17,22 88:20
  88:21,21,25
  89:11 95:12

96:6
**refunded**  75:3
**refunds**  75:2
  76:2 79:5 80:22
  82:18 85:6,12
  85:19 86:11,15
  86:21 87:5,8,16
  87:17 88:5
  102:12
**refusal**  8:3,8
  11:24 12:1,9
  16:14
**regard**  108:22
  112:16
**regarding**  22:15
  28:9
**regardless**  77:4
  78:4,14
**regional**  51:25
**regions**  7:10,10
  28:25
**registered**  1:24
  26:9 110:5,16
  111:5
**regulated**  97:7
**regulating**
  82:21
**regulation**  28:5
**regulations**  85:9
**regulator**  99:18
**regulatory**
  97:12,24 100:5
**rehabilitation**
  96:12

**rehabilitative**
  96:15,17,19
**reimbursing**
  43:19
**related**  5:15
  32:5 75:16
  96:21
**relates**  54:12
**relationship**
  82:24 83:3
  85:23
**relative**  24:7,7
  111:12,14
**relevant**  48:23
  53:25 64:3
**reliability**  45:6
  48:16 91:14
**reliable**  47:15
  47:23 68:7,13
**reliance**  95:1
**relied**  51:13,15
  82:6
**relief**  37:20
**relies**  95:4
**rely**  41:8,9 81:2
  94:19
**relying**  40:19
  87:24 93:25
**remain**  17:2
**remainder**  67:4
**remember**  7:14
  8:5 10:2 13:18
  24:24 26:5
  28:12 33:1
  36:16 63:17

105:4
**remembering**
  12:13 16:5
**render**  24:12
  103:6
**rendered**  22:23
  27:11
**rendering**  17:17
**rent**  41:20,21
  89:18,24
**rents**  92:10
**repayment**
  86:19 105:6
**repayments**
  85:16 86:16,24
  86:25 87:2,21
**repeat**  6:5 86:11
**report**  3:12,16
  4:21 8:12 10:10
  10:13,21,23
  11:1,7,8,10,11
  11:12 27:11
  28:4 30:15
  37:25 38:2,6
  42:11,12,17,23
  42:24 49:24
  52:5,16 53:23
  54:10 55:12
  56:11 59:14,17
  63:24 64:2
  65:13 66:13,22
  68:9 72:5 74:22
  75:7,9 81:13
  85:12,18 87:11
  90:16,24 91:20

92:6 93:2,20,21 94:4,12,17 95:2 95:4 98:14 100:23,24 101:11 102:7,8 102:24 103:14 103:15 104:22 107:25 109:12 111:7

**reported** 1:24 18:3,5 45:24 46:18 55:14,18 56:9 57:6,18 58:9 67:21 68:6 91:2

**reporter** 1:25 3:5 4:3 109:18 109:20 110:6,16 111:1,6,6

**reporting** 55:24 56:7 89:21

**reports** 9:17 11:13 31:18 56:21,23,25 57:7 59:16 67:2 67:15 103:6

**represent** 8:24

**representation** 47:20

**represented** 77:1

**represents** 77:10 95:13,16

**reputation** 58:2 60:6

**request** 53:24

**requested** 10:16 111:9

**require** 67:19

**required** 25:24 42:12 56:8 71:2 79:23 92:20

**requirement** 20:25 56:11 97:20 100:10 102:13

**requirements** 46:18 97:14,16 97:24

**requires** 18:5 56:3

**requiring** 67:17

**resale** 66:3 75:4 76:10

**resales** 62:18 65:16 73:16 74:21 85:14 87:16

**research** 100:20 100:22 101:3

**reserve** 56:10 84:17,19,22 85:5 93:7 97:15 97:24 99:20 100:10

**reserved** 3:22 109:22

**reserves** 26:12 26:16 79:23 84:11,13,15

99:3,6,24 100:12

**resident** 40:4,23 70:12 83:19 84:9 89:19

**residents** 40:8 75:14,21 77:1 77:11 83:7 85:17 86:2,2,17 87:1 95:13,16 95:18,23 106:13 106:17

**respect** 82:24 92:2

**respective** 3:22

**responses** 12:5

**result** 9:22

**resulted** 26:10 29:16

**retained** 24:22 25:1,19 82:2

**retains** 61:16

**retention** 25:19

**retire** 32:12,14 33:11

**retirement** 79:9

**returned** 112:15

**revenue** 24:7 43:10 45:9 53:17 62:18 63:17 65:4,8,11 65:20 69:7,14 70:8,9,11,18,18 70:20 71:4,21 72:6,12,16 73:6

73:7,10,16,17 74:8,9,11,14 76:14 84:5 88:14,16,19,22 89:1,1 92:9 95:14,18 96:3

**revenue's** 66:9

**revenues** 63:23 65:22,23 74:6

**review** 9:25 30:12,25 31:1 34:12 35:15,25 38:23 41:11 111:8 112:9

**reviewed** 18:10 31:8 34:9 37:24 38:6,17 39:3,15 41:6 42:2 49:20 60:20 101:25

**rice** 4:23

**right** 5:23 8:3,4 8:8,16 9:4 11:24 11:25 12:8 15:21 16:7,14 16:20 17:5,8 20:14,15,16 23:18 24:10,21 26:2 27:4,8 28:15,17 29:8 30:10 31:11 35:5 36:20 39:9 39:18 44:15,21 46:22 50:6 52:10 54:11 55:15 57:17

**[right - sheet]**

60:11 61:22 64:22 65:10,22 66:9,15 67:5,7 69:6 70:4 71:5,5 71:11,13,14 72:6 73:6,19 74:2,5 78:20 80:5 83:10,24 84:5,18 85:7,13 86:4,5,12,16 87:9,11,25 88:1 89:6,21 90:13 90:15,18,21 94:5 96:11,24 97:1,9,17 99:3,5 99:24 101:21 102:7,23 105:17 105:18 106:12 107:13

**rights** 12:12,21
**road** 107:16
**roll** 53:10 56:18 57:4 81:7
**rolled** 66:21 68:16 80:9 81:7
**rolls** 89:18,24 89:25
**ross** 1:22
**roughly** 5:10 59:8
**royalties** 6:12 6:20
**rpr** 111:24
**rule** 112:24,25

**rules** 97:10 112:15
**run** 98:17
**running** 79:20 102:24

**s**

**s** 2:1,8 3:10,20 3:20 4:1 105:2 113:4
**sale** 8:2 26:8 41:19 57:22 92:21
**sales** 66:3 72:6 72:10 74:15
**satisfaction** 37:1 39:25 81:23
**satisfied** 61:21
**satisfy** 34:1
**savings** 53:15
**saw** 49:24
**saying** 40:9 41:14 55:8 61:21,22,23 67:7 72:3 73:18 75:17 76:4,18 78:3,18 86:10 91:8,10,11
**says** 29:11 40:18 41:6,9 52:10 60:10 62:18 64:21,24 65:2 65:16 73:15,17 74:21 95:5

**schedule** 50:25
**scheme** 84:7 97:12 100:5
**schemes** 97:24 99:18
**science** 5:2
**scope** 8:9 13:13 25:4 26:25
**screening** 43:5
**screens** 43:6
**scrutiny** 18:8 67:22
**seal** 110:10
**second** 11:9 40:20 42:22,23 56:17 66:23 68:24 79:10
**section** 101:2
**sections** 64:4
**secured** 105:7,8
**see** 13:20 14:25 15:3 19:6 20:12 24:5 27:7 38:4 40:18 41:7,12 41:15 42:1 49:25 55:24 57:15 59:2 60:19 62:19 65:4,6,17 74:21 85:13 91:6 109:9
**seem** 42:6
**seems** 65:19 87:12

**seen** 102:16
**self** 28:9,16
**sell** 23:5 32:3
**sellers** 43:7
**selling** 57:21
**senior** 39:23 41:1
**seniors** 41:1
**sense** 46:11 80:17 87:24
**sent** 31:16 35:16
**sentence** 90:20
**separate** 75:6 79:1,6 80:8 98:9
**separated** 106:7
**september** 33:13,19
**services** 24:17 71:1,2,3 88:23 88:24 89:7,13 93:4 106:18,21 106:23 107:8,9
**set** 35:18,24
**settled** 81:12,13
**seven** 5:24
**several** 25:15 26:8 34:14 95:10
**shareholder** 5:17 23:3 81:18
**shareholders** 81:21
**shed** 103:11
**sheet** 3:7 13:19 14:8,25 15:15

**[sheet - specificity]**

16:25 17:25 18:3 21:20,24 22:3,12 23:13 46:1,5,7,9,15,17 46:19 49:1,24 50:2,7,10,14 54:17 57:6 58:19 59:7 60:23 63:5 66:16,17 67:5 69:11,18,22,24 71:16,16 72:25 73:4 76:24 77:9 77:10 79:4 81:8 95:11 112:11,12

**sheets** 85:4

**show** 10:4,9,20 29:3 34:16,24 50:6 69:21 92:16 109:10

**showed** 35:18

**showing** 74:8

**shown** 85:24

**shows** 55:14 74:19

**side** 61:13,24,24 74:12,12,13 77:22 82:2,3

**sided** 39:11

**sign** 3:6 112:12

**signature** 109:22 110:15 111:23

**signed** 112:17

**significant** 28:22 29:24 48:3 82:19 95:10

**signing** 3:22

**similar** 20:11 24:5 42:11 80:17,21 82:10 100:1

**similarly** 45:23 79:23

**simply** 13:6 33:24 48:10,21 49:9 101:13

**single** 24:3 98:8 98:10,11

**sit** 16:6 28:18 108:23

**site** 98:8,10,11

**sitting** 10:2 11:16 70:4

**situation** 33:8

**skilled** 59:18 96:4 105:25 106:9 107:11

**slight** 56:12

**slightly** 53:7,17 79:22 83:11

**slow** 5:18

**slowly** 6:7

**small** 53:19

**smith** 82:2

**sold** 24:5 60:4

**sole** 10:23 11:5 11:6

**solemnly** 4:3

**solutions** 112:21

**solvency** 7:1,3 8:15 9:8,10,11 11:22 13:11,15 13:24 14:9,15 15:13 16:22 17:2,14,18,19 18:15 21:8,12 21:13,15 22:2,6 22:14,21,23 24:13,15,18,20 25:8 30:4 45:10 45:15,22,25 52:14,21 54:21 65:24 71:12 90:17 100:24 101:11 102:20 102:22 104:10

**solvent** 12:1,19 12:22 22:9 95:10 101:14

**somebody** 9:21 23:5 47:9 61:20 104:19 107:10

**somewhat** 42:24 80:16

**sorry** 37:9,21 56:14 60:14 67:9 69:12,16 74:9 86:6 103:13

**sort** 6:14 11:11 14:17,23 16:1 17:3,7 19:6

32:17 46:2,14 47:14,17 48:22 61:1 80:6 85:7 89:5 90:4 106:2

**sounds** 80:2

**source** 48:2

**sources** 18:6 24:8 51:7,10,12 71:25 106:13

**south** 2:4 5:1 112:2

**speak** 104:24

**speaking** 99:21

**specific** 18:8 19:1 20:10 26:24 39:1 43:12 84:17,19 84:22 85:5 89:8 89:17 92:2 97:7 97:10 98:4,6,23 100:21 104:13 104:14 109:8

**specifically** 6:8 7:21 12:13 13:23 18:18 19:15 22:11,21 24:19,24 35:9 35:18,20 36:16 37:5 52:15 54:15 98:15 100:8,20 101:8 108:20

**specificity** 86:1 87:19

| | | | |
|---|---|---|---|
| **specifics** 33:23 33:24 34:15 89:22 102:5 | **starts** 52:18 | 70:2,6 90:6 98:13,19 100:1 101:5 | **studies** 4:24 21:4 |
| **spent** 44:3 103:14 | **state** 1:25 4:13 20:17 42:11 56:3 64:7 82:21 82:21 97:2,7,23 100:6 102:21 104:13 110:2,6 110:17 111:2 | **states** 1:1 97:8 97:10 | **study** 21:6 |
| **spinning** 26:11 | | **statute** 112:16 | **stuff** 6:20 |
| **spinoff** 58:19 69:1 | | **statutes** 97:7 | **subject** 90:21 97:23 |
| **spoken** 25:17 | | **statutory** 56:3 56:10 106:4 | **subjective** 61:18 |
| **spreadsheet** 90:1 | **stated** 24:4 113:23 | **stellar** 103:24 104:5 | **submit** 41:6 |
| **spring** 47:6 | **statement** 13:17 17:15 18:7 27:23 28:25 29:2 45:17 47:5 47:10,25 48:16 48:18 49:21 50:5 51:1 54:17 55:23 56:17 66:21 70:6 90:24 91:3,12 104:21 | **stenographic** 111:11 | **submitted** 28:5 |
| **spun** 26:15 91:25 92:13 | | **stenographica...** 111:7 | **subsequent** 47:7 60:22 |
| **stabilized** 53:11 53:18,19,22 63:2,10,15,19 63:24 65:9 72:9 73:8 75:5,17 | | **step** 88:11 | **subsidiary** 1:14 |
| | | **steps** 13:14 15:12 16:23 24:12 | **substantially** 55:25 |
| | | **steve** 8:12 | **subtract** 71:17 |
| **stafford** 2:9 | | **stipulated** 3:21 | **subtracted** 67:3 |
| **stan** 2:16 | | **stock** 11:22 | **successor** 1:15 |
| **stand** 96:11 | **statements** 13:17 14:19,21 15:6,8,9,10,22 16:2,6,9 17:4,4 17:7,10,17 18:10 23:15 27:19,25 28:4 29:7 44:19,22 44:24,24 45:1,4 45:8,13 46:23 47:1,19 48:6,11 48:24 55:19 67:9,12,24 68:1 68:10,16 69:25 | **stop** 93:7 | **suggest** 99:7 |
| **standards** 24:10 24:14,16,19 | | **stopped** 56:14 | **suggested** 112:14 |
| **standing** 14:1,6 | | **straight** 44:9 | **suggesting** 61:15 |
| **standpoint** 83:4 | | **street** 107:8 | **suggests** 38:22 |
| **stands** 93:24 95:2,4 | | **strictly** 23:6 44:6 | **suite** 2:10 |
| **started** 5:7 13:16 66:20 | | **stronger** 85:4 | **summarize** 14:17 |
| **starters** 98:4 | | **structure** 26:14 32:21 98:1 | **summarizing** 53:1 |
| **starting** 17:10 46:11 48:3 50:17 67:8 90:22 | | **structured** 26:10 | **support** 18:6 27:22 |
| | | **studied** 4:23 5:6 | **suppose** 73:16 |
| | | | **supposed** 93:5 93:10 |
| | | | **sure** 4:23 6:25 7:9 15:23 16:2 |

20:24 25:5 29:24 39:4 62:11 90:11 107:17 109:1,3

**surprising** 46:17

**surrounding** 33:8

**suspect** 17:25 56:5

**suspension** 29:17,18,21,25

**swear** 4:3

**sworn** 4:9 110:8

**system** 14:5 89:16,23

**systems** 14:2

**t**

**t** 2:3 3:10,20,20 112:1 113:4,4

**tab** 10:12

**take** 13:14 15:12 24:12 26:18 27:4 34:1 37:10 43:21 59:10 60:21 61:1 62:5 90:17 98:19

**taken** 1:19,20 26:1 39:10 70:25 75:25 78:1,25 88:22

**talk** 24:12 34:23 36:22

**talked** 25:5,23 45:18 66:19 71:23

**talking** 19:17 20:5,13 22:8 53:8 80:4 85:1 87:13 96:1,2 97:12 99:17,24 99:25 107:10

**talks** 41:17

**tampa** 1:2,4,5,9 1:23 2:4 39:21 39:22,24 40:14 40:14 69:1 105:16 112:2,5 113:1

**tangible** 19:8 57:16

**task** 7:21 13:13

**tasks** 16:22 22:16

**teletronics** 7:20 7:22 8:4,7,13 12:7,10,19 13:12 14:2,14 15:13 17:5,9 22:9,9 45:7 60:25

**tell** 29:9 105:21

**telling** 26:13 86:3

**tells** 30:20

**teltronics** 7:13 11:20 14:16 23:11

**ten** 4:19 5:24 9:7 62:8 91:16 91:21 92:3,7,19 93:22 94:8,10 95:6

**tenant** 89:25

**tend** 51:8

**term** 15:24 41:12 58:25 59:8 71:6

**terminate** 87:3

**terms** 11:22 22:5 41:11 45:2 53:7 56:1 71:12 72:17 74:11 76:10 77:21 80:2 87:23 99:17

**test** 17:3 40:19 61:1 71:16

**tested** 14:24 15:2

**testified** 4:9 5:20 42:13 66:8 92:23 102:4 104:6

**testify** 40:2 63:13

**testimony** 3:2 4:4 5:24 9:25 10:22 11:9 13:9 38:23 39:18 40:6 42:14 52:2 93:1,3 102:6 108:21 112:10

112:15

**testing** 21:2 48:11,13 90:8

**tests** 102:20,22

**thank** 27:8 109:13,14,16

**theoretical** 21:3

**theoretically** 99:4,20

**thing** 16:10 70:10 79:17 99:19

**things** 17:24 18:1 31:14 35:16 43:6 45:16 49:15 57:21,24,25 58:1,3 60:6 61:23 75:14 79:6 80:6 89:7

**think** 6:17 7:2 7:16 11:15 12:20 14:4,5,13 16:24 17:24 19:15 20:6 21:13 23:9 25:14,16 27:15 28:2,7,18 29:19 29:23 31:25 33:12 37:6 38:14,21 39:18 42:9,10 45:12 48:19 49:21,23 50:16 51:17 59:13 61:12,19

63:2,13 66:19
69:6 70:14
71:23 73:20,23
75:13 77:8
79:21,22 81:12
92:5,19 93:2,11
93:24,25 94:1,7
94:14 95:2,3,5
95:25 98:24
100:4,5 102:13
102:14 104:17
104:25 105:2,20
107:5
**thinking** 20:4
**third** 55:23
56:19 68:6
81:22
**thought** 14:9
45:24 49:24
57:19 58:6 61:8
61:11 68:5,12
98:22
**three** 6:2 21:3
53:4,9 55:22
58:12 77:5 78:9
80:7,8,19,20
86:12
**thumb** 36:8,10
36:17
**tie** 50:4
**time** 1:21 7:25
8:13 11:23
12:11,20 14:13
16:16 30:13
32:25 39:10

43:20 47:6 51:8
53:25 54:3,24
62:9 69:18
83:20 84:8 89:5
100:25 102:16
103:5 109:14
**timely** 102:13
**times** 5:23,25
**today** 4:5 11:17
16:6 28:19 38:8
108:23 109:14
109:15
**together** 35:25
36:3 107:25
**told** 26:22 102:3
**tonya** 1:24
110:5,16 111:5
111:24
**took** 5:6 14:18
20:24 71:20
77:16 84:4 93:8
**top** 9:6 42:23
**total** 5:25 30:25
56:1,1 64:24
65:5 91:2,4
**track** 89:18
**trademark** 6:9
6:15 19:19
**trail** 17:4
**transaction**
28:14 32:10,17
51:8 54:1 58:22
85:2 101:1
105:5 108:2,10
108:11

**transactions**
18:21 19:20,22
20:5,8,10 33:20
33:22
**transcript** 3:22
29:12,13 93:4
101:25 104:2
111:9,10 112:8
112:17
**transcripts** 32:4
112:13
**transfer** 7:1,14
8:17 58:4 59:25
60:11 81:21,24
**transferable**
18:19
**transferred**
8:14 12:12 29:3
57:13 58:18
59:6 67:3 81:22
**transferring**
60:1,2
**transfers** 7:3,5
60:13
**transported**
106:23 107:9,13
107:16
**travel** 43:13,16
43:16,20,22
44:4
**treatment**
105:25
**treatments**
96:20

**tremendous**
103:9
**tried** 64:3
**tries** 47:14
**true** 111:10
113:24
**truly** 43:9
**trust** 31:24
**trustee** 1:9 12:6
12:13 13:1,6
93:19 94:13
112:5 113:1
**truth** 4:5,5,6
**try** 87:12
**trying** 7:1 32:3
37:13 44:10
48:18 54:21
76:13 86:6
**turn** 34:6
**turned** 49:14
**turning** 62:16
**two** 7:22 9:17
11:12,15,16
20:24 22:15,15
30:25 43:11
53:10,13 56:23
57:7,8 72:4 73:6
73:15 75:14
79:6 86:11
93:16
**type** 6:8,20,20
9:18 16:10
23:12 99:19
**types** 5:13,14,19
6:6,23 49:5,6

96:21 97:25
**typical** 27:2
**typically** 16:20
23:24

**u**

**u** 3:20
**uh** 50:1 64:20
77:15 85:15
**ultimate** 81:8,18
81:19
**ultimately** 45:11
53:4 80:13 84:9
92:14
**ultrasounds**
43:6
**under** 1:6 4:9
12:9 45:19,21
45:24 46:7 65:8
66:9 68:19
70:13 74:10
79:20 85:8,13
85:16 86:17
88:3 105:23
106:3 112:15
113:23
**undercapitaliz...**
99:14,22
**underneath**
90:21
**understand**
51:3 64:14
75:23 76:13
78:3 106:6
**understanding**
32:10,18,19,20

33:7 34:3 36:25
39:20 40:3
45:15 46:24
47:4 48:19
82:23 83:3
88:15 95:23
**understood**
80:1
**united** 1:1
**units** 92:21
**university** 3:13
3:14 4:23 5:1
29:11 31:17
32:21 34:2
40:22 41:2
51:23 89:16,21
91:19 101:17
106:7
**unrelated** 75:15
93:9
**unspecified**
86:25
**unterholzner**
1:18 3:2 4:8,15
10:20 34:25
37:18 39:7
62:14 109:5
110:7 111:8
112:7 113:3,25
**upfront** 70:15
**usage** 89:13
**usameribank**
1:15 26:21 32:5
32:9,11 58:18

**use** 6:11 15:2
19:10 45:2 53:7
63:1,4 65:23
67:16 68:12
71:6,18 73:5
76:13 78:5,9,10
78:11,12,14,19
89:4 93:11
**used** 51:10 53:1
53:12 54:3,6,13
56:20 60:22
61:10 62:22
63:6,8,15 65:25
66:5 72:9,23
73:24 74:5,5
75:8,17 77:6
81:4 90:3,6 91:3
91:12,14 93:9
100:17 109:5
112:17
**uses** 75:11
**using** 50:20
76:11 77:12
88:7
**usually** 28:17
**utilized** 91:21

**v**

**v** 3:13 55:13,14
105:2
**valid** 61:7
**valley** 1:13,14
8:24 26:12,17
26:20 112:6
113:2

**valuation** 5:16
11:7 20:18 21:7
21:11,14,14,22
21:23 22:10,24
23:2,4,8,12,16
23:18,20 27:12
44:5,6,9 45:3
51:6 52:19 53:5
59:21 74:12
77:21 78:6,20
79:17 80:24
81:2 82:6 94:19
**valuators** 60:9
**value** 12:7 13:21
15:5,22,23,24
18:1,4,5,15,19
18:23,25 19:3,5
19:9,14,19 20:9
20:12 21:20
22:7,12,13
23:14,23 27:21
30:2,3 45:22
46:3,10,12 49:2
49:4,7,10,15,19
50:7,9,15,19,21
50:24 51:4,9
53:11,12,12,25
54:25 55:14
56:19,21 57:5
57:19,19 58:1
58:10 59:17
60:5,10,13
61:13 62:23
63:6 65:25
66:24 69:10,13

71:13 72:11,17
72:22 73:2,24
74:1,6 75:9,12
75:17,18 76:12
76:14,21 77:13
77:16,24 78:2,5
78:10,15,23
79:25 80:3,4
81:5,10,24
87:20 88:1,4,7,8
97:20 104:14
106:25

**valued** 53:3,3,9
59:19,25 72:21

**values** 16:2 18:7
27:22 60:23
63:1 66:18 67:1
67:1 72:24

**valuing** 60:7
77:5 78:13
79:15

**varied** 9:15

**various** 97:7

**verbal** 12:5

**verifies** 47:21

**verify** 47:25
112:10

**verifying** 48:10

**veritext** 112:13
112:21

**veritext.com**
112:13

**versions** 70:5

**versus** 17:19
19:24 56:4

97:10

**view** 48:2

**viii** 54:10,12
56:16 66:12,13
75:7,19 85:17
86:5,7,19 87:24
88:9

**village** 3:13,14
29:11 31:18
32:21 34:2
40:23 41:2
51:23 89:16,21
91:19 101:18
106:7

**violated** 9:21

**violation** 9:23

**volume** 103:9

**vs** 1:12 112:6
113:2

### w

**w** 1:8 112:5
113:1

**wage** 43:16

**wait** 86:10

**wakefield** 3:14
3:15 31:20
51:10,17,25
52:1,8 53:7
54:13 56:20,25
57:18 58:10,17
59:11 60:18
61:2 62:1,15
63:9 64:6 65:13
67:2 71:19
72:20 75:9

76:19

**walk** 54:11
107:7

**walking** 54:15
106:22 107:12

**want** 6:4,7 10:3
10:17 30:14
32:1 36:21
37:10 61:20
64:7,8,12 88:17
108:24 109:3

**wanted** 35:19
68:18 101:7

**wants** 23:5,6

**warren** 1:8 25:2
25:3,16,22 26:2
26:13,22 27:1
28:11 29:9
30:22 31:3,15
35:8,9,17 36:9
41:10 101:16
103:18 112:5
113:1

**warren's** 35:17
36:6

**way** 10:4 17:19
26:6 47:22
50:13 56:11
61:12,16 73:23
77:13 82:14,19
85:25 86:3,23
87:20 92:15
105:21 108:11

**ways** 18:24

**we've** 6:10,10
6:12 39:10
90:16 97:6

**wednesday** 1:20

**wells** 14:13

**went** 4:24,25
13:18 15:7
23:12 27:18,19
28:1 53:20
63:24 80:13
105:10,12,12

**west** 2:4 112:2

**westport** 1:4,5,9
1:10 25:8 26:11
26:15,16 29:4
32:11,13,21
39:21,22,23,23
40:14,14,15
46:23 50:7 51:5
56:8 57:10,14
58:12,19,20
59:6,19 66:16
66:16 67:4 69:1
70:13 76:25
80:4 83:12 84:2
84:14 91:23,25
91:25 92:10,11
92:13,15 99:2
99:12,12 100:16
100:25 101:5,17
102:9 103:1,7
105:7,8,13,15
105:16 106:8
108:1,8,12
112:5,5 113:1,1

**[westport's - years]**

| | | |
|---|---|---|
| **westport's** 29:17 | **workforce** 58:2 60:5 | **years** 4:19,25 26:8 85:2 86:12 92:18 |
| **whitson** 2:8 3:3 4:12 8:24 10:6,9 10:14,16,20 30:16,20 34:18 34:22 35:2 36:20,24 37:13 37:18,23 38:19 38:25 39:5,6 51:22 62:8,13 64:14,17 88:11 88:13 90:15 108:24 109:3,7 109:13,19 | **working** 5:7 47:18 101:6 104:8 | |
| | **worth** 19:25 20:2,6 23:6 46:8 91:9 | |
| | **written** 68:25 69:4 | |
| | **wrong** 4:25 19:23 61:22 | |
| | **www.flmb.us...** 1:2 | |
| **whuv** 32:23 | **x** | |
| **wipe** 73:18 | **x** 3:1,10 110:20 | |
| **witness** 36:23 110:10 112:10 112:10,12,17 | **y** | |
| | **yards** 107:15 | |
| **wonder** 2:9 10:7 | **yeah** 6:17 52:20 64:3 65:15 74:3 94:21 97:13 103:21 105:14 107:17 109:6,19 | |
| **word** 14:24 15:2 | | |
| **words** 22:14 74:14 86:18 88:1 108:10 | **year** 5:3 9:17 24:25 25:17,17 33:18,19 36:15 59:1 64:22 74:21 86:22 87:17,18 91:16 91:21 92:3,7,17 92:17,19 93:22 94:8,10 95:6 104:20 108:9 | |
| **work** 16:9 18:5 20:25 43:2 46:12 79:14 93:23 95:1 98:19 108:17 | | |
| **worked** 5:13,19 6:23 7:4 8:6 11:21 79:10 94:22 | | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.