**ANNUAL REVIEW MEMO**
**Commercial Real Estate Relationship**
BVM Management & 2234
1/27/2016

## INTRODUCTION AND RELATIONSHIP BACKGROUND

USAB originated a $15MM term loan in March 2014 to finance the acquisition of a 230-bed assisted living facility (ALF)/skilled nursing facility (SNF) located in Tampa. BVM Management is the Guarantor. The Borrower is Westport Nursing Tampa, LLC. This is the only loan USAB has originated with the Guarantor/Borrower. The loan is secured by a FREM on the 230-bed ALF/SNF along with an assignment of rents, leases and profits as well as a $3MM cash account held by USAB as additional collateral.

The loan has only a two-year term, since the business plan for the collateral is to be refinanced after 24 months of operations with HUD financing under the Section 232/223(f) program that provides FHA mortgage insurance on loans that cover housing for the elderly.

At the time of loan origination, the ownership group was purchasing an interest in the entire Continuing Care Retirement Community (CCRC) doing business as University Village for $27MM, which included two assets owned by Westport Holdings Tampa (a 446-bed independent living facility (ILF) and a 60-unit villa complex on an adjacent 11 acres) and two assets to be owned by Westport Nursing Tampa (a 120-bed SNF and 110-bed ALF). The properties are all part of the Continued Care Retirement Community and are now doing business as the University Village.

The Bank's borrower is Westport Nursing Tampa, LLC that owns the real estate for the 230 bed SNF and ALF. As a condition of the loan, the bank required that the property which serves as collateral for our loan be owned by a stand alone entity separate from the ILF facility which would have its own lender. Thus, as part of closing, the property was titled in the name of Westport Nursing Tampa, LLC. The bank's borrower, is a real estate holding company that leases the 230 bed health center to the operating entities. It is leased to the operators of the ALF and SNF.

Westport Holdings Tampa is a partnership that owns the 446 bed and 60 villa ILF. This entity is not a bank customer and has its own lender on the ILF property. Both entities are linked through common ownership as affiliates.

At the time of the purchase, Westport Nursing Tampa, LLC leased the subject collateral to two not-for-profit related parties (TR & SNF, Inc. and TALF, Inc.) for a 15-year term. The formation of these leases is typical in the industry as it shelters liability for Westport Nursing Tampa and allows for maintaining its not-for-profit legal status. The lease required the tenants to pay rent totaling $2.5MM in the first year to Westport Nursing Tampa with increases by $0.5MM per year until the fifth year when annual increases are based on CPI increases. The rent payments serve as the primary source of income to service the USAB loan. Currently, USAB is in the process of reviewing and approving a new lease with an unrelated party. The new tenant is Novum Tampa SNF, Inc. and vill be replacing the lease to TR & SNF, Inc. and TALF, Inc. The new lease is for a 30-year term with two 5-year renewal options.

- 1 -

PLAINTIFF'S EXHIBIT 185

The ILF owned by Westport Holdings Tampa provides condo-like units and villas as part of a life-care contract that features a large entrance fee with a lower monthly rent payment. For example, the entrance fee could be $150M and the monthly payment could be $1.5M. When a resident leaves the ILF, a portion (usually 40% to 90%) is refundable. Because of the ongoing refund liability associated with this business model, the Florid Office of Insurance Regulation (OIR) regulates the ILF to ensure that the facility is in good standing and has the ability to pay refunds when they are due. The collateral securing the Bank's loan is not subject to the OIR, since it does not directly participate in the life-care contracts. The Bank's loan is operated by entities licensed by AHCA.

The relation between the two properties is that the health center, the 230 bed SNF and ALF, has an agreement to provide beds to former residents at the ILF. Once a resident living in the ILF needs a level of care provided at the ALF or SNF, they transfer over to the health center. The ALF and SNF operators are free to operate the healthcenter as a market project leasing rooms to community residents that are not Life Care Contract members of the ILF. When an ILF resident needs a bed, the ALF and SNF agree to provide them one. If they have one available, the ILF resident will move to it. If they do not have one available at the time, they will place the ILF resident in another facility. When a bed becomes available for the ILF resident, the ALF and SNF operator will provide that ILF resident a first right of refusal on that bed. If they decline it, the ALF and SNF operator is then free to lease it to a community resident. Because the ALF and SNF have historically not been 100% occupied, there has rarely been a time when a bed was not available for an ILF resident with a Life Care Contract.

Westport Holdings Tampa (owner of the ILF and villas but not the Bank's borrower) has been involved in an ongoing dispute with the OIR since the beginning of 2015. The ongoing dispute has been a distraction for the Borrower, since it has inhibited the ability to increase occupancy as well as resolve certain financial matters lik refund obligations of Westport Holdings Tampa.

**Timeline of Events:**
Below is a timeline of events surrounding the dispute and litigation with the OIR as provided by the Ownership Group, their Counsel, and Public Records.

- Prior to the creation of the separate entities (the Bank's borrower Westport Nursing Tampa, LLC owning the health center and Westport Holdings Tampa, LP owning the ILF), the entire campus was owned by Westport Holdings Tampa, LP.
- Westport Holdings Tampa, LP. was comprised of a 1% General Partner, and 99% Limited Partner. Both entities were owned by Larry Landry.
- The BVM Management group and related investors were seeking to acquire the 99% Limited Partnership percentage while Larry Landry would remain as the 1% General Partner.
- A person seeking to acquire a 10% triggering ownership interest in a CCRC must apply with the OIR for approval.
- In early to mid-2013, BVM Management, Inc. became interested in acquiring the 99% limited partnership interest in the property.
- In mid-2013, Larry Landry and John Bartle of BVM Management, met with representatives of the OIR to discuss the proposed acquisition of Westport Holdings Tampa, LP's 99% limited partnership interest b BVM Management.
- In the Fall of 2013, Larry Landry and BVM Management entered into an agreement whereby BVM would purchase the 99% ownership as limited partners.

- On December 6, 2013, the OIR advised Larry Landry "that if BVM buys the 99% limited partnership interest in Westport that it would not be required to file and acquisition application."
- After getting confirmation from the OIR that the purchase of the 99% limited partnership interest would not require a formal application process to the OIR, BVM located investors interested in purchasing the interest. The sale was closed on 3/31/14.
- Larry Landry remained on as the 1% GP.
- As part of the closing and loan transactions, Westport Nursing Tampa, LLC was spun off as an affiliate the create the single asset LLC to own the health center property (Bank's borrower).
- By April of 2014, the OIR was made aware of the acquisition of the 99% partnership interest, the loan documents, entity structures, and ownership change.
- Although far greater than 10% of the ownership interest in Westport Holdings Tampa, LP was transferred as a result of the transaction, the OIR did not require that the entities acquiring the ownership interest either individually or as a group, submit an acquisition application. This has been confirmed on record during the ongoing litigation that the OIR did not require the application at that time. Though, it appears that they should have and that they have admitted it was an error.
- From April 2014 through December of 2014, Larry Landry (through a solely owned entity) remained as the GP. During that period, he was an infrequent visitor and John Bartle and employees of BVM were more actively involved in management.
- The property had a management contract with AgeWell Senior Living, LLC, which was reported to also be Larry Landry's management company.
- In December of 2014, the ownership group elected to terminate AgeWell's management contract when it expired on January 31, 2015.
- On December 29th of 2014, Larry Landry notified the OIR that he was resigning as the General Partner of Westport Holdings Tampa. The ownership group indicated to the bank that this was a result of the management contract termination through which Landry was compensated.
- On December 29th of 2014 upon learning of Larry Landry's resignation as General Partner, the OIR sent an email to John Bartle of BVM advising him that the person or affiliated person assuming the role of General Partner would be required to complete and file an acquisition application.
- In January of 2015, Westport Holdings Tampa, LP proposed Compliance Concepts, LLC as the general partner. Compliance Concepts is owned by Rebecca Bartle who is the wife of John Bartle. Compliance Concepts was the managing member of a 39.6% limited partner of Westport Holdings Tampa.
- In February of 2015, Compliance Concepts submitted the application to the OIR which determined the application to be incomplete.
- On February 11th of 2015, the OIR commenced an examination of Westport Holdings Tampa. A field examiner was assigned to the facility. Upon arrival, the examiner requested the financial records which were not immediately produced. The ownership group has communicated that they did not immediately turn over the financial records at the advice of their counsel until they could confirm the identity of the examiner, and their association with the OIR.
- On February 13th, 2015 the OIR issued an Initial Order of Suspension which is the first step to try and revoke the provider's ability to sell continuing care contracts. Their suspension was based on that they didn't immediately turn over financial records and that the facility was being operated by unapproved persons. The owner's responded to that complaint and it reportedly has never been pursued.
- The borrower's response is that the OIR was aware of the ownership change, did not require an approval of the transaction, and that they were in the process of submitting applications for the new GP.

- On February 20th, 2015, the OIR sent a notice requesting additional information regarding Compliance Concepts acquisition application.
- On February 26th, 2015, the OIR made a request to appoint a receiver for Westport Holdings Tampa which was challenged by the ownership group. The original challenge was dismissed, but the ownership group was successful on appeal and thus the temporary appointment of a receiver was stopped. The ownership group is seeking a permanent injuction to the appointment of a receiver and the case is still pending.
- Sensing that the OIR was not going to approved Compliance Concepts as the GP, the ownership group elected IMH Healthcare and Eli Freiden as a potential GP replacement candidate. IMH owns 19.8% of the limited partnership interests.
- In March of 2015 the OIR denied the IMH application noting that the applicant didn't meet the requirements including experience, financial stability, etc. as required by the governing statute. Eli Freiden and IMH Healthcare appealed this denial.
- According to the ownership group and/or their counsel, during the summer of 2015 they reached out to the OIR to come up with an amicable resolution. The two sides reportedly engaged in several conversations to amicably resolve the matter. The ownership group indicated they offered various potential solutions as outlined below:
    o They offered to sell the entire campus with OIR approval of the new buyer. They reportedly obtained four offers for purchase ranging from $37MM to $41MM including one from a USAB client. Reportedly the OIR would not meet with any of the applicants to discuss approval.
    o They offered to bring in a third party manager at the OIR's recommendation. They asked the OIR who they would like to have run the property and indicated they would bring in this group. Reportedly the OIR never responded to this potential solution.
    o They brought in a third party operator with no ownership ties to the property in Doug Klinowsl and Novum, LLC. It was indicated that Novum was encouraged to apply as an operator at AHCA's urging. Novum was brought in to show the OIR that the ownership group would step back and allow the property to be operated by an independent third party. Novum was operating under a consulting agreement. They applied for OIR approval but their application was denied by the OIR.
    o The owners offered to pay for a financial advisor of the OIR's choosing to validate their budgets and plan to refinance the entire property under a single entity. Reportedly the OIR did not agree to this either.
- According to the ownership group, agents from the OIR have occupied the ILF facility every day since February of 2014 (nearly a full year). They have reportedly not issued a Statement of Deficiencies for which the ownership group is to respond. Their presence at the property has reportedly hurt their ability to maintain entrance fee sales contracts after what the owners indicated was a banner year in 2014. With neither the issuance of a Statement of Deficiencies, nor a response to several potential solutions noted above, the ownership group has been stuck in limbo waiting for the courts to help provide clarity.

## Subsequent Events

- The ownership group continues to challenge the OIR on a potential receivership at the ILF based on several arguments including 1) that the OIR admittedly did not require an application for acquisition with the original transaction and cannot now try to make it an applicable event, 2) the OIR was aware of the transaction in early 2014 at its inception, aware of the structure changes, financing structure, and sale of the 99% limited partnerhip, 3) that OIR has occupied the ILF for nearly a year without out ever having issued a Statement of Deficiencies or anything that the ownership group can address, and 4) that the ownership group has offered several reasonable solutions to the issues (including selling the entire project

to an OIR approved owner) with no response from the OIR. This litigation is ongoing and the ownership group hopes to have a positive ruling from the court in the coming months.

- IMH Healthcare appealed their denial of application as the GP. The basis for the appeal is that they were only acquiring an additional 1% ownership which is less than the 10% required for approval. They were successful in this appeal based on the threshold being less than 10%. Though, the judge did note that they might not be qualified per the State's qualification criteria, but that the appeal was upheld based on statute that the triggering ownership change must be at least 10%. It appears that the time of the 99% ownership change in 2014 was when this issue should have been vetted.

- To try an appease the OIR, the borrower brought in Doug Klinowski of Novum to manage the healthcenter and ILF on a consulting basis using the existing providers licenses. It appears he has done a good job as occupancy has increased and based on reported financials at the healthcenter, the property is performing well. The healthcenter went through an AHCA survey in December of 2015 as well as a follow up survey in January of 2016. The healthcenter passed. The healthcenter was moved from a 6 month survey cycle to a 12 month cycle based on the results.

- AHCA indicated that Doug Klinowski and Novum can't continue to manage the property in perpetuity on a consulting basis and that if they plan to stay on as operator that they would need to apply to be the provider. Thus, Doug and Novum are currently in the process of a Change of Ownership application with AHCA to become the licensed provider at the ALF and SNF. They would lease the property from the bank's borrower as an unrelated third party tenant. The proposed leases and budget required for application are to be submitted to AHCA for approval in February of 2016. The process for approval typically takes 45 to 60 days. The leases and change of tenant/provider would also be subject to bank approval.

- The borrower will continue to look for a lender to refinance the subject loan. The loan officer has indicated to the borrower that the bank would like to loan to be paid off. The ongoing litigation with the OIR has muddied the waters making a refinance somewhat difficult. The borrower has provided the loan officer with some correspondce from HJ Sims, a bond underwriter out of Orlando, who might be willing to refinance the healthcenter property. HJ Sims was the original underwriter for the project when the borrower was pursuing bond financing in 2013. They are very familiar with the project. They have underwritten it once before and one of the principal's father was the Executive Director for years while he was a child. Thus, he knows the project well. The latest indication from the parties is a refinance of approximately $18,500M which would pay off USAB and provide some additional funds for improvements. The loan officer is waiting on correspondence from the borrower and HJ Sims as to whether or not the refinance is viable in the near term. It is likely that Novum would need to be approved by AHCA as the provider before a refinance could proceed.

- It appears that part of the issue from the OIR's perspective is that some of the assets formerly owned by Westport Holdings Tampa were transferred to Westport Nursing Tampa, LLC. These assets include the real estate leased and cash securing the bank's loan. Prior to the acquisition and loan closing, all assets were owned by Westport Holdings Tampa. Westport Nursing Tampa, the bank's borrower, is not a subsidiary of Westport Holdings Tampa. It is an affiliate linked by common ownership. CCRC's are required to maintain Minimum Liquidity Reserves (MLR's) as fallback for the campus and financial stability. This is required by statute and the MLR's can be used for such things as refund liabilities on the ILF side, debt service, debt reduction, taxes, insurance, capital improvements, etc. The $3MM in cash collateral securing the bank's loan is part of the MLR calculation. Given that it is additional collateral for the bank's loan, it could be used to reduce the overall debt on the campus by paying down the bank's loan. USAB's counsel thoroughly reviewed the statue prior to closing and was comfortable that this cash could

contribute to the minimum MLR calculation because it was held by an affiliate.  The OIR apparently believes it should not have been moved into the new Westport Nursing Tampa entity.  The borrower's argument continues to be that the OIR was aware of this structure change at closing and told the borrower the change did not need to be approved.  They argue that the OIR has requested, and received, copies ( all of the loan documents, entity structures, etc and never had an issue with it for nearly a year after the transaction closed.  They also argue that prior to any litigation or the initial order of suspension, the OIR requested bank statements verifying the account balances.  USAB submitted these statements to the OIR when requested.  The borrower argues that this is further evidence that they were aware of this change as the statements show that the assets are held by Westport Nursing Tampa and didn't have an issue with it. They further contend that they have offered to sell the entire project to a new OIR approved owner under a single entity, or refinance the entire project with one lender and consolidate the assets and ownership back into one entity.  Either of these options would satisfy the issue that the assets are held separately. The borrower contends that the OIR did not respond to either of these proposals.  It should be noted that Westport Holdings Tampa also holds a portion of these reserves and they are not only held in Westport Nursing Tampa.  It should also be noted that the funds held at USAB are held in an escrow account and the only signors are USAB officers.  The borrower has no rights or access to these funds.  The funds are also pledged to USAB through a pledge agreement executed at loan closing.

- The subject loan currently matures on 3/31/16.  It is likely that USAB will have to extend the term for at least an additional 90 days so that the new providers can be approved by AHCA and USAB, and so the borrower can continue to work on a refinance.
- USAB's counsel has not been involved in the nearly yearlong litigation with the OIR because it appears to be focused on the ILF side and the entrance fee life care contracts.  The loan officer asked bank counsel to spend some time getting caught up on the litigation issues to be sure the bank is not at risk.  They ar currently working on reviewing the litigation and  will brief the bank upon completion of their review.

## LOAN PERFORMANCE AND COVENANT COMPLIANCE

The loan has performed as expected with no issues regarding payment history.  While the Borrower has been involved in the ongoing legal dispute with the OIR, it should be noted that the dispute itself is not an Event of Default, but if a Receivership was somehow appointed over the ALF and/or SNF, that would be an Event of Default. The following includes the current status of compliance with the financial and reporting covenants.

- Borrower Financial Statements (quarterly within 30 days) – in compliance as of 4Q2015
- Unaudited Guarantor Financial Statements (annually within 30 days) – not in compliance; last received was for 8/31/2014 and 8/31/2015 is past due
- Audited Guarantor Financial Statements (annually within 90 days) – not in compliance
- Borrower Tax Returns (annually) – not received
- Guarantor Tax Returns (annually) – in compliance as of 8/31/2014
- Rent Roll (annually as of 8/31 within 30 days) –In compliance; last rent roll received was for 12/31/2015
- Census report showing beds/patient type (quarterly) –in compliance
- Medicaid/Medicare costs reports (quarterly) – not in compliance
- Lessee must maintain EBITDARM of $2,500,000 (annually) – in compliance
- Borrower and Guarantor must maintain combined liquidity of $3,000,000 – in compliance
- DSCR of at least 1.75x (annually beginning 12/31/2014) – in compliance

- Occupancy rate of at least 82% (quarterly) – In compliance

## COLLATERAL ANALYSIS

The collateral for the loan is a FREM on a 110-bed ALF and 120-bed SNF located at 12401 N. 22nd Street in Tampa. The exact location is about 9 miles north of downtown and 1 mile west of USF just to the north of University Mall. The three-floor property was built in 1989 with about 131,000 SF on about a 3.6 acre site. The first floor is dedicated to the SNF. The second floor is dedicated to memory care and ALF. The third floor has the remaining ALF units and therapy space for both ALF and SNF residents.

The photo below shows the University Village complex. The collateral for the subject loan is on the left and is identified by the Nursing Center at University Village label in the photo. The X-shaped building to the right is the ILF. The vacant and slightly developed land above the collateral is the location of the Villas. Lastly, the Dillard's store at University Mall is at the bottom of the photo and shows how the property is adjacent to the mall.



The subject property has been able to maintain an average occupancy in the mid-80s for the last several years. The ALF is entirely made up of private pay patients. On average, the SNF includes some private pay patients (about 25%), Medicare (about 25%) and Medicaid (about 50%).

The subject property was appraised in February 2014 and the fee simple market value was concluded to be $16.39MM, which include allocated values of $13.04MM for the real property, $0.46MM for FF&E and $2.89MM for intangibles. Based on the current loan balance less the $3MM cash collateral and this appraised value, the LTV is currently about 69%. The LTV is about 86% based on only the real property value.

As can be seen in the following real estate analysis, the subject property has experienced strong cash flow since the loan was originated. The figures below include all items that need to be included to calculate EBITDAR, so the costs of capital as reported on the financial statements by the Borrower is not included. Additionally, the Borrower does not report management fees or replacement reserves which are included below for normalization purposes. As can be seen in the following, the $2.5MM EBITDARM covenant was met in 2014 and so far in 2015 by annualizing the EBITDAR and backing out the management fees and replacement reserve. Additionally, the DSCR covenant of 1.75x which is based on EBITDAR was achieved in 2014 with a 2.12x and so far in 2015 with a 2.51x.

## REAL ESTATE ANALYSIS

| Borrower: | Westport Nursing Tampa LLC | Property Location: 12250 N 22nd Street, Tampa, FL 33612 | |
|---|---|---|---|
| Loan Amount | $14,258,044 | Monthly Debt Service | $98,580 |
| Term (Years) | 2.00 | Annual Debt Service | $1,182,954 |
| Amort.Period | 20 | Facility Type: | Term |
| Rate | 4.95% | Overall Cap. Rate | 10.50% |
| Units | 230 | Square Footage | 130,946 |

| Occupancy | | 84.59% | | | 86.96% | | | 85.00% | |
|---|---|---|---|---|---|---|---|---|---|
| **Combined SNF/ALF Financials** | | **YTD Apr-14 Dec-14** | | | **YTD Jan-15 Oct-15** | | | **Proforma Nov-15 Oct-16** | |
| | %/Rev | | $/Unit | %/Rev | | $/Unit | %/Rev | | $/Unit |
| SNF Income | 73.31% | $8,978,805 | $39,038 | 70.65% | $8,987,523 | $39,076 | 70.65% | $12,282,948 | $53,404 |
| ALF Income | 26.69% | $3,268,570 | $14,211 | 29.35% | $3,734,223 | $16,236 | 29.35% | $5,103,438 | $22,189 |
| Effective Gross Income | 100.00% | $12,247,374 | $53,249 | 100.00% | $12,721,746 | $55,312 | 100.00% | $17,386,386 | $75,593 |
| | | | | | | | | | |
| **Expenses** | | | | | | | | | |
| Real Estate Taxes & Insurance | 0.69% | $84,867 | $369 | 1.86% | $236,592 | $1,029 | 1.86% | $323,342 | $1,406 |
| Laundry & Activities | 3.21% | $393,718 | $1,712 | 3.32% | $422,084 | $1,835 | 3.32% | $576,848 | $2,508 |
| Utilities | 3.17% | $387,984 | $1,687 | 3.66% | $465,952 | $2,026 | 3.66% | $636,801 | $2,769 |
| Payroll | 13.71% | $1,679,435 | $7,302 | 10.00% | $1,271,577 | $5,529 | 10.00% | $1,737,822 | $7,556 |
| G&A | 7.91% | $969,157 | $4,214 | 11.39% | $1,448,730 | $6,299 | 11.39% | $1,979,931 | $8,608 |
| Dietary | 7.54% | $923,195 | $4,014 | 5.74% | $729,675 | $3,173 | 5.74% | $997,223 | $4,336 |
| Medical Records | 1.38% | $169,514 | $737 | 1.02% | $130,081 | $566 | 1.02% | $177,777 | $773 |
| Nursing/Personal Care | 26% | $3,125,054 | $13,587 | 24.74% | $3,147,823 | $13,686 | 24.74% | $4,302,025 | $18,704 |
| Ancillaries | 11.36% | $1,391,231 | $6,049 | 8.11% | $1,031,106 | $4,483 | 8.11% | $1,409,178 | $6,127 |
| Housekeeping | 1.83% | $224,233 | $975 | 1.92% | $244,526 | $1,063 | 1.92% | $334,186 | $1,453 |
| Management Fee          5% | 5.00% | $612,369 | $2,662 | 5.00% | $636,087 | $2,766 | 5.00% | $869,319 | $3,780 |
| Maintenance & Repairs | 2.86% | $350,279 | $1,523 | 3.37% | $428,670 | $1,864 | 3.37% | $585,849 | $2,547 |
| Replacement Reser       $300 | 0.42% | $51,750 | $225 | 0.45% | $57,500 | $250 | 0.40% | $69,000 | $300 |
| Total Operating Expenses | 84.61% | $10,362,787 | $45,056 | 80.57% | $10,250,403 | $44,567 | 80.52% | $13,999,301 | $60,867 |
| | | | | | | | | | |
| EBITDAR | 15.39% | $1,884,587 | $8,194 | 19.43% | $2,471,343 | $10,745 | 19.48% | $3,387,085 | $14,726 |
| Current Rent | | $1,875,000 | | | $2,375,000 | | | $3,291,667 | |
| FCCR | | 1.01 x | | | 1.04 x | | | 1.03 x | |
| | | | | | | | | | |
| Debt Service (P & I) | | $887,216 | | | $985,795 | | | $1,182,954 | |
| Cash After Debt Service | | $997,371 | | | $1,485,548 | | | $2,204,131 | |
| | | | | | | | | | |
| Debt Service Coverage | | 2.12 x | | | 2.51 x | | | 2.86 x | |
| | | | | | | | | | |
| Debt Service (P & I) (15-year) | | $1,068,890 | | | $1,187,656 | | | $1,425,187 | |
| Cash After Debt Service | | $9,293,897 | | | $9,062,747 | | | $12,574,114 | |
| | | | | | | | | | |
| Debt Service Coverage | | 1.76 x | | | 2.08 x | | | 2.38 x | |
| | | | | | | | | | |
| EBITDARM (annualized) | | $3,176,901 | | | $3,659,199 | | | $4,325,404 | |
| | | | | | | | | | |
| *DSC Stress Test* | | | | | | | | | |
| 20% Decrease in NOI | | 1.70 x | | | 2.01 x | | | 2.29 x | |
| P&I with 3% Int Rate Increase | | 1.56 x | | | 1.94 x | | | 2.10 x | |
| 20% Decrease NOI & 3% Int Rate Incr | | 1.25 x | | | 1.56 x | | | 1.68 x | |

(i) Financials for the 1st quarter 2014 are not available.

(ii) Management fees and replacement reserve actual figures are included for normalization purposes and assume 5% of EGI and $300/unit.

(iii) Proforma income and expenses assume a 2.5% increase over the annualized 2015 figures.

(iv) 2nd DSC scenario assumes a 15-year amortization schedule at 4.95% fixed interest rate.

## MARKET ANALYSIS

The nursing care facilities industry has good fundamentals with strong growth potential due to the aging population. However, there are several growth inhibitors including decreased reimbursement from government programs and the shift of people preferring to remain in their homes and receive home health care. The following includes various segments from an IBISWorld report completed in October 2015.

Executive Summary

Over the five years to 2015, the Nursing Care Facilities industry is expected to grow at an annualized rate of 2.2% to $130.4 billion. Due to the necessary nature of services provided by nursing care facilities, the industry was able to grow despite broad economic stagnation. Additionally, the continued aging of the population has spurred demand for industry services. Over the current five-year period, the number of adults aged 65 and older is expected to increase 3.4% per year on average to 47.8 million. Since the elderly are more prone to injury and illness, and therefore require more

Despite favorable demographic trends, decreased government funding has hindered growth at times

assistance with daily activities, the larger share of senior adults has propelled demand for nursing care facilities. In 2015 alone, industry revenue is expected to grow 5.0%.

Despite favorable demographic trends, unsatisfactory government funding has hindered industry growth. As a result of reforms and budgetary pressures, reimbursement rates for Medicare and Medicaid have fallen over the past five years. Notably, under corrective proposal issues by the federal government, Medicare reimbursement rates were trimmed 11.1% in 2012. In addition,

sequestration, the automatic federal spending cuts that took effect in 2013, reduced Medicare funding for industry services by 2.0% during that year. Consequently, industry revenue grew just 0.1% in 2012 and declined 0.2% in 2013.

An unstable reimbursement model and changes implemented by healthcare reform have initiated a shift from nursing homes to at-home managed care and community care services. Since these services are completed at home, their growth represents a potential threat to industry operators. In response, nursing care operators have begun to adjust their business models, taking advantage of mergers to broaden the scope of services they offer and providing supplementary services to reduce costs.

Over the five years to 2020, the industry is expected to continue expanding. Continued aging of the population, which is expected to accelerate over the next five-year period, will drive industry growth. Nonetheless, revenue growth will be partially offset by regulatory changes favoring at-home managed care in an effort to curtail ballooning healthcare spending, as well as continued reductions in Medicare and Medicaid reimbursements. However, favorable demographic trends will outweigh potential impediments to growth, with revenue expected to increase at an annualized rate of 5.9% to $173.6 billion in the five years to 2020.

**Key External Drivers**

**Federal funding for Medicare and Medicaid**
The majority of nursing homes are certified to provide services under Medicare and Medicaid programs. Medicare and Medicaid reimbursements account for about 75.0% of industry revenue. Federal funding of Medicare and Medicaid and the federally determined terms of access to these programs affect demand for skilled nursing services and the price charged for those services. Although federal funding for Medicare and Medicaid is expected to increase in 2015, continuing reimbursement pressure will remain a potential threat to the industry.

**Key External Drivers continued**

**Number of adults aged 65 and older**
More than 88.0% of all nursing home residents are older than 65, while 45.0% are 85 or older. Therefore, the rate of growth in these age groups affects demand for nursing home care. The number of adults aged 65 and older is expected to increase in 2015, representing a potential opportunity for the industry.

**Federal expenditure on disability benefits**
The US Census Bureau defines disability as a long-lasting sensory, physical, mental or emotional condition. These conditions may make it difficult for a person to perform daily activities, meaning individuals may require nursing care in a facility. As disability expenditure increases, demand for industry services also rises. Federal expenditure on disability benefits is expected to increase in 2015.

**Number of people with private health insurance**
Private insurance can reduce patients' out-of-pocket costs, as people are more likely to use services when they are covered by insurance, therefore boosting demand for industry services. Nonetheless, payments made through private health insurance make up only a small portion of total industry revenue. The number of people with private health insurance is expected to increase considerably in 2015.

**Per capita disposable income**
As household income rises, households are more likely to purchase insurance and can afford out-of-pocket expenses. In addition, households become better able to pay for their elderly family members' stay in nursing facilities. Consequently, a rise in disposable income can result in greater demand for industry services. Per capita disposable income is expected to increase in 2015.



Number of adults aged 65 and older

Federal funding for Medicare and Medicaid

# Current Performance

The Nursing Care Facilities industry has remodeled itself to accommodate a tough economy, unstable reimbursement rates and costly professional insurance. This adaptability has shielded the industry from the economic downturn, with industry revenue rising every year since 2007. The aging of the population has fueled growth over this period as the baby boomer generation approaches retirement age, swelling the size of the population aged 65 years and older. Despite this favorable demographic trend, decreasing Medicare and Medicaid reimbursement levels have forced industry operators to make adjustments. Companies have adopted progressive acquisition strategies and made use of cost mitigation techniques in an effort to boost occupancy rates while maintaining profitability. Consequently, IBISWorld expects industry revenue to grow at an annualized rate of 2.2% to nearly $130.4 billion in the five years to 2015. Demand for industry services is expected to continue growing, driven by rising private health insurance coverage rates as a result of the implementation of the Patient Protection and Affordable Care Act (PPACA) of 2010 and a rebound in household disposable income; in 2015 alone, industry revenue is expected to grow 5.0%.

# Industry Outlook

Over the next five years, the continued aging of the population will stimulate demand for the Nursing Care Facilities industry. In addition, growth in personal disposable income is expected to accelerate, enabling individuals to purchase private healthcare and nursing care services. Nonetheless, growing demand for industry services will be partially offset by decreasing government reimbursement rates and the continued movement toward at-home managed care services as the government attempts to contain rising healthcare costs. Over the five years to 2020, industry revenue is forecast to rise at an average annual rate of 5.9% to more than $173.6 billion.



Industry revenue

SOURCE: WWW.IBISWORLD.COM

## GUARANTOR ANALYSIS

BMV Management was incorporated in 1950 in Indiana under the name of Bethany Village Ministries and amended in 2000 to BMV Management. The purpose of BVM was to provide affordable housing and health services for seniors. The company is a charitable organization chartered under the section 501(c) (3) tax-exempt status. The operations of BVM are managed by a Board of Directors. Besides the University Village complex, the company has ownership interests in 14 other senior care facilities with approximately 1,200 beds/units. (*See the January 2014 original underwriting for more details regarding BVM Management and the ownership structure*).

In 2014, the company reported about $27.3MM in revenue that is shown on the tax return as program servic revenue. Additionally, the company reported about $23.8MM in expenses with about $12.8MM being for payroll related expenses, about $1.1MM for depreciation and $2.2MM for interest expenses. The net profit was about $3.6MM and increases to $4.7MM after adding back depreciation.

The company has a fiscal year ending August 31. The following provides the financial activity of BVM Management from 2011 to 2014.

| BVM Management Company Inc.<br>Underwriter: David Goble | . Prepared | | Co. Prepared | | Co. Prepared | | Co. Prepared | |
|---|---|---|---|---|---|---|---|---|
| Tax Status: Tax Exempt (not for profit) | # of Mos. | | # of Mos. | | # of Mos. | | # of Mos. | |
| ($000s) | 12 | | 12 | | 12 | | 12 | |
| **Income Statement** | 08/31/11 | % | 08/31/12 | % | 08/31/13 | % | 08/31/14 | % |
| Sales | $38,810 | 100% | $39,580 | 100% | $41,169 | 100% | $27,355 | 100% |
| COGS | $0 | 0% | $0 | 0% | $0 | 0% | $0 | 0% |
| *Gross Profit* | *$38,810* | 100% | *$39,580* | 100% | *$41,169* | 100% | *$27,355* | 100% |
| Operating Expenses | $34,678 | 89% | $35,263 | 89% | $35,360 | 86% | $20,444 | 75% |
| Depreciation/Amortization Expense | $864 | 2% | $864 | 2% | $845 | 2% | $1,071 | 4% |
| *Total Operating Expenses* | *$35,541* | 92% | *$36,127* | 91% | *$36,205* | 88% | *$21,515* | 79% |
| *Net Operating Profit* | *$3,269* | 8% | *$3,453* | 9% | *$4,965* | 12% | *$5,840* | 21% |
| Interest Expense | $1,396 | 4% | $1,355 | 3% | $1,333 | 3% | $2,245 | 8% |
| *Net Profit* | *$1,873* | 5% | *$2,098* | 5% | *$3,632* | 9% | *$3,595* | 13% |
| Dividends ( - ) & Contributions ( + ) | $0 | | $0 | | $0 | | $0 | |
| | | | | | | | | |
| **Balance Sheet** | | % | | % | | % | | % |
| Cash | $3,536 | 8% | $3,572 | 8% | $1,787 | 4% | $1,204 | 2% |
| Accounts Receivable | $907 | 2% | $1,207 | 3% | $1,075 | 2% | $1,877 | 4% |
| Other Current Assets | $810 | 2% | $1,310 | 3% | $781 | 2% | $487 | 1% |
| *Current Assets* | *$5,253* | 11% | *$6,089* | 13% | *$3,643* | 8% | *$3,568* | 7% |
| Net Fixed Assets | $41,689 | 89% | $40,826 | 87% | $40,160 | 92% | $47,723 | 93% |
| *Total Assets* | *$46,942* | 100% | *$46,915* | 100% | *$43,803* | 100% | *$51,291* | 100% |
| CPLTD | $3,813 | 8% | $3,791 | 8% | $3,813 | 9% | $2,605 | 5% |
| Accounts Payable | $748 | 2% | $1,468 | 3% | $987 | 2% | $1,211 | 2% |
| Other Current Liabilities | $1,598 | 3% | $1,282 | 3% | $277 | 1% | $205 | 0% |
| *Current Liabilities* | *$6,159* | 13% | *$6,541* | 14% | *$5,077* | 12% | *$4,021* | 8% |
| Long Term Debt | $38,994 | 83% | $37,634 | 80% | $34,674 | 79% | $41,762 | 81% |
| *Total Liabilities* | *$45,153* | 96% | *$44,175* | 94% | *$39,751* | 91% | *$45,783* | 89% |
| *Net Worth* | *$1,789* | 4% | *$2,740* | 6% | *$4,052* | 9% | *$5,508* | 11% |
| | | | | | | | | |
| **Key Financial Ratios** | | | | | | | | |
| Current Ratio | 0.85 | | 0.93 | | 0.72 | | 0.89 | |
| Debt/Net Worth | 25.24 | | 16.12 | | 9.81 | | 8.31 | |
| Senior Debt/Tangible Capital Funds | 25.24 | | 16.12 | | 9.81 | | 8.31 | |
| Interest Coverage Ratio | 2.34 | | 2.55 | | 3.72 | | 2.60 | |
| A/R Days | 8.53 | | 11.13 | | 9.53 | | 25.05 | |
| Sales Growth | N/A | | 1.98% | | 4.02% | | -33.56% | |
| Sustainable Sales Growth | -111.97% | | -120.41% | | -110.23% | | -111.93% | |
| Gross Profit Margin | 100.00% | | 100.00% | | 100.00% | | 100.00% | |
| Net Operating Profit Margin | 8.42% | | 8.72% | | 12.06% | | 21.35% | |
| Net Profit Margin | 4.83% | | 5.30% | | 8.82% | | 13.14% | |
| | | | | | | | | |
| **Cash Flow** | | | | | | | | |
| Net Income | $1,873 | | $2,098 | | $3,632 | | $3,595 | |
| Depreciation Expense | $864 | | $864 | | $845 | | $1,071 | |
| Interest Expense | $1,396 | | $1,355 | | $1,333 | | $2,245 | |
| *Cash Available for Debt Service (CADS)* | *$4,132* | | *$4,316* | | *$5,809* | | *$6,911* | |
| *CADS Pro-Rated for Ownership* | *$4,132* | 100% | *$4,316* | 100% | *$5,809* | 100% | *$6,911* | 100% |
| | | | | | | | | |
| 1) USAB loan | $1,190 | | $1,190 | | $1,190 | | $1,190 | |
| 2) Other debt ($27MM bal, 5%, 20-year) | $2,138 | | $2,138 | | $2,138 | | $2,138 | |
| *Debt Service* | *$3,328* | | *$3,328* | | *$3,328* | | *$3,328* | |
| *Debt Service Pro-Rated for Ownership* | *$3,328* | | *$3,328* | | *$3,328* | | *$3,328* | |

## GLOBAL CASH FLOW ANALYSIS

Due to the lack of individual guarantors and long-term financial operating history for the subject property, a relevant global cash flow could not be provided. However, the sole Guarantor has exhibited strong cash flows for several years, and the subject property has performed very well since the loan was originated.

## SUMMARY
### Strengths
- The cash flow of both the Borrower and Guarantor are strong.
- The new management company is already making improvements by better controlling expenses.
- Guarantors has significant experience owning and managing ALF/SNF properties.

### Risks & Mitigating Factors
- The ongoing litigation between the OIR and Westport Holdings Tampa could eventually pull Westport Nursing into the litigation. This risk of Westport Nursing getting dragged into the litigation is mitigated by each of the legal documents in the dispute clearly states the defendant is Westport Holdings Tampa.
- The loan could possibly not be repaid on or before the 3/31/2016 maturity date due to inability to complete the HUD refinancing in a timely manner. This risk is mitigated by the Borrower should be able to provide a full calendar year of financials for refinance purposes, and the borrower is using the same bond underwriter that is working on a deal to pay off the USAB debt.
- The ILF could still be experiencing significant financial issues that could cause the litigation with the OIR to continue indefinitely and prohibit the ability of Borrower to refinance the USAB loan or sell the property. This risk is somewhat mitigated by the offers were about $38MM one year ago, which is significantly higher than the approximately $21MM needed to retire both loans.

### Grade Change Recommendations
- While the underlying property cash flows are strong so far and the Guarantor has significant cash flow/net worth, the ongoing dispute with the OIR with the affiliate of the Borrower continues to put a cloud of uncertainty on this loan. Until the litigation is completely resolved, the loan grade should be downgraded from a 4 to a 5.

### Attachments:
- Borrower Grade Criteria and Characteristics Worksheet – Westport Nursing Tampa, LLC
- Guarantor Grade Criteria Worksheet – BVM Management, Inc.

*Prepared By: David Goble/Commercial Credit Underwriter*