Filing # 27878727 E-Filed 05/29/2015 04:05:35 PM

UV-depo of Kathy Burkholder.txt

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR LEON COUNTY

State of Florida, ex rel., the
Department of Financial Services
of the State of Florida,

      Relator,

vs.                       CASE NO.:   2015-CA-0585

WESTPORT HOLDINGS TAMPA, LIMITED
PARTNERSHIP d/b/a University
Village, a Delaware limited
partnership licensed as a
continuing care retirement
community in the State of Florida,

      Respondent.
_____/

| | |
|---|---|
| DEPOSITION OF: | KATHLEEN BURKHOLDER |
| DATE: | April 24, 2015 |
| TIME: | 11:17 a.m. - 1:37 p.m. |
| PLACE: | Allen Dell<br>202 S. Rome Avenue<br>Tampa, Florida 33606 |
| PURSUANT TO: | Notice by counsel for Relator for purposes of discovery, use at trial or such other purposes as are permitted under the Florida Rules of Civil Procedure |
| BEFORE: | Rishelle M. Meier, RMR<br>Notary Public<br>State of Florida at Large |
| | Pages 1 - 97 |

PLAINTIFF'S EXHIBIT
188
tabbies

UV-depo of Kathy Burkholder.txt

APPEARANCES:

    TIMOTHY L. NEWHALL, ESQUIRE
    Deputy Chief Attorney
    Florida Department of Financial Services
    Division of Rehabilitation and Liquidation
    2020 Capital Circle SE
    Suite 310
    Tallahassee, Florida 32301
    (850) 413-4408
        Attorney for Relator

    ANNA G. SMALL, ESQUIRE
    Allen Dell
    202 S. Rome Avenue
    Suite 100
    Tampa, Florida 33606
    (813) 223-5351
    and
    (By telephone)
    M. STEPHEN TURNER, ESQUIRE
    WENDY WIENER, ESQUIRE
    Broad and Cassel
    215 S. Monroe Street
    Suite 400
    Tallahassee, Florida 32301
    (850) 681-6810
        Attorneys for Respondent

INDEX

| | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. NEWHALL | 3 |
| CROSS-EXAMINATION BY MR. TURNER | 74 |
| REDIRECT EXAMINATION BY MR. NEWHALL | 86 |
| RECROSS-EXAMINATION BY MR. TURNER | 90 |
| CERTIFICATE OF OATH | 94 |
| REPORTER'S CERTIFICATE | 95 |
| READ AND SIGN LETTER | 96 |
| ERRATA | 97 |

EXHIBITS

| | ID'd |
|---|---|
| 1 - Copy of Loan Closing Statement | 28 |
| 2 - Copy of MLR Calculation of Westport Holdings Tampa | 56 |

3

UV-depo of Kathy Burkholder.txt

KATHLEEN BURKHOLDER,

the witness herein, being first duly sworn on oath was

examined and deposed as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. NEWHALL:

Q.  Would you tell us your full name, please, ma'am.

A.  Kathleen Burkholder.

Q.  All right.  Do you go by "Kathy"?

A.  Yes, I go by "Kathy".

Q.  Okay.  Kathy -- or Mrs. Buckholder -- where -- where do you reside?  In what city?

A.  I live in Largo, Florida.

Q.  Okay.  And do you also work in the Tampa Bay area?

A.  Yes.

Q.  And where do you --

A.  I work in Tampa.

Q.  Where do you work?

A.  At University Village.

Q.  Okay.  Do you have any plans next Wednesday, I believe it is, April 29th to be within a hundred miles of the Leon County Courthouse?

A.  I have not been asked to do that, so I didn't have any plans to do that.

Q.  Okay.  Fair enough.  I'm not asking, by the way.

4

A.  Okay.

UV-depo of Kathy Burkholder.txt

Q.   I'm not asking you to come.  I was asking you if you had any plans to come.

A.   Okay.

Q.   What is your position at University Village?

A.   I'm the CFO there at University Village.

Q.   When we talk about University Village, what are we referring to?

A.   The legal entity name is Westport Holdings Tampa, Limited Partnership.

Q.   Okay.  And do you know what a CCRC or a continuing care retirement community is?

A.   Yes, I do.

Q.   Is -- is it your understanding that University Village, as you've just named it, is a CCRC or at least part of a CCRC?

A.   Yes.

Q.   Okay.  What is the physical address of the independent living facility at University Village?

A.   It's 12401 North 22nd Street, Tampa, Florida 33612.

Q.   And is there an adjacent assisted living facility and skilled nursing facility or nursing home?

A.   Yes.  It's across the street from our community.

Q.   And do you know what the physical address is

5

there?

A.   Yeah.  It's 12250 North 22nd Street --

UV-depo of Kathy Burkholder.txt

Q. Okay.

A. -- Tampa.

Q. Okay. And are both the independent living facility and the nursing facility in one building?

A. No. They're in separate buildings.

Q. Okay. Adjacent to each other?

A. There -- there's a street. 22nd Street is in between the independent living and the nursing center and the assisted living.

Q. Are you -- as CFO, currently do you have any responsibilities over the nursing facility and the assisted living facility --

A. Not any longer. I did for a short period of time --

Q. Okay.

A. -- but then those duties were taken away.

Q. Over what period of time were you also responsible for the skilled nursing facility and the assisted living facility?

A. Since the sale, I took over responsibilities in July of 2014, and then in October 2014 I -- those duties were taken away and were given, I guess, to the BVM Management team.

6

Q. Okay. How long have you been employed with University Village all told?

A. I have been out at the community since 1997. I

UV-depo of Kathy Burkholder.txt

worked for the management company, the -- the original owner prior to that for 10 years prior. So I really started with the organization back in 1986.

Q. Okay. And who was the initial owner?

A. Dave Veltman.

Q. And that's who you worked for?

A. I worked for him at the management company, yes.

Q. Okay. And when you say management company --

A. It was --

Q. -- can you tell us what you mean?

A. -- Southern Management, and they were the management company for University Village and other communities as well.

Q. Okay. Did -- did that company also manage -- did it manage all aspects of the CCRC or did it just manage one or another?

A. All aspects of it. The whole nursing center, assisted living and independent living. They managed all of it.

Q. Okay. How long -- I'm taking -- I'm guessing that University Village has been in operation as a CCRC since 1986?

7

A. '88. '88 is when the independent living opened.

Q. Okay.

A. I think the skilled nursing opened in '86 --

Q. Okay.

UV-depo of Kathy Burkholder.txt

A.   -- so that opened first.

Q.   Okay.  And you worked for the management company for approximately 10 years?

A.   Mm-hmm.  Yes.

Q.   And during that 10-year period did your duties involve all aspects -- the independent living facility, the skilled nursing facility and the assisted living facility -- or just one or another part?

A.   I did the general ledger work for all of it.  The independent living, the nursing center, assisted living.  I was not -- you know, I was the general ledger accountant back then when I worked for the management company.

Q.   Okay.  And when did your -- you've been with the -- with University Village for a long time but with different employers.  When did your employment or your employer change?

A.   I came out to University Village as the director of accounting in 1997.

Q.   Okay.

A.   I believe it was September of 1997.

Q.   And how long did you hold the position of director

8

of accounting?

A.   Until about a year ago I was promoted to chief financial officer.  So I was the director of accounting for the whole campus up until they decided to lease out the nursing center/assisted living to a not-for-profit

UV-depo of Kathy Burkholder.txt

organization, and that occurred in 2002.

Q. Okay. As director of accounting starting in 1997, you were responsible for the accounting for the entire facility that included the independent living facility, the skilled nursing facility and the assisted living facility?

A. Yes. That's correct.

Q. Okay. I'm going to throughout this deposition resist the temptation to save time by using terms like -- and not use terms like TALF and SNF and things like that, just so that I'm clear.

A. Okay.

Q. Okay? I probably would confuse no one except myself, but I try to avoid that.

From 1997 until 2002 I believe you said --

A. Mm-hmm.

Q. -- what was the ownership structure of University Village?

A. It was all one community. I mean, there wasn't -- you know, the independent living and the assisted living and skilled nursing were all under the same

9

ownership --

Q. Okay.

A. -- as a CCRC.

Q. What is your understanding of what a CCRC is since we're using the term?

A. It's a continuing care retirement community, which

UV-depo of Kathy Burkholder.txt

means it starts out with independent living and then the residents move through the continuum to assisted living if they need and then to skilled nursing if that's necessary for their care.

Q.   I assume the idea is that assuming they can meet the financial obligations of entry into the facility that they're guaranteed an appropriate level of care provided the facility can provide it?

A.   That's correct.  I mean that's all in their contract.  They pay an entrance fee to come in, and they will get all levels of the continuing of care that they need, whether it's independent, assisted or skilled nursing.

Q.   Okay.  When did the -- you were working for the management company then initially --

A.   Mm-hmm.

Q.   -- at least before 1997.

A.   Correct.

Q.   Okay.  In 1997 when you became employed by University Village who was the actual owner of it?

10

A.   At the time it was still Dave Veltman-owned with I think -- I believe he had a couple other partners, but he was the main partner.  He was the general partner.  And then he sold the community in 1999 to Westport Senior Living Investment Fund.

Q.   Okay.  And that was Larry Landry?

A.   Larry Landry's group, yes.  Mm-hmm.

UV-depo of Kathy Burkholder.txt

Q. When Mr. Landry came in in 1999 was there any change in the structure of --

A. Of the --

Q. -- of the community?

A. No. Everything remained the same structure.

Q. Okay. And, you know, without getting into too much detail, what was the structure at that time, as you understood it to be?

A. It was all as one company. It -- there was two different Federal Tax ID numbers for the skilled nursing center, but they were subsidiaries of each other. So you had, you know, independent living University Village, which became Westport Holdings Tampa. Subsidiary of that was Westport Nursing which included the assisted living and the skilled nursing. So it was a subsidiary of Westport Holdings.

Q. And by subsidiary do you mean to indicate that the skilled nursing center and the assisted living

11

facility -- and they were owned by an entity known as Westport Tampa or Westport Nursing Tampa? Is that --

A. That's the legal entity name was Westport Nursing Tampa, LLC, and it was a subsidiary of Westport Holdings Tampa.

Q. Okay. So essentially Westport Holdings Tampa owned the legal entity that owned the skilled nursing facility and the assisted living facility.

UV-depo of Kathy Burkholder.txt

A.   Yes.  It was all under one structure.  Mm-hmm.

Q.   Okay.  I think you mentioned there was a change in 2002.  What -- what was that change?

A.   The -- they wanted to lease out the operations of the skilled nursing and the assisted living to a not-for-profit entity because they were getting -- a lot of lawsuits were going on and the ownership Westport Senior Living did not want to be, you know, vulnerable to any lawsuits.  So they decided to bring in an operator not-for-profit to do all of the operations of the skilled nursing and assisted living and they would just be the landlord and collect a lease payment from them.

Q.   Okay.  Did they form -- did they -- were legal entities -- non-profit entities formed to be the lessees of the skilled nursing center and the assisted living facility?

A.   Yes.

Q.   And do you recall the names of those non-profit

12

entities?

A.   It was TR & SNF, Inc. for the skilled nursing which --

Q.   TR kind of ampersand?

A.   That's correct.

Q.   All right.

A.   Ampersand, and then --

Q.   And then an SNF --

A.   -- for --

Page 11

UV-depo of Kathy Burkholder.txt

Q.  -- Inc?

A.  -- skilled nursing.  Right.  Inc.

Q.  Okay.  Skilled -- that's the skilled nursing center.

A.  And then the assisted living was TALF, Inc.

Q.  The ALF being -- I'm cleverly assuming that was assisted living facility?

A.  Yes.

Q.  Okay.

A.  Yes.

Q.  And it was T-A-L-F or TALF, Inc.

A.  Mm-hmm.

Q.  Okay.  So the structure, was that Westport Nursing Tampa at that time instead of owning the -- I guess the nursing center and the skilled -- the skilled nursing center and the assisted living facility that leased them to these

13

entities.

A.  They leased out the operations.  They were still the landlord.  They collected a lease payment and at the time they were still a subsidiary of Westport Holdings.

Q.  Okay.  Do you remember -- and, really, I'm testing your memory --

A.  Mm-hmm.

Q.  -- but do you remember what the annual rent or the monthly rent, however it was broken down, that was paid by TR & SNF, Inc. and TALF, Inc. --

UV-depo of Kathy Burkholder.txt

A.   In the --

Q.   -- back in 2002?

A.   Well, in the beginning they knew they had to get off their feet.  So the -- the base rent was very low.  I think they even forgave it the first year.  It ramped itself up I'm thinking it was like 25,000 a month.  Went to 30, 35 and then on up, and then it got to 75,000 a month base rent and it stayed there --

Q.   Mm-hmm.

A.   -- throughout the time that -- before the sale occurred.

Q.   Can you recall approximately how long the base rent paid by the skilled nursing facility and the assisted living facility was $75,000 a month?

A.   I believe that went back to 2007.  Possibly

14

2006.  But I know in 2007 it was when it went to 75,000 and remained that for -- now, that was the base rent.  There could be additional rents based on the lease, based on their revenue and based on their cash flow.

Q.   Okay.  Okay.  So but you call it the base rent.

A.   Mm-hmm.

Q.   So $75,000 a month, was that $900,000 a year?

A.   Yes.

Q.   As the director of accounting at that time, do you remember how that -- that rental income was accounted for?

A.   It was a -- a check would come to us for the lease

Page 13

UV-depo of Kathy Burkholder.txt

every month and deposited in Westport Nursing Tampa.

Q.   And what was done with those funds?  Pay the mortgage or --

A.   Yeah.  It went into operations just like all the rest of the monies.  It wasn't separated out or anything.  It was put in with all the monies from Westport Holdings as well.  So it would either go for mortgage or whatever other bill needed to be paid.

Q.   Okay.  So if I understand you correctly, then, that the rental income was used for more than just for -- for expenses other than just paying the mortgage.

A.   Yeah.  It wasn't solely identified for just the mortgage.

Q.   Okay.

15

A.   That was not.

Q.   Okay.  We've talked about a sale, and it's my understanding that there was another change in ownership of University Village in around perhaps March or April of 2014.

A.   Yeah.  I think it was either March 31st or April 1st when it all transpired.

Q.   Okay.  And do you recall at that point in time who became the new owner of University Village?

A.   From what I understood, it was just the investors changed.  That it wasn't a true asset sale.  It was just new investors came in and stepped into the shoes of the old investors who wanted to -- in essence, no longer wanted to be

UV-depo of Kathy Burkholder.txt

investors in University Village anymore.

Q. Okay. And as --

MR. TURNER: Excuse me just a second. This is Stephen Turner. I just wanted to announce my appearance here to the court reporter.

MR. NEWHALL: Hey, Steve.

MR. TURNER: Excuse me. I appreciate it, Tim. Thank you.

(Brief discussion off the record).

BY MR. NEWHALL:

Q. When this -- the sale occurred, what was your understanding of who the new owner or owners of University Village was?

16

A. Well, I know BVM came in and announced themselves as the new owner. And I had also had met Kevin Angelis. Other than that, I had not met any other partners. I believe them at the time to be silent partners because I really had no interaction with them. Most of my interaction was with BVM.

Q. Okay. And BVM is BVM Management? Is that the right entity?

A. There is BVM Management, yes. And so it was John Bartle, Lou Jackson, Jared McCowan and Cassidy McCowan were the ones who were in the community and their faces is who everyone saw.

Q. Okay. And you remained the director of accounting

UV-depo of Kathy Burkholder.txt

in charge of the whole facility until when?

A. I -- I was still in charge of Westport Nursing even though we were just the landlord. So I had been that. That didn't change at all. And then -- but the operations for TR & SNF and TALF, I wasn't involved with that until July of 2014 when they asked me to also oversee the operations of the nursing center/assisted living.

Q. And by overseeing the operations of the assisted living facility and the nursing facility, what exactly were you doing?

A. I was overseeing the accounting for the billing, the payables, creating the financial statements. I was in

17

the process of switching them over to our software system. That was the intent that was to be made. They -- once the old -- you know, the ownership of TR & SNF and TALF left, we weren't using their software so we needed to get onto new software, and it was a decision made to come onto the software I was using at the independent living. So I was in the process of working on that for them.

Q. Okay. So I -- as I understand it, then, for at least a period of some months there was a -- sort of a unified accounting system where the independent living facility, the skilled nursing facility and the assisted living facility were all, you know, being accounted or you were doing their accounting --

A. Yes.

UV-depo of Kathy Burkholder.txt

Q.   -- through a unified system.

A.   That's correct.   I was -- I was overseeing all aspects of the accounting functions for a few months.

Q.   Okay.   And how long did that last?

A.   Till about October of 2014.

Q.   And what changed in October of 2014?

A.   John Bartle just pulled me into a meeting and said that he had decided that I would no longer be responsible for the financial records or overseeing anything for the nursing center and the assisted living and that, you know, that would be handled at BVM.

18

Q.   Okay.   Did he indicate to you why?

A.   He did not.

Q.   And is this when your job title changed?

A.   They never changed my job title.   I -- so I'm still the CFO, so nothing -- nothing changed other than he, you know, didn't want me to do the TR & SNF and TALF --

Q.   Okay.

A.   -- financials or any accounting anymore.   He wanted that done up at BVM Management.

Q.   Okay.   As of October of 2014, at least until you no longer had any responsibility for accounting for the skilled nursing facility or the assisted living facility, can you recall what the -- their aged accounts payables were? And by "they", I mean the skilled nursing facility and the assisted living facility.

UV-depo of Kathy Burkholder.txt

A.   They had taken over from the previous owner it was probably about 700,000 in payables. So that's what they inherited. And then over the few months that I was there the payables did grow. I don't have an exact amount. We -- I was still in the process of trying to get everything reconciled into our software before that stopped. But I know the payables were growing because we weren't paying our current bills -- not all the current bills either.

Q.   And was there a reason that you were aware of why the current bills were not being paid?

19

A.   I wasn't in charge of the cash. The cash was being handled up at BVM. And all I knew was there wasn't a lot of money, according to them, to pay some of the bills. We -- we definitely paid payroll. We had to pay the electricity, some of the utilities, and for a few months that was about all that got paid. A few other little pieces here and there, but other than that that's all that was paid.

Q.   What about any health insurance premiums for the employees of the skilled nursing facility or assisted living facility?

A.   At the time I was doing it the health insurance was an automatic withdrawal from the bank, so that was being paid. I know their last payment, which was September of 2014, they had that come off of an automatic payment and that was to be paid by a check, which has not been paid. I actually did get a call just a day or two ago. They were

UV-depo of Kathy Burkholder.txt

still looking for payment.

Q. Okay. And health insurance, is this Blue Cross/Blue Shield? Is that who -- the carrier that provides the insurance?

A. That is as of 10/1. This was -- as of September was Aetna. So Aet -- the insurance changes on 10/1. That's -- we don't go by a calendar year. So Blue Cross/Blue Shield is the insurance carrier that we have now.

20

Q. Okay. So when you were talking about, I guess, the September premium payment that was not made was that to be paid to Aetna?

A. That was to be paid to Aetna.

Q. Okay.

A. That's correct.

Q. And do you know why the decision was made to take the health insurance -- employee health insurance premium payment off of an automatic pay?

A. I was instructed to do that by John Bartle and Sandy Guion. I do not know why. I think they were -- I think they were trying to close out their bank accounts and switch them over is what the intent was for.

Q. Okay. Are you just guessing at that or is that what you were told?

A. That's what I recall.

Q. Okay.

UV-depo of Kathy Burkholder.txt

A.   And that's what I was told, so yeah.

Q.   Do you know one way or the other if that last -- or that September 2014 premium payment to Aetna was ever made?

A.   No, it has not been made.  They just contacted me yesterday or the day before and they were looking for payment.  So I did give them John's phone number.

Q.   And was there any failure of Aetna, as far as

21

you're aware, to do what they were supposed to under the policy?  Were they not paying claims they should have paid?

A.   Not to my knowledge.

Q.   Were you aware of any dissatisfaction or any dispute between Mr. Bartle or anybody else connected with University Village and Aetna over the health insurance?

A.   Not to my knowledge.

Q.   Do you know what the amount of that unpaid premium is?

A.   Approximately 70,000.

Q.   During the time that you remained responsible up until approximately October of 2014 that you remained responsible for accounting for the assisted living facility and the skilled nursing facility, did the rent -- do you know how much the annual -- the monthly or annual rent was?

A.   The -- are you talking about the lease payment?

Q.   Yes.  The rental payments for -- for the assisted living facility and the skilled nursing facility.

UV-depo of Kathy Burkholder.txt

A.   Well, I still do the books for Westport Nursing, so I do know what that is.  It was originally supposed to go up to $208,333 a month immediately.  However, for the first five months they forgave some of that and so it was a hundred thousand that was paid for the first five months.  And then as of October the premium -- I mean the lease payment went up to the 208,000 and change per month.

22

Q.   Was there a new lease agreement that was entered between Westport Nursing Tampa and the skilled nursing facility and the assisted living facility?

A.   From what I understand, there is a new lease.  I did not see that at the time --

Q.   Okay.

A.   -- this occurred.  I was told that this is just what the lease payment structure was going to be.

Q.   Do you know what the -- the annual -- is there any escalation clause in the lease, as you understand it, if you know?

A.   I -- I don't know.  I haven't seen the lease to know if that's supposed to escalate over -- over time.

Q.   Okay.  You still do the accounting for Westport Nursing; is that correct?

A.   Yes.

Q.   Okay.  When Westport Nursing receives the rental payments, what does it do with those payments?  What -- how is the money handled?

UV-depo of Kathy Burkholder.txt

A.    They put the money into -- into the bank up in New York. I don't handle their bank accounts, but I do see them. And they pay their mortgage payment from that, which is about 98,000 a month.

Q.    Okay.

A.    And then starting in October they paid

23

distributions to the four partners.

Q.    Okay.

A.    A total of a hundred thousand per month in distributions.

Q.    To your knowledge have distributions been made to the limited partners every month since October of 2014?

A.    Every month except for I did not see that in March. I didn't see any distribution in March's statements.

Q.    To your knowledge, ma'am, are the rental payments received by Westport Holdings Tampa currently being used for payment of any operating expense other than the mortgage?

A.    No. Unless there's any legal issues that need to be paid, no operations. It's not tied in with Westport Holdings at all --

Q.    Okay.

A.    -- for our operations.

Q.    To your knowledge was -- did Westport Holdings Tampa sell Westport Nursing Tampa to some other entity?

A.    Well, when the sale occurred they told me that they were just going to step into the shoes of the investors

UV-depo of Kathy Burkholder.txt

and that nothing was supposed to change.  However, now, you know, we see the structure that Westport Nursing is no longer a subsidiary of Westport Holdings.

Q.   Okay.  To your knowledge, if you know -- okay? -- I can only --

24

A.   Okay.

Q.   -- ask you for things you know.  To your knowledge, does Westport Holdings and Westport Nursing have common ownership?

A.   Yes.

Q.   Okay.  The same limited partners?

A.   Same limited partners.  Different percentages.

Q.   Okay.  Limited partnership percentages are different among the four?

A.   Among Westport Holdings and Westport Nursing, yes.

Q.   Okay.  Are you aware of what the aged account payables are for the assisted living facility and the skilled nursing facility presently?

A.   I am not sure of that amount at all because they have used our software for some things and paid things out of BVM that might not have reduced payables.  I don't know if all the payables are in.  So I really could not say what I would think that the payable balance is to this -- to this date.

Q.   Is that unusual for -- for you since your -- you have the title of CFO at least for some facility and you

UV-depo of Kathy Burkholder.txt

handle the accounting for Westport Nursing Tampa. I mean is it unusual that you don't see all the records and the books?

A. It's very unusual for me. It's very unusual to have payables being paid out of multiple software systems,

25

multiple bank accounts. So I'm -- yeah, I'm not used to that. I'm used to, you know, having your software in one place and all your records accountable in one place so --

Q. Okay. Who is responsible for paying the accounts payable at Westport Nursing Tampa, if you know?

A. Well, are you speaking Westport Nursing Tampa or the lessee TR & SNF and TALF?

Q. Well, I guess I'm speaking of the lessees. The operators.

A. To my knowledge, the payables are done through BVM Management.

Q. Let me -- one thing I guess I need to clear up -- and we're talking about these rental payments being made by the assisted living facility and the skilled nursing facility. We're talking about a monthly figure. Is it -- is that monthly figure paid by both of these entities combined or is it paid by each one paying that amount?

A. It's a combined payment. How they make the payments, I don't -- if that's in two payments, I'm not sure of that.

Q. Okay. When -- let's go back to when was your -- I guess your -- I guess as director of accounting you would

UV-depo of Kathy Burkholder.txt

have been fairly attuned to changes in ownership of the company. I'm assuming that. Maybe it's not the case. When did you have some inkling that the -- there was going to be a

26

change in ownership?

A. When I knew there would be a possible sale?

Q. We're talking about back in -- yeah -- within the past couple of years.

A. The community's been up for sale for many years as far back as 2006. They did sell our sister community then, and they did not sell University Village but they had it on the market for many years. And then the real estate market kind of crashed, made it very difficult to sell, and the value of the community was declining. And the investors in Westport Senior Living wanted to get out. They didn't -- they didn't want to have any more liabilities. They actually said they would turn the keys over to the bank.

So the bank actually had come in and was doing their due diligence to take over the community, but then the ownership with BVM and the other partners, they came in at the last minute and were able to refinance the loan and take over the ownership of the community.

Q. You're -- and this was -- I guess this all kind of -- all of this would have been in the works prior to March 31st or April 1st of 2014.

A. Right. This -- it was probably in 2013 a lot of that was heating up between the bank and the current

UV-depo of Kathy Burkholder.txt

ownership trying to purchase the community.

    Q.  Okay. Who was the bank that was coming in to take

27

over at that point?

    A.  It was with Horizon. Horizon -- I'm not sure of the exact name. But that was our lender. Horizon actually bought our note from Capmark because Capmark was our mortgage holder and they were selling off all of their -- their notes.

    Q.  You mentioned that the new buyer was able to -- to refinance. Was there just one loan to refinance the whole facility or was there more than one loan?

    A.  There was two separate loans. One for Westport Holdings and one for Westport Nursing Tampa.

    Q.  Okay. The loan for Westport Holdings Tampa was -- was that CPIF?

    A.  CPIF Lending. Mm-hmm.

    Q.  Okay. And do you know the amount of that?

    A.  The loan was for 9 and a half million.

    Q.  Okay. And that was just to retire -- I guess refinance -- retire the old debt and refinance the independent living facility?

    A.  Yes. They had to do it together because there was actually a higher note on Westport Holdings. It was a little under 12 million. And so when they refinanced they had to pay off the two notes with Horizon between USAmeriBank and CPIF Lending because they wanted to put higher debt over on Westport Nursing. So they reduced Westport Holdings from a

UV-depo of Kathy Burkholder.txt

little under 12 million to 9 and a half, and Westport Nursing

28

went from about 8 million to 15 million.

Q.   Was the -- the combined -- I think you mentioned a figure of 12 million dollars. Was that the combined debt on the independent living facility, the skilled nursing facility and the assisted living facility prior to the sale?

A.   No.  That was just on Westport Holdings, the 12 million.  There was 8 million on Westport Nursing --

Q.   Okay.

A.   -- prior.

Q.   And do you know who the lender was for Westport Nursing at that time?

A.   It was Horizon as well.

Q.   Okay.  All right.  Are you -- were you familiar with the -- well, strike that.

Let me just try to find this thing.  Bear with me.

A.   That's okay.

Q.   Let me show you what we're going to mark as Exhibit 1 for your deposition.

MR. NEWHALL:  And I'll put a 1 there for you.

BY MR. NEWHALL:

Q.   And just ask you if you can recognize that.

A.   Okay.  Yes.  This is the closing statement for CPIF Lending's loan.

MS. SMALL:  Can I interrupt for a second?

MR. NEWHALL:  Sure.

UV-depo of Kathy Burkholder.txt

29

MS. SMALL: Steve, do you need a copy of this?

MR. TURNER: I'll try to follow the dialogue. If I do -- if I can't follow, I'll let you know.

MR. NEWHALL: I don't mind if you want to just scan it and email it to him.

Ms. SMALL: I can scan it in and shoot it to you in an email, Steve.

MR. TURNER: That's fine.

MS. SMALL: All right.

MR. TURNER: If it's easy for you.

MS. SMALL: Yeah, it's not -- it's no problem. All right. we'll just go off the record for a second.

MR. TURNER: Go ahead with the depo. You know, let somebody do it.

MR. NEWHALL: No. Anna --

MS. SMALL: Yeah, yeah. I will.

MR. NEWHALL: Well, I'll wait until Anna gets back.

MS. SMALL: I'm just going to step out of the room and give it to the assistant. I'll be right back.

MR. TURNER: I'm trying to avoid interruptions, so just go ahead and -- and talk to her about it while Anna's -- somebody's doing that for you.

(Brief discussion off the record).

MS. SMALL: Okay, Steve. I'll send it to you.

UV-depo of Kathy Burkholder.txt

30

BY MR. NEWHALL:

Q.   Okay.  Ma'am, have you seen Exhibit 1 before today?  Are you generally familiar with it?

A.   Yes, I am familiar with it.

Q.   And how are you familiar with it?

A.   I recorded all the entries from the closing on our books.

Q.   There is a -- the closing statement reflects a figure of 1.75 million dollars.  Can you tell me what that represents?

A.   It was set up for a capital expenditure reserve for us so that we could proceed with doing a lot of renovations in the community.  That was the purpose of it.

Q.   Okay.  And was it a condition of this lender making this loan that that money be used for renovations on the property?

A.   Yes.  I could only use it for renovations on the properties.  For no other reason.

Q.   And is this mortgage 9 and a half million dollars the obligation of West Port Holdings Tampa d/b/a University Village?

A.   Yes, it is.

Q.   Has that 1.75 million dollars been used for improvements on the premises at University Village?

A.   I was only allowed to use a portion of it.  We

UV-depo of Kathy Burkholder.txt

31

could use 250,000 in the beginning and after the 250,000 I had to reserve 400,000 into like a debt reserve -- that was per the lender -- before I could tap into any more of the money. That was done in August. The reserve was set aside, 400,000, and --

Q. Was -- I'm sorry. Go ahead.

A. Okay. So once the reserve was out there I could tap into the money again. I started to. I got to approximately 380,000 total drawdown before a million dollars was used to -- as collateral for two other communities, so I could no longer tap into that money.

Q. Okay. Westport Holdings Tampa has to make the payments on the full amount of this mortgage, this 9 and a half million dollars. Correct?

A. That's correct.

Q. What -- the separate 400,000 that was taken out, was that sort of after closing a change in condition? I'm not following that.

A. It was a stipulation as part of the loan agreement. So we had time to do that from April 1 through August. So I had till the end of August to set aside 400,000. That was in the loan agreement with CPIF Lending.

Q. And that money was to be -- that 400,000 was to be used for what?

A. I'm using it as a debt service reserve for the

UV-depo of Kathy Burkholder.txt

loan.

Q. Okay. Debt service meaning in case payments are missed that can be accessed by the lender to make up for any missed payments?

A. That's my knowledge, yes.

Q. Okay. Now, the million dollars that was taken out, do you know is that for some other obligation of University Village?

A. Not of University Village, no.

Q. What was -- first of all, who -- do you know who or what took that million dollars out of the 1.75 million dollar reserve for construction?

A. That was done from John Bartle and I'm not sure what other parties were involved. And they used it as collateral for the Bridges and Coral Landings, which is two other properties that BVM is -- owns, manages. Not exactly sure of their structure. But they used this money in order to close on two other properties.

Q. Okay. Does Westport Holdings Tampa or University Village or d/b/a University Village have any interest at all, to your knowledge, in Coral Landings or the Bridges?

A. Not to my knowledge, no.

Q. Has that million dollars been taken off of the obligation that Westport Holdings Tampa has to CPIF to repay

UV-depo of Kathy Burkholder.txt

33

the loan?

A.   No, it has not.

Q.   Ma'am, are you familiar with something known as the PIP account?

A.   Yes, I am.

Q.   What -- you know, when I think of PIP, I think of P-I-P, it's personal injury protection that has to do with automobile insurance.  What is it in connection with University Village?

A.   It's a personal income protection plan that was set up in the early 1990s by the original owner.  It was a way -- it was -- it's an addendum to the original contract for the residents.  It's a way for them to put in additional entrance fee dollars, but they're a hundred percent refundable back to the residents.  And in return we give them a discount off their monthly service fee.  So it's a good way for the residents to invest in their community and the ownership doesn't have to go get a loan.  So it was really a win-win situation.

The addendum was sent to the OIR back in the early '90s and it was an approved program.

Q.   During the time that you were director of accounting was there always a PIP program?

A.   Yes.  Sometimes it was closed.  They would -- it would be open periodically throughout the years depending on

34

UV-depo of Kathy Burkholder.txt

what the current ownership wanted to do.

Q.   And when the money was -- I guess the -- you know, if Mr. and Mrs. Jones had an extra, you know, $50,000 or whatever and they wanted to put it into the PIP program was there a term for this?  I mean was it repayable after a certain amount of time or was it just at the unit owner's discretion?

A.   No.  The addendum is a three-year program, so it's a commitment for three years.  And it can automatically roll over if they, you know, like the rate that we're offering during that time that their PIP matures.  They can give us 30 days' written notice and get all their money back.

Q.   In other words, they're not committed for three years if they get into it initially?

A.   They are committed for three years --

Q.   Oh, okay.  Okay.

A.   -- unless they term their contract.  So if they die or they're to move out, the PIP is refunded just like their entrance fee is refunded.  No penalties.  If they want to pull the money out sooner than the three-year commitment it's a 10 percent penalty.

Q.   Okay.  What does the -- what does the facility University Village do with the money that's paid into the PIP account?  Is it escrowed?  Does it go into general revenue?  How is it used?

35

UV-depo of Kathy Burkholder.txt

A.    It -- it's -- has to go into escrow for seven days just like an entrance deposit would.  Then it can be used in operations.  And -- and, really, there is no stipulation of what the funds need to be used for.  You know, the goal typically is to use it for capital improvements, but it doesn't have to be tied to that.

Q.    Is it shown on the books of University Village as a liability?

A.    Yes.

Q.    Do you know at present what the total PIP or personal injury protection -- personal -- do you know what the total PIP obligation of University Village is?

A.    It's approximately 10 million.

Q.    And I'm assuming that potentially that entire approximate 10 million dollar figure is repayable at some point over the next three years.

A.    As they mature.  Correct.

Q.    Theoretically.

A.    They -- they can roll it over, though.

Q.    Okay.

A.    So --

Q.    Theoretically, it could all mature within a three-year period?

A.    Correct.

Q.    Okay.

36

MR. TURNER:  I'm sorry.  I did not hear the

UV-depo of Kathy Burkholder.txt

witness -- the amount she said. Was it 10 million? Was that the word I --

THE WITNESS: Yes. Yeah, Steve. It's approximately 10 million.

MR. TURNER: Okay. I'm sorry. I just didn't hear what you said. Thank you.

THE WITNESS: That's okay. Mm-hmm.

BY MR. NEWHALL:

Q. Has -- has the -- have the new owners of University Village reopened the PIP account recently?

A. They did in January of 2015.

Q. Okay. And do you know how much money the residents have contributed into the PIP program since January?

A. Yeah. It's approximately 2.4 million.

Q. And is that 2.4 million contained within the 10 million figure you gave earlier?

A. Yes.

Q. Okay. Let's go back to the -- we were talking about Exhibit 1 and the 1.75 million dollars that was set aside for capital improvements. How much money is left in that fund? How much is still available for rehabilitation or capital improvements?

A. It's -- I don't have the exact figure, but I would

37

say approximately a little over 300,000. But they have put stipulations on me that I have to meet certain income

UV-depo of Kathy Burkholder.txt

threshold criteria, which has not been able to be met, so I -- I still am not able to pull out any more money.

Q. Who has put that -- this criteria for use of the money on -- on --

A. CPIF Lending did in their amendment, according to them. I haven't seen where it says Westport Holdings, but according to the bank they're telling me that there's criteria that we have to meet before we can draw down any more money.

Q. And the criteria is there has to be -- is it based on cash flow or amount of earnings or --

A. Yeah. I believe -- I believe it was net income of 1.1 over a three-month period.

Q. Okay. Aggregate or 1.1 million each month?

A. For the three-month period so --

Q. Okay. And did I understand you to say that you have been unable to -- because I assume that the earnings of 1.1 million over a three-month period have not --

A. Have not been met.

Q. Okay. So that money, until that condition is met, is unavailable.

A. That's correct.

Q. Do you know when the last time University Village

38

was able to access any of the remaining funds in that account to make improvements on the property?

A. I don't know the exact month, but I would say

UV-depo of Kathy Burkholder.txt

probably around September of 2014.

Q.    Okay.  All right.  Let me -- let's kind of -- all right.  Maybe I'm not backing up.  The PIP money that has been paid in since January, what use has been made of that money, if any?

A.    I had to pay for refund obligations and some capitals that we did.

Q.    Let's talk for a minute about -- you mentioned entry fees and refund obligations.  Could you describe for us what you mean by that?

A.    What I mean by refund obligations?

Q.    Right.

A.    So if a resident's contract terms, whatever is remaining -- they pay an entrance fee.  Part of that entrance fee is refundable to them based on whatever plan they have chosen.  Over the years we've actually had 90 percent refundable contracts.  Some were 40 percent.  Some were 50.  Many different plans.  We only offer 40 percent refundable plans now, but I have many residents that have those higher refundable plans.  So once they decide to move out or they pass on, within 120 days I have to refund what's remaining in their entrance fees that's refundable to them.

39

Q.    Would it be -- would I be correct in assuming that the higher the refundable amount of the entry fee the higher the entry fee?

A.    Correct.  If it's a 90 percent refundable plan,

UV-depo of Kathy Burkholder.txt

when we did offer them, we would upcharge 42 percent more than what we would normally have in an entrance fee for somebody with a 40 percent --

Q.    Okay.

A.    -- refundable contract.

Q.    Is there -- if somebody just wants to make the smallest possible entry fee, can they just have no refund at all?

A.    We did have that program for a while.  We have to get permission to do that now, but, yes, we have 40 percent advanced refunds.  So, in essence, if -- just to keep it simple, if their entrance fee was a hundred thousand, they'd only have to give us 60 because we give them all their refund up front.  So they would have no refund, you know, after we got through our 2 percent per month of occupancy that -- there's stipulations the State of Florida says you have to abide by in order to get your whole non-refundable portion of the entrance fee.

Q.    It seems like if somebody makes a -- you know, a -- comes in and says, "Okay.  Yeah.  I want that 90 percent.  I've got the, you know, money laying around" --

40

A.    Mm-hmm.

Q.    -- "in a trunk in the garage and I want the big refund some day when I move out or if I pass away," it's almost like the facility is being granted the use of the money for as long as they're a resident and alive.

UV-depo of Kathy Burkholder.txt

A. Mm-hmm.

Q. Is that -- am I -- is that essentially correct?

A. Well, yeah. We get to use that and -- for operations. I don't have to reserve any of that money. And then once -- once -- the refunds that are going out typically you pay for them by money coming in. That's historically what we've done.

Q. Okay. Has Westport Holdings Tampa d/b/a University Village continued to market, you know, its -- to elderly to move into -- to become residents of the CCRC?

A. Are we now?

Q. Yes.

A. Yes, we are.

Q. Okay. Since the -- well, since -- since 2014 -- well, strike that.

Do you know how many sales University Village had in 2014?

A. We had 90 move-ins and two additional ones were conversion from a rental to life care, so we kind of, in essence, say we had 92 move-ins in 2014.

41

Q. Okay. How many move-ins have you had in 2015 to date?

A. I believe it's been 12 through March. And -- I take that back -- 2 more in April. 14.

Q. 14 to this point in April --

A. Mm-hmm.

UV-depo of Kathy Burkholder.txt

Q. -- that you're aware of.

A. Mm-hmm.

Q. Okay. You mentioned that you can only offer the 40 percent refundable entry fees now.

A. Right.

Q. When did that start?

A. April 1st, 2014.

Q. Okay. Of the 12 plans that I'm assuming -- life care plans or 12 move-ins that you had before in January, February and March --

A. Mm-hmm.

Q. -- of 2015, do you know if they were the 90 percent refundable? 40 percent?

A. The ones that moved in? No. They're only 40 percent refundable. We don't sell the 90 percent refundable plan anymore.

Q. Okay. I thought you said you had stopped selling it as of April 1st of 2014.

A. Correct. We stopped -- we stopped --

42

Q. Oh, okay.

A. -- so any new people coming in would not be 90 percent refundable.

Q. Got it. Okay. Does that somewhat limit the amount of income that is brought in because the entry fees are lower on the 40 percent refundable --

A. Yes.

UV-depo of Kathy Burkholder.txt

Q.   -- plans?

A.   Yes, it does.  It makes it harder because you still have 90 percent refunds going out the door.  Some of those move-ins, those 92 were rentals which means they don't pay any entrance fee.  I believe it was 25 in 2014 were rentals.  So it's great for occupancy, but it doesn't bring in any entrance fees to help meet those refund obligations that are going out the door.

Q.   How do the monthly rental fees for renters compare to what the monthly fees paid by the residents who have paid the entry fee?

A.   They -- the renters pay over we call our market rate.  We have a certain rate for our life cares that we have.  They'll pay higher for rentals.  Plus, we've actually been discounting the monthly service fee to entice people to move in.  We've done that all through 2014 and currently.  We give them maybe a 15 percent discount off their monthly service fee.  But only if you're a life care resident.

43

MR. TURNER:  Tim, let me ask you just for scheduling here, what -- can you give me some idea?  I've got some lunch requests --

MR. NEWHALL:  This is off the record.

(Brief discussion off the record).

BY MR. NEWHALL:

Q.   Ma'am, as the director of accounting for -- I'm sorry.  You're CFO of University Village now.  My -- my

UV-depo of Kathy Burkholder.txt

apologies.

A.    That's fine.  No worries.

Q.    Are you aware of the facility's current cash flow position?

A.    For Westport Holdings, yes, I am.

Q.    Okay.  What is that position?  What is the cash position of Westport Holdings Tampa?

A.    Currently, the cash is very tight.  We're going to have cash flow through the end of April, but once we get into May there's approximately 1.6 million dollars' worth of refunds that are due in the month of May.  And without any move-ins coming in to help offset that, yes, I've -- I've relayed that concern to the general partner so he's well aware.

Q.    That would be Mr. Freiden?

A.    Yes.

Q.    Is there a -- I presume that you have a -- you

44

know when the obligations will mature to make these refund payments.  Correct?

A.    Yes.  Yes, I do.

Q.    And is that -- I assume that the independent living facility or the CCRC by statute has to make these refunds within 120 days?

A.    Yes.  That's correct.

Q.    Okay.  Is there a day that you can project currently, absent some new development, when the -- well,

UV-depo of Kathy Burkholder.txt

Westport Holdings Tampa will not be able to pay its obligations?

A. Unless there's cash infusion of some sort, I have a very large refund due May 9th.

Q. Would -- as it currently stands is Westport Holdings Tampa going to be able to pay that refund on May 9th?

A. Without cash infusion, no, we will not.

Q. Would it be correct to say that without some cash infusion that as of May 9, 2014, Westport Holdings Tampa d/b/a University Village will not be able to pay its obligations as they come due in the normal course of business?

A. 2015.

Q. I'm sorry. 2015.

A. Yeah. Because of the refunds, that's correct. I

45

Will not be able to -- if I have to make that -- I won't have money to make the refund payment. So if I had to make a partial payment we wouldn't be able to pay our other operating expenses --

Q. Have --

A. -- or payroll.

Q. I'm sorry. Were you finished?

A. Or payroll. I mean we wouldn't be able to pay anything if I had to make that large payment out of my operating cash.

UV-depo of Kathy Burkholder.txt

Q. Okay. What has been -- over the past year since April 1st of 2014, what has been the general trend, if there has been a trend, of University Village's cash position?

A. We did well in 2014. Monies that were -- with the move-ins that we had. We had about, you know, 67 life care contracts close, so we were able to meet our refund obligations. Luckily 2014 it was a lower year than normal of refunds. They do go up and down. You can never really anticipate when somebody's refund's going to come due. Only 120 days out.

So we had a good year. The refunds were low and move-ins coming in. So that got us through the end of the year. The problem was it wasn't enough to get us into January of 2015 because there was a lot of refund obligations in that month and not enough money excess to flow over into

46

January. That's why we had to open up the PIP program.

Q. Okay. Without opening up the PIP program in January would Westport Holdings Tampa d/b/a University Village been able to pay its obligations as they came due in the normal course of business in January of 2015?

A. No. Without the PIP we would not have been able to make those refund obligations.

Q. Are residents continuing to, you know, get involved in the -- in the PIP program or did that sort of -- was there a big flood in January, February and then it sort of dried out?

UV-depo of Kathy Burkholder.txt

A. There was a big flood in January and February. We collected 2.4 million. People were very excited about the program. Once the OIR came in, it just -- it just stopped dead. The program's still open if somebody wants to put in, but we really -- we really haven't had hardly any interest at all.

Q. To your knowledge, ma'am -- and, again, I can only ask you as to what you know. Okay?

A. Mm-hmm.

Q. But to your knowledge have any of the limited partners in Westport Holdings Tampa made any cash infusions over the past year?

A. No.

Q. What has been the source of the money that has

47

been used for -- you know, the rehabilitation -- I'll call them capital improvements but, you know, sort of improving the property? What's been the source of that money?

A. After what I could draw from the capital reserve, when that was done it's been through operations.

Q. And that would include the money in the PIP account. Correct?

A. Correct.

Q. Has there been -- except for, I think you said, there were no distribution -- well, strike that. Strike that.

Do you know if there have been any distributions

UV-depo of Kathy Burkholder.txt

to the limited partners from Westport Holdings Tampa?

A.    There has not.

Q.    What is the minimum liquid reserve or MLR?

A.    It's a requirement through the Florida Statutes that we keep a reserve on hand. And my guess is that -- I think it's for if the State needs to come in and run the community, there's money -- there's a reserve there for them to do it. But it is a requirement that we have to have these funds unencumbered and on hand at all times.

Q.    Okay. You said unencumbered. Do you have any knowledge that there may be certain situations in which the funds could be encumbered?

A.    Yes. There was a letter created in January --

48

came from the attorneys at BVM -- telling -- informing me that the MLR -- that the banks would have a right to the debt reserve portion that was set aside in the MLR. And so I -- that was when I became knowledgeable that that was a fact. I had to sign the letter and send it to the OIR. So I was not aware that the banks had any right to that money before that time.

Q.    Okay. Are you the individual at the independent living facility or University Village who is responsible for preparing the MLR?

A.    Yes.

Q.    Okay.

A.    I did the calculation.

Page 46

UV-depo of Kathy Burkholder.txt

Q.   Okay.  You're familiar with how to make that calculation?

A.   Yes.  I've been doing it for many, many years.

Q.   Okay.  Can you -- without getting too technical, can you give us some understanding of how that -- what the components of the minimum liquid reserve are?

A.   Okay.  Sure.  You take three years' history of your operating expenses, less certain, you know, interest.  There's things that you pull out.  But you take three years' history and then you take 15 percent of that number, and that's one part of the reserve.  You take your cumulated depreciation number and you take a portion of that and that

49

is another part of the reserve.  And then whatever your debt service is, your interest, your principal, your taxes for the next year, that's the other portion of the MLR.

Q.   Okay.  What is the -- what is your calculation of what the minimum liquid reserve should be for the continuing care retirement community known as University Village at this point in time?

A.   How I had done the calculation, I included Westport Nursing as part of the calculations, part of the continuing of care.  That was discussed.  Everyone agreed that we should include Westport Nursing with Westport Holdings.  Even the OIR because I had contacted them about making sure how to report this.  Should I combine the two entities.  And the answer was yes.  So I --

UV-depo of Kathy Burkholder.txt

Q.   Well, who is everybody?  I mean there's you. There's OIR.

A.   I'm talking about the partners.  John Bartle, Kevin Angelis are the two that I spoke with about the MLR calculation and shared with them, you know, this is how I'm -- how I'm going to do the MLR calculation so that they -- they understood it.  They also sent it to their auditors Clifton Larson Allen who also reviewed it.  And I spoke with them about it to say, okay, do you agree with the calculation.  He verbally told me over the phone that, yes, he did.

50

Q.   He being?

A.   Greg Hawthorne at Clifton Larson Allen.

Q.   Okay.

A.   So we had amended the MLR calculation in October. Once -- after the sale we knew we had refinancing.  It was requested that we redo it because typically you only do the MLR once a year, the calculation, but the financing changed so we were instructed to redo it, which was done in October.

So I included Westport Nursing along with Westport Holdings because Westport Nursing was holding 3 million dollars of the MLR money, so it only made sense that we talked about that should we include all of them.  And it was agreed by OIR, myself, John Bartle and Kevin Angelis and Clifton Larson Allen to combine the entities on the MLR

UV-depo of Kathy Burkholder.txt

calculation.

Q.    You mentioned that the nursing facility was holding 3 million dollars of the MLR money.

A.    Mm-hmm.

Q.    How -- can you explain why they were or how that came to be?

A.    After the refinancing took place in April of 2014 I was told by Larry Landry and John Bartle that 3 million of the money in Regions Bank MLR needed to be transferred to USAmeriBank and that they would be holding part of the MLR

51

money and that was a requirement of getting the loan with USAmeriBank.

Q.    Now, this 3 million dollars that was being held as part of the MLR before it was transferred to USAmeriBank, what was the -- in whose account was it being held?

A.    Before the transfer?

Q.    Yes.

A.    It was in Westport Holdings' name through Regions Bank.

Q.    Okay.  All right.  And it gets transferred to USAmeriBank why?

A.    It was a requirement of the loan that they would hold this 3 million dollars and that they would hold it as an MLR is what I was told.

Q.    And you're referring to the -- I guess the refinancing of the nursing facility and the assisted living

UV-depo of Kathy Burkholder.txt

facility.

A.   That's correct.

Q.   Okay.  So that 3 million dollar reserve was for part of that -- that loan.

A.   Right.  It was a requirement of that loan.

Q.   Okay.

A.   Mm-hmm.

Q.   All right.  Based --

MR. TURNER:  Tim, I have to request a point of

52

personal privilege here.  I was trying to get you to let me have a little bit of a break a few minutes ago.

MR. NEWHALL:  Oh, sure, Steve.  We -- and I'm sorry.  We can take a five-minute break.

MR. TURNER:  Probably three.

MR. NEWHALL:  We'll give you five.

(Off the record from 12:30 p.m. to 12:34 p.m.).

BY MR. NEWHALL:

Q.   Okay.  Currently, what is your understanding or your calculation of what the University Village CCRC should have as a minimum liquid reserve?

A.   Well, I have discussed this with the auditors.  Clifton Larson Allen have been out doing our annual audit.  We've discussed it.  They are now saying that Westport Nursing should be separate.  And without their debt on there, it's currently 4.7 million will be the calculation that will probably be filed.

UV-depo of Kathy Burkholder.txt

Q. Okay. I thought that Clifton Larson Allen had initially indicated that the nursing center should be included.

A. That's correct. That's what they told me back in October or November when they were reviewing it. But now that they're out there looking more closely -- I don't know if they had all the information in front of them at the time, and as they're getting all the information they're saying

53

that now it should be separate.

Q. Okay. So if they were not separate what would the appropriate minimum liquid reserve be according to your calculations?

A. I believe it was 5.9 million.

Q. Okay. And if the nursing center is considered separately the appropriate minimum liquid reserve is 4.7 million?

A. Correct.

Q. What is University Village currently holding as a minimum liquid reserve?

A. There is 2 million dollars in Regions Bank under Westport Holdings' name. There is 3 million that is in Westport Nursing's name. So if they're separate that won't be counted. So really there's 2 million dollars in Regions Bank.

Q. Okay. So what about the $400,000 that we mentioned earlier? Does that --

UV-depo of Kathy Burkholder.txt

A.    That is also not in Westport Holdings' name.  Did not realize that because I had told them when they moved it it should be kept in Westport Holdings' name for me to use it as a debt service reserve.  It is in BVM University Village's name.

Q.    Is that one of the limited partners?

A.    I believe so, yes.

54

Q.    Okay.  Okay.

A.    yeah.  I don't have it in front of me to know exact -- the exact name, but I believe that's how it is.

Q.    Okay.  And do you know -- assuming that it is the BVM University Village --

A.    Mm-hmm.

Q.    -- that is one of the limited partners, do you know what they're holding that $400,000 for?  Is it to secure some obligation of that entity?  Is there some other entity?

A.    That I'm not aware of.

Q.    So if I follow your numbers correctly, at this point in time, assuming that the two entities are in fact separate, Westport Nursing Tampa --

A.    Mm-hmm.

Q.    -- is to be considered separately for purposes of the MLR from Westport Holdings Tampa, the minimum liquid reserve for Westport Holdings Tampa is about 2.7 million dollars underfunded?

A.    Yes.

UV-depo of Kathy Burkholder.txt

Q. And if you were to include both of the facilities University Holdings and University -- University -- Westport Holdings and Westport Nursing, if you were to consider them together, you would have 5 million dollars and it would be about $900,000 underfunded?

A. That -- that could be, yes, if we cannot use the

55

400,000 that was in BVM's name because that was -- what I had originally done was use that as a debt service reserve for CPIF Lending is my understanding of what that was for, but that's just my understanding. If you cannot use that towards it, then that's correct. It will be underfunded by about 900,000.

Q. If you could use it, then it would be underfunded by about half a million.

A. Roughly. I thought -- I mean, I would like to look at the numbers because I thought it was closer to 400,000 but there could be some interest. There could be a little more monies in the account. Yeah.

Q. Okay. Have -- have you been asked to change the MLR calculations to somehow reflect that it's properly funded or perhaps overfunded?

A. I have been asked by John Bartle and Eli Freiden to resubmit the MLR and include the -- keep it separate and include the 3 million from USAmeriBank on there and include the 400,000 that's in BVM's name. I have been asked to do that by them.

UV-depo of Kathy Burkholder.txt

Q.   Okay.  So Clifton Larson Allen is now telling you that the nursing facility should be considered separately, but John Bartle and Eli Freiden are asking you to consider it as part of the -- combine it with -- I'm sorry.  I'm not following.

56

A.   They want me to redo the calculation, do not include the debt or anything for Westport Nursing, but include the funds that are in USAmeriBank as part of the -- to show the monies that are in the MLR.  They asked -- that's what they asked for.

Q.   Okay.  So they want to exclude the debt but then show the money that's being held aside to secure that debt as part of the MLR?

A.   That's correct.

Q.   Have you -- I mean is that something that you can do?

A.   I told them that I would not send that.  That I didn't think it was correct because it was not -- you can't -- you can't exclude the debt and then include that money.  They were going to turn it over to their attorneys, and that's the last I know of where that is.

Q.   Okay.  When was the last time that you discussed the MLR issue with either Mr. Freiden or Mr. Bartle?

A.   Yesterday I talked to Eli Freiden about it.

Q.   When was the last time you remember talking to Mr. Bartle about it?

UV-depo of Kathy Burkholder.txt

A.    That was probably about a week, a week and a half ago.

Q.    Okay.  Let me show you something I received by email today.  And I have -- I have sent this to Ms. Small.

57

MR. NEWHALL:  And also, Steve, I emailed a copy of it to you.  I'm going to mark this as Exhibit 2.  And I'm thinking that it's 18 pages.

BY MR. NEWHALL:

Q.    Can you take a look at that and tell me if you recognize it?

MS. SMALL:  When did you send this?

MR. NEWHALL:  That's what you printed out for me.  I took the cover off of it.  The cover hand-scrawled note that was on it.

MS. SMALL:  Right.  Right.  I think just the pages are in different order because I didn't recognize the first page.

MR. NEWHALL:  Yeah.  I put them in order 1 through 18 --

MS. SMALL:  Oh.

MR. NEWHALL:  -- because they were out of order.

MS. SMALL:  Got it.  Okay.

THE WITNESS:  Okay.  This looks like what I had just redid for Eli Freiden yesterday because I took off the signatures and he asked me to include all the banks on here.  So I -- I told him I disagreed with it and -- but I printed

UV-depo of Kathy Burkholder.txt

it out for him.

BY MR. NEWHALL:

Q.   Okay.

58

A.   He was going to give this to his attorneys.

Q.   Okay.  So he asked you to prepare it, as we discussed a moment ago, and that is to include the 3 million dollars that's held in USAmeriBank but not to include the 15 million dollar loan that that 3 million dollars is supposedly securing?

A.   That's correct.

Q.   Did he ask you to sign that?

A.   He told me to prepare it.  I told him I would not upload it onto the system, the rep system with the State because I have to state that everything is true and accurate.  So I told him I didn't feel comfortable.  I wasn't going to do it.  He did ask Tim Parker to sign it and as far as I know Tim was waiting for the attorneys so --

Q.   Okay.

A.   -- that's where we're at.

Q.   Okay.  So would it be correct to say that as we sit here today based upon your understanding and the way that you've always calculated the MLR reserves that the -- in any scenario that the MLR reserve for University Village is underfunded?

A.   It's been underfunded since we recalculated -- recalculated it in October of 2014, yes.

UV-depo of Kathy Burkholder.txt

Q.   Prior to October of 2014 was the MLR properly funded?

59

A.   Well, if it was combined -- if the two entities were combined, there was -- because you're going off the previous MLR calculation, there was sufficient funds in there.  If you combine Nursing and Holdings, if that 3 million, in essence, in USAmeriBank is truly an MLR account which is what I was told it was.

Q.   Okay.

MR. TURNER:   I didn't hear the witness' answer. She said if you combine them, but I didn't hear the rest of the answer.

THE WITNESS:   So if you combine them and you can use Westport Nursing and Westport Holdings ML -- the two accounts together, the account wasn't technically underfunded because you use the calculation from the prior year, which was lower.  It was only about 5 million because we were going on the previous debt.  And until they make you redo the calculation you go off of the prior year.

MR. NEWHALL:   Okay.

MR. TURNER:   Thank you.  I'm sorry.  I didn't hear that.

THE WITNESS:   Mm-hmm.

BY MR. NEWHALL:

Q.   Did John Bartle ever ask you to sign off on a calculation of the minimum liquid reserve that you did not

UV-depo of Kathy Burkholder.txt
feel was correct?

60

A.   Yes.

Q.   Okay.

A.   About a week and a half ago when he asked me to take the debt off but include the USAmeriBank 3 million dollars and he told me to send it. And I told him I couldn't do that. It wasn't under our name. And he said just go ahead and put it on there anyway just like you always have.

Q.   Okay. What -- since the transfer of ownership of University Village back in we'll say April 1st, approximately, of 2014, what has been John Bartle's involvement, to your experience, in the day-to-day operations of the University Village facility?

A.   He was very much involved every -- through all the day-to-day operations until sometime late in January of 2015.

Q.   What happened in late January of 2015?

A.   When -- when the OIR said they were coming in to, you know, examine the community, he told me to refer everything to his wife Becky who was the person who at the time was going through the application process for general partner. He told me that he had nothing to do with the community and to route everything to her.

Q.   Okay. Did that -- his statement that he had nothing to do with the community meet with your experience that you'd had from April of 2014 into January of 2015?

A.   No, it did not. He was very much a part. I

UV-depo of Kathy Burkholder.txt

61

presented budgets to him. He sat in finance committee meetings with myself and Tim Parker. He made decisions for the community. No increases in the budget. Directed a lot of type of situations like that.

Q. Okay. Was he on -- frequently onsite on the premises?

A. Not always onsite.

Q. When he was not onsite did -- was he in communication with you by telephone or by email?

A. Yes.

Q. Sporadically?

A. Sporadically. Yeah. I mean, I also had a lot of direction through Lou Jackson --

Q. Okay.

A. -- one of his partners so --

Q. All right. Who is Jared McCowan?

A. He's his wife Becky Bartle's son.

Q. Okay. What involvement since April of 2014 has Jared McCowan had on or with University Village?

A. He's had a significant role in the operations of University Village.

Q. What have you observed as to his involvement in the operations at University Village?

A. He -- on top of the capital renovations, which he was originally sent out there to do, he has pretty much taken

UV-depo of Kathy Burkholder.txt

62

over the operations in the maintenance department. He signed off on all the purchasing. All the POs that have gone through there he signed off on. He also has a lot of -- come into the accounting department, in essence. He deals directly with my staff and he has actually told them that they report to him and not to me.

Q.   When did he tell them that?

A.   That was probably back in September of 2014. Maybe -- maybe earlier. He did -- he would go to them and -- and tell them that he wanted to know everything that was going on and that really they reported to him. We lost a person, and he appointed his best friend who was in the maintenance department, he put him in accounting under accounts payable. And I didn't agree to that change, but I didn't have a choice.

Q.   What's his best friend's name?

A.   Chris Leobold.

Q.   Is Mr. Leobold still in the accounting department?

A.   Yes, he is.

Q.   Does he have any knowledge or experience in accounting?

A.   He has a degree in finance but he didn't have any knowledge of accounting practices. So in essence we have been training him, but he really reports -- he reported to Jared for many, many months until Eli came in and Eli has

UV-depo of Kathy Burkholder.txt

63

tried to take -- tell him to report to me. But he still, you know, communicates a lot with Jared because they are friends.

Q. Do you have any -- any control over Mr. Leobold even though -- in the accounting department?

A. It's very difficult to do that. I have tried. He doesn't respond very well. He doesn't like to do tedious tasks. He doesn't want to file. He doesn't -- you know, things that he doesn't want to do. I have kind of pulled him aside verbally and have tried to get him back on track. I have not written him up yet. It just makes it difficult when he is -- his best friend is a partner's son.

Q. Is Mr. Leobold formerly -- not formerly -- formally an employee of University Village?

A. He worked in the maintenance department when he first came on. He was actually a supervisor in maintenance. So I really didn't understand why he was moved into accounting to do accounts payable. That whole move didn't make any sense to me.

Q. Okay. Did -- does -- is Mr. McCowan, Jared McCowan, is he a -- is he an employee of University Village?

A. No, he's not.

Q. How do you know that?

A. Well, he's not paid through University Village.

Q. Do you know how he gets paid?

UV-depo of Kathy Burkholder.txt

64

A.   I'm not sure how he gets paid.  I would -- I don't want to state to that because I'm not sure.

Q.   And has Mr. McCowan, to your knowledge, ever signed -- I think you said that he signed purchase orders and things of that nature.

A.   Yes.  He signed contracts.  He signed them as director of operations.

Q.   For University Village?

A.   For University Village, yes.

Q.   To your knowledge is he director of operations?

A.   I don't know.  Possibly.  Just not paid through our community.

Q.   Okay.  Have you ever had any discussions with Mr. McCowan about or at least tried to talk to him about what his role in the community is?

A.   Not necessarily about his role, no.  I know he's -- the son of a partner, so you don't question that.

Q.   Okay.  He's -- he's John Bartle's stepson.

A.   That's correct.

Q.   What was -- you mentioned that he had some role in -- Mr. McCowan had some role in the renovations that were being done.  What -- what exactly was his role, if you know?

A.   His role was to come in and renovate all -- you know, as many apartments as he can, hallways and, you know, make them upscale -- you know, nice cabinets, granite -- so

65

UV-depo of Kathy Burkholder.txt

that we could hopefully turn the apartments and get more sales from that.

Q. Did Mr. McCowan sign any contracts on behalf of University Village?

A. Yes.

Q. As director of operations?

A. Yes.

Q. Has Mr. McCowan ever, to your knowledge, stated that he works for John Bartle?

A. He said he works for BVM.

Q. Okay. Does Mr. McCowan have, to your knowledge, any sort of consulting contract or does BVM have any sort of a consulting contract?

A. I have not seen a contract.

Q. Up until approximately the end of January of 2015 I understand that the manager of the University Village the independent living facility was AgeWell Senior Living. Is that correct?

A. Yes, that's correct.

Q. Okay. But was that one of Mr. Landry's companies, AgeWell Senior Living?

A. Yes.

Q. Did that contract with AgeWell Senior Living and University Village expire at the end of January 2015?

A. Yes.

66

UV-depo of Kathy Burkholder.txt

Q. Has there been any other sort of management contract entered into by University Village?

A. No.

Q. Who is -- who is managing the facility?

A. An executive board was created in February --

Q. Okay.

A. -- to manage the facility.

Q. And who on the executive board?

A. Eli Freiden, Tim Parker, myself, Merrilyn Fernandez. She's our marketing director. Our HR director Sandra Dinero, and Dennis Donovan our maintenance director. Oh. Michelle Cronin, our activities director, and Karen Northover who is administrator of the nursing center.

Q. Are there regular meetings of this committee?

A. We've had two meetings so far. We're supposed to meet twice a month for a period of time till things start flowing and then we'll do monthly meetings after that.

Q. Okay. So starting in February, March and then into April you're supposed to meet two times a month?

A. Yes, but we have only met twice so far.

Q. And what was discussed at those two meetings?

A. Just people were reporting things that were happening in their department.

Q. Did Mr. Bartle attend either of those meetings?

A. No.

67

Q. Did Eli Freiden attend them?

UV-depo of Kathy Burkholder.txt

A.    Yes.

Q.    Anybody else?  Lou Jackson?  Any of the other -- any individuals related with any of the other partners?

A.    No.  The -- it wasn't even our meeting, but when we were told about the executive board and the creation of it Becky Bartle was turning over her -- saying she was no longer going to run for general partner and told us -- and introduced us to Eli Freiden at that time.

Q.    Do you know why Rebecca Bartle withdrew as general partner?

A.    She just told us it was conflict of interest.

Q.    Did she explain what this conflict of interest was?

A.    Not in detail.

Q.    Even in general terms?

A.    She just -- not -- not really.  No.  She just said there'll be conflicts of interest and she wanted to get back to the nursing center where she felt more comfortable in her role.

Q.    Okay.  What has she been doing at the nursing center, if you know?

A.    She's an RN, so she was overseeing, you know, the nursing staff and, you know, the care of the residents over

68

there.

Q.    Okay.  We've talked about Clifton Larson Allen.

UV-depo of Kathy Burkholder.txt

They're the -- they're doing the current audit for the 2014 year.  Is that correct?

A.   That's correct.

Q.   Okay.

A.   Mm-hmm.

Q.   Who was the auditor prior to that?  Who was the auditor last year?

A.   Lamn, Krielow & Dytrych.  Do you need me to spell it?

Q.   Yeah.  I just got initials here.  Maybe you better.

A.   It's L-a-m-n for Lamn, Krielow, C-r-i-e-l-o-w (sic) and Dytrych, D-y-t-r-c-h (sic) but that's probably wrong but that's probably close enough.

Q.   Okay.  And do you know how long that firm had been auditors for University Village?

A.   Oh, it was many years.  I would say approximately 10 years.

Q.   Okay.  Were they auditing that -- that firm -- and I'm just going to refer to it by the initials of LKD.

A.   Yes.

Q.   Was that firm auditing the -- the independent living facility, the skilled nursing facility and the

69

assisted living facility?

A.   They were not auditing the lessee.

Q.   The lessee.

UV-depo of Kathy Burkholder.txt

A.    The lessee.

Q.    Okay.

A.    They were not.  They -- you know, Westport Nursing is just a landlord.  That's -- the lease and the mortgage payment is pretty much all that's run through that.  So, yes, they did audit that and Westport Holdings.

Q.    Okay.  Is the prior auditor LKD, are they owed any money for their 2014 audit?

A.    Yes, they are.

Q.    Do you know how much money they're owed?

A.    Approximately $52,000.

Q.    Have you participated in any negotiations with LKD to try to resolve that amount owed?

A.    Yes, I have.  Eli actually asked me to make an offer for eight installments but they wanted their work papers immediately.  I called the partner JoAnn Wagner and told her that and she -- she wanted to work with us, but she said she didn't want to give up her work papers until the bill was paid in full.  She would do payments of over two months or she would reduce all of the interest and knock off some of the expense and say 50,000 paid in full and she would accept that.

70

Q.    Okay.  Had Mr. Bartle -- John Bartle -- ever asked you to negotiate with LKD to try to either reduce the amount or come to some kind of payment terms?

A.    He did not speak with me about that, no.  It was

UV-depo of Kathy Burkholder.txt

Eli Freiden.

Q.    Okay.  Are there any other creditors -- current creditors of University Village that they have attempted to either negotiate down the total amount owed or come up with some kind of a payment plan?

A.    The only other one that I'm aware of is -- it's Green Circle Capital.  They are asking for 190,000 saying they were owed commission on the refinancing with CPIF Lending.  That is under dispute.  Eli Freiden told me that yesterday.  It's under disputes and not to do anything with it.

Q.    Do you know what the nature of the dispute is?

A.    They're disagreeing that they owe it.

Q.    Okay.  That's a dispute.

A.    Yeah.

Q.    Do -- do you have any knowledge of any amounts owed to any of the current or present -- or former pharmacy benefit managers at the nursing facility?

A.    I do know that they are owed money.  They were owed money when I was doing the books.  Back as of October of 2014 they owed them over a half a million dollars at that

♀

71

point.

Q.    At what time was that?  I'm sorry.

A.    October of 2014.

Q.    And how long had that debt been outstanding; do you know?

UV-depo of Kathy Burkholder.txt

A.   Well, they had never made a payment to them since they took over and there could have been some prior.  I don't have the exact numbers in front of me.

Q.   Okay.  All right.  Had there been an amount payable to the pharmacy benefit manager before the sale of March 31st or April 1st, 2014?

A.   I don't have that figure here.  I don't think it's a large amount, though.

Q.   Okay.  Is that -- has that pharmacy benefit manager been replaced with another pharmacy benefit manager?

A.   From what I've heard, that is correct.  They've been replaced by Omnicare.

Q.   Okay.

A.   I think it's Omnicare.

Q.   Can you recall the name of the former pharmacy benefit manager that was owed money as of October?

A.   Yeah.  It was Pharmerica.

Q.   To your knowledge is there still an amount outstanding to Pharmerica?

A.   As far as I know, there is.  I do not have the

72

amount.

MR. NEWHALL:  Okay.  I don't think I have any further questions, but if you would give me just a minute to take a break and think about it.

THE WITNESS:  Sure.

MR. NEWHALL:  I'll be right back.

UV-depo of Kathy Burkholder.txt

THE WITNESS:  Okay.

(Off the record from 1:04 p.m. to 1:07 p.m.).

MS. SMALL:  Steve, are you there?

MR. TURNER:  Yes.

MS. SMALL:  Okay.  We're going back on the record, I think.

BY MR. NEWHALL:

Q.    Ma'am, has Jared McCowan been involved in making any personnel decisions on behalf of University Village?  Do you know that?

A.    Well, I do know he did two of my department alone so -- and then I've heard that, yes, he's made decisions in other departments as well.

Q.    What just for -- I'll ask you about the ones in your department.  You have personal -- more direct personal knowledge --

A.    Yes.

Q.    -- of those.  Correct?

A.    Yes.

73

Q.    What personnel decisions has he made in the accounting department?

A.    He brought in his friend Chris Leobold like we talked about.  And I was actually interviewing for somebody for accounts receivable before the holidays.  I had gone through many interviews, and after the holidays I got back and I was told that he had already appointed somebody to come

UV-depo of Kathy Burkholder.txt

in to my department. I had no knowledge of this person and she had no experience, so I really didn't understand why she was put into the department. She's still under training today because she had no knowledge of any accounting before she came in so --

Q.   What's -- what's this individual's name?

A.   Her name is Lakesha Bellamy.

Q.   Does -- did you have any input at all in the hiring of Lakesha Bellamy?

A.   None. I was told that she was starting the day I came back from Christmas vacation.

Q.   Was Ms. Bellamy -- had she been employed by University Village in some other capacity or was she a new hire?

A.   She was a receptionist for many years.

Q.   Does -- to your knowledge does Ms. Bellamy have any sort of -- any connection with or contact with Jared Bartle or -- Jared -- I'm sorry -- Jared McCowan or

74

John Bartle?

A.   No, not to my knowledge. She's been an employee for many years at University Village.

Q.   Since she has been in the accounting department has she been reporting to Jared McCowan?

A.   She reports directly to Christy Perez who is my assistant, but I'm sure if Jared asked her to do anything of course she would do it.

UV-depo of Kathy Burkholder.txt

Q.   Let me ask you this, ma'am.  And this is a difficult question.  I'm sorry.  But are you at all concerned about the security of your employment with University Village?

A.   Yes.

Q.   And why?  Why would you be?

A.   Because Jared told my assistant Christy that he wanted to get rid of me.

Q.   And when did he tell her that?

A.   Back in October 2014.

MR. NEWHALL:  I don't have any further questions.

MR. TURNER:  I do have a few questions, Ms. Burkholder.

THE WITNESS:  Okay.

CROSS-EXAMINATION

BY MR. TURNER:

Q.   We met, so you kind of know who I am.

75

A.   Yes.

Q.   Right?

A.   Yes.

Q.   I think we met for about 20 or 30 minutes one day.

A.   Mm-hmm.

Q.   Just a moment.  I'm getting a glass of water here.

Okay.  Let me understand.  Prior to the end of January of this year AgeWell and Mr. Landry were managing the facility.  Am I correct?

UV-depo of Kathy Burkholder.txt

A.    Yes.

Q.    Now, do you know the relationship between AgeWell and Mr. Landry and Mr. Bartle and Mr. McCowan?

A.    Do I know the relationship between them?

Q.    Yes, ma'am.

A.    They were just the management company.  That's the only relationship that I'm aware of.

Q.    So you don't know what negotiations or what -- what plans those people have to go forward for management, do you?

A.    There was talk of them merging their management company with BVM and AgeWell and that that fell through.

Q.    And Mr. Landry left, didn't he.  Mr. Landry left and did not continue on in the facility in any capacity after January of '15.

A.    Correct.

76

Q.    All right.  Let me -- let me understand a little bit about the licensees that you -- the lessees -- sorry -- the lessees that you referenced.  For example, this pharmacy benefit that you recall some money being owed, is that an obligation of the lessees of the skilled nursing facility and/or the ALF?

A.    Yes.  That's correct.  Obligation of the lessee.

Q.    Yeah.  So is the lessee a separate operator of that facility separate from the operation of the CCRC?

A.    Yes.  It's a separate entity.  Mm-hmm.

UV-depo of Kathy Burkholder.txt

Q.   And Westport Tampa -- Westport Nursing -- I'm sorry -- an affiliate of Westport Holdings Tampa, leases those facilities to an operator.

A.   Yes.

Q.   Now, at some -- it would seem to me that you said at some point you -- let me say this.  At some point did you -- were you asked to help in the operator's bookkeeping functions or accounting functions?

A.   I'm sorry.  Was I asked to help?

Q.   Well, not -- well, did --

A.   Yes.  I was asked to help in -- as of July 1st, 2014.  Mm-hmm.

Q.   So for a period of time you assisted the operator of those facilities and then those functions that you were doing went to BVM for it to handle for the operator.

77

A.   Yes.

Q.   Is that more or less correct?

A.   Yes.

Q.   So would you say that you were just helping out for a period of time on the operator's side of the lessee?

A.   Well, that was not the intention when I went in. I was supposed to take over as campus accounting director/CFO for both sides.  You know, the nursing center and the assisted living and the independent living.  That was the intention when I went in.  Signed all the bank statements, got fingerprinted.  So I was a little surprised

UV-depo of Kathy Burkholder.txt

when John asked me not to do that anymore. Yeah.

Q. Well, wouldn't they be different employers if you were doing -- wouldn't you be under -- if you in fact became the accountant for the operator of the nursing home and the ALF, wouldn't that be a different employer for you?

A. Well, how they -- how John was looking at it as it was one campus and that he was sharing people. He still shares people right now as campus directors and we just allocate their time over there.

Q. Okay. So there would be an allocation internally --

A. Yes.

Q. -- for employees. Okay. That makes sense. All right. So prior to this -- this period when

78

you went over and did some work on an allocated basis for the operator of the nursing home were you ever doing any books for the nursing home operation?

A. Prior to doing this with -- yes. Actually, I did. Prior to 2002 I did their books.

Q. Okay. So but basically you have not -- basically that operator -- that license -- lessee has been separate and another entity from the community, from the CCRC community.

A. Right. Prior to John McCoy stepping into the board of directors over there, the previous -- we didn't share any staff. We didn't allocate anyone as campus director. None of that occurred. We were actually separate.

Page 75

UV-depo of Kathy Burkholder.txt

Q. Okay. All right. And you're separate now. Is that correct?

A. Yes.

Q. All right. So let me see if I've got everything I need to ask you here now. Just give me a minute. I know you're --

A. Sure.

Q. -- anxious to get on to lunch. I am, too, actually.

Do you know whether there's any arrangements been made for the million dollars that was transferred from the reserve to be -- to be assigned or to the people that it was transferred to?

79

MR. NEWHALL: Object to the form of the question.

THE WITNESS: I'm not -- I'm not sure I understand. What?

BY MR. TURNER:

Q. No problem. I'll re-ask it. Let's see. Let me see if I can focus on this. You indicated that there was some reserve monies. Is that correct?

A. Oh, for the capital expenditure reserve?

Q. Right. For renovations.

A. Yes.

Q. That was an account for renovations. Let me first ask you if you're not using that money for renovations why do you pay interest on it?

UV-depo of Kathy Burkholder.txt

A. That was always my question to the partners. "The loan said you owe 9 and a half million," and I said, "We're paying interest on something we don't have."

Q. Okay. So until you drew the money down from the reserve you can't use it. Is that right?

A. No. It was part of the 9 and a half million dollar loan that they set aside 1.7 million in a capital reserve account. So I was paying interest on the whole amount. So, in essence, that reserve should have been -- we should have been able to use it, all of it, and --

Q. Or you should -- or you shouldn't pay interest until you draw it down.

80

A. That -- I agree, but that's not how they -- it was set up.

Q. Not set up that way.

A. Yeah.

Q. All right. So now I understand that 1 million of that money that you're not able to draw down anyway was used --

A. Right.

Q. -- for or was transferred to another facility.

A. Yes.

Q. That's what I'm -- the way I understood your testimony.

Now, do you know whether arrangements have been made or are being made for there -- for there to be an

UV-depo of Kathy Burkholder.txt

adjustment so that the other facility is going to bear the responsibility for that loan?

A.    I got a memo just last night at midnight. I just looked at it before I came to this. Eli stating to such fact that they wanted to move a million over to BVM Management's books and reduce our loan to 8 and a half million. I just got that, like I said, read that this morning. So I haven't seen any documentation from the bank stating that that's what's happening.

Q.    All right. But you know there is at least an intention to do that. At least you heard about it.

81

A.    Yes. Just this morning. Mm-hmm.

Q.    All right. Let me see if I have any more.

Now I want to be sure I understand about the refunds that are made out of the entrance fees. As I understand, 2 percent of the entrance fee is earned for every month that the resident stays? Did I misunderstand your testimony?

A.    The calculation how it works is the OIR, the statutes, say you can only earn 2 percent per month of occupancy your nonrefundable portion. And you can earn 4 percent right up front for -- for termination refurbishing fees. So if you have a plan that is 60 percent is nonrefundable to the resident, it takes 28 months for you to earn that. So if a resident was to term earlier than the 28 months I would owe them more than 40 percent. Is that clear,

UV-depo of Kathy Burkholder.txt

Steve?

Q. No. Well, almost. It's such an interesting calculation, I'm going to try to get a -- is -- if you have a 40 percent plan, does that mean you get back 40 percent when you leave or die?

A. Correct.

Q. No matter what. No matter how many months you stay, you get back 40 percent. Is that --

A. No. No. So what we do is we -- we sell a 40 percent refundable plan, assuming the resident's going to

82

be with us for years and years. If by chance they are -- they term earlier than 28 months, we have to refund more than 40 percent and that's when the calculation of the 2 percent per month of occupancy kicks in.

Q. I see.

A. And you can do a one-time 4 percent termination refurbishing fee. So that's why I say after 28 months we've earned our whole 60 percent, so now if they term in 3 years then it's definitely -- you know, the 40 percent's refundable.

Q. And if they term after 3 percent -- after 3 years, what is refundable?

A. Same thing. 40 percent. It's 40 percent from then on after you earn your portion.

Q. Now let's talk about the money that you say -- the refunds that you say are going to be due in May.

Case 8:20-ap-00007-CPM    Doc 444-10    Filed 11/15/23    Page 80 of 94

UV-depo of Kathy Burkholder.txt

A.    Okay.

Q.    Are those coming -- in other words, are those obligations already accrued refunds or are you expecting people to leave at that point and therefore the refunds come about?

A.    Oh, no.  This is already in progress, so the 120 days ends in May.  So these would have -- they would have already, you know, either gave us notice to move out or they've passed on.

83

Q.    All right.  Now, the -- as I understood, there was -- there was $100,000 a month being paid to the partners of nursing -- of Westport Nursing that has been paid since October, I think you said.

A.    Yes.

Q.    And apparently continue to be paid.  Is there anything precluding capital contributions to be made of those funds by the partners, the same people in the CCRC, in order to help meet those obligations?

A.    No, not to my knowledge.  There's no restrictions from them taking distributions.

Q.    And there's no restrictions from them putting back in money --

A.    Right.

Q.    -- in order to meet the needs of the company.

A.    Right.

Q.    Now I want to ask you one more thing here about
Page 80

UV-depo of Kathy Burkholder.txt

the MLR calculation. If the MLR -- if the debt of Westport Nursing -- that is the company that leases to the SNF and ALF -- if that debt is not included, that debt service -- the debt service for that debt's not included in the calculation and all of the monies reserved are included as -- as monies that are applicable -- let me start again.

If the debt service for the Westport Nursing facility is not included in the calculation, I believe you

84

said it would be a 4.7 million dollar number?

A. Mm-hmm.

Q. Is that right?

A. Yes.

Q. Okay. Now, if -- you indicated to me that in excess of 5 million dollars is held in escrow but the problem you're having is 3 million of it is held in Westport Nursing.

A. Right.

Q. Okay. So if that money -- if that money were allocated back to Westport Holdings or if the bank permitted that to be used in some way that would -- that would take care of the problem; would it not?

MR. NEWHALL: Object to the form of the question.

BY MR. TURNER:

Q. In other words, there would be an overfunding at that point.

A. Yeah. I mean, if that money was put back and it could be used, yes, you'd have 5 million in the MLR.

UV-depo of Kathy Burkholder.txt

Q.    All right.  That's what I was trying to understand, the calculation.

A.    Mm-hmm.

Q.    And so the idea was if that money was considered and you didn't consider the debt -- the debt service of the separate entity, the nurse -- Westport Holding, which is essentially a leasing company, then you would have

85

sufficient -- sufficient funds to meet the corrected calculation.

MR. NEWHALL:  Object to the form.

THE WITNESS:  Yeah.  Yeah.

BY MR. TURNER:

Q.    Okay.

A.    Yes.

Q.    I was trying to understand what the -- what the situation was.

Now, did anybody -- you had your opinion.  You took your opinion on this and it was accepted by Eli.  Am I correct?  I mean, he said he wanted you to do something and certify something as he understood it and you said that's not the way you understood it, and that was the end of it.  Am I correct?

A.    Well, yeah.  When I told him that I didn't feel comfortable signing it, he accepted that and said "I'm sending it to the attorneys" --

Q.    All right.

UV-depo of Kathy Burkholder.txt

A.    -- "and the attorneys will decide."

Q.    Okay.

A.    That's what he said and --

Q.    Isn't that your job -- isn't that your job, Kathy -- if you don't mind me calling you by your first name. Isn't that your job to point out what your position is and

86

how you feel --

A.    Yes.

Q.    -- things should be done?

A.    Yes.  And sometimes owners will accept you doing that and sometimes they won't.

Q.    And in this case they did.

A.    Eli did.  Yes, he did.

MR. TURNER:  All right.  That's all I have.  Thank you, Kathy.

THE WITNESS:  Okay.

MR. TURNER:  I'm sorry for keeping you so long.

THE WITNESS:  That's all right.

MR. NEWHALL:  Just very few follow-up.

REDIRECT EXAMINATION

BY MR. NEWHALL:

Q.    You were asked about an agreement to merge the management of the University Village campus facility between AgeWell Senior Living and BVM --

A.    Mm-hmm.

Q.    -- in some way, shape or form.

UV-depo of Kathy Burkholder.txt

A. Mm-hmm. Yes.

Q. Okay. And that fell apart in January when Mr. Landry --

A. No. They were actually going to do this in August of 2014 and -- near the end of the month, and for some

87

reason -- it was about the same time as the reserve was moved for the Bridges and the Landings -- I don't know what happened, but the management -- the merge did not happen.

Q. Did you -- well, strike that.

Did -- to your observation was there any difference in the way that Jared McCowan participated in the affairs of University Village before this proposed merger fell apart in August of 2014 and the way he involved himself in the affairs of University Village after it fell apart?

A. Yeah. He became a lot more where he was making decisions, a lot of decisions, after that happened. And, you know, those -- he has since -- when the OIR came in, that's when he really has backed off of doing that.

Q. Are you at all familiar with the contracts that residents sign?

A. Yes.

Q. The life care contracts?

A. Yes.

Q. Do those life care contracts promise them any benefits at the skilled nursing facility and/or the assisted living facility that are actually there on the campus?

UV-depo of Kathy Burkholder.txt

A.   Yes.  It definitely spells out that they will get benefits in the skilled nursing and the assisted living.

Q.   You mentioned that John Bartle occasionally shares people between Westport Holdings Tampa and Westport Nursing

88

Tampa and allocates their time.  Correct?

A.   He actually shares them with the lessee, which is TR & SNF and TALF, so which that's the one who's doing the operation.  He shares staff with the independent living --

Q.   Okay.

A.   -- and the lessee.

Q.   Are you at all familiar with the access agreements that have been in place between Westport Holdings Tampa on one hand and the skilled nursing facility and the assisted living facility on the other?

A.   The old service agreements.  I -- come to my understanding that there are new ones in place, and I really haven't read through them thoroughly the new service agreements that pretty much just came to light.

Q.   When was it again that the 1 million dollars was taken out of the CPIF reserve of 1.75 million dollars and used for the Bridges?  When did that happen?

A.   That was in August of 2014.

Q.   Okay.  And just last night you get this memo saying that there's some discussion about trying to make arrangements for that.  Correct?

A.   Right.  That they're going to put a million

UV-depo of Kathy Burkholder.txt

dollars of that debt on BVM's books and that the loan should be reduced.

Q. Okay.

89

A. Yeah.

Q. So that came about after -- last night after eight months. Correct?

A. Right. Right.

Q. If the 3 million dollars that Mr. Turner was asking you about is moved from the Westport Nursing Tampa back to Westport Holdings Tampa --

A. Mm-hmm.

Q. -- or moved to Westport Holdings Tampa -- I don't know if "back to" is the correct term -- is -- to your knowledge, would -- would Westport Nursing Tampa then be in violation of one of its loan covenants?

A. The loan covenants said they needed to have those 3 million debt reserves. So unless that's being amended, yeah, that would be against their loan agreement.

Q. And as of today we know that the partners have been taking distributions in the amount of $100,000 from Westport Nursing Tampa every month for at least eight months now. Is that right?

A. It started October and went through --

Q. Oh, six months.

A. -- to February --

Q. Six months.

UV-depo of Kathy Burkholder.txt

A.    -- because they didn't do it in March.  Mm-hmm.

Q.    Okay.  I stand corrected.  You're right.  So

90

they've taken from -- they -- they -- we know the limited partners took distributions of $100,000 from, well, October, November, December, January, February and April?

A.    I have not seen -- in March, nothing.  I haven't seen April's numbers yet.

Q.    Okay.  So at least -- setting April aside, they've taken distributions of $100,000 from Westport Nursing Tampa in at least five months.  Correct?

A.    Mm-hmm.  Yes.

Q.    As of today August or -- I'm sorry; what day is It -- April 24th, 2015, have any of the limited partners put any money back into Westport Nursing Tampa or Westport Holdings Tampa?

A.    No.

MR. NEWHALL:  I don't have any further questions.

MS. SMALL:  Okay.

MR. NEWHALL:  All right.

RECROSS-EXAMINATION

BY MR. TURNER:

Q.    One follow-up to the question I have is do you know the relationship -- after some deal fell through in August of 2014, do you know whether there was any further negotiations being conducted between AgeWell and anyone else on behalf of BVM or any of the principals?

UV-depo of Kathy Burkholder.txt

A.   To renew their management contract?  I guess I

91

need to understand the question.

Q.   To renew their management contract or to change it in some way or to change the relationship in some way.

A.   Yes, according to David Mills -- who works for AgeWell -- he told me that they tried numerous times to restructure their management agreement so they could stay on past the 30th of January, and they were just told either no or they were -- it wasn't accepted.

Q.   Now, let me ask one more thing that is about the auditor, this new auditor.  How long has this new auditor been working and looking at the -- you know, been in trying to get the audit completed?

A.   Are we talking the State examiner or Clifton Larson Allen?

Q.   Clifton Larson.

A.   Clifton Larson Allen has been at the community for the last two weeks doing their audit.

Q.   So problems that they would identify and bring to management's attention could have been brought any time during that period; am I correct?

A.   Yes.  Also Clifton Larson Allen was -- John Bartle hired them to review the MLR back in October of 2014.  So they were -- and I also called them to help me to understand the whole structure of what happened during the sale, and I really didn't get anywhere until just recently with them.

UV-depo of Kathy Burkholder.txt

92

Q.   And they also could be concerned or address this question of the transfer of money to be sure the books were properly adjusted to reflect the transaction properly.

MR. NEWHALL:  Objection, speculation.

BY MR. TURNER:

Q.   That's something they were bringing up, as far as you know.  You don't know one way or another, I guess.

A.   Yeah, I don't know.  I mean, I was trying to get them to help me understand it earlier, but, you know, now that they're here doing the audit, things are -- they're going to give me findings probably next week and how we're going to adjust certain accounts.  They said they needed to discuss everything with John Bartle to figure out how everything was supposed to be set up from this -- from the structure of the sale.

MR. TURNER:  All right.  That's all I have.  Thank you.

MR. NEWHALL:  Nothing further, ma'am.

THE WITNESS:  Okay.

MR. NEWHALL:  Get up and -- let me explain to you you have the right to read the deposition if it's -- and it is going to be typed up.  I'm going to order it.  And you're going to have to -- if you want to read it, you're going to have to do it within the next -- almost immediately after it's prepared because I have to have it by Tuesday.  But, you

UV-depo of Kathy Burkholder.txt

93

know, you can -- if you want to exercise your right -- which you can't really change what the reporter has taken down, but you can note on an errata sheet that "I said 30. She thought I said 40. She typed down the wrong thing" --

THE WITNESS: Yeah. Yeah.

MR. NEWHALL: -- "on page 20, line 2," for example. Or you can waive your right to read and sign. That's entirely up to you, as far as I'm concerned. They may have some input to it.

MS. SMALL: She'll read.

MR. NEWHALL: She'll read.

(Deposition concluded at 1:37 p.m.).

UV-depo of Kathy Burkholder.txt

94

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

     I, the undersigned authority, certify that Kathleen Burkholder personally appeared before me on April 24, 2015, and was duly sworn.

     WITNESS my hand and official seal this 25th day of April, 2015.

_____

Rishelle M. Meier

Notary Public – State of Florida

My Commission Expires:  12/23/15

Commission No.  EE 141125

UV-depo of Kathy Burkholder.txt

95

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, RISHELLE M. MEIER, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of Kathleen Burkholder; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 25th day of April, 2015.

_____

Rishelle M. Meier, RMR

96

UV-depo of Kathy Burkholder.txt

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA
CASE NO.:  2015-CA-00585

State of Florida, ex rel.,
the Department of Financial
Services of the State of Florida,
Relator,

vs.

WESTPORT HOLDINGS TAMPA,
Respondent.
_____/

IN RE:  DEPOSITION OF KATHLEEN BURKHOLDER
TAKEN:  April 24, 2015
DATE EMAILED TO COUNSEL FOR WITNESS:  April 25, 2015

TO:  Kathleen Burkholder
C/o: Sturner@broadandcassel.com
Wwiener@broadandcassel.com
asmall@allendell.com

The referenced transcript has been completed regarding the above-referenced deponent.

The errata page is located at page 97 where changes, if any, are to be made.  On this errata page, have the witness note the page and line numbers of the changes.  Kindly return to opposing counsel.

The original of this deposition has been forwarded to the ordering party.

Thank you.

_____
Rishelle M. Meier, RMR

cc:  Timothy Newhall, Esquire

97

UV-depo of Kathy Burkholder.txt

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

IN RE:    Florida Dept. of Financial Services vs. Westport
          WITNESS:   Kathleen Burkholder
          DATE OF DEPOSITION:   April 24, 2015

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| | | | |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____    _____
DATE              DEPONENT

Reporter:   Rishelle M. Meier, RMR