

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

---

In re: WESTPORT HOLDINGS TAMPA, LP and WESTPORT HOLDINGS TAMPA II, LP, Debtors,

Jointly Administered Under Case No. 8:16-bk-08167-MGW

JEFFREY W. WARREN, Liquidating Trustee for Westport Holdings Tampa, LP and Westport Holdings II, LP, Plaintiff,

v.

VALLEY NATIONAL BANK, principal subsidiary to VALLEY NATIONAL BANKCORP, a New Jersey corporation, as successor by merger to USAMERIBANK, Defendant

Adv. Pro. No.: 8:20-ap-00007-MGW

EXPERT REBUTTAL REPORT OF
Stanley A. Murphy, CPA/ABV/CFF, CIRA/CDBV, CVA
ANKURA CONSULTING GROUP, LLC

JULY 7, 2023



PLAINTIFF'S
EXHIBIT
189



# Contents

I.   SCOPE OF WORK ....................................................................2

II.  PROFESSIONAL BACKGROUND AND EXPERIENCE ...........................2

III. COMPENSATION ...................................................................3

IV. INFORMATION CONSIDERED ....................................................3

V.   GENERAL BACKGROUND OF THE CURRENT MATTER ......................3

VI. SUMMARY OF OPINIONS .......................................................3

VII. BASIS & REASONING – ANALYSIS ............................................5

   A.  Unterholzner's Makes Critical Errors in Her Solvency Analysis. .................6

VIII. RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE ..................13



## I.    SCOPE OF WORK

1.    In addition to preparing the Expert Report of Stanley A. Murphy dated April 17, 2023, ("my original expert report"), I have been asked to (1) review and analyze the expert report by Lisl Unterholzner dated April 17, 2023 ("Unterholzner Report"); (2) prepare this expert rebuttal report; and (3) possibly testify at trial.

2.    This rebuttal report presents my observations, findings, conclusions, and opinions related to Unterholzner's solvency analysis.

3.    This is not an attestation or audit report as defined by the Association of International Certified Professional Accountants ("AICPA") and this engagement is not an attest or audit engagement as defined by the AICPA.[1]

4.    This rebuttal report is to be used solely for the purposes of the above-referenced litigation and is not to be used for any purpose unrelated to this matter without the prior written approval of Ankura. The use of terms "I," "we," "our," or "my" in this rebuttal report, in the context of procedures, research, and analyses, refers to work performed by both me and staff working under my supervision and direction. The following sections set forth my qualifications as an expert, my conclusions, the documents considered, the basis for my conclusions, and disclosure of compensation.

## II.    PROFESSIONAL BACKGROUND AND EXPERIENCE

5.    For a discussion of my background and experience, please see my original expert report at pages 4 - 5, as well as Attachments A and B to my original expert report.

---

[1] In 2017, American Institute of Certified Public Accountants and the Chartered Institute of Management Accountants formed a joint venture and created the Association of International Certified Professional Accountants.  According to paragraph 44 of the American Institute of Certified Public Accountant's publication, "Litigation Services and Applicable Professional Standards", in an attestation engagement, "the CPA assesses the fairness of the written assertions of others, which may be in the form of financial statements, parts of such statements, or information not of a financial nature...the opinion expressed is that of the CPA firm." Similarly, the PCAOB defines an attest engagement as one in which "a certified public accountant in the practice of public accounting is engaged to issue or does issue an examination, a review, or an agreed-upon procedures report on subject matter, or an assertion about the subject matter that is the responsibility of another party." Ankura is not a CPA firm. Ankura's services under this engagement did not involve preparing, examining/auditing or expressing an opinion on the fair presentation of any financial statements as those terms are used in pertinent state Statutes and in generally accepted professional standards issued by the AICPA.



## III.   COMPENSATION

6. Ankura is being compensated at hourly rates ranging from $250 to $750 for services provided in this matter. Ankura's compensation is not contingent upon the results of any analyses or opinions I am offering and is not dependent on the outcome of this litigation.

## IV.   INFORMATION CONSIDERED

7. In arriving at the opinions set forth below, I have relied on my education, training, and experience in accounting, valuations, financial and damages analysis, and my review of various documents, pleadings, transcripts and exhibits produced thus far by the parties. A list of the documents and information considered to arrive at my conclusions and opinions includes Attachment C to my original report and the Unterholzner Report.

## V.   GENERAL BACKGROUND OF THE CURRENT MATTER

8. For a discussion of certain background facts and information relevant to my opinions, please see pages 6 - 7 of my original expert report, as well as specific facts discussed in this rebuttal report. My discussion of background facts and information in my original expert report is not intended to be a comprehensive history or analysis of this dispute, nor is it intended to represent any conclusion of fact or law relevant to this case. Please refer to the pleadings and discovery for a comprehensive background of this matter.

## VI.   SUMMARY OF OPINIONS

9. I formed my opinions based on the results of analyses detailed in this report, as well as my education, knowledge, experience, and training. Many of the conclusions and findings in Unterholzner's report are based on unsupported and unreasonable assumptions, are in conflict with facts in evidence which were available to Unterholzner, and, as a result, Unterholzner's findings and conclusions are flawed, erroneous, unreliable, unsupported and unreasonable. A summary of my opinions are as follows:

   A. Unterholzner's assumptions used in her solvency analyses as of December 31,



2013 and March 31, 2014 were erroneous, flawed and were in conflict with the evidence I reviewed in this case and the appraisal prepared by Cushman & Wakefield[2] ("CW") of the Independent Living ("ILF") portion of University Village. These errors render her findings unsupported and unreliable. As discussed in this rebuttal report, her solvency calculation as of December 31, 2013 and March 31, 2014 erroneously included the following liability amounts in her solvency analyses:

| Description | Overstatement Errors at 12/31/2013 | Overstatement Errors at 3/31/2014 |
|---|---|---|
| Refundable Entrance Fees Liability | $ 28,186,003 | $ 27,562,356 |
| Deferred Revenue Balance | 15,817,495 | 16,039,980 |
| Due to Affiliates Liability | - | 12,883,697 |
| **Total Liability Overstatement Error** | **$ 44,003,498** | **$ 56,486,033** |

Adjusting for these errors alone in Unterholzner's solvency analyses results in Westport Holdings Tampa, LP ("Westport I") and Westport Holdings Tampa II, LP ("Westport II"), collectively ("Westport"), being solvent at both December 31, 2013 and March 31, 2014.

B. Unterholzner did not consider the 10-year contemporaneous budgets for University Village prepared by Chief Financial Officer Kathy Burkholder in early 2014. This error renders her findings unreliable.

C. Unterholzner's solvency analysis of University Village is invalid for several reasons, including, among others, she did not perform a business valuation of University Village as of the valuation dates, even though the necessary information for a business valuation as of her insolvency analyses dates (December 31, 2013 and March 31, 2014) was available to her. In my experience in prior insolvency assessment/analyses, business valuations of the subject entity are a crucial component of an expert rendering a solvency opinion. Unterholzner's solvency analyses were limited to adjustments to the balance sheets using the valuation

---

[2] #289571.1 - #289571.321 – CW Appraisal of the Going Concern of University Village, effective date March 6, 2014.



amounts from the Integra Realty Resources ("IRR") appraisal[3] of the skilled nursing facility and assisted living facility (the "Health Center") and the CW appraisal. She failed to perform an independent business valuation of any portions of University Village to arrive at the fair value of University Village's assets and compare the fair values to University Village's liabilities as of the valuation dates.

    D.   Unterholzner relied completely on the findings in the IRR and the CW appraisals for the fair value of the assets of University Village as of the valuation dates. There is no discussion in Unterholzner's report of any analyses performed to assess the reasonableness of IRR or CW's findings. As discussed in this rebuttal report we noted two critical errors in the CW appraisal which materially understated the fair market value findings in the CW appraisal. If Unterholzner had performed tests or analyses of the CW appraisal assumptions, calculations or findings she would likely have detected these errors. As a result of Unterholzner not identifying these errors, her solvency conclusions are unreliable, not supported and are in conflict with the evidence in this matter.

10. My analyses are based upon procedures performed with respect to specific documents and information provided by the Plaintiff, Defendant and their respective counsel in conjunction with my own research and knowledge of the issues in this matter. The following sections set forth my analysis and basis for my findings and conclusions relating to the Unterholzner Report.

## VII.   BASIS & REASONING – ANALYSIS

11. My opinions and findings are based upon the analysis and study of information and documents received as of the date of this rebuttal report. I reserve the right to supplement and amend the opinions expressed herein in response to positions taken by other experts or by the Plaintiff. I further reserve the right to amplify what is stated in this report, where necessary, and especially in view of information not presently

---

[3] #289777.1 - #289777.206 – IRR appraisal, effective date February 21, 2014.



known to me including, but not limited to, any information revealed in ongoing discovery or new information presented by Plaintiff's expert(s) prior to, or at trial, and to supplement this report should additional information be brought to my attention during the course of this proceeding. Furthermore, I may be involved in the preparation of demonstrative exhibits and other materials to illustrate my testimony at trial.

12. I was asked to assess Ms. Unterholzner's opinions set forth in the Unterholzner Report. The following sets forth my analysis of Unterholzner's opinions, calculations and her underlying methodologies.

### A. Unterholzner's Makes Critical Errors in Her Solvency Analysis.

13. Unterholzner's assumptions used in her solvency analyses are in conflict with the evidence in this matter and with the CW appraisal of University Village which she relies on for her solvency analysis. As discussed below, Unterholzner's calculation of net equity for her solvency analysis assumes that the refundable entrance fee liability and the balance sheet deferred revenue liabilities balances, as of the valuation dates, should be subtracted from the CW fair market value appraisal amounts. This assumption was an error and was in conflict with the CW appraisal detailed calculations, Burkholder's deposition testimony and Burkholder's early 2014 10-year budgets.

14. As discussed below, Unterholzner's solvency analysis as of December 31, 2013 and March 31, 2014 (as reflected in Exhibit VII and Exhibit VIII of her report, respectively) erroneously included the following liabilities as of December 31, 2013 and March 31, 2014 in her solvency analysis, as shown in the table below.

| Description | Overstatement Errors at 12/31/2013 | Overstatement Errors at 3/31/2014 |
|---|---|---|
| Refundable Entrance Fees Liability | $ 28,186,003 | $ 27,562,356 |
| Deferred Revenue Balance | 15,817,495 | 16,039,980 |
| Due to Affiliates Liability | - | 12,883,697 |
| **Total Liability Overstatement Error** | **$ 44,003,498** | **$ 56,486,033** |



15. The impact of correcting these errors by Unterholzner results in a net positive equity for Westport as of December 31, 2013 and March 31, 2014, as shown in the table below.

| Description | Overstatement Errors at 12/31/2013 | Overstatement Errors at 3/31/2014 |
|---|---|---|
| Unterholzner Net Worth | $ (41,438,468) | $ (45,165,669) |
| | Insolvent | Insolvent |
| | | |
| **Unterholzner Overstatement Errors** | | |
| Refundable Entrance Fees Liability | 28,186,003 | 27,562,356 |
| Deferred Revenue Balance | 15,817,495 | 16,039,980 |
| Due to Affiliates Liability | - | 12,883,697 |
| Subtotal Liability Overstatement Err | 44,003,498 | 56,486,033 |
| | | |
| **Adjusted Net Worth** | $ 2,565,030 | $ 11,320,364 |
| | Solvent | Solvent |

### Refundable Entrance Fees Liability

16. The CW appraisal Unterholzner utilizes only includes an income approach, consisting of the discounted cash flow method ("DCF Method") and income capitalization method for the ILF.

17. CW's estimated future cash flows to the ILF are net of repayments of refundable entrance fees as of the valuation dates.[4] We noted that the refunds of the refundable entrance fees included in the discounted cash flows used by CW are larger than the refundable entrance fee liability as of the valuation dates.[5] Accordingly, the discounted cash flows used by CW are net of the refundable entrance fees liabilities as of the valuation dates. Therefore, the refundable entrance fees should not be included as a liability in Unterholzner's solvency analysis for the simple reason that CW's discounted cash flows already netted out the refunds payable balance as of the valuation dates. Or said another way, the discounted cash flows used to determine CW's value of the ILF as

---

[4] #289571.1 - #289571.321 – CW Appraisal of the Going Concern of University Village, effective date March 6, 2014, page 83 - 87.
[5] See discussion below for additional details regarding CW appraisal errors.



of the valuation dates have already been reduced for the repayment of the refundable entrance fees liabilities.

18. In my opinion, Unterholzner overstated the ILF liabilities for refundable entrance fees by nearly $28.2 million as of December 31, 2013 and by $27.6 million as of March 31, 2014. This $28.2 million and $27.6 million error renders her solvency analyses findings as unsupported, unreliable and in conflict with the available evidence.

**Deferred Revenue Balance at the Valuation Date**

19. The projected cashflows used in CW's income approach were net of or did not include any non-cash income representing accounting entries to amortize into accounting income a portion of the annual deferred revenue balance sheet account as of the valuation dates. For accounting purposes, the deferred revenue balance as of the valuation dates represented the unamortized portion of non-refundable entrance fees collected in prior years.

20. Per my review of University Village's audited financial statements, University Village uses the estimated remaining life expectancy of each resident and adjusts the deferred revenue balance sheet account so that the balance of the non-refundable entrance fees are recognized as accounting income over the resident's remaining life expectancy.

21. It is my understanding from review of the University Village financial statement footnotes, my discussions with Kathy Burkholder and my review of resident contract agreements that once a resident contract has been in effect for 28 months, the non-refundable entrance fee is no longer payable to the resident regardless of the reasons for future contract termination. For example, if a resident dies for any reason or terminates the contract for any other reason, unless the resident contract has been in effect for less than 28 months, none of the non-refundable entrance fee will ever be refunded to the resident regardless of the reason for the eventual contract termination. In summary, the deferred revenue balance at the valuation dates represents the present value of estimated portions of the non-refundable entrance fees amounts to



be amortized into accounting income in future periods. Based on my review of the CW appraisal, CW's discounted cash flows include expense amounts for provision of services due to all residents, including but not limited to resident care expenses, food, activities, and housekeeping.

22. Unterholzner should not have included the deferred revenue balance sheet amounts in her solvency analyses at the valuation dates because: 1) no cash payments for the non-refundable contract portion will ever be due in the future to any resident with a contract date greater than 28 months before the valuation dates; 2) the present value of the cost of providing future services to all residents with contracts comprising the balance sheet deferred revenue amount at the valuation dates were included in CW's discounted cash flows.

23. CW prepared a two-year budget to utilize in their DCF Method. The CW two-year budget reasonably reconciles to the first two years of Kathy Burkholder's contemporaneous budget adding validity to the CW appraisal.

24. Unterholzner overstated the deferred revenue for non-refundable entrance fees by $15.8 million as of December 31, 2013 and by $16.0 million as of March 31, 2014. This $15.8 million and $16.0 million error renders her solvency analyses findings as unsupported, unreliable and in conflict with the evidence.

**Due to Affiliates Liability**

25. Unterholzner erroneously included the $12.9 million due to affiliates liability in her March 31, 2014 solvency analysis. Based on my review of available records, including but not limited to, the loan closing journal entries for the Health Center and ILF associated with the March 31, 2014 transaction, the intercompany assets/liabilities were written-off in connection with the March 31, 2014 transaction closing.

26. Unterholzner's erroneous inclusion of the $12.9 million due to affiliates liability in her March 31, 2014 solvency analysis renders her findings unreliable and in conflict with the evidence in this matter.



27. Instead of using the actual March 31, 2014 balance sheets for the ILF and for the Health Center, which were available to Unterholzner and included the impact of the March 31, 2014 transaction, Unterholzner created a projected March 31, 2014 balance sheet for the ILF for her March 31, 2014 solvency analyses. As a result, several asset and liability amounts in her created March 31, 2014 balance sheet differed from the actual asset and liability amounts on Westport I and Westport II's balance sheet ranging from $4,670 to $12,348,443.

### Cushman & Wakefield Appraisal

28. Unterholzner's solvency analysis adjustments rely solely on the opinions within the CW and IRR appraisals. Based on my review of the CW appraisal, the calculations performed by CW included the following errors[6]:

   A. CW utilized the DCF Method to determine the values of the ILF. CW prepared two opinions for the ILF: 1) the market value of the ILF as-is: and 2) the market value of the ILF as stable. In both opinions CW calculated the projected ILF revenue. However, for the as-is value, CW failed to include any entrance fee revenue in their calculation. Net entrance fee revenues are included in the value for the stable opinion. In my opinion, net entrance fee revenues should also be included in the as-is value, as the ILF had numerous consecutive years with substantial net entrance fee revenues from the sale of life-care contracts. By appropriately including the net entrance fees revenue in the as-is calculation, the as-is and stable values would be the same, thus increasing CW's as-is value by $4.1 million.

   B. CW provides an analysis of the entrance fees historically received and refunded by the ILF, but as discussed above, for an unknown reason, the net entrance fee revenues are not included in the calculated as-is value of the ILF. I believe this is a critical mistake and an issue that Unterholzner should have identified if she had

---

[6] For the purposes of my analyses, I did not review the IRR appraisal which provided an opinion for the value of the Health Center.



performed an appropriate level of testing in her solvency analysis.

C. For the stable opinion, CW calculated the projected annual future net entrance fees that the ILF would collect to be $442,035. Based on the reasons discussed below I believe this figure to be understated.[7]

   i.   To begin, CW determined the total weighted average entrance fee was $138,819 per unit based on the ILF entrance fees for the 40% and 90% refundable plans per unit type.[8]

   ii.   Next, CW determined the median refund percentage of the entrance fees as 64.2%. CW calculated the percentage by reviewing historical entrance fee activity from 2009 through 2013.[9]

   iii.   Based on the same historical entrance fee activity, the actual average entrance fee per unit between 2009 and 2013 was $176,903.[10] The historical entrance fee per unit based on actual ILF values is approximately $38K more than the entrance fee value calculated by CW.

   iv.   Next, CW used the $138,819 average entrance fee less some market concessions ($15,000) for a net average entrance fee of $123,819 per unit. Then CW applied a 90% average refund ($111,437) for a net entrance fee of $12,382 per unit. We believe CW should have instead used their previously calculated 64.2% median refund of the entrance fee.

   v.   Nonetheless, CW multiplied the $12,382 net entrance fee by 35.7, or CW's calculated annual number of units turning over, to determine the

---

[7] #289571.1 - #289571.321 – CW Appraisal of the Going Concern of University Village, effective date March 6, 2014, page 86.
[8] #289571.1 - #289571.321 – CW Appraisal of the Going Concern of University Village, effective date March 6, 2014, page 84.
[9] Ibid.
[10] Ibid.



annual net entrance fee $442,035.[11]

    vi.    I believe a more reasonable net entrance fee for the ILF would incorporate historical actual values for the average entrance fees and refund percentages. By replacing the CW per unit average entrance fee of $138,819 and average refund percentage with the actual historical values, the net entrance fee increases from $442,035 to $2,069,220 per year. Alternatively, the average of the actual net entrance fees from 2009 to 2013 was $1,462,564. Either way, the net entrance fee was likely understated by at a minimum $1 million per year in CW's DCF Method analysis.

29. In addition to the errors for the improper inclusion of the refundable entrance fees liability, deferred revenue and due to affiliates liability, Unterholzner's solvency analysis is unreliable, unsupported and in conflict with the evidence in this matter, due to the errors in CW's appraisal discussed above.

---

[11] #289571.1 - #289571.321 – CW Appraisal of the Going Concern of University Village dated March 6, 2014, page 86.



## VIII.   RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE

30. The findings and conclusions expressed above are current as of the date of this rebuttal report and are limited to my review and analysis of available records in this matter, information gathered from discussions with Defendant's representatives, discussions with counsel, and my education, experience, and training. Accordingly, I reserve the right to revise or expand these conclusions based upon further study and analyses of any existing or newly acquired information, expanded views expressed by Plaintiff's or Defendants expert witnesses or other interested parties, and/or documentary and testimonial evidence introduced at trial.

31. Ankura's hourly professional services rate in connection with my time on this engagement is $750 per hour[12], plus actual expenses. Payment of these professional fees and expenses is not dependent upon the outcome of this matter.

Dated July 7, 2023

Respectfully Submitted,

By: _____

Stanley A. Murphy
Senior Managing Director
Ankura Consulting Group, LLC
101 E. Kennedy Blvd., Suite 2250
Tampa, FL  33602
(813) 277-1700

---

[12] Rates for my staff who assisted on the matter were billed at rates lower than $750 per hour.

13