Filing # 43660099 E-Filed 07/07/2016 02:02:50 PM

**CPIF ADVERESARY DOCUMENT**

## IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
## IN AND FOR LEON COUNTY, FLORIDA

STATE OF FLORIDA, ex rel., THE
DEPARTMENT OF FINANCIAL SERVICES
OF THE STATE OF FLORIDA,

    Relator,

v.                                    Case No. 2015 CA 000585

WESTPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP d/b/a
UNIVERSITY VILLAGE, a Delaware limited
partnership licensed as a continuing care
retirement community in the State of Florida,

    Respondent.

_____/

### RELATOR'S CORRECTED[1] MEMORANDUM IN OPPOSITION TO RESPONDENT'S
### MOTION FOR SUMMARY JUDGMENT ON LIMITED PARTNERSHIP ISSUE

Pursuant to Florida Rule of Civil Procedure 1.510, Relator, State of Florida, Department

of Financial Services ("Relator") hereby files its memorandum in opposition to Westport Holdings

Tampa, LP's ("Respondent") motion for summary judgment on limited partnership issue (the

"Motion"). The Motion, which was filed just two (2) months after Westport filed its Counterclaim,

represents that it is based upon Westport's "counterclaim Count I" and asks the Court to declare

"that the 9% [sic] limited partnership interest in Westport is lawfully acquired and not void."

*Motion*, p. 7. In sum, Westport asks that its self-declared "limited partners" be found to have

lawfully acquired their interests based upon disputed allegations that OIR was "fully informed" of

the transaction. Those facts, however, are squarely in dispute, and Westport may not secure an

instantaneous summary judgment of "estoppel" or "waiver" in this proceeding.

---

[1] This corrected filing includes Exhibit A and its attachments.

1



PLAINTIFF'S EXHIBIT

175

Overview

DFS initiated this receivership proceeding against Westport, which possesses a certificate of authority to operate a Continuing Care Retirement Community ("CCRC"). § 651.021, Fla. Stat. A CCRC provides shelter, nursing care or personal services to elderly citizens that have purchased a continuing care contract from the CCRC. § 651.011(2) and (14), Fla. Stat. The continuing care contract is treated as the equivalent of a policy of insurance. As a result, CCRC providers are regulated as "specialty insurers" and are subject to regulatory oversight by OIR to ensure the protection of the residents and the financial stability of the provider. §§ 628.4615(1)(h) and 651.013, Fla. Stat.

The regulatory oversight of CCRC's has been explained by the First District Court of Appeals:

> Since the advent of CCRCs in the 1980s, the State of Florida has taken an active regulatory approach to ensure that residents of these facilities—who expend substantial monies for having health care, nursing, and assisted living services under one roof—are protected from potential scams and the economic vicissitudes of the industry as it established itself and evolved. The legislature created, and later revised, the regulatory structure that oversees the providers of CCRCs and their relationships to their residents, which is primarily contained in Chapter 651, Florida Statutes, with other relevant provisions in Chapter 631 and elsewhere. Although contracts to purchase interests in CCRCs are not "insurance" products in the ordinary meaning of that term, the statutory framework is placed under the auspices of insurance regulation and regulators. The oversight and regulatory functions mirror those for insurers, with important exceptions, but also have a strong consumer protection component to safeguard the interests of residents.

*Devonshire at PGA Nat., LLC v. State, ex. rel. Dep't of Fin. Servs.*, 103 So.3d, 1061-62 (Fla. 1st DCA 2013).

The "strong" consumer protection component needed to safeguard the interests of the residents starts with a comprehensive assessment of the facility's owners and management to ensure that they (i) are reputable and responsible; (ii) have sufficient experience in the operation

2

FOIR_066368

of CCRC's; and (iii) have sufficient financial resources which, in part, is established through the submission of "[c]omplete audited financial statements of the applicant, prepared by an independent certified public accountant in accordance with generally accepted accounting principles." See § 651.022, Fla. Stat., and § 651.023(1)(g), Fla. Stat.

After the certificate of authority has been issued, persons who wish to acquire the CCRC are subject to the "specialty insurer" acquisition requirements. See § 651.024, Fla. Stat., and § 628.4615, Fla. Stat. Here too, proposed parties must submit extensive personal and background information so that OIR may "examine the character, experience, ability, and other qualifications of the person or affiliated person of such person for the protection of the insureds of the insurer and of the public." § 628.4615(4), Fla. Stat.

As shown below, Westport's Motion essentially asks the Court to determine that Westport's owners did not need approval of OIR to acquire the certificate of authority, despite the undisputed fact that no one has been approved by OIR to operate this facility. In sum, Westport's Motion asks the Court to essentially deem Westport authorized, as a result of "estoppel" and "waiver" by OIR. Westport claims that it should be exempt from any regulatory and oversight process because OIR was "fully informed" and "waived any objection." *Counterclaim*, ¶ 36. Westport is wrong. OIR was not "fully informed," Westport's partners were anything but "limited," and no estoppel or waiver can apply to the government on these matters of law. Westport knows that OIR disputes these allegations because Westport petitioned for a formal administrative hearing and listed each of the "undisputed" facts in this action as the "disputed" facts which would entitle it to a DOAH hearing. For all these reasons, the Motion must be denied.

FOIR_066369

Procedural History

1. On March 11, 2015, the Department filed an Application for Order to Show Cause, Injunction, and Notice of Automatic Stay for Purposes of Rehabilitation ("Original Application").

2. At that time, the Department set forth detailed allegations and requested that the Department be appointed as Receiver for Westport.

3. The Original Application explained, among other things, that the operation of the CCRC was effectively being managed by Mr. John Bartle and others, as unapproved providers, and that the situation rendered "the continued operation of University Village [Westport] presently and prospectively hazardous to its elderly residents, its creditors and the public." *Original Application*, ¶31.

4. On March 13, 2015, the Court issued the requested Order to Show Cause ("Original Order"). Thereafter, the parties engaged in discovery.

5. On July 24, 2015, the Department filed a Motion to Issue Amended Order to Show Cause. At that time, the Department explained that it had discovered additional bases to support its claim that it should be appointed as a receiver. In particular, the Department explained that: (i) Westport was insolvent; (ii) Westport had willfully violated section 651.026, Florida Statutes, by failing to file audited financial statements; and (iii) Westport had been the victim of fraud and embezzlement.

6. After a full hearing, the Court issued the requested Amended Order to Show Cause ("Amended Order") on September 4, 2015.

7. On October 6, 2015, Westport originally answered the Amended Order.

8. On March 15, 2016, the Florida Office of Insurance Regulation ("OIR") issued two Initials Orders of Suspension regarding Westport's certificate of authority as a CCRC. *See*

FOIR_066370

*attached Exhibit A, Affidavit of Carolyn Morgan dated July 6, 2016,* ¶ 13 and Attachments 1 and 2 appended thereto (suspension orders from *In the Matter of Westport Holdings Tampa, Limited Partnership d/b/a University Village,* OIR Case No. 185108-16, DOAH Case No. 16-002028 and *In the Matter of Westport Holdings Tampa, Limited Partnership d/b/a University Village,* OIR Case No. 188018-16, DOAH Case No. 16-002027) (the "Suspension Based Upon Ownership Order")).

9.      After OIR issued a suspension order to Westport in OIR Case 188018-16, Westport filed a petition for administrative hearing. *See attached Exhibit A, Affidavit of Carolyn Morgan dated July 6, 2016,* ¶ 14, and Attachment 3 appended thereto.

10.     Near this same time, Westport made a request in this delinquency proceeding for leave to file an Amended Response to the Amended Order and to include a counterclaim.

11.     On April 8, 2016, the Court entered an order granting Westport leave to file its Amended Response and Counterclaim.

12.     On April 14, 2016, Westport filed its Amended Response and Counterclaim.

13.     With respect to its Counterclaim, Westport essentially repeated many of the allegations it had set forth in its DOAH Petition against OIR.

14.     Count I of Westport's counterclaim requests declaratory relief and asks for a judgment that "Westport partners are the lawful owners of the physical property and the CCRC licensure." *Counterclaim*, p. 27.[2]

15.     On June 17, 2016, Westport filed its Motion for Summary Judgment on Limited Partnership Issue. The Motion purports to be made on Westport's "counterclaim Count I." *Motion*,

---

[2] Curiously, the Counterclaim failed to attach any of the transactional documents through which the unnamed "Westport partners" claim their interest.

FOIR_066371

p. 1. The Motion's requested relief, however, fails to mention the "physical property" listed in Count I and, instead, requests a declaration that the "9% [sic] limited partner interest in Westport is lawfully acquired and not void."

16.     Also, on June 17, 2016, Westport filed a Statement of Undisputed Material Facts in support of the Motion (the "Statement"). Westport's Statement is nothing more than a cut-and-paste from its DOAH petition, which, ironically, admitted that "Westport anticipates OIR will dispute the facts alleged in this Request. Disputed issues of material fact or mixed issues of fact and law will likely include at least the following:  a. Whether OIR had knowledge of Westport's changes in 99% limited partner ownership in April 2014 [and so on]." *See Attachment 3 to attached Exhibit A*, DOAH Petition at ¶81.

17.     Despite this glaring oversight, the Motion and Statement proclaim "everything remains in limbo" (*Motion*, p. 2) and "no one could even be served with process as Respondent in this case" (*id.*, p. 1), because the OIR's "orders and actions create uncertainty as to Westport's limited partners' ownership rights." *Statement*, p. 5.

18.     In essence, Westport proclaims that it is in doubt as to its ownership rights based upon OIR's actions and orders.

19.     When laid bare, the Statement asserts that OIR was "fully informed and aware of the acquisition transaction" and that OIR told Westport "that no application for acquisition approval would be required for the 99% limited partner share acquisition." *Statement*, ¶¶ 6 and 10.

20.     As support for the allegation that OIR is now estopped from questioning the limited partnership acquisition, Westport attaches a hodgepodge of emails from OIR staff which, Westport claims, supports its view that OIR "cannot change its position retroactively." *Motion*, p. 3.

FOIR_066372

21.     Westport's alleged record evidence, however, demonstrates that OIR's position has been unchanged and that OIR's understanding was based upon promises from Westport that there would be "no change in control" – statements which were utterly false.[3]

22.     If anything, the OIR emails support the conclusion that a dispute exists as to OIR's understanding of whether individuals who claimed to be "limited" partners and just "investors" were actually exercising control over the management and operations of Westport (also known as "University Village") and how the transaction was to unfold.

23.     In fact, in her original affidavit attached to the Original Application, Ms. Morgan explained that OIR had been misled. *See Affidavit of Carolyn Morgan, February 26, 2015*, attached as an Exhibit to the Department's Application for Order to Show Cause filed March 11, 2015.

24.     Ms. Morgan attested that:

- On March 11, 2014, BVM, an Indiana corporation, under the assumed name BVM Management/Westport Holdings, L.P., entered into an agreement to purchase the limited partnership interest in University Village. (*Morgan Affidavit*, ¶8).

- John Bartle is the managing director of BVM, and Rebecca Bartle is the Secretary of BVM. (*Id.*).

- At the time of the transaction, John Bartle and University Village represented to the Office that BVM would be a limited partner who would not exercise control over the management and operations of University Village. (*Id.*).

- University Village represented that there was a plan for BVM to eventually acquire and assume control of the general partner, but BVM had not done so. (*Id.*).

- University Village and BVM made representations that management and control of University Village remained with Larry Landry, manager of

---

[3] For example, the November 14, 2013 email from Christopher Struk to Toma Wilkerson notes that OIR employee Mary Mostoller was "leaning toward replacement of a the [sic] Limited Partners would not trigger an acquisition *since there is no change in control.*" *Statement*, p. 11 (emphasis added).

FOIR_066373

Westport Advisors, Ltd., which was the managing member of the general partner of University Village. (*Id.*).

- Despite representations and filings made by Compliance Concepts, LLC and University Village to the contrary, John Bartle and BVM are operating University Village by exercising control over the management and operations of University Village. John Bartle and BVM employees, including Jared and Kassidy McCown, Rebecca Bartle's son and daughter-in-law, have represented themselves to residents, employees, lenders and others as individuals with authority to bind and exercise control over University Village. (*Id.* at ¶15).

25. Ms. Morgan's affidavit then presented very specific evidence of Mr. Bartle's involvement (and the involvement of Bartle family members) in Westport's regular operations including that:

- John Bartle has repeatedly corresponded with the Office on behalf of University Village. (*Id.* at ¶18)

- Further, on February 17, 2015, there was a meeting between the Office, the limited partners of University Village, and Compliance Concepts, LLC, which I attended. During said meeting, John Bartle responded to nearly all of the Office's inquiries regarding the operations and affairs of University Village. (*Id.*).

- In the meeting, John Bartle also questioned the accuracy of information and documents provided to the Office by actual University Village employees. (*Id.*).[4]

- Bartle family members retained various vendors and performed services on Westport's apparent behalf. (*Id.* at ¶¶16-17).

26. Ms. Morgan's affidavit also comports with the Affidavit of John Bartle which was apparently prepared for this litigation. Mr. Bartle's own affidavit, dated August 24, 2015 and filed

---

[4] ALJ Early's Recommended Order in the *IMH* administrative case made similar findings of fact: "From April through December 2014, Westport Holdings University Village, LLC, remained as Westport's general partner. During that period, Mr. Landry was an infrequent visitor to the University Village campus. OIR began to receive communications from residents of University Village that Mr. Bartle was acting as a spokesperson for University Village, and had taken a visible role in facility operations and capital improvements." Recommended Order in *IMH Matter*, filed in this case on July 7, 2016, at ¶ 47.

FOIR_066374

in this suit on July 7, 2016, confirm that Mr. Bartle was negotiating with vendors, arranging financing and acting in well beyond the scope of an "investor." *See Westport's July 7, 2015 Letter to William F. Spivey* (signed by John Bartle on Westport letterhead and purporting to be an authorized representative, noting that Westport "will submit to the Florida Department Finance Corporation a completed Tax Exempt Enterprise Program application for financing in the coming days").[5]

27.     Because of his ongoing involvement with the operations of University Village, OIR sought background information on Mr. Bartle. To date, Mr. Bartle has failed or refused to provide any personal information. *See attached Exhibit A, Affidavit of Carolyn Morgan dated July 6, 2016,* ¶12.

28.     The information that OIR and DFS possess about Mr. Bartle, however, is troubling.[6]

29.     At present, there is no company or individual currently in an ownership position at Westport that has been approved to hold a CCRC certificate of authority and act as a provider to the hundreds of elderly citizens that reside at the CCRC. *See attached Exhibit A, Affidavit of Carolyn Morgan dated July 6, 2016,* at ¶ 10.

---

[5] It seems incredible that Westport could be corresponding with the Florida Development Finance Corporation about applying for the receipt of bonds not to exceed $30,000,000 to, while Westport continually and willfully violating its obligation to file audited financial statements as required by section 651.026(2), Florida Statutes.

[6] As noted in the Original Application, OIR was gravely concerned about, among other things, Mr. Bartle's role in Skyline Manor, a CCRC in Nebraska which was driven into bankruptcy. *Original Application,* ¶32. Since that time, the Skyline Manor bankruptcy trustee has now initiated claims against the Bartles, BVM Management and others for breach of fiduciary duty, unauthorized distributions, and fraudulent transfers. *See Complaint in In Re Skyline Manor, Inc.,* In the United States Bankruptcy Court, Nebraska District, Case No. 16-08024-TLS, a copy of which was filed by the Relator/Department in this case on July 7, 2016.

FOIR_066375

30.    At no time prior to the transaction did Westport indicate that the acquisition would include four (4) limited partners or that Westport would be divested of Westport Nursing, LLC. *Id.*, at ¶ 8.

31.    Westport represented to OIR that the change would be a mere change in passive investment and the limited partner would not manage the entity until it could acquire the general partnership interest at which time an acquisition application would be submitted for OIR approval. That representation was false. *Id.*, at ¶ 6.

32.    Mr. Bartle began managing the facility soon after the transaction closed, as evidenced by the fact that the onsite manager (Mr. Tim Parker) had sent Mr. Bartle, for his review, draft press releases to announce the sale. *See Deposition of John Bartle* (taken in this case), April 22, 2015, p. 70 and Exhibit 6 thereto; *see also,* Exs. 1 and 2 thereto (press releases to University Village residents announcing that University Village had been acquired by "BVM Management" and that the "ownership team from BVM" would be meeting with residents) filed in this suit on May 5, 2015.

33.    As Ms. Morgan's affidavit of July 6, 2016 makes clear, "Westport did not truthfully disclose the nature of this acquisition to OIR." *Id.*, at ¶ 9.

34.    In prior deposition testimony, Mr. Bartle admitted that the limited partners intentionally decided to <u>NOT</u> seek OIR approval before the transaction. When asked why, Mr. Bartle responded: "<u>Because the transaction would have taken too long to have occurred under Florida Statutes, and the purchase of the asset we refer to as University Village wouldn't have been able to occur at the March 31st deadline.</u>" Deposition of John Bartle as corporate representative for BVM Management, Inc., *Health Care Advances, Inc., v. BVM Management, Inc.*, Case No. 14-CA-7354, at p. 66 (lines 12-15) filed in this suit on July 7, 2016.

FOIR_066376

35.     In sum, Mr. Bartle has admitted that the transaction did not occur "under Florida Statutes." *Id.* If anything, it occurred in contravention of them.

36.     Against this backdrop, it is impossible to summarily decide that Westport's limited partners acquired their interest "lawfully" when, if anything, the evidence suggests the exact opposite.

<u>**MEMORANDUM OF LAW**</u>

**I.     STANDARD OF REVIEW.**

Entry of summary judgment is appropriate where there is no genuine issue of material fact and where the moving party is entitled to a judgment as a matter of law. *Menendez v. Palms W. Condo. Ass'n*, 736 So. 2d 58, 60 (Fla. 1st DCA 1999). When the basic facts of the case are clear and undisputed, and there is only a question of law to be determined, the Court shall grant a motion for summary judgment. *Duprey v. United Servs. Auto. Assoc.*, 254 So. 2d 57, 58 (Fla. 1st DCA 1971).

If the moving party shows with competent evidence that there is no genuine issue as to a material fact, the movant is entitled to judgment. *Page v. Staley*, 226 So. 2d 129, 131 (Fla. 4th DCA 1969). "The proof must be such as to overcome all reasonable inferences which may be drawn in the favor of the opposing party." *Holl v. Talcott*, 191 So. 2d 40, 43 (Fla. 1966). The movant has the initial burden to show that there are no disputes over material facts. *Id.* "The existence of a dispute as to matters not material to disposition of the case will not preclude entry of a summary judgment." *Armstrong v. S. Bell Tele. & Telegraph Co.*, 366 So. 2d 88, 90 (Fla. 1st DCA 1979). Once the movant has met its burden, the non-moving party "must come forward with counter-evidence sufficient to reveal a genuine issue." *Landers v. Milton*, 370 So. 2d 368, 370 (Fla. 1979). If the opponent does not make this showing, summary judgment is proper. *Id.*

FOIR_066377

## II.    WESTPORT IS NOT ENTITLED TO SUMMARY JUDGMENT BEFORE THE DEPARTMENT HAS ANSWERED.

The Department has moved to dismiss all of Westport's claims with prejudice.  As explained in the Department's motion to dismiss, any claim by Westport against the Department is barred by section 631.392, Florida Statutes.  § 631.392, Fla. Stat. (providing that "no cause of action of any nature shall arise against [DFS]" . . .).  As a result, the Department has not answered the Counterclaim and is not required to do so until its motion is adjudicated.

In seeking summary judgment before DFS has even answered, Westport's burden is an "unusually heavy one" as "summary judgment should not be granted unless it is clear that an issue of material fact can not be presented . . . ." *Rodriguez v. Tri-Square Constr., Inc.,* 635 So. 2d 125, 126 (Fla. 3d DCA 1994) (citation and quotation omitted) (declining to enter summary judgment on the basis that disputes of material fact could be presented by defendants).  Given that Westport's petition in the DOAH proceeding concedes that it expects allegations to be disputed, Westport's burden is impossible as even Westport expects disputes of material fact to be presented.  Regardless, as shown below, the Department has presented a multitude of disputed facts and summary judgment must be denied.

## III.    THE RECORD IS REPLETE WITH DISPUTED FACTS ABOUT WESTPORT'S MISREPRESENTATIONS TO OIR.

Westport requests a summary adjudication on the basis that it "fully disclosed" its acquisition to OIR.  As shown above, Westport is wrong.  There are a host of disputed facts about what was communicated to OIR and the basis for OIR's statements that an acquisition application would not be required if only Westport's limited investor changed.  At the time that these conversations occurred, there was zero discussion about Westport's four (4) limited partnership interests and no discussion that Westport would be divested of its wholly owned subsidiary,

12

Westport Nursing. As Ms. Morgan's affidavit attests, "Westport did not truthfully disclose the nature of this acquisition to OIR."

When, as here, the record is replete with disputed facts about what was communicated, to whom, when and how that communication was relied upon, there can be no finding of estoppel, waiver or acquiescence. *See Competelli v. City of Belleair Bluffs,* 113 So. 3d 92, 92-92 (Fla. 2d DCA 2013) (citing *Snyder v. Cheezem Dev. Corp.,* 373 So. 2d 719, 720 (Fla. 2d DCA 1979) ("If the record reflects the existence of any genuine issue of material fact, or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, summary judgment is improper."); *Scheibe v. Bank of Am., N.A.,* 822 So. 2d 575, 575-76 (Fla. 5th DCA 2002) (citing cases for the proposition that, in general, "questions of waiver and estoppel typically involve fact issues inappropriate for summary judgment").

## IV. EVEN IF THE RECORD WERE CLEAR, WESTPORT IS NOT ENTITLED TO A FINDING OF ESTOPPEL OR WAIVER AS A MATTER OF LAW.

In the end, Westport alleges that OIR communicated that no formal application or formal approval was required in order for the Westport limited partnership interest to be conveyed. Whether an acquisition application is required, however, is a pure issue of law. In Florida, it is axiomatic that even a mistake of law cannot be used to estop the government. *See Associated Indus. Ins. Co., v. State, Dep't of Labor,* 923 So.2d 1252, 1258 (Fla. 1st DCA 2006); *see also Branca v. City of Miramar,* 634 So. 2d 604, 606 (Fla. 1994) (noting that a "governmental entity may not estopped through mistaken statements of the law").

Westport's contention that estoppel is available here is unavailing. (*See* Motion pp. 3-4.) Notably, the authority on which Westport relies concerns municipalities exercising their zoning power and sets forth a test for equitable estoppel specifically applicable to zoning matters that is not relevant here. *See Town of Largo v. Imperial Homes Corp.,* 309 So. 2d 571, 572-73 (Fla. 2d

13

FOIR_066379

DCA 1975) (citation omitted) ("The doctrine of equitable estoppel is applicable to local government exercising its zoning power when a property owner (1) relying in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the rights he has acquired."); *accord Hollywood Beach Hotel Co. v. City of Hollywood,* 329 So. 2d 10, 15-16 (Fla. 1976); *Equity Resources, Inc. v. County of Leon,* 643 So. 2d 1112, 1117 (Fla. 1st DCA 1994). These cases are clearly distinguishable and cannot support a finding of equitable estoppel here.

Instead, equitable estoppel will only apply against a governmental entity in rare or exceptional circumstances. *Associated Indus. Ins. Co.,* 923 So. 2d at 1255 (citation omitted). The elements of equitable estoppel include: (1) a representation as to a material fact that is contrary to a later asserted position; (2) reliance on the representation; and (3) a detrimental change in position caused by reliance on the representation. *Id.* Additionally, to assert estoppel against a governmental agency the following additional "exceptional" circumstances are required: (1) conduct by the government that goes beyond mere negligence and causes serious injustice; and (2) a showing that application of estoppel would not harm the public interest. *Id.* Simply put, Westport has not and cannot established these factors.

Most significantly, Westport cannot establish that it was justified in relying on any representations made by OIR. Any communications from OIR that no formal application was required is nothing more than an explicit interpretation of the law and does not constitute a representation of fact upon which Westport can base an argument of estoppel. *See Associated Indus. Ins. Co.,* 923 So. 2d at 1258 -59 (finding that an insurance carrier was not justified in relying on departmental employees' views concerning the propriety of certain deductions because the

14

FOIR_066380

discussions were legal opinions that involved the interpretation of the law). Accordingly, Westport is not entitled to a finding of estoppel or waiver as a matter of law.

## V.   THE DEEMER PROVISION DOES NOT APPLY WHEN NO APPLICATION WAS SUBMITTED.

The undisputed evidence in this record establishes that "[p]rior to 2015, none of the entities or alleged owners of Westport's limited partnership interest filed an application for approval of their acquisition with the OIR." *Morgan Affidavit*, July 6, 2016, ¶ 11. As a result, there is nothing for the law to "deem" approved and permit the Court to declare that Westport's current limited partnership owners "lawfully acquired" their interest.

Section 120.60(1), Florida Statutes, which governs license applications, specifies that "upon receipt of a license application" the agency will examine and review the application. § 120.60(1), Fla. Stat. Notably, the statute, on which Westport relies, is conditioned upon the receipt of a license application. As discussed herein, no application for approval of the limited partnership interest acquisition was filed with OIR. This is directly distinguishable from the cases upon which Westport relies in its Motion. Specifically, the cases cited by Westport concern persons or entities that actively pursued licensure approval with the applicable agency by actually submitting the requisite application. *See Doheny v. Grove Isle, Ltd.,* 442 So. 2d 966 (Fla. 1st DCA 1983) (discussing Grove Isle's application for a permit to construct a marina); *Krakow v. Dep't of Prof'l Reg., Bd. of Chiropractic,* 586 So. 2d 1271 (Fla. 1st DCA 1991) (noting the doctors applied to the Board of Chiropractic for licensure); *Tuten v. State Dep't of Envtl. Protection,* 906 So. 2d 1202 (Fla. 4th DCA 2005) (addressing an application to the department seeking permission to dredge a canal).

Additionally, in its Motion, Westport tries to contend that, when OIR said it would not require an acquisition statement from the limited partners, OIR was sufficiently informed about

15

FOIR_066381

the acquisition. That is false. The evidence shows that OIR had no knowledge of the limited partners at issue here as they did not materialize until immediately prior to the transaction. *See Exhibit A, Morgan Affidavit* at ¶4 ("Although Westport has stated that BVM assigned some of its limited partnership interest to three other entities, none of these entities were known to OIR before the transaction occurred."). As Mr. Bartle has indicated under oath, the limited partnership entities were "four limited liability companies that were formed to acquire the 99 percent interest." *Bartle Depo.*, taken in this case and filed on May 29, 2015, p. 12; *see also* p. 15 (referring to BHMSILF, LLC as "the fourth entity formed to purchase the limited partnership interest").

In fact, in a different lawsuit, Mr. Bartle testified that even BVM University Village, LLC was forced to come into existence because his legal team expressed concern that "BVM Management Westport Holdings, LP" was not "a bona fide company":

Q: You mentioned earlier that, at some point, BVM University Village came into the transaction, right?

A: Yes. Sometime during the first quarter of 2014, it seems like there was some concern about this BVM Management Westport Holdings, LP, being a bona fide company, and it seems like BVM University Village, LLC, became the ultimate purchaser of the 99 percent interest.

Q: Okay. Who was concerned that BVM Management slash Westport Holdings was not a bona fide entity?

A: Well, I don't know. Again, it was the legal team for the seller, legal team for the buyer, legal for the lenders, and it was through that process, that, my recollection is, that there was some concern.

Deposition of John Bartle in *Health Care Advances, Inc., v. BVM Management, Inc.*, Case No. 14-CA-7354 at pp. 41-42.[7] The record also shows that these four (4) entities were heavily involved.

---

[7] When questioned about the transactional documents, Bartle also testified that "there were about seven iterations of this agreement, and I would have to look at this one specifically, to see if it was the one that survived closing." *Id.*, at p. 40.

16

In that same case, Mr. Bartle admitted that the four new partnership groups (none of whom were disclosed to OIR) "had equal input into the transaction structure." *Id.*, at p. 67.

Curiously, Mr. Bartle also testified that the limited partners intentionally avoided any request for approval from the regulatory agencies (AHCA and OIR) because they were not assured that the transaction to go through by the "March 31" deadline:

Q: Do you know why there wasn't new entities formed to operate the skilled nursing facility and assisted living facility rather than just changing the boards of TR&SNF and TALF?

A: Yes.

Q: Why is that?

A: **Because the transaction would have taken too long to have occurred under Florida Statutes, and the purchase of the asset we refer to as University Village wouldn't have been able to occur at the March 31st deadline.**

Q: What do you mean by that?

A: **Well, I mean by that, the regulatory agencies could not guarantee when a change of ownership would be processed, and so the buyer didn't want to run the risk of a $24 and a half million transaction blowing up, because the state agency couldn't process the application.**

Q: And what was the agency, the Agency for Health Care Administration?

A: In the case of TR&SNF and TALF, that's correct. **In the case of Westport Holdings Tampa, it was the Office of Insurance Regulation.**

*Id.*, at pp. 66-67 (emphasis added). In sum, the record evidence demonstrates that Westport's limited partners acted completely contrary to a "deemer" provision. If anything, Westport's limited partners intentionally avoided acquisition approval. Accordingly, against this backdrop, it is impossible to decide, at summary judgment, that Westport's limited partners should somehow be "deemed" to have lawfully acquired their interest. *See Hervey v. Alfonso,* 650 So. 2d 644, 646 (Fla. 2d DCA 1995) (recognizing that a "trial court is precluded from resolving disputed issues of fact when considering" a motion for summary judgment).

17

## Conclusion

For all the foregoing reasons, DFS respectfully requests that Respondent's Motion for

Final Summary Judgment on Limited Partnership Ownership be denied.

/s/ Christopher B. Lunny
CHRISTOPHER B. LUNNY (Fla. Bar No. 8982)
E-Mail:  clunny@radeylaw.com
Secondary E-mails: cdemeo@radeylaw.com;
mlangford@radeylaw.com
Radey Law Firm
Post Office Box 10967 (32302)
301 South Bronough Street, Suite 200
Tallahassee, Florida  32301
(850) 425-6654 (phone)
(850) 425-6694 (facsimile)

**COUNSEL FOR RELATOR
THE STATE OF FLORIDA, DEPARTMENT
OF FINANCIAL SERVICES**

FOIR_066384

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served via and e-service through the Florida Courts E-Filing Portal, AND VIA HAND DELIVERY on this 7th day of July, 2016 to:

Stephen Turner
David K. Miller
Frank E. Sheffield
Ginger Barry Boyd
BROAD AND CASSEL
215 South Monroe Street, Suite 400
Tallahassee, FL 32301
P.O. Drawer 11300
Tallahassee, FL 32302
Telephone: 850-681-6810
Fax: 850-681-9792
Email: sturner@broadandcassel.com
Email: fsheffield@broadandcassel.com
Email: dmiller@broadandcassel.com
Email: gbarry@broadandcassel.com
Email: sfogarty@broadandcassel.com
Email: mubieta@broadandcassel.com
Email: charrelson@broadandcassel.com

Timothy L. Newhall, Chief Attorney
Conor J. McLaughlin, Senior Attorney
Florida Department of Financial Services
Division of Rehabilitation and Liquidation
2020 Capital Circle SE, Suite 310
Tallahassee, FL 32301
Telephone: (850) 413-4528
Email: tim.newhall@myfloridacfo.com
Email: conor.mclaughlin2@myfloridacfo.com

/s/ Christopher B. Lunny
CHRISTOPHER B. LUNNY

19

FOIR_066385

# EXHIBIT A

FOIR_066386

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA

S TATE OF FLORIDA, ex rel., THE
DEPARTMENT OF FINANCIAL SERVICES
OF THE STATE OF FLORIDA,

     Relator,

v.                             Case No. 2015 CA 000585

WE STPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP d/b/a
UNIVERSITY VILLAGE, a Delaware limited
partnership licensed as a continuing care
retirement community in the State of Florida,

     Respondent,

_____/

## AFFIDAVIT OF CAROLYN MORGAN

STATE OF FLORIDA

COUNTY OF LEON

     BEFORE ME, the undersigned authority, personally appeared Carolyn Morgan, who, upon being duly sworn, deposes and says:

     1.     My name is Carolyn Morgan. I am over eighteen (18) years of age, am competent to testify and have personal knowledge of the facts stated herein.

     2.     I am employed by the Florida Office of Insurance Regulation ("OIR") as Director of Life and Health Financial Oversight. In that capacity, I have oversight of continuing care retirement communities ("CCRC") including the Respondent, Westport Holdings Tampa Limited Partnership,("Westport").

FOIR_066387

## ACQUISITION OF WESTPORT

3.      It is my understanding that Westport has two (2) partnership interests: a ninety-nine percent (99%) limited partnership interest and a one percent (1%) general partnership interest.

4.      Similarly, it is my understanding that, on March 31, 2014, BVM University Village, LLC obtained the ninety-nine percent (99%) limited partnership interest of Westport. BVM University Village, LLC is a Florida limited-liability company incorporated in August 2013. Although Westport has stated that BVM assigned some of its limited partnership interest to three other entities, none of these entities were known to OIR before the transaction occurred.

5.      In addition, Westport represented to OIR that, because only ownership of the passive limited partnership interest had been obtained, management and control of the entity would continue to be held by the 1% general partner (Westport Holdings University Village, LLC). Thus, according to Westport, control of Westport as a CCRC provider would not change. That was false. As evidenced in my prior affidavit of February 26, 2015, Mr. Bartle and others exercised control over the management and operations of Westport in 2014, without any approval from OIR.

6.      Westport represented to OIR that the change would be a mere change in passive investment and the limited partner would not manage the entity until it could acquire the general partnership interest at which time an acquisition application would be submitted for OIR approval. That representation was false.

7.      By letter dated March 31, 2014, Williams Mullen opined that, as part of this acquisition, a corporate restructuring of Westport also took place. According to Williams Mullen, the restructuring included divesting Westport of its wholly owned subsidiary, Westport Nursing, LLC ("Westport Nursing") so that Westport Nursing became a stand-alone entity. As

2

detailed in my prior affidavits, this act amounted to a conversion of Westport's assets and another unauthorized act.

8. At no time prior to the transaction did Westport indicate that the acquisition would include four (4) limited partners or that Westport would be divested of Westport Nursing, LLC.

9. Westport did not truthfully disclose the nature of this acquisition to OIR.

10. At present, there is no company or individual currently in an ownership position at Westport that has been approved to hold a CCRC certificate of authority and act as a provider to the hundreds of elderly citizens that reside at the CCRC.

11. Prior to 2015, none of the entities or alleged owners of Westport's limited partnership interest filed an application for approval of their acquisition with the OIR.

12. Because of his ongoing involvement with the operations of University Village, OIR sought background information on Mr. Bartle. To date, Mr. Bartle has failed or refused to provide any personal information.

13. On March 15, 2016, the Florida Office of Insurance Regulation issued two Initial Orders of Suspension regarding Westport's certificate of authority as a CCRC. True and correct copies of these suspension orders are attached hereto as Attachments 1 and 2.

14. After OIR issued a suspension order to Westport in OIR Case No. 188018-16, Westport filed a petition for formal administrative hearing. A true and correct copy of Westport's petition for formal administrative hearing in OIR Case No. 188018-16 is attached hereto as Attachment 3.

3

FOIR_066389

FURTHER AFFIANT SAYETH NAUGHT.

_Carolyn Morgan_
CAROLYN MORGAN

SWORN TO and subscribed before me this 6th day of July, 2016, by Carolyn Morgan, who is personally known to me or who has produced_____identification.

WITNESS my hand and official seal.

> DEBRA L SEYMOUR
> MY COMMISSION # FF 005933
> EXPIRES: August 8, 2017
> Bonded Thru Notary Public Underwriters

_Debra L Seymour_
NOTARY PUBLIC

_Debra L Seymour_
Printed Name of Notary
My Commission Expires: _August 8, 2017_

*Notary Stamp*:

4

FOIR_066390

**ATTACHMENT 1**



**FILED**

MAR 15 2016

OFFICE OF INSURANCE REGULATION

OFFICE OF
INSURANCE REGULATION
Docketed by: _____

KEVIN M. McCARTY
COMMISSIONER

IN THE MATTER OF:

CASE NO.: 185108-16

WESTPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP
d/b/a UNIVERSITY VILLAGE

_____/

## INITIAL ORDER OF SUSPENSION

TO:  Westport Holdings Tampa, Limited Partnership
d/b/a University Village
12401 North 22nd Street
Tampa, Florida 33612

THIS CAUSE came on for consideration as a result of an on-going examination of WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP d/b/a UNIVERSITY VILLAGE ("WESTPORT") pursuant to Section 651.105, Florida Statutes. The FLORIDA OFFICE OF INSURANCE REGULATION ("OFFICE"), having considered the matter and otherwise being advised in the premises, finds as follows:

## GENERAL ALLEGATIONS

1. The OFFICE has jurisdiction over WESTPORT and the subject matter of this proceeding.

2. The OFFICE is an agency of the State of Florida and regulates insurers and other risk-bearing entities as provided in the Florida Insurance Code. Pursuant to Chapter 651, Florida Statutes, the OFFICE has the duty and authority to regulate providers of continuing care as specialty insurers.

Page 1 of 33

3.    WESTPORT is a limited partnership formed in 2000 and existing under the laws of the State of Delaware.

4.    University Village is a Continuing Care Retirement Community ("CCRC") in Hillsborough County, Florida, and has been since 1987. A CCRC offers shelter, care, and services for residents upon payment of an entrance fee pursuant to continuing care contracts. § 651.011(2), Fla. Stat. Continuing care contracts are between the resident and the CCRC provider and establish the terms and conditions of the residents' care while at the CCRC. § 651.055, Fla. Stat. Such terms include the entrance fee to be paid, the amount of monthly fees, future levels of care through advanced aging, including assisted living and skilled nursing, and any refund to be paid by the provider to the resident or the resident's estate upon exit from the CCRC.

5.    University Village accommodates the required spectrum of care for its residents in several buildings on one campus. There are two six- to seven-story buildings on the campus referred to as the Towers that contain four hundred and forty-six (446) apartments for independent living. At all times relevant hereto, WESTPORT has owned the Towers.

6.    Near the Towers are forty-six (46) patio homes or duplexes, known as the Villas, which are also used for independent living. At all times relevant hereto, the Villas have been owned by Westport Holdings Tampa II, Limited Partnership, a limited partnership separate from WESTPORT.

7.    There is a three-story building on the University Village CCRC campus for more advanced care ("Health Center"). The first floor of the Health Center contains one hundred and twenty (120) skilled nursing beds. The second and third floors contain one hundred and ten (110) beds for assisted living, with a memory care wing included on the second floor. At all

FOIR_066392

times relevant hereto, Westport Nursing, LLC ("Westport Nursing") has owned the Health Center. Prior to the March 31, 2014, transactions described below, Westport Nursing was a wholly owned subsidiary of WESTPORT.

8. University Village contains a total of four hundred and ninety-two (492) independent living units and two hundred and thirty (230) beds in the Health Center. University Village currently has several hundred residents.

9. CCRCs are regulated by the OFFICE as "specialty insurers" pursuant to Chapter 651, Florida Statutes. Florida law requires that every CCRC be operated by a provider approved by the OFFICE to hold a Certificate of Authority. § 651.021, Fla. Stat.

10. In 2000, WESTPORT was approved by the OFFICE to be the provider for the University Village CCRC and to hold a Certificate of Authority pursuant to Chapter 651, Florida Statutes.

11. WESTPORT is subject to regulation by the OFFICE, pursuant to Chapter 651, Florida Statutes.

12. Pursuant to existing continuing care contracts, WESTPORT is contractually obligated to provide shelter, nursing care, and personal services to University Village's current residents on the University Village campus, including at the Health Center. WESTPORT is also contractually obligated to pay refunds to former residents or their estates as provided in their continuing care contracts.

## CHANGES IN OWNERSHIP AND MANAGEMENT

13. WESTPORT has two partnership interests: a ninety-nine percent (99%) limited partnership interest and a one percent (1%) general partnership interest. From 2000 until March 31, 2014, those interests were held by two entities, Westport Senior Living Investment Fund, L.P

FOIR_066393

(the ninety-nine percent (99%) limited partnership interest) and Westport Holdings University Village, LLC (the one percent (1%) general partnership interest).

14.     On March 31, 2014, BVM University Village, LLC obtained from Westport Senior Living Investment Fund, L.P. the ninety-nine percent (99%) limited partnership interest of WESTPORT. BVM University Village, LLC is a Florida limited-liability company incorporated in August 2013 by John Bartle. The managing member of BVM University Village, LLC when formed was BVM Management, Inc. ("BVM Management").

15.     BVM University Village, LLC retained thirty-nine and six-tenths percent (39.6%) of the limited partnership interest and simultaneously assigned the remainder of that interest to three other companies as follows: JF Consultants, LLC (thirteen and two-tenths percent (13.2%)); BHMSILF, LLC (twenty-six and four-tenths percent (26.4%)); and IMH Healthcare, LLC ("IMH") (nineteen and eight-tenths percent (19.8%)).[1] Upon information and belief, no capital contributions were made by these three limited partners for the assignment. Upon information and belief, other than these assigned partnership interests, these entities have no assets.

16.     BVM University Village, LLC accomplished its limited partnership takeover by retiring some minor debts and restructuring the remainder through two loans.

17.     The first loan is between WESTPORT, Westport Holdings Tampa II, Limited Partnership, and CPIF Lending in the amount of nine million five hundred thousand U.S. Dollars ($9,500,000). This loan is secured by mortgages on the Towers and the Villas. This loan was negotiated by John Bartle and is guaranteed by the company of which he is President, BVM Management.

---

[1] Subsequently, on or about June 30, 2015, BHMSILF, LLC transferred all of its limited partnership interest to JF Consultants, LLC.

FOIR_066394

18.   The second loan is between Westport Nursing and USAmeriBank in the amount of fifteen million U.S. Dollars ($15,000,000). This loan is secured, in part, by a mortgage on the Health Center.   This loan was also negotiated by Mr. Bartle and guaranteed by BVM Management.

19.   In addition to the mortgage on the Health Center, the USAmeriBank loan is secured by three million U.S. Dollars ($3,000,000) cash collateral. This money was removed from a statutorily required minimum liquid reserve ("MLR") account held by WESTPORT at Regions Bank and placed in an account at USAmeriBank maintained by Westport Nursing, where it was pledged and remains as collateral for the loan.

20.   As part of these transactions, a corporate restructuring also took place. Westport Nursing was moved from being the wholly owned subsidiary of WESTPORT to being a stand-alone entity. Westport Nursing took with it ownership of the Health Center and the three million U.S. Dollars ($3,000,000), neither of which are now under the ownership or control of WESTPORT.

21.   WESPORT did not truthfully disclose the nature of this transaction to the OFFICE.

22.   WESTPORT represented to the OFFICE that because only ownership of the passive limited partnership interest had been obtained and management and control of the general partnership remained with Westport Holdings University Village, LLC, control of WESTPORT as the University Village CCRC provider had not changed.

23.   Soon after the transactions described above ("March 2014 transactions"), WESTPORT represented to the OFFICE that there was a plan for BVM Management to eventually acquire the general partnership interest. WESTPORT made continued representations

FOIR_066395

through the remainder of 2014 that management and control of WESTPORT as the University Village CCRC provider had not changed.

24.     Effective December 29, 2014, the general partner of WESTPORT, Westport Holdings University Village, LLC, resigned.  The new limited partners exercised control over WESTPORT until Compliance Concepts, LLC ("Compliance Concepts"), the managing member of BVM University Village, LLC, a limited partner of WESTPORT, was elected as the new general partner, effective January 26, 2015.  The managing member of Compliance Concepts is Rebecca Bartle, the spouse of John Bartle.[2]

25.     Subsequently, on March 2, 2015, IMH was elected and replaced Compliance Concepts as general partner of WESTPORT.  IMH's sole and managing member is Eliyahu ("Eli") Freiden.  IMH also holds a nineteen and eight-tenths percent (19.8%) limited partnership interest in WESTPORT.

26.     To date, the OFFICE has not approved the acquisition of WESTPORT.

27.     Since March 2, 2015, IMH, through Eli Freiden, has continued to have an ownership interest in WESTPORT and its assets, both as a limited partner and as the general partner, and has continued to exercise control over WESTPORT.  IMH, through Mr. Freiden, continues to operate the University Village CCRC.

28.     Mr. Freiden on behalf of WESTPORT entered into a consulting agreement with Novum, LLC ("Novum").  Pursuant to this agreement, Novum was to provide consulting services to WESPORT on a myriad of issues at the University Village CCRC.  The services being

---

[2] BVM Management, with Mr. Bartle as its President, was the managing member of BVM University Village, LLC, through the filing of an Annual Report with the Florida Department of State on April 15, 2014.  An Amended Annual Report was filed October 16, 2014, listing Compliance Concepts as the managing member.

FOIR_066396

provided by Novum have continued to date and now include many substantive managerial responsibilities.

29.   The OFFICE does not concede that WESTPORT is being legally operated as a CCRC provider by general and limited partner IMH, limited partners BVM University Village, LLC and JF Consultants, LLC, guarantor BVM Management, or its President Mr. Bartle, "consultant" Novum, or any other person.   The legality of the current operation of WESTPORT as a CCRC provider by IMH as its general partner is the subject of the Final Order entered in IMH Healthcare, LLC v. Office of Insurance Regulation, DOAH Case No. 15-2495 (denial of IMH's Acquisition Application, Final Order issued March 11, 2016).[3]   The legality of current control and operations is also an issue in Department of Financial Services v. Westport Holdings Tampa, LP, Case No. 2015 CA 000585 (Second Judicial Circuit) (receivership action).[4] Notwithstanding the lack of legal authority for any of the above-listed persons to act as the provider for the University Village CCRC, one or more of them are taking actions in that role, individually or in concert, purportedly on behalf of WESTPORT, an entity in the name of which there is an existing Certificate of Authority.   The purpose of the instant action is to suspend that

---

[3] In June 2015, after signing the management consulting agreement, Novum filed an application for Provisional Certificate of Authority and Certificate of Authority to become the provider for the University Village CCRC.   The OFFICE denied that application on July 21, 2015, due to, among other things, Novum's lack of CCRC experience.

Novum filed a petition for administrative hearing regarding the OFFICE's denial of Novum's application, which was referred to DOAH.   See Novum, LLC v. Office of Ins. Regulation, DOAH Case No. 15-4730.   The petition for administrative hearing was dismissed on January 21, 2016, by way of stipulation between Novum and the OFFICE.   The stipulation provides that Novum may file an application in the future so long as the application reflects a significant change in circumstances or demonstrates a public interest.

The OFFICE issued a final order denying Novum's application on January 26, 2016.

[4] With respect to the receivership action, a petition for writs of prohibition and quo warranto is currently pending in Westport Holdings Tampa, Limited Partnership v. Department of Financial Services, Case No. 1D15-4465 (1st DCA).   The First District Court of Appeal denied WESTPORT's petition on February 29, 2016.

FOIR_066397

Certificate of Authority on the basis that the actions described herein violate the Florida Insurance Code, no matter under what authority, or lack thereof, they have been undertaken and by whom.

## INVOLVEMENT OF JOHN BARTLE AND BVM MANAGEMENT

30.     BVM Management and John Bartle played an integral role in orchestrating the March 2014 transactions. BVM Management is the corporate guarantor for all the debt related to the University Village campus, despite having no current ownership interest in WESTPORT, Westport Nursing, or the entities that acquired the limited partnership interest in March 2014.

31.     During the pendency of and subsequent to the March 2014 transactions, John Bartle and BVM Management have exercised control over the management and operations of WESTPORT. John Bartle and other individuals employed by BVM Management have represented themselves to residents, employees, vendors, lenders, and the OFFICE as authorized representatives of WESTPORT, have signed agreements on behalf of WESTPORT, and have sought financing on behalf of WESTPORT. WESTPORT and John Bartle have represented that there are no written agreements between WESTPORT and BVM Management to provide such services.

32.     Subsequent to the March 2014 transactions, John Bartle and other individuals associated with BVM Management assumed control of the entity operating the assisted living facility, which is TALF, Inc. ("TALF"), and the entity operating the skilled nursing facility, which is TR & SNF, Inc. ("TR & SNF"). The assisted living facility and the skilled nursing facility are located in the Health Center on the University Village campus. TALF and TR & SNF are not-for-profit corporations licensed by the Agency for Healthcare Administration ("AHCA") and housed in the physical plant owned by Westport Nursing.

FOIR_066398

33.    WESTPORT's CCRC Certificate of Authority to be a provider is, in part, predicated upon the contractual obligation of TALF and TR & SNF to provide nursing care and personal services to University Village residents.

34.    TR & SNF, the skilled nursing facility, has encountered substantial difficulties under the direction of John Bartle and other members of BVM Management. First, TR & SNF, Inc. has been subject to proceedings brought by AHCA to revoke its license, currently pending at DOAH in AHCA v. TR and SNF, Inc. d/b/a The Nursing Center at University Village, Case No. 15-2128. Second, TR & SNF has been subject to a civil receivership. See Arvon Funding, LLC v. TR & SNF, Inc., Case No. 2014-26430-CA-01 (Fla. 11th Cir. Ct.). In the civil receivership case, TR & SNF refused to turn over its books and records to the civil receiver and was subject to a motion seeking to have its principals held in contempt.

35.    TALF has also encountered difficulties under the direction of John Bartle and other members of BVM Management. AHCA initiated proceedings on November 10, 2015, to revoke the license of TALF to operate as an assisted living facility in Florida, currently pending at DOAH in AHCA v. TALF, Inc. d/b/a The Inn at University Village, DOAH Case No. 15-7353.

36.    The OFFICE has discovered a troubling similar situation involving John Bartle and other individuals associated with BVM Management. Mr. Bartle and individuals associated with BVM Management were involved in the bankruptcy of Skyline Manor Inc., an Omaha, Nebraska continuing care retirement community, which filed for Chapter 11 bankruptcy on May 8, 2014. See In re Skyline Manor, Inc., Case No. 8:14-bk-80934-TLS (Bankr. D. Neb. filed May 8, 2014). The bankruptcy court subsequently appointed an independent trustee on May 29, 2014. In ruling to appoint an independent trustee, the bankruptcy court noted that the financial and corporate aspects of Skyline Manor, Inc. were clearly not adequate. The court stated on the

FOIR_066399

record, as documented in audio records of the proceedings, that there was overwhelming evidence to support the appointment of an independent trustee due to gross mismanagement, which included, among other things, disregarding state laws, disregarding the bylaws of the entity, establishing incestuous vendor relationships, which included entities and people related to John Bartle, and failing to file accurate records.[5]

## MINIMUM LIQUID RESERVE FUNDS

37.     On January 21, 2015, the OFFICE was notified by letter that WESTPORT's minimum liquid reserves ("MLR") account was underfunded by three hundred seventy thousand three hundred and twenty-four U.S. Dollars ($370,324).

38.     The OFFICE has discovered through the course of its investigation that WESTPORT's MLR account is far more underfunded.  Three million U.S. Dollars ($3,000,000) of WESTPORT's statutorily required MLR funds were transferred from WESTPORT's MLR account at Regions Bank to an account maintained by Westport Nursing at USAmeriBank to act as cash collateral to secure a fifteen million U.S. Dollar ($15,000,000) loan to Westport Nursing. WESTPORT continues to report the USAmeriBank account as part of its MLR, even though the funds are not held by WESTPORT, the provider, as required pursuant to Section 651.035, Florida Statutes.

39.     As most recently calculated and verified, the required MLR for University Village is five million nine hundred fifty-one thousand four hundred forty U.S. Dollars ($5,951,440). As most recently submitted by WESTPORT, but unverified by the OFFICE due to WESTPORT's failure to submit its 2014 audited financial statement, the required MLR for University Village is

---

[5]Audio Recording of Hearing on Appointment of Chapter 11 Trustee, In re Skyline Manor, Inc., Case No. 8:14-bk-80934-TLS (Bankr. D. Neb. May 29, 2014) (on file with the OFFICE).

FOIR_066400

five million seven hundred sixty-nine thousand eight hundred eighty-one U.S. Dollars ($5,769,881).

40.    As of February 17, 2016, WESTPORT's MLR account at Region's Bank had a balance, based on market value, of two million one hundred forty-one thousand four hundred twenty-five U.S. Dollars and seven cents ($2,141,425.07).

## FAILURE TO COMPLY WITH EXAMINATION AND FILING FALSE INFORMATION

41.    On February 11, 2015, the OFFICE began a target examination of WESTPORT. Throughout the course of the examination, WESTPORT has refused to grant open, unrestricted access to its books and records as required by Chapters 651 and 624, Florida Statutes. To date, WESTPORT has not fully responded to the OFFICE's examination requests.

42.    On or about August 17, 2015, WESTPORT suspended and subsequently terminated Timothy Parker, Executive Director, and Kathleen Burkholder, Chief Financial Officer of WESTPORT. Mr. Parker and Ms. Burkholder had each been employed by WESTPORT for more than seventeen (17) years. To the extent possible, Mr. Parker and Ms. Burkholder had attempted to comply with the OFFICE's examination by providing bank statements, bank account snapshots, bank reconciliations, information related to cancelled or terminated CCRC contracts, entrance fee refund information, PIP refund information, documentation of cash balance/cash position of WESTPORT, Move in-Refund Cash Flow Spreadsheets, and Cash Forecast Spreadsheets. Since the departure of Mr. Parker and Ms. Burkholder, who in her role as Chief Financial Officer prepared and submitted financial reports, WESTPORT has failed to timely provide even the routine information listed above.

43.    WESTPORT has filed false financial statements with the OFFICE since the departure of Mr. Parker and Ms. Burkholder. As of June 30, 2015, WESTPORT reported two

Page 11 of 33

FOIR_066401

million eight hundred eighty-five thousand five hundred ninety U.S. Dollars ($2,885,590) in refunds payable.  In its periodic report as of July 31, 2015, WESTPORT reported only three hundred one thousand eight hundred thirty-four U.S. Dollars ($301,834) in refunds payable. Despite the reported two million five hundred eighty-three thousand seven hundred fifty-six U.S. Dollar ($2,583,756) difference in the June and July periodic statements, WESTPORT has admitted that it has paid only two installments of fifteen thousand U.S. Dollars ($15,000) towards a Personal Income Protection ("PIP") refund.  When questioned about discrepancies in its required periodic reports, WESTPORT has admitted that the reports are inaccurate. Subsequently, on January 29, 2016, WESTPORT submitted refund information to the OFFICE that reported four million one hundred six thousand five hundred seventy-one U.S. Dollars and forty-eight cents ($4,106,571.48) in refunds payable as of that date.  Most recently, on February 16, 2016, WESTPORT submitted refund information to the OFFICE that reported four million three hundred twenty-three thousand seventy-one U.S. Dollars and forty-eight cents ($4,323,071.48) in refunds payable as of that date, with the amount of refunds payable increasing to four million nine hundred ninety-six thousand seven hundred eighty-six U.S. Dollars and eight cents ($4,996,786.08) by April 1, 2016, and to five million four hundred eighty-three thousand one hundred ninety-seven U.S. Dollars and twelve cents ($5,483,197.12) by June 11, 2016.

### FAILURE TO FULFILL STATUTORY AND CONTRACTUAL OBLIGATIONS

44.     WESTPORT is failing to fulfill its statutory and contractual obligations to its residents, the estates of former residents, and prospective residents.  WESTPORT has interfered with the statutorily guaranteed rights of the residents' council, misrepresented its financial position in statutorily required disclosures to prospective residents, and failed to honor residents' contracts.

FOIR_066402

45.     WESTPORT is infringing upon the statutorily guaranteed rights and the University Village residents' council. A self-organized CCRC residents' council has certain rights pursuant to Section 651.081, Florida Statutes. "The activities of a residents' council are independent of the provider," pursuant to Section 651.081(2)(c), Florida Statutes. WESTPORT has attempted to restrict the ability of the residents' council to assemble and disseminate information by requiring management approval of resident publications and seeking to prohibit residents from assembling on campus unless WESTPORT representatives are present. In addition, Novum has admittedly attempted to restrict the ability of the residents' council to communicate or disseminate information, in violation of Section 651.081(2)(c), Florida Statutes.

46.     WESTPORT is failing to fulfill contractual obligations to prospective residents by providing inaccurate disclosures to prospective residents. The current disclosure statement, as of December 2015, presented to prospective residents by WESTPORT, the MLR portion of which was last revised July 17, 2014, states the status of WESTPORT's MLR account as being five million one hundred forty-five thousand two hundred sixty-seven U.S. Dollars ($5,145,267.00) at Regions Bank as of December 31, 2013. On July 1, 2014, as well as on July 17, 2014, WESTPORT's MLR account at Region's Bank had a balance, based on market value, of only one million eight hundred forty-six thousand four hundred forty-eight U.S. Dollars and seven cents ($1,846,448.07). As of February 17, 2016, WESTPORT's MLR account at Region's Bank had a balance, based on market value, of only two million one hundred forty-one thousand four hundred twenty-five U.S. Dollars and seven cents ($2,141,425.07). WESTPORT's current disclosure statement also contains a letter to prospective residents from Carolyn Bachonski as Executive Director of WESTPORT. Ms. Bachonski left WESTPORT on or before November 3, 2015.

FOIR_066403

47.     As set forth in paragraph forty-three (43) above, WESTPORT is failing to fulfill its contractual obligations to residents, former residents, and the estates of former residents by failing to pay refunds in the normal course of business. Since May 2015, WESTPORT has not paid refunds within the period of time specified by contract. WESTPORT and its agents have dishonestly responded to requests for payment and inquiries regarding refunds by misrepresenting that refunds have not been paid because the OFFICE has prevented WESTPORT from doing so.

### CONTINUING TO WRITE BUSINESS WHILE INSOLVENT

48.     A CCRC is insolvent if it is "unable to pay its obligations as they come due in the normal course of business," pursuant to Section 651.011(8), Florida Statutes.

49.     WESTPORT is insolvent. WESTPORT has not filed its 2014 audited financial statement with notes or provided much of the financial information requested by the OFFICE as part of its examination, and, as such, the OFFICE cannot ascertain the exact financial position of WESTPORT. However, WESTPORT has been unable to pay its obligations as they come due in the normal course of business since on or about May 9, 2015.

50.     As of October 27, 2015, WESTPORT failed to pay two million six hundred sixty-four thousand five hundred eighteen U.S. Dollars and twenty-six cents ($2,664,518.26) in refunds to residents, former residents, and the estates of former residents as they become due in the normal course of business.

51.     On February 16, 2016, WESTPORT submitted refund information to the OFFICE that reported four million three hundred twenty-three thousand seventy-one U.S. Dollars and forty-eight cents ($4,323,071.48) in refunds payable as of that date, with the amount of refunds payable increasing to four million nine hundred ninety-six thousand seven hundred eighty-six

FOIR_066404

U.S. Dollars and eight cents ($4,996,786.08) by April 1, 2016, and to five million four hundred eighty-three thousand one hundred ninety-seven U.S. Dollars and twelve cents ($5,483,197.12) by June 11, 2016.

52.    As of the last accounts payable aging report the OFFICE received, dated as of January 26, 2016, most of WESTPORT's accounts payable were overdue and not being paid in the normal course of business.  Specifically, the AP Aged Accounts Payable Report Open as of 01/26/2016 shows that WESTPORT owes one million three hundred thirty-five thousand eight hundred eighty-three U.S. Dollars and three cents ($1,335,883.03) to various vendors, of which nine hundred fifty-two thousand four hundred seventy-eight U.S. Dollars and fifty-four cents ($952,478.54) is sixty-one (61) or more days old, eight hundred forty-five thousand two hundred forty U.S. Dollars and nineteen cents ($845,240.19) is ninety-one (91) or more days old, and seven hundred eighty-nine thousand five hundred nine U.S Dollars and forty-seven cents ($789,509.47) is one hundred and twenty-one (121) or more days old.

53.    Despite this insolvency, according to information provided by WESTPORT on February 16, 2016, WESTPORT has accepted full or partial payment for at least eleven (11) CCRC contracts since May 9, 2015, totaling at least one million five hundred eight thousand seven hundred ninety-four U.S. Dollars ($1,508,794) in entrance fees, of which at least one million ninety thousand fifty U.S. Dollars ($1,090,050) has been collected to date.

**COUNT I**
**MISAPPROPRIATION, CONVERSION, OR WITHHOLDING OF MONEYS**

54.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

FOIR_066405

55.     The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Misappropriation, conversion, or withholding of moneys," pursuant to Section 651.106(6), Florida Statutes.

56.     Three million U.S. Dollars ($3,000,000) of WESTPORT's statutorily required minimum liquid reserve ("MLR") funds were misappropriated or converted to secure Westport Nursing's fifteen million U.S. Dollar ($15,000,000) loan with USAmeriBank. Those funds were transferred from WESTPORT's MLR account, are no longer held in WESTPORT's name, are no longer the property of WESTPORT, and are encumbered as cash collateral for another entity's debt.

## COUNT II
### DEMONSTRATED LACK OF FITNESS OR TRUSTWORTHINESS

57.     The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

58.     The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Demonstrated lack of fitness or trustworthiness," pursuant to Section 651.106(4), Florida Statutes.

59.     WESTPORT has demonstrated a lack of fitness and trustworthiness. Among other unfit and untrustworthy acts, WESTPORT has: (1) failed to timely produce information required by the OFFICE as part of its examination; (2) provided false information to prospective, current, and former residents and to the estates of deceased residents; (3) infringed upon the statutorily guaranteed rights of the residents' council; (4) terminated employees who attempted to comply with the OFFICE's examination; (5) filed false financial statements; and (6) continued to accept payments for entrance fees for continuing care agreements when it is insolvent.

FOIR_066406

## COUNT III
## FRAUDULENT OR DISHONEST PRACTICES OF MANAGEMENT IN THE CONDUCT OF BUSINESS

60.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

61.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Fraudulent or dishonest practices of management in the conduct of business," pursuant to Section 651.106(5), Florida Statutes.

62.    The management of WESTPORT has engaged in fraudulent or dishonest practices in the conduct of business.  To date, WESTPORT has: (1) misrepresented the nature of the March 2014 transactions and WESTPORT's ownership structure to the OFFICE and current and prospective residents; (2) dishonestly represented to former residents or their estates that the OFFICE has prevented WESTPORT from paying refunds; (3) filed false financial statements with the OFFICE; (4) failed to timely produce information required by the OFFICE as part of its examination; and (5) provided false information regarding its MLR funds to prospective residents in violation of Section 651.091, Florida Statutes.

## COUNT IV
## VIOLATION OF FLORIDA STATUTES AND RULES

63.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

64.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure to comply with, or violation of, any proper order or rule of the office or commission or violation of any provision of this chapter," pursuant to Section 651.106(7), Florida Statutes.

FOIR_066407

65.   At this time, the OFFICE has determined that WESTPORT has violated Sections 651.026, 651.035, 651.081, 651.083, and 651.105, Florida Statutes, and Rules 69O-193.007 and 69O-193.058, Florida Administrative Code.

**A.  WESTPORT has violated Section 651.026, Florida Statutes.**

66.   A CCRC provider is required to submit an annual report, which includes an audited financial statement with notes, to the OFFICE annually on or before May 1, pursuant to Section 651.026, Florida Statutes.

67.   To date, WESTPORT has not submitted its 2014 audited financial statement with notes, which is more than ten (10) months past due.

**B.  WESTPORT has violated Section 651.035, Florida Statutes.**

68.   A CCRC provider is required to maintain in escrow certain MLR pursuant to Section 651.035, Florida Statutes.  As most recently calculated and verified, the required MLR for University Village is five million nine hundred fifty-one thousand four hundred forty U.S. Dollars ($5,951,440).  As most recently submitted by WESTPORT, but unverified by the OFFICE due to WESTPORT's failure to submit its 2014 audited financial statement, the required MLR for University Village is five million seven hundred sixty-nine thousand eight hundred eighty-one U.S. Dollars ($5,769,881).

69.   As set forth in paragraphs forty (40) and forty-six (46) above, as of February 17, 2016, WESTPORT's MLR account at Region's Bank had a balance, based on market value, of only two million one hundred forty-one thousand four hundred twenty-five U.S. Dollars and seven cents ($2,141,425.07).

FOIR_066408

70.    As set forth in paragraph thirty-seven (37) above, on January 21, 2015, the OFFICE was notified by letter that WESTPORT's MLR escrow account was underfunded by three hundred seventy thousand three hundred and twenty-four U.S. Dollars ($370,324).

71.    As set forth in paragraph thirty-eight (38) above, WESTPORT's MLR is actually underfunded by an additional three million U.S. Dollars ($3,000,000) due to improperly reporting Westport Nursing's cash collateral account as MLR.  Section 651.035, Florida Statutes, requires that the provider, in this case WESTPORT, maintain the reserves.  The three million U.S. Dollars ($3,000,000) at USAmeriBank reported as MLR funds by WESTPORT are the property of Westport Nursing, not WESTPORT.

72.    Alternatively, even if the funds at USAmeriBank are, for the sake of argument, considered part of WESTPORT's MLR funds, WESTPORT's MLR would be underfunded by at least six hundred twenty-eight thousand U.S. Dollars ($628,000).

73.    Moreover, even if the funds at USAmeriBank are, for the sake of argument, considered part of WESTPORT's MLR funds, the three million U.S. Dollars ($3,000,000) at USAmeriBank that WESTPORT purports qualify as MLR are encumbered as cash collateral securing Westport Nursing's loan, in violation of Sections 651.033 and 651.035, Florida Statutes. Section 651.033(1)(d), Florida Statutes, provides that "Funds deposited in an escrow account are not subject to charges by the escrow agent except escrow agent fees associated with administering the accounts, or subject to any liens, judgments, garnishments, creditor's claims, or other encumbrances against the provider or facility except as provided in s. 651.035(1)." Section 651.035(1)(c), Florida Statutes, provides that "the operating reserves required under this subsection shall be in an unencumbered account held in escrow for the benefit of the residents.

FOIR_066409

Such funds may not be encumbered or subject to any liens or charges by the escrow agent or judgments, garnishments, or creditors' claims against the provider or facility."

## C. WESTPORT has violated Section 651.081, Florida Statutes.

74.    "The activities of a residents' council are independent of the provider," pursuant to Section 651.081(2)(c), Florida Statutes.

75.    WESTPORT has violated Section 651.081(2)(c), Florida Statutes, by attempting to restrict the ability of the residents' council to assemble and disseminate information as set forth in paragraphs forty-four (44) and forty-five (45) above.

## D. WESTPORT has violated Section 651.105, Florida Statutes.

76.    Any duly authorized employee of the OFFICE may have access to and inspect any records of a CCRC, with or without advance notice, to secure compliance with, or to prevent a violation of, any provision of Chapter 651, pursuant to Section 651.105(2), Florida Statutes.

77.    A duly authorized employee of the OFFICE has made numerous such requests to WESTPORT since the OFFICE began its examination on February 11, 2015.

78.    To date, WESTPORT has failed to timely allow the OFFICE's employee to have access to and inspect all of the records necessary to conduct the examination. WESTPORT has failed to provide the immediate, open access to records required by the Section 651.105, Florida Statutes.

## E. WESTPORT has violated Rule 69O-193.007, Florida Administrative Code.

79.    Rule 69O-193.007, Florida Administrative Code, provides: "Each manager or management company [of a CCRC] must demonstrate that it meets the requirements of Section 651.022," Florida Statutes. Section 651.022, Florida Statutes, and the accompanying Rules 69O-

FOIR_066410

193.003 and 69O-193.060, requires the submission of fingerprints and biographical and background information.

80.    WESTPORT has violated Rule 69O-193.007, Florida Administrative Code, by failing to require that individuals acting in a management capacity at University Village submit the required biographical, fingerprint, and background information.  Individuals promoted to management positions by Mr. Freiden or acting in a management capacity, such as individuals employed by Novum, have not filed the required information with the OFFICE, even after the OFFICE specifically requested that such information be provided.

### F.  WESTPORT has failed to file continuous updates as required by Rule 69O-193.058, Florida Administrative Code.

81.    Rule 69O-193.058(2), Florida Administrative Code, requires a provider to immediately notify the OFFICE and file pertinent documents within five (5) business days of any proceeding for denial, suspension, or revocation of any license or permit needed to operate a facility.

82.    WESTPORT has not filed continuous updates regarding two proceedings for the suspension or revocation of any license or permit needed to operate a facility, in violation of Rule 69O-193.058(2), Florida Administrative Code.

83.    First, as set forth in paragraph thirty-four (34) above, AHCA has initiated a proceeding to suspend the license of TR & SNF, Inc., the skilled nursing facility that is required for WESTPORT to hold a CCRC license.  WESTPORT failed to notify the OFFICE regarding this proceeding and to file the required documents, in violation of Rule 69O-193.058(2), Florida Administrative Code.

84.    Second, as set forth in paragraph thirty-five (35) above, AHCA has initiated a proceeding to revoke the license of TALF, Inc., the assisted living facility that is required for

FOIR_066411

WESPORT to hold a CCRC license. WESTPORT failed to notify the OFFICE regarding this proceeding and to file the required documents, in violation of Rule 69O-193.058(2), Florida Administrative Code.

85.    Rule 69O-193.058(4), Florida Administrative Code, requires a provider to immediately notify the OFFICE and file pertinent documents within five (5) business days of any change in the management company of a facility.

86.    WESTPORT has failed to file the requisite information regarding changes to managers and management companies, in violation of Rule 69O-193.058(4), Florida Administrative Code.

## COUNT V
### INSOLVENT CONDITION SUCH THAT FURTHER TRANSACTIONS IN THIS STATE WOULD BE HAZARDOUS OR INJURIOUS TO THE PUBLIC

87.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

88.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "The insolvent condition of the provider or the provider's being in such condition or using such methods and practices in the conduct of its business as to render its further transactions in this state hazardous or injurious to the public," pursuant to Section 651.106(8), Florida Statutes.

89.    WESTPORT is currently insolvent, as it is no longer able to pay its obligations as they come due in the normal course of business. WESTPORT has not paid refunds due to residents, former residents, or the estates of former residents in the normal course of business since on or about May 9, 2015. By WESTPORT's own admission, WESTPORT does not have the necessary funds to make the required payments.

FOIR_066412

90.     WESTPORT is also not paying vendors in the normal course of business, according to its accounts payable report as of January 26, 2016, which shows that WESTPORT owes one million three hundred thirty-five thousand eight hundred eighty-three U.S. Dollars and three cents ($1,335,883.03) to various vendors, of which nine hundred fifty-two thousand four hundred seventy-eight U.S. Dollars and fifty-four cents ($952,478.54) is sixty-one (61) or more days old, eight hundred forty-five thousand two hundred forty U.S. Dollars and nineteen cents ($845,240.19) is ninety-one (91) or more days old, and seven hundred eighty-nine thousand five hundred nine U.S Dollars and forty-seven cents ($789,509.47) is one hundred and twenty-one (121) or more days old.

91.     Despite this insolvency, WESTPORT has continued to make payments to its general partner and various consultants, instead of honoring resident contracts or paying vendors. WESTPORT's continued operation is hazardous or injurious to the public.

<u>**COUNT VI**</u>
**HAZARDOUS OR INJURIOUS TRANSACTIONS, METHODS, OR PRACTICES**

92.     The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

93.     The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "The insolvent condition of the provider or the provider's being in such condition or using such methods and practices in the conduct of its business as to render its further transactions in this state hazardous or injurious to the public," pursuant to Section 651.106(8), Florida Statutes.

94.     Rule 69O-193.033, Florida Administrative Code, provides that hazardous or injurious transactions, methods, or practices may include, but are not limited to, those set forth in the rule.

Page 23 of 33

FOIR_066413

95. WESTPORT has engaged in numerous hazardous or injurious transactions, methods, or practices as defined by Rule 69O-193.033, Florida Administrative Code, which are set forth below.

**A. Making payments or distributing funds, other than salaries and wages earned in the normal course of business, while insolvent.**

96. Rule 69O-193.033(2), Florida Administrative Code, defines hazardous or injurious transactions, methods, or practices to include: "Payment or distribution of funds, other than salaries and wages earned in the normal course of business, to a provider or any affiliate when: (a) A provider is insolvent or no longer financially viable; or (b) Payment results or could result in a facility or provider becoming insolvent or no longer financially viable."

97. WESTPORT is currently insolvent, pursuant to Section 651.011(8), Florida Statutes, as it is no longer able to pay its obligations as they come due in the normal course of business. By WESTPORT's own admission, WESTPORT has not paid refunds due to residents, former residents, or the estates of former residents as it does not have the necessary funds. While failing to honor these obligations, WESTPORT continues to pay its general partner, IMH, for the services of Mr. Freiden. WESTPORT also regularly makes payments to Novum for "consulting" services.

98. Moreover, due to the lack of statutorily required transparency by WESTPORT and the corporate relationships created by individuals and entities associated with John Bartle, Eli Freiden, BVM Management, IMH, TR & SNF, Inc., and TALF, Inc., the OFFICE believes that WESTPORT may have distributed funds other than salaries and wages earned in the normal course of business to affiliates.

Page 24 of 33

FOIR_066414

**B. Employing or contracting with persons unable
to provide proper oversight or services.**

99.     Rule 69O-193.033(3), Florida Administrative Code, defines hazardous or injurious transactions, methods, or practices to include: "Employing or contracting with persons to perform supervisory or policy roles or perform consulting work, who are unable to provide proper oversight or services due to limited, unsuccessful, or no experience in owning, operating, or managing a continuing care facility or in providing continuing care or consulting in the field of continuing care."

100.     WESTPORT is employing or contracting with Mr. Bartle and Novum despite the fact that those individuals and entities are unable to provide proper oversight or services due to limited, unsuccessful, or no experience owning, operating, or managing a CCRC or consulting in the field of continuing care.  To the extent that Mr. Bartle has CCRC experience, that experience is unsuccessful and marked by financial failures, such as Skyline Manor.  Any CCRC experience the individuals associated with Novum have to date pertains to WESTPORT and demonstrates that they are unable to provide proper oversight and comply with numerous statutes and administrative rules, as documented herein.

**C. Accepting full or partial payment of an entrance fee
for a continuing care agreement while insolvent.**

101.     Rule 69O-193.033(4), Florida Administrative Code, defines hazardous or injurious transactions, methods, or practices to include: "Accepting full or partial payment of an entrance fee for a continuing care agreement when a facility is insolvent or in imminent danger of becoming insolvent or no longer financially viable, unless 100 percent of such funds are escrowed pursuant to an agreement with the Office."

102.     WESTPORT is currently insolvent, as it is no longer able to pay its obligations as they come due in the normal course of business.  WESTPORT has not paid refunds due to

Page 25 of 33

FOIR_066415

residents, former residents, or the estates of former residents in the normal course of business since on or about May 9, 2015. By WESTPORT's own admission, WESTPORT does not have the necessary funds to make the required payments.

103. Despite being insolvent, according to information provided by WESTPORT on February 16, 2016, WESTPORT has accepted full or partial payment for at least eleven (11) CCRC contracts since May 9, 2015, totaling at least one million five hundred eight thousand seven hundred ninety-four U.S. Dollars ($1,508,794) in entrance fees, of which at least one million ninety thousand fifty U.S. Dollars ($1,090,050) has been collected to date.

104. WESTPORT is not escrowing one hundred percent (100%) of such entrance fee funds, and there is no agreement with the OFFICE allowing WESTPORT to do so.

### D. Failure to fulfill its obligations to residents.

105. Rule 69O-193.033(7), Florida Administrative Code, defines hazardous or injurious transactions, methods, or practices to include: "Failure of a licensed provider to fulfill its obligations to residents."

106. Westport is not fulfilling its statutory and contractual obligations to residents. WESTPORT has not timely paid refunds due to residents, former residents, or the estates of former residents in violation of residents' contracts.

### COUNT VII
### REFUSAL TO BE EXAMINED OR TO PRODUCE ACCOUNTS, RECORDS, AND FILES FOR EXAMINATION, AND REFUSAL TO GIVE INFORMATION

107. The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

108. The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Refusal by the provider to be examined or to produce its accounts, records, and files for examination, or refusal by any of

Page 26 of 33

its officers to give information with respect to its affairs or to perform any other legal obligation under this chapter when required by the office," pursuant to Section 651.106(9), Florida Statutes.

109.    WESTPORT has refused to be examined, produce all of its accounts, records, and files, and refused to give information with respect to its affairs as discussed in Count IV.D. above.

### COUNT VIII
### FAILURE TO COMPLY WITH SECTIONS 651.026 AND 651.033, FLORIDA STATUTES

110.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

111.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure by the provider to comply with the requirements of s. 651.026 or s. 651.033," pursuant to Section 651.106(10), Florida Statutes.

112.    Section 651.026, Florida Statutes, requires a CCRC provider to file an annual report, including audited financial statements and notes, with the OFFICE on or before May 1.

113.    WESTPORT has failed to comply with the requirements of Section 651.026, Florida Statutes, because, to date, WESTPORT has not provided its 2014 audited financial statement with notes.

114.    Section 651.033(1)(d), Florida Statutes, requires in pertinent part that "Funds deposited in an escrow account are not . . . subject to any liens, judgments, garnishments, creditor's claims, or other encumbrances against the provider or facility."

115.    WESTPORT has failed to comply with the requirements of Section 651.033(1)(d), Florida Statutes, because, assuming for the sake of argument that Westport Nursing's

FOIR_066417

USAmeriBank account should be counted as part of WESTPORT's MLR, those funds are encumbered.

## COUNT IX
### FAILURE TO MAINTAIN ESCROW ACCOUNTS OR FUNDS AS REQUIRED BY CHAPTER 651

116.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

117.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure by the provider to maintain escrow accounts or funds as required by this chapter," pursuant to Section 651.106(11), Florida Statutes.

118.    As set forth in Counts I, IV.B., and VIII above, WESTPORT has failed to maintain escrow accounts or funds as required by Section 651.035, Florida Statutes. WESTPORT's MLR account is drastically underfunded or, alternatively, underfunded and encumbered in violation of the Section 651.106(11), Florida Statutes.

## COUNT X
### FAILURE TO DISCLOSE INFORMATION TO RESIDENTS AND FAILURE TO HONOR CONTINUING CARE CONTRACTS

119.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

120.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure by the provider to meet the requirements of this chapter for disclosure of information to residents concerning the facility, its ownership, its management, its development, or its financial condition or failure to honor its continuing care or continuing care at-home contracts," pursuant to Section 651.106(12), Florida Statutes.

FOIR_066418

121.    WESTPORT has failed to meet the disclosure requirements.  WESTPORT is currently providing outdated disclosure documents to prospective CCRC residents that misrepresent the status of its MLR funds in violation of Section 651.091(3)(g), Florida Statutes.

122.    WESTPORT is not honoring its continuing care contracts by failing to provide refunds to residents, former residents, or the estates of former residents.

**COUNT XI**
**FAILURE TO CONTINUE TO MEET THE REQUIREMENTS**
**FOR THE AUTHORITY ORIGINALLY GRANTED**

123.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

124.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure by the provider to continue to meet the requirements for the authority originally granted," pursuant to Section 651.106(1), Florida Statutes.  WESTPORT does not meet the requirements for the authority originally granted.

125.    A CCRC must produce "[e]vidence satisfactory to the office of the ability of the applicant to comply with the provisions of this chapter and with rules adopted by the commission pursuant to this chapter," pursuant to Section 651.022(2)(c)2., Florida Statutes.

126.    WESTPORT has repeatedly demonstrated inability and unwillingness to comply with Chapter 651, Florida Statutes, and Chapter 69O-193, Florida Administrative Code, which govern CCRCs. As discussed herein, WESTPORT has not complied with numerous statutes and rules, including Sections 651.026, 651.035, 651.081, and 651.105, Florida Statutes, and Rules 69O-193.007 and 69O-193.058, Florida Administrative Code.

FOIR_066419

## COUNT XII
## UNFAIR METHODS OF COMPETITION OR
## UNFAIR OR DECEPTIVE ACTS OR PRACTICES

127.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

128.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist:  "In the conduct of business under the license, engaging in unfair methods of competition or in unfair or deceptive acts or practices prohibited under part IX of chapter 626," pursuant to Section 651.106(15), Florida Statutes.

129.    Section 626.9541(1), Florida Statutes, provides in relevant part:

(b)    *False information and advertising generally.*—Knowingly making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public:
1.    In a newspaper, magazine, or other publication,
2.    In the form of a notice, circular, pamphlet, letter, or poster,
3.    Over any radio or television station, or
4.    In any other way,

an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance, which is untrue, deceptive, or misleading.

. . . .

(w)    *Soliciting or accepting new or renewal insurance risks by insolvent or impaired insurer prohibited; penalty.*—
1.    Whether or not delinquency proceedings as to the insurer have been or are to be initiated, but while such insolvency or impairment exists, no director or officer of an insurer, except with the written permission of the office, shall authorize or permit the insurer to solicit or accept new or renewal insurance risks in this state after such director or officer knew, or reasonably should have known, that the insurer was insolvent or impaired. "Impaired" includes impairment of capital or surplus, as defined in s. 631.011(12) and (13).
2.    Any such director or officer, upon conviction of a violation of this paragraph, is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

FOIR_066420

130.   WESTPORT is currently knowingly making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public an advertisement, announcement, or statement containing assertions, representations, or statements with respect to continuing care which are untrue, deceptive, or misleading.

131.   WESTPORT is also accepting new continuing care risks while insolvent, as set forth in paragraphs forty-eight (48) through fifty-three (53) above.

WHEREFORE, you, WESTPORT, are hereby notified, pursuant to Sections 651.106 and 120.57, Florida Statutes, that, based upon the foregoing allegations, the OFFICE intends to enter a Final Order of Suspension suspending the Certificate of Authority of WESTPORT. This Initial Order of Suspension supersedes the Initial Order of Suspension issued on February 13, 2015, in Case No. 168243-15. WESTPORT is further notified that it has twenty-one (21) days from the date of receipt of this Initial Order of Suspension to file a proceeding to contest this action in accordance with the attached Notice of Rights.

DONE and ORDERED this 15th day of March, 2016.



Kevin M. McCarty, Commissioner
Office of Insurance Regulation

FOIR_066421

## NOTICE OF RIGHTS

Pursuant to Sections 120.569 and 120.57, Florida Statutes and Rule Chapters 28-106, Florida Administrative Code (F.A.C.), you have a right to request a proceeding to contest this action by the Office of Insurance Regulation (hereinafter the "Office"). You may request a proceeding by filing a Petition. Your Petition must be in writing and must be filed with the General Counsel acting as the Agency Clerk, Office of Insurance Regulation. If served by U.S. Mail the Petition should be addressed to the Florida Office of Insurance Regulation at 647 Larson Building, Tallahassee, Florida 32399-4206. If Express Mail or hand delivery is utilized, the Petition should be delivered to 647 Larson Building, 200 East Gaines Street, Tallahassee, Florida 32399-0300. The written Petition must be received by, and filed in the Office no later than 5:00 p.m. on the twenty-first (21) day after your receipt of this notice. Unless your Petition challenging this action is received by the Office within twenty-one (21) days from the date of the receipt of this notice, the right to a proceeding shall be deemed waived. Mailing the response on the twenty-first day will not preserve your right to a hearing.

If a proceeding is requested and there is no dispute of material fact the provisions of Section 120.57(2), Florida Statutes would apply. In this regard you may submit oral or written evidence in opposition to the action taken by this agency or a written statement challenging the grounds upon which the agency has relied. While a hearing is normally not required in the absence of a dispute of fact, if you feel that a hearing is necessary one will be conducted in Tallahassee, Florida or by telephonic conference call upon your request.

If you dispute material facts which are the basis for this agency's action you may request a formal adversarial proceeding pursuant to Sections 120.569 and 120.57(1), Florida Statutes. If you request this type of proceeding, the request must comply with all of the requirements of Rule Chapter 28-106.2015, F.A.C., including but not limited to:

a) A statement requesting an administrative hearing identifying those material facts that are in dispute. If there are none, the petition must so state; and

b) A statement of when the respondent received notice of the agency's action.

These proceedings are held before a State Administrative Law Judge of the Division of Administrative Hearings. Unless the majority of witnesses are located elsewhere the Office will request that the hearing be conducted in Tallahassee.

In some instances, you may have additional statutory rights than the ones described herein.

Failure to follow the procedure outlined with regard to your response to this notice may result in the request being denied. Any request for administrative proceeding received prior to the date of this notice shall be deemed abandoned unless timely renewed in compliance with the guidelines as set out above.

FOIR_066422

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Initial Order of Suspension was sent by Certified Mail, Return Receipt Requested to the following:

Westport Holdings Tampa, Limited Partnership
d/b/a University Village
12401 North 22nd Street
Tampa, Florida 33612

Mr. Eli Freiden, IMH Healthcare, LLC
As Registered Agent for
Westport Holdings Tampa, Limited Partnership
7000 W. Camino Real, Suite 240
Boca Raton, Florida 33433

and sent via e-mail and U.S. Mail to the following:

M. Stephen Turner, Esq.
Broad and Cassel
215 South Monroe Street, Suite 400
Tallahassee, Florida 32301
E-mail: sturner@broadandcassel.com

on this 15th day of March , 2016.

Shaw P. Stiller
Chief Assistant General Counsel
Office of Insurance Regulation
200 East Gaines Street
Tallahassee, Florida 32399
Telephone: (850) 413-4213
Facsimile: (850) 922-2543
E-Mail: Shaw.Stiller@floir.com

Page 33 of 33

FOIR_066423

**ATTACHMENT 2**



**FILED**

MAR 15 2016

OFFICE OF
INSURANCE REGULATION
Docketed by: _____

OFFICE OF INSURANCE REGULATION

KEVIN M. MCCARTY
COMMISSIONER

IN THE MATTER OF:

CASE NO.: 188018-16

WESTPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP
d/b/a UNIVERSITY VILLAGE

_____/

### INITIAL ORDER OF SUSPENSION

TO:    Westport Holdings Tampa, Limited Partnership
       d/b/a University Village
       12401 North 22nd Street
       Tampa, Florida 33612

THIS CAUSE came on for consideration as a result of an ongoing examination of WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP d/b/a UNIVERSITY VILLAGE ("WESTPORT") pursuant to Section 651.105, Florida Statutes. The FLORIDA OFFICE OF INSURANCE REGULATION ("OFFICE"), having considered the matter and otherwise being advised in the premises, finds as follows:

1.     The OFFICE has jurisdiction over WESTPORT and the subject matter of this proceeding.

2.     The OFFICE is an agency of the state of Florida and regulates insurers and other risk-bearing entities as provided in the Florida Insurance Code.

3.     Continuing Care Retirement Communities ("CCRC") are regulated by the OFFICE as "specialty insurers" pursuant to Chapter 651, Florida Statutes.

FOIR_066424

4.     Florida law requires that every CCRC be operated by a provider approved by the OFFICE to hold a Certificate of Authority.  § 651.021, Fla. Stat.

5.     WESTPORT is a limited partnership formed in 2000 and existing under the laws of the state of Delaware.

6.     In 2000, WESTPORT was approved by the OFFICE to be the provider for the University Village CCRC in Hillsborough County, Florida, and to hold a Certificate of Authority pursuant to Chapter 651, Florida Statutes.

7.     WESTPORT is subject to regulation by the OFFICE, pursuant to Chapter 651, Florida Statutes.

8.     WESTPORT has two partnership interests: a ninety-nine percent (99%) limited partnership interest and a one percent (1%) general partnership interest.  From 2000 until March 31, 2014, those interests were held by two entities, Westport Senior Living Investment Fund, L.P (the ninety-nine percent (99%) limited partnership interest) and Westport Holdings University Village, LLC (the one percent (1%) general partnership interest).

9.     On March 31, 2014, BVM University Village, LLC obtained from Westport Senior Living Investment Fund, L.P. the ninety-nine percent (99%) limited partnership interest of WESTPORT.  BVM University Village, LLC is a Florida limited-liability company formed in August 2013. BVM University Village, LLC accomplished its limited partnership takeover by retiring some minor debts and restructuring the remainder through two loans.

10.     BVM University Village, LLC retained thirty-nine and six-tenths percent (39.6%) of the limited partnership interest and simultaneously assigned the remainder of that interest to three other companies as follows: JF Consultants, LLC (thirteen and two-tenths percent

FOIR_066425

(13.2%)); BHMSILF, LLC (twenty-six and four-tenths percent (26.4%)); and IMH Healthcare, LLC ("IMH") (nineteen and eight-tenths percent (19.8%)).

11.     Subsequently, on or about June 30, 2015, BHMSILF, LLC transferred all of its limited partnership interest to JF Consultants, LLC.

12.     Effective December 29, 2014, the general partner of WESTPORT, Westport Holdings University Village, LLC, resigned.  The new limited partners exercised control over WESTPORT until Compliance Concepts, LLC ("Compliance Concepts") was elected as the new general partner, effective January 26, 2015.

13.     Subsequently, on March 2, 2015, IMH was elected and replaced Compliance Concepts as general partner of WESTPORT.

14.     By virtue of these actions and continuing to the present, IMH, JF Consultants, LLC and BVM University Village, LLC own 100% of WESTPORT.

15.     Section 628.4615(2), Florida Statutes, provides in full as follows:

A person may not, individually or in conjunction with any affiliated person of such person, directly or indirectly, conclude a tender offer or exchange offer for, enter into any agreement to exchange securities for, or otherwise finally acquire, 10 percent or more of the outstanding voting securities of a specialty insurer which is a stock corporation or of a controlling company of a specialty insurer which is a stock corporation; or conclude an acquisition of, or otherwise finally acquire, 10 percent or more of the ownership interest of a specialty insurer which is not a stock corporation or of a controlling company of a specialty insurer which is not a stock corporation, unless:

(a)     The person or affiliated person has filed with the office and sent by registered mail to the principal office of the specialty insurer and controlling company a letter of notification regarding the transaction or proposed transaction no later than 5 days after any form of tender offer or exchange offer is proposed, or no later than 5 days after the acquisition of the securities or ownership interest if no tender offer or exchange offer is involved. The notification must be provided on forms prescribed by the commission containing information determined necessary to understand the transaction and identify all purchasers and owners involved;

(b)     The person or affiliated person has filed with the office an application signed under oath and prepared on forms prescribed by the

FOIR_066426

commission which contains the information specified in subsection (4). The application must be completed and filed within 30 days after any form of tender offer or exchange offer is proposed, or after the acquisition of the securities if no tender offer or exchange offer is involved; and

(c)    The office has approved the tender offer or exchange offer, or acquisition if no tender offer or exchange offer is involved.

16.    To date, the OFFICE has not approved the acquisition of WESTPORT.

17.    IMH filed an application to acquire the general partnership interest of WESTPORT pursuant to section 628.4615, Florida Statutes.    The OFFICE denied that application by Final Order issued in IMH Healthcare, LLC. v. Office of Insurance Regulation, DOAH Case No. 15-2495, OIR Case No. 171773-15 (March 11, 2016).

18.    Section 628.4615(12)(a), Florida Statutes, provides in full as follows:

The office shall, if necessary to protect the public interest, suspend or revoke the certificate of authority of any specialty insurer or controlling company acquired in violation of this section.

19.    The acts and actions described above constitute the unlawful acquisition of WESTPORT without approval of the OFFICE in violation of Section 628.4615, Florida Statutes.

20.    Notwithstanding this unlawful acquisition, IMH as general partner of WESTPORT, through its sole member Elijahu Freiden, has exercised control over WESTPORT and the provision of continuing care to the residents of University Village as though it possesses legal authority to act as the CCRC provider.

21.    As part of its illegal operation of University Village, IMH as general partner of WESTPORT, through Mr. Freiden, is entering into contracts with new CCRC residents.

22.    Undertaking these activities without a lawfully obtained Certificate of Authority violates the Florida Insurance Code. See § 651.021, Fla. Stat. ('No person may engage in the business of providing continuing care . . . [or] issuing contracts for continuing care . . . without a certificate of authority obtained from the office as provided in this chapter.").

FOIR_066427

23. The provisions of the Florida Insurance Code relating to CCRCs were enacted and exist to protect the senior population from the historic scams and economic vicissitudes of the industry.

24. The ongoing illegal operation of a specialty insurer in violation of laws enacted to protect the public health, safety and welfare—specifically that of Florida's senior population—is directly contrary to the State's manifested intent to protect this class.

25. Suspension of the Certificate of Authority held by WESTPORT is necessary to arrest this violation and protect the public interest.

WHEREFORE, you, WESTPORT, are hereby notified, pursuant to Sections 628.4615(12) and 120.57, Florida Statutes, that, based upon the foregoing allegations, the OFFICE intends to enter a Final Order of Suspension suspending the Certificate of Authority of WESTPORT. WESTPORT is further notified that it has twenty-one (21) days from the date of receipt of this Initial Order of Suspension to file a proceeding to contest this action in accordance with the attached Notice of Rights.

DONE and ORDERED this 15th day of March, 2016.

Kevin M. McCarty, Commissioner
Office of Insurance Regulation

FOIR_066428

## NOTICE OF RIGHTS

Pursuant to Sections 120.569 and 120.57, Florida Statutes and Rule Chapters 28-106, Florida Administrative Code (F.A.C.), you have a right to request a proceeding to contest this action by the Office of Insurance Regulation (hereinafter the "Office"). You may request a proceeding by filing a Petition. Your Petition must be in writing and must be filed with the General Counsel acting as the Agency Clerk, Office of Insurance Regulation. If served by U.S. Mail the Petition should be addressed to the Florida Office of Insurance Regulation at 647 Larson Building, Tallahassee, Florida 32399-4206. If Express Mail or hand delivery is utilized, the Petition should be delivered to 647 Larson Building, 200 East Gaines Street, Tallahassee, Florida 32399-0300. The written Petition must be received by, and filed in the Office no later than 5:00 p.m. on the twenty-first (21) day after your receipt of this notice. Unless your Petition challenging this action is received by the Office within twenty-one (21) days from the date of the receipt of this notice, the right to a proceeding shall be deemed waived. Mailing the response on the twenty-first day will not preserve your right to a hearing.

If a proceeding is requested and there is no dispute of material fact the provisions of Section 120.57(2), Florida Statutes would apply. In this regard you may submit oral or written evidence in opposition to the action taken by this agency or a written statement challenging the grounds upon which the agency has relied. While a hearing is normally not required in the absence of a dispute of fact, if you feel that a hearing is necessary one will be conducted in Tallahassee, Florida or by telephonic conference call upon your request.

If you dispute material facts which are the basis for this agency's action you may request a formal adversarial proceeding pursuant to Sections 120.569 and 120.57(1), Florida Statutes. If you request this type of proceeding, the request must comply with all of the requirements of Rule Chapter 28-106.2015, F.A.C., including but not limited to:

a) A statement requesting an administrative hearing identifying those material facts that are in dispute. If there are none, the petition must so state; and

b) A statement of when the respondent received notice of the agency's action.

These proceedings are held before a State Administrative Law Judge of the Division of Administrative Hearings. Unless the majority of witnesses are located elsewhere the Office will request that the hearing be conducted in Tallahassee.

In some instances, you may have additional statutory rights than the ones described herein.

Failure to follow the procedure outlined with regard to your response to this notice may result in the request being denied. Any request for administrative proceeding received prior to the date of this notice shall be deemed abandoned unless timely renewed in compliance with the guidelines as set out above.

FOIR_066429

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Initial Order of Suspension was sent by Certified Mail, Return Receipt Requested to the following:

Westport Holdings Tampa, Limited Partnership
d/b/a University Village
12401 North 22nd Street
Tampa, Florida 33612

Mr. Eli Freiden
IMH Healthcare, LLC
7000 W. Camino Real, Suite 240
Boca Raton, Florida 33433

and sent via e-mail and U.S. Mail to the following:

M. Stephen Turner, Esq.
Broad and Cassel
215 South Monroe Street, Suite 400
Tallahassee, Florida 32301
E-mail: sturner@broadandcassel.com

on this 15th day of __March__, 2016.

Shaw P. Stiller
Chief Assistant General Counsel
Office of Insurance Regulation
200 East Gaines Street
Tallahassee, Florida 32399
Telephone: (850) 413-4317
Facsimile: (850) 922-2543
E-Mail: Shaw.Stiller@floir.com

FOIR_066430

**ATTACHMENT 3**

IN THE OFFICE OF INSURANCE REGULATION
OF THE STATE OF FLORIDA

IN THE MATTER OF
WESTPORT HOLDINGS TAMPA, L.P.
d/b/a UNIVERSITY VILLAGE

OFFICE OF INSURANCE REGULATION

                Petitioner,

vs.                                     OIR Case No. 188018-16

WESTPORT HOLDINGS TAMPA, L.P.
d/b/a UNIVERSITY VILLAGE,

                Respondent.

_____/

## WESTPORT HOLDINGS TAMPA LP's REQUEST FOR FORMAL ADMINISTRATIVE HEARING TO REVIEW LICENSE SUSPENSION ORDER (OWNERSHIP ISSUES)

Respondent Westport Holdings Tampa, LP, d/b/a University Village (Westport), requests a formal administrative hearing and relief under Fla. Stat. §§ 120.569, 120.57, and other statutes cited herein, saying:

1.      Westport is a limited partnership organized under the laws of Delaware and authorized to do business in Florida. Westport's physical address is 12401 North 22d Street, Tampa FL, but for purposes of this Request, Westport's address is that of undersigned counsel.

2.      Respondent Office of Insurance Regulation (OIR) is the affected agency and is responsible for regulating specialty insurers under Fla. Stat. Ch. 651. OIR's address is 647 Larson Building, 200 East Gaines Street, Tallahassee FL 32399-4206.

3.      Westport owns property in Hillsborough County Florida, on which it operates a Continuing Care Retirement Community (CCRC), known as University Village, pursuant to a certificate of authority issued by the OIR pursuant to Ch. 651.

1

4814-8855-6847.1
50383 0001

4.      OIR issued two "Initial Orders of Suspension" directed to Westport, each dated March 15, 2016. One of these Orders bearing OIR Case No. 188018-16, deals primarily with Westport's ownership (hereafter "the Order"), and is the subject of this Request. Westport seeks formal administrative review of the other Order, which deals other issues, by a separate Request.

5.      The Order affects Westport's substantial interests by announcing a preliminary freeform decision to indefinitely suspend Westport's authority to operate a CCRC, without specifying any curative action to avoid or end the suspension, or any date for reinstatement.

6.      The Order serves as OIR's administrative complaint pursuant to Fla. Stat. § 120.60(5). It contains a "Notice of Rights" advising that Westport has the right to seek administrative review of the Order pursuant to Fla. Stat. §§ 120.569 and 120.57. Westport received this Order on March 18, 2016. This Request is timely filed.

7.      Westport, by this Request, invokes its right to formal de novo administrative review and the relief as requested herein. Pursuant to Fla. Stat. § 120.57(1)(j) and controlling case law, OIR has the burden to prove the basis for its license suspension by clear and convincing evidence.

## Factual Background and Ultimate Facts Supporting Relief

8.      University Village has operated as a CCRC under a certificate of authority from OIR or its predecessor agency since 1987. Westport became the owner beginning in 2000, and continuing to this date.

9.      In or before 2013, when Westport was in previous ownership, the partnership experienced serious financial problems, including default on its mortgage, deferred maintenance on the facility, and unpaid refunds to residents who cancelled their contracts.

2

4514-8855-6547.1
50583 0001

10.     At some point in 2013 OIR began monitoring Westport, which monitoring has been continuous since that time. OIR has closely watched all events that concern Westport over the last three years, including particularly changes in its ownership.

11.     In August 2013, BVM Management Inc. (BVM), a tax exempt charitable purpose corporation under IRC § 501(c)(3), became interested in acquiring the 99% limited partner share in Westport, and in arranging and underwriting new financing to resolve the financial issues. BVM disclosed its interest in this acquisition to OIR, which did not express any objection to this proposed acquisition and refinancing, or indicate that this would require any formal application.

12.     On August 11, 2013, BVM entered into an agreement to purchase the 99% limited partner share, and initially sought to arrange tax exempt refinancing to save the facility from foreclosure. However, this refinancing could not be concluded before the mortgage debt became seriously delinquent and foreclosure was imminent.

13.     On December 6, 2013, OIR advised Westport's then 1% general partner that no formal application would be required for the proposed 99% limited partner share acquisition.

14.     BVM recruited limited partners to acquire the 99% limited partner share through BVM on March 31, 2014, as follows:

|   |   |   |
|---|---|---|
| a. | BVM University Village LLC | 39.6% |
| b. | BHMSILF, LLC | 26.4% |
| c. | IMH Healthcare LLC | 19.8% |
| d. | JF Consultants LLC | 13.2% |

Westport fully disclosed this acquisition to OIR on April 2, 2014, provided OIR a copy of the amended limited partnership agreement, and provided all information requested by OIR, which was substantially the same information that OIR would have received in a formal acquisition application, if OIR had required a formal application. However OIR never suggested that a formal acquisition application or formal approval under Fla. Stat. § 628.4615 was required, for

3

FOIR_066433

either the initial transfer of the 99% limited partner share to BVM, or for a second transfer from BVM to the four limited partners named above; or that the acquisition of the 99% limited partner share was in any doubt, or gave any indication of disapproval.

15. Relying on OIR's communication that no formal application or formal approval was required and lack of objection, the new limited partners did not submit a formal application.

16. In connection with the acquisition, BVM was able to arrange some $ 24.5 million in refinancing, which it also guaranteed, to continue operation of the ILF and affiliated properties used for assisted living and skilled nursing facilities and avoid foreclosure.

17. Specifically, BVM arranged a $ 9.5 million loan from CPIF Holding Tampa L.P., to Westport, secured by a mortgage on the independent living facility, and guaranteed by BVM.

18. BVM also arranged a second loan of $15 million from AmeriBank, for Westport Nursing LLC. Westport Nursing LLC is a related entity that owned the contiguous parcel of land on which affiliated assisted living and skilled nursing facilities were located. This loan enabled avoidance of foreclosure and allowed the ALF and SNF to continue in business under licensed operators who leased the facilities. This loan was secured by a mortgage on the contiguous parcel, and was also guaranteed by BVM. As a condition of this loan, the lender required that Westport Nursing LLC be a sibling entity to avoid cross collateralization of the different loans.

19. OIR was informed of these arrangements by letter dated March 31, 2014, and did not indicate any objection to the restructuring and refinancing.

20. Westport partners understood that OIR welcomed these transactions as the only available way to rescue the facility from foreclosure. In reliance on their understanding that OIR approved their acquisition or did not object, Westport began improvements and operations, meeting residents' need.

4

JS14-8855-8817.)
50553 0001

FOIR_066434

21.    On December 29, 2014, Westport's 1% general partner resigned, as the limited partners had planned to ultimately occur, and had disclosed to OIR. OIR was promptly informed of this resignation and a new 1% general partner was proposed.

22.    OIR took the position that any new 1% general partner would require a formal acquisition application and approval. While Westport believes OIR's position is legally unsupported as discussed below, the proposed new 1% general partner sought OIR's approval, hoping to accommodate OIR's demand and expedite approval. When OIR objected to the proposed general partner, its application was withdrawn and a new general partner was proposed.

23.    While questions concerning the new proposed general partner were under review, on February 11, 2015, OIR began a targeted compliance audit examination of Westport.

24.    On February 13, 2015, OIR Commissioner Kevin McCarty, without awaiting the results of this investigation (which continues to this date without any final report), or offering Westport any notice of deficiency or opportunity to cure, as required by Fla. Stat. § 651.105(4), publicly announced that OIR's goal was to remove Westport's current management.

25.    Contemporaneous with Commissioner McCarty's announcement, OIR referred the case to DFS to begin a receivership action against Westport in the Circuit Court, raising the same issues as in the two current license suspension orders. The receivership action is still pending.

26.    When Westport representatives sought to see if OIR's concerns could be resolved, OIR Deputy Commissioner or Chief of Staff Belinda Miller expressed her view that Westport had diverted the $24.5 million in refinancing to its own use, and made other disparaging remarks about Westport, all of which were unfounded and based on prejudgment rather than evidence.

27.    OIR staff received marching orders from the Commissioner before investigation was started, much less complete. In furtherance of the Commissioner's goal to oust Westport's

5

4814-8853-6642.1
50583 0001

owners, OIR has permanently stationed its investigator at Westport's facility; made repetitious burdensome demands for information; disrupted Westport's good will and communications with residents and employees; and tried to control Westport's operations, using trumped up and baseless charges that hinder Westport's ability to attract new residents and capital.

28.     OIR previously issued an Order of Suspension dated February 13, 2015. This prior Order stated that BVM (misnamed in the Order as "BMV") was exercising control over Westport without OIR authorization. The Order stated that BVM's principal had informed OIR that BVM would become a limited partner, and planned to become a general partner. The Order did not express any objection to BVM remaining a limited partner, or to any of the three other limited partners. Westport challenged this order, but the parties requested that DOAH relinquish jurisdiction pending settlement. OIR did not pursue this prior order, and it appears to be abandoned, moot, or superseded.

29.     On March 2, 2015, Westport's limited partners elected limited partner IHM Healthcare LLC to be the new 1% general partner. On March 6, 2015, IMH filed an acquisition application form styled "Statement of Acquisition, Merger or Consolidation of a Specialty Insurer Pursuant to Florida Statutes 628.4615." This application referenced Westport's access to an additional $5 million in cash from an investor, Ark Real Estate Group, which funds could have been used to cover outstanding obligations such as resident refunds or any shortage in liquid reserves. However, OIR did not investigate this offer, preferring to pursue the Commissioner's goal of ousting Westport's owners.

30.     OIR apparently deemed IMH's application to be complete, as it did not request additional information.

6

31.     On March 27, 2015, OIR issued a notice that it denied IMH's application. OIR did not issue any order questioning the limited partners' continued ownership rights.

32.     IMH sought formal administrative review of this preliminary denial order in the case styled *IMH Healthcare LLC v. Office of Ins. Reg.*, No. 15-2495 (Fla. DOAH Rec. Ord. Jan. 26, 2016). The ALJ's recommended order recommended dismissal of OIR's denial action on grounds that OIR had no statutory authority to review or disapprove acquisition of a less than 10% ownership share in a CCRC under Fla. Stat. § 651.4615

33.     While this administrative case was pending, four limited partners continued to own their shares in Westport without any indication of objection from OIR. IMH functioned as the general partner to oversee partnership business, as Fla. Stat § 628.4615(6)(a) allows, with management personnel and consultants in place, and the facility functioned well. Westport continuing to provide services to residents, despite OIR's continuing attempts to interfere.

34.     The first time OIR notified Westport that it was disapproving its limited partners was OIR's Suspension Order of March 15, 2016, almost two years after their acquisition.

35.     The Order fails to state any reason why OIR thinks any of the 99% limited partners is not qualified to be a limited partner in Westport. The Order states a conclusory allegation that "OIR has not approved the acquisition of Westport," Order par. 16, but fails to identify any justification or substantive basis for belatedly objecting to the limited partners.

36.     Contrary to OIR's allegations, Westport is highly solvent. The campus properties have value far in excess of the $24.5 million mortgage debt, so substantial equity is present. The facility enjoys a far better debt to equity ratio and per unit debt than most CCRC's, which are not subject to OIR investigation and attack. This equity enables Westport to attract additional capital

7

FOIR_066438

by equity investment or refinancing with current or other lenders, that would make additional funds available that can be used to cover all obligations that OIR claims are due.

37.     Westport presently has an offer of an additional $10 million in cash, documented in a letter from the same investment group, subject to OIR's and DFS's lifting of the receivership case and other regulatory orders including the license suspension orders. This amount is more than sufficient to resolve any alleged claims against Westport. In addition, Westport has opportunities to raise other cash capital by refinancing from current or new lenders.

38.     Given the Commissioner's goal to oust Westport's owners, the two challenged OIR license suspension orders are not the result of objective investigation, but rather seek to justify his predetermined condemnation and campaign by finding reasons to support that result.

39.     The Order is unsupported and unlawful for each of the reasons stated below.

I.     **OIR Cannot Lawfully Disapprove Ownership of 99% Limited Partner Shares**

40.     OIR was repeatedly notified of the limited partners' acquisition – at the planning stage in August 2013, by detailed information at the time of the closing in early April 2014, and again by the background information in the application for a new general partner in early 2015. OIR never at any time gave Westport or the limited partners any indication that a formal application was required for the limited partners or that the limited partners needed to do anything further, or that it had any basis to contest the acquisition.

41.     Nonetheless, two years after the limited partners' acquisition, in a precipitous maneuver to advance its campaign to undermine Westport's ownership and seize the business and property and install an owner of its choice, OIR suddenly changed its mind and launches a surprise attack the limited partners' investment acquisition by its subject Order.

8

42.    OIR has no lawful basis to disapprove Westport's limited partners now. This action is unauthorized and unlawful for each of the reasons stated below.

### A. Failure to identify any basis to object to limited partners

43.    OIR's Order lacks any factual allegation to support disqualification or disapproval of Westport's limited partners. The bare unsupported allegation that the limited partners are not approved is not a basis to disqualify or disapprove them. The Order is thus facially defective.

### B. Statutory waiver of objections to Limited Partner acquisitions

44.    An approval required by OIR for acquisition of limited partner interests in a CCRC is a "license" as defined in Fla. Stat. § 120.52(10). Parties seeking such approval or license are entitled to the procedural protections in Fla. Stat. § 120.60.

45.    Fla. Stat. § 120.60(1) governing license application proceedings (1) requires an agency to inform a party that seeks an approval regarding any omission or deficiency within 30 days, with opportunity to cure, and mandates that failure to issue such notice bars the agency from denying the application based on the deficiency; (2) deems that upon the agency's receipt of all requested information, the application is complete; and (3) requires the agency to approve or deny an application within 90 days of receipt of all requested information, or deem the application granted by default.

46.    OIR knew the limited partners were acquiring limited partner shares in excess of 10%. It received and reviewed essentially the same information a formal application would have elicited. OIR led Westport and its limited partners to believe this acquisition was accepted and lawful, without any need to submit a formal application; and the information OIR requested and Westport provided substantially complied with any requirement for an application in any case.

9

FOIR_066439

47.    Having led Westport to believe that no formal application was required, OIR cannot complain that it did not receive a formal application, as a way to avoid or defeat statutory rights to default approval arising from OIR's failure to give notice of deficiency or issue a denial. A "gotcha" denial without warning two years after the acquisition is contrary to § 120.60.

48.    Westport and its limited partners are within the protection for applicants in § 120.60(1) and entitled to have the limited partner acquisitions recognized as lawful by default.

### C. Waiver, acquiescence and estoppel to assert objections

49.    Westport and its limited partners, as well as lenders, other creditors, and residents, all reasonably relied on OIR's actions and failures to object to the 99% share limited partner acquisition for the last two years. As a practical matter, Westport cannot now undo the limited partner acquisitions and be returned to the status quo ante.

50.    The circumstances described above constitute a waiver, acquiescence or estoppel to require Westport to submit any further or formal application, and bars any objection to the limited partner share acquisitions now.

### D. Denial of Limited Partner acquisition approval is unlawful based on unadopted rule

51.    At the time of the limited partners' acquisition in March 2014 and when notified of the same in April 2014, OIR was satisfied with the information provided and did not to require any formal application and formal approval of changes in CCRC limited partner ownership. This is a generally applicable policy affecting private parties' rights, and thus is a "rule" as defined in Fla. Stat. § 120.52(16).

52.    OIR apparently recently changed its policy to require formal application and formal approval for acquisition of limited partner shares, without formal rule adoption. This new general policy affects private rights and is also a "rule" within the meaning of § 120.52(16).

10

4811-8855-0847.1
50353.0001

53.    Such change in policy requires OIR to formally adopt a rule under Fla. Stat. §§ 120.54(1)(a), 120.56(4), and 120.57(1)(e).

54.    OIR cannot apply its change in policy (new unadopted rule) to divest Westport and its limited partners of their rights to their respective limited partner shares. *See* Fla. Stat. §§ 120.52(8) and (16) (definitions), and §§ 120.54(1)(a), 120.56(4) and 120.57(1)(e) (unlawful to base license suspension or change policy by invalid unadopted rule).

55.    OIR cannot adopt a rule retroactively to deny or hinder the Westport limited partners' completed acquisitions. Fla. Stat. § 120.54(1)(f).

56.    On information and belief, OIR improvised this new rule and imposed it on Westport in response to IMH's argument in the administrative case cited above. This arbitrary and retroactive change in a prior policy is also unlawful under Fla. Stat. § 120.68(7)(e)3.

57.    In addition, OIR's application form is required to be an adopted rule under Fla. Stat. §§ 120.52(16). However, OIR's current application form for acquisition of ownership in a CCRC, Form OIR-CI-448 rev. 12/05 located on OIR's website,[1] is not adopted by formal rulemaking. *Compare* Rules 690-193.003(1) and 690-193.065(1)(h), effective 12/93, adopting Statement of Acquisition Form OIR 448, rev. 05/89. This rule-adopted 1989 form is not available on OIR's website, and its whereabouts are unknown to Westport. To the extent OIR's intended disapproval of the limited partners is based on failure to submit an acquisition application form, this disapproval action is invalid for lack of an adopted rule/form.

58.    A rule as defined in Fla. Stat. § 120.52(16) is invalid if not adopted by formal rulemaking. Fla. Stat. § 120.52(8)(a). OIR is obligated to adopt its policies and forms as formal rules by the rulemaking process under Fla. Stat. § 120.54(1). OIR cannot lawfully base its action

---

[1] See OIR website at http://www.floir.com/sections/appcoord/is_ac_cont_stock_si.aspx

4814-8855-6847.1
50583.0001

FOIR_066441

on unadopted rules under Fla. Stat. § 120.57(1)(e). Fla. Stat. § 120.56(4)(d) requires that OIR immediately discontinue all reliance upon unadopted rules as a basis for agency action.

59.     Accordingly, OIR cannot lawfully disapprove Westport limited partner acquisitions as based on an invalid unadopted and retroactive rule.

## II. OIR has no basis to deny acquisition of a 1% general partner share

### A.     No authority to review 1% general partner share acquisition

60.     In the *IMH* case, ALJ Gary Early agreed with IMH's argument that OIR has no statutory authority under Fla. Stat. § 628.4615, to require an application for changes in ownership for less than a 10% share, and thus could not require IMH to submit an application for approval of its acquisition of the 1% general partner share. Judge Early reached this decision based on careful analysis of Delaware partnership law as well as the Florida law. *See* Recommended Order par. 118-142 and recommendation p. 53.

61.     However, OIR excepted to the Recommended Order on this point. Commissioner McCarty issued a Final Order holding that OIR is authorized to require IMH to submit the acquisition application for a 1% general partner share, and upheld the disapproval of this application. Case No. 185730-16 (Fla. OIR Final Order Mar. 11, 2016).

62.     IMH has sought appellate review of this Final Order, Case No. 1D16-1183 (Fla. 1st DCA pending). Westport reserves its right to contend that OIR had no authority to deny the IMH acquisition, as Judge Early ruled; and thus IMH is a lawful general partner for CCRC operations, as will be determined in the appellate case; and reserves its right to have IMH own this 1% general partner share without an application or approval by OIR, if the appellate court reverses the OIR Final Order.

B.     No basis to suspend license or deny opportunity to propose new 1% general partner

4814-8855-6847.1
50583 0001

FOIR_066442

63. Even if OIR acted within its authority to disapprove IMH as a 1% general partner, immediate suspension of Westport's certificate of authority is not warranted. The proper remedy, if OIR was authorized to disapprove IMH, is to void the transfer to IMH.

64. Fla. Stat. § 631.051(9) allows and encourages such replacements, by granting the insurer a "reasonable time" in which to replace a disapproved owner with a new proposed owner, before OIR can bring proceedings. Nothing in the law precludes Westport from submitting another proposed 1% general partner for OIR review.

65. A new application for a 1% general partner is expected shortly. Such application is without prejudice to Westport's position in the appellate case that no approval is required by law. If OIR denies approval of the new proposed general partner, the proposed new general partner has the right to contest OIR's preliminary denial by formal administrative proceedings.

66. While this application is pending review, including any formal proceedings, the applicant can function as the general partner without OIR interference, *see* Fla. Stat. § 628.4615(6)(a), and oversee the partnership business, while the CCRC operation which can be delegated to a hired manager disclosed to OIR.

### III. Initial Suspension Order is Otherwise Unlawful

A. Order unlawful for failure to comply with conditions precedent in Fla. Stat. § 651.105(4)

67. OIR is allowed to take action only after it gives the provider (Westport) notice of any deficiency and reasonable opportunity to cure the deficiency, under Fla. Stat. § 651.105(4).

68. OIR failed to provide Westport any prior notice of a deficiency, including what steps would be necessary to cure the deficiency, or any opportunity to cure the deficiency, before issuing its suspension Order in this case.

13

FOIR_066443

69.    OIR's Order is unlawful for failure to satisfy the statutory conditions precedent in Fla. Stat. § 651.105(4).

70.    In addition, OIR's Order does not specify any duration of the suspension, but instead makes the suspension indefinite. This omission is particularly harmful to Westport, given the OIR's failure to provide any prior notice of deficiency or indication what steps may be taken to cure the deficiency, or why the Westport limited partners could not be approved.

71.    Fla. Stat. § 651.107(1) requires that "Suspension of a certificate of authority shall be for such period, not to exceed one year, as is fixed by the office in the order of suspension." The Order is defective as it does not comply with the statute to fix the duration of the suspension.

72.    The purpose for this law is to assure a suspension does not exceed the time needed to cure a deficiency, if in fact a deficiency exists. Since the Order did not allege how the limited partners' acquisition is deficient, and no notice or opportunity to cure was afforded, the Order imposing an indefinite suspension cannot possibly be lawful.

B.    Suspension Order Unlawful Under Fla. Stat. 651.114(8)(a)

73.    Fla. Stat. § 651.114(8)(a) requires that when a CCRC's mortgage lender agrees that it will protect the rights of residents, this private remedy takes priority, and OIR must halt any remedial action as specified in the statute. This statute directs:

> *The rights of the office described in this section are subordinate to the rights of a trustee or lender* pursuant to the terms of a resolution, ordinance, loan agreement, indenture of trust, mortgage, lease, security agreement, or other instrument creating or securing bonds or notes issued to finance a facility, and *the office,* subject to the provisions of paragraph (c), *shall not exercise its remedial rights provided under this section and ss. 651.018, 651.106, 651.108, and 651.116 ....*
> (e.s.)

74.    This law subordinates "the rights of the office" to the secured lender's rights by suspending OIR (using the mandatory phrase "shall not") remedial actions under § 651.106

14

4814-8855-6847 1
50583 0001

FOIR_066444

(suspension or revocation of certificate of authority). This law is designed to avoid needless litigation depleting the provider's assets, by suspending the OIR's suspension or other action if the mortgage lender, which normally has the most to lose if the CCRC fails, gives a private guarantee. *See Devonshire at PGA Nat'l, LLC v. State ex rel. Dep't of Fin. Services,* 103 So. 3d 1060, 1067 (Fla. 1ˢᵗ DCA 2013), applying this statute to suspend a court receivership action.

75.     Westport has furnished OIR a copy of a loan modification instrument showing its lender's commitment to meet the requirements for this immunity. This instrument modifies Westport's loan agreement with CPIF Lending, LLC for a $9.5 million mortgage loan, in which the lender agreed to subordinate its rights to the rights of the residents, even though it retains the right to foreclose on the property should Westport default on the loan. The mortgage lender for the health center property has given made a similar subordination provision.

76.     As *Devonshire* notes, the only exception to this statute is under paragraph (8)(c) of the statute, if the OIR, after giving notice and reasonable opportunity to cure, shows the lender cannot carry out the intended work out.

77.     OIR has not adopted any rules to govern when it can reinstate action against a CCRC, over a mortgage lender's guarantee, under Fla. Stat. § 651.114(8)(a) and (c). OIR cannot rely on unadopted rules to justify this penal action. *See* Fla. Stat. §§ 120.52(8) and (16), 120.54(1), 120.56(4), and 120.57(1)(e).

78.     OIR never afforded the mortgage lender this opportunity. Rather, OIR has engaged in unrelenting pursuit of claims against Westport contrary to this statute, and has never stood down or given the lender any workout opportunity.

15

4814-8835-6847.1
50583.0001

FOIR_066445

79.     OIR should be precluded from pursuing a suspension of Westport's certificate of authority while the mortgage lender exercises its workout opportunity under Fla. Stat. § 651.114(8)(a).

## Statutes on which Westport Relies

80.     Westport relies on all of the statutes cited in this Request.

## Disputed Issues of Material Fact

81.     Westport anticipates OIR will dispute the facts alleged in this Request. Disputed issues of material fact or mixed issues of fact and law will likely include at least the following:

a.     Whether OIR had knowledge of Westport's changes in 99% limited partner ownership in April 2014 (when Westport gave notice of the changes), or thereafter.

b.     Whether Westport's furnishing of requested information to OIR concerning Westport's changes in limited partner ownership in April 2014, or thereafter was substantially compliant with any requirement for an application.

c.     Whether OIR advised Westport or its limited partners of any requirement to submit an application for acquisition of 99% limited partner shares in April 2014, or thereafter.

d.     Whether OIR had knowledge of Westport's restructuring and refinancing in April 2014 and thereafter.

e.     Whether OIR received all requested information from Westport concerning Westport's changes in limited partner ownership, restructuring and refinancing in April 2014, or thereafter.

f.     Whether OIR expressed any objection to Westport's changes in limited partner ownership, restructuring or refinancing to Westport in April 2014, or thereafter.

16

4814-8855-6813.1
50583 0001

g.  Whether Westport and its limited partners reasonably relied on the understanding that OIR approved Westport's changes in limited partner ownership, restructuring and refinancing, or did not disapprove or require formal approval for such changes, in April 2014 and thereafter.

h.  Whether the Westport limited partners are entitled to have their ownership shares recognized under Fla. Stat. § 120.60.

i.  Whether the Westport limited partners are entitled to have their ownership shares recognized under common law or equitable waiver, estoppel or acquiescence.

j.  Whether OIR relied on invalid unadopted or retroactive rules as a basis for challenging Westport's ownership shares, including (1) Whether OIR had a policy or practice not to require application for review or approval of limited partner acquisitions in April 2014 or thereafter which amounts to a "rule;" (2) Whether OIR changed its policy/rule concerning approval of limited partner share acquisitions without formal rulemaking; and (3) Whether OIR's application form for acquiring interests in a CCRC on its website is an unadopted rule.

k.  Whether OIR has authority to require review of a change in a 1% general partner share in the circumstances of this case.

l.  Whether OIR intends to review Westport's new general partner application, and if so, whether the new proposed general partner can continue to operate as such pending OIR review.

m.  Whether OIR gave Westport any notice of deficiency and reasonable opportunity to cure the deficiency under Fla. Stat. § 651.105(4) before issuing the Order.

n.  Whether OIR prescribed the length of the suspension (which is related to the opportunity to cure any deficiency) as required in Fla. Stat. § 651.107(1).

o.  Whether OIR may impose a license suspension remedy contrary to the exemption in Fla. Stat. § 651.114(8) (facility mortgage lender's commitment to honor resident rights).

17

4814-8855-6847.1
50583 0001

p.   Whether OIR allowed Westport mortgage lender the opportunity to effect a private workout under Fla. Stat. § 651.114(8)(a) and (c).

q.   Whether Westport is insolvent.

r.   Whether OIR has any basis to deny approval of Westport's limited partners.

s.   Whether OIR properly applied the statutes and rules in issuing the Order.

t.   Whether the OIR Order has any factual or legal basis.

u.   Whether OIR's claims if proven warrant license suspension or a lesser penalty.

v.   If license suspension is appropriate, what duration of license suspension is appropriate and what curative action would lift the suspension.

Also, the parties dispute the fact issues set forth in Westport's Request for Formal Administrative Hearing on License Suspension Order (Issues other than Ownership).

Other disputed issues of material fact may be discovered as the case progresses.

## Disqualification of Commissioner McCarty and Deputy Commissioner or Chief of Staff Miller

Since Commissioner McCarty and Deputy Commissioner or Chief of Staff Miller announced their conclusions before the investigation was conducted, much less completed, without notice to Westport or opportunity to respond (much less a full record or neutral recommended order), they cannot possibly be objective, and are each disqualified to sit as agency head to issue a final order in this case.

## Relief Requested

Westport requests that OIR refer this Request to the Division of Administrative Hearings to assign an Administrative Law Judge, to conduct a de novo evidentiary hearing on a record;

18

FOIR_066448

and issue a Recommended Order making findings and recommending that the OIR Order be vacated and dismissed; and also issue a Final Order holding unadopted rules are invalid under Fla. Stat. 120.56(4); and award such other relief as may be proper;

And that OIR appoint an agency head other than Commissioner McCarty and Deputy Commissioner or Chief of Staff Miller to issue a Final Order that

(1) vacates and dismisses its Order of Suspension

(2) recognizes all Westport 99% limited partners as having been approved at the time of acquisition, or as not lawfully disapproved, and thus entitled to continue their ownership;

(3) recognizes Westport's 1% general partner (either IMH Healthcare LLC if the prior Final Order is reversed, or a new general partner proposed by Westport) as entitled to be the general partner;

(4) recognizes Westport's and its limited partners' rights to own and continue operation of the CCRC under a valid certificate of authority; and

(5) grants such other and further relief as may be proper.

Filed with the Office of Insurance Regulation this 4th day of April, 2016.

M. STEPHEN TURNER, P.A. (FBN 095691
sturner@broadandcassel.com
sfogarty@broadandcassel.com
DAVID K. MILLER, P.A. (FBN 0213128)
dmiller@broadandcassel.com
mubieta@broadandcassel.com
WENDY RUSSELL WIENER, P.A. (FBN 0983667)
wwiener@broadandcassel.com
khoover@broadandcassel.com
Broad and Cassel
215 S. Monroe Street, Suite 400 (32301)
P.O. Drawer 11300
Tallahassee, FL 32302
Tel 850-681-6810; Fax 850-681-9792
Attorneys for Respondent Westport

19

4814-8853-6547.1
50583.0001

FOIR_066449

## CERTIFICATE OF SERVICE

I hereby certify that the original of the foregoing WESTPORT HOLDINGS TAMPA LP's REQUEST FOR FORMAL ADMINISTRATIVE HEARING TO REVIEW LICENSE SUSPENSION ORDER (OWNERSHIP ISSUES) has been served by hand-delivery and a copy by E-Mail on Anoush Brangaccio, General Counsel Legal Services, acting as the Agency Clerk, Office of Insurance Regulation, 647 Larson Building, 200 East Gaines Street, Tallahassee, FL 32399, E-Mail: anoush.brangaccio@floir.com; and by E-Mail on Shaw P. Stiller, Chief Assistant General Counsel, Office of Insurance Regulation, 647 Larson Building, 200 East Gaines Street, Tallahassee, FL 32399, E-Mail: shaw.stiller@floir.com, this 4th day of April, 2016.

_David K Miller_
Attorney

20

4814-8855-6847.1
50583 0001

FOIR_066450