Filing # 27878984 E-Filed 05/29/2015 04:07:46 PM

IN THE CIRCUIT COURT OF THE
SECOND JUDICIAL CIRCUIT, IN
AND FOR LEON COUNTY, FLORIDA

STATE OF FLORIDA, ex. rel., the
DEPARTMENT OF FINANCIAL
SERVICES OF THE STATE OF FLORIDA,

    Relator,

v.

                               CASE NO. 2015-CA-0585

WESTPORT HOLDINGS, TAMPA,
LIMITED PARTNERSHIP
d/b/a University Village,
a Delaware limited partnership
licensed as a continuing care retirement
community in the State of Florida,

    Respondent.

_____/

### DEPOSITION TRANSCRIPT



PLAINTIFF'S
EXHIBIT
4

April 22, 2015

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA
CASE NO. 2015-CA-0585

STATE OF FLORIDA, ex. rel., the
DEPARTMENT OF FINANCIAL SERVICES
OF THE STATE OF FLORIDA,

    Relator,

vs.

WESTPORT HOLDINGS, TAMPA,
LIMITED PARTNERSHIP d/b/a
University Village, a Delaware
limited partnership licensed as
a continuing care retirement
community in the State of Florida,

    Respondent.

_____/

TELEPHONIC DEPOSITION OF JOHN WILLIAM BARTLE, JR.
Taken By Counsel for Relator
(Pages 1 - 129)

Wednesday, April 22, 2015
10:09 a.m. - 3:33 p.m.

Allen Dell, P.A.
202 South Rome Avenue
Suite 100
Tampa, Florida

Stenographically Reported By:
Jennifer Figueroa, RPR, CLR, FPR
Notary Public, State of Florida at Large
Esquire Deposition Solutions - Tampa Office
Phone - 813.221.2535, 800.838.2814
Esquire Job No. 323880



JOHN W. BARTLE, JR.                                      April 22, 2015
STATE OF FLORDA vs. WESTPORT                                          2

TELEPHONIC APPEARANCES:

    TIMOTHY L. NEWHALL, ESQUIRE
    Deputy Chief Attorney
    Florida Department of Financial Services
    Division of Rehabilitation and Liquidation
    2020 Capital Circle SE, Suite 310
    Tallahassee, Florida 32301
    850.413.4408
    tim.newhall@myfloridacfo.com

        On Behalf of the Relator


    STEVE TURNER, ESQUIRE
    Broad & Cassel
    215 South Monroe Street, Suite 400
    Tallahassee, Florida 32301
    850.681.6810
    sturner@broadandcassel.com

        On Behalf of Westport

ALSO PRESENT:

    ANNA G. SMALL, A.R.N.P., ESQUIRE
    Allen Dell, P.A.
    202 South Rome Avenue
    Suite 100
    Tampa, Florida 33606
    813.223.5351
    asmall@allendell.com

    WENDY RUSSELL WIENER, ESQUIRE (Telephonic)
    Broad & Cassel
    215 South Monroe Street, Suite 400
    Tallahassee, Florida 32301
    850.681.6810

    LEEAN JOHNS CHOJNOWSKI, ESQUIRE (Telephonic)
    VIRGINIA ANN CHRISTY, ESQUIRE (Telephonic)
    Office of Insurance Regulation
    200 East Gaines Street
    Tallahassee, Florida 32301-2413
    850.413.4108

    CAROLYN MORGAN, REPRESENTATIVE FOR OIR (Telephonic)
    ELIYAHU TZVI FREIDEN



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015

3

                    I N D E X

                                                        PAGE

Direct Examination by Mr. Newhall                          4

Cross-Examination by Mr. Turner                          116

Redirect Examination by Mr. Newhall                      118

Errata Sheets                                        125-127

Certificate of Reporter                                  128

Certificate of Oath                                      129


                      EXHIBITS

NO.                 DESCRIPTION                          PAGE

  1     Memorandum addressed to All
        Independent Living Staff from
        Tim Parker dated 4/2/14                           48

  2     Memorandum addressed to All
        Independent Living Residents from
        Tim Parker dated 4/2/14                           50

  3     Reinstatement and Amendment Agreement
        dated 4/11/14                                     61

  4     E-mail addressed to Lou Jackson
        from Tim Parker dated 3/31/14                     64

  5     E-mail addressed to Lou Jackson and
        John Bartle from Mark Lichtenwalner
        dated 4/17/14                                     69

  6     E-mail addressed to
        jbartle6081@yahoo.com from Tim Parker
        dated 3/31/14                                     70



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
4

Telephonic deposition taken before Jennifer Figueroa, Registered Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

*    *    *    *    *

(Ms. Christy is not present.)

THE COURT REPORTER:  Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT REPORTER:  Thank you.

THEREUPON,

JOHN WILLIAM BARTLE, JR.,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NEWHALL:

Q.   Mr. Bartle.  My name is Tim Newhall.  I'm an attorney with the Department of Financial Services up in Tallahassee.  I'm going to be asking you a series of questions today.  Since we're doing this over the telephone, I want to make sure that you understand my questions and that I understand your answers.  So please make sure that I'm finished with my question before you start to answer; and I will make sure that you're



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
5

finished with your answer before I start the next question.  Is that acceptable?

A.    Yes, sir.

Q.    Okay.  Can you hear me okay?

A.    I can.  Yes, sir.

Q.    Okay.  And I guess the other instruction would be Mr. Turner may feel it appropriate to make an objection from time to time.  If he does, please let him complete his objection; and unless he tells you not to answer, then I would ask you to go ahead and answer the question.  If you do not understand a question that I ask, please feel free to ask me to repeat it.

And I guess lastly, for the court reporter's benefit, let's make sure that we're not both talking at the same time because she won't be able to understand us.

Would you tell me your full name for the record, please, sir?

A.    John W. Bartle, B-a-r-t-l-e.

Q.    What does the "W" stand for?

A.    William.

Q.    What's your date of birth, Mr. Bartle?

A.    5/7/47.

Q.    Could you very briefly give me your educational background?



A.    Yes.  I have an associate's degree in accounting from the Indiana Business College and another 100 hours of study in business and finance, Ball State University.

Q.    Are you a certified public accountant or have you ever been?

A.    No.  I've been a public accountant, but not a certified public accountant.

Q.    Do you have any licenses, professional licenses, that you maintain or have you at any time?

A.    Not since 1985, no.

Q.    What license did you have until 1985?

A.    I practiced public accounting in Indiana until '85, until the accounting practice was sold.

Q.    As a public accountant are you required to be licensed?

A.    Well, at the time -- at that particular point in time, the statute required that, yes.

Q.    Okay.  And is this an Indiana Statute?

A.    Yes.

Q.    Was that license ever suspended or revoked for any reason?

A.    No.

Q.    I'm sorry.  What did you say?

A.    No.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
7

Q.    Mr. Bartle, what is your -- I'm going to have to start this from the broad end -- what is your current business?

A.    Well, my current business -- I'm employed by a company called BVM Management, Inc., in a special practice group called Americare Partners.  So I'm an employee of BVM Management, Inc., in that special practice group.

Q.    What is your position with BVM partners -- I'm sorry, BVM Management?

A.    Well, as I sit here today I don't have a position with BVM Management, Inc.  It's a 65-year-old nonprofit, and I'm not an officer or director.

Q.    Okay.  Do you receive any compensation from BVM Management?

A.    I do.

Q.    Okay.  What kind of compensation do you receive?

A.    I receive W-2 income of approximately $75,000 a year.

Q.    Are you -- you're not employed by BVM Management.  Correct?

A.    Yes, sir, I am employed by BVM Management, Inc.

Q.    Okay.  What's your position with BVM


ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Management?

A.    I work in a special practice group called Americare Partners, and my position is working in mergers and acquisitions, and financial structures for acquisitions and joint ventures for the company.

Q.    Do you have an ownership interest in BVM Management?

A.    BVM Management is a 65-year-old 501(c)3 charitable purpose nonprofit corporation that has no ownership.

Q.    All right.  What is your position with Americare Partners?

A.    I'm the managing director of Americare Partners.

Q.    How many different units does BVM Management have besides Americare Partners?

A.    Well, they have a -- they have a senior housing division, a public multifamily housing division, and a consulting division.

Q.    And that's in addition to Americare Partners?

A.    Correct.

Q.    What's your -- what is your compensation from Americare Partners?

A.    My compensation with Americare Partners is



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
9

through the parent, BVM Management, Inc.; and it's approximately $75,000 per year.

Q.   Are you an owner of Westport Holdings, which does business as University Village?

A.   No.

Q.   What is -- can you describe -- is there any sort of relationship between Westport Holdings, Tampa, d/b/a University Village and BVM Management?

A.   The only relationship is that BVM Management is the corporate guarantor of the indebtedness.

Q.   What indebtedness is that, sir?

A.   The indebtedness of I think $9.5 million, as I recall, for the -- for Westport Holdings, Tampa, LP, and Westport Holdings, Tampa II, LP.

Q.   How is it that BMV Management guarantees the indebtedness of Westport Holdings, Tampa I, and Westport Holdings, Tampa II, and yet there is no corporate relationship between the two?

A.   Well, there was intending to be a relationship between the two subsequent to the expiration of the AgeWell Senior Living Management agreement as of January 30th, 2015.  There was an anticipation that BVM Management would become at some point in 2015 the managing agent for Westport Holdings, Tampa, and Westport Holdings, Tampa II, LP.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
10

Q.   Has that taken place?

A.   Not yet.

Q.   When is it intended to take place?  In other words, when does BVM Management, Inc., become the managing entity of Westport Holdings, Tampa I, and Westport Holdings, Tampa II?

A.   In my opinion, it will be solely dependent upon the culmination of the legal actions depending with DFS, the OIR, and AHCA.

Q.   When did you personally, through any corporate relationship, first become involved with the University Village Continuing Care Retirement Community, or CCRC, in Tampa, Florida?

A.   Well, if we can agree on a definition of "involved" ... I first became aware of the property being for sale in 2012 and began negotiating with the general partner in late 2012, early 2013, in an attempt to make an acquisition.

Q.   And you were negotiating with Mr. Larry Landry?

A.   Yes, sir.

Q.   When was the -- and just for purposes of clarity, what were you -- "you" -- when you were negotiating with Mr. Landry, on behalf of what entity were you proposing to buy University Village?



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
11

A.    At the time I was negotiating on behalf of BVM Management, Inc.

Q.    And how long did these negotiations progress?

A.    Well, it was sometime during the first quarter or early second quarter of 2013 when there was a limited partnership purchase agreement executed between Mr. Landry's organization and the BVM organization.  So the negotiations resulted in a limited partnership purchase agreement execution sometime I believe in the first or second quarter of 2013.

Q.    Would it be correct that -- well, strike that.

Can you recall what the terms of this proposed purchase on behalf of BVM Management were?

A.    Well, the general terms would be that the existing loan would be paid, the mortgage indebtedness would be paid in full with a refinancing, and that Mr. Landry's organization and the Connecticut Police and Fire Pension Fund would receive $2.5 million in additional compensation.  So to sum it up, it's about a $20.5 million, $20 million transaction to pay off the indebtedness, plus the closing cost, plus another $2.5 million to Connecticut Police and Fire.

Q.    And when did the sale actually close?

A.    The sale actually closed on March 31st, 2014.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
12

Q. And had the terms of the sale changed before -- by the time it closed?

A. Yes.

Q. And how had the terms of the sale changed?

A. When I began negotiating with Mr. Landry, it was anticipated that BVM Management, Inc., would be the owner of the property subject to the issuance of tax-exempt bonds for the indebtedness and the other funding necessary to close the transaction.

During 2013 the bond market collapsed during the second quarter, and the coupon rated the bonds changed dramatically, forcing the acquiring party to retreat to more conventional lending. And so the lender changed and BVM Management, Inc., was no longer the purchaser.

Q. And who became the purchaser?

A. The purchaser eventually was -- the 99 percent interest of the limited partner was purchased by four limited liability companies that were special purpose entities formed to acquire the 99 percent interest.

Q. All right. And let me run a series of entities by you one at a time and you can just either confirm or refute that those are the four limited partner entities that you're referring to, or the four -- I'm sorry, the four entities. How about BVM



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
13

University Village, LLC?

A.   Correct.

Q.   Okay.   And do you have any ownership interest in BVM University Village?

A.   No.

Q.   Are you an officer or director of BVM University Village?

A.   No.

Q.   Are you in any way an employee of BVM University Village, LLC?

A.   No.

Q.   Do you receive any compensation from BVM University Village, LLC?

A.   No.

Q.   Are you aware of who the officers and directors are of BVM University, LLC?

A.   I recall that the managing member is Compliance Concepts LLC.   I'm not sure about the rest of the ownership.

Q.   Do you have any personal involvement in Compliance Concepts as an officer, director, or employee?

A.   No.

Q.   Do you receive any compensation from Compliance Concepts?



A.   No.

Q.   Who is the managing member of Compliance Concepts?

A.   As I recall the sole member is my wife, Rebecca J. Bartle.

Q.   How about JF Consultants LLC?  Is that one of the entities that was formed to close the sale at University Village?

A.   Yes.

Q.   And do you -- are you at all aware of the managing members or member of JF Consultants?

A.   The only person I've spoken with that represents that organization, besides an attorney, is a gentleman by the name of Jonathan Fuchs, F-u-c-h-s.

Q.   Does JF Consultants LLC do anything in terms of operating or managing the CCRC known as University Village?

A.   No.

Q.   How about BVM University Village, LLC?  Does it have any role or responsibility or any duties at all with respect to operating or managing University Village?

A.   No.

Q.   All right.  The next -- the next entity that I have is IMH Healthcare, LLC.  Is that one of the



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
15

entities that was formed to purchase University Village CCRC?

A.   Yes.

Q.   And is that Mr. Freiden's -- is he -- is Mr. Freiden -- Eli or Eli Freiden the managing member of IMH Healthcare?

A.   Yes.

Q.   Then there is BHMSILF, LLC.  I don't know if that's supposed to be pronounceable or not.  Was that the fourth entity that was formed to purchase the University Village CCRC?

A.   It was the fourth entity formed to purchase the limited partnership interest, yes.

Q.   Okay.  And who is the managing member or members of BHMSILF, LLC?

A.   The only person I recall is a gentleman by the name of Kevin Angelis.

Q.   Does BHMSILF, LLC, or Kevin Angelis, have any role or responsibility in operating or managing any part of University Village?

A.   No.

Q.   Let me ask you.  Mr. Freiden -- Mr. Freiden is present for your deposition.  Is that correct?

A.   Yes, sir.

Q.   And have you been involved in businesses with



Mr. Freiden prior to the limited partnership interest purchase at University Village?

A.    No.

Q.    Have you been acquainted at all with Mr. Freiden prior to University Village?

A.    Yes.  I met Mr. Freiden and his associate, Jeff Baum, B-a-u-m, a couple of years ago as Mr. Baum and Mr. Freiden tried to arrange some financing for BVM and some of its affiliates.

Q.    Have you ever been involved in any assisted living facility business or any continuing care retirement center business, any nursing home business, prior to University Village with Mr. Freiden?

A.    No.

Q.    As I understand it, Mr. Freiden is -- I'm getting a little bit ahead of ourselves, but Mr. Freiden does have a role in the management or operation of the University Village CCRC.  Is that correct?

A.    I think Mr. Freiden is the general partner for Westport Holdings, Tampa, LP, and is assuming -- I'm assuming he's assumed that role as the general partner. So that's the scope of my involvement is knowing that much.

Q.    When did Mr. Freiden become general partner?

A.    According to the document I reviewed, March



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
17

2nd, 2015.

Q.   And who did Mr. Freiden replace as general partner of Westport Holdings, Tampa?

A.   IMH Healthcare, LLC, replaced Compliance Concepts LLC as the general partner.

Q.   And why was that change made?  Why did IMH Healthcare, landlords, replace compliance concepts as the -- why was that change made?

A.   Well, it was generally believed on the advice of counsel that Compliance Concepts LLC might be in a conflict of interest; and because of that reason, Compliance Concepts chose to withdraw as general partner to avoid the appearance of conflict.

Q.   Did -- was IMH substituted -- IMH Healthcare substituted for Compliance Concepts?  Did that change have anything to do with the application process to the office of insurance regulation to take over the general partnership interest of Westport -- of University Village?

A.   Well, the documents that I reviewed suggested that the application was amended on March 2nd for the introduction of IMH Healthcare, LLC, as the successor to Compliance Concepts LLC for the purpose of the acquisition application.

Q.   And again, was that change made -- does that



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
18

change have anything to do with the process of applying to the office of insurance regulation as required by Florida Statutes to assume control of the University Village CCRC?

A.   Well, I -- I don't know what "anything to do," Counsel, means.  It obviously was a substitute of general partners.  I don't know how to explain it any other way.

Q.   All right.  When -- let's go back to the closing on March 31st, 2014.  At that time what interest did BVM Management, Inc., have in the four -- I'm sorry, let me strike that and start over.

As of March 31st, 2014, what interest did these four limited partners have in the University Village CCRC?

A.   Well, on March 31st -- the closing was either March 31st or April 1st, but at the point in time that the closing occurred, those four limited partnerships assumed the 99 percent interest in Westport Holdings, Tampa, LP, and Westport Holdings, Tampa II, LP.

Q.   Who was the general partner as of that time, after the closing?

A.   Well, there were two -- two legal entities that were both controlled by Larry Landry.  I can't speak to who they are.  He signed all -- Larry Landry



signed all the documents, so I really don't recall who the legal entities were that were the general partners for those two limited partnerships.

Q.   So let's just refer to the Landry entities then were still as the general partner.  Correct?

A.   Yes, sir.

Q.   And the -- after the closing on March 31st, 2014, or April 1st, whichever it was, the general partnership interest owned by Mr. Landry's entities was 1 percent?

A.   Yes.

Q.   So at that point in time who is in effective control of the University Village CCRC?

A.   Well, I'm not sure I'm qualified to answer that question.  That may be a -- maybe required as a legal conclusion based on the definition of "control."

Q.   Who was responsible for the operation and management of the CCRC after the closing on March 31st or April 1st?

A.   The Landry entities had the general partnership control, but the property was actually being managed by AgeWell Senior Living, LLC, which is a company that Mr. Landry had an ownership interest in as well.  So, in other words, the limited partnership interest was purchased subject to an existing management



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
20

contract that didn't expire until January 30th, 2015.

So if you're asking me who's in control, you know, generally I'm going to say that Larry Landry, the Landry entities, controlled the partnerships; but the day-to-day management at the time of closing was AgeWell Senior Living.

Q.   At some point in time did Mr. Landry resign as the -- well, did the Landry entities resign as the general partner?

A.   Yes.

Q.   And do you recall when that was?

A.   That was December 29th, 2014.

Q.   What were the events, to your knowledge, that led up to Mr. Landry's resignation or the Landry entities resigning as general partnership on December 29th, 2014?

A.   Well, the events were as promised by Mr. Landry.  He and I and Mr. Lich -- Mark Lichtenwalner and David Mills met with the OIR in Tallahassee in the fourth quarter of 2013 before the closing, and Mr. Landry expressed at that time that he would be remaining as the general partner until sometime in 2015, and then he would resign during that year.  And so it was just anticipated that the resignation would come sometime after July of 2015 but before December 31st.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
21

Q.    Are you saying 2014 or 2015 that Mr. Landry's entities --

A.    I'm sorry.  Mr. Landry's entities would resign -- I misspoke.  It was July of 2014 to December 2014, but nobody really knew exactly when.

Q.    And during that meeting was a representation made to OIR that BMV University Village or any other entity that may have been formed would not be purchasing the general partnership agreement of Mr. Landry's entities?

A.    Well, there were several discussions and several e-mails that date back into 2013 that originally, as I stated earlier, BVM Management, Inc., was the intended buyer until the financing fell through because of the bond market problems that we had with the underwriter.  And so at the end of 2013 private financing was sought, and the Office of Insurance Regulation knew who that private financing was with and the terms of the financing because the documents were sent to Becky Griffith and Desmond Wilson.

Q.    Are those the individuals at OIR -- Becky Griffith and Desmond Wilson -- that you had contact with at that time?

A.    Going back to the original chronology, if I could, just --



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
22

Q.   Please.

A.   -- to be clear.  The original parties to this transaction was a gentleman by the name of Christopher Struk, a gentleman by the name of Dan Papka, Desmond Wilson, and I believe Becky Griffith was also in the room when the original transaction was proposed.

Q.   And that original transaction was that BVM Management, Inc., was going to purchase the 99 percent limited partnership interest of the University Village CCRC?

A.   Yes, sir.

Q.   And was there any discussion at that time about a change in ownership of the 1 percent general partnership interest that was held by Mr. Landry's entities?

A.   Yes.

Q.   And what was that discussion?

A.   Mr. Landry proposed that -- it was his interpretation that there would not be a change in control until the 1 percent general partnership interest was transferred.  And so he proposed to Christopher Struk that -- who I think at the time was the director, I'm not sure his exact title -- that the acquisition application not be filed until the 1 percent GP ownership had been transferred.



At that meeting, in which I was present, there was no indication from the OIR that that was acceptable or not until sometime later when Mr. Landry called and said that he received a call from Christopher Struk and they indeed thought that that was appropriate; that as long as he stayed in -- the Landry entity stayed in as the general partner, an acquisition application would not be required.

Q.   So at the time of the closing in the spring of 2014 for the 99 percent limited partnership interest that we've been discussing there was no acquisition application required by OIR?

A.   That's -- that's correct.

Q.   What happened -- well, strike that.

Had you had any discussions with Mr. Landry prior to him resigning his general partnership interest on December 29th, 2014?

A.   Yes.

Q.   And what were those discussions with Mr. Landry concerning the -- his entity bowing out as the general partner?

A.   Well, he -- there was going to be a decision between Connecticut Police and Fire, his attorney, the attorney for the State of Connecticut when they could wrap up their business; and all Landry told the



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
24

acquiring parties and the BVM folks as the guarantor was that he would try to give at least two to three weeks' notice when he intended to send in the resignation letter. But he did make it explicit that it would be before December 31st, 2014.

Q. At that point in time did you or anyone else, to your knowledge, have any contact with OIR about the application process that would be necessary when the general partnership interest was exchanged or transferred?

A. No. The OIR made it explicit from the date of the 99 percent acquisition of the limited partnership interest that there would be indeed an acquisition application to be required to be filed within 30 days of the resignation of the Landry entities. So that was made clear all through the spring and summer of 2014.

Q. All right. So when Mr. Landry resigned, what step was -- what steps were taken to have a new general partner take the place of the Landry entities?

A. The limited partnership agreement dictated that the partnership had 60 days to name a substitute general partner under Delaware Law, which is where the limited partnership was organized. And so the limited partnership members met, and there was a discussion about who should be the successor; and certain parties



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
25

were eliminated, and other parties were nominated.

Simultaneous with that the application -- Becky Griffith had downloaded the application and sent it to Attorney Dane Starbuck to begin the process of getting the acquisition application prepared running coterminous with the successor general partner nomination.

Q.   And do you recall when Mr. Starbuck received the application form to be completed?

A.   I think he received -- I'm pretty sure I was copied on the same e-mail from Becky Griffith, and I'm pretty certain that was December 29th, on the same day that she received the Landry entities resignation.

Q.   When was -- well, strike that.

When was a decision made about the replacement general partner?

A.   The replacement general partner was made effective January 26th, 2015.

Q.   And that replacement general partner was who?

A.   Compliance Concepts LLC.

Q.   Was that an entity that was created at that time specifically to assume the roles of the general partnership interest?

A.   No.  As I recall, that entity was created in



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
26

2007.

Q.   Okay.  Has Rebecca Bartle always been the managing and sole member of Compliance Concepts LLC?

A.   Yes.

Q.   And what state -- in what state was Compliance Concepts LLC, Incorporated?

A.   It was organized in the state of Indiana.

Q.   Was there ever an intent prior to Compliance Concepts LLC being designated as the replacement general partner for the Landry entities that Mr. Kevin Angelis or his entity, BHMSILF, LLC, would become general partner?

A.   Yes.

Q.   And why did BHMSILF, LLC, not become general partner?

A.   Mr. Starbuck -- it's my understanding Mr. Starbuck received a telephone conversation or an e-mail from the attorney representing Mr. Angelis and his organization, and Mr. Angelis declared himself ineligible because his company's policy dictated that he would be in a conflict of interest with his primary employer by becoming a general partner in an out-of-state entity; and so for that reason, he withdrew himself from nomination.

Q.   Who employs Dane Starbuck?  I know that he's



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
27

an attorney, but who does he work for?

A. He has a private law practice, but he's also an employee of BVM Management, Inc.

Q. And his position with BVM Management, Inc., is what?

A. General counsel.

Q. All right. Mr. Bartle, when was the application to have Compliance Concepts LLC become the general partner -- when was that completed and submitted to OIR?

A. It was completed on the 29th of January and sent by UPS with signature to a 200 Gaines Street address in Tallahassee and signed for by somebody at the OIR on January 30th, 2015.

Q. And did OIR advise in response that additional information was needed?

A. Yes. As I recall, Mr. Starbuck was at a continuing legal education forum in Bonita Springs, Florida, and he was contacted on January the -- excuse me, February the 4th, 2015, that the hard-copy application that was requested by Becky Griffith in a three-ring binder be uploaded to iApply as soon as possible.

Q. And was any additional information requested at that time?



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
28

A.    I -- I don't recall.

Q.    What was your involvement personally in the application process, Mr. Bartle?

A.    Well, my overall role was to make sure that the application was timely filed in a completed form so that the application would be in compliance with Florida Statute.

Q.    Bear with me for just one minute, please.

All right.  I'm back.  Did OIR subsequently advise Mr. Starbuck, or anyone else, that the application submitted by Compliance Concepts to assume control of the general partnership interest was inadequate, that additional information was requested?

A.    Yes.

Q.    And do you recall approximately when that was?

A.    The letter I saw was dated I think February the 20th, 2015.  And there was a request for additional information to be submitted by the 27th of 2015.

Q.    Was additional information request provided?

A.    It was.

Q.    Were you involved in gathering or submitting the additional information submitted to OIR in response to their February 20th letter?

A.    Well, to the extent that some of the questions



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
29

dealt with BVM documents, I would have been involved; but, you know, background screening and fingerprints and other things, that was left to Mr. Starbuck and the attorneys that were assisting us at the time.

Q.   Following the acquisition of the 99 percent limited partnership interest of University Village by Compliance Concepts LLC -- no, I'm sorry.  That's not right.

I got to salute you, Mr. Bartle.  Just an observation, not a question, that if it's possible to create a very difficult corporate structure, you have succeeded admirably.  So you'll have to bear with my occasional confusion as to the structure.

MR. TURNER:  Excuse me, Tim.  I don't mind your struggling, but I would move to strike your voluntary comment --

MR. NEWHALL:  And I certainly understand that and don't oppose it.

MR. TURNER:  I understand your concern, so okay.

MR. NEWHALL:  Okay.  All right.

BY MR. NEWHALL:

Q.   I'll try to frame the question this way, Mr. Bartle.  After the purchase of the 99 percent limited partnership interest in the University Village



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
30

CCRC, what involvement did you have, if any, in the day-to-day operations of any part of the University Village CCRC?

A.   Well, here comes a long answer for that question.  In 2013 Americare Partners, BVM Management, and AgeWell entered into a comanagement process at University Village which was intended to end up in a merger of some of the employees of BVM and some of the employees of AgeWell into a successor company called AgeWell Senior Living.

So subsequent to April 1st, when the acquisition occurred, various parties of BVM, Americare, and AgeWell took on responsibilities to comanage the property pursuant to the proposed comanagement agreement that was circulated by --

Q.   Okay.  "Proposed comanagement agreement."  Was this comanagement agreement ever executed?

A.   No, it was not executed.

Q.   Was -- okay.  I'm sorry.  Was it ever -- was this comanagement agreement as proposed ever reduced to writing?

A.   It was.

Q.   All right.  I'm sorry.  Go ahead, sir.  You were telling me about this comanagement agreement.

A.   Yes, which I think just for the record is on



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
31

Mr. Turner's exhibit list as a document reduced to writing.

So at the time AgeWell and BVM personnel and Americare personnel were jointly managing the property, consolidating some of the company -- some of the department heads, changing the vendors, the buying habits, reclaiming the nursing home operation; and so different individuals were appointed into different positions under the guidance of AgeWell Senior Living.

Q.    But officially the manager of University Village, at least the independent living facility, continued to be AgeWell.  Correct?  That's Mr. Landry's organization?

A.    Yes, it was owned by Mr. Landry, Mr. Lichtenwalner, and David Mills.

Q.    And who were the individuals with BVM Management who were involved in this proposed comanagement agreement actually on the ground at University Village?

A.    The individuals on the ground were myself; Rebecca Bartle; Jared McCowan; Kassidy McCowan; Ed Fodrea, F-o-d-r-e-a; Dana Huth; Lou Jackson; as well as the AgeWell folks.

Q.    Rebecca Bartle is your spouse.  Correct?

A.    Correct.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015

32

Q.   And Jared McCowan is who?

A.   My wife's oldest son, my stepson.

Q.   And Kassidy McCowan is who?

A.   Is Jared's wife.

Q.   And what is your -- the extent of your involvement with Dana Huth prior to University Village?

A.   Dana I first met back in 1995 when she was a vice president of finance for a nonprofit housing developer, and she's been an employee of BVM I think for the last six or seven years.

Q.   And what is her -- she's been an employee of what entity?

A.   BVM Management, Inc.

Q.   And her involvement actually on the ground at University Village was what?

A.   She was assisting with the preparation of financial statements and documents that would be sent to the lenders for -- you know, for covenant compliance under the loan documents.

Q.   And how about Lou Jackson?  How long have you been engaged in any sort of business relationship with Lou Jackson?

A.   For about the last seven years.

Q.   And what has the nature of your business



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

relationship with Mr. Jackson been?

A.   Mr. Jackson controls a company called Eagle One Properties and Americare and some of the BVM housing entities have contracted with Eagle One to perform acquisition analysis and to do site visits on certain acquisition targets, and that's what Mr. Jackson's company does.

Q.   Is Eagle One Properties a member or in any way involved with BVM University Village?

A.   I don't recall whether they -- originally they were a member of the limited liability company.  I'm uncertain as to whether or not they are still a member.

Q.   And there is a gentleman by the name of Rynard, R-y-n-a-r-d.  What is Mr. Rynard's first name?

A.   Robert.

Q.   What is your relationship with Robert Rynard?

A.   Well, I've known Mr. -- his name -- we pronounce it Rynard, it's R-y-n-a-r-d.  But I've known Mr. Rynard since the early '70s as an individual who owns interest in healthcare facilities, and also he and his son own a construction company.  So I've known him in business for 30 -- you know, 35-plus years.

Q.   And is Robert Rynard married to Dorothy Rynard?



A.   Yes.

Q.   Is Mrs. Rynard or any entity that she may be involved with in any way associated with or involved with BVM University Village?

A.   It's my understanding that Dorothy Rynard is the managing member of a company called Venice Investors or Venice Avenue Investors, LLC, which is a member of BVM University Village, LLC.

Q.   Mr. Bartle, forgive me if I'm repeating myself, but what -- as of late 2014, what was your involvement or position with BVM Management, Inc.?

A.   It's the same as it is today.  I'm the managing director of Americare Partners, which is a division of BVM Management, Inc.

Q.   Have you ever represented yourself as being managing director of BVM Management, Inc.?

A.   I think there was an e-mail signature line that we ended up with some server problems that were now corrected.  So there's -- I don't know that I've signed anything representing that, but I do understand there was an IT issue with some of the signature lines on the BVM website and the BVM server, which has now been corrected.

Q.   All right.  Let me back up.  Hang on just a second, please.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
35

Okay, Mr. Bartle. I apologize. Is Robert Rynard at all involved with BVM Management?

A. Yes. Bob's the chairman of the board of BVM Management as we sit here today.

Q. Okay. And how long has he been chairman of the board?

A. I want to say nearly five years.

Q. All right. Let me back up just a little bit. We were talking about people who were on -- actually on the ground because of what you described as this proposed comanagement agreement. What was your son-in-law, Jerry McCowan, doing on-site?

A. Originally he was in charge of the renovation project to rehab somewhere between 80 and 100 apartments during 2014. Then later in the summer he was being groomed by AgeWell to become the assistant executive director, which would put some other departments under his watch. So he was originally involved in the construction side of it -- in fact, 106 units were finally remodeled in 2014 -- and he also was being groomed by AgeWell for an additional slot.

Q. And did he ever actually take on a position with AgeWell?

A. Well, as it turns out, AgeWell did not move to appoint him in any official position during the term of



their management agreement; and since there was only it seems like seven working days between the time the AgeWell agreement expired until the OIR field examination began, there was no chance to realign any of the personnel, you know, in February since the interruption.

Q.   Has Jared McCowan ever been an employee of Westport Holdings, Tampa, Limited Partner, or University Village CCRC in any way, shape, or form?

A.   No.

Q.   Has he ever been serving as a consultant for some entity during his time on the ground at University Village?

A.   Yes.

Q.   And whom was he serving as a consultant for?

A.   BVM Management, Inc.

Q.   Did he have a written agreement with BVM Management, Inc., to serve as a consultant?

A.   No.

Q.   What were the terms of Mr. McCowan's service as a consultant for BVM Management?

A.   Well, the terms were he was in charge of, as I said, the maintenance -- excuse me, the construction part of the business as he was trying to turn it between 80 to 100 units the first year.  The terms were that he



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
37

would be responsible for hiring the vendors necessary to do the flooring, the painting, the lights, the cabinetry, the appliances; it would be executing contracts and making sure the work was being completed in a workmanlike manner and the contractors were paid timely.

Q.   And what was his compensation?

A.   He -- he'd receive no compensation from Westport.

Q.   Did he receive compensation from anyone?

A.   He was paid -- he's paid by BVM Management, Inc.

Q.   And what was Jared McCowan paid by BVM Management, Inc., for his -- whatever he did on-site?

A.   Well, I don't know exactly what he was paid, that's not what I do.  But I think the number you're going to find is between 60- and $80,000 a year.

Q.   How about Kassidy McCowan, what was she doing on-site?

A.   She was working with the marketing department at University Village to bring alive more of the website information and the collateral material that was used for marketing; and she was also in charge of helping BVM with other advertising in the local market for the university area, the Florida hospital area.  So she was



in the external marketing role, you know, during her tenure there at the Westport building.

Q. Was Kassidy McCowan ever an employee of University Village in any way, shape, or form?

A. No.

Q. Did Kassidy McCowan ever enter into residency contracts with people who were interested in living at University Village?

A. Well, I wouldn't know that.

Q. Was Kassidy McCowan also a -- serving in a consultant capacity?

A. Yes.

Q. And she was consulting for who?

A. BVM Management, Inc.

Q. Who supervised her and Jared McCowan while they performed their duties as consultants?

A. Well, AgeWell primarily because AgeWell was the management company authorizing the work to be done; and the AgeWell director of operations, a guy named David Mills, was the direct supervisor and met with Jared and Kassidy on almost a daily basis.

Q. My understanding is that AgeWell's contract to manage the independent living facility expired on January 30th, 2015. Is that right?

A. That's correct.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
39

Q.   Has Kassidy McCowan and Jared McCowan continued to serve as consultants for BVM Management since October -- since January 30th, 2015?

A.   Yes.

Q.   And who has been supervising them since January 30th, 2015, as they perform as consultants for BVM Management?

A.   From January 31st of 2015 through March the 1st it was Compliance Concepts LLC; from March the 2nd forward it's IMH Healthcare, LLC.

Q.   All right.  Who with Compliance Concepts LLC was supervising Jared and Kassidy McCowan?

A.   Rebecca Bartle.

Q.   Anyone else?

A.   Well, I don't know exactly.  There obviously is interaction between other department heads.  You know, Tim Parker could have been supervising Jaret or Kassidy in certain activities.  I don't know, actually.

Q.   And since IMH Healthcare, LLC, has become general partner, who has supervised Jared and Kassidy McCowan?

A.   Well, according to the organizational chart that I saw for the executive directors, Jaret McCowan falls under the supervision of Eli Freiden, the chairman of the board, the executive board; and Kassidy falls



under Marilyn Fernandez, the marketing director.

Q.   Marilyn Fernandez is an employee of which entity?

A.   Westport Holdings, Tampa.

Q.   Are either Jaret or Kassidy an employee of Westport Holdings, Tampa?

A.   No.

Q.   But Marilyn Fernandez as an employee of Westport Holdings, Tampa, supervises Kassidy McCowan in her work as a consultant for BMT -- BVM Management, Inc.?

A.   Yes.

Q.   And would it be correct, then, that Tim Parker -- as executive director, is he employed by Westport Holdings, Tampa, LP?

A.   He is.

Q.   Does he have any supervisory authority over Jaret McCowan?

A.   I think at times he would, yes.

Q.   And what times would that be?  I mean, how is Jaret supposed to know when Tim Parker is supervising him and when he's not?

A.   Well, when there's ever confusion about that, generally in the structure Jaret would go to Eli Freiden and ask for a clarification because Eli is the general



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
41

partner.

Q. Is it the situation that whenever Mr. Parker gives Jaret McCowan some instruction or supervision or direction that he may not agree with that he goes to Eli Freiden to counterman those directions from Mr. Parker?

A. I honestly don't get involved in all that drama, so I don't really know what the protocols are. I just told you what I knew to the best of my knowledge.

Q. Mr. Bartle, were you ever involved in approving press releases concerning or announcing the acquisition of University Village by BVM Management, Inc., or the limited partners?

A. I don't recall.

Q. Would that be something that typically you would be involved in?

A. No, not generally.

Q. Did you appear at any residents' meetings, meetings of residents, to explain to them the acquisition of the University Village CCRC?

A. Well, I've appeared at several residents' meetings. Maybe you can help me with more specifics.

Q. At any point after the closing on March 31st or April 1st of 2014 did you appear at a meeting of residents of the University Village CCRC to explain the



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
42

purchase to them and try to allay any concerns they might have?

A.   I did do that, yes.   I mean, I was one of the panel members, but I was there.

Q.   Did you represent to the residents of University Village that the CCRC had been acquired by BVM Management?

A.   I wouldn't have represented that because it wasn't true.

Q.   Did anyone else there represent that to the residents?  Anyone else at this meeting that you recall attending represent to the residents that the University Village CCRC had been acquired by BVM Management, Inc.?

A.   I saw written material that came out of Mr. Parker's office that referenced -- it overstated BVM's role, and we required that reference to be deleted so that BVM's role could be defined as the guarantor of the corporate debt, and a joint venture participant with AgeWell in the comanagement effort, you know, at the property subsequent to April 1st, 2014.

Q.   Were there ever any announcements made to the residents -- either by press release, by mail or otherwise -- telling them of this proposed comanagement agreement?

A.   Not -- not that I heard specifically.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
43

Q.   Were the owners ever advised -- I say "owners" -- were the residents at University Village CCRC ever advised that AgeWell would continue managing the independent living facility?

A.   Certain members of the board and the finance committee knew that there was a joint venture and comanagement effort underway for not only that property, but six or seven other properties.  So certain members knew, mostly board members and finance committee members that were also residents at the campus.

Q.   Who was aware of the unwritten -- I'm sorry, the unsigned comanagement agreement?

A.   Who would -- who all would have been aware of it that I know?

Q.   Yes.

A.   I think Tim Parker; Kathy Burkholder; Sue Aude; most likely Bob Larmon and Dick Clark on the finance committee; and potentially Steve Miller, the chairman of the board, of the resident board; also an individual by the name of Walter Hood.  Those are the people that come to mind.

Q.   Mr. Bartle, I'm going to represent to you that there was an April 2nd, 2014, memorandum that was issued to all independent living staff from Tim Parker, executive director, and the date is April 2nd, 2014,



which states in pertinent part, "I am pleased to announce that BVM Management, Inc., has purchased University Village Campus from Westport senior living," period, end of quote.  Is that an incorrect statement?

MS. SMALL:  Do you think you could provide that document to us?  Do you want to e-mail it to me?

MR. NEWHALL:  I'll try to do that.

BY MR. NEWHALL:

Q.   Mr. Bartle, does that sound -- are you aware of any such press release -- I'm sorry, "press release" -- release to independent living staff that was issued to Mr. Parker around April 2nd, 2014?

A.   No.

Q.   Would you have been involved in reviewing any such announcement that Mr. Parker would have issued to his staff?

A.   I don't recall seeing that particular announcement.

Q.   Are you aware of whether or not there was an announcement that was a written announcement issued to all independent living residents, again from Mr. Parker, executive director, on or about April 2nd, 2014, announcing the acquisition of the University Village CCRC?

ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
45

A.   I would be surprised that he would do that because he had the post-closing organizational chart in his office that was used by Kathy Burkholder to disclose the transaction to the OIR.  So I can't imagine why he would be confused about who purchased the 99 percent; but then again I can't speak --

Q.   Did you have -- I'm sorry.  Do you recall having any involvement at all in reviewing and approving any announcement made to the independent living residents by Mr. Parker --

A.   Not that I recall.

Q.   -- concerning the acquisition -- I'm sorry, concerning the acquisition at University Village?

A.   Only the disclosure documents that we provided to Kathy Burkholder for the post-closing organizational chart to be disclosed to the OIR.

MR. TURNER:  Can I request that you e-mail that document so we can make it --

MR. NEWHALL:  I'm -- I'm trying to fire up my computer.  We may end up having to take a short break here, but let me continue on for --

MS. SMALL:  Actually --

MR. NEWHALL:  -- a couple of minutes, if you don't mind.

MR. TURNER:  Sure.  Do you want to fax it?



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
46

Could you fax it?

MR. NEWHALL:   No.   Me and computers are not always friends.   I think that I scanned it this morning and if I did it right, it should be in my computer, and I ought to be able to locate it and send it to you.

MS. SMALL:   Could we take a quick break anyway?   Maybe this would be a good time to take a --

MR. NEWHALL:   Sure, absolutely.   We'll do that.

MS. SMALL:   Okay.

MR. NEWHALL:   Let's take a break until 11:30.

(Recess from 11:23 a.m. to 11:40 a.m.)

MS. SMALL:   Just so everyone knows, I just handed a copy of the e-mail document to the witness, Mr. Bartle.

MR. NEWHALL:   And did you hand him all of the e-mailed documents or just one?

MS. SMALL:   I handed him one, two, three, four, five, six, seven, eight -- nine pages in total.

MR. NEWHALL:   All right.   Okay.

I just had Virginia Christy, C-h-r-i-s-t-y, come in.   She is an attorney for OIR as well.   She



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
47

has just entered the deposition room.

THE COURT REPORTER:  Thank you.

BY MR. NEWHALL:

Q.   All right.  Mr. Bartle, are you ready?

A.   Yes, sir.

MR. NEWHALL:  All right.  I would like the court reporter to mark as Exhibit 1 for this deposition a copy of the memorandum on University Village letterhead addressed to all independent living staff from Tim Parker, executive director, dated April 2nd, 2014, subject: University Village announces new ownership.

BY MR. NEWHALL:

Q.   Have you had an opportunity to review this document?

MS. SMALL:  So, Tim --

MR. TURNER:  Let me just make sure.  Hold on a second, Tim.

MR. NEWHALL:  Okay, Steve, I'm sorry.

MR. TURNER:  Yeah.  The memorandum that I'm holding -- there's a document titled "memorandum," it's a one-page document.  Underneath the second -- the second page of the materials you gave us is also something entitled "Resident Bulletin."

Now --



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
48

MR. NEWHALL:  That's a separate document.

MR. TURNER:  Okay.  So you're just talking of the first page.

MR. NEWHALL:  The memorandum that I'm referring to and marking as Exhibit 1 is just that one page.

MR. TURNER:  Okay.  Thank you.

MR. NEWHALL:  All right.

(Exhibit 1 marked for identification.)

BY MR. NEWHALL:

Q.    Have you had a chance to review that document, Mr. Bartle?

A.    Yes.

Q.    Did you play any part in proofreading or editing this memorandum before it was issued to independent living staff by Mr. Parker?

A.    Not that I recall.

Q.    Okay.  The first paragraph states that BMV Management had purchased University Village Campus from Westport Senior Living.  Is that correct or incorrect?

A.    Well, it's correct that that's what it says, but it's incorrect in its substance because of course that didn't happen.

Q.    If you had reviewed -- I'm sorry, go ahead if you're not done.



MR. TURNER: Let me just say something. Sorry to interrupt, but you stated that the memorandum had been distributed or circulated -- I can't remember exactly how you said it -- but I don't know that the witness has been asked if he's aware of that or not, so I don't know if that's a fact.

MR. NEWHALL: That's a fair question, Steve. Let me ask him.

BY MR. NEWHALL:

Q. Mr. Bartle, do you know one way or the other whether or not this memorandum marked as Exhibit 1 was in fact issued to independent living staff?

A. No.

Q. Had you reviewed this document, would you have corrected the part in which it states that BMV Management has purchased University Village Campus?

A. Yes.

Q. And you would have corrected it to say what?

A. Well, I don't know exactly what I would have said. I would have made a reference that the 99 percent interest was purchased and that Larry Landry's entities were still the general partner. Part of this memo is correct about the history of the company dating back to 1950, so I would have merely just changed -- I would have just changed the parts that were incorrect.



Q.   To your knowledge, did Mr. Parker have any knowledge of the history of BVM or its predecessor, Bethany Village Ministries prior to -- at all?

A.   Well, it likely is on the website, as I recall, so he could have picked it up there.

Q.   All right.  Mr. Bartle, I'm going to move on to another document.  We're going to mark this one as Exhibit 2 for your deposition.  And this one is entitled, "Residents Bulletin No. 1358, date 4/2/14." Do you have that document?

A.   Yes.

MR. NEWHALL:  Madam Court Reporter, have you been able to mark these exhibits?  Am I giving you enough time to do that?

MS. SMALL:  Yeah, she's got it.

MR. NEWHALL:  Okay.

(Exhibit 2 marked for identification.)

BY MR. NEWHALL:

Q.   I'm going to read from the first paragraph starting at the beginning, quote, "I am pleased to announce that BMV Management has purchased University Village Campus from Westport Senior Living," period, close quote.  It is -- I'm -- just assume that I read that correctly, since you're looking at it along with me.  Is that information correct?

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
51

A.    No.

Q.    Did you review this document before it was --
well, strike that.

As a predicate to that, do you know if this resident bulletin was in fact released or issued to the independent living residents?

A.    No.

Q.    Did you review or edit this resident bulletin marked as Exhibit 2 before it may have been issued?

A.    No.

Q.    If you had reviewed or edited or been asked to review this resident bulletin, would you have changed the first sentence in which it states that BMV Management has purchased University Village?

A.    Yes.

Q.    Mr. Bartle, going back to -- just take a look quickly at both Exhibit 1 and Exhibit 2.  Do either one of these things -- either one of these documents contain any mention at all of the comanagement agreement that was proposed that you've testified to?

A.    Well, there's a loose reference in the first exhibit to the BVM and AgeWell management folks in the last paragraph.  I don't know what Mr. Parker intended to say, but obviously he intended to imply that there was something going on between BVM representatives and



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
52

AgeWell.

Q. Mr. Bartle, when was OIR, the Office of Insurance Regulation, first advised that the 99 percent limited partnership interest at University Village had not been acquired by BMV Management?

A. I wouldn't know when they were first advised.

Q. Was -- prior to closing of the 99 percent partnership interest on March 31st or April 1st, 2014, had OIR been made aware that BVM Management, Inc., was not the entity purchasing the 99 percent partnership interest?

A. I believe they were aware of that during the first quarter of 2014.

Q. If any organizational charts of University Village and its -- the ownership of University Village had been provided to OIR in the first or second quarter of 2014, would those organizational charts have mentioned that BMV Management, Inc., was, in fact, the purchaser and owner of the 99 percent limited partnership interest?

A. The only person that would have been disclosing that information to the OIR would have been Larry Landry directing Kathy Burkholder to provide the required disclosures to the OIR. I wouldn't have seen -- as a person, I wouldn't have seen those



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
53

disclosures all the time because Kathy Burkholder was employed by Westport and Larry Landry was the general partner. So I wouldn't have been --

Q. In the --

A. I'm sorry.

Q. I'm sorry. I apologize. Go ahead and finish your answer.

A. Yes, sir. I wouldn't have been personally involved in the preparation of documents going to the OIR subsequent to closing.

Q. Did you ever participate in a meeting with the Office of Insurance Regulation either before or after closing?

A. Yes. David Mills and I and Mark Lichtenwalner met in Tallahassee I want to say May or June of 2014 and Mr. Landry joined by telephone. So that's the last meeting I think that we had in Tallahassee as a group.

Q. And was that in 2014?

A. Yes. Yes, I believe it was May or June.

Q. And was it represented to OIR at that meeting that the owner of the 99 percent partnership interest as of the date of that meeting was BMV Management?

A. I wouldn't have made that representation because the facts were already disclosed to the OIR. They wanted copies of the loan documents subsequent to



JOHN W. BARTLE, JR.  
STATE OF FLORDA vs. WESTPORT

April 22, 2015  
54

closing, which would have been happening in April or May, so I wouldn't have represented that BVM owned anything. I would have simply said BVM was the guarantor of the debt, but of course it didn't have any ownership interest.

Q. Would you have provided -- you personally -- have provided OIR with any organizational chart that reflected that BMV Management was the owner of the 99 percent partnership interest?

A. I wouldn't have, no.

Q. If you were at a meeting with representatives of OIR and someone else made the statement that the owner of the 99 percent partnership interest was BMV Management, Inc., would you have corrected that?

A. Yes.

Q. Mr. Bartle, you mention that -- well, maybe you didn't mention that. Let me ask you.

There was a purchase agreement, was there not, for the 99 percent partnership interest?

A. There -- yes, there was an original limited partnership purchase agreement, and there were several amendments.

Q. Do you recall how many amendments there were?

A. I do not.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
55

Q.    Do you recall when the last amendment would have been made prior to the March 31st, 2014, closing?

A.    It would have been made sometime during the first quarter of 2014, but I was not involved with any of the legal work.

Q.    Was there a -- well, strike that.

Was the ultimate purchase agreement, however many amendments there were, was that the one that was signed by all the parties?

A.    Well, it -- when you say "all the parties," there would have been just the parties to the limited partnership purchase agreement.

Q.    Well, I've -- for example, I -- to your knowledge, was there a reinstatement and amendment agreement dated March 11th, 2014, for the sale of the 99 percent limited partnership interest?

MS. SMALL:    Tim, again, is this a document you want to send over to me?

MR. NEWHALL:    Yeah.    I'll try to do that.    And in the meantime I'll just continue on.    I'm going to have to scan it.

BY MR. NEWHALL:

Q.    In other words, here's my question, Mr. Bartle.    Was the ultimate purchase agreement, whichever amendment it was, for the sale of the 99



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
56

percent purchase -- 99 percent limited partnership interest -- was it signed -- did it represent BMV Management to be the seller or buyer?  Let me start over.  I wouldn't blame you for being confused.

The ultimate last version of the sale agreement for the 99 percent limited partnership agreement, did it list BMV Management, Inc., as the purchaser of the 99 percent partnership agreement?

A.   I don't know.

Q.   Should it have listed BMV Management, Inc., as the purchaser?

A.   Well, again, I wasn't involved with the legal work for the acquisition; that was Mr. Starbuck and a law firm in New York known as Williams Mullins or Williams Mullin.  But the idea between the Landry entities and BVM was for the purchase agreement to be entered into by the seller, the purchaser would acquire and then assign its interest to the four LLCs that ultimately, as we sit here today, own the 99 percent interest in Westport Holdings, Tampa, LP, and Westport Holdings, Tampa II, LP.  So the intent --

Q.   Was there an assignment by BMV Management of the 99 percent partnership interest to the four limited partnership entities that we've discussed?

A.   Well, there -- yes.  There is a consent and



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
57

ratification or an assignment agreement that I've seen, I don't recall which, but the lenders wanted to see it. Mr. Starbuck supplied it, you know, to the four respective LLCs showing that they're -- what percentage of ownership they were in Westport Holdings, Tampa, and Westport Holdings, Tampa II.

Q.   Did you review the ultimate purchase agreement before it was signed?

A.   I would have seen a final version from either the Holland & Knight law firm representing Mr. Landry, or the Williams Mullins law firm.  I would have likely seen a final version.

Q.   Who was representing you?  Was it Mr. Starbuck?

A.   Mr. Starbuck was representing BVM, and the Williams Mullin firm was representing the other limited liability companies.

Q.   So let's go back to Exhibits 1 and 2 then. First of all, can you tell me when the assignment was made by BVM to -- BMV Management -- to the four limited partnership entities?

A.   I believe that the assignment was simultaneous with the closing.  Those are the documents that I've seen over the last year.

Q.   So -- hang on.  Excuse me for one second,



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
58

please.  I'm sorry, Mr. Bartle.  I apologize for the delay.

Going back to Exhibits 1 and 2, in light of -- strike that.

Do you believe that the -- this assignment that you've described -- first of all, the assignment from BMV Management, Inc., to the four limited partnership entities of the 99 percent limited partnership interest in University Village, you believe that was done simultaneously with the closing on -- assuming it was March 31st, 2014, that assignment would have been signed the same day?

A.   Well, I'm not even going to admit that it was BMV Management, Inc.  It could have been a BVM entity, I'm not positive it was BMV Management, Inc.  But I do believe the assignment was simultaneous since the loan documents reflected all the signatories for all the various LLCs that became the -- that held the undivided interest.

Q.   Okay.

MR. TURNER:  Excuse me.  Could I make -- get a clarification, Tim?  Do you have a document that shows some entity was part of the original purchase and then presumably guaranteed the loan?

MR. NEWHALL:  Here's what I have, okay.  I'm



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
59

working on getting this and being able to e-mail it to you. But there is a document that is -- appears to be four pages in length. It is titled "Reinstatement and Amendment Agreement." It says, "This agreement was made as of March 11th, 2014, by and between BMV Management/Westport Holdings, LP, buyer; BMV Management, Inc., BVM University Village, LLC, and Westport senior living investment fund, seller."

And it goes on to say that the -- concerns the 99 percent limited partnership interest, and it is signed by Robert L. Rynard on behalf of BMV Management/Westport Holdings, LP, by Mr. Rynard on behalf of BMV Management, Inc., and also by Mr. Rynard on behalf of BVM University Village; and then it is signed by Larry Landry on behalf of Westport Senior Living Investment Fund.

So that's what I'm referring to, and I'll send it to you.

BY MR. NEWHALL:

Q. Now, with that description -- and recognizing, Mr. Bartle, that you still don't have it in front of you, does that description help you at all in helping me to understand how this transaction transpired?

MR. TURNER: In other words, are you asking



the witness what is the significance of this particular document you described?  Is that kind of what you want him to address?

MR. NEWHALL:  Yes, that would be a good start.

A.    Well, I think it outlines the terms of the purchase of the 99 percent interest of Westport Holdings, Tampa, and Tampa II.  That's its intent.

BY MR. NEWHALL:

Q.    And would there then have been a separate agreement -- a separate agreement, a written assignment, of the 99 percent limited partnership interest to the four limited partnership entities?

A.    I believe so, yes.

Q.    To your knowledge, was it ever communicated to the Office of Insurance Regulation, or any of its representatives, after March 31st, 2014, that the purchaser of the 99 percent limited partnership interest was Westport Holdings -- I'm sorry, was BMV Management, Inc.?

A.    No, not -- because that wouldn't have been true.

MR. TURNER:  Let's go off the record for a second, if we could, Tim.  I may have a suggestion that may help clarify this.

THE COURT REPORTER:  I'm off the record?



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
61

MR. NEWHALL:  That's fine with me.

(Off the record from 12:05 p.m. to 12:15 p.m.)

THE COURT REPORTER:  I'm back on the record.

BY MR. NEWHALL:

Q.   Mr. Bartle, you are reviewing the document that I have been trying to describe to you over the telephone.

MR. NEWHALL:  We're going to mark this as Exhibit 3 to the deposition, just for clarity sake.

(Exhibit 3 marked for identification.)

BY MR. NEWHALL:

Q.   Having had a chance to review this document, do you recognize it?

A.   I recognize it.  I can't tell you if it's the last version, but I do recognize it as the portrayal of the transaction.

Q.   I guess my question would be this.  If it were not have been the final version, would it have been executed by all parties, the buyer and the seller?

A.   Well, yeah -- I mean, let me say it this way. This could be the final version, but if it had to be further amended and restated, it would also have been signed by all the parties.

Q.   Okay.  All right.  And it's your testimony that following this transaction reflected by Exhibit 3



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
62

that there would have been at closing an assignment of the 99 percent limited partnership interest in University Village to the four limited partnership entities?

A.   Well, yeah, the four LLC entities.

Q.   Okay.  Okay.  The four LLC entities, you're correct.

Would that assignment to the four LLC entities have been provided to OIR?

A.   Well, I don't -- I actually don't have the answer to that question.  It was provided to the lenders because the lenders, of course, had to see who the ownership was.  So I don't know exactly what was provided to the OIR.

Q.   Okay.  Let me -- in the packet of documents that I had e-mailed previously to your attorney and to Anna Small, there are a couple of e-mails, and I think they may be on the bottom of the stack.  There's an e-mail from Tim Parker to Lou Jackson dated Monday, March 31st, 2014, at 12:52 p.m. --

MS. SMALL:  It's the second to last page.

BY MR. NEWHALL:

Q.   -- subject is "Auto Response (sale announcements letters)"; and then below that there's a -- it looks like an e-mail from Lou Jackson to Tim



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
63

Parker dated Tuesday, April 1st, 2014, at 9:23 a.m. Do you have those documents?

A.    Well, I've got the Tim Parker to Lou Jackson "auto response" dated March 31st.  And the next one you were looking for?

Q.    It should be the one right below that dated April 1st, 2014, from Lou Jackson to Tim Parker?

A.    Yeah, okay, I see that.

MR. NEWHALL:  I'm going to mark these as Composite Exhibit 5.

MS. SMALL:  Hold on.  You didn't do 4.

MR. NEWHALL:  I'm sorry.  Yeah.  Well, whatever the next correct number is.  I've exceeded my capacity.

MR. TURNER:  Let me say this.  One document dated March 31st, is that the one you're referring to?

MR. NEWHALL:  Yes.

MR. TURNER:  Okay.  And then the other document you're referring to is dated March 31st also.  Right?  Those two --

MR. NEWHALL:  No, it's April 1st.  It's -- the April 1st e-mail is from Lou Jackson to Tim Parker and reads in its entirety, "OK on sending out announcement to staff and residents."

MR. TURNER:  Okay.  You want to mark that as Exhibit 4?

MR. NEWHALL:  Yeah, we'll mark that as Composite Exhibit 4, those two documents.  The next one is also dated April 1st?

MS. SMALL:  March 31st.

MR. TURNER:  And it's from Parker to John --

MR. NEWHALL:  -- to Lou Jackson.

MR. TURNER:  Wait a minute.  Give me a minute to catch up with you here.  Parker to Lou Jackson.  Okay.

MS. SMALL:  It's Pages 8 and 9 of the original e-mail he forwarded, Steve.

MR. NEWHALL:  I believe that's correct.

MR. TURNER:  Is it just these two pages now that you're marking now Exhibit 4?

MR. NEWHALL:  That's correct.

MR. TURNER:  Okay.  Thank you.

(Exhibit 4 marked for identification.)

BY MR. NEWHALL:

Q.   All right.  Mr. Bartle, these may help refresh your recollection a little bit.  The March 31st e-mail, which is Page 1 of Composite Exhibit 4, is from Mr. Parker to Mr. Jackson, and Mr. Parker is telling Mr. Jackson that, quote, "Lou, I got a bounce back on



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
65

the letters from John's e-mail address.  Should I call his assistant?  See below, or will you be reviewing and getting back to me on these?"  And then the second e-mail is a day later and it's from Lou Jackson to Mr. Parker and it says, "OK on sending out announcement to staff and residents."

First of all, do you recall seeing these before?

A.   No.

Q.   Does this at all refresh your recollection on whether or not you reviewed the letters and notices that were marked as Exhibits 1 and 2 earlier in the deposition?

A.   No.  Actually, the e-mail from Parker said it bounced back from my e-mail, so I didn't get a copy of it.

Q.   Okay.  And I was just wondering, do you know if either Mr. Parker or Mr. Jackson touched base with you afterwards to discuss whether it was okay to send out those announcements?

A.   Not that I recall.

Q.   Mr. Jackson, as I recall, is the managing member of Eagle One, which was one of the four LLCs that assumed the 99 percent limited partnership interest.  Is that correct?



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
66

A.   In the beginning that was correct.

Q.   Has that changed?

A.   I am not sure.

Q.   Do you think it may have changed or you just don't know if it's changed or not changed?

A.   I know that there was discussions with Mr. Rynard, Mrs. Rynard, and Dane Starbuck and Mr. Jackson about Eagle One withdrawing as a member of BVM University Village, LLC.  I was just not present to know whether that document was executed.  So that's as much as I know.

Q.   Just to try and tie a bow on that, do you know one way or the other if there has been any change in any of the limited liability company entities that owned the 99 percent limited partnership interest?

A.   Other than the Eagle One in which I'm not sure of, I don't think there's been any other change.

MR. TURNER:  I want to be sure I'm clear because I think you said that Eagle One was one of the member entities, but I think I'm understanding the witness to say it was a member of one of the entities.  Am I mis -- I just want to make sure we've got it correct.  Eagle One is not itself an owner of the limited partnership, but it was at one time at least a member of one?

JOHN W. BARTLE, JR.
STATE OF FLORIDA vs. WESTPORT

April 22, 2015
67

MR. NEWHALL:  Mr. Turner is correct.

BY MR. NEWHALL:

Q.    Mr. Bartle, is it correct that Eagle One Properties, LLC, was at one time a member of BVM University Village, LLC?

A.    Yes.

Q.    And you're not sure, but there may have been some sort of a change with respect to Eagle One as a member of BVM University Village?

A.    Yes.

Q.    Do you believe or do you know one way or the other whether Dorothy Rynard is still a -- well, not Dorothy Rynard, but Venice Avenue Investors, LLC, is still a member of BVM University Village?

A.    Yes, Venice is still a member.

Q.    Okay.  And is Compliance Concepts LLC still a member of BVM University Village?

A.    Yes.

Q.    All right.  Bear with me for just one sec.

All right.  I want to ask you a couple of questions about three more of the documents that are in the package that I previously e-mailed to Ms. Small and to Mr. Turner.  The first page appears to be an e-mail from Mark Lichtenwalner to Lou Jackson and John Bartle, and it's dated April 17, 2014.  And below that there are



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
68

two documents.  One is titled University "Press Release For All Residents!"; and another one is titled, "Press Release - Draft #4 for Comment and Approval - Mark & David."   Do you have those documents, Mr. Bartle?

A.   I do.

Q.   Okay.  First of all, do you recall receiving this proposed or a proposed press release from Mr. Lichtenwalner by e-mail dated April 17th, 2014?

A.   I do not.  I notice that he has my name spelled wrong, so that may have been -- could potentially have been part of the problem.

Q.   Is your name spelled correctly on the "to" line of the e-mail?

A.   No.

Q.   Do you recall whether or not a press release was issued after the acquisition of University Village of the 99 percent limited partnership interest?

A.   I recall mention of a press release, but -- but I didn't see it or wouldn't have contributed to it.

Q.   You did not review it and/or approve it or make any changes to it?

A.   I did -- I don't recall making any changes. Again, I wouldn't -- I wouldn't have stated that the new owner is BVM because that's factually inaccurate.

Q.   Do you know if this press release, the one



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
69

that's -- this press release, one of the ones attached or something similar to it, was actually released?

A.   I don't know.  I do see the name of Gary Solomonson on the CC line, who was an outside consultant that AgeWell hired who may have contributed to a press release, but I -- I wouldn't have seen it, that I recall.

MR. NEWHALL:  Let's mark these --

MR. TURNER:  Go ahead.

MR. NEWHALL:  -- these three documents that we've been referring to -- Mr. Lichtenwalner's April 17, 2014, e-mail; the one entitled "Official Press Release For All Residents!"; and then the one titled "Press Release - Draft #4 for Comment and Approval" -- we're going to mark that as Composite Exhibit 5, please.

(Exhibit 5 marked for identification.)

MR. TURNER:  With the stipulation -- with the understanding that the witness has not identified these because he doesn't recall receiving them.

MR. NEWHALL:  This is a document that we are going to mark as Exhibit 6, and this is a -- the e-mail from Tim Parker to jbartle6081@yahoo.com.

I'm going to mark that as Exhibit 6.

BY MR. NEWHALL:



Q.    Do you have that in front of you, Mr. Bartle?

A.    I do.

MS. SMALL:  Hold on.  Hold on.  Is it the one dated March 31st at 11:02 a.m.?

MR. NEWHALL:  Yes, that's correct.

MS. SMALL:  This is 6.

MR. TURNER:  It's preceded by the one that you got here dated March 28, 2014?

MR. NEWHALL:  Yes.  I have not marked that one.

MR. TURNER:  Okay.  Don't mark this one yet.  Okay.

(Exhibit 6 marked for identification.)

BY MR. NEWHALL:

Q.    Mr. Bartle, first of all, is that a correct e-mail address for you, or was it a correct e-mail address back on March 31st, 2014?

A.    Yes, sir, it was and is.

Q.    Okay.  Did you receive that e-mail?

A.    I likely did.

Q.    Okay.  Did you receive drafts intended to announce the sale of University Village for your review with this March 31st e-mail to Mr. Parker?

A.    I don't recall receiving the drafts.



Q.    Do you recall reviewing and requesting any changes made to the drafts?

A.    I do not.

Q.    And are these drafts referred to in Mr. Parker's March 31st, 2014, e-mail marked as Exhibit 6?  Are they contained within the official press release for all residents and/or press release draft No. 4 that were included within Exhibit No. 5?

A.    Well, I don't know because I didn't -- I didn't see the attachments.

Q.    All right.  It's 12:30.  I had agreed with Mr. Turner that we would take an hour break for lunch. So with that, unless there's been some change, Steve, we'll break, and I'll be back at 1:30.

MR. TURNER:  Hold on.  I'm fine about the break.

I do want to observe, though, that it seems to me -- and I'm not very good at this e-mail stuff, in terms of piecing all this stuff together, but it seems to me that Exhibit 6 that you just marked, Tim Parker to Mr. Bartle, is sent at 11:02 a.m., and Exhibit 4 that you marked is a response from Mr. Parker to Mr. Jackson dated (sic) 12:52 p.m., I guess that afternoon, where he's saying "I got a bounce back from John's e-mail."



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
72

MR. NEWHALL:  That may --

MR. TURNER:  So I don't know if the two of these -- I don't know if this is supposed to be read together or how they were in sequence, but I think Mr. -- it seems to me that they connect somehow or another.

But anyway, we'll have to ask Mr. Bartle. Okay.

MR. NEWHALL:  All right.  I will speak to you at 1:30.

MS. SMALL:  Okay.  So we'll just all dial back in in an hour.  Is that the plan?

MR. NEWHALL:  Yeah.  Will the call-in number still be effective?

MS. SMALL:  Yes, it should be.

MR. NEWHALL:  Okay.  Thank you.

(Recess from 12:33 p.m. to 2:05 p.m.)

MR. NEWHALL:  Back on the record.

BY MR. NEWHALL:

Q.   Mr. Bartle, I remind you that you're still under oath.

MR. NEWHALL:  And one thing I want to put on the record also is that -- is Mr. Freidman still present?

MS. SMALL:  He is.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
73

MR. NEWHALL: Mr. Freidman is present and I'm told as the corporate representative. Is that correct --

MS. SMALL: Yeah. It's actually "Freiden."

MR. NEWHALL: -- Steve?

MR. TURNER: My first position is that you don't have a right to invoke the rule on depositions. Depositions do not say that. You can attend depositions. Witnesses attend depositions all the time, so that's my first position.

But if you want to have somebody in a technical capacity, he is the general partner, he's serving in that capacity, and is properly representing the respondent.

BY MR. NEWHALL:

Q.   All right. Mr. Bartle, back on March 31st, 2014, when the 99 percent limited partnership share of University Village was acquired, what parts of -- I mean, was this 99 percent of the CCRC as a whole, including the assisted living facility and the nursing home?

A.   It was the purchase of the 99 percent interest of Westport Holdings, Tampa, LP, and Westport Holdings, Tampa II, LP.

Q.   Okay. Was there a separate -- was that purely



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
74

for then the independent living facility?

A.   I'm told -- I did not participate in closing with the lawyers at closing, but I'm told it also included the asset called Westport Nursing Tampa, LLC, which owned the bricks and mortar that houses the skilled nursing and the assisted living.

Q.   At the time of the acquisition of the 99 percent limited partnership interest was Westport Nursing, Tampa, a subsidiary of Westport Holdings, Tampa I and II?

A.   Well, according to the March 31st organizational chart that I reviewed, it was a subsidiary of Westport Holdings, Tampa, LP.  And I'm speaking --

Q.   I stand corrected.  You're right.

And Westport Holdings, Tampa I and -- well, strike that.  Strike that.

Okay.  So the 99 percent partnership interest then that was acquired on March 31st, 2014, also included the interest in Westport Nursing, Tampa, LLC?

A.   Yes.

Q.   Is Westport Nursing, Tampa, LLC, still a subsidiary of Westport Holdings, Tampa, LP?

A.   I am told they are not.

Q.   Told by who?



A.   The managing member of Westport Nursing, Tampa, LLC, which is -- the managing member is this BHMSILF, LLC, and its principal, Kevin Angelis.

Q.   Okay.  How was Westport Nursing, Tampa, transferred from Westport Holdings, Tampa, to BHMSILF? What was the mechanism of that transfer?

A.   I don't know.

Q.   I mean, was it just drawing another line on the organizational chart?

A.   I don't know what the mechanism was.

Q.   What was the consideration that BHMSILF, LLC, paid to Westport Holdings, Tampa, for Westport Nursing, Tampa?

A.   I don't know.

Q.   Do you know if -- well, strike that.

Westport Nursing, Tampa, as I understand it consists of an assisted living facility, which is about 110 beds, and a nursing home, which is 120 beds.  Is that your understanding?

A.   Well, Westport Nursing, Tampa, LLC, owns the land, the building, and the equipment, but they are not the licensee to provide services for the ALF and the skilled nursing.

Q.   The licensee for the assisted living facility is the entity known as T-A-L-F, Inc., that's TALF, Inc.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
76

Is that correct?

A.    Yes, sir.

Q.    What is your position or your relationship with TALF, Inc.?

A.    I'm the board chairman.

Q.    Do you hold any other offices or positions with TALF?

A.    No.  TALF is a Florida nonprofit corporation, so it only has three board members; myself, Dana Huth, and Robert Rynard, Sr.

Q.    Okay.  And do the same four LLC entities own 99 percent of limited partnership interest in TALF as they do in the independent living facility?

A.    No.

Q.    How does that work?  Who owns -- what are the ownership structure of TALF, Inc.?

A.    TALF, Inc., is a Florida not-for-profit corporation, and it has no divisible ownership.  It's controlled by a volunteer board, and the three board members I think I just gave you.  So there is no divisible interest in a nonprofit.

Q.    All right.  I understand.  Who is the licensee for the nursing home?

A.    That is another Florida nonprofit corporation known as capital "T," capital "R," the "and" sign, SNF,



Inc., period.

Q.    And what is your position, if any, with TR&SNF?

A.    TR&SNF has the same three board members as TALF, and I'm the chairman, Robert Rynard is the secretary, and Dana Huth is the treasurer.

Q.    TR&SNF and -- can we just call that the nursing facility, the nursing home?

A.    Yeah.  We like to refer to them as the SNF and the ALF because it's just -- S-N-F and A-L-F because it's easier acronyms to follow along.

Q.    "A-L-F" being assisted living facility, "S-N-F" meaning skilled nursing facility?

A.    Yes, sir.

Q.    So the ALF and the SNF are leased from Westport Nursing, Tampa.  Correct?

A.    Correct.

Q.    Okay.  Were they -- was there a lease in place when the 99 percent partnership interest was acquired?

A.    The lease -- the lease had expired with the former tenant, the former board -- the board control of the tenant -- and that tenant was in there on a month-to-month rental agreement.  When the asset was purchased, the rental agreement was canceled and a new lease was entered into by Westport Nursing, Tampa, LLC,



and TR&SNF and TALF.

Q.   Okay.   What was the monthly rent prior to the acquisition during the period that the month-to-month lease was still in place?

A.   Well, the base rent was to be $75,000 a month under the documents that I reviewed; and the additional rent was supposed to be another $50,000 a month.

Q.   Why was the rent split into two amounts like that?

A.   When the provider -- when the provider reached a certain benchmark of total revenue, that triggered the additional rent calculation; and I can't recall what year that was, but seems like it was 2006 or '7 when the -- when that trigger mechanism came in for additional rent.

And so my review of the audited statements of the former lessee indicated that the lessee was accruing $125,000 a month in rental expense, as in experience on their books, but they were only paying 75,000, and that's per month.

Q.   Under the new lease that Westport Nursing, Tampa, LLC, entered into with TALF and SNF, what is the monthly rent?   Is it spelled out in annual terms?   Maybe that would be easier.

A.   It's approximate -- I don't know exactly what



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
79

it is.  It's about 200,000 a month.

Q.    Were there -- is there escalation clause in the lease from year to year?

A.    There was.

Q.    And do you recall what the -- was it approximately 200,000 a month for the first year?

A.    Yes.

Q.    Was the actual rent to be paid by TALF and SNF the first year to be two hundred and -- 2,500,000?

A.    That's close.

Q.    Do you know what the rent went to the second year of the lease?

A.    I do not.

Q.    Would this be the second year of the lease, by the way, after April 1st?

A.    This would be the first month of the second year, that's correct.

Q.    Okay.  I want you to assume that the lease between Westport Nursing, Tampa, and ALF and SNF that is now in place calls for an annual rent this year, April 1st to March 31st, 2016, of $3 million.  Do you have any reason to dispute that?

A.    I don't -- I don't have -- I just simply don't have the lease in front of me, so I don't know if that's true or not.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
80

Q.   Okay.

A.   But the lease speaks for itself.

Q.   I'm sorry.  Go ahead.

A.   I said, no, the lease speaks for itself.  So if you're looking at the lease, maybe ...

Q.   Okay.  Do -- well, if I were to tell you that the annual increment of the lease started out at 2,500,000 per year, went to 3 million a year in year two, 4 million a year in year 3, and $5 million a year in year 4, would you have any reason to dispute that?

A.   If you're reading the lease agreement and it's in front of you, I have no reason to believe you're making it up.

Q.   Let's put it this way.  I have read it.  It's not in front of me.  I think I'm right, but I'm doing my best to remember it.  I believe the numbers I've given you are correct.

Who is the -- the rent is paid to Westport Holdings, Tampa.  Correct?

A.   No, it's --

Q.   No, I'm sorry.  Westport Nursing, Tampa?

A.   That's correct; Westport Nursing, Tampa, LLC.

Q.   And where -- what does Westport Nursing, Tampa, LLC, do with the rental income it receives?

A.   I don't know.  Well, it makes a mortgage



payment, I'm sure, but I don't keep those books, I don't do those tax returns, so I can't tell you, you know, where --

Q.    Do you have an approximate idea of what the monthly mortgage payment for the ALF and the SNF are?

A.    Yes.  Approximately 99,000 a month.

Q.    Okay.  So let's assume, then, that the monthly rental income to Westport Nursing, Tampa, is approximately $200,000 a year.  That would have been the case in -- I'm sorry, a month, $200,000 a month.  That would have been the case in year one of the lease.  The mortgage payment is made, that leaves roughly $100,000 left.  What was Westport Nursing, Tampa, doing with that money?

A.    Well, it retained some of that money, and I can't tell you how much, and then it would have distributed -- according to the limited liability company agreement, it would have distributed any excess cash to the members of the limited liability company on a pro rata basis.

Q.    And the members of Westport Nursing, Tampa, LLC, are they the same four LLC entities that are limited partners that own the 99 percent?

A.    Yes.

Q.    How much money per month does Westport



Nursing, Tampa, pull back and not distribute to the four members of the limited liability or the limited partnership?

A.   I do not know.

MR. TURNER:  Can I get a clarification here. I'm trying to get the connection between West Point Nursing, Tampa --

MR. NEWHALL:  It's not -- it's "Westport." I'm sorry.

MR. TURNER:  -- Westport Nursing Tampa and the respondent in this case.  Can we at least get that clear on the record so I can --

MR. NEWHALL:  Well, I tried to get it clear, too, and I'm really not sure because he testified that when the -- well --

(Indiscernible cross-talk.)

MR. TURNER:  (Inaudible) about a mortgage, I know that.  I know they got to pay taxes and insurance and other things, but I don't know what the connection to the respondent in this case is.

MR. NEWHALL:  Well, the respondent is the -- let's put it this way.  When the acquisition was made, the Westport Nursing, Tampa, was a -- apparently a wholly owned subsidiary of Westport Holdings, Tampa; and now it has somehow been



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
83

divested from Westport Holdings, Tampa, and it's off on its own, apparently, but Mr. Bartle told me that he's not aware of the nature of that transaction, what consideration, if any, was paid, so I'm just as much --

MR. TURNER: Am I not correct it's the same ownership? The owners own it and have a subsidiary, they own it in two separate companies? I mean, isn't it the same people owning the company both ways? I'm just trying to follow where we're going here.

MR. NEWHALL: Well, you know, maybe I'm going nowhere. Maybe I'm going in circles, Steve.

MR. TURNER: I'll hush. I'll hush. Go ahead. I'm sorry.

MR. NEWHALL: Let me try to get ...

BY MR. NEWHALL:

Q. Mr. Bartle, did you appear at a residents council meeting within the past couple of weeks at University Village?

A. There was a resident board meeting I think Tuesday or Wednesday of this week.

Q. So within the past couple of days then maybe?

A. I'm sorry. I'm sorry. I think it was last



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
84

week.  Let me rephrase that.  I think the resident board meeting that I attended was last Tuesday or last Wednesday at University Village.

Q.   Did you make the statement to the residents or to the members of the resident board that the nursing facility and the ALF were now separated from the independent living facility?

A.   Well, I -- yes, I think that's consistent with what I just said here as it's my understanding that Westport Nursing, Tampa, LLC, had been divested from Westport Holdings, Tampa, LP.  That's consistent with what I've been told by the managing member of Westport Nursing, Tampa, LLC, Kevin Angelis.

Q.   Did you tell the resident board that the ALF and the nursing facility did not have any contractual obligation to provide services to them as members of the CCRC?

A.   I -- I think I told them the truth.  I said I think that they -- that there's an access agreement in place that provides for the independent living residents that would have access to the ALF and the SNF provided they could pay for the service, and the ALF and SNF could meet their needs, and provided the resident wanted to be transferred to the ALF and SNF.  So those are pretty much the three conditions.

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
85

Q.   The -- what conditions, if any, concerning the ALF and the S-N-F, the SNF, are contained within the residential life care contracts that the residents enter into when they become -- move into University Village?

A.   Well, the contract that I've seen, the independent living facility represents that it has a responsibility to make a transfer to ALF or SNF when the medical needs occur, and that it warrants that it will pay for that transfer at the SNF, ALF on this campus or the SNF, ALF in any other campus.  Responsibility for payment is with the independent living facility, not SNF, ALF.  So that's what I see in the residency care agreement.

Q.   All right.  So let me see if I got this right. Does the residential contract give the -- give the residents -- assuming they -- No. 1, there's an available bed; and No. 2, the facility can provide the necessary treatment:  Given those conditions, are the residents then guaranteed the appropriate level of care in either the ALF or the SNF?

A.   Not by the ALF or SNF, they're not guaranteed the appropriate level of care.  That guarantee comes from the ILF.  The ILF warrants that it will provide for a transfer to the ALF or another ALF to the SNF or another SNF, and they warrant that they will pay for



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015

86

that monthly fee up to a lifetime benefit of $21,000 per resident.

I don't see any reference in any residency agreement that TR&SNF and TALF have any responsibility to the ILF.

Q.   Okay.  The access agreement.  The access agreement is between -- is it between Westport Nursing, Tampa, or is it between SNF and ALF?

A.   I think the asset -- excuse me, the access agreement is by and between SNF ALF and Westport Holdings, Tampa.

Q.   Okay.  Does the access agreement, then, guarantee that residents will receive the level of care and the services that they've contracted for in their residential contract?

A.   I don't recall the word "guarantee" being in the access agreement.  I think what it says --

Q.   Does --

A.   I'm sorry.  Go ahead.

Q.   No, no, you go ahead.

A.   I think what it --

Q.   Maybe you'll save me some time.

A.   Well, I think what it's intended to say is that provided that there is a necessary transfer based on the recommendation of the medical director or the



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
87

attending physician, No. 1; No. 2, that SNF ALF can meet your needs; No. 3, that there's a bed available, then the access agreement then provides access, you know, to SNF out beds.  But there's no guarantee that -- if the IL calls up today there's no guarantee that anybody will be able to get a bed except for those conditions I just mentioned, medical --

Q.   Let's assume that -- let's assume that the independent living facility determines that a resident needs to move into the assisted living facility, and let's assume there's a bed available, okay --

A.   Yes.

Q.   -- and the ALF can provide whatever services are necessary to assist the resident.  Are they then -- you know, can the ALF then, pursuant to this access agreement, deny the resident the available bed?

A.   The only reason for denial would be no medical necessity, no bed available, or the ALF could not meet their needs based on staffing requirements and obviously --

Q.   So -- okay.  Assuming all of those conditions are met, that none are a problem, the ALF could not deny -- there's medical necessity, there's available bed, and the level of service can be provided, is that resident then guaranteed the available bed in the ALF?



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
88

A.    Yeah.    The only other condition would be the resident would have to exhibit the ability to pay because there's no government subsidiary for ALF.

Q.    Okay.    What obligation then would the independent living facility have?  Because the resident's, you know, plunking down a fairly large entrance fee and I presume has been paying monthly fees. What obligation would the independent living facility have to pay toward the resident's care at the ALF?

A.    My recollection is that it's a $500 a month payment approximately that the IL makes to the ALF, and the monthly bill is somewhere close to let's say $3,000 a month.  So the resident would have to show the ability to pay $2500 a month from their own resources to be able to, you know, live in the ALF.

Q.    Is that in addition to whatever the resident's monthly fee might be at the independent living facility?

A.    No.    It's my understanding that when they move out of the independent living facility and they are -- let's say they are discharged to ALF, their monthly fee at the ILF doesn't continue to be paid unless that resident or if that family member wants that particular room reserved because there's an expectation that the person would come back from the ALF, you know, after



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
89

treatment and rehab.

Q.   For example, if you have an elderly gentleman who has a broken leg and he needs a little bit more assistance with the activities of daily living until he can rehab maybe for a few months, he would then have the option to continue paying the monthly service charge at the independent living facility to maintain his apartment there?

A.   If that's -- that's really not what I do, so I can't be explicit about it.  That's supposedly the way it works.  Oftentimes there's husbands and wives living in independent; so if the husband or wife is discharged to ALF, sometimes the husband stays in ILF until the rehab occurs.  So it depends on the fact circumstance for each discharge and admission.

But generally the goal is to accommodate the resident and accommodate their desire.  So if they want to keep the apartment open during the rehab period, I think management's goal is to accommodate that request.

Q.   Okay.  If the resident -- if you have a single resident and they're in the independent living facility and it becomes obvious that they're going to need to move into the assisted living facility, and it's extremely unlikely that they're going to be going back to the independent living facility, do they continue

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
90

paying the monthly fee toward the assisted living facility, or do they simply at that point in time start paying whatever charge they have to meet at the ALF?

A.   Well, they will pay for the service they're getting at the ALF.  I'm not certain what, if anything, they're paying at the ILF after they're discharged.

Q.   Would -- does the ILF then have the obligation to continue making the monthly payment toward the assisted living facility on behalf of the resident?

A.   They do up to a lifetime benefit of $21,000.

Q.   Okay.  Let me see if I understand this. Again, you have to forgive my lack of corporate savvy. Do Westport Holdings, Tampa, and Westport Nursing, Tampa, have common ownership?

A.   Yes.

Q.   And that would be the four LLCs that comprise the limited partners?

A.   Yes.

Q.   Who is the general partner for Westport Nursing, Tampa?

A.   I think it's BHMSILF, LLC.

Q.   Mr. Bartle, have you ever had the chance to review the prior access agreement or service agreement between the ALF and the SNF on one hand and Westport Holdings, Tampa, on the other, the one that has now been



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
91

replaced by the new access agreement?

A.    If you're referring to the agreement that was dated 2002 or 2003 --

Q.    I believe that's correct.

A.    -- I don't know what they're titled, but I have looked at both of those agreements over the years.

Q.    The prior agreement or agreements specifically acknowledged the obligation of the assisted living facility and the skilled nursing facility to meet the terms and conditions of the residents' contracts.  In other words, accept the amounts of payment set forth in the residents' contracts at Westport Holdings, Tampa. Is that correct?

A.    You know, Counsel, I'm not sure.  I've looked at those agreements.  I mean, we did look at those agreements as a part of the due diligence process, you know, almost two years ago; but my read on those agreements were that they expired in 2007, and they were not renewed.  I couldn't find any evidence of any renewal.  But even if they were renewed for the two-, three-year periods, they still would have expired in 2013.  So they weren't in effect when the acquisition occurred, so I didn't really study those agreements at all because I -- I didn't think they were in force.

Q.    Let me ask you this.  To your knowledge, at



the time of the acquisition back around April 1st or March 31st of 2014, were TALF and the nursing facility still honoring the terms of that prior access agreement, whatever the title may be?

A. I have no idea.

Q. Let me ask you, then, we talked about the relationship between maybe a resident moving from the independent living facility to the assisted living facility. What about -- let me ask you some questions now when a resident might need to go from the independent living facility into the SNF, the skilled nursing facility. Assuming that the nursing facility can provide the requisite level of care and provided that there's an available bed, is there any reason why the skilled nursing nursing facility could not accept the resident from the independent living facility?

A. Only if the resident couldn't pay for the service or was not eligible for Medicaid; or (b) -- maybe that's (b); (a) sometimes the resident does not want to reside in the skilled nursing home on the campus, and they discharge to a competitor.

Q. I guess my question is this. Assuming that the resident has -- signs the agreement, you know, doesn't mind moving into the skilled nursing facility -- in fact, they want to because it's in the same ballpark



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
93

as the independent living facility, and it may be close to family or who knows -- assuming the resident is capable and can make the payment, and assuming the level of care can be provided for and there's an available bed, can the nursing facility refuse to accept that resident?

A.   Not unless there's grounds that I'm not aware of.  I don't do admissions, but I'm assuming if you've got a physician's order and everything else is as you've said, there would be no reason to deny admission.

Q.   Okay.  When a resident moves from the independent living facility into the nursing facility -- let's assume that all the other conditions are met and there's an available bed and they make the move -- are they still entitled to the same level of discounts, I believe up to $21,000, that someone moving from the ILF to the SNF -- I'm sorry, into the -- let me just say moving from the independent living facility into the assisted living facility, is somebody moving into the nursing home entitled to the same level of discount?

A.   I believe that's correct.

Q.   Okay.  Thank you for following that question.

I'm assuming that most of these people are going to be over the age of 65 and are eligible for Medicare or Medicaid.  Does the skilled nursing facility



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
94

qualify someone to receive Medicare benefits?

A.   Yes.

Q.   In other words, somebody moving into the nursing home?

A.   If they're -- if they are determined to be Medicare-eligible, it's the responsibility of the facility to make sure that that benefit is made available to that admission.

Q.   Okay.  So I'm assuming that let's say someone moves from the independent living facility into the nursing facility, there's going to be a charge, of course, by the nursing facility to the resident, that is the resident's responsibility?

A.   Well, yes, there's a monthly charge, you know, for --

Q.   Okay.  A monthly charge.  And that monthly charge may be satisfied by -- in part by a payment by the independent living facility up to $21,000. Correct?

A.   Correct.

Q.   And a good portion of it will be paid by Medicare or perhaps Medicaid.  Would that be correct?

A.   Well, Medicare if they're there on -- Medicare eligible stay up to 100 days, and then from there Medicare benefits cease and you either become private



insurance, private pay, or Medicaid.

Q.    Okay.   Does the current access agreement between Westport Holdings, Tampa, and the skilled nursing facility and the assisted living facility on the other hand, does it specifically mention the -- or commit the ALF or the SNF to accept the benefits that the resident is entitled to under the life care contract, that being a discount of up to $21,000?

A.    Well, I'm not sure I follow the question, but --

Q.    Let me try again.

A.    Okay.

Q.    Does the current access agreement obligate the ALF and the SNF to honor the $21,000 discount or benefit that the resident is entitled to pursuant to their life care contract with the independent living facility?

A.    I'm not sure exactly if it gets down to that level of detail.  I think the practice is is that if the bill is $3,000 a month, you know, for that resident stay, then the resident is charged $2500 a month, and the independent living is charged $500 a month; and it's the responsibility of independent living to pay that $500 up to the $21,000 cap.  That's the practice.

Q.    That's the practice.  Could -- I guess my question is, could the skilled nursing facility or



assisted living facility decide that they no longer wish to honor that practice and not accept that $21,000 benefit?

A.   Well, I couldn't -- I couldn't imagine why that would happen because if I'm billing you $3,000 a month, I don't care what the source of payment is.  My obligation is to take care of you on a monthly basis.  So if it comes 500 from the family or 500 from the IL, we don't care where the money comes from on the ALF side.  So I can't imagine why the payer source would matter to the assisted living licensee as long as somebody paid the bill.

Q.   Are you familiar with the term "shelter beds" in a nursing facility as that term is defined under Florida Law?

A.   I am.

Q.   How many beds total are there in the skilled nursing facility?

A.   The skilled nursing facility's licensed for 120 beds.

Q.   How many of those 120 beds are considered shelter beds?

A.   I'm not certain.  I think there's a couple --

Q.   Go ahead.

A.   No, there's a couple of interpretations.



JOHN W. BARTLE, JR.                                              April 22, 2015
STATE OF FLORDA vs. WESTPORT                                              97

No. 1, since the nursing home provider has been paying

the community nursing home rate for over 15 years and

admitting people from the outside, you know, from

Hillsborough, Pinellas County area, there is a legal

opinion or a legal thought that those beds are now

community nursing home beds; and there may be some

backup for that under 651.118 in the Florida Statute.

On the other hand, if you read the statute

from the very beginning, 651, it implies for the first

five years your beds are granted sheltered nursing home

status after a period of time that status expires,

unless it's upon request by the licensee.

So there's at least --

Q.   I'm sorry.

A.   -- a couple of --

Q.   I'm --

A.   I'm sorry.  There's at least a couple of legal

opinions about --

Q.   No, I interrupted you.

A.   Okay.  So my understanding can go it's a legal

argument that we really haven't -- on the provider side

we really haven't discussed much at this point.

Q.   All right.  What is the -- let me see if I can

maybe ask you about one thing you said.  I think you

said that a provider for a period of five years is



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
98

granted shelter bed status. Did you mean to say they're granted "community bed status"?

A. Well, they're sheltered nursing home beds and they're granted community nursing home bed status for five years and that can be extended upon request, and in this case it has been, you know, for a good number of years.

More importantly -- for me, at least, on the provider side -- it looks like for the records that we can see, the nursing home provider has paid the license fee for community nursing home beds for 15 straight years; not sheltered nursing home beds, community nursing home beds, and the fee structure is different.

Also under my read -- and I'm not an attorney, Counsel, but I've been told by reliable sources that there's an interpretation under 651.118 and the subparagraphs that follow that permanently grant potentially community nursing home bed status to CCRC beds when there's been a period of practice and course of dealing of admitting residents from outside the community for an extended period of time. And so --

Q. I don't -- I don't argue -- I don't need to argue your interpretation. I just wanted to make sure I was clear on it. But do you know of the 120 beds in this skilled nursing facility, how many of them were



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
99

initially licensed as shelter beds and how many

initially may have been licensed as community beds?

A.   I do not know.

Q.   Okay.  Is it your understanding that the

skilled nursing facility was licensed as being part of a

CCRC or a continuing care retirement center?

A.   There's no doubt at one point that occurred.

Q.   Okay.  So would you agree with me, then, that

at least some of the beds, if not all of the 120 beds,

were initially licensed as shelter beds?

A.   I think that's likely to be true.

Q.   And is it your understanding that shelter beds

are reserved for residents of the continuing care

retirement community?

A.   Initially, yes.

Q.   Okay.  When you say "initially," do you mean

subject to all the different legal theories that you

were telling me about a few minutes ago?

A.   Well, it's actually standards of practice.

It's not a legal theory.  It's you're either admitting

people from the city and county that surrounds the CCRC,

or you're not.  And if you are, then those beds can be

deemed to be community nursing home beds, unless the

provider exclusively reserves the right to keep them as

sheltered nursing home beds by written request.  I think



that's what the regulation says, I may be wrong.

Q.   All right.   Let's assume that -- you know, let's just talk about one bed.   Okay.   It's part of a nursing facility that is licensed as a CCRC and this one bed is a shelter bed.   You with me so far?

A.   I am.

Q.   All right.   That bed, as I understand it, is supposed to be reserved for a resident of the continuing care retirement center, or the CCRC, who may need it. Is that correct?

A.   It can be correct, correct.   That's right. That's originally the way the campus was set up.

Q.   Okay.   And the theory is that because over time some of these beds have been used as community beds, that their character has changed to become community beds just by operation of usage?

A.   I think it's -- it's language dealing with course of dealing over time and AHCA's acceptance of the community license fee instead of sheltered bed fee.   So it's kind of a course of dealing, standard of practice, over a long period of time may have had the effect of modifying the original regulation by practice.

Q.   And do you know of the 120 beds how many have been paying fees based on the community bed rate as opposed to the shelter bed rate?



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
101

A.   My review of the application was, for as far back as I could see, it was always they paid 120 beds times the community bed rate; and the license hanging on the wall says "standard license."

Q.   Is there a -- let me ask you this.  If you know, is there a -- what is the difference between a licensing fee between a shelter bed and a community bed?

A.   I do -- I do not know that answer.  My recollection is community nursing home bed fees are higher than sheltered nursing home bed fees, but I can't tell you the increment.

MR. TURNER:  Tim, I, for the life of me, don't understand how any of this relates to the order to show cause or how anybody has been shown to not be able to get beds when they need them in ALFs or SNFs.  How is any of this related to anything that is before the court?  I just don't see where we're going to get a general lecture on AHCA, nursing homes, and all that when we're dealing with a -- you know, we're dealing here with a respondent that operates a community as a specialty insurer because it's operating a CCR -- whatever it's called -- CCRC.

MR. NEWHALL:  Yeah, you're right.  You know,



maybe I can explain it to you over a beer, Steve.

Right now I got to finish this deposition.

MR. TURNER:  Well, I'm in favor of that.  I was just trying to shorten it, if we could.  I guess I object because I don't see any relation.

Let's go ahead and get what you need.

BY MR. NEWHALL:

Q.    Just a couple of more questions.  Do you have any idea currently how many of the skilled nursing beds are occupied of the 120?

A.    I do --

MR. TURNER:  Objection.

A.    I do not know.

BY MR. NEWHALL:

Q.    Okay.  And do you know the percentage, even a rough percentage, of how many of the beds occupied are occupied by sheltered residents as opposed to community residents?

A.    My honest recollection of that, through the due diligence period, Counsel, was that approximately 1 out of 4 residents in the skilled nursing facility come from the IL; and 3 out of 4 will come from outside the IL, like through normal hospital discharges and doctor referrals.

Q.    Let me -- just to get to the end of this, let



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
103

me ask you this question just to get your understanding. Let's -- just assume for me that there is one bed left, that 119 of the beds are occupied and that on the same day at almost exactly the same time there is a referral to the skilled nursing facility from the independent living facility, and there is a referral from a local hospital, somebody in the community needs a nursing home bed. Is the skilled nursing facility under any obligation to accept the resident of the CCRC for that one available bed as opposed to somebody from the community that may have a slightly higher price tag?

A.   Well, yes.  I think there is an ethical, moral, and potentially legal obligation to meet the terms of the access agreement. Assuming, you know, all the needs are met and all the boxes are checked, there would be no reason to deny anybody access to the skilled nursing in favor of somebody coming from the outside at any payer rate. It wouldn't matter what the payer rate was.

Q.   Okay.  I appreciate that.

We talked about I think $25 million in mortgages. The mortgage on the independent living facility was recently refinanced with CPIF or something, those four initials?

A.   Yeah, that's the acronym for Columbia Pacific



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
104

Investment Fund, so we call it CPIF.

Q. I believe that mortgage was in the grand total of, what, $9.5 million?

A. That's approximately correct, yes.

Q. Okay. What's the repayment schedule on that mortgage?

A. It's interest only I think for 18 months, and I think it's scheduled to mature in September 30th maybe of this year with maybe a six-month extension option.

Q. Okay. So basically there's going to be a balloon either this September or perhaps March of next year?

A. Yes. The mortgage -- the actual loan matures September 30th, and there's one six-month extension period so far that's been granted by CPIF that would take it to approximately March 31st of 2016.

Q. Is it the intent at that time to refinance?

A. Actually, Westport Holdings, Tampa, has a term sheet from USAmeriBank, a local bank in Tampa, to refinance the IL portion of the campus under much more favorable terms.

Q. Okay. So you may refinance before maturity?

A. That's correct.

Q. The mortgage on the assisted living facility, the skilled nursing facility, that is already with



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
105

USAmeriBank.  Is it not?

A.    Yes, sir.

Q.    And I believe subject to the acquisition that was refinanced and the total loan was $15 million?

A.    Yes, sir.

Q.    Okay.  And that's the monthly payment is about 98- or $99,000?

A.    Yes; right in there, yes.

Q.    Okay.  Do you know offhand what the age accounts payable situation of the skilled nursing facility is?  In other words, are there bills that have been overdue for more than 120 days?

A.    There may be a bill that's more than 120 days and likely that's disputed.  We've been going through that inquiry with AHCA currently who provide the regulatory oversight for the skilled nursing and the ALF.  So the first part of your question was, I think the accounts payable aging for legitimate creditors are somewhere between 7- and 800,000; for disputed claims there could be a few that were related to the predecessor management company or that are disputed because of a breach of contract by the provider; meaning the provider of the service.

So and that -- just to be clear, that revised accounts payable aging was put in the Mary Beth Perry



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
106

DropBox in March -- I think mid-March of 2015.

Q.   Okay.   That's for the ALF and the SNF?

A.   Correct.

Q.   What is the repayment term on the mortgage on the skilled nursing facility and the assisted living facility?

A.   Well, it's principal and interest, I don't know what the -- I told you what the total payment is, I'm not sure about the allocation -- and I think it matures March 31st of 2016.   So when USAmeriBank proposed the term in January before the OIR folks showed up, that term sheet was to consolidate the two loans and rewrite the loans for another three-year period of time, you know, commencing the summer of this year, you know, through 2018.

Q.   Does the proposal by USAmeriBank to refinance the independent living facility, does it also -- would that also include wrapping up the mortgage on the skilled nursing facility and the assisted living facility, into one obligation?

A.   Yes.

Q.   Where is the -- well, strike that.

Has BMV Management entered into a credit and security agreement with SCM Specialty Finance Opportunities Fund?



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
107

A.   Yes.

Q.   Can you give me an idea of how that credit and security agreement function?

A.   It's a line of credit provided for -- by a line-of-credit provider, and it's used to -- it's used for general obligations of BMV Management and its affiliates.

Q.   And is part of the line of credit secured by receivables from Medicare or Medicaid?

A.   Yes.

Q.   When an amount -- well, strike that.

When Medicare makes a payment, or Medicaid, for that matter, does it go into a specific designated account?

A.   Yes.

Q.   And do you know if that's an account at Bank of America?

A.   I believe that's true.

Q.   Okay.  How does it -- how does it secure the line of credit?  How do those payments secure the line of credit?

A.   Well, the line-of-credit provider advances funds for the operation -- for general operating purposes and expects to be paid back from its advance from the collection of the third-party receivables that



are pledged. And so the borrower establishes a deposit account control agreement with the depository bank so that the lender can be assured that when the third-party funds come into the account subject to the terms of the DACA agreement, the funds are then wire transferred back to the lender in order the lender can ensure repayment.

Q. Okay. So if I understand that, then what happens is the money is paid by Medicare, the government pays it into the Bank of America account, and then that money is swept out into an account that's controlled by SCM Specialty Finance? Is that how it works?

A. Well, generally. There's a few steps missing there. First of all, you have to be able to bill for an eligible service and you have to get paid for that service. It has to be a clean claim --

Q. All of that's assumed, Mr. Bartle, because the payment is made by Medicare. Okay? Medicare makes the payment, it goes into the Bank of America account, and then I'm assuming that SCM Specialty Finance somehow is able to access that money and have it transferred into an account that it controls to repay it for the line of credit that you may have -- advances that you may have taken?

A. That's accurate.

Q. Okay. Does SCM management get a percentage of



800.211.DEPO (3376)
EsquireSolutions.com

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
109

the deposits that -- in other words, if it -- if $100,000 is transferred from Bank of America into SCM Specialty Finances account to repay advances on the line of credit, does it -- does all of that money go toward repaying advances, or does SCM Finance get a certain percentage of that as a fee?

A.   Well, the fee that they receive is set forth in the loan agreements.  First of all, SCM only advances 85 percent of the face value of the claim.  And so they withhold 15 percent of what I call "par value" of the claim in order to ensure collections come in; and then they do take a fee, a monthly fee, that shows up on the fee statement.  It's about an 8 percent annual percentage rate of return; plus they get a small monitoring fee, you know, on a monthly basis depending on what amount of money is outstanding.  But I can't recite all the terms of the agreement because it's a 50 page agreement, but all of the terms are set forth in the agreement.

Q.   Thank you.  All right.

MR. TURNER:  I need clarification if you're talking about the nursing home operation or the ALF operation?  I --

MR. NEWHALL:  I assume -- Mr. Bartle can correct me if I'm wrong, but I'm assuming that at



least as far as Medicare payments are concerned, we're talking about the nursing facility since the assisted living facility would not entitle anyone to Medicare benefits.

THE WITNESS:  That's correct.  We're only talking about skilled nursing.

MR. TURNER:  Okay.  Same objection.

THE COURT REPORTER:  I'm sorry.  Did you say --

BY MR. NEWHALL:

Q.    And the --

THE COURT REPORTER:  Hold on.  Hold on.  Just a second.

Mr. Turner, did you just object?  I couldn't hear you.

MR. TURNER:  I just said "same objection."

THE COURT REPORTER:  Thank you.  That's fine.

MR. TURNER:  I just think all of this is unrelated.

THE COURT REPORTER:  Thank you.  I just couldn't hear you.

MR. TURNER:  He can go ahead and ask whatever he wants to so we get it behind us.

BY MR. NEWHALL:

Q.    How much time in the past -- since -- we'll



ESQUIRE
SOLUTIONS

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
111

let's say over the past six months have you spent at University Village?

MR. TURNER:  Wait just a moment.  Let's be clear.  When you say "University Village," are you asking him about the CCRC, or are you asking about the nursing facility?

MR. NEWHALL:  That's an excellent point, Steve.

BY MR. NEWHALL:

Q.   How much time have you spent at the entire University Village Campus, including the independent living facility, the skilled nursing facility, and the assisted living facility?

A.   Well, I mean, a lot in the last six months because there was a lot of transition issues going on. So I spend two weeks a month in Florida with this project and a couple of other related projects.  And so a lot of the time is spent at skilled nursing.

I do attend board meetings at the IL when I'm requested to attend board meetings.  But there's been a lot of activity at the SNF ALF over the last couple of months with AHCA, so we've had to kind of bear down on some thing over there and it's taken up a lot of time.

I'm also involved with labor negotiations with the FCIU, and those are meetings every other week with

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
112

the delegates and the union organizers.  So I spend quite a bit of time, you know, at the skilled nursing and the assisted living, not so much in IL.

Q.   Do you exercise any personal direction or control at any time over any of the operations of the independent living facility?

A.   Well, at the point in time when AgeWell and BVM and Americare were comanaging the property, I, and the other people that I spoke of, were involved in communications frequently -- maybe not daily, maybe not even weekly, but frequently -- about making sure that we're meeting our goals on occupancy and sales and renovations.

Q.   All right.  Bear with me just one moment -- I'm very close to being finished -- if you would.

Sir, are you at all involved in the independent audit of the CCRC that's being undertaken by an accounting firm?

A.   I am.

Q.   What's your involvement?

A.   Well, the involvement is that the auditors owe a report, you know, to the OIR and a report to our lenders, and I have been questioned by the lead auditor, Greg Hathorne, and the tax return preparer, Mark Joyce, on certain closing transactions and allocation



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
113

transactions to do the opening balance sheet, so that's my involvement.

Q. Mr. Bartles, have you ever declared personal bankruptcy?

A. I have never declared personal bankruptcy where it resulted in the discharge of creditors.

Q. All right. That's a clarification. Could you explain that for me?

A. Yes. I was involved in an involuntary Chapter 11 in which there was a discharge, but I didn't voluntarily declare bankruptcy that resulted in the discharge of creditors.

Q. You were forced into bankruptcy by creditors?

A. Three creditors.

Q. And this is not a business that you're affiliated with. This was you personally?

A. Well, the result -- it was a business. The problem is I was a grantor of business debt.

Q. Oh, okay. Was this the -- I believe it's the Skyline Villas CCRC?

A. No, no. The involuntary bankruptcy --

Q. This was the -- okay. An involuntary personal bankruptcy. Was a receiver appointed in that involuntary personal bankruptcy?



A.   No, there was a trustee appointed.

Q.   That's routine, is it not?

A.   It is.

Q.   Tell me about the -- what was Skyline Villas? Is that a continuing care retirement community as it would be defined in Florida?

A.   No.  That was a --

Q.   What was that?

A.   It was a rental community where people paid rent a month in advance; or if it's Medicaid, a month in arrears; and BVM made an acquisition -- tried to make an acquisition of that asset, and it failed.

Q.   And did that facility, Skyline Villas, declare bankruptcy, file for bankruptcy?

A.   Well, the legal name was Skyline Manor, Inc., and it --

Q.   I'm sorry.  Skyline Manor.  Did Skyline Manor file for bankruptcy?

A.   It did.

Q.   And was at least initially did the operators of Skyline Manor continue as debtor in possession?

A.   Initially that was true.

Q.   And was -- at the request of a creditor was a receiver subsequently appointed in the Skyline Manor bankruptcy case?



A.   At the request of the creditor's committee and the secured creditor, a receiver was appointed.

Q.   Did -- what was your -- John Bartle's -- personal involvement with the operations of Skyline Manor?

A.   Well, I was the chief restructuring officer for Skyline Manor attempting to rescue it from its financial problems.

Q.   Did the federal judge or the bankruptcy judge handling the bankruptcy called Skyline Manor make findings that accused you of any sort of financial irregularity or dishonest behavior?

A.   I was there -- I was there in the courtroom. I didn't hear the judge accuse me of anything. The judge simply ruled it was the best interest of the debtor and the debtor's estate to appoint a receiver.

Q.   Have any of the other facilities that you've been involved with through BMV Management, Inc., ever declared or filed for bankruptcy?

A.   No.

Q.   Have you ever been convicted of a felony?

A.   No.

Q.   Have you ever been convicted of a crime that would involve dishonesty or false statement?

A.   I don't even know what that means. I have not



been convicted of a felony so that --

Q.   Burglary, for example.

A.   Burglary, no.  I don't know what --

Q.   Not burglary.  Forgery, you know, petit theft according to some states, things like that?

A.   No.

Q.   Bear with me just one more minute.  I may be finished.

MR. NEWHALL:  Mr. Bartle, I don't have any further questions, sir.  Thank you for your time.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MR. TURNER:

Q.   Mr. Bartle, let me ask you one question about the loans.  Is the loan of $15 million connected with the nursing LLC or the nursing LP, is that something that the SNF and the ALF have to meet and pay?

A.   Yes.

Q.   So that $15 million burdens the SNF and the ALF, and it doesn't burden the ILF, the CCRC facility.

A.   That's correct.

Q.   Is that true?

A.   That's correct.

Q.   Did the lender, to your recall, want there not to be cross-collateralization or mixing of the two



loans?

A.    Yes.    Both lenders, CPIF and USAmeriBank, wanted their own mortgages on their own properties and no cross-collateralization.

Q.    Right.    Right.

Do you want to say anything further regarding the Skyline that we've heard so much moaning and groaning about?    Is there anything you want to say about that that you haven't said already?

A.    Well, sure.    Our business is -- primarily the practice that I'm in is dealing with troubled assets. And I'm the one, myself and one other lawyer and another businessman, we're in the special practice of troubled assets.    And sometimes it works out when you're going in to help a debtor; sometimes it doesn't.

Skyline was a case where there was just a recalcitrant lender and a sympathetic judge, and it just got to the point where that asset was no longer worth fighting for and the price got a little bit too high. So the partners involved in the decision-making and the lender involved with us decided that it was time to walk away from that transaction and not bid on it.

Q.    That was a matter that the lender wanted its money in a certain amount and the facility couldn't make the payments --



A.   That's correct.

Q.   -- more or less?

A.   The lender had --

Q.   And is that the situation here with the ILF that we're talking about?

A.   No, sir.

Q.   Is there any problem of fulfilling your debts and paying your lender that you've refinanced for?

A.   No.  The payments are current on both loans.

MR. TURNER:  All right.  That's all I have, Tim.

MR. NEWHALL:  Okay.  Just a couple of follow-up.

REDIRECT EXAMINATION

BY MR. NEWHALL:

Q.   Mr. Bartle, didn't Mr. Freiden come in and make a bid for the Skyline Manor property from the receiver that was appointed?

A.   I -- that's a question you'll have to ask Mr. Freiden.  I was not present during any bid process; and Mr. Freiden has other clients besides, you know, BVM.

Q.   Were you in any way connected with Mr. Freiden's bid for the Skyline Manor project?

A.   Again, I was not a part of the bid process.



According to the court records that I reviewed on PACER, there was only one bid and that was the successful bid.

Q.   Was BMV Management at all associated with the bid that Mr. Freiden made for Skyline Manor?

A.   Well, again, I only saw one bid, it was the stalking horse bid that was the bid that was successful. I did not see another bid. I don't think there was another qualified bid based on my reading of the records on the PACER system.

Q.   Did Mr. -- I'm sorry --

MR. TURNER:   I thought he might want to clarify whether that bidder was BVM or somebody else?

BY MR. NEWHALL:

Q.   Who was the qualified bidder, "the stalking horse," as you described it?

A.   Well, it was an affiliate of an operating group out of California called Ensign, E-n-s-i-g-n; and they formed an affiliate to take fee simple title and then managed the property. They were the stalking horse bidder and according to the court records that I reviewed, there was no other qualified bid.

Q.   Did Mr. Freiden make an unqualified bid, to your knowledge?

A.   You'll have to ask Mr. Freiden.



JOHN W. BARTLE, JR.
STATE OF FLORIDA vs. WESTPORT

April 22, 2015
120

Q.    I will.  Did BMV Management get involved with Mr. Freiden or anyone else in making a bid on Skyline Manor that was not accepted or was not deemed to be qualified?

A.    BMV Management did not make a bid.

Q.    Did any corporate entity with which you have any affiliation make any sort of a bid, qualified or otherwise, on the Skyline Manor project to buy it from the receiver?

A.    The only involvement that BVM had or that I had was prior to the Chapter 11 filing there was a term sheet released by Mutual of Omaha Bank to refinance the outstanding indebtedness, and I saw that term sheet. But during the bankruptcy and during the sale process, the stalking horse process, neither I nor BVM or anybody that I know of at BVM made a qualified or unqualified bid for the Skyline asset.

Q.    The skilled nursing facility and the assisted living facility are located in the same building that is adjacent to the independent living facility.  Is that correct?

A.    Well, there's a city street known as North 22nd Street that separates the ALF and SNF from the IL.

Q.    Okay.  So the assisted living facility and the skilled nursing facility are directly across the street



from the independent living facility?

A.    That's correct.

Q.    And as you've already discussed, the resident contracts, so they're life care contracts, based upon certain conditions -- that is medical necessity, medical ability, and available bed -- are guaranteed access to that assisted living facility and that skilled nursing facility directly across the street.  Is that right?

MR. TURNER:  Objection; it's been asked, fully discussed, it's inconsistent with prior testimony, and it's beyond the scope of direct, and I'd like to move on and get this matter resolved and move on to the next.

MR. NEWHALL:  Then stop talking and let him answer.

MR. TURNER:  I'm not going to let him answer something that's improper predicate.  I think he's already explained fully what those agreements do, and I think it's in the record, and this is repetitive testimony and beyond the scope of direct -- beyond the scope of cross.  I think --

MR. NEWHALL:  Steve, please accept my apology.  Okay.

MR. TURNER:  Well, I don't think we need to go where we've already been.  I think he's been there,



this is full explanation, and this is not anything related to my cross-examination.

MR. NEWHALL:  That was a sincere apology to you; and I'm just a little tired and cranky, and I was out of line.

MR. TURNER:  I think we should move on.  I just think he's done a good job of laying this out for you.

BY MR. NEWHALL:

Q.   So would you agree with me that if the skilled nursing facility or the assisted living facility runs into financial difficulty, that that is going to impact potentially the rights of the residents under their continuing care contract?

A.   No.

MR. TURNER:  Object.

BY MR. NEWHALL:

Q.   You do not believe that the financial difficulties, assuming they develop in the skilled nursing facility or the assisted living facility, would jeopardize the contractual rights of the residents?

A.   The promise that's made to the resident by the independent living organization is a promise to discharge that resident to an appropriate level of care and to pay a monthly fee up to a lifetime benefit.



There is no reciprocal promise by the SNF ALF.  It's a promise only by and between the independent living provider and the resident, and that's what the contract says.

Q.   And we -- I believe that under the current access agreement -- well, strike that.  Never mind.

MR. NEWHALL:  I don't have any further questions.  Thank you.

MR. TURNER:  Okay.  John, I assume you want to read this.  Is that correct?

THE WITNESS:  Signature, yes.

MS. SMALL:  Yeah, he wants to read.

MR. TURNER:  Are you ordering this deposition?

MR. NEWHALL:  Yes, I am.

MR. TURNER:  So I guess --

MR. NEWHALL:  And did my assistant discuss the delivery arrangements with you, Madam Court Reporter?

THE COURT REPORTER:  Yes.  I believe you want it by Friday, plus a rough ASCII.  Am I correct?

MR. NEWHALL:  Yes.

THE COURT REPORTER:  Did you want the same thing, Mr. Turner?

MR. TURNER:  You've got to get it to the witness, do you not, for him to review?



JOHN W. BARTLE, JR.
STATE OF FLORIDA vs. WESTPORT

April 22, 2015
124

THE COURT REPORTER:  Yeah.  Yeah, I'll get it to the witness.

MR. TURNER:  I do want him to be able to sign it.  If we're going to use this, I want him to be able to review it.

MR. NEWHALL:  He's asserted his right to read it, and I want him to have that right.

MR. TURNER:  I'm trying to figure out how to mechanically get it to him.

MR. NEWHALL:  That's fine.

MS. SMALL:  Steve, you want a copy then. Right?

MR. TURNER:  Yeah, I think we should have a copy.

THE COURT REPORTER:  I'll get the witness's e-mail, which I think we said on the record anyway, but I'll get his e-mail, and I'll have Esquire send him a copy via e-mail.

(The reading and signing of this deposition is not waived, and the taking of this deposition concluded at 3:33 p.m.)



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
125

DEPOSITION ERRATA SHEET

Our Assignment No. 323880

Case Caption:  State of Florida vs. Westport Holdings, Tampa

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20___.

_____
JOHN WILLIAM BARTLE, JR.



JOHN W. BARTLE, JR.                                    April 22, 2015
STATE OF FLORDA vs. WESTPORT                                      126

DEPOSITION ERRATA SHEET
ESQUIRE JOB NO. 323880

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

SIGNATURE:_____DATE:_____
        JOHN WILLIAM BARTLE, JR.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT
April 22, 2015
127

DEPOSITION ERRATA SHEET
ESQUIRE JOB NO. 323880

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

SIGNATURE:_____DATE:_____
          JOHN WILLIAM BARTLE, JR.



JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
128

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Jennifer Figueroa, Registered Professional Reporter, certify that I was authorized to and did stenographically report the foregoing deposition, Pages 1 through 124; and that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 24th day of April, 2015.



Jennifer Figueroa, RPR

JOHN W. BARTLE, JR.
STATE OF FLORDA vs. WESTPORT

April 22, 2015
129

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Jennifer Figueroa, Registered Professional Reporter, Notary Public, State of Florida, certify that JOHN WILLIAM BARTLE, JR., personally appeared before me on the 22nd day of April, 2015, and was duly sworn.

WITNESS my hand and official seal this 24th day of April, 2015.

Identification:

Personally known __ or produced identification X.

Type of identification produced:

Florida driver's license.



Jennifer Figueroa, RPR
Notary Public, State of Florida
Commission No.: EE 848734
Commission Expires: 03/02/2017

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com