UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEBRASKA

IN RE:                          .     Case No. 14-80934-TLS
                                .
SKYLINE MANOR, INC.,            .
                                .     111 South 18th Plaza
                                .     Suite 1125
                                .     Omaha, NE 68102
                                .
        Debtor.                 .
. . . . . . . . . . . . . . ..        May 29, 2014
                                      1:05 p.m.

TRANSCRIPT OF TESTIMONY OF JOHN BARTLE
BEFORE HONORABLE THOMAS L. SALADINO
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 Stinson Leonard Street LLP
                                By:  ROBERT V. GINN, ESQ.
                                     PATRICK RAYMOND TURNER, ESQ.
                                1299 Farnam Street, Suite 1500
                                Omaha, NE  68102

For the U.S. Trustee,           Office of the U.S. Trustee
Patricia Fahey:                 By:  JERRY L. JENSEN, ESQ.
                                111 South 18th Plaza
                                Suite 1148
                                Omaha, NE  68102

Audio Operator:                 Cheryl B.

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@jjcourt.com

(609) 586-2311      Fax No. (609) 587-3599


PLAINTIFF'S EXHIBIT
Bartle #176
4-20-23 DK

2

APPEARANCES (CONT'D):

| | |
|---|---|
| For Oxford Finance LLC: | Katten Muchin Rosenman LLP<br>By:  PAIGE E. BARR, ESQ.<br>        KENNETH J. OTTAVIANO, ESQ.<br>525 West Monroe Street<br>Chicago, IL  60661 |
| | Abrahams Kaslow & Cassman LLP<br>By:  ROBERT M. SCHARTZ, ESQ.<br>8712 W. Dodge Road, Suite 300<br>Omaha, NE  68114 |
| State of Nebraska, Office of the Attorney General: | Office of the Attorney General<br>By:  ABIGAIL MARIE STEMPSON, ESQ.<br>2115 State Capital<br>Lincoln, NE  68509 |
| For Official Committee of Unsecured Creditors: | Pepper Hamilton LLP<br>By:  FRANCIS J. LAWALL, ESQ.<br>3000 Two Logan Square<br>18th & Arch Streets<br>Philadelphia, PA  19103 |
| Skyline Foundation, Inc.: | Young & White Law Offices<br>By:  KEITH I. KOSAKI, ESQ.<br>8742 Frederick Street<br>Omaha, NE  68124 |

3

# I N D E X

|                                              | PAGE |
|----------------------------------------------|------|

**WITNESS FOR THE DEBTOR**

JOHN W. BARTLE

| | PAGE |
|---|---|
| Direct Examination by Mr. Ginn | 4 |
| Cross Examination by Mr. Ottaviano | 14 |
| Cross Examination by Mr. Lawall | 42 |
| Cross Examination by Ms. Stempson | 47 |
| Redirect Examination by Mr. Ginn | 61 |

Bartle - Direct/Ginn                                    4

(The following is the requested excerpted portion of the proceeding)

JOHN W. BARTLE, DEBTOR'S WITNESS, SWORN

MR. GINN:  Your Honor, if I may, before we get started with Mr. Bartle, I would like to confirm with the Court that it is our agreement that we are not sticking on clear procedure here over who has rested their case or who has not.

THE COURT:  Correct.

MR. GINN:  As a matter of convenience we are putting Mr. Bartle on.  I am going to do a direct examination of Mr. Bartle.  It is a clear agreement with Mr. Ottaviano that his cross examination can exceed the scope of the original direct examination.

THE COURT:  Sure.

MR. GINN:  And I believe it is our clear agreement that the redirect may then go wherever it needs to go.

THE COURT:  All right.  Understood.

MR. GINN:  Thank you.

DIRECT EXAMINATION

BY MR. GINN:

Q    Would you please state your name for the Court, sir?

A    John W. Bartle.

Q    And where do you live?

A    9155 Sergeant Manor Court, Indianapolis, Indiana.

Q    What is your educational background, sir?

Bartle - Direct/Ginn                                          5

A     I have an associate's degree in accounting from Indiana Business College, and over 100 hours of advanced studies from Ball State University.

Q     You are -- or, let me rephrase this in a question fashion. Are you the chief executive officer, president, person in charge of BVM Management?  And you can perhaps elaborate on the exact corporate name and entity?

A     BVM Management, Inc. is a 64 year-old 501(c)(3) charitable purpose corporation.  I hold the title of manager of loss control and risk mitigation for that corporation.

Q     Are you the chief restructuring officer for the debtor in this case, Skyline Manor, Inc.?

A     Yes, sir.

Q     Please tell the Court about your experience in the healthcare industry?

A     I started in 1976 with the acquisition of a skilled nursing facility in Gas City, Indiana, and over the course of the next 35 years acquired or developed over 40 properties with a fair market value in excess of $500 million.

Q     At present, given your capacity with BVM, and I'm hopeful that we can just use the term BVM, and not have to go through the exact corporate name every time we mention it, how many healthcare and residential facilities does BVM under your general guidance direct or manage?

A     BVM has direct management or co-management over 54

Bartle - Direct/Ginn                                6

properties in five states.

Q    And what would be the approximately gross revenue of those facilities over the course of their, I'm sure, overlapping fiscal years?  If you could just sort of aggregate and give us an idea of --

A    It would be in excess of $200 million annually.

Q    How long has -- well, let's talk about the structure of Skyline.  At this point who is the manager of Skyline Manor, Inc., the debtor in this case?

A    BVM Management assumed the management contract from AmeriCare Communities III, LLC.

Q    All right.  Let's talk about AmeriCare Communities. Previous to -- at what point did BVM take over management from AmeriCare Communities?

A    I believe it was 2012.

Q    Prior to that could you explain to the Court what the structure, what the corporate structure that would show the Court sort of a -- a flow chart of responsibilities through BVM, AmeriCare and Skyline?

A    From a historical perspective our group, the BVM AmeriCare Group, was brought in to the property because the current non-profit board had failed in the operations and the property was under foreclosure actions by First National Bank.  BVM had -- and its affiliates had the ability to contact various lenders in which one of those lenders was Oxford Finance.  One of the

Bartle - Direct/Ginn                    7

conditions precedent to approving the loan was that the board needed to be reconstituted with business and professional people that are involved in the industry or real estate, and not lay members of the board, in order to ensure that Oxford's loan would likely be paid in full. And so, in fact, the board was reconstituted in late 2009.

Q    And --

A    And the board members --

Q    Excuse me. Go ahead.

A    -- the board members at that time consisted of Robert L. Rynard, Sr. as chairman, Dana Huth as treasurer, Rebecca Bartle as secretary. And there were three other -- the other board members were Paige Harvey and David Richey.

Q    Would you please explain -- were those directors directly involved in the operations of the debtor?

A    At the time they were involved in the restructuring of the debt, and the reconstruction of the operations. David Richey works for a public company, or large company known as Senior Lifestyles Corporation out of Chicago. And Mr. Rynard has an extensive background in real estate. Rebecca Bartle, my wife, has 30 years experience as a nurse with her master's degree and health facility administrator's license, both in Indiana and Nebraska. And so -- and Dana Huth is an accountant with an accounting degree and her own private accounting practice. So, the board members were chosen because of their skill sets and

Bartle - Direct/Ginn                                    8

the -- it was necessary at the time, I think, to impress upon Oxford that there was professional people running the operation rather than a non-profit lay board.

Q    With respect to the debtor, would it be fair to state that you believe that the operations of the debtor are divided into at least two separate functions, those being the healthcare and primary -- and the primary concern, the care of the aging population, and the other being the actual -- actual financial management of the company?

A    I would -- I would add to that corporate governance.  I think it breaks down to financial management, corporate governance, and then the -- obviously the most important piece is the continuation of the healthcare, what's expected of the residents on the premises.

Q    At present who is responsible for I think what we all consider to be the primary purpose of the debtor, which is the healthcare of the patient population?

A    Sandy Leimur, as I'm sure you heard her testimony, is the chief executive director of the healthcare actions at the premises.  She reports to BVM Management personnel, who assumed the management contract from AmeriCare Communities III, LLC.  So, she communicates with the BVM personnel on a weekly basis.

Q    How long have you been involved in the healthcare industry, sir?

A    Since 1976.

Bartle - Direct/Ginn                                    9

Q    And does that involvement include supervision of and knowledge of reasonable standards of care for facilities under your control?

A    It does.

Q    In your professional opinion at this point how would you judge the care being provided to the patient population at Skyline Manor?

A    The statement of deficiencies actually from the most recent survey that Ms. Leimur spoke of that occurred a couple weeks ago just came to Skyline.  It was sent to us on electronic format to the BVM Group yesterday.  And of the 175 possible deficiencies that could be called by the survey team only one deficiency was actually cited on a minor medication error.

Q    Was there a time when Skyline was cited for substantial deficiencies?

A    Yes.

Q    When was that time?

A    That time was in early 2013, when the Nebraska Department of Health and Human Services discovered that there had been a significant weight loss on one of the residents that was not reported by the administrator, and apparently no action taken to mitigate the circumstance from occurring in the future, and that survey didn't go well.

Q    Were those circumstances subsequently corrected?

Bartle - Direct/Ginn                          10

A     Yes, they were.

Q     To the approval of the Nebraska Department of Health and Human Services?

A     Yes.  On December 3rd, 2013, the facility received its letter stating it was in substantial compliance under Nebraska and federal regulations.

Q     Does the debtor remain under a -- without knowing terms of art, a -- some sort of disciplinary order?

A     The current license is in a probationary status and will remain that way until the next annual survey for the property occurs.

Q     But is it my understanding it cannot be corrected until that annual survey?

A     That is correct.

Q     It will simply remain in situs until that time?

A     That is correct.

Q     Much has been made -- well, actually, very little has been made about the involvement of the debtor with affiliates, members of your family -- I'll simply leave it at that and ask the question that it generates.  Could you just, in general terms, tell us how various members of your family interrelate with both BVM in general and Skyline specifically, and what actual remuneration any of them may or may not receive from Skyline?  I'm not concerned about what they received from BVM. That's another issue.  But could you just be specific with

Bartle - Direct/Ginn                           11

regard to that?

A    Well, in 2013 or 2014 I'm not sure there's any family member receiving any money, you know, from Skyline itself.  The -- during 2011 and 2012 BVM made acquisitions of several properties, and the BVM platform of employees and board members expanded dealing with the five states that BVM conducted its business in.  So, at the present time there's no family member receiving compensation from Skyline Manor, Inc.

Q    Let me restate that question.  Subsequent to the entry into of the financing arrangement with Oxford, has any substantial sum of money been paid to any family member of yours without equal consideration of services rendered being performed?

A    No.

Q    I believe there was prior testimony that in October of 2013 revenues fell and there were unsubstantiated allegations at Skyline, and there were unsubstantiated allegations and no particulars about conversion of funds.  Have you ever diverted funds from Skyline Manor for any purpose other than the maintenance of the welfare of the patients at Skyline?

A    And -- and/or the property the answer is no, I have not.

Q    Can you explain the dropping revenues during that time period?  Which I believe to be, and I'm not entirely clear, October/November of 2013?

A    During the survey revisit cycle in 2013 the revenues fell

Case 14-80934-TLS    Doc 257    Filed 06/27/14    Entered 06/27/14 10:26:21    Desc Main
Document    Page 12 of 68

Bartle - Direct/Ginn                    12

because the skilled nursing facility lost approximately 15 residents on an average daily census at the rate of about $5,000 in revenue per month for each resident, or $75,000 a month.  So, the revenue dropped, you know, during that period of time while there was a denial of payment for new admissions until the facility achieved survey compliance.

Q    Have you in particular, BVM in general, and Skyline in general, negotiated in good faith with Oxford to try to find alternative financing sources or a purchaser for the debtor's facility?

A    Yes.  I presented John Toufanian and other members of the Oxford team with a financing proposal from Forrest Newburg, a loan officer at First National -- or, excuse me, at Mutual of Omaha Bank, and also arranged for Oxford to have a telephonic conference call with Mr. Newburg to validate their interest in financing the property.

Q    Do you have negotiations presently undergoing with other potential sources to either refinance, and when I say refinance I mean take out Oxford, or purchase the property?

A    Yes.

Q    Do you believe those are realistic and could be brought to fruition in a reasonable amount of time?

A    I do.

Q    Are you aware of a recent audit, survey -- I'm not sure of the term of art, conducted by the Nebraska Health and Human

Bartle - Direct/Ginn                                              13

Services division of the Skyline facility?

A    I am aware of that.  Yes.

Q    Have you been given a copy of the results of that survey?

A    Yes.

Q    Have you read it?

A    Yes.

Q    Could you tell the Court generally what the results of that survey were?

MR. OTTAVIANO:  Your Honor, I'm going to object.  If there are paper documents out there that show these results and they're currently not on line or available to us, I would object to the witness testifying as to what they say.  The best evidence rule, where's the evidence?

THE COURT:  Or hearsay.

MR. OTTAVIANO:  Or hearsay, too.

THE COURT:  Mr. Ginn, is this -- can you explain where this survey results --

MR. GINN:  Well, yes, Your Honor, the exact same testimony that Ms. Leimur gave, the Department of Health and Human Services did a surprise audit of the premises with four inspectors over a two-day period, and found one non-substantive violation, and I guess I'll withdraw the question.

THE COURT:  Since you just testified to that.

MR. GINN: I just did.

THE COURT:  All right.

Bartle - Cross/Ottaviano                    14

MR. GINN:  Your Honor, reserving, per our agreement, all rights to redirect, I have no further questions at this time.

THE COURT:  Thank you.  Mr. Ottaviano, are you first?

MR. OTTAVIANO:  Yes, Your Honor.

THE COURT:  Or second, or third?

CROSS EXAMINATION

BY MR. OTTAVIANO:

Q    Mr. Bartle, are you currently in charge of BVM Management?

A    In charge?

Q    Yes.  Is BVM -- what's your title at BVM Management?

A    Risk Mitigation Loss Control Director.

Q    And you make approximately how much per year?

A    70,000.

Q    And you're not on the board of directors, correct?

A    I am not.

Q    And with respect to Skyline, you are the chief restructuring officer of Skyline, is that correct?

A    That is correct.

Q    And you're not on the board of Skyline, is that correct?

A    That is correct.

Q    And my understanding is BVM, or AmeriCare is a for profit company, correct?

A    We'll have to agree on the definition of AmeriCare. AmeriCare Partners is a subsidiary of -- and as a matter of

Bartle - Cross/Ottaviano                               15

fact, as my signature on my e-mail, AmeriCare Partners is a subsidiary division of BVM Management, Inc.  AmeriCare Communities III, LLC was organized as an Indiana limited liability company for profit.

Q    And AmeriCare Communities has been merged into BVM Management, is that correct?

A    Correct.

Q    And it no longer is in existence since 2012?

A    I think that's correct.  That's right.

Q    And you testified earlier that the -- well, with respect to that merger can you tell me, did the BVM board of directors vote on that merger?

A    I'm sorry.  Could you repeat the question?

Q    Did the BVM board of directors vote on the merger with AmeriCare?

A    It was an acquisition, actually.  It was an assignment of a management contract, and just an acquisition.  It wasn't a statutory merger, per se.

Q    Did BVM Management pay any money to AmeriCare for --

A    $10.

        THE COURT:  Try and let him finish asking his question before you answer, because you talked over him there. Can you repeat your answer?

        THE WITNESS:  I'm sorry.  The --

        THE COURT:  Your answer to that last question was

Bartle - Cross/Ottaviano                          16

some amount of dollars.

THE WITNESS:  I'm sorry.  It's $10.

THE COURT:  Okay.

Q     And, once again, to your knowledge, did the BVM Management board of directors vote to approve the acquisition of AmeriCare Communities III, LLC for $10?

A     Yes.

Q     And did AmeriCare Communities III, LLC's board of directors approve the sale to BVM Management for $10?

A     It has no board of directors.

Q     AmeriCare Communities III, LLC never had a board of directors?

A     It's not recorded to have a board of directors under Indiana statute.

Q     Does it have a managing member?

A     It does.

Q     And who was that managing member?

A     The managing member, I believe, was Compliance Concepts, LLC.

Q     And who is Compliance Concepts, LLC?

A     It's Rebecca J. Bartle is the managing member of Compliance Concepts, LLC.

Q     And is Rebecca Bartle also on the board of BVM Management?

A     She is.

Q     Let's move on to the board of directors of BVM Management.

Bartle - Cross/Ottaviano                    17

BVM Management's board of directors is comprised of whom?

A    Presently it's Robert Rynard, Sr., Rebecca J. Bartle, Dana Huth, Paige Harvey, and I believe Ed Fadray (phonetic). Strike that.  Ed Fadray, not Paige Harvey.

Q    Ed Fadray, and not, I'm sorry?

A    And not Paige Harvey.

Q    Just to be clear, so, Paige Harvey is not on the board of BVM Management?

A    I don't believe so.

Q    And who is on the board of Skyline Manor?

A    Robert L. Rynard, Sr.  Presently it's Robert L. Rynard, Sr., Rebecca J. Bartle, Dana Huth and Paige Harvey.

THE COURT:  Earlier you said a David Richey also.

THE WITNESS:  He was originally, and he resigned in 2013.

Q    And is Skyline Manor considered an affiliate of BVM in your mind?

A    It's an affiliate for federal tax reporting purposes, yes.

Q    And why is it considered an affiliate for federal tax purposes?

A    Because of common control.

Q    Can you explain what common control means?

A    A common board of directors, common corporate governors, (indiscernible) board of directors.

Q    So, it gives you the ability to file a consolidated 9900

Bartle - Cross/Ottaviano                    18

(sic), correct?

A    That's what I'm told by the accounting firm.

Q    But other than the ability to file a consolidated 990, or 990 form, it gives you no ownership control, is that correct?

A    That's correct.

Q    And this affiliation, this was approved by the Skyline board of directors?

A    Yes.

Q    And it was also approved by the BVM board of directors?

A    Yes.

Q    Let's talk about Mr. Rynard.  Mr. Rynard is currently on the board and is president and chairman of BVM, correct?

A    That is correct.

Q    And Mr. Rynard is currently the president and chairman of the board of Skyline, correct?

A    That is correct.

Q    And Mr. Rynard currently receives $5,000 per month for his board services for sitting on the board of Skyline Manor, is that correct?

A    I'm not sure that's what his compensation is for, but he does receive $5,000 a month.

Q    And Mr. Rynard has been president and chairman since 2009, is that correct?

A    Since, I think, November 2009, yes.

Q    And Mr. Rynard, to your knowledge, has been out at the

Bartle - Cross/Ottaviano                              19

facility one time, is that correct?

A    That is correct.

Q    And Mr. Rynard -- is he an employee of BVM?

A    He is not.

Q    Why does he carry a business card with BVM -- a BVM business card?

A    Well, because he is affiliated with BVM, and oftentimes he is in meetings where BVM is conducting its business.  Mr. Rynard's background is construction and real estate, and oftentimes he represents BVM.

Q    Did you have an opportunity to ever look at the article and bylaws of Skyline Manor?

A    No.

Q    Would it surprise you that direct payments to board members is strictly prohibited by the articles of corporation?

A    It would not surprise me.

Q    Let's talk about Dana Huth.  She is a BVM employee, is that correct?

A    She is a BVM employee and maintains her own accounting practice, as well.

Q    And she is paid approximately $70,000 by the BVM?

A    That is correct.

Q    And that $70,000 in compensation, is that money then allocated across to other companies that are managed by BVM?

A    Allocated across?

Bartle - Cross/Ottaviano                    20

Q    Well, who pays the $70,000?  Does it come straight out of BVM's pocketbook, or does BVM then turn around and charge Skyline?

A    No.  It comes directly from BVM.

Q    There is no allocation involved?

A    There is no allocation involved unless the accountants allocate part of the BVM overhead on cost reports.  It wouldn't be permitted.

Q    And Paige Harvey is your daughter, is that correct?

A    She is.

Q    And she is also a board member of Skyline?

A    Of Skyline.  That's correct.

Q    And she was paid $2,000 in February of 2013.  Do you know what that was for?

A    I think for consulting services on -- she has -- her degree is in interior design, and so I believe she was paid for consulting services as we sought to remodel the second floor of the manor building.

Q    And who did she consult with?

A    Lou Jackson (phonetic), myself, and I think Dave Richey and Ed Fadray.

Q    Did she ever go out to the facility?

A    No.

Q    And you mentioned that Dave Richey is no longer on the board.  Is that correct?

Bartle - Cross/Ottaviano                    21

A     That is correct.

Q     And when did Mr. Richey resign from the board?

A     Some time in 2013, if I recall.

Q     Do you recall why Mr. Richey received over $4,000 in payments from Skyline Manor in 2013?

A     Yes.  David was hired to review the budgets for the independent and assisted living.  He operated the 350-unit CCRC in a continuing care retirement community in the Cincinnati area, and we sought David's review of the budget to compare it with his budget to see if there were any ways to change things and make the facility more economical.

Q     And who is Whitney Buckles (phonetic)?

A     Whitney Buckles is my daughter.

Q     And her company is SBW Enterprises, LLC, is that correct?

A     I don't know who owns SBW Enterprises, LLC.

Q     Do you know if her and her husband own it?

A     I don't know who owns it.

Q     Do you know who her husband is?

A     I know her husband is named Scott Buckles.

Q     And is he an employee of BVM?

A     No.

Q     Did Scott Buckles ever receive any money from Skyline?

A     Personally not that I've seen.

Q     Would it surprise you that SBW Enterprises, in fact, incorporated in Florida, and is an entity that is jointly owned

Bartle - Cross/Ottaviano                                     22

by your daughter and her husband?

A    It would not surprise me.

Q    How much is your wife paid from BVM, $130,000 per year, is that correct?

A    Approximately.

Q    And is any part of that $130,000 attributable to Skyline?

A    Part of her responsibility is overseeing the clinical aspects of the survey process and the daily activities of Skyline includes her to be on call every day of the year for Skyline Manor, as she is.

Q    How much of that $130,000 is attributable to Skyline?

A    I don't think there is anything attributable.  Part of her -- the scope of her work is to oversee a number of facilities where she has clinical oversight for the regulatory process. And so, she gets paid a salary and she follows a job description.

Q    And so, BVM just pays the $130,000 to her and doesn't seek reimbursement from Skyline, is that correct?

A    That's correct.  Skyline's contribution to that was through the management fee process.

Q    Earlier you testified that AmeriCare Communities III was merged into BVM in 2012, and the contract was assigned to BVM, is that correct?

A    Well, acquired.  It was acquired.

Q    I'm sorry.  Acquired.  You are correct.  But AmeriCare

Bartle - Cross/Ottaviano                    23

Communities III, LLC, from January 1st of 2013 through April 30th, 2014, received over $518,600, is that correct?

A     I am not aware of that.

Q     And what was the average monthly fee for BVM Management for January of 2013 through April of 2014?

A     The fee?

Q     The management fee.

A     Oh.  The management fee?  The management fee would have been five percent of the gross revenue for any particular month.

Q     The current payroll company is U.S. -- the current payroll company for Skyline Manor is U.S. Holding B&J LLC, is that correct?

A     Yes.  It's a personnel and H.R. company based in Florida.

Q     And it's 90 percent owned by Rebecca Bartle, correct?

A     That is correct.

Q     And it's ten percent owned by yourself, is that correct?

A     At the present time that is correct.

Q     And the managing member of the payroll company -- or strike that.  The managing member of U.S. Holding B&J LLC is Rebecca Bartle, correct?

A     That is correct.

Q     And part of the services that -- well, there is a contract between Skyline and U.S. Holding B&J LLC, is that correct?

A     There is a contract.

Bartle - Cross/Ottaviano                    24

Q    And that contract includes withholdings for -- it includes U.S. Holding to withhold employee withholding and payroll taxes, is that correct?

A    Correct.

MR. OTTAVIANO:  What number is the contract?

(Pause)

MS. BARR:  NN.

MR. OTTAVIANO:  Huh?

MS. BARR:  NN.

MR. OTTAVIANO:  NN?  I'd ask the Court to pull up Docket Number 125, please?

Q    Mr. Bartle, is this a copy of a contract between Skyline and U.S. Holdings B&J?

A    It appears to be the first page of the contract.

MR. OTTAVIANO:  Perhaps we can scroll down through the document.  If you could please stop at the signature pages?

THE COURT:  No.  Back up.  Okay.  Thank you.

Q    Mr. Bartle, who is Jarred McKeown (phonetic)?

A    Jarred McKeown is our operations and personnel services director at the U.S. Holding B&J location in Florida.

Q    And are you related to Jarred McKeown?

A    He is my stepson.

Q    And that signature on this document is on behalf of U.S. Holding B&J LLC.  Does Jarred McKeown own any interest in that entity?

Bartle - Cross/Ottaviano                    25

A    No.

Q    And what is his title at that entity?

A    He is director of personnel services and grounds and maintenance and maintenance at the property in Florida, and he also serves in the collateral role of U.S. Holding B&J.

Q    And who's signature -- who signed on behalf of Skyline?

A    Skyline is the client.  It's Robert L. Rynard, Sr.

Q    The chairman and president of the board of Skyline, is that correct?

A    That's his title.  Yes.

Q    Is that his signature?

A    That's his name.

Q    I'm asking if you recognize his signature.

A    I recognize his name.

Q    I'm asking if you recognize his signature.

A    Well, he has at least two signatures.  One is on a facsimile stamp, and one is his signature.  So, I know of at least two signatures that he has.  I didn't sign the document for him, so I don't know.

Q    I'm going to ask the question again.  Do you recognize this signature as either a stamped signature that you're aware of, or his handwriting?

A    It could be a stamped signature.

Q    And who has -- where is the stamped signature of Mr. Rynard located?

Bartle - Cross/Ottaviano                                    26

A    It's in the possession of Jerry Long (phonetic) and attorney Dane Starbuck.

Q    So, two people have a stamp with Mr. Rynard's name on it, is that correct?

A    Well, two people have access to the same stamp.

Q    Okay.  Thank you for that clarification.  I appreciate that.

A    Okay.

Q    Did the board of directors approve this contract?

A    I'm not sure the board of directors approved the contract. There has been an employment company at Skyline since 2010, so it's the continuation of the same type of off-premise employment contract that has been on for the benefit of the Skyline employees since 2010.

Q    And the previous payroll company was what?

A    It was the Hancock Management Group, and later assigned to Lyons HR Inc.

Q    In fact, Lyons HR Inc. has a judgment against you personally and Skyline in an amount of over $290,000, is that correct?

A    That sounds correct.

Q    So, when Skyline sends the gross payroll to your company, U.S. Holding B&J, LLC, that company is responsible, through earlier testimony, of taking out the taxes and withholding, and submitting those to the appropriate authorities.  So I guess my

Bartle - Cross/Ottaviano                                   27

question is who checks up on U.S. Holding B&J to make sure that, in fact, those taxes are being paid along with the withholdings?

A    Who checks up?  You mean, like who at what entity?  To be clear, U.S. Holding B&J processes payroll and insurance withholdings and garnishments for about 15 properties.  Skyline is just one of them.  So, when you say who checks up, are you talking about at the U.S. Holding level?  Or are you talking about at the Skyline level?

Q    I'm talking about at the Skyline level.  When Skyline funds gross payroll there and U.S. Holding B&J, LLC is responsible or taking out the withholdings and the taxes and submitting those to the appropriate authorities, who on behalf of Skyline makes sure that those payments are, in fact, made?

A    I'm not sure it's anybody's responsibility at Skyline to do that, because it's a contracted service.

Q    So, just so I'm clear, you as the chief restructuring officer that has been delegated the responsibility by the board to basically monitor all the activities of Skyline, do not deem it necessary to check up to see if payroll taxes and other withholdings were taken out by a third-party payroll processor?

A    No, I don't.  If I pay you an insurance premium because you're my agent of record I don't check up to see whether you've paid that insurance premium to your parent company or to the actual insurance company.  It's a contract that I have with

Bartle - Cross/Ottaviano                      28

you as the agent of record.  So I don't look behind that contract.

Q    But at least you get a receipt in that situation.  Are you familiar with Rehab Associates, LLC?

A    To my knowledge it was a therapy company back in -- ten or 15 years ago.

Q    And isn't it true that the government obtained a judgment against you in the amount of seven thousand nine hundred thousand two hundred and seventy-five dollars and forty-nine cents for willful failure to collect, truthfully account for, or pay over income and federal insurance contribution taxes that were withheld from wages of employees of Rehab Associates?

        MR. GINN:  Your Honor, objection on the basis of relevance.

        THE COURT:  Overruled.

Q    I'm sorry.  It was 7.9 million.

A    I  don't -- I don't know.  If you're reading something that I can't see, I just don't know.

Q    Okay.  Well, perhaps we can turn to Tab DD, which has been marked as -- I'll get the docket number in one hour --

        THE COURT:  38.

        MR. OTTAVIANO:  38?  Thank you, Your Honor.

                        (Pause)

        MR. OTTAVIANO:  Oh.  I apologize, Your Honor.  It's Docket Number 121.

Bartle - Cross/Ottaviano                                29

Q    Mr. Bartle, can you please take a look at this document? It's already been admitted into evidence.  Do you recognize this judgment against you to the tune of $7.9 million?

A    Yes.

Q    Has the debtor opened up a DIP account yet?

A    The account was maintained under the instruction of our attorney based on Nebraska Federal District Court statutes. I'm not aware of whether it's a DIP account or not.

Q    So, just to be clear, there has been no separate bank account opened up with respect to the debtor-in-possession, correct?

A    Not that I opened up.

Q    And do you know if pre-petition creditors are still being paid?

A    I do not believe so, unless it's under the consent of Oxford.

Q    You currently have an account at Fifth Third -- or, strike that.  Currently Skyline has an account at Fifth Third Bank, correct?

A    That is correct.

        MR. OTTAVIANO:  Perhaps we can pull up -- what is Exhibit DVB-7?

        MS. BARR:  It would either be, I believe, in Docket Number 164 or 165.  This is not the one we were looking at. Can we try 165, just for the convenience of everybody?  And can

Bartle - Cross/Ottaviano                    30

you scroll towards the -- oh.  I'm sorry.  Scroll towards -- this is the document.

MR. OTTAVIANO:  Can you scroll down, please?

Q    You are aware that Skyline Manor filed for bankruptcy on May 8th, correct?

A    I believe that's correct.

Q    And, in fact, not only under the Bankruptcy Code but pursuant to a letter sent to the debtor by Oxford Finance, cash collateral was not to be used after the petition date, correct?

A    I don't know anything about the letter.

Q    Okay.  But were you informed not to pay pre-petition vendors upon filing?

A    I was not informed because I don't pay vendors.  That's not my role.

Q    So, you, as the chief restructuring officer, never informed anyone to stop paying pre-petition vendors?

A    Well, I know Mr. Starbuck and Sandy Guyen (phonetic), the treasury manager for BVM Management and Skyline had conversations with Mr. Ginn and Mr. Turner about Oxford's desire in that regard.  I was not in on many of those conversations.

Q    Do you see all of these transactions following the petition, these are numerous -- hundreds of transactions following the petition date?

A    Well, you would have to realize that at the date of the

Bartle - Cross/Ottaviano                          31

petition there were checks that had already been issued that had not cleared the bank yet, so that potentially could account for some of those items clearing post-petition.

Q    And do you know if there was any Court authority granted to pay these pre-petition vendors?

A    Not that I have seen.

Q    And pre-petition payroll was also paid, is that correct?

A    Yes.

Q    And was there any Court authority given to pay pre-petition payroll?

A    I don't know.

Q    You are the CRO up there?

A    Yes, I am.

Q    And you provided your counsel with a retainer, is that correct?

A    Mr. Starbuck and Ms. Guyen, or Sandy Guyen, arranged for the retainer to be paid.

Q    And do you know how much that retainer was?

A    I do not.

Q    So, as the CRO you don't know how much of a retainer was paid to your bankruptcy counsel, is that your testimony?

A    Well, the testimony is clearly that that's the responsibility of the BVM attorney, Dane Starbuck.  I am not involved with outside attorneys at this level.

Q    Did you interview Mr. Ginn?

Bartle - Cross/Ottaviano                                        32

A    I didn't personally interview Mr. Ginn in this particular matter.

Q    But you are the CRO, isn't that correct?

A    I am the CRO.

Q    And you don't think it's necessary as the CRO for Skyline Manor to interview your bankruptcy counsel?

A    Counsel, I'm not an attorney.  Mr. Starbuck is the BVM attorney.  Jay Bemis at Walentine, O'Toole here in Omaha is local counsel, and it was Jay Bemis's recommendation that Skyline obtain the services of Mr. Ginn.  Skyline followed those recommendations.

Q    Dane Starbuck, is he the general counsel for Skyline?

A    No.  The general counsel for Skyline is Jay Bemis.

Q    You're familiar with the cash collateral order and budget that was attached to the interim cash collateral order that was entered in this case, is that correct?

A    I've reviewed that budget.  Yes, sir.

Q    And you're aware that it showed a negative at the end of this period of approximately $17,000, is that correct?

A    I believe that number to be accurate.  Yes.

Q    So, how much do you have in your bank account today?

A    I do not know.

Q    Well, did you make payroll this week?

A    Well, that would have been a function of Sandra Guyen and Dane Starbuck.

Bartle - Cross/Ottaviano                    33

Q    So, you as the CRO don't know if you made payroll?

A    Well, we issued payroll.  I do know it was issued.  But it would have been issued as it was issued two weeks ago under the same format.  It's a bi-weekly payroll.

Q    Correct.  So, your testimony is there was sufficient money in the account, then, to cover that payroll?

A    Likely not.

Q    So, who -- how was it covered -- excuse me.  How was payroll covered?

A    BVM had been advancing funds for several months to cover deficiencies of Skyline.

Q    So, BVM has been a creditor of Skyline, is that correct?

A    BVM advanced money on an unsecured basis.

Q    So, it is a creditor of Skyline, is that correct?

A    That's a legal --

        MR. GINN:  Objection to the extent it calls for a legal conclusion.

        THE WITNESS:  It calls for a legal conclusion.  I'm not qualified to answer that question.

        THE COURT:  I can answer it.  Yes.

                    (Laughter)

Q    So, did BVM seek Court authority to make a loan to Skyline post-petition?

A    No.

Q    You said BVM was advancing money to Skyline for several

Case 14-80934-TLS    Doc 257    Filed 06/27/14    Entered 06/27/14 10:26:21    Desc Main
Document    Page 34 of 68

Bartle - Cross/Ottaviano                                34

months prior to the petition date.  They are not listed, sir, on the list of the 20 largest creditors, is that correct?

A    I don't believe they are.

Q    So, the amount that BVM allegedly advanced on behalf of Skyline is in what dollar amount, pre-petition?

A    I don't know the pre-petition and post-petition difference, but I think the total potentially is over 225,000.

Q    So, BVM has advanced -- this is your testimony, and you don't know if it's pre or post-petition, correct?

A    Well, if -- sir, if payroll had to be met today or yesterday BVM is going to cover that payroll, because it affects the health and safety of the residents that live at the property.  If payroll is not met it's a huge health and safety concern.

Q    How much is payroll on a bi-weekly basis?

A    About 185,000.

Q    And how much money was in -- how much of the $185,000 was funded by Skyline, and how much was funded by BVM?

A    I don't know on this most recent payroll.  That's a question that Sandy Guyen would have to answer.

Q    But you are the CRO?

A    I think I've made that clear, sir.  I am the CRO.  But I don't do everything with respect to a company that has over $200 million of income.

Q    Well, then, perhaps you're too busy to worry about this

Bartle - Cross/Ottaviano                    35

debtor.

MR. GINN:  Objection, Your Honor.

THE COURT:  Well --

MR. OTTAVIANO:  Withdrawn.  I'll withdraw it.

Q   Are you familiar with University Village, sir?

A   I am.

Q   And, in fact, BVM is a 40 percent owner of a limited partner, correct?

A   Correct.

Q   And, in fact, right directly out of the Skyline account Skyline paid on behalf of University Village $57,500 on April 17th of 2014, is that correct?

A   I don't know.

Q   Well, maybe we should look at the bank statement.

MS. BARR:  I believe it's Docket Number 164.  165 started -- I apologize.  Can we go back to 165 and scroll to the top? Can we go to 163?  It's one of the entries for Fifth Third's bank statements.

MR. OTTAVIANO:  Page 15?  No, that's not it.  That's March.  I'm looking for April.

MS. BARR:  Can you scroll to the bottom, please? Your Honor, we have hard copies of these documents.  I don't know which docket number it goes to with these bank statements.

THE COURT:  So, what point are you trying to make?

MR. OTTAVIANO:  The point I'm trying to make, Your

Bartle - Cross/Ottaviano                                    36

Honor, is according to the information provided by BVM Management the Skyline Manor checking account, there was a wire that was wired out on May 17th -- strike that -- April 17th of 2014 in the amount of $57,500, and the reference line says April management fees for University Village, which we've just established is owned by BVM.

THE COURT:  Okay.  So, you're going to ask a question about that?

MR. OTTAVIANO:  I don't think I have to at this point, but --

MR. GINN:  Your Honor, I'm at a loss here.  I see nothing.  I don't know what the allegation is.  I don't know --

MR. OTTAVIANO:  All right.  I'll ask --

MR. GINN:  -- what the explanation is.

MR. OTTAVIANO:  Sure.

Q    Does Skyline Manor own any interest in University Village?

A    No.

MR. OTTAVIANO:  Enough said.

THE COURT:  There's no question pending, so there's nothing to object to, Mr. Ginn.

Q    You mentioned the Mutual Bank of Omaha letter, is that correct?

A    I mentioned the financing proposal by Mutual of Omaha Bank, yes.

Q    And that was just a term sheet, correct?

Bartle - Cross/Ottaviano                               37

A      It was a term sheet.

Q      And it was unsigned, correct?

A      It was issued by the loan officer.  It needed not to be unsigned.  It was unsigned -- it was signed by Skyline.

Q      I'm sorry.  You said it was signed by Skyline?

A      Yes.  It was issued by the Mutual of Omaha Bank loan officer, Forrest Newburg, and it was signed by Skyline.

Q      Well, sir, I don't understand how Skyline could be a signatory to it because the Mutual Bank of Omaha term sheet that I'm looking at, the borrower was, in fact, listed as Graceland Property Investors Limited Partnership (phonetic) --

A      I'm sorry.  I --

Q      -- signed by --

A      I'm sorry.

Q      -- signed by Robert L. Rynard.  Apparently it must be his stamp.

        MR. GINN:  Objection, Your Honor.  First of all, this is --

        THE COURT:  Well, let's pull up the document.  How's that?

        MR. GINN:  Let's.  Please.

        THE COURT:  And what document would that be?

        MR. OTTAVIANO:  Your Honor, I don't believe, since this is cross examination, and we didn't enter this in our case-in-chief, I don't believe we put this as an exhibit.  I

Bartle - Cross/Ottaviano                        38

certainly have enough copies to pass around the courtroom and we'll file it later.

THE COURT:  You can ask him whatever questions you want, but, you know, we had to get the exhibits on file prior to this hearing, so --

MR. OTTAVIANO:  Fair enough.

Q    So, Mr. Bartle, Graceland Property Investors LP is listed as the borrower on this term sheet, is that correct?

A    That is correct.

Q    And Skyline Manor, Inc. is not even mentioned, or not a borrower on this term sheet, is that correct?

A    They are not a borrower.  That's correct.

Q    Earlier you testified that Skyline -- or, strike that. Earlier you testified that Lyons HR obtained a judgment against you and Skyline in I believe it was January of 2013, is that correct?

A    I'm not sure when.

Q    But that judgment was in the amount of $290,000 you've testified to earlier, is that correct?

A    I think that sounds correct.  Yes.

(Pause)

MS. BARR:  The docket number is three, and 3-1.

Q    Mr. Bartle, can you take a look at this document that is on your screen, please?

A    Okay.

Bartle - Cross/Ottaviano                    39

Q    Do you recognize this document?

A    Only for what it is.  I didn't prepare it.

Q    Can you scroll up a little bit?  Thank you.  Right there.
But you signed it under declaration of penalty of perjury, is
that correct?

A    Yes.

Q    So, it must be true and accurate as of the time that you
signed it, is that correct?

A    To the best of my knowledge.  Yes.

Q    Okay.  But you were aware -- are you aware that the top 20
creditor list excludes Lyons HR?

A    I think I'm aware of that.  Yes.

Q    And why isn't Lyons HR included in this list?

A    One, I think they're a judgment creditor.  Two, I didn't
prepare the list, and obviously thought that it could be
amended.

Q    Well, why haven't you amended it?

A    We actually just had that discussion earlier this week
with counsel.

Q    Is there anyone else you're going to add to the list?

A    Well, there will be some more research done, you know, by
Sandy Guyen and Dane Starbuck, who prepared most of the names
and addresses on this list.

Q    Is Dane Starbuck an attorney?

A    He is.

Bartle - Cross/Ottaviano                         40

Q    And does he have an outside practice?

A    Yes.

Q    So, is he providing legal services on behalf of Skyline?

A    He's assisting Mr. Ginn and Mr. Turner.

Q    Has he filed an application with this Court to be retained?

A    He is not asking for fees.

MR. OTTAVIANO:  If you could turn to --

MS. BARR:  Docket Number 65 and 65-2.

Q    Mr. Bartle, I'm pulling up what has been previously entered on the Court's docket.  Please take a look at it.

A    Please slow down.  All right.  I've reviewed the document.

Q    And is that your signature?

A    It is.

Q    And in that declaration, in Paragraph 6 you state that there are cash reserves available for the debtor, and -- as of the petition date, or as of this day, I should say, which is in March, I believe that's in '11, or May '11.  How much cash reserves did Skyline Manor have on that date they signed the affidavit?

A    As I recall, it was approximately $100,000.

Q    And you -- as part of your declaration in the second -- or the last paragraph, ten here, it said you prepared and oversought a preparation of the budget, is that correct?

A    Yes.

Bartle - Cross/Ottaviano                    41

Q    And it was attached?  It should be the next -- or probably after this appraisal.  If you could just slide all the way down, please?  Yup.  There you go.  Mr. Bartle, is this the budget that was attached to your declaration, which you reviewed and approved?

A    Could we go a little -- scroll -- yes.  Thank you.  Yes. I believe it is.

Q    And when you reviewed and approved it, or oversought a preparation of it, did you have an opportunity to do any of the math on it?

A    No.

Q    So, you didn't realize that the expense column is overstated by over $140,000?

A    No.  Honestly, I looked at the line items to make sure the line items, like food and electricity and salaries and personnel and supplies were all there.  I did not actually do the mathematical calculation.

Q    Would it surprise you that where it says $464,474 actually when you add up the column should be $329,487?

A    Well, it just is what it is.  I don't have an adding machine.

        MR. OTTAVIANO:  Your Honor, I'm going to tender to Mr. Fran Lawall, for the unsecured creditors' committee.

        THE COURT:  Mr. Lawall?

        MR. LAWALL:  Thank you, Your Honor.

Bartle - Cross/Lawall                      42
CROSS EXAMINATION

BY MR. LAWALL:

Q    Mr. Bartle, if I could go back for a moment.  With respect to your initial testimony elicited from Mr. Ginn, I believe you indicated that BVM is currently providing the financial and the corporate side of the services for the debtor, correct?

A    I'm not sure that's what I said.  BVM is providing the oversight for the healthcare services off-premises and the financial services off-premises.

Q    Who is providing the corporate management side?  And from that perspective I suggest the legal, adherence to corporate requirements, things of that sort?

A    For BVM or Skyline, sir?

Q    Skyline.

A    That would be Dane Starbuck, and local counsel, Jay Bemis.

Q    Okay.  With respect to the financial side, though, it's currently being provided by BVM?

A    BVM, primarily through Dana Huth.

Q    Okay.  Now, if I recall your testimony yesterday, the management agreement as between BVM and which was initially AmeriCare, but now BVM apparently, through an assignment a couple of years ago, but the management agreement as between BVM now and the debtor no longer exists, isn't that correct?

A    Correct.

Q    And with respect to the debtor, it's a 501(c)(3), right?

Bartle - Cross/Lawall                    43

A     It is.

Q     And therefore there's no stock?

A     There is no stock.  That's correct.

Q     And so, BVM has no ownership interest in the debtor, correct?

A     BVM does not.

Q     Okay.  But yet today BVM, having no management agreement with the debtor, no ownership interest in the debtor, continues to effectively control the entire financial condition and operations of the debtor, isn't that correct?

A     I would take exception with that statement.  I don't know what you mean by effectively control.

Q     Well, the debtor -- BVM is providing all of the financial oversight with respect to the debtor, is it not?

A     Well, the individuals on the board of Skyline Manor, Inc. are providing oversight, as well, which is primarily Rebecca Bartle, and Dana Huth, and myself, as the chief restructuring officer.  Those three individuals are providing most of the oversight.

Q     But as chief restructuring officer have you been retained in this Bankruptcy Court on behalf of the debtor to serve in that capacity?

A     I have not sought to be retained.  No.

Q     Okay.  So, you personally have not been retained.  There is no management agreement.  And yet BVM continues to

Bartle – Cross/Lawall                              44

effectively control the debtor?

A    Well, I'm going to object to effectively control, because the daily operations of the debtor are being overseen by Sandy Leimur and the crew on site at the property.

Q    I'm sorry.  You were here for Ms. Leimur's testimony, weren't you?

A    I was.

Q    And did she not testify that she was primarily responsible for patient health, safety, welfare, the care side of the house?

A    She is.

Q    So, somebody else was providing all of the other services, is that not true?

A    That is true.

Q    Okay.  And isn't that other entity BVM?

A    It is the board members of Skyline, which primarily would be Dana Huth and Rebecca Bartle.

Q    And is Ms. Huth being paid by the debtor?

A    No.  Ms. Huth is being paid by BVM.

Q    Okay.  So, she is being paid by BVM but yet she is exercising significant financial control over the debtor?

A    Oh.  I don't know what significant financial control is. She keeps the books and records.  She provides the financial statements and prepares the tax returns.

Q    I'd consider that pretty significant, wouldn't you?

Bartle - Cross/Lawall                                45

A    Well, I -- again, we'd just have to agree on the definition.

Q    Okay.  I think we can agree on that one.  Okay.  And now, with respect -- at the time that the debtor filed bankruptcy you had indicated that Mr. Starbuck was involved in that decision making?

A    Well, no.  Mr. Starbuck was part -- I specifically stated, I believe, that Mr. Starbuck was involved in conversations with local attorney Jay Bemis, with Robert Rynard, myself, Lou Jackson, and subsequent phone calls to Patrick Turner and Robert Ginn.

Q    So, Mr. Starbuck, who is employed by BVM, played a substantial role in the decision making with respect to whether the debtor should file bankruptcy?

A    No.  He did not play a significant role in that at all. He merely made the contact with Jay Bemis.  Jay Bemis had the relationship with Bob Ginn, and recommended that Bob Ginn be sought -- thought his firm of Stinson Leonard and Street be sought to represent Skyline.

Q    Really?  Would it surprise you that there was other testimony that suggested Mr. Starbuck called the individual board members for purposes of obtaining authority to file bankruptcy?

A    Well, that may have been true.

Q    Well, wouldn't that be a significant role?

Bartle - Cross/Lawall                    46

A    It would have been a role that he thought was necessary for the minutes of the board.

Q    And that would go along the lines of effecting corporate control over the debtor, would it not?

A    It would go along the lines of him making sure that there was a record kept of the vote to file the bankruptcy petition.

        MR. LAWALL:  Could I have a minute, Your Honor?

        THE COURT:  Yes.

                        (Pause)

Q    We can agree, can we not, that there is at least an 80 percent identity between the board of Skyline and the board of BVM?

A    Yes, we can.

Q    And you've already indicated that you were aware that Mr. Rynard was receiving a director's fee on behalf of Skyline, right?

A    No.  I think my testimony was he was receiving compensation, but I don't think it was -- that I said director's fee.

Q    Do you know whether it was or it wasn't?

A    I believe it wasn't for director's fees.

Q    Would it surprise you if he testified that, in fact, it was a director's fee?

A    That would surprise me.  Yes.

        MR. LAWALL:  That's all I have, Your Honor.

Bartle - Cross/Stempson                                    47

THE COURT:  Thank you.  Ms. Stempson?

CROSS EXAMINATION

BY MS. STEMPSON:

Q    Mr. Bartle, who is in charge of making sure Skyline Manor is in compliance with the Non-Profit Corporation Act in Nebraska?

A    Jay Bemis.

Q    And who gives Mr. Bemis the information to determine whether Skyline is in compliance?

A    Mr. Bemis's firm has been representing Skyline for about seven years.

Q    Does the board meet with Mr. Bemis periodically to give factual information so that Mr. Bemis can determine whether the Non-Profit Act is being complied with?

A    He is given anything he requests in order to make sure that they are in compliance.

Q    How does he know to request information?

A    Well, he is a Nebraska licensed attorney.  He's been representing the board and the foundation for a good number of years.  And it was my belief that he had knowledge of Nebraska statutes regarding non-profit corporations.

Q    Does he go to meetings of the board of directors so that he has factual information to determine whether the Non-Profit Act is being complied with?

A    The protocol, Ms. Stempson, is that Mr. Bemis requests

Bartle - Cross/Stempson                                    48

information that he deems necessary from Attorney Dane Starbuck, or from myself, and then that information is provided to him upon request.

Q    But it doesn't come from the board of directors?

A    Well, it comes in the fashion of however he wants it to come.  If it's something that needs to be filed with a deadline he requests something, you know, pretty quickly, so it wouldn't necessarily come from the board, it may come from an officer of the board.

Q    So, is he on retainer of some fashion --

        MR. GINN:  Your Honor, I'm going to object just once on the basis of relevancy.  I don't know where this is going.

        MS. STEMPSON:  It's going -- I'm trying to figure out who is actually in charge of this non-profit right now.

        THE COURT:  What do you mean by in charge?

        MS. STEMPSON:  Who ultimately has the responsibility legally to make sure that compliance happens with the Non-Profit Act.

        THE COURT:  Wouldn't that be the board of directors?

        MS. STEMPSON:  Well, I would assume so, but that's why I'm asking Mr. Bartle, and he is telling me that it's Mr. Bemis, hence the question.

        THE COURT:  Okay.  You may continue.

BY MS. STEMPSON:

Q    Who is responsible for making filings with the Nebraska

Bartle - Cross/Stempson                      49

Secretary of State?

A     I believe that's Mr. Starbuck's and Mr. Bemis's responsibility.

Q     Does the board of directors, to your knowledge, ever review those filings?

A     They may be on an agenda, you know, periodically for the board.  It would depend on the time of year, whether there were licensure renewals pending, you know, for the health center.  They may be, in fact, on the agenda for any specific meeting.

Q     But you don't know for certain if they are on the agenda?

A     They are only on the agenda when it's necessary for a board vote.

Q     Would you be surprised to know that depending on which record you look at filed with the Secretary of State Skyline Manor is either a public benefit corporation or a religious corporation?  It's not consistent.  Is that surprising to you?

A     Well, it's surprising in some respects, but it's, as I said to you on the phone yesterday during my deposition, it's a check the box kind of issue.  If you miss the box one year you go back and try to correct it when you found out you made a mistake.  So, it was not deliberate.

Q     So, did anyone -- has anyone recently found the mistakes and tried to correct them, to your knowledge?

A     Not to my knowledge, Ms. Stempson.  No.

Q     In regard to tax returns filed with the IRS, who is in

Bartle - Cross/Stempson                    50

charge of filing those for Skyline Manor?

A    Dana Huth.

Q    And does the board review those tax returns?

A    They review the financial statements with the history of the financial information prior to the tax return being filed.

Q    Did you testify yesterday that the tax return for the most recent year for BVM, which includes Skyline Manor information was not ran by the board of directors prior to filing?

A    I think I testified that was true for the 2013.

Q    And why was it not ran by the board of directors prior to filing?

A    Because the board of directors approved the financial statements that were consolidated on the BVM 990.

Q    And for prior years do you have any knowledge of whether the board of directors viewed the tax returns?

A    Yes.  I believe they were on the agenda for the annual business meeting.

Q    To your knowledge are there any inaccuracies in those tax returns?

A    Not that have been brought to my attention.

Q    I would like to refer a few of the tax returns then.  The last time Skyline Manor filed its own 990 was the tax year ending 6/30/2011.  So, if you would pull up -- it's somewhere in the old -- but give me a second -- it is NNN, Number 156. And if you could go to Page 6, Part 6, Number 2?  You'll note

Bartle - Cross/Stempson                    51

it says did any officer, director, trustee or key employee have a family relationship or business relationship with any other officer, director, trustee or key employee?  The response is no.  Is this accurate?

A    Let's look at this question.  Where did you say it was?

Q    It's Number 2.  Did any officer, director, trustee or key employee have a family relationship or business relationship with any other officer, director, trustee or key employee?  Is no an accurate answer?

A    It may have -- it may be an accurate answer.  I didn't prepare the tax return, nor did I do the research.

Q    If you'll scroll down to the next page?  It lists the board of directors.  Dana Wadman Huth, David Richey, Hazel Klever, Paige Harvey, Rebecca Bartle, Robert Rynard, and Katie Wray.  Is it my understanding that Paige Harvey and Rebecca Bartle are family members?

A    Familial family members.  Yes.

Q    Okay.  So, can you now say that that answer of no would be inaccurate?

A    Yes.

Q    And again, whose responsibility was it to file this tax return and make sure it was accurate?

A    Again, it was Dana Wadman Huth that would have been doing the research on the Form 990.

Q    If you'll scroll back up to Number 6, it was right under

Bartle - Cross/Stempson                                                    52

Number 2.  It asks does the organization have members or stockholders, and the answer is yes.  Is this correct?

A    I don't know what a member is.  I know what a stockholder is.  But I don't know what a member is under the IRS Code.

Q    A member would not be a director, for instance, so if this answer is yes, who would this be referring to?

A    All I know are the facts, and the facts are that Skyline has board members and officers.  I don't believe they have members or stockholders.

Q    And would it surprise you to know that the bylaws of Skyline state that they have no members?

A    No.

Q    Does it concern you that information given to the IRS is inaccurate and hasn't been amended, to my knowledge?

A    Well, typically what happens when something like this is discovered, it's brought to the attention of the tax return preparer, and the tax return preparer in the subsequent year makes the correction and footnotes what previous years there was inaccurate statements, and asks if an amended return needs to be filed.  And that answer will be either yes or no.

Q    How can this be discovered if the board of directors doesn't approve the 990?

A    Well, it would be discovered through a variety of ways. You know, just -- you can go through financial audits, through a review by the officers, by Dana Wadman Huth herself.

Bartle - Cross/Stempson                                        53

Q    But no one has discovered it prior to this time, or to the deposition yesterday when I pointed it out?

THE COURT:  Well, we're getting somewhat argumentative at this point.  I mean, can we move on?

MS. STEMPSON:  We can.  One last thing on the tax returns, Your Honor.

Q    This is in the BVM tax return, Number 157.  If you'll turn to page -- what is about four pages from the end, it doesn't actually have a page number to my knowledge.  It's a box.  Yes. Right there.  You've got it.  Are you aware that it states the board of directors are required to avoid conflict of interest situations?

A    Yes.

Q    And do they avoid conflict of interest situations?

A    Yes.

Q    And how -- can you explain that based on testimony we've heard today where multiple parties in your family are business relations receive payments?

A    Well, that has no bearing on the conflict of interest. The people that were compensated were compensated for good and valuable services, usual and customary in the market, so it's not a conflict of interest, per se.

Q    And did you have an independent party determine whether those were for good and value services for payments, and that they were reasonable?

Bartle - Cross/Stempson                    54

A    No, but the payments were nominal.

Q    Are you aware that the tax return states that an independent review was done?

A    Where does it state that?

Q    If you'll give me a second I'll show you.  My apologies. I have lots of papers in front of me.

THE COURT:  This one might not be that important.  Do we need it?

MR. STEMPSON:  Well -- I think it's good to show that, again, information in the tax return is inaccurate and for non-profit purposes independent review of transactions is pretty important when here can be a conflict.  But since it's taking me so long, I'll forget it for now.

Q    You testified earlier that there's common control between Skyline and between BVM Management, is that correct?

A    That is correct.

Q    And what is your understanding of what common control means?

A    Common control is common officers and director.

Q    And does that mean all the officers and directors have to be identical?

A    No.

Q    How -- what percentage?

A    80 percent.

Q    And did you testify earlier today that on the board of

Bartle - Cross/Stempson                                    55

directors for BVM is Rynard, Paige, Rebecca, Richey, Huth and Bradley Jackson?

A    I don't remember mentioning Bradley Jackson, but he could be a board member.

Q    He's on the tax return as a board member.  Does that sound accurate?

A    The BVM tax return?

Q    Yes.

A    If that's what it says, that's what it says.

Q    And did you testify that currently the directors of Skyline are Rynard, Paige, Rebecca and Dana Huth?

A    Correct.

Q    So, I believe that 66 percent there -- is there going -- is this an issue now with the common interest, since 80 percent isn't made?

A    No.  Because when the tax return is filed there will be more than 80 percent.

Q    So, you plan on having control over the Skyline board, BVM having control?

A    Well, that's been the plan since 2010.

Q    Are you aware that the articles require that five directors are required at Skyline Manor?

A    Yes.

Q    And you've testified that there's only four right now?

A    I think you brought that to my attention at the deposition

Bartle - Cross/Stempson                                    56

yesterday.  I don't know if there's been another person elected as I sit here today, but I do know that Dane Starbuck is interviewing candidates.

Q    Do you know whether Skyline is current in its payments to he Nebraska Department of Revenue?

A    Skyline wouldn't have employees.

Q    For -- how about for the employees that work at the physical location of Skyline Manor?

A    I believe so.

Q    And how about with the Department of Labor?

A    Who are they?

Q    Who is the Department of Labor?

A    The -- yes.  The Department of Labor?

Q    It's an agency under the State of Nebraska.

MR. GINN:  Your Honor, I have to object.  I've said I'd only do it once, but as much as I'm enjoying this colloquy I just don't see the relevance.

MS. STEMPSON:  I'm almost done, Your Honor.

THE COURT:  What is the relevance, and what are you asking?

MS. STEMPSON:  I'm trying to determine whether the fiduciary duties have been served in order to operate the non-profit.

THE COURT:  So --

BY MS. STEMPSON:

Bartle - Cross/Stempson                    57

Q     If you don't know what it is, I'll drop my question.

A     Well, there's the department of labor as in the United States Department of Labor.  But all they do is oversee employment practices, to my knowledge.  So, I don't know who else there might be.

Q     Okay.  Who is in charge of hiring the management company at Skyline Manor?

A     Well, for what year?  In 2009, or the present?  You'll have to be more specific.

Q     In general who has the power to hire a management company at Skyline Manor?

A     It could be the board or any of its officers.

Q     Would they also then have the power to fire any sort of management company?

A     Yes.

Q     And if the board of directors determines -- strike that. Are you aware that the State of Nebraska Attorney General's Office can go to the District Court to ask to have a board of directors removed?

A     I am not that well versed on Nebraska statutes, Ms. Stempson.

Q     If the current board of directors were removed from Skyline Manor would that have any family -- excuse me -- would that have any financial detriment to you?

A     No.

Bartle - Cross/Stempson                                    58

Q     How about to your family?

A     I don't -- if you're asking me if it will be an economic hardship to my family, the answer is no.

Q     And to any of your business partners?

A     Not to my knowledge.

Q     So, it's your testimony that you have no financial interest in keeping the current board of directors on the board?

A     Well, that's not exactly true because the proposal with Skyline in the very beginning with Oxford was to transfer the property to a for profit, which the board obtained approval from the Nebraska Attorney General's Office back in 2010.  And so -- and that approval has not been rescinded.  So, it was always the intent for Graceland Property Investors to own the real estate and to lease that real estate to BVM Management.

        MS. STEMPSON:  Your Honor, can I speak to that, about our approval?

        THE COURT:  I -- he just testified as to some legal things, and now you want to testify as to some legal things?

        MS. STEMPSON:  Let me see if I can ask it in a question.

Q     Did you ever contact the Attorney General's Office to notify us that the transaction that was supposed to take place with Cambridge Financial actually occurred?

A     No.  That wasn't a requirement of the approval.

Bartle - Cross/Stempson                59

THE COURT:  All right.  Let's stay within our record, I guess.  Frankly, within our motion that we have pending.

MS. STEMPSON:  I will drop it, Your Honor.

THE COURT:  All right.

Q    You mentioned in your testimony that you came in, you and people that you were associated with in about 2009 because Skyline was in a financial crisis, or they were about to foreclosure, is that correct?

A    To be specific for the record --

Q    Uh-huh.

A    -- the property was in notice of foreclosure with First National Bank of Omaha.  There was approximately $700,000 of mechanic's liens filed against the property.  There was a half a million dollars of management fees owed to the prior management company that were unpaid.  And there were two or three hundred thousand dollars of real estate taxes unpaid.

Q    Is Skyline better off then or is it better off now under -- after you've been there for a few years?

A    Well, when we -- when our team got to Skyline there was an eight-and-a-half million dollar default on the First National Bank loan.  Four million of that had been written off by the bank.  The BVM/Skyline group, you know, put together a financing package that restored not only the four-and-a-half million that First National Bank had on its books, but the $4 million that it had written off.  It also paid White (phonetic)

Bartle - Cross/Stempson                    60

Construction for its full lien amount, paid the back taxes, and put about $500,000 aside for capital improvements at the property, which included relocating the therapy room, improving the dining room, relocating that dining room, and upgrading the premises.  When we also got there, there were 22 people living in the assisted living facility, now there's 55.  There was 57 people living in the nursing home, and the census had gone up to 92 during our watch.  Revenue had grown from 650,000 to 925,000 a month, you know, during our management.  So, for a lot of reasons I would say the facility is much better off.

Q    And how much does Skyline owe creditors currently?

A    I haven't added the list up.

Q    Can you guess within a million dollars?

A    No.

MS. STEMPSON:  Thank you, Your Honor.

THE COURT:  Thank you.  Anybody else other than Mr. Ginn?

MR. GINN:  Your Honor, would this be an appropriate time to take a brief break before I go ahead and redirect?  Or would you prefer that I proceed?

THE COURT:  Are you planning to spend some time on redirect?

MR. GINN:  I --

THE COURT:  Then, yes, it would.  Yes.  I was actually looking at the time.  Yes, it would be.  I'd really

Bartle - Redirect/Ginn                    61

like to get it wrapped up after we get back.

MR. GINN:  Your Honor, I don't have -- ten minutes.

THE COURT:  Oh.  Cheryl?  Are you okay?

COURT CLERK:  Ten minutes.

(Laughter)

THE COURT:  Go ahead.  Because then I want to take a short break to get my thoughts together.

MR. GINN:  Okay.

REDIRECT EXAMINATION

BY MR. GINN:

Q   Mr. Bartle, I'm not quite sure where to start here.  Let's start with the allegation of what -- just calling a spade a spade, what appear to be the allegations of improper payments made to your family members from the debtor.  And why don't we just start from the top, and let's start with your daughter.  Specifically what funds have been paid from the debtor to your daughter in what time frame for what services?

A   Paige Harvey was paid, I don't know the exact amount she was paid, but a nominal amount for her consulting work at the property for her interior design qualifications.  Scott Buckles and Whitney Buckles were never paid anything directly from Skyline.  My wife, Rebecca Bartle, is an R.N., with her master's degree and health facility administrator's license, and she may have received some compensation for fee for services for travel out here and for stays at the property, and

Bartle - Redirect/Ginn                                          62

for work that was performed.  But that -- those services and fees were all usual and customary that she would charge any other client in the industry.

Q    And to be clear here, sir, is it my understanding that your wife works, technically, for BVM?

A    That is true.

Q    And with respect to how many facilities does she provide services?

A    She provides services to over 50 properties.

Q    Her total -- and I believe you testified that her total income for whatever relevant period people were talking about, so let's say last year, what -- let me rephrase that.  What was her total income from her services to BVM for last year?

A    $130,000.

Q    And, once again, that's spread over a large number of facilities?

A    28 nursing homes, and about 14 assisted living facilities in three campuses.

Q    So, would it be unfair to characterize her as having been paid $130,000 from Skyline?

A    That would be unfair.

Q    Does Skyline pay its proportionate share for those services?

A    Skyline pays a management fee, which will go to BVM, and then BVM pays its employees for services throughout -- for

Bartle - Redirect/Ginn                                      63

whether they're administrative services, legal services, skilled nursing services, data processing, billing, you know, whatever the vendors are.

Q    So, there's no specific allocation by facility to facility with respect to her services?

A    That is correct.  The accounting firm allocates a certain portion of the management fee on the cost report in accordance with the regulations.

Q    And with respect to these minimal payments to affiliates, to family members, is it your testimony that those are all necessary, legitimate functions being paid at market or below market rates?

A    Yes.

Q    In other words, nobody is getting rich off of Skyline?

A    I certainly am not.

Q    You were questioned at some length about the employment contract that is presently in place with respect to the leasing of employees by the Skyline facility.  And I believe you spent some time testifying as to the prior arrangement that Skyline had with respect to employees.  Is it your testimony, sir, that the existing leasing terms and conditions with I believe it's U.S. Holdings are the same or similar to those that had historically been in place with Skyline?

A    Yes.

Q    And would it be your testimony, or if it's your testimony

Bartle - Redirect/Ginn                                                    64

that those are in all respects in your judgment within industry norms and not exorbitant?

A    That's correct.

Q    We also talked at some length about post-petition payments being made by the debtor.  Are you aware, sir, that an interim cash collateral stipulation has been entered into with the secured creditor, Oxford financial?

A    Yes.

Q    And are you aware that under the terms of that it has a -- what is called in legal terms a nunc pro tunc function, meaning it refers back to the original filing date?

A    Yes.

Q    You have, in fact, you -- I'm sorry.  Skyline has, in fact, made post-petition payments to unsecured creditors, has it not?

A    I believe so.

Q    And was that at the express insistence and direction of Oxford Financial?

A    Yes.

Q    And were those payments for the care and maintenance of the patient population at the debtor?

A    Yes.

Q    And to the best of your knowledge were those payments made not only with the knowledge, but once again, with -- at the insistence of Oxford Financial?

Bartle - Redirect/Ginn                                          65

A     Yes.

        MR. OTTAVIANO:  I'm going to object, Your Honor. Let's get specific about the payments that we insisted on, for the record.

        THE COURT:  And what would that be?

        MR. GINN:  That would be, specifically, Your Honor, that we saw an exhibit, and I don't remember the --

        THE COURT:  Insurance premiums?

        MR. GINN:  I don't remember the number, but it had --

        MR. OTTAVIANO:  That is correct, Your Honor.  We did consent to the use of cash collateral with respect to the immediate payment which was due on the insurance.

        MR. GINN:  Your Honor, if I may continue?

        THE COURT:  You may.

BY MR. GINN:

Q     There were specific discussions with and specific direction by Oxford that --

        MR. OTTAVIANO:  I'm going to object.  Is he testifying, or is the witness testifying?

        THE COURT:  Yes.  Is there a question?

        MR. GINN:  Yes.

        THE COURT:  All right.

        MR. GINN:  I'll save it for argument.  That's fine.

        THE COURT:  Okay.

BY MR. GINN:

Bartle - Redirect/Ginn                        66

Q    You were also questioned, Mr. Bartle, about the omission of Lyons from the list of 20 largest unsecured creditors.  Is it your understanding that -- or was it your belief that Lyons was omitted from the list of unsecured creditors because it is your belief that being a judgment creditor with a judgment lien, Lyon, was, in fact, a secured creditor?

A    That would be my understanding.

MR. LAWALL:  Your Honor?  Your Honor, I mean, in order to keep this moving forward, I'm trying to let this keep going, but effectively Mr. Ginn is testifying, and he's lining the witness up on direct and saying either yes or no.  And --

THE COURT:  Yes.  But --

MR. LAWALL:  These are all leading questions.

THE COURT:  I understand.  Overruled --

MR. LAWALL:  Thank you.

THE COURT:  -- because what he was coaching him to say, which is what he's --

MR. GINN:  I'm almost done, Your Honor, and I promise to do -- I deny that I have been leading the witness, but I promise to not do any more of it.

BY MR. GINN:

Q    Mr. OTTAVIANO showed you, and once again I don't have the exhibit right here in front of me, but it's not necessary, the budget appended to your original affidavit in this proceeding.  Do you recall that?

67

A    I do.

Q    Has that budget substantially changed since that affidavit based on your understanding of negotiations with Oxford and other creditor --

A    Yes.  It changes weekly.

Q    All right.  And with respect to the questions of the Attorney General of the State of Nebraska, and multiple questions with respect to the preparation of and accuracy of tax returns, is it fair to say that you are not a tax accountant, you didn't prepare the returns, even if you reviewed them you would have no basis on which to believe that they were inaccurate?

A    That's correct.

MR. GINN:  I have nothing further, Your Honor.

THE COURT:  Thank you.  Anything else from Mr. OTTAVIANO?

MR. OTTAVIANO:  No, Your Honor.

THE COURT:  Mr. Lawall?

MR. LAWALL:  Nothing, Your Honor.  Thank you.

THE COURT:  Ms. Stempson?

MS. STEMPSON:  No, Your Honor.

THE COURT:  Anybody else?  All right.  Mr. Ginn?

MR. GINN:  Well, Your Honor, with respect to Mr. Bartle, I'm done.

(Conclusion of requested excerpted portion of the proceeding)

68

* * * * *

## CERTIFICATION

I, TAMMY DeRISI, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of my ability.

/s/ Tammy DeRisi                    Date:   June 26, 2014

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.