UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:  8:16-bk-08167-MGW
Chapter 11
Adv. Pro. No. 8:20-ap-00007-MGW

JEFFREY W. WARREN, LIQUIDATING
TRUSTEE FOR WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP and
WESTPORT HOLDINGS II, LIMITED
PARTNERSHIP,

        Plaintiff,

vs.

VALLEY NATIONAL BANK, principal
Subsidiary to VALLEY NATIONAL
BANKCORP, a New Jersey domestic profit
Corporation, as successor by merger to
USAMERIBANK,

        Defendant.

_____/

DEPOSITION OF:       SHAW STILLER

DATE:                WEDNESDAY, MARCH 8, 2023

TIME:                10:28 A.M. - 4:15 P.M.

PLACE:               OFFICE OF INSURANCE REGULATION
                     200 EAST GAINES STREET
                     ROOM 116
                     TALLAHASSEE, FLORIDA 32399
STENOGRAPHICALLY
REPORTED BY:         GREG T. SMITH

A P P E A R A N C E S:

JEFFREY W. WARREN, ESQUIRE

OF: BUSH ROSS, PA

    1801 NORTH HIGHLAND AVENUE

    TAMPA, FLORIDA 33602

    (813) 224-9255, FAX-(813) 223-9620

    JWARREN@BUSHROSS.COM

    APPEARING ON BEHALF OF THE PLAINTIFF

EDMUND S. WHITSON, III, ESQUIRE

OF: MCGLINCHEY STAFFORD, PLLC

    10407 CENTURION PARKWAY NORTH

    SUITE 200

    JACKSONVILLE, FLORIDA 32256

    (904) 224-4486, FAX-(904) 212-1784

    EWHITSON@MCGLINCHEY.COM

    APPEARING ON BEHALF OF THE DEFENDANT

LORRAINE M. NOVAK, ESQUIRE

OF: THE OFFICE OF INSURANCE REGULATION

    2620 SATINWOOD CIRCLE

    TALLAHASSEE, FLORIDA 32309

    (850) 320-4185, FAX-(850) 320-4185

    LORRAINENOVAK11@GMAIL.COM

    APPEARING ON BEHALF OF THE OFFICE OF INSURANCE

    REGULATION

I N D E X

TESTIMONY OF SHAW STILLER

    DIRECT EXAMINATION BY MR. WHITSON...................6

    CROSS-EXAMINATION BY MR. WARREN....................92

    REDIRECT EXAMINATION BY MR. WHITSON..............134

CERTIFICATE OF OATH..................................143

CERTIFICATE OF REPORTER..............................144

ERRATA SHEET.........................................145

NOTIFICATION LETTER..................................146

INDEX OF EXHIBITS

DEFENDANT'S EXHIBITS

EXHIBIT D1        RECOMMENDED ORDER RE: IMH HEALTHCARE

                  V. OIR.................................28

EXHIBIT D2        UNIVERSITY VILLAGE ORGANIZATIONAL

                  CHART..................................30

EXHIBIT D3        WILLIAMS MULLEN LETTER, 3/31/14.......36

EXHIBIT D4        AFFIDAVIT OF CAROLYN MORGAN...........39

EXHIBIT D5        FLORIDA STATUTE 651.1081..............58

EXHIBIT D6        EMAIL TO JAY PRICE, 5/9/16............60

EXHIBIT D7        EMAIL TO JAY PRICE, 5/10/16...........62

EXHIBIT D8        BURR FORMAN LETTER FROM JAY PRICE,

                  5/11/16...............................62

EXHIBIT D9        EMAIL FROM TIM GRAY TO JAY PRICE,

                  9/16/16...............................64

EXHIBIT D10       FLORIDA STATUTE 651.125...............72

EXHIBIT D11       SEVENTH AMENDED CONSENT ORDER........89

PLAINTIFF'S EXHIBITS

EXHIBIT 1        SEVENTH AMENDED CONSENT ORDER WITH
                 EXHIBITS.............................94

EXHIBIT 2        AMENDED NOTICE OF DEPOSITION OF ELIYAHU
                 FREIDEN..............................98

EXHIBIT 3        THIRD NOTICE OF DEPOSITION OF ELIYAHU
                 FREIDEN..............................98

EXHIBIT 4        DEPOSITION TRANSCRIPT OF ELIYAHU
                 FREIDEN..............................99

EXHIBIT 5        INITIAL ORDER OF SUSPENSION, CASE
                 NO. 168243-15.......................101

EXHIBIT 6        INITIAL ORDER OF SUSPENSION, CASE
                 NO. 185108-16.......................105

EXHIBIT 7        COMPLAINT FOR DECLARATORY RELIEF AND
                 DAMAGES.............................106

EXHIBIT 8        JOINT PRE-HEARING STATEMENT RE: IMH
                 HEALTHCARE..........................110

EXHIBIT 9        PROPOSED RECOMMENDED ORDER..........110

EXHIBIT 10       PROPOSED RECOMMENDED ORDER..........111

EXHIBIT 11       RECOMMENDED ORDER...................112

EXHIBIT 12       LETTER FROM CAROLYN MORGAN TO WENDY
                 WIENER, 3/27/15.....................112

EXHIBIT 13       RESPONDENT'S NOTICE OF FILING IN DOAH
                 CASE NO. 16-2027....................114

EXHIBIT 14       FINAL ORDER IN DOAH CASE, FILED
                 3/11/16.............................115

EXHIBIT 15       ORDER TO SHOW CAUSE, INJUNCTION, AND
                 NOTICE OF AUTOMATIC STAY FOR PURPOSES OF
                 REHABILITATION......................118

EXHIBIT 16       LETTER FROM DESMOND WILSON TO KATHLEEN
                 BURKHOLDER, DATED 4/18/14...........119

EXHIBIT 17    CONSOLIDATED FINANCIAL STATEMENTS FOR THE
              YEARS ENDED DECEMBER 31, 2013 AND
              2012..................................121

EXHIBIT 18    PERIODIC FINANCIAL REPORT FOR WESTPORT
              HOLDINGS TAMPA, L.P. FOR PERIOD ENDED
              3/31/14...............................125

EXHIBIT 19    PERIODIC FINANCIAL REPORT FOR WESTPORT
              HOLDINGS TAMPA, L.P. FOR THE PERIOD ENDED
              3/31/15...............................126

EXHIBIT 20    LIQUIDATING TRUSTEE'S NOTICE OF FILING
              PRO FORMA CLOSING STATEMENT...........127

EXHIBIT 21    AMENDMENT TO LOAN AGREEMENT...........130

EXHIBIT 22    LOAN AGREEMENT AMENDMENT LETTER FROM JOHN
              BARTLE TO TREY KOHRN..................130

------

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the counsel for the respective parties and the deponent that the reading and signing of the deposition transcript be reserved.

------

P R O C E E D I N G S

THE COURT REPORTER:  Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, I do.

SHAW STILLER,

having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITSON:

Q.   Good morning.  Would you please state your full name for the record.

A.   My full name is Shaw --

MR. WARREN:  Before this begins, I just wanted to make sure the record is clear that I do have a continuing objection to Valley Bank taking depositions after the fact discovery deadline without Court approval.  I'm here, and I'm not going to interrupt the deposition.  And I will avail myself of my rights to ask questions.  But I just wanted the record to be clear before the deposition began.  Thank you.

MR. WHITSON:  And just from Valley National Bank's standpoint, my understanding is that there were agreements to conduct these depositions, and

we're just following through those agreements.  And we've asked for a continuance of the deadlines, and that was declined.  So we have no alternative but to move forward without waiver of any objections that we raised to the capacity of the trustee to represent himself.  So all rights are reserved.  Is that fair?

MR. WARNER:  Well, you have the right to reserve whatever you want to reserve.

MR. WHITSON:  Okay.

THE WITNESS:  Okay.  My full name?

MR. WHITSON:  Yeah.

THE WITNESS:  First name is Shaw, S-h-a-w.  Middle name, Philip with one "L."  Last name, Stiller.

BY MR. WHITSON:

Q.   And would you briefly describe your educational background.

A.   Sure.  I graduated De La Salle High School in 1984.  Go Cavaliers.  Have a bachelor's in political science and philosophy from Loyola in New Orleans, graduated '88.  And graduated Florida State University College of Law in 1991.  And that's been the last of my formal schooling.

Q.   And would you just again briefly describe your

legal career post graduation at Florida State.

A.   Sure.  First job was with Judge Maurice Paul, chief judge for the Northern District of Florida.  I worked for Judge Paul, a two-year clerkship, '91 to '93.  I then went to work for Broad and Cassel -- and a familiar name, Steve Turner.  I worked there for a little bit over a year.

I left there to go to -- and I'll spell these names -- Apgar, A-p-g-a-r; Pelham, P-e-l-h-a-m; Pfeiffer, P-f-e-i-f-f-e-r; and Theriaque, T-h-e-r-i-a-q-u-e.  I worked there until '97.  I went to the Department of Community Affairs for 14 years, the last four was general counsel.  I then had a solo practice for a few years.  And then worked for the City of Tallahassee from 2013 to 2015.

I joined the Office of Insurance Regulation in July of 2015, and I worked at the Office of Insurance Regulation until late -- well, I guess my last day was actually early February 2020, but I was no longer here.  I was on leave beginning in January, and then I started my current job as a senior attorney at the Florida Public Service Commission in the first week of February, 2020.  And as far as I know, I'm still employed there as of yesterday.

Q.   Thank you.  And you said Office of Insurance

Regulation.  Is that the is same as -- you were general counsel to the OIR; correct?

A.   No.  I was general counsel for the Department of Community Affairs from 2007 to 2011.  My title at Office of Insurance Regulation -- I think my people-first title was executive senior attorney.  And then I think it was changed to chief attorney or chief counsel.  But my walking-around title was supervisor of litigation or chief of litigation.  I supervised a handful of attorneys in the litigation section of the OIR.

Q.   And that was in July of 2015?

A.   That's when I started -- July 6th.

Q.   And are you familiar with the -- I guess we'll say -- generally the issues concerning University Village?  When was your first sort of exposure to University Village?

A.   My first exposure -- well, there was hallway exposure when I first got here, because it was a topic of discussion.  It was the most energy consumptive case then pending in the office of general counsel.  I was not immediately involved, to my recollection, in July.  In that fall I became involved because of a scheduled hearing at the Division of Administrative Hearings.  So I would say the August-September 2015 time period is

when I began my involvement with University Village.

Q.   Okay.  Let's back up a little bit.  You said it was hallway exposure and topic of discussion.  Could you be more specific.  What was the hallway exposure?  What was sort of the scuttlebutt, if you will?  Or what was being discussed about University Village?

A.   I did not know the merits of what was being discussed.  I just know Tim Gray -- who was in the litigation section and who was one of my supervisees -- was very busy working with another attorney, Alyssa Lathrop, L-a-t-h-r-o-p.  And it was about University Village.  And I saw staff -- people coming up who was not involved in those discussions and don't know exactly what was being discussed when I first got there.

MS. NOVAK:  Just go off the record for a minute.

(Discussion off the record.)

BY MR. WHITSON:

Q.   Did you have any conversations with Tim Gray at that time about what was going on at University Village and what his perception of the issues were?

A.   I did.

Q.   What were those?

A.   The issues at that time -- I think there was an emergency suspension pending, and there were procedural

discussions about how best to address what was perceived here as the illegal acquisition of University Village by the new purported owners.  That was the general topic of discussion.

Q.   All right.  What was meant by illegal acquisition?  Are you aware of any specifics or details behind sort of that characterization or that feeling or how it was labeled?  I mean, what were the grounds or basis for that terminology?

A.   The purported new owners of Westport Holdings -- I remember one of the LLCs was IMH Healthcare; I think that was the primary.  They had acquired University Village without following the acquisition process set up in the statute and rule with the Office.  As a regulated entity, a provider for University Village needs office approval before they can legitimately undertake any actions regarding the CCRC. And IMH Healthcare and the other affiliated LLCs have not done that.

Q.   Okay.  Maybe we should sort of set the table a little bit before we get further in the questioning.  So a continuing care retirement community is what you mean by "CCRC"; correct?

A.   Correct.

Q.   And that operative statute would be 651,

Florida Statutes?

A.   At that time it was, yes.

Q.   Okay.  What is your understanding of University Village as a CCRC -- it's various components, how the CCRC functions and operates in terms of -- you know, I'll just sort of suggest things like life care contracts and how the independent living facility might be different from the health center as we call it.

I mean, you're familiar with these topics, so I'm sort of abbreviating a little bit.  But just for the record, I'd like your understanding sort of, you know, how the CCRC functions and specifically as related to University Village at that time in July of 2015.  And also your understanding generally about CCRCs?

A.   Okay.  I'll answer that complex question.  A CCRC -- it's not a building or a set of buildings.  The whole concept is it's insurance; and that's why it's regulated by the people in this building.  At the heart of the CCRC are the continuing care contracts.  And that's a contract where someone pays a down payment.  And from my recollection at that time, the down payments from CCRCs varied widely from 100,000 to over a million, depending on the CCRC.  You pay an entrance fee, and then you are insured a continuum of care.

Now, the entrance fee is not all that you pay.

There are monthly fees; and I at one point probably knew all the details of that, but those are gone.  But, anyway, for the upfront payment and payments, you get a continuum of care from retiring and living in an apartment, to needing perhaps some assisted living because of mobility or memory issues, all the way to skilled nursing when there might be about acute illness that needed treatment.  So, anyway, a CCRC is the structure that fulfills the insurance contract.

Now, in the case of University Village, as I recall, the most -- independent living for people who entered was accommodated in two separate pieces of the development.  I believe there were towers with apartments, and then there were town homes.  And the people who lived in those two were rather independent. I believe it was across the street.  And I'm thinking -- 32nd Street for some reason is sticking in my head.

But across the street was another building.  As I recall the building was three floors.  And it included skilled nursing, assisted living, and, also, I think there was a memory care wing associated with the assisted living.  Now, that, even though it was part of the CCRC campus and that care is part of the contract, that facility was also regulated by another agency -- the Agency for Health Care Administration, I believe.

And I think that was the entirety of the University Village campus.  As I recall, it was plus or minus 30 acres.

Q.   So is it fair to say that the health center -- we'll call it the health center -- and the ALF and the skilled nursing facility across the street -- that was regulated by AHCA; correct?

A.   The licences for the care were regulated by AHCA; yes.

Q.   And what role did OIR have for regulating the health center?

A.   The health center is part of the continuum of care that is part of the insurance contract.  So if there is no continuum of care, you can't have -- there is no CCRC.  To my knowledge there was at least one CCRC that had a slightly separated campus by a mile or so -- maybe a couple of miles.  But normally it's one campus where you can go from apartment living to assisted living to skilled nursing.  And so in that essence, OIR had oversight of the facility.  But the care that was taking place in that facility was under the regulation of AHCA.

Q.   Now, who issued the license for the health center -- the provider license?

A.   Well --

Q.   If I'm using the terminology correctly.

A.   Well, "provider" is a CCRC term.

Q.   Okay.  Who was the provider at University Village?

A.   Well, it was Larry Landry's companies before 2015.  And, arguably, Larry Landry never was not the provider; because the acquisition was illegal.

Q.   You say arguably --

A.   No other entity was approved as a provider.  Prior to bankruptcy court, I think there was a provider named.  But as far as the oversight of the CCRC as a functioning CCRC -- I think Larry Landry's company was Westport.  They had a certificate of authority from the Office of Insurance Regulation.  And that is the last -- when I left here, I believe -- provider; the last certificate of authority that was issued by this office.

Q.   And what was your understanding of the acquisition -- what you might call the purported acquisition or attempted acquisition, but let's just call it the acquisition by IMH.  What was your understanding of how that took place?  I mean, wasn't Mr. Landry still involved after this acquisition?

A.   The acquisition occurred either in late 2014 or early 2015.  It predated my arrival at the office.  So all I know about the acquisition is what I gleaned from

the documents. There were promissory notes between BBM Management, which was not -- which was a company run by a gentlemen named by John Bartle. So there was some consideration exchanged between this new group and Larry Landry as part of a, quote, "transfer," end quote, of the facility. But it was not -- in the opinion of this office, it was not a legal acquisition.

Q. Now, does the date of March 31, 2014, ring a bell at all?

A. That may have been the closing date for the acquisition. The dates that stick in my head are February 2015 -- because that's when I'm aware the Office sent a team down to University Village to try to figure out what was going on. But March 31st may have been the date when all the various documents were signed.

Q. But it wasn't until February 2015 that OIR sent anybody to University Village?

A. That's not correct. That's when an entire team went down. In the fall of 2014 -- actually, beginning in the summer of 2014, I believe, the office was sending repeated letters requesting information about this transfer -- we'll call it the acquisition -- about the acquisition. And I believe -- I believe the examiner -- his first name was Bernie. I don't remember his last

name.  I think he went down before 2015.

So I don't think it's accurate to say OIR didn't -- I know they went down -- a whole team, including attorneys -- in February.  I believe Bernie went down before.

Q.  And so that was five months before you joined OIR; right?

A.  Yes.

Q.  And who was the team that went down?

A.  Carolyn Morgan, Leean Chojnowski -- C-h-o-j-n-o-w-s-k-i, I believe.  I think Virginia Christie may have gone.  Again, I wasn't here.  But those are the people who I dealt with when I became involved with University Village who talked about that meeting.  I did not see minutes or an attendance roaster from that meeting, so I can't tell you everyone who was there.

Q.  Right.  Are you familiar with the name Christopher Struck?

A.  Yes, Chris Struck; he was likely there.

Q.  What was Mr. Struck's role in that 2014-2015 timeframe?

A.  I did not interact much with Mr. Struck.  So I am uncertain as to what his role was.  90 percent of my dealings were with Carolyn Morgan and Virginia Christie

as far as staff.  Chris, I know was -- he was a longtime staff member who was involved with CCRCs.  I recall him being -- people went to him with questions.  But when I was involved with University Village in the litigation, Mr. Struck was not a involved on a daily or even weekly basis.  And I don't believe he was ever listed as a witness.

Q.   A witness in the DOAH proceeding?

A.   Correct.

Q.   And that's D-O-A-H.

So when did Carolyn Morgan -- what was Carolyn Morgan's title at this time?

A.   I'm embarrassed I don't know it.  She is in life and health.  And I cannot remember the title.

Q.   Was she -- it is fair to say that she was sort of in charge of CCRCs in Florida?  Or how would you describe sort of her role from a layperson's prospective?

A.   Well, I mean, of course, unless the things have changed, the person in charge is the commissioner.  There are no delegations of authority.  If you want the final word from the Office -- at least when I was here -- it was the commissioner, then the deputy commissioner.  And I believe Carolyn was maybe in the org chart right below the deputy commissioner.  I don't

know that there was another person between her.  So for day-to-day matters, Carolyn was indeed the lead person. But ultimate decisions on any of the major matters in this would have come from the office of the commissioner.

Q.   And who was that at the time?

A.   It was two commissioners.  It was Kevin McCarty when it started, and then David Altmaier after Commissioner McCarty left.

Q.   And who was deputy commissioner?

A.   The deputy commissioner for life and health under Kevin was Eric -- his last name I'm forgetting. David Altmaier was property and casualty deputy.  And then I think after Eric, Craig Wright -- W-r-i-g-h-t -- was deputy of life and health.  And I don't recall anybody in between the two of them.

Q.   All right.  And do you know who had Carolyn Morgan's position before she did?

A.   No.

Q.   Could it have been Chris Struck?

A.   I would be guessing.  I do not know.

Q.   Okay.  Chris Struck was somebody who was a lifetime staff member who was involved with CCRCs, I think is what you said.

A.   Yes.

Q.   And when you say "involved," -- do you have any specifics you would sort of reference in saying how he was involved?  Like, titles, roles, or just your general understanding of what Chris Struck did with respect to CCRCs?

A.   No.  My recollection is -- I was in meetings; I never instigated them.  But Chris Struck was used as a resource for the history of Chapter 651.  As I recall, he was familiar with maybe its initial passage, but certainly the evolution of the current state of Chapter 651.  And it's my recollection that's when he was consulted.  Also, my general recollection is he was not in life and health at that time; he was in another section.  I cannot remember what section that is or was.

Q.   Okay.  Are you familiar with the -- I don't want to say "situation"; that's too vague.  But of sort of that January 2014 to March 2014 timeframe, are you familiar with a lender with respect to University Village known as Horizon?

A.   The name rings a bell.  But I'm not recalling anything specifically.

Q.   Okay.  So you -- in terms of the hallway conversations or sort of the discussions with Tim Gray and just kind of what you were getting from sort of the just general conversations about University Village, you

never heard that there was a forced deed in lieu and a foreclosure going on at University Village initiated by Horizon? Were you aware of that?

A. Not the specifics, no. I do recall there was a balloon mortgage and -- I mean, there was an interest only mortgage; there was a balloon payment. And other than that, I just -- I remember Horizon being mentioned. But, no, the specifics, I do not remember.

Q. Okay. And you don't know exactly when Carolyn Morgan assumed her role?

A. I'm sorry?

Q. The day Carolyn Morgan came into her position?

A. No. When I got involved in this, Carolyn Morgan was the point person for the agency. Now, I don't know if that was because of her position or because of her knowledge of this specific CCRC. But she was the point person.

Q. Do you know what her position was prior to becoming that point person?

A. What her title was?

Q. Yes.

A. No.

Q. Okay. Do you know what sort of her function was or her job? Was she involved with CCRCs before she -- in other words, did she work her way up the ranks

to this?  Or did she come from a different area and kind of came over to CCRCs?

A.   It's my recollection that there was not a CCRC unit or something; just it was a function of the life and health side of the building.  Some staffers for whatever reason had more historic involvement with CCRCs, and so maybe they got more of those assignments. But to my knowledge, it was not a "this is the CCRC section."

Q.   So before I get too far into the history, let's go back to a couple of things you said in terms of discussing sort of the basics of CCRCs.  You mentioned that continuing care contracts are sort of the heart of the CCRC; right?

A.   I mean, I think it's the foundation.  That's what it's built on, is those contracts.  It's insurance.

Q.   Correct.

A.   And the foundation of insurance is your insurance policy.  And that's the same thing here -- the foundation of the CCRC is the insurance policy.

Q.   And you said you had the entrance fees and also what's been referred to as the initial entry deposit -- the IED.

A.   It could be.  But it's -- I remember it as the entrance fee.  But whatever CCRC calls it, as long as it

met the statutory criteria -- IED might be a term.

Q.   Okay.  And you mentioned the phrase "continuum of care" -- that the purchase of the life care contract creates the right to an expectation of a continuum of care.  Is that fair to say?  If I understand your testimony so far?

A.   Yes.  I mean, that's the entire concept of a continuing care retirement community -- where you can stay in place, even when you get sick or even when your health gets to a point where you might need a little bit of help getting around.  Or with meals or something, you can go to assisted living.

Q.   So would it be fair to characterize the components -- and we talked about the independent living facility, which would be the towers and the town homes. I guess they were also called the villas; is that fair? And then the health center as sort of interrelated.  Is that -- well, whatever phrase you would use in terms of providing the continuum of care -- those health services.

A.   They're all necessary components; whether they're in the same building or across the street.  So the health center is as necessary a component as the towers, if that's where the continuum of care.  And it's my recollection the average stay for a CCRC resident is

about 12 years.  So if that's the mien or median, you can see on either side of that that people are getting in in their sixties.  You are going to have a continuum of care.

Q.   So it is also fair to say that without the health center, there would be no CCRC?  You would not be able to sell life care contracts?

A.   Without a continuum of care; correct.  They don't want to foreclose, there might be another possibility.  But if the health center went away, that function would have to be replaced in a manner consistent with the statute.

Q.   And what would be the manner consistent with the statute?

A.   What I'm referring to there is -- I think there is a geographic component.  And, again, I have not read 651 since I left OIR.  It's a wonderful statute, but I have new ones to read now.  But I think there is a campus-like requirement; in other words, you don't want independent living to take place on one side of town and then an hour on the other side of town is the skilled nursing.

One of the reasons that I understand for that arrangement is -- it's not uncommon for couples to go into CCRC.  I know I talked many times with Mr. Walter

Page 25

Hood and his wife.  And that was very important to them -- that if one of them would get sick or need assistance in living, that they would be in very close proximity to one another and not have to go in a car and drive across town to the hospital.

Q.   And would Mr. Hood's sort of experience and his opinion, you think, be common to the couples that were at University Village?

A.   I do not think that you can generalize.  What I was told about CCRCs -- and I think it rings true -- is if you've seen one CCRC, you've seen one CCRC.  They're all different.  And all the residents are different.  I do think that there are those who are like Mr. and Mrs. Hood -- who died a few years ago, I think at 99.

Q.   Good for him.

A.   He never went to assisted living; he stayed in his villa, as I understand it.  But I also know there was another lady there who I met at the first bankruptcy hearing who moved in.  And she was about my age now -- quite young and single.  So I don't think that the Hoods are, you know, some known percentage of the CCRCs.

Q.   What about -- not all CCRCs, but just University Village, the demographic that was there? Were you familiar with that?  And would you say that the Hoods were representative?

A.    I was only familiar with the residents I met at the bankruptcy proceedings.  I've never been to University Village.  I've driven by it; I've never been in and met the people.  I met a wide variety of residents at bankruptcy hearings -- from the retired meteorologist; I know there was a former speaker for the house of representatives who was living there; the Hoods.  It's a wide spectrum of people.

Q.    All right.  So going back to what you said when you first started describing your arrival at OIR in February of 2015 -- you said there was some sort of suspension that was going on?  Or a DOAH hearing?

A.    There was -- as I recall, there was a suspension -- what would be in the nature of an administrative complaint or a notice of violation.  And it had been withdrawn by the agency -- this was before I arrived -- to allow time for some negotiations.  And, again, apparently this was all happening before I arrived; and then that didn't go so well.

And then I'm trying to recall whether that petition was sent back to DOAH or a new one was filed, and I'm not at all clear.  But then there was a hearing scheduled for DOAH.  And as that hearing approached, I got more involved.

Q.    Okay.  And when was that hearing?

A.   I can't remember if it was in '15 or '16.  I know it got moved a couple times because of attorney conflicts.  I can't remember exactly when it was.  But what happened in the meantime is Mr. Gray had some personal health issues -- and if we could leave it at that, I'd like to.  And he was not able to participate as actively in the litigation.

And so because I have a -- litigation is what I've done for most of my career, I stepped in and became more involved with University Village leading up to that first hearing.  That first hearing was largely a -- even though it was a disputed fact hearing that was heard at DOAH before Judge Early -- it was mainly a legal issue.  And the issue was whether or not IMH Healthcare actually tripped the acquisition statute -- whether they were required to file for acquisition.  Their position was because of the manner in which they approached it, they didn't trigger the acquisition statute.  OIR's position was, no, you did.  That's what the DOAH hearing was about -- the first one.

Q.   Okay.  And was there one hearing on that issue?  Or was there multiple hearings on that issue?

A.   There was one DOAH hearing.  Judge Early issued a recommended order that was unfavorable to the agency.  His recommended order was in favor of IMH Healthcare.

He found that they did not trip the statutory requirements for acquisition.  The agency in its final order reversed Judge Early on that legal ground and found that the actions of IMH Healthcare did trip the acquisition statute.  That was appealed to the First District and affirmed.

Q.   Okay.  So then the reversal of Judge Early was affirmed by the First DCA?

A.   Correct.  And so the end of the day ruling was IMH had triggered the requirement to file for acquisition under the statute.

MR. WHITSON:  So in terms of the recommended order -- I brought this for a reason.  So I'm just going to -- and I only have two copies.  But I'm not going to go over it extensively.

(Defendant's Exhibit No. D1 was marked for identification.)

BY MR. WHITSON:

Q.   But I'll show you what we're going to mark as Exhibit 1 to your deposition, Mr. Stiller.  It's a document titled "Recommended Order -- IMH Healthcare, LLC, petitioner, versus Office of Insurance Regulation." Do you see that there?

A.   I see it.

Q.   Is that the recommended order you were

referring to?  You can take a moment to read through it, if you'd like, just to make sure.

A.    It is.  I'm looking at the dates.  And now I'm remembering this was originally scheduled for September of 2015, but then was moved to November.  Yes.  This is it.

MS. NOVAK:  Can I just take a quick look at it.
BY MR. WHITSON:

Q.    Do you remember the basis on which the agency -- I guess I didn't understand that procedure. So there was a recommended order by Judge Early?

A.    Correct.

Q.    And you said that the agency reversed that?

A.    Right.  Recommended orders come back to an agency from the Division of Administrative Hearing --

Q.    And what agency would that be here?

A.    Office of Insurance Regulation.  Whenever a petition is filed rasing issues of disputed fact, an agency can refer it over to DOAH for the assignment of an administrative law judge and the preparation of a recommended order.  That's what happened in this instance.  When the recommended order comes back to the agency, the agency can reject findings of fact if they're not supported by competent substantial evidence, and can reverse conclusions of law if a contrary

conclusion would be as or more reasonable -- at least that was the law then.

When Judge Early concluded that the statute was not triggered based on his interpretation of Chapter 651 -- when it came to the agency, the agency had a contrary interpretation, which found it was more reasonable.  And so it flipped the legal conclusion, which flipped the recommended order.  That went to the First District, and the First District affirmed it.

Q.   So the factual determinations that Judge Early made were not disturbed, but his conclusions of law was reversed by the agency; is that fair to say?

A.   I would have to read the final order, because there may have been findings of fact that were reversed. But the main point -- and the point that was litigated and argued before the First District in my recollection -- was a pure legal issue.

MR. WHITSON:  Okay.  So let me -- now that I'm on a roll with exhibits -- I have extra copies of this.  Let me show you Exhibit 2 to your deposition. It is a copy of an organizational chart.

(Defendant's Exhibit No. D2 was marked for identification.)

BY MR. WHITSON:

Q.   Take a moment to familiarize yourself with

that.  Does this chart look familiar to you?  Have you seen this chart before?

A.   I don't know if I've seen this precise chart before.  I can tell you that from the period 2014 through 2015, University produced multiple organizational charts.  And at the agency here, we tried to prepare our own.  Because it was not entirely clear what the organization was.

Q.   So the OIR prepared its own organizational chart for University Village?

A.   I believe we did.  I mean, when I say prepared our own, it would have been taking what's been handed to me entitled "University Village" --

Q.   You mean Exhibit 2?

A.   Given to me; right.  There might just be some notations on it.  I mean, the -- I can't remember the specific differences.  But when we received organizational charts, I remember we received one that disagreed with the last one.  And so we'd take the two and try to put them together and try to make sense of them.  That's what I mean about creating our own organizational chart.  It was just trying to understand what was actually happening.

        But this looks -- these names are all familiar.  And as far as the organization up top -- Westport

Nursing, Westport Holdings, and Westport Holdings Tampa II -- that's very familiar.

Q. You mean that middle row, rather than the top? Because there are other entities listed up top there.

A. Not on the one I have.

Q. Oh. We have different --

A. See? Right now we have different organizational charts.

MR. WHITSON: You know what? You're right.

Which one did I you give you?

MR. WARREN: I have --

MR. WHITSON: That one.

You have the -- so we'll work from this one, then. This is Exhibit 2.

MR. WARNER: Just so I'm correct, is the one that's got in the lower right-hand corner No. 3674 --

MR. WHITSON: That's right.

MR. WARREN: -- .1. That is your Exhibit 2?

MR. WHITSON: Correct. That's the control number; right.

BY MR. WHITSON:

Q. So you're saying that those entities at the top of Exhibit 2 are correct?

A. That it's my recollection -- that Westport

Nursing Tampa, LLC, held the healthcare centers; Westport Holdings Tampa, the towers; and Westport Tampa II, I believe, the villas.  I think that's the way it was working.

Q.   And prior to this structure, are you familiar with how these entities were owned or organized?

A.   No.

Q.   Through your conversations with Mr. Gray or any others at OIR, did you have a understanding of how these entities were organized or owned prior to March 31, 2014?

A.   No.  My recollection and what I was told is they were owned by Larry Landry entities.  I can't remember what those entities were.

Q.   Okay.  So let's go back to the issue about whether or not the -- I don't know how you want to phrase it -- the change of ownership requirements were tripped.  Is that fair to say?

A.   Okay.  I understand what you're saying.

Q.   Is that accurate?

A.   Yes.

Q.   Okay.  That gets affirmed by the First DCA. What happens next?

A.   What happened next, as I recall, is we prepared maybe four separate petitions to file at Division of

Administrative Hearings.  Because now that we had a legal ruling that they should have but did not apply to -- they did not properly acquire.  They were in essence illegal owners, squatters.  And so the agency prepared and instituted administrative actions to take the next step.  And that is get an order that says the acquisition was illegal.  Because the first order just says you had to apply.  And it's my recollection that the relief -- the statutory relief in the case of an illegal acquisition is that the acquiring party can be ordered to divest its assets.  And that was the ultimate goal -- was to have the new purported owners divested of any claim of ownership interest in University Village.

Q.   Would that be essentially a recission?  Would everything then revert back to the prior structure?  Or what was sort of the end goal there?

A.   There was an immediate goal.  And the immediate goal was to get the illegal owners out.

Q.   Well, "illegal owners" was the terminology OIR used; right?

A.   Right.

Q.   There was never any determination of illegality, was there?

A.   There was a court decision saying they needed to apply to acquire.  There was the fact they never did

apply.  So they were not in the view of the agency the legal owners.  They were not a provider.  I believe the statute requires notice prior to an acquisition, also.

Q.   Did the OIR take position they didn't have notice of this acquisition?

A.   The OIR was not given prior notice of the acquisition.

Q.   All right.  That's their position?  Or are you saying that definitively?

A.   It's my recollection that prior to the execution of the acquisition documents, there was no notice given to the OIR.  That's my recollection.

MR. WHITSON:  Okay.  And how much -- let me just go through it, then.  Hang on.  I think I have enough copies of this one.

Mr. Stiller, I'm going to show you what we're going to mark as Exhibit 3 to your deposition -- correspondence dated March 31, 2014.  I've got one extra copy, if you want to show it to Lorraine.

I know you have seen that before.

MS. NOVAK:  Oh, I've seen that before.  Yeah.

MR. WHITSON:  You've seen that before; right, Mr. Warren?

MR. WARREN:  Have I seen this before?

MR. WHITSON:  Yeah.

MR. WARREN:  Yeah.

(Defendant's Exhibit No. D3 was marked for identification.)

BY MR. WHITSON:

Q.   Okay.  Mr. Stiller, have you seen Exhibit 3 before?

A.   I think I have.

Q.   All right.  And take a moment to review that. And is it your understanding that along with this letter -- this basically addresses the MLR -- what we'll call the MLR issue -- with the minimum loss reserve; correct?

A.   I think it's minimum liquid reserve.

Q.   I'm sorry; I keep saying it -- and along with this letter did not warrant all the loan documents for that transaction that closed on March 31, 2014, transmitted to OIR?

A.   Well, this says there's an Exhibit A, but there is no Exhibit A.

MR. WHITSON:  Right.  I've got -- actually, there's a more complete copy attached to the affidavit of Carolyn Morgan, which is a much larger document.  I only have one copy of this.  This is an excerpt from that document.  Look at that real quick.  I only have one copy.

MR. WARNER:  I'm guess I'm not understanding --

MR. WHITSON:  That was all a part of that letter.  And that's a copy I got from OIR.  You got all of these.  We sent them all to you.

MR. WARNER:  Just to be accurate, a copy of what was sent to you is going to be sent to me so I have a complete copy.

MS. NOVAK:  Is this what I sent you yesterday?

MR. WHITSON:  Yes.  This is the supplemental affidavit of Carolyn Morgan.

MS. NOVAK:  Yes.  I can send you all of that. I'll make a note to do that.

MR. WHITSON:  Well, I think my office sent you everything too.  I told them to.

MR. WARNER:  I'm not saying they didn't.  I'm just wanting to be careful.

MR. WHITSON:  Okay.

MS. NOVAK:  So you understand, I'm going to be sending Mr. Warren all the documents that I've sent over to you the last few days.

MR. WHITSON:  That's fine.  We have an agreement that I would send him whatever we got.

MS. NOVAK:  Sure.

MR. WHITSON:  And I sent him what you sent to me.  But if you want to --

MS. NOVAK:  Sure.  Nobody is trying to fool anyone, but we just want to make sure --

MR. WHITSON:  No, that's fine.

MS. NOVAK:  -- it's accurate and complete.

MR. WHITSON:  Yeah.

MR. WARREN:  Just so I'm not more confused than I already am -- what you identified appears to me to be the same letter from Mr. Rabke to the OIR on March 31st, 2014, which references an assignment and pledge of account, cash collateral -- Exhibit A. And then there's an unsigned copy of what's marked as an assignment and pledge of deposit account, but it's not actually a copy that was signed.  And then in addition, there's an Exhibit B; which is not referenced in the letter that is saying USAB note attached.  And then there's an unsigned copy of a note.

So I guess what I'm trying to understand is is all of this part of the same -- and then there's other documents behind this as well.  It looks like maybe it's a copy of a closing statement.

MR. WHITSON:  What I'm saying is that is part of Exhibit Q to an affidavit of Carolyn Morgan that was produced by the OIR in response to a document request.

MR. WARREN:  Well, maybe my suggestion would be instead of taking pieces out of Ms. Morgan's affidavit, maybe you should put her entire affidavit and mark it.  And then you can refer to the pieces of it so that --

MR. WHITSON:  That's what I was going to do.

MR. WARREN:  Okay.

MR. WHITSON:  Just move it in.

MR. WARREN:  Yeah.

MR. WHITSON:  I wanted to show it -- this is really the relevant excerpt we're talking about here.  You saw what I was going to show the witness, but --

MR. WARNER:  Yeah.  My concern was whether that was the same document that was sent after the closing to OIR.  That was my concern.

MR. WHITSON:  Right.  And that's what's referenced in the supplemental affidavit of Carolyn Morgan.  So, with that, I'll just make the entire affidavit Exhibit 4.

Is that where we are?

THE COURT REPORTER:  Yes.

MR. WHITSON:  Okay.  This is Exhibit 4.

(Defendant's Exhibit No. D4 was marked for identification.)

MR. WHITSON:  And, Ms. Novak, given the volume of this, can you do just an electronic version?  I can just email what you sent me, or you can provide it if you want if you want to send it to Mr. Warren.

MS. NOVAK:  I was going to do that, depending on when we got done today, with all the documents. And that will be among them.

MR. WHITSON:  Okay.

MS. NOVAK:  So it's easier electronically; that's for sure.

MR. WHITSON:  That's the --

MR. WARNER:  So you are going to mark that as Exhibit -- the entire -- is it the supplemental affidavit?

MR. WHITSON:  It's the supplemental affidavit, yes.

MS. NOVAK:  It's a big document.  There's at least 20 -- maybe probably more like 30 or 40 attachments to it.  But it's all included in the electronic document.

BY MR. WHITSON:

Q.   Bernie Stuffle?

A.   That's him.

Q.   He was the examiner?

A.   He was the examiner for University Village;

correct.

MR. WARNER:  And just for the record, because there was a bankruptcy examiner who I can relate to, this was an examiner --

MR. WHITSON:  You bear some resemblance to that person.

MR. WARREN:  Who I know quite intimately.  For the record, it was myself.  That he is an examiner for OIR who actually -- physically located at University Village is my understanding.

THE WITNESS:  Mr. Warren's recitation is correct.  Mr. Stuffle was an OIR employee and was sent down there by OIR to serve as -- little e -- examiner; not in any way related in any fashion to in any way to the Bankruptcy -- capital E -- Examiner.

MR. WHITSON:  Okay.  So let me put this...

MS. NOVAK:  Off the record.

(Discussion off the record.)

BY MR. WHITSON:

Q.   Mr. Stiller, we have marked the supplemental affidavit of Carolyn Morgan that was produced by OIR as Exhibit 4 to your deposition.  And I'll refer you to Exhibit Q to that affidavit - which contains the letter that I gave you, which is another copy of Exhibit 3 to

your deposition with attachments.  Do you see those there?

A.    I do.  Okay.

Q.    And do those attachments -- why don't you just take a moment to just read the title of those documents into the record, so the record shows what you're looking at.

A.    Okay.  Exhibit A to the Williams Mullen letter is titled "Assignment and Pledge of Deposit Account." And Exhibit B is titled "Promissory Note."  And it is between Westport Nursing Tampa, LLC, and USAmeriBank.

Q.    Have you have seen -- I may have asked you this before; if so I apologize.  Have you seen Exhibit Q -- any of those documents or that letter or before?

A.    I have.  And we just took a break, and I was staring at this letter over the break.  And I do recall seeing it.

Q.    Do you recall when you first saw it?

A.    I do not.

Q.    Well, the letter predated your employment at OIR; correct?

A.    Correct.

Q.    But you don't recall the circumstances under which you first saw the letter?

A.    I believe the first time I saw the letter was

when it was produced to OIR from another party.

Q.   And who was that party?

A.   I do not recall.  The early litigation -- you know, the firm representing Westport was Broad and Cassel, so maybe it came from them.  But I -- my general recollection is that there was some -- there was great uncertainty on the OIR side about this letter.  I'm looking at it.  It doesn't have a received stamp on it, which is unusual.  Mail that is received at OIR -- at least when I was here in the three agencies I worked at -- is stamped as received when it's received.

And staring at this over the break it's coming back to me that that was a question.  Internally we were asking why -- okay; this was obviously sent.  It says it was sent to OIR via FedEx; presumably there's a tracking number somewhere.  I don't recall ever seeing that, and I don't recall ever seeing a received stamp.  And there, again, that gave rise to some uncertainty.

Now, I'm not sure if this was ultimately found in OIR records or not.  That's one part that I have been thinking about, and I do not have a firm recollection. But I do believe the first time I saw it, it came from an outside source.

Q.   But it is attached to Exhibit 4 -- the supplemental affidavit of Carolyn Morgan.  I pulled it

out of here.

A.   I'll take your word that it's attached.  And it certainly -- if it's attached, it's attached.

MR. WARREN:  May I ask for the record:  Which matter was that supplemental affidavit filed in?

MR. WHITSON:  I don't know.  This was produced by OIR.  It doesn't have a caption on it.

BY MR. WHITSON:

Q.   So if you'll read Paragraph 23 of her affidavit -- could you read that into the record.

A.   Sure.  "On March 31, 2014, W. Wilhelm Rabke on behalf of University Village and Westport Nursing, informed the Office that Westport Nursing was a wholly owned subsidiary of University Village, but was 'undergoing a refinancing and restructuring' to cause Westport Nursing 'to become a sister entity' to University Village.  Mr. Rabke stated that, as part of this restructuring, University Village was 'transferring' $3 million of its MLR to Westport Nursing, characterized as 'another affiliate.' Mr. Rabke further represented that University Village and Westport Nursing were owned by 'identical owners.' Mr. Rabke stated that $3 million would be used to satisfy the MLR requirements for University Village and Westport Nursing and would 'continue to be considered a

portion of MLR Escrow' as required by Section 651.035(1)(b), Florida Statutes."

Q.   Okay.   Thank you.

Now, so in her affidavit -- do you agree with me Mrs. Morgan doesn't raise any issue about the date on which notice was given to the OIR?

A.   She doesn't mention anything about a date of receipt; correct.

Q.   But she does say on March 31, 2014, W. Wilhelm Rabke, on behalf of University Village and Westport Nursing informed the Office that Westport Nursing was a wholly owned subsidiary of University Village, but was undergoing a refinancing and restructuring to cause Westport Nursing to become a sister entity to University Village.   She does that; correct?   You read that language in her affidavit?

A.   That's what the affidavit said; correct.

Q.   Okay.   So attached to that Exhibit Q to Exhibit 4 -- the Carolyn Morgan supplemental affidavit -- there is an Assignment and Pledge of Deposit Account.   You noted that when you were going through the documents. Would you mind reading the Recitals C and D.

A.   C:   "The Cash Collateral Funds (as defined below) deposited by Pledgor hereunder shall be included in the Pledgor's reserve requirements as required under

Section 651.035 of the Florida Statutes (the 'MLR Statute'), as such Cash Collateral Funds meet the statutory uses allowed under Section 1(b) of the MLR Statute."

Paragraph D:  "The MLR Statute provides that the State of Florida (the 'Department') shall have information rights regarding the Cash Collateral Funds."

Q.   Okay.  So I'm not asking you to say whether or not you agree with that.  But to the extent that that language and this document were included in March 31, 2014, letter -- Exhibit Q to Exhibit 4 -- that Ms. Morgan is saying that notice of that provision -- these documents -- was given to OIR as of March 31, 2014.  Is that a fair statement of what her affidavit seems to indicate?

A.   I mean, I would be speculating as to what Ms. Morgan meant.  She referenced the letter and OIR being informed of the contents of the letter.

Q.   Right.  And she attached that Assignment and Pledge of Deposit agreement to her affidavit.

A.   That is correct.

MR. WHITSON:  Okay.

MR. WARREN:  So this was marked as Exhibit 4?

MR. WHITSON:  Right.  I'll just leave it in here.  I mean, I may need to -- off the record.

(Discussion off the record.)

BY MR. WHITSON:

Q.   Are you aware of whether or not OIR took -- ever made any response to the March 31, 2014, letter from the Williams Mullen firm -- Mr. Rabke?

A.   I'm not aware of any response or whether one was sent.

Q.   All right.  Did you ever -- were you ever involved in any conversations or meetings concerning -- where that letter was discussed?  Any meetings involving Ms. Morgan or Mr. Gray or anyone at OIR?

A.   I probably was.  I don't remember any specifics other than, like I said, I have a general recollection that there was an uncertainty about this letter; because, number one, it was sent to "whom it may concern," which is generally not how you give notice of something.  And, two, there was no received stamp.  That's the only general matters I recall about this letter.  And once I saw the heading I recalled seeing it.  And that's it.

Q.   Right.  But you agree with me Ms. Morgan doesn't express any such uncertainty when she refers to it in her affidavit?

A.   Her affidavit just says they were informed.  But, yes, the word "uncertainty" does not appear in

Page 48

there.

Q. All right. So let's go back to the proceedings that were ongoing as you entered the agency in February 2015.

A. July.

Q. I'm sorry. July 2015; right.

So there has been a recommended order. The agency essentially rejected that recommended order from Judge Early. And then that was submitted to the First DCA, and that was affirmed by the First DCA saying that the statute had to be complied with or was tripped or whatever your word. And I'm just trying to catch up to where we were before. So I'm not trying to hold you to what I'm saying, but just kind of bringing us back to where you were in your testimony before we went into the Williams Mullen letter. Is that right?

A. That's about right.

Q. Okay. So -- okay. As the man said, "Then what happens?"

A. Then we prepared, as I recall, a number of petitions to be filed at DOAH. And there were a number of them. And, as I recall, Mr. Freiden -- I think he filed an application here, if I'm remembering correctly. Because there was a second DOAH hearing scheduled. And I'm trying to remember if it was on the Administrative

Complaint of the Agency seeking to remove the alleged illegal owners, if it was a denial of Mr. Freiden's application, or maybe it was a consolidation of those two.  And the reason I'm uncertain is because I tried that case and I remember with DOAH we went first with the burden of proof.  So it actually could be either one.

But that was the next step.  There were a number of petitions filed at DOHA; some were held in abeyance on the understanding that by litigating whether Mr. Freiden could or could not be licensed in essence, we would resolve the other petitions.  Parallel over in the Second Circuit, I believe the receivership proceeding was proceeding.  That's what Ms. Morgan's affidavits were for.

Q.   Okay.  For the Second DCA?

A.   No.  For referal to receive -- it's very likely as part of the referal of Westport Holdings to the Department of Financial Services to institute receivership proceedings.

Q.   But weren't those in front of Judge Shelfer here in Leon County?

A.   They were originally before Judge Dempsey, and then they were transferred to Judge Shelfer when the judges rotated.

Q.   You mentioned the Second DCA, though.

A.   Second Circuit.

Q.   I apologize.  I didn't process what you said correctly.  Okay.  So I can follow the various tracts of litigation, there were a number of DOAH petitions prepared -- some held in abeyance, some, I guess, proceeded involving -- was Mr. Freiden's application denied by the agency and that was the subject one challenge?

A.   I have a faint recollection that he filed an application, because I remember deposing him on his qualifications.  But, again, it's been awhile, and I can't remember exactly.

There were four DOAH petitions, and I believe two were consolidated for hearing.  And that did go to hearing before Judge Alexander at DOAH.  Simultaneously the receivership proceeding was occurring in the Second Circuit.  And, in fact, between Judges Dempsey and Shelfer, we had Judge Cooper who denied the motion to stay the DOAH proceeding because the receivership was going on.  There was a lot going on.  I want to say that she was probably putting ten to twelve hours a day into this matter.

Q.   Thank you for providing some guidance.  Because I tried to follow this from the documents, and I wasn't

really able to track in my mind exactly which proceeding was going on and, you know, what it was trying to achieve.

I did notice that there were orders of suspension that were entered.  Are you familiar with those?  Can you elaborate on the context of those orders?

A.    An order of suspension -- as I recall, I referred to an administrative complaint.  It's -- an order of suspension, a notice of violation, or administrative complaint -- no matter what you call it, that is under 121; the Agency takes affirmative action and becomes the petitioner.

Q.    You said order of suspension, notice of violation --

A.    Administrative complaint.  It depends what agency you're at.  They get different labels.  But if you want to go to Chapter 120, it calls them all administrative complaints.  And it is an agency affirmatively reaching out to someone who is regulated and saying you violated the regulations, or someone that should be regulated and say you're not following regulations.

Q.    Okay.  So I'll just jump to, you know, my understanding.  And you can sort of tell me where I'm

wrong or maybe backfill exactly how we got to that point. But did there ever come a time where there was any sort of order or action by OIR to prevent University Village -- the ILF -- from selling any more life care contracts or continuing care contracts? I assume those are synonymous terms. I've seen both used.

A.   I believe that -- let me back up. If you're not the -- if you're not a provider, if you haven't received a certificate of authority from the Office, you cannot sell continuing care contracts. You are not an insurer. Just as I couldn't walk out on Monroe Street here and start selling life insurance policies.

So I do believe that there were allegations in one or more petitions that University should not and was legally prohibited from selling -- entering into continuing care contracts.

Q.   Okay.

A.   I don't recall if that was an independent petition on its own, or if it was just one of the allegations within a larger petition.

Q.   Okay. And you used the phrase "allegation." But once the agency gives notice that you're not allowed to sell any more life care contracts -- continuing care contracts -- what is the effect of that? Does that by its own stop the sale?

A.    No.

Q.    Okay.

A.    An agency order of suspension -- administrative complaint or whatever -- is agency action with challenge.  It's not final.  The only action that agency could have taken which would have had the immediate effect of stopping the sale of contracts would be to enter an emergency final order.  And that is final from its issuance and binding until you go and get it dissolved.  It's like an injunction.

In this case, she issued an order of suspension, Westport's counsel filed a petition seeking a hearing on that.  That in essence holds the order of suspension in abeyance until you get a final order following a disputed fact hearing.  So that's the long answer.  The short answer is:  No, it did not have the immediate effect of stopping the sale of contracts.

Q.    Okay.  Did anything ever occur in those proceedings which resulted in stopping the sale of life care contracts?

A.    We did not get to a final order, because prior to the final order in this matter the entity filed for bankruptcy and the automatic stay kicked in.

Q.    That was the receivership though; right?  There was the hearing on the receivership in front of Judge

Shelfer.  Isn't that when -- September 22nd, 2016 -- isn't that when the petition was filed?

A.   I don't recall.

Q.   Okay.  You mentioned the receivership proceeding, though; right?  There was a referral to DFS --

A.   There was.

Q.   -- to initiate a receivership proceeding.

A.   There was.

Q.   Can you tell me little bit about that.

A.   I was not involved.  Just, you know, when the Department of Insurance was split up and no longer -- the insurance commissioner was no longer a member of cabinet, the functions of DOI got split.  And one of the outcomes of that split is while OIR regulates the insurers, Depart of Financial Services does receiverships.  So the reason you will see an affidavit of Carolyn Morgan is one agency -- OIR -- actually refers the matter to another agency -- DFS -- a partner agency; a separate agency.  And DFS does the receivership.

So from that point forward -- I mean, I was not the attorney for the receivership.  That was -- Miriam Victorian, I believe is her name.  So I was -- I was not directly involved in the receivership.

Q.   Okay.  Do you know whether or not University Village or Westport Holdings continued to sell life care contracts after the order for suspension was issued?

A.   I do not know if they sold any after the order of suspension.  I do recall that after the -- whatever we're going to call it -- the March 31st '14, that acquisition.  From that point going forward, they did continue to sell contracts -- I think 15 or 20 or so.

Q.   When was the order of suspension issued, though?

A.   I don't recall.

Q.   Is it fair to say it was in 2015?

A.   I don't know.  I don't recall the dates.  And, again, there were different orders.  There were orders entered before I showed up here that were withdrawn.  So I don't know what date are on those.

The proceedings I was involved in would probably have to be '16, because we had to wait for the First District opinion to become final before we knew we were standing on solid law to go forward.  So 2016 may very well be right.  I'm not disagreeing with you.  I just don't have that firm of a recollection.  But based on other recollections it makes sense that it would be 2016.

Q.   I was thinking it may have actually been 2015.

That's why it wouldn't have been when you were there.

A.    There may have been one issued in 2015 early on.  Like I said, I wasn't here.  I know there was things done and withdrawn.  Because at that time and always through the thing there was the hope that there would be a breakthrough.  And I think early on in that spirit there was something that was filed and withdrawn.  But, again, I wasn't here.  And for whatever reason, I don't recall what that was.

Q.    Well, let's explore that for a moment.  You said that it was always -- and you mentioned earlier there was sort of a suspension or withdrawal to allow the parties to negotiate further in some sort of aspect of all this.  But what was the hope for the breakthrough?  What was sort of the settlement at that time that the OIR was hoping to achieve rather than, you know, essentially a recision, if you will?

You know, if this was not -- this acquisition was not done correctly and there was more applications that had to be, you know, submitted or approvals to be submitted before it was -- it should have been consummated?  What was the hope for the breakthrough, to use your phrase?  What sort of the end game here -- the solution that OIR was hoping would come about?

A.    That a qualified provider would apply and

receive a certificate of authority.  That is -- that was the way out then.

The last snapshot of University Village was audited financial in 2014.  It wasn't in that bad of shape.  It was certainly showing some downturns in finances.  I believe there was a loss, if I'm remembering correctly, in 2014.  But it wasn't tragic. There was some deferred repairs.  But overall in 2015, at least in the assessment of OIR, University Village could continue.  The problem was we didn't have an approved provider.  The problem was we didn't have someone who was qualified to get the certificate of authority to move forward.  So that was the solution that was sought at that time.

Q.   And was there any thought that the existing group could somehow qualify as a provider?  Or was there some other thought?

A.    Until someone submits their biographical and background information and gives the Office a set of prints, it's hard to know.  But on the surface, there was no one who had any experience in continuing care retirement communities who was part of this current team.

Q.    Okay.  So are you familiar with the proceedings of the revocation -- the licence revocation proceedings

that were sort of ongoing even after the bankruptcy case was filed?

A.    What licences?

Q.    The one for the ILF and I think the one for the ALF.  One was in front of the First DCA, and one was for some reason in front of the Second DCA.

A.    The only --

MR. WARREN:  Did you say "ILF"?  Did you mean the ALF and the SNF?

MR. WHITSON:  Was it the SNF?  I thought the ILF --

MR. WARREN:  It wouldn't have been revocation proceedings with respect to the ILF, other than what OIR and DFS was doing.

MR. WHITSON:  Maybe we should go off the record.

(Brief recess.)

MR. WHITSON:  Mr. Stiller, before we broke for lunch, we were talking about actions that OIR had taken with respect to the -- this argument that there is a requirement that certain application or approvals to be a provider were not obtained in connection with the March 31st, 2014, sale.

(Defendant's Exhibit No. D5 was marked for identification.)

MR. WHITSON:  I'll show what we'll mark as Exhibit 5 to your deposition.  It's just a copy of the 2014 Statute 651.1081, which says "Remedies available in case of unlawful sale --"

MS. NOVAK:  I'm sorry.  You're putting in an old copy of the statute as an exhibit?  Okay.

MR. WHITSON:  Well, it's because it's the law at the time in 2014.

BY MR. WHITSON:

Q.   It says, "Upon a determination by the Office that a provider..."  Would "the Office" be the Office of Insurance Regulation?

A.   Presumably.  This is Chapter 651.

Q.   "...that a provider is or has been violating the provisions of this chapter, the office may order the provider to cease sales and make a recission offer to the resident in accordance with the provisions of this section."

Did the Office, to your recollection, make such an order?  Or do you know?

A.   I do not specifically recall.

Q.   Okay.  Have you -- all right.  Well, that's fine.  I'll move on.

Now, there was some correspondence between you and Mr. Price.  Do you remember Jay Price at the Burr

Forman law firm?  Do you recall?

A.    I believe -- Jay Price.  The name is familiar.

MR. WHITSON:  I'll show you what we'll mark as Exhibit 6 to your deposition.

(Defendant's Exhibit No. D6 was marked for identification.)

BY MR. WHITSON:

Q.    It's a letter dated May 9th.  Do you recall sending that Exhibit 6 to Mr. Price?

A.    You know, I do not recall it.  But that is my signature.

Q.    Do you recall the context in which you sent this letter?

A.    Give me a minute to read it.

Q.    Sure.  Take your time.

A.    I do remember the context of this now.

Q.    Okay.  And would you elaborate now your recollection has been refreshed.

A.    The residents rights provision was used as -- if I'm recalling correctly -- as a defense in a prior case involving a CCRC referred to as Devonshire.  And I believe that's what this relates to.  The Devonshire case, if I'm recalling correctly, turned in large part on the presence on a residents rights provision.  And this letter to Mr. Price is asking about some purported

amendments to the loan agreement that inserted that

provision.  I generally recall it, yes.

Q.  When it says that somehow it was a defense that

certain claims raised by the office and the Department

of Financial Services, that was in the Devonshire case?

A.  That's my general recollection, yes.

Q.  Okay.  And so the operative language that you

wanted to insert into the loan agreement between

Westport Nursing Tampa and USAmeriBank -- I guess and

BBM Management -- was what we see here on paragraph 2 of

the amendment to loan agreement?

A.  Well, you said it's what I wanted inserted, and

that's not true.

Q.  Okay.

A.  I was asking if it had legally been inserted.

Q.  Okay.  Was it the desire of the Office to have

that language in the agreement or not?  I'm unclear.

Because I understood the context differently, so I'm

just trying to understand exactly how this came about.

A.  I do not have a very specific recollection

about this letter.  But reading the letter, it appears

as though these two documents were provided to the

Office of Insurance Regulation.  And we were wanting

conformation as to whether these were valid amendments

endorsed by USAmeriBank.  I don't know that I can add

anything further to the letter.  I don't have any specific recollection.

MR. WHITSON:  Okay.  That's fine.  There was another letter you sent.  I'm not sure we have to mark it.  I'll show it to you, though.  I guess we'll mark it as Exhibit 7.

(Defendant's Exhibit No. D7 was marked for identification.)

BY MR. WHITSON:

Q.   This was just asking about the SCN loan.  I think that was something that had confusion that was cleared up by Mr. Price's response to you.  I think at that point you had seen a second lien filing, and you were wondering if the loan from the SRN Bank had been transferred to the SCN --

A.   That's what it says.  Again, I don't have a specific recollection of this letter.

MR. WHITSON:  All right.  We don't need to worry about it.

And then we'll mark this as Exhibit 8.

(Defendant's Exhibit No. D8 was marked for identification.)

BY MR. WHITSON:

Q.   So I think Mr. Price confirms to you that at some point the language in the amendment he drafted did

become a part of the loan.  And that agreement was for the protection of the residents; correct?  In terms of just it had -- nothing to do with the default or foreclosure would affect their rights; they would stay in place.  That was, I believe, the intent.

A.   I don't know what the intent was.  And I would have to review Devonshire and residents rights provision to refamiliarize myself with it.  But this letter from Mr. Price does clarify that the partially executed amendment was recorded in error, but that the fully executed amendment is valid and endorsed by USAmeriBank.

Q.   Okay.  And is it fair to say the reason why the OIR was concerned about that issue -- or maybe it's hard to say, given what you said.  But is that -- the goal of the OIR is to protect the residents; is that right?  Is that fair to say in sort of the broadest sense that would seem to be the -- during the bankruptcy case and everything else, that would seem to be where the OIR's focus was?  But we can go -- I don't want to get too far ahead.  But, I mean...

A.   Chapter 651 and other insurance statutes do place the insured as the priority and that the office's goal in enforcing 651 isn't necessarily to, in your words, "protect the residents," but ensure the integrity of the insurance policy.

Page 64

Q. So you're protecting the insureds; the insureds just happen to be the residents in this situation.

A. Correct. Just like after a hurricane, you know, the Office goes and sets up little villages to help homeowners and make sure they get the benefit of their insurance contract. Same theory.

MR. WHITSON: Mr. Stiller, I'm showing you what we're marking as Exhibit 9 to your deposition.

(Defendant's Exhibit No. D9 was marked for identification.)

BY MR. WHITSON:

Q. This is an email from Mr. Gray, dated September 16th, 2016. Subject: USAmeriBank, Westport Nursing, Westport Holdings, University Village, CCRC use of collateral. Do you see that there?

A. Uh-huh.

Q. Did you -- this is from Mr. Gray to Jay Price. And it copies Mr. Anoush Brangaccio.

A. Ms. Anoush --

Q. Oh, I apologize.

A. Mrs. Anoush Brangaccio, actually. Who was the general counsel, and I think still is.

Q. Yourself as well?

A. Correct.

Q. Do you recall seeing this email before?

A.   I'm sure I did.  I'm copied on it, and that's my correct email address here.  So I'm sure I've received this.

Q.   Mr. Gray refers to the contentious nature of a telephone conversation.  Do you recall that telephone conversation?

A.   I do not, no.

Q.   He says in the next paragraph, "The main issue we discussed was whether the $3 million constituted part of the 'minimum liquid reserves' (MLR) of Westport Holdings and the University Village Continuing Care Retirement Community.  We comprehend the position of the Bank, as you related, that that $3 million cash collateral account was solely additional security (owner's contribution) for the loan the Bank made to Westport Nursing..."  Does that refresh your recollection of the conversation?

A.   Again, I don't recall being a part of that phone conversation.  I would not be surprised if I was. I do not remember it.  But everything in this paragraph is consistent with my recollection of where we were in our understanding with USAmeriBank at that time.

Q.   Is it fair to say USAmeriBank's position was that the money in the cash collateral account was its collateral?  The fact that, you know -- and I believe

the Assignment of the Deposit Account Agreement that we looked at earlier has the recitals to it.  But it was -- Westport Nursing was the party taking the position that that would qualify as part of the minimum liquid reserve; it wasn't the bank saying that.  Is that fair? I mean, as you read Mr. Gray's next paragraph?

A.    What was the question?

Q.    The fact that it was not -- it was USAmeriBank's position that it was just its cash collateral -- borrower's equity that came in, and it was being held in that account.  It was Westport Nursing's position that that money qualified as part of the MLR calculation.

MR. WARREN:  I am sorry.  What's the question?

BY MR. WHITSON:

Q.    Do you recall those being the positions of the parties with respect to the $3 million?

MR. WARREN:  I'm sorry.  Just so I understand -- based upon Exhibit 9?  Or based upon his independent knowledge?

MR. WHITSON:  Well, if it refreshes his recollection at all.

THE WITNESS:  You said it was Westport Nursing's position.  And at this point --

MR. WHITSON:  Holdings.  I should have said

Holdings.  I apologize.

THE WITNESS:  Okay.  My recollection is that three parties have three positions.  USAmeriBank said that it was cash collateral -- we're just holding this cash collateral.  Mr. Bartle said it's MLR, but it can be used as cash collateral.  And the Office was saying not your money, couldn't be used as cash collateral, and there are issues with an MLR being used as collateral.  That's what I think the three different positions were.  It was a very odd Venn diagram.

BY MR. WHITSON:

Q.   When you say the OIR's position was it's not your money, whose money was it?  Was it the residents' money?

A.   It's the provider.  The provider is the only one who can do anything with the assets of the CCRC. So -- and what can you do with the MLR?  No, it's not the residents.  The residents can't go in with some receipt and say, "Here's my percentage of the MLR.  Give it to me."  It is, to my recollection, established for the benefit of the residents.

As I recall, there were three components to the MLR.  The one I do remember is repair and replacement. And as I recall, the provider is able to borrow a part

Page 68

of the MLR to undertake repairs, but must repay it -- I believe it was in 12 months.  And so the MLR needs to be available for that.  Mr. Landry actually did that one time.

Q.   Okay.

A.   The other two parts of the MLR, I don't recall what they're for.  But that's the issue with having it -- number one, only the provider can legitimately assign anything with respect to an assets of an CCRC to my recollection of law; and, number two, making it cash collateral to the extent it would make it unavailable for its other purposes would be problematic.

Q.   So then the provider here, though, was Westport Holdings; correct?

A.   The certificate of authority was issued to Westport Holdings; correct.

Q.   Okay.  And it was Westport Holdings who transferred the $3 million into the cash collateral account, was it not?

A.   It was Westport Holdings with new owners.

Q.   Okay.  I understand.

A.   And whenever -- as the First DCA affirmed -- there was a change in more than ten percent in ownership -- I mean, it's a low threshold to have you come in and give background and biographical information

to the agency.  It's not just the providers.  Anybody with more than a ten percent ownership; again, because it's an insurance policy, and you want to know who the insurer is.

Q.   Right.  For the protection of the insured; correct?

A.   Correct.

Q.   Okay.  In fact -- I couldn't put my hands on it, but I think there was an email from Mr. Gray that said this was stealing money from old people.  Do you recall him saying that in an email?

A.   I don't know if he said it in an email.  But if you were around Tim Gray for ten minutes and you mentioned MLR, he was going to say it was stolen.  That was his way of expressing what was done with the MLR.

Q.   From the old people, though; right?

A.   I don't know.

Q.   Okay.

A.   I just remember "stolen" being associated with MLR.  I used in court a couple of times.  I thought it was very effective.

Q.   But you would agree with me, though, that that transfer was disclosed to OIR on March 31, 2014, as we read in Ms. Morgan's affidavit.

A.   Ms. Morgan said the office was informed.  But

you're going to have to ask her about that.

Q.   I understand.

Okay.  I do have the MLR statute as it existed in 2014, if that helps to refresh your recollection. But we don't need to go over that.

A.   Not unless there are more questions that you need me to read it for.

MR. WARREN:  I'd like for you to give me a copy if you have it.

MR. WHITSON:  Sure.  Here you go.  The only question I would have had -- I actually have extra copies of this, too.  The shorter ones I can copy.

MR. WARREN:  The only reason I asked the question -- and I don't mind this being on the record.

But this was last amended in 2003.  Are you sure this is what it was in 2014?

MR. WHITSON:  I just print out the year.  You know, you have the option of printing out the law as effective in that year.  So I made sure I had a 2014 version of it.  I'm not saying it was changed or altered from prior years.

I believe it's -- Subsection B is what is sort of what the language I think everyone is sort of arguing about in terms of the minimum liquid

reserve.  That last sentence of Subsection B, "The trustee shall provide the office with any information concerning the debt service reserve account upon request of the provider or the office." But there were certain informational rights that we looked at that were granted to the OIR in the assignment of deposit account agreement.  We can go back and look at it.

BY MR. WHITSON:

Q.   Can you tell me who Desmond Wilson is?

A.   Desmond Wilson -- I think he was employed here for a fairly short time during this period and then went over to Ag and Consumer Services, if I recall -- if that's the fellow I'm thinking about.

MR. WHITSON:  So if we go on to look at -- and I'm going to produce 651.

I didn't mark the MLR statute as an exhibit; right?

THE COURT REPORTER:  You did not?  Okay.

MR. WHITSON:  Mr Stiller, I will mark this as an exhibit.

Are we on No. 9?

THE COURT REPORTER:  I think we'll be on 10 now.

MR. WHITSON:  10.

(Defendant's Exhibit No. D10 was marked for identification.)

BY MR. WHITSON:

Q.   This is Exhibit 10.  This is the 2014 version of Section 651.125 -- Criminal penalties; injunctive relief.

It says, "Any person who maintains, enters into, or, as a manager or officer or in any other administrative capacity, assists in entering into, maintaining, or performing any continuing care or continuing care at-home contract subject to this chapter without doing so in pursuance of a valid certificate of authority or renewal thereof, as contemplated by or provided in this chapter..."  Well, you can read that too.  "...who violates any provision of this chapter or rule adopted in pursuance of this chapter, commits a felony of the third degree."  Do you see that there?

A.   Uh-huh.

Q.   So this section -- did OIR ever take the position or the view that the challenge of the transfer of the MLR constituted a crime under this section?

A.   I do not recall us making a referal to the State Attorney.

Q.   Okay.  In your tenure at the OIR, did the OIR ever make such a referral to the State Attorney's

office?

A.   I was not involved in any referal to the State Attorney's office.

Q.   Okay.

A.   What others did, I do not know.

Q.   Okay.  And then at 651.13 below that, there's a section entitled "Civil action"; right?

A.   Correct.

Q.   "Any resident" -- first, a "resident," meaning -- that would be the resident of the ILF in this situation?  The residents at --

A.   Could be a resident anywhere at University Village.  It doesn't just need to be in the ILF.

Q.   Okay.  "-- injured by a violation of this chapter may bring an action for the recovery of damages plus reasonable attorney's fees."  Do you see that there?

A.   Uh-huh.

Q.   All right.  So this seems to confer a civil action to the residents to recover monies of this sort, does it not?

A.   To recover damages.

Q.   Damages.

A.   How they were damaged.

Q.   So did the Office take the position that the

transfer of the MLR damaged the residents?

A.   I don't know that we were ever confronted with that specific question -- whether they were damaged monetarily as might be contemplated here.

Q.   Okay.

A.   And one of the things with all of this is if you skip the administrative step and you go right to circuit court, you're probably going to get kicked right back to DOAH by the circuit court judge who is going to go exhaust your administrative remedies.

So when we look at these circuit court relief provisions and we've got a half dozen cases pending at DOAH this is not as far as an agency an immediately available remedy.  In my now almost 30 years of experience in the Second Circuit, if there is an available administrative remedy, it's probably going to be sent back as a regulator.

Q.   Right.  But here it says a civil action is conferred to the residents; right?

A.   Correct.  And they would have to prove damages.  If they were still living in the facility -- though fearful of the elevators not working and what's going on -- and they had services available, I don't know what their damages would be.

Q.   But, still -- I mean, that's a question they

would be able to litigate or raise if they felt aggrieved.

A.    Correct.  And they would be best to assess, not the Office.

Q.    Right.  But in terms of the recovery of the MLR, was that -- or the issues concerning the MLR -- was that an issue that the Office felt fell within the scope and purview of its responsibilities?

A.    I don't understand the question.

Q.    In terms of -- well, looking at Mr. Gray's email again.  Let's go back to that.

A.    No. 9.  Okay.  I got it.

Q.    Okay.  He talks about the main issue that -- you know, again laying out the bank's position -- it's his collateral.  Bartle is saying -- his group are saying that there are representations made to Leon County Circuit judge that the -- it was part of the MLR.

And then he says at the end, "Please be advised --" in all caps -- "that because of the dispute over the source and use of the $3 million, should Mr. Bartle or Westport Nursing attempt to satisfy the outstanding principal amount, Bartle and Westport Nursing should not be given credit for the $3 million, either by reduction in the $15 million loan principle attempting to be satisfied..."  And he goes on to

whether USAmeriBank was prepared to assume care of the residents of the health center which collateralizes the bank's loan. And, you know, he talks about, like, a signature.

But here it seems to be Mr. Gray's position that it's the OIR who is going to determine or at least weigh in on the issue as to how the $3 million should be applied; correct? In that last all caps language?

A. That's what Mr. Gray states in that paragraph; that's correct.

Q. Right. And was that the position of the Office at the time?

A. The position of the Office is that the $3 million is MLR. It is not eligible to be claimed by -- should there be a default, to say it would be immediately applied to offset the $15 million is what Mr. Gray was saying the Office objects to. That's not what the MLR is for.

Q. But you would agree with me that the statute that we looked at earlier does allow the MLR to be pledged as collateral.

A. No.

Q. You do not?

A. I do not.

Q. Okay.

A.   I don't think that statute speaks to collateral.  May I have that exhibit back?  It talks about principle.  I don't see where this says it can be held as collateral.

BY MR. WHITSON:

Q.   I think the language that -- and I'm not arguing with you here today.  I'm just saying I think the language I've seen referred to is in (b).

A.   The debt service reserve -- that only a part of the MLR.  I mean, it's going to take me a while to study it.  But that would be at most a portion of the MLR; right?

Q.   Well, I think it's a little ambiguous as to whether the MLR can be counted under certain circumstances.  If the reserve is there for the payment of principle and interest, then it seems to suggest that upon certain conditions it can be counted as part of the MLR.  But, again, that's not an argument that the bank was making; that was an argument that Holdings was making.  So that's my only reference to it.

So let's fast forward now to the bankruptcy.

A.   Okay.

Q.   And the OIR was very active in the bankruptcy proceedings.  And the OIR filed a motion for relief of stay in order to go forward with the receivership; is

that correct?

A.    I believe DFS filed the motion, yes.

Q.    Right.  On behalf of OIR.

A.    No, it was DFS.  I mean, the receivership is their case, I believe.

Q.    Okay.

A.    And Judge Williamson said, "I can either enter an order denying this for the time being, or you can just hold the motion and the bank call it back up at appropriate time," as I recall.

Q.    And so the OIR engaged in at some point negotiations with -- well, let me just -- you had conversations with Mr. Warren and meeting with Mr. Warren here in Tallahassee; correct?

A.    I believe he came up here.

Q.    All right.  And do you recall what capacity Mr. Warren attended those meetings?

A.    Capacity in reference to the bankruptcy case?

Q.    Right.  Was he the examiner?  Do you recall --

A.    I think at that point when he came up here, I believe so.

Now, I want to go back.  When you said OIR was involved, I want to be clear.  I did go down prior to DFS filing the motion to have the case sent back.  I did go down for the first bankruptcy hearing.  I was there.

Tim Gray went down for a subsequent one.  I think Mr. Warren may have been appointed examiner by then. And I think I went back to another one.

So OIR did participate in two, perhaps three of the bankruptcy hearings in person.  We made ourselves available as a resource to anyone who wanted documents. No one was shy about that.  But other than that, after the denial of the motion, we were a resource; except that we did go to Tampa to participate in the mediation.

Q.   Right.  And so I'm not talking about anything that occurred during the mediation.

A.   Right.

Q.   But there were meetings with the OIR.  Were you present in meetings with Mr. Warren here in Tallahassee?

A.   The reason I'm stopping is I can -- I remember meeting -- meetings in person, plural, I'm less certain of.  But I would not be surprised if there was more than one.  Again, it's been a long time.  It was more frequently a quick phone call or a quick question -- "Do you have a copy of the amendment?"  So that's how most of those interactions were.  But there may have been more than one meeting up here.

Q.   Okay.  Was --

A.   There may have been meetings I did not attend that either Tim or another attorney attended.

Q.   Are you aware if there were any meetings with Ms. Morgan?  Between Mr. Warren and Ms. Morgan -- Carolyn Morgan?

A.   I would say if she met with Mr. Warren, she would have had an attorney with her.  She was very good about that.  And that's not just with Mr. Warren; with any attorney she was very good about contacting legal. I bet she still is.

MS. NOVAK:  Yes, she is.

BY MR. WHITSON:

Q.   So did you -- what was the primary focus of the OIR in participating in the bankruptcy?  Whose rights was the OIR most concerned about protecting in the bankruptcy case?

A.   Again, the OIR is concerned -- I mean, Office of Insurance Regulation.  Regulate insurance.  These contracts are insurance.  That was the focus.

What I saw my main role in the bankruptcy as being a factual and state law resource.  The bankruptcy court is a very odd place to have an insurance company. It doesn't happen -- I don't think it's going to happen with CCRCs anymore.  I think there has been a statutory amendment.  So while the bankruptcy court, of course, is real tuned into finances, there are nuances when it comes to this kind of stuff.

And so I was there -- OIR was there, and I think I and Carolyn were sort of the faces of OIR in this case at the time to number one provide any help we could on 651 and its application and its historic application; and, number two, we were the repository of documents and facts from the beginning of this to whatever point we were at.  That was our role.  We were not -- Judge Williamson very cordial.  But we were not a party at the table.  So, of course, you know, others were more actively involved.

Q.   But the OIR did participate in the mediation; correct?

A.   Correct.

MR. WHITSON:  And that's because -- is it your understanding that the solution -- any solution -- well, let's just talk about it for a second.

I only have one copy of this.  I am not sure if the OIR was a signatory to this.  But here is the -- let's just talk about --

MR. WARREN:  What is it?

MR. WHITSON:  It's just the joint motion to produce --

MR. WARREN:  Okay.

BY MR. WHITSON:

Q.   But was it the goal and desire of the OIR to

maintain the continuity of the CCRC structure at University Village?

A.    That was the preferred outcome, yes.

Q.    And, in fact, there have been a series of discussions, the ultimate -- and this is in public record -- the ultimate outcome of the mediation was referred to as the "grand bargain."  Do you recall that phrase being used?

A.    Yes.

Q.    All right.

A.    I didn't remember it until just now.  But, yes, it does refresh my recollection.

Q.    Did you participate in the conformation of the First Amended and Restated Mediated Joint Plan of Liquidation -- the conformation hearings?

A.    I may have been on the telephone; I do not believe I was there in person.  It is likely I saw and reviewed a draft.  I would not be surprised if I saw multiple drafts, as did Ms. Morgan.

Q.    And without referring -- and just reading the conformation order, one of the basic issues in the bankruptcy case was that only Westport Holdings I and Westport Holdings II -- or maybe it was just Holdings and Holding II -- were debtors in bankruptcy.  And Westport Nursing Tampa was not a Chapter 11 debtor.  Do

you recall that?

A.    I believe that's true.

Q.    And Westport Nursing owned the health center. But, you know, in terms of the wholistic operation of the CCRC and the sale of the CCRC, there wasn't desire through the mediated plan to sell -- to sort of reunite the ownership, if you will -- in order for the CCRC to be sold to a buyer.  Do you recall that?

A.    The desire was for it to remain a CCRC.  And for it to do so, the entire campus had to go as one.

Q.    Okay. Right.  Better said your way than my way.  But as part of that, the membership interest in Westport Nursing were transferred to the liquidating trustee; do you recall that?

A.    Vaguely.  Okay.  You're getting into details that are -- but there was something that occurred that brought Westport Nursing under the tent, as I recall.

Q.    Right; so it could be sold as a unitary campus. Does that refresh your recollection?  Or do you have a different understanding?

A.    I don't want to say that's the only purpose; because there may have been more.  But ultimately that's what it would have allowed.  And ultimately, that was the most desired outcome from the OIR perspective.

Q.    Okay.  And did the OIR then sort of monitor the

sale process, if you will, thereafter in terms of once the plan was confirmed and there were a bunch of appeals and things that were taken of that?  But the marketing of the CCRC -- did the OIR have any monitoring?  Or just sort of -- just keeping an eye on that?  Were you involved in any meetings -- when I say you, I mean the OIR -- concerning potential sales?

A.   I recall -- I don't know if "monitoring" is right.  Again, because we weren't in every room at every meeting.  But potential buyers, several of them, did -- I don't know if Mr. Warren told them to come up here.  I suspect he may have.  Or if they came up here because when they retained a Tallahassee attorney, the Tallahassee attorney said you got to meet with OIR.  But there were a number of potential buyers who came in and met with the Office as part of that process.

I recall -- Big Rock comes to mind.  I think there was one called Southpoint, and another called A Plus.  And I recall -- I recall in-person and phone meetings with Big Rock; probably the same with Southpoint.  I don't recall with A Plus if we ever met in person.

Q.   So -- and Big Rock, was that Mr. Ackerman?

A.   Richard.  Yes.

Q.   Not the lawyer.

A.   No.  I believe he was one of the principals of Big Rock.

Q.   And Big Rock didn't want to buy the entire CCRC, did it?

A.   I don't recall.  I don't know if they -- there was buyers that just wanted the independent living facility.  There was one buyer who was going to keep the CCRC going by using Florida Hospital for skilled nursing.  I don't remember which one Black Rock was.  Because not everyone was interested in the whole campus.

Q.   Okay.  Is it fair to say that whoever entered into a transaction involving University Village -- however it was structured -- had to have the OIR's approval as part of that?

A.   As long as there was continuing care contracts, yes.

Q.   Okay.

A.   That's the key.  The insurance policies are still there; you still need the stamp from OIR.

Q.   Right.  So do you recall the last time a continuing care contract or life care contract was sold at University Village?

A.   No.  I do not believe any were sold after the calendar year '15.  I think there was a hybrid contract that we got a copy of that was sort of like a -- it

Page 86

purported to not be a CCRC contract.  But I think there were just some contracts entered into right after that March sale into 2015.  But I believe they stopped.

Q.  So would the OIR have been supportive early on in the case of a sale less than the entire CCRC?  I mean, wasn't -- and I'll back up.

Wasn't the goal to sort of keep that continuum of care that you mentioned earlier in your testimony today intact; right?  That's the expectation of the CCRC -- the people that bought those life care contracts were bargaining for and buying that continuum of care so that they would have that proximity -- married couples that you referenced or whoever -- of being able to stay together as one or both of them needed additional care either through assisted living or through medical care at the skilled nursing facility -- that it would all be subsumed within that campus, available to them, and as part of the purchase of the life care contract.  Isn't that fair to say?

A.  That's part of the insurance contract.  Just like I have insurance for my house.  If a tree falls on the roof, the roof should get replaced.  If the pipe breaks and ruins my floors, my floors should be replaced.  Roofs and floors.  We wanted these people's contracts to cover roof and floors -- to cover

independent living, assisted living, and skilled nursing. And there is an existing CCRC -- again, at that time the perceived problem was there were people there acting as a provider who shouldn't be.

Q. Who are --

A. Should this be a campus? Should it be split? No. The issue was get somebody in there who can act as the CCRC provider.

Q. Right. CCRC provider. But not necessarily for the entire CCRC; right? I mean, it wasn't that the -- whoever was there was prohibited, necessarily. They just hadn't gone through the approval process; right?

Had OIR made an affirmative determination? Or is it simply that you just didn't follow the steps you needed to follow in order to be, you know, granted that status to be vetted by the OIR and be approved as a provider?

A. It's both. And I'm having trouble remembering those early DOAH cases.

And as to whether Mr. Freiden applied or not -- I know when we went to litigate before Judge Alexander, when we went the second time, we put on a case proving not only did he not apply -- so he should be kicked out -- but also looking at him on the merits. And on his background and bio, he was affirmatively not

qualified to be a provider.  He had no insurance experience, no CCRC experience.  He had some experience at a hotel, as I recall, and said that would allow him to take care of guests.  And he was in a position where he would hire the best people.  And we put on a case -- the transcript is still out there somewhere -- before Judge Alexander that that did not satisfy the criteria. In that case, at least, we went on both prongs -- didn't apply, not qualified.

Q.    Okay.

A.    It went to bankruptcy before we got an order, so we don't know what the ALJ thought of our case.

Q.    Okay.  Going back to the grand bargain.  I think -- would you agree with me the goal of that was to sort of reunify the ownership so that the CCRC could be sold as a unitary campus?

A.    I believe that was the goal.  And the grand bargain had two big pieces:  Number one, finding a qualified entity with the money; and, number two, at that point the regulatory hurdles had become a little more impressive because the licenses on the heath center side had lapsed and been revoked.  So we were in more of a regulatory mess by the time we got to the grand -- or we were heading to more of a regulatory mess by the time we got to the grand bargain.

Q.   I think the timing might be a little different there.  But I understand what you're saying.

And the skilled nursing facility I think we clarified earlier was never revoked.  That was reversed by the First DCA.  The ALF licence, I think, was revoked.  But that withstood the appeal to the Second DCA.  Does that refresh your recollection at all?

A.   It does.  But the reversal on the one order was not, as I recall, on the merits; it was procedural.

MR. WHITSON:  So now I'll show you what we'll mark as Exhibit 11.

I only have one copy of this.  This is just the consent order -- the Seventh Amended Consent Order.

MR. WARREN:  This is only a portion of the order, not the complete order.

MR. WHITSON:  Oh, it isn't?

MR. WARREN:  I have a copy of the complete order.

(Defendant's Exhibit No. D11 was marked for identification.)

BY MR. WHITSON:

Q.   Mr. Stiller, I'm showing you what we marked as Exhibit 11 to your deposition -- the Seventh Amended Consent Order.  Do you recall a series of consent orders that were entered into between the OIR and Westport?

A.   Well, this one postdates my leaving by a few months.  So I don't have any knowledge of this one.  I generally recall -- I think there was one entered before I left.  But --

MR. WARREN:  I think what's causing concern is that you're seeing an incomplete document.  The entirety of the Seventh Amended Consent Order is attached to all of the prior consent orders.  Mr. Stiller was involved in the creation of the first consent order and several of the others.  But by the time we got to the seventh, he was no longer involved.

MR. WHITSON:  Okay.  That was my confusion.

MR. WARREN:  So without the history of the entirety of the executed consent orders, it's just an incomplete picture.  And I can tell you I have a complete set.

BY MR. WHITSON:

Q.   Well, maybe we'll circle back to that once there is a complete document in front of you, Mr. Stiller.  But the thrust of, I believe, the seventh order was essentially to the amended plan.  The first mediated plan had been amended, and that there was going to be a sale to one of the Big Rock entities -- Tampa Life Care, I believe it was -- of just the ILF.  Do you

recall that? Or was that after your time?

A. I don't recall that.

Q. So essentially the CCRC was essentially severed; do you recall that at all?

MR. WARREN: I'll object. That's not what happened at all.

MR. WHITSON: Okay.

THE WITNESS: And I don't recall.

BY MR. WHITSON:

Q. But that was after your time. Okay.

A. The last entity I can remember was Quality Senior Housing. I think that was the last one that was on the plate when I left; represented by Bruce Black, I think. And I think Southpoint was Mark Flores. A Plus had some foreign investors, I believe. And Black Rock showed up, went away, showed up, went away, and then showed up, as I recall.

Q. I think that part, I agree with you.

MR. WARREN: It's Big Rock.

THE WITNESS: Big Rock. Sorry. Big Rock.

MR. WHITSON: I think Black Rock is actually probably -- well. All right.

I'll tender the witness to Mr. Warren. I'll reserve some followup if there's time.

MS. NOVAK: Do you want to take a break? Or do

you want to go right into it?

MR. WARREN:  I am prepared to go ahead and maybe start some questions, and then take a break.

MS. NOVAK:  Sure.

THE WITNESS:  That's fine with me.

CROSS-EXAMINATION

BY MR. WARREN:

Q.   Good afternoon.

A.   Good afternoon.

Q.   How are you, Mr. Stiller?

A.   I'm doing well.

Q.   I'm here taking your deposition as the liquidating trustee in connection with the liquidated estates for Westport Holdings Tampa and Westport Holdings Tampa II.

My first question is to sort of ask you:  As part of your review of information, did you ever understand the nature -- the ownership of the CCRC components prior to the time when Mr. Bartle got involved and USAB made its loan?  Do you understand what I'm asking?

A.   The ownership structure prior to 2014?

Q.   Yes.

A.   My only knowledge of that is that a gentleman named Larry Landry was the owner.  I do not remember the

corporate names -- if it was still Westport.

Q.   If I was to tell you that the certificate holder was Westport Holdings Tampa as the provider -- and it was owned by entities controlled by Mr. Landry, as I understand it.  It owned the equity interest in Westport Nursing Tampa -- the entity that owned the health center where the assisted living facility and the skilled nursing facility operated.  Is that information that you're aware of?  Or that you're familiar with?

A.   If I understand the question correctly, the answer is yes.  It was unified ownership of health center, ILF.  I think the villas may have been separate.

Q.   The villas were owned by Westport Holdings Tampa II.  But the ILF and the SNF and the ALF were all owned and controlled by the same entity.

A.   That is my understanding.  And the term that was used after the acquisition was that Westport Nursing was, quote, "spun off."

Q.   And the acquisition was funded by the loan made by USAmeriBank.  Is that your understanding?

MR. WHITSON:  Object to the form.

THE WITNESS:  As far as the whole CCRC, I think there were two loans.  One was USAmeriBank for the health center.  I think there was a separate loan from the CPIF for the remainder.

BY MR. WARREN:

Q. And in connection with the last questions about the consent order, do you recall negotiating provisions of the consent order with the liquidating trustee for Westport Holdings Tampa and Westport Holdings Tampa II?

A. I generally remember; yes, sir.

MR. WARREN: And I'm going to ask this to be marked as Plaintiff's Exhibit 1.

(Plaintiff's Exhibit No. 1 was marked for identification.)

THE WITNESS: All right.

BY MR. WARREN:

Q. Do you see the process by which the consent orders attached the prior consent orders with respect to the same subject matter?

A. Yes. I have flipped to the Exhibit A, the first consent order. And I notice the last one attached is No. 6. And I presume 2 through 5 are between them.

Q. And do you remember the negotiation of the consent order -- the first consent order, which was filed May 30th, 2018?

A. I generally recall it, yes. And I actually recognize some of this language as mine.

Q. And do you recall the sequence of this activity upon the conformation of the order by the bankruptcy

court appointing me, Jeffrey Warren, as the liquidating trustee?

A. Are you asking about the timing?

Q. Just -- yes. Let me word this a little differently. I apologize. I'm trying to short circuit some of these things. I just want to have as clear of a record as we can.

Immediately upon being appointed as the liquidating trustee, one of the first things that I did was resolve disputes with OIR. And that's what's memorialized in the consent order.

A. That is correct. And now that you mention it, I believe that was a representation made to Judge Williamson -- that that was the first thing you would do. Yes, sir.

Q. And that is what is represented in these consent orders that are part of Plaintiff Exhibit 1.

A. Certainly. I've looked at the first one, and yes. And I'm presuming if I go through the ones that the dates are within my tenure, I would recognize them similarly.

Q. And in the progression of events, you were no longer involved with OIR at the time that the confirmed plan was amended to provide for a sale without including a sale of the health center property.

A.   I believe that was after my involvement.

Q.   And today, as you've testified -- you talked about the importance of maintaining the CCRC.

A.   Correct.

Q.   And when the OIR approved the seventh consent order -- which was after there was a further amendment to the confirmed plan to allow the sale to occur without the health center -- there was also a continuation of having a CCRC as the entity that would take on the responsibility of dealing with the residents in their life care contract.

MR. WHITSON:  Object to the form.

THE WITNESS:  You lost me there.

MR. WARREN:  Okay.  I'm sorry.

BY MR. WARREN:

Q.   Are you at all familiar with the approval of OIR of licensing Tampa Life Plan Village as the provider at the former University Village site?

A.   I am not.

Q.   Okay.  So you don't know whether that approval included not putting back together the ownership of the health center with the ownership of the independent living facility?

MR. WHITSON:  Object to the form.

THE WITNESS:  I have no knowledge of that.

BY MR. WARREN:

Q.   You previously testified that CCRC did not have to have contiguous buildings or properties as long as the components of the insurance contract provisions were provided for the residents who had life care contracts.

A.   That is correct.  I do not -- at that time I do not believe there was a contiguity or compactness requirement.  And I seem to recall that there was the CCRC in southwest Florida that some of the components were about a five-minute drive apart.

Q.   So if I told you that Tampa Life Plan Village is a CCRC today but it doesn't own the property where the health center is, that wouldn't surprise you that it would still be able to satisfy the requirements of OIR for a CCRC?

MR. WHITSON:  Object to the form.

THE WITNESS:  It would not surprise me that everything could be satisfied without using that particular building.

BY MR. WARREN:

Q.   So when you testified about the importance of continuity, that doesn't mean there has to be or had to be the provision of everything on the same campus.

A.   Correct.  What I was referring to -- and so I can be clear -- in 2015 and 2016 it made -- it was a

sound decision in the opinion of OIR to keep the campus together as it had historically functioned.  But was that a requirement in 651 that it be that?  No.

MR. WARREN:  I wanted to help clarify something in my mind.  I'm going to hand you what we'll mark as Plaintiff's Exhibit 2.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. WARREN:

Q.   Do you recognize this pleading in the administrative proceeding?

A.   Yes.

Q.   I know there were multiple administrative proceedings.  This one is Case No. 16-2027.  And you, I believe, referred to Mr. Freiden in your prior testimony as somebody who you sought to depose.

A.   Correct.  Mr. Freiden was the managing member of IMH Healthcare, LLC, as I recall.

MR. WARREN:  And I've got these a little out of order.

Let me mark this as Plaintiff's Exhibit 3.

(Plaintiff's Exhibit No. 3 was marked for identification.)

BY MR. WARREN:

Q.   And just for the record, this is the third

notice of taking deposition of Mr. Freiden.

A.   Yes.

Q.   And in connection with trying to take Mr. Freiden's deposition, did you have trouble coordinating or taking his deposition?

A.   As I recall, it took some doing; yes.

MR. WARREN:  And, unfortunately, I only have one copy of this.  But let's mark this as Plaintiff's Exhibit 4.

(Plaintiff's Exhibit No. 4 was marked for identification.)

BY MR. WARREN:

Q.   This a transcript of the deposition of Mr. Freiden taken in the Circuit Court case for the State of Florida.  It was making the claim against Westport Holdings seeking a receiver.  That is case number 215-CA-00085.

A.   Correct.  This is the receivership proceeding instituted by the Department of Financial Services.

Q.   And do you recall Mr. Freiden testifying at that deposition?

A.   What's the date?

Q.   It was September 16th, 2016.

A.   I can remember several depositions of Mr. Freiden.  I'm not sure I can pick this one out.

Q.   All right.  Let me ask you:  Do you remember this deposition where Mr. Freiden declined based upon his Fifth Amendment rights to provide any answers to any questions that he was being asked?

MR. WHITSON:  Object to the form.

THE WITNESS:  Yes.  That was the last deposition.  Mr. Freiden invoked his Fifth Amendment right, and did not answer any questions.

BY MR. WARREN:

Q.   Did you have any occasion to understand why he was invoking his Fifth Amendment right?

MR. WHITSON:  Object to the form.

THE WITNESS:  I don't know exactly why he did.

BY MR. WARREN:

Q.   Mr. Whitson asked you whether or not OIR had made a criminal referal to the State Attorney's office, and you said not to your knowledge or words to that effect; is that correct?

A.   Yes.

Q.   But isn't it true that if a crime has been committed, it doesn't require a referral from the OIR to the State Attorney's office for that crime to have existed?

MR. WHITSON:  Object to the form.

THE WITNESS:  That is correct.  I was referring

to the statute which seemed to indicate there would be a referral from the Office.

BY MR. WARREN:

Q.    And the fact that the OIR didn't seek a referral doesn't mean a crime didn't occur.

A.    Correct.

MR. WHITSON:  Object to the form.

MR. WARREN:  I wanted to sort of put together a little more complete record with respect to some of the administrative proceedings that you have testified to.

Let me have this marked as Plaintiff's Exhibit 5.

(Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. WARREN:

Q.    Do you recognize this document?

A.    I have seen this before.  This was filed before I started -- just before I started with the agency.

Q.    And this is an initial order of suspension?

A.    Correct.

Q.    And so this would have been to initiate the suspension of the provider licensing to Westport Holdings Tampa?

A.    Correct.

Q.   And with respect to this type of initiation of a proceeding, OIR would be basically making allegations of its contentions as to what factually had occurred?

A.   Correct.

Q.   And is this initial order of suspension in Case 168243-15 part of the sequence of challenging the transfer of the ownership of Westport Holdings that occurred on March 31st, 2014?

A.   This is.  This was prepared -- yes.  That's exactly what it's about.

Q.   And this position contains references to John Bartle.  Who is John Bartle?

A.   John Bartle, from the documents, appeared to be the lead person -- for lack of a better word -- in this -- in the March 31st, 2014, transaction.  John Bartle acting on his own and through BBM Management.

Q.   And did you have occasion to do any type of review of Mr. Bartle's background?

A.   Yes and no.  Importantly no, because Mr. Bartle refused to fill out the background and biographical information and supply a set of prints.  The yes is, of course, we have the internet and all sorts of other things.  And we tried to track down the best we could about Mr. Bartle.

Q.   And there are allegations that are particularly

in paragraph 6 of Plaintiff's Exhibit 5 regarding Skyline Manor, Inc., a bankruptcy case in Omaha, Nebraska.  Do you remember that?

A.   I remember Skyline; yes, sir.

Q.   Tell me what you remember about Skyline.

A.   It was the Nebraska equivalent of a CCRC.  It failed horribly and was in bankruptcy.  And Mr. Bartle was a principal in that.  I spoke to the trustee in Nebraska who, in his words, was still looking for Mr. Bartle.

Q.   Footnote 1 on page 3 of 11 on Exhibit 5 references an audio recording of the hearing of the appointment of the Chapter 11 trustee for Skyline Manor. Do you remember obtaining that recording?

A.   I never heard or was aware of the contents of that recording.

Q.   Did you know that Mr. Bartle described himself as the chief restructuring officer for Skyline Manor, Inc.?

MR. WHITSON:  Object to the form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.   And did you understand that there was a Chapter 11 trustee appointed by the bankruptcy court to replace Mr. Bartle?

A.   That is correct.

Q.   And do you recall any of the assertions of wrongdoing by Mr. Bartle in connection with that proceeding?

A.   I do not recall specifically, no.  Fraud comes to mind.  And I know it was of such a nature that Ms. Morgan and her staff were quite alarmed.

Q.   Did you ever have the occasion to obtain information regarding Mr. Bartle's personal bankruptcy?

A.   No.  You said "personal"?

Q.   Personal.

A.   No, sir.

Q.   Do you know anything about the Internal Revenue Service claims against Mr. Bartle?

MR. WHITSON:  Object to the form.

THE WITNESS:  I do not recall specifically.

No, sir.

BY MR. WARREN:

Q.   Did the involvement of Mr. Bartle in the affairs of Westport Holdings Tampa at University Village cause OIR any concerns?

MR. WHITSON:  Object to the form.

THE WITNESS:  They did on two fronts.  Number one, as with the others, he had never gone through the process of approval.  And, number two, and very

significantly, he consistently misrepresented his involvement.  He consistently denied that he was involved in the activities of financial and day to day activities of University Village.  But those claims were belied by documents including an email I recall where he was involved with things such as where to take the van to be repaired -- the University Village transport van for the residents.

MR. WARREN:  We'll have this marked as Exhibit 6.

(Plaintiff's Exhibit No. 6 was marked for identification.)

MR. WHITSON:  Again, I just want to put on the record we maintain our objections that we've already raised to the Court about all this, and we're not waving anything that is reserved.  I'm sorry.  Go ahead.  I just had to say that for the record.

BY MR. WARREN:

Q.   Do you recall ever seeing what's being marked as Plaintiff's Exhibit 6?

A.   I do.  And I have a feeling when I flip to page 33, I'm going to see my signature.  There it is.  Yes. This was one of the, I believe, four petitions that were prepared simultaneously; contemporaneously filed.

Q.   In and connection with the pleadings, you were

the attorney who signed this particular document.

A.   Yes.  At this time I was lead counsel for all things Westport.

Q.   And I don't want to take the time to go through everything.  But in this particular initial order of suspension there are specific references to the minimum liquid reserve funds and the transfer of that $3 million from Westport.  Do you recall those concerns?

A.   I do.  Yes.

Q.   And there were other bases for which the OIR found concerns with the operation by the new parties in control of Westport Holdings Tampa; is that a fair statement?

A.   Yes.

Q.   And if we went through all of these allegations when they were asserted by OIR, they were based upon OIR's good faith belief they were true and correct and they were a basis for relief being sought administratively.

A.   That's right.

MR. WARREN:   I'll have this marked as Exhibit 7.  And I do apologize for the trees that died in putting this together.  But I wanted the record to be fairly complete.

(Plaintiff's Exhibit No. 7 was marked for

identification.)

BY MR. WARREN:

Q.   I've handed you what's been marked as Plaintiff's Exhibit 7 -- a Complaint for Declaratory Relief and Damages by Horizon LP UV Lender against BVM University Village that was filed in United States District Court in Tampa on March 4th, 2014.

My first question is:  Are you familiar with this particular complaint in this particular lawsuit?

A.   I am not.

Q.   Okay.

A.   It's ringing a very, very, very faint bell. But, no, I'm not familiar with it.

Q.   I'd like you to take a look at Exhibit A that starts on page 16.

A.   Is it titled "Loan Extension Agreement"?

Q.   Yes, sir.

A.   Okay.  I'm there.

Q.   And if you would turn to paragraph 7, which is on page 22 of this document -- do you see in the paragraph titled "Deed in Lieu"?

A.   Yes, sir.

Q.   Did you know anything about the deed in lieu of foreclosure that had been negotiated by Westport with Horizon LP UV Lender?

MR. WHITSON:  Object to the form.

THE WITNESS:  Again, when Mr. Whitson asked the same question -- a very faint, faint bell is ringing.  But, no, nothing.  I have no specific recollection.

BY MR. WARREN:

Q.  Are you familiar with the phrase "deed in lieu of foreclosure"?

A.  Yes.

Q.  And what does that mean in your understanding?

A.  It's my understanding that you hand your lender the deed to the asset -- the property -- in lieu of going through foreclosure procedures.

Q.  Were you aware that was something that was in place at University Village in 2014?

MR. WHITSON:  Object to the form.

THE WITNESS:  I became aware of it during my dealings, yes.  I don't know when I learned it.  But as we're going through this and now as we're talking about it, I do recall that being mentioned as something occurring in '14.  And as I said to Mr. Whitson, Horizon also rings a faint bell.

BY MR. WARREN:

Q.  If I told you that Horizon held a mortgage on the University Village property, would that help refresh

your memory?

A.   I think that's correct.  And somewhere along the line there were allegations of predatory lending.  But that my not have been Horizon; that may have been someone else.  I do recall, as I said, there was an interest only loan.  There was a balloon payment.  And there were all sorts of things happening leading up to the acquisition.  I remember seeing handwritten promissory notes from Mr. Bartle for $1 million to Mr. Landry and things of that sort.

Q.   But you're not really familiar with any of that?

A.   I cannot recall it specifically.  No.

Q.   As part of exhausting the administrative remedies -- is that a fair statement of what OIR was doing with the various proceedings with the Division of Administrative Hearings?

A.   Correct.  As an administrative agency, they're our first stop.

MR. WARREN:  I put together after listening to your earlier testimony what I think is a picture of what was happening, you know, with OIR in particular dealing with IMH Healthcare.  And I don't want to burden your deposition with an enormous amount of material, but I thought it might be helpful if I had

you identify things that I believe you were intimately involved in in connection with that process, and it might help put a little understanding to the process.  So I'd like to mark this as Plaintiff's Exhibit 8.

(Plaintiff's Exhibit No. 8 was marked for identification.)

BY MR. WARREN:

Q.   Do you recognize this document?

A.   I do.

Q.   And what is it?

A.   This is the Joint Pre-hearing Statement filed before the hearing of -- before Judge Early that I referenced regarding the need to apply before an acquisition.  So this was the first case that went to DOHA.  This is the filing that immediately proceeds the final hearing.

MR. WARREN:  Okay.  And as I understand it -- well, let me have this marked as Plaintiff's Exhibit 9.

(Plaintiff's Exhibit No. 9 was marked for identification.)

BY MR. WARREN:

Q.   I've handed you what's been titled a Proposed Recommended Order, that I believe was submitted by the

legal counsel for IMH Healthcare, LLC; is that correct?

A.    That is what this document is; correct.

Q.    And that's a normal part of the administrative procedure when you have a contested matter, that the administrative judge has both sides provide a recommended order; is that correct?

A.    Correct.  And the normal proceeding -- after the final hearing before DOAH you do before the judge enters her or his recommended order, you're given the opportunity to submit a proposed order.  In this case we were also allowed to submit memorandums of law.

MR. WARREN:  Let me have this marked as Plaintiff's Exhibit 10.

(Plaintiff's Exhibit No. 10 was marked for identification.)

BY MR. WARREN:

Q.    And, for the record, can you identify what Plaintiff's Exhibit 10 is.

A.    I believe this is the proposed recommended order.  Even though I don't -- submitted under -- this looks like mine.  And I say that because it's in Courier New, and I was using DOAH's font at that time.

Q.    I think if you -- the way this was submitted, I don't know that it bears a signature of yours.  But the relief requested would be consistent being OIR's?

A.   This is OIR's Proposed Recommended Order.  It was submitted under a notice of filing, and the notice of filing would have had my signature.  But I recognize this.  I can recognize my own writing for better or for worse.

MR. WARREN:  Let's mark this as 11.

(Plaintiff's Exhibit No. 11 was marked for identification.)

BY MR. WARREN:

Q.   And do you recognize what's been marked as Plaintiff's Exhibit 11?

A.   This is Judge Gary Early's Recommended Order back to the Agency in that same case -- in that same 2015 proceeding.

MR. WARREN:  Let's mark this as Plaintiff's Exhibit 12.

(Plaintiff's Exhibit No. 12 was marked for identification.)

BY MR. WARREN:

Q.   In this process -- I'm asking you if you can recognize -- if you do recognize what's been marked as Exhibit 12.

A.   This is letter from Ms. Morgan to counsel for Westport regarding an amended acquisition proposal.  And it's a disapproval letter.

MR. WHITSON:  It's a what?  I'm sorry.

THE WITNESS:  A disapproval letter.  It says, "The acquisition of University Village as described in the application is hereby disapproved."

BY MR. WARREN:

Q.  And is it unusual to have multiple parallel tracks of administrative proceedings and activities that are involving what may be alternatives?  I mean, if I understand -- strike what I said.

Let me ask you this question:  In the contention regarding the requisite obligation for there to be an acquisition application filed, is what happened here -- is it while that issue is being litigated the IMF entity made an application?

A.  It's not usual.  And in my experience in OIR, it was the only time such a thing had happened.

Q.  So this is not a normal type of sequencing for something to occur.

MR. WHITSON:  Object to the form.

THE WITNESS:  No, it is not the norm.

BY MR. WARREN:

Q.  And so how does Exhibit 12 tie into -- or does it tie into what was occurring with the administrative court?

A.  As what's going on in Case 15-2495?

Q.   Yes.

A.   I'm trying to remember the sequencing.  I can't recall when the disapproval of March 27th went to DOAH. I'm a little confused here.  I think it may have been wrapped in this case, but I'm not certain.

Q.   And just so you know, this case you're referring to --

A.   15-2495.

MR. WARREN:  That makes me feel a little bit better.  Because I couldn't figure easily myself either.

Let me see if this will help tie things together.  Let's mark this as Plaintiff's Exhibit 13.

(Plaintiff's Exhibit No. 13 was marked for identification.)

THE WITNESS:  The disapproval of the March 27th, 2015, letter was tried in the case -- DOAH Case 15-2495.

BY MR. WARREN:

Q.   And the reason why I asked you to look at what's been marked as Plaintiff's Exhibit 13 is it's entitled "Respondent's Notice of Filing."  But it references final orders that were entered by the DOAH proceedings with respect to the acquisition -- whether

the entity was required to apply for acquisition approval -- and then also the final order that denied the acquisition application of IMH Healthcare; correct?

A. Correct.

Q. And then there was an appeal to the First District. And you've attached to this notice of filing the per curiam confirmed by the First District Court of Appeal; is that correct?

A. Correct.

Q. So does that tie these together? Is that --

A. Yes. The denial of Mr. Freiden's application -- the March 27th letter -- was part of the trial in DOAH Case 15-2495; which ultimately went to the First District and was affirmed. Exhibit 13 is the filing of that First District opinion in a subsequent DOAH proceeding -- the case I referred to as being tried before Judge Alexander. That's what this was filed in -- the one we never got a recommended order in.

MR. WARREN: Okay. Let's mark this as Plaintiff's Exhibit 14.

(Plaintiff's Exhibit No. 14 was marked for identification.)

MR. WHITSON: I'm sorry. You said you never got a recommended order?

THE WITNESS: In 16-2027, I don't believe we

did.

MR. WHITSON:  Okay.

BY MR. WARREN:

Q.   Could you tell me what Exhibit 14 is.

A.   This is the Final Order that reversed Judge Early's recommended order.  And this final order was appealed to the First District and affirmed.

Q.   And what was confusing me about this is the case number -- 185730-16 is a different case number than --

A.   Yes.  The case number on this final order is the Office's internal case number for this matter. 15-2495 is the Division of Administrative Hearings's case number for the same matter.  And if it confuses you even more, there's probably a third number for this final order.

Q.   Well, but just for my own edification, what the First District Court of Appeals confirmed was this final order which was marked as Exhibit 14?

A.   Yes.  Exhibit 14; correct.

Q.   And, as I understand it, there were ongoing issues when the bankruptcy of Westport was filed.

MR. WHITSON:  Object to the form.

THE WITNESS:  I'm not sure what you mean by "ongoing issues."

BY MR. WARREN:

Q.   There were -- certain administrative proceedings, including the state court receivership proceedings, were stayed by the filing of bankruptcy proceeding.

A.   Yes.   There were pending -- at least one pending proceeding at DOAH, and the receivership in the Second Court that were stayed by the bankruptcy filing; correct.

Q.   And during the bankruptcy case, none of those matters proceeded any further.

A.   That's correct.

Q.   And when I was liquidating trustee negotiating with OIR for the first consent order, we were in part bringing to closure those various disputes as part of the new effort to sell the University Village CCRC to an approved provider.

MR. WHITSON:  Object to form.

THE WITNESS:  It's my recollection that as part of that negotiation the Office expressed a willingness to put those to the side and keep only the receivership case as an active case as a just in case if the bankruptcy and sale completely failed. I think one of the first consent orders contemplated it might go back to receivership if the grand

bargain completely fell apart, if I'm remembering correctly. But all the other DOAH proceedings were -- for lack of a better phrase -- going to treated as water under the bridge.

BY MR. WARREN:

Q. If it's okay, we'll agree the consent order provides for what it provide for.

A. What it provides. Yes.

Q. What I remember is -- the part of the consent order -- was that if we were not successful in the disposition of the CCRC, that the receivership would be put in place.

A. Yes.

Q. The state court receivership. That was part of the consent order that we had --

A. That's consistent with my recollection -- is that we were going to go for the grand bargain; if for whatever reason it just fell completely apart, we would back at the Second Circuit pursuing receivership.

MR. WARREN: Why don't we take a ten-minute break.

(Brief recess.)

(Plaintiff's Exhibit No. 15 was marked for identification.)

BY MR. WARREN:

Q.   I'm handing you what has been marked as Plaintiff's Exhibit 15 and ask you if you can identify that.

A.   It is a document from the Circuit Court of the Second Judicial Circuit.  And it is titled "Order to Show Cause, Injunction, and Notice of Automatic Stay For Purposes of Rehabilitation."  And it's dated March 2015 -- it looks like the 19th.

Q.   And when we discussed the Second Circuit -- I'm sorry.  Yeah.  The Second Judicial Circuit State Court receivership action --

A.   Correct.  This document is the order that is generally issued by the circuit court upon reviewing an application by DFS for appointment of a receiver.  And if the application is found sufficient, as it was in this instance, the Court issues an order to show cause.

Q.   And that's the order that was issued?

A.   This is the order that was issued with respect to Westport receivership; yes, sir.

MR. WARREN:   Okay.  I'll have this marked as Exhibit 16.

(Plaintiff's Exhibit No. 16 was marked for identification.)

BY MR. WARREN:

Q.   Mr. Stiller, I know this letter was provided to

the Office of Insurance Regulation before your involvement.  But I'm asking whether you recall in your preparations if you've seen this letter.

A.   Everything in this letter is familiar.  So I'm certain I've seen this letter.  I'm familiar with both who Desmond Wilson is and Ms. Kathleen Burkholder.

Q.   And this is a letter dated April 18, 2014; correct?

A.   Yes.

Q.   And you were previously asked when and what OIR did after it learned about the transactions that had occurred on March 31st, 2014, at University Village.

A.   Yes.

Q.   And several weeks after that, I assume this letter would have been a reaction by OIR --

MR. WHITSON:  Object to the form.  Sorry.

MR. WARREN:  -- is that a fair statement?

MR. WHITSON:  Object to the form.

THE WITNESS:  Yes, I think it is.  This would be OIR's response to receiving whatever was received in 2014.  And it specifically references the purchase of the ownership by BBM.

BY MR. WARREN:

Q.   And so there's some suggestion that OIR didn't spring into action quickly.  This letter would sort of

debunk that theory, though --

MR. WHITSON:  Object to form.

MR. WARREN:  -- is that a fair statement?

MR. WHITSON:  Object to form.

THE WITNESS:  Well, this letter is a -- is the typical first step that's taken with a troubled facility.  It's asking for a corrective action plan.  Just like with the other agencies, the first request is for voluntary compliance.  And it was made within three weeks of the purchase.

MR. WARREN:  Please mark this as Exhibit 17.

(Plaintiff's Exhibit No. 17 was marked for identification.)

MR. WARREN:  And, again, Exhibit 17 is in the category where -- I apologize, Mr. Whitson, I don't have multiple copies.  But we'll obviously get them.

BY MR. WARREN:

Q.   You, Mr. Stiller, testified about the financial concerns or conditions at University Village at the time of the ownership transfer; correct?

A.   Correct.

Q.   And did you study any of the financial records or information with respect to University Village at that time?

A.   The only specific document I recall looking at

was the audited 2014 financial statement.  And at some point, I believe, we obtained the unaudited 2015 statement.

Q.   I'm going to hand you what's been marked as Exhibit 17.  And this is a Consolidated Financial Statement for the years ended December 31, 2013, and 2012.

A.   Okay.

Q.   It was prepared by LKD Certified Public Accountants & Consultants.  Do you have any recollection of having seen this financial statement?

A.   LKD is familiar.  So I'm relatively certain I've seen this statement.  The 2014 one sticks out in my head, because that was the most recent audited financial.  And that was the one we most frequently went back to.

Q.   I apologize for the delay, but I removed the Post-it note I put on this so it wouldn't be part of the record.  And now I can't find what I wanted to show you. So just bear with me.

A.   Absolutely.

MR. WARREN:  For some reason I'm not finding what I was looking for.  So we'll just leave this marked, and we'll --

MR. WHITSON:  Hey, Lorraine --

MR. WARREN:   -- move on.

MR. WHITSON:   I don't think we have the audited 2014 financial statements.

MS. NOVAK:   You don't think we have the what?

MR. WHITSON:   I don't think we have the audited 2014 financial statements that Shaw is referring to. I've read drafts.

MS. NOVAK:   I can ask the person who emailed you if they can find audited 2014 financial statements.

MR. WHITSON:   Okay.

MS. NOVAK:   I can do that right now.

MR. WARREN:   And we can leave this on the record. I believe -- in fact, I'm certain that Mr. Lavine, an accountant who was the accountant for A Plus, was retained by the debtors during the bankruptcy case. And he prepared the 2014 statement and the 2015 statement back after -- you know, he prepared them in, like, 2017 or something like that or 2018. So if you don't have copies of those, I have them.

MR. WHITSON:   Well, no. But, I mean, Mr. Stiller referred to 2014 audited financial statements that they went back to that he relied upon. And I don't have those. These weren't the

ones that were sort of retroactively created.  These are the ones they had at the time, if I understood Mr. Stiller's answer.

MR. WARREN:  And I believe that the financial statements at the time is Exhibit 17.

MR. WHITSON:  Okay.

MR. WARREN:  And the reason why I say that is that you will see that the accountants added the supplement dated June 24th, 2014.  But the reason why I'm having problems is because I'm remembering that there is a marked section here that in my fumbling around I'm not finding.  So --

MR. WHITSON:  Well, I think Mr. Stiller might remember --

MR. WARREN:  I found it.

MR. WHITSON:  Okay.

BY MR. WARREN:

Q.   If you will read paragraph 13 into the record.

A.   Okay.  This is paragraph 13, Plaintiff's Exhibit 17:  "As of December 31, 2013, the Partnership had incurred significant losses, has a working capital deficit, and its current liabilities exceed current assets by approximately $21,371,000.  On December 15th, 2013, the lender granted a forbearance, on the long-term debt, through March 31, 2014, to facilitate a pending

sale. In March 2014, the Partnership's sole general and sole limited partners sold their partnership interest in the Partnership for $2,500,000. The sale included the transfer of the Partnership's assets, with the exception of the amounts due from the operation of the skilled nursing and assisted living facilities, and the assumption of the liabilities of the Partnership. See Notes 6 and 18."

Q. Does that refresh your memory with respect to the financial condition at University Village in March of 2014?

A. I don't know if I've read that before.

MR. WARREN: Okay. Let me hand you what we'll mark as Exhibit 18.

(Plaintiff's Exhibit No. 18 was marked for identification.)

BY MR. WARREN:

Q. Would you describe for the record what Exhibit 18 is.

A. It is a Periodic Financial Report for Westport Holdings Tampa, L. P.

Q. And is that the type of report that you're used to seeing?

A. Yes. I cannot remember how often these came in. I did not see every one of them. They go to Life

and Health.  In fact, I think Westport was on monthly reporting.  So these may have been coming in every month from Westport.  Different facilities based on their condition can be ordered to report more frequently than every year or six months.

Q.    Is this something that you may have reviewed? Or do you remember?

A.    The form looks familiar.  And the names in it are familiar.  If I looked at these specific ones, I'm not one hundred percent certain.

MR. WARREN:  Okay.

MS. NOVAK:  For the record, our colleague here says that they have a letter from the company when it was due saying it's been delayed.  She's still looking for the document.

MR. WHITSON:  Okay.

MS. NOVAK:  If we find it, we'll produce it.

MR. WHITSON:  Thank you.

MR. WARREN:  We'll mark this as Exhibit 19.

(Plaintiff's Exhibit No. 19 was marked for identification.)

BY MR. WARREN:

Q.    Would you describe for the record Exhibit 19.

A.    This is another Periodic Financial Report for Westport Holdings Tampa Limited Partnership.  This one

for the period ending May 31, 2015.

Q.   And, again, is this something that has information you are familiar with?  Or are you just looking at it for the first now to your recollection?

A.   I don't recall looking at this one before. It's unusual, because there are no names filled out as to who completed the form.  But I do recall looking at forms like this.  Because this gave us the occupancy count -- the bed count.

MR. WARREN:  Would you mark this as Exhibit 20.

(Plaintiff's Exhibit No. 20 was marked for identification.)

BY MR. WARREN:

Q.   I'm handing you what has been marked as Exhibit 20.  And this was a pleading that was filed in the bankruptcy court on June 22nd, 2020.  And if I'm remembering correctly, your testimony is you had already left OIR at this time.

A.   That is correct.

Q.   And the reason why I marked this as Exhibit 20 is because I wanted to you to look at the closing document and particularly to look at the very bottom of the closing statement from the transaction involving Tampa Life Plan Village, Inc., that occurred in July of 2020.  And if you see at the bottom, you see

"Distribution to Allowed Resident Claims."

A.   Okay.

Q.   Do you see what that number was in the column "Deferred Amount"?

A.   The $34,732,985.54?

Q.   Yes.

A.   Okay.

MR. WHITSON:  I'm sorry.  Where are we looking?

MR. WARREN:  It's the next-to-bottom number on the --

MR. WHITSON:  I got you.

MR. WARREN:  -- chart.

BY MR. WARREN:

Q.   And do you understand that that's the amount of money owed to the residents as a result of the conclusion of the active bankruptcy case, as allowed --

MR. WHITSON:  Object to the form.

THE WITNESS:  I'm not sure what "Distribution to Allowed Resident Claims" means specifically.

BY MR. WARREN:

Q.   Let me ask it in a different fashion:  Do you have an understanding of the magnitude of the obligations owed to residents under the life care contracts at University Village?

A.   Presently, I do not.

Q.   Okay.

A.   It was, I believe -- we'll I'd be guessing.  I don't know.

Q.   I don't want you guess.  Because this is the number from the bankruptcy court that was the aggregate of all of the claims under the life care contract.

A.   This amount does not seem beyond any range -- it does not surprise me that it was $34 million.  I think it was 17 when I left.  Or the estimate -- there was an estimate that it was at least 17.  So it doesn't surprise me that we ended up at $34 million.

Q.   And I don't want to take you into the weeds of University Village.  But did you understand that residents at University Village not only had their initial entrance deposit refund rights per their contracts, but there was a personal income protection addendum that was also part of the obligations under their life care contract?

A.   I believe the PIP; yes, sir.

Q.   Okay.  And does the number $10 million ring a bell with you as to what aggregate of the personal income protection amounts were?

A.   I recall it being an appreciable amount in the multiple millions.  So 10 million sounds very reasonable as to the range.

MR. WARREN:  I'm going to hand you -- can we take about a two-minute break?

MS. NOVAK:  Sure.

(Brief recess.)

BY MR. WARREN:

Q.  In your earlier testimony, you talked about the Amendment to Loan Agreement.

A.  Yes.

MR. WARREN:  Let's mark this as Plaintiff's Exhibit 21.

(Plaintiff's Exhibit No. 21 was marked for identification.)

BY MR. WARREN:

Q.  And this is the Amendment to Loan Agreement you had an exchange with Mr. Price about -- or the people in your office had an exchange with Mr. Price about?

A.  Yes.

MR. WARREN:  We'll mark this as Exhibit 22.

(Plaintiff's Exhibit No. 22 was marked for identification.)

BY MR. WARREN:

Q.  I've handed you what's been marked as Plaintiff's Exhibit 22, which is a letter from John Bartle/Eli Freiden to Trey Kohrn, Senior Vice President USAmeriBank, dated June 29, 2015; do you see that?

A.    Yes, sir.

Q.    And you were asked questions and got a response from Mr. Price regarding the execution of what's been marked as Plaintiff's Exhibit 21.

A.    Yes.

Q.    And so my question to you is:  In the Devonshire matter, wasn't the issue that a receiver should not be appointed if the residents occupancy would be honored by a lender in a foreclosure?

A.    In most general terms, yes; I believe that is accurate.

Q.    And do you know why Mr. Bartle would be requesting the bank to amend the loan agreement as he articulates in Exhibit 22 to keep the loan in compliance with Chapter 651?

MR. WHITSON:  Object to the form.

THE WITNESS:  Well, if I recall correctly, in Devonshire the receivership was denied on the basis of a resident's right agreement.  So it stands to reason that the reason this provision was being put in was to raise a defense against the receivership that was being sought for Westport.

BY MR. WARREN:

Q.    And so if USAmeriBank agreed to help Mr. Bartle raise that defense -- strike that.

Do you know of any other reason why Mr. Bartle would have been asking the bank to amend the loan agreement?

MR. WHITSON:  Object to the form.

THE WITNESS:  I don't.  Because I don't see another way that this would benefit BVM, other than by keeping the asset as he referred to it out of receivership.

BY MR. WARREN:

Q.   In connection with the MLR and your prior testimony in terms of the creation and operation and management of a MLR in a CCRC, is that something that you have familiarity with?

A.   Generally.

Q.   And you testified about the requirement with respect to the MLR.

A.   Yes.

Q.   And is it fair to say that OIR interest in MLRs is greater than just having a reporting of the MLR?

MR. WHITSON:  Object to the form.

THE WITNESS:  Yes.  The OIR is charged with making sure first that the MLR is calculated correctly.  I think it's percentage of entrance fees.  And then it is maintained and available for the purposes set out in statute.

BY MR. WARREN:

Q.   And is there an MLR requirement for an assisted living facility?

A.   That is not licensed as a CCRC?

Q.   Correct.

A.   I'm not aware of any.  That would be an AHCA regulation.  But I have not heard the term used.

Q.   And is there a provider MLR requirement for a skilled nursing facility?

MR. WHITSON:  Object to the form.

THE WITNESS:  I do not believe so.

BY MR. WARREN:

Q.   And in the statutes that require the MLR, it refers to the provider; correct?

A.   Yes.

Q.   And in the context of University Village, who was the provider?

A.   Westport.

Q.   Westport Holdings Tampa?

A.   Correct.

Q.   Would there ever be any reason to refer to Westport Nursing Tampa either as a wholly owned subsidiary of Westport Holdings Tampa or as a sister entity owned and controlled by the borrower -- for lack of a better term -- that it would be a provider?

MR. WHITSON:  Object to the form.

THE WITNESS:  No.  Unless Westport Nursing came in and filed to replace Westport Holdings as the provider, no.

BY MR. WARREN:

Q.  Did you ever see any of the banking reports from USAmeriBank in connection with the MLR funds that it received on March 31st, 2014?

A.  From USAmeriBank, I'm not certain.  I seem to recall seeing statements from Regions Bank.  That's sticking in my head for some reason.  I may have seen them from USAmeriBank.  That's a detail that I'm not one hundred percent firm on.

Q.  Are you familiar with the process by which OIR approves in advance of creating an MLR the actual terms and conditions under which the financial institution holds the MLR?

MR. WHITSON:  Object to the form.

THE WITNESS:  I'm not familiar at this point.

MR. WARREN:  I have no further questions at this time.

REDIRECT EXAMINATION

BY MR. WHITSON:

Q.  Going back to Exhibit 6, the letter that you wrote to Jay Price on May 9, 2016, on the resident's

rights provision.  I don't know if you can pull that out of the stack.

A.   I have it.

Q.   Your letter about the residents right provision -- you basically describe the loan agreement that was entered into -- $15 dollars.  And then you go on to talk about, "Both Amendments purport to insert the same 'Resident's Rights.'"

"I have attached both documents for your review.  Once you have had an opportunity to review them and consult with your client, I would appreciate you sharing the position of USAmeriBank as to whether and when an Amendment to the Loan Agreement was actually made.  As a basic factual matter, the Office would like confirmation as to whether the August 2015 Amendment was ever executed."

You don't seem to be raising any suggestion that there is some attempt to crate a Devonshire defense in your letter, do you?

A.   The end of the third paragraph, I wrote, "Westport Holdings Tampa, L.P., is arguing that the presence of this provision in the loan documents is a defense to certain claims raised by the Office and the Department of Financial Services."  That's the Devonshire defense.

Q.   Okay.

A.   The main concern is they recorded that first Amendment to Loan Agreement.  It was signed by Eli Freiden and John Bartle and recorded in the clerk's records.  That raised all sorts of concerns.  There was no signature from the lender.

Q.   Right.

A.   And then there was a separate document showing SCM as holding a first mortgage.

Q.   Then you see in Jay Price's response to you, he says, "As far as USAmeriBank in concerned, the missing signature of USAmeriBank on the August 2015 agreement is a moot point given that the 'Residents' Rights' provision is relevant only after lender acceleration of the indebtedness and steps are taken to take control over the facility.  USAmeriBank has not exercised any such remedies to date.  The language is now in place with all signatures being completed in the event such circumstances come to pass.  That said, at the time of this letter, I am aware of no imminent plans by the bank to exercise such remedies."

I mean, I think -- well, I guess I understand your point.  But I think the bank is not -- I mean, do you draw anything from Mr. Price's response that contemplates there was some sort of assertion of the

Devonshire defense by complicity with the bank?

A.   Mr. Price doesn't say that.  But Mr. Turner made that allegation.  And that's why there's a sentence in the letter to raise the Devonshire defense.  One of the reasons you will see delay in the Office action is because -- and I use this term in court and internally -- this case was stabbing at smoke.  The stories kept changing.

I am not doubting what Mr. Price said was one hundred percent honest from the bank's perspective.  I'm not doubting that.  But it contradicts what Mr. Turner was saying in court.  And it contradicts what Mr. Bartle was saying.  That's the concern.

Q.   Right.  But those are the concerns you have with the latter two, but not with USAmeriBank; right?

A.   The latter two were in the Second Circuit attempting to get the cause dismissed.  We had no privity with USAmeriBank.

Q.   You had no knowledge that USAmeriBank was in any way acting to create a Devonshire defense or assist in raising that defense; right?

A.   No.  I have no knowledge that was their specific intent, no.

Q.   Okay.  And when Mr. Warren -- you said the OIR was charged with making sure that MLR was calculated

correctly.  Was there any efforts to -- prior to the March 31, 2014, transaction, do you recall what the balance of the MLR was in Regions Bank?

A.   It was right around $3 million the entire time this was pending, I believe.  I think the last calculation of the MLR was in 2014.  I don't know that it was ever recalculated.

Q.   Now, you said when it came to the refund liability -- Mr. Warren showed you a closing statement. And in response you said that you recall that the refund liability at Westport Holdings was estimated at around $17 million at the time you left; is that right?

A.   I seem to recall -- I think it was around 2018. I don't think it was 2020.  It was around $17 million, and that did not include PIP.

Q.   And that was in 2018?

A.   That's my recollection; yes, sir.

Q.   Okay.  And that was an estimate?

A.   Correct.

Q.   Do you know how that estimate was determined?

A.   No, sir.

Q.   And would that date range -- 2018 -- hold true for the PIP number you were talking about too?

A.   I don't know what the PIP number was.  I recall it was high.  I recall it was immediately identified as

a program that needed to be discontinued for financial liability of the facility.

Q.   Okay.  But you don't recall that you -- you said when Mr. Warren threw out the number of $10 million, you said it seemed reasonable.  But do you know what date that $10 million figure would be attached to?

A.   I do not, no.

Q.   And do you know whether it's reasonable or unreasonable to estimate $10 million?  Do you have an opinion either way as to that figure?

A.   I would say it doesn't surprise me.  If I was completely wrong, then I could be surprised.  But it was a large amount of money that was growing.  And I just recall that everyone except the residents who had money was anxious to stop that program because of the ballooning amount.

MR. WHITSON:  The statements that Mr. Warren showed you -- I believe that was Exhibit 13.  There was only one copy of it.  It was an audited -- it was a financial statement that had been prepared, I believe, retroactively.

THE COURT REPORTER:  You're looking for No. 13?

MR. WHITSON:  Maybe I wrote down the wrong number.  No, that's not it.  The financial statement.

MR. WARREN:  It might be 17.

THE COURT REPORTER:  It was.  Here is 17.

BY MR. WHITSON:

Q.   This was a consolidated financial statement for the years ending December 31, 2013, 2012.  You said you've never seen this document before?

A.   You know, I'm -- that document has jogged my memory.  I believe I have seen that document before.  LKD does ring a bell.  And I've been talking about the 2014 audit -- or the 2014 financials.  I thought it was '15.  It may be the '14 I'm referring to.  I can see the financial in front of me.  If one of you had it, I know I would recognize it.

As I recall now, the accountant refused to -- my word is going to be "signed."  But I'm sure there's a better word.  Like, an engineer's stamp -- the accountant equivalent.  And there were -- I never found out why.  But there were rumors --

Q.   I don't want to hear about rumors.

A.   Okay.

Q.   That's fine.  Whatever you know.  But you've never -- but you just recognize it because you recognize the LKD.  But do you recall this specific document?  Or just the familiarity with LKD?

A.   The familiarity with LKD leads me to believe I

have seen that document.

Q. But can you say definitively you have before or have not?

A. No.

Q. Okay. And do you know on what basis what's consolidated in this statement as opposed to -- what entities are consolidated here?

A. I think that would be Westport and Westport II.

Q. Do you know that to be true?

A. Excuse me?

Q. Do you know that to be true absolutely -- what entities were considered to be consolidated for the purposes of this statement?

A. Not without looking at it.

Q. Okay. Do you know if this document was produced by OIR?

A. I don't know. But if it's the financials, it would have been in OIR's records.

Q. All right. Mr. Warren was asking you about -- I believe he just made the statement that just because you don't make a referral doesn't mean a crime did not occur when it came to the operative section of 651 we were talking about earlier when I was asking you questions.

Mr. Stiller, if OIR was left with a definite

and firm conviction that a crime had been committed, would it have done nothing?

A.   I can't tell you what the commissioner would do.  I mean, as staff -- which is all I've ever been -- we make recommendations.  An agency head or their delegatee make the decision based on whatever.  That's all I can say about that.

Q.   Has staff ever made a recommendation for a criminal referal with regard to Westport?

A.   To the State Attorney, no.

MR. WHITSON:  All right.  I don't think I have anything more right now.

THE COURT REPORTER:  Would you like to read or waive?

THE WITNESS:  I would like to read.

THE COURT REPORTER:  Would you like to order at this time?

MR. WHITSON:  I'll order.

THE COURT REPORTER:  Would you like a copy?

MR. WARREN:  I'll take his copy.

(This deposition was concluded at 4:15 p.m.)

- - -

CERTIFICATE OF OATH

STATE OF FLORIDA:

COUNTY OF LEON:


   I, GREG T. SMITH, Notary Public, State of Florida, do hereby certify that SHAW STILLER personally appeared before me on March 8, 2023, and was duly sworn and produced his driver's license as identification.

   Signed this 22nd day of MARCH, 2023.




_____

GREG T. SMITH


Notary Public, State of Florida

My Commission No.:  GG933698

Expires:  March 21, 2024

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF LEON:

I, GREG T. SMITH, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of SHAW STILLER; that a review of the transcript was requested; and that the foregoing transcript, pages 6 through 142, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 22nd day of MARCH, 2023.

_Greg T. Smith_

_____

GREG T. SMITH

Page 145

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE

IN RE:      WARREN V. VALLEY NATIONAL BANK

CASE NO:   8:16-BK-08167-MGW

DATE:       MARCH 8, 2023

DEPONENT:  SHAW STILLER

PAGE NO. LINE NO.  CORRECTION & REASON

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

_____  _____     _____

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true."

_____

DATE                              SHAW STILLER

Veritext Legal Solutions

800-726-7007                                      305-376-8800

March 22, 2023

SHAW STILLER
2540 Shumard Oak Boulevard
Tallahassee, Florida 32399

In Re:  March 8, 2023, Deposition of SHAW STILLER

Dear SHAW STILLER:

     This letter is to advise that the transcript for the above-referenced deposition has been completed and is available for review.  Please contact our office at (800)275-7991 to make arrangements for read and sign or sign below to waive review of this transcript.

     It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules*; however, there is no Florida Statute to this regard.
     The original of this transcript has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties for inclusion in the transcript.

                              Sincerely,


                              Greg T. Smith
                              Orange Legal/Veritext

cc:  JEFFREY W. WARREN, Esquire
     EDMUND S. WHITSON, III, Esquire
Waiver:
I,_____, hereby waive the reading and signing of my deposition transcript.


_____     _____
Deponent Signature            Date
*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e)

| **&** | **118** 4:23 | **15th** 124:23 | **200** 1:20 2:7 |
|---|---|---|---|
| **&** 122:10 145:6 | **119** 4:24 | **16** 4:24 27:1 | **2003** 70:16 |
| **0** | **12** 4:17 24:1 | 55:18 107:15 | **2007** 9:4 |
| | 68:2 112:16,17 | 119:21,22 | **2011** 9:4 |
| **00007** 1:5 | 112:22 113:22 | **16-2027** 4:19 | **2012** 5:2 122:7 |
| **00085** 99:17 | **120** 51:18 | 98:14 115:25 | 140:5 |
| **08167** 1:3 145:3 | **121** 5:2 51:12 | **168243-15** 4:8 | **2013** 5:2 8:15 |
| **1** | **125** 5:4 | 102:6 | 122:6 124:20,24 |

**1** 4:2 28:20 32:19 45:2 46:3 94:8,9 95:17 103:11 109:9

**1.310** 146:24

**10** 4:15 71:23,25 72:4 111:13,14 111:18 129:20 129:24 139:4,6 139:9

**100,000** 12:22

**101** 4:8

**10407** 2:7

**105** 4:10

**106** 4:11

**10:28** 1:18

**11** 1:4 4:16 82:25 89:11,23 103:11,13,24 112:6,7,11

**110** 4:13,14

**111** 4:15

**112** 4:16,18

**114** 4:19

**115** 4:21

**116** 1:20

**126** 5:6

**127** 5:8

**13** 4:19 114:14 114:15,22 115:14 124:18 124:19 139:18 139:22

**130** 5:9,10

**134** 3:5

**14** 4:20 8:12 55:6 108:21 115:20,21 116:4 116:19,20 140:11

**142** 144:9

**143** 3:6

**144** 3:7

**145** 3:8

**146** 3:9

**15** 4:22 27:1 55:8 75:24 76:16 85:24 118:23 119:2 135:6 140:11

**15-2495** 113:25 114:8,19 115:13 116:13

**16th** 64:13 99:23

**17** 5:1 121:11,12 121:14 122:5 124:5,20 129:9 129:10 138:12 138:14 140:1,2

**18** 5:3 120:7 125:8,14,15,19

**1801** 2:3

**185108-16** 4:10

**185730-16** 116:9

**19** 5:5 126:19,20 126:23

**1984** 7:20

**1991** 7:23

**19th** 119:8

**2**

**2** 4:3 30:20 31:14 32:14,19 32:24 61:10 94:18 98:6,7

**2,500,000** 125:3

**20** 5:7 40:18 55:8 127:10,11 127:15,20

140:5

**2014** 15:23 16:8 16:20,21 20:17 20:17 31:4 33:11 35:18 36:16 38:9 44:11 45:9 46:11,14 47:4 57:4,7 58:23 59:3,8 69:23 70:4,17,20 72:4 92:22 102:8,15 107:7 108:15 120:7,12,21 122:1,13 123:3 123:6,9,17,23 124:9,25 125:1 125:11 134:8 138:2,6 140:10 140:10

**2014-2015** 17:21

**2015** 8:15,17 9:12,25 12:13 15:6,24 16:12 16:17 17:1 26:11 29:5 31:5

**[2015 - 6th]** Page 148

48:4,6 55:12,25
56:2 57:8 86:3
97:25 112:14
114:18 119:8
122:2 123:18
127:1 130:25
135:15 136:12
**2016** 54:1 55:20
55:24 64:13
97:25 99:23
134:25
**2017** 123:19
**2018** 94:21
123:20 138:13
138:16,22
**2020** 8:19,23
127:16,25
138:14
**2023** 1:17 143:8
143:10 144:17
145:4 146:2,5
**2024** 143:17
**21** 5:9 130:10,11
131:4 143:17
**21,371,000**
124:23
**212-1784** 2:8
**215** 99:17
**22** 5:10 107:20
130:18,19,23
131:14 146:2
**223-9620** 2:4
**224-4486** 2:8
**224-9255** 2:4

**22779** 143:14
144:19
**22nd** 54:1
127:16 143:10
144:17
**23** 44:9
**24th** 124:9
**2540** 146:4
**2620** 2:11
**275-7991** 146:9
**27th** 114:3,18
115:12
**28** 3:13
**29** 130:25

**3**

**3** 4:5 35:17 36:5
41:25 44:19,23
65:9,13 66:17
68:18 75:20,23
76:7,13 98:21
98:22 103:11
106:7 138:4
**3/11/16** 4:21
**3/27/15** 4:18
**3/31/14** 3:16 5:4
**3/31/15** 5:6
**30** 3:15 14:2
40:18 74:14
146:11,24
**30th** 94:21
**31** 5:2 16:8
33:10 35:18
36:16 44:11
45:9 46:10,13
47:4 69:23

122:6 124:20,25
127:1 138:2
140:5
**31st** 16:14 38:9
55:6 58:23
102:8,15 120:12
134:8
**320-4185** 2:12
2:12
**32256** 2:8
**32309** 2:12
**32399** 1:21
146:4
**32nd** 13:17
**33** 105:22
**33602** 2:3
**34** 129:8,11
**34,732,985.54**
128:5
**36** 3:16
**3674** 32:17
**39** 3:17

**4**

**4** 4:6 39:20,23
41:23 43:24
45:19 46:11,23
99:9,10
**4/18/14** 4:24
**40** 40:18
**4:15** 1:18
142:21
**4th** 107:7

**5**

**5** 4:8 59:2 94:18
101:13,14 103:1
103:11
**5/10/16** 3:20
**5/11/16** 3:21
**5/9/16** 3:19

**6**

**6** 3:3 4:9 60:4,9
94:18 103:1
105:10,11,20
125:8 134:24
144:9
**60** 3:19
**62** 3:20,21
**64** 3:23
**651** 11:25 20:8
20:11 24:17
30:5 59:13
63:21,23 71:16
81:4 98:3
131:15 141:22
**651.035** 45:2
46:1
**651.1081** 59:3
**651.1081...........**
3:18
**651.125** 72:5
**651.125.............**
3:24
**651.13** 73:6
**6th** 9:13

| 7 | a |
|---|---|

**7** 4:11 62:6 106:22,25 107:4 107:19

**8**

**8** 1:17 4:12 62:20 110:5,6 143:8 145:4 146:5
**800** 146:9
**813** 2:4,4
**850** 2:12,12
**88** 7:22
**89** 3:25
**8:16** 1:3 145:3
**8:20** 1:5

**9**

**9** 4:14 64:8 66:19 71:22 75:12 110:20,21 134:25
**9/16/16** 3:23
**90** 17:24
**904** 2:8,8
**91** 8:4
**92** 3:4
**93** 8:4
**94** 4:2
**97** 8:11
**98** 4:4,5
**99** 4:7 25:14
**9th** 60:8

**a.m.** 1:18
**abbreviating** 12:10
**abeyance** 49:10 50:6 53:14
**able** 24:7 27:6 51:1 67:25 75:1 86:13 97:14
**above** 146:8
**absolutely** 122:21 141:11
**acceleration** 136:14
**accommodated** 13:12
**accordance** 59:17
**account** 38:10 38:12 42:9 45:20 65:14,24 66:1,11 68:19 71:4,7
**accountant** 123:15,15 140:14,17
**accountants** 122:10 124:8
**accurate** 17:2 33:20 37:5 38:4 131:11 144:10
**achieve** 51:3 56:16
**ackerman** 84:23

**acquire** 34:3,25
**acquired** 11:13
**acquiring** 34:10
**acquisition** 11:2 11:6,14 15:7,18 15:19,19,20,22 15:23,25 16:7 16:11,23,24 27:15,16,18 28:2,5,11 34:7 34:10 35:3,5,7 35:11 55:7 56:18 93:17,19 109:8 110:15 112:24 113:3,12 114:25 115:1,3
**acres** 14:3
**act** 87:7
**acting** 87:4 102:16 137:20
**action** 51:12 52:3 53:4,5 73:7 73:15,20 74:18 119:11 120:25 121:7 137:5 144:14,15
**actions** 11:17 28:4 34:5 58:19
**active** 77:23 117:22 128:16
**actively** 27:7 81:10
**activities** 105:3 105:4 113:7

**activity** 94:24
**actual** 134:15
**actually** 8:19 16:20 27:14 31:23 36:20 38:13 41:9 49:6 54:18 55:25 64:21 68:3 70:11 91:21 94:22 135:13
**acute** 13:7
**add** 61:25
**added** 124:8
**addendum** 129:17
**addition** 38:14
**additional** 65:14 86:14
**address** 11:1 65:2
**addresses** 36:10
**administration** 13:25
**administrative** 9:24 26:15 29:15,20 34:1,5 48:25 51:9,11 51:16,19 53:3 72:9 74:7,10,16 98:11,13 101:10 109:14,17,18 111:3,5 113:7 113:23 116:13 117:2

**[administratively - anybody]**                      Page 150

**administratively**
  106:19
**adopted**  72:16
**adv**  1:5
**advance**  134:15
**advise**  146:7
**advised**  75:19
**affairs**  8:12 9:4
  104:20
**affect**  63:4
**affidavit**  3:17
  36:22 37:10
  38:23 39:3,3,18
  39:20 40:14,15
  41:22,24 43:25
  44:5,10 45:4,16
  45:17,19 46:14
  46:20 47:23,24
  54:17 69:24
**affidavits**  49:15
**affiliate**  44:20
**affiliated**  11:18
**affirm**  6:2
**affirmative**
  51:12 87:13
**affirmatively**
  51:20 87:25
**affirmed**  28:6,8
  30:9 33:22
  48:10 68:22
  115:14 116:7
**afternoon**  92:8
  92:9
**ag**  71:13

**age**  25:19
**agencies**  43:10
  121:8
**agency**  13:24,25
  21:14 26:16
  27:24 28:2
  29:10,13,15,16
  29:19,23,23
  30:5,5,12 31:6
  34:4 35:1 48:3,8
  49:1 50:8 51:12
  51:17,19 52:22
  53:3,4,5 54:18
  54:19,20,20
  69:1 74:13
  101:19 109:18
  112:13 142:5
**aggregate**  129:5
  129:21
**aggrieved**  75:2
**ago**  25:14
**agree**  45:4 46:9
  47:21 69:22
  76:19 88:14
  91:18 118:6
**agreed**  5:15
  131:24
**agreement**  5:9
  5:10 37:22
  46:20 61:1,8,11
  61:17 63:1 66:1
  71:7 107:16
  130:7,14 131:13
  131:19 132:3
  135:5,13 136:3

  136:12
**agreements**
  6:25 7:1
**ahca**  14:7,9,22
  133:6
**ahead**  63:20
  92:2 105:17
**alarmed**  104:7
**alexander**  50:16
  87:21 88:7
  115:17
**alf**  14:5 58:5,9
  89:5 93:14
**alj**  88:12
**allegation**  52:21
  137:3
**allegations**
  52:13,20 102:2
  102:25 106:15
  109:3
**alleged**  49:1
**allow**  26:17
  56:12 76:20
  88:3 96:7
**allowed**  46:3
  52:22 83:23
  111:11 128:1,16
  128:19
**altered**  70:22
**alternative**  7:3
**alternatives**
  113:8
**altmaier**  19:8
  19:13

**alyssa**  10:10
**ambiguous**
  77:13
**amend**  131:13
  132:2
**amended**  3:25
  4:2,3 70:16
  82:14 89:13,23
  90:7,22,23
  95:24 112:24
**amendment**  5:9
  5:10 61:11
  62:25 63:10,11
  79:20 80:23
  96:6 100:3,7,11
  130:7,14 135:13
  135:15 136:3
**amendments**
  61:1,24 135:7
**amount**  75:22
  109:24 128:4,14
  129:7,23 139:13
  139:16
**amounts**  125:5
  129:22
**anoush**  64:18,19
  64:21
**answer**  12:15
  53:16,16 93:11
  100:8 124:3
**answers**  100:3
**anxious**  139:15
**anybody**  16:18
  19:16 69:1

anymore 80:22
anyway 13:3,8
ap 1:5
apart 97:10
  118:1,18
apartment 13:5
  14:18
apartments
  13:14
apgar 8:9
apologize 42:13
  50:3 64:20 67:1
  95:5 106:22
  121:15 122:17
apparently
  26:18
appeal 89:6
  115:5,8
appealed 28:5
  116:7
appeals 84:2
  116:18
appear 47:25
appeared
  102:13 143:7
appearing 2:5,9
  2:13
appears 38:7
  61:21
application
  48:23 49:3 50:7
  50:11 58:21
  81:4,5 113:4,12
  113:14 115:3,12
  119:14,15

applications
  56:19
applied 76:8,16
  87:20
apply 34:2,8,25
  35:1 56:25
  87:23 88:9
  110:14 115:1
appointed 79:2
  95:8 103:24
  131:8
appointing 95:1
appointment
  103:13 119:14
appreciable
  129:23
appreciate
  135:11
approached
  26:23 27:17
appropriate
  78:10
approval 6:18
  11:16 85:14
  87:12 96:16,20
  104:25 115:2
approvals 56:20
  58:22
approved 15:9
  57:11 87:16
  96:5 117:17
approves
  134:15
approximately
  124:23

april 120:7
area 22:1
arguably 15:6,8
argued 30:16
arguing 70:25
  77:7 135:21
argument 58:20
  77:18,19
arrangement
  24:24
arrangements
  146:9
arrival 15:24
  26:10
arrived 26:17
  26:19
articulates
  131:14
asked 7:2 42:12
  70:13 100:4,15
  108:2 114:21
  120:10 131:2
asking 43:14
  46:8 60:25
  61:15 62:10
  92:21 95:3
  112:20 120:2
  121:7 132:2
  141:19,23
aspect 56:13
asserted 106:16
assertion
  136:25
assertions 104:2

assess 75:3
assessment 57:9
asset 108:12
  132:7
assets 34:11
  67:17 68:9
  124:23 125:4
assign 68:9
assignment
  29:19 38:9,12
  42:9 45:20
  46:19 66:1 71:7
assignments
  22:7
assist 137:20
assistance 25:3
assisted 13:5,20
  13:22 14:18
  23:12 25:16
  86:15 87:1 93:7
  125:6 133:2
assists 72:9
associated
  13:21 69:19
assume 52:5
  76:1 120:14
assumed 21:10
assumption
  125:7
attached 36:21
  38:16 43:24
  44:2,3,3 45:18
  46:19 90:8
  94:14,17 115:6
  135:9 139:6

**[attachments - basis]** Page 152

**attachments** 40:19 42:1,4
**attempt** 75:21 135:18
**attempted** 15:19
**attempting** 75:25 137:17
**attend** 79:24
**attendance** 17:15
**attended** 78:17 79:25
**attorney** 8:21 9:6,7 10:10 27:2 54:23 72:23 79:25 80:5,7 84:13,14 106:1 142:10 144:12
**attorney's** 72:25 73:3,16 100:16 100:22
**attorneys** 9:10 17:4 144:14
**audio** 103:12
**audit** 140:10
**audited** 57:4 122:1,14 123:2 123:5,9,23 139:19
**august** 9:25 135:15 136:12
**authority** 15:13 15:16 18:21 52:9 57:1,13 68:15 72:13

**authorized** 144:6
**automatic** 4:22 53:23 119:6
**avail** 6:19
**available** 59:4 68:3 74:14,16 74:23 79:6 86:17 132:24 146:8
**avenue** 2:3
**average** 23:25
**aware** 11:6 16:12 21:3 47:3 47:6 80:1 93:9 103:15 108:14 108:17 133:6 136:20
**awhile** 50:12

**b**

**b** 38:14 42:10 45:2 46:3 70:23 71:1 77:8
**bachelor's** 7:20
**back** 10:2 22:11 26:9,21 29:14 29:22 33:15 34:15 43:13 48:2,14 52:7 71:8 74:9,17 75:11 77:2 78:9 78:22,24 79:3 86:6 88:13 90:19 96:21 112:13 117:25

118:19 122:16 123:18,24 134:24
**backfill** 52:1
**background** 7:18 57:19 68:25 87:25 102:18,20
**bad** 57:4
**balance** 138:3
**balloon** 21:5,6 109:6
**ballooning** 139:16
**bank** 1:11 6:16 62:14 65:13,15 66:5 77:18 78:9 131:13 132:2 134:10 136:20 136:23 137:1 138:3 145:3
**bank's** 6:24 75:14 76:3 137:10
**bankcorp** 1:12
**banking** 134:6
**bankruptcy** 1:1 15:10 25:18 26:2,5 41:3,15 53:23 58:1 63:17 77:21,23 78:18,25 79:5 80:12,14,18,19 80:23 82:22,24 88:11 94:25

103:2,7,24 104:9 116:22 117:4,8,10,23 123:17 127:16 128:16 129:5
**bargain** 82:7 88:13,18,25 118:1,17
**bargaining** 86:11
**bartle** 5:10 16:3 67:5 75:15,21 75:22 92:19 102:12,12,13,16 102:19,24 103:7 103:10,17,25 104:3,14,19 109:9 130:24 131:12,24 132:1 136:4 137:12
**bartle's** 102:18 104:9
**based** 30:4 55:22 66:19,19 100:2 106:16 126:3 142:6
**bases** 106:10
**basic** 82:21 135:14
**basically** 36:10 102:2 135:5
**basics** 22:12
**basis** 11:9 18:6 29:9 106:18 131:18 141:5

**bbm**  16:1 61:10 102:16 120:22
**bear**  41:5 122:20
**bears**  111:24
**becoming**  21:19
**bed**  127:9
**began**  6:22 10:1
**beginning**  8:20 16:20 81:6
**begins**  6:14
**behalf**  2:5,9,13 44:12 45:10 78:3
**belied**  105:5
**belief**  106:17
**believe**  13:13,16 13:25 15:15 16:21,24,24 17:4,11 18:6,24 31:11 33:3 35:2 42:25 43:22 49:13 50:14 52:7,13 54:24 57:6 60:2,22 63:5 65:25 68:2 70:23 78:2,5,15 78:21 82:17 83:2 85:1,23 86:3 88:17 90:21,25 91:15 95:13 96:1 97:7 98:15 105:23 110:1,25 111:19 115:25 122:2

123:14 124:4 129:2,19 131:10 133:11 138:5 139:18,21 140:8 140:25 141:20
**bell**  16:9 20:20 107:12 108:3,22 129:21 140:9
**benefit**  64:5 67:22 132:6
**bernie**  16:25 17:4 40:22
**best**  11:1 75:3 88:5 102:23
**bet**  80:8
**better**  83:11 102:14 112:4 114:10 118:3 133:25 140:16
**beyond**  129:7
**big**  40:17 84:17 84:20,23 85:2,3 88:18 90:24 91:19,20,20
**binding**  53:9
**bio**  87:25
**biographical**  57:18 68:25 102:20
**bit**  8:7 10:2 11:21 12:10 23:10 54:10 114:9
**bk**  1:3 145:3

**black**  85:9 91:13,15,21
**borrow**  67:25
**borrower**  133:24
**borrower's**  66:10
**bottom**  127:22 127:25 128:9
**bought**  86:10
**boulevard**  146:4
**brangaccio**  64:18,21
**break**  42:15,16 43:12 91:25 92:3 118:21 130:2
**breaks**  86:23
**breakthrough**  56:6,15,22
**bridge**  118:4
**brief**  58:17 118:22 130:4
**briefly**  7:17,25
**bring**  73:15
**bringing**  48:14 117:15
**broad**  8:5 43:4
**broadest**  63:16
**broke**  58:18
**brought**  28:13 83:17
**bruce**  91:13

**building**  12:16 12:18 13:18,19 22:5 23:22 97:19
**buildings**  12:16 97:3
**built**  22:16
**bunch**  84:2
**burden**  49:6 109:24
**burkholder**  4:24 120:6
**burr**  3:21 59:25
**bush**  2:2
**bushross.com**  2:4
**busy**  10:10
**buy**  85:3
**buyer**  83:8 85:7
**buyers**  84:10,15 85:6
**buying**  86:11
**bvm**  107:5 132:6

**c**

**c**  2:1 6:1 17:11 45:22,23
**ca**  99:17
**cabinet**  54:14
**calculated**  132:22 137:25
**calculation**  66:13 138:6
**calendar**  85:24

**call** 12:8 14:5
15:18,20 16:23
36:11 51:11
55:6 78:9 79:19
**called** 23:16
84:18,18
**calls** 22:25
51:18
**campus** 13:23
14:2,16,17
24:19 83:10,18
85:10 86:17
87:6 88:16
97:23 98:1
**capacity** 7:5
72:9 78:16,18
**capital** 41:15
124:21
**caps** 75:19 76:8
**caption** 44:7
**car** 25:4
**care** 11:22 12:6
12:19,24 13:4
13:21,23,25
14:8,13,14,20
22:13 23:3,3,5,8
23:19,24 24:4,7
24:8 52:4,5,10
52:16,23,23
53:20 55:2
57:21 65:11
72:10,11 76:1
85:15,21,21
86:8,10,11,14
86:15,18 88:4

90:25 96:11
97:5 128:23
129:6,18
**career** 8:1 27:9
**careful** 37:16
**carolyn** 3:17
4:17 17:10,25
18:11,11,24
19:2,17 21:9,12
21:13 36:22
37:10 38:23
39:18 41:22
43:25 45:19
54:18 80:3 81:2
**case** 1:3 4:8,9,19
4:20 9:20 13:10
34:9 49:5 53:11
58:1 59:4 60:21
60:23 61:5
63:17 78:5,18
78:24 80:14
81:3 82:22 86:5
87:22 88:5,8,12
98:14 99:14,16
102:5 103:2
110:15 111:10
112:13 113:25
114:5,6,18,19
115:13,16 116:9
116:9,11,12,14
117:10,22,22,23
123:17 128:16
137:7 145:3
**cases** 74:12
87:19

**cash** 38:10
45:23 46:2,7
65:13,24 66:9
67:4,5,6,8 68:10
68:18
**cassel** 8:5 43:5
**casualty** 19:13
**catch** 48:12
**category** 121:15
**cause** 4:22
44:15 45:13
104:21 119:6,16
137:17
**causing** 90:5
**cavaliers** 7:20
**cc** 146:18
**ccrc** 11:17,23
12:4,5,12,16,19
12:23 13:8,23
14:15,15 15:2
15:11,12 21:16
22:3,8,14,20,25
23:25 24:6,25
25:11,11 60:21
64:14 67:17
68:9 82:1 83:5,5
83:7,9 84:4 85:4
85:8 86:1,5,10
87:2,8,9,10 88:2
88:15 91:3
92:18 93:22
96:3,9 97:2,9,12
97:15 103:6
117:16 118:11
132:12 133:4

**ccrcs** 12:14,22
18:2,16 19:23
20:5 21:24 22:2
22:7,12 25:10
25:21,22 80:22
**cease** 59:16
**center** 12:8 14:4
14:5,11,12,24
23:17,23 24:6
24:10 76:2 83:3
88:21 93:7,12
93:24 95:25
96:8,22 97:13
**centers** 33:1
**centurion** 2:7
**certain** 58:21
61:4 71:5 77:14
77:17 79:16
114:5 117:2
120:5 122:12
123:14 126:10
134:9 135:23
**certainly** 20:10
44:3 57:5 95:18
**certificate** 3:6,7
15:13,16 52:9
57:1,12 68:15
72:12 93:2
143:1 144:1
**certified** 122:9
**certify** 143:7
144:6,11
**challenge** 50:9
53:5 72:20

**challenging** 102:6

**change** 33:17 68:23

**changed** 9:7 18:20 70:21

**changes** 145:2

**changing** 137:8

**chapter** 1:4 20:8 20:10 30:4 51:18 59:13,15 63:21 72:11,14 72:15,16 73:15 82:25 103:13,23 131:15

**characterization** 11:7

**characterize** 23:13

**characterized** 44:20

**charge** 18:16,20

**charged** 132:21 137:25

**chart** 3:15 18:25 30:21 31:1,2,3 31:10,22 128:12

**charts** 31:6,18 32:8

**chief** 8:3 9:7,7,9 103:18

**chojnowski** 17:10

**chris** 17:20 18:1 19:20,22 20:4,7

**christie** 17:12 17:25

**christopher** 17:19

**circle** 2:11 90:19

**circuit** 49:13 50:2,18 74:8,9 74:11,15 75:17 95:5 99:14 118:19 119:4,5 119:9,10,13 137:16

**circumstances** 42:23 77:15 136:19

**city** 8:14

**civil** 73:7,19 74:18 146:24,24

**claim** 34:13 99:15

**claimed** 76:14

**claims** 61:4 104:14 105:5 128:1,19 129:6 135:23

**clarified** 89:4

**clarify** 63:9 98:4

**clear** 6:15,21 26:22 31:7 78:23 95:6 97:25

**cleared** 62:12

**clerk's** 136:4

**clerkship** 8:4

**client** 135:11

**close** 25:3

**closed** 36:16

**closing** 5:8 16:10 38:21 39:16 127:21,23 138:9

**closure** 117:15

**collateral** 38:10 45:23 46:2,7 64:15 65:14,24 65:25 66:10 67:4,5,6,8,9 68:11,18 75:15 76:21 77:2,4

**collateralizes** 76:2

**colleague** 126:12

**college** 7:23

**column** 128:3

**come** 19:4 22:1 29:14 52:2 56:24 68:25 84:11 136:19

**comes** 29:22 80:25 84:17 104:5

**coming** 10:12 43:12 126:2

**commission** 8:22 143:17

**commissioner** 18:20,23,24,25

19:5,9,10,11 54:13 142:3

**commissioners** 19:7

**commits** 72:16

**committed** 100:21 142:1

**common** 25:7

**communities** 57:22

**community** 8:12 9:4 11:22 23:8 65:12

**compactness** 97:7

**companies** 15:5

**company** 15:12 16:2 80:20 126:13

**competent** 29:24

**complaint** 4:11 26:15 49:1 51:9 51:11,16 53:4 107:4,9

**complaints** 51:19

**complete** 36:21 37:7 38:4 89:15 89:17 90:17,20 101:9 106:24

**completed** 127:7 136:18 146:8,11

**completely** 117:23 118:1,18 139:12
**complex** 12:15
**compliance** 121:9 131:14
**complicity** 137:1
**complied** 48:11
**component** 23:23 24:16
**components** 12:4 23:14,21 67:23 92:19 97:4,9
**comprehend** 65:12
**concept** 12:17 23:7
**concern** 39:14 39:16 47:16 90:5 136:2 137:13
**concerned** 63:13 80:13,15 136:11
**concerning** 9:15 47:9 71:3 75:6 84:7
**concerns** 104:21 106:8,11 121:19 136:5 137:14
**concluded** 30:3 142:21

**conclusion** 30:1 30:7 128:16
**conclusions** 29:25 30:11
**condition** 125:10 126:4
**conditions** 77:17 121:19 134:16
**conduct** 6:25
**confer** 73:19
**conferred** 74:19
**confirmation** 135:15
**confirmed** 84:2 95:23 96:7 115:7 116:18
**confirms** 62:24
**conflicts** 27:3
**conformation** 61:24 82:13,15 82:21 94:25
**confronted** 74:2
**confused** 38:6 114:4
**confuses** 116:14
**confusing** 116:8
**confusion** 62:11 90:13
**connected** 144:14
**connection** 58:23 92:13 94:2 99:3 104:3 105:25 110:2

132:10 134:7
**consent** 3:25 4:2 89:13,13,24,24 90:7,8,10,15 94:3,4,13,14,17 94:20,20 95:11 95:17 96:5 117:14,24 118:6 118:9,15
**consideration** 16:4
**considered** 44:25 141:12 146:11
**consistent** 24:12 24:13 65:21 111:25 118:16
**consistently** 105:1,2
**consolidated** 5:1 50:15 122:5 140:4 141:6,7 141:12
**consolidation** 49:3
**constituted** 65:9 72:21
**consult** 135:11
**consultants** 122:10
**consulted** 20:12
**consumer** 71:13
**consummated** 56:22

**consumptive** 9:20
**contact** 146:8
**contacting** 80:7
**contains** 41:24 102:11
**contemplated** 72:13 74:4 117:24
**contemplates** 136:25
**contemporane...** 105:24
**contention** 113:11
**contentions** 102:3
**contentious** 65:4
**contents** 46:18 103:15
**contested** 111:4
**context** 51:6 60:12,16 61:18 133:16
**contiguity** 97:7
**contiguous** 97:3
**continuance** 7:2
**continuation** 96:8
**continue** 44:25 55:8 57:10
**continued** 55:2
**continuing** 6:16 11:22 12:19

22:13 23:8 52:5 52:10,16,23 57:21 65:11 72:10,11 85:15 85:21

**continuity** 82:1 97:22

**continuum** 12:24 13:4 14:12,14 23:2,4 23:19,24 24:3,8 86:7,11

**contract** 12:20 13:9,23 14:13 23:3 64:6 72:11 85:21,21,24 86:1,18,20 96:11 97:4 129:6,18

**contracts** 12:7 12:19 22:13,16 24:7 52:5,5,10 52:16,23,24 53:7,17,20 55:3 55:8 80:17 85:15 86:2,10 86:25 97:5 128:24 129:16

**contradicts** 137:11,12

**contrary** 29:25 30:6

**contribution** 65:15

**control** 32:20 106:12 136:15

**controlled** 93:4 93:15 133:24

**conversation** 65:5,6,17,19

**conversations** 10:19 20:23,25 33:8 47:9 78:13

**conviction** 142:1

**cooper** 50:19

**coordinating** 99:5

**copied** 65:1

**copies** 28:14 30:19 35:15 64:18 70:12 121:16 123:20

**copy** 30:21 35:19 36:21,23 36:25 37:3,5,7 38:11,13,16,21 41:25 59:2,6 70:8,12 79:20 81:17 85:25 89:12,17 99:8 139:19 142:19 142:20

**cordial** 81:8

**corner** 32:16

**corporate** 93:1

**corporation** 1:13

**correct** 9:2 11:23,24 14:7 16:19 18:9 22:17 24:8 28:9 29:12 32:15,20 32:24 36:12 41:1,12 42:21 42:22 45:8,15 45:17 46:21 63:2 64:3,24 65:2 68:14,16 69:6,7 73:8 74:20 75:3 76:8 76:10 78:1,14 81:12,13 95:12 96:4 97:6,24 98:17 99:18 100:18,25 101:6 101:21,25 102:4 104:1 106:17 109:2,18 111:1 111:2,6,7 115:3 115:4,8,9 116:20 117:9,12 119:12 120:8 121:20,21 127:19 133:5,14 133:20 138:19

**correction** 145:6

**corrective** 121:7

**correctly** 15:1 48:23 50:4 56:19 57:7 60:20,23 93:10

118:2 127:17 131:17 132:23 138:1

**correspondence** 35:18 59:24

**counsel** 5:16 8:13 9:2,3,8,21 53:12 64:22 106:2 111:1 112:23 144:12 144:14

**count** 127:9,9

**counted** 77:14 77:17

**county** 49:22 75:17 143:4 144:3

**couple** 14:17 22:11 27:2 69:20

**couples** 24:24 25:7 86:12

**courier** 111:21

**course** 18:19 80:23 81:9 102:22

**court** 1:1 6:2,18 15:10 34:24 39:22 69:20 71:19,23 74:8,9 74:11 80:20,23 95:1 99:14 103:24 105:15 107:7 113:24 115:7 116:18

117:3,8 118:14
119:4,10,13,16
127:16 129:5
137:6,12 139:22
140:2 142:13,16
142:19
**cover** 86:25,25
**cpif** 93:25
**craig** 19:14
**crate** 135:18
**create** 137:20
**created** 124:1
**creates** 23:4
**creating** 31:21
 134:15
**creation** 90:9
 132:11
**credit** 75:23
**crime** 72:21
 100:20,22 101:5
 141:21 142:1
**criminal** 72:5
 100:16 142:9
**criteria** 23:1
 88:7
**cross** 3:4 92:6
**curiam** 115:7
**current** 8:21
 20:10 57:22
 124:22,22

**d**

**d** 3:1 6:1 18:10
 45:22 46:5
**d1** 3:13 28:16

**d10** 3:24 72:1
**d11** 3:25 89:19
**d2** 3:14 30:22
**d3** 3:16 36:2
**d4** 3:17 39:24
**d5** 3:18 58:24
**d6** 3:19 60:5
**d7** 3:20 62:7
**d8** 3:21 62:21
**d9** 3:22 64:9
**daily** 18:5
**damaged** 73:24
 74:1,3
**damages** 4:11
 73:15,22,23
 74:20,24 107:5
**date** 1:17 16:8
 16:10,15 45:5,7
 55:16 99:22
 136:17 138:22
 139:6 145:4,25
 146:23
**dated** 4:24
 35:18 60:8
 64:12 119:7
 120:7 124:9
 130:25 144:17
**dates** 16:11 29:3
 55:13 95:20
**david** 19:8,13
**day** 8:18 19:2,2
 21:12 28:9
 50:22 105:3,4
 143:10 144:17

**days** 37:20
 146:11
**dca** 28:8 33:22
 48:10,10 49:16
 50:1 58:5,6
 68:22 89:5,7
**de** 7:19
**deadline** 6:17
**deadlines** 7:2
**dealing** 96:10
 109:23
**dealings** 17:25
 108:18
**dealt** 17:13
**dear** 146:6
**debt** 71:3 77:9
 124:25
**debtor** 82:25
**debtors** 82:24
 123:16
**debunk** 121:1
**december** 5:2
 122:6 124:20,23
 140:5
**decision** 34:24
 98:1 142:6
**decisions** 19:3
**declaratory**
 4:11 107:4
**declare** 145:22
**declined** 7:3
 100:2
**deed** 21:1
 107:21,23 108:7
 108:12

**default** 63:3
 76:15
**defendant** 1:14
 2:9
**defendant's**
 3:12 28:16
 30:22 36:2
 39:24 58:24
 60:5 62:7,21
 64:9 72:1 89:19
**defense** 60:20
 61:3 131:21,25
 135:18,23,25
 137:1,4,20,21
**deferred** 57:8
 128:4
**deficit** 124:22
**defined** 45:23
**definite** 141:25
**definitively** 35:9
 141:2
**degree** 72:17
**delay** 122:17
 137:5
**delayed** 126:14
**delegatee** 142:6
**delegations**
 18:21
**demographic**
 25:23
**dempsey** 49:23
 50:18
**denial** 49:2 79:8
 115:11

**denied** 50:8,19 105:2 115:2 131:18
**denying** 78:8
**depart** 54:16
**department** 8:12 9:3 46:6 49:19 54:12 61:4 99:19 135:24
**depending** 12:23 40:5
**depends** 51:16
**deponent** 5:16 145:4 146:23
**depose** 98:16
**deposing** 50:11
**deposit** 22:22 38:12 42:9 45:20 46:20 66:1 71:7 129:15
**deposited** 45:24
**deposition** 1:16 4:3,5,6 5:17 6:19,21 28:20 30:20 35:17 41:23 42:1 59:2 60:4 64:8 89:23 92:12 99:1,4,5 99:13,21 100:2 100:7 109:24 142:21 144:7 146:5,8,21

**depositions** 6:17 6:25 99:24
**deputy** 18:23,25 19:10,11,13,15
**describe** 7:17,25 18:17 125:18 126:23 135:5
**described** 103:17 113:3
**describing** 26:10
**desire** 61:16 81:25 83:5,9
**desired** 83:24
**desmond** 4:24 71:10,11 120:6
**detail** 134:12
**details** 11:6 13:2 83:15
**determination** 34:22 59:10 87:13
**determinations** 30:10
**determine** 76:6
**determined** 138:20
**development** 13:13
**devonshire** 60:21,22 61:5 63:7 131:7,18 135:18,25 137:1 137:4,20

**dfs** 54:6,19,20 58:14 78:2,4,24 119:14
**diagram** 67:11
**died** 25:14 106:22
**differences** 31:17
**different** 12:8 22:1 25:12,12 32:6,7 51:17 55:14 67:10 83:20 89:1 116:9 126:3 128:21
**differently** 61:18 95:5
**direct** 3:3 6:9
**directly** 54:25
**disagreed** 31:19
**disagreeing** 55:21
**disapproval** 112:25 113:2 114:3,17
**disapproved** 113:4
**disclosed** 69:23
**discontinued** 139:1
**discovery** 6:17
**discussed** 10:6,8 10:14 47:10 65:9 119:9

**discussing** 22:12
**discussion** 9:20 10:3,17 11:4 41:19 47:1
**discussions** 10:13 11:1 20:23 82:5
**dismissed** 137:17
**disposition** 118:11
**dispute** 75:19
**disputed** 27:12 29:18 53:15
**disputes** 95:10 117:15
**dissolved** 53:10
**distribution** 128:1,18
**district** 1:1 8:3 28:6 30:9,9,16 55:19 107:7 115:6,7,14,15 116:7,18
**disturbed** 30:11
**divest** 34:11
**divested** 34:12
**division** 1:2 9:24 29:15 33:25 109:16 116:13
**doah** 4:19,20 18:8 26:12,21 26:23 27:13,19

**[doah - enters]**

27:23 29:19 48:21,24 49:5 50:5,14,16,20 74:9,13 87:19 111:8 114:3,18 114:24 115:13 115:16 117:7 118:2

**doah's** 111:22

**document** 28:21 36:23,24 38:24 39:15 40:17,20 46:10 90:6,20 101:17 106:1 107:20 110:9 111:2 119:4,12 121:25 126:15 127:22 136:8 140:6,7,8,23 141:1,15 145:22

**documents** 16:1 16:15 35:11 36:15 37:19 38:20 40:6 42:5 42:14 45:21 46:13 50:25 61:22 79:6 81:6 102:13 105:5 135:9,22

**doha** 49:9 110:16

**doi** 54:14

**doing** 58:14 72:12 92:11 99:6 109:16

**dollars** 135:6
**domestic** 1:12
**doubting** 137:9 137:11
**downturns** 57:5
**dozen** 74:12
**draft** 82:18
**drafted** 62:25
**drafts** 82:19 123:7
**draw** 136:24
**drive** 25:5 97:10
**driven** 26:3
**driver's** 143:9
**due** 125:5 126:14
**duly** 6:7 143:8

**e**

**e** 2:1,1 3:1 6:1,1 8:9,10,10,11,11 41:13,15 146:24 146:24
**earlier** 56:11 66:2 76:20 86:8 89:4 109:21 130:6 141:23
**early** 8:19 15:24 27:13,23 28:3,7 29:11 30:3,10 43:3 48:9 56:2,6 86:4 87:19 110:13
**early's** 112:12 116:6

**easier** 40:9
**easily** 114:10
**east** 1:20
**edification** 116:17
**edmund** 2:6 146:19
**educational** 7:17
**effect** 52:24 53:7,17 100:18
**effective** 69:21 70:20
**effort** 117:16
**efforts** 138:1
**either** 15:23 24:2 49:6 75:24 78:7 79:25 86:15 114:11 133:22 139:10
**elaborate** 51:6 60:17
**electronic** 40:2 40:20
**electronically** 40:9
**elevators** 74:22
**eli** 130:24 136:3
**eligible** 76:14
**eliyahu** 4:3,5,6
**email** 3:19,20,22 40:3 64:12,25 65:2 69:9,11,12 75:11 105:5

**emailed** 123:8
**embarrassed** 18:13
**emergency** 10:25 53:8
**employed** 8:23 71:11
**employee** 41:12 144:12,13
**employment** 42:20
**ended** 5:2,4,6 122:6 129:11
**endorsed** 61:25 63:11
**energy** 9:20
**enforcing** 63:23
**engaged** 78:11
**engineer's** 140:16
**enormous** 109:24
**ensure** 63:24
**enter** 53:8 78:7 145:2
**entered** 13:12 48:3 51:5 55:15 85:11 86:2 89:25 90:3 114:24 135:6
**entering** 52:15 72:9
**enters** 72:7 111:9

**entire** 16:19 23:7 39:3,19 40:13 83:10 85:3 86:5 87:10 138:4

**entirely** 31:7

**entirety** 14:1 90:7,15

**entities** 32:4,23 33:6,10,13,14 90:24 93:4 141:7,12

**entitled** 31:13 73:7 114:23

**entity** 11:15 15:9 44:16 45:14 53:22 88:19 91:11 93:6,15 96:9 113:14 115:1 133:24

**entrance** 12:23 12:25 22:21,25 129:15 132:23

**entry** 22:22

**equity** 66:10 93:5

**equivalent** 103:6 140:17

**eric** 19:12,14

**errata** 3:8 145:1 146:13

**error** 63:10

**escrow** 45:1

**esquire** 2:2,6,10 146:18,19

**essence** 14:19 34:4 49:11 53:13

**essentially** 34:14 48:8 56:17 90:22 91:3,3

**established** 67:21

**estates** 92:14

**estimate** 129:9 129:10 138:18 138:20 139:9

**estimated** 138:11

**event** 136:18

**events** 95:22

**evidence** 29:24

**evolution** 20:10

**ewhitson** 2:9

**exactly** 10:13 21:9 27:3 50:13 51:1 52:1 61:19 100:13 102:10

**examination** 3:3 3:4,5 6:9 92:6 134:22

**examined** 6:7

**examiner** 16:24 40:24,25 41:3,4 41:8,14,16 78:19 79:2

**exceed** 124:22

**except** 79:8 139:14

**exception** 125:4

**excerpt** 36:24 39:11

**exchange** 130:15,16

**exchanged** 16:4

**excuse** 141:10

**executed** 63:9 63:11 90:15 135:16

**execution** 35:11 131:3

**executive** 9:6

**exercise** 136:21

**exercised** 136:16

**exhaust** 74:10

**exhausting** 109:14

**exhibit** 3:13,14 3:16,17,18,19 3:20,21,22,24 3:25 4:2,3,5,6,8 4:9,11,12,14,15 4:16,17,19,20 4:22,24 5:1,3,5 5:7,9,10 28:16 28:20 30:20,22 31:14 32:14,19 32:24 35:17 36:2,5,18,19 38:10,14,23

39:20,23,24 40:13 41:23,24 41:25 42:8,10 42:13 43:24 45:18,18 46:11 46:11,23 58:24 59:2,6 60:4,5,9 62:6,7,20,21 64:8,9 66:19 71:17,21 72:1,4 77:2 89:11,19 89:23 94:8,9,16 95:17 98:6,7,21 98:22 99:9,10 101:12,14 103:1 103:11 105:9,11 105:20 106:21 106:25 107:4,14 110:5,6,19,21 111:13,14,18 112:7,11,16,17 112:22 113:22 114:13,15,22 115:14,20,21 116:4,19,20 118:23 119:2,21 119:22 121:11 121:12,14 122:5 124:5,20 125:14 125:15,18 126:19,20,23 127:10,11,14,20 130:10,11,18,19 130:23 131:4,14 134:24 139:18

**exhibits** 3:11,12 4:1,2 30:19
**existed** 70:3 100:23
**existing** 57:15 87:2
**expectation** 23:4 86:9
**experience** 25:6 57:21 74:15 88:2,2,2 113:15
**expires** 143:17
**explore** 56:10
**exposure** 9:16 9:18,19 10:3,4
**express** 47:22
**expressed** 117:20
**expressing** 69:15
**extension** 107:16
**extensively** 28:15
**extent** 46:9 68:11
**extra** 30:19 35:18 70:11
**eye** 84:5

**f**

**f** 8:10,10,10
**faces** 81:2
**facilitate** 124:25
**facilities** 125:6 126:3

**facility** 12:7 13:24 14:6,20 14:21 16:6 23:15 74:21 85:7 86:16 89:3 93:7,8 96:23 121:7 133:3,9 136:16 139:2
**fact** 6:17 27:12 29:18,23 30:14 34:25 50:18 53:15 65:25 66:8 69:8 82:4 101:4 123:14 126:1
**facts** 81:6 145:22
**factual** 30:10 80:19 135:14
**factually** 102:3
**failed** 103:7 117:23
**faint** 50:10 107:12 108:3,3 108:22
**fair** 7:7 14:4 18:15 23:5,13 23:16 24:5 30:12 33:18 46:14 55:12 63:12,16 65:23 66:5 85:11 86:19 106:12 109:15 120:17 121:3 132:18

**fairly** 71:12 106:24
**faith** 106:17
**fall** 9:23 16:20
**falls** 86:21
**familiar** 8:6 9:14 12:9 17:18 20:9,15,18 25:24 26:1 31:1 31:24 32:2 33:5 51:5 57:24 60:2 93:9 96:16 107:8,13 108:7 109:11 120:4,5 122:12 126:8,9 127:3 134:14,19
**familiarity** 132:13 140:24 140:25
**familiarize** 30:25
**far** 8:23 15:11 18:1 22:10 23:6 31:25 63:19 74:13 93:22 136:11
**fashion** 41:14 128:21
**fast** 77:21
**favor** 27:25
**fax** 2:4,8,12
**fearful** 74:22
**february** 8:19 8:22 16:12,17 17:4 26:11 48:3

**federal** 146:11 146:24
**fedex** 43:15
**fee** 12:23,25 22:25
**feel** 114:9
**feeling** 11:7 105:21
**fees** 13:1 22:21 73:16 132:24
**fell** 75:7 118:1 118:18
**fellow** 71:14
**felony** 72:17
**felt** 75:1,7
**fifth** 100:3,7,11
**figure** 16:14 114:10 139:6,10
**file** 27:16 28:10 33:25
**filed** 4:20 26:21 29:18 44:5 48:21,23 49:9 50:10 53:12,22 54:2 56:7 58:2 77:24 78:2 94:21 101:18 105:24 107:6 110:12 113:12 115:17 116:22 127:15 134:3
**filing** 4:19 5:7 62:13 78:24 110:16 112:2,3 114:23 115:6,15

117:4,8
**fill** 102:20
**filled** 127:6
**final** 4:20 18:22
28:2 30:13 53:5
53:8,8,14,21,22
55:19 110:17
111:8 114:24
115:2 116:5,6
116:11,16,18
**finances** 57:6
80:24
**financial** 5:1,3,5
49:19 54:16
57:4 61:5 99:19
105:3 121:18,22
122:1,5,11,15
123:3,6,9,23
124:4 125:10,20
126:24 134:16
135:24 139:1,20
139:24 140:4,12
**financially**
144:15
**financials**
140:10 141:17
**find** 122:19
123:9 126:17
**finding** 88:18
122:22 124:12
**findings** 29:23
30:14
**fine** 37:21 38:3
59:23 62:3 92:5
140:21

**firm** 43:4,21
47:5 55:22 60:1
134:13 142:1
**first** 6:7 7:13
8:2,22 9:6,16,18
9:19 10:14
16:25 25:18
26:10 27:11,11
27:20 28:5,8
30:9,9,16 33:22
34:7 42:18,24
42:25 43:22
48:9,10 49:5
55:19 58:5
68:22 73:9
78:25 82:14
89:5 90:10,22
92:16 94:17,20
95:9,14,18
107:8 109:19
110:15 115:5,7
115:14,15 116:7
116:18 117:14
117:24 121:6,8
127:4 132:22
136:2,9
**five** 17:6 97:10
**flip** 105:21
**flipped** 30:7,8
94:16
**floors** 13:19
86:23,23,24,25
**flores** 91:14
**florida** 1:1,21
2:3,8,12 3:18,24

7:22 8:1,3,21
12:1 18:16 45:2
46:1,6 85:8 97:9
99:15 143:3,6
143:16 144:2,5
146:4,12,24
**focus** 63:19
80:11,17
**follow** 50:4,25
87:14,15
**following** 7:1
11:13 51:22
53:15
**follows** 6:8
**followup** 91:24
**font** 111:22
**fool** 38:1
**footnote** 103:11
**forbearance**
124:24
**forced** 21:1
**foreclose** 24:9
**foreclosure** 21:2
63:4 107:24
108:8,13 131:9
**foregoing** 144:9
145:22
**foreign** 91:15
**forgetting** 19:12
**form** 93:21
96:12,24 97:16
100:5,12,24
101:7 103:20
104:15,22 108:1
108:16 113:19

116:23 117:18
120:16,18 121:2
121:4 126:8
127:7 128:17
131:16 132:4,20
133:10 134:1,18
**forma** 5:8
**formal** 7:24
**forman** 3:21
60:1
**former** 26:6
96:18
**forms** 127:8
**forward** 7:4
54:22 55:7,20
57:13 77:21,25
**forwarded**
146:13,14
**found** 28:1,4
30:6 43:19
106:11 119:15
124:15 140:17
**foundation**
22:15,18,20
**four** 8:13 33:25
50:14 105:23
**fraud** 104:5
**freiden** 4:4,5,7
48:22 49:11
87:20 98:15,17
99:1,14,20,25
100:2,7 130:24
136:4
**freiden's** 49:2
50:7 99:4

**[freiden's - ground]** Page 164

115:11
**frequently**
79:19 122:15
126:4
**front** 49:21
53:25 58:5,6
90:20 140:12
**fronts** 104:23
**fulfills** 13:9
**full** 6:11,13 7:11
**fully** 63:10
**fumbling**
124:12
**function** 21:23
22:4 24:11
**functioned** 98:2
**functioning**
15:12
**functions** 12:5
12:12 54:14
**funded** 93:19
**funds** 45:23
46:2,7 106:7
134:7
**further** 11:21
44:21 56:13
62:1 96:6
117:11 134:20
144:11

**g**

**g** 6:1 8:9 19:14
**gaines** 1:20
**game** 56:23
**gary** 112:12

**general** 8:13 9:1
9:3,21 11:3 20:3
20:12,25 43:5
47:13,18 61:6
64:22 125:1
131:10
**generalize** 25:9
**generally** 9:15
12:14 47:16
61:2 90:3 94:6
94:22 119:13
132:14
**gentleman**
92:24
**gentlemen** 16:3
**geographic**
24:16
**getting** 20:24
23:11 24:2
83:15
**gg933698**
143:17
**give** 6:3 32:10
47:16 60:14
67:20 68:25
70:8
**given** 31:15 35:6
35:12 40:1 45:6
46:13 63:14
75:23 111:9
136:13
**gives** 52:22
57:19
**gleaned** 15:25

**gmail.com** 2:13
**go** 7:20 8:8
10:15 14:18
22:11 23:12
24:24 25:4
26:19 28:15
33:15 35:14
48:2 50:15
51:18 53:9
55:20 58:15
63:19 67:19
70:5,10 71:7,15
74:7,10 75:11
77:25 78:22,23
78:25 79:9
83:10 92:1,2
95:19 105:16
106:4 117:25
118:17 125:25
135:6
**goal** 34:12,16,17
34:18 63:14,23
81:25 86:7
88:14,17
**goes** 64:4 75:25
**going** 6:18
10:20 16:14
21:2 24:3 26:9
26:12 28:14,15
28:19 35:16,17
37:6,18 39:6,12
40:5,12 45:21
50:21,21 51:2
55:6,7 69:14
70:1 71:16 74:8

74:9,16,22 76:6
77:10 80:21
85:7,8 88:13
90:23 94:7 98:5
105:22 108:13
108:19 113:25
118:3,17 122:4
130:1 134:24
140:15
**good** 6:11 25:15
80:5,7 92:8,9
106:17
**graduated** 7:19
7:22,22
**graduation** 8:1
**grand** 82:7
88:13,17,23,25
117:25 118:17
**granted** 71:6
87:15 124:24
**gray** 3:22 10:8
10:19 20:23
27:4 33:8 47:11
64:12,17 65:4
69:9,13 76:9,17
79:1
**gray's** 66:6
75:10 76:5
**great** 43:6
**greater** 132:19
**greg** 1:22 143:6
143:15 144:5,20
146:17
**ground** 28:3

**grounds** 11:8
**group** 16:4
  57:16 75:15
**growing** 139:13
**guess** 8:18 9:14
  23:16 29:10
  37:1 38:18 50:6
  61:9 62:5 129:4
  136:22
**guessing** 19:21
  129:2
**guests** 88:4
**guidance** 50:24

**h**

**h** 7:13 8:9,11
  10:11 17:11
  18:10 19:14
**half** 74:12
**hallway** 9:18
  10:3,4 20:22
**hand** 32:16 98:5
  108:11 122:4
  125:13 130:1
**handed** 31:12
  107:3 110:24
  130:22
**handful** 9:10
**handing** 119:1
  127:14
**hands** 69:8
**handwritten**
  109:8
**hang** 35:14
**happen** 64:2
  80:21,21

**happened** 27:4
  29:21 33:24
  91:6 113:12,16
**happening**
  26:18 31:23
  109:7,22
**happens** 33:23
  48:19
**hard** 57:20
  63:13
**head** 13:17
  16:11 122:14
  134:11 142:5
**heading** 47:19
  88:24
**health** 12:8
  13:25 14:4,5,11
  14:12,23 18:14
  19:11,15 20:13
  22:5 23:10,17
  23:19,23 24:6
  24:10 27:5 76:2
  83:3 93:7,11,24
  95:25 96:8,22
  97:13 126:1
**healthcare** 3:13
  4:13 11:12,18
  27:14,25 28:4
  28:21 33:1
  98:18 109:23
  111:1 115:3
**hear** 140:19
**heard** 21:1
  27:12 103:15
  133:7

**hearing** 4:12
  9:24 25:19
  26:12,22,23,25
  27:11,11,12,19
  27:21,23 29:15
  48:24 50:15,16
  53:13,15,25
  78:25 103:12
  110:12,13,17
  111:8
**hearings** 9:24
  26:5 27:22 34:1
  79:5 82:15
  109:17
**hearings's**
  116:13
**heart** 12:18
  22:13
**heath** 88:21
**held** 33:1 49:9
  50:6 66:11 77:4
  108:24
**help** 23:11 64:5
  81:3 98:4
  108:25 110:3
  114:12 131:24
**helpful** 109:25
**helps** 70:4
**hereunder**
  45:24
**hey** 122:25
**high** 7:19
  138:25
**highland** 2:3

**hire** 88:5
**historic** 22:6
  81:4
**historically** 98:2
**history** 20:8
  22:10 90:14
**hold** 48:13 78:9
  138:22
**holder** 93:3
**holding** 67:5
  82:24 136:9
**holdings** 1:7,8
  5:4,6 11:11 32:1
  32:1 33:2 49:18
  55:2 64:14
  65:11 66:25
  67:1 68:14,16
  68:17,20 77:19
  82:22,23,23
  92:14,15 93:3
  93:13 94:5,5
  99:16 101:24
  102:7 104:20
  106:12 125:21
  126:25 133:19
  133:23 134:3
  135:21 138:11
**holds** 53:13
  134:17
**home** 72:11
**homeowners**
  64:5
**homes** 13:14
  23:15

**[honest - inserted]** Page 166

**honest** 137:10
**honored** 131:9
**hood** 25:1,14
**hood's** 25:6
**hoods** 25:20,25
26:8
**hope** 56:5,14,22
**hoping** 56:16,24
**horizon** 20:19
21:3,7 107:5,25
108:22,24 109:4
**horribly** 103:7
**hospital** 25:5
85:8
**hotel** 88:3
**hour** 24:21
**hours** 50:22
**house** 26:7
86:21
**housing** 91:12
**huh** 64:16 72:18
73:18
**hundred** 126:10
134:13 137:10
**hurdles** 88:20
**hurricane** 64:3
**hybrid** 85:24

**i**

**identical** 44:22
**identification**
28:17 30:23
36:3 39:25
58:25 60:6 62:8
62:22 64:10
72:2 89:20

94:10 98:8,23
99:11 101:15
105:12 107:1
110:7,22 111:15
112:8,18 114:16
115:22 118:24
119:23 121:13
125:16 126:21
127:12 130:12
130:20 143:9
**identified** 38:7
138:25
**identify** 110:1
111:17 119:2
**ied** 22:23 23:1
**ii** 1:8 32:2 33:3
82:23,24 92:15
93:14 94:5
141:8
**iii** 2:6 146:19
**ilf** 52:4 58:4,8
58:11,13 73:10
73:13 90:25
93:12,14
**illegal** 11:2,5
15:7 34:4,7,10
34:18,19 49:2
**illegality** 34:23
**illness** 13:7
**imf** 113:14
**imh** 3:13 4:12
11:11,18 15:20
27:14,25 28:4
28:10,21 98:18
109:23 111:1

115:3
**immediate**
34:17,17 53:6
53:17
**immediately**
9:22 74:13
76:16 95:8
110:16 138:25
**imminent**
136:20
**importance**
96:3 97:21
**important** 25:1
**importantly**
102:19
**impressive**
88:21
**include** 138:15
**included** 13:19
40:19 45:24
46:10 96:21
125:3
**including** 17:4
95:24 105:5
117:3
**inclusion**
146:14
**income** 129:16
129:22
**incomplete** 90:6
90:16
**incurred** 124:21
**indebtedness**
136:15

**independent**
12:7 13:11,15
23:14 24:20
52:18 66:20
85:6 87:1 96:22
**index** 3:11
**indicate** 46:15
101:1
**information**
16:22 46:7
57:19 68:25
71:3 92:17 93:8
102:21 104:9
121:23 127:3
**informational**
71:5
**informed** 44:13
45:11 46:18
47:24 69:25
**initial** 4:8,9 20:9
22:22 101:20
102:5 106:5
129:15
**initiate** 54:8
101:22
**initiated** 21:2
**initiation** 102:1
**injunction** 4:22
53:10 119:6
**injunctive** 72:5
**injured** 73:14
**insert** 61:8
135:7
**inserted** 61:1,12
61:15

**instance** 29:22 119:16
**instigated** 20:7
**institute** 49:19
**instituted** 34:5 99:19
**institution** 134:16
**insurance** 1:19 2:11,13 8:16,17 8:25 9:5 12:17 13:9 14:13 15:14 22:16,18 22:19,20 28:22 29:17 52:12 54:12,13 59:12 61:23 63:21,25 64:6 69:3 80:16 80:16,17,20 85:18 86:20,21 88:1 97:4 120:1
**insured** 12:24 63:22 69:5
**insureds** 64:1,1
**insurer** 52:11 69:4
**insurers** 54:16
**intact** 86:9
**integrity** 63:24
**intent** 63:5,6 137:23
**interact** 17:23
**interactions** 79:21

**interest** 21:5 34:13 77:16 83:12 93:5 109:6 125:2 132:18
**interested** 85:10 144:15
**internal** 104:13 116:12
**internally** 43:13 137:7
**internet** 102:22
**interpretation** 30:4,6
**interrelated** 23:17
**interrupt** 6:19
**intimately** 41:7 110:2
**investors** 91:15
**invoked** 100:7
**invoking** 100:11
**involved** 9:22 9:23 10:13 15:22 17:14 18:2,4,5 19:23 20:1,3 21:13,24 26:24 27:10 47:9 54:11,25 55:17 73:2 78:23 81:10 84:6 90:9,12 92:20 95:23 105:3,6 110:2

**involvement** 10:1 22:6 96:1 104:19 105:2 120:2
**involving** 47:10 50:7 60:21 85:12 113:8 127:23
**issuance** 53:9
**issue** 27:13,14 27:21,22 30:17 33:15 36:11 45:5 63:13 65:8 68:7 75:7,13 76:7 87:7 113:13 131:7
**issued** 14:23 15:16 27:23 53:11 55:3,9 56:2 68:15 119:13,17,18
**issues** 9:15 10:21,24 13:6 27:5 29:18 67:8 75:6 82:21 116:22,25 119:16

**j**

**j** 17:11
**jacksonville** 2:8
**january** 8:20 20:17
**jay** 3:19,20,21 3:22 59:25 60:2 64:17 134:25

136:10
**jeffrey** 1:6 2:2 95:1 146:18
**jersey** 1:12
**job** 8:2,21 21:24
**jogged** 140:7
**john** 5:10 16:3 102:11,12,13,15 130:23 136:4
**joined** 8:16 17:6
**joint** 4:12 81:21 82:14 110:12
**judge** 8:2,3,4 27:13,23 28:3,7 29:11,20 30:3 30:10 48:9 49:21,23,24 50:16,19 53:25 74:9 75:17 78:7 81:8 87:21 88:7 95:13 110:13 111:5,8 112:12 115:17 116:5
**judges** 49:25 50:18
**judicial** 119:5 119:10
**july** 8:17 9:12 9:13,22 12:13 48:5,6 127:24
**jump** 51:24
**june** 124:9 127:16 130:25
**jwarren** 2:4

**[k - letter]**

| k | | | |
|---|---|---|---|
| **k** 17:11 | 74:23 75:14 | **lack** 102:14 | **lead** 19:2 102:14 |
| **kathleen** 4:24 | 76:3 81:9 83:4 | 118:3 133:24 | 106:2 |
| 120:6 | 84:8,11 85:5 | **lady** 25:18 | **leading** 27:10 |
| **keep** 36:14 85:7 | 87:15,21 88:12 | **landry** 15:6,22 | 109:7 |
| 86:7 98:1 | 96:20 98:13 | 16:5 33:13 68:3 | **leads** 140:25 |
| 117:21 131:14 | 100:13 103:17 | 92:25 93:4 | **learned** 108:18 |
| **keeping** 84:5 | 104:6,13 107:23 | 109:10 | 120:11 |
| 132:7 | 108:18 109:22 | **landry's** 15:5,12 | **leave** 8:20 27:5 |
| **kept** 137:8 | 111:24 114:6 | **language** 45:16 | 46:24 122:23 |
| **kevin** 19:7,12 | 119:25 123:18 | 46:10 61:7,17 | 123:13 |
| **key** 85:18 | 125:12 129:3 | 62:25 70:24 | **leaving** 90:1 |
| **kicked** 53:23 | 131:12 132:1 | 76:8 77:6,8 | **leean** 17:10 |
| 74:8 87:23 | 135:1 138:6,20 | 94:23 136:17 | **left** 8:8 15:15 |
| **kind** 20:24 22:1 | 138:24 139:5,8 | **lapsed** 88:22 | 19:9 24:17 90:4 |
| 48:14 80:25 | 140:7,12,21 | **large** 60:23 | 91:13 127:18 |
| **knew** 13:1 55:19 | 141:5,9,11,15 | 139:13 | 129:9 138:12 |
| **know** 8:23 10:7 | 141:17 | **largely** 27:11 | 141:25 |
| 10:8,13 12:5,11 | **knowledge** | **larger** 36:22 | **legal** 8:1 16:7 |
| 15:25 17:3 18:1 | 14:15 21:16 | 52:20 | 27:13 28:3 30:7 |
| 18:13 19:1,17 | 22:8 66:20 90:2 | **larry** 15:5,6,12 | 30:17 34:2 35:2 |
| 19:21 21:9,15 | 92:24 96:25 | 16:4 33:13 | 80:7 111:1 |
| 21:18,23 24:25 | 100:17 137:19 | 92:25 | 146:17 |
| 25:17,21 26:6 | 137:22 | **late** 8:18 15:23 | **legally** 52:15 |
| 27:2 31:3 32:9 | **known** 20:19 | **lathrop** 10:11 | 61:15 |
| 33:16 35:20 | 25:21 | **lavine** 123:15 | **legitimately** |
| 41:7 43:4 44:6 | **kohrn** 5:10 | **law** 7:23 29:20 | 11:17 68:8 |
| 51:2,24 54:11 | 130:24 | 29:25 30:2,11 | **lender** 20:18 |
| 55:1,4,13,16 | | 55:20 59:7 60:1 | 107:5,25 108:11 |
| 56:3,17,18,20 | l | 68:10 70:19 | 124:24 131:9 |
| 57:20 59:20 | **l** 5:14 7:14 8:9 | 80:19 111:11 | 136:6,14 |
| 60:10 61:25 | 10:11 125:21 | **lawsuit** 107:9 | **lending** 109:3 |
| 63:6 64:4 65:25 | **l.p.** 5:4,6 135:21 | **lawyer** 84:25 | **leon** 49:22 75:16 |
| 69:3,12,17 | **la** 7:19 | **laying** 75:14 | 143:4 144:3 |
| 70:19 73:5 74:2 | **labeled** 11:8 | **layperson's** | **letter** 3:9,16,21 |
| | **labels** 51:17 | 18:17 | 4:17,24 5:10 |

36:10,15 37:3 38:8,15 41:24 42:8,14,16,20 42:24,25 43:7 46:11,17,18 47:4,10,14,19 48:16 60:8,13 60:25 61:21,21 62:1,4,17 63:8 112:23,25 113:2 114:18 115:12 119:25 120:3,4 120:5,7,15,25 121:5 126:13 130:23 134:24 135:4,19 136:20 137:4 146:7,11

**letters** 16:22

**liabilities** 124:22 125:7

**liability** 138:9 138:11 139:2

**licence** 57:25 89:5

**licences** 14:8 58:3

**license** 14:23,24 143:9

**licensed** 49:11 133:4

**licenses** 88:21

**licensing** 96:17 101:23

**lien** 62:13

**lieu** 21:1 107:21 107:23 108:7,12

**life** 12:6 18:14 19:11,15 20:13 22:4 23:3 24:7 52:4,12,23 53:19 55:2 85:21 86:10,18 90:25 96:11,17 97:5,11 125:25 127:24 128:23 129:6,18

**lifetime** 19:23

**likely** 17:20 49:17 82:17

**limited** 1:7,8 125:2 126:25

**line** 109:3 145:6

**liquid** 36:13 65:10 66:4 70:25 106:7

**liquidated** 92:13

**liquidating** 1:6 5:7 83:13 92:13 94:4 95:1,9 117:13

**liquidation** 82:15

**listed** 18:6 32:4

**listening** 109:20

**litigate** 75:1 87:21

**litigated** 30:15 113:13

**litigating** 49:10

**litigation** 9:9,9 9:10 10:9 18:4 27:7,8 43:3 50:5

**little** 8:7 10:2 11:21 12:10 23:10 41:13 54:10 64:4 77:13 88:20 89:1 95:4 98:19 101:9 110:3 114:4,9

**lived** 13:15

**living** 12:7 13:4 13:5,11,20,22 14:18,19 23:12 23:14 24:20 25:3,16 26:7 74:21 85:6 86:15 87:1,1 93:7 96:23 125:6 133:3

**lkd** 122:9,12 140:9,23,24,25

**llc** 28:22 33:1 42:11 98:18 111:1

**llcs** 11:11,18

**loan** 5:9,10 36:15 61:1,8,11 62:10,14 63:1 65:15 75:24 76:3 92:20 93:19,24 107:16 109:6 130:7,14

131:13,14 132:2 135:5,13,22 136:3

**loans** 93:23

**located** 41:9

**long** 22:25 53:15 79:18 85:15 97:3 124:24

**longer** 8:19 54:12,13 90:11 95:23

**longtime** 18:1

**look** 29:7 31:1 36:24 71:8,15 74:11 107:14 114:21 127:21 127:22

**looked** 66:2 71:6 76:20 95:18 126:9

**looking** 29:3 42:6 43:8 75:10 87:24 103:9 121:25 122:23 126:15 127:4,5 127:7 128:8 139:22 141:14

**looks** 31:24 38:20 111:21 119:8 126:8

**lorraine** 2:10 35:19 122:25

**lorrainenovak...** 2:13

**[loss - mean]** Page 170

loss 36:11 57:6
losses 124:21
lost 96:13
lot 50:21
low 68:24
lower 32:16
loyola 7:21
lp 107:5,25
lunch 58:19

**m**

m 2:10 8:9
made 30:11
  47:4 65:15
  70:20 75:16
  79:5 87:13
  92:20 93:19
  95:13 97:25
  100:16 113:14
  121:9 135:14
  137:3 141:20
  142:8
magnitude
  128:22
mail 43:9
main 30:15 65:8
  75:13 80:18
  136:2
maintain 82:1
  105:14
maintained
  132:24
maintaining
  72:10 96:3
maintains 72:7

major 19:3
make 6:15 29:2
  31:20 37:12
  38:2 39:19
  59:16,19 64:5
  68:11 72:25
  141:21 142:5,6
  146:9
makes 55:23
  114:9
making 68:10
  72:22 77:19,20
  99:15 102:2
  132:22 137:25
man 48:18
management
  16:2 61:10
  102:16 132:12
manager 72:8
managing 98:17
manner 24:11
  24:13 27:17
manor 103:2,13
  103:18
march 1:17 16:8
  16:14 20:17
  33:10 35:18
  36:16 38:9
  44:11 45:9
  46:10,13 47:4
  55:6 58:23
  69:23 86:3
  102:8,15 107:7
  114:3,17 115:12
  119:7 120:12

124:25 125:1,10
  134:8 138:2
  143:8,10,17
  144:17 145:4
  146:2,5
mark 28:19
  35:17 39:4
  40:12 59:1 60:3
  62:5,6,20 71:17
  71:20 89:11
  91:14 98:5,21
  99:8 110:4
  112:6,15 114:13
  115:19 121:11
  125:14 126:19
  127:10 130:9,18
marked 28:16
  30:22 36:2
  38:11 39:24
  41:21 46:23
  58:24 60:5 62:7
  62:21 64:9 72:1
  89:19,22 94:8,9
  98:7,22 99:10
  101:12,14 105:9
  105:11,19
  106:21,25 107:3
  110:6,19,21
  111:12,14 112:7
  112:10,17,21
  114:15,22
  115:21 116:19
  118:23 119:1,20
  119:22 121:12
  122:4,24 124:11

125:15 126:20
  127:11,14,20
  130:11,19,22
  131:4
marketing 84:3
marking 64:8
married 86:12
material 109:25
matter 44:5
  50:23 51:11
  53:22 54:19
  94:15 111:4
  116:12,14 131:7
  135:14
matters 19:2,3
  47:18 117:11
maurice 8:2
mccarty 19:7,9
mcglinchey 2:6
mcglinchey.c...
  2:9
meals 23:11
mean 11:8,22
  12:9 15:21
  18:19 21:5
  22:15 23:7
  31:11,14,16,21
  32:3 46:16,25
  54:22 58:8
  63:20 66:6
  68:24 74:25
  77:10 78:4
  80:15 84:6 86:6
  87:10 97:22
  101:5 108:10

113:8 116:24 123:22 136:22 136:23 141:21 142:4

**meaning** 73:10

**means** 128:19

**meant** 11:5 46:17

**median** 24:1

**mediated** 82:14 83:6 90:23

**mediation** 79:9 79:11 81:11 82:6

**medical** 86:15

**meet** 46:2 84:14

**meeting** 17:15 17:16 78:13 79:16,22 84:10

**meetings** 20:6 47:9,10 78:17 79:13,14,16,24 80:1 84:6,20

**member** 18:2 19:23 54:13 98:17

**membership** 83:12

**memorandums** 111:11

**memorialized** 95:11

**memory** 13:6,21 109:1 125:9 140:8

**mention** 45:7 95:12

**mentioned** 21:7 22:12 23:2 50:1 54:4 56:11 69:14 86:8 108:20

**merger** 1:13

**merits** 10:7 87:24 89:9

**mess** 88:23,24

**met** 23:1 25:18 26:1,4,4 80:4 84:16,21

**meteorologist** 26:6

**mgw** 1:3,5 145:3

**middle** 1:1 7:14 32:3

**mien** 24:1

**mile** 14:16

**miles** 14:17

**million** 12:22 44:19,23 65:9 65:13 66:17 68:18 75:20,23 75:24 76:7,14 76:16 106:7 109:9 129:8,11 129:20,24 138:4 138:12,14 139:5 139:6,9

**millions** 129:24

**mind** 45:22 51:1 70:14 84:17 98:5 104:6

**mine** 94:23 111:21

**minimum** 36:11 36:13 65:10 66:4 70:25 106:6

**minus** 14:2

**minute** 10:16 60:14 97:10 118:20 130:2

**minutes** 17:15 69:13

**miriam** 54:23

**misrepresented** 105:1

**missing** 136:11

**mlr** 36:10,11 44:19,24 45:1 46:1,3,5 65:10 66:12 67:6,8,18 67:20,24 68:1,2 68:6 69:14,15 69:20 70:3 71:17 72:21 74:1 75:6,6,17 76:14,18,20 77:10,11,14,18 132:10,12,16,19 132:22 133:2,8 133:13 134:7,15 134:17 137:25 138:3,6

**mlrs** 132:18

**mobility** 13:6

**moment** 29:1 30:25 36:8 42:5 56:10

**monetarily** 74:4

**money** 65:24 66:12 67:7,14 67:14,15 69:10 88:19 128:15 139:13,14

**monies** 73:20

**monitor** 83:25

**monitoring** 84:4 84:8

**monroe** 52:11

**month** 126:2

**monthly** 13:1 126:1

**months** 17:6 68:2 90:2 126:5

**moot** 136:13

**morgan** 3:17 4:17 17:10,25 18:11 21:10,12 21:14 36:22 37:10 38:23 39:19 41:22 43:25 45:5,19 46:12,17 47:11 47:21 54:18 69:25 80:2,2,3 82:19 104:7 112:23

**morgan's** 18:12
19:18 39:2
49:14 69:24
**morning** 6:11
**mortgage** 21:5,6
108:24 136:9
**motion** 50:19
77:24 78:2,9,24
79:8 81:21
**move** 7:4 39:8
57:13 59:23
123:1
**moved** 25:19
27:2 29:5
**mullen** 3:16
42:8 47:5 48:16
**multiple** 27:22
31:5 82:19
98:13 113:6
121:16 129:24

**n**

**n** 2:1 3:1 5:14
6:1 17:11
**name** 6:12,13
7:11,13,14,14
8:6 16:25 17:1
17:18 19:12
20:20 54:24
60:2
**named** 15:11
16:3 92:25
**names** 8:9 31:24
93:1 126:8
127:6

**national** 1:11,12
6:23 145:3
**nature** 26:14
65:4 92:18
104:6
**nebraska** 103:3
103:6,9
**necessarily**
63:23 87:9,11
**necessary** 23:21
23:23
**need** 23:10 25:2
46:25 62:18
70:5,7 73:13
85:19 110:14
**needed** 13:8
34:24 86:14
87:15 139:1
**needing** 13:5
**needs** 11:16
68:2
**negotiate** 56:13
**negotiated**
107:24
**negotiating** 94:3
117:13
**negotiation**
94:19 117:20
**negotiations**
26:17 78:12
**never** 15:6 20:7
21:1 25:16 26:2
26:3 34:22,25
89:4 103:15
104:24 115:18

115:23 140:6,17
140:22
**new** 1:12 7:21
11:3,10 16:4
24:18 26:21
34:12 68:20
106:11 111:22
117:16
**norm** 113:20
**normal** 111:3,7
113:17
**normally** 14:17
**north** 2:3,7
**northern** 8:3
**notary** 143:6,16
144:5
**notations** 31:16
**note** 37:12
38:15,17 42:10
122:18
**noted** 45:21
**notes** 16:1 109:9
125:8 144:10
**notice** 4:3,5,19
4:22 5:7 26:15
35:3,5,6,12 45:6
46:12 47:16
51:4,10,14
52:22 94:17
99:1 112:2,2
114:23 115:6
119:6
**notification** 3:9
**novak** 2:10
10:15 29:7

35:21 37:8,11
37:18,23 38:1,4
40:1,5,9,17
41:18 59:5 80:9
91:25 92:4
123:4,8,12
126:12,17 130:3
**november** 29:5
**nuances** 80:24
**number** 32:21
43:16 47:15
48:20,21 49:9
50:5 68:8,10
81:3,5 84:15
88:18,19 99:17
104:23,25 116:9
116:9,11,12,14
116:15 128:3,9
129:5,20 138:23
138:24 139:4,24
**nursing** 13:7,20
14:6,19 24:22
32:1 33:1 42:11
44:12,13,16,20
44:22,25 45:11
45:11,14 61:9
64:13 65:16
66:3 75:21,23
82:25 83:3,13
83:17 85:9
86:16 87:2 89:3
93:6,8,17 125:6
133:9,22 134:2
**nursing's** 66:11
66:24

**o**

**o** 5:14 6:1 10:11 17:11,11 18:10
**oak** 146:4
**oath** 3:6 143:1
**object** 91:5 93:21 96:12,24 97:16 100:5,12 100:24 101:7 103:20 104:15 104:22 108:1,16 113:19 116:23 117:18 120:16 120:18 121:2,4 128:17 131:16 132:4,20 133:10 134:1,18
**objection** 6:16
**objections** 7:4 105:14
**objects** 76:17
**obligation** 113:11
**obligations** 128:23 129:17
**obtain** 104:8
**obtained** 58:22 122:2
**obtaining** 103:14
**obviously** 43:14 121:16
**occasion** 100:10 102:17 104:8

**occupancy** 127:8 131:8
**occur** 53:18 96:7 101:5 113:18 141:22
**occurred** 15:23 79:11 83:16 102:3,8 120:12 127:24
**occurring** 50:17 108:21 113:23
**odd** 67:10 80:20
**offer** 59:16
**office** 1:19 2:11 2:13 8:16,17,25 9:5,21 11:15,16 15:14,16,24 16:7,13,21 18:22 19:4 28:22 29:17 37:13 44:13 45:11 52:9 57:19 59:10,11 59:11,15,19 61:4,16,23 64:4 67:7 69:25 71:2 71:4 73:1,3,25 75:4,7 76:11,13 76:17 80:15 84:16 100:16,22 101:2 117:20 120:1 130:16 135:14,23 137:5 146:8

**office's** 63:22 116:12
**officer** 72:8 103:18
**offset** 76:16
**oh** 32:6 35:21 64:20 89:16
**oir** 3:13 9:2,11 14:10,19 16:17 17:2,7 24:17 26:10 31:9 33:9 34:19 35:4,6,12 36:17 37:3 38:8 38:24 39:16 41:9,12,13,22 42:21 43:1,7,9 43:15,20 44:7 45:6 46:13,17 47:3,11 52:3 54:15,18 56:16 56:24 57:9 58:14,19 63:13 63:15 69:23 71:6 72:19,24 72:24 76:6 77:23,24 78:3 78:11,22 79:4 79:13 80:12,13 80:15 81:1,2,11 81:18,25 83:24 83:25 84:4,7,14 85:19 86:4 87:13,16 89:25 95:10,23 96:5 96:17 97:14

98:1 100:15,21 101:4 102:2 104:21 106:10 106:16 109:15 109:22 113:15 117:14 120:10 120:15,24 127:18 132:18 132:21 134:14 137:24 141:16 141:25
**oir's** 27:18 63:18 67:13 85:13 106:17 111:25 112:1 120:20 141:18
**okay** 7:10,11 10:2 11:20 12:3 12:15 15:3 19:22 20:15,22 21:9,23 23:2 26:25 27:21 28:7 30:18 33:15,19,22 35:13 36:5 37:17 39:7,23 40:8 41:17 42:3 42:8 43:14 45:3 45:18 46:8,22 48:18,18 49:16 50:4 51:24 52:17,21 53:2 53:18 54:4 55:1 57:24 59:6,22 60:17 61:7,14

61:16 62:3 63:12 67:2 68:5 68:17,21 69:8 69:18 70:3 71:19 72:24 73:4,6,14 74:5 75:12,13 76:25 77:22 78:6 79:23 81:23 83:11,15,25 85:11,17 88:10 88:13 90:13 91:7,10 96:14 96:20 107:11,18 110:18 115:19 116:2 118:6 119:20 122:8 123:11 124:6,16 124:19 125:13 126:11,16 128:2 128:7 129:1,20 136:1 137:24 138:18 139:3 140:20 141:5,15

**old** 59:6 69:10 69:16

**omaha** 103:2

**once** 47:19 52:22 84:1 90:19 135:10 146:13

**ones** 24:18 70:12 95:19 124:1,2 126:9

**ongoing** 48:3 58:1 116:21,25

**operated** 93:8

**operates** 12:5

**operation** 83:4 106:11 125:5 132:11

**operative** 11:25 61:7 141:22

**opinion** 16:6 25:7 55:19 98:1 115:15 139:10

**opportunity** 111:10 135:10

**opposed** 141:6

**option** 70:19

**orange** 146:17

**order** 3:13,25 4:2,8,9,14,15,16 4:20,22 27:24 27:25 28:3,13 28:21,25 29:11 29:21,22 30:8 30:13 34:6,7 48:7,8 51:8,10 51:14 52:3 53:3 53:8,11,13,14 53:21,22 55:3,4 55:9 59:15,20 77:25 78:8 82:21 83:7 87:15 88:11 89:8,13,13,15 89:15,18,24 90:7,10,22 94:3

94:4,17,20,20 94:25 95:11 96:6 98:20 101:20 102:5 106:5 110:25 111:6,9,10,20 112:1,12 115:2 115:18,24 116:5 116:6,6,11,16 116:19 117:14 118:6,10,15 119:5,12,16,17 119:18 142:16 142:18

**ordered** 34:11 126:4

**ordering** 146:13 146:14

**orders** 29:14 51:4,7 55:14,14 89:24 90:8,15 94:14,14 95:17 114:24 117:24

**org** 18:25

**organization** 31:8,25

**organizational** 3:14 30:21 31:6 31:9,18,22 32:8

**organized** 33:6 33:10

**original** 146:13

**originally** 29:4 49:23

**orleans** 7:21

**outcome** 82:3,6 83:24

**outcomes** 54:15

**outside** 43:23

**outstanding** 75:22

**overall** 57:8

**oversight** 14:20 15:11

**owed** 128:15,23

**own** 31:7,9,12 31:21 52:19,25 97:12 102:16 112:4 116:17

**owned** 33:6,10 33:13 44:14,22 45:12 83:3 93:4 93:5,6,13,15 133:22,24

**owner** 92:25

**owner's** 65:15

**owners** 11:3,10 34:4,12,18,19 35:2 44:22 49:2 68:20

**ownership** 33:17 34:13 68:24 69:2 83:7 88:15 92:18,22 93:11 96:21,22 102:7 120:22 121:20

**p**

**p** 2:1,1 5:14 6:1 8:9,9,10 10:11 125:21
**p.m.** 1:18 142:21
**pa** 2:2
**page** 103:11 105:21 107:15 107:20 145:6
**pages** 144:9
**paragraph** 44:9 46:5 61:10 65:8 65:20 66:6 76:9 103:1 107:19,21 124:18,19 135:20
**parallel** 49:12 113:6
**parkway** 2:7
**part** 13:22,23 14:12,13 16:5 37:2 38:19,22 43:20 44:17 49:18 57:22 60:23 63:1 65:9 65:18 66:4,12 67:25 75:17 77:9,17 83:12 84:16 85:14 86:18,20 91:18 92:17 95:17 102:6 109:14 111:3 115:12 117:14,15,19

118:9,14 122:18 129:17
**partially** 63:9
**participate** 27:6 79:4,9 81:11 82:13
**participating** 80:12
**particular** 97:19 106:1,5 107:9,9 109:22
**particularly** 102:25 127:22
**parties** 5:16 56:13 66:17 67:3 106:11 144:12,13 146:14
**partner** 54:19
**partners** 125:2
**partnership** 1:7 1:8 124:20 125:2,3,7 126:25
**partnership's** 125:1,4
**parts** 68:6
**party** 34:10 43:1,2 66:3 81:9 146:13
**pass** 136:19
**passage** 20:9
**paul** 8:2,4
**pay** 12:23,25

**payment** 12:20 13:3 21:6 77:15 109:6
**payments** 12:21 13:3
**pays** 12:20
**pelham** 8:9
**penalties** 72:5 145:22
**pending** 9:21 10:25 74:12 117:6,7 124:25 138:5
**people** 9:6 10:12 12:18 13:11,15 17:13 18:3 24:2 26:4,8 69:10,16 86:10 87:3 88:5 130:15
**people's** 86:24
**perceived** 11:1 87:3
**percent** 17:24 68:23 69:2 126:10 134:13 137:10
**percentage** 25:21 67:20 132:23
**perception** 10:21
**performing** 72:10
**period** 5:4,6 9:25 31:4 71:12

127:1
**periodic** 5:3,5 125:20 126:24
**perjury** 145:22
**person** 18:20 19:1,2 21:14,17 21:19 41:6 72:7 79:5,16 82:17 84:19,22 102:14 123:8
**personal** 27:5 104:9,10,11 129:16,21
**personally** 143:7
**perspective** 83:24 137:10
**petition** 26:21 29:18 52:19,20 53:12 54:2
**petitioner** 28:22 51:13
**petitions** 33:25 48:21 49:9,12 50:5,14 52:14 105:23
**pfeiffer** 8:10
**philip** 7:14
**philosophy** 7:21
**phone** 65:19 79:19 84:19
**phrase** 23:2,18 33:17 52:21 56:23 82:8 108:7 118:3

**[physically - principle]**                                                    Page 176

**physically** 41:9
**pick** 99:25
**picture** 90:16
  109:21
**pieces** 13:12
  39:2,4 88:18
**pip** 129:19
  138:15,23,24
**pipe** 86:22
**place** 1:19 14:21
  15:21 23:9
  24:20 63:5,22
  80:20 108:15
  118:12 136:17
**plaintiff** 1:9 2:5
  95:17
**plaintiff's** 4:1
  94:8,9 98:6,7,21
  98:22 99:9,10
  101:12,14 103:1
  105:11,20
  106:25 107:4
  110:5,6,19,21
  111:13,14,18
  112:7,11,15,17
  114:13,15,22
  115:20,21
  118:23 119:2,22
  121:12 124:19
  125:15 126:20
  127:11 130:9,11
  130:19,23 131:4
**plan** 82:14 83:6
  84:2 90:22,23
  95:24 96:7,17

97:11 121:7
  127:24
**plans** 136:20
**plate** 91:13
**pleading** 98:10
  127:15
**pleadings**
  105:25
**please** 6:11
  75:18 121:11
  146:8
**pledge** 38:10,12
  42:9 45:20
  46:20
**pledged** 76:21
**pledgor** 45:24
**pledgor's** 45:25
**pllc** 2:6
**plural** 79:16
**plus** 14:2 73:16
  84:19,21 91:14
  123:16
**point** 13:1 21:14
  21:17,19 23:10
  30:15,15 52:2
  54:22 55:7
  62:13,25 66:24
  78:11,20 81:7
  88:20 122:2
  134:19 136:13
  136:23
**policies** 52:12
  85:18
**policy** 22:19,20
  63:25 69:3

**political** 7:20
**portion** 45:1
  77:11 89:14
**position** 19:18
  21:12,15,18
  27:16,18 35:4,8
  65:12,23 66:3,9
  66:12,24 67:13
  72:20 73:25
  75:14 76:5,11
  76:13 88:4
  102:11 135:12
**positions** 66:16
  67:3,10
**possibility**
  24:10
**post** 8:1 122:18
**postdates** 90:1
**potential** 84:7
  84:10,15
**practice** 8:14
**pre** 4:12 110:12
**precise** 31:3
**predated** 15:24
  42:20
**predatory** 109:3
**preferred** 82:3
**preparation**
  29:20
**preparations**
  120:3
**prepare** 31:7
**prepared** 31:9
  31:11 33:24
  34:5 48:20 50:6

76:1 92:2 102:9
  105:24 122:9
  123:17,19
  139:20
**presence** 60:24
  135:22
**present** 79:14
**presently**
  128:25
**president**
  130:24
**presumably**
  43:15 59:13
**presume** 94:18
**presuming**
  95:19
**prevent** 52:3
**previously** 97:2
  120:10
**price** 3:19,20,21
  3:22 59:25,25
  60:2,9,25 62:24
  63:9 64:17
  130:15,16 131:3
  134:25 137:2,9
**price's** 62:12
  136:10,24
**primary** 11:12
  80:11
**principal** 1:11
  75:22 103:8
**principals** 85:1
**principle** 75:24
  77:3,16

**print** 70:18
**printing** 70:19
**prints** 57:20
  102:21
**prior** 15:10
  21:18 33:5,10
  34:15 35:3,6,10
  53:21 60:20
  70:22 78:23
  90:8 92:19,22
  94:14 98:15
  132:10 138:1
**priority** 63:22
**privity** 137:18
**pro** 1:5 5:8
**probably** 13:1
  40:18 47:12
  50:22 55:18
  74:8,16 84:20
  91:22 116:15
**problem** 57:10
  57:11 87:3
**problematic**
  68:12
**problems**
  124:10
**procedural**
  10:25 89:9
**procedure**
  29:10 111:4
  146:24,24
**procedures**
  108:13
**proceeded** 50:7
  117:11

**proceeding** 18:8
  49:14,14 50:17
  50:20 51:1 54:5
  54:8 98:11
  99:18 102:2
  104:4 111:7
  112:14 115:16
  117:5,7
**proceedings**
  26:2 48:2 49:20
  53:19 55:17
  57:24,25 58:13
  77:24 98:14
  101:10 109:16
  113:7 114:25
  117:3,4 118:2
**proceeds** 110:16
**process** 11:14
  50:3 84:1,16
  87:12 94:13
  104:25 110:3,4
  112:20 134:14
**produce** 71:16
  81:22 126:17
**produced** 31:5
  38:24 41:22
  43:1 44:6
  141:16 143:9
**profit** 1:12
**program** 139:1
  139:15
**progression**
  95:22
**prohibited**
  52:15 87:11

**promissory** 16:1
  42:10 109:9
**prongs** 88:8
**proof** 49:6
**properly** 34:3
**properties** 97:3
**property** 19:13
  95:25 97:12
  108:12,25
**proposal** 112:24
**proposed** 4:14
  4:15 110:24
  111:10,19 112:1
**prospective**
  18:18
**protect** 63:15,24
**protecting** 64:1
  80:13
**protection** 63:2
  69:5 129:16,22
**prove** 74:20
**provide** 40:3
  71:2 81:3 95:24
  100:3 111:5
  118:7
**provided** 61:22
  72:14 97:5
  119:25
**provider** 11:15
  14:24 15:2,3,7,9
  15:10,15 35:2
  52:8 56:25
  57:11,16 58:22
  59:11,14,16
  67:16,16,25

  68:8,13 71:4
  87:4,8,9,17 88:1
  93:3 96:17
  101:23 117:17
  133:8,14,17,25
  134:4
**providers** 69:1
**provides** 46:5
  118:7,8
**providing** 23:19
  50:24
**proving** 87:22
**provision** 46:12
  60:19,24 61:2
  63:7 72:15
  97:23 131:20
  135:1,4,22
  136:14
**provisions**
  59:15,17 74:12
  94:3 97:4
**proximity** 25:4
  86:12
**public** 8:22 82:5
  122:9 143:6,16
  144:5
**pull** 135:1
**pulled** 43:25
**purchase** 23:3
  86:18 120:22
  121:10
**pure** 30:17
**purport** 135:7
**purported** 11:3
  11:10 15:18

**[purported - recall]** Page 178

34:12 60:25
86:1
**purpose** 83:21
**purposes** 4:22
68:12 119:7
132:25 141:13
**pursuance**
72:12,16
**pursuing**
118:19
**purview** 75:8
**put** 31:20 39:3
41:17 69:8
87:22 88:5
101:8 105:13
109:20 110:3
117:21 118:12
122:18 131:20
**putting** 50:22
59:5 96:21
106:23

**q**

**qualifications**
50:12
**qualified** 56:25
57:12 66:12
88:1,9,19
**qualify** 57:16
66:4
**quality** 91:11
**question** 12:15
43:13 66:7,14
70:11,14 74:3
74:25 75:9
79:19 92:16

93:10 107:8
108:3 113:10
131:6
**questioning**
11:21
**questions** 6:20
18:3 70:6 92:3
94:2 100:4,8
131:2 134:20
141:24
**quick** 29:7
36:25 79:19,19
**quickly** 120:25
**quite** 25:20 41:7
104:7
**quote** 16:5,5
93:18

**r**

**r** 2:1 6:1 8:9,10
8:11 10:11
19:14
**rabke** 38:8
44:11,17,21,23
45:10 47:5
**raise** 45:5 75:1
131:21,25 137:4
**raised** 7:5 61:4
105:15 135:23
136:5
**raising** 135:17
137:21
**range** 129:7,25
138:22
**ranks** 21:25

**rasing** 29:18
**rather** 13:15
32:3 56:16
**reaching** 51:20
**reaction** 120:15
**read** 24:16,18
29:1 30:13 42:5
44:9,10 45:15
60:14 66:6
69:24 70:7
72:14 123:7
124:18 125:12
142:13,15
145:22 146:9
**reading** 5:17
45:22 61:21
82:20 146:21
**real** 36:24 80:24
**really** 39:11
51:1 109:11
**reason** 13:17
22:6 28:13 49:4
54:17 56:8 58:6
63:12 70:13
79:15 114:21
118:18 122:22
124:7,9 127:20
131:20,20 132:1
133:21 134:11
145:6
**reasonable** 30:1
30:7 73:16
129:24 139:5,8
146:11

**reasons** 24:23
137:5
**recalculated**
138:7
**recall** 13:11,19
14:2 18:2 19:15
20:8 21:4 26:13
26:20 33:24
42:16,18,23
43:3,16,17
47:18 48:20,22
51:8 52:18 54:3
55:5,11,13 56:9
59:21 60:1,8,10
60:12 61:2
64:25 65:5,18
66:16 67:23,25
68:6 69:11
71:13 72:22
78:10,16,19
82:7 83:1,8,14
83:17 84:8,17
84:19,19,21
85:5,20 88:3
89:9,24 90:3
91:1,2,4,8,17
94:3,22,24 97:8
98:18 99:6,20
104:2,5,16
105:6,19 106:8
108:20 109:5,13
114:3 120:2
121:25 127:5,7
129:23 131:17
134:10 138:2,10

138:13,24,25
139:3,14 140:14
140:23
**recalled** 47:19
**recalling** 20:20
60:20,23
**receipt** 45:8
67:20 146:11
**receive** 49:17
57:1
**received** 31:17
31:18 43:8,9,11
43:11,17 47:17
52:9 65:3
120:20 134:8
146:13
**receiver** 99:16
119:14 131:7
**receivership**
49:13,20 50:17
50:20 53:24,25
54:4,8,21,23,25
77:25 78:4
99:18 117:3,7
117:22,25
118:11,14,19
119:11,19
131:18,21 132:8
**receiverships**
54:17
**receiving**
120:20
**recent** 122:14
**recess** 58:17
118:22 130:4

**recision** 56:17
**recission** 34:14
59:16
**recitals** 45:22
66:2
**recitation** 41:11
**recognize** 94:23
95:20 98:10
101:17 110:9
112:3,4,10,21
112:21 140:13
140:22,22
**recollection**
9:22 12:21 20:6
20:11,12 22:3
23:25 30:17
32:25 33:12
34:8 35:10,12
43:6,21 47:13
50:10 55:22
59:19 60:18
61:6,20 62:2,17
65:17,21 66:22
67:2,21 68:10
70:4 82:12
83:19 89:7
108:5 117:19
118:16 122:10
127:4 138:17
**recollections**
55:23
**recommendati...**
142:8
**recommendati...**
142:5

**recommended**
3:13 4:14,15,16
27:24,25 28:12
28:21,25 29:11
29:14,21,22
30:8 48:7,8
110:25 111:6,9
111:19 112:1,12
115:18,24 116:6
**record** 6:12,15
6:21 10:15,17
12:11 41:2,8,18
41:19 42:6,6
44:4,10 46:25
47:1 58:16
70:15 82:6 95:7
98:25 101:9
105:14,17
106:23 111:17
122:19 123:14
124:18 125:18
126:12,23
144:10
**recorded** 63:10
136:2,4
**recording**
103:12,14,16
**records** 43:20
121:22 136:5
141:18
**recover** 73:20
73:22
**recovery** 73:15
75:5

**redirect** 3:5
134:22
**reduction** 75:24
**refamiliarize**
63:8
**refer** 29:19 39:4
41:23 133:21
**referal** 49:17,18
72:22 73:2
100:16 142:9
**reference** 20:2
77:20 78:18
**referenced**
38:15 39:18
46:17 86:13
110:14 146:8
**references** 38:9
102:11 103:12
106:6 114:24
120:21
**referral** 54:5
72:25 100:21
101:2,5 141:21
**referred** 22:22
51:9 60:21 77:8
82:7 98:15
115:16 123:23
132:7
**referring** 24:15
29:1 82:20
97:24 100:25
114:7 123:6
140:11
**refers** 47:22
54:19 65:4

133:14
**refinancing**
44:15 45:13
**refresh** 65:16
70:4 82:12
83:19 89:7
108:25 125:9
**refreshed** 60:18
**refreshes** 66:21
**refund** 129:15
138:8,10
**refused** 102:20
140:14
**regard** 142:9
146:12
**regarding** 11:17
46:7 103:1
104:9 110:14
112:24 113:11
131:3
**regions** 134:10
138:3
**regulate** 80:16
**regulated** 11:15
12:18 13:24
14:7,8 51:20,22
**regulates** 54:15
**regulating**
14:10
**regulation** 1:19
2:11,14 8:16,18
9:1,5 14:21
15:14 28:22
29:17 59:12
61:23 80:16

120:1 133:7
**regulations**
51:21,23
**regulator** 74:17
**regulatory**
88:20,23,24
**rehabilitation**
4:23 119:7
**reject** 29:23
**rejected** 48:8
**relate** 41:3
**related** 12:12
41:14 65:13
**relates** 60:22
**relative** 144:11
144:13
**relatively**
122:12
**relevant** 39:11
136:14
**relied** 123:24
**relief** 4:11 34:9
34:9 72:6 74:11
77:24 106:18
107:5 111:25
**remain** 83:9
**remainder**
93:25
**remedies** 59:3
74:10 109:15
136:17,21
**remedy** 74:14
74:16
**remember**
11:11 16:25

18:14 20:14
21:7,8 22:24
27:1,3 29:9
31:16,18 33:14
47:12 48:25
49:5 50:11,13
59:25 60:16
65:20 67:24
69:19 79:15
82:11 85:9
91:11 92:25
94:6,19 99:24
100:1 103:3,4,5
103:14 109:8
114:2 118:9
124:14 125:24
126:7
**remembering**
29:4 48:23 57:7
87:18 118:1
124:10 127:17
**remove** 49:1
**removed** 122:17
**renewal** 72:13
**repair** 67:24
**repaired** 105:7
**repairs** 57:8
68:1
**repay** 68:1
**repeated** 16:22
**replace** 103:24
134:3
**replaced** 24:11
86:22,24

**replacement**
67:24
**report** 5:3,5
125:20,22 126:4
126:24 144:7
**reported** 1:22
**reporter** 3:7 6:2
39:22 71:19,23
139:22 140:2
142:13,16,19
144:1
**reporting** 126:2
132:19
**reports** 134:6
**repository** 81:5
**represent** 7:6
**representation**
95:13
**representations**
75:16
**representative**
25:25
**representatives**
26:7
**represented**
44:21 91:13
95:16
**representing**
43:4
**request** 38:25
71:4 121:8
**requested**
111:25 144:8
**requesting**
16:22 131:13

**[require - rights]**

**require** 100:21 133:13

**required** 27:16 45:1,25 115:1

**requirement** 24:19 28:10 58:21 97:8 98:3 132:15 133:2,8

**requirements** 28:2 33:17 44:24 45:25 97:14

**requires** 35:3

**requisite** 113:11

**resemblance** 41:5

**reserve** 7:9,9 36:11,13 45:25 66:5 71:1,3 77:9 77:15 91:24 106:7

**reserved** 5:18 7:6 105:16

**reserves** 65:10

**resident** 23:25 59:17 73:9,9,10 73:12 128:1,19

**resident's** 131:19 134:25 135:8

**residents** 25:12 26:1,5 60:19,24 63:2,7,15,24 64:2 67:14,19 67:19,22 73:11

73:20 74:1,19 76:2 96:10 97:5 105:8 128:15,23 129:14 131:8 135:4 136:13 139:14

**resolve** 49:12 95:10

**resource** 20:8 79:6,8 80:19

**respect** 20:4,18 58:13,20 66:17 68:9 94:14 101:9 102:1 114:25 119:18 121:23 125:9 132:16

**respective** 5:16

**respondent's** 4:19 114:23

**response** 38:24 47:4,6 62:12 120:20 131:2 136:10,24 138:10

**responsibilities** 75:8

**responsibility** 96:10

**restated** 82:14

**restructuring** 44:15,18 45:13 103:18

**result** 128:15

**resulted** 53:19

**retained** 84:13 123:16

**retired** 26:5

**retirement** 11:22 23:8 57:22 65:12

**retiring** 13:4

**retroactively** 124:1 139:21

**reunify** 88:15

**reunite** 83:6

**revenue** 104:13

**reversal** 28:7 89:8

**reverse** 29:25

**reversed** 28:3 29:13 30:12,14 89:4 116:5

**revert** 34:15

**review** 36:8 63:7 92:17 102:18 135:10 135:10 144:8 146:8,9,10

**reviewed** 82:18 126:6

**reviewing** 119:13

**revocation** 57:25,25 58:12

**revoked** 88:22 89:4,6

**richard** 84:24

**right** 7:8 11:5 17:7,18 18:25 19:17 22:14 23:4 26:9 29:14 31:15 32:7,9,16 32:18,21 34:20 34:21 35:8,22 36:8,20 39:17 46:19,24 47:8 47:21 48:2,6,16 48:17 53:24 54:5 55:21 59:22 62:18 63:15 69:5,16 71:18 73:7,19 74:7,8,18,19 75:5 76:11 77:12 78:3,16 78:19 79:10,12 82:10 83:11,18 84:9 85:20 86:2 86:9 87:9,10,12 91:22 92:1 94:11 100:1,8 100:11 106:20 123:12 131:19 135:4 136:7 137:14,15,21 138:4,12 141:19 142:11,12

**rights** 6:20 7:6 46:7 60:19,24 63:4,7 71:5 80:12 100:3 129:15 135:1,8

**[rights - seen]**

136:13
**ring** 16:8 129:20 140:9
**ringing** 107:12 108:4
**rings** 20:20 25:10 108:22
**rise** 43:18
**roaster** 17:15
**rock** 84:17,20 84:23 85:2,3,9 90:24 91:15,19 91:20,20,21
**role** 14:10 17:21 17:24 18:17 21:10 80:18 81:7
**roles** 20:3
**roll** 30:19
**roof** 86:22,22,25
**roofs** 86:24
**room** 1:20 84:9
**ross** 2:2
**rotated** 49:25
**row** 32:3
**ruins** 86:23
**rule** 11:14 72:16 146:24,24
**rules** 146:11
**ruling** 28:9 34:2
**rumors** 140:18 140:19
**run** 16:2

**s**

**s** 2:1,6 5:14,14 6:1 7:13 17:11 146:19
**sale** 52:25 53:7 53:17,19 58:23 59:4 83:5 84:1 86:3,5 90:24 95:24,25 96:7 117:23 125:1,3
**sales** 59:16 84:7
**salle** 7:19
**satinwood** 2:11
**satisfied** 75:25 97:18
**satisfy** 44:24 75:21 88:7 97:14
**saw** 10:12 39:12 42:18,24,25 43:22 47:19 80:18 82:17,18
**saying** 20:2 32:23 33:19 34:24 35:9 36:14 37:15 38:15,22 46:12 48:10,14 51:21 66:5 67:7 69:11 70:21 75:15,16 76:17 77:7 89:2 126:14 137:12 137:13
**says** 34:6,8 36:18 43:14

47:24 59:3,10 61:3 62:16 65:8 72:7 74:18 75:18 77:3 113:2 126:13 136:11
**scheduled** 9:23 26:23 29:4 48:24
**school** 7:19
**schooling** 7:24
**science** 7:21
**scm** 136:9
**scn** 62:10,15
**scope** 75:7
**scuttlebutt** 10:5
**second** 48:24 49:13,16 50:1,2 50:17 58:6 62:13 74:15 81:16 87:22 89:6 117:8 118:19 119:5,9 119:10 137:16
**section** 9:10 10:9 20:14,14 22:9 45:1 46:1,3 59:18 72:5,19 72:21 73:7 124:11 141:22
**security** 65:14
**see** 17:15 24:2 28:23,24 32:7 42:1 54:17 61:10 64:15

72:17 73:16 77:3 94:13 105:22 107:20 114:12 124:8 125:7,25 127:25 127:25 128:3 130:25 132:5 134:6 136:10 137:5 140:11
**seeing** 42:17 43:16,17 47:19 64:25 90:6 105:19 109:8 125:23 134:10
**seek** 101:4
**seeking** 49:1 53:12 99:16
**seem** 63:17,18 97:8 129:7 134:9 135:17 138:13
**seemed** 101:1 139:5
**seems** 46:15 73:19 76:5 77:16
**seen** 25:11,11 31:2,3 35:20,21 35:22,24 36:5 42:12,13 52:6 62:13 77:8 101:18 120:3,5 122:11,13 134:11 140:6,8 141:1

**sell**  24:7 52:10 52:23 55:2,8 83:6 117:16
**selling**  52:4,12 52:15
**send**  37:11,22 40:4
**sending**  16:21 37:19 60:9
**senior**  8:21 9:6 91:12 130:24
**sense**  31:20 55:23 63:16
**sent**  16:13,17 26:21 37:4,6,6,8 37:13,19,24,24 39:15 40:3 41:13 43:14,15 47:7,15 60:12 62:4 74:17 78:24
**sentence**  71:1 137:3
**separate**  13:12 33:25 54:20 93:12,24 136:8
**separated**  14:16
**september**  9:25 29:4 54:1 64:12 99:23
**sequence**  94:24 102:6
**sequencing** 113:17 114:2

**series**  82:4 89:24
**serve**  41:13
**service**  8:22 71:3 77:9 104:14
**services**  23:20 49:19 54:16 61:5 71:13 74:23 99:19 135:24
**set**  11:14,20 12:16 57:19 90:17 102:21 132:25
**sets**  64:4
**settlement** 56:15
**seventh**  3:25 4:2 89:13,23 90:7 90:11,21 96:5
**several**  84:10 90:10 99:24 120:14
**severed**  91:4
**shape**  57:5
**sharing**  135:12
**shaw**  1:16 3:2 6:6,13 7:13 123:6 143:7 144:7 145:4,25 146:3,5,6
**sheet**  3:8 145:1
**shelfer**  49:21,24 50:19 54:1

**short**  53:16 71:12 95:5
**shorter**  70:12
**show**  4:22 28:19 30:20 35:16,19 39:10,12 59:1 60:3 62:5 89:10 119:6,16 122:19
**showed**  55:15 91:16,16,17 138:9 139:18
**showing**  57:5 64:7 89:22 136:8
**shows**  42:6
**shumard**  146:4
**shy**  79:7
**sick**  23:9 25:2
**side**  22:5 24:2 24:20,21 43:7 88:22 117:21
**sides**  111:5
**sign**  146:9,9
**signatory**  81:18
**signature**  60:11 76:4 105:22 111:24 112:3 136:6,12 143:14 144:19 146:23
**signatures** 136:18
**signed**  16:16 38:13 106:1 136:3 140:15 143:10

**significant** 124:21
**significantly** 105:1
**signing**  5:17 146:21
**similarly**  95:21
**simply**  87:14
**simultaneously** 50:16 105:24
**sincerely**  146:15
**single**  25:20
**sir**  94:6 95:15 103:4 104:12,17 107:17,22 119:19 129:19 131:1 138:17,21
**sister**  44:16 45:14 133:23
**site**  96:18
**situation**  20:16 64:2 73:11
**six**  126:5
**sixties**  24:3
**skilled**  13:7,20 14:6,19 24:21 85:8 86:16 87:1 89:3 93:8 125:5 133:9
**skip**  74:7
**skyline**  103:2,4 103:5,13,18
**slightly**  14:16
**smith**  1:22 143:6,15 144:5

144:20 146:17
**smoke** 137:7
**snapshot** 57:3
**snf** 58:9,10
  93:14
**sold** 55:4 83:8
  83:18 85:21,23
  88:16 125:2
**sole** 125:1,2
**solely** 65:14
**solid** 55:20
**solo** 8:13
**solution** 56:24
  57:13 81:15,15
**somebody** 19:22
  87:7 98:16
**sorry** 21:11
  36:14 48:6 59:5
  66:14,18 91:20
  96:14 105:16
  113:1 115:23
  119:10 120:16
  128:8
**sort** 9:16 10:5
  11:7,20 12:6,10
  12:11 18:15,17
  20:2,16,23,24
  21:23 22:12,13
  23:17 25:6
  26:11 34:16
  51:25 52:3
  56:12,13,15,23
  58:1 63:16
  70:23,24 73:20
  81:2 83:6,25

84:5 85:25 86:7
88:15 92:16
101:8 109:10
120:25 124:1
136:25
**sorts** 102:22
  109:7 136:5
**sought** 57:14
  98:16 106:18
  131:22
**sound** 98:1
**sounds** 129:24
**source** 43:23
  75:20
**southpoint**
  84:18,21 91:14
**southwest** 97:9
**speaker** 26:6
**speaks** 77:1
**specific** 10:4
  21:16 31:17
  61:20 62:2,17
  74:3 106:6
  108:4 121:25
  126:9 137:23
  140:23
**specifically**
  12:12 20:21
  59:21 104:5,16
  109:13 120:21
  128:19
**specifics** 11:6
  20:2 21:4,8
  47:12

**spectrum** 26:8
**speculating**
  46:16
**spell** 8:8
**spirit** 56:7
**split** 54:12,14
  54:15 87:6
**spoke** 103:8
**spring** 120:25
**spun** 93:18
**squatters** 34:4
**srn** 62:14
**stabbing** 137:7
**stack** 135:2
**staff** 10:12 18:1
  18:2 19:23
  104:7 142:4,8
**staffers** 22:5
**stafford** 2:6
**stamp** 43:8,17
  47:17 85:19
  140:16
**stamped** 43:11
**standing** 55:20
**standpoint** 6:24
**stands** 131:19
**staring** 42:16
  43:12
**start** 52:12 92:3
**started** 8:20
  9:13 19:8 26:10
  101:19,19
**starts** 107:15
**state** 6:11 7:22
  8:1 20:10 46:6

72:23,25 73:2
80:19 99:15
100:16,22 117:3
118:14 119:10
142:10 143:3,6
143:16 144:2,5
**stated** 44:17,23
  145:22
**statement** 4:12
  5:8 38:21 46:14
  106:13 109:15
  110:12 120:17
  121:3 122:1,3,6
  122:11,13
  123:17,18
  127:23 138:9
  139:20,25 140:4
  141:6,13,20
**statements** 5:1
  123:3,6,10,24
  124:5 134:10
  139:17
**states** 1:1 76:9
  107:6
**status** 87:16
**statute** 3:18,24
  11:14,25 24:12
  24:14,17 27:15
  27:18 28:5,11
  30:3 35:3 46:2,4
  46:5 48:11 59:3
  59:6 70:3 71:17
  76:19 77:1
  101:1 132:25
  146:12

**statutes** 12:1 45:2 46:1 63:21 133:13

**statutory** 23:1 28:1 34:9 46:3 80:22

**stay** 4:22 23:9 23:25 50:20 53:23 63:4 77:25 86:13 119:6

**stayed** 25:16 117:4,8

**stealing** 69:10

**stenographic** 144:10

**stenographica...** 1:22 144:7

**step** 34:6 49:8 74:7 121:6

**stepped** 27:9

**steps** 87:14 136:15

**steve** 8:6

**stick** 16:11

**sticking** 13:17 134:11

**sticks** 122:13

**stiller** 1:16 3:2 6:6 7:15 28:20 35:16 36:5 41:21 58:18 64:7 71:20 89:22 90:9,21 92:10 119:25

121:18 123:23 124:13 141:25 143:7 144:7 145:4,25 146:3 146:5,6

**stiller's** 124:3

**stipulated** 5:15

**stolen** 69:14,19

**stop** 52:25 109:19 139:15

**stopped** 86:3

**stopping** 53:7 53:17,19 79:15

**stories** 137:8

**street** 1:20 13:16,17,18 14:6 23:22 52:11

**strike** 113:9 131:25

**struck** 17:19,20 17:23 18:5 19:20,22 20:4,7

**struck's** 17:21

**structure** 13:9 33:5 34:15 82:1 92:22

**structured** 85:13

**study** 77:10 121:22

**stuff** 80:25

**stuffle** 40:22 41:12

**subject** 50:8 64:13 72:11 94:15

**submit** 111:10 111:11

**submits** 57:18

**submitted** 48:9 56:20,21 110:25 111:20,23 112:2

**subsection** 70:23 71:1

**subsequent** 79:1 115:15

**subsidiary** 1:12 44:14 45:12 133:23

**substantial** 29:24

**subsumed** 86:17

**successful** 118:10

**successor** 1:13

**sufficient** 119:15

**suggest** 12:6 77:16

**suggested** 146:10

**suggestion** 39:1 120:24 135:17

**suite** 2:7

**summer** 16:21

**supervised** 9:9

**supervisees** 10:9

**supervisor** 9:8

**supplement** 124:9

**supplemental** 37:9 39:18 40:13,15 41:21 43:25 44:5 45:19

**supply** 102:21

**supported** 29:24

**supportive** 86:4

**sure** 6:15 7:19 8:2 29:2 37:23 38:1,2 40:10 43:19 44:11 60:15 62:4 64:5 65:1,2 70:10,17 70:20 81:17 92:4 99:25 116:24 128:18 130:3 132:22 137:25 140:15

**surface** 57:20

**surprise** 97:13 97:17 129:8,11 139:11

**surprised** 65:19 79:17 82:18 139:12

**suspect** 84:12

**suspension** 4:8 4:9 10:25 26:12 26:14 51:5,8,10 51:14 53:3,12

53:14 55:3,5,9 56:12 101:20,23 102:5 106:6

**swear** 6:2

**sworn** 6:7 143:8

**synonymous** 52:6

**t**

**t** 1:22 5:14,14 8:11 10:11 19:14 143:6,15 144:5,20 146:17

**table** 11:20 81:9

**take** 24:20 29:1 29:7 30:25 31:19 34:5 35:4 36:8 42:5 44:2 60:15 72:19 73:25 77:10 88:4 91:25 92:3 96:9 99:3 105:7 106:4 107:14 118:20 129:12 130:2 136:15 142:20

**taken** 53:6 58:20 84:3 99:14 121:6 136:15

**takes** 51:12

**talk** 81:16,19 135:6

**talked** 17:14 23:14 24:25 96:2 130:6

**talking** 39:11 58:19 79:10 108:19 138:23 140:9 141:23

**talks** 75:13 76:3 77:2

**tallahassee** 1:21 2:12 8:15 78:14 79:14 84:13,14 146:4

**tampa** 1:2,7 2:3 5:4,6 32:1 33:1 33:2,2 42:11 61:9 79:9 82:25 90:24 92:14,15 93:3,6,14 94:5,5 96:17 97:11 101:24 104:20 106:12 107:7 125:21 126:25 127:24 133:19 133:22,23 135:21

**team** 16:13,19 17:3,9 57:23

**telephone** 65:5 65:5 82:16

**tell** 17:16 31:4 51:25 54:10 71:10 90:16 93:2 103:5 116:4 142:3

**ten** 50:22 68:23 69:2,13 118:20

**tender** 91:23

**tent** 83:17

**tenure** 72:24 95:20

**term** 15:2 23:1 93:16 124:24 133:7,25 137:6

**terminology** 11:9 15:1 34:19

**terms** 12:5 20:22 22:11 23:18 28:12 52:6 63:2 70:25 75:5,10 83:4 84:1 131:10 132:11 134:15

**testified** 6:8 96:2 97:2,21 101:11 121:18 132:15

**testifying** 99:20

**testimony** 3:2 6:3 23:6 48:15 86:8 98:15 109:21 127:17 130:6 132:11

**thank** 6:22 8:25 45:3 50:24 126:18

**theory** 64:6 121:1

**thereof** 72:13

**theriaque** 8:10

**thing** 22:19 56:5 95:14 113:16

**things** 12:6 18:19 22:11 56:4 74:6 84:3 95:6,9 102:23 105:6 106:3 109:7,10 110:1 114:12

**think** 9:5,7 10:24 11:12 13:20 14:1 15:10,12 17:1,2 17:11 19:14,24 22:15 24:15,18 25:7,9,10,13,14 25:20 33:3 35:14 36:7,13 37:13 48:22 55:8 56:6 58:4 62:11,12,24 64:22 67:9 69:9 70:24 71:11,23 77:1,6,7,13 78:20 79:1,3 80:21,22 81:2 84:17 85:24 86:1 88:14 89:1 89:3,5 90:3,5 91:12,14,14,18 91:21 93:12,22 93:24 109:2,21 111:23 114:4 117:24 120:19 123:2,4,5 124:13 126:1 129:9 132:23

136:22,23 138:5
138:13,14 141:8
142:11
**thinking**   13:16
43:21 55:25
71:14
**third**   4:5 72:17
98:25 116:15
135:20
**thought**   57:15
57:17 58:10
69:20 88:12
109:25 140:10
**three**   13:19
43:10 67:3,3,10
67:23 79:4
121:10
**threshold**   68:24
**threw**   139:4
**thrust**   90:21
**tie**   113:22,23
114:12 115:10
**tim**   3:22 10:8,19
20:23 69:13
79:1,25
**time**   1:18 9:25
10:20,24 12:2
12:13,21 18:12
19:6 20:13
26:17 42:25
43:22 52:2 56:4
56:16 57:14
59:8 60:15
65:22 68:4
71:12 76:12

78:8,10 79:18
81:3 85:20 87:3
87:22 88:23,24
90:11 91:1,10
91:24 92:19
95:23 97:6
106:2,4 111:22
113:16 121:19
121:24 124:2,5
127:18 134:21
136:19 138:4,12
142:17
**timeframe**
17:22 20:17
**times**   24:25 27:2
69:20
**timing**   89:1 95:3
**title**   9:4,6,8
18:12,14 21:20
42:5
**titled**   28:21 42:9
42:10 107:16,21
110:24 119:5
**titles**   20:3
**today**   40:6 77:7
86:9 96:2 97:12
**together**   31:20
86:14 96:21
98:2 101:8
106:23 109:20
114:13 115:10
**told**   25:10 33:12
37:14 84:11
97:11 108:24

**took**   15:21
42:15 47:3 99:6
**top**   31:25 32:3,4
32:23
**topic**   9:19 10:3
11:3
**topics**   12:9
**towers**   13:13
23:15,24 33:2
**town**   13:14
23:15 24:20,21
25:5
**track**   51:1
102:23
**tracking**   43:15
**tracks**   113:7
**tracts**   50:4
**tragic**   57:7
**transaction**
36:16 85:12
102:15 127:23
138:2
**transactions**
120:11
**transcript**   4:6
5:18 88:6 99:13
144:8,9 145:2
146:7,9,10,13
146:14,21
**transfer**   16:5,23
69:23 72:20
74:1 102:7
106:7 121:20
125:4

**transferred**
49:24 62:15
68:18 83:13
**transferring**
44:19
**transmitted**
36:17
**transport**   105:8
**treated**   118:4
**treatment**   13:8
**tree**   86:21
**trees**   106:22
**trey**   5:10 130:24
**trial**   115:13
**tried**   31:6 49:4
50:25 102:23
114:18 115:16
**trigger**   27:18
**triggered**   28:10
30:4
**trip**   28:1,4
**tripped**   27:15
33:18 48:11
**trouble**   87:18
99:4
**troubled**   121:6
**true**   25:10 61:13
83:2 100:20
106:17 138:22
141:9,11 144:9
145:23
**trustee**   1:7 7:5
71:2 83:14
92:13 94:4 95:2
95:9 103:8,13

103:24 117:13
**trustee's** 5:7
**truth** 6:4,4,4
**try** 16:13 31:20
 31:20
**trying** 26:20
 31:22 38:1,18
 48:12,13,25
 51:2 61:19 95:5
 99:3 114:2
**tuned** 80:24
**turn** 107:19
**turned** 60:23
**turner** 8:6 137:2
 137:11
**twelve** 50:22
**two** 8:4 13:12
 13:15 19:7,16
 28:14 31:19
 47:17 49:4
 50:15 61:22
 68:6,10 79:4
 81:5 88:18,19
 93:23 104:23,25
 130:2 137:15,16
**type** 102:1,17
 113:17 125:22
**typical** 121:6

**u**

**u** 5:14 8:11
**uh** 64:16 72:18
 73:18
**ultimate** 19:3
 34:11 82:5,6

**ultimately** 43:19
 83:22,23 115:13
**unaudited**
 122:2
**unavailable**
 68:11
**uncertain** 17:24
 49:4
**uncertainty**
 43:7,18 47:14
 47:22,25
**unclear** 61:17
**uncommon**
 24:24
**under** 14:21
 19:12 28:11
 42:23 45:25
 46:3 51:12
 72:21 77:14
 83:17 111:20
 112:2 118:4
 128:23 129:6,17
 134:16 145:22
 146:11
**undergoing**
 44:15 45:13
**understand**
 23:5 24:23
 25:17 29:10
 31:22 33:19
 37:18 38:18
 61:19 66:19
 68:21 70:2 75:9
 89:2 92:18,20
 93:5,10 100:10

103:23 110:18
 113:9 116:21
 128:14 129:13
 136:22
**understanding**
 6:24 12:3,11,14
 15:17,21 20:4
 33:9 36:9 37:1
 41:10 49:10
 51:25 65:22
 81:15 83:20
 93:16,20 108:10
 108:11 110:4
 128:22
**understood**
 61:18 124:2
**undertake**
 11:17 68:1
**unfavorable**
 27:24
**unfortunately**
 99:7
**unified** 93:11
**unit** 22:4
**unitary** 83:18
 88:16
**united** 1:1 107:6
**university** 3:14
 7:22 9:15,17
 10:1,6,11,20
 11:2,13,16 12:3
 12:13 13:10
 14:1 15:3 16:13
 16:18 17:14
 18:4 20:18,25

21:2 25:8,23
 26:3 27:10 31:5
 31:10,13 34:13
 40:25 41:10
 44:12,14,17,18
 44:21,24 45:10
 45:12,14 52:3
 52:14 55:1 57:3
 57:9 64:14
 65:11 73:12
 82:2 85:12,22
 96:18 104:20
 105:4,8 107:6
 108:15,25 113:3
 117:16 120:12
 121:19,23
 125:10 128:24
 129:13,14
 133:16
**unlawful** 59:4
**unreasonable**
 139:9
**unsigned** 38:11
 38:16
**unusual** 43:9
 113:6 127:6
**upfront** 13:3
**usab** 38:15
 92:20
**usameribank**
 1:13 42:11 61:9
 61:25 63:11
 64:13 65:22
 67:3 76:1 93:20
 93:23 130:25

131:24 134:7,9 134:12 135:12 136:11,12,16 137:15,18,19

**usameribank's** 65:23 66:9

**use** 23:18 56:23 64:14 75:20 137:6

**used** 20:7 34:20 44:23 52:6,21 60:19 67:6,7,9 69:20 82:8 93:17 125:22 133:7

**uses** 46:3

**using** 15:1 85:8 97:18 111:22

**usual** 113:15

**uv** 107:5,25

**v**

**v** 3:13 145:3

**vague** 20:16

**vaguely** 83:15

**valid** 61:24 63:11 72:12

**valley** 1:11,12 6:16,23 145:3

**van** 105:7,8

**varied** 12:22

**variety** 26:4

**various** 12:4 16:15 50:4 109:16 117:15

**venn** 67:11

**veritext** 146:17

**version** 40:2 70:21 72:4

**versus** 28:22

**vetted** 87:16

**vice** 130:24

**victorian** 54:24

**view** 35:1 72:20

**villa** 25:17

**village** 3:14 9:16 9:17 10:1,6,12 10:20 11:2,13 11:16 12:4,13 13:10 14:2 15:4 16:13,18 17:14 18:4 20:19,25 21:2 25:8,23 26:3 27:10 31:10,13 34:13 40:25 41:10 44:12,14,17,18 44:21,24 45:10 45:12,15 52:4 55:2 57:3,9 64:14 65:11 73:13 82:2 85:12,22 96:17 96:18 97:11 104:20 105:4,8 107:6 108:15,25 113:3 117:16 120:12 121:19 121:23 125:10 127:24 128:24

129:13,14 133:16

**villages** 64:4

**villas** 23:16 33:3 93:12,13

**violated** 51:21

**violates** 72:15

**violating** 59:14

**violation** 26:15 51:10,15 73:14

**virginia** 17:11 17:25

**volume** 40:1

**voluntary** 121:9

**vs** 1:10

**w**

**w** 1:6 2:2 7:13 17:11 19:14 44:11 45:9 146:18

**wait** 55:18

**waive** 142:14 146:9,21

**waiver** 7:4 146:20

**walk** 52:11

**walking** 9:8

**walter** 24:25

**want** 7:9 18:21 20:16 24:9,19 33:16 35:19 37:25 38:2 40:4 40:4 50:21 51:18 63:19 69:3 78:22,23

83:21 85:3 91:25 92:1 95:6 105:13 106:4 109:23 129:4,12 140:19

**wanted** 6:14,21 39:10 61:8,12 79:6 85:6 86:24 98:4 101:8 106:23 122:19 127:21

**wanting** 37:16 61:23

**warner** 7:8 32:15 37:1,5,15 39:14 40:12 41:2

**warrant** 36:15

**warren** 1:6 2:2 3:4 6:14 32:11 32:19 35:23,24 36:1 37:19 38:6 39:1,7,9 40:4 41:7 44:4 46:23 58:8,12 66:14 66:18 70:8,13 78:13,14,17 79:2,14 80:2,4,6 81:20,23 84:11 89:14,17 90:5 90:14 91:5,19 91:23 92:2,7 94:1,7,12 95:1 96:14,15 97:1 97:20 98:4,9,19

98:24 99:7,12
100:9,14 101:3
101:8,16 103:22
104:18 105:9,18
106:21 107:2
108:6,23 109:20
110:8,18,23
111:12,16 112:6
112:9,15,19
113:5,21 114:9
114:20 115:19
116:3 117:1
118:5,20,25
119:20,24
120:17,23 121:3
121:11,14,17
122:22 123:1,13
124:4,7,15,17
125:13,17
126:11,19,22
127:10,13 128:9
128:12,13,20
130:1,5,9,13,18
130:21 131:23
132:9 133:1,12
134:5,20 137:24
138:9 139:4,17
140:1 141:19
142:20 145:3
146:18
**warren's**  41:11
**water**  118:4
**waving**  105:16
**way**  13:6 21:25
  33:3 41:14,15

57:2 69:15
83:11,12 111:23
132:6 137:20
139:10
**we've**  7:2 74:12
  105:14
**wednesday**  1:17
**weeds**  129:12
**week**  8:22
**weekly**  18:5
**weeks**  120:14
  121:10
**weigh**  76:7
**wendy**  4:17
**went**  8:5,11
  16:20 17:1,3,5,9
  18:3 24:10
  25:16 30:8
  48:15 49:5
  71:12 79:1,3
  87:21,22 88:8
  88:11 91:16,16
  106:15 110:15
  114:3 115:13
  122:15 123:24
**westport**  1:7,8
  5:3,5 11:10
  15:13 31:25
  32:1,1,25 33:2,2
  42:11 43:4
  44:12,13,16,19
  44:22,25 45:10
  45:11,14 49:18
  55:2 61:9 64:13
  64:14 65:10,16

66:3,11,23
68:13,16,17,20
75:21,22 82:22
82:23,25 83:3
83:13,17 89:25
92:14,14 93:1,3
93:6,13,17 94:5
94:5 99:16
101:23 102:7
104:20 106:3,8
106:12 107:24
112:24 116:22
119:19 125:20
126:1,3,25
131:22 133:18
133:19,22,23
134:2,3 135:21
138:11 141:8,8
142:9
**westport's**
  53:12
**whitson**  2:6 3:3
  3:5 6:10,23 7:10
  7:12,16 10:18
  28:12,18 29:8
  30:18,24 32:9
  32:12,18,20,22
  35:13,22,25
  36:4,20 37:2,9
  37:13,17,21,24
  38:3,5,22 39:6,8
  39:10,17,23
  40:1,8,11,15,21
  41:5,17,20 44:6
  44:8 46:22,24

47:2 58:10,15
58:18 59:1,7,9
60:3,7 62:3,9,18
62:23 64:7,11
66:15,21,25
67:12 70:10,18
71:9,15,20,25
72:3 77:5 80:10
81:14,21,24
89:10,16,21
90:13,18 91:7,9
91:21 93:21
96:12,24 97:16
100:5,12,15,24
101:7 103:20
104:15,22
105:13 108:1,2
108:16,22 113:1
113:19 115:23
116:2,23 117:18
120:16,18 121:2
121:4,15 122:25
123:2,5,11,22
124:6,13,16
126:16,18 128:8
128:11,17
131:16 132:4,20
133:10 134:1,18
134:23 139:17
139:23 140:3
142:11,18
146:19
**wholistic**  83:4
**wholly**  44:13
  45:12 133:22

**[wide - young]**

| | | x |
|---|---|---|
| **wide** 26:4,8 | 131:17 132:5,21 | |
| **widely** 12:22 | 133:11 134:2,19 | **x** 3:1 |
| **wiener** 4:18 | 142:15 | |
| **wife** 25:1 | **wonderful** | y |
| **wilhelm** 44:11 | 24:17 | **yeah** 7:12 35:21 |
| 45:9 | **wondering** | 35:25 36:1 38:5 |
| **williams** 3:16 | 62:14 | 39:9,14 119:10 |
| 42:8 47:5 48:16 | **word** 18:22 44:2 | **year** 8:4,7 70:18 |
| **williamson** 78:7 | 47:25 48:12 | 70:20 85:24 |
| 81:8 95:14 | 95:4 102:14 | 126:5 |
| **willingness** | 140:15,16 | **years** 5:2 8:12 |
| 117:21 | **words** 21:25 | 8:14 24:1 25:14 |
| **wilson** 4:24 | 24:19 63:24 | 70:22 74:14 |
| 71:10,11 120:6 | 100:17 103:9 | 122:6 140:5 |
| **wing** 13:21 | **work** 8:5 21:25 | **yesterday** 8:24 |
| **withdrawal** | 32:13 | 37:8 |
| 56:12 | **worked** 8:4,6,11 | **young** 25:20 |
| **withdrawn** | 8:14,17 43:10 | |
| 26:16 55:15 | **working** 10:10 | |
| 56:4,7 | 33:4 74:22 | |
| **withstood** 89:6 | 124:21 | |
| **witness** 6:5 7:11 | **worry** 62:19 | |
| 7:13 18:7,8 | **worse** 112:5 | |
| 39:12 41:11 | **wrapped** 114:5 | |
| 66:23 67:2 91:8 | **wright** 19:14 | |
| 91:20,23 92:5 | **write** 145:2 | |
| 93:22 94:11 | **writing** 112:4 | |
| 96:13,25 97:17 | **wrong** 52:1 | |
| 100:6,13,25 | 139:12,23 | |
| 103:21 104:16 | **wrongdoing** | |
| 104:23 108:2,17 | 104:3 | |
| 113:2,20 114:17 | **wrote** 134:25 | |
| 115:25 116:24 | 135:20 139:23 | |
| 117:19 120:19 | | |
| 121:5 128:18 | | |

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.