

# OFFICE OF INSURANCE REGULATION

**FILED**

**MAR 15 2016**

OFFICE OF
INSURANCE REGULATION
Docketed by: ___

**KEVIN M. MCCARTY**
COMMISSIONER

IN THE MATTER OF:

CASE NO.: 185108-16

WESTPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP
d/b/a UNIVERSITY VILLAGE

_____/

## INITIAL ORDER OF SUSPENSION

TO:    Westport Holdings Tampa, Limited Partnership
d/b/a University Village
12401 North 22nd Street
Tampa, Florida 33612

THIS CAUSE came on for consideration as a result of an on-going examination of WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP d/b/a UNIVERSITY VILLAGE ("WESTPORT") pursuant to Section 651.105, Florida Statutes. The FLORIDA OFFICE OF INSURANCE REGULATION ("OFFICE"), having considered the matter and otherwise being advised in the premises, finds as follows:

### GENERAL ALLEGATIONS

1.    The OFFICE has jurisdiction over WESTPORT and the subject matter of this proceeding.

2.    The OFFICE is an agency of the State of Florida and regulates insurers and other risk-bearing entities as provided in the Florida Insurance Code. Pursuant to Chapter 651, Florida Statutes, the OFFICE has the duty and authority to regulate providers of continuing care as specialty insurers.



PLAINTIFF'S
EXHIBIT 84.16

6

3/8/22

3.     WESTPORT is a limited partnership formed in 2000 and existing under the laws of the State of Delaware.

4.     University Village is a Continuing Care Retirement Community ("CCRC") in Hillsborough County, Florida, and has been since 1987. A CCRC offers shelter, care, and services for residents upon payment of an entrance fee pursuant to continuing care contracts. § 651.011(2), Fla. Stat. Continuing care contracts are between the resident and the CCRC provider and establish the terms and conditions of the residents' care while at the CCRC. § 651.055, Fla. Stat. Such terms include the entrance fee to be paid, the amount of monthly fees, future levels of care through advanced aging, including assisted living and skilled nursing, and any refund to be paid by the provider to the resident or the resident's estate upon exit from the CCRC.

5.     University Village accommodates the required spectrum of care for its residents in several buildings on one campus. There are two six- to seven-story buildings on the campus referred to as the Towers that contain four hundred and forty-six (446) apartments for independent living. At all times relevant hereto, WESTPORT has owned the Towers.

6.     Near the Towers are forty-six (46) patio homes or duplexes, known as the Villas, which are also used for independent living. At all times relevant hereto, the Villas have been owned by Westport Holdings Tampa II, Limited Partnership, a limited partnership separate from WESTPORT.

7.     There is a three-story building on the University Village CCRC campus for more advanced care ("Health Center"). The first floor of the Health Center contains one hundred and twenty (120) skilled nursing beds. The second and third floors contain one hundred and ten (110) beds for assisted living, with a memory care wing included on the second floor. At all

times relevant hereto, Westport Nursing, LLC ("Westport Nursing") has owned the Health Center. Prior to the March 31, 2014, transactions described below, Westport Nursing was a wholly owned subsidiary of WESTPORT.

8.    University Village contains a total of four hundred and ninety-two (492) independent living units and two hundred and thirty (230) beds in the Health Center. University Village currently has several hundred residents.

9.    CCRCs are regulated by the OFFICE as "specialty insurers" pursuant to Chapter 651, Florida Statutes. Florida law requires that every CCRC be operated by a provider approved by the OFFICE to hold a Certificate of Authority. § 651.021, Fla. Stat.

10.    In 2000, WESTPORT was approved by the OFFICE to be the provider for the University Village CCRC and to hold a Certificate of Authority pursuant to Chapter 651, Florida Statutes.

11.    WESTPORT is subject to regulation by the OFFICE, pursuant to Chapter 651, Florida Statutes.

12.    Pursuant to existing continuing care contracts, WESTPORT is contractually obligated to provide shelter, nursing care, and personal services to University Village's current residents on the University Village campus, including at the Health Center. WESTPORT is also contractually obligated to pay refunds to former residents or their estates as provided in their continuing care contracts.

## CHANGES IN OWNERSHIP AND MANAGEMENT

13.    WESTPORT has two partnership interests: a ninety-nine percent (99%) limited partnership interest and a one percent (1%) general partnership interest. From 2000 until March 31, 2014, those interests were held by two entities, Westport Senior Living Investment Fund, L.P

(the ninety-nine percent (99%) limited partnership interest) and Westport Holdings University Village, LLC (the one percent (1%) general partnership interest).

14.     On March 31, 2014, BVM University Village, LLC obtained from Westport Senior Living Investment Fund, L.P. the ninety-nine percent (99%) limited partnership interest of WESTPORT. BVM University Village, LLC is a Florida limited-liability company incorporated in August 2013 by John Bartle. The managing member of BVM University Village, LLC when formed was BVM Management, Inc. ("BVM Management").

15.     BVM University Village, LLC retained thirty-nine and six-tenths percent (39.6%) of the limited partnership interest and simultaneously assigned the remainder of that interest to three other companies as follows: JF Consultants, LLC (thirteen and two-tenths percent (13.2%)); BHMSILF, LLC (twenty-six and four-tenths percent (26.4%)); and IMH Healthcare, LLC ("IMH") (nineteen and eight-tenths percent (19.8%)).[1] Upon information and belief, no capital contributions were made by these three limited partners for the assignment. Upon information and belief, other than these assigned partnership interests, these entities have no assets.

16.     BVM University Village, LLC accomplished its limited partnership takeover by retiring some minor debts and restructuring the remainder through two loans.

17.     The first loan is between WESTPORT, Westport Holdings Tampa II, Limited Partnership, and CPIF Lending in the amount of nine million five hundred thousand U.S. Dollars ($9,500,000). This loan is secured by mortgages on the Towers and the Villas. This loan was negotiated by John Bartle and is guaranteed by the company of which he is President, BVM Management.

---

[1] Subsequently, on or about June 30, 2015, BHMSILF, LLC transferred all of its limited partnership interest to JF Consultants, LLC.

18.     The second loan is between Westport Nursing and USAmeriBank in the amount of fifteen million U.S. Dollars ($15,000,000). This loan is secured, in part, by a mortgage on the Health Center.  This loan was also negotiated by Mr. Bartle and guaranteed by BVM Management.

19.     In addition to the mortgage on the Health Center, the USAmeriBank loan is secured by three million U.S. Dollars ($3,000,000) cash collateral.  This money was removed from a statutorily required minimum liquid reserve ("MLR") account held by WESTPORT at Regions Bank and placed in an account at USAmeriBank maintained by Westport Nursing, where it was pledged and remains as collateral for the loan.

20.     As part of these transactions, a corporate restructuring also took place.  Westport Nursing was moved from being the wholly owned subsidiary of WESTPORT to being a stand-alone entity.  Westport Nursing took with it ownership of the Health Center and the three million U.S. Dollars ($3,000,000), neither of which are now under the ownership or control of WESTPORT.

21.     WESPORT did not truthfully disclose the nature of this transaction to the OFFICE.

22.     WESTPORT represented to the OFFICE that because only ownership of the passive limited partnership interest had been obtained and management and control of the general partnership remained with Westport Holdings University Village, LLC, control of WESTPORT as the University Village CCRC provider had not changed.

23.     Soon after the transactions described above ("March 2014 transactions"), WESTPORT represented to the OFFICE that there was a plan for BVM Management to eventually acquire the general partnership interest.  WESTPORT made continued representations

through the remainder of 2014 that management and control of WESTPORT as the University Village CCRC provider had not changed.

24.    Effective December 29, 2014, the general partner of WESTPORT, Westport Holdings University Village, LLC, resigned.  The new limited partners exercised control over WESTPORT until Compliance Concepts, LLC ("Compliance Concepts"), the managing member of BVM University Village, LLC, a limited partner of WESTPORT, was elected as the new general partner, effective January 26, 2015.  The managing member of Compliance Concepts is Rebecca Bartle, the spouse of John Bartle.[2]

25.    Subsequently, on March 2, 2015, IMH was elected and replaced Compliance Concepts as general partner of WESTPORT.  IMH's sole and managing member is Eliyahu ("Eli") Freiden.  IMH also holds a nineteen and eight-tenths percent (19.8%) limited partnership interest in WESTPORT.

26.    To date, the OFFICE has not approved the acquisition of WESTPORT.

27.    Since March 2, 2015, IMH, through Eli Freiden, has continued to have an ownership interest in WESTPORT and its assets, both as a limited partner and as the general partner, and has continued to exercise control over WESTPORT.  IMH, through Mr. Freiden, continues to operate the University Village CCRC.

28.    Mr. Freiden on behalf of WESTPORT entered into a consulting agreement with Novum, LLC ("Novum").  Pursuant to this agreement, Novum was to provide consulting services to WESPORT on a myriad of issues at the University Village CCRC. The services being

---

[2] BVM Management, with Mr. Bartle as its President, was the managing member of BVM University Village, LLC, through the filing of an Annual Report with the Florida Department of State on April 15, 2014.  An Amended Annual Report was filed October 16, 2014, listing Compliance Concepts as the managing member.

provided by Novum have continued to date and now include many substantive managerial responsibilities.

29. The OFFICE does not concede that WESTPORT is being legally operated as a CCRC provider by general and limited partner IMH, limited partners BVM University Village, LLC and JF Consultants, LLC, guarantor BVM Management, or its President Mr. Bartle, "consultant" Novum, or any other person. The legality of the current operation of WESTPORT as a CCRC provider by IMH as its general partner is the subject of the Final Order entered in IMH Healthcare, LLC v. Office of Insurance Regulation, DOAH Case No. 15-2495 (denial of IMH's Acquisition Application, Final Order issued March 11, 2016).[3] The legality of current control and operations is also an issue in Department of Financial Services v. Westport Holdings Tampa, LP, Case No. 2015 CA 000585 (Second Judicial Circuit) (receivership action).[4] Notwithstanding the lack of legal authority for any of the above-listed persons to act as the provider for the University Village CCRC, one or more of them are taking actions in that role, individually or in concert, purportedly on behalf of WESTPORT, an entity in the name of which there is an existing Certificate of Authority. The purpose of the instant action is to suspend that

---

[3] In June 2015, after signing the management consulting agreement, Novum filed an application for Provisional Certificate of Authority and Certificate of Authority to become the provider for the University Village CCRC. The OFFICE denied that application on July 21, 2015, due to, among other things, Novum's lack of CCRC experience.

Novum filed a petition for administrative hearing regarding the OFFICE's denial of Novum's application, which was referred to DOAH. See Novum, LLC v. Office of Ins. Regulation, DOAH Case No. 15-4730. The petition for administrative hearing was dismissed on January 21, 2016, by way of stipulation between Novum and the OFFICE. The stipulation provides that Novum may file an application in the future so long as the application reflects a significant change in circumstances or demonstrates a public interest.

The OFFICE issued a final order denying Novum's application on January 26, 2016.

[4] With respect to the receivership action, a petition for writs of prohibition and quo warranto is currently pending in Westport Holdings Tampa, Limited Partnership v. Department of Financial Services, Case No. 1D15-4465 (1st DCA). The First District Court of Appeal denied WESTPORT's petition on February 29, 2016.

Certificate of Authority on the basis that the actions described herein violate the Florida Insurance Code, no matter under what authority, or lack thereof, they have been undertaken and by whom.

## INVOLVEMENT OF JOHN BARTLE AND BVM MANAGEMENT

30.     BVM Management and John Bartle played an integral role in orchestrating the March 2014 transactions. BVM Management is the corporate guarantor for all the debt related to the University Village campus, despite having no current ownership interest in WESTPORT, Westport Nursing, or the entities that acquired the limited partnership interest in March 2014.

31.     During the pendency of and subsequent to the March 2014 transactions, John Bartle and BVM Management have exercised control over the management and operations of WESTPORT. John Bartle and other individuals employed by BVM Management have represented themselves to residents, employees, vendors, lenders, and the OFFICE as authorized representatives of WESTPORT, have signed agreements on behalf of WESTPORT, and have sought financing on behalf of WESTPORT. WESTPORT and John Bartle have represented that there are no written agreements between WESTPORT and BVM Management to provide such services.

32.     Subsequent to the March 2014 transactions, John Bartle and other individuals associated with BVM Management assumed control of the entity operating the assisted living facility, which is TALF, Inc. ("TALF"), and the entity operating the skilled nursing facility, which is TR & SNF, Inc. ("TR & SNF"). The assisted living facility and the skilled nursing facility are located in the Health Center on the University Village campus. TALF and TR & SNF are not-for-profit corporations licensed by the Agency for Healthcare Administration ("AHCA") and housed in the physical plant owned by Westport Nursing.

33.    WESTPORT's CCRC Certificate of Authority to be a provider is, in part, predicated upon the contractual obligation of TALF and TR & SNF to provide nursing care and personal services to University Village residents.

34.    TR & SNF, the skilled nursing facility, has encountered substantial difficulties under the direction of John Bartle and other members of BVM Management. First, TR & SNF, Inc. has been subject to proceedings brought by AHCA to revoke its license, currently pending at DOAH in AHCA v. TR and SNF, Inc. d/b/a The Nursing Center at University Village, Case No. 15-2128. Second, TR & SNF has been subject to a civil receivership. See Arvon Funding, LLC v. TR & SNF, Inc., Case No. 2014-26430-CA-01 (Fla. 11th Cir. Ct.). In the civil receivership case, TR & SNF refused to turn over its books and records to the civil receiver and was subject to a motion seeking to have its principals held in contempt.

35.    TALF has also encountered difficulties under the direction of John Bartle and other members of BVM Management. AHCA initiated proceedings on November 10, 2015, to revoke the license of TALF to operate as an assisted living facility in Florida, currently pending at DOAH in AHCA v. TALF, Inc. d/b/a The Inn at University Village, DOAH Case No. 15-7353.

36.    The OFFICE has discovered a troubling similar situation involving John Bartle and other individuals associated with BVM Management. Mr. Bartle and individuals associated with BVM Management were involved in the bankruptcy of Skyline Manor Inc., an Omaha, Nebraska continuing care retirement community, which filed for Chapter 11 bankruptcy on May 8, 2014. See In re Skyline Manor, Inc., Case No. 8:14-bk-80934-TLS (Bankr. D. Neb. filed May 8, 2014). The bankruptcy court subsequently appointed an independent trustee on May 29, 2014. In ruling to appoint an independent trustee, the bankruptcy court noted that the financial and corporate aspects of Skyline Manor, Inc. were clearly not adequate. The court stated on the

record, as documented in audio records of the proceedings, that there was overwhelming evidence to support the appointment of an independent trustee due to gross mismanagement, which included, among other things, disregarding state laws, disregarding the bylaws of the entity, establishing incestuous vendor relationships, which included entities and people related to John Bartle, and failing to file accurate records.[5]

### MINIMUM LIQUID RESERVE FUNDS

37.     On January 21, 2015, the OFFICE was notified by letter that WESTPORT's minimum liquid reserves ("MLR") account was underfunded by three hundred seventy thousand three hundred and twenty-four U.S. Dollars ($370,324).

38.     The OFFICE has discovered through the course of its investigation that WESTPORT's MLR account is far more underfunded.  Three million U.S. Dollars ($3,000,000) of WESTPORT's statutorily required MLR funds were transferred from WESTPORT's MLR account at Regions Bank to an account  maintained by Westport Nursing at USAmeriBank to act as cash collateral to secure a fifteen million U.S. Dollar ($15,000,000) loan to Westport Nursing. WESTPORT continues to report the USAmeriBank account as part of its MLR, even though the funds are not held by WESTPORT, the provider, as required pursuant to Section 651.035, Florida Statutes.

39.     As most recently calculated and verified, the required MLR for University Village is five million nine hundred fifty-one thousand four hundred forty U.S. Dollars ($5,951,440). As most recently submitted by WESTPORT, but unverified by the OFFICE due to WESTPORT's failure to submit its 2014 audited financial statement, the required MLR for University Village is

---

[5]Audio Recording of Hearing on Appointment of Chapter 11 Trustee, In re Skyline Manor, Inc., Case No. 8:14-bk-80934-TLS (Bankr. D. Neb. May 29, 2014) (on file with the OFFICE).

five million seven hundred sixty-nine thousand eight hundred eighty-one U.S. Dollars ($5,769,881).

40.    As of February 17, 2016, WESTPORT's MLR account at Region's Bank had a balance, based on market value, of two million one hundred forty-one thousand four hundred twenty-five U.S. Dollars and seven cents ($2,141,425.07).

## FAILURE TO COMPLY WITH EXAMINATION AND FILING FALSE INFORMATION

41.    On February 11, 2015, the OFFICE began a target examination of WESTPORT. Throughout the course of the examination, WESTPORT has refused to grant open, unrestricted access to its books and records as required by Chapters 651 and 624, Florida Statutes. To date, WESTPORT has not fully responded to the OFFICE's examination requests.

42.    On or about August 17, 2015, WESTPORT suspended and subsequently terminated Timothy Parker, Executive Director, and Kathleen Burkholder, Chief Financial Officer of WESTPORT.  Mr. Parker and Ms. Burkholder had each been employed by WESTPORT for more than seventeen (17) years.  To the extent possible, Mr. Parker and Ms. Burkholder had attempted to comply with the OFFICE's examination by providing bank statements, bank account snapshots, bank reconciliations, information related to cancelled or terminated CCRC contracts, entrance fee refund information, PIP refund information, documentation of cash balance/cash position of WESTPORT, Move in-Refund Cash Flow Spreadsheets, and Cash Forecast Spreadsheets.  Since the departure of Mr. Parker and Ms. Burkholder, who in her role as Chief Financial Officer prepared and submitted financial reports, WESTPORT has failed to timely provide even the routine information listed above.

43.    WESTPORT has filed false financial statements with the OFFICE since the departure of Mr. Parker and Ms. Burkholder.  As of June 30, 2015, WESTPORT reported two

million eight hundred eighty-five thousand five hundred ninety U.S. Dollars ($2,885,590) in refunds payable.  In its periodic report as of July 31, 2015, WESTPORT reported only three hundred one thousand eight hundred thirty-four U.S. Dollars ($301,834) in refunds payable. Despite the reported two million five hundred eighty-three thousand seven hundred fifty-six U.S. Dollar ($2,583,756) difference in the June and July periodic statements, WESTPORT has admitted that it has paid only two installments of fifteen thousand U.S. Dollars ($15,000) towards a Personal Income Protection ("PIP") refund.  When questioned about discrepancies in its required periodic reports, WESTPORT has admitted that the reports are inaccurate. Subsequently, on January 29, 2016, WESTPORT submitted refund information to the OFFICE that reported four million one hundred six thousand five hundred seventy-one U.S. Dollars and forty-eight cents ($4,106,571.48) in refunds payable as of that date.  Most recently, on February 16, 2016, WESTPORT submitted refund information to the OFFICE that reported four million three hundred twenty-three thousand seventy-one U.S. Dollars and forty-eight cents ($4,323,071.48) in refunds payable as of that date, with the amount of refunds payable increasing to four million nine hundred ninety-six thousand seven hundred eighty-six U.S. Dollars and eight cents ($4,996,786.08) by April 1, 2016, and to five million four hundred eighty-three thousand one hundred ninety-seven U.S. Dollars and twelve cents ($5,483,197.12) by June 11, 2016.

## FAILURE TO FULFILL STATUTORY AND CONTRACTUAL OBLIGATIONS

44.   WESTPORT is failing to fulfill its statutory and contractual obligations to its residents, the estates of former residents, and prospective residents.  WESTPORT has interfered with the statutorily guaranteed rights of the residents' council, misrepresented its financial position in statutorily required disclosures to prospective residents, and failed to honor residents' contracts.

45.    WESTPORT is infringing upon the statutorily guaranteed rights and the University Village residents' council. A self-organized CCRC residents' council has certain rights pursuant to Section 651.081, Florida Statutes. "The activities of a residents' council are independent of the provider," pursuant to Section 651.081(2)(c), Florida Statutes. WESTPORT has attempted to restrict the ability of the residents' council to assemble and disseminate information by requiring management approval of resident publications and seeking to prohibit residents from assembling on campus unless WESTPORT representatives are present. In addition, Novum has admittedly attempted to restrict the ability of the residents' council to communicate or disseminate information, in violation of Section 651.081(2)(c), Florida Statutes.

46.    WESTPORT is failing to fulfill contractual obligations to prospective residents by providing inaccurate disclosures to prospective residents. The current disclosure statement, as of December 2015, presented to prospective residents by WESTPORT, the MLR portion of which was last revised July 17, 2014, states the status of WESTPORT's MLR account as being five million one hundred forty-five thousand two hundred sixty-seven U.S. Dollars ($5,145,267.00) at Regions Bank as of December 31, 2013. On July 1, 2014, as well as on July 17, 2014, WESTPORT's MLR account at Region's Bank had a balance, based on market value, of only one million eight hundred forty-six thousand four hundred forty-eight U.S. Dollars and seven cents ($1,846,448.07). As of February 17, 2016, WESTPORT's MLR account at Region's Bank had a balance, based on market value, of only two million one hundred forty-one thousand four hundred twenty-five U.S. Dollars and seven cents ($2,141,425.07). WESTPORT's current disclosure statement also contains a letter to prospective residents from Carolyn Bachonski as Executive Director of WESTPORT. Ms. Bachonski left WESTPORT on or before November 3, 2015.

47.    As set forth in paragraph forty-three (43) above, WESTPORT is failing to fulfill its contractual obligations to residents, former residents, and the estates of former residents by failing to pay refunds in the normal course of business. Since May 2015, WESTPORT has not paid refunds within the period of time specified by contract. WESTPORT and its agents have dishonestly responded to requests for payment and inquiries regarding refunds by misrepresenting that refunds have not been paid because the OFFICE has prevented WESTPORT from doing so.

### CONTINUING TO WRITE BUSINESS WHILE INSOLVENT

48.    A CCRC is insolvent if it is "unable to pay its obligations as they come due in the normal course of business," pursuant to Section 651.011(8), Florida Statutes.

49.    WESTPORT is insolvent. WESTPORT has not filed its 2014 audited financial statement with notes or provided much of the financial information requested by the OFFICE as part of its examination, and, as such, the OFFICE cannot ascertain the exact financial position of WESTPORT. However, WESTPORT has been unable to pay its obligations as they come due in the normal course of business since on or about May 9, 2015.

50.    As of October 27, 2015, WESTPORT failed to pay two million six hundred sixty-four thousand five hundred eighteen U.S. Dollars and twenty-six cents ($2,664,518.26) in refunds to residents, former residents, and the estates of former residents as they become due in the normal course of business.

51.    On February 16, 2016, WESTPORT submitted refund information to the OFFICE that reported four million three hundred twenty-three thousand seventy-one U.S. Dollars and forty-eight cents ($4,323,071.48) in refunds payable as of that date, with the amount of refunds payable increasing to four million nine hundred ninety-six thousand seven hundred eighty-six

U.S. Dollars and eight cents ($4,996,786.08) by April 1, 2016, and to five million four hundred eighty-three thousand one hundred ninety-seven U.S. Dollars and twelve cents ($5,483,197.12) by June 11, 2016.

52.    As of the last accounts payable aging report the OFFICE received, dated as of January 26, 2016, most of WESTPORT's accounts payable were overdue and not being paid in the normal course of business.  Specifically, the AP Aged Accounts Payable Report Open as of 01/26/2016 shows that WESTPORT owes one million three hundred thirty-five thousand eight hundred eighty-three U.S. Dollars and three cents ($1,335,883.03) to various vendors, of which nine hundred fifty-two thousand four hundred seventy-eight U.S. Dollars and fifty-four cents ($952,478.54) is sixty-one (61) or more days old, eight hundred forty-five thousand two hundred forty U.S. Dollars and nineteen cents ($845,240.19) is ninety-one (91) or more days old, and seven hundred eighty-nine thousand five hundred nine U.S Dollars and forty-seven cents ($789,509.47) is one hundred and twenty-one (121) or more days old.

53.    Despite this insolvency, according to information provided by WESTPORT on February 16, 2016, WESTPORT has accepted full or partial payment for at least eleven (11) CCRC contracts since May 9, 2015, totaling at least one million five hundred eight thousand seven hundred ninety-four U.S. Dollars ($1,508,794) in entrance fees, of which at least one million ninety thousand fifty U.S. Dollars ($1,090,050) has been collected to date.

## COUNT I
## MISAPPROPRIATION, CONVERSION, OR WITHHOLDING OF MONEYS

54.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

55.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Misappropriation, conversion, or withholding of moneys," pursuant to Section 651.106(6), Florida Statutes.

56.    Three million U.S. Dollars ($3,000,000) of WESTPORT's statutorily required minimum liquid reserve ("MLR") funds were misappropriated or converted to secure Westport Nursing's fifteen million U.S. Dollar ($15,000,000) loan with USAmeriBank. Those funds were transferred from WESTPORT's MLR account, are no longer held in WESTPORT's name, are no longer the property of WESTPORT, and are encumbered as cash collateral for another entity's debt.

## COUNT II
## DEMONSTRATED LACK OF FITNESS OR TRUSTWORTHINESS

57.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

58.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Demonstrated lack of fitness or trustworthiness," pursuant to Section 651.106(4), Florida Statutes.

59.    WESTPORT has demonstrated a lack of fitness and trustworthiness. Among other unfit and untrustworthy acts, WESTPORT has: (1) failed to timely produce information required by the OFFICE as part of its examination; (2) provided false information to prospective, current, and former residents and to the estates of deceased residents; (3) infringed upon the statutorily guaranteed rights of the residents' council; (4) terminated employees who attempted to comply with the OFFICE's examination; (5) filed false financial statements; and (6) continued to accept payments for entrance fees for continuing care agreements when it is insolvent.

## COUNT III
### FRAUDULENT OR DISHONEST PRACTICES OF MANAGEMENT IN THE CONDUCT OF BUSINESS

60. The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

61. The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Fraudulent or dishonest practices of management in the conduct of business," pursuant to Section 651.106(5), Florida Statutes.

62. The management of WESTPORT has engaged in fraudulent or dishonest practices in the conduct of business. To date, WESTPORT has: (1) misrepresented the nature of the March 2014 transactions and WESTPORT's ownership structure to the OFFICE and current and prospective residents; (2) dishonestly represented to former residents or their estates that the OFFICE has prevented WESTPORT from paying refunds; (3) filed false financial statements with the OFFICE; (4) failed to timely produce information required by the OFFICE as part of its examination; and (5) provided false information regarding its MLR funds to prospective residents in violation of Section 651.091, Florida Statutes.

## COUNT IV
### VIOLATION OF FLORIDA STATUTES AND RULES

63. The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

64. The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure to comply with, or violation of, any proper order or rule of the office or commission or violation of any provision of this chapter," pursuant to Section 651.106(7), Florida Statutes.

65.    At this time, the OFFICE has determined that WESTPORT has violated Sections 651.026, 651.035, 651.081, 651.083, and 651.105, Florida Statutes, and Rules 69O-193.007 and 69O-193.058, Florida Administrative Code.

### A. WESTPORT has violated Section 651.026, Florida Statutes.

66.    A CCRC provider is required to submit an annual report, which includes an audited financial statement with notes, to the OFFICE annually on or before May 1, pursuant to Section 651.026, Florida Statutes.

67.    To date, WESTPORT has not submitted its 2014 audited financial statement with notes, which is more than ten (10) months past due.

### B. WESTPORT has violated Section 651.035, Florida Statutes.

68.    A CCRC provider is required to maintain in escrow certain MLR pursuant to Section 651.035, Florida Statutes. As most recently calculated and verified, the required MLR for University Village is five million nine hundred fifty-one thousand four hundred forty U.S. Dollars ($5,951,440). As most recently submitted by WESTPORT, but unverified by the OFFICE due to WESTPORT's failure to submit its 2014 audited financial statement, the required MLR for University Village is five million seven hundred sixty-nine thousand eight hundred eighty-one U.S. Dollars ($5,769,881).

69.    As set forth in paragraphs forty (40) and forty-six (46) above, as of February 17, 2016, WESTPORT's MLR account at Region's Bank had a balance, based on market value, of only two million one hundred forty-one thousand four hundred twenty-five U.S. Dollars and seven cents ($2,141,425.07).

70. As set forth in paragraph thirty-seven (37) above, on January 21, 2015, the OFFICE was notified by letter that WESTPORT's MLR escrow account was underfunded by three hundred seventy thousand three hundred and twenty-four U.S. Dollars ($370,324).

71. As set forth in paragraph thirty-eight (38) above, WESTPORT's MLR is actually underfunded by an additional three million U.S. Dollars ($3,000,000) due to improperly reporting Westport Nursing's cash collateral account as MLR. Section 651.035, Florida Statutes, requires that the provider, in this case WESTPORT, maintain the reserves. The three million U.S. Dollars ($3,000,000) at USAmeriBank reported as MLR funds by WESTPORT are the property of Westport Nursing, not WESTPORT.

72. Alternatively, even if the funds at USAmeriBank are, for the sake of argument, considered part of WESTPORT's MLR funds, WESTPORT's MLR would be underfunded by at least six hundred twenty-eight thousand U.S. Dollars ($628,000).

73. Moreover, even if the funds at USAmeriBank are, for the sake of argument, considered part of WESTPORT's MLR funds, the three million U.S. Dollars ($3,000,000) at USAmeriBank that WESTPORT purports qualify as MLR are encumbered as cash collateral securing Westport Nursing's loan, in violation of Sections 651.033 and 651.035, Florida Statutes. Section 651.033(1)(d), Florida Statutes, provides that "Funds deposited in an escrow account are not subject to charges by the escrow agent except escrow agent fees associated with administering the accounts, or subject to any liens, judgments, garnishments, creditor's claims, or other encumbrances against the provider or facility except as provided in s. 651.035(1)." Section 651.035(1)(c), Florida Statutes, provides that "the operating reserves required under this subsection shall be in an unencumbered account held in escrow for the benefit of the residents.

Such funds may not be encumbered or subject to any liens or charges by the escrow agent or judgments, garnishments, or creditors' claims against the provider or facility."

### C. WESTPORT has violated Section 651.081, Florida Statutes.

74. "The activities of a residents' council are independent of the provider," pursuant to Section 651.081(2)(c), Florida Statutes.

75. WESTPORT has violated Section 651.081(2)(c), Florida Statutes, by attempting to restrict the ability of the residents' council to assemble and disseminate information as set forth in paragraphs forty-four (44) and forty-five (45) above.

### D. WESTPORT has violated Section 651.105, Florida Statutes.

76. Any duly authorized employee of the OFFICE may have access to and inspect any records of a CCRC, with or without advance notice, to secure compliance with, or to prevent a violation of, any provision of Chapter 651, pursuant to Section 651.105(2), Florida Statutes.

77. A duly authorized employee of the OFFICE has made numerous such requests to WESTPORT since the OFFICE began its examination on February 11, 2015.

78. To date, WESTPORT has failed to timely allow the OFFICE's employee to have access to and inspect all of the records necessary to conduct the examination. WESTPORT has failed to provide the immediate, open access to records required by the Section 651.105, Florida Statutes.

### E. WESTPORT has violated Rule 69O-193.007, Florida Administrative Code.

79. Rule 69O-193.007, Florida Administrative Code, provides: "Each manager or management company [of a CCRC] must demonstrate that it meets the requirements of Section 651.022," Florida Statutes. Section 651.022, Florida Statutes, and the accompanying Rules 69O-

193.003 and 69O-193.060, requires the submission of fingerprints and biographical and background information.

80.    WESTPORT has violated Rule 69O-193.007, Florida Administrative Code, by failing to require that individuals acting in a management capacity at University Village submit the required biographical, fingerprint, and background information.  Individuals promoted to management positions by Mr. Freiden or acting in a management capacity, such as individuals employed by Novum, have not filed the required information with the OFFICE, even after the OFFICE specifically requested that such information be provided.

### F.  WESTPORT has failed to file continuous updates as required by Rule 69O-193.058, Florida Administrative Code.

81.    Rule 69O-193.058(2), Florida Administrative Code, requires a provider to immediately notify the OFFICE and file pertinent documents within five (5) business days of any proceeding for denial, suspension, or revocation of any license or permit needed to operate a facility.

82.    WESTPORT has not filed continuous updates regarding two proceedings for the suspension or revocation of any license or permit needed to operate a facility, in violation of Rule 69O-193.058(2), Florida Administrative Code.

83.    First, as set forth in paragraph thirty-four (34) above, AHCA has initiated a proceeding to suspend the license of TR & SNF, Inc., the skilled nursing facility that is required for WESTPORT to hold a CCRC license.  WESTPORT failed to notify the OFFICE regarding this proceeding and to file the required documents, in violation of Rule 69O-193.058(2), Florida Administrative Code.

84.    Second, as set forth in paragraph thirty-five (35) above, AHCA has initiated a proceeding to revoke the license of TALF, Inc., the assisted living facility that is required for

WESPORT to hold a CCRC license. WESTPORT failed to notify the OFFICE regarding this proceeding and to file the required documents, in violation of Rule 69O-193.058(2), Florida Administrative Code.

85.    Rule 69O-193.058(4), Florida Administrative Code, requires a provider to immediately notify the OFFICE and file pertinent documents within five (5) business days of any change in the management company of a facility.

86.    WESTPORT has failed to file the requisite information regarding changes to managers and management companies, in violation of Rule 69O-193.058(4), Florida Administrative Code.

<u>COUNT V</u>
**INSOLVENT CONDITION SUCH THAT FURTHER TRANSACTIONS IN THIS STATE WOULD BE HAZARDOUS OR INJURIOUS TO THE PUBLIC**

87.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

88.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "The insolvent condition of the provider or the provider's being in such condition or using such methods and practices in the conduct of its business as to render its further transactions in this state hazardous or injurious to the public," pursuant to Section 651.106(8), Florida Statutes.

89.    WESTPORT is currently insolvent, as it is no longer able to pay its obligations as they come due in the normal course of business. WESTPORT has not paid refunds due to residents, former residents, or the estates of former residents in the normal course of business since on or about May 9, 2015. By WESTPORT's own admission, WESTPORT does not have the necessary funds to make the required payments.

90.   WESTPORT is also not paying vendors in the normal course of business, according to its accounts payable report as of January 26, 2016, which shows that WESTPORT owes one million three hundred thirty-five thousand eight hundred eighty-three U.S. Dollars and three cents ($1,335,883.03) to various vendors, of which nine hundred fifty-two thousand four hundred seventy-eight U.S. Dollars and fifty-four cents ($952,478.54) is sixty-one (61) or more days old, eight hundred forty-five thousand two hundred forty U.S. Dollars and nineteen cents ($845,240.19) is ninety-one (91) or more days old, and seven hundred eighty-nine thousand five hundred nine U.S Dollars and forty-seven cents ($789,509.47) is one hundred and twenty-one (121) or more days old.

91.   Despite this insolvency, WESTPORT has continued to make payments to its general partner and various consultants, instead of honoring resident contracts or paying vendors. WESTPORT's continued operation is hazardous or injurious to the public.

## COUNT VI
## HAZARDOUS OR INJURIOUS TRANSACTIONS, METHODS, OR PRACTICES

92.   The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

93.   The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "The insolvent condition of the provider or the provider's being in such condition or using such methods and practices in the conduct of its business as to render its further transactions in this state hazardous or injurious to the public," pursuant to Section 651.106(8), Florida Statutes.

94.   Rule 69O-193.033, Florida Administrative Code, provides that hazardous or injurious transactions, methods, or practices may include, but are not limited to, those set forth in the rule.

95.    WESTPORT has engaged in numerous hazardous or injurious transactions, methods, or practices as defined by Rule 69O-193.033, Florida Administrative Code, which are set forth below.

**A. Making payments or distributing funds, other than salaries and wages earned in the normal course of business, while insolvent.**

96.    Rule 69O-193.033(2), Florida Administrative Code, defines hazardous or injurious transactions, methods, or practices to include: "Payment or distribution of funds, other than salaries and wages earned in the normal course of business, to a provider or any affiliate when: (a) A provider is insolvent or no longer financially viable; or (b) Payment results or could result in a facility or provider becoming insolvent or no longer financially viable."

97.    WESTPORT is currently insolvent, pursuant to Section 651.011(8), Florida Statutes, as it is no longer able to pay its obligations as they come due in the normal course of business. By WESTPORT's own admission, WESTPORT has not paid refunds due to residents, former residents, or the estates of former residents as it does not have the necessary funds. While failing to honor these obligations, WESTPORT continues to pay its general partner, IMH, for the services of Mr. Freiden. WESTPORT also regularly makes payments to Novum for "consulting" services.

98.    Moreover, due to the lack of statutorily required transparency by WESTPORT and the corporate relationships created by individuals and entities associated with John Bartle, Eli Freiden, BVM Management, IMH, TR & SNF, Inc., and TALF, Inc., the OFFICE believes that WESTPORT may have distributed funds other than salaries and wages earned in the normal course of business to affiliates.

## B. Employing or contracting with persons unable to provide proper oversight or services.

99.    Rule 69O-193.033(3), Florida Administrative Code, defines hazardous or injurious transactions, methods, or practices to include: "Employing or contracting with persons to perform supervisory or policy roles or perform consulting work, who are unable to provide proper oversight or services due to limited, unsuccessful, or no experience in owning, operating, or managing a continuing care facility or in providing continuing care or consulting in the field of continuing care."

100.    WESTPORT is employing or contracting with Mr. Bartle and Novum despite the fact that those individuals and entities are unable to provide proper oversight or services due to limited, unsuccessful, or no experience owning, operating, or managing a CCRC or consulting in the field of continuing care. To the extent that Mr. Bartle has CCRC experience, that experience is unsuccessful and marked by financial failures, such as Skyline Manor. Any CCRC experience the individuals associated with Novum have to date pertains to WESTPORT and demonstrates that they are unable to provide proper oversight and comply with numerous statutes and administrative rules, as documented herein.

## C. Accepting full or partial payment of an entrance fee for a continuing care agreement while insolvent.

101.    Rule 69O-193.033(4), Florida Administrative Code, defines hazardous or injurious transactions, methods, or practices to include: "Accepting full or partial payment of an entrance fee for a continuing care agreement when a facility is insolvent or in imminent danger of becoming insolvent or no longer financially viable, unless 100 percent of such funds are escrowed pursuant to an agreement with the Office."

102.    WESTPORT is currently insolvent, as it is no longer able to pay its obligations as they come due in the normal course of business. WESTPORT has not paid refunds due to

residents, former residents, or the estates of former residents in the normal course of business since on or about May 9, 2015. By WESTPORT's own admission, WESTPORT does not have the necessary funds to make the required payments.

103. Despite being insolvent, according to information provided by WESTPORT on February 16, 2016, WESTPORT has accepted full or partial payment for at least eleven (11) CCRC contracts since May 9, 2015, totaling at least one million five hundred eight thousand seven hundred ninety-four U.S. Dollars ($1,508,794) in entrance fees, of which at least one million ninety thousand fifty U.S. Dollars ($1,090,050) has been collected to date.

104. WESTPORT is not escrowing one hundred percent (100%) of such entrance fee funds, and there is no agreement with the OFFICE allowing WESTPORT to do so.

### D. Failure to fulfill its obligations to residents.

105. Rule 69O-193.033(7), Florida Administrative Code, defines hazardous or injurious transactions, methods, or practices to include: "Failure of a licensed provider to fulfill its obligations to residents."

106. Westport is not fulfilling its statutory and contractual obligations to residents. WESTPORT has not timely paid refunds due to residents, former residents, or the estates of former residents in violation of residents' contracts.

### COUNT VII
### REFUSAL TO BE EXAMINED OR TO PRODUCE ACCOUNTS, RECORDS, AND FILES FOR EXAMINATION, AND REFUSAL TO GIVE INFORMATION

107. The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

108. The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Refusal by the provider to be examined or to produce its accounts, records, and files for examination, or refusal by any of

its officers to give information with respect to its affairs or to perform any other legal obligation under this chapter when required by the office," pursuant to Section 651.106(9), Florida Statutes.

109.    WESTPORT has refused to be examined, produce all of its accounts, records, and files, and refused to give information with respect to its affairs as discussed in Count IV.D. above.

## COUNT VIII
### FAILURE TO COMPLY WITH SECTIONS 651.026 AND 651.033, FLORIDA STATUTES

110.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

111.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure by the provider to comply with the requirements of s. 651.026 or s. 651.033," pursuant to Section 651.106(10), Florida Statutes.

112.    Section 651.026, Florida Statutes, requires a CCRC provider to file an annual report, including audited financial statements and notes, with the OFFICE on or before May 1.

113.    WESTPORT has failed to comply with the requirements of Section 651.026, Florida Statutes, because, to date, WESTPORT has not provided its 2014 audited financial statement with notes.

114.    Section 651.033(1)(d), Florida Statutes, requires in pertinent part that "Funds deposited in an escrow account are not . . . subject to any liens, judgments, garnishments, creditor's claims, or other encumbrances against the provider or facility."

115.    WESTPORT has failed to comply with the requirements of Section 651.033(1)(d), Florida Statutes, because, assuming for the sake of argument that Westport Nursing's

USAmeriBank account should be counted as part of WESTPORT's MLR, those funds are encumbered.

## COUNT IX
### FAILURE TO MAINTAIN ESCROW ACCOUNTS OR FUNDS AS REQUIRED BY CHAPTER 651

116.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

117.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure by the provider to maintain escrow accounts or funds as required by this chapter," pursuant to Section 651.106(11), Florida Statutes.

118.    As set forth in Counts I, IV.B., and VIII above, WESTPORT has failed to maintain escrow accounts or funds as required by Section 651.035, Florida Statutes. WESTPORT's MLR account is drastically underfunded or, alternatively, underfunded and encumbered in violation of the Section 651.106(11), Florida Statutes.

## COUNT X
### FAILURE TO DISCLOSE INFORMATION TO RESIDENTS AND FAILURE TO HONOR CONTINUING CARE CONTRACTS

119.    The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

120.    The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure by the provider to meet the requirements of this chapter for disclosure of information to residents concerning the facility, its ownership, its management, its development, or its financial condition or failure to honor its continuing care or continuing care at-home contracts," pursuant to Section 651.106(12), Florida Statutes.

121. WESTPORT has failed to meet the disclosure requirements. WESTPORT is currently providing outdated disclosure documents to prospective CCRC residents that misrepresent the status of its MLR funds in violation of Section 651.091(3)(g), Florida Statutes.

122. WESTPORT is not honoring its continuing care contracts by failing to provide refunds to residents, former residents, or the estates of former residents.

**COUNT XI**
**FAILURE TO CONTINUE TO MEET THE REQUIREMENTS**
**FOR THE AUTHORITY ORIGINALLY GRANTED**

123. The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

124. The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "Failure by the provider to continue to meet the requirements for the authority originally granted," pursuant to Section 651.106(1), Florida Statutes. WESTPORT does not meet the requirements for the authority originally granted.

125. A CCRC must produce "[e]vidence satisfactory to the office of the ability of the applicant to comply with the provisions of this chapter and with rules adopted by the commission pursuant to this chapter," pursuant to Section 651.022(2)(c)2., Florida Statutes.

126. WESTPORT has repeatedly demonstrated inability and unwillingness to comply with Chapter 651, Florida Statutes, and Chapter 69O-193, Florida Administrative Code, which govern CCRCs. As discussed herein, WESTPORT has not complied with numerous statutes and rules, including Sections 651.026, 651.035, 651.081, and 651.105, Florida Statutes, and Rules 69O-193.007 and 69O-193.058, Florida Administrative Code.

## COUNT XII
## UNFAIR METHODS OF COMPETITION OR
## UNFAIR OR DECEPTIVE ACTS OR PRACTICES

127.   The aforementioned general allegations, *supra* ¶¶ 1-53, are hereby re-alleged and incorporated by reference.

128.   The OFFICE may suspend or revoke the certificate of authority of a provider if it finds that one or more of the following applicable to the provider exist: "In the conduct of business under the license, engaging in unfair methods of competition or in unfair or deceptive acts or practices prohibited under part IX of chapter 626," pursuant to Section 651.106(15), Florida Statutes.

129.   Section 626.9541(1), Florida Statutes, provides in relevant part:

(b)   *False information and advertising generally.*—Knowingly making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public:
1.   In a newspaper, magazine, or other publication,
2.   In the form of a notice, circular, pamphlet, letter, or poster,
3.   Over any radio or television station, or
4.   In any other way,

an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance, which is untrue, deceptive, or misleading.

. . . .

(w)   *Soliciting or accepting new or renewal insurance risks by insolvent or impaired insurer prohibited; penalty.*—
1.   Whether or not delinquency proceedings as to the insurer have been or are to be initiated, but while such insolvency or impairment exists, no director or officer of an insurer, except with the written permission of the office, shall authorize or permit the insurer to solicit or accept new or renewal insurance risks in this state after such director or officer knew, or reasonably should have known, that the insurer was insolvent or impaired. "Impaired" includes impairment of capital or surplus, as defined in s. 631.011(12) and (13).
2.   Any such director or officer, upon conviction of a violation of this paragraph, is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

130. WESTPORT is currently knowingly making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public an advertisement, announcement, or statement containing assertions, representations, or statements with respect to continuing care which are untrue, deceptive, or misleading.

131. WESTPORT is also accepting new continuing care risks while insolvent, as set forth in paragraphs forty-eight (48) through fifty-three (53) above.

WHEREFORE, you, WESTPORT, are hereby notified, pursuant to Sections 651.106 and 120.57, Florida Statutes, that, based upon the foregoing allegations, the OFFICE intends to enter a Final Order of Suspension suspending the Certificate of Authority of WESTPORT. This Initial Order of Suspension supersedes the Initial Order of Suspension issued on February 13, 2015, in Case No. 168243-15. WESTPORT is further notified that it has twenty-one (21) days from the date of receipt of this Initial Order of Suspension to file a proceeding to contest this action in accordance with the attached Notice of Rights.

DONE and ORDERED this 15th day of March, 2016.

Kevin M. McCarty, Commissioner
Office of Insurance Regulation

## NOTICE OF RIGHTS

Pursuant to Sections 120.569 and 120.57, Florida Statutes and Rule Chapters 28-106, Florida Administrative Code (F.A.C.), you have a right to request a proceeding to contest this action by the Office of Insurance Regulation (hereinafter the "Office"). You may request a proceeding by filing a Petition. Your Petition must be in writing and must be filed with the General Counsel acting as the Agency Clerk, Office of Insurance Regulation. If served by U.S. Mail the Petition should be addressed to the Florida Office of Insurance Regulation at 647 Larson Building, Tallahassee, Florida 32399-4206. If Express Mail or hand delivery is utilized, the Petition should be delivered to 647 Larson Building, 200 East Gaines Street, Tallahassee, Florida 32399-0300. The written Petition must be received by, and filed in the Office no later than 5:00 p.m. on the twenty-first (21) day after your receipt of this notice. Unless your Petition challenging this action is received by the Office within twenty-one (21) days from the date of the receipt of this notice, the right to a proceeding shall be deemed waived. Mailing the response on the twenty-first day will not preserve your right to a hearing.

If a proceeding is requested and there is no dispute of material fact the provisions of Section 120.57(2), Florida Statutes would apply. In this regard you may submit oral or written evidence in opposition to the action taken by this agency or a written statement challenging the grounds upon which the agency has relied. While a hearing is normally not required in the absence of a dispute of fact, if you feel that a hearing is necessary one will be conducted in Tallahassee, Florida or by telephonic conference call upon your request.

If you dispute material facts which are the basis for this agency's action you may request a formal adversarial proceeding pursuant to Sections 120.569 and 120.57(1), Florida Statutes. If you request this type of proceeding, the request must comply with all of the requirements of Rule Chapter 28-106.2015, F.A.C., including but not limited to:

a) A statement requesting an administrative hearing identifying those material facts that are in dispute. If there are none, the petition must so state; and

b) A statement of when the respondent received notice of the agency's action.

These proceedings are held before a State Administrative Law Judge of the Division of Administrative Hearings. Unless the majority of witnesses are located elsewhere the Office will request that the hearing be conducted in Tallahassee.

In some instances, you may have additional statutory rights than the ones described herein.

Failure to follow the procedure outlined with regard to your response to this notice may result in the request being denied. Any request for administrative proceeding received prior to the date of this notice shall be deemed abandoned unless timely renewed in compliance with the guidelines as set out above.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Initial Order of Suspension was

sent by Certified Mail, Return Receipt Requested to the following:

Westport Holdings Tampa, Limited Partnership
d/b/a University Village
12401 North 22nd Street
Tampa, Florida 33612

Mr. Eli Freiden, IMH Healthcare, LLC
As Registered Agent for
Westport Holdings Tampa, Limited Partnership
7000 W. Camino Real, Suite 240
Boca Raton, Florida 33433

and sent via e-mail and U.S. Mail to the following:

M. Stephen Turner, Esq.
Broad and Cassel
215 South Monroe Street, Suite 400
Tallahassee, Florida 32301
E-mail: sturner@broadandcassel.com

on this 15 day of March , 2016.

Shaw P. Stiller
Chief Assistant General Counsel
Office of Insurance Regulation
200 East Gaines Street
Tallahassee, Florida 32399
Telephone: (850) 413-4213
Facsimile: (850) 922-2543
E-Mail: Shaw.Stiller@floir.com