STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

IMH HEALTHCARE, LLC,

      Petitioner,

vs.                                                                          Case No. : 15-002495

OFFICE OF INSURANCE REGULATION,

      Respondent.

_____/

## PROPOSED RECOMMENDED ORDER

Pursuant to notice, a formal hearing was conducted in this matter on November 12-13 &

16, 2015, in Tallahassee, Florida, before the Honorable E. Gary Early, a duly designated

Administrative Law Judge of the Division of Administrative Hearings.

## APPEARANCES

For Petitioner,                                   Shaw P. Stiller, Esq.
IMH Healthcare, LLC:                     Clifford Timothy Gray, Esq.
                                                          Patrick David Flemming, Esq.
                                                          Office of Insurance Regulation
                                                          200 East Gaines Street
                                                          Tallahassee, FL 32399-4206

For Respondent,                                 M. Stephen Turner, Esq.
Office of Insurance Regulation:         Wendy Russell Wiener, Esq.
                                                          Broad and Cassel
                                                          215 South Monroe Street, Suite 400
                                                          Post Office Drawer 11300
                                                          Tallahassee, FL 32301

## STATEMENT OF THE ISSUES

Whether Petitioner was required to file an application pursuant to Section 628.4615,

Florida Statutes, upon becoming general partner of Westport Holdings Tampa, LP d/b/a



PLAINTIFF'S EXHIBIT 9

University Village (Westport), a specialty insurer licensed to operate a facility that undertakes to provide continuing care, pursuant to Section 628.4615, Florida Statutes.

Whether Petitioner has filed sufficient information to enable the Office to approve IMH Healthcare, LLC (IMH) becoming the 1% general partner of Westport.

## WITNESSES AND EXHIBITS

The following persons testified during the Final Hearing:

John Bartle

Eliyahu T. Freiden

Douglas Klinowski

Desmond Wilson

Becky Griffith

Carolyn Morgan

Steven H. Parton, Esq.

The following exhibits were admitted into evidence during the Final Hearing:

### Petitioner

2       Westport Holdings Tampa Limited Partnership Agreement (10/23/2000)

1       First 2014 Amendment of Limited Partnership Agreement (Tampa)

6       12/29/2014 Letter from Lawrence Landry to John Bartle re resignation of Westport Advisors, Ltd as Managing Member

31      12/30/14 E-mail from B. Griffith to J. Bartle re: Underfunded MLR

10      12/29/14 E-mail from B. Griffith to J. Bartle re: Notice of Westport Advisors resignation

4       Property Financed Between 2013 and 2015

33      Biographical Affidavit of E. Freiden

5       Consulting Agreement, May 26, 2015, between Westport Holdings Tampa L.P. and NOVUM, LLC, and Addendum, August 25, 2015

| | |
|---|---|
| 3 | 3/31/2014 Letter from W. Wilhelm Rabke (Williams Mullen) to OIR re University Village MLR Escrow Transfer, with attachments:  Assignment and Pledge of Account, Promissory Note |
| 23 | 2/12/14 E-mail from D. Papka to C. Struk re: CCRC Request |
| 8 | 4/15/14 E-mail from C. Struk to B. Napier re: OIR |
| 27 | 5/8/14 E-mail from B. Griffith to C. Morgan re: Manager Meeting-05/08/14 |
| 13 | 7/15/14 E-mail from W. Hood to B. Griffith re: Review of Loan Documents re "sale" of University Village to BVM |
| 12 | 12/29/14 E-mail from B. Griffith to V. Reglat re: Amendment to Promissory Note |
| 36 | 2/11/15 E-mail from B. Griffith to V. Reglat re: University Village Timeline (including attachment:  UV Action Timeline Memo.pdf) (pp. 1-7, 12-17) |
| 34 | 2/24/15 E-mail from B. Griffith to V. Reglat, D. Wilson re: Westport Holdings and Westport Nursing document request: Escrow Agreement |
| 35 | 3/2/15 E-mail from V. Reglat to C. Morgan, V. Christy, L. Chojnowski, B. Griffith re: List of Name (including attachment: Eli Freiden.pdf) |
| 26 | 6/23/14 E-mail from B. Griffith to V. Reglat re: University Village-88104 |
| 16 | 12/6/13 E-mail from D. Papka to D. Wilson re: University Village-Update |
| 17 | 12/6/13 E-mail from D. Wilson to L. Landry re: University Village-Update |
| 40 | 5/12/14 Letter from L. and T. Korhn to D. Wilson re:  Provider: Westport Holdings Tampa, L.P., Facility: University Village, Company Number: 88104 – MLR Debt Service Reserve Approval Request and Certification |

## Respondent

| | |
|---|---|
| 1 | Composite:  Application File (four volumes) |
| 23A | June 7, 2015 letter signed by John W. Bartle to William Spivey (attachment to Exhibit 23, Affidavit of John Bartle filed in Department of Financial Services v. Westport Holdings Tampa, Limited Partnership, Case No. 2015-CA-000585 |
| 13 | Amendment No. 2 to Loan Agreement between Westport Holdings Tampa, Limited Partnership, Westport Holdings Tampa II, Limited Partnership, and CPIF Lending LLC (Aug. 10, 2015) |

18      Certificate of Dissolution for Westport Advisors, Ltd. (filed June 16, 2015, effective Jan. 1, 2015)

19      Amendment to Loan Agreement between Westport Nursing Tampa, LLC, BVM Management, Inc., and USAmeribank.

20      Articles of Amendment to Articles of Organization of Westport Nursing Tampa, LLC, filed September 25, 2015.

9       Loan Closing Statement for USAmeriBank

9A      Loan Closing Statement dated March 31, 2014 (not listed on the Joint Prehearing Stipulation, admitted without objection)

10      Bank Statement for Westport Nursing Tampa LLC Escrow Account with USAmeriBank

12      Letter from Kathy Burkholder, CFO for University Village, to Becky Griffith, Office of Insurance Regulation (Jan. 21, 2015)

22      August 12, 2015 letter from IMH Healthcare (Eli Freiden) to University Village Residents.

14      Documents in <u>NOVUM, LLC. v. Office of Insurance Regulation</u>, DOAH Case No. 15-4730.

      a.   Agency action letter
      b.   Petition for Formal Administrative Hearing
      c.   Agency referral letter
      d.   Order Granting Continuance and Re-scheduling Hearing

15      Documents in <u>Agency for Health Care Administration v. TR & SNF, Inc., d/b/a The Nursing Center at University Village</u>, DOAH Case No. 15-2128.

      a.   Administrative Complaint
      b.   Request for Formal Administrative Hearing
      c.   Notice of Agency Referral
      d.   Notice of Hearing by Video Teleconference

This Recommended Order is divided into three distinct sections corresponding to the issues presented during the proceeding.

## I.   IMH WAS NOT REQUIRED TO FILE, AND OIR WAS NOT ENTITLED TO DENY, THE ACQUISITION APPLICATION

### *Findings of Fact*

1.   A threshold issue is whether IMH was required by law to file an acquisition application with OIR under the circumstances of this case.

2.   Westport is a Delaware limited partnership.  (Jt. Pre-Hrg. State., ¶ 5.a.; Pet. Exh. 2)

3.   Westport holds a Certificate of Authority (COA) to operate a Continuing Care Retirement Community (CCRC) known as University Village and is thus a "specialty insurer." (Jt. Pre-Hrg. State., ¶ 5.b.)

4.   Westport, as COA holder, is regulated by Respondent pursuant to Chapter 651, Florida Statutes.  (Jt. Pre-Hrg. State., ¶ 5.b.)

5.   Ninety-nine percent (99%) of Westport is and has been owned by its limited partner or partners.  One percent (1%) is and has been owned by its general partner.  (Pet. Exh. 2)

6.   Prior to March 31, 2014, one limited partner owned the 99% limited partnership ownership interest in Westport.  (Pet. Exh. 2)

7.   As of March 31, 2014, four limited partners, including IMH, acquired and continue to hold the 99% limited partnership ownership interest.  (Pet. Exh. 1)

8.   The four limited partners executed the First 2014 Amendment of Limited Partnership Agreement (Tampa) (Amendment to LPA) as of March 31, 2014.  (Pet. Exh. 1)

9.   OIR was provided with a copy of the Amendment to LPA after April 1, 2014 (Hrg. Tr. Vol. 1, 107:4-19, Nov. 12, 2015)

10.   Pursuant to the Amendment to LPA, a majority in interest of the four limited partners are entitled to approve or disapprove the appointment of a successor general partner, dissolve the partnership and amend the Amendment to LPA.  An amendment to the Amendment

to LPA could also result in the removal of the general partner. Therefore, the ability to control the limited partnership rests with a majority in interest of the four limited partners. (Pet. Exh. 1; Hrg. Tr. Vol. 2, 151:9-14, Nov. 12, 2015)

11.    The OIR did not require, and has not required, approval of the acquisition of the 99% limited partnership ownership interest. (Jt. Pre-Hrg. State., ¶ 5.f.)

12.    Near the end of 2014, the general partner of Westport resigned and relinquished its 1% partnership interest in the limited partnership. (Hrg. Tr. Vol. 1, 58:12-15; Pet. Exh. 6)

13.    Initially, one of the members of an existing limited partner, Compliance Concepts, LLC, was elected to serve as general partner. (Hrg. Tr. Vol. 1, 60:13-17)

14.    Upon denial of the request for waiver, OIR demanded an acquisition application, which was filed on January 29, 2015. (Res. Exh. 1, pg. 7-16; Hrg. Tr. Vol. 3, 333:23-334:1, Nov. 13, 2015)

15.    Subsequently, on March 2, 2015, another general partner, IMH, was elected and was given a 1% partnership interest in the limited partnership. (Jt. Pre-Hrg. State., ¶ 5.g.)

16.    OIR does not require an acquisition application for the acquisition of less than 10% ownership of a specialty insurer. (Hrg. Tr. Vol. 3, 346:24-348:1)

17.    OIR requires submission of biographical information on certain managers of CCRCs. (Hrg. Tr. Vol. 3, 348:18-25)

18.    OIR received biographical information on Eliyahu T. Freiden, the sole member of IMH. (Pet. Exhs. 33, 35)

19.    Neither law nor rule requires submission of a background report from a certain background reporting agency. (Hrg. Tr. Vol. 3, 358:18-359:23)

### *Conclusions of Law*

1. My conclusions regarding this issue are consistent with the Petitioner's Supplemental Argument on OIR's Lack of Authority to Require and Deny Acquisition Application.

2. Section 628.4615, Florida Statutes, applies to Westport as a specialty insurer.

3. The plain language of Section 628.4615, Florida Statutes, however, does not require compliance with the statute unless 10% or more of the ownership interest of a specialty insurer is acquired.

4. IMH, upon becoming general partner, acquired only a 1% ownership interest in the specialty insurer and therefore, it was not required to comply with Section 628.4615, Florida Statutes.

5. The nature of the partners', limited and general, ownership interest in the limited partnership is akin to a corporate shareholder's interest. Wulsin v. Palmetto Fed. Sav. & Loan Ass'n, 507 So. 2d 1149, 1151 (Fla. 3d DCA 1987), *approved sub nom.* Goldome Sav. Bank v. Wulsin, 530 So. 2d 291 (Fla. 1988) (approving limited partner's right to bring a derivative action or raise a defense for the limited partnership); Renda v. Peoples Fed. Sav. & Loan Ass'n, 538 So. 2d 860, 863 (Fla. 1st DCA 1988) (limited partners are investors in the limited partnership, holding an interest in the partnership analogous to the purchase of stock in a corporation).

6. The partners own a percentage of the limited partnership entity, but do not own a percentage of the limited partnership's assets. Inasmuch, IMH does not own any assets related to the limited partnership. Rather, as general partner, it owns only 1% of the limited partnership entity. Matter of Dutch Inn of Orlando, Ltd., 2 B.R. 268, 272 (Bankr. M.D. Fla. 1980).

7. A Disclaimer of Control Affidavit referenced by an OIR witness is not contemplated in Section 628.4615, Florida Statutes. Rather, Section 628.461, Florida Statutes, which is the controlling statute for non-specialty insurers, has a provision for a Disclaimer of Control Affidavit. The Disclaimer of Control Affidavit for non-specialty insurers' made pursuant to Section 628.461(12)(a), Florida Statutes, serves to allow a person to rebut a presumption of control and to be relieved of any duty to provide biographical information within an acquisition application.

8. Respondent may not expand its powers to read Section 628.4615, Florida Statutes, to require approval of any ownership interest other than the acquisition of a 10% or greater ownership interest, which the law regards as controlling. State, Dep't of Env. Reg. v. Falls Chase Special Taxing Dist., 424 So.2d 787, 793 (Fla. 1st DCA 1982). *See also* Dep't of Bus. & Prof. Reg. v. Calder Race Course, Inc., 724 So. 2d 100, 104 (Fla. 1st DCA 1998).

9. The statute does not require an application for the purchase of an ownership interest of less than 10% contemporaneous with elevation to a management position in the business.

10. Therefore, IMH was not required to seek Respondent's approval to acquire its 1% general partnership interest, and Respondent's disapproval of such acquisition is of no legal force and effect.

11. IMH's acquisition of its 1% general partnership interest in Westport did not require Respondent's approval.

II.   **EVEN IF SECTION 628.4615, FLORIDA STATUTES, REQUIRED AN ACQUISITION APPLICATION, OIR'S PREVIOUS ACCEPTANCE OF IMH AS AN OWNER OF A 19.8% LIMITED PARTNERSHIP INTEREST SERVES TO APPROVE OR EFFECTIVELY CONSENT TO ITS 1% GENERAL PARTNERSHIP INTEREST, SUBJECT ONLY TO BIOGRAPHICAL INFORMATION BEING FURNISHED**

### *Findings of Fact*

1.   On March 31, 2014, IMH became the owner of 19.8% of the limited partnership interests in Westport.  (Pet. Exh. 1)

2.   OIR knew that IMH was among the limited partners acquiring the 99% limited partnership interest.  (Hrg. Tr. Vol. 3, 276:4-21)

3.   OIR did not require that IMH submit any application to acquire such ownership percentage.  (Jt. Pre-Hrg. State., ¶ 5.f.; Hrg. Tr. Vol. 3, 264:21-265:6, 343:6-22)

4.   OIR did, however, request and receive information regarding Westport once the new limited partners acquired their interests.  The information regarded financial stability, debt structure, management of the company, marketing and the transaction to acquire 99% of the limited partnership interests.  (Pet. Exh. 16, 17; Hrg. Tr. Vol. 3, 266:21-267:11, 273:7-18)

5.   OIR's requests for information were satisfied by the new limited partners.  (Hrg. Tr. Vol. 3, 295:5-22, 323:5-324:13)

6.   OIR had no concerns regarding the acquisition of the 19.8% limited partnership interest by IMH.  (Hrg. Tr. Vol. 3, 277:1-14)

7.   IMH continues to own 19.8% of the limited partnership interests in Westport.  (Pet. Exh. 1)

8.  OIR has never expressed any concern regarding the ownership of the 19.8% limited partnership interest by IMH, since its acquisition of that interest on March 31, 2014. (Hrg. Tr. Vol. 1, 47:8-13)

9.  OIR directed the submission of an application upon the change in the 1% general partner when Westport's request for a waiver of the requirement to file an acquisition application was denied.  (Hrg. Tr. Vol. 3, 330:9-331:15; Res. Exh. 25)

### *Conclusions of Law*

1.  OIR may not now reasonably object to the acquisition of ownership by IMH of 1% of Westport when it did not object and has not objected to its ownership of 19.8% interest in the COA holder.

2.  OIR's considered decision not to require a formal acquisition application or approval when IMH acquired 19.8% ownership of Westport equates to its approval of IMH or consent for IMH to be a substantial owner of Westport.

3.  OIR cannot be heard to demand a second bite at the proverbial apple, given the constraints of Section 628.4615, Florida Statutes, by requiring an acquisition application for the subsequent acquisition of a 1% interest by IMH.

4.  Within this case, OIR had, and was fully aware of, an ability to require a review of the limited partners' acquisition of 99% of the limited partnership interest, which included IMH's 19.8% portion.  OIR, however, admittedly determined not to require any formal approval of an acquisition application.

5.  The additional 1% ownership interest is effectively approved by OIR's informal approval of IMH's prior acquisition of 19.8% ownership interest upon OIR's examination of significant information provided upon acquisition of the entire 99% limited partnership

interest as referred to in Petitioner's Exhibit 8 ("much of the same information that would be contained in an acquisition filing").

III.  **IF APPROVAL OF AN ACQUISITION APPLICATION WERE REQUIRED, IMH IS ENTITLED TO APPROVAL**

*Findings of Fact*

1.  University Village, as a CCRC, has several components: independent living, assisted living and skilled nursing. Westport, the COA holder for the CCRC, owns only a portion of the independent living facilities. The other portion of the independent living facilities is owned by Westport Holdings Tampa, II, LP. The assisted living facilities are owned and operated by TALF, Inc. The skilled nursing facilities are owned by Westport Nursing Tampa, LP and operated by TR&SNF. (Hrg. Tr. Vol. 1, 127:16-128:2, 130:12-132:8, Vol. 2, 213:2-214:16)

2.  Prior to March 31, 2014, University Village had fallen into disrepair and was in serious financial straits. The campus was suffering from "deferred maintenance" which is maintenance on the structures at University Village because of lack of capital. OIR was concerned about the deferred maintenance. (Hrg. Tr. Vol. 1, 47:22-48:13)

3.  A predatory lender was pursuing foreclosure of the loan securing University Village. (Hrg. Tr. Vol. 1, 44:16-45:10)

4.  OIR was, at that time, concerned about the financial situation, specifically the reserve amounts, held for the benefit of University Village. (Hrg. Tr. Vol. 1, 48:14-49:1)

5.  OIR was aware that University Village might be foreclosed upon. (Hrg. Tr. Vol. 3, 269:3-5, 322:19-323:4)

6.     BVM Management, Inc. (BVM) is a 65 year old 501(c)(3) charitable purpose corporation that holds assets in affordable and senior housing. It provides consulting services to some 40 skilled nursing facilities and CCRCs. (Hrg. Tr. Vol. 1, 43:19-24)

7.     During mid-2013, BVM began to interact with OIR regarding potential acquisition of 99% of the limited partnership interests. Representatives of BVM met with representatives of OIR in Tallahassee. (Hrg. Tr. Vol. 1, 46:1-21, Vol. 3, 262:20-263:17)

8.     OIR was told that the 1% general partner would remain in place for the time being. (Hrg. Tr. Vol. 1, 49:11-15)

9.     OIR expressed no concern during the meeting about BVM's acquisition of the 99% limited partnership interests. (Hrg. Tr. Vol. 1, 47:2-7)

10.     Also during 2013, BVM entered into a purchasing agreement to acquire 99% of the limited partnership interests in Westport. (Hrg. Tr. Vol. 1, 45:12-25)

11.     Between the date of entry into the purchasing agreement and the date of acquisition of the 99% limited partnership interests, the structure of the transaction was revised so that ultimately four entities, including IMH, acquired the 99% limited partnership interests. (Hrg. Tr. Vol. 1, 50:8-22; Pet. Exh. 1)

12.     BVM became the guarantor of the debt owed by Westport, but has no ownership interest in the limited partnership. (Hrg. Tr. Vol. 1, 50:23-51:10)

13.     Purchase of 99% of the limited partnership interests in Westport rescued it from foreclosure. (Hrg. Tr. Vol. 1, 124:3-125:2)

14. OIR was furnished significant information and engaged in productive communication after the 99% limited partnership interest was acquired as of March 31, 2014. Many documents were requested from and provided relating to Westport's financial structure and other matters. (Hrg. Tr. Vol. 1, 72:2-18; Pet. Exh. 31)

15. The new limited partners secured $1.6 million of capital improvements between April 1 and December 31, 2014, which were primarily to ready 125 units to marketing condition. Both cosmetic and substantive improvements were made. (Hrg. Tr. Vol. 1, 65:15-21, 110:12-25)

16. During that same time period, move-ins at University Village increased to an historic high of 96 versus 56 in 2013. (Hrg. Tr. Vol. 1, 75:21-76:2)

17. A budget prepared for 2015, using the trends of 2014, was prepared. The budget reflected an anticipation that sales would increase, refund obligations would decrease, census would increase and move-ins would increase. (Res. Exh. 1, 344-357)

18. Effective December 29, 2014, the general partner of Westport resigned. (Pet. Exh. 6)

19. A new general partner, Compliance Concepts, LLC, was elected in January, 2015. (Hrg. Tr. Vol. 1, 60:13-17)

20. Compliance Concepts was directed to submit an acquisition application to the OIR. (Hrg. Tr. Vol. 1, 61:3-12)

21. Within days of the submission of the acquisition application, the Insurance Commissioner's comments regarding the need for new management of University Village appeared in the local paper. (Hrg. Tr. Vol. 1, 89:2-90:16)

22. A new general partner, IMH, was elected by the limited partners on March 2, 2015, to replace Compliance Concepts. (Jt. Pre-Hrg. State., ¶ 5.g.); Hrg. Tr. Vol. 1, 91:4-6)

23. IMH became the substitute applicant on the acquisition application filed by Compliance Concepts. (Hrg. Tr. Vol. 3, 336:1-12)

24. The materials filed with the OIR together with the testimony and exhibits introduced at the Final Hearing demonstrate that:

A. IMH, through its sole member, Eliyahu T. Freiden, is of reputable and responsible character.

   1. Mr. Frieden is the sole member of IMH. (Jt. Pre-Hrg. State., ¶ 5.i.)

   2. Mr. Frieden is a responsible person with a wife and four children. (Hrg. Tr. Vol., 152:22-153:1)

   3. He is heavily engaged in his community at his local synagogue, with the local YMCA and with the creation of a girls' Jewish high school. (Hrg. Tr. Vol. 2, 153:2-154:3)

   4. No evidence was presented to support any conclusion that Mr. Freiden is not of reputable and responsible character.

B. The financial condition of IMH will not jeopardize the financial stability of Westport.

   1. IMH has access to capital through an entity with which Mr. Freiden has a business relationship. (Res. Exh. 1, 736; Hrg. Tr. Vol. 2, 155:2-20, 216:14-217:6)

   2. Access to capital is a positive attribute for an owner of a specialty insurer. (Hrg. Tr. Vol. 3, 375:21-25)

   3. Nothing of record suggests that IMH is unable to meet its financial obligations in the ordinary course of business. (Res. Exh. 1).

4. Neither IMH, nor its sole member, has filed for bankruptcy. (Res. Exh. 1, Pet. Exh. 33)

5. The financial stability of Westport is not a statutory factor. Westport is not the applicant for ownership acquisition, nor does the current financial condition of Westport negatively reflect on the applicant's financial stability. Before IMH even applied, Westport was being negatively impacted in a significant way by precipitous actions taken by OIR. Such negative impacts continue through today. (Hrg. Tr. Vol. 1, 85:15-86:11, 128:11-129:1).

6. OIR's ongoing examination, begun February 11, 2015, has had a detrimental impact upon Westport's financial stability, although no findings, official or unofficial, have been rendered as a result of the examination, which is essentially an attempt to improperly monitor operations at the facility. (Hrg. Tr. Vol. 1, 86:7-20, Vol. 2, 214:17-23)

7. Westport has not provided its final 2014 audited financial statement to the OIR (draft report has been provided), because the final report cannot be completed by the accountants, due to their inability to opine on Westport as a going concern when it is the subject of a receivership proceeding, and inquiries to OIR have not been responded to. (Hrg. Tr. Vol. 1, 113:1-23, 125:3-126:10)

8. Residents of University Village have become concerned about the ongoing OIR examination. (Hrg. Tr. Vol. 1, 88:4-22)

9. Two days after the examination was initiated, OIR issued an Initial Order of Suspension. The basis for the Initial Order of Suspension was that there were

unapproved people running the CCRC. (Hrg. Tr. Vol. 4, 441:20-442:7, Nov. 16, 2015)

10. On that same day, two days after the examination was initiated, University Village was the subject of negative press in the local newspaper caused by OIR. (Hrg. Tr. Vol. 1, 88:24-90:16)

11. On February 26, 2015, 15 days after the initiation of the examination, OIR referred Westport to the Department of Financial Services for it to pursue the appointment of a receiver for the CCRC based upon information gathered in the examination. (Hrg. Tr. Vol. 1, 86:17-20, Vol. 4, 496:8-24)

12. That action has had an extremely negative effect on Westport's financial stability. (Hrg. Tr. Vol. 1, 92:3-10)

13. Westport is unable to obtain additional financing while the receivership action is pending because of lenders' unwillingness to extend additional credit under threat of divestiture of ownership. (Hrg. Tr. Vol. 1, 95:10-23)

14. Westport is also unable to attract additional investors while the receivership action is pending as investors do not want to invest into a property that is under siege by a state agency. (Hrg. Tr. Vol. 1, 96:6-13)

15. The receivership action has had a detrimental impact upon Westport's financial stability, as OIR knew clearly that it would. (Depo. S. Parton, Dec. 7, 2015, 7:17-9:7, 13:25-14:12)

16. Under normal circumstances, refunds due to residents are paid from new entrance fees as new residents enter the CCRC, but new resident sales have been diminished by OIR's action so that such funds are not available. (Hrg. Tr. Vol. 4, 477:18-480:19)

17. Mr. Freiden, for IMH, has repeatedly asked OIR what it needs to show to support a finding that it will not jeopardize the financial stability of Westport. OIR has failed to respond. (Hrg. Tr. Vol. 2, 178:3-10)

C.     IMH, through its sole member, Eliyahu T. Frieden, has the competence, experience and integrity to operate University Village in the best interests of the residents and the public.

1.  Operating a CCRC does not require specific industry experience. Solid management and hospitality skills are sufficient to ensure successful operation of a CCRC so long as those components of the CCRC which require special skills (such as the skilled nursing facility) are operated by persons qualified to do so. (Hrg. Tr. Vol. 2, 239:18-241:3)

2.  Mr. Frieden's education includes study of Talmudic law in Israel and study biology and business management at Touro College in Brooklyn, NY. (Hrg. Tr. Vol. 2, 151:15-25)

3.  He did not obtain a degree from Touro College as he began to pursue employment. (Hrg. Tr. Vol. 2, 152:1-9)

4.  He has no criminal history or record. (Jt. Pre-Hrg. State., ¶ 5.k.; Hrg. Tr. Vol. 2, 152:10-11)

5. Mr. Frieden's employment experience includes:

a) Work for a regulated private financial institution assisting with financing acquisitions. His duties there included underwriting, office management, loan origination and management of a team of loan originators. (Hrg. Tr. Vol. 2, 144:6-145:14; Pet. Exh. 33)

b) Work for a company which assisted in managing skilled nursing facilities throughout the country. His duties there included on-sight oversight of management of 30 licensed skilled nursing facilities in the Midwest, specifically with regarding to the financial health of the facilities and assistance with regulatory compliance. (Hrg. Tr. Vol. 2, 145:15-146:25; Pet. Exh. 33)

c) Work for a credit reporting company he established to provide background screening and checks for heathcare, daycare and rental facilities. (Hrg. Tr. Vol. 2, 147:9-15; Pet. Exh. 33)

d) Work for a customs clearinghouse and skipping brokerage firm. His duties there included sales and office management. The firm, as a US Customs clearinghouse was regulated. (Hrg. Tr. Vol. 2, 148:2-14; Pet. Exh. 33)

e) Work for a property management company he established to manage hundreds of units of real estate. (Hrg. Tr. Vol. 2, 148:15-19; Pet. Exh. 33)

f) Work for a cruise line. His duties there included marketing and sales. (Hrg. Tr. Vol. 2, 149:2-12; Pet. Exh. 33)

g) Mr. Freiden's management experience includes budgeting and budget oversight, monitoring financial goal setting and achievement and overseeing regulatory matters. (Hrg. Tr. Vol. 2, 217:7-17)

6. Mr. Freiden has never been reprimanded by an employer. (Hrg. Tr. Vol. 2, 174:12-17)

7. Mr. Freiden has no negative disciplinary history. (Jt. Pre-Hrg. State., ¶ 5.k.; Hrg. Tr. Vol. 2, 149:13-17; Pet. Exh. 33)

8. IMH, through Mr. Freiden, has been acting as general partner of Westport since March 2, 2015. (Jt. Pre-Hrg. State., ¶ 5.g.)

9. He has gained significant experience in managing the business of the limited partnership and overseeing CCRC operations since March 2, 2015. (Hrg. Tr. Vol. 2, 217:18-218:1)

10. Westport employs more than one hundred employees who carry out day to day operations at University Village. (Hrg. Tr. Vol. 2, 156:5-13)

11. Staffing at University Village is adequate to meet the residents' needs. (Hrg. Tr. Vol. 2, 238:11-14)

12. Mr. Freiden directs, interacts with and replies upon key employees of Westport who make up his executive team to assist in operating the CCRC. (Hrg. Tr. Vol. 2, 158:22-159:13)

13. Mr. Freiden's executive team members are present at University Village daily. He has a very good working relationship with them. He measures their efficacy on a regular basis, monitoring their goals and achievements. (Hrg. Tr. Vol. 2, 159:17-160:20)

14. His staff has expressed no concern to him regarding his capabilities to act as general partner of Westport. (Hrg. Tr. Vol. 2, 160:21-25)

15. On a weekly basis Mr. Freiden meets with residents, listens to and addresses concerns they express, meets with his staff as a group and individually, monitors budgets, monitors revenues and monitors expenses. Residents feel comfortable approaching him with concerns they may have about operational needs. (Hrg. Tr. Vol. 2, 161:10-20, 162:22-163:11)

16. He has provided his personal cell phone number and e-mail address to staff and residents. (Hrg. Tr. Vol. 2, 165:21-25).

17. University Village is currently meeting residents' needs. A new dietary manager was hired, meals are better, activities have been added, successful events are conducted and transportation is provided to residents. (Hrg. Tr. Vol. 2, 161:21-162:17)

18. In addition, Mr. Freiden has contracted with Novum, LLC for management consulting services. Novum, LLC assists with multiple aspects of management including accounting, marketing, sales, housekeeping and physical plant operations. (Hrg. Tr. Vol. 2, 156:14-158:8)

19. Mr. Freiden meets with Novum, LLC's employees who are regularly on the University Village campus. (Hrg. Tr. Vol. 2, 158:9-20)

20. Mr. Freiden recently hired a new Executive Director who, as an R.N. with CCRC experience, was very qualified for the job. (Hrg. Tr. Vol. 2, 163:17-164:21)

21. The new Executive Director, however, left the campus after receiving a letter from the OIR that "spooked" her.  (Hrg. Tr. Vol. 2, 165:2-10, 244:20-245:4).

22. Even without a current Executive Director, the duties of an Executive Director are being fulfilled at University Village by the members of Mr. Freiden's executive team.  (Hrg. Tr. Vol. 2, 165:11-20)

23. Resident' experience at University Village is very positive.  (Hrg. Tr. Vol. 2, 167:1-10).

24. During 2014, residents were a significant referral source for new sales at University Village.  Residents witnessed upgrades and renovations and were excited.  (Hrg. Tr. Vol. 2, 235:25-236:16)

25. IMH, through its sole member, Mr. Freiden, is more than able to manage the limited partnership and oversee CCRC operations given his knowledge of and background in financing, resident care, hospitality and real estate and his ability to retain relevant professionals.  (Hrg. Tr. Vol. 2, 219:15-220:5, 242:2-25)

D.    Mr. Freiden's background indicates that it is in the best interests of the residents and the public to permit him to acquire the 1% general partnership interest in Westport as set forth in the Amended LPA.

1. I refer to my findings above and below regarding Mr. Freiden's background.

2. The background report on Mr. Freiden, prepared by the OIR's parent agency, Department of Financial Services, is sufficient to enable OIR to review Mr. Freiden's background.  (Pet. Exh. 35)

3. OIR did not notify Mr. Freiden that the background report it received was insufficient. (Hrg. Tr. Vol. 3, 384:23-385:1)

E.   Persons to be employed by Westport to operate the CCRC after the acquisition will have sufficient experience and ability to assure reasonable promise of successful operation of University Village.

1. Novum, LLC, the entity contracted to provide management consulting services, by Westport has its background in skilled nursing facilities, a heavily regulated industry. (Hrg. Tr. Vol. 2, 183:10-13)

2. Novum, LLC brought together four individuals with experience in senior care. (Hrg. Tr. Vol. 2, 224:5-8).

3. Marc Flores is a licensed nursing home administrator with a master's degree who is obtaining his Ph.D is risk management at present. (Hrg. Tr. Vol. 2, 224:5-20).

4. Jeanette Baltzy is a licensed nursing home administrator. She is an RN with 15 or 20 years of experience operating assisted living facilities. She also has CCRC experience. (Hrg. Tr. Vol. 2, 224:23-225:4)

5. Novum, LLC employs persons with educational experience in science and healthcare management. (Hrg. Tr. Vol. 2, 221:9-14)

6. Novum, LLC employs persons with years of experience in assisted living and skilled nursing. (Hrg. Tr. Vol. 2, 221:22-222:4)

7. Novum, LLC employs persons with experience in independent living. (Hrg. Tr. Vol. 2, 222:5-18)

8. Novum, LLC's Chief Executive Officer, Douglas Klinowski, is an officer of the Florida Assisted Living Association. (Hrg. Tr. Vol. 2, 223:17-21)

9. An affiliate of Novum, LLC, Trusted Senior Care provides services for facilities in Florida. All of the facilities for which Novum, LLC's affiliate entity currently provide services are licensed by the Agency for Health Care Administration (AHCA) and such licenses are in good standing. (Hrg. Tr. Vol. 2, 223:22-224:4)

10. Novum, LLC manages two facilities in Florida. Services provided include day to day operations, installing budges, hiring and firing staff, training and development and ensuring regulatory compliance. (Hrg. Tr. Vol. 2, 225:14-226:1)

11. AHCA brought Novum, LLC to the attention of OIR. (Hrg. Tr. Vol. 2, 228:15-22).

12. Novum, LLC has significant experience complying with regulatory requirements. (Hrg. Tr. Vol. 2, 230:23-231:13)

13. Novum, LLC is capable of complying with the requirements of Chapter 651, Florida Statutes. (Hrg. Tr. Vol. 2, 231:14-232:3)

14. On the University Village campus, Novum, LLC provides the following consulting services: assisting the business offices with books and records, verifying numbers, staff training, human resources, marketing and sales. (Hrg. Tr. Vol. 2, 232:4-233:10)

F.     Management of University Village will continue to be competent and trustworthy and will possess sufficient facility management experience to make the operation of University Village not hazardous to the residents.

1.  I refer to my findings above and below regarding the competence, trustworthiness and management experience of IMH, through Mr. Freiden.

2.  Neither BVM nor John Bartle is affiliated with IMH.  (Hrg. Tr. Vol. 1, 91:10-17)

3.  John Bartle does not oversee capital expenditures.  Therefore, OIR's suspicions about this partner, whether or not justified, are irrelevant.  (Hrg. Tr. Vol. 2, 206:17-207:21)

4.  Residents have been deprived of no service nor activity despite the impacts of the OIR's actions as described herein.  (Hrg. Tr. Vol. 1, 119:7-13)

G.     Management of University Village does not include any person who has acted in bad faith with respect to assets, accounts, finances or books of any insurer.

1.  No evidence was presented to support any finding that any person included among management of University Village has acted in bad faith with respect to assets, accounts, finances or books of any insurer.

2.  OIR's reliance upon incomplete information on Mr. Bartle cannot support a finding that IMH or other management of University Village has acted in bad faith with respect to assets, accounts, finances or books of any insurer.  (Hrg. Tr. Vol. 4, 485:7-486:6)

H.   Approval of IMH to serve as 1% general partner is not likely to be hazardous or prejudicial to the residents or the public.

1.   While IMH has served as general partner, University Village has become a very vibrant campus. There are many heathcare and transportation services and activities available to residents. (Hrg. Tr. Vol. 1, 96:14-97:5)

25.   Violations of Chapter 651, Florida Statutes, alleged by OIR form the basis for OIR's denial of the acquisition application. (Hrg. Tr. Vol. 4, 530:4-531:11)

### *Conclusions of Law*

1.   IMH, as the applicant for acquisition approval, has the ultimate burden to show its entitlement to the approval, by a preponderance of the evidence. *See* Dep't of Banking & Fin. v. Osborne, Stern & Co., 670 So. 2d 932, 934 (Fla. 1996). However, the burden to go forward with evidence and the burden of proof can shift as the proceeding progresses. Pursuant to Section 120.60(3), Florida Statutes, an agency must give notice to an applicant for a license that states with particularity the grounds or basis for denying the license, and it has the burden to produce substantial evidence to support denial. *See* Comprehensive Med. Access, Inc. v. Office of Ins. Reg., 983 So. 2d 45, 46-47 (Fla. 1st DCA 2008); Dallas Nat'l Ins. Co. v. Office of Ins. Reg. Case No. 08-5624 (Fla. DOAH 2010) at ¶ 91 (recommended order to grant insurer certificate of authority over OIR's initial freeform denial). Thus OIR has the burden to go forward to show that, based on all information it now has available, it cannot make the required findings regarding IMH's qualification for the license, stating its reasons.

2.   OIR's letter of March 27, 2015, cited that IMH failed to provide adequate information with its application to assure OIR of its qualifications. However, this is a *de novo*

proceeding, not a review of the denial letter and record at the time of that letter. *See* McDonald v. Dep't of Banking and Finance, 346 So.2d 569, 584 (Fla. 1st DCA 1977) (petition for formal hearing commences a de novo proceeding, which is intended to formulate final agency action and not to review action taken earlier and preliminarily, so the ALJ may consider changes or circumstances external to the application); Lawnwood Med. Ctr., Inc. v. AHCA, 678 So. 2d 421, 425-26 (Fla. 1st DCA 1996) (same). OIR's decision-making must consider any additional information adduced in this proceeding. OIR therefore has the initial burden to go forward with reasons, based on the full record of this case, to show a basis for denial.

3.      OIR cannot base its denial on mere suspicion. Comprehensive Medical Access, (bare civil complaint against applicant insufficient). Nor can OIR act arbitrarily or without any reason.[1]

4.      OIR's denial letter of March 27, 2015, enumerates specific reasons for denying IMH's application; however, at the Final Hearing, OIR's witnesses testified that OIR had insufficient information to make the statutorily required findings.

5.      Four of OIR's specific reasons for denying IMH's application in the denial question IMH's fitness for approval as a CCRC provider (general partner). Specifically, OIR's cited reasons for denial include the following concerns: (a) Questions about whether IMH is reputable and of responsible character as required by Section 651.022(1), Florida Statutes; (b) Questions about the integrity of persons who will control directly or

---

[1] Regulatory action denying a license must be reasonable. "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose...." Lowe v. Sec. & Exch. Comm'n, 472 U.S. 181, 228 (1985). "[T]he liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." Conn v. Gabbert, 526 U.S. 286, 291–92 (1999).

indirectly the operation of University Village per Section 628.4615(8)(d), Florida

Statutes; (c) Questions about the trustworthiness of persons who will control directly or

indirectly the operation of University Village per Section 628.4615(8)(g), Florida

Statutes, and (d) Questions about whether IMH unlawfully manipulated the assets,

accounts, finances, or books of any insurer or otherwise acted in bad faith with respect

thereto, per Section 628.4615(8)(h), Florida Statutes. These statements doubt IMH's

fitness. For these issues, the burden shifts to OIR to prove IMH's unfitness for approval

by a preponderance of the evidence. *See* Osborne Stern, above, 670 So. 2d at 934:

> … the Department had the burden of presenting evidence that
> appellants had violated certain statutes and were thus unfit for
> registration [quoting Booth, J., concurring and dissenting in the
> First District Court of Appeal, 647 So.2d at 250]

Recently Florida Dep't of Children & Families v. Davis Family Day Care Home, 160 So.

3d 854, 857 (Fla. 2015), reaffirmed the rule in *Osborne Stern*, stating as follows:

> … we explained that where the agency proposes to deny the
> license because the applicant is unfit, it has the burden to prove the
> applicant's unfitness. *See* Osborne Stern, 670 So.2d at 934
> [quoting Osborne Stern].

Administrative cases follow this rule. *See* Rising Stars et al. v. Dept. of Children and

Families, No. 11-4315 (Fla. DOAH 2011) at ¶s 56, 62,

> 56. The Department has based its licensing decision on instances
> of wrongdoing on the part of Petitioner. Therefore, even though the
> ultimate burden of proof remains with Petitioner to demonstrate
> entitlement to the renewal of her license, the burden in this
> proceeding shifts to the Department to prove up those incidents
> upon which it relies for its decision to deny the license….

[analysis omitted]

> 62. … the undersigned concludes that since this case involves the
> denial of an application for renewal of a license, Petitioner has the
> overall burden to prove entitlement, but that the Department must
> prove up the incidents of wrongdoing that support its decision that

Petitioner does not meet child care facility standards by a preponderance of the evidence.

Accord. Housley v. Smith, No.08-0714 (Fla. DOAH 2008) at ¶ 30 (if agency alleges conduct that would justify revoking certificate, burden of proof of these violations is on the agency); Silverstone v. AHCA, No. 96-5772 (Fla. DOAH 1997) at ¶ 21 (once applicant presents prima facie case demonstrating qualifications, agency must demonstrate that applicant's conduct violated law and that the result (license denial) is appropriate, considering any aggravating and mitigating circumstances); Ziadie, v. Dep't of Bus. and Prof. Reg., No. 15-5037 (Fla. DOAH 2015), p. 43 n. 5 (recent case applying Davis).

5. IMH has presented a prima facie case of its entitlement to approval of an acquisition application.

6. Despite OIR's adherence to its position that IMH must demonstrate experience and competence within the insurance industry, neither relevant law nor any rule requires such proof. In fact, even Section 651.022, Florida Statutes, the law regarding what an applicant for a provisional certificate of authority to operate a CCRC must show, does not require that an applicant have experience specific to insurance or to a CCRC. Instead, the law, as applied to this situation, requires only that IMH show competence, experience and integrity which indicate that the acquisition is in the best interests of the residents and the public. The law expressly allows for the licensee, here Westport, to employ persons with sufficient industry and managerial experience and ability to assure reasonable promise of successful operation. Westport's contractual relationship with Novum, LLC is evidence of the ability of IMH, through Mr. Freiden, to employ persons with relevant experience and ability to assure reasonable promise of success at University Village.

7.  Operating a CCRC does not require specific industry experience.  Solid management skills are sufficient to ensure successful operation of a CCRC so long as those components of the CCRC which require special skills are operated by persons qualified to do so.  Hospitality related skills are important.

8.  OIR has not demonstrated that IMH is unfit for licensure.  OIR rested on its claims that IMH provided insufficient information to enable it to make the findings contemplated in Section 628.4615, Florida Statutes.  Yet, it gave little, and certainly insufficient, attention to proving that IMH is unfit as described above.

9.  Any shortcomings or insufficiencies in the acquisition application have been cured through the presentation of testimony and evidence as to the history of University Village, Mr. Freiden's qualifications and business acumen and Novum, LLC's ongoing role on campus.

10. Concerns expressed by residents to OIR about BVM's or John Bartle's involvement at University Village do not transform BVM or John Bartle into a person that owns or is permitted to control any part of IMH, the only applicant appropriately considered within this proceeding. The same is true with respect to the CCRC. BVM is a guarantor of Westport's debt and is entitled to monitor the financial well-being of the debtor to pay the facility mortgage. The denial of the subject acquisition application cannot lawfully be based upon the qualifications of any party other than IMH and its sole member, Mr. Freiden.

11. To the extent that OIR requires qualifications not specifically set forth in law or rule, failure to meet such qualifications cannot be the basis for the denial of the acquisition application.

12.    I conclude that IMH is qualified to acquire the ownership of the 1% general partnership interest in Westport for the reasons set forth above.

_____
E. GARY EARLY
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, FL  32399-3060
Tel: 850-488-9764 / Fax: 850-921-6847
www.doah.state.fl.us

Filed with the Clerk of the Division of Administrative Hearings this 18th day of December, 2015.

_____
WENDY RUSSELL WIENER
Attorney for Respondent
Florida Bar No. 0983667
Broad and Cassel
215 S. Monroe Street
Tallahassee, FL 32301
Tel:  850-681-6810 / Fax: 850-385-5416
wwiener@broadandcassel.com

M. STEPHEN TURNER
Attorney for Respondents
Florida Bar No. 095691
Broad and Cassel
215 S. Monroe Street
Tallahassee, FL 32301
Tel:  850-681-6810 / Fax: 850-385-5416
sturner@broadandcassel.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was delivered on the 18th day of December, 2015, via email to the following parties:  C. Timothy Gray (tim.gray@floir.com), Patrick D. Fleming (patrick.flemming@floir.com), Shaw P. Stiller (Shaw.Stiller@floir.com) and Alyssa Lathrop (alyssa.lathrop@floir.com).

_____
WENDY RUSSELL WIENER