**STATE OF FLORIDA**
**DIVISION OF ADMINISTRATIVE HEARINGS**

IMH HEALTHCARE, LLC.,

      Petitioner,

v.
                                    Case No.  15-2495

OFFICE OF INSURANCE REGULATION,

      Respondent.

_____/

## PROPOSED RECOMMENDED ORDER

Pursuant to notice, a final hearing was held in this matter before the Honorable E. Gary Early, the assigned Administrative Law Judge of the Division of Administrative Hearings, on November 12, 13 & 16, 2015, in Tallahassee, Florida.

### APPEARANCES

For Petitioner:

    M. Steven Turner
    Wendy Russell Wiener
    Broad and Cassel
    215 S. Monroe Street
    Tallahassee, FL 32301


For Respondent:

    Shaw P. Stiller
    Chief Assistant General Counsel
    C. Timothy Gray
    Assistant General Counsel
    Office of Insurance Regulation
    Larson Building
    200 East Gaines Street
    Tallahassee, FL 32399-4206



PLAINTIFF'S EXHIBIT Silver Sollul
3/6/23   10   (RE)

1

STATEMENT OF THE ISSUES

Issue raised in the Petition:  Whether Petitioner has provided sufficient information to enable to the Office to approve the acquisition by IMH Healthcare, LLC, of Westport Holdings Tampa, LP, d/b/a University Village, a specialty insurer licensed to operate a facility that undertakes to provide continuing care, pursuant to section 628.4615, Florida Statutes.

Issue raised in the Motion for Dismissal by Tribunal: Whether Petitioner was required to file an application pursuant to section 628.4615, Florida Statutes upon becoming general partner of Westport Holdings Tampa, LP.

PRELIMINARY STATEMENT

This proceeding was referred by the Office of Insurance Regulation (Office) to the Division of Administrative Hearings (DOAH) for assignment of an Administrative Law Judge (ALJ) and the conduct of a formal administrative hearing.  The agency action at issue is the Office's denial of an application for acquisition (Application) of a specialty insurer under section 628.4615, Florida Statutes.  IMH Healthcare, LLC (IMH), is the denied applicant and the Petitioner in this proceeding.

A final hearing was conducted on the issues raised by Petitioner on November 12-13 & 16, 2015.  Petitioner called John W. Bartle, Eliyahu Freiden, Douglas Klinowski and Desmond Wilson

as witnesses at the final hearing. Petitioner offered the deposition testimony of Steven H. Parton as rebuttal. The following exhibits offered by Petitioner were accepted into evidence, with the numbering being as assigned in the Joint Prehearing Stipulation: 1-6, 8, 10, 12-13, 16-17, 23, 26-27, 31, 33-35, 36 (pp. 1-7 & 12-17 only) and 40.

Respondent called Becky Griffith and Carolyn Morgan as witnesses at the final hearing. The following exhibits offered by Respondent were accepted into evidence, with the numbering being as assigned in the Joint Prehearing Stipulation: 1, 9, 9a (Loan Closing Statement dated March 31, 2014, not listed on the Joint Prehearing Stipulation, admitted without objection), 10, 12-15, 18-19, 22 and 23a (June 7, 2015 letter signed by John W. Bartle that was one of two attachments of listed exhibit 23).

At the commencement of the final hearing, Petitioner filed a Motion for Dismissal by Tribunal, requesting that the Administrative Law Judge dismiss its Petition. Given the late filing and nature of the requested relief, the parties were allowed to file Memoranda of Law along with their Proposed Recommended Orders to address the issues raised by the Motion for Dismissal. The recommended ruling on that Motion is set forth in this Recommended Order.

A transcript of the final hearing was ordered and filed with DOAH on December 8, 2015. The parties' Memoranda of Law

and Proposed Recommended Orders have been considered in the entry of this Recommended Order.

## FINDINGS OF FACT

1.    University Village is a continuing care retirement community (CCRC) in Hillsborough County, Florida.  Ex. R1 at 3.[1] A CCRC offers shelter, care and services for residents upon payment of an entrance fee pursuant to continuing care contracts.  Fla. Stat. § 651.011(2).

2.    Continuing care contracts, also referred to as "entrance agreements," are between the resident and the CCRC provider and establish the terms and conditions of the residents' care while at the CCRC. Fla. Stat. § 651.055. Such terms include the entrance fee to be paid, the amount of monthly fees, future levels of care through advanced aging, including assisted living and skilled nursing, and any refund to be paid by the provider to the resident or their estate upon exit from the CCRC. See Tr. at 319 & 391. The investment in entering a CCRC can be substantial, with entrance fees ranging from $10,000 to $2 million. Id. at 320. The refund due upon exit from the CCRC is a percentage of the entrance fee and, accordingly, can also be substantial.

3.    University Village accommodates the required spectrum of care for its residents in several buildings on one campus. There are two six- to seven-story buildings on the campus

referred to as the Towers that contain 446 apartments for independent living. Near the Towers are 46 patio homes or duplexes, which are also used for independent living.[2] There is a three-story building for more advanced care (Health Center). The first floor of the Health Center contains 120 skilled nursing beds. The second and third floors contain 110 beds for assisted living, with a memory care wing included on the second floor. University Village contains a total of 492 independent living units and 230 beds in the Health Center and has over 600 residents. Tr. at 52-53, 129; Ex. R1 at 76.

5. Westport Holdings Tampa, LP (WHT) provides continuing care for the University Village CCRC residents pursuant to their contracts and, therefore, is the "provider" for that facility. See Fla. Stat. § 651.011(12). As a CCRC provider, WHT is subject to State regulation and required to obtain a certificate of authority from the Office of Insurance Regulation. Fla. Stat. § 651.021. WHT currently holds a certificate of authority to operate the University Village CCRC. PHS ¶5b.

6. WHT is a limited partnership formed and existing under the laws of the State of Delaware. PHS ¶5a. WHT has two partnership percentage interests; a 99% limited partnership interest and a 1% general partnership interest. PHS ¶5c. WHT is governed by the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement dated October 23, 2000, as

5

subsequently amended. Prior to March 2014, Westport Holdings University Village, L.L.C. held the 1% general partnership interest and Westport Senior Living Investment Fund, L.P. held the 99% limited partnership interest. Ex. R1 at 225. Mr. Larry Landry was the President and Manager of both entities and, for all practical purposes, personally held 100% of WHT. See id. at 244 & 514. The record does not reflect any business interest or asset of WHT other than University Village.

7.   John W. Bartle plays a leading role in the transactions here at issue. Mr. Bartle has been employed by his current company, BVM Management, Inc. (BVM) for five years, and is currently its President. His work focuses on the analysis and acquisition of assets that are in foreclosure or some form of financial distress. This work has before attracted Mr. Bartle to the acquisition of a financially distressed facility providing care for seniors, Skyline Manor in Nebraska, which ended up in Chapter 11 Bankruptcy. Tr. at 117-18 & 127. Mr. Bartle became interested in BVM purchasing University Village in 2012 because it had become a financially distressed asset. Tr. at 44-45 & 101.

8.   In 2006, WHT entered into two notes payable totaling $32,250,000, both of which related to and were secured by University Village. The original maturity date of both loans was January 2010. The maturity date was extended to January 2012 by

the original lender, Capmark Bank, conditioned, in part, on a $10 million principal reduction payment that was funded by Westport Holdings University Village, L.L.C. (WHT general partner). In August 2012, Horizon LP UV Lender, LLC (Horizon) purchased the debt, the obligations on which WHT was not keeping current. Due to these troubles, the maturity date was extended by agreement multiple times, with the last extension expiring December 15, 2013. Ex. P36; Ex. R1 at 638-39.

9.    In August 2013, with the December deadline looming from Horizon, BVM Management/Westport Holdings, L.P. entered into a Limited Partnership Purchasing Agreement with Larry Landry to purchase the 99% WHT interest held by Westport Senior Living Investment Fund, LP (limited partner) and address the debt. BVM was to pay $2.5 million to Mr. Landry and address the existing mortgage indebtedness in exchange for the limited partnership interest. Ex. R1 at 96-99; Tr. at 45. BVM attempted to close pursuant to that Agreement before December but was unsuccessful. See Ex P16. Horizon then began to pursue a potential foreclosure or a deed-in-lieu thereof, prompting BVM to sue Horizon for unfair business practices. Ex. P3 at 3. The result of the litigation was another extension to accommodate the transaction with BVM described below. Ex. R1 at 638-39; Tr. at 124-25.

10.   The limited partnership interest and its sole asset – University Village – were ultimately obtained by BVM University Village on or about March 31, 2014, following the closing of two loans which resulted in full payment of the existing indebtedness and partial payment to Mr. Landry. Ex. R1 at 639; Exs. R9 & 9a. Of the $2.5 million owing to Mr. Landry for the limited partnership under the 2013 Limited Partnership Purchase Agreement, $500,000 had been previously received as earnest deposits and was credited to the amount owing. Exs. R1 at 96-99 & P1 at 1. Mr. Landry received $1 million from BVM from loan proceeds at the closing described immediately below for a total of $1.5 million paid for the limited partnership interest. Ex. P36 at 3-4; Ex. 9a at 4. The remaining $1 million was made part of a Promissory Note to be paid later in exchange for the general partner interest, as described infra.

11.   The first loan is in the amount of $9.5 million and is between WHT and CPIF Lending, LLC. Ex. R1 at 30-72. This loan is secured by a mortgage on the Towers and is guaranteed by BVM. Id. at 34 & 127-48; Tr. at 51. Of this loan, $5.6 million was disbursed to pay existing mortgage debt, and $1.75 million was held as a "Capital Expenditure Reserve" to be used for improvements – "replacements and alterations" – to The Towers and the Health Center.  Ex. R1 at 40 & 43.  The remaining approximately $2 million went to various expenses, including the

$1 million to Mr. Landry for the partnership interest, a $95,000 "placement fee" to Johnson Capital Group, Inc., $431.813.53 to the Williams Mullen Real Estate Trust Account[3] and $300,000 to WEMAMM I, LLC[4] for "transaction management expenses." Ex. 9a.

12. The second loan is in the amount of $15 million and is between Westport Nursing, LLC and USAmeriBank. Ex. R1 at 653-704. This loan is secured by a mortgage on the Health Center and is guaranteed by BVM. Ex. R1 at 100-26 & Tr. at 51. This loan is also secured by $3 million in cash collateral. Ex. R1 at 661 & 680. This cash was pledged from the existing statutorily-required "minimum liquid reserve" (MLR) for University Village and was not contributed by BVM or the new limited partners. Ex. P3 at 1. [5]

13. None of the collateral or security – or even closing costs – for these loans involved any investment of cash or assets by the new WHT limited partners or BVM: the loans were obtained and costs paid by pledging the equity in the Towers and the Health Center and collateralizing cash from the residents' existing MLR. See Ex. R1 at 729 (question 3(b)); Exs. R9 & 9a. The record is absent evidence of any independent cash or asset investment in University Village by BVM or the new WHT limited partners at any time subsequent to March 31, 2014. [6]

14. Immediately following the closing of the loans, BVM University Village, LLC[7] was substituted for Westport Senior

Living Investment Fund, L.P. as WHT's limited partner with ownership of the 99% interest. Ex. P1 at 1 (First 2014 Amendment of Limited Partnership Agreement). Upon this substitution, BVM University Village, LLC retained a 39.6% interest and "simultaneously assigned" the remainder to the following four limited partners in the indicated percentages;  IMH Healthcare, LLC (19.8%); JF Consultants, LLC (13.2%); and BHMSILF, LLC (26.4). Id.; Ex. R1 293-306, 466-67; Ex. P1.

15.  The general partner did not immediately change as part of this transaction: however, the parties expressly contemplated that Mr. Landry would soon be replaced in that role. Tr. at 104. The process for this replacement was memorialized in a Partnership Interest Transfer Agreement and a Promissory Note. Pursuant to the Note, existing general partner Westport Senior Investment Fund, LP – whose sole member was Mr. Landry – would be paid the $1 million still owing for the limited partnership deal by BVM University Village, LLC – which was now managed by Rebecca Bartle, Mr. Bartle's wife. Ex. R1 at 161-64 & 525. Upon this payment and as required by the Partnership Interest Transfer Agreement, Mr. Landry would deliver to WHT the Second 2014 Amendment to the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement. By operation of the Second 2014 Amendment with no further partnership action necessary, BHMSILFGP, LLC – a managing member of whom is Kevin

Angelis - would replace Westport Senior Investment Fund, LP as the general partner of WHT. Ex. R1 at 151-60; Tr. at 104.[8] Put more simply, Mr. Landry would be paid $1 million by Mrs. Bartle to resign as general partner and Mr. Angelis would replace him.

16. The above-described sequence of events from late 2013 through Spring 2014 caused the Office concern regarding the operations of University Village. Accordingly, the Office sought a "Corrective Action Plan" from University Village in April 2014 to address four specific issues: the purchase of the limited partnership interest; the prolonged uncertainty regarding ownership of the facility; a steady increase of overdue refunds; and delayed capital improvements. Ex. P36 at 12; Tr. at 323-24. The Office communicated with Messrs. Landry and Bartle about these issues over many months, never reaching full resolution.

17. From April through December 2014, Mr. Landry remained on paper as the general partner of WHT as he had not yet received the $1 million. Tr. at 325-26. For all practical purposes, however, BVM was the general partner and manager of University Village during this time.[9] BVM - more specifically, Mr. Bartle - was frequently the spokesperson for the partnership. Tr. at 322. The Office received numerous communications from the residents of University Village that Mr. Bartle was acting as general partner. Tr. at 435. BVM oversaw the operations and was responsible for and directed capital

11

improvements to the University Village property. Tr. at 62-63. BVM also effected changes in policies and procedures of the facility by directing the existing management company, AgeWell, to instruct employees of WHT. Tr. at 62. BVM provided many services in the independent living portion of University Village, including the following: oversight of construction and renovation; preparation of all compliance reports due to lenders; oversight of capital expenditure budget; approval of contracts; overseeing renovations; and assisting with marketing and public relations. Ex. R1 at 472.[10]

18. Following the many months of non-payment of the $1 million due, on December 22, 2014, Mr. Landry and Mrs. Bartle executed an Amendment to the Promissory Note. Ex. R1 at 165-67. This Amendment provided for a greatly reduced immediate payment from BVM University Village, LLC, to Westport Senior Investment Fund, LP, followed by installments. Id. Mr. Landry then resigned on December 29, 2014. Ex. P6.

19. This event triggered the second component of BVM's acquisition of WHT/University Village; the requirement to file for and obtain Office approval for acquisition of the specialty insurer pursuant to Section 628.4615, Florida Statutes.

20. The record is without dispute that this requirement and timing had been agreed upon among BVM, WHT and the Office since 2013. The Office had consistently informed BVM and WHT

that, upon the replacement of Mr. Landry as general partner, an application for acquisition would be required. See, e.g., Exs. P8, P13 & P17. Mr. Bartle and WHT had consistently informed the Office that BVM would be filing for acquisition when appropriate and agreed that the appropriate time would be upon the change in general partner. Ex. P36 at 5-6 & 16 ("BVM expects to assume control of the General Partner and will file its application with OIR not later than October 1, 2014").

21.    Based on these representations and agreements, the same day the Office was informed of Mr. Landry's resignation it notified Mr. Bartle that the triggering event had arrived. The Office provided Mr. Bartle the forms to complete and instructions on how to submit an on-line application. Ex. P10.

22.    On January 2, 2015, the Office received the 5-day notification of the acquisition application filing, the first step in the acquisition process. Fla. Stat. § 628.4615(2)(a). This submission listed BHMSILFGP, LP, as the proposed new general partner and requested a waiver of the formal application. Ex. P36 at 6. The Office determined that the request did not meet the statutory criteria for a waiver and sent Mr. Bartle a responsive letter denying the request. Tr. at 331.

23.    The Second 2014 Amendment was never executed and BHMSILFGP, LLC, never became the WHT general partner. Ex. R1 at

363-65.[11] The limited partners met later in January and elected Compliance Concepts, LLC (Compliance) as general partner. Tr. at 60. At the time of its election as general partner, Compliance was controlled by Mrs. Bartle and was the managing member of BVM University Village, the 40% limited partner of WHT formed by Mr. Bartle to lead the March 2014 transaction. Compliance filed an application for acquisition of WHT with the Office pursuant to section 628.4615, Florida Statutes, in February 2015.  Ex. R1 7-16; Tr. at 60-61.

24.   The online application process was a last-minute effort instituted by Compliance just before the 30-day due date and, as a result, the submitted application was very incomplete. Tr. at 332-34; see Fla. Stat § 628.4615(2)(b). Accordingly, the Office issued a lengthy 30-day clarification letter requesting additional information on seventy-four separate items. Tr. at 335; Ex. R1 at 280-88. These information requests did not include those relating to biographical and background information, which would be made under separate cover. Id. at 288.

25.   Before submitting a response to the 30-day letter, Compliance withdrew as general partner. Ex. R1 at 469. By letter dated March 2, 2015, the Office was informed that IMH Healthcare, LLC (IMH) had been elected as the new general partner of WHT and the pending application would be updated and

supplemented to reflect the change. Ex. R1 at 457. IMH represented that the amended application would only address the change of ownership of WHT and its general partner: accordingly, all previous relevant representations made and materials supplied by Compliance as part of the Application would be equally applicable to and binding on IMH. As promised, IMH subsequently filed a "Statement of Acquisition Merger or Consolidation of a Specialty Insurer Pursuant to Florida Statutes 628.4615." PHS ¶51-o; Ex. R1 at 725-34.

26.  Along with its March 2, 2015, letter, IMH also provided a response to the pending 30-day clarification letter. Ex. R1 at 466-78. This response provided additional, though still lacking, information regarding the application. Tr. at 337.

27.  After full review of the application and the responses to the 30-day clarification letters, staff at the Office recommended that the application be denied. Tr. at 339. The Commissioner of the Office authorized denial of the IMH Application and a letter of denial was sent to counsel for IMH on March 27, 2015. Tr. at 446. Of the ten requirements an applicant must meet for approval of an acquisition under section 628.4615, Florida Statutes, the Office determined that IMH failed to satisfy all but two.

28. The factual grounds supporting the eight grounds for the denial can be placed into two general categories: competence, experience and integrity; and financial condition.

29. Mr. Freiden is the sole and managing member of IMH. PHS ¶5i. IMH has no employees. PHS ¶5j. The competence, experience and integrity of IMH, then, are those of Mr. Freiden.

30. Mr. Freiden does not have a college degree and has no specific education, expertise or formal training in insurance. Mr. Freiden has no education, training, experience or expertise in continuing care requirements or retirement communities. Tr. at 169, 450. He has never applied for an insurance license, a license in the health care field and is not qualified as a health care professional. Mr. Freiden had no experience with operating a CCRC prior to his involvement at University Village beginning in March 2015. Tr at 170.

31. Mr. Freiden lists his current occupation as "Real Estate Investor and Consultant." Ex. P22 at 1. His work experience is focused almost solely in finance and acquisition with lending institutions. Tr. at 144-45. And like Mr. Bartle, Mr. Freiden "fell in love" with University Village as a potentially profitable investment opportunity. Tr. at 187-88. Mr. Freiden had no intention to actually operate the CCRC, anticipating his role being only as an investor. In his own

words, "I would be lying if I told you I was not into it for the money." Id. at 188.

32.   Mr. Freiden worked for several years for Primesource National, whose type of business he lists as "Healthcare Procurement Management." Ex. P33 at 2. Mr. Freiden's position was "Senior Account Manager/Supervisor," where budgeting, expenses and finance relating to skilled nursing facilities, none of which were located in Florida, were his primary foci. Id.; Tr. at 146-47 & 171. Mr. Freiden spent a fairly small amount of his time at Primesource involved with ensuring the physical safety of his accounts (ie., facilities) for purposes of passing surveys by State licensing agencies. Tr. at 146, 171 & 173. None of this experience in procurement management is substantially related to being a provider for a CCRC.

33.   Importantly, Mr. Freiden failed to file with his application required information regarding his background. Tr. at 340 & 379-80. Mr. Freiden did submit a biographical affidavit and a fingerprint card but did not submit the required background (investigative) reports. Ex. R1 at 731. As clearly set forth in the application form, "[b]ackground reports must be submitted by the selected background investigator vendor directly to the Office prior to or contemporaneously with the submission of the application filing." Id. at 732. This report provides important additional background information from court

records and other sources and is crucial as a third-party verification of the information submitted by the applicant regarding employment and the like. Tr. at 384. Mr. Freiden skipped this step, leaving the Office with an incomplete background composite and without the required independent verification of the facts presented.

34.  The determination of reputable and responsible character, like the determination with respect to education and experience, is made by examining the applicant's background in the subject industry and whether it demonstrates success. This inquiry focuses on industry-related jobs, including management or ownership of a facility. Tr. at 448. In this instance, the industry would be insurance and, specifically, CCRCs. It would not be relevant or persuasive, for example, whether a person has an outstanding reputation and responsible character as a sailor or dentist in demonstrating whether they are qualified to run a specialty insurer.

35.  The Office is also directed by statute to investigate the backgrounds of persons and entities indirectly involved with the management of an acquiring entity as part of the application process. Tr. at 451; Fla. Stat. § 628.4615(8)(d). Because of Mr. Bartle's continuous involvement with the operations of University Village and his substantial financial ties as guarantor for the two loans, the Office sought background

information on him. Tr. at 449-50 & 452. However, the application was absent any information regarding Mr. Bartle. The Office received only a handwritten note with the phrase "To be sent" in response to its inquiries for background and biographical information.  Ex. R1 at 183. No further information was provided at the final hearing. The Office has no reliable data regarding Mr. Bartle's past employment, personal information or financial background.

36.  The Office also sought background and biographical information on numerous other individuals involved with the direct and indirect control of WHT and IMH. These individuals had been identified and some information provided early in the application process when Compliance was the general partner and applicant. Further inquiry regarding these individuals, who appear in various transactions and entities associated WHT, was unilaterally deemed by IMH "no longer relevant" and not supplied, rendering the acquisition application incomplete in that additional respect. Tr. at 337-39.

37.  Regarding financial ability, the submissions by IMH were similarly lacking. The only assets of IMH identified in the record are its limited (19.8%) and general (1%) partnership interests in University Village. Tr. at 143-44. IMH was formed on March 24, 2014, one week before the closings, apparently

solely to assume partnership interests in WHT. Ex. R1 at 500. IMH brings nothing of its own to this venture.

38.   As part of the Application, IMH produced a letter from Ark Real Estate Group, LLC – not a bank or similarly regulated financial institution – that purports to represent that five million dollars in capital or subordinated debt is available to IMH. Ex. R1 at 736. All that the record demonstrates about this company is that Mr. Freiden does consulting work for it and it was a potential party to a joint venture Mr. Freiden unsuccessfully attempted to form. Its financial ability, like that of IMH, is unknown. The letter itself is vague and not backed up by a formal term sheet or line of credit. This letter is not credible evidence of available cash or credit on which the Office could rely. Tr. at 176-78.

39.   This inability of IMH to demonstrate it has any financial resources is particularly troubling in the current circumstance.[12] Following its withdrawal as general partner, Compliance would be "providing <u>no further financial support</u> for the benefit of the Limited Partnerships," including WHT. Ex. R 1 at 286 & 473 (emphasis added). Instead, it was represented to the Office that IMH was an "investment company," would be providing all "credit support" for the benefit of WHT and would demonstrate this capability through the provision of unaudited financials and "additional information and documentation." <u>Id.</u>

at 473-74. The unaudited financials were never supplied. The above-referenced letter is the only "other information and documentation" for "credit support" supplied by IMH.

40. Thus, the Office had no information in the application file regarding the financial stability or ability of IMH. Tr. at 340, 449. IMH did not provide any further evidence on this issue at the final hearing.[13]

41. Mr. Freiden has taken numerous actions during his tenure at University Village since March 2015 that further demonstrate he is not qualified to acquire and be the provider of a CCRC.

42. Mr. Freiden terminated the Executive Director of University Village, Mr. Tim Parker, without first seeking and obtaining approval from the Office as required by section 628.4615(6), Florida Statutes. Tr. at 453. This termination is also directly contrary to the representation in the Application that no major changes in management were anticipated as part of the acquisition. Ex. R1 at 728 (question 12). A new executive director was then hired without the required notification to and review and approval by the Office. Tr. at 454; see Fla. Admin. Code rr. 690-193.058(4)(requiring continuous updates on the change in a management company), 690-193.002(providing the same definition of "management company" and "manager") & 690-193.007(a manager or management company must demonstrate

compliance with sections 651.022 & 651.1151, Florida Statutes, including biographical information and background reports).

43.   On March 11, 2015, the Agency for Health Care Administration issued an Administrative Complaint against TR&SNF, the operator of the skilled nursing facility at the Health Center, seeking to have its license revoked. Ex. R15a. TRSNF filed a Request for Formal Administrative Hearing which was referred to DOAH and set for final hearing. Ex. R15b-d. Pursuant to Rule 690-193.058, Florida Administrative Code, each provider must immediately notify the Office and submit all pertinent documents regarding any proceeding for the revocation of any license needed to operate a CCRC facility. The license held by TR&SNF is needed to operate University Village. Neither IMH nor any other person or entity on behalf of WHT notified the Office of the pendency of this proceeding.

44.   The 2014 audited financial statement for WHT was due May 1, 2015. Fla. Stat. § 651.026(2)(b). WHT did not timely file an audited financial statement and had failed to do so as of the final hearing in this matter. Tr. at 398. University Village is the only CCRC in the State that did not timely file an audited financial statement this year. Id.

45.   There is no current dispute that the statutory MLR for University Village is underfunded by approximately $400,000 and has been since Fall 2014. Ex. R1 at 93-94; Tr. at 326-27. Mr.

22

Freiden has taken no steps to address this deficiency during his tenure at University Village, despite pledging to the Office upon becoming general partner that he would do so within five business days of a calculation confirming a deficiency. Tr. at 455; Ex. R1 at 468.

46.   While disputed by IMH, the record demonstrates that the MLR is actually underfunded by over $3 million. The statute is unambiguous regarding the entity that must maintain the MLR: "[a] provider shall maintain in escrow a minimum liquid reserve . . . ." Fla. Stat. § 651.035(1)(emphasis added). WHT is the provider for University Village. PHS ¶5b. Three million dollars of the aggregate MLR is held in escrow by USAmeriBank in an account maintained by Westport Nursing Tampa, LLC. Ex. R10. Westport Nursing is not the University Village provider, is not a subsidiary or parent of the provider, has no legal affiliation with WHT and is not authorized to maintain or hold any of the MLR funds.

47.   The Office has the right to access and inspect any records of a CCRC. Fla. Stat. § 651.105(2). WHT is currently subject to a targeted financial examination by the Office. See Fla. Stat. § 624.318. Mr. Freiden has not responded to inquiries and has not provided access to all requested information during this financial examination. Tr. at 453.

48. Each of these actions violates the Florida Insurance Code and reinforces the Office's conclusion that IMH lacks the qualifications to lawfully operate University Village.

49. Mr. Freiden's professed expertise in financial transactions and management as a reason to grant the application is not evidenced by his actions as de facto provider of University Village. In August 2015, Mr. Frieden executed two documents amending the outstanding $15 and $9.5 million loans. Exs. R13 & 17. Mr. Freiden executed one of the loan amendments on behalf of three corporations formerly owned by Mr. Landry, none of which he operates and one of which was dissolved in January 2015. Ex. R18 at 5. Mr. Freiden executed the second on behalf of Westport Nursing Tampa, L.L.C. on August 14, 2015. Ex. R19. Mr. Freiden was not added and BHMS Investments, LP, removed as the managing member of Westport Nursing until September 25, 2015, when the appropriate Articles of Amendment were filed with the Florida Secretary of State. Ex. R20 at 2. The addition and deletion of a corporate managing member is effective only as of the date of the filing. Id. As to these documents, both of which are purported to protect residents' rights, Mr. Freiden signed without apparent legal authority on behalf of corporations and partnerships. While the merits of those transactions are not here at issue, the lack of diligence in executing such important documents is relevant to Mr. Freiden's alleged qualifications.

50.   After becoming general partner, Mr. Freiden retained Novum, LLC, to act as a consultant for the independent living portion of University Village. Ex. P5.[14] Though not allowed by the statute, rule or the existing contract, Novum is acting in a managerial, not consulting, role for WHT without approval by the Office. One of the Novum employees, Mr. Marc Flores, has been granted signatory authority over WHT checking accounts and has signed checks made payable to Novum. Not making the time to sign checks and delegating that authority to a payee/consultant are not sound business practices.

51.   The current financial status of University Village, from what can be gleaned from the documents that have been made available, is unstable at best. In March 2014, BVM and the limited partners obtained $24.5 million in loans to service debt and provide capital for improvements. Occupancy during 2014 increased from 71% to 80% and move-ins exceeded move-outs by forty. Ex. R1 at 346-47. Net entrance fees were $3.6 million in the black. Id. at 350. Yet University Village failed to fully fund its MLR, allowed the refund backlog to increase to almost $3 million[15] and has accumulated over $1 million in accounts payable more than sixty-days overdue. Tr. at 456 & 461. Despite these troubled financial times, Mr. Freiden receives an annual salary of approximately $234,000. Tr. at 208.

52.   Tracking the exact reason(s) for these losses is not possible with certainty due to the refusal of University Village to provide full access to the audited financial statements for fiscal year 2014.[16] However, given that University Village is the only CCRC to have withheld its 2014 audited financial statement, the only CCRC to have failed to respond to a data call regarding refunds, the only CCRC to have overdue refunds and is being run by persons with no CCRC experience leads to the reasonable inference that unqualified management has led to this unfortunate financial situation.

53.   Messrs. Bartle and Freiden aver that these financial woes are the fault of the Office for commencing and continuing an examination. The Office opened a financial examination of University Village on February 11, 2015, based on numerous complaints from residents as well as the available information demonstrating questionable management and financial deterioration. Tr. at 438. Exemplary of the reasons for concern is the inability of the Office to obtain even the most basic information regarding University Village. Over several weeks leading up to the examination, management of WHT was not able to produce a single organization chart of the corporate structure that owned and was operating University Village, instead producing four separate, conflicting charts. Tr. at 440. Even after the examination was commenced and a meeting of all parties

scheduled, WHT remained unable to produce an accurate organizational chart. Tr. at 445.

54.   Two days after the placing an examiner on-site, the Office issued a suspension order. Tr. at 441. Two weeks later, on February 26, 2015, the Office referred WHT to the Department of Financial Services and requested the institution of proceedings to place University Village in receivership. Id. at 442. It took very little time for the breadth and depth of the financial and management problems of University Village to become readily apparent.

55.   The examination was still open at the time of the final hearing. The length of the examination is consistent with other, similar examinations. Tr. at 458-59. It is also apparent that the sole reason the examination has been prolonged is noncooperation from WHT, beginning with Mr. Bartle directing University Village staff to not talk or provide documentation to the Office exam staff at the outset. Tr. at 444.

56.   Mr. Bartle also seemed to argue that University Village was in a dire financial situation due to a comprehensive loss of $4.3 million in 2013. Tr. at 71. However, $3.9 million of that loss was a write-off for "impairment of goodwill," which is the devaluation of an intangible asset calculated pursuant to a two-step process prescribed by generally accepted accounting principles. Ex. R1 at 628 & 623. As explained in the notes to

the Audited Financial Statement, "[a]t December 31, 2013, management determined that an impairment of $3,900,000 was required as the carrying value of goodwill exceeded its estimated implied fair value." Ex. R1 at 637 (emphasis added). Without that figure, which does not reflect on the ground finances, the actual operating deficit for 2013 is decreased approximately 90% to $471,134.

57. The proposed "solution" to the current financial situation is not to seek capital contributions from the partners as contemplated under the 2000 Limited Partnership Agreement as amended, but rather to borrow further against the remaining equity of University Village. Acting on behalf of WHT and with the express consent of Mr. Freiden, Mr. Bartle is seeking to obtain the issuance of $30 million in bonds. Ex. R23a. These bond proceeds would presumably be used for the similar purposes as the 2014 loan proceeds, which supported the CCRC for less than one calendar year under the leadership of BVM and its affiliates.

CONCLUSIONS OF LAW

1. The Office is a state agency within the Financial Services Commission and is responsible for all activities concerning insurers and other risk-bearing entities. Fla. Stat. § 20.121(3)(a)1. WHT is licensed to operate a facility that

undertakes to provide continuing care, is a specialty insurer and, therefore, is subject to regulation by the Office. Fla. Stat. §§ 628.4615(1)(h), 651.011 & 651.013.

2. IMH filed an application to acquire WHT pursuant to section 628.4615, Florida Statutes, which governs the acquisition of specialty insurers. The Office denied this application. On April 16, 2015, IMH timely filed a petition for an administrative proceeding involving disputed issues of material fact pursuant to 120.569 & 120.57(2), Florida Statutes, which was referred to DOAH for further proceedings and entry of a Recommended Order.

3. In invoking the jurisdiction of the Office and the Tribunal in April 2015, IMH alleged in its Petition that "Applicant's substantial interests are affected by OIR's issuance of the [denial] letter." In the Prehearing Stipulation filed November 6, 2015, IMH stipulated that DOAH "has jurisdiction over the parties to and subject matter of this proceeding." PHS ¶6b. In a Motion for Dismissal by Tribunal filed at the commencement of the final hearing on November 12, 2015, IMH asserted for the first time that the denial letter has "no impact upon the substantial interests of Petitioner" and this proceeding "should be dismissed for lack of subject matter jurisdiction."

4.    There was no intervening change in the law or the facts between the dates of filing the Petition and the Prehearing Stipulation and the filing of the Motion for Dismissal. By alleging that "there is no justiciable issue presented for review," IMH is requesting that this Tribunal find that its Petition was filed with no basis in law.[17]

5.    The legal argument forwarded by IMH in its Motion for Dismissal is that IMH did not acquire a sufficient interest in the WHT limited partnership upon becoming general partner to trigger the requirement that it file an application for acquisition.

6.    An application for acquisition must be filed when any person will acquire 10 percent or more of the assets or, in the alternative, of the ownership interest of a specialty insurer by any form of change of control. Fla. Stat. § 628.4615(2)&(13). The election of a new general partner of a limited partnership that is a CCRC provider is a triggering event meeting these criteria and the newly-elected entity or individual is required to file an application for acquisition.

7.    As set forth in detail in Respondent's Memorandum of Law, this conclusion is compelled by interpreting section 628.4615, Florida Statutes, as it applies to generally to limited partnerships and specifically to the facts of this proceeding.

8.   A limited partner is a passive investor and does not participate in the control of the business or partnership.  In turn, a limited partner enjoys limited liability.  The general partner conducts the day-to-day business and affairs of the partnership and controls the partnership's assets for the benefit of the partnership. Unlike the limited partners, the general partner may be responsible for the debts and obligations of the partnership.

9.   Upon being elected general partner of WHT, IMH "acquired" – which means assuming possession or control of - the limited partnership's one asset – University Village – by virtue of the authority vested in it by the 2000 Limited Partnership Agreement, as amended. By operation of the same Agreement, IMH also obtained possession or control over the controlling ownership interest of WHT. Mr. Freiden has made clear his exercise of this sole control, informing University Village management "it's just me here[, i]f you listen to anyone else but me, there's going to be problems." Tr. at 208.

10. Assuming the argument in the Motion for Dismissal is correct in that the only measure for acquisition purposes is made by numerical analysis of an ownership interest and the ownership interest in a limited partnership is measured only by partnership interest, IMH was still required to file the subject

31

application as it currently holds a combined 20.8% partnership interest in WHT.

11. Petitioner's Motion for Dismissal by Tribunal is denied.

12. The acquisition of a specialty insurer such as WHT requires that sufficient evidence be provided upon which the Office can make specific findings on each of the criteria in section 628.4615(8), Florida Statutes. As the applicant for acquisition and the Petitioner for review of the Office's denial, IMH bears the ultimate burden to prove its entitlement to approval by a preponderance of the evidence. Fla. Stat. § 628.4615(8).

13. As set forth in Findings 17 & 29-50, the preponderance of the evidence does not demonstrate that upon completion of the acquisition by IMH, WHT will have satisfied the conditions of the certificate of authority for which it is presently certificated, as required by section 628.4615(8)(a), Florida Statutes, specifically that Mr. Freiden and others involved with the ownership and management of University Village are of reputable and responsible character, as required by section 651.022, Florida Statutes.

14. As set forth in Findings 37-40 & 44-46, the preponderance of the evidence does not demonstrate that the financial condition of IMH is such that it would not jeopardize

32

the financial stability of University Village or prejudice the interests of its residents or the public, as required by section 628.4615(8)(b), Florida Statutes.

15. As set forth in Findings 17 & 29-50, the preponderance of the evidence does not demonstrate that the competence, experience and integrity of those persons who will control directly or indirectly the operation of University Village indicate that the acquisition is in the best interest of the residents of University Village and is in the public interest, as required by section 628.4615(8)(d), Florida Statutes.

16. As set forth in Findings 29-36, the preponderance of the evidence does not demonstrate that the natural persons for whom background information is required to be furnished have such backgrounds as to indicate that it is in the best interests of the residents of University Village and in the public interest to permit such persons to exercise control over University Village, as required by section 628.4615(8)(e), Florida Statutes.

17. As set forth in Findings 29-34 & 42-47, the preponderance of the evidence does not demonstrate that Mr. Freiden has sufficient insurance experience and ability to assure reasonable promise of successful operation, as required by section 628.4615(8)(f), Florida Statutes.

18.   As set forth in Findings 29-50, the preponderance of the evidence does not demonstrate that the management of University Village after the acquisition will be competent and trustworthy, and will possess sufficient managerial experience so as to make the proposed operation of University Village not hazardous to the insurance-buying public, as required by section 628.4615(8)(g), Florida Statutes.

19.   As set forth in Findings 42-47, the preponderance of the evidence does not demonstrate that the management of University Village after the acquisition will not include any person who has directly or indirectly through ownership, control or insurance or business relations unlawfully manipulated the assets, accounts, finances or books of any insurer or otherwise acted in bad faith with respect thereto, as required by section 628.4615(8)(h), Florida Statutes.

20.   As set forth in Findings 29-50, the preponderance of the evidence does not demonstrate that the acquisition is not likely to be hazardous or prejudicial to the residents of University Village or the public, as required by section 628.4615(8)(i), Florida Statutes.

21.   The ultimate burden on all of the above issues remains at all times on IMH. See Department of Banking and Finance v. Osborne Stern and Co., 670 So.2d 932, 934 (Fla. 1996). As to the few matters presented by the Office as further support for

34

denial that were outside of the application, particularly as they relate to violations of the Insurance Code set forth in Findings 42-47, the Office carried its burden of presenting competent, substantial evidence. See Osborne, 670 So.2d at 934 ("the Department had the burden of presenting evidence that appellants had violated certain statutes and were thus unfit for registration") (quoting Osborne, 647 So.2d at 250) (Booth, J., concurring and dissenting)).

22. In making its Recommendation, this Tribunal recognizes the deference to be afforded the Office generally in matters under its substantive jurisdiction and the heightened discretion given the Office regarding this application. See Department of Children and Families v. Davis Family Day Care Home, 160 So.3d 854 (Fla. 2015) ("[D]iscretionary authority is particularly necessary where an agency regulates occupations which are practiced by privilege rather than by right and which are potentially injurious to the public welfare." (internal quotation marks omitted)).

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is RECOMMENDED that the Office of Insurance Regulation enter a final order denying the application for acquisition by IMH Healthcare, LLC.

DONE AND ENTERED this ___ day of ____, 2016, in

Tallahassee, Leon County, Florida.

_____
E. GRAY EARLY
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida 32399-3060
(850) 488-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
This ___ day of ____, 2016.

COPIES FURNISHED:

M. Stephen Turner
Wendy Russell Wiener
Broad and Cassel
215 S. Monroe Street, Ste. 400
Tallahassee, FL 32301
(eServed)

Shaw P. Stiller,
Chief Assistant General Counsel
C. Timothy Gray
Alyssa Lathrop
Patrick Flemming
Assistant General Counsels
Office of Insurance Regulation
Legal Services Office
200 East Gaines Street,
Tallahassee, FL 32399-4206
(eServed)

Anoush Brangaccio, Agency Clerk
Office of Insurance Regulation
200 East Gaines Street,

Tallahassee, FL 32399-4206
(eServed)

Anoush Brangaccio, General Counsel
Office of Insurance Regulation
Legal Services Office
200 East Gaines Street,
Tallahassee, FL 32399-4206
(eServed)

Kevin McCarty, Commissioner
Office of Insurance Regulation
200 East Gaines Street,
Tallahassee, FL 32399-4206
(eServed)

NOTICE OF RIGHT TO SUBMIT EXCEPTIONS

All parties have the right to submit written exceptions
within 15 days from the date of this Recommended Order. Any
exceptions to this Recommended Order should be filed with the
agency that will issue the Final Order in this case.

ENDNOTES

_____

1    References to Exhibits will be made as "Ex. P# at [page #]"
for Petitioner's and "Ex. R# at [page #]" for Respondent's.
References to the transcript will be made at "Tr. at [page #]."
References to the Admitted Facts and Reservations and Statement
of Issues of Law about Which there is Agreement in the
Prehearing Stipulation will be made as "PHS ¶5*" and "PHS ¶6*,"
with the asterisk corresponding to the letter of the referenced
matter of law(¶5) or fact(¶6), respectively.

2    Westport Holdings Tampa II Limited Partnership is the
property owner of the Villas. Ex. R1 at 201-22. Because the
transactions here at issue involve WHT and its certificate of
authority, Westport Holdings Tampa II will not be addressed
separately.

3    Williams Mullen authored an opinion letter regarding the
MLR, so it is assumed that this amount is for attorneys' fees.
See Ex. P3.

4   WEMAMM I, LLC, was listed on an application filed with the Florida Agency for Health Care Administration as the entity providing management for the nursing home portion of University Village. Ex. R15a at 2.

5   "Minimum liquid reserve" is a statutorily-required fund that must be held in escrow by every CCRC. Fla. Stat. §651.035. This fund has three components: the debt service reserve, which must contain sufficient funds to pay principal, interest and taxes for one year; the operating reserve, which must contain sufficient funds to cover certain operating expenses; and the renewal and replacement reserve, which is similar to the operating reserve although directed more at capital expenses. Id.; See Tr. at 314-18. The basic purpose of the MLR is to keep a facility running and the residents safe without the disruption of operations in case of unforeseen problems. Tr. at 317.

6   While there is no direct testimony on the source of the funds, the reasonable inference from the record is that the $1.6 million spent on capital improvements in 2014 was taken from the Capital Expenditure Fund of $1.75 million and not from partnership contributions. Tr. at 65 & Ex. R1 at 43.

7   BVM University Village, LLC was incorporated by Mr. Bartle with BVM as its managing member. Ex. R1 at 446-48.

8   An identical agreement was executed for Westport Holdings Tampa II, LP. Ex. R1 at 270-79.

9   In a document dated June 7, 2014, involving a separate transaction, it is represented that on "[A]pril 1, 2014, BVM Affiliates purchased 99% limited partnership interest in a 722 unit continuing care community in Tampa, Florida. BVM Management/Americare Partners are co-managing that asset and plan on a major rehabilitation of the facility." Ex. R1 at 582.

10   Further evidence of the almost complete corporate overlap and involvement of Mr. Bartle is his dealings with the Inn and Health Center. BVM provides services to the licensed operator of the Inn and Health Center, TR&SNF, by virtue of a Corporate Administration Agreement. Ex. R1 at 479-82. The Agreement was executed on behalf of TR&SNF by S. Louis Jackson. Id. at 482. Messrs. Jackson and Bartle are co-principals of Americare Property Investors, Inc., a firm that provides financial consulting and analysis services to BVM, "and are currently advising BVM on $90,000,000 in acquisition opportunities of

senior care properties in multiple states." Id. at 579. For services rendered in the last seven months of 2014, BVM billed TR&SNF $107,000. Id. at 568-74 & 596. These services were not itemized by hour, day or hourly rate, ranged from union contract negotiations to "oversight for services for recruiting of facility personnel," and included "Regulatory Consulting by Becky Bartle." Id. While wearing many different corporate and partnership cloaks, the persons receiving and exchanging substantial moneys are few and close.

11   Later it was revealed that despite being formed solely for the purpose of becoming the general partner of WHT, BHMSILFGP, LLC was legally ineligible to serve in that capacity. Ex. R1 at 363 & 469.

12    A 2015 Proforma Statement for WHT for 2015 submitted by Compliance as part of the Application sheds no meaningful light on the financial resources of the partnership. Ex R1 at 95.

13   Unaudited financials are used as support data in reviewing an application for a certificate of authority and were expected by the Office as support for the application. Tr. at 340; Fla. Stat. § 651.023(1)(g). IMH could have chosen to supply alternative information, even after representing unaudited financials would be used, but did not do so in the application or at the final hearing.

14   Novum separately applied for a certificate of authority to be the provider at University Village. The Office denied this application on several grounds, including a lack of sufficient experience with the CCRC management and operation. Novum's petition for hearing regarding that denial was referred to DOAH and is currently scheduled for final hearing in January 2016. See Ex. R14.

15   Of the 72 CCRC facilities in Florida, University Village is the only one to have any overdue refunds and the only facility to not response to a data call regarding refund status in June 2015. Tr. at 457. And contrary to the suggestion by counsel for IMH at the final hearing, there is no statutory authority for the Office to allow the use of MLR to pay overdue refunds. See Fla. Stat. § 651.035(6)(any MLR withdrawal can be for only "capital items or major repairs").

[16]   The Office has been supplied a draft audited financial statement without notes, which does not allow for verification of the numbers. Tr. at 460. As Mr. Bartle testified, without the accountant's workpapers and notes, "it's just a number on a piece of paper." Tr. at 109.

[17]   IMH asserts that the application was filed only because it was "required" by the Office. The record is replete with evidence that BVM and WHT agreed to submit an application upon the change in general partner as requested by the Office and had consistently made these representations since 2013. More importantly to this matter, if the position of IMH is that the denial letter is of no import, any "requirement" by the Office that an application be submitted would not justify filing and pursuing for months a petition for administrative review of agency action now alleged to be "of no force or consequence."