STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

IMH HEALTHCARE, LLC,

    Petitioner,

vs.                                    Case No. 15-2495

OFFICE OF INSURANCE REGULATION,

    Respondent.

_____/

## RECOMMENDED ORDER

Pursuant to notice, a final hearing was held in this case on November 12, 13, and 16, 2015, in Tallahassee, Florida, before E. Gary Early, a designated Administrative Law Judge of the Division of Administrative Hearings.

### APPEARANCES

For Petitioner:  Wendy Russell Weiner, Esquire
                    M. Stephen Turner, Esquire
                    Broad and Cassel
                    215 South Monroe Street, Suite 400
                    Tallahassee, Florida  32301

For Respondent:  Shaw P. Stiller, Esquire
                    Clifford Timothy Gray, Esquire
                    Patrick David Fleming, Esquire
                    Office of Insurance Regulation
                    200 East Gaines Street, Room 645.2
                    Tallahassee, Florida  32399-4206

### STATEMENT OF THE ISSUES

Whether Petitioner, IMH Healthcare, LLC, was required to submit an application for acquisition of Westport Holdings



#3667.1

Tampa, L.P., d/b/a University Village, a specialty insurer licensed to operate a facility that undertakes to provide continuing care, pursuant to section 628.4615, Florida Statutes, and, if so, whether Petitioner has proven its entitlement to approval of the acquisition application.

PRELIMINARY STATEMENT

On March 27, 2015, the Office of Insurance Regulation (OIR or Respondent) issued its notice of denial of acquisition application (Application) to IMH Healthcare, LLC (Petitioner).

On April 16, 2015, Petitioner filed its "Request for Hearing Pursuant to Section 120.57(1) Florida Statutes before the Division of Administrative Hearings," by which Petitioner disputed the bases for OIR's notice of proposed agency action.

On May 4, 2015, Respondent referred the petition to the Division of Administrative Hearings. The case was assigned to the undersigned, and the final hearing was scheduled for September 21 through 24, 2015. The final hearing was continued and rescheduled for November 12, 13, 16, and 17, 2015, and was held as scheduled.

On the morning of November 12, 2015, Petitioner filed a Motion for Dismissal by Tribunal, in which Petitioner alleged that the interest in Westport Holdings Tampa, L.P., by IMH Healthcare, LLC, was insufficient to meet the threshold interest necessary to require the filing of an acquisition application,

2

#3667.2

and requesting that the proceeding be dismissed for lack of subject matter jurisdiction.  The Motion was taken under advisement.  The Motion is hereby denied, with the issue raised being addressed in the Conclusions of Law herein.

At the final hearing, Petitioner presented the testimony of John W. Bartle, the president of BVM Management, Inc.; Eliyahu Freiden, the sole member of IMH Healthcare, LLC; Douglas Klinowski, the CEO of NOVUM, LLC; and Desmond Wilson, an employee of OIR.  Petitioner's Exhibits 1-6, 8, 10, 12, 13, 16, 17, 23, 26, 27, 31, 33 through 36, 40, and 41 were received into evidence.

By agreement of the parties, rebuttal evidence in the form of the deposition testimony of Steven H. Parton, Esquire, was filed on December 8, 2015, and is accepted in evidence as Petitioner's Rebuttal Exhibit 1, and given weight as though Mr. Parton testified at the final hearing.

Respondent presented the testimony of Rebecca Griffith, who was, at all times relevant to this proceeding, a financial examiner and supervisor of OIR's CCRC section; and Carolyn Morgan, OIR Director of Life and Health Oversight.  Respondent's Exhibits 1, 9, 9A, 10, 12-15, 18-20, 22, and 23A were received in evidence.

On December 8, 2015, the four-volume Transcript of the proceedings was filed.  The parties timely filed Proposed

#3667.3

Recommended Orders, which have been duly considered by the undersigned in the preparation of this Recommended Order.

On December 22, 2015, Petitioner filed a Motion to Substitute Petitioner's Exhibit 33, requesting that a revised biographical affidavit of Mr. Freiden be substituted for the exhibit introduced at the final hearing, for the sole purpose of redacting confidential personal information. The OIR had no objection to the substitution. The motion is granted, and Petitioner's revised Exhibit 33 is accepted in lieu of the original Petitioner's Exhibit 33.

References to statutes are to Florida Statutes (2015).

FINDINGS OF FACT

1.  The Department of Financial Services (Department) is the agency of the State of Florida having authority, among its other duties and responsibilities, to enforce the provisions of the Florida Insurance Code.

2.  The Financial Services Commission is a separate and independent budget entity within the Department composed of the Governor, the Attorney General, the Chief Financial Officer, and the Commissioner of Agriculture. § 20.121(3), Fla. Stat.

3.  The OIR is the agency within the Financial Services Commission responsible for all activities concerning insurers and other risk-bearing entities as provided under the Florida Insurance Code. § 20.121(3)(a)1., Fla. Stat.

#3667.4

4.   Westport Holdings Tampa, L.P. (Westport), is a limited partnership formed and existing under the laws of the State of Delaware.  Westport operates the University Village continuing care retirement community (CCRC) in Hillsborough County, Florida.

5.   IMH Healthcare, LLC, is a limited liability corporation formed on March 24, 2014, and is in good standing under the laws of the State of Delaware.

6.   CCRCs offer a continuum of services that generally consist of independent living units, assisted living units, and skilled nursing care on a single campus.  Persons choosing to live in a CCRC will typically start out in an independent living unit.  As their needs change, they may move to an assisted living unit in which they may receive assistance and supervision for their activities of daily living.  As residents of the CCRC transition to needing more care due to age, injury, or infirmity, they are entitled to care in the skilled nursing facility.

7.   In order to become a resident of a CCRC, a person enters into an individual continuing care contract with the CCRC.  That contract, which includes an up-front entrance fee, part of which may be refundable, and monthly payments, is treated as the equivalent of a policy of insurance.  Therefore,

5

#3667.5

the owners and operators are regulated as "specialty insurers" and are required to obtain certificates of authority from OIR.

8.   Westport currently holds a certificate of authority to operate the University Village CCRC pursuant to chapter 651, Florida Statutes.

9.   University Village accommodates the spectrum of care at a single campus.  Independent living facilities consist of 446 apartments in two multi-story apartment buildings known as the Towers, and 46 patio homes known as the Villas.  The assisted living facility and skilled nursing facility, which includes a memory care facility, are housed in a three-story facility, generally known as the "health center," located across the street from the independent living facilities.  The skilled nursing facility, containing 120 beds, is located on the first floor, with the remaining 110 assisted living units located on the second and third floors.  University Village currently has more than 400 residents.

10.   A person seeking to acquire a "triggering" ownership interest in a CCRC with an existing certificate of authority must file an application for acquisition under section 628.4615. The application is subject to review under statutory criteria designed to ensure the protection of the residents and the public.

#3667.6

11. Westport has two partnership percentage interests; a 99-percent limited partnership interest, and a one-percent general partnership interest. Westport is governed by the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement, dated October 23, 2000, as subsequently amended.

12. Prior to March 2014, Westport Holdings University Village, LLC, held the one-percent general partnership interest and Westport Senior Living Investment Fund, L.P. (WSLIF) held the 99-percent limited partnership interest. Larry Landry was the president and sole manager of both entities.

13. During the period leading up to the filing of the acquisition application by Petitioner, management of University Village was performed by AgeWell Senior Living, LLC. The executive director was Tim Parker, who had served in that role for a lengthy period.

14. In 2006, Westport entered into two notes payable totaling $32,250,000, both of which related to and were secured by University Village. The original maturity date of both loans was January 2010. The maturity date was extended to January 2012 by the original lender, Capmark Bank, conditioned, in part, on a $10 million principal reduction payment.

15. In August 2012, Horizon LP UV Lender, LLC (Horizon), purchased the debt, the obligations of which Westport was not keeping current. The maturity date was extended by agreement

#3667.7

multiple times, with the last extension expiring December 15, 2013.

16. By 2013, OIR had become concerned with the lack of funds to catch up on deferred maintenance to the University Village buildings, which included extraordinary maintenance to roofs and chillers, HVAC equipment, and the like, and with the amount maintained in reserve for the deferred maintenance and refunds. By February 28, 2014, the amount of refunds payable was estimated at $1.7 million.

17. In early to mid-2013, BVM Management, Inc. (BVM Management) became interested in acquiring the 99-percent limited partnership interest in Westport. BVM Management is a 501(c)(3) charitable purpose corporation. It holds assets in affordable housing and senior housing, and offers consulting services to approximately 40 skilled nursing facilities and continuing care retirement communities.

18. BVM Management's president is John W. Bartle, whose scope of work includes identifying special assets that are in some event of foreclosure or distress, usually with banks or bankruptcy courts, receiverships, and conservatorships.

19. In mid-2013, Mr. Landry and Mr. Bartle, among others, met with representatives of OIR to discuss the proposed acquisition of Westport's 99-percent limited partnership ownership interest by BVM Management. By that time, OIR was

#3667.8

very engaged in the status of University Village, monitoring its operations on almost a monthly basis.  It was discussed that the acquisition would allow for the infusion of capital into Westport and University Village to address OIR's concerns. During that meeting, a decision as to whether the acquisition of Westport's 99-percent limited partnership interest would trigger a requirement for the purchaser to file an acquisition application was deferred.

20.   BVM Management undertook to arrange for the issuance of tax-exempt bonds to raise the capital to acquire Westport's 99-percent limited partnership interest and provide funding to meet OIR's concerns.

21.   On August 11, 2013, BVM Management/Westport Holdings, L.P., entered into a Limited Partnership Purchasing Agreement to purchase WSLIF's 99-percent limited partnership interest in Westport.

22.   On December 6, 2013, OIR advised Mr. Landry "that if BVM buys the [99-percent] limited partnership interest of Westport Holdings Tampa, LP, that it would not be required to file an acquisition application."  However, OIR requested the submission of a Corrective Action Plan to address BVM's "financial stability, debt structure, the management company, marketing efforts, etc."

#3667.9

23. The parties to the Limited Partnership Purchasing Agreement attempted to close before the December 15, 2013, loan maturity date expiration. However, due to the inability of the bond underwriter to deliver tax exempt bonds at the expected price, the closing did not occur.

24. As a result of the failure to close the sale of the 99-percent ownership interest, Horizon began to pursue foreclosure. Before that occurred, Horizon issued a forbearance through March 31, 2014.

25. After consultation with the accounting firm that was performing the feasibility study and market study, Mr. Bartle contacted lenders that might be interested in financing the University Village property. He approached USAmeriBank and Columbia Pacific Investment Fund (CPIF) Lending, LLC, with a structure for financing that would require additional limited partners as purchasers instead of BVM Management.

26. Thereafter, BVM Management located investors interested in purchasing Westport's 99-percent limited partnership interest.

27. On March 29, 2014, a Promissory Note was entered which provided that its $1 million principal sum and interest would be paid to "Westport Senior Investment Fund, Limited Partnership, . . . attention Larry L. Landry,"[1] either upon delivery by BVM University Village, LLC, of "the Second 2014 Amendments to the

10

#3667.10

Limited Partnership Agreements of Westport Holdings Tampa Limited Partnership . . . and Westport Tampa II, Limited Partnership," by which the general partnership interest would be transferred, or upon the Note's July 1, 2014, maturity date.  At the time, pursuant to a conditional Partnership Interest Transfer Agreement, it was anticipated that the Westport one-percent general partnership interest would be transferred from Westport Holdings University Village, LLC, to BHMSILFGP, LLC.

28.  On March 31, 2014, WSLIF sold its 99-percent limited partnership interest in Westport to a group of limited partners.

29.  Westport Holdings University Village, LLC, retained its one-percent interest in Westport as the general partner. The one-percent general partnership interest was not transferred to BHMSILFGP, LLC.

30.  The sale of the limited partnership interest was memorialized in the First 2014 Amendment of Limited Partnership Agreement (Tampa), by which the limited partnership interest was sold and conveyed by WSLIF to BVM University Village, LLC. Immediately thereafter, and as part of the same transaction, the 99-percent limited partnership shares were allocated to the limited partners as follows:

| | | |
|---|---|---|
| BVM University Village, LLC | -- | 39.6% |
| BHMSILF, LLC | -- | 26.4% |
| IMH Healthcare, LLC | -- | 19.8% |
| JF Consultants, LLC | -- | 13.2% |

#3667.11

31. Pursuant to the First 2014 Amendment of Limited Partnership Agreement (Tampa), a majority interest of the four limited partners are entitled to remove Westport's general partner, approve or disapprove the appointment of a successor general partner, dissolve the partnership, and amend the limited partnership agreement.

32. Also on March 31, 2014, the limited partners authorized Westport to enter into two loan agreements, the proceeds from which were used to retire existing debt, to fund repairs and renovations of independent living units, and for other purposes related to the CCRC.

33. As part of the loan transactions, Westport Nursing, LLC, was "spun off" of Westport as an accommodation of the loan agreement with USAmeriBank described below. It is not known if that transaction was reported to OIR, and it was not explained whether the transaction affected Westport's certificate of authority to operate the University Village CCRC.

34. One loan, in the amount of $9.5 million, was taken out by Westport Holdings Tampa, L.P., and Westport Holdings Tampa II, L.P. The lender was CPIF Lending, LLC. The loan was secured by a mortgage on the independent living facilities. Loan proceeds of $5.6 million were used to pay existing mortgage debt, and loan proceeds of $1.75 million were disbursed to a "capital expenditure reserve" for facility improvements in the

12

#3667.12

form of "replacements and alterations." The remaining proceeds went to various expenses, including $1 million to the seller of the partnership interest.

35. The other loan, in the amount of $15 million, was taken out by Westport Nursing, LLC. The lender was USAmeriBank. Proceeds were to be used for the benefit of the assisted living and nursing care facility. The loan was also used to fund $3 million of "minimum liquid reserve" (MLR) for University Village, which was then pledged as cash collateral to secure the loan. The cash collateral was not contributed by BVM or the new limited partners.

36. The owner or operator of a CCRC is required to · maintain the MLR in an escrowed account to cover expenses of the CCRC in the event of financial difficulties. The MLR consists of an amount equal to principal and interest payments due during the next 12 months on any mortgage loan or other long-term financing of the facility, including property taxes; an operating reserve equal to 15 percent of the total annual operating expenses; and a renewal and replacement reserve equal to 15 percent of the facility's average operating expenses for the past three fiscal years.

37. An owner or operator of a CCRC may satisfy the MLR requirements by acquiring a clean, unconditional, irrevocable letter of credit equal to the sum of the three parts. The

13

#3667.13

letter of credit must be issued by a financial institution participating in the State of Florida Treasury Certificate of Deposit Program, must name OIR as beneficiary, and must be approved by OIR before issuance.

38.   BVM Management, because of its more established financial footings, was required to guarantee both loans due to uncertainty on the part of the lenders as to whether University Village could "turn-around" in a two or three-year period.

39.   Neither of the loans involved any contribution or investment of cash or assets by the new Westport limited partners or BVM Management.  Rather, the loans were obtained, and costs paid, by pledging the equity in the independent living facilities and the assisted living and skilled nursing health center and collateralizing cash from the existing MLR.

40.   By April 2, 2014, OIR was made aware of the acquisition of the 99-percent partnership interest in Westport by the group of limited partners, and was provided with a copy of the First 2014 Amendment of Limited Partnership Agreement (Tampa).

41.   Although far greater than 10 percent of the ownership interest in Westport was transferred as a result of the transaction, OIR did not require that the entities acquiring the 99-percent partnership interest, either individually or as a group, submit an acquisition application.

14

#3667.14

42.   On April 18, 2014, OIR sent a request to Westport for a "Corrective Action Plan" to address BVM's purchase of the Westport limited partnership interest, the uncertainty regarding ownership of the facility, a steady increase of overdue refunds, and delayed capital improvements to the University Village campus.

43.   BVM Management was retained by Westport to extricate the existing operator of the health center by canceling the lease and moving the personnel away from the property.

44.   By the fall of 2014, OIR determined the Westport MLR was underfunded by $300,000 to $400,000.

45.   Between April and December 2014, BVM Management commissioned a physical needs assessment (PNA) of the University Village physical plant.  The PNA identified approximately $2.5 million in needed improvements over a five-year period. Projected needs included repair and replacement of roofs, HVAC units, guttering, and similar structural improvements.

46.   After the acquisition of the 99-percent partnership interest in Westport by the group of limited partners, $1.6 million was spent to remodel 106 residential units, with the improvements in the nature of new appliances and cabinetry, elevator repairs, and wireless internet.  The improvements, though needed, were not those identified in the PNA.

#3667.15

47. From April through December 2014, Westport Holdings University Village, LLC, remained as Westport's general partner. During that period, Mr. Landry was an infrequent visitor to the University Village campus. OIR began to receive communications from residents of University Village that Mr. Bartle was acting as a spokesperson for University Village, and had taken a visible role in facility operations and capital improvements.

48. Improvements at the facilities and changes in University Village policies and procedures were conveyed by BVM Management to Westport's existing managing agent, AgeWell Senior Living, LLC, which then communicated instructions to Westport's employees. BVM Management provided many services in the independent living portion of University Village, including oversight of construction and renovation, preparation of compliance reports due to lenders, oversight of the capital expenditure budget, approval of contracts, oversight of renovations, and assisting with marketing and public relations.

49. On December 22, 2014, BVM University Village, LLC; Westport Senior Investment Fund, L.P.; AgeWell Senior Living, LLC; Westport Holdings Tampa, L.P.; and Westport Holdings Tampa II, L.P., entered into an Amendment to Promissory Note by which the due date for payment of sums under the note was extended, and by which the parties acknowledged that the management

16

agreement with AgeWell Senior Living, LLC, would not be renewed upon its January 31, 2015, expiration.

50. On December 29, 2014, Westport Holdings University Village, LLC, resigned as Westport's general partner. A copy of the resignation was provided to OIR on that same day.

51. On December 29, 2014, after learning of the resignation of Westport Holdings University Village, LLC, as Westport's general partner, OIR sent an email to Mr. Bartle advising him that the "person or affiliated person" assuming the role of Westport's general partner would be required to complete and file an acquisition application pursuant to section 628.4615(2).

52. On January 2, 2015, OIR received a letter of notification regarding the proposed appointment of BHMSILFGP, LLC, as Westport's new general partner. The submission requested a waiver of the requirement to file an acquisition application. OIR denied the request.

53. The March 29, 2014, Second 2014 Amendment to the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement was never executed, and BHMSILFGP, LLC, did not become the Westport general partner.

54. On January 26, 2015, Westport's limited partners elected Compliance Concepts, LLC, as Westport's general partner. Compliance Concepts, LLC, was the managing member of BVM

17

#3667.17

University Village, LLC, a 39.6-percent limited partner of Westport.

55. On or about February 9, 2015, Compliance Concepts, LLC, filed an acquisition application with OIR. OIR determined the acquisition application to be incomplete.

56. On February 11, 2015, OIR commenced an examination of the Westport CCRC. An OIR field staff examiner was assigned to University Village, and provided with office space in a University Village building.

57. Upon arrival at University Village, the OIR examiner requested the books and records of the Westport CCRC. The records were not immediately produced. The evidence suggests that the reason for the delay in production was a desire on the part of Westport to have its attorney review the documents and approve their being turned over to the OIR examiner.

58. On February 13, 2015, OIR issued an Initial Order of Suspension to Westport. The basis for the suspension order included the failure to immediately turn over financial records, as well as the operation and management of University Village by unapproved persons. Westport challenged the suspension order, thus staying its effect.

59. On February 20, 2015, OIR sent a notice requesting additional information regarding the Compliance Concepts, LLC, acquisition application. The response was due on February 27,

18

#3667.18

2015.  The notice did not request "background information issues," which request was to be made under separate cover.

60.  On February 26, 2015, OIR made a request to DFS for the appointment of a receiver to manage the operation and finance of the Westport CCRC.  At that point, with the request being in the nature of pending litigation, OIR required that all communications or meetings between Westport and OIR be arranged through counsel.

61.  On or about March 2, 2015, Compliance Concepts, LLC, resigned as Westport's general partner, and Petitioner was elected by Westport's limited partners as its general partner.  As such, Petitioner was assigned Westport's one-percent general partnership interest.  The assignment was not accompanied by any monetary consideration.

62.  By letter dated March 2, 2015, OIR was informed that Petitioner, a 19.8-percent limited partner, had been elected as Westport's new general partner.  The March 2, 2015, letter also advised OIR that the Compliance Concepts, LLC, acquisition application would be updated and supplemented to reflect the change of ownership of Westport and its general partner.

63.  Along with its March 2, 2015, letter, Westport provided a response to the February 20, 2015, request for additional information regarding the Compliance Concepts, LLC, acquisition application.

#3667.19

64. On March 6, 2015, Petitioner filed a "Statement of Acquisition Merger or Consolidation of a Specialty Insurer Pursuant to Florida Statutes 628.4615." Petitioner was identified as the "Acquiring Company" and Westport was identified as the "Specialty Insurer Affected."

65. The application was submitted as an amendment to the application for acquisition filed by Compliance Concepts, LLC. In addition to information regarding Petitioner and its managing member, Eliyahu Freiden, the application relied in large part on information submitted in the Compliance Concepts, LLC, acquisition application.

66. Mr. Freiden is Petitioner's sole and managing member. Petitioner has no employees. As such, Petitioner's competence, experience, and integrity are largely and fairly attributable to Mr. Freiden.

67. Over the course of several months, OIR received a series of organizational charts offering different descriptions of Westport's ownership and managerial structure.

68. The revised acquisition application contained no financial information regarding Mr. Freiden or Petitioner.

69. Mr. Freiden signed a Waiver of Public Hearing and Request for Approval and "respectfully request[ed] that the Director of the Office of Insurance Regulation approve the acquisition immediately."

#3667.20

70.   OIR did not request additional information regarding Petitioner's acquisition application.

71.   On March 27, 2015, the OIR director issued a notice of denial of the acquisition application.  The notice provided that the denial was based on Petitioner's failure to meet the requirements for approval set forth in section 628.4615(8)(a), (8)(b), and (8)(d)-(i).

Mr. Freiden's Educational and Employment History

72.   Mr. Freiden studied Talmudic law at Neveh Zion Talmudic University in Israel.  He also studied biology and business management at Touro College in Brooklyn, New York. Mr. Freiden did not obtain a degree from Touro College, or elsewhere, choosing to terminate his studies to pursue employment.

73.   Since entering the work force, Mr. Freiden has held a number of positions with various companies.

74.   From January 2000 until June 2003, Mr. Freiden was involved in marketing and sales for the Carnival cruise line.

75.   From June 2003 until May 2007, Mr. Freiden was the principal and officer of Rental Quest, LLC, a property management company.  During that period, the company managed hundreds of units of real estate in Connecticut.

76.   From May 2007 to August 2008, Mr. Freiden was employed as a senior account manager for HYC Logistics, a customs

#3667.21

clearinghouse and shipping brokerage firm. His duties included sales and office management.

77. From August 2008 to June 2012, Mr. Freiden was a senior account manager and supervisor for Primesource National, a company engaged in managing skilled nursing facilities. His duties included financial oversight of 30 skilled nursing facilities in the Midwest, specifically regarding their budgets, expenses, purchasing, and regulatory surveys. Mr. Freiden's duties included on-site visits to the facilities.

78. From June 2012 to November 2013, Mr. Freiden was an analyst and office director for Greystone Financial Group, a bank in Manhattan. His duties included property loan underwriting, and management of a team of loan originators.

79. From September 2012 to the present, Mr. Freiden has been the principal and officer of Human Assurance, LLC, a credit reporting company engaged in providing background screening for healthcare facilities, daycare facilities, employment, and multi-family rental facilities.

80. Mr. Freiden has no criminal history or record, has never been reprimanded by an employer, and has no negative professional disciplinary history.

81. Mr. Freiden is heavily engaged in his community at his local synagogue, with the local YMCA, and with the creation of a

#3667.22

girls' Jewish high school.  No evidence was presented that Mr. Freiden is not of reputable and responsible character.

82.  Mr. Freiden has no specific education, expertise, or formal training in insurance, or in CCRCs.  He has never applied for an insurance license or a license in the healthcare field. He is not a healthcare professional.  Mr. Freiden had no experience with operating a CCRC prior to his involvement at University Village beginning in March 2015.

83.  The focus on an applicant's education and experience is for the purpose of determining the applicant's background in the subject.  The education and experience required of an applicant must be related to the applicant's ability to operate and manage a CCRC facility, and not merely the applicant's ability to hire others with the necessary education and experience to perform those duties.

Mr. Freiden's Background Information

84.  Section 628.4615(8)(e) provides that "natural persons for whom background information is required [must] have such backgrounds as to indicate that it is in the best interests of the insureds of the specialty insurer and in the public interest to permit such persons to exercise control over the specialty insurer."

85.  Petitioner submitted a biographical affidavit and a fingerprint card for Mr. Freiden.

23

#3667.23

86. The acquisition application form provides that "[b]ackground reports must be submitted by the selected background investigator vendor directly to OIR prior to or contemporaneously with the submission of the application filing." The background investigation must be performed by an external company that has been approved by the National Association of Insurance Commissioners. The person submitting the application must pay for the background check and contact the approved vendor who is responsible for submitting the report to OIR. The report provides, among other items, background information from court records and other sources, and is crucial as verification of the information submitted by the applicant by an approved third party.

87. The record of this proceeding contains a report generated by Accurint, a LexisNexis company, which includes information allegedly obtained from the Florida Department of Financial Services, as well as information from an undetermined source. The record is not clear as to whether the background information was provided by Petitioner or was accessed by OIR. In either event, the information does not comply with the established standards for background information.

Petitioner's Financial Capabilities

88. The only assets of IMH identified in the record are its limited (19.8 percent) and general (one-percent) partnership

24

#3667.24

#3667.25

interests in University Village. IMH was formed on March 24, 2014, one week before it acquired its limited partnership interest in Westport. Since the funding of the purchase of the limited partnership interest was accomplished through loans secured by Westport's existing facilities, and guaranteed by BVM Management, and since there was no evidence of any cash contribution by the limited partners, IMH has no apparent financial investment in Westport.

89. As part of the revised acquisition application, IMH submitted a letter from Ark Real Estate Group, LLC, which indicated that Ark Real Estate Group, LLC, "has the capacity to provide up to $5,000,000.00 (Five Million Dollars) in capital or subordinated debt to ensure that [IMH] has sufficient liquidity to support its role as limited partner. If you would like a formal term sheet for this commitment, please advise." The financial stability and ability of Ark Real Estate Group, LLC, to provide such funds is unknown. The letter itself is vague, and does not establish Petitioner's ability to access cash or credit.

90. The information provided in the acquisition application was insufficient to establish the financial condition of IMH.

#3667.26

Other Financial Issues

91.   The 2014 audited financial statement for Westport was due May 1, 2015.  Westport did not timely file an audited financial statement and had not done so as of the final hearing in this matter.  Although a draft report was provided, it did not include auditor's notes necessary to evaluate the "going concern" portion of the audit.  University Village is the only CCRC in Florida that did not timely file a 2014 audited financial statement.

92.   The statutory MLR for University Village is underfunded by approximately $400,000, and has been since fall 2014.  On January 21, 2015, the CFO for University Village advised OIR that the MLR "is under funded by $370,324" and that there would be "a plan in place to have this shortfall funded within 30 days."  Petitioner has not addressed the MLR deficiency since becoming Westport's general partner, despite the statement in the March 2, 2015, Response to Clarification Letter that the deficiency would be replenished within five business days of a calculation confirming a deficiency.

93.   Westport is currently subject to a targeted financial examination by OIR.  The preponderance of the evidence indicates that Petitioner has not responded to OIR inquiries and has not provided access to requested information during the financial examination.

94.  Payments to vendors supplying goods and services to University Village are approximately $1 million in arrears, with some vendor invoices being more than 60 days past due.  However, no services have been denied to residents.

95.  The March 31, 2014, loans secured by the University Village facilities, which loans total $24.5 million, come due in March 2016.

BVM Management

96.  BVM Management, and its president, Mr. Bartle, have been extensively engaged in the operations of Westport, starting with BVM Management's mid-2013 interest in acquiring Westport, to its guarantee of loans to buy Westport's 99-percent limited partnership interest, and extending to Mr. Bartle's participation as a representative of the acquiring entities in meetings with OIR.

97.  Beginning in April 2014 and extending through October 2014, BVM Management engaged in merger discussions between Westport's designated facility manager, AgeWell Senior Living, LLC, and BVM Management beginning in April 2014 and extending through October 29, 2014.  During that period, a lot of the work being done on the campus was coordinated between AgeWell Senior Living, LLC, and BVM Management.  Although AgeWell Senior Living, LLC, had the management contract and was the OIR-identified overall management agent, BVM Management was

#3667.27

#3667.28

participating in the plan of finance and the rehabilitation of the facility, and was involved in "extricating" the operator of the Westport health center. During that period, AgeWell Senior Living, LLC, personnel and BVM Management personnel were working in tandem on several projects.

98. There were up to six BVM Management employees on the campus at any one time. Although Mr. Bartle was not the most frequent BVM Management employee on the campus, he tended to go to the board meetings or the finance committee meetings, and would make presentations for the health center and its financial condition.

99. BVM Management's presence on the facility grounds has remained active, particularly since the termination of AgeWell Senior Living, LLC, as the CCRC manager upon the expiration of its management contract, and the termination of the long-term executive director, Tim Parker.

100. Because of Mr. Bartle's ongoing involvement with the operations of University Village, and BVM Management's substantial financial ties as guarantor for the two loans, OIR sought background information on Mr. Bartle as a person indirectly involved with the management of an acquiring entity.

101. Petitioner's acquisition application was absent any information regarding BVM Management or Mr. Bartle. In response to its inquiries for background and biographical information,

28

OIR received only a handwritten note with the phrase "To be sent". No further information was provided. As a result, OIR has little information regarding Mr. Bartle's past employment, personal information, or financial background.

Management and Consulting Services - NOVUM, LLC

102. On May 15, 2015, after Petitioner became Westport's general partner, Westport contracted with NOVUM, LLC, for "consulting management" services for the independent living facilities (Retirement Center) of University Village. NOVUM, LLC, has a background in nursing homes.

103. NOVUM, LLC, has management contracts "with a couple of buildings" in Florida. The context of the testimony suggests that the services are performed at assisted living facilities, but the exact nature of the facilities was not described. Services provided include day-to-day operations, installing budgets, hiring and firing staff, training and development, and ensuring regulatory compliance.

104. NOVUM, LLC, employs persons with education in science and healthcare management, and with experience in independent living facilities, assisted living facilities, and skilled nursing facilities.

105. NOVUM, LLC, has provided services on behalf of Westport, including accounting, financial record keeping and reporting, marketing, sales, and attendance and participation in

29

#3667.29

resident board meetings. NOVUM, LLC, has been engaged in hiring recommendations, including those for the executive director, director of sales, administrator of the assisted living facility, directors of nursing, and other staff positions. NOVUM, LLC, has Westport bank account signature authority, which it exercises in paying vendors, including NOVUM, LLC, itself.[2/]

106. Mr. Freiden regularly meets with NOVUM, LLC, employees who are on the University Village campus on a daily basis.

107. After the termination of former executive director, Tim Parker, efforts to find a replacement have proven difficult. During the vacancy, Mr. Freiden testified, in response to a question as to whether the duties of the CCRC manager's executive director were "going unmet," that "I feel like we've got five executive directors. Besides Marc Flores, [NOVUM, LLC's] chief operational officer, who's there every day and myself who act in that position, everybody knows they can grab someone from NOVUM or myself at any given time and we fill those shoes very well."

108. The preponderance of the evidence indicates that NOVUM, LLC, is performing managerial duties for University Village as described in Florida Administrative Code Rule 690-193.002(13).

#3667.30

109. Rule 69O-193.007 requires that "[e]ach manager or management company must demonstrate that it meets the requirements of Section 651.022, F.S., and that the management agreement conforms with the cancellation requirements of Section 651.1151, F.S."

110. There is no evidence that Petitioner, Westport, or NOVUM, LLC, has made the requisite demonstration that NOVUM, LLC, meets the requirements of section 651.022.

CONCLUSIONS OF LAW

A.  Jurisdiction

111. The Division of Administrative Hearings has jurisdiction over the subject matter of this proceeding and of the parties thereto pursuant to sections 120.569 and 120.57(1), Florida Statutes (2015).

B.  Standards

112. Section 628.4615(1)(h) defines a "specialty insurer" as including "[a] provider that is licensed to operate a facility that undertakes to provide continuing care as those terms are defined in s. 651.011."

113. Section 628.4615(2) provides, in pertinent part, that:

> (2)  A person may not, individually or in conjunction with any affiliated person of such person, directly or indirectly, . . . conclude an acquisition of, or otherwise finally acquire, 10 percent or more of the

#3667.31

ownership interest of a specialty insurer which is not a stock corporation or of a controlling company of a specialty insurer which is not a stock corporation, unless:

(a)   The person or affiliated person has filed with the office and sent by registered mail to the principal office of the specialty insurer and controlling company a letter of notification . . . .

(b)   The person or affiliated person has filed with the office an application signed under oath and prepared on forms prescribed by the commission which contains the information specified in subsection (4).

114.   Section 628.4615(4) establishes the information that must be provided by the applicant for acquisition as follows:

(4)   The application to be filed with the office and furnished to the specialty insurer and controlling company shall contain the following information and any additional information as the office deems necessary to determine the character, experience, ability, and other qualifications of the person or affiliated person of such person for the protection of the insureds of the insurer and of the public:

(a)1.   The identity of, and the background information specified in subsection (5) on, each natural person by whom, or on whose behalf, the acquisition is to be made; and,

2.   If the acquisition is to be made by, or on behalf of, a person other than a natural person and as to any person who controls, either directly or indirectly, such other person, the identity of, and the background information specified in subsection (5) on:

a.   Each director, officer, or trustee, if a corporation, or

32

#3667.32

b.  Each partner, owner, manager, or joint venturer, or other person performing duties similar to those of persons in the aforementioned positions, if not a corporation, for the person.

(b)  The source and amount of the funds or other consideration used, or to be used, in making the acquisition.

(c)  Any plans or proposals which such persons may have made to liquidate the specialty insurer, to sell any of its assets or merge or consolidate it with any person, or to make any other major change in its business or corporate structure or management; and any plans or proposals which such persons may have made to liquidate any controlling company of the specialty insurer, to sell any of its assets or merge or consolidate it with any person, or to make any other major change in its business or corporate structure or management.

(d)  The nature and the extent of the controlling interest which the person or affiliated person of such person proposes to acquire, the terms of the proposed acquisition, and the manner in which the controlling interest is to be acquired of a specialty insurer or controlling company which is not a stock corporation.

(e)  The number of shares or other securities which the person or affiliated person of such person proposes to acquire, the terms of the proposed acquisition, and the manner in which the securities are to be acquired.

(f)  Information as to any contract, arrangement, or understanding with any party with respect to any of the securities of the specialty insurer or controlling company, including, but not limited to, information relating to the transfer of any of the securities, option arrangements, puts or

33

#3667.33

calls, or the giving or withholding of proxies, which information names the party with whom the contract, arrangement, or understanding has been entered into and gives the details thereof.

(5)(a)  The information as to the background and identity of each natural person, which information is required to be furnished pursuant to paragraph (4)(a), shall include:

1.  The natural person's occupations, positions of employment, and offices held during the past 10 years.

2.  The principal business and address of any business, corporation, or organization in which each such office of the natural person was held, or in which each such occupation or position of employment was carried on.

3.  Whether the natural person was, at any time during such 10-year period, convicted of any crime other than a traffic violation.

4.  Whether the natural person has been, during such 10-year period, the subject of any proceeding for the revocation of any license and, if so, the nature of the proceeding and the disposition of the proceeding.

5.  Whether, during the 10-year period, the natural person has been the subject of any proceeding under the federal Bankruptcy Act; or whether, during the 10-year period, any person or other business or organization in which the natural person was a director, officer, trustee, partner, owner, manager, or other official has been subject to any such proceeding, either during the time in which the natural person was a director, officer, or trustee, if a corporation, or a partner, owner, manager, joint venturer, or other official, if not a corporation, or within 12 months thereafter.

#3667.34

6.  Whether, during the 10-year period, the natural person has been enjoined, either temporarily or permanently, by a court of competent jurisdiction from violating any federal or state law regulating the business of insurance, securities, or banking, or from carrying out any particular practice or practices in the course of the business of insurance, securities, or banking, together with details as to any such event.

7.  Fingerprints of each person referred to in subsection (4).

115.  The provisions of section 628.4615(8), upon which OIR based its Denial of Acquisition Application, are as follows:

(8)  The person or persons filing the application required by subsection (2) shall have the burden of proof.  The office shall approve any such acquisition if it finds, on the basis of the record made during any proceeding or on the basis of the filed application if no proceeding is conducted, that:

(a)  Upon completion of the acquisition, the specialty insurer will be able to satisfy the requirements for the issuance of a license or certificate to write the line of insurance for which it is presently licensed or certificated.

(b)  The financial condition of the acquiring person or persons will not jeopardize the financial stability of the specialty insurer or prejudice the interests of its insureds or the public.

* * *

(d)  The competence, experience, and integrity of those persons who will control directly or indirectly the operation of the specialty insurer indicate that the acquisition is in the best interest of the

35

#3667.35

insureds of the insurer and in the public interest.

(e)   The natural persons for whom background information is required to be furnished pursuant to this section have such backgrounds as to indicate that it is in the best interests of the insureds of the specialty insurer and in the public interest to permit such persons to exercise control over the specialty insurer.

(f)   The directors and officers, if such specialty insurer or controlling company is a stock corporation, or the trustees, partners, owners, managers, or joint venturers or other persons performing duties similar to those of persons in the aforementioned positions, if such specialty insurer or controlling company is not a stock corporation, to be employed after the acquisition have sufficient insurance experience and ability to assure reasonable promise of successful operation.

(g)   The management of the specialty insurer after the acquisition will be competent and trustworthy, and will possess sufficient managerial experience so as to make the proposed operation of the specialty insurer not hazardous to the insurance-buying public.

(h)   The management of the specialty insurer after the acquisition shall not include any person who has directly or indirectly through ownership, control, reinsurance transactions, or other insurance or business relations unlawfully manipulated the assets, accounts, finances, or books of any insurer or otherwise acted in bad faith with respect thereto.

(i)   The acquisition is not likely to be hazardous or prejudicial to the insureds of the insurer or to the public.

36

#3667.36

C.    The Burden and Standard of Proof

116.    As the party seeking approval of an acquisition application, Petitioner has the burden of proving by a preponderance of evidence that it satisfies the applicable standards and requirements. § 628.4615(8), Fla. Stat.; Dep't of Banking & Fin. v. Osborne Stern & Co., 670 So. 2d 932 (Fla. 1996).

117.    Petitioner's ultimate burden notwithstanding, Respondent has the burden of presenting evidence of any statutory or regulatory violations alleged in the Denial of Acquisition Application as sufficient to warrant denial of the application. Osborne Stern & Co., 670 So. 2d at 934; Comprehensive Med. Access, Inc. v. Off. of Ins. Reg., 983 So. 2d 45 (Fla. 1st DCA 2008).

D.    Jurisdictional Requirement for an Acquisition Application

118.    Before proceeding with an analysis of the extent to which substantive criteria for the acquisition of Westport by Petitioner were met, a determination must be made as to whether Petitioner's succession to the "1% general partnership interest" in Westport meets the threshold criteria for requiring the submission of an acquisition application.

119.    As indicated previously, section 628.4615(2) provides, in pertinent part, that:

#3667.37

> (2) A person may not, individually or in conjunction with any affiliated person of such person, directly or indirectly, . . . conclude an acquisition of, or otherwise finally acquire, 10 percent or more of the ownership interest of a specialty insurer which is not a stock corporation or of a controlling company of a specialty insurer which is not a stock corporation . . . .

120. Section 628.4615(13)(a) provides, in pertinent part, that:

> For the purpose of this section, the term "acquisition" includes:
>
> * * *
>
> 5. Any other form of change of control whereby any person or affiliated person acquires or attempts to acquire, directly or indirectly, 10 percent or more of the ownership interest or assets of a specialty insurer or of a controlling company. (emphasis added).

121. Partnerships are governed by chapter 620, Florida Statutes, which establishes that "[a] limited partnership is an entity distinct from its partners." § 620.1104(1), Fla. Stat.

122. A person becomes a general partner of a limited partnership on terms as provided in the partnership agreement, or with the consent of all of the partners. § 620.1401, Fla. Stat.

123. Section 620.4106(1) provides, in pertinent part, that:

#3667.

> Any matter relating to the activities of the limited partnership may be exclusively decided by the general partner or, if there is more than one general partner, by a majority of the general partners, . . . .

124.    Section 620.1901(1) provides that:

> (1) The laws of the state or other jurisdiction under which a foreign limited partnership is organized govern relations among the partners of the foreign limited partnership and between the partners and the foreign limited partnership and the liability of partners as partners for an obligation of the foreign limited partnership.

Thus, Delaware law is applicable to Westport.

125.    The state of Delaware defines a "partner" as "a limited or general partner" (6 Del. C § 17-101(11)), and a "limited partnership" as, *inter alia*, "a partnership formed under the laws of the State of Delaware consisting of 2 or more persons and having 1 or more general partners and 1 or more limited partners." (6 Del. C § 17-101(9)). Likewise, Florida law defines "partner" as "a limited partner or general partner" (§620.1102(13)), and a "limited partnership" as, *inter alia*, "an entity, having one or more general partners and one or more limited partners." (§ 620.1102(12)). Neither Delaware nor Florida distinguish general and limited partners as having any greater or lesser ownership interest in the partnership than that reflected by their ownership share.

39

#3667.

126.    The Delaware Uniform Limited Partnership Act provides that "[a] partnership interest is personal property.  A partner has no interest in specific limited partnership property." 6 Del. C. § 17-701.  The "ownership interest" is therefore in the partnership itself, regardless of whether the share of the partnership is held by a general partner or by limited partners. See, e.g., Ruggerio v. Estate of Poppiti, 2005 Del. Ch. LEXIS 32 at *5 (Del. Ch. 2005), in which the Chancery Court noted that:

> The Cricklewood Partnership was formed in 1995 and funded by loans of $ 2,909,246 from the Ruth E. Poppiti Trust ("REP Trust") and $840,253 from Poppiti, Sr.  Cricklewood Associates, Inc. ("Cricklewood Corporation"), a Delaware corporation, is the Cricklewood Partnership's general partner and a 1% shareholder.  Ruggerio, Poppiti, Sr. and Poppiti, Jr. were the limited partners, each with a 33% ownership interest.  (emphasis added).

127.    Under Delaware law, the ownership interest of partners, whether they are general partners or limited partners, is defined by the percentage of the shares held in the partnership.

> By claiming an ownership interest in particular Facebook shares, the Favored LPs are claiming an ownership interest in specific Partnership property.  By statute, a limited partnership is a separate entity, and individual partners do not have any rights in specific partnership property.  The LP Act says just that: "A partner has no interest in specific limited partnership property."  6 Del. C. § 17-701. What a partner instead owns is a

#3667.40

"partnership interest."  The LP Act defines that term as "a partner's share of the profits and losses of a limited partnership and the right to receive distributions of partnership assets."  Id.  § 17-101(13). Ownership of a partnership interest does not carry with it any rights to specific limited partnership property.

Although clear as a matter of statutory law, the Partnership Agreement reiterated these propositions.

* * *

Section 1.7 of the Partnership Agreement addressed the nature of an ownership interest in the Partnership.  It stated:

> The Partnership shall have two (2) classes of Partnership Interests: "General Partnership Interests", [sic] and "Limited Partnership Interests." Limited Partnership Interests and General Partner Interests shall be reflected by the issuance of units ("Units").  Such Units shall represent an ownership interest in the Partnership . . . .

ESG Capital Partners II, LP v. Passport Special Opportunities Master Fund, LP, 2015 Del. Ch. LEXIS 302 (Del. Ch. 2015).

128.  The ownership interest in the partnership is not affected by the division of management authority between general partner(s) and the limited partners.  In that regard, the Delaware courts have established that:

> A general partner of a limited partnership generally has rights and powers to manage and control the business and affairs of the limited partnership.  It is not uncommon, however, for the general partner to have a

#3667.41

> small ownership stake in the limited partnership. By contrast, a limited partner may have a large or even a majority ownership interest in the limited partnership, but, by design, that limited partner would not have any power to manage or control the business and affairs of the partnership.

Friedman v. Aimco Props., L.P., 2015 Del. Ch. LEXIS 33 at *16-17 (Del. Ch. 2015); see also, Imbert v. LCM Interest Holding LLC, 2013 Del. Ch. LEXIS 126, at *3 (Del. Ch. 2013)("After the restructuring, LCM Holding became the 99% owner and sole limited partner of Louis Capital Markets, L.P. ("LCM"), a New York-based broker-dealer. LCM GP owns the remaining 1% interest in LCM and serves as its general partner.").

129. Florida case law similarly recognizes that an "ownership interest" in a limited partnership is that held by either a limited partner or a general partner based on the percentage of the shares held by the partner.

> Harbor Inn of CS Associates, Ltd. is a Florida limited partnership which has owned an apartment building in South Florida for nearly fifteen years. The limited partnership agreement provides that Florida law shall apply to disputes arising under the limited partnership agreement. Plaintiff, M.S.L. Property Management, Inc. ("MSL"), is the general partner. Plaintiffs Paul and Deane Marcus are limited partners. Defendant Siegel is a limited partner with a 19.80% ownership interest in the limited partnership.

Siegel v. Marcus, 980 So. 2d 1272, 1274 (Fla. 4th DCA 2008).

42

#3667.42

130. In establishing a partner's "ownership interest" in a limited partnership, the percentage of ownership is the relevant factor; the extent of a partner's management or operational duties are not.

131. Although, as the general partner, Petitioner assumed decision-making authority over the activities of the Westport limited partnership, Petitioner did not acquire 10 percent or more of the ownership interest of Westport, nor did it acquire any interest in a controlling company of Westport.

132. OIR, in its memorandum of law on the issue, poses the standard for determining whether an acquisition application is required as follows:

> an acquisition filing is required by section 628.4615, Florida Statutes, when a person will obtain possession or control over 10% or more of the assets of a specialty insurer or, in the alternative, 10% or more of the controlling ownership interests of a specialty insurer.

133. OIR's insistence upon an acquisition application in this case may fit its understanding of "the legislative intent to ensure that the [OIR] is in a position to vet those who will be in control of a CCRC provider or its assets 'for the protection of the insureds [here, the residents] of the [CCRC provider] and of the public.'" However, it grafts language to the statute that simply does not exist. Section 628.4615(2) is plainly predicated upon the acquisition of "10 percent or more

#3667.43

of the ownership interest of a specialty insurer," not 10 percent or more of the controlling ownership interests of a specialty insurer.

134. The undersigned does not dismiss OIR's argument that CCRC's are subject to tight and aggressive regulation "to ensure that residents of these facilities . . . are protected from potential scams and the economic vicissitudes of the industry as it established itself and evolved." Devonshire at PGA Nat'l, LLC v. Dep't of Fin. Servs., 103 So. 3d 1060, 1061 (2013). However, the legislative standards established by statute cannot be expanded by the implementing agency or the undersigned to fit OIR's view of the scope of its mission.

135. The modified clause is "ownership interest." Thus, even under the language of section 628.4615(13), which defines acquisition as "attempts to acquire, directly or indirectly, 10 percent or more of the ownership interest or assets of a specialty insurer or of a controlling company," the management duties and responsibilities of a general partner under chapter 620, regardless of their scope, do not constitute the acquisition of either 10 percent or more of the ownership interest in a company, or of 10 percent of the assets of a company. Management simply does not equate to acquisition.

136. OIR references language in section 628.4615(4), which describes the information to be included in an acquisition

44

#3667.44

application, and limitations on the operation, management, and disposition of company capital and surplus during the pendency of the review, as providing support for its position in this case. However, before the contents of an application become pertinent, there must be a requirement that the application be filed. There is nothing inconsistent in allowing for a review of issues of management and control in the context of an acquisition application. However, such review criteria do not supersede the threshold issue of whether an application is required.

137. The undersigned is cognizant of the fact that OIR is the entity statutorily charged with implementing chapter 628, and that its construction of such legislation is generally afforded a degree of deference. However, no deference is due if OIR's construction is inconsistent with the plain language of the statute.

> Judicial deference never requires that courts adopt an agency's interpretation of a statute or rule when the agency's interpretation cannot be reconciled with the plain language of the statute or rule, taken as a whole:
>
> > "If the agency's interpretation is within the range of possible and reasonable interpretations, it is not clearly erroneous and should be affirmed," Fla. Dep't of Educ. v. Cooper, 858 So. 2d 394, 396 (Fla. 1st DCA 2003), but "judicial adherence to the agency's view is not demanded when

45

#3667.45

#3667.46

> it is contrary to the statute's plain meaning." Werner v. Dep't of Ins. & Treasurer, 689 So. 2d 1211, 1214 (Fla. 1st DCA 1997) (quoting PAC for Equal. v. Dep't of State, Fla. Elections Comm'n, 542 So. 2d 459, 460 (Fla. 2d DCA 1989)).

Kessler v. Dep't of Mgmt. Servs., 17 So. 3d 759 (Fla. 1st DCA 2009) (citing Sullivan v. Fla. Dep't of Envtl. Prot., 890 So. 2d 417, 420 (Fla. 1st DCA 2004)).

138. A statute cannot be construed contrary to its plain language, even when such construction is supported by a laudable public purpose. As established by the First District Court of Appeals:

> The Department urges us to consider overall statutory intent and allow it to provide adult protective services for appellee, a party clearly in need of such services. While the Department's view in this case may be supported by sound public policy consideration, we are constrained as the trial judge was by the unambiguous language of the statute: adult protective services may only be provided to a non-consenting adult if such adult is subject to abuse, exploitation, or neglect of another person.
>
> The supreme court stated the duty of the courts when asked to construe unambiguous statutory language in *State v. Jett,* 626 So. 2d 691 (Fla.1993):
>
> > It is a settled rule of statutory construction that unambiguous language is not subject to judicial construction, however wise it may seem to alter the plain language. While the dissent's view below has much to commend it, we find that the decision

whether or not to engraft that view into the Florida Statutes is for the legislature. We trust that if the legislature did not intend the result mandated by the statute's plain language, the legislature itself will amend the statute at the next opportunity. *Id.* at 692.

Thus, where a department's construction of a statute is inconsistent with clear statutory language it must be rejected, notwithstanding how laudable the goals of that department. See <u>Cleveland v. Fla. Dep't of Children & Families</u>, 868 So. 2d 1227, 1229 (Fla. 1st DCA, 2004).

<u>Dep't of Child. & Fam. Servs. v. McKim</u>, 869 So. 2d 760, 761-62 (Fla. 1st DCA 2004); <u>see also</u> <u>Knowles v. Beverly Enterprises-Florida, Inc.</u>, 898 So. 2d 1, 5-7 (Fla. 2004).

139. Regardless of the public interest to be served by OIR's desire to oversee and regulate the transaction at issue, section 628.4615 cannot be read to require the filing of an acquisition application when less than 10-percent of the ownership of the company or its assets has been transferred, because the suggested construction requires the addition of words not found in the statute.

140. It may well be that governmental oversight over the management of Westport is warranted. However, such oversight must be performed under authority other than that of approval or disapproval of an acquisition application under section 628.4615.

47

#3667.47

141.  In this case, the time for the submission of an acquisition application was when the 99-percent limited partnership interest was sold on March 31, 2014.  The assignment of a one-percent ownership interest in Westport is not a vehicle to correct the error in failing to require an acquisition application upon the acquisition of a 99-percent ownership interest in Westport.[3/]

142.  For the reasons set forth herein, the OIR notice of denial of acquisition application, and the acquisition application itself, should be dismissed as being unauthorized by the express terms of section 628.4615.

E.  Acquisition Application

143.  In the event it is determined that Petitioner's acquisition of Westport's one-percent general partnership share was sufficient to trigger an acquisition application, and since the parties fully litigated the denial of the application as though OIR jurisdiction was not at issue, the following conclusions as to the standards cited as the bases for denial are made.

Section 628.4615(8)(a), Florida Statutes

144.  Based on the findings of fact set forth herein, and for the reasons set forth in the remaining paragraphs, Petitioner did not meet its burden of proving, by a

#3667.48

preponderance of the evidence, that Petitioner will be able to satisfy the requirements for the issuance of a CCRC license.

### Section 628.4615(8)(b), Florida Statutes

145. Based on the findings of fact set forth herein, Petitioner did not meet its burden of proving, by a preponderance of the evidence, that Petitioner's financial condition will not jeopardize Westport's financial stability or prejudice the interests of its residents or the public. It is furthermore concluded that the acquisition application and supporting documentation was deficient in information regarding Petitioner's financial condition, so as to prevent OIR from drawing a meaningful conclusion as to Petitioner's financial condition.

### Section 628.4615(8)(c), Florida Statutes

146. Based on the findings of fact set forth herein, Petitioner did not meet its burden of proving, by a preponderance of the evidence, that the changes to Westport's corporate structure or management is fair and free of prejudice to its residents or to the public. It is furthermore concluded that the acquisition application and supporting documentation contained contradictory information, and was otherwise deficient in information regarding the changes to Westport's corporate structure or management, so as to prevent OIR from drawing a

#3667.49

meaningful conclusion as to the changes being made, or whether they meet statutory and regulatory standards.

Section 628.4615(8)(d), Florida Statutes

147. Based on the findings of fact set forth herein, Petitioner did not meet its burden of proving, by a preponderance of the evidence that the competence, experience, and integrity of Petitioner, and its sole member, Mr. Freiden, indicate that the acquisition is in the best interest of Westport's residents and is in the public interest. The undersigned has no hesitation in concluding that Mr. Freiden is a man of personal integrity, and that he demonstrates business competence in a number of fields. However, the evidence was not sufficient to demonstrate that Mr. Freiden has the requisite degree of competence and experience in the field of insurance or healthcare facility management generally, or CCRC operation and management specifically.

148. As set forth in the findings of fact herein, the education and experience required of an applicant must be related to the applicant's ability to operate and manage a CCRC facility, and not merely the applicant's ability to hire others with the necessary education and experience to perform those duties. Petitioner failed to meet that degree of education and experience.

#3667.50

Section 628.4615(8)(e), Florida Statutes

149. Based on the findings of fact set forth herein, Petitioner did not meet its burden of proving, by a preponderance of the evidence, that it is in the best interests of Westport's residents and in the public interest to permit Mr. Freiden to exercise control over Westport. This conclusion is not predicated on any finding of a disqualifying offense in Mr. Freiden's past, but is predicated entirely on Petitioner's failure to provide information regarding his background in the manner and form required by statute and rule.

Section 628.4615(8)(f), Florida Statutes

150. Based on the findings of fact set forth herein, Petitioner did not meet its burden of proving, by a preponderance of the evidence, that Petitioner, as Westport's "acquiring" partner, has sufficient insurance experience and ability to assure reasonable promise of successful operation.

Section 628.4615(8)(g), Florida Statutes

151. Based on the findings of fact set forth herein, Petitioner did not meet its burden of proving, by a preponderance of the evidence, that the management of Westport after the acquisition will be competent and trustworthy, and will possess sufficient managerial experience so as to make the proposed operation of Westport not hazardous to its residents.

#3667.51

152. The evidence in this case demonstrates that the entity with a management contract, AgeWell Senior Living, LLC, and the executive director, Mr. Parker, were relieved of their duties through non-renewal of the contract. No management company has been retained to assume those management responsibilities. The companies that have, for all practical purposes, assumed Westport's management, BVM Management and NOVUM, LLC, were not disclosed or referenced in any meaningful degree in the acquisition application, and their obvious management duties and responsibilities were minimized. Thus, it is concluded that the acquisition application and supporting documentation was deficient in information regarding the management of Westport after the acquisition so as to prevent OIR from drawing a meaningful conclusion as to the changes being made, or whether they meet statutory and regulatory standards.

Section 628.4615(8)(h), Florida Statutes

153. Given the conclusions as to the lack of specificity regarding the management of Westport drawn in the preceding paragraph, Petitioner did not meet its burden of proving that this standard was met, simply because it did not identify the persons retained as managers. As to those persons who were found to have assumed Westport's management duties and responsibilities, BVM Management and NOVUM, LLC, there was no evidence upon which to base a conclusion that those entities, or

52

their officers, employees, members, or agents, unlawfully manipulated Westport's assets, accounts, finances, or books, or otherwise acted in bad faith with respect thereto.

Section 628.4615(8)(i), Florida Statutes

154. Based on the findings of fact set forth herein, Petitioner did not meet its burden of proving, by a preponderance of the evidence, that Petitioner's acquisition of Westport is not likely to be hazardous or prejudicial to Westport's residents or to the public. This conclusion is not the result of any affirmative action of Petitioner, but is based on Petitioner's failure to include in the acquisition application information required by statute, rule, and the application form.

RECOMMENDATION

Upon consideration of the facts found and conclusions of law reached, it is

RECOMMENDED that the Department of Financial Services, Office of Insurance Regulation, enter a final order determining that IMH Healthcare, LLC's, acquisition of the one-percent general partner ownership interest in Westport Holdings Tampa, L.P., was insufficient to meet the threshold requirement for an acquisition application pursuant to section 628.4615(2), Florida Statutes, and that the March 27, 2015, notice of denial of acquisition application be DISMISSED.

#3667.53

It is, furthermore, RECOMMENDED that, if it is determined that an acquisition application is required when a one-percent general partner ownership interest in a CCRC is acquired, the Department of Financial Services, Office of Insurance Regulation, enter a final order determining that IMH Healthcare, LLC, failed to meet its burden of proving entitlement to the approval of the acquisition application, and that the application should therefore be DENIED.

DONE AND ORDERED this 26th day of January, 2016, in Tallahassee, Leon County, Florida.

E. GARY EARLY
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 26th day of January, 2016.

ENDNOTES

1/ The relationship between Westport Senior Investment Fund, L.P., and WSLIF was not explained, though both are affiliated with Mr. Landry.

2/ NOVUM, LLC, has applied for a certificate of authority to be the provider at University Village.  OIR denied the application.

#3667.54

NOVUM, LLC's, petition for hearing regarding that denial was referred to the Division of Administrative Hearings and is currently assigned as DOAH Case No. 15-4730.

[3/]    In Respondent's Memorandum of Law, OIR argues that, regardless of whether Petitioner met the threshold for filing an acquisition application as a result of its acquisition of Westport's one-percent general partnership interest, an application is nonetheless required "under the specific facts of this case" since:

> at the time of IMH's acquisition of part of the limited partnership interest, as well as at the time of its application for the acquisition of the general partnership interest, IMH owned more than 10% of the limited partnership.

OIR thus asserts that "[a]ssuming for the sake of argument that IMH's position is correct, the Office's determination that an acquisition filing was not required in March 2014 would be a mistake of law," and that the requirement for Petitioner to file an application could be predicated on the earlier acquisition of its 19.8 percent limited partnership interest.

OIR never asserted in this case that the acquisition of the 99-percent limited partnership interest by any of the four limited partners triggered the requirement to file an acquisition application.  Though the undersigned believes that the decision to forego review at the time of the 99-percent ownership acquisition was inconsistent with the express terms of section 628.4615, OIR expressed that was not its position on numerous occasions in the record evidence of this proceeding, and by statements of counsel.  The prehearing stipulation provided that "Respondent was aware of the acquisition of the 99% partnership interest in Westport Holdings Tampa, LP on or about April 2, 2014." and that "Respondent did not require that the acquirers of such 99% partnership interest submit an application pursuant to Section 628.4615, Florida Statutes." Furthermore, during the questioning of OIR employee, Mr. Wilson, counsel for OIR objected to evidence of the limited partnership acquisition, stating that "[t]he Office has stipulated that an acquisition was not required at the time of the limited partnership purchase, and there's no reason to re-plow this ground."

#3667.55

In the event OIR has modified its position regarding the acquisition of the 99-percent ownership interest in Westport, it can raise that issue by requiring the limited partners to file a separate acquisition application.  However, the issue having not been pled or litigated in this proceeding, no findings or conclusions will be made as to that issue.

COPIES FURNISHED:

Wendy Russell Wiener, Esquire
M. Stephen Turner, Esquire
John F. Loar, Esquire
Broad and Cassel
215 South Monroe Street, Suite 400
Tallahassee, Florida  32301
(eServed)

Shaw P. Stiller, Esquire
Clifford Timothy Gray, Esquire
Patrick David Flemming, Esquire
Alyssa S. Lathrop, Esquire
Florida Office of Insurance Regulation
200 East Gaines Street, Room 645.2
Tallahassee, Florida  32399-4206
(eServed)

Kevin M. McCarty, Commissioner
Office of Insurance Regulation
200 East Gaines Street
Tallahassee, Florida  32399-0305
(eServed)

Anoush Brangaccio, General Counsel
Office of Insurance Regulation
200 East Gaines Street
Tallahassee, Florida  32399-0305
(eServed)

NOTICE OF RIGHT TO SUBMIT EXCEPTIONS

All parties have the right to submit written exceptions within 15 days from the date of this recommended order.  Any exceptions to this recommended order should be filed with the agency that will issue the final order in this case.

#3667.56