EXHIBIT

1   9   Stiller

3/8/23

**From:** "Gray, Tim" <Tim.Gray@floir.com>
**To:** "Price, Jay" <jprice@burr.com>
**Cc:** "Brangaccio, Anoush" <Anoush.Brangaccio@floir.com>, "Stiller, Shaw" <Shaw.Stiller@floir.com>
**Subject:** USAMERIBANK, WESTPORT NURSING, WESTPORT HOLDINGS, UNIVERSITY VILLAGE CCRC - Use of Collateral
**Date:** Fri, 16 Sep 2016 20:43:53 +0000
**Importance:** Normal
**Attachments:** MTD_5th_Ground_for_Receivership.pdf; WN_Loan_Agreement_Amendment.pdf

---

Dear Jay:

First, I want to apologize for the contentious nature of the telephone conversation today. Please understand that the Office of Insurance Regulation was quite dismayed to learn the $3 million being held by USAmeriBank in a cash collateral account had been applied to the Loan made by the Bank to Westport Nursing. The Office comprehends the Bank's position.

The main issue we discussed was whether the $3 million constituted part of the "minimum liquid reserves" (MLR) of Westport Holdings and the University Village Continuing Care Retirement Community. We comprehend the position of the Bank, as you relayed, that the $3 million cash collateral account was solely additional security (owner's contribution) for the loan the Bank made to Westport Nursing in the principal amount of $15 million.

I relayed how attorneys for guarantor Mr. John Bartle had made representations to the Leon County Circuit Court in the Westport Holdings delinquency proceeding that the $3 million was part of the University Village MLR account. As promised, attached please find Westport Holdings' Motion to Dismiss the Fifth Ground for Receivership. The motion and attached exhibits establish that I was correct in stating that Mr. Bartle's attorneys had represented to the circuit court that the $3 million was available for inclusion in Westport Holdings'/University Village's MLR calculation. However, because of the incompleteness of the document presented to the court, we can neither confirm nor disclaim that it was or was not signed by someone authorized by the Bank. We will endeavor to locate the complete document. If for some reason the complete document is part of Mr. Korhn's loan file of Westport Nursing, the Office would respectfully request that a full copy of Exhibit 4 to the motion to dismiss be provided to the Office. If the full agreement is not in the Bank's files, we would like confirmation of that fact.

As I understand from our conversation, the principal loan amount of $15 million remains in place pending a default date on which the loan will be "called," or otherwise extended. PLEASE BE ADVISED THAT BECAUSE OF THE DISPUTE OVER THE SOURCE AND USE OF THE $3 MILLION, SHOULD MR. BARTLE OR WESTPORT NURSING ATTEMPT TO SATISFY THE OUTSTANDING PRINCIPAL AMOUNT, BARTLE AND WESTPORT NURSING SHOULD NOT BE GIVEN CREDIT FOR THE $3 MILLION, EITHER BY REDUCTION IN THE $15 MILLION LOAN PRINCIPAL ATTEMPTING TO BE SATISFIED OR A DIRECT PAYMENT OF THE $3 MILLION. (The figures are rounded and assume accumulation of interest.)

9

I also inquired as to whether USAmeriBank was prepared to assume care of the residents of the "health center" which collateralizes the Bank's loan. This inquiry was made on the basis of the attached "Amendment to Loan Agreement" was filed in court committing the Bank to honor the CCRC purchasers'/residents' contracts. That commitment was also presented to the circuit court in an effort to avoid appointment of a receiver. See, section 651.114(8), Florida Statutes. While the attachment does not have a signature of a Bank officer, we will present a copy subsequently signed by Mr. Korhn should you insist on that documentation.

Finally, we would appreciate your providing the Office with the Bank's default letter to Mr. Bartle and Westport Nursing informing them of application of the $3 million to the $15 million loan.

I'm sure we will communicate more in the near future. Thank you for your cooperation.

Sincerely,

C. Timothy Gray, Assistant General Counsel

Florida Office of Insurance Regulation

Larson Building, Room 647B

200 East Gaines Street

Tallahassee, Florida 32399-4206

(850) 413-4122 - Phone

(850) 922-2543 - Facsimile

tim.gray@floir.com - E-mail

Filing # 31109909 E-Filed 08/20/2015 01:12:53 PM

IN THE CIRCUIT COURT OF THE
SECOND JUDICIAL CIRCUIT, IN AND
FOR LEON COUNTY, FLORIDA

STATE OF FLORIDA, ex rel., the
DEPARTMENT OF FINANCIAL SERVICES
OF THE STATE OF FLORIDA,

    Relator,

v.

WESTPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP d/b/a
UNIVERSITY VILLAGE, a Delaware limited
partnership licensed as a continuing care
retirement community in the State of Florida,

    Respondent.

CASE NO. 2015-CA-000585

_____/

## MOTION FOR DISMISSAL OF FIFTH GROUND FOR RECEIVERSHIP

Respondent, Westport Holdings Tampa, Limited Partnership, d/b/a University Village, moves for dismissal of the new alleged Fifth Ground for Receivership under F. S. § 631.051(13), *i.e.*, that Respondent is the victim of conversion or wrongful encumbrance of assets, and says:

1.    Section 631.051(13), Fla. Stats., provides as a ground for judicial imposition of receivership that the insurer (provider) "Has been the victim of embezzlement, wrongful sequestration, conversion or encumbering of its assets; . . . or fraud affecting it; or other illegal conduct in, by, or with respect to it, which if established would threaten its solvency . . . ."

2.    Relator's Motion for Leave to Issue Amended Order to Show Cause alleges that Respondent "is the victim of embezzlement, conversion, encumbrance of assets, or fraud," in that (i) a subsidiary corporate owner of the health center property was transferred out of its ownership, and (ii) $3 million held as minimum liquid reserve subject to § 681.035(1)(b) was used as collateral for the loan on the property of the health center owner. These transactions alleged are not criminal, illegal or wrongful, and do not threaten the provider's solvency, and are not sufficient basis for receivership.

4817-1366-3015.1
50583/0001

*Corporate Restructure to Accommodate Facility Lender is Not Wrongful*

3.      Westport Nursing Tampa, LLC was a corporate subsidiary of Respondent, Westport Holdings Tampa, L.P. *See* draft 2014 Audit Report, Note 1, p. 7, attached as Exhibit 1.

4.      Westport Nursing Tampa, LLC, owns the campus healthcare center property (the ALF and nursing home) adjoining the independent living facilities (ILF) owned by Respondent.

5.      To facilitate new interim refinancing obtained by Respondent's new limited partners to rescue the campus property from prior-lender foreclosure, Westport Nursing Tampa, LLC was considered a controlled affiliate of Respondent.  The new lender whose loan was secured by the healthcare facilities wanted to avoid its revised property from cross-collaterizing a second lender's indebtedness secured by the ILF property. *See* Mullen letter to OIR, dated March 31, 2014, attached as Exhibit 2.

6.      There is nothing wrong, criminal or illegal about such transaction, and OIR was informed of the transaction by the Mullen letter, Exhibit 2, and did not object.

7.      The Mullen letter explained that Respondent's owners own and control Westport Nursing Tampa, LLC so that it is an affiliated part of Respondent's corporate structure and its assets benefit Respondent. *See* draft 2014 Audit Report, Note 4, p. 14, reporting consolidated assets, attached as Exhibit 3.

8.      When Respondent subsequently obtains permanent financing from a single lender, a subsidiary structure can be resumed, if desired, but regardless, the assets are owned for the benefit of Respondent and controlled as part of its corporate structure.

9.      A company may control such a dominant interest in another company that it can dictate its policies and control its management, so as to be considered a holding company of that

4817-1366-3015.1
50583/0001

business, or a brother-sister controlled affiliate, owned and effectively controlled by the same persons. *See* 18 Am. Jur. 2d *Corporations*, §§ 41 and 43 (2004 ed.).

10. A CCRC "Provider" is defined by § 651.011(12), Fla. Stats., to mean the <u>owner or operator</u> . . . <u>however organized</u> . . . of an <u>institution</u> . . . which owner or operator provides continuing care [shelter and nursing services or personal services] . . . for a fixed or variable fee, for the period of care, payable in a lump sum or lump sums and monthly maintenance charges or in installments . . . . (e.s.)

11. Corporate restructure made in good faith, for business purposes and without harm to the control and benefit of assets, is not criminal, illegal or wrongful. Courts do not second-guess business decisions within the purview of management if made in good faith. *See e.g. Hollywood Towers Condo. Assn. v. Hampton*, 40 So. 3d 784, 787 (Fla. 4th DCA 2010); *Lobato-Bleidt v. Lobato*, 688 So. 2d 431, 434 (Fla. 5th DCA 1997). *See also, e.g., G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 238 (Ind. 2001) (business judgment rule protects action taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes).

12. Nor can receivership be judicially imposed pursuant to § 631.051(7), Fla. Stats., unless the provider has transferred "substantially its entire property or business, or has entered into any transaction the effect of which is to merge  substantially its entire property or business into that of any other insurer or entity without having first obtained the written approval of the Office . . . ."

13. The Office was informed of the intended transaction by letter of March 31, 2014, and did not object.

4817-1366-3015.1
50583/0001

14. In any event, intercompany transfer of particular financed property to a controlled affiliate to accommodate successful refinancing does not require OIR approval and is not a specified ground for receivership.

15. The interim loan transaction was not a transfer of substantially all of Respondent's entire property to a third party for their aggrandizement. Rather, encumbered property was transferred intercompany and stayed encumbered to facilitate refinancing. The property and the associated indebtedness remain under the corporate umbrella, and operational assets remain in control of Respondent.

16. OIR cannot convert this transaction into a ground for judicial receivership when it is not a ground specifically authorized by the statute.

*MLR Reserve Remains in Tact for the Benefit of Respondent*
*in Compliance with § 651.035(1)(b)*

17. Relator alleges that $3 million of the minimum liquid reserve (MLR) pursuant to F.S. § 651.035 was wrongfully encumbered because it was pledged as collateral for the health center indebtedness of Westport Nursing Tampa, LLC (a part of the Company). But this is not an illegal or improper encumbrance.

18. Section 651.035(1)(b), Fla. Stats., provides that if the provider has outstanding indebtedness that requires a debt service reserve to be held in escrow pursuant to a mortgage lien on the facility, and that debt service reserve can only be used to pay that debt, then the debt service reserve may be included in computing the minimum liquid reserve (MLR), if the agreement under which the debt is secured is provided to the Office.

19. There is no question that the $3 million is part of such debt service reserve, pledged for the indebtedness secured by the healthcare facilities' property, and may thus be part of the MLR pursuant to § 651.035(1)(b), and that the Office was notified of the agreement to this

4

4817-1366-3015.1
50583/0001

effect.  See Exhibit 2.  The Pledge Agreement provided to the Office states on its front page, copy attached as Exhibit 4, that the Cash Collateral Funds deposited "shall be included in the Pledgor's reserve requirements as required under Section 651.035 of the Florida Statutes (the "MLR Statute"), as such Cash Collateral Funds meet the statutory uses allowed under Section 1(b) of the MLR Statute."

20.     This is not a wrongful encumbrance of assets that could justify receivership because Westport Nursing LLC may be considered a controlled affiliate instead of a subsidiary. The health center property is part of the campus property and is properly financed by the Respondent through controlled entities as part of its corporate ownership structure.  Respondent's draft 2014 annual audit reflects at Note 5, pg. 15, copy attached as Exhibit 5, that the $3 million debt service reserve is part of the Provider's assets, and reflects at Note 8, pp. 17-18, copy attached as Exhibit 6, that the indebtedness of the healthcare center property is part of the indebtedness of the "Company," *i.e.*, the "Provider," Westport Holdings Tampa, LP and Affiliates."

21.     The indebtedness of the healthcare center property is properly secured by the MLR reserve funds pursuant to § 651.035(1)(b).  These assets have not been converted by third persons to some nefarious or unlawful purpose.

22.     In other words, the campus indebtedness is properly reserved for with MLR funds as the statute allows.  It is immaterial that the reserve is in the name of the controlled affiliate to parallel the secured indebtedness of the healthcare center property for which the reserve is pledged.  The health center property secured debt is part of the Respondent's indebtedness through a controlled affiliate in connection with its entire operational assets.

4817-1366-3015.1
50583/0001

23.     Any possible irregularity in facilitating two different interim lenders to serve their loans or different parts of the corporate property is technical, not substantive.  The lender bank is agreeable for the reserve funds to be placed in Respondent's corporate name and pledged for its benefit in relation to the indebtedness secured by the health center property.

24.     There has been no wrongful conversion, embezzlement or dissipation of corporate assets to benefit the CCRC Provider.  The reserve funds are properly part of the MLR, and OIR was informed of the agreement in this regard.  This pledge of assets to secure campus indebtedness of the Respondent Company is not basis for imposition of receivership.

WHEREFORE, Relator's new Fifth Ground for appointment of receiver should be dismissed, or judgment of dismissal entered thereon.

Respectfully submitted,


*s/ M. Stephen Turner*
M. STEPHEN TURNER, P.A. (FBN 0095691)
Primary E-mail: sturner@broadandcassel.com
Secondary E-mails:
pwilliams@broadandcassel.com
mubieta@broadandcassel.com
BROAD AND CASSEL
215 South Monroe Street, Suite 400
Tallahassee, FL  32301
Tel 850.681.6810; Fax 850.681.9792
Attorneys for Respondent

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been served by E-mail through the Court's E-Filing Portal system on Timothy L. Newhall, Deputy Chief Attorney (Tim.Newhall@myfloridacfo.com) and C. Timothy Gray (Tim.Gray@floir.com), Florida Department of Financial Services, Division of Rehabilitation and Liquidation, 2020 Capital Circle SE, Suite 310, Tallahassee, FL 32301, this 20th day of August, 2015.


*s/ M. Stephen Turner*
Attorney

6

4817-1366-3015.1
50583/0001

WESTPORT HOLDINGS TAMPA, LP AND AFFILIATES
DBA: UNIVERSITY VILLAGE
NOTES TO COMBINED FINANCIAL STATEMENTS
DECEMBER 31, 2014

NOTE 1   ORGANIZATION

Westport Holdings Tampa, LP, was organized in Delaware and registered to transact business in the State of Florida in October 2000, merged on December 31, 2000 with Westport Housing Tampa, L.L.C., a limited liability company originally incorporated in the State of Florida in July 1999. Westport Holdings Tampa, Limited Company is the surviving business entity. Westport Holdings Tampa II, Limited Company (the Villas), was organized in Delaware and registered to transact business in the State of Florida in October 2000. Westport Nursing Tampa, L.L.C. was incorporated in the State of Florida in January 1999. Collectively, the three affiliated companies are known as "the Company."

Prior to March 31, 2014, Westport Holdings University Village, L.L.C. was the sole general partner of Westport Holdings Tampa, Limited Company. Westport Senior Living Investment Fund, L.P. (the Fund) was the sole limited partner of Westport Holdings Tampa, Limited Company and the sole member of Westport Holdings University Village, L.L.C. Westport Nursing Tampa, L.L.C. was a wholly owned subsidiary of Westport Holdings Tampa, Limited Company.  Westport Holdings Tampa II, Limited Company was an affiliate for which the Company was the primary beneficiary.  On March 31, 2014, BVM University Village purchased the membership in the entities (See Note 3 for details of the acquisition).

The Company owns and operates an independent living facility under the name University Village (the Village), containing 446 apartments in Tampa, Florida. The Company operates under the "continuing care" concept (CCRC) in which residents enter into a residency and care agreement which requires payment of one time entrance fee (either prospective or deferred) and a monthly service fee. Generally, payment of these fees entitles residents to the use and privileges of the Village for life. The residency and care agreement does not entitle the residents to an interest in the real estate or any property owned by the Company. The Villas is developing 60 villa units and a community clubhouse on approximately 11 acres adjacent to the Village.  At December 31, 2014, 46 villa units had been completed. The completed units are operated as additional residences for the Village's CCRC.

Westport Nursing Tampa, L.L.C. owns a health center within the Village, which consists of a 120 bed skilled nursing facility and a 110 unit assisted living facility. Effective March 31, 2014, the Company leased the skilled nursing center assisted living facility and related assets to a non-related Florida not-for-profit corporation under a lease agreement with an original expiration date of March 31, 2029.

(7)

**Exhibit 1**

# WILLIAMS MULLEN

Direct Dial: 804.420.6395
wrabke@williamsmullen.com

March 31, 2014

FED-EX DELIVERY

Office of Insurance Regulation
Specialty Product Administration
200 East Gaines Street
Tallahassee, FL  32399-0331

    Re:    University Village MLR Escrow Transfer

To Whom It May Concern:

    This letter is being delivered on behalf of Westport Holdings Tampa Limited Partnership, a Delaware limited partnership (the "ProviderLP"), and Westport Nursing Tampa, L.L.C., a Florida limited liability company (the "ProviderLLC") that is owned by the identical owners as the ProviderLP, which together with another affiliate operate the University Village Retirement Community, a residential continuing care retirement community located in Hillsborough County, Florida (the "Community"). The ProviderLP has been issued a certificate of authority from the State of Florida to provide continuing care at the Community. The ProviderLP is required by Section 651.035, Florida Statutes (the "MLR Statute"), to establish an escrow account (the "MLR Escrow") in a Florida bank, a Florida savings and loan association, or a Florida trust company acceptable to the Office of Insurance Regulation of the State of Florida (the "Department"). Currently the ProviderLLC is a wholly-owned subsidiary of ProviderLP; however, the Community is undergoing a refinancing and restructuring (the "Restructuring") to cause the ProviderLLC to become a sister entity to the ProviderLP in lieu of it being a subsidiary. Upon the completion of the Restructuring, each of the ProviderLP and the ProviderLLC will maintain separate MLR Escrows under the MLR Statute.

    Currently, the entire MLR Escrow of the ProviderLP is held by Regions Bank, pursuant to that certain Agreement for University Village Minimum Liquid Reserve Escrow dated June 22, 2004 (the "Existing MLR Agreement"). The ProviderLP is hereby providing notice as required by the MLR Statute, that as part of the Restructuring, it is moving $3,000,000 (the "Transferred Amount"), representing a portion of the ProviderLP MLR Escrow, from Regions Bank to USAmeriBank, a Florida state banking corporation ("USAB"), on behalf of the ProviderLLC. This move from Regions Bank to USAB is expected to be completed on or before March 31, 2014. The Transferred Amount shall be held at USAB under the Westport Nursing Tampa LLC Escrow Account, identified as Account Number 500106000, pursuant to that Assignment and Pledge of Account (Cash Collateral Account) between the ProviderLLC and USAB, which is attached hereto as Exhibit A. The Transferred Amount is a requirement for the funding of a mortgage loan (the "Mortgage Loan") by USAB, as evidenced by the promissory note (the "USAB Note") attached hereto as Exhibit B. The USAB Note attached is not in final form, but this version is substantially final.

Williams Mullen Center | 200 South 10th Street, Suite 1600 (23219) P.O. Box 1320 Richmond, VA 23218 | www.williamsmullen.com
T 804.420.6000 | F 804.420.6507 | DC NC VA | A Professional Corporation

**Exhibit 2**

# WILLIAMS MULLEN

Office of Insurance Regulation
March 31, 2014
Page 2

USAB, as a condition of the Mortgage Loan, is requiring principal, interest, fees, taxes and insurance in the amount of $3,000,000 to be escrowed at USAB for the term of said Mortgage Loan. The transfer of the Transferred Amount shall satisfy this condition, and as such, the Transferred Amount shall continue to be considered a portion of the MLR Escrow pursuant to Section 1(b) of the MLR Statute that is now segregated between two different lenders for the Community. The remainder of the MLR Escrow is remaining with Regions Bank under control of the Existing MLR Agreement. Further details on the Restructuring and the debt allocation between the ProviderLP and the ProviderLLC will be provided in the Form OIR-A3-477 (rev. 07/03) to be filed with the Department by May 1.

If you have any questions about the matters describe in this letter, please call me at the number above.

Sincerely,

W. Wilhelm Rabke

25150532_3

# WILLIAMS MULLEN

## EXHIBIT A

### Assignment and Pledge of Account (Cash Collateral)

[Attached]

WESTPORT HOLDINGS TAMPA, LP AND AFFILIATES
DBA: UNIVERSITY VILLAGE
NOTES TO COMBINED FINANCIAL STATEMENTS
DECEMBER 31, 2014

NOTE 4   PROPERTY AND EQUIPMENT

Property and equipment, net consists of the following at December 31, 2014:

| | Westport Holdings Tampa, L.P. (Village) | Westport Nursing Tampa LLC (Nursing) | Combined Total |
|---|---|---|---|
| Land and Improvements | $ 3,123,022 | $ 548,523 | $ 3,671,545 |
| Buildings and Improvements | 13,894,056 | 12,491,477 | 26,385,533 |
| Furniture and Equipment | 3,087,466 | 460,000 | 3,547,466 |
| Vehicles | 48,894 | - | 48,894 |
| Construction in Progress | 683,294 | - | 683,294 |
| Subtotal | 20,836,732 | 13,500,000 | 34,336,732 |
| Less: Accumulated Depreciation | (656,441) | (303,215) | (959,656) |
| Total Property and Equipment, Net | $ 20,180,291 | $ 13,196,785 | $ 33,377,076 |

Depreciation expense for the nine-month period ended December 31, 2014 was $683,096 and $303,215 for the Village and Nursing, respectively.

NOTE 5   INVESTMENTS AND ASSETS LIMITED AS TO USE

Investments are stated at fair value. The composition of investments and assets limited as to use is set forth in the following table as of December 31:

| | |
|---|---|
| Cash and Cash Equivalents | $ 3,663,201 |
| U.S. Treasury Obligations | 1,899,906 |
| Total | $ 5,563,107 |

**Exhibit 3**

## ASSIGNMENT AND PLEDGE OF DEPOSIT ACCOUNT
### (Cash Collateral Account)

THIS ASSIGNMENT AND PLEDGE OF DEPOSIT ACCOUNT (Cash Collateral Account) (this "Assignment"), dated as of the _____ day of March, 2014, by **WESTPORT NURSING TAMPA, L.L.C.**, a Florida limited liability company ("Pledgor"), in favor of **USAMERIBANK**, a Florida banking corporation ("Lender").

### RECITALS:

A.    Pledgor has requested a loan from Lender (the "Loan") evidenced by that certain Promissory Note of even date herewith by Pledgor, payable to Lender in the principal amount of $15,000,000.00 (including all amendments thereto and as the same may be hereafter amended, modified or extended, the "Note"). The Loan is also evidenced by a certain Loan Agreement between Pledgor and Lender of even date herewith (including all amendments thereto and as the same may be hereafter amended or modified, the "Loan Agreement") and by certain other Loan Documents (as defined in the Loan Agreement).

B.    Pursuant to the Loan Documents and as a condition to Lender making the Loan, Pledgor is required to deposit and maintain certain Cash Collateral (as defined in the Loan Documents) in an account established for such purpose and Pledgor is required to assign and pledge to Lender such account as additional collateral security for all payment and performance obligations with respect to the Loan (collectively, the "Loan Obligations"). This Assignment is therefore being provided by Pledgor for such purposes and as an inducement to Lender to make the Loan to Pledgor.

C.    The Cash Collateral Funds (as defined below) deposited by Pledgor hereunder shall be included in the Pledgor's reserve requirements as required under Section 651.035 of the Florida Statutes (the "MLR Statute"), as such Cash Collateral Funds meet the statutory uses allowed under Section 1(b) of the MLR Statute.

D.    The MLR Statute provides that the Office of Insurance Regulation of the State of Florida (the "Department") shall have information rights regarding the Cash Collateral Funds.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing recitals and other good and valuable consideration, the parties agree as follows:

1.    Recitals. The recitals hereto are true and correct.

2.    **Establishment of Cash Collateral Account.** Pursuant to the Loan Documents, Pledgor is required to establish a Cash Collateral Account for purposes of holding deposits of required Cash Collateral. Pledgor has agreed to make the required deposits in connection with closing of the Loan (all funds so deposited, together with interest from time to time earned thereon and together with moneys thereafter deposited with Lender

**Exhibit 4**

WESTPORT HOLDINGS TAMPA, LP AND AFFILIATES
DBA: UNIVERSITY VILLAGE
NOTES TO COMBINED FINANCIAL STATEMENTS
DECEMBER 31, 2014

NOTE 5    INVESTMENTS AND ASSETS LIMITED AS TO USE (CONTINUED)

Assets limited as to use are held under the following limitations as of December 31:

Description

| | |
|---|---:|
| Assets held in escrow under State of Florida Statutes as a condition of the Obligated Group's Certificate of Authority (Minimum Liquid Reserve Fund) | $ 1,979,626 |
| Assets held in escrow under Loan Agreement for the payment of costs of operating, repairing, or expanding the Facility (Capital Reserve Fund) | 381,046 |
| Assets held in escrow under Loan Agreement for the payment of principal and accrued interest (Debt Service Reserve Fund) | 3,005,656 |
| Assets held in escrow under Loan Agreement for the payment of real estate taxes (Real Estate Tax Fund) | 196,779 |
| Subtotal | $ 5,563,107 |

NOTE 6    FAIR VALUE MEASUREMENTS

The Organization uses fair value measurements to record fair value adjustments to certain assets and liabilities and to determine fair value disclosures. For additional information on how the Organization measures fair value refer to Note 2 – Summary of Significant Accounting Policies.

The following table presents the fair value hierarchy for the balances of financial assets and liabilities of the Organization measured at fair value on a recurring basis as of December 31, 2014:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---:|---:|---:|---:|
| Investments and Assets Limited as to Use: | | | | |
| Cash and Cash Equivalents | $ 3,663,201 | $ - | $ - | $ 3,663,201 |
| U.S. Government Obligations | 1,899,906 | - | - | 1,899,906 |
| | $ 5,563,107 | $ - | $ - | $ 5,563,107 |

(15)

**Exhibit 5**

WESTPORT HOLDINGS TAMPA, LP AND AFFILIATES
DBA: UNIVERSITY VILLAGE
NOTES TO COMBINED FINANCIAL STATEMENTS
DECEMBER 31, 2014

NOTE 8   DEBT

The Company's long-term debt consists of the following at December 31:

Description

| | | |
|---|---|---|
| Note Payable to CPIF Lending, LLC.; interest payable monthly in arrears at 11.0% per annum commencing on May 5, 2014; and principal due in full at maturity on September 30, 2015. Interest expense during the period ended December 31, 2014 was $787,329 | $ | 9,500,000 |
| Note Payable to USAmeriBank.; interest payable monthly in arrears at 4.95% per annum and principal due commencing on May 1, 2014 paid in 23 equal installments of $98,580 with the remaining principal due in full at maturity on March 1, 2016. Interest expense during the period ended December 31, 2014 was $563,881 | | 14,712,533 |
| Capital Lease Payable to Verizon; interest at 4.8% per annum and principal of $2,313 due in 60 monthly payments through December 31, 2016 | | 52,810 |
| Capital Lease Payable to Vend; interest at 14.25% per annum and principal and interest of $391 due in 34 monthly payments through December 31, 2015 | | 4,181 |
| Capital Lease Payable to Ford; interest at 6.24% per annum and principal of $530 due in 36 monthly payments through September 30, 2015 | | 7,076 |
| | | 24,276,600 |
| Less Current Portion of Notes Payable | | 10,002,591 |
| Notes Payable, Net of Current Portion | $ | 14,274,009 |

Future maturities of notes payable as of December 31, 2014:

Year Ending December 31,

| | | |
|---|---|---|
| 2015 | $ | 10,002,591 |
| 2016 | | 14,274,009 |
| | $ | 24,276,600 |

**Exhibit 6**

WESTPORT HOLDINGS TAMPA, LP AND AFFILIATES
DBA:  UNIVERSITY VILLAGE
NOTES TO COMBINED FINANCIAL STATEMENTS
DECEMBER 31, 2014

NOTE 8    DEBT (CONTINUED)

Notes Payable

On March 31, 2014 the Company entered into a loan agreement with CPIF Lending, LLC (CPIF) to provide a $9,500,000 term loan (Note), which is secured by a first priority preferred security interest in all property of Westport Holdings Tampa I, L.P. and Westport Holdings Tampa II, L.P., including, without limitation, the accounts and other collateral of the two entities. The note entered into with CPIF matures on September 30, 2015. The Company pays interest in arrears monthly at the rate of 11% per annum.

On March 31, 2014 the Company entered into a loan agreement with USAmeriBank (USAB) to provide a $15,000,000 term loan (Note), which is secured by a first priority preferred security interest in all property of Westport Nursing Tampa, LLC, including, without limitation, the accounts and other collateral of the Company. The note entered with USAB matures on March 1, 2016. The Company pays interest in arrears monthly at the rate of 11% per annum, along with principal totaling $98,580.

The Company is required to maintain certain minimum financial covenants under its debt agreements commencing on March 31, 2014. As of December 31, 2014 the Company was not in compliance with the covenants. The Company received a waiver of compliance with the required covenants as of December 31, 2014.

As of the date of the financial statements, the Company is in the process of refinancing the CPIF debt due to mature on September 30, 2015 with US AmeriBank. The terms of the deal would provide funding in the amount of $11,600,000 in order to payoff the existing debt of $9,500,000 and provide for additional funding for capital improvements. The maturity date would be extended 2 years from the date of closing, with an option to extend for a third year. The Company would be required to pay a monthly amount of $40,000, including interest at a fixed rate of 4.75%.

Capital Lease

During December 2011, the Company acquired equipment under a long-term capital lease. The lease requires 60 monthly payments of $2,313 including interest at 4.8% and expires in December 2016. For financial reporting purposes, the present value of the minimum lease payments has been capitalized. The property under this lease had a total cost of $123,078 and accumulated depreciation of $54,213 at December 31, 2014.  Future minimum payments required under the lease for 2015 and 2016 are $27,751, for a total of $55,502. The future minimum lease payments include interest of $2,692 for a net present value of the capital lease payable of $52,810.

During February 2013, the Company acquired equipment under a long-term capital lease. The lease requires a security deposit of $783 and 34 monthly payments of $391 including interest at 14.25% and expires in December 2015. For financial reporting purposes, the present value of the minimum lease payments has been capitalized. The property under this lease had a total cost of $14,263 and accumulated depreciation of $3,095 at December 31, 2014.  Future minimum payments required under the lease for 2015 are $4,496. The future minimum lease payments include interest of $317 for a net present value of the capital lease payable of $4,181.

THIS IS NOT A
CERTIFIED COPY

## AMENDMENT TO LOAN AGREEMENT

**THIS AMENDMENT TO LOAN AGREEMENT** (this "Agreement"), dated as of the 14th day of August, 2015, between **WESTPORT NURSING TAMPA, L.L.C.,** a Florida limited liability company (the "**Borrower**"), **BVM MANAGEMENT, INC.,** an Indiana non-profit corporation (the "**Guarantor**"), and **USAMERIBANK,** a Florida state banking corporation (the "**Lender**").

### RECITALS

A.      Borrower is indebted to Lender for a certain loan (the "**Loan**") in the original principal amount of $15,000,000.00 evidenced by a certain Loan Agreement between Borrower Lender dated March 31, 2014 (together with any amendments thereto, the "**Loan Agreement**") and the other Loan Documents (as defined in the Loan Agreement). *Capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Loan Agreement.*

B.      In connection with the Loan, Guarantor executed that certain Guaranty Agreement dated March 31, 2014 in favor of Lender (together with any amendments thereto, the "**Guaranty**").

C.      Borrower, Guarantor and Lender now mutually desire to amend the Loan Agreement as hereinafter provided.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing recitals and other good and valuable consideration, the parties agree as follows:

1.      The recitals hereto are true and correct.

2.      The Loan Agreement is hereby amended to add the following paragraph as the final paragraph of Article VI (i.e., following Section 6.2(g) thereof):

> As set forth herein above, upon an Event of Default, Lender shall have exclusive rights to pursue remedies as set forth in this Loan Agreement and the other Loan Documents; provided, however, in the course of the exercise of any such remedies, the rights of the residents under a continuing care or continuing care at home contract will be honored and will not be disturbed by a foreclosure or conveyance in lieu thereof as long as the resident (a) is current in the payment of all monetary obligations required by the contract, (b) is in compliance and continues to comply with all provisions of the contract, and (c) has asserted no claim inconsistent with the rights of the Lender.

3.      Borrower and Guarantor each represents and warrants that no Event of Default currently exists.

24503324 v1

THIS IS NOT A CERTIFIED COPY

4.      Except as hereby expressly modified and amended, the Loan Agreement shall remain in full force and effect, and the Loan Agreement, as so amended, is hereby ratified and affirmed in all respects.

5.      No rights of Lender with respect to the Loan Agreement or other Loan Documents (including without limitation, the Guaranty) are or will be in any manner released, destroyed, diminished, or otherwise adversely affected by this Agreement, except as expressly provided herein.  Borrower and Guarantor each confirm that neither of them have any defenses or setoffs with respect to its respective obligations pursuant to any of the Loan Documents to which it is a party.

6.      This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns.

7.      This Agreement may be executed in counterparts, each of which shall be an original, but all of which when taken together shall constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

24503324 v1                                              2

THIS IS NOT A CERTIFIED COPY

4. Except as hereby expressly modified and amended, the Loan Agreement shall remain in full force and effect, and the Loan Agreement, as so amended, is hereby ratified and affirmed in all respects.

5. No rights of Lender with respect to the Loan Agreement or other Loan Documents (including without limitation, the Guaranty) are or will be in any manner released, destroyed, diminished, or otherwise adversely affected by this Agreement, except as expressly provided herein. Borrower and Guarantor each confirm that neither of them have any defenses or setoffs with respect to its respective obligations pursuant to any of the Loan Documents to which it is a party.

6. This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns.

7. This Agreement may be executed in counterparts, each of which shall be an original, but all of which when taken together shall constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be properly executed and delivered as of the day and year first above written.

BORROWER:

**WESTPORT NURSING TAMPA, L.L.C.,**

a Florida limited liability company

By:    IMH HEALTHCARE, L.L.C.,

a Delaware limited liability company

Its Managing Member

By: _____

Eli Freiden

Its Sole and Managing Member

STATE OF   Florida        )

COUNTY OF   Palm Beach,  )

The foregoing instrument was acknowledged before me this 14th day of August, 2015 _____

*Nancy E Smith*

Signature of Notary Public

Nancy E. Smith

NANCY E. SMITH
Notary Public, State of Florida
Commission# FF 242263
My comm. expires June 21, 2019

THIS IS NOT A CERTIFIED COPY

**GUARANTOR:**

**BVM MANAGEMENT, INC.,**
an Indiana non-profit corporation

By: _John Bartle_
Print Name: _John Bartle_
Its: _Vice_

STATE OF _Florida_ )

COUNTY OF _Hillsborough_ )

The foregoing instrument was acknowledged before me this _14_ day of _August_ , 2015, by _John Bartle_ as the _President_ of BVM Management, Inc., an Indiana non-profit corporation. S/he is personally known to me or has produced a driver's license as identification.

_Lucette Marie Lowery_
Signature of Notary Public
Print name: _Lucette Marie Lowery_
My Commission Expires: _02/15/2018_

AFFIX NOTARY SEAL / STAMP



LUCETTE MARIE LOWERY
Notary Public - State of Florida
My Comm. Expires Feb 15, 2018
Commission # FF 078664
Bonded Through National Notary Assn.

[Signatures Continue on Following Page]

24503324 v1                              4