UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP, | Case No. 8:16-bk-8167-MGW |
| WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP, | Case No. 8:16-bk-8168-MGW |
| Debtors. | *Jointly Administered under Case No. 8:16-bk-8167-MGW* |
| _____/ | |
| WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP, | |
| Counterclaim Plaintiff, | |
| vs. | Adv. Proc. No.: |
| TIMOTHY PARKER and KATHLEEN BURKHOLDER, | |
| Counterclaim Defendants. | |
| _____/ | |

**COMPLAINT OBJECTING TO
CLAIM NOS. 91 AND 92 FILED BY TIMOTHY PARKER AND
KATHLEEN BURKHOLDER AND COUNTERCLAIM FOR DAMAGES**

Plaintiff and Debtor, WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP (the

"**Debtor**" or "**Westport**"), by and through its undersigned counsel, objects to Claim Nos. 91 and

92 (the "**Claims**") filed by Timothy Parker ("**Parker**") and Kathleen Burkholder ("**Burkholder**,"

and together with Parker, the "**Claimants**"), respectively, and requests that the Court disallow the

Claims for the reasons set forth below. The Debtor further files its counterclaims and sues (the

"**Counterclaim**") Parker and Burkholder for damages resulting from their tortious conduct and


PLAINTIFF'S
EXHIBIT
Burkholder #98
4-15-23 DK

Case 8:11-ap-00684-MGW Doc 17 Filed 05/14/13 Page 2 of 30

breaches of duties. In support of this objection to the Claims (the "**Objection**") and the Counterclaim, the Debtor states as follows:

## JURISDICTION

1.      The claims asserted in the Counterclaim are necessary to resolve in the course of determining the allowance or disallowance of the Claims.

2.      To the extent the Court determines it lacks jurisdiction or constitutional authority to adjudicate any of the claims raised in the Objection and Counterclaim, the Debtor consents to this Courts final adjudication of those claims pursuant to 28 U.S.C. § 157(c).

3.      The statutory predicates for the relief sought herein include 11 U.S.C. § 502; and Rules 3007 and 7001, *et seq*. of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4.      This Objection is properly brought as an adversary proceeding because it includes claims for relief of the kind specified in Bankruptcy Rule 7001. *See* Fed. R. Bankr. P. 3007(b).

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND AND THE PARTIES

6.      On September 21, 2016 (the "**Petition Date**"), the Debtor filed with this Court its Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

7.      The Debtor continues to manage its assets and financial affairs as debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code and orders of this Court.

8.      Westport and its affiliate operate as a continuing care retirement community (a "**CCRC**") known as "University Village," which includes an independent living facility comprised

of 446 independent living facility apartments and 46 independent living facility villas (collectively, "**University Village**").

9.  The villas are owned by Westport Holdings Tampa II, L.P., ("**Westport II**") also a debtor before this Court.[1]

10.  As a CCRC, Westport provides "lifecare" services to its residents, which recognize that the healthcare and residency needs vary along a continuum from independent living to full-time nursing care.  Under the "continuing care" concept, residents enter into a residency and care agreement with Westport which requires payment of a one-time entrance fee (either prospective or deferred) and a monthly service fee (a "**Life Care Contract**").  Generally, payment of these fees entitles residents to the use and privileges of University Village for life but does not entitle the residents to an interest in the real estate or any property owned by Holdings.

11.  As a CCRC, the Debtor is governed by Section 651 of the Florida Statutes, compliance with which is overseen by Florida's Office of Insurance Regulation (the "**OIR**").

12.  A non-debtor, non-party entity, Westport Nursing Tampa, LLC, owns a building on the University Village campus across the street from the ILF Apartments, which contains a 110-bed assisted living facility and a 120-bed skilled nursing facility (collectively, the "**Health Center**").

13.  The Debtor is a Delaware limited partnership.

14.  Parker is the former Executive Director of the Debtor and is a resident of Hillsborough County, Florida.

15.  Parker filed a proof of claim, Claim No. 91, in the Debtor's bankruptcy case seeking payment of $999,999 for "employment discrimination."

---

[1] The bankruptcy case of WHT II has been administratively consolidated with the Debtor's case.

16.     Burkholder is the former Chief Financial Officer ("**CFO**") of the Debtor and is a resident of Pinellas County, Florida.

17.     Burkholder filed a proof of claim, Claim No. 92, in the Debtor's bankruptcy case seeking payment of $250,000 for "employment discrimination."

18.     The Claims attached a copy of a complaint filed by the Claimants pre-petition in the Circuit Court for Hillsborough County, Florida which asserts one count under Florida's Private Whistleblower Act (the "**State Court Complaint**"), a copy of which is attached hereto as **Exhibit A**.[2]

## ALLEGATIONS COMMON TO OBJECTION AND COUNTERCLAIM

### *The Debtor's Litigation with the OIR and DFS*

19.     Under the Debtor's limited partnership agreement, the Debtor's general partner has the responsibility to manage and oversee the Debtor's operations as a CCRC.

20.     In December 2014, the Debtor's then general partner, Westport Holdings University Village, LLC ("**WHUV**"), run by Larry Landry, abruptly notified the Debtor's limited partners that it intended to immediately abdicate its general partnership duties.

21.     Following WHUV's resignation as general partner, the Debtor was notified by the OIR that a replacement general partner would need to submit an acquisition application under Section 628.4615 of the Florida Statutes to the OIR.

22.     Although the Debtor disputed the need for an acquisition application for the Debtors' 1% general partnership interest, the Debtor's new general partners nonetheless submitted acquisition applications to the OIR.

23.     The OIR denied each acquisition application.

---

[2] The State Court Complaint was never served.  Initially, the State Court Complaint was stayed by the filing of the OIR's receivership action and then stayed by the Debtor's bankruptcy filing.

24.     On April 16, 2015, the Debtor, along with its general partner IMH Healthcare, LLC ("**IMH**"), requested a hearing with the Division of Administrative Hearings regarding OIR's denial of IMH's acquisition application. A final hearing in was set for November 2015.

25.     On March 11, 2015, the State of Florida, Department of Financial Services (the "**DFS**") filed an Application for an Order to Show Cause against the Debtor relating to the appointment of a receiver over the Debtor.

26.     Thus, the Debtor was engaged in active litigation with the OIR and the DFS from approximately early 2015 until the Petition Date on September 21, 2016.

### *The Claimants and their Conduct Prior to Termination*

27.     Parker was the Executive Director of the Debtor from 1996 until his termination in August 2015. As Executive Director, Parker was responsible for overseeing all day-to-day affairs of the Debtor, similar to the role of a Chief Executive Officer.

28.     At all times material, Burkholder was the Chief Financial Officer of the Debtor.

29.     Beginning in the fourth quarter of 2014 and continuing through 2015, the Claimants undertook a course of action designed to undermine the Debtor's operations, force the Debtor into receivership, and align themselves with third parties for their personal gain and enrichment.

30.     On or about February 12, 2015, Parker was asked by interim general partner representative, Rebecca J. Bartle, on behalf of Compliance Concepts, LLC (the then-general partner), how detrimental information about University Village was leaked to the OIR and local Tampa news outlets.

31.     Parker replied to Mrs. Bartle, with John Bartle as a witness, stating he did not have any idea where the information came from.

32. Such statement by Parker was a false statement, as both Parker and Burkholder had been in communication with the OIR and provided unreliable, false, and/or misleading information to the OIR.

33. The Debtor was damaged as a result of the Claimants' inaccurate statements made to the OIR and/or news media outlets.

34. Parker made a false statement when he denied his involvement or his awareness of Burkholder's actions in supplying information to the OIR and/or news media outlets against the directions of the then general partner.

35. Throughout 2015, Burkholder, in her position as CFO, transferred proprietary, confidential, and/or trade secret information of Westport and University Village to third-party competitors of Westport without the consent of Westport or Westport's general partner.

36. This proprietary, confidential, and/or trade secret information included revenue forecasts, budgets, valuation analyses, financial statements, balance sheets, and refund obligation information, among other unknown information. At no time was Burkholder authorized to transmit proprietary information belonging to her employer, Westport, to third parties.

37. Burkholder used her personal email (on company time) to transmit proprietary, confidential information from company files to competitors.

38. Upon information and belief, Parker and Burkholder were working with these third-party competitors to orchestrate a scheme aimed towards acquiring University Village through a DFS receivership.

39. Burkholder and Parker had a prior employment relationship with this third-party competitor and, upon information and belief, were positioning themselves to obtain ownership

6

Case 8:17-ap-00684-MGW Doc 2-1 Filed 09/14/17 Page 7 of 30

and/or employment in the prospective purchaser of University Village in return for their assistance in orchestrating the takeover bid.

40. Burkholder and Parker met with third-party investors and/or participated in conference calls with third-party competitors on several occasions to orchestrate a scheme to undermine the operations of Westport and lead the operations of University Village to become so impaired that a receiver would be appointed over Westport.

41. Upon information and belief, Burkholder and Parker were active in this conspiracy and met with third-parties continually in an attempt to further advance their personal net worth and/or future employment.

42. Upon information and belief, third-party competitors contacted and supplied proprietary, confidential, and/or trade secret information by Parker and/or Burkholder regarding a potential acquisition of University Village include, but may not be limited to: Lawrence Landry, Chief Executive Officer of Agewell Senior Living; David Mills, Chief Operating Officer of Agewell Senior Living; Mark Lichtenwalner, Vice President of Agewell Senior Living; Richard Ackerman, Senior Managing Principal of Big Rock Senior Housing; Kevin Angelis, Co-Managing Partner of BHMS Investments; and Robert Salamon, Co-Managing Partner of BHMS Investments.

43. Burkholder and Parker also transmitted proprietary, confidential, and/or trade secret information of Westport and University Village to certain "residents" at University Village without the authorized consent of the Debtor's general partner or the Debtor's other owners.

44. Upon information and belief, some of the unauthorized information supplied to the residents was either false, misleading or inappropriate. The transmission of this information through the email account of Burkholder was damaging to the employer and contained

Case 8:17-ap-00684-MGW    Doc 17    Filed 09/14/17    Page 8 of 30

misrepresentations and other statements that were not factual and furthered the efforts of Burkholder and Parker to undermine the going concern value of University Village.

45.    The transmission of proprietary, confidential, and/or trade secret information of Westport and University Village to residents was an attempt to undermine the authority of ownership and to impair the operating efficiency of University Village, all to the personal advantage of the Claimants.

46.    Burkholder routinely transmitted proprietary information to third-parties, met with those third-parties on off premises meetings, and continued to conspire with Parker and others to undermine the going concern value of University Village.

47.    In response to questions from the OIR to Burkholder and Parker, the Debtor's then-existing counsel, the law firm of Broad & Cassel, advised Westport to make certain Parker and Burkholder did not transmit any information to the OIR without providing the law firm with the opportunity to review the information in advance.

48.    This policy was to ensure accuracy of the information being provided and is typical in cases involving active litigation with government agencies.

49.    At a meeting held on April 28, 2015, by and between Parker, the Debtor's general partner representative Eli Frieden, and Human Resources Director Sandra Dinero, Parker was informed of the advice and instruction of the law firm of Broad & Cassel.

50.    At that meeting, Parker stated that he would not follow the instructions and advice of Westport's legal counsel.

51.    Burkholder continued to interfere with the operations of the Health Center and had provided unreliable, false, and/or misleading information to the OIR.  The unreliable, false, and/or

Case 8:17-ap-00684-MGW Doc 1 Filed 05/14/17 Page 9 of 30

misleading nature of such information was not discovered until mid-2015, which led to Burkholder's suspension.

52. Following these insubordinate acts of Parker and Burkholder, both were placed on administrative leave in order to provide a thorough investigation of their activities and insubordinate behavior.

53. Soon after they were placed on administrative leave, Westport discovered that, using her company computer, Burkholder had been transferring the proprietary, confidential, and/or trade secret information of Westport (discussed more fully above) from her computer files to third-parties without the authorized approval of Westport.

54. Upon further investigation, it was determined Burkholder had copied Parker on privileged communication relating to the business affairs of the employer and Parker and Burkholder conspired to undermine the going concern of Westport with the goal of securing ownership and/or employment with prospective purchasers of University Village after a sale through the DFS receivership action.

55. Following the discovery of the emails documenting the Claimants' efforts to orchestrate a scheme to takeover and/or oust Westport's ownership through a receivership sale, Eli Frieden, as representative of the general partner IMH, terminated the employment of Parker and Burkholder.

## OBJECTION TO CLAIM

56. This is an objection to the Claim pursuant to Section 502 of the Bankruptcy Code and Bankruptcy Rule 3007.

57. All conditions precedent to the maintenance of this Objection have occurred.

58.     The Claims are based on the State Court Complaint's single count asserted under Florida's Private Whistleblower Act (the "**FWA**"), which alleges, in pertinent part:

a.     Defendant is an employer as defined by the [FWA] and employed Plaintiffs[3] at all relevant times.  (State Court Complaint ¶ 36.)

b.     Defendant retaliated against Plaintiffs as set forth because they objected to and/or refused to participate in violations of laws, rules, or regulations. (State Court Complaint ¶ 37.)

c.     Plaintiffs' terminations were in retaliation for their objections to and/or refusal to participate in said violations of laws, rules or regulations. (State Court Complaint ¶ 38.)

d.     The retaliatory actions of Defendant violate the [FWA].  (State Court Complaint ¶ 39.)

e.     As a result of the retaliatory actions of Defendant, Plaintiffs have suffered, and will continue to suffer, damages. (State Court Complaint ¶ 40.)

59.     Based on the above-cited paragraphs of the Complaint, the Claims appear to be based on § 448.102(3) of the Florida Statutes, which provides:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
>
> (3)     Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

Fla. Stat. § 448.102(3).

60.     A plaintiff asserting a private whistleblower claim must initially make a prima facie showing that the termination was a result of retaliation—that (1) he or she engaged in statutorily

---

[3] Plaintiffs in the State Court Complaint are Timothy Parker and Kathleen Burkholder.

Case 8:17-ap-00684-MGW Doc 1 Filed 09/14/17 Page 11 of 30

protected expression; (2) he or she suffered an adverse employment action; and (3) the adverse employment action was causally related to the protected expression. *Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 831 (11th Cir. 2013); *see also Kearns v. Farmer Acquisition Co.*, 157 So.3d 458, 462 (Fla. 2d DCA 2015).

61. The State Court Complaint bases the alleged FWA claim on purported violations of certain sections of chapters 651 and 631 of the Florida Statutes.

62. As an initial matter, the State Court Complaint does not plead sufficient facts to conclude that Westport *actually* violated a law, rule, or regulation. *See, e.g., Gradd v. Wal-Mart Stores East, LP*, 2017 WL 600094 (M.D. Fla. Feb. 14, 2017) (requiring finding of *actual*—not perceived—violation of a law, rule, or regulation to sustain a claim under Fla. Stat. § 448.102(3)).

63. Further, Claimants' FWA claims based on purported violations of chapter 631 of the Florida statues does not assert a violation of a law because, pursuant to Section 651.013 of the Florida Statutes, except as specifically provided in Section 651, providers of continuing care and continuing care at-home are governed by the provisions of Section 651 are exempt from all other provisions of the Florida Insurance Code.

64. The Claims also fail to contain any information or calculation showing how the Claimants determined the amount of their Claims: $999,000 for Burkholder and $250,000 for Parker. Indeed, the amounts asserted appear to be arbitrary.

65. The Claims fail to provide any basis upon which to conclude whether the Claimants engaged in any efforts to mitigate any damages allegedly sustained as a result of their termination.

66. Most importantly, the Claimants were not terminated as retaliation for their objection to, or refusal to participate in, an activity, policy, or practice of Westport which could

have been in violation of a law, rule, or regulation. The Claimants were terminated because, among other potential reasons:

a.  Claimants refused to follow the advice of Westport's legal counsel that all information to be disclosed to the OIR should be provided first to their legal counsel so they could review such information in advance of disclosure;

b.  Claimants provided unreliable, false, and/or misleading information to the OIR and/or local news outlets, which caused damage to the Debtor;

c.  Westport's general partner representative discovered emails on Burkholder's company computer evidencing a course of conduct designed to orchestrate a takeover of Westport's ownership through a sale through the DFS receivership action and, upon information and belief, the Debtors believe Parker was aware of and complicit with such conduct;

d.  Westport's general partner representative discovered emails on Burkholder's company computer evidencing the unauthorized disclosure of proprietary, confidential, and/or trade secret information of Westport and University Village to third-party competitors of Westport and, upon information and belief, the Debtors believe Parker was aware of and complicit with such disclosure;

e.  The Claimants made false and damaging statements to state agencies, federal agencies, and residents of University Village with malicious intent, which irreparably harmed the Debtor; and

f.  Claimants are liable for the claims pleaded through the Counterclaim, *infra*.

12

67.     Further, as set forth in more detail below, the Claims are subject to setoff against the counter-claims of the Debtor pleaded below.

68.     The Debtor is entitled to and hereby demands from the Claimants an award of attorney fees incurred in connection with this proceeding pursuant to § 448.104 of the Florida Statutes.

WHEREFORE, the Debtor respectfully requests that this Court (i) sustain this Objection (ii) disallow the Claims; (iii) award attorney fees to the Debtor incurred in connection with this proceeding; and (iv) provide for such other and further relief as the Court deems just and proper.

## COUNTERCLAIM AND CLAIM FOR RELIEF

Westport, in its capacity as a Debtor in Possession, counterclaims against and sues Parker and Burkholder (together, the "**Counter-Defendants**") and states the following:

### COUNT I
### Breach of Fiduciary Duty

69.     Westport hereby realleges paragraphs 1 through 68 above as if fully set forth herein.

70.     At all times material, Parker owed fiduciary duties to Westport by virtue of his role as Executive Director.

71.     At all times material, Burkholder owed fiduciary duties to Westport by virtue of her role as Chief Financial Officer.

72.     At all times material, Westport reposed its confidence in the Counter-Defendants, and the Counter-Defendants, in equity and good conscience, were bound to act in good faith and with due regard to Westport's interests.

73.     Counter-Defendants breached their fiduciary duties by coordinating with competitors to take over ownership of University Village following a potential receivership or DFS liquidation.

13

Case 8:17-ap-00684-MGW   Doc 1   Filed 09/14/17   Page 14 of 30

74.     Upon information and belief, Counter-Defendants were promised ownership and/or employment in the potential purchasing entity in return for their assistance in coordinating the takeover bid.

75.     In the course of soliciting potential takeover bids, Counter-Defendants disclosed confidential and/or proprietary information to these competitors, without the knowledge or consent of their employer.

76.     By disclosing confidential and/or proprietary information to competitors, and otherwise taking efforts to cause the Debtor's operations to deteriorate in furtherance of their goals to force the Debtor into receivership, Counter-Defendants' actions damaged the Debtor.

WHEREFORE, the Debtor respectfully requests that this honorable Court enter judgment against the Claimants, awarding damages, litigation costs and attorneys' fees to the extent allowable, and for such other legal and equitable relief the Court deems just.

## COUNT II
### Tortious Interference with Business Relationships

77.     Westport hereby realleges paragraphs 1 through 68 above as if fully set forth herein.

78.     At all times material to this action, the Westport maintained business relationships with its residents.

79.     Parker had knowledge of the business relationship between Westport and its residents.

80.     Burkholder had knowledge of the business relationship between Westport and its residents.

81.     Counter-Defendants intentionally and unjustifiably interfered with Westport's contractual relationships with the residents by providing confidential and/or proprietary information to residents, some of which was false, inaccurate, and/or unreliable, and was far

14

beyond the scope of information generally provided to residents and/or required to be provided under the Life Care Contracts, against the orders of Westport's general partner, and which had the effect of interfering and/or damaging Westport's business relationship with is residents.

82.     Counter-Defendants intentionally and unjustifiably interfered with Westport's business relationships with the residents by providing confidential and/or proprietary information to the OIR, some of which was false, inaccurate, and/or unreliable, and which was beyond the scope of the information required to be provided to the OIR, against the orders of Westport's general partner, which had the effect of interfering and/or damaging Westport's business relationship with is residents.

83.     Counter-Defendants intentionally and unjustifiably engaged in a course of conduct designed to undermine Westport's operations so they could orchestrate a takeover of Westport's ownership, which had the effect of interfering and/or damaging Westport's business relationship with is residents.

84.     Westport has suffered damages as a result of the Claimants' interference with the Westport's business relationships with its residents.

WHEREFORE, Westport respectfully requests that the Court enter judgment against the Claimants, awarding damages, litigation costs, and attorneys' fees to the extent allowable, and for such other legal and equitable relief the Court deems just.

## COUNT III
### Tortious Interference with Contract

85.     Westport hereby realleges paragraphs 1 through 68 above as if fully set forth herein.

86.     At all times material to this action, Westport had advantageous business relationships with its residents, evidenced by the Life Care Contracts entered into by Westport and each resident.

15

Case 8:17-ap-00684-MGW    Doc 1    Filed 09/14/17    Page 16 of 30

87.    At all times material to this action, Counter-Defendants had knowledge of the existence of the Life Care Contracts between Westport and each resident.

88.    Counter-Defendants intentionally and unjustifiably interfered with Westport's contractual relationships with the residents by providing confidential and/or proprietary information to residents, some of which was false, inaccurate, and/or unreliable, and was far beyond the scope of information generally provided to residents and/or required to be provided under the Life Care Contracts, against the orders of Westport's general partner.

89.    Counter-Defendants intentionally and unjustifiably interfered with Westport's contractual relationships with the residents by providing confidential and/or proprietary information to the OIR, some of which was false, inaccurate, and/or unreliable, and which was beyond the scope of the information required to be provided to the OIR, against the orders of Westport's general partner.

90.    Counter-Defendants intentionally and unjustifiably interfered with Westport's contractual relationships with the residents by engaging in a course of conduct designed to undermine Westport's operations so they could orchestrate a takeover of Westport's ownership.

91.    Counter-Defendants' actions amounted to an attempt to procure the beneficial rights of Westport's Life Care Contracts for a competitor.

92.    Upon information and belief, Counter-Defendants intended to obtain ownership and/or employment in the prospective purchaser.

93.    Westport has suffered damages as a result of the Claimants' interference with the Westport's contractual relationships with its residents.

WHEREFORE, Westport respectfully requests that the Court enter judgment against the Claimants, awarding damages, litigation costs, and attorneys' fees to the extent allowable, and for such other legal and equitable relief the Court deems just.

## COUNT IV
### Misappropriation of Trade Secrets – Uniform Trade Secrets Act

94.     Westport hereby realleges paragraphs 1 through 68 above as if fully set forth herein.

95.     This is an action for misappropriation of trade secrets under Section 688.001 *et seq.* of the Florida Statutes.

96.     Counter-Defendants disclosed trade secrets of Westport to Westport's competitors without Westport's express or implied consent.

97.     At the time of Parker's and Burkholder's unauthorized disclosure of Westport's trade secrets, Counter-Defendants used improper means to acquire the trade secrets by, among other means, emailing trade secret information from their Westport/University Village email accounts to their personal email accounts.

98.     At the time of Parker's and Burkholder's unauthorized disclosure of Westport's trade secrets, Counter-Defendants knew or had reason to know that their knowledge of the trade secrets were acquired under circumstances giving rise to a duty to maintain the trade secrets' secrecy or limit their use.

99.     At the time of Counter-Defendants' unauthorized disclosure of Westport's trade secrets, Counter-Defendants owed fiduciary duties to Westport.

100.    The trade secrets misappropriated by Counter-Defendants include, but may not be limited to:

a.      Proprietary projections and revenue forecasts of Westport;

b.      Proprietary budgets for Westport, Westport II, and/or the Health Center;

17

Case 8:17-ap-00684-MGW   Doc 1   Filed 09/14/17   Page 18 of 30

    c.      Proprietary budget information for the Health Center, including census assumptions, payer types, and payroll information which was not property of the Claimants or the Debtor;

    d.      Proprietary valuation analyses of Westport and/or University Village which were compiled with the use of other proprietary trade secret information;

    e.      Proprietary information on Westport's historical refund obligations paid to residents under Life Care Contracts;

101.    Counter-Defendants disclosed trade secrets to competitors of Westport in an effort to orchestrate a takeover or buyout of Westport's ownership and, upon information and belief, to obtain ownership and/or employment in the prospective purchaser.

102.    Counter-Defendants' misappropriation of Westport's trade secrets caused damage to Westport.

103.    Counter-Defendants' misappropriation of Westport's trade secrets was willful and malicious and, therefore, Westport is entitled to attorney fees pursuant to Section 688.004 of the Florida Statutes.

WHEREFORE, Westport respectfully requests that the Court enter judgment against the Claimants, awarding damages, litigation costs, and attorneys' fees to the extent allowable, and for such other legal and equitable relief the Court deems just.

## COUNT VI
### Civil Conspiracy

104.    The Debtor hereby realleges paragraphs 1 through 68 above as if fully set forth herein.

105.    Counter-Defendants are parties to a civil conspiracy.

18

106.    Counter-Defendants conspired to orchestrate a scheme whereby they would undermine the operations of Westport and coordinate a takeover or buyout of Westport's ownership and, upon information and belief, obtain ownership and/or employment in the prospective purchaser.

107.    Counter-Defendants' scheme constituted an unlawful breach of fiduciary duty and/or was implemented by a series of unlawful breaches of fiduciary duty.

108.    Counter-Defendants committed overt acts in furtherance of their conspiracy, including the disseminating confidential, proprietary, and/or trade secret information of Westport to competitors of Westport, all in furtherance of their conspiracy.

109.    Counter-Defendants' conspiracy and their respective overt acts caused Westport to suffer damages.

WHEREFORE, Westport respectfully requests that the Court enter judgment against the Claimants, awarding damages, litigation costs, and attorneys' fees to the extent allowable, and for such other legal and equitable relief the Court deems just.

Dated: September 14, 2017.

/s/ Scott A. Stichter
Scott A. Stichter (FBN 0710679)
Matthew B. Hale (FBN 0110600)
Stichter, Riedel, Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:      (813) 229-0144
Facsimile:      (813) 229-1811
Emails:         sstichter@srbp.com
                mhale@srbp.com
Attorneys for Debtor

## IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH FLORIDA
### CIRCUIT CIVIL DIVISION

**TIMOTHY PARKER and
KATHY BURKHOLDER,**

     Plaintiffs,

v.

**WESTPORT HOLDINGS TAMPA, LP
d/b/a University Village,**

     Defendant.

_____/

## COMPLAINT

**COMES NOW**, Plaintiffs, TIMOTHY PARKER and KATHY BURKHOLDER, by and through their undersigned counsel, and sues the Defendant, WESTPORT HOLDINGS TAMPA, LP d/b/a University Village, and in support thereof, state as follows:

### JURISDICTION AND VENUE

1. This is an action for damages which exceed Fifteen Thousand Dollars ($15,000.00).

2. Venue lies within Hillsborough County because a substantial part of the events giving rise to this claim arose in this Judicial District.

### PARTIES

3. Plaintiff, TIMOTHY PARKER (Parker), is a resident of Hillsborough County, Florida.

4. Plaintiff, KATHY BURKHOLDER (Burkholder), is a resident of Pinellas County, Florida.

5. Defendant, WESTPORT HOLDINGS TAMPA, LP dba University Village (Westport Tampa I or University Village) is a foreign corporation licensed and authorized to conduct business in the State of Florida an doing business within Hillsborough County.

6. University Village is a Continuing Care Retirement Community (CCRC), regulated by the

Exhibit A

Florida Office of Insurance Regulation (OIR) pursuant and subject to Florida Statutes Chapter 651.

## FACTS

7.       University Village is a continuing care retirement community (CCRC) in Hillsborough County, Florida.  A CCRC offers shelter, care, and services for residents upon payment on an entrance fee pursuant to continuing care contracts under Florida Statute § 651.011(2).

8.       Continuing care contracts, also referred to as "entrance agreements," are between the resident and the CCRC provider and establish the terms and conditions of the residents' care while at the CCRC.  Such terms include the entrance fee to be paid, the amount of monthly fees, future levels of care through advanced aging, including assisted living and skilled nursing, and any refund to be paid by the provider to the resident or their estate upon exit from the CCRC.  Entrance fees typically range from $10,000 to $2 million.  The refund due upon exist from the CCRC is a percentage of the entrance fee and, accordingly, can also be substantial.

9.       University Village houses 446 apartments and 46 duplexes as an Independent Living Facility (ILF), and a Health Center containing 120 beds as a Skilled Nursing Facility (SNF), and 110 beds as an Assisted Living Facility (ALF) with a memory care wing.  All tolled, University Village contains a total of 492 independent living units and 230 beds in the Health Center, housing and caring for over 600 Residents.

10.      In April 2014, University Village owner, Larry Landry, sold the limited partnership/minority interest in University Village to John Bartle.  Landry intended to sell the general partnership/controlling interest to Bartle at a later date.

11.      Landry and Bartle represented to the OIR that the management and control of University Village remained with Landry, and that when the Bartle acquired the controlling interest of University Village they would file the required application for acquisition with the OIR pursuant to

2

Exhibit A

statute.

12.     However, it became almost immediately apparent that John Bartle and his affiliates, primarily his wife and other family members, were controlling the day-to-day operations of University Village, and had essentially taken over, without permission from the OIR.

13.     On or about January 31, 2015, Rebecca Bartle, John Bartles wife, sent notice to the employees of University Village, advising them that effective January 26, 2015, she held the controlling interest in University Village through a corporation she exclusively owned and operated. However, as of this date, no one had submitted an application to OIR for approval to acquire University Village, as required by Florida Statutes § 651.024 and § 628.4615.

14.     On or about February 13, 2015, having still not received a completed application for approval to acquire University Village from the Bartles, the OIR filed an Initial Order of Suspension, requiring University Village to show cause why the OIR should not permanently suspend or revoke University Village's Certificate of Authority to do business as a CCRC in the State of Florida.

15.     Since March 2014, John and Rebecca Bartle, and their affiliates, had taken over day-to-day operations, management, and personnel decisions, directing capital for improvements, changing policy and procedure of the facility, approving contracts, directing when and if vendors were paid, and managing the monetary accounts related to University Village, all without the authority of the OIR.[1]

16.     John Bartle continued calling the shots at University Village, despite the OIR's repeated warnings that Bartle and his affiliates must comply with the statutory requirements. By this time, the OIR was aware that John Bartle, was associated with Skyline Manor, a CCRC in Nebraska, which

---

[1] As an example, in or around April 2014, Jared McCowan began giving plaintiff, Burkholder, instructions regarding what vendors to pay and when to pay them. This was a function over which she exercised independence and discretion previously.

3

Case 8:17-ap-00684-MGW   Doc 1   Filed 09/14/17   Page 23 of 30

was driven into bankruptcy. Although Skyline Manor remained as a debtor in possession during the bankruptcy proceedings, the presiding Judge appointed a receiver to operate the facility based upon a finding that the management provided by Bartle and his associates was grossly incompetent. In fact, in its Application for Order to Show Cause, the Florida Department of Financial Services stated, "given this [John Bartle's mismanagement and bankruptcy of Skyline Manner], it is hardly surprising that [Bartle] has failed to provide the biographical information required of an applicant seeking to acquire controlling interest in a CCRC by sections 628.4615 and 651.024, Florida Statutes."

17.     On or about February 10, 2015, the OIR began an investigation into their concerns at University Village. The OIR has the right to access and inspect any records of a CCRC under Fla. Stat. 651.105(2). Fla. Stat. 651.106, 631.051(4) and 631.391 require that University Village, its subsidiaries, and affiliates cooperate with State inspectors.

18.     However, staff at University Village had been instructed by John Bartle not to communicate with the investigators or answer any of their questions.

19.     Early in their investigation, investigators began asking questions of Plaintiffs, Parker and Burkholder. Parker had been the Executive Director at University Village since June 1996, and Burkholder had held various Accounting Department roles over the years, including Accounting Director and, most recently, CFO. As instructed, they told investigators that they were not permitted to answer their questions.

20.     Out of concern for the events that had been unfolding and the apparent impending demise of the CCRC, Parker and Burkholder began cooperating with investigators and answering their questions.

21.     Parker's deposition was taken on April 24, 2015; during his examination, Parker confirmed and expanded upon many of the statutory violations that had taken place, and were still taking place,

4

Exhibit A

at University Village at the direction of the Bartles and their affiliates, including misappropriation of funds in the Minimum Liquid Reserve (MLR) Account.

22.     The MLR is required by statute to maintain adequate funds for operational emergencies.  Not only must it be maintained at the required amount, but withdrawals can only be taken after written approval of the State.  Parker knew, and provided evidence to OIR investigators, not only was money being inappropriately transferred from the MLR, causing it to be unfunded, but that the Bartles, as well as the new, self-proclaimed general partner, Eli Freiden,[2] were intentionally misrepresenting the amount in the MLR to the OIR, and that they had encumbered the money in the MLR by posting is as collateral to a loan they received, also in violation of Florida Statutes.

23.     Just days after his deposition, Parker was formally disciplined for being seen communicating with an OIR investigator "behind closed doors," and for "providing specific MLR documents to the OIR" without University Village's approval.  Reprimand is attached hereto as Exhibit "A."

24.     During this disciplinary meeting with  Eli Freiden and the Human Resources Director, Sandra Dinero, Parker admitted to speaking to the investigator, and that it was clear to him that violations of Florida Statutes Chapter 651 had taken place, and continued to take place, at University Village, and stated that he intended to cooperate fully with the investigation.

25.     Parker further refused to participate in violations of Florida Statutes Chapter 651 when Freiden instructed Parker to sign off on an MLR submission form required by the OIR representing that the MLR had $3 million more than it did.  When Parker refused to sign the document, telling Freiden that it was untruthful, Freiden encouraged Parker to sign in and let the attorneys deal with that later.  Parker steadfastly refused.

26.     Around this same time (April 2015), Burkholder similarly refused to submit a report, as

---

2 Freiden claimed to own the general partnership/majority interest in University Village in or around March, 2015, also without OIR approval, and began participating in operational decisions and directing the work of University

5

Exhibit A

instructed by Freiden and Bartle, misrepresenting the amount of funds in the MLR to the OIR, and told Freiden and Bartle she would not participate in deceiving the State because she knew that the MLR was underfunded. Then, in May 2015, Freiden instructed Burkholder to represent to the State on its annual report that University Village owed a bank $1 million less than it actually did. Burkholder refused to provide false information to the State.

27.    Burkholder was also required to give deposition testimony, at which time she testified that in her estimation, as of May 9, 2015, University Village would not be able to pay their refund obligations due to lack of funds.

28.    In or around May 2015, control of entrance fees and refunds was taken away from Parker and Burkholder. Freiden told Parker that if anyone asked about refunds, to tell them that refunds cannot be issued during the OIR inspection period, which is untrue. University Village began failing to meet its refund obligations to residents, defaulting on residents' continuing care contracts.

29.    In or around July 2015, Freiden instructed Burkholder to only reply to the investigators once a month, and to tell them that she is too busy to gather the documents they request any more frequently than that. However, the OIR investigators stated that they needed the documents immediately, and Burkholder continued cooperating and complying with their requests in a timely fashion as, opposed to once a month as instructed.

30.    On or about August 17, 2015 Parker and Burkholder were informed that they were being suspended from University Village effective immediately, pending a "review of operations" by the Freiden. They were instructed to turn in keys and computer, and to stay off University Village property and not communicate in any way with University Village employees, suppliers, financial institutions, residents, or any other person affiliated with University Village. Notice of suspension is

---

Village Staff, including Parker and Burkholder.

6

Exhibit A

attached hereto as Exhibit "B."

31.     Around the same time, Parker's Executive Assistant of twenty (20) years was terminated for "poor performance"; however, as her supervisor, Parker had given her nothing but excellent reviews.

32.     After extending her suspension at the end of the initial two weeks, HR Director Sandra Dinero informed Burkholder via email on September 7, 2015, that Burkholder's position was being eliminated.

33.     After similarly extending his suspension at the end of the initial two weeks, Parker was formally terminated from University Village on September 25, 2015, after almost twenty (20) years of service.  Parker was not given a reason for his termination.  Notice of termination is attached hereto as Exhibit "C."

**COUNT I**
**Florida's Private Whistleblower's Act**

34.     Plaintiffs reallege and adopt, as if fully set forth herein, the allegations stated in paragraphs one (1) through thirty-three (33).

35.     This is an action for damages pursuant to Florida's Private Whistleblower Act, Florida Statutes § 448.101 et seq.

36.     Defendant is an employer as defined by the Act and employed Plaintiffs at all relevant times.

37.     Defendant retaliated against Plaintiffs as set forth because they objected to and/or refused to participate in violations of laws, rules, or regulations.

38.     Plaintiffs' terminations were in retaliation for their objections to and/or refusal to participate in said violations of laws, rules or regulations.

39.     The retaliatory actions of Defendant violate the Florida Private Whistleblower Act.

40.     As a result of the retaliatory actions of Defendant, Plaintiffs have suffered, and will continue to suffer, damages.

7

Exhibit A

WHEREFORE, Plaintiffs , Timothy Parker and Kathy Burkholder, demand judgment against Defendant, Westport Holdings Tampa, LP d/b/a University Village, and for back pay and benefits; interest on back pay; front pay and/or lost earning capacity; compensatory damages; costs and attorneys' fees; and for such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED THIS 15th day of August, 2016.

**FLORIN, ROEBIG, P.A.**

/s/Wolfgang M. Florin
**Wolfgang M. Florin**
Primary E-mail address:wmf@florinroebig.com
Florida Bar No.: 907804
**Christopher D. Gray**
cdg@florinroebig.com
Florida Bar No.: 902004
**Lindsey C. Kofoed**
lck@florinroebig.com
Florida Bar No.: 63956
Secondary E-Mail Addresses:
 LABOR_efiling@florinroebig.com
tsm@florinroebig.com
777 Alderman Road
Palm Harbor, FL 34683
Telephone No.: (727) 786-5000
Facsimile No.: (727) 772-9833
Attorneys for Plaintiff(s)

Exhibit A

**Employee File Note for: Timothy Parker, Executive Director**

On Tuesday, April 28, 2015, you were seen behind closed doors in your office conversing with a representative from OIR by Eli Freiden. During this conversation two residents were waiting outside your office without being acknowledged while you were conversing with an OIR representative. Previously you had been instructed by the attorneys for Westport Holdings and Eli Freiden, General Partner not to converse or hand over any documents to OIR due to continued litigation with the OIR and that all correspondence and documents should go through the attorney, Wendy Weiner.

Additionally, you have been found to be insubordinate by providing, specific MLR documents to the OIR without the attorney's approval.

In the future, you will refrain from all conversations with the OIR or provide any documentation unless directed by the attorneys for Westport Holdings or Eli Freiden, General Partner.

Further occurrences may result in further disciplinary action.

By signing below you agree that these incidents occurred.

_____          _____

_____          _____

Exhibit "□"

Exhibit A



## UNIVERSITY VILLAGE

### Live Better Longer!

University Village Retirement Center
12401 North 22nd Street
Tampa, FL 33612

Monday, August 17, 2015

Tim,

I am writing to advise you that you are hereby suspended with pay for two weeks, effective immediately, pending a review of the operations by the general partner.

Before leaving the property you must turn in all keys and any computer equipment owned by University Village.

During this period of suspension, you shall not attend your place of work. Nor shall you contact any other employees, suppliers, financial institutions, residents, etc., or any other person affiliated with University Village via phone or email.

Once our investigation is complete you will be contacted with the results. Please make sure we have your current contact information.

Sincerely,

Sandra Dinero, PHR
Human Resources Director
University Village

Exhibit "B"

12401 N. 22nd Street • Tampa, FL 33612
(800) 524-5020 • (813) 975-5000 • Fax (813) 975-5476

Exhibit A



# UNIVERSITY
## V I L L A G E

### Live Better Longer!

University Village Retirement Center
12401 North 22nd Street
Tampa, FL 33612

Friday, September 25, 2015

Tim,

This letter constitutes the right of University Village to terminate employment under the Florida Employment at Will doctrine. Under this doctrine the company may terminate the employment relationship at anytime, with or without cause, with or without notice.

As of this date, the company has decided to terminate your employment effective immediately. We will consider the time for your paid suspension as four (4) weeks of severance; therefore, we will not pay out any additional hours or PTO (paid time off bank).

All insurances will be cancelled as of September 30, 2015 at which time you may elect COBRA. You will be contacted by the company's third party administrator with information on this program.

*For those 40 years old or older* (It is understood and agreed: 1) the acceptance of the above program is in full accord and satisfaction of any claim you may have which may be available to you through or as a result of the Age Discrimination of Employment Act (ADEA), and 2) University village's delivery of the above program is not to be construed in any way as an admission of liability on the part of University Village.

If you have any questions, please contact me.

Sincerely,

Sandra Dinero, PHR
Human Resources Director
University Village

Exhibit "C"

12401 N. 22nd Street • Tampa, FL 33612
(800) 524-5020 • (813) 975-5009 • Fax (813) 975-5476

Exhibit A