## SUPPLEMENTAL AFFIDAVIT OF CAROLYN MORGAN

STATE OF FLORIDA

COUNTY OF LEON

BEFORE ME, the undersigned authority appeared Carolyn Morgan, who after being sworn, deposes and says:

1.    I, Carolyn Morgan, am over the age of eighteen (18), sui juris, and I am competent to testify to and have personal knowledge of the facts contained herein.

2.    I, Carolyn Morgan, currently hold the position of Director with the Life & Health Financial Oversight business unit of the Florida Office of Insurance Regulation ("Office"). I graduated from Florida State University in 2007 with a Bachelor's degree in Accounting. I hold one professional certification, Associate Professional in Regulation (APIR). I have been employed by the Office since June 2004. My responsibilities include managing the activities regarding the compliance, operational, and solvency analysis of life and health insurers as well as Continuing Care Retirement Communities.

3.    Westport Holdings Tampa, Limited Partnership, d/b/a University Village ("University Village"), located in Tampa, Florida, is a Continuing Care Retirement Community ("CCRC") subject to regulation by the Office under Chapter 651, Florida Statutes.

4.    The Office referred University Village to the Department of Financial Services for the initiation of delinquency proceedings on February 26, 2015. In the interim, the Office has determined that one or more additional grounds exist for the initiation of delinquency proceedings against University Village, pursuant to Sections



PLAINTIFF'S EXHIBIT 215

631.051 and 651.114, Florida Statutes. Further, the Office has additional support for a ground previously set forth in my Affidavit dated February 26, 2015.

5.    As specified in Section 631.051, Florida Statutes, grounds for the initiation of delinquency proceedings include the following:

a.    Is impaired or insolvent, pursuant to Sections 631.051(1) and 651.011(8), Florida Statutes;

b.    Has willfully violated its charter or certificate of incorporation or any law of this state, pursuant to Section 631.051(8), Florida Statutes; and

d.    Has been the victim of embezzlement, wrongful sequestration, conversion, diversion, or encumbering of its assets; forgery or fraud affecting it; or other illegal conduct in, by, or with respect to it, which if established would threaten its solvency; or that the office has reasonable cause to so believe any of the foregoing has occurred or may occur.

## I. ADDITIONAL GROUND: UNIVERSITY VILLAGE IS INSOLVENT

6.    As provided in Section 631.051(1), Florida Statutes, among the grounds that allow for initiation of delinquency proceedings is that a CCRC "[i]s impaired or insolvent." A CCRC is insolvent if it is "unable to pay its obligations as they come due in the normal course of business," pursuant to Section 651.011(8), Florida Statutes.

7.    On July 13, 2015, University Village provided an Accounts Payable Report as of July 13, 2015, which is attached as Exhibit A ("Accounts Payable Report").

8.    The Accounts Payable Report shows that University Village owes $1,239,433.96 to various venders, of which $538,445.62 is 61 days or more old (Exhibit A).

9. According to University Village's Chief Financial Officer, Kathy Burkholder, the majority of University Village's vendor contracts have terms requiring payment within 45 days; however, "some do require 30 days (mainly utilities, leases, etc..)." (Exhibit B). University Village owes vendors $538,445.62 for invoices that are 61 days or more old (Exhibit A).

10. According to the most recent cash flow information received from University Village, it reported ending cash balances of $5,756.48 at April 30, 2015, $(34,401.22) at May 31, 2015, $104,782.82 at June 30, 2015, and $233,425.07 at July 13, 2015 (Exhibit C). According to accounts payable reports for the same timeframe, University Village reported past due amounts to its vendors, 61 days and over, of $142,763.00 at April 30, 2015 (Exhibit D), $324,225.02 at May 31, 2015 (Exhibit E), $575,767.95 at June 30, 2015 (Exhibit F), and $538,445.62 at July 13, 2015 (Exhibit G). The below chart exhibits the cash balances and the amounts due for invoices that are 61 days or more old on these dates.

| Date | 4/30/2015 | 5/31/2015 | 6/30/2015 | 7/13/2015 |
|---|---|---|---|---|
| Cash balance | $5,756.48 | $ (34,401.22) | $104,782.82 | $233,425.07 |
| Past due debt 61 or more days (vendors only) | $142,763.00 | $324,225.02 | $575,767.95 | $538,445.62 |

Based upon the above information, University Village's past due debt to its vendors has far exceeded the cash available to pay its obligations to its vendors since at least April 30, 2015.

11. On June 25, 2015, Ms. Burkholder represented to the Office that "University Village will be running a negative cash balance by the end of the week" and that "additional funding" was expected by June 26, 2015 (Exhibit H). This "additional

funding" was not revenue or monies received from current owners or investors, but rather a transfer of $209,960.00 from University Village's capital expenditure reserve account to its operating account (Exhibit I). The latest cash flow documentation received by the Office from University Village shows that University Village had a negative cash balance of $34,401.22 at the end of May 2015 and a negative cash balance of $90,638.23 as of June 25, 2015 (Exhibit C), prior to the funds being transferred from the capital expenditure reserve account on June 26, 2015. Using borrowed money for operations further increases University Village's debt.

12.     The June 2015 bank reconciliation reflects a bank balance of $370,290.25, outstanding checks totaling $244,799.65, and deposits in transit of $0, resulting in an available bank balance of $125,490.60 at the close of June 2015 (Exhibit J).

13.     Based on the most recent cash flow information received for June 2015, revenues received for the month were $1,097,879.74, representing the largest monthly revenue for 2015, and total expenses for the month were $1,020,358.20 (Exhibit C). When considering the available cash balance as of the close of June 2015 of $125,490.60 (as discussed in paragraph 12 above) and the simplified calculation of leftover revenue for June 2015 of $77,521.54 ($1,097,879.74 in revenue minus $1,020,358.20 in total expenses), University Village's available cash balance as of the end of July 2015, roughly projected, would be approximately $203,012.14 (cash balance of $125,490.60 plus leftover revenue of $77,521.54), assuming that the revenue and expenses in July 2015 are similar to June 2015.

14.    In addition to the funds due to vendors, University Village owes $1,608,391.74 in past due refunds[1] to residents or residents' estates for May 9, 2015, through July 2, 2015 (Exhibit K).[2] Refunds have not been paid since May 9, 2015 (Exhibit K).

15.    Additional refunds will be due in July 2015 of $380,507.86, in August 2015 of $300,807.87, in September 2015 of $434,048.30, and October 2015 of $73,000.000, totaling $1,188,364.03 in refunds coming due in the near future (Exhibit K).

16.    As set forth in paragraphs 9 and 14 above, University Village currently owes past due debt of $2,146,837.36 for invoices that are more than 61 days old and refunds past due to residents or residents' estates. University Village had an available cash balance at the end of June 2015 of $125,490.60 and, as of the end of July 2015, will only have projected cash balance of $203,012.14. Accordingly, University Village is not, and has not been, meeting its financial obligations as they come due in the normal course

---

[1] These refunds due include refunds for residents' participation in the PIP program. An addendum to a resident's life-care contract (Exhibit L) gives the resident an option of entering into what is known as the PIP program. Residents participating in the PIP program pay an amount in addition to their entry fee, and in return receive a discount on their monthly fees; in this instance four percent (4%) of the additional entry fee reduces their rent by that same amount spread out over a twelve month period. For example, a five thousand dollar ($5,000) additional entry fee would reduce the monthly rent by sixteen dollars and sixty seven cents ($16.67) a month. A resident entering into the PIP program is obligating an additional sum of money for a three (3) year period, which can be renewed for additional three (3) year periods if the resident chooses.

University Village has PIP participants who have loaned additional entrance fees from five thousand dollar ($5,000) to two hundred thousand dollar ($200,000) increments. A resident who moves out of University Village or passes away is entitled to a full refund of his or her PIP payment, together with any refundable portion of his or her entry fee, regardless of whether the three (3) year maturity. As of June 30, 2015, through the PIP program, residents have loaned University Village $9,508,498.13 that has not been repaid (either because it past due or not yet due) (Exhibit M). As of July 14, 2015, $508,250.00 in PIP refunds are past due, with an additional $ 328,335.00 due to be paid between July 17, 2015, and October 27, 2015 (Exhibit K).

[2] The past due refunds include approximately $83,460 that was due to be received by a former resident on June 21, 2015. On July 13, 2015, the Office was contacted via e-mail by an individual whose mother was a resident at University Village regarding this past-due amount that remained unpaid as of that date (Exhibit N).

of business and therefore is deemed to be insolvent, pursuant to Section 651.011(8), Florida Statutes.

17. On July 7, 2015, the Office requested that University Village provide, for the period March 1, 2015, through current date, copies of any demand or claim for payment received by University Village (or its designated representative) related to an outstanding amount owed (Exhibit O). On July 13, 2015, Kathy Burkholder responded to this request by email stating "Currently, we only have one demand claim for payment (see below). This expense is for the 2013 audit which was under the period of the general partner, Larry Landry. The claim is under dispute with the current general partner and the resolution is still on-going." (Exhibit O.) Further, Kathy Burkholder went on to state, "As for the other vendors, I am in communication with them, and I am currently working out payment plans that are acceptable to them." (Exhibit O.) University Village has, therefore, admitted it is not paying its financial obligations as they come due in the normal course of business and is, therefore, deemed to be insolvent, pursuant to Section 651.011(8), Florida Statutes.

## II. ADDITIONAL GROUND: UNIVERSITY VILLAGE IS WILLFULLY VIOLATING THE LAWS OF THIS STATE

18. As provided in Section 631.051(8), Florida Statutes, among the grounds that allow for initiation of delinquency proceedings is that a CCRC "[h]as willfully violated its charter or certificate of incorporation or any law of this state." (Emphasis added.)

19. Section 651.026, Florida Statutes, requires CCRCs to file annual financial statements audited by an independent Certified Public Account no later than May 1 for the previous calendar year. University Village has not provided the Office with its 2014

Financial Statement audited by an independent Certified Public Accountant ("2014 Audit"), in violation of Section 651.026, Florida Statutes. The 2014 Audit was due on May 1, 2015, and is, therefore, more than two months past due. University Village did not request, and the Office did not grant, University Village an extension of time to file the 2014 Audit at a later date. The Office has the statutory authority to fine University Village $50 per day for each day the 2014 Audit is late, pursuant to Sections 651.026(1) and 651.015(2)(c), Florida Statutes.

20.    According to the Accounts Payable Report, University Village owes $50,805.00 to Clifton Larson Allen, its current auditor (not the auditor referenced in paragraph 17, whose $52,840 past-due account is in dispute (see also Exhibit A)). Of the amount due to Clifton Larson Allen, $16,125.00 is 61 to 90 days due, $10,530.00 is 91 to 120 days due, and $24,150.00 is over 121 days due (Exhibit A). The Office believes that Clifton Larson Allen has not finalized the statutorily required 2014 Audit because it has not been paid. The Office further believes that University Village is willfully refusing to pay Clifton Larson Allen and failing to finalize the 2014 Audit in order to further obfuscate the financial condition of University Village. Therefore, University Village is found to be willfully in violation of Section 651.026, Florida Statutes.

### III. ADDITIONAL SUPPORT FOR THE OFFICE'S BELIEF THAT UNIVERSITY VILLAGE AS THE PROVIDER IS THE VICTIM OF EMBEZLEMENT, CONVERSION, ENCUMBERANCE OF ASSETS, OR FRAUD

21.    As provided in Section 631.051(13), Florida Statutes, among the grounds that allow for initiation of delinquency proceedings is that a CCRC "[h]as been the victim of embezzlement, wrongful sequestration, conversion, diversion, or encumbering of its assets; forgery or fraud affecting it; or other illegal conduct in, by, or with respect to it,

which if established would threaten its solvency; or that the office has reasonable cause to so believe any of the foregoing has occurred or may occur."

22.     In my Affidavit dated February 26, 2015 (attached as Exhibit P, without exhibits), I stated that the Office had reason to believe that University Village is the victim of embezzlement, conversion, encumbrance of assets, or fraud. Specifically, I stated that Minimum Liquid Reserve ("MLR") funds that University Village is required to maintain were no longer being held in accounts bearing its name. Among other things, $3,005,655.99 (which includes accrued interest) was held in the name of Westport Nursing, LLC ("Westport Nursing") and "encumbered by the security interest of a creditor of Westport Nursing, LLC." Since that time, the Office has obtained additional information regarding the transfer of these funds.

23.     On March 31, 2014, W. Wilhlem Rabke, on behalf of University Village and Westport Nursing, informed the Office that Westport Nursing was a wholly owned subsidiary of University Village, but was "undergoing a refinancing and restructuring" to cause Westport Nursing "to become a sister entity" to University Village. Mr. Rabke stated that, as part of this restructuring, University Village was "transferring" $3 million of its MLR to Westport Nursing, characterized as "another affiliate." Mr. Rabke further represented that University Village and Westport Nursing were owned by "identical owners." Mr. Rabke stated that $3 million would be used to satisfy the MLR requirements for University Village and Westport Nursing[3] and would "continue to be considered a portion of the MLR Escrow" as required by Section 651.035(1)(b), Florida Statutes. (March 31, 2014, letter is attached as Exhibit Q.)

---

[3] Although Mr. Rabke stated that University Village and Westport Nursing "will maintain separate MLR Escrow under the MLR Statute," as explained below, Westport Nursing would not be subject to the MLR requirements after the transfer and restructuring described.

24.    However, the Office has since learned that the $3 million was used as collateral for a loan that was used to transfer, without approval by the Office as required by Section 628.4615, Florida Statutes, certain real property previously held in the name of University Village to Westport Nursing. The $3 million was listed on the closing statement of a refinancing loan from USAmeriBank ("USAB") as "TOTAL BORROWER EQUITY DEPOSIT AT CLOSING." The $3 million is also specified on the closing statement as "CASH COLLATERAL DEPOSIT BY BORROWER" – the borrower being Westport Nursing, not University Village. The USAB loan was identified on the closing statement as for the purpose of a "Project" specified as "Westport Nursing Tampa, a 110-bed assisted living and 120-bed skilled nursing facility." (Exhibit R.)

25.    The USAB loan was utilized to transfer ownership of the assisted living/skilled nursing building, without approval by the Office as required by Section 628.4615, Florida Statutes, from University Village to Westport Nursing, and the $3 million was "transferred" from the MLR account held by University Village in order to serve as "cash collateral" for the USAB loan (Exhibit R). This constitutes a transfer of ownership of the $3 million from University Village to Westport Nursing.

26.    Contrary to the representations in the March 31, 2014, letter referenced in paragraph 23 above that the $3 million held as "cash collateral" for the USAB loan to Westport Nursing serves as part of the required MLR of University Village, the $3 million does not meet the eligibility for inclusion of the MLR of University Village in accordance with Section 651.035(1)(b), Florida Statutes. As of June 30, 2015, the $3 million is being held by USAB in the name of Westport Holdings, not University Village. (Exhibits S and T.)

27.    The transfer of the assisted living/skilled nursing building from University Village to Westport Nursing as well as the transfer (and subsequent encumbering) of the $3 million from the University Village's MLR account to serve as "cash collateral" for the USAB refinancing loan, which was used to transfer the assisted living/skilled nursing building from University Village to Westport Nursing, constitutes "conversion, diversion, or encumbering" of the assisted living/skilled nursing building and the $3 million. These acts violate Section 631.051(13), Florida Statutes, and constitute additional support for the ground for commencement of a delinquency proceeding against University Village pursuant to Part I, Ch. 631, Florida Statutes.

## CONCLUSION

28.    In consideration of the foregoing, the OFFICE has determined that additional grounds for issuing an Order for the immediate appointment of a Receiver exist under Section 631.051, Florida Statutes. In addition, the OFFICE has additional support for, and information pertaining to, a ground previously set forth in my Affidavit dated February 26, 2015.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Carolyn Morgan
Director
Life & Health Financial Oversight
Office of Insurance Regulation

STATE OF _FLORIDA____

COUNTY OF __LEON____

The foregoing affidavit was sworn to and subscribed before me this 16th day of

_July____, 2015, by _Carolyn Morgan_____.

ALYSSA LATHROP
MY COMMISSION # FF 160272
EXPIRES: November 12, 2018
Bonded Thru Notary Public Underwriters.

_____
(Signature of the Notary)

[Notary Seal]

_____
(Print, Type, or Stamp Commissioned Name of Notary)

Personally Known ___✓___ OR Produced Identification _____

Type of Identification Produced ____n/a_____

My Commission Expires ___Nov. 12, 2018_____