UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Chapter 11

WESTPORT HOLDINGS TAMPA,                        Case No. 8:16-bk-08167-MGW
LIMITED PARTNERSHIP,

WESTPORT HOLDINGS TAMPA                          Case No. 8:16-bk-08168-MGW
II, LIMITED PARTNERSHIP,

                                                *Jointly Administered under*
        Debtors.                                *Case No. 8:16-bk-08167-MGW*
_____/

> **NOTICE IS HEREBY GIVEN THAT** a hearing will be held in Courtroom 8A, Sam M. Gibbons United States Courthouse, 801 N. Florida Ave., Tampa, Florida on <u>September 13, 2017 at 9:30 a.m.</u> before the Honorable Michael G. Williamson, Chief Bankruptcy Judge to consider and act upon this Motion.
>
> Any objection to the relief requested shall be filed with the Clerk of the Court and served on counsel for the Movant, the Debtors, the United States Trustee, and any party receiving service via CM/ECF on or before <u>12:00 noon on Tuesday, September 12, 2017</u>. If no objection is timely filed, the Court may consider and grant the relief requested without further notice or hearing.

## OFFICIAL COMMITTEE OF RESIDENT CREDITORS' MOTION FOR DERIVATIVE AUTHORITY TO PURSUE CAUSES OF ACTION OF THE ESTATES

The Official Committee of Resident Creditors (the "<u>Resident Committee</u>") of Westport Holdings Tampa, Limited Partnership ("<u>Westport</u>") and Westport Holdings Tampa II, Limited Partnership ("<u>Westport II</u>") (and, collectively with Westport, the "<u>Debtors</u>"), by undersigned counsel, files this motion for derivative authority to pursue causes of action of the estates (the "<u>Motion</u>") and respectfully states as follows:

### Background

1.      The Debtors filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code, on September 22, 2016. (Doc. No. 1).

{00293333.DOCX;7}

EXHIBIT  7
WIT: Jennis
DATE: 2.27.2023
Tina Stuhr, CSR, RPR

2.     The Resident Committee was appointed as an official committee by the United States Trustee's Office on December 29, 2016 to represent University Village's current residents (the "Current Residents"), who are among the largest creditors of the Debtors' estates. (Doc. No. 258). The Court approved a procedure whereby the schedules filed by the Debtors setting forth the various amounts reflected in the Debtors' records as being owed to Current Residents on account of their Life-Care Residency and Care Contracts (the "Life-Care Contracts"), including (i) the amount of the remaining refund of the Current Residents' Initial Entry Deposit (also described as an 'Ending Line of Credit'), (ii) the Health Center Daily Allowance Credit, (iii) Free Days, (iv) PIP Deposits, and (v) Homestead Exemption Credit[1] were deemed to constitute allowed claims and a procedure by which disputes as to the amount of such allowed claims could be resolved. (Doc. No. 309).

3.     On July 1, 2017 (the "July 1 Demand"), the Resident Committee requested that the Debtors pursue certain causes of action of the Debtors' estates that the Resident Committee had identified, analyzed, and researched. The claims and causes of action identified by the Resident Committee included various causes of action (collectively, the "Insider Causes of Action") that the Resident Committee believed should be asserted by the Debtors in connection with the transfer of the Debtors' membership interest in Westport Nursing of Tampa, LLC ("WNT") and other causes of action relating to transactions involving BVM Management, Inc. ("BVM Management"), an entity affiliated with or controlled by John Bartle ("Bartle"). While not being specifically identified as a member of any of the corporate entities that are the limited partners or general partner of the Debtors or the members of WNT, Bartle, through BVM Management, has testified as the corporate representative of the Debtors, and appears to have

---

[1] The components of the Current Resident allowed claims described in paragraph 2 correspond to the various rights and benefits conferred to the Current Residents under their Life-Care Contracts.

{00293333.DOCX;7}                    2

exercised (and may continue to exercise) considerable financial control over the management of the Debtors and almost complete financial control through one or more "Management Agreements" with BVM Management over the financial operations of WNT and over TR & SNF, Inc., the operator of the Skilled Nursing Facility ("SNF") and TALF, Inc., the operator of the Assisted Living Facility ("ALF") that are the actual licensees and lessees of WNT and operators of the "Health Center." The July 1 Demand included a draft complaint and motion to allow the Resident Committee derivative standing to pursue the Insider Causes of Action if the Debtors refused to do so.[2]

4.     In addition to the Insider Causes of Action identified in the July 1 Demand, the Resident Committee has also identified claims and causes of action that should be asserted against CPIF Lending, LLC ("CPIF") as (i) an objection to CPIF's Claim, (ii) a request for affirmative relief, and in connection with the determination of the extent, validity, and priority of CPIF's claimed lien on the Debtors' property. Specifically, the Resident Committee has prepared an adversary proceeding complaint and objection to claim (the "Proposed Complaint"), which objects to CPIF's proof of claim ("Claim No. 22"), and asserts claims under Florida law for usury, aiding and abetting breach of fiduciary duty, setoff against Claim No. 22, and sues under the Bankruptcy Code for contractual subordination and/or equitable subordination of the liens and claims asserted through Claim No. 22 to the claims of the Current Residents of University Village and a declaration and determination as to the validity, priority, and extent of

---

[2] As a result of the tentative agreements reached at the global mediation that commenced on July 24, 2017, and have been continuing, the Debtors have not acted or responded to the Resident Committee's demand and the Resident Committee agreed to forbear from requesting derivative standing to pursue claims against BVM Management and other insiders and affiliates of the Debtors, with full reservation of rights to seek such derivative standing.

the liens claimed by CPIF through Claim No. 22.[3] The causes of action against CPIF and objections to the claims of CPIF that could be asserted by the Debtors' estates, including, but not limited to, the causes of action identified in the Proposed Complaint, are referred to herein as the "CPIF Causes of Action."

5. A copy of the form of the Proposed Complaint (without exhibits) is attached as Exhibit "A."[4]

6. On September 6, 2017, the Resident Committee made written request to Debtors' counsel to pursue the CPIF Causes of Action or permit the Resident Committee to exercise derivative standing to do so. While both counsel for the Resident Committee and the Examiner have previously identified the bases for objection to Claim No. 22 and the CPIF Causes of Action described in the Proposed Complaint, the Resident Committee believes that the Debtors may be unwilling or unable to pursue the CPIF Causes of Action for a number of reasons, including the status of the ongoing mediation and issues relating to BVM Management's status as a guarantor of the Debtors' obligations to CPIF. Accordingly, the Resident Committee believes that additional demand on the Debtors to bring the CPIF Causes of Action or otherwise object to Claim No. 22 would be futile, or could place Debtors' counsel in an untenable conflict at a critical stage in these proceedings. Accordingly, the Resident Committee seeks derivative standing to pursue the CPIF Causes of Action.

---

[3] As described in the Proposed Complaint, the Resident Committee submits that based on consensual contractual language included by CPIF in an Amendment to its Loan Agreement to specifically avoid OIR oversight and regulatory enforcement, CPIF voluntarily subordinated its liens to the Debtors' obligations to the Residents.

[4] The majority of the exhibits to the Proposed Complaint are voluminous and are of record as attachments to Claim No. 22. If derivative standing is granted to the Resident Committee, additional factual allegations and/or causes of action may be asserted.

{00293333.DOCX;7} 4

**Relief Requested**

7.    The Resident Committee hereby requests derivative authority to pursue the CPIF Causes of Action for the benefit of the Debtors' estates.

8.    Bankruptcy courts may confer derivative standing on other parties to pursue litigation that a debtor-in-possession or trustee does not wish to pursue. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003).

9.    Bankruptcy courts have generally recognized derivative standing where a colorable claim is alleged that would benefit the estate and the debtor or trustee will not pursue such claim. *See Fogel v. Zell*, 221 F.3d 955, 965–66 (7th Cir. 2000); *In re Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995); *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1397 (5th Cir. 1987); *In re Nat'l Forge Co.*, 326 B.R. 532, 543 (W.D. Pa. 2005); *In re Tennessee Valley Steel Corp.*, 183 B.R. 795, 799–800 (Bankr. E.D. Tenn. 1995); *In re First Capital Holdings Corp.*, 146 B.R. 7, 11 (Bankr. C.D. Cal. 1992); *In re Toledo Equipment Co., Inc.*, 35 B.R. 315, 320 (Bankr. N.D. Ohio 1983).

10.    In the instant case, the Resident Committee has identified certain CPIF Causes of Action that will inure to the benefit of the Debtors' estates including, but not limited to, colorable claims for usury, aiding and abetting breach of fiduciary duty, contractual subordination, and equitable subordination.

11.    To the extent that the Resident Committee's demand for the Debtors to pursue the CPIF Causes of Action creates any potential or actual conflict of interest for Debtors' counsel, by this Motion, the Resident Committee suggests that any conflict would be eliminated through the Court's grant of derivative standing.

{00293333.DOCX;7}                                    5

**Conclusion**

WHEREFORE, the Resident Committee respectfully requests that this Court enter an order (a) granting this Motion, (b) conferring derivative authority on the Resident Committee to pursue the Causes of Action, and (c) granting such other and further relief as the Court deems just and proper.

Dated: Tampa, Florida
September 8, 2017

By:   /s./ David S. Jennis
      David S. Jennis
      Florida Bar No. 775940
      **Jennis Law Firm**
      606 East Madison Street
      Florida 33602
      Telephone: (813) 229-2800
      Facsimile: (813) 229-1707
      Email: djennis@jennislaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 8, 2017, I electronically filed a true and correct copy of the foregoing Motion with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system.

/s/ David S. Jennis
David S. Jennis

{00293333.DOCX;7}                    6

EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No.:  8:16-bk-08167-MGW |
| WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP, | Chapter 11 |
| WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP, | Case No.:  8:16-bk-08168-MGW |
| Debtors. _____/ | Jointly Administered Under Case No. 8:16-bk-08167-MGW |
| OFFICIAL COMMITTEE OF RESIDENT CREDITORS, | |
| Plaintiff, | |
| v. | Adv. Pro. No.:_____ |
| CPIF LENDING, LLC, | |
| Defendant. _____/ | |

**COMPLAINT AND OBJECTION TO CLAIM NO. 22**

Plaintiff, the Official Committee of Resident Creditors (the "Resident Committee") of Westport Holdings Tampa, Limited Partnership ("Westport") and Westport Holdings Tampa II, Limited Partnership ("Westport II" and, collectively with Westport, the "Debtors"), by counsel, hereby files this complaint against the Defendant, CPIF Lending, LLC ("CPIF"), and objection to Claim No. 22 ("Claim No. 22"). In support, the Resident Committee respectfully states as follows:

{00292820.DOC;7}

## JURISDICTION AND VENUE

1. Pursuant to this Court's *Order Granting the Resident Committee's Motion for Derivative Authority to Pursue Causes of Action of the Estates* ("Derivative Authority Order"), the Resident Committee brings this adversary proceeding to pursue claims that will benefit the Debtors' estates. (Doc. No. _____)[1]

2. This is an adversary proceeding brought pursuant to Rules 3007(a), 3007(b), and 7001 of the Federal Rules of Bankruptcy Procedure, Sections 510(a) and 510(b) of Title 11 of the United States Code (the "Bankruptcy Code"), and Sections 687.147 and 651.114(8)(a) of the Florida Statutes.

3. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), and (O).

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

6. The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 22, 2016 (the "Petition Date"). (Doc. No. 1.)

7. The Resident Committee was appointed as an official committee by the United States Trustee's Office on December 29, 2016 to represent the current residents who were residing at University Village as of the Petition Date (the "Current Residents"), who collectively are among the largest creditors of the Debtors' estates. (Doc. No. 258.) On January 30, 2017, this Court approved a process by which the Debtors were to file a form of Current Resident Claim Summary and any amendments thereto (the "Claims Summary"), which was deemed to be

---

[1] Docket entries from the bankruptcy case, Case No. 8:16-bk-08167, are cited as follows: (Doc. No. #.)

{00292820.DOC;7}    2

an amendment to the Debtors' schedules and whereby the Current Residents have been deemed to have allowed claims in the amounts set forth in the Claims Summary and by which any disputes as to the allowance of such claims could be resolved. (Doc. No. 309.) Similar procedures were applicable to the claims of former residents of University Village (the "Former Residents"). The Current Residents and the Former Residents shall collectively be referred to as the "Residents").

8.    Defendant, CPIF, is a Washington for-profit corporation formed in 2013.

**GENERAL ALLEGATIONS**

9.    The Debtors, along with affiliate Westport Nursing Tampa, LLC ("WNT"), own and operate the property and business commonly known as University Village as a continuing care retirement community ("CCRC") pursuant to Section 651 of the Florida Statutes. A CCRC is considered a "specialty insurer subject to regulatory oversight by the Office of Insurance Regulation (the "OIR"), among other regulation agencies."

10.    CCRCs offer a continuum of services that generally consist of independent living units, assisted living units, and skilled nursing care on a single campus. Persons choosing to live in a CCRC will typically start out in an independent living unit. As their needs change, they may move to an assisted living unit in which they may receive assistance and supervision for their activities of daily living. As Residents of the CCRC transition to needing more care due to age, injury, or infirmity, they are entitled to care in the Skilled Nursing Facility (the "SNF").

11.    The University Village CCRC is comprised of (i) an Independent Living Facility (the "ILF") containing 446 independent living apartments in a facility owned by Westport and 46 independent living villas clustered within a neighborhood of duplex buildings, including a dedicated clubhouse, owned by Westport II, and (ii) a Health Center containing an assisted living

{00292820.DOC;7}         3

facility containing 110 assisted living units (the "ALF") and a 120-bed SNF. The real property where the ALF and the SNF are located is owned by WNT. The ALF is managed and operated by TALF, Inc. ("TALF"), a Florida nonprofit corporation. The SNF is managed and operated by TR & SNF, Inc. ("TR&SNF"), a Florida nonprofit corporation.

12.    University Village was intended to accommodate a spectrum of continuing care at a single campus. Residents of University Village who enter into a continuing care contract (the "Life-Care Contracts") pay a substantial entrance fee (an "Initial Entry Deposit" or "IED"), and make all required monthly payments, are entitled to live in the ILF as long as they are physically able and then may move into the Health Center as their health and care needs may dictate. Most of the Life-Care Contracts at University Village contemplate that a significant portion of the IED be paid or refunded to the Residents or their estates upon termination of the Life-Care Contract (the "IED Refund").

13.    As a provider of continuing care contracts pursuant to Section 651 of the Florida Statutes, University Village is subject to the regulations of the OIR and the Florida Department of Financial Services (the "DFS").

14.    Prior to March 31, 2014, Westport Holdings University Village, LLC ("WHUVLLC"), held the 1% general partnership interest in Westport and Westport Senior Living Investment Fund, L.P. ("WSLIF") held the 99% limited partnership interest in Westport. Lawrence Landry was the president and sole manager of both entities. Prior to March 31, 2014, Westport owned 100% of the membership interests in WNT, resulting in WNT being a wholly owned subsidiary.

15.    On or about March 31, 2014, WSLIF and BVM University Village, LLC ("BVMUV") consummated a leveraged buyout transaction (the "LBO") whereby BVMUV

acquired the 99% limited partnership interests in Westport and Westport II[2] owned by WSLIF

through a loan made by CPIF as "Lender," to Westport and Westport II as Borrowers (the "CPIF

Loan"). The stated principal amount of the CPIF Loan was $9,500,000. From the CPIF Loan

proceeds, $1,000,000 was paid directly to WSLIF as the "purchase price for Borrower

Partnership Interests" and $1,750,000 was retained by CPIF as a Capital Expenditure Reserve (as

defined below).

16.    As part of the LBO transaction, the 100% membership interest in WNT owned by

Westport was also transferred from Westport to the Ownership Group in roughly proportionate

shares as to the limited partnership interest in Westport.

17.    The CPIF Loan is evidenced by the following loan documents, among others:

a)    a Loan Agreement in which the Debtors ostensibly borrowed the principal

amount of $9,500,000 from CPIF (the "Loan Agreement") attached hereto as **Exhibit**

**"A"**;

b)    a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing,

as recorded in Official Records Book 22502, at Page 1793, in the Public Records of

Hillsborough County, Florida, executed by the Debtors, granting a mortgage to CPIF on

the ILF (the "Mortgage") attached hereto as **Exhibit "B"**;

c)    a Promissory Note executed by the Debtors in favor of CPIF (the "Note")

attached hereto as **Exhibit "C"**; and

d)    a Loan Closing Statement dated March 31, 2014 (the "Closing

Statement") attached hereto as **Exhibit "D."**

---

[2] Portions of the 99% limited partnership interests in Westport and Westport II were ultimately distributed to IMH Health Care, LLC, a Delaware limited liability company ("IMH"), JF Consultants, LLC ("JFC"), BHMSILF Investments, LLC ("BHMSILF"). BVMUV, IMH, JFC, and BHMSILF shall collectively be referred to as the "Ownership Group").

18.     The Loan Agreement required interest only payments at an interest rate of 11% until September 30, 2015, when the principal balance became due.  (Exhibit A, at Art. 5.)

19.     The Loan Agreement included, among other fees and charges, a "Prepayment Premium" in the amount of all remaining interest payments to be paid during the term of the loan if the Debtors attempted to prepay the principal balance (the "Prepayment Premium"), a "Loan Origination Fee" in the amount of $285,000 (the "Loan Origination Fee"), an "Exit Fee" in the amount of $190,000 (the "Exit Fee"), and the establishment of a "Controlled Account" containing at least $400,000, which would be controlled solely by CPIF and which would be subject to CPIF's first priority security interest  (the "Controlled Account").  (Exhibit A, at ¶¶ 4.5.3, 7.2, 7.3, and 9.21.)  Under the terms of the Loan Agreement, the amounts of all IED Refunds for any Life-Care Contracts entered into by the Debtors after the Closing (defined below) were to be deposited into the Controlled Account. (Exhibit A, at ¶ 9.21.)

20.     The Loan Agreement further provided that, on the date of the closing of the CPIF Loan (the "Closing"), the amount of $1,750,000 would be held by CPIF as a capital expenditure reserve (the "Capital Expenditure Reserve") to be disbursed only as provided in Section 6.3 of the Loan Agreement at the written request of the Debtors "to pay for capital expenditures (i.e. replacements and alterations) relating to the Property and the Independent Living Facility." (Exhibit A, at ¶ 6.3.)

21.     The Capital Expenditure Reserve was funded at the time of the Closing of the CPIF Loan to the Debtors on March 31, 2014, as evidenced by the Closing Statement.  For purposes of calculating interest and fees under the Loan Agreement, the Loan Agreement expressly provided that the Capital Expenditure Reserve "shall be deemed as fully disbursed on the date of the Closing of the Loan."

{00292820.DOC;7}                                   6

22.     The Capital Expenditure Reserve required under the Loan Agreement was distinct from and in addition to the repair and replacement reserve required of all CCRC facilities pursuant to Section 651.035 of the Florida Statutes.  Specifically, Section 651.035(1)(d) requires a renewal and replacement reserve provision whereby "[e]ach provider shall maintain in escrow a renewal and replacement reserve equal to 15 percent of the total accumulated depreciation based on the audited financial statement" required to be filed by Westport as the provider.  Under Section 651.035(6), each fiscal year, a provider may withdraw up to 33% of the total renewal and replacement reserve available provided that "[t]he withdrawal must be used for capital items or major repairs."

23.     Likewise, Section 6.3 of the Loan Agreement provided similar limitations and restrictions on the use of the Capital Expenditure Reserve.  Section 6.3 of the Loan Agreement strictly limited the use of those funds, borrowed by the Debtors "to pay for capital expenditures (i.e. replacements and alterations) relating to the Property and Independent Living Facility." Section 6.3 of the Loan Agreement further provided that

> Until both the Control Agreement is established and the Controlled Account is funded with the minimum of $400,000.00 balance as provided in Section 9.21, Borrower shall be limited to an aggregate maximum of $250,000 in disbursements from the Capital Expenditure Reserve, which disbursements may only be used for capital expenditures necessary to refurbish independent living units to a rent ready standard and quality of comparable units at the Independent Living Facility.

The Loan Agreement specifically provided that "[i]n connection with any request for funds from the Capital Expenditure Reserve, Borrower shall submit to Lender a written statement of the amount requested, a description of the proposed capital expenditure, and a budget for the costs of the capital expenditure."

24.     The Loan Agreement was guaranteed by BVM Management, Inc. ("BVM Management"), an Indiana nonprofit corporation that manages senior living communities in

Indiana and Florida, and BHMSILFGP, LLC ("BHMSILFGP"), a Delaware limited liability company that was intended to acquire the 1% general partnership interest in Westport, held by WHUV, and the 1% general partnership interest in Westport II, held by Westport Holdings Hidden Springs, LLC ("WHHS").[3]

25.    As of August 24, 2015, BVM Management also was (i) the sole member of BVM The Bridges, LLC ("BVM Bridges"), a Florida limited liability company formed to acquire a retirement facility known as "The Bridges" in Riverview, Florida, and (ii) BVM Coral Landing, LLC ("BVM Coral Landing"), a Florida limited liability company formed to acquire a retirement facility known as "Coral Landing" in St. Augustine, Florida.  The Bridges and Coral Landing are hereinafter collectively referred to as the "Other Retirement Facilities."

26.    On August 25, 2014, the Debtors, CPIF, and BVM Management (as guarantor) executed an Amendment No. 1 to Loan Agreement (the "First Amendment"), in which the parties (i) acknowledged, among other things, the disbursement of $7,750,000 of the CPIF Loan at Closing, the retainage of $1,750,000 by CPIF as the Capital Expenditure Reserve, and the disbursement of only $368,954.50 of the Capital Expenditure Reserve, and (ii) agreed to amend the Loan Agreement to allow the Debtors to withdraw $1,000,000 from the Capital Expenditure Reserve to fund a "Securities Account" for the sole purpose of allowing BVM Management to provide a "credit enhancement" to enable BVM Management to obtain bond financing (the "Bridges Bond Financing") for the Other Retirement Facilities (the "Capital Expenditure Reserve Withdrawal").  A copy of the First Amendment is attached hereto as **Exhibit "E."**

---

[3] On information and belief, BHMSILFGP never acquired the 1% general partnership interest in Westport or Westport II.  Instead, in January 2015, Compliance Concepts, LLC ("Compliance"), an Indiana limited liability company controlled by Rebecca Bartle (wife of John Bartle), was elected as general partner for each of the Debtors, to be subsequently replaced by IMH in March 2015.

27.    The First Amendment further discloses that the bonds (the "Bridges Bonds") to be issued pursuant to the Bridges Bond Financing were to be purchased by CPIF (Exhibit E, Recital ¶ R) and that BVM Management, BVM Bridges, and BVM Coral Landing (collectively, the "BVM Borrowers") had entered into a Fee Agreement whereby the BVM Borrowers had agreed to make certain additional "fee payments" to CPIF as long as CPIF was the holder of any of the Bridges Bonds issued under the Bridges Bond Financing.  (Exhibit E, Recital ¶ N.)  BVM Management further agreed to issue additional guaranties for the benefit of CPIF guaranteeing payment of all amounts owed under the Bridges Bond Financing.

28.    The First Amendment provided no explanation of how the Capital Expenditure Reserve Withdrawal would be used to pay for capital expenditures at the ILF as required under the Loan Agreement.  Instead, the First Amendment merely states, "[g]uarantor has a financial interest in [BVM Bridges and BVM Coral Landing] and/or will receive a direct and material benefit from the issuance of the Bonds.  The aforementioned benefits to Guarantor will inure, directly or indirectly, to the benefit of [the Debtors]."  (Exhibit E, at 2, ¶ Q.)  Notwithstanding the referenced language in the First Amendment, the Debtors received no benefits, directly or indirectly, from the Capital Expenditure Reserve Withdrawal or the issuance of the Bridges Bond Financing and acquired no ownership interest or other benefit from the Other Retirement Facilities.  Instead, the Capital Expenditure Reserve Withdrawal appears to have been used solely to make an interest free loan by the Debtors to BVM Management so BVM Management could obtain the Bridges Bond Financing for the acquisition of the Other Retirement Facilities through the purchase of the Bridges Bonds by CPIF, while the Debtors continued to pay interest on the full amount of the Capital Expenditure Reserve, and while needed repairs at University Village were left undone.

29.     In a deposition taken by the OIR,[4] John W. Bartle ("Bartle"), who testified as the designated corporate representative of the Debtors and is or was an officer or representative of BVM Management, BVM Bridges, and BVM Coral Landing,[5] confirmed that the Capital Expenditure Reserve Withdrawal was made only to loan money to the Other Retirement Facilities and that University Village continued to pay interest on the withdrawn amount.

> Q.     Okay.  Was any of that money loaned to a sister facility of University Village?
> A.     There was $1 million loaned to, I think, BVM Management, Inc., as a credit enhancement for the same lender, Columbia Pacific, for the acquisition of two properties in October of 2014.
> Q.     So did that $1 million come from University Village's $1.75 million capital expenditure budget?
> A.     Yes.
> . . .
> Q.     So was -- so the other two entities were bond financed?
> A.     Yes.
> Q.     Okay.  With the million dollar loan from University Village as a credit enhancer?
> A.     Credit enhancement, yes, sir.
> Q.     Was that money ever paid back?
> A.     Yes.
> Q.     With interest?
> A.     No.
> Q.     University Village paid 12 percent interest on that; correct?
> A.     Yes.
> Q.     As part of their loan.

(Exhibit F, at 85:4-12; 95:21-96:9.)

30.     On August 10, 2015, the Debtors, CPIF, BVM Management, and IMH executed Amendment No. 2 to Loan Agreement (the "Second Amendment"), in which the parties agreed

---

[4] A true and correct copy of relevant portions of the referenced transcript are attached hereto as **Exhibit "F."**

[5] At the time of the Capital Expenditure Reserve Withdrawal, Bartle's only disclosed relationship with the Debtors was through his wife's ownership interest in Compliance.  Compliance is believed to be the sole member of BVMUV, one of the limited partners of the Debtors and one of the members of WNT.  Through his association with TALF & TR&SNF, Bartle also is affiliated and in control of BVM Management, a Guarantor of the CPIF Loan, and controls the boards of TALF and TR&SNF.  The Capital Expenditure Reserve Withdrawal appears to have been made at Bartle's request and, upon information and belief, the Capital Expenditure Reserve Withdrawal was authorized only by the then limited partners of the Debtors.

to further amend the Loan Agreement to (i) reflect the resignation of WHUV as general partner of Westport and the resignation of WHHS as general partner of Westport II and the ultimate substitution of IMH as general partner of each of the Debtors, (ii) replace BHMSILFGP with IMH as a guarantor, (iii) reflect the transfer of all limited partnership interests in the Debtors from BHMSILF to JFC. BVM Management and IMH are collectively referred to as the "Guarantors." A copy of the Second Amendment is attached hereto as **Exhibit "G."**

31.    In addition, pursuant to the Second Amendment, the parties added a new Section 11.3 (the "Devonshire Language") to the Loan Agreement that provides:

> Resident Rights, pursuant to Section 651.114, Florida Statutes, Borrower and Lender agree that the rights of each resident of University Village, under the terms of the Residency Agreement will be honored and will not be disturbed by a foreclosure under the Financing Documents or a conveyance in lieu thereof, as long as the Resident is (a) current in the payment of all monetary obligations required by the Residency Agreement, (b) is in compliance and continues to comply with all of the non-monetary terms of the Residency Agreement, and (c) has asserted no claim inconsistent with the rights of the Borrower or Lender.

32.    As demonstrated by Article 12 of the Loan Agreement, at all times CPIF was aware that any transfer of the 1% general partnership interest in the Debtors was subject to regulatory approval, including the requirement that such a transfer would require provisional approval from any regulatory authority (Exhibit A, ¶¶ 12.1, 12.1.1.)

33.    On March 31, 2016, the Debtors, CPIF, and the Guarantors executed Amendment No. 3 to Loan Agreement (the "Third Amendment"), in which the parties agreed to amend the Loan Agreement to extend the maturity date to March 31, 2016 in exchange for the Debtors' payment no later than April 1, 2016 of an "Extension Fee" in the amount of $15,833.33. A copy of the Third Amendment is attached hereto as **Exhibit "H."**

34.    On April 30, 2016, the Debtors, CPIF, and the Guarantors executed Amendment No. 4 to Loan Agreement (the "Fourth Amendment"), in which the parties agreed to amend the Loan Agreement to extend the maturity date to May 31, 2016 in exchange for the Debtors' payment no later than May 1, 2016 of an "Extension Fee" of $15,833.33. A copy of the Fourth Amendment is attached hereto as **Exhibit "I."**

35.    On June 1, 2016, the Debtors, CPIF, and the Guarantors executed Amendment No. 5 to Loan Agreement (the "Fifth Amendment"), in which the parties agreed to amend the Loan Agreement to extend the maturity date to June 30, 2016 in exchange for the Debtors' payment no later than June 3, 2016 of an "Extension Fee" in the amount of $15,833.33. A true and correct copy of the Fifth Amendment is attached hereto as **Exhibit "J."**

36.    Under the terms of the Loan Agreement, as amended, the CPIF Loan matured on June 30, 2016. A maturity of the CPIF Loan was declared a "non-exclusive Event of Default" by CPIF, leaving an outstanding principal balance of $9,500,000.

37.    On July 1, 2016, the Debtors, CPIF, and the Guarantors executed a Forbearance Agreement in which the parties agreed to enter into a forbearance period in exchange for the Debtors' agreement to pay a fee in the amount of $63,333.33 (the "Forbearance Agreement"). A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit "K."**

38.    According to the Forbearance Agreement, the forbearance period terminated on the first of the following occurrences (the "Forbearance Termination Date"):

a)    Any default by Borrower or any of the Guarantors in the timely observance of any of the Forbearance Conditions;

b)    A court or agency appointment of a receiver or trustee over the Property;

c)    The occurrence of any other material Event of Default under the Loan Documents which is not addressed as part of this Agreement; or

c)    November 30, 2016.

{00292820.DOC;7}                                          12

(Exhibit K, at 3, ¶ 5.)  The period from the execution of the Forbearance Agreement through the Forbearance Termination Date is defined as the "Forbearance Period."

39.    Among the "Forbearance Conditions" are the following:

a)    Unless otherwise directed by Lender, Borrower shall continue to make monthly payments of all accrued contract interest at a per annum interest rate of 11.0%;
. . .

c)    Interest at the maturity rate as permitted in the Loan Documents (equal to 25.0% per annum), will accrue on the outstanding principal balance under the Loan from July 1, 2016 through and beyond the Forbearance Termination Date, but such accrued maturity rate interest in excess of contract interest will be waived by Lender if Borrower has repaid all outstanding principal on or before November 30, 2016;

d)    The Exit Fee as described in Section 7.3 of the Loan Agreement shall be equal to 3.0% of the outstanding principal balance of the Loan, $285,000, to be paid to Lender by Borrower and added to the outstanding Loan balance and the Note Amount under the Note due and payable on the Forbearance Termination Date.

(Exhibit K, at 3, ¶ 6.)

40.    Unlike the Loan Agreement and many of the other loan documents, which are governed by the laws of the state of Washington, the Forbearance Agreement is expressly governed by the laws of the State of Florida.  (Exhibit K, at 5, ¶ 20.)

41.    Moreover, the Forbearance Agreement specifically provides that "[i]f there is any conflict between the terms of this Agreement and any of the Loan Documents, then the terms of this Agreement shall prevail."  (Exhibit K, at 5, ¶ 21.)

42.    On September 22, 2016, during the Forbearance Period, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  (Doc. No. 1.)

43. On October 26, 2016, CPIF filed Claim No. 22 in the amount of $9,781,224.58, comprising "(a) outstanding principal in the amount of $9,500,000.00; (b) accrued interest in the amount of $457,821.92; (c) an exit fee of $285,000.00; (d) an extension fee of $63,333.33; (e) legal fees and expenses of $24,729.87;[6] and (f) document processing/release fees of $250.00, less (x) $140,984.03 in tax escrow funds, and (y) $408,926.51 in reserves –CapEx." A true and correct copy of Claim No. 22 is attached hereto as **Exhibit "L."**

44. CPIF has also filed numerous motions for interest, attorneys' fees, and expenses pursuant to Section 506(b) of the Bankruptcy Code (the "CPIF Interest and Fees Motions"). (Doc. Nos. 215, 272, 371, 582.) As of the most recent motion, CPIF sought post-petition attorneys' fees and expenses through May 2017 totaling approximately $236,789.64. The CPIF Interest and Fees Motions remain pending in the bankruptcy case.

## COUNT I
## USURY

45. The Resident Committee re-alleges and incorporates herein paragraphs 1 through 44 as if fully set forth herein.

46. As evidenced by the loan documents, CPIF agreed to loan the Debtors a principal amount of $9,500,000 secured by the Mortgage on the ILF.

47. The default rate of interest at 25% per annum has accrued on the outstanding principal amount since July 1, 2016.

48. According to the Forbearance Agreement, which expressly controls any conflicting terms within the loan documents, the interest rate charged by CPIF is governed by the laws of the state of Florida.

---

[6] In a later motion, CPIF stated that "the legal fees and expenses were incorrectly identified" in CPIF's proof of claim and the correct amount is $22,755.37. (Doc. No. 215 at 2.)

{00292820.DOC;7}                    14

49.    Under Sections 687.02 and 687.071(2) of the Florida Statutes, a loan exceeding $500,000 is usurious if the interest rate exceeds 25% per annum.

50.    CPIF knowingly charged excessive interest considering all of the circumstances surrounding the loan, including the additional fees and restrictions provided for in the Loan Agreement (i.e. the Prepayment Premium, the Loan Origination Fee, the Exit Fee, and the Controlled Account) and CPIF's continual charge of interest on the total amount of the Capital Expenditure Reserve (despite the Capital Expenditure Reserve Withdrawal through which $1,000,000 was transferred to the Other Retirement Facilities without consideration to the Debtors).

WHEREFORE, the Resident Committee requests that this Court enter an order reducing Claim No. 22 to setoff for damages caused to the Debtors in an amount to be determined at trial pursuant to Section 687.147 of the Florida Statutes, awarding such damages, and granting such other and further relief as the Court deems just and proper.

### COUNT II
**Aiding and Abetting Breach of Fiduciary Duty**

51.    The Resident Committee re-alleges and incorporates herein paragraphs 1 through 44 as if fully set forth herein.

52.    At all times they occupied their respective positions, the general partners of the Debtors, including WHUV, WHHS, Compliance, and IMH (collectively, the "GP") and the limited partners of the Debtor, specifically IMH, JFC, BHMSILF,[7] and BVMUV (collectively, the "Limited Partners") owed to the Debtors multiple fiduciary duties.

---

[7] On information and belief and as stated in Exhibit G, either BHMSILF transferred its limited partnership interest in the Debtors (and presumably its membership interest in WNT) or to JFC sometime in June 2014.

53.    The GP and Limited Partners breached their fiduciary duties to the Debtors by, among other things and without limitation, (i) authorizing and allowing the Capital Expenditure Reserve Withdrawal, whereby $1,000,000 that was dedicated to be used exclusively for necessary capital expenditures at University Village (including expenditures necessary for the health and well-being of the Residents and necessary to maintain occupancy at University Village) was, instead, used as an interest free loan to provide a credit enhancement for BVM Management to acquire the Other Retirement Facilities, without consideration to the Debtors; and (ii) authorizing and allowing the substitution of IMH as general partner of the Debtors without any regulatory approval or provisional authority as required under the Loan Agreement.

54.    CPIF knew or should have known that the GP and Limited Partners breached their fiduciary duties to the Debtors.

55.    CPIF substantially assisted or encouraged the Limited Partners' breaches of their fiduciary duties by, among other things and without limitation, (i) agreeing to and facilitating the Capital Expenditure Reserve Withdrawal by entering into the First Amendment, (ii) charging the Debtors interest on the entire Capital Expenditure Reserve despite the improper withdrawal of $1,000,000, and (iii) permitting the substitution of the GP without regulatory approval or authority.

56.    The assistance of CPIF facilitated the GPs' and the Limited Partners' breaches of their fiduciary duties.

57.    As a direct and proximate cause of CPIF's conduct, the Debtors suffered damages in an amount to be determined at trial.

WHEREFORE, the Resident Committee requests that this Court enter an order reducing Claim No. 22 to setoff for damages caused to the Debtors in an amount to be determined at trial,

{00292820.DOC;7}                                    16

awarding such damages, and granting such other and further relief as the Court deems just and proper

## COUNT III
### Contractual Subordination

58.     The Resident Committee re-alleges and incorporates herein paragraphs 1 through 44 as if fully set forth herein.

59.     In the Second Amendment, CPIF agreed to amend the Loan Agreement to add Section 11.3, which provides that "the rights of each resident of University Village, under the terms of the Residency Agreement will be honored and will not be disturbed by a foreclosure under the Financing Documents or a conveyance in lieu thereof."

60.     Section 651.114(8)(a) of the Florida Statutes states that the OIR's powers are subordinated if a lender "by inclusion or by amendment to the loan documents . . . agrees that the rights of residents under a continuing care or continuing care at-home contract will be honored and will not be disturbed by a foreclosure or conveyance in lieu thereof."

61.     CPIF contractually agreed to subordinate its claims to the claims of Residents of University Village.

WHEREFORE, the Resident Committee requests that this Court enter an order determining that Claim No. 22 is subordinate to the claims of the Residents of University Village under the Loan Agreement (as amended) pursuant to Section 510(a) of the Bankruptcy Code and granting such other and further relief as the Court deems just and proper.

## COUNT IV
### Equitable Subordination

62.     The Resident Committee re-alleges and incorporates herein paragraphs 1 through 44 as if fully set forth herein.

{00292820.DOC;7}                                    17

63. CPIF has engaged in efforts and actions to coordinate with the Debtors, BVM Management, and various officers of both to, among other things and without limitation, (i) facilitate the Capital Expenditure Reserve Withdrawal, resulting in the improper transfer of $1,000,000 from the Debtors' Capital Expenditure Reserve for no benefit to the Debtors and for the sole purposes of facilitating the acquisition of the Other Retirement Facilities without consideration to the Debtors, and (ii) allow the unauthorized transfer of the GP without the required regulatory authority and approval.

64. As described in Count I above, CPIF has charged usurious interest under the circumstances surrounding the loan, including additional fees provided for in the Loan Agreement and CPIF's continual charge of interest on the total amount of the Capital Expenditure Reserve (despite the Capital Expenditure Reserve Withdrawal).

65. CPIF has engaged in other inequitable conduct as alleged in the body of this Complaint.

66. CPIF's inequitable conduct has injured creditors of the Debtors' bankruptcy estates and/or conferred an unfair advantage on CPIF.

67. As a consequence of CPIF's gross inequitable conduct, the Resident Committee is entitled, pursuant to Section 510(c) of the Bankruptcy Code, to equitable subordination of CPIF's claims to the claims of the creditors.

68. Equitable subordination of CPIF's claims would not be inconsistent with the Bankruptcy Code.

WHEREFORE, the Resident Committee requests that this Court enter an order determining that Claim No. 22 is subordinate to the claims of the Residents of University Village

pursuant to Section 510(b) of the Bankruptcy Code, and granting such other and further relief as the Court deems just and proper.

## COUNT V
### Setoff

69. The Resident Committee re-alleges and incorporates herein paragraphs 1 through 44 as if fully set forth herein.

70. The Debtors and CPIF entered into the Loan Agreement and various other loan documents as set forth in this Complaint and engaged in conduct described in this Complaint as part of a loan transaction (the "Loan Transaction").

71. Through this Complaint, the Resident Committee has asserted various causes of action (on behalf of the Debtors) arising out of the Loan Transaction.

72. CPIF filed Claim No. 22 arising out of the same Loan Transaction.

73. To the extent Claim No. 22 is a valid claim against the Debtors' estates, the Debtors are entitled to setoff Claim No. 22 by the amount of damages awarded to the Debtors in this action.

WHEREFORE, the Resident Committee requests that this Court enter an order determining that Claim No. 22 will be setoff by an amount to be determined at trial, and granting such other and further relief as the Court deems just and proper.

## COUNT VI
### Determination of the Validity, Priority, and Extent of CPIF's Lien

74. The Resident Committee re-alleges and incorporates herein paragraphs 1 through 44 as if fully set forth herein.

75. CPIF filed Claim No. 22, comprised of its claim for (a) outstanding principal in the amount of $9,500,000; (b) accrued interest in the amount of $457,821.92; (c) an exit fee of

{00292820.DOC;7}                                     19

$285,000; (d) an extension fee of $63,333.33; (e) legal fees and expenses of $22,755.37; and (f) document processing/release fees of $250.

76.     In accordance with Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the Resident Committee disputes the validity, priority, and extent of the secured claim asserted by CPIF pursuant to Claim No. 22.

77.     In accordance with Rules 7001(8) and 7001(9) of the Federal Rules of Bankruptcy Procedure, the Resident Committee seeks a declaration that the secured claim asserted by CPIF pursuant to Claim 22 is subordinate and inferior to the rights of the Residents and all obligations of the Debtors to the Residents pursuant to the contractual subordination provisions contained in the Devonshire Language added in the Second Amendment to the Loan Agreement and under the principals of equitable subordination described above.

WHEREFORE, the Resident Committee requests that this Court enter an order determining the validity, priority, and extent of Claim No. 22 and declaring that the liens asserted through Claim 22 are subordinate to the rights of Debtors' obligations to the Residents, and granting such other and further relief as the Court deems just and proper.

## OBJECTION TO CLAIM NO. 22

78.     This is an objection to Claim No. 22, filed by CPIF, brought pursuant to Rules 3007(a), 3007(b), and 7001 of the Federal Rules of Bankruptcy Procedure.

79.     The Resident Committee re-alleges and incorporates herein paragraphs 1 through 44 as if fully set forth herein.

80.     The Resident Committee objects to Claim No. 22 on the grounds that CPIF charged the Debtors usurious interest and additional fees as alleged in Count I.

81.    The Resident Committee objects to Claim No. 22 on the grounds that CPIF aided and abetted in various officers' breaches of fiduciary duties to the Debtors as alleged in Count II.

82.    The Resident Committee objects to Claim No. 22 on the grounds that CPIF contractually agreed to subordinate any valid lien to the claims of the Residents of University Village as alleged in Count III.

83.    The Resident Committee objects to Claim No. 22 on the grounds that Claim No. 22 is equitably subordinate to the claims of the Residents of University Village as alleged in Count IV.

84.    The Resident Committee objects to Claim No. 22 on the grounds that Claim No. 22 is subject to setoff as alleged in Count V.

85.    The Resident Committee objects to Claim No. 22 on the grounds that CPIF asserts a first priority lien that is subordinate to the rights and obligations of the Debtors to the Residents as alleged in Count VI.

86.    The Resident Committee reserves the right to amend, modify, or supplement this objection to assert additional or further objections on grounds other than those stated herein.

WHEREFORE, the Resident Committee requests that this Court enter an order reducing Claim No. 22, subordinating Claim No. 22 to the claims of the Residents of University Village, and granting such other and further relief as the Court deems just and proper.

## CONCLUSION

WHEREFORE, the Resident Committee respectfully requests this Court enter an order granting the requested relief and any other and further relief as is just and proper.

Dated: Tampa, Florida
        September 7, 2017

By: ___/s/_____
David S. Jennis
Florida Bar No. 775940
Jennis Law Firm
606 East Madison Street
Florida 33602
Telephone: (813) 229-2800
Facsimile: (813) 229-1707
djennis@jennislaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 7, 2017, I electronically filed a true and correct copy of the foregoing Motion with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system.

_____/s/_____
David S. Jennis

{00292820.DOC;7}                    22