UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

WESTPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP,

WESTPORT HOLDINGS TAMPA II,
LIMITED PARTNERSHIP,

Debtors.

_____/

OFFICIAL COMMITTEE OF RESIDENT
CREDITORS,

Plaintiff,

v.

CPIF LENDING, LLC,

Defendant.

_____/

Case No.:  8:16-bk-08167-MGW

Chapter 11

Case No.:  8:16-bk-08168-MGW

Jointly Administered Under
Case No. 8:16-bk-08167-MGW

Adv. Pro. No.:8:18-ap-00102-MGW

## AMENDED COMPLAINT AND OBJECTION TO CLAIM NO. 22

Plaintiff, the Official Committee of Resident Creditors of Westport Holdings Tampa, Limited Partnership and Westport Holdings Tampa II, Limited Partnership (the "Plaintiff" or "Resident Committee"), by counsel, hereby files this complaint against the Defendant, CPIF Lending, LLC (the "Defendant" or "CPIF"), and objection to CPIF's Proof of Claim No. 22.  In support, the Resident Committee respectfully alleges as follows:

{00302566.DOC;4}



EXHIBIT  8
WIT: Jennis
DATE: 2·27·2023
Tina Stuhr, CSR, RPR

## PRELIMINARY STATEMENT

This is an action to redress serious and irreparable harm inflicted on the residents of University Village by the Defendant. As set forth in more detail below, the Defendant orchestrated, participated in, and benefited from a series of transactions that caused the Debtors (defined below) to become deeply insolvent, and jeopardized the Debtors' ability to retain the necessary regulatory authority and approvals to continue to operate the Debtors' property and assets as a Continuing Care Retirement Community ("CCRC"). Worse still, the Defendant's actions seriously hindered the Debtors' ability to successfully emerge from bankruptcy, necessitated the expenditure of millions of dollars in professional fees, and resulted in the permanent destruction of the investments, security, care, and personal freedom of the residents of University Village, virtually all of whom are senior adults. All the while, the Defendant has demanded payment of exorbitant interest accruing at likely usurious rates and the recovery of significant legal fees in connection with its claim against the Debtors and, thereby, the residents of University Village. As a result, the Plaintiff respectfully requests that the Court sustain its objection to the Defendant's proof of claim, award Plaintiff the damages and setoff requested through Counts VI through VIII, issue declaratory relief (Counts IX and X), award the Plaintiff damages as compensation for the Defendant's unlawful, tortious, and/or inequitable conduct (Counts I through IV), and finding and invalidating the Defendant's loans to the Debtors as being usurious (Count V).

## JURISDICTION AND VENUE

1. The Resident Committee has standing to bring this adversary proceeding pursuant to the Court's *Interim Order Granting in Part Official Committee of Resident Creditors' Motion to (I) Appoint Chapter 11 Trustee or, Alternatively, (II) Expand Power of Examiner to (A)*

{00302566.DOC;4}                                      2

*Restart the Sale Process, (B) Employ a Marketing Firm, and (C) Employ an Auction Firm, and Grant Committee Standing to Pursue Fraudulent Transfer Claims* (Doc. No. 770).[1]

2.    This is an adversary proceeding brought pursuant to Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

3.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.

4.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), and (O).

5.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PLAINTIFF, DEFENDANT, AND OTHER INTERESTED PARTIES

6.    The Plaintiff was appointed as an official committee by the United States Trustee's Office on December 29, 2016 to represent the interests of the residents of University Village.

7.    The Defendant, CPIF, is a Washington for-profit corporation formed in 2013. At all times relevant, Defendant has been transacting business in Florida without registering with the Secretary of State as required by Section 605.0902 of the Florida Statutes.

8.    Westport Holdings Tampa, Limited Partnership ("Westport") and Westport Holdings Tampa II, Limited Partnership ("Westport II") (collectively, the "Debtors") are Delaware limited partnerships that filed voluntary petitions under Chapter 11 of the Bankruptcy Code[2] on September 22, 2016.

---

[1] Docket entries from the bankruptcy case, Case No. 8:16-bk-08167, are cited as follows: (Doc. No. #.)

[2] All references to the "Bankruptcy Code" are to the applicable section of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

9.      The Debtors, along with affiliate Westport Nursing Tampa, LLC ("WNT"), own and operate "University Village," a CCRC organized pursuant to Section 651 of the Florida Statutes.[3] University Village consists of:

a)      An Independent Living Facility (the "ILF"), containing (a) 446 independent living apartments in a facility owned by Westport, and (b) 46 independent living villas clustered within a neighborhood of duplex buildings, including a dedicated clubhouse, owned by Westport II; and

b)      A Health Center, containing a 110-unit Assisted Living Facility (the "ALF"), and a 120-bed Skilled Nursing Facility (the "SNF"), both located on property owned by WNT.

10.     Upon information and belief, prior to March 31, 2014, the organizational and operational structure of Westport and Westport II was as follows:

a)      Westport Holdings University Village, LLC ("WHUV"), a Delaware limited liability company, was the 1% general partner interest in Westport, and managed and operated the ILF at University Village;

b)      Westport Holdings Hidden Springs, LLC ("WHHS"), a Delaware limited liability company, held the 1% general partnership interest in Westport II;

c)      Lawrence Landry ("Landry"), the president and sole manager of Westport and Westport II, controlled both WHUV and WHHS, the general partners of Westport and Westport II, respectively, through a separate entity, Westport Advisors, Ltd., as manager;

---

[3] A CCRC is considered a "specialty insurer subject to regulatory oversight by the Office of Insurance Regulation (the "OIR"), among other regulation agencies."

d) Westport Senior Living Investment Fund, L.P. ("WSLIF"), a Delaware limited partnership, held the 99% limited partnership interest in Westport and Westport II;

e) TALF, Inc. ("TALF"), a Florida non-profit corporation, was the designated licensee and operator for the ALF at University Village;

f) TR & SNF, Inc. ("TR&SNF"), a Florida non-profit corporation, was the designated licensee and operator of the SNF at University Village;

g) WEMAMM I, LLC ("WEMAMM"), a Florida for-profit limited liability company, was the managing member of TALF and TR&SNF, and provided management services under a management contract with TALF and TR&SNF for the operations of the ALF and the SNF;

h) Westport owned 100% of the membership interests in WNT, which owned the property housing the ALF and the SNF at University Village, making WNT a wholly owned subsidiary of Westport; and

i) Westport, Westport II, and WNT's primary secured lender was Horizon LP UV Lender, LLC ("Horizon"), which held mortgages totaling approximately $20,000,000 secured by Westport, Westport II, and WNT's property.

11. John Bartle ("Bartle") is a resident of the State of Indiana. On or before March 31, 2014, Bartle, CPIF, and the Debtors' former equity holders orchestrated a leveraged buyout and series of related transactions intended to dissipate the Debtors' assets and with the intention of hindering, delaying, and defrauding residents and other creditors of the Debtors. Upon information and belief, Bartle used the following entities, which he directly or indirectly owns or controls, to facilitate the leveraged buyout and related transactions:

a)   BVM University Village, LLC ("BVMUV"), a Florida limited liability company formed in 2013 to acquire some interest in University Village, which was distributed a portion of the 99% limited partnership interests in Westport and Westport II, as well as a membership interest in WNT;

b)   BVM Management, Inc. ("BVM Management"), an Indiana non-profit corporation that manages senior living communities in Indiana and Florida, which Bartle initially used to attempt to acquire the 99% limited partnership interests in University Village and WEMAMM's for-profit management contracts with TALF and TR&SNF;

c)   IMH Health Care, LLC ("IMH"), a Delaware limited liability company, which was subsequently distributed a portion of the 99% limited partnership interests in Westport and Westport II, acquired the 1% general partnership interests in Westport and Westport II, received a membership interest in WNT, and ultimately became the managing member of WNT;

d)   JF Consultants, LLC ("JFC"), a Delaware limited liability company not registered with the Secretary of State as required by Section 605.0902 of the Florida Statutes, which was subsequently distributed a portion of the 99% limited partnership interests in Westport and Westport II, and received a membership interest in WNT;

e)   BHMSILF Investments, LLC ("BHMSILF"), a Delaware limited liability company not registered with the Secretary of State as required by Section 605.0902 of the Florida Statutes, which was subsequently distributed a portion of the 99% limited partnership interests in Westport and Westport II, and received a membership interest in WNT;

f)        BHMSILFGP, LLC ("BHMSILFGP"), a Delaware limited liability company formed to acquire the 1% general partnership interests in Westport and Westport II;

g)        Compliance Concepts, LLC ("Compliance"), an entity controlled by Bartle through his wife, Rebecca Bartle, which subsequently acquired or attempted to acquire the 1% general partnership interests in Westport and Westport II;

h)        BVM The Bridges, LLC ("BVM Bridges"), a Florida limited liability company formed to acquire a retirement facility known as "The Bridges" in Riverview, Florida; and

i)        BVM Coral Landing, LLC ("BVM Coral Landing"), a Florida limited liability company formed to acquire a retirement facility known as "Coral Landing" in St. Augustine, Florida.

**GENERAL ALLEGATIONS**

A. *Overview of CCRCs*

12.        CCRCs offer a combination of long-term care and housing to retirees and senior citizens. Initially, CCRC residents live in apartment or condominium style units located in a residential complex, often referred to as an independent living facility. As residents' needs progress, they are entitled to move into an assisted living facility and, if necessary, eventually into a skilled nursing facility, where they can receive more intensive and specialized care.

13.        Generally, to join a CCRC, a resident is required to pay a substantial up-front entrance fee, sometimes referred to as an initial entry deposit ("Initial Entry Deposit" or "IED"), and enter into a continuing care contract ("Life-Care Contract"). A typical Life-Care Contract between a resident and Westport generally provides a "Refundable" portion of the IED, a small

balance being non-Refundable.  The Life-Care Contract allows the CCRC to periodically deduct funds from the resident's Refundable Initial Entry Deposit through a "healthcare line of credit" to supplement and provide for the resident's living and long-term care expenses when the time comes for the resident to need additional care in the ALF or the SNF.

14.    Residents who require care at the ALF or the SNF for a long period of time, or who necessitate significant long-term care expenses that are provided under the Life-Care Contract, may incur costs that equal or exceed the Refundable balance of their IED.  When this occurs, Life-Care Contracts function much like long-term care insurance policies, allowing the resident to remain at the CCRC indefinitely and for no additional charge under the terms of the Life-Care Contract.  If, on the other hand, a resident voluntarily leaves the CCRC or passes away prior to the exhaustion of their Refundable Initial Entry Deposit through application of the healthcare line of credit, the resident or the resident's estate is entitled to a refund of the unused portion of their Refundable Initial Entry Deposit.

15.    Given the substantial living and long-term care services provided by CCRCs, residents' IEDs can range from $75,000 to in excess of $400,000.  As a result, many residents sell their primary residence or otherwise deplete their personal resources and use the proceeds to finance their IEDs.

16.    CCRCs are not a static environment.  Residents continually move between the ILF, the ALF, and the SNF.  To attract new residents and, by extension, safeguard the long-term viability of the community, CCRCs must continually make capital expenditures to maintain and improve their facilities.  These capital expenditures are typically funded, in most or in part, from the sale of new Life-Care Contracts and the new IEDs generated thereby, and through sources such as external financing and cash flow generated by the operations of the associated ALF and

{00302566.DOC;4}                                      8

SNF. If the necessary capital improvements do not occur, CCRCs are less able to attract new residents and, by extension, the IEDs necessary to offset facility maintenance and the long-term care expenses of existing residents. If this process continues, CCRCs can face financial challenges and, eventually, become insolvent.

B. *Debtors' Loan with Horizon, Proposed Sale to Bartle, and Deed-in-Lieu-of-Foreclosure Agreement*

17. University Village is a CCRC that has entered into Life-Care Contracts with senior citizens and retirees in the Tampa Bay area.

18. Prior to Bartle's involvement in University Village, the Debtors' primary secured creditor was Horizon.

19. Under the terms of the Debtors' loan agreements with Horizon, the indebtedness owed to Horizon was scheduled to mature on January 15, 2013.

20. During the years or months leading up to January 15, 2013, the Debtors marketed University Village for sale to a new ownership group that could obtain funding to retire the Horizon debt.

21. The Debtors ultimately identified Bartle as a possible buyer of University Village, and subsequently entered into negotiations with Bartle to sell University Village to one of Bartle's companies, BVMUV.

22. While the Debtors negotiated with Bartle regarding a possible sale of University Village, the Debtors' loans with Horizon matured.

23. At that time, the Debtors lacked the funds necessary to retire the Horizon debt, so Horizon and the Debtors entered into a carefully negotiated deed-in-lieu agreement.

24. Under the deed-in-lieu agreement, the Debtors would be given additional time to effectuate a sale of University Village to Bartle and his companies. In the event that Bartle was

{00302566.DOC;4}                    9

unable to close the transaction to purchase University Village in a timely manner, the parties agreed that Horizon would receive title to the University Village property through deeds in lieu of foreclosure and, in exchange, Horizon would:

a)    Release the Debtors of their outstanding obligations to Horizon (approximately $20,000,000);

b)    Allow the Debtors to retain their cash on hand; and

c)    Assume all obligations to the residents living at University Village, including the Life-Care Contracts and corresponding obligations to pay Refundable portions of the residents' IEDs as they came due.

25.    In essence, if Bartle's deal to purchase University Village fell through, Horizon committed to preserve and honor the residents' Life-Care Contracts and any requests for refunds of their Initial Entry Deposits.

26.    In the end, Bartle was unable to close the transaction to purchase University Village pursuant to the terms of the deed-in-lieu agreement.

27.    As a result, Horizon demanded title to University Village pursuant to the deed-in-lieu agreement, and hired Life Care Services, LLC ("Life Care"), one of the largest operators of CCRCs in the country, to manage University Village on its behalf.

28.    Based on Horizon's understanding that it was entitled to assume ownership of University Village under the deed-in-lieu agreement, Life Care conducted a comprehensive ownership and management transition process during the week of February 10-14, 2014.

29.    This process cost Horizon considerable sums of money, but nevertheless helped ensure a smooth transition for the residents of University Village.

C. *The Leveraged Buyout*

30. Despite Horizon's good faith efforts to protect the residents of University Village, the Debtors and Bartle refused to cede control of University Village to Horizon as required under the deed-in-lieu agreement.

31. Instead, the Debtors and Bartle negotiated a deal with a lender, CPIF, to conduct a leveraged buyout of University Village.

32. Under the leveraged buyout, the equity interests in the Debtors would be transferred to Bartle and/or affiliates or related entities, and the Horizon debt would be retired and replaced with additional, higher interest-bearing debt owed to CPIF.

33. The leveraged buyout of University Village closed on or about March 31, 2014 (the "Closing").

34. Under the terms of the March 31, 2014 leveraged buyout, the Debtors executed and delivered to CPIF a promissory note in the original principal amount of $9,500,000 (the "CPIF Note) at an annual interest rate of 11% with a maturity date of September 30, 2015, and a mortgage (the "CPIF Mortgage") on the property comprising the ILF at University Village. The terms of the "loan" from CPIF are further evidenced by a loan agreement (the "CPIF Loan Agreement) (the CPIF Note, CPIF Mortgage, and CPIF Loan Agreement are hereinafter referred to as the "Original CPIF Loan Documents").

35. At the Closing, the $9,500,000 "loan" from CPIF to the Debtors was disbursed as follows:

    a) $5,611,740.47 was paid to Horizon to retire a portion of the Horizon debt;

    b) $1,750,000 was held by CPIF, and not disbursed, purportedly to fund a capital improvement reserve for University Village;

c)    $190,000 was paid to CPIF as a loan origination fee;

d)    $1,000,000 was paid to WSILF or WSILF's equity holders in exchange for the 99% limited partnership interests in University Village, which interests were transferred to BVMUV, and subsequently distributed among BVMUV, IMH, JFC, and BHMSILF pro rata;

e)    $300,000 was paid to WEMAMM, purportedly for "Transaction Management Expenses" but, in reality, to obtain the resignation of the then-members of the boards of directors of TALF and TR&SNF, to install Bartle and affiliates as the directors of the not-for-profit entities, and to obtain control of WEMAMM's for-profit management contracts with TALF and TR&SNF and all related cash flow; and

f)    The remainder of the loan proceeds was paid towards taxes, fees, and other costs.

36.    As part of the leveraged buyout orchestrated by the Debtors, Bartle, and CPIF, the membership interests in Westport's solely owned subsidiary, WNT, were "spun off" to BVMUV, IMH, BHMSILF, and JFC, and WNT's assets were encumbered with an additional $15,000,000 in mortgage debt owed to USAmeriBank. In addition, approximately $3,000,000 of Westport's statutory required minimum liquid reserves ("MLR"), which generally were derived from a portion of the IED paid by the residents, were taken from the existing escrow account where the MLR was maintained and improperly pledged as collateral to secure USAmeriBank's loan to WNT.

37.    All told, the Debtors and WNT emerged from the leveraged buyout with significantly more debt than they had prior to the March 31, 2014 transaction, a significantly

higher interest "carry," and only 18 months of "runway" to repay their newly incurred obligations.

38.     Bartle and CPIF failed to seek and obtain the required regulatory pre-approval for the changes in ownership contemplated under the leveraged buyout, which placed University Village (and its residents) at an extraordinary and intolerable risk of the Debtors being investigated, audited, placed under supervision, and ultimately being the subject of a delinquency proceeding and possible receivership, and potential shut-down by state authorities, including the Florida Office of Insurance Regulation (the "OIR").

39.     In the months that would follow, the OIR and the Florida Department of Financial Services (the "DFS") did undertake a review of the March 31, 2014 leveraged buyout and commenced delinquency proceedings against the Debtors.  These proceedings were pending for approximately 18 months, ultimately resulted in the Debtors seeking bankruptcy protection, and were a leading cause of the significant adverse financial consequences suffered by University Village and its residents.

   D. *CPIF and the Debtors' Improper Use of the $1,750,000 Capital Improvement Reserve to Fund the Expansion of Bartle's Retirement Community Empire and Issuance of New Bond Debt to CPIF*

40.     On August 25, 2014, approximately six months after the leveraged buyout, the Debtors, CPIF, and Bartle's management company, BVM Management, amended the Original CPIF Documents (the "First Amendment") to permit Bartle and/or BVM Management or their agents to withdraw $1,000,000 from the Debtors' capital improvement reserve.  The purpose of the First Amendment was to enable Bartle to use $1,000,000 of the Debtors' $1,750,000 capital improvement reserve as a "credit enhancement" to fund Bartle's debt-financed acquisition of

other retirement communities commonly known as the BVM Bridges and BVM Coral Landing, entities unrelated to the Debtors' business and operations.

41. Under the First Amendment, CPIF agreed to purchase the BVM Bridges and BVM Coral Landing bond debt to be issued in connection with the acquisition of those communities, which bond debt was guaranteed by BVM Management, in exchange for additional "fee payments" from Bartle's companies to CPIF.

42. The use of the Debtors' capital improvement reserve to fund the acquisition of additional retirement communities by Bartle and his companies provided no discernable benefit to the Debtors, University Village, or its residents. To the contrary, Bartle essentially used $1,000,000 of the Debtors' $1,750,000 capital improvement reserve, which the Debtors were required to pay interest on at 11% per annum, to fund the expansion of his retirement community empire. During this timeframe, the funds that had been advanced by CPIF and reserved for capital improvements were not used for that purpose.

43. CPIF, understanding full well the Debtors' precarious financial condition and obligations under the March 31, 2014 transaction, not only allowed Bartle to use $1,000,000 of the Debtors' capital improvement reserve for the improper purpose described above, but also, on information and belief based on the First Amendment, used the First Amendment to acquire millions of dollars in new interest-bearing bonds secured by additional retirement facilities owned or controlled by Bartle and obtain additional fees.

44. All the while, critical capital improvements at University Village were not performed, the property further deteriorated, and the Debtors' insolvency deepened.

E. *Additional Amendments of the CPIF Loan Documents, Including Amendment to Add so-called "Devonshire Language" Honoring Residents' Residency Agreements*

45.     In the months that followed, the Debtors and CPIF entered into a series of additional amendments to the Original CPIF Loan Documents.  The amendments, among other things:

      a)     Proposed further changes in the Debtors' ownership structure, which were not approved by the Florida regulatory authorities, and resulted in further exacerbation of the already-pending delinquency proceedings;

      b)     Added additional provisions to the CPIF Loan Agreement (the "Second Amendment"), generally referred to as the "Devonshire Language", through which CPIF and the Debtors agreed "that the rights of each Resident of University Village, under the terms of the Residency Agreement will be honored and will not be disturbed by a foreclosure . . . or a conveyance in lieu thereof . . ."; and

      c)     Resulted in the Debtors paying CPIF a series of one-time payments to extend the maturity date of the March 31, 2014 loan.

46.     Thereafter, on July 1, 2016, the Debtors and CPIF entered into a forbearance agreement under which the loan maturity was further extended (the "Forbearance Agreement") in exchange for an additional one-time payment, and the interest rate would be increased from 11% to 25% upon the Debtors' eventual default under the loan agreement or the expiration of the repayment period contemplated under the Forbearance Agreement.

F. *The Debtors File for Bankruptcy*

47.     Shortly prior to the expiration of the forbearance period, and on the eve of the evidentiary hearing on the delinquency proceedings commenced by the Florida regulatory authorities to shutdown University Village due to Bartle's failure and inability to satisfy the

{00302566.DOC;4}                              15

regulatory authorities that he or his affiliates were fit to operate CCRCs in Florida, the Debtors filed for bankruptcy.

48.     Given the dire financial and regulatory condition of the Debtors upon filing for bankruptcy, it ultimately became apparent that a successful reorganization by the Debtors' existing management under Chapter 11 of the Bankruptcy Code would be impossible and that a sale of the CCRC to a new ownership group would be necessary to maintain the viability of the CCRC.

49.     As a result, through an extensive mediation process, various stakeholders in University Village have proposed a plan under which University Village will be sold to a new management and ownership group, and the residents' ability to continue to receive long-term care and other benefits under the terms of their Life-Care Contracts will be assumed by the purchasing entity.

50.     This process took more than one year to resolve, resulted in an incalculable toll of emotional and physical distress to the residents of University Village, and necessitated the expenditure of millions of dollars in legal fees by counsel for the Debtors, the Resident Committee, the Court-appointed Examiner, his counsel, the financial advisors to the Resident Committee, and various other stakeholders.

51.     Unfortunately, due to the issues referenced above and the conduct of Bartle, CPIF, and others, the Debtors, the Resident Committee, and other stakeholders have been unable to propose a plan that would allow University Village's current and former residents, who have passed away or terminated their contracts, to recover any immediate refund of their IEDs, as provided under the Life-Care Contracts or the loans made by certain residents to the Debtors through a program known as "Personal Income Protection" ("PIP") and face, at best, a long term

and extended payout of their IED and PIP funds. As a result, many of the remaining current residents of University Village have lost their freedom to move to a different CCRC and, worse still, face an uncertain future.

G.    *CPIF's Claim No. 22*

52.    On October 26, 2016, CPIF filed Claim No. 22 as a secured claim in the bankruptcy case seeking a total of $9,781,224.58. CPIF has also filed numerous motions for interest, attorneys' fees, and expenses pursuant to Section 506(b) of the Bankruptcy Code. (Doc. Nos. 215, 272, 371, and 582). As of the most recent motion, CPIF sought post-petition attorneys' fees and expenses through May 2017 totaling approximately $193,830.99.

## COUNT I: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

53.    The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

54.    At all times they occupied their respective positions, the Debtors' general and limited partners owed the Debtors and the residents of University Village multiple fiduciary duties.

55.    The Debtors' general and limited partners breached their fiduciary duties by, among other things and without limitation:

a)    Entering into a leveraged buyout transaction with CPIF under terms and conditions less favorable to the Debtors and the residents of University Village than were otherwise available under the deed-in-lieu agreement with Horizon;

b)    Authorizing and allowing Bartle to use $1,000,000 from the Debtors' capital improvement reserve as an interest free loan to acquire additional retirement facilities; and

Case 8:20-ap-00007-CPM Doc 463-8 Filed 11/20/23 Page 18 of 36
Case 8:18-ap-00102-MGW Doc 7 Filed 03/16/18 Page 18 of 36

c) Authorizing and allowing the substitution of the Debtors' limited and general partners without first obtaining required regulatory approval or provisional authority, resulting in the commencement of delinquency proceedings by Florida regulators that jeopardized the Debtors' ability to continue as a going concern.

56. At all times, CPIF knew or should have known that senior housing CCRC communities, nursing homes, and similar facilities are highly regulated at both the state and federal levels and that through the leveraged buyout and other transactions described above, would allow the Debtors' limited and general partners to breach their fiduciary duties to the Debtors and the residents of University Village.

57. CPIF substantially assisted or encouraged the foregoing breaches of fiduciary duties by, among other things and without limitation:

a) Structuring, agreeing to, and facilitating the March 31, 2014 leveraged buyout under terms and conditions less favorable to the Debtors and the residents of University Village than the deed-in-lieu agreement with Horizon;

b) Authorizing and allowing Bartle to use $1,000,000 from the Debtors' capital improvement reserve to issue debt to finance the acquisition of additional retirement facilities, which debt CPIF acquired and held for its own financial gain; and

c) Authorizing and allowing the substitution of the Debtors' limited and general partners without first obtaining required regulatory approval or provisional authority, resulting in the commencement of delinquency proceedings by Florida regulators that jeopardized the Debtors' ability to continue as a going concern.

58. The assistance of CPIF facilitated the foregoing breaches of fiduciary duties.

{00302566.DOC;4}                    18

59.     As a direct and proximate cause of CPIF's conduct, the Plaintiff has suffered significant financial, physical, and emotional harm, including loss of life, money, and freedom of personal action.

WHEREFORE, the Plaintiff requests that this Court enter an order (1) finding CPIF liable for the tort of aiding and abetting breach of fiduciary duty, (2) awarding the Plaintiff damages, including damages for economic and non-economic losses, damages for emotional pain and suffering, and punitive damages, and (3) granting such other and further relief as the Court deems just and proper.

## COUNT II: CIVIL CONSPIRACY

60.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

61.     Beginning on or before March 31, 2014 and continuing through the present, CPIF and Bartle entered into oral and written agreements to, among other things and without limitation:

a)     Dissipate the Debtors' assets through the leveraged buyout transaction and series of related transactions described above; and

b)     Transfer and propose to transfer the Debtors' limited and general partnership interests to persons and entities affiliated with Bartle in violation of the applicable state and federal laws and regulations.

62.     The foregoing transactions and agreements contemplated one or more unlawful acts, namely the systematic dissipation of the Debtors' and the residents of University Village's assets through the transactions described above, and the transfer of the Debtors' limited and general partnership interests in violation of State laws and regulations.

{00302566.DOC;4}                              19

63. Alternatively, the foregoing agreement contemplated the commission of lawful acts by unlawful means.

64. CPIF and Bartle committed and participated in one or more overt acts in furtherance of the conspiracy, namely by structuring, enabling, and participating in the transactions described above.

65. As a direct and proximate cause of CPIF's conduct, the Plaintiff has suffered significant financial, physical, and emotional harm, including loss of life, money, and freedom of personal action.

WHEREFORE, the Plaintiff requests that this Court enter an order (1) finding CPIF liable for the tort of civil conspiracy, (2) awarding the Plaintiff damages, including damages for economic and non-economic losses, damages for emotional pain and suffering, and punitive damages, and (3) granting such other and further relief as the Court deems just and proper.

## COUNT III: NEGLIGENCE

66. The Plaintiff re-alleges and incorporates by reference paragraphs 1 through 52 as if fully set forth herein.

67. By extending credit to retirement communities and CCRCs in the State of Florida, CPIF owed its borrowers and its borrowers' constituents (in this case, the Debtors and the residents of University Village) a duty of reasonable care.

68. CPIF breached its duty of care to the Plaintiff by orchestrating, enabling, and participating in a leveraged buyout and subsequent transactions that, among other things:

a) Caused the Debtors to incur debts beyond their ability to repay;

b) Resulted in the commencement of delinquency proceedings by Florida regulators that jeopardized the Debtors' ability to continue as a going concern; and

     c)     Ultimately deepened the insolvency of the Debtors and caused the Debtors to seek bankruptcy protection under disadvantageous circumstances.

69.     As a direct and proximate cause of CPIF's conduct, the Plaintiff has suffered significant financial, physical, and emotional harm, including loss of life, money, and freedom of personal action.

WHEREFORE, the Plaintiff requests that this Court enter an order (1) finding CPIF liable for the tort of negligence, (2) awarding the Plaintiff damages, including damages for economic and non-economic losses, damages for emotional pain and suffering, and punitive damages, and (3) granting such other and further relief as the Court deems just and proper.

## COUNT IV: DEEPENING INSOLVENCY

70.     The Plaintiff re-alleges and incorporates by reference paragraphs 1 through 52 as if fully set forth herein.

71.     CPIF, as a result of the foregoing conduct, enabled the Debtors to expand their debts beyond, and under terms less favorable than, the debts owed to Horizon.

72.     As a result of the foregoing conduct, the Debtors' insolvency was prolonged and deepened, resulting in additional and unnecessary harm to the residents of University Village, including:

     a)     The permanent loss of the residents' entitlement to the Refundable portion of their Initial Entry Deposit and consequent inability to move to another CCRC;

     b)     The necessitation and incurrence of millions of dollars in professional fees that have adversely affected the Debtors' ability to reorganize, and

c)    The incurrence of interest, fees, and other payments over and above what would have been necessary to retire the Horizon debt under the terms of the deed-in-lieu agreement with Horizon.

WHEREFORE, the Plaintiff requests that this Court enter an order (1) finding CPIF liable for the tort of deepening insolvency, (2) awarding the Plaintiff damages, including damages for economic and non-economic losses, damages for emotional pain and suffering, and punitive damages, and (3) granting such other and further relief as the Court deems just and proper.

## COUNT V: USURY

73.    The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

74.    As evidenced by the loan documents, CPIF agreed to loan the Debtors a principal amount of $9,500,000 secured by a mortgage on their property.

75.    The default rate of interest at 25% per annum has accrued on the outstanding principal amount since July 1, 2016.

76.    According to the forbearance agreement, which expressly controls any conflicting terms within the loan documents, the interest rate charged by CPIF is governed by the laws of the state of Florida.

77.    Under Sections 687.02 and 687.071(2) of the Florida Statutes, a loan exceeding $500,000 is usurious if the interest rate exceeds 25% per annum.

78.    CPIF knowingly charged excessive interest considering all of the circumstances surrounding the loan, including:

a)      The additional fees and restrictions provided for in the loan agreement (i.e. the prepayment premium, the loan origination fee, the exit fee, and the controlled account); and

b)      CPIF's continual charge of interest on the total amount of the capital improvement reserve despite the withdrawal of $1,000,000 of said amount for Bartle's and CPIF's personal financial gain without consideration to the Debtors.

WHEREFORE, the Plaintiff requests that this Court enter an order (1) finding CPIF's loan agreement with the Debtors usurious, (2) awarding the Plaintiff damages, including damages for economic and non-economic losses, damages for emotional pain and suffering, punitive damages, and attorneys' fees, and (3) granting such other and further relief as the Court deems just and proper.

## COUNT VI: CONTRACTUAL SUBORDINATION

79.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

80.     In the Second Amendment to its loan agreement with the Debtors, CPIF agreed to add Section 11.3, which provides that "the rights of each resident of University Village, under the terms of the Residency Agreement will be honored and will not be disturbed by a foreclosure under the Financing Documents or a conveyance in lieu thereof."

81.     Section 651.114(8)(a) of the Florida Statutes states that the Florida Office of Insurance Regulation's powers are subordinated if a lender "by inclusion or by amendment to the loan documents . . . agrees that the rights of residents under a continuing care or continuing care at-home contract will be honored and will not be disturbed by a foreclosure or conveyance in lieu thereof."

{00302566.DOC;4}                                    23

82.     CPIF contractually agreed to subordinate its claims to the claims of the residents of University Village.

WHEREFORE, the Plaintiff requests that this Court enter an order (i) determining that Claim No. 22 is subordinate to the claims of the residents of University Village pursuant to Section 510(a) of the Bankruptcy Code, and (ii) granting such other and further relief as the Court deems just and proper.

## COUNT VII: EQUITABLE SUBORDINATION

83.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

84.     CPIF has acted in concert with Bartle and his companies to, among other things and without limitation:

a)      Dissipate the Debtors' assets through the series of transactions described above;

b)      Transfer and propose to transfer the Debtors' limited and general partnership interests to persons and entities affiliated with Bartle in violation of State laws and regulations;

c)      Charge usurious interest, as described above; and

d)      Engage in other inequitable conduct as alleged herein.

85.     CPIF's inequitable conduct has injured creditors of the Debtors' bankruptcy estates, the residents of University Village, and/or conferred an unfair advantage on CPIF.

86.     As a consequence of CPIF's inequitable conduct, the Plaintiff is entitled, pursuant to Section 510(c) of the Bankruptcy Code, to equitable subordination of CPIF's claims to the claims of the creditors.

{00302566.DOC;4}                        24

87.    Equitable subordination of CPIF's claims would not be inconsistent with the Bankruptcy Code.

WHEREFORE, the Plaintiff requests that this Court enter an order (i) determining that Claim No. 22 is subordinate to the claims of the residents of University Village pursuant to Section 510(a) of the Bankruptcy Code, and (ii) granting such other and further relief as the Court deems just and proper.

## COUNT VIII: SETOFF

88.    The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

89.    The Debtors and CPIF entered into the March 31, 2014 leveraged buyout and related transactions described herein.

90.    Through this complaint, the Plaintiff has asserted various causes of action (on behalf of the Debtors' estates) arising out of the March 31, 2014 leveraged buyout and related transactions.

91.    CPIF filed Claim No. 22 arising out of the March 31, 2014 leveraged buyout and related transactions.

92.    To the extent Claim No. 22 is a valid claim against the Debtors' estates, the Debtors are entitled to setoff Claim No. 22 by the amount of damages awarded to the Plaintiff in this action.

WHEREFORE, the Plaintiff requests that this Court enter an order (i) determining that Claim No. 22 will be setoff by an amount to be determined at trial, and (ii) granting such other and further relief as the Court deems just and proper.

## COUNT IX:
## DECLARATORY RELIEF REGARDING
## THE VALIDITY, PRIORITY, AND EXTENT OF CPIF'S LIEN

93.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

94.     CPIF filed Claim No. 22 as a secured claim in the bankruptcy case, seeking a total of $9,781,224.58, and currently seeks the allowance of post-petition interest accruing at a default rate of twenty-five percent (25%), in excess of $414,124.01 in attorneys' fees and other expenses, for a total claim of approximately $2,859,430.16.

95.     In accordance with Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the Plaintiff disputes the validity, priority, and extent of the secured claim asserted by CPIF.

96.     In accordance with Rules 7001(8) and 7001(9) of the Federal Rules of Bankruptcy Procedure, the Plaintiff seeks a declaration that:

a)     The secured claim asserted by CPIF is subordinate and inferior to the rights of the residents and all obligations of the Debtors to the residents pursuant to the contractual subordination provisions contained in the Devonshire Language, added in the Second Amendment, and under the principals of equitable subordination described above;

b)     To the extent that CPIF's claim is undersecured, Claim No. 22 must be bifurcated into secured and unsecured claims under 11 U.S.C. § 506(a)(1), and CPIF is not entitled to any post-petition interest, fees, costs, or charges under 11 U.S.C. § 506(b); and

c)     To the extent that any portion of CPIF's claim is secured, CPIF does not have a secured claim with respect to personal property or "Personalty," as defined in

{00302566.DOC;4}                              26

Section 4.1 of CPIF's Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, based on CPIF's failure to file UCC-1 financing statements in accordance with applicable law.

WHEREFORE, the Plaintiff requests that this Court enter an order (i) determining the validity, priority, and extent of Claim No. 22 and declaring that the liens asserted through Claim 22 are subordinate to the rights of Debtors' obligations to the residents, (ii) bifurcating CPIF's Claim No. 22 into secured and unsecured claims under 11 U.S.C. § 506(a)(1), (iii) determining that CPIF is not entitled to any post-petition interest, fees, costs, or charges under 11 U.S.C. § 506(b), and (iv) granting such other and further relief as the Court deems just and proper.

**COUNT X:**
**DECLARATORY RELIEF REGARDING CPIF'S OR ITS SUCCESSORS'**
**OBLIGATION TO HONOR RESIDENT OBLIGATIONS AND**
**DETERMINATION OF SECURED STATUS**

97.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

98.     Under Section 506(a) of the Bankruptcy Code, an allowed claim of a secured creditor is a "secured claim to the extent of the value of such creditor's interest in the estate's interest in such property … and is an unsecured claim to the extent the value of such creditor's interest … is less than the amount of such allowed claim."

99.     Under Section 506(b) of the Bankruptcy Code, to the extent that an allowed secured claim is secured by property, the value of which, after any recovery under subsection [506](c) is greater than the amount of such claim," such secured creditor shall be allowed interest and reasonable attorneys' fees, costs, and other charges, to the extent provided under the applicable agreement or state laws.

100.   CPIF asserts that the value of the collateral securing its claim exceeds the amount of the debt secured by the collateral and it is, therefore, entitled to be paid all post-petition interest and attorneys' fees as part of its allowed secured claim.

101.   On information and belief, CPIF disputes that pursuant to the Devonshire Language added to the Second Amendment, and the provisions of Section 651.114(8), Fla. Stat., that CPIF, or any purchaser of the property by, through, or under CPIF through foreclosure, deed in lieu of foreclosure, or otherwise, must honor all monetary and non-monetary obligations owed to the residents under the Life-Care Contracts, including the obligations to pay all refund claims and PIP claims to the current and former residents.

102.   The Resident Committee contends that as an alternative to the relief sought in Count IX, the Devonshire Language and Section 651.114(8), Fla. Stat. require that CPIF and any purchaser of University Village or its component property by, through, or under CPIF through foreclosure, deed in lieu of foreclosure, or otherwise, must honor and pay all monetary and non-monetary obligations owed to the residents under their Life-Care Contracts, including the obligations to pay all refund claims and PIP claims owed to the current and former residents as such claims have or will come due, subject only to a limited ninety (90) day suspension of the obligations to pay refund claims only, as provided under Section 651.114(8)(b)(2) and 651.114 (8)(d).

103.   In accordance with Rules 7001(8) and 7001(9) of the Federal Rules of Bankruptcy Procedure, the Plaintiff seeks a declaration that the Devonshire Language and Section 651.114(8), Fla. Stat. require that CPIF and any purchaser of University Village or its component property by, through, or under CPIF through foreclosure, deed in lieu of foreclosure, or otherwise, must honor and pay all monetary and non-monetary obligations owed to the residents

under their Life-Care Contracts, including the obligations to pay all refund claims and PIP claims owed to the current and former residents as such claims have or will come due, subject only to a limited ninety (90) day suspension of the obligations to pay refund claims only, as provided under Section 651.114(8)(b)(2) and 651.114 (8)(d).

104. The Plaintiffs further seek the determination of the secured status of CPIF's Claim, if allowed and determined to be secured based on the declarations requested in paragraph 103, above.

105. The Plaintiffs submit that such determinations are necessary and essential to the determination of multiple issues in this case, including, without limitation, the determination of CPIF's secured status under Section 506(a), its entitlement to post-petition interest, costs, and attorneys' fees under Section 506(b), the ultimate distribution of the proceeds of any sale of University Village, as contemplated under any proposed plan, and multiple other issues.

WHEREFORE, as an alternative to the relief sought in Count IX, the Resident Committee requests that the Court enter an order or judgment (a) declaring that the Devonshire Language and Section 651.114(8), Fla. Stat. require that CPIF and any purchaser of University Village or its component property by, through, or under CPIF through foreclosure, deed in lieu of foreclosure, or otherwise, must honor and pay all monetary and non-monetary obligations owed to the residents under their Life-Care Contracts, including the obligations to pay all refund claims and PIP claims owed to the current and former residents as such claims have or will come due, subject only to a limited ninety (90) day suspension of the obligations to pay refund claims only, as provided under Section 651.114(8)(b)(2) and 651.114 (8)(d), and (b) determining the secured status of any allowed claim of CPIF.

**COUNT XI:**
**DECLARATORY RELIEF RECHARATERIZING**
**THE CPIF "LOAN" AS EQUITY**

106.   The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

107.   At the time the Debtors executed the Original CPIF Documents, the Debtors were severely undercapitalized, were or became insolvent, and had unmatured PIP and IED refund obligations to residents totaling in excess of $15,000,000.

108.   On its website, CPIF purports to have substantial experience as an investor in the senior housing industry and continuing care retirement communities.

109.   On its website, CPIF solicits investors by describing itself as an "opportunistic" lender.

110.   The obligations to CPIF under the Original CPIF Documents, as amended, although denominated as a "loan," are in substance an equity contribution.

111.   No reasonable lender would have loaned the Debtors the $9,500,000.00 invested by CPIF pursuant to the Original CPIF Documents because of the Debtors' obvious inability to repay the obligations as structured.  To the contrary, the Debtors' only prospect for repayment was a speculative bond financing that never came to fruition.

112.   The CPIF "loans" were made by CPIF for the purpose of facilitating CPIF's ultimate acquisition of the Debtors' assets, to the detriment of residents and creditors of the Debtors.

113.   Treating the CPIF investment as a true loan would result in injury to creditors and confer an unfair advantage on CPIF by allowing CPIF to reap the benefits of the overreaching conduct in which it engaged.

114.     Pursuant to the equitable powers of the Bankruptcy Court and 11 U.S.C. Section 105(a), the Bankruptcy Court may look beyond the form of the CPIF transactions and consider the substance of the transactions to determine whether it should be recharacterized as equity.

WHEREFORE, the Resident Committee requests that the Court enter an order or judgment (1) recharacterizing and declaring that the CPIF transactions are, in whole or in part, equity and not debt; and (2) granting such other and further relief as is just and proper.

## COUNT XII:
## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS
## ACTUAL FRAUD UNDER 11 U.S.C. §§ 544 and 550

115.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

116.     The Debtors orchestrated the March 30, 2014 leveraged buyout transaction and executed the Original CPIF Documents (and amendments thereto) with the intention and for the purpose of hindering, delaying, and defrauding residents and other creditors of the Debtors, as evidenced by, among others, the following badges of fraud:

a)   The leveraged buyout transaction benefited insiders;

b)   The Debtors did not receive reasonably equivalent value in exchange for the transactions;

c)   The Debtors were insolvent at the time of or were rendered insolvent by the transaction; and

d)   The Debtors were grossly undercapitalized.

117.     At the time of the leveraged buyout transaction and at all times since the transaction, there were actual creditors of the Debtor holding unsecured claims allowable within

the meaning of Sections 502 and 544(b) of the Bankruptcy Code that could have avoided the Transfers pursuant to Florida Statutes, Section 726.105(1)(a).

WHEREFORE, the Resident Committee demands judgment against CPIF: (i) avoiding the Transfers under Section 544(b) of the Bankruptcy Code pursuant to Florida Statutes, Sections 726.105 and 726.109; (ii) entitling Plaintiff to recover the Transfers or the value of the Transfers from Defendant under Section 550(a) of the Bankruptcy Code, together with the award of pre- and post-judgment interest thereon from the date of demand to the date of payment or other satisfaction of such order and judgment; and (c) granting such other or further relief as is just and equitable.

## COUNT XIII:
## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS
## CONSTRUCTIVE FRAUD UNDER 11 U.S.C. §§ 544 and 550

118.    The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

119.    The Debtors did not receive reasonably equivalent value in exchange for the transactions with CPIF and the granting of the CPIF Mortgage.

120.    At the time of the March 30, 2014 leveraged buyout transaction, the Debtors were engaged in or about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

121.    At the time of the March 30, 2014 leveraged buyout transaction, the Debtors intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' ability to pay as they became due.

122.    At the time of the leveraged buyout transaction and at all times since the transaction, there were actual creditors of the Debtors holding unsecured claims allowable within

{00302566.DOC;4}                    32

the meaning of Sections 502 and 544(b) of the Bankruptcy Code that could have avoided the Transfers pursuant to Florida Statutes, Section 726.105(1)(a).

WHEREFORE, the Resident Committee demands judgment against CPIF: (i) avoiding the Transfers under Section 544(b) of the Bankruptcy Code pursuant to Florida Statutes, Sections 726.105 and 726.109; (ii) entitling Plaintiff to recover the Transfers or the value of the Transfers from Defendant under Section 550(a) of the Bankruptcy Code, together with the award of pre- and post-judgment interest thereon from the date of demand to the date of payment or other satisfaction of such order and judgment; and (c) granting such other or further relief as is just and equitable.

**COUNT XIV:**
**AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**
**CONSTRUCTIVE FRAUD UNDER 11 U.S.C. §§ 544 and 550**

123.    The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

124.    The Debtors did not receive reasonably equivalent value in exchange for the transactions with CPIF and the granting of the CPIF Mortgage.

125.    At the time of the March 30, 2014 leveraged buyout transaction and/or as a result of the transaction, the Debtors' total liabilities exceeded the fair value of its assets.

126.    At the time of the March 30, 2014 leveraged buyout transaction and/or as a result of the transaction, the Debtors were generally not paying their debts as they became due.

127.    At the time of the leveraged buyout transaction, there were actual creditors of the Debtors holding unsecured claims allowable within the meaning of Sections 502 and 544(b) of the Bankruptcy Code that could have avoided the Transfers pursuant to Florida Statutes, Section 726.105(1)(a).

WHEREFORE, the Resident Committee demands judgment against CPIF: (i) avoiding the Transfers under Section 544(b) of the Bankruptcy Code pursuant to Florida Statutes, Sections 726.106 and 726.109; (ii) entitling Plaintiff to recover the Transfers or the value of the Transfers from Defendant under Section 550(a) of the Bankruptcy Code, together with the award of pre- and post-judgment interest thereon from the date of demand to the date of payment or other satisfaction of such order and judgment; and (c) granting such other or further relief as is just and equitable.

## OBJECTION TO CLAIM NO. 22

128.    This is an objection to Claim No. 22, filed by CPIF, brought pursuant to Rules 3007(a), 3007(b), and 7001 of the Federal Rules of Bankruptcy Procedure.

129.    The Plaintiff re-alleges and incorporates herein paragraphs 1 through 52 as if fully set forth herein.

130.    The Plaintiff objects to Claim No. 22 on the grounds that:

a)    CPIF's negligence described herein caused and/or deepened the Debtors' insolvency and resulted in significant harm to the Debtors and the residents of University Village;

b)    CPIF's aiding and abetting the breaches of fiduciary duties described herein caused and/or deepened the Debtors' insolvency and resulted in significant harm to the Debtors and the residents of University Village;

c)    CPIF's civil conspiracy described herein caused and/or deepened the Debtors' insolvency and resulted in significant harm to the Debtors and the residents of University Village;

d) CPIF charged the Debtors usurious interest and additional fees as alleged herein;

e) CPIF contractually agreed to subordinate any valid lien to the claims of the residents of University Village as alleged herein;

f) Claim No. 22 is equitably subordinate to the claims of the residents of University Village as alleged herein;

g) Claim No. 22 is subject to setoff as alleged herein;

h) CPIF asserts a first priority lien that is subordinate to the rights and obligations of the Debtors to the residents as alleged herein;

i) CPIF has no "claim" against the Debtors because its "loans" are not true loans, but equity contributions;

j) Claim No. 22 should be disallowed pursuant to 11 U.S.C. § 502(d); and

k) Claim No. 22 is undersecured based on the estates' and CPIF's obligations to refund a portion of the University Village residents' IEDs and, as a result, must be bifurcated into secured and unsecured claims under 11 U.S.C. § 506(a)(1), such that CPIF is not entitled to any post-petition interest, fees, costs, or charges under 11 U.S.C. § 506(b).

131. The Plaintiff reserves the right to amend, modify, or supplement this objection to assert additional or further objections on grounds other than those stated herein.

WHEREFORE, the Plaintiff requests that this Court enter an order (i) reducing Claim No. 22, (ii) subordinating Claim No. 22 to the claims of the residents of University Village, (iii) bifurcating Claim No. 22 under 11 U.S.C. § 506(a)(1) and denying any claim for fees, costs, or

charges under 11 U.S.C. § 506(b); and (iv) granting such other and further relief as the Court

deems just and proper.

Dated: Tampa, Florida
March 16, 2018

By: /s/ David S. Jennis
David S. Jennis
Florida Bar No. 775940
Erik Johanson
Florida Bar No. 106417
Jennis Law Firm
606 East Madison Street
Florida 33602
Telephone: (813) 229-2800
Email: djennis@jennislaw.com
     ejohanson@jennislaw.com