UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No.:  8:16-bk-08167-MGW |
| WESTPORT HOLDINGS TAMPA,<br>LIMITED PARTNERSHIP, | Chapter 11 |
| WESTPORT HOLDINGS TAMPA II,<br>LIMITED PARTNERSHIP, | Case No.:  8:16-bk-08168-MGW |
| Debtors. | Jointly Administered Under<br>Case No. 8:16-bk-08167-MGW |
| _____/ | |
| JEFFREY W. WARREN, LIQUIDATING<br>TRUSTEE FOR WESTPORT HOLDINGS<br>TAMPA, LIMITED PARTNERSHIP and<br>WESTPORT HOLDINGS II, LIMITED<br>PARTNERSHIP, | |
| Plaintiff, | |
| v. | Adv. Pro. No.: 8:20-ap-00007-MGW |
| VALLEY NATIONAL BANK, principal<br>subsidiary to VALLEY NATIONAL<br>BANKCORP, a New Jersey domestic profit<br>corporation, as successor by merger to<br>USAMERIBANK, | |
| Defendant. | |
| _____/ | |

## AMENDED COMPLAINT

Plaintiff, Jeffrey W. Warren, Liquidating Trustee for Westport Holdings Tampa, Limited

Partnership and Westport Holdings Tampa II, Limited Partnership (the "Plaintiff" or

"Liquidating Trustee"), by counsel, hereby files this amended complaint against the Defendant,

{00340168.DOC}

**Exhibit A**

EXHIBIT 9
WIT: Jennis
DATE: 2.27.2023
Tina Stuhr, CSR, RPR

Valley National Bank, as successor by merger to USAmeriBank (the "Defendant" or "Valley").

In support, the Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1.     This is an adversary proceeding brought pursuant to Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

2.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.

3.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (H), (K), and (O).

4.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PLAINTIFF, DEFENDANT, AND OTHER INTERESTED PARTIES

5.     Pursuant to the *First Amended and Restated Mediated Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code dated as of December 31, 2017* (Doc. No. 838), as modified (the "Plan") and *Order (A) Confirming First Amended and Restated Mediated Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code, as Modified, Pursuant to 11 U.S.C. § 1129, and (B) Approving Disclosure Statement for First Amended and Restated Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code, on a Final Basis, Pursuant to 11 U.S.C. § 1125* (Doc. No. 1016) (the "Confirmation Order"), the Plaintiff has been appointed as Liquidating Trustee, and has been empowered to commence and pursue causes of action on behalf of the Debtors' estates.

6.     The Defendant, Valley National Bank, principal subsidiary to Valley National Bankcorp, as successor by merger to USAmeriBank, is a New Jersey domestic profit corporation

{00340168.DOC}                          2

headquartered in Wayne, Passaic County, New Jersey, with branches operating in New Jersey, New York, Florida and Alabama ("Valley").

7.      Westport Holdings Tampa, Limited Partnership ("Westport") and Westport Holdings Tampa II, Limited Partnership ("Westport II") (collectively, the "Debtors") are Delaware limited partnerships that filed voluntary petitions under Chapter 11 of the Bankruptcy Code[1] on September 22, 2016.

8.      The Debtors, along with affiliate Westport Nursing Tampa, LLC ("WNT"), own "University Village," a CCRC organized pursuant to Section 651 of the Florida Statutes.[2] University Village consists of:

a)  An Independent Living Facility (the "ILF"), containing (a) 446 independent living apartments in a facility owned by Westport, and (b) 46 independent living villas clustered within a neighborhood of duplex buildings, including a dedicated clubhouse, owned by Westport II; and

b)  A Health Center, containing a 110-unit Assisted Living Facility (the "ALF"), and a 120-bed Skilled Nursing Facility (the "SNF"), both located on property owned by WNT but independently operated by TALF, Inc. and TR & SNF, Inc., respectively.

9.      Upon information and belief, prior to March 31, 2014, the organizational and operational structure of Westport and Westport II was as follows:

---

[1] All references to the "Bankruptcy Code" are to the applicable section of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

[2] A CCRC is considered a "specialty insurer subject to regulatory oversight by the Office of Insurance Regulation (the "OIR"), among other regulation agencies."

{00340168.DOC}                   3

a) Westport Holdings University Village, LLC ("WHUV"), a Delaware limited liability company, was the 1% general partner interest in Westport, and managed and operated the ILF at University Village;

b) Westport Holdings Hidden Springs, LLC ("WHHS"), a Delaware limited liability company, held the 1% general partnership interest in Westport II;

c) Lawrence Landry ("Landry"), the president and sole manager of Westport and Westport II, controlled both WHUV and WHHS, the general partners of Westport and Westport II, respectively, through a separate entity, Westport Advisors, Ltd., as manager;

d) Westport Senior Living Investment Fund, L.P. ("WSLIF"), a Delaware limited partnership, held the 99% limited partnership interest in Westport and Westport II;

e) TALF, Inc. ("TALF"), a Florida non-profit corporation, was the designated licensee and operator for the ALF at University Village;

f) TR & SNF, Inc. ("TR&SNF"), a Florida non-profit corporation, was the designated licensee and operator of the SNF at University Village;

g) WEMAMM I, LLC ("WEMAMM"), a Florida for-profit limited liability company, was the managing member of TALF and TR&SNF, and provided management services under a management contract with TALF and TR&SNF for the operations of the ALF and the SNF;

h) Westport owned 100% of the membership interests in WNT, which owned the property housing the ALF and the SNF at University Village, making WNT a wholly owned subsidiary of Westport; and

{00340168.DOC}                    4

i) Prior to March 31, 2014, Westport, Westport II, and WNT's primary secured lender was Horizon LP UV Lender, LLC ("Horizon"), which held mortgages totaling approximately $20,000,000 secured by Westport, Westport II, and WNT's property.

10.  John Bartle ("Bartle") is a resident of the State of Indiana. On or before March 31, 2014, Bartle, CPIF Lending, LLC ("CPIF"), USAmeriBank, and the Debtors' former equity holders orchestrated a leveraged buyout and series of related transactions intended to dissipate the Debtors' assets and with the intention of hindering, delaying, and defrauding residents and other creditors of the Debtors. Upon information and belief, Bartle used the following entities, which he directly or indirectly owns or controls, to facilitate the leveraged buyout and related transactions:

a) BVM University Village, LLC ("BVMUV"), a Florida limited liability company formed in 2013 to acquire some interest in University Village, which was to be distributed a portion of the 99% limited partnership interests in Westport and Westport II, as well as a membership interest in WNT;

b) BVM Management, Inc. ("BVM Management"), an Indiana non-profit corporation that manages senior living communities in Indiana and Florida, which Bartle initially used to attempt to acquire the 99% limited partnership interests in University Village and WEMAMM's for-profit management contracts with TALF and TR&SNF;

c) IMH Health Care, LLC ("IMH"), a Delaware limited liability company, which was subsequently distributed a portion of the 99% limited partnership interests in Westport and Westport II, acquired the 1% general partnership interests in

Westport and Westport II, received a membership interest in WNT, and ultimately became the managing member of WNT;

d) JF Consultants, LLC ("JFC"), a Delaware limited liability company not registered with the Secretary of State as required by Section 605.0902 of the Florida Statutes, which was subsequently distributed a portion of the 99% limited partnership interests in Westport and Westport II, and received a membership interest in WNT;

e) BHMSILF Investments, LLC ("BHMSILF"), a Delaware limited liability company not registered with the Secretary of State as required by Section 605.0902 of the Florida Statutes, which was subsequently distributed a portion of the 99% limited partnership interests in Westport and Westport II, and received a membership interest in WNT;

f) BHMSILFGP, LLC ("BHMSILFGP"), a Delaware limited liability company formed to acquire the 1% general partnership interests in Westport and Westport II; and

g) Compliance Concepts, LLC ("Compliance"), an entity controlled by Bartle through his wife, Rebecca Bartle, which subsequently acquired or attempted to acquire the 1% general partnership interests in Westport and Westport II.

## GENERAL ALLEGATIONS

A. *Overview of CCRCs*

11.    CCRCs offer a combination of long-term care and housing to retirees and senior citizens. Initially, CCRC residents live in apartment or condominium style units located in a residential complex, often referred to as an independent living facility. As residents' needs

progress, they are entitled to move into an assisted living facility and, if necessary, eventually into a skilled nursing facility, where they can receive more intensive and specialized care.

12. Generally, to join a CCRC, a resident is required to pay a substantial up-front entrance fee, sometimes referred to as an initial entry deposit ("Initial Entry Deposit" or "IED"), and enter into a continuing care contract ("Life-Care Contract"). A typical Life-Care Contract between a resident and Westport generally provides a "Refundable" portion of the IED, a small balance being non-Refundable. The Life-Care Contract allows the CCRC to periodically deduct funds from the resident's Refundable Initial Entry Deposit through a "healthcare line of credit" to supplement and provide for the resident's living and long-term care expenses when the time comes for the resident to need additional care in the ALF or the SNF.

13. Residents who require care at the ALF or the SNF for a long period of time, or who necessitate significant long-term care expenses that are provided under the Life-Care Contract, may incur costs that equal or exceed the Refundable balance of their IED. When this occurs, Life-Care Contracts function much like long-term care insurance policies, allowing the resident to remain at the CCRC indefinitely under the terms of the Life-Care Contract. If, on the other hand, a resident voluntarily leaves the CCRC or passes away prior to the exhaustion of their Refundable Initial Entry Deposit through application of the healthcare line of credit, the resident or the resident's estate is entitled to a refund of the unused portion of their Refundable Initial Entry Deposit.

14. Given the substantial living and long-term care services provided by CCRCs, residents' IEDs can range from $75,000 to in excess of $400,000. As a result, many residents sell their primary residence or otherwise deplete their personal resources and use the proceeds to finance their IEDs.

B. *Debtors' Loan with Horizon, Proposed Sale to Bartle, and Deed-in-Lieu-of-Foreclosure Agreement*

15.     University Village is a CCRC that has entered into Life-Care Contracts with senior citizens and retirees in the Tampa Bay area.

16.     Prior to Bartle's involvement in University Village, the Debtors' primary secured creditor was Horizon.

17.     Under the terms of the loan agreements with Horizon, the indebtedness owed to Horizon was scheduled to mature on January 15, 2013.

18.     During the years or months leading up to January 15, 2013, the Debtors marketed University Village for sale to a new ownership group that could obtain funding to retire the Horizon debt.

19.     The Debtors ultimately identified Bartle as a possible buyer of University Village, and subsequently entered into negotiations with Bartle to sell University Village to one of Bartle's companies, BVMUV.

20.     While the Debtors negotiated with Bartle regarding a possible sale of University Village, the loans with Horizon matured.

21.     At that time, the Debtors lacked the funds necessary to retire the Horizon debt, so Horizon and the Debtors entered into a carefully negotiated deed-in-lieu agreement.

22.     Under the deed-in-lieu agreement, the Debtors would be given additional time to effectuate a sale of University Village to Bartle and his companies.  In the event that Bartle was unable to close the transaction to purchase University Village in a timely manner, the parties agreed that Horizon would receive title to the University Village property through deeds in lieu of foreclosure and, in exchange, Horizon would:

a) Release the Debtors of their outstanding obligations to Horizon (approximately $20,000,000);

b) Allow the Debtors to retain their cash on hand; and

c) Assume all obligations to the residents living at University Village, including the Life-Care Contracts and corresponding obligations to pay Refundable portions of the residents' IEDs as they came due.

23. In essence, if Bartle's deal to purchase University Village fell through, Horizon committed to preserve and honor the residents' Life-Care Contracts and any requests for refunds of their Initial Entry Deposits.

24. In the end, Bartle was unable to close the transaction to purchase University Village pursuant to the terms of the deed-in-lieu agreement.

25. As a result, Horizon demanded title to University Village pursuant to the deed-in-lieu agreement, and hired Life Care Services, LLC ("Life Care"), one of the largest operators of CCRCs in the country, to manage University Village on its behalf.

26. Based on Horizon's understanding that it was entitled to assume ownership of University Village under the deed-in-lieu agreement, Life Care conducted a comprehensive ownership and management transition process during the week of February 10-14, 2014.

27. This process cost Horizon considerable sums of money, but nevertheless helped ensure a smooth transition for the residents of University Village.

C. *The Leveraged Buyout*

28. Despite Horizon's good faith efforts to protect the residents of University Village, the Debtors and Bartle refused to cede control of University Village to Horizon as required under the deed-in-lieu agreement.

29. Instead, the Debtors, WNT, and Bartle negotiated a deal with two lenders, CPIF and USAmeriBank, to conduct a leveraged buyout of University Village.

30. Under the leveraged buyout, the equity interests in the Debtors and the Debtors' equity interests in WNT would be transferred to Bartle and/or affiliates or related entities, and the Horizon debt would be retired and replaced with additional, higher interest-bearing debt owed to CPIF and USAmeriBank (the "CPIF Loan" and "USAB Loan", respectively).

31. The leveraged buyout of University Village closed on or about March 31, 2014 (the "Closing").

32. Under the terms of the March 31, 2014 leveraged buyout, the CPIF Loan and USAB Loan were generally structured as follows:

| CPIF Loan | USAB Loan |
|---|---|
| $5,611,740.47 was transferred to Horizon to retire a portion of the Horizon debt | $14,557,145.89 was transferred to Horizon to retire a portion of the Horizon debt |
| $1,750,000 was transferred to or held by CPIF, and in any event not disbursed to the Debtors, purportedly to fund a capital improvement reserve for University Village | $3,000,000 of Westport's statutory required minimum liquid reserves ("MLR Funds"), which generally were derived from a portion of the IED paid by the residents, was transferred from Westport's existing escrow account, where the MLR Funds were maintained, and pledged as collateral to secure the USAB Loan (the "USAB MLR Transfer") |
| $1,000,000 was transferred to WSILF or WSILF's equity holders in exchange for the 99% limited partnership interests in University Village, which interests were transferred to BVMUV, and subsequently distributed among BVMUV, IMH, JFC, and BHMSILF pro rata | The membership interests in Westport's solely owned subsidiary, WNT, were "spun off" and transferred to BVMUV, IMH, BHMSILF, and JFC |

| | |
|---|---|
| $300,000 was transferred to WEMAMM, purportedly for "Transaction Management Expenses" but, in reality, to obtain the resignation of the then-members of the boards of directors of TALF and TR&SNF, to install Bartle and affiliates as the directors of the not-for-profit entities, and to obtain control of WEMAMM's for-profit management contracts with TALF and TR&SNF and all related cash flow | $150,000.00 was transferred to Green Circle Capital Group as a purported broker's fee |
| The Debtors transferred to CPIF liens in the amount of $9,500,000.00 (the CPIF Loan transfers referred to above shall be referred to collectively herein as the "CPIF Transfers"). | WNT transferred to USAB liens in the amount of $18,000,000.00. |

Notably, while the loan documents underlying the USAB Loan purportedly state that WNT pledged the MLR Funds as "cash collateral" for the USAB Loan, in actuality Bartle caused the Debtors to make the USAB MLR Transfer to the Defendant to fund the "cash collateral" account required to be established by WNT.

### D. Regulatory Scrutiny and Operational Underperformance

33.     Bartle, CPIF, and USAmeriBank failed to seek and obtain the required regulatory pre-approval for the changes in ownership contemplated under the leveraged buyout, which placed University Village (and its residents) at an extraordinary and intolerable risk of the Debtors being investigated, audited, placed under supervision, and ultimately being the subject of a delinquency proceeding and possible receivership, and potential shut-down by state authorities, including the Florida Office of Insurance Regulation (the "OIR").

34.     In the months that would follow, the OIR and the Florida Department of Financial Services (the "DFS") did undertake a review of the March 31, 2014 leveraged buyout and commenced delinquency proceedings against the Debtors.  These proceedings were pending for approximately 18 months, ultimately resulted in the Debtors seeking bankruptcy protection, and

were a leading cause of the significant adverse financial consequences suffered by University Village and its residents.

35. In addition, by "spinning off" the Debtors' wholly owned subsidiary, WNT, Bartle, CPIF, and WNT fractured the ownership structure of University Village, which increased expenses and interfered with operational synergies. These increased expenses and decreased operational synergies further deteriorated the Debtors' operational performance and deepened the Debtors' insolvency.

36. All the while, the MLR, which was the residents' final "lifeline" in the event the Debtors became unable to honor the residents' Life Care Contracts, was transferred and pledged to USAmeriBank as additional collateral for a loan that was made to WNT, which subsidiary in turn was simultaneously "spun out" of the Debtors to Bartle and his network of affiliates. The encumbrance and use of the residents' MLR to fund the "spin off" of WNT to Bartle and his affiliates further deepened the Debtor's insolvency during a time of heightened regulatory scrutiny and operational underperformance.

### E. The Debtor's Bankruptcy Filing

37. On the eve of an evidentiary hearing in the delinquency proceedings commenced by the Florida regulatory authorities to shutdown University Village due to Bartle's failure and inability to satisfy the regulatory authorities that he or his affiliates were fit to operate CCRCs in Florida, the Debtors filed for bankruptcy.

38. Given the dire financial and regulatory condition of the Debtors upon filing for bankruptcy, it ultimately became apparent that a successful reorganization by the Debtors' existing management under Chapter 11 of the Bankruptcy Code would be impossible and that a

sale of the CCRC to a new ownership group would be necessary to maintain the viability of the CCRC.

39. As a result, through an extensive mediation process, various stakeholders in University Village have proposed a plan under which University Village will be sold to a new management and ownership group, and the residents' ability to continue to receive long-term care and other benefits under the terms of their Life-Care Contracts will be assumed by the purchasing entity.

40. This process took more than one year to resolve, resulted in an incalculable toll of emotional and physical distress to the residents of University Village, and necessitated the expenditure of millions of dollars in legal fees by counsel for the Debtors, the Resident Committee, the Liquidating Trustee (including in his prior capacity as Court-appointed examiner), his counsel, the financial advisors to the Resident Committee, and various other stakeholders.

41. Unfortunately, due to the issues referenced above and the conduct of Bartle, CPIF, and others, the Debtors, the Resident Committee, and other stakeholders were unable to propose a plan that would allow University Village's current and former residents, who have passed away or terminated their contracts, to recover any immediate refund of their IEDs, as provided under the Life-Care Contracts or the loans made by certain residents to the Debtors through a program known as "Personal Income Protection" ("PIP") and face, at best, a long term and extended payout of their IED and PIP funds. As a result, many of the remaining current residents of University Village have lost their freedom to move to a different CCRC and, worse still, face an uncertain future.

## COUNT I: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

42.    The Plaintiff re-alleges and incorporates herein paragraphs 1 through 41 as if fully set forth herein.

43.    At all times they occupied their respective positions, the Debtors' general and limited partners owed the Debtors and the residents of University Village multiple fiduciary duties.

44.    The Debtors' general and limited partners breached their fiduciary duties by, among other things and without limitation:

a)    Entering into a leveraged buyout transaction with CPIF and USAmeriBank under terms and conditions that they knew were less favorable to the Debtors and the residents of University Village than were otherwise available under the deed-in-lieu agreement with Horizon;

b)    Authorizing and allowing the substitution of the Debtors' limited and general partners without first obtaining required regulatory approval or provisional authority, despite having knowledge of the regulatory requirements attendant to the operation of CCRCs in the State of Florida, which resulted in the commencement of delinquency proceedings by Florida regulators that jeopardized the Debtors' ability to continue as a going concern; and

c)    Entering into a leveraged buyout transaction with USAmeriBank that resulted in the "spin off" of the Debtors' wholly owned subsidiary, WNT, and the corresponding transfer of $3,000,000.00 of Westport's MLR to USAmeriBank as purported security for the USAB Loan.

{00340168.DOC}                    14

45.    At all times, USAmeriBank knew or should have known that senior housing CCRC communities, nursing homes, and similar facilities are highly regulated at both the state and federal levels, and that through the leveraged buyout and other transactions described above, USAmeriBank would allow the Debtors' limited and general partners to breach their fiduciary duties to the Debtors and the residents of University Village.

46.    USAmeriBank substantially assisted or encouraged the foregoing breaches of fiduciary duties by, among other things and without limitation:

a) Structuring, agreeing to, and facilitating the March 31, 2014 leveraged buyout under terms and conditions less favorable to the Debtors and the residents of University Village than the deed-in-lieu agreement with Horizon;

b) Authorizing and allowing the substitution of the Debtors' limited and general partners without first obtaining required regulatory approval or provisional authority, resulting in the commencement of delinquency proceedings by Florida regulators that jeopardized the Debtors' ability to continue as a going concern; and

c) Structuring, agreeing to, and facilitating the "spin off" of the Debtors' wholly owned subsidiary, WNT, and the corresponding transfer of $3,000,000.00 of Westport's MLR to USAmeriBank as security for the USAB Loan.

47.    The assistance of USAmeriBank facilitated the foregoing breaches of fiduciary duties.

48.    As a direct and proximate cause of USAmeriBank's conduct, the Plaintiff has suffered damages as described in this complaint.

WHEREFORE, the Plaintiff requests that this Court enter an order (a) finding USAmeriBank liable for the tort of aiding and abetting breach of fiduciary duty, (b) awarding the Plaintiff damages, and (c) granting such other and further relief as the Court deems just and proper.

## COUNT II: CIVIL CONSPIRACY

49.    The Plaintiff re-alleges and incorporates herein paragraphs 1 through 41 as if fully set forth herein.

50.    Beginning on or before March 31, 2014 and continuing through the present, USAmeriBank and Bartle entered into oral and written agreements to, among other things and without limitation:

a) Dissipate the Debtors' assets through the leveraged buyout transaction and series of related transactions described above;

b) Transfer and propose to transfer the Debtors' limited and general partnership interests to persons and entities affiliated with Bartle in violation of the applicable state and federal laws and regulations; and

c) Transfer or "spin off" the Debtors' interests in its wholly owned subsidiary, WNT, to the detriment of the Debtors.

51.    The foregoing transactions and agreements contemplated one or more unlawful acts, namely the systematic dissipation of the Debtors' and the residents of University Village's assets through the transactions described above, and the transfer of the Debtors' limited and general partnership interests in violation of State laws and regulations, all of which is described above and specifically alleged in Counts I, III, IV, V, and VI of this complaint

{00340168.DOC}                    16

52.  Alternatively, the foregoing agreement contemplated the commission of lawful acts by unlawful means.

53.  USAmeriBank and Bartle committed and participated in one or more overt acts in furtherance of the conspiracy, namely by structuring, enabling, and participating in the transactions described above.

54.  As a direct and proximate cause of USAmeriBank's conduct, the Plaintiff has suffered damages as described in this complaint.

WHEREFORE, the Plaintiff requests that this Court enter an order (a) finding USAmeriBank liable for the tort of civil conspiracy, (b) awarding the Plaintiff damages, and (c) granting such other and further relief as the Court deems just and proper.

### COUNT III: DEEPENING INSOLVENCY

55.  The Plaintiff re-alleges and incorporates by reference paragraphs 1 through 41 as if fully set forth herein.

56.  USAmeriBank, as a result of the foregoing conduct, enabled the Debtors to expand their debts beyond, and under terms less favorable than, the debts owed to Horizon.

57.  As a result of the foregoing conduct, the Debtors' insolvency was prolonged and deepened, resulting in additional and unnecessary harm to the residents of University Village, including:

a) The permanent loss of the residents' entitlement to the Refundable portion of their Initial Entry Deposit and consequent inability to move to another CCRC;

b) The necessitation and incurrence of millions of dollars in professional fees that have adversely affected the Debtors' ability to reorganize, and

c) The incurrence of interest, fees, and other payments over and above what would have been necessary to retire the Horizon debt under the terms of the deed-in-lieu agreement with Horizon.

WHEREFORE, the Plaintiff requests that this Court enter an order (a) finding USAmeriBank liable for the tort of deepening insolvency, (b) awarding the Plaintiff damages, and (c) granting such other and further relief as the Court deems just and proper.

## COUNT IV:
## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS
## ACTUAL FRAUD UNDER 11 U.S.C. §§ 544 and 550

58.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 41 as if fully set forth herein.

59.     The Debtors orchestrated the March 30, 2014 leveraged buyout transaction with the intention and for the purpose of hindering, delaying, and defrauding residents and other creditors of the Debtors, as evidenced by, among others, the following badges of fraud:

a) The leveraged buyout transaction benefited insiders;

b) The Debtors did not receive reasonably equivalent value in exchange for the transactions;

c) The Debtors were insolvent at the time of or were rendered insolvent by the transaction; and

d) The Debtors were grossly undercapitalized.

60.     In connection with the foregoing, the Debtors made the USAB MLR Transfer, which transfer is subject to avoidance and/or recovery under Sections 544 and 550 of the Bankruptcy Code.

{00340168.DOC}                    18

61.     At the time of the USAB MLR Transfer, and at all times since, there were actual creditors of the Debtor holding unsecured claims allowable within the meaning of Sections 502 and 544(b) of the Bankruptcy Code that could have avoided the transfers and obligations described herein pursuant to Florida Statutes, Section 726.105(1)(a).

WHEREFORE, the Plaintiff demands judgment against Valley: (a) avoiding the USAB MLR Transfer under Section 544(b) of the Bankruptcy Code pursuant to Florida Statutes, Sections 726.105 and 726.109; (b) entitling Plaintiff to recover the USAB MLR Transfer or the value of the USAB MLR Transfer from Defendant under Section 550(a) of the Bankruptcy Code, together with the award of pre- and post-judgment interest thereon from the date of demand to the date of payment or other satisfaction of such order and judgment; and (c) granting such other or further relief as is just and equitable.

**COUNT V:**
**AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**
**CONSTRUCTIVE FRAUD UNDER 11 U.S.C. §§ 544 and 550**

62.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 41 as if fully set forth herein.

63.     The Debtors did not receive reasonably equivalent value in exchange for the USAB MLR Transfer.

64.     At the time of the USAB MLR Transfer, the Debtors were engaged in or about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

65.     At the time of the USAB MLR Transfer, the Debtors intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' ability to pay as they became due.

{00340168.DOC}                    19

66.     At the time of the USAB MLR Transfer and at all times since, there were actual creditors of the Debtors holding unsecured claims allowable within the meaning of Sections 502 and 544(b) of the Bankruptcy Code that could have avoided the transfers and obligations described herein pursuant to Florida Statutes, Section 726.105(1)(b).

WHEREFORE, the Plaintiff demands judgment against Valley: (a) avoiding the USAB MLR Transfer under Section 544(b) of the Bankruptcy Code pursuant to Florida Statutes, Sections 726.105 and 726.109; (b) entitling Plaintiff to recover the USAB MLR Transfer or the value of the USAB MLR Transfer from Defendant under Section 550(a) of the Bankruptcy Code, together with the award of pre- and post-judgment interest thereon from the date of demand to the date of payment or other satisfaction of such order and judgment; and (c) granting such other or further relief as is just and equitable.

**COUNT VI:**
**AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**
**CONSTRUCTIVE FRAUD UNDER 11 U.S.C. §§ 544 and 550**

67.     The Plaintiff re-alleges and incorporates herein paragraphs 1 through 41 as if fully set forth herein.

68.     The Debtors did not receive reasonably equivalent value in exchange for the USAB MLR Transfer.

69.     At the time of the USAB MLR Transfer, the Debtors' total liabilities exceeded the fair value of their assets.

70.     At the time of the USAB MLR Transfer, the Debtors were generally not paying their debts as they became due.

71.     At the time of the USAB MLR Transfer, there were actual creditors of the Debtors holding unsecured claims allowable within the meaning of Sections 502 and 544(b) of the

{00340168.DOC}                              20

Bankruptcy Code that could have avoided the foregoing transfers and obligations pursuant to Florida Statutes, Section 726.106(1).

WHEREFORE, the Plaintiff demands judgment against Valley: (a) avoiding the USAB MLR Transfer under Section 544(b) of the Bankruptcy Code pursuant to Florida Statutes, Sections 726.106 and 726.109; (b) entitling Plaintiff to recover the USAB MLR Transfer or the value of the USAB MLR Transfer from Defendant under Section 550(a) of the Bankruptcy Code, together with the award of pre- and post-judgment interest thereon from the date of demand to the date of payment or other satisfaction of such order and judgment; and (c) granting such other or further relief as is just and equitable.

DATED: March 17, 2020

By: */s/ Erik Johanson*
David S. Jennis
Florida Bar No. 775940
Erik Johanson
Florida Bar No. 106417
Jennis Law Firm
606 East Madison Street
Florida 33602
Telephone: (813) 229-2800
Email: ecf@jennislaw.com
       djennis@jennislaw.com
       ejohanson@jennislaw.com
*Counsel for Liquidating Trustee*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing has been served on all counsel of record using the Court's CM/ECF filing system on this 17th day of March 2020.

*/s/ Erik Johanson*
Erik Johanson

{00340168.DOC}            216DL7990.DOC