Page 1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

WESTPORT HOLDINGS TAMPA,          Case No.
LIMITED PARTNERSHIP,              8:16-bk-08167-MGW
                                  Chapter 11
WESTPORT HOLDINGS TAMPA II,       Case No.
LIMITED PARTNERSHIP,              8:16-bk-08168-MGW

                 Debtors.         Jointly Administered
                                  Under Case No.
_____/8:16-bk-08167-MGW

JEFFREY W. WARREN, LIQUIDATING
TRUSTEE FOR WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP and
WESTPORT HOLDINGS II, LIMITED
PARTNERSHIP,

                 Plaintiff,

vs.

VALLEY NATIONAL BANK, principal
subsidiary to VALLEY NATIONAL
BANKCORP, a New Jersey domestic
profit corporation, as successor
by merger to USAMERIBANK,
                 Defendant.
_____/

DEPOSITION OF DAVID SAMUEL JENNIS, ESQ.
TAKEN ON BEHALF OF DEFENDANT VALLEY NATIONAL BANK
Volume 1 (Pages 1 - 89)
Monday, February 27, 2023
11:15 a.m. - 3:29 p.m.

Jennis Morse Etlinger
606 East Madison Street
Tampa, Florida  33602

Stenographically Reported by:  Tina M. Stuhr, RPR,
                               CSR-HI, FPR

APPEARANCES:

On behalf of the Plaintiff:

       Bush Ross, P.A.
       P.O. Box 3913
       Tampa, Florida  33601-3913
       813.224.9255

       BY:  JEFFREY W. WARREN, ESQ.
       jwarren@bushross.com

On behalf of the Defendant:

       McGlinchey Stafford
       10407 Centurion Parkway North
       Suite 200
       Jacksonville, Florida  32256
       904.224.4486

       BY:  EDMUND S. WHITSON, III, ESQ.
       ewhitson@mcglinchey.com

On behalf of the Witness:

       Jennis Morse Etlinger
       606 Madison Street
       Tampa, Florida  33602
       813.229.2800
       BY:  MICHAEL A. STAVROS, ESQ.
       mstavros@jennislaw.com

                         I N D E X
EXAMINATION:                                          PAGE
Testimony of DAVID SAMUEL JENNIS, ESQ.
   Direct Examination by Mr. Whitson                   5

Certificate of Oath                                   86

Certificate of Reporter                               87

Read and Sign Letter                                  88

Errata Sheet                                          89

                  Defendant's Exhibits
NO.                                                  PAGE
Exhibit 1  Case Docket                                18
Exhibit 2  Notice of Appearance as Counsel for        18
           University Village Life Care
           Residents' Legal Protection Ad-Hoc
           Committee and Request for Service of
           Papers
Exhibit 3  Notice of Filing                           18
Exhibit 4  Notice of Appointment of Committee         21
           of Resident Creditors

Exhibit 5  Commendation for Mr. Jennis                24

Exhibit 6  E-mail to Mr. Tockman and others           25
           from Mr. Tockman, 5/14/2018,
           Subject:  Re:  Celebratory Dinner on
           for Wednesday, May 16, with an
           attached e-mail

Exhibit 7  Official Committee of Resident             39
           Creditors' Motion for Derivative
           Authority to Pursue Causes of Action
           of the Estates

Page 4

I N D E X (Continued)

Defendant's Exhibits

NO.                                                          PAGE

Exhibit 8   Amended Complaint and Objection to      52
            Claim No. 22

Exhibit 9   Amended Complaint                        64

The following proceedings began at 11:15 a.m.

THE STENOGRAPHIC REPORTER:  Mr. Jennis, if you'll raise your right hand for me, please, I'm going to swear you in.

Do you solemnly swear or affirm that the testimony you're about to give in this matter will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

Thereupon:

DAVID SAMUEL JENNIS, ESQ.,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITSON:

Q.   Would you please state your full name for the record.

A.   David Samuel Jennis.

Q.   And where are you employed?

A.   I work for David Jennis, P.A., which does business as Jennis Morse Etlinger.

Q.   And prior to that, where were you employed?

A.   Prior to that, I was employed by Jennis &

Bowen, P.A.

Q.   Okay.  Were you ever employed by an entity possessing the domain jennislaw.com?

A.   Yes.

Q.   And what was that entity?

A.   This entity possesses -- this entity David Jennis, P.A. dba Jennis Morse Etlinger uses the domain of jennislaw.com.

Q.   Okay.  And on what date did your current -- I guess that would be your current firm, though, right, that uses jennislaw.com as the domain?

A.   That's correct.

Q.   Okay.  On what date did your current firm begin using jennislaw.com as an e-mail domain?

A.   Roughly August 22, 2016 was the date this firm was created.  We registered domain names shortly after that and started doing business under that name sometime in August of 2016.

Q.   All right.  And prior to the deposition, we've had discussions about the production of documents in connection with taking your deposition, correct?

A.   Correct.

Q.   And we've agreed -- and correct me if I'm

misstating this.  I'm trying to make sure that it's clear for the record -- that communications between you and Jeffrey Warren in his capacity as examiner or at any time prior to the date that there was the -- he was appointed as mediator that you were going to have someone search those e-mails and see if there was anything responsive to the request for communication between you as counsel for the ad hoc residence committee and then the official residence committee and Mr. Warren; is that correct?  Or do you want to state that differently?  I know it was sort of an awkward question, but I want to make sure that this is clear on the record.

A.   I'm not sure what you stated.  We have discussed a production or your request for production of communications between either my firm and primarily me with Mr. Warren in whatever capacity he may have been serving in connection with the Westport case.

Q.   Westport Holdings.

A.   Yeah, we call it the Westport case.  You can say the title, but that's what I would call the Westport case.  And I have prior to going on the record had my IT specialist come in to discuss the search that we think we would need to do of both

Page 8

this firm's records and potentially the prior law firm's records, if any exist, given the dates of Mr. Warren's involvement as either examiner, mediator, or liquidating trustee.

Q.   Right.

A.   Is that fair to characterize it that way?

Q.   Yeah.  And to be clear, and you're correct to sort of focus that, this is only in connection with the Westport Holdings matter, bankruptcy case, Case No. 8:16-bk-08167 and any related adversary proceedings -- well, no, just the case.  Yeah, just the case.  So let's start developing that a little bit.

All right.  So do you recall the date that Westport Holdings Tampa, limited partnership and Westport Holdings Tampa II, limited partnership filed for voluntarily relief under Chapter 11 of the bankruptcy code?

A.   Not as we sit here today.

Q.   Let me show you a copy of the docket, which we'll mark for identification as Exhibit 1. This might help you a little bit.

For the record, this is September 22, 2016; is that correct?

A.   That appears to be reflected on the

docket.

Q.   Okay.  And if you'll look at -- I'll show you what we'll mark as Exhibit 2.  It's the Notice of Appearance as Counsel for University Village Life Care Residents' Legal Protection Ad-Hoc Committee and Request For Service of Papers.  You can take a moment to review that, but it identifies you as a member of the Jennis Law Firm, correct?

A.   Yes.

Q.   And that was filed on September 27, 2016?

A.   It appears so.

Q.   Okay.  How long prior to September 27, 2016 had you been engaged by University Village Life Care Residents' Legal Protection Ad Hoc Committee?

A.   My recollection is that that representation started at the prior law firm probably a year earlier, most likely September -- August or September of 2015.

Q.   All right.  And later, I think -- and we'll get to that -- that committee was granted -- that ad hoc committee was granted official committee status to the U.S. Trustee's Office, was it not?

A.   No.  The U.S. Trustee appointed an official committee of resident creditors to serve in that case.  Many of the members of the ad hoc

committee were appointed by the U.S. Trustee as members of the official committee of resident creditors.  Other members of the ad hoc committee were subsequently asked to join the official committee as, I think the term would be, ex-officio members at the request of the residents.

Q.   Okay.  And without divulging any attorney-client privilege, what was the purpose of the formation of the ad hoc committee?

A.   To protect the interests of the residents of University Village, which was a continuing care retirement community, and to protect the rights of the residents under their life care contracts.

Q.   All right.  So let's break that down a little bit.  So just for the purposes of background in the record, what were those interests, as specifically as you can be, as you recall them in terms of the life care contracts?  I know there's been a lot of different back and forth early on in the case about the residents' claims, but can you just describe those briefly?

A.   I'm going to need you to rephrase the question.  Can you rephrase the question?

Q.   Well, your answer to my question about the purpose of the formation of the committee was to

protect the interests of the residents and you mentioned life care contracts, and so I was wishing that you could possibly be a little bit more specific about what those interests were in terms of -- for example, I think there was some discussion about PIP claims and things like that in the case. But as you understand it, what were the residents' rights and interests under the life care contracts in the CCRC format under Chapter 651 Florida statutes?

A.   First and foremost, the residents who initially formed the ad hoc committee were concerned about preserving what they considered to be their homes.  They believed that their -- where they lived, which they acquired through the life care contract process under 651, they believed they were their homes and they wanted to preserve their homes and their ability to continue to live at University Village in the -- under the terms of their contracts.

There was also a very significant concern among a number of the residents that their right to refund under their life care contracts would also be preserved and that they would continue to have the care that they had contracted for when they entered

into contracts with the continuing care retirement community.

Q.   Okay.   So let me ask you a few questions about that.   So we've got the continuity of residents issue, we've got the right to refunds issue, and we've got the continued continuity of care issue, and what is your understanding about what rights are conveyed through the life care contract?

Describe your understanding of when someone enters the University Village or Westport -- the property owned by Westport Holdings, the CCRC, right, at the time in 2016 or whenever it was they entered, what -- describe that process as you understand it in terms of those three goals.

A.   The person that would be entering into a contractual relationship with the -- and this is my understanding.

Q.   That's all I'm asking for.

A.   I'm not giving you a legal opinion --

Q.   It's not a legal opinion.

A.   -- on Section 651.

Q.   It's simply your understanding.

A.   The person who would be entering into a life care contract with the continuing care

retirement community I will call a resident, okay? That resident would enter into a life care contract.

The life care contract would require an initial entry deposit.  We would call that IED, okay?  And they would typically -- the resident would pay the IED to the operator of the continuing care retirement community, and depending on the terms of the life care contract, they would typically have right to use an apartment of various size and style.

Initially a resident would typically enter into the independent living facility portion of University Village, which was referred to as the ILF, and part of the benefit of the life care contracts was the objective of aging in place.  So someone would remain in residence at the independent living facility as long as they were able to live independently, and my understanding was that at the point in time when a resident could no longer live independently, they would be guaranteed access to the skilled nursing facility or the assisted -- you know, the assisted living facility, which is known as an ALF, or the skilled nursing facility, which is known as the SNF, and that the amounts that they would pay is what was referred to as their monthly

maintenance fee would not change depending on whether they were in the independent living, assisting living, or skilled nursing care portion of the community.

Q. Would you say that a material element of the life care contract and the expectations of the residents, as you described them, would be that guaranteed access to the ALF and to the SNF, the skilled nursing facility?

A. Can you state -- I don't understand your question.

Q. Well, I was just sort of drilling down a little bit more in your answer. You said that there would be guaranteed access to the ALF and the SNF at some point when that heightened level of -- when they could no longer live independently; is that fair to say?

A. An important aspect was the continuing care element of a continuing care retirement community and the ability to age in place. That's what I believe was important to the residents that I interacted with.

Q. Right. And that included what you called the guaranteed access to the ALF and SNF, right?

A. I don't want to say guaranteed access.

There was a lot of technical issues there.  I do know that the concern was -- the continuity of care was important.

Q.   Right, the continuity of care on the same campus, correct, I mean, in terms of proximity?

A.   I can't tell you that the same campus was -- I can't tell you how important that was to the residents.

Q.   Isn't that part of the whole concept behind the CCRC, though, and the aging-in-place element that you were talking about before, where you've got one campus where you start off as a resident in the ILF, and as you need more care and more attention, you can no longer live independently, then you can then go to the ALF, which is the assisted living facility, and if you need medical treatment or what have you, then you have access to the skilled nursing facility, not necessarily on a residential basis at first, but perhaps to have care administered in that reasonably close proximity?  Isn't that correct?

A.   Again, I'm asking you, what was your question?  Is it --

Q.   Isn't that -- in terms of the life care contract and the concept of the CCRC is that you've

got all of that in one particular location, right?

A.   I think a community was important.  I don't know whether -- I can't tell you what was in the minds of the residents, whether -- how proximate the various components of the continuing care retirement community was.  I do know, for example, to try to answer your question, that the layout of University Village at the time was, you know, a residential tower -- a multi-floor residential tour.  Many of the residents lived in there.  Common dining area, many of the residents used that.  Common activity venues, many of the residents used that.

The reason I'm a little imprecise is that there were separate housing villas, separate independent -- I guess they were in the nature of townhouses that a number of the residents lived in, so I don't know how proximate everything was to each other.  That was the layout of University Village, as I recall it, and the various accommodations that the residents had there.

Q.   Okay.  Now, did the life care contracts entitle the residents to services from what we'll call the health center?  I'll just refer to that as the ALF and the skilled nursing facility.

A.   I believe the various life care

contracts -- and there were several different forms that various residents had.  They all didn't have an identical contract, but the representative form of life care contracts that I reviewed, which was many of them, contemplated that services may be provided under that contract at either the -- on an assisted living basis or at the skilled nursing facility, the SNF, and I believe that was contemplated under the life care contracts.  I don't know whether -- you know, 651 or the OIR would probably tell you whether it was a guarantee -- guaranteed, but that was the concept of the life care contracts as I recall them now.

Q.   Okay.  So you were retained as counsel -- or your firm was retained as counsel for the ad hoc committee, and that was -- you filed notice of appearance on September 27, 2016, correct?

A.   I filed a -- or this law firm, Jennis Law Firm, which is this law firm, filed a notice of appearance on 9/27/16.  That was after the Westport bankruptcy case had been commenced.  So, yes, I did do that.

Q.   And shortly thereafter, on October 13, 2016, you filed a notice of filing.  This is Docket No. 83, and I wish I had more copies of this.  We'll

mark this -- I believe we've already marked your notice of appearance.  I'm not going to make the docket an exhibit to the -- well, let's go ahead.  I've already marked it Exhibit 1.  We'll make the docket Exhibit 1, we'll make the notice of appearance Exhibit 2, the ad hoc committee, and we'll make this Exhibit 3.

(Defendant's Exhibits 1 through 3 were marked.)

BY MR. WHITSON:

Q.   I'll show you what we've marked as Exhibit 3 to your deposition, Mr. Jennis.

MR. WHITSON:  I apologize, Mr. Warren.  I only have one copy of it.

BY MR. WHITSON:

Q.   But it's a notice of filing of the motion to dismiss, the fifth amended -- well, you can read what it is.  But you filed that, correct?  And take a moment to read through it.  It's probably been some time since you've seen this.

A.   The notice of filing that you've given to me as Exhibit 3 bears my electronic signature, and it appears to have been filed in the Westport Holdings Tampa bankruptcy cases Docket 83.  So, yes, I did authorize that to be filed under my filing

number.

Q.    And can you identify what that document is that's attached to the notice of filing?

A.    It appears to be a Motion For Dismissal of Fifth Ground For Receivership that was filed by respondent Westport Holdings Tampa, Limited Partnership dba University Village in the case that had been commenced by the State of Florida, Department of Financial Services against Westport Holdings in the Circuit Court for the Second Judicial Circuit in Leon County.

So this was a motion to dismiss filed by Westport Holdings through its attorney Stephen Turner in connection with the State through the Department of Financial Services' efforts to obtain a receiver over University Village, and this was a filing by -- "this" being the motion for dismissal was a filing by Westport seeking to dismiss -- have the receivership dismissed.

Q.    Well, there was never a receivership granted, is that correct, or put in place?

A.    I don't believe that the DFS action for the appointment of a receiver over Westport was ever completed because of the filing -- or concluded because of the filing of the bankruptcy case.

And I want to be precise only because this is a long time ago, as I'm realizing.  University Village -- when I refer to Westport, it would be Westport Holdings Tampa, Limited Partnership dba University Village.  I'll refer to either Westport or University Village.  Those two things are the same thing in my mind.  They are the CCRC, the continuing care retirement community that was at issue.  So I don't want to get you confused if I call it Westport or University Village at some point in time.  I'll use those terms interchangeably.  If you're not clear on what I'm talking about, please ask me.

Q.   Certainly.  All right.  So what was the purpose of filing that motion that was in, as you said, the receivership action in Leon County, Florida?  Why did you file it in the bankruptcy case?

A.   At this point in time I have no idea.  It was -- the bankruptcy case had been filed, and my thinking at the time was that it would have been in the interest of my then client, which was the ad hoc committee, to have Judge Williamson be aware of the positions that Westport had taken in the receivership case.

Q.   Okay.

A.   I don't know what else was going on in the case at the time, just looking at this single filing.

Q.   I understand.  Context is important.

So I'll show you what we'll mark as Exhibit 4 to your deposition.

(Defendant's Exhibit 4 was marked.)

BY MR. WHITSON:

Q.   And I only have one copy, so Mr. Warren can look over your shoulder.  That's the notice of appointment of the creditors committee for the residents, right?  Can you identify that?

A.   It does appear to be the Notice of Appointment of Committee of Resident Creditors.

Q.   And the members of the committee were -- could you just put those --

A.   The appointed members of the committee was David Whiting and Norma Jean Whiting as trustees of a revocable living trust, Irwin J. Karpay -- I called him IJ -- Irwin J. Karpay, David P. Henry, Marvin Weathers, Denis Johnson, Mary Adams Castor, I would refer to her as Mickey, and Stephen K. Miller were the members or the residents that were appointed by the U.S. Trustee to be on the official

committee of resident creditors.

Q. And who were the members of -- the ex-officio members, as you may recall, that you mentioned earlier in your testimony?

A. The committee, when it was formed, asked whether additional members of the ad hoc committee -- typically these were residents who had taken leadership roles in the community itself, such as the various committees that were part of the community. So the members of the official committee, with the addition of the ad hoc members -- Kay Bates was asked to become an ex-officio member, Mickey Castor was already appointed, Denis Johnson -- I'm cross-referencing these lists for a second. Denis Johnson was an appointed member by the U.S. Trustee. I went over IJ Karpay. Stephen Miller was appointed and he took the chair of the residents committee, Ray Shulstad, General Shulstad -- he was a retired brigadier general -- was asked to become an ex-officio member, and Melvyn Tockman was also asked to be on the residents committee as an officio member.

Q. Now, you mentioned there were various committees that had been formed by the residents as part of the community, correct?

A.    To be more specific, I believe Section --
or Chapter 651 which governs the regulation of
continuing care of retirement communities in Florida
contemplates that a CCRC would have various
committees of residents, and I believe those -- some
of the members of the resident committee or the
ex-officio members had previously served on what
I'll call statutory committees for lack of a better
term.

Q.    Do you recall the names of those
committees?  And before you answer that question,
you were referring to a document in your file when
you were just answering the question about the
ex-officio members.  Would you mind identifying what
document you were referring to for the record?

A.    Sure.  I wanted to remember who the
members of the residents committee were, and after
the conclusion of the -- my involvement in the
bankruptcy and the confirmation of the plan, the
members of the official committee of resident
creditors issued a certificate of condemnation --
commendation --

Q.    Freudian.

A.    -- commendation for me and the team at my
law firm for preserving the University Village

community, and the dates listed on that are August 2015 through May of 2018, and I was referring to that because it had the list of each -- the names of each of the -- each of the active members of the residents committee.

And I do know -- or I recall that one or more of the initial members of the residents committee may have resigned or did not wish to continue to serve at some point in time during the duration of the committee's existence, so I was reviewing this to make sure I remembered who was on the committee and who the members were.

Q. All right. Can we make a copy of that? I'd like to make that an exhibit.

MR. WHITSON: I guess we're on 5 now?

THE STENOGRAPHIC REPORTER: We are.

MR. WHITSON: I'll mark that as Exhibit 5 to your deposition, Mr. Jennis.

(Defendant's Exhibit 5 was marked.)

(Recess taken, 11:50 a.m. to 11:52 a.m.)

MR. WHITSON: Let's go back on the record.

A. I will say for purposes of the record that this was presented to me and my wife at the University Village where a number of people attended, including myself. I'm not waiving any

privilege by giving that to you because this was a document that was presented at a public forum.

BY MR. WHITSON:

Q.   Understood.  In fact, I'll show you what we'll mark as Exhibit 6 to your deposition.

(Defendant's Exhibit 6 was marked.)

BY MR. WHITSON:

Q.   This is an e-mail dated May 14, 2018, and then the subject is "Celebratory Dinner for Wednesday, May 15th."  Was this the dinner where you received the certificate of commendation?

A.   I believe so.  The dinner identified where Dr. Tockman was talking about meal selection was the dinner that I was referring to.  It was a while ago. It was the day before my 55th birthday.

Q.   Congratulations.  Although you just identified some personal identifiable information.

A.   That's true.  I talk too much.  So go ahead.

MR. WHITSON:  Okay.  It's seven minutes to 12 o'clock.  When do you want to break?

MR. WARREN:  Off the record.

(Discussion was had off the record.)

BY MR. WHITSON:

Q.   So you -- so what were the goals -- I know

you've answered this already, but let's go back to when you first entered the case, the bankruptcy case.  You had been retained perhaps for a year prior to the actual filing of the case.  Did you ever perform any services for the -- the -- we'll call it the ad hoc committee or for the residents of University Village in the receivership action in Leon County, Florida, identified in the exhibit that we looked at earlier?

A.   At the ad hoc committee's request, I did attend at least one hearing in Tallahassee.  I interacted with the officials from the Office of Insurance Regulation, which I will refer to as OIR, who were involved in what I'll call the receivership action, and I interacted with officers of the Florida Life Care Residents Association, which I will refer to as FLCRA.

Q.   Who at OIR did you interact with?

A.   Primarily Shaw Stiller.  I believe there were other OIR employees or attorneys who were working with Shaw, but I think my primary line of communication with OIR was typically with Shaw. There may have been someone else.  I do not remember.

Q.   Okay.  And could you describe your

conversations with Mr. Stiller?  What did you guys talk about during that time frame?

A.   Generally the situation at University Village, the delinquency proceeding, whatever the DFS action was called, the residents' concerns as to their being able to obtain the continuing care that they had contracted for, the availability of refunds that would have been due under the life care contracts, and then the impact the appointment of a receiver would have if DFS was successful.

Q.   And at that time was there any -- what did Mr. Stiller tell you about the impact of the appointment of a receiver?

A.   They -- OIR wanted a receiver for University Village.  They wanted management removed.

Q.   Right, but in terms of -- you know, you said the impact of the appointment of a receiver. Clearly that would have required the removal of management, but what other impacts on the residents did you discuss with Mr. Stiller?

A.   I believe it was OIR's position that the residents would be better served by the appointment of a receiver than leaving current management in place.

Q.   Did the residents agree with that

Page 28

position?

A.    The residents that were on the ad hoc committee at that particular point in time -- that particular point in time being right around the time that we went to Tallahassee to observe the hearings in the DFS action.  At that point in time the residents that were on the ad hoc committee supported the appointment of a receiver over the community.

Q.    Did they make any filings in support?

A.    I don't recall.  We may have -- "we" meaning the ad hoc committee that my then firm was representing may have filed papers in the DFS action.  I don't recall.

MR. WHITSON:  I don't want to get into all of this right now.  That starts to be pretty lengthy.

MR. WARREN:  If you want to break now, you can.  My meeting doesn't start until 12:30, though.

MR. WHITSON:  Right, but if we're only going ten more minutes and I'm almost five minutes away from that and I'm about to start a line of questioning that will --

MR. WARREN:  Yeah, I don't want you to

break it up.

MR. WHITSON:  Why don't we go ahead and break for lunch or break for whatever Jeff needs to do, and we can reconvene at 1:30.  Is that all right with everybody?

THE WITNESS:  That's fine.

(Recess taken, 11:59 a.m. to 1:36 p.m.)

(At this time Mr. Stavros was not present.)

MR. WHITSON:  All right.  Let's go back on the record.

BY MR. WHITSON:

Q.   Mr. Jennis, before we broke for lunch, you had mentioned that you had discussions with the OIR. I think you specifically identified Shaw Stiller, and you mentioned -- you said officers of Florida life care residents.  There was some acronym you mentioned about some trade association.  If I'm misremembering, correct me, but there was some other entity or organization that you had conversations with?

A.   The entity I was referring to is the Florida Life Care Residents Association, and it goes by an acronym of FLCRA, F-L-I-C-R-A is the way you say it, and that was the organization I was

referring to. A number of the residents that had been both on the ad hoc committee and then were ultimately named or appointed to the official residents committee had been participants in FLCRA, and that's one of the ways that I became aware of the situation at University Village.

Q. Okay. And what conversation did you have with FLCRA about the situation at University Village?

A. The general situation, the residents had contacted FLCRA about their concerns and their issues with management. They were very, very concerned with the transaction whereby the health center -- I'll call it the health center had been, in the residents' vernacular, spun off or divested or separated from the main campus -- I think that was your term, main campus, and the residents had expressed their extreme concern with that with respect to the other management issues, had raised the issue with FLCRA, so I spoke with FLCRA's general counsel, a gentleman named Eric Thorn, and I believe their executive director who was a gentleman named Bennett Napier. I believe that's spelled N-a-p-i-e-r. And I met with Mr. Thorn and Mr. Napier on a number of occasions, including at

the time when the ad hoc committee had asked us to go to Tallahassee for one of the hearings on the receivership action, and both Mr. Thorn and Mr. Napier were there at that point in time.  So I spoke with them at that point in time as well.

Q.   Okay.  Now, you said that the residents or some of the residents were concerned about the spinoff, the phrase you used, at the health center. What concerns did they have?  What specifically did they say to you that you know of?

A.   Well, what they said to me would have been privileged.  You're asking me what they said to --

Q.   FLCRA.

A.   -- FLCRA and what FLCRA expressed to me, and it was that the current ownership group referred to as Mr. Bartle and other terms had -- had broken up the unified campus by transferring the interests in the Westport nursing entity, which -- let me look at your style here -- the interest in the Westport nursing entity, which I believe was a separate entity.  They had spun those interests off into ownership by affiliates of the current ownership group which was Mr. Bartle and his -- Mr. Bartle, I think it was Mr. Freidman, and others.  It was very intricate how the transaction was structured and I

don't remember, but there was some very significant concerns because the residents, as communicated to Mr. Thorn, Mr. Napier, FLCRA, were very concerned because the funding that came from the nursing center or the health center to operate the entire facility, including what I understood may have been a subsidy for the independent living facility was being removed and those funds -- or those amounts, whatever it was, that the nursing center contributed to the overall economic welfare of the entire CCRC was being removed or syphoned out, I believe, was the term that FLCRA used -- or that I was told when I met with Mr. Thorn and Mr. Napier in Tallahassee.

Q. And were there any specific examples of this syphoning off or any evidence of that or was this a suspicion that they had?

A. I think they had -- well, Dr. Tockman was a member of the finance committee, and he had specific examples of what was the economic consequences of the spinoff. I'm trying to remember the transaction, Ed, and I think that at one point in time there was a lease of the skilled nursing center that created cash to the overall Westport Holdings.

Apparently, if I remember, nursing

historically had paid significant amounts to Holdings and once the spinoff or the transfer of the ownership of the SNF occurred, those funds were no longer being paid.  And I do believe that Dr. Tockman, you know, had specific examples of the economic consequences and why, you know, that -- why that created what was the refund backlog or refund queue that created the -- you know, created -- the initial resident concern was that residents were either passing or moving out.  They would have been entitled to refunds under their life care contracts, and there was no money to pay those refunds, and there was a queue of, my recollection is, roughly about $30 million that would have been owed to either departed residents or deceased residents, and that was one of the things that FLCRA bought to my attention, expressed both their concern -- and that was one of the issues that OIR was raising at the proceeding to appoint the receiver.

Q.   Okay.  And what was the date of the communications you had with FLCRA where this was expressed?

A.   I don't remember.  I think the first person I talked to about University Village was Eric Thorn who had either been contacted or referred to

me by Rick Thames -- that's T-h-a-m-e-s -- who's an attorney in Jacksonville who had recently done a CCRC bankruptcy case, and he had given Mr. Thorn my information.

I contacted Mr. Thorn.  He likely gave me the contact people at University Village, including Dr. Tockman and Mr. Miller.  Ultimately I went up and met with them.  We actually did a presentation to a group at University Village.

This was after the DFS proceeding.  So I believe there was OIR representatives on site at that point in time, and one of the concerns was that because of the proceeding and -- the OIR proceeding, I don't believe they were allowed to continue to sell life care contracts, which was a concern, but I couldn't tell you the precise date other than I believe it was in the summer of '15, and there were multiple conversations with Mr. Thorn, less so with Mr. Napier.

There were not much e-mails, and I know we can check the date of the hearing in front of, I think it was, Judge Dorsey, I think that was her name, in Tallahassee where Mr. Turner had been opposing the DFS receivership.  So it would have been around that point in time.  So I'd have to

calculate by reference to when that Tallahassee hearing was.

Q.   Was that the case that was being handled by Attorney Lunny, L-u-n-n-y?

A.   I don't believe so.

Q.   All right.  Was there more than one case pending in Leon County Circuit Court on Westport?

A.   I don't believe so.  If you could give me back that notice of filing, the exhibit.

THE STENOGRAPHIC REPORTER:  Here you go.

BY MR. WHITSON:

Q.   And for the record, you're referring to which exhibit?

A.   Six.  No.  No, I'm sorry.  Six was the e-mail about the dinner.  I'm referring to Exhibit 3 and that's the notice of filing, and under that there is the case, State of Florida, ex rel., the Department of Financial Services of the State of Florida, Relator, R-e-l-a-t-o-r, versus Westport Holdings Tampa, Limited Partnership dba University Village.  That's the case I'm referring to.

Q.   Okay.  So you're saying that's in the summer of 2015.  The case number -- I can't read the case number.

A.   The case number was 2015-CA-000585.

Q. So that's almost a year before the bankruptcy filing; is that correct?

A. I believe so.

Q. So you were involved at that time or closer to the filing date? Because I was unclear from your earlier testimony. It seemed like you were involved the summer before the petition was filed. Now it seems like you were probably involved a year before. Am I understanding you correctly?

A. I think so.

Q. Okay.

A. I got the initial call I believe from either Mr. Thorn or Mr. Thames. I believe it was in the summer of '15, and I believe Mr. Bowen did the initial intake of the matter, initial communications, and then he went on an extended trip and I wound up handling the matter going forward primarily.

Q. Right. So there was a concern -- if I can paraphrase, and correct me if I'm not doing it accurately, that the residents were concerned about the spinoff of the health center into Westport Nursing Tampa because that cut off the revenue that was otherwise being used as a subsidy, I think was your word, for the entire CCRC. Is that fair to

say?

A.   That's a fair characterization, and you're helping me with the dates.  Because I do remember, I believe, Mr. Bowen went with me on the -- when we went to the hearing in Tallahassee, and I do know that he left for his sabbatical on -- in September of 2015, so it would have been before that.

Q.   Okay.  So what happens after -- the delinquency proceedings are in the summer of 2015.  I mean, no receiver was ever appointed.  So what happened at those hearings where -- I guess I need to sort of back up.

What was the event or the precipitating event or court order which prevented the sale of life care contracts, as you recall?

A.   I do not recall.  I believe it might have been the administrative action by the DFS or the OIR.

Q.   And that would have affected only the ILF, right, only the Westport Holdings property because they're the only entity that was regulated by OIR?  Isn't that fair to say?

A.   I -- my understanding -- again, I don't know the answer to your question.  My understanding was that one way the then management group funded

operations and any capital improvements was by selling life care contracts, and they -- and it was my recollection that they had -- that the then management had been aggressively marketing and selling life care contracts, raised a great deal of money through the sale of new life care contracts and the payment of initial entry deposits, and that those moneys were not used to maintain the property and the campus, and the residents were concerned and had raised issues with life care about what they perceived to be deteriorating conditions and deferred maintenance at the facility, and the fact that residents who had either moved out or passed on were not being paid their refunds and that the refund queue, my recollection, had, you know, climbed or was amounting to about $30 million of refunds that had been requested and would have been refunded if they either had been able to sell life care contracts and had new residents move in or had otherwise had the money to pay the refunds.

Q. Okay. And that was in the summer of 2015, right?

A. That's my recollection.

Q. Okay. So let me show you --

MR. WHITSON: Off the record.

(Discussion was had off the record.)

MR. WHITSON:   Back on the record.  Let's mark this.

(Defendant's Exhibit 7 was marked.)

BY MR. WHITSON:

Q.   Mr. Jennis, I'm showing you what we've marked as Exhibit 7 to your deposition.  It is a document that was filed in the Westport Holdings Tampa bankruptcy case Docket 713 on September 8, 2017.  Please take a moment to review that.  It's entitled "Official Committee of Resident Creditors Motion For Derivative Authority to Pursue Causes of Action of the Estates."

A.   Okay.  I'm familiar with this.

Q.   Okay.  Well, I'll go ahead and ask you some specific questions, but why don't you generally describe your familiarity with this motion.

A.   I prepared it.  I signed it.  I directed that it be filed.  The factual allegations in there were generally made of my personal knowledge, for example, the demand that was made on debtor's counsel to pursue certain causes of action.

Q.   And that was the Stichter Riedel firm?

A.   That was the Stichter Riedel firm, and I personally made direct demand, and I believe I had

actually prepared either a draft complaint or there is a document where we demanded -- the resident committee demanded that the debtor take action, and that's -- I think when they refused, that's when this particular motion was filed.

Q. Okay. And on Paragraph 3 of your motion you said you made a demand on July 1, 2017. "The Resident Committee requested that the Debtors pursue certain causes of action of the Debtors' estates that the Resident Committee had identified, analyzed, and researched. The claims and causes of action identified by the Resident Committee included various causes of action (collectively, the 'Insider Causes of Action') that the Resident Committee believed should be asserted by the Debtors in connection with the transfer of the Debtors' membership interest in Westport Nursing of Tampa, LLC."

Could you be more -- and I don't want to keep reading, but could you be more specific about what these causes of action were?

A. I'd have to look back at my letter to Scott Stichter and Charlie Postler. I believe that the Stichter Riedel firm was hopelessly conflicted in this case, and I believe I had to identify the

various causes of action that I thought that the debtor in possession needed to be pursuing.  I laid them out for them.  I think I even may have -- is there a draft complaint attached to this?

Q.   There's a draft complaint actually attached to this.

A.   That would have been the causes of action that I was referring to.

Q.   All right.  Let's walk through that then.  And that is, for the record, attached as Exhibit A to Exhibit 7 to your deposition.  The plaintiff in this case is the official committee of resident creditors.

This complaint was actually filed, was it not, ultimately?

A.   I don't know.  I would have attached it to the motion for derivative standing --

Q.   It was.

A.   -- and I don't know whether this particular complaint was ever filed because we -- I don't believe Judge Williamson granted derivative standing.  I believe the motion for derivative standing and other events that were transpiring in the case at the time was what was led -- what led to Mr. Warren's appointment as an examiner.

I do not recall whether at the time I filed this motion for derivative standing we also asked for the appointment of a trustee, but I will tell you I did not believe that debtor's counsel would properly pursue all the causes of action that I believe needed to be pursued, and that's why -- and I do recall either arguing for the appointment of a trustee -- and I believe that's what resulted in Mr. Warren's appointment as examiner.

Q.    Okay.  Look at Exhibit 1, I believe, Docket No. 745, Order Granting Motion For Derivative Authority.  I didn't pull the actual copy of the order, but it looked like this motion had been granted on Docket 745 on October 16, 2017, unless your recollection of the wording of that order is different than what the docket seems to indicate.

A.    I don't have a recollection today of the wording of that order.  So where?

Q.    745.

A.    I may need you to help me find it.

Q.    You're getting close.

A.    Order granting motion -- Docket No. 745 reads as "Order Granting Motion For Derivative Authority to Pursue Causes of Action," and then it directs me to serve a copy of the order within three

days.  I can't tell you -- remember today what that order stated.

Q.   Okay.

A.    If it was not the order that resulted in Mr. Warren's appointment, I don't know.

Q.   Okay.

MR. WARREN:  I don't want to interject, but I'm happy to try to help.

MR. WHITSON:  Sure.

MR. WARREN:  In the context of discovery, the dates are a little messed up.  I was appointed as the examiner fairly early in the case.

MR. WHITSON:  Yes.

MR. WARREN:  I was the examiner a year earlier than the derivative standing.  What I remember was when we confirmed the plan in 2018, Mr. Jennis was engaged -- his firm was engaged by me as the liquidating trustee, and we pursued the complaint against CPIF.

A.    I believe that's correct.  There was a complaint that was served and I pursued against CPIF.  I don't know if that complaint was ever pursued.

MR. WARREN:  I don't remember the

committee's complaint, but that's possible.  I just don't remember.

A.   Mr. Whitson, my memory fades.  The only thing I do remember is I was very -- I think Mr. Warren, if his timeline is correct and he had already been appointed, then I was wrong on my sequence.  I just remember I was very upset with the Stichter Riedel firm because I believed they needed to pursue these causes of actions.

BY MR. WHITSON:

Q.   Right.  According to my notes, Mr. Warren is correct.

MR. WARREN:  Can I look at the docket?

MR. WHITSON:  Yeah.

MR. WARREN:  If there was a complaint filed afterwards, it would show up on the docket.

BY MR. WHITSON:

Q.   There was an order on November 8, 2017, Docket No. 770, granting a motion to expand the power of the examiner.  And I believe Docket 144 is where Mr. Warren was appointed the examiner on November 15, 2016.  And this motion was filed on September 8, 2017.

A.   So your recollection of the docket was

this motion was filed after Mr. Warren had been appointed as examiner?

Q.   Appointed examiner on November 15, 2016, Docket No. 144.

A.   Okay.  And then this was filed in September of '17, "this" being Exhibit 7?

Q.   Correct.

A.   Okay.

Q.   So this draft complaint is attached to the residents committee's motion and does reference CPIF, and it talks about the use of a million dollars of the capital expenditure reserve.  Does that refresh your recollection about -- these are obviously against CPIF and not against John Bartle or the ownership group that you referenced before.

A.   My recollection is that there was a series of -- there was a number of concerns about the use of reserves, and one of the concerns was the use of reserves, I believe, as collateral for your client, and that was a major concern.  I don't recall whether -- sitting here today whether we addressed that in this complaint, but I do know there was some very substantial concern about the use of -- or the pledge of the -- MLR was the acronym we were using, the pledge of MLR to USAmeriBank I believe it was,

Page 46

the predecessor bank, to secure its financing of what we would refer to as the spinoff.

Q. Okay. We'll come back to that, but if you look at Paragraph 28 of the complaint attached to your motion, it says, "The First Amendment," which refers to the document that was executed between the BVM parties and CPIF above in Paragraph 27, "provided no explanation of how the Capital Expenditure Reserve Withdrawal would be used to pay for capital expenditures at the ILF as required under the Loan Agreement."

And I don't want to read the whole paragraph, but it seems to be sort of suggesting that the residents felt there was damage to the ILF because this reserve account that had been established wasn't being used to pay for the capital expenditures of the ILF. Is that accurate as I read the allegation in Paragraph 28?

A. The residents were concerned about the entire transaction, whereby the nursing affiliate, Westport Nursing, was severed from the continuing care retirement community through the transfer of the membership interest by the BVM group. There was also significant concerns as to the use of the reserves or the minimum -- MLRs, the minimum liquid

reserve I think the term is, for use as collateral in connection with that transaction.

Q.   But this document that you prepared talks about a capital reserve that was established under the CPIF loan documents, though, right?

A.   This document may have been talking about something totally different.

Q.   It sounds like it.  I mean, if you read Paragraph 28, which I commend your review, it talks about a very different reserve that was dedicated towards the ILF, right?

A.   It may.  I mean, I haven't studied this in detail.

Q.   It's right there in Paragraph 28, I mean, just in terms of --

A.   Okay.  I'm reading it.  What's your question?

Q.   Isn't that the thrust of the allegations in this complaint -- again, I'm not sure when it was filed, but you drafted it -- was this capital expenditure reserve that was established under the CPIF loan documents for repairs to be done to the ILF was not being used for that purpose?  Wouldn't you agree with me that that's the thrust of that allegation?

A.   I used the define term here in Paragraph 20 called "Capital Expenditure Reserve." That defined term defines a transaction that was provided when the CPIF loan closed, 1,750,000 would be held by CPIF as a capital expenditure reserve.  I believe that was a CPIF-specific document.

I don't know whether it was at the time or subsequently we determined that management of University Village had also pledged a significant amount of their reserves -- I can't remember what those -- that amount was -- to USAmeriBank, now Valley, in connection with -- I'm just going to call it Valley -- Valley's financing of what we'll call the spinoff transaction.

So the capital expenditure reserve use I'm referring to here was a CPIF-specific transaction which is different than what I am now recalling was the pledge of reserves in connection with the USAmeriBank/Valley transaction.  Does that help?

Q.   I think you're answering my question but in your own way.  Again, the allegations in this complaint are of a different reserve that was dedicated for the ILF not being used for that purpose.  So --

A.   That's what I think it -- that's what I

think -- tying the defined terms together, that's what I think it says.

Q.   Okay.  So then going back to your point about the concern about -- and at this time you're saying -- and that would be when this was filed on September 8, 2017, the residents were not aware that -- what you referenced earlier in your testimony that part of the MLR had been pledged to -- in the USAmeriBank loan transaction.  Is that what you said?

A.   No.  That was your characterization.  I don't think I ever told you what the residents were aware of or not aware of because what they would have communicated to me would have been privileged.

I do believe that there was the awareness that reserves, MLRs, had been pledged to USAmeriBank in connection with its financing of the spinoff transaction.  I don't know or recall when the residents or the -- the residents or the ad hoc committee first became aware of that specific detail.

Q.   Okay.  Why were the residents concerned about the pledge of a portion of the MLR?

A.   They believed that the MLRs needed to be maintained under the statute and should be available

for whatever the proper purpose for MLRs are under Section 651.

Q.   What did the residents believe that the proper purpose for MLRs were under Section 651?

A.   I can't tell you what their individualized beliefs were.

Q.   Is it fair to say that given the coincidence of these allegations and the condition at the ILF, that it was their understanding that the MLR was to be used to make those repairs and capital expenditures for the ILF?

A.   I can't tell you there was that specific understanding.  There was a general concern as to the transfer of the capital expenditure reserve as described in this document.  There was a general concern as to the propriety of the transfer of any of the reserves to USAmeriBank as part of that transaction.

Q.   Did the residents -- you mentioned the refund liability.  Did the residents believe that part of that reserve was there to help fund the refund payment?

A.   I don't recall.

Q.   Okay.  But generally there was a concern about the lack of capital expenditures being made to

the ILF; is that fair to say?

A. It's fair to say there was concern about the lack of capital expenditures being made to maintain the ILF the way the residents believed it should have been maintained. I believe there was concern that -- whether there was sufficient reserve to maintain and operate the SNF the way the residents could have expected.

Q. Were there problems with the SNF too?

A. I was focused at the time -- at this point in time on the issues concerning the ILF. The SNF was, I believe, regulated by AHCA at the time. I was interfacing with OIR who was regulating the independent living people and what they viewed as an insurance policy, so I don't recall whether there were specific concerns as to whether the pledge of the reserves impacted the general operation of the SNF. I don't recall.

Q. Okay. Because -- I was confused by your answer a minute ago when you mentioned the SNF rather than the ILF, so thank you for clarifying that.

Okay. So then let's look at what we'll mark as 8.

(Defendant's Exhibit 8 was marked.)

MR. WHITSON:  Here's a copy for Mr. Warren.

BY MR. WHITSON:

Q.    Mr. Jennis, let me show you what we've marked as Exhibit 8 to your deposition.  It is a document entitled, "Amended Complaint and Objection to Claim No. 22."  This was filed by the Official Committee of Resident Creditors, correct, against CPIF Lending?

A.    I'm sorry, Mr. Whitson.  I don't flip pages as quickly as I would like to be able to.

Q.    No, take your time.

A.    Okay.  Yes, sir.

Q.    Okay.

A.    What was your question?

MR. WHITSON:  So I guess could you read it back now that I've forgotten it?

THE STENOGRAPHIC REPORTER:  Sure.

(The question beginning on Page **, Line **, was read back as follows:  "This was filed by the Official Committee of Resident Creditors, correct, against CPIF Lending?")

A.    Yes.

BY MR. WHITSON:

Q.    And if you'll look at Paragraph 30 under

Subsection C entitled "The Leveraged Buyout."

A.   Yes.

Q.   Well, actually, let me back up to the prior page.  This is describing the loan to Horizon. The Horizon obligation was about approximately $20 million, was it not?

A.   A $20 million amount is referenced in Subparagraph (a) at the top of Page 10.

Q.   24(a) essentially?

A.   Yes, 24 sub (a).

Q.   Okay.  And then in Paragraph 27, "Horizon demanded title to University Village pursuant to the deed-in-lieu agreement, and hired Life Care Services, LLC . . . to manage University Village on its behalf."  Do you see that there?

A.   Yes.

Q.   Did you have any communications with Life Care Services, LLC?

A.   If there was no connection or cross between Life Care Services, LLC and Novum who was, I believe, the management group that BVM brought in, the answer would be no, I did not have any communications with Life Care Services, LLC.

Q.   And who was the principal at Novum that you communicated with?

A.   I didn't generally communicate with anybody at Novum.  The principal on site that I interacted the most with was Mark Flores.  I believe there was a woman who was also on site named Jeanette, and then there was another person, Doug Klinowski.  Those were the three people at Novum I talked with primarily, and probably most of my communications were with Mark Flores.

Q.   And when was Novum brought in as the manager?

A.   I don't remember.

Q.   Okay.  But -- all right.  So then it says under Paragraph 34, "Under the terms of the March 31, 2014 leveraged buyout, the Debtors executed and delivered to CPIF a promissory note," and it describes that as the CPIF note and the CPIF mortgage.

And then Paragraph 35 shows a breakdown, "At the Closing, the $9,500,000 'loan' from CPIF" -- and the word loan is in quotes -- "to the Debtors was disbursed as follows:"  About 5.6 million was paid to Horizon to retire a portion of the Horizon debt; 1.75 was held by CPIF -- and I'm abbreviating these numbers, for the record -- and not disbursed pursuant to a capital improvement reserve for

University Village.  Would that mean the ILF?

A.   I was not specific as to whether it was the ILF, and I'd have to check and see how I defined University Village earlier in the complaint.  I'm pretty rigid about defined terms, so somewhere in here I have a definition of University Village in all caps.  That would be what I was referring to in that subparagraph.

Q.   Okay.  I didn't see it.  I mean, I may have missed it too.

All right.  So then $1 million -- going back to Paragraph 35 -- was paid to WSILF or WSI -- WSILF's, sorry, I'm a little tongue-tied there, equity holders in exchange for the 99 percent limited partnership interests in University Village, and then it was subsequently distributed to other entities there in Paragraph (d).

And then 300,000 was paid to WEMAMM to obtain, as you allege or the committee alleges, the resignation of the then members of the boards of directors of TALF and TR&SNF to install Bartle and affiliates.

So TALF and TR&SNF, they were tenants -- I'm sorry, yes, tenants of the health center, were they not?

A.   I believe they were either tenants or the actual licensed operators of the skilled nursing facility, which we're colloquially referring to as the health center, but TR&SNF -- TALF, if you look at Paragraph 9(e), I describe T-A-L-F, TALF, a Florida non-profit corporation, "was the designated licensee and operator for the ALF at University Village."

And then Subparagraph (f) TR & -- that's an ampersand -- SNF, Inc. "was the designated licensee and operator for the SNF at University Village."

Q.   Okay.  So TALF held the license for the skilled -- the ALF, and TR&SNF held the license for the skilled nursing facility; is that fair?

A.   From what I pled here, I believe that is correct.  I do think I recall at the time that one of the entities had had a receiver appointed for it, and I don't remember who -- which one.  I think Drew Dillworth was the receiver for one of the entities. I don't remember which one.

Q.   Right.  But it wasn't a receiver in the sense that he had full control over the entity; it was simply to collect a judgment, was it not?

A.   I don't remember.

Q.   Okay.  And then in Paragraph 36 you refer to Westport Nursing Tampa and the spinoff I think you referred to earlier in your testimony today where it talks about a $15 million loan to USAmeriBank, but looking at that in comparison with the Horizon transaction and what happened with CPIF, the 5 million or so dollars -- or more dollars were paid to Horizon from the CPIF transaction and $15 million was paid out to Horizon from the USAmeriBank, didn't that just satisfy the debt that was owed to Horizon or pay them off and stop the deed-in-lieu from proceeding and stop the foreclosure?

A.   I don't remember what Horizon was owed, so I can't tell you.

Q.   We saw earlier in the complaint, it was approximately $20 million, and that's at Paragraph 24(a) that we read from a few minutes ago.

A.   Okay.

Q.   Okay.  So you mentioned the MLR in this complaint, right?

A.   I think that's -- the pledge of, it looks like, $3 million of the MLR to USAmeriBank is what I'm alleging in Paragraph 36 of the complaint, as far as I can tell from reading it now.

Q. All right. Now, did you file this complaint with derivative standing or did you file this as a direct action by the residents or both?

A. I don't remember.

Q. Okay.

A. It appears from the style that I filed it in -- on behalf of the Official Committee of Resident Creditors, so I don't remember whether we had been granted derivative standing -- the committee had been granted derivative standing or not. All I do remember is that Stichter Riedel refused the demand made, that they filed a complaint. I don't remember whether there was derivative standing granted or not.

Q. If you look at Paragraph 1 on Page 2, you allege that the committee does have standing to bring this adversary proceeding "pursuant to the Court's Interim Order Granting in Part Official Committee of Resident Creditors' Motion to Appoint Chapter 11 Trustee," which I think you referenced earlier, "or alternatively, Expand Power of Examiner."

So the committee sues CPIF and the allegation counts include "Count I, Aiding and Abetting Breach of Fiduciary Duty." Do you see that

on Page 17, Paragraph 53?

A.   Yes.

Q.   Okay.  You say -- in Paragraph 54 you allege on behalf of your client "At all times they occupied their respective positions, the Debtors' general and limited partners owed the Debtors and the residents of University Village multiple fiduciary duties."  Do you see that?

A.   Yes.

Q.   And then at 55, they breached their duties by, among other things and without limitation, and you list those there.  "Entering into a leveraged buyout transaction with CPIF under terms and conditions less favorable to the Debtors and the residents of University Village; Authorizing and allowing Bartle to use $1 million from the Debtors' capital improvement reserve" -- do you need to take that?

A.   No.

Q.   Okay.  And then (c), you mention "the substitution of the Debtors' limited and general partners without first obtaining required regulatory approval or provisional authority."

And then -- so which -- now, when you say back in Paragraph 54 you owed -- the general and

limited partners owed the Debtors and the residents of University Village multiple fiduciary duties, what specific fiduciary duties are you referring to?

A.   I can't tell you sitting here today what specific fiduciary duties I'm referring to.  That allegation would have been based on research I would have done at the time, review of documents I would have done at the time, discussions with OIR or other entities.  I can't tell you sitting here today which specific fiduciary duty I'm referring to at that time in that paragraph.

Q.   But you're clear that you feel that the debtors' general and limited partners, you allege anyway -- you assert -- that there are direct fiduciary obligations owed by the general and limited partners by the debtors to the residents, correct?

A.   I certainly believed that at the time based on the research and work I had done.

Q.   Has anything changed your belief today?

A.   I haven't really thought about it since then, but I doubt it.

Q.   Okay.  So you mentioned, "Entering into a leveraged buyout transaction with CPIF" under 55(a). You mention "Authorizing and allowing Bartle to use

$1 million from the Debtors' capital improvement reserve as an interest free loan," and you mention the substitution which resulted in the delinquency proceeding that was commenced by DFS.  Now, you don't mention anything to do with the MLR, though, right, even though you referred to it earlier in the complaint?

A.    In this particular complaint, which I believe was drafted against -- or for the purpose of being filed against CPIF, I do not believe that I mentioned the use of the MLR in connection with the CPIF transaction as a specific breach of fiduciary duty other than what I may say -- or what I said in Paragraph 58 which states that "The assistance of CPIF facilitated the foregoing" -- which I guess are described above -- "breaches of fiduciary duties."

Q.    You also allege that in Paragraph 37 -- well, in Paragraph 36 you do reference the MLR, correct?

A.    Correct.

Q.    All right.  And then you say in 37, "All told, the Debtors and WNT emerged from the leveraged buyout with significantly more debt than they had prior to the March 31, 2014 transaction."  As I was looking at the breakout that we were -- where you

showed the amounts that were paid on the $9.5 million loan to CPIF -- or from CPIF, so only 5 million and some change were used to retire a portion of the Horizon debt from the CPIF transaction; is that fair to say?

A.   I don't recall.  Whatever I would have said here would have been my best recollection at the time.

Q.   Okay.  We went through that -- I'm not sure where we were talking about it, but there was sort of a description of how the moneys were disbursed from the CPIF loan.  Yeah, that's in Paragraph 35.

So if 5.6 million was paid to Horizon to retire a portion of the Horizon debt, that would have left close to $15 million remaining on the Horizon debt, right?

A.   I'll have to trust you on the math.

Q.   Well, if we say the Horizon debt was approximately $20 million, then if we deduct 5.6, we're looking at 14.4 remaining plus whatever the 20 million really was in terms of the actual accrued interest and how it was being satisfied by Horizon, and then the USAmeriBank loan was $15 million.

So is it fair to say that all, if not

substantially all of the USAmeriBank loan was used to retire the Horizon debt, but a portion of the CPIF debt, approximately 4 million, was disbursed other than to retire the Horizon debt?  Is that fair to say if I'm doing the math correct and kind of meshing these allegations?

A.  I don't know.  I'd have to read this thoroughly and carefully as to what I was alleging at that point in time.  I do -- I think based on Paragraph 37, I was of the firm conviction after looking at the pre-transaction status and the post-transaction status, which could mean both CPIF and USAmeriBank since I'm referring to both transactions in the paragraph, that I believed that after the leveraged buyout, the debtors and WNT, Westport Nursing of Tampa, had significantly more debt than they would have before.

Q.  But, again, as you're sitting here today, you don't remember what the quantum of that significantly more debt would have been?

A.  That's correct.

Q.  Okay.  And then in Paragraph 40 you say, "On August 25, 2014, approximately six months after the leveraged buyout, the Debtors, CPIF, and Bartle's management company, BVM Management, amended

the Original CPIF Documents ('First Amendment') to permit Bartle and/or BVM Management or their agents to withdraw $1 million from the Debtors' capital improvement reserve.  The purpose of the First Amendment was to enable Bartle to use $1 million of the Debtors' 1.75 capital improvement reserve as a 'credit enhancement' to fund Bartle's debt-financed acquisition of other retirement communities commonly known as BVM Bridges and BVM Coral Landing."  That's very specific, would you agree?

A.   It says what it says.  So if I was specific, yes.

Q.   All right.  Well, I won't belabor this, but let's move on to the complaint that was filed approximately almost to the day two years later. The CPIF complaint filed by the Official Committee of Resident Creditors was on March 16, 2018.  The complaint that was filed by Trustee Warren was filed on March 17, 2020.

MR. WHITSON:  And I'll mark this as 9.

(Defendant's Exhibit 9 was marked.)

BY MR. WHITSON:

Q.   So, Mr. Jennis, I've shown you what we've marked as Exhibit 9 to your deposition.  This is the Amended Complaint.  Are you familiar with this

document?

A.   Generally, yes.

Q.   How are you familiar with it?

A.   I believe I either authored it or revised it, and I can -- if you'll give me a second.

Q.   Take your time.

A.   It appears to have been electronically signed by Erik Johanson who was an attorney practicing with my firm at the time, but I would have been very involved in the preparation and completion of this complaint.

Q.   Your name is on it too, right, below Mr. Johanson's?

A.   Correct.

Q.   And you wouldn't have filed this unless you had thoroughly reviewed its accuracy and knew it to be true and correct, correct?

A.   Correct.

Q.   Okay.  So two years later this Amended Complaint is filed, and this is filed pursuant to the First Amended and Restated Mediated Joint Plan of Liquidation, Paragraph 5.

A.   What Paragraph 5 says is that pursuant to the plan, the liquidating trustee, Mr. Warren, had the power and standing or -- I'm paraphrasing, power

and standing to pursue causes of action on behalf of the debtors' estates.

Q.   All right.  And you go on to describe in Paragraph 9 the original ownership structure of Westport and Westport II, their operational structure, correct?

A.   Let me get to Paragraph 9.  Yes, "Upon information and belief, prior to March 31, 2014, the organizational and operational structure of Westport and Westport II was as follows," and that has following subparagraphs.

Q.   Right.  And you reference on Page 4, Subparagraph (c), Lawrence Landry.  Larry Landry was the president and sole manager of Westport and Westport II before the leveraged buyout, correct?

A.   My recollection of what I allege in this complaint or what the committee alleges in this complaint or Mr. Warren, I'm sorry -- what's alleged in this complaint was that Landry was the president and sole manager of Westport and Westport II and controlled those other entities which were the general partners of Westport and Westport II.  And then again there's -- it's referring to a third entity called Westport Advisors, Limited as manager.

Q.   Right.  And isn't it also true that

Mr. Landry was the general partner after March 31, 2014?

A.   I don't recall how long he remained in any capacity.  I know at a point in time subsequent he either resigned -- I believe he resigned.

Q.   Right.

A.   That's my recollection.

Q.   So we go through the general allegations, again, an overview of the CCRCs and the IEDs as you referred to them earlier in your testimony.  And you talk about the leveraged buyout again, and then you show the comparison on Page 10 of the CPIF loan and the USAB loan, correct?

A.   Paragraph 32 on Page 10 speaks to the general structure of the CPIF loan and USAB loan under the terms of the leveraged buyout, yes.

Q.   Okay.  So this goes back to the earlier questions we were talking about in terms of that comparison of the CPIF loan and the USAB loan.  The original amount of the CPIF loan, principle amount was $9.5 million, correct?

A.   I believe that's correct.

Q.   And the principle amount of the USAB loan was $15 million, correct?

A.   I can't tell from what I'm looking at or

my recollection.  It appears to me from that last row in the chart on Page 11 that I'm referring to an amount of $18 million.

Q.   Okay.  So then is it fair to say that for the purposes that -- of the 9.5 CPIF loan, only 4 -- I guess a little shy of $4 million went elsewhere to retire the Horizon debt, right?

A.   Mr. Whitson, honestly --

Q.   We're doing the math again, I know.

A.   -- speaking here today, I cannot remember.

Q.   Okay.  But there's no allegation that there were any moneys transferred from the USAB loan to any of the Bartle entities or -- other than for the benefit of West Partners [sic] of Tampa?  I mean, here on the CPIF loan we've got the 1.75, which transferred to or held by CPIF in the event not disbursed to the debtors reportedly to fund a capital improvement reserve for University Village.

The prior complaint, we saw an allegation that a million dollars of that 1.75 had been given to Bartle as an interest free loan to acquire the Bridges and some other -- Coral Community -- yeah, Coral Community, correct?  That was the allegation there.

And that, again, another million dollars

under the CPIF part of the table was transferred to WSILF.  We don't see those similar uses of funds in the columns under the USAB loan, do we?

A.   I don't know.  Again, I don't -- I haven't read, again, this complaint in detail since before July of 2020, so I can't remember what's in it and then comparatively to the other complaint.  I just haven't done that, so I can't tell you.

Q.   Okay.  Are you aware of whether or not OIR was aware of the pledge of $3 million of the 5 million MLR on March 31, 2014 to USAB?

A.   I don't know what OIR was or was not aware of.  My recollection at this point in time was they were aware of it.  I don't remember what their position was with respect to it.

Q.   Okay.  So if I look at Count I on Page 14 of Exhibit 9, you allege "Aiding and Abetting Breach of Fiduciary Duty," right?

A.   One of the counts asserted in this complaint that was filed on Mr. Warren's behalf as liquidating trustee alleges aiding and abetting breach of fiduciary duty.

Q.   Right, but you drafted both the allegations in this count -- this complaint, as well as the allegations of aiding and abetting breach of

fiduciary duty in the complaint filed against CPIF by the residents committee, right?

A.   I reviewed and approved both complaints as they were filed with particularly my name on them or under my signature.  I don't recall who would have actually drafted a specific allegation.  It would have either been me or Mr. Johanson.

Q.   Right, but if we look at these allegations of what the -- you know, similarly in Paragraph 43 you say, "At all times" -- or you allege on behalf of your client, "At all times they occupied their respective positions, the Debtors' general and limited partners owed the Debtors and the residents of University Village multiple fiduciary duties." Almost identical if not the identical language as the prior complaint that you reviewed, right?

A.   I think so, yes.

Q.   Okay.

MR. WHITSON:  Off the record.

(Discussion was had off the record.)

BY MR. WHITSON:

Q.   Okay.  And then you list the examples in Paragraph 44.  "The Debtors' general and limited partners breached their fiduciary duties by, among other things and without limitation, entering into a

leveraged buyout transaction with CPIF and USAmeriBank," correct?

A.    That's what it says, yes.

Q.    All right.  And aren't these allegations essentially the same allegations you made in the complaint against CPIF or very similar?

A.    They may be similar.  I think there are allegations that are asserted in the complaint that we're looking at, which is Exhibit 9, that are specific to USAmeriBank, but they are similar, yes.

Q.    Okay.  And so in Paragraph 46 you say, "USAmeriBank substantially assisted or encouraged the foregoing breaches of fiduciary duties, among other things and without limitation," and you list them there, "Structuring, agreeing to, and facilitating the March 31, 2014 leveraged buyout."

When you drafted this, what evidence did you review to support the allegation that USAmeriBank had substantially assisted or encouraged by structuring this transaction?  Did USAmeriBank have any part in actually developing the structure?

MR. WARREN:  I'm going to have to violate my desire not to reference things, but aren't you getting pretty close to the attorney-client work product privilege?  Because Mr. Jennis was

my counsel at the time he prepared this complaint.  I'm just -- you know, maybe you can recharacterize the question or maybe I heard the question wrong, but I thought you were essentially seeking his mental impressions which would not be discoverable.

BY MR. WHITSON:

Q.   Right, that would be work product, but what I asked him was specifically not any conversations with Mr. Warren, but what evidence had you reviewed?

A.   My recollection of the question is what did I look at to make these allegations.

MR. WHITSON:  Did I say evidence or did I -- what did I say exactly?

(The question beginning on Page **, Line **, was read back as follows:  "When you drafted this, what evidence did you review to support the allegation that USAmeriBank had substantially assisted or encouraged by structuring this transaction?")

A.   Okay.

BY MR. WHITSON:

Q.   I think you can answer that question unless it's anything based on -- anything Mr. Warren

would tell you is in evidence, so I'm excluding communications with Mr. Warren.

MR. WARREN:  No, counsel's mental impressions formed based upon reviewing documents and records would be privileged.

MR. WHITSON:  Well, but the -- but those documents and records he reviewed in forming those mental impressions would not be privileged.

MR. WARREN:  They could be if they contributed to the formation of his mental impressions which would be privileged.  The documents themselves are not privileged, but the attorney's -- what the attorney thought was important or not important would be.

I'm not going to direct Mr. Jennis not to answer the question, but I just raise the concern that I -- you know, asking him questions about what he reviewed to assert the claims that he did I think is in the protected area.

MR. WHITSON:  Well, since we agree that whatever documents -- unless they were communications from the client -- that Mr. Jennis reviewed in terms of just -- I

presume from the allegations that I have read in this complaint that those would consist of membership transfer documents, the leveraged buyout transaction documents. None of that would be privileged.

So that's what I'm assuming Mr. Jennis looked at, but if you can tell me without disclosing any communications from Mr. Warren and without revealing any mental impressions -- although I'm not necessarily conceding that point, but just for the purpose of getting this question answered, what documents, what evidence you reviewed in making the allegations in Paragraph 46.

BY MR. WHITSON:

Q. Specifically what evidence did you review that USAmeriBank participated in structuring the leveraged buyout, if any? I mean, that certainly would not be privileged, so . . .

A. My recollection, as we sit here almost three years later, is that I reviewed loan documents, I reviewed closing statements, I reviewed what may have been e-mail correspondence that was available to me, I reviewed deposition transcripts of Mr. Bartle and Mr. Freidman and others, and

probably a number of other documents, including various lawsuits that had been filed outside of the bankruptcy court among third parties, and in particular my recollection is Mr. Bartle's deposition testimony in various proceedings, USAB documents, closing statements, CPIF documents, and probably a whole lot more.

But that's, I think, what I can recall sitting here today as the primary sources of information that I would have reviewed to prepare this complaint and plead out both the allegations here and in the CPIF complaint.

Q.   Okay.  Thank you.  Other than making the loan to WNT, what evidence of any actions of USAmeriBank did you review or rely upon to support the allegations in Paragraph 46?

A.   I can't recall again at this date, three years later, what specific documents I looked at, but I will tell you again, with the caveat that I'm not waiving work product immunity, I was left after reviewing all of those sources with the clear sense that the entire structure of the -- what I've referred to as the leveraged buyout was either at the request or the initiation of USAmeriBank, and I have a vague recollection of the sense that for some

reason USAmeriBank could not make a loan for whatever reason, I have no idea, capital requirements, regulatory requirements, no idea why that it couldn't make the loan to do the entire project, so it structured the portion of the loan that was on the health center side of it and that that structure was USAmeriBank's desired structure and then CPIF did the remainder of the loan. That is my recollection.

Q. All right. So then moving on to the -- I think civil conspiracy was actually dismissed.

MR. WARREN: That's out.

MR. WHITSON: Yeah.

BY MR. WHITSON:

Q. And deepening insolvency was also --

MR. WARREN: That's out.

MR. WHITSON: Yeah.

MR. WARREN: I'm just trying to help facilitate and go a little faster.

MR. WHITSON: No. No.

A. I just didn't know that they were --

MR. WARREN: I think that -- well . . .

THE WITNESS: Can we go off the record for a second?

MR. WHITSON: Sure.

(Discussion was had off the record.)

BY MR. WHITSON:

Q.    Okay.  So we're looking at Page 18 of the complaint, Exhibit 9, where in Paragraph 59 you set forth various badges of fraud associated with the March 30, 2014 -- I think it's March 31 -- I'm not sure when it actually occurred, the leveraged buyout transaction.  It says that "The leveraged buyout transaction benefited insiders; the Debtors did not receive reasonably equivalent value in exchange for the transactions; that they were insolvent and rendered insolvent by the transaction; and Debtors were grossly undercapitalized."

Again, nothing privileged, but what evidence did you look at in terms of analyzing whether or not the transaction benefited -- the USAB transaction benefited insiders as you laid out in that table in the prior paragraphs?

A.    I think all of those documents or source materials that I previously referred to that question would have been what I looked at or considered in making these allegations in Count IV on Page 19 and going forward.

Q.    And what about (b), "The Debtors did not receive reasonably equivalent value in exchange for

the transactions," in the sense that from what I saw in the table, the debtors received $14 million in payoff of the Horizon debt. Why wasn't that reasonably equivalent value from what you reviewed or analyzed?

A. I do not recall at this moment other than whether -- I don't believe it was a dollar-for-dollar exchange or -- I just don't remember.

Q. Okay.

A. And I remember that I was fairly convinced it was not reasonably equivalent based on the research and the work that I had done and what I reviewed. I can't remember today.

Q. I understand. And then (c), "The Debtors were insolvent at the time or rendered insolvent by the transaction." Again, what evidence or documents do you recall reviewing showing any evidence of solvency or insolvency on March 30, 2014?

A. I think what was sticking out in my head at that time was the fact that the refund queue or the amount of residents that had passed or moved out that wanted refunds, they weren't able to meet those expenses. I remember there being various cash flow issues that had been brought to my attention, but I

think it was -- it was the insolvency to the tune of 30-plus million dollars.  That's the number that sticks out in my mind as to the refund queue and the debtor was not able to -- the debtor was not able to pay any of those.  That was Sherman's constituency.

Q.   And that evidence you saw was as of March 31st or 30th of 2014 or at some later point?

A.   When did I see it?

Q.   Well, you're talking about a $30 million refund liability, for example.  You mentioned that phrase or that number.  At what point in time did you see any evidence that there was a $30 million refund liability?  Was it in 2014 or was it at some other point?

A.   My recollection is that as soon as I became involved with the ad hoc committee and familiar with the matter, that there was a very large refund queue on refunds that had been -- were due to be paid and they could not be paid.  I don't recall whether that was something I -- whether that's something I knew from the beginning as soon as I became involved.

I know it was an issue that had been raised based on one of my first preliminary meetings with the residents that ultimately became the ad hoc

committee.  They raised that to my attention.

Q.   And that was in the summer of 2015?

A.   I believe so, yes.

Q.   Okay.  Would that be the same answer for (d), "Debtors were grossly undercapitalized"?

A.   Yes, I believe so.

Q.   Okay.  All right.

MR. WHITSON:  Off the record for a moment.

(Discussion was had off the record.)

MR. WHITSON:  Well, with that reservation about --

MR. WARREN:  Why don't we put it on the record.  Mr. Whitson and I have an agreement, twofold.  Number one is that I on behalf of Bush Ross will have our systems searched for the period from the date the petition for Chapter 11 relief was filed by Westport Holdings Tampa until the date that the confirmation order was entered where I was appointed as the liquidating trustee to find any communications between myself and Mr. Jennis or people at Jennis Law.  And I will provide that to Mr. Whitson as soon as I can get it.

And once that's provided to Mr. Whitson,

you know, if he desires, I'm agreeable that we can continue to resume Mr. Jennis' deposition as to items that are reflected in that -- in those documents.

THE WITNESS:  Can I --

MR. WHITSON:  I have one more question to ask subsequently before we conclude.  I just thought of something I wanted to ask you.

MR. WARREN:  I'm sorry.  I regret that I opened my mouth.

MR. WHITSON:  No, nothing you said triggered that.

BY MR. WHITSON:

Q.   Okay.  Did you want to say something before I ask you this question?

A.   No.  I may want to talk to Mr. Warren about his search parameters, but, no.

Q.   Back on the record in terms of the deposition.

Were you present at any -- well, first of all I should ask, were there any meetings between Mr. Warren while he was examiner and your client or any of the residents at University Village, for a town hall-type meeting?

A.   Between Mr. Warren as examiner and my

client being the official resident committee?

Q. Yeah, or the ad hoc committee. I mean, there was the official committee before he was the examiner, so that makes sense.

A. Correct. So there would have been nothing on the ad hoc committee because he was not involved in the case at that time.

I could not tell you whether there were any meetings between the resident committee and Mr. Warren as examiner. I don't recall whether we had a meeting on site or -- it would have been on site or telephone to prepare for the mediation because Mr. Warren was mediator after he became examiner, and the committee was actively involved in the preparation for the mediation. I do not recall whether we had any separate pre- or post-mediation session. I just don't remember. And most of the -- my recollection is most of the committee members came to the mediation, I think.

MR. WARREN: Yeah.

A. It was in Sherman's office. So it would have been -- the answer to your question is -- I'm sorry, I rambled a bit. The answer to your question is I do not believe -- pre-examiner, I think the answer would be no. Post-examiner, potentially in

connection with mediation. Post-confirmation, probably. Almost certainly no as the committee as a group had been -- the committee as a committee had been, I think, dissolved through the confirmation order, and I do not know, but I believe Mr. Warren continued to have communication with some of the individual members who remained residents, but I would not have been involved certainly post July of '20.

BY MR. WHITSON:

Q. Okay. And the committee retained CR3 as its advisors, correct?

A. Correct.

Q. Did CR3 perform any insolvency analysis on Westport Nursing Tampa?

A. CR3 did quite a bit of analysis, okay, in connection with virtually all of the aspects of the case, and particularly their focus at the time I brought CR3 in as the financial advisor to the committee was primarily on the sale because Mr. Warren offered at the inception of the case. Scott Stichter and Charlie Postler told Judge Williamson, We've got a sale. Everybody can be paid off. Ignore anything that anyone wants to say about our clients because we've got a sale. Everybody

will be paid.

And CR3 was brought in because it did not appear from my initial review -- well, I think we had one buyer.  Soriano had a buyer -- Rob Soriano represented a buyer at the beginning that was going to take everybody out, and I think they pulled out, my recollection is, and the second buyer came in -- I believe we brought in CR3 in to make sure the second buyer was real, and that's where they did a lot of the analysis.

I don't recall whether CR3 did much analysis post-confirmation after Mr. Warren was appointed as liquidating agent, and my recollection was that Mr. Danner, who was my primary contact, had left and taken the job with CPIF's expert that everybody told me not to cross.  So that's -- I don't think they had much involvement in the post-confirmation analysis.

Q.   Okay.

MR. WHITSON:  All right.  Well, then we'll just reserve.  I'll wait to hear from you.

MR. WARREN:  Yeah, I'll let you know tomorrow.

MR. WHITSON:  Okay.  Thank you, Mr. Jennis.

THE WITNESS:  Thank you, Ed.

THE STENOGRAPHIC REPORTER:  Do you want a copy of the transcript?

MR. WHITSON:  Yes.

MR. WARREN:  And I'll take a copy.

THE STENOGRAPHIC REPORTER:  Great.

(Thereupon, the taking of the deposition was adjourned at 3:29 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA        )

COUNTY OF HILLSBOROUGH )

I, the undersigned authority, Tina M. Stuhr, RPR, CSR-HI, FPR, Notary Public, State of Florida, certify that DAVID SAMUEL JENNIS, ESQ., appeared before me on February 27, 2023 and was duly sworn.

Signed this 9th day of March, 2023.

_____

Tina M. Stuhr, RPR, CSR-HI, FPR

Notary Public, State of Florida

My Commission No. HH 153035

Expires:  07/12/2025

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH   )

          I, TINA M. STUHR, RPR, CSR-HI, FPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of DAVID SAMUEL JENNIS, pages 1 through 86; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

          I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

          DATED this 9th day of March, 2023.


          _____

          TINA M. STUHR, RPR, CSR-HI, FPR

March 9, 2023
David Samuel Jennis, Esq.
djennis@jennislaw.com

IN RE:   Westport Holdings Tampa, Limited
         Partnership; Case No. 8:16-bk-08167-MGW
         (February 27, 2023/David Samuel Jennis, Esq.
         Job No. 5788191)

The above-referenced transcript is now available for your review.

You should read the testimony to verify its accuracy.  If there are any changes, you should note those with the reason on the attached Errata Sheet.

You should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at transcripts-fl@veritext.com and copies will be emailed to all ordering parties.
It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If you fail to do so, the transcript may be used as if signed.

Yours,


Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

(In re:  Westport Holdings Tampa, Limited Partnership; Case No. 8:16-bk-08167-MGW)

(February 27, 2023/DAVID SAMUEL JENNIS, ESQ.)

E R R A T A   S H E E T

PAGE _____LINE_____CHANGE_____

_____

REASON _____

PAGE _____LINE_____CHANGE_____

_____

REASON _____

PAGE _____LINE_____CHANGE_____

_____

REASON _____

PAGE _____LINE_____CHANGE_____

_____

REASON _____

PAGE _____LINE_____CHANGE_____

_____

REASON _____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____  _____

     DAVID SAMUEL JENNIS, ESQ.              DATE

**[& - 5.6]**                                                    Page 90

**&**

**&**   5:25 56:9

**0**

**000585**   35:25
**07/12/2025**   86:17
**08167**   1:4,8 8:10 88:4 89:1
**08168**   1:6

**1**

**1**   1:20,20 3:12 8:21 18:4,5,8 40:7 42:10 55:11 58:15 59:16 61:1 64:3 64:5 87:9
**1,750,000**   48:4
**1.310**   88:25
**1.75**   54:23 64:6 68:15,20
**10**   53:8 67:12,14
**10407**   2:9
**11**   1:5 8:17 58:20 68:2 80:17
**11:15**   1:21 5:2
**11:50**   24:20
**11:52**   24:20
**11:59**   29:7
**12**   25:21
**12:30**   28:19
**13**   17:23
**14**   25:8 69:16 78:2

**14.4**   62:21
**144**   44:21 45:4
**15**   34:17 36:14 44:23 45:3 57:4 57:9 62:16,24 67:24
**153035**   86:16
**15th**   25:10
**16**   3:21 42:14 64:17
**17**   45:6 59:1 64:19
**18**   3:12,13,16 68:3 77:3
**19**   77:23
**1:30**   29:4
**1:36**   29:7

**2**

**2**   3:13 9:3 18:6 58:15
**20**   48:2 53:6,7 57:17 62:20,22 83:9
**200**   2:9
**2014**   54:14 61:24 63:23 66:8 67:2 69:11 71:16 77:6 78:19 79:7,13
**2015**   9:18 24:2 35:23,25 37:7,9 38:21 80:2
**2016**   6:16,19 8:24 9:10,13 12:13 17:17,24

44:23 45:3
**2017**   39:10 40:7 42:14 44:19,24 49:6
**2018**   24:2 25:8 43:18 64:17
**2020**   64:19 69:6
**2023**   1:21 86:9 86:11 87:19 88:1,5 89:2
**21**   3:17
**22**   4:4 6:16 8:23 52:7
**24**   3:18 53:9,10 57:18
**25**   3:19 63:23
**27**   1:21 9:10,12 17:17 46:7 53:11 86:9 88:5 89:2
**28**   46:4,18 47:9 47:14
**28753**   86:14 87:21

**3**

**3**   3:16 18:7,8,12 18:22 35:15 40:6 57:23 69:10
**30**   33:14 38:16 52:25 77:6 78:19 79:2,9,12 88:13,24
**300,000**   55:18

**30th**   79:7
**31**   54:14 61:24 66:8 67:1 69:11 71:16 77:6
**31st**   79:7
**32**   67:14
**32256**   2:10
**33601-3913**   2:4
**33602**   1:23 2:15
**34**   54:13
**35**   54:18 55:12 62:13
**36**   57:1,24 61:18
**37**   61:17,21 63:10
**39**   3:22
**3913**   2:3
**3:29**   1:21 85:8

**4**

**4**   3:17 21:7,8 63:3 66:12 68:5 68:6
**40**   63:22
**43**   70:9
**44**   70:23
**46**   71:11 74:14 75:16

**5**

**5**   3:4,18 24:15 24:17,19 57:7 62:3 65:22,23 69:11
**5.6**   54:21 62:14 62:20

**5/14/2018** 3:20
**52** 4:4
**53** 59:1
**54** 59:3,25
**55** 59:10 60:24
**55th** 25:15
**5788191** 88:5
**58** 61:14
**59** 77:4

**6**

**6** 3:19 25:5,6
**606** 1:23 2:15
**64** 4:5
**651** 11:9,16
   12:22 17:10
   23:2 50:2,4

**7**

**7** 3:22 39:4,7
   41:11 45:6
**713** 39:9
**745** 42:11,14,19
   42:22
**770** 44:20

**8**

**8** 4:4 39:9 44:19
   44:24 49:6
   51:24,25 52:5
**813.224.9255**
   2:4
**813.229.2800**
   2:16
**83** 17:25 18:24
**86** 3:5 87:9

**87** 3:6
**88** 3:7
**89** 1:20 3:8
**8:16** 1:4,6,8
   8:10 88:4 89:1

**9**

**9** 4:5 56:5 64:20
   64:21,24 66:4,7
   69:17 71:9 77:4
   88:1
**9,500,000** 54:19
**9.5** 62:2 67:21
   68:5
**9/27/16** 17:20
**904.224.4486**
   2:10
**99** 55:14
**9th** 86:11 87:19

**a**

**a.m.** 1:21 5:2
   24:20,20 29:7
**abbreviating**
   54:23
**abetting** 58:25
   69:17,21,25
**ability** 11:18
   14:20
**able** 13:17 27:6
   38:18 52:11
   78:23 79:4,4
**above** 46:7
   61:16 88:7
**access** 13:20
   14:8,14,24,25

   15:18
**accommodati...**
   16:19
**account** 46:15
**accrued** 62:22
**accuracy** 65:16
   88:9
**accurate** 46:17
**accurately**
   36:21
**acquire** 68:21
**acquired** 11:15
**acquisition** 64:8
**acronym** 29:17
   29:24 45:24
**action** 3:23
   19:22 20:16
   26:7,15 27:5
   28:6,14 31:3
   37:17 39:13,22
   40:3,9,12,13,14
   40:21 41:1,7
   42:5,24 58:3
   66:1 87:17,18
**actions** 44:9
   75:14
**active** 24:4
**actively** 82:14
**activity** 16:12
**actual** 26:4
   42:12 56:2
   62:22
**actually** 34:8
   40:1 41:5,14
   53:3 70:6 71:21

   76:11 77:7
**ad** 3:14 7:8 9:5
   9:14,21,25 10:3
   10:9 11:12
   17:15 18:6
   20:22 22:6,11
   26:6,10 28:2,7
   28:12 30:2 31:1
   49:19 79:16,25
   82:2,6
**adams** 21:22
**addition** 22:11
**additional** 22:6
**addressed** 45:21
**adjourned** 85:8
**administered**
   1:7 15:20
**administrative**
   37:17
**adversary** 8:10
   58:17
**advisor** 83:19
**advisors** 66:24
   83:12
**affected** 37:19
**affiliate** 46:20
**affiliates** 31:22
   55:22
**affirm** 5:6
**age** 14:20
**agent** 84:13
**agents** 64:2
**aggressively**
   38:4

**aging** 13:15 15:10
**ago** 20:2 25:14 51:20 57:18
**agree** 27:25 47:24 64:10 73:22
**agreeable** 81:1
**agreed** 6:25
**agreeing** 71:15
**agreement** 46:11 53:13 80:13
**ahca** 51:12
**ahead** 18:3 25:19 29:2 39:15
**aiding** 58:24 69:17,21,25
**alf** 13:23 14:8 14:14,24 15:15 16:24 56:7,14
**allegation** 46:18 47:25 58:24 60:6 68:11,19 68:23 70:6 71:18 72:19
**allegations** 39:19 47:18 48:21 50:8 63:6 67:8 69:24,25 70:8 71:4,5,8 72:13 74:1,13 75:11,16 77:22

**allege** 55:19 58:16 59:4 60:13 61:17 66:16 69:17 70:10
**alleged** 66:18
**alleges** 55:19 66:17 69:21
**alleging** 57:24 63:8
**allowed** 34:14
**allowing** 59:16 60:25
**alternatively** 58:21
**amended** 4:4,5 18:17 52:6 63:25 64:25 65:19,21
**amendment** 46:5 64:1,5
**amount** 48:10 48:11 53:7 67:20,20,23 68:3 78:22
**amounting** 38:16
**amounts** 13:24 32:8 33:1 62:1
**ampersand** 56:10
**analysis** 83:14 83:16 84:10,12 84:18

**analyzed** 40:11 78:5
**analyzing** 77:15
**answer** 10:24 14:13 16:7 23:11 37:24 51:20 53:22 72:24 73:17 80:4 82:22,23 82:25
**answered** 26:1 74:12
**answering** 23:13 48:20
**anybody** 54:2
**anyway** 60:14
**apartment** 13:9
**apologize** 18:13
**apparently** 32:25
**appear** 21:14 84:3
**appearance** 3:13 9:4 17:17 17:20 18:2,6
**appearances** 2:1
**appeared** 86:9
**appears** 8:25 9:11 18:23 19:4 58:6 65:7 68:1
**appoint** 33:19 58:19
**appointed** 7:5 9:23 10:1 21:18 21:25 22:14,16

22:17 30:3 37:10 43:12 44:6,22 45:2,3 56:18 80:20 84:13
**appointment** 3:17 19:23 21:12,15 27:9 27:13,17,22 28:8 41:25 42:3 42:7,9 43:5
**approval** 59:23
**approved** 70:3
**approximately** 53:5 57:17 62:20 63:3,23 64:15
**area** 16:11 73:21
**arguing** 42:7
**asked** 10:4 22:5 22:12,20,21 31:1 42:3 72:9
**asking** 12:19 15:22 31:12 73:18
**aspect** 14:18
**aspects** 83:17
**assert** 60:14 73:19
**asserted** 40:15 69:19 71:8
**assistance** 61:14
**assisted** 13:21 13:22 15:16

17:6 71:12,19 72:20
**assisting** 14:3
**associated** 77:5
**association** 26:16 29:18,23
**assuming** 74:6
**attached** 3:21 19:3 41:4,6,10 41:16 45:9 46:4 88:9
**attend** 26:11
**attended** 24:25
**attention** 15:14 33:17 78:25 80:1
**attorney** 10:8 19:13 34:2 35:4 65:8 71:24 73:14 87:14,16 88:11
**attorney's** 73:14
**attorneys** 26:20
**august** 6:16,19 9:18 24:2 63:23
**authored** 65:4
**authority** 3:23 39:12 42:12,24 59:23 86:6
**authorize** 18:25
**authorized** 87:7
**authorizing** 59:15 60:25
**availability** 27:7

**available** 49:25 74:24 88:7
**aware** 20:23 30:5 49:6,13,13 49:20 69:9,10 69:12,14
**awareness** 49:15
**awkward** 7:12

**b**

**b** 77:24
**back** 10:19 24:21 26:1 29:10 35:9 37:12 39:2 40:22 46:3 49:3 52:17,20 53:3 55:12 59:25 67:17 72:17 81:18
**background** 10:15
**backlog** 33:7
**badges** 77:5
**bank** 1:14,19 46:1
**bankcorp** 1:15
**bankruptcy** 1:1 8:9,18 17:21 18:24 19:25 20:17,20 23:19 26:2 34:3 36:2 39:9 75:3
**bartle** 31:16,23 31:23 45:14

55:21 59:16 60:25 64:2,5 68:13,21 74:25
**bartle's** 63:25 64:7 75:4
**based** 60:6,19 63:9 72:25 73:4 78:12 79:24
**basis** 15:19 17:7
**bates** 22:12
**bears** 18:22
**began** 5:1
**beginning** 52:19 72:16 79:21 84:5
**behalf** 1:19 2:2 2:7,13 53:15 58:7 59:4 66:1 69:20 70:10 80:14
**belabor** 64:13
**belief** 60:20 66:8
**beliefs** 50:6
**believe** 14:21 16:25 17:8 18:1 19:22 23:1,5 25:12 26:19 27:21 30:22,23 31:20 32:11 33:4 34:11,14 34:17 35:5,8 36:3,12,13,14 37:4,16 39:25 40:23,25 41:21

41:22 42:4,6,8 42:10 43:21 44:21 45:19,25 48:6 49:15 50:3 50:20 51:5,12 53:21 54:3 56:1 56:16 61:9,10 65:4 67:5,22 78:7 80:3,6 82:24 83:5 84:8
**believed** 11:14 11:16 40:15 44:8 49:24 51:4 60:18 63:14
**benefit** 13:14 68:14
**benefited** 77:9 77:16,17
**bennett** 30:23
**best** 62:7
**better** 23:8 27:22
**birthday** 25:15
**bit** 8:13,22 10:15 11:3 14:13 82:23 83:16
**bk** 1:4,6,8 8:10 88:4 89:1
**boards** 55:20
**bought** 33:16
**bowen** 6:1 36:14 37:4
**box** 2:3

**breach** 58:25
61:12 69:17,22
69:25
**breached** 59:10
70:24
**breaches** 61:16
71:13
**break** 10:14
25:21 28:18
29:1,3,3
**breakdown**
54:18
**breakout** 61:25
**bridges** 64:9
68:22
**briefly** 10:21
**brigadier** 22:19
**bring** 58:17
**broke** 29:13
**broken** 31:16
**brought** 53:21
54:9 78:25
83:19 84:2,8
**bush** 2:3 80:15
**bushross.com**
2:6
**business** 5:22
6:18
**buyer** 84:4,4,5,7
84:9
**buyout** 53:1
54:14 59:13
60:24 61:23
63:15,24 66:15
67:11,16 71:1

71:16 74:4,18
75:23 77:7,8
**bvm** 46:7,23
53:21 63:25
64:2,9,9

**c**

**c** 29:24 53:1
59:20 66:13
78:15
**ca** 35:25
**calculate** 35:1
**call** 7:21,22 13:1
13:4 16:23
20:10 23:8 26:6
26:14 30:14
36:12 48:12,13
**called** 14:23
21:21 27:5 48:2
66:24
**campus** 15:5,6
15:12 30:16,17
31:17 38:9
**capacity** 7:3,18
67:4
**capital** 38:1
45:12 46:8,10
46:16 47:4,20
48:2,5,15 50:10
50:14,25 51:3
54:25 59:17
61:1 64:3,6
68:18 76:2
**caps** 55:7
**care** 3:13 9:5,14
10:11,13,18

11:2,8,15,23,25
12:1,7,8,25,25
13:2,3,7,8,14
14:3,6,19,19
15:2,4,13,20,24
16:5,21,25 17:4
17:9,12 20:8
23:3 26:16 27:6
27:8 29:17,23
33:11 34:15
37:15 38:2,5,6
38:10,19 46:22
53:13,18,20,23
**carefully** 63:8
**case** 1:4,6,8 3:12
7:19,21,23 8:9
8:10,11,12 9:25
10:20 11:6
17:21 19:7,25
20:18,20,25
21:3 26:2,3,4
34:3 35:3,6,17
35:21,23,24,25
39:9 40:25
41:12,24 43:13
82:7 83:18,21
88:4 89:1
**cases** 18:24
**cash** 32:23
78:24
**castor** 21:22
22:13
**causes** 3:23
39:12,22 40:9
40:11,13,14,21

41:1,7 42:5,24
44:9 66:1
**caveat** 75:19
**ccrc** 11:9 12:12
15:10,25 20:7
23:4 32:10 34:3
36:25
**ccrcs** 67:9
**celebratory**
3:20 25:9
**center** 16:23
30:14,14 31:8
32:5,5,9,23
36:22 55:24
56:4 76:6
**centurion** 2:9
**certain** 39:22
40:9
**certainly** 20:14
60:18 74:18
83:2,8
**certificate** 3:5,6
23:21 25:11
86:1 87:1
**certify** 86:8 87:7
87:13
**chair** 22:18
**change** 14:1
62:3 89:4,7,10
89:13,16
**changed** 60:20
**changes** 88:9
**chapter** 1:5 8:17
11:9 23:2 58:20
80:17

**characterization** 37:2 49:11
**characterize** 8:6
**charlie** 40:23 83:22
**chart** 68:2
**check** 34:21 55:3
**circuit** 19:10,11 35:7
**civil** 76:11 88:24 88:24
**claim** 4:4 52:7
**claims** 10:20 11:6 40:11 73:20
**clarifying** 51:21
**clear** 7:2,13 8:7 20:12 60:12 75:21
**clearly** 27:18
**client** 10:8 20:22 45:19 59:4 70:11 71:24 73:24 81:22 82:1
**clients** 83:25
**climbed** 38:16
**close** 15:21 42:21 62:16 71:24
**closed** 48:4
**closer** 36:5
**closing** 54:19 74:22 75:6

**code** 8:18
**coincidence** 50:8
**collateral** 45:19 47:1
**collect** 56:24
**collectively** 40:13
**colloquially** 56:3
**columns** 69:3
**come** 7:24 46:3
**commenced** 17:21 19:8 61:4
**commend** 47:9
**commendation** 3:18 23:22,24 25:11
**commission** 86:16
**committee** 3:14 3:17,22 7:9,10 9:5,14,20,21,21 9:24 10:1,2,3,5 10:9,25 11:12 17:16 18:6 20:23 21:12,15 21:16,18 22:1,5 22:7,11,18,22 23:6,17,20 24:5 24:8,12 26:6 28:3,7,12 30:2,4 31:1 32:18 39:11 40:3,8,10 40:12,14 41:12

49:20 52:8,21 55:19 58:7,10 58:16,19,23 64:16 66:17 70:2 79:16 80:1 82:1,2,3,6,9,14 82:18 83:2,3,3 83:11,20
**committee's** 24:10 26:10 44:1 45:10
**committees** 22:9 22:24 23:5,8,11
**common** 16:10 16:11
**commonly** 64:8
**communicate** 54:1
**communicated** 32:2 49:14 53:25
**communication** 7:8 26:22 83:6
**communicatio...** 7:2,16 33:21 36:16 53:17,23 54:8 73:2,24 74:8 80:21
**communities** 23:3 64:8
**community** 10:12 12:2 13:1 13:7 14:4,20 16:2,6 20:8 22:8 22:10,25 24:1

28:9 46:22 68:22,23
**company** 63:25
**comparatively** 69:7
**comparison** 57:5 67:12,19
**complaint** 4:4,5 40:1 41:4,5,14 41:20 43:20,22 43:23 44:1,15 45:9,22 46:4 47:19 48:22 52:6 55:4 57:16 57:21,24 58:2 58:13 61:7,8 64:14,16,18,25 65:11,20 66:17 66:18,19 68:19 69:5,7,20,24 70:1,16 71:6,8 72:2 74:2 75:11 75:12 77:4
**complaints** 70:3
**completed** 19:24 88:13
**completion** 65:11
**components** 16:5
**conceding** 74:10
**concept** 15:9,25 17:12
**concern** 11:21 15:2 30:18 33:9

33:17 34:15
36:19 45:20,23
49:4 50:13,16
50:24 51:2,6
73:18
**concerned**
11:12 30:13
31:7 32:3 36:21
38:9 46:19
49:22
**concerning**
51:11
**concerns** 27:5
30:11 31:9 32:2
34:12 45:17,18
46:24 51:16
**conclude** 81:7
**concluded**
19:24
**conclusion**
23:18
**condemnation**
23:21
**condition** 50:8
**conditions**
38:11 59:14
**confirmation**
23:19 80:19
83:1,4 84:12,18
**confirmed**
43:17
**conflicted** 40:24
**confused** 20:9
51:19

**congratulations**
25:16
**connected** 87:16
**connection** 6:22
7:18 8:8 19:14
40:16 47:2
48:12,18 49:17
53:19 61:11
83:1,17
**consequences**
32:20 33:6
**considered**
11:13 77:22
88:14
**consist** 74:2
**conspiracy**
76:11
**constituency**
79:5
**contact** 34:6
84:14
**contacted** 30:11
33:25 34:5
**contemplated**
17:5,8
**contemplates**
23:4
**context** 21:5
43:10
**continue** 11:18
11:24 24:9
34:14 81:2
**continued** 4:1
12:6 83:6

**continuing**
10:11 12:1,25
13:6 14:18,19
16:5 20:8 23:3
27:6 46:21
**continuity** 12:4
12:6 15:2,4
**contract** 11:16
12:9,25 13:2,3,8
14:6 15:25 17:3
17:6
**contracted**
11:25 27:7
**contracts** 10:13
10:18 11:2,8,20
11:23 12:1
13:15 16:21
17:1,4,9,12 27:9
33:11 34:15
37:15 38:2,5,6
38:19
**contractual**
12:17
**contributed**
32:9 73:11
**control** 56:23
**controlled**
66:21
**conversation**
30:7
**conversations**
27:1 29:20
34:18 72:10
**conveyed** 12:8

**conviction**
63:10
**convinced** 78:11
**copies** 17:25
88:11
**copy** 8:20 18:14
21:10 24:13
42:12,25 52:1
85:3,5
**coral** 64:9 68:22
68:23
**corporation**
1:15 56:6
**correct** 6:13,23
6:24,25 7:10 8:7
8:24 9:8 15:5,21
17:17 18:18
19:21 22:25
29:19 36:2,20
43:21 44:5,12
45:7 52:8,22
56:17 60:17
61:19,20 63:5
63:21 65:14,17
65:17,18 66:6
66:15 67:13,21
67:22,24 68:23
71:2 82:5 83:12
83:13
**correctly** 36:9
**correspondence**
74:23
**counsel** 3:13 7:8
9:4 17:14,15
30:21 39:22

42:4 72:1 87:14
87:16
**counsel's** 73:3
**count** 58:24
69:16,24 77:22
**counts** 58:24
69:19
**county** 19:11
20:16 26:8 35:7
86:4 87:4
**court** 1:1 19:10
35:7 37:14 75:3
**court's** 58:18
**cpif** 43:20,23
45:11,14 46:7
47:5,22 48:4,5,6
48:16 52:9,22
54:15,16,16,19
54:23 57:6,8
58:23 59:13
60:24 61:10,12
61:15 62:2,2,4
62:12 63:3,12
63:24 64:1,16
67:12,15,19,20
68:5,15,16 69:1
70:1 71:1,6 75:6
75:12 76:8
**cpif's** 84:15
**cr3** 83:11,14,16
83:19 84:2,8,11
**created** 6:17
32:23 33:7,8,8
**credit** 64:7

**creditors** 3:17
3:23 9:24 10:3
21:12,15 22:1
23:21 39:11
41:13 52:8,22
58:8,19 64:17
**cross** 22:14
53:19 84:16
**csr** 1:25 86:7,15
87:6,23
**current** 6:10,10
6:14 27:23
31:15,22
**cut** 36:23

**d**

**d** 3:1 4:1 55:17
80:5
**damage** 46:14
**danner** 84:14
**date** 6:9,14,16
7:4 8:14 33:20
34:16,21 36:5
75:17 80:16,18
88:10 89:24
**dated** 25:8
87:19
**dates** 8:2 24:1
37:3 43:11
**david** 1:18 3:3
5:12,19,21 6:6
21:19,21 86:8
87:9 88:2,5 89:2
89:24
**day** 25:15 64:15
86:11 87:19

**days** 43:1 88:13
**dba** 6:7 19:7
20:4 35:20
**deal** 38:5
**debt** 54:23
57:10 61:23
62:4,15,17,19
63:2,3,4,17,20
64:7 68:7 78:3
**debtor** 40:3
41:2 79:4,4
**debtor's** 39:21
42:4
**debtors** 1:7 40:8
40:9,15,16
54:14,20 59:5,6
59:14,16,21
60:1,13,16 61:1
61:22 63:15,24
64:3,6 66:2
68:17 70:12,13
70:23 77:9,12
77:24 78:2,15
80:5
**deceased** 33:15
**declare** 89:20
**dedicated** 47:10
48:23
**deduct** 62:20
**deed** 53:13
57:12
**deepening**
76:15
**defendant** 1:17
1:19 2:7

**defendant's**
3:10 4:2 18:8
21:8 24:19 25:6
39:4 51:25
64:21
**deferred** 38:12
**define** 48:1
**defined** 48:3
49:1 55:3,5
**defines** 48:3
**definition** 55:6
**delinquency**
27:4 37:9 61:3
**delivered** 54:15
**demand** 39:21
39:25 40:7
58:12
**demanded** 40:2
40:3 53:12
**denis** 21:22
22:14,15
**departed** 33:15
**department**
19:9,15 35:18
**depending** 13:7
14:1
**deposing** 88:11
**deposit** 13:4
**deposition** 1:18
6:20,22 18:12
21:7 24:18 25:5
39:7 41:11 52:5
64:24 74:24
75:5 81:2,19
85:7 87:8

**deposits** 38:7

**derivative** 3:23 39:12 41:17,21 41:22 42:2,11 42:23 43:16 58:2,9,10,14

**describe** 10:21 12:10,14 26:25 39:17 56:5 66:3

**described** 14:7 50:15 61:16

**describes** 54:16

**describing** 53:4

**description** 62:11

**designated** 56:6 56:10

**desire** 71:23

**desired** 76:7

**desires** 81:1

**detail** 47:13 49:21 69:5

**deteriorating** 38:11

**determined** 48:8

**developing** 8:12 71:21

**dfs** 19:22 27:5 27:10 28:6,13 34:10,24 37:17 61:4

**different** 10:19 17:1 42:16 47:7 47:10 48:17,22

**differently** 7:11

**dillworth** 56:20

**dining** 16:10

**dinner** 3:20 25:9,10,12,14 35:15

**direct** 3:4 5:15 39:25 58:3 60:14 73:16

**directed** 39:18

**director** 30:22

**directors** 55:21

**directs** 42:25

**disbursed** 54:21 54:24 62:12 63:3 68:17

**disclosing** 74:8

**discoverable** 72:6

**discovery** 43:10

**discuss** 7:24 27:20

**discussed** 7:15

**discussion** 11:5 25:23 39:1 70:20 77:1 80:9

**discussions** 6:21 29:14 60:8

**dismiss** 18:17 19:12,18

**dismissal** 19:4 19:17

**dismissed** 19:19 76:11

**dissolved** 83:4

**distributed** 55:16

**district** 1:1

**divested** 30:15

**division** 1:2

**divulging** 10:7

**djennis** 88:2

**docket** 3:12 8:20 9:1 17:24 18:3,5,24 39:9 42:11,14,16,22 44:13,17,20,21 44:25 45:4

**document** 19:2 23:12,15 25:2 39:8 40:2 46:6 47:3,6 48:6 50:15 52:6 65:1 89:20

**documents** 6:22 47:5,22 60:7 64:1 73:5,7,13 73:23 74:3,4,12 74:22 75:1,6,6 75:18 77:19 78:17 81:4

**doing** 6:18 36:20 63:5 68:9

**dollar** 78:8,8

**dollars** 45:12 57:7,7 68:20,25 79:2

**domain** 6:3,8,12 6:15,17

**domestic** 1:15

**dorsey** 34:22

**doubt** 60:22

**doug** 54:5

**dr** 25:13 32:17 33:5 34:7

**draft** 40:1 41:4 41:5 45:9

**drafted** 47:20 61:9 69:23 70:6 71:17 72:18

**drew** 56:19

**drilling** 14:12

**due** 27:8 79:19

**duly** 5:13 86:9

**duration** 24:10

**duties** 59:8,10 60:2,3,5 61:16 70:14,24 71:13

**duty** 58:25 60:10 61:13 69:18,22 70:1

e

**e** 3:1,19,21 4:1 6:15 7:6 25:8 30:24 34:1,20 35:15,19 56:5 74:23 88:24,25 89:3,3,3

**earlier** 9:17 22:4 26:9 36:6 43:16 49:7 55:4 57:3,16 58:21 61:6 67:10,17

**early** 10:19 43:12

**east** 1:23

**economic** 32:10 32:19 33:6

**ed** 32:21 85:1

**edmund** 2:11

**efforts** 19:15

**either** 7:16 8:3 17:6 20:5 33:10 33:15,25 36:13 38:13,18 40:1 42:7 56:1 65:4 67:5 70:7 75:23

**electronic** 18:22

**electronically** 65:7

**element** 14:5,19 15:11

**email** 88:11

**emailed** 88:12

**emerged** 61:22

**employed** 5:20 5:24,25 6:2

**employee** 87:14 87:15

**employees** 26:20

**enable** 64:5

**encouraged** 71:12,19 72:20

**engaged** 9:13 43:18,19

**enhancement** 64:7

**enter** 13:2,11

**entered** 11:25 12:14 26:2 80:19

**entering** 12:16 12:24 59:12 60:23 70:25

**enters** 12:11

**entire** 32:5,10 36:25 46:20 75:22 76:4

**entities** 55:17 56:18,20 60:9 66:21 68:13

**entitle** 16:22

**entitled** 33:11 39:11 52:6 53:1

**entity** 6:2,5,6,6 29:20,22 31:18 31:20,21 37:21 56:23 66:24

**entry** 13:4 38:7

**equity** 55:14

**equivalent** 77:10,25 78:4 78:12

**eric** 30:21 33:24

**erik** 65:8

**errata** 3:8 88:9 88:10,13

**esq** 1:18 2:5,11 2:17 3:3 5:12 86:8 88:2,5 89:2 89:24

**essentially** 53:9 71:5 72:5

**established** 46:16 47:4,21

**estates** 3:24 39:13 40:9 66:2

**etlinger** 1:22 2:14 5:22 6:7

**event** 37:13,14 68:16

**events** 41:23

**everybody** 29:5 83:23,25 84:6 84:16

**evidence** 32:15 71:17 72:10,14 72:18 73:1 74:13,16 75:14 77:15 78:17,18 79:6,12

**ewhitson** 2:12

**ex** 10:5 22:3,13 22:20 23:7,14 35:17

**exactly** 72:15

**examination** 3:2 3:4 5:15

**examined** 5:13

**examiner** 7:3 8:3 41:25 42:9 43:12,15 44:21 44:22 45:2,3 58:22 81:22,25 82:4,10,14,24 82:25

**example** 11:5 16:6 39:21 79:10

**examples** 32:14 32:19 33:5 70:22

**exchange** 55:14 77:10,25 78:8

**excluding** 73:1

**executed** 46:6 54:15

**executive** 30:22

**exhibit** 3:12,13 3:16,17,18,19 3:22 4:4,5 8:21 9:3 18:3,4,5,6,7 18:12,22 21:7,8 24:14,17,19 25:5,6 26:8 35:9 35:13,15 39:4,7 41:10,11 42:10 45:6 51:25 52:5 64:21,24 69:17 71:9 77:4

**exhibits** 3:10 4:2 18:8

**exist** 8:2

**existence** 24:10

**expand** 44:20 58:21

**expectations** 14:6

**expected** 51:8

**expenditure** 45:12 46:9

47:21 48:2,5,15 50:14

**expenditures** 46:10,17 50:11 50:25 51:3

**expenses** 78:24

**expert** 84:15

**expires** 86:17

**explanation** 46:8

**expressed** 30:18 31:14 33:17,22

**extended** 36:16

**extreme** 30:18

**f**

**f** 29:24 56:5,9

**facilitate** 76:19

**facilitated** 61:15

**facilitating** 71:16

**facility** 13:12,17 13:21,22,23 14:9 15:16,18 16:24 17:7 32:6 32:7 38:12 56:3 56:15

**fact** 25:4 38:12 78:21

**facts** 89:20

**factual** 39:19

**fades** 44:3

**fail** 88:16

**fair** 8:6 14:17 36:25 37:2,22 50:7 51:1,2

56:15 62:5,25 63:4 68:4

**fairly** 43:12 78:11

**familiar** 39:14 64:25 65:3 79:17

**familiarity** 39:17

**far** 57:25

**faster** 76:19

**favorable** 59:14

**february** 1:21 86:9 88:5 89:2

**federal** 88:14,24

**fee** 14:1

**feel** 60:12

**felt** 46:14

**fiduciary** 58:25 59:8 60:2,3,5,10 60:15 61:12,16 69:18,22 70:1 70:14,24 71:13

**fifth** 18:17 19:5

**file** 20:17 23:12 58:1,2

**filed** 8:17 9:10 17:16,18,19,24 18:18,23,25 19:5,12 20:20 28:13 36:8 39:8 39:19 40:5 41:14,20 42:2 44:16,23 45:1,5 47:20 49:5 52:7

52:20 58:6,12 61:10 64:14,16 64:18,18 65:15 65:20,20 69:20 70:1,4 75:2 80:17

**filing** 3:16 17:24 18:16,21,25 19:3,17,18,24 19:25 20:15 21:4 26:4 35:9 35:16 36:2,5

**filings** 28:10

**finance** 32:18

**financed** 64:7

**financial** 19:9 19:15 35:18 83:19

**financially** 87:17

**financing** 46:1 48:13 49:17

**find** 42:20 80:20

**fine** 29:6

**firm** 6:10,14,17 7:16 9:8,16 17:15,18,19,19 23:25 28:12 39:23,24 40:24 43:18 44:8 63:10 65:9

**firm's** 8:1,2

**first** 5:13 11:11 15:19 26:2 33:23 46:5

49:20 59:22 64:1,4 65:21 79:24 81:20

**five** 28:22

**fl** 88:11

**flcra** 26:17 29:24 30:4,8,11 30:20 31:13,14 31:14 32:3,12 33:16,21

**flcra's** 30:20

**flip** 52:10

**floor** 16:9

**flores** 54:3,8

**florida** 1:1,23 2:4,10,15 11:9 19:8 20:17 23:3 26:8,16 29:16 29:23 35:17,19 56:6 86:3,8,16 87:3 88:14,24

**flow** 78:24

**focus** 8:8 83:18

**focused** 51:10

**following** 5:1 66:11

**follows** 5:14 52:20 54:21 66:10 72:17

**foreclosure** 57:13

**foregoing** 61:15 71:13 87:8 89:20

**foremost** 11:11
**forgotten** 52:17
**form** 17:3
**format** 11:9
**formation** 10:9
  10:25 73:11
**formed** 11:12
  22:5,24 73:4
**forming** 73:7
**forms** 17:1
**forth** 10:19 77:5
**forum** 25:2
**forward** 36:17
  77:23
**fpr** 1:25 86:7,15
  87:6,23
**frame** 27:2
**fraud** 77:5
**free** 61:2 68:21
**freidman** 31:24
  74:25
**freudian** 23:23
**front** 34:21
**full** 5:17 56:23
**fund** 50:21 64:7
  68:17
**funded** 37:25
**funding** 32:4
**funds** 32:8 33:3
  69:2
**further** 87:13

**g**

**general** 22:19
  22:20 30:10,21
  50:13,15 51:17

59:6,21,25
60:13,15 66:22
67:1,8,15 70:12
70:23
**generally** 27:3
  39:16,20 50:24
  54:1 65:2
**gentleman**
  30:21,22
**getting** 42:21
  71:24 74:11
**give** 5:7 35:8
  65:5
**given** 8:2 18:21
  34:3 50:7 68:20
**giving** 12:20
  25:1
**go** 15:15 18:3
  24:21 25:18
  26:1 29:2,10
  31:2 35:10
  39:15 66:3 67:8
  76:19,23
**goals** 12:15
  25:25
**goes** 29:23
  67:17
**going** 5:5 7:6,23
  10:22 18:2 21:2
  28:22 36:17
  48:12 49:3
  55:11 71:22
  73:16 77:23
  84:5

**governs** 23:2
**granted** 9:20,21
  19:21 41:21
  42:14 58:9,10
  58:14
**granting** 42:11
  42:22,23 44:20
  58:18
**great** 38:5 85:6
**grossly** 77:13
  80:5
**ground** 19:5
**group** 31:15,23
  34:9 37:25
  45:15 46:23
  53:21 83:3
**guarantee** 17:11
**guaranteed**
  13:20 14:8,14
  14:24,25 17:11
**guess** 6:10 16:15
  24:15 37:11
  52:16 61:15
  68:6
**guys** 27:1

**h**

**h** 34:1 89:3
**hall** 81:24
**hand** 5:4
**handled** 35:3
**handling** 36:17
**happened** 37:11
  57:6
**happens** 37:8

**happy** 43:8
**head** 78:20
**health** 16:23
  30:13,14 31:8
  32:5 36:22
  55:24 56:4 76:6
**hear** 84:21
**heard** 72:3
**hearing** 26:11
  34:21 35:2 37:5
**hearings** 28:5
  31:2 37:11
**heightened**
  14:15
**held** 48:5 54:23
  56:13,14 68:16
**help** 8:22 42:20
  43:8 48:19
  50:21 76:18
**helping** 37:3
**henry** 21:21
**hh** 86:16
**hi** 1:25 86:7,15
  87:6,23
**hillsborough**
  86:4 87:4
**hired** 53:13
**historically** 33:1
**hoc** 3:14 7:8 9:5
  9:14,21,25 10:3
  10:9 11:12
  17:15 18:6
  20:22 22:6,11
  26:6,10 28:2,7
  28:12 30:2 31:1

49:19 79:16,25 82:2,6
**holders** 55:14
**holdings** 1:4,6 1:10,11 7:20 8:9 8:15,16 12:12 18:24 19:6,10 19:13 20:4 32:24 33:2 35:20 37:20 39:8 80:18 88:4 89:1
**homes** 11:14,17 11:17
**honestly** 68:8
**hopelessly** 40:24
**horizon** 53:4,5 53:11 54:22,22 57:6,8,9,11,14 62:4,14,15,17 62:19,23 63:2,4 68:7 78:3
**housing** 16:14

**i**

**idea** 20:19 76:2 76:3
**identical** 17:3 70:15,15
**identifiable** 25:17
**identification** 8:21
**identified** 25:12 25:17 26:8

29:15 40:10,12
**identifies** 9:7
**identify** 19:2 21:13 40:25
**identifying** 23:14
**ied** 13:4,6
**ieds** 67:9
**ignore** 83:24
**ii** 1:6,11 8:16 66:5,10,15,20 66:22
**iii** 2:11
**ij** 21:21 22:17
**ilf** 13:14 15:13 37:19 46:10,14 46:17 47:11,23 48:23 50:9,11 51:1,4,11,21 55:1,3
**immunity** 75:20
**impact** 27:9,12 27:17
**impacted** 51:17
**impacts** 27:19
**important** 14:18 14:21 15:3,7 16:2 21:5 73:15 73:15
**imprecise** 16:13
**impressions** 72:5 73:4,8,12 74:9
**improvement** 54:25 59:17

61:1 64:4,6 68:18
**improvements** 38:1
**inception** 83:21
**include** 58:24
**included** 14:23 40:12
**including** 24:25 30:25 32:6 34:6 75:1
**independent** 13:12,16 14:2 16:15 32:7 51:14
**independently** 13:18,20 14:16 15:15
**indicate** 42:16
**individual** 83:7
**individualized** 50:5
**information** 25:17 34:4 66:8 75:10
**initial** 13:4 24:7 33:9 36:12,15 36:15 38:7 84:3
**initially** 11:12 13:11
**initiation** 75:24
**insider** 40:13
**insiders** 77:9,17
**insolvency** 76:15 78:19

79:1 83:14
**insolvent** 77:11 77:12 78:16,16
**install** 55:21
**insurance** 26:13 51:15
**intake** 36:15
**interact** 26:18
**interacted** 14:22 26:12,15 54:3
**interchangeably** 20:11
**interest** 20:22 31:19 40:17 46:23 61:2 62:23 68:21
**interested** 87:17
**interests** 10:10 10:16 11:1,4,8 31:17,21 55:15
**interfacing** 51:13
**interim** 58:18
**interject** 43:7
**intricate** 31:25
**involved** 26:14 36:4,7,8 65:10 79:16,22 82:6 82:14 83:8
**involvement** 8:3 23:18 84:17
**irwin** 21:20,21
**issue** 12:5,6,7 20:9 30:20 79:23

**issued** 23:21
**issues** 15:1
30:12,19 33:18
38:10 51:11
78:25
**items** 81:3
**iv** 77:23

**j**

**j** 21:20,21
**jacksonville**
2:10 34:2
**jean** 21:19
**jeanette** 54:5
**jeff** 29:3
**jeffrey** 1:9 2:5
7:3
**jennis** 1:18,22
2:14 3:3,18 5:3
5:12,19,21,22
5:25 6:7,7 9:8
17:18 18:12
24:18 29:13
39:6 43:18 52:4
64:23 71:25
73:16,25 74:6
80:22,22 81:2
84:25 86:8 87:9
88:2,5 89:2,24
**jennislaw.com**
2:17 6:3,11,15
88:2
**jennislaw.com.**
6:8
**jersey** 1:15

**job** 84:15 88:5
**johanson** 65:8
70:7
**johanson's**
65:13
**john** 45:14
**johnson** 21:22
22:14,15
**join** 10:4
**joint** 65:21
**jointly** 1:7
**judge** 20:23
34:22 41:21
83:22
**judgment** 56:24
**judicial** 19:11
**july** 40:7 69:6
83:8
**jwarren** 2:6

**k**

**k** 21:23
**karpay** 21:20,21
22:17
**kay** 22:12
**keep** 40:20
**kind** 63:5
**klinowski** 54:6
**knew** 65:16
79:21
**know** 7:11
10:18 13:22
15:2 16:3,6,8,17
17:9,10 21:2
24:6 25:25
27:16 31:10

33:5,6,8 34:20
37:5,24 38:15
41:16,19 43:5
43:23 45:22
48:7 49:18 63:7
67:4 68:9 69:4
69:12 70:9 72:2
73:18 76:21
79:23 81:1 83:5
84:22
**knowledge**
39:20
**known** 13:22,24
64:9

**l**

**l** 29:24 35:4,19
56:5
**lack** 23:8 50:25
51:3
**laid** 41:2 77:17
**landing** 64:9
**landry** 66:13,13
66:19 67:1
**language** 70:15
**large** 79:18
**larry** 66:13
**law** 8:1 9:8,16
17:18,18,19
23:25 80:22
**lawrence** 66:13
**lawsuits** 75:2
**layout** 16:7,18
**leadership** 22:8
**lease** 32:22

**leaving** 27:23
**led** 41:24,24
**left** 37:6 62:16
75:20 84:15
**legal** 3:14 9:5,14
12:20,21 88:22
**lending** 52:9,22
**lengthy** 28:17
**leon** 19:11 20:16
26:8 35:7
**letter** 3:7 40:22
**level** 14:15
**leveraged** 53:1
54:14 59:12
60:24 61:22
63:15,24 66:15
67:11,16 71:1
71:16 74:3,18
75:23 77:7,8
**liability** 50:20
79:10,13
**license** 56:13,14
**licensed** 56:2
**licensee** 56:7,11
**lieu** 53:13 57:12
**life** 3:13 9:4,13
10:13,18 11:2,8
11:15,23 12:8
12:25 13:2,3,8
13:14 14:6
15:24 16:21,25
17:4,9,12 26:16
27:8 29:17,23
33:11 34:15
37:15 38:2,5,6

38:10,18 53:13 53:17,20,23
**likely** 9:17 34:5
**limitation** 59:11 70:25 71:14
**limited** 1:4,6,10 1:11 8:15,16 19:6 20:4 35:20 55:15 59:6,21 60:1,13,16 66:24 70:13,23 88:4 89:1
**line** 26:21 28:24 52:19 72:16 89:4,7,10,13,16
**liquid** 46:25
**liquidating** 1:9 8:4 43:19 65:24 69:21 80:20 84:13
**liquidation** 65:22
**list** 24:3 59:12 70:22 71:14
**listed** 24:1
**lists** 22:15
**little** 8:12,22 10:15 11:3 14:13 16:13 43:11 55:13 68:6 76:19
**live** 11:18 13:17 13:19 14:16 15:14

**lived** 11:15 16:10,16
**living** 13:12,17 13:22 14:2,3 15:16 17:7 21:20 32:7 51:14
**llc** 40:18 53:14 53:18,20,23
**loan** 46:11 47:5 47:22 48:4 49:9 53:4 54:19,20 57:4 61:2 62:2 62:12,24 63:1 67:12,13,15,15 67:19,19,20,23 68:5,12,15,21 69:3 74:21 75:14 76:1,4,5,8
**location** 16:1
**long** 9:12 13:17 20:2 67:3
**longer** 13:19 14:16 15:14 33:4
**look** 9:2 21:11 31:18 40:22 42:10 44:13 46:4 51:23 52:25 56:4 58:15 69:16 70:8 72:13 77:15
**looked** 26:9 42:13 74:7

75:18 77:21
**looking** 21:3 57:5 61:25 62:21 63:11 67:25 71:9 77:3
**looks** 57:22
**lot** 10:19 15:1 75:7 84:10
**lunch** 29:3,13
**lunny** 35:4

**m**

**m** 1:24 34:1 86:6,15 87:6,23
**made** 39:20,21 39:25 40:7 50:25 51:3 58:12 71:5
**madison** 1:23 2:15
**mail** 3:19,21 6:15 25:8 35:15 74:23
**mails** 7:6 34:20
**main** 30:16,17
**maintain** 38:8 51:4,7
**maintained** 49:25 51:5
**maintenance** 14:1 38:12
**major** 45:20
**make** 7:1,12 18:2,4,5,7 24:11 24:13,14 28:10 50:10 72:13

76:1,4 84:8
**makes** 82:4
**making** 74:13 75:13 77:22
**manage** 53:14
**management** 27:15,19,23 30:12,19 37:25 38:4 48:8 53:21 63:25,25 64:2
**manager** 54:10 66:14,20,24
**march** 54:14 61:24 64:17,19 66:8 67:1 69:11 71:16 77:6,6 78:19 79:7 86:11 87:19 88:1
**mark** 8:21 9:3 18:1 21:6 24:17 25:5 39:3 51:24 54:3,8 64:20
**marked** 18:1,4,9 18:11 21:8 24:19 25:6 39:4 39:7 51:25 52:5 64:21,24
**marketing** 38:4
**marvin** 21:22
**mary** 21:22
**material** 14:5
**materials** 77:20
**math** 62:18 63:5 68:9

**[matter - napier]**

**matter** 5:7 8:9 36:15,17 79:17
**mcglinchey** 2:8
**mcglinchey.c...** 2:12
**meal** 25:13
**mean** 15:5 37:10 47:8,12 47:14 55:1,9 63:12 68:15 74:18 82:2
**meaning** 28:12
**mediated** 65:21
**mediation** 82:12 82:15,16,19 83:1
**mediator** 7:5 8:4 82:13
**medical** 15:17
**meet** 78:23
**meeting** 28:19 81:24 82:11
**meetings** 79:24 81:21 82:9
**melvyn** 22:21
**member** 9:8 22:13,16,20,22 32:18
**members** 9:25 10:2,3,6 21:16 21:18,24 22:2,3 22:6,10,12 23:6 23:7,14,17,20 24:4,7,12 55:20 82:18 83:7

**membership** 40:17 46:23 74:3
**memory** 44:3
**mental** 72:5 73:3,8,11 74:9
**mention** 59:20 60:25 61:2,5
**mentioned** 11:2 22:4,23 29:14 29:16,18 50:19 51:20 57:20 60:23 61:11 79:10
**merger** 1:16
**meshing** 63:6
**messed** 43:11
**met** 30:24 32:13 34:8
**mgw** 1:4,6,8 88:4 89:1
**michael** 2:17
**mickey** 21:23 22:13
**middle** 1:1
**miller** 21:23 22:17 34:7
**million** 33:14 38:16 45:11 53:6,7 54:21 55:11 57:4,7,9 57:17,23 59:16 61:1 62:2,3,14 62:16,20,22,24 63:3 64:3,5

67:21,24 68:3,6 68:20,25 69:10 69:11 78:2 79:2 79:9,12
**mind** 20:7 23:14 79:3
**minds** 16:4
**minimum** 46:25 46:25
**minute** 51:20
**minutes** 25:20 28:22,23 57:18
**misrememberi...** 29:19
**missed** 55:10
**misstating** 7:1
**mlr** 45:24,25 49:8,23 50:10 57:20,23 61:5 61:11,18 69:11
**mlrs** 46:25 49:16,24 50:1,4
**moment** 9:7 18:19 39:10 78:6 80:8
**monday** 1:21
**money** 33:12 38:6,20
**moneys** 38:8 62:11 68:12
**monthly** 13:25
**months** 63:23
**morse** 1:22 2:14 5:22 6:7

**mortgage** 54:17
**motion** 3:23 18:16 19:4,12 19:17 20:15 39:12,17 40:5,6 41:17,22 42:2 42:11,13,22,23 44:20,23 45:1 45:10 46:5 58:19
**mouth** 81:10
**move** 38:19 64:14
**moved** 38:13 78:22
**moving** 33:10 76:10
**mstavros** 2:17
**multi** 16:9
**multiple** 34:18 59:7 60:2 70:14

**n**

**n** 3:1 4:1 30:24 35:4,4
**name** 5:17 6:19 34:23 65:12 70:4
**named** 30:3,21 30:23 54:4
**names** 6:17 23:10 24:3
**napier** 30:23,25 31:4 32:3,13 34:19

**[national - order]** Page 106

**national** 1:14,14 1:19
**nature** 16:15
**necessarily** 15:19 74:10
**need** 7:25 10:22 15:13,17 37:11 42:20 59:17
**needed** 41:2 42:6 44:8 49:24
**needs** 29:4
**never** 19:20
**new** 1:15 38:6 38:19
**non** 56:6
**norma** 21:19
**north** 2:9
**notary** 86:7,16
**note** 54:15,16 88:9
**notes** 44:11 87:12
**notice** 3:13,16 3:17 9:3 17:16 17:19,24 18:2,5 18:16,21 19:3 21:11,14 35:9 35:16
**november** 44:19 44:23 45:3
**novum** 53:20,24 54:2,6,9
**number** 11:22 16:16 19:1 24:24 30:1,25

35:23,24,25 45:17 75:1 79:2 79:11 80:14
**numbers** 54:24
**nursing** 13:21 13:23 14:3,9 15:18 16:24 17:7 31:18,20 32:4,9,22,25 36:23 40:17 46:20,21 56:2 56:15 57:2 63:16 83:15

**o**

**o** 35:19
**o'clock** 25:21
**oath** 3:5 86:1
**objection** 4:4 52:6
**objective** 13:15
**obligation** 53:5
**obligations** 60:15
**observe** 28:5
**obtain** 19:15 27:6 55:19
**obtaining** 59:22
**obviously** 45:14
**occasions** 30:25
**occupied** 59:5 70:11
**occurred** 33:3 77:7
**october** 17:23 42:14

**offered** 83:21
**office** 9:22 26:12 82:21
**officers** 26:15 29:16
**official** 3:22 7:9 9:21,24 10:2,4 21:25 22:10 23:20 30:3 39:11 41:12 52:7,21 58:7,18 64:16 82:1,3
**officials** 26:12
**officio** 10:5 22:3 22:13,20,22 23:7,14
**oir** 17:10 26:13 26:18,20,22 27:14 29:14 33:18 34:11,13 37:18,21 51:13 60:8 69:9,12
**oir's** 27:21
**okay** 6:2,9,14 9:2,12 10:7 12:3 13:1,5 16:21 17:14 21:1 25:20 26:25 30:7 31:6 33:20 35:22 36:11 37:8 38:21,24 39:14,15 40:6 42:10 43:3,6 45:5,8 46:3 47:16 49:3,22

50:24 51:19,23 52:13,14 53:11 54:12 55:9 56:13 57:1,19 57:20 58:5 59:3 59:20 60:23 62:9 63:22 65:19 67:17 68:4,11 69:9,16 70:18,22 71:11 72:22 75:13 77:3 78:10 80:4 80:7 81:14 83:11,16 84:19 84:24
**once** 33:2 80:25
**opened** 81:10
**operate** 32:5 51:7
**operation** 51:17
**operational** 66:5,9
**operations** 38:1
**operator** 13:6 56:7,11
**operators** 56:2
**opinion** 12:20 12:21
**opposing** 34:24
**order** 37:14 42:11,13,15,18 42:22,23,25 43:2,4 44:19 58:18 80:19 83:5

**[ordering - pled]** Page 107

ordering 88:12
organization 29:20,25
organizational 66:9
original 64:1 66:4 67:20
outside 75:2
overall 32:10,23
overview 67:9
owed 33:14 57:11,14 59:6 59:25 60:1,15 70:13
own 48:21
owned 12:12
ownership 31:15,22,22 33:3 45:15 66:4

**p**

p 21:21 30:24
p.a. 2:3 5:21 6:1 6:7
p.m. 1:21 29:7 85:8
p.o. 2:3
page 3:2,11 4:3 52:19 53:4,8 58:15 59:1 66:12 67:12,14 68:2 69:16 72:16 77:3,23 89:4,7,10,13,16
pages 1:20 52:11 87:9

paid 33:1,4 38:14 54:22 55:12,18 57:8,9 62:1,14 79:19 79:19 83:23 84:1
papers 3:15 9:6 28:13
paragraph 40:6 46:4,7,13,18 47:9,14 48:2 52:25 53:11 54:13,18 55:12 55:17 56:5 57:1 57:18,24 58:15 59:1,3,25 60:11 61:14,17,18 62:13 63:10,14 63:22 65:22,23 66:4,7 67:14 70:9,23 71:11 74:14 75:16 77:4
paragraphs 77:18
parameters 81:17
paraphrase 36:20
paraphrasing 65:25
parkway 2:9
part 13:14 15:9 22:9,25 49:8 50:17,21 58:18

69:1 71:21
participants 30:4
participated 74:17
particular 16:1 28:3,4 40:5 41:20 61:8 75:4
particularly 70:4 83:18
parties 46:7 75:3 87:15,16 88:12
partner 67:1
partners 59:6 59:22 60:1,13 60:16 66:22 68:14 70:13,24
partnership 1:4 1:6,10,11 8:15 8:16 19:7 20:4 35:20 55:15 88:4 89:1
passed 38:13 78:22
passing 33:10
pay 13:6,25 33:12 38:20 46:9,16 57:11 79:5
payment 38:7 50:22
payoff 78:3
penalties 89:20

pending 35:7
people 24:24 34:6 51:14 54:6 80:22
perceived 38:11
percent 55:14
perform 26:5 83:14
period 80:16
perjury 89:20
permit 64:2
person 12:16,24 33:24 54:5
personal 25:17 39:20
personally 39:25
petition 36:7 80:16
phrase 31:8 79:11
pip 11:6
place 13:15 14:20 15:10 19:21 27:24
plaintiff 1:12 2:2 41:11
plan 23:19 43:17 65:21,24
plead 75:11
please 5:4,17 20:12 39:10 88:10
pled 56:16

**pledge** 45:24,25 48:18 49:23 51:16 57:22 69:10

**pledged** 48:9 49:8,16

**plus** 62:21 79:2

**point** 13:19 14:15 20:10,19 24:9 28:3,4,6 31:4,5 32:21 34:12,25 49:3 51:10 63:9 67:4 69:13 74:11 79:7,11,14

**policy** 51:15

**portion** 13:12 14:3 49:23 54:22 62:4,15 63:2 76:5

**position** 27:21 28:1 69:15

**positions** 20:24 59:5 70:12

**possesses** 6:6

**possessing** 6:3

**possession** 41:2

**possible** 44:1

**possibly** 11:3

**post** 63:12 82:16 82:25 83:1,8 84:12,18

**postler** 40:23 83:22

**potentially** 8:1 82:25

**power** 44:21 58:21 65:25,25

**practicing** 65:9

**pre** 63:11 82:16 82:24

**precipitating** 37:13

**precise** 20:1 34:16

**predecessor** 46:1

**preliminary** 79:24

**preparation** 65:10 82:15

**prepare** 75:10 82:12

**prepared** 39:18 40:1 47:3 72:1

**present** 29:9 81:20

**presentation** 34:8

**presented** 24:23 25:2

**preserve** 11:17

**preserved** 11:24

**preserving** 11:13 23:25

**president** 66:14 66:19

**presume** 74:1

**pretty** 28:16 55:5 71:24

**prevented** 37:14

**previously** 23:7 77:20

**primarily** 7:17 26:19 36:18 54:7 83:20

**primary** 26:21 75:9 84:14

**principal** 1:14 53:24 54:2

**principle** 67:20 67:23

**prior** 5:23,25 6:20 7:4,23 8:1 9:12,16 26:4 53:4 61:24 66:8 68:19 70:16 77:18

**privilege** 10:8 25:1 71:25

**privileged** 31:12 49:14 73:5,9,12 73:13 74:5,19 77:14

**probably** 9:17 17:10 18:19 36:8 54:7 75:1,7 83:2

**problems** 51:9

**procedure** 88:24,25

**proceeding** 27:4 33:19 34:10,13

34:13 57:12 58:17 61:4

**proceedings** 5:1 8:11 37:9 75:5

**process** 11:16 12:14

**product** 71:25 72:8 75:20

**production** 6:21 7:15,16

**profit** 1:15 56:6

**project** 76:5

**promissory** 54:15

**proper** 50:1,4

**properly** 42:5

**property** 12:12 37:20 38:8

**propriety** 50:16

**protect** 10:10,12 11:1

**protected** 73:20

**protection** 3:14 9:5,14

**provide** 80:23

**provided** 17:5 46:8 48:4 80:25

**provisional** 59:23

**proximate** 16:4 16:17

**proximity** 15:5 15:21

**public** 25:2 86:7 86:16

**[pull - reference]**                                                Page 109

**pull** 42:12
**pulled** 84:6
**purpose** 10:8,25
  20:15 47:23
  48:24 50:1,4
  61:9 64:4 74:11
**purposes** 10:15
  24:22 68:5
**pursuant** 53:12
  54:25 58:17
  65:20,23
**pursue** 3:23
  39:12,22 40:8
  42:5,24 44:9
  66:1
**pursued** 42:6
  43:20,22,24
**pursuing** 41:2
**put** 19:21 21:17
  80:12

**q**

**quantum** 63:19
**question** 7:12
  10:23,23,24
  14:11 15:23
  16:7 23:11,13
  37:24 47:17
  48:20 52:15,19
  72:3,4,12,16,24
  73:17 74:12
  77:21 81:6,15
  82:22,23
**questioning**
  28:24

**questions** 12:3
  39:16 67:18
  73:19
**queue** 33:8,13
  38:15 78:21
  79:3,18
**quickly** 52:11
**quite** 83:16
**quotes** 54:20

**r**

**r** 29:24 30:24
  35:19,19 89:3,3
**raise** 5:4 73:17
**raised** 30:19
  38:5,10 79:24
  80:1
**raising** 33:18
**rambled** 82:23
**rather** 51:21
**ray** 22:18
**read** 3:7 18:17
  18:19 35:23
  46:12,17 47:8
  52:16,20 57:18
  63:7 69:5 72:17
  74:1 88:8 89:20
**reading** 40:20
  47:16 57:25
**reads** 42:23
**real** 84:9
**realizing** 20:2
**really** 60:21
  62:22
**reason** 16:13
  76:1,2 88:9 89:6

89:9,12,15,18
**reasonable**
  88:14
**reasonably**
  15:20 77:10,25
  78:4,12
**recall** 8:14
  10:17 16:19
  17:12 22:3
  23:10 24:6
  28:11,14 37:15
  37:16 42:1,7
  45:20 49:18
  50:23 51:15,18
  56:17 62:6 67:3
  70:5 75:8,17
  78:6,18 79:20
  82:10,15 84:11
**recalling** 48:17
**receipt** 88:13
**receive** 77:10,25
**received** 25:11
  78:2
**receiver** 19:16
  19:23 27:10,13
  27:14,17,23
  28:8 33:19
  37:10 56:18,20
  56:22
**receivership**
  19:5,19,20
  20:16,25 26:7
  26:14 31:3
  34:24

**recently** 34:2
**recess** 24:20
  29:7
**recharacterize**
  72:3
**recollection**
  9:15 33:13 38:3
  38:15,23 42:15
  42:17 44:25
  45:13,16 62:7
  66:16 67:7 68:1
  69:13 72:12
  74:20 75:4,25
  76:9 79:15
  82:18 84:7,13
**reconvene** 29:4
**record** 5:18 7:2
  7:13,24 8:23
  10:16 23:15
  24:21,22 25:22
  25:23 29:11
  35:12 38:25
  39:1,2 41:10
  54:24 70:19,20
  76:23 77:1 80:8
  80:9,13 81:18
  87:11
**records** 8:1,2
  73:5,7
**refer** 16:23 20:3
  20:5 21:23
  26:13,17 46:2
  57:1
**reference** 35:1
  45:10 61:18

66:12 71:23
**referenced**
  45:15 49:7 53:7
  58:20 88:7
**referencing**
  22:14
**referred**  13:13
  13:25 31:15
  33:25 57:3 61:6
  67:10 75:23
  77:20
**referring**  23:12
  23:15 24:2
  25:14 29:22
  30:1 35:12,15
  35:21 41:8
  48:16 55:7 56:3
  60:3,5,10 63:13
  66:23 68:2
**refers**  46:6
**reflected**  8:25
  81:3
**refresh**  45:13
**refund**  11:23
  33:7,7 38:15
  50:20,22 78:21
  79:3,10,13,18
**refunded**  38:18
**refunds**  12:5
  27:7 33:11,12
  38:14,17,20
  78:23 79:18
**refused**  40:4
  58:12

**regard**  88:14
**registered**  6:17
**regret**  81:9
**regulated**  37:21
  51:12
**regulating**
  51:13
**regulation**  23:2
  26:13
**regulatory**
  59:22 76:3
**rel**  35:17
**related**  8:10
**relationship**
  12:17
**relative**  87:14
  87:15
**relator**  35:19
**relief**  8:17 80:17
**rely**  75:15
**remain**  13:16
**remainder**  76:8
**remained**  67:3
  83:7
**remaining**
  62:16,21
**remember**
  23:16 26:24
  32:1,20,25
  33:23 37:3 43:1
  43:17,25 44:2,4
  44:7 48:10
  54:11 56:19,21
  56:25 57:14
  58:4,8,11,13

63:19 68:10
  69:6,14 78:9,11
  78:14,24 82:17
**remembered**
  24:11
**removal**  27:18
**removed**  27:15
  32:8,11
**rendered**  77:12
  78:16
**repairs**  47:22
  50:10
**rephrase**  10:22
  10:23
**report**  87:8
**reported**  1:24
**reportedly**
  68:17
**reporter**  3:6 5:3
  24:16 35:10
  52:18 85:2,6
  87:1
**representation**
  9:16
**representative**
  17:3
**representatives**
  34:11
**represented**
  84:5
**representing**
  28:13
**request**  3:14 7:7
  7:15 9:6 10:6
  26:10 75:24

**requested**  38:17
  40:8 87:10
**require**  13:3
**required**  27:18
  46:10 59:22
**requirements**
  76:3,3
**research**  60:6
  60:19 78:13
**researched**
  40:11
**reservation**
  80:10
**reserve**  45:12
  46:9,15 47:1,4
  47:10,21 48:2,5
  48:15,22 50:14
  50:21 51:6
  54:25 59:17
  61:2 64:4,6
  68:18 84:21
**reserves**  45:18
  45:19 46:25
  48:10,18 49:16
  50:17 51:17
**residence**  7:9,9
  13:16
**resident**  3:17,22
  9:24 10:2 13:1,2
  13:5,11,19
  15:13 21:15
  22:1 23:6,20
  33:9 39:11 40:2
  40:8,10,12,14
  41:12 52:8,21

58:8,19 64:17 82:1,9
**residential** 15:19 16:9,9
**residents** 3:14 9:5,14 10:6,10 10:13,20 11:1,7 11:11,22 12:5 14:7,21 15:8 16:4,10,11,12 16:16,20,22 17:2 21:13,24 22:7,18,22,24 23:5,17 24:5,7 26:6,16 27:5,19 27:22,25 28:2,7 29:17,23 30:1,4 30:10,15,17 31:6,7 32:2 33:9 33:15,15 36:21 38:9,13,19 45:10 46:14,19 49:6,12,19,19 49:22 50:3,19 50:20 51:4,8 58:3 59:7,15 60:1,16 70:2,13 78:22 79:25 81:23 83:7
**resignation** 55:20
**resigned** 24:8 67:5,5
**respect** 30:19 69:15

**respective** 59:5 70:12
**respondent** 19:6
**responsive** 7:7
**restated** 65:21
**resulted** 42:8 43:4 61:3
**resume** 81:2
**retained** 17:14 17:15 26:3 83:11
**retire** 54:22 62:3,15 63:2,4 68:7
**retired** 22:19
**retirement** 10:12 12:1 13:1 13:7 14:19 16:6 20:8 23:3 46:22 64:8
**returned** 88:13
**revealing** 74:9
**revenue** 36:23
**review** 9:7 39:10 47:9 60:7 71:18 72:18 74:16 75:15 84:3 87:10 88:7
**reviewed** 17:4 65:16 70:3,16 72:11 73:7,19 73:25 74:13,21 74:22,22,24 75:10 78:4,14

**reviewing** 24:11 73:4 75:21 78:18
**revised** 65:4
**revocable** 21:20
**rick** 34:1
**riedel** 39:23,24 40:24 44:8 58:11
**right** 5:4 6:11 6:20 8:5,14 9:19 10:14 11:22 12:5,13 13:9 14:23,24 15:4 16:1 20:14 21:13 24:13 27:16 28:4,16 28:21 29:5,10 35:6 36:19 37:20 38:22 41:9 44:11 47:5 47:11,14 54:12 55:11 56:22 57:21 58:1 61:6 61:21 62:17 64:13 65:12 66:3,12,25 67:6 68:7 69:18,23 70:2,8,16 71:4 72:8 76:10 80:7 84:20
**rights** 10:12 11:8 12:8
**rigid** 55:5

**rob** 84:4
**roles** 22:8
**ross** 2:3 80:15
**roughly** 6:16 33:13
**row** 68:2
**rpr** 1:24 86:7,15 87:6,23
**rule** 88:24,25
**rules** 88:14

**s**

**s** 2:11 34:1 89:3
**sabbatical** 37:6
**sale** 37:14 38:6 83:20,23,25
**samuel** 1:18 3:3 5:12,19 86:8 87:9 88:2,5 89:2 89:24
**satisfied** 62:23
**satisfy** 57:10
**saw** 57:16 68:19 78:1 79:6
**saying** 35:22 49:5
**says** 46:5 49:2 54:12 64:11,11 65:23 71:3 77:8
**scott** 40:23 83:22
**search** 7:6,25 81:17
**searched** 80:15
**second** 19:10 22:15 65:5

**[second - specific]**

76:24 84:7,9
**section** 12:22
  23:1 50:2,4
**secure** 46:1
**see** 7:6 53:15
  55:3,9 58:25
  59:8 69:2 79:8
  79:12
**seeking** 19:18
  72:5
**seemed** 36:6
**seems** 36:8
  42:16 46:13
**seen** 18:20
**selection** 25:13
**sell** 34:15 38:18
**selling** 38:2,5
**sense** 56:23
  75:21,25 78:1
  82:4
**separate** 16:14
  16:14 31:20
  82:16
**separated** 30:16
**september** 8:23
  9:10,12,17,18
  17:17 37:6 39:9
  44:24 45:6 49:6
**sequence** 44:7
**series** 45:16
**serve** 9:24 24:9
  42:25
**served** 23:7
  27:22 43:22

**service** 3:14 9:6
**services** 16:22
  17:5 19:9,15
  26:5 35:18
  53:14,18,20,23
**serving** 7:18
**session** 82:17
**set** 77:4
**seven** 25:20
**several** 17:1
**severed** 46:21
**shaw** 26:19,21
  26:22 29:15
**sheet** 3:8 88:9
  88:10
**sherman's** 79:5
  82:21
**shortly** 6:18
  17:23
**shoulder** 21:11
**show** 8:20 9:2
  18:11 21:6 25:4
  38:24 44:16
  52:4 67:12
**showed** 62:1
**showing** 39:6
  78:18
**shown** 64:23
**shows** 54:18
**shulstad** 22:18
  22:19
**shy** 68:6
**sic** 68:14
**side** 76:6

**sign** 3:7 88:10
**signature** 18:22
  70:5 86:14
  87:21
**signed** 39:18
  65:8 86:11
  88:17
**significant**
  11:21 32:1 33:1
  46:24 48:9
**significantly**
  61:23 63:16,20
**similar** 69:2
  71:6,7,10
**similarly** 70:9
**simply** 12:23
  56:24
**single** 21:3
**sir** 52:13
**sit** 8:19 74:20
**site** 34:11 54:2,4
  82:11,12
**sitting** 45:21
  60:4,9 63:18
  75:9
**situation** 27:3
  30:6,8,10
**six** 35:14,14
  63:23
**size** 13:10
**skilled** 13:21,23
  14:3,9 15:18
  16:24 17:7
  32:22 56:2,14
  56:15

**snf** 13:24 14:8
  14:14,24 17:8
  33:3 51:7,9,11
  51:18,20 56:10
  56:11
**sole** 66:14,20
**solemnly** 5:6
**solutions** 88:22
**solvency** 78:19
**soon** 79:15,21
  80:23
**soriano** 84:4,4
**sorry** 35:14
  52:10 55:13,24
  66:18 81:9
  82:23
**sort** 7:12 8:8
  14:12 37:12
  46:13 62:11
**sounds** 47:8
**source** 77:19
**sources** 75:9,21
**speaking** 68:10
**speaks** 67:14
**specialist** 7:24
**specific** 11:4
  23:1 32:14,19
  33:5 39:16
  40:20 48:6,16
  49:20 50:12
  51:16 55:2 60:3
  60:5,10 61:12
  64:10,12 70:6
  71:10 75:18

**specifically**
10:17 29:15
31:9 72:9 74:16
**spelled** 30:23
**spinoff** 31:8
32:20 33:2
36:22 46:2
48:14 49:17
57:2
**spoke** 30:20
31:5
**spun** 30:15
31:21
**stafford** 2:8
**standing** 41:17
41:22,23 42:2
43:16 58:2,9,10
58:14,16 65:25
66:1
**start** 8:12 15:12
28:19,23
**started** 6:18
9:16
**starts** 28:16
**state** 5:17 7:11
14:10 19:8,14
35:17,18 86:3,7
86:16 87:3
**stated** 7:14 43:2
89:21
**statements**
74:22 75:6
**states** 1:1 61:14
**status** 9:22
63:11,12

**statute** 49:25
88:14
**statutes** 11:10
**statutory** 23:8
**stavros** 2:17
29:8
**stenographic**
5:3 24:16 35:10
52:18 85:2,6
87:11
**stenographica...**
1:24 87:8
**stephen** 19:13
21:23 22:17
**stichter** 39:23
39:24 40:23,24
44:8 58:11
83:22
**sticking** 78:20
**sticks** 79:3
**stiller** 26:19
27:1,12,20
29:15
**stop** 57:11,12
**street** 1:23 2:15
**structure** 66:4,6
66:9 67:15
71:21 75:22
76:7,7
**structured**
31:25 76:5
**structuring**
71:15,20 72:21
74:17

**studied** 47:12
**stuhr** 1:24 86:7
86:15 87:6,23
**style** 13:10
31:19 58:6
**sub** 53:10
**subject** 3:20
25:9
**subparagraph**
53:8 55:8 56:9
66:13
**subparagraphs**
66:11
**subsection** 53:1
**subsequent** 67:4
**subsequently**
10:4 48:8 55:16
81:7
**subsidiary** 1:14
**subsidy** 32:7
36:24
**substantial**
45:23
**substantially**
63:1 71:12,19
72:20
**substitution**
59:21 61:3
**successful** 27:10
**successor** 1:15
**sues** 58:23
**sufficient** 51:6
**suggested** 88:13
**suggesting**
46:13

**suite** 2:9
**summer** 34:17
35:23 36:7,14
37:9 38:21 80:2
**support** 28:10
71:18 72:19
75:15
**supported** 28:8
**sure** 7:1,12,14
23:16 24:11
43:9 47:19
52:18 62:10
76:25 77:7 84:8
**suspicion** 32:16
**swear** 5:5,6
**sworn** 5:13
86:10
**syphoned** 32:11
**syphoning**
32:15
**systems** 80:15

**t**

**t** 34:1 35:19
56:5 89:3,3
**table** 69:1 77:18
78:2
**take** 9:6 18:18
39:10 40:3
52:12 59:17
65:6 84:6 85:5
**taken** 1:19
20:24 22:8
24:20 29:7
84:15

**talf** 55:21,23 56:4,5,13
**talk** 25:18 27:2 67:11 81:16
**talked** 33:24 54:7
**talking** 15:11 20:12 25:13 47:6 62:10 67:18 79:9
**talks** 45:11 47:3 47:9 57:4
**tallahassee** 26:11 28:5 31:2 32:13 34:23 35:1 37:5
**tampa** 1:2,4,6 1:10,23 2:4,15 8:15,16 18:24 19:6 20:4 35:20 36:23 39:9 40:17 57:2 63:16 68:14 80:18 83:15 88:4 89:1
**team** 23:24
**technical** 15:1
**telephone** 82:12
**tell** 15:6,7 16:3 17:10 27:12 34:16 42:4 43:1 50:5,12 57:15 57:25 60:4,9 67:25 69:8 73:1 74:7 75:19 82:8

**ten** 28:22
**tenants** 55:23 55:24 56:1
**term** 10:5 23:9 30:17 32:12 47:1 48:1,3
**terms** 10:18 11:4,19 12:15 13:8 15:5,24 20:11 27:16 31:16 47:15 49:1 54:13 55:5 59:13 62:22 67:16,18 73:25 77:15 81:18
**testified** 5:14
**testimony** 3:3 5:7 22:4 36:6 49:8 57:3 67:10 75:5 88:8,13
**thames** 34:1 36:13
**thank** 51:21 75:13 84:24 85:1
**thing** 20:7 44:4
**things** 11:6 20:6 33:16 59:11 70:25 71:14,23
**think** 7:25 9:19 10:5 11:5 16:2 26:21 29:15 30:16 31:24 32:17,21 33:23 34:22,22 36:10

36:24 40:4 41:3 44:4 47:1 48:20 48:25 49:1,2,12 56:17,19 57:2 57:22 58:20 63:9 70:17 71:7 72:24 73:20 75:8 76:11,22 77:6,19 78:20 79:1 82:19,24 83:4 84:3,6,17
**thinking** 20:21
**third** 66:23 75:3
**thorn** 30:21,24 31:3 32:3,13 33:25 34:3,5,18 36:13
**thoroughly** 63:8 65:16
**thought** 41:1 60:21 72:4 73:14 81:8
**three** 12:15 42:25 54:6 74:21 75:17
**thrust** 47:18,24
**tied** 55:13
**time** 7:4 12:13 13:19 16:8 18:20 20:2,11 20:19,21 21:3 24:9 27:2,11 28:3,4,4,6 29:8 31:1,4,5 32:22 34:12,25 36:4

41:24 42:1 48:7 49:4 51:10,11 51:12 52:12 56:17 60:7,8,11 60:18 62:8 63:9 65:6,9 67:4 69:13 72:1 78:16,21 79:11 82:7 83:18
**timeline** 44:5
**times** 59:4 70:10 70:11
**tina** 1:24 86:6 86:15 87:6,23
**title** 7:22 53:12
**tockman** 3:19 3:20 22:21 25:13 32:17 33:5 34:7
**today** 8:19 42:17 43:1 45:21 57:3 60:4 60:9,20 63:18 68:10 75:9 78:14
**together** 49:1
**told** 32:12 49:12 61:22 83:22 84:16
**tomorrow** 84:23
**tongue** 55:13
**took** 22:17
**top** 53:8
**totally** 47:7

tour 16:9
towards 47:11
tower 16:9
town 81:24
townhouses 16:16
tr 56:9
tr&snf 55:21,23 56:4,14
trade 29:18
transaction 30:13 31:25 32:21 46:20 47:2 48:3,14,16 48:19 49:9,18 50:18 57:6,8 59:13 60:24 61:12,24 62:5 63:11,12 71:1 71:20 72:21 74:4 77:8,9,12 77:16,17 78:17
transactions 63:14 77:11 78:1
transcript 85:3 87:10,11 88:7 88:16
transcripts 74:24 88:11
transfer 33:2 40:16 46:22 50:14,16 74:3
transferred 68:12,16 69:1

transferring 31:17
transpiring 41:23
treatment 15:17
triggered 81:12
trip 36:16
true 25:18 65:17 66:25 87:11 89:21
trust 21:20 62:18
trustee 1:10 8:4 9:23 10:1 21:25 22:16 42:3,8 43:19 58:20 64:18 65:24 69:21 80:20
trustee's 9:22
trustees 21:19
truth 5:8,8,9
try 16:7 43:8
trying 7:1 32:20 76:18
tune 79:1
turner 19:14 34:23
two 20:6 64:15 65:19
twofold 80:14
tying 49:1
type 81:24
typically 13:5,9 13:11 22:7 26:22

**u**

u 35:4
u.s. 9:22,23 10:1 21:25 22:16
ultimately 30:3 34:7 41:15 79:25
unclear 36:5
under 1:8 6:18 8:17 10:13 11:8 11:9,16,19,23 17:6,8 18:25 27:8 33:11 35:16 46:11 47:4,21 49:25 50:1,4 52:25 54:13,13 59:13 60:24 67:16 69:1,3 70:5 88:14 89:20
undercapitaliz... 77:13 80:5
undersigned 86:6
understand 11:7 12:15 14:10 21:5 78:15
understanding 12:7,10,18,23 13:18 36:9 37:23,24 50:9 50:13
understood 25:4 32:6

unified 31:17
united 1:1
university 3:13 9:4,13 10:11 11:18 12:11 13:13 16:8,18 19:7,16 20:2,5,6 20:10 23:25 24:24 26:7 27:3 27:15 30:6,8 33:24 34:6,9 35:20 48:9 53:12,14 55:1,4 55:6,15 56:7,11 59:7,15 60:2 68:18 70:14 81:23
upset 44:7
usab 67:13,15 67:19,23 68:12 69:3,11 75:5 77:16
usameribank 1:16 45:25 48:11,19 49:9 49:16 50:17 57:5,10,23 62:24 63:1,13 71:2,10,12,19 71:20 72:19 74:17 75:15,24 76:1
usameribank's 76:7

**use** 13:9 20:11 45:11,17,18,23 46:24 47:1 48:15 59:16 60:25 61:11 64:5
**used** 16:11,12 31:8 32:12 36:24 38:8 46:9 46:16 47:23 48:1,23 50:10 62:3 63:1 88:16
**uses** 6:7,11 69:2
**using** 6:15 45:24

**v**

**vague** 75:25
**valley** 1:14,14 1:19 48:12,13 48:19
**valley's** 48:13
**value** 77:10,25 78:4
**various** 13:9 16:5,19,25 17:2 22:9,23 23:4 40:13 41:1 75:2 75:5 77:5 78:24
**venues** 16:12
**verify** 88:8
**veritext** 88:11 88:22
**veritext.com** 88:11
**vernacular** 30:15

**versus** 35:19
**viewed** 51:14
**village** 3:13 9:4 9:13 10:11 11:19 12:11 13:13 16:8,18 19:7,16 20:3,5,6 20:10 23:25 24:24 26:7 27:4 27:15 30:6,9 33:24 34:6,9 35:21 48:9 53:12,14 55:1,4 55:6,15 56:8,12 59:7,15 60:2 68:18 70:14 81:23
**villas** 16:14
**violate** 71:22
**virtually** 83:17
**volume** 1:20
**voluntarily** 8:17
**vs** 1:13

**w**

**w** 1:9 2:5
**wait** 84:21
**waiving** 24:25 75:20
**walk** 41:9
**want** 7:11,12 14:25 20:1,9 25:21 28:15,18 28:25 40:19 43:7 46:12 81:14,16 85:2

**wanted** 11:17 23:16 27:14,15 78:23 81:8
**wants** 83:24
**warren** 1:9 2:5 7:3,10,17 18:13 21:10 25:22 28:18,25 43:7 43:10,15,25 44:5,11,13,15 44:22 45:1 52:2 64:18 65:24 66:18 71:22 72:10,25 73:2,3 73:10 74:8 76:12,16,18,22 80:12 81:9,16 81:22,25 82:10 82:13,20 83:5 83:21 84:12,22 85:5
**warren's** 8:3 41:25 42:9 43:5 69:20
**way** 8:6 29:24 37:25 48:21 51:4,7
**ways** 30:5
**we've** 6:21,25 12:4,5,6 18:1,11 39:6 52:4 64:23 68:15 83:23,25
**weathers** 21:22
**wednesday** 3:21 25:10

**welfare** 32:10
**wemamm** 55:18
**went** 22:16 28:5 34:7 36:16 37:4 37:5 62:9 68:6
**west** 68:14
**westport** 1:4,6 1:10,11 7:19,20 7:21,23 8:9,15 8:16 12:11,12 17:20 18:23 19:6,9,13,18,23 20:3,4,5,10,24 31:18,19 32:23 35:7,19 36:22 37:20 39:8 40:17 46:21 57:2 63:16 66:5 66:5,9,10,14,15 66:20,20,22,22 66:24 80:17 83:15 88:4 89:1
**whiting** 21:19 21:19
**whitson** 2:11 3:4 5:16 18:10 18:13,15 21:9 24:15,17,21 25:3,7,20,24 28:15,21 29:2 29:10,12 35:11 38:25 39:2,5 43:9,14 44:3,10 44:14,18 52:1,3 52:10,16,24

**[whitson - years]**

64:20,22 68:8
70:19,21 72:7
72:14,23 73:6
73:22 74:15
76:13,14,17,20
76:25 77:2 80:8
80:10,13,23,25
81:6,11,13
83:10 84:20,24
85:4
**wife** 24:23
**williamson**
20:23 41:21
83:23
**wish** 17:25 24:8
**wishing** 11:2
**withdraw** 64:3
**withdrawal**
46:9
**witness** 2:13
5:10 29:6 76:23
81:5 85:1
**wnt** 61:22 63:15
75:14
**woman** 54:4
**word** 36:25
54:20
**wording** 42:15
42:18
**work** 5:21 60:19
71:25 72:8
75:20 78:13
**working** 26:21
**wound** 36:17

**wrong** 44:6 72:4
**wsi** 55:12
**wsilf** 55:12 69:2
**wsilf's** 55:13

**x**

**x** 3:1 4:1

**y**

**y** 35:4
**yeah** 7:21 8:7,11
28:25 44:14
62:12 68:22
76:13,17 82:2
82:20 84:22
**year** 9:17 26:3
36:1,9 43:15
**years** 64:15
65:19 74:21
75:18

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.