Page 1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

WESTPORT HOLDINGS TAMPA                Case No.
LIMITED PARTNERSHIP,                   8:16-bk-08167-CED
                                       Chapter 11

WESTPORT HOLDINGS TAMPA II,            Case No.
LIMITED PARTNERSHIP,                   8:16-bk-08168-CED
                                       Chapter 11

        Debtors.


JEFFREY W. WARREN, LIQUIDATING
TRUSTEE FOR WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP and
WESTPORT HOLDINGS II, LIMITED
PARTNERSHIP,

            Plaintiff,
                                       Adv. Pro. No.
        vs.
                                       8:20-ap-00007-CPM
VALLEY NATIONAL BANK, principal
subsidiary to VALLEY NATIONAL
BANKCORP, a New Jersey domestic
profit corporation, as successor
by merger to USAMERIBANK,

            Defendant.




        DEPOSITION OF KEITH R. SEELOFF
        November 14, 2023 - 10:20 a.m.
           191 Peachtree Street, NE
                Suite 2800
              Atlanta, Georgia
          J. David Brown, B-1401

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 4/17/2023 Expert Report of Louis E. Robichaux IV | 6 |
| Exhibit 2 | July 2023 Rebuttal Expert Report of Keith Seeloff | 8 |
| Exhibit 3 | BVM Obligated Group Forecasted Statements of Operations for the Years Ending 8/31 | 68 |
| Exhibit 4 | 12/21/2006 Loan Closing Statement | 72 |
| Exhibit 5 | 9/27/2013 Loan Extension Agreement | 79 |
| Exhibit 6 | 3/31/2014 CPIF Loan Closing Statement | 87 |
| Exhibit 7 | 3/31/2014 USAmeriBank Loan Closing Statement | 90 |
| Exhibit 8 | 3/31/2014 Assignment and Pledge of Deposit Account | 160 |
| Exhibit 9 | 6/22/2004 Agreement for University Village Minimum Liquid Reserve Escrow | 168 |
| Exhibit 10 | Title XXXVII, Chapter 651.033, The Florida Statutes | 171 |
| Exhibit 11 | July 2023 Rebuttal Expert Report of Meredith Benedict | 199 |

INDEX TO EXAMINATIONS

| | PAGE |
|---|---|
| By Mr. Whitson | 4 |
| By Mr. Appleby | 205 |

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:

    KEITH T. APPLEBY, ESQ. (via Zoom)

    Appleby Law P.A.

    4916 West Melrose Avenue S

    Tampa, Florida 33629

    813.435.0396

On behalf of the Defendant:

    EDMUND S. WHITSON, III, ESQ.

    CHANTEL C. WONDER, ESQ. (via Zoom)

    COLIN T. DEAN, ESQ. (via Zoom)

    McGlinchey Stafford

    10407 Centurion Parkway N

    Suite 200

    Jacksonville, Florida 32256

    904.224.4486

Also Present:

    JEFFREY WARREN (via Zoom)

    LOUIS E. ROBICHAUX IV (via Zoom)

P R O C E E D I N G S

KEITH R. SEELOFF

having been first duly sworn, was examined and

testified as follows:

EXAMINATION

BY MR. WHITSON:

Q    Good morning.

A    Good morning.

Q    Would you please state your full name for the record.

A    Keith Richard Seeloff.

Q    Good morning, Mr. Seeloff.  My name is Ed Whitson, and I am an attorney representing Valley National Bank as successor to USAmeriBank in the adversary proceeding filed by Jeffrey Warren as trustee.  I believe you have prepared a rebuttal expert report in connection with that adversary proceeding; is that correct?

A    Yes.

Q    I will be asking you a few questions this morning about that.  If at any time I ask you a question you don't understand, please ask me to repeat it or rephrase it and I'm happy to do that.

A    Okay.

Q   And if you do answer a question I've asked you, can you and I have the agreement that you have understood my question and you're accurately answering it to the best of your personal knowledge as an expert?

A   Okay.  Yes.

Q   Why don't you first -- I think the first tab in your notebook --

MR. WHITSON:  Keith, did you get a copy of the exhibits?

THE WITNESS:  I have.

MR. APPLEBY:  I just received it.

MR. WHITSON:  I'm sorry, we have two Keiths.

I'm sorry, I didn't hear your answer, Keith.

MR. APPLEBY:  I just received it just now.

MR. WHITSON:  Good.

MR. APPLEBY:  I haven't printed it yet.

MR. WHITSON:  Do you want me to wait a minute while you catch up with it?

MR. APPLEBY:  Well, I'm familiar with the first few that you have marked very well, so I don't think I need to wait.

MR. WHITSON:  Okay.

(Defendant's Exhibit 1 marked)

BY MR. WHITSON:

Q    Well, then, Mr. Seeloff, I'll go ahead and direct you to tab 1 of the notebook which is the Expert Report of Louis Robichaux IV.  Do you see that there?

A    Yes.

Q    And is this the report that you reviewed in connection with your rebuttal report?

A    Yes, it is.

Q    What else did you review in connection with preparing your rebuttal report?

A    I referred to it in my notes here.

Q    You have notes with you?

A    My report.  So we refamiliarized ourselves with the 651 and the statutes referred to here.  There's also an Expert Report of Stanley Murphy, some closing documents.

Q    Now, when you're looking at Mr. Robichaux's report, would you mind being specific as to what you're looking at when you say looking at in terms of when you say looking at the statutes here what page you're on for the record. I just need to have --

A    I am --

Q    -- a clear record.

A    -- referring to the list of exhibits on page 28 of my rebuttal report of the external information and documents that we considered.

Q    Page 28 I have says Presentations.

A    Let's see here.

Q    Okay.  26 and 25.  Gotcha.

A    So I have got a different version.

Q    Is your version better than my version?

A    Nope.

Q    What's the difference between the two versions?

A    Mine is dated July.  It just kind of come off my desk here.  So it could be the shuffling of exhibits, my resume', page numbering mechanism.

Q    So number 1 you identified Mr. Robichaux's expert report.  Number 2 you looked at Mr. Murphy's expert report.  Why did you look at Mr. Murphy's expert report?

A    They came as a set there.  One was the primary and the other was just color and context.

Q    But am I correct that Ms. Benedict is the one who prepared the rebuttal report in response to Mr. Murphy's report?

A    I'd have to refer to hers.

(Defendant's Exhibit 2 marked)

BY MR. WHITSON:

Q    I'll make it Exhibit 2.  You can take a look at my copy.

A    This is the second one.

Q    That's the Expert Report of Meredith Benedict, the rebuttal report.  You see at the bottom?

A    Uh-huh (affirmative).  Yes, that is her report, correct.

Q    So you looked at Mr. Murphy's report in connection with preparing your report in response to Mr. Robichaux's report?

A    I read all their documents as part of a set.  Meredith Benedict works for me.  So we just looked at all those together.

Q    So did Ms. Benedict assist you in preparing your report?

A    No.

Q    Did anyone else assist you in preparing your report?

A    I have staff.

Q    Who on your staff?

A    Haley Bennett -- Haley Adrian.

Q    And what is Ms. Adrian's position?

A    She's a senior consultant.

Q    And what did she do to assist you?

A    Compiled information.

Q    What kind of information?

A    The information that you are reading here.

Q    That would be on page 25, the Exhibit V, it says information.  I'm just trying to get a sense --

A    Our whole report.  My whole report.  I had my senior consultant with me preparing this report.  I did not type all the words.

Q    I understand that.  But she did more than type, right?

A    She would have pulled the research, helped me read the documents, organized our thoughts here, and iterate on the material.

Q    When you say iterate on the material -- I love that word by the way -- but what do you mean when you use it when you say iterate on the material?

A    So the drafting process around expressing our thoughts, organizing those thoughts, and editing the content.

Q    All right.  Who else assisted you?

A    You know, so I don't know how to answer that directly and indirectly.  I'm here as an expert in the field, so I'm bringing a career of experience to the table here.  So many of these thoughts would have been socialized and discussed and then I have gone back and prepared my material.

So those discussions might not be in the direct context of this case, but let me understand 651, let me understand the definitions of the provider here.  I chased that stuff down.  So I'm not sure where we want to draw the line in support here.  But if I go to the time sheet and look at those hours, it is going to be primarily Haley, Adrian, and myself.

Q    All right.  And did you produce your time sheets?

A    No.

Q    Do you have copies of those?

A    Not handy.

Q    Well, then do you have a rough understanding of how much time that Ms. Adrian spent on preparing your rebuttal report or working with you?

A    I don't have an answer for that, no.  I

could back into some numbers.

Q    Well, why don't we try.  Do the best you can.

A    All right.  So we have probably got --

Q    And I don't want you to guess.  If you can get --

A    Then I don't --

Q    -- your time sheets --

A    -- want to back into it.

Q    Right.  I mean if you can get your time sheets and look at them and maybe just take a few minutes to refresh your memory, that way you'll have a more accurate answer.  I'm not trying to -- this is not a memory contest.

A    Right.

Q    I just want the --

A    I can look --

Q    -- most accurate --

A    We can look for that information or request it.

Q    You want to go ahead and do that. Because it probably has a little bit of lead time, right?

A    Yeah.  I can just -- let me pop out a message here while we're doing that and see if I

can facilitate some of that.

MR. APPLEBY:  Ed, just for the record, I'm going to object to the extent that you didn't request these documents in advance of today's deposition.

MR. WHITSON:  I understand.  But it seems like they're readily available.  And I'm just looking for the amount of time.  I'm not actually looking at the actual entries.

THE WITNESS:  We have had a system conversion here with the name change.  Let's see how easy it is.  Okay.

BY MR. WHITSON:

Q    And when you say name change, is that from Dixon Hughes Goodman to Forvis?

A    Yes.

Q    When did that occur?

A    June 1st, 2022.

Q    And may I refer to it as DHG?

A    Yes.

Q    How long were you with DHG?  I think you'd said 15 years on your --

A    15 years at that time.  17 today.  2004.

Q    I'm sorry, did you finish making the request for the time sheets?

A    I did.

Q    Thank you.  So we'll come back to that. But when you said let's look at 651, let's look at definition of provider in terms of I guess I assume collaborating with Ms. Adrian, would that be fair to assume?

A    Repeat the question.

Q    Well, you were saying earlier when I said what did Ms. Adrian assist you with, and you said pulling the statutes, looking at 651, definition of provider, that sort of thing.  What else -- what part of that did Ms. Adrian -- and you said you sort of collaborated or socialized if you will I think was your word about this information.  Could you be more specific about that.  I'm trying to --

I'm not hiding anything here.  I'm just trying to understand how much of your input is in this report and how much of it is Ms. Adrian's input and how much time total did each of you spend preparing it.  Is that fair?

A    It is fair.  We can look at the hours. We can clearly look at the experience and who's giving direction and who's providing the direction and the expert.

Q    I'm not questioning that.

A     Right.

Q     I'm just trying to understand exactly what the division of labor was on preparing your report.

A     And we'll look at the time sheets.

Q     Okay.  But just as you recall, because, you know, unless you want to read all the time sheets.  Which is fine, that's your right, but you mentioned a lot of this information was socialized.  What does that mean?

A     That I am not the -- the issues that are being considered as we -- some of that could have been socialized.  I'm not socializing the report, you know, with other people.

Q     But in terms of forming your conclusions, is that fair, that's what these discussions were about?

A     Sure.

Q     And those would be the opinions as laid out in your report, right?

A     Yes.

Q     So you said there was a summary of support for aiding and abetting claim provided by Mr. Warren.  What is that?  It is number 3 on your page 25, page 28 of yours.

A    Yeah.  Yeah.  Yeah.  It would have been on one of the documents.  What number is that, number 3?

Q    Number 3.

A    Can I just refer to yours or the exhibit that we're looking at here?

Q    Yeah.  Mine has got notes all over it though.  There's one in your book.

A    Okay.

Q    It is tab 2, the marvelous Forvis cover page.

A    This is a document provided by Jeffrey Warren.  It is confidential provided in mediation.  Seems to be a summary of much of what was going on in those documents.  So it would have been one of -- a summary document that was provided with the other source documents.

Q    Well, I'm not going to ask for anything that was confidential.

MR. WHITSON:  Keith, is this something that was provided to the mediator?

MR. APPLEBY:  Yes.  And it was subject to mediation privilege.

MR. WHITSON:  That's fine.  That's why I didn't want to look at it.  I wanted to make sure

that's what we're talking about here.

BY MR. WHITSON:

Q    All right.  What kind of information did you draw from the summary?

A    I can't differentiate at this point in time which came from which document.  I'd have to --

Q    Well, take a look at the summary real quick.  Because I'm not going to ask for a copy of it and I'm not going to ask you about anything that Mr. Warren said.  I just want to know what information that's on the summary --

A    The sequence was this came early and then the source documents were right behind it.  So the focus would have been on the source documents and the summary document would have been a cursory read early as we were familiarizing ourself with the deck or the package.  That's how we used it.  I'm not sure which paragraphs were more meaningful than others.  But that's how it was used.

Q    Well, I think it is important to understand what information you considered in analyzing this claim, right?  That's what you're opining about.

A    Yeah.

Q    So if you wouldn't mind just looking at that and then you can put it in your own words as to what your understanding of the claim was rather than repeating what Mr. Warren wrote.

A    Yeah.

Q    Because it is important for me to understand and for the record to reflect your understanding of the issue you're opining on.

A    Okay.

Q    I mean that's kind of the root of everything we're dealing with here today.  So if you wouldn't mind just taking a quick look at that and then telling me in your own words what your understanding of the claim is that you're opining about.

A    Well, I don't want to look at that document and do that.  I have got a stack of documents here.

Q    Well, that's the document that you looked at to summarize your understanding --

A    One of --

Q    -- of the claim.

A    -- the documents.  That's one of the documents.

Q    Right.  But that's the claim against my

client, right?  These other documents appear to be -- it says the Florida Senate, number 5, I'm not sure what that refers to.  Is there some sort of legislative history?

A    Yeah.  Yeah.  And there was a change to 651, University Village, Westport Holdings, and that bankruptcy proceeding caused an update to the 651 regulations.

Q    We're getting ahead of ourselves.

A    Yeah.  Well, that's why we're being listed and there's a history here.  You asked the question.

Q    No, you're right.  And I'm just referring to what that document is.  It says the Florida Senate.  So if there's some sort of legislative history that you asked for or you pulled --

A    These are all 2014.  So these are the regs in place at the time this happened.

Q    Right.  And you were mentioning that there was a change --

A    Yeah.

Q    -- in the statute, which I am not necessarily agreeing with you, based on what happened in this case.  But you're looking at not the amended statute --

A    Yeah.

Q    -- if I can use --

A    I'm not.

Q    -- that phrase --

A    Correct.

Q    -- but just the original one.  But I do want to understand exactly what your understanding was of the claim against my client in analyzing Mr. Robichaux's report.  Is that fair?  I mean we got to start at the beginning, right?  And the beginning is here's the claim.  Here's what Mr. Robichaux said about that.  And here's what you're saying about that.

A    So --

Q    So I need to understand what your awareness of the claim.  Did you read the actual complaint itself?

A    I read the expert report.  I don't see the complaint itself on this list.

Q    Right.  So you looked at the summary?

A    No.  I looked at -- yeah, I did look at the summary and I have also read Robichaux's report here, the Ankura report.

Q    Right.

A    Two of them.

Q    But in terms of the claim itself that's been asserted which you're both opining about, you are relying on the summary that was provided by Mr. Warren?

A    Yes.  Yes.  In addition to these other documents, yes.

Q    Right.  So can you briefly just for the benefit of the record and help moving forward review the summary and then we'll talk about your understanding of the claim if that refreshes your recollection.

A    You want me to express what the claim is?

Q    No.  What I want is for you to tell me what your understanding was of the claim that is the subject of the opinions.

A    So my understanding -- can I just -- I mean I have an understanding.

Q    That's fine.  I didn't know if you -- you said you looked at that in order to get that understanding.  I want to make sure you took a look at it and your answer was complete and accurate. But go ahead.

A    Well, I'm not -- I'm prepared to give an answer of what my understanding of the claim.

Q    What is that?

Page 21

A   My understanding of the claim is that we have an account, a minimum liquid reserve, that's been pledged to Valley Bank and that Valley Bank swept those proceeds on behalf of the loan obligation provided by WNT.  And the issue at hand is did WNT have rights to those funds -- did they have -- for collateral -- as collateral.

Q   Anything else?  I want to make sure I have your complete understanding about what the claim is that you're opining on.

A   I think it unpacks from there.

Q   Well, let's unpack it.  What about you said the MLR account was pledged.  What do you want to unpack from that?

A   Well, there's an ownership chain of events here that caused I think the original breach here, was it WNT's proceeds to pledge or not. There were -- there was an original Westport Holdings would have been the original applicant and then there was a splitting of those two entities.

Q   What's your understanding of the splitting of the two entities?

A   There became a WNT and -- what are the titles here.  There's a number of entities well laid out here in your document so ...

Q    You're referring to Mr. Robichaux's report?

A    Yes.  And ...

Q    What page are you on?

A    Well, I'm trying to get -- I'm in mine at the moment, but I'm trying to get to these definitions here.  WHT, the two primary entities, Westport Holdings being the independent living provider, right, and WNT is the nursing home provider.

Q    What page are you on?

A    I am thumbing through paper.  I'm not reading anything.  I'm just trying to get a common understanding of who the two parties are.

Q    All right.  So then your next sentence was -- understanding was that Valley Bank swept those proceeds.

A    Right.

Q    What do you mean by that?  I tell you what, rather than me just sort of nitpick, I'm not trying to nitpick your statements, describe for me what your understanding of the transaction you're talking about here in terms of you can take a look at your report or Mr. Robichaux's report.  But, you know, we're dealing with essentially a transaction

that took place on March 31, 2014; is that fair?

A   Yes.

Q   Let me help you out a little bit.

A   Please.  There you go.

Q   So what is your understanding about exactly what happened on March 31, 2014 as it affects any entity, as it affects any funds that were -- and then the reason why it all occurred on March 31, 2014.  That's what I'd like you to sort of start with and maybe that's the way we'll kind of work back from there.

A   Well, we got to March 31st, 2014 would have been a financing event with Valley Bank or the predecessor to Valley Bank; is that right?

Q   Whatever your understanding is.  I mean, again, this is not a quiz.  I just want to know what --

A   So --

Q   -- your thinking is --

A   So --

Q   -- and what your understanding is.

A   A new owner comes in prior to 2014, starts to restructure the entity.  They create --

Q   So you're talking about 2013 or what time frame are you --

A    It could --

Q    -- talking about --

A    -- have been two thousand --

Q    -- when you say --

A    -- twelve.

Q    -- prior to --

A    I don't have the timeline here in front of me.

Q    Well, let me back up then.  Because you're familiar with University Village, aren't you?

A    Yes.

Q    And maybe that's the way to sort of build to this point rather than work, you know, let's focus on when did you first become familiar with University Village?

A    University Village has been a staple in Tampa most of my career.

Q    What do you mean by that?

A    It was developed by Westport Holdings.

Q    It was developed by Westport Holdings?

A    Well, I don't know who -- the original developers go back and the names could have changed there.  But it would have been developed in the late nineties about when I started my career.  I

have worked with other communities in Tampa.  They show up in the competitive analysis often.  And we have -- post this transaction we have had a fair amount of involvement with what is now Unisen, so I'm aware of that history there at University Village.

Q   Well, in fact, you were involved in doing the feasibility study for the bonds that were issued to Rosemawr in part of the acquisition --

A   That's right.

Q   -- of the ILF by Tampa Life --

A   That's right.

Q   -- Plan Village?

(Off-the-record discussion)

BY MR. WHITSON:

Q   So I'm just trying to help out here.  And again, I'm just trying to organize this deposition --

A   Okay.

Q   -- in a way that makes sense for you so I'm not asking you questions --

A   Right.

Q   -- out of context.

A   Okay.

Q   So let's start from the beginning.  So

you said it was a staple throughout your entire career.  Let's talk about your career as it began in the late nineties.  Maybe that's the way we'll roll forward from there.

A    Okay.

Q    Does that make sense?

A    Yep.  Yep.  I just want to get to the Table of Contents here.  There you go.

Q    Let's talk about your -- it is in your report but let's just go ahead and start that way.  Maybe we'll get a flow going.  That way it will make it easier for you to sort of --

A    Okay.

Q    -- develop a sequence here.  So let's go with your educational background.  That's just a very simple easy question just to start going through this.  Go ahead, describe your educational background after high school.

A    All right.  I graduated -- I went to Ball State University, graduated with an accounting degree.

Q    What year was that?

A    1984.  I spent five years working for a Medicare and Medicaid intermediary where we audited cost reports on behalf of the federal government.

Q    Weren't you with KPMG?

A    I started my career at a Medicare intermediary.

Q    I'm sorry.

A    I did go to KPMG in 1995.  So between 1984 and 1995 I had five years at the intermediary and another five years in an equipment manufacturer, medical equipment.

Q    DME?

A    Yes.  And then in approximately 1995 we moved the family to Atlanta.  I had a short job at a home infusion company, another short job at BDO Seidman doing consulting work.  Then I joined KPMG in 1997.

That started my career with these continuing care retirement communities that take entrance fees and sell life care contracts.  I spent seven years at KPMG and moved to Dixon Hughes, and have been here through a couple of name changes since.

Q    So in 1997 that marked your first experience with continuing care retirement communities?

A    It did.

Q    Do you need a glass of water or

something?

A   No.  I'm good for now.  I will.

Q   All right.  So then let's talk about your experience with CCRCs.  Why don't you describe that for me, what states you worked in --

A   Sure.

Q   -- that type of thing.

A   So in 1997, it was certainly a younger industry than it is today.  The entrance fee requirements for these puts them in a regulatory industry.  Because we have got a number of states that have regulations on top of those insurance contracts, so there is some healthcare benefits, some insurance elements, and an annuity to selling that contract.  Some of the heavier regulated states is where we do a lot of our work.

Q   What states are those?

A   Florida, Maryland, New York, North Carolina.  And those are all East Coast.  From those states with heavy regulations we developed our experience and our expertise and then transport that to others in the industry.

Q   When you say we, is there a particular group that you are working with?

A   So the KPMG, it was a dedicated practice

at KPMG.  When that disbanded and we went our various ways, I brought that dedicated practice to Dixon Hughes.  So this is a dedicated practice doing planning and feasibility work for continuing care retirement communities and providers along that continuum of care.

Q    And continuum of care is sort of the guiding phrase for all the CCRCs, would you agree?

A    It is the post-acute care concept after you leave the hospital what's the continuum of care from residential based to home based solutions.

Q    So let's talk about when you say planning and feasibility, what type of work with CCRCs have you done?  Has it been feasibility studies for bond issuances?  I'm just giving you an example.

A    Yeah.

Q    I'm not trying to limit you.

A    I think that's a place -- that's a place to start.  That's kind of the center of gravity. Around that core competency we're doing feasibility studies for new projects and new financing deals, and from that core competency we provide planning services early in the process.

Q    What does that mean, planning services? You mentioned that before.  I just want --

A    Yeah.

Q    -- to break that down.

A    So that could be market research, competitive analysis, pricing considerations, economic financial modeling, our ability to pay debt service and provide a return, meet our mission, et cetera.

Q    Does that include solvency analysis?

A    Yeah.  Not directly that word, but you would have a solvency determination whether it is feasible or not.

Q    Right.  So financial modeling.  What else?

A    Then performance improvement and when things are not going according to plan.  And that could get into some other governance considerations, due diligence around change of ownership, and you can see how it cascades out from there.

Q    Due diligence around change of ownership. What does that mean?

A    So often a seller -- there's a buyer and seller.  We would often be engaged by the buyer to help them better understand the opportunity and challenges around the opportunity to acquire or

affiliate with somebody else, the seller.

Q    Were you engaged by the buyer of University Village, the independent --

A    No.

Q    -- living facility?

A    No.

Q    Who were you engaged by?

A    Well, not to do due diligence.  Not to do due diligence.  The feasibility study I think could have been a due diligence or underwriting expectation as part of the transaction itself but not as part of a planning activity.

Q    All right.  Well, then what else have you done before I move on in sort of the CCRC space other than what you just said, planning and feasibility, providers along continuum of care, post-acute care.  In terms of specific examples rather than broad categories, tell me what you have done.  I mean I know you have done feasibility studies for bond issuances --

A    Uh-huh (affirmative).

Q    -- right?

A    Uh-huh (affirmative).

Q    So that's one concrete example rather than sort of generic --

A    Okay.

Q    -- categories.  What else have you done?

A    So we'll do planning work.  I'll put some product names against the planning activity.  So that would be market research and competitive analysis or a market study.

Q    Now, what's the point of like determining what you can charge versus your competition for a life care contract?  Break that down to me in terms of how I can understand what you're saying as it relates to the mechanics of the business.

A    So if it is just a stand-alone market study, you'd want to understand the competition and you'd want to understand your position in the market.  That would be the core research to help make those determinations.  Management would be informed about their pricing, and they'd get an indication as to whether they have upward ability or downward pressure.  We're not determining a pricing per se.  Here, you can charge this.  So I'm just --

Q    Well, is it fair to say -- maybe I can help -- that if you're looking at you're maybe a B or maybe a C plus property and you're looking at your competition that may be A or whatever, and

you're looking at what they're charging, what their service offering is if I can use my own phrases. Don't adopt my phrase.  If you want to say it differently, please say it differently.  Then is that fair to say, number one, you would do that analysis in terms of where you fit in the market, you know, in terms of rank?

A   Yep.

Q   And then the pricing that sort of corresponds to that?

A   Yes.

Q   That's fair.  So then do you do any sort of analysis of if you were to say invest more money in the actual physical property, make improvements if you will, then there would be sort of forecasting what, you know, on a pro forma basis what that might look like in terms of it being a different property?  Or what exactly do you do when that -- you do your market study and you say it is for planning purposes and you inform management --

A   Well, the market --

Q   -- what's the next step from there?

A   The next step would be some financial planning.

Q   And what does that mean?

A   To test those -- that hypothesis that you just laid out.  If I were to invest more capital, could I get more rent, what would that look like. So we would run scenar -- we could do scenario planning in the context in which you just mentioned.  So the market research, the market study would then inform your financial planning exercises.

Q   What else do you do for CCRCs?

A   There's two there.  We are doing -- what am I doing or what is the firm doing?

Q   Well, you.  I mean this is your opinion.

A   I gotcha.

Q   And it draws from your experience and your expertise.  So I'm trying to understand exactly what you have done in connection with developing your opinions.

A   Okay.

Q   Your work experience --

A   So --

Q   -- and your education.

A   -- the feasibility studies for bond offerings as we mentioned one.  We also have in the state of Florida we have an update to that feasibility study for escrow release.

Q    What does that mean?

A    The Florida -- in the state of Florida they escrow entrance fees until a certain threshold is reached, 70 percent occupancy.  Upon achieving that threshold, those entrance fees are released and then can pay down debt and other -- for other purposes.

Q    Is that a fairly new --

A    No.  That's been in existence since I started.

Q    Okay.

A    If there's been a material adverse change during that period, an update to the original feasibility study is required.  So the concept of an updated feasibility study is something that we do when there's been a change in circumstances.  And we will do that for on behalf of the borrower so that other stakeholders have visibility to those new expectations.

Q    Who are the other stakeholders?

A    Could be bondholders, management, the board.

Q    What about a residents committee?

A    Residents committee, yes.  Residents, absolutely, stakeholders.

Q    What's your understanding of the role of the residents committee under Florida law?

A    Well, there's requirements of resident participation in the governance structures.  I'm aware of that dynamic.  I'm not an expert in those dynamics.  But we're accountable to those residents in a couple of ways.

Q    And what are those?

A    Well, one, you're signing a lifetime -- a lifetime contract, right, so you've got a contract to provide services.  So I think that's first and foremost.  The fact that they have -- and because there's a lifetime, you know, that entrance fee, the endowment that they've put -- the financial commitments they've made along with that gives them some governance rights, and those are laid out in the statutes for Florida.  And then how they're implemented and executed on is seems to be rather unique to each organization.

Q    Unique to each CCRC?

A    Yeah.  Some have pretty broad participation of residents and some limit up to the, you know, what the law -- the statutes require there.

Q    What is sort of the base level of

participation, the minimum if you will, what a resident is entitled to be involved in?

A    Well, at minimum they have got the ability -- it is a board -- it is a board -- it is a board seat and board participation.

Q    And we're talking about Florida?

A    Yes.

Q    Now, I'm just curious, is that similar to other states or is that unique to Florida or ...

A    I wouldn't say it is unique to -- it is similar to other states.  They are not a uniform set.  And really the regulated ones kind of fall into a different category, and then there's a whole category of what I would call unregulated.

Q    Well, let's talk about that.  Because when you say regulated in Florida and unregulated, what are you talking about?

A    Well, we have a department of insur -- OIR in Florida, Office of Insurance Regulation.  In North Carolina it is Department of Insurance.  Maryland has got a different department and New York has got another one.  And they have -- in those departments they have specific rules around continuing care retirement communities and those entrance fees.  Others may have space in their

regulations, but there's just not a lot of substance around them or expectations.

Q   So you have got some pretty clear requirements about entrance fees like the 70 percent threshold that you mentioned earlier; is that right?

A   Yes.

Q   And the rest of it you're saying is not as clear but it is more discretionary?  I'm trying to understand your last answer.

A   I'm differentiating Florida from other states.

Q   Right.  Right.  Right.

A   All right.  So the 70 percent expectation is a Florida expectation.

Q   What about other types of regulatory activity or regulatory supervision, is it all just dictated by the statutes and the regs or is there a lot of interpretation?  Do you work a lot with OIR in terms of figuring out what OIR's position is on certain issues?  That's what I'm trying to get at.

A   I'm not -- the OIR issues around the entrance fee requirement -- there's a requirement for a feasibility study for a COA on the front end. There's a requirement for a feasibility study at

financing. And there's a potential requirement for an update to that feasibility study if there's been a material advent -- adverse event. So we interact with the OIR in those three kind of moments in that life cycle around the filing requirements that needing a feasibility study.

Q So is it fair to say that the most of your work really sort of centers on feasibility studies?

A Yes.

Q That's where I was trying to get to.

A I do not audit and I'm not doing tax work. I'm an advisory partner.

Q And that's all I'm trying to understand --

A Okay.

Q -- Mr. Seeloff --

A All right.

Q -- is what's the primary focus of your work. And it sounds like it is feasibility studies in terms of if there's a MAC event like you said, you have to update those. And then if you have got certificates of authority -- when you say COA, that's what you mean?

A Yes, it is, yeah.

Q    I know there's a lot of abbreviations and a lot of alphabet --

A    That's fair.

Q    -- in this work.  But I want to make sure the record is clear as to what you're talking about.

A    Okay.  So there's feasibility studies and there's all kinds of things people -- you're asked to do because you have got a core competency in that.  Right?

Q    Right.

A    Like be here today.

Q    How many times have you been deposed?

A    This is my second or third time.

Q    Wow.

A    Third maybe.

Q    Do you recall was what was your first deposition about?

A    It was stucco damage on a CCRC that had to close and repair, loss damages.

Q    Gotcha.  So you were looking at basically lost profits, is that fair to say, from the closing of the CCRC?

A    The impact -- the economic impact.

Q    And what case was that in?

Page 41

A   It would have -- it is in -- it is in my -- it is in the record here.  The attorney's name and the property name are getting mixed up here.  Vaccarella was the attorney.  Does it show in my -- in the back there?

Q   I'm looking.  I'm sorry.  I should have been tracking this along.

A   There it is, 2009, Vincent Vaccarella, Aventura, Inc. versus The Weitz Company.  Aventura was the CCRC.

Q   And that's in South Florida?

A   Yes.

Q   I saw where your engagements.  I didn't see your testimony.  What page is that on?

A   I'm on page 28.

Q   So that's my 25.

A   Well, I'm reading from your book here.

Q   Right.  Oh, so you're on my page.

A   Yeah.

Q   Presentations.

A   Of my report.

Q   All right.  Oh, I see it, the last bullet there.

A   Last bullet.

Q   Vincent Vaccarella.

A     2009.  Yep.

Q     All right.  So that was sort of a damages opinion, right?

A     Yes.

Q     What about the other deposition you have done?  You said there were two or three.  You weren't sure.

A     Yeah.  There's another one for a CCRC.  The one here in 2021 was not for a CCRC.  It is for a critical access hospital.

Q     Is that the one in West Virginia?

A     Yes.

Q     Yeah, I read that opinion.  What else?

A     Well, the one in 2016 doesn't mention -- it is Mike Hino and Pepper.

Q     Pepper Hamilton?

A     Yeah.  I wrote a report.  There's no deposition in that one.  I don't think there's a deposition.

Q     In 2016 that was the one that kind of caught my eye.  Is that the one you're reading --

A     Yep.

Q     -- the bullet?

A     Yep.

Q     It says:  The purpose of the engagement

was to analyze the impact of refunding residents' entrance fees on a large CCRC financial obligations in the overall financial health of the CCRC.  CCRC was defendant.

Tell me a little bit about that case, because that seemed interesting.

A    I'm going to have to look that up.  I'm going to have to make sure I have got the right case here.  That might be the one in Medford, Oregon.  Let me confer.

Q    Sure.

A    Can we come back to that one?

Q    Yeah.  If Ms. Wonder will remind me because I'll forget.

So was there a third potential deposition you have given?

A    The third one is the 2016, it is a possible.  But I mean that's more of a report.  I'm not sure I was deposed on that.

Q    So you have got the Aventura.

A    Uh-huh (affirmative).  West --

Q    And then -- what was that?

A    West Virginia.

Q    And then West Virginia?

A    Uh-huh (affirmative).

Q    The SGA one.

A    Yeah.

Q    So while we're on this page, looking at Presentations, you mentioned LeadingAge.  Is that a significant publication in your industry?

A    It is a trade group.

Q    Trade group.

A    Trade group that all the CC -- the nonprofit CCRCs would belong to and other nonprofits.

Q    And you have got the first one there most recent 2023, the Future of Health Service -- Health Care Services and Consumer Preferences --

A    Uh-huh (affirmative).

Q    -- with Allan Blum?

A    Yes.

Q    What was that about?

A    It was at LeadingAge New York and it would have been about an hour long topic on really industry topics.  Workforce would have been a primary issue up there, changing regulations in New York, minimum staffing requirements would have come up, and we would have talked about the stress in the nursing home industry in particular and what providers are doing to try and stay afloat up

there.

Q   And then the third one, LeadingAge Colorado 2022, Good Governance with Meredith Benedict --

A   Uh-huh (affirmative).

Q   -- and Tim Johnson.  Who's Tim Johnson?

A   Tim Johnson is the CEO of Frasier Meadows, a CCRC in Boulder, Colorado, retired.

Q   And what did you talk about in the good governance presentation?

A   So good -- LeadingAge has a -- it would have been about board -- health of the board, recruiting issues around the board, diversity issues around the board, resident participation on the board, and board responsibilities and -- and board responsibilities in that context.

Q   And the good governance bullet below that in 2021 --

A   With Larry Minnix.

Q   Larry Minnix?

A   Yep.

Q   Would that be similar?

A   It would have been a -- yeah, very similar.  Larry Minnix would have been the president of LeadingAge living here in Atlanta, and

he would have helped kind of lead that conversation, been our star on a panel. And then we -- that was at a national -- that was at national.

Q    National, right.

A    And then we went -- we basically took the same presentation to the state show.

Q    So the core competency -- did you get your information about the Medford, Oregon?

A    Not yet.

Q    I just saw you check your phone. So your main core competency to use your words is on the feasibility studies?

A    Yes.

Q    Any other expertise that you have in the CCRC space?

A    I'm going to say leadership and governance.

Q    And what do you mean by those phrases?

A    Well, just leadership and governance. I mean being a leader, being a leader is kind of a soft skill set and what -- and you're just bringing some -- I wouldn't say that's specific to CCRCs though.

Q    Right.

A    That's just my -- that's just my ...

Q    So what does a leader mean in the CCRC context?

A    That's just being -- that's just being old or older than others.

Q    Fair enough.  And then what was the other phrase, leadership and?

A    Governance.

Q    And governance.  What does governance mean in the CCRC context?

A    Well, we got nonprofit boards.

Q    Right.

A    And they're predominantly volunteer boards.  And governance being good stewards and fiduciaries of large communities responsible for seniors' lives, there's a lot of responsibility inside of that governance structure which is unique to the nonprofit space, and it is different than our for profit providers, so they govern differently in a for profit.

So bringing that context and bringing that discussion and debate to that boardroom is important as they identify their role, their identity, and their responsibilities and relationship with management.

Q    So breaking that down, when you talk about the comparison between nonprofit and for profit, on the nonprofit side in the CCRC space what's the primary -- who are the constituents that you are worried about as opposed to the for profit space?  Do you understand my question?

A    I do understand your question.  I think our resident base is uniquely represented in the nonprofit space as compared to the for profit space.  You got to save your stakeholders in both, but I think their position is elevated in the nonprofit structure.

Q    And from a regulatory perspective, the Florida OIR to be specific, what is their primary focus in terms of who are they trying to protect?

A    I think the residents.  Yes.

Q    And would you agree that the primary focus of Chapter 651 and the regulations that are set forth in there are designed primary to protect the residents as well?

A    Yes.

MR. APPLEBY:  Objection that you're asking for a legal conclusion.  Objection to form.

BY MR. WHITSON:

Q    You can still answer my question.  He's

just preserving his record.

A    Okay.

Q    All right.  So I think that covers your education and your experience --

A    Okay.

Q    -- pretty well.

Now let's talk about University Village.

A    Okay.

Q    When did you first become aware of -- are you looking at Medford?

A    I am going to reply to this message here if you don't mind.

Q    Is it from anybody in this case?

A    Yes.  It is in regards to trying to get to 2'16 -- 2016.

Q    Is this from Mr. Appleby?

A    Yes.

MR. APPLEBY:  No.

A    No.  We asked earlier about this --

BY MR. WHITSON:

Q    Medford, Oregon?

A    -- 2016 case here.

Q    Right.  Okay.  Did you have an update on that?

A    Yes, I did.  But I was having difficulty

getting to it.  It is The Hill at Whitemarsh in New Jersey.  Pennsylvania, sorry.  Philadelphia, Pennsylvania.  I was not deposed in that case.

Q    Okay.  So this is New Jersey?

A    No.  Philadelphia, Pennsylvania.

Q    I'm sorry.  You said that.

A    I did say New Jersey.  It is Philadelphia.

Q    Well, that's pretty close.

A    Yeah.  Anyway.

Q    So you looked at the summary from Mr. Warren about what the claim was about.  So why don't you tell me in your own words one more time because now we're going back to the focus of your opinion.

A    Okay.

Q    What is your understanding, I guess you already said that, in sort of broad sense the claim with MLR account pledged?

A    Yeah.

Q    Valley Bank sweeping the proceeds and then --

A    So we jumped to 2014.  I guess leading up to that it could be helpful here to kind of go through what the sequence of events are.

Q    Let's do that.  But let me ask you a quick question.  When I ask you when your first experience or exposure to University Village is, what's your answer to that question?

A    Exposure to -- I was aware that it existed.

Q    When did you ever do any work in connection with --

A    This two --

Q    -- University Village?

A    -- thousand fourteen transaction would have been our first transaction with them.

Q    Am I correct in understanding that you did a feasibility study in 2013 for a potential bond issuance for University Village?

A    I would have considered that in the same transaction space.

Q    So when you say 2014, you mean 2013 as well?

A    Yes.  I mean that time period where this transaction was being -- the change of ownership was being consummated.

Q    Right.  So you got more depth in this than just reading a summary from Mr. Warren, you were actually involved in that time frame, were you

not?

A    Yes.

Q    And what was the extent of your involvement?

A    We would have been doing the market financial and economic planning, the feasibility study for this change of ownership.

Q    In 2013?

A    Whenever that -- whenever we got engaged to get started culminating in March.  So that would have been in 2013, so I'm sure that there was drafting and work leading up to this transaction.

Q    Well, that's important.  I don't want to just brush over that.  Because let's -- can you tell me definitively when you were first engaged --

A    No.

Q    -- and who engaged you in 2013 in that time frame or 2012?  I mean when --

A    Yeah.

Q    -- exactly was it?

A    I don't know.  I don't know.  The investment bankers would have been involved there.

Q    Is that H.J. Sims?

A    H.J. Sims.

Q    Let's put names on things.

A     Yeah.  H.J. Sims.

Q     Did you deal with Rob Gall?

A     Rob Gall in particular.

Q     Don't make me have to say everything. Tell me.

A     Well, I don't want to be throwing out names or acronyms that are foreign.  So yes, there's a transaction there.  Rob Gall is involved. We do a lot of work with the investment bankers.

Q     When you say investment bankers, you mean H.J. Sims?

A     H.J. Sims, yeah, and Rob is one of the investment bankers there.

Q     Who else?

A     Oh, gosh, he's got his bosses.  Aaron Rulnick, I got Andrew Nesi up in New York, I got any number of people.  Skip Frey would have been a predecessor down there in Florida.  I don't want to name all the bankers.  Bill Sims.

Q     Well, no.  I just want to -- so when you say you -- would you say you have a significant relationship with H.J. Sims?

A     Yes.

Q     And when you say significant, what do you mean by that in terms of dollars or a percentage of

your business, what would that be?

A    The referrals are -- I'm going to put this in context just so we're fair with the assessment.  Referrals are triangulated often, so the developer is referring us work, the banker is referring us work, and then we get work from -- and we know our clients.  So when there's a transaction, I can get referred from all three into the same transaction, so we got familiar parties with each.

Q    I'm sorry, developers, investment bankers, and who was the third?

A    The client.

Q    The client?

A    The client.

Q    Would that be the owner?

A    The owner, yeah.  The borrower.  The owner.  The provider.  The person paying the bills.

Q    And you've used the word provider several times this morning.

A    Uh-huh (affirmative).

Q    What is your meaning of the word -- what do you define provider as?

A    Well, broadly a provider is somebody providing healthcare services to people, patients,

seniors.

Q    And what is sort of captured by healthcare services?

A    Well, a provider could be a doctor or a hospital or a nursing home, it could be a place or a person.  But in this context we have defined provider or the OIR has defined provider in the context of OIR and what they're going to hold the provider accountable to.

Q    And what is that definition as you understand it?

A    That would be in here, the provider would be the applicant to the certificate of application.

Q    Specifically in this context when you have got the ILF and you have got the nursing center, who --

A    The ILF would be the provider in the OIR context, they're the applicant.  They would be the provider for the life care contracts.  And then WNT, the nursing home, would be a provider to skilled nursing patients.

Q    Right.

A    That may also be contract holders with ILF.

Q    Right.  So it is kind of all under the

CCRC umbrella, right, that's the whole point of the CCRC?

A    That was the issue.  So in 2012 that was coming apart.  University Village, it was all one. There was one applicant.  It would have been one. That's how I would have pictured that, right, University Village is the applicant.  They're going bankrupt.  New management comes in, tries to restructure.  They create two entities.

Q    Well, let's take this in steps.  First of all, you said in 2012 going bankrupt?

A    When did it file for bankruptcy?  Which time did it file for bankruptcy?

Q    September 22nd, 2016.

A    So there's the '16 bankruptcy.  We have got a default -- what's happened, we got a change in ownership in 2012 and we're under OIR supervision; is that right?

Q    Well, let's back up.  Okay.  So maybe it would be helpful if you could take a minute and figure out when you were first engaged at University Village.  That might help sort of bracket our timeline here.  I don't want you guessing about dates.

A    Yeah, me either.

Q    So let's figure that out.  And I'm not trying to be nosy, but are you emailing with Ms. Adrian?

A    Kendra Harris, my assistant.  And it could have been Haley but I can only text one of them at a time.

Q    Well, if you need to take a minute and just go ask her, that would probably be productive.

A    That would probably be easier.

MR. WHITSON:  Yeah.  Why don't we just take a short break.  And I should have said that in the beginning.  If at any time you need to take a break, you know, this is not an endurance contest --

A    Well, let me --

Q    -- just let me know.

A    -- make sure lunch is taken care of here and make sure I got -- these people are paying attention so if I need something, we're not just waiting for them to find it.

Q    That makes a lot of sense.

(Recess 11:28-11:43 a.m.)

BY MR. WHITSON:

Q    So did you have a chance to confirm your exact date of engagement in the University Village?

A   No.  It is being looked up.  I'm validating that.

Q   So you mentioned 2012.  Why don't we start with that and if we can qualify that later.  When were you first approached, engaged, and who approached you about University Village?

A   We would have been introduced via Rob Gall.

Q   And is it fair to say, I think you mentioned three different constituencies, but you get most of your referral work from the bond industry?

A   Yes.  Sure.  Yeah.  Yeah.

Q   So Rob Gall would have approached you.  Do you know what Rob Gall's experience with University Village was or is?

A   Prior to that, no, I don't.

Q   Well, do you know what it is now?

A   He remains as the investment banker there.

Q   Is that with Ziegler?

A   He's now with Ziegler, yes.

Q   So Rob Gall would have contacted you.  What do you recall about that?  Was it a phone call?  You know, kind of walk me through that a

little bit as best you recall.

A    Yeah, it is likely a phone call or an email or a combination of those two.  Hey, this is coming up.  I would have been made aware that he was courting them as a client and that they would need our services there to ultimately execute on that.  Hey, we're going to need a feasibility study would have been the -- okay.  And he would have probably worked on that for some time before he brought us in.

Q    Well, he wouldn't work on a feasibility study, would he?

A    He would work on the transaction.

Q    Meaning?

A    Getting the parties right, getting a borrower in place.  And they might have -- they would have done some of their own planning, and then decide to bring us in when they felt it was mature enough to do so.

Q    So let's talk about that particular continuum.  So in your industry, in your line of work the investment banker would do what you just said, right?  They would -- I assume they would be contacted about a potential financing; is that accurate?

A    Yep.

Q    And then they do the initial analysis of who the parties are and who the borrower is going to be.  And so when you said planning, was this kind of was that like an initial type of feasibility study or what would that be?  I'm just trying to understand what they do and then when it gets mature enough to use your phrase, what does that mean when they bring you in?

A    Well, they would -- they have got some -- you know, they got to start the flywheel moving somehow.  So somebody generates a phone call.  Then they've got to get a lawyer involved, you know, to find the premise, explore what their options are, and they'd be working that out with the borrower before they hire lawyers and accountants and feasibility consultants.

So they want a premise on the table, maybe a deal sheet or a term sheet.  Once they've got a deal -- a term sheet identified, I think that's the trigger here is a term sheet is used then to identify and solicit other professionals to execute the transaction.

Q    And so what is or was your understanding of why you were being approached in 2012, what was

the need for a feasibility study if I'm accurately --

A    It would have been multiple needs.  One here is we would have needed -- that would have been an expectation as part of the change of ownership with the OIR.

Q    So a change of ownership.  What was your understanding of why the ownership was changing if you recall?

A    I don't know.  I called it a bankruptcy wrongly.  There was a -- the old owners were leaving.  And I don't know if the OIR came in and took over in a receivership and forced management to turn over.  I don't know what that was.

Q    Are you familiar with the debt structure of University Village -- well, who was the owner of University Village at the time, do you recall that --

A    I do not --

Q    -- 2012?

A    I don't.

Q    Do you have any recollection of who the ownership was contemplated being changed to?

A    I should know that.  That would have been the borrower.

Q    But you don't recall as you sit here today?

A    Well, I don't know the name of that -- I don't recall the name of that entity.  John Bartle would have been a key figure in that transaction.

Q    When you say key figure, what do you mean by that?

A    Key contact.  He would have represented the management and ownership group coming in.

Q    And have you had dealings with Mr. Bartle before?

A    No.  Well, not before that time period. There was another transaction at just prior to this that was also going on.

Q    What was that?

A    It would have been a handful of -- an assisted living facility and a nursing home in the state of Florida.

Q    Do you recall the name of it?

A    No.

Q    Do you recall where it was located?

A    State of Florida.

Q    Anywhere's?

A    No, I don't.

Q    It is a big state.

A   I don't.  I don't.  It was not in the Tampa area.  It seems like -- it was disconnected from this transaction.  But Rob Gall was involved, and that that might have been how ultimately that -- the second transaction came.

Q   What happened with the first transaction, the one somewhere that was disconnected from Tampa?

A   I haven't seen it come -- I haven't seen it since.

Q   Does Freedom Village ring a bell?

A   I know that name.  Is that the previous name of University Village?

Q   No.

A   So I'm not --

Q   Don't guess.

A   Yeah.  Freedom Village is a pretty common name.

Q   So you had some familiarity with Mr. Bartle just prior to University Village?

A   (Nods head affirmatively).

Q   Is that fair?

A   Yes.

Q   Sorry, when you nod I need a --

A   Yes.

Q   -- verbal response.

A    Fair enough.  That's good.

Q    All right.  So there would have been something like a term sheet, old owners were leaving, that's your recollection?

A    Uh-huh (affirmative).

Q    And I think I asked you were you familiar with the debt structure on University Village in the 2012 time frame?

A    I was not.

Q    All right.  But that would have been something that Mr. Gall would have been --

A    Yes.

Q    -- looking at?

A    Yes.

Q    So if I ask you, I say the names Capmark or Horizon, do those ring a bell?

A    Capmark sounds like a familiar name, but I am not placing it in any context.  Were they a borrower or the previous borrower?  What were they?

Q    I mean I don't want to educate you during your deposition.

A    Okay.

Q    That's not strategic.  I just don't want to -- I want to make sure I understand what your personal knowledge is.  And if I ask you and it

doesn't jog your memory --

A    Okay.

Q    -- or refresh your recollection, I don't want to, you know, I don't want to cull your testimony in other words, so it is just what you recall.  And if you never heard that name in connection with University Village or Horizon -- how about Kisco?

A    Kisco is a management company.  I've not heard them in the context of University Village, no.

Q    Andy Kohlberg?

A    I know him in the context of Kisco but not in -- again, not in this -- I don't know their relationship with University Village.

Q    And is it fair to say that the majority or bulk of your experience is in sort of the nonprofit tax exempt bond area?

A    Yes.

Q    How much experience do you have in sort of the commercial, general commercial finance area?

A    I would say limited.

Q    Limited?

A    Yeah.

Q    Would you say none?

A    I wouldn't say none.  It is just it's a financing stack.  But I'm much more familiar with the nonprofit stacks, tax exempt bond stacks.

Q    Right.  How many straight commercial deals have you done?

A    Taxable, one or two.

Q    And your career is how long?

A    30 years.

Q    So let's go back to 2012.  Rob Gall contacts you, you'd worked with him before, right?

A    Uh-huh (affirmative).

Q    How many deals have you done with Rob Gall?

A    30 approximate.

Q    In Florida?

A    Most of them would be in Florida.  Just finished one with him in South Carolina.

Q    If you had to rank the investment bankers you have dealt with in terms of number of deals, where would Mr. Gall kind of fall on that listing?  When you say 30 deals with Rob, is that a lot of deals or have you done deals --

A    No.  I think Rob has got to be in a middle tier in a three-tier system.  I got my top bankers.  He's in the middle, so very relevant.

But he's not in the bottom third.

Q    But he's very relevant?

A    Yes.

Q    Would you say he was a significant source of business or referral client type relation?

A    Yes, I would.  Yes, I would.

Q    So we're in 2012.  What do you recall happening with your -- what was your role in 2012, what did you do?

A    We would have been hired to do a feasibility study for a pending transaction.

Q    Did you do one?

A    We did ultimately in two thousand and -- I believe in 2014 for the financing transaction with Rosemawr.

Q    Rosemawr was in 2014?

A    No.  It must have been two thousand -- I don't know.  When was the Rosemawr transaction?  I don't know.

Q    Well, again, I don't want to --

A    I don't recall.

Q    I'd prefer you testify from your personal recollection or your records.

A    I just don't recall.  I don't recall that.

Q    Well, let me see if I can refresh your recollection.  Now, you mentioned the phrase capital stack, right?  A stack?  Do you recall what that was at University Village in 2012?

A    No.

(Defendant's Exhibit 3 marked)

BY MR. WHITSON:

Q    But you mentioned you would have done a feasibility study.  I'll show you what we'll mark as Exhibit 3.  Mr. Appleby, I don't know if this is in your set or not.  But do you recognize what this document is, Mr. Seeloff?

A    Yeah, I think I do.

Q    All right.  And did you prepare this document?

A    Looks like I did.

Q    And it says BVM Obligated Group; is that right?

A    Yes.

Q    Forecasted Statement of Operations for the Years Ending August 31, and it shows 2014, 2015, and so forth, right?

A    Uh-huh (affirmative).

Q    Do you recall preparing this document?

A    I don't know about the recollection here.

But I claim ownership of it, yeah.

Q    And do you know what happened with this transaction?  I mean if I look at page 4 of 5, the footnote there says:  Maximum annual debt service for the Series 2013 bonds, excluding the final principal amounts.  Assumes 8.5 months of debt service for fiscal year 2014.

Do you see that there?

A    Yes.

Q    And then you have a second footnote about daily operating expenses.

A    Yes.

Q    So you did some work here, right?

A    Yeah.

Q    I mean you looked at some financial information.  What would you have looked at to prepare this?

A    They would have had an operating plan, a business plan of some kind here.

Q    They meaning the borrower?

A    They meaning the borrower, yeah.

Q    Pronouns are kind of vague --

A    That's right.

Q    -- so let's --

A    Fair enough.

Q    And they would have had a plan.  Would you have looked at actual --

A    We would have had a history, yep.

Q    And then you would have done these forecasts based upon your expertise --

A    Yes.

Q    -- or what would have gotten involved in that?

A    We would have used our experience -- we would have applied our experience to this.  But we were compiling management's assumptions here and then determining the reasonableness.  I'm sure it is an iterative dialogue about maybe we should consider a slower fill or something about the revenue ramp-up here and their expenses as well.

Q    Right.  And you look at market study too, right?

A    Uh-huh (affirmative).

Q    That's what you talked about earlier?

A    Right.  Exactly.

Q    And when you say uh-huh --

A    Yes.

Q    So do you recall what happened with the 2013 bonds?

A    No.

Q    But is it fair to say this deal did not come to fruition or do you recall?

A    I don't recall.

Q    But in general would you consider your work to be fair and accurately performed and created?

A    Yeah.  This was a -- is this a draft or I don't know what sequence this was produced.

Q    Well, I don't think the deal ever actually closed.  I think it was a draft and it says for discussion.  Who would have been part of the discussion about this draft?

A    Sims and BBM and the BBM team.

Q    And when you mean Sims, you mean Rob Gall?

A    I do mean Rob Gall, yes.

Q    Anybody else would have been involved?

A    Predominantly Rob.  He might have -- he's probably got a second person on the calls.  I do not remember who it was.

Q    All right.  And did Rob Gall ever mention he had some previous connection with University Village?

A    I don't know if he did or didn't.

Q    So you remember John Bartle in the 2012

time frame.  Maybe does 2013 sound more accurate given the fact these were 2013 bonds you were looking at, the footnote?

A    It does sound more accurate.  But it could have been a wide spanning period here.

Q    Sure.  And if I were to show you -- I don't know if you would have seen this.  We'll mark this as 4.

(Defendant's Exhibit 4 marked)

BY MR. WHITSON:

Q    I've shown you, Mr. Seeloff, what we have marked as Exhibit 4 to your deposition.  It is a Loan Closing Statement where the lender is Capmark Finance.

A    Okay.

Q    Have you ever seen this document before?

A    No.

Q    Would you see something like this in connection with your feasibility study role?

A    It would be a closing document I know that they go by.  Plus my name is on it.  I'm not paying attention to it.

Q    It is not.  This is actually a prior transaction.  If you look at the closing date, it shows December 21, 2006.

A    Okay.

Q    So did you have any involvement with University Village in that time frame?

A    I don't know.  I don't think so.

Q    And you said you knew the name -- you'd heard the name Capmark before?

A    Yep.

Q    What's your understanding of Capmark?

A    Well, now that I'm looking at this, they're a lender of some kind.  Probably a sole lender.  I'm not familiar with them.  I have heard the name before.

Q    That's fine.  I just want to make sure that, you know, we identify these things as we go. It shows two borrowers.  It says Westport Holdings Tampa and Westport Nursing Tampa, LLC.  Do you see that?

A    Yes, I do.

Q    And you're familiar with those entities, correct?

A    I am.

Q    All right.  And it says re: Modification and increase to, and it shows 23,050,000 loan to Westport Holdings Tampa, Limited Partnership and then a $12,200,000 loan to Westport Nursing Tampa,

LLC.  Do you see that there?

A    I do.

Q    And you had never -- weren't familiar with the debt structure prior to --

A    No.

Q    You can take a minute to review this. But would you agree with me that there were separate loans from Westport Holdings to Westport Nursing?

A    Yes.

Q    One is the UV-IL loan defined as for holdings and the UV-ALF-SNF loan.  Do you see --

A    Yes.

Q    -- that there --

A    Yes, I do.

Q    -- on page 2?

Well, you can see it on page 1 too, but page 2 kind of breaks it down a little bit more. And so do you see on page 3 the Recording Costs - Land Records, Hillsborough County, Florida?

A    How far down?

Q    It is on page 3 just looking at the top there, Roman numeral II.

A    Notice of Termination.

Q    I'm sorry, the heading.

A    Recording costs.

Q    Yeah.

A    Yes, I do.

Q    So it shows various documents being recorded there, correct?

A    Yes.

Q    All right.  And you have got a WHT Amended and Restated Mortgage and Security Agreement, right, fourth one down?

A    Yep.

Q    And then you have got a -- further down a WNT, Westport Nursing Tampa, Amended and Restated Mortgage Security Agreement.

A    Yes.

Q    And then the last document at the bottom of the page is a WHT Cross-Collateralization, Cross-Default and Mortgage and Loan Document Modification Agreement.  Do you see that there?

A    I do.

Q    And then the next page there's another Cross-Collateralization, Cross-Default and Mortgage and Loan Document Modification Agreement?

A    Uh-huh (affirmative).

Q    Is that a yes?

A    Yes.

Q   All right.  So if you're looking at this closing statement, is it fair to say that -- we're looking at this without looking at the documents. Is it a fair inference that the two loans from Westport Holdings Tampa and Westport Nursing Tampa were cross-collateralized and cross-defaulted?

A   There's an agreement to that.  That's what this is referring to, that agreement, yeah.

Q   And so but again, you weren't familiar with the debt structure of University Village?

A   I was not.

Q   But this would have been, well, I guess if you know, you were contacted in 2012 for a refinancing; would that be right?

A   Yes.

Q   Or maybe it was 2013.  Did your assistant manage to nail down the actual date so we can correct that for the record?

A   No.  She's got the current transaction, not the original transaction.

Q   And by the current transaction, you have got it in front of you.

A   This would have been the 2019 transaction.

Q   Is that the Rosemawr --

A    Yes.

Q    -- deal?

A    Yes.

Q    And Mr. Gall was involved in that too?

A    Yes.

Q    Was that Ziegler or was that H.J. Sims?

A    I don't know.  I really do not know.  It is not going to be in here.

Q    Well, I don't want to get bogged down in all that.  So do you have any recollection of when the -- what the change of ownership issue was -- you mentioned that there was a new ownership.  Old ownership was going out.  New ownership was coming in.  This bond deal was part of that; is that right?

A    Yes.

Q    And what was the state -- do you know why the bonds were not issued, why the bond deal didn't close in 2013?

A    No.

Q    What was the general state of the bond market for CCRCs if it is more idiosyncratic to particular types of properties in 2013, late 2013 time frame?

A    I don't know.

Q    So then is it fair to say that using --
if I understand your prior testimony, that most of
your work is sort of what would be called the
developer side?

A    Yes.

Q    Let's fastforward a little bit.  So did
you have any dealings, for lack of a better phrase,
with University Village, Rob Gall, or, you know,
anything that sort of touches on that deal after
2013 until 2019, were you involved in any
discussions about the financing, refinancing in
that six-year, five-year time frame?

A    I don't think so.

Q    So when do you recall being contacted
about the 2019 transaction?

A    Let's say that would have been -- the
engagement letter was dated or I have a letter
dated April 2019.  We might have been contacted in
2018 about a pending, again, change of ownership
and a financing transaction to go along with that.

Q    Were you aware at that time that
University Village had been -- had filed
bankruptcy?

A    I was not keeping track of the -- I knew
that they were in trouble.  I knew that the OIR had

been in there.  The bank -- the proceedings around their debt relief.  I didn't keep track of when any of that happened.  I would have had to familiarize myself with that when we got engaged.

Q    All right.  So I'll show you what we will mark as Exhibit 5 to your deposition.

(Defendant's Exhibit 5 marked)

BY MR. WHITSON:

Q    Mr. Seeloff, have you ever seen this document before?

A    I don't know.

Q    You can ignore the writing at the top. That just shows that this was filed in a federal lawsuit.

A    Okay.

Q    But you'll see that it -- you'll agree with me that it references Horizon LP UV Lender, LLC at the top, lender as successor by assignment to Capmark Bank.  Are you with me?

A    No, not really.

Q    Right under where it says --

A    I see Capmark, Westport Holdings, Delaware holdings.

Q    Right.  But in terms of the first one is Horizon LP UV Lender --

A    Okay.

Q    -- LLC.

A    Okay.

Q    Okay?

A    Yes.

Q    As successor by assignment to Capmark?

A    Okay.

Q    And again, are you familiar with either of those two --

A    No.

Q    -- entities?

MR. APPLEBY:  Mr. Whitson, can you direct me to what document you're referring to.

MR. WHITSON:  This is the Loan Extension Agreement.

MR. APPLEBY:  Was it included in documents that I have received?

MR. WHITSON:  It may not be.  But we have used this document in several depositions, Mr. Appleby.  I think it is appended to some of your filings.

MR. APPLEBY:  But my point this morning is did you provide it for today?  I don't have the document handy.  You're referring to a document, and I'm not real clear on what you're looking at.

MR. WHITSON:  Well, I think it is the Loan Extension Agreement.

MR. APPLEBY:  I've received a numerous batch of documents.  I'm just trying to clarify.  So this is not one of the documents you provided?

MR. WHITSON:  It may or may not be.  I'm not sure what was sent to you.  But this is not a document that -- it isn't new or anything.  This has been -- I think it is one of the main points of your --

MR. APPLEBY:  That's not my question, Mr. Whitson.  My question is did you provide it today?  If the answer is no, it is no.

MR. WHITSON:  I don't know.  I don't know if it was provided to you or not.  I didn't think it would come as any surprise.

MR. APPLEBY:  Can you have someone send me what you're looking at so I can look at the same document.

MR. WHITSON:  Yeah, if somebody can send you the Loan Extension Agreement, that would be fine.  I would assume you have copies of it.  It was produced by you and Mr. Warren to me.

MR. APPLEBY:  So Mr. Whitson, so you're asking me to go search for a document that you're

referring to and are using today.  I'm just asking basic common courtesy, professional courtesy to provide me with the documents that you're looking at.

MR. WHITSON:  Well, maybe Ms. Wonder can email it to you.  I don't think I'm going to have very many questions about this I don't believe.

BY MR. WHITSON:

Q   Mr. Seeloff, have you seen this document before.

A   No, I haven't.

Q   Were you aware that in the 2013-2014 time frame, about the same time you were looking at doing a bond deal, that there was a maturity of any outstanding debt on University Village?

A   I was not aware of that.

Q   And if you'll look at the top, there's a numbering system, 21 of 106.

A   Uh-huh (affirmative).

MR. WHITSON:  Ms. Wonder, were you able to send a copy of the Loan Extension Agreement to Mr. Appleby?  I've got it on my desktop.  If she doesn't have it, I can get it to you really quickly if I can just log in.  In fact, I tell you what, why don't we break for lunch.

(Recess 12:18-12:51 p.m.)

BY MR. WHITSON:

Q    All right.  So Mr. Seeloff, prior to the lunch break we were looking at Exhibit 5 to your deposition, the Loan Extension Agreement.  Do you still have a copy of that in front of you?

A    I do have the Loan Extension Agreement right here.

Q    If you'll look at paragraph 6 on page 21 of 106 at the top.

A    Uh-huh (affirmative).

Q    Extension and Termination.  It says:  The maturity date of the loan is hereby extended from the effective date December 15, 2013, the extension period.

That was the same time you were looking -- you did your feasibility analysis for University Village, right?

A    Yes.

Q    But you were not aware of this extension agreement?

A    Not uniquely aware.

Q    And if you'll go back to the recitals on the first page, I'm flipping back, recital A there references the WHT term loan in the amount of

23,050,000 that we looked at earlier, the other loan --

A     Okay.

Q     -- documents, right?

A     Yep.

Q     And then it references the $12.2 million WNT term loan.  Do you see that there?

A     Yep.

Q     And then C says:  The WHT term loan is secured by the Second Amended and Restated Mortgage.  And then D talks about the security for the WNT mortgage.  You see that there?

A     Uh-huh (affirmative).

Q     And then G, it is a very long paragraph. If you read through that, you'll see where it talks about the various spreader agreements and cross-collateralization agreements that were executed that we looked at earlier as well.

So based on this, without giving an opinion on it, I mean it appears that the -- that all the collateral under the CCRC whether owned by WHT or WNT are encumbered by the loans to Horizon LP UV Lender, LLC.  Is that what this document reflects in your opinion?

A     Yes.

Q    And then I talks about the assignment by Capmark to Horizon to the loan documents in the collateral recital?

A    Okay.

Q    So we have got a maturity of December 15, 2013.  And then if you look at paragraph 7, the next page, 22 of 106, it talks about a deed in lieu.  Were you aware of there being sort of what's been called in this case a forced deed in lieu?

A    I was not aware of that.

Q    Were you aware that foreclosure actions had been filed by Horizon in both federal and state court?

A    No, I wasn't, not uniquely.

Q    Not uniquely aware?

A    No.

Q    All right.  And if you'll look at -- this page isn't marked.  Oh, wait a minute.  Yeah, it is page 60 of 106, Exhibit D.

A    Yes.

Q    Entitled Outstanding Principal Amount. Loan A, which I believe was defined as the Westport Holdings --

A    Yep.

Q    -- Tampa loan.

A    Okay.

Q    Shows that current outstanding principal amount of $12,261,264.29.  Would you agree?

A    Yes.

Q    And then loan B, the Westport Nursing Tampa loan, had a current balance of $7,814,464.30, agree?

A    Yep.

Q    And then on page 62 of 106 there's a University Village Campus Income Summary dated 2013.  Have you seen that document before?

A    I don't recall.

Q    Is it possible that you prepared this or someone in your office prepared this document?

A    No.

Q    The next documents we're going to look at, Mr. Appleby, I don't know if you have them in front of you, are the loan closing statements for the CPIF loan and for the USAmeriBank loan.

MR. WHITSON:  Do you have those, Keith?

MR. APPLEBY:  Were they labeled as tabs in your index, the table of contents?

MR. WHITSON:  I don't know what the link that you got says, but I can send those to you too as long as -- hang on.  Let me look.

MR. APPLEBY:  So my understanding of what your office sent me was what you had a table of contents for something that was in a notebook.  If it is outside of that, I don't think I have it.

(A pause was had in the proceedings.)

MR. WHITSON:  Mr. Appleby, Shantel is sending you the CPIF Loan Closing Statement.  These are all attached to the motion for summary judgment, but I understand you're entitled to a clean copy.  We'll mark this as 6.

(Defendant's Exhibit 6 marked)

BY MR. WHITSON:

Q    Now, Mr. Seeloff, I have shown you what we have marked as Exhibit 6 to your deposition.  It is a Loan Closing Statement where the borrower is Westport Holdings Tampa and Westport Holdings Tampa II.  That was the owner of the ILF and the Villas, correct?

A    Okay.

Q    Is that your recollection?

A    Yes.

Q    And then the lender is CPIF Lending, LLC. Are you familiar with Columbia Pacific?

A    No.

Q    And it shows a $9.5 million loan, does it

not?

A    Yes.

Q    And looking back at the Loan Extension Agreement we talked about before, Exhibit D, that was -- the loan A was a $12,261,264.29 obligation, right?

A    Uh-huh (affirmative).

Q    Of Westport Holdings.  And the project says independent living facility located at 1204 North 22nd Street, right?

A    Uh-huh (affirmative).

Q    So the loan amount is 9.5.  The amount of debt owed by Westport Holdings is 12.2, right?

A    Uh-huh (affirmative).

Q    Yes or no?

A    Yes.

Q    Thanks.  So would you agree with me that $9.5 million is not sufficient to pay off a $12.2 million obligation?

A    Yes.

Q    And were you aware of any of these facts when you rendered your opinion?

A    No.

Q    And if we look at the closing statement, you'll see the various usual things there.  But it

shows that there's a payoff of the GEMSA Loan Services, LP loan, correct?

A     Yep.

Q     And the Horizon is above that which is zero.  But the GEMSA was $5,611,740.47?

A     Yes.

Q     And that was part of the encumbrance that we were talking about earlier under the Loan Extension Agreement as well.

So if you look at the other distributions that are made there, if you go back to page 1 of 4 where it says lender CPIF Lending, LLC.

A     Uh-huh (affirmative).

Q     It shows the origination fee, due diligence expenses, and then it shows a capital expenditure reserve of $1,750,000.  Were you aware that as part of the refinancing of Westport Holdings that a 1.75 cap ex reserve was created under that loan?

A     I was not aware of that.

MR. WHITSON:  Mr. Appleby, do you have the closing statements?

MR. APPLEBY:  I have the CPIF statement. I don't have the USAmeriBank yet.

MR. WHITSON:  I was going to move there,

so hopefully that's on its way.  We'll go ahead and mark it.

THE WITNESS:  So this is the loan closing statement for the March 31st, 2014 transaction?

MR. WHITSON:  Right.  In other words, my understanding was that, you know, the bond yield was supposed to happen.  It didn't happen because there were certain conditions in the bond market that -- and I haven't spoke to Mr. Gall about this.  This is what I have learned generally through the case.  So they had to switch to a more conventional commercial deal in order to pay off the Horizon GEMSA obligations.

We'll mark this as 7.

(Defendant's Exhibit 7 marked)

MR. WHITSON:  I won't ask you any questions until Mr. Appleby gets it.

MR. APPLEBY:  Still waiting.

(A pause was had in the proceedings.)

MR. WHITSON:  Let me know when you receive that, Mr. Appleby.

MR. APPLEBY:  Thank you.

BY MR. WHITSON:

Q    All right.  So Mr. Seeloff, I'm showing you what we marked as Exhibit 7 to your deposition.

It is a Loan Closing Statement, borrower is Westport Nursing Tampa and lender is USAmeriBank.

A     Uh-huh (affirmative).  Yes.

Q     Predecessor to Valley, the Defendant in this adversary proceeding, and the loan amount is $15 million.  And you'll recall as we looked at the Loan Extension Agreement, the WNT loan was only $7.8 million.  Do you remember that?

A     Uh-huh (affirmative).  Yes.

Q     So we have got collectively loan proceeds available for $24.5 million.  And you'll see that in addition to the 5 million -- and GEMSA was the servicer for Horizon -- 5.6 was paid back from the loan to Westport Holdings and the remainder of the debt, as we see on page 2, 6.4 million on line 5, 8.05 roughly million on line 6, and then an additional on line 7, hundred thousand dollars.  Do you see that there?

A     Yes.

Q     So if we sort of combine these two closings, would you agree with me that the proceeds from both loans were used to retire and pay off the Horizon debt that we saw in the Loan Extension Agreement?

A     Yes.

Q    Now, would you also agree with me that the aggregate amount of indebtedness of approximately $20 million was cross-collateralized, cross-defaulted, and guaranteed on the books of Westport Holdings prior to March 31, 2014 as we saw under the Loan Extension Agreement?

A    Say that again, make sure I understand.

Q    That the entire $20 million that was owed to Horizon was owed by Westport Holdings and Westport Nursing under both the various loan agreements, the cross-collateralization, the guaranties back and forth?

A    Prior to the transaction it looks that way, yes.

Q    And on March 31 the only indebtedness that's owed by Westport Holdings is $9.5 million. There was no guarantee or cross-collateralization of these two loans.  So the sole indebtedness owed by Holdings is on Exhibit 6?

MR. APPLEBY:  Object form.

BY MR. WHITSON:

Q    You can still answer.

A    I believe so, yes.

Q    So then the debt was reduced from $20 million on Holdings' books down to

$9.5 million; would you agree with me?

A    Yes.

Q    And that the secured indebtedness on the assets of Holdings was reduced from $12.2 million to $9.5 million; is that also correct?

A    I don't know.  I'd have to map that out.

Q    Right.  And then the debt on Westport Nursing's books went from $7.8 million that we saw on Exhibit D --

A    Uh-huh (affirmative).

Q    -- to $15 million, right?  So it almost doubles.  Would you agree with me?

A    Yes.

Q    And we see there the $3 million cash collateral that was the pledge of the MLR funds to the cash collateral account.

Now, are you aware of how the money flowed, the $3 million of the -- now we're jumping to the MLR issue that you sort of -- part of your opinion, and we can probably -- should probably go through your opinion and talk about it there.  But since it is referenced on the closing statement that the money was -- the MLR was being held at an escrow -- under escrow agreement in an account at Regions Bank.  Were you aware of that?

A    Before or after --

Q    Before March 31, 2014 or actually on March 31, 2014 as well.

A    Okay.

Q    Do you remember that or ...

A    I knew it was held in an escrow account. I'm losing track at which bank it was at.  It ultimately ended up at Valley Bank.

Q    Right.  But the money -- do you know how the money left -- where the money was wired to from the Regions escrow account?

A    Where it was wired to?

Q    Yes.

A    I thought it was -- I think I do.  I do not know for a fact.

Q    That's fine.  I think that covers what we need to cover with those documents.  Now let's go back to your -- let's look at your opinion.  And we'll mark this as Exhibit 8.

A    It's also tab 2.

Q    Tab 2 in the book, correct.  Oh, wait a minute.  We already marked it as 2.  I apologize. This will be 2.

A    Okay.

Q    Let's go back to Exhibit 2.  Mr. Seeloff,

I'm looking at Exhibit 2 dated July 7, 2023.  You see that there?

A    Uh-huh (affirmative).  Yes.

Q    Now, who contacted you regarding the preparation of Exhibit 2?

A    I would have been referred by Richard Ackerman to Jeffrey Warren.

Q    Did Mr. Ackerman contact you first?

A    I was with Mr. Ackerman when it happened.  Call it spontaneous.

Q    I gotcha.

A    Yes.

Q    Where were you guys at?

A    I would have been on a site visit in Kiawah, charleston.

Q    Is that a golf trip?

A    No, it was not.

Q    Well, Mr. Ackerman lives in that area, right?

A    He lives south of there, yes, in the state of South Carolina.

Q    Right.  And in what site were you visiting?

A    We were visiting the Seafields site, CCRC under development.

Q    And so just describe that call for me.
Was there a phone call from Mr. Warren to
Mr. Ackerman or how did that work?

A    Well, we were visiting on Seafields and
then had lunch and we went through his deal
portfolio.  We talked a bit about Unisen.  I think
he knew he needed an expert witness.  Hey, let me
put you in touch with Jeffrey Warren, see if you'd
be -- consider being an expert witness for this
thing he's got going.

Q    What is Unisen?

A    Unisen is the new name for University
Village.

Q    How do you spell that?

A    U-N-I-S-O-N.  So they would have
rebranded it on their way out of this transaction.

Q    When you say they, who are you referring
to?

A    The new owner, the new management
company, Big Rock, and that development team,
development and management team.

Q    What's your understanding of the role of
Tampa Life Plan Village in that team?

A    Well, that would be the nonprofit, the
nonprofit entity?

Q    I assume.  I don't know the details of all of that side of the deal.

A    Well, you have got the entity.  They own the assets and then they'll hire a management company or development company to execute.  So these are the executers Tampa Life Plan or West -- whatever the name of the nonprofit is here.

Q    This is the deal you did do?

A    Uh-huh (affirmative).

Q    The 2020 deal, right, that we're talking about now?

A    The twenty -- I don't know.  It would have been -- yes.  Yes.  Because they didn't rebrand it until -- Big Rock rebranded it in the 2020 deal, yes.

Q    What is the connection between Big Rock and Tampa Life Plan Village?

A    I don't -- their current -- Tampa Life Plan Village is -- they would be the management company for Tampa Life Plan Village.

Q    Big Rock would be?

A    Yeah.  And is it Tampa Life Plan d/b/a Unisen at this point?

Q    I don't know.  This is the first time I have heard the name Unisen.

A    Okay.

Q    So I don't have any idea what tradename now that might be associated with.

A    Okay.

Q    I can tell you I'll probably know tonight.

A    Yep.

Q    And so you were aware through Mr. Ackerman that Mr. Warren needed an expert for this lawsuit?

A    Yes.

Q    What else did you talk about with Mr. Ackerman about this lawsuit?

A    Next to nothing.

Q    Why did he say Mr. Warren needed an expert in this case?

A    Probably because Mr. Warren asked him hey, I need an expert in this case.

Q    And what kind of expert were you told that Mr. Warren needed?

A    Somebody who specialized or understood Chapter 651 and the minimum liquid reserve, who knows, you know, the requirements and expectations around that.

Q    And would you consider yourself an expert

on Chapter 651 and the MLR?

A    Yes.

Q    And we can go through your report.  But just while we're on the subject right now, why would you consider yourself to be an expert?  I'm not saying you're not, I'm just saying --

A    To experience -- I'm experienced at it, times at bat.  We have watched it evolve quite a bit here over the time.  People need to wrestle with those expectations.

Q    Well, let's talk about that.  So you have watched it evolve.  So can you describe for me that evolution.  Are you talking about the 651 or the MLR or both?

A    Well, 651 and the enforcement around it. So you have had some leadership changes politically at the department.

Q    When did those occur?

A    Oh, I can't keep track.  But certainly those changes have affected the department and the people regulated by that.  2008 and '9 was another, you know, opportunity for the OIR to revisit their enforcement of those rules.  And then the leadership turnover and then some regulatory changes that showed up more recently.  But that was

multi -- that was a multi-election cycle process.

Q    And when you say the department, you're referring to Department of Insurance or --

A    OI -- office of Insurance Regulation.

Q    OIR?

A    Yeah.

Q    And what's your understanding of the connection between the Department of Financial Services, DFS, and OIR?

A    I can't quite articulate the separation of responsibilities.  But one is the Insurance Department and the other Department of Financial Services.  I do not know.

Q    That's fine.  All right.  Let's talk about the changes in enforcement, so let's break that down.  How would you describe the enforcement if you will in 2008, 2009?

A    Compliance and oriented regulatory in nature, not enforcement.

Q    What does that mean?  How do you differentiate those two things, compliance versus enforcement?

A    Are you filing your paperwork, did you file your annual requirements.  So yes, I did.  The enforcement would be well, what are you doing -- so

the enforcement around -- let's see here.  So they've got -- the department -- OIR has remedies if the applicant is not in compliance.

Q   And what are those remedies?

A   Well, ultimately receivership and they can put them into supervision and review.  I think that -- other than that it is more compliance, more filing paperwork.  So you're trying -- they're all trying to avoid the supervision and review from the department -- from OIR.

Q   Would that be like the nuclear option essentially by OIR or not, something less that that?

A   Yeah, no.  Let's call that the nuclear option.  I don't know that they have got much remedy prior to that.  But that certainly puts them on a path getting the previous owners out, previous management team turns over, and now they have got -- now they're sitting in a seat without an answer, right?  So old owners probably stick around longer than they should have.  Difficult to find new owners without new capital.  Timeline gets extended there.

Q   So in other words, you're sort of, and I'll use my phrase, in the 2008-2009 it is

compliance but we're willing to kind of kick the can down the road a little bit; is that fair to say?

A     That's -- that's -- that's my point of view on sitting on -- from sitting here in Atlanta on that -- on what that looked like at the time, yeah.

Q     So then we're looking at changes after that.  So you said there was a leadership turnover, this is after '09?

A     I believe it is after '09, yeah.

Q     So what happens after '09?  I mean I'm not trying to tie you down to specific dates --

A     Well, so --

Q     -- but in terms of just the broad --

A     So there's two -- there's at least two critical failures in Florida, Glenmoor and University Village where residents' refunds are at risk.  And that's when you saw not only a leadership change but a more active Office of Insurance.

Q     You said Glenmoor?

A     Glenmoor is another CCRC in Florida.

Q     Glenmoor and University Village?

A     Uh-huh (affirmative).

Q   Where resident refunds were --

A   At risk.  There was a third one in there too but I'm drawing a blank on that name.

Q   What about Devonshire?

A   That would have been it.  Also with a name change.

Q   What about La Posada, are you familiar with La Posada?

A   Yes, I am.  They also had resident refunds.  Devonshire and La Posada are not the same but they're on the same side of the state.

Q   Right.

A   Yeah.

Q   East Coast?

A   Yes.

Q   So you're aware of La Posada and Devonshire.  Did you do any feasibility studies in connection with --

A   On the La Posada engagement, we're going back a ways.

Q   I know.

A   Yeah.  Devonshire, I'm not drawing -- I'm not making a conclusion with that one.

Q   So we've got really four CCRCs that are in trouble after --

A    Well, you have got some time separation between --

Q    Let's just --

A    -- the first generation and second.

Q    Let's tag that.  So let's go to the time. Walk me through that chronology as you remember it.

A    Well, I think the early ones were the Devonshire and La Posada.  Then you had -- I believe then you would have had our financial crisis and we would have had a new generation of trouble post that.

But the issues are the same.  The rules were the same.  The activity and now the awareness of the residents and the Office of Insurance is different.  So I think they're much more active in the next two cases than they were in the first two.

Q    So Devonshire and La Posada less active?

A    I'm saying they're less active.

Q    I know.  I'm trying to make sure I match things up.

A    Okay.

Q    So as a result of that, when it came to Glenmoor and University Village, they're more active; is that fair to say?

A    I believe so, yes.

Q    And when you say more active, what does that mean in terms of the facts that happened here?

A    Well, here they took action.  Here they inserted themselves and exercised their right for supervision and review.  They didn't do that in any of the other three cases as far as I'm aware.  I don't think so.

Q    And do you recall when that happened?

A    No.

Q    I think it is referenced in your report, but there was a February 2015 initial order of suspension.

A    Okay.

Q    Do you recall that?

A    No.

Q    Did you review that in connection with preparing your report?

A    We would have looked at that whole timeline and recorded it, yeah.

Q    Was an initial order of suspension entered in any of the other four?

A    I don't think so.  I don't know.

Q    Do you have any opinion or know why UV might have been treated -- University Village when I say UV -- might have been treated differently

than the other two -- other three, I'm sorry?

A    The political pressure changed.  I don't know.

Q    You said there were changes in leadership, changes in the administration.

A    Uh-huh (affirmative).

Q    Can you be more specific about that?

A    I can't.

Q    Are you familiar with the name Kevin McCartney?

A    No.

Q    Well, that's very helpful.  Because I was aware of all those but I wasn't sure how they kind of fit into sort of a --

A    Yeah.

Q    -- regulatory shift if I can call it that.

A    There's some context there.  I'm not sure I answered it completely.

Q    Go ahead.  Give me --

A    I don't know -- I don't know more than all that.  Clearly there's other contexts out there.  There's some building -- there's some other building blocks I'm aware of.

Q    And then you mentioned financial crisis.

What does that mean?

A    Well, the financial -- they're not paying debt service.

Q    I gotcha.

A    So at that point refunds are at risk and debtholders are not getting paid or certainly not getting paid in their entirety.

Q    What's your understanding of when you say refunds are at risk, when it came to University Village at various -- and sort of also kind of match that to a timeline as to when you --

A    Yeah.

Q    Do you have a specific understanding of that?

A    You know, not sitting here today.  But there would have been at some point in time there -- a queue would have started to develop where the refund was due but there was no cash to pay it, so that they would wait until there was cash or more people moved in.  And then they would get behind on that and the queue would build.

Q    Well, let's talk about that.  I have been involved with this case a while, and I know in the various discussions I had with people at the OIR they referred to CCRCs -- and this is not meant to

be a serious comment but just loose jargon --
legalized Ponzi schemes.  Would you agree with that
or do you want me to --

        A     I understand the analogy.

        Q     Do you necessarily disagree with the
analogy?

        A     Legalized Ponzi scheme.

        Q     Let me break it down for you.

        A     It -- it -- it ...

        Q     Go ahead.

        A     I think a better analogy is multi-tiered
marketing.  You know, I don't think the Ponzis --
the Ponzis got a negative connotation at the end
here and a fraudulent context.

              So I think the mechanics are -- would we
call Social Security a Ponzi scheme?  So this is
much like Social Security.  The next person refunds
my obligation.  So Social Security is a good
analogy here too.  We might call Social Security a
Ponzi scheme.  So if it fits the Social Security,
then perhaps --

        Q     Careful.  That's a big part of my
retirement program.

        A     I'm sorry about that.  Substantial,
right?  But so there's that context.

Q    So but it is fair to say then that when you have that refund obligation for a departing or deceased resident that the way the business is structured in the ordinary course is that that is paid by the initial entry deposit of the incoming resident?

A    Correct.

Q    And there's nothing wrong with that in your opinion, right, nothing fraudulent about that?

A    Nope.

Q    And that's by design, is it not?

A    Yep.

Q    And that's what the regulatory and statutory framework sort of embodies, is it not?

A    Yes.  It recognizes that, acknowledges that, and puts a framework around it to protect the parties.

Q    Right.  So we kind of veered off a little bit and I'll get back on where we were before.  So you're having a meeting with Mr. Ackerman looking at the Kiawah site and having lunch.  And he says I need to give your name to Jeff Warren because we need an expert in this case on these issues, and that's when we diverted off into this tangent.

What happened next, did Mr. Warren call

you or did you call Mr. Warren or what was the next step after that lunch meeting?

A    It would have been an email introduction and then we would have traded an engagement letter and then just started trading documents.

Q    And who did the email come from?

A    It would have been Jeff Warren.

Q    And then when you started exchanging documents, were those the documents that you listed in your report?

A    Yes.

Q    And we may have to sort of bracket this conversation.  But so at that point you did you get a copy of Mr. Robichaux's opinion?

A    Yes.  His report.

Q    All right.  And I may have asked you this before.  Are you familiar with Mr. Robichaux?

A    I am not.

Q    I didn't know how tight-knit this industry was.

A    No, I'm not.

Q    And I think Mr. Robichaux is experienced, has a little bit more to do with sort of interim management services, a chief restructuring officer.  Have you ever done anything like that?

A    No.  I have been at the table, not directing traffic.

Q    So explain that in lay terms.  When you say been at the table, what does that mean?

A    Well, I have been at the table during a restructure.

Q    Right.

A    Case in point.

Q    Documenting a document?

A    Documenting a document.  I've been at the table when we have had change of management and discussed the merits thereof.

Q    Right.  But I mean directing traffic you haven't actually been --

A    I'm not making those decisions or --

Q    Gotcha.

A    -- providing counsel per se either.

Q    Right.  And do you do any advising on boards of directors about decisions like that or --

A    Advising to boards.  I'm not on any boards.

Q    Right.  You don't sit on a board?

A    I don't sit on a board at the moment. And in the context of a feasibility consultant and our role, we'll often be asked to make comments on

the transaction.

Q    Is that the sum and substance of your interaction with the board usually?

A    Yes.

Q    So then let's keep going through your report.

A    Okay.  Page 2.

Q    We're making progress.  Do you recall about the date that you were retained by Mr. Warren?

A    No.

Q    Could you look at --

MR. APPLEBY:  Mr. Whitson, I'll object to your statement.  I don't think it's the testimony that he was retained by Mr. Warren.  He was retained by me as counsel for Mr. Warren.

THE WITNESS:  That's right.

MR. WHITSON:  Well, thank you for correcting that.

BY MR. WHITSON:

Q    Do you recall the date that you were contacted by Mr. Warren?

A    I'd have to look that up.

Q    Would you mind checking your email, just give me the date.  I don't want the email.  I just

want to know the date.

A    Let's see if we can do a sort here.  I'd be better off asking.

MR. WHITSON:  You want to take a minute to go ask your assistant?

THE WITNESS:  That would be faster.

MR. WHITSON:  Yeah, let's just do that, take a second.

(Recess 1:43-1:51 p.m.)

BY MR. WHITSON:

Q    So Mr. Seeloff, did you have an opportunity to confirm --

A    Yes.

Q    -- the day you were first contacted ...
What was that date?

A    We talked about it in May of 2023 and I was engaged in July of 2023.

Q    That was your lunch with Mr. Ackerman?

A    Yes.

Q    And you said July?

A    Yes.

Q    And that was the engagement.  Was July 2023 the date of the email from Mr. Warren?

A    No.  That was the date of the engagement letter.

Q    Right.  When was the email from Mr. Warren?

A    It would have been in May.  The lunch would have been -- initial conversation would have been in May with Mr. Ackerman and then a phone call with Mr. Warren soon thereafter.

Q    Oh, phone call.  Okay.

A    There were emails too.

Q    And then you were engaged in July?

A    Yep.

Q    All right.  And have you ever served as an expert witness before?

A    Yes.

Q    How many times?

A    I got three.

Q    Three?

A    This is my third.

Q    This is the third.

A    We went through that in the back of the record there.

Q    Right.  I know you testified in the SGA West Virginia case?

A    Yes.  I was an expert in the Vaccarella, I was an expert witness at the Whitemarsh, and here.

Q    So we already talked about your opinions in those cases.  I think in the West Virginia case it was basically if a hospital lost its certification as a --

A    Sole --

Q    -- CAS or something like that?

A    Critical access hospital.

Q    Critical access hospital.

A    Sole community provider.

Q    That would have a detrimental economic impact on that hospital?

A    Uh-huh (affirmative).

Q    Right?

A    Yes.

Q    And you did the financial forecasting?

A    We did the economic impact, yes, of losing that.  Same thing with the Vaccarella, we did the economic impact of if this wouldn't have happened, what would it look like, measure the gap.

Q    That was the stucco case?

A    Yes.

Q    So have you ever given any expert opinion or consulted on interpreting a state statute like 651 or specifically 651, Florida Statutes?

A    I cannot recall any.

Q    What about any particular guidance or interpretation you may have given in connection with the use of a minimum liquid reserve, have you ever done that?

A    Postmortem.

Q    What does that mean?

A    So not use of the funds.  So restate the question, please.

Q    Have you ever given any consulting advice, what have you, in the scope of your professional activities with the use of a minimum liquid reserve such as the one at issue here under 651.035 or any other state statute or anything like that?

A    I would have been involved in some informal communication or discussion around that, but never a unique or distinct opinion about it.

Q    When you say informal discussions, what would that sound like?

A    So the minimum liquid reserve comes down in a couple different buckets.  So if they need cash for capital assets, hey, Keith, what do you know, can I take this much money out, how do I replenish it with this count, with that count.

So if they need to access the minimum

liquid reserve, then one, they got a liquidity problem just to be there and then whether we accessed that for capital improvements and then they would have to prepare a plan to replenish that over 12 months.

And we would not have prepared these plans, but I might have a couple of CFOs who would have called me and said hey, what do you think about this as I'm preparing my plan.  So I don't know if that's a non-answer or not but there's the context.

Q   No, that's a great answer because I like the context.

A   Okay.

Q   That way I understand the answer better. So then would that be in Florida or other jurisdictions?

A   Minimum liquid reserve is unique to Florida.

Q   Oh, it is?

A   There are other minimum liquidity requirements that other states have, North Carolina being one.  I have had similar conversations in North Carolina.  But they're minimum liquidity requirements, and they've got a unique formula and

application in North Carolina that's different than Florida.  But the purpose I think is generally the same.

Q    And what do you understand -- well, let's back up then.  So looking at your opinion -- so actually let me just close the loop on that then.  So you might get a call from a CFO about needing to use the MLR for some purpose.  Do you opine or do you consult with them about whether or not that is a legitimate purpose for the use of the MLR?

A    No.

Q    And so when you come up with the plan to replenish, is that where you really come in in terms of looking at the feasibility of that, the forecasting?

A    No.  I come in confirming that they need a plan.

Q    You got to pay this back?

A    You got to pay this back.  You got to do it over 12 months.  And do you have a plan to do that.  Yeah, we got a plan to do that.  This is what it is.  Okay.

Q    You don't actually look and see if the plan can work?

A    He didn't ask me if it would work, no.

Q    So as long as they got a plan, you're fine with that?

A    Well, you know, it would be a separate question, do you think my plan would work.  Well, we can talk about your plan and we can unpack your plan.  But I think the question about replenishing the minimum liquid reserve, do you have a plan to do so, yes or no.  Okay.  Well, if we want to talk about your plan or scenarios around your plan and what if, you know, something doesn't go according to plan.

Q    Right.  Is the plan realistic and what's the sensitivity now; is that fair to say?

A    We can have those discussions.  I'm typically not engaged at that level of planning.

Q    But you have gotten those phone calls?

A    Sure, I have been in those conversations.

Q    But those haven't been the subject of a specific engagement if I understand what you're saying?

A    Not around the MLR itself, no.  No. We're closer to the financing event and not month-to-month working capital.

Q    Right.  And is it fair to say that if you get a lot of calls from a particular client or CFO,

I won't say client because that kind of has some other meanings to it, and you're starting to have working capital issues, does that sort of suggest maybe the need for a restructuring to some extent or how do you -- or is that just temporary or does it --

A    It brings up a gamut of questions, what are you going to do about it.  Restructuring is probably not the first thing they're thinking about.  They need a liquidity infusion and a performance improvement plan and probably some move-ins.

Q    And how would you get a liquidity infusion, would that be from equity or how would you typically do that?

A    Well, now we're in an affiliation status here and those aren't typical, so that's more of a hypothetical.  But you do need a liquidity infusion, so that's either debt restructuring or move-ins which is basically your capital, your resident capital coming in via entrance fees.  So, you know, ten move-ins would be a capital infusion.

Q    When you say affiliate, do you mean loans from affiliates or --

A    It could be a loan.  It could be a gift.

It could be a contribution. However we want to consummate the member substitution.

Q Gotcha. Now, going back to University Village, you know, and we'll go through your opinion, but you mentioned there was a change of ownership. Do you recall any specifics about what that change of ownership involved?

A I don't have specifics of the timeline. I know there was a previous owner and the management company, Larry Landry's name comes in.

Q Do you know Larry Landry?

A I have met him. I don't know him per se. He's senior to me. So I know who he is but I have not worked with him directly in a substantive way. But he's got a management team and I probably -- management company that was there.

Q Have you worked with Mark Lichtenwaller?

A I have known Mark.

Q David Mills.

A I have met David. Yeah. I know them both. So they were there. And then the Bartle team came in. And now we've got a new team. Now, if there was another person there in there, I'm not aware of. But there's at least two or three. And there was something prior to Larry Landry.

Q    Right.

A    Yeah.

Q    What's your understanding of when Mr. Landry sort of came into ownership of University Village?

A    See, that's at the genesis of my introduction here.  There was chaos before.  Larry might have been involved in that in some way.  He stepped in.  And, you know, that's not exactly prehistoric history but that's history.  And then it builds.

Q    Did you ever work with Cathy or Cathleen Burkholder?

A    I don't know that name.

Q    You don't know the name?

A    Not specifically.

Q    Did you work with any people on sort of the finance team at University Village when you were putting together your projections and numbers?

A    No.  I don't remember who in the 2013 --

Q    Right.

A    I don't know who -- I don't remember who the point of contact would have been for pulling all that source data together.  But we would have had history which would have been relevant, and

then we had a new manager with new -- with basically a new plan.

Q   Right.  So looking at page 1 of your report, second paragraph.  You say:  I was designated as a rebuttal expert witness to serve as a senior living subject matter expert in respect to the application in the healthcare industry of Title XXXVII, Section 651.035, Florida Statutes (2014).

Do you see that there?

A   Uh-huh (affirmative).

Q   Have you ever been a rebuttal expert witness in the two other times?

A   The Vaccarella was a rebuttal.

Q   Rebuttal.

A   Actually you know what, what's a rebuttal of a rebuttal?

Q   Surrebuttal.

A   Surrebuttal.  I think it was a surrebuttal.

Q   Wow, you must be good.

A   I'm not sure how it got settled.

Q   And you say later on:  Related to the adversary proceeding and in rebuttal specifically to the expert report of Louis Robichaux IV of

Ankura Consulting Group.

Q    Are you familiar with anybody at Ankura?

A    No.

Q    I just get a sense that this is kind of a small world and I would think you guys would know each other, but you don't?

A    I know the firm.  I mean they've changed names too.  But it is the professionals in there that I have not bumped up against.

Q    Gotcha.

A    I mean I'm generally familiar with Ankura.

Q    It says in the third paragraph there, second sentence:  The rebuttal report is based on work completed to date, and I reserve the right to supplement the rebuttal report if any additional information becomes available.

Are you anticipating any supplement to this report?

A    No.

Q    Do you have any further opinions that you have formed that are in addition to or different --

A    Not prior to this meeting, no.

Q    And if you do, you'll let me know?

A    Yep.

Q    I'm just kidding.

A    Gotcha.

Q    So but everything that you have an opinion about is contained in this report; is that fair to say?

A    I believe so.  That's certainly the intent.

Q    In the footnotes there it says you looked at the expert report of Dan Murphy.  But you don't recall exactly what you pulled out of Mr. Murphy's report; is that what you said earlier?

A    That's right.  In regards to the escrow release or, you know, not the escrow but in regards to the MLR, no.

Q    Right.  Because Mr. Murphy's report was really more about solvency, correct?

A    Yes.

Q    All right.  And do you have any opinion about solvency?

A    About their point of view on solvency?

Q    Well, obviously --

A    I mean --

Q    -- I'll leave --

A    -- I don't understand.

Q    -- it open.  You tell me.  Do you have

any opinions at all about the solvency of University Village either Westport Holdings or Westport Nursing in March 31, 2014?

A    Post transaction I said no.

Q    Post transaction?

A    Post to the 2014 transaction, right, with the new debt, you know, we said that the plan that was submitted for that financing had our feasibility study on it that that was the reason -- those were reasonable assumptions and a reasonable plan.

Q    Right.

A    But I don't know about the ones before that.

Q    Right.  So now we're talking about -- when you say -- when you said no, what do you mean that you had no issue about solvency at that point on the feasibility study?

A    On that plan, right.

Q    Right.

A    That's right.

Q    Okay.  Right.  Well, I'm --

A    But the plan proposed from the Murphy report was a different plan.  So we can have a comment on the solvency, you know, what we think

about the solvency of that plan versus the solvency of the plan in 2014. So solvency is really directed at the plan on the table, right?

Q    Okay.

A    Okay.

Q    So did you work on Ms. Benedict's rebuttal report?

A    I worked with her on that, yes.

Q    You did. And what was your role in working with Ms. Benedict on her report?

A    I call it supervision, review, and coaching.

Q    And you said before that Ms. Benedict works for you?

A    Yes.

Q    And that's why when I look at your bios online, I was wondering why you didn't do the rebuttal to Mr. Murphy's report. Is that a fair question for me to ask?

A    I think it is a fair question.

Q    And why didn't you do the rebuttal report for Mr. Murphy's report?

A    Meredith is unique -- has a unique set of skill sets and capabilities that are different from mine. So she was -- looked more credible on that

subject matter.  I looked more credible on this subject matter.  We just came up with two reports, two experts.

Q    Right.  But you collaborated -- is it fair to say you collaborated -- each collaborated on both reports?

A    Yes.

Q    So how much -- what was Ms. Benedict's role in your report?

A    You know, the reports were being done -- well, they were cascading.  You know, this one got started first and we were hired for the second one.  It was a team effort.  But I was focused on this one.  She participated in some of the conversations.  She was focused on the other one.  I participated in those conversations.  Haley helped us pull together the documents and keep the documents straight.  And there might have been another person in there helping to do the same.

Q    All right.  Let's go to Alleged Injury on page 2.  You say:  As part of normal business financing activity, WHT, Westport Holdings Tampa, established and funded an escrow account at Regions Bank on June 22nd, 2004 to comply with Section 651.035, Florida Statutes.

Did you ever look at the 2004 Regions Bank escrow agreement?  I think I asked you that before.

A     I don't know.  No, I don't think so.

Q     Because the footnote it says University Village Minimum Liquid Reserve Escrow, Regions Bank, June 22, 2004.  So I didn't know what that was referring to.

A     Don't know either.  It could be a typo. Shouldn't that be 2014?

Q     No.

A     No.

Q     I mean --

A     I don't know.  I don't know.

Q     That's fine.  It says:  As set-aside funds regulated by the Florida Office of Insurance Regulation, OIR.

What do you mean by set-aside funds?

A     They're in a unique account.

Q     Anything else?

A     And for a unique purpose with restrictions upon their use.  Requires OIR approval to use the funds.

Q     Approval?

A     Yeah, I think it is approval.

Q    Are you sure it isn't notice?

A    You have me doubting myself.  Don't know.

Q    And you say:  These funds were not available for use to any other entity whether associated or unassociated with WHT including Westport Nursing Tampa, LLC.  Limited liability company WHT owned all the member interests of WNT.

What do you mean by that statement, that opinion?

A    They're restricted funds for unique purposes.

Q    And so these funds are available -- at this point you're looking at the CCRC, right, as sort of in total.  And isn't that how the OIR kind of looks at all this stuff in terms of they look at -- the continuum of care is really their focus which means you have got to have the resident center but you have got to have the nursing component as well, right?

A    No.

Q    No?

A    I might look at it differently.  I think their focus is the entrance fee and the contract associated with the entrance fee.  Your nursing home may or may not have -- your CCRC may or may

not have a nursing home.  It may or may not have enough nursing home beds.

You would be obligated to provide for my service in house or out of house.  OIR is -- its purpose is around the contract.  And the fact that you're providing health insurance benefits and an annuity contract to a resident, and that is what's giving them auspices over that contract.

Q    Right.  But the MLR has three components, correct?  We talk about that -- you talk about it in your report?

A    Uh-huh (affirmative).

Q    You've got the, you know, the debt service reserve, right?  You have got the operational reserve?

A    Uh-huh (affirmative).

Q    And you have got the cap ex reserve?

A    Uh-huh (affirmative).

Q    Is that fair to say?

A    Yes.

Q    Now, when you have got, as we did in University Village up to March 31, 2014, sort of an integrated CCRC.  I'm not talking about what's -- other CCRCs could be an off-campus if you will nursing component.  But here you have got two

related parties?

A    They're not related.  Are they related?
They're not related.

Q    Nursing Tampa and Holdings?

A    I don't think your governance structure
is related though.

Q    Well, but Larry Landry is a general
partner, correct?

A    Post transaction, right?

Q    What's your understanding?

A    That we have two entities.  My
understanding is we have two separate entities and
they've separated the two entities.  That's
basically what --

Q    As of what date?

A    The two thousand -- March 2014.

Q    Now, when you say separated, are you
talking --

A    I don't know --

Q    What do you mean -- what do you mean by
separated?

A    Well, I don't know when the entities got
separated.  The 2014 transaction was one
transaction for WHT.  It wasn't a WNT transaction.

Q    Well, we just looked at closing

statements dated March 31, 2014 for the financing, right?

A   Uh-huh (affirmative).  That's what they did with the proceeds.  Feasibility study was for one of those two entities.

Q   Right.  The feasibility study you did prior to March 31, 2014, right, probably in 2013 you're thinking?

A   I don't know the date.  I assume that the date was the same date as the closing transaction.

Q   No.  I think the -- I think your feasibility study -- and again, this is just my understanding, so I could be completely wrong, so I want you to confirm -- but I thought that you were engaged to do the feasibility study sometime in two thousand -- you mentioned 2012 at one point, so I don't know when -- I know there's a lot of lag time sometimes when you first get contacted when you first -- and then you start putting, you know, pen to paper --

A   Uh-huh (affirmative).

Q   -- if you will.

You mentioned 2012 earlier.  And the feasibility study that we looked at looks like it was a partial 2013, then roll it forward.  So I

didn't know exactly when that was done.

A   The Exhibit 2 doesn't have a date on it and I don't know -- I mean --

Q   But you look at the forecast ranges, right?

A   Yeah.

Q   That's what I was looking at.

A   Right.  So you're backing into the general time period.

Q   I am.

A   I don't know what -- that looks like it was a draft leading up to that March 31st, 2014 transaction, does it not?  Yes.

Q   Well, remember the backdrop of all this is you got to pay off the Horizon debt, right? Which you didn't know about.  But I think if you think about it in context, the whole point was to raise enough money to pay off Horizon.  Because you have got a maturity issue there and there have been extensions.  But the music is about to stop with respect to Horizon.

Now, you don't know that.  You weren't given those documents.  But that's what I showed you today evidenced the fact that there was the Loan Extension Agreement which had a forced deed in

lieu provision and there was also, as we saw across the top of that, there was a federal filing which was a foreclosure action which had already been filed.

So all of this is happening in the same time frame, and you may not have been made aware of that. But you're looking at having -- you got to pay off Horizon. That's really where all this is going. And I'm surprised that no one told you about that at the time. But that seems to be what your recollection, you didn't recall there was this need to --

A    Well, there was a sense of urgency to move the transaction -- to get to a transaction. So we knew that there was stress and the debtor that wanted to be paid back. And we have got a new owner trying to raise capital and challenging environment looked like near the end of the year so ...

Q    That all makes sense the way I see --

A    Right.

Q    -- the time frame too.

A    So I'm aware of the pressure and the sense of urgency and the implications of we got to get deals done. The fact that Horizon's on the

other side of that conversation dealing with

multiple extensions was not part of my conscience

other than I know they want to be paid back.

Q   Right.  But I mean is it fair to say that

you sort of read the room that there was a sense of

urgency?

A   Yes.  A sense of urgency, yes.

Q   So then you describe the transaction

March 31, 2014 in the next paragraph.  Does that

refresh your recollection?

A   Toward what?

Q   The transaction, the Westport Nursing

transaction.

A   Okay.  Yep.

Q   Now, you're referencing on page 3 a

document that contains definitions, right, in that

third paragraph, the second full paragraph.

A   Uh-huh (affirmative).

Q   About Provider LP and Provider LLC.  Did

you actually review that letter?

A   I don't know.

Q   You say that in redefining the entity's

names.  First of all, you don't know who drafted

this letter, do you?

A   I do not.

Q   You say:  It is likely the OIR would have believed the correct provider, University Village WHT was the entity seeking access to the funds.

What do you base that opinion on?

A   I'm not sure.  Sounds like conjecture here.  Don't know.

Q   And then you say in the next paragraph what you said earlier in your testimony here today: An MLR must be maintained and, if at any time, it is not maintained, it must be replenished --

A   Yep.

Q   -- to its minimum level as soon as practically possible.

You said 12 months earlier.  Is there a deadline or is it --

A   I believe it is a plan to get that back within 12 months.  Practically possible, there's a definitive end date to that.

Q   Right.  And then the next sentence or I guess the sentence after that you say, next sentence:  As included in Section 651.035(4), the OIR may extend the time for compliance upon approval of a plan fulfilling the requirements of 651.035.

And then the next sentence is:  The

penalty for not maintaining MLR funds may include an order of suspension by the OIR terminating the provider's ability to accept new continuing care contracts from prospective residents.

A    Uh-huh (affirmative).

Q    Do you agree with that statement?

A    Yes.  And it goes back to what I think the focus is, it is the contract itself, not the skilled nursing service per se or the continuum of services.

Q    Right.  But in this time frame there's, like you mentioned before, there's an evolution in the concept --

A    Uh-huh (affirmative).

Q    -- of enforcement, right?

A    Uh-huh (affirmative).

Q    So is it fair to say this was sort of the -- that statement reflects sort of the post Glenmoor era?

A    I think they've always had the ability.

Q    They had the ability.  But did they actually exercise that?

A    I had not seen them exercise it before here.  This is the first time I have seen them exercise this.

Q    Is in University Village?

A    Yes.  That's the first time I've seen it.

Q    Right.  And you attributed that I think just because of the Glenmoor experience sort of raised the level of enforcement, is that fair to say, from compliance to enforcement?

A    Well, I think Glenmoor raised the awareness again.  But it was University Village that got everybody to change the behaviors.

Q    Did Glenmoor predate University Village?

A    Hard to predate University Village.  I don't know the sequence of events here because there could have been some early issues with University Village along the way.  You know, because certainly this is not the first of a process that they've gone through.

Q    Are you aware that Glenmoor also filed bankruptcy?

A    I was not aware how they settled that debt.

Q    And then the last you said:  This penalty is completely detrimental to a provider and will immediately obliterate liquidity as new contracts are the life blood of a provider.

Do you agree with that statement,

immediately obliterate liquidity?

A    You can't take new contracts, so there would be no source of new cash.  Yeah, obliterates it.

Q    Strong word.

A    Strong word.

Q    Do you agree with the use of obliterate in this --

A    That's not the best word, no.

Q    So then, and this is on February 13th, 2015, the OIR issued initial order of suspension to WHT based upon violations of the requirement of Chapter 651, Florida Statutes.

I asked you earlier, do you recall ever seeing this initial order of suspension?  You didn't before.  Does that refresh your recollection?

A    No.  I was aware it was there.  I didn't read it.

Q    And we talked about your qualifications and your prior testimony.  Looking at page 8, the third full paragraph.  It says:  Prior to a provider opening a CCRC in Florida, provider must obtain a certificate of authority from the OIR.

And it talks about the application for a

COA includes five primary categories, and you mention the fifth one being forms.  It says within the forms category a minimum liquid reserve agreement is required.  So that would be the agreement with Regions Bank; is that fair to say?  You haven't seen that, I guess maybe you can't answer it but ...

A    Okay.  So they would have had to have established that escrow agreement prior as part of the COA application.

Q    And isn't it fair to say that under 651 point I believe it is 033 about escrow agreements, isn't every MLR required to be deposited under an escrow agreement that's approved by the OIR?

A    Yes.

Q    Are you familiar with that process of submitting that to --

A    Nope.

Q    -- the OIR to be approved?

A    Nope.

Q    Then on page 9, Regulations, it says: Pursuant to Section 651.035, Florida Statutes, a provider in Florida must maintain a minimum liquid reserve, MLR.  An MLR is a liquidity enforcement mechanism, in quotes, to financially protect

existing and prospective residents of a provider by enforcing the provider to maintain available funds to be used for specified purposes as detailed in 651.035.

Do you agree with that statement?

A    Yes.

Q    And then you talk about the three components.  And then the first full sentence on page 10 it says:  The three components of the MLR are designed like legs of a stool.

Are those your words?

A    Yes.

Q    To ensure sustainable residency for residents of a provider.

Do you agree with that?

A    In part yes.

Q    And what part do you not agree with that?

A    It is not a complete liquidity -- I mean it is a portion of a liquidity expectations, so it is the minimum liquidity expectations.

Q    I gotcha.  As they move through the continuum of care from their initial contract date to the move into an independent living unit and finally to the date of contract termination which often includes a settlement of any entrance fee

refund paid.

Is that correct?

A   Yes.

Q   It says:  The MLR is designed and enforced with the provider resident and by extension their families and the general public in mind; is that right?

A   Yes.

Q   Then on page a little bit below the minimum -- sorry, the middle it says:  The concept of a state regulatory agency requiring a liquidity enforcement mechanism, like an MLR, emerged in various ways across the United States soon after CCRCs, also referred to as life plan communities, were developed as a vibrant industry.  Then you have some historical discussion there.

Is that consistent with what you said about North Carolina and Maryland and New York and all the other areas --

A   Yes.

Q   -- you talked about?

A   Yes.

Q   That each do it differently but they have the same --

A   Right.

Q    -- concept --

A    Right.

Q    -- is that right?

A    Yes.  We can do the history.

Q    Now, on page 11, the last paragraph there beginning with the function, it says:  The function of the MLR is mirrored to other trustee-held funds.

What do you mean by that?

A    Well, the function of the MLR, so there are a number of buckets of cash on the balance sheet held for different purposes.  So we have the minimum liquid reserve required by the OIR.

Q    Right.

A    We have a debt service reserve fund required by bondholders.  We have an operating reserve requirement which could include a couple of those buckets.  During construction we have got a funded interest account which is also under a different escrow.  We would be holding resident entrance fees in another escrow account until they can be used for the appropriate purpose.

Q    Until the 70 percent threshold --

A    The 70 percent --

Q    -- is met?

A    -- threshold or some other leakage

options that they have got.  But the point would be there are multiple buckets of cash required for different purposes.

Q    Right.

A    MLR being one of them.

Q    Understood.

A    Good.

Q    But you say trustee-held funds, so they're held by a trustee in your mind the way you view this?

A    Yes.  Yes.  Escrow being completely different than a trustee.  They could be one in the same or they could be both at the same time.

Q    Understood.  Now, look at page 15, please.  The last paragraph -- well, I guess the second to the last, the penultimate paragraph on that page is:  Another purpose of Section 651.035, Florida Statutes is to protect residents as they move through the continuum of care and to safeguard their financial investment in a CCRC, like insurance or retirement fiduciary standards.

Do you agree with that?

A    Yes.

Q    This is perhaps most evident from the capital reserve and replacement component of the

MLR requirement as included in Section 651.035(1)(d), Florida statutes.  The reserve and replacement component of the requirement is a fund designated to the upkeep and replenishment of the physical plant and related facilities and systems of a CCRC.

Now, you're referring to the CCRC there, and you're not limiting that to just -- and I'm just being very open about this question -- to just the ILF, right?  You're looking at the CCRC, this protects the entire CCRC, right?  That's what you're saying here?

A    The provider, yes, I am.

Q    But it refers to the whole CCRC, right?

A    It refers to the applicant.

Q    You say CCRC here.

A    I did.

Q    Do you stand by that statement?

A    The applicant is a continuing care retirement community, yes.

Q    Now, in looking at what we looked at before Exhibit 6, under the CPIF loan to Westport Holdings Tampa, you know, the applicant to use your words, there's a $1.75 million cap ex reserve established, right?

A    Uh-huh (affirmative).

Q    Doesn't that essentially perform the same function as that component of the MLR?

A    That could actually be fulfill the MLR requirement, it could.

Q    So then let's keep on going through.  I didn't realize that.  This first sentence here:  If a resident enters a nursing home, the average life expectancy is less than three years and often much shorter.

Is that accurate?

A    Yes.  Not to confuse assisted living with skilled nursing, but yeah.

Q    Right.  Right.  Right.  Yeah.

A    I think it is under two and a half.

Q    So on page 17 you refer to CCRC Supply and Demand.  I just was curious, it says: According to the LeadingAge Ziegler 200, LeadingAge is the group, the sort of senior living --

A    Nonprofit association.

Q    Right.

A    Yes.

Q    Did they merge with Ziegler or is that --

A    No.  They just co-sponsor this top 200 list.

Q    I gotcha.

A    They maintain that database.

Q    And then I missed this earlier until you mentioned this word.  Page 18 --

A    Uh-huh (affirmative).

Q    -- you mentioned University Village now known as Unisen Senior Living, so I didn't pick up on that.

Page 20 your opinion addresses the Current Status of the Community.  And above that it says:  On July 17, 2020, the Tampa Life Plan Village acquired the independent living assets of University Village and assumed certain obligations pursuant to an asset purchase agreement and confirmed plan of liquidation approved by United States Bankruptcy Court.

Do you see that?

A    Yes.

Q    Now, were you involved in the Tampa Life Plan Village acquisition at all?

A    I did the feasibility study.

Q    And what did that feasibility study address the feasibility of, the bonds or --

A    The take out, the new financing and the new plan.

Q    So that was paying off the CPIF loan?

A    It would have paid off this preceding loan, CPIF or USAmeriBank.

Q    Well, USAmeriBank was on the nursing side.

A    It would have been the CPIF loan, yes.

Q    Right.  So it says:  The acquisition was financed with tax exempt and taxable conduit bonds issued by the Florida Development Finance Corporation.

Could you explain to people who don't work in your world what that means.

A    A government entity needs to issue tax exempt bonds, so they create -- there are these conduit government entities that can issue debt on behalf of a certain amount of profit organizations, hospitals and -- hospitals being a great example. Here we have -- we could have an economic issuing authority that wants to issue debt on behalf of some new business that we want to come to the city or to the state.

Q    Like an IRB kind of thing or --

A    I don't know that acronym.  Like an IRB, what is an IRB?

Q    Industrial revenue bond.

A    Yes, like an industrial revenue bond.  So this is new bonds and we need an authority to issue those so that we can get appropriate tax exempt status as a borrower.  I'm sure somebody could do a better job than that, but there you go.

Q    And then you mention here the management development agreements with BRP Senior Housing Management.

A    Uh-huh (affirmative).

Q    And that's Mr. Ackerman, right?

A    Yes.

Q    And this says:  As part of the acquisition -- it's on page 20, last paragraph -- the corporation was required to pay assumed liabilities as set forth in the May 10, 2018 Bankruptcy Court order.  And then you later say: The assumed liabilities include the current resident contracts, the allowed unsecured claims.

What's your understanding about there were subordinate notes that were issued to the residents, right?

A    Yes.

Q    What is it subordinated to?

A    To the senior debt.

Q    To the bond debt --

A   Yes.

Q   -- right?

A   Yes.

Q   How much is the bond debt?

A   We'd have to look at the sources and uses there.

Q   Right.  But do you have a rough idea of what the current amount is?

A   I do not.  I do not.

Q   All right.

A   And there's a stack, so there's two levels of subordination.  We can look at the financial statements, but there's a senior debt and then that debtholder has some accretion or another level of bond that are subordinate to his senior and then you've got unsecured debtors like residents and others.

Q   So there's two layers of senior debt above the resident --

A   Yes.

Q   -- subordinated notes?

A   Yeah.

Q   And you don't have a rough idea of how much --

A   I do --

Q    -- that is?

A    -- not.

Q    Would it be more than 20 million?

A    Likely.

Q    Would it be more than 30 million?

A    I don't know.  Could be as much as 40, between 20 and 40.  It just sounds -- and those just sound like numbers that feel like they fit.

Q    Right.

A    So I --

Q    What was the amount of the initial issuance, the offering, $40 million?

A    I'm going to have to say I'm going to have to look it up.  It is not a trick question though.

Q    No.

A    I don't think it is.

Q    It is not.  I'm not trying to trick you.

A    But that sounds right, yes.

Q    And it says:  As of December 15, 2022, the corporation had fully drawn down the Series 2020 bonds proceeds --

A    Right.

Q    -- and completed the initial phase of their planned rehabilitating and equipping of the

community.  The first phase of the multi-phase capital improvement plan included capital reinvestment of approximately 23 million funded from the proceeds of the Series 2020 bonds.

So are you familiar with the improvements to the physical plant and physical --

A     At a high level.

Q     At a high level?

A     Yeah.

Q     And are you familiar with the current operational performance of University Village or I guess Unisen?

A     Its occupancy?

Q     Yes.

A     Yeah.

Q     How much is the -- what is the occupancy today?

A     Off of the -- well, out of 500 units that I think most people would -- probably close to 25, 30 percent.

Q     Is that vacancy or occupancy?

A     That is an occupancy on the total.

Q     So 25 percent of 500 units are occupied?

A     Yep.  We could look at an exact number. It is a low number.  But all of those units are

available.  So that was my pause on the occupancy here.  So if we look at the percentage of occupied units that are available to be rented, I think you have got a much more industry standard let's call it 70 percent.  And then they'll need to fill those units to create more capital to invest into the next.  So they've got a bunch of unrenovated units.

Q    Okay.  Can you give me the breakdown of that.

A    I can -- we can look that up.  I don't have it in front of me.

Q    But there are 500 total units?

A    Yes.

Q    But not all of those are available for rent?

A    Correct.

Q    And you don't know exactly how many -- so that 25 percent number is 25 percent of 500?

A    Yeah.

Q    But you're saying the occupancy might be higher if you look at that compared to what's available?

A    Yes.

Q    But you don't know that number?

A    I don't have those numbers in front of

me.

Q    Is Unisen currently servicing the bond debt?  Are they making their payments?

A    I don't know.

Q    Well, if there was a default, would you know about it?

A    Not right away, no.

Q    All right.  When would you know?

A    I would pick it up through some general conversation about, you know, through industry, you know, conversations, people are going to talk about the state of affairs.  So I would learn about it socially that way.  Typically you'd learn about it professionally through some course of action that needed to be taken.

Q    That's what I was thinking.

A    Yeah.

Q    I mean I know there's basically a circulatory system if you will --

A    Yeah.

Q    -- in this market --

A    Yeah.

Q    -- about everyone kind of knows what deals are, you know, what deals doing out there, you know, what's in trouble, what's doing well; is

that fair to say?

A    Yes.

Q    Because you have got a lot of industry --

A    Yeah.

Q    -- groups that sort of track all this stuff, right?

A    Uh-huh (affirmative).

Q    And you're involved in all those industry groups?

A    Yep.

Q    So what's the general perception of Unisen today as --

A    That they're out of capital and they'll need another change of ownership or infusion of capital.

Q    Is that immediate?

A    I think it is near.  It's as near term as you can make it.  I don't really know the patient's level in the sense of urgency.  But when we say immediate here, we're standing here the week before Thanksgiving, so it is not going to happen this year, so it's not that immediate.

Q    Well, yeah.  Definitions and meaning are two different things entirely.

All right.  Well, let's look at your

first rebuttal opinion.

A    Okay.

Q    Not separately refinanced.  So within paragraph III -- and we can refer back to Mr. Robichaux's report at the same time.  I've got a loose copy of it.  So Mr. Robichaux's first opinion is that it is not unusual for operating reserve funds to be used as collateral.

And your first rebuttal -- so are you not responding to Mr. Robichaux's first opinion?

A    No, I'm not doing it in that order.  I think I'm doing it in order of relevance.

Q    Yeah, I'm trying to match these up so --

A    I didn't do them in sequence.

Q    Because Mr. Robichaux you'll agree with me essentially --

A    He is not on there anymore.

Q    Oh, I'm sorry?

A    He dropped.

Q    Who's that?

A    Mr. Robichaux.

Q    Okay.  That's fine.  But he essentially gave two opinions, right?

A    He did or I did?

Q    I think he did.  You have I think seven

rebuttal opinions.

A    Okay.

Q    That's why I was just trying to keep the numbers straight --

A    Okay.

Q    -- in my mind.  I think he only had two --

A    All right.

Q    -- and you've got seven.

A    All right.

Q    So let's look at Mr. Robichaux's opinions.

A    Okay.

Q    And then we'll look at yours.

A    Okay.

Q    Opinion number 1:  It is not unusual for operating reserve funds to be used as collateral.  As a general proposition do you agree or disagree with that?

A    I agree with that.

Q    And then:  Based on my professional experience, it is not unusual in the senior housing industry for lenders to be granted a security interest in an MLR fund or similarly constructed liquidity, construction or debt service reserve

funds.

You agree with that?

A    I am -- I did not read what you just read.

Q    What did you read?

A    I'm reading the second bullet.  Did you go to ...

Q    We're looking at the same document?

A    Opinion number 1, it is not unusual for operating reserve.  Okay.  So I got the header. Then in the first bullet:  Based on my professional experience, it is not unusual.

Q    Right.  That's what I just read.

A    Okay.  That's correct.  I agree with that.

Q    All right.  Number 2, WNTs assignment and pledge of the MLR was typical and customary for loans of this type in the senior housing industry.

First of all, have you ever seen the assignment of deposit account agreement?

A    No.

Q    You have not read the actual --

A    No.

Q    -- agreement itself?

If I have somebody email a document --

A    We can get it printed.

Q    We can?

A    Yeah.

MR. WHITSON:  Ms. Wonder, Chantel, are you still on the line?

MS. WONDER:  I'm here.

MR. WHITSON:  Could you email the assignment of the deposit account agreement.

MS. WONDER:  Which one?

MR. WHITSON:  The main document in this case, the assignment of the deposit account for the pledge.

MS. WONDER:  Okay.  Let me look.

MR. WHITSON:  I forgot what it's called exactly.  I should know that by heart now.

(Recess 2:50-3:01 p.m.)

(Defendant's Exhibit 8 marked)

BY MR. WHITSON:

Q    So Mr. Seeloff, I have shown you what we have marked as Exhibit 8 to your deposition.  It is a document entitled Assignment and Pledge of Deposit Account.  Have you ever seen this document before?

A    I do not recall this document.

Q    So is it fair to say you did not review

this document --

A     Yes.

Q     -- prior to issuing your opinion?

A     Yes.

Q     If you'll look at the recitals.  Take a moment to read them all of course to put it in context.  But if you'll focus on recitals C and D.

A     Okay.

Q     Were you aware of those two provisions being part of the I guess we'll call it the transfer of the MLR as part of the March 31, 2014 transaction?

A     I was not aware.  And this is an assignment of pledged deposit between Westport and AmeriBank.

Q     Westport Nursing --

A     Westport Nursing Tampa and USAmeriBank. And those recitals are made between those two parties.  But are they validating OIR's point of view on this or --

Q     Well --

A     -- their understanding of this?

Q     That's a different issue.  But I think what I wanted just to be aware of, if you had seen this document before --

A    No.

Q    -- and focused on it, you know, and were aware of those two recitals.  Were you aware that this document was sent to OIR?

A    No.

Q    And are you aware that as part of the regulatory requirements, Westport -- well, let's just call it University Village as a collective reference -- that certain annual reports and MLR reports are required to be submitted to the OIR?

A    Right.  Annual -- they're required to submit annual forms validating their MLR responsibilities.

Q    Right.  By May 1, correct?

A    Yeah.  Okay.  Yes.

Q    I mean I think that's the deadline.  But you tell me if I'm wrong.

A    I do not know.

Q    So were you aware that on the reporting forms to the OIR that both the Regions account and the USAmeriBank account were shown and disclosed to the OIR as holding MLR funds?

A    I certainly was not aware of that.  And I'm not sure I can differentiate the two accounts. There's a Regions account and what's the other one?

Q    The one at USAmeriBank.

A    Okay.

Q    This account.

A    The Regions account is for?

Q    That the 2004.  We're going get a copy of that --

A    Okay.

Q    -- in a minute.

A    All right.

Q    I asked you that question about whether you knew that this had been provided to the OIR because you reference a letter in those definitions we talked about, and I asked you had you seen the March 31, 2014 letter from the Williams Mullen law firm to the OIR.  And you never saw that letter?

A    I have not seen that letter.

Q    Right.  And that then you were not aware that the Assignment and Pledge of Deposit Account document that we just referred to as Exhibit 8 was attached to that letter?

A    I was not aware of that, correct.

Q    Were you aware that prior to the March 31, 2014 transaction that there were meetings with Larry Landry and John Bartle and Christopher Struk at the OIR discussing this transaction before

it actually happened?

        A     I was not aware of that.

        Q     Do you know who Christopher Struk is?

        A     I know the name here.  Was he the head of the OIR?

        Q     I think he was the head of this particular, the CCRC division.

        A     Okay.  Fair enough.  Yeah.

        Q     We can continue while we're waiting for those things to come.  So then looking back at Mr. Robichaux's opinion, we're on the third bullet now, and he says:  It is not unusual for a regulated CCRC operator to include MLR funds and similarly constructed liquidity and debt service reserve funds pledged to a lender on their balance sheets and to also include such funds in their statutory financial statements filed with regulatory agencies.

              Do you agree with that?

        A     Yes, I do.

        Q     The next bullet:  From the evidentiary record that I have reviewed, the Defendant's actions regarding the MLR funds were taken in good faith as that term is understood and applied in accordance with general industry practice.

Now, you haven't necessarily reviewed the evidentiary record that Mr. Robichaux has.  But do you disagree with that bullet?

A    I do.

Q    And why?

A    So I go back to the previous two bullets, and because the regulated CCRC here in my mind is WHT and they can pledge their assets, their funds that sit on their balance sheet as collateral for their loan.

Q    All right.

A    Yep.

Q    Now let's back up a little bit and look at the -- remember the closing statements that we looked at.

A    I gotcha.

Q    Do you know where I'm going with this?

A    I do.

Q    All right.  So let me ask the question and you can answer however you want to answer it. But given the fact that Westport Holdings Tampa owed $20 million to Horizon and could only finance from its assets 9.5 million with Columbia Pacific, isn't it fair to say that the pledge it made of the $3 million enabled it to get the additional funding

from the Westport Nursing transaction so that in the aggregate those two transactions could pay off Horizon; isn't that fair?

MR. APPLEBY:  Objection to form.

A    I don't know.

BY MR. WHITSON:

Q    Well, we know that 9.5 isn't going to pay off 20 million, right?

A    I don't know what other considerations were made in that.  But I see how we're trying to get the debit, you know, the columns to match here and ...

Q    Well, let's look at the economic reality of the transaction, right?

A    Okay.

Q    Holdings owes $20 million, Nursing owes $20 million.  These are all, you know, co-obligors of a $20 million debt owed to Horizon.  It has matured.

A    Yep.

Q    All right.  As you noted, there was a sense of urgency at this time about paying it off.  So isn't it fair to say if you look at the economic reality of these two transactions that they were one transaction to pay off $20 million.  Westport

Holdings could not get home with just financing the CPIF loan, right?  It only could get $9.5 million, is that fair to say, from what you saw in the closing statement?

MR. APPLEBY:  Objection to form.

BY MR. WHITSON:

Q    That's fine.  You can still answer my question.

A    I don't know is my answer here.  That's not exactly the transaction we were in back in here.  But I understand -- why don't you restate the question.

Q    Well, you weren't aware until I showed you those closing statements today that that was the structure of --

A    On who -- how those obligations -- I was focused on the transaction moving forward.

Q    Right.

A    And what they did with those proceeds and how they met their obligations, I was not aware of those details.

Q    Right.  So with this new information --

A    Right.

Q    -- looking at this, isn't it fair to say that these transactions combined on the same

closing date, all of this was simultaneous, to pay off the Horizon debt which is owed by both entities, both Westport Holdings and Westport Nursing?

A    That's what happened here, yeah.

Q    And is it also fair to say that the loan that Westport Holdings Tampa had taken out with CPIF was not enough by itself to pay off the Horizon debt, the $20 million?

A    That's correct.

Q    All right.  And is it also fair to say that after the transaction and Horizon's paid off, the amount of debt that Westport Holdings Tampa, the ILF if you will, has on its books is only $9.5 million as opposed to $20 million?

A    Right.

Q    You agree with that?

A    I do.

(A pause was had in the proceedings.)

(Defendant's Exhibit 9 marked)

BY MR. WHITSON:

Q    Mr. Seeloff, could you take a moment to review Exhibit 9, and let me know if you've ever seen this document before?

A    I have not seen this document before.

Q    Have you seen documents similar to this?

A    Similar to this, yes.

Q    And you'll see that in recitals A and B it talks about the establishment of the minimum liquid reserve, right?

A    Okay.  Purpose, formation.

Q    Right.  And then on C in Disbursements it reads:  Escrow Agent shall make no disbursements which would reduce the funds in the minimum liquid reserve escrow account below the minimum liquid reserve amount unless escrow agent or another person designated to act in its place and University Village shall notify the department in writing ten days before the withdrawal of such funds.

Do you see that there?

A    Yes.

Q    So when we talk about approval being required before, this seems --

A    Uh-huh (affirmative).

Q    -- to only refer to notice.

A    Uh-huh (affirmative).

Q    Do you agree with me?

A    This does, yes.

Q    And then as far as the emergency

provision after that, I mean does that comport with your understanding of statutory restrictions on the MLR?

A    Yes.

Q    And so if you look at the bottom of page 2, it says:  The department may in its discretion in addition to any other penalty that may be provided for under Chapter 651, Florida Statutes levy a fine against escrow agent not to exceed $25 a day for each day the escrow agent fails to comply with provisions of 651.033.

Do you see that there?

A    Uh-huh (affirmative).

Q    Now, so if there's any violation, then it is the department that enforces it, correct?

A    Uh-huh (affirmative).

Q    Yes?

A    Yes.

Q    Now, going back to page 1 under Roman numeral I(A), Purpose of Account, it says:  The purpose of the account -- are you with me?

A    Uh-huh (affirmative).  Yes.

Q    Created hereunder is to protect the current or prospective residents of the community.

Do you agree with that?

A    Yes.

Q    I don't have any further questions about that document.  You can put it aside for now.

We'll mark Section 651.033 as Exhibit 10.

(Defendant's Exhibit 10 marked)

BY MR. WHITSON:

Q    All right, Mr. Seeloff, I have shown you what we have marked as Exhibit 10 to your deposition Section 651.033 of the 2014 version of the Florida Statutes.

A    Okay.

Q    Subsection 1(b) states:  An escrow agreement shall be entered into between the bank, savings and loan association, or trust company and the provider of the facility.

Will you agree that that's what we just looked at as Exhibit 9?

A    Yes.

Q    The agreement shall state that its purpose is to protect the resident or the prospective resident.

Do you agree that's what it says?

A    Yes.

Q    And that's what the escrow agreement says, correct?

A    Yes.

Q    And, upon presentation of evidence of compliance with applicable portions of this chapter, or upon order of a court of competent jurisdiction, the escrow agent shall release and pay over the funds, or portions thereof, and it says the rest of it there.

So then let's look at subsection 1(d). All funds deposited in an escrow account, if invested, shall be invested as set forth in part II of chapter 625.  However, such investment may not diminish the funds held in escrow below the amount required by this chapter.  Funds deposited in an escrow account are not subject to charges by the escrow agent except escrow agent fees associated with administering the accounts, or subject to any liens, judgments, garnishments, creditor's claims, or other encumbrances against the provider or facility except as provided in Section 651.035.

That's what we have been talking about in terms of the exceptions where the MLR can be pledged, right?

A    Okay.

Q    That's 651.035.  But in general the default rule is that none of the money in the MLR

can be attached by creditors or anyone else; is that your understanding?

A    That's my understanding.

Q    Yeah.  So when you reference in your opinion sort of the trust funds, is that consistent with what we just read in 651.033?

A    In regards to the other trust funds?

Q    No.  The funds that are established in the MLR having that sort of character.

A    Yes.

Q    So let's look at Mr. Robichaux's opinion one more time.  I asked you if you agreed with bullet number 4 under Roman VI.

A    Yes.

Q    And I don't recall your response.

A    So I was -- we were -- I went back to the evidentiary record that he's reviewed and the actual MLR taken in good faith.  So the CCRC is responsible to the residents and the contractors, and that's what those -- the MLR funds are there for.  And they are regardless of what it said there in that one sentence here, those funds are to be required -- are to be spent for specific purposes.

Q    I understand that.

A    Right.

Q    Yep.

A    And it says they may and what they're allowed to be used for.

Q    I'm sorry, finish your answer.

A    So the regulated CCRC, which happens to be WHT.

Q    Well, the CCRC is bigger than WHT, right?

A    No.  I think that's the core of this issue here is --

Q    I think it is where we disagree.

A    I think it is where we disagree, yeah.

MR. APPLEBY:  And I'll lodge for the record too, Mr. Whitson, you're asking a question that requires a legal conclusion.  You're also interpleading your own legal conclusion.

MR. WHITSON:  I'm just having a spirited discussion with Mr. Seeloff.  But that's fine.  I understand your objection.

BY MR. WHITSON:

Q    So let's move on then.  But you'll agree with me that 651.035(1)(b) allows the debt service reserve portion of the MLR to be pledged for a financing or refinancing, correct?

A    Yes, I believe that's true.

Q    And while I understand your analysis of

the transaction, isn't it not fair to say that the pledge of the $3 million of the MLR enabled Westport Holdings Tampa to reduce the debt on its books by $10.5 million?

A    That would have been part of the formula. It is right there.

Q    And does a $10.5 million reduction of debt by Westport Holdings Tampa benefit the residents?

A    The allocation of the debt, yeah.  Well, I mean we've got two assets here.  We've got two operating entities here that had a collective 20 million, right?

Q    Well, jointly and severally, right?

A    Jointly and severally 20 million.  Then we want a divorce.  We're going to separate.

Q    I would take that differently, but let's go with what you're saying.

A    We're going to separate our obligations. We're going to satisfy our old obligations.  The division of the debt is proportionate to the division of the assets and our ability to pay that back.  So I don't know why should it be 50/50, 75/25.  They become commingled assets.  I'm not sure that we can equate the 15 to the debt capacity

of WNT and with the debt capacity of W -- of the other provider was.

Q    Well, that's more of an academic argument right?  The economic reality of this transaction was CPIF was only willing to loan 9.5 million to WHT and USAB was willing to loan $15 million to Westport Nursing Tampa, right?

A    Uh-huh (affirmative).

Q    We had to get to 20, right?  So in order for Westport Holdings Tampa to get $20 million of debt off its books, it had to get the benefit of the WNT loan, the USAB loan, right?

A    Yes.  I'd ask a question but that's not the purpose here.

Q    No.  You've deposed me as much as I've deposed you.  It has been a good exchange.  So what about that --

A    Well --

Q    -- suggests bad faith to you?  Is that bad faith?

MR. APPLEBY:  Objection, Mr. Whitson, you're calling for a legal conclusion.

BY MR. WHITSON:

Q    I'm asking a question.

A    The three -- why wouldn't the $3 million

have been a credit to the other one?  Why wouldn't we just move that $3 million over here and change the nature of that?  I would be making the case here that that $3 million is theirs and it should be over here.  It could still add up to the 20.  It is their asset.  I believe it is their asset.  And it is sitting on this side of the books and then it got swept, and now they don't have it and it was for their benefit.

Q    Well, but aren't they 10 and a half million dollars better off?

A    I don't know.

Q    Well, we do know, right?  If they owe 20 million on March 31, two thousand --

A    Well, I don't know that they're -- they're not better off.  They're in the same position.  It is the same after the fact.  They're walking -- everybody is made whole.  Horizon was made whole.

Q    Right.

A    Right.

Q    Horizon is paid off?

A    Okay.

Q    But the Westport Nursing Tampa loan wasn't going to pay off Horizon in full, was it?

A   No.  It is a division -- nor would it be expected to.

Q   Right.  It took a unitary -- viewing this as a unitary transaction on March 31, 2014 --

A   The divorcing couple has to satisfy --

Q   But they're not --

A   -- their obligations.

Q   -- divorced on March 31, 2014.

A   Well, they're -- when are they divorced?

Q   After.

A   I'm not sure the timing matters here, but they've got to satisfy their obligations.

Q   Right.

A   And then each party is responsible for their obligations going forward, right?

Q   So if you're the husband and the wife, and the wife leaves the marriage with $10 million less debt and the husband has --

A   It's not less debt.  She doesn't have -- it is co-debt.

Q   Well, yeah.

A   It's co-debt.

Q   But it is joint and several, right?

A   Joint and several.

Q   Correct.

A    Okay.

Q    So there's $20 million of debt on Westport Holdings Tampa's books.  It is just like a marital debt --

A    Uh-huh (affirmative).

Q    -- right?

A    Right.  Right.

Q    All right.  So in this situation Holdings -- Westport Nursing only had -- had less than $8 million of debt on its assets, right?  Remember we looked at that on the Loan Extension Agreement.  It was 12 and 8, right, roughly?

A    Okay.

Q    7 something, little bit more than 12. 12.2 --

A    I gotcha.

Q    -- and 7.8.

Okay.  So and then at the end of the day Nursing has got 15 million.  It is doubled.  Is Nursing better off or worse off after March 31, 2014?

A    They're divorced.

Q    Yeah.  But who walked away with all the marital debt or the bulk of the marital debt?

A    The people with the capability to cover

it.

Q    And that would be?

A    Westport Nursing.

Q    Thank you.  So let's keep on going.  How about the next bullet:  Owners of businesses facing financial distress, such as imminent foreclosure, often seek alternative equity and debt investors and investment structures to provide for an enhanced out-of-court turnaround runway.  Often these structures involve creating separate (i.e., siloed) ownership and/or borrowing structures in the place of one consolidated ownership/borrower structure.

This is frequently observed in the senior living/ALF/SNF industry, such as when OpCo/PropCo structures are implemented with separate investors/lenders.  These out-of-court financial restructuring transactions are not always successful, but often provide critical time for a borrower to improve operational cash flow.  As such, I do not believe that the presence of this type of restructuring transaction is, in and of itself, an indication of improprieties or questionable conduct.

Do you agree with that?

A    I agree.

Q    Based on the record in this matter and my professional opinion -- professional experience, granting of a security interest in the MLR funds was typical and common.

Do you agree?

A    I think it is typical and common, yes.

Q    All right.  Let's look at opinion number 2.  Defendant had a good faith basis to believe that Florida Statute 651.035 minimum liquid reserve requirement was not violated by the loan or security pledge.

All right.  Let's go through the bullets. When making loans in a regulated industry, it is customary for lenders to confirm with borrowers that inter alia -- do you know what that means by the way?

A    Nope.

Q    Inter alia means among other things.

A    Okay.

Q    That's what lawyers say instead of saying among other things.

A    Okay.

Q    Consummation of such loans and the pledging of collateral will not violate any laws or

regulations.  In this case, the Defendant followed that practice by obtaining presentation from WNT to that effect.

And then he footnotes Section 3.6 of the loan agreement dated March 31, 2014.  Have you looked at the loan agreement, the Westport Nursing Tampa loan agreement --

A    No.

Q    -- and the Westport Holdings loan agreements?

A    No.

Q    So you have not reviewed any of the March 31, 2014 transaction documents either with CPIF and Holdings or with USAmeriBank and Nursing?

A    That's correct.

Q    So then I'll ask you a hypothetical.  If a loan document contained a representation such as what Mr. Robichaux references here, in other words, if there were legal opinions issued in connection with a transaction and there are requisite warranties issued in connection with a transaction that said that the transaction complied with all applicable laws, regulations, ordinances, you know, the typical sort of rep that you would get, would that in any way affect your opinion about the good

faith or bad faith of a transaction or the ability
of the lender to rely on that?

A    I'm not going to speak to motive here.
But ...

Q    From an industry standard can lenders,
whether they're bond issuers, whether they're
conventional lenders, do they have the right to
rely upon opinion letters of counsel issued in
connection with the transaction and reps and
warranties of their borrowers in engaging in a
transaction in good faith?

MR. APPLEBY:  Objection, calls for a
legal conclusion.

A    I'm going to pass.  I don't know.

BY MR. WHITSON:

Q    You don't know that?

A    I would rely on it.

Q    You would?

A    I would.  I would expect that -- I am not
a lawyer, so I don't know the nuances there.

Q    I understand that.  But from your --

A    As a layperson that's what we should --
that's what reps and warranties are for.

Q    As a sophisticated lender, right?

A    Yes.

Q    That's why you get those documents?

A    That's why you get them.

Q    Right.

A    Yep.  And in this case why would -- we got it from WNT but did we get it from WHT.  It should have been from all parties, right?  I guess it probably was so ...

Q    But I mean I don't have all those with me --

A    Yep.

Q    -- so I'm just asking you -- that's why I asked it in the form of a hypothetical rather than drag you through --

A    Okay.

Q    -- all those loan documents.

A    Yep.  Yep.  Yep.

Q    But you agree with me then?

A    Yes.

Q    The next bullet.  Well, I'm not sure you can answer that one.

A    Again, it's what WNT's legal counsel says.

Q    Right.  But it also says the debtor has made similar representations --

A    Yep.

Q    -- in the loan agreement, right?

A    That's what -- that's what was catching our back and forth right there.

Q    Right.

A    Yep.

Q    So it is from both loans --

A    Okay.

Q    -- and from both closing attorneys, right?  That's what it says here in his assumptions.  I mean I'm not showing you that to say that actually factually accurate, but that's what he's saying here.  I mean he's looking at reps and warranties on both sides.

A    Quasi-integrated is quoted here.

Q    Well, I think those are Mr. Robichaux's words.

A    Uh-huh (affirmative).

Q    But I mean you may not agree with that phrase.  But would you agree that these were not stand-alone transactions in a vacuum?

A    Not at that date.

Q    Right.

A    They had to be unwound together.

Q    Well, they had to be combined in order to pay off the Horizon debt, right?

A    They were already combined.

Q    But the transactions had to be -- the two loans --

A    Okay.

Q    -- were not stand-alone transactions --

A    They were already cross-collateralized at that point, right?

(Off-the-record discussion)

BY MR. WHITSON:

Q    They were not stand-alone transactions in a vacuum?

A    That's right.  You want to repeat the question here and get the -- I don't know where we left off.

Q    Well --

A    I agree with this statement.

Q    Which statement?

A    The debtors made similar representations in the loan agreement dated March 31st by and between Westport Holdings regarding the CPIF loan, the consummation of the loan.  By extension that the overall quasi-integrated refinancing transactions involving the debtor would not violate any laws or regulations.  So that's what the depositors and other similar representations did, I

agree.

Q    I mean you can read the rest of those bullet points.  But I could ask you those in the form of a hypothetical.  But assuming those bullets are correct, do you feel that Westport Nursing -- I'm sorry, USAmeriBank had the right to rely upon those representations and warranties and opinions?

A    Yes.  Borrowers and debtors are plural and we're referring to one of these two loans, right?

Q    Well, I think they're referring to the combined transaction.

A    All right.

Q    Does that change your answer?

A    No.

Q    And then on the next page, page 8, the top bullet there, I mean you can read that.  I'll ask it in the form of a hypothetical.  If the MLR calculation that had been provided to the OIR reflected $3 million the MLR was being held at USAmeriBank, does that disclosure to the OIR, that transparency to the OIR, does that indicate anything irregular or any indicia of bad faith in your opinion?

A    I have a disconnect.  No.  When we -- the

$3 million was pledged by WNT to Valley Bank for their loan.  The $3 million is carried on WHT's balance sheet.

Q It never left WHT and the money --

A It didn't leave their balance sheet.

Q Didn't leave their balance sheet.

A But those funds were also not held by their lender.  The funds were held by WNT's lender. So when that WNT's loans didn't pay, they swept that asset which is an asset sitting on WHT's -- it's WHT's money.

Q Let me add a few more facts to that analysis.  Would it change your opinion if there was no evidence of any transfer by WHT to WNT and concurrently there was no evidence of any obligation from WNT back to WHT for those funds?

A That means this deal didn't happen?  Go back to that $3 million being over here?

Q I'm just saying that hypothetically if the money went directly from the Regions account to the closing attorney to USAB, it never passed through Westport Nursing Tampa?

MR. APPLEBY:  Objection, calls for speculation.

MR. WHITSON:  This is a hypothetical,

Mr. Appleby.  I'm asking it in the form of a hypothetical.  Does that change --

MR. APPLEBY:  I'm objecting that it calls for speculation --

MR. WHITSON:  It is a hypothetical.

MR. APPLEBY:  -- and assumes facts not in evidence.

MR. WHITSON:  That's fine.  It is a hypothetical question.

A    I'm not sure I understand it.

BY MR. WHITSON:

Q    So you're focusing on the $3 million being on Westport Holdings Tampa's books, right?

A    And -- that and its -- the purpose of those funds is for their contract holders and their residents.

Q    But a portion of those funds can be pledged for financing and refinancing, right?

A    I would assume for their own debt, yeah.

Q    And their own debt would be --

A    What they agreed to here.

Q    But again, I don't -- we have probably taken this as far as we need to take it at this point.  But I think you see the point I'm trying to drive at.  I see what you're saying too.

A    Okay.

Q    All right.  So then would you also agree with me that one of the pillars or foundations of good faith is transparency and disclosure?

A    Yes.

MR. APPLEBY:  Objection, calls for legal conclusion.

BY MR. WHITSON:

Q    Well, in your --

A    In my --

Q    -- practice --

A    -- profession?

Q    Yeah, in your profession, I mean doesn't that -- isn't that what you expect in a commercial transaction that people are going to be transparent and give you full disclosure and tell you the truth?

A    I try to behave that way.  Yes, and yes to your question.

Q    And that is the industry standard, that is --

A    That's professional --

Q    -- good faith as you --

A    -- standard.

Q    -- understand --

Right.

A      Yeah.

Q      We talked over each other again.

(Off-the-record discussion)

BY MR. WHITSON:

Q      In your industry, in your profession that is the expectation and the understanding, correct?

A      Yes.

Q      All right.  So let's go back to your rebuttal opinion.  Your rebuttal opinion is directed -- the first rebuttal on Roman IV.A on page 21 of your opinion.  Are you with me?

A      Yes.

Q      Within paragraph III, relevant factual background, the Robichaux report states on March 31, 2014 the debtors WHT and WHT II and WNT separately refinanced University Village.  And you say the use of refinanced, in quotes, may be intentional as Form OIR-A3-477 allows MLR funds to be accessed as part of a provider's refinancing or provider acquisition event.

And then you say:  By combining unique financing events between WHT, WHT II, and WNT, it can appear that each entity was involved in the other's financings working together with the same

objectives.

Can you explain that opinion especially in light of what we discussed here this afternoon.

A    I think it gets right to the heart of this discussion around common objectives here. They are separate -- they are in the middle of some separation.  They each had their own -- there is a refinancing for their previous obligations and then they are coming together in their unique entities to go forward in their restructured current state, future state.  They were involved in each other's financings, but they didn't have each other's objective -- each other's future interests in mind.

Q    Well, there was a $20 million hammer over both their heads, right?

A    Yep.

Q    A forced deed in lieu, a sense of urgency in the atmosphere?

A    Uh-huh (affirmative).

Q    So --

A    They collaborated to get out of that.

Q    Correct.

A    Yep.

Q    All right.  Anything wrong with that?

A    Nope.

Q     All right.  And you reference that opinion from an accounting perspective.  We don't need to go into that.  I'm not an accountant.

On your second rebuttal opinion you object to Mr. Robichaux's use of the phrase common ownership.  Is that essentially what you're responding to there?

A     I am objecting to the common ownership, the use of the word common ownership for the two properties.

Q     Were you aware of the ownership structure of Holdings Tampa and Nursing Tampa on March 31, 2014?

A     No.

Q     Let's look at page 24.  You say in the first full sentence on the top paragraph:  The reliance on independent living to sustain operations is universally appreciated by industry professionals, as when residents move through the continuum of care there are higher costs and lower operating margins.  As such, nursing care is less profitable than assisted living care which is less profitable than independent living services.

So is your opinion there that while the CCRC is required to provide the nursing services,

the real profitability of a CCRC is on the ILF side?

A    The margins are typically bigger there, yeah.

Q    But they're statutorily required to at least offer the nursing services as part of being a CCRC, right?

A    If the contract requires it, yes.

Q    Right.

A    They are not required by statute to provide it.

Q    But does that mean the continuum -- I know that you I think -- and correct me if I'm misstating -- but I think the other half of that answer is that they can affiliate or they can associate with nursing to provide that care, they don't have to have it themselves; is that --

A    They can do a transfer agreement.

Q    Right.

A    Formal.  And that can have levels of formality around it.

Q    And that's what happened at University Village, right?

A    Yep.  And they separated the ownership, they created a transfer agreement to create your

virtual CCRC.

Q   So let me ask you a question.  In terms of looking at the transaction, the structure of the transaction, on March 31, 2014, the act of separating if you will, the divorce if you will, the ILF from the ALF SNF, right?

A   Just the SNF.

Q   Well, the ALF was also separated out, wasn't it?

A   It is in the same building.  It might be under the same -- a different entity.

Q   Right.

A   Okay.

Q   I mean just hypothetically assume with me that Westport Holdings Tampa, Westport Holdings Tampa II following the tower if you will and the Villas.

A   Okay.

Q   And that Westport Nursing Tampa owns what's collectively referred to as the Health Center which was the ALF and the SNF.

A   Okay.

Q   Okay.  So that transaction in March 31, 2014 separated the Resident Center from the Health Center, right?

A    Yes.

Q    The transaction in 2020 also separated the Resident Center from the Health Center, did it not?

A    It was already separated.  I'm not sure how there would be further separation.

Q    Are you aware that as part of the bankruptcy -- this may be a fact you were unaware of -- that the membership interests of Westport Nursing Tampa were transferred with the approval and consent of USAmeriBank to Jeff Warren as trustee so that Mr. Warren as the capacity as trustee owned and controlled the entire CCRC as it existed on March 31, 2014; were you aware of that?

A    No.

Q    And that that was done as part of the mediated plan of reorganization so that Mr. Warren in his capacity as liquidating trustee could market and sell the entire CCRC; were you aware of that?

A    No.

Q    And were you aware of the various OIR consent orders that were in place during the bankruptcy case which required that the CCRC be maintained in its unitary form?

A    Not specifically.  But this is where I

would start to be introduced to what was going on.

Q    Did you ever review any of the consent orders?

A    No.

Q    I think there were 11 of them --

A    Yeah.

Q    -- entered in the case.

A    So there was a bit of a journey there that you would have heard some locker room talk over, watercooler talk.

Q    I think journey is a really good, you know, odyssey might be another phrase.  And then in the 2020 transaction, essentially would you agree with me that if you assume hypothetically that the CCRT -- CCRC had been reunited under common ownership with Mr. Warren that it was once again separated as part of the Tampa Life Plan transaction?

A    I wasn't aware of the first so I couldn't have been aware of the second.

Q    Were you aware that Mr. Warren transferred the membership interests of WNT back to Mr. Bartle?

A    No.

Q    And just to clarify, you have not seen

the initial order of suspension that was issued by OIR in February of 2015?

A    I had not seen that, no.

Q    Then hypothetically if the OIR had issued the initial order of suspension in February of 2015, would that have a materially adverse effect on the ability of Westport Holdings to repay its refund obligations --

A    Yes.

Q    -- for the reasons we discussed earlier in your testimony, correct?

A    Yes.  I would have chosen a different word other than obliterated.  But yes, it would have had an impact, significant.

MR. WHITSON:  All right.  You want to take five minutes and let me take a phone call.

(Recess 3:58-4:06 p.m.)

BY MR. WHITSON:

Q    Mr. Seeloff, you mentioned earlier in your testimony that you had assisted Ms. Benedict in the formation of her opinions and the completion of her rebuttal expert report; is that correct?

A    Yes.

(Defendant's Exhibit 11 marked)

BY MR. WHITSON:

Q    I'll mark as Exhibit 11 to your deposition the Rebuttal Expert Report of Meredith Benedict.  Would you mind reviewing Exhibit 11, tab 5, and letting me know which portions of Ms. Benedict's report that you were assisting her with.

A    We would have shared the front end of that report.

Q    Could you be more specific.

A    The front end of the report is background and discussion on the facts and circumstances which are common to this case.  And then the premise is different.  We're then rebutting a different expert report and their ten-year projections which they used for their financing event I thought.

Q    Well, do you know who created the ten-year projections?

A    It would have been their management team, and the names would have been -- I'd have to look it up.

Q    Yeah.  Let's look at -- what document are you specifically referring to?

A    I don't think that's an attachment here.

Q    Well, I guess page --

Page 200

A    It's called University Village Ten-Year Projection here.

Q    Did you actually review the ten-year projections?

A    I looked at them, yes.

Q    You say in summary or Ms. Benedict says in summary it is my opinion that unit occupancy, unit fill-up, and pricing assumptions within the University Village Ten-Year Projection lack reasonableness.

A    Okay.

Q    You see that there?  Is that your opinion as well?

A    Yes.

Q    And what's the basis for your saying you and Ms. Benedict's opinion that it lacks reasonableness?

A    We have move-in expectations of 80 a year outlined on page -- summarized on page 14 which is summarizing their projection of fill-up.

Q    So you created a table summarizing what you saw in Mr. Murphy's report?

A    Yes.

Q    Was this based on any independent data that you had from when you did your 2013

projections?  2013 feasibility I should say.  I'm sorry.

A    I don't -- I'd have to look at that and compare the two.

Q    Right.

A    But we could look at those.

Q    I did.

A    Okay.

Q    So again, I'm asking you why are you saying that Mr. Murphy's --

A    There were --

Q    -- projections are unreasonable or lack reasonableness?

A    So let's go to where we say that.  The challenge to the move-ins other than the inventory building of the community University Village did not have a profound unveiling or new expansion of the independent living.  So there's no unveiling to create a sense of urgency for front-loading move-ins.

Q    Where exactly are you reading from?

A    I'm on page 14 under Fill-up-Assumptions, IV.B.  Under Table 2 we discuss move-ins.  There's a couple of concepts that are going to be laid out here to get to an 80 move-in or net 10 moving net

occupancy up.  They would have had to create an event.  They have to have units available to be occupied which would have required a capital infusion to accomplish these kind of move-in objectives.

Q    What is your knowledge of the physical plant and availability of units --

A    In 2013?

Q    Yeah, 2014, that time frame.

A    I don't have any direct knowledge.  My understanding was there were not many units available for occupancy.  That's my impression.

Q    How do you have that impression?

A    Well, that would have been they were -- they had cash issues and they were wrestling with getting prepared.  They had all kinds of capital improvement, deferred capital maintenance there that's evident.  So that's just ...

Q    How do you know that though?  I mean what did you look at in that time frame, 2013-2014?  That's why I asked you --

A    I don't know.

Q    -- did you go back and look at what you looked at when you did your --

A    The but --

Q    -- feasibility study in 2013?

A    We'd have to just look at that.  We'd just have to look at that.

Q    Anything else on this report that you worked on with Ms. Benedict?

A    It would have -- we would have -- I would have -- the revenue fill-up and the -- we just helped her assess those documents.

Q    What documents --

A    We're walking --

Q    (Unintelligible)

We're doing it again.

A    The expert report by Mr. Murphy and University Village Ten-Year Projection right here in the front, the two reports that we said we considered.

Q    So those are documents you're referring to when you say documents?

A    Yes.

Q    Okay.  That's it as far as Ms. Benedict's report just to --

A    Okay.

Q    -- make sure.

Now, do you intend to offer any opinions at trial that you have not presented or disclosed

in your report?

A    No.

Q    A couple of just few closing questions. Have you familiarized yourself with all relevant information you feel necessary in your capacity as testifying expert to support the basis or bases for the opinions you have expressed in your report?

A    I do.

Q    Do you feel you have been given a fair chance to state these other opinions and other bases for those opinions?

A    I do.

Q    Is there anything else you would like to add so as not to be misunderstood or misinterpreted?

A    No, I think I have had that opportunity. Thank you.

Q    And is there anything specific that you are not opining on in your report or in your testimony?

A    Not that I am aware of, no.

MR. WHITSON:  All right.  I have no further questions at this time.  And Mr. Appleby may have some questions and I may have some redirect based on that.  But thank you very much,

Mr. Seeloff.  I appreciate you being here today.

THE WITNESS:  Sure.  Keith, any thoughts here?

EXAMINATION

BY MR. APPLEBY:

Q   Yeah, Mr. Seeloff, I just have just a couple of questions for clarification.  In your report at Section V which is the Exhibits section, page 25 of your report.

A   Uh-huh (affirmative).

Q   If you still have that handy, if you could take a look at it.

A   I'm looking at my report, Section V.

Q   That section is the Exhibits section.

A   Okay.  Yep.  There it is.  Gotcha.

Q   At the section underneath that under V.B, External Information and Documents Considered, it contains a complete list of external information and documents that you considered and relied on throughout the production of the rebuttal report. Is it still your position that these were the documents that you reviewed at the time you made your report?

A   Yes.

Q   Were you asked -- in preparation for

today's deposition were you asked to bring any specific documents with you or to review any particular documents?

A    No.

MR. APPLEBY:  Thank you.  No further questions.

MR. WHITSON:  Okay.  See you in December.

(Deposition concluded at 4:20 p.m.)

(Signature reserved)

The following reporter and firm disclosures were presented by me at this proceeding for review by counsel:

REPORTER DISCLOSURES

The following representations and disclosures are made in compliance with Georgia Law, more specifically:

Article 10 (B) of the Rules and Regulations of the Board of Court Reporting (disclosure forms)

OCGA Section 9-11-28 (c) (disqualification of reporter for financial interest)

OCGA Sections 15-14-37 (a) and (b) (prohibitions against contracts except on a case-by-case basis).

- I am a certified court reporter in the State of Georgia.

- I am a subcontractor for Veritext Legal Solutions.

- I have been assigned to make a complete and accurate record of these proceedings.

- I have no relationship of interest in the matter on which I am about to report which would disqualify me from making a verbatim record or maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

- I have no direct contract with any party in this action, and my compensation is determined solely by the terms of my subcontractor agreement.

FIRM DISCLOSURES

- Veritext Legal Solutions was contacted to provide reporting services by the noticing or taking attorney in this matter.

- There is no agreement in place that is prohibited by OCGA 15-14-37 (a) and (b).  Any case-specific discounts are automatically applied to all parties, at such time as any party receives a discount.

- Transcripts:  The transcript of this proceeding as produced will be a true, correct, and complete record of the colloquies, questions, and answers as submitted by the certified court reporter.

- Exhibits:  No changes will be made to the exhibits as submitted by the reporter, attorneys, or witnesses.

- Password-Protected Access:  Transcripts and exhibits relating to this proceeding will be uploaded to a password-protected repository, to which all ordering parties will have access.

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down to the best of my ability, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This the 19th day of November 2023.

J. DAVID BROWN, CCR-B-1401

DEPOSITION ERRATA SHEET

To:  Keith T. Appleby, Esq.

Re: Signature of Deponent:  Keith R. Seeloff

Date Errata due back at our offices: 30 Days

Greetings:

This deposition has been requested for read and sign by the deponent.  It is the deponent's responsibility to review the transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript.  We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please send completed Errata to:
Veritext Production Facility
20 Mansell Court, Suite 300
Roswell, GA 30076
(770) 343-9696

Page 211

ERRATA for ASSIGNMENT:  FLA 6293820

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that:

_____ There are no changes noted.

_____ The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them.  To assist you in making any such corrections, please use the form below.  If additional pages are necessary, please furnish same and attach.

Page ___ Line ___ Change _____

_____

Reason for change:

Page ___ Line ___ Change _____

_____

Reason for change:

Page ___ Line ___ Change _____

_____

Reason for change:

Page ___ Line ___ Change _____

_____

Reason for change:

Page 212

Page ___ Line ___ Change _____

_____

Reason for change:

Page ___ Line ___ Change _____

_____

Reason for change:

Page ___ Line ___ Change _____

_____

Reason for change:

Page ___ Line ___ Change _____

_____

Reason for change:

Page ___ Line ___ Change _____

_____

Reason for change:

Page ___ Line ___ Change _____

_____

Reason for change:

                        Deponent's Signature

Sworn to and subscribed before me this ___ day of

_____, _____.


_____

Notary Public

My Commission Expires:_____

**[00007 - 2014]**                                                                 Page 213

| 0 |
|---|
| **00007** 1:13 |
| **033** 141:12 |
| **08167** 1:4 |
| **08168** 1:6 |
| **09** 102:10,11,12 |

| 1 |
|---|
| **1** 2:4 6:2,5 7:17 74:17 89:11 123:3 146:2 158:16 159:9 162:14 170:19 171:12 172:8 174:21 |
| **1,750,000** 89:16 |
| **1.75** 89:18 146:24 |
| **10** 2:17 142:9 150:15 171:4,5 171:8 177:10 178:17 201:25 207:5 |
| **10.5** 175:4,7 |
| **10407** 3:9 |
| **106** 82:18 83:10 85:7,19 86:9 |
| **10:20** 1:21 |
| **11** 1:5,6 2:18 144:5 197:5 198:24 199:2,4 |
| **11:28-11:43** 57:22 |
| **12** 117:5 118:20 137:14,17 179:12,14 |

**12,200,000** 73:25
**12,261,264.29** 88:5
**12,261,264.29.** 86:3
**12.2** 84:6 88:13 88:19 93:4 179:15
**12/21/2006** 2:9
**1204** 88:9
**12:18-12:51** 83:1
**13th** 140:10
**14** 1:21 200:19 201:22
**1401** 1:25 209:18
**14080** 209:18
**15** 12:22,23 83:14 85:5 91:6 93:11 145:14 152:20 175:25 176:6 179:19
**15-14-37** 207:7 207:20
**16** 56:15
**160** 2:14
**168** 2:16
**17** 12:23 147:16 148:11
**171** 2:17
**18** 148:4
**191** 1:22

**1984** 26:23 27:6
**199** 2:19
**1995** 27:5,6,10
**1997** 27:14,21 28:8
**19th** 209:15
**1:43-1:51** 113:9
**1st** 12:18

| 2 |
|---|
| **2** 2:5 7:18 8:2,4 15:10 74:16,18 91:15 94:20,21 94:22,23,25 95:1,5 112:7 128:21 134:2 159:16 170:6 181:9 201:23 |
| **2'16** 49:15 |
| **20** 92:3,8,25 148:9 150:13 152:3,7 165:22 166:8,16,17,18 166:25 168:9,15 175:13,15 176:9 176:10 177:5,14 179:2 192:14 210:23 |
| **200** 3:9 147:18 147:24 |
| **2004** 12:23 128:24 129:1,7 163:5 |
| **2006** 72:25 |
| **2008** 99:21 100:17 |

**2008-2009** 101:25
**2009** 41:8 42:1 100:17
**2012** 52:18 56:3 56:11,17 58:3 60:25 61:20 64:8 66:9 67:7,8 68:4 71:25 76:13 133:16,23
**2013** 23:24 51:14,18 52:8 52:11,17 69:5 70:24 72:1,2 76:16 77:19,23 77:23 78:10 83:14 85:6 86:11 122:20 133:7,25 200:25 201:1 202:8 203:1
**2013-2014** 82:12 202:20
**2014** 18:17 23:1 23:6,9,12,22 50:23 51:18 67:14,16 68:21 69:7 90:4 92:5 94:2,3 123:9 126:3,6 127:2 129:10 131:22 132:16,23 133:1 133:7 134:12 136:9 161:11 163:14,23 171:9

**[2014 - 7.8.]** Page 214

178:4,8 179:21 182:5,13 191:16 193:13 195:4,24 196:14 202:9
**2015** 68:22 105:11 140:11 198:2,6
**2016** 42:14,20 43:17 49:15,22 56:14
**2018** 78:19 150:15
**2019** 76:23 78:10,15,18
**2020** 97:10,15 148:11 152:22 153:4 196:2 197:13
**2021** 42:9 45:18
**2022** 12:18 45:3 152:20
**2023** 1:21 2:5,18 44:12 95:1 113:16,17,23 209:15
**205** 2:24
**21** 72:25 82:18 83:9 191:12
**22** 85:7 129:7
**22nd** 56:14 88:10 128:24
**23** 153:3
**23,050,000** 73:23 84:1

**24** 193:15
**24.5** 91:11
**25** 7:8 9:8 14:25 41:16 153:19,23 154:18,18 170:10 205:9
**26** 7:8
**28** 7:4,6 14:25 41:15
**2800** 1:23
**2:50-3:01** 160:16

**3**

**3** 2:7 14:24 15:3 15:4 68:6,10 74:19,22 93:14 93:18 136:15 165:25 175:2 176:25 177:2,4 187:20 188:1,2 188:18 189:12
**3.6** 182:4
**3/31/2014** 2:11 2:12,13
**30** 66:8,14,21 152:5 153:20 210:4 211:6
**300** 210:23
**30076** 210:24
**31** 23:1,6,9 68:21 92:5,15 94:2,3 126:3 131:22 133:1,7 136:9 161:11 163:14,23

177:14 178:4,8 179:20 182:5,13 191:16 193:12 195:4,23 196:14
**31st** 23:12 90:4 134:12 186:19
**32256** 3:10
**33629** 3:4
**343-9696** 210:24
**3:58-4:06** 198:17

**4**

**4** 2:9,23 69:3 72:8,9,12 89:11 137:21 173:13
**4/17/2023** 2:4
**40** 152:6,7,12
**4916** 3:4
**4:20** 206:8

**5**

**5** 2:10 18:2 69:3 79:6,7 83:4 91:12,15 199:5
**5,611,740.47** 89:5
**5.6** 91:13
**50/50** 175:23
**500** 153:18,23 154:12,18

**6**

**6** 2:4,11 83:9 87:10,11,14 91:16 92:19

146:22
**6.4** 91:15
**6/22/2004** 2:15
**60** 85:19
**62** 86:9
**625** 172:11
**6293820** 211:1
**651** 6:17 10:10 13:3,10 18:6,8 48:18 98:22 99:1,13,15 115:24,24 140:13 141:11 170:8
**651.033** 2:17 171:4,9 173:6
**651.033.** 170:11
**651.035** 116:13 123:8 128:25 137:21 141:22 145:17 146:2 174:21 181:10
**651.035.** 137:24 142:4 172:19,24
**68** 2:8

**7**

**7** 2:12 85:6 90:14,15,25 91:17 95:1 179:14 211:6
**7,814,464.30** 86:6
**7.8** 91:8 93:8
**7.8.** 179:17

**70** 35:4 38:5,14 144:22,23 154:5
**72** 2:9
**75/25** 175:24
**770** 210:24
**79** 2:10

**8**

**8** 2:6,13 94:19 140:21 160:17 160:20 163:19 179:10,12 187:16
**8.05** 91:16
**8.5** 69:6
**8/31** 2:8
**80** 200:18 201:25
**813.435.0396** 3:5
**87** 2:11
**8:16** 1:4,6
**8:20** 1:13

**9**

**9** 2:15 99:21 141:21 168:20 168:23 171:17
**9-11-28** 207:6
**9-11-30** 211:6
**9.5** 87:25 88:18 92:16 93:1,5 165:23 166:7 167:2 168:15 176:5

**9.5.** 88:12
**9/27/2013** 2:10
**90** 2:12
**904.224.4486** 3:10

**a**

**a.m.** 1:21 57:22
**a3-477** 191:19
**aaron** 53:15
**abbreviations** 40:1
**abetting** 14:23
**ability** 30:5 32:18 37:4 138:3,20,21 175:22 183:1 198:7 209:4
**able** 82:20
**above** 89:4 148:10 151:19 210:19
**absolute** 209:13
**absolutely** 35:25
**academic** 176:3
**accept** 138:3
**access** 42:10 115:7,8 116:25 137:3 208:1,2
**accessed** 117:3 191:20
**accomplish** 202:4
**accordance** 164:25

**account** 2:14 21:2,13 50:19 93:16,24 94:6 94:11 128:23 129:19 144:18 144:20 159:20 160:8,11,22 162:20,21,25 163:3,4,18 169:10 170:20 170:21 172:9,14 188:20
**accountable** 36:6 55:9
**accountant** 193:3
**accountants** 60:16
**accounting** 26:20 193:2
**accounts** 162:24 172:16
**accretion** 151:14
**accurate** 11:13 11:18 20:21 59:25 72:1,4 147:11 185:11 207:12
**accurately** 5:4 61:2 71:5
**achieving** 35:4
**ackerman** 95:7 95:8,9,18 96:3 98:9,13 109:20

113:18 114:5 150:10
**acknowledges** 109:15
**acquire** 30:25
**acquired** 148:12
**acquisition** 25:9 148:20 149:7 150:13 191:21
**acronym** 149:23
**acronyms** 53:7
**act** 169:12 195:4
**action** 105:3 135:3 155:14 207:15 209:9,12
**actions** 85:11 164:23
**active** 102:20 104:15,17,18,24 105:1
**activities** 116:11
**activity** 31:12 32:4 38:17 104:13 128:22
**actual** 12:9 19:16 33:14 70:2 76:17 159:22 173:18
**actually** 12:8 51:25 71:10 72:23 94:2 111:14 118:6,23 123:16 136:20 138:22 147:4 164:1 185:11

**[actually - alphabet]**

200:3
**acute** 29:9 31:17
**add** 177:5
188:12 204:14
**addition** 20:5
91:12 124:22
170:7
**additional**
91:17 124:16
165:25 211:9
**address** 148:23
**addresses** 148:9
**administering**
172:16
**administration**
106:5
**adopt** 33:3
**adrian** 8:25
10:15,22 13:5,9
13:12 57:3
**adrian's** 9:1
13:18
**adv** 1:12
**advance** 12:4
**advent** 39:3
**adversary** 4:16
4:18 91:5
123:24
**adverse** 35:12
39:3 198:6
**advice** 116:10
**advising** 111:18
111:20
**advisory** 39:13

**affairs** 155:12
**affect** 182:25
**affected** 99:20
**affects** 23:7,7
**affiliate** 31:1
120:23 194:15
**affiliates** 120:24
**affiliation**
120:16
**affirmative** 8:10
31:21,23 43:21
43:25 44:14
45:5 54:21 64:5
66:11 68:23
70:18 75:23
82:19 83:11
84:13 88:7,11
88:14 89:13
91:3,9 93:10
95:3 97:9
102:25 106:6
115:12 123:11
131:12,16,18
133:3,21 136:18
138:5,14,16
147:1 148:5
150:9 156:7
169:20,22
170:13,16,22
176:8 179:5
185:17 192:19
205:10
**affirmatively**
63:20

**afloat** 44:25
**afternoon** 192:3
**agencies** 164:18
**agency** 143:11
**agent** 169:8,11
170:9,10 172:5
172:15,15
**aggregate** 92:2
166:2
**agree** 29:8
48:17 74:7
79:16 86:3,7
88:17 91:21
92:1 93:1,12
108:2 138:6
139:25 140:7
142:5,15,17
145:22 157:15
158:18,20 159:2
159:14 164:19
168:17 169:23
170:25 171:16
171:22 174:20
180:25 181:1,6
184:17 185:18
185:19 186:16
187:1 190:2
197:13
**agreed** 173:12
189:21
**agreeing** 18:23
**agreement** 2:10
2:15 5:2 75:9,13
75:18,22 76:7,8
80:15 81:2,21

82:21 83:5,7,21
88:4 89:9 91:7
91:24 92:6
93:24 129:2
134:25 141:4,5
141:9,14 148:14
159:20,24 160:8
171:13,19,24
179:12 182:5,6
182:7 185:1
186:19 194:18
194:25 207:16
207:19 209:12
**agreements**
84:16,17 92:11
141:12 150:7
182:10
**ahead** 6:4 11:21
18:9 20:22
26:10,17 90:1
106:20 108:10
**aiding** 14:23
**alf** 74:12 180:15
195:6,8,21
**alia** 181:16,19
**allan** 44:15
**alleged** 128:20
**allocation**
175:10
**allowed** 150:18
174:3
**allows** 174:21
191:19
**alphabet** 40:2

**[alternative - asking]** Page 217

**alternative** 180:7
**amended** 18:25 75:8,12 84:10
**ameribank** 161:15
**amount** 12:8 25:4 83:25 85:21 86:3 88:12,12 91:5 92:2 149:16 151:8 152:11 168:13 169:11 172:12
**amounts** 69:6
**analogy** 108:4,6 108:11,19
**analysis** 25:2 30:4,8 32:6 33:6 33:13 60:2 83:17 174:25 188:13
**analyze** 43:1
**analyzing** 16:23 19:8
**andrew** 53:16
**andy** 65:12
**ankura** 19:23 124:1,2,12
**annual** 69:4 100:24 162:9,11 162:12
**annuity** 28:14 131:7

**answer** 5:1,15 10:2,25 11:13 20:21,24 38:10 48:25 51:4 81:13 92:22 101:20 117:10 117:12,15 141:7 165:20,20 167:7 167:9 174:4 184:20 187:14 194:15
**answered** 106:19
**answering** 5:4
**answers** 207:22 209:5
**anticipating** 124:18
**anybody** 49:13 71:17 124:2
**anymore** 157:17
**anyway** 50:10
**anywhere's** 62:23
**ap** 1:13
**apart** 56:4
**apologize** 94:22
**appear** 18:1 191:24
**appearances** 3:1
**appears** 84:20
**appended** 80:20
**appleby** 2:24 3:3,3 5:12,17,20 5:23 12:2 15:22

48:22 49:16,18 68:10 80:12,16 80:20,22 81:3 81:11,17,24 82:22 86:17,21 87:1,6 89:21,23 90:17,18,21,22 92:20 112:13 166:4 167:5 174:12 176:21 183:12 188:23 189:1,3,6 190:6 204:23 205:5 206:5 210:2
**applicable** 172:3 182:23
**applicant** 21:19 55:13,18 56:5,7 101:3 146:15,19 146:23
**application** 55:13 118:1 123:7 140:25 141:10
**applied** 70:10 164:24 207:20
**appreciate** 205:1
**appreciated** 193:18
**approached** 58:5,6,14 60:25
**appropriate** 144:21 150:3

**approval** 129:22,24,25 137:23 169:18 196:10
**approved** 141:14,19 148:15
**approximate** 66:14
**approximately** 27:10 92:3 153:3
**april** 78:18
**area** 63:2 65:18 65:21 95:18
**areas** 143:19
**argument** 176:3
**arrangements** 209:13
**article** 207:5
**articulate** 100:10
**aside** 129:15,18 171:3
**asked** 5:2 18:11 18:16 40:8 49:19 64:6 98:17 110:16 111:25 129:2 140:14 163:10 163:13 173:12 184:12 202:21 205:25 206:1
**asking** 4:21 25:21 48:23

81:25 82:1
113:3 174:13
176:24 184:11
189:1 201:9
**asserted** 20:2
**assess** 203:8
**assessment** 54:4
**asset** 148:14
177:6,6 188:10
188:10
**assets** 93:4 97:4
116:22 148:12
165:8,23 175:11
175:22,24
179:10
**assigned** 207:11
**assignment** 2:13
79:18 80:6 85:1
159:16,20 160:8
160:11,21
161:14 163:18
211:1
**assist** 8:18,21
9:3 13:9 211:8
**assistant** 57:4
76:16 113:5
**assisted** 10:1
62:17 147:12
193:22 198:20
**assisting** 199:6
**associate** 194:16
**associated** 98:3
130:5,24 172:15
**association**
147:20 171:14

**assume** 13:4,6
59:23 81:22
97:1 133:9
189:19 195:14
197:14
**assumed** 148:13
150:14,17
**assumes** 69:6
189:6
**assuming** 187:4
**assumptions**
70:11 126:10
185:10 200:8
201:22
**atlanta** 1:24
27:11 45:25
102:5
**atmosphere**
192:18
**attach** 211:10
**attached** 87:8
163:20 173:1
210:9
**attachment**
199:24
**attention** 57:19
72:22
**attorney** 4:14
41:4 188:21
207:19 209:8
210:16
**attorney's** 41:2
**attorneys** 185:8
207:24

**attributed**
139:3
**audit** 39:12
**audited** 26:24
**august** 68:21
**auspices** 131:8
**authority** 39:23
140:24 149:19
150:2
**automatically**
207:20
**availability**
202:7
**available** 12:7
91:11 124:17
130:4,12 142:2
154:1,3,14,22
202:2,12
**aventura** 41:9,9
43:20
**avenue** 3:4
**average** 147:8
**avoid** 101:9
**aware** 25:5 36:5
49:9 51:5 59:4
78:21 82:12,16
83:20,22 85:8
85:10,11,15
88:21 89:16,20
93:17,25 98:8
103:16 105:6
106:13,24
121:24 135:6,23
139:17,19
140:18 161:9,13

161:24 162:3,3
162:6,19,23
163:17,21,22
164:2 167:13,20
193:11 196:7,14
196:19,21
197:19,20,21
204:21
**awareness**
19:16 104:13
139:8

**b**

**b** 1:25 32:23
86:5 97:22
169:3 171:12
174:21 207:5,7
207:20 209:18
**back** 10:7 11:1,9
13:2 23:11 24:9
24:23 41:5
43:12 50:14
56:19 66:9
83:23,24 88:3
89:11 91:13
92:12 94:18,25
103:20 109:19
114:19 118:5,18
118:19 121:3
135:16 136:3
137:16 138:7
157:4 164:10
165:6,13 167:10
170:19 173:16
175:23 185:3
188:16,18 191:9

197:22 202:23
210:4
**backdrop** 134:14
**background** 26:15,18 191:15 199:11
**backing** 134:8
**bad** 176:19,20 183:1 187:23
**balance** 86:6 144:10 164:15 165:9 188:3,5,6
**ball** 26:19
**bank** 1:13 4:15 21:3,3 22:16 23:13,14 50:21 79:1,19 93:25 94:7,8 128:24 129:2,7 141:5 171:13 188:1
**bankcorp** 1:14
**banker** 54:5 58:19 59:22
**bankers** 52:22 53:9,10,13,19 54:12 66:18,25
**bankrupt** 56:8 56:11
**bankruptcy** 1:1 18:7 56:12,13 56:15 61:10 78:23 139:18 148:16 150:16 196:8,23

**bartle** 62:4,10 63:19 71:25 121:21 163:24 197:23
**base** 36:25 48:8 137:4
**based** 18:23 29:11,11 70:5 84:19 124:14 140:12 158:21 159:11 181:2 200:24 204:25 209:12
**bases** 204:6,11
**basic** 82:2
**basically** 40:21 46:6 115:3 120:20 123:2 132:14 155:18
**basis** 33:16 181:9 200:15 204:6 207:8
**bat** 99:8
**batch** 81:4
**bbm** 71:13,13
**bdo** 27:12
**beds** 131:2
**began** 26:2
**beginning** 19:10 19:11 25:25 57:12 144:6
**behalf** 3:2,6 21:4 26:25 35:17 149:16,19

**behave** 190:18
**behaviors** 139:9
**believe** 4:17 67:14 82:7 85:22 92:23 102:11 104:9,25 125:6 137:16 141:12 174:24 177:6 180:21 181:10
**believed** 137:2
**bell** 63:10 64:16
**belong** 44:9
**benedict** 2:19 7:23 8:8,16,18 45:4 127:10,13 198:20 199:4 200:6 203:5
**benedict's** 127:6 128:8 199:6 200:16 203:20
**benefit** 20:8 175:8 176:11 177:9
**benefits** 28:13 131:6
**bennett** 8:25
**best** 5:4 11:2 59:1 140:9 209:4
**better** 7:10 30:24 78:7 108:11 113:3 117:15 150:5 177:11,16

179:20
**big** 62:25 96:20 97:14,16,21 108:22
**bigger** 174:7 194:3
**bill** 53:19
**bills** 54:18
**bios** 127:16
**bit** 11:22 23:3 43:5 59:1 74:18 78:6 96:6 99:9 102:2 109:19 110:23 143:9 165:13 179:14 197:8
**bk** 1:4,6
**blank** 103:3
**blocks** 106:24
**blood** 139:24
**blum** 44:15
**board** 35:22 37:4,4,5,5 45:12 45:12,13,14,15 45:15,16 111:22 111:23 112:3 207:6
**boardroom** 47:22
**boards** 47:11,14 111:19,20,21
**bogged** 77:9
**bond** 29:14 31:20 34:22 51:15 58:11

65:18 66:3
77:14,18,21
82:14 90:6,8
149:25 150:1,25
151:4,15 155:2
183:6
**bondholders**
35:21 144:15
**bonds** 25:8 69:5
70:24 72:2
77:18 148:23
149:8,14 150:2
152:22 153:4
**book** 15:8 41:17
94:21
**books** 92:4,25
93:8 168:14
175:4 176:11
177:7 179:3
189:13
**borrower** 35:17
54:17 59:16
60:3,15 61:25
64:19,19 69:20
69:21 87:15
91:1 150:4
180:12,20
**borrowers**
73:15 181:15
183:10 187:8
**borrowing**
180:11
**bosses** 53:15
**bottom** 8:9 67:1
75:15 170:5

**boulder** 45:8
**bracket** 56:23
110:12
**breach** 21:16
**break** 30:2 32:9
57:11,13 82:25
83:4 100:15
108:8
**breakdown**
154:8
**breaking** 48:1
**breaks** 74:18
**briefly** 20:7
**bring** 59:18
60:9 206:1
**bringing** 10:4
46:22 47:21,21
**brings** 120:7
**broad** 31:18
36:21 50:18
102:15
**broadly** 54:24
**brought** 29:2
59:10
**brown** 1:25
209:18
**brp** 150:7
**brush** 52:14
**buckets** 116:21
144:10,17 145:2
**build** 24:13
107:21
**building** 106:23
106:24 195:10
201:16

**builds** 122:11
**bulk** 65:17
179:24
**bullet** 41:22,24
42:23 45:17
159:6,11 164:11
164:21 165:3
173:13 180:5
184:19 187:3,17
**bullets** 165:6
181:13 187:4
**bumped** 124:9
**bunch** 154:7
**burkholder**
122:13
**business** 32:11
54:1 67:5 69:19
109:3 128:21
149:20
**businesses**
180:5
**buyer** 30:22,23
31:2
**bvm** 2:7 68:17

**c**

**c** 3:7 4:1 32:24
84:9 161:7
169:7 207:6
**calculation**
187:19
**call** 37:14 58:25
59:2 60:12
95:10 96:1,2
101:14 106:16
108:16,19

109:25 110:1
114:5,7 118:7
127:11 154:4
161:10 162:8
198:16
**called** 61:10
78:3 85:9 117:8
160:14 200:1
**calling** 176:22
**calls** 71:19
119:16,25
183:12 188:23
189:3 190:6
**campus** 86:10
131:24
**cap** 89:18
131:17 146:24
**capabilities**
127:24
**capability**
179:25
**capacity** 175:25
176:1 196:12,18
204:5
**capital** 34:2
68:3 89:15
101:22 116:22
117:3 119:23
120:3,20,21,22
135:17 145:25
153:2,2 154:6
156:13,15 202:3
202:16,17
**capmark** 64:15
64:17 72:13

**[capmark - changed]** Page 221

73:6,8 79:19,22 80:6 85:2

**caption** 209:5

**captured** 55:2

**care** 27:16,17,22 29:5,6,7,9,10 31:16,17 32:9 37:24 44:13 55:19 57:17 130:16 138:3 142:22 145:19 146:19 193:20 193:21,22 194:16

**career** 10:4 24:18,25 26:2,2 27:2,15 66:7

**careful** 108:22

**carolina** 28:19 37:20 66:17 95:21 117:22,24 118:1 143:18

**carried** 188:2

**cas** 115:6

**cascades** 30:18

**cascading** 128:11

**case** 1:4,5 10:9 18:24 40:25 43:5,9 49:13,22 50:3 85:9 90:11 98:16,18 107:23 109:23 111:8 114:22 115:2,20 160:11 177:3

182:1 184:4 196:23 197:7 199:13 207:8,8 207:20

**cases** 104:16 105:6 115:2

**cash** 93:14,16 107:18,20 116:22 140:3 144:10 145:2 180:20 202:15

**catch** 5:22

**catching** 185:2

**categories** 31:18 32:2 141:1

**category** 37:13 37:14 141:3

**cathleen** 122:12

**cathy** 122:12

**caught** 42:21

**caused** 18:7 21:16

**cc** 44:8

**ccr** 209:18

**ccrc** 31:14 36:20 40:19,23 41:10 42:8,9 43:2,3,3 45:8 46:16 47:2 47:10 48:3 56:1 56:2 84:21 95:24 102:23 130:13,25 131:23 140:23 145:20 146:6,7 146:10,11,14,16

147:16 164:7,13 165:7 173:18 174:5,7 193:25 194:1,7 195:1 196:13,19,23 197:15

**ccrcs** 28:4 29:8 29:13 34:9 44:9 46:23 77:22 103:24 107:25 131:24 143:14

**ccrt** 197:15

**ced** 1:4,6

**center** 29:19 55:16 130:18 195:21,24,25 196:3,3

**centers** 39:8

**centurion** 3:9

**ceo** 45:7

**certain** 35:3 38:21 90:8 148:13 149:16 162:9

**certainly** 28:8 99:19 101:16 107:6 125:6 139:15 162:23

**certificate** 55:13 140:24 209:1

**certificates** 39:23

**certification** 115:4

**certified** 207:9 207:23

**certify** 209:4,7 211:2

**cetera** 30:7

**cfo** 118:7 119:25

**cfos** 117:7

**chain** 21:15

**challenge** 201:15

**challenges** 30:25

**challenging** 135:17

**chance** 57:24 204:10

**change** 12:11,14 18:5,20 30:17 30:20 35:12,16 51:21 52:7 56:16 61:5,7 77:11 78:19 102:20 103:6 111:11 121:5,7 139:9 156:14 177:2 187:14 188:13 189:2 211:12,14,15,17 211:18,20,21,23 212:1,3,4,6,7,9 212:10,12,13,15 212:16,18

**changed** 24:23 61:23 106:2 124:7

**[changes - commercial]**                                      Page 222

changes   27:20 99:16,20,25 100:15 102:8 106:4,5 207:23 210:9 211:3,4,6

changing   44:21 61:8

chantel   3:7 160:4

chaos   122:7

chapter   1:5,6 2:17 48:18 98:22 99:1 140:13 170:8 172:4,11,13

character   173:9

charge   32:8,20

charges   172:14

charging   33:1

charleston 95:15

chased   10:11

check   46:11

checking   112:24

chief   110:24

chosen   198:12

christopher 163:24 164:3

chronology 104:6

circulatory 155:19

circumstances 35:16 199:12

city   149:20

civil   211:6

claim   14:23 16:23 17:3,14 17:22,25 19:8 19:11,16 20:1 20:10,12,14,24 21:1,10 50:12 50:18 69:1

claims   150:18 172:17

clarification 205:7

clarify   81:4 197:25

clean   87:10

clear   7:2 38:3,9 40:5 80:25

clearly   13:22 106:22

client   18:1 19:8 54:13,14,15 59:5 67:5 119:25 120:1

clients   54:7

close   40:20 50:9 77:19 118:6 153:19

closed   71:10

closer   119:22

closing   2:9,11 2:12 6:19 40:22 72:13,20,24 76:2 86:18 87:7 87:15 88:24

89:22 90:3 91:1 93:22 132:25 133:10 165:14 167:4,14 168:1 185:8 188:21 204:3

closings   91:21

coa   38:24 39:23 141:1,10

coaching   127:12

coast   28:19 103:14

code   207:14 209:11

colin   3:8

collaborated 13:13 128:4,5,5 192:21

collaborating 13:5

collateral   21:7,7 84:21 85:3 93:15,16 157:8 158:17 165:9 181:25

collateralization 75:16,21 84:17 92:11,17

collateralized 76:6 92:3 186:6

collective   162:8 175:12

collectively 91:10 195:20

colloquies 207:22 209:5

color   7:22

colorado   45:3,8

columbia   87:23 165:23

columns   166:11

combination 59:3

combine   91:20

combined 167:25 185:24 186:1 187:12

combining 191:22

come   7:14 13:2 43:12 44:23 63:8 71:2 81:16 110:6 118:12,13 118:16 149:20 164:10

comes   23:22 56:8 116:20 121:10

coming   56:4 59:4 62:9 77:13 120:21 192:9

comment   108:1 126:25

comments 111:25

commercial 65:21,21 66:4 90:12 190:14

commingled
175:24
commission
212:25
commitment
209:13
commitments
36:15
committee
35:23,24 36:2
common 22:13
63:16 82:2
181:5,7 192:5
193:5,8,9
197:15 199:13
communication
116:16
communities
25:1 27:16,23
29:5 37:24
47:15 143:14
community
115:9 146:20
148:10 153:1
170:24 201:16
company 27:12
41:9 65:9 96:20
97:5,5,20
121:10,16 130:7
171:14
compare 201:4
compared 48:9
154:21
comparison
48:2

compensation
207:15 209:12
competency
29:20,22 40:9
46:8,12
competent
172:4
competition
32:8,13,25
competitive
25:2 30:4 32:5
compiled 9:4
compiling 70:11
complaint 19:17
19:19
complete 20:21
21:9 142:18
205:18 207:11
207:22
completed
124:15 152:24
210:22
completely
106:19 133:13
139:22 145:11
completion
198:21
compliance
100:18,21 101:3
101:7 102:1
137:22 139:6
172:3 207:4,14
209:10
complied
182:22

comply 128:24
170:11
component
130:19 131:25
145:25 146:3
147:3
components
131:9 142:8,9
comport 170:1
concept 29:9
35:14 138:13
143:10 144:1
concepts 201:24
concluded
206:8
conclusion
48:23 103:23
174:14,15
176:22 183:13
190:7
conclusions
14:15
concrete 31:24
concurrently
188:15
conditions 90:8
conduct 180:24
conduit 149:8
149:15
confer 43:10
confidential
15:13,19
confirm 57:24
113:12 133:14
181:15

confirmed
148:15
confirming
118:16
confuse 147:12
conjecture
137:5
connection 4:18
6:10,12 8:13
34:16 51:8 65:7
71:22 72:19
97:16 100:8
103:18 105:16
116:2 182:19,21
183:9
connotation
108:13
conscience
136:2
consent 196:11
196:22 197:2
consider 70:14
71:4 96:9 98:25
99:5
considerations
30:4,17 166:9
considered 7:5
14:12 16:22
51:16 203:16
205:17,19
consistent
143:17 173:5
consolidated
180:12

**constituencies** 58:10

**constituents** 48:4

**constructed** 158:24 164:14

**construction** 144:17 158:25

**consult** 118:9

**consultant** 9:2 9:12 111:24

**consultants** 60:17

**consulted** 115:23

**consulting** 27:13 116:9 124:1

**consumer** 44:13

**consummate** 121:2

**consummated** 51:22

**consummation** 181:24 186:21

**contact** 62:8 95:8 122:23

**contacted** 58:23 59:24 76:13 78:14,18 95:4 112:22 113:14 133:18 207:18

**contacts** 66:10

**contained** 125:4 182:17

**contains** 136:16 205:18

**contemplated** 61:23

**content** 9:25

**contents** 26:8 86:22 87:3

**contest** 11:14 57:14

**context** 7:22 10:9 25:23 34:5 45:16 47:3,10 47:21 54:3 55:6 55:8,14,18 64:18 65:10,13 106:18 108:14 108:25 111:24 117:11,13 134:17 161:7

**contexts** 106:22

**continue** 164:9

**continuing** 27:16,22 29:4 37:24 138:3 146:19

**continuum** 29:6 29:7,10 31:16 59:21 130:16 138:9 142:22 145:19 193:20 194:12

**contract** 28:15 32:9 36:10,10 55:23 130:23 131:5,7,8 138:8

142:22,24 189:15 194:8 207:15 209:11

**contractors** 173:19

**contracts** 27:17 28:13 55:19 138:4 139:23 140:2 150:18 207:8

**contribution** 121:1

**controlled** 196:13

**conventional** 90:11 183:7

**conversation** 46:2 110:13 114:4 136:1 155:10

**conversations** 117:23 119:17 128:15,16 155:11

**conversion** 12:11

**copies** 10:19 81:22 210:17

**copy** 5:9 8:5 16:9 82:21 83:6 87:10 110:14 157:6 163:5

**core** 29:20,22 32:15 40:9 46:8 46:12 174:8

**corporation** 1:15 149:10 150:14 152:21

**correct** 4:19 7:23 8:11 19:5 51:13 73:20 75:5 76:18 87:18 89:2 93:5 94:21 109:7 125:16 131:10 132:8 137:2 143:2 154:16 159:14 162:14 163:21 168:10 170:15 171:25 174:23 178:25 182:15 187:5 191:7 192:22 194:13 198:11 198:22 207:22 209:6

**correcting** 112:19

**corrections** 210:9 211:9

**corresponds** 33:10

**cost** 26:25

**costs** 74:19 75:1 193:20

**counsel** 3:1 111:17 112:16 183:8 184:21 207:2

**[count - debt]**

**count** 116:24,24
**county** 74:20
  209:2
**couple** 27:19
  36:7 116:21
  117:7 144:16
  178:5 201:24
  204:3 205:7
**course** 109:4
  155:14 161:6
**court** 1:1 85:13
  148:16 150:16
  172:4 180:9,17
  207:6,9,23
  209:14 210:20
  210:23
**courtesy** 82:2,2
**courting** 59:5
**cover** 15:10
  94:17 179:25
**covers** 49:3
  94:16
**cpif** 2:11 86:19
  87:7,22 89:12
  89:23 146:22
  149:1,3,6 167:2
  168:8 176:5
  182:14 186:20
**cpm** 1:13
**create** 23:23
  56:9 149:14
  154:6 194:25
  201:19 202:1
**created** 71:6
  89:18 170:23

194:25 199:17
  200:21
**creating** 180:10
**credible** 127:25
  128:1
**credit** 177:1
**creditor's**
  172:17
**creditors** 173:1
**crisis** 104:10
  106:25
**critical** 42:10
  102:17 115:7,8
  180:19
**cross** 75:16,17
  75:21,21 76:6,6
  84:17 92:3,4,11
  92:17 186:6
**cull** 65:4
**culminating**
  52:10
**curious** 37:8
  147:17
**current** 76:19
  76:21 86:2,6
  97:18 148:10
  150:17 151:8
  153:10 170:24
  192:10
**currently** 155:2
**cursory** 16:16
**customary**
  159:17 181:15
**cycle** 39:5 100:1

**d**

**d** 4:1 84:11
  85:19 88:4 93:9
  97:22 146:2
  161:7 172:8
**daily** 69:11
**damage** 40:19
**damages** 40:20
  42:2
**dan** 125:9
**data** 122:24
  200:24
**database** 148:2
**date** 57:25
  72:24 76:17
  83:13,14 112:9
  112:21,25 113:1
  113:15,23,24
  124:15 132:15
  133:9,10,10
  134:2 137:18
  142:22,24 168:1
  185:21 210:4
**dated** 7:14
  78:17,18 86:10
  95:1 133:1
  182:5 186:19
**dates** 56:24
  102:13
**david** 1:25
  121:19,20
  209:18
**day** 113:14
  170:10,10
  179:18 209:15

212:21
**days** 169:14
  210:4
**deadline** 137:15
  162:16
**deal** 53:2 60:19
  60:20 71:1,9
  77:2,14,18 78:9
  82:14 90:12
  96:5 97:2,8,10
  97:15 188:17
**dealing** 17:11
  22:25 136:1
**dealings** 62:10
  78:7
**deals** 29:21 66:5
  66:12,19,21,22
  66:22 135:25
  155:24,24
**dealt** 66:19
**dean** 3:8
**debate** 47:22
**debit** 166:11
**debt** 30:6 35:6
  61:15 64:7 69:4
  69:6 74:4 76:10
  79:2 82:15
  88:13 91:15,23
  92:24 93:7
  107:3 120:19
  126:7 131:13
  134:15 139:20
  144:14 149:15
  149:19 150:24
  150:25 151:4,13

151:18 155:3
158:25 164:14
166:18 168:2,9
168:13 174:21
175:3,8,10,21
175:25 176:1,11
178:18,19,20,22
179:2,4,10,24
179:24 180:7
185:25 189:19
189:20
**debtholder**
151:14
**debtholders**
107:6
**debtor** 135:15
184:23 186:23
**debtors** 1:7
151:16 186:18
187:8 191:16
**deceased** 109:3
**december** 72:25
83:14 85:5
152:20 206:7
**decide** 59:18
**decisions**
111:15,19
**deck** 16:18
**dedicated** 28:25
29:2,3
**deed** 85:7,9
134:25 192:17
**default** 56:16
75:17,21 155:5
172:25

**defaulted** 76:6
92:4
**defendant** 1:16
3:6 43:4 91:4
181:9 182:1
**defendant's** 6:2
8:2 68:6 72:9
79:7 87:11
90:15 160:17
164:22 168:20
171:5 198:24
**deferred** 202:17
**define** 54:23
**defined** 55:6,7
74:11 85:22
**definition** 13:4
13:10 55:10
**definitions**
10:10 22:7
136:16 156:23
163:12
**definitive**
137:18
**definitively**
52:15
**degree** 26:21
**delaware** 79:23
**demand** 147:17
**departing** 109:2
**department**
37:18,20,21
99:17,20 100:2
100:3,8,12,12
101:2,10 169:13
170:6,15

**departments**
37:23
**deponent** 210:3
210:8,10,12,20
**deponent's**
210:8 212:20
**deposed** 40:13
43:19 50:3
176:15,16
**deposit** 2:14
109:5 159:20
160:8,11,22
161:14 163:18
**deposited**
141:13 172:9,13
**deposition** 1:20
12:5 25:18
40:18 42:5,18
42:19 43:15
64:21 72:12
79:6 83:5 87:14
90:25 160:20
171:9 199:3
206:1,8 210:1,8
211:7
**depositions**
80:19
**depositors**
186:25
**depth** 51:23
**describe** 22:21
26:17 28:4 96:1
99:12 100:16
136:8

**description** 2:3
**design** 109:11
**designated**
123:5 146:4
169:12
**designed** 48:19
142:10 143:4
**desire** 211:7
**desk** 7:15
**desktop** 82:22
**detailed** 142:3
**details** 97:1
167:21
**determination**
30:10
**determinations**
32:16
**determined**
207:15
**determining**
32:7,19 70:12
**detrimental**
115:10 139:22
**develop** 26:14
107:17
**developed** 24:20
24:21,24 28:20
143:15
**developer** 54:5
78:4
**developers**
24:23 54:11
**developing**
34:17

**development** 95:25 96:20,21 97:5 149:9 150:7

**devonshire** 103:4,10,17,22 104:8,17

**dfs** 100:9

**dhg** 12:19,21

**dialogue** 70:13

**dictated** 38:18

**difference** 7:12

**different** 7:9 33:18 37:13,21 47:18 58:10 104:15 116:21 118:1 124:22 126:24 127:24 144:11,19 145:3 145:12 156:24 161:23 195:11 198:12 199:14 199:14

**differentiate** 16:5 100:21 162:24

**differentiating** 38:11

**differently** 33:4 33:4 47:20 105:25 130:22 143:23 175:17

**difficult** 101:21

**difficulty** 49:25

**diligence** 30:17 30:20 31:8,9,10 89:15

**diminish** 172:12

**direct** 6:5 10:9 80:12 202:10 207:15 209:11

**directed** 127:3 191:11

**directing** 111:2 111:13

**direction** 13:23 13:23 209:6

**directly** 10:3 30:9 121:14 188:20

**directors** 111:19

**disagree** 108:5 158:18 165:3 174:10,11

**disbanded** 29:1

**disbursements** 169:7,8

**disclosed** 162:21 203:25

**disclosure** 187:21 190:4,16 207:6

**disclosures** 207:1,3,4,17

**disconnect** 187:25

**disconnected** 63:2,7

**discount** 207:21

**discounts** 207:20

**discretion** 170:7

**discretionary** 38:9

**discuss** 201:23

**discussed** 10:6 111:12 192:3 198:10

**discussing** 163:25

**discussion** 25:14 47:22 71:11,12 116:16 143:16 174:17 186:8 191:4 192:5 199:12

**discussions** 10:8 14:16 78:11 107:24 116:18 119:14

**disqualification** 207:6

**disqualify** 207:13 209:10

**distinct** 116:17

**distress** 180:6

**distributions** 89:10

**district** 1:1

**diversity** 45:13

**diverted** 109:24

**division** 1:2 14:3 164:7

175:21,22 178:1

**divorce** 175:16 195:5

**divorced** 178:8 178:9 179:22

**divorcing** 178:5

**dixon** 12:15 27:18 29:3

**dme** 27:9

**doctor** 55:4

**document** 15:12 15:16 16:6,16 17:17,19 18:14 21:25 68:12,15 68:24 72:16,20 75:15,17,22 79:10 80:13,19 80:24,24 81:8 81:19,25 82:9 84:23 86:11,14 111:9,10 136:16 159:8,25 160:10 160:21,22,24 161:1,25 162:4 163:19 168:24 168:25 171:3 182:17 199:22

**documenting** 111:9,10

**documents** 6:19 7:5 8:15 9:17 12:4 15:2,15,17 16:14,15 17:18 17:23,24 18:1 20:6 75:4 76:3

80:17 81:4,5 82:3 84:4 85:2 86:16 94:17 110:5,9,9 128:17,18 134:23 169:1 182:13 184:1,15 203:8,9,17,18 205:17,19,22 206:2,3

**doing** 11:25 25:7 27:13 29:4 29:20 34:10,11 34:11 39:12 44:25 52:5 82:14 100:25 155:24,25 157:11,12 203:12

**dollars** 53:25 91:17 177:11

**domestic** 1:14

**doubled** 179:19

**doubles** 93:12

**doubting** 130:2

**downward** 32:19

**draft** 71:7,10,12 134:12

**drafted** 136:23

**drafting** 9:23 52:12

**drag** 184:13

**draw** 10:12 16:4

**drawing** 103:3 103:22

**drawn** 152:21

**draws** 34:14

**drive** 189:25

**dropped** 157:19

**due** 30:17,20 31:8,9,10 89:15 107:18 210:4

**duly** 4:4

**dynamic** 36:5

**dynamics** 36:6

**e**

**e** 2:4 3:13 4:1,1 211:6,6

**earlier** 13:8 38:5 49:19 70:19 84:1,18 89:8 125:11 133:23 137:8,14 140:14 148:3 198:10,19

**early** 16:13,17 29:23 104:7 139:13

**easier** 26:12 57:9

**east** 28:19 103:14

**easy** 12:12 26:16

**economic** 30:5 40:24 52:6 115:10,16,18 149:18 166:13

166:23 176:4

**ed** 4:13 12:2

**editing** 9:25

**edmund** 3:7

**educate** 64:20

**education** 34:21 49:4

**educational** 26:15,17

**effect** 182:3 198:6

**effective** 83:14

**effort** 128:13

**either** 56:25 80:8 111:17 120:19 126:2 129:9 182:13

**election** 100:1

**electronically** 210:10

**elements** 28:14

**elevated** 48:11

**email** 59:3 82:6 110:3,6 112:24 112:25 113:23 114:1 159:25 160:7

**emailing** 57:2

**emails** 114:8

**embodies** 109:14

**emerged** 143:12

**emergency** 169:25

**employee** 209:8

**enabled** 165:25 175:2

**encumbered** 84:22

**encumbrance** 89:7

**encumbrances** 172:18

**ended** 94:8

**endowment** 36:14

**endurance** 57:13

**enforced** 143:5

**enforcement** 99:15,23 100:15 100:16,19,22,25 101:1 138:15 139:5,6 141:24 143:12

**enforces** 170:15

**enforcing** 142:2

**engaged** 30:23 31:2,7 52:9,15 52:17 56:21 58:5 79:4 113:17 114:9 119:15 133:15

**engagement** 42:25 57:25 78:17 103:19 110:4 113:22,24 119:19

**engagements**
41:13
**engaging**
183:10
**enhanced** 180:9
**ensure** 142:13
**entered** 105:21
171:13 197:7
211:7
**enters** 147:8
**entire** 26:1 92:8
146:11 196:13
196:19
**entirely** 156:24
**entirety** 107:7
**entities** 21:20,22
21:24 22:7 56:9
73:19 80:11
132:11,12,13,22
133:5 149:15
168:3 175:12
192:9
**entitled** 37:2
85:21 87:9
160:21
**entity** 23:7,23
62:4 96:25 97:3
130:4 137:3
149:13 191:24
195:11
**entity's** 136:22
**entrance** 27:17
28:9 35:3,5
36:13 37:25
38:4,23 43:2

120:21 130:23
130:24 142:25
144:20
**entries** 12:9
**entry** 109:5
**environment**
135:18
**equate** 175:25
**equipment** 27:7
27:8
**equipping**
152:25
**equity** 120:14
180:7
**era** 138:19
**errata** 210:1,4,9
210:10,12,15,17
210:19,22 211:1
**escrow** 2:16
34:25 35:3
93:24,24 94:6
94:11 125:12,13
128:23 129:2,6
141:9,12,14
144:19,20
145:11 169:8,10
169:11 170:9,10
171:12,24 172:5
172:9,12,14,15
172:15
**especially** 192:2
**esq** 3:3,7,7,8
210:2
**essentially**
22:25 101:12

147:2 157:16,22
193:6 197:13
**established**
128:23 141:9
146:25 173:8
**establishment**
169:4
**et** 30:7
**ethics** 207:14
209:11
**event** 23:13 39:3
39:21 119:22
191:21 199:16
202:2
**events** 21:16
50:25 139:12
191:23
**everybody**
139:9 177:18
**evidence** 172:2
188:14,15 189:7
209:6
**evidenced**
134:24
**evident** 145:24
202:18
**evidentiary**
164:21 165:2
173:17
**evolution** 99:13
138:12
**evolve** 99:8,12
**ex** 89:18 131:17
146:24

**exact** 57:25
153:24
**exactly** 14:2
19:7 23:6 33:18
34:16 52:20
70:20 122:9
125:10 134:1
154:17 160:15
167:10 201:21
**examination** 4:6
205:4
**examinations**
2:21
**examined** 4:4
**example** 29:15
31:24 149:17
**examples** 31:17
**exceed** 170:10
**except** 172:15
172:19 207:8
**exceptions**
172:21
**exchange**
176:16
**exchanging**
110:8
**excluding** 69:5
**execute** 59:6
60:23 97:5
**executed** 36:18
84:18
**executers** 97:6
**exempt** 65:18
66:3 149:8,14
150:3

exercise 138:22
138:23,25
exercised 105:4
exercises 34:8
exhibit 2:3,4,5,7
2:9,10,11,12,13
2:15,17,18 6:2
8:2,4 9:8 15:5
68:6,10 72:9,12
79:6,7 83:4
85:19 87:11,14
88:4 90:15,25
92:19 93:9
94:19,25 95:1,5
134:2 146:22
160:17,20
163:19 168:20
168:23 171:4,5
171:8,17 198:24
199:2,4
exhibits 2:1
5:10 7:3,16
205:8,14 207:23
207:24 208:1
existed 51:6
196:14
existence 35:9
existing 142:1
expansion
201:17
expect 183:19
190:14
expectancy
147:9

expectation
31:11 38:14,15
61:5 191:7
expectations
35:19 38:2
98:23 99:10
142:19,20
200:18
expected 178:2
expenditure
89:16
expenses 69:11
70:15 89:15
experience 10:5
13:22 27:22
28:4,21 34:14
34:19 49:4 51:3
58:15 65:17,20
70:9,10 99:7
139:4 158:22
159:12 181:3
experienced
99:7 110:22
expert 2:4,5,18
4:18 5:5 6:6,18
7:18,19,20 8:7
10:4 13:24
19:18 36:5 96:7
96:9 98:9,16,18
98:19,25 99:5
109:23 114:12
114:23,24
115:22 123:5,6
123:12,25 125:9
198:22 199:3,14

203:13 204:6
expertise 28:21
34:15 46:15
70:5
experts 128:3
expires 212:25
explain 111:3
149:11 192:2
explore 60:14
exposure 51:3,5
express 20:12
expressed 204:7
expressing 9:23
extend 137:22
extended 83:13
101:23
extension 2:10
80:14 81:2,21
82:21 83:5,7,12
83:14,20 88:3
89:9 91:7,23
92:6 134:25
143:6 179:11
186:21
extensions
134:20 136:2
extent 12:3 52:3
120:4
external 7:4
205:17,18
eye 42:21

**f**

facilitate 12:1
facilities 146:5

facility 31:5
62:17 88:9
171:15 172:19
210:23
facing 180:5
fact 25:7 36:12
72:2 82:24
94:15 131:5
134:24 135:25
165:21 177:17
196:8
facts 88:21
105:2 188:12
189:6 199:12
factual 191:14
factually 185:11
fails 170:11
failures 102:17
fair 13:5,20,21
14:16 19:9 23:1
25:3 32:22 33:5
33:12 39:7 40:3
40:22 47:6 54:3
58:9 63:21 64:1
65:16 69:25
71:1,5 76:2,4
78:1 102:2
104:24 109:1
119:13,24 125:5
127:18,20 128:5
131:19 136:4
138:17 139:5
141:5,11 156:1
160:25 164:8
165:24 166:3,23

167:3,24 168:6 168:11 175:1 204:9

**fairly** 35:8

**faith** 164:24 173:18 176:19 176:20 181:9 183:1,1,11 187:23 190:4,23

**fall** 37:12 66:20

**familiar** 5:23 24:10,15 54:9 61:15 64:6,17 66:2 73:11,19 74:3 76:9 80:8 87:23 103:7 106:9 110:17 124:2,11 141:16 153:5,10

**familiarity** 63:18

**familiarize** 79:3

**familiarized** 204:4

**familiarizing** 16:17

**families** 143:6

**family** 27:11

**far** 74:21 105:6 169:25 189:23 203:20

**faster** 113:6

**fastforward** 78:6

**feasibility** 25:8 29:4,13,14,20 31:9,16,19 34:22,25 35:14 35:15 38:24,25 39:2,6,8,20 40:7 46:13 51:14 52:6 59:7,11 60:6,17 61:1 67:11 68:9 72:19 83:17 103:17 111:24 118:14 126:9,18 133:4,6,12,15 133:24 148:21 148:22,23 201:1 203:1

**feasible** 30:11

**february** 105:11 140:10 198:2,5

**federal** 26:25 79:13 85:12 135:2 211:6

**fee** 28:9 36:13 38:23 89:14 130:23,24 142:25

**feel** 152:8 187:5 204:5,9

**fees** 27:17 35:3 35:5 37:25 38:4 43:2 120:21 144:20 172:15

**felt** 59:18

**fiduciaries** 47:15

**fiduciary** 145:21

**field** 10:4

**fifth** 141:2

**figure** 56:21 57:1 62:5,6

**figuring** 38:20

**file** 56:12,13 100:24 210:16

**filed** 4:16 78:22 79:13 85:12 135:4 139:17 164:17 210:19

**filing** 39:5 100:23 101:8 135:2

**filings** 80:21

**fill** 70:14 154:5 200:8,20 201:22 203:7 210:10,10

**final** 69:5

**finally** 142:24

**finance** 65:21 72:14 122:18 149:9 165:22

**financed** 149:8

**financial** 30:5 30:12 33:23 34:7 36:14 43:2 43:3 52:6 69:15 100:8,12 104:9 106:25 107:2 115:15 145:20

151:13 164:17 180:6,17 207:7

**financially** 141:25 209:8

**financing** 23:13 29:21 39:1 59:24 66:2 67:14 78:11,20 119:22 126:8 128:22 133:1 148:24 167:1 174:23 189:18 191:23 199:16

**financings** 191:25 192:12

**find** 57:20 60:14 101:21

**fine** 14:8 15:24 20:18 73:13 81:22 94:16 100:14 119:2 129:15 157:22 167:7 170:9 174:17 189:8

**finish** 12:24 174:4

**finished** 66:17

**firm** 34:11 124:7 163:15 207:1,17

**first** 4:4 5:7,7,24 24:15 27:21 36:11 40:17 44:11 49:9 51:2 51:12 52:15

56:10,21 58:5
63:6 79:24
83:24 95:8
97:24 104:4,16
113:14 120:9
128:12 133:18
133:19 136:23
138:24 139:2,15
142:8 147:7
153:1 157:1,6,9
157:10 159:11
159:19 191:11
193:16 197:19
**fiscal** 69:7
**fit** 33:6 106:14
  152:8
**fits** 108:20
**five** 26:23 27:6
  27:7 78:12
  141:1 198:16
**fla** 211:1
**flipping** 83:24
**florida** 1:1 2:17
  3:4,10 18:2,14
  28:18 34:24
  35:2,2 36:2,17
  37:6,9,16,19
  38:11,15 41:11
  48:14 53:18
  62:18,22 66:15
  66:16 74:20
  102:17,23
  115:24 117:16
  117:19 118:2
  123:8 128:25

129:16 140:13
140:23 141:22
141:23 145:18
146:2 149:9
170:8 171:10
181:10
**flow** 26:11
  180:20
**flowed** 93:18
**flywheel** 60:11
**focus** 16:15
  24:15 39:19
  48:15,18 50:14
  130:16,23 138:8
  161:7
**focused** 128:13
  128:15 162:2
  167:17
**focusing** 189:12
**followed** 182:1
**following**
  195:16 207:1,4
  211:4
**follows** 4:5
**footnote** 69:4,10
  72:3 129:5
**footnotes** 125:8
  182:4
**forced** 61:13
  85:9 134:25
  192:17
**forecast** 134:4
**forecasted** 2:7
  68:20

**forecasting**
  33:16 115:15
  118:15
**forecasts** 70:5
**foreclosure**
  85:11 135:3
  180:6
**foregoing** 209:4
**foreign** 53:7
**foremost** 36:12
**forget** 43:14
**forgot** 160:14
**form** 48:23
  92:20 166:4
  167:5 184:12
  187:4,18 189:1
  191:19 196:24
  211:7,9
**forma** 33:16
**formal** 194:20
**formality**
  194:21
**formation** 169:6
  198:21
**formed** 124:22
**forming** 14:15
**forms** 141:2,3
  162:12,20 207:6
**formula** 117:25
  175:5
**forth** 48:19
  68:22 92:12
  150:15 172:10
  185:3

**forvis** 12:15
  15:10
**forward** 20:8
  26:4 133:25
  167:17 178:15
  192:10 210:16
**foundations**
  190:3
**four** 103:24
  105:21
**fourteen** 51:11
**fourth** 75:9
**frame** 23:25
  51:25 52:18
  64:8 72:1 73:3
  77:24 78:12
  82:13 135:6,22
  138:11 202:9,20
**framework**
  109:14,16
**frasier** 45:7
**fraudulent**
  108:14 109:9
**freedom** 63:10
  63:16
**frequently**
  180:14
**frey** 53:17
**front** 24:7 38:24
  76:22 83:6
  86:18 154:11,25
  199:8,11 201:19
  203:15
**fruition** 71:2

**fulfill** 147:4
**fulfilling** 137:23
**full** 4:10 136:17
140:22 142:8
177:25 190:16
193:16
**fully** 152:21
**fulton** 209:2
**function** 144:6,6
144:9 147:3
**fund** 144:14
146:3 158:24
**funded** 128:23
144:18 153:3
**funding** 165:25
**funds** 21:6 23:7
93:15 116:7
129:16,18,23
130:3,10,12
137:3 138:1
142:2 144:7
145:8 157:8
158:17 159:1
162:22 164:13
164:15,16,23
165:8 169:9,15
172:6,9,12,13
173:5,7,8,20,22
181:4 188:7,8
188:16 189:15
189:17 191:19
**furnish** 211:9
**further** 75:11
124:21 171:2
196:6 204:23

206:5 209:7
**future** 44:12
192:11,13

**g**

**g** 4:1 84:14
**ga** 210:24
**gall** 53:2,3,8
58:8,14,23 63:3
64:11 66:9,13
66:20 71:15,16
71:21 77:4 78:8
90:9
**gall's** 58:15
**gamut** 120:7
**gap** 115:19
**garnishments**
172:17
**gemsa** 89:1,5
90:13 91:12
**general** 65:21
71:4 77:21
132:7 134:9
143:6 155:9
156:11 158:18
164:25 172:24
**generally** 90:10
118:2 124:11
**generates** 60:12
**generation**
104:4,10
**generic** 31:25
**genesis** 122:6
**georgia** 1:24
207:4,10 209:2

**getting** 18:9
41:3 50:1 59:15
59:15 101:17
107:6,7 202:16
**gift** 120:25
**give** 20:23
106:20 109:22
112:25 154:8
190:16
**given** 43:16 72:2
115:22 116:2,9
134:23 165:21
204:9 209:6
211:8
**gives** 36:15
**giving** 13:23
29:15 84:19
131:8
**glass** 27:25
**glenmoor**
102:17,22,23,24
104:23 138:19
139:4,7,10,17
**go** 6:4 10:13
11:21 20:22
23:4 24:23 26:8
26:10,14,17
27:5 50:24 57:8
66:9 72:21
73:14 78:20
81:25 83:23
89:11 90:1
93:20 94:17,25
99:3 104:5
106:20 108:10

113:5 119:10
121:4 128:20
150:5 159:7
165:6 175:18
181:13 188:17
191:9 192:10
193:3 201:14
202:23
**goes** 138:7
**going** 10:14
12:3 15:14,18
16:9,10 26:11
26:16 30:15
43:7,8 46:17
49:11 50:14
54:2 55:8 56:7
56:11 59:7 60:3
62:14 77:8,13
82:6 86:16
89:25 96:10
103:19 112:5
120:8 121:3
135:9 147:6
152:13,13
155:11 156:21
163:5 165:17
166:7 170:19
175:16,19,20
177:25 178:15
180:4 183:3,14
190:15 197:1
201:24
**golf** 95:16
**good** 4:8,9,13
5:19 28:2 45:3,9

45:11,17 47:14 64:1 108:18 123:21 145:7 164:23 173:18 176:16 181:9 182:25 183:11 190:4,23 197:11

**goodman** 12:15

**gosh** 53:15

**gotcha** 7:8 34:13 40:21 95:11 107:4 111:16 121:3 124:10 125:2 142:21 148:1 165:16 179:16 205:15

**gotten** 70:7 119:16

**govern** 47:19

**governance** 30:16 36:4,16 45:3,10,17 46:18,20 47:8,9 47:9,14,17 132:5

**government** 26:25 149:13,15

**graduated** 26:19,20

**granted** 158:23

**granting** 181:4

**gravity** 29:19

**great** 117:12 149:17

**greetings** 210:6

**group** 2:7 28:24 44:6,7,8 62:9 68:17 124:1 147:19

**groups** 156:5,9

**guarantee** 92:17

**guaranteed** 92:4

**guaranties** 92:12

**guess** 11:5 13:4 50:17,23 63:15 76:12 137:20 141:6 145:15 153:12 161:10 184:6 199:25

**guessing** 56:24

**guidance** 116:1

**guiding** 29:8

**guys** 95:13 124:5

**h**

**h.j.** 52:23,24 53:1,11,12,22 77:6

**haley** 8:25,25 10:14 57:5 128:16

**half** 147:15 177:10 194:14

**hamilton** 42:16

**hammer** 192:14

**hand** 21:5

**handful** 62:16

**handy** 10:20 80:24 205:11

**hang** 86:25

**happen** 90:7,7 156:21 188:17

**happened** 18:18 18:24 23:6 56:16 63:6 69:2 70:23 79:3 95:9 105:2,8 109:25 115:19 164:1 168:5 194:22

**happening** 67:8 135:5

**happens** 102:12 174:5

**happy** 4:24

**hard** 139:11

**harris** 57:4

**head** 63:20 164:4,6

**header** 159:10

**heading** 74:25

**heads** 192:15

**health** 43:3 44:12,12 45:12 131:6 195:20,24 196:3

**healthcare** 28:13 54:25 55:3 123:7

**hear** 5:15

**heard** 65:6,10 73:6,11 97:25

197:9

**heart** 160:15 192:4

**heavier** 28:15

**heavy** 28:20

**held** 93:23 94:6 144:7,11 145:8 145:9 172:12 187:20 188:7,8

**help** 20:8 23:3 25:16 30:24 32:15,23 56:22

**helped** 9:17 46:1 128:17 203:8

**helpful** 50:24 56:20 106:12

**helping** 128:19

**hereunder** 170:23

**hey** 59:3,7 96:7 98:18 116:22 117:8

**hiding** 13:16

**high** 26:18 153:7,8

**higher** 154:21 193:20

**hill** 50:1

**hillsborough** 74:20

**hino** 42:15

**hire** 60:16 97:4

**hired** 67:10 128:12

**[historical - important]**

**historical** 143:16

**history** 18:4,11 18:16 25:5 70:3 122:10,10,25 144:4

**hold** 55:8

**holders** 55:23 189:15

**holding** 144:19 162:22

**holdings** 1:4,5,9 1:10 18:6 21:19 22:8 24:20,21 73:15,24 74:8 74:12 76:5 79:22,23 85:23 87:16,16 88:8 88:13 89:18 91:14 92:5,9,16 92:19,25 93:4 126:2 128:22 132:4 146:23 165:21 166:16 167:1 168:3,7 168:13 175:3,8 176:10 179:3,9 182:9,14 186:20 189:13 193:12 195:15,15 198:7

**home** 22:9 27:12 29:11 44:24 55:5,20 62:17 130:25 131:1,2 147:8

167:1

**hopefully** 90:1

**horizon** 64:16 65:7 79:17,25 84:22 85:2,12 89:4 90:12 91:13,23 92:9 134:15,18,21 135:8 165:22 166:3,18 168:2 168:9 177:18,22 177:25 185:25

**horizon's** 135:25 168:12

**hospital** 29:10 42:10 55:5 115:3,7,8,11

**hospitals** 149:17 149:17

**hour** 44:19

**hours** 10:14 13:21

**house** 131:4,4

**housing** 150:7 158:22 159:18

**hughes** 12:15 27:19 29:3

**huh** 8:10 31:21 31:23 43:21,25 44:14 45:5 54:21 64:5 66:11 68:23 70:18,21 75:23 82:19 83:11 84:13 88:7,11

88:14 89:13 91:3,9 93:10 95:3 97:9 102:25 106:6 115:12 123:11 131:12,16,18 133:3,21 136:18 138:5,14,16 147:1 148:5 150:9 156:7 169:20,22 170:13,16,22 176:8 179:5 185:17 192:19 205:10

**hundred** 91:17

**husband** 178:16 178:18

**hypothesis** 34:1

**hypothetical** 120:18 182:16 184:12 187:4,18 188:25 189:2,5 189:9

**hypothetically** 188:19 195:14 197:14 198:4

**i**

**i.e.** 180:10

**idea** 98:2 151:7 151:23

**identified** 7:17 60:20

**identify** 47:23 60:22 73:14

**identity** 47:24

**idiosyncratic** 77:22

**ignore** 79:12

**ii** 1:5,10 74:23 87:17 172:10 191:16,23 195:16

**iii** 3:7 157:4 191:14

**il** 74:11

**ilf** 25:11 55:15 55:17,24 87:17 146:10 168:14 194:1 195:6

**immediate** 156:16,20,22

**immediately** 139:23 140:1

**imminent** 180:6

**impact** 40:24,24 43:1 115:11,16 115:18 198:14

**impacts** 209:13

**impartial** 209:14

**impartiality** 207:14 209:10

**implemented** 36:18 180:16

**implications** 135:24

**important** 16:21 17:6 47:23 52:13

**[impression - involved]** Page 236

impression 202:12,13

improprieties 180:23

improve 180:20

improvement 30:14 120:11 153:2 202:17

improvements 33:14 117:3 153:5

include 30:8 138:1 144:16 150:17 164:13 164:16

included 80:16 137:21 146:1 153:2

includes 141:1 142:25

including 130:5

income 86:10

incoming 109:5

increase 73:23

indebtedness 92:2,15,18 93:3

independent 22:8 31:3 88:9 142:23 148:12 193:17,23 200:24 201:18

index 2:1,21 86:22

indicate 187:22

indication 32:18 180:23

indicia 187:23

indirectly 10:3

industrial 149:25 150:1

industry 28:9 28:11,22 44:5 44:20,24 58:12 59:21 110:20 123:7 143:15 154:4 155:10 156:3,8 158:23 159:18 164:25 180:15 181:14 183:5 190:20 191:6 193:18

inference 76:4

inform 33:20 34:7

informal 116:16 116:18

information 7:5 9:4,5,6,9 11:19 13:14 14:9 16:3 16:12,22 46:9 69:16 124:17 167:22 204:5 205:17,18

informed 32:17

infusion 27:12 120:10,14,19,22 156:14 202:4

initial 60:2,5 105:11,20 109:5

114:4 140:11,15 142:22 152:11 152:24 198:1,5

injury 128:20

input 13:17,19

ins 120:12,20,22 201:15,20,23

inserted 105:4

inside 47:17

insur 37:18

insurance 28:12 28:14 37:19,20 100:3,4,11 102:21 104:14 129:16 131:6 145:21

integrated 131:23 185:14 186:22

intend 203:24

intent 125:7

intentional 191:19

inter 181:16,19

interact 39:3

interaction 112:3

interest 144:18 158:24 181:4 207:7,12 209:9

interested 209:8

interesting 43:6

interests 130:7 192:13 196:9 197:22

interim 110:23

intermediary 26:24 27:3,6

interpleading 174:15

interpretation 38:19 116:2

interpreting 115:23

introduced 58:7 197:1

introduction 110:3 122:7

inventory 201:15

invest 33:13 34:2 154:6

invested 172:10 172:10

investment 52:22 53:9,10 53:13 54:11 58:19 59:22 66:18 145:20 172:11 180:8

investors 180:7 180:17

involve 180:10

involved 25:7 37:2 51:25 52:22 53:8 60:13 63:3 70:7 71:17 77:4 78:10 107:23 116:15 121:7

122:8 148:19 156:8 191:24 192:11

**involvement** 25:4 52:4 73:2

**involving** 186:23

**irb** 149:22,23,24

**irregular** 187:23

**issuance** 51:15 152:12

**issuances** 29:15 31:20

**issue** 17:8 21:5 44:21 56:3 77:11 93:19 116:12 126:17 134:19 149:13 149:15,19 150:2 161:23 174:9

**issued** 25:9 77:18 140:11 149:9 150:20 182:19,21 183:8 198:1,4

**issuers** 183:6

**issues** 14:11 38:21,22 45:13 45:14 104:12 109:23 120:3 139:13 202:15

**issuing** 149:18 161:3

**iterate** 9:18,19 9:21

**iterative** 70:13

**iv** 2:4 3:13 6:6 123:25

**iv.a** 191:11

**iv.b.** 201:23

**j**

**j** 1:25 209:18

**jacksonville** 3:10

**jargon** 108:1

**jeff** 109:22 110:7 196:11

**jeffrey** 1:8 3:12 4:16 15:12 95:7 96:8

**jersey** 1:14 50:2 50:4,7

**job** 27:11,12 150:5

**jog** 65:1

**john** 62:4 71:25 163:24

**johnson** 45:6,6 45:7

**joined** 27:13

**joint** 178:23,24

**jointly** 175:14 175:15

**journey** 197:8 197:11

**judgment** 87:9

**judgments** 172:17

**july** 2:5,18 7:14 95:1 113:17,20 113:23 114:9 148:11

**jumped** 50:23

**jumping** 93:18

**june** 12:18 128:24 129:7

**jurisdiction** 172:5

**jurisdictions** 117:17

**k**

**keep** 79:2 99:19 112:5 128:17 147:6 158:3 180:4

**keeping** 78:24

**keith** 1:20 2:6 3:3 4:3,12 5:9 5:16 15:20 86:20 116:22 205:2 210:2,3

**keiths** 5:14

**kendra** 57:4

**kevin** 106:9

**key** 62:5,6,8

**kiawah** 95:15 109:21

**kick** 102:1

**kidding** 125:1

**kind** 7:14 9:5 16:3 17:10 23:10 29:19 37:12 39:4

42:20 46:1,21 50:24 55:25 58:25 60:5 66:20 69:19,22 73:10 74:18 98:19 102:1 106:13 107:10 109:18 120:1 124:4 130:14 149:22 155:23 202:4

**kinds** 40:8 202:16

**kisco** 65:8,9,13

**knew** 73:5 78:24 78:25 94:6 96:7 135:15 163:11

**knit** 110:19

**know** 10:2,2 14:7,14 16:11 20:18 22:25 23:16 24:14,22 31:19 33:7,16 36:13,23 40:1 52:21,21 54:7 57:13,16 58:15 58:18,25 60:11 60:13 61:10,12 61:14,24 62:3 63:11 65:4,13 65:14 67:18,19 68:10,25 69:2 71:8,24 72:7,20 73:4,14 76:13 77:7,7,17,25

78:8 79:11
81:14,14 86:17
86:23 90:6,20
93:6 94:9,15
97:1,12,24 98:5
98:23 99:22
100:13 101:15
103:21 104:19
105:22,23 106:3
106:21,21
107:15,23
108:12 110:19
113:1 114:21
116:23 117:10
119:3,10 120:22
121:4,9,11,12
121:13,20 122:9
122:14,15,22
123:16 124:5,7
124:24 125:13
126:7,13,25
128:10,11 129:4
129:7,9,14,14
130:2 131:13
132:19,22 133:9
133:17,17,19
134:1,3,11,16
134:22 136:3,21
136:23 137:6
139:12,14
146:23 149:23
152:6 154:17,24
155:4,6,8,10,11
155:18,24,25
156:18 160:15

162:2,18 164:3
164:4 165:17
166:5,7,9,11,17
167:9 168:23
175:23 177:12
177:13,15
181:16 182:23
183:14,16,20
186:13 194:13
197:12 199:5,17
202:19,22
**knowledge** 5:5
64:25 202:6,10
**known** 121:18
148:7
**knows** 98:23
155:23
**kohlberg** 65:12
**kpmg** 27:1,5,13
27:18 28:25
29:1

**l**

**la** 103:7,8,10,16
103:19 104:8,17
**labeled** 86:21
**labor** 14:3
**lack** 78:7 200:9
201:12
**lacks** 200:16
**lag** 133:17
**laid** 14:19 21:25
34:2 36:16
201:24
**land** 74:20

**landry** 121:11
121:25 122:4
132:7 163:24
**landry's** 121:10
**large** 43:2 47:15
**larry** 45:19,20
45:24 121:10,11
121:25 122:7
132:7 163:24
**late** 24:25 26:3
77:23
**law** 3:3 36:2,23
163:14 207:4
**laws** 181:25
182:23 186:24
**lawsuit** 79:14
98:10,13
**lawyer** 60:13
183:20
**lawyers** 60:16
181:21
**lay** 111:3
**layers** 151:18
**layperson**
183:22
**lead** 11:22 46:1
**leader** 46:21,21
47:2
**leadership**
46:17,20 47:7
99:16,24 102:9
102:20 106:5
**leading** 50:23
52:12 134:12

**leadingage** 44:4
44:18 45:2,11
45:25 147:18,18
**leakage** 144:25
**learn** 155:12,13
**learned** 90:10
**leave** 29:10
125:23 188:5,6
**leaves** 178:17
**leaving** 61:12
64:4
**left** 94:10
186:14 188:4
**legal** 48:23
174:14,15
176:22 182:19
183:13 184:21
190:6 207:10,18
**legalized** 108:2
108:7
**legislative** 18:4
18:15
**legitimate**
118:10
**legs** 142:10
**lender** 72:13
73:10,11 79:17
79:18,25 84:23
87:22 89:12
91:2 164:15
183:2,24 188:8
188:8
**lenders** 158:23
180:17 181:15
183:5,7

**lending** 87:22 89:12

**letter** 78:17,17 110:4 113:25 136:20,24 163:12,14,15,16 163:20

**letters** 183:8

**letting** 199:5

**level** 36:25 119:15 137:12 139:5 151:15 153:7,8 156:19

**levels** 151:12 194:20

**levy** 170:9

**liabilities** 150:15,17

**liability** 130:6

**lichtenwaller** 121:17

**liens** 172:17

**lieu** 85:8,9 135:1 192:17

**life** 25:11 27:17 32:9 39:5 55:19 96:23 97:6,17 97:18,20,22 139:24 143:14 147:8 148:11,19 197:17

**lifetime** 36:9,10 36:13

**light** 192:3

**likely** 59:2 137:1 152:4

**limit** 29:17 36:22

**limited** 1:4,6,9 1:10 65:22,23 73:24 130:6

**limiting** 146:8

**line** 10:12 59:21 91:15,16,17 160:5 211:12,15 211:18,21 212:1 212:4,7,10,13 212:16

**link** 86:23

**liquid** 2:15 21:2 98:22 116:3,12 116:20 117:1,18 119:7 129:6 141:3,23 144:12 169:5,9,10 181:10

**liquidating** 1:8 196:18

**liquidation** 148:15

**liquidity** 117:1 117:21,24 120:10,13,18 139:23 140:1 141:24 142:18 142:19,20 143:11 158:25 164:14

**list** 7:3 19:19 147:25 205:18

**listed** 18:11 110:9

**listing** 66:20

**little** 11:22 23:3 43:5 59:1 74:18 78:6 102:2 109:18 110:23 143:9 165:13 179:14

**lives** 47:16 95:18,20

**living** 22:8 31:5 45:25 62:17 88:9 123:6 142:23 147:12 147:19 148:7,12 180:15 193:17 193:22,23 201:18

**llc** 73:16 74:1 79:18 80:2 84:23 87:22 89:12 130:6 136:19

**loading** 201:19

**loan** 2:9,10,11 2:12 21:4 72:13 73:23,25 74:11 74:12 75:17,22 80:14 81:2,21 82:21 83:5,7,13 83:25 84:2,7,9 85:2,22,25 86:5

86:6,18,19,19 87:7,15,25 88:3 88:5,12 89:1,2,8 89:19 90:3 91:1 91:5,7,7,10,14 91:23 92:6,10 120:25 134:25 146:22 149:1,3 149:6 165:10 167:2 168:6 171:14 176:5,6 176:12,12 177:24 179:11 181:11 182:5,6 182:7,9,17 184:15 185:1 186:19,20,21 188:2

**loans** 74:8 76:4 84:22 91:22 92:18 120:23 159:18 181:14 181:24 185:6 186:3 187:9 188:9

**located** 62:21 88:9

**locker** 197:9

**lodge** 174:12

**log** 82:24

**long** 12:21 44:19 66:7 84:14 86:25 119:1

**[longer - management]**

**longer** 101:21
**look** 7:19 8:5
  10:13 11:11,17
  11:19 13:3,3,21
  13:22 14:5
  15:25 16:8
  17:12,16 19:21
  20:20 22:23
  33:17 34:3 43:7
  69:3 70:16
  72:24 81:18
  82:17 83:9 85:6
  85:17 86:16,25
  88:24 89:10
  94:18 112:12,23
  115:19 118:23
  127:16 129:1
  130:15,22 134:4
  145:14 151:5,12
  152:14 153:24
  154:2,10,21
  156:25 158:11
  158:14 160:13
  161:5 165:13
  166:13,23 170:5
  172:8 173:11
  181:8 193:15
  199:20,22 201:3
  201:6 202:20,23
  203:2,3 205:12
**looked** 7:18
  8:12,17 17:19
  19:20,21 20:19
  50:11 58:1
  69:15,16 70:2

  84:1,18 91:6
  102:6 105:18
  125:8 127:25
  128:1 132:25
  133:24 135:18
  146:21 165:15
  171:17 179:11
  182:6 200:5
  202:24
**looking** 6:20,22
  6:23,23 12:8,9
  13:10 15:6 17:1
  18:24 32:23,24
  33:1 40:21 41:6
  44:3 49:10
  64:13 72:3 73:9
  74:22 76:1,3,3
  80:25 81:18
  82:3,13 83:4,17
  88:3 95:1 102:8
  109:20 118:5,14
  123:3 130:13
  134:7 135:7
  140:21 146:10
  146:21 159:8
  164:10 167:24
  185:12 195:3
  205:13
**looks** 68:16
  92:13 130:15
  133:24 134:11
**loop** 118:6
**loose** 108:1
  157:6

**losing** 94:7
  115:17
**loss** 40:20
**lost** 40:22 115:3
**lot** 14:9 28:16
  38:1,19,19 40:1
  40:2 47:16 53:9
  57:21 66:21
  119:25 133:17
  156:3
**louis** 2:4 3:13
  6:6 123:25
**love** 9:20
**low** 153:25
**lower** 193:20
**lp** 79:17,25
  84:23 89:2
  136:19
**lunch** 57:17
  82:25 83:4 96:5
  109:21 110:2
  113:18 114:3

**m**

**mac** 39:21
**made** 36:15
  59:4 89:11
  135:6 161:18
  165:24 166:10
  177:18,19
  184:24 186:18
  205:22 207:4,23
  209:13
**mail** 210:13
**main** 46:12 81:9
  160:10

**maintain**
  141:23 142:2
  148:2
**maintained**
  137:9,10 196:24
**maintaining**
  138:1 207:14
  209:10
**maintenance**
  202:17
**majority** 65:16
**make** 8:4 15:25
  20:20 21:8 26:6
  26:12 32:16
  33:14 40:4 43:8
  53:4 57:17,18
  64:24 73:13
  92:7 104:19
  111:25 156:18
  169:8 203:23
  207:11 211:7
**makes** 25:20
  57:21 135:20
**making** 12:24
  103:23 111:15
  112:8 155:3
  177:3 181:14
  207:13 211:8,8
**manage** 76:17
**management**
  32:16 33:20
  35:21 47:25
  56:8 61:13 62:9
  65:9 96:19,21
  97:4,19 101:18

110:24 111:11
121:10,15,16
150:6,8 199:19
**management's**
70:11
**manager** 123:1
**mansell** 210:23
**manually**
210:10
**manufacturer**
27:8
**map** 93:6
**march** 23:1,6,9
23:12 52:10
90:4 92:5,15
94:2,3 126:3
131:22 132:16
133:1,7 134:12
136:9 161:11
163:14,23
177:14 178:4,8
179:20 182:5,13
186:19 191:16
193:12 195:4,23
196:14
**margins** 193:21
194:3
**marital** 179:4
179:24,24
**mark** 68:9 72:7
79:6 87:10 90:2
90:14 94:19
121:17,18 171:4
199:2

**marked** 5:24 6:2
8:2 27:21 68:6
72:9,12 79:7
85:18 87:11,14
90:15,25 94:22
160:17,20
168:20 171:5,8
198:24
**market** 30:3
32:5,6,12,15
33:6,19,21 34:6
34:6 52:5 70:16
77:22 90:8
155:21 196:18
**marketing**
108:12
**marriage**
178:17
**marvelous**
15:10
**maryland** 28:18
37:21 143:18
**match** 104:19
107:11 157:13
166:11
**material** 9:18
9:19,22 10:7
35:12 39:3
**materially**
198:6
**matter** 123:6
128:1,2 181:2
207:12,19
209:10

**matters** 178:11
**mature** 59:19
60:8
**matured** 166:19
**maturity** 82:14
83:13 85:5
134:19
**maximum** 69:4
**mccartney**
106:10
**mcglinchey** 3:8
**meadows** 45:8
**mean** 9:20
11:10 14:10
17:10 19:9
20:17 22:19
23:15 24:19
29:24 30:21
31:19 33:25
34:12 35:1
39:24 43:18
46:19,21 47:2
47:10 51:18,20
52:18 53:10,25
60:9 62:6 64:20
69:3,15 71:14
71:14,16 84:20
100:20 102:12
105:2 107:1
111:4,13 116:6
120:23 124:7,11
125:22 126:16
129:13,18 130:8
132:20,20 134:3
136:4 142:18

144:8 155:18
162:16 170:1
175:11 184:8
185:10,12,18
187:2,17 190:13
194:12 195:14
202:19
**meaning** 54:22
59:14 69:20,21
156:23
**meaningful**
16:19
**meanings** 120:2
**means** 130:17
149:12 181:16
181:19 188:17
**meant** 107:25
**measure** 115:19
**mechanics**
32:11 108:15
**mechanism** 7:16
141:25 143:12
**medford** 43:9
46:9 49:10,21
**mediated**
196:17
**mediation** 15:13
15:23
**mediator** 15:21
**medicaid** 26:24
**medical** 27:8
**medicare** 26:24
27:2
**meet** 30:6

**meeting** 109:20 110:2 124:23

**meetings** 163:23

**melrose** 3:4

**member** 121:2 130:7

**membership** 196:9 197:22

**memory** 11:12 11:14 65:1

**mention** 42:14 71:21 141:2 150:6

**mentioned** 14:9 29:25 34:6,23 38:5 44:4 58:3 58:10 68:2,8 77:12 106:25 121:5 133:16,23 138:12 148:4,6 198:19

**mentioning** 18:19

**meredith** 2:19 8:7,16 45:3 127:23 199:3

**merge** 147:23

**merger** 1:15

**merits** 111:12

**message** 11:25 49:11

**met** 121:12,20 144:24 167:20

**middle** 1:1 66:24,25 143:10

192:6

**mike** 42:15

**million** 84:6 87:25 88:18,19 91:6,8,11,12,15 91:16 92:3,8,16 92:25 93:1,4,5,8 93:11,14,18 146:24 152:3,5 152:12 153:3 165:22,23,25 166:8,16,17,18 166:25 167:2 168:9,15,15 175:2,4,7,13,15 176:5,6,10,25 177:2,4,11,14 178:17 179:2,10 179:19 187:20 188:1,2,18 189:12 192:14

**mills** 121:19

**mind** 6:21 17:1 17:12 49:12 112:24 143:7 145:9 158:6 165:7 192:13 199:4

**mine** 7:14 15:7 22:5 127:25

**minimum** 2:15 21:2 37:1,3 44:22 98:22 116:3,11,20,25 117:18,21,24

119:7 129:6 137:12 141:3,23 142:20 143:10 144:12 169:4,9 169:10 181:10

**minnix** 45:19,20 45:24

**minute** 5:22 56:20 57:7 74:6 85:18 94:22 113:4 163:8

**minutes** 11:12 198:16

**mirrored** 144:7

**misinterpreted** 204:15

**missed** 148:3

**mission** 30:7

**misstating** 194:14

**misunderstood** 204:14

**mixed** 41:3

**mlr** 21:13 50:19 93:15,19,23 99:1,14 118:8 118:10 119:21 125:14 131:9 137:9 138:1 141:13,24,24 142:9 143:4,12 144:7,9 145:5 146:1 147:3,4 158:24 159:17 161:11 162:9,12

162:22 164:13 164:23 170:3 172:21,25 173:9 173:18,20 174:22 175:2 181:4 187:18,20 191:19

**modeling** 30:5 30:12

**modification** 73:22 75:18,22

**moment** 22:6 111:23 161:6 168:22

**moments** 39:4

**money** 33:13 93:17,23 94:9 94:10,10 116:23 134:18 172:25 188:4,11,20

**month** 119:23 119:23

**months** 69:6 117:5 118:20 137:14,17

**morning** 4:8,9 4:13,22 54:20 80:22

**mortgage** 75:8 75:13,17,21 84:11,12

**motion** 87:8

**motive** 183:3

**move** 31:14 89:25 120:12,20

120:22 135:14 142:21,23 145:19 174:20 177:2 193:19 200:18 201:15 201:20,23,25 202:4

**moved** 27:11,18 107:20

**moving** 20:8 60:11 167:17 201:25

**mullen** 163:14

**multi** 100:1,1 108:11 153:1

**multiple** 61:3 136:2 145:2

**murphy** 6:19 125:9 126:23 203:13

**murphy's** 7:19 7:20,25 8:12 125:10,15 127:18,22 200:22 201:10

**music** 134:20

**n**

**n** 3:9 4:1 96:15 96:15

**nail** 76:17

**name** 4:10,13 12:11,14 27:19 41:3,3 53:19 62:3,4,19 63:11 63:12,17 64:17

65:6 72:21 73:5 73:6,12 96:12 97:7,25 103:3,6 106:9 109:22 121:10 122:14 122:15 164:4

**names** 24:23 32:4 52:25 53:7 64:15 124:8 136:23 199:20

**national** 1:13,14 4:15 46:3,4,5

**nature** 100:19 177:3

**ne** 1:22

**near** 135:18 156:17,17

**necessarily** 18:23 108:5 165:1

**necessary** 204:5 211:9

**need** 5:25 6:25 19:15 27:25 57:7,12,19 59:6 59:7 61:1 63:23 94:17 98:18 99:9 109:22,23 116:21,25 118:16 120:4,10 120:18 135:12 150:2 154:5 156:14 189:23 193:3

**needed** 61:4 96:7 98:9,15,20 155:15

**needing** 39:6 118:7

**needs** 61:3 149:13

**negative** 108:13

**nesi** 53:16

**net** 201:25,25

**never** 65:6 74:3 116:17 163:15 188:4,21

**new** 1:14 23:22 28:18 29:21,21 35:8,19 37:22 44:18,22 50:2,4 50:7 53:16 56:8 77:12,13 81:8 96:12,19,19 101:22,22 104:10 121:22 123:1,1,2 126:7 135:16 138:3 139:23 140:2,3 143:18 148:24 148:25 149:20 150:2 167:22 201:17

**nineties** 24:25 26:3

**nitpick** 22:20,21

**nod** 63:23

**nods** 63:20

**non** 117:10

**nonprofit** 44:9 47:11,18 48:2,3 48:9,12 65:18 66:3 96:24,25 97:7 147:20

**nonprofits** 44:10

**nope** 7:11 109:10 141:18 141:20 181:18 192:25

**normal** 128:21

**north** 28:18 37:20 88:10 117:22,24 118:1 143:18

**nosy** 57:2

**notarized** 210:13

**notary** 212:24

**notebook** 5:8 6:5 87:3

**noted** 166:21 211:3,4

**notes** 6:14,15 15:7 150:20 151:21

**notice** 74:24 130:1 169:21

**noticing** 207:18

**notify** 169:13

**noting** 210:9

**november** 1:21 209:15

**nuances** 183:20
**nuclear** 101:11
101:14
**number** 7:17,18
14:24 15:2,3,4
18:2 21:24
28:11 33:5
53:17 66:19
144:10 153:24
153:25 154:18
154:24 158:16
159:9,16 173:13
181:9
**numbering** 7:16
82:18
**numbers** 11:1
122:19 152:8
154:25 158:4
**numeral** 74:23
170:20
**numerous** 81:3
**nursing** 22:9
44:24 55:5,15
55:20,21 62:17
73:16,25 74:9
75:12 76:5 86:5
91:2 92:10
126:3 130:6,18
130:24 131:1,2
131:25 132:4
136:12 138:9
147:8,13 149:4
161:16,17 166:1
166:16 168:4
176:7 177:24

179:9,19,20
180:3 182:6,14
187:5 188:22
193:12,21,25
194:6,16 195:19
196:10
**nursing's** 93:8

**o**

**o** 4:1 96:15
**object** 12:3
92:20 112:13
193:5
**objecting** 189:3
193:8
**objection** 48:22
48:23 166:4
167:5 174:18
176:21 183:12
188:23 190:6
**objective**
192:13
**objectives** 192:1
192:5 202:5
**obligated** 2:7
68:17 131:3
**obligation** 21:5
88:5,19 108:18
109:2 188:16
207:14 209:10
**obligations** 43:2
90:13 148:13
167:16,20
175:19,20 178:7
178:12,15 192:8
198:8

**obligors** 166:17
**obliterate**
139:23 140:1,7
**obliterated**
198:13
**obliterates**
140:3
**observed**
180:14
**obtain** 140:24
**obtaining** 182:2
**obviously**
125:21
**occupancy** 35:4
153:13,16,21,22
154:1,20 200:7
202:1,12
**occupied** 153:23
154:2 202:3
**occur** 12:17
99:18
**occurred** 23:8
**ocga** 207:6,7,20
211:6
**odyssey** 197:12
**offer** 194:6
203:24
**offering** 33:2
152:12
**offerings** 34:23
**office** 37:19
86:14 87:2
100:4 102:20
104:14 129:16

**officer** 110:24
209:14
**offices** 210:4,13
**oh** 41:18,22
53:15 85:18
94:21 99:19
114:7 117:20
157:18
**oi** 100:4
**oir** 37:19 38:19
38:22 39:4
48:14 55:7,8,17
56:17 61:6,12
78:25 99:22
100:5,9 101:2
101:10,12
107:24 129:17
129:22 130:14
131:4 137:1,22
138:2 140:11,24
141:14,19
144:12 162:4,10
162:20,22
163:11,15,25
164:5 187:19,21
187:22 191:19
196:21 198:2,4
**oir's** 38:20
161:19
**okay** 4:25 5:6
6:1 7:8 12:12
14:6 15:9 17:9
25:19,24 26:5
26:13 32:1
34:18 35:11

39:16 40:7 49:2
49:5,8,23 50:4
50:16 56:19
59:8 64:22 65:2
72:15 73:1
79:15 80:1,3,4,7
84:3 85:4 86:1
87:19 94:4,24
98:1,4 104:21
105:13 112:7
114:7 117:14
118:22 119:8
126:22 127:4,5
136:14 141:8
154:8 157:2,22
158:2,5,13,15
159:10,14
160:13 161:8
162:15 163:2,7
164:8 166:15
169:6 171:11
172:23 177:23
179:1,13,18
181:20,23
184:14 185:7
186:4 190:1
195:13,18,22,23
200:11 201:8
203:20,22
205:15 206:7
**old** 47:5 61:11
64:3 77:12
101:20 175:20
**older** 47:5

**once** 60:19
197:16 210:12
**ones** 37:12
104:7 126:13
**online** 127:17
**opco** 180:15
**open** 125:25
146:9
**opening** 140:23
**operating** 69:11
69:18 144:15
157:7 158:17
159:10 175:12
193:21
**operational**
131:15 153:11
180:20
**operations** 2:7
68:20 193:18
**operator** 164:13
**opine** 118:8
**opining** 16:24
17:8,14 20:2
21:10 204:19
**opinion** 34:12
42:3,13 50:15
84:20,24 88:22
93:20,21 94:18
105:23 109:9
110:14 115:22
116:17 118:5
121:5 125:4,18
130:9 137:4
148:9 157:1,7
157:10 158:16

159:9 161:3
164:11 173:5,11
181:3,8 182:25
183:8 187:24
188:13 191:10
191:10,12 192:2
193:2,4,24
200:7,12,16
**opinions** 14:19
20:15 34:17
115:1 124:21
126:1 157:23
158:1,12 182:19
187:7 198:21
203:24 204:7,10
204:11
**opportunity**
30:24,25 99:22
113:12 204:16
**opposed** 48:5
168:15
**option** 101:11
101:15
**options** 60:14
145:1
**order** 20:19
90:12 105:11,20
138:2 140:11,15
150:16 157:11
157:12 172:4
176:9 185:24
198:1,5
**ordering** 208:2
210:17

**orders** 196:22
197:3
**ordinances**
182:23
**ordinary** 109:4
**oregon** 43:10
46:9 49:21
**organization**
36:19
**organizations**
149:16
**organize** 25:17
**organized** 9:17
**organizing** 9:24
**oriented** 100:18
**original** 19:6
21:16,18,19
24:22 35:13
76:20 210:16,19
**origination**
89:14
**ourself** 16:17
**outcome** 209:8
**outlined** 200:19
**outside** 87:4
**outstanding**
82:15 85:21
86:2
**overall** 43:3
186:22
**owe** 177:13
**owed** 88:13 92:8
92:9,16,18
165:22 166:18
168:2

owes 166:16,16
own 17:2,13
  33:2 50:13
  59:17 97:3
  174:15 189:19
  189:20 192:7
owned 84:21
  130:7 196:13
owner 23:22
  54:16,17,18
  61:16 87:17
  96:19 121:9
  135:17
owners 61:11
  64:3 101:17,20
  101:22 180:5
ownership
  21:15 30:18,20
  51:21 52:7
  56:17 61:6,7,8
  61:23 62:9 69:1
  77:11,12,13,13
  78:19 121:6,7
  122:4 156:14
  180:11,12 193:6
  193:8,9,11
  194:24 197:16
owns 195:19

**p**

p 4:1
p.a. 3:3
p.m. 83:1 113:9
  160:16 198:17
  206:8

pacific 87:23
  165:23
package 16:18
page 2:3,22 6:24
  7:4,6,16 9:8
  14:25,25 15:11
  22:4,11 41:14
  41:15,18 44:3
  69:3 74:16,17
  74:18,19,22
  75:16,20 83:9
  83:24 85:7,18
  85:19 86:9
  89:11 91:15
  112:7 123:3
  128:21 136:15
  140:21 141:21
  142:9 143:9
  144:5 145:14,17
  147:16 148:4,9
  150:13 170:6,19
  187:16,16
  191:12 193:15
  199:25 200:19
  200:19 201:22
  205:9 211:12,15
  211:18,21 212:1
  212:4,7,10,13
  212:16
pages 211:9
paid 91:13
  107:6,7 109:5
  135:16 136:3
  143:1 149:2
  168:12 177:22

panel 46:2
paper 22:12
  133:20
paperwork
  100:23 101:8
paragraph 83:9
  84:14 85:6
  123:4 124:13
  136:9,17,17
  137:7 140:22
  144:5 145:15,16
  150:13 157:4
  191:14 193:16
paragraphs
  16:19
parkway 3:9
part 8:15 13:12
  25:9 31:11,12
  61:5 71:11
  77:14 89:7,17
  93:19 108:22
  128:21 136:2
  141:9 142:16,17
  150:12 161:10
  161:11 162:6
  172:10 175:5
  191:20 194:6
  196:7,16 197:17
partial 133:25
participated
  128:14,16
participation
  36:4,22 37:1,5
  45:14

particular
  28:23 44:24
  53:3 59:20
  77:23 116:1
  119:25 164:7
  206:3
parties 22:14
  54:9 59:15 60:3
  109:17 132:1
  161:19 184:6
  207:20 208:2
  209:14 210:17
partner 39:13
  132:8
partnership 1:4
  1:6,9,10 73:24
party 178:14
  207:15,21 209:8
  209:11
pass 183:14
passed 188:21
password 208:1
  208:2
path 101:17
patient's 156:18
patients 54:25
  55:21
pause 87:5
  90:19 154:1
  168:19
pay 30:5 35:6
  88:18 90:12
  91:22 107:19
  118:18,19
  134:15,18 135:8

150:14 166:2,7 166:25 168:1,8 172:6 175:22 177:25 185:25 188:9
**paying** 54:18 57:18 72:22 107:2 149:1 166:22
**payments** 155:3
**payoff** 89:1
**pdf** 210:9
**peachtree** 1:22
**pen** 133:19
**penalty** 138:1 139:21 170:7
**pending** 67:11 78:19
**pennsylvania** 50:2,3,5
**penultimate** 145:16
**people** 14:14 40:8 53:17 54:25 57:18 99:9,21 107:20 107:24 122:17 149:11 153:19 155:11 179:25 190:15
**pepper** 42:15,16
**percent** 35:4 38:5,14 144:22 144:23 153:20 153:23 154:5,18

154:18
**percentage** 53:25 154:2
**perception** 156:11
**perform** 147:2
**performance** 30:14 120:11 153:11
**performed** 71:5
**period** 35:13 51:20 62:12 72:5 83:15 134:9
**person** 54:18 55:6 71:19 108:17 121:23 128:19 169:12
**personal** 5:5 64:25 67:22
**perspective** 48:13 193:2
**phase** 152:24 153:1,1
**philadelphia** 50:2,5,8
**phone** 46:11 58:24 59:2 60:12 96:2 114:5,7 119:16 198:16
**phrase** 19:4 29:8 33:3 47:7 60:8 68:2 78:7 101:25 185:19

193:5 197:12
**phrases** 33:2 46:19
**physical** 33:14 146:5 153:6,6 202:6
**pick** 148:7 155:9
**pictured** 56:6
**pillars** 190:3
**place** 18:18 23:1 29:18,18 55:5 59:16 169:12 180:12 196:22 207:19
**placing** 64:18
**plaintiff** 1:11 3:2
**plan** 25:13 30:15 69:18,19 70:1 96:23 97:6 97:17,19,20,22 117:4,9 118:12 118:17,20,21,24 119:1,4,5,6,7,9 119:9,11,12 120:11 123:2 126:7,11,19,23 126:24 127:1,2 127:3 137:16,23 143:14 148:11 148:15,20,25 153:2 196:17 197:17

**planned** 152:25
**planning** 29:4 29:12,22,24 31:12,15 32:3,4 33:20,24 34:5,7 52:6 59:17 60:4 119:15
**plans** 117:7
**plant** 146:5 153:6 202:7
**please** 4:10,23 23:4 33:4 116:8 145:15 210:13 210:22 211:9,9
**pledge** 2:13 21:17 93:15 159:17 160:12 160:21 163:18 165:8,24 175:2 181:12
**pledged** 21:3,13 50:19 161:14 164:15 172:22 174:22 188:1 189:18
**pledging** 181:25
**plural** 187:8
**plus** 32:24 72:21
**point** 16:5 24:14 32:7 56:1 80:22 97:23 102:4 107:5,16 110:13 111:8 122:23 125:20 126:17 130:13 133:16

134:17 141:12
145:1 161:19
186:7 189:24,24
**points** 81:9
187:3
**political** 106:2
**politically** 99:16
**ponzi** 108:2,7
108:16,20
**ponzis** 108:12
108:13
**pop** 11:24
**portfolio** 96:6
**portion** 142:19
174:22 189:17
**portions** 172:3,6
199:5
**posada** 103:7,8
103:10,16,19
104:8,17
**position** 9:1
32:14 38:20
48:11 177:17
205:21
**possible** 43:18
86:13 137:13,17
**post** 25:3 29:9
31:17 104:11
126:4,5,6 132:9
138:18
**postmortem**
116:5
**potential** 39:1
43:15 51:14
59:24

**practically**
137:13,17
**practice** 28:25
29:2,3 164:25
182:2 190:11
**preceding** 149:2
**predate** 139:10
139:11
**predecessor**
23:14 53:18
91:4
**predominantly**
47:13 71:18
**prefer** 67:22
**preferences**
44:13
**prehistoric**
122:10
**premise** 60:14
60:18 199:13
**preparation**
95:5 205:25
**prepare** 68:14
69:17 117:4
**prepared** 4:17
7:24 10:7 20:23
86:13,14 117:6
202:16
**preparing** 6:13
8:13,19,21 9:12
10:23 13:20
14:3 68:24
105:17 117:9
**presence** 180:21

**present** 3:11
**presentation**
45:10 46:7
172:2 182:2
**presentations**
7:6 41:20 44:4
**presented**
203:25 207:1
**preserving** 49:1
**president** 45:25
**pressure** 32:19
106:2 135:23
**pretty** 36:21
38:3 49:6 50:9
63:16
**previous** 63:11
64:19 71:22
101:17,17 121:9
165:6 192:8
**pricing** 30:4
32:17,20 33:9
200:8
**primarily** 10:14
**primary** 7:22
22:7 39:19
44:21 48:4,14
48:17,19 141:1
**principal** 1:13
69:6 85:21 86:2
**print** 210:10
**printed** 5:20
160:1
**prior** 23:22 24:6
58:17 62:13
63:19 72:23

74:4 78:2 83:3
92:5,13 101:16
121:25 124:23
133:7 140:21,22
141:9 161:3
163:22
**privilege** 15:23
**pro** 1:12 33:16
**probably** 11:4
11:22 57:8,9
59:9 71:19
73:10 93:20,20
98:5,17 101:20
120:9,11 121:15
133:7 153:19
184:7 189:22
**problem** 117:2
**procedure**
211:6
**proceeding** 4:16
4:19 18:7 91:5
123:24 207:1,21
208:1 209:7,13
**proceedings**
79:1 87:5 90:19
168:19 207:12
**proceeds** 21:4
21:17 22:17
50:21 91:10,21
133:4 152:22
153:4 167:19
**process** 9:23
29:23 100:1
139:16 141:16

**produce**  10:16
**produced**  71:8
  81:23 207:22
**product**  32:4
**production**
  205:20 210:23
**productive**  57:8
**profession**
  190:12,13 191:6
**professional**
  82:2 116:11
  158:21 159:11
  181:3,3 190:22
  207:14 209:11
**professionally**
  155:14
**professionals**
  60:22 124:8
  193:19
**profit**  1:15
  47:19,20 48:3,5
  48:9 149:16
**profitability**
  194:1
**profitable**
  193:22,23
**profits**  40:22
**profound**
  201:17
**program**  108:23
**progress**  112:8
**prohibited**
  207:19
**prohibitions**
  207:8

**project**  88:8
**projection**
  200:2,9,20
  203:14
**projections**
  122:19 199:15
  199:18 200:4
  201:1,12
**projects**  29:21
**pronouns**  69:22
**propco**  180:15
**properties**
  77:23 193:10
**property**  32:24
  33:14,18 41:3
**proportionate**
  175:21
**proposed**
  126:23
**proposition**
  158:18
**prospective**
  138:4 142:1
  170:24 171:21
**protect**  48:15,19
  109:16 141:25
  145:18 170:23
  171:20
**protected**  208:1
  208:2
**protects**  146:11
**provide**  29:22
  30:6 36:11
  80:23 81:12
  82:3 131:3

180:8,19 193:25
  194:11,16
  207:18
**provided**  14:23
  15:12,13,16,21
  20:3 21:5 81:5
  81:15 163:11
  170:8 172:19
  187:19
**provider**  10:11
  13:4,11 22:9,10
  54:18,19,23,24
  55:4,7,7,9,12,17
  55:19,20 115:9
  136:19,19 137:2
  139:22,24
  140:23,23
  141:23 142:1,2
  142:14 143:5
  146:13 171:15
  172:18 176:2
  191:21
**provider's**
  138:3 191:20
**providers**  29:5
  31:16 44:25
  47:19
**providing**  13:23
  54:25 111:17
  131:6
**provision**  135:1
  170:1
**provisions**
  161:9 170:11

**public**  143:6
  212:24
**publication**
  44:5
**pull**  128:17
**pulled**  9:16
  18:16 125:10
**pulling**  13:10
  122:23
**purchase**
  148:14
**purpose**  42:25
  118:2,8,10
  129:21 131:5
  144:21 145:17
  169:6 170:20,21
  171:20 176:14
  189:14
**purposes**  33:20
  35:7 130:11
  142:3 144:11
  145:3 173:23
**pursuant**
  141:22 148:14
  211:6
**put**  17:2 32:3
  36:14 52:25
  54:2 96:8 101:6
  161:6 171:3
**puts**  28:10
  101:16 109:16
**putting**  122:19
  133:19

**q**

**qualifications** 140:20
**qualify** 58:4
**quasi** 185:14 186:22
**question** 4:23 5:1,3 13:7 18:12 26:16 48:6,7,25 51:2,4 81:11,12 116:8 119:4,6 127:19,20 146:9 152:14 163:10 165:19 167:8,12 174:13 176:13 176:24 186:13 189:9 190:19 195:2
**questionable** 180:24
**questioning** 13:25
**questions** 4:21 25:21 82:7 90:17 120:7 171:2 204:3,23 204:24 205:7 206:6 207:22 209:5
**queue** 107:17,21
**quick** 16:9 17:12 51:2
**quickly** 82:23
**quite** 99:8 100:10

**quiz** 23:16
**quoted** 185:14
**quotes** 141:25 191:18

**r**

**r** 1:20 4:1,3 210:3
**raise** 134:18 135:17
**raised** 139:5,7
**ramp** 70:15
**ranges** 134:4
**rank** 33:7 66:18
**rather** 17:3 22:20 24:14 31:18,24 36:18 184:12
**reached** 35:4
**read** 8:15 9:17 14:7 16:16 19:16,18,22 42:13 84:15 136:5 140:19 159:3,4,5,13,22 161:6 173:6 187:2,17 210:8 211:2
**readily** 12:7
**reading** 9:6 22:13 41:17 42:21 51:24 159:6 201:21
**reads** 169:8
**real** 16:8 80:25 194:1

**realistic** 119:12
**reality** 166:13 166:24 176:4
**realize** 147:7
**really** 37:12 39:8 44:19 77:7 79:20 82:23 103:24 118:13 125:16 127:2 130:16 135:8 156:18 197:11
**reason** 23:8 126:9 211:14,17 211:20,23 212:3 212:6,9,12,15 212:18
**reasonable** 126:10,10
**reasonableness** 70:12 200:10,17 201:13
**reasons** 198:10 211:8
**rebrand** 97:14
**rebranded** 96:16 97:14
**rebuttal** 2:5,18 4:17 6:10,13 7:4 7:24 8:8 10:23 123:5,12,14,15 123:16,17,24 124:14,16 127:7 127:18,21 157:1 157:9 158:1 191:10,10,11

193:4 198:22 199:3 205:20
**rebutting** 199:14
**recall** 14:6 40:17 58:24 59:1 61:9,17 62:1,4,19,21 65:6 67:7,21,24 67:24 68:3,24 70:23 71:2,3 78:14 86:12 91:6 105:8,14 112:8,21 115:25 121:6 125:10 135:11 140:14 160:24 173:15
**receive** 90:21
**received** 5:12,17 80:17 81:3
**receivership** 61:13 101:5
**receives** 207:21
**recent** 44:12
**recently** 99:25
**recess** 57:22 83:1 113:9 160:16 198:17
**recital** 83:24 85:3
**recitals** 83:23 161:5,7,18 162:3 169:3
**recognize** 68:11

**recognizes**
109:15
**recollection**
20:11 61:22
64:4 65:3 67:23
68:2,25 77:10
87:20 135:11
136:10 140:17
**record** 4:11
6:24 7:2 12:2
17:7 20:8 25:14
40:5 41:2 49:1
76:18 114:20
164:22 165:2
173:17 174:13
181:2 186:8
191:4 207:12,13
207:22 209:6
**recorded** 75:5
105:19
**recording** 74:19
75:1
**records** 67:23
74:20
**recruiting** 45:13
**redefining**
136:22
**redirect** 204:25
**reduce** 169:9
175:3
**reduced** 92:24
93:4 209:5
**reduction** 175:7
**refamiliarized**
6:16

**refer** 8:1 12:19
15:5 147:16
157:4 169:21
**reference** 162:9
163:12 173:4
193:1
**referenced**
93:22 105:10
**references**
79:17 83:25
84:6 182:18
**referencing**
136:15
**referral** 58:11
67:5
**referrals** 54:2,4
**referred** 6:14,17
54:8 95:6
107:25 143:14
163:19 195:20
**referring** 7:3
18:13 22:1 54:5
54:6 76:8 80:13
80:24 82:1
96:17 100:3
129:8 146:7
187:9,11 199:23
203:17
**refers** 18:3
146:14,15
**refinanced**
157:3 191:17,18
**refinancing**
76:14 78:11
89:17 174:23

186:22 189:18
191:20 192:8
**reflect** 17:7
**reflected** 187:20
**reflects** 84:24
138:18
**refresh** 11:12
65:3 68:1
136:10 140:16
**refreshes** 20:10
**refund** 107:18
109:2 143:1
198:8
**refunding** 43:1
**refunds** 102:18
103:1,10 107:5
107:9 108:17
**regarding** 95:4
164:23 186:20
**regardless**
173:21
**regards** 49:14
125:12,13 173:7
**regions** 93:25
94:11 128:23
129:1,6 141:5
162:20,25 163:4
188:20
**regs** 18:18 38:18
**regulated** 28:15
37:12,16 99:21
129:16 164:13
165:7 174:5
181:14

**regulation**
37:19 100:4
129:17
**regulations** 18:8
28:12,20 38:1
44:21 48:18
141:21 182:1,23
186:24 207:5
**regulatory**
28:10 38:16,17
48:13 99:24
100:18 106:16
109:13 143:11
162:7 164:18
**rehabilitating**
152:25
**reinvestment**
153:3
**related** 123:23
132:1,2,2,3,6
146:5
**relates** 32:11
**relating** 208:1
**relation** 67:5
**relationship**
47:25 53:22
65:15 207:12
209:9
**relative** 209:7
**release** 34:25
125:13 172:5
**released** 35:5
**relevance**
157:12

**relevant** 66:25
67:2 122:25
191:14 204:4
**reliance** 193:17
**relied** 205:19
**relief** 79:2
**rely** 183:2,8,17
187:6
**relying** 20:3
**remainder**
91:14
**remains** 58:19
**remedies** 101:2
101:4
**remedy** 101:16
**remember**
71:20,25 91:8
94:5 104:6
122:20,22
134:14 165:14
179:11
**remind** 43:13
**rendered** 88:22
**rent** 34:3 154:15
**rented** 154:3
**reorganization**
196:17
**rep** 182:24
**repair** 40:20
**repay** 198:7
**repeat** 4:24 13:7
186:12
**repeating** 17:4
**rephrase** 4:24

**replacement**
145:25 146:3
**replenish**
116:24 117:4
118:13
**replenished**
137:10
**replenishing**
119:6
**replenishment**
146:4
**reply** 49:11
**report** 2:4,5,18
4:18 6:6,9,10,13
6:16,18,21 7:4
7:18,19,20,24
7:25 8:7,8,11,12
8:13,14,19,22
9:11,11,13
10:23 13:18
14:4,13,20 19:9
19:18,22,23
22:2,24,24
26:10 41:21
42:17 43:18
99:3 105:10,17
110:10,15 112:6
123:4,25 124:14
124:16,19 125:4
125:9,11,15
126:24 127:7,10
127:18,21,22
128:9 131:11
157:5 191:15
198:22 199:3,6

199:9,11,15
200:22 203:4,13
203:21 204:1,7
204:19 205:8,9
205:13,20,23
207:13
**reporter** 207:1
207:3,7,9,23,24
**reporting**
162:19 207:6,18
**reports** 26:25
128:2,6,10
162:9,10 203:15
**repository**
208:2
**representation**
182:17
**representations**
184:24 186:18
186:25 187:7
207:4
**represented**
48:8 62:8
**representing**
4:14
**reps** 183:9,23
185:12
**request** 11:20
12:4,25
**requested** 210:8
**require** 36:23
**required** 35:14
141:4,13 144:12
144:15 145:2
150:14 162:10

162:11 169:19
172:13 173:23
193:25 194:5,10
196:23 202:3
**requirement**
38:23,23,25
39:1 140:12
144:16 146:1,3
147:5 181:11
**requirements**
28:10 36:3 38:4
39:5 44:22
98:23 100:24
117:22,25
137:23 162:7
**requires** 129:22
174:14 194:8
**requiring**
143:11
**requisite** 182:20
**research** 9:16
30:3 32:5,15
34:6
**reserve** 2:15
21:2 89:16,18
98:22 116:3,12
116:20 117:1,18
119:7 124:15
129:6 131:14,15
131:17 141:3,24
144:12,14,16
145:25 146:2,24
157:8 158:17,25
159:10 164:15
169:5,10,11

174:22 181:11
**reserved** 206:9
**residency**
  142:13
**resident** 36:3
  37:2 45:14 48:8
  103:1,9 109:3,6
  120:21 130:17
  131:7 143:5
  144:19 147:8
  150:18 151:19
  171:20,21
  195:24 196:3
**residential**
  29:11
**residents** 35:23
  35:24,24 36:2,6
  36:22 43:1
  48:16,20 102:18
  104:14 138:4
  142:1,14 145:18
  150:21 151:17
  170:24 173:19
  175:9 189:16
  193:19
**respect** 123:6
  134:21
**responding**
  157:10 193:7
**response** 7:24
  8:13 63:25
  173:15
**responsibilities**
  45:15,16 47:24
  100:11 162:13

**responsibility**
  47:16 210:9
**responsible**
  47:15 173:19
  178:14
**rest** 38:8 172:7
  187:2
**restate** 116:7
  167:11
**restated** 75:8,12
  84:10
**restricted**
  130:10
**restrictions**
  129:22 170:2
**restructure**
  23:23 56:9
  111:6
**restructured**
  192:10
**restructuring**
  110:24 120:4,8
  120:19 180:18
  180:22
**result** 104:22
**resume** 7:16
**retained** 112:9
  112:15,16
**retire** 91:22
**retired** 45:8
**retirement**
  27:16,22 29:5
  37:24 108:23
  145:21 146:20

**return** 30:6
**returned** 210:15
  210:19
**reunited** 197:15
**revenue** 70:15
  149:25 150:1
  203:7
**review** 6:12
  20:9 74:6 101:6
  101:9 105:5,16
  127:11 136:20
  160:25 168:23
  197:2 200:3
  206:2 207:1
  210:9
**reviewed** 6:9
  164:22 165:1
  173:17 182:12
  205:22
**reviewing** 199:4
**revisit** 99:22
**richard** 4:12
  95:6
**right** 9:15 10:1
  10:16 11:4,10
  11:15,23 14:1,8
  14:20 16:3,14
  16:23 17:25
  18:1,13,19
  19:10,20,24
  20:7 22:9,15,18
  23:14 25:10,12
  25:22 26:19
  28:3 30:12
  31:13,22 36:10

38:6,13,13,13
38:14 39:18
40:10,11 41:18
41:22 42:2,3
43:8 46:5,25
47:12 49:3,23
51:23 55:22,25
56:1,6,18 59:15
59:23 64:2,10
66:4,10 68:3,14
68:18,22 69:13
69:23 70:16,17
70:20 71:21
73:22 75:7,9
76:1,14 77:15
79:5,21,24 83:3
83:8,18 84:4
85:17 88:6,10
88:13 90:5,24
93:7,11 94:9
95:19,22 97:10
99:4 100:14
101:20 103:12
105:4 108:25
109:9,18 110:16
111:7,13,18,22
112:17 114:1,11
114:21 115:13
119:12,24 122:1
122:21 123:3
124:15 125:12
125:15,18 126:6
126:12,15,19,20
126:21,22 127:3
128:4,20 130:13

130:19 131:9,14
132:9 133:2,6,7
134:5,8,15
135:21 136:4,16
137:19 138:11
138:15 139:3
143:7,25 144:2
144:3,13 145:4
146:10,11,14,25
147:14,14,14,21
149:7 150:10,21
151:2,7,10
152:9,19,23
155:7,8 156:6
156:25 157:23
158:8,10 159:13
159:16 162:11
162:14 163:9,17
165:11,19 166:8
166:14,21 167:2
167:18,22,23
168:11,16 169:5
169:7 171:7
172:22 173:25
174:7 175:6,13
175:14 176:4,7
176:9,12 177:13
177:20,21 178:3
178:13,15,23
179:6,7,7,8,10
179:12 181:8,13
183:7,24 184:3
184:6,23 185:1
185:3,4,9,22,25
186:7,12 187:6

187:10,13
189:13,18 190:2
191:1,9 192:4
192:15,24 193:1
194:7,9,19,23
195:6,12,25
198:15 201:5
203:14 204:22
**rights** 21:6
36:16
**ring** 63:10 64:16
**risk** 102:19
103:2 107:5,9
**road** 102:2
**rob** 53:2,3,8,12
58:7,14,15,23
63:3 66:9,12,21
66:23 71:14,16
71:18,21 78:8
**robichaux** 2:4
3:13 6:6 19:12
110:17,22
123:25 157:15
157:21 165:2
182:18 191:15
**robichaux's**
6:21 7:18 8:14
19:9,22 22:1,24
110:14 157:5,6
157:10 158:11
164:11 173:11
185:15 193:5
**rock** 96:20
97:14,16,21

**role** 36:1 47:23
67:8 72:19
96:22 111:25
127:9 128:9
**roll** 26:4 133:25
**roman** 74:23
170:19 173:13
191:11
**room** 136:5
197:9
**root** 17:10
**rosemawr** 25:9
67:15,16,18
76:25
**roswell** 210:24
**rough** 10:21
151:7,23
**roughly** 91:16
179:12
**rule** 172:25
211:6
**rules** 37:23
99:23 104:12
207:5 211:6
**rulnick** 53:16
**run** 34:4
**runway** 180:9

**s**

**s** 3:4,7 4:1 96:15
**safeguard**
145:19
**satisfy** 175:20
178:5,12
**save** 48:10

**savings** 171:14
**saw** 41:13 46:11
91:23 92:5 93:8
102:19 135:1
163:15 167:3
200:22
**saying** 13:8
19:13 32:10
38:8 99:6,6
104:18 119:20
146:12 154:20
175:18 181:21
185:12 188:19
189:25 200:15
201:10
**says** 7:6 9:9
18:2,14 42:25
68:17 69:4
71:11 73:15,22
79:21 83:12
84:9 86:24 88:9
89:12 109:21
124:13 125:8
129:5,15 140:22
141:2,21 142:9
143:4,10 144:6
147:17 148:11
149:7 150:12
152:20 164:12
170:6,20 171:22
171:25 172:7
174:2 184:22,23
185:9 200:6
**scenar** 34:4

**scenario** 34:4
**scenarios** 119:9
**scheme** 108:7
  108:16,20
**schemes** 108:2
**school** 26:18
**scope** 116:10
**se** 32:20 111:17
  121:12 138:9
**seafields** 95:24
  96:4
**seal** 210:16
**search** 81:25
**seat** 37:5 101:19
**second** 8:6
  40:14 63:5
  69:10 71:19
  84:10 104:4
  113:8 123:4
  124:14 128:12
  136:17 145:16
  159:6 193:4
  197:20
**section** 123:8
  128:25 137:21
  141:22 145:17
  146:1 171:4,9
  172:19 182:4
  205:8,8,13,14
  205:14,16 207:6
**sections** 207:7
**secured** 84:10
  93:3
**security** 75:8,13
  84:11 108:16,17

108:18,19,20
  158:23 181:4,12
**see** 6:7 7:7 8:8
  11:25 12:11
  19:18 30:18
  41:14,22 68:1
  69:8 72:18
  73:16 74:1,12
  74:17,19 75:18
  79:16,22 84:7
  84:12,15 88:25
  91:11,15,18
  93:14 95:2 96:8
  101:1 113:2
  118:23 122:6
  123:10 135:20
  148:17 166:10
  169:3,16 170:12
  189:24,25
  200:12 206:7
**seeing** 140:15
**seek** 180:7
**seeking** 137:3
**seeloff** 1:20 2:6
  4:3,12,13 6:4
  39:17 68:12
  72:11 79:9 82:9
  83:3 87:13
  90:24 94:25
  113:11 160:19
  168:22 171:7
  174:17 198:19
  205:1,6 210:3
**seemed** 43:6

**seems** 12:6
  15:14 36:18
  63:2 135:10
  169:19
**seen** 63:8,8 72:7
  72:16 79:9 82:9
  86:11 138:23,24
  139:2 141:6
  159:19 160:22
  161:24 163:13
  163:16 168:24
  168:25 169:1
  197:25 198:3
**seidman** 27:13
**sell** 27:17
  196:19
**seller** 30:22,23
  31:1
**selling** 28:14
**senate** 18:2,15
**send** 81:17,20
  82:21 86:24
  210:16,22
**sending** 87:7
**senior** 9:2,12
  121:13 123:6
  147:19 148:7
  150:7,24 151:13
  151:15,18
  158:22 159:18
  180:14
**seniors** 47:16
  55:1
**sense** 9:10 25:20
  26:6 50:18

57:21 124:4
  135:13,20,24
  136:5,7 156:19
  166:22 192:17
  201:19
**sensitivity**
  119:13
**sent** 81:7 87:2
  162:4
**sentence** 22:15
  124:14 137:19
  137:20,21,25
  142:8 147:7
  173:22 193:16
**separate** 74:8
  119:3 132:12
  175:16,19
  180:10,16 192:6
**separated**
  132:13,17,21,23
  194:24 195:8,24
  196:2,5 197:17
**separately**
  157:3 191:17
**separating**
  195:5
**separation**
  100:10 104:1
  192:7 196:6
**september**
  56:14
**sequence** 16:13
  26:14 50:25
  71:8 139:12
  157:14

**series** 69:5 152:21 153:4

**serious** 108:1

**serve** 123:5 209:13

**served** 114:11

**service** 30:6 33:2 44:12 69:4 69:7 107:3 131:4,14 138:9 144:14 158:25 164:14 174:21

**servicer** 91:13

**services** 29:23 29:24 36:11 44:13 54:25 55:3 59:6 89:2 100:9,13 110:24 138:10 193:23 193:25 194:6 207:18

**servicing** 155:2

**set** 7:21 8:16 37:12 46:22 48:19 68:11 127:23 129:15 129:18 150:15 172:10

**sets** 127:24

**settled** 123:22 139:19

**settlement** 142:25

**seven** 27:18 157:25 158:9

**several** 54:19 80:19 178:23,24

**severally** 175:14 175:15

**sga** 44:1 114:21

**shantel** 87:6

**shared** 199:8

**sheet** 10:13 60:19,19,20,21 64:3 144:11 165:9 188:3,5,6 210:1

**sheets** 10:17 11:8,11 12:25 14:5,8 164:16

**shift** 106:16

**short** 27:11,12 57:11

**shorter** 147:10

**show** 25:2 41:4 46:7 68:9 72:6 79:5

**showed** 99:25 134:23 167:13

**showing** 90:24 185:10

**shown** 72:11 87:13 160:19 162:21 171:7

**shows** 68:21 72:25 73:15,23 75:4 79:13 86:2 87:25 89:1,14 89:15

**shuffling** 7:15

**side** 48:3 78:4 97:2 103:11 136:1 149:5 177:7 194:2

**sides** 185:13

**sign** 210:8

**signature** 206:9 209:18 210:3,20 212:20

**signed** 210:12 210:15,19

**significant** 44:5 53:21,24 67:4 198:14

**signing** 36:9

**siloed** 180:11

**similar** 37:8,11 45:22,24 117:23 169:1,2 184:24 186:18,25

**similarly** 158:24 164:14

**simple** 26:16

**sims** 52:23,24 53:1,11,12,19 53:22 71:13,14 77:6

**simultaneous** 168:1

**sit** 62:1 111:22 111:23 165:9

**site** 95:14,22,24 109:21

**sitting** 101:19 102:5,5 107:15 177:7 188:10

**situation** 179:8

**six** 78:12

**skill** 46:22 127:24

**skilled** 55:21 138:9 147:13

**skip** 53:17

**slower** 70:14

**small** 124:5

**snf** 74:12 180:15 195:6,7,21

**social** 108:16,17 108:18,19,20

**socialized** 10:6 13:13 14:9,13

**socializing** 14:13

**socially** 155:13

**soft** 46:22

**sole** 73:10 92:18 115:5,9

**solely** 207:15 209:12

**solicit** 60:22

**solutions** 29:11 207:11,18

**solvency** 30:8 30:10 125:16,19 125:20 126:1,17 126:25 127:1,1 127:2

**[somebody - statement]**

**somebody** 31:1
54:24 60:12
81:20 98:21
150:4 159:25
**soon** 114:6
137:12 143:13
**sophisticated**
183:24
**sorry** 5:13,15
12:24 27:4 41:6
50:2,6 54:11
63:23 74:25
106:1 108:24
143:10 157:18
174:4 187:6
201:2
**sort** 13:11,13
18:3,15 22:20
23:9 24:13
26:12 29:7
31:14,25 33:9
33:12,15 36:25
39:8 42:2 50:18
55:2 56:22
65:17,20 78:3,9
85:8 91:20
93:19 101:24
106:14 107:10
109:14 110:12
110:23 113:2
120:3 122:4,17
130:14 131:22
136:5 138:17,18
139:4 147:19
156:5 173:5,9

182:24
**sound** 72:1,4
116:19 152:8
**sounds** 39:20
64:17 137:5
152:7,19
**source** 15:17
16:14,15 67:4
122:24 140:3
**sources** 151:5
**south** 41:11
66:17 95:20,21
**space** 31:14
37:25 46:16
47:18 48:3,6,9
48:10 51:17
**spanning** 72:5
**speak** 183:3
**specialized**
98:21
**specific** 6:22
13:15 31:17
37:23 46:23
48:14 102:13
106:7 107:13
119:19 173:23
199:10 204:18
206:2 207:20
**specifically**
55:14 115:24
122:16 123:24
196:25 199:23
207:5
**specifics** 121:6,8

**specified** 142:3
**speculation**
188:24 189:4
**spell** 96:14
**spend** 13:19
**spent** 10:23
26:23 27:18
173:23
**spirited** 174:16
**splitting** 21:20
21:22
**spoke** 90:9
**sponsor** 147:24
**spontaneous**
95:10
**spreader** 84:16
**stack** 17:17 66:2
68:3,3 151:11
**stacks** 66:3,3
**staff** 8:23,24
**staffing** 44:22
**stafford** 3:8
**stakeholders**
35:18,20,25
48:10
**stand** 32:12
146:18 185:20
186:5,10
**standard** 154:4
183:5 190:20,24
**standards**
145:21
**standing** 156:20
**stanley** 6:18

**staple** 24:17
26:1
**star** 46:2
**start** 19:10
23:10 25:25
26:10,16 29:19
58:4 60:11
133:19 197:1
**started** 24:25
27:2,15 35:10
52:10 107:17
110:5,8 128:12
**starting** 120:2
**starts** 23:23
**state** 4:10 26:20
34:24 35:2 46:7
62:18,22,25
77:17,21 85:12
95:21 103:11
115:23 116:13
143:11 149:21
155:12 171:19
192:10,11
204:10 207:9
209:2
**stated** 209:4
**statement** 2:9
2:11,12 68:20
72:13 76:2 87:7
87:15 88:24
89:23 90:4 91:1
93:22 112:14
130:8 138:6,18
139:25 142:5
146:18 167:4

186:16,17 211:8
**statements** 2:7
22:21 86:18
89:22 133:1
151:13 164:17
165:14 167:14
**states** 1:1 28:5
28:11,16,17,20
37:9,11 38:12
117:22 143:13
148:16 171:12
191:15
**status** 120:16
148:10 150:4
**statute** 18:22,25
115:23 116:13
181:10 194:10
**statutes** 2:17
6:17,24 13:10
36:17,23 38:18
115:24 123:8
128:25 140:13
141:22 145:18
146:2 170:9
171:10
**statutorily**
194:5
**statutory**
109:14 164:17
170:2
**stay** 44:25
**step** 33:22,23
110:2
**stepped** 122:9

**steps** 56:10
**stewards** 47:14
**stick** 101:20
**stool** 142:10
**stop** 134:20
**straight** 66:4
128:18 158:4
**strategic** 64:23
**street** 1:22
88:10
**stress** 44:23
135:15
**strong** 140:5,6
**structure** 47:17
48:12 61:15
64:7 74:4 76:10
132:5 167:15
180:13 193:11
195:3
**structured**
109:4
**structures** 36:4
180:8,10,11,16
**struk** 163:25
164:3
**stucco** 40:19
115:20
**studies** 29:14,21
31:20 34:22
39:9,20 40:7
46:13 103:17
**study** 25:8 31:9
32:6,13 33:19
34:7,25 35:14
35:15 38:24,25

39:2,6 51:14
52:7 59:7,12
60:6 61:1 67:11
68:9 70:16
72:19 126:9,18
133:4,6,12,15
133:24 148:21
148:22 203:1
**stuff** 10:11
130:15 156:6
**subcontractor**
207:10,16
209:12
**subject** 15:22
20:15 99:4
119:18 123:6
128:1,2 172:14
172:16
**submit** 162:12
**submitted** 126:8
162:10 207:23
207:24
**submitting**
141:17
**subordinate**
150:20 151:15
**subordinated**
150:23 151:21
**subordination**
151:12
**subscribed**
212:21
**subsection**
171:12 172:8

**subsidiary** 1:14
**substance** 38:2
112:2 211:7
**substantial**
108:24
**substantive**
121:14
**substitution**
121:2
**successful**
180:19
**successor** 1:15
4:15 79:18 80:6
**sufficient** 88:18
**suggest** 120:3
**suggests** 176:19
**suite** 1:23 3:9
210:23
**sum** 112:2
**summarize**
17:20
**summarized**
200:19
**summarizing**
200:20,21
**summary** 14:22
15:14,16 16:4,8
16:12,16 19:20
19:22 20:3,9
50:11 51:24
86:10 87:8
200:6,7
**supervision**
38:17 56:18
101:6,9 105:5

127:11
**supplement** 124:16,18
**supply** 147:16
**support** 10:12 14:23 204:6
**supposed** 90:7
**sure** 10:12 14:18 15:25 16:19 18:3 20:20 21:8 28:6 40:4 42:7 43:8 43:11,19 52:11 57:17,18 58:13 64:24 70:12 72:6 73:13 81:7 92:7 104:19 106:13,18 119:17 123:22 130:1 137:5 150:4 162:24 175:25 178:11 184:19 189:10 196:5 203:23 205:2
**surprise** 81:16
**surprised** 135:9
**surrebuttal** 123:18,19,20
**suspension** 105:12,20 138:2 140:11,15 198:1 198:5
**sustain** 193:17

**sustainable** 142:13
**sweeping** 50:21
**swept** 21:4 22:16 177:8 188:9
**switch** 90:11
**sworn** 4:4 212:21
**system** 12:10 66:24 82:18 155:19
**systems** 146:5

**t**

**t** 3:3,8 210:2
**tab** 5:8 6:5 15:10 94:20,21 199:5
**table** 10:5 26:8 60:18 86:22 87:2 111:1,4,5 111:11 127:3 200:21 201:23
**tabs** 86:21
**tag** 104:5
**take** 8:4 11:11 16:8 22:23 27:16 56:10,20 57:7,11,12 74:6 113:4,8 116:23 140:2 148:24 161:5 168:22 175:17 189:23 198:16,16 205:12

**taken** 57:17 155:15 164:23 168:7 173:18 189:23 209:4
**talk** 20:9 26:2,9 28:3 29:12 37:15 45:9 48:1 49:7 59:20 93:21 98:12 99:11 100:14 107:22 119:5,8 131:10,10 142:7 155:11 169:18 197:9,10
**talked** 44:23 70:19 88:4 96:6 113:16 115:1 140:20 143:21 163:13 191:3
**talking** 16:1 22:23 23:24 24:2 37:6,17 40:5 89:8 97:10 99:13 126:15 131:23 132:18 172:20
**talks** 84:11,15 85:1,7 140:25 169:4
**tampa** 1:2,4,5,9 3:4 24:18 25:1 25:11 63:2,7 73:16,16,24,25 75:12 76:5,5 85:25 86:6

87:16,17 91:2 96:23 97:6,17 97:18,20,22 128:22 130:6 132:4 146:23 148:11,19 161:17 165:21 168:7,13 175:3 175:8 176:7,10 177:24 182:7 188:22 193:12 193:12 195:15 195:16,19 196:10 197:17
**tampa's** 179:3 189:13
**tangent** 109:24
**tax** 39:12 65:18 66:3 149:8,13 150:3
**taxable** 66:6 149:8
**team** 71:13 96:20,21,23 101:18 121:15 121:22,22 122:18 128:13 199:19
**tell** 20:13 22:19 31:18 43:5 50:13 52:15 53:5 82:24 98:5 125:25 162:17 190:16

**telling** 17:13
**temporary** 120:5
**ten** 120:22 169:14 199:15 199:18 200:1,3 200:9 203:14
**term** 60:19,20 60:21 64:3 83:25 84:7,9 156:17 164:24
**terminating** 138:2
**termination** 74:24 83:12 142:24
**terms** 6:23 13:4 14:15 20:1 22:23 31:17 32:9 33:6,7,17 38:20 39:21 48:15 53:25 66:19 79:24 102:15 105:2 111:3 118:14 130:15 172:21 195:2 207:16 209:12
**test** 34:1
**testified** 4:5 114:21
**testify** 67:22
**testifying** 204:6
**testimony** 41:14 65:5 78:2

112:14 137:8 140:21 198:11 198:20 204:20 211:2,7
**text** 57:5
**thank** 13:2 90:22 112:18 180:4 204:17,25 206:5
**thanks** 88:17
**thanksgiving** 156:21
**theirs** 177:4
**thereof** 111:12 172:6
**thing** 13:11 28:7 96:10 115:17 120:9 149:22
**things** 30:15 40:8 52:25 73:14 88:25 100:21 104:20 156:24 164:10 181:19,22
**think** 5:7,25 12:21 13:14 16:21 21:11,16 29:18 31:9 36:11 42:18 48:7,11,16 49:3 58:9 60:20 64:6 66:23 68:13 71:9,10 73:4 78:13 80:20 81:1,9,15 82:6

87:4 94:14,16 96:6 101:6 104:7,15 105:7 105:10,22 108:11,12,15 110:22 112:14 115:2 117:8 118:2 119:4,6 123:19 124:5 126:25 127:20 129:2,4,25 130:22 132:5 133:11,11 134:16,17 138:7 138:20 139:3,7 147:15 152:17 153:19 154:3 156:17 157:12 157:25,25 158:6 161:23 162:16 164:6 174:8,10 174:11 181:7 185:15 187:11 189:24 192:4 194:13,14 197:5 197:11 199:24 204:16
**thinking** 23:19 120:9 133:8 155:16
**third** 40:14,16 43:15,17 45:2 54:12 67:1 103:2 114:17,18 124:13 136:17

140:22 164:11
**thought** 94:14 133:14 199:16
**thoughts** 9:18 9:24,24 10:6 205:2
**thousand** 24:3 51:11 67:13,17 91:17 132:16 133:16 177:14
**three** 39:4 42:6 54:8 58:10 66:24 105:6 106:1 114:15,16 121:24 131:9 142:7,9 147:9 176:25
**threshold** 35:3,5 38:5 144:22,25
**throwing** 53:6
**thumbing** 22:12
**tie** 102:13
**tier** 66:24,24
**tiered** 108:11
**tight** 110:19
**tim** 45:6,6,7
**time** 4:22 10:13 10:16,22 11:8 11:10,22 12:8 12:23,25 13:19 14:5,7 16:6 18:18 23:24 40:14 50:13 51:20,25 52:18 56:13 57:6,12

59:9 61:17 62:12 64:8 72:1 73:3 77:24 78:12,21 82:12 82:13 83:16 97:24 99:9 102:6 104:1,5 107:16 133:17 134:9 135:6,10 135:22 137:9,22 138:11,24 139:2 145:13 157:5 166:22 173:12 180:19 202:9,20 204:23 205:22 207:21 210:19

**timeline** 24:7 56:23 101:22 105:19 107:11 121:8

**times** 40:13 54:20 99:8 114:14 123:13

**timing** 178:11

**title** 2:17 123:8

**titles** 21:24

**today** 12:23 17:11 28:9 40:12 62:2 80:23 81:13 82:1 107:15 134:24 137:8 153:17 156:12 167:14 205:1

**today's** 12:4 206:1

**together** 8:17 122:19,24 128:17 185:23 191:25 192:9

**told** 98:19 135:9

**tonight** 98:6

**took** 20:20 23:1 46:6 61:13 105:3 178:3

**top** 28:12 66:24 74:22 79:12,18 82:17 83:10 135:2 147:24 187:17 193:16

**topic** 44:19

**topics** 44:20

**total** 13:19 130:14 153:22 154:12

**touch** 96:8

**touches** 78:9

**toward** 136:11

**tower** 195:16

**track** 78:24 79:2 94:7 99:19 156:5

**tracking** 41:7

**trade** 44:6,7,8

**traded** 110:4

**tradename** 98:2

**trading** 110:5

**traffic** 111:2,13

**transaction** 22:22,25 25:3 31:11 51:11,12 51:17,21 52:12 53:8 54:8,9 59:13 60:23 62:5,13 63:3,5,6 67:11,14,18 69:3 72:24 76:19,20,21,24 78:15,20 90:4 92:13 96:16 112:1 126:4,5,6 132:9,23,24,24 133:10 134:13 135:14,14 136:8 136:12,13 161:12 163:23 163:25 166:1,14 166:25 167:10 167:17 168:12 175:1 176:4 178:4 180:22 182:13,20,21,22 183:1,9,11 187:12 190:15 195:3,4,23 196:2 197:13,18

**transactions** 166:2,24 167:25 180:18 185:20 186:2,5,10,23

**transcript** 207:21 209:4,6 210:9,16,19

211:2

**transcripts** 207:21 208:1

**transfer** 161:11 188:14 194:18 194:25

**transferred** 196:10 197:22

**transparency** 187:22 190:4

**transparent** 190:15

**transport** 28:21

**treated** 105:24 105:25

**trial** 203:25

**triangulated** 54:4

**trick** 152:14,18

**tries** 56:8

**trigger** 60:21

**trip** 95:16

**trouble** 78:25 103:25 104:11 155:25

**true** 174:24 207:22 209:6

**trust** 171:14 173:5,7

**trustee** 1:9 4:17 144:7 145:8,9 145:12 196:12 196:13,18

**truth** 190:17

**try** 11:2 44:25 190:18

**trying** 9:9 11:13 13:15,17 14:2 22:5,6,13,21 25:16,17 29:17 34:15 38:9,21 39:11,14 48:15 49:14 57:2 60:7 81:4 101:8,9 102:13 104:19 135:17 152:18 157:13 158:3 166:10 189:24

**turn** 61:14

**turnaround** 180:9

**turnover** 99:24 102:9

**turns** 101:18

**twelve** 24:5

**twenty** 97:12

**two** 5:13 7:12 19:25 21:20,22 22:7,14 24:3 34:10 42:6 51:9 56:9 59:3 66:6 67:13,17 73:15 76:4 80:9 91:20 92:18 100:21 102:16,16 104:16,16 106:1 121:24 123:13 128:2,3 131:25 132:11,12,13,16

133:5,15 147:15 151:11,18 156:24 157:23 158:7 161:9,18 162:3,24 165:6 166:2,24 175:11 175:11 177:14 186:2 187:9 193:9 201:4 203:15

**type** 9:13,15 28:7 29:13 60:5 67:5 159:18 180:22

**types** 38:16 77:23

**typewriting** 209:5

**typical** 120:17 159:17 181:5,7 182:24

**typically** 119:15 120:15 155:13 194:3

**typo** 129:9

**u**

**u** 96:15

**uh** 8:10 31:21 31:23 43:21,25 44:14 45:5 54:21 64:5 66:11 68:23 70:18,21 75:23 82:19 83:11 84:13 88:7,11

88:14 89:13 91:3,9 93:10 95:3 97:9 102:25 106:6 115:12 123:11 131:12,16,18 133:3,21 136:18 138:5,14,16 147:1 148:5 150:9 156:7 169:20,22 170:13,16,22 176:8 179:5 185:17 192:19 205:10

**ultimately** 59:6 63:4 67:13 94:8 101:5

**umbrella** 56:1

**unassociated** 130:5

**unaware** 196:8

**under** 36:2 55:25 56:17 79:21 84:21 89:8,19 92:6,10 93:24 95:25 116:12 141:11 141:13 144:18 146:22 147:15 170:8,19 173:13 195:11 197:15 201:22,23 205:16 209:5

**underneath** 205:16

**undersigned** 211:2

**understand** 4:23 9:14 10:9 10:10 12:6 13:17 14:2 16:22 17:7 19:7 19:15 30:24 32:10,13,14 34:15 38:10 39:15 48:6,7 55:11 60:7 64:24 78:2 87:9 92:7 108:4 117:15 118:4 119:19 125:24 167:11 173:24 174:18,25 183:21 189:10 190:25

**understanding** 10:22 17:3,8,14 17:20 19:7 20:10,14,16,17 20:20,24 21:1,9 21:21 22:14,16 22:22 23:5,15 23:21 36:1 50:17 51:13 60:24 61:8 73:8 87:1 90:6 96:22 100:7 107:8,13 122:3 132:10,12

**[understanding - valley]** Page 263

133:13 150:19
161:22 170:2
173:2,3 191:7
202:11
**understood** 5:3
98:21 145:6,14
164:24
**underwriting**
31:10
**uniform** 37:11
**unintelligible**
203:11
**unique** 36:19,20
37:9,10 47:17
116:17 117:18
117:25 127:23
127:23 129:19
129:21 130:10
191:22 192:9
**uniquely** 48:8
83:22 85:14,15
**unisen** 25:4 96:6
96:11,12 97:23
97:25 148:7
153:12 155:2
156:12
**unit** 142:23
200:7,8
**unitary** 178:3,4
196:24
**united** 1:1
143:13 148:15
**units** 153:18,23
153:25 154:3,6
154:7,12 202:2

202:7,11
**universally**
193:18
**university** 2:15
18:6 24:10,16
24:17 25:5
26:20 31:3 49:7
51:3,10,15 56:4
56:7,22 57:25
58:6,16 61:16
61:17 63:12,19
64:7 65:7,10,15
68:4 71:22 73:3
76:10 78:8,22
82:15 83:18
86:10 96:12
102:18,24
104:23 105:24
107:9 121:3
122:5,18 126:2
129:5 131:22
137:2 139:1,8
139:10,11,14
148:6,13 153:11
162:8 169:13
191:17 194:22
200:1,9 201:16
203:14
**unpack** 21:12
21:14 119:5
**unpacks** 21:11
**unreasonable**
201:12
**unregulated**
37:14,16

**unrenovated**
154:7
**unsecured**
150:18 151:16
**unusual** 157:7
158:16,22 159:9
159:12 164:12
**unveiling**
201:17,18
**unwound**
185:23
**update** 18:7
34:24 35:13
39:2,22 49:23
**updated** 35:15
**upkeep** 146:4
**uploaded** 208:2
**upward** 32:18
**urgency** 135:13
135:24 136:6,7
156:19 166:22
192:17 201:19
**usab** 176:6,12
188:21
**usameribank**
1:15 2:12 4:15
86:19 89:24
91:2 149:3,4
161:17 162:21
163:1 182:14
187:6,21 196:11
**use** 9:21 19:2
33:2 46:12 60:8
101:25 116:3,7
116:11 118:8,10

129:22,23 130:4
140:7 146:23
191:18 193:5,9
211:9
**used** 16:18,20
54:19 60:21
70:9 80:19
91:22 142:3
144:21 157:8
158:17 174:3
199:16
**uses** 151:5
**using** 78:1 82:1
**usual** 88:25
**usually** 112:3
**uv** 74:11,12
79:17,25 84:23
105:23,25

**v**

**v** 9:8 205:8,13
**v.b** 205:16
**vacancy** 153:21
**vaccarella** 41:4
41:8,25 114:23
115:17 123:14
**vacuum** 185:20
186:11
**vague** 69:22
**validating** 58:2
161:19 162:12
**valley** 1:13,14
4:14 21:3,3
22:16 23:13,14
50:21 91:4 94:8
188:1

**various** 29:2 75:4 84:16 88:25 92:10 107:10,24 143:13 196:21

**veered** 109:18

**verbal** 63:25

**verbatim** 207:13

**veritext** 207:10 207:18 210:13 210:23

**version** 7:9,10 7:10 171:9

**versions** 7:13

**versus** 32:8 41:9 100:21 127:1

**vi** 173:13

**vibrant** 143:15

**view** 102:5 125:20 145:10 161:20

**viewing** 178:3

**village** 2:15 18:6 24:10,16,17 25:6,13 31:3 49:7 51:3,10,15 56:4,7,22 57:25 58:6,16 61:16 61:17 63:10,12 63:16,19 64:7 65:7,10,15 68:4 71:23 73:3 76:10 78:8,22 82:15 83:18

86:10 96:13,23 97:17,19,20 102:18,24 104:23 105:24 107:10 121:4 122:5,18 126:2 129:6 131:22 137:2 139:1,8 139:10,11,14 148:6,12,13,20 153:11 162:8 169:13 191:17 194:23 200:1,9 201:16 203:14

**villas** 87:18 195:17

**vincent** 41:8,25

**violate** 181:25 186:23

**violated** 181:11

**violation** 170:14

**violations** 140:12

**virginia** 42:11 43:23,24 114:22 115:2

**virtual** 195:1

**visibility** 35:18

**visit** 95:14

**visiting** 95:23 95:24 96:4

**volunteer** 47:13

**vs** 1:12

**w**

**w** 1:8 176:1

**wait** 5:21,25 85:18 94:21 107:19

**waiting** 57:20 90:18 164:9

**walk** 58:25 104:6

**walked** 179:23

**walking** 177:18 203:10

**want** 5:21 10:12 11:5,9,16,21 14:7 15:25 16:11 17:16 19:7 20:12,13 20:20 21:8,13 23:16 26:7 29:25 32:13,14 33:3 40:4 52:13 53:6,18,20 56:23 60:18 64:20,23,24 65:4,4 67:20 73:13 77:9 108:3 112:25 113:1,4 119:8 121:1 133:14 136:3 149:20 165:20 175:16 186:12 198:15

**wanted** 15:25 135:16 161:24

**wants** 149:19

**warranties** 182:21 183:10 183:23 185:13 187:7

**warren** 1:8 3:12 4:16 14:24 15:13 16:11 17:4 20:4 50:12 51:24 81:23 95:7 96:2,8 98:9 98:15,17,20 109:22,25 110:1 110:7 112:10,15 112:16,22 113:23 114:2,6 196:11,12,17 197:16,21

**watched** 99:8,12

**water** 27:25

**watercooler** 197:10

**way** 9:20 11:12 23:10 24:13 25:20 26:3,10 26:11 90:1 92:14 96:16 109:3 117:15 121:14 122:8 135:20 139:14 145:9 155:13 181:17 182:25 190:18

**ways** 29:2 36:7 103:20 143:13

**[we've - worked]** Page 265

**we've** 103:24
121:22 175:11
175:11
**week** 156:20
**weitz** 41:9
**went** 26:19 29:1
46:6 93:8 96:5
114:19 173:16
188:20
**west** 3:4 42:11
43:21,23,24
97:6 114:22
115:2
**westport** 1:4,5,9
1:10 18:6 21:18
22:8 24:20,21
73:15,16,24,25
74:8,8 75:12
76:5,5 79:22
85:22 86:5
87:16,16 88:8
88:13 89:17
91:2,14 92:5,9
92:10,16 93:7
126:2,3 128:22
130:6 136:12
146:22 161:14
161:16,17 162:7
165:21 166:1,25
168:3,3,7,13
175:3,8 176:7
176:10 177:24
179:3,9 180:3
182:6,9 186:20
187:5 188:22

189:13 195:15
195:15,19 196:9
198:7
**whitemarsh**
50:1 114:24
**whitson** 2:23
3:7 4:7,14 5:9
5:13,19,21 6:1,3
8:3 12:6,13
15:20,24 16:2
25:15 48:24
49:20 57:10,23
68:7 72:10 79:8
80:12,14,18
81:1,6,12,14,20
81:24 82:5,8,20
83:2 86:20,23
87:6,12 89:21
89:25 90:5,16
90:20,23 92:21
112:13,18,20
113:4,7,10
160:4,7,10,14
160:18 166:6
167:6 168:21
171:6 174:13,16
174:19 176:21
176:23 183:15
186:9 188:25
189:5,8,11
190:8 191:5
198:15,18 199:1
204:22 206:7
**wht** 22:7 75:7
75:16 83:25

84:9,22 128:22
130:5,7 132:24
137:3 140:12
165:8 174:6,7
176:6 184:5
188:4,14,16
191:16,16,23,23
**wht's** 188:2,10
188:11
**wide** 72:5
**wife** 178:16,17
**williams** 163:14
**willing** 102:1
176:5,6
**wired** 94:10,12
**withdrawal**
169:14
**witness** 5:11
12:10 90:3 96:7
96:9 112:17
113:6 114:12,24
123:5,13 205:2
**witnesses**
207:24
**wnt** 21:5,6,23
22:9 55:20
75:12 84:7,12
84:22 91:7
130:7 132:24
176:1,12 182:2
184:5 188:1,14
188:16 191:16
191:23 197:22
**wnt's** 21:17
184:21 188:8,9

**wnts** 159:16
**wonder** 3:7
43:13 82:5,20
160:4,6,9,13
**wondering**
127:17
**word** 9:20 13:14
30:9 54:19,22
140:5,6,9 148:4
193:9 198:13
**words** 9:13 17:2
17:13 46:12
50:13 65:5 90:5
101:24 142:11
146:24 182:18
185:16
**work** 23:11
24:14 27:13
28:16 29:4,13
32:3 34:19
38:19 39:8,13
39:20 40:4 51:7
52:12 53:9 54:5
54:6,6 58:11
59:11,13,22
69:13 71:5 78:3
96:3 118:24,25
119:4 122:12,17
124:15 127:6
149:12
**worked** 25:1
28:5 59:9 66:10
121:14,17 127:8
203:5

**[workforce - zoom]**

**workforce**
  44:20
**working**  10:23
  26:23 28:24
  60:15 119:23
  120:3 127:10
  191:25
**works**  8:16
  127:14
**world**  124:5
  149:12
**worried**  48:5
**worse**  179:20
**wow**  40:15
  123:21
**wrestle**  99:9
**wrestling**
  202:15
**writing**  79:12
  169:14
**wrong**  109:8
  133:13 162:17
  192:24
**wrongly**  61:11
**wrote**  17:4
  42:17

**x**

**xxxvii**  2:17
  123:8

**y**

**yeah**  11:24 15:1
  15:1,1,7 16:25
  17:5 18:5,5,10
  18:21 19:1,21

29:16 30:1,9
36:21 39:25
41:19 42:8,13
42:17 43:13
44:2 45:23
50:10,20 52:19
53:1,12 54:17
56:25 57:10
58:13,13 59:2
63:16 65:24
68:13 69:1,14
69:21 71:7 75:2
76:8 81:20
85:18 97:22
100:6 101:14
102:7,11 103:13
103:22 105:19
106:15 107:12
113:7 118:21
121:20 122:2
129:25 134:6
140:3 147:13,14
151:22 153:9,15
154:19 155:17
155:20,22 156:4
156:23 157:13
160:3 162:15
164:8 168:5
173:4 174:11
175:10 178:21
179:23 189:19
190:13 191:2
194:4 197:6
199:22 202:9
205:6

**year**  26:22 69:7
  78:12,12 135:18
  156:22 199:15
  199:18 200:1,3
  200:9,18 203:14
**years**  2:7 12:22
  12:23 26:23
  27:6,7,18 66:8
  68:21 147:9
**yep**  26:7,7 33:8
  42:1,22,24
  45:21 60:1 70:3
  73:7 75:10 84:5
  84:8 85:24 86:8
  89:3 98:7
  109:12 114:10
  124:25 136:14
  137:11 153:24
  156:10 165:12
  166:20 174:1
  184:4,10,16,16
  184:16,25 185:5
  192:16,23
  194:24 205:15
**yield**  90:6
**york**  28:18
  37:22 44:18,22
  53:16 143:18
**younger**  28:8

**z**

**zero**  89:5
**ziegler**  58:21,22
  77:6 147:18,23
**zoom**  3:3,7,8,12
  3:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.