# FORV/S

Healthcare Consulting



# REBUTTAL EXPERT REPORT OF KEITH SEELOFF

Jeffrey W. Warren, as Liquidating Trustee for Westport Holdings Tampa, Limited Partnership and Westport Holdings Tampa II, Limited Partnership

v.

Valley National Bank

United States Bankruptcy Court in the Middle District of Florida Tampa Division
Hillsborough County, FL
Case No 8:16-Bk-8167-CED
Adv. Proc. No. 8:20-ap-00007-CPM

JULY 2023

FORVIS is a trademark of FORVIS, LLP, registration of which is pending with the U.S. Patent and Trademark Office

DEFENDANT'S EXHIBIT 2

PENGAD 800-631-6989

# FORV/S

191 Peachtree Street NE, Suite 2700  /  Atlanta, GA 30303
**P** 404.575.8900  /  **F** 404.575.8870
forvis.com

**Keith Appleby, Esq.**
Appleby Law P.A.
4916 W Melrose Ave S
Tampa, FL 33629-5420

Thank you for the opportunity to provide litigation consulting services for Appleby Law, P.A. and Jeffrey W. Warren, as Liquidating Trustee on behalf of Westport Holdings Tampa, Limited Partnership ("**WHT**") and Westport Holdings Tampa II, Limited Partnership ("**WHT II**") (collectively defined as the "**Specified Parties**"), in connection with the matter of Jeffrey W. Warren, as Liquidating Trustee for WHT and WHT II (collectively defined as the "**Plaintiff**") v. Valley National Bank (principal subsidiary to Valley National BankCorp, a New Jersey corporation, as successor by merger to USAmeriBank) (the "**Defendant**"), existing in the United States Bankruptcy Court in the Middle District of Florida, Tampa Division (the "**Adversary Proceeding**").

FORVIS, LLP ("**FORVIS**") has been retained, and I have been designated as an expert witness to serve as a senior living subject matter expert in respect to the application in the healthcare industry of Title XXXVII, Section 651.035, Florida Statutes (2014) and provide opinions, as applicable, related to the Adversary Proceeding and in rebuttal specifically to the Expert Report of Louis E. Robichaux IV of Ankura Consulting Group, LLC dated April 17, 2023 (the "**Robichaux Report**"). As such, I developed this report (the "**Rebuttal Report**"), with the support of other FORVIS professionals, to detail the events and regulations related to the alleged injury (the "**Alleged Injury**") of the Plaintiff caused by and attributed to the Defendant. The Rebuttal Report is based on work completed to date, and I reserve the right to supplement the Rebuttal Report, if additional information becomes available. Definitions, regulations, entity descriptions, and other details included in the Rebuttal Report reflect those as of March 31, 2014, unless otherwise stated.

Our services were provided in accordance with the Statement on Standards for Forensic Services promulgated by the American Institute of Certified Public Accountants, and, accordingly, do not constitute a rendering by FORVIS or its partners or staff of any legal advice, nor do they include the compilation, review, or audit of financial statements.

The opinions provided in the Rebuttal Report are not intended to be legal opinions, but rather my professional opinions, based on my experience in the senior living industry and other industry best practices.

FORVIS is a trademark of FORVIS, LLP, registration of which is pending with the U.S. Patent and Trademark Office



The Rebuttal Report is the property of FORVIS has been prepared solely for the purpose of the Plaintiff for the Adversary Proceeding for the use of the Specified Parties and is not intended for any other use. It should not be used, reproduced, or distributed for any other purpose without my written permission in each specific instance. If the Adversary Proceeding goes to trial, I may prepare demonstratives to present.

Respectfully submitted July 7, 2023

Keith Seeloff, CPA
FORVIS, LLP
keith.seeloff@forvis.com
404.575.8992

# REBUTTAL EXPERT REPORT

## Jeffrey W. Warren as Liquidating Trustee of Westport Holdings Tampa, Limited Partnership and Westport Holdings Tampa II, Limited Partnership
### v.
### Valley National Bank

---

## Assistance to Keith Appleby of Appleby Law, P.A.

July 7, 2023

### CONFIDENTIAL

This report (the "**Rebuttal Report**") is intended solely for the information and use of Keith Appleby of Appleby Law, P.A. and Jeffrey W. Warren, as Liquidating Trustee of Westport Holdings Tampa, Limited Partnership ("WHT") and Westport Holdings Tampa II, Limited Partnership ("WHT II") (the "**Specified Parties**"). The Specified Parties are to use the Rebuttal Report in connection with the claims of Jeffrey W. Warren, as Liquidating Trustee of WHT and WHT II (case No 8:16-bk-8167-CED) (the "**Plaintiff**") against Valley National Bank, principal subsidiary to Valley National BankCorp, a New Jersey corporation, as successor by merger to USAmeriBank (the "**Defendant**") in the Adversary Proceeding No. 8:20-ap-0007-CPM (the "**Adversary Proceeding**"). The Rebuttal Report is intended to be and should not be used by anyone other than the Specified Parties.

**Plaintiff Expert Opinion Report**

TABLE OF CONTENTS

**I.  Background**                                                                           **1**

   I.A.      Engagement Overview                                            1

   I.B.      Assignment                                                    1

   I.C.      Alleged Injury                                                2

**II.  Credentials**                                                                         **4**

   II.A.     Expert Qualifications                                         4

   II.B.     Prior Testimony                                               6

   II.C.     Compensation                                                  7

**III.  Information and Documents Considered and Relied Upon**                               **7**

   III.A.    Background                                                     7

   III.B.    Regulations                                                   9

   III.D.    University Village Minimum Liquid Reserve Accounts            13

   III.E.    Senior Living Industry Support Organizations                  16

   III.F.    CCRC Supply and Demand                                        17

   III.G.    University Village (n/k/a Unisen Senior Living)               18

   III.H.    List of Information                                           21

**IV.  Rebuttal to Defendant's Expert Report**                                              **21**

   IV.A.    First Rebuttal Opinion (Not Separately Refinanced)            21

   IV.B.    Second Rebuttal Opinion (Not Common Ownership)                22

   IV.C.    Third Rebuttal Opinion (Operating Reserves Cannot be Used as Collateral)   22

   IV.D.    Fourth Rebuttal Opinion (Arguing Good Faith Basis)            23

   IV.E.    Fifth Rebuttal Opinion (WNT Not a Provider)                   23

   IVI.F.    Sixth Rebuttal Opinion (Must be Debt of Provider)            23

   IV.G.    Seventh Rebuttal Expert Opinion (Non-Compliance with MLR Requirement)   24

**V.  Exhibits**                                                                            **25**

   VI.A.    Keith Seeloff Curriculum Vitae                                25

   VI.B.    External Information and Documents Considered                  25

# I.  Background[1] [2] [3]

### I.A.    Engagement Overview

FORVIS, LLP ("FORVIS") was retained by Keith Appleby of Appleby Law, P.A. ("**Counsel**") and Jeffrey W. Warren, as Liquidating Trustee of Westport Holdings Tampa, LP ("**WHT**") and Westport Holdings Tampa II, LP ("**WHT II**") (the "**Client**") to provide a rebuttal expert witness report for Appleby Law, P.A. and Jeffrey W. Warren, as Liquidating Trustee on behalf of WHT and WHT II (collectively defined as the "**Specified Parties**"), in connection with the matter of Jeffrey W. Warren, as Liquidating Trustee for WHT and WHT II (collectively defined as the "**Plaintiff**") v. Valley National Bank (principal subsidiary to Valley National BankCorp, a New Jersey corporation, as successor by merger to USAmeriBank) (the "**Defendant**"), existing in the United States Bankruptcy Court in the Middle District of Florida, Tampa Division (the "**Adversary Proceeding**").

I was designated as a rebuttal expert witness to serve as a senior living subject matter expert in respect to the application in the healthcare industry of Title XXXVII, Section 651.035, Florida Statutes (2014) (the "**Section 651.035, Florida Statutes**") and provide opinions as applicable, related to the Adversary Proceeding and in rebuttal specifically to the Expert Report of Louis E. Robichaux IV of Ankura Consulting Group, LLC dated April 17, 2023 (the "**Robichaux Report**").

As such, I developed this report (the "**Rebuttal Report**"), with the support of other FORVIS professionals, to detail the events and regulations related to the alleged injury (the "**Alleged Injury**") of the Plaintiff caused by and attributed to the Defendant. The Rebuttal Report is based on work completed to date, and I reserve the right to supplement the Rebuttal Report, if additional information becomes available. Definitions, regulations, entity descriptions, and other details included in the Rebuttal Report reflect those as of March 31, 2014, unless otherwise stated.

### I.B.    Assignment

The Rebuttal Report, which sets forth my opinion and reasoning, is based upon the information considered and relied upon and the assumptions set forth in the Rebuttal Report, as of the date of the Rebuttal Report. I reserve the right to supplement or amend the Rebuttal Report based on additional information made available to me, including, but not limited to, additional documents produced, testimony, or other evidence presented in the matter. References to "I", "me", "we", or "our" in the Rebuttal Report refer to me personally or other FORVIS professionals working on this engagement at my direction and under my supervision.

---

[1] Expert Report of Louis E. Robichaux IV of Ankura Consulting Group, LLC dated April 17, 2023 (the "Robichaux Report").
[2] Expert Report and Disclosure of Stanley A. Murphy, CPA/ABV/CFF/CDBY, CVA of Ankura Consulting Group, LLC dated April 17, 2023.
[3] Summary Of Support for Aiding and Abetting Claim. Provided by Jeffery Warren.

1

The opinions provided in the Rebuttal Report are not intended to be legal opinions, but rather my professional opinions, based on my experience in the senior living industry and other industry best practices.

Our services do not constitute a rendering by FORVIS or its partners or staff of any legal advice, nor do they include the compilation, review, or audit of financial statements.

The Rebuttal Report is the property of FORVIS has been prepared solely for the purpose of the Plaintiff for the Adversary Proceeding for the use of the Specified Parties and is not intended for any other use. It should not be used, reproduced, or distributed for any other purpose without my written permission in each specific instance. If the Adversary Proceeding goes to trial, I may prepare demonstratives to present.

### I.C.    Alleged Injury

As part of normal business financing activity, WHT established and funded an escrow account at Regions Bank on June 22, 2004, to comply with Section 651.035, Florida Statutes.[4] As set-aside funds regulated by the Florida Office of Insurance Regulation ("**OIR**"), these funds were not available for use to any other entity, whether associated or unassociated, with WHT, including Westport Nursing Tampa, LLC, a Florida limited liability company ("**WNT**").[5] [6] WHT owned all of the member interests of WNT.

On March 31, 2014, WNT entered into a $15,000,000 loan with USAmeriBank.[7] USAmeriBank, effective January 1, 2018, merged with Valley National BankCorp and is now known as Valley National Bank. The loan is defined herein as the "**USAB Loan**". Collaborators at USAmeriBank agreed to advance $15,000,000 to WNT with the requirement that $3,000,000 in cash was deposited with USAmeriBank and pledged to secure the USAmeriBank Loan.[8] Employees and agents of WNT, and individuals and entities seeking to acquire the member interests of WNT from WHT, on one hand (collectively, the "**WNT Actors**"), and USAmeriBank, on the other hand, collaborated, among other activities, to (a) transfer the ownership of the member interests in WNT from WHT (the "**WNT Membership Transfer**") to a group of investors led by John Bartle (the "**Bartle Group**") and (b) transfer approximately $3,000,000 from WHT's existing MLR escrow account located at Regions Bank to an account established at USAmeriBank (the "**Cash Collateral Account**") to be used by USAmeriBank as cash collateral for the USAB Loan (the "**MLR Transfer**").[7] [8] [9] [10] [11] [12] [13] Although the Cash Collateral Account was named

---

[4] University Village Minimum Liquid Reserve Escrow. Regions Bank. June 22, 2004.
[5] The Florida Senate. Title XXXVII, Section 651.035, Florida Statutes (2014). Minimum liquid reserve requirements.
[6] The Florida Senate. Title XXXVII, Section 651.033, Florida Statutes (2014). Escrow accounts.
[7] Loan Closing Statement $15 Million. USAmeriBank. Westport Nursing Tampa, L.L.C. March 31, 2014
[8] Email J. Price to T. Roofner (Re: Florida Statutes 651.035).
[9] Email from W. Rabke to T. Kohrn (Re: Westport Nursing Cash Collateral Agreement) 1.
[10] Email from W. Rabke to T. Kohrn (Re: Westport Nursing Cash Collateral Agreement) 2.
[11] Email J. Price to W. Rabke (Re: Westport MLR OIR Notice Letter) 1.
[12] Email W. Rabke to J. Price (Re: Westport MLR OIR Notice Letter) 2.
[13] Email J. Price to W. Rabke (Re: MLR Issue).

2

as an account of WNT, the Cash Collateral Account was controlled solely by USAmeriBank and WNT could not access the Cash Collateral Account.

WNT was, and is, a separate legal entity from WHT. As part of the understanding of the employees and agents of WNT, and individuals and entities seeking to acquire the member interest of WNT from WHT (collectively, the "**WNT Actors**"), of the OIR's oversight of providers in Florida ("**Providers**"), they knew in order to access MLR-related funds, approval from the OIR was needed.[5][6][7][8][9] A "Provider" of continuing care is defined as the owner or operator, pursuant to a contract, furnishing shelter and nursing care or personal services to a resident who resides in a facility, whether such nursing care or personal services are provided in the facility or in another setting designated in the contract for continuing care, by an individual not related by consanguinity or affinity to the resident, upon payment of an entrance fee.[2]

It is alleged that in order to achieve the MLR Transfer, the WNT Actors and Defendant led the OIR to believe that the Provider for University Village (WHT) was seeking permission to access the MLR funds.[4][6][14][15] In redefining the entities names to "ProviderLP" for WHT and "ProviderLLC" for WNT, it is likely the OIR would have believed the correct "Provider" of University Village (WHT) was the entity seeking access to the funds.[4][6][8][9] However, WNT was not regulated by the OIR and not subject to Section 651.035, Florida Statutes; thus WNT did not require or have an MLR and would not have been thought to be contacting the OIR in such case.

A MLR must be maintained and, if at any time, it is not maintained, it must be replenished to its minimum level as soon as practically possible.[2] As included in Section 651.035(4), Florida Statutes, the OIR may extend the time for compliance, upon approval of a plan for fulfilling the requirements of Section 651.035, Florida Statutes and upon demonstration by the Provider of an annual increase in liquid reserves.[2] The penalty for not maintaining MLR funds may include an order of suspension by the OIR, terminating the Provider's ability to accept any new continuing care contracts from prospective residents. This penalty is completely detrimental to a Provider and will immediately obliterate liquidity, as new contracts are the lifeblood of a Provider. On February 13, 2015, the OIR issued an initial order of suspension (the "**Order of Suspension**") to WHT, based upon violations of the requirements of Chapter 651, Florida Statutes.[16]

The alleged damages to WHT caused by the MLR Transfer and the WNT Membership Transfer are generally referred to in this Rebuttal Report as the "**Alleged Injury**."

---

[14] Draft MLR Notice to the OIR. Williams Mullen. March 2014.
[15] MLR Notice to the OIR. Williams Mullen. March 31, 2014.
[16] Order of Suspension from the OIR. February 13, 2015.

## II.  Credentials

### II.A.    Expert Qualifications

I am the Partner-in-Charge of the FORVIS Senior Living Practice, which is a part of the FORVIS Healthcare Finance team. I have more than 30 years of experience in the healthcare industry, primarily serving the senior living sector. I have been a key participant in more than 100 life plan communities' development projects, including startup communities, existing campus repositioning, and obligated group financings. I have conducted financial analyses of merger and acquisition transactions and financing structures to include valuations, due diligence, economic feasibility analysis, and market feasibility analyses for proposed and existing healthcare and other retirement housing projects.

FORVIS ranks among the top 10 public accounting firms in the nation and is a leading professional services firm offering assurance, tax, and advisory services for clients in all 50 states and internationally. FORVIS was created by the merger of equals between BKD, LLP and Dixon Hughes Goodman LLP, effective June 1, 2022. FORVIS includes more than 530 partners and principals and nearly 6,000 team members. FORVIS serves 72 unique markets across more than 10 distinctive industries.

Within the healthcare industry, the FORVIS Healthcare Practice is the provider of choice to more than 6,100 healthcare organizations. The FORVIS Healthcare Practice is comprised of more than 950 team members, including 175 Partners, Principals, Managing Directors, and Directors, offering 12 unique advisory capabilities. The twelve capabilities offered by the FORVIS Healthcare Practice include: Analytics, ESG & Climate Risk, Finance, Forensic & Valuation, Internal Audit & Risk Advisory, IT Risk & Compliance, Performance Improvement. Strategy, Transaction Advisory Services, Reimbursement & Regulatory, Tax Advisory, and SOC & HITRUST.

Collectively, the Finance, Performance Improvement, Regulatory Compliance & Reimbursement, Strategy, and capabilities make up the FORVIS Healthcare Consulting Practice. The FORVIS Healthcare Consulting Practice is a portfolio designed specifically to address a healthcare organizations' unique and complex challenges and opportunities. The FORVIS Healthcare Consulting Practice is comprised of more than 175 professionals and serves the entire continuum of care, including 25% of the Top 20 Hospitals in the US. As ranked by Modern Healthcare, the FORVIS Healthcare Consulting Practice was the 9th largest healthcare consulting firm and 93% of FORVIS Healthcare Consulting Practice clients would recommend its services.

Within the FORVIS Healthcare Consulting Practice is the FORVIS Senior Living Practice, which focuses on the aging services continuum – life plan communities, independent living communities, assisted living facilities, skilled nursing facilities, and home- and community-based services. The Senior Living Practice has a comprehensive staff of 18 professionals, who exclusively serve the senior living and care industry, devoting their time to the following services: strategic and development planning, campus repositioning,

4

business advisory services, financial feasibility and market analyses, operational assessments, and other performance improvement. Collectively, the Senior Living Practice has supported healthcare providers across the country with projects representing more than $19 billion of capital raised and have provided strategic planning, market analysis, volume forecasting, and economic feasibility support for more than 150 unique healthcare markets.

The FORVIS Senior Living Practice has significant experience providing feasibility and consulting services to non-profit clients and for-profit senior living developers including start-up entrance fee, rental independent living, assisted living and memory support communities financing with debt in the state of Florida. My team and I have led several feasibility studies and preliminary certificate of occupancy related work for Providers in the state of Florida, resulting in a detailed understanding of (a) various regulations promulgated by the OIR and (b) proper calculations and use in the MLR in Florida. Recent OIR submissions/studies the FORVIS Senior Living Practice has completed include:

- 12/2022: Examination of a Projection with Market Study for Tampa Life Plan Village. The Examination included plans for short-term bridge financing of $8,100,000 in proceeds and a subsequent refinancing of $91,787,000 in proceeds, for which funds would be used to redeem existing debt and fund renovations of existing independent living units.
- 09/2022: Feasibility Study for Cypress Cove at HealthPark Florida, Inc., Fort Myers. The Feasibility Study included plans for financing of $68,664,000 in proceeds to be used for the development and construction of 48 new independent living units.
- 01/2022: Feasibility Study for Green Cay Life Plan Village, Inc. (Green Cay Life Plan Village). The Feasibility Study included plans for BANS financing of $32,000,000 in proceeds to be used for pre-development of 174 independent living units, 16 assisted living units, 16 memory care units, and associated common areas.
- 07/2021: Feasibility Study for The Mayflower, Winter Park. The Feasibility Study included plans for financing of $80,000,000 in proceeds to be used to refund existing debt and fund the development and construction costs for a new healthcare building, 50 new independent living units, new common areas, and the renovation of existing assisted living units.
- 04/2021: Feasibility Study for Glenridge at Palmer Ranch, Sarasota. The Feasibility Study included plans for financing of $93,797,000 in proceeds to be used to refund existing debt and fund routine capital expenditures, a renovation and expansion project to common areas, and predevelopment for new independent living units.
- 03/2021: Feasibility Study for DeLand Senior Care, LLC (The Alliance Community for Retirement Living). The Feasibility Study included plans for financing of $2,640,000 in proceeds to be used for a 285-unit independent living, assisted living, and nursing acquisition in DeLand, Florida.
- 10/2020: Feasibility Study for The Mayflower, Winter Park. The Feasibility Study included plans for financing of $61,287,000 in proceeds to be used for the

5

development and construction of 60 new skilled nursing beds, 24 new memory care units, and new related therapy and common areas.

- 02/2020: Feasibility Study for Tampa Life Plan Village, Inc (University Village). The Feasibility Study included plans for financing of $59,699,000 in proceeds to be used for a 491-unit independent living acquisition in Tampa, Florida.
- 09/2019: Feasibility Study for CCRC Development Corporation (Legacy Pointe at UCF). The Feasibility Study included plans for financing of $168,265,000 in proceeds to fund the development and construction of a 300-unit start-up independent living, assisted living, memory support, and nursing project in Oviedo, Florida.
- 11/2018: Feasibility Study for Fleet Landing, Atlantic Beach. The Feasibility Study included plans for financing of $117,702,000 in proceeds to be used for the development and construction of 128 new independent units, 38 new assisted living units, 30 new skilled nursing units, new dining and social spaces, and expanded and renovated common areas.
- 12/2017: Feasibility Study for Southwest Florida Retirement Center, Inc. (Village on the Isle). The Feasibility Study included plans for financing of $70,000,000 in proceeds to be used for the construction and reconfiguration of existing spaces to include 46 new independent living apartments, four new nursing beds, and a net increase of seven assisted living and memory support units, and health center project in Venice, Florida.
- 11/2013: Feasibility Study for CCRC Operations Corp (Sinai Residences of Boca Raton) The Feasibility Study included plans for financing of $206,010,000 in proceeds to be used for the development and construction of a 369-unit start-up independent living, catered living, assisted living, memory support, and health center project in Boca Raton, Florida.

## II.B.    Prior Testimony

In the past ten years, I have served as an expert witness or consultant for the following cases:

- I, as a representative of FORVIS, was engaged via an engagement letter dated April 12, 2023, to assist Nelson Mullins Riley & Scarborough LLP in connection with reading and commenting on certain agreements and reports related to a complaint filed by Kruger against Marietta Memorial Hospital. The complaint resulted in a settlement provided by Marietta Memorial Hospital.
- FORVIS Senior Living Practice was engaged via an engagement letter dated July 9, 2021, to assist James W. Thomas of Jackson Kelly, PLLC. The purpose of the engagement was to produce a financial feasibility study to illustrate the financial performance of St. Joseph's Hospital of Buckhannon, Inc. and maintaining its Critical Access Hospital Designation. Following the production of the financial feasibility, I appeared as a fact witness at the Certificate of Need hearing on September 2, 2021.
- I, as a representative of FORVIS (f/k/a DHG), was engaged via an engagement letter dated March 9, 2016, to serve as an expert consultant to Michael S. Hino of Pepper Hamilton LLP. The purpose of the engagement was to analyze the impact

6

of refunding residents' entrance fees on The Hill at Whitemarsh's financial obligations and the overall financial health of The Hill at Whitemarsh's. The Hill at Whitemarsh's was the defendant and Klock-Hood was the plaintiff for case no. 150601412 of Court of Common Pleas, Philadelphia County.

- 2010: I, as a representative of FORVIS (f/k/a DHG), was engaged to review the residency and care agreements and analyze monthly service fees of a CCRC located in Greenville, South Carolina.
- 2009: Keith, as representative of FORVIS (f/k/a DHG), was engaged for Response to the Rebuttal Report prepared by Vincent Vaccarella – CC-Aventura, Inc., et al. v. The Weitz Company, LLC, et al. Response to Rebuttal Report prepared by Gerontological Services, Inc. and Classic Residence by Hyatt concerning a use of funds/construction cost dispute.

Prior to joining FORVIS, I worked for an international accounting firm as a senior manager in the long-term care industry and prior to that I worked as an auditor for a Medicare Intermediary. I am a member of AICPA and LeadingAge and am also an accomplished presenter on topics affecting the senior living industry, acute care providers, skilled nursing providers, and home health agencies. A list of my presentations and publications is included in my Curriculum Vitae attached as Exhibit "A." I hold a Bachelor of Science of Accounting from Ball State University.

### II.C.    Compensation

FORVIS is being compensated for my time at the rate of $700 per hour and the time of other FORVIS professionals working on this matter at hourly rates ranging between $300 and $600. The compensation is not contingent on the outcome of the Adversary Proceeding.

# III.    Information and Documents Considered and Relied Upon

In addition to my education, experience, and consultation with Counsel and the Client, I considered the following when developing my opinions:

### III.A.    Background[1][2][3][5]

The Adversary Proceeding is between the Plaintiff, Jeffrey W. Warren, as Liquidating Trustee for WHT and WHT II, represented by his Counsel, and Defendant, Valley National Bank, principal subsidiary to Valley National BankCorp, as successor by merger to USAmeriBank, represented by McGlinchey Stafford PLLC.

WHT, a Delaware limited partnership, owned the 446 independent living apartments and related operations within University Village. WHT II, a Delaware limited partnership and sister company to WHT, owned the real property housing the 46 independent living villas within University Village. WHT operated WHT and WHT II.

WNT owned the real property housing the 110 assisted living beds and 120 skilled nursing beds within University Village and leased its assets to other entities that held licenses to operate and did operate those facilities. WHT was the sole member of WNT.

In Florida, CCRCs are regulated by both OIR and AHCA in separate capacities. AHCA regulates the healthcare quality of a CCRC, while the OIR regulates a CCRC's financial solvency, residency contracts, and disclosures made to prospective residents. The OIR also works in conjunction with the Florida Department of Financial Services ("**DFS**"). DFS processes resident complaints not related to the quality of healthcare and oversees mediation and arbitration between residents and CCRCs.

A CCRC must be licensed with the OIR prior to entering into continuing care contracts. Licensing must include providing financial statements and other information required by the OIR. Annually, audited financial statements and an annual report are required subsequent to initial licensure. The Provider is also required to issue a disclosure statement to prospective residents prior to execution of their continuing care contract.

Prior to a Provider opening a CCRC in Florida, the Provider must obtain a certificate of authority ("**COA**") from the OIR. A COA is a license issued by the state of Florida to a company that allows the company to conduct its business. A prerequisite to a COA is a Provisional COA, except for entities which were obtained through acquisition, merger, or consolidation. The application for a COA includes five primary categories: 1. Application Form and Related Fees; 2. Legal; 3. Financial; 4. Management; 5. Forms. Within the Forms category, a Minimum Liquid Reserve Escrow Agreement is required. The application for a COA is a mechanism to determine the financial stability and capacity, sincerity, and integrity of a prospective Provider. Again, this process is in place to ultimately protect prospective residents from non-viable or unsustainable Providers.

Each Provider holding a COA is required to file an annual report to the OIR, regardless of whether the facility is operational or not (the "**OIR Annual Report**"). The OIR Annual Report is a compilation of financial information. As part of the OIR Annual Report, Providers with more than one COA must complete and submit Form OIR-A3-477 and its related supporting schedules to the OIR. Date of submission for the OIR Annual Report, including the Form OIR-A3-477, is based on the Provider's fiscal year end. For Providers with a December 31 fiscal year end, the OIR Annual Report is due to the OIR on or before May 1 of each year. For Providers with a fiscal year end other than December 31, the OIR Annual Report is due to the OIR within 120 days of the end of the entity's fiscal year.

Additionally, if Providers undergo long-term financing or other occurrences that result in a change to the debt service or leasehold payments due during the fiscal year, then they must submit Form OIR-A3-477 to the OIR. Providers undergoing circumstance that impact debt service or leaseholder payments should submit their Form OIR-A3-477 to the OIR within ten days from the date of closing on the new financing or change in the amount of payments due during the fiscal year.

New Providers commencing operations are required to submit an updated version of Form OIR-A3-477, and its supporting schedules, no later than 30 days before the Provider requests the release of moneys held in escrow pursuant to Section 651.023(6), Florida Statutes. The Provider should reference the update to the MLR calculation in the Periodic Filing requesting the release of initial entrance fees. If the Provider is requesting its release of initial entrance fees pursuant to Section 651.023(6), Florida Statutes, before the OIR Annual Report has been filed, then the Provider should submit Form OIR-A3-477 in the Periodic Filing requesting the release of funds.

WHT was regulated by the OIR, as WHT was the holder of the Certificate of Authority (the "**University Village COA**") issued by the OIR. The OIR regulates CCRC Providers as specialty insurers, while the Agency for Health Care Administration regulates the provision of healthcare. As a continuum of care organization, the COA established WHT as the approved provider ("**University Village Provider**") of continuing care, per Chapter 651 of the Florida Statues, for University Village.

The operations on the property owned by WNT, the assisted living facility and the skilled nursing facility, were licensed and regulated by the Florida Agency for Health Care Administration ("**AHCA**"), a Florida regulatory organization separate and distinct from the OIR. WNT did not require payment of an entrance fee or require a residential contract for continuing care, as the facility did not offer the continuity of care. As such, WNT is not subject to regulations as provided by the OIR.

The operations on the property owned by WNT, the assisted living facility and the skilled nursing facility, were licensed and regulated by AHCA, a Florida regulatory organization separate and distinct from the OIR. WNT did not require payment of an entrance fee or require a residential contract for continuing care, as the facility did not offer the continuity of care. As such, WNT is not subject to regulations as provided by the OIR.

Collectively, the physical assets owned by WHT, WHT II, and WNT composed a 32-acre campus known as "**University Village.**" University Village was a continuing care senior living and residential healthcare campus located in Tampa, Florida consisting as of March 31, 2014, of independent living apartments, independent living villas, assisted living beds, and skilled nursing beds. Since opening in phases from 1988 to 1991 University Village had struggled to achieve financial success due to persistent occupancy and operating challenges leading to stressed liquidity. These challenges were only increasing as the "first generation" of residents began to fully turn over (something that happens at Continuing Care Retirement Communities ("**CCRCs**") after 10-15 years).

### III.B.    Regulations

Pursuant to Section 651.035, Florida Statutes, a Provider in Florida must maintain a minimum liquid reserve ("**MLR**"). A MLR is a "liquidity enforcement mechanism" to financially protect existing and prospective residents of a Provider by enforcing the Provider to maintain available funds to be used for specified purposes, as detailed in Section 651.035, Florida Statutes. The MLR includes three components – a debt service

reserve, operating reserve, and a capital asset renewal and replacement reserve. The three components of the MLR are designed like legs of a stool to ensure sustainable residency for residents of a Provider, as they move through the continuum of care from their initial contract date to the move into an independent living unit and finally to the date of contract termination, which often includes a settlement of any entrance fee refund paid. The MLR is designed and enforced with the Provider resident (and by extension their families and the general public) in mind. Due to the particularities of the Adversary Proceeding, the Rebuttal Report is primarily focused on the debt service reserve component of the MLR, but each component is of equal relevance to a Provider.[2]

The debt service reserve is calculated to meet the "Debt Reserve Requirement" established by Section 651.035(2)(a), Florida Statutes, relating to the debt of the Provider which includes the following:

   a. Aggregate amount of all principal and interest payments due during the fiscal year on any mortgage loan or other long-term financing of the facility, including property taxes as recorded in the audited financial statements required under Section 651.026, Florida Statues. If principal payments are not due during the fiscal year, the Provider must maintain in escrow as a minimum liquid reserve an amount equal to interest payments due during the next twelve months on any mortgage loan or other long-term financing of the facility, including property taxes; and,
   b. Any leasehold payments and all costs related to such payments.

In addition to being accessible to the Provider, as defined by the OIR, and debtor associated with the necessitated MLR fund, the MLR funds may be accessible under certain circumstances, as part of an acquisition of the Provider or as part of a refinancing event. However, financing activities of non-Providers do not result in MLR funds being accessible, regardless of their purpose.

The concept of a state regulatory agency requiring a "liquidity enforcement mechanism", like an MLR, emerged in various ways across the United States soon after CCRCs, also referred to as life plan communities, were developed as a vibrant industry. Continuing care itself is a relatively young concept. Prior to the 1950s, seniors did not live as long as they do today, and family and economic dynamics led to most seniors living their final years in close proximity to younger family members. The origin of the non-profit CCRC is deeply rooted in religious and social charitable organizations, which would often create adequate places to take care of otherwise isolated or indigent individuals. The broadly defined "senior living industry" or "senior housing industry" emerged more widely in the 1970s. During this time, the senior population was rising as many seniors were living longer and had more access to healthcare and financial tools to support more independent lifestyles – a luxury that was much less pervasive for prior generations.

Like any new industry with rising economic prospects, the initial wave of interest and opportunity led to higher risk taking and less stable business models. The internet technology market bubbles of the 1990s and early 2000s is a relevant parallel. As advances in healthcare continued and seniors could now independently maintain a vibrant lifestyle well into their 90s, the economic case for the industry grew rapidly. With

this reality, many organizations and real estate developers aggressively pushed into the industry, without fully understanding the complex dynamics of the continuing care model.

While there are many, one helpful example of this misunderstanding would be that until the 2000s, professional actuaries were not routinely relied on in the financial planning of a CCRC. The average life expectancy of a resident often proved much longer than anticipated and any business model requiring liquidity from "turnovers" (re-sales of previously occupied independent living units) was rapidly exposed with many quick failures. The attraction of the general business case also led to overdevelopment resulting in too much supply, leaving failed operators and vacant buildings. States were often left to intercede and restructure debt or obligations to residents, an expensive undertaking. The negative, and often tragic, consequences of people in their final stages of life being failed by overzealous actors in an under-regulated industry required action from the general public and policy makers. It became imperative to create solutions that would help ensure any senior who chose to buy into a continuing care product would be protected and cared for through their final years.

Given the large senior population and historical retirement destination nature of the the state of Florida, policy makers saw the need to develop statutes and regulations to protect existing and prospective residents of a Provider. What is now known as Chapter 651 of the Florida Statutes is still a model around the United States, as other states recognize that Florida understands the continuing care model. FORVIS is routinely contacted by other states with growing continuing care industries to provide our expertise on the Florida MLR processes, most recently South Carolina in 2022.

Through "black box" style analysis of failed Provider's liquidity problems, it became apparent that cash issues could be summarized between three general areas: debt compliance, operations, and building and property upkeep. A Provider that could only afford to pay off their debt, but not keep operations at an adequate level, was not sustainable. A Provider that put off regularly needed property upkeep and maintenance as a way to stay current with their vendors and lenders was also not viable long term. As such, the Florida policy makers prescribed a three-pronged mechanism for Providers to be equipped to handle these three areas simultaneously and in perpetuity. Providers would have to reserve appropriate amounts of liquidity specifically related to these three areas to ensure there would be enough cash available to continue operations and sustain economic viability of the CCRC. The three prongs of the MLR work together with a focus on viability of a Provider as current residents phase out and new residents enter the continuum of care.

The function of the MLR is mirrored to other trustee-held funds seen in home mortgages and debt compliance (escrows). Cash is literally set aside for specific purposes as a buffer in the event difficult economic issues arise as a way to safeguard residents. The reality of these reserve requirements also serve as a barrier to entry for prospective Providers. Any prospective Provider that does not have a viable enough business model to sustain a marketable product, while setting aside cash in the MLR, would not have an acceptable application to the OIR. Therefore, the MLR provides not only financial value for the

operators and their stakeholders, but also security and peace of mind to the residents during their last years of their lives. To put in perspective how well understood and scrutinized a Provider's MLR position in Florida is, audited balance sheets of a Provider often have a separate line devoted to the MLR. This balance sheet category is among the most scrutinized categories in a Provider's financial statements, particularly for Providers struggling with operation or liquidity metrics. How to access or free up any excess funds in an MLR is a common topic of Providers, particularly those in stressed business situations. While perhaps not even the most critical injury in the Adversary Proceeding – the idea that using MLR funds would be undertaken separately without the Provider leading the decision making and practical application seems entirely unreasonable and unlikely, aside from neglectful or nefarious behavior by the party using the MLR funds.

While there are annual revisions and adjustments concerning regulation of CCRCs, including adjustments and revisions to the administration of the MLR, for purposes of the Rebuttal Report, all references to MLR and CCRC regulations are as of March 31, 2014, the date of the Alleged Injury. In paragraph I.G., I will state the actual statute with relevant commentary.

Per Section 651.035, Florida Statutes, a Provider may satisfy the MLR requirements by obtaining a clean, unconditional, irrevocable letter of credit that meets the following requirements:

1. The letter of credit must be issued by a financial institution participating in the State of Florida Treasury Certificate of Deposit Program and must be approved by the OIR before issuance and before any renewal or modification thereof. At a minimum, the letter of credit must provide for: a. Ninety days' prior written notice to both the Provider and the OIR of the financial institution's determination not to renew or extend the term of the letter of credit; b. Unless otherwise arranged by the Provider to the satisfaction of the OIR, deposit by the financial institution of letter of credit funds in an account designated by the office no later than thirty days before the expiration of the letter of credit; and c. Deposit by the financial institution of letter of credit funds in an account designated by the OIR within four business days following written instructions from the OIR that, in the sole judgment of the OIR, funding of the minimum liquid reserve is required.

2. The terms of the letter of credit must be approved by the OIR and the long-term debt of the financial institution providing such letter of credit must be rated in one of their top three long-term debt rating categories by either Moody's Investors Service, Standard & Poor's Corporation, or a recognized securities rating agency acceptable to the office.

3. The letter of credit must name the OIR as beneficiary. Notwithstanding any other provision of this section, a Provider using a letter of credit, pursuant to the herein requirements, shall at all times have and maintain in escrow an operating cash reserve equal to two months' operating expenses as determined pursuant to Section 651.026, Florida Statutes. If the issuing financial institution no longer participates in the State of Florida Treasury Certificate of Deposit Program, such

12

financial institution shall deposit as collateral with the department eligible securities, as prescribed by Section 625.52, Florida Statutes, having a market value equal to or greater than 100 percent of the stated amount of the letter of credit.

In facilities where not all residents are under continuing care or continuing care at-home contracts, the reserve requirements of the below three reserve accounts shall be computed only with respect to the proportional share of operating expenses that are applicable to these residents. For purposes of the MLR calculations, the proportional share shall be based upon the ratio of residents under continuing care or continuing care at-home contracts to those residents who do not hold such contracts.

### III.D.     University Village Minimum Liquid Reserve Accounts[2]

As relevant to WHT, the MLR of the University Village Provider must consist of the following reserve:

1.  *Debt Service Reserve.* A debt service reserve calculated to meet the "Debt Reserve Requirement" established by Section 651.035(1)(a), Florida Statutes, which is to include the following:

    a.  Aggregate amount of all principal and interest payments due during the fiscal year on any mortgage loan or other long-term financing of the facility, including property taxes as recorded in the audited financial statements required under Section 651.026, Florida Statues. If principal payments are not due during the fiscal year, the Provider must maintain in escrow as a minimum liquid reserve an amount equal to interest payments due during the next twelve months on any mortgage loan or other long-term financing of the facility, including property taxes; and
    b.  Any leasehold payments and all costs related to such payments.

If the Provider has any outstanding indebtedness that requires a debt service reserve to be held in escrow pursuant to a trust indenture or mortgage lien on the facility and for which the debt service reserve may only be used to pay principal and interest payments on the debt that the debtor is obligated to pay, and which may include property taxes and insurance, the Provider may include such debt service reserve in computing the MLR needed to satisfy the MLR requirement per Section 651.035, Florida Statues. If such is true, the Provider is to furnish the OIR with a copy of the agreement under which such debt service is held, together with a statement of the amount being held in escrow for the debt service reserve, certified by the lender or trustee and the Provider. The trustee shall provide the OIR with any information concerning the debt service reserve account upon request of the Provider or OIR.

In facilities that have voluntarily and permanently discontinued marketing continuing care and continuing care at-home contracts, the OIR may allow a reduced debt service reserve as required for debt service reserve funds based upon the ratio of residents under

13

continuing care or continuing care at-home contracts to those residents who do not hold such contracts if the OIR finds that such reduction is not inconsistent with the security protections intended by Chapter 651 of the Florida Statues. In making this determination, the OIR may consider such factors as the financial condition of the facility, the provisions of outstanding continuing care and continuing care at-home contracts, the ratio of residents under continuing care or continuing care at-home contracts to those residents who do not hold such contracts, the current occupancy rates, the previous sales and marketing efforts, the life expectancy of the remaining residents, and the written policies of the board of directors of the provider or a similar board.

If principal and interest payments are paid to a trust that is beneficially held by the residents as described in Section 651.023(7), Florida Statutes, the office may waive all or any portion of the escrow requirements for mortgage principal and interest contained in subsection (1) if the OIR finds that such waiver is not inconsistent with the security protections intended by this chapter.

2. *Operating Reserve.* The purpose of Section 651.035(1)(c), Florida Statutes is to serve as a mechanism and financial buffer to support Providers during financially difficult periods. Adequate reserves can protect Providers from the lower-than-expected attrition/turnover and occupancy, as well as higher than expected fixed and variable costs, such as staffing. Providers are often challenged during one or more of the following circumstances: slower than assumed initial fill up the community through stabilization; natural disasters, such as hurricanes or flooding; pervasive industry challenges, such as a pandemic or a worse-than-expected flu season; labor issues leading to higher wages and other inflationary challenges; reputational hits, including resident- or regulatory body-led litigation; and, the inability to accept new residents for any period of time, which may occur as a penalty when a Provider is found out of compliance with the OIR regulations. The Operating Reserve component of Section 651.035(1)(c), Florida Statues provides a buffer to maintain baseline operational service for when things do not go as planned, which in the continuing care industry is what can be expected.

Per Section 651.035(1)(c), Florida Statutes, Providers are to calculate their operating reserve requirement by using a 12-month period; however, approaches used historically in other states have included setting reserves based on net worth requirements established by the respective state.

An operating reserve, as calculated to meet the "Operating Reserve Requirement" established by *Section* 651.035(1)(c), Florida Statutes in an amount equal to 30%, for the first 12 months of operations and 15% thereafter, of "Total Annual Operating Expenses", excluding, depreciation, amortization, interest, taxes, insurance, and certain extraordinary expenses, as set forth in the annual report filed pursuant to Section 651.026, Florida Statutes. Total Annual Operating Expenses shall be determined by averaging the total annual operating expenses over the preceding three-year period, as reported on the entity's annual report filing. The operating reserve shall be in an unencumbered account held in escrow for the benefit of the residents. Such funds may not be encumbered or

subject to any liens or charges by the escrow agent or judgments, garnishments, or creditors' claims against the provider or facility.

    a. For new CCRCs – for the first twelve months of operation, an amount equal to thirty percent of the total operating expenses per the project's feasibility study, which is required by Section 651.023, Florida Statutes. Annually thereafter, an amount equal to fifteen percent the total operating expenses as reported in the annual report filed pursuant to Section 651.026, Florida Statues.

    b. For CCRCs that have been in operation for more than twelve months – total annual operating expenses shall be determined by averaging the total annual operating expenses reported to the OIR by the number of annual reports filed with the OIR within the preceding three-year period subject to adjustment if there is a change in the number of facilities owned.

Total annual operating expenses include all expenses of the facility except the following: (a) depreciation and amortization; (b) interest and property taxes as recorded in the audited financial statements required under Section 651.026, Florida Statues; (c) extraordinary expenses that are adequately explained and documented in accordance with generally accepted accounting principles; (d) liability insurance premiums in excess of those paid in calendar year 1999; and,(e) changes in the obligation to provide future services to current residents.

    3. *Renewal and Replacement Reserve*. Renewal and replacement reserve as calculated to meet the "Replacement Reserve Requirement" established by Section 651.035(1)(d), Florida Statutes, which will be maintained in an amount equal to 15 percent of the Community's accumulated depreciation, based on the audited financial statement required to be filed pursuant to Section 651.026, Florida Statutes not to exceed 15 percent of its average operating expenses during the immediately preceding three-year period. For a Provider who is an operator of a facility but is not the owner and depreciation is not included as part of the provider's financial statement, the renewal and replacement reserve required herein must equal fifteen percent of the total operating expenses of the provider, as described in this section.

Another purpose of Section 651.035, Florida Statutes is to protect residents as they move through the continuum of care and to safeguard their financial investment in a CCRC, like insurance or retirement fiduciary standards. This is perhaps most evident from the capital reserve and replacement component of the MLR requirement, as included in Section 651.035(1)(d), Florida Statutes. The reserve and replacement component of the requirement is a fund designated to the upkeep and replenishment of the physical plant and related facilities and systems of a CCRC. A few uses of this fund could include renovations to common spaces and residential units, replacement of systems (i.e., HVAC, technological infrastructure, etc.), and maintaining and updating the landscape.

If a resident enters a nursing home, their average life expectancy is less than three years, and often much shorter. That resident would not be personally impacted by a nursing home that did not continually replenish and maintain the property for years to come. If a

resident enters a continuing care Provider contract beginning in an independent living unit, their average life expectancy is greater than 10 years. This resident would be directly impacted by a Provider's failure to adequately maintain the community, both in terms of the time they spend at the Provider moving through the continuum but also from the Provider's ability to re-sell their independent living unit once they move. Even today, it is not unusual that admission fee/entrance fee refunds owed to estates of deceased residents are only paid once their previously occupied residence had been re-sold or turned over – another clear example of the importance of the reserve being focused on the continuing care resident, even after they pass away.

### III.E.    Senior Living Industry Support Organizations

Within the past few decades, the senior living industry has gained interest and popularity among investors, operators, and seniors alike. As such, many lobbying and non-profit associations have emerged to protect and enhance the lives of those participating in the senior living industry. The nation's leading non-profit lobbying organization for aging services is LeadingAge. LeadingAge, established in 1961, is a national community of nonprofit aging services providers and other mission-driven organizations serving older adults. According to LeadingAge, as of 2022, LeadingAge represents more than 5,000 provider members that touch millions of lives every day. LeadingAge and their 38 state partners leverage applied research, advocacy, education, and community-building to make America a better place to grow old.

One of LeadingAge's state partners is LeadingAge Florida. LeadingAge Florida was established in 1963 as a Florida not-for-profit corporation, committed to assisting its members in achieving excellence as providers, businesses, and employers. To accomplish this goal, LeadingAge Florida provides up-to-date regulatory information, a wide variety of educational opportunities, representation before the legislature and government agencies, group purchasing services, and opportunities for networking with peers. LeadingAge Florida is comprised of more than 250 mission-driven communities, representing more than 500 facilities and more than 140 business associates. More than 80,000 seniors live in LeadingAge Florida-member communities. Thousands more are served through home health services, adult day care centers, and other community outreach programs offered by our members. LeadingAge Florida members are economic engines, providing an estimated 25,000 jobs statewide. LeadingAge members are sponsored primarily by community-based nonprofit civic, religious, fraternal, and other mission-driven organizations.

The Florida Life Care Residents ("**FLiCRA**"), established in 1989, is a statewide not-for-profit association made up exclusively of residents living in CCRCs in Florida. According to FLiCRA, as of 2022, FLiCRA membership is comprised of more than 13,000 residents across 55 licensed CCRCs in Florida. Since its inception, FLiCRA has been responsible for and participated in many legislative efforts that benefit CCRC residents. Several issues FLiCRA has worked on have resulted in not only protection for residents, but also significant cost savings to residents. One of the most notable contributions of FLiCRA was its assistance in the development of Section 651.083, Florida Statutes, which outlines

the rights of residents of CCRC Providers. Additionally, the following are a few examples of Florida laws passed or proposals defeated due, in part or whole, to the efforts of FLiCRA:

- Secured right of qualified residents to have prescription drugs provided through retirement programs repackaged for use in the health/nursing center. Residents with retirement prescription programs can now use their plans in health and nursing centers within their communities.
- Supported legislation requiring background checks on prospective employees in nursing facilities and long-term care communities.
- Secured "homestead exemption" benefits for residents of for-profit and leased not-for-profit CCRCs.

### III.F.    CCRC Supply and Demand

According to the LeadingAge Ziegler 200, as of July 2021, there were approximately 2,000 CCRCs comprising more than 22,000 residents across the United States. The image below (Ziegler, July 2021) illustrates the number of not-for-profit and for-profit CCRCs in the United States. Florida (106) has the fifth most CCRCs, compared to all states, just behind New York (199), Ohio (144), California (131), Illinois (109).



Factors influencing market attractiveness to prospective operators include senior demographic trends, adult caregiver demographic trends, occupancy trends, proposed projects, local economic conditions, awareness and acceptability of the product, and velocity of pre-sales at current projects.

Factors that make a community attractive to prospective residents include the cost of an entrance fee and monthly fee or month rent, community amenities, community spaces, unit designs, contract options, marketing plans, distance to healthcare facilities, distance to recreational activities, distance to family, and reputation of the community and Provider.

Demand for the senior living industry has exploded the past few decades, particularly in preparation for an aging population. By 2030, one in five persons in the United States will be over 65, with all members of the Baby Boomer generation being above the age of 65. Nearly 70% of those turning 65 will need some form on long-term care, whether in the community or in a residential care facility. The below image (Ziegler 2021) shows the Baby Boomer population size as a proportion of total population size per market. The South Florida and Central Florida markets have the largest share of baby boomers per total market population. Populations shown range from 17-35%.



Given the retirement destination nature of Florida, as well as the wealth of product options, the senior population size continues to grow rapidly. In 2021, Florida netted more than 78,000 residents ages 60 and above from other states, three times as many as the second-highest state, Arizona. Jacksonville, St. Petersburg, and Tampa all rank among top 20 cities with the largest population of ages 60 and above.

### III.G.    <u>University Village (n/k/a Unisen Senior Living)</u>

As of the date of the Alleged Injury, March 14, 2014, University Village was situated on approximately 32 acres at 12401 North 22nd Street in Tampa, Hillsborough County, Florida. University Village is off of North 22nd Street and located near the University of South Florida. University Village is approximately 9 miles north of downtown Tampa, 30 miles east of Clearwater and 32 miles northeast of St. Petersburg.

The following map depicts the location of University Village, its primary service area, comparable existing retirement communities within and near the primary market area and a 10-mile radius to provide context, as of December 2022.

18

Westport Holdings Tampa, LP and Westport Holdings Tampa II, LP v. Valley National Bank
Keith Appleby (Appleby Law, P.A.) and Jeffrey W. Warren (Liquidating Trustee)          Rebuttal Report



10 Mile Radius



Legend

☆ The Community                          The PMA

**Existing Comparable Entrance Fee Communities in the PMA**
1 – Concordia Village of Tampa

**Comparable Rental Communities in the PMA**
2 – Renaissance North Tampa
3 – Discovery Village at Tampa Palms
4 – Keystone Place at Terra Bella
5 – Arbor Terrace of Citrus Park

**Existing Comparable Entrance Fee Communities Near the PMA**
6 – Canterbury Tower
7 – Westminster Palms
8 – Westminster Shores/Sunrise Point
9 – Westminster SunCoast
10 – Estates at Carpenters

Tampa MSA
Existing Comparable Entrance Fee Communities Near the PMA

Source: Maptitude

University Village consisted of 446 independent living apartments, 46 independent living villages (collectively the "Independent Living Units"), and related common areas. The independent living Apartments and common areas opened in phases between 1988 and 1991 and were composed of two main buildings, an eight-story independent living apartment building and a seven-story independent living apartment building. The independent living villas were constructed between 2004 and 2008. The University Village's commons area included a single-story commons building located between the two independent living buildings. The commons area features a beauty salon, workstations, offices, a library, a snack bar, a kitchen, a bank, an arts and crafts room, a conference center, restrooms, a private dining area, and a 180-seat auditorium with stage. Residents at University Village, in March 2014 and today, are required to pay an entrance fee ("**Entrance Fee**") and a monthly fee for occupancy of a residential unit (the "**Monthly Fee**").

On July 17, 2020, the Tampa Life Plan Village, Inc. acquired the independent living assets of the University Village and assumed certain obligations pursuant to an asset purchase agreement and confirmed plan of liquidation approved by the United States Bankruptcy Court for the Middle District of Florida (the "Acquisition"). The Acquisition was financed with tax-exempt and taxable conduit bonds issued by the Florida Development Finance Corporation (the "Series 2020 Bonds" or "Existing Debt"). The Series 2020 Bonds were issued on a delay-draw basis for the sole purpose of acquiring, rehabilitating, and equipping Unisen Senior Living, funding certain reserve accounts, and paying costs of issuance. In connection with the acquisition of the Community, the Corporation entered into management and development agreements with BRP Senior Housing Management, LLC ("**BRP**") to develop, market, and operate the Community.

*Current Status of the Community*

University Village was rebranded to be known as "Unisen Senior Living" (referred herein as the "**Community**"). Tampa Life Plan Village, Inc. (the "**Corporation**") was formed on January 31, 2020, and is recognized by the Internal Revenue Service as an entity described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. The Corporation is a Florida not-for-profit corporation formed to acquire, renovate, and assume certain liabilities of the Community. The Corporation is managed by a board of directors and has engaged BRP Senior Housing Management, LLC as the day-to-day manager of the Community.

As part of the acquisition, the Corporation was required to pay Assumed Liabilities (the "**Assumed Liabilities**") as set forth in the May 10, 2018, Bankruptcy Court order (the "**Confirmation Order**") (Doc. No. 1016 in the WHT I Bankruptcy Case) confirming the first amended and restated mediated joint plan of liquidation under Chapter 11 of the Bankruptcy Code, as modified (the "**Confirmed Plan**") (Doc. No.1012 in the WHT I Bankruptcy Case). The Assumed Liabilities include the current resident contracts, the allowed unsecured claims, and the deferred allowed administrative expenses. At closing of the Series 2020 Bonds, Tampa Life Plan Village, Inc assumed all future payment and performance of the assumed liabilities in accordance with the Confirmed Plan.

As of December 15, 2022, the Corporation had fully drawn down the Series 2020 Bonds proceeds and completed the initial phase of their planned rehabilitating and equipping of the Community. The first phase of the multi-phase capital improvement plan included capital reinvestment of approximately $23 million funded from the proceeds of the Series 2020 Bond proceeds (the "**2020 Project**"). The 2020 Project included the complete renovation of the Community's common areas (hallways, dining, lobbies, elevators, lounges, and recreation space) and addressed mechanical, electrical, and plumbing deficiencies. The exterior was addressed with additional improvements along with landscaping and parking lots with new landscape, hardscape, and resurfacing. The 2020 Project also included complete renovations of each independent living unit on the first two floors of the eight-story independent living building. The 2020 Project was completed as of October 31, 2022. Despite signs of modest progress emerging from the COVID-19 pandemic, reputational and financial challenges persist.

### III.H.    List of Information

A complete list of external information and documents considered and relied upon throughout the production of the Rebuttal Report is described on Exhibit "B."

# IV.    Rebuttal to Defendant's Expert Report

In addition to any statements in this Rebuttal Expert Report that are or may be deemed opinions relating to the Adversary Proceeding, as opposed to factual or background reliance recitations, I have the following specific rebuttal expert opinions with respect to the Robichaux Report. In reaching these opinions, I have analyzed and evaluated the actions of the Defendant relating to the MLR Transfer and Defendant's taking a security interest in WHT's MLR funds in connection with the March 31, 2014, loan transaction between WNT and the Defendant and the direct consequences of such actions by the Defendant.

The following are not an all-inclusive list of questions or disputes I may have with the Robichaux Report, nor are the items of disagreement presented in order of importance or chronology.

### IV.A.    First Rebuttal Opinion (Not Separately Refinanced)

Within Paragraph III, "Relevant Factual Background," the Robichaux Report states, "On March 31, 2014, the Debtors [WHT and WHT II] and WNT *separately refinanced* University Village…". The use of "refinanced" may be intentional as Form OIR-A3-477 allows MLR funds to be accessed as part of a Provider refinancing or Provider acquisition event. By combining unique financing events between WHT, WHT II, and WNT it can appear that each entity was involved in the others' financings, working together with the same objectives.

After evaluating the timeline and particularities of events, it is my opinion, from an accounting perspective, that the $15,000,000 loan to WNT was not a refinancing of

21

WHT's obligations because it was explicitly stated to be for WNT and WNT's purposes. Separately, WHT closed on a $9,500,000 loan from CPIF to refinance WHT's existing debt.

The fact that WNT had pledged $3,000,000 of the Provider's (WHT's) MLR to complete WNT's financing, does not make the Provider a participant in the WNT Loan (i.e., if a loan for a Provider's Refinancing or a loan for a Provider's Acquisition, as allowable by Form OIR-A3-477, proceeds of the loan would be for purposes of the Provider and be received by the Provider).

The fact that the $3,000,000 was removed from WHT's MLR escrow, which was related to WHT's debt, to be leveraged as collateral for WNT's debt does not align with my experience on such transactions. If all parties had a full knowledge and awareness of the situation, it is likely that the $3,000,000 from WHT's MLR account at Regions Bank to USAmeriBank would not have been transferred.

### IV.B.    Second Rebuttal Opinion (Not Common Ownership)

Within Paragraph III, "Relevant Factual Background," the Robichaux Report states, "The relationship between the two properties is that: i) they have *common ownership*, and…" The usage of "common ownership" here by Robichaux is likely an attempt to support WNT's usage of the MLR funds.

Based on my expert knowledge of and experience with MLR funds, it is my opinion that the "owner" of an entity (or entities) does not have the right to use MLR funds for any of their partners or subsidiaries simply by being an owner. MLR funds belong to the "Provider," as defined and regulated by the OIR.[2] In all respects, the University Village Provider is WHT so all MLR funds had to be WHT's.

### IV.C.    Third Rebuttal Opinion (Operating Reserves Cannot be Used as Collateral)

Within Paragraph IV, "Summary of Allegations," the Robichaux Report states, "It is not unusual for operating reserve funds of this type (e.g., the MLR) to be pledged as loan or bond collateral." I agree that MLR funds can be used for bond collateral.

However, it is my opinion that the funds that are pledged must be those of the Provider and can only be used for loan or bond collateral on the Provider's borrowing. Moreover, the amount of the statutorily required Operating Reserve must be free from debt service pledges or collateral commitments. In this Adversary Proceeding, the funds that were used as collateral were state-regulated set-aside funds belonging to WHT (the University Village Provider) and not the non-Provider WNT and the MLR Transfer could not, given regulations in effect at the time, reduce the required Operating Reserve of the University Village Provider below the required amount.

### IV.D.    Fourth Rebuttal Opinion (Arguing Good Faith Basis)

Within Paragraph VII, "Summary of Allegations," the Robichaux Report states, "Defendant had good faith basis to believe that Florida statute 651.035 – minimum liquid reserve requirement was not violated by the loan or security pledge." However, paragraphs 24-40 of the Robichaux Report describe vivid detail of a series of events that raise significant questions whether the Defendant acted in "good faith" of the alleged wrongdoing.

Mr. Robichaux is providing legal arguments regarding whether or not the Defendant had a "good faith basis" to believe what the statute states. These are not objective expert opinions of an accountant, financial analyst, or healthcare consultant, but are legal arguments that should be left to the attorneys and the trier of fact.

Based on my expert knowledge of and experience with MLR funds, it is my opinion that the discrepancies and genuine questions raised by the Defendant and the WNT Actors indicate that they understood the complexity of the transactions in question and the complexities of regulation of Providers in Florida. In my opinion, the actual actions taken violated the regulations in place for the healthcare industry operating under these regulations. The determination of what is a "good faith basis" is a question for the trier of fact to determine, and not for accounting and financial experts to opine on.

### IV.E.    Fifth Rebuttal Opinion (WNT Not a Provider)

Based on my experience within the Florida senior living industry and particularly Providers, while considering all available information known by me related to the Adversary Proceeding, it is my opinion that WNT is not a Provider and was not the University Village Provider with the right to the MLR funds. Therefore, WNT is not subject to the OIR participation, compliance, or enforcement. Even in the event of an acquisition or refinancing of WHT by the Bartle Group, WNT would not have the ability to use the WHT MLR funds for WNT debt. Further, WNT was not the debtor associated with the debt compliance component of the MLR and as such did not have the right to the funds associated with WHT's MLR.

### IVI.F.    Sixth Rebuttal Opinion (Must be Debt of Provider)

The purpose of Section 651.035(1)(a), Florida Statutes is to ensure a Provider's short- and long-term debt compliance from inception of the debt and throughout its term. While all three components of Section 651.035, Florida Statutes are equally important, it's valuable to note the order of the components are in alignment with the natural business cycle of a CCRC – debt compliance related to inception of the community and other borrowing activities, regular business operations of the community, and maintenance and replacement of capital assets within the community.

Providers are predominantly debt financed with principal often paid by cash flow from residents that enter the community as independent living residents. The financing reality of a Provider is generally well understood throughout the industry. This understanding is,

in part, related to learnings from early industry challenges when Providers struggled to maintain debt compliance if initial move-ins of independent living units were slower than anticipated or if independent living occupancy challenges persisted for prolonged periods of time. The reliance on independent living to sustain operations is universally appreciated by industry professionals, as when residents move through the continuum of care there are higher cost and lower operating margins. As such, nursing care is less profitable than assisted living care, which is less profitable than independent living services. To restate, Section 651.035(1)(a), Florida Statutes is focused on a Provider's ability to achieve and maintain debt compliance, particularly when the Provider is reliant on independent living operations. Provisions of Section 651.035(1)(a), Florida Statutes also serve as a barrier to entry for prospective Providers, as prospective Providers must demonstrate the ability to maintain a MLR through independent living success. This regulation helps weed out risky Providers who would pose a risk to residents.

To the extent funds in an MLR are pledged to any use, whether legal or not, does not affect the purpose or role of the Section 651.035(1)(a), Florida Statutes to responsibly facilitate the stability of a Provider. It also goes without saying, the debt in which compliance is regulated in Section 651.035(1)(a), Florida Statues is the debt held by the Provider. Debt not held by a Provider would therefore not be subjected to Section 651.035(1)(a), Florida Statutes.

In my opinion, the event of a non-provider seeking financing for any purpose, including potentially acquiring the University Village Provider, would not be considered a refinancing or acquisition event by the University Village Provider in terms of MLR fund access. Proceeds of the financing, and resulting debt compliance, would need to be for and go to the University Village Provider for MLR funds to be accessed as part of the University Village Provider's financing event. This is another example of how all funds in the MLR (be it for debt compliance, operating reserve, or reserve and replenishment) are exclusively held for the benefit of current and future residents at the University Village Provider, with any action regarding MLR usage needing to be initiated by the University Village Provider.

### IV.G.    Seventh Rebuttal Expert Opinion (Non-Compliance with MLR Requirement)

Based on our experience within the Florida senior living industry and particularly Providers, while considering all available information known by us related to the Adversary Proceeding, it is my opinion that the non-compliance with the University Village Provider's MLR requirements directly resulted in the OIR issued initial order of suspension (the "**Order of Suspension**") to WHT on February 13, 2015. This was the first of many administrative and legal actions taken by the OIR and AHCA involving University Village. The list of matters complied by the OIR included 16 matters, as of the Chapter 11 petition date.

These administrative and legal actions precluded WHT from entering new continuing care contracts and expedited the decline of the physical status of the University Village

24

facilities, which in turn accelerated the move outs of existing residents thereby reducing occupancy levels and related revenues. The inability of a Provider to enter new contracts is an impossible restriction to sustainable operations. The continued reputational decline led to enormous financial distress and is still, as of the date of the Rebuttal Report, impacting of University Village (n/k/a Unisen Senior Living). The ultimate decline and subsequent bankruptcy of University Village is certainly tied to the events that transpired leading to the Order of Suspension. As a CPA reference, a comparison would be getting a Going Concern opinion on a financial statement audit. Once that occurs, it is usually only a matter of time before there is a business failure as any creditor begins demanding their debt paid. Once a Provider can no longer enter new contracts, failure is nearly guaranteed as the initial impact is on existing residents who realize their investment is not safe and they vacate the community in droves.

# V.   Exhibits

### VI.A.    Keith Seeloff Curriculum Vitae

My curriculum vitae is attached to the back of the Rebuttal Report.

### VI.B.    External Information and Documents Considered

The following is a complete list of external information and documents considered and relied upon throughout the production of the Rebuttal Report.
1. Expert Report of Louis E. Robichaux IV of Ankura Consulting Group, LLC dated April 17, 2023 (the "Robichaux Report").
2. Expert Report and Disclosure of Stanley A. Murphy, CPA/ABV/CFF/CDBY, CVA of Ankura Consulting Group, LLC dated April 17, 2023.
3. Summary Of Support for Aiding and Abetting Claim. Provided by Jeffery Warren.
4. University Village Minimum Liquid Reserve Escrow. Regions Bank. June 22, 2004.
5. The Florida Senate. Title XXXVII, Section 651.035, Florida Statutes (2014). Minimum liquid reserve requirements.
6. The Florida Senate. Title XXXVII, Section 651.033, Florida Statutes (2014). Escrow accounts.
7. Loan Closing Statement $15 Million. USAmeriBank. Westport Nursing Tampa, L.L.C. March 31, 2014
8. Email J. Price to T. Roofner (Re: Florida Statutes 651.035).
9. Email from W. Rabke to T. Kohrn (Re: Westport Nursing Cash Collateral Agreement) 1.
10. Email from W. Rabke to T. Kohrn (Re: Westport Nursing Cash Collateral Agreement) 2.
11. Email J. Price to W. Rabke (Re: Westport MLR OIR Notice Letter) 1.
12. Email W. Rabke to J. Price (Re: Westport MLR OIR Notice Letter) 2.
13. Email J. Price to W. Rabke (Re: MLR Issue).
14. The Florida Senate. Title XXXVII, Section 651.035, Florida Statutes (2014). Minimum liquid reserve requirements (the "**Section 651.035, Florida Statutes**").
15. Draft MLR Notice to the OIR. Williams Mullen. March 2014.

16. MLR Notice to the OIR. Williams Mullen. March 31, 2014.
17. Order of Suspension from the OIR. February 13, 2015.
18. The Florida Senate. Title XXXVII, Section 651.033, Florida Statutes (2014). Escrow accounts.
19. Rebuttal Expert Report of Meredith Benedict, CPA of FORVIS dated July 7, 2023.
20. Tampa Life Plan Village, Inc. Examination of Financial Projection with market Study. December 22, 2022.
21. Tampa Life Plan Village, Inc. Financial Feasibility Study 2020, dated February 27, 2020.

Respectfully submitted July 7, 2023

*Keith R. Seeloff*

Keith Seeloff, CPA
FORVIS, LLP
keith.seeloff@forvis.com
404.575.8992

## KEITH R. SEELOFF, CPA  /  FORVIS, Partner
keith.seeloff@forvis.com  /  **770.330.6413**

## PROFESSIONAL BACKGROUND



Keith is currently the Partner-in-Charge of the FORVIS Healthcare Senior Living Practice, which is part of the FORVIS Healthcare Finance team. He has more than 30 years of experience in the healthcare industry, primarily serving the senior housing sector. The FORVIS Healthcare Finance team offers advisory services such as strategic planning, financial forecasting, market demand analysis, third party reimbursement, operational audits, and systems review. Within the senior housing sector, Keith's team has supported healthcare providers across the country with projects representing more than $19 billion of capital raised and have provided strategic planning, market analysis, volume forecasting, and economic feasibility support for more than 150 unique healthcare markets. Due to his knowledge and experience in healthcare and senior living specifically, Keith has regularly served in litigation support roles including as a subject matter fact and expert witness.

Keith has been a key participant in more than 100 continuing care retirement community development projects, including startup communities, existing campus repositionings, and obligated group financings. Additionally, he has conducted financial analyses of merger and acquisition transactions and financing structures to include valuations, due diligence, economic feasibility analyses, and market feasibility analyses for proposed and existing healthcare and other retirement housing projects.

Prior to joining FORVIS, Keith worked for an international accounting firm as a consultant in the long-term care industry and an auditor for a Medicare intermediary. He is a member of AICPA and LeadingAge, and is also an accomplished presenter on topics affecting acute care facilities, skilled nursing providers, and home health agencies. He holds a Bachelor of Science in Accounting from Ball State University.

## EDUCATION
- Butler University – Master of Business Administration
- Ball State University – Miller College of Business: Bachelor of Science, Accounting

## LICENSES & MEMBERSHIP
- Certified Public Accountant
- Memberships: AICPA, LeadingAge

## RECENT EXPERT WITNESS EXPERIENCE
- 2023: Keith, as representative of FORVIS, is presently engaged via an engagement letter dated June 8, 2023, to assist in a confidential case as subject matter expert witness.
- 2023: Keith, as representative of FORVIS, was engaged via an engagement letter dated April 12, 2023, to assist Nelson Mullins Riley & Scarborough LLP in connection with reading and commenting on certain agreements and reports related

to a complaint filed against a hospital. The complaint resulted in a settlement provided by the hospital.

- 2021: Keith, as a representative of FORVIS (f/k/a DHG) was engaged via an engagement letter dated July 9, 2021, to assist James W. Thomas of Jackson Kelly, PLLC. The purpose of the engagement was to produce a financial feasibility study to illustrate the financial performance of a hospital maintaining its Critical Access Hospital Designation. Following the production of the financial feasibility, Keith appeared as a fact witness at the Certificate of Need hearing on September 2, 2021.

- 2016: Keith, as a representative of FORVIS (f/k/a DHG), was engaged via an engagement letter dated March 9, 2016, where Keith served as an expert consultant to Michael S. Hino of Pepper Hamilton LLP. The purpose of the engagement was to analyze the impact of refunding residents' entrance fees on a large CCRC's financial obligations and the overall financial health of the CCRC. The CCRC was the defendant.

- 2010: Keith, as a representative of FORVIS (f/k/a DHG), was engaged via an engagement letter dated May 14, 2010, to review the residency and care agreements and analyze monthly service fees of a CCRC located in Greenville, South Carolina.

- 2009: Keith, as representative of FORVIS (f/k/a DHG) was engaged in 2009, for Response to the Rebuttal Report prepared by Vincent Vaccarella - CC-Aventura, Inc., et al. v. The Weitz Company, LLC, et al. Response to Rebuttal Report prepared by Gerontological Services, Inc. and Classic Residence by Hyatt concerning a use of funds/construction cost dispute.

## PRESENTATIONS
- LeadingAge New York 2023: The Future of Health Care Services and Consumer Preferences with Allan Blum
- LeadingAge Virginia 2023: Secrets to a Highly Engaged Board with Melissa Andrews
- LeadingAge Colorado 2022: Good Governance with Meredith Benedict, Tim Johnson
- LeadingAge Georgia 2022: Occupancy and Demand Trends – Senior Living Communities in Georgia
- LeadingAge Virginia 2022: Keep an Eye on the Forest While Being Mindful of the Trees: Board Responsibilities in the Senior Living Environment with Jon Joseph
- LeadingAge National 2021: Good Governance with Larry Minnix and Meredith Benedict
- National Federation of Municipal Analysts 2019: Breakout 6 - Senior Living "P.O.P." with Mary Jane Minier
- Southeast Finance Conference 2021
- Southeast Finance Conference 2020
- Southeast Finance Conference 2019
- Southeast Finance Conference 2018

**PUBLICATIONS**

- New York's CON Law Amended to Require Health Equity Impact Assessment, NY Public Law § 2802-b(1) (2023)
- Pricing Analysis Overview (2023)
- Independent Living Market Snapshots: CO, FL, GA, MS, NC, SC, TX & VA (2023, 2022)
- Independent Living Penetration Rates: One Indicator of Market Demand (2022)
- Capturing the Demand for Assisted Living Services: The Senior Living Challenge (2022)
- CHALLENGE Series / Part III: Be a Rhino Spotter and Keeper (2022)
- CHALLENGE Series / Part II: What to Do with Your Gray Rhino (2021)
- CHALLENGE Series / Part I: Recognize and Define Your Rhino (2021)