# FORV/S



# REBUTTAL EXPERT REPORT OF MEREDITH BENEDICT

Jeffrey W. Warren, as Liquidating Trustee for Westport Holdings Tampa, Limited Partnership and Westport Holdings Tampa II, Limited Partnership

v.

Valley National Bank

United States Bankruptcy Court in the Middle District of Florida Tampa Division Hillsborough County, FL

Case No 8:16-Bk-8167-CED

Adv. Proc. No. 8:20-ap-00007-CPM

JULY 2023

FORVIS is a trademark of FORVIS, LLP, registration of which is pending with the U.S. Patent and Trademark Office

DEFENDANT'S EXHIBIT 11

PENGAD 800-631-6989

# FORV/S

191 Peachtree Street NE, Suite 2700  /  Atlanta, GA 30303
**P** 404.575.8900  /  **F** 404.575.8870
forvis.com

**Keith Appleby, Esq.**
Appleby Law P.A.
4916 W Melrose Ave S
Tampa, FL 33629-5420

Thank you for the opportunity to provide litigation consulting services for Appleby Law, P.A. and Jeffrey W. Warren, as Liquidating Trustee on behalf of Westport Holdings Tampa, Limited Partnership ("**WHT**") and Westport Holdings Tampa II, Limited Partnership ("**WHT II**") (collectively defined as the "**Specified Parties**"), in connection with the matter of Jeffrey W. Warren, as Liquidating Trustee for WHT and WHT II (collectively defined as the "**Plaintiff**") v. Valley National Bank (principal subsidiary to Valley National BankCorp, a New Jersey corporation, as successor by merger to USAmeriBank) (the "**Defendant**"), existing in the United States Bankruptcy Court in the Middle District of Florida, Tampa Division (the "**Adversary Proceeding**").

FORVIS, LLP ("**FORVIS**") has been retained, and I have been designated as a rebuttal expert witness to serve as a senior living subject matter expert in respect to occupancy assumptions and provide opinions, as applicable, related to the Adversary Proceeding and in rebuttal specifically to the 10-Year Budget for University Village for 2014-2023, prepared by Kathleen (Kathy) Burkholder of University Village in approximately March 21, 2014 (the "**University Village 10-Year Projection**"). As such, I developed this report (the "**Rebuttal Report**"), with the support of other FORVIS professionals, to provide opinions regarding the reasonableness of the occupancy projections and associated assumptions related to the alleged injury (the "**Alleged Injury**") of the Plaintiff caused by and attributed to the Defendant. The Rebuttal Report is based on work completed to date, and I reserve the right to supplement the Rebuttal Report, if additional information becomes available. Definitions, regulations, entity descriptions, and other details included in the Rebuttal Report reflect those as of March 31, 2014, unless otherwise stated.

Our services were provided in accordance with the Statement on Standards for Forensic Services promulgated by the American Institute of Certified Public Accountants, and, accordingly, do not constitute a rendering by FORVIS or its partners or staff of any legal advice, nor do they include the compilation, review, or audit of financial statements.

The opinions provided in the Rebuttal Report are not intended to be legal opinions, but rather my professional opinions, based on my experience in the senior living industry and other industry best practices.

FORVIS is a trademark of FORVIS, LLP, registration of which is pending with the U.S. Patent and Trademark Office



The Rebuttal Report is the property of FORVIS and has been prepared solely for the purpose of the Plaintiff for the Adversary Proceeding for the use of the Specified Parties and is not intended for any other use. It should not be used, reproduced, or distributed for any other purpose without my written permission in each specific instance. If the Adversary Proceeding goes to trial, I may prepare demonstratives to present.

Respectfully submitted July 7, 2023

*Meredith Benedict*

Meredith Benedict, CPA
FORVIS
meredith.benedict@forvis.com
303.946.9388

2

# REBUTTAL EXPERT REPORT

## Jeffrey W. Warren as Liquidating Trustee of Westport Holdings Tampa, Limited Partnership and Westport Holdings Tampa II, Limited Partnership
### v.
### Valley National Bank

---

## Assistance to Keith Appleby of Appleby Law, P.A.

July 7, 2023

## CONFIDENTIAL

This report (the "**Rebuttal Report**") is intended solely for the information and use of Keith Appleby of Appleby Law, P.A. and Jeffrey W. Warren, as Liquidating Trustee of Westport Holdings Tampa, Limited Partnership ("WHT") and Westport Holdings Tampa II, Limited Partnership ("WHT II") (the "**Specified Parties**"). The Specified Parties are to use the Rebuttal Report in connection with the claims of Jeffrey W. Warren, as Liquidating Trustee of WHT and WHT II (case No 8:16-bk-8167-CED) (the "**Plaintiff**") against Valley National Bank, principal subsidiary to Valley National BankCorp, a New Jersey corporation, as successor by merger to USAmeriBank (the "**Defendant**") in the Adversary Proceeding No. 8:20-ap-0007-CPM (the "**Adversary Proceeding**"). The Rebuttal Report is intended to be and should not be used by anyone other than the Specified Parties.

**Plaintiff Expert Opinion Report**

TABLE OF CONTENTS

I. Background                                                              5

   I.A.    <u>Engagement Overview</u>                                     5

   I.B.    <u>Assignment</u>                                             5

   I.C.    <u>Alleged Injury</u>                                         6

II. Credentials                                                           8

   II.A.   <u>Expert Qualifications</u>                                  8

   II.C.   <u>Compensation</u>                                           10

III.Information & Documents Considered & Relied Upon                      11

   III.A.  <u>Background</u>                                             11

   III.B.  <u>Relevant Factual Background</u>                            11

IV. Rebuttal to the University Village 10-Year Projections                12

   IV.A.  <u>Units Available for Occupancy</u>                          13

   IV.B.  <u>Fill-up Assumptions</u>                                    14

   IV.D.  <u>Capital Expenditures</u>                                   15

V. Exhibits                                                               15

   VI.A.  <u>Meredith Benedict Curriculum Vitae</u>                     15

   VI.B.  <u>External Information & Documents Considered</u>             16

# I.  Background[1] [2] [3]

### I.A.    Engagement Overview

FORVIS, LLP ("FORVIS") was retained by Keith Appleby of Appleby Law, P.A. ("**Counsel**") and Jeffrey W. Warren, as Liquidating Trustee of Westport Holdings Tampa, LP ("**WHT**") and Westport Holdings Tampa II, LP ("**WHT II**") (the "**Client**") to provide a rebuttal expert witness report for Appleby Law, P.A. and Jeffrey W. Warren, as Liquidating Trustee on behalf of WHT and WHT II (collectively defined as the "**Specified Parties**"), in connection with the matter of Jeffrey W. Warren, as Liquidating Trustee for WHT and WHT II (collectively defined as the "**Plaintiff**") v. Valley National Bank (principal subsidiary to Valley National BankCorp, a New Jersey corporation, as successor by merger to USAmeriBank) (the "**Defendant**"), existing in the United States Bankruptcy Court in the Middle District of Florida, Tampa Division (the "**Adversary Proceeding**").

I was designated as a rebuttal expert witness to serve as a senior living subject matter expert in respect to occupancy projections and associated assumptions and provide opinions as applicable, related to the Adversary Proceeding and in rebuttal specifically to the 10-Year Budget for University Village for 2014-2023, prepared by Kathleen (Kathy) Burkholder ("**Burkholder**") of University Village as a representative of Management of University Village ("**Management**") in approximately March 21, 2014 (the "**University Village 10-Year Projection**"). The University Village 10-Year Projection was used to support opinions provided in the Expert Report and Disclosure of Stanley A. Murphy, CPA/ABV/CFF/CDBY, CVA of Ankura Consulting Group, LLC dated April 17, 2023 (the "**Murphy Report**").

As such, I developed this report (the "**Rebuttal Report**"), with the support of other FORVIS professionals, to provide opinions regarding the reasonableness of the occupancy projections and associated assumptions related to the alleged injury (the "**Alleged Injury**") of the Plaintiff caused by and attributed to the Defendant. The Rebuttal Report is based on work completed to date, and I reserve the right to supplement the Rebuttal Report, if additional information becomes available. Definitions, regulations, entity descriptions, and other details included in the Rebuttal Report reflect those as of March 31, 2014, unless otherwise stated.

### I.B.    Assignment

The Rebuttal Report, which sets forth my opinion and reasoning, is based upon the information considered and relied upon and the assumptions set forth in the Rebuttal Report, as of the date of the Rebuttal Report. I reserve the right to supplement or amend the Rebuttal Report based on additional information made available to me, including, but

---

[1] Expert Report of Louis E. Robichaux IV of Ankura Consulting Group, LLC dated April 17, 2023 (the "Robichaux Report").

[2] Expert Report and Disclosure of Stanley A. Murphy, CPA/ABV/CFF/CDBY, CVA of Ankura Consulting Group, LLC dated April 17, 2023.

[3] Summary Of Support for Aiding and Abetting Claim. Provided by Jeffery Warren.

not limited to, additional documents produced, testimony, or other evidence presented in the matter. References to "I", "me", "we", or "our" in the Rebuttal Report refer to me personally or other FORVIS professionals working on this engagement at my direction and under my supervision.

Our services do not constitute a rendering by FORVIS or its partners or staff of any legal advice, nor do they include the compilation, review, or audit of financial statements.

The Rebuttal Report is the property of FORVIS has been prepared solely for the purpose of the Plaintiff for the Adversary Proceeding for the use of the Specified Parties and is not intended for any other use. It should not be used, reproduced, or distributed for any other purpose without my written permission in each specific instance. If the Adversary Proceeding goes to trial, I may prepare demonstratives to present.

### I.C.    Alleged Injury

As part of normal business financing activity, WHT established and funded an escrow account at Regions Bank on January 8, 2004, to comply with Section 651.035, Florida Statutes.[4] As set-aside funds regulated by the Florida Office of Insurance Regulation ("**OIR**"), these funds were not available for use to any other entity, whether associated or unassociated, with WHT, including Westport Nursing Tampa, LLC, a Florida limited liability company ("**WNT**").[5] [6] WHT owned all of the member interests of WNT.

On March 31, 2014, WNT entered into a $15,000,000 loan with USAmeriBank.[7] USAmeriBank, effective January 1, 2018, merged with Valley National BankCorp and is now known as Valley National Bank. The loan is defined herein as the "**USAB Loan**". Collaborators at USAmeriBank agreed to advance $15,000,000 to WNT with the requirement that $3,000,000 in cash was deposited with USAmeriBank and pledged to secure the USAmeriBank Loan.[8] Employees and agents of WNT, and individuals and entities seeking to acquire the member interests of WNT from WHT, on one hand (collectively, the "**WNT Actors**"), and USAmeriBank, on the other hand, collaborated, among other activities, to (a) transfer the ownership of the member interests in WNT from WHT (the "**WNT Membership Transfer**") to a group of investors led by John Bartle (the "**Bartle Group**") and (b) transfer approximately $3,000,000 from WHT's existing MLR escrow account located at Regions Bank to an account established at USAmeriBank (the "**Cash Collateral Account**") to be used by USAmeriBank as cash collateral for the USAB Loan (the "**MLR Transfer**").[9] [10] [11] [12] [13] Although the Cash Collateral Account was named

---

[4] University Village Minimum Liquid Reserve Escrow. Regions Bank. June 22, 2004.
[5] The Florida Senate. Title XXXVII, Section 651.035, Florida Statutes (2014). Minimum liquid reserve requirements.
[6] The Florida Senate. Title XXXVII, Section 651.033, Florida Statutes (2014). Escrow accounts.
[7] Loan Closing Statement $15 Million. USAmeriBank. Westport Nursing Tampa, L.L.C. March 31, 2014.
[8] Email J. Price to T. Roofner (Re: Florida Statutes 651.035).
[9] Email from W. Rabke to T. Kohrn (Re: Westport Nursing Cash Collateral Agreement) 1.
[10] Email from W. Rabke to T. Kohrn (Re: Westport Nursing Cash Collateral Agreement) 2.
[11] Email J. Price to W. Rabke (Re: Westport MLR OIR Notice Letter) 1.
[12] Email W. Rabke to J. Price (Re: Westport MLR OIR Notice Letter) 2.
[13] Email J. Price to W. Rabke (Re: MLR Issue).[13]

as an account of WNT, the Cash Collateral Account was controlled solely by USAmeriBank and WNT could not access the Cash Collateral Account.

WNT was, and is, a separate legal entity from WHT. As part of the understanding of the employees and agents of WNT, and individuals and entities seeking to acquire the member interest of WNT from WHT (collectively, the "**WNT Actors**"),  of the OIR's oversight of providers in Florida ("**Providers**"), they knew in order to access MLR-related funds, approval from the OIR was needed.[5][6][7][8][9] A "Provider" of continuing care is defined as the owner or operator, pursuant to a contract, furnishing shelter and nursing care or personal services to a resident who resides in a facility, whether such nursing care or personal services are provided in the facility or in another setting designated in the contract for continuing care, by an individual not related by consanguinity or affinity to the resident, upon payment of an entrance fee.[2]

It is alleged that in order to achieve the MLR Transfer, the WNT Actors and Defendant led the OIR to believe that the Provider for University Village (WHT) was seeking permission to access the MLR funds.[4][6][14][15] In redefining the entities names to "ProviderLP" for WHT and "ProviderLLC" for WNT, it is likely the OIR would have believed the correct "Provider" of University Village (WHT) was the entity seeking access to the funds.[4][6][8][9] However, WNT was not regulated by the OIR and not subject to Section 651.035, Florida Statutes; thus WNT did not require or have an MLR and would not have been thought to be contacting the OIR in such case.

A MLR must be maintained and, if at any time, it is not maintained, it must be replenished to its minimum level as soon as practically possible.[2] As included in Section 651.035(4), Florida Statutes, the OIR may extend the time for compliance, upon approval of a plan for fulfilling the requirements of Section 651.035, Florida Statutes and upon demonstration by the Provider of an annual increase in liquid reserves.[2] The penalty for not maintaining MLR funds may include an order of suspension by the OIR, terminating the Provider's ability to accept any new continuing care contracts from prospective residents. This penalty is completely detrimental to a Provider and will immediately obliterate liquidity, as new contracts are the lifeblood of a Provider. On February 13, 2015, the OIR issued an initial order of suspension (the "**Order of Suspension**") to WHT, based upon violations of the requirements of Chapter 651, Florida Statutes.[16]

The alleged damages to WHT caused by the MLR Transfer and the WNT Membership Transfer are generally referred to in the Rebuttal Report as the "**Alleged Injury.**"

---

[14] Draft MLR Notice to the OIR. Williams Mullen. March 2014.
[15] MLR Notice to the OIR. Williams Mullen. March 31, 2014..
[16] Order of Suspension from the OIR. February 13, 2015.

# II.  Credentials

### II.A.    Expert Qualifications

I am a Director with the FORVIS Healthcare Finance team. I have more than 25 years of experience in the healthcare industry, primarily serving the senior housing sector. I have been a key participant in more than 100 life plan communities' development projects, including startup communities, existing campus repositioning, and obligated group financings. I have experience performing advisory services in the areas of market positioning and feasibility assessments, strategy, and other planning analyses for senior living providers. My career has focused on helping clients with various aspects of the strategic planning and development process of senior living communities, including expansion and campus repositioning projects. I have experienced in the preparation of financial feasibility studies and market demand analysis for proposed and existing CCRC entities.

FORVIS ranks among the top 10 public accounting firms in the nation and is a leading professional services firm offering assurance, tax, and advisory services for clients in all 50 states and internationally. FORVIS was created by the merger of equals between BKD, LLP and Dixon Hughes Goodman LLP, effective June 1, 2022. FORVIS includes more than 530 partners and principals and nearly 6,000 team members. FORVIS serves 72 unique markets across more than 10 distinctive industries.

Within the healthcare industry, the FORVIS Healthcare Practice is the provider of choice to more than 6,100 healthcare organizations. The FORVIS Healthcare Practice is comprised of more than 950 team members, including 175 Partners, Principals, Managing Directors, and Directors, offering 12 unique advisory capabilities. The twelve capabilities offered by the FORVIS Healthcare Practice include: Analytics, ESG & Climate Risk, Finance, Forensics & Valuation, Internal Audit & Risk Advisory, IT Risk & Compliance, Performance Improvement. Strategy, Transaction Advisory Services, Reimbursement & Regulatory, Tax Advisory, and SOC & HITRUST.

Collectively, the Finance, Performance Improvement, Regulatory Compliance & Reimbursement, and Strategy capabilities make up the FORVIS Healthcare Consulting Practice. The FORVIS Healthcare Consulting Practice is a portfolio designed specifically to address a healthcare organizations' unique and complex challenges and opportunities. The FORVIS Healthcare Consulting Practice is comprised of more than 175 professionals and serves the entire continuum of care, including 25% of the Top 20 Hospitals in the US. As ranked by Modern Healthcare, the FORVIS Healthcare Consulting Practice was the 9th largest healthcare consulting firm and 93% of FORVIS Healthcare Consulting Practice clients would recommend its services.

Within the FORVIS Healthcare Consulting Practice is the FORVIS Senior Living Practice, which focuses on the aging services continuum – life plan communities, independent living communities, assisted living facilities, skilled nursing facilities, and home- and community-based services. The Senior Living Practice has a comprehensive staff of 18

8

professionals, who exclusively serve the senior living and care industry, devoting their time to the following services: strategic and development planning, campus repositioning, business advisory services, financial feasibility and market analyses, operational assessments, and other performance improvement. Collectively, the Senior Living Practice has supported healthcare providers across the country with projects representing more than $19 billion of capital raised and have provided strategic planning, market analysis, volume forecasting, and economic feasibility support for more than 150 unique healthcare markets.

The FORVIS Senior Living Practice has significant experience providing feasibility and consulting services to non-profit clients and for-profit senior living developers including start-up entrance fee, rental independent living, assisted living and memory support communities financing with debt in the state of Florida. The HCC Senior Living Practice has led several feasibility studies and preliminary certificate of occupancy related work for Providers in the state of Florida, resulting in a detailed understanding of (a) various regulations promulgated by the OIR and (b) proper calculations and use in the MLR in Florida. Recent OIR submissions/studies the FORVIS Senior Living Practice has completed include:

- 12/2022: Examination of a Projection with Market Study for Tampa Life Plan Village. The Examination included plans for short-term bridge financing of $8,100,000 in proceeds and a subsequent refinancing of $91,787,000 in proceeds, for which funds would be used to redeem existing debt and fund renovations of existing independent living units.
- 09/2022: Feasibility Study for Cypress Cove at HealthPark Florida, Inc., Fort Myers. The Feasibility Study included plans for financing of $68,664,000 in proceeds to be used for the development and construction of 48 new independent living units.
- 01/2022: Feasibility Study for Green Cay Life Plan Village, Inc. (Green Cay Life Plan Village). The Feasibility Study included plans for BANS financing of $32,000,000 in proceeds to be used for pre-development of 174 independent living units, 16 assisted living units, 16 memory care units, and associated common areas.
- 07/2021: Feasibility Study for The Mayflower, Winter Park. The Feasibility Study included plans for financing of $80,000,000 in proceeds to be used to refund existing debt and fund the development and construction costs for a new healthcare building, 50 new independent living units, new common areas, and the renovation of existing assisted living units.
- 04/2021: Feasibility Study for Glenridge at Palmer Ranch, Sarasota. The Feasibility Study included plans for financing of $93,797,000 in proceeds to be used to refund existing debt and fund routine capital expenditures, a renovation and expansion project to common areas, and predevelopment for new independent living units.
- 03/2021: Feasibility Study for DeLand Senior Care, LLC (The Alliance Community for Retirement Living). The Feasibility Study included plans for financing of $2,640,000 in proceeds to be used for a 285-unit independent living, assisted living, and nursing acquisition in DeLand, Florida.

- 10/2020: Feasibility Study for The Mayflower, Winter Park. The Feasibility Study included plans for financing of $61,287,000 in proceeds to be used for the development and construction of 60 new skilled nursing beds, 24 new memory care units, and new related therapy and common areas.
- 02/2020: Feasibility Study for Tampa Life Plan Village, Inc (University Village). The Feasibility Study included plans for financing of $59,699,000 in proceeds to be used for a 491-unit independent living acquisition in Tampa, Florida.
- 09/2019: Feasibility Study for CCRC Development Corporation (Legacy Pointe at UCF). The Feasibility Study included plans for financing of $168,265,000 in proceeds to fund the development and construction of a 300-unit start-up independent living, assisted living, memory support, and nursing project in Oviedo, Florida.
- 11/2018: Feasibility Study for Fleet Landing, Atlantic Beach. The Feasibility Study included plans for financing of $117,702,000 in proceeds to be used for the development and construction of 128 new independent units, 38 new assisted living units, 30 new skilled nursing units, new dining and social spaces, and expanded and renovated common areas.
- 12/2017: Feasibility Study for Southwest Florida Retirement Center, Inc. (Village on the Isle). The Feasibility Study included plans for financing of $70,000,000 in proceeds to be used for the construction and reconfiguration of existing spaces to include 46 new independent living apartments, four new nursing beds, and a net increase of seven assisted living and memory support units, and health center project in Venice, Florida.

Prior to joining FORVIS, I worked for an international accounting firm and a senior housing and care developer. I am a member of AICPA and LeadingAge and am also an accomplished presenter on topics affecting the senior living industry, acute care providers, skilled nursing providers, and home health agencies. A list of my presentations and publications is included in my Curriculum vitae attached as Exhibit "A."

I am a magna cum laude graduate and holds B.S. degrees in finance and international business from Florida State University and in accounting from University of South Florida.

## II.C.      Compensation

FORVIS is being compensated for my time at the rate of $700 per hour and the time of other FORVIS professionals working on this matter at hourly rates ranging between $300-$640. The compensation is not contingent on the outcome of the Adversary Proceeding.

# III.  Information & Documents Considered & Relied Upon

In addition to my education, experience, and consultation with Counsel and the Client, I considered the following when developing my opinions:

### III.A.    Background[1][2][3][5]

The Adversary Proceeding is between the Plaintiff, Jeffrey W. Warren, as Liquidating Trustee for WHT and WHT II, represented by his Counsel, and Defendant, Valley National Bank, principal subsidiary to Valley National BankCorp, as successor by merger to USAmeriBank, represented by McGlinchey Stafford PLLC.

WHT, a Delaware limited partnership, owned the 446 independent living apartments and related operations within University Village. WHT II, a Delaware limited partnership and sister company to WHT, owned the real property housing the 46 independent living villas within University Village. WHT operated WHT and WHT II.

WNT owned the real property housing the 110 assisted living beds and 120 skilled nursing beds within University Village and leased its assets to other entities that held licenses to operate and did operate those facilities. WHT was the sole member of WNT.

Collectively, the physical assets owned by WHT, WHT II, and WNT composed a 32-acre campus known as "**University Village.**" University Village was a continuing care senior living and residential healthcare campus located in Tampa, Florida consisting as of March 31, 2014, of independent living apartments, independent living villas, assisted living beds, and skilled nursing beds. Since opening in phases from 1988 to 1991 University Village had struggled to achieve financial success due to persistent occupancy and operating challenges leading to stressed liquidity. These challenges were only increasing as the "first generation" of residents began to fully turn over (something that happens at Continuing Care Retirement Communities ("**CCRCs**") after 10-15 years).

Additional relevant background information regarding the regulation of continuing care retirement communities (CCRCs"), particularly in respect to the Adversary Proceeding, can be found within Section III.A. Information & Documents Considered & Relied Upon of the Rebuttal Expert Report of Keith Seeloff, prepared by Keith Seeloff of FORVIS dated July 7, 2023 (the "**Rebuttal Report of Keith Seeloff**").

### III.B.    Relevant Factual Background

The following summary is not intended to be a comprehensive history and background of the Plaintiff or Defendant, nor is it intended to represent any conclusion of fact or law relevant to the Adversary Proceeding.

On March 31, 2014, WNT entered into a $15,000,000 loan with USAmeriBank. The loan is defined herein as the "**USAB Loan**". USAmeriBank was only willing to advance $15,000,000 to WNT if $3,000,000 cash was deposited with USAmeriBank and used as cash collateral to secure the USAmeriBank Loan. Employees and agents of WNT, and individuals and entities seeking to acquire the member interest of WNT from WHT, on one hand (collectively, the "**WNT Actors**"), and USAmeriBank, on the other hand, collaborated, among other activities, to (a) transfer the ownership of the member interest in WNT from WHT (the "**WNT Membership Transfer**") to a group of investors led by John Bartle (the "**Bartle Group**") and (b) transfer approximately $3,000,000 from WHT's existing MLR escrow account located at Regions Bank to an account established at USAmeriBank (the "**Cash Collateral Account**") to be used by USAmeriBank as cash collateral for the USAB Loan (the "**MLR Transfer**"). Although the Cash Collateral Account was named as an account of WNT, the Cash Collateral Account was controlled solely by USAmeriBank and WNT could not access the Cash Collateral Account. USAmeriBank, effective January 1, 2018, merged with Valley National BankCorp and is now known as Valley National Bank.

In order to support the USAB Loan, Management prepared the University Village 10-Year Projection in a Microsoft Excel financial model, which was based on achieving and maintaining certain occupancy and operating assumptions.

# IV.  Rebuttal to the University Village 10-Year Projections

In addition to my education, experience, and consultation with Counsel and the Client, I performed the following tasks:
- Read and considered the following documents:
  - ○ Expert Report and Disclosure of Stanley A. Murphy, CPA/ABV/CFF, CIRA/CDBV, CVA  Ankura Consulting Group, LLC.
  - ○ University Village 10-Year Projection.
- Evaluated the then-current assumptions in the University Village 10-Year Projection.
- Provided the following opinions.

My work focused on Management's assumptions of unit occupancy and fill-up, which are the primary drivers of the increased revenue and performance expectations of CCRCs. My observations regarding the reasonableness of Management's assumptions are summarized as follows. In summary, it is my opinion that unit occupancy, unit fill-up, and pricing assumptions within the University Village 10-Year Projection lack reasonableness.

Westport Holdings Tampa, LP and Westport Holdings Tampa II, LP v. Valley National Bank
Keith Appleby (Appleby Law, P.A.) and Jeffrey W. Warren (Liquidating Trustee)    Rebuttal Report

### IV.A.    Units Available for Occupancy

The following table presents the unit configuration, size of units and pricing of University Village at the time of the projection.

| Table 1 | | | | | | | |
| Independent Living Unit Configuration & Fees[1,2,3] | | | | | | | |
| | Total Units | 2013 Year Ending Occupied Units[4] | 2013 Year Ending Unoccupied Units | 2013 Year Ending Occupancy Percentage | Average Square Footage | 90% Refundable Entrance Fee | Monthly Fees |
|---|---|---|---|---|---|---|---|
| *Apartments* | | | | | | | |
| Studio | 24 | 20 | 4 | 83.3% | 528 | $86,900 | $1,725 |
| One Bedroom | 283 | 168 | 115 | 59.4% | 908 | $167,971 | $2,416 |
| Two Bedroom | 121 | 100 | 24 | 82.6% | 1,352 | $265,731 | $3,117 |
| Three Bedroom | 18 | 15 | 0 | 83.3% | 1,720 | $356,900 | $3,446 |
| **Total Apts/ Wtd Avg** | **446** | **303** | **143** | **67.9%** | **1,038** | **$197,142** | **$2,609** |
| *Villas* | | | | | | | |
| Two Bedroom | 46 | 37 | 9 | 80.4% | 1,288 | $242,900 | $2,935 |
| **Total/Wtd Avg – Apts and Villas** | **492** | **340** | **152** | **69.1%** | **1,061** | **$201,420** | **$2,639** |

Source:  University Village 10-Year Projection (PDF Page 30-31 of 395)
(1). Total Units, square footage, Entrance Fees, and Monthly Fees data presented in Table 1 are according to fiscal year 2014, per the University Village 10-Year Projection.
(2). Year Ending Occupied Units and Year Ending Unoccupied Units data presented in Table 1 are according to fiscal year 2013, per the University Village 10-Year Projection.
(3). The University Village 10-Year Projection Fee Structure Page (PDF Page 30 of 395) was printed in low quality; therefore, values presented in Table 2 may have a slight margin of error.

University Village has approximately 500 independent living units and is considered a large community by most industry standards. One-bedroom units and studio units make up 62 percent of the total inventory and 78 percent of the available inventory.

Smaller units in older senior living communities are typically the most difficult to sell. For University Village, the large number of available one-bedrooms units does not appear to justify an assumption of nine resident move-ins per month every month over a contiguous 48-month period.

13

### IV.B.    Fill-up Assumptions

Management assumed the following resident move-in and move-out pattern to create net fill-up in the University Village 10-Year Projection:

### Table 2
### Budgeted Annual Move-in Pattern

| Year Ending December 31, | Beginning Year Occupied Units | Move-ins | Move-outs | Ending Year Occupied Units | Ending Year Available Units | Ending Year Occupancy % |
|---|---|---|---|---|---|---|
| 2014 | 347 | 80 | 59 | 368 | 492 | 74.8% |
| 2015 | 368 | 79 | 59 | 388 | 492 | 78.9% |
| 2016 | 388 | 75 | 60 | 403 | 492 | 81.9% |
| 2017 | 403 | 68 | 58 | 413 | 492 | 83.9% |
| 2018 | 413 | 68 | 58 | 423 | 492 | 86.0% |
| 2019 | 423 | 67 | 57 | 433 | 492 | 88.0% |
| 2020 | 433 | 67 | 57 | 443 | 492 | 90.0% |
| 2021 | 443 | 67 | 57 | 453 | 492 | 92.1% |
| 2022 | 453 | 67 | 57 | 463 | 492 | 94.1% |
| 2023 | 463 | 67 | 57 | 473 | 492 | 96.1% |

Source: University Village 10-Year Projection.

*Move-ins*

Other than the inventory available at the community, University Village did not have a profound unveiling of a new expansion of independent living apartments, marketing campaign, price incentives, or increase in the marketing budget to justify the assumed increase in annual move-ins of 80 and 79, in 2014 and 2015, respectively.

The challenges associated with selling 6 to 7 units a month with an available inventory of primarily smaller, difficult-to-sell studio and one-bedroom units would require a significant marketing campaign, sales budget and price incentives. The added difficulty of maintaining this strong sales pace over expected turnover of 4 to 6 per month given the age of the community and the disproportionate availability of dated one-bedroom independent living units would be significant, absent a substantive marketing and sales plan that may include additional sale team members; appropriate marketing and advertising budgets; and campaign to launch such an effort.  A significant capital investment would also be appropriate to modernize, stage, and prepare units for an expected wave of accelerated move-in activity.

Industry standards for sales and move-ins typically range from 2 to 4 per month absent some pent-up demand from a pre-sales effort or completion of a significant capital project ready inventory for occupancy.
*Move-outs*

14

University Village is considered a mature facility, in which initial residents would have aged in place and started moving through the continuum of care or passing. Mature entrance fee-based communities could see in excess of 15 percent turnover of independent living units annually. Management could reasonably expect between 50 and 60 move-outs per year.

*Occupancy*

### IV.D.    Capital Expenditures

Management assumed the following capital expense budget in the University Village 10-Year Projection:

**Table 1**

**Capital Expenditures Projection – University Village 2014 – 2023**

| Year Ending Dec 31, | Capital Expenses | Age of Community | Ending Year Available Units |
|---|---|---|---|
| 2014 | $1,926,900 | 26 years | 492 |
| 2015 | $1,948,300 | 27 years | 492 |
| 2016 | $1,683,800 | 28 years | 492 |
| 2017 | $1,713,000 | 29 years | 506 |
| 2018 | $1,745,200 | 30 years | 506 |
| 2019 | $1,685,500 | 31 years | 506 |
| 2020 | $1,714,200 | 32 years | 506 |
| 2021 | $1,742,900 | 33 years | 506 |
| 2022 | $1,771,600 | 34 years | 506 |
| 2023 | $1,800,300 | 35 years | 506 |

Source: University Village 10-Year Projection (PDF Pages 1 and 4 of 395)
(1). Data by Years 1 through 10 in the University Village 10-Year Projection is assumed to be mislabeled as between 2012 – 2021 instead of the correct projection period 2014 to 2023.

Budgeted capital expenses over the 10-year projection period remain relatively constant and reflect ongoing maintenance of units and common spaces in a large community. There is not a significant increase in the budgeted capital expense in 2016 to indicate an increase in of 14 additional independent living units.

Additionally, capital expenses do not indicate a reason for the significant net move-ins of 80 and 79, in years 2014 and 2015, respectively.

# V.  Exhibits

### VI.A.    Meredith Benedict Curriculum Vitae

My curriculum vitae is attached to the back of the Rebuttal Report.

## VI.B.    External Information & Documents Considered

The following is a complete list of external information and documents considered and relied upon throughout the production of the Rebuttal Report.

1. 10-Year Budget for University Village, prepared by Kathleen (Kathy) Burkholder of University Village in approximately March 21, 2014 (the "**University Village 10-Year Projection**").
2. Expert Report and Disclosure of Stanley A. Murphy, CPA/ABV/CFF/CDBY, CVA of Ankura Consulting Group, LLC dated April 17, 2023 (the "**Murphy Report**").
3. Expert Report of Louis E. Robichaux IV of Ankura Consulting Group, LLC dated April 17, 2023 (the "**Robichaux Report**").
4. The Florida Senate. Title XXXVII, Section 651.035, Florida Statutes (2014). Minimum liquid reserve requirements (the "**Section 651.035, Florida Statutes**").
5. The Florida Senate. Title XXXVII, Section 651.033, Florida Statutes (2014). Escrow accounts (the "**Section 651.033, Florida Statutes**").
6. Tampa Life Plan Village, Inc. Examination of Financial Projection with market Study. December 22, 2022.
7. Tampa Life Plan Village, Inc. Financial Feasibility Study 2020, dated February 27, 2020.

Respectfully submitted July 7, 2023

*Meredith Benedict*

_____

FORVIS, LLP  /  Meredith Benedict, CPA
meredith.benedict@forvis.com  /  303.946.9388

16

## MEREDITH BENEDICT, CPA / FORVIS, Director
### meredith.benedict@forvis.com / **303.946.9388**

### PROFESSIONAL BACKGROUND



Meredith is currently a Director with the FORVIS Healthcare Finance team. She has more than 25 years of experience in the healthcare industry, primarily serving the senior housing sector. The FORVIS Healthcare Finance team offers advisory services such as strategic planning, financial forecasting, market demand analysis, third party reimbursement, operational audits, and systems review. Within the senior housing sector, the FORVIS Healthcare Finance team has supported healthcare providers across the country with projects representing more than $19 billion of capital raised and have provided strategic planning, market analysis, volume forecasting, and economic feasibility support for more than 150 unique healthcare markets. Due to her knowledge and experience in healthcare and senior living specifically, Meredith has served in litigation support roles including as a subject matter fact and expert witness.

Meredith has experience performing advisory services in the areas of market positioning and feasibility assessments, strategy, and other planning analyses for senior living providers. Her career has focused on helping clients with various aspects of the strategic planning and development process for senior living communities, including expansion and campus repositioning projects.

Prior to joining FORVIS, Meredith worked for an international accounting firm and a senior housing and care developer. Meredith is a magna cum laude graduate and holds B.S. degrees in finance and international business from Florida State University and in accounting from University of South Florida.

### EDUCATION
- Florida State University – Bachelor of Science, Finance and International Business
- University of South Florida – Bachelor of Science, Accounting

### LICENSES & MEMBERSHIP
- Certified Public Accountant
- Memberships: AICPA, LeadingAge

### PRESENTATIONS
- LeadingAge Colorado 2022: Good Governance with Keith Seeloff and Tim Johnson
- LeadingAge Colorado 2021: Defining and Understanding the Elusive Middle Market with Michael Starke and Karen Adams
- LeadingAge National 2021: Good Governance with Larry Minnix and Keith Seeloff
- LeadingAge California 2021 The Feasibility of Serving the Middle Market with Michael Starke and Karen Adams
- LeadingAge Florida 2021: The Feasibility of Serving the Middle Market with Michael Starke and Karen Adams

- Southeast Finance Conference 2021
- Southeast Finance Conference 2020
- Southeast Finance Conference 2019
- Southeast Finance Conference 2018

**PUBLICATIONS**
- Pricing Analysis Overview (2023)
- Independent Living Market Snapshots: CO, FL, GA, MS, NC, SC, TX & VA (2023, 2022)
- Independent Living Penetration Rates: One Indicator of Market Demand (2022)
- Capturing the Demand for Assisted Living Services: The Senior Living Challenge (2022)