UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re: Chapter 11

WESTPORT HOLDINGS TAMPA LIMITED PARTNERSHIP, Case No: 8:16-bk-08167-CED

WESTPORT HOLDINGS TAMPA II LIMITED PARTNERSHIP, Case No: 8:16-bk-08168-CED

Debtors. (Jointly Administered Under Case No: 8:16-bk-08167-CED)
_____________________________________/

JEFFREY W. WARREN, LIQUIDATING TRUSTEE FOR WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP and WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP,

Plaintiff,

v. Adv. Pro. No.:8:20-ap-00007-CPM

VALLEY NATIONAL BANK, principal subsidiary to VALLEY NATIONAL BANKCORP, a New Jersey domestic profit corporation, as successor by merger to USAMERIBANK,

Defendant.
_____________________________________/

**SUPPLEMENT TO PLAINTIFF'S AMENDED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (HIGHLIGHTED STATUTES)**

Plaintiff, Jeffrey W. Warren, as Liquidating Trustee (the "**Liquidating Trustee**" or "**Plaintiff**") of Westport Holdings Tampa, Limited Partnership ("**WESTPORT**") and Westport Holdings Tampa II, Limited Partnership ("**WESTPORT II,**" and together with WESTPORT, the "**Debtors**"), submits copies of the following Florida Statutes as they existed on March 31, 2014, in support of *Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* (Doc. 489).[1] The Liquidating Trustee has added highlighting to reflect the portions of the Florida Statutes that are emphasized.

1. Section 651.125, Florida Statutes:

Any person . . . who otherwise violates any provision of this chapter . . . , commits a felony of the third degree, punishable as provided in s. 775.082 or s. 775.083. Each violation of this chapter constitutes a separate offense.

2. Section 651.011(12), Florida Statutes:

(12) "Provider" means the owner or operator, whether a natural person, partnership or other unincorporated association, however organized, trust, or corporation, of an institution, building, residence, or other place, whether operated for profit or not, which owner or operator provides continuing care or continuing care at-home for a fixed or variable fee, or for any other remuneration of any type, whether fixed or variable, for the period of care, payable in a lump sum or lump sum and monthly maintenance charges or in installments.

3. Section 651.011(2):

(2) "Continuing care" or "care" means, pursuant to a contract, furnishing shelter and nursing care or personal services to a resident who resides in a facility, whether such nursing care or personal services are provided in the facility or in another setting designated in the contract for continuing care, by an individual not related by consanguinity or affinity to the resident, upon payment of an entrance fee.

4. Section 628.4615, Florida Statutes:

(1) For the purposes of this section, the term "specialty insurer" means any person holding a license or certificate of authority as:

(h) A provider that is licensed to operate a facility that undertakes to provide continuing care as those terms are defined in s. 651.011;

[1] Where certain portions of a statute are extraneous to the issues in this case, they have been omitted.

(2) A person may not, individually or in conjunction with any affiliated person of such person, directly or indirectly, . . . conclude an acquisition of, or otherwise finally acquire 10 percent or more of the ownership interest of a specialty insurer which is not a stock corporation or of a controlling company of a specialty insurer which is not a stock corporation, unless:

(a) The person or affiliated person has filed with the office and sent by registered mail to the principal office of the specialty insurer and controlling company a letter of notification regarding the transaction or proposed transaction no later than 5 days after any form of tender offer or exchange offer is proposed, or no later than 5 days after the acquisition of the securities or ownership interest if no tender offer or exchange offer is involved. The notification must be provided on forms prescribed by the commission containing information determined necessary to understand the transaction and identify all purchasers and owners involved;

(b) The person or affiliated person has filed with the office an application signed under oath and prepared on forms prescribed by the commission which contains the information specified in subsection (4). The application must be completed and filed within 30 days after any form of tender offer or exchange offer is proposed, or after the acquisition of the securities if no tender offer or exchange offer is involved; and

(c) The office has approved the tender offer or exchange offer, or acquisition if no tender offer or exchange offer is involved.

(4) The application to be filed with the office and furnished to the specialty insurer and controlling company shall contain the following information and any additional information as the office deems necessary to determine the character, experience, ability, and other qualifications of the person or affiliated person of such person for the protection of the insureds of the insurer and of the public:

(a) 1. The identity of, and the background information specified in subsection (5) on, each natural person by whom, or on whose behalf, the acquisition is to be made; and,

2. If the acquisition is to be made by, or on behalf of, a person other than a natural person and as to any person who controls, either directly or indirectly, such other person, the identity of, and the background information specified in subsection (5) on:

a. Each director, officer, or trustee, if a corporation, or

b. Each partner, owner, manager, or joint venturer, or other person performing duties similar to those of persons in the aforementioned positions, if not a corporation, for the person.

(b) The source and amount of the funds or other consideration used, or to be used, in making the acquisition.

(c) Any plans or proposals which such persons may have made to liquidate the specialty insurer, to sell any of its assets or merge or consolidate it with any person, or to make any other

major change in its business or corporate structure or management; and any plans or proposals which such persons may have made to liquidate any controlling company of the specialty insurer, to sell any of its assets or merge or consolidate it with any person, or to make any other major change in its business or corporate structure or management.

(5) (a) The information as to the background and identity of each natural person, which information is required to be furnished pursuant to paragraph (4)(a), shall include:

1. The natural person's occupations, positions of employment, and offices held during the past 10 years.

2. The principal business and address of any business, corporation, or organization in which each such office of the natural person was held, or in which each such occupation or position of employment was carried on.

3. Whether the natural person was, at any time during such 10-year period, convicted of any crime other than a traffic violation.

4. Whether the natural person has been, during such 10-year period, the subject of any proceeding for the revocation of any license and, if so, the nature of the proceeding and the disposition of the proceeding.

5. Whether, during the 10-year period, the natural person has been the subject of any proceeding under the federal Bankruptcy Act; or whether, during the 10-year period, any person or other business or organization in which the natural person was a director, officer, trustee, partner, owner, manager, or other official has been subject to any such proceeding, either during the time in which the natural person was a director, officer, or trustee, if a corporation, or a partner, owner, manager, joint venturer, or other official, if not a corporation, or within 12 months thereafter.

6. Whether, during the 10-year period, the natural person has been enjoined, either temporarily or permanently, by a court of competent jurisdiction from violating any federal or state law regulating the business of insurance, securities, or banking, or from carrying out any particular practice or practices in the course of the business of insurance, securities, or banking, together with details as to any such event.

7. Fingerprints of each person referred to in subsection (4).

(b) Any person filing the statement required by this section shall give all required information that is within the knowledge of:

1. The directors, officers, or trustees, if a corporation, or

2. The partners, owners, managers, or joint venturers, or others performing functions similar to those of a director, officer, or trustee, if not a corporation, of the person making the filing and of any person controlling either directly or indirectly such person. If any material change occurs in the facts set forth in the application filed with the office pursuant to this section, an amendment

setting forth such changes shall be filed immediately with the office, and a copy of the amendment shall be sent by registered mail to the principal office of the specialty insurer and to the principal office of the controlling company.

(6) (a) The acquisition application shall be reviewed in accordance with chapter 120. The office may on its own initiate, or, if requested to do so in writing by a substantially affected person, shall conduct, a proceeding to consider the appropriateness of the proposed filing. Time periods for purposes of chapter 120 shall be tolled during the pendency of the proceeding. Any written request for a proceeding must be filed with the office within 10 days of the date notice of the filing is given. During the pendency of the proceeding or review period by the office, any person or affiliated person complying with the filing requirements of this section may proceed and take all steps necessary to conclude the acquisition so long as the acquisition becoming final is conditioned upon obtaining office approval. The office shall, however, at any time it finds an immediate danger to the public health, safety, and welfare of the insureds exists, immediately order, pursuant to s. 120.569(2)(n), the proposed acquisition disapproved and any further steps to conclude the acquisition ceased.

(b) During the pendency of the office's review of any acquisition subject to the provisions of this section, the acquiring person shall not make any material change in the operation of the specialty insurer or controlling company unless the office has specifically approved the change nor shall the acquiring person make any material change in the management of the specialty insurer unless advance written notice of the change in management is furnished to the office. A material change in the operation of the specialty insurer is a transaction which disposes of or obligates 5 percent or more of the capital and surplus of the specialty insurer. A material change in the management of the specialty insurer is any change in management involving officers or directors of the specialty insurer or any person of the specialty insurer or controlling company having authority to dispose of or obligate 5 percent or more of the specialty insurer's capital or surplus. The office shall approve a material change in operations if it finds the applicable provisions of subsection (8) have been met. The office may disapprove a material change in management if it finds that the applicable provisions of subsection (8) have not been met and in such case the specialty insurer shall promptly change management as acceptable to the office.

(c) If a request for a proceeding is filed, the proceeding shall be conducted within 60 days after the date the written request for a proceeding is received by the office. A recommended order shall be issued within 20 days of the date of the close of the proceedings. A final order shall be issued within 20 days of the date of the recommended order or, if exceptions to the recommended order are filed, within 20 days of the date the exceptions are filed.

(7) The office may disapprove any acquisition subject to this section by any person or any affiliated person of such person who:

(a) Willfully violates this section;

(b) In violation of an order of the office issued pursuant to subsection (12), fails to divest himself or herself of any stock or ownership interest obtained in violation of this section or fails to

divest himself or herself of any direct or indirect control of such stock or ownership interest, within 25 days after such order; or

(c) In violation of an order issued by the office pursuant to subsection (12), acquires an additional stock or ownership interest in a specialty insurer or controlling company or direct or indirect control of such stock or ownership interest, without complying with this section.

(8) The person or persons filing the application required by subsection (2) shall have the burden of proof. The office shall approve any such acquisition if it finds, on the basis of the record made during any proceeding or on the basis of the filed application if no proceeding is conducted, that:

(a) Upon completion of the acquisition, the specialty insurer will be able to satisfy the requirements for the issuance of a license or certificate to write the line of insurance for which it is presently licensed or certificated.

(b) The financial condition of the acquiring person or persons will not jeopardize the financial stability of the specialty insurer or prejudice the interests of its insureds or the public.

(c) Any plan or proposal which the acquiring person has, or acquiring persons have, made:

1. To liquidate the specialty insurer, sell its assets, or merge or consolidate it with any person, or to make any other major change in its business or corporate structure or management, or

2. To liquidate any controlling company, sell its assets, or merge or consolidate it with any person, or to make any major change in its business or corporate structure or management which would have an effect upon the specialty insurer, is fair and free of prejudice to the insureds of the specialty insurer or to the public.

(d) The competence, experience, and integrity of those persons who will control directly or indirectly the operation of the specialty insurer indicate that the acquisition is in the best interest of the insureds of the insurer and in the public interest.

(e) The natural persons for whom background information is required to be furnished pursuant to this section have such backgrounds as to indicate that it is in the best interests of the insureds of the specialty insurer and in the public interest to permit such persons to exercise control over the specialty insurer.

(f) The directors and officers, if such specialty insurer or controlling company is a stock corporation, or the trustees, partners, owners, managers, or joint venturers or other persons performing duties similar to those of persons in the aforementioned positions, if such specialty insurer or controlling company is not a stock corporation, to be employed after the acquisition have sufficient insurance experience and ability to assure reasonable promise of successful operation.

(g) The management of the specialty insurer after the acquisition will be competent and trustworthy, and will possess sufficient managerial experience so as to make the proposed operation of the specialty insurer not hazardous to the insurance-buying public.

(h) The management of the specialty insurer after the acquisition shall not include any person who has directly or indirectly through ownership, control, reinsurance transactions, or other insurance or business relations unlawfully manipulated the assets, accounts, finances, or books of any insurer or otherwise acted in bad faith with respect thereto.

(i) The acquisition is not likely to be hazardous or prejudicial to the insureds of the insurer or to the public.

(j) The effect of the acquisition would not substantially lessen competition in the line of insurance for which the specialty insurer is licensed or certified in this state or would not tend to create a monopoly therein.

(9) No vote by the stockholder of record, or by any other person, of any security acquired in contravention of the provisions of this section is valid. Any acquisition contrary to the provisions of this section is void. Upon the petition of the specialty insurer or the controlling company, the circuit court for the county in which the principal office of the specialty insurer is located may, without limiting the generality of its authority, order the issuance or entry of an injunction or other order to enforce the provisions of this section. There shall be a private right of action in favor of the specialty insurer or controlling company to enforce the provisions of this section. No demand upon the office that it perform its functions shall be required as a prerequisite to any suit by the specialty insurer or controlling company against any other person, and in no case shall the office be deemed a necessary party to any action by the specialty insurer or controlling company to enforce the provisions of this section. Any person who makes or proposes an acquisition requiring the filing of an application pursuant to this section, or who files such an application, shall be deemed to have thereby designated the Chief Financial Officer, or his or her assistant or deputy or another person in charge of his or her office, as such person's agent for service of process under this section and shall thereby be deemed to have submitted himself or herself to the administrative jurisdiction of the office and to the jurisdiction of the circuit court.

(10) Any approval by the office under this section does not constitute a recommendation by the office of the tender offer or exchange offer, or acquisition, if no tender offer or exchange offer is involved. It is unlawful for a person to represent that the office's approval constitutes a recommendation. A person who violates the provisions of this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The statute-of-limitations period for the prosecution of an offense committed under this subsection is 5 years.

(11) If the office determines that any person or any affiliated person of such person has acquired 10 percent or more of the outstanding voting securities of a specialty insurer or controlling company which is a stock corporation, or 10 percent or more of the ownership interest of a specialty insurer or controlling company which is not a stock corporation, without complying with the provisions of this section, the office may order that the person and any affiliated person of such

person cease acquisition of the specialty insurer or controlling company and, if appropriate, divest itself of any stock or ownership interest acquired in violation of this section.

(12) (a) The office shall, if necessary to protect the public interest, suspend or revoke the certificate of authority of any specialty insurer or controlling company acquired in violation of this section.

(b) If any specialty insurer is subject to suspension or revocation pursuant to paragraph (a), the specialty insurer shall be deemed to be in such condition, or to be using or to have been subject to such methods or practices in the conduct of its business, as to render its further transaction of insurance presently or prospectively hazardous to its insureds, creditors, or stockholders or to the public.

(13) (a) For the purpose of this section, the term "acquisition" includes:

1. A tender offer or exchange offer for securities, assets, or other ownership interest;

2. An agreement to exchange securities for other securities, assets, or other ownership interest;

3. A merger of a person or affiliated person into a specialty insurer or a merger of any person with a specialty insurer;

4. A consolidation; or

5. Any other form of change of control whereby any person or affiliated person acquires or attempts to acquire, directly or indirectly, 10 percent or more of the ownership interest or assets of a specialty insurer or of a controlling company. However, in the case of a health maintenance organization organized as a for-profit corporation, the provisions of s. 628.451 shall govern with respect to any merger or consolidation, and, in the case of a health maintenance organization organized as a not-for-profit corporation, the provisions of s. 628.471 shall govern with respect to any merger or consolidation.

(b) For the purpose of this section, the term "affiliated person" of another person includes:

1. The spouse of such other natural person;

2. The parents of such other natural person and their lineal descendants and the parents of such other natural person's spouse and their lineal descendants;

3. Any person who directly or indirectly owns or controls, or holds with power to vote, 10 percent or more of the outstanding voting securities of such other person;

4. Any person who directly or indirectly owns 10 percent or more of the outstanding voting securities which are directly or indirectly owned or controlled, or held with power to vote, by such other person;

5. Any person or group of persons who directly or indirectly control, are controlled by, or are under common control with such other person;

6. Any director, officer, trustee, partner, owner, manager, joint venturer, or employee, or other person performing duties similar to those of persons in the aforementioned positions, of such other person;

7. If such other person is an investment company, any investment adviser of such company or any member of an advisory board of such company;

8. If such other person is an unincorporated investment company not having a board of directors, the depositor of such company; or

9. Any person who has entered into an agreement, written or unwritten, to act in concert with such other person in acquiring, or limiting the disposition of, securities of a specialty insurer or controlling company which is a stock corporation or in acquiring, or limiting the disposition of, an ownership interest of a specialty insurer or controlling company which is not a stock corporation.

(c) For the purposes of this section, the term "controlling company" means any corporation, trust, or association owning, directly or indirectly, 25 percent or more of the voting securities of one or more specialty insurance companies which are stock corporations, or 25 percent or more of the ownership interest of one or more specialty insurance companies which are not stock corporations.

(d) For the purpose of this section, the term "natural person" means an individual.

(e) For the purpose of this section, the term "person" includes a natural person, corporation, association, trust, general partnership, limited partnership, joint venture, firm, proprietorship, or any other entity which may hold a license or certificate as a specialty insurer.

(14) The commission may adopt, amend, or repeal rules that are necessary to implement the provisions of this section, pursuant to chapter 120.

5. Section 651.019, Florida Statutes:

(1) After issuance of a certificate of authority, the provider shall submit to the office a general outline, including intended use of proceeds, with respect to any new financing, additional financing, or refinancing at least 30 days before the closing date of such financing transaction.

(2) The provider shall furnish any information the office may reasonably request in connection with any new financing, additional financing, or refinancing, including, but not limited to, the financing agreements and any related documents, escrow or trust agreements, and statistical

or financial data. The provider shall also submit to the office copies of executed financing documents within 30 days after the closing date.

6. Section 651.022, Florida Statutes:

(1) Each applicant for a certificate of authority shall first apply for and obtain a provisional certificate of authority pursuant to this section.

(2) The application for a provisional certificate of authority shall be on a form prescribed by the commission and shall contain the following information:

(f) … if the applicant or provider is a partnership . . ., a copy of the partnership agreement….

(g) The full names, residences, and business addresses of:

2. Every partner or member, if the applicant or provider is a partnership …. Having fewer than 50 partners …, together with the business name and address of the partnership or other organization.

6. The manager, whether an individual, corporation, partnership, or association.

(c)1. Evidence that the applicant is reputable and of responsible character. If the applicant is a firm, association, organization, partnership, business trust, corporation, or company, the form shall require evidence that the members or shareholders are reputable and of responsible character, and the person in charge of providing care under a certificate of authority shall likewise be required to produce evidence of being reputable and of responsible character.

2. Evidence satisfactory to the office of the ability of the applicant to comply with the provisions of this chapter and the rules adopted by the commission pursuant to this chapter.

3. A statement of whether a person identified in the application for a provisional certificate of authority or the administrator or manager of the facility, if such person has been designated, or any such person living in the same location:

a. Has been convicted of a felony or has pleaded nolo contender to a felony charge, or has been held liable or has been enjoined in a civil action by final judgment, if the felony or civil action involved fraud, embezzlement, fraudulent conversion, or misappropriation of property.

b. Is subject to a currently effective injunctive or restrictive order or federal or state administrative order relating to business activity or health care as a result of an action brought by a public agency or department, including, without limitation, an action affecting a license under chapter 400 or chapter 429.

The statement shall set forth the court or agency, the date of conviction or judgment, and the penalty imposed or damages assessed, or the date, nature, and issuer of the order. Before determining whether a provisional certificate of authority is to be issued, the office may make an inquiry to determine the accuracy of the information submitted pursuant to subparagraph 1. and 2.

(f) Such other reasonable data, financial statements, and pertinent information as the commission or office may reasonably require with respect to the provider or the facility, including the most recent audited financial statements of comparable facilities currently or previously owned, managed, or developed by the applicant or its principal, to assist in determining the financial viability of the project and the management capabilities of its managers and owners.

(8) The office shall not approve any application which includes in the plan of financing any encumbrance of the operating reserves required by this chapter.

7. Section 651.026, Florida Statutes:

(1) Annually, on or before May 1, the provider shall file an annual report and such other information and data showing its condition as of the last day of the preceding calendar year, except as provided in subsection (5). If the office does not receive the required information on or before May 1, a late fee may be charged pursuant to s. 651.015(2)(c). The office may approve an extension of up to 30 days.

(2) The annual report shall be in such form as the commission prescribes and shall contain at least the following:

(a) Any change in status with respect to the information required to be filed under s. 651.022(2).

(b) Financial statements audited by an independent certified public accountant which must contain, for two or more periods if the facility has been in existence that long, all of the following:

1. An accountant's opinion and, in accordance with generally accepted accounting principles:

a. A balance sheet;
b. A statement of income and expenses;
c. A statement of equity or fund balances; and
d. A statement of changes in cash flows.

2. Notes to the financial statements considered customary or necessary for full disclosure or adequate understanding of the financial statements, financial condition, and operation.

(c) The following financial information:

1. A detailed listing of the assets maintained in the liquid reserve as required under s. 651.035 and in accordance with part II of chapter 625;

2. A schedule giving additional information relating to property, plant, and equipment having an original cost of at least $25,000, so as to show in reasonable detail with respect to each separate facility original costs, accumulated depreciation, net book value, appraised value or insurable value and date thereof, insurance coverage, encumbrances, and net equity of appraised or insured value over encumbrances. Any property not used in continuing care must be shown separately from property used in continuing care.

3. The level of participation in Medicare or Medicaid programs, or both;

4. A statement of all fees required of residents, including, but not limited to, a statement of the entrance fee charged, the monthly service charges, the proposed application of the proceeds of the entrance fee by the provider, and the plan by which the amount of the entrance fee is determined if the entrance fee is not the same in all cases; and

5. Any change or increase in fees if the provider changes the scope of, or the rates for, care or services, regardless of whether the change involves the basic rate or only those services available at additional costs to the resident.

(d) Such other reasonable data, financial statements, and pertinent information as the commission or office may require with respect to the provider or the facility, or its directors, trustees, members, branches, subsidiaries, or affiliates, to determine the financial status of the facility and the management capabilities of its managers and owners.

(e) Each facility shall file with the office annually, together with the annual report required by this section, a computation of its minimum liquid reserve calculated in accordance with s. 65.035 on a form prescribed by the commission.

(6) The workpapers, account analyses, descriptions of basic assumptions, and other information necessary for a full understanding of the annual statement of a provider as filed with the office shall be made available for visual inspection by the office at the facility or, if the office requests, at another agreed-upon site. Photocopies may not be made unless consented to by the provider.

(8) All financial reports and any supplemental financial information submitted to the office shall be prepared in conformity with generally accepted accounting principles.

8. Section 651.033, Florida Statutes:

(1) When funds are required to be deposited in an escrow account pursuant to s. 651.022, s. 651.023, s. 651.035, or s. 651.055:

(a) The escrow account shall be established in a Florida bank, Florida savings and loan association, or Florida trust company acceptable to the office or on deposit with the

department; and the funds deposited therein shall be kept and maintained in an account separate and apart from the provider's business accounts.

(b) An escrow agreement shall be entered into between the bank, savings and loan association, or trust company and the provider of the facility; the agreement shall state that its purpose is to protect the resident or the prospective resident; and, upon presentation of evidence of compliance with applicable portions of this chapter, or upon order of a court of competent jurisdiction, the escrow agent shall release and pay over the funds, or portions thereof, together with any interest accrued thereon or earned from investment of the funds, to the provider or resident as directed.

(c) Any agreement establishing an escrow account required under the provisions of this chapter shall be subject to approval by the office. The agreement shall be in writing and shall contain, in addition to any other provisions required by law, a provision whereby the escrow agent agrees to abide by the duties imposed under this section.

(d) All funds deposited in an escrow account, if invested, shall be invested as set forth in part II of chapter 625; however, such investment my not diminish the funds held in escrow below the amount required by this chapter. Funds deposited in an escrow account are not subject to charges by the escrow agent except escrow agent fees associated with administering the accounts, or subject to any liens, judgments, garnishments, creditor's claims, or other encumbrances against the provider or facility except as provided in s. 651.035(1).

(e) At the request of either the provider or the office, the escrow agent shall issue a statement indicating the status of the escrow account.

(2) In addition, the escrow agreement shall provide that the escrow agent or another person designated to act in the escrow agent's place and the provider, except as otherwise provided in s. 651.035, shall notify the office in writing at least 10 days before the withdrawal of any portion of any funds required to be escrowed under the provision of s. 651.035. However, in the event of an emergency and upon petition by the provider, the office may waive the 10-day notification period and allow a withdrawal of up to 10 percent of the required minimum liquid reserve. The office shall have 3 working days to deny the petition for the emergency10-percent withdrawal. If the office fails to deny the petition within 3 working days, the petition shall be deemed to have been granted by the office. For the purpose of this section, "working day" means each day that is not a Saturday, Sunday or legal holiday as defined by Florida law. Also for the purpose of this section, the day the petition is received by the office shall not be counted as one of the 3 days.

. . . .

(5) When funds are required to be deposited in an escrow account pursuant to s. 651.022, s. 651.023, or s. 651.035, the following shall apply:

(a) The escrow agreement shall require that the escrow agent furnish the provider with a quarterly statement indicating the amount of any disbursements from or deposits to the escrow account and the condition of the account during the period covered by the statement. The agreement shall require that the statement be furnished to the provider by the escrow agent on

or before the 10th day of the month following the month for which the statement is due, the office may, in its discretion, levy against the escrow agent a fine not to exceed $25 a day for each day of noncompliance with the provisions of this subsection.

(b) If the escrow agent does not provide the quarterly statement to the provider on or before the 10th day of the month following the quarter for which the statement is due, the provider shall, on or before the 15th day of the month following the quarter for which the statement is due, send a written request for the statement to the escrow agent by certif8ed mail return receipt requested.

(c) On or before the 20th day of the month following the quarter for which the statement is due, the provider shall file with the office a copy of the escrow agent's statement or, if the provider has not received the escrow agent's statement, a copy of the written request to the escrow agent for the statement.

(d) The office may, in its discretion, in addition to any other penalty that may be provided for under this chapter, levy a fine against the provider not to exceed $25 a day for each day the provider fails to comply with the provisions of this subsection.

(e) Funds held on deposit with the department are exempt from the reporting requirements of this subsection.

9. Section 651.035, Florida Statutes:

(1) A provider shall maintain in escrow a minimum liquid reserve consisting of the following reserves, as applicable:

(a) Each provider shall maintain in escrow as a debt service reserve the aggregate amount of all principal and interest payments due during the fiscal year on any mortgage loan or other long-term financing of the facility, including property taxes as recorded in the audited financial statements required under s. 651.026. The amount must include any leasehold payments and all costs related to such payments. If principal payments are not due during the fiscal year, the provider shall maintain in escrow as a minimum liquid reserve an amount equal to interest payments due during the next 12 months on any mortgage loan or other long-term financing of the facility, including property taxes.

(b) A provider that has outstanding indebtedness that requires a debt service reserve to be held in escrow pursuant to a trust indenture or mortgage lien on the facility and for which the debt service reserve may only be used to pay principal and interest payments on the debt that the debtor is obligated to pay, and which may include property taxes and insurance, may include such debt service reserve in computing the minimum liquid reserve needed to satisfy this subsection if the provider furnishes to the office a copy of the agreement under which such debt service is held, together with a statement of the amount being held in escrow for the debt service reserve, certified by the lender or trustee and the provider to be correct. The trustee shall provide the office with any information concerning the debt service reserve account upon request of the provider or the office.

(c) Each provider shall maintain in escrow an operating reserve equal to 30 percent of the total operating expenses projected in the feasibility study required by s. 651.023 for the first 12 months of operation. Thereafter, each provider shall maintain in escrow an operating reserve equal to 15 percent of the total operating expenses in the annual report filed pursuant to s. 651.026. If a provider has been in operation for more than 12 months, the total annual operating expenses shall be determined by averaging the total annual operating expenses reported to the office by the number of annual reports filed with the office within the preceding 3-year period subject to adjustment if there is a change in the number of facilities owned. For purposes of this subsection, total annual operating expenses include all expenses of the facility except: depreciation and amortization; interest and property taxes included in paragraph (a); extraordinary expenses that are adequately explained and documented in accordance with generally accepted accounting principles; liability insurance premiums in excess of those paid in calendar year 1999; and changes in the obligation to provide future services to current residents. For providers initially licensed during or after calendar year 1999, liability insurance shall be included in the total operating expenses in an amount not to exceed the premium paid during the first 12 months of facility operation. Beginning January 1, 1993, the operating reserves required under this subsection shall be in an unencumbered account held in escrow for the benefit of the residents. Such funds may not be encumbered or subject to any liens or charges by the escrow agent or judgments, garnishments, or creditors' claims against the provider or facility. However, if a facility had a lien, mortgage, trust indenture, or similar debt instrument in place before January 1, 1993, which encumbered all or any part of the reserves required by this subsection and such funds were used to meet the requirements of this subsection, then such arrangement may be continued, unless a refinancing or acquisition has occurred, and the provider shall be in compliance with this subsection.

(d) Each provider shall maintain in escrow a renewal and replacement reserve equal to 15 percent of the total accumulated depreciation based on the audited financial statement required to be filed pursuant to s. 651.026, not to exceed 15 percent of the facility's average operating expenses for the past 3 fiscal years based on the audited financial statements for each of those years. For a provider who is an operator of a facility but is not the owner and depreciation is not included as part of the provider's financial statement, the renewal and replacement reserve required by this paragraph must equal 15 percent of the total operating expenses of the provider, as described in this section. Each provider licensed before October 1, 1983, shall fully fund the renewal and replacement reserve by October 1, 2003, by multiplying the difference between the former escrow requirement and the present escrow requirement by the number of years the facility has been in operation after October 1, 1983. The Provider for a CCRC was required by OIR to report and properly maintain a MLR pursuant to statutes in Florida (Chapter 651) and the requirements are governed and administered by OIR.

(4) The office, upon approval of a plan for fulfilling the requirements of this section and upon demonstration by the facility of an annual increase in liquid reserves, may extend the time for compliance.

(5) A provider may satisfy the minimum liquid reserve requirements of this section by acquiring from a financial institution, as specified in paragraph (b), a clean, unconditional irrevocable letter of credit equal to the requirements of this section.

(6) Each fiscal year, a provider may withdraw up to 33 percent of the total renewal and replacement reserve available. The reserve available is equal to the market value of the invested reserves at the end of the provider's prior fiscal year. The withdrawal must be used for capital items or major repairs.

(a) Before any funds are eligible for withdrawal, the provider must obtain written permission from the office by submitting the following:

1. The amount of the withdrawal and the intended use of the proceeds.

2. A board resolution and sworn affidavit signed by two officers or general partners of the provider which indicates approval of the withdrawal and use of the funds.

3. Proof that the provider has met all funding requirements for the operating, debt service, and renewal and replacement reserves computed for the previous fiscal year.

4. Anticipated payment schedule for refunding the renewal and replacement reserve fund.

(b) Within 30 days after the withdrawal of funds, the provider must begin refunding the reserve account in equal monthly payments that allow for a complete funding of the withdrawal within 36 months. If the payment schedule required under subparagraph (a)4. has changed, the provider must update the office with the new payment schedule. If the provider fails to make a required monthly payment or the payment is late, the provider must notify the office within 5 days after the due date of the payment. No additional withdrawals from the renewal and replacement reserve will be allowed until all scheduled payments are current.

/s/ *Keith T. Appleby*
Keith T. Appleby, Esq.
Florida Bar No: 0011028
Appleby Law P.A.
4916 W Melrose Ave S
Tampa, FL 33629
Telephone: (813) 435-0396
Email: keithtappleby@icloud.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 27, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system, which sent automatic email notices of electronic filing to all parties indicated on the electronic filing receipt, including:

Edmund S. Whitson, III
MCGLINCHEY STAFFORD,
PLLC
100 S. Ashley Drive, Ste. 600
Tampa, FL 33602
ewhitson@mcglinchey.com

and

Adina L. Pollan, Esq.
10407 Centurion Parkway N., Suite 200
Jacksonville, Florida 32256
apollan@mcglinchey.com
nreid@mcglinchey.com
***Counsel for Defendant***

*/s/ Keith T. Appleby*
Keith T. Appleby

Online Sunshine

Select Year: 2014 Go

# The 2014 Florida Statutes

Title XXXVII INSURANCE | Chapter 651 CONTINUING CARE CONTRACTS | View Entire Chapter

**651.125 Criminal penalties; injunctive relief.**—

(1) Any person who maintains, enters into, or, as manager or officer or in any other administrative capacity, assists in entering into, maintaining, or performing any continuing care or continuing care at-home contract subject to this chapter without doing so in pursuance of a valid certificate of authority or renewal thereof, as contemplated by or provided in this chapter, or who otherwise violates any provision of this chapter or rule adopted in pursuance of this chapter, commits a felony of the third degree, punishable as provided in s. 775.082 or s. 775.083. Each violation of this chapter constitutes a separate offense.

(2) The state attorney for a circuit shall, upon application of the office or its authorized representative, institute and conduct the prosecution of an action for violation, within such circuit, of any provision of this chapter.

(3) The office may bring an action to enjoin a violation, threatened violation, or continued violation of this chapter in the circuit court in and for the county in which the violation occurred, is occurring, or is about to occur.

(4) Any action brought by the office against a provider shall not abate by reason of a sale or other transfer of ownership of the facility used to provide care, which provider is a party to the action, except with the express written consent of the director of the office.

(5) The provisions of s. 624.310 apply to any person whose identity is required to be disclosed pursuant to s. 651.022(2) or s. 651.023(1)(a).

**History.**—s. 1, ch. 77-323; s. 25, ch. 81-292; s. 2, ch. 81-318; s. 3, ch. 83-265; ss. 22, 31, 33, 35, ch. 83-328; s. 8, ch. 92-56; s. 12, ch. 93-22; s. 1697, ch. 2003-261; s. 17, ch. 2011-193.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

Online Sunshine

Select Year: 2014 Go

# The 2014 Florida Statutes

| Title XXXVII | Chapter 651 | View Entire Chapter |
|---|---|---|
| INSURANCE | CONTINUING CARE CONTRACTS | |

**651.011 Definitions.**—As used in this chapter, the term:

(1) "Advertising" means the dissemination of written, visual, or electronic information by a provider, or any person affiliated with or controlled by a provider, to potential residents or their representatives for the purpose of inducing such persons to subscribe to or enter into a contract for continuing care or continuing care at-home.

(2) "Continuing care" or "care" means, pursuant to a contract, furnishing shelter and nursing care or personal services to a resident who resides in a facility, whether such nursing care or personal services are provided in the facility or in another setting designated in the contract for continuing care, by an individual not related by consanguinity or affinity to the resident, upon payment of an entrance fee.

(3) "Continuing Care Advisory Council" or "advisory council" means the council established in s. 651.121.

(4) "Continuing care at-home" means, pursuant to a contract other than a contract described in subsection (2), furnishing to a resident who resides outside the facility the right to future access to shelter and nursing care or personal services, whether such services are provided in the facility or in another setting designated in the contract, by an individual not related by consanguinity or affinity to the resident, upon payment of an entrance fee.

(5) "Entrance fee" means an initial or deferred payment of a sum of money or property made as full or partial payment for continuing care or continuing care at-home. An accommodation fee, admission fee, member fee, or other fee of similar form and application are considered to be an entrance fee.

(6) "Facility" means a place where continuing care is furnished and may include one or more physical plants on a primary or contiguous site or an immediately accessible site. As used in this subsection, the term "immediately accessible site" means a parcel of real property separated by a reasonable distance from the facility as measured along public thoroughfares, and the term "primary or contiguous site" means the real property contemplated in the feasibility study required by this chapter.

(7) "Generally accepted accounting principles" means those accounting principles and practices adopted by the Financial Accounting Standards Board and the American Institute of Certified Public Accountants, including Statement of Position 90-8 with respect to any full year to which the statement applies.

(8) "Insolvency" means the condition in which the provider is unable to pay its obligations as they come due in the normal course of business.

(9) "Licensed" means that the provider has obtained a certificate of authority from the department.

(10) "Nursing care" means those services or acts rendered to a resident by an individual licensed or certified pursuant to chapter 464.

(11) "Personal services" has the same meaning as in s. 429.02.

(12) "Provider" means the owner or operator, whether a natural person, partnership or other unincorporated

association, however organized, trust, or corporation, of an institution, building, residence, or other place, whether operated for profit or not, which owner or operator provides continuing care or continuing care at-home for a fixed or variable fee, or for any other remuneration of any type, whether fixed or variable, for the period of care, payable in a lump sum or lump sum and monthly maintenance charges or in installments. The term does not apply to an entity that has existed and continuously operated a facility located on at least 63 acres in this state providing residential lodging to members and their spouses for at least 66 years on or before July 1, 1989, and has the residential capacity of 500 persons, is directly or indirectly owned or operated by a nationally recognized fraternal organization, is not open to the public, and accepts only its members and their spouses as residents.

(13) "Records" means the permanent financial, directory, and personnel information and data maintained by a provider pursuant to this chapter.

(14) "Resident" means a purchaser of, a nominee of, or a subscriber to a continuing care or continuing care at-home contract. Such contract does not give the resident a part ownership of the facility in which the resident is to reside, unless expressly provided in the contract.

(15) "Shelter" means an independent living unit, room, apartment, cottage, villa, personal care unit, nursing bed, or other living area within a facility set aside for the exclusive use of one or more identified residents.

**History.**—s. 1, ch. 77-323; s. 170, ch. 79-164; ss. 1, 25, ch. 81-292; s. 2, ch. 81-318; s. 3, ch. 83-265; ss. 1, 31, 33, 35, ch. 83-328; s. 1, ch. 91-98; s. 33, ch. 91-263; s. 12, ch. 93-22; s. 36, ch. 93-216; s. 2, ch. 96-363; s. 12, ch. 97-82; s. 1, ch. 97-229; s. 1662, ch. 2003-261; s. 99, ch. 2006-197; s. 1, ch. 2010-202; s. 1, ch. 2011-193.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

Online Sunshine

Select Year: 2014 Go

# The 2014 Florida Statutes

| Title XXXVII | Chapter 628 | View Entire Chapter |
|---|---|---|
| INSURANCE | STOCK AND MUTUAL INSURERS; HOLDING COMPANIES | |

**628.4615 Specialty insurers; acquisition of controlling stock, ownership interest, assets, or control; merger or consolidation.**—

(1) For the purposes of this section, the term "specialty insurer" means any person holding a license or certificate of authority as:

(a) A motor vehicle service agreement company authorized to issue motor vehicle service agreements as those terms are defined in s. 634.011;

(b) A home warranty association authorized to issue "home warranties" as those terms are defined in s. 634.301;

(c) A service warranty association authorized to issue "service warranties" as those terms are defined in s. 634.401(13) and (14);

(d) A prepaid limited health service organization authorized to issue prepaid limited health service contracts, as those terms are defined in chapter 636;

(e) An authorized health maintenance organization operating pursuant to s. 641.21;

(f) An authorized prepaid health clinic operating pursuant to s. 641.405;

(g) A legal expense insurance corporation authorized to engage in a legal expense insurance business pursuant to s. 642.021;

(h) A provider that is licensed to operate a facility that undertakes to provide continuing care as those terms are defined in s. 651.011;

(i) A multiple-employer welfare arrangement operating pursuant to ss. 624.436-624.446;

(j) A premium finance company authorized to finance insurance premiums pursuant to s. 627.828; or

(k) A corporation authorized to accept donor annuity agreements pursuant to s. 627.481.

(2) A person may not, individually or in conjunction with any affiliated person of such person, directly or indirectly, conclude a tender offer or exchange offer for, enter into any agreement to exchange securities for, or otherwise finally acquire, 10 percent or more of the outstanding voting securities of a specialty insurer which is a stock corporation or of a controlling company of a specialty insurer which is a stock corporation; or conclude an acquisition of, or otherwise finally acquire, 10 percent or more of the ownership interest of a specialty insurer which is not a stock corporation or of a controlling company of a specialty insurer which is not a stock corporation, unless:

(a) The person or affiliated person has filed with the office and sent by registered mail to the principal office of the specialty insurer and controlling company a letter of notification regarding the transaction or proposed transaction no later than 5 days after any form of tender offer or exchange offer is proposed, or no later than 5 days after the acquisition of the securities or ownership interest if no tender offer or exchange offer is involved.

The notification must be provided on forms prescribed by the commission containing information determined necessary to understand the transaction and identify all purchasers and owners involved;

(b) The person or affiliated person has filed with the office an application signed under oath and prepared on forms prescribed by the commission which contains the information specified in subsection (4). The application must be completed and filed within 30 days after any form of tender offer or exchange offer is proposed, or after the acquisition of the securities if no tender offer or exchange offer is involved; and

(c) The office has approved the tender offer or exchange offer, or acquisition if no tender offer or exchange offer is involved.

(3) This section does not apply to any acquisition of voting securities or ownership interest of a specialty insurer or of a controlling company by any person who, on July 9, 1986, is the owner of a majority of such voting securities or ownership interest or who, on or after July 9, 1986, becomes the owner of a majority of such voting securities or ownership interest with the approval of the office under this section. The person or affiliated person filing the required notice in paragraph (2)(a) may request the office to waive the requirements of paragraph (2)(b) if there is no change in the ultimate controlling shareholder or ownership percentages of the ultimate controlling shareholders and no unaffiliated parties acquire any direct or indirect interest in the specialty insurer. The office may waive the filing if it determines that in fact there is no change in the ultimate controlling shareholder or ownership percentages of the ultimate controlling shareholders and no unaffiliated parties will acquire any direct or indirect interest in the specialty insurer.

(4) The application to be filed with the office and furnished to the specialty insurer and controlling company shall contain the following information and any additional information as the office deems necessary to determine the character, experience, ability, and other qualifications of the person or affiliated person of such person for the protection of the insureds of the insurer and of the public:

(a)1. The identity of, and the background information specified in subsection (5) on, each natural person by whom, or on whose behalf, the acquisition is to be made; and,

2. If the acquisition is to be made by, or on behalf of, a person other than a natural person and as to any person who controls, either directly or indirectly, such other person, the identity of, and the background information specified in subsection (5) on:

a. Each director, officer, or trustee, if a corporation, or

b. Each partner, owner, manager, or joint venturer, or other person performing duties similar to those of persons in the aforementioned positions, if not a corporation,

for the person.

(b) The source and amount of the funds or other consideration used, or to be used, in making the acquisition.

(c) Any plans or proposals which such persons may have made to liquidate the specialty insurer, to sell any of its assets or merge or consolidate it with any person, or to make any other major change in its business or corporate structure or management; and any plans or proposals which such persons may have made to liquidate any controlling company of the specialty insurer, to sell any of its assets or merge or consolidate it with any person, or to make any other major change in its business or corporate structure or management.

(d) The nature and the extent of the controlling interest which the person or affiliated person of such person proposes to acquire, the terms of the proposed acquisition, and the manner in which the controlling interest is to be acquired of a specialty insurer or controlling company which is not a stock corporation.

(e) The number of shares or other securities which the person or affiliated person of such person proposes to acquire, the terms of the proposed acquisition, and the manner in which the securities are to be acquired.

(f) Information as to any contract, arrangement, or understanding with any party with respect to any of the securities of the specialty insurer or controlling company, including, but not limited to, information relating to the transfer of any of the securities, option arrangements, puts or calls, or the giving or withholding of proxies, which information names the party with whom the contract, arrangement, or understanding has been entered into and gives the details thereof.

(5)(a) The information as to the background and identity of each natural person, which information is required to be furnished pursuant to paragraph (4)(a), shall include:

1. The natural person's occupations, positions of employment, and offices held during the past 10 years.

2. The principal business and address of any business, corporation, or organization in which each such office of the natural person was held, or in which each such occupation or position of employment was carried on.

3. Whether the natural person was, at any time during such 10-year period, convicted of any crime other than a traffic violation.

4. Whether the natural person has been, during such 10-year period, the subject of any proceeding for the revocation of any license and, if so, the nature of the proceeding and the disposition of the proceeding.

5. Whether, during the 10-year period, the natural person has been the subject of any proceeding under the federal [1]Bankruptcy Act; or whether, during the 10-year period, any person or other business or organization in which the natural person was a director, officer, trustee, partner, owner, manager, or other official has been subject to any such proceeding, either during the time in which the natural person was a director, officer, or trustee, if a corporation, or a partner, owner, manager, joint venturer, or other official, if not a corporation, or within 12 months thereafter.

6. Whether, during the 10-year period, the natural person has been enjoined, either temporarily or permanently, by a court of competent jurisdiction from violating any federal or state law regulating the business of insurance, securities, or banking, or from carrying out any particular practice or practices in the course of the business of insurance, securities, or banking, together with details as to any such event.

7. Fingerprints of each person referred to in subsection (4).

(b) Any person filing the statement required by this section shall give all required information that is within the knowledge of:

1. The directors, officers, or trustees, if a corporation, or

2. The partners, owners, managers, or joint venturers, or others performing functions similar to those of a director, officer, or trustee, if not a corporation,

of the person making the filing and of any person controlling either directly or indirectly such person. If any material change occurs in the facts set forth in the application filed with the office pursuant to this section, an amendment setting forth such changes shall be filed immediately with the office, and a copy of the amendment shall be sent by registered mail to the principal office of the specialty insurer and to the principal office of the controlling company.

(6)(a) The acquisition application shall be reviewed in accordance with chapter 120. The office may on its own initiate, or, if requested to do so in writing by a substantially affected person, shall conduct, a proceeding to consider the appropriateness of the proposed filing. Time periods for purposes of chapter 120 shall be tolled during the pendency of the proceeding. Any written request for a proceeding must be filed with the office within 10 days of the date notice of the filing is given. During the pendency of the proceeding or review period by the office, any person or affiliated person complying with the filing requirements of this section may proceed and take all steps necessary to conclude the acquisition so long as the acquisition becoming final is conditioned

upon obtaining office approval. The office shall, however, at any time it finds an immediate danger to the public health, safety, and welfare of the insureds exists, immediately order, pursuant to s. 120.569(2)(n), the proposed acquisition disapproved and any further steps to conclude the acquisition ceased.

(b) During the pendency of the office's review of any acquisition subject to the provisions of this section, the acquiring person shall not make any material change in the operation of the specialty insurer or controlling company unless the office has specifically approved the change nor shall the acquiring person make any material change in the management of the specialty insurer unless advance written notice of the change in management is furnished to the office. A material change in the operation of the specialty insurer is a transaction which disposes of or obligates 5 percent or more of the capital and surplus of the specialty insurer. A material change in the management of the specialty insurer is any change in management involving officers or directors of the specialty insurer or any person of the specialty insurer or controlling company having authority to dispose of or obligate 5 percent or more of the specialty insurer's capital or surplus. The office shall approve a material change in operations if it finds the applicable provisions of subsection (8) have been met. The office may disapprove a material change in management if it finds that the applicable provisions of subsection (8) have not been met and in such case the specialty insurer shall promptly change management as acceptable to the office.

(c) If a request for a proceeding is filed, the proceeding shall be conducted within 60 days after the date the written request for a proceeding is received by the office. A recommended order shall be issued within 20 days of the date of the close of the proceedings. A final order shall be issued within 20 days of the date of the recommended order or, if exceptions to the recommended order are filed, within 20 days of the date the exceptions are filed.

(7) The office may disapprove any acquisition subject to the provisions of this section by any person or any affiliated person of such person who:

(a) Willfully violates this section;

(b) In violation of an order of the office issued pursuant to subsection (11), fails to divest himself or herself of any stock or ownership interest obtained in violation of this section or fails to divest himself or herself of any direct or indirect control of such stock or ownership interest, within 25 days after such order; or

(c) In violation of an order issued by the office pursuant to subsection (11), acquires an additional stock or ownership interest in a specialty insurer or controlling company or direct or indirect control of such stock or ownership interest, without complying with this section.

(8) The person or persons filing the application required by subsection (2) shall have the burden of proof. The office shall approve any such acquisition if it finds, on the basis of the record made during any proceeding or on the basis of the filed application if no proceeding is conducted, that:

(a) Upon completion of the acquisition, the specialty insurer will be able to satisfy the requirements for the issuance of a license or certificate to write the line of insurance for which it is presently licensed or certificated.

(b) The financial condition of the acquiring person or persons will not jeopardize the financial stability of the specialty insurer or prejudice the interests of its insureds or the public.

(c) Any plan or proposal which the acquiring person has, or acquiring persons have, made:

1. To liquidate the specialty insurer, sell its assets, or merge or consolidate it with any person, or to make any other major change in its business or corporate structure or management, or

2. To liquidate any controlling company, sell its assets, or merge or consolidate it with any person, or to make

any major change in its business or corporate structure or management which would have an effect upon the specialty insurer,

is fair and free of prejudice to the insureds of the specialty insurer or to the public.

(d) The competence, experience, and integrity of those persons who will control directly or indirectly the operation of the specialty insurer indicate that the acquisition is in the best interest of the insureds of the insurer and in the public interest.

(e) The natural persons for whom background information is required to be furnished pursuant to this section have such backgrounds as to indicate that it is in the best interests of the insureds of the specialty insurer and in the public interest to permit such persons to exercise control over the specialty insurer.

(f) The directors and officers, if such specialty insurer or controlling company is a stock corporation, or the trustees, partners, owners, managers, or joint venturers or other persons performing duties similar to those of persons in the aforementioned positions, if such specialty insurer or controlling company is not a stock corporation, to be employed after the acquisition have sufficient insurance experience and ability to assure reasonable promise of successful operation.

(g) The management of the specialty insurer after the acquisition will be competent and trustworthy, and will possess sufficient managerial experience so as to make the proposed operation of the specialty insurer not hazardous to the insurance-buying public.

(h) The management of the specialty insurer after the acquisition shall not include any person who has directly or indirectly through ownership, control, reinsurance transactions, or other insurance or business relations unlawfully manipulated the assets, accounts, finances, or books of any insurer or otherwise acted in bad faith with respect thereto.

(i) The acquisition is not likely to be hazardous or prejudicial to the insureds of the insurer or to the public.

(j) The effect of the acquisition would not substantially lessen competition in the line of insurance for which the specialty insurer is licensed or certified in this state or would not tend to create a monopoly therein.

(9) No vote by the stockholder of record, or by any other person, of any security acquired in contravention of the provisions of this section is valid. Any acquisition contrary to the provisions of this section is void. Upon the petition of the specialty insurer or the controlling company, the circuit court for the county in which the principal office of the specialty insurer is located may, without limiting the generality of its authority, order the issuance or entry of an injunction or other order to enforce the provisions of this section. There shall be a private right of action in favor of the specialty insurer or controlling company to enforce the provisions of this section. No demand upon the office that it perform its functions shall be required as a prerequisite to any suit by the specialty insurer or controlling company against any other person, and in no case shall the office be deemed a necessary party to any action by the specialty insurer or controlling company to enforce the provisions of this section. Any person who makes or proposes an acquisition requiring the filing of an application pursuant to this section, or who files such an application, shall be deemed to have thereby designated the Chief Financial Officer, or his or her assistant or deputy or another person in charge of his or her office, as such person's agent for service of process under this section and shall thereby be deemed to have submitted himself or herself to the administrative jurisdiction of the office and to the jurisdiction of the circuit court.

(10) Any approval by the office under this section does not constitute a recommendation by the office of the tender offer or exchange offer, or acquisition, if no tender offer or exchange offer is involved. It is unlawful for a person to represent that the office's approval constitutes a recommendation. A person who violates the provisions of this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s.

775.083, or s. 775.084. The statute-of-limitations period for the prosecution of an offense committed under this subsection is 5 years.

(11) If the office determines that any person or any affiliated person of such person has acquired 10 percent or more of the outstanding voting securities of a specialty insurer or controlling company which is a stock corporation, or 10 percent or more of the ownership interest of a specialty insurer or controlling company which is not a stock corporation, without complying with the provisions of this section, the office may order that the person and any affiliated person of such person cease acquisition of the specialty insurer or controlling company and, if appropriate, divest itself of any stock or ownership interest acquired in violation of this section.

(12)(a) The office shall, if necessary to protect the public interest, suspend or revoke the certificate of authority of any specialty insurer or controlling company acquired in violation of this section.

(b) If any specialty insurer is subject to suspension or revocation pursuant to paragraph (a), the specialty insurer shall be deemed to be in such condition, or to be using or to have been subject to such methods or practices in the conduct of its business, as to render its further transaction of insurance presently or prospectively hazardous to its insureds, creditors, or stockholders or to the public.

(13)(a) For the purpose of this section, the term "acquisition" includes:

1. A tender offer or exchange offer for securities, assets, or other ownership interest;
2. An agreement to exchange securities for other securities, assets, or other ownership interest;
3. A merger of a person or affiliated person into a specialty insurer or a merger of any person with a specialty insurer;
4. A consolidation; or
5. Any other form of change of control

whereby any person or affiliated person acquires or attempts to acquire, directly or indirectly, 10 percent or more of the ownership interest or assets of a specialty insurer or of a controlling company. However, in the case of a health maintenance organization organized as a for-profit corporation, the provisions of s. 628.451 shall govern with respect to any merger or consolidation, and, in the case of a health maintenance organization organized as a not-for-profit corporation, the provisions of s. 628.471 shall govern with respect to any merger or consolidation.

(b) For the purpose of this section, the term "affiliated person" of another person includes:

1. The spouse of such other natural person;
2. The parents of such other natural person and their lineal descendants and the parents of such other natural person's spouse and their lineal descendants;
3. Any person who directly or indirectly owns or controls, or holds with power to vote, 10 percent or more of the outstanding voting securities of such other person;
4. Any person who directly or indirectly owns 10 percent or more of the outstanding voting securities which are directly or indirectly owned or controlled, or held with power to vote, by such other person;
5. Any person or group of persons who directly or indirectly control, are controlled by, or are under common control with such other person;
6. Any director, officer, trustee, partner, owner, manager, joint venturer, or employee, or other person performing duties similar to those of persons in the aforementioned positions, of such other person;
7. If such other person is an investment company, any investment adviser of such company or any member of an advisory board of such company;
8. If such other person is an unincorporated investment company not having a board of directors, the

Online Sunshine

Select Year: 2014 Go

# The 2014 Florida Statutes

Title XXXVII INSURANCE | Chapter 651 CONTINUING CARE CONTRACTS | View Entire Chapter

**651.019 New financing, additional financing, or refinancing.**—

(1) After issuance of a certificate of authority, the provider shall submit to the office a general outline, including intended use of proceeds, with respect to any new financing, additional financing, or refinancing at least 30 days before the closing date of such financing transaction.

(2) The provider shall furnish any information the office may reasonably request in connection with any new financing, additional financing, or refinancing, including, but not limited to, the financing agreements and any related documents, escrow or trust agreements, and statistical or financial data. The provider shall also submit to the office copies of executed financing documents within 30 days after the closing date.

**History.**—ss. 3, 16, ch. 91-98; s. 12, ch. 93-22; s. 1668, ch. 2003-261.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

Online Sunshine

Select Year: 2014 Go

# The 2014 Florida Statutes

| Title XXXVII | Chapter 651 | View Entire Chapter |
|---|---|---|
| INSURANCE | CONTINUING CARE CONTRACTS | |

**651.022 Provisional certificate of authority; application.**—

(1) Each applicant for a certificate of authority shall first apply for and obtain a provisional certificate of authority pursuant to this section.

(2) The application for a provisional certificate of authority shall be on a form prescribed by the commission and shall contain the following information:

(a) If the applicant or provider is a corporation, a copy of the articles of incorporation and bylaws; if the applicant or provider is a partnership or other unincorporated association, a copy of the partnership agreement, articles of association, or other membership agreement; and, if the applicant or provider is a trust, a copy of the trust agreement or instrument.

(b) The full names, residences, and business addresses of:

1. The proprietor, if the applicant or provider is an individual.

2. Every partner or member, if the applicant or provider is a partnership or other unincorporated association, however organized, having fewer than 50 partners or members, together with the business name and address of the partnership or other organization.

3. The principal partners or members, if the applicant or provider is a partnership or other unincorporated association, however organized, having 50 or more partners or members, together with the business name and business address of the partnership or other organization. If such unincorporated organization has officers and a board of directors, the full name and business address of each officer and director may be set forth in lieu of the full name and business address of its principal members.

4. The corporation and each officer and director thereof, if the applicant or provider is a corporation.

5. Every trustee and officer, if the applicant or provider is a trust.

6. The manager, whether an individual, corporation, partnership, or association.

7. Any stockholder holding at least a 10 percent interest in the operations of the facility in which the care is to be offered.

8. Any person whose name is required to be provided in the application under this paragraph and who owns any interest in or receives any remuneration from, directly or indirectly, any professional service firm, association, trust, partnership, or corporation providing goods, leases, or services to the facility for which the application is made, with a real or anticipated value of $10,000 or more, and the name and address of the professional service firm, association, trust, partnership, or corporation in which such interest is held. The applicant shall describe such goods, leases, or services and the probable cost to the facility or provider and shall describe why such goods, leases, or services should not be purchased from an independent entity.

9. Any person, corporation, partnership, association, or trust owning land or property leased to the facility,

along with a copy of the lease agreement.

10. Any affiliated parent or subsidiary corporation or partnership.

(c)1. Evidence that the applicant is reputable and of responsible character. If the applicant is a firm, association, organization, partnership, business trust, corporation, or company, the form shall require evidence that the members or shareholders are reputable and of responsible character, and the person in charge of providing care under a certificate of authority shall likewise be required to produce evidence of being reputable and of responsible character.

2. Evidence satisfactory to the office of the ability of the applicant to comply with the provisions of this chapter and with rules adopted by the commission pursuant to this chapter.

3. A statement of whether a person identified in the application for a provisional certificate of authority or the administrator or manager of the facility, if such person has been designated, or any such person living in the same location:

a. Has been convicted of a felony or has pleaded nolo contendere to a felony charge, or has been held liable or has been enjoined in a civil action by final judgment, if the felony or civil action involved fraud, embezzlement, fraudulent conversion, or misappropriation of property.

b. Is subject to a currently effective injunctive or restrictive order or federal or state administrative order relating to business activity or health care as a result of an action brought by a public agency or department, including, without limitation, an action affecting a license under chapter 400 or chapter 429.

The statement shall set forth the court or agency, the date of conviction or judgment, and the penalty imposed or damages assessed, or the date, nature, and issuer of the order. Before determining whether a provisional certificate of authority is to be issued, the office may make an inquiry to determine the accuracy of the information submitted pursuant to subparagraphs 1. and 2.

(d) The contracts for continuing care and continuing care at-home to be entered into between the provider and residents which meet the minimum requirements of s. 651.055 or s. 651.057 and which include a statement describing the procedures required by law relating to the release of escrowed entrance fees. Such statement may be furnished through an addendum.

(e) Any advertisement or other written material proposed to be used in the solicitation of residents.

(f) Such other reasonable data, financial statements, and pertinent information as the commission or office may reasonably require with respect to the provider or the facility, including the most recent audited financial statements of comparable facilities currently or previously owned, managed, or developed by the applicant or its principal, to assist in determining the financial viability of the project and the management capabilities of its managers and owners.

(g) The forms of the residency contracts, reservation contracts, escrow agreements, and wait list contracts, if applicable, which are proposed to be used by the provider in the furnishing of care. The office shall approve contracts and escrow agreements that comply with ss. 651.023(1)(c), 651.033, 651.055, and 651.057. Thereafter, no other form of contract or agreement may be used by the provider until it has been submitted to the office and approved.

(3) In addition to the information required in subsection (2), an applicant for a provisional certificate of authority shall submit a market feasibility study. The market feasibility study shall include at least the following information:

(a) A description of the proposed facility, including the location, size, anticipated completion date, and the proposed construction program.

(b) An identification and evaluation of the primary and secondary market areas of the facility and the projected unit sales per month.

(c) Projected revenues, including anticipated entrance fees; monthly service fees; nursing care rates, if applicable; and all other sources of revenue, including the total amount of debt financing required.

(d) Projected expenses, including staffing requirements and salaries; cost of property, plant, and equipment, including depreciation expense; interest expense; marketing expense; and other operating expenses.

(e) Current assets and liabilities of the applicant.

(f) Expectations of the financial condition of the project, including the projected cash flow and a projected balance sheet and an estimate of the funds anticipated to be necessary to cover startup losses.

(g) The inflation factor, if any, assumed in the study for the proposed facility and how and where it is applied.

(h) Project costs, marketing projections, resident fees and charges, the competition, resident contract provisions, and other factors which affect the feasibility of the facility.

(i) The name of the person who prepared the feasibility study and the experience of such person in preparing similar studies or otherwise consulting in the field of continuing care.

(4) If an applicant has or proposes to have more than one facility offering continuing care or continuing care at-home, a separate provisional certificate of authority and a separate certificate of authority must be obtained for each facility.

(5)(a) Within 30 days after receipt of an application for a provisional certificate of authority, the office shall examine the application and shall notify the applicant in writing, specifically setting forth and specifically requesting any additional information the office is permitted by law to require. If the application submitted is determined by the office to be substantially incomplete so as to require substantial additional information, including biographical information, the office may return the application to the applicant with a written notice that the application as received is substantially incomplete and, therefore, unacceptable for filing without further action required by the office. Any filing fee received shall be refunded to the applicant.

(b) Within 15 days after receipt of all of the requested additional information, the office shall notify the applicant in writing that all of the requested information has been received and the application is deemed to be complete as of the date of the notice. Failure to so notify the applicant in writing within the 15-day period shall constitute acknowledgment by the office that it has received all requested additional information, and the application shall be deemed to be complete for purposes of review upon the date of the filing of all of the requested additional information.

(6) Within 45 days after the date an application is deemed complete as set forth in paragraph (5)(b), the office shall complete its review and issue a provisional certificate of authority to the applicant based upon its review and a determination that the application meets all requirements of law, that the feasibility study was based on sufficient data and reasonable assumptions, and that the applicant will be able to provide continuing care or continuing care at-home as proposed and meet all financial obligations related to its operations, including the financial requirements of this chapter. If the application is denied, the office shall notify the applicant in writing, citing the specific failures to meet the provisions of this chapter. Such denial entitles the applicant to a hearing pursuant to chapter 120.

(7) The issuance of a provisional certificate of authority entitles the applicant to collect entrance fees and reservation deposits from prospective residents. All or any part of an entrance fee or deposit collected shall be placed in an escrow account or on deposit with the department, pursuant to s. 651.033, until a certificate of authority is issued by the office.

(8) The office shall not approve any application which includes in the plan of financing any encumbrance of the operating reserves required by this chapter.

**History.**—ss. 4, 33, ch. 83-328; s. 35, ch. 85-62; s. 42, ch. 85-321; s. 2, ch. 87-136; s. 2, ch. 89-363; s. 2, ch. 92-56; s. 12, ch. 93-22; s. 4, ch. 97-229; s. 1670, ch. 2003-261; s. 100, ch. 2006-197; s. 3, ch. 2010-202; s. 5, ch. 2011-193.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

Online Sunshine

Select Year: 2014 Go

# The 2014 Florida Statutes

Title XXXVII INSURANCE | Chapter 651 CONTINUING CARE CONTRACTS | View Entire Chapter

**651.026 Annual reports.**—

(1) Annually, on or before May 1, the provider shall file an annual report and such other information and data showing its condition as of the last day of the preceding calendar year, except as provided in subsection (5). If the office does not receive the required information on or before May 1, a late fee may be charged pursuant to s. 651.015(2)(c). The office may approve an extension of up to 30 days.

(2) The annual report shall be in such form as the commission prescribes and shall contain at least the following:

(a) Any change in status with respect to the information required to be filed under s. 651.022(2).

(b) Financial statements audited by an independent certified public accountant which must contain, for two or more periods if the facility has been in existence that long, all of the following:

1. An accountant's opinion and, in accordance with generally accepted accounting principles:

a. A balance sheet;

b. A statement of income and expenses;

c. A statement of equity or fund balances; and

d. A statement of changes in cash flows.

2. Notes to the financial statements considered customary or necessary for full disclosure or adequate understanding of the financial statements, financial condition, and operation.

(c) The following financial information:

1. A detailed listing of the assets maintained in the liquid reserve as required under s. 651.035 and in accordance with part II of chapter 625;

2. A schedule giving additional information relating to property, plant, and equipment having an original cost of at least $25,000, so as to show in reasonable detail with respect to each separate facility original costs, accumulated depreciation, net book value, appraised value or insurable value and date thereof, insurance coverage, encumbrances, and net equity of appraised or insured value over encumbrances. Any property not used in continuing care must be shown separately from property used in continuing care;

3. The level of participation in Medicare or Medicaid programs, or both;

4. A statement of all fees required of residents, including, but not limited to, a statement of the entrance fee charged, the monthly service charges, the proposed application of the proceeds of the entrance fee by the provider, and the plan by which the amount of the entrance fee is determined if the entrance fee is not the same in all cases; and

5. Any change or increase in fees if the provider changes the scope of, or the rates for, care or services, regardless of whether the change involves the basic rate or only those services available at additional costs to

the resident.

6. If the provider has more than one certificated facility, or has operations that are not licensed under this chapter, it shall submit a balance sheet, statement of income and expenses, statement of equity or fund balances, and statement of cash flows for each facility licensed under this chapter as supplemental information to the audited financial statements required under paragraph (b).

(d) Such other reasonable data, financial statements, and pertinent information as the commission or office may require with respect to the provider or the facility, or its directors, trustees, members, branches, subsidiaries, or affiliates, to determine the financial status of the facility and the management capabilities of its managers and owners.

(e) Each facility shall file with the office annually, together with the annual report required by this section, a computation of its minimum liquid reserve calculated in accordance with s. 651.035 on a form prescribed by the commission.

(f) If, due to a change in generally accepted accounting principles, the balance sheet, statement of income and expenses, statement of equity or fund balances, or statement of cash flows is known by any other name or title, the annual report must contain financial statements using the changed names or titles that most closely correspond to a balance sheet, statement of income and expenses, statement of equity or fund balances, and statement of changes in cash flows.

(3) The commission shall adopt by rule meaningful measures of assessing the financial viability of a provider. The rule may include the following factors:

(a) Debt service coverage ratios.

(b) Current ratios.

(c) Adjusted current ratios.

(d) Cash flows.

(e) Occupancy rates.

(f) Other measures, ratios, or trends.

(g) Other factors as may be appropriate.

(4) If the provider is an individual, the annual statement shall be sworn to by him or her; if a limited partnership, by the general partner; if a partnership other than a limited partnership, by all the partners; if any other unincorporated association, by all its members or officers and directors; if a trust, by all its trustees and officers; and, if a corporation, by the president and secretary thereof.

(5) A provider may declare at the time of application a fiscal year other than the calendar year, and may use such fiscal year for its accounting period. A provider may subsequently adopt a fiscal year upon providing the office with a copy of the Internal Revenue Service approval of such change, if such approval is required. The annual report filing with the office must be made within 120 days of the last day of the fiscal year of the provider.

(6) The workpapers, account analyses, descriptions of basic assumptions, and other information necessary for a full understanding of the annual statement of a provider as filed with the office shall be made available for visual inspection by the office at the facility or, if the office requests, at another agreed-upon site. Photocopies may not be made unless consented to by the provider.

(7) A filing fee in the amount of $100 shall accompany each annual report required by this section.

(8) All financial reports and any supplemental financial information submitted to the office shall be prepared in conformity with generally accepted accounting principles.

(9) The commission may by rule require all or part of the statements or filings required under this section to be submitted by electronic means in a computer-readable form compatible with the electronic data format specified by the commission.

**History.**—s. 1, ch. 77-323; s. 250, ch. 79-400; s. 3, ch. 80-13; s. 1, ch. 80-73; s. 437, ch. 81-259; ss. 4, 25, ch. 81-292; s. 2, ch. 81-318; s. 3, ch. 83-265; ss. 6, 31, 33, 35, ch. 83-328; s. 44, ch. 85-321; s. 5, ch. 87-136; s. 4, ch. 89-363; s. 4, ch. 92-56; ss. 3, 12, ch. 93-22; s. 509, ch. 97-102; s. 7, ch. 97-229; s. 1673, ch. 2003-261; s. 5, ch. 2006-64; s. 5, ch. 2010-202.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

Online Sunshine

Select Year: 2014 Go

# The 2014 Florida Statutes

| Title XXXVII | Chapter 651 | View Entire Chapter |
|---|---|---|
| INSURANCE | CONTINUING CARE CONTRACTS | |

**651.033 Escrow accounts.**—

(1) When funds are required to be deposited in an escrow account pursuant to s. 651.022, s. 651.023, s. 651.035, or s. 651.055:

(a) The escrow account shall be established in a Florida bank, Florida savings and loan association, or Florida trust company acceptable to the office or on deposit with the department; and the funds deposited therein shall be kept and maintained in an account separate and apart from the provider's business accounts.

(b) An escrow agreement shall be entered into between the bank, savings and loan association, or trust company and the provider of the facility; the agreement shall state that its purpose is to protect the resident or the prospective resident; and, upon presentation of evidence of compliance with applicable portions of this chapter, or upon order of a court of competent jurisdiction, the escrow agent shall release and pay over the funds, or portions thereof, together with any interest accrued thereon or earned from investment of the funds, to the provider or resident as directed.

(c) Any agreement establishing an escrow account required under the provisions of this chapter shall be subject to approval by the office. The agreement shall be in writing and shall contain, in addition to any other provisions required by law, a provision whereby the escrow agent agrees to abide by the duties imposed under this section.

(d) All funds deposited in an escrow account, if invested, shall be invested as set forth in part II of chapter 625; however, such investment may not diminish the funds held in escrow below the amount required by this chapter. Funds deposited in an escrow account are not subject to charges by the escrow agent except escrow agent fees associated with administering the accounts, or subject to any liens, judgments, garnishments, creditor's claims, or other encumbrances against the provider or facility except as provided in s. 651.035(1).

(e) At the request of either the provider or the office, the escrow agent shall issue a statement indicating the status of the escrow account.

(2) In addition, the escrow agreement shall provide that the escrow agent or another person designated to act in the escrow agent's place and the provider, except as otherwise provided in s. 651.035, shall notify the office in writing at least 10 days before the withdrawal of any portion of any funds required to be escrowed under the provisions of s. 651.035. However, in the event of an emergency and upon petition by the provider, the office may waive the 10-day notification period and allow a withdrawal of up to 10 percent of the required minimum liquid reserve. The office shall have 3 working days to deny the petition for the emergency 10-percent withdrawal. If the office fails to deny the petition within 3 working days, the petition shall be deemed to have been granted by the office. For the purpose of this section, "working day" means each day that is not a Saturday, Sunday, or legal holiday as defined by Florida law. Also for the purpose of this section, the day the

petition is received by the office shall not be counted as one of the 3 days.

(3) In addition, when entrance fees are required to be deposited in an escrow account pursuant to s. 651.022, s. 651.023, or s. 651.055:

(a) The provider shall deliver to the resident a written receipt. The receipt must show the payor's name and address, the date, the price of the care contract, and the amount of money paid. A copy of each receipt, together with the funds, shall be deposited with the escrow agent or as provided in paragraph (c). The escrow agent shall release such funds to the provider 7 days after the date of receipt of the funds by the escrow agent if the provider, operating under a certificate of authority issued by the office, has met the requirements of s. 651.023(6). However, if the resident rescinds the contract within the 7-day period, the escrow agent shall release the escrowed fees to the resident.

(b) At the request of an individual resident of a facility, the escrow agent shall issue a statement indicating the status of the resident's portion of the escrow account.

(c) At the request of an individual resident of a facility, the provider may hold the check for the 7-day period and shall not deposit it during this time period. If the resident rescinds the contract within the 7-day period, the check shall be immediately returned to the resident. Upon the expiration of the 7 days, the provider shall deposit the check.

(d) A provider may assess a nonrefundable fee, which is separate from the entrance fee, for processing a prospective resident's application for continuing care or continuing care at-home.

(4) Any fees of $1,500 or less which are assessed with respect to prospective residents to have their names placed on a facility's waiting list shall not be subject to the escrow provisions of this section.

(5) When funds are required to be deposited in an escrow account pursuant to s. 651.022, s. 651.023, or s. 651.035, the following shall apply:

(a) The escrow agreement shall require that the escrow agent furnish the provider with a quarterly statement indicating the amount of any disbursements from or deposits to the escrow account and the condition of the account during the period covered by the statement. The agreement shall require that the statement be furnished to the provider by the escrow agent on or before the 10th day of the month following the end of the quarter for which the statement is due. If the escrow agent does not provide the quarterly statement to the provider on or before the 10th day of the month following the month for which the statement is due, the office may, in its discretion, levy against the escrow agent a fine not to exceed $25 a day for each day of noncompliance with the provisions of this subsection.

(b) If the escrow agent does not provide the quarterly statement to the provider on or before the 10th day of the month following the quarter for which the statement is due, the provider shall, on or before the 15th day of the month following the quarter for which the statement is due, send a written request for the statement to the escrow agent by certified mail return receipt requested.

(c) On or before the 20th day of the month following the quarter for which the statement is due, the provider shall file with the office a copy of the escrow agent's statement or, if the provider has not received the escrow agent's statement, a copy of the written request to the escrow agent for the statement.

(d) The office may, in its discretion, in addition to any other penalty that may be provided for under this chapter, levy a fine against the provider not to exceed $25 a day for each day the provider fails to comply with the provisions of this subsection.

(e) Funds held on deposit with the department are exempt from the reporting requirements of this subsection.

**History.**—ss. 6, 25, ch. 81-292; s. 3, ch. 83-265; ss. 7, 33, 35, ch. 83-328; s. 47, ch. 85-321; s. 3, ch. 86-209; s. 6, ch. 87-136; s. 12,

ch. 91-110; s. 12, ch. 93-22; s. 510, ch. 97-102; s. 8, ch. 97-229; s. 2, ch. 2002-222; s. 1676, ch. 2003-261; s. 6, ch. 2010-202; s. 7, ch. 2011-193.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

Online Sunshine

Select Year: 2014 Go

# The 2014 Florida Statutes

| Title XXXVII | Chapter 651 | View Entire Chapter |
|---|---|---|
| INSURANCE | CONTINUING CARE CONTRACTS | |

**651.035 Minimum liquid reserve requirements.**—

(1) A provider shall maintain in escrow a minimum liquid reserve consisting of the following reserves, as applicable:

(a) Each provider shall maintain in escrow as a debt service reserve the aggregate amount of all principal and interest payments due during the fiscal year on any mortgage loan or other long-term financing of the facility, including property taxes as recorded in the audited financial statements required under s. 651.026. The amount must include any leasehold payments and all costs related to such payments. If principal payments are not due during the fiscal year, the provider shall maintain in escrow as a minimum liquid reserve an amount equal to interest payments due during the next 12 months on any mortgage loan or other long-term financing of the facility, including property taxes.

(b) A provider that has outstanding indebtedness that requires a debt service reserve to be held in escrow pursuant to a trust indenture or mortgage lien on the facility and for which the debt service reserve may only be used to pay principal and interest payments on the debt that the debtor is obligated to pay, and which may include property taxes and insurance, may include such debt service reserve in computing the minimum liquid reserve needed to satisfy this subsection if the provider furnishes to the office a copy of the agreement under which such debt service is held, together with a statement of the amount being held in escrow for the debt service reserve, certified by the lender or trustee and the provider to be correct. The trustee shall provide the office with any information concerning the debt service reserve account upon request of the provider or the office.

(c) Each provider shall maintain in escrow an operating reserve equal to 30 percent of the total operating expenses projected in the feasibility study required by s. 651.023 for the first 12 months of operation. Thereafter, each provider shall maintain in escrow an operating reserve equal to 15 percent of the total operating expenses in the annual report filed pursuant to s. 651.026. If a provider has been in operation for more than 12 months, the total annual operating expenses shall be determined by averaging the total annual operating expenses reported to the office by the number of annual reports filed with the office within the preceding 3-year period subject to adjustment if there is a change in the number of facilities owned. For purposes of this subsection, total annual operating expenses include all expenses of the facility except: depreciation and amortization; interest and property taxes included in paragraph (a); extraordinary expenses that are adequately explained and documented in accordance with generally accepted accounting principles; liability insurance premiums in excess of those paid in calendar year 1999; and changes in the obligation to provide future services to current residents. For providers initially licensed during or after calendar year 1999, liability insurance shall be included in the total operating expenses in an amount not to exceed the premium

paid during the first 12 months of facility operation. Beginning January 1, 1993, the operating reserves required under this subsection shall be in an unencumbered account held in escrow for the benefit of the residents. Such funds may not be encumbered or subject to any liens or charges by the escrow agent or judgments, garnishments, or creditors' claims against the provider or facility. However, if a facility had a lien, mortgage, trust indenture, or similar debt instrument in place before January 1, 1993, which encumbered all or any part of the reserves required by this subsection and such funds were used to meet the requirements of this subsection, then such arrangement may be continued, unless a refinancing or acquisition has occurred, and the provider shall be in compliance with this subsection.

(d) Each provider shall maintain in escrow a renewal and replacement reserve equal to 15 percent of the total accumulated depreciation based on the audited financial statement required to be filed pursuant to s. 651.026, not to exceed 15 percent of the facility's average operating expenses for the past 3 fiscal years based on the audited financial statements for each of those years. For a provider who is an operator of a facility but is not the owner and depreciation is not included as part of the provider's financial statement, the renewal and replacement reserve required by this paragraph must equal 15 percent of the total operating expenses of the provider, as described in this section. Each provider licensed before October 1, 1983, shall fully fund the renewal and replacement reserve by October 1, 2003, by multiplying the difference between the former escrow requirement and the present escrow requirement by the number of years the facility has been in operation after October 1, 1983.

(2)(a) In facilities where not all residents are under continuing care or continuing care at-home contracts, the reserve requirements of subsection (1) shall be computed only with respect to the proportional share of operating expenses that are applicable to residents. For purposes of this calculation, the proportional share shall be based upon the ratio of residents under continuing care or continuing care at-home contracts to those residents who do not hold such contracts.

(b) In facilities that have voluntarily and permanently discontinued marketing continuing care and continuing care at-home contracts, the office may allow a reduced debt service reserve as required in subsection (1) based upon the ratio of residents under continuing care or continuing care at-home contracts to those residents who do not hold such contracts if the office finds that such reduction is not inconsistent with the security protections intended by this chapter. In making this determination, the office may consider such factors as the financial condition of the facility, the provisions of outstanding continuing care and continuing care at-home contracts, the ratio of residents under continuing care or continuing care at-home contracts to those residents who do not hold such contracts, the current occupancy rates, the previous sales and marketing efforts, the life expectancy of the remaining residents, and the written policies of the board of directors of the provider or a similar board.

(3) If principal and interest payments are paid to a trust that is beneficially held by the residents as described in s. 651.023(7), the office may waive all or any portion of the escrow requirements for mortgage principal and interest contained in subsection (1) if the office finds that such waiver is not inconsistent with the security protections intended by this chapter.

(4) The office, upon approval of a plan for fulfilling the requirements of this section and upon demonstration by the facility of an annual increase in liquid reserves, may extend the time for compliance.

(5) A provider may satisfy the minimum liquid reserve requirements of this section by acquiring from a financial institution, as specified in paragraph (b), a clean, unconditional irrevocable letter of credit equal to the requirements of this section.

(a) The letter of credit must be issued by a financial institution participating in the State of Florida Treasury Certificate of Deposit Program, and must be approved by the office before issuance and before any renewal or modification thereof. At a minimum, the letter of credit must provide for:

1. Ninety days' prior written notice to both the provider and the office of the financial institution's determination not to renew or extend the term of the letter of credit.

2. Unless otherwise arranged by the provider to the satisfaction of the office, deposit by the financial institution of letter of credit funds in an account designated by the office no later than 30 days before the expiration of the letter of credit.

3. Deposit by the financial institution of letter of credit funds in an account designated by the office within 4 business days following written instructions from the office that, in the sole judgment of the office, funding of the minimum liquid reserve is required.

(b) The terms of the letter of credit must be approved by the office and the long-term debt of the financial institution providing such letter of credit must be rated in one of their top three long-term debt rating categories by either Moody's Investors Service, Standard & Poor's Corporation, or a recognized securities rating agency acceptable to the office.

(c) The letter of credit must name the office as beneficiary.

(d) Notwithstanding any other provision of this section, a provider using a letter of credit pursuant to this subsection shall, at all times, have and maintain in escrow an operating cash reserve equal to 2 months' operating expenses as determined pursuant to s. 651.026.

(e) If the issuing financial institution no longer participates in the State of Florida Treasury Certificate of Deposit Program, such financial institution shall deposit as collateral with the department eligible securities, as prescribed by s. 625.52, having a market value equal to or greater than 100 percent of the stated amount of the letter of credit.

(6) Each fiscal year, a provider may withdraw up to 33 percent of the total renewal and replacement reserve available. The reserve available is equal to the market value of the invested reserves at the end of the provider's prior fiscal year. The withdrawal must be used for capital items or major repairs.

(a) Before any funds are eligible for withdrawal, the provider must obtain written permission from the office by submitting the following:

1. The amount of the withdrawal and the intended use of the proceeds.

2. A board resolution and sworn affidavit signed by two officers or general partners of the provider which indicates approval of the withdrawal and use of the funds.

3. Proof that the provider has met all funding requirements for the operating, debt service, and renewal and replacement reserves computed for the previous fiscal year.

4. Anticipated payment schedule for refunding the renewal and replacement reserve fund.

(b) Within 30 days after the withdrawal of funds, the provider must begin refunding the reserve account in equal monthly payments that allow for a complete funding of the withdrawal within 36 months. If the payment schedule required under subparagraph (a)4. has changed, the provider must update the office with the new payment schedule. If the provider fails to make a required monthly payment or the payment is late, the provider must notify the office within 5 days after the due date of the payment. No additional withdrawals from the renewal and replacement reserve will be allowed until all scheduled payments are current.

**History.**—s. 1, ch. 77-323; ss. 7, 25, ch. 81-292; s. 2, ch. 81-318; s. 3, ch. 83-265; ss. 8, 31, 33, 35, ch. 83-328; s. 53, ch. 85-321; s. 4, ch. 86-209; s. 7, ch. 87-136; s. 5, ch. 89-363; s. 7, ch. 91-98; s. 184, ch. 91-108; ss. 5, 12, ch. 93-22; s. 9, ch. 97-229; s. 3, ch. 2002-222; s. 1677, ch. 2003-261; s. 1, ch. 2006-202; s. 7, ch. 2010-202; s. 8, ch. 2011-193.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us