UNITED STATES BANKRUPTCY
COURT MIDDLE DISTRICT OF
FLORIDA TAMPA DIVISION

In re:                        )
                              )
WESTPORT HOLDINGS             )
TAMPA, LIMITED                )
PARTNERSHIP, WESTPORT         ) Chapter 11
HOLDINGS TAMPA II,            )
LIMITED PARTNERSHIP,          ) Case No. 8:16-bk-08167-CED
                              )
          Debtors             ) Case No. 8:16-bk-08168-CED
_____      )
                              ) Jointly Administered Under
JEFFREY W. WARREN,            ) Case No. 8:16-bk-08167-CED
LIQUIDATING TRUSTEE           )
FOR WESTPORT HOLDINGS         ) Adv. Pro. No.:
CPM TAMPA, LIMITED            ) 8:20-ap-00007
PARTNERSHIP and               )
WESTPORT HOLDINGS II,         )
LIMITED PARTNERSHIP,          )
                              )
     Plaintiff                )
                              )
     v.                       )
                              )
VALLEY NATIONAL BANK,         )
principal subsidiary          )
to VALLEY NATIONAL            )
BANKCORP, a New               )
Jersey domestic              )
profit corporation,           )
as successor by               )
merger to                     )
USAMERIBANK,                  )
                              )
          Defendant.          )

ZOOM DEPOSITION OF DANIEL SHEESLEY, a Witness, taken remotely on behalf of the Plaintiff before Cassandra L. Sinthusy, CCR #1272, RMR, CRR, pursuant to Notice on the 9th day of November, 2023, at the offices of Regus-Kansas City Crown, Two Pershing Square, 2300 Main Street, 9th Floor, Kansas City, Missouri 64108.

A P P E A R A N C E S

FOR THE PLAINTIFF VIA ZOOM:
      Mr. Keith T. Appleby
      APPLEBY LAW PA
      4916 West Melrose Avenue
      S Tampa, FL 33629
      813.435.0396
      keithtappleby@icloud.com

FOR THE DEFENDANT:
      Mr. Edmund S. Whitson III
      Ms. Chantel Wonder, Appearing via Zoom
      Mr. Colin Dean, Appearing via Zoom
      MCGLINCHEY
      100 South Ashley Drive
      Suite 600
      Tampa, FL 33602
      813.310.0733
      ewhitson@mcglinchey.com

                              I N D E X
WITNESS:                                              PAGE:
DANIEL SHEESLEY
    EXAMINATION VIA ZOOM BY MR. APPLEBY                 5


                          E X H I B I T S
NO.             DESCRIPTION:                          PAGE:

Exhibit 276 Valley National Bank's                      10
            Third Amended Answer and
            Affirmative Defenses to
            Liquidating trustee's
            Amended Complaint

Exhibit 277 2/2/2018 Email Exchange -                   12
            VNB_034141

Exhibit 278 7/1/2019 Email Exchange -                   17
            VNB_036919 through 036922

Exhibit 279 4/30/2018 Email Exchange -                  13
            VNB_042123 through 042124

Exhibit 280 2/13/2020 Email Exchange -                  18
            VNB_042126 through 042127

Exhibit 281 4/15/2020 Email Exchange -                  20
            VNB_042131 through 042132

Exhibit 282 4/19/2019 Email Exchange -                  36
            Bartle 000577 through
            000582

Exhibit 283 5/10/2019 Email Exchange -                  38
            Bartle 000532 through
            000534

Exhibit 284 5/19/2021 Email Exchange -                  40
            Bartle 000556 through
            000561

Exhibit 285 8/21/2019 Email Exchange -                  42
            Bartle 000571 through
            000576

Exhibit 286 4/29/2021 Email - Bartle          43
            000586 through 000588
Exhibit 287 4/11/2019 Email Exchange -        49
            Bartle 000535 through
            000547
Exhibit 289 7/1/2021 Email Exchange -         49
            Bartle 000554

Exhibit 290 1/12/2022 Email Exchange -        52
            Bartle 000251 through
            000253

Exhibit 291 6/29/2022 Email Exchange -        53
            Bartle 000354 through
            000484

(Reporter's Note:  Exhibit 288 was not
referenced.  All other exhibits sent with the
transcript.)

(Deposition commenced at 11:17 a.m.)

DANIEL SHEESLEY,

being first duly sworn, testified under oath as follows:

EXAMINATION

BY MR. APPLEBY:

Q.   Thank you.  Mr. Sheesley, my name's Keith Appleby; I'm the attorney for the liquidating trustee, Jeff Warren.  We're here today on the case Jeff Warren, as Liquidating Trustee for Westport Holdings Tampa, Limited Partnership, and Westport Holdings II, Limited Partnership, versus Valley National Bank, who is a successor by merger to the USAmeriBank.

Mr. Sheesley, if you would, please, state your full name for the record.

A.   Daniel Sheesley.

Q.   Mr. Sheesley, have you ever had your deposition taken before?

A.   Yes.

Q.   Have you ever had it taken by Zoom or in this type of format?

A.   Yes.

Q.   Okay.  Well, I'll probably tell you things that you already know, but because we're

on video and sometimes there's a little delay, you know, I'll just ask that you respond with verbal answers, you know, orally so that the court reporter can hear you, and me as well.

If at any point this -- today you need a break or would like to take a break, we'll do that.  Likewise, if I ask a question that's not clear and you don't understand what I'm asking, please just let me know and I'll do my best to rephrase the question.

A.   Understood.  Thank you.

Q.   Mr. Sheesley, who's the name of your current employer?

A.   Valley National Bank.

Q.   What is your current job title?

A.   I'm a special assets team leader.

Q.   Okay.  How long have you been employed with Valley National Bank?

A.   A little over 16 years.  But -- sorry. Prior to was my prior bank, First United, which Valley acquired at the end of 2014, so I apologize.  I included all of those together. But Valley --

Q.   No problem.

A.   Valley would be about eight years then.

Q.   Okay.  And how long have you been involved in special assets?

A.   Somewhere around ten or 11 years would be my best guess.  I've had a number of different positions in my early career.

Q.   Okay.  Where is Valley National Bank headquartered?

A.   Recently we relocated our headquarters, we're now in Morristown, New Jersey.

Q.   And could you tell me how large of a bank Valley National Bank is?

A.   It's about 60 billion in total asset size, roughly.

Q.   Do you know what states Valley Bank -- Valley National Bank operates in?

A.   Some of our products are nationwide.  We have, I would say, New Jersey, New York, Florida, Alabama, are our primary states, but we have offices in Chicago, California, other states as well that I'm not 100 percent sure on because it's outside of my line of business.

Q.   Okay.  I think I've seen recent emails with your bank's signature block on it, they indicate that you're located in West Palm Beach, Florida, but today we're taking your deposition

in Kansas City. Can you tell me why -- what's --
where are you located, I guess, where do you
work --

A. Sure.

Q. -- physically?

A. Sure. My office is in West Palm Beach,
Florida, but I do work remotely from Kansas as
well.

Q. Mr. Sheesley, have you ever been
involved in any other bankruptcy proceedings
separate from this particular case?

A. Yes, I have.

Q. Were any of those cases involving
retirement communities?

A. I don't recall offhand. There's been a
numerous amount of bankruptcies that I've dealt
with.

Q. Okay. And similar question, but do you
know whether any of the bankruptcies you might
have dealt with previously involved assisted
living facilities or skilled nursing facilities?

MR. WHITSON: Object to form.

A. They may have, but it's not coming to
mind at the moment.

Q. (BY MR. APPLEBY) Have you reviewed any

documents or other evidence related to this lawsuit in preparation for this deposition?

A.   I have.

Q.   Could you tell me what you've reviewed.

A.   I reviewed the hearing transcript from October 18th; I reviewed my fellow colleague's deposition transcript; I looked at some correspondence with Richard Akerman.  And I spoke with my counsel.

Q.   Okay.  When you mentioned your former -- or excuse me, your colleague.  You mean Trey Korhn?

A.   I do.  That's correct.

MR. APPLEBY:  Ed, did you all receive the documents, do you know -- do you have documents there?

MR. WHITSON:  I have a FedEx package addressed to me.  I haven't opened it.

MR. APPLEBY:  Okay.  Well, if you wouldn't mind, please go ahead.  Hopefully I'll be able to organize us here.  They should be pre-labeled and in order.

MR. WHITSON:  All right.  These are in separate envelopes and the envelopes don't appear to be marked.  Are these three copies of

the same documents or are they different?

MR. APPLEBY:  They should be -- the first document that I'm going to refer to is premarked as Plaintiff's Exhibit 276.

MR. WHITSON:  All right.  I've got that.  And let's see, are there extra copies in here?

MR. APPLEBY:  Well, there should be three copies of each.

MR. WHITSON:  Okay.  So that's what I was trying to find out.  If these are sequencive documents or if they're copies of the same document, so -- you may want to keep that for your set.

So I'm going to keep a set, the court reporter has a set, and the witness has a set.

MR. APPLEBY:  Okay, perfect.  Thank you.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, the first document that I will refer to is premarked as Plaintiff's Exhibit 276.  Can you tell me whether you've seen this document before?

A.   Yes.

Q.   Do you recall whether you participated in the preparations of preparing this pleading?

A.    I don't recall.

Q.    Okay.  For the record, I'll state this is Valley National Bank's Third Amended Answer and Affirmative Defenses to Liquidating Trustee's Amended Complaint.

Do you know whether you participated in any version of an answer or affirmative defenses on behalf of the bank?

A.    To that end, it would have likely been a verbal discussion with my counsel, but I don't remember the details.

Q.    Okay.  Can you describe for me your role in the eventual circumstances that resulted in this lawsuit?

MR. WHITSON:  I'll object to form.

A.    I'm an asset manager for the bank, and this matter was assigned to myself after acquisition.  That's my only real involvement.  And it's been ongoing since then.

Q.    (BY MR. APPLEBY)  Okay.  When -- can you tell me when you became involved in this matter or when you became aware of the issues with the loan related to Westport Nursing?

A.    So Valley acquired USAmeriBank, I believe it was January 1st of 2018.  It would

have been around that time frame where it would have been put on my radar. I do know that the USAmeriBank special asset officer who was handling it remained involved after that date until he was ultimately let go, I do not recall when exactly that was. It was not my decision. But I would say around -- around January of 2018 would be when I was aware of this.

Q. Okay. If I could refer you to the next document that's labeled Plaintiff's Exhibit 277. And Mr. Sheesley, do you recognize this email exchange?

A. I don't recognize it exactly, but I -- it makes sense that this would go -- come across. And yes, it would -- it looks very legitimate and it -- we would have had an introduction like this, so yes, to that extent, I do recognize it. I don't recall the exact email at the time, but this --

Q. Okay.

A. This looks like something I would have received, absolutely, yes.

Q. Okay. And this is consistent with what you just mentioned, this was dated February 2, 2018, it was an introduction from Ellsworth

Summers to Mr. Whitson.  Well, basically an introduction of you as who would be working on the Westport Nursing matter.

Can you tell me who Ellsworth Summers is?

A.   Sure.  Ellsworth Summers is a partner with the law firm of Burr Forman.  And around this time that was a law firm that was handling the case.  Ellsworth is Valley's main point of contact with this firm.

Q.   If I could next direct you to what's marked as Plaintiff's Exhibit -- well, I think I may have one out of order here, but if you would go to 279.

A.   Okay.

Q.   And Mr. Sheesley, do you recall this email exchange?

A.   I don't recall the exact exchange as it was many years ago, but this seems in order of an exchange that I would have, yes.

Q.   Okay.  And in this it references "alpha additions."  Can you tell me what's an alpha addition?

A.   Sure.  Our department keeps an alphabetical listing of active matters.  And the

alpha here would be a reference to that report.

Q.   Okay.   If you -- if you could just flip to the back page of this, it appears to be a -- the report.   And top left says Sheesley Alpha Additions.   But if you wouldn't mind looking down to where it references Westport Nursing Tampa.  Could you tell me across that line what -- essentially what those -- what that information means?

MR. WHITSON:   I'm just going to interpose an objection that we keep this within the scope of what the judge's order was about Mr. Sheesley's personal knowledge.   To the extent he's being asked to testify about the bank's knowledge or bank policies and procedures, bank format -- forms, that type of thing, you know, I mean, I'm willing to allow a little bit of background questioning on that, Mr. Appleby, but you know, I think the judge was very clear that, I mean, your reference was that Mr. Sheesley was mentioned in affirmative defense, I can find no reference in the affirmative defenses.   And your reference in the -- at the hearing was that Mr. Sheesley worked with Mr. Warren and assisting in the sale, which again, I'm not aware of that.

But I mean, to the extent that we're --

MR. APPLEBY:  Listen, your --

MR. WHITSON:  -- we're going beyond that.

MR. APPLEBY:  -- objection's noted --

MR. WHITSON:  No, I'm getting -- I will to instruct him not to answer.

MR. APPLEBY:  -- this isn't your deposition this morning.

MR. WHITSON:  Well, I'm being very clear, Mr. Appleby, we're going to stay faithful to the judge's order.

Q.   (BY MR. APPLEBY)  Well, I'm asking very specifically, Mr. Sheesley, your knowledge about this information.

A.   Sure.

THE WITNESS:  Ed, can I answer?

MR. WHITSON:  Yeah, you can answer.

A.   So to the extent of that line item in this reference, there are column titles at the top of the page, the first is the day he was assigned, that corresponds with the date of acquisition of the bank.  The account name is the loan name; loan origin, USAB stands for

USAmeriBank.  Is this what you're asking for?

Q.  (BY MR. APPLEBY)  Yes, sir.

A.  Okay.  The account number would be the loan number assigned to it.  The officer are my initials.  The loan type, CM stands for commercial mortgage.  The bank attorney assigned is the law firm of Burr Forman.  And the book balance is the bank's internal principal book balance.  And the last column -- well, there's a blank column which shows the charge off -- any charge off amounts, and the last column is the bank's internal risk grade.

Q.  Okay.  With that, again, I'm asking your personal knowledge.  The seven is -- what's the scale that this type of risk grade is based on?

A.  Sure.  There's a nine-level grading system.  One being, you know, the best, if you will, as far as loan strength, usually cash secured.  And nine being a charge off.  This is a seven, which stands for substandard.  And that's the rating system, and that's done for regulatory purposes.

Q.  Okay.  Thank you, Mr. Sheesley.

A.  Uh-huh.

Q.  Next I would refer you to Plaintiff's

Exhibit premarked 278.

MR. WHITSON:  Didn't we start with 278?

THE WITNESS:  We skipped it.

MR. APPLEBY:  No, I had one out of order, so we went 279, now 278.

MR. WHITSON:  Okay.

A.   I've got it.

Q.   (BY MR. APPLEBY)  And Mr. Sheesley, this is an email from you to Josephine Cusmano dated July 1, 2019.  The last page of this document also has a chart on it.  If you wouldn't mind, could you basically just tell me what's the -- what's the use of this chart?

MR. WHITSON:  Object to form.

A.   This, from what I -- it appears to be, is an internal bank platform that records what attorneys and what matters they're assigned to. This is not a report that I use.  This comes from Josephine, one of our assistants.  And it lists the various law firms with the various case names.  And it appears this list are the ones that are assigned to me, bank officer.

Q.   (BY MR. APPLEBY)  So the -- to the third column from the right, it's titled CYF with an

asterisk, and below at the bottom the asterisk is defined as Current Year Fees.  Does that $78,836.95, does that refer to attorney's fees or that calendar year?

A.   I don't know the specifics on that.

Q.   Thank you.  Mr. Sheesley, if we could look next at Plaintiff's Exhibit 280, 2-8-0.

A.   Okay.

Q.   And this is an email dated February 13, 2020, from you to what's referred to as -- or defined as Impaired Loan Reporting.  The very last page of this document is a -- appears to be a document called Credit Risk Management, borrower name Westport Nursing Tampa.  In this document there's a reference to Risk Rating Loan Balance, those appear to be consistent with the -- the previous document we looked at.  But farther down in the document there's a reference to an appraisal at lines five and six.  Do you know personally what appraisal those numbers would be referring to?

A.   Not offhand.  It would be a -- an appraisal that the bank has possession of, but I don't know which one.  There were multiple.

Q.   Okay.  Farther down under additional

comments and information, could you read out loud what that paragraph says.

A.    "Valley has engaged an expert on assisted living facilities and skilled nursing facilities to complete a new appraisal.  However, the appraiser does not feel comfortable with the financial information being provided by the current operator.  Without accurate financials, the appraiser will not complete the appraisal.  The bank recently had a receiver appointed in an effort to better fun," which I'm assuming is a typo, "the facility and gain accurate financial information.  Bank is hopeful an appraisal can be completed within the next month or two based on the receiver."

Q.    Do you recall who the expert was that the bank engaged?

A.    I don't.  I don't recall.

Q.    And it mentions a new appraisal.  Do you recall who would have been the entity that would have been requested for the new appraisal?

A.    I don't remember.

Q.    Do you recall any details concerning why the appraiser indicated they weren't comfortable with the financial information provided by the

provider -- or excuse me, the operator?

A.   I don't recall specific details at this time.

Q.   Thank you.  If we could next look at Plaintiff's Exhibit 281.

A.   Okay.

Q.   And Mr. Sheesley, do you recall this email exchange?

A.   Not specifically.  But it's from me.

Q.   I'm just going to compare that with the prior -- they have different dates on them.

A.   Okay.

Q.   Move along to Plaintiff's Exhibit 282.  Oh, excuse me.  We'll hold off on 282.

Mr. Sheesley, can you walk me through the timeline of events that led up to your involvement of the loan that we're discussing today.

MR. WHITSON:  Object to form.

A.   That's a little broad.  Could you be more specific, please.

Q.   (BY MR. APPLEBY)  Well, when you became involved in this -- in this loan as a special assets manager, what was your understanding of the history of this loan from the time it closed

Page 21

on March 31, 2014, through the point at which you became involved?

A. I mean, at bank acquisition, you know, it would have been virtually zero. And as I -- as time progressed and I, you know, learned more things in my role, I would see certain -- what happened historically, but I don't -- I can't think of, you know, a specific timeline of events with respect to knowledge of the case that I could recall at this juncture. But you know, the longer I handle it, you know, the more I know about it, but I really had zero involvement prior to the date of acquisition. And anything I would have learned at that point, you know, in my position, I wouldn't be able to verify that. If that -- does that answer your question?

Q. Well, yes. Mr. Sheesley, I appreciate -- I appreciate your answer. Let me also just say for clarity, I'm -- if you don't know the answer to something, again, I'm not trying to get you to guess or invent an answer, if you don't know, you don't know.

A. I appreciate that.

Q. So I'm not trying to trick you or anything like that.

Page 22

A.   I appreciate that.

Q.   So again, if my question's not clear, just let me know.

A.   Thank you.

Q.   Do you recall or do you know who the loan closing agent was for this loan?

MR. WHITSON:  Object to form.

A.   The -- who the USAmeriBank loan officer was?  Who closed the loan?

Q.   (BY MR. APPLEBY)  No, who the title agent was, who the closing agent was.

A.   I don't know.

Q.   Okay.  Are you familiar with the name Dedrick & Ryan, PA?

A.   I'm not.

Q.   Do you know an individual named Alice Daniels?

A.   No.

Q.   Larry Smith?

A.   No.

Q.   Do you know whether a foreclosure lawsuit was filed against the borrower in this case?

A.   I -- I don't recall at this time, as that was done prior to my involvement, if it was.

I just honestly don't remember at this time.

Q.   Do you recall whether this loan had a guarantor?

A.   I don't recall.

Q.   Do you know whether the bank ever pursued or -- pursued any guarantor in this action as it relates to this loan?

A.   I can't recall.  A lot of that was before my involvement, to my recollection.

Q.   Are you familiar with the liquidating trustee in this case Jeff Warren?

A.   I am.

Q.   What is your understanding of what a liquidating trustee does in a bankruptcy case?

MR. WHITSON:  Object to form.

A.   It's a court-appointed custodian, if you will, that helps navigate, you know, to resolve the loan with all parties, if possible.

Q.   (BY MR. APPLEBY)  Do you -- are you familiar with any other responsibilities that a liquidating trustee might have?

A.   Not specifically.

Q.   Okay.  Do you know whether the bank was ultimately paid in full for its loan to Westport Nursing?

A.   With respect to principal balance, we were, but that's all.  There was a significant amount of interest and fees that were never repaid.

Q.   Can you tell me your recollection of how the -- how the bank was paid at the end?

A.   There was a sale of the asset, the real property, the collateral.  I don't remember the specifics of the transaction, but there was a sale and the bank received proceeds from that sale.

Q.   Did the bank participate in the marketing of the real estate --

MR. WHITSON:  Object --

Q.   (BY MR. APPLEBY)  -- of the asset?

MR. WHITSON:  Object to form.

A.   Not that I recall.

Q.   (BY MR. APPLEBY)  Do you personally know whether the bank had any policies or procedures in place to ensure compliance with regulatory requirements when it made this loan?

MR. WHITSON:  Object to form.

A.   I have no personal knowledge of that.

Q.   (BY MR. APPLEBY)  Do you have any knowledge about the notification by the bank to

the Florida Department of -- to Florida Office of Insurance Regulation as it related to the transfer of $3 million to the bank for a cash collateral account?

A.   No.

Q.   Do you personally know whether the bank took any steps to ensure that that minimum liquid reserve accounts were held in compliance with the OIR's regulatory requirements?

A.   No.

MR. WHITSON:  Well, and just to be clear, the question was did he have any knowledge of that -- your statement, Mr. Appleby.  I want to be very clear the record is clear what the "no" refers to, so...

MR. APPLEBY:  I'm sorry, Mr. Whitson, are you asking me a question?  I didn't understand.

MR. WHITSON:  No, I mean, I think the question was vague, and I'm objecting to its form.  But you know, the answer, again, was -- just to clarify there was -- he has no personal knowledge.  That's the point of my --

MR. APPLEBY:  We can read the question back.

MR. WHITSON:  That's fine.

A.  That was done prior to Valley.

Q.  (BY MR. APPLEBY)  I'm sorry, Mr. Sheesley, I didn't understand what you just said.

A.  My recollection is that was all done prior to Valley's acquisition of USAmeriBank, so I have no personal knowledge of it.

Q.  Thank you.  Mr. Sheesley, are you aware of the regulatory requirements to hold funds in an escrow account as a minimum liquid reserve --

A.  I'm not.

Q.  -- regarding -- I'm sorry?

A.  No.  No.

Q.  Are you aware that there was a dispute as it relates to the $3 million that was held with USAmeriBank, subsequently Valley Bank, in a cash collateral account that those funds were also alleged to be part of a minimum liquid reserve?

A.  I'm sorry, could you repeat that.

Q.  Are you aware that there's a dispute -- or there was a dispute related to $3 million that at the loan closing was transferred from a Regions Bank minimum liquid reserve escrow

account to USAmeriBank and put in a cash collateral account?

MR. WHITSON:  I'm going to object to the form of the question.  And all of these questions relate to a time period before Valley National Bank was involved with USAmeriBank.  And so to that extent it can't be based on Mr. Sheesley's personal knowledge and is outside the scope of the order.  And I'll instruct the witness not to answer the question.  You're way beyond the scope of the order, Mr. Appleby.

MR. APPLEBY:  Mr. Whitson, I'm asking Mr. Sheesley's personal knowledge.  Again, I would appreciate it if you would limit your objections, proper objections and not speaking objections.

MR. WHITSON:  Well, again, I want the basis to be clear as to why I'm instructing the witness not to answer the question.  And that is, there is a Protective Order in place and you're asking questions before -- a time period before Valley National Bank was even involved. How can Mr. Sheesley have personal knowledge?

MR. APPLEBY:  Mr. Whitson, his answer can simply be that he doesn't.  If he

Page 28

doesn't have knowledge, he doesn't have knowledge.  I've been very clear on that.  I'm only asking Mr. Sheesley about his personal knowledge.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, have you ever worked on other loans that have regulated escrow accounts or matters that are subject to regulation by state entities or state administrative entities?

A.   Not that I recall offhand.

Q.   Can you tell me as special asset manager, when you were assigned this loan, effectively, what -- what is your responsibility as it relates to this -- this loan?

A.   To the Westport loan specifically?

MR. WHITSON:  I'm going to object to --

Q.   (BY MR. APPLEBY)  Yes.

MR. WHITSON:  I'm going to object to the form.

A.   Could -- I apologize, could you repeat that.

Q.   (BY MR. APPLEBY)  Well, what I'm trying to understand is in your role as a special assets manager, when you're assigned a loan like this,

or let's specifically refer to this -- to the Westport Nursing loan. What is your responsibility to the loan, what is it that you're trying to do on behalf of the bank?

A. Sure. It varies case by case, loan to loan. In this instance, it's my job to become the point person at the bank who communicates with bank outside counsel to resolve the matter, whatever it may be. And exit, you know, however we can, based on the substandard risk rating, we're looking to exit. So I manage that process. And at this point when there's litigation involved, I'm heavily involved with bank counsel through that process.

Q. Are there any other individuals in this case that you were -- that you were involved with or dealt with, communicated with on a regular basis?

A. You know, at acquisition I would have been involved with the prior loan officer for a period of time, which I don't exactly recall that, and then it would have transitioned fully under my care after he was let go. That would have been the only true individual I would have interacted with.

Q.   And just so I'm clear, who's the individual you're referring to that no longer works at the bank?

A.   Mike Carter.

Q.   And Mr. Carter was also a special assets manager?

A.   He -- I don't recall his exact title, but essentially, yes, for USAmeriBank.

Q.   Mr. Sheesley, do you know what a CCRC is?

A.   It's an acronym for what I believe is a Continuing Care Retirement Center, or some close -- that's my best guess.

Q.   What is your experience in dealing with loans that are involved with CCRC's?

MR. WHITSON:   Object to form.

A.   Again, there may -- I may have had some involvement in a prior case, but nothing comes to my mind outside of this.

Q.   (BY MR. APPLEBY)   Do you have any familiarity with Florida's statutes Chapter 651?

A.   No.

Q.   Do you know in this loan whether Westport Nursing held any certificate to operate as a CCRC or a Continuing Care Retirement

Community?

MR. WHITSON: Object to form.

A. I don't recall at this time.

Q. (BY MR. APPLEBY) Are you familiar with the term "life care contract"?

A. I've heard the term, but I couldn't give you a definition.

Q. Do you know or recall whether you've ever reviewed any of the Westport -- and I'll refer in this case to University Village. If you ever reviewed or saw any life care contracts related to University Village?

A. I honestly don't recall.

Q. Would it be fair to say that you did not review any life care contract in preparation for today's deposition?

A. That's true.

Q. And do you have any experience concerning loans to assisted living facilities or skilled nursing facilities?

MR. WHITSON: Object to form.

A. Again, if I -- if I've come across it, be in a limited nature. And I can't recall any specific thing at this time.

Q. (BY MR. APPLEBY) Are you aware of any

restrictions regarding assisted living facilities or skilled nursing facilities regarding skilled nursing beds or specific license requirements related to those types of entities?

MR. WHITSON:  Object to form.

A.   I don't know any specifics about that.

Q.   (BY MR. APPLEBY)  Do you know whether the borrower, Westport Nursing, had any specific license regarding its skilled nursing or assisted living facility?

A.   I can't recall specifics on that.

Q.   Do you recall the terms of this particular loan, such as the interest rate or payment terms?

A.   Not offhand, no.

Q.   In your involvement with this loan, what is your understanding of the ownership of Westport Nursing, the borrower?

MR. WHITSON:  Object to form.

A.   You know, the ownership structure was relatively convoluted.  I can't speak to specifics on that.  I just don't recall the exact chain of ownership.

Q.   (BY MR. APPLEBY)  Do you recall any individuals who you dealt with directly that

would have been involved in the ownership or management of Westport Nursing?

MR. WHITSON:  Object to form.

A.   I had limited correspondence with John Bartle.

Q.   (BY MR. APPLEBY)  And do you recall who Mr. Bartle was, can you tell me more about him?

MR. WHITSON:  Object to form.

A.   I can't recall specifics, but he was the or one of the principals behind the ownership structure, but I can't speak to exactly what that structure was.

Q.   (BY MR. APPLEBY)  Do you know why the bank required separation of ownership between Westport Nursing and Westport Holdings Tampa --

A.   I don't.

Q.   -- at the time it made the loan?

A.   I don't --

MR. WHITSON:  Object to form.

A.   -- that was before my time.

Q.   (BY MR. APPLEBY)  Are you aware that prior to the loan closing that Westport Nursing was a wholly-owned subsidiary of Westport Holdings?

MR. WHITSON:  Object to form.

A.   Again, that was prior to my time, I'm not familiar with those specifics.

Q.   (BY MR. APPLEBY)  When you become involved in the loan, do you review the payment history of the loan?

A.   I would say yes, but not always in-depth.  But it is looked at.

Q.   Do you also review the financial statements, meaning profit-and-loss statements and balance sheets?

A.   Typically no.  But on instances, I may have looked as well, but it would have not been in great depth.

Q.   Are you aware of whether Westport Nursing owed any -- any money to Westport Holdings for its operations at the time of the loan closing?

MR. WHITSON:  Object to the form.

A.   I'm not aware.  That was before my time.

Q.   (BY MR. APPLEBY)  You recall when you were introduced or met John Bartle?

A.   I don't recall the date.

Q.   Do you recall the reason that you would have been introduced to John Bartle?

MR. WHITSON:  Object to form.

Mischaracterizes the witness's testimony.

A.    Could you repeat --

Q.    (BY MR. APPLEBY)  Let me ask it differently.  Have you ever met John Bartle personally?

A.    I don't believe I have.  In person? Physically?

Q.    Yes, sir.

A.    I don't believe I have, that I recall.

Q.    Do you recall ever having email or telephone exchanges with Mr. Bartle?

A.    There were a limited amount of I believe email correspondence.  I believe that was the extent.

Q.    Do you recall how soon after you became involved in this loan that you would have had any interactions with Mr. Bartle?

A.    I don't recall the timing.

Q.    Do you recall how you would have been introduced to him by email or otherwise?

A.    I don't remember the exact context of the introduction.

Q.    Do you know whether Mr. Bartle was ever approved in Florida or anywhere else to operate a CCRC?

MR. WHITSON:  Object to the form.

A.   I don't know.

Q.   (BY MR. APPLEBY)  Are you aware of any litigation that Mr. Bartle was involved with concerning -- concerning the University Village and the buyer or Landry -- any Larry Landry entity, who was the seller, regarding the purchase transaction related to this loan?

A.   I'm not aware of that.

Q.   If we could refer to Plaintiff's Exhibit 282.

A.   Okay.

Q.   Mr. Sheesley, if you would, just take a moment and review this.  It's an email string which just -- you might be aware, but if you start at the back and work forward, that generally takes you from the first email to the most recent.

A.   Okay.

Q.   Mr. Sheesley, do you have any recollection of this email exchange?

A.   Not specifically, but it -- it's vaguely familiar that this transpired.

Q.   Okay.  If you would look at page five, numbered page five at the bottom, also it has a

Bates Label at the far right that says Bartle 000581.  This email exchange appears to start with an email from you to a Sam Talkow dated April 17, 2019.  Could you tell me who Mr. Talkow was?

A.   I don't know.  I can't recall.

Q.   And actually, I apologize, I misstated that.  This email was from Mr. Talkow to you.  But in the first line it says, "I understand John" -- "from John Bartle that Valley National Bank would like to do some KYC on Monticello."  Do you know what KYC means?

A.   In the banking industry usually means "know your customer."  And I would presume that's the context here.

Q.   Okay.  And do you recall who Monticello was or is?

A.   I don't.

Q.   If you could then look to page two, the number two at the bottom of this, it's Bates Labeled Bartle 000578.  This begins a little -- basically paragraph down dated April 19, 2019.  Appears that you had written an email to Sam Talkow.  Midway through that it says, "The discounted payoff number provided to me was 12

million.  Please confirm that number as well."

Can you tell me what that 12 million -- it says discounted payoff number.  Can you tell me whether -- is that 12 million the amount owed or is that an amount that the bank, from your understanding, would have accepted?  And again, I'm asking your personal knowledge.

A.   This appears --

Q.   What is that 12 --

A.   I don't recall in this context.  It appears to be an offer that would have been submitted by the potential acquirer.  It doesn't mean anything to the bank numbers, as far as I can tell.

Q.   Okay.  If we could refer to what's marked as Plaintiff's Exhibit 283.

A.   Okay.

Q.   Very straightforward on this, Mr. Sheesley.  This appears on page two, it's an email from you to -- to John, and I'm trying to see if I understand which John this goes to, it appears maybe John Bartle.  But looks like you were asking Mr. Bartle for various insurance and other documents.  Do you recall making this request to Mr. Bartle?

A. Not specifically, but I see the email that I sent.

Q. Okay. Can you tell me, why would the bank require those types of documents from Mr. Bartle?

A. Typically when our collateral is real estate, we like to see this kind of information just to make sure it's in place or what they have, you know. In a distress situation we don't always have a lot of information.

Q. At the top of page one here it appears it's an email from John Bartle to you dated May 10, 2019. And midway down it says, "Marc Flores of Seacoast is expecting to hear from AHCA very soon." Do you recall who Marc Flores or Seacoast was?

MR. WHITSON: Object to form.

A. I recognize the name, I can't remember exactly what his role was or who -- or who he was affiliated with. Presumably Seacoast, but I can't recall exactly their place.

Q. (BY MR. APPLEBY) Okay. Do you recall what Seacoast was?

A. I can't remember off -- no, I don't recall exactly.

Q.   Okay.  Then there's a reference to AHCA, A-H-C-A, do you know what AHCA is?

A.   I recognize it as an acronym for one of the -- I can't remember exactly what it stands for at this time.

Q.   Do you recall whether that's a regulatory agency?

A.   I believe it is.  But again, I just --

Q.   Do you know whether your -- whether the borrower, Westport Nursing, was regulated by AHCA?

A.   I can't recall the details.  The regulation is convoluted and I just can't recall.

Q.   If we could refer to Plaintiff's Exhibit 284.

A.   Okay.

Q.   At page five of this email exchange, which has a Bates Label at the bottom-right corner Bartle 000560.  It's an email from Patty Miron, with what I believe is Brown & Brown Insurance, to Danielle Martin with Valley.  Can you tell me who Ms. Martin is, who Danielle Martin is?

A.   She's a Valley -- or she was, I don't know her current status, associated with

insurance, our insurance department.

Q.   In the last line of that email, it -- it indicates that, "Seacoast Health Systems was the new management company for the building and will be responsible for getting their own insurance policies."

Does that remind you of who Seacoast was or help you out with what role they played?

A.   Yes.   They appear to be the management company that was in the facility.

Q.   And if you could flip back to the first page of Plaintiff's Exhibit 284.   At the bottom there is an email from you to Patty Miron dated May 19, 2021.   Could you read out loud that, following the statement, "Good afternoon."

A.   "I have made a request to our counsel and the court-appointed receiver to provide us with a copy of their current policy.   Will of course, provide upon receipt.   Thank you for your efforts, Dan."

Q.   Okay.   Do you -- do you recall who you might have been referring to as corporate -- court-appointed receiver?

A.   I would presume Mr. Warren, but I -- I can't recall the exact specifics, but...

Q.    If I could then direct you to Plaintiff's Exhibit 285.

A.    Okay.

Q.    What's numbered five at the bottom, Bates Labeled Bartle 000575.  At the top of that page there appears to be an email or a text, I'm not sure the context, but a message from you to what appears to be Marc Flores.  And it says, "Senior management is not agreeable to a forbearance agreement under the terms you and I discussed, nor are they interested in extending the loan."

Can you tell me what was the context of that conversation and that statement?

A.    I don't recall.

Q.    On page three of the same email exchange, at the bottom of page three there again it appears to be an email from you to Marc Flores dated August 20, 2019.  At the last statement -- or the last sentence, excuse me, says, "A true payoff would be significantly larger as a default interest of 18 percent has been ticking away for years and bank attorneys' fees are also significant."

Can you tell me the context of this

conversation?

A.   I don't recall exactly.  Seems to relate to a bank payoff.

Q.   Do you recall, was Seacoast Elite, were they trying to purchase Westport Nursing or what -- what was the -- I guess what was the reason for having these types of communications?

A.   I can't recall specifics, but it's -- appears they're trying to make an offer to the bank for purchase that's being discussed or negotiated.

Q.   On the first page of this same document, begins with -- excuse me, an email from John Bartle to Marc Flores.  You would -- looking over that, it appears that Mr. Bartle is suggesting there's sort of two options.  Do you recall ever seeing this email or having a discussion about either of these two options as it relates to your position with the bank?

MR. WHITSON:  Object to form.

A.   Honestly, I don't recall.

Q.   (BY MR. APPLEBY)  If we could refer to Document 286.  Plaintiff's Exhibit 286.

A.   Okay.

Q.   And the last page of this document

appears to be an email from John Hutton at GreenbergTraurig to Mr. Whitson.  Do you recall who -- why GreenbergTraurig was involved in this matter and who they represented?

A.   I -- I don't recall exactly their position.

Q.   Okay.  In the message it indicates in the same -- second sentence that, "Seacoast has decided that it was going to step back in as the purchaser."

Do you have any recollection of that process, whereby Seacoast was stepping back in?

MR. WHITSON:  I'm going to object to the form of this question.

A.   This, I believe, would relate to Seacoast, again, attempting to purchase the loan or transact to pay off the bank, but I -- I don't remember the specifics.

MR. WHITSON:  All right. Mr. Appleby, I'm going to take a break real quick.  We'll just go off the record for five minutes.  I need to step outside, so I'll be right back.

MR. APPLEBY:  Okay.

(Short break was taken.)

MR. WHITSON:  I just want to put an objection on the record to any questions about documents from the Bartle subpoena.  I confirmed at the break that none of these documents were provided to our firm prior to this deposition.  I have never seen these documents before, I'm not sure where they came from.  And we were never provided copies of these documents, to my knowledge.

So again, you know, I'm going to put that on the record.  And I think these questions are all beyond the scope of what the Protective Order required.  So if you want to continue your examination, Mr. Appleby, that's fine, but I ask that you restrict it to the scope that you articulated to the Court and was part of the order, the Protective Order.  This has nothing to do with anything you mentioned to the Court.

MR. APPLEBY:  Okay.  Mr. Whitson, in response to what you just said, I'll state that these records, to the best of my understanding, were provided to you.  I understand you're saying you haven't received them; I don't know why.  They're Bates Labeled and my understanding is you would have had them.

MR. WHITSON:  Well, and that's why I wanted to double-check if we had these.  And I know that these were not provided prior to today's deposition.  And I've never seen them before.  They look like they were produced by Mr. Bartle.  And I saw -- I see Minerva Granger at the top of Exhibit Number 286 and I know she's Mr. Mike Marcum's assistant.  So I -- I can tell you that I have never seen this before, I don't think it's been provided to our office.  And I wanted to double-check that at the break just to make sure, but we have never seen -- no one on our team has seen these documents before.

MR. APPLEBY:  Okay.  Not sure. It's my understanding you have everything.

MR. WHITSON:  Well, I can't confirm that.  And based on the information I was able to obtain at the break, it does not appear to be the case.  But either way, we did not receive them prior to today's deposition, so...

MR. APPLEBY:  Okay.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, if we could refer back to Plaintiff's Exhibit 286.

A.   Okay.

Q.   Do you recall who Tim Kincaid is?

A.   Off -- I don't off the top of my head.

Q.   Do you recall who Tim Peters is?

A.   I don't recall exactly who they were or where they fit in.

Q.   Midway down there's a reference that just states, "Maybe Sheesley needs a little reassurance."  Do you have any idea what -- what that would have meant?

A.   I don't recall the exact context.

MR. WHITSON:  And again, you know, there's an email in this chain directly from Dan to me.  And that -- and this is within the time frame of attorney-client privilege, so I don't understand why that's in here.  Again, I did not produce this document.  Appears to have been produced by someone else, Mr. Bartle perhaps, but again, we're not waiving any attorney-client privilege and we object to any questions about any communication I had with Mr. Sheesley.

I object to this entire line of questioning as being pure ambush.

MR. APPLEBY:  Well, Mr. Whitson, just for sake of clarifying what you're saying.  Yes, there's an email from you behind, but clearly you sent this email to Tim Kincaid, which

as it relates to this email, once you share to third parties, there is no privilege.

MR. WHITSON:  Well, I don't know about that.  And again, I'm not prepared --

MR. APPLEBY:  Anyway --

MR. WHITSON:  I'm not prepared to address these issues because I've never seen these documents, you know, in connection with this case.  This is way beyond the scope of what you represented to the Court.

MR. APPLEBY:  You stated your objection, Mr. Whitson.

MR. WHITSON:  No.  This is a very serious matter, Mr. Appleby.  You made representations to the Court on the record.  I was not at the hearing, but I reviewed the transcript and I've consulted with my team who was at the hearing.  And none of this was discussed with Judge McEwen.  This is way beyond the scope of what you made a personal representation to the Court about.  So again --

MR. APPLEBY:  Mr. Whitson, I appreciate your objection.  It's noted.  I disagree.  It's noted.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, if I

could direct you to Plaintiff's Exhibit 287.

A.   Okay.

Q.   Do you recall this email exchange, Mr. Sheesley?

MR. WHITSON:   Again, I object to any questions about a document that was not produced to counsel to -- for Valley prior to today's deposition.

THE WITNESS:   Answer?

MR. WHITSON:   I'm going to instruct the witness not to answer this question.   It's beyond the scope of what's provided for in the Protective Order.

Q.   (BY MR. APPLEBY)   Mr. Sheesley, do you have any personal recollection of conversations regarding the sale of the loan to Monticello Capital?

A.   I don't recall specifics.   I know that there were multiple conversations with multiple parties.   This appears to be one, but I don't recall the specifics.

Q.   If you would skip over 288, we'll go ahead and go on to Plaintiff's Exhibit 289.

A.   Okay.

Q.   And Mr. Sheesley, on this email it

appears to be an email from you to John Bartle -- well, excuse me.  There's a second page of this, let me refer to that first.  There's originally an email from John Bartle to you dated July 1, 2021.  And Mr. Bartle's statement is, "Your legal counsel needs historical perspective of the collateral, $3 million, received by USAmeriBank, USAB, at the inception of the loan in 2014.  I'm happy to help."  Then moving forward in this --

MR. WHITSON:  You see this?

Q.   (BY MR. APPLEBY)  -- your response on July 1, 2021 --

MR. WHITSON:  Mr. Appleby?

Q.   (BY MR. APPLEBY)  -- I very much appreciate --

MR. WHITSON:  Mr. Appleby, I'm going to have to object.  We have one page and we don't have anything -- we don't have an email that says anything that you just said.  The email you have as Exhibit 289 is a one-page document with 00554 at the bottom of it.  So we have -- we have nothing that indicates what you said.

MR. APPLEBY:  I understand.  Thank you.

MR. WHITSON:  I'm instructing the

witness not to answer a question about a document he hasn't been given.

MR. APPLEBY:  Okay.  I understand your objection.  And obviously there was a printing error, but that's okay.

Q.   (BY MR. APPLEBY)  If you would just look to the first page that you're looking at. There's an email that says, "Good morning, John, I very much appreciate your email and your willingness to assist if needed."

Did you ever reach out to Mr. Bartle -- Mr. Sheesley, did you ever reach out to Mr. Bartle and ask for his assistance in analyzing or dealing with this loan?

MR. WHITSON:  This is outside the scope of the Protective Order.  And I'm going to instruct the witness not to answer.

MR. APPLEBY:  Mr. Whitson, I fail to understand how me asking Mr. Sheesley whether he personally recalls reaching out to Mr. Bartle is outside the scope.

MR. WHITSON:  I'll allow him to answer that question, but Mr. Appleby, you're way beyond the scope of the Protective Order and I'm not waiving any rights that Valley has to enforce

that order or to bring any proceedings in connection with that order.

A.   I don't recall reaching out.

Q.   (BY MR. APPLEBY)  Thank you.  Okay, Mr. Sheesley, if I could, next, Plaintiff's Exhibit 290.  If you would take a look at this and let me know if you recall ever reviewing this email.

MR. WHITSON:  Again, I'm going to -- to the extent this document was never produced to our office prior to this deposition, I'm not going to let -- I'm going to instruct the witness not to answer any questions about it.

MR. APPLEBY:  So Mr. Whitson, you're saying -- I believe you were under an order to supply everything over to the liquidating trustee.  This is referencing an email between you and your client.  Are you stating Mr. Sheesley and USAmeriBank and Valley Bank has not provided you with documents they were part of?

MR. WHITSON:  This is a 2022 email. This email is dated January 12, 2022.  This is two years after the lawsuit was filed -- after --

MR. APPLEBY:  Okay.

MR. WHITSON:  -- it was filed, Mr. Appleby.  And again, we were never notified that these documents were produced.  We've never seen these documents before.  This is pure ambush on the part of the liquidating trustee.

MR. APPLEBY:  Your objection's noted.  Again, it's my understanding you have all of these documents.

MR. WHITSON:  Well, I can tell you personally I have never seen these emails before.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, if I could direct you to Plaintiff's Exhibit 291.

A.   Okay.

Q.   Do you have any recollection of receiving this email?

A.   I don't recall specifically, but this does appear to have been sent to me.

Q.   Okay.  Was there an attachment to the email that I'm asking you to look at?

A.   There's a -- quite a bit of information in this stack.

Q.   Okay.  If you would just flip to the second -- well, the first full page after, there's a pleading attached.  Could you tell me what the name of that pleading is?

A.   Plaintiff's Motion to Compel the Production of Documents.

Q.   Do you recall whether you've ever reviewed this pleading?

A.   I don't recall.  Presumably I would have looked at it, but I don't recall the detail.

Q.   On the first page of this, again, this is an email from John Bartle to Daniel Sheesley dated June 29, 2022.  At the end of the first full -- or the second full paragraph the statement is, "Burr Forman had no reason to deal with the OIR, as Westport Nursing was not regulated by the OIR."  Do you know if that's a true statement?

MR. WHITSON:  Again, Mr. Appleby, this is beyond the scope of the Protective Order.  This is a document that I do not believe was ever produced to our office prior to today's deposition.  And I'm instructing the witness not to answer.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, do you know whether Westport Nursing was regulated by the OIR?

A.   I don't recall the specifics.

Q.   I'm going to skip past 292.

Mr. Sheesley, were you aware that John Bartle at one point owed more than $7.5 million in taxes that were withheld from employee wages?

A.   I don't recall that.

Q.   Were you aware that John Bartle allegedly concealed over a million dollars of income in violation of a court order that required him to submit monthly sworn statements concerning his income?

A.   I don't recall that.

Q.   Do you recall who Ellie Freiden is?

A.   I recognize the name, I don't remember his role exactly.  But I -- I have heard the name before.

Q.   Are you aware of any litigation or administrative proceedings as it related to Westport Holdings Tampa, Limited Partnership?

A.   Could you ask that again, please.  I'm sorry.

Q.   Are you aware of whether there was any litigation between Westport Holdings and any Florida administrative group, such as the OIR or Florida Department of Financial Services?

A.   I don't -- I honestly don't recall.

Q.   Do you know whether the bank at the time

the loan was made, whether they conducted any due diligence on John Bartle?

MR. WHITSON:  Object to the form.

A.   That was prior to my involvement, I don't know.

Q.   (BY MR. APPLEBY)  Are you aware of whether John Bartle had any insolvency experience regarding any special purpose entities or whether he -- that he owned or controlled?

A.   I don't know.

Q.   Do you know whether John Bartle was involved in any bankruptcy proceedings prior to this particular case?

A.   I don't recall.

Q.   Do you have any familiarity with the horizon -- what's been called the "horizon loan," it was the loan that was in place prior to USAmeriBank's loan?

MR. WHITSON:  I object to the form. Use of the word "familiarity."  This is about Mr. Sheesley's personal knowledge.

A.   I don't --

Q.   (BY MR. APPLEBY)  That's what I'm asking.

A.   I don't have familiarity with it.

Q.   Thank you.  Do you know whether --
whether the prior loan had -- was made as -- and
secured by the entire CCRC campus or if it was
segregated based on each entity, such as Westport
Nursing?

A.   I don't recall the specifics.

Q.   Are you aware that prior to the
USAmeriBank loan, Westport Holdings, including
Westport Nursing, were in default and entered
into a forbearance agreement with a deed in lieu
of foreclosure?

A.   I'm not familiar with that.

Q.   Are you familiar -- are you familiar
with what a deed in lieu of foreclosure is?

A.   Yes.

Q.   Do you have any knowledge of the CPIF
loan that was made to Westport Holdings Tampa?

MR. WHITSON:  Object to form.

A.   I'm not familiar with it.

Q.   (BY MR. APPLEBY)  Do you know what value
was given by the bank to the bankrupt debtors,
Westport Holdings Tampa and Westport Holdings
Tampa II, in exchange for the $3 million that was
transferred to USAmeriBank as cash collateral?

MR. WHITSON:  Object to the form.

And I believe as it calls for legal conclusion. And I think you're just -- your circumventing the Court's order again, Mr. Appleby.

MR. APPLEBY:  I'm asking Mr. Sheesley's personal knowledge --

A.   I don't recall.

MR. APPLEBY:  -- or personal understanding.

Q.   (BY MR. APPLEBY)  I'm sorry, I didn't hear you, Mr. Sheesley.

A.   I don't recall.

Q.   Do you know what the source of the $3 million that was transferred to USAmeriBank at the time the loan was made?

MR. WHITSON:  Object to form.

A.   I don't recall the specifics.

Q.   (BY MR. APPLEBY)  Do you know whether the bank, USAmeriBank, was governed by the Florida Office of Insurance Regulation as it relates to this loan?

MR. WHITSON:  Object to form.

A.   I never worked for USAmeriBank.  I don't know.

Q.   (BY MR. APPLEBY)  Do you know whether the borrower, Westport Nursing, was regulated by

the Florida Office of Insurance Regulation?

MR. WHITSON:  Object to form.

A.   I don't recall the specifics.

Q.   (BY MR. APPLEBY)  Since you mentioned you don't recall the specifics, what do you recall as it relates to the Office of Insurance Regulation?

MR. WHITSON:  Object to the form.

A.   I recall there's a lot of acronyms and various regulatory authorities, and I -- I couldn't make heads or tails of it at this point in time, too much time has passed, but I know it's a very specific industry and heavily regulated.  I am aware of that.  But as to matching who goes with who, I can't recall.

Q.   (BY MR. APPLEBY)  Okay.  As we sit here today, you believe that the bank accepting $3 million for the minimum liquid reserves was lawful?

MR. WHITSON:  Object to form. You're asking for an opinion, not his fact -- not his personal knowledge.  You're again beyond the scope of the Protective Order.  I will instruct the witness not to answer.

Q.   (BY MR. APPLEBY)  Do you have any

knowledge of whether USAmeriBank ever got a formal opinion or approval from the Florida OIR regarding accepting the $3 million from the minimum liquid reserves?

A. I don't have knowledge on that.

Q. Do you know what ultimately happened with the $3 million?

MR. WHITSON: Object to the form.

Q. (BY MR. APPLEBY) It was held in a cash collateral account, do you know whether those funds were taken by the bank or whether they were returned to the borrower?

MR. WHITSON: Object to form. Again, this is based on the witness's personal knowledge.

THE WITNESS: Answer it?

MR. WHITSON: If you -- if you know.

A. Can you repeat the question, I'm sorry.

MR. APPLEBY: Can you read it back.

(The requested portion of the record was read by the reporter as follows: "Do you know what ultimately happened with the $3 million?

MR. WHITSON: Object to the form.

Q.   (BY MR. APPLEBY)  It was held in a cash collateral account, do you know whether those funds were taken by the bank or whether they were returned to the borrower?")

A.   I don't recall the logistical specifics, but I believe they were offset by the prior bank, USAmeriBank, but I was not involved at that juncture.

Q.   (BY MR. APPLEBY)  So it's your understanding that USAmeriBank applied the $3 million to the loan prior to the acquisition by Valley Bank?

A.   Again --

MR. WHITSON:  No --

A.   -- I don't know the specifics of how they handled it.

MR. WHITSON:  I'm going to object as to outside the scope of the witness's personal knowledge.  He's already testified that he was not with USAmeriBank.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, when you became involved in this loan, was there a $3 million cash collateral account still available or had it disappeared prior to your involvement with this loan?

MR. WHITSON:  Object to the form.

A.   I don't recall the exact specifics of the collateral at that juncture.  You're asking if I knew -- if there was -- if a cash collateral account came over with the Valley acquisition?

Q.   (BY MR. APPLEBY)  Yes.

A.   Not to my knowledge.

Q.   Mr. Sheesley, in several of the bank's affirmative defenses, they use the term "good faith."  What is your understanding of the term "good faith"?

A.   In what context?

Q.   In the context of the bank's affirmative defenses.

A.   I'm not familiar with the affirmative defenses in -- you know, specifically.  I would say good faith is typically the bank's ordinary course of business with respect to a loan.  That would be my response.

Q.   Do you know what reasonably equipment value that Westport Nursing -- or excuse me, Westport Holdings Tampa received from the transfer of the $3 million?

MR. WHITSON:  I'm going to object to the form as in violation of the Protective

Order.  And instruct the witness not to answer.
That's legal -- that is a legal conclusion.  And
my understanding from the transcript and the
order is that you were specifically told not to
ask for legal conclusions.

Q.    (BY MR. APPLEBY)  Mr. Sheesley, do you
know what consideration was given to Westport
Holdings for the $3 million?

MR. WHITSON:  Same objection.
Outside the scope of the Protective Order.  Calls
for legal conclusion.  Instruct the witness not
to answer.

Q.    (BY MR. APPLEBY)  Mr. Sheesley, do you
know who or what other persons, parties, or
entities were responsible for the damages or
losses suffered by the plaintiff or the debtors?

MR. WHITSON:  Object to the form.
Calls for legal conclusion as to what are
damages.  Outside the scope of the Protective
Order.  Instruct the witness not to answer.

Q.    (BY MR. APPLEBY)  Mr. Sheesley, is it
your understanding that John Bartle owned,
controlled, and dominated Westport Holdings
Tampa?

MR. WHITSON:  Object to the form.

Again, outside the scope of the Protective Order. Calls for legal conclusion. Instruct the witness not to answer.

Q. (BY MR. APPLEBY) Mr. Sheesley, if you would again, tell me what was your understanding of what Mr. Bartle's role was with Westport Nursing, the borrower?

MR. WHITSON: Objection. Asked and answered.

MR. APPLEBY: You instructing him not to answer that, Ed?

MR. WHITSON: He already answered the question. His answer stands the question before. You're asking -- by the nature of your question, you're asking him again, and he already answered the question. He stands on his prior answer.

Q. (BY MR. APPLEBY) Mr. Sheesley, do you know if the CCRC remained intact after the loan closing?

MR. WHITSON: Object to the form. Again, calls for legal conclusion. Outside the scope of the Protective Order. Instruct the witness not to answer.

Q. (BY MR. APPLEBY) Mr. Sheesley, do you

know whether the CCRC was ever severed from Westport Nursing?

MR. WHITSON:  Object to the form. Again calls for legal conclusion.  Outside the scope of the Protective Order.  Instruct the witness not to answer.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, do you know or can you tell me how the bank supported the liquidating trustee Jeff Warren in marketing the sale of the property?

A.   I don't know.  I don't believe we did.

Q.   Do you have any knowledge or evidence that would support the contention that no money would go to the residents if Mr. -- if Mr. Warren prevails in the current lawsuit?

MR. WHITSON:  Object to the form. Again, calls for a legal conclusion.  Outside the scope of the Protective Order.  Instruct the witness not to answer.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, do you know why Westport Nursing was a necessary part of the CCRC?

MR. WHITSON:  Object to the form. Again, calls for legal conclusion.  Outside the scope of the Protective Order.  Instruct the

witness not to answer.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, do you know or have any knowledge or information about whether Valley Bank has a tolling agreement in place against Burr Forman?

MR. WHITSON:  Object to the form. Again, way outside the scope of the Protective Order.  Instruct the witness not to answer.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, I'm asking very specifically your personal knowledge. Do you know whether Valley Bank has any tolling agreement in place regarding Burr Forman?

MR. WHITSON:  This question is outside the scope of the Protective Order; outside the representations made by the liquidating trustee as to the scope of Mr. Sheesley's deposition.  And therefore, I'm instructing the witness not to answer.

Q.   (BY MR. APPLEBY)  Mr. Sheesley, to the best of your knowledge, has Valley Bank made any demand against Burr Forman?

MR. WHITSON:  Again, this is way outside the scope of what Counsel represented to the Court would be the scope of Mr. Sheesley's deposition.  It's outside the scope of the

Protective Order.  And I'm instructing the witness not to answer.

Q.   Mr. Sheesley, I have no further questions.

A.   Thank you.

(Deposition ended at 12:52 p.m.)

C E R T I F I C A T E

I, Cassandra L. Sinthusy, a Certified Court Reporter of the State of Missouri, do hereby certify:

That prior to being examined the witness was by me duly sworn;

That said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

WITNESS my hand and seal this 16th day of November, 2023.

CASSANDRA L. SINTHUSY, CCR #1272, RMR, CRR

Edmund S. Whitson, III, Esquire

ewhitson@mcglinchey.com

                                November 16, 2023

RE:   Westport Holdings Tampa Limited Partnership

      vs. Valley National Bank

      11/9/2023 DEPOSITION OF DANIEL SHEESLEY

      Job No. FLA6284488

     The above-referenced transcript is available for review.

     The witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason on the attached Errata Sheet.

     The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

     It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

     If the witness fails to do so, the transcript may be used as if signed.

                 Yours,

                 Veritext Legal Solutions


 *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure
   Rule 1.310(e).

RE:  Westport Holdings Tampa Limited Partnership
     vs. Valley National Bank
     11/9/2023 DEPOSITION OF DANIEL SHEESLEY
     Job No. FLA6284488

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

_____    _____

     DANIEL SHEESLEY                      DATE

**[& - 52]**                                                                    Page 71

**&**

**&**  22:14 40:20

**0**

**00007**  1:11
**000251**  4:7
**000253**  4:7
**000354**  4:9
**000484**  4:9
**000532**  3:21
**000534**  3:21
**000535**  4:3
**000547**  4:4
**000554**  4:5
**000556**  3:23
**000560**  40:19
**000561**  3:23
**000571**  3:25
**000575**  42:5
**000576**  3:25
**000577**  3:19
**000578**  37:21
**000581**  37:2
**000582**  3:19
**000586**  4:2
**000588**  4:2
**00554**  50:21
**034141**  3:11
**036919**  3:13
**036922**  3:13
**042123**  3:14
**042124**  3:14
**042126**  3:16
**042127**  3:16
**042131**  3:17

**042132**  3:17
**08167**  1:7,9
**08168**  1:8

**1**

**1**  17:11 50:4,12
**1.310**  69:25
**1/12/2022**  4:6
**10**  3:8 39:13
**100**  2:21 7:20
**11**  1:6 7:3
**11/9/2023**  69:5
  70:2
**11:17**  5:1
**12**  3:11 37:25
  38:2,4,9 52:23
**1272**  2:6 68:24
**12:52**  67:6
**13**  3:14 18:9
**16**  6:19 69:3
**16th**  68:16
**17**  3:12 37:4
**18**  3:15 42:22
**18th**  9:6
**19**  37:22 41:14
**1st**  11:25

**2**

**2**  12:24
**2-8-0**  18:7
**2/13/2020**  3:15
**2/2/2018**  3:11
**20**  3:17 42:19
**2014**  6:21 21:1
  50:8

**2018**  11:25 12:7
  12:25
**2019**  17:11 37:4
  37:22 39:13
  42:19
**2020**  18:10
**2021**  41:14 50:5
  50:12
**2022**  52:22,23
  54:9
**2023**  2:7 68:17
  69:3
**2300**  2:9
**24955**  68:23
**276**  3:8 10:4,21
**277**  3:11 12:10
**278**  3:12 17:1,3
  17:6
**279**  3:14 13:14
  17:6
**280**  3:15 18:7
**281**  3:17 20:5
**282**  3:18 20:13
  20:14 36:11
**283**  3:20 38:16
**284**  3:22 40:15
  41:12
**285**  3:24 42:2
**286**  4:1 43:23,23
  46:7,23
**287**  4:3 49:1
**288**  4:11 49:22
**289**  4:5 49:23
  50:20

**29**  54:9
**290**  4:6 52:6
**291**  4:8 53:12
**292**  54:25

**3**

**3**  25:3 26:16,23
  50:7 57:23
  58:13 59:18
  60:3,7,24 61:11
  61:23 62:23
  63:8
**30**  69:16,24
**31**  21:1
**33602**  2:22
**33629**  2:15
**36**  3:18
**38**  3:20

**4**

**4/11/2019**  4:3
**4/15/2020**  3:17
**4/19/2019**  3:18
**4/29/2021**  4:1
**4/30/2018**  3:14
**40**  3:22
**42**  3:24
**43**  4:1
**49**  4:3,5
**4916**  2:15

**5**

**5**  3:4
**5/10/2019**  3:20
**5/19/2021**  3:22
**52**  4:6

**[53 - appears]** Page 72

**53** 4:8

**6**

**6/29/2022** 4:8
**60** 7:12
**600** 2:21
**64108** 2:10
**651** 30:21

**7**

**7.5** 55:2
**7/1/2019** 3:12
**7/1/2021** 4:5
**78,836.95** 18:3

**8**

**8/21/2019** 3:24
**813.310.0733** 2:22
**813.435.0396** 2:16
**8:16** 1:7,8,9
**8:20** 1:11

**9**

**9th** 2:6,9

**a**

**a.m.** 5:1
**able** 9:21 21:15 46:17
**above** 69:6
**absolutely** 12:22
**accepted** 38:6
**accepting** 59:17 60:3

**account** 15:24 16:3 25:4 26:11 26:18 27:1,2 60:10 61:2,23 62:5
**accounts** 25:8 28:7
**accuracy** 69:9
**accurate** 19:8 19:12
**acquired** 6:21 11:24
**acquirer** 38:12
**acquisition** 11:18 15:24 21:3,13 26:7 29:19 61:11 62:5
**acronym** 30:11 40:3
**acronyms** 59:9
**action** 23:7 68:15
**active** 13:25
**actually** 37:7
**addition** 13:23
**additional** 18:25
**additions** 13:22 14:5
**address** 48:7
**addressed** 9:18
**administered** 1:9

**administrative** 28:9 55:16,22
**adv** 1:10
**affiliated** 39:20
**affirmative** 3:9 11:4,7 14:21,22 62:9,13,15
**afternoon** 41:15
**agency** 40:7
**agent** 22:6,11 22:11
**ago** 13:19
**agreeable** 42:9
**agreement** 42:10 57:10 66:4,12
**ahca** 39:14 40:1 40:2,11
**ahead** 9:20 49:23
**akerman** 9:8
**alabama** 7:18
**alice** 22:16
**alleged** 26:19
**allegedly** 55:6
**allow** 14:17 51:22
**alpha** 13:21,22 14:1,4
**alphabetical** 13:25
**ambush** 47:21 53:4
**amended** 3:8,10 11:3,5

**amount** 8:16 24:3 35:12 38:4 38:5
**amounts** 16:11
**analyzing** 51:14
**answer** 3:8 11:3 11:7 15:8,18,19 21:16,18,20,21 25:21 27:10,19 27:25 49:9,11 51:1,17,23 52:13 54:20 59:24 60:16 63:1,12,20 64:3 64:11,13,17,24 65:6,19 66:1,8 66:18 67:2
**answered** 64:9 64:12,16
**answers** 6:3
**anyway** 48:5
**ap** 1:11
**apologize** 6:22 28:21 37:7
**appear** 9:25 18:16 41:9 46:18 53:17
**appearing** 2:19 2:20
**appears** 14:3 17:16,22 18:12 37:2,23 38:8,11 38:19,22 39:11 42:6,8,18 43:9 43:15 44:1

47:15 49:20 50:1
**appleby**  2:14,14 3:4 5:6,8 8:25 9:14,19 10:2,8 10:17,19 11:20 14:18 15:2,5,9 15:12,14 16:2 17:5,9,24 20:22 22:10 23:19 24:15,18,24 25:13,16,24 26:3 27:11,12 27:24 28:5,18 28:23 30:20 31:4,25 32:7,24 33:6,13,21 34:3 34:20 35:3 36:3 39:22 43:22 44:20,24 45:14 45:19 46:14,21 46:22 47:22 48:5,11,14,22 48:25 49:14 50:11,13,14,16 50:23 51:3,6,18 51:23 52:4,14 52:25 53:2,6,11 54:15,21 56:6 56:23 57:20 58:3,4,7,9,17,24 59:4,16,25 60:9 60:20 61:1,9,21 62:6 63:6,13,21 64:4,10,18,25

65:7,20 66:2,9 66:19
**applied**  61:10
**appointed**  19:10 23:16 41:17,23
**appraisal**  18:19 18:20,23 19:5,9 19:13,19,21
**appraiser**  19:6 19:9,24
**appreciate** 21:18,18,23 22:1 27:14 48:23 50:15 51:9
**approval**  60:2
**approved**  35:24
**april**  37:4,22
**articulated** 45:16
**ashley**  2:21
**asked**  14:14 64:8
**asking**  6:8 15:14 16:1,13 25:17 27:13,21 28:3 38:7,23 51:19 53:19 56:24 58:4 59:21 62:3 64:14,15 66:10
**asset**  7:12 11:16 12:3 24:7,15 28:11
**assets**  6:16 7:2 20:24 28:24

30:5
**assigned**  11:17 15:23 16:4,6 17:18,23 28:12 28:25
**assist**  51:10
**assistance**  51:13
**assistant**  46:8
**assistants**  17:20
**assisted**  8:20 19:4 31:19 32:1 32:9
**assisting**  14:24
**associated** 40:25
**assuming**  19:11
**asterisk**  18:1,1
**attached**  53:24 69:11
**attachment** 53:18
**attempting** 44:16
**attorney**  5:8 16:6 47:13,17 68:13,14 69:13
**attorney's**  18:3
**attorneys**  17:18 42:23
**august**  42:19
**authorities** 59:10
**available**  61:24 69:6

**avenue**  2:15
**aware**  11:22 12:8 14:25 26:9 26:15,22 31:25 33:21 34:14,19 36:3,9,15 55:1,5 55:15,20 56:6 57:7 59:14

**b**

**b**  3:6
**back**  14:3 25:25 36:16 41:11 44:9,12,23 46:23 60:20
**background** 14:18
**balance**  16:8,9 18:16 24:1 34:10
**bank**  1:15 5:13 6:14,18,20 7:6 7:11,11,14,15 11:8,16 14:15 14:15 15:24 16:6 17:17,23 18:23 19:10,13 19:17 21:3 23:5 23:23 24:6,10 24:12,19,25 25:3,6 26:17,25 27:6,22 29:4,7,8 29:13 30:3 33:14 37:11 38:5,13 39:4 42:23 43:3,10

43:19 44:17
52:20 55:25
57:21 58:18
59:17 60:11
61:3,6,12 65:8
66:4,11,20 69:4
70:1
**bank's**  3:8 7:23
11:3 14:14 16:8
16:12 62:8,13
62:17
**bankcorp**  1:17
**banking**  37:13
**bankrupt**  57:21
**bankruptcies**
8:16,19
**bankruptcy**  1:1
8:10 23:14
56:12
**bartle**  3:19,21
3:23,25 4:1,3,5
4:7,9 33:5,7
34:21,24 35:4
35:11,17,23
36:4 37:1,10,21
38:22,23,25
39:5,12 40:19
42:5 43:14,15
45:3 46:6 47:16
50:1,4 51:11,13
51:20 54:8 55:1
55:5 56:2,7,11
63:22
**bartle's**  50:5
64:6

**based**  16:15
19:14 27:7
29:10 46:17
57:4 60:14
**basically**  13:1
17:13 37:22
**basis**  27:18
29:18
**bates**  37:1,20
40:18 42:5
45:24
**beach**  7:24 8:6
**beds**  32:3
**begins**  37:21
43:13
**behalf**  2:4 11:8
29:4
**believe**  11:25
30:11 35:6,9,12
35:13 40:8,20
44:15 52:15
54:17 58:1
59:17 61:6
65:11
**best**  6:9 7:4
16:17 30:13
45:21 66:20
**better**  19:11
**beyond**  15:3
27:11 45:12
48:9,19 49:12
51:24 54:16
59:22
**billion**  7:12

**bit**  14:17 53:20
**bk**  1:7,8,9
**blank**  16:10
**block**  7:23
**book**  16:7,8
**borrower**  18:14
22:22 32:8,18
40:10 58:25
60:12 61:4 64:7
**bottom**  18:1
36:25 37:20
40:18 41:12
42:4,17 50:21
**break**  6:6,6
44:20,25 45:4
46:11,18
**bring**  52:1
**broad**  20:20
**brown**  40:20,20
**building**  41:4
**burr**  13:7 16:7
54:11 66:5,12
66:21
**business**  7:21
62:18
**buyer**  36:6

### c

**c**  2:12 40:2 68:1
68:1
**calendar**  18:4
**california**  7:19
**called**  18:13
56:16
**calls**  58:1 63:10
63:18 64:2,22

65:4,17,24
**campus**  57:3
**capital**  49:17
**care**  29:23
30:12,25 31:5
31:11,15
**career**  7:5
**carter**  30:4,5
**case**  1:7,8,9 5:10
8:11 13:9 17:21
21:9 22:23
23:11,14 29:5,5
29:16 30:18
31:10 46:19
48:9 56:13
**cases**  8:13
**cash**  16:18 25:3
26:18 27:1
57:24 60:9 61:1
61:23 62:4
**cassandra**  2:5
68:3,24
**ccr**  2:5 68:24
**ccrc**  30:9,25
35:25 57:3
64:19 65:1,22
**ccrc's**  30:15
**ced**  1:7,8,9
**center**  30:12
**certain**  21:6
**certificate**  30:24
**certified**  68:3
**certify**  68:5
**chain**  32:23
47:11

**[change - counsel]**

change 70:4,7 70:10,13,16
changes 69:9
chantel 2:19
chapter 1:6 30:21
charge 16:10,11 16:19
chart 17:12,14
check 46:2,11
chicago 7:19
circumstances 11:13
circumventing 58:2
city 2:8,9 8:1
civil 69:24,24
clarify 25:22
clarifying 47:23
clarity 21:19
clear 6:8 14:19 15:12 22:2 25:12,14,14 27:18 28:2 30:1
clearly 47:25
client 47:13,17 52:18
close 30:13
closed 20:25 22:9
closing 22:6,11 26:24 33:22 34:17 64:20
cm 16:5

colin 2:20
collateral 24:8 25:4 26:18 27:2 39:6 50:7 57:24 60:10 61:2,23 62:3,4
colleague 9:11
colleague's 9:6
column 15:21 16:9,10,11 17:25
come 12:14 31:22
comes 17:19 30:18
comfortable 19:6,24
coming 8:23
commenced 5:1
comments 19:1
commercial 16:6
communicated 29:17
communicates 29:7
communication 47:19
communicatio... 43:7
communities 8:14
community 31:1
company 41:4 41:10

compare 20:10
compel 54:1
complaint 3:10 11:5
complete 19:5,9
completed 19:14 69:16
compliance 24:20 25:8
concealed 55:6
concerning 19:23 31:19 36:5,5 55:9
conclusion 58:1 63:2,11,18 64:2 64:22 65:4,17 65:24
conclusions 63:5
conducted 56:1
confirm 38:1 46:16
confirmed 45:3
connection 48:8 52:2
consideration 63:7
considered 69:17
consistent 12:23 18:16
consulted 48:17
contact 13:10
contention 65:13

context 35:21 37:15 38:10 42:7,13,25 47:9 62:12,13
continue 45:13
continuing 30:12,25
contract 31:5,15
contracts 31:11
controlled 56:9 63:23
conversation 42:14 43:1
conversations 49:15,19
convoluted 32:21 40:13
copies 9:25 10:6 10:9,12 45:8 69:14
copy 41:18
corner 40:19
corporate 41:22
corporation 1:18
correct 9:13
correspondence 9:8 33:4 35:13
corresponds 15:23
counsel 9:9 11:10 29:8,13 41:16 49:7 50:6 66:23 68:13,14

**[course - duly]**

**course** 41:19 62:18
**court** 1:1 6:4 10:15 23:16 41:17,23 45:16 45:18 48:10,15 48:21 55:7 66:24 68:4
**court's** 58:3
**cpif** 57:16
**cpm** 1:11
**credit** 18:13
**crown** 2:8
**crr** 2:6 68:24
**current** 6:13,15 18:2 19:8 40:25 41:18 65:15
**cusmano** 17:10
**custodian** 23:16
**customer** 37:14
**cyf** 17:25

**d**

**d** 3:1
**damages** 63:15 63:19
**dan** 41:20 47:11
**daniel** 2:3 3:3 5:2,17 54:8 69:5 70:2,23
**danielle** 40:21 40:22
**daniels** 22:17
**date** 12:4 15:23 21:13 34:22 69:12 70:23

**dated** 12:24 17:10 18:9 37:3 37:22 39:12 41:13 42:19 50:4 52:23 54:9
**dates** 20:11
**day** 2:7 15:22 68:16
**days** 69:17
**deal** 54:11
**dealing** 30:14 51:14
**dealt** 8:16,20 29:17 32:25
**dean** 2:20
**debtors** 1:8 57:21 63:16
**decided** 44:9
**decision** 12:6
**declare** 70:20
**dedrick** 22:14
**deed** 57:10,14
**default** 42:21 57:9
**defendant** 1:20 2:18
**defense** 14:21
**defenses** 3:9 11:4,7 14:22 62:9,14,16
**defined** 18:2,11
**definition** 31:7
**delay** 6:1
**demand** 66:21

**department** 13:24 25:1 41:1 55:23
**deposing** 69:13
**deposition** 2:3 5:1,19 7:25 9:2 9:7 15:10 31:16 45:5 46:4,20 49:8 52:11 54:19 66:17,25 67:6 68:8 69:5 70:2
**depth** 34:7,13
**describe** 11:12
**description** 3:7
**detail** 54:6
**details** 11:11 19:23 20:2 40:12
**different** 7:4 10:1 20:11
**differently** 35:4
**diligence** 56:2
**direct** 13:11 42:1 49:1 53:12
**direction** 68:11
**directly** 32:25 47:11
**disagree** 48:24
**disappeared** 61:24
**discounted** 37:25 38:3
**discussed** 42:11 43:10 48:19

**discussing** 20:17
**discussion** 11:10 43:17
**dispute** 26:15 26:22,23
**distress** 39:9
**district** 1:1
**division** 1:2
**document** 10:3 10:13,20,22 12:10 17:11 18:12,13,15,17 18:18 43:12,23 43:25 47:15 49:6 50:20 51:1 52:10 54:17 70:20
**documents** 9:1 9:15,16 10:1,12 38:24 39:4 45:3 45:4,6,8 46:13 48:8 52:20 53:3 53:4,8 54:2
**dollars** 55:6
**domestic** 1:17
**dominated** 63:23
**double** 46:2,11
**drive** 2:21
**due** 56:1
**duly** 5:3 68:7

**[e - facts]** Page 77

**e**

**e** 2:12,12 3:1,6
68:1,1 69:24,25
70:3,3,3
**early** 7:5
**ed** 9:14 15:18
64:11
**edmund** 2:19
69:1
**effectively** 28:13
**effort** 19:11
**efforts** 41:20
**eight** 6:25
**either** 43:18
46:19
**elite** 43:4
**ellie** 55:11
**ellsworth** 12:25
13:4,6,9
**email** 3:11,12,14
3:15,17,18,20
3:22,24 4:1,3,5
4:6,8 12:11,18
13:17 17:10
18:9 20:8 35:10
35:13,20 36:14
36:17,21 37:2,3
37:8,23 38:20
39:1,12 40:17
40:19 41:2,13
42:6,16,18
43:13,17 44:1
47:11,24,25
48:1 49:3,25
50:1,4,18,19

51:8,9 52:8,18
52:22,23 53:15
53:19 54:8
69:13
**emailed** 69:15
**emails** 7:22
53:10
**employed** 6:17
**employee** 55:3
68:12,14
**employer** 6:13
**ended** 67:6
**enforce** 51:25
**engaged** 19:3,17
**ensure** 24:20
25:7
**entered** 57:9
**entire** 47:20
57:3
**entities** 28:8,9
32:4 56:8 63:15
**entity** 19:20
36:7 57:4
**envelopes** 9:24
9:24
**equipment**
62:20
**errata** 69:11,13
69:16
**error** 51:5
**escrow** 26:11,25
28:7
**esquire** 69:1
**essentially** 14:8
30:8

**estate** 24:13
39:7
**events** 20:16
21:8
**eventual** 11:13
**evidence** 9:1
65:12
**ewhitson** 2:23
69:1
**exact** 12:18
13:18 30:7
32:22 35:21
41:25 47:9 62:2
**exactly** 12:6,13
29:21 33:11
39:19,21,25
40:4 43:2 44:5
47:3 55:13
**examination** 3:4
5:5 45:14
**examined** 68:6
**exchange** 3:11
3:12,14,15,17
3:18,20,22,24
4:3,5,6,8 12:12
13:17,18,20
20:8 36:21 37:2
40:17 42:17
49:3 57:23
**exchanges**
35:11
**excuse** 9:11 20:1
20:14 42:20
43:13 50:2
62:21

**exhibit** 3:8,11
3:12,14,15,17
3:18,20,22,24
4:1,3,5,6,8,11
10:4,21 12:10
13:12 17:1 18:7
20:5,13 36:11
38:16 40:15
41:12 42:2
43:23 46:7,23
49:1,23 50:20
52:6 53:12
**exhibits** 4:11
**exit** 29:9,11
**expecting** 39:14
**experience**
30:14 31:18
56:7
**expert** 19:3,16
**extending** 42:11
**extent** 12:17
14:13 15:1,20
27:7 35:14
52:10
**extra** 10:6

**f**

**f** 68:1
**facilities** 8:21,21
19:4,5 31:19,20
32:1,2
**facility** 19:12
32:10 41:10
**fact** 59:21
**facts** 70:20

fail 51:18
fails 69:20
fair 31:14
faith 62:10,11
  62:17
faithful 15:12
familiar 22:13
  23:10,20 31:4
  34:2 36:23
  57:12,13,13,19
  62:15
familiarity
  30:21 56:15,20
  56:25
far 16:18 37:1
  38:13
farther 18:18,25
february 12:24
  18:9
federal 69:18,24
fedex 9:17
feel 19:6
fees 18:2,3 24:3
  42:23
fellow 9:6
filed 22:22
  52:24 53:1
financial 19:7
  19:12,25 34:8
  55:23
financially
  68:15
financials 19:8
find 10:11 14:21

fine 26:1 45:14
firm 13:7,8,10
  16:7 45:5
firms 17:21
first 5:3 6:20
  10:3,20 15:22
  36:17 37:9
  41:11 43:12
  50:3 51:7 53:23
  54:7,9
fit 47:4
five 18:19 36:24
  36:25 40:17
  42:4 44:21
fl 2:15,22 69:14
fla6284488 69:5
  70:2
flip 14:2 41:11
  53:22
floor 2:9
flores 39:14,15
  42:8,18 43:14
florida 1:2 7:17
  7:25 8:7 25:1,1
  35:24 55:22,23
  58:19 59:1 60:2
  69:18,24
florida's 30:21
following 41:15
follows 5:4
  60:22
forbearance
  42:10 57:10
foreclosure
  22:21 57:11,14

foregoing 70:20
form 8:22 11:15
  17:15 20:19
  22:7 23:15
  24:16,22 25:21
  27:4 28:20
  30:16 31:2,21
  32:5,19 33:3,8
  33:19,25 34:18
  34:25 36:1
  39:17 43:20
  44:14 56:3,19
  57:18,25 58:15
  58:21 59:2,8,20
  60:8,13,25 62:1
  62:25 63:17,25
  64:21 65:3,16
  65:23 66:6
formal 60:2
forman 13:7
  16:7 54:11 66:5
  66:12,21
format 5:22
  14:16
former 9:10
forms 14:16
forward 36:16
  50:9
frame 12:1
  47:13
freiden 55:11
full 5:16 23:24
  53:23 54:10,10
fully 29:22

fun 19:11
funds 26:10,18
  60:11 61:3
further 67:3

g

gain 19:12
generally 36:17
getting 15:7
  41:5
give 31:6
given 51:2 57:21
  63:7
go 9:20 12:5,14
  13:14 29:23
  44:21 49:22,23
  65:14
goes 38:21
  59:15
going 10:3,15
  14:10 15:3,12
  20:10 27:3
  28:16,19 44:9
  44:13,20 45:10
  49:10 50:17
  51:16 52:9,12
  52:12 54:25
  61:17 62:24
good 41:15 51:8
  62:9,11,17
governed 58:18
grade 16:12,15
grading 16:16
granger 46:6
great 34:13

**greenbergtrau...** 44:2,3
**group** 55:22
**guarantor** 23:3 23:6
**guess** 7:4 8:2 21:21 30:13 43:6

**h**

**h** 3:6 40:2 70:3
**hand** 68:16
**handle** 21:11
**handled** 61:16
**handling** 12:4 13:8
**happened** 21:7 60:6,23
**happy** 50:9
**head** 47:1
**headquartered** 7:7
**headquarters** 7:8
**heads** 59:11
**health** 41:3
**hear** 6:4 39:14 58:10
**heard** 31:6 55:13
**hearing** 9:5 14:23 48:16,18
**heavily** 29:13 59:13
**held** 25:8 26:16 30:24 60:9 61:1

**help** 41:8 50:9
**helps** 23:17
**hereinbefore** 68:10
**historical** 50:6
**historically** 21:7
**history** 20:25 34:5
**hold** 20:14 26:10
**holdings** 1:5,6 1:10,12 5:11,12 33:15,24 34:16 55:17,21 57:8 57:17,22,22 62:22 63:8,23 69:4 70:1
**honestly** 23:1 31:13 43:21 55:24
**hopeful** 19:13
**hopefully** 9:20
**horizon** 56:16 56:16
**huh** 16:24
**hutton** 44:1

**i**

**icloud.com** 2:16
**idea** 47:7
**ii** 1:6,12 5:12 57:23
**iii** 2:19 69:1
**impaired** 18:11
**inception** 50:8

**included** 6:22
**including** 57:8
**income** 55:7,9
**indicate** 7:24
**indicated** 19:24
**indicates** 41:3 44:7 50:22
**individual** 22:16 29:24 30:2
**individuals** 29:15 32:25
**industry** 37:13 59:13
**information** 14:8 15:16 19:1 19:7,13,25 39:7 39:10 46:17 53:20 66:3
**initials** 16:5
**insolvency** 56:7
**instance** 29:6
**instances** 34:11
**instruct** 15:8 27:9 49:10 51:17 52:12 59:23 63:1,11 63:20 64:2,23 65:5,18,25 66:8
**instructing** 27:18 50:25 54:19 64:10 66:18 67:1
**insurance** 25:2 38:23 40:21

41:1,1,5 58:19 59:1,6
**intact** 64:19
**interacted** 29:25
**interactions** 35:17
**interest** 24:3 32:13 42:22
**interested** 42:11 68:15
**internal** 16:8,12 17:17
**interpose** 14:11
**introduced** 34:21,24 35:20
**introduction** 12:16,25 13:2 35:22
**invent** 21:21
**involved** 7:2 8:10,20 11:21 12:4 20:23 21:2 27:6,22 29:13 29:13,16,20 30:15 33:1 34:4 35:16 36:4 44:3 56:12 61:7,22
**involvement** 11:18 20:17 21:12 22:25 23:9 30:18 32:16 56:4 61:25
**involving** 8:13

**issues** 11:22 48:7
**item** 15:20

**j**

**january** 11:25 12:7 52:23
**jeff** 5:9,10 23:11 65:9
**jeffrey** 1:9
**jersey** 1:17 7:9 7:17
**job** 6:15 29:6 69:5 70:2
**john** 33:4 34:21 34:24 35:4 37:10,10 38:20 38:21,22 39:12 43:13 44:1 50:1 50:4 51:8 54:8 55:1,5 56:2,7,11 63:22
**jointly** 1:9
**josephine** 17:10 17:20
**judge** 14:19 48:19
**judge's** 14:12 15:13
**july** 17:11 50:4 50:12
**juncture** 21:10 61:8 62:3
**june** 54:9

**k**

**kansas** 2:8,9 8:1 8:7
**keep** 10:13,15 14:11
**keeps** 13:24
**keith** 2:14 5:8
**keithtappleby** 2:16
**kincaid** 46:25 47:25
**kind** 39:7
**knew** 62:4
**know** 5:25 6:2,3 6:9 7:14 8:19 9:15 11:6 12:2 14:16,19 16:17 18:5,20,24 21:3 21:5,8,10,11,11 21:14,20,22,22 22:3,5,12,16,21 23:5,17,23 24:18 25:6,21 29:9,19 30:9,23 31:8 32:6,7,20 33:13 35:23 36:2 37:6,12,14 39:9 40:2,9,25 45:10,24 46:3,7 47:10 48:3,8 49:18 52:7 54:13,22 55:25 56:5,10,11 57:1 57:20 58:12,17 58:23,24 59:12

60:6,10,18,23 61:2,15 62:16 62:20 63:7,14 64:19 65:1,8,11 65:21 66:3,11
**knowledge** 14:13,15 15:15 16:14 21:9 24:23,25 25:12 25:23 26:8 27:8 27:13,23 28:1,2 28:4 38:7 45:9 56:21 57:16 58:5 59:22 60:1 60:5,15 61:19 62:7 65:12 66:3 66:10,20
**korhn** 9:12
**kyc** 37:11,12

**l**

**l** 2:5 68:3,24
**label** 37:1 40:18
**labeled** 9:22 12:10 37:21 42:5 45:24
**landry** 36:6,6
**large** 7:10
**larger** 42:21
**larry** 22:19 36:6
**law** 2:14 13:7,8 16:7 17:21
**lawful** 59:19
**lawsuit** 9:2 11:14 22:22 52:24 65:15

**leader** 6:16
**learned** 21:5,14
**led** 20:16
**left** 14:4
**legal** 50:5 58:1 63:2,2,5,11,18 64:2,22 65:4,17 65:24 69:23
**legitimate** 12:15
**level** 16:16
**license** 32:3,9
**lieu** 57:10,14
**life** 31:5,11,15
**likely** 11:9
**likewise** 6:7
**limit** 27:14
**limited** 1:5,7,11 1:12 5:11,12 31:23 33:4 35:12 55:17 69:4 70:1
**line** 7:21 14:7 15:20 37:9 41:2 47:20 70:4,7,10 70:13,16
**lines** 18:19
**liquid** 25:7 26:11,19,25 59:18 60:4
**liquidating** 1:10 3:9 5:9,10 11:4 23:10,14,21 52:17 53:5 65:9 66:16

**list** 17:22
**listen** 15:2
**listing** 13:25
**lists** 17:20
**litigation** 29:12
  36:4 55:15,21
**little** 6:1,19
  14:17 20:20
  37:21 47:6
**living** 8:21 19:4
  31:19 32:1,10
**loan** 11:23
  15:25,25 16:4,5
  16:18 18:11,15
  20:17,23,25
  22:6,6,8,9 23:2
  23:7,18,24
  24:21 26:24
  28:12,14,15,25
  29:2,3,5,6,20
  30:23 32:13,16
  33:17,22 34:4,5
  34:17 35:16
  36:8 42:12
  44:16 49:16
  50:8 51:14 56:1
  56:16,17,18
  57:2,8,17 58:14
  58:20 61:11,22
  61:25 62:18
  64:19
**loans** 28:6 30:15
  31:19
**located** 7:24 8:2

**logistical** 61:5
**long** 6:17 7:1
**longer** 21:11
  30:2
**look** 18:7 20:4
  36:24 37:19
  46:5 51:6 52:6
  53:19
**looked** 9:7
  18:17 34:7,12
  54:6
**looking** 14:5
  29:11 43:14
  51:7
**looks** 12:15,21
  38:22
**loss** 34:9
**losses** 63:16
**lot** 23:8 39:10
  59:9
**loud** 19:1 41:14

**m**

**made** 24:21
  33:17 41:16
  48:14,20 56:1
  57:2,17 58:14
  66:15,20
**main** 2:9 13:9
**make** 39:8 43:9
  46:12 59:11
**makes** 12:14
**making** 38:24
**manage** 29:11
**management**
  18:13 33:2 41:4

41:9 42:9
**manager** 11:16
  20:24 28:12,25
  30:6
**marc** 39:13,15
  42:8,18 43:14
**march** 21:1
**marcum's** 46:8
**marked** 9:25
  13:12 38:16
**marketing**
  24:13 65:9
**martin** 40:21,22
  40:23
**matching** 59:15
**matter** 11:17,21
  13:3 29:8 44:4
  48:14
**matters** 13:25
  17:18 28:7
**mcewen** 48:19
**mcglinchey** 2:20
**mcglinchey.c...**
  2:23 69:1
**mean** 9:11
  14:17,20 15:1
  21:3 25:19
  38:13
**meaning** 34:9
**means** 14:9
  37:12,13
**meant** 47:8
**melrose** 2:15
**mentioned** 9:10
  12:24 14:21

45:18 59:4
**mentions** 19:19
**merger** 1:19
  5:14
**message** 42:7
  44:7
**met** 34:21 35:4
**middle** 1:1
**midway** 37:24
  39:13 47:5
**mike** 30:4 46:8
**million** 25:3
  26:16,23 38:1,2
  38:4 50:7 55:2,6
  57:23 58:13
  59:18 60:3,7,24
  61:11,23 62:23
  63:8
**mind** 8:24 9:20
  14:5 17:12
  30:19
**minerva** 46:6
**minimum** 25:7
  26:11,19,25
  59:18 60:4
**minutes** 44:22
**miron** 40:20
  41:13
**mischaracteri...**
  35:1
**missouri** 2:10
  68:4
**misstated** 37:7
**moment** 8:24
  36:14

**money** 34:15 65:13
**month** 19:14
**monthly** 55:8
**monticello** 37:11,16 49:16
**morning** 15:10 51:8
**morristown** 7:9
**mortgage** 16:6
**motion** 54:1
**move** 20:13
**moving** 50:9
**multiple** 18:24 49:19,19

**n**

**n** 2:12 3:1
**name** 5:16 6:12 15:24,25 18:14 22:13 39:18 53:25 55:12,13
**name's** 5:7
**named** 22:16
**names** 17:22
**national** 1:15,16 3:8 5:13 6:14,18 7:6,11,15 11:3 27:6,22 37:10 69:4 70:1
**nationwide** 7:16
**nature** 31:23 64:14
**navigate** 23:17
**necessary** 65:21

**need** 6:5 44:22
**needed** 51:10
**needs** 47:6 50:6
**negotiated** 43:11
**never** 24:3 45:6 45:7 46:4,9,12 48:7 52:10 53:2 53:3,10 58:22
**new** 1:17 7:9,17 7:17 19:5,19,21 41:4
**nine** 16:16,19
**note** 4:11 69:10
**noted** 15:6 48:23,24 53:7
**notice** 2:6
**notification** 24:25
**notified** 53:2
**november** 2:7 68:17 69:3
**number** 7:4 16:3,4 37:20,25 38:1,3 46:7
**numbered** 36:25 42:4
**numbers** 18:20 38:13
**numerous** 8:16
**nursing** 8:21 11:23 13:3 14:6 18:14 19:4 23:25 29:2 30:24 31:20

32:2,3,8,9,18 33:2,15,22 34:15 40:10 43:5 54:12,22 57:5,9 58:25 62:21 64:7 65:2 65:21

**o**

**oath** 5:3
**object** 8:22 11:15 17:15 20:19 22:7 23:15 24:14,16 24:22 27:3 28:16,19 30:16 31:2,21 32:5,19 33:3,8,19,25 34:18,25 36:1 39:17 43:20 44:13 47:18,20 49:5 50:17 56:3 56:19 57:18,25 58:15,21 59:2,8 59:20 60:8,13 60:25 61:17 62:1,24 63:17 63:25 64:21 65:3,16,23 66:6
**objecting** 25:20
**objection** 14:11 45:2 48:12,23 51:4 63:9 64:8
**objection's** 15:5 53:6

**objections** 27:15,15,16
**obtain** 46:18
**obviously** 51:4
**october** 9:6
**offer** 38:11 43:9
**offhand** 8:15 18:22 28:10 32:15
**office** 8:6 25:1 46:10 52:11 54:18 58:19 59:1,6
**officer** 12:3 16:4 17:23 22:8 29:20
**offices** 2:7 7:19
**offset** 61:6
**oh** 20:14
**oir** 54:12,13,23 55:22 60:2
**oir's** 25:9
**okay** 5:24 6:17 7:1,6,22 8:18 9:10,19 10:10 10:17 11:2,12 11:20 12:9,20 12:23 13:15,21 14:2 16:3,13,23 17:7 18:8,25 20:6,12 22:13 23:23 36:12,19 36:24 37:16 38:15,17 39:3 39:22 40:1,16

**[okay - plaintiff's]** Page 83

41:21 42:3 43:24 44:7,24 45:19 46:14,21 46:24 49:2,24 51:3,5 52:4,25 53:13,18,22 59:16

**once** 48:1

**ones** 17:22

**ongoing** 11:19

**opened** 9:18

**operate** 30:24 35:24

**operates** 7:15

**operations** 34:16

**operator** 19:8 20:1

**opinion** 59:21 60:2

**options** 43:16 43:18

**orally** 6:3

**order** 9:22 13:13,19 14:12 15:13 17:6 27:9 27:11,20 45:13 45:17,17 49:13 51:16,24 52:1,2 52:16 54:16 55:7 58:3 59:23 63:1,4,10,20 64:1,23 65:5,18 65:25 66:8,14 67:1

**ordering** 69:15

**ordinary** 62:17

**organize** 9:21

**origin** 15:25

**originally** 50:3

**outside** 7:21 27:8 29:8 30:19 44:22 51:15,21 61:18 63:10,19 64:1,22 65:4,17 65:24 66:7,14 66:15,23,25

**owed** 34:15 38:4 55:2

**own** 41:5

**owned** 33:23 56:9 63:22

**ownership** 32:17,20,23 33:1,10,14

**p**

**p** 2:12,12

**p.m.** 67:6

**pa** 2:14 22:14

**package** 9:18

**page** 3:2,7 14:3 15:22 17:11 18:12 36:24,25 37:19 38:19 39:11 40:17 41:12 42:6,16 42:17 43:12,25 50:2,17,20 51:7 53:23 54:7 70:4 70:7,10,13,16

**paid** 23:24 24:6

**palm** 7:24 8:6

**paragraph** 19:2 37:22 54:10

**part** 26:19 45:16 52:21 53:5 65:21

**participate** 24:12

**participated** 10:24 11:6

**particular** 8:11 32:13 56:13

**parties** 23:18 48:2 49:20 63:14 68:13 69:15

**partner** 13:6

**partnership** 1:6 1:7,11,12 5:12 5:13 55:17 69:4 70:1

**passed** 59:12

**past** 54:25

**patty** 40:19 41:13

**pay** 44:17

**payment** 32:14 34:4

**payoff** 37:25 38:3 42:21 43:3

**penalties** 70:20

**percent** 7:20 42:22

**perfect** 10:17

**period** 27:5,21 29:21

**perjury** 70:20

**pershing** 2:8

**person** 29:7 35:6

**personal** 14:13 16:14 24:23 25:22 26:8 27:8 27:13,23 28:3 38:7 48:20 49:15 56:21 58:5,7 59:22 60:14 61:18 66:10

**personally** 18:20 24:18 25:6 35:5 51:20 53:10

**persons** 63:14

**perspective** 50:6

**peters** 47:2

**physically** 8:5 35:7

**place** 24:20 27:20 39:8,21 56:17 66:5,12 68:9

**plaintiff** 1:13 2:5,13 63:16

**plaintiff's** 10:4 10:21 12:10 13:12 16:25 18:7 20:5,13

36:10 38:16
40:14 41:12
42:2 43:23
46:23 49:1,23
52:5 53:12 54:1
**platform** 17:17
**played** 41:8
**pleading** 10:25
53:24,25 54:4
**please** 5:15 6:9
9:20 20:21 38:1
55:18 69:12
**point** 6:5 13:9
21:1,14 25:23
29:7,12 55:2
59:11
**policies** 14:15
24:19 41:6
**policy** 41:18
**portion** 60:21
**position** 21:15
43:19 44:6
**positions** 7:5
**possession**
18:23
**possible** 23:18
**potential** 38:12
**pre** 9:22
**premarked** 10:4
10:20 17:1
**preparation** 9:2
31:15
**preparations**
10:25

**prepared** 48:4,6
**preparing** 10:25
**presumably**
39:20 54:5
**presume** 37:14
41:24
**prevails** 65:15
**previous** 18:17
**previously** 8:20
**primary** 7:18
**principal** 1:16
16:8 24:1
**principals** 33:10
**printing** 51:5
**prior** 6:20,20
20:11 21:12
22:25 26:2,7
29:20 30:18
33:22 34:1 45:5
46:3,20 49:7
52:11 54:18
56:4,12,17 57:2
57:7 61:6,11,24
64:16 68:6
**privilege** 47:13
47:18 48:2
**pro** 1:10
**probably** 5:24
**problem** 6:24
**procedure**
69:24,24
**procedures**
14:15 24:19
**proceedings**
8:10 52:1 55:16

56:12
**proceeds** 24:10
**process** 29:11
29:14 44:12
**produce** 47:15
**produced** 46:5
47:16 49:7
52:11 53:3
54:18
**production** 54:2
**products** 7:16
**profit** 1:18 34:9
**progressed** 21:5
**proper** 27:15
**property** 24:8
65:10
**protective** 27:20
45:12,17 49:13
51:16,24 54:16
59:23 62:25
63:10,19 64:1
64:23 65:5,18
65:25 66:7,14
67:1
**provide** 41:17
41:19
**provided** 19:7
19:25 37:25
45:5,8,22 46:3
46:10 49:12
52:20
**provider** 20:1
**purchase** 36:8
43:5,10 44:16

**purchaser** 44:10
**pure** 47:21 53:4
**purpose** 56:8
**purposes** 16:22
**pursuant** 2:6
**pursued** 23:6,6
**put** 12:2 27:1
45:1,10

**q**

**question** 6:7,10
8:18 21:16
25:12,17,20,25
27:4,10,19
44:14 49:11
51:1,23 60:19
64:13,13,15,16
66:13
**question's** 22:2
**questioning**
14:18 47:21
**questions** 27:5
27:21 45:2,11
47:18 49:6
52:13 67:4
**quick** 44:21
**quite** 53:20

**r**

**r** 2:12 68:1 70:3
70:3
**radar** 12:2
**rate** 32:13
**rating** 16:21
18:15 29:10

**reach** 51:11,12
**reaching** 51:20
  52:3
**read** 19:1 25:24
  41:14 60:20,22
  69:8 70:20
**real** 11:18 24:7
  24:13 39:6
  44:20
**really** 21:12
**reason** 34:23
  43:7 54:11
  69:10 70:6,9,12
  70:15,18
**reasonable**
  69:17
**reasonably**
  62:20
**reassurance**
  47:7
**recall** 8:15
  10:24 11:1 12:5
  12:18 13:16,18
  19:16,18,20,23
  20:2,7 21:10
  22:5,24 23:2,4,8
  24:17 28:10
  29:21 30:7 31:3
  31:8,13,23
  32:11,12,22,24
  33:6,9 34:20,22
  34:23 35:9,10
  35:15,18,19
  37:6,16 38:10
  38:24 39:15,21

39:22,25 40:6
  40:12,13 41:21
  41:25 42:15
  43:2,4,8,16,21
  44:2,5 46:25
  47:2,3,9 49:3,18
  49:21 52:3,7
  53:16 54:3,5,6
  54:24 55:4,10
  55:11,24 56:14
  57:6 58:6,11,16
  59:3,5,6,9,15
  61:5 62:2
**recalls** 51:20
**receipt** 41:19
  69:17
**receive** 9:15
  46:19
**received** 12:22
  24:10 45:23
  50:7 62:22
**receiver** 19:10
  19:15 41:17,23
**receiving** 53:15
**recent** 7:22
  36:18
**recently** 7:8
  19:10
**recognize** 12:11
  12:13,17 39:18
  40:3 55:12
**recollection**
  23:9 24:5 26:6
  36:21 44:11
  49:15 53:14

**record** 5:16
  11:2 25:14
  44:21 45:2,11
  48:15 60:22
**records** 17:17
  45:21
**reduced** 68:10
**refer** 10:3,20
  12:9 16:25 18:3
  29:1 31:10
  36:10 38:15
  40:14 43:22
  46:23 50:3
**reference** 14:1
  14:20,22,23
  15:21 18:15,18
  40:1 47:5
**referenced** 4:11
  69:6
**references**
  13:21 14:6
**referencing**
  52:17
**referred** 18:10
**referring** 18:21
  30:2 41:22
**refers** 25:15
**regard** 69:19
**regarding** 26:13
  32:1,2,9 36:7
  49:16 56:8 60:3
  66:12
**regions** 26:25
**regular** 29:17

**regulated** 28:6
  40:10 54:13,22
  58:25 59:14
**regulation** 25:2
  28:8 40:13
  58:19 59:1,7
**regulatory**
  16:21 24:20
  25:9 26:10 40:7
  59:10
**regus** 2:8
**relate** 27:5 43:2
  44:15
**related** 9:1
  11:23 25:2
  26:23 31:12
  32:4 36:8 55:16
**relates** 23:7
  26:16 28:14
  43:18 48:1
  58:20 59:6
**relative** 68:12
  68:14
**relatively** 32:21
**relocated** 7:8
**remained** 12:4
  64:19
**remember**
  11:11 19:22
  23:1 24:8 35:21
  39:18,24 40:4
  44:18 55:12
**remind** 41:7
**remotely** 2:4 8:7

**repaid** 24:4
**repeat** 26:21
  28:21 35:2
  60:19
**rephrase** 6:10
**report** 14:1,4
  17:19
**reporter** 6:4
  10:16 60:22
  68:4
**reporter's** 4:11
**reporting** 18:11
**representation**
  48:21
**representations**
  48:15 66:15
**represented**
  44:4 48:10
  66:23
**request** 38:25
  41:16
**requested** 19:21
  60:21
**require** 39:4
**required** 33:14
  45:13 55:8
**requirements**
  24:21 25:9
  26:10 32:3
**reserve** 25:8
  26:11,20,25
**reserves** 59:18
  60:4
**residents** 65:14

**resolve** 23:17
  29:8
**respect** 21:9
  24:1 62:18
**respond** 6:2
**response** 45:20
  50:11 62:19
**responsibilities**
  23:20
**responsibility**
  28:13 29:3
**responsible**
  41:5 63:15
**restrict** 45:15
**restrictions** 32:1
**resulted** 11:13
**retirement** 8:14
  30:12,25
**returned** 60:12
  61:4 69:16
**review** 31:15
  34:4,8 36:14
  69:7
**reviewed** 8:25
  9:4,5,6 31:9,11
  48:16 54:4
**reviewing** 52:7
**richard** 9:8
**right** 9:23 10:5
  17:25 37:1
  40:18 44:19,23
**rights** 51:25
**risk** 16:12,15
  18:13,15 29:10

**rmr** 2:6 68:24
**role** 11:12 21:6
  28:24 39:19
  41:8 55:13 64:6
**roughly** 7:13
**rule** 69:24,25
**rules** 69:18
**ryan** 22:14

### s

**s** 2:12,15,19 3:6
  69:1 70:3
**sake** 47:23
**sale** 14:25 24:7
  24:10,11 49:16
  65:10
**sam** 37:3,23
**saw** 31:11 46:6
**saying** 45:23
  47:23 52:15
**says** 14:4 19:2
  37:1,9,24 38:3
  39:13 42:8,20
  50:19 51:8
**scale** 16:15
**scope** 14:12
  27:9,11 45:12
  45:15 48:9,20
  49:12 51:16,21
  51:24 54:16
  59:23 61:18
  63:10,19 64:1
  64:23 65:5,18
  65:25 66:7,14
  66:16,23,24,25

**seacoast** 39:14
  39:16,20,23
  41:3,7 43:4 44:8
  44:12,16
**seal** 68:16
**second** 44:8
  50:2 53:23
  54:10
**secured** 16:19
  57:3
**see** 10:6 21:6
  38:21 39:1,7
  46:6 50:10
**seeing** 43:17
**seems** 13:19
  43:2
**seen** 7:22 10:22
  45:6 46:4,9,12
  46:13 48:7 53:4
  53:10
**segregated** 57:4
**seller** 36:7
**senior** 42:9
**sense** 12:14
**sent** 4:11 39:2
  47:25 53:17
**sentence** 42:20
  44:8
**separate** 8:11
  9:24
**separation**
  33:14
**sequencive**
  10:12

**[serious - subsidiary]**

**serious** 48:14
**services** 55:23
**set** 10:14,15,16
  10:16
**seven** 16:14,20
**several** 62:8
**severed** 65:1
**share** 48:1
**sheesley** 2:3 3:3
  5:2,7,15,17,18
  6:12 8:9 10:19
  12:11 13:16
  14:4,20,24
  15:15 16:23
  17:9 18:6 20:7
  20:15 21:17
  26:4,9 27:23
  28:3,5 30:9
  36:13,20 38:19
  46:22 47:6,19
  48:25 49:4,14
  49:25 51:12,19
  52:5,19 53:11
  54:8,21 55:1
  58:10 61:21
  62:8 63:6,13,21
  64:4,18,25 65:7
  65:20 66:2,9,19
  67:3 69:5 70:2
  70:23
**sheesley's** 14:13
  27:8,13 56:21
  58:5 66:17,24
**sheet** 69:11,13

**sheets** 34:10
**short** 44:25
**shorthand** 68:9
**shows** 16:10
**sign** 69:12
**signature** 7:23
  68:23
**signed** 69:21
**significant** 24:2
  42:24
**significantly**
  42:21
**similar** 8:18
**simply** 27:25
**sinthusy** 2:5
  68:3,24
**sir** 16:2 35:8
**sit** 59:16
**situation** 39:9
**six** 18:19
**size** 7:13
**skilled** 8:21 19:4
  31:20 32:2,2,9
**skip** 49:22 54:25
**skipped** 17:4
**smith** 22:19
**solutions** 69:23
**soon** 35:15
  39:15
**sorry** 6:19 25:16
  26:3,13,21
  55:19 58:9
  60:19
**sort** 43:16

**source** 58:12
**south** 2:21
**speak** 32:21
  33:11
**speaking** 27:15
**special** 6:16 7:2
  12:3 20:23
  28:11,24 30:5
  56:8
**specific** 20:2,21
  21:8 31:24 32:3
  32:8 59:13
**specifically**
  15:15 20:9
  23:22 28:15
  29:1 36:22 39:1
  53:16 62:16
  63:4 66:10
**specifics** 18:5
  24:9 32:6,11,22
  33:9 34:2 41:25
  43:8 44:18
  49:18,21 54:24
  57:6 58:16 59:3
  59:5 61:5,15
  62:2
**spoke** 9:8
**square** 2:8
**stack** 53:21
**stands** 15:25
  16:5,20 40:4
  64:13,16
**start** 17:2 36:16
  37:2

**state** 5:16 11:2
  28:8,8 45:20
  68:4
**stated** 48:11
  68:10 70:21
**statement** 25:13
  41:15 42:14,19
  50:5 54:11,14
**statements** 34:9
  34:9 55:8
**states** 1:1 7:14
  7:18,19 47:6
**stating** 52:19
**status** 40:25
**statute** 69:18
**statutes** 30:21
**stay** 15:12
**step** 44:9,22
**stepping** 44:12
**steps** 25:7
**straightforward**
  38:18
**street** 2:9
**strength** 16:18
**string** 36:14
**structure** 32:20
  33:11,12
**subject** 28:7
**submit** 55:8
**submitted** 38:12
**subpoena** 45:3
**subsequently**
  26:17
**subsidiary** 1:16
  33:23

**[substandard - true]** Page 88

**substandard** 16:20 29:10
**successor** 1:18 5:14
**suffered** 63:16
**suggested** 69:16
**suggesting** 43:15
**suite** 2:21
**summers** 13:1,4 13:6
**supply** 52:16
**support** 65:13
**supported** 65:8
**sure** 7:20 8:4,6 13:6,24 15:17 16:16 29:5 39:8 42:7 45:7 46:12 46:14
**sworn** 5:3 55:8 68:7
**system** 16:17,21
**systems** 41:3

**t**

**t** 2:14 3:6 68:1,1 70:3,3
**tails** 59:11
**take** 6:6 36:13 44:20 52:6
**taken** 2:4 5:19 5:21 44:25 60:11 61:3 68:8
**takes** 36:17
**talkow** 37:3,4,8 37:24

**tampa** 1:2,5,6 1:11 2:15,22 5:11 14:6 18:14 33:15 55:17 57:17,22,23 62:22 63:24 69:4 70:1
**taxes** 55:2
**team** 6:16 46:13 48:17
**telephone** 35:11
**tell** 5:24 7:10 8:1 9:4 10:21 11:21 13:4,22 14:7 17:13 24:5 28:11 33:7 37:4 38:2,3,14 39:3 40:22 42:13,25 46:8 53:9,24 64:5 65:8
**ten** 7:3
**term** 31:5,6 62:9 62:10
**terms** 32:12,14 42:10
**testified** 5:3 61:19
**testify** 14:14
**testimony** 35:1 69:8,17
**text** 42:6
**thank** 5:7 6:11 10:17 16:23 18:6 20:4 22:4 26:9 41:19

50:23 52:4 57:1 67:5
**thing** 14:16 31:24
**things** 5:25 21:6
**think** 7:22 13:12 14:19 21:8 25:19 45:11 46:10 58:2
**third** 3:8 11:3 17:24 48:2
**three** 9:25 10:9 42:16,17
**ticking** 42:22
**tim** 46:25 47:2 47:25
**time** 12:1,18 13:8 20:3,25 21:5 22:24 23:1 27:5,21 29:21 31:3,24 33:17 33:20 34:1,16 34:19 40:5 47:12 55:25 58:14 59:12,12 68:9
**timeline** 20:16 21:8
**timing** 35:18
**title** 6:15 22:10 30:7
**titled** 17:25
**titles** 15:21
**today** 5:10 6:5 7:25 20:18

59:17
**today's** 31:16 46:4,20 49:8 54:18
**together** 6:22
**told** 63:4
**tolling** 66:4,11
**took** 25:7
**top** 14:4 15:22 39:11 42:5 46:7 47:1
**total** 7:12
**transact** 44:17
**transaction** 24:9 36:8
**transcript** 4:12 9:5,7 48:17 63:3 69:6,20
**transcripts** 69:14
**transfer** 25:3 62:23
**transferred** 26:24 57:24 58:13
**transitioned** 29:22
**transpired** 36:23
**trey** 9:11
**trick** 21:24
**true** 29:24 31:17 42:20 54:14 70:21

**trustee** 1:10 5:9 5:11 23:11,14 23:21 52:17 53:5 65:9 66:16
**trustee's** 3:9 11:4
**trying** 10:11 21:21,24 28:23 29:4 38:20 43:5 43:9
**two** 2:8 19:14 37:19,20 38:19 43:16,18 52:24
**type** 5:22 14:16 16:5,15
**types** 32:4 39:4 43:7
**typically** 34:11 39:6 62:17
**typo** 19:12

**u**

**uh** 16:24
**ultimately** 12:5 23:24 60:6,23
**under** 1:9 5:3 18:25 29:23 42:10 52:15 68:11 69:18 70:20
**understand** 6:8 25:18 26:4 28:24 37:9 38:21 45:23 47:14 50:23 51:3,19

**understanding** 20:24 23:13 32:17 38:6 45:22,25 46:15 53:7 58:8 61:10 62:10 63:3,22 64:5
**understood** 6:11
**united** 1:1 6:20
**university** 31:10 31:12 36:5
**usab** 15:25 50:8
**usameribank** 1:19 5:14 11:24 12:3 16:1 22:8 26:7,17 27:1,6 30:8 50:7 52:19 57:8,24 58:13 58:18,22 60:1 61:7,10,20
**usameribank's** 56:18
**use** 17:14,19 56:20 62:9
**used** 69:20
**usually** 16:18 37:13

**v**

**v** 1:14
**vague** 25:20
**vaguely** 36:22
**valley** 1:15,16 3:8 5:13 6:14,18 6:21,23,25 7:6

7:11,14,15 11:3 11:24 19:3 26:2 26:17 27:5,22 37:10 40:21,24 49:7 51:25 52:19 61:12 62:5 66:4,11,20 69:4 70:1
**valley's** 13:9 26:7
**value** 57:20 62:21
**varies** 29:5
**various** 17:21 17:21 38:23 59:10
**verbal** 6:3 11:10
**verify** 21:15 69:9
**veritext** 69:14 69:23
**veritext.com** 69:14
**version** 11:7
**versus** 5:13
**video** 6:1
**village** 31:10,12 36:5
**violation** 55:7 62:25
**virtually** 21:4
**vnb** 3:11,13,14 3:16,17
**vs** 69:4 70:1

**w**

**w** 1:9
**wages** 55:3
**waiving** 47:17 51:25
**walk** 20:15
**want** 10:13 25:13 27:17 45:1,13
**wanted** 46:2,11
**warren** 1:9 5:9 5:10 14:24 23:11 41:24 65:9,14
**way** 27:10 46:19 48:9,19 51:23 66:7,22
**we've** 53:3
**went** 17:6
**west** 2:15 7:24 8:6
**westport** 1:5,6 1:10,12 5:11,12 11:23 13:3 14:6 18:14 23:24 28:15 29:2 30:24 31:9 32:8 32:18 33:2,15 33:15,22,23 34:14,15 40:10 43:5 54:12,22 55:17,21 57:4,8 57:9,17,22,22 58:25 62:21,22 63:7,23 64:6

65:2,21 69:4 70:1

**whitson** 2:19 8:22 9:17,23 10:5,10 11:15 13:1 14:10 15:3 15:7,11,19 17:2 17:7,15 20:19 22:7 23:15 24:14,16,22 25:11,17,19 26:1 27:3,12,17 27:24 28:16,19 30:16 31:2,21 32:5,19 33:3,8 33:19,25 34:18 34:25 36:1 39:17 43:20 44:2,13,19 45:1 45:19 46:1,16 47:10,22 48:3,6 48:12,13,22 49:5,10 50:10 50:13,16,25 51:15,18,22 52:9,14,22 53:1 53:9 54:15 56:3 56:19 57:18,25 58:15,21 59:2,8 59:20 60:8,13 60:17,25 61:14 61:17 62:1,24 63:9,17,25 64:8 64:12,21 65:3 65:16,23 66:6

66:13,22 69:1

**wholly** 33:23
**willing** 14:17
**willingness** 51:10
**withheld** 55:3
**witness** 2:4 3:2 10:16 15:18 17:4 27:10,19 49:9,11 51:1,17 52:13 54:19 59:24 60:16 63:1,11,20 64:2 64:24 65:6,19 66:1,8,18 67:2 68:6,16 69:8,10 69:12,20
**witness's** 35:1 60:14 61:18
**wonder** 2:19
**word** 56:20
**work** 8:3,7 36:16
**worked** 14:24 28:6 58:22
**working** 13:2
**works** 30:3
**writing** 68:11
**written** 37:23

**x**

**x** 3:1,6

**y**

**yeah** 15:19

**year** 18:2,4
**years** 6:19,25 7:3 13:19 42:23 52:24
**york** 7:17

**z**

**zero** 21:4,12
**zoom** 2:3,13,19 2:20 3:4 5:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.