Gipson, Christine

# REDACTED

**From:** Richard Ackerman <rackerman@bigrockpartners.com>
**Sent:** Monday, December 31, 2018 9:32 AM
**To:** Sheesley, Daniel <DSheesley@valley.com>; Stan Brading (sbrading@khlawfirm.com) <sbrading@khlawfirm.com>; Rob Gall <rgall@hjsims.com>; Tom Brockwell <tbrockwell@bigrockpartners.com>; Sean Nealon <snealon@bigrockpartners.com>
**Subject:** University Village

Dan,

I hope you had a nice Christmas and Happy New Year. Not sure if you are in today but we were given your name from Jeff Warren as a point of contact for the Bank concerning the University Village project. As you can see from the attached Jeff has made a motion to sell UV to the Quality



EXHIBIT
18
Ackerman 11/20/23

Senior Housing Foundation, Inc. We at Big Rock Senior Housing Management LLC. with HJ Sims are working with QSHF to complete the sale. We are located in Delray Beach and thought it would be a good idea for us all to get together for lunch so we can see what the Bank's view is on the property.

Let me know.

Richard Ackerman
Managing Partner
BRP LLC
315 South Beverly Dr
Suite 404
Beverly Hills Ca 90212

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP, | Case No. 8:16-bk-8167-MGW |
| WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP, | Case No. 8:16-bk-8168-MGW |
| Debtors. | *Jointly Administered under* Case No. 8:16-bk-8167-MGW |
| _____/ | |

**LIQUIDATING TRUSTEE'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING (I) THE SALE OF THE ASSETS OF DEBTORS AND WNT FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, AND (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS**

Jeffrey W. Warren, as the Liquidating Trustee (The "**Liquidating Trustee**") for Westport Holdings Tampa, Limited Partnership ("**WHT I**") and Westport Holdings Tampa II, Limited Partnership ("**WHT II**," and together with WHT I, the "**Debtors**"), by and through his undersigned counsel, requests that this Court enter an order authorizing: (a) the sale of substantially all of the assets of the Debtors and Westport Nursing Tampa, L.L.C. ("**WNT**") free and clear of all liens, claims, and encumbrances to Quality Senior Housing Foundation, Inc. ("**QSH**" or the "**Purchaser**"),[1] and (b) the assumption and assignment of the Assumed Contracts (as defined herein), and in support thereof, states as follows:

**Preliminary Statement**

1.      By this Motion, the Liquidating Trustee seeks entry of an order authorizing the sale of substantially all of the Debtors' assets in connection with the sale of the re-unified

---

[1] For purposes of this Motion, the terms "QSH" and "Purchaser" shall also include any affiliate of QSH who may be assigned the obligations to close on the proposed transaction under the LOI (as defined below).

continuing care retirement community named "**University Village**" to QSH pursuant to the terms of the Letter of Intent attached hereto as Exhibit "A" (the "**LOI**").[2] Under the LOI, subject to the execution of definitive documentation, QSH proposes to acquire substantially all of the assets owned by the Debtors relating to the independent living facility located at 12401 North 22nd Street, Tampa, Florida 33612, comprising 446 independent living apartments and 46 independent living villas (collectively, the "**Debtor's Purchased Assets**"). In addition, under the LOI and subject to the execution of definitive documentation, QSH proposes to acquire the assets owned by WNT relating to the 110-bed assisted living facility (the "**Assisted Living Facility**") and the 120-bed skilled nursing facility (the "**Skilled Nursing Facility**" and, together with the Assisted Living Facility, the "**Health Center**") located at 12250 North 22nd Street, Tampa, Florida 33612 (the "**WNT Purchased Assets**").

### Jurisdiction and Venue

2.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1408.

3.      The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§ 105, 363, 365, 1107, 1108, 1123, 1129, 1142, and 1146; Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure; and Local Rule 6004-1.

### Background

4.      On September 22, 2016 (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

---

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the LOI.

5.    Pursuant to an order of this Court dated September 22, 2016, the Debtors' Chapter 11 cases are being jointly administered for procedural purposes only under *In re: Westport Holdings Tampa, Limited Partnership*, Case No. 8:16-bk-8167-MGW.

6.    On May 10, 2018, this Court entered an order (the "**Confirmation Order**") (Doc. No. 1016) confirming the First Amended and Restated Mediated Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code, As Modified (the "**Confirmed Plan**") (Doc. No. 1012).

7.    The Liquidating Trustee is operating the Debtors' businesses and managing their properties pursuant to the terms of the Confirmed Plan and Confirmation Order.

8.    WHT I owns a Certificate of Authority to operate University Village as a continuing care retirement community (the "**CCRC**"), which includes (1) an independent living facility (the "**Independent Living Facility**") comprising 446 independent living apartments owned by WHT I and 46 independent living villas owned by WHT II and (2) the Health Center owned by WHT I's wholly-owned subsidiary WNT.[3] The Health Center and the Independent Living Facility shall collectively be referred to as the "**Facilities**."

9.    As the holder of the Certificate of Authority to operate the CCRC, WHT I is regulated by the Florida Office of Insurance Regulation (the "**OIR**"). Effective May 30, 2018, the Liquidating Trustee and the OIR entered into a Consent Order that, among other things, authorized the Liquidating Trustee to operate and manage the Debtors pursuant to the Confirmation Order pending a sale of the re-unified CCRC. The Consent Order further provided

---

[3] On May 25, 2018, this Court entered an order (the "**Transfer Order**") compelling the transfer of the membership interests in WNT to WHT I in compliance with Confirmed Plan and Confirmation Order. (Doc. No. 1035.) Certain pre-confirmation holders of the membership interests in WNT appealed the Transfer Order. (Doc. No. 1049) On December 27, 2018, the United Stated District Court for the Middle District of Florida affirmed the Transfer Order. (Doc. No. 1276.)

that, if the OIR has not approved the acquisition of the Debtors or their assets and issued a Certificate of Authority to new ownership for the University Village CCRC by December 31, 2018, then WHT I shall consent to the dismissal of its bankruptcy case and consent to a receivership by the OIR. Effective December 20, 2018, the Liquidating Trustee and the OIR entered into an Amended Consent Order (Doc. No. 1274), among other things, extending the December 31, 2018 deadline until March 31, 2019.

10.     WNT leases the Skilled Nursing Facility and the Assisted Living Facility to third party operators, and WNT does not operate or in any way oversee the operations of the Assisted Living Facility or the Skilled Nursing Facility. The operations of the Assisted Living Facility are run by TALF, Inc., a Florida not-for-profit corporation, and the operations of the Skilled Nursing Facility are run by TR & SNF, Inc., also a Florida not-for-profit corporation (collectively, the **"Current Operators"**).

11.     As a CCRC, WHT I contracts to provide "lifecare" services to its residents, which recognize that the healthcare and residency needs vary along a continuum from independent living to full-time nursing care. Under the "continuing care" concept, residents enter into a residency and care agreement with WHT I—called a "Life Care Residence Agreement"—which requires payment of a one-time entrance fee (either prospective or deferred) and a monthly service fee. The payment of these fees entitles residents to the use and privileges of the Facilities for life but does not entitle the residents to an interest in the real estate or any property owned by the Debtors or WNT. If a resident moves from the Independent Living Facility to the Health Center, they also enter into a separate agreement with the applicable Current Operator.

12.     The Confirmed Plan and the Confirmation Order contemplate a sale of the reunified University Village CCRC, comprising substantially all of the Debtors' and WNT's

assets pursuant to court approval and the provisions of Section 363 of the Bankruptcy Code. Since confirmation, the Liquidating Trustee has engaged in substantial discussions and negotiations with several potential purchasers of the re-unified University Village CCRC. The Liquidating Trustee believes that the proposed sale outlined in the LOI provides the best opportunity for the sale contemplated under the Confirmed Plan and is in the best interests of the Debtors' estates and their creditors.

13.     Subject to the execution and delivery of a definitive asset purchase agreement by and between the Liquidating Trustee and QSH (the "**Purchase Agreement**"),[4] the LOI provides for the sale to QSH of substantially all of the assets of the Debtors and WNT, as more fully described in the LOI. The Debtors and WNT are referred to collectively as the "**Sellers**" in the LOI.

14.     The material provisions of the LOI are summarized below. *If any provision of the summary provided below conflicts with or is inconsistent with the terms of the LOI or Purchase Agreement, the terms of the LOI or Purchase Agreement shall expressly control.* All capitalized terms used in the summary below shall have the meaning ascribed to them in the LOI.

### Summary of the LOI

| Purchased Assets | Substantially all of the assets, real, personal, or mixed, tangible or intangible, owned or held by the Sellers as of the Closing Date (as defined below), relating to University Village (collectively, the "**Purchased Assets**") consisting of (i) the Debtors' Purchased Assets and (ii) the WNT Purchased Assets. The Purchased Assets shall include (without limitation) real property and improvements thereon, furniture, fixtures, equipment, vehicles, accounts receivable, intellectual property, software, contracts, licenses, permits, and business and resident records and data. The Purchased Assets shall exclude the operating leases between WNT, as lessor, and the Current Operators, as lessees, which operating leases will be terminated prior to or contemporaneously with Closing. |
| --- | --- |

---

[4] Upon entering into the Purchase Agreement, the Liquidating Trustee will file a copy with this Court.

| Purchase Price | The total consideration payable to the Sellers comprises both cash paid at closing and the assumption by the Purchaser of certain liabilities, including:<br><br>A.  An amount for the Debtors' Purchased Assets consisting of:<br><br>(1) cash (the "**Debtors' Cash Consideration**") sufficient to pay the following liabilities or obligations of the Debtors at the Closing (collectively, the "**Debtors' Claims**"):<br>  (a) the amount necessary to satisfy in full and/or remove the priming mortgage lien and any other lien or security interest held by CPIF Lending, LLC ("**CPIF**") against the Purchased Assets granted in connection with the post-confirmation financing approved by order of the Bankruptcy Court dated November 14, 2018 (the "**CPIF Bridge Loan**");<br>  (b) the amount necessary to satisfy in full and/or remove the allowed mortgage lien and any other lien or security interest held by CPIF, including but not limited to any adequate protection liens, against the Purchased Assets which claims were treated in the Confirmed Plan as an Allowed Secured Claim (the "**CPIF Secured Claim**")<br>  (c) the amount necessary to satisfy in full and/or remove the subordinate mortgage lien and any other lien or security interest held by SouthPoint Global Investments, LLC ("**SouthPoint**") against the Purchased Assets granted in connection with the debtor in possession loan approved by order of the Bankruptcy Court on May 2, 2018 (the "**SouthPoint DIP Loan**");<br>  (d) $750,000 or such lesser amount as is necessary to fully fund the payment of allowed general unsecured claims against the Debtors;<br>  (e) the amount necessary to satisfy in full and/or remove the lien against the Purchased Assets granted in the Confirmed Plan in favor of any deferred allowed administrative claims against the Debtors;<br>  (f) the amount necessary to satisfy in full all allowed priority claims against the Debtors, including the amount necessary to satisfy in full all real property and tangible personal property taxes that constitute liens against the Purchased Assets;<br>  (g) the additional amount necessary to fund the Required MLR; and<br>  (h) the amount necessary to pay the closing costs of the Debtors, including reasonable attorney's fees; and<br><br>(2) the assumption by the Purchaser of the following liabilities or obligations of the Debtors at the Closing (collectively, the "**Debtors' Assumed Obligations**"):<br>  (a) certain of Debtors' trade payables, accrued payroll, and resident deposits as of Closing, to the extent (i) not in default as of Closing, (ii) incurred in the ordinary course of business, and (iii) disclosed in the schedules to the Definitive Purchase Agreement (collectively the "**Assumed Ordinary Course** |

**Liabilities");**

(b) performance obligations arising after Closing under existing equipment leases and selected vendor and service contracts to assure continuity of care, to the extent (i) not in default as of Closing, (ii) entered in the ordinary course of business, (iii) competitive pricing, appropriate levels and quality of service, and (iv) disclosed in the schedules to the Definitive Purchase Agreement (collectively the "**Assumed Ordinary Course Contracts**");

(c) all existing liabilities of the Debtors to current and former residents of the CCRC for entrance fee refund obligations and personal income protection obligations (collectively, the "**Resident Obligations**") related to or arising from Life Care Contracts made by WHT (the "**Assumed Residency Obligations**"); provided, however, it is understood that (i) none of the Assumed Residency Obligations will be paid at Closing, (ii) pursuant to the Confirmed Plan, the Assumed Residency Obligations will be paid, in full and final satisfaction of such claims, equal quarterly cash payments beginning on the last Business Day of the first full calendar quarter following the second anniversary of the Effective Date of the Confirmed Plan and continuing on the last Business Day of each subsequent calendar quarter until the twelfth anniversary of the Effective Date of the Confirmed Plan, together with interest at 3% per annum beginning on the second anniversary of the Effective Date of the Confirmed Plan, and (iii) the repayment of the Assumed Resident Obligations described in Section 2(c)(ii) above will be subordinate to operations, capital costs, including debt service on the senior debt that will finance the acquisition by Purchaser and capital expenditures of the Community;

(3) Notwithstanding the foregoing, although it is expected that the Parties will cooperatively use their best efforts to fairly and equitably establish a reasonable Retirement Center Purchase Price for the Debtors' Purchased Assets through continued negotiations with all interested parties, as a condition to Closing, the aggregate amount of the Debtors' Cash Consideration and the Debtors' Assumed Obligations must be acceptable to Purchaser, in its sole discretion; and

B. An amount for the WNT Purchased Assets consisting of:

(1) cash (the "**WNT Cash Consideration**") sufficient to pay the following liabilities or obligations of WNT at the Closing (collectively, the "**WNT Claims**"):

(a) the amount necessary to satisfy in full and/or remove the mortgage lien and any other lien or security interest held or asserted by Valley Bank, as successor in interest to USAmeriBank against the Purchased Assets (the "**Valley Bank Secured Claim**"); and

- 7 -

| | |
|---|---|
| | (b) the amount necessary to satisfy in full all real property and tangible personal property taxes that constitute liens against the Purchased Assets; and

(2) the amount necessary to satisfy in full and/or remove the mortgage lien and any other lien or security interest held or asserted by CNH Finance ("**CNH**") against the Purchased Assets which claims are secured by assets of the Current Operators, the primary obligors to CNH (the "**CNH Secured Claim**"); and

(3) Notwithstanding the foregoing, although it is expected that the Parties will cooperatively use their best efforts to fairly and equitably establish a reasonable Health Center Purchase Price for the WNT Purchased Assets through continued negotiations with all interested parties, as a condition to Closing, the aggregate amount of the WNT Cash Consideration must be acceptable to Purchaser, in its sole discretion. In the event the Health Center Purchase Price for the WNT Purchased Assets is deemed by Purchaser as unreasonable, the Parties will explore approval of alternative means to continue the CCRC without ownership of the Health Center. In that event, the Debtors will retain all claims and rights against WNT and the Current Operators. |
| Assumed Contracts | The Purchased Assets will include (i) all life-care and residency care contracts (including any amendments thereto) between the Debtors and residents of the CCRC (the "**Life Care Contracts**"), (ii) all other executory contracts and/or unexpired leases and post-petition contracts or leases to which either Debtor is a party and designated to be assumed by the Purchaser, at the Purchaser's discretion, (iii) all contracts between WNT or the Current Operators and the current residents of the CCRC designated to be assumed by the Purchaser, at the Purchaser's discretion, and (iv) all other executory contracts and/or unexpired leases and contracts or leases to which WNT is a party and designated to be assumed by the Purchaser, at the Purchaser's discretion (collectively, the "**Assumed Contracts**"). The Purchaser will be responsible for the payment of all cure amounts, if any, due and owing by the Debtors pursuant to Section 365(b) of the Bankruptcy Code under such Assumed Contracts and allowed by order of the Bankruptcy Court (collectively, the "**Cure Claims**") and shall also fund such additional amounts above the Existing MLR as necessary to establish the amount of minimum liquid reserve required and approved by the Florida Office of Insurance Regulation (the "**FOIR**") as of the Closing, as calculated in accordance with Rule 69O-19.050 of the Florida Administrative Code (the "**Required MLR**"), which shall serve as adequate assurance of the Purchaser's future performance as contemplated under Section 365(b)(1)(C) of the Bankruptcy Code. |
| Excluded Assets | The Purchased Assets will not include (i) any claims or causes of action which either of the Debtors or WNT may have against a third party including, but not limited to, under any provision of the Bankruptcy Code, (ii) the federal and state income tax attributes of the Sellers as of |

| | the Closing Date, and (iii) the limited partnership and limited liability company records of the Debtors and WNT, respectively. |
|---|---|
| Excluded Liabilities | Except for the obligations or liabilities under the Assumed Contracts, the Purchaser shall not assume any liabilities or obligations of the Sellers of any nature whatsoever. |
| Investigation/Due Diligence Period | The Purchaser, its agents, employees, advisors, and other representatives shall have until 5:00 p.m. on January 31, 2019 in which to conduct due diligence as to the Sellers and their businesses relating to the CCRC. |
| Closing | The closing of the Proposed Transaction (the "**Closing**") shall occur by no later than ten (10) days after the satisfaction or waiver (if permissible) of the conditions to Closing set forth in the Definitive Purchase Agreement (the "**Closing Date**"), which Closing Date may be extended upon the mutual written agreement of the Sellers and the Purchaser. |
| Operations Transfer Agreement | WNT shall use its best efforts (i) to cause the Current Operators to transfer to the Purchaser or the Purchaser's designee (the "**New Operator(s)**") any and all rights, licenses, permits, governmental authorizations, provider numbers and contracts to operate, or necessary to operate, the ALF and the SNF (the "**Operator Authorizations**"), to the extent permissible under applicable law, and (ii) to cause the Current Operators to enter into one or more operations transfer agreements with the Purchaser and the New Operator(s) (the "**OTA**") relating to the transfer of operations of the Health Center, including, without limitation, as to Operator Authorizations, employees, accounts payable, accounts receivable, third party contracts, and assignment to the Purchaser or the New Operator(s) of any Medicare provider number held by the Current Operators. |
| Interim Covenants/ Exclusivity | In consideration of substantial expenditures of time, effort, and expense to be undertaken by Purchaser and its affiliates in connection with the negotiation and preparation of the Definitive Agreements, and the various investigations and inspections referred to above, from the date of execution of the LOI by Sellers until January 12, 2019, Sellers will not enter into or conduct any discussions or negotiations with, disclose any non-public information to, grant options to, or execute an agreement or commitment with, any other prospective purchaser of the Purchased Assets, or relating to a proposed merger or other such reorganization or change of control of Sellers not involving Purchaser. Furthermore, in consideration of efforts of and expense to Purchaser in conducting a preliminary evaluation of the Community for the Possible Transaction prior to the execution and delivery of the Definitive Agreement, Seller agrees that, commencing upon the date of this letter and continuing until the close of this transaction or the termination of negotiations in connection with this letter of the Definitive Agreement by either party to the other, Seller will not enter into any letter of intent, |

| | agreement or so-called back-up agreement for the sale or other disposition of the Community to any third party. In addition, Seller will notify Purchaser of the execution of any lease or other agreement pertaining to the Community or any amendment or other modification thereof, as well as any material changes in or relating to the Community, and Seller will provide to Purchaser a copy and other relevant documentation in connection therewith. Purchaser and Seller intend that this paragraph will be legally binding and enforceable. |
|---|---|
| Regulatory Filings | Sellers and Purchaser agree to use their good faith and commercially reasonable best efforts to make appropriate governmental filings pursuant to any laws or regulations which may govern the Proposed Transaction, in particular the approvals of the OIR and the Florida Agency for Health Care Administration, and to pursue with reasonable diligence the necessary third party and governmental licenses, permits, consents, and approvals for consummation of these transactions and the operation of the CCRC by Purchaser after the Closing. |

15.     The Purchaser is not an insider of the Debtors and neither the Liquidating Trustee nor the Debtors have any interest in the Purchaser.  Indeed, as a condition to the effectiveness of the LOI, QSH delivered to the Liquidating Trustee the declaration under penalty of perjury attached to the LOI as Exhibit "A," affirming (a) that Purchaser is not connected with the Sellers, the Current Operators, or their respective principals, limited partners, members, or affiliates, and (b) the Purchaser has not entered into any agreements, express or implied, with the Sellers, the Current Operators, or their respective principals, limited partners, members, or affiliates.

**Relief Sought and Basis for Relief**

**A.     Sale of Assets Free and Clear of Liens, Claims, and Encumbrances.**

16.     The Liquidating Trustee proposes a sale of the Purchased Assets pursuant to the terms of the LOI and the Purchase Agreement and Court approval. The Purchased Assets will be sold free and clear of all liens, claims, and encumbrances pursuant to Section 363(f) of the Bankruptcy Code (the "**Sale**"), with any liens, claims, or encumbrances to attach to the proceeds of the Sale to the same extent, validity, and priority as existed prior to the Closing.

17.     This Court has statutory authority to authorize the sale of substantially all of the Purchased Assets free and clear pursuant to Section 363(f) of the Bankruptcy Code. A trustee or debtor in possession may sell property under subsection (b) or (c) of this section free and clear, only if—

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;
(b)     such entity consents;
(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(d)     such interest is in bona fide dispute; or
(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 365(f)(5); *In re Bryan*, 2013 WL4716194, *1 (Bankr. M.D. Ala. 2013) ("Pursuant to 11 U.S.C. § 363(f) the trustee may sell property of the estate 'free and clear of any interest in such property of an entity other than the estate,' provided any one of the five disjunctive conditions are satisfied . . ."). Courts usually defer to the business judgment of a debtor in deciding whether or not to authorize a debtor to sell property outside the ordinary course of business. *See e.g., In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Mason's Nursing Center, Inc.*, 73 B.R. 360, 362 (Bankr. S.D. Fla. 1987).

18.     Section 363(b)(1) of the Bankruptcy Code authorizes a trustee or debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing. 11 U.S.C. §§ 363(b)(1). The standard applicable to a motion under Section 363(b)(1) of the Bankruptcy Code is whether the proposed sale serves a sound business purpose. *In re BDK Health Management*, 1998 WL 34188241, *5 (Bankr. M.D. Fla. 1998). To determine whether this standard is satisfied, Courts have considered whether: (1) there is any improper or bad faith motive, (2) price is fair and the negotiations or bidding

- 11 -

occurred at arm's length, (3) there has been an adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest. *In re Gulf States Steel Inc. of Alabama*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002). In this instance each of the factors are met.

19. Subject to the terms and conditions of the LOI and the Purchase Agreement, the Liquidating Trustee in the sound exercise of his business judgment, has concluded that consummation of the Sale will best maximize the value of the Purchased Assets for the benefit of the creditors of the Debtors and WNT.

20. Pursuant to Section 363(f) of the Bankruptcy Code, the Liquidating Trustee will sell the Purchased Assets free and clear of all liens, claims, and encumbrances, except those assumed in the Purchase Agreement. The Liquidating Trustee seeks an order that the contemplated Sale of the Purchased Assets to the Purchaser be free and clear of all liens, claims, and encumbrances. The Liquidating Trustee proposes that any liens transfer and attach to the net sale proceeds with the same validity, priority, force, and effect that such liens had on the Purchased Assets immediately prior to the Closing. The Sale will result in sufficient proceeds to pay all claims in full—including all secured claims—which satisfies the requirements of Section 363(f).

21. The Liquidating Trustee requests that this Court find that the Purchaser is a good-faith purchaser entitled to the protections of Sections 363(m) and (n) of the Bankruptcy Code. The Liquidating Trustee further requests that this Court enter the order approving the sale (the "**Sale Approval Order**") authorizing and approving the Purchase Agreement, and authorizing the Liquidating Trustee's execution of, entry into, and consummation of the Purchase Agreement and the Sale.

22. The Liquidating Trustee further requests that the Court enter a finding that the Purchaser constitutes a good faith purchaser of the Purchased Assets pursuant to 11 U.S.C. § 363(m) such that the reversal or modification on appeal of the Sale of the Purchased Assets to the Purchaser shall not affect the validity of the Sale to the Purchaser whether or not the Purchaser knew of the pendency of the appeal.

**B.      Final Assumption and Assignment of Contracts.**

23. By this Motion, the Liquidating Trustee also seeks, pursuant to Sections 365(a) and (b)(1) of the Bankruptcy Code, authority to finally assume[5] and assign to the Purchaser all of the Sellers' right, title, and interest in and to the Assumed Contracts free and clear of all liens, claims, and encumbrances, except that the Purchaser will be responsible for the payment of all Cure Claims, if any, and shall also fund the Required MLR, which shall serve as adequate assurance of the Purchaser's future performance as contemplated under Section365(b)(1)(C) of the Bankruptcy Code. The final assumption and/or assignment to the Purchaser of the Assumed Contracts is conditioned upon the approval of this Court and the closing of the transactions contemplated by the Purchase Agreement as well as the resolution of any objections to such assumption and/or assignment filed with the Court.

24. The Purchaser has agreed to assume and pay all Resident Obligations in accordance with the Confirmed Plan, which will provide significant benefit to the residents.

**C.      Section 1146 Exemption**

25. In accordance with the Confirmed Plan and Confirmation Order, pursuant to § 1146(a) of the Bankruptcy Code, the making or delivery of any instruments of transfer of any

---

[5] The Confirmed Plan provides that executory contracts and unexpired leases identified on Exhibit A to the Confirmed Plan would be conditionally assumed on the Effective Date with any final assumption of such contracts and leases to occur at the closing of the Sale to Purchaser at the discretion of the Purchaser. (Doc. No. 1012 at §§ 7.01, 7.02, and 7.05).

real or personal property, including, without limitation, all documents relating to or referred to in the LOI, may not be taxed under any law imposing any recording, registration, transfer or stamp tax or fee, or any similar tax or fee, including any applicable transfer taxes or fees, sales taxes, or mortgage recording taxes or fees.

WHEREFORE, the Liquidating Trustee respectfully request that the Court enter an order (a) approving the sale of the Purchased Assets free and clear of all liens, claims, and encumbrances, except as noted herein; (b) authorizing the final assumption and assignment of the Assumed Contracts, and (c) for such other and further relief as the Court deems just and proper.

Dated: Tampa, Florida
December 28, 2018

BUSH ROSS, P.A.
Post Office Box 3913
Tampa, Florida 33601-3913
(813) 224-9255 (telephone)
(813) 223-9620 (telecopy)
*Attorneys for Jeffrey W. Warren, as Liquidating Trustee for Westport Holdings Tampa, Limited Partnership, and Westport Holdings Tampa II, Limited Partnership*

By:    /s/ Adam Lawton Alpert
           Adam Lawton Alpert
           Florida Bar No. 0490857
           *aalpert@bushross.com*
           Laura B. Labbee
           Florida Bar No. 113577
           *llabbee@bushross.com*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing Sale Motion have been furnished on this 28th day of December 2018, by the Court's CM/ECF system to all creditors and parties in interest receiving noticing through the Court's CM/ECF system.

                    /s/ Adam Lawton Alpert
                    ATTORNEY

- 14 -

69J642007.DOCX