Page 1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

                              Case No.: 8:16-bk-08167-MGW
WESTPORT HOLDINGS TAMPA,      Chapter 11
LIMITED PARTNERSHIP,

WESTPORT HOLDINGS TAMPA II    Case No.: 8:16-bk-08168-MGW
LIMITED PARTNERSHIP,

                              Jointly Administered Under
       Debtors                Case No.: 8:16-bk-08167-MGW
_____/

JEFFREY W. WARREN, LIQUIDATING
TRUSTEE FOR WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP and
WESTPORT HOLDINGS II, LIMITED
PARTNERSHIP,
       Plaintiffs,
v.                            Adv. Pro. No. 8:20-ap-00007-MGW

VALLEY NATIONAL BANK, principal
subsidiary to VALLEY NATIONAL
BANKCORP, a New Jersey domestic profit
corporation, as successor by merger to
USAMERIBANK,
       Defendant.
_____/


          DEPOSITION OF JEFFREY W. WARREN

     DATE:           April 24, 2023

     TIME:           10:30 a.m. - 5:26 p.m.

     PLACE:          1801 North Highland Avenue
                     Tampa, Florida
     BEFORE:         Dorothy A. King, Stenographer
                     Notary Public, State of Florida


                Pages 1 - 192

EXHIBIT
DH2
Comp
11/7/23 Landy
PENGAD 800-631-6989

Page 2

APPEARANCES:

KEITH APPLEBY, ESQUIRE

Appleby Law, P.A.

4916 West Melrose Avenue South

Tampa, Florida 33629-5420

        Attorney for Plaintiff

EDMUND S. WHITSON, III, ESQUIRE

KIMBERLY ISRAEL, ESQUIRE

(Appearing by Videoconference)

McGlinchey Stafford PLLC

100 South Ashley Drive

Suite 600

Tampa, Florida 33602

        Attorneys for Defendant

I N D E X

DIRECT EXAMINATION BY MR. WHITSON         Page   4

CERTIFICATE OF OATH                       Page 190

REPORTER'S CERTIFICATE                    Page 191

ERRATA SHEET                              Page 192

Page 3

EXHIBITS

| DEFENDANT'S | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | University Village Tampa, Florida Assisted Living and Skilled Nursing Facility in Tampa, Florida from BHMS Investments. | 53 |
| Exhibit 2 | Regions Bank Agreement | 72 |
| Exhibit 3 | 3-31-14 Letter from Williams Mullen to OIR | 83 |
| Exhibit 4 | University Village Life Care Residency and Care Contract | 103 |
| Exhibit 5 | Complaint | 107 |
| Exhibit 6 | Order Confirming First Amended and Restated Mediated Joint Plan | 110 |
| Exhibit 7 | Mutual Release and Transfer and Assignment of Membership Interest in Westport Nursing Tampa | 121 |
| Exhibit, 8 | Tampa Life Plan Village Monthly Report | 126 |
| Exhibit 9 | Final Order Granting Liquidating Trustee's Motion | 127 |
| Exhibit 10 | Order Granting Liquidating Trustee's Motion for Entry of Final Order | 135 |
| Exhibit 11 | Liquidating Trustee's Notice of Filing Executed Litigation Funding Agreement | 144 |
| Exhibit 12 | Morse Etlinger Motion | 148 |
| Exhibit 13 | Amended Complaint | 149 |

Page 4

JEFFREY W. WARREN, the witness herein, being first duly sworn on oath, was examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. WHITSON:

Q.    Good morning.  Would you please state your full name for the record?

A.    Jeffrey Wayne Warren.

Q.    Mr. Warren, where are you employed?

A.    I am an attorney with Bush Ross, P.A.  I serve as the liquidating trustee for the Westport Holdings Tampa, Limited Partnership, and Westport Holdings Tampa II, Limited Partnership.

Q.    Thank you.  Well, we all know each other so I'm going to dispense with the usual routine questions or at least information.  So we'll just kind of --

A.    Well, I was hoping you would ask me whether I was competent on any medicine.  I could say, Yeah, I'm not competent and I don't have any medicine.

Q.    No, I know different.  But, anyway, so of course my name is Ed Whitson.  I represent Valley National Bank, and I'm taking your deposition in connection with the adversary proceeding that you filed against Valley for fraudulent transfer and aiding and

abetting. And I think that's pretty much the gist of that complaint. And we'll get into that in more detail later on.

But let's just start sort of chronologically of your involvement in the case in terms of I guess your appointment as examiner. That would be your initial participation in the Westport Holdings and then Westport Holdings II bankruptcy case?

A. Correct. I can't remember the dates very well, but in September of 2016 I think the case was filed.

Q. September 22nd?

A. Okay. September 22nd, 2016 the case was filed. At the very outset of the case, there were some pleadings filed challenging the debtors. And at a hearing the Court appointed an examiner in the U.S. Trustee's office, contacted me, and I went through their process and was appointed the examiner sometime in, I want to say early November or end of October of 2016.

Q. And after your appointment, what did you undertake to accomplish at that point? And kind of describe to me the steps you took to accomplish that.

A. There was a specific order entered by Judge Williamson that authorized me to participate in the sale process with respect to what I'll call

generically the University Village facility.  The debtors had put forth a letter of intent to sell the facility to an entity, and I think it was called Skyline Manor.

And my responsibilities initially were to participate in evaluating that sale and any other sales and other options and alternatives available to the debtors.

Q.   Was that the limit of the scope of your appointment and the duties you undertook?

A.   No.  No, you know, but that was clearly the initial focus of my activities as the examiner.  But I was involved in all aspects of the case.  The debtors had put forth the retention, you know, of an accountant to do financial statements of the previous years.  And, you know, there were a huge amount of activity going on in the case.  So I was involved in all of that.  But, you know, I felt then that, you know, the primary focus was to evaluate and participate in the sale process.

Q.   Did you conduct any sort of investigation about any alleged improprieties or mismanagement of the debtor?

A.   I did.  There was at the time an ad hoc committee of residents represented by the Jennis law firm, and then they had been investigating the debtors'

activities for a very long time and had gathered a significant amount of information with respect to what they believed to have been wrongful acts by the debtors, the principals of the debtors, and for lack of a better term a non-debtor entity that was also owned and controlled by the same principals, that being Westport Nursing Tampa.  And I did some of my own investigating and evaluations.

Q.   All right.  Pulling back a little bit, you know, just for background, Westport Holdings owns the independent living facility -- I don't mean to just drag you through this, but maybe you can just sort of lay out exactly your understanding when you say --

A.   Sure.

Q.   -- the non-debtor Westport Nursing.  Let's just go ahead and put everything on the table so we know what the pieces are and we can talk about them.

A.   Sure.  And, you know, I, like many people in this case, have sort of loosely used terms which can be confusing and misleading.  And so I'll try to be precise or specific.

Q.   Well, I'm never going to suggest you did anything misleading.

A.   No, I'm not suggesting --

Q.   It is confusing.

A.    But, you know, it's a little complicated in the sense that University Village is a continuing care retirement community.  There is a certificate of authority that was issued to Westport Holdings Tampa, a Delaware limited partnership, by the Office of Insurance Regulation which governs and supervises and regulates continuing care retirement communities, which is generally referred to as CCRCs.  In the state of Florida there are somewhere between 65 and 70 licensed CCRCs.  University Village was one of them.

The actual business structure and corporate structure at University Village prior to March 31st, 2014, was a structure that had been in place for a fairly long period of time that I think was probably created around 1999 or the year 2000.  And that was the provider, which was the entity that OIR licensed, Westport Holdings Tampa, was owned by an investment group headed by an individual by the name of Larry Landry.

Q.    Do you recall the name of that group?

A.    Westport Advisers or something like that.  And I, you know, I will confess that, you know, keeping the names straight is beyond my capabilities.  But, you know, it's all documented, but even if I had it in front of me, I'd still be fumbling because there's a lot of

usage of the word Westport in the names, and it added to a lot of confusion.

Westport Holdings Tampa as the provider and as the license holder, was the actual entity that owned and operated the independent living facilities that were contained in two towers of apartments connected by common areas on a complex with 446 residential units. These were apartments, one- and two-bedroom apartments that were located behind University Mall off of 22nd Street.

Westport Holdings Tampa II, another Delaware limited partnership, also owned the land where a series of duplexes had been built and where there was land to build some additional duplexes that was across the street, meaning 22nd Street, from where the twin tower -- not twin but the two towers were located. And Westport Holdings Tampa II had the same investment group led by Larry Landry that owned it. And on its land there were I think 46 duplexes. They were all independent living.

There were some common areas and there was land for additional duplexes or some other use that was owned by Westport Holdings Tampa II. As a wholly-owned subsidiary of Westport Holdings Tampa was an entity called Westport Nursing LLC. It was not a limited

partnership, it was a limited liability company.

Q.   Is that a Florida limited liability company?

A.   My recollection is that it was.  I may be mistaken.  I'm pretty sure that it was a Florida limited liability company.  And Westport Nursing Tampa owned what is generically referred to as the health center, which was across 22nd Street from the two apartment towers.

Q.   Was it on the same side as the villas though?

A.   It was on the same side of the villas, to the south of the villas.  And so the Westport Nursing Tampa was a building that contained three stories, and within it was lodged an assisted living facility on floors and also on other floors a skilled nursing facility.  And I never quite get the numbers right, but there were, like, 110 beds for the assisted living facility and 120 beds for the skilled nursing facility.

And the skilled nursing facility did not have beds that were licensed to it as a skilled nursing facility which I think are generally referred to as community beds, having previously sold and disposed of its rights to have those types of skilled nursing beds.  But as part of a CCRC, the skilled nursing facility could have what I believe is generally referred to as sheltered beds.

So that property and equipment was owned by Westport Nursing Tampa, a wholly-owned subsidiary of Westport Holdings Tampa.  Unlike Westport Holdings Tampa, Westport Nursing Tampa had a master lease of its facilities and had two tenants, one tenant called TALF, Inc., which was a Florida not-for-profit corporation, generally referred to as TALF.  And that was an entity that operated the assisted living facility and was licensed by Florida's AHCA, which was the Florida department that governed health-related activities in the state.

And the second tenant entity was called TR&SNF, Inc., another Florida not-for-profit corporation.  And it operated the skilled nursing facility and held the license issued by AHCA for that activity.  And then those entities, as well as the independent living facilities, had certain management agreements that they entered into for groups that provided management services to the entire operation.

So prior to March 31, 2014, you know, that was the structure of the facilities.

Q.    All right.

A.    Was that more than what you wanted to hear?

Q.    No.  That's exactly what I was asking.  So now we've got sort of the stages set and we'll talk about

Page 12

what happens after March 31, 2014, as you sort of identified that date in your testimony.

What do you contend happened after March 31, 2014?

A.    Well, let me just sort of set the stage for what happened, you know.

Q.    You want to talk about the Horizon foreclosure?

A.    Well, I was going to go back to 2009.

Q.    Okay.

A.    When -- and I refer to the ownership interests that owned the equity in Westport Holdings Tampa and Westport Holdings Tampa II as Landry.  You know, it was groups that Landry led, but I don't mean it was Landry individually but entities that he was involved with or that he controlled.

And so Landry, you know, began marketing for sale University Village in 2009.  And in 2012 or 2013 time period, Landry went into default with the various loans that had been granted liens on all of the assets of the University Village complex.

Q.    What type of default do you allege existed in that 2012 to 2013 timeframe?

A.    I'm not sure about 2012, but I believe they were covenant defaults and payment defaults.  But in

September of 2013, the loans matured.  So they were fully due and payable, and there were two different loans but they were cross-collateralized, one on the independent living facilities and one on the health center.

Q.   Do you recall the amounts of those loans?

A.   You know, I know the specific numbers; but off the top of my head I can't.  But what I remember was that the loan secured by the health center was a little under $8 million, as I recall; and the loan secured by the independent living facility was a little over $12 million.  So the aggregate was about $20 million that was owed and secured by first mortgage liens on all of the assets of the entities that operated University Village.

And as a result of that default and that maturity, Landry and Westport Holdings Tampa and Westport Holdings Tampa II entered into a loan extension agreement which contained a deed in lieu of foreclosure provision which provided that if the terms weren't satisfied, the Landry entities would convey by deed in lieu to Horizon or Horizon's assignee the continuing care retirement community, the entire facility.

And at that time Landry had been involved in negotiations and discussions with an individual named

Page 14

John Bartle. And in the loan extension agreement which contained the deed in lieu of foreclosure provisions which were fairly detailed and extensive as to what would occur, there was an exception that permitted Landry to proceed with negotiations and discussions with Mr. Bartle.

But Mr. Bartle wasn't doing things in his individual name. He was using an entity called BVM Management, which I understand to be a not-for-profit entity but it's not a charitable entity. It functions as a business, as best I can tell. But, you know, when I refer to Mr. Bartle, you know, I'm including within that name the entities that he represented that he was involved with.

So in the agreement that was reached with Horizon, Mr. Landry, you know, could continue to pursue negotiations with Mr. Bartle subject to, I think, a couple of conditions. One was that they needed to reach an agreement by, I want to say October 1st, 2013, and they needed to have the agreement consummated and the Horizon debt satisfied by I want to say it was December 15th, 2013.

December 15th came and went. There wasn't a closing, but there was a request to extend the closing. And it's my understanding, although the dates are not

clear because I don't think they put in the actual date, but there's a document where there's a purchase agreement for the equity interest of the Landry group in the Westport entities in favor of BVM, whereby BVM would pay the Landry equity interest 2 and a half million dollars.

And I think, and I get a little confused about some of the numbers here, but I think the document, which would obviously speak for itself and be more accurate than my memory, but the document I think was an aggregate payment of two and a half million dollars payable, I think either one or one and a half million dollars at the closing. And then the balance, either one or one and a half million dollars, payable when permanent financing was obtained by the Bartle group.

Q.   Do you recall the nature of that permanent financing at the time?

A.    I think what was being proposed was HUD financing, but I also know -- I say I know, but I also understand from the documents that there was some potential bond finance financing that was being examined or looked at at that time.

Q.   Wasn't HJ Simms involved at that time?

A.    Yes.  It's my understanding HJ Simms, you know, and particularly an individual by the name of Rob

Gall, was having discussions with the Bartle group with respect to bond financing activity.

And so when the, for lack of a better term, the drop-dead date of December 15 came and went, there was some discussions and proposals and exchanges of options to extend the time for closing to, like, February 28th under certain circumstances.

And by then there was what I would guess is a series of disputes that arose that started with a lawsuit that BVM filed in State Court in Hillsborough County Circuit Court, I want to say in the early part of February 2014, maybe around February 2nd or thereabouts. And BVM was suing Horizon claiming that Horizon had tortiously interfered with BVM's rights to acquire the equity interest in University Village. And there was a lis pendens that was filed against the property by BVM.

And then it's my understanding from the records that, you know, BVM withdrew that complaint without prejudice. But Mr. Bartle wrote an email to Horizon, I think to Horizon's legal counsel, saying that, you know, we needed to clean up our pleadings but we're going to refile this complaint.

Q.   That was Horizon's in-house counsel; correct?

A.   I think so.  But, again, this is all coming from memory.

Page 17

Q.   I understand.

A.   But I'm, you know, the documents will make clear what I'm maybe mistaken about.  But the gist of my understanding was that Mr. Bartle was communicating directly with the attorney who I think maybe was an outside attorney.  Because I think Horizon had offices in California, but I want to say the attorney was in South Carolina or North Carolina or something like that.

Anyhow, what next happened, as far as I understand it, and I know it did happen, is that Horizon filed a complaint in Federal District Court in the Middle District of Florida, Tampa division, suing BVM and asserting a variety of different claims, including slander of title and other claims, you know, predicated upon interference with the loan extension agreement that had been entered into in 2013 spelling out, you know, the exchanges that had occurred with respect to implementing that loan extension agreement and seeking, you know, damage claims against BVM for its conduct with respect to what was happening and occurring.

And there was an agreement among the parties at some point that resulted in a reinstatement of the limited partnership purchase agreement between BVM and the Landry entities that called for a change in the payment terms and called for closing on or before

March 31, 2014.

And during that process, the Bartle group went and sought funding for its purchase of University Village from USAmeriBank and funding from, I believe it's a state of Washington entity called Columbia Pacific. And I think the actual entity that would be the lender was CPIF.

Q.   Well, you sued CPIF in this bankruptcy case.

A.   I did.

Q.   Yeah. One housekeeping, and I don't mean to sidetrack this, but -- and it may be in the documents that you sent to Jacksonville, but I don't think I've seen the loan extension agreement. And I don't -- it may be in the hard drives that you sent, but would you mind sending that to me?

A.   It's attached to the Horizon complaint --

Q.   Okay.

A.   -- you know, and we refer to it as the deed in lieu of foreclosure agreement or deed in lieu agreement, you know. But it's been actually described as a loan extension agreement.

Q.   That may be why I'm confused. I just haven't seen --

A.   Yeah, yeah. It's -- and I want to say paragraph 7 is where the deed in lieu provisions are.

And there were -- there were a variety of what I would call forbearance-type covenants that were part of that agreement where there was an acknowledgment of the debt, there was an acknowledgment that the collateral for the debt was $12 million.

There were restrictions that -- on the operations of University Village. For example, there was, as I recall, a prohibition that stopped them from continuing to take in personal income protection funds from the residents. I want to say they were limited to operate under a budget. And, you know, it was a very detailed, comprehensive document which had, like, a complete list of all the residents and things like that.

Q.   Yeah, I don't know that I've seen that but --

A.   If you have the federal complaint filed by your former firm, Carlton Fields, represented Horizon.

Q.   That's a broad term.

A.   Yeah, but if you don't -- if you have problems finding it, it's there.

Q.   All right.

A.   So the Bartle group sought to complete the transaction by March 31, 2014 whereby it would own and control University Village as a result of its transaction and agreements with what I call the Landry group.

Q.   All right.  There were other individuals, like say Kevin Angelis, for example, who was involved in these negotiations, not just John Bartle?

A.   What -- yes.  Yeah.  What I under- -- this is an opinion.  It's an informed opinion, but I'm not saying it's absolutely true.  But, you know, at every level in every instance in every situation, no one acted contrary to what John Bartle wanted to be done.  So whether he was the owner's representative or whether he was an officer or director, you know, as best I can tell, John Bartle was always the person who was in control.

But there were a variety of entities, and Mr. Bartle has confirmed or has documented that there was a group of investors that he worked with that were part of his BVM Management group.  And Mr. Bartle was involved in a variety of transactions.  I mean, University Village wasn't the only activity that he was involved in.  He was in the Tampa Bay area involved with The Bridges assisted living facility.  He was involved with a facility in St. Augustine.

And in the same timeframe, he and his family and BVM were involved in a CCRC facility in Nebraska called Skyline Manor -- no, that's not right.  Anyhow, there's a facility that went into a bankruptcy in

Nebraska.  And Mr. Bartle and his group was like the chief restructuring officer in that matter.

You know, so, you know, I don't -- I couldn't possibly tell you the universe of investors, but Mr. Angelis and Mr. Freiden, Lou Jackson and several other names appeared from time to time in entities that they were involved in, you know, all part of what I call under the common umbrella of the Bartle group.

Q.  And it's your contention that regardless of the name of the entity or whoever else was involved, this is always -- all the businesses of these entities were under the control of John Bartle?  I believe you said that.

A.  Well, let me be -- let me be clear, you know. I don't know how many other entities Mr. Bartle was involved in.

Q.  Well, the ones you've identified then in these transactions.

A.  There's no, you know, in every instance that I understood was occurring, Mr. Bartle was involved, you know.  From a legal standpoint, he may not have had the corporate authority to act on behalf of the entity.  But in my belief, you know, he was always a party to those activities.

I believe that there were oftentimes people

other than Mr. Bartle who were in a position to interfere or stop an activity against Mr. Bartle's wishes, but Mr. Bartle would do whatever he could to eliminate those people when he could.  For example, in the University Village situation, you know, there was an executive director who was responsible for the -- who was the chief financial officer who was responsible for things.  And so they had, you know, independent status and, you know, were treated by OIR's, whistle blowers with respect to the activities that was ongoing at University Village.

And, for example, in the Omaha, Nebraska situation, the bankruptcy court appointed a Chapter 11 trustee to replace Mr. Bartle in that -- in that activity.

So, you know, one of the vagaries in all of this is, you know, how do you measure control?

But Mr. Bartle certainly had significant influence.

Q.   All right.  So that takes us to the deadline of March 31, 2014; right?

A.   Right.

Q.   Okay.  So what are your contentions with respect to the transactions that occurred on March 31, 2014 as you -- I just want to mention, you also filed an

adversary complaint involving The Bridges, did you not?

A.   No.

Q.   You did not?  Okay.

A.   No, I -- it's a little confusing, but the residents committee during the bankruptcy case first functioned as an ad hoc committee but then became an official committee of residents.  And they sought derivative rights to bring claims because the debtors were, you know, under Mr. Bartle's control and weren't interested in pursuing remedies or causes of action.

So, you know, the committee may have had some claims involving bridges.  What I remember, and I may be not remembering this correctly, but what I remember is, is that out of the CPIF loan closing that occurred on March 31, 2014, there was a reserve set aside to do renovations and improvements at the independent living facility.  And I want to say that the aggregate money set aside was, like, one and a half million dollars.

Q.   1.760.

A.   Okay.  And there was a commencement of doing some of the work which brought back online for proper rental or occupancy, you know, a material number of units that were, for lack of a better term, unusable based upon their condition at the independent living facility.  And Mr. Bartle took a million dollars of that

Page 24

money and pledged it or used it for a transaction that he was trying to obtain ownership or control or refinancing or something with respect to the bridges and a facility in St. Augustine, I think. There were two of them.

And I know that the residents committee was -- I don't want to be facetious on the record, but they were more than agitated at what had occurred because that money should have been used to repair and remodel and renovate the facilities to, you know, improve living conditions at University Village. And, instead, it was frozen and couldn't be used because it had been tied up for Mr. Bartle's other investment activities.

Q. But bringing that particular scenario back to the instant adversary proceeding that was filed against USAmeriBank and Valley, isn't that one of the acts of breach of fiduciary duty that you contend occurred by Mr. Bartle?

A. Yes, yes, you know. Just so there's no misunderstanding, the primary breach of fiduciary duty was by Landry in agreeing to evade the deed in lieu of foreclosure, which would have protected the residents as creditors of Westport Holdings Tampa and would have been an acceptable resolution of the issues at University Village with OIR and would have avoided everything that

Page 25

happened subsequent to March 31, 2014.

And it was that breach of duty by Landry seeking personal enrichment at the expense of the residents and the other parties in interest, that -- that was the act.  That bank not only aided and abetted, but it could not have occurred but for the bank's actual act of participation in a transaction that led to 10, 15 administrative and civil proceedings brought by OIR, AHCA and other entities, you know, all derived from what the bank approved to do and did do on March 31, 2014.

Q.   Well, we'll go through the complaint in more detail, but my understanding from reading the amended complaint was that you're alleging that Bartle committed these breach of fiduciary duties.  This is the first time I'm hearing that it's Landry was actually the primary object of this alleged breach of fiduciary duty.

A.   Bartle and Landry together.  I mean, Landry was the one that did things for his own personal benefit.

Q.   Okay.  Well, let's break that down.  I mean, I intend to kind of go through the complaint in more detail, but since we're on the subject now, we may revisit it later as we go through the amended complaint.

But you said that OIR -- so let me clarify what I understand to be what you're saying, and correct

me if I'm misstating anything or I'm in any way inaccurate.

But you're saying that the deed-in-lieu transaction was the loan extension agreement, for lack of -- I guess as the actual document name was the breach of fiduciary duty, or was it the agreement to?

A.   No, no, it was the --

Q.   Okay.  So --

A.   It was the substitution of the Bartle transaction for the Horizon transaction.  That was the breach of duty.

Q.   Thank you for pointing that out because I was a little confused in your testimony because I think -- I understand what you're saying but I wasn't sure that's what you said.

So the breach of fiduciary duty that you're claiming occurred was when Mr. Landry took steps to avoid the foreclosure, and you're saying the foreclosure would have been -- was approved by OIR?

A.   Well, there was never going to be a foreclosure.  There was a -- there was to be a transfer approved by OIR protecting the residents under strict circumstances that were spelled out in the agreement.

Q.   And the OIR approved this agreement, is that your -- or was it a condition?

Page 27

A.   It was a condition of the transfer.  And what Horizon did was Horizon engaged the services of Life Care Services, which is one of the premier senior care resident providers in the United States with a number of facilities in Florida, to be the operator at University Village.  And the life care contract obligations to the residents would have been assumed and performed under the Horizon transaction.

And so it wasn't a foreclosure and it wasn't an extinguishment of the creditor rights that the residents would have had.  To the contrary, it was a proposal that would have required OIR's approval and would have satisfied the obligations that Westport Holdings Tampa had to the residents under the life care contracts, whether it was for the refund of their entrance deposits, which was 25-, $28 million or some number in that range.  It's very easy to mathematically establish, you know, what the damage amount is because it's strictly what those contracts called for.

And then there was about $9 million in obligations for the personal income protection plans where residents, you know, put money with, you know, Westport Holdings Tampa with the right to get that money back.  And, in exchange, they got a reduction in their monthly maintenance expenses.  But, of course, that

money was used by Westport Holdings Tampa for operations and distributions made to the equity interests.

And, you know, so as of March 31, 2014, if the Horizon transfer had occurred, there would have been no problems with the OIR and the residents would have been fully protected with respect to their rights. And as a result, you know, that's the damages that arise from the bank's aiding and abetting the breach of fiduciary duty.

Q. I'm sorry, would you repeat that last part again? Because it kind of snuck in to the end of the answer there. That's the essence of the --

A. That's the damage claim.

Q. -- damage claim.

A. Very simple damage claim. It doesn't take an expert to identify exactly what happened, you know, is that the bank prevented, through its conduct and its actions, the completion of a transition that would have protected the residents as the significant creditor body of Westport Holdings Tampa.

Now, there's more than that, you know, just so you'll know. I mean, what the -- what the bank was involved in was the removal of $3 million of the minimum liquid reserve that was an asset of Westport Holdings Tampa on March 31, 2014, and was no longer an asset of Westport Holdings Tampa after that day.

Page 29

And the banks, you know, funded the disposition by Westport Holdings Tampa of its member interest owning Westport Nursing Tampa. And so that stripped away from the creditors of Westport Holdings Tampa the value of Westport Nursing Tampa, which there was an appraisal done for the bank in February 2014 that put the value of Westport Nursing Tampa at $16,390,000, I think.

Q. So there was value in those membership interests. Is that what you're saying just now?

A. There was sig- -- there was significant value in that membership interest because it was part of the continuing care responsibilities. It was an asset of Westport Holdings Tampa. And what Mr. Bartle did with the bank's funding, with the bank's knowledge, with the bank's approval, was he segregated the health center from the CCRC. And that was intentional.

The bank required it because the bank was looking at the health care center as a potential liability because of the nursing home tort claims that existed in Florida and --

Q. What -- I'm sorry.

A. And that asset, Westport Nursing Tampa, was generating significant income as a result of its status as the landlord with respect to the facility. And

although there's indicia that the agreements that were in place with the prior operators of TALF and TR&SNF, you know, those were replaced by more egregious activities by TALF and TR&SNF under the Bartle regime control, because they redid transactions that made things actually worse for everybody except the Bartle group.

And, in fact, you know, after the March 31, 2014 transaction, the debt service to USAmeriBank was paid by Westport Holdings Tampa.  Westport Holdings Tampa was transferring a hundred thousand dollars each month into an account at USAmeriBank to pay the debt service that Westport Nursing Tampa, a separated and -- then separated entity had to USAmeriBank.

Q.    What evidence do you have of that?

A.    The testimony of Ms. Burkholder.

Q.    All right.  But wasn't Westport Holdings also receiving the lease payment amounts from Westport Nursing Tampa?

A.    Didn't receive anything.

Q.    All right.

A.    In fact, there were something like $7 million worth of receivables that got written off, which didn't matter when Westport Holdings owned Westport Nursing Tampa because they had the aggregate value of all of

that operation and enterprise.  And what the bank financed was the segregation and the deprivation of those resources and assets from Westport Holdings Tampa.

Q.   All right.  So let's sort of break that down a little bit.  And, again, I may go back to it when we go through the amended complaint.  But since you've sort of put that on the table, let's discuss it.

You're saying that the bank required that the membership interests of Westport Nursing Tampa be transferred out?

A.   Yes.

Q.   What evidence do you have of that?

A.   In the CARS report.

Q.   Okay.

A.   Now, I was in the deposition where Mr. Bartle testified that his investors, you know, wanted to do that separation.

Q.   Correct.

A.   But, you know, but it was also the bank insisted upon and supported that segregation and separation of the health center from the independent living operation.

Q.   Other than the CARS report, what other evidence do you have that the bank insisted upon that structure?

A.    There are communications within the bank, you know, with respect to the approval process.  The loan application that the bank received described the transaction as the purchase of a 230-bed F -- NF/ALF. You know, it's prominently discussed in lots of different places.

Q.    By the way, you mentioned the damages issue which I need to discuss with you further, but you said you don't need an expert to quantify the damages that you've just described from this breach of fiduciary duty.  Is that accurate?

A.    Correct.

Q.    Okay.  And do you recall having discussions with me before about saying that there was a $30 million damages model that had been created by OSHA Consulting?

A.    I'm not going to comment on settlement discussions with you, Mr. Whitson.

Q.    Okay.  But you'll agree with me, and we can talk about it more in depth, but that there's no damages calculation for breach of fiduciary duty contained in the expert report that was filed by Lisa Unterholzen on behalf of OSHA Consulting?

A.    In connection with the aiding and abetting Count I of the complaint, that is correct, because her expert testimony addresses the insolvency and the

Page 33

avoidance of transfer claim.  But they are connected in the sense that, you know, the aiding and abetting, you know, mathematically, you know, took $19 million in assets away from Westport Holdings Tampa on March 31, 2014.

Q.   So you're saying that the damages resulted from this alleged breach of fiduciary duty that the bank allegedly aided and abetted was $19 million?

A.   No.  I'm saying that that's a component of the -- of what caused the ultimate damage, which is the simple mathematical nonpayment of the life care resident contract amounts that was quantified at $34 million in 2020.

Q.   Where was that number -- you're saying $34 million, where was that number calculated?

A.   It's in the report that I filed in the bankruptcy court in 2020.

Q.   And who did that calculation?

A.   It was -- it was the mathematical addition of the life care contract claims that were allowed in the bankruptcy case.

Q.   And who did that calculation?

A.   I think it was the combination of a number of people's activities.  CR3 was the consulting entity that was engaged by the residents committee to provide

consulting services to the committee.  And I also conferred with CR3.  And I think they were part of the compilation of that information.

I believe the Stichter Riedel firm was involved in the proof of claim process that established these liquidated amounts.  I believe the official committee of residents was involved in that process that resulted in that analysis.  And I believe that the Life Plan Village Group also reviewed and participated in determining those amounts which existed.

My firm was involved in the drafting of the subordinated notes that were issued as part of the consummation of the sale and the plan of liquidation that occurred.

So along the way, I believe there were auditors who looked at that information, particularly in terms of the bond financing.  I don't want to say that Rosemawr was active in that analysis, but I'm sure that they reviewed and approved what was done.  BigRock Partners would have been involved in reviewing and approving what was done.

I was not involved in the bond closing, so I don't want to say what they may or may not have reviewed.  And because it was public, anybody could have reviewed it.

Q. And were the subordinated notes that your firm drafted in the exact amount of the respective proofs of claim?

A. There was a process that we went through where there were proofs of claim that were objected to and there were results that occurred as a result of those objections. So, you know, the numbers came from the finalization of each resident's claim, and some had the combination of a PIP component and some of it was just an entrance refund obligation.

There were adjustments that occurred because of utilization of entitlements by current residents who remained at the facility, you know. So it was a, you know, I mean --

Q. Would those adjustments be for services that were provided and then deducted, the costs of which were deducted from the refund obligation?

A. Correct. There was a bookkeeping, record-keeping mechanism that, you know, if a current resident, for example, utilized services at the assisted living facility or at the skilled nursing facility, then, you know, that would have reduced their refund entitlement. And so there was a tracking that was done with respect to all of that information.

Q. And who filed the objections to the claims,

the residents' claims?

A.   I think I as the liquidating trustee did most of the claims resolution process.  And then we worked with all of the interested parties, both the Stichter Riedel attorneys, the Jennis law firm attorneys, you know, practically everybody took a look at things.

I don't remember whether OIR ever got into those weeds, if you understand what I'm saying; but they were certainly very, very interested in making sure that the rights, you know, of the residents were acknowledged and protected.

Q.   But they never participated in any calculations of the alleged damage claim that you're asserting in this adversary proceeding?

A.   That's correct, you know.  You know, that's -- that's my claim that I, as the liquidating trustee, put together, calculated, derived from all the sources that I've just told you.

Q.   All right.  Well, let's summarize those sources, because I'm hearing a lot of different numbers.  I'm hearing that there were $19 million of assets taken away; right?

A.   Correct.

Q.   All right.  And then you're saying that there was $34 million of claims under the life care contracts

that would never have occurred but for USAmeriBank making a $15 million loan?

A.    Correct.  My claims against USAmeriBank and Valley Bank don't try to duplicate recoveries.  The $34 million claim is the loss suffered by the residents, is the aggregate claim.  What contributed to creating that $34 million loss were things like the removal of the $19 million worth of assets from Westport Holdings Tampa.  But we have a separate avoidance claim for $3 million, plus prejudgment interest, that deals with the MLR amount.

There's no claim that I'm asserting for direct damages against the bank based upon the disposition of the Westport Nursing Tampa asset as an asset at Westport Holdings Tampa.

Q.    So the $19 million is not part of your claim?  You're not asserting any cause of action for that?

A.    There's not a separate claim to recover that sum, but it's a contributing factor to why there's a $34 million claim.

Now, if you have a theory that would give me the ability to make that claim, I'd be happy to look at it, but I don't think -- I don't think so.  You know, the $3 million was a direct transfer from Westport Holdings Tampa to USAB.  The transfer to benefit the

Bartle group, you know, did not -- was not a direct transfer to USAB and I've not made that claim against USAB.

Q. Okay. So if I understand, the theory is that the loan -- well, first of all, the original loan you're talking about, the Horizon loan, was a Capmark loan; correct? There were two loans that were owned by Capmark?

A. It's my understanding that back, you know, sometime between 2001 and 2012, there was a series of loans, and I believe there were two that were made by Capmark. I may not have this correct, but I want to believe that Capmark was involved in an insolvency proceeding of some type, and there was a sale or disposition of those loans. And Horizon was the acquirer of those loans and stepped into the Capmark shoes with respect to those loans. That may not be right because I never really investigated or studied that.

Q. Right. But wouldn't you characterize, or maybe you wouldn't, but Horizon was sort of a vulture fund loan to own-type group that bought up all the debt from Capmark on senior living facilities?

A. I would not describe Horizon as a vulture fund. I would describe Horizon as a sophisticated,

well-funded investment group that acquired these notes and was prepared to own and operate University Village because they saw the possibilities to be very successful and to make sure that the residents were protected and taken care of.

But I don't think that they were a CCRC operator, if that's what you're asking.  I think that their intent would have been to have improved the facility's appearance, improve its functionality, updated it, you know, with the necessary capital improvements and investment, and to have maximized their recovery after it was being properly operated by a qualified group like Life Care Services.  And under that circumstance, they were very much driven by their profit motivation.

Q.   So what evidence do you have that Horizon was prepared to make any investment in University Village?

A.   Horizon and, you know, and LCS, you know, were in discussions with OIR, were in discussions with the residents.

Actually, I'm curious because Mr. Bartle said in his testimony last week that he had a copy of the slide presentation made to the residents, and yet he didn't produce it in his response to the request for production, which doesn't surprise me given that it's

from Mr. Bartle.  But, you know, I have not seen that.
I don't know whether the bank has seen it or not.

But that, you know, from all accounts that I
am aware of, LCS is an extremely high quality group.  I
did talk to them about trying to get them interested in
acquiring, you know, University Village, but they were
not interested.

Q.    When did you talk to LCS about that?

A.    After I was appointed as liquidating trustee,
I talked to anybody and everybody, including the man in
the moon, about buying University Village.

Q.    Well, we'll talk about that and you and the
man in the moon in a little bit.  But you talked to LCS.
Why was LCS not interested?

A.    I don't know.  I will say that I think that
the Bartle group ran University Village into the ground
and made it extremely difficult for a profit-driven
entity to make the investment necessary for the facility
to be successful, which is why we ended up dealing with
a not-for-profit entity to do so.

Q.    Well, you ended up dealing with essentially
BigRock.  You mentioned BigRock as part of the damage
calculation.  They were part of the $34 million you're
asserting here.  And wasn't BigRock essentially there on
day one of the bankruptcy case represented by Mr. Gart,

essentially saying that they wanted to buy the ILF?

A.    I wasn't there on day one, but I was there on, say, day 60.  And, you know, the interest that BigRock had in the facility was well known.  And Mr. Gart was a very capable, competent attorney representing their interests and filed a number of positions to advance the interests of BigRock.

Q.    And didn't BigRock have meetings with the residents?  Were you part of those meetings?  And when I say BigRock, I mean Mr. Richard Ackerman?

A.    I've been involved with a number of meetings where Mr. Ackerman was involved dealing with groups of residents, particularly the residents council.  And most all those meetings were in the, you know, the 2018 time period when I was engaged in, you know, effectuating a transaction first with QSH and then with Tampa Life Plan Village.

I don't have a clear remembrance of being in any prior meetings with Mr. Ackerman with residents.  But I know that I had conversations with Mr. Ackerman, and I'm pretty certain that I've heard that he's had discussions with other parties, residents about University Village from the very beginning.

Q.    Well, tell me about your discussions with Mr. Ackerman and we'll talk about the meetings which you

Page 42

had and where you were there with the residents.

A.    Sure.  Originally, very arm's length discussions with Mr. Ackerman.

Q.    Can you put a date or timeframe on that for me, as close as you can remember, when you say originally?

A.    In towards the end of 2016.  And to put this in context, at the outset of the bankruptcy, the Bartle group, through the debtors, advanced a letter of intent to acquire all of University Village, both the health center and the independent living facility to an entity called Skyline Manor or Skyline Healthcare.  I think that's the name, Skyline Healthcare.  And you know, it was like a $78 million transaction that was presented.

And then -- I don't want to misstate this. And one good thing about my involvement in things is -- and I'll just make this clear, is that, you know, I don't believe I redacted any of my time billing records as an examiner or as in any capacity until this litigation, you know.  So if I had a discussion with Mr. Ackerman, it would be in the public records as a result of my, you know, invoices and applications.

But I want to say that the first time I talked to Mr. Ackerman, I think it was related to Skyline.  And I think he was telling me at the time that that was a

bogus offer trumped up by Mr. Bartle, and that entity was not capable of raising those kinds of dollars and doing that kind of transaction.

And I remember later on thinking that Mr. Ackerman was pretty clairvoyant because that entity collapsed completely and totally, and I think it's principal was charged. I don't know if he was convicted, you know, with significant tax evasion obligations.

Q.   Who was that?

A.   I can't think of his name now, you know, but I think you can Google it and you can find it. It's pretty easy. I mean, it's all in the public domain.

And then the debtors proposed a sale to A Plus Operating, LLC. And I may not have this right, but I want to say both Skyline and another bidder, SouthPoint, were represented by Mr. Soriano (phonetic), who I have the highest regard for.

But sandwiched between them was a proposal from the debtors to sell everything to an entity called A Plus Operating, which I believe was out of New York or New Jersey, but up in that area. And I spent an enormous amount of time, you know, working with them. Judge Grossman, not a judge then, was their lawyer. And the Greenberg Traurig firm, you know, was very much

involved in significant due diligence and working with OIR and working with AHCA and working through making sure that the data room had all the information necessary and working with the issues regarding the union, issues with, you know, all aspects of the transaction.

Q.    You mentioned the union.  I don't want to forward you up too fast, but what do you mean by the union?

A.    There was a union that represented workers at University Village both in the health center and in the independent living facility.

Q.    That union was in the ILF as well or just in the LC?

A.    I think so.  I mean, there -- I don't want to misstate it, but there were contribution obligations with the union that had to deal with the independent living facility.  So there were certain groups of workers who were part of the union.  And so we -- I remember, you know, working with them, and then we ultimately resolved some claims they had, you know, with respect to the pension account or something like that.

Q.    So from the standpoint of your negotiations or discussions with prospective buyers, say, A Plus or SouthPoint, what was the reaction to the presence of the

union from those prospective buyers?

A.    I think that there's generally in businesses in this area a --

Q.    You mean in Central Florida or --

A.    In the Tampa Bay area because I'm not going to pretend that I have much experience outside this area, that there's a reticence to want to deal with unionized workers.  So, you know, I don't believe that there was any significant issues associated, you know, with that.  But it was an issue that needed to be dealt with.  And one of the problems was there weren't many firms that had a lot of familiarization with the union worker and those types of issues.

Then there were some -- there were some disputes, you know, the -- I can't remember precisely what the details were, but we worked through them.  So, you know, I wouldn't say it was a big impediment.  In fact, I'm positive it was not a big impediment; but it was a factor that had to come into play.

Q.    Okay.  So we were talking about Mr. Ackerman's attempts to purchase --

A.    And -- and, you know, and --

Q.    -- early on?

A.    I talked about Skyline.  And then with A Plus --

Q.   Well, did -- before we jump into those two.  I didn't mean to interrupt you, Mr. Warren.

A.   No, that's okay.

Q.   But I really want to focus in sort of the chronology of Mr. Ackerman and his discussions about what his interest level was in terms of the purchase.

A.   Well, that's why -- yeah.  That's, you know, and the chronology is bankruptcy's filed, Skyline has a letter of intent.  It's in the bankruptcy record.

Q.   Right.

A.   And then A Plus has a letter of intent.

Q.   Who obtained the A Plus letter?  Who negotiated with A Plus initially?

A.   I think it was Stichter Riedel and, you know, but they were all coming through sponsored by the debtor, you know, and in the back of my mind the debtor was Bartle.  Not officially, but that's, you know, where and how I think, you know, these entities were coming forward.  You know, I put a lot of credence in the A Plus Operating proposal because, A, I know very well the Greenberg Traurig firm and worked with them in transactions before.  And they are extremely good and they, you know, they do a very, very good job and they're very expensive.

And my assumption, which turned out to be

false in this case, but my assumption at the time was that there was a legitimate funding basis for A Plus Operating to do what they said they could do, you know, because of the expense that they were going to do the due diligence.

Q.   All right.

A.   And as to A Plus, I am not remembering any specific comment or suggestion from Mr. Ackerman that I was privy to.  And I don't remember having a conversation with him.  I did discuss with Brian Gart.

Q.   Mr. Gart, Mr. Ackerman's lawyer?

A.   Mr. Gart was with the Ackerman firm and he was Mr. -- he was BigRock's attorney.  I do recall having some discussions with Mr. Gart.  I believe that there was an objection that BigRock filed to the -- a sale motion, the debtors filed with respect to A Plus.  And I think it echoed what Mr. Ackerman, to my understanding, had been saying, which is that these all cash offers are bogus, that there's not the financing available for these transactions to occur and they're not going to be successful.

Now that -- I don't want to overgeneralize that, but that's, you know, that's my sense of remembrance going back six years ago.  And, you know, it was an extremely difficult set of circumstances because

you had the debtors, which were subject to the Bankruptcy Court's control and approval, dealing with the independent living facilities.

But these buyers wanted to perpetuate the CCRC, and they wanted to have the health center as well. And the health center was a non-debtor, wasn't controlled by anything in the bankruptcy court. But the same equity interest controlled or led by Mr. Bartle, you know, was the decision maker. And so it just made it very awkward.

And so, you know, these -- any of the potential buyers who came in through the Bartle group created at least some suspicious concern from OIR, the residents committee, and others that these were just fronts for Bartle in another form. Because for the two years previous, there had been efforts by several entities or groups tied to Mr. Bartle to get OIR approval and none of them, you know, could get that approval. And I remember going to great length to put together a disqualifier list of entities that, you know, were nonstarters in terms of acquirers or bidders with respect to the property.

And A Plus met that criteria. They were, you know, they were deemed and perceived by me to not be, for lack of a better term, a shell for Mr. Bartle.  I

believed that the A Plus people who I met with and dealt with, you know, were sincere and legitimate.  The problem was at the end of the day, after spending several million dollars with Greenberg Traurig, they could not get funding or financing.

Q.    Did A Plus own any other CCRCs?

A.    It was my understanding that they had a couple of nursing homes but not CCRCs.

Q.    Did you see any evidence of any ownership of nursing homes?

A.    Yeah, yeah.  I mean, they had an operation, one or two operations.  I didn't go visit them, you know.  But the accountant that Bartle or the debtors engaged, Josh Levine, was their accountant.

Q.    So if A Plus had the same accountant as Mr. Bartle, why did you think there was no connection between Mr. Bartle and A Plus?

A.    I didn't -- no.  If I said that wrong, Josh Levine is an accountant up in the New York, New Jersey area.  He was the accountant for A Plus.

Q.    Okay.

A.    When the debtors knew that in order to ever get things cleaned up, they needed to have financial statements for the missing years, 2014 and 2015 and 2016.  And in '14, Westport Holdings had accountants who

never completed their work because they didn't get paid and they didn't report things the way Mr. Bartle wanted them reported. So they were replaced by other accountants. They didn't complete their work. Their work resulted in their lack of going concern determinations, which meant that they didn't finish their work and they didn't get paid.

And so they needed to have another accountant. So the debtors engaged Levine, with court approval. That was pending or right at the time I was appointed as the examiner. And, you know, I did not have or raise any objection at the time because it wasn't -- it didn't seem to me that it was a relevant or material problem at the time.

Now I know better because I've learned, you know, what's wrong with the work that Levine did. But at the time it didn't seem -- it was just trying to sort of check a box to satisfy the requirements of OIR. And, you know, as long as we had a sale it didn't really matter what the historical financial statements really looked like, whether they were correct or accurate or performed in accordance with generally accepted accounting principles or not.

And since we were all focused on A Plus becoming the acquiring entity because the terms of their

proposal were satisfactory to all of the warring factions, then it really didn't matter.

Q.    Okay.  So you said a lot of things in that, and I want to just sort of unpack one thing in particular.  You said that there was a going concern opinion that had been reached by some auditor or some accountants?

A.    CliftonLarson was brought in to try to complete the 2014 audited financial statements.  And their draft drew into serious question the going concern of University Village.

Q.    All right.

A.    They never finished their work.

Q.    Drew into question, what do you mean by that?

A.    Well, they had a footnote on going concern and they, you know -- but, again, remember that by the time they were doing their work, the Bartle group was in significant dispute with OIR.  The initial order of suspension I think was issued by OIR in January of 2015.

Q.    February.

A.    February 2015, you know, and so doing this audit work for 2014, that would be a subsequent event of material consequence with respect to the activities at the facility.

Q.    What timeframe was CliftonLarson doing their

work?

A. Well, I think they were doing work in the Spring of 2015 because it would have been the prior --

Q. You said the debtor engaged CliftonLarson though. That would have been in 2016.

A. No.

Q. I'm sorry.

A. I'm sorry. This is pre-Chapter 11 --

Q. Okay.

A. -- so we're talking about Westport Holdings Tampa --

Q. All right.

A. -- engaged, you know, their original group of accountants was something called, like, LTD or something -- that's not the right. It's three initials was the accounting firm. And they had done several financial statements for previous years.

And then in the middle of doing the 2014 statement, you know, when they did sort of the supplement to pick up the March 2014 transaction, they -- for whatever reasons, you know, they didn't finish their work.

And so Mr. Bartle brought in CliftonLarson, which is a well-recognized accounting firm and one that has I believe significant CCRC experience and does --

Page 53

they were well versed in the MLR calculation world.

And they are the ones who raised the going concern value, but they never finished their work and Mr. Bartle never paid them.

Q. That was a draft.

A. It was just a draft, a tentative draft. And I think we've made those exhibits, I could be misremembering.

MR. APPLEBY: They were included in the documents that I had delivered to your office last week.

MR. WHITSON: It's 12:15. We're going to order some food.

(Discussion off the record)

BY MR. WHITSON:

Q. All right. Mr. Warren, I'll show you what we'll mark as Exhibit 1 to your deposition.

(Defendant's Exhibit Number 1 was marked for identification.)

Take a moment to review this. It's a document entitled University Village Tampa, Florida, Assisted Living and Skilled Nursing Facility in Tampa, Florida from BHMS Investments. Do you know who BHMS Investments is?

A. No.

Q.   You've never heard that name of that entity before as a Bartle entity?

A.   I remember seeing initials like that, but I don't recognize that name, BHMS Investments.

Q.   Okay.  And if you'll look at page 3, University Village Overview, there's discussion about the basic facility that we -- I think we've already talked about, the 110-bed ALF and the 120-bed skilled nursing facility.  That's consistert with what you said earlier.

And then the fourth bullet down says BVM Management.  BVM is a longstanding developer, owner and operator of SNF, ALF and independent living and continuing care retirement communities, agreed to acquire the property for $15.4 million; see it there?

A.   I see it.

Q.   And then BHMS Investments, in the last bullet, is seeking $12 million of debt for the acquisition of the health center.

So I'll represent to you that this was a document that was presented to USAmeriBank by Westport Nursing Tampa or BHMS Investments.

And this is solely as to the ALF and the SNF, not the ILF.  You can take a moment to agree -- I mean to agree -- to review it.  And if you'll look at page 6,

with the Key Assumptions, Scenario A, it talks about the OpCo, PropCo structure.  Do you see that there?

MR. WHITSON:  Kim, are you back on?  Let me make sure she's back.

(Discussion off the record)

MR. WHITSON:  I've shown Mr. Warren what we've marked as Exhibit 1 to his deposition.  It's a proposal that was submitted to the bank, USAmeriBank, by BHMS Investments.

BY MR. WHITSON:

Q.    And we're looking at page 6 of this which talks about the OpCo/PropCo assumptions.  Mr. Warren, are you familiar with the expressions PropCo and OpCo?

A.    I've heard them in connection with this transaction.

Q.    All right.  And if you'll look at the last page of this exhibit, it says, Leading industry management team.  Do you see those names there?

A.    Yes.

Q.    The first name is John Bartle, Managing Director Americare; do you see that?

A.    Yes.

Q.    We've already talked about Mr. Bartle.  S. Louis Jackson, I believe you mentioned Mr. Jackson in response to one of my questions earlier.  But are you

familiar with Mr. Jackson?

A. Only his name.

Q. Okay. And then Robert Rynard, have you heard that name before in connection with this transaction?

A. Only his name.

Q. And then Edward Fodrea, I'm probably mispronouncing that, but I think all these people were discussed in Mr. Bartle's deposition at which you were present; do you recall that?

A. Yes, only his name; right.

Q. So you'll agree with me, Mr. Warren, and if you need another minute, that's fine, that this proposal only deals with a loan to the health center?

A. I have not read this proposal. I can't agree, but I won't deny what you say about it, if you understand. My point is I haven't studied or looked at this.

Q. I understand. And, you know, but if we look at the overview on page 2, it says, Located nine miles north of downtown Tampa and less than one mile from the campus of the University of Florida. Well, that would be a little bit inaccurate.

University Village is a 110-bed assisted living facility, assisted living ALF, and 120-bed skilled nursing facility, SNF, and together the health

center or facility.  And the rest of the proposal speaks to the facility.

So would you agree with me that based on that definition of facility that we just read in that bullet point, it's just the health center?

A.  I don't disagree.  It says what you say it says, you read it accurately.  I mean, there are things here that obviously are not accurate.  The location, the -- if there is an agreement to acquire the property for $15.4 million, I've never seen that document, you know.  I'm not sure where any of that is coming from.

Q.  Well, if you'll look at the front page of Exhibit 1, this is dated December 2013.  Do you see the top right-hand corner?

A.  I see that.

Q.  And that date predates any discussion about the transaction that occurred in March 31 of 2014; would you agree with me?

MR. APPLEBY:  Objection to your form.
Mr. Whitson, the only thing I would question here
is, and it's clear, Mr. Warren's testified --

MR. WHITSON:  Are you objecting to form?
That's fine if you are.

MR. APPLEBY:  Yes.

MR. WHITSON:  All right.  Thank you.

Page 58

MR. APPLEBY:  And I'm also objecting to the relevance and the authentication of this document.

MR. WHITSON:  All right.

MR. APPLEBY:  Mr. Warren has testified that he hadn't seen the document.

MR. WHITSON:  I understand.

Q.    All right.

A.    To put this in context, my information is that in September of 2013, BVM Management entered into an agreement with respect to acquiring the equity from the Landry group for $2.5 million.  I don't know what the rest of any of this is about, and it doesn't appear to be addressed to USAmeriBank.  It just seems to be a general proposal.  But, again, since I'm not familiar with the document --

Q.    Right.  Well, you just mentioned that on September of 2013, your information -- have you seen any agreement where BVM entered into some arrangement or agreement to purchase the interest you just mentioned?

A.    Yes.  It's attached to the Horizon complaint. That's the version that I've seen, and it's signed, I want to say by Mr. Rynard and I thought maybe it was Mr. Angelis, but I'm not a hundred percent sure of that. And it's not dated.  It says September blank, 2013.

Q.    Is it executed?

A.   Yes.  Well, it's signed by -- the handwriting is really -- what I remember is that the handwriting is very difficult to read.  But I think it says Mr. Rynard, and under his name it says chairman.  But, you know, my memory is really very fuzzy.  But I mean, if it's important, we can find the document that I'm remembering.  I don't want to misstate any of the details of even who signed it now because I just don't have a clear remembrance of who signed it.

Q.   So you mentioned that the CARS report was the evidence that you're relying upon to support the allegation that the bank insisted upon the structure of this transaction in terms of just splitting the health center away from the Westport Holdings.  Is that -- am I recalling your testimony accurately?

A.   No, but it's not -- it's just incomplete, you know.  The CARS report, the application, you know, all of those documents that I mentioned earlier, you know, were all part of that same analysis.

Q.   Well, you were present during the deposition of Mr. Korhn, both in his personal capacity and in his representative capacity on 30(b)(6) on behalf of Valley Bank, as successor to USAmeriBank; were you not?

A.   I was.

Q.   Is there anything in the testimony that you

elicited from Mr. Korhn that supports your allegation that the bank, it was the bank who insisted upon separating the health center from ownership by -- as a wholly owned subsidiary from Westport Holdings to a sister affiliated company with different limited partners?

A.    I'm confused by your question.  If you're asking if I thought there was anything inaccurate testified to by Mr. Korhn, the answer is yes, because he testified in ways that contradicted the exhibits.  But there were a significant number of exhibits to his testimony including, you know, agreements and the documents that I have referred to.

Q.    I guess my question was, can you point to any statements that were made in his deposition that support your allegations?

A.    The exhibits to his deposition.

Q.    Okay.  But you're saying that his testimony conflicts with those exhibits?

A.    To the extent that his testimony conflicts with the exhibits, I think the exhibits that were executed and documented what was transpiring at the time, do contradict what Mr. Korhn was trying to testify to.

Q.    All right.  And one of those exhibits that

you're citing now is dated September 2013; is that correct?

A.    It's September blank 2013, but that's not the significant documents.  There were documents signed all the way up through, I want to say middle to late March of 2014, right before the transaction closed, because the bank had an amended CARS report.  They actually received the application, you know, after the loan was approved, after the transaction occurred.

And there's a lot of information in those reports that suggests that the bank didn't understand the transactions that the Bartle group was proposing. And there was a lot of complaining about the inaccuracies and the changes and all of the aspects with respect to the transaction that was in communications between the bank and it's legal counsel, Jay Price.

Q.    All right.  But what communications, what evidence of any communications do you have of -- or between Mr. Landry and USAmeriBank or any entity controlled or owned by Mr. Landry?

A.    Well, Mr. Landry and the bank executed a significant number of documents, including documents that were sent to OIR.

Q.    Are you speaking of the loan documents that were attached to the March 31, 2014 letter from Williams

Mullen sent to OIR?

A.   That would be -- that would be part of it. Mr. Landry was copied on a significant number of the communications, but he wasn't copied on everything. After the closing, there were joint communications to OIR that Mr. Landry and the bank signed.

Q.   What type of joint communications are you referring to?

A.   Particularly part of the effort to -- and I don't mean this pejoratively but it's going to come out pejorative. You know, I believe, and I think the evidence will show that there was a great deception that occurred that the bank participated in with OIR whereby information sought by OIR was responded to in ways that misled OIR as to the true activities that had occurred on March 31, 2014 and subsequently.

And that the bank was active in assisting the Bartle group in creating the confusion and the misleading OIR with regards to the MLR account, the compliance with the MLR account.

And so it was like a situation where you have ten things, and if you piece them all together correctly, then you get the right picture; but they're not pieced together, and there are misleading things that suggest that something is X when it's really Y.

And it took OIR a long time before it finally figured out what had actually happened.

And that's when OIR began to take increasingly more aggressive action as it became more understanding of what had really been done and how the bank had participated in creating the allusion that a provider, you know, was holding the MLR funds pursuant to Chapter 651 when, in fact, the bank was holding the funds for its sole and exclusive purposes and had no intention of ever complying with the MLR requirements with respect to those funds.

Q. Okay. What is the evidence you have? I mean, I understand generally what you just said, Mr. Warren, but you said of this -- you termed the great deception. What other documents can you point to to evidence this other than the March -- are you talking about the March 31, 2014 letter?

A. There's a May 12, 2014 communication to OIR, and there are subsequent communications with OIR that the bank is involved in or was involved in.

Q. After May 12?

A. Yes. And the bank, you know, created two sets of reporting documentation for the escrow account that the bank held. One set reflected that it was going to OIR, and the other set reflected it was going to the

bank.  And the suggestion to OIR was that the funds were being held pursuant to the MLR when, in fact, the bank had no intention of those funds ever serving as part of the MLR.

Q.    And, again, when you speak of intention, what evidence do you have that the bank had no intention of those funds ever serving as the MLR?

A.    All of the communications that the bank had on the eve of the transaction where the bank was wanting to clarify that the funds were coming cleanly into the bank; but the bank knew that the funds were coming from the Regions MLR of Westport Holdings Tampa because they were told that in an early email.

And the bank was so concerned that it requested an opinion with respect to the appropriateness of the transaction, and the bank was told that no opinion would be given because that would kill the deal.

And the bank, you know, went ahead and closed on the loan even though it knew that it wasn't in compliance with the MLR requirement.  The bank, you know, was aware and knew of what the statutes required it to do as a holder of MLR funds before it became a holder of MLR funds.  And the bank did not comply with any of the requirements.

The notice to the OIR that was sent, you know,

went through several iterations that concealed, you know, what was really transpiring. And the bank had many opportunities to stop the transaction.

And when it was told by Bartle's attorney that, you know, they didn't want to be in a position where you would notify or deal with OIR because that would create problems that it could never get it done, I think that's pretty concrete evidence of the deception that was going on. And it did take OIR a pretty long time to figure things out, but they ultimately did.

Q.   And who on behalf of the bank was part of those communications that you just referred to?

A.   Mr. Korhn.

Q.   Anyone else?

A.   I wouldn't say there wasn't anybody else. But, you know, and I wouldn't say that I have seen everything that was communicated. But Mr. Price, as the bank's attorney, and Mr. Korhn, as the bank officer, were the people who had the great concern that something was wrong with the transaction and still did nothing.

Q.   Well, I think there's an email that your counsel has used in prior depositions where -- and I could try to put my hands on it, but I do recall an email between Mr. Price and Mr. Rabke. Do you recall who Mr. Rabke was?

A.   Mr. Rabke was the attorney for the Bartle group.

Q.   Well, specifically in this transaction, the attorney for Westport Nursing; is that fair?

A.   Well --

Q.   In the USAB transaction?

A.   In theory, at the time of the communications, Westport Nursing Tampa was not under the -- at least the active ownership and control of the Bartle group.  It was under the control of Landry.

But Landry was not involved in any of the communications.  And, you know, I have no idea of how or why the bank thought that it was dealing with Westport Nursing Tampa in these transactions when everybody it was dealing with was the Bartle group.

And the Bartle group had a contract to purchase but had not become the purchaser because the bank was funding the ability of the Bartle group to be the purchaser.  So the Williams Mullen group, as best I could tell, was acting on behalf of Bartle.

Q.   So going back to the email I was about to refer to, do you recall an email between Mr. Rabke and Mr. Price where Mr. Rabke's inquiring about whether the bank has -- Well, is there a way to go forward with the transaction, specifically with respect to the funding of

the $3 million cash collateral account?  And Mr. Price says, "I've got the bank comfortable with it, I believe."  Do you remember that email?

A.    Yeah.   There -- this is what I remember, but this is all documented.  With the closing on -- set to occur on Monday, the 31st, on Friday, March 28th -- and I may not have the sequence totally correct, but I think I can remember it -- Mr. Korhn communicates with Mr. Price and basically says, "I can't sleep, I'm concerned about this statute," referring to the MLR statute, "and how that creates my concern that we're not in compliance."

Mr. Price responds and basically says, as I recall, words to the effect, you know:  "I agree."  You know, "I think the statute doesn't apply, but I have concerns with respect to the application of the statute. I think we should get an opinion to protect the bank." He doesn't say it like that but he does say, "We should get an opinion."

And then Mr. Price communicates with Mr. Rabke saying, "The bank is concerned, the bank officer can't sleep at night.  I think there should be an opinion to put the bank at comfort with respect to going forward with this transaction."

Rabke responds to Price, saying, "Can't give

you an opinion.  That's a deal killer, because we'd have to go to OIR and we couldn't get something from OIR, you know, in a day," or words to that effect.

And then Price and Rabke have an exchange where Rabke suggests, "Well, I'm going to see if we can just go back to having $3 million and not deal with it being part of the MLR."

And Price says, "That's fine."

And then Rabke comes back and says to Price words to the effect -- I'm sorry.

I think the sequence was Price, and there's no indication of how this came about, but I know that Price on the same day sent an email to partners in the Burr Forman firm in a practice group dealing with the health care industry, saying, "I don't know anything about this MLR.  I don't know anything about what's going on here, it's not in my experience.  Can somebody help me?"

And a lawyer in Burr Forman in their Orlando office responds and says to the effect that, you know, the deals that we are involved in, this doesn't ever become an issue because the bond financing requires greater reserves.  And so, you know, I'm not really familiar with this.

And then Mr. Price articulates in a response a series of concerns that he has with respect to the

transaction that what's happening is that there's -- Bartle is trying to mix projects.  Because the bank is loaning money just on the health center, and they're trying to use the health center's money to satisfy the MLR requirements of the provider, which is Westport Holdings Tampa.  And Price articulates what those issues are.

And, you know, there's a suggestion from Rabke to Price that, you know, "Maybe we'll just do this a different way."

And then I think the next email is from Price saying to Rabke, "I think the bank is comfortable now," or words to that effect.

And Rabke responds, "Excellent."

And then they go about closing, using the MLR funds of Westport Holdings Tampa transferred directly to the closing agent, for the closing agent, pursuant to the bank's instructions, directed to an account at the bank.  The account at the bank is not in Westport Nursing Tampa's name.  It's the bank's account.  Nobody has any rights to that account except the bank.  And they consummate the closing as a result of that transaction.

And on that day, a notice goes to OIR that suggests that Westport Nursing Tampa is a provider with

an MLR requirement and is holding these funds pursuant to satisfying the MLR requirement, when in fact Westport Nursing Tampa is not a provider, has no MLR requirements, and the bank had no intention of those funds ever being part of the MLR for Westport Holdings and the CCRC community.

And then on May 12, I think it is, the bank sends OIR a form in response to a request from OIR to explain what's going on, and that form suggests that the bank is holding the funds pursuant to the MLR requirements, when in fact the bank is not holding those funds pursuant to the MLR requirements.

Q.   Anything else?

A.   Probably.  And I laugh only because, you know, I mean it's, you know, from my memory is not all that great, but that's what I remember and that's what I believe the facts will show.  And it's not what I think, it's what's in the written documents and exchanges that occurred.  And it's undeniable that the bank had an obvious concern about what they were doing and then went ahead and did it.

And the other component of it is when the bank asks for an opinion and were told one wouldn't be forthcoming, the bank did it anyway.

Q.   Well, like you said, the emails speak for

themselves.  But isn't it true that what Mr. Price says is the bank is thinking about asking for a legal opinion?

A.    I don't remember it ever being phrased like that.

Q.    Okay.

A.    But, again, the emails --

Q.    Speak for themselves.

A.    -- speak directly to the point.  And what I was trying to find was where did the bank get comfort, and there's nothing in writing that I could -- that was at least produced in the document production that did anything to provide that comfort.

And I don't know how it could be because once you look at the MLR statutes and the requirements, you know, for the escrow and for the party holding the escrow, and you see what was done by Regions to be the escrow agent, and I see what was done when Tampa Life Plan Village had to set up the MLR account that was required when it acquired the facility, and what they went through and the approvals that they went through and the process they went through, you know, all of that tells the correct picture on how you do it correctly. And what was done on March 31, 2014 wasn't done correctly.

Q.    Mr. Warren, you referenced the Regions agreement.  We'll mark this as Exhibit 2 to your deposition.

(Defendant's Exhibit Number 2 was marked for identification.)

MR. WHITSON:  I think we passed these out several times, I've been making multiple copies because we're just trying to save paper here.  But I think there's been at least three or four copies of this passed around.

Q.    Mr. Warren, I'm showing you what we've marked Exhibit 2 to your deposition.  It's an agreement for University Village, the minimum liquid reserve escrow, dated June 22nd, 2004; do you recognize this document?

A.    Yes.

Q.    Is this the document that you were referring to earlier in your testimony about the agreement with Regions?

A.    Yes.

Q.    And have you ever communicated in your capacity as liquidating trustee with Regions to obtain a withdrawal from the minimum liquid reserve?

A.    Yes.

Q.    How many occasions?

A.    The only time that I think that I dealt with

Page 73

them directly was as part of the Tampa Life Plan Village closing when the -- whatever was left at the account needed to be closed.  I may be wrong in that recollection, but that's what I remember.

Q.    You don't recall asking for distributions from the MLR to make any repairs or improvements to University Village?

A.    I don't remember ever communicating with Regions.  I do -- I do remember that right after I was appointed as the liquidating trustee and maybe even while I was the examiner, in fact, I think it was when I was still the examiner, I communicated with OIR to follow up on suggestions from the residents' council that given the desperate need for repairs at the facility, that, you know, we try to access, with OIR's approval, some of the reserves that were left at Regions after the $3 million was removed.

Q.    That was approximately $1.9 million; correct?

A.    It wasn't an insubstantial sum, I know it was a fairly large amount of money that was in that account. And, you know, what I remember, and I may be misremembering it, but I think what I remember is that -- and I'll try not to put my hand in front of my face -- what I think happened was that I had communications with somebody at OIR -- perhaps Shaw

Stiller, because that's who I normally talked to -- about the possibility.  And the response that I think I got was that it was unlikely that OIR would approve that.  And I think that was in the context of creating some debtor in possession loan funding to do repairs that were necessary at the facility.

Q.   And did you obtain debtor in possession loan funding to do that?

A.   I did.

Q.   Who did you obtain it from?

A.   USAmeriBank.

Let the record show that we're all smiling.

Q.   All right.  Well, going back to Exhibit 2, Mr. Warren, did you ever inquire of Regions Bank as to how the $3 million was released from the Regions Bank escrow and transferred to USAmeriBank?

A.   I did not.  I relied upon Mr. Jennis, who was the drafter of the original complaint in this matter and who had done the investigation and background with respect to those details.  So I don't -- I don't remember I ever, you know, contacted Regions Bank directly in connection with that.

Q.   So are you saying that you understood that Mr. Jennis had communicated with Regions Bank?

A.   I don't want to say he did --

Q.   Okay.

A.   -- you know, but I know that I relied upon Mr. Jennis and the work that he did in investigating transactions and transfers that led to my approval of filing the original adversary proceeding here against USAmeriBank, and also a number of other adversary proceedings that were filed throughout the course of the case.

Q.   Well, as you noted at the inception of your deposition, you are an attorney.  And in reading this document, and I'm referring to Exhibit 2, would not -- wouldn't you want to know exactly what was provided to Regions Bank in order for Regions Bank to release $3 million of the MLR?

A.   Well, I think I knew, which was that there was an instruction that Mr. Landry executed directing the bank to make the transfer.  And, again, I can't tell you that I've actually seen that document, but it's my understanding that that's exactly what Mr. Landry did which was part of the great deception.

Because, you know, on the one hand, moving funds among providers, you know, maintaining the MLR status of the funds wouldn't in and of itself be controversial.  But transferring it, the money, to a separate segregated entity that had no MLR

responsibility is where the deception occurred.

And, you know, it's possible that Regions shouldn't have acted on the direction from Mr. Landry, but I don't think anybody ever pursued a claim against Regions for its failure to adhere to the statutory requirements and the notices, you know, regarding that transfer.

Q.    Well, I'm not suggesting that that happened. I'm suggesting sort of the opposite, and that is Regions never would have released this money, $3 million, if they hadn't been properly instructed to do so under the terms of the escrow agreement because that's not what banks do.  Banks are very -- would you agree with me banks tend to be very careful about acting in their capacity as escrow agent?  Perhaps you wouldn't agree with me.

A.    Let me -- in my experience and as a young lawyer, I spent the first ten years of my life representing banks almost exclusively; and, as a result of that experience, I formed general opinions that lawyers make a lot of money because banks make a lot of mistakes.

And it's not because the banks are willfully negligent, but they, you know, are involved in transactions and transfers; and, you know, although they

should know their customers, oftentimes they're deceived and fooled.

In this instance, you know, I believe that the terms of this escrow agreement were not complied with respect to that withdrawal. Now, I have not, and I will say I have not tried to compare this 2004 agreement with, you know, any changes that the statutes require regarding activities, you know, for MLR accounts. And it's my understanding that in 2018, I think, there was significant activity by OIR with the Legislature trying to address concerns that had arisen because of the experiences at University Village with a lot of things. And so I believe there were changes in the statutes with respect to those matters.

In fact, one of the concerns that Mr. Price raised was that there was some conditions in the statutes as they existed in 2014 that talked about activities being grandfathered in, and that Mr. Price thought it was very ambiguous.

So, the bottom line is that, you know, generally I believe banks want to do the right thing, they just are in an environment where oftentimes they don't.

Q.   Okay.  You mentioned that you had an understanding that Mr. Landry issued an instruction.

Page 78

How did you gain that understanding?

A.    I'm pretty confident I relied upon my counsel, Mr. Jennis.

Q.    And was that instruction in writing?

A.    During the bankruptcy case when the residents committee sought derivative standing to pursue claims, I believe that there were written allegations with respect to the claims that they thought should be brought.  And the focus at that time was primarily with CPIF, because that was the entity that maintained the lien on the assets at Westport Holdings Tampa and Westport Holdings Tampa II, the debtors.

So, you know, in terms of things in writing, I'm not remembering any specific opinion or prepared fact statement or memorandum that Mr. Jennis, you know, provided; but I have a distinct recollection that somewhere there was some form of written instruction from Landry delivered to the bank directing the bank to make the transfer to USAmeriBank, and that USAmeriBank provided the wire transfer instructions to the law firm, acting as the escrow agent for the simultaneous loan closings involving CPIF, USAmeriBank and the Bartle/Landry transactions, all being done at the same time by the same law firm as part of one integrated closing because they were all predicated upon each

other.

Meaning that without USAmeriBank, there wouldn't have been a CPIF closing and there wouldn't have been a transaction involving Landry and Bartle. You know, without the CPIF loan, there wouldn't have been a transaction, you know, involving USAmeriBank and involving Landry and the Bartle group.

And with neither lender, the Bartle group didn't bring any money to the transaction at all, so there was never the equity that USAmeriBank thought it was getting. It was money that came from Westport Holdings Tampa's MLR reserve account with Regions. And so at the closing, the only people who didn't bring anything to the table was the Bartle group.

Q.   So this may be just a housekeeping issue, but I will tell you that I personally and have others scoured all the documents that you produced looking for some written instruction to Regions Bank. So if there is one out there, would you mind having someone produce that to us?

A.   I, you know, I can't do it myself, Mr. Whitson, but there's a paralegal here who can search the records and, you know, we can do so.

Q.   Thank you.

A.   And I do believe that I can put my hands on

the documents where USAmeriBank was asked and provided the wire transfer instructions. But what you are looking for is the instructions given to Regions?

Q. That's right. I have the one you just referred to, and Elise Daniels and all that --

A. That's the name I remember.

Q. Right. But I've never seen that document, you know, to Regions. So, okay.

All right. Well, thank you for that.

(Recess from 1:36 p.m. - 2:03 p.m.)

BY MR. WHITSON:

Q. All right. So when we left off before lunch, Mr. Warren, we were talking about what you've termed the great deception.

A. Um-hum. Yes.

Q. Thank you. I like to say you know better.

And I'm just wanting to know more about what was Mr. Landry's role, specifically, in the great deception?

A. He executed documents that were sent to OIR that were false and misleading.

MR. WHITSON: And are those documents among the exhibits that were sent to the Jacksonville office, Mr. Appleby?

MR. APPLEBY: Well, I mean, if you're asking

me specifically which documents, there was -- well, you'll have to ask the question because I don't know which documents we're referring to.

MR. WHITSON:  Well, maybe we can be more specific.

Q.   I was going to ask you that, Mr. Warren, but I didn't want to again tax your memory any further.

A.   No.  I think that the documents that I have that have helped put together my confirmation of the great deception are the documents that I received from Valley, you know, and from Burr Forman.  But I believe these documents were all part of the various documentation for the communications and transactions with OIR.

Q.   So, and if I understand your answer, the documents that were sent to OIR that were signed by Mr. Landry were the loan documents for the USAmeriBank loan to Westport Nursing Tampa; is that accurate?

A.   No, there -- well, it's accurate but it's incomplete.  They were, like, the May 2014 documents was created by the Bartle group, you know.  They actually discussed among themselves who should sign it, and they put it together and sent it to Mr. Landry to sign.

And then after Mr. Landry signed it, they put it together and discussed who to try to get the bank to

Page 82

sign it, you know, who should contact the bank about signing it. And then they sent it and got it signed, you know, by Mr. Korhn, and then they sent it to OIR.

Q.   You're talking about the notice that was sent to Desmond Wilson that was signed by Mr. Landry?

A.   That's one of them, yeah.

Q.   Okay. All right. Well, that was May -- okay.

A.   May 12, I think, 2014.

Q.   Yeah. May 12, that's right. We talked about May 12th.

You mentioned that it was talked about by Bartle, and then you have email communications involving Mr. Bartle and Mr. Landry about who's going to sign that particular document?

A.   I have email communications at Westport regarding that subject.

Q.   And are those communications part of the exhibits that you intend on offering at trial?

A.   Yes.

Q.   So I have copies of those in what was sent to Jacksonville?

A.   I mean, I'm not privy to exactly what was sent to Jacksonville, but they were all on the hard drive that you have, as I recall, you know, and I think many of them were used in the bank's -- in the depositions of

Mr. Korhn.

And some things were produced by OIR as part of their document productions that have been sort of rolling.

But there's -- I recall seeing a specific string of messages, you know, saying, Who is the best person to reach out to Mr. Landry?  Who's the best person to reach out to the bank?

Q.   Okay.  Since we talked about it, let's go ahead and make this an exhibit to your deposition.

We'll mark this as Exhibit 3.

MR. WHITSON:  I have an extra copy if you want it, Mr. Appleby, but, again, this is one that's been passed around numerous times.

MR. APPLEBY:  If you have an extra copy, I would appreciate it.

MR. WHITSON:  It doesn't have the attachments to it, but you're familiar with that.  It's the cover letter.

(Defendant's Exhibit Number 3 was marked for identification.)

BY MR. WHITSON:

Q.   Mr. Warren, I'm showing you what we've marked as Exhibit 3.  This is a March 31, 2014 letter from Williams Mullen to the Office of Insurance Regulation.

Page 84

Is this one of the documents you've been referring to in your testimony as part of the great deception that was communicated to OIR?

A.    Yes.

Q.    And if you'll look at Exhibit A to this document, it's a document entitled Assignment and Pledge of Deposit Account, and below that, in parentheses, Cash Collateral Account; do you see that there?

A.    Yes.

Q.    Would you agree with me that the recitals to this agreement on that same page, the first page of the assignment of Pledge and Deposit Account, recital C says:  The cash collateral funds, as defined below, deposited by pledgor -- and we can debate about that expression -- hereunder shall be included in pledgor's reserve requirements as required under Section 651.035 of the Florida Statute, the MLR statute.  As such, cash collateral funds meet the statutory uses allowed under Section 1B of the MLR statute.

And then D says:  The MLR statute provides that the Office of Insurance Regulation of the State of Florida, the department shall have informational rights -- information rights regarding the cash collateral funds.

Now, my question to you is, regardless of

whether you think that that's an accurate statement or not, at least there's disclosure to the OIR that these funds have been transferred and that they're subject to this pledge agreement; would you not agree with me?

A.    Well, that's the deception.  Because the -- because the fund held by USAB does not meet the statutory uses allowed under Section 1B of the MLR statute.  And the agreement under which the bank held those funds does not comply with the MLR statutes, and that's where the deception occurs.

Plus, this is a document that is unsigned, but it's sent at a time when they actually had closed. They'd already transferred the doc- -- the funds, they had already completed the transaction, and they should have just sent OIR the actual signed document.

And the drafting history of this document, the cover transmittal letter, demonstrates that they knew and the bank knew, you know, that the provider was Westport Holdings Tampa, Limited Partnership.  But when they changed it, they changed it to treat Westport Nursing Tampa LLC as though it was the provider, and they described it as a provider LLC.

And that simply is a false representation, because Westport Holdings -- Westport Nursing Tampa is not, never has been, a provider under the CCRC

requirements, you know, and was not a holder of a certificate of authority.  It was only Westport Holdings Tampa.

And so the deception was, is that they acted like this was just a movement of money, but it was still Westport Holding Tampa's money in the MLR account, and it wasn't.  And it's very confusing to read this to understand what was really going on because you think it's one thing; but, in reality, you know, the bank's position was that OIR had no rights other than informational rights with respect to this account.  And that, obviously, does not make it an MLR escrow account as required by the statute.

Plus, the funding, there are, you know, three components of the MLR statute, and only one component of that deals with debt reserve.  And this fund, you know, that they took the $3 million came from, you know, an account where all of the escrows required by the MLR existed.

And so that's the deception, you know, and it took -- you know, it took OIR a while to figure out what had happened.  But once they did, you know, they took action that they could administratively and otherwise to try to stop what was happening with the operations of the facility that had not complied with the statutory

requirements. And the bank was aiding and abetting and participating in all of these activities.

And they knew -- and the bank had actual knowledge. And before this was sent, the bank officer was saying, "I can't sleep, you know, I need -- I don't -- I'm not comfortable what's happening here." For good reason, because it wasn't right.

Q. So what else do you allege is deceptive about Exhibit 3? Is there anything you left out?

A. I'm sure that there's a whole bunch of things that were left out, but, you know, I don't really have the time now, I don't think you want me to take the time to go back and look at it. But, you know, I think we've touched on the major points.

I mean, you know, they're sending this by Federal Express to whom it may concern at OIR.

Q. But the OIR has admitted they got this letter.

A. Eventually, at some point, but they don't know when.

Q. Well, I mean --

A. They don't have a date-stamped version of it. You know, that's -- again, that's all part of the massive deception that's been orchestrated here with respect to OIR.

Q. But you'll agree with me we've covered in

Page 88

several depositions in which you've been present that there is an affidavit of Caroline Morgan, a supplemental affidavit, where she admits that the OIR received this document on March 31, 2014?

A.    No.  Well, I don't remember and I'm highly confident that they did not receive this on March 31st, 2014, because it wasn't sent until March 31, 2014, and it was sent by FedEx delivery.  Unless I'm misunderstanding FedEx, you know, maybe they didn't -- we don't know, there's not a receipt that's ever been produced by anybody that I am aware of.

But I don't think OIR denies that at some point they got this document.  At some point, you know, by April 18th, OIR was sufficiently alarmed at what had happened that they sent a requirement for there to be corrective action at University Village.  They then followed up, you know, once they understood, because Ms. Burkholder advised OIR that the $3 million had been transferred.  That triggered the May 12, you know, activity, and there was a list provided, you know, to the parties from OIR about what was required to properly set up an escrow account.

And that list was never complied with, meaning that the escrow agreement never satisfied the statutory requirements that existed in the plain statutes that

were always there.

So I'm not going to try to tell you that I've identified everything that's wrong here; but, you know, I think that this objectively confirms that the deception was ongoing. And what makes it more understandable of the deception is to see the drafting history of this particular document in which the bank's lawyer participated.

Q. Well, you'll agree with me though that the second paragraph of this letter, regardless of your contentions as to the defined terms, I don't want to debate that with you, but it says: The provider LP is hereby providing notice as required by the MLR statute.

A. I'm sorry, I'm not sure where you are.

Q. Oh, I'm sorry, second paragraph, beginning with currently, and it's the second full sentence of that second paragraph.

A. I see it.

Q. The provider LP is hereby providing notice as required by the MLR statute that as part of the restructuring, it is moving 3 million, the transferred amount, representing a portion of the provider LP MLR escrow account -- escrow from Regions Bank to USAmeriBank on behalf of the provider LLC -- on behalf of the provider LLC.

A.   Right.   That's the -- that's the deception. You have to understand what was going on to be able to figure out what they mean here because the provider LLC is not a provider.   It's not -- it's not the entity that has the MLR obligations.   And it is a -- it became, as a result of this transaction, a totally separate entity on purpose, a separate entity without connection and relationship to the actual provider.   And that was because the bank insisted on that structure.

Q.   Well, we'll disagree with that but -- rather than debating.   But you'll agree with me, Mr. Warren, that the OIR knows who the provider is at University Village; correct?   You were present at Mr. Struk's deposition?

A.   I watched Mr. Struk get totally confused as he was looking at the great deception because it was confusing to him because --

Q.   You were present.

A.   I was present.   But he never understood that instead of Westport Nursing Tampa being part of Westport Holdings Tampa, it had been severed.

Q.   Well --

A.   And once it was severed --

Q.   -- we'll let Mr. Struk's testimony --

A.   -- he kept thinking of the umbrella, but it

was no longer under the umbrella.

Q.    Well, I think what Mr. Struk -- I mean, I don't want to debate with you, but for the clarity of this record -- referred to the facility, and he referred to the CCRC.  And he didn't necessarily take any real distinction from what you're describing.  I think he was looking at -- looking at the entire CCRC, and that money there was still for the benefit of the entire CCRC.

But we'll move past that and we'll say -- but going back to what this letter says, I mean, OIR knows who the provider is.  We agree that the OIR knows what a provider is at a CCRC?

A.    They designated that Westport Holdings Tampa, Limited Partnership, was the provider that held the certificate of authority issued by OIR.

Q.    They know who that is.

A.    And it was the only provider.

Q.    And they know that; right?

A.    Well, again, I think they -- I think the OIR did know that.

Q.    Okay.  And it says:  The transferred amount shall be held at USAB under the Westport Nursing Tampa, LLC escrow account, identified as account --

And then it says the account number.

-- pursuant to assignment and pledge of

account, cash collateral account, between the provider LLC and USAB which is attached hereto as Exhibit B.

What is deceptive about that?

A.   The whole thing is deceptive because it continues to act like the bank was acting as an escrow agent.  But all they did was add the word escrow to a pledge account document, and that's well documented in the drafting history of the pledge agreement is that they simply added the word escrow to mislead OIR into thinking that this was a documentation that satisfied the MLR statute.

Q.   But they simultaneously provided the pledge agreement which shows there's a lien on those funds.

A.   And they called -- correct.  But the funds should have been unencumbered.  And I'm not defending OIR, I know that they should have been smarter and they should have been sharper.  They should have figured this out earlier than they did.  But they didn't figure it out, but that doesn't make it right.

The fact that OIR got bamboozled by the bank and Bartle doesn't mean that OIR's rights weren't impacted and that the residents rights weren't impacted by what happened.

And that's the key here, it's a gotcha game that seems to be occurring with regards to how

Mr. Bartle operates and how the bank was involved in helping him operate with this transaction. Because if OIR knew that the purpose of this transaction was to sever the health center from the CCRC, then there was no longer an umbrella. There was no longer the commonality of interest. And the bank intended there to be that separation. The bank wanted to have a separate stand-alone health center. And that's what the bank got.

But OIR wasn't told that because they were told it's part of the provider LLC, and it was part of the same commonality as the CCRC. So what the bank did was it caused the separation. The separation -- it was no longer part of the CCRC, and that's where the deception occurred.

Q. All right. Well, you were present when we talked about this issue with Mr. Struk at the OIR?

A. I was.

Q. And he recalled, as the emails also indicated, that the structure of the purchase of the limited partnership interest of Westport Holdings was discussed with the OIR ahead of time. And he agreed and the emails likewise reflect that that -- because Mr. Landry or his company, AgeWell, whatever the actual general partner was, would remain the same, be unchanged, that

Page 94

no application process was triggered.  There was no change of ownership as long you have a partner remain the same.  Do we agree?

A.   Do -- no, I don't agree.  I mean, the way I understood where, you know, part of the great deception was that sometime in 2013, and certainly in 2014, the Bartle group moved into University Village.  And they became the control parties with respect to University Village.

And although in name only, the general partner interest didn't change.  The control of the facility, the operations, all of the activities at the facility became under the control of the Bartle group, which is the antithesis of what a limited partnership does with the limited partners who have no say-so in the operation because it's all under the general partner.

And the bank participated in creating all sorts of new management agreements and new agreements that all came into effect on March 31st, 2024 [sic].  And the Bartle group got control of TALF and TR&SNF as part of the transactions, and they were therefore separating the operations of the health center, making it completely segregated from the CCRC.  And that's what the bank insisted on.  That's what the bank's documentation required to occur.

Q.   What evidence do you have the bank insisted on that?

A.   Because it's in their cards, it's in their documents.  In the loan document, the application was to acquire the health center; and so that's what the bank was funding to occur.

And for a while Landry stayed, at least in title only; for a while he was still around.  But by December, Landry was done and he resigned as the general partner.  And then there was no longer any issue.

But there was no one in the Bartle group who could satisfy the real requirements of OIR to operate and conduct the CCRC as intended.

Then, ultimately, AHCA got involved seeking to revoke the licenses given to TALF and TR&SNF.  And so they were in all sorts of controversies because there was no one in the Bartle group who could satisfy OIR and satisfy AHCA.  And this all occurred as a result of the bank being that pivotable activity in making this loan and wanting it to be separate.

And once it got separate, once they got into bankruptcy, the bank went to extreme interest to try to undo what the bank had done in 2014; and, ultimately, I succeeded in getting that done.  And then once that was done, yep, we had to undo it again.

Q.   What specific -- what did the bank try to undo once the bankruptcy was filed, the separation?

A.   They wanted to bring it back together.

Q.   And that was your goal too, right, Mr. Warren?

A.   Yes.  It was absolutely my goal.  And it's exactly what I wanted to do, and I succeeded in doing it even after having made an agreement, having to sue to enforce the agreement, and then having it there, and then finding out that we could not make it work.

Q.   We'll get to that in a minute.  But that's what we refer to as the grand bargain; correct?

A.   Yes.

Q.   And --

A.   You know I have an affinity for the word "grand," if you're getting that picture.

Q.   Well, grand and great apparently has risen to the fore.  But I do appreciate your love of a catchy phrase or catchy expression.

A.   Well, it's just cosmetic.

Q.   But not to jump too far ahead, but as part of that grand bargain, USAmeriBank participated in that mediation that resulted in the grand bargain; did it not?

A.   Yes.

Q.   And USAmeriBank consented to the transfer of

the membership interest to you to help reunify Westport Nursing under the same umbrella that -- again a phrase you use, so that the entire CCRC could be sold as a unitary campus. Wasn't that the effect, the intent and purpose?

A.    I want to be careful because I don't want to overstate something, because I've heard this position from the bank many times. What I remember and what I recall and what was the reality was that USAmeriBank's loan went into default. The bank filed a foreclosure action in state court, you know. I did everything I could to help the bank, you know, enforce its rights against its collateral.

The bank wanted very much for its collateral to be sold as part of the sale of the CCRC. And that's why, you know, that was the letter of intent by Skyline, that was the letter of intent by A Plus Operating, that was the letter of intent by SouthPoint, you know. And it was certainly, while the Bartle group was in control of the debtors and in control of Westport Nursing Tampa, that combination was always there.

But the hiccup was that nobody trusted nobody -- when I say nobody, the people who were interested in the independent living facility didn't trust, didn't want to have anything to do with the

Page 98

Bartle group, because the Bartle group was perceived, may not have been true, but it was perceived as being toxic.

And like in that Exhibit 1, BHMS Investments, you know, describes Mr. Bartle in glowing terms as part of its summary of Mr. Bartle. But the other side of Mr. Bartle is described in the bankruptcies and described by the Bankruptcy Court in Nebraska with respect to the different Mr. Bartle.

And so putting together any kind of an agreement and being dependent upon having Mr. Bartle involved was very challenging and difficult to occur.

And so during the mediation when it was discovered that A Plus Operating was not in a position to close, and it was discovered that SouthPoint, you know, had lost its South American investment group -- and this is during a protracted mediation, not at one session but over a protracted period of time -- you know, that it became important, you know, to reconsolidate the assets to the extent that they were prior to March 31, 2014. And there was a major claim against the Bartle group that was pending with respect to accomplishing all of those activities.

Q.    Well, let's stop there. You had sued BVM and John Bartle for breach of fiduciary duty, correct? Is

that the claim you're talking about?

A. Well, it was more than that. It was largely to recover the fraudulently transferred ownership of Westport Nursing Tampa.

Q. Right.

A. That was the primary objective of that litigation.

And, you know, part of the grand bargain was in order to get releases from the estates, the Bartle group agreed to transfer back the member interest. That takes us back to the discussion that I don't know that the bank's consent to that transaction was needed or required, because the breach would only be a breach giving rise to the bank's right to complete its foreclosure, which had been pending for multiple years; and so, consequently, nobody thought the bank was giving any consideration when it didn't object to accomplishing what the bank really wanted, which was to put the health center back into the CCRC.

Q. Well, and the bank had discussions with you about using the state court foreclosure proceeding in order to also achieve that result; did it not?

A. Yeah. Well, you know, the assistance that I provided to the bank in the foreclosure was didn't oppose the appointment of a receiver, didn't oppose the

effort to foreclose in any way, shape or form, and, you know, not wanting to interfere with the bank's ability to make its recovery with respect to its collateral.

Q.   But the idea was then to transfer the collateral to you so that it could be sold?

A.   That was certainly contemplated.  That was, you know, and that was the -- and that was the belief as to what would be done.  And so once the Bartle group agreed to return the member interest, there was not -- I don't think the bank was asked to sign a consent.  Now, maybe the bank acquiesced, but I don't remember there being a consent from the bank on that transfer of the member interest.  But I had to go to court to force the Bartle group to give up the member interest because they changed their mind, or some of them changed their mind and they didn't want to give it up.

Q.   Do you recall that I, as counsel for the bank, announced to the Court that we had the restriction on the transfer and that we consented the transfer to you?

A.   I am not disputing that you did.  I'm just saying that it was not -- in the overall scheme of things, it was not perceived to be something that the bank was creating or granting, because it was in the bank's best interest at the time for that to occur.

And so, ultimately, the Court authorized me to

execute the final documents to complete the transfer back of Westport Nursing Tampa.  And we were able for the first time to market the CCRC as a whole without the Bartle group having veto power or having control over that process.

And then that process, you know, took us into other issues, significant issues, trying to deal with SouthPoint, which was making a good faith effort, but always dealt with the cloud that their history as an entity had entanglements with the Bartle group because of the ties to Novum and those situations and circumstances.

And then ultimately the magnitude of the debt to USAmeriBank became an obstacle based upon the perceived value of the health center by anybody and everybody, but in the --

Q.   Did you ever ask the bank if they would accept a lower amount as part of the sale of the entire CCRC?

A.   I had numerous discussions with all the parties trying to get people to agree to anything and everything, and I think the bank's position, and I don't blame the bank for this, was we're not going to make a number in a vacuum.  You bring us a number and we'll consider it.

Q.   Right.

A.   And I think that was -- and I don't have any problem with the bank in doing that.  But what happened, in my opinion, was that when COVID came, that enabled the health center to have the opportunity to become a step-down facility.

And, you know, the people who were operating the health center, you know, had the ability and good sense to get a very good representative for them in Tallahassee to help them with AHCA.  And the obstacles that had existed for years and years and years in getting approval of new licenses for the ALF and the SNF, you know, were overcome because of the willingness of the health center to be a step-down facility for people recovering from COVID.

And so that, you know, created a good opportunity for the people at the health center to stand on their own.  It caused a lot of consternation among the residents because of the fears caused by COVID; but, you know, we were able to work out ways to block off access through properties and gates that we reinstituted in order for that to occur.

And by then, you know, the proposals that were coming to deal with University Village, the CCRC part of it, no longer were requiring the need of the health center.  But the health center had become -- it had, how

can I say it -- buried some of its problems with AHCA. So that -- so that enabled that group, the SouthPoint group which changed their name to Seacoast Elite, it was the same people, to do a transaction that ultimately led to the bank's realization on its collateral.

Q.   Well, thank you for that, but let's go ahead and let me break it down a little bit because I want to back up now.

MR. WHITSON:  We'll mark this as 4, I believe?

THE REPORTER:  Yes.

(Defendant's Exhibit Number 4 was marked for identification.)

BY MR. WHITSON:

Q.   Just to fill in some of the blanks here, Mr. Warren, I'm showing you what we've marked as Exhibit 4 to the deposition.  It's a copy of the University Village Life Care Residency and Care Contract; do you see that there?

A.   Yes.

Q.   And it's marked approved by the OIR.  This is a copy of what we've been referring to as the life care contract; correct?

A.   Well, one of the biggest problems at University Village was that there were between 20 and 23 versions of the life care contract that were used by

Page 104

University Village over time.  So on a continuum, this document approved in 2010, you know, was just one of 22 or 23 different versions of a life care contract.

Q.   Well, I mean, but the principal elements of a life care contract remain the same, whether it was a different refund percentage or other business terms that were negotiated.

Essentially, what we're talking about here is the fact that, you know, as you set forth in recital B, there was -- Westport Holdings is affiliated -- right? -- with Westport Nursing Tampa, LLC, which owns in close proximity the retirement center and assisted living facility, providing those services described in paragraphs three and four of this contract, and a nursing home facility, providing those services described in paragraph five of this contract.

And that affiliation existed in 2010, and that affiliation existed in 2015, after the 2014 transaction, March 31?

A.   No.  That affiliation changed dramatically.

Q.   It changed but it existed.

A.   Well --

Q.   It became a sister/sister affiliation rather than a parent/sub or parent --

A.   Parent/sub means that the provider owned and

controlled the complete operations of the nursing center.

Q.    I agree with that, but affiliated means something broader than that; right?

A.    Yes.  But there is no comparable circumstance where a parent/subsidiary is remotely equivalent to a brother/sister relationship.  That's -- those are completely different circumstances.

And so this agreement in 2010 was entered into under the parent/subsidiary relationship, and the bank participated in allowing the Bartle group to break that affiliation and to change it; and to change it not for the better but to change it for the worse --

Q.    Well --

A.    -- because it took away from holdings the provider the asset that was providing income and revenue to deal with the obligations to the person who signed this contract as a resident and who had an entitlement to a refund of their entrance fee; they lost, they lost the opportunity to look to Westport Nursing Tampa for that obligation.  And that's the damage that occurred as a result of the bank's conduct here in aiding the Bartle group and the Landry group in breaking the affiliation and making it totally different than the parent/subsidiary relationship.

Q.   But Mr. Landry was still in control of both Westport Nursing Tampa and Westport Holdings after this --

A.   I do not agree with that because all evidence, and I believe the OIR came to the same conclusion, and I think the testimony of anybody who was at the facility is that Bartle was in control.  Landry was not in control.  In fact, Bartle stopped dealing with AgeWell, you know, and Bartle wanted to change those transactions.

And I'm not suggesting that these were ugly, awful transactions, but the flow of money was changing. And there was discussions and documentation where Bartle was going to merge his entity into AgeWell.  So he would take over the good will that AgeWell had because BVM really didn't have any good will.

And certainly after the problems that were disclosed in May of 2014 and the summer of 2014 in Nebraska with Bartle's activities where he was ousted as a chief restructuring officer and a Chapter 11 trustee put in his stead, you know, pretty much sealed the fate of Mr. Bartle being able to get anybody to approve him to operate and operate in a facility like a CCRC where the OIR has a duty and responsibility to deal with the financial wherewithal of the people who it approves to

operate.

And AgeWell, through Mr. Landry, had that good will. Bartle tried to come into control of it, but that didn't work out and I don't know why. But I just know it didn't work out.

All right. We'll mark this as Exhibit 5.

(Defendant's Exhibit Number 5 was marked for identification.)

BY MR. WHITSON:

Q. All right. Mr. Warren, I'm showing you what we've marked as Exhibit 5 to your deposition. It's a document entitled Complaint, and it is filed by you as plaintiff in your capacity as liquidating trustee. Again, it's BVM Management, BVM University Village, LLC, IMH Healthcare, Westport Nursing Tampa, LLC, TR&SNF, Inc., TALF, Inc., John Bartle, Rebecca Bartle, Eli Freiden, Kassidy McCowan, and Jared McCowan. Do you see that?

A. Yes.

Q. Is this the claim that you were talking about earlier in your testimony you had against Bartle as part of --

A. Yes.

Q. Okay. Getting him to essentially consent to the transfer of the membership interests of Westport

Nursing back to you in exchange for release of this claim; is that right?

A.   I don't want to misstate the sequence of events.  This was filed on September 21, 2018.  We had already had mediation sessions, and there was not a result.  Coming out of the inability to restore the CCRC, this complaint was filed.  And then --

Q.   Well --

A.   And then after this complaint was filed, during the ensuing months there was a resumption of discussions that resulted in the completed grand bargain, with the residents committee and the debtors jointly proposing an amended and restated mediated plan of reorganization.

Q.   So hearing your testimony, it sounds like Mr. Bartle was dragging his feet on transferring the membership interest back, and so -- or I think he was --

A.   No, this is --

Q.   -- balking at the signature issue and that was on appeal?

A.   No, just so -- and, again, I'm pretty sure that I have this correct.  When this complaint was filed, there had not been an agreement by the Bartle group to restore assets back to Westport Holdings Tampa.

You know, I don't want to take unnecessary

credit, but I have the perception that this complaint demonstrated the seriousness with which, you know, the interested parties wanted to restore things.

Q.   But this also brought into frame your -- all the allegations about the various breaches of fiduciary duty that occurred as a result of the March 31, 2014 transaction; does it not?

A.   It does, and I want to correct myself.  And I may be getting confused and getting tired.  I became the liquidating trustee pursuant to the amended mediated plan.

Q.   Correct.

A.   And that was May of 2018?

Q.   I have that document here.  Hang on and I'll take a look.

The Order Confirming First Amended and Restated Mediated Joint Plan was in May of 2018.

A.   Yeah.

Q.   I'll make that -- go ahead and make that an exhibit.

A.   Yeah.  And that's the order that appointed me as the liquidating trustee.

MR. WHITSON:  I just have one big copy of that, so I'll make it Exhibit 6.

(Defendant's Exhibit Number 6 was marked for

identification.)

BY MR. WHITSON:

Q.    Does that refresh your recollection?

A.    Yeah.  There's a provision in this order that named me as the liquidating trustee.

Q.    So getting back to this complaint, Exhibit 5, that was filed in September of 2018, because you were a plaintiff, as --

A.    Yes.

Q.    -- liquidating trustee here.

A.    And that's why, you know, I needed to correct the sequencing of events, but what I'm now a little confused in my own mind is when some of these counts came into play with respect to the member interest in Westport Nursing Tampa.  Because this is not the action by which we forced the recovery of the member interest.

And so I correct myself.  I think you had this correct in the beginning that this complaint was after the grand bargain was reached but before we had a resolution with the Bartle group.

The grand bargain was between the debtors and the residents committee as the primary participants, wanting to put everything back together; but, it wasn't put back together at that time.  It didn't get put back together until subsequently, and that's when this

Page 111

complaint came into play. We then reached an agreement and then we had to enforce that agreement against Bartle.

Q. Correct. That's the way I remember the sequence was.

A. Give me time, I'll get it straight.

Q. This is one of those cases, I did mention to you before, you do have sort of a pension for epic litigation, being with Celotex, Colony, and --

A. Just call me Mr. Complex.

Q. I'll tell you. All right. So let's look at page 11, in this complaint, the leveraged buy-out of University Village. And you -- are you with me?

A. I am.

Q. Okay. Paragraph 51, you say: Bartle recruited IMH and JFC to participate in purchasing Westport's 99 percent limited partnership interest. Are you there?

A. Yes.

Q. In August/September 2013, BVM Management/Westport Holdings, LP, which you call defined BVMMWH, I'm not sure the defined terms are any less complicated than the actual names that are used in this complaint, but --

A. Yeah. This BVM Management/Westport Holdings,

LP was a different entity than BVM Management.

Q.   And WSILF, what was WSILF?

A.   I want to say that was Lou Jackson's entity, but I'm not 100 percent sure that that's the case.  But I think that's right.

Q.   Entered into a limited partnership purchase agreement pursuant to which BVMMWH agreed to purchase 99 percent limited partnership interest in Westport and Westport II from WSILF for a total consideration of $2.5 million.

I was looking for the definition of WSILF to make sure we're talking about the right people.

A.   WSLIF was Westport Senior Living Investment Fund, LP, which was the entity that held the 99 percent limited partnership interest in Westport and Westport II.

Q.   And that was Lou Jackson?

A.   No, that's not Lou Jackson.  That's Landry's entity.

Q.   That's what I thought when you mentioned Mr. Jackson.  I wanted to make sure I was right about that.

A.   No, I had the wrong entity.

Q.   So, the only portion of the purchase price funded with equity was $500,000 which was contributed by

JFC.

And then it says on March 11, 2014, BVMMWH and WSLIF entered into a reinstatement, an amendment agreement which amended and restated the terms upon which the 99 percent limited partnership interest in Westport and Westport II would be sold by WSLIF to BVMMWH.

And then there was discussion about a note made by BVMUV. And then that transaction, BVMMWH and WSLIF, excuse me, closing agreement. Shortly thereafter, BVMUV replaced BVMMWH as buyer.

All right. So then that occurs on March 31, 2014. Then you say on March 31, 2014, WHUV, as the debtors' general partner.

Is that a Landry entity?

A.    I think so. But it's -- that's not right, it's not the maker of the note.

Q.    That allegation confused me.

A.    There's a mixing of the entities that were part of the Bartle group that were -- I think there were four separate groups that had participation interest in acquiring the 99 percent interest.

Q.    Right. Because it says: Prior to March 31 -- I'm looking at paragraph 48 on page 9.

Prior to March 31, 2014, the organizational

operational structure of Westport and Westport II was as follows:  A, Westport Holdings University Village, WHUV, a Delaware limited liability company, was --

THE REPORTER:  I'm sorry.  Slow down just a little bit.

Q.   -- was the 1 percent general partner interest in Westport and managed and operated the ILF at University Village.

So that's the situation prior to March 31, 2014, is WHUV was a Landry entity; right?

A.   Correct.

Q.   And paragraph 49 says:  WHUV -- OIR had approved WHUV, in that the management was performed by AgeWell, which is Mr. Landry's company; right?

A.   Correct.

Q.   So then it says:  On March 31, 2014, in paragraph 57, that WHUV, as again Mr. Landry, the debtor's general partner, consented to the sale of the 99 percent limited partnership interest in the debtors by WSLIF to BVMUV; right?

A.   Correct.

Q.   And that they retained this 1 percent general partner.  That's the situation we have understood, that Landry still stayed in for that 1 percent general partnership interest, general partner and 1 percent

limited partnership interest; correct?

A.   Correct.

Q.   Then you say in paragraph 59: BVMUV acquired all of the membership interest in WNT, Westport Nursing Tampa, from Westport; right?  And that was done on March 28, 2014.  Is that right?

A.   I don't have a recollection of the document described as WNT's March 28, 2014 amended restated limited liability company agreement.  But the amended and restated limited liability company agreement wouldn't have been a document that would have transferred the membership interest.  There would have to have been some other documentation.

Q.   Well, there's generally an assignment of membership interest, but that's also reflected in changes to the operating agreement.

A.   Correct.  And so, again, part of the issues are, you know, I don't know whether the fact that this document is referencing March 28, 2014 as being the date that things occurred or not.  I just -- I really just don't remember that.  But I believe that somewhere there would be documentation that could be researched and could make this -- that would support the timing of this.

But, you know, with the Bartle group, there

were oftentimes gaps in documentation.  You know, there were documents that were signed, you know, March 13th by one person and signed March 27th by somebody else.  And there were often references to "effective as of."  So you don't know when something's signed or not signed.

But I don't -- I don't remember that Landry would have disposed of the member interest in Westport Holdings, the member interest owned by Westport Holdings Tampa in Westport Nursing Tampa prior to the March 31st closing.  That --

Q.    Three days prior.

A.    That comes as a surprise to me if that's exactly what the documents actually say, I just don't know.

Q.    Right.  I noticed the change in the dates too or a difference in the dates.  That's why I asked the question.

So looking back -- skipping forward to paragraph 64 of this exhibit.  As part of the loan process, and I think you're referring there to the CPIF loan and the USAB loan?

A.    I'm sorry, where are you?

Q.    Well, we're talking about paragraph 60 through 64.  You talk about that WNT was spun off?

A.    Well, yeah, again, that's -- it was spun off

to be -- from being a wholly-owned subsidiary of Westport to being owned by BVMUV, IMH, BHMS ILF and JFC. Those were the four Bartle entities. So, again, I would be very surprised if that spinning off occurred on the 28th as opposed to it occurring on the 31st.

Q. Right. But that's what this complaint does say, so let's --

A. No. What it says is as set forth in WNT's March 28. It doesn't say that that's when it occurred, it's just -- it's what it's -- what the allegation in paragraph 59 is reciting what is stated in the amended and restated limited liability company agreement.

You know, when the transfer occurred is not -- I don't think we were intending to allege it. But what we did intend to allege is in 60, that it was transferred to the -- to the Bartle group. And I can't imagine in a million years that Mr. Landry would have transferred ownership of nursing to the Bartle group before they had a closing.

Q. Okay. So there's the spin-off. There's the talk about the CPIF loan and how the proceeds of that loan were sort of divided up on the closing statement.

And then we go on to paragraph 64 and saying as part of the loan process, $3 million of Westport's statutory required MLR held in a Westport bank account

maintained at Regions Bank was transferred to WNT's escrow account at USAB, and improperly pledged as collateral to secure USAB's loan to WNT.

You see that there?

A.    Yes.

Q.    And then 67:  As a result of the CPIF loan and USAB loan, bank accounts that were reported as contained in University Village's MLR were improperly transferred to other entities and pledged as collateral to secure the obligations under loan agreements.

Do you agree with me there?

A.    That's what it says.

Q.    And there's various allegations about the failure to seek required regulatory preapproval for changes in ownership.  We have the leveraged buyout in paragraph 74, which placed University Village and its residents at an extraordinary and intolerable risk of the debtors being placed under regulatory supervision, ultimately being the subject of a delinquency proceeding and possible receivership and potential shutdown by state authorities.

Do you see that there?

A.    Yes.

Q.    Okay.  And then paragraph 79, you talk about Mr. Landry's resignation on December 29, 2014; correct?

A.   Yes.

Q.   So then we go to breach of fiduciary duties by Bartle, Rebecca Bartle, BVMUV, and the various other defendants named in that under Count I.

And you say:  The debtors, partners and their principals breached their fiduciary duties by, among other things and without limitation, authorizing and allowing the substitution of the debtors' limited and general partners without first obtaining required regulatory approval --

MR. WHITSON:  I'm sorry.

Q.   -- and the various allegations there.

And then E:  Authorizing and allowing approximately $3 million of Westport's MLR to be taken, the existing escrow account.

And then Count II is civil conspiracy among those defendants.  Count III, negligence.  Count IV, deepening insolvency by Bartle.

And then again Count V, fraudulent transfer, which again references the transfers.

In paragraph 109:  The purpose of these transfers was to insulate and conceal WNT and its assets from creditors of the debtors.

So you're referring to the MLR there as part of these transfers?

A.    I'm sorry?

Q.    We're talking about the purpose of these transfers.  The defendants received a transfer or transfers of the assets; right?  And the whole idea, I guess, is this fraudulent transfer.  What is the fraudulent transfer that you're talking about that left the debtors undercapitalized, that they're insolvent or close to insolvency, and then, you know, the various other allegations in paragraph 110?

A.    If we were pursuing this case because it didn't get resolved, you know, I would be responding to a motion for more definite statement because the complaint is deficient in terms of specificity.  It's very generic, you know, so I -- we would be repleting.

Q.    Okay.  So my question to you is why didn't you sue Larry Landry as part of this complaint?  Because he was involved in these transactions that you're challenging and -- or WSLIF, his entity, or AgeWell, again referenced throughout the allegations in this complaint but never named as part of the breach of fiduciary duty claim that you brought in this adversary proceeding?

A.    Well, as of December 29, 2014, Landry was no longer in a position of any importance in connection with Westport Nursing Tampa or Westport Holdings Tampa.

And so, consequently, at this time period, September of 2018, this claim was against the recipients of the transfers to recover those rights.

And, you know, we have religiously preserved our rights to make claims against Landry. We have investigated the transfers and the source of the transfers to Landry and have not filed an action against Landry, but one remains contemplated. But at this point in time, Landry wasn't the player that we were interested.

You know, my task as the liquidating trustee, or my prime directive was to be able to dispose of the assets of Westport Holdings Tampa. And although we had and we have claims against Landry, these claims were being pursued strategically to effectuate the recovery, to unify back the campus for disposition purposes. And, I will add, we were successful.

Q.    And I'll show you what I've marked as Exhibit 7 to your deposition, Mr. Warren.

(Defendant's Exhibit Number 7 was marked for identification.)

Q.    It's a document entitled Mutual Release and Transfer and Assignment of Membership Interest in Westport Nursing Tampa. Is this the document you're referring to as part of the success?

A.    Yes.

Q.    And this was achieved after filing the adversary proceeding that we were just discussing?

A.    I'm looking at the date and I'm scratching my head about --

Q.    That's why I was saying there was -- you had the litigation, but then you also had the issue about the signatures, and then BVM appealed all of this and it was all sort of still pending.  And does this refresh your recollection?  Because these recitals kind of lay some of that out, but --

A.    Yeah.  Let me just take a second to try to recreate.  Sorry that I'm still having a little confusion.

Oh, wait.  This is the transfer back.

Q.    Oh, okay.  This is not the original one?  In my note -- that's my misunderstanding.

A.    I'm sorry, I was so confused until I -- the dates just threw me off.  This was the resolution that ended the effort by the Bartle group to prevent the disposition of the facility to Tampa Life Plan Villages, and in consideration of the fact that the health center wasn't part of that sale.

This document, Exhibit 7, is the transfer by me as the liquidating trustee on behalf of the entities

back to the Bartle group.

Q.   All right.  Then we just jumped --

A.   And, as a result, their appeal was dismissed, and that enabled us to complete the bond financing transaction.

Q.   Okay.

A.   But there's a -- in 2018, you know, I think, you know, you'll find the transaction whereby the Bartle group reached an agreement.  There were releases.  But then the Bartle group wouldn't -- there were certain parties in that group who wouldn't execute the document to transfer the member interest.

Q.   Right.

A.   And we went to court.  Judge Williamson ordered it to occur, authorized me, pursuant to the Bankruptcy Code, to execute the document to complete the transfer.  And we did that.

I feel a lot better.  I was trying to figure out why I had gotten so confused.  It helps to read the document.

Q.   So -- and I think we actually covered that other release in a prior deposition.

A.   Yeah.  It wouldn't be hard for me to find those documents if you wanted them but, you know, I just, I can't tell you the timing of it, but --

Q.    We may come back to that.  Let me see how far -- we need to get through the rest of this other stuff, but --

So if I'm looking, again, so we have -- back to the reunification and the sale process.  Do you recall that --

We talked about this at a prior deposition.

-- there was an order entered on November 14, 2018, final order granting liquidating trustee's expedited motion for authority to obtain post-confirmation financing and grant senior liens.  And there's a bunch of other things.

Part of that order was to require you to engage a real estate broker to market and sell University Village unless a signed term sheet for the acquisition of the entire University Village campus with a bona fide and qualified entity has been executed and presented to this Court for approval.  And then you had a December 1, 2018 deadline.

Did you ever retain a real estate broker to market and sell University Village?

A.    I did not.

Q.    And what was the signed term sheet for the acquisition of the entire University Village campus with a bona fide and qualified entity that you obtained?

A.   Keeping the sequence in my head without looking at the document that you're referring to, I think it was QSH, was the entity that was the first entity that an agreement was reached with respect to the disposition of the property.

Q.   Now, QSH, were they interested in buying a term sheet for the entire CCRC or was that simply for the ILF?

A.   You're testing my memory, you know, so I again will defer to what the actual documents say, which are all a matter of record.

But I'm fairly confident that at that time, the transaction that was proposed would not have included the health center, would have only dealt with the independent living facilities, the duplexes, and the towers, with the contemplation that there would be an ALF and maybe other facilities incorporated into the other building structures.

The acquiring entity was a not-for-profit entity.  There would be a bond issuance who would finance the acquisition and the renovation and reconstruction of the facility at University Village. And this was an entity that was led by an individual in Atlanta, whose name is escaping me right now, who had a facility in Durham, North Carolina, a CCRC, as I recall.

Q.   I remember he came to court and then --

A.   Yeah.

Q.   -- he just disappeared thereafter?

A.   Yeah.  He was a very, very smart, very honest, I thought was a very capable person.  And something happened, and I don't know what, but something happened with his property in Durham that had been a fairly contentious activity.  And I think he was the type of person that was, you know, very honest about what he thought he could do and not do.  And he -- I don't think he felt like he could devote the attention necessary.  And so that led to the creation of Tampa Life Plan Village.  And part of -- part of the issue was that for the bond financing --

Q.   Well, let me just make that a part of your deposition.

(Defendant's Exhibit Number 8 was marked for identification.)

A.   That being what?  Oh, the Life Plan Village.

Q.   Right.

A.   Monthly report.

Q.   So you sold the ILF to Tampa Life Plan Village; correct?

A.   Yes, eventually.

Q.   Right.  And then that was -- let me just close

the loop on this order.  So --

A.    When you're talking about this order, you haven't marked that as an exhibit.

Q.    It's been -- I can make it an exhibit.  It's the order -- we've used it in other depositions, but it's the document number 1197.  I can show you, I've highlighted the actual paragraph.  We can make it an exhibit.

A.    Why don't we mark it, make it an exhibit?  And then I'll give it back to you.  I just need to look at it.

(Defendant's Exhibit Number 9 was marked for identification.)

Q.    If you look at the language that I highlighted, it should be the language that required the hiring of a real estate broker.  And I guess my question to you, just to follow up, was that the QSH term sheet that you did provide by that deadline in the judge's order really wasn't for the sale of the entire, the whole CCRC, the whole campus, and therefore really didn't comply with that portion of the order; did it?

A.    Well, this order dealt with post petition financing.

Q.    But included in that order was a requirement that you hire another real estate broker?

A.    I believe -- and, again, I'm -- my Evelyn Wood speed reading doesn't enable me to pick this up so fast. But I believe that Rosemawr, which was the entity that was interested in the bond financing to acquire the bond, and other interested parties, including the OIR, were very interested in completing the transaction. And I agreed to the nonfinancial terms as part of putting together that complete package. And so --

Q.    For the sale of the entire CCRC?

A.    At that time --

And, again, this is November 2018.

-- it was absolutely contemplated that the entire campus would be marketed and sold together. And I believe that by this date, we had resolved the dispute with the Bartle group. But I don't -- I don't know that for sure.

Because, you know, that complaint was filed in September, this is November. So I don't remember the complaint being resolved quite that quickly. But it's easy to find out when those dates occurred. But I don't think there was anybody involved with University Village who wanted further delays and who didn't, you know, want me to do whatever I could to get things done.

Q.    So you're saying that hiring a real estate broker would have been a further delay?

A.    No.  It wouldn't necessarily have been a further delay.

Q.    Why didn't you hire a real estate broker?  I mean, without being -- this order notwithstanding --

A.    Yeah, I --

Q.    -- I guess my question is why didn't --

A.    I was involved starting in the fall of 2016. By the fall of 2018, you know, I had learned a lot about the CCRC world, and I had talked to countless people, and I had met with a number of brokers.

Q.    Did you meet with Mr. McMurtry?  He was mentioned in Mr. Bartle's --

A.    His name sounds familiar and, you know, I never have gone back to look at my records but I think he came highly recommended.  I think there were other people who were highly recommended, and I talked to a number of them.

But what I learned, you know, was that there's a very small universe of entities who have the proper wherewithal to satisfy all of the different requirements to get through an acquisition of a CCRC.

I mean, there's between 65 and 70 CCRCs in the state of Florida, and there were several fairly high profile defaulted entities:  Devonshire, Glenmoor, University Village.

And in the community of entities capable of satisfying OIR and dealing with, you know, the rigors of their approval process, including the significant requirement of experience in a CCRC, which was in addition to perhaps the financial character flaws of the Bartle group, was their significant problem.  They -- the only CCRC that Bartle was known to have been involved in was the facility in Nebraska where the Bankruptcy Court had replaced him with --

Q.    Right.  But we're not going back to Bartle again.  We're talking about --

A.    But what I'm saying is, is that, you know, the community interest on a statewide and national level about University Village was widely known.  Landry had been marketing since 2009.

Q.    Did Landry have a real estate broker?

A.    Not to my knowledge, he did not use a real estate broker.  I think he might have had a real estate broker.  In fact, I think he did, you know, but they were not successful, you know.  The Bartle group came in, no real estate broker.  Skyline came in, no real estate broker.  A Plus Operator came in, no real estate broker.

Q.    But that's my point.  We had a series of un -- of really just sort of people who really didn't know

what they were doing trying to buy this.  And why didn't we take stronger steps to find a qualified buyer?

A.    Because I talked to lots and lots of brokers, and they all basically told me the same thing.  None of them had a buyer who needed a broker to do their due diligence with respect to --

Q.    How many brokers did you talk to?

A.    I did a report to the Court, and I want to say there were at least two that I interviewed.

Q.    Two?

A.    Yeah.  And, again, remember, the first thing -- I shouldn't say remember, but among the first things that I did when I was appointed as the liquidating trustee was I made a consent agreement with OIR so that there would be no question as to my authority to operate the CCRC at University Village.

And as part of all of those activities, you know, I never resisted having or using a broker.  I use brokers a lot in my work, and I think they're extremely helpful and very beneficial in many, many transactions. But given the limited universe of entities that would be capable of satisfying and properly dealing with something at University Village, and particularly including the residents, you know, who were well informed and very involved in all of the activities and

processes, the people at LeadingAge, you know, the state organizations both for residents and for CCRC owners, all said the same thing, everybody knew about University Village. So that there wouldn't be any package that anybody could put together that would attract anybody new.

And I constantly had entities and people coming to me, you know, wanting to see things. I mean, that's why the data room was set up like it was. And so as the failsafe backup plan, I never resisted engaging a broker. But no -- but every broker that had an interest who had a client or who had somebody that had an interest came to me.

Q. Those were buyers' brokers, right? They weren't your brokers?

A. That's right. And so -- and part of that was, was there a need for a broker? Because the vetting was the residents' committee, CR3, you know, CPIF was definitely involved. They, you know, they would have fallen into the loan to own category.

Q. But it was your -- it was responsibility, you had the authority; correct?

A. That's right. I had the authority but there -- but there was no reason, because there was a constant supply of people to acquire. And if there

wasn't a viable transaction, then the plan was -- and there was no resistance for me to engage a broker, which is why I interviewed brokers to select who would be the broker that would be used.

Q.    You interviewed two.

A.    I think there was at least two that I actually interviewed.  And then, you know, I had the experts at CR3 to help.

Q.    Did CR3 have any expertise in senior housing or CCRCs?

A.    They had a fellow by the name of Gray who was in Massachusetts, I think, who had CCRC expertise, and I met with him a number of times.  The residents committee, I think, engaged CR3 because Mr. Jennis had a previous relationship with Eric Danner.  Eric Danner was fairly well known, you know, to a number of the turn-around professionals in this area.  And so I think that's how they got involved or that's how CR3 got involved.

But there was a recognition that there needed to be some additional expertise, and that's why -- I think his name was Steven Gray -- was part of the engagement and the retention.

Q.    Okay.

A.    So --

Q.   But he didn't do any real estate marketing for you, right?

A.   To my knowledge, I don't think Gray did.  I think that the -- I think what was basically done was, by CR3 was to sort of try to maintain and keep track of the areas of inquiry, you know, and then record, you know, the sequencing and who was doing what, you know.  There were people who sort of made proposals, kicked the tires, looked a little deeper, then went away.

There were -- one of the biggest problems that I had was entities like Pinta, you know, contacted Bartle about the health center.  And then that evolved into a proposal that was essentially a nonstarter in terms of the merits of it.  And, you know, once the Bartle connection was identified and once the terms were identified, there was nothing there.  You know, I mean there was -- not that they were not a qualified entity, you know, but they're interested in getting to the nursing center, you know, and discarding the life care contract and not assuming and being responsible for the life care contract.  It was the kind of nonstarter that, you know, didn't -- wasn't within the directive, you know, that I had as the liquidating trustee.

Q.   Okay.  Let me move on.  All right.  So then we have what we'll mark as the next exhibit to your

deposition, document 1634.

(Defendant's Exhibit Number 10 was marked for identification.)

Q.   It's the order granting liquidating trustee's motion for entry of final order authorizing the sale of the assets of debtors free and clear -- well, strike that.

That was the sale to Tampa Life Plan Village, right?

A.   This is March 14, 2020?  Yes.

Q.   Okay.  So, again, I don't want to spend too much time on this, make sure we cover everything we need to cover.  But you had mentioned the consent orders and the various -- there were numerous consent orders reached with the OIR to allow you to keep operating, forestall, you know, any action by OIR.  But the whole premise was to sell the entire CCRC as an entire campus; right?

A.   Well, at the beginning that was correct.

Q.   Okay.

A.   And then as it -- and then the consent orders were amended, and they were amended several times.  And then during that amendment process was when the alternative utilization of assisted living facilities and skilled nursing facilities in the near area was

substituted for having the health center serve as the entity providing the continuum care for the residents was --

Q.    Right.  Rather than --

A.    -- was done.  And OIR approved that.

Q.    Rather than have a deal where the residents had to walk across the street to get the care, you came up with a plan to sell the independent living facility and have those people obtain health services off-site. Is that -- I mean, I think that's what you just said.

A.    Yeah.  But there's a component of this that I think is important and is being implemented, and that was to create inside the independent living facility assisted living entity capability.

Q.    Has that happened?

A.    Yeah.  It's being done.

Q.    It's being done.

A.    And that was -- you know, so consequently there was a gap period where the services, you know, would be necessarily within an area, and OIR insisted upon a specific geographic proximity to the facility and documentation regarding the --

Q.    And what was that geographic proximity?

A.    I don't think it was very big, it was just a couple of miles.  I mean, I remember going to a number

of the facilities that were on Bruce B. Downs road that, you know, was just a few minutes away from Westport.

Q.    How far away is the facility that the residents go to now?

A.    I can't tell you.  I mean, I assume it's the same facility, but it's just a few minutes away.

Q.    But while there may be ALF services getting done, there's no skilled nursing facility within that -- the same --

A.    Yes, yes.

Q.    Within the ILF?

A.    No, no.  There's -- to my knowledge, they have not evolved into creating a memory unit.

I mean, frankly, in today's marketplace, nursing homes have a stigma associated with them, and I think that nobody wants to promote a nursing home; but they talk about rehabilitation centers and, you know, specialized, you know, care, particularly memory centers.

And what was always contem- -- I shouldn't say always contemplated.  What was known to exist was that you had land to create a facility on the villas real estate.  And there was a synergy of activity between, you know, the Tampa Life Plan Village group and the developers for the --

Q.   But that's not happened?

A.   -- University Mall.

Q.   Has that happened?  Has any of that happened?

A.   Well, I think all of it's happening. University Mall is transforming into a dramatically different facility, you know, as we speak.  And that's taken several years to implement, but I think that's coming to pass.  And the whole area is changing, so --

Q.   Let's move on.  I handed you before a little bit out of order the monthly report for Tampa Life Plan Village.  Maybe we can fish that out again?  I'm sorry.

All right.  There you go.  Are you familiar with this document?  Have you seen it before?

A.   No.

Q.   All right.  One of the dis- -- people on the distribution list is Mr. Richard Ackerman.  You see him down there on the left-hand side?

A.   Yes.

Q.   Ron Shuck, I think you mentioned his before, and Rob Gall, who was --

A.   Yes.  Mr. Shuck is the chair of the Tampa Life Plan Village Board of Directors.  Seth Klempner is with Rosemawr.  Michelle Lazalof (phonetic) is a director.  I think Kristin Wharton is a director.  Michael Brown is the executive director.

Q.    What is the relationship of Mr. Ackerman to the Tampa Life Care Plan Village?

A.    I'm not aware.

Q.    Well, he's on the distribution list.

A.    Oh.  Well, the BigRock organization, and I don't want to tell you the specific entities, you know, implemented the renovation and the rebuild of the entire campus facility at University Village in order to provide the proper amenities for the current residents and to provide a facility that would last into the future.  And they, you know, through various agreements you know, supervised and implemented that construction and that work.

Q.    Let's look at how it's going.  If I turn to page 4 of this report, that's only about less than a month old; right?

It says ongoing areas of focus:  Lack of renovated inventory, currently one studio, zero two-bedroom, zero small one-bedrooms, prioritizing rent roll for unrenovated apartments.

And then it says basically number two: Driving new prospects to an off-site event and then following up with a tour, as we have found the location can be an immediate turnoff to prospects.

So it doesn't seem like these renovations are

going very well, and they're certainly as of now not -- they have not been completed.  So, again, if I look at this report --

A.    Well, I --

Q.    -- move-ins, look at page 6, move-ins for February, two; and for March, also two.  And the goals were three.  So, again, I don't need to belabor.  Do you have any reason to doubt the accuracy of this report?

A.    I've never seen it but I suspect that it's accurate.

Q.    Okay.

A.    But I will say that your comments are out of context.  Because even Mr. Bartle said that he secretly shopped University Village, and I think he said it was spectacular.  Maybe is that -- and maybe that's not the right word that he used.

Q.    It doesn't seem --

A.    But the reality is that it is a very difficult market today for the facility and --

Q.    Well, they don't have renovated units though, I mean, that was the first thing I noticed that --

And, listen, I'm going to move on, Mr. Warren. I understand, but I mean --

A.    I don't know what that -- I'm not sure what that means.  I know that I've been to the facility and

I've seen the renovated units. But I can't -- I can tell you that they worked on or planned working with the current residents to redo sections, you know, in the facility. And, you know, I think they have a very solid plan. I don't know what that has to do with this scenario, but I'm happy to answer your question.

Q. I guess what I'm trying to say is, all right, at the end of the day -- well, we need to go back through the amended complaint. But the crux of your allegations was that spinning off Westport Nursing Tampa injured the CCRC?

A. It destroyed it.

Q. Right. And that's essentially what you've done --

A. No.

Q. -- by just selling -- by selling the ILF separately from the health center --

A. No.

Q. -- rather than as an entire CCRC, you've essentially come to the same point?

A. That's -- no. That's -- that's sort of silly. But, you know, if you walk across the street and you look at the health center and the condition that the health center is in, you know, you're comparing apples and oranges.

The prospects associated with the independent living facility are extremely bright. That's why money is continuing to be invested in that property, which is a fact and which is reality. And it's not because somebody wants to just throw good money after bad. It's because there are extremely strong values associated with the location of the facility.

Q. Well, let's be specific. You've got, what, $80 million worth of bond debt that's on the facility now; right?

A. Yes.

Q. And I believe another $9 million was just advanced?

A. No. I think that brought it to 80. But you're talking to the wrong person.

Q. No, that's fine.

A. I'm not involved in any of those activities.

Q. But the residents' claims under the second, the confirmed second amended and restated joint plan, I believe they're treated at -- as Class 13, that they are -- they were given subordinated notes; correct --

A. Correct.

Q. -- for the full amount of their refund claims?

A. Correct.

Q. But they're subordinated to the bond debt,

$80 million?

A.   Correct.

Q.   And they're subordinated to other secured claims, including the CPIF's remaining secured claim; right?

A.   No.  But they are subordinated and there are administrative claims that are prior to the unsecured claims of the residents.

Q.   And those would be for attorney's fees?

A.   Yes.  Because there was not enough funds to close and pay the attorney's fees at the closing.

Q.   Right.  So the attorneys received, I think received 25 percent of their allowed claims?

A.   You want to just rub it in and make it more painful than it already is, but it was 20 percent.

Q.   20 percent, I'm sorry.  And so the residents' claims are below $80 million of bond debt.  How much in professional fees are we talking about, the 80 percent remaining?

A.   4 million, maybe.

Q.   $4 million?

A.   Yes.

Q.   And so any recovery that you would obtain in the lawsuit here against Valley, how would those monies be distributed, under the plan?

A.    Well, the monies that would come into the liquidating estates, you know, would be used to retire obligations of the liquidating estates.

Q.    Well, specifically --

A.    There's the litigation funding agreement that I entered into in order to consummate the closing in 2020.  And there's currently a restructuring of that agreement in order to allow the residents to receive the benefit of the aiding and abetting claim against the bank.

Q.    All right.  So we'll make that an exhibit.

(Defendant's Exhibit Number 11 was marked for identification.)

Q.    We've marked as Exhibit 11 to your deposition, Mr. Warren, Liquidating Trustee's Notice of Filing Executed Litigation Funding Agreement with A/Z Property Partners, LLC.

A/Z Property Partners, LLC, is essentially Richard Ackerman, is it not?  He's the managing member, right?

A.    I think he's the managing member.

Q.    Okay.  And how much money has A/Z advanced, A/Z Property Partners, LLC advanced under this agreement in connection with this adversary proceeding?

A.    At the closing, they advanced $250,000, and

subsequent to the closing they've advanced sums of money to Robert Mercer Law.

Q.   How much?

A.   I don't know.  I mean, I truly don't know. But it was a substantial amount of money.

Q.   More than 500,000?

A.   Not to Mercer, no.  But they also have obligations to me and to Bruce Ross in connection with the appeals that Valley took from this agreement to the Fifth Circuit -- to the 11th Circuit.

Q.   So including the $250,000 that they paid initially, how much is owned under the litigation funding agreement, as best as you can estimate sitting here today?

A.   I think that their total aggregate obligation is somewhere in the range of a 1.2 million, 1.3 million, plus the 250.

Q.   Plus the 250?

A.   Yes, and growing rapidly.

Q.   So approximately $1.5 million or more is owed under this agreement now?

A.   Yes, paid and/or owed.

Q.   And you're saying there's currently a restructuring agreement being negotiated?

A.   Yes.

Q.   When do those discussions start?

A.   Around December of 2022.

Q.   And so that would be, what, almost five or six months?

A.   Yes.

Q.   So you had discussions for five or six months, what is the -- and you mentioned it briefly, to allow the residents to get the money from the breach of fiduciary duty claims?

A.   Yes.  My advocacy is to see that the residents get the benefit of the recovery from the bank.

Q.   So that would be essentially a modification of the second amended plan?

A.   No.  It would be a modification of the litigation funding agreement.

Q.   So the residents are going to get a distribution outside the plan.  Now they're currently subordinated by operation of the plan to over $80 million of bond debt and others and $4 million of professional fees.  So the plan is to rework litigation funding agreement to then try to -- looking for the word, I guess divert some recovery under breach of fiduciary duty claim to the residents directly not withstanding the provisions of the plan?

A.   It's in accordance of the provision of the

plan but it's under the litigation funding agreement. And instead of the funders receiving 85 percent and the estate receiving 15 percent, my proposal with the funders -- which they have acknowledged is acceptable to them but we haven't documented or memorialized it -- is that the recovery with respect to the aiding and abetting claim which is monetized, and damaged monetized by the obligations to the residents, should go to the residents, meaning the funders are not seeking to profit at the expense of the residents.

Q.    Why is it taking so long to not be documented? You've been talking about it for five or six months, why haven't they signed something to that effect?

A.    I've been busy.

Q.    And was that designed to essentially circumvent the jurisdictional argument that's been made by Valley that these are residents' monies, they belong to the residents?

A.    No, has never nothing to do with that.  That argument by Valley is frivolous.

Q.    And I'll show you the amended complaint in a minute, but there's been recently a motion by Mr. Jennis --

MR. WHITSON:  The next exhibit.

THE REPORTER:  Exhibit 12.

(Defendant's Exhibit Number 12 was marked for identification.)

Q.    -- on behalf of David Jennis, P.A., seeking to impose a charging lien against recovery in this adversary proceeding; is that correct?

A.    I don't think so.  You know, I think that the claim that is being asserted by Mr. Jennis is against the Tampa Life Plan Village real estate, trying to evade the Court's sale free and clear of liens order as part of the complaint that Mr. Jennis has regarding a closing in 2020.

Q.    Mr. Jennis --

A.    Mr. Jennis does have, I've acknowledged that as the counsel for me before he was replaced by Mr. Mercer, a charging lien in the approximate amount of about $30,000, which has been -- the amount of obligations to Jennis Law have been memorialized by an order recently by Judge Delano, but that's the -- there's never been any dispute that Mr. Jennis has that claim.

Q.    Okay.  Let's talk about copies of this -- I'm sorry.  I'm looking for the amended complaint.

MR. WHITSON:  While I'm looking for that, do you need to take a restroom break?  I think probably a five-minute break would be a good idea

right now.  I'm going to have a series of questions about this.

(Recess from 3:59 p.m. - 4:09 p.m.)

(Defendant's Exhibit Number 13 was marked for identification.)

BY MR. WHITSON:

Q.    Mr. Warren, I'm showing you what we've marked Exhibit 13 so the deposition.  It's the amended complaint.  You may have an order granting stipulation in front of that, but --

A.    This one has a B there.

Q.    There was a copy that had a stipulation attached to the front.  Part of that was dismissing the appeal that was filed.

A.    Yeah.  Okay.

Q.    All right.  This is a -- yourself as liquidating trustee as plaintiff against Valley National Bank, subsidiary to Valley National Bancorp as successor to USAmeriBank.

Now, I think we covered some of the basic allegations that you made earlier regarding the claims contained in this complaint.  Let's just kind of go through specifically.

Paragraph 10, above paragraph 10, you refer to the Horizon debt, $20 million, secured by Westport,

Westport II and WNT's property.  You see that under subsection I, top of page 5?

A.  Paragraph 9?

Q.  I mean, I'm looking at --

A.  I'm with you.

Q.  Okay.  And you mention Mr. Landry on page 4, paragraph C:  President/manager of Westport and Westport II control of both WHUV and WHHS.

Then you refer to paragraph 10, Mr. Bartle, and the other entities.  And then I believe Mr. Johanson on behalf of Mr. Jennis' law firm drafted this complaint; is that correct?

A.  I don't know whether he was the drafter or Mr. Jennis was the drafter, but that law firm was responsible for drafting the original complaint and this amended complaint.

Q.  All right.  And as we've gone over in other depositions, we don't need to belabor it, but the allegations, at least as far as the background and the substance of the claims, is very similar to the complaint that was filed against BVM and Mr. Bartle that we went over earlier in your deposition; would you agree?

A.  Well, they certainly are allegations, you know, arising from the same circumstances and

transaction.  So I can't tell you whether they are described the same or differently, but I would suspect that they would be somewhat close to each other.

Q.    So paragraph 15, page 8, we start talking about the loan with Horizon, proposed sale to Bartle and deed in lieu of foreclosure agreement?

A.    I'm sorry, what paragraph?

Q.    15?

A.    Oh, okay.

Q.    And we kind of covered this earlier in your testimony about the maturity date of a Horizon debt that it purchased from Capmark was January 13, 2013 that is marketed University Village for sale to a new ownership group.  And then ultimately in paragraph 19 you say you identified Bartle as a possible buyer.  Correct?

A.    Correct.

Q.    And it says:  While the debtor negotiated with Bartle regarding possible sale, University Village loans with Horizon matured.  At that time, paragraph 21, the debtors lack funds to retire the Horizon debt, so Horizon enters into a carefully negotiated deed-in-lieu agreement.

So is it your claim that the debtors could not have refinanced the Horizon debt or paid off the Horizon debt at that time?

A.    We didn't make that allegation.  But the maturity of the loan and the inability of the borrower to refinance itself or it's unwillingness to refinance is certainly an objective fact that existed at that time.

Q.    Which was it?  If it's an objective fact, was it inability or unwillingness?

A.    Well, in the absence of some outside infusion, there was no liquidity of the debtors to write a check for $20 million.

Q.    Okay.  But it was -- I mean, it says paragraph 22:  Under the deed-in-lieu agreement debtors were given additional time to effectuate a sale of University Village to Bartle and his companies.  In the event that Bartle wasn't able to close the transaction or purchase University Village in a timely manner, parties agree that Horizon would receive the title to University Village's deed in lieu of foreclosure.  In exchange Horizon would -- and then you continue the next page.

But certainly it's your -- the allegations in the complaint and you filed numerous motions for extensions of time to amend this complaint, did you not?

A.    Yes.

Q.    And you never did amend it; is that right?

A.   This is an amended complaint.  And when we entered into the litigation funding agreement there were appeals associated with that which caused Mercer Law to not want to get gainfully involved until the appeals were at least resolved at the initial level.  And so consequently there were a series of extensions at the time within which there would have been a right to amend the pleadings; and at the end of the day, it was determined not to amend the pleadings further.

Q.   But there were numerous motions filed by Mr. Alpert from your firm?

A.   Yes, during that hiatus when Valley was appealing the --

Q.   Yes is fine, Mr. Warren.

All right.  Now, at the time that the deed-in-lieu agreement was negotiated, it's your allegation that there was still -- it was done in order to enable Mr. Landry to have additional time to sell University Village to Mr. Bartle?  I mean, that's what paragraph 22 says, right?

A.   Well, yes.  As I previously testified today the actual loan extension agreement had a provision in it that subject to two conditions allowed Mr. Landry to continue negotiations with Mr. Bartle -- and I'm using those terms generically, meaning Landry for his entities

and Bartle through his entities -- as long as they completed their discussions, I think by October 1st, 2013, and Bartle closed on the transaction by December 15, 2013.

Q.    So the agreement by which you allege that Horizon was going to honor, in paragraph 23, the residents' life care contracts and refund requests, that's embodied in the loan extension agreement?

A.    Yes.

Q.    Okay.  And any other documents or any other evidence of that agreement to honor those obligations?

A.    Agreement, you mean from Horizon?

Q.    Correct?

A.    I'm not aware of anything but that doesn't mean there isn't anything.  I just --

Q.    Well, you weren't aware of to support the claims you made in this amended complaint, is that fair to say that?

A.    No.

Q.    You're not aware of it now.  Were you aware at the time you got the complaint?

A.    We pled in the complaint what we knew from the terms and conditions of the loan extension agreement dated September 27, 2013.  That does not mean that there doesn't exist other documents, it just means that I'm

Page 155

not aware of those other documents.

And we didn't allege except what we could determine based upon what we could determine from the documents that we had.  And we had that document because it was attached to the Horizon complaint against the Bartle entities in Federal Court.

Q.  So ultimately though, and I understand it didn't close on the exact date set forth in the deed-in-lieu agreement or loan extension agreement, but Bartle did close on the transaction to purchase University Village.

A.  He closed on the transaction to acquire the limited partnership interest in Westport Holdings and Westport Holdings II on March 31st, 2014.  And in that same transaction, the Horizon debt was satisfied to the satisfaction of Horizon.

Q.  Now, did Horizon possess liens on any deposit or escrow accounts held by Westport Holdings or Westport Holdings II?

A.  The MLR account at Regions were unencumbered as required by the OIR.  I believe that there may have been typical security interest granted in accounts receivable and accounts -- I'm not aware of any account control agreements or anything of that nature that Horizon had.  Horizon was not a banking institution so

Page 156

its rights wouldn't have been like those of a bank holding money.

Q.   Well, this was also they purchased Capmark debt, so Horizon did not originate this loan; correct?

A.   Correct.  But I don't think Capmark was a repository institution for the borrower debtor entities, but that's surmise on my part.

Q.   Do you recall there being any carve-out of the Regions escrow agreement from any collateral description contained in the Capmark/Horizon loan documents?

A.   I can't tell you that I've ever read or studied the Capmark/Horizon underlying documentation. I've just accepted what was admitted in the loan extension agreement and then whatever rights existed were satisfied, at least to the satisfaction of USAmeriBank and CPIF.

Q.   You say in paragraph 26 that Life Care -- I'm sorry, paragraph 25, that Horizon hired Life Care Services to manage University Village on its own behalf?

A.   Yes.

Q.   Okay.  You say:  Despite Horizon's good faith efforts to protect the residents of University Village, the debtors and Bartle refused to cede control of University Village to Horizon as required in the deed-in-lieu agreement.

Were the residents or their committee a party to the loan extension agreement?

A.    No.  No.  I don't even think at this time there was a residents committee.  In a CCRC there is a residents council that must exist as sort of a collective representative for the residents at the facility, and I'm sure that existed.  But there would have been no formal status that they would have had like they subsequently did.

Q.    In paragraph 32 of the amended complaint you have a chart where you describe what you term as the leveraged buyout.  And at the bottom of the next page, 11, you say:  Notably while the loan documents underlying the USAB loan purportedly state that WNT pledged the OIR funds as cash collateral for the UASB loan, in actuality Bartle caused the debtors to make the USAB MLR transfer to the defendant to fund the cash collateral account acquired to be established by WNT.

Do you see that there?

A.    Yeah.

Q.    And then you say in paragraph 33:  Bartle, CPIF and USAmeriBank failed to seek and obtain the required regulatory preapproval for changes in ownership contemplated under the leveraged buyout, which placed University Village and its residents at extraordinary

intolerable risk of the debtors being investigated, audited, placed under supervision, also being subject to delinquency proceedings and possible receivership and potential shut-down by state authorities, including the Florida Office of Insurance Regulation.

You see that allegation there?

A.    Yes.

Q.    All right.  So what obligation did USAmeriBank have to seek preapproval for changes in ownership?

A.    As the lender effectuating the changes, control of the change in ownership, I think it was USAmeriBank's duty and obligation to make certain that its borrower was not engaged in any deception with the regulatory entities that would harm the residents and the other creditors of the debtor.

And certainly under the MLR statutes, to the extent that USAB intended to become an escrow holder with respect to MLR funds, there was a process of approval of that transaction and the agreement setting up that escrow that required preapproval by OIR, which was not done.

Q.    But you don't say that.  You just say changes in ownership, right, in paragraph 33?

A.    I think they're all connected.

Q.    Okay.  Then you see in paragraph 34:  The OIR,

Florida Department of Financial Services, did undertake a review of the March 31, 2014 leveraged buyout and commenced bankruptcy proceedings against the debtors. Right?

But it is true that the OIR did not see any issue with the sale of a limited partnership interest; right?  We covered that with Mr. Struk's deposition. You were there.  He did not see that simply the sale of limited partnership interest triggered the need to file an acquisition or the need to file an application; do you recall that?

A.    My remembrance of Mr. Struk's testimony is a little different than yours.

But I believe what Mr. Struk testified to was that to the extent that limited partnership interests would transfer to limited partners who had no control, who had no say-so, who had nothing to do with the operation of the limited partnership, that there was a determination within OIR that that in and of itself would not trigger the acquisition regimen that OIR would have.  But if there was a change in control then that would trigger the acquisition regimen.

Q.    Is that what Mr. Struk said?

A.    That's my understanding of what OIR's position was.  And Mr. Struk acknowledged the footnote that was

in the OIR pleading where OIR asserted that it had been deceived as to what role was being taken at University Village by the Bartle group after March 31st, 2014, and for that matter even prior to March 31, 2014. And, of course, Mr. Struk's deposition says what it says.

Q. Paragraph 36, you say: All the while the MLR, the minimum liquid reserve, which was a residents' final lifeline in the event the debtors became unable to honor the residents' life care contracts, was transferred and pledged to USAmeriBank as additional collateral for a loan that was made to WNT which subsidiary term simultaneously spun out of the debtors to Bartle and his network of affiliates.

Do you see it that there?

A. Yes.

Q. All right. You say: The encumbrance and use of debtors' -- I'm sorry, the residents' MLR to spin off -- to fund this spin-off of WNT to Bartle and his affiliates further deepened the debtors' insolvency during a time of heightened regulatory scrutiny and operational underperformance.

Are you saying that the debtors were already under regulatory scrutiny on March 31, 2014 and were at operational underperformance?

A. Yes and yes.

Q.   On March 31, 2014?

A.   Yes.  They were in monetary default of their primary lending obligation to Horizon, and OIR had been contacted regarding the transition of the facility as a result of that circumstances to Horizon and, you know, I think there was a heightened concern.

Q.   There was a maturity default though, right. We covered that earlier in your testimony.

A.   It was not an accelerated default, it was a maturity default, meaning that the entire obligations were due and payable in full.

Q.   All right.  Under Count I, Aiding and Abetting Breach of Fiduciary Duty.  At all times they occupied their respective position, the debtors, general and limited partners owed the debtors and the residents of University Village multiple fiduciary duties.

So you're saying that the general and limited partners owed a duty to the residents directly?

A.   I think the fiduciary duty of the general partners, whether it was a mischaracterization, Landry or Bartle was to the entity.  And the entity's primary obligation and responsibility at that time were to the residents who were the creditors under the refund entitlement and the PIP agreements.  There were other creditors but the fiduciary duty, I believe, is owed to

Page 162

the entity, not to the individual creditors.

Q.    And then under A, you say that -- 44, I'm sorry.  Debtors and general partners breached their fiduciary duty by, among other things, without limitation, entering into a leveraged buyout transaction with CPIF and USAmeriBank under terms and conditions they knew were less favorable to the debtors and the residents of University Village that were otherwise available under the deed-in-lieu agreement with Horizon.

What evidence do you have to support that claim?

A.    Everything we've talked about.

Q.    You're talking about the loan extension agreement?

A.    Yes, the loan extension agreement.  The fact that Horizon was a responsible entity working with Life Care Services, a highly regarded entity in connection with providing the care and protection of the residents under their life care contracts in a circumstance where the facility required significant capital improvements. And the facility needed to have stability with the regulatory environment, the OIR, having gone through a period of being for sale for what appears to have been four or five years and, you know, being in material default for a substantial period of time.

Q.    And then you say in B, authorizing and allowing the substitution of the debtors' limited and general partners.  When were the general parters substituted?

A.    I think the de facto substitution occurred when Bartle stepped on the property and took over.

Q.    When was that?

A.    That was in 2013 when Bartle first got involved.  But it didn't become official until Landry resigned as the -- his entity resigned as the general partner in December of 2014, and immediately the same time dissolved the limited -- the entity that served as the general partner.

So Landry knew that the wheels had come off, things were going to fall apart, and he was getting out of the scenario as fast as he possibly could.  I mean he resigned as the general partner and dissolved the entity the same day.  But he had already abdicated the activities at the facility, as has widely been testified to by everybody.

Q.    Well, who's specifically testified that Larry Landry abdicated his role as general partner?

A.    I just did.  But I think that it's consistent with all the documentation, you know, and certainly Ms. Burkholder, and, you know, how everything was done.

Page 164

I mean, everything at University Village changed the moment Bartle stepped on the campus, and they documented those changes with new management agreements and new everything on March 31, 2014.

And the bank was involved in that because the bank recognized that at the very end before the closing on the loan that there weren't new management agreements, so they scrambled to put together new documentation. And the documentation for the health center, according to the bank, was intended and designed to make certain that there wasn't an attractive entity for claimants to make tort claims.

Q. I'm just making some notes, I'm sorry, Mr. Warren.

A. That's all right. I'm in no hurry. Dot's the only one I care about. If she poops out on us we're in trouble.

Q. I'm giving her a break. I'm trying to speak slower.

Now the third paragraph below 44 says: Entering into a leveraged buyout transaction with USAmeriBank that resulted in the spin-off of the debtors' wholly-owned subsidiary, WNT, and the forced transfer of the $3 million of Westport's MLR to USAmeriBank as purported security for USAB loan.

How did Mr. Landry participate in that?

A.    Well, it would never occur if Landry didn't participate in it.  Earlier you showed me something that indicated that there was documentation as of March 28th which would indicate that Landry did it entirely.  But I really question whether or not that's accurate because I don't think Landry would have turned over everything to Bartle before they had the closing, and Landry at least got the million dollars that he got at the closing.

Q.    That documentation was actually a pleading prepared by your attorney, wasn't it?

A.    Yes.  But what was referenced was the date of the document.

Q.    Right.

A.    The document itself wasn't the transfer document, it was the operating agreement.  And, you know, just like the bank signed the loan documents on the 27th and 28th of March, the loan didn't become effective until the 31st.  But there are lots of things that get dated or documented before the event actually occurred.

I think I was clear.  If I wasn't, I should be clear.  I don't know when the actual transfer occurred. I believe it didn't occur the 31st.  But, you know, by

the 31st these activities occur, and the $16,390,000 value of Westport Nursing Tampa was no longer an asset of Westport Holdings Tampa to deal with the obligations Westport Holdings Tampa had to the residents under the life care contract and the PIP agreements.

And the $3 million in the MLR was gone, so it's no longer an asset of Westport Holdings Tampa. I submit that that is an incredible breach of fiduciary duty by the parties.

Q.    The $3 million MLR that you're seeking to recover is part of the breach of fiduciary duty claim and also part of the fraudulent transfer claims?

A.    No.  The transfer of the $3 million is a factor of the breach of fiduciary duty.  But the damage claim that I assert is the simple damage claim that it's the residents' obligations that remain unsatisfied.

Q.    Okay.  So we keep getting back to the other point you keep making about the Williams Mullen letter, even though it's a letter dated March 31.  I mean, isn't it possible that was a letter that was going to executed at closing but it was sent to the OIR before closing? That's why it attaches an unexecuted assignment of deposit account agreement?

A.    No.  Because the drafting history of the document is pretty plain that it was going through

drafting changes on 27th and 28th.

Q.   It could have happened on the 28th, right? You just said the date that certain documents were signed wasn't necessarily March 31?

A.   It was dated the 31st.  So if it was sent in advance of the 31st, that's more of a deception out there than what really happened.  Because no one wanted the OIR to know what was happening in those transactions, and that's why an opinion couldn't be provided to the bank, at least by the borrower, according to Bartle's lawyer.

Q.   What other breaches of fiduciary duty do you contend were committed by Mr. Landry?

A.   Landry and his entities, while the general partner, after the closing, failed to protect the entity as the treasury was being raided by Bartle.

Q.   Which entity are you referring to?

A.   Westport Holdings.

Q.   Okay.

A.   For example, Westport Holdings Tampa was directed by the Bartle group to transfer $100,000 each month to USAmeriBank into an account so that USAmeriBank could use that hundred thousand dollars to pay the debt service obligation of Westport Nursing Tampa.  And that happened month after month after month after month.

And Landry was the control person of the general partner who failed to protect the entity from those diversions of assets.

And I submit that there are lots of other transfers and transactions that were ongoing that Landry turned a blind eye to that harmed Westport Holdings Tampa and his entities were in breach of their duties.

Landry, like Bartle, used a variety of entities. I think there were maybe three layers, if not more, before you got to Landry personally in the organizational tree of entities. So again when I refer to Landry, I'm referring to the entities that were in place that had positions of responsibility.

Q. Which entity was the general parter? Was that AgeWell?

A. No. AgeWell was a management entity that was receiving fees as a management entity, and continued to receive fees until its contract expired in January of 2015. Which I sense and suspect, although I don't know, was one of the reasons why Landry resigned when he did in December of 2014.

But Westport Advisers was the owner of Westport Holdings University Village which was the general partner of Westport Holdings Tampa. And then how you get above Westport Advisers is I think spelled

out in the dissolution papers where they dissolved the general partner, but I'm not 100 percent sure how that was set up.

Q.   All right.  Any other breaches of fiduciary duty by Mr. Landry or any of Mr. Landry's entities?  If you refer to an entity, please be specific which entity you're referring to.

A.   I believe in their communications to OIR, continuing the great deception, particularly to go to the May 12 communication signed by Mr. Landry, and the failure to inform OIR that the bank was providing two statements of account for the escrow account, you know, each month sending something to the OIR to make them think that there was a proper escrow when indeed there wasn't.

And to the extent that Landry was there, these are all additional actions that harm Westport Holdings Tampa.

Q.   Anything else in terms of what you contend a fiduciary duty by Mr. Landry or any of Mr. Landry's entities and to whom that duty was owed?

A.   I'm sure if I wasn't as tired as I am I'd remember some more.  Right now I'm not thinking of anything specific.  But if something -- the way my memory works these days seems to pop in at later times.

If something pops in and comes to mind, I'll certainly report it to you.

Q.   Prior to trial?

A.   Prior to trial or at trial.

Q.   Hopefully prior to trial.  All right.  So then let me look.

A.   I tell everybody I have a random system, my brain is full.  It's not a system that gets pushed out when something new comes in; it's very random.

Q.   You don't dispute that the debtors, I mean Westport Holdings Tampa, continue to report to the OIR and disclose the fact that $3 million of the MLR or so was being held at USAmeriBank?

A.   I don't dispute what the MLR reports state, but they are misleading and deceptive.  Because they suggest that the funds are held pursuant to Section 651, Florida Statutes, or Chapter 651 of the Florida Statutes, when the bank and the agreements that the bank had were not in compliance with Chapter 651.  And so it took the OIR a while before it figured out that reporting that $3 million as part of the required MLR for Westport Holdings Tampa was simply false.

Q.   When did the OIR make that determination?  You said it took them a while.

A.   It took them a while.  They started peeling

things back, you know, April 18th, but they got information that continued to mislead them. And then finally by -- I thought it was the middle of January when the initial order of suspension was issued by OIR. They still hadn't figured out the MLR issues completely but they knew enough to initiate administrative proceedings to stop University Village.

Q. Would you agree with me though that the assignment of deposit account agreement was attached to the March 31, 2014 letter from Williams Mullen that the OIR admitted that they received on March 31, 2014?

A. I do not admit they acknowledged they received it on March 31, 2014. To my belief, Ms. Morgan and the OIR only acknowledged that they received it at some point in time.

But it says what it says, meaning that, you know, in the documentation the agreement was attached. It was constructed to look like an escrow agreement but it wasn't an escrow agreement. It was constructed and represented to comply with Chapter 651, but it did not contain what Chapter 651 required.

Q. That's obvious on the face of that document though, it's not an escrow.

A. It is. There's no -- I'm not here to defend OIR, but I understand how they could be bamboozled by

what was being presented to them.  Because that's how, you know, people conduct themselves when they absolutely say with certainty that X is X when in fact they know it's really Y; but they can say it convincingly that it's X and, sadly, you know, people don't catch something; but the fact they didn't catch it doesn't mean that it didn't happen, because it did.

Q.   But it's fair to say that it was disclosed to them?  They got that assignment deposit account agreement either at or near March 31, 2014.  It was attached to a letter, they acknowledged receiving it. That document does not purport to be an escrow agreement, it doesn't say anywhere it's an escrow agreement, it's a deposit account agreement, that $3 million is being held as collateral; does it not?

A.   You and I may disagree about whether or not it has the word escrow in it because I think it does.

Q.   All right.  Let's look at it.

A.   At the end of the March 31, 2014 document to establish an escrow account, the MLR escrow in a Florida bank, Florida savings and loan association or Florida trust company acceptable to the Office of Insurance Regulation.

Q.   You're referring to the letter but not the actual assignment of deposit account agreement.

A.    Correct.

Q.    So you'll agree with me that the deposit account agreement --

A.    I don't see the word escrow there.  What I remember, and the reason that I'm a little confused, not that I'm not confused about a lot of things -- was I remember there was a big exchange between Mr. Rabke and Mr. Price about the terminology in the documentation to be used in connection with the agreement.  And Rabke said you had to use the word escrow.

Now what I'm thinking is at the end of the day when Rabke said we could use the original document, he was referring to the document to the bank that doesn't say escrow in it, because the escrow was being changed by Rabke.

But, again, that's all part of the great deception here.  You read the cover letter and then you read an attachment, and, you know, I don't blame the OIR people for not catching these issues because there's so many other missing components in this assignment and pledge of deposit account that makes it not satisfy the MLR requirements.

And that's, you know, that's certainly an error by OIR in not finding it earlier, you know, but it doesn't change the fact that it doesn't comply with the

law.  And the misrepresentation in the cover letter or the transmittal letter is in plain sight.  And the bank was involved in the drafting of the cover letter.

So, I don't know what was going on between Mr. Price and Mr. Rabke with respect to how they were documenting the pledge.  But now it's making sense to me that if the bank's pledge agreement removed escrow from it, then that may have been what suggested to Mr. Price that the bank, you know, didn't need to worry that it wasn't really in compliance with MLR.

But then, you know, what Mr. Price may not have contemplated whether the bank on May 12 would make a specific representation to OIR that it was being -- holding the funds pursuant to the MLR statute.

Q.   All right.  Let's go to -- I'm trying to wrap up.  Going back to the amended complaint, Exhibit 13, the next count, Count V -- wait a minute, Count IV, I think it's the first one, I'm not sure.

Yeah, Count IV, actual fraud.  What do you contend, what evidence do you contend supports your claim that the USAB MLR transfer as you defined it here in Count IV was done with actual fraud --

A.   Well, the first --

Q.   -- actual intent?

A.   I think the first scenario is that Chapter 651

is very specific regarding MLRs and what's required and what has to be done.  And it's also very clear that in a circumstance where there is a provision that is violative of the requirements in Chapter 651 that that constitutes a crime.

And when there is a crime associated with the transfer, I believe the law is that constitutes actual fraud.  In the traditional sense of actual fraud, there are badges of fraud that exist throughout these transactions.  We've talked about them.

Q.    Specifically what?

A.    The specific ones are that you have an insider benefiting from the transaction.

Q.    Who is that?

A.    Landry and Landry's entities, you know, were induced to this transaction by Bartle with the promise that they would be paid 2 and a half million dollars of which I think they got a million dollars at the closing.

Number two, you have a situation where the transfer was made by Westport Holdings Tampa at a time when it was in economic distress.  It had a mature loan for $20 million it couldn't pay.  It had a viable option to protect its creditors but it's leadership determined to not protect its creditors to enrich themselves, whether it's the Landry side with the payment --

Landry's side or the Bartle side, but all the economics that they gained control over in connection with the transaction.

You have the transfer of the MLR from Westport Holdings Tampa to the bank. Westport Holdings Tampa had no duty or obligation to the bank, and had and received no benefit with respect to the transfer of that $3 million from its MLR account, which resulted in Westport Holdings Tampa having an underfunded MLR account. It was underfunded for other reasons, but the magnitude of that underfunding with the $3 million was completely significant, it had no capital with which to provide continued operations. And without a proper MLR account, there was no expectation that it could continue to operate. And, indeed, that's what happened when OIR issued its suspension with respect to its operations.

Q. So if the MLR account is there to fund the refund claims, the refund claims are over $30 million?

A. The MLR is not there to deal with refunds. The MLR consists of a fund of money that is intended to protect the ongoing viability of the provider.

Q. That's not what you allege. You alleged it's the residents' life line.

A. And by the statute, protecting the provider protects the residents. And protecting the provider,

the MLR contains three separate calculated amounts: One, for debt service reserve.  It's to be unencumbered, it's supposed to only be available to pay principal and interest on obligations of the provider.

The second is an operation reserve which is to provide support to, you know, temporary needs for operation purposes for the facility, calculated pursuant to the formula that OIR creates by statute and regulation.

And the third component of it is for repairs and maintenance.  You know, it's intended to provide for funding for things that, you know, can be done fairly quickly and in order to maintain the integrity of the operations.

So, you've got three components of that MLR.

Q.   One is for debt service though?

A.   Part of it is for debt service, but that's not the only.  So, that's the difference.  And that's one of the illegal improper activities by the bank is that they did not understand that the money being taken from the Regions account was an aggregate of three separate requirements for separate funds.

And you can't use funds in the account as though they were fungible.  You can only use them for the purposes for which the reserve was created.  And

therein lies, you know, part of the badges of fraud, but it's also one of the reasons why this is such an egregious conduct by the bank, because it obviously didn't study, didn't know what the MLR was before; and it should before it took that money, because it knew that the $3 million wasn't coming in as equity from Bartle group, which is what the bank was requiring under its commitment, but instead was coming from Westport Holdings Tampa from the account at Regions.

And the bank took it anyway, and so -- I think the OIR referred to it as embezzled or stolen money in one of their pleadings. I'm not quite that harsh. But I think that certainly from the standpoint of the badges of fraud, you have touched all the bases regarding actual fraud because of the harm that it did to the creditors of Westport Holdings Tampa; and the major creditors of Westport Holdings Tampa are the residents under their life care contract.

Q. You'll agree with me though that both Mr. Stiller and Mr. Struk at the OIR testified that it did not regard the transfer of the MLR as a crime under the statute?

A. No, I won't agree with that. I think what they were asked was did they prosecute a claim against anybody with respect to the violation of Chapter 651.

And I think they both said to their knowledge the OIR has not prosecuted a claim.

But I think Mr. Stiller made it clear that just because someone didn't get a referral to the State Attorney for prosecution doesn't mean a crime wasn't committed. It's sort of like if a tree fell in the woods and nobody was there, did it make a sound?

Q. We'll let the testimony speak for itself. I disagree with your --

A. That's fine. I mean, I was there. I listened to the testimony. That's what I took from their testimony. I don't think they embraced the idea that people can go around violating 651 and never have a problem.

Q. 651 requires a lot of different things. If any violation of a comma or this or there wouldn't be a third-degree felony under Florida law, you'll agree with me?

A. No, I won't. But I'll say that I also understand and very much agree with prosecutorial judgment, and I would not think any prosecutor worth his salt would prosecute somebody for that scenario. But to take $3 million, I think I'd give it a lot of thought.

Q. Okay. The OIR was aware of all those factors, were they not?

A.    Correct.

Q.    And made a referral to the transaction?

A.    To my knowledge, I think the testimony was clear that they did not.

Q.    So any other evidence you would offer at trial to support or you're going to offer at trial to support your claims in Count IV of the amended complaint?

A.    Well, I think, and there's an overlap between actual and constructive fraud.  But I believe that it's pretty plain that at the time of this transaction that Westport Holdings Tampa was insolvent.  Under the balance sheet test of insolvency, the only way that Westport Holdings Tampa was in the vicinity of solvency was if you attributed about 40-plus million dollars in good will.  And that $40 million in good will is typically the result of a difference between a purchase price for an asset and the cost of the asset, and it gets attributed as good will which is then amortized usually under less than ten years.

Here, the Westport Holdings Tampa transaction was back in 1999, you know, whatever good will didn't exist.  But I think it's unprecedented that an entity that enters into a deed in lieu of foreclosure transaction still has $40 million worth of good will as an asset.

But, moreover, once you consider the actual transaction, Westport Holdings not only had $3 million of its assets directly taken away with nothing in exchange, the entirety of Westport Nursing Tampa was taken away with nothing in exchange.

And if you take the appraisal that the bank had of $16,390,000, and add to that the $3 million, you have the loss of assets my Westport Holdings Tampa notwithstanding whatever you think about the good will. And in return Westport Holdings Tampa got released from the debt to Horizon which was $20 million.

Q.    Right.

A.    Yeah.

Q.    So, and there was 2 and a half million dollars less debt on Westport Holdings Tampa after the March 31, 2014 transaction?

A.    Which the entire enterprise ended up with 24 and-a-half million dollars as a result of the transaction.  So the overall debt on the entirety of the facility increased by 4 and a half million dollars.

Q.    Not the entirety of the facility, we're talking about Westport Holdings Tampa?

A.    If you're talking Westport Holdings Tampa, then it lost $19 million worth of assets, and it got released of a direct liability that it had for 12 -- a

little over $12 million.

Q.   But it was a guarantor for the other eight?

A.   Correct.  But, again, you combine all of it, no matter how you look at it, it's completely totally insolvent under a balance sheet test.  But it has no capital to operate, it can't fund its MLR.

And the entirety of the Bartle scheme was predicated on not paying the residents out of the operations, because they intended to take all of that money and put it in their back pocket, whereas they were going to sell new life care contracts, and they would take that money to pay the old life care contract obligations, which, frankly sounds a lot like a Ponzi scheme to me.

Q.   Does the whole concept of CCRC sound like a Ponzi scheme?

A.   To the extent that you don't operate properly, yes.

Q.   Well, no.  With the CCRC, you pay initial entry deposits that's going in and you get a refund obligation going out.  The only way to way get the refund obligation on the way out, you have to have new entries coming in, and that's --

A.   No.  You take the operating income, and instead of, you know, spending it or giving it to

somebody else or segregating it away from the enterprise, which is what the bank enabled Bartle to do, you use those funds.

Q.    Okay.  So anything else to support your claim for constructive fraud under Count V?

A.    Everything that Ms. King has taken down is part of it.

Q.    So you've already put out all the evidence on the facts that you claim support your claim for constructive fraud?

A.    I continue to review the information that the bank recently provided to us.  And as we find things, we continue to be amazed at what the bank did in this transaction.  So I'm not going to say there's nothing more.  As I'm sitting here at the end of the day, this is what I can recall and remember.  And I think we've made sufficient allegations with respect to the actual fraud.

Q.    Any other evidence other than what you've already testified to today to support your claims for relief under Count VI?

A.    The difference in Count VI is constructive fraud is predicated upon insolvency and lack of reasonably equivalent value.  So there's a lot of evidence that you'll identify the absence of reasonably

equivalent value.  There was no quid pro quo between Westport Holdings Tampa and Westport Nursing Tampa for the transfers that occurred.

There was no agreement.  The bank wasn't asking Westport Holdings Tampa with respect to what was happening.  The bank insisted upon the separation and the segregation of the entity; so, consequently, there is no predicate upon which there's an indirect benefit to Westport Holdings Tampa as a result of the transfer that being sought to be avoided.

It was taken from Westport Holdings Tampa, OIR insisted that it be replaced, it couldn't be replaced. OIR sought the appointment of a receiver.  The bankruptcy was filed to avoid the appointment of the receiver in the State Court proceedings the OIR brought.

So in terms of the lack of reasonably equivalent value, there's a complete record of the absence of benefit coming to Westport Holdings Tampa. To the contrary, all the harm was visited upon it because it was the entity that had all the liability to the residents, and it was the entity that OIR challenged in connection with the proceedings based upon the enablement of the Bartle group control and to operate the facility without licensure, without approval, and without the ability to get approval because the

composition of the group was incapable of satisfying the requirements of the OIR.

So I'm not aware of any defense that the bank has to construct a fraudulent conveyance other than the urge that somehow miraculously an entity that enters a deed in lieu of foreclosure is solvent.

Q.    But there is a contractual relationship between Westport Holdings, Westport Holdings Tampa and Westport Holdings to provide the medical care?

A.    I'm not --

Q.    And did provide to the residents as part of the CCRC.  In other words, the whole eligibility of Westport Holdings Tampa to function as a CCRC depends upon the existence of Westport Nursing Tampa?

A.    That's not remotely true.  Look at Tampa Life Plan Village, it's a licensed CCRC, it doesn't have Westport Nursing Tampa.  That's exactly why there's no consideration coming to Westport Holdings Tampa.

Q.    You're talking after the fact?

A.    I'm talking about --

Q.    After four years or more of a bankruptcy case where there's no possible solution, the OIR acquiesced to a transaction that it held its nose and approved?

A.    The bank insisted on separation; therefore, there was a separation.  The bank can't go back and say,

"Oh, no, there wasn't a separation."  The bank can't have it that way.

And there was no agreement, I don't know what the agreement is that you're talking about.  I mean, you've got an agreement you've got a written.

Q.   The residents of Westport Holdings Tampa, the ILF, had arrangements for care and assisted living facility --

A.   What's the agreement?

Q.   -- access across Westport Nursing Tampa?

A.   Once Westport Holdings Tampa was no longer the parent of Westport Holdings, Westport Nursing Tampa, what's the documented agreement that you're talking about?

Q.   Are you saying --

A.   Westport Holdings Tampa had the obligation to the residents; but, once the bank caused the severance, there's not an agreement between Westport Holdings Tampa.

Q.   So you're saying that the residents, after March 31, 2014, it's your position that the evidence will show that the residents of Westport Holdings Tampa, the ILF, did not receive any medical care, any medical benefits?

A.   No, that's not what I said.  There's no

agreement --

Q.    But it did happen?

A.    -- between Westport Nursing Tampa.  Yes, it occurred, because the only way that Westport Nursing Tampa could operate a nursing facility was if they had sheltered beds, because they asserted that they had a relationship with Westport Holdings Tampa CCRC, because they did not have community beds that were approved by AHCA.

You know, but it was -- but the value always went to Westport Nursing Tampa, not back to Westport Holdings.  And we haven't talked about it but when the Bartle transaction occurred there was like $7 million worth of receivables by Westport Holdings Tampa that got wiped out.

Q.    What was the value of those receivables?

A.    Well, they became zero because they got eliminated.

Q.    What was the value of them before they were written off?

A.    Seven-plus million dollars was what was owed to Westport Holdings Tampa.

Q.    But you're saying all these entities were insolvent anyway so what's $7 million receivable worth?

A.    Well, again, it was worth the continued

operations of Westport Nursing Tampa that was deprived from Westport Holdings Tampa, because Bartle took those funds and put those in his and his investors' pocket, because that's where all the money went.

Q. Okay. Let me make a quick phone call. We may be pretty close.

(Recess from 5:19 p.m. - 5:23 p.m.)

BY MR. WHITSON:

Q. Mr. Warren, earlier we were talking about Chapter 651 and the three components that are calculated to determine the minimum liquid reserve; do you recall that?

A. Yes.

Q. And we agreed that one of those components was for debt service?

A. I don't know that we agreed to that but that's one of the components.

Q. Okay. Have you done, or anyone you know working in connection with you, any calculation of what would be the debt service reserve component of the minimum liquid reserve?

A. I'm sorry, you mean in connection with --

Q. The $3 million, had anybody quantified the debt service reserve component of that?

A. I have not tried to go back and audit or go

through the actual reports prepared for and filed with the OIR to see what the breakdown is between the three components, if that's what you're asking me.

Q.   Yes.

A.   But I think that paperwork is all in the records and I think it's there.  I did look at the formulas and it gave me a headache.

Q.   One of my favorite moments is when I was asked by a judge to calculate something.  I said, "Judge, if I could do math I'd be a doctor."

You think that's funny, don't you?

MR. WHITSON:  Kim, anything else?

MS. ISRAEL:  Nothing that I can think of.

MR. WHITSON:  Okay.  All right. I will read.

(Deposition concluded at 5:26 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


I, the undersigned authority, hereby certify that the witness named herein appeared before me via videoconference and was duly sworn pursuant to the Florida Supreme Court Administrative Order No AOSC-20-16 and extended by AOSC-20-17.


WITNESS my hand and official seal this 25th day of April, 2023.


Dorothy A. King, RPR

Notary Public - State of Florida

My Commission Expires:  10/25/2023

Commission No.:  GG 920199

Page 191

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


        I, DOROTHY KING, Reporter, certify that I was authorized to and did stenographically report the deposition of JEFFREY W. WARREN; that a review of the transcript was requested and that the transcript is a true and complete record of my stenographic notes.

        I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative, employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of the foregoing action.


        Dated this 25th day of April, 2023, in THE CITY OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.


_____

Dorothy A. King, RPR

Page 192

Westport v. Warren

4-24-23/Jeffrey W. Warren

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.


_____        _____

          JEFFREY W. WARREN                    DATE

Keith Appleby, esquire

keith.appleby@banker.com

April 25, 2023

RE: Westport v. Warren

4-24-23/Jeffrey W. Warren/No. 5873814

The above-referenced transcript is available for review.

Jeffrey W. Warren should read the testimony to verify its accuracy. If there are any changes, Jeffrey W. Warren should note those with the reason on the attached Errata Sheet.

Jeffrey W. Warren should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Federal Civil Procedure Rule 30(e)

Florida Civil Procedure

Rule 1.318(e)

| 0 | | | |
|---|---|---|---|
| **00007** 1:11 | 120:9 | **1634** 135:1 | **2012** 12:18,23 |
| **08167** 1:3,7 | **1197** 127:6 | **1801** 1:20 | 12:24 38:10 |
| **08168** 1:5 | **11th** 145:10 | **18th** 88:14 | **2013** 12:18,23 |
| **1** | **12** 3:20 13:12 | 171:1 | 13:1 14:19,22 |
| **1** 1:25 3:3 53:17 | 19:5 54:18 | **19** 33:3,8 36:21 | 17:16 57:13 |
| 53:18 55:7 | 63:18,21 70:7 | 37:8,16 151:14 | 58:9,17,24 61:1 |
| 57:13 98:4 | 82:8,9 88:19 | 181:24 | 61:3 94:6 |
| 114:6,22,24,25 | 147:25 148:1 | **190** 2:15 | 111:20 151:12 |
| 124:19 | 169:10 174:12 | **191** 2:16 | 154:3,4,24 |
| **1.2** 145:16 | 181:25 182:1 | **192** 1:25 2:17 | 163:8 |
| **1.3** 145:16 | **120** 10:16 54:8 | **1999** 8:15 | **2014** 8:13 11:20 |
| **1.318** 193:25 | 56:24 | 180:21 | 12:1,4 16:12 |
| **1.5** 145:20 | **121** 3:12 | **1:36** 80:10 | 18:1 19:22 |
| **1.760.** 23:19 | **126** 3:14 | **1b** 84:19 85:7 | 22:21,25 23:15 |
| **1.9** 73:18 | **127** 3:15 | **1st** 14:19 154:2 | 25:1,10 28:3,24 |
| **10** 3:17 25:7 | **12:15** 53:12 | **2** | 29:6 30:9 33:5 |
| 135:2 149:24,24 | **12th** 82:10 | **2** 3:5 15:5 56:19 | 49:24 51:9,22 |
| 150:9 | **13** 3:21 142:20 | 72:2,4,12 74:13 | 52:18,20 57:17 |
| **10/25/2023** | 149:4,8 151:12 | 75:11 175:17 | 61:6,25 62:16 |
| 190:19 | 174:16 | 181:14 | 63:17,18 71:24 |
| **100** 2:7 112:4 | **135** 3:17 | **2.5** 58:11 112:10 | 77:17 81:20 |
| 169:2 | **13th** 116:2 | **20** 13:12 103:24 | 82:8 83:24 88:4 |
| **100,000** 167:21 | **14** 49:25 124:8 | 143:15,16 | 88:7,7 94:6 |
| **103** 3:8 | 135:10 | 149:25 152:10 | 95:23 98:21 |
| **107** 3:9 | **144** 3:18 | 175:22 181:11 | 104:18 106:18 |
| **109** 119:21 | **148** 3:20 | **20-16** 190:9 | 106:18 109:6 |
| **10:30** 1:19 | **149** 3:21 | **20-17** 190:10 | 113:2,13,13,25 |
| **11** 1:4 3:18 | **15** 16:4 25:7 | **2000** 8:15 | 114:10,16 115:6 |
| 22:13 52:8 | 37:2 147:3 | **2001** 38:10 | 115:8,19 118:25 |
| 106:20 111:12 | 151:4,8 154:4 | **2004** 72:14 77:6 | 120:23 155:14 |
| 113:2 144:12,14 | **15.4** 54:15 57:10 | **2009** 12:9,18 | 159:2 160:3,4 |
| 157:13 | **15th** 14:22,23 | 130:15 | 160:23 161:1 |
| **110** 3:10 10:16 | **16,390,000** 29:7 | **2010** 104:2,17 | 163:11 164:4 |
| 54:8 56:23 | 166:1 181:7 | 105:9 | 168:21 171:10 |
| | | | 171:11,13 |

[2014 - 5:26]    Page 195

172:10,19
181:16 186:21
**2015** 49:24
51:19,21 52:3
104:18 168:19
**2016** 5:10,13,19
42:7 49:25 52:5
129:7
**2018** 41:14 77:9
108:4 109:13,17
110:7 121:2
123:7 124:9,19
128:11 129:8
**2020** 33:13,17
135:10 144:7
148:11
**2022** 146:2
**2023** 1:18
190:13 191:11
193:2
**2024** 94:19
**21** 108:4 151:19
**22** 104:2 152:12
153:20
**22nd** 5:12,13
9:9,15 10:7
72:14
**23** 103:24 104:3
154:6
**230** 32:4
**24** 1:18 181:17
**24991** 190:16
191:18
**25** 27:16 143:13
156:18 193:2

**250** 145:17,18
**250,000** 144:25
145:11
**25th** 190:12
191:11
**26** 156:17
**27** 154:24
**27th** 116:3
165:19 167:1
**28** 27:16 115:6,8
115:19 117:9
**28th** 16:7 67:6
117:5 165:5,19
167:1,2
**29** 118:25
120:23
**2:03** 80:10
**2nd** 16:12

**3**

**3** 3:6 28:22
37:10,24 54:5
67:1 68:6 73:17
74:15 75:14
76:10 83:11,20
83:24 86:17
87:9 88:18
89:21 117:24
119:14 164:24
166:6,10,13
170:12,21
172:15 176:8,11
178:6 179:23
181:2,7 188:23
**3-31-14** 3:6

**30** 32:14 59:22
176:18 193:16
193:23
**30,000** 148:16
**31** 11:20 12:1,3
18:1 19:22
22:21,24 23:15
25:1,10 28:3,24
30:8 33:4 57:17
61:25 62:16
63:17 71:24
83:24 88:4,7
98:21 104:19
109:6 113:12,13
113:23,25 114:9
114:16 159:2
160:4,23 161:1
164:4 166:19
167:4 171:10,11
171:13 172:10
172:19 181:15
186:21
**31st** 8:12 67:6
88:6 94:19
116:9 117:5
155:14 160:3
165:20,25 166:1
167:5,6
**32** 157:10
**33** 157:21
158:23
**33602** 2:8
**33629-5420** 2:3
**34** 33:12,15
36:25 37:5,7,20

40:23 158:25
**36** 160:6
**3:59** 149:3

**4**

**4** 2:14 3:8 103:9
103:11,16
139:15 143:20
143:21 146:19
150:6 181:20
**4-24-23** 192:2
193:4
**40** 180:14,15,24
**44** 162:2 164:20
**446** 9:7
**46** 9:19
**48** 113:24
**49** 114:12
**4916** 2:3
**4:09** 149:3

**5**

**5** 3:9 107:6,7,11
110:6 150:2
**500,000** 112:25
145:6
**51** 111:15
**53** 3:3
**57** 114:17
**5873814** 193:4
**59** 115:3 117:11
**5:19** 188:7
**5:23** 188:7
**5:26** 1:19
189:15

**6**

**6** 3:10 54:25 55:11 59:22 109:24,25 140:5
**60** 41:3 116:23 117:15
**600** 2:7
**64** 116:19,24 117:23
**65** 8:9 129:22
**651** 63:8 170:16 170:17,19 171:20,21 174:25 175:4 178:25 179:13 179:15 188:10
**651.035** 84:16
**67** 118:6

**7**

**7** 3:12 18:25 30:22 121:19,20 122:24 187:13 187:24
**70** 8:9 129:22
**72** 3:5
**74** 118:16
**78** 42:14
**79** 118:24

**8**

**8** 3:14 13:10 126:17 151:4
**80** 142:9,14 143:1,17,18 146:19

**83** 3:6
**85** 147:2
**8:16** 1:3,5,7
**8:20** 1:11

**9**

**9** 3:15 27:20 113:24 127:12 142:12 150:3
**920199** 190:20
**99** 111:17 112:8 112:14 113:5,22 114:19

**a**

**a.m.** 1:19
**abdicated** 163:18,22
**abetted** 25:5 33:8
**abetting** 5:1 28:8 32:23 33:2 87:1 144:9 147:7 161:12
**ability** 37:22 66:18 100:2 102:7 184:25
**able** 90:2 101:2 102:19 106:22 121:12 152:15
**above** 149:24 168:25 193:5
**absence** 152:8 183:25 184:18
**absolutely** 20:6 96:5 128:12

172:2
**accelerated** 161:9
**accept** 101:17
**acceptable** 24:24 147:4 172:22
**accepted** 50:22 156:13
**access** 73:15 102:20 186:10
**accomplish** 5:21 5:22
**accomplishing** 98:23 99:17
**accordance** 50:22 146:25
**account** 30:12 44:22 62:19,20 63:23 67:1 69:18,19,20,21 71:19 73:2,20 79:12 84:7,8,12 86:6,11,12,18 88:22 89:23 91:23,23,24 92:1,1,7 117:25 118:2 119:15 155:20,23 157:18 166:23 167:22 169:12 169:12 171:9 172:9,14,20,25 173:3,21 176:8 176:10,14,17

177:21,23 178:9
**accountant** 6:14 49:13,14,15,19 49:20 50:8
**accountants** 49:25 50:4 51:7 52:14
**accounting** 50:23 52:16,24
**accounts** 40:3 77:8 118:7 155:18,22,23
**accuracy** 140:8 193:8
**accurate** 15:10 32:11 50:21 57:8 81:18,19 85:1 140:10 165:7
**accurately** 57:7 59:15
**achieve** 99:22
**achieved** 122:2
**ackerman** 41:10 41:12,19,20,25 42:3,21,24 43:5 46:5 47:8,12,17 138:16 139:1 144:19
**ackerman's** 45:20 47:11
**acknowledged** 36:10 147:4 148:13 159:25 171:12,14

172:11
acknowledgm...
19:3,4
acquiesced
100:11 185:22
acquire 16:14
42:10 54:15
57:9 95:5 128:4
132:25 155:12
acquired 39:1
71:20 115:3
157:18
acquirer 38:16
acquirers 48:21
acquiring 40:6
50:25 58:10
113:22 125:19
acquisition
54:18 124:16,24
125:21 129:21
159:10,20,22
act 21:22 25:5,7
92:5
acted 20:7 76:3
86:4
acting 66:20
76:14 78:21
92:5
action 23:10
37:17 63:4
86:23 88:16
97:11 110:15
121:7 135:16
191:9,10

actions 28:17
169:17
active 34:18
62:17 66:9
activities 6:12
7:1 11:11 21:24
22:10 24:13
30:4 33:24
51:23 62:15
77:8,18 87:2
94:12 98:23
106:19 131:17
131:25 142:17
163:19 166:1
177:19
activity 6:16
11:16 16:2
20:18 22:2,15
77:10 88:20
95:19 126:8
137:23
acts 7:3 24:16
actual 8:11 9:4
15:1 18:6 25:6
26:5 85:15 87:3
90:8 93:24
111:23 125:10
127:7 153:22
165:24 172:25
174:19,22,24
175:7,8 178:15
180:9 181:1
183:17 189:1
actuality 157:16

actually 18:20
25:15 30:6
39:21 61:7 63:2
75:18 81:21
85:12 116:13
123:21 133:6
165:11,21
ad 6:23 23:6
add 92:6 121:17
181:7
added 9:1 92:9
addition 33:19
130:5
additional 9:14
9:22 133:21
152:13 153:18
160:10 169:17
address 77:11
addressed 58:13
addresses 32:25
adhere 76:5
adjustments
35:11,15
administered
1:6
administrative
25:8 143:7
171:6 190:9
administratively
86:23
admit 171:12
admits 88:3
admitted 87:17
156:13 171:11

adv 1:11
advance 41:6
167:6
advanced 42:9
142:13 144:22
144:23,25 145:1
adversary 4:24
23:1 24:15
36:14 75:5,6
120:21 122:3
144:24 148:5
advised 88:18
advisers 8:21
168:22,25
advocacy
146:10
affidavit 88:2,3
affiliated 60:5
104:10 105:3
affiliates 160:13
160:19
affiliation
104:17,18,20,23
105:12,23
affinity 96:14
agent 69:17,17
71:18 76:15
78:21 92:6
agewell 93:24
106:8,14,15
107:2 114:14
120:18 168:15
168:16
aggregate 13:12
15:11 23:17

30:25 37:6 145:15 177:21

**aggressive** 63:4

**agitated** 24:8

**ago** 47:24

**agree** 32:18 54:24,25 56:11 56:14 57:3,18 67:14 76:13,15 84:10 85:4 87:25 89:9 90:11 91:11 94:3,4 101:20 105:3 106:4 118:11 150:23 152:17 171:8 173:2 178:19,23 179:17,20

**agreed** 54:14 93:22 99:10 100:9 112:7 128:7 188:14,16

**agreeing** 24:21

**agreement** 3:5 3:19 13:19 14:1 14:15,19,20 15:3 17:15,18 17:21,23 18:13 18:19,19,21 19:3 26:4,6,23 26:24 57:9 58:10,18,19 72:2,12,17 76:12 77:4,6 84:11 85:4,8

88:24 92:8,13 96:7,8 98:11 105:9 108:23 111:1,2 112:7 113:4,10 115:9 115:10,16 117:12 123:9 125:4 131:14 144:5,8,16,23 145:9,13,21,24 146:15,21 147:1 151:6,22 152:12 153:2,16,22 154:5,8,11,12 154:23 155:9,9 156:9,14,25 157:2 158:19 162:9,14,15 165:17 166:23 171:9,17,18,19 172:10,13,14,14 172:25 173:3,9 174:7 184:4 186:3,4,5,9,13 186:18 187:1

**agreements** 11:18 19:24 30:1 60:12 94:18,18 118:10 139:11 155:24 161:24 164:3,8 166:5 170:18

**ahca** 11:9,15 25:9 44:2 95:14 95:18 102:9

103:1 187:9

**ahead** 7:16 64:18 70:21 83:10 93:22 96:20 103:6 109:19

**aided** 25:5 33:8

**aiding** 4:25 28:8 32:23 33:2 87:1 105:22 144:9 147:6 161:12

**alarmed** 88:14

**alf** 32:4 54:8,13 54:23 56:24 102:11 125:17 137:7

**allegation** 59:12 60:1 113:18 117:10 152:1 153:17 158:6

**allegations** 60:16 78:7 109:5 118:13 119:12 120:9,19 141:10 149:21 150:19,24 152:21 183:17

**allege** 12:22 87:8 117:14,15 154:5 155:2 176:22

**alleged** 6:21 25:16 33:7 36:13 176:22

**allegedly** 33:8

**alleging** 25:13

**allow** 135:15 144:8 146:7

**allowed** 33:20 84:18 85:7 143:13 153:23

**allowing** 105:11 119:8,13 163:2

**allusion** 63:6

**alpert** 153:11

**alternative** 135:24

**alternatives** 6:7

**amazed** 183:13

**ambiguous** 77:19

**amend** 152:23 152:25 153:7,9

**amended** 3:10 3:21 25:12,23 31:6 61:7 108:13 109:10 109:16 113:4 115:8,9 117:11 135:22,22 141:9 142:19 146:13 147:21 148:22 149:8 150:16 153:1 154:17 157:10 174:16 180:7

**amendment** 113:3 135:23

amenities  139:9
american  98:16
americare  55:21
amortized
  180:18
amount  6:16 7:2
  27:18 35:2
  37:11 43:23
  73:20 89:22
  91:21 101:18
  142:23 145:5
  148:15,16
amounts  13:6
  30:18 33:12
  34:6,10 177:1
analysis  34:8,18
  59:19
angelis  20:2
  21:5 58:23
announced
  100:18
answer  28:11
  60:9 81:15
  141:6
antithesis  94:14
anybody  34:24
  40:10 65:15
  76:4 88:11
  101:15 106:6,22
  128:21 132:5,5
  178:25 188:23
anyway  4:21
  70:24 178:10
  187:24

aosc  190:9,10
ap  1:11
apart  163:15
apartment  10:7
apartments  9:6
  9:8,8 139:20
apparently
  96:16
appeal  108:20
  123:3 149:14
appealed  122:8
appealing
  153:13
appeals  145:9
  153:3,4
appear  58:12
appearance
  39:9
appearances  2:1
appeared  21:6
  190:7
appearing  2:6
appears  162:23
appleby  2:2,2
  53:9 57:19,24
  58:1,4 80:24,25
  83:13,15 193:1
apples  141:24
application  32:3
  59:17 61:8
  67:16 94:1 95:4
  159:10
applications
  42:22

apply  67:15
appointed  5:16
  5:18 22:13 40:9
  50:10 73:10
  109:21 131:13
appointment
  5:6,20 6:10
  99:25 184:13,14
appraisal  29:6
  181:6
appreciate
  83:16 96:17
appropriateness
  64:15
approval  27:12
  29:16 32:2 48:2
  48:18,19 50:9
  73:16 75:4
  102:11 119:10
  124:18 130:3
  158:19 184:24
  184:25
approvals  71:21
approve  74:3
  106:22
approved  25:10
  26:19,22,24
  34:19 61:9
  103:20 104:2
  114:13 136:5
  185:23 187:8
approves
  106:25
approving
  34:21

approximate
  148:15
approximately
  73:18 119:14
  145:20
april  1:18 88:14
  171:1 190:13
  191:11 193:2
area  20:19
  43:22 45:3,5,6
  49:20 133:17
  135:25 136:20
  138:8
areas  9:7,21
  134:6 139:17
argument
  147:16,20
arisen  77:11
arising  150:25
arm's  42:2
arose  16:9
arrangement
  58:18
arrangements
  186:7
articulates
  68:24 69:6
ashley  2:7
aside  23:15,18
asked  80:1
  100:10 116:16
  178:24 189:8
asking  11:24
  39:7 60:8 71:2
  73:5 80:25

184:5 189:3
asks 70:23
aspects 6:13
44:5 61:14
assert 166:15
asserted 148:7
160:1 187:6
asserting 17:13
36:14 37:12,17
40:24
asset 28:23,24
29:13,23 37:14
37:14 105:16
166:2,7 180:17
180:17,25
assets 12:20
13:14 31:3 33:4
36:21 37:8
78:11 98:20
108:24 119:22
120:4 121:13
135:6 168:3
181:3,8,24
assignee 13:22
assignment 3:12
84:6,12 91:25
115:14 121:23
166:22 171:9
172:9,25 173:20
assistance 99:23
assisted 3:3
10:13,16 11:8
20:20 35:20
53:21 56:23,24
104:12 135:24

136:14 186:7
assisting 62:17
associated 45:9
137:15 142:1,6
153:3 175:6
association
172:21
assume 137:5
assumed 27:7
assuming
134:20
assumption
46:25 47:1
assumptions
55:1,12
atlanta 125:24
attached 18:16
58:20 61:25
92:2 149:13
155:5 171:9,17
172:11 193:10
attaches 166:22
attachment
173:18
attachments
83:17
attempts 45:21
attention
126:11
attorney 2:4
4:11 17:5,6,7
41:5 47:13 65:4
65:18 66:1,4
75:10 165:12
179:5 191:8,9

193:12
attorney's 143:9
143:11
attorneys 2:8
36:5,5 143:12
attract 132:5
attractive
164:11
attributed
180:14,18
audit 51:22
188:25
audited 51:9
158:2
auditor 51:6
auditors 34:16
august 111:20
augustine 20:21
24:4
authentication
58:2
authorities
118:21 158:4
authority 8:4
21:22 86:2
91:15 124:10
131:16 132:22
132:23 190:6
authorized 5:24
100:25 123:15
191:5
authorizing
119:7,13 135:5
163:1

available 6:7
47:19 162:9
177:3 193:5
avenue 1:20 2:3
avoid 26:18
184:14
avoidance 33:1
37:9
avoided 24:25
184:10
aware 40:4
64:21 88:11
139:3 154:14,16
154:20,20 155:1
155:23 179:24
185:3
awful 106:12
awkward 48:10

**b**

b 3:1 59:22 92:2
104:9 137:1
149:11 163:1
back 7:9 12:9
23:21 24:14
27:24 31:5 38:9
46:16 47:24
55:3,4 66:21
68:6,9 74:13
87:13 91:10
96:3 99:10,11
99:19 101:2
103:8 108:1,17
108:24 110:6,23
110:24,24
116:18 121:16

122:15 123:1
124:1,4 127:10
129:14 130:10
141:8 166:17
171:1 174:16
180:21 182:10
185:25 187:11
188:25

**background**
7:10 74:19
150:19

**backup** 132:10

**bad** 142:5

**badges** 175:9
178:1,13

**balance** 15:13
180:12 182:5

**balking** 108:19

**bamboozled**
92:20 171:25

**bancorp** 149:18

**bank** 1:12 3:5
4:23 25:5,10
28:16,21 29:6
29:18,18 31:1,8
31:19,24 32:1,3
33:7 37:4,13
40:2 55:8 59:12
59:23 60:2,2
61:7,11,16,21
62:6,13,17 63:5
63:8,20,22,24
64:1,2,6,8,9,11
64:11,14,16,18
64:20,23 65:2

65:11,18 66:13
66:18,24 67:2
67:17,21,21,23
69:2,12,19,19
69:21 70:4,7,10
70:11,19,22,24
71:2,10 74:14
74:15,21,24
75:13,13,17
78:18,18 79:18
81:25 82:1 83:8
85:8,18 87:1,3,4
89:23 90:9 92:5
92:20 93:1,6,7,8
93:12 94:17,24
95:1,5,19,22,23
96:1 97:8,10,12
97:14 99:16,18
99:20,24 100:10
100:11,12,17,23
101:17,22 102:2
105:10 117:25
118:1,7 144:10
146:11 149:18
156:1 164:5,6
164:10 165:18
167:10 169:11
170:18,18
172:21 173:13
174:2,9,12
176:5,6 177:19
178:3,7,10
181:6 183:2,12
183:13 184:4,6
185:3,24,25

186:1,17

**bank's** 25:6
28:8 29:15,15
29:16 65:18
69:18,20 82:25
86:9 89:7 94:24
99:12,14 100:2
100:24 101:21
103:5 105:22
174:7

**bankcorp** 1:13

**banker.com**
193:1

**banking** 155:25

**bankruptcies**
98:7

**bankruptcy** 1:1
5:8 18:8 20:25
22:13 23:5
33:17,21 40:25
42:8 46:9 48:2,7
78:5 95:22 96:2
98:8 123:16
130:9 159:3
184:14 185:21

**bankruptcy's**
46:8

**banks** 29:1
76:13,13,14,19
76:21,23 77:21

**bargain** 96:11
96:21,22 99:8
108:12 110:19
110:21

**bartle** 14:1,6,7
14:12,17 15:15
16:1,19 17:4
18:2 19:21 20:3
20:8,11,14,16
21:1,8,12,15,20
22:1,3,14,18
23:25 24:18
25:13,17 26:9
29:14 30:4,6
31:15 38:1
39:21 40:1,16
42:8 43:1 46:17
48:8,12,15,17
48:25 49:13,16
49:17 50:2
51:17 52:23
53:4 54:2 55:20
55:23 61:12
62:18 66:1,9,15
66:16,18,20
69:2 78:23 79:4
79:7,8,14 81:21
82:12,13 92:21
93:1 94:7,13,20
95:11,17 97:19
98:1,1,5,6,7,9
98:11,22,25
99:9 100:8,14
101:4,10 105:11
105:22 106:7,8
106:9,13,22
107:3,16,16,21
108:16,23
110:20 111:3,15

113:20 115:25
117:3,16,18
119:3,3,18
122:20 123:1,8
123:10 128:15
130:6,7,10,20
134:12,15
140:13 150:9,21
151:5,15,18
152:14,15
153:19,24 154:1
154:3 155:6,10
156:23 157:16
157:21 160:3,12
160:18 161:21
163:6,8 164:2
165:8 167:16,21
168:8 175:16
176:1 178:7
182:7 183:2
184:23 187:13
188:2
**bartle's** 22:2
23:9 24:13 56:8
65:4 106:19
129:12 167:11
**based** 23:24
37:13 57:3
101:14 155:3
184:22
**bases** 178:14
**basic** 54:7
149:20
**basically** 67:9
67:13 131:4

134:4 139:21
**basis** 47:2
**bay** 20:19 45:5
**becoming** 50:25
**bed** 32:4 54:8,8
56:23,24
**bedroom** 9:8
139:19
**bedrooms**
139:19
**beds** 10:16,16
10:19,21,22,25
187:6,8
**began** 12:17
63:3
**beginning** 41:23
89:15 110:18
135:19
**behalf** 21:22
32:22 59:22
65:11 66:20
89:24,24 122:25
148:3 150:11
156:19
**belabor** 140:7
150:18
**belief** 21:23
100:7 171:13
**believe** 10:24
12:24 18:4
21:12,25 34:4,6
34:8,15 38:11
38:13 42:18
43:21 45:8
47:14 52:25

55:24 62:11
67:3 70:17 77:3
77:13,21 78:7
79:25 81:11
103:9 106:5
115:21 128:1,3
128:14 142:12
142:20 150:10
155:21 159:14
161:25 165:25
169:8 175:7
180:9
**believed** 7:3
49:1
**belong** 147:17
**beneficial**
131:20
**benefit** 25:19
37:25 91:8
144:9 146:11
176:7 184:8,18
**benefiting**
175:13
**benefits** 186:24
**best** 14:11 20:10
66:19 83:6,7
100:24 145:13
**better** 7:4 16:3
23:23 48:25
50:15 80:16
105:13 123:18
**beyond** 8:23
**bhms** 3:4 53:23
53:23 54:4,17
54:22 55:9 98:4

117:2
**bidder** 43:16
**bidders** 48:21
**big** 45:17,18
109:23 136:24
173:7
**biggest** 103:23
134:10
**bigrock** 34:19
40:22,22,24
41:3,7,8,10
47:15 139:5
**bigrock's** 47:13
**billing** 42:18
**bit** 7:9 31:5
40:13 56:22
103:7 114:5
138:10
**bk** 1:3,5,7
**blame** 101:22
173:18
**blank** 58:24
61:3
**blanks** 103:14
**blind** 168:6
**block** 102:19
**blowers** 22:9
**board** 138:22
**body** 28:18
**bogus** 43:1
47:19
**bona** 124:17,25
**bond** 15:21 16:2
34:17,22 68:21
123:4 125:20

126:14 128:4,5
142:9,25 143:17
146:19

**bookkeeping**
35:18

**borrower** 152:2
156:6 158:13
167:10

**bottom** 77:20
157:12

**bought** 38:22

**box** 50:18

**brain** 170:8

**breach** 24:17,20
25:2,14,16 26:5
26:11,16 28:8
32:10,20 33:7
98:25 99:13,13
119:2 120:20
146:8,22 161:13
166:8,11,14
168:7

**breached** 119:6
162:3

**breaches** 109:5
167:12 169:4

**break** 25:20
31:4 103:7
105:11 148:24
148:25 164:18

**breakdown**
189:2

**breaking** 105:23

**brian** 47:10

**bridges** 20:20
23:1,12 24:3

**briefly** 146:7

**bright** 142:2

**bring** 23:8 79:9
79:13 96:3
101:23

**bringing** 24:14

**broad** 19:17

**broader** 105:4

**broker** 124:14
124:20 127:16
127:25 128:25
129:3 130:16,18
130:19,21,22,23
131:5,18 132:11
132:11,17 133:2
133:4

**brokers** 129:10
131:3,7,19
132:14,15 133:3

**brother** 105:7

**brought** 23:21
25:8 51:8 52:23
78:8 109:4
120:21 142:14
184:15

**brown** 138:24

**bruce** 137:1
145:8

**budget** 19:11

**build** 9:14

**building** 10:12
125:18

**built** 9:13

**bullet** 54:11,17
57:4

**bunch** 87:10
124:12

**buried** 103:1

**burkholder**
30:16 88:18
163:25

**burr** 68:13,18
81:11

**bush** 4:11

**business** 8:11
14:11 104:6

**businesses**
21:11 45:2

**busy** 147:14

**buy** 41:1 111:12
131:1

**buyer** 113:11
131:2,5 151:15

**buyers** 44:24
45:1 48:4,12
132:14

**buying** 40:11
125:6

**buyout** 118:15
157:12,24 159:2
162:5 164:21

**bvm** 14:8 15:4,4
16:10,13,16,18
17:12,19,23
20:16,23 54:11
54:12 58:9,18
98:24 106:15

107:14,14
111:20,25 112:1
122:8 150:21

**bvm's** 16:14

**bvmmwh**
111:22 112:7
113:2,7,9,11

**bvmuv** 113:9,11
114:20 115:3
117:2 119:3

c

**c** 84:12 150:7

**calculate** 189:9

**calculated**
33:15 36:17
177:1,7 188:10

**calculation**
32:20 33:18,22
40:23 53:1
188:19

**calculations**
36:13

**california** 17:7

**call** 5:25 19:2,24
21:7 111:10,21
188:5

**called** 6:3 9:25
11:5,12 14:8
17:24,25 18:5
20:24 27:19
42:12 43:20
52:14 92:14

**campus** 56:21
97:4 121:16
124:16,24

127:20 128:13 135:17 139:8 164:2

**capabilities** 8:23

**capability** 136:14

**capable** 41:5 43:2 126:5 130:1 131:22

**capacity** 42:19 59:21,22 72:21 76:15 107:13

**capital** 39:10 162:20 176:12 182:6

**capmark** 38:6,8 38:12,13,16,23 151:12 156:3,5 156:10,12

**cards** 95:3

**care** 3:8,8 8:2,7 13:23 27:3,3,6 27:14 29:13,19 33:11,20 36:25 39:5,13 54:14 68:15 103:17,17 103:21,25 104:3 104:5 134:19,21 136:2,7 137:18 139:2 154:7 156:17,18 160:9 162:17,18,19 164:16 166:5 178:18 182:11

182:12 185:9 186:7,23

**careful** 76:14 97:6

**carefully** 151:21

**carlton** 19:16

**carolina** 17:8,8 125:25

**caroline** 88:2

**cars** 31:13,23 59:10,17 61:7

**carve** 156:8

**case** 1:3,5,7 5:5 5:8,10,13,14 6:13,17 7:19 18:8 23:5 33:21 40:25 47:1 75:8 78:5 112:4 120:10 185:21

**cases** 111:7

**cash** 47:18 67:1 84:7,13,17,23 92:1 157:15,17

**catch** 172:5,6

**catching** 173:19

**catchy** 96:17,18

**category** 132:20

**cause** 37:17

**caused** 33:10 93:13 102:17,18 153:3 157:16 186:17

**causes** 23:10

**ccrc** 10:23 20:23 29:17 39:6 48:5

52:25 70:6 85:25 91:5,7,8 91:12 93:4,12 93:14 94:23 95:13 97:3,15 99:19 101:3,18 102:23 106:23 108:7 125:7,25 127:20 128:9 129:9,21 130:4 130:7 131:16 132:2 133:12 135:17 141:11 141:19 157:4 182:15,19 185:12,13,16 187:7

**ccrcs** 8:8,9 49:6 49:8 129:22 133:10

**cede** 156:23

**celotex** 111:9

**center** 10:6 13:5 13:9 29:16,19 31:21 42:11 44:11 48:5,6 54:19 56:13 57:1,5 59:14 60:3 69:3 93:4,8 94:22 95:5 99:19 101:15 102:4,7,13,16 102:25,25 104:12 105:2 122:22 125:14

134:12,19 136:1 141:17,23,24 164:10

**center's** 69:4

**centers** 137:17 137:19

**central** 45:4

**certain** 11:17 16:7 41:21 44:18 123:10 158:12 164:11 167:3

**certainly** 22:18 36:9 94:6 97:19 100:6 106:17 140:1 150:24 152:4,21 158:16 163:24 170:1 173:23 178:13

**certainty** 172:3

**certificate** 2:15 2:16 8:3 86:2 91:15 190:1 191:1

**certify** 190:6 191:5,8

**chair** 138:21

**chairman** 59:4

**challenged** 184:21

**challenging** 5:15 98:12 120:18

**change** 17:24 94:2,11 105:12

105:12,13 106:9 116:15 158:11 159:21 173:25 192:4,7,10,13 192:16

**changed** 85:20 85:20 100:15,15 103:3 104:20,21 164:1 173:14

**changes** 61:14 77:7,13 115:16 118:15 157:23 158:9,10,22 164:3 167:1 193:8

**changing** 106:12 138:8

**chapter** 1:4 22:13 52:8 63:8 106:20 170:17 170:19 171:20 171:21 174:25 175:4 178:25 188:10

**character** 130:5

**characterize** 38:20

**charged** 43:7

**charging** 148:4 148:15

**charitable** 14:10

**chart** 157:11

**check** 50:18 152:9

**chief** 21:2 22:7 106:20

**chronologically** 5:4

**chronology** 46:5 46:8

**circuit** 16:11 145:10,10

**circumstance** 39:14 105:5 162:19 175:3

**circumstances** 16:7 26:23 47:25 101:12 105:8 150:25 161:5

**circumvent** 147:16

**citing** 61:1

**city** 191:11

**civil** 25:8 119:16 193:23,24

**claim** 28:12,13 28:14 33:1 34:5 35:3,5,8 36:13 36:16 37:5,6,9 37:12,16,18,20 37:22 38:2 76:4 98:21 99:1 107:20 108:2 120:21 121:2 143:4 144:9 146:23 147:7 148:7,20 151:23 162:11 166:11

166:15,15 174:21 178:24 179:2 183:4,9,9

**claimants** 164:12

**claiming** 16:13 26:17

**claims** 17:13,14 17:19 23:8,12 29:20 33:20 35:25 36:1,3,25 37:3 44:21 78:6 78:8 121:5,14 121:14 142:18 142:23 143:4,7 143:8,13,17 146:9 149:21 150:20 154:17 164:12 166:12 176:18,18 180:7 183:20

**clairvoyant** 43:5

**clarify** 25:24 64:10

**clarity** 91:3

**class** 142:20

**clean** 16:21

**cleaned** 49:23

**cleanly** 64:10

**clear** 15:1 17:3 21:14 41:18 42:17 57:21 59:9 135:6 148:9 165:23,24

175:2 179:3 180:4

**clearly** 6:11

**client** 132:12

**cliftonlarson** 51:8,25 52:4,23

**close** 42:5 98:15 104:11 120:8 126:25 143:11 151:3 152:15 155:8,10 188:6

**closed** 61:6 64:18 73:3 85:12 154:3 155:12

**closing** 14:24,24 15:13 16:6 17:25 23:14 34:22 62:5 67:5 69:15,17,17,22 73:2 78:25 79:3 79:13 113:10 116:10 117:19 117:22 143:11 144:6,25 145:1 148:10 164:6 165:8,10 166:21 166:21 167:15 175:18

**closings** 78:22

**cloud** 101:9

**code** 123:16

**collapsed** 43:6

**collateral** 19:4 67:1 84:8,13,18

84:24 92:1
97:13,14 100:3
100:5 103:5
118:3,9 156:9
157:15,18
160:10 172:15
**collateralized**
13:3
**collective** 157:6
**colony** 111:9
**columbia** 18:5
**combination**
33:23 35:9
97:21
**combine** 182:3
**come** 45:19
62:10 107:3
124:1 141:20
144:1 163:14
**comes** 68:9
116:12 170:1,9
**comfort** 67:23
71:10,13
**comfortable**
67:2 69:12 87:6
**coming** 16:24
46:15,18 57:11
64:10,11 102:23
108:6 132:8
138:8 178:6,8
182:23 184:18
185:18
**comma** 179:16
**commenced**
159:3

**commencement**
23:20
**comment** 32:16
47:8
**comments**
140:12
**commission**
190:19,20
**commitment**
178:8
**committed**
25:13 167:13
179:6
**committee** 6:24
23:5,6,7,11 24:6
33:25 34:1,7
48:14 78:6
108:12 110:22
132:18 133:14
157:1,4
**common** 9:7,21
21:8
**commonality**
93:5,12
**communicated**
65:17 72:20
73:12 74:24
84:3
**communicates**
67:8,20
**communicating**
17:4 73:8
**communication**
63:18 169:10

**communicatio...**
32:1 61:15,17
61:18 62:4,5,7
63:19 64:8
65:12 66:7,12
73:25 81:13
82:12,15,17
169:8
**communities**
8:7 54:14
**community** 8:3
10:21 13:23
70:6 130:1,13
187:8
**companies**
152:14
**company** 10:1,2
10:5 60:5 93:24
114:3,14 115:9
115:10 117:12
172:22
**comparable**
105:5
**compare** 77:6
**comparing**
141:24
**competent** 4:19
4:20 41:5
**compilation**
34:3
**complaining**
61:13
**complaint** 3:9
3:21 5:2 16:18
16:22 17:11

18:16 19:15
23:1 25:11,13
25:21,23 31:6
32:24 58:20
74:18 107:12
108:7,9,22
109:1 110:6,18
111:1,12,24
117:6 120:13,16
120:20 128:17
128:19 141:9
147:21 148:10
148:22 149:9,22
150:12,15,16,21
152:22,23 153:1
154:17,21,22
155:5 157:10
174:16 180:7
**complete** 19:13
19:21 50:4 51:9
99:14 101:1
105:1 123:4,16
128:8 184:17
191:7
**completed** 50:1
85:14 108:11
140:2 154:2
193:15
**completely** 43:6
94:23 105:8
171:5 176:12
182:4
**completing**
128:6

completion 28:17

complex 9:7 12:21 111:10

compliance 62:20 64:20 67:12 170:19 174:10

complicated 8:1 111:23

complied 77:4 86:25 88:23

comply 64:23 85:9 127:21 171:20 173:25

complying 63:10

component 33:9 35:9 70:22 86:15 136:11 177:10 188:20 188:24

components 86:15 173:20 177:15 188:10 188:14,17 189:3

composition 185:1

comprehensive 19:12

conceal 119:22

concealed 65:1

concept 182:15

concern 48:13 50:5 51:5,10,15

53:3 65:19 67:11 70:20 87:16 161:6

concerned 64:14 67:10,21

concerns 67:16 68:25 77:11,15

concluded 189:15

conclusion 106:5

concrete 65:8

condition 23:24 26:25 27:1 141:23

conditions 14:18 24:11 77:16 153:23 154:23 162:6

conduct 6:20 17:19 28:16 95:13 105:22 172:2 178:3

conferred 34:2

confess 8:22

confident 78:2 88:6 125:12

confirmation 81:9 124:11

confirmed 20:14 142:19

confirming 3:10 109:16

confirms 89:4

conflicts 60:19 60:20

confused 15:7 18:22 26:13 60:7 90:15 109:9 110:13 113:18 122:18 123:19 173:5,6

confusing 7:20 7:25 23:4 86:7 90:17

confusion 9:2 62:18 122:14

connected 9:6 33:1 158:24 191:9

connection 4:24 32:23 49:16 55:14 56:4 74:22 90:7 120:24 134:15 144:24 145:8 162:17 173:9 176:2 184:22 188:19,22

consent 99:12 100:10,12 107:24 131:14 135:13,14,21

consented 96:25 100:19 114:18

consequence 51:23

consequently 99:16 121:1

136:18 153:6 184:7

consider 101:24 181:1

consideration 99:17 112:9 122:22 185:18

considered 193:16

consistent 163:23

consistert 54:9

consists 176:20

conspiracy 119:16

constant 132:25

constantly 132:7

consternation 102:17

constitutes 175:5,7

construct 185:4

constructed 171:18,19

construction 139:12

constructive 180:9 183:5,10 183:22

consulting 32:15,22 33:24 34:1

consummate 69:22 144:6

consummated 14:20
consummation 34:13
contact 82:1
contacted 5:17 74:21 134:11 161:4
contain 171:21
contained 9:6 10:12 13:19 14:2 32:20 118:7 149:22 156:10
contains 177:1
contem 137:20
contemplated 100:6 121:8 128:12 137:21 157:24 174:12
contemplation 125:16
contend 12:3 24:17 167:13 169:19 174:20 174:20
contention 21:9
contentions 22:23 89:11
contentious 126:8
context 42:8 58:8 74:4 140:13

continue 14:16 152:19 153:24 170:11 176:14 183:11,13
continued 168:17 171:2 176:13 187:25
continues 92:5
continuing 8:2,7 13:22 19:9 29:13 54:14 142:3 169:9
continuum 104:1 136:2
contract 3:8 27:6 33:12,20 66:16 103:18,22 103:25 104:3,5 104:14,16 105:18 134:20 134:21 166:5 168:18 178:18 182:12
contracts 27:15 27:19 36:25 154:7 160:9 162:19 182:11
contractual 185:7
contradict 60:23
contradicted 60:10
contrary 20:8 27:11 184:19

contributed 37:6 112:25
contributing 37:19
contribution 44:16
control 19:23 20:12 21:12 22:17 23:9 24:2 30:5 48:2 66:9 66:10 94:8,11 94:13,20 97:19 97:20 101:4 106:1,7,8 107:3 150:8 155:24 156:23 158:11 159:16,21 168:1 176:2 184:23
controlled 7:6 12:16 48:7,8 61:20 105:1
controversial 75:24
controversies 95:16
conversation 47:10
conversations 41:20
convey 13:21
conveyance 185:4
convicted 43:8
convincingly 172:4

copied 62:3,4
copies 72:7,9 82:20 148:21 193:14
copy 39:22 83:12,15 103:16 103:21 109:23 149:12
corner 57:14
corporate 8:11 21:22
corporation 1:14 11:7,14
correct 5:9 16:23 25:25 31:18 32:12,24 35:18 36:15,23 37:3 38:7,12 50:21 61:2 67:7 71:23 73:18 90:13 92:14 96:11 98:25 103:22 108:22 109:8,12 110:11 110:17,18 111:4 114:11,15,21 115:1,2,17 118:25 126:23 132:22 135:19 142:21,22,24 143:2 148:5 150:12 151:15 151:16 154:13 156:4,5 173:1 180:1 182:3

corrective  88:16
correctly  23:13
  62:23 71:23,25
cosmetic  96:19
cost  180:17
costs  35:16
council  41:13
  73:13 157:5
counsel  16:20
  16:23 61:16
  65:22 78:2
  100:17 148:14
  191:8,9
count  32:24
  119:4,16,17,17
  119:19 161:12
  174:17,17,17,19
  174:22 180:7
  183:5,21,22
countless  129:9
counts  110:13
county  16:11
  190:4 191:3,12
couple  14:18
  49:7 136:25
course  4:22
  27:25 75:7
  160:5
court  1:1 5:16
  16:10,11 17:11
  22:13 33:17
  48:7 50:9 97:11
  98:8 99:21
  100:13,18,25
  123:14 124:18

126:1 130:9
131:8 155:6
184:15 190:9
court's  48:2
  148:9
covenant  12:25
covenants  19:2
cover  83:19
  85:17 135:12,13
  173:17 174:1,3
covered  87:25
  123:21 149:20
  151:10 159:7
  161:8
covid  102:3,14
  102:18
cpif  18:7,8
  23:14 78:9,22
  79:3,5 116:20
  117:21 118:6
  132:18 156:16
  157:22 162:6
cpif's  143:4
cr3  33:24 34:2
  132:18 133:8,9
  133:14,18 134:5
create  65:7
  136:13 137:22
created  8:15
  32:15 48:13
  63:22 81:21
  102:15 177:25
creates  67:11
  177:8

creating  37:6
  62:18 63:6 74:4
  94:17 100:23
  137:13
creation  126:12
credence  46:19
credit  109:1
creditor  27:10
  28:18
creditors  24:23
  29:4 119:23
  158:15 161:23
  161:25 162:1
  175:23,24
  178:16,17
crime  175:5,6
  178:21 179:5
criteria  48:23
cross  13:3
crux  141:9
curious  39:21
current  35:12
  35:19 139:9
  141:3
currently  89:16
  139:18 144:7
  145:23 146:17
customers  77:1

d

d  2:13 84:20
damage  17:19
  27:18 28:12,13
  28:14 33:10
  36:13 40:22
  105:21 166:14

166:15
damaged  147:7
damages  28:7
  32:7,9,15,19
  33:6 37:13
daniels  80:5
danner  133:15
  133:15
data  44:3 132:9
date  1:18 12:2
  15:1 16:4 42:4
  57:16 87:21
  115:19 122:4
  128:14 151:11
  155:8 165:13
  167:3 192:23
  193:11
dated  57:13
  58:24 61:1
  72:14 154:24
  165:21 166:19
  167:5 191:11
dates  5:9 14:25
  116:15,16
  122:19 128:20
david  148:3
day  28:25 40:25
  41:2,3 49:3 68:3
  68:13 69:24
  141:8 153:8
  163:18 173:11
  183:15 190:12
  191:11
days  116:11
  169:25 193:16

**de** 163:5
**dead** 16:4
**deadline** 22:20
  124:19 127:18
**deal** 44:17 45:7
  64:17 65:6 68:1
  68:6 101:7
  102:23 105:17
  106:24 136:6
  166:3 176:19
**dealing** 40:19
  40:21 41:12
  48:2 66:13,15
  68:14 106:8
  130:2 131:22
**deals** 37:10
  56:13 68:20
  86:16
**dealt** 45:10 49:1
  72:25 101:9
  125:14 127:22
**debate** 84:14
  89:12 91:3
**debating** 90:11
**debt** 14:21 19:3
  19:5 30:9,12
  38:22 54:18
  86:16 101:13
  142:9,25 143:17
  146:19 149:25
  151:11,20,24,25
  155:15 156:4
  167:23 177:2,16
  177:17 181:11
  181:15,19

188:15,20,24
**debtor** 6:22 7:5
  7:15 46:16,16
  48:6 52:4 74:5,7
  151:17 156:6
  158:15
**debtor's** 114:18
**debtors** 1:7 5:15
  6:2,8,13,25 7:3
  7:4 23:8 42:9
  43:14,20 47:16
  48:1 49:13,22
  50:9 78:12
  97:20 108:12
  110:21 113:14
  114:19 118:18
  119:5,8,23
  120:7 135:6
  151:20,23 152:9
  152:12 156:23
  157:16 158:1
  159:3 160:8,12
  160:17,19,22
  161:14,15 162:3
  162:7 163:2
  164:23 170:10
**deceived** 77:1
  160:2
**december** 14:22
  14:23 16:4
  57:13 95:9
  118:25 120:23
  124:19 146:2
  154:4 163:11
  168:21

**deception** 62:12
  63:14 65:8
  75:20 76:1
  80:14,19 81:10
  84:2 85:5,10
  86:4,20 87:23
  89:5,6 90:1,16
  93:15 94:5
  158:13 167:6
  169:9 173:17
**deceptive** 87:8
  92:3,4 170:15
**decision** 48:9
**declare** 192:20
**deducted** 35:16
  35:17
**deed** 13:19,21
  14:2 18:18,19
  18:25 24:21
  26:3 151:6,21
  152:12,18
  153:16 155:9
  156:25 162:9
  180:23 185:6
**deemed** 48:24
**deepened**
  160:19
**deepening**
  119:18
**deeper** 134:9
**default** 12:19,22
  13:16 97:10
  161:2,7,9,10
  162:25

**defaulted**
  129:24
**defaults** 12:25
  12:25
**defend** 171:24
**defendant** 1:15
  2:8 157:17
**defendant's** 3:2
  53:18 72:4
  83:20 103:11
  107:7 109:25
  121:20 126:17
  127:12 135:2
  144:12 148:1
  149:4
**defendants**
  119:4,17 120:3
**defending** 92:15
**defense** 185:3
**defer** 125:10
**deficient** 120:13
**defined** 84:13
  89:11 111:21,22
  174:21
**definite** 120:12
**definitely**
  132:19
**definition** 57:4
  112:11
**degree** 179:17
**delano** 148:18
**delaware** 8:5
  9:11 114:3
**delay** 128:25
  129:2

delays 128:22
delinquency 118:19 158:3
delivered 53:10 78:18
delivery 88:8
demonstrated 109:2
demonstrates 85:17
denies 88:12
deny 56:15
department 11:10 84:22 159:1
dependent 98:11
depends 185:13
deposing 193:12
deposit 84:7,12 155:17 166:23 171:9 172:9,14 172:25 173:2,21
deposited 84:14
deposition 1:17 4:23 31:15 53:17 55:7 56:8 59:20 60:15,17 72:3,12 75:10 83:10 90:14 103:16 107:11 121:19 123:22 124:7 126:16 135:1 144:14 149:8 150:22

159:7 160:5 189:15 191:6
depositions 65:22 82:25 88:1 127:5 150:18
deposits 27:16 182:20
deprivation 31:2
deprived 188:1
depth 32:19
derivative 23:8 78:6
derived 25:9 36:17
describe 5:22 38:24,25 157:11
described 18:20 32:3,10 85:22 98:7,8 104:13 104:16 115:8 151:2
describes 98:5
describing 91:6
description 3:2 156:9
designated 91:13
designed 147:15 164:10
desmond 82:5
desperate 73:14
despite 156:21

destroyed 141:12
detail 5:2 25:12 25:22
detailed 14:3 19:12
details 45:16 59:8 74:20
determination 159:19 170:23
determinations 50:6
determine 155:3 155:3 188:11
determined 153:9 175:23
determining 34:10
developer 54:12
developers 137:25
devonshire 129:24
devote 126:11
difference 116:16 177:18 180:16 183:22
different 4:21 13:2 17:13 32:6 36:20 60:5 69:10 98:9 104:3,6 105:8 105:24 112:1 129:20 138:6 159:13 179:15

differently 151:2
difficult 40:17 47:25 59:3 98:12 140:18
diligence 44:1 47:5 131:6
direct 2:14 4:5 37:12,24 38:1 181:25
directed 69:18 167:21
directing 75:16 78:18
direction 76:3
directive 121:12 134:22
directly 17:5 69:16 71:9 73:1 74:22 146:23 161:18 181:3
director 20:10 22:6 55:21 138:23,24,25
directors 138:22
dis 138:15
disagree 57:6 90:10 172:16 179:9
disappeared 126:3
discarding 134:19
disclose 170:12

disclosed
106:18 172:8
disclosure 85:2
discovered
98:14,15
discuss 31:7
32:8 47:10
discussed 32:5
56:8 81:22,25
93:21
discussing
122:3
discussion
42:20 53:14
54:6 55:5 57:16
99:11 113:8
discussions
13:25 14:5 16:1
16:5 32:13,17
39:19,19 41:22
41:24 42:3
44:24 46:5
47:14 99:20
101:19 106:13
108:11 146:1,6
154:2
dismissed 123:3
dismissing
149:13
dispense 4:16
dispose 121:12
disposed 10:21
116:7
disposition 29:2
37:13 38:15

121:16 122:21
125:5
dispute 51:18
128:14 148:19
170:10,14
disputes 16:9
45:15
disputing
100:20
disqualifier
48:20
dissolution
169:1
dissolved
163:12,17 169:1
distinct 78:16
distinction 91:6
distress 175:21
distributed
143:25
distribution
138:16 139:4
146:17
distributions
28:2 73:5
district 1:1
17:11,12
diversions
168:3
divert 146:22
divided 117:22
division 1:2
17:12
doc 85:13

doctor 189:10
document 15:2
15:8,10 19:12
26:5 53:20
54:21 57:10
58:2,5,15 59:6
71:12 72:14,16
75:11,18 80:7
82:14 83:3 84:6
84:6 85:11,15
85:16 88:4,13
89:7 92:7 95:4
104:2 107:12
109:14 115:7,11
115:19 121:22
121:24 122:24
123:11,16,20
125:2 127:6
135:1 138:13
155:4 165:14,16
165:17 166:25
171:22 172:12
172:19 173:12
173:13 192:20
documentation
63:23 81:13
92:10 94:25
106:13 115:13
115:22 116:1
136:22 156:12
163:24 164:9,9
165:4,11 171:17
173:8
documented
8:24 20:14

60:22 67:5 92:7
147:5,11 164:2
165:21 186:13
documenting
174:6
documents
15:20 17:2
18:11 53:10
59:18 60:13
61:4,4,22,22,24
63:15 70:18
79:17 80:1,20
80:22 81:1,3,8
81:10,12,16,17
81:20 84:1 95:4
101:1 116:2,13
123:24 125:10
154:10,25 155:1
155:4 156:10
157:13 165:18
167:3
doing 14:7
23:20 43:3
51:17,21,25
52:2,18 70:20
96:6 102:2
131:1 134:7
dollars 15:6,11
15:13,14 23:18
23:25 30:11
43:2 49:4 165:9
167:23 175:17
175:18 180:14
181:14,18,20
187:21

domain 43:13
domestic 1:13
dorothy 1:22
 190:17 191:5,19
dot's 164:15
doubt 140:8
downs 137:1
downtown
 56:20
draft 51:10 53:5
 53:6,6
drafted 35:2
 150:11
drafter 74:18
 150:13,14
drafting 34:11
 85:16 89:6 92:8
 150:15 166:24
 167:1 174:3
drag 7:11
dragging
 108:16
dramatically
 104:20 138:5
drew 51:10,14
drive 2:7 82:23
driven 39:14
 40:17
drives 18:14
driving 139:22
drop 16:4
due 13:2 44:1
 47:5 131:5
 161:11

duly 4:2 190:8
duplexes 9:13
 9:14,19,22
 125:15
duplicate 37:4
durham 125:25
 126:7
duties 6:10
 25:14 119:2,6
 161:16 168:7
duty 24:17,20
 25:2,16 26:6,11
 26:16 28:8
 32:11,20 33:7
 98:25 106:24
 109:6 120:21
 146:9,23 158:12
 161:13,18,19,25
 162:4 166:9,11
 166:14 167:12
 169:5,20,21
 176:6

e

e 2:13 3:1
 119:13 192:3,3
 192:3 193:23,25
earlier 54:10
 55:25 59:18
 72:17 92:18
 107:21 149:21
 150:22 151:10
 161:8 165:3
 173:24 188:9
early 5:19 16:11
 45:23 64:13

easy 27:17
 43:13 128:20
echoed 47:17
economic
 175:21
economics
 176:1
ed 4:22
edmund 2:5
edward 56:6
effect 67:14
 68:3,10,19
 69:13 94:19
 97:4 147:13
effective 116:4
 165:20
effectuate
 121:15 152:13
effectuating
 41:15 158:10
effort 62:9
 100:1 101:8
 122:20
efforts 48:16
 156:22
egregious 30:3
 178:3
eight 182:2
either 15:12,13
 172:10
elements 104:4
eli 107:16
elicited 60:1
eligibility
 185:12

eliminate 22:4
eliminated
 187:18
elise 80:5
elite 103:3
email 16:19
 64:13 65:21,24
 66:21,22 67:3
 68:13 69:11
 82:12,15 193:12
emailed 193:14
emails 70:25
 71:7 93:19,23
embezzled
 178:11
embodied 154:8
embraced
 179:12
employed 4:10
employee 191:8
 191:9
enable 128:2
 153:18
enabled 102:3
 103:2 123:4
 183:2
enablement
 184:23
encumbrance
 160:16
ended 40:19,21
 122:20 181:17
enforce 96:8
 97:12 111:2

engage 124:14 133:2

engaged 27:2 33:25 41:15 49:14 50:9 52:4 52:13 133:14 158:13

engagement 133:23

engaging 132:10

enormous 43:23

enrich 175:24

enrichment 25:3

ensuing 108:10

entanglements 101:10

entered 5:23 11:18 13:18 17:16 58:9,18 105:9 112:6 113:3 124:8 144:6 153:2

entering 162:5 164:21

enterprise 31:1 181:17 183:2

enters 151:21 180:23 185:5

entire 11:19 13:23 91:7,8 97:3 101:18 124:16,24 125:7 127:19 128:9,13

135:17,17 139:7 141:19 161:10 181:17

entirely 165:6

entirety 181:4 181:19,21 182:7

entities 11:16 12:15 13:14,21 14:13 15:4 17:24 20:13 21:6,11,15 25:9 46:18 48:17,20 113:19 117:3 118:9 122:25 129:19,24 130:1 131:21 132:7 134:11 139:6 150:10 153:25 154:1 155:6 156:6 158:14 167:14 168:7,9 168:11,12 169:5 169:21 175:15 187:23

entitled 53:21 84:6 107:12 121:22

entitlement 35:23 105:18 161:24

entitlements 35:12

entity 6:3 7:5 8:16 9:4,24 11:8 11:12 14:8,10

14:10 18:5,6 21:10,22 30:14 33:24 40:18,20 42:11 43:1,5,20 50:25 54:1,2 61:19 75:25 78:10 90:4,6,7 101:10 106:14 112:1,3,14,19 112:23 113:15 114:10 120:18 124:17,25 125:3 125:4,19,20,23 128:3 134:17 136:2,14 161:21 162:1,16,17 163:10,12,17 164:11 167:15 167:17 168:2,14 168:16,17 169:6 169:6 180:22 184:7,20,21 185:5

entity's 161:21

entrance 27:16 35:10 105:19

entries 182:23

entry 3:17 135:5 182:20

environment 77:22 162:22

epic 111:8

equipment 11:1

equity 12:12 15:3,5 16:15

28:2 48:8 58:10 79:10 112:25 178:6

equivalent 105:6 183:24 184:1,17

eric 133:15,15

errata 2:17 193:10,12,15

error 173:24

escaping 125:24

escrow 63:23 71:16,17,18 72:13 74:16 76:12,15 77:4 78:21 86:12 88:22,24 89:23 89:23 91:23 92:5,6,9 118:2 119:15 155:18 156:9 158:17,20 169:12,14 171:18,19,23 172:12,13,17,20 172:20 173:4,10 173:14,14 174:7

escrows 86:18

esquire 2:2,5,5 193:1

essence 28:11

essentially 40:21,24 41:1 104:8 107:24 134:13 141:13 141:20 144:18

146:12 147:15
**establish** 27:18
  172:20
**established** 34:5
  157:18
**estate** 124:14,20
  127:16,25
  128:24 129:3
  130:16,18,18,21
  130:22,22 134:1
  137:23 147:3
  148:8
**estates** 99:9
  144:2,3
**estimate** 145:13
**etlinger** 3:20
**evade** 24:21
  148:8
**evaluate** 6:19
**evaluating** 6:6
**evaluations** 7:8
**evasion** 43:8
**eve** 64:9
**evelyn** 128:1
**event** 51:22
  139:22 152:15
  160:8 165:21
**events** 108:4
  110:12
**eventually**
  87:18 126:24
**everybody** 30:6
  36:6 40:10
  66:14 101:16
  132:3 163:20

170:7
**evidence** 30:15
  31:12,24 39:16
  49:9 59:11
  61:18 62:12
  63:12,15 64:6
  65:8 95:1 106:4
  154:11 162:10
  174:20 180:5
  183:8,19,25
  186:21
**evolved** 134:12
  137:13
**exact** 35:2 155:8
**exactly** 7:13
  11:24 28:15
  75:12,19 82:22
  96:6 116:13
  185:17
**examination**
  2:14 4:5
**examined** 4:3
  15:21
**examiner** 5:6,16
  5:18 6:12 42:19
  50:11 73:11,12
**example** 19:7
  20:2 22:4,12
  35:20 167:20
**excellent** 69:14
**except** 30:6
  69:21 155:2
**exception** 14:4
**exchange** 27:24
  68:4 108:1

152:19 173:7
  181:4,5
**exchanges** 16:5
  17:17 70:18
**exclusive** 63:9
**exclusively**
  76:19
**excuse** 113:10
**execute** 101:1
  123:11,16
**executed** 3:19
  58:25 60:22
  61:21 75:16
  80:20 124:17
  144:16 166:20
**executive** 22:6
  138:25
**exhibit** 3:3,5,6,8
  3:9,10,12,14,15
  3:17,18,20,21
  53:17,18 55:7
  55:17 57:13
  72:2,4,12 74:13
  75:11 83:10,11
  83:20,24 84:5
  87:9 92:2 98:4
  103:11,16 107:6
  107:7,11 109:20
  109:24,25 110:6
  116:19 121:19
  121:20 122:24
  126:17 127:3,4
  127:8,9,12
  134:25 135:2
  144:11,12,14

147:24,25 148:1
  149:4,8 174:16
**exhibits** 53:7
  60:10,11,17,19
  60:21,21,25
  80:23 82:18
**exist** 137:21
  154:25 157:5
  175:9 180:22
**existed** 12:22
  29:21 34:10
  77:17 86:19
  88:25 102:10
  104:17,18,21
  152:4 156:14
  157:7
**existence** 185:14
**existing** 119:15
**expectation**
  176:14
**expedited**
  124:10
**expense** 25:3
  47:4 147:10
**expenses** 27:25
**expensive** 46:24
**experience** 45:6
  52:25 68:17
  76:17,20 130:4
**experiences**
  77:12
**expert** 28:15
  32:9,21,25
**expertise** 133:9
  133:12,21

experts 133:7
expired 168:18
expires 190:19
explain 70:9
express 87:16
expression 84:15 96:18
expressions 55:13
extend 14:24 16:6
extended 190:10
extension 13:18 14:1 17:15,18 18:13,21 26:4 153:22 154:8,23 155:9 156:14 157:2 162:13,15
extensions 152:23 153:6
extensive 14:3
extent 60:20 98:20 158:17 159:15 169:16 182:17
extinguishment 27:10
extra 83:12,15
extraordinary 118:17 157:25
extreme 95:22
extremely 40:4 40:17 46:22 47:25 131:19

142:2,6
eye 168:6

**f**

f 32:4
face 73:24 171:22
facetious 24:7
facilities 9:5 11:5,17,21 13:4 24:10 27:5 38:23 48:3 125:15,17 135:24,25 137:1
facility 3:4 6:1,3 7:11 10:13,14 10:16,17,18,20 10:23 11:8,15 13:11,23 20:20 20:21,23,25 23:17,25 24:4 29:25 35:13,21 35:21 40:18 41:4 42:11 44:12,18 51:24 53:22 54:7,9 56:24,25 57:1,2 57:4 71:20 73:15 74:6 86:25 91:4 94:11,12 97:24 102:5,13 104:13 104:15 106:6,23 122:21 125:22 125:25 130:8 136:8,13,21

137:3,6,8,22
138:6 139:8,10
140:19,25 141:4
142:2,7,9 157:7
161:4 162:20,21
163:19 177:7
181:20,21
184:24 186:8
187:5
facility's 39:9
fact 30:8,22 45:18 63:8 64:2 70:2,11 73:11 77:15 78:15 92:20 104:9 106:8 115:18 122:22 130:19 142:4 152:4,6 162:15 170:12 172:3,6 173:25 185:19
factions 51:2
facto 163:5
factor 37:19 45:19 166:14
factors 179:24
facts 70:17 183:9 192:20
failed 157:22 167:15 168:2
fails 193:19
failsafe 132:10
failure 76:5 118:14 169:11

fair 66:4 154:17 172:8
fairly 8:14 14:3 73:20 125:12 126:7 129:23 133:16 177:12
faith 101:8 156:21
fall 129:7,8 163:15
fallen 132:20
false 47:1 80:21 85:23 170:22
familiar 55:13 56:1 58:14 68:23 83:18 129:13 138:12
familiarization 45:12
family 20:22
far 17:9 96:20 124:2 137:3 150:19
fast 44:8 128:2 163:16
fate 106:21
favor 15:4
favorable 162:7
favorite 189:8
fears 102:18
february 16:7 16:12,12 29:6 51:20,21 140:6
federal 17:11 19:15 87:16

155:6 193:17,23
**fedex** 88:8,9
**fee** 105:19
**feel** 123:18
**fees** 143:9,11,18
  146:20 168:17
  168:18
**feet** 108:16
**fell** 179:6
**fellow** 133:11
**felony** 179:17
**felt** 6:18 126:11
**fide** 124:17,25
**fiduciary** 24:17
  24:20 25:14,16
  26:6,16 28:8
  32:10,20 33:7
  98:25 109:5
  119:2,6 120:21
  146:9,23 161:13
  161:16,19,25
  162:4 166:8,11
  166:14 167:12
  169:4,20
**fields** 19:16
**fifth** 145:10
**figure** 65:10
  86:21 90:3
  92:18 123:18
**figured** 63:1
  92:17 170:20
  171:5
**file** 159:9,10
**filed** 4:24 5:11
  5:14,15 16:10

16:16 17:11
19:15 22:25
24:15 32:21
33:16 35:25
41:6 46:8 47:15
47:16 75:7 96:2
97:10 107:12
108:4,7,9,23
110:7 121:7
128:17 149:14
150:21 152:22
153:10 184:14
189:1
**filing** 3:19 75:5
  122:2 144:15
**fill** 103:14
**final** 3:15,17
  101:1 124:9
  135:5 160:7
**finalization**
  35:8
**finally** 63:1
  171:3
**finance** 15:21
  125:21
**financed** 31:2
**financial** 6:15
  22:7 49:23
  50:20 51:9
  52:17 106:25
  130:5 159:1
**financially**
  191:9
**financing** 15:15
  15:17,19,21

16:2 34:17
47:19 49:5
68:21 123:4
124:11 126:14
127:23 128:4
**find** 43:12 59:6
  71:10 123:8,23
  128:20 131:2
  183:12
**finding** 19:19
  96:9 173:24
**fine** 56:12 57:23
  68:8 142:16
  153:14 179:10
**finish** 50:6
  52:22
**finished** 51:13
  53:3
**firm** 6:25 19:16
  34:4,11 35:1
  36:5 43:25
  46:21 47:12
  52:16,24 68:14
  78:20,24 150:11
  150:14 153:11
**firms** 45:11
**first** 3:10 4:2
  13:13 23:5
  25:14 38:5
  41:16 42:23
  55:20 76:18
  84:11 101:3
  109:16 119:9
  125:3 131:11,12
  140:21 163:8

174:18,23,25
**fish** 138:11
**five** 104:16
  146:3,6 147:12
  148:25 162:24
**fl** 193:13
**flaws** 130:5
**floors** 10:13,14
**florida** 1:1,21
  1:22 2:3,8 3:3,4
  8:8 10:2,4 11:6
  11:10,13 17:12
  27:5 29:21 45:4
  53:21,22 56:21
  84:17,22 129:23
  158:5 159:1
  170:17,17
  172:20,21,21
  179:17 190:3,8
  190:18 191:2,12
  193:17,24
**florida's** 11:9
**flow** 106:12
**focus** 6:12,18
  46:4 78:9
  139:17
**focused** 50:24
**fodrea** 56:6
**follow** 73:13
  127:17
**followed** 88:17
**following**
  139:23
**follows** 4:3
  114:2

[food - generally]

food 53:13
fooled 77:2
footnote 51:15
159:25
forbearance
19:2
force 100:13
forced 110:16
164:23
fore 96:17
foreclose 100:1
foreclosure 12:8
13:19 14:2
18:19 24:22
26:18,18,21
27:9 97:10
99:15,21,24
151:6 152:18
180:23 185:6
foregoing
191:10 192:20
forestall 135:16
form 48:15
57:19,22 70:8,9
78:17 100:1
formal 157:8
forman 68:14
68:18 81:11
formed 76:20
former 19:16
formula 177:8
formulas 189:7
forth 6:2,14
104:9 117:8
155:8

forthcoming
70:24
forward 44:8
46:19 66:24
67:23 116:18
found 139:23
four 72:9
104:14 113:21
117:3 162:24
185:21
fourth 54:11
frame 109:4
frankly 137:14
182:13
fraud 174:19,22
175:8,8,9 178:1
178:14,15 180:9
183:5,10,18,23
fraudulent 4:25
119:19 120:5,6
166:12 185:4
fraudulently
99:3
free 135:6 148:9
freiden 21:5
107:17
friday 67:6
frivolous 147:20
front 8:24 57:12
73:23 149:10,13
fronts 48:15
frozen 24:12
full 4:8 89:16
142:23 161:11
170:8

fully 13:2 28:6
fumbling 8:25
function 185:13
functionality
39:9
functioned 23:6
functions 14:10
fund 38:22,25
85:6 86:16
112:14 157:17
160:18 176:17
176:20 182:6
funded 29:1
39:1 112:25
funders 147:2,4
147:9
funding 3:19
18:3,4 29:15
47:2 49:5 66:18
66:25 74:5,8
86:14 95:6
144:5,16 145:13
146:15,21 147:1
153:2 177:12
funds 19:9 63:7
63:9,11 64:1,3,7
64:10,11,22,23
69:16 70:1,5,10
70:12 75:22,23
84:13,18,24
85:3,9,13 92:13
92:14 143:10
151:20 157:15
158:18 170:16
174:14 177:22

177:23 183:3
188:3
fungible 177:24
funny 189:11
further 32:8
81:7 128:22,25
129:2 153:9
160:19 191:8
future 139:11
fuzzy 59:5

g

gain 78:1
gained 176:2
gainfully 153:4
gall 16:1 138:20
game 92:24
gap 136:19
gaps 116:1
gart 40:25 41:4
47:10,11,12,14
gates 102:20
gathered 7:1
general 58:14
76:20 93:24
94:10,16 95:9
113:14 114:6,18
114:22,24,25
119:9 161:14,17
161:19 162:3
163:3,3,10,13
163:17,22
167:14 168:2,14
168:24 169:2
generally 8:8
10:20,24 11:7

45:2 50:22 63:13 77:21 115:14

**generating** 29:24

**generic** 120:14

**generically** 6:1 10:6 153:25

**geographic** 136:21,23

**getting** 79:11 95:24 96:15 102:11 107:24 109:9,9 110:6 134:18 137:7 163:15 166:17

**gg** 190:20

**gist** 5:1 17:3

**give** 37:21 67:25 100:14,16 111:6 127:10 179:23

**given** 39:25 64:17 73:14 80:3 95:15 131:21 142:21 152:13

**giving** 99:14,16 164:18 182:25

**glenmoor** 129:24

**glowing** 98:5

**go** 7:16 12:9 25:11,21,23 31:5,5 49:12 66:24 68:2,6

69:15 83:9 87:13 100:13 103:6 109:19 117:23 119:2 137:4 138:12 141:8 147:8 149:22 169:9 174:15 179:13 185:25 188:25 188:25

**goal** 96:4,5

**goals** 140:6

**goes** 69:24

**going** 4:16 6:16 7:22 12:9 16:22 26:20 32:16 45:5 47:4,20,24 48:19 50:5 51:5 51:10,15 53:2 53:12 62:10 63:24,25 65:9 66:21 67:23 68:5,16 70:9 74:13 81:6 82:13 86:8 89:2 90:2 91:10 101:22 106:14 130:10 136:25 139:14 140:1,22 146:16 149:1 154:6 163:15 166:20,25 174:4 174:16 180:6 182:11,20,21 183:14

**good** 4:7 42:16 46:22,23 87:7 101:8 102:7,8 102:15 106:15 106:16 107:2 142:5 148:25 156:21 180:15 180:15,18,21,24 181:9

**google** 43:12

**gotcha** 92:24

**gotten** 123:19

**governed** 11:10

**governs** 8:6

**grand** 96:11,15 96:16,21,22 99:8 108:11 110:19,21

**grandfathered** 77:18

**grant** 124:11

**granted** 12:20 155:22

**granting** 3:15 3:17 100:23 124:9 135:4 149:9

**gray** 133:11,22 134:3

**great** 48:19 62:12 63:14 65:19 70:16 75:20 80:14,18 81:10 84:2 90:16 94:5

96:16 169:9 173:16

**greater** 68:22

**greenberg** 43:25 46:21 49:4

**grossman** 43:24

**ground** 40:16

**group** 8:18,20 9:17 15:3,15 16:1 18:2 19:21 19:25 20:15,16 21:1,8 30:7 34:9 38:1,22 39:1,13 40:4,16 42:9 48:12 51:17 52:13 58:11 61:12 62:18 66:2,9,15,16,18 66:19 68:14 79:7,8,14 81:21 94:7,13,20 95:11,17 97:19 98:1,1,16,22 99:10 100:8,14 101:4,10 103:2 103:3 105:11,23 105:23 108:24 110:20 113:20 115:25 117:16 117:18 122:20 123:1,9,10,11 128:15 130:6,20 137:24 151:14 160:3 167:21 178:7 184:23

185:1
**groups** 11:18
12:14 41:12
44:18 48:17
113:21
**growing** 145:19
**guarantor**
182:2
**guess** 5:5 16:8
26:5 60:14
120:5 127:16
129:6 141:7
146:22

**h**

**h** 3:1 192:3
**half** 15:5,11,12
15:14 23:18
175:17 181:14
181:18,20
**hand** 57:14
73:23 75:21
138:17 190:12
**handed** 138:9
**hands** 65:23
79:25
**handwriting**
59:1,2
**hang** 109:14
**happen** 17:10
172:7 187:2
**happened** 12:3
12:6 17:9 25:1
28:15 63:2
73:24 76:8
86:22 88:15

92:23 102:2
126:6,6 136:15
138:1,3,3 167:2
167:7,25 176:15
**happening**
17:20 69:1
86:24 87:6
138:4 167:8
184:6
**happens** 12:1
**happy** 37:22
141:6
**hard** 18:14
82:23 123:23
**harm** 158:14
169:17 178:15
184:19
**harmed** 168:6
**harsh** 178:12
**head** 13:8 122:5
125:1
**headache** 189:7
**headed** 8:18
**health** 10:6
11:10 13:4,9
29:16,19 31:21
42:10 44:11
48:5,6 54:19
56:13,25 57:5
59:13 60:3
68:14 69:3,4
93:4,8 94:22
95:5 99:18
101:15 102:4,7
102:13,16,24,25

122:22 125:14
134:12 136:1,9
141:17,23,24
164:9
**healthcare**
42:12,13 107:15
**hear** 11:23
**heard** 41:21
54:1 55:14 56:3
97:7
**hearing** 5:16
25:15 36:20,21
108:15
**heightened**
160:20 161:6
**held** 11:15
63:24 64:2 85:6
85:8 91:14,22
112:14 117:25
155:18 170:13
170:16 172:15
185:23
**help** 68:17 97:1
97:12 102:9
133:8
**helped** 81:9
**helpful** 131:20
**helping** 93:2
**helps** 123:19
**hereto** 92:2
**hereunder**
84:15
**hiatus** 153:12
**hiccup** 97:22

**high** 40:4
129:23
**highest** 43:18
**highland** 1:20
**highlighted**
127:7,15
**highly** 88:5
129:15,16
162:17
**hillsborough**
16:10 190:4
191:3,12
**hire** 127:25
129:3
**hired** 156:18
**hiring** 127:16
128:24
**historical** 50:20
**history** 85:16
89:7 92:8 101:9
166:24
**hj** 15:23,24
**hoc** 6:23 23:6
**holder** 9:4 64:22
64:23 86:1
158:17
**holding** 63:7,8
70:1,10,11
71:16 86:6
156:2 174:14
**holdings** 1:4,5,9
1:10 4:12,13 5:7
5:8 7:10 8:4,17
9:3,11,17,23,24
11:3,3 12:12,13

13:17,18 24:23
27:14,23 28:1
28:19,23,25
29:2,4,14 30:10
30:10,17,24
31:3 33:4 37:8
37:15,25 49:25
52:10 59:14
60:4 64:12 69:6
69:16 70:5
78:11,11 79:12
85:19,24 86:2
90:21 91:13
93:21 104:10
105:15 106:2
108:24 111:21
111:25 114:2
116:8,8 120:25
121:13 155:13
155:14,18,19
166:3,4,7
167:18,20 168:6
168:23,24
169:17 170:11
170:22 175:20
176:5,5,9 178:9
178:16,17
180:11,13,20
181:2,8,10,15
181:22,23 184:2
184:5,9,11,18
185:8,8,9,13,18
186:6,11,12,16
186:18,22 187:7
187:12,14,22

188:2
**home**  29:20
   104:15 137:16
**homes**  49:8,10
   137:15
**honest**  126:4,9
**honor**  154:6,11
   160:8
**hopefully**  170:5
**hoping**  4:18
**horizon**  12:7
   13:22 14:16,21
   16:13,13,20
   17:6,10 18:16
   19:16 26:10
   27:2,2,8 28:4
   38:6,15,21,24
   38:25 39:16,18
   58:20 149:25
   151:5,11,19,20
   151:21,24,24
   152:17,19 154:6
   154:12 155:5,15
   155:16,17,25,25
   156:4,10,12,18
   156:24 161:3,5
   162:9,16 181:11
**horizon's**  13:22
   16:20,23 156:21
**house**  16:23
**housekeeping**
   18:10 79:15
**housing**  133:9
**hud**  15:18

**huge**  6:16
**hum**  80:15
**hundred**  30:11
   58:23 167:23
**hurry**  164:15

**i**

**idea**  66:12 100:4
   120:4 148:25
   179:12
**identification**
   53:19 72:5
   83:21 103:12
   107:8 110:1
   121:21 126:18
   127:13 135:3
   144:13 148:2
   149:5
**identified**  12:2
   21:17 89:3
   91:23 134:15,16
   151:15
**identify**  28:15
   183:25
**ii**  1:5,10 4:14
   5:8 9:11,17,23
   12:13 13:18
   78:12 112:9,16
   113:6 114:1
   119:16 150:1,8
   155:14,19
**iii**  2:5 119:17
**ilf**  41:1 44:13
   54:24 114:7
   117:2 125:8
   126:22 137:11

141:16 186:7,23
**illegal**  177:19
**imagine**  117:17
**imh**  107:15
   111:16 117:2
**immediate**
   139:24
**immediately**
   163:11
**impacted**  92:22
   92:22
**impediment**
   45:17,18
**implement**
   138:7
**implemented**
   136:12 139:7,12
**implementing**
   17:18
**importance**
   120:24
**important**  59:6
   98:19 136:12
**impose**  148:4
**improper**
   177:19
**improperly**
   118:2,8
**improprieties**
   6:21
**improve**  24:10
   39:9
**improved**  39:8
**improvements**
   23:16 39:11

73:6 162:20
inability 108:6
  152:2,7
inaccuracies
  61:14
inaccurate 26:2
  56:22 60:8
incapable 185:1
inception 75:9
included 53:9
  84:15 125:14
  127:24
including 14:12
  17:13 40:10
  60:12 61:22
  128:5 130:3
  131:24 143:4
  145:11 158:4
income 19:9
  27:21 29:24
  105:16 182:24
incomplete
  59:16 81:20
incorporated
  125:17
increased
  181:20
increasingly
  63:3
incredible 166:8
independent
  7:11 9:5,20
  11:17 13:4,11
  22:8 23:16,24
  31:21 42:11

44:12,17 48:3
  54:13 97:24
  125:15 136:8,13
  142:1
indicate 165:5
indicated 93:19
  165:4
indication 68:12
indicia 30:1
indirect 184:8
individual 8:18
  13:25 14:8
  15:25 125:23
  162:1
individually
  12:15
individuals 20:1
induced 175:16
industry 55:17
  68:15
influence 22:19
inform 169:11
information
  4:17 7:2 34:3,16
  35:24 44:3 58:8
  58:17 61:10
  62:14 84:23
  171:2 183:11
informational
  84:22 86:11
informed 20:5
  131:25
infusion 152:8
initial 5:6 6:12
  51:18 153:5

171:4 182:19
initially 6:5
  46:13 145:12
initials 52:15
  54:3
initiate 171:6
injured 141:11
inquire 74:14
inquiring 66:23
inquiry 134:6
ins 140:5,5
inside 136:13
insider 175:12
insisted 31:20
  31:24 59:12
  60:2 90:9 94:24
  95:1 136:20
  184:6,12 185:24
insolvency
  32:25 38:13
  119:18 120:8
  160:19 180:12
  183:23
insolvent 120:7
  180:11 182:5
  187:24
instance 20:7
  21:19 77:3
instant 24:15
institution
  155:25 156:6
instructed
  76:11
instruction
  75:16 77:25

78:4,17 79:18
instructions
  69:18 78:20
  80:2,3
insubstantial
  73:19
insulate 119:22
insurance 8:5
  83:25 84:21
  158:5 172:22
integrated
  78:24
integrity 177:13
intend 25:21
  82:18 117:15
intended 93:6
  95:13 158:17
  164:10 176:20
  177:11 182:9
intending
  117:14
intent 6:2 39:8
  42:9 46:9,11
  97:4,16,17,18
  174:24
intention 63:10
  64:3,5,6 70:4
intentional
  29:17
interest 3:12
  15:3,5 16:15
  25:4 29:3,12
  37:10 41:3 46:6
  48:8 58:19 93:6
  93:21 94:11

95:22 97:1 99:10 100:9,13 100:14,24 108:17 110:14 110:16 111:17 112:8,15 113:5 113:21,22 114:6 114:19,25 115:1 115:4,12,15 116:7,8 121:23 123:12 130:13 132:11,13 155:13,22 159:6 159:9 177:4

**interested** 23:10 36:4,9 40:5,7,14 97:24 109:3 121:10 125:6 128:4,5,6 134:18 191:10

**interests** 12:11 28:2 29:10 31:9 41:6,7 107:25 159:15

**interfere** 22:2 100:2

**interfered** 16:14

**interference** 17:15

**interrupt** 46:2

**interviewed** 131:9 133:3,5,7

**intolerable** 118:17 158:1

**inventory** 139:18

**invested** 142:3

**investigated** 38:18 121:6 158:1

**investigating** 6:25 7:7 75:3

**investigation** 6:20 74:19

**investment** 8:17 9:17 24:13 39:1 39:11,17 40:18 98:16 112:13

**investments** 3:4 53:23,23 54:4 54:17,22 55:9 98:4

**investors** 20:15 21:4 31:16 188:3

**invoices** 42:22

**involved** 6:13 6:17 12:15 13:24 14:14 15:23 20:2,17 20:19,19,20,23 21:7,10,16,20 28:22 34:5,7,11 34:20,22 38:13 41:11,12 44:1 63:20,20 66:11 68:20 76:24 93:1 95:14 98:12 120:17

128:21 129:7 130:8 131:25 132:19 133:18 133:19 142:17 153:4 163:9 164:5 174:3

**involvement** 5:5 42:16

**involving** 23:1 23:12 78:22 79:4,6,7 82:12

**israel** 2:5 189:13

**issuance** 125:20

**issue** 32:7 45:10 68:21 79:15 93:17 95:10 108:19 122:7 126:13 159:6

**issued** 8:4 11:15 34:12 51:19 77:25 91:15 171:4 176:16

**issues** 24:24 44:4,5 45:9,13 69:6 101:7,7 115:17 171:5 173:19

**iterations** 65:1

**iv** 119:17 174:17 174:19,22 180:7

**j**

**jackson** 21:5 55:24,24 56:1 112:17,18,21

**jackson's** 112:3

**jacksonville** 18:12 80:23 82:21,23

**january** 51:19 151:12 168:18 171:3

**jared** 107:17

**jay** 61:16

**jeffrey** 1:8,17 4:1,9 191:6 192:2,23 193:4 193:7,9,11

**jennis** 6:24 36:5 74:17,24 75:3 78:3,15 133:14 147:23 148:3,7 148:10,12,13,17 148:19 150:11 150:14

**jersey** 1:13 43:22 49:19

**jfc** 111:16 113:1 117:2

**job** 46:23

**johanson** 150:10

**john** 14:1 20:3,8 20:11 21:12 55:20 98:25 107:16

**joint** 3:11 62:5,7 109:17 142:19

**jointly** 1:6 108:13

**josh** 49:14,18
**judge** 5:24
43:24,24 123:14
148:18 189:9,9
**judge's** 127:18
**judgment**
179:21
**jump** 46:1 96:20
**jumped** 123:2
**june** 72:14
**jurisdictional**
147:16

**k**

**kassidy** 107:17
**keep** 134:5
135:15 166:17
166:18
**keeping** 8:22
35:19 125:1
**keith** 2:2 193:1
**keith.appleby**
193:1
**kept** 90:25
**kevin** 20:2
**key** 55:1 92:24
**kicked** 134:8
**kill** 64:17
**killer** 68:1
**kim** 55:3 189:12
**kimberly** 2:5
**kind** 4:17 5:21
25:21 28:10
43:3 98:10
122:10 134:21
149:22 151:10

**kinds** 43:2
**king** 1:22 183:6
190:17 191:5,19
**klempner**
138:22
**knew** 49:22
64:11,19,21
75:15 85:17,18
87:3 93:3 132:3
154:22 162:7
163:14 171:6
178:5
**know** 4:15,21
6:11,14,16,18
6:18 7:10,16,18
8:1,22,22,24
11:20 12:6,13
12:17 13:7,7
14:11,12,16
15:19,19,25
16:18,21 17:2
17:10,14,16,19
18:18,20 19:11
19:14 20:6,10
21:3,3,7,14,15
21:19,21,23
22:5,8,9,16,17
23:9,11,22 24:6
24:10,19 25:9
27:18,22,22
28:3,7,15,20,21
29:1 30:3,8
31:16,19 32:2,5
33:2,3,3 35:7,13
35:14,19,22

36:6,10,15,15
37:23 38:1,9
39:10,18,18
40:1,2,3,6,15
41:3,14,15,20
42:13,17,20,22
43:7,8,11,23,25
44:5,20,21 45:8
45:9,15,17,22
46:7,14,16,17
46:18,19,20,23
47:3,23,24 48:9
48:11,18,20,24
49:2,13 50:11
50:15,16,19
51:16,21 52:13
52:19,21 53:23
56:18 57:11
58:11 59:4,17
59:17,18 60:12
61:8 62:11 63:7
63:22 64:18,21
64:25 65:2,5,16
66:12 67:14,15
68:3,12,15,16
68:19,22 69:8,9
70:14,15 71:14
71:16,22 73:15
73:19,21 74:21
75:2,2,12,21,22
76:2,6,24,25
77:1,3,7,8,20
78:13,15 79:5,6
79:21,23 80:8
80:16,17 81:3

81:11,21 82:1,3
82:24 83:6
85:18 86:1,9,14
86:16,17,20,21
86:22 87:5,11
87:13,15,18,22
88:9,10,13,17
88:19,20 89:3
91:16,18,20
92:16 94:5
96:14 97:11,12
97:16,18 98:5
98:16,19,19
99:8,11,23
100:2,7 101:6
102:6,7,12,15
102:19,22 104:2
104:9 106:9,21
107:4,4 108:25
109:2 110:11
115:18,18,25
116:1,2,5,14
117:13 120:8,11
120:14 121:4,11
123:7,8,24
125:9 126:6,9
128:15,17,22
129:8,13,18
130:2,12,19,20
130:25 131:18
131:24 132:1,8
132:18,19 133:7
133:16 134:6,7
134:7,11,14,16
134:18,19,22,23

135:16 136:18
136:19 137:2,17
137:18,24 138:6
139:6,11,12
140:24,25 141:3
141:4,5,22,24
144:2 145:4,4
148:6 150:13,25
161:5 162:24
163:24,25
165:18,24,25
167:8 168:19
169:12 171:1,17
172:2,3,5
173:18,23,24
174:4,9,11
175:15 177:6,11
177:12 178:1,4
180:21 182:25
186:3 187:10
188:16,18

**knowledge**
29:15 87:4
130:17 134:3
137:12 179:1
180:3

**known** 41:4
130:7,14 133:16
137:21

**knows** 90:12
91:10,11

**korhn** 59:21
60:1,9,23 65:13
65:18 67:8 82:3
83:1

**kristin** 138:24

**l**

**lack** 7:4 16:3
23:23 26:4
48:25 50:5
139:17 151:20
183:23 184:16

**land** 9:12,13,18
9:22 137:22

**landlord** 29:25

**landry** 8:19
9:18 12:13,14
12:14,17,19
13:17,21,24
14:5,16 15:3,5
17:24 19:24
24:21 25:2,15
25:17,17 26:17
58:11 61:19,20
61:21 62:3,6
66:10,11 75:16
75:19 76:3
77:25 78:18,23
79:4,7 81:17,23
81:24 82:5,13
83:7 93:23 95:7
95:9 105:23
106:1,7 107:2
113:15 114:10
114:17,24 116:6
117:17 120:16
120:23 121:5,7
121:8,9,14
130:14,16 150:6
153:18,23,25

161:20 163:9,14
163:22 165:1,2
165:5,7,9
167:13,14 168:1
168:5,8,10,12
168:20 169:5,10
169:16,20
175:15,25

**landry's** 80:18
112:18 114:14
118:25 169:5,20
175:15 176:1

**language**
127:14,15

**large** 73:20

**largely** 99:2

**larry** 8:18 9:18
120:16 163:21

**late** 61:5

**laugh** 70:14

**law** 2:2 6:24
36:5 78:20,24
145:2 148:17
150:11,14 153:3
174:1 175:7
179:17

**lawsuit** 16:10
143:24

**lawyer** 43:24
47:11 68:18
76:18 89:8
167:11

**lawyers** 76:21

**lay** 7:12 122:10

**layers** 168:9

**lazalof** 138:23

**lc** 44:14

**lcs** 39:18 40:4,8
40:13,14

**leadership**
175:23

**leading** 55:17

**leadingage**
132:1

**learned** 50:15
129:8,18

**lease** 11:4 30:18

**led** 9:18 12:14
25:7 48:8 75:4
103:4 125:23
126:12

**left** 73:2,16
80:12 87:9,11
120:6 138:17

**legal** 16:20
21:21 61:16
71:2 193:22

**legislature**
77:10

**legitimate** 47:2
49:2

**lender** 18:7 79:8
158:10

**lending** 161:3

**length** 42:2
48:19

**letter** 3:6 6:2
42:9 46:9,11,12
61:25 63:17

83:19,24 85:17 87:17 89:10 91:10 97:16,17 97:18 166:18,19 166:20 171:10 172:11,24 173:17 174:1,2 174:3

**level** 20:7 46:6 130:13 153:5

**leveraged** 111:12 118:15 157:12,24 159:2 162:5 164:21

**levine** 49:14,19 50:9,16

**liability** 10:1,2,5 29:20 114:3 115:9,10 117:12 181:25 184:20

**license** 9:4 11:15

**licensed** 8:9,16 10:19 11:9 185:16

**licenses** 95:15 102:11

**licensure** 184:24

**lien** 78:10 92:13 148:4,15

**liens** 12:20 13:13 124:11 148:9 155:17

**lies** 178:1

**lieu** 13:19,22 14:2 18:19,19 18:25 24:21 26:3 151:6,21 152:12,18 153:16 155:9 156:25 162:9 180:23 185:6

**life** 3:8,14 27:2 27:6,14 33:11 33:20 34:8 36:25 39:13 41:16 71:18 73:1 76:18 103:17,21,25 104:3,5 122:21 126:12,19,22 134:19,21 135:8 137:24 138:10 138:21 139:2 148:8 154:7 156:17,18 160:9 162:16,19 166:5 176:23 178:18 182:11,12 185:15

**lifeline** 160:8

**likewise** 93:23

**limit** 6:9

**limitation** 119:7 162:5

**limited** 1:4,6,9 1:10 4:13,14 8:5 9:12,25 10:1,2,4 17:23 19:10

60:5 85:19 91:14 93:20 94:14,15 111:17 112:6,8,15 113:5 114:3,19 115:1,9,10 117:12 119:8 131:21 155:13 159:6,9,15,16 159:18 161:15 161:17 163:2,12

**line** 77:20 176:23 192:4,7 192:10,13,16

**liquid** 28:23 72:13,22 160:7 188:11,21

**liquidated** 34:6

**liquidating** 1:8 3:15,17,18 4:12 36:2,16 40:9 72:21 73:10 107:13 109:10 109:22 110:5,10 121:11 122:25 124:9 131:14 134:23 135:4 144:2,3,15 149:17

**liquidation** 34:13

**liquidity** 152:9

**lis** 16:16

**lisa** 32:21

**list** 19:13 48:20 88:20,23 138:16 139:4

**listen** 140:22

**listened** 179:10

**litigation** 3:19 42:20 99:7 111:9 122:7 144:5,16 145:12 146:15,20 147:1 153:2

**little** 7:9 8:1 13:9,11 15:7 23:4 26:13 31:5 40:13 56:22 103:7 110:12 114:5 122:13 134:9 138:9 159:13 173:5 182:1

**living** 3:3 7:11 9:5,20 10:13,16 11:8,17 13:4,11 20:20 23:16,24 24:10 31:22 35:21 38:23 42:11 44:12,18 48:3 53:22 54:13 56:24,24 97:24 104:12 112:13 125:15 135:24 136:8,13 136:14 142:2 186:7

**llc**  9:25 43:15 85:21,22 89:24 89:25 90:3 91:23 92:2 93:11 104:11 107:14,15 144:17,18,23
**loan**  13:9,10,18 14:1 17:15,18 18:13,20 23:14 26:4 32:2 37:2 38:5,5,6,6,22 56:13 61:8,24 64:19 74:5,7 78:21 79:5 81:17,18 95:4 95:19 97:10 116:19,21,21 117:21,22,24 118:3,6,7,10 132:20 151:5 152:2 153:22 154:8,23 155:9 156:4,10,13 157:2,13,14,16 160:11 162:13 162:15 164:7,25 165:18,19 172:21 175:21
**loaning**  69:3
**loans**  12:20 13:1 13:3,6 38:7,11 38:15,16,17 151:18

**located**  9:9,16 56:19
**location**  57:8 139:23 142:7
**lodged**  10:13
**long**  7:1 8:14 50:19 63:1 65:9 94:2 147:11 154:1
**longer**  28:24 91:1 93:5,5,14 95:10 102:24 120:24 166:2,7 186:11
**longstanding**  54:12
**look**  36:6 37:22 54:5,25 55:16 56:18 57:12 71:15 84:5 87:13 105:20 109:15 111:11 127:10,14 129:14 139:14 140:2,5 141:23 170:6 171:18 172:18 182:4 185:15 189:6
**looked**  15:22 34:16 50:21 56:16 134:9
**looking**  29:19 55:11 79:17 80:3 90:16 91:7 91:7 112:11

113:24 116:18 122:4 124:4 125:2 146:21 148:22,23 150:4
**loop**  127:1
**loosely**  7:19
**loss**  37:5,7 181:8
**lost**  98:16 105:19,19 181:24
**lot**  8:25 9:2 36:20 45:12 46:19 51:3 61:10,13 76:21 76:21 77:12 102:17 123:18 129:8 131:19 173:6 179:15,23 182:13 183:24
**lots**  32:5 131:3,3 165:20 168:4
**lou**  21:5 112:3 112:17,18
**louis**  55:24
**love**  96:17
**lower**  101:18
**lp**  89:12,19,22 111:21 112:1,14
**lunch**  80:12

**m**

**made**  28:2 30:5 38:2,11 39:23 40:17 48:9 53:7 60:15 96:7

113:9 131:14 134:8 147:16 149:21 154:17 160:11 175:20 179:3 180:2 183:17
**magnitude**  101:13 176:11
**maintain**  134:5 177:13
**maintained**  78:10 118:1
**maintaining**  75:22
**maintenance**  27:25 177:11
**major**  87:14 98:21 178:16
**make**  17:2 37:22 39:4,17 40:18 42:17 55:4 73:6 75:17 76:21,21 78:19 83:10 86:12 92:19 96:9 100:3 101:22 109:19,19,24 112:12,21 115:23 121:5 126:15 127:4,7 127:9 135:12 143:14 144:11 152:1 157:16 158:12 164:11 164:12 169:13

170:23 174:12 179:7 188:5
**maker** 48:9 113:17
**makes** 89:5 173:21
**making** 36:9 37:2 44:2 72:7 94:22 95:19 101:8 105:24 164:13 166:18 174:6
**mall** 9:9 138:2,5
**man** 40:10,13
**manage** 156:19
**managed** 114:7
**management** 11:17,19 14:9 20:16 54:12 55:18 58:9 94:18 107:14 111:21,25 112:1 114:13 164:3,7 168:16,17
**manager** 150:7
**managing** 55:20 144:19,21
**manner** 152:16
**manor** 6:4 20:24 42:12
**march** 8:12 11:20 12:1,3 18:1 19:22 22:21,24 23:15 25:1,10 28:3,24

30:8 33:4 52:20 57:17 61:5,25 62:16 63:16,17 67:6 71:24 83:24 88:4,6,7 94:19 98:21 104:19 109:6 113:2,12,13,23 113:25 114:9,16 115:6,8,19 116:2,3,9 117:9 135:10 140:6 155:14 159:2 160:3,4,23 161:1 164:4 165:5,19 166:19 167:4 171:10,11 171:13 172:10 172:19 181:15 186:21
**mark** 53:17 72:2 83:11 103:9 107:6 127:9 134:25
**marked** 3:2 53:18 55:7 72:4 72:11 83:20,23 103:11,15,20 107:7,11 109:25 121:18,20 126:17 127:3,12 135:2 144:12,14 148:1 149:4,7
**market** 101:3 124:14,21

140:19
**marketed** 128:13 151:13
**marketing** 12:17 130:15 134:1
**marketplace** 137:14
**massachusetts** 133:12
**massive** 87:23
**master** 11:4
**material** 23:22 50:13 51:23 162:24
**math** 189:10
**mathematical** 33:11,19
**mathematically** 27:17 33:3
**matter** 21:2 30:24 50:20 51:2 74:18 125:11 160:4 182:4
**matters** 77:14
**mature** 175:21
**matured** 13:1 151:19
**maturity** 13:17 151:11 152:2 161:7,10
**maximized** 39:11

**mccowan** 107:17,17
**mcglinchey** 2:6
**mcmurtry** 129:11
**mean** 7:11 12:14 18:10 20:17 25:17,20 28:21 35:14 41:10 43:13 44:8,15 45:4 46:2 49:11 51:14 54:24 57:7 59:5 62:10 63:12 70:15 80:25 82:22 87:15,20 90:3 91:2,10 92:21 94:4 104:4 129:4,22 132:8 134:16 136:10 136:25 137:5,14 140:21,23 145:4 150:4 152:11 153:19 154:12 154:15,24 163:16 164:1 166:19 170:10 172:7 179:5,10 186:4 188:22
**meaning** 9:15 79:2 88:23 147:9 153:25 161:10 171:16

**means** 104:25
105:3 140:25
154:25
**meant** 50:6
**measure** 22:17
**mechanism**
35:19
**mediated** 3:11
108:13 109:10
109:17
**mediation** 96:22
98:13,17 108:5
**medical** 185:9
186:23,23
**medicine** 4:19
4:20
**meet** 84:18 85:6
129:11
**meetings** 41:8,9
41:11,14,19,25
**melrose** 2:3
**member** 29:2
99:10 100:9,13
100:14 110:14
110:16 116:7,8
123:12 144:19
144:21
**membership**
3:12 29:9,12
31:9 97:1
107:25 108:17
115:4,12,15
121:23
**memorandum**
78:15

**memorialized**
147:5 148:17
**memory** 15:10
16:25 59:5
70:15 81:7
125:9 137:13,18
169:25
**mention** 22:25
111:7 150:6
**mentioned** 32:7
40:22 44:7
55:24 58:16,19
59:10,18 77:24
82:11 112:20
129:12 135:13
138:19 146:7
**mercer** 145:2,7
148:15 153:3
**merge** 106:14
**merger** 1:14
**merits** 134:14
**messages** 83:6
**met** 48:23 49:1
129:10 133:13
**mgw** 1:3,5,7,11
**michael** 138:24
**michelle** 138:23
**middle** 1:1
17:12 52:18
61:5 171:3
**mile** 56:20
**miles** 56:19
136:25
**million** 13:10,12
13:12 15:5,11

15:12,14 19:5
23:18,25 27:16
27:20 28:22
30:22 32:14
33:3,8,12,15
36:21,25 37:2,5
37:7,8,10,16,20
37:24 40:23
42:14 49:4
54:15,18 57:10
58:11 67:1 68:6
73:17,18 74:15
75:14 76:10
86:17 88:18
89:21 112:10
117:17,24
119:14 142:9,12
143:1,17,20,21
145:16,16,20
146:19,19
149:25 152:10
164:24 165:9
166:6,10,13
170:12,21
172:15 175:17
175:18,22 176:8
176:11,18 178:6
179:23 180:14
180:15,24 181:2
181:7,11,14,18
181:20,24 182:1
187:13,21,24
188:23
**mind** 18:15
46:16 79:19

100:15,15
110:13 170:1
**minimum** 28:22
72:13,22 160:7
188:11,21
**minute** 56:12
96:10 147:22
148:25 174:17
**minutes** 137:2,6
**miraculously**
185:5
**mischaracteri...**
161:20
**mislead** 92:9
171:2
**misleading** 7:20
7:23 62:19,24
80:21 170:15
**misled** 62:15
**mismanageme...**
6:21
**mispronounci...**
56:7
**misrememberi...**
53:8 73:22
**misrepresenta...**
174:1
**missing** 49:24
173:20
**misstate** 42:15
44:16 59:7
108:3
**misstating** 26:1
**mistaken** 10:4
17:3

mistakes 76:22
misunderstan...
  24:20 88:9
  122:17
mix 69:2
mixing 113:19
mlr 37:11 53:1
  62:19,20 63:7
  63:10 64:2,4,7
  64:12,20,22,23
  67:10 68:7,16
  69:5,15 70:1,2,3
  70:5,10,12
  71:15,19 73:6
  75:14,22,25
  77:8 79:12
  84:17,19,20
  85:7,9 86:6,12
  86:15,18 89:13
  89:20,22 90:5
  92:11 117:25
  118:8 119:14,24
  155:20 157:17
  158:16,18 160:6
  160:17 164:24
  166:6,10 170:12
  170:14,21 171:5
  172:20 173:22
  174:10,14,21
  176:4,8,9,13,17
  176:19,20 177:1
  177:15 178:4,21
  182:6
mlrs 175:1

model 32:15
modification
  146:12,14
moment 53:20
  54:24 164:2
moments 189:8
monday 67:6
monetary 161:2
monetized
  147:7,7
money 23:17
  24:1,9 27:22,23
  28:1 69:3,4
  73:20 75:24
  76:10,21 79:9
  79:11 86:5,6
  91:7 106:12
  142:2,5 144:22
  145:1,5 146:8
  156:2 176:20
  177:20 178:5,11
  182:10,12 188:4
monies 143:24
  144:1 147:17
month 30:12
  139:16 167:22
  167:25,25,25,25
  169:13
monthly 3:14
  27:25 126:21
  138:10
months 108:10
  146:4,6 147:12
moon 40:11,13

morgan 88:2
  171:13
morning 4:7
morse 3:20
mortgage 13:13
motion 3:16,17
  3:20 47:16
  120:12 124:10
  135:5 147:22
motions 152:22
  153:10
motivation
  39:15
move 91:9
  134:24 138:9
  140:5,5,22
moved 94:7
movement 86:5
moving 75:21
  89:21
mullen 3:7 62:1
  66:19 83:25
  166:18 171:10
multiple 72:7
  99:15 161:16
mutual 3:12
  121:22

#### n

n 2:13
name 4:8,22
  8:18,20 14:8,13
  15:25 21:10
  26:5 42:13
  43:11 54:1,4
  55:20 56:2,4,5

56:10 59:4
  69:20 80:6
  94:10 103:3
  125:24 129:13
  133:11,22
named 13:25
  110:5 119:4
  120:20 190:7
names 8:23 9:1
  21:6 55:18
  111:23
national 1:12,13
  4:23 130:13
  149:17,18
nature 15:16
  155:24
near 135:25
  172:10
nebraska 20:23
  21:1 22:12 98:8
  106:19 130:8
necessarily 91:5
  129:1 136:20
  167:4
necessary 39:10
  40:18 44:4 74:6
  126:11
need 32:8,9
  56:12 73:14
  87:5 102:24
  124:2 127:10
  132:17 135:12
  140:7 141:8
  148:24 150:18
  159:9,10 174:9

**needed** 14:18,20 16:21 45:10 49:23 50:8 73:3 99:12 110:11 131:5 133:20 162:21
**needs** 177:6
**negligence** 119:17
**negligent** 76:24
**negotiated** 46:13 104:7 145:24 151:17 151:21 153:16
**negotiations** 13:25 14:5,17 20:3 44:23 153:24
**neither** 79:8
**network** 160:13
**never** 7:22 10:15 26:20 36:12 37:1 38:18 50:1 51:13 53:3,4 54:1 57:10 65:7 76:10 79:10 80:7 85:25 88:23,24 90:19 120:20 129:14 131:18 132:10 140:9 147:19 148:19 152:25 165:2 179:13

**new** 1:13 43:21 43:22 49:19,19 94:18,18 102:11 132:6 139:22 151:13 164:3,3 164:7,8 170:9 182:11,22
**nf** 32:4
**night** 67:22
**nine** 56:19
**non** 7:5,15 48:6
**nonfinancial** 128:7
**nonpayment** 33:11
**nonstarter** 134:13,21
**nonstarters** 48:21
**normally** 74:1
**north** 1:20 17:8 56:20 125:25
**nose** 185:23
**notably** 157:13
**notary** 1:22 190:18
**note** 113:8,17 122:17 193:9
**noted** 75:9
**notes** 34:12 35:1 39:1 142:21 164:13 191:7
**notice** 3:18 64:25 69:24 82:4 89:13,19

144:15
**noticed** 116:15 140:21
**notices** 76:6
**notify** 65:6
**notwithstanding** 129:4 181:9
**november** 5:19 124:8 128:11,18
**novum** 101:11
**number** 23:22 27:4,17 33:14 33:15,23 41:6 41:11 53:18 60:11 61:22 62:3 72:4 75:6 83:20 91:24 101:23,23 103:11 107:7 109:25 121:20 126:17 127:6,12 129:10,17 133:13,16 135:2 136:25 139:21 144:12 148:1 149:4 175:19
**numbers** 10:15 13:7 15:8 35:7 36:20
**numerous** 83:14 101:19 135:14 152:22 153:10
**nursing** 3:3,13 7:7,15 9:25 10:5 10:11,14,17,18

10:19,22,23 11:2,4,14 29:3,5 29:7,20,23 30:13,19,24 31:9 35:21 37:14 49:8,10 53:22 54:9,22 56:25 66:4,8,14 69:20,25 70:3 81:18 85:21,24 90:20 91:22 97:2,20 99:4 101:2 104:11,15 105:1,20 106:2 107:15 108:1 110:15 115:4 116:9 117:18 120:25 121:24 134:19 135:25 137:8,15,16 141:10 166:2 167:24 181:4 184:2 185:14,17 186:10,12 187:3 187:4,5,11 188:1

|  o  |
| :---: |

**oath** 2:15 4:2 190:1
**object** 25:16 99:17
**objected** 35:5
**objecting** 57:22 58:1

objection 47:15 50:12 57:19
objections 35:7 35:25
objective 99:6 152:4,6
objectively 89:4
obligation 35:10 35:17 105:21 145:15 158:8,12 161:3,22 167:24 176:6 182:21,22 186:16
obligations 27:6 27:13,21 43:9 44:16 90:5 105:17 118:10 144:3 145:8 147:8 148:17 154:11 161:10 166:3,16 177:4 182:13
obstacle 101:14
obstacles 102:9
obtain 24:2 72:21 74:7,10 124:10 136:9 143:23 157:22
obtained 15:15 46:12 124:25
obtaining 119:9
obvious 70:20 171:22
obviously 15:9 57:8 86:12

178:3
occasions 72:24
occupancy 23:22
occupied 161:13
occur 14:4 47:20 67:6 94:25 95:6 98:12 100:24 102:21 123:15 165:2,25 166:1
occurred 17:17 22:24 23:14 24:8,17 25:6 26:17 28:4 34:14 35:6,11 37:1 57:17 61:9 62:13,15 70:19 76:1 93:15 95:18 105:21 109:6 115:20 117:4,9,13 128:20 163:5 165:22,24 184:3 187:4,13
occurring 17:20 21:20 92:25 117:5
occurs 85:10 113:12
october 5:19 14:19 154:2
offer 43:1 180:5 180:6

offering 82:18
offers 47:18
office 5:17 8:5 53:10 68:19 80:24 83:25 84:21 158:5 172:22
officer 20:10 21:2 22:7 65:18 67:21 87:4 106:20
offices 17:6
official 23:7 34:6 163:9 190:12
officially 46:17
oftentimes 21:25 77:1,22 116:1
oh 89:15 122:15 122:16 126:19 139:5 151:9 186:1
oir 3:7 8:16 24:25 25:8,24 26:19,22,24 28:5 36:7 39:19 44:2 48:13,17 50:18 51:18,19 61:23 62:1,6,13 62:14,15,19 63:1,3,18,19,25 64:1,25 65:6,9 68:2,2 69:24 70:8,8 73:12,25

74:3 77:10 80:20 81:14,16 82:3 83:2 84:3 85:2,15 86:10 86:21 87:16,17 87:24 88:3,12 88:14,18,21 90:12 91:10,11 91:15,19 92:9 92:16,20 93:3 93:10,17,22 95:12,17 103:20 106:5,24 114:12 128:5 130:2 131:15 135:15 135:16 136:5,20 155:21 157:15 158:20,25 159:5 159:19,20 160:1 160:1 161:3 162:22 166:21 167:8 169:8,11 169:13 170:11 170:20,23 171:4 171:11,14,25 173:18,24 174:13 176:15 177:8 178:11,20 179:1,24 184:11 184:13,15,21 185:2,22 189:2
oir's 22:9 27:12 73:15 92:21 159:24

okay 5:13 12:10 18:17 22:23 23:3,20 25:20 26:8 31:14 32:13,18 38:4 45:20 46:3 49:21 51:3 52:9 54:5 56:3 60:18 63:12 71:6 75:1 77:24 80:8 82:7 82:7 83:9 91:21 107:24 111:15 117:20 118:24 120:15 122:16 123:6 133:24 134:24 135:11 135:20 140:11 144:22 148:21 149:15 150:6 151:9 152:11 154:10 156:21 158:25 166:17 167:19 179:24 183:4 188:5,18 189:14

old 139:16 182:12

omaha 22:12

once 71:14 86:22 88:17 90:23 95:21,21 95:24 96:2 100:8 134:14,15 181:1 186:11,17

ones 21:17 53:2 175:12

ongoing 22:10 89:5 139:17 168:5 176:21

online 23:21

opco 55:2,12,13

operate 19:11 39:2 93:2 95:12 106:23,23 107:1 131:16 176:15 182:6,17 184:23 187:5

operated 9:5 11:8,14 13:14 39:12 114:7

operates 93:1

operating 43:15 43:21 46:20 47:3 97:17 98:14 102:6 115:16 135:15 165:17 182:24

operation 11:19 31:1,22 49:11 94:15 146:18 159:18 177:5,7

operational 114:1 160:21,24

operations 19:7 28:1 49:12 86:24 94:12,22 105:1 176:13,16 177:14 182:9 188:1

operator 27:5 39:7 54:13 130:22

operators 30:2

opinion 20:5,5 51:6 64:15,17 67:17,19,22 68:1 70:23 71:3 78:14 102:3 167:9

opinions 76:20

opportunities 65:3

opportunity 102:4,16 105:20

oppose 99:25,25

opposed 117:5

opposite 76:9

option 175:22

options 6:7 16:6

oranges 141:25

orchestrated 87:23

order 3:10,15 3:17,17 5:23 49:22 51:18 53:13 75:13 99:9,22 102:21 109:16,21 110:4 124:8,9,13 127:1,2,5,19,21 127:22,24 129:4 135:4,5 138:10 139:8 144:6,8 148:9,18 149:9

153:17 171:4 177:13 190:9

ordered 123:15

ordering 193:14

orders 135:13 135:14,21

organization 139:5

organizational 113:25 168:11

organizations 132:2

original 38:5 52:13 74:18 75:5 122:16 150:15 173:12

originally 42:2 42:6

originate 156:4

orlando 68:18

osha 32:15,22

ousted 106:19

outcome 191:10

outset 5:14 42:8

outside 17:6 45:6 146:17 152:8

overall 100:21 181:19

overcome 102:12

overgeneralize 47:22

overlap 180:8

[overstate - particular]

| | | | |
|---|---|---|---|
| overstate 97:7 | **p** | 117:11,23 | 98:5 99:8 |
| overview 54:6 | | 118:16,24 | 101:18 102:23 |
| 56:19 | p.a. 2:2 4:11 | 119:21 120:9 | 107:21 113:20 |
| owed 13:13 | 148:3 | 127:7 149:24,24 | 115:17 116:19 |
| 145:20,22 | p.m. 1:19 80:10 | 150:3,7,9 151:4 | 117:24 119:24 |
| 161:15,18,25 | 80:10 149:3,3 | 151:7,14,19 | 120:16,20 |
| 169:21 187:21 | 188:7,7 189:15 | 152:12 153:20 | 121:25 122:23 |
| own 7:7 19:22 | pacific 18:6 | 154:6 156:17,18 | 124:13 126:13 |
| 25:18 38:22 | package 128:8 | 157:10,21 | 126:13,15 128:7 |
| 39:2 49:6 | 132:4 | 158:23,25 160:6 | 131:17 132:16 |
| 102:17 110:13 | page 2:14,15,16 | 164:20 | 133:22 148:9 |
| 132:20 156:19 | 2:17 54:5,25 | paragraphs | 149:13 156:7 |
| owned 7:5 8:17 | 55:11,17 56:19 | 104:14 | 166:11,12 |
| 9:4,12,18,23,23 | 57:12 84:11,11 | paralegal 79:22 | 170:21 173:16 |
| 10:5 11:1,2 | 111:12 113:24 | parent 104:24 | 177:17 178:1 |
| 12:12 30:24 | 139:15 140:5 | 104:24,25 105:6 | 183:7 185:11 |
| 38:7 60:4 61:20 | 150:2,6 151:4 | 105:10,25 | parter 168:14 |
| 104:25 116:8 | 152:20 157:12 | 186:12 | parters 163:3 |
| 117:1,2 145:12 | 192:4,7,10,13 | parentheses | participants |
| 164:23 | 192:16 | 84:7 | 110:22 |
| owner 54:12 | pages 1:25 | part 10:23 | participate 5:24 |
| 168:22 | paid 30:10 50:1 | 16:11 19:2 | 6:6,19 111:16 |
| owner's 20:9 | 50:7 53:4 | 20:16 21:7 28:9 | 165:1,3 |
| owners 132:2 | 145:11,22 | 29:12 34:2,12 | participated |
| ownership | 151:24 175:17 | 37:16 40:22,23 | 34:9 36:12 |
| 12:11 24:2 49:9 | painful 143:15 | 41:9 44:19 | 62:13 63:6 89:8 |
| 60:3 66:9 94:2 | paper 72:8 | 59:19 62:2,9 | 94:17 96:21 |
| 99:3 117:18 | papers 169:1 | 64:3 65:11 68:7 | 105:11 |
| 118:15 151:13 | paperwork | 70:5 73:1 75:20 | participating |
| 157:23 158:9,11 | 189:5 | 78:24 81:12 | 87:2 |
| 158:23 | paragraph | 82:17 83:2 84:2 | participation |
| owning 29:3 | 18:25 89:10,15 | 87:22 89:20 | 5:7 25:7 113:21 |
| owns 7:10 | 89:17 104:16 | 90:20 93:11,11 | particular |
| 104:11 | 111:15 113:24 | 93:14 94:5,21 | 24:14 51:5 |
| | 114:12,17 115:3 | 96:20 97:15 | 82:14 89:7 |
| | 116:19,23 | | |

**particularly** 15:25 34:16 41:13 62:9 131:23 137:18 169:9

**parties** 17:21 25:4 36:4 41:22 88:21 94:8 101:20 109:3 123:11 128:5 152:17 166:9 191:8,9 193:14

**partner** 93:25 94:2,10,16 95:10 113:14 114:6,18,23,25 163:11,13,17,22 167:15 168:2,24 169:2

**partners** 34:20 60:6 68:13 94:15 119:5,9 144:17,18,23 159:16 161:15 161:18,20 162:3 163:3

**partnership** 1:4 1:6,9,10 4:13,14 8:5 9:12 10:1 17:23 85:19 91:14 93:21 94:14 111:17 112:6,8,15 113:5 114:19,25 115:1 155:13

159:6,9,15,18

**party** 21:23 71:16 157:1

**pass** 138:8

**passed** 72:6,10 83:14

**past** 91:9

**pay** 15:5 30:12 143:11 167:23 175:22 177:3 182:12,19

**payable** 13:2 15:12,14 161:11

**paying** 182:8

**payment** 12:25 15:11 17:25 30:18 175:25

**peeling** 170:25

**pejorative** 62:11

**pejoratively** 62:10

**penalties** 192:20

**pendens** 16:16

**pending** 50:10 98:22 99:15 122:9

**pension** 44:22 111:8

**people** 7:18 21:25 22:4 49:1 56:7 65:19 79:13 97:23 101:20 102:6,14 102:16 103:4

106:25 112:12 129:9,16 130:25 132:1,7,25 134:8 136:9 138:15 172:2,5 173:19 179:13

**people's** 33:24

**perceived** 48:24 98:1,2 100:22 101:15

**percent** 58:23 111:17 112:4,8 112:14 113:5,22 114:6,19,22,24 114:25 143:13 143:15,16,18 147:2,3 169:2

**percentage** 104:6

**perception** 109:1

**performed** 27:7 50:22 114:13

**period** 8:14 12:19 41:15 98:18 121:1 136:19 162:23 162:25

**perjury** 192:20

**permanent** 15:15,16

**permitted** 14:4

**perpetuate** 48:4

**person** 20:11 83:7,8 105:17

116:3 126:5,9 142:15 168:1

**personal** 19:9 25:3,18 27:21 59:21

**personally** 79:16 168:10

**petition** 127:22

**phone** 188:5

**phonetic** 43:17 138:23

**phrase** 96:18 97:2

**phrased** 71:4

**pick** 52:20 128:2

**picture** 62:23 71:23 96:15

**piece** 62:22

**pieced** 62:24

**pieces** 7:17

**pinta** 134:11

**pip** 35:9 161:24 166:5

**pivotable** 95:19

**place** 1:20 8:13 30:2 168:13

**placed** 118:16 118:18 157:24 158:2

**places** 32:6

**plain** 88:25 166:25 174:2 180:10

plaintiff 2:4 107:13 110:8 149:17
plaintiffs 1:11
plan 3:11,14 34:9,13 41:16 71:19 73:1 108:13 109:11 109:17 122:21 126:12,19,22 132:10 133:1 135:8 136:8 137:24 138:10 138:22 139:2 141:5 142:19 143:25 146:13 146:17,18,20,24 147:1 148:8 185:16
planned 141:2
plans 27:21
play 45:19 110:14 111:1
player 121:9
pleading 160:1 165:11
pleadings 5:15 16:21 153:8,9 178:12
please 4:7 169:6 193:11
pled 154:22
pledge 84:6,12 85:4 91:25 92:7 92:8,12 173:21

174:6,7
pledged 24:1 118:2,9 157:15 160:10
pledgor 84:14
pledgor's 84:15
pllc 2:6
plus 37:10 43:14 43:21 44:24 45:25 46:11,12 46:13,20 47:2,7 47:16 48:23 49:1,6,15,17,20 50:24 85:11 86:14 97:17 98:14 130:22 145:17,18 180:14 187:21
pocket 182:10 188:3
point 5:21 17:22 56:16 57:5 60:14 63:15 71:9 87:18 88:13,13 121:8 130:24 141:20 166:18 171:15
pointing 26:12
points 87:14
ponzi 182:13,16
poops 164:16
pop 169:25
pops 170:1
portion 89:22 112:24 127:21

position 22:1 65:5 86:10 97:7 98:14 101:21 120:24 159:24 161:14 186:21
positions 41:6 168:13
positive 45:18
possess 155:17
possession 74:5 74:7
possibilities 39:3
possibility 74:2
possible 76:2 118:20 151:15 151:18 158:3 166:20 185:22
possibly 21:4 163:16
post 124:11 127:22
potential 15:21 29:19 48:12 118:20 158:4
power 101:4
practically 36:6
practice 68:14
pre 52:8
preapproval 118:14 157:23 158:9,20
precise 7:20
precisely 45:15

predates 57:16
predicate 184:8
predicated 17:14 78:25 182:8 183:23
prejudgment 37:10
prejudice 16:19
premier 27:3
premise 135:17
prepared 39:2 39:17 78:14 165:12 189:1
presence 44:25
present 56:9 59:20 88:1 90:13,18,19 93:16
presentation 39:23
presented 42:14 54:21 124:18 172:1
preserved 121:4
president 150:7
pretend 45:6
pretty 5:1 10:4 41:21 43:5,13 65:8,9 78:2 106:21 108:21 166:25 180:10 188:6
prevent 122:20
prevented 28:16

**previous** 6:15 48:16 52:17 133:15

**previously** 10:21 153:21

**price** 61:16 65:17,24 66:23 67:1,9,13,20,25 68:4,8,9,11,12 68:24 69:6,9,11 71:1 77:15,18 112:24 173:8 174:5,8,11 180:17

**primarily** 78:9

**primary** 6:18 24:20 25:16 99:6 110:22 161:3,21

**prime** 121:12

**principal** 1:12 43:7 104:4 177:3

**principals** 7:4,6 119:6

**principles** 50:23

**prior** 8:12 11:20 30:2 41:19 52:3 65:22 98:21 113:23,25 114:9 116:9,11 123:22 124:7 143:7 160:4 170:3,4,5

**prioritizing** 139:19

**privy** 47:9 82:22

**pro** 1:11 184:1

**probably** 8:14 56:6 70:14 148:25

**problem** 49:3 50:13 102:2 130:6 179:14

**problems** 19:18 28:5 45:11 65:7 103:1,23 106:17 134:10

**procedure** 193:23,24

**proceed** 14:5

**proceeding** 4:24 24:15 36:14 38:14 75:5 99:21 118:19 120:22 122:3 144:24 148:5

**proceedings** 25:8 75:7 158:3 159:3 171:7 184:15,22

**proceeds** 117:21

**process** 5:18,25 6:19 18:2 32:2 34:5,7 35:4 36:3 71:22 94:1 101:5,6 116:20 117:24 124:5 130:3 135:23 158:18

**processes** 132:1

**produce** 39:24 79:19

**produced** 71:12 79:17 83:2 88:11

**production** 39:25 71:12

**productions** 83:3

**professional** 143:18 146:20

**professionals** 133:17

**profile** 129:24

**profit** 1:13 11:6 11:13 14:9 39:14 40:17,20 125:19 147:9

**prohibition** 19:8

**projects** 69:2

**prominently** 32:5

**promise** 175:16

**promote** 137:16

**proof** 34:5

**proofs** 35:2,5

**propco** 55:2,12 55:13

**proper** 23:21 129:19 139:9 169:14 176:13

**properly** 39:12 76:11 88:21

131:22 182:17

**properties** 102:20

**property** 11:1 16:16 48:22 54:15 57:9 125:5 126:7 142:3 144:16,18 144:23 150:1 163:6

**proposal** 27:12 43:19 46:20 51:1 55:8 56:12 56:14 57:1 58:14 134:13 147:3

**proposals** 16:5 102:22 134:8

**proposed** 15:18 43:14 125:13 151:5

**proposing** 61:12 108:13

**prosecute** 178:24 179:22

**prosecuted** 179:2

**prosecution** 179:5

**prosecutor** 179:21

**prosecutorial** 179:20

**prospective** 44:24 45:1

prospects 139:22,24 142:1
protect 67:17 156:22 167:15 168:2 175:23,24 176:21
protected 24:22 28:6,18 36:11 39:4
protecting 26:22 176:24,25
protection 19:9 27:21 162:18
protects 176:25
protracted 98:17,18
provide 33:25 71:13 127:18 139:9,10 176:13 177:6,11 185:9 185:11
provided 11:19 13:20 35:16 75:12 78:16,20 80:1 88:20 92:12 99:24 167:10 183:12
provider 8:16 9:3 63:6 69:5,25 70:3 85:18,21 85:22,25 89:12 89:19,22,24,25 90:3,4,8,12 91:11,12,14,17 92:1 93:11

104:25 105:16 176:21,24,25 177:4
providers 27:4 75:22
provides 84:20
providing 89:13 89:19 104:13,15 105:16 136:2 162:18 169:11
provision 13:20 110:4 146:25 153:22 175:3
provisions 14:2 18:25 146:24
proximity 104:12 136:21 136:23
public 1:22 34:24 42:21 43:13 190:18
pulling 7:9
purchase 15:2 17:23 18:3 32:4 45:21 46:6 58:19 66:17 93:20 112:6,7 112:24 152:16 155:10 180:16
purchased 151:12 156:3
purchaser 66:17 66:19
purchasing 111:16

purport 172:12
purported 164:25
purportedly 157:14
purpose 90:7 93:3 97:5 119:21 120:2
purposes 63:9 121:16 177:7,25
pursuant 63:7 64:2 69:17 70:1 70:10,12 91:25 109:10 112:7 123:15 170:16 174:14 177:7 190:8
pursue 14:16 78:6
pursued 76:4 121:15
pursuing 23:10 120:10
pushed 170:8
put 6:2,14 7:16 15:1 27:22 29:7 31:7 36:16 42:4 42:7 46:19 48:19 58:8 65:23 67:23 73:23 79:25 81:9,23,24 99:18 106:21 110:23,24,24 132:5 164:8

182:10 183:8 188:3
putting 98:10 128:7

**q**

qsh 41:16 125:3 125:6 127:17
qualified 39:13 124:17,25 131:2 134:17
quality 40:4
quantified 33:12 188:23
quantify 32:9
question 51:10 51:14 57:20 60:7,14 81:2 84:25 116:17 120:15 127:16 129:6 131:15 141:6 165:6
questions 4:16 55:25 149:1
quick 188:5
quickly 128:19 177:13
quid 184:1
quite 10:15 128:19 178:12
quo 184:1

**r**

r 192:3,3
rabke 65:24,25 66:1,22 67:20

67:25 68:4,5,9
69:8,12,14
173:7,9,12,15
174:5
**rabke's** 66:23
**raided** 167:16
**raise** 50:11
**raised** 53:2
77:16
**raising** 43:2
**ran** 40:16
**random** 170:7,9
**range** 27:17
145:16
**rapidly** 145:19
**rather** 90:10
104:23 136:4,6
141:19
**reach** 14:18
83:7,8
**reached** 14:15
51:6 110:19
111:1 123:9
125:4 135:15
**reaction** 44:25
**read** 56:14 57:4
57:7 59:3 86:7
123:19 156:11
173:17,18
189:14 192:20
193:7
**reading** 25:12
75:10 128:2
**real** 91:5 95:12
124:14,20

127:16,25
128:24 129:3
130:16,17,18,21
130:21,22 134:1
137:22 148:8
**reality** 86:9 97:9
140:18 142:4
**realization**
103:5
**really** 38:18
46:4 50:19,20
51:2 59:2,5
62:25 63:5 65:2
68:22 86:8
87:11 99:18
106:16 115:20
127:19,20
130:25,25 165:6
167:7 172:4
174:10
**reason** 87:7
132:24 140:8
173:5 192:6,9
192:12,15,18
193:9
**reasonable**
193:16
**reasonably**
183:24,25
184:16
**reasons** 52:21
168:20 176:10
178:2
**rebecca** 107:16
119:3

**rebuild** 139:7
**recall** 8:20 13:6
13:10 15:16
19:8 32:13
47:13 56:9
65:23,24 66:22
67:14 73:5
82:24 83:5 97:9
100:17 124:6
125:25 156:8
159:11 183:16
188:11
**recalled** 93:19
**recalling** 59:15
**receipt** 88:10
193:16
**receivable**
155:23 187:24
**receivables**
30:23 187:14,16
**receive** 30:20
88:6 144:8
152:17 168:18
186:23
**received** 32:3
61:8 81:10 88:3
120:3 143:12,13
171:11,12,14
176:6
**receiver** 99:25
184:13,15
**receivership**
118:20 158:3
**receiving** 30:18
147:2,3 168:17

172:11
**recently** 147:22
148:18 183:12
**recess** 80:10
149:3 188:7
**recipients** 121:2
**recital** 84:12
104:9
**recitals** 84:10
122:10
**reciting** 117:11
**recognition**
133:20
**recognize** 54:4
72:14
**recognized**
52:24 164:6
**recollection**
10:3 73:4 78:16
110:3 115:7
122:10
**recommended**
129:15,16
**reconsolidate**
98:20
**reconstruction**
125:22
**record** 4:8 24:7
35:19 46:9
53:14 55:5
74:12 91:4
125:11 134:6
184:17 191:7
**records** 16:18
42:18,21 79:23

129:14 189:6
**recover** 37:18
  99:3 121:3
  166:11
**recoveries** 37:4
**recovering**
  102:14
**recovery** 39:12
  100:3 110:16
  121:15 143:23
  146:11,22 147:6
  148:4
**recreate** 122:13
**recruited**
  111:16
**redacted** 42:18
**redid** 30:5
**redo** 141:3
**reduced** 35:22
**reduction** 27:24
**refer** 12:11
  14:12 18:18
  66:22 96:11
  149:24 150:9
  168:11 169:6
**referenced** 72:1
  120:19 165:13
  193:5
**references**
  116:4 119:20
**referencing**
  115:19
**referral** 179:4
  180:2

**referred** 8:8
  10:6,20,24 11:7
  60:13 65:12
  80:5 91:4,4
  178:11
**referring** 62:8
  67:10 72:16
  75:11 81:3 84:1
  103:21 116:20
  119:24 121:25
  125:2 167:17
  168:12 169:7
  172:24 173:13
**refile** 16:22
**refinance** 152:3
  152:3
**refinanced**
  151:24
**refinancing**
  24:3
**reflect** 93:23
**reflected** 63:24
  63:25 115:15
**refresh** 110:3
  122:9
**refund** 27:15
  35:10,17,22
  104:6 105:19
  142:23 154:7
  161:23 176:18
  176:18 182:20
  182:22
**refunds** 176:19
**refused** 156:23

**regard** 43:18
  178:21 193:18
**regarded**
  162:17
**regarding** 44:4
  76:6 77:8 82:16
  84:23 136:22
  148:10 149:21
  151:18 161:4
  175:1 178:14
**regardless** 21:9
  84:25 89:10
**regards** 62:19
  92:25
**regime** 30:4
**regimen** 159:20
  159:22
**regions** 3:5
  64:12 71:17
  72:1,18,21 73:9
  73:16 74:14,15
  74:21,24 75:13
  75:13 76:2,5,9
  79:12,18 80:3,8
  89:23 118:1
  155:20 156:9
  177:21 178:9
**regulates** 8:6
**regulation** 8:6
  83:25 84:21
  158:5 172:23
  177:9
**regulatory**
  118:14,18
  119:10 157:23

158:14 160:20
  160:23 162:22
**rehabilitation**
  137:17
**reinstatement**
  17:22 113:3
**reinstituted**
  102:20
**related** 11:10
  42:24
**relationship**
  90:8 105:7,10
  105:25 133:15
  139:1 185:7
  187:7
**relative** 191:8,9
**release** 3:12
  75:13 108:1
  121:22 123:22
**released** 74:15
  76:10 181:10,25
**releases** 99:9
  123:9
**relevance** 58:2
**relevant** 50:13
**relied** 74:17
  75:2 78:2
**relief** 183:21
**religiously**
  121:4
**relying** 59:11
**remain** 93:25
  94:2 104:5
  166:16

**remained** 35:13
**remaining**
   143:4,19
**remains** 121:8
**remedies** 23:10
**remember** 5:9
   13:8 23:12,13
   36:7 42:5 43:4
   44:20 45:15
   47:9 48:19
   51:16 54:3 59:2
   67:3,4,8 70:16
   71:4 73:4,8,9,21
   73:22 74:21
   80:6 88:5 97:8
   100:11 111:4
   115:21 116:6
   126:1 128:18
   131:11,12
   136:25 169:23
   173:5,7 183:16
**remembering**
   23:13 47:7 59:7
   78:14
**remembrance**
   41:18 47:24
   59:9 159:12
**remodel** 24:9
**remotely** 105:6
   185:15
**removal** 28:22
   37:7
**removed** 73:17
   174:7

**renovate** 24:10
**renovated**
   139:18 140:20
   141:1
**renovation**
   125:21 139:7
**renovations**
   23:16 139:25
**rent** 139:19
**rental** 23:22
**reorganization**
   108:14
**repair** 24:9
**repairs** 73:6,14
   74:5 177:10
**repeat** 28:9
**replace** 22:14
**replaced** 30:3
   50:3 113:11
   130:9 148:14
   184:12,12
**repleting**
   120:14
**report** 3:14
   31:13,23 32:21
   33:16 50:2
   59:10,17 61:7
   126:21 131:8
   138:10 139:15
   140:3,8 170:2
   170:11 191:5
**reported** 50:3
   118:7
**reporter** 103:10
   114:4 147:25

   191:5
**reporter's** 2:16
   191:1
**reporting** 63:23
   170:21
**reports** 61:11
   170:14 189:1
**repository**
   156:6
**represent** 4:22
   54:20
**representation**
   85:23 174:13
**representative**
   20:9 59:22
   102:8 157:6
**represented**
   6:24 14:13
   19:16 40:25
   43:17 44:10
   171:20
**representing**
   41:5 76:19
   89:22
**request** 14:24
   39:24 70:8
**requested** 64:15
   191:6
**requests** 154:7
**require** 77:7
   124:13
**required** 27:12
   29:18 31:8
   64:21 71:20
   84:16 86:13,18

   88:21 89:13,20
   94:25 99:13
   117:25 118:14
   119:9 127:15
   155:21 156:24
   157:23 158:20
   162:20 170:21
   171:21 175:1
**requirement**
   64:20 70:1,2
   88:15 127:24
   130:4
**requirements**
   50:18 63:10
   64:24 69:5 70:4
   70:11,12 71:15
   76:6 84:16 86:1
   87:1 88:25
   95:12 129:20
   173:22 175:4
   177:22 185:2
**requires** 68:21
   179:15
**requiring**
   102:24 178:7
**researched**
   115:22
**reserve** 23:15
   28:23 72:13,22
   79:12 84:16
   86:16 160:7
   177:2,5,25
   188:11,20,21,24
**reserves** 68:22
   73:16

residency   3:8
  103:17
resident   27:4
  33:11 35:20
  105:18
resident's   35:8
residential   9:7
residents   6:24
  19:10,13 23:5,7
  24:6,22 25:4
  26:22 27:7,11
  27:14,22 28:5
  28:18 33:25
  34:7 35:12 36:1
  36:10 37:5 39:4
  39:20,23 41:9
  41:13,13,19,22
  42:1 48:14
  73:13 78:5
  92:22 102:18
  108:12 110:22
  118:17 131:24
  132:2,18 133:13
  136:2,6 137:4
  139:9 141:3
  142:18 143:8,16
  144:8 146:8,10
  146:16,23 147:8
  147:9,10,17,18
  154:7 156:22
  157:1,4,5,6,25
  158:14 160:7,9
  160:17 161:15
  161:18,23 162:8
  162:18 166:4,16

176:23,25
  178:17 182:8
  184:21 185:11
  186:6,17,20,22
resignation
  118:25
resigned   95:9
  163:10,10,17
  168:20
resistance   133:2
resisted   131:18
  132:10
resolution   24:24
  36:3 110:20
  122:19
resolved   44:21
  120:11 128:14
  128:19 153:5
resources   31:3
respect   5:25 7:2
  16:2 17:17,20
  22:10,24 24:3
  28:6 29:25 32:2
  35:24 38:17
  44:22 47:16
  48:22 51:23
  58:10 61:15
  63:11 64:15
  66:25 67:16,23
  68:25 74:20
  77:5,14 78:7
  86:11 87:24
  94:8 98:9,22
  100:3 110:14
  125:4 131:6

147:6 158:18
  174:5 176:7,16
  178:25 183:17
  184:5
respective   35:2
  161:14
responded
  62:14
responding
  120:11
responds   67:13
  67:25 68:19
  69:14
response   39:24
  55:25 68:24
  70:8 74:2
responsibilities
  6:5 29:13
responsibility
  76:1 106:24
  132:21 161:22
  168:13
responsible
  22:6,7 134:20
  150:15 162:16
rest   57:1 58:12
  124:2
restated   3:11
  108:13 109:17
  113:4 115:8,10
  117:12 142:19
restore   108:6,24
  109:3
restriction
  100:18

restrictions   19:6
restroom
  148:24
restructuring
  21:2 89:21
  106:20 144:7
  145:24
result   13:16
  19:23 28:7
  29:24 35:6
  42:22 69:22
  76:19 90:6
  95:18 99:22
  105:22 108:6
  109:6 118:6
  123:3 161:5
  180:16 181:18
  184:9
resulted   17:22
  33:6 34:8 50:5
  96:22 108:11
  164:22 176:8
results   35:6
resumption
  108:10
retain   124:20
retained   114:22
retention   6:14
  133:23
reticence   45:7
retire   144:2
  151:20
retirement   8:3,7
  13:23 54:14
  104:12

**return** 100:9 181:10
**returned** 193:15
**reunification** 124:5
**reunify** 97:1
**revenue** 105:16
**review** 53:20 54:25 159:2 183:11 191:6 193:6
**reviewed** 34:9 34:19,24,25
**reviewing** 34:20
**revisit** 25:23
**revoke** 95:15
**rework** 146:20
**richard** 41:10 138:16 144:19
**riedel** 34:4 36:5 46:14
**right** 7:9 10:15 11:22 19:20 20:1,24 22:20 22:21,22 27:23 30:17,21 31:4 36:19,22,24 38:18,20 43:15 46:10 47:6 50:10 51:12 52:12,15 53:16 55:16 56:10 57:14,25 58:3,7 58:16 60:25 61:6,17 62:23

73:9 74:13 77:21 80:4,7,9 80:12 82:7,9 87:7 90:1 91:18 92:19 93:16 96:4 99:5,14 101:25 104:10 105:4 107:6,10 108:2 111:11 112:5,12,21 113:12,16,23 114:10,14,20 115:5,6 116:15 117:6 120:4 123:2,13 125:24 126:20,25 130:10 132:14 132:16,23 134:2 134:24 135:9,18 136:4 138:12,15 139:16 140:16 141:7,13 142:10 143:5,12 144:11 144:20 149:1,16 150:17 152:25 153:7,15,20 158:8,23 159:4 159:7 160:16 161:7,12 164:15 165:15 167:2 169:4,23 170:5 172:18 174:15 181:12 189:14
**rights** 10:22 16:14 23:8

27:10 28:6 36:10 69:21 84:23,23 86:10 86:11 92:21,22 97:12 121:3,5 156:1,14
**rigors** 130:2
**rise** 99:14
**risen** 96:16
**risk** 118:17 158:1
**road** 137:1
**rob** 15:25 138:20
**robert** 56:3 145:2
**role** 80:18 160:2 163:22
**roll** 139:20
**rolling** 83:4
**ron** 138:19
**room** 44:3 132:9
**rosemawr** 34:18 128:3 138:23
**ross** 4:11 145:8
**routine** 4:16
**rpr** 190:17 191:19
**rub** 143:14
**rule** 193:23,25
**rules** 193:17
**rynard** 56:3 58:22 59:3

**s**

**s** 2:5 3:1 55:24 192:3
**sadly** 172:5
**sale** 5:25 6:6,19 12:18 34:13 38:14 43:14 47:15 50:19 97:15 101:18 114:18 122:23 124:5 127:19 128:9 135:5,8 148:9 151:5,13 151:18 152:13 159:6,8 162:23
**sales** 6:6
**salt** 179:22
**sandwiched** 43:19
**satisfaction** 155:16 156:15
**satisfactory** 51:1
**satisfied** 13:21 14:21 27:13 88:24 92:10 155:15 156:15
**satisfy** 50:18 69:4 95:12,17 95:18 129:20 173:21
**satisfying** 70:2 130:2 131:22 185:1

save  72:8
savings  172:21
saw  39:3
saying  16:20
20:6 25:25 26:3
26:14,18 29:10
31:8 32:14 33:6
33:9,14 36:8,24
41:1 47:18
60:18 67:21,25
68:15 69:12
74:23 83:6 87:5
100:21 117:23
122:6 128:24
130:12 145:23
160:22 161:17
186:15,20
187:23
says  54:11 55:17
56:19 57:6,7
58:24 59:3,4
67:2,9,13 68:8,9
68:19 71:1
84:13,20 89:12
91:10,21,24
113:2,23 114:12
114:16 117:8
118:12 139:17
139:21 151:17
152:11 153:20
160:5,5 164:20
171:16,16
scenario  24:14
55:1 141:6
163:16 174:25

179:22
scheme  100:21
182:7,14,16
scope  6:9
scoured  79:17
scrambled
164:8
scratching
122:4
scrutiny  160:20
160:23
seacoast  103:3
seal  190:12
sealed  106:21
search  79:22
second  11:12
89:10,15,16,17
122:12 142:18
142:19 146:13
177:5
secretly  140:13
section  84:16,19
85:7 170:16
sections  141:3
secure  118:3,9
secured  13:9,10
13:13 143:3,4
149:25
security  155:22
164:25
see  49:9 54:15
54:16 55:2,18
55:21 57:13,15
68:5 71:17,18
84:8 89:6,18

103:18 107:17
118:4,22 124:1
132:8 138:16
146:10 150:1
157:19 158:6,25
159:5,8 160:14
173:4 189:2
seeing  54:3 83:5
seek  118:14
157:22 158:9
seeking  17:18
25:3 54:18
95:14 147:9
148:3 166:10
seem  50:13,17
139:25 140:17
seems  58:13
92:25 169:25
seen  18:13,23
19:14 40:1,2
57:10 58:5,17
58:21 65:16
75:18 80:7
138:13 140:9
141:1
segregated
29:16 75:25
94:23
segregating
183:1
segregation
31:2,20 184:7
select  133:3
sell  6:2 43:20
124:14,21

135:17 136:8
153:18 182:11
selling  141:16
141:16
sending  18:15
87:15 169:13
sends  70:8
senior  27:3
38:23 112:13
124:11 133:9
sense  8:2 33:2
47:23 102:8
168:19 174:6
175:8
sent  18:12,14
61:23 62:1
64:25 68:13
80:20,23 81:16
81:23 82:2,3,4
82:20,22 85:12
85:15 87:4 88:7
88:8,15 166:21
167:5
sentence  89:16
separate  37:9
37:18 75:25
90:6,7 93:7
95:20,21 113:21
177:1,21,22
separated  30:13
30:14
separately
141:17
separating  60:3
94:22

**separation**
31:17,21 93:7
93:13,13 96:2
184:6 185:24,25
186:1

**september** 5:10
5:12,13 13:1
58:9,17,24 61:1
61:3 108:4
110:7 111:20
121:2 128:18
154:24

**sequence** 67:7
68:11 108:3
111:5 125:1

**sequencing**
110:12 134:7

**series** 9:12 16:9
38:10 68:25
130:24 149:1
153:6

**serious** 51:10

**seriousness**
109:2

**serve** 4:11 136:1

**served** 163:12

**service** 30:9,13
167:24 177:2,16
177:17 188:15
188:20,24

**services** 11:19
27:2,3 34:1
35:15,20 39:13
104:13,15 136:9
136:19 137:7

156:19 159:1
162:17

**serving** 64:3,7

**session** 98:18

**sessions** 108:5

**set** 11:25 12:5
23:15,18 47:25
63:24,25 67:5
71:19 88:22
104:9 117:8
132:9 155:8
169:3

**seth** 138:22

**sets** 63:22

**setting** 158:19

**settlement**
32:16

**seven** 187:21

**sever** 93:4

**several** 21:5
48:16 49:4
52:16 65:1 72:7
88:1 129:23
135:22 138:7

**severance**
186:17

**severed** 90:21
90:23

**shape** 100:1

**sharper** 92:17

**shaw** 73:25

**sheet** 2:17
124:15,23 125:7
127:17 180:12
182:5 193:10,12

**shell** 48:25

**sheltered** 10:25
187:6

**shoes** 38:17

**shopped** 140:14

**shortly** 113:10

**show** 53:16
62:12 70:17
74:12 121:18
127:6 147:21
186:22

**showed** 165:3

**showing** 72:11
83:23 103:15
107:10 149:7

**shown** 55:6

**shows** 92:13

**shuck** 138:19,21

**shut** 158:4

**shutdown**
118:20

**sic** 94:19

**side** 10:9,10
98:6 138:17
175:25 176:1,1

**sidetrack** 18:11

**sig** 29:11

**sight** 174:2

**sign** 81:22,23
82:1,13 100:10
193:11

**signature**
108:19 190:16
191:18

**signatures**
122:8

**signed** 58:21
59:1,8,9 61:4
62:6 81:16,24
82:2,5 85:15
105:17 116:2,3
116:5,5 124:15
124:23 147:13
165:18 167:4
169:10 193:20

**significant** 7:2
22:18 28:18
29:11,24 43:8
44:1 45:9 51:18
52:25 60:11
61:4,22 62:3
77:10 101:7
130:3,6 162:20
176:12

**signing** 82:2

**silly** 141:21

**similar** 150:20

**simms** 15:23,24

**simple** 28:14
33:11 166:15

**simply** 85:23
92:9 125:7
159:8 170:22

**simultaneous**
78:21

**simultaneously**
92:12 160:12

**sincere** 49:2

sister 60:5 104:23,23 105:7
site 136:9 139:22
sitting 145:13 183:15
situation 20:7 22:5,13 62:21 114:9,23 175:19
situations 101:11
six 47:24 146:3 146:6 147:12
skilled 3:3 10:14 10:17,18,19,22 10:23 11:14 35:21 53:22 54:8 56:25 135:25 137:8
skipping 116:18
skyline 6:3 20:24 42:12,12 42:13,24 43:16 45:24 46:8 97:16 130:21
slander 17:14
sleep 67:9,22 87:5
slide 39:23
slow 114:4
slower 164:19
small 129:19 139:19
smart 126:4

smarter 92:16
smiling 74:12
snf 54:13,23 56:25 102:12
snuck 28:10
sold 10:21 97:3 97:15 100:5 113:6 126:22 128:13
sole 63:9
solely 54:23
solid 141:4
solution 185:22
solutions 193:22
solvency 180:13
solvent 185:6
somebody 68:17 73:25 116:3 132:12 142:5 179:22 183:1
something's 116:5
somewhat 151:3
sophisticated 38:25
soriano 43:17
sorry 28:9 29:22 52:7,8 68:10 89:14,15 114:4 116:22 119:11 120:1 122:13,18 138:11 143:16 148:22 151:7 156:18 160:17 162:3 164:13

188:22
sort 5:4 6:20 7:12,19 11:25 12:1,5 31:4,6 38:21 46:4 50:17 51:4 52:19 76:9 83:3 111:8 117:22 122:9 130:25 134:5,8 141:21 157:5 179:6
sorts 94:18 95:16
sought 18:3 19:21 23:7 62:14 78:6 184:10,13
sound 179:7 182:15
sounds 108:15 129:13 182:13
source 121:6
sources 36:17 36:20
south 2:3,7 10:11 17:8 98:16
southpoint 43:16 44:25 97:18 98:15 101:8 103:2
speak 15:9 64:5 70:25 71:8,9 138:6 164:18 179:8

speaking 61:24
speaks 57:1
specialized 137:18
specific 5:23 7:21 13:7 47:8 78:14 81:5 83:5 96:1 136:21 139:6 142:8 169:6,24 174:13 175:1,12
specifically 66:3 66:25 80:18 81:1 144:4 149:23 163:21 175:11
specificity 120:13
spectacular 140:15
speed 128:2
spelled 26:23 168:25
spelling 17:16
spend 135:11
spending 49:3 182:25
spent 43:22 76:18
spin 117:20 160:17,18 164:22
spinning 117:4 141:10

splitting  59:13
sponsored
  46:15
spring  52:3
spun  116:24,25
  160:12
st  20:21 24:4
stability  162:21
stafford  2:6
stage  12:5
stages  11:25
stamped  87:21
stand  93:8
  102:16
standing  78:6
standpoint
  21:21 44:23
  178:13
start  5:4 146:1
  151:4
started  16:9
  170:25
starting  129:7
state  1:22 4:7
  8:8 11:11 16:10
  18:5 84:21
  97:11 99:21
  118:21 129:23
  132:1 157:14
  158:4 170:14
  179:5 184:15
  190:3,18 191:2
  191:12
stated  117:11
  192:21

statement  52:19
  78:15 85:1
  117:22 120:12
statements  6:15
  49:24 50:20
  51:9 52:17
  60:15 169:12
states  1:1 27:4
statewide
  130:13
status  22:8
  29:24 75:23
  157:8
statute  67:10,11
  67:15,16 84:17
  84:17,19,20
  85:8 86:13,15
  89:13,20 92:11
  174:14 176:24
  177:8 178:22
  193:17
statutes  64:21
  71:15 77:7,13
  77:17 85:9
  88:25 158:16
  170:17,18
statutory  76:5
  84:18 85:7
  86:25 88:24
  117:25
stayed  95:7
  114:24
stead  106:21
stenographer
  1:22

stenographic
  191:7
stenographica...
  191:5
step  102:5,13
stepped  38:16
  163:6 164:2
steps  5:22 26:17
  131:2
steven  133:22
stichter  34:4
  36:4 46:14
stigma  137:15
stiller  74:1
  178:20 179:3
stipulation
  149:9,12
stolen  178:11
stop  22:2 65:3
  86:24 98:24
  171:7
stopped  19:8
  106:8
stories  10:12
straight  8:23
  111:6
strategically
  121:15
street  9:10,15
  9:15 10:7 136:7
  141:22
strict  26:22
strictly  27:19
strike  135:6

string  83:6
stripped  29:4
strong  142:6
stronger  131:2
structure  8:11
  8:12,13 11:21
  31:25 55:2
  59:12 90:9
  93:20 114:1
structures
  125:18
struk  90:15 91:2
  93:17 159:14,23
  159:25 178:20
struk's  90:13,24
  159:7,12 160:5
studied  38:18
  56:16 156:12
studio  139:18
study  178:4
stuff  124:3
sub  104:24,25
subject  14:17
  25:22 48:1
  82:16 85:3
  118:19 153:23
  158:2
submit  166:8
  168:4
submitted  55:8
subordinated
  34:12 35:1
  142:21,25 143:3
  143:6 146:18

**subsection** 150:2

**subsequent** 25:1 51:22 63:19 145:1

**subsequently** 62:16 110:25 157:9

**subsidiary** 1:13 9:24 11:2 60:4 105:6,10,25 117:1 149:18 160:11 164:23

**substance** 150:20

**substantial** 145:5 162:25

**substituted** 136:1 163:4

**substitution** 26:9 119:8 163:2,5

**succeeded** 95:24 96:6

**success** 121:25

**successful** 39:3 40:19 47:21 121:17 130:20

**successor** 1:14 59:23 149:18

**sue** 96:7 120:16

**sued** 18:8 98:24

**suffered** 37:5

**sufficient** 183:17

**sufficiently** 88:14

**suggest** 7:22 62:25 170:16

**suggested** 174:8 193:15

**suggesting** 7:24 76:8,9 106:11

**suggestion** 47:8 64:1 69:8

**suggestions** 73:13

**suggests** 61:11 68:5 69:25 70:9

**suing** 16:13 17:12

**suite** 2:7

**sum** 37:19 73:19

**summarize** 36:19

**summary** 98:6

**summer** 106:18

**sums** 145:1

**supervised** 139:12

**supervises** 8:6

**supervision** 118:18 158:2

**supplement** 52:20

**supplemental** 88:2

**supply** 132:25

**support** 59:11 60:15 115:23

154:16 162:10 177:6 180:6,6 183:4,9,20

**supported** 31:20

**supports** 60:1 174:20

**supposed** 177:3

**supreme** 190:9

**sure** 7:14,18 10:4 12:24 26:14 34:18 36:9 39:4 42:2 44:3 55:4 57:11 58:23 87:10 89:14 108:21 111:22 112:4,12 112:21 128:16 135:12 140:24 157:7 169:2,22 174:18

**surmise** 156:7

**surprise** 39:25 116:12

**surprised** 117:4

**suspect** 140:9 151:2 168:19

**suspension** 51:19 171:4 176:16

**suspicious** 48:13

**sworn** 4:2 190:8

**synergy** 137:23

**system** 170:7,8

**t**

**t** 3:1 192:3,3

**table** 7:16 31:7 79:14

**take** 19:9 28:14 53:20 54:24 63:3 65:9 87:12 91:5 106:15 108:25 109:15 122:12 131:2 148:24 179:23 181:6 182:9,12 182:24

**taken** 36:21 39:5 119:14 138:7 160:2 177:20 181:3,5 183:6 184:11

**takes** 22:20 99:11

**talf** 11:6,7 30:2 30:4 94:20 95:15 107:16

**talk** 7:17 11:25 12:7 32:19 40:5 40:8,12 41:25 116:24 117:21 118:24 131:7 137:17 148:21

**talked** 40:10,13 42:23 45:24 54:8 55:23 74:1 77:17 82:9,11 83:9 93:17

**[talked - testimony]**                                        Page 249

| | | | |
|---|---|---|---|
| 124:7 129:9,16 | 41:16 45:5 | 186:10,11,12,16 | **terminology** |
| 131:3 162:12 | 52:11 53:21,22 | 186:19,22 187:3 | 173:8 |
| 175:10 187:12 | 54:22 56:20 | 187:5,7,11,14 | **terms** 5:5 7:19 |
| **talking** 38:6 | 64:12 66:8,14 | 187:22 188:1,2 | 13:20 17:25 |
| 45:20 52:10 | 69:6,16,25 70:3 | 191:12 | 34:17 46:6 |
| 63:16 80:13 | 71:18 73:1 | **tampa's** 69:20 | 48:21 50:25 |
| 82:4 99:1 104:8 | 78:11,12 81:18 | 79:12 86:6 | 59:13 76:12 |
| 107:20 112:12 | 85:19,21,24 | **task** 121:11 | 77:4 78:13 |
| 116:23 120:2,6 | 86:3 90:20,21 | **tax** 43:8 81:7 | 89:11 98:5 |
| 127:2 130:11 | 91:13,22 97:20 | **team** 55:18 | 104:6 111:22 |
| 142:15 143:18 | 99:4 101:2 | **tell** 14:11 20:11 | 113:4 120:13 |
| 147:12 151:4 | 104:11 105:20 | 21:4 41:24 | 128:7 134:14,15 |
| 162:13 181:22 | 106:2 107:15 | 66:20 75:17 | 153:25 154:23 |
| 181:23 185:19 | 108:24 110:15 | 79:16 89:2 | 162:6 169:19 |
| 185:20 186:4,13 | 115:5 116:9,9 | 111:11 123:25 | 184:16 |
| 188:9 | 120:25,25 | 137:5 139:6 | **test** 180:12 |
| **talks** 55:1,12 | 121:13,24 | 141:2 151:1 | 182:5 |
| **tallahassee** | 122:21 126:12 | 156:11 170:7 | **testified** 4:3 |
| 102:9 | 126:22 135:8 | **telling** 42:25 | 31:16 57:21 |
| **tampa** 1:2,4,5,9 | 137:24 138:10 | **tells** 71:23 | 58:4 60:9,10 |
| 1:21 2:3,8 3:3,4 | 138:21 139:2 | **temporary** | 153:21 159:14 |
| 3:13,14 4:13,14 | 141:10 148:8 | 177:6 | 163:19,21 |
| 7:7 8:4,17 9:3 | 166:2,3,4,7 | **ten** 62:22 76:18 | 178:20 183:20 |
| 9:11,17,23,24 | 167:20,24 168:7 | 180:19 | **testify** 60:23 |
| 10:5,11 11:2,3,4 | 168:24 169:18 | **tenant** 11:5,12 | **testimony** 12:2 |
| 11:4 12:12,13 | 170:11,22 | **tenants** 11:5 | 26:13 30:16 |
| 13:17,18 17:12 | 175:20 176:5,5 | **tend** 76:14 | 32:25 39:22 |
| 20:19 24:23 | 176:9 178:9,16 | **tentative** 53:6 | 59:15,25 60:12 |
| 27:14,23 28:1 | 178:17 180:11 | **term** 7:5 16:3 | 60:18,20 72:17 |
| 28:19,24,25 | 180:13,20 181:4 | 19:17 23:23 | 84:2 90:24 |
| 29:2,3,5,5,7,14 | 181:8,10,15,22 | 48:25 124:15,23 | 106:6 107:21 |
| 29:23 30:10,11 | 181:23 184:2,2 | 125:7 127:17 | 108:15 151:11 |
| 30:13,19,25 | 184:5,9,11,18 | 157:11 160:11 | 159:12 161:8 |
| 31:3,9 33:4 37:9 | 185:8,13,14,15 | **termed** 63:14 | 179:8,11,12 |
| 37:14,15,25 | 185:17,18 186:6 | 80:13 | 180:3 193:7,16 |

testing 125:9
thank 4:15
  26:12 57:25
  79:24 80:9,16
  103:6
theory 37:21
  38:4 66:7
thereabouts
  16:12
thing 42:16 51:4
  57:20 77:21
  86:9 92:4 131:4
  131:12 132:3
  140:21
things 14:7
  19:13 22:8
  25:18 30:6 36:6
  37:7 42:16
  49:23 50:2 51:3
  57:7 62:22,24
  65:10 77:12
  78:13 83:2
  87:10 100:22
  109:3 115:20
  119:7 124:12
  128:23 131:13
  132:8 162:4
  163:15 165:20
  171:1 173:6
  177:12 179:15
  183:12
think 5:1,10 6:3
  8:14 9:19 10:20
  14:17 15:1,7,8
  15:10,12,18

16:20,24 17:5,6
18:6,12 24:4
26:13 29:8
33:23 34:2 36:2
37:23,23 39:6,7
40:15 42:12,24
42:25 43:6,11
43:12 44:15
45:2 46:14,18
47:17 49:16
51:19 52:2 53:7
54:7 56:7 59:3
60:21 62:11
65:8,21 67:7,15
67:17,22 68:11
69:11,12 70:7
70:17 72:6,9,25
73:11,22,24
74:2,4 75:15
76:4 77:9 81:8
82:8,24 85:1
86:8 87:12,13
88:12 89:4 91:2
91:6,19,19
100:10 101:21
102:1 106:6
108:17 110:17
112:5 113:16,20
116:20 117:14
123:7,21 125:3
126:8,10 128:21
129:14,15
130:18,19
131:19 133:6,12
133:14,17,22

134:3,4,4
136:10,12,24
137:16 138:4,7
138:19,24
140:14 141:4
142:14 143:12
144:21 145:15
148:6,6,24
149:20 154:2
156:5 157:3
158:11,24 161:6
161:19 163:5,23
165:7,23 168:9
168:25 169:14
172:17 174:18
174:25 175:18
178:10,13,23
179:1,3,12,21
179:23 180:3,8
180:22 181:9
183:16 189:5,6
189:11,13
thinking 43:4
  71:2 90:25
  92:10 169:23
  173:11
third 164:20
  177:10 179:17
thought 58:22
  60:8 66:13
  77:19 78:8
  79:10 99:16
  112:20 126:5,10
  171:3 179:23

thousand 30:11
  167:23
three 10:12
  52:15 72:9
  86:14 104:14
  116:11 140:7
  168:9 177:1,15
  177:21 188:10
  189:2
threw 122:19
throw 142:5
tied 24:12 48:17
ties 101:11
time 1:19 6:23
  7:1 8:14 12:19
  13:24 15:17,22
  15:23 16:6 21:6
  21:6 25:15
  41:14 42:18,23
  42:25 43:23
  47:1 50:10,12
  50:14,17 51:16
  60:23 63:1
  65:10 66:7
  72:25 78:9,24
  85:12 87:12,12
  93:22 98:18
  100:24 101:3
  104:1 110:24
  111:6 121:1,9
  125:12 128:10
  135:12 151:19
  151:25 152:5,13
  152:23 153:7,15
  153:18 154:21

157:3 160:20
161:22 162:25
163:12 171:15
175:20 180:10
**timeframe**
12:23 20:22
42:4 51:25
**timely** 152:16
**times** 72:7 83:14
97:8 133:13
135:22 161:13
169:25
**timing** 115:23
123:25
**tired** 109:9
169:22
**tires** 134:9
**title** 17:14 95:8
152:17
**today** 140:19
145:14 153:21
183:20
**today's** 137:14
**together** 25:17
36:17 48:20
56:25 62:22,24
81:9,23,25 96:3
98:10 110:23,24
110:25 128:8,13
132:5 164:8
**told** 36:18 64:13
64:16 65:4
70:23 93:10,11
131:4

**took** 5:22 23:25
26:17 33:3 36:6
63:1 86:17,21
86:21,22 101:6
105:15 145:9
163:6 170:20,24
170:25 178:5,10
179:11 188:2
**top** 13:8 57:14
150:2
**tort** 29:20
164:12
**tortiously** 16:14
**total** 112:9
145:15
**totally** 43:6 67:7
90:6,15 105:24
182:4
**touched** 87:14
178:14
**tour** 139:23
**towards** 42:7
**tower** 9:16
**towers** 9:6,16
10:8 125:16
**toxic** 98:3
**tr&snf** 11:13
30:2,4 94:20
95:15 107:15
**track** 134:5
**tracking** 35:23
**traditional**
175:8
**transaction**
19:22,24 24:1

25:7 26:4,10,10
27:8 30:9 32:4
41:16 42:14
43:3 44:6 52:20
55:15 56:4
57:17 59:13
61:6,9,15 64:9
64:16 65:3,20
66:3,6,25 67:24
69:1,23 79:4,6,9
85:14 90:6 93:2
93:3 99:12
103:4 104:18
109:7 113:9
123:5,8 125:13
128:6 133:1
151:1 152:15
154:3 155:10,12
155:15 158:19
162:5 164:21
175:13,16 176:3
180:2,10,20,24
181:2,16,19
183:14 185:23
187:13
**transactions**
20:17 21:18
22:24 30:5
46:22 47:20
61:12 66:14
75:4 76:25
78:23 81:13
94:21 106:10,12
120:17 131:20
167:9 168:5

175:10
**transcript** 191:6
191:6 193:5,19
**transcripts**
193:13
**transfer** 3:12
4:25 26:21 27:1
28:4 33:1 37:24
37:25 38:2
75:17 76:7
78:19,20 80:2
96:25 99:10
100:4,12,19,19
101:1 107:25
117:13 119:19
120:3,5,6
121:23 122:15
122:24 123:12
123:17 157:17
159:16 164:24
165:16,24
166:12,13
167:21 174:21
175:7,20 176:4
176:7 178:21
184:9
**transferred**
31:10 69:16
74:16 85:3,13
88:19 89:21
91:21 99:3
115:12 117:16
117:18 118:1,8
160:9

**transferring**
  30:11 75:24
  108:16
**transfers**  75:4
  76:25 119:20,22
  119:25 120:3,4
  121:3,6,7 168:5
  184:3
**transforming**
  138:5
**transition**  28:17
  161:4
**transmittal**
  85:17 174:2
**transpiring**
  60:22 65:2
**traurig**  43:25
  46:21 49:4
**treasury**  167:16
**treat**  85:20
**treated**  22:9
  142:20
**tree**  168:11
  179:6
**trial**  82:18
  170:3,4,4,5
  180:5,6
**tried**  77:6 107:3
  188:25
**trigger**  159:20
  159:22
**triggered**  88:19
  94:1 159:9
**trouble**  164:17

**true**  20:6 62:15
  71:1 98:2 159:5
  185:15 191:6
  192:21
**truly**  145:4
**trumped**  43:1
**trust**  97:25
  172:22
**trusted**  97:22
**trustee**  1:9 4:12
  22:14 36:2,16
  40:9 72:21
  73:10 106:20
  107:13 109:10
  109:22 110:5,10
  121:11 122:25
  131:14 134:23
  149:17
**trustee's**  3:16
  3:17,18 5:17
  124:9 135:4
  144:15
**try**  7:20 37:4
  51:8 65:23
  73:15,23 81:25
  86:24 89:2
  95:22 96:1
  122:12 134:5
  146:21
**trying**  24:2 40:5
  50:17 60:23
  69:2,4 71:10
  72:8 77:10
  101:7,20 123:18
  131:1 141:7

  148:8 164:18
  174:15
**turn**  133:17
  139:14
**turned**  46:25
  165:7 168:6
**turnoff**  139:24
**twin**  9:15,16
**two**  9:6,8,16
  10:7 11:5 13:2
  15:11 24:4 38:7
  38:11 46:1
  48:16 49:12
  63:22 131:9,10
  133:5,6 139:19
  139:21 140:6,6
  153:23 169:11
  175:19
**type**  12:22 19:2
  38:14,22 62:7
  126:8
**types**  10:22
  45:13
**typical**  155:22
**typically**  180:16

               **u**

**u.s.**  5:16
**uasb**  157:15
**ugly**  106:11
**ultimate**  33:10
**ultimately**  44:21
  65:10 95:14,23
  100:25 101:13
  103:4 118:19
  151:14 155:7

**um**  80:15
**umbrella**  21:8
  90:25 91:1 93:5
  97:2
**un**  130:24
**unable**  160:8
**unchanged**
  93:25
**undeniable**
  70:19
**under**  1:6 13:10
  16:7 19:11 20:4
  21:8,12 23:9
  26:22 27:7,14
  30:4 36:25
  39:13 59:4 66:8
  66:10 76:11
  84:16,18 85:7,8
  85:25 91:1,22
  94:13,16 97:2
  105:10 118:10
  118:18 119:4
  142:18 143:25
  144:23 145:12
  145:21 146:22
  147:1 150:1
  152:12 157:24
  158:2,16 160:23
  161:12,23 162:2
  162:6,9,19
  166:4 178:7,18
  178:21 179:17
  180:11,19 182:5
  183:5,21 192:20
  193:17

undercapitaliz... 120:7
underfunded 176:9,10
underfunding 176:11
underlying 156:12 157:14
underperform... 160:21,24
undersigned 190:6
understand 14:9 15:20 17:1 17:10 25:25 26:14 36:8 38:4 56:16,18 58:6 61:11 63:13 81:15 86:8 90:2 140:23 155:7 171:25 177:20 179:20
understandable 89:6
understanding 7:13 14:25 15:24 16:17 17:4 25:12 38:9 47:17 49:7 63:4 75:19 77:9,25 78:1 159:24
understood 21:20 74:23 88:17 90:19 94:5 114:23

undertake 5:21 159:1
undertook 6:10
undo 95:23,25 96:1
unencumbered 92:15 155:20 177:2
unexecuted 166:22
unify 121:16
union 44:5,7,9 44:10,13,17,19 45:1,12
unionized 45:7
unit 137:13
unitary 97:4
united 1:1 27:4
units 9:7 23:23 140:20 141:1
universe 21:4 129:19 131:21
university 3:3,8 6:1 8:2,10,12 9:9 12:18,21 13:14 16:15 18:3 19:7,23 20:18 22:5,11 24:11,24 27:5 39:2,17 40:6,11 40:16 41:23 42:10 44:11 51:11 53:21 54:6 56:21,23 72:13 73:7

77:12 88:16 90:12 94:7,8 102:23 103:17 103:24 104:1 107:14 111:13 114:2,8 118:8 118:16 124:15 124:16,21,24 125:22 128:21 129:25 130:14 131:16,23 132:3 138:2,5 139:8 140:14 151:13 151:18 152:14 152:16,18 153:19 155:11 156:19,22,24 157:25 160:2 161:16 162:8 164:1 168:23 171:7
unnecessary 108:25
unpack 51:4
unprecedented 180:22
unrenovated 139:20
unsatisfied 166:16
unsecured 143:7
unsigned 85:11
unterholzen 32:21

unusable 23:23
unwillingness 152:3,7
updated 39:10
urge 185:5
usab 37:25 38:2 38:3 66:6 85:6 91:22 92:2 116:21 118:2,7 157:14,17 158:17 164:25 174:21
usab's 118:3
usage 9:1
usameribank 1:14 18:4 24:16 30:9,12,14 37:1 37:3 54:21 55:9 58:13 59:23 61:19 74:11,16 75:6 78:19,19 78:22 79:2,6,10 80:1 81:17 89:24 96:21,25 101:14 149:19 156:16 157:22 158:8 160:10 162:6 164:22,25 167:22,22 170:13
usameribank's 97:9 158:12
use 9:22 69:4 97:3 130:17 131:18 160:16

167:23 173:10
173:12 177:23
177:24 183:3
**used**   7:19 24:1,9
24:12 28:1
65:22 82:25
103:25 111:23
127:5 133:4
140:16 144:2
168:8 173:9
193:20
**uses**   84:18 85:7
**using**   14:8 69:15
99:21 131:18
153:24
**usual**   4:16
**usually**   180:19
**utilization**
35:12 135:24
**utilized**   35:20

**v**

**v**   1:11 119:19
174:17 183:5
192:1 193:3
**vacuum**   101:23
**vagaries**   22:16
**valley**   1:12,13
4:22,25 24:16
37:4 59:22
81:11 143:24
145:9 147:17,20
149:17,18
153:12
**value**   29:5,7,9
29:11 30:25

53:3 101:15
166:2 183:24
184:1,17 187:10
187:16,19
**values**   142:6
**variety**   17:13
19:1 20:13,17
168:8
**various**   12:19
81:12 109:5
118:13 119:3,12
120:8 135:14
139:11
**verify**   193:8
**veritext**   193:13
193:22
**veritext.com**
193:13
**versed**   53:1
**version**   58:21
87:21
**versions**   103:25
104:3
**veto**   101:4
**vetting**   132:17
**vi**   183:21,22
**viability**   176:21
**viable**   133:1
175:22
**vicinity**   180:13
**videoconferen...**
2:6 190:8
**village**   3:3,8,14
6:1 8:2,10,12
12:18,21 13:15

16:15 18:4 19:7
19:23 20:18
22:5,11 24:11
24:25 27:6 34:9
39:2,17 40:6,11
40:16 41:17,23
42:10 44:11
51:11 53:21
54:6 56:23
71:19 72:13
73:1,7 77:12
88:16 90:13
94:7,9 102:23
103:17,24 104:1
107:14 111:13
114:2,8 118:16
124:15,16,21,24
125:22 126:13
126:19,23
128:21 129:25
130:14 131:16
131:23 132:4
135:8 137:24
138:11,22 139:2
139:8 140:14
148:8 151:13,18
152:14,16
153:19 155:11
156:19,22,24
157:25 160:3
161:16 162:8
164:1 168:23
171:7 185:16
**village's**   118:8
152:18

**villages**   122:21
**villas**   10:9,10,11
137:22
**violating**   179:13
**violation**   178:25
179:16
**violative**   175:4
**visit**   49:12
**visited**   184:19
**vulture**   38:21
38:24

**w**

**w**   1:8,17 4:1
191:6 192:2,23
193:4,7,9,11
**wait**   122:15
174:17
**walk**   136:7
141:22
**want**   5:19 12:7
14:19,21 16:11
17:7 18:24
19:10 22:25
23:17 24:7
34:17,23 38:12
42:15,23 43:16
44:7,15 45:7
46:4 47:22 51:4
58:22 59:7 61:5
65:5 74:25
75:12 77:21
81:7 83:12
87:12 89:11
91:3 97:6,6,25
100:16 103:7

108:3,25 109:8
112:3 128:22
131:8 135:11
139:6 143:14
153:4
**wanted** 11:23
20:8 31:16 41:1
48:4,5 50:2 93:7
96:3,6 97:14
99:18 106:9
109:3 112:21
123:24 128:22
167:7
**wanting** 64:9
80:17 95:20
100:2 110:23
132:8
**wants** 137:16
142:5
**warren** 1:8,17
4:1,9,10 46:2
53:16 55:6,12
56:11 58:4
63:13 72:1,11
74:14 80:13
81:6 83:23
90:11 96:4
103:15 107:10
121:19 140:22
144:15 149:7
153:14 164:14
188:9 191:6
192:1,2,23
193:3,4,7,9,11

**warren's** 57:21
**warring** 51:1
**washington**
18:5
**watched** 90:15
**way** 26:1 32:7
34:15 50:2 61:5
66:24 69:10
94:4 100:1
111:4 169:24
180:12 182:21
182:21,22 186:2
187:4
**wayne** 4:9
**ways** 60:10
62:14 102:19
**we've** 11:25
53:7 54:7 55:6
55:23 72:11
83:23 87:13,25
103:15,21
107:11 127:5
144:14 149:7
150:17 162:12
175:10 183:16
**weeds** 36:8
**week** 39:22
53:11
**went** 5:17 12:19
14:23 16:4 18:2
20:25 35:4
64:18 65:1
70:20 71:21,21
71:22 95:22
97:10 123:14

134:9 150:22
187:11 188:4
**west** 2:3
**westport** 1:4,5,9
1:10 3:13 4:12
4:13 5:7,7 7:6
7:10,15 8:4,17
8:21 9:1,3,11,17
9:23,24,25 10:5
10:11 11:2,3,3,4
12:12,13 13:17
13:18 15:4
24:23 27:13,23
28:1,19,23,25
29:2,3,4,5,7,14
29:23 30:10,10
30:13,17,18,24
30:24 31:3,9
33:4 37:8,14,14
37:24 49:25
52:10 54:21
59:14 60:4
64:12 66:4,8,13
69:5,16,19,25
70:2,5 78:11,11
79:11 81:18
82:15 85:19,20
85:24,24 86:2,6
90:20,20 91:13
91:22 93:21
97:1,20 99:4
101:2 104:10,11
105:20 106:2,2
107:15,25
108:24 110:15

111:21,25 112:8
112:9,13,15,16
113:6,6 114:1,1
114:2,7 115:4,5
116:7,8,9 117:2
117:25 120:25
120:25 121:13
121:24 137:2
141:10 149:25
150:1,7,7
155:13,14,18,18
166:2,3,4,7
167:18,20,24
168:6,22,23,24
168:25 169:17
170:11,22
175:20 176:4,5
176:9 178:8,16
178:17 180:11
180:13,20 181:2
181:4,8,10,15
181:22,23 184:2
184:2,5,9,11,18
185:8,8,9,13,14
185:17,18 186:6
186:10,11,12,12
186:16,18,22
187:3,4,7,11,11
187:14,22 188:1
188:2 192:1
193:3
**westport's**
111:17 117:24
119:14 164:24

wharton 138:24
wheels 163:14
wherewithal
  106:25 129:20
whhs 150:8
whistle 22:9
whitson 2:5,14
  4:6,22 32:17
  53:12,15 55:3,6
  55:10 57:20,22
  57:25 58:3,6
  72:6 79:22
  80:11,22 81:4
  83:12,17,22
  103:9,13 107:9
  109:23 110:2
  119:11 147:24
  148:23 149:6
  188:8 189:12,14
wholly 9:23
  11:2 60:4 117:1
  164:23
whuv 113:13
  114:2,10,12,13
  114:17 150:8
widely 130:14
  163:19
willfully 76:23
williams 3:6
  61:25 66:19
  83:25 166:18
  171:10
williamson 5:24
  123:14

willingness
  102:12
wilson 82:5
wiped 187:15
wire 78:20 80:2
wishes 22:3
withdrawal
  72:22 77:5
withdrew 16:18
withstanding
  146:24
witness 4:2,4
  190:7,12 193:19
wnt 115:4
  116:24 118:3
  119:22 157:14
  157:18 160:11
  160:18 164:23
wnt's 115:8
  117:8 118:1
  150:1
wood 128:1
woods 179:7
word 9:1 92:6,9
  96:14 140:16
  146:22 172:17
  173:4,10
words 67:14
  68:3,10 69:13
  185:12
work 23:21 50:1
  50:4,5,7,16
  51:13,17,22
  52:1,2,22 53:3
  75:3 96:9

102:19 107:4,5
  131:19 139:13
worked 20:15
  36:3 45:16
  46:21 141:2
worker 45:12
workers 44:10
  44:19 45:8
working 43:23
  44:1,2,2,4,20
  141:2 162:16
  188:19
works 169:25
world 53:1
  129:9
worry 174:9
worse 30:6
  105:13
worth 30:23
  37:8 142:9
  179:21 180:24
  181:24 187:14
  187:24,25
wrap 174:15
write 152:9
writing 71:11
  78:4,13
written 30:23
  70:18 78:7,17
  79:18 186:5
  187:20
wrong 49:18
  50:16 65:20
  73:3 89:3
  112:23 142:15

wrongful 7:3
wrote 16:19
wsilf 112:2,2,9
  112:11
wslif 112:13
  113:3,6,10
  114:20 120:18

x

x 2:13 3:1 62:25
  172:3,3,5

y

y 62:25 172:4
yeah 4:19 18:10
  18:24,24 19:14
  19:18 20:4 46:7
  49:11,11 67:4
  82:6,9 99:23
  109:18,21 110:4
  111:25 116:25
  122:12 123:23
  126:2,4 129:5
  131:11 136:11
  136:16 149:15
  157:20 174:19
  181:13
year 8:15
years 6:15 47:24
  48:16 49:24
  52:17 76:18
  99:15 102:10,10
  102:10 117:17
  138:7 162:24
  180:19 185:21

**yep**  95:25
**york**  43:21
  49:19
**young**  76:17

**z**

**z**  144:16,18,22
  144:23
**zero**  139:18,19
  187:17

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.