CONFIDENTIAL

**CPIF ADVERESARY DOCUMENT**

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement") is made as of the 31st day of March, 2014, by and among **WESTPORT NURSING TAMPA, L.L.C.**, a Florida limited liability company ("Borrower"), and **USAMERIBANK**, a Florida state banking corporation (together with its successors and assigns, the "Lender").

### RECITALS

A.      Borrower has requested that the Lender make a loan to Borrower in the principal amount of $15,000,000.00.

B.      Lender has agreed to make such loan on the terms and conditions hereinafter set forth.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the recitals set forth above and other good and valuable consideration, the parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS, ACCOUNTING PRINCIPLES, UCC TERMS.

1.1      **Definitions.**  As used in this Agreement, the following terms shall have the following meanings unless the context hereof shall otherwise indicate:

**"Accounts"** shall mean all of Borrower's accounts (including all accounts receivable) arising from the ownership of the Facility, including but not limited to, rights to payment for goods sold or leased or for services rendered, not evidenced by an Instrument, and specifically including, if any, all health-care-insurance receivables and rights to payment from Reimbursement Contracts.

**"Applicable Environmental Law"** shall mean any applicable federal, state or local laws, rules or regulations pertaining to health or the environment, or petroleum products, or radon radiation, or oil or hazardous substances, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA") and the Federal Emergency Planning and Community Right-To-Know Act of 1986, as amended.  The terms "hazardous substance" and "release" shall have the meanings specified in CERCLA, and the terms "solid waste," disposal," "dispose," and "disposed" shall have the meanings specified in RCRA, except that if such acts are amended to broaden the meanings thereof, the broader meaning shall apply herein prospectively from and after the date of such amendments; notwithstanding the foregoing, provided, to the extent that the laws of the State in which the Property is located establish a meaning for "hazardous substance" or "release" which is broader than that specified in CERCLA, as CERCLA may be amended from time to time, or a meaning for "solid waste," "disposal," and "disposed" which is broader than specified in RCRA, as RCRA may be amended from time to time, such broader meanings under said state law shall apply in all matters relating to the laws of such State.



PLAINTIFF'S
EXHIBIT
**24**
KORAN

SUB_LANDRY_00018789

LIQ_TT_1636502

CONFIDENTIAL

"**Assignment and Pledge**" shall mean the Assignment and Pledge of Deposit Account (Cash Collateral Account) of even date herewith by Borrower in favor of Lender with respect to the Cash Collateral deposited with Lender pursuant to Section 4.20 hereof, as the same may be amended from time to time.

"**Assignment of Leases and Rents**" means collectively the Assignment of Leases and Rents of even date herewith by Borrower in favor of Lender, to be recorded in the public records of Hillsborough County, Florida, as the same may be amended from time to time.

"**Assignment of Licenses**" means that certain Assignment of Licenses, Permits, and Contracts of even date herewith executed by Borrower and Lessees in favor of Lender, as the same may be amended from time to time.

"**Borrower**" means Westport Nursing Tampa, L.L.C., a Florida limited liability company.

"**Business Day**" means a day, other than Saturday or Sunday and legal holidays, when the Lender is open for business.

"**Cash Collateral**" means the cash collateral to be deposited and maintained by Borrower as additional collateral for the Loan Obligations pursuant to Section 4.20 hereof and the Assignment and Pledge.

"**Cash Collateral Account**" means the deposit account established and maintained by Borrower with Lender (and any replacement accounts therefor) for the purpose of holding the Cash Collateral, which such deposit account is pledged by Borrower as additional collateral for the Loan Obligations pursuant to the Assignment and Pledge.

"**Closing Date**" means the initial date on which the Loan is disbursed by the Lender to or for the benefit of Borrower.

"**Collateral**" shall mean, collectively, all of Borrower's right, title and interest in the Property, Improvements, Equipment, Rents, Accounts, General Intangibles, Instruments, Inventory, Money, and (to the full extent assignable) Permits and Reimbursement Contracts, the Cash Collateral and all Proceeds, all whether now owned or hereafter acquired, and including replacements, additions, accessions, substitutions, and products, and all other property which is or hereafter may become subject to a Lien in favor of Lender as security for any of the Loan Obligations pursuant to any Loan Document.

"**Commitment Letter**" means that certain commitment letter issued by Lender to Borrower for the Loan dated February 5, 2014, including any amendments thereto.

"**Debt Service**" means, with respect to any particular period of time, scheduled principal and interest payments due under the Note.

"**Debt Service Coverage Ratio**" shall mean a ratio, calculated on a twelve month trailing basis, of EBITDAR (before any permitted distributions to members) to Debt Service for such period.

SUB_LANDRY_00018790

LIQ_TT_1636503

CONFIDENTIAL

"**Default**" means the occurrence or existence of any event which, but for the giving of notice or expiration of time or both, would constitute an Event of Default.

"**Default Rate**" has the meaning given to that term in the Note.

"**EBITDAR**" means, for any period, Gross Income from Operations less all Facility Operating Expenses (before interest, taxes and assessments, depreciation, amortization and rent and lease expenses) for such period.

"**EBITDARM**" means, for any period, Gross Income from Operations less all Facility Operating Expenses (before interest, taxes and assessments, depreciation, amortization, rent and lease expenses and management fees) for such period.

"**Effective Capacity**" means the number of licensed beds from time to time at the Facility actually available for utilization (which may be less than the number of beds licensed due to utilization of single patient rooms or other reasonable and prudent operating decisions), but not less than the number of beds for the Facility as specified on Exhibit G hereto.

"**Equipment**" shall mean all fixtures and equipment located on, attached to or used in connection with the Property or the Facility, including, but not limited to, beds, linen, televisions, carpeting, telephones, cash registers, computers, lamps, glassware, rehabilitation equipment and restaurant and kitchen equipment; provided, however, that with respect to any items which are leased and not owned, the Equipment shall include Borrower's leasehold interest only together with any options to purchase any of said items and any additional or greater rights with respect to such items hereafter acquired (but nothing herein shall permit the leasing of any Equipment except as otherwise expressly permitted herein unless Lender's written consent is first obtained).

"**Event of Default**" means any "Event of Default" as defined in Article VI hereof.

"**Exhibit**" means an Exhibit to this Agreement, unless the context refers to another document, and each such Exhibit shall be deemed a part of this Agreement to the same extent as if it were set forth in its entirety wherever reference is made thereto.

"**Extraordinary Income**" and "**Extraordinary Expenses**" means material items of a character significantly different from the typical or customary business activities of Borrower which would not be expected to recur frequently and which would not be considered as recurring factors in any evaluation of the ordinary operating processes of Borrower's business, and which would be treated as extraordinary income or extraordinary expenses under GAAP.

"**Facility**" means that certain 110-bed assisted living facility located on the Property currently commonly known as The Inn at University Village and that certain 120-bed skilled nursing facility located on the Property currently commonly known as University Village Nursing Center, as the same may now or hereafter exist, together with any other general or specialized care facilities, if any (including any Alzheimer's care unit, subacute, and any facility, now or hereafter operated on the Property).

SUB_LANDRY_00018791

LIQ_TT_1636504

CONFIDENTIAL

"**Facility Operating Expenses**" shall mean the total of all expenditures of whatever kind relating to the operation, maintenance and management of the Property and the Facility that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, taxes and assessments, advertising expenses, management fees, administrative service fees, professional fees, payroll and related taxes, computer processing charges, operational, equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, capital expenditures and any Extraordinary Expenses, all calculated for an applicable period in accordance with GAAP consistently applied.

"**GAAP**" means, as in effect from time to time, generally accepted accounting principles consistently applied as promulgated by the American Institute of Certified Public Accountants.

"**General Intangibles**" shall mean all of Borrower's general intangibles and other intangible personal property arising out of or connected with the Property or the Facility (other than Accounts, Rents, Instruments, Inventory, Money, Permits and Reimbursement Contracts), including, without limitation, things in action, contract rights and other rights to payment of money.

"**Governmental Authority**" means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Facility, Property and/or the Improvements or the use, operation or improvement of the Property.

"**Gross Income from Operations**" shall mean all income, computed on an accrual basis in accordance with GAAP consistently applied, derived from the operation of the Property and the Facility in the aggregate from whatever source, including, but not limited to, all patient or resident room revenues, revenues for services provided to patients or residents, revenues from charges imposed on patients or persons acting by or on behalf of patients or residents, or revenues received for care or services to patients or residents, all food, beverage, and merchandise sales receipts, all interest income, if any, rent, utility charges, escalations, forfeited security deposits, service fees or charges, license fees, parking fees, professional fees, rent concessions or credits, and any business interruption insurance proceeds but excluding sales, use and occupancy or other taxes on receipts applicable to the Property required to be accounted for by any Lessee to any government or Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, proceeds of casualty insurance and condemnation awards, interest on credit accounts or any other Extraordinary Income, all calculated for an applicable period in accordance with GAAP consistently applied.

"**Guarantor**" means BVM Management, Inc., an Indiana non-profit corporation.

"**Guaranty Agreement**" means that certain Guaranty Agreement of even date herewith from Guarantor to and for the benefit of Lender, as the same may be amended from time to time.

SUB_LANDRY_00018792

LIQ_TT_1636505

CONFIDENTIAL

"**HIPAA**" shall mean the so-called "Administrative Simplification" provisions of the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**Improvements**" means all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Property, including, but not limited to, all gas and electric fixtures, radiators, heaters, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, air conditioning equipment, carpeting and other floor coverings, water heaters, awnings and storm sashes, cleaning apparatus, signs, landscaping and parking areas which are or shall be attached to the Property or said buildings, structures or improvements.

"**Indebtedness**" means any (a) obligations for borrowed money, (b) obligations, payment for which is being deferred by more than ninety (90) days, representing the deferred purchase price of property other than accounts payable arising in connection with the purchase of inventory customary in the trade and in the ordinary course of Borrower's business, (c) obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from the Accounts and/or property now or hereafter owned or acquired, and (d) the amount of any other obligation (including obligations under financing leases) which would be shown as a liability on a balance sheet prepared in accordance with GAAP.

"**Indemnity Agreement**" shall mean that certain Environmental Indemnity Agreement of even date herewith from the Borrower and Guarantor to Lender, as the same may be amended from time to time.

"**Instruments**" shall mean instruments, chattel paper, documents or other writings obtained from or in connection with the ownership and operation of the Property or the Facility (including, without limitation, all ledger sheets, computer records and printouts, data bases, programs, books of account and files relating thereto).

"**Inventory**" shall mean all inventory from time to time used at the Facility, including, but not limited to, food, beverages, other comestibles, soap, towels, linens, bedding, paper supplies, medical supplies, drugs and all other such goods, wares and merchandise held for sale to or for consumption or use by guests or residents of the Property or the Facility, including all such goods that are returned or repossessed.

"**Lender**" means USAmeriBank, a Florida state banking corporation.

"**Lease**" means that certain Master Lease Agreement dated March 31, 2014 between Borrower and Lessees with respect to the Facility.

"**Lessee**" means any one of the Lessees.

"**Lessees**" means, collectively, TALF, Inc., a Florida non-profit corporation (which operates the assisted living component of the Facility pursuant to the Lease) and TR & SNF, Inc., a Florida non-profit corporation (which operates the skilled nursing component of the Facility pursuant to the Lease).

20394303 v8

Loan Agreement - Page 5
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018793

LIQ_TT_1636506

CONFIDENTIAL

"**Lien**" means any voluntary or involuntary mortgage, security deed, deed of trust, lien, pledge, assignment, security interest, title retention agreement, financing lease, levy, execution, seizure, judgment, attachment, garnishment, charge, lien or other encumbrance of any kind, including those contemplated by or permitted in this Agreement and the other Loan Documents.

"**Loan**" means the Loan in the principal sum of $15,000,000.00 made by Lender to Borrower as of the date hereof pursuant to this Agreement and the Loan Documents.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases and Rents, the Assignment of Licenses, the Assignment and Pledge, the Guaranty Agreement, the Indemnity Agreement, the Subordination of Management Agreement and the SNDA, together with any and all other documents executed by Borrower or any other Person and delivered to Lender, evidencing, securing or otherwise relating to the Loan, all as the same may be amended from time to time.

"**Loan Obligations**" means the aggregate of all principal and interest owing from time to time under the Note and all expenses, charges and other amounts from time to time owing under the Note, this Agreement, or the other Loan Documents and all covenants, agreements and other obligations from time to time owing to, or for the benefit of, Lender pursuant to the Loan Documents.

"**Management Agreement**" means, individually and collectively, (a) that certain Management Agreement between TALF, Inc. and Manager dated March 31, 2014 with respect to the Facility, and (b) that certain Management Agreement between TR & SNF, Inc. and Manager dated March 31, 2014 with respect to the Facility.

"**Manager**" means WEMAMM I, LLC, a Florida limited liability company, and any successor manager of the Facility approved by Lender in writing.

"**Material Adverse Effect**" or "**Material Adverse Change**" means any event, condition or circumstance or set of events, conditions or circumstances or any change(s) which (i) has, had or could reasonably be expected to have any material adverse effect upon or change in the validity, enforceability or priority of any Loan Document, (ii) has been or could reasonably be expected to be material and adverse to the value of the Property or of Lender's security interest in or Lien on the Property, (iii) has or could reasonably be expected to have a material adverse effect on the business, operations, prospects, properties, assets, liabilities or condition of Borrower and Guarantor, taken as a whole, or (iv) has materially impaired or could reasonably be expected to materially impair the ability of Borrower or Guarantor to perform the obligations under the Loan Documents to which it is a party.

"**Maturity Date**" shall have the meaning given to such term in the Note.

"**Medicaid**" means that certain program of medical assistance, funded jointly by the federal government and the States, for impoverished individuals who are aged, blind and/or disabled, and/or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq.*) and the regulations promulgated thereunder.

SUB_LANDRY_00018794

LIQ_TT_1636507

CONFIDENTIAL

"**Medicare**" means that certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled nursing homes, assisted living facilities, home health care and other providers are reimbursed for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq.*) and the regulations promulgated thereunder.

"**Money**" shall mean all monies, cash, rights to deposit or savings accounts or other items of legal tender obtained from or for use in connection with the operation of the Facility.

"**Monthly Debt Service Payment**" shall mean any payment of principal and/or interest by Borrower to Lender on a Scheduled Payment Date.

"**Mortgage**" means that certain Mortgage and Security Agreement of even date herewith by Borrower in favor of and for the benefit of Lender, to be recorded in the public records of Hillsborough County, Florida for the purpose of encumbering the Property and the Improvements located thereat and certain other Collateral relating to the Facility, as the same may be amended from time to time.

"**Note**" means that certain Promissory Note of even date herewith in the principal amount of the Loan payable by Borrower to the order of Lender, as the same may be amended, modified, extended or renewed.

"**OFAC List**" means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Requirements of Law, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible through the internet website maintained by the U.S. Treasury Department.

"**O&M Program**" means any written program of operations and maintenance established or approved in writing by Lender relating to the Property or any Improvements.

"**Permits**" means all licenses, permits, certificates, approvals, authorizations and registrations used or necessary in connection with the ownership, operation, use or occupancy of the Property and/or the Facility, including, without limitation, business licenses, state health department licenses, food service licenses, licenses to conduct business, nursing home licenses, assisted living facility licenses, certificates of need and all such other permits, licenses and rights, obtained from any governmental, quasi-governmental or private person or entity whatsoever concerning ownership, operation, use or occupancy.

"**Permitted Encumbrances**" has the meaning given to that term in the Mortgage.

"**Permitted Liens**" shall have the meaning given to such term in Section 5.2 of this Agreement.

SUB_LANDRY_00018795

LIQ_TT_1636508

CONFIDENTIAL

"**Permitted Substances**" means (i) substances used for cleaning and maintenance of the Facility in the ordinary course of business which contain hazardous substances and which are purchased and stored in commercially reasonable quantities and used, handled and stored at the Facility in compliance with all Applicable Environmental Laws and (ii) medications and other substances, "sharps" and other items utilized in the ordinary course of business of the Facility as an assisted living and skilled nursing facility which are used, stored, handled and disposed of in compliance with all applicable law, including without limitation, all Applicable Environmental Laws.

"**Person**" means an individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**Proceeds**" shall mean all proceeds (whether cash or non-cash, moveable or immoveable, tangible or intangible), including proceeds of insurance and condemnation, from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the Collateral.

"**Property**" shall mean the real estate in Hillsborough County, Florida, which is more particularly described in Exhibit A hereto, upon which the Facility is located and operated.

"**Reimbursement Contracts**" means all third party reimbursement contracts for the Facility which are now or hereafter in effect with respect to residents or patients qualifying for coverage under the same, including Medicare, Medicaid and private insurance agreements, and any successor program or other similar reimbursement program and/or private insurance agreements.

"**Related Facility**" means the separate independent living facility at University Village which is located adjacent to the Property and owned and operated by affiliates of Borrower and Lessees.

"**Rents**" shall mean all rent and other payments of whatever nature from time to time payable pursuant to any lease of the Property or the Facility, or any part thereof, including, but not limited to, all leases or subleases of individual units to residents and of retail space or other space at the Property for businesses such as newsstands, barbershops, beauty shops, physicians' offices, pharmacies and specialty shops.

"**Scheduled Payment Date**" shall mean any date upon which a Monthly Debt Service Payment becomes due from Borrower to Lender under the Note.

"**Single Purpose Entity**" means a Person that complies with the requirements of Section 5.14 hereof.

"**SNDA**" means that certain Subordination, Nondisturbance and Attornment Agreement between Borrower, Lessees and Lender of even date herewith, as the same may be amended from time to time.

SUB_LANDRY_00018796

LIQ_TT_1636509

CONFIDENTIAL

"**Subordination of Management Agreement**" means the Subordination of Management Agreement of even date herewith by Borrower, Lessees and Manager, as the same may be amended from time to time.

"**Subordinate Seller Note**" means a certain Seller Promissory Note dated March 31, 2014 by Borrower to BVM Management, Inc., in the principal amount of $1,000,000, as the same may be amended from time to time.

"**Title Company**" shall mean Old Republic National Title Insurance Company.

1.2     Singular terms shall include the plural forms and vice versa, as applicable, of the terms defined.

1.3     Terms contained in this Agreement shall, unless otherwise defined herein or unless the context otherwise indicates, have the meanings, if any, assigned to them by the Uniform Commercial Code in effect in the State of Florida.

1.4     All accounting terms used in this Agreement shall be construed in accordance with GAAP, except as otherwise specified.

1.5     All references to other documents or instruments shall be deemed to refer to such documents or instruments as they may hereafter be extended, renewed, modified, or amended and all replacements and substitutions therefor.

1.6     All references herein to "Medicaid" and "Medicare" shall be deemed to include any successor programs thereto. References to Medicaid and Medicare in this Agreement are not intended to imply that such programs are applicable to the Facility. Any terms or covenants relating to Medicaid or Medicare shall be deemed applicable only as and to the extent the Facility participates in any such program.

## ARTICLE II
## TERMS OF THE LOAN

2.1     **The Loan.** Borrower has agreed to borrow from Lender, and Lender has agreed to make the Loan to Borrower, subject to Borrower's compliance with and observance of the terms, conditions, covenants, and provisions of this Agreement and the other Loan Documents, and the Borrower has made the covenants, representations, and warranties herein and therein as a material inducement to Lender to make the Loan.

2.2     **Use of Loan Proceeds.** A principal amount of $15,000,000 of the Loan shall be used to refinance existing indebtedness of the Property and Improvements, to pay closing expenses related to the Loan and for such other purposes as may be approved by Lender. If the principal amount of the Loan is insufficient for all intended uses, the Borrower agrees to inject cash at closing to the extent of such deficiency. As required by Section 4.20 hereof, Borrower shall deliver from its own separate funds $3,000,000 to fund the required Cash Collateral which shall serve as additional security for the Loan Obligations.

20394303 v8

Loan Agreement - Page 9
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018797

LIQ_TT_1636510

CONFIDENTIAL

2.3    **Security for the Loan.** The Loan will be evidenced, secured and guaranteed by the Loan Documents.

2.4    **Interest Rate.**

(a)    The outstanding principal balance of the Loan will bear interest as more particularly set forth in the Note.

(b)    Simple interest on the outstanding principal balance of the Loan shall be calculated on the daily outstanding balance for the previous period using a 360-day year base, as set forth in the Note.

2.5    **Repayment of Loan.** Each payment of the Loan Obligations shall be paid directly to the Lender in lawful money of the United States of America at the following address:

USAmeriBank
113 East Whiting Street
Tampa, Florida 33602
Attention: Trey Korhn

or such other place as the Lender shall designate in writing to the Borrower from time to time. Each such payment shall be paid to Lender in immediately available funds by 2:00 p.m. Tampa, Florida time on the applicable Scheduled Payment Date, except if such Scheduled Payment Date is not a Business Day, such payment shall then be due on the first Business Day after such Scheduled Payment Date unless such next succeeding Business Day does not fall within the same calendar month, in which case the due date thereof shall be shortened to the immediately preceding Business Day. Each Monthly Debt Service Payment will be applied first to the payment of interest accrued at the applicable interest rate and then to the reduction of the unpaid principal balance of this Note. Any payment received after 2:00 p.m. shall be deemed to have been received on the immediately following Business Day for all purposes, including, without limitation, the accrual of interest on principal.

2.6    **Prepayment.** The Loan may be prepaid in whole or in part, subject to the terms and conditions of the Note (including, without limitation, prepayment premiums when applicable under the Note). Borrower shall not be entitled to reborrow any amounts so prepaid.

2.7    **Late Charges On Overdue Installments; Default Rate; Collection Costs.**

(a)    If any scheduled payment of principal or interest, or any other agreed charge (other than the balloon payment at maturity), is not made on or before the tenth (10th) day after the same became due, Borrower agrees to pay to Lender a late charge equal to five percent (5%) of the amount of the payment or charge which is in default.

(b)    Upon the occurrence of any Event of Default, Borrower agrees to pay interest to Lender at the Default Rate on the aggregate outstanding Loan Obligations (including accrued interest) and such Default Rate shall remain in full force and effect until the Event of Default is cured, and thereafter shall revert to the otherwise applicable rate under the Note.

SUB_LANDRY_00018798

LIQ_TT_1636511

CONFIDENTIAL

(c)   Borrower will also pay to Lender, in addition to the amount due, all reasonable costs of collecting, securing, or attempting to collect or secure the Note, this Agreement, and the other Loan Documents, including, without limitation, court costs and reasonable attorneys' fees, including, without limitation, reasonable attorneys' fees for preparation of litigation and in any appellate and bankruptcy proceedings.

2.8   **Usury Provisions.**   In no event shall the amount of interest due or payable hereunder or pursuant to any of the Loan Documents exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by Borrower or inadvertently received by Lender, then such excess sum shall be credited as a payment of principal. It is the express intent hereof that Borrower not pay and Lender not receive, directly or indirectly, interest in excess of that which may be legally paid by Borrower under applicable law.

2.9   **Miscellaneous Waivers.** With respect to the amounts due under the Note and other Loan Documents, Borrower waives the following to the fullest extent permitted by law:

(i)   All rights of exemption of property from levy or sale under execution or other process for the collection of debts under the Constitution or laws of the United States or any state thereof; and

(ii)   Except for any notice or demand specifically required by the Loan Documents, demand, presentment, protest, notice of dishonor, notice of non-payment, diligence in collection, and all other requirements necessary to enforce the Note; and

(iii)   Any further receipt by Lender or acknowledgment by Lender of any Collateral now or hereafter deposited with Lender as security for the Loan.

2.10   **Fees and Closing Expenses.** Borrower will pay to Lender, or reimburse Lender for, all fees and expenses set forth in the Commitment Letter or otherwise incurred by Lender in connection with the Loan, including, without limitation:  an origination fee in the amount of one percent (1.00%) of the principal amount of the Loan; all recording fees, recording taxes, intangible taxes, documentary taxes or similar taxes with respect to the Loan; all title insurance premiums; any standard underwriting fees of Lender; all appraisal costs; appraisal review fees; any inspection fees or expenses; all UCC, litigation, bankruptcy and tax lien search fees; all reasonable attorneys' fees and expenses of Lender's counsel; and such other fees and expenses as otherwise required by this Agreement and the Loan Documents.

2.11   **Disbursement of the Loan on Closing Date.**   On the Closing Date, subject to Borrower's satisfaction of all closing and funding requirements of Lender, the entire Loan will be available for immediate funding for the purposes herein provided.

# ARTICLE III
## BORROWER'S REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loan to the Borrower, the Borrower represents and warrants to Lender as follows:

20394303 v8

Loan Agreement - Page 11
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018799

LIQ_TT_1636512

CONFIDENTIAL

3.1    **Existence, Power and Qualification.**  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida, has the power to own its properties and to carry on its business as is now being conducted, and is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned by it or in which the transaction of its business makes its qualification necessary, including, without limitation, the State of Florida.

3.2    **Power and Authority.**  Borrower has full power and authority to borrow hereunder and to incur the obligations provided for herein and in each of the other Loan Documents to which Borrower is a party, all of which have been authorized by all proper and necessary limited liability company action of Borrower.

3.3    **Due Execution and Enforcement.**  Each of the Loan Documents to which Borrower is a party constitutes a valid and legally binding obligation of Borrower, enforceable in accordance with its respective terms (except to the extent that (i) enforcement may be limited by or subject to any bankruptcy, insolvency, reorganization, moratorium or similar law as is now or hereafter in effect relating to creditors' rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief are subject to certain equitable defenses and to the discretion of the court or other authority or person before which any proceeding therefore may be brought) and does not violate, conflict with, or constitute any default under (a) any applicable law, government regulation, decree, or judgment, (b) Borrower's articles of organization or operating agreement or (c) any other agreement or instrument binding upon Borrower.

3.4    **Pending Matters.**  Borrower has not received any written notice of any action or investigation pending or threatened before or by any state or federal court or administrative agency which might result in any Material Adverse Change in the financial condition, operations or prospects of Borrower or the Facility.  Borrower has not received any written notice of any violation of any agreement, the violation of which might reasonably be expected to have a materially adverse effect on its business or assets, and Borrower has not received any written notice of any violation of any order, judgment, or decree of any state or federal court, or any statute or governmental regulation to which it is subject.

3.5    **Financial Statements Accurate.**  All financial statements heretofore or hereafter provided by Borrower are and will be true and complete in all material respects as of their respective dates and fairly and will fairly present the financial condition of Borrower and the Facility, and there are no material liabilities, direct or indirect, fixed or contingent, as of the respective dates of such statements which are not reflected therein or in the notes thereto or in a written certificate delivered with such statements, except as permitted by GAAP.  The financial statements of the Borrower have been prepared in accordance with GAAP.  There has been no Material Adverse Change in the financial condition, operations, or prospects of Borrower or the Facility since the dates of such statements except as fully disclosed in writing prior to the date hereof, with respect to past financial statements, or with the delivery of such statements, with respect to financial statements delivered after the date hereof.

3.6    **Compliance with Facility Laws.**

SUB_LANDRY_00018800

LIQ_TT_1636513

CONFIDENTIAL

(a)    Borrower, Lessees and the Facility currently possess any and all required licenses for the Facility's current operation under the laws of the State of Florida. The current Effective Capacity of the Facility as set forth in Exhibit G hereof is true and correct. Borrower and Lessees are in compliance in all material respects with the applicable provisions of assisted living and skilled nursing facility laws, rules, regulations and published interpretations to which the Facility is subject. No waivers of any laws, rules, regulations or requirements (including, but not limited to, minimum square footage requirements per bed) are required for the Facility to operate at the foregoing current licensed bed capacity.

(b)    All applicable Reimbursement Contracts, if any, are in full force and effect with respect to the Facility. To the extent applicable, the Facility is in material compliance with all requirements for participation in Medicare and Medicaid, including, without limitation, the Medicare and Medicaid Patient Protection Act of 1987 and the Facility is in conformance in all material respects with all insurance, reimbursement and cost reporting requirements and has a current provider agreement which is in full force and effect under Medicare and Medicaid.

(c)    Borrower and Lessees have provided to Lender, and are in good standing with the respective agencies under, such applicable facility licenses and program certifications for the Facility.

(d)    Borrower and Lessees are current in payment of any so-called provider specific taxes or other assessments with respect to such Reimbursement Contracts, if applicable.

(e)    There is no pending or, to Borrower's knowledge, threatened revocation, suspension, termination, probation, restriction, limitation, or nonrenewal affecting Borrower, any Lessee or the Facility or any participation or provider agreement with any third-party payor, including Medicare, Medicaid, Blue Cross and/or Blue Shield, and any other private commercial insurance managed care and employee assistance program (such programs, the "Third-Party Payors' Programs") to which Borrower, any Lessee or the Facility presently is subject. All Medicare, Medicaid and private insurance cost reports and financial reports submitted by Borrower or any Lessee with respect to the Facility are and will be materially accurate and complete and have not been and will not be misleading in any material respects. No cost reports for the Facility remain "open" or unsettled, except as otherwise disclosed to Lender.

3.7    **Transfer of License or Bed Capacity.** Neither Borrower nor Lessees have, nor has Borrower or any Lessee granted to any third party, the right to reduce the number of licensed beds in the Facility or to apply for approval to move the right to any or all of the licensed beds to any other location. To Borrower's knowledge, if the Lease is terminated or Lender acquires the Facility through foreclosure or otherwise, Borrower, Lender, a subsequent lessee or manager, or a subsequent purchaser (through foreclosure or otherwise) need not obtain a new certificate of need from any applicable state health care regulatory authority or agency. Borrower agrees to cooperate with Lender or any subsequent lender, lessee, manager, purchaser or operator in good faith in obtaining any required consents, confirmations or certifications at any time after or in connection with a transfer of the Facility and the licensure of the Facility.

3.8    **Payment of Taxes.** Borrower has filed all federal, state, and local tax returns which are required by law to be filed by Borrower (taking into account any extensions of time

20394303 v8

SUB_LANDRY_00018801

LIQ_TT_1636514

CONFIDENTIAL

within which to file such returns) and has paid, or made adequate provision for the payment of, all taxes which have or may become due pursuant to such returns or to assessments received by Borrower, including, without limitation, provider taxes, if any.

3.9     **Title to Collateral**. Borrower has good and marketable title to all of the Collateral, subject to no Lien, except for Permitted Liens and except for Collateral owned by Lessees.

3.10    **Priority of Mortgage**. The Mortgage constitutes a first Lien upon and security interest in the real and personal property described therein, prior to all other Liens, including those which may hereafter accrue, excepting only Permitted Liens.

3.11    **Location of Chief Executive Offices**. The location of Borrower's principal places of business and chief executive offices is as set forth on Exhibit B hereto.

3.12    **Disclosure**. All information furnished or to be furnished by Borrower to the Lender in connection with the Loan or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Lender a true and accurate knowledge of the subject matter.

3.13    **Trade Names**. Neither Borrower nor the Facility has changed its name or been known by any other name within the last five (5) years and Borrower has not been a party to a merger or similar reorganization within the last five (5) years.

3.14    **ERISA**. Borrower is in compliance with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

3.15    **Ownership**. The ownership of Borrower is fully and accurately set forth on Exhibit C hereto.

3.16    **Proceedings Pending**. There are no proceedings pending, or, to the best of the Borrower's knowledge, threatened, to acquire any power of condemnation or eminent domain with respect to any part of the Property, or to enjoin or similarly prevent or restrict the use of the Property or the operation of the Facility in any manner.

3.17    **Compliance With Other Applicable Laws**. To the best of Borrower's knowledge, the Improvements and the Property comply in all material respects with all covenants and restrictions of record and applicable laws, ordinances, rules and regulations applicable to the Improvements and/or Property in their current condition, including, without limitation, the Americans with Disabilities Act, and  Fair Housing Act, and regulations thereunder, and all laws, ordinances, rules and regulations relating to zoning, setback requirements and building codes. The Improvements do not constitute a nonconforming structure and the operation of the Facility is a not nonconforming use under current zoning, and there are no waivers of any current building code requirements for the Property or Improvements. Borrower agrees to indemnify and hold Lender harmless from any fines or penalties assessed or any corrective costs incurred by Lender if the Improvements or the Property, or any part thereof, is hereafter determined to be in violation of any covenants or

20394303 v8

Loan Agreement - Page 14
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018802

LIQ_TT_1636515

CONFIDENTIAL

restrictions of record or any applicable laws, ordinances, rules or regulations, and such indemnity shall survive any foreclosure or deed in lieu of foreclosure.

3.18 **Environmental Matters.** Except as set forth in that certain Phase I Environmental Site Assessment prepared by ATMAB, Inc., ATMAB Project No. 14120, dated February 2014 with respect to the Property that has been supplied to Lender (the "Environmental Report"), Borrower has received no written notice of any violation of any existing, pending, or threatened investigation or inquiry by any Governmental Authority or any response costs or remedial obligations under any Applicable Environmental Law regarding the Improvements, the Property, the Lessees or Borrower, and this representation and warranty would continue to be true and correct following disclosure to the applicable Governmental Authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Improvements, the Property, Lessees or Borrower. Borrower has not obtained, and Borrower is not required to obtain, any permits, licenses or similar authorizations to construct, occupy, operate or use any Improvements or Equipment at the Property by reason of any Applicable Environmental Law (except such permits, licenses and authorizations which have been obtained). Except as described in the Environmental Report, to the best of Borrower's knowledge, no petroleum products, oil, or hazardous substances or solid wastes have been disposed of or otherwise released on or are otherwise located on the Property, except Permitted Substances. Except as described in the Environmental Report, to the best of Borrower's knowledge, the use of the Property as previously operated has not, and as hereafter intended to be operated by the Borrower will not, result in the location on or disposal or other release of any petroleum products, oil, or hazardous substances or solid wastes on or to the Property, except for Permitted Substances. Borrower hereby agrees to remedy promptly any violation of any Applicable Environmental Law with respect to the Property, and to pay any fines, charges, fees, expenses, damages, losses, liabilities, and response costs arising from or pertaining to the application of any such Applicable Environmental Law to Borrower or Property. Borrower agrees to permit Lender to have access to the Facility and the Property at all reasonable times in order to conduct any investigation and testing which Lender reasonably deems necessary to ensure that Borrower, Lessees, the Improvements, and the Property are in compliance with all Applicable Environmental Law, and Borrower agrees to promptly reimburse Lender for all reasonable costs incurred in such investigation and testing; provided that Lender agrees that it shall not conduct any such tests unless an Event of Default exists, Lender has reason to believe that such audit may disclose the presence or release of hazardous substances in violation of Applicable Environmental Law or unless an environmental audit deems further testing necessary. Borrower and Guarantor have entered into the Indemnity Agreement, and Borrower agrees to perform its obligations thereunder. Borrower also agrees to provide to Lender for its review and approval and maintain in effect any existing or hereafter required O&M Plan for any suspect asbestos-containing materials at the Property or Improvements.

3.19 **Solvency.** Borrower represents and warrants that it is solvent within the meaning of 11 U.S.C. § 548 and GAAP, and the borrowing of the Loan will not render Borrower insolvent within the meaning of 11 U.S.C. § 548 and GAAP.

3.20 **Permits, Roads and Utilities.** All public utility and public sanitary sewage services necessary for the operation of the Facility are available to the Property, and dedicated

SUB_LANDRY_00018803

LIQ_TT_1636516

CONFIDENTIAL

and publicly maintained roads necessary for the full operation of the Facility have been completed to and are in service for the Property.

3.21    **Lease.** The Lease is in full force and effect and has not been modified or amended and no default exists thereunder.

3.22    **Fraudulent Conveyances.** Borrower (a) has not entered into this Agreement or any of the other Loan Documents with the actual intent to hinder, delay, or defraud any creditor, and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and mature. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out their businesses as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond their ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

3.23    **Fraud and Abuse.**

(a)    **Anti-Kickback Law.** After consultation with counsel concerning the federal anti-kickback law (42 U.S.C.A. SEC. 1320a-7b(b)), neither Borrower or any of its agents have offered or given any remuneration or thing of value to any person to encourage referral to the Facility nor has Borrower or any agent solicited or received any remuneration or thing of value in exchange for any Borrower's agreement to make referrals or to purchase goods or services for the Facility.

(b)    **Relationships.** No physician or other healthcare practitioner has an ownership interest in, or financial relationship with, Borrower, any Lessee or the Facility.

(c)    **Required Adjustments.** Lessees have filed timely and accurate cost reports and are in material compliance with all applicable reimbursement and cost reporting requirements. All required adjustments for previously filed cost reports have been fully paid and/or implemented.

3.24    **No Illegal Activity as Source of Funds.** No portion of the Collateral has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity.

3.25    **Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.** Borrower, and to the best of Borrower's knowledge, after having made diligent inquiry, each Person owning an interest of 20% or more in Borrower, Guarantor, or any Lessee, (i) is not currently identified on the OFAC List, and (ii) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States. Borrower has implemented procedures, and will consistently

SUB_LANDRY_00018804

LIQ_TT_1636517

CONFIDENTIAL

apply those procedures throughout the term of the Loan, to ensure the foregoing representations and warranties remain true and correct during the term of the Loan.

3.26   **Fraud and Abuse Compliance Program.**  To Borrower's knowledge, Lessees have adopted and are adhering to a compliance program meeting the guidelines published by the Office of the Inspector General on March 16, 2000, at 65 Fed. Reg. 14289, as supplemented by 73 Fed. Reg. 190 (September 30, 2008).  Lessees' designated compliance officer is David Mills.

3.27   **Single Purpose Entity.**  Borrower and each Lessee is a Single Purpose Entity.

3.28   **Management Agreement.**  The Management Agreement is in full force and effect and has not been modified or amended and no default exists thereunder.

3.29   **Subordinate Seller Note.**  The Subordinate Seller Note contains a legend expressly stating that it is fully subordinate to the Loan and all Loan Documents and the Subordinate Seller Note evidences unsecured indebtedness.

## ARTICLE IV
## AFFIRMATIVE COVENANTS OF THE BORROWER

Borrower agrees with and covenants unto the Lender that until the Loan Obligations have been paid in full, the Borrower shall:

4.1   **Payment of Loan/Performance of Loan Obligations.**  Duly and punctually pay or cause to be paid the principal and interest of the Note in accordance with its terms and duly and punctually pay and perform or cause to be paid or performed all Loan Obligations hereunder and under the other Loan Documents.

4.2   **Maintenance of Existence.**  Maintain Borrower's existence, and, in each jurisdiction in which the character of the property owned by it or in which the transaction of its business makes qualification necessary, maintain good standing.

4.3   **Accrual and Payment of Taxes.**  During each fiscal year of Borrower, to the extent required by GAAP, accrue all current tax liabilities of all kinds (including, without limitation, federal and state income taxes, franchise taxes, payroll taxes, and, if applicable, so-called provider specific taxes (to the extent necessary to participate in and receive maximum funding pursuant to any Reimbursement Contracts applicable to the Facility)), all required withholding of income taxes of employees, all required old age and unemployment contributions, and all required payments to employee benefit plans, and pay the same prior to the accrual of penalties and interest due to nonpayment when they become due.

4.4   **Insurance.**  At all times while Borrower is indebted to Lender, to maintain or cause to be maintained the following insurance for Borrower, Lessees and the Facility, which coverage and policies must be acceptable to Lender in its sole discretion:

(a)   Insurance against loss or damage by fire, casualty and other hazards as now are or subsequently may be covered by an "all risk" policy or a policy covering "special" causes of loss, with such endorsements as Lender may from time to time reasonably require and

20394303 v8

Loan Agreement - Page 17
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018805

LIQ_TT_1636518

CONFIDENTIAL

which are customarily required by institutional lenders of similar properties similarly situated, including, without limitation, building ordinance or law, lightning, windstorm, civil commotion, hail, riot, strike, water damage, sprinkler leakage, collapse, malicious mischief, explosion, smoke, aircraft, vehicles, vandalism, falling objects and weight of snow, ice or sleet, and covering the Facility in an amount equal to one hundred percent (100%) of the full insurable replacement value of the Facility (exclusive of footings and foundations below the lowest basement floor) without deduction for depreciation. The determination of the replacement cost amount shall be adjusted annually to comply with the requirements of the insurer issuing the coverage or, at Lender's election, by reference to such indexes, appraisals or information as Lender determines in its reasonable discretion, and, unless the insurance required by this paragraph shall be effected by blanket and/or umbrella policies in accordance with the requirements of this Agreement, the policy shall include inflation guard coverage that ensures that the policy limits will be increased over time to reflect the effect of inflation. Each policy shall, subject to Lender's approval, contain (i) a replacement cost endorsement, without deduction for depreciation, (ii) either an agreed amount endorsement or a waiver of any co-insurance provisions, and (iii) an ordinance or law coverage or enforcement endorsement if the Improvements or the use of the Property constitutes any legal nonconforming structures or uses, and shall provide for deductibles in such amounts as Lender may permit in its sole discretion. In the event the Property is located in a flood hazard area requiring flood insurance, Borrower shall maintain and provide evidence of such required flood insurance in form acceptable to Lender.

(b)  Commercial general liability insurance under a policy containing "Comprehensive General Liability Form" of coverage (or a comparably worded form of coverage) and the "Broad Form CGL" endorsement (or a policy which otherwise incorporates the language of such endorsement), providing coverage on an occurrence (or on such other basis as Lender may otherwise approve) basis, which policy shall include, without limitation, coverage against claims for personal injury, bodily injury, death and property damage liability with respect to the Facility and the operations related thereto, whether on or off the Property, and the following coverages: Employee as Additional Insured, Product Liability/Completed Operations; Broad Form Contractual Liability, Independent Contractor, Personal Injury and Advertising Injury Protection, Medical Payment (with a minimum limit of $5,000 per person), Broad Form Cross Suits Liability Endorsement, where applicable, hired and non-owned automobile coverage (including rented and leased vehicles), all of which shall be in such amounts as Lender may from time to time reasonably require, but not less than One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate. If such policy shall cover more than one property, such limits shall apply on a "per location" basis. Such liability policy shall delete the contractual exclusion under the personal injury coverage, if possible, and if available, shall include the following endorsements: Notice of Accident, Knowledge of Occurrence, and Unintentional Error and Omission.

(c)  Professional liability insurance coverage in an amount equal to One Hundred Thousand Dollars ($100,000) per occurrence and Three Hundred Thousand Dollars ($300,000) in the aggregate and insuring Borrower for acts occurring prior to the date of the Loan, or such greater amount as may be required from time to time by any Governmental Authority with jurisdiction over the Facility.

SUB_LANDRY_00018806

LIQ_TT_1636519

CONFIDENTIAL

(d)     Loss of rents insurance (i) covering the same perils of loss as are required to be covered by the property insurance required under Section 4.4(a) above, (ii) in an amount equal to the projected annual net income from the Facility plus carrying costs and extraordinary expenses of the Property for a period of six (6) months, based upon Borrower's reasonable estimate thereof as approved by Lender, (iii) including either an agreed amount endorsement or a waiver of any co-insurance provisions, so as to prevent Borrower, Lender and any other insured thereunder from being a co-insurer, and (iv) providing that any covered loss thereunder shall be payable to Lender.

(e)     During the period of any construction and/or renovation of capital improvements with respect to the Facility, a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any improvements under construction, including, without limitation, for demolition and increased cost of construction or renovation, in an amount equal to one hundred percent (100%) of the estimated replacement cost value on the date of completion, including "soft cost" coverage, and Workers' Compensation Insurance covering all persons engaged in such construction, in an amount at least equal to the minimum required by law. In addition, each contractor and subcontractor shall be required to provide Lender with a certificate of insurance for (i) workers' compensation insurance covering all persons engaged by such contractor or subcontractor in such construction in an amount at least equal to the minimum required by law, and (ii) general liability insurance showing minimum limits of at least Five Million Dollars ($5,000,000), including coverage for products and completed operations. Each contractor and subcontractor also shall cover Borrower and Lender as an additional insured under such liability policy and shall indemnify and hold Borrower and Lender harmless from and against any and all claims, damages, liabilities, costs and expenses arising out of, relating to or otherwise in connection with its performance of such construction.

(f)     If the Facility contains steam boilers, steam pipes, steam engines, steam turbines or other high pressure vessels, insurance covering the major components of the central heating, air conditioning and ventilating systems, boilers, other pressure vessels, high pressure piping and machinery, elevators and escalators, if any, and other similar equipment installed in the Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost of the Facility, which policies shall insure against physical damage to and loss of occupancy and use of the Improvements arising out of an accident or breakdown covered thereunder.

(g)     Workers' compensation insurance or other similar insurance which may be required by governmental authorities or applicable legal requirements in an amount at least equal to the minimum required by law, and employer's liability insurance with a limit of One Million Dollars ($1,000,000) per accident and per disease per employee, and Three Million Dollars ($3,000,000) in the aggregate for disease arising in connection with the operation of the Property.

(h)     Such other insurance coverages, in such amounts, and such other forms and endorsements, as may from time to time be required by Lender and which are customarily required by institutional lenders to similar properties, similarly situated, including, without limitation, coverages against other insurable hazards (including, by way of example only, earthquake, sinkhole and mine subsidence), which at the time are commonly insured against and

20394303 v8

SUB_LANDRY_00018807

LIQ_TT_1636520

CONFIDENTIAL

generally available, including, without limitation, any insurance coverages for Manager with respect to the Facility as may reasonably be required by Lender.

All insurance required under this Section 4.4 shall have a term of not less than one year and shall be in the form and amount and with deductibles or self-insurance retentions as, from time to time, shall be reasonably acceptable to Lender, under valid and enforceable policies issued by financially responsible insurers either licensed to transact business in the State where the Facility is located, or obtained through a duly authorized surplus lines insurance agent or otherwise in conformity with the laws of such State, with a (i) rating of not less than the third (3rd) highest rating category by either Standard & Poor's Ratings Group, Duff & Phelps Credit Rating Co., Moody's Investors Service, Inc., Fitch Investors Service, Inc. or any successors thereto, or (ii) an A:V rating in Best's Key Rating Guide, provided that Lender shall take into account prevailing market conditions and industry practices with respect to cost and availability of coverages required hereunder. Originals or certified copies of all insurance policies shall be delivered to and held by Lender. All such policies, other than workers' compensation, employment practices liability, crime and auto liability insurance, shall name Lender as an additional insured, shall provide for loss payable solely to Lender and shall contain: (A) unless waived by Lender, a standard "non-contributory mortgagee endorsement or its equivalent relating, inter alia, to recovery by Lender notwithstanding the negligent or willful acts or omissions of Borrower and notwithstanding (1) occupancy or use of the Facility for purposes more hazardous than those permitted by the terms of such policy, (2) any foreclosure or other action taken by Lender pursuant to any Mortgage upon the occurrence of an Event of Default, or (3) any change in title or ownership of the Facility; and (B) a provision that such policies shall not be canceled or amended, including, without limitation, any amendment reducing the scope or limits of coverage, or failed to be renewed, without at least ten (10) days prior written notice to Lender in each instance. With respect to insurance policies which require payment of premiums annually, not less than ten (10) days past the binding of the insurance policies obtained pursuant to this Agreement, Borrower shall pay such amount, except to the extent Lender is escrowing sums therefor pursuant to the Loan Documents. Not less than ten (10) days prior past the binding dates of the insurance policies obtained pursuant to this Agreement, originals or certified copies of such policies or certificates evidencing such renewals bearing notations evidencing the payment of premiums or accompanied by other evidence satisfactory to Lender of such payment, shall be delivered by Borrower to Lender. Borrower shall not carry separate insurance, concurrent in kind or form or contributing in the event of loss, with any insurance required under this Section 4.4. If the limits of any policy required hereunder are reduced or eliminated due to a covered loss, Borrower shall pay the additional premium, if any, in order to have the original limits of insurance reinstated, or Borrower shall purchase new insurance in the same type and amount that existed immediately prior to the loss.

If Borrower fails to maintain and deliver to Lender the original policies within thirty (30) days of receipt from the insurance company or certificates within ten (10) days of binding, Lender may, at its option, procure such insurance and Borrower shall pay or, as the case may be, reimburse Lender for, all premiums thereon promptly, upon demand by Lender, with interest thereon at the Default Rate from the date paid by Lender to the date of repayment and such sum shall constitute a part of the Loan Obligations.

SUB_LANDRY_00018808

LIQ_TT_1636521

CONFIDENTIAL

The insurance required by this Agreement may, at the option of Borrower, be effected by blanket and/or umbrella policies issued to Borrower or to an affiliate of Borrower covering the Facility and the properties of such affiliate; provided that, in each case, the policies otherwise comply with the provisions of this Agreement and allocate to the Facility, from time to time, the coverage specified by this Agreement, without possibility of reduction or coinsurance by reason of, or damage to, any other property (real or personal) named therein. If the insurance required by this Agreement shall be affected by any such blanket or umbrella policies, Borrower shall furnish to Lender original policies or certified copies thereof, with schedules attached thereto showing the amount of the insurance provided under such policies which is applicable to the Facility.

Neither Lender nor its agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Agreement; it being understood that (i) Borrower shall look solely to its insurance company for the recovery of such loss or damage, (ii) such insurance company shall have no rights of subrogation against Lender, its agents or employees, and (iii) Borrower shall use their best efforts to procure from such insurance company a waiver of subrogation rights against Lender. If, however, such insurance policies do not provide for a waiver of subrogation rights against Lender (whether because such a waiver is unavailable or otherwise), then Borrower hereby agrees, to the extent permitted by law and to the extent not prohibited by such insurance policies, to waive its rights of recovery, if any, against Lender, its agents and employees, whether resulting from any damage to the Facility, any liability claim in connection with the Facility or otherwise. If any such insurance policy shall prohibit Borrower from waiving such claims, then Borrower must obtain from such insurance company a waiver of subrogation rights against Lender.

At its option, Lender agrees that Lender shall make the net proceeds of insurance or condemnation (after payment of Lender's reasonable costs and expenses) available to Borrower for Borrower's repair, restoration and replacement of the Improvements, Equipment and Inventory damaged or taken on the following terms and subject to Borrower's satisfaction of the following conditions:

(a)    The aggregate amount of all such proceeds shall not exceed the aggregate amount of all Loan Obligations;

(b)    At the time of such loss or damage and at all times thereafter while Lender is holding any portion of such proceeds, there shall exist no Default or Event of Default;

(c)    The Improvements, Equipment, and Inventory for which loss or damage has resulted shall be capable of being restored to its preexisting condition and utility in all material respects with a value equal to or greater than that which existed prior to such loss or damage and such restoration shall be capable of being completed prior to the earlier to occur of (A) the expiration of business interruption insurance as determined by an independent inspector or (B) the Maturity Date;

(d)    Within thirty (30) days from the date of such loss or damage, Borrower shall have given Lender a written notice electing to have the proceeds applied for such purpose;

20394303 v8

SUB_LANDRY_00018809

LIQ_TT_1636522

CONFIDENTIAL

(e)     Within sixty (60) days following the date of notice under the preceding subparagraph (d) and prior to any proceeds being disbursed to Borrower, Borrower shall have provided to Lender all of the following:

(i)     complete plans and specifications for restoration, repair and replacement of the Improvements, Equipment and Inventory damaged to the condition, utility and value required by (c) above,

(ii)     if loss or damage exceeds $50,000, fixed-price or guaranteed maximum cost bonded construction contracts for completion of the repair and restoration work in accordance with such plans and specifications,

(iii)     builder's risk insurance for the full cost of construction with Lender named under a standard mortgagee loss-payable clause,

(iv)     such additional funds as in Lender's reasonable opinion are necessary to complete such repair, restoration and replacement, and

(v)     copies of all permits and licenses necessary to complete the work in accordance with the plans and specifications;

(f)     Lender may, at Borrower's expense, retain an independent inspector to review and approve plans and specifications and completed construction and to approve all requests for disbursement, which approvals shall be conditions precedent to release of proceeds as work progresses;

(g)     No portion of such proceeds shall be made available by Lender for architectural reviews or for any other purposes which are not directly attributable to the cost of repairing, restoring or replacing the Improvements, Equipment and Inventory for which a loss or damage has occurred unless the same are covered by such insurance;

(h)     Borrower shall diligently pursue such work and shall complete such work prior to the earlier to occur of the expiration of business interruption insurance or the Maturity Date;

(i)     The Facility continues to achieve and maintain compliance with the financial covenants of this Agreement;

(j)     Each disbursement by Lender of such proceeds and deposits shall be funded subject to conditions and in accordance with disbursement procedures which a commercial construction lender would typically establish in the exercise of sound banking practices and shall be made only upon receipt of disbursement requests on an AIA G702/703 form (or similar form approved by Lender) signed and certified by Borrower and, if required by the Lender, its architect and general contractor with appropriate invoices and lien waivers as required by Lender; and

(k)     Lender shall have a first lien and security interest in all building materials and completed repair and restoration work and in all fixtures and equipment acquired with such

20394303 v8

SUB_LANDRY_00018810

LIQ_TT_1636523

CONFIDENTIAL

proceeds, and Borrower shall execute and deliver such mortgages, deeds of trust, security agreements, financing statements and other instruments as Lender shall request to create, evidence, or perfect such lien and security interest.

In the event and to the extent such proceeds are not required or used for the repair, restoration and replacement of the Improvements, Equipment and Inventory for which a loss or damage has occurred, or in the event Lender does not permit Borrower to have the insurance proceeds applied to the restoration of the Improvements, Equipment, or Inventory, or, if the conditions set forth herein for such application are otherwise not satisfied, then Lender shall be entitled without notice to or consent from Borrower to apply such proceeds, or the balance thereof, at Lender's option either (i) to the full or partial payment or prepayment of the Loan Obligations (without premium) in the manner aforesaid, or (ii) to the repair, restoration and/or replacement of all or any part of such Improvements, Equipment and Inventory for which a loss or damage has occurred.

Borrower appoints Lender as Borrower's attorney-in-fact to cause the issuance of or an endorsement of any insurance policy to bring Borrower into compliance herewith and, as limited above, at Lender's sole option, to make any claim for, receive payment for, and execute and endorse any documents, checks or other instruments in payment for loss, theft, or damage covered under any such insurance policy; however, in no event will Lender be liable for failure to collect any amounts payable under any insurance policy.

4.5    **Financial and Other Information.** Provide to Lender, or cause to be provided to Lender, the following financial statements and information on a continuing basis during the term of the Loan:

(a)    Within thirty (30) days after the end of each calendar quarter (or fiscal quarter for any Person that has a different fiscal year) for such quarter and within ninety (90) days after the end of each calendar year (or fiscal year for any Person that has a different fiscal year) for such year, compiled financial statements of Borrower and each Lessee, certified as true and correct in all material respects by a financial officer of the applicable Person, prepared in accordance with GAAP, which statements shall include a balance sheet, statement of income and expenses for the quarter then ended and operating statements for the Facility.

(b)    Within thirty (30) days after the end of each fiscal year of Guarantor, annual company-prepared financial statements of Guarantor, certified as true and correct in all material respects by a financial officer of the applicable Person, prepared in accordance with GAAP, which statements shall include a balance sheet, statement of income and expenses for the quarter then ended.

(c)    Within ninety (90) days after the end of each fiscal year of Guarantor, audited financial statements of Guarantor prepared in accordance with GAAP by a nationally recognized accounting firm or independent certified public accountant acceptable to Lender, which shall include a balance sheet and a statement of income and expenses for the year then ended.

SUB_LANDRY_00018811

CONFIDENTIAL

(d)     Within thirty (30) days of filing, copies of all federal, state and local tax returns of Borrower, Guarantor and each Lessee (including all consolidated tax returns with related entities and including any extensions filed), together with all supporting documentation and required schedules.

(e)     Within thirty (30) days after the end of each calendar year, a rent roll for the Facility signed and certified to be true, complete and correct by the Lessees.

(f)     Within thirty (30) days after the end of each calendar quarter, a statement of the number of bed days available and the actual patient days incurred for such quarter, together with quarterly census information of the Facility as of the end of such quarter in sufficient detail to show patient-mix (i.e., private, Medicare, Medicaid, and VA, to the extent applicable) on a daily average basis for such year through the end of such quarter, certified by a financial officer of the Lessees to be true and correct.

(g)     Within thirty (30) days of the end of each calendar quarter, quarterly census information of the Facility in sufficient detail to show patient-mix on a daily average basis for such quarter in a form acceptable to Lender.

(h)     Within twenty (20) days after the end of each fiscal quarter of the Facility, to the extent applicable, all Medicaid and/or Medicare cost reports and any amendments thereto filed with respect to the Facility, if any, and all responses, audit reports or inquiries with respect to such cost reports.

(i)     Within ten (10) days of receipt, copies of all licensure and certification survey reports and statements of deficiencies (with plans of correction attached thereto).

(j)     Within ten (10) days of receipt, to the extent applicable, a copy of the "Medicaid Rate Calculation Worksheet" (or the equivalent thereof) from the applicable agency.

(k)     Within ten (10) days after receipt, a statement of the number of patient days for which the Facility has received the Medicare default rate for any applicable period. For purposes herein, "default rate" shall have the meaning ascribed to it in that certain applicable Medicare rate notification letter prepared in connection with any review or survey of the Facility.

(l)     Within three (3) days after receipt, any and all notices (regardless of form) from any and all licensing and/or certifying agencies, including but not limited to Medicaid and/or Medicare certification, if applicable, that the Facility's license is being downgraded to a substandard category, revoked, or suspended, or that action is pending or being considered to downgrade to a substandard category, revoke, or suspend the Facility's license or certification.

(m)     If requested by Lender, evidence of payment by Borrower or Lessees of any applicable provider bed taxes or similar taxes, which Borrower agrees to pay or cause to be paid.

(n)     If requested by Lender, within fifteen (15) days of Lender's request, an aged accounts receivable report for the Facility in sufficient detail to show amounts due from

SUB_LANDRY_00018812

LIQ_TT_1636525

CONFIDENTIAL

each class of patient-mix (i.e., private, Medicare, Medicaid, and VA) by the account age classifications of 30 days, 60 days, 90 days, 120 days and over 120 days.

Lender reserves the right to require that the annual financial statements of the Borrower and any Lessee be audited and prepared by a nationally recognized accounting firm or independent certified public accountant acceptable to Lender, at their respective cost and expense, if (i) an Event of Default exists, (ii) if required by internal policy of Lender or (iii) if Lender has reasonable grounds to believe that the unaudited financial statements do not accurately represent the financial condition of Borrower or any Lessee, as the case may be.

Lender further reserves the right to require such other financial information of Borrower, Guarantor, Lessees and/or the Facility, in such form and at such other times (including monthly or more frequently) as Lender shall deem reasonably necessary, and Borrower agrees promptly to provide or to cause to be provided, such information to Lender. All financial statements must be in the form and detail as Lender may from time to time reasonably request.

4.6    **Compliance Certificate**.    At the time of furnishing the quarterly financial statement and census data for the Facility required under the foregoing Section 4.5, furnish to Lender a compliance certificate in the form attached hereto as Exhibit E with all information completed and certified by the Borrower as true and correct.

4.7    **Books and Records**. Permit, and require Lessees to permit, Persons designated by Lender to inspect the books and records of the Borrower, the Lessees and the Facility and to discuss the affairs of the Borrower, the Lessees and the Facility with the managers and/or officers of Borrower, the Lessees, and employees of Borrower and the Lessees, as designated by Lender, all at such times during normal business hours as Lender shall reasonably request.

4.8    **Payment of Indebtedness**. Duly and punctually pay or cause to be paid all other Indebtedness now owing or hereafter incurred by the Borrower in accordance with the terms of such Indebtedness, except such Indebtedness owing to those other than Lender which is being contested in good faith and with respect to which any execution against properties of the Borrower has been effectively stayed and for which reserves adequate for payment have been established.

4.9    **Records of Accounts**. Maintain or cause to be maintained all records, including records pertaining to the Accounts of the Facility, at the applicable chief executive offices of Borrower or Lessees or at the Facility.

4.10    **Notice of Loss**. Immediately notify the Lender of any event causing a loss or depreciation in value of Borrower's assets in excess of $100,000 and the amount of such loss or depreciation, except Borrower shall not be required to notify Lender of depreciation in Equipment resulting from ordinary use thereof.

4.11    **Conduct of Business**. Cause the operation of the Facility to be continuously conducted at all times. Without limiting the foregoing, Borrower shall cause Lessees to:

(a)    maintain the standard of care for the residents of the Facility at all times at a level necessary to insure quality care for the residents of the Facility;

SUB_LANDRY_00018813

LIQ_TT_1636526

CONFIDENTIAL

(b)    operate the Facility in a prudent manner in material compliance with applicable laws and regulations relating thereto and cause all licenses, permits, certificates of need, Reimbursement Contracts (to the extent applicable), and any other agreements necessary for the use and operation of the Facility or as may be necessary for participation in the Medicaid, Medicare, or other applicable reimbursement programs to remain in effect without reduction in the number of licensed beds or beds authorized for use in Medicaid, Medicare, or other applicable reimbursement programs;

(c)    maintain sufficient Inventory and Equipment of types and quantities at the Facility to enable Lessees adequately to perform operation of the Facility; and

(d)    keep all Improvements and Equipment located on or used or useful in connection with the Facility in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions, and improvements thereto to keep the same in good operating condition.

4.12    **Periodic Surveys.** Furnish (or cause Lessees to furnish) to Lender within ten (10) days of receipt a copy of any licensing agency or Medicaid, Medicare or other reimbursement agency survey or report containing any statement of deficiencies at a substandard or more severe level, and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Lender a copy of the plan of correction generated from such survey or report for the Facility, and commence correction of any deficiency within thirty (30) days from notice from the licensure or reimbursement agency and diligently pursue correction of any deficiency, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure or for full participation in Medicaid, Medicare or other reimbursement program pursuant to any Reimbursement Contract for existing patients or for new patients to be admitted with Medicaid, Medicare or Reimbursement Contract coverage, not later than the date required for cure by such agency (plus extensions granted by such agency or any additional time period permitted under an agency's process for contesting such report results).

4.13    **Updated Appraisals.** For so long as the Loan remains outstanding, Lender may cause the Property to be reappraised by an appraiser selected by Lender, and in accordance with Lender's appraisal guidelines and procedures then in effect, and Borrower agrees to cooperate in all respects with such appraisals and furnish to the appraisers all reasonably requested information regarding the Property, the Improvements and the Facility. If the reappraisal is requested following an Event of Default, such reappraisal shall be at Borrower's expense; otherwise, the reappraisal shall be at Lender's expense.

4.14    **Comply with Covenants and Laws.** Comply in all material respects with all applicable covenants and restrictions of record and all laws, ordinances, rules and regulations and keep the Facility, the Improvements and the Property in compliance in all material respects with all applicable laws, ordinances, rules and regulations, including, without limitation, the Americans with Disabilities Act, Fair Housing Act, and regulations thereunder, and laws, ordinances, rules and regulations relating to zoning, health, building codes, setback requirements, Medicaid, Medicare and Applicable Environmental Laws.

SUB_LANDRY_00018814

LIQ_TT_1636527

CONFIDENTIAL

4.15    **Taxes and Other Charges.** Pay all taxes, assessments, charges, claims for labor, supplies, rent, and other obligations which, if unpaid, might give rise to a Lien against property of Borrower, except Permitted Liens.

4.16    **Financial Covenants.**

(a)    At all times during the term of the Loan, Lessee must maintain (and evidence thereof must be provided to Lender with the required annual financial statements) a minimum EBITDARM of $2,500,000, with EBITDARM for Lessee being calculated based upon the operations of the Facility and being calculated on a twelve-month trailing basis as of the end of each fiscal year of Lessee; provided, however, for the first such test, the calculation shall be based upon the results from the Closing Date to the end of such fiscal year on an annualized basis.

(b)    At all times during the term of the Loan, Borrower and Guarantor must maintain (and evidence thereof must be provided to Lender upon request) combined liquidity of not less than $3,000,000.

(c)    At all times during the term of the Loan, the Facility must achieve and maintain (tested annually on a twelve-month trailing basis with the first test being for the year ending December 31, 2014; provided, however, for the first such test, the calculation shall be based upon the results for the period from the Closing Date to the end of such fiscal year on an annualized basis), a Debt Service Coverage Ratio of not less than 1.75 to 1.0.

(d)    If the Facility fails to achieve the Debt Service Coverage Ratio required in (c) above, Borrower shall, within thirty (30) days of written notice from Lender, deposit or cause to be deposited with Lender additional cash or other liquid collateral in an amount which, when added to the first number of the ratio, would have resulted in the noncomplying coverage requirement having been satisfied, and such deposit shall be considered a temporary cure of such Default. Borrower grants Lender an assignment of and security interest in such cash or other collateral and upon Lender's request will execute and deliver to Lender such additional assignments and security agreements in favor of Lender with respect thereto. Such additional collateral will be held by the Lender as Collateral for the Loan Obligations and, upon the occurrence of an Event of Default, may be applied by the Lender, in such order and manner as the Lender may elect, to the reduction of the Loan Obligations. Provided that there is no outstanding Default or Event of Default, such cash or other liquid collateral so deposited with Lender pursuant to this Section which has not been applied to the Loan Obligations will be released by the Lender at such time as the Borrower provides the Lender with evidence that the required coverage ratios set forth above have been achieved and maintained as of the end of subsequent year.

4.17    **Occupancy.** Maintain or cause to be maintained a minimum average daily occupancy for the Facility of eight-two percent (82%) for each calendar quarter based on Effective Capacity, and provide Lender with a certificate confirming compliance within thirty (30) days after the end of each quarter.

SUB_LANDRY_00018815

LIQ_TT_1636528

CONFIDENTIAL

4.18    **Use of Proceeds.**  Use the proceeds of the Loan solely and exclusively for the purposes set forth herein or as otherwise may be permitted by Lender.

4.19    **Reports and Notices.**  Furnish promptly to Lender such information as Lender may reasonably require regarding the Property, the Improvements and the Facility; notify Lender promptly of any material litigation instituted or overtly threatened in writing against Borrower, Guarantor or any Lessee, and any material deficiencies asserted or liens filed by the Internal Revenue Service against Borrower, Guarantor or any Lessee; notify Lender promptly of any condemnation or similar proceedings with respect to any of the Property or Improvements, any proceeding seeking to enjoin the operation of the Facility, and of all changes in governmental requirements pertaining to the Property, the Improvements or the Facility, utility availability, anticipated costs of completion of the Improvements, and any other matters which could reasonably be expected to have a Material Adverse Effect on Borrower's, Guarantor's or any Lessee's ability to perform its obligations under this Agreement or any other Loan Documents.

4.20    **Cash Collateral Account.**  On the Closing Date, Borrower shall deposit with Lender (such deposit to be made from Borrower's separate funds) a minimum amount of $3,000,000 to serve as the Cash Collateral held in the Cash Collateral Account with Lender as additional collateral for the Loan Obligations.  The Cash Collateral Account shall be maintained throughout the term of the Loan and shall at all times remain under the control of Lender. Withdrawals from the Cash Collateral Account shall not be permitted without Lender's prior consent, which may be given or withheld in Lender's sole discretion.  The Cash Collateral Account shall be an interest-bearing account of type typically offered by Lender for such cash collateral accounts.  Interest earned on amounts deposited into the Cash Collateral Account shall remain in the Cash Collateral Account during the term of the Loan and shall become part of the cash collateral for the Loan.  Pursuant to the Assignment and Pledge, Borrower has assigned and pledged the Cash Collateral and Cash Collateral Account to Lender as additional collateral for the Loan Obligations.

4.21    **Termite Inspection and Bond.**  If termite infestation and damage is a threat in the area of the country where the Improvements are located, cause the Improvements to be inspected for termites annually and promptly repair all damage and retreat the Improvements for any infestation as needed.  Borrower shall promptly provide copies of all such annual inspection reports to Lender.  Should any inspection reveal infestation, Lender shall require Borrower to repair all damage and retreat the Improvements as set forth above, and Lender reserves the right to require Borrower to thereafter maintain a transferable termite bond on the Facility acceptable to Lender.

4.22    **HIPAA Compliance.**  To the extent that and for so long as Lessees are "covered entities" within the meaning of HIPAA, Borrower shall take all actions reasonably necessary to ensure that each Lessee (a) has undertaken or will promptly undertake all necessary surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of their businesses and operations required by HIPAA and/or that could be reasonably be expected to have a Material Adverse Effect by the failure of Lessees to be HIPAA Compliant (as defined below); (b) has developed or will promptly develop a detailed plan and time line for becoming HIPAA Compliant (a "HIPAA Compliance Plan"); and (c) has implemented or will implement those provisions of such HIPAA Compliance Plan in all material

SUB_LANDRY_00018816

LIQ_TT_1636529

CONFIDENTIAL

respects necessary to ensure each Lessee is or becomes HIPAA Compliant.    For purposes hereof, "HIPAA Compliant" shall mean that each Lessee (x) is or will be in compliance with each of the applicable requirements of HIPAA on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "HIPAA Compliance Date") and (y) is not and could not reasonably be expected to become, as of any date following any such HIPAA Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding that could result in any of the foregoing or that could reasonably be expected to have a Material Adverse Effect on the Facility, in connection with any actual or potential violation by Lessees of the then effective provisions of HIPAA.

4.23    **Annual Site Inspections**. Allow the Facility to be inspected at such reasonable times during normal business hours as desired by Lender, and reimburse Lender for its reasonable site inspection costs and expenses; provided, however, that such inspections shall only be at Borrower's expense once per annum unless an Event of Default has occurred and is continuing.

4.24    **Operational Accounts**. Establish and maintain, and cause Lessees to establish and maintain, all their operational deposit accounts with Lender, other than payroll accounts.

4.25    **Lease**. Maintain the Lease in full force and effect and timely perform all of Borrower's obligations under the Lease and not permit the termination, amendment or assignment of the Lease unless the prior written consent of Lender is first obtained, which consent may be in the sole and absolute discretion of Lender. Borrower will not enter into any other operating lease for the Facility without Lender's prior written consent, which consent may be in the sole and absolute discretion of Lender. Lender, at its sole option immediately upon an Event of Default, may require Borrower to permit a third party oversight management consultant access to the Facility and all records pertaining to the Facility to the extent permitted by applicable law for the purpose of evaluating the management of the Facility and providing consulting services with respect to management of the Facility.    Borrower may select the oversight management consultant, subject to Lender's approval to be granted or refused in Lender's sole discretion. The oversight management consultant's review of the Facility must be to Lender's specifications. All fees and expenses of such oversight management consultant shall be paid by Borrower.

4.26    **O&M Program Compliance**. If an O&M Program has been established with respect to the Facility, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons, including Lessees, present on the Property to comply with the O&M Program. All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's reasonable out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender. Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Loan Obligations.

SUB_LANDRY_00018817

LIQ_TT_1636530

CONFIDENTIAL

4.27   **Maintenance of Single Purpose**.   Maintain Borrower's existence as a Single Purpose Entity.

4.28   **Subordinate Seller Note**.   At all times ensure that the Subordinate Seller Note remains, according to its terms, fully subordinate to the Loan and all Loan Documents and ensure that the Subordinate Seller Note and all obligations thereunder remain unsecured.

4.29   **Management Agreement**.   Not permit the termination or amendment of the Management Agreement unless the prior written consent of Lender is first obtained and cause Manager and Lessees to enter into the Subordination of Management Agreement.   The Facility shall at all times be managed by Manager or another manager approved by Lender pursuant to a management agreement in form and content acceptable to Lender.

## ARTICLE V
## NEGATIVE COVENANTS OF THE BORROWER

Until the Loan Obligations have been paid in full, Borrower shall not, without the prior written consent of Lender:

5.1   **Assignment of Licenses and Permits**.   Assign or transfer, or permit the assignment or transfer of, any interest in any Permits or, to the extent hereafter in effect, any Reimbursement Contracts (including rights to payment thereunder), or assign, transfer, or remove or permit any other person to assign, transfer, or remove any records pertaining to the Facility, including, without limitation, residents' records, medical and clinical records (except for removal of such residents' records as directed by the residents owning such records and temporary removal required by regulatory agencies or pursuant to the order of a court of competent jurisdiction), without Lender's prior written consent, which consent may be granted or refused in Lender's sole discretion.

5.2   **No Liens; Exceptions**.   Create, incur, assume or suffer to exist any Lien upon or with respect to any of the Collateral, whether now owned or hereafter acquired, other than the following permitted Liens (the "**Permitted Liens**"):

(a)   Liens at any time existing in favor of the Lender;

(b)   Inchoate Liens arising by operation of law for the purchase of labor, services, materials, equipment or supplies, provided payment shall not be delinquent and, if such Lien is a lien upon the Property or Improvements, which Lien is fully subordinate to the Mortgage, and is disclosed to Lender and bonded off and removed from the Property and Improvements in a manner satisfactory to Lender;

(c)   Liens incurred in the ordinary course of business in connection with workmen's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of statutory obligations (provided Borrower complies with all obligations with respect to such insurance, benefits and statutory obligations);

SUB_LANDRY_00018818

LIQ_TT_1636531

CONFIDENTIAL

(d)    Liens for current year's taxes, assessments or governmental charges or levies provided payment thereof shall not be delinquent;

(e)    "Permitted Encumbrances" upon the Property, as defined in the Mortgage;

(f)    Personal property leases or purchase money liens for acquisition of office machines, copiers, computer equipment and other equipment, hereafter leased or acquired, which is not necessary for the continued operation of the Facility or the normal daily activities of or care of residents of the Facility, provided further that if any such equipment is leased by Borrower, such lease must have been submitted to Lender if such equipment in the aggregate has a replacement cost in excess of $25,000, must be limited to equipment utilized at the Property only and must be maintained free from default by Borrower; and

(g)    Liens which are listed in Exhibit F attached hereto.

5.3    **Merger, Consolidation, Etc.**  Enter into any merger, consolidation or similar transaction, or sell, assign, lease or otherwise dispose of (whether in one transaction or in a series of transactions), all or substantially all of any Borrower's assets (whether now or hereafter acquired), without the prior written consent of the Lender, which may be granted or refused by Lender in Lender's sole discretion.

5.4    **Disposition of a Material Portion of Its Assets.**  Sell, lease, transfer or otherwise dispose of any material portion of Borrower's assets, unless any such disposition is of property other than the Collateral and is in the ordinary course of business for a full and fair consideration, which in no event shall include a transfer for full or partial satisfaction of a preexisting debt.

5.5    **Dividends, Distributions and Redemptions.**  During any Event of Default, or if such action would cause or result in a financial covenant Default hereunder, declare or pay any dividends or distributions on any of Borrower's equity interests, and purchase, redeem, retire, or otherwise acquire for value, any of Borrower's equity interests now or hereafter outstanding.

5.6    **Change in Business.**  Make any material change in the nature of its business or the business of the Facility as it is contemplated to be conducted or conduct any business other than ownership of the Facility.

5.7    **Changes in Accounting.**  Change Borrower's or the Facility's methods of accounting, unless such change is permitted by GAAP, and provided such change does not have the effect of curing or preventing what would otherwise be an Event of Default had such change not taken place.

5.8    **ERISA Funding and Termination.**  Permit (a) the funding requirements of ERISA with respect to any employee plan to be less than the minimum required by ERISA at any time, or (b) any employee plan to be subject to involuntary termination proceedings at any time.

5.9    **Transactions with Affiliates.**  Enter into any transaction with any Person affiliated with the Borrower other than the Lease or in the ordinary course of its business and on

SUB_LANDRY_00018819

LIQ_TT_1636532

CONFIDENTIAL

fair and reasonable terms no less favorable to the Borrower than those they would obtain in a comparable arms-length transaction with a Person not an affiliate.

5.10    **Transfer of Interests.**  Permit a change in the ownership interests in Borrower, Guarantor, any Lessee or the respective owners of each, or any change in control of Borrower, Guarantor, or any Lessee, without first obtaining Lender's written consent thereto other than a transfer occasioned by death or by an individual solely for estate planning purposes or a transfer by any indirect owner of Borrower such that no change of control occurs with respect to Borrower.   For purposes of this Section 5.10, "control" means the possessions, directly or indirectly, of the power to direct or cause the direction of the management policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

5.11    **Change of Use.**  Alter or change the use of the Facility, unless Borrower first obtains Lender's written consent thereto.

5.12    **Place of Business.**  Change or permit the change of the chief executive officer of Borrower or any such Person's principal place of business or state of domicile without first giving Lender at least thirty (30) days prior written notice thereof and promptly providing Lender such information as Lender may request in connection therewith.

5.13    **Acquisitions.**  Directly or indirectly, purchase, lease, manage, own, operate, or otherwise acquire any property or other assets (or any interest therein) which are not used in connection with the ownership and operation of the Facility.

5.14    **Maintain Single Purpose Entity Status.**

(a)    Engage in any business or activity other than the ownership and maintenance of the Property and Improvements and leasing or operation of the Facility, and activities incidental thereto;

(b)    Acquire or own any material assets other than the Collateral;

(c)    Own any subsidiary or make an investment in, any Person without the consent of Lender;

(d)    Commingle in a way that is difficult or costly to segregate its funds or assets with assets of, or pledge its assets with or for, any of their general partners, managers, members, shareholders, affiliates, principals or any other Person;

(e)    Fail to maintain Borrower's and the Facility's records, books of account and bank accounts separate and apart from those of their general partners, managers, members, shareholders, principals, and affiliates, the affiliates of any of its general partners, managers, members, shareholders, principals, and any other Person;

(f)    Seek the dissolution or winding up in whole or in part of Borrower;

(g)    Maintain Borrower's assets in such a manner that it will be costly or difficult to segregate, ascertain or identify their individual assets from those of any of their

20394303 v8

SUB_LANDRY_00018820

LIQ_TT_1636533

CONFIDENTIAL

general partners, managers, members, shareholders, principals and affiliates, the affiliates of any of their general partners, managers, members, shareholders, principals or any other Person;

(h)    Hold Borrower out to be responsible for the debts of any other Person or pay or secure another Person's liabilities with any Borrower's own funds or assets except as otherwise expressly approved in writing by Lender in its discretion;

(i)    Make any loans or advances to any third party, including any of Borrower's general partners, managers, members, shareholders, principals or affiliates, or the affiliates of any of Borrower's general partners, managers, members, shareholders, or principals, except for Indebtedness to related parties which is covered by a written subordination agreement in favor of Lender;

(j)    Fail to prepare and file Borrower's own tax return separate from those of any other Person; or

(k)    Fail to hold Borrower out to the public as a legal Person separate and distinct from any other Person or to conduct its business solely in its own name, in order (i) not to mislead others as to the identity with which such other party is transacting business, or (ii) not to suggest that it is responsible for the debts of any other Person.

5.15    **Management Agreement**. With the exception of the Management Agreement, Enter into any affiliated or third party management agreement for the Facility without Lender's prior written consent or without satisfying Lender's requirements for a subordination thereof.

5.16    **Leases.** Enter into any leases with respect to the Facility (other than the resident leases or the Lease) without the prior consent of Lender and, if Lender's consent is given, Borrower shall cause any lessees of the Facility to enter into a subordination, non-disturbance and attornment agreement acceptable to Lender.

5.17    **Cash Collateral Account.** Access, withdraw or otherwise utilize any of the Cash Collateral deposited in the Cash Collateral Account without Lender's prior written consent.

5.17    **Related Facility.** Permit the sale of the Related Facility without Lender's prior written consent.

### ARTICLE VI
### EVENTS OF DEFAULT AND REMEDIES

6.1    The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder:

(a)    The failure by Borrower to pay any installment of principal, interest, or other charges required under the Note or any other Loan Documents as and when due; or

(b)    Borrower's violation of any covenant set forth in Article V which is not cured within thirty (30) days of Lender's notice to Borrower of such Default; or

20394303 v8

Loan Agreement - Page 33
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018821

LIQ_TT_1636534

CONFIDENTIAL

(c)     The failure of Borrower to properly and timely perform or observe any covenant or condition set forth in this Agreement (other than those specified in (a) and (b) of this Section) or any other Loan Documents which is not cured within any applicable cure period as set forth herein or, if no cure period is specified therefor, is not cured within thirty (30) days of Lender's notice to Borrower of such Default; or

(d)     The occurrence of any Event of Default (other than those specified in (a), (b) or (c) of this Section) pursuant to other Loan Documents; or

(e)     The filing by Borrower, Guarantor or any Lessee of a voluntary petition in bankruptcy or the adjudication of any of the aforesaid Persons as a bankrupt or insolvent, or the filing by any of the aforesaid Persons of any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or if any of the aforesaid Persons should seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator for itself or of all or any substantial part its property or of any or all of the rents, revenues, issues, earnings, profits or income thereof, or the making of any general assignment for the benefit of creditors or the admission in writing by any of the aforesaid Persons of its inability to pay its debts generally as they become due; or

(f)     The entry by a court of competent jurisdiction of an order, judgment, or decree approving a petition filed against Borrower, Guarantor or any Lessee, which such petition seeks any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency, or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or the appointment of any trustee, receiver or liquidator of any of the aforesaid Persons or of all or any substantial part of its properties or of any or all of the rents, revenues, issues, earnings, profits or income thereof which appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

(g)     Any certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of Borrower, Guarantor or any Lessee pursuant to or in connection with this Agreement or otherwise (including, without limitation, representations and warranties contained herein or in any Loan Documents) or as an inducement to Lender to extend any credit to or to enter into this or any other agreement with Borrower, Guarantor or any Lessee in connection with this Loan or other loans now existing or hereafter created, proves to have been false in any material respect at the time when the facts therein set forth were stated or certified, or proves to have omitted any substantial contingent or unliquidated liability or claim against Borrower. Guarantor or any Lessee, or on the date of execution of this Agreement there shall have been any Material Adverse Change in any of the facts previously disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed to Lender in writing at or prior to the time of such execution; or

(h)     The failure of Borrower to timely cure, or cause to be timely cured, any deficiency required to be corrected pursuant to Section 4.12 of this Agreement which in Lender's

SUB_LANDRY_00018822

LIQ_TT_1636535

CONFIDENTIAL

reasonable opinion puts the Facility's licensure or full participation under any Reimbursement Contract in jeopardy; or

(i) The Facility (or Borrower or any Lessee with respect to any the Facility) should be assessed fines or penalties in excess of $50,000 in the aggregate in any calendar year by any state or any licensing agency (or, to the extent hereafter applicable, any reimbursement agency) having jurisdiction over Borrower, Lessees or the Facility; provided that no Event of Default shall occur (1) during the contest of such fine or penalty so long as Borrower, such Lessee or the Facility are timely and diligently pursuing an appeal or other legal challenge to such agency's action and the license of the Facility is not subject to forfeiture or revocation during the pendency of such appeal or legal challenge; or (2) if such fines or penalties have been paid in full and the license of the Facility is not subject to forfeiture or revocation as a result of the acts or omissions resulting in such fines or penalties; or

(j) A final judgment (being one no longer subject to appeal or for which all appeals have been exhausted) shall be rendered by a court of law or equity against Borrower, Guarantor or any Lessee and the same shall remain undischarged for a period of thirty (30) days, unless such judgment is either (i) fully covered by collectible insurance and such insurer has within such period acknowledged such coverage in writing, or (ii) although not fully covered by insurance, enforcement of such judgment has been effectively stayed, such judgment is being contested or appealed by appropriate proceedings and Borrower, Guarantor or any Lessee, as the case may be, has established reserves adequate for payment in the event Borrower, Guarantor or any Lessee is ultimately unsuccessful in such contest or appeal and evidence thereof is provided to Lender; or

(k) The occurrence of any Material Adverse Change in the financial condition of Borrower, Guarantor or any Lessee, which, in Lender's reasonable determination, constitutes an impairment of any such Person's ability to perform their obligations under any Loan Document or the Lease; or

(l) Any default under the Subordinate Seller Note if the holder thereof has made any claim or taken any enforcement action with respect to any Collateral or taken any other action that jeopardizes the operation of the Facility or any Collateral in Lender's opinion.

Notwithstanding anything in this Section, all requirements of notice shall be deemed eliminated if Lender is prevented from giving such notice by bankruptcy or other applicable law. The cure period, if any, shall then run from the occurrence of the event or condition of Default rather than from the date of notice.

6.2 **Remedies.** Upon the occurrence of any Event of Default which continues after the giving of any applicable notice and expiration of any applicable cure period, Lender shall have the absolute right at its option and election and in its sole discretion to exercise alternatively or cumulatively any or all of the following remedies:

(a) Take immediate possession of the Property and Improvements and do anything in its sole judgment to fulfill the obligations of Borrower hereunder, including availing itself of and procuring performance of existing contracts, amending the same, or entering into

SUB_LANDRY_00018823

LIQ_TT_1636536

CONFIDENTIAL

new contracts to protect the Property and Improvements from injury. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution exercisable during an Event of Default to purchase any fixtures, equipment, machinery, furniture or any other personal property as may be necessary or desirable for the operation of the Facility; to execute all applications and certificates in the name of any Borrower which may be useful or required; to prosecute and defend all actions or proceedings in connection with the Property or Improvements, fixtures, equipment, machinery, furniture or any other personal property; and to do any act which Borrower might do in its own behalf relating to the Property or Improvements; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.

(b)     Declare the entire unpaid principal of the Loan Obligations to be, and the same shall thereupon become, immediately due and payable, without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived.

(c)     Proceed to protect and enforce its rights by action at law (including, without limitation, bringing suit to reduce any claim to judgment), suit in equity and other appropriate proceedings including, without limitation, for specific performance of any covenant or condition contained in this Agreement.

(d)     Exercise any and all rights and remedies afforded by the laws of the United States, the state in which the Property or other Collateral is located or any other appropriate jurisdiction as may be available for the collection of debts and enforcement of covenants and conditions such as those contained in this Agreement and the Loan Documents.

(e)     To the extent permitted by applicable law, exercise the rights and remedies of setoff and/or banker's lien against the interest of any Borrower in and to every account and other property of the Borrower which is in the possession of the Lender or any person who then owns a participating interest in the Loan, to the extent of the full amount of the Loan.

(f)     Exercise its rights and remedies pursuant to any other Loan Documents.

(g)     All rights and remedies of Lender under the terms of this Agreement, the Note, any of the other Loan Documents, and any applicable statutes or rules of law shall be cumulative and may be exercised successively or concurrently.

## ARTICLE VII
## MISCELLANEOUS

7.1     **Waiver.** No remedy conferred upon, or reserved to, the Lender in this Agreement or any of the other Loan Documents is intended to be exclusive of any other remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing in law or in equity. Exercise or omission to exercise any right of the Lender shall not affect any subsequent right of Lender to exercise the same. No course of dealing between Borrower and Lender or any delay on the Lender's part in exercising any rights shall operate as a waiver of any of the Lender's rights. No waiver of any Default under this Agreement or any of the other Loan Documents shall extend to or shall affect

20394303 v8

Loan Agreement - Page 36
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018824

LIQ_TT_1636537

CONFIDENTIAL

any subsequent or other then existing Default or shall impair any rights, remedies or powers of Lender.

7.2    **Costs and Expenses**. Borrower will bear all taxes, fees and expenses (including reasonable fees and expenses of counsel for Lender) in connection with the Loan, the Note, the preparation of this Agreement and the other Loan Documents (including any amendments hereafter made), and in connection with any modifications thereto and the recording of any of the Loan Documents. If, at any time, a Default occurs or Lender becomes a party to any suit or proceeding in order to protect its interests or priority in any Collateral for any of the Loan Obligations or its rights under this Agreement or any of the Loan Documents, or if Lender is made a party to any suit or proceeding by virtue of the Loan, this Agreement or any Collateral for any Loan Obligations and as a result of any of the foregoing, the Lender employs counsel to advise or provide other representation with respect to such Default, or to collect the balance of the Loan Obligations, or to take any action in or with respect to any suit or proceeding relating to this Agreement, any of the other Loan Documents, any Collateral for any of the Loan Obligations, Borrower, Guarantor or any Lessee, or to protect, collect, or liquidate any of the Collateral for the Loan Obligations, or attempt to enforce any security interest or lien granted to the Lender by any of the Loan Documents, then in any such events, all of the reasonable attorney's fees arising from such services, including fees on appeal and in any bankruptcy proceedings, and any expenses, costs and charges relating thereto shall constitute additional obligations of Borrower to the Lender payable on demand of the Lender; provided however, that Borrower shall not be obligated to reimburse or indemnify Lender for any attorney's fees or expenses relating to any dispute between Borrower and Lender where Borrower is the prevailing party with regard to all material issues in dispute. Without limiting the foregoing, Borrower has undertaken the obligation for payment of, and shall pay, all recording and filing fees, revenue or documentary stamps or taxes, intangibles taxes, transfer taxes, recording taxes and other taxes, expenses and charges payable in connection with this Agreement, any of the Loan Documents, the Loan Obligations, the recording of the Mortgage, or the filing of any financing statements or other instruments required to effectuate the purposes of this Agreement, and should Borrower fail to do so, Borrower agrees to reimburse Lender for the amounts paid by Lender, together with penalties or interest, if any, incurred by Lender as a result of underpayment or nonpayment. This Section shall survive repayment of the remaining Loan Obligations.

7.3    **Performance of Lender**. At its option, upon Borrower's failure to do so, the Lender may make any payment or do any act on Borrower's behalf that the Borrower or others are required to do to remain in compliance with this Agreement or any of the other Loan Documents, and Borrower agrees to reimburse the Lender, on demand, for any payment made or expense incurred by Lender pursuant to the foregoing authorization, including, without limitation, attorneys' fees, and until so repaid any sums advanced by Lender shall bear interest at the Default Rate from the date advanced until repaid.

7.4    **Headings**. The headings of the Sections of this Agreement are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

7.5    **Survival of Covenants**. All covenants, agreements, representations and warranties made herein and in certificates or reports delivered pursuant hereto shall be deemed to

SUB_LANDRY_00018825

LIQ_TT_1636538

CONFIDENTIAL

have been material and relied on by Lender, notwithstanding any investigation made by or on behalf of Lender, and shall survive the execution and delivery to Lender of the Note and this Agreement.

7.6 **Notices, etc.** Any notice or other communication required or permitted to be given by this Agreement or the other Loan Documents or by applicable law shall be in writing and shall be deemed received (a) on the date delivered, if sent by hand delivery (to the person or department if one is specified below), (b) three (3) Business Days following the date deposited in U.S. mail, certified or registered, with return receipt requested, or (c) one (1) Business Day following the date deposited with FedEx or other national overnight carrier, and in each case addressed as follows:

If to Borrower:

Westport Nursing Tampa, L.L.C.
P. O. Box 501188
Indianapolis, Indiana 46250
Attention: Robert L. Rynard, Sr.
Facsimile: (317) 806-6771

and

BHMS Investments, LP
152 West 57th Street, 46th Floor
New York, New York 10019
Attention: Kevin L. Angelis
Telephone: (646) 481-6214

With a copies to:

Dane Starbuck
Attorney at Law
P. O. Box 501398
Indianapolis, Indiana 46250
Facsimile: (317) 806-6771

and

Williams Mulen
100 S. 10th Street, Suite 1600
Richmond, Virginia 23219
Attention: Beth G. Hungate-Noland
Telephone: (804) 420-6913
Facsimile: (804) 420-6507

SUB_LANDRY_00018826

LIQ_TT_1636539

CONFIDENTIAL

If to Lender:

    USAmeriBank
    113 East Whiting Street
    Tampa, Florida 33602
    Attention: Trey Korhn

With a copy to:

    Burr & Forman LLP
    420 North 20th Street
    Suite 3400
    Birmingham, Alabama 35203
    Attention: Joel A. Price, Jr., Esq.

Any party may change its address to another single address by notice given as herein provided, except any change of address notice must be actually received in order to be effective.

7.7 **Benefits.** All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns. No Person other than Borrower or Lender shall be entitled to rely upon this Agreement or be entitled to the benefits of this Agreement.

7.8 **Inspections and Reviews.** The review of surveys, title commitments or reports, environmental reports, property condition reports or any other documents or matters relating to the real property or improvements (collectively, the "Project Documents and Matters") by Lender or any third party consultants retained by Lender (collectively, the "Consultants") is solely for the use and benefit of Lender in connection with Lender's decision to make the Loan thereof and shall not result in any obligation or liability of any kind upon Lender or any of the Consultants. Such reviews are not intended to supplement or replace a diligent review of Project Documents and Matters or similar reports by Borrower or professionals retained by Borrower, and Borrower shall not be entitled to rely upon such reviews by Lender or the Consultants even though Borrower has agreed to reimburse Lender for the costs thereof. None of the Consultants shall be considered an agent, employee or contractor of or for Borrower, and Borrower is not an intended beneficiary of their work or their contracts with Lender. Neither Lender nor the Consultants shall have any duty to disclose to Borrower the results or conclusions of any such reviews. Neither Lender nor the Consultants will be responsible for the condition, quality or safety of any Improvements.

7.9 **Participation.** Borrower acknowledges that Lender may, at its option, sell participation interests in, or assign all of its interest in, the Loan. Borrower agrees with each present and future participant or owner of the Loan that if an Event of Default should occur, each present and future participant or owner shall have all of the rights and remedies of Lender with respect to any deposit due from any participant to the Borrower. The execution by a participant of a participation agreement with Lender, and the execution by the Borrower of this Agreement, regardless of the order of execution, shall evidence an agreement between Borrower and said participant in accordance with the terms of this Section.

SUB_LANDRY_00018827

LIQ_TT_1636540

CONFIDENTIAL

7.10  **Publicity.**  Lender shall have the right to advertise the Loan for its own and its affiliates' marketing purposes (including, without limitation, general references to the Facility, the Facility's location, and Loan amount) in industry periodicals and other industry-related media from time to time, and Borrower hereby consents to such advertising.

7.11  **Supersedes Prior Agreements; Counterparts.**  This Agreement and the Loan Documents referred to herein supersede and incorporate all representations, promises, and statements, oral or written, made by Lender in connection with the Loan. Without limiting the foregoing, this Agreement and the Loan Documents supersede and replace the Commitment Letter in its entirety. This Agreement may not be varied, altered, or amended except by a written instrument executed by an authorized officer of the Lender. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument.

7.12  **Construction of Provisions of this Agreement.**  Lender has not agreed to make any loan other than that specifically described herein. All requirements herein shall be deemed material to Lender. Except as specified herein, all conditions and requirements must be satisfied by Borrower prior to the Closing Date. Except as specified herein, whenever this Agreement refers to a matter being "satisfactory" to Lender, subject to Lender's "approval" or "consent," at Lender's "option," at Lender's "determination," "required" by Lender, at Lender's "request," as Lender shall "deem necessary," or similar terminology, it is deemed that each of the aforesaid shall be in the sole discretion of the Lender, and if any term or condition requires Lender's approval, consent, or satisfaction (the "Lender's Approval"), the Lender's Approval shall not be implied, but shall be evidenced only by a written notice from Lender specifically addressed to the particular requirement or condition and expressing Lender's Approval.

7.13  **Waiver of Certain Damages.**  BORROWER AGREES THAT WITH RESPECT TO ANY CLAIM OF BORROWER ARISING UNDER THE LOAN

SUB_LANDRY_00018828

LIQ_TT_1636541

CONFIDENTIAL

ARISING HEREUNDER MAY BE BROUGHT IN THE CIRCUIT COURT FOR HILLSBOROUGH COUNTY, FLORIDA, OR THE APPLICABLE UNITED STATES DISTRICT COURT FOR HILLSBOROUGH COUNTY, FLORIDA AND ASSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF ANY SUCH COURT IN ANY ACTION OR PROCEEDING INVOLVING THIS AGREEMENT. NOTHING HEREIN SHALL LIMIT THE JURISDICTION OF ANY OTHER COURT.

7.15     Waiver of Jury Trial. BORROWER AND LENDER HEREBY WAIVE ANY RIGHT THAT ANY OF THEM MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, THE LOAN DOCUMENTS, THE RELATED LOAN DOCUMENTS, THE LOAN OR THE RELATED LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF LENDER AND BORROWER WITH RESPECT TO THE LOAN DOCUMENTS OR THE RELATED LOAN DOCUMENTS OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. BORROWER AND LENDER AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF BORROWER AND LENDER IRREVOCABLY TO WAIVE THEIR RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT OF LENDER TO MAKE THE LOAN AND RELATED LOAN, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN BORROWER AND LENDER SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

[Remainder of Page Intentionally Left Blank]

SUB_LANDRY_00018829

LIQ_TT_1636542

CONFIDENTIAL

IN WITNESS WHEREOF, the Borrower and Lender have caused this Agreement to be properly executed as of the day and year first above written.

BORROWER:

WESTPORT NURSING TAMPA, L.L.C.,
a Florida limited liability company

By:    BHMSUNI, LLC
       a Delaware limited liability company,
       Its managing member

       By:    BHMS Investments, LP
              a Delaware limited partnership
              Its managing member

              By: _____
                  Kevin L. Angelis
                  Managing Partner

STATE OF _NEW YORK_ )

COUNTY OF _NEW YORK_ )

The foregoing instrument was acknowledged before me this 28th day of MARCH, 2014, by KEVIN ANGELIS as the Managing Partner of BHMS Investments, LP, a Delaware limited partnership, as managing member of BHMSUNI, LLC, a Delaware limited liability company, as managing member of Westport Nursing Tampa, L.L.C., a Florida limited liability company.  He is personally known to me or has produced a driver's license as identification.

_____
Notary Public

My Commission Expires:_____

DEEANNE P. GORMAN
Notary Public, State of New York
No. 01GO6075970
Qualified in Queens County
Certificate filed in New York County
Commission Expires August 20, 20__

[SEAL]

Loan Agreement  - Signature Page
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018830

LIQ_TT_1636543

CONFIDENTIAL

LENDER:

USAMERIBANK,
a Florida state banking corporation

By: _____
Trey Korhn
Its Vice President


STATE OF FL )

COUNTY OF Hillsborough )

The foregoing instrument was acknowledged before me this 27 day of March, 2014, by Trey Korhn as the Vice President of USAmeriBank, a Florida state banking corporation. He is personally known to me or has produced a driver's license as identification.

_____
Notary Public

My Commission Expires:_____

SHARI D. SMITH
MY COMMISSION # FF 086156
EXPIRES: March 24, 2018
Bonded Thru Notary Public Underwriters

[SEAL]

Loan Agreement  - Signature Page
Westport Nursing Tampa, L.L.C.
19200-37

SUB_LANDRY_00018831

LIQ_TT_1636544

CONFIDENTIAL

## EXHIBIT A

### LEGAL DESCRIPTION

A parcel consisting of part of the Southeast 1/4 of Section 7, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00°08'00" East, along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a point on the North right-of-way line of Fowler Avenue (S.R. No. 582);

Thence South 89°47'00" East, along said North line a distance of 1331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

Thence North 00°08'05" East, (North 00°07'54" East), along said East line a distance of 1274.92 (1274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section 8;

Thence North 00°07'13" East, (North 00°07'13" East), along the East line of the Northwest 1/4 of the Southwest 1/4 of said Section a distance of 1330.63 (1330.58) feet to a point;

Thence North 89°56'41" West (North 89°58'41" West), along the North line of the Northwest 1/4 of the Southwest 1/4 of Section 8, a distance of 1331.73 (1332.11) feet to the Northeast corner of the Northeast 1/4 of the Southeast 1/4 of Section 7;

Thence North 89°41'16" West (North 89°36'57" West), along the North line of said Section 7, a distance of 30.00 (30.00) feet to the principal point and PLACE OF BEGINNING of the following description:

Thence South 00°07'35" West (South 00°12'25" West), a distance of 473.74 (473.97) feet to a point;

Thence North 89°46'02" West (North 89°37'05" West), a distance of 100.00 (100.03) feet to a point;

Thence South 45°13'58" West (South 45°08'11" West), a distance of 28.28 (28.23) feet to a point;

Thence North 89°46'02" West (North 89°42'02" West), a distance of 219.97 (220.16) feet to a point;

Thence North 00°07'35" East (North 00°13'21" East), a distance of 494.40 (494.35) feet to a point on the North line of the Northeast 1/4 of the Southeast 1/4 of Section 7;

20394303 v8

Loan Agreement
Exhibit A - 1

SUB_LANDRY_00018832

LIQ_TT_1636545

CONFIDENTIAL

Thence South 89°41'16" East (South 89°36'57" East), along said North line a distance of 340.00 (340.00) feet to the POINT OF BEGINNING.

LESS AND EXCEPTING THEREFROM the East 6 feet thereof conveyed to Hillsborough County in instrument recorded in Official Records Book 5068, Page 1265 of the Public Records of Hillsborough County, Florida.

NOTE:   Bearings and distances in parenthesis are measured bearings and distances, per Special Warranty Deed recorded in Official Records Book 4486, Page 248, of the Public Records of Hillsborough County, Florida.

TOGETHER WITH non-exclusive Easement rights as set forth in the Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 5832, page 1191; as affected by First Amendment to Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 6129, Page 1653, both of the Public Records of Hillsborough County, Florida.

20394303 v8

Loan Agreement
Exhibit A - 2

SUB_LANDRY_00018833

LIQ_TT_1636546

CONFIDENTIAL

## EXHIBIT B

### BORROWER'S PRINCIPAL PLACES OF BUSINESS AND CHIEF EXECUTIVE OFFICES

**Westport Nursing Tampa, L.L.C.:**

Chief Executive Office:
152 West 57th Street
46th Floor
New York, New York 10019

Principal Place of Business:
12250 N. 22nd Street
Tampa, Florida 33612

20394303 v8

Loan Agreement
Exhibit B

SUB_LANDRY_00018834

LIQ_TT_1636547

CONFIDENTIAL

## EXHIBIT C

### OWNERSHIP INTERESTS IN BORROWER

**Westport Nursing Tampa, L.L.C.**

| | |
|---|---|
| BVM University Village, LLC | 40% |
| BHMSUNI, LLC | 26.67% |
| IMH Healthcare, LLC | 20% |
| JF Consultants, LLC | 13.33% |

20394303 v8

Loan Agreement
Exhibit C

SUB_LANDRY_00018835

LIQ_TT_1636548

CONFIDENTIAL

## EXHIBIT D

### QUARTERLY FINANCIAL STATEMENT AND CENSUS DATA

Facility Name: _____

Management Company: _____

Report Date: _____

| | Quarter Ending (Date) | Quarter Ending (Date) | Quarter Ending (Date) | Quarter Ending (Date) | 12 Months Ending (Date) |
|---|---|---|---|---|---|
| **Census Data** | | | | | |
| Total Number of Beds: | ___ | ___ | ___ | ___ | ___ |
| Number of Days in Period: | ___ | ___ | ___ | ___ | ___ |
| Total Patient Days Available: | ___ | ___ | ___ | ___ | ___ |
| Patient Utilization Days: | | | | | |
| Medicaid | ___ | ___ | ___ | ___ | ___ |
| Private | ___ | ___ | ___ | ___ | ___ |
| Medicare | ___ | ___ | ___ | ___ | ___ |
| Other | ___ | ___ | ___ | ___ | ___ |
| Total Utilization Days: | ___ | ___ | ___ | ___ | ___ |
| Average Occupancy | ___ | ___ | ___ | ___ | ___ |
| **Debt Service Coverage Analysis** | | | | | |
| Total Routine Patient Revenue: | ___ | ___ | ___ | ___ | ___ |
| Total Net Revenue: | ___ | ___ | ___ | ___ | ___ |
| Total Expenses: | ___ | ___ | ___ | ___ | ___ |
| Pre-Tax Income: | ___ | ___ | ___ | ___ | ___ |
| **Add Back** | | | | | |
| Depreciation and Amortization: | ___ | ___ | ___ | ___ | ___ |
| Interest on Mortgage: | ___ | ___ | ___ | ___ | ___ |
| Facility Lease Expense (if applicable): | ___ | ___ | ___ | ___ | ___ |
| Management Fees: | ___ | ___ | ___ | ___ | ___ |
| Extraordinary Items: | ___ | ___ | ___ | ___ | ___ |
| Net Operating Income: | ___ | ___ | ___ | ___ | ___ |

I hereby certify the above to be true and correct. Dated this ____ day of _____, ____.

By: _____

Name: _____

Title: _____

20394303 v8

Loan Agreement
Exhibit D

SUB_LANDRY_00018836

LIQ_TT_1636549

CONFIDENTIAL

## EXHIBIT E

### COMPLIANCE CERTIFICATE

USAmeriBank
113 East Whiting Street
Tampa, Florida 33602
Attention: Trey Korhn

Re:    Loan Agreement dated March 31, 2014 (together with amendments, if any, the "Loan Agreement") by and among USAmeriBank, as Lender, and Westport Nursing Tampa, L.L.C., as Borrower

The undersigned officer of the above named Borrower, docs hereby certify that for the quarterly financial period ending _____:

1.    No Default or Event of Default has occurred or exists except _____.

2.    The Debt Service Coverage Ratio for the Facility for the applicable period of _____ months was:

        Required:    1.75 to 1.0
        Actual:    ____ to 1.0

        **The manner of calculation is attached.**

4.    The quarterly average daily occupancy for the Facility was:

        Required:    Not less than 82%
        Actual:

5.    EBITDARM for Lessee based on operations of the Facility for the applicable period of _____ months was:

        Required:    $2,500,000
        Actual:    $_____

6.    Combined liquidity of Borrower and Guarantor as of the end of the preceding year was:

        Required:    $3,000,000
        Actual:$_____

7.    All representations and warranties contained in the Loan Agreement and other Loan Documents are true and correct in all material respects as though given on the date hereof, except _____.

8.    All information provided herein is true and correct.

20394303 v8

Loan Agreement
Exhibit E

SUB_LANDRY_00018837

LIQ_TT_1636550

CONFIDENTIAL

9.     Capitalized terms not defined herein shall have the meanings given to such terms in the Loan Agreement.

Dated this _____ day of _____, _____.

By: _____

Name: _____

Title: _____

20394303 v8

Loan Agreement
Exhibit E

SUB_LANDRY_00018838

LIQ_TT_1636551

CONFIDENTIAL

# EXHIBIT F

## PERMITTED LIENS

None.

20394303 v8

SUB_LANDRY_00018839

LIQ_TT_1636552

CONFIDENTIAL

## EXHIBIT G

### EFFECTIVE CAPACITY

Assisted Living Beds          110

Skilled Nursing Beds          120

20394303 v8

Loan Agreement
Exhibit H

SUB_LANDRY_00018840

LIQ_TT_1636553