## MANAGING PARTNER'S CERTIFICATE

March 31, 2014

The undersigned, solely in his capacity as a duly appointed managing partner of BHMS INVESTMENTS, LP, a Delaware limited partnership ("BHMS Investments"), which is the managing member of BHMSUNI, LLC, a Delaware limited liability company, which is the managing member of WESTPORT NURSING TAMPA, L.L.C., a Florida limited liability company (the "Company"), does hereby certify, in connection with that certain Loan Agreement by and among the Company and USAmeribank, a Florida state banking corporation (the "Bank") (the "Loan Agreement"), that:

1.    Attached hereto as Exhibit A is a true, correct and complete copy of the Company's Certificate of Formation, and any amendments thereto, as in effect on the date hereof, which were certified to by the Secretary of State of the State of Delaware as of the date indicated in such certification (collectively, the "Certified Documents"). There have been no amendments to the Certified Documents since the date of certification indicated on such Certified Documents. No action has been taken by the Company or its members to amend, modify or repeal the Certified Documents, the same being in full force and effect in the attached form on the date hereof.

2.    Attached hereto as Exhibit B is a true, correct and complete copy of the Company's limited liability company agreement, including all amendments thereto, as in effect on the date hereof. No action has been taken by the Company or its members in contemplation of any amendment thereto.

3.    Attached hereto as Exhibit C is a true and correct copy of resolutions of the board of managers of the Company authorizing, approving and ratifying the execution, delivery and performance by the Company of each Loan Document to which the Company is a party. Such resolutions have not in any way been amended, rescinded or modified and have been in full force and effect since their adoption to and including the date hereof, and such resolutions are the only proceedings of the Company now in force relating to or affecting the matters referred to therein.

4.    Attached hereto as Exhibit D is a true, correct and complete copy the Company's Certificate of Existence demonstrating that the Company is duly organized, validly existing and in good standing under the laws of the State of Delaware on the date of such certification. As of the date hereof, the Corporation is in good standing in the State of Delaware and there are no proceedings for the dissolution or liquidation of the Company.

This certificate may, upon execution, be delivered by facsimile or electronic mail, which shall be deemed for all purposes to be an original signature.

Unless otherwise defined herein, capitalized terms defined in the Loan Agreement shall have the same meanings when used herein.

[SIGNATURE PAGE FOLLOWS]

24971703v3





CONFIDENTIAL

VNB_071916

*{Signature page to Managing Partner's Certificate of Westport Nursing Tampa, L.L.C.}*

IN WITNESS WHEREOF, I have hereunto set my hand as of the day and year first above written.

By: _____

Name: Kevin L. Angelis

Title: Managing Partner of BHMS Investments, LP

CONFIDENTIAL

VNB_071917

**EXHIBIT A**

<u>**Certified Documents**</u>

[Attached]

VNB_071918



## State of Florida

### Department of State

I certify the attached is a true and correct copy of Articles of Organization of WESTPORT NURSING TAMPA, L.L.C., a limited liability company, organized under the laws of the State of Florida, filed on January 21, 1999, as shown by the records of this office.

The document number of this company is L99000000339.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-fourth day of March, 2014

Ken Detzner
Secretary of State

CR2E022 (1-11)

VNB_071919

FILED
SECRETARY OF STATE
DIVISION OF CORPORATIONS
99 JAN 21 PM 2: 13

## ARTICLES OF ORGANIZATION

### FOR

#### WESTPORT NURSING TAMPA, L.L.C.,
a Florida Limited Liability Company

The undersigned, desiring to form a limited liability company under and pursuant to Florida Statute 608 entitled the Florida Limited Liability Company Act, do hereby adopt the following Articles of Organization for such company:

1.  Name.   The name of this company shall be WESTPORT NURSING TAMPA, L.L.C.

2.  Duration/Continuation.  The period of this company's duration shall be perpetual, unless terminated by the unanimous written agreement of all members or by the death, retirement resignation, expulsion, bankruptcy or dissolution of a member or upon the occurrence of any other event which terminates the continued membership of a member, unless the business of the company is continued by the consent of all the remaining members, or by amendment of these Articles of Organization providing for the continued existence of the company subsequent to the foregoing events.

3.  The mailing address and the street address of the company is 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, FL 33410.

4.  Registered Agent and Office. The name and street address of the initial registered agent and office for this company is as follows: Lawrence L. Landry, 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, FL 33410.

5. Admission of Additional Members; and Terms and Conditions of such Admissions. Additional members may be admitted only upon the approval of the majority of the nontransferring members of the Company upon the written application of such new member, in the manner set forth in the Regulations of the Company.

6.  Right to Continue Business. Company shall be dissolved upon the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a member or upon the occurrence of any other event which terminates the continued membership of a member in the Company, unless the business of the Company is continued by the consent of all the remaining members.

7.  Management of Company. The management of the Company is reserved to a manager. The name and address of the Manager, who shall serve until the first annual meeting of members or until his successor is elected and qualified, is:

| Names | Addresses |
|---|---|
| Westport Realty Advisors, Ltd., a Florida Limited Partnership | 3801 PGA Boulevard, Suite 805 Palm Beach Gardens, FL 33410 |

8.  Regulations of Company. The power to adopt, alter, amend or repeal the regulations of the limited liability company shall be vested in the member(s). Regulations adopted by the members or by the Manager(s) may be repealed or altered, new Regulations may be adopted by the members, and the members may prescribe in any Regulations made by them that such Regulations may not be altered, amended or repealed by the Manager(s).

9.  Informal Action of Members. Any action of the members may be taken without a meeting if consent in writing setting forth the action so taken shall be signed by all members who would be entitled

VNB_071920

to vote upon such action at a meeting (and filed with the Manager(s) of the Company as part of its records.)

IN WITNESS WHEREOF, the undersigned Incorporator(s) have hereunto set their hands and seals this 20th day of January, 1999.

Lawrence L. Landry, as President and authorized representative of Westport Holdings Tampa, L.L.C., a Florida limited liability company

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 20th day of January, 1999, by Lawrence L. Landry, as President and authorized representative of Westport Holdings Tampa, L.L.C., a Florida limited liability company, who is personally known to me or who has produced _____ as identification.

NOTARY PUBLIC
SERIAL NO.:

VIRGINIA L. DEIGHAN
Notary Public - State of Florida
My Commission Expires Apr 8, 2002
Commission # CC722102

## REGISTERED AGENT ACCEPTANCE

Having been named as Registered Agent and to accept service of process for the above stated limited liability company, I hereby accept the appointment as Registered Agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as Registered Agent.

Lawrence L. Landry

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 20th day of January, 1999, by Lawrence L. Landry, who is personally known to me or who has produced _____ as identification.

NOTARY PUBLIC
SERIAL NO.:

VIRGINIA L. DEIGHAN
Notary Public - State of Florida
My Commission Expires Apr 8, 2002
Commission # CC722102

elys\and3865.art

CONFIDENTIAL

VNB_071921

JAN-19 99 15:09  FROM:GARY,DYTRYCH & RYAN  561-844-1064          TO:5616248037          PAGE: 04/07

99 JAN 21 PM 2:13
FILED
SECRETARY OF STATE
DIVISION OF CORPORATIONS

## AFFIDAVIT

**STATE OF FLORIDA**
**COUNTY OF__Palm Beach__**

Before the undersigned authority personally appeared Lawrence L. Landry, who on oath says:

1. That he is the President of _Westport Holdings Tampa, L.L.C., a Florida limited liability company_, which is the sole member of WESTPORT NURSING TAMPA, L.L.C., a Florida limited liability company.

2. That WESTPORT NURSING TAMPA, L.L.C., a Florida limited liability company has at least one member.

3. The amount of cash and description and agreed value of the property other than cash contributed by the sole member is as follows:

Westport Holdings Tampa, L.L.C.,
      a Florida limited liability company  . . . . . . . . . . . . . . . . . . . $1,000,000.00 (Cash only)

The agreed value of property other than cash contributed by the member(s), if any, is . . . . . .$0.00

4. The additional amounts anticipated to be contributed by the member is $40,000,000.00.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Lawrence L. Landry

Sworn to and subscribed before me this 20th day of January , 1999 by Lawrence L. Landry who is personally known to me or who has produced [type of identification] as identification.

_____
Signature of Notary

VIRGINIA L. Deighan
Print, type or Stamp
Commissioned Name of Notary Public

VIRGINIA L. DEIGHAN
Notary Public - State of Florida
My Commission Expires Apr 8, 2002
Commission # CC722102

CONFIDENTIAL                                                          VNB_071922

# EXHIBIT B

## Operating Agreement

[Attached]

CONFIDENTIAL

VNB_071923

AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTPORT NURSING TAMPA, L.L.C.

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT is made and entered into and shall be effective as of March 28, 2014 (the "Effective Date"), by and among BVM University Village, LLC, a Florida limited liability company ("BVM"); BHMSUNI, LLC, a Delaware limited liability company ("BHMS"); IMH Healthcare, LLC, a Delaware limited liability company ("IMH"); JF Consultants LLC, a Delaware limited liability company ("Fuchs"); or those Persons admitted as Members by the Company at a later date (collectively, the "Members"), and Westport Nursing Tampa, L.L.C., a Florida limited liability company (the "Company").

WHEREAS, the Company was formed on January 1, 1999;

WHEREAS, the Company previously entered into a written Limited Liability Agreement (the "Existing Limited Liability Company Agreement");

WHEREAS, until the effective date of this Amended and Restated Limited Liability Company, the Existing Limited Liability Company Agreement governed the operations of the Company;

WHEREAS, prior to the effectiveness of this Amended and Restated Limited Liability Company Agreement, BVM acquired all of the outstanding equity of the prior sole member of the Company, and BVM consents to the effects described herein; and

WHEREAS, the Members believe it is advisable and in the best interest of the Company to amend and restate the Existing Limited Liability Company Agreement by approving this Amended and Restated Limited Liability Company Agreement to govern and control the Company.

SECTION 1
DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"Act" means the Florida Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other period after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the next to the last sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)    Debit to such Capital Account the items described in regulations Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

CONFIDENTIAL

VNB_071924

"Affiliate" means (a) any corporation in which the Company or the Member or any Manager of the Company directly or indirectly owns or controls more than ten percent (10%) of the beneficial interest, (b) any partnership, joint venture or limited liability company in which the Company or the Member or any Manager of the Company is a partner, joint venturer or member, (c) any trust in which the Company or the Member or any Manager of the Company is a trustee or beneficiary, (d) any Person that is directly or indirectly owned or controlled by the Company or the Member or any Manager of the Company, (e) the Member or any Manager of the Company, (f) any Person related by birth, adoption or marriage to the Member or any Manager of the Company, or (g) any Borrower Party as defined in the Loan Documents.

"Agreement" means this Limited Liability Company Agreement, as amended, modified or supplemented from time to time, together with the schedules attached hereto.

"Articles of Organization" means the Articles of Organization of the Company filed with the Florida Department of State on January 1, 1999, as amended from time to time in accordance with the Act.

"Bankruptcy Action" means, with respect to a Person, the occurrence of (a) an assignment by the Person for the benefit of creditors; (b) the filing by the Person of a voluntary petition in bankruptcy; (c) the entry of a judgment by any court that the Person is bankrupt or insolvent, or the entry against the Person of an order for relief in any bankruptcy or insolvency proceeding; (d) the filing of a petition or answer by the Person seeking for itself any reorganization arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (e) the filing by the Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding for reorganization or of a similar nature; (f) the consent or acquiescence of the Person to the appointment of a trust, receiver or liquidator of the Person or of all or any substantial part of its properties; or (g) any other event which would cause the Person to cease to be a member of a limited liability company under Section 608.4237 of the Act.

"Board of Managers" has the meaning set forth in Section 4.

"Capital Account" as of any given date shall mean the account calculated and maintained by the Company for each Member as specified in Section 7.

"Capital Contribution" means the amount of cash or property contributed to the Company by the Member from time to time.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

"Company" means Westport Nursing Tampa, L.L.C., a Florida limited liability company.

"Debt" means, for any Person, without duplication: (a) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or any of its assets is liable, (b) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person or any of its assets would be liable or subject, if such amounts were advanced under the credit facility, (c) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (d) all indebtedness guaranteed by such Person, directly or indirectly, (e) all obligations under leases that constitute capital leases for which such Person or any of its assets is liable or subject, and (f) all obligations of such Person under interest rate swaps, caps, floors,

2

CONFIDENTIAL

VNB_071925

collars and other interest hedge agreements, in each case whether such Person or any of its assets is liable or subject contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"Facility" means that certain 110-bed assisted living and 120-bed skilled nursing facility located on the Property, as it may now or hereafter exist, together with any other general or specialized care facilities, if any (including any Alzheimer's care unit, subacute, and any facility, now or hereafter operated on the Property).

"Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year; unless for U.S. federal income tax purposes another taxable year is required, in which case the Fiscal Year shall be such taxable year.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Managing Member;

(ii)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member, as of the following times: (A) the acquisition of an additional interest in the Company following its initial capitalization by any new or existing Member in exchange for more than a de minimus Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimus amount of Company property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a de minimus interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a partner capacity in anticipation of being a Member; provided, however, that the adjustments pursuant to clauses (A), (B), and (D) above shall be made only if the Managing Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)     The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by such Member and the Managing Member; and

(iv)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and the definition of Profits and Losses hereof or Section 8.3(g) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the Managing Member determines that an adjustment pursuant to subparagraph (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

3

CONFIDENTIAL

VNB_071926

"Lender" means any holder of the Loan and the Loan Documents related thereto, and any successor holder(s).

"Loan" means, collectively, those certain loans made to the Company and originated by USAmeribank, a Florida state banking corporation.

"Loan Documents" means, collectively, each promissory note or other evidence of indebtedness and all mortgages, deeds of trust, deeds to secure debt and security agreement, assignments, financing statements, guarantees, pledges, environmental indemnity agreements, collateral security agreements and other documents or instruments required by Lender and delivered in connection with the Loan, and any replacement, renewal, extension, substitution, addition, supplement, amendment or modification of any of the foregoing.

"Manager" means the Person, appointed by the appropriate Members to serve on the Board of Managers or as otherwise designated by the Members pursuant to this Agreement.

"Managing Member" means BHMS or the Person designated by BHMS.

"Master Lease" means the Master Lease Agreement by and among the Company, as landlord, and TR & SNF, Inc., a Florida corporation, and TALF, Inc., a Florida corporation (collectively, as "Tenant").

"Member" means the undersigned Person signing as Member and any other Person who hereafter becomes an additional or substituted Member of the Company, for as long as each such Person continues to be a Member of the Company.

"Membership Interest" or "Interest" means the ownership interest of a Member in the Company at any particular time, expressed as a percentage, including the right of the Member to any and all of the benefits to which the Member may be entitled as provided in this Agreement and in the Act, together with the obligations of the Member to comply with all the provisions of this Agreement and of the Act. The Membership Interests of the Members as of the Effective Date are set forth on *Schedule A*. Any changes in the Membership Interests of the Members shall be evidenced by an amendment to *Schedule A*.

"Member Nonrecourse Debt" shall have the meaning set forth in Regulations Section 1.704-2(b)(4) with respect to partner nonrecourse debt.

"Member Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Member Nonrecourse Deductions" has the meaning set forth in Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2) with respect to partner nonrecourse deductions.

"Net Cash Flow" shall mean, with respect to any fiscal period, all cash receipts during such fiscal period not used for capital expenditures and not considered as Net Cash Flow in a prior fiscal period and any amount theretofore held in any reserve that was not considered as part of Net Cash Flow in a prior fiscal period which the Managing Member determines need not be held any longer in reserve, all determined in accordance with the Company's method of accounting, less Operating Expenses.

4

CONFIDENTIAL

VNB_071927

"Operating Expenses" shall mean, with respect to any fiscal period, (i) to the extent paid other than with cash withdrawn from reserves, the amount of cash disbursed in such period in order to operate the Company and for principal and interest payment obligations of the Company under the Loan and (ii) amounts, if any, added to reserves as determined by the Managing Member in its good business judgment.

"Person" means an individual, a general partnership, a limited partnership, a limited liability partnership, a trust, an estate, an association, a corporation, a limited liability company or any other legal or commercial entity.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of "Depreciation";

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii)     Notwithstanding any other provision of this definition of "Profits" and "Losses," any items that are specially allocated pursuant to Section 8.3 or Section 8.4 shall not be taken into account in computing Profits or Losses.

5

CONFIDENTIAL

VNB_071928

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 8.3 and 8.4 shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

"Property" means the parcel of real property owned by the Company as set forth on *Schedule B*, and all improvements and appurtenances and all fixtures and other personal property related thereto.

"Regulations" means the regulations promulgated by the United States Department of Treasury pursuant to and in respect of the provisions of the Code. All references herein to sections of the Regulations shall include any corresponding provisions of succeeding, similar or substitute, temporary, or final Regulations.

"Special Purpose Entity" means a Person, other than an individual, that (a) is formed or organized solely for the purposes set forth in Section 2.6 hereof, (b) does not engage in any business unrelated to such purpose, (c) does not have any material assets other than the Property, such incidental personal property as may be necessary in connection with the leasing of the Property, or as otherwise permitted under the Loan Documents, (d) is subject to all of the limitations on powers set forth in the organizational documents of the Company, and (e) at all times complies with the covenants set forth in Sections 5 and 6 hereof.

## SECTION 2
## FORMATION OF LIMITED LIABILITY COMPANY

2.1    Formation.    The Company was formed as Westport Nursing Tampa, L.L.C., in accordance with the Act, by filing the Articles of Organization with the Florida Department of State on January 21, 1999.

The rights and obligations of the Member shall be as provided in the Act, except as otherwise expressly provided herein. In the event of any inconsistency between any terms and conditions contained in this Agreement and any non mandatory provisions of the Act, the terms and conditions contained in this Agreement shall govern and in the event of any inconsistency between any items and conditions contained in this Agreement and any mandatory provisions of the Act, the terms and conditions of the Act shall govern.

2.2    Name.    The business of the Company shall be conducted under the name "Westport Nursing Tampa, L.L.C." or such other name as the Managing Member shall hereafter designate.

2.3    Principal Office.    The principal office and principal place of business of the Company shall be c/o BHMS Investments, LP, 152 West 57th Street, 46th Floor, New York, New York 10019, or at such other place as the Managing Member may designate. The Company may have other offices at any place or places as may be determined by the Managing Member.

2.4    Foreign Qualification.    The Managing Member shall comply with the requirements to qualify the Company as a foreign limited liability company in any jurisdiction where such qualification is necessary because of the conduct of its business.

2.5    Registered Agent and Office. The Company shall at all times maintain a registered office and a registered agent as required under the Act, which shall be the office and agent as stated in the Certificate of Formation or as otherwise may be determined from time to time by the Managing Member. The initial registered agent of the Company is:

6

CONFIDENTIAL

VNB_071929

Mr. Buddy D. Ford, Esq.
115 North MacDill Avenue
Tampa, FL 33609

2.6     Purpose.  The nature of the business and of the purpose to be conducted and promoted by the Company is to engage solely in the following activities:

(a)     to acquire, own, hold, lease, operate, manage, maintain, develop and improve the Property (or an undivided interest therein) and to contract for the operation, maintenance, management and development of the Property;

(b)     to enter into and perform its obligations under the Loan Documents;

(c)     to sell, transfer, service, convey, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with the Property to the extent permitted under the Loan Documents; and

(d)     to engage in any lawful act or activity and to exercise any powers set forth in the Act that are related or incidental to and necessary, convenient or advisable for the accomplishment of the foregoing specifically enumerated purposes.

Notwithstanding anything contained herein to the contrary, the Company shall not engage in any business, and it shall have no purpose, unrelated to the Property and shall not acquire any real estate or own assets other than those related to the Property and/or otherwise in furtherance of the purpose of the Company.

2.7     Term.  The Company shall continue indefinitely unless terminated in accordance with this Agreement.

## SECTION 3
## MEMBERS

3.1     Powers and Duties of Members.  The Members in their capacity as a member of the Company shall not participate in the business affairs of the Company, transact any business on behalf of the Company, or have any power or authority to bind or obligate the Company.  The Members shall, however, be entitled to vote on those matters requiring Member approval set forth in this Agreement.

3.2     Action by Members.  Any action to be taken by the Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by a the Members holding at least 80% of the Membership Interests of the Company.

3.3     Liability of Member.  The Members shall have no individual liability whatsoever, arising out of their ownership of Interests, whether to the Company or to the creditors of the Company, for the debts of the Company or any of its losses or liabilities.

## SECTION 4
## BOARD OF MANAGERS; MANAGING MEMBER AND OFFICER APPOINTMENT

4.1     Management of Company.  The business and affairs of the Company shall be managed by the Managing Member. The Managing Member shall direct, manage, and control the business of the Company to the best of its ability and shall have full and complete authority, power, and discretion,

7

VNB_071930

subject to Sections 4.3 and 4.4 and Sections 5 and 6, to make any and all decisions, and to do any and all things that the Managing Member deems necessary or desirable for that purpose. The Managing Member shall devote such time to the Company's business as it may, in its sole discretion, deem to be necessary to conduct said business.

4.2    Number, Tenure and Qualifications.    The Board of Managers shall consist of five (5) Managers. The initial Managers shall be those Persons identified on the signature pages as a Manager. BVM, IMH and Fuchs shall each appoint one (1) Manager, and BHMS shall appoint two (2) Managers; each Member may remove its appointed Manager at any time for any reason. In the event of a vacancy in the position of a Manager, the Member holding the appointment right for such Manager shall, as soon as practicable, appoint a successor Manager.

4.3    Board of Manager Consent.    Notwithstanding anything set forth in this Agreement to the contrary, the following actions by the Managing Member shall require the written consent of Managers representing at least 80% of the Board of Managers, on a per capita basis:

(i)    the execution of any and all real estate leases related to the Property;

(ii)    instituting or pursuing any litigation or arbitration by or with respect to the Company which involves a claim in excess of $100,000;

(iii)    instituting proceedings to adjudicate the Company a bankrupt, or consent to the filing of a bankruptcy proceeding against the Company, or filing a petition or answer consenting to or seeking reorganization of the Company under the Bankruptcy Code or any other similar applicable federal or state law, or consenting to the filing of any such petition against the Company, or consenting to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of the Company or of its property, or making an assignment for the benefit of creditors of the Company, or admitting the Company's inability to pay its debts generally as they become due;

(iv)    terminating and dissolving the Company;

(v)    the sale of substantially all of the assets of the Company or the merger or consolidation of the Company with or into any third party;

(vi)    the creation by the Company of any single debt or contract obligation of $100,000 or more or any debt or contract obligations that, taken with all other existing debts or contract obligations, cause the Company to have more than $500,000 in outstanding debt;

(vii)    amending the Company's Articles of Organization or this Agreement;

(viii)    the issuance of any equity interest in the Company; and

(ix)    amending or agreeing to amend any of the Loan Documents.

4.4    Management Restrictions.

(a)    Anything in this Agreement to the contrary notwithstanding, neither the Managing Member nor the Board of Managers shall have authority to perform any act in respect of the Company in violation of any applicable laws or regulations.

8

CONFIDENTIAL

VNB_071931

(b)      Except as otherwise provided herein, all actions to be taken, decisions or determinations to be made, authorizations to be granted, and power and authority to be exercised by the Board of Managers on behalf of the Company shall be so taken, made, granted and exercised only by the Board of Managers.

(c)      Except as otherwise provided herein, all actions to be taken, decisions or determinations to be made, authorizations to be granted, and power and authority to be exercised by the Managing Member on behalf of the Company shall be so taken, made, granted and exercised only by the Managing Member.

4.5      Liability of Manager.  A Manager, whether as a member of the Board of Managers or as the Managing Member, shall have no individual liability whatsoever, whether to the Company, to the Members or to the creditors of the Company, for the debts of the Company or any of its losses or liabilities, except to the extent specifically set forth in the Act.

4.6      Action by Managers.  Any action required or permitted to be taken by the Board of Managers may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action, shall be signed by the number of Managers that would be necessary to authorize or take such action at a meeting at which all the Managers were present and voted.

4.7      Officers.  The Board of Managers may appoint such officers of the Company with such titles as it may select to act on behalf of the Company with such power and authority as the Board of Managers may delegate in writing to any such officer.

## SECTION 5
## UNDERTAKINGS

5.1      Special Purpose Entity.  The Company is intended to be a Special Purpose Entity.  In furtherance thereof, and notwithstanding anything to the contrary set forth herein, for so long as the indebtedness remains outstanding under the Loan, the Company shall and the Managing Member shall cause the Company to:

(a)      Engage in any business or activity other than the ownership and maintenance of the Property and Improvements and leasing or operation of the Facility, and activities incidental thereto;

(b)      Acquire or own any material assets other than the Collateral (as defined in the Loan Documents;

(c)      Own any subsidiary or make an investment in, any Person without the consent of Lender;

(d)      Commingle in a way that is difficult or costly to segregate its funds or assets with assets of, or pledge its assets with or for, any of its Managers, Members, affiliates, principals or any other Person;

(e)      Fail to maintain Company's and the Facility's records, books of account and bank accounts separate and apart from those of its Managers, Members, principals, and affiliates, and the affiliates of any of their general partners, managers, members, shareholders, principals or any other Person;

9

CONFIDENTIAL

(f)     Seek the dissolution or winding up in whole or in part of the Company or any Tenant;

(g)     Maintain the Company's assets in such a manner that it will be costly or difficult to segregate, ascertain or identify their individual assets from those of any of its Managers, Members, principals and affiliates, the affiliates of any of their general partners, managers, members, shareholders, principals or any other Person;

(h)     Hold the Company out to be responsible for the debts of any other Person or pay or secure another Person's liabilities with the Company's own funds or assets except as otherwise expressly approved in writing by Lender in its discretion;

(i)     Make any loans or advances to any third party, including any of the Company's Managers, Members, principals or affiliates, or the affiliates of any of the Company's Managers, Members, or principals, except for Indebtedness to related parties which is covered by a written subordination agreement in favor of Lender;

(j)     Fail to prepare and file the Company's own tax return separate from those of any other Person; or

(k)     Fail to hold the Company out to the public as a legal Person separate and distinct from any other Person or to conduct its business solely in its own name, in order (i) not to mislead others as to the identity with which such other party is transacting business, or (ii) not to suggest that it is responsible for the debts of any other Person.

5.2     Insurance.  The Company shall carry and maintain in force insurance in amounts and coverage as is customarily carried by enterprises with similar assets and business, as determined by the Managing Member.

5.3     Bankruptcy.  For as long as the Loan remains due and payable, the Company shall not, without the prior written consent of the Board of Managers, take any Bankruptcy Action; or take any action in furtherance of any such Bankruptcy Action.  The Company shall not terminate or dissolve solely as a consequence of the bankruptcy, insolvency, appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of a Manager or a substantial part of such Manager's property, or assignment for the benefit of its creditors, or an admission in writing of the inability to pay its debts generally as they become due, or any similar action, of such Manager so long as a solvent replacement Manager is appointed. No Member or member of the Board of Managers shall take any action in contravention of the foregoing.

## SECTION 6
## INDEMNIFICATION

6.1     Indemnification.

(a)     The Company shall indemnify any Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that he, she or it is or was a Member, Managing Member, Manager, officer, employee or agent of the Company, or who is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such action, suit or

10

CONFIDENTIAL

VNB_071933

proceeding, if such Person acted in good faith and in a manner he, she or it reasonably believed to be in, or not opposed to the best interests of the Company, and with respect to any criminal action or proceeding, had no reasonable cause to believe his, her or its conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or on a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which such Person reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that such Person's conduct was unlawful.

(b)     The Company shall indemnify any Person who was or is a party, or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Person is or was a Member, Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection with the defense or settlement of such action or suit, if such Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company, provided that no indemnification shall be made with respect to any claim, issue, or matter as to which such Person has been adjudged to have been liable to the Company, unless, and only to the extent that the court in which such action or suit was brought shall determine on application that, despite the adjudication of liability, but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

(c)     Any indemnification under the first two paragraphs of this Section 6.1 (unless ordered by a court) shall be made by the Company only as authorized in the specific case, on a determination that indemnification of the Person is proper in the circumstances because he has met the applicable standard of conduct set forth in the said two paragraphs.

6.2     Expenses.  Expenses incurred in defending a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding on receipt of an undertaking by or on behalf of the Person seeking indemnification to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Company as authorized in this Section 6.

6.3     Non-Exclusivity.  The indemnification and advancement of expenses provided by or granted under this Section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any other agreement.

6.4     Insurance.  The Company shall have power to purchase and maintain insurance on behalf of any Person who is or was a Member, Manager, officer, employee or agent of the Company, or who is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of his, her or its status as such, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Section 6.

6.5     Continuation.  The indemnification and advancement of expenses provided by or granted under this Section 6 shall continue as to a Person who has ceased to be a Member, Manager, director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of that Person.

11

## SECTION 7
## MEMBER'S INTEREST AND CAPITAL

7.1     Members' Interest and Capital. The name, address, Capital Contribution and Membership Interest of the Members are set forth on *Schedule A*, which shall be amended from time to time by the Managing Member. No interest shall accrue on any Capital Contributions, and the Members shall not have the right to withdraw or be repaid any portion of its capital account except through distribution or dissolution in each case as provided herein or in the Act. In addition to the Capital Contribution, the Members may make additional Capital Contributions.  No Member shall be obligated to make any additional Capital Contributions.

7.2     Uncertificated Membership Interests. The Membership Interests of the Company shall be uncertificated, shall not be dealt in or traded on securities exchanges or in securities markets, and shall not be considered or treated as "securities" governed by Article 8 of the Uniform Commercial Code as in effect in any jurisdiction in which it has been adopted, including, without limitation, the Florida Uniform Commercial Code – Investment Securities.

## SECTION 8
## ALLOCATIONS; DISTRIBUTIONS

8.1     Distributions.

(a)     All distributions of cash or other property, except distributions upon the Company's dissolution (which shall be governed by Section 11.2(b)), shall be made to the Members on a pro rata basis in accordance with their respective Membership Interests on the record date of such distribution.

(b)     Intentionally omitted.

(c)     The Managing Member shall have the right to establish, maintain and expend reserves if the Managing Member deems such reserves are in the best interest of the Company.  An example of such reserves would be, if the Company became involved in litigation requiring reserves to be set aside.

(d)     Except as provided in Section 11.2(b) hereof, all distributions of cash and property shall be made at such times and in such amounts as determined by the Managing Member.

(e)     All other provisions hereof notwithstanding, the Company's obligation, and the Managing Member's authority, to make any distribution is subject to the restrictions governing distributions under the Act and such other pertinent governmental restrictions as are now and may hereafter become effective. Currently, among other prohibitions, the Act prohibits the Company from making a distribution to the extent that, after giving effect to the distribution, liabilities of the Company exceed the fair value of the assets of the Company.  The Company is authorized to withhold from all amounts made to or any distributive share of a Member any taxes required to be withheld pursuant to the Code or any provisions of state, local, or foreign tax law and such amounts shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section 8.

8.2     Allocations Generally. After giving effect to the special allocations set forth in Sections 8.3 and 8.4 hereof, Profits or Losses for any Fiscal Year shall be allocated in the following order and priority:

(a)     Except as provided in Section 8.2(b) below, Profits and Losses shall be allocated to and among the Members in proportion to the Membership Interest held by each Member.

12

CONFIDENTIAL

VNB_071935

(b)    In the event that the allocation of Losses pursuant to Section 8.2(a) above would result in a Member having an Adjusted Capital Account Deficit at the end of any Fiscal Year and at such time there are other Members who will not, as a result of such allocation, have an Adjusted Capital Account Deficit, then all Losses in excess of the amount which can be allocated until the foregoing circumstance occurs shall be allocated among the Members who do not have Adjusted Capital Account Deficits on a proportionate basis according to their Membership Interests until each such Member would similarly be caused to have an Adjusted Capital Account Deficit. At such time as a further allocation of Losses cannot be made without causing some Member to have an Adjusted Capital Account Deficit, then all remaining Losses for such Fiscal Year shall be allocated in accordance with the ratio described in Section 8.2(a) above.

8.3    Special Allocations. The following special allocations shall be made in the following order:

(a)    Minimum Gain Chargeback. Notwithstanding any other provision of this Section 8, if there is a net decrease in Company Minimum Gain during any Fiscal Year, then except as otherwise provided in Regulations Section 1.704-2(f), each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain during such Fiscal Year determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 8.3(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Debt Minimum Gain Chargeback. Except as otherwise provided in Regulations Sections 1.704-2(i)(4), notwithstanding any other provision of this Section 8, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of such Person's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Person pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 8.3(b) is intended to comply with the minimum gain chargeback requirement Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*), or 1.704-1(b)(2)(ii)(*d*)(*6*), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 8.3(c) shall only be made if, and only to the extent that, such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 8 have been tentatively made as if this Section 8.3(c) were not in the Agreement.

(d)    Gross Income Allocation. In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 8.3(d) shall be made if and only to the extent that such Person would have a deficit

13

CONFIDENTIAL

VNB_071936

Capital Account in excess of such sum after all other allocations provided for in this Section 9 have been tentatively made as if Section 8.3(c) hereof and this Section 8.3(d) were not in the Agreement.

(e)     Nonrecourse Deductions.   Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Membership Interest.

(f)     Member Nonrecourse Deductions.   Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable.   Such allocations shall be made in accordance with, and in the manner set forth in, Regulations Section 1.704-2(i)(1).

(g)     Section 754 Adjustment.   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Sections 1.704-1(b)(2)(iv)($m$)(2) or 1.704-1(b)(2)(iv)($m$)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their Membership Interests in the event Regulations Section 1.704-1(b)(2)(iv)($m$)(2) applies, or to the Members to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)($m$)(4) applies.

(h)     Allocations Related to Taxable Issuance of Membership Interests.   Any income, gain, loss or deduction realized as a direct or indirect issuance of an interest in the Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each Member if the Issuance Items had not been realized.

8.4     Curative Allocations.   The allocations set forth in Sections 8.2(b), 8.3(a), 8.3(b), 8.3(c), 8.3(d), 8.3(e), 8.3(f) and 8.3(g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.   It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.4.   Therefore, notwithstanding any other provision of this Section 8 (other than the Regulatory Allocations), the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner determined by the Managing Member to be appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to the Sections of this Agreement other than the Regulatory Allocations and this Section.   In exercising their discretion under this Section, the Managing Member shall take into account future Regulatory Allocations under Sections 8.3(a) and 8.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 8.3(e) and 8.3(f).

8.5     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Code Section 706 and the Regulations thereunder.

14

CONFIDENTIAL

VNB_071937

(b)      Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members, in the same proportions as they share Profits or Losses, as the case may be, for the year.

(c)      The Members are aware of the income tax consequences of the allocations made by this Section 8 and hereby agree to be bound by the provisions of this Section 8 in reporting their shares of Company income and loss for income tax purposes.

(d)      Solely for the purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), the Members' interests in Company Profits are equal to the Members' Membership Interests.

(e)      To the extent permitted by Sections 1.704-2(h)(2) and 1.704-2(h)(3) of the Regulations, the Managing Member shall endeavor to treat distributions as having been made from proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Member.

8.6      Tax Allocations: Code Section 704(c). In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with such definition hereof).

In the event the Gross Asset Value of any Company asset is adjusted pursuant to such definition hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 8.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Agreement.

8.7      Allocation of Recapture. For purposes of determining the character (as ordinary income or capital gain) of any taxable income or gain of the Company allocated to the Members pursuant to this Section 8, such portion of the taxable income or gain of the Company allocated pursuant to this Section 8 which is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (a) the amount of depreciation previously allocated to each Member bears to (b) the total of such depreciation allocated to all Members. This Section shall not alter the amount of allocations among the Members pursuant to Section 8 but merely the character of the income so allocated.

8.8      Returns and Other Elections. The Managing Member shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's Fiscal Year.

15

CONFIDENTIAL

VNB_071938

All elections permitted to be made by the Company under federal, state, and foreign laws, including but not limited to any election under Code Section 754, shall be made by the Managing Member.

8.9    Tax Matters Manager. To the extent that such a designation is required pursuant to the Code or the Regulations, the parties hereto agree to the designation of BHMS as the Tax Matters Manager of the Company who shall fulfill the role of a "tax matters partner" pursuant to Code Section 6231 with full power and authority to act on behalf of the Company and the Members in such capacity. If any state or local tax law provides for a tax matters partner or person having similar rights, powers, authorities or obligations, the Tax Matters Manager shall also serve in such capacity.

## SECTION 9
## ACCOUNTING AND BANK ACCOUNTS

9.1    Tax Returns. The Company shall cause to be prepared all tax returns and statements, if any, which must be filed on behalf of the Company with all federal, state and local taxing authorities, and shall submit such returns and statements to the Managing Member for its approval before filing. On approval thereof, the Company shall make timely filing thereof. The Company shall deliver to each Member a copy of each tax return and statement filed by the Company.

9.2    Fiscal Year. The fiscal year of the Company shall be the calendar year.

9.3    Books and Records. The books of account of the Company and the other records required to be maintained under the Act shall be kept and maintained at all times at the Company's principal place of business.

9.4    Financial Statements. Within 90 days after the close of each fiscal year, the Company shall prepare and furnish to each Member a report showing the operations of the Company for such fiscal year including, without limitation, such information concerning the Company as may be required by the Members for state or federal tax returns.

9.5    Access to Books of Account and Records. Each Member shall have the right at all reasonable times during usual business hours to audit, examine, and make copies of or extracts from the books of account of the Company and the records required to be maintained under the Act, provided that he has delivered a prior written request (which may be by email) to the Managing Member at least three business days before such examination. Such right may be exercised through any agent or employee of such Member designated by it or by an independent public accountant designated by the Member. Each Member shall bear all expenses incurred in any examination made for the Member's account.

9.6    Bank Account(s). All funds of the Company shall be deposited in the name of the Company of such bank or banks as may be deemed prudent by the Managing Member and checks drawn on such account(s) shall require the signature of the Managing Member. All funds received from the operation and business of the Company shall be promptly deposited in the account(s) maintained in its name and all debts, expenses and charges shall be paid by checks drawn on such account(s). There shall be no commingling of the funds of the Company with the funds of any other Person, except as required by the Loan Documents.

9.7    Admin Fee. The Managing Member shall receive an administrative fee in the annual amount (the "**Admin Fee**") of $50,000 or as increased by the Board of Managers for subsequent years. The Admin Fee is paid by the Company for those services performed by the Managing Member related to the clerical and administrative oversight of the Company.

16

CONFIDENTIAL

VNB_071939

## SECTION 10
## RESTRICTIONS ON TRANSFER

10.1     Restrictions on Transfer.  No Member shall sell, assign, transfer, pledge, create a security interest in or otherwise dispose of or encumber any part or all of its Membership Interest (collectively, "Transfer") without the prior written consent of the Managing Member and, for so long as the Loan remains outstanding, the Lender. On consent to a Transfer and admission of an additional Member, this Agreement shall be amended to reflect the admission of the substitute Member, and the Managing Member shall take any action required of record to reflect such admission.

## SECTION 11
## DISSOLUTION AND WINDING UP

11.1     Events Causing Dissolution.  Notwithstanding anything to the contrary contained in this Agreement, the Company will be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a)     The written consent of the Board of Managers to dissolve the Company; or

(b)     The entry of a decree of judicial dissolution under the Act.

The death, resignation, retirement, expulsion, bankruptcy or dissolution of a Member or occurrence of any other event that terminates the continued membership of a Member in the Company shall not of itself dissolve the Company.

11.2     Winding Up.

(a)     Winding Up Procedures.  If the Company is dissolved, then the Managing Member shall proceed to wind up the affairs of the Company.  During the period beginning with dissolution of the Company and ending with the liquidation of the Company and the termination of this Agreement, the business affairs of the Company shall be conducted by the Managing Member.  During such period, the business and affairs of the Company shall be conducted so as to preserve the assets of the Company and maintain the status thereof that existed immediately before such dissolution.

(b)     Distributions in Liquidation.

Upon the dissolution and winding up of the affairs of the Company, the proceeds of liquidation shall be applied and distributed in the following order of priority:

(i)     to the payment of all expenses of the dissolution, winding up and liquidation;

(ii)     to the payment of all debts and liabilities of the Company or to which the Company assets are subject with the Loan having first priority, and thereafter in the order of priority as provided by law;

(iii)     to the creation of such cash reserves as the Managing Member may reasonably deem necessary for any contingencies or any unforeseen liabilities of the Company; and

17

CONFIDENTIAL

VNB_071940

(iv)    to the Members in accordance with their positive Capital Account balances after giving effect to all contributions, distributions, and allocations for all periods.

Any cash reserves established pursuant to <u>Section 11.2(b)(iii)</u> shall be deposited in an appropriate account for such purposes, and when the Managing Member determines that all contingent or unforeseen liabilities have been paid or otherwise satisfied the balance of such reserve shall be distributed to the Members. Notwithstanding anything herein to the contrary, for so long as the Loan remains due and payable, the Company shall not liquidate collateral unless the Lender consents thereto.

(c)    <u>Final Reports</u>.  Within 90 days after the complete liquidation of the Company, the Managing Member shall furnish to the Members a financial statement for the period from the first day of the then current fiscal year through the date of such complete liquidation prepared by the Company's accountants.  Such statement shall include a Company statement of operations for such period and a Company balance sheet as to the date of such complete liquidation. Following the completion of the liquidation and distribution of the Company's assets and the winding up of the Company, the Managing Member shall be authorized to execute, acknowledge and cause to be filed all certificates and notices required by law to terminate the Company, and the existence of the Company shall terminate upon the filing of articles of dissolution in accordance with the Act.

11.3    <u>Waiver of Right to Court Decree of Dissolution</u>.  The Members agree that irreparable damage would be done to the goodwill and reputation of the Company if the Members should bring an action in court to dissolve this Company except for an action to enforce this <u>Section 11</u>.  Care has been taken in this Agreement to provide what the Members feel are fair and just payments to the Members withdrawing from the Company for any reason.  Accordingly, the Members accept the provisions of this Agreement as to its sole entitlement on termination of its Interest in the Company.  The Members hereby waive and renounce their right to seek court decree of dissolution or to seek the appointment by a court of a liquidator for the Company except for an action to enforce this <u>Section 11</u>.

## SECTION 12
## MISCELLANEOUS

12.1    <u>Amendment</u>.  This Agreement shall be amended only with the approval of the Board of Managers and in accordance with <u>Section 5</u> hereof.  Notwithstanding the foregoing, ***Schedule A*** may be amended by the Board of Managers from time to time to reflect the then current status of the information contained thereon.

12.2    <u>Inurement</u>.  This Agreement shall be binding on, and inure to the benefit of, all parties hereto, their successors and assigns to the extent, but only to the extent, that assignment is made in accordance with, and permitted by, the provisions of this Agreement.

12.3    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof.  It supersedes any prior agreement or understandings between any of them relating to the subject matter hereof.

12.4    <u>Governing Law</u>.  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Florida without regard to conflict of law principles.

18

CONFIDENTIAL

VNB_071941

12.5  Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.

12.6  Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstances shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected hereby.

12.7  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  Any signature delivered by facsimile or other electronic transmission will be deemed to be an original signature to this Agreement.

12.8  Schedules.  Each Schedule referred to in this Agreement is incorporated and made part of this Agreement by this reference.

12.9  Waiver.  No consent or waiver, express or implied, by the Members to or of any breach or default by another party in the performance of obligations hereunder shall be deemed or construed to be a consent or waiver of any other obligations of the Members hereunder.

12.10  Company Losses Due to Members' Litigation.  If the Company is made a party to any litigation or otherwise incurs any losses or expenses as a result of or in connection with a Member's obligations or liabilities unconnected with the Company's business, then such Member shall reimburse the Company for all such expenses incurred, including attorneys' fees, and the interest of such Member in the Company may be charged therefor.

12.11  Equitable Remedies.  The rights and remedies of the Members hereunder shall not be mutually exclusive, i.e., the exercise of rights granted under any provisions hereof shall not preclude the exercise of any other provisions hereof.  Each Member confirms that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agrees that, in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it, limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention by this Section 12.11 to make clear the agreement of each Member that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise.

12.12  Notices.  All notices and other communications required or permitted under this Agreement shall be in writing and may be sent by certified U.S. mail, return receipt requested, postage prepaid, overnight air courier, facsimile, or personal delivery to the Members at their address as shown from time to time on the records of the Company.  The Members may specify a different address by notifying the Company in writing of such different address.  Such notices shall be deemed given (i) three days after mailing, (ii) the day after deposit with an overnight air courier, or (iii) when delivered in person or transmitted by fax machine (confirmation of transmission received), as the case may be.

**[SIGNATURE PAGE TO FOLLOW]**

24780986v11

19

CONFIDENTIAL

VNB_071942

IN WITNESS WHEREOF, the undersigned hereby executes and delivers this Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MEMBERS:

**BVM University Village, LLC,**
A Florida limited liability company

By: _____
Name: Rebecca J. Bartle
Title:   Secretary

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By: _____
Name: Kevin L. Angelis
Title:   Managing Partner

**IMH Healthcare, LLC,**
A Delaware limited liability company

By: _____
Name: Eli Freiden
Title:   Manager

**JF Consultants LLC,**
A Delaware limited liability company

By: _____
Name: Shabse Fuchs
Title:   Manager

The undersigned hereby executes and delivers this Agreement on behalf of the Company and accepts appointment as a Manager of the Company as of the day and year first above written.

**BVM Manager Appointee:**

_____
Name: Rebecca J. Bartle

**BHMS Manager Appointee:**

_____
Name: Robert Salamon

**Fuchs Manager Appointee:**

_____
Name: Jonathan Fuchs

**BHMS Manager Appointee:**

_____
Name: Kevin Angelis

**IMH Manager Appointee:**

_____
Name: Eli Freiden

*[Signature Page to Westport Nursing Tampa, L.L.C. A&R Limited Liability Company Agreement]*

CONFIDENTIAL

VNB_071943

IN WITNESS WHEREOF, the undersigned hereby executes and delivers this Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MEMBERS:

**BVM University Village, LLC,**
A Florida limited liability company

By: _____
Name:  Rebecca J. Bartle
Title:  Secretary

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By: _____
Name:  Kevin L. Angelis
Title:  Managing Partner

**IMH Healthcare, LLC,**
A Delaware limited liability company

By: _____
Name:  Eli Freiden
Title:  Manager

**JF Consultants LLC,**
A Delaware limited liability company

By: _____
Name:  Shabse Fuchs
Title:  Manager

The undersigned hereby executes and delivers this Agreement on behalf of the Company and accepts appointment as a Manager of the Company as of the day and year first above written.

**BVM Manager Appointee:**

_____
Name:  Rebecca J. Bartle

**BHMS Manager Appointee:**

_____
Name:  Robert Salamon

**Fuchs Manager Appointee:**

_____
Name:  Jonathan Fuchs

**BHMS Manager Appointee:**

_____
Name:  Kevin Angelis

**IMH Manager Appointee:**

_____
Name:  Eli Freiden

*[Signature Page to Westport Nursing Tampa, L.L.C. A&R Limited Liability Company Agreement]*

CONFIDENTIAL

VNB_071944

IN WITNESS WHEREOF, the undersigned hereby executes and delivers this Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MEMBERS:

**BVM University Village, LLC,**
A Florida limited liability company

By: _____
Name: Rebecca J. Bartle
Title: Secretary

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

**IMH Healthcare, LLC,**
A Delaware limited liability company

By: _____
Name: Eli Freiden
Title: Manager

**JF Consultants LLC,**
A Delaware limited liability company

By: _____
Name: Shabse Fuchs
Title: Manager

The undersigned hereby executes and delivers this Agreement on behalf of the Company and accepts appointment as a Manager of the Company as of the day and year first above written.

**BVM Manager Appointee:**

_____
Name: Rebecca J. Bartle

**BHMS Manager Appointee:**

_____
Name: Robert Salamon

**Fuchs Manager Appointee:**

_____
Name: Jonathan Fuchs

**BHMS Manager Appointee:**

_____
Name: Kevin Angelis

**IMH Manager Appointee:**

_____
Name: Eli Freiden

*[Signature Page to Westport Nursing Tampa, L.L.C. A&R Limited Liability Company Agreement]*

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned hereby executes and delivers this Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MEMBERS:

**BVM University Village, LLC,**
A Florida limited liability company

By: _____
Name:  Rebecca J. Bartle
Title:   Secretary

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By: _____
Name:  Kevin L. Angelis
Title:   Managing Partner

**IMH Healthcare, LLC,**
A Delaware limited liability company

By: _____
Name:  Eli Freiden
Title:   Manager

**JF Consultants LLC,**
A Delaware limited liability company

By: _____
Name:  Shabse Fuchs
Title:   Manager

The undersigned hereby executes and delivers this Agreement on behalf of the Company and accepts appointment as a Manager of the Company as of the day and year first above written.

**BVM Manager Appointee:**

_____
Name:  Rebecca J. Bartle

**BHMS Manager Appointee:**

_____
Name:  Robert Salamon

**Fuchs Manager Appointee:**

_____
Name:  Jonathan Fuchs

**BHMS Manager Appointee:**

_____
Name:  Kevin Angelis

**IMH Manager Appointee:**

_____
Name:  Eli Freiden

[*Signature Page to Westport Nursing Tampa, L.L.C. A&R Limited Liability Company Agreement*]

CONFIDENTIAL

VNB_071946

IN WITNESS WHEREOF, the undersigned hereby executes and delivers this Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MEMBERS:

**BVM University Village, LLC,**
A Florida limited liability company

By: _____
Name: Rebecca J. Bartle
Title:   Secretary

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By: _____
Name: Kevin L. Angelis
Title:   Managing Partner

**IMH Healthcare, LLC,**
A Delaware limited liability company

By: _____
Name: Eli Freiden
Title:   Manager

**JF Consultants LLC,**
A Delaware limited liability company

By: _____
Name: Shabse Fuchs
Title:   Manager

The undersigned hereby executes and delivers this Agreement on behalf of the Company and accepts appointment as a Manager of the Company as of the day and year first above written.

**BVM Manager Appointee:**

_____
Name:  Rebecca J. Bartle

**BHMS Manager Appointee:**

_____
Name:  Robert Salamon

**Fuchs Manager Appointee:**

_____
Name:  Jonathan Fuchs

**BHMS Manager Appointee:**

_____
Name:  Kevin Angelis

**IMH Manager Appointee:**

_____
Name:  Eli Freiden

[*Signature Page to Westport Nursing Tampa, L.L.C. A&R Limited Liability Company Agreement*]

CONFIDENTIAL

VNB_071947

## SCHEDULE A

### LIMITED LIABILITY COMPANY AGREEMENT
### OF
### WESTPORT NURSING TAMPA, L.L.C.

### MEMBERS, INITIAL CAPITAL AND MEMBERSHIP INTERESTS

| Member Name and Address | Agreed Value of Initial Capital Contribution | Membership Interest |
| --- | --- | --- |
| BVM University Village, LLC | $40.00 | 40% |
| BHMSUNI, LLC<br>c/o BHMS Investments, LP<br>152 West 57th Street, 46th Floor<br>New York, New York 10019 | $26.67 | 26.67% |
| IMH Healthcare, LLC | $20.00 | 20% |
| JF Consultants LLC | $13.33 | 13.33% |
| Total | $100.00 | 100% |

CONFIDENTIAL

VNB_071948

## SCHEDULE B

### LIMITED LIABILITY COMPANY AGREEMENT
### OF
### WESTPORT NURSING TAMPA, L.L.C.

### PROPERTY

University Village Health Center
12250 North 22nd Street
Tampa, FL 33612
County: Hillsborough

CONFIDENTIAL

VNB_071949

**EXHIBIT C**

**Consent in Writing**

[Attached]

VNB_071950

**WRITTEN CONSENT
OF
THE BOARD OF MANAGERS
OF
WESTPORT NURSING TAMPA, L.L.C.**

**March 31, 2014**

The undersigned, being all of the members of the board of managers (collectively, the "Board of Managers") of Westport Nursing Tampa, L.L.C., a Florida limited liability company (the "Company"), do hereby consent without a meeting pursuant to Section 4.6 of the Amended and Restated Limited Liability Company Agreement of the Company, dated March 28, 2014, to the adoption of the following resolutions:

WHEREAS, in order to refinance that certain that certain 110-bed assisted living and 120-bed skilled nursing facility located at 12250 N. 22nd St., Tampa, Florida 33612 and certain property related thereto (the "Facility"), the Board of Managers, after due consideration, deems it to be advantageous for and in the best interest of the Company and its Members, for the Company to enter into a loan agreement in the principal amount of $15,000,000 (the "Loan") pursuant to that certain Loan Agreement by and among the Company and USAmeribank, a Florida state banking corporation (the "Bank") (the "Loan Agreement", and collectively with each promissory note or other evidence of indebtedness and all mortgages, deeds of trust, deeds to secure debt and security agreement, assignments, financing statements, guarantees, pledges, environmental indemnity agreements, collateral security agreements and other documents or instruments required by the Bank and delivered in connection with the Loan, and any replacement, renewal, extension, substitution, addition, supplement, amendment or modification of any of the foregoing, the "Loan Documents"); and

WHEREAS, simultaneously with the consummation of the transactions contemplated in the Loan Documents, the Board of Managers, after due consideration, deems it to be advantageous for and in the best interest of the Company and its Members, for the Company to lease the Facility to TR & SNF, Inc., a Florida non-profit corporation ("TR & SNF"), and TALF, Inc., a Florida non-profit corporation ("TALF" and together with TR & SNF, collectively, "Tenant") pursuant to that certain Master Lease Agreement by and among the Company and Tenant (the "Master Lease" and collectively with any and all guaranties, memoranda, subordinations, agreements, assignments, certificates, consents and other documents or instruments delivered in connection with the Master Lease, and any replacement, renewal, extension, substitution, addition, supplement, amendment or modification of any of the foregoing, the "Master Lease Documents").

NOW, THEREFORE, BE IT RESOLVED, that the Board of Managers has determined that the Loan Documents, the Master Lease Documents and the other transactions contemplated thereby are in the best interest and necessary and convenient to the conduct, promotion and attainment of the business and activities of the Company, and are hereby authorized and approved; and be it

FURTHER RESOLVED, that the Board of Managers hereby authorizes and approves the execution, delivery and performance by the Company, acting on its own behalf, of (i) the Loan Documents, (ii) the Master Lease Documents and (iii) any certificates,

CONFIDENTIAL

VNB_071951

agreements or any other documents as may be necessary or appropriate to give effect to, or for the Company to perform its obligations under, the Loan Documents or Master Lease Documents; and be it

FURTHER RESOLVED, that the Board of Managers hereby authorizes and approves the execution, delivery and performance by BHMSUNI, LLC, a Delaware limited liability company, acting in its capacity as Managing Member of the Company (the "Managing Member") of the Loan Documents and Master Lease Documents; and be it

FURTHER RESOLVED, that the Board of Managers hereby authorizes the Managing Member to take all action necessary on behalf of the Company, to authorize and approve the execution, delivery and performance by the Company of the Loan Documents and Master Lease Documents to which the Company is a party; and be it

FURTHER RESOLVED, that the Managing Member is hereby authorized and directed to execute and deliver on behalf of the Company, such further documents and to take such other actions on behalf of the Company, as the Managing Member deems necessary or appropriate in its discretion to carry out the purposes of these resolutions (such determination being evidenced conclusively, but not exclusively, by such Managing Member's taking of such actions or execution and delivery of such documents); and be it

FURTHER RESOLVED, that all actions heretofore taken by the Managing Member, in connection with the Loan Documents or Master Lease Documents are hereby confirmed, ratified and approved in all respects as the valid and binding acts of the Company; and be it

FURTHER RESOLVED, that this consent in writing (this "Consent in Writing") may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute one Consent in Writing, and any signature delivered by facsimile transmission or by means of some other electronic transmission will be deemed to be an original signature to this Consent in Writing; and be it

FURTHER RESOLVED, that this Consent in Writing is effective as of the date first written above.

*[Signature page follows]*

24976535v2

VNB_071952

There being no further action to be taken at this time, witness the following signatures, effective as of the date first written above:

**BOARD OF MANAGERS:**

**BVM Manager Appointee:**

*Rebecca Bartle*

Name:  Rebecca J. Bartle

**BHMS Manager Appointee:**

Name:  Robert Salamon

**Fuchs Manager Appointee:**

Name:  Jonathan Fuchs

**BHMS Manager Appointee:**

Name:  Kevin Angelis

**IMH Manager Appointee:**

Name:  Eli Freiden

**ACKNOWLEDGED AND AGREED BY THE MANAGING MEMBER OF THE COMPANY:**

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By:  _____
Name:  Kevin L. Angelis
Title:  Managing Partner

*[Signature Page to Written Consent
of the Board of Managers of Westport Nursing Tampa, L.L.C.]*

CONFIDENTIAL

VNB_071953

There being no further action to be taken at this time, witness the following signatures, effective as of the date first written above:

**BOARD OF MANAGERS:**

**BVM Manager Appointee:**

_____
Name:  Rebecca J. Bartle

**BHMS Manager Appointee:**

_____
Name:  Robert Salamon

**Fuchs Manager Appointee:**

_____
Name:  Jonathan Fuchs

**BHMS Manager Appointee:**

_____
Name:  Kevin Angelis

**IMH Manager Appointee:**

_____
Name:  Eli Freiden

ACKNOWLEDGED AND AGREED BY THE MANAGING MEMBER OF THE COMPANY:

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By:  _____
Name:  Kevin L. Angelis
Title:  Managing Partner

*[Signature Page to Written Consent*
*of the Board of Managers of Westport Nursing Tampa, L.L.C.]*

CONFIDENTIAL

VNB_071954

There being no further action to be taken at this time, witness the following signatures, effective as of the date first written above:

**BOARD OF MANAGERS:**

BVM Manager Appointee:                    BHMS Manager Appointee:

_____          _____
Name:  Rebecca J. Bartle                  Name:  Kevin Angelis

BHMS Manager Appointee:                   IMH Manager Appointee:

_____          _____
Name:  Robert Salamon                     Name:  Eli Freiden

Fuchs Manager Appointee:

_____
Name:  Jonathan Fuchs


ACKNOWLEDGED AND AGREED BY THE MANAGING MEMBER OF THE COMPANY:

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By:  _____
Name:  Kevin L. Angelis
Title:   Managing Partner


*[Signature Page to Written Consent*
*of the Board of Managers of Westport Nursing Tampa, L.L.C.]*

CONFIDENTIAL

VNB_071955

There being no further action to be taken at this time, witness the following signatures, effective as of the date first written above:

**BOARD OF MANAGERS:**

**BVM Manager Appointee:**

Name:  Rebecca J. Bartle

**BHMS Manager Appointee:**

Name:  Robert Salamon

**Fuchs Manager Appointee:**

Name:  Jonathan Fuchs

**BHMS Manager Appointee:**

Name:  Kevin Angelis

**IMH Manager Appointee:**

·Name:  Eli Freiden

ACKNOWLEDGED AND AGREED BY THE MANAGING MEMBER OF THE COMPANY:

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By:
Name:  Kevin L. Angelis
Title:   Managing Partner

*[Signature Page to Written Consent*
*of the Board of Managers of Westport Nursing Tampa, L.L.C.]*

CONFIDENTIAL

VNB_071956

There being no further action to be taken at this time, witness the following signatures, effective as of the date first written above:

**BOARD OF MANAGERS:**

BVM Manager Appointee:

BHMS Manager Appointee:

---

Name:  Rebecca J. Bartle

Name:  Kevin Angelis

BHMS Manager Appointee:

IMH Manager Appointee:

---

Name:  Robert Salamon

Name:  Eli Freiden

Fuchs Manager Appointee:

---

Name:  Jonathan Fuchs

ACKNOWLEDGED AND AGREED BY THE MANAGING MEMBER OF THE COMPANY:

**BHMSUNI, LLC,**
A Delaware limited liability company
By: BHMS Investments, LP, its managing member

By:   _____
Name:  Kevin L. Angelis
Title:   Managing Partner

*[Signature Page to Written Consent*
*of the Board of Managers of Westport Nursing Tampa, L.L.C.]*

CONFIDENTIAL

VNB_071957

**EXHIBIT D**

<u>**Good Standing Certificate**</u>

# State of Florida
# Department of State

I certify from the records of this office that WESTPORT NURSING TAMPA, L.L.C., is a limited liability company organized under the laws of the State of Florida, filed on January 21, 1999.

The document number of this company is L99000000339.

I further certify that said company has paid all fees due this office through December 31, 2013, that its most recent annual report was filed on April 5, 2013, and its status is active.

*Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Eleventh day of February, 2014*



*Ken Detzner*

**Secretary of State**

Authentication ID: CU7072602228

To authenticate this certificate, visit the following site, enter this ID, and then follow the instructions displayed.

https://efile.sunbiz.org/certauthver.html

CONFIDENTIAL

VNB_071959