## CERTIFICATE OF FACT

### March 31, 2014

The undersigned, as President of DOUBLE L INVESTMENT, INC., a Texas corporation "**Investment**"), which is the manager of WESTPORT ASSET MANAGEMENT, L.L.C., a Florida limited liability company ("**Asset Management**"), which is the general partner of WESTPORT ADVISORS, LTD., a Florida limited partnership ("**Advisors**"), which is (i) the manager of WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.L.C., a Delaware limited liability company ("**University Village**"), which is the general partner of WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP, a Delaware limited partnership ("**Tampa**"), and (ii) the manager of WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C., a Delaware limited liability company ("**Hidden Springs**"), which is the general partner of WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP, a Delaware limited partnership ("**Tampa II**" and together with Investment, Asset Management, Advisors, University Village, Hidden Springs and Tampa, collectively, the "**Loan Parties**" and each, individually, a "**Loan Party**"), does hereby certify, in such capacity, for reliance by Williams Mullen in connection with the issuance of its opinion letter dated of even date herewith (the "**Opinion Letter**"), with respect to the execution and delivery of that certain Loan Agreement (the "**Loan Agreement**") made as of the date hereof, between CPIF Lending, LLC, a Washington limited liability company ("**Lender**"), Tampa and Tampa II and the other Transaction Documents (as defined in the Opinion Letter), the following:

1.      Attached hereto as <u>Exhibit A</u> is a true, correct and complete copy of each Loan Party's Certificate of Formation, Certificate of Limited Partnership, Articles of Incorporation, Articles of Organization or other governing document, as applicable, and any amendments thereto, in each case, as in effect on the date hereof, which was certified to by the Secretary of State of Delaware, the Secretary of State of Florida or the Secretary of State of Texas, as applicable, as of the date indicated in each such certification (collectively, the "**Certified Documents**"). There have been no amendments to the Certified Documents since the date of certification indicated on such Certified Document. No action has been taken by any Loan Party or the shareholders, members or partners, as applicable, of any Loan Party to amend, modify or repeal the Certified Documents, the same being in full force and effect in the attached form on the date hereof.

2.      Attached hereto as <u>Exhibit B</u> is a true, correct and complete copy of each Loan Party's Limited Liability Company Agreement, Bylaws or Partnership Agreement, as applicable, and any amendments thereto as in effect on the date hereof. No action has been taken by any Loan Party or the shareholders, members or partners, as applicable, of any L oan Party in contemplation of any amendment thereto.

3.      Attached hereto as <u>Exhibit C</u> is a true, correct and complete copy of resolutions of the Limited Partners of Tampa and Tampa II approving and authorizing the execution, delivery and performance by each of Tampa and Tampa II of each Transaction Document. S uch resolutions have not in any way been amended, rescinded or modified and have been in full force and effect since their adoption to and including the date hereof, and such resolutions are the only proceedings of any Loan Party now in force relating to or affecting the matters referred to therein.

4.      Attached hereto as <u>Exhibit D</u> is a true, correct and complete copy of each Loan Party's Certificate of Good Standing demonstrating that such Loan Party is duly organized,

Certificate of Fact - WM Opinion - CPIF Lending, LLC Loan:25145380_1





SUB_LANDRY_00000418

validly existing and in good standing under the laws of the state of domestic jurisdiction of such Loan Party on the date of such certification. As of the date hereof, each Loan Party is in good standing in the state of domestic jurisdiction of such Loan Party and there are no proceedings for the dissolution or liquidation of such Loan Party.

5.      The execution and delivery by each Loan Party of the Transaction Documents to which it is a party and the performance by such Loan Party of its obligations under the Transaction Documents to which it is a party do not and will not conflict with or violate or constitute a default under (i) any provision of the organizational documents of such Loan Party; (ii) any indenture, mortgage, deed of trust, guaranty, lease, agreement, or other document or instrument to which such Loan Party is a party or by which it or any of its property is bound; or (iii) any law, administrative regulation, court order, or consent decree which is binding upon such Loan Party.

6.      There is no action, temporary restraining order, injunction, suit, proceeding, inquiry, or investigation pending or threatened in writing against any Loan Party at law or in equity or before or by any judicial or administrative court or agency that would materially adversely affect (i) the ability of such Loan Party to perform its obligations under the Transaction Documents to which it is a party or (ii) the business, financial condition, or assets of such Loan Party.

7.      No consent, approval, authorization, or order of, or any filing with, any court, regulatory authority or any governmental body is required for the valid authorization, execution, delivery, or performance by any Loan Party of the Transaction Documents to which such Loan Party is a party, except for the filing of the Financing Statements (as defined in the Opinion Letter) in the Filing Office (as defined in the Opinion Letter).

[SIGNATURE PAGE TO FOLLOW]

Certificate of Fact - WM Opinion - CPIF Lending, LLC Loan:25145380_1

SUB_LANDRY_00000419

*[Signature Page to Certificate of Fact – CPIF Lending, LLC Opinion Letter]*

IN WITNESS WHEREOF, I have signed this certificate this as of the date first written above.

By: _____

Name:   Lawrence L. Landry

Title:   President of Double L Investment, Inc.

Certificate of Fact - WM Opinion - CPIF Lending, LLC Loan:25145380

SUB_LANDRY_00000420

# EXHIBIT A

Certified Documents

SUB_LANDRY_00000421



Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Nandita Berry
Secretary of State

## Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

DOUBLE L INVESTMENT, INC.
Filing Number: 141294100

Articles Of Incorporation

August 29, 1996

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on March 26, 2014.



*Nandita Berry*

Nandita Berry
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555
Prepared by: SOS-WEB

Fax: (512) 463-5709
TID: 10266

Dial: 7-1-1 for Relay Services
Document: 535860750003

SUB_LANDRY_00000422

SENT BY:DALLAS, TX #1 - 4343 ; 8-28-96 ; 3:58PM ; AKIN GUMP, ET AL→ ; 512 489 6280;# 2/ 6

FILED
in the Office of the
Secretary of State of Texas

AUG 29 1996

CORPORATIONS SECTION

## ARTICLES OF INCORPORATION

### OF

## DOUBLE L INVESTMENT, INC.

### I.

The name of the corporation is DOUBLE L INVESTMENT, INC.

### II.

The corporation is to have perpetual existence.

### III.

The purpose for which the corporation is organized is the transaction of any or all lawful business for which corporations may be incorporated under the Texas Business Corporation Act.

### IV.

The aggregate number of shares of capital stock which the corporation shall have authority to issue is 100,000, par value $0.01 per share. All of such shares shall be common stock of the corporation. Unless specifically provided otherwise herein, the holders of such shares shall be entitled to one vote for each share held in any shareholder vote in which any of such holders is entitled to participate.

The board of directors may establish series of unissued shares of any class of capital stock by fixing and determining the designation and preferences, limitations and relative rights, including voting rights, of the shares of any series so established and may increase or decrease the number of shares within each such series; provided, however, that the board of directors may not decrease the number of shares within a series to less than the number of shares within such series that are then issued.

### V.

The preemptive right of any shareholder of the corporation to acquire additional, unissued or treasury shares of the corporation, or securities of the corporation convertible into or carrying a right to subscribe to or acquire shares of the corporation, is hereby denied; provided, however, that nothing herein shall preclude the corporation from granting preemptive rights by contract or agreement to any person, corporation or other entity. Cumulative voting by the shareholders of the corporation at any election of directors of the corporation is hereby prohibited.

- 1 -

SUB_LANDRY_00000423

SENT BY:DALLAS, TX #1 - 4343   ; 8-28-96 ; 3:58PM ;     AKIN GUMP, ET AL→ ;     512 499-9280;# 3/ 6

## VI.

The street address of the initial registered office of the corporation is 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201-4618 and the name of its initial registered agent at such address is John P. Buser.

## VII.

The name and address of the incorporator is as follows:

| Name | Address |
|---|---|
| Deborah Ann Kopsky | Akin, Gump, Strauss, Hauer & Feld, L.L.P. 1700 Pacific Avenue, Suite 4100 Dallas, Texas 75201-4618 |

## VIII.

To the fullest extent permitted by any applicable law, as the same exists or may hereafter be amended, a director of the corporation shall not be liable to the corporation or its shareholders for monetary damages for an act or omission in the director's capacity as a director. Any repeal or amendment of this Article VIII by the shareholders of the corporation or by changes in applicable law shall, to the extent permitted by applicable law, be prospective only, and shall not adversely affect any limitation on the personal liability of any director of the corporation at the time of such repeal or amendment.

## IX.

The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, any appeal in such an action, suit or proceeding and any inquiry or investigation that could lead to such an action, suit or proceeding (whether or not by or in the right of the corporation), by reason of the fact that he is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another corporation, partnership, joint venture, sole proprietorship, trust, nonprofit entity, employee benefit plan or other enterprise, against all judgments, penalties (including excise and similar taxes), fines, settlements and reasonable expenses (including attorneys' fees and court costs) actually and reasonably incurred by him in connection with such action, suit or proceeding to the fullest extent permitted by any applicable law, and such indemnity shall inure to the benefit of the heirs, executors and administrators of any such person so indemnified pursuant to this Article IX. The right to indemnification under this Article IX shall be a contract right and shall not be deemed exclusive of any other right to which those seeking indemnification may be entitled under any law, bylaw, agreement, vote of shareholders

- 2 -

SUB_LANDRY_00000424

SENT BY:DALLAS, TX #1 - 4343   : 8-28-96 ; 3:59PM :   AKIN GUMP, ET AL→ ;   512 499 6280;# 4/ 6

or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Any repeal or amendment of this Article IX by the shareholders of the corporation or by changes in applicable law shall, to the extent permitted by applicable law, be prospective only, and shall not adversely affect the indemnification of any person who may be indemnified at the time of such repeal or amendment.

## X.

No contract or other transaction between the corporation and any other corporation and no other acts of the corporation with relation to any other corporation shall, in the absence of fraud, in any way be invalidated or otherwise affected by the fact that any one or more of the directors or officers of the corporation are pecuniarily or otherwise interested in, or are directors or officers of, such other corporation.  Any director or officer of the corporation individually, or any firm or association of which any director or officer may be a member, may be a party to, or may be pecuniarily or otherwise interested in, any contract or transaction of the corporation, provided that the fact that he individually or as a member of such firm or association is such a party or is so interested shall be disclosed or shall have been known to the board of directors or a majority of such members thereof as shall be present at any meeting of the board of directors at which action upon any such contract or transaction shall be taken; and any director of the corporation who is also a director or officer of such other corporation or who is such a party or so interested may be counted in determining the existence of a quorum at any meeting of the board of directors which shall authorize any such contract or transaction and may vote thereat to authorize any such contract or transaction, with like force and effect as if he were not such a director or officer of such other corporation or not so interested.  Any director of the corporation may vote upon any contract or any other transaction between the corporation and any subsidiary or affiliated corporation without regard to the fact that he is also a director or officer of such subsidiary or affiliated corporation.

Any contract, transaction, act of the corporation or of the directors, which shall be ratified at any annual meeting of the shareholders of the corporation, or at any special meeting of the shareholders of the corporation, or at any special meeting called for such purpose, shall, insofar as permitted by law, be as valid and as binding as though ratified by every shareholder of the corporation; provided, however, that any failure of the shareholders to approve or ratify any such contract, transaction or act, when and if submitted, shall not be deemed in any way to invalidate the same or deprive the corporation, its directors, officers or employees, of its or their right to proceed with such contract, transaction or act.

Subject to any express agreement which may from time to time be in effect, any shareholder, director or officer of the corporation may carry on and conduct in his own right and for his own personal account, or as a partner in any partnership, or as a joint venturer in any joint venture, or as an officer, director or shareholder of any corporation, or as a participant in any syndicate, pool, trust or association, any business which competes with the business of the corporation and shall be free in all such capacities to make investments in any kind of property in which the corporation may make investments.

- 3 -

SUB_LANDRY_00000425

SENT BY:DALLAS, TX #1 - 4343  ; 8-28-96 ; 3:59PM ;    AKIN GUMP, ET AL→        512 499 6290;# 5/ 6

## XI.

The number of directors constituting the initial board of directors is two, and the names and addresses of the persons who are to serve as directors until the first annual meeting of shareholders or until their successors are duly elected and qualified, are as follows:

| Name | Address |
|------|---------|
| Lawrence L. Landry | 1962 Portage Landing North<br>North Palm Beach, Florida 33408 |
| Janice Marie Landry | 1962 Portage Landing North<br>North Palm Beach, Florida 33408 |

## XII.

Any action which would otherwise be taken at any annual or special meeting of shareholders may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holder or holders of shares having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitled to vote on the action were present and voted.

## XIII.

With respect to any matter for which the affirmative vote of the holders of a specified portion of the shares entitled to vote is required by the Texas Business Corporation Act, the act of the shareholders on that matter shall be the affirmative vote of the holders of more than fifty percent of the outstanding shares entitled to vote thereon, rather than the affirmative vote otherwise required by the Texas Business Corporation Act. With respect to any matter for which the affirmative vote of the holders of a specified portion of the shares of any class or series is required by the Texas Business Corporation Act, the act of the holders of shares of that class or series on that matter shall be the affirmative vote of the holders of more than fifty percent of the outstanding shares of that class or series, rather than the affirmative vote of the holders of shares of that class or series otherwise required by the Texas Business Corporation Act. Without limiting the generality of the foregoing, the provisions of this Article XIII shall be applicable to any required shareholder authorization or approval of any amendment to the articles of incorporation, any plan of merger, share exchange or reorganization involving the corporation, any sale, lease, exchange or disposition of all, or substantially all, the property and assets of the corporation and any voluntary dissolution of the corporation.

- 4 -

SUB_LANDRY_00000426

SENT BY:DALLAS, TX #1 - 4343  ; 8-28-96 ; 4:00PM ;    AKIN GUMP, ET AL→        512 488 6280;# 6/ 6

## XIV.

The corporation will not commence business until it has received for the issuance of its shares of capital stock consideration of the value of at least one thousand dollars ($1,000.00) consisting of money, labor done or property actually received.

## XV.

Election of directors need not be by written ballot. Any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors, except as otherwise provided by law. In furtherance and not in limitation of the powers conferred by statute, the board of directors of the corporation is expressly authorized to adopt the initial bylaws of the corporation, to amend or repeal the bylaws or to adopt new bylaws, subject to any limitations which may be contained in such bylaws.

IN WITNESS WHEREOF, the incorporator has executed these Articles of Incorporation on the 27th day of August, 1996.

INCORPORATOR

Printed Name:
Deborah Ann Kopsky

DAK\12817\0000DOC\ARTINC.TEX

- 5 -

SUB_LANDRY_00000427



# State of Florida

## Department of State

I certify the attached is a true and correct copy of Articles of Organization, as amended to date, of WESTPORT ASSET MANAGEMENT, L.L.C., a limited liability company, organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this company is L99000000056.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-fifth day of March, 2014

*Ken Detzner*

Ken Detzner
Secretary of State

CR2EO22 (1-11)

ARTICLES OF ORGANIZATION

FOR

WESTPORT ASSET MANAGEMENT, L.L.C.,
a Florida Limited Liability Company

The undersigned, desiring to form a limited liability company under and pursuant to Florida Statute 608 entitled the Florida Limited Liability Company Act, do hereby adopt the following Articles of Organization for such company:

1.    Name.    The name of this company shall be WESTPORT ASSET MANAGEMENT, L.L.C.

2.    Duration/Continuation.  The period of this company's duration shall be perpetual, unless terminated by the unanimous written agreement of all members or by the death, retirement resignation, expulsion, bankruptcy or dissolution of a member or upon the occurrence, of any other event which terminates the continued membership of a member, unless the business of the company is continued by the consent of all the remaining members, or by amendment of these Articles of Organization providing for the continued existence of the company subsequent to the foregoing events.

3.    The mailing address and the street address of the company is 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, FL 33410.

4.    Registered Agent and Office.  The name and street address of the initial registered agent and office for this company is as follows: Lawrence L. Landry, 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, FL 33410.

5.  Admission of Additional Members; and Terms and Conditions of such Admissions.  Additional members may be admitted only upon the approval of the majority of the nontransferring members of the Company upon the written application of such new member, in the manner set forth in the Regulations of the Company.

6.    Right to Continue Business.  Company shall be dissolved upon the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a member or upon the occurrence of any other event which terminates the continued membership of a member in the Company, unless the business of the Company is continued by the consent of all the remaining members.

7.    Management of Company.  The management of the Company is reserved to a manager. The name and address of the Manager(s), who shall serve until the first annual meeting of members or until his successor is elected and qualified, is:

| Names | Addresses |
|---|---|
| Double L Investment , Inc. a Texas Corporation | 3801 PGA Boulevard, Suite 805 Palm Beach Gardens, FL 33410 |

8.    Regulations of Company.  The power to adopt, alter, amend or repeal the regulations of the limited liability company shall be vested in the member(s).  Regulations adopted by the members or by the Manager(s) may be repealed or altered, new Regulations may be adopted by the members, and the members may prescribe in any Regulations made by them that such Regulations may not be altered, amended or repealed by the Manager(s).

SUB_LANDRY_00000429

9. **Informal Action of Members.** Any action of the members may be taken without a meeting if consent in writing setting forth the action so taken shall be signed by all members who would be entitled to vote upon such action at a meeting (and filed with the Manager(s) of the Company as part of its records.)

**IN WITNESS WHEREOF,** the undersigned incorporator(s) have hereunto set their hands and seals this 29th day of December, 1998. .

Lawrence L. Landry, as ~~President~~
~~as general partner~~ and authorized
representative of Double L Investment, Inc.

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 29 day of Dec, 1998, by Lawrence L Landry, as President and authorized representative of Double L Investment, Inc. who is personally known to me or ~~who has produced~~ as identification.

NOTARY PUBLIC
SERIAL NO.:

ALYS NAGLER DANIELS
COMMISSION # CC 440851
EXPIRES FEB 21, 1999
BONDED THRU
ATLANTIC BONDING CO., INC.

## REGISTERED AGENT ACCEPTANCE

Having been named as Registered Agent and to accept service of process for the above stated limited liability company, I hereby accept the appointment as Registered Agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as Registered Agent.

Lawrence L Landry

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 29 day of Dec, 1998, by Lawrence L Landry, who is personally known to me or who has produced as identification.

NOTARY PUBLIC
SERIAL NO.:

alys\land3956.art

ALYS NAGLER DANIELS
COMMISSION # CC 440851
EXPIRES FEB 21, 1999
BONDED THRU
ATLANTIC BONDING CO., INC.

SUB_LANDRY_00000430

**AFFIDAVIT**

**STATE OF FLORIDA**
**COUNTY OF PALM BEACH**

Before the undersigned authority personally appeared <u>Lawrence L. Landry</u>, who on oath says:

1. That he is the President of Double L Investments, Inc., a Texas corporation which is the member and manager of Westport Asset Management, L.L.C.

2. That WESTPORT ASSET MANAGEMENT, L.L.C., a Florida limited liability company has at least one member.

3. The amount of cash and description and agreed value of the property other than cash contributed by the member(s) are as follows:

Double L Investments, Inc.                    $1,000.00   cash

(No other property has been contributed)

4. The additional amounts anticipated to be contributed by the members are $41,000.00.

FURTHER AFFIANT SAYETH NAUGHT.

Lawrence L. Landry

Sworn to and subscribed before me this 29 day of December, 1998 by Lawrence L. Landry who is personally known to me or who has produced [type of identification] as identification.

Signature of Notary

Print, type or stamp
Commissioned Name of Notary Public

alys\and3958.srt

ALYS NAGLER DANIELS
COMMISSION.# CC 440851
EXPIRES FEB 21, 1999
BONDED THRU
ATLANTIC BONDING CO., INC.

SUB_LANDRY_00000431

ARTICLES OF MERGER
OF
Westport Asset Management, L.L.C.,
a Florida limited liability company
AND
Westport Asset Management, Ltd.,
a Florida limited partnership

L99 000 000056

A98 000000337

1.      The undersigned limited liability company and limited partnership, being validly and legally formed under the laws of the State of Florida, have adopted a Plan of Merger.

2.      The surviving entity, Westport Asset Management, L.L.C., a Florida limited liability company, shall be merged with Westport Asset Management, Ltd., a Florida limited partnership.

3.      The Plan of Merger of the undersigned entities was adopted pursuant to Sections 608.438. 608.4381, 620.201 and 620.202 et.seq. of the Florida Statutes, and all other applicable provisions of Chapters 608 and 620 of the Florida Statutes.

4.      The Plan of Merger will become effective upon the filing of these Articles of Merger with the Secretary of State.

5.      No changes in the Articles of Organization of the surviving entity have been made.

6.      The Plan of Merger, dated December 29, 1998, pursuant to which Westport Asset Management, Ltd., a Florida limited partnership shall be merged with and into Westport Asset Management, L.L.C., a Florida limited liability company, was adopted by all the Members and Manager of Westport Asset Management, L.L.C., a Florida limited liability company, by resolution adopted on December 29, 1998.

7.      The Plan of Merger, dated December 29, 1998, pursuant to which Westport Asset Management, Ltd., a Florida limited partnership shall be merged with and into Westport Asset Management, L.L.C., a Florida limited liability company, was adopted by all the Partners of Westport Asset Management, Ltd., a Florida limited partnership by resolution adopted on December 29, 1998.

SUB_LANDRY_00000432

DATED: December 29, 1998.

Westport Asset Management, L.L.C., a Florida limited liability company

BY: _Lawrence L. Landry_, as managing member

Westport Asset Management, Ltd., a Florida limited partnership

BY:   Double L. Investment, Inc., a Texas corporation, as General Partner

BY: _Lawrence L. Landry_, as President

STATE OF FLORIDA        )
COUNTY OF Palm Beach)

On this 29th day of December, 1998, before me personally appeared Lawrence L. Landry, who acknowledged to me that he is the President of Westport Asset Management, L.L.C., a Florida limited liability company, and that he executed the foregoing Articles of Merger as President of the limited liability company, and he is personally known to me or he provided ____ ____, as identification.

IN WITNESS WHEREOF, I have hereunto set my hand and seal on December 29, 1998.

Notary Public
My Commission Expires:

(Seal)

Page 2
of Articles of Merger

ALYS NAGLER DANIELS
COMMISSION # CC 440851
EXPIRES FEB 21, 1999
BONDED THRU
ATLANTIC BONDING CO., INC.

SUB_LANDRY_00000433

STATE OF FLORIDA        )
COUNTY OF Palm Beach)

On this 29th day of December, 1998, before me personally appeared Lawrence L. Landry, who acknowledged to me that he is the President of Double L Investment, Inc., a Texas corporation, which is the Sole General Partner of Westport Asset Management, Ltd., a Florida limited partnership, and that he executed the foregoing Articles of Merger as President of Double L. Investment, Inc., a Texas corporation, which is the Sole General Partner of Westport Asset Management, Ltd., a Florida limited partnership, and he is personally known to me or he provided _____ as identification.

IN WITNESS WHEREOF, I have hereunto set my hand and seal on December 29, 1998.

Notary Public
My Commission Expires:

(Seal)

ALYS NAGLER DANIELS
COMMISSION # CC 440851
EXPIRES FEB 21,1999
BONDED THRU
ATLANTIC BONDING CO., INC.

Page 3
of Articles of Merger

SUB_LANDRY_00000434

## PLAN OF MERGER

This Plan of Merger, dated effective as of December 29, 1998, between Westport Asset Management, L.L.C., a Florida limited liability company ("Surviving Entity") and Westport Asset Management, Ltd., a Florida limited partnership ("Absorbed Entity").

WITNESSETH:

WHEREAS, Surviving Entity is a limited liability company organized and existing under the laws of the State of Florida, with its principal office at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida, 33410.

WHEREAS, Surviving Entity has a capitalization of $ 1,000.00.

WHEREAS, Absorbed Entity is a limited partnership organized and existing under the laws of the State of Florida, with its principal office at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida, 33410.

WHEREAS, Absorbed Entity has a capitalization of $ 41,000.00.

WHEREAS, the Members and Manager of the Surviving Entity and the Partners of the Absorbed Entity deem it desirable and in the best business interests of the entities and their members and partners, as applicable, that Absorbed Entity be merged into Surviving Entity pursuant to the provisions of Sections 608.438, 608.4381, 620.201 and 620.202 et seq. of the Florida General Corporation Act in order that the transaction qualify as a "reorganization" within the meaning of Section 368 (a)(1)(A) of the Internal Revenue Code of 1954, as amended.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the terms and conditions hereinafter set forth, the constituent entities agree as follows:

Section 1. Recitals. Each party hereto acknowledges and represents to the other party that each of the above recitals pertaining to itself is true and correct.

Section 2. Plan and Merger.
Terms and Conditions of the Merger:
2.01    Plan Adopted. A plan of merger of Absorbed Entity and Surviving Entity pursuant to Sections 608.438, 608.4381. 620.201 and 620.202 et.seq. of the Florida Statutes and Section 368(a)(1)(A) of the Internal Revenue Code, is adopted as follows:

(a)     Absorbed Entity shall be merged with and into Surviving Entity, to exist and be governed by the laws of the State of Florida.

(b)     The name of the Surviving Entity shall be Westport Asset Management, L.L.C.

(c)     On the effective date of the merger, the separate existence of the Absorbed Entity shall

SUB_LANDRY_00000435

cease, and the Surviving Entity shall succeed to all the rights, privileges, immunities, and franchises, and all the property, real, personal, and mixed of the Absorbed Entity, without the necessity for any separate transfer. The Surviving Entity shall thereafter be responsible and liable for all liabilities and obligations of the Absorbed Entity, and neither the rights of creditors nor any liens on the property of the Absorbed Entity shall be impaired by the merger.

(d)    The Surviving Corporation will carry on business with the assets of the Absorbed Entity, as well as with the assets of Surviving Entity.

(e)    The Partners of Absorbed Entity will surrender all of their partnership interest in the manner hereinafter set forth.

(f)    In exchange for the partnership interest of Absorbed Entity surrendered by its Partners, the Surviving Entity will issue and transfer to these Partners, on the basis set forth in SECTION 5.02, below, membership interest in the Surviving Entity.

(g)    The members of Surviving Entity will retain their membership interest in the Surviving Entity.

(h)    The Articles of Organization of Surviving Entity, as existing on the effective date of the merger shall continue in full force as the Articles of Organization of the Surviving Entity until altered, amended, or repealed as provided in the Articles or as provided by law.

2.02 Effective Date. The effective date of the merger ("Effective Date") shall be the date the Articles of Merger are filed with the Secretary of State.

Section 3. Representations and Warranties of Constituent Entities.

3.01    Absorbed Entity. As a material inducement to the Surviving Entity    to    execute    this Agreement and perform its
obligations under this Agreement, Absorbed Entity represents and warrants to the Surviving Entity as follows:

(a)    Limited Partnership. Absorbed Entity is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Florida and has full power and authority to own, operate and lease its properties, as presently owned, operated and leased, and to conduct its business as now and heretofore conducted. Absorbed corporation has no other office or other place Absorbed Entity does business other than as stated in the Recitals above. Absorbed Entity has delivered to Surviving Entity true and complete copies of the Limited Partnership Certificate and Partnership Agreement of Absorbed Entity.

(b)    Subsidiaries. Absorbed Entity has no Subsidiaries and no ownership interest in any business organization or entity other than as previously disclosed to Absorbed Entity

(c)    Partnership Interest. As of the time immediately prior to the merger one hundred percent (100%) of Absorbed Entity will be owned by and will be free and clear of any lien, liability,

SUB_LANDRY_00000436

encumbrance or other restriction, as follows:

| Name | Percent of Interest |
|---|---|
| **General Partner:** | |
| Double L Investment, Inc., a Texas Corporation | 25% |
| **Limited Partners:** | |
| Mahalo Limited, a Texas limited partnership | 40% |
| Derek M. Landry | 10% |
| Michele M. Landry | 10% |
| Steven F. Landry | 10% |
| Landry Grandchildren Trust | 5% |

There is no restriction imposed by the Absorbed Entity or by any other person on transfers of any of the partnership interest.

(d)     Tax Matters. The Absorbed Entity has duly filed with the appropriate federal, state, and local government agencies all tax returns and reports or claims to be due by any taxing authority, except for any taxes being contested in good faith by appropriate proceeding.

(e)     Books and Records. The books and records of Absorbed Entity are true and complete and accurately record all action taken by their Partners.

(f)     Partners. The names and addresses of all of Absorbed Entity's partners are:

Name/Addresses

General Partner:
Double L. Investment, Inc., 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410

Limited Partners:
Mahalo Limited, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410
Derek M. Landry, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410
Michele M. Landry, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410
Steven F. Landry, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410
Landry Grandchildren Trust, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410

(g)     Authority Relative to Agreement. The execution, delivery and performance of this Agreement by Absorbed Entity and the consummation by Absorbed Entity of the transaction contemplated hereby, has been duly and effectively authorized by any necessary action, and this Agreement constitutes a legal, valid and binding obligation of Absorbed Entity and is enforceable against Absorbed Entity in accordance with the terms contained herein.

(h)     Effect of Agreement. The execution, delivery, and performance of this Agreement by

Page 3
of Plan of Merger

SUB_LANDRY_00000437

Absorbed Entity hereby does not (i) require the consent, waiver, approval, license or authorization of any person or public authority; (ii) violate, with or without the giving of notice or the passage of time, any provision of law applicable to Absorbed Entity; conflict with or result in a breach of the Absorbed Entity's Partnership Agreement, or any mortgage deed or trust, license, indenture, or other agreement or instrument, or any judgment, decree, statute, regulation or other restriction of any kind or character to which Absorbed Entity is a party or by which Absorbed Entity or any of Absorbed Entity's assets may be bound or give to others any right to terminate or result in termination of any provision of any such instruments; (iv) result in the creation of any lien, charge or encumbrance upon any of the property or assets of Absorbed Entity or in the acceleration or maturity of any debt of Absorbed Entity.

(I)     Finders Fees.  No person acting on behalf of Absorbed Entity has claimed or is entitled to, under any contract or otherwise, any payment as a broker, finder or intermediary in connection with the origin, negotiation, execution or consummation of the transaction provided for in this Agreement.

(j)     No Known Adverse Factors.  Absorbed Entity has no knowledge of any material adverse factors affecting Absorbed Entity except normal market competitive forces.

3.02   Surviving Entity.  As a material inducement to the Absorbed Entity to execute this Agreement and perform its obligations under this Agreement, Surviving Entity represents and warrants to the Surviving Entity as follows:

(a)     Limited Liability Company. Surviving Entity is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida and has full power and authority to own, operate and lease its properties, as presently owned, operated and leased, and to conduct its business as now and heretofore conducted. Surviving Entity has no other office or other place of business other than as stated in the Recitals above. Surviving Entity has delivered to Absorbed Entity true and complete copies Of the Certificate of Organization and Regulations of Surviving Entity.

(b)     Subsidiaries.  Surviving Entity has no Subsidiaries and no ownership interest in any business organization or entity other than as previously disclosed to Absorbed Entity.

(c)     Surviving Entity Interest.  As of the time immediately prior to the merger one hundred percent (100%) of Surviving Entity will be owned by and will be free and clear of any lien, liability, encumbrance or other restriction, as follows:

| Members Names | Percent of Interest |
|---|---|
| Double L. Investment, Inc., a Texas Corporation | 25% |
| Mahalo Limited, a Texas limited partnership | 40% |
| Derek M. Landry | 10% |
| Michele M. Landry | 10% |
| Steven F. Landry | 10% |
| Landry Grandchildren Trust | 5% |

SUB_LANDRY_00000438

There is no restriction imposed by the Surviving Entity or by any other person on transfers of any of the partnership interest.

(d)    Tax Matters. The Surviving Entity has duly filed with the appropriate federal, state, and local government agencies all tax returns and reports or claims to be due by any taxing authority except for any taxes being contested in good faith by appropriate proceeding.

(e)    Books and Records. The books and records of Surviving Entity are true and complete and accurately record all action taken by their Members and Manager.

(f)    Members and Manager. The names and addresses of all of Surviving Entity's Members and Manager are:

Name/Addresses

Members:
Mahalo Limited, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410
Derek M. Landry, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410
Michele M. Landry, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410
Steven F. Landry, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410
Landry Grandchildren Trust, 3801 PGA Blvd, Suite 805, Palm Beach Gardens, FL 33410

Manager, and Member
Double L Investment , Inc., 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida

(g)    Authority Relative to Agreement. The execution, delivery and performance of this Agreement by Surviving Entity and the consummation by Surviving Entity of the transaction contemplated hereby, has been duly and effectively authorized by any necessary action, and this Agreement constitutes a legal, valid and binding obligation of Surviving Entity and is enforceable against Surviving Entity in accordance with the terms contained herein.

(h)    Effect of Agreement. The execution, delivery, and performance of this Agreement by Surviving Entity hereby does not (i) require the consent, waiver, approval, license or authorization of any person or public authority; (ii) violate, with or without the giving of notice or the passage of time, any provision of law applicable to Surviving Entity; conflict with or result in a breach of the Surviving Entity's Articles of Organization or Regulations, or any mortgage deed or trust, license, indenture, or other agreement or instrument, or any judgment, decree, statute, regulation or other restriction of any kind or character to which Surviving Entity is a party or by which Surviving Entity or any of Surviving Entity's assets may be bound or give to others any right to terminate or result in termination of any provision of any such instruments; (iv) result in the creation of any lien, charge or encumbrance upon any of the property or assets of Surviving Entity or in the acceleration or maturity of any debt of Surviving Entity.

(I)    Finders Fees. No person acting on behalf of Surviving Entity has claimed or is entitled to, under any contract or otherwise, any payment as a broker, finder or intermediary in connection with the origin, negotiation, execution or consummation of the transaction provided for in this

Page 5
of Plan of Merger

SUB_LANDRY_00000439

Agreement.

(j) No Known Adverse Factors. Surviving Entity has no knowledge of any material adverse factors affecting Surviving Entity except normal market competitive forces.

3.03 Securities Laws. The parties will mutually arrange for and manage all necessary procedures under the requirements of federal and Florida securities laws and the related supervisory commissions to the end that this plan is properly processed to comply with registration formalities, or to take full advantage of any appropriate exemptions from registration, and to otherwise be in accord with all antifraud restrictions in the area.

Section 4. Covenants; Actions and Obligations Prior to the Effective Date.

4.01 Interim Conduct of Business; Limitations. Pending consummation of the merger, each of the constituent entities will carry on its business in substantially the same manner as before and will use its best efforts to maintain its business organization intact, to retain its present employees, and to maintain its relationships with suppliers and other business contacts.

4.02 Submission to Owners. This Agreement shall be submitted separately to the owners of the constituent entities in the manner provided by the laws of the State of Florida for approval.

Section 5. Manner of Converting Ownership Interest.

5.01 Manner. The holders of a partnership interest of Absorbed Entity shall surrender their partnership interest to the secretary of the Surviving Entity promptly after the Effective Date, in exchange for a membership interest in the Surviving Entity to which they are entitled under this SECTION.

5.02 Basis. (a) The manner and basis of converting the interests of the members of the Surviving Entity and the interests of the partners of Absorbed Entity into membership interests in Surviving Entity, is as follows:

In proportion to capital accounts since ownership is the same in both, the absorbed and surviving entities, therefore the ownership is as follows upon merger.

| | |
|---|---|
| Double L. Investment, Inc., a Texas Corporation | 25% |
| Mahalo Limited, a Texas limited partnership | 40% |
| Derek M. Landry | 10% |
| Michele M. Landry | 10% |
| Steven F. Landry | 10% |
| Landry Grandchildren Trust | 5% |

SUB_LANDRY_00000440

### 6. Manager and Officers

6.01  **Manager and Officer of Surviving Entity.** On the Effective Date, the names of the Manager and Officers of the Surviving Entity, who shall manage the Surviving Entity and hold office respectively until the next annual meeting of the Members of the Surviving Entity or until their respective successors have been elected or appointed and qualified are:

(a)  **Manager.** Double L Investment., Inc., whose business address is 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, FL. 33410.

(b)  Officers:

| | |
|---|---|
| President: | Lawrence L. Landry |
| Vice President: | Janice M. Landry |

### Section 7. Regulations.

7.01  **Regulations of Surviving Entity.** The Regulations of Surviving Entity on the Effective Date of the merger, shall continue in full force as the Regulations of the Surviving Entity until altered, amended, or repealed as provided in the Regulations or as provided by law.

### Section 8. Termination.

8.01  **Termination or Abandonment of Merger.** This plan of merger may be abandoned by action of the Members, Manager or Partners of either Surviving Entity or Absorbed Entity at any time prior to the Effective Date on the happening of either of the following events:

(a)  If the merger is not approved by the Members, Manager and Partners, as applicable, of either Surviving Entity or Absorbed Entity on or before December 29, 1998; or

(b)  If, in the judgment of the Members, Manager or Partners, as applicable, of either Surviving Entity or Absorbed Entity, the merger would be impracticable because of the number of dissenting members or partners asserting appraisal rights under the laws of the state of Florida; or

(c)  the discovery prior to the Effective Date of any misrepresentation contained herein without the party to whom the misrepresentation was made waiving said misrepresentation.

### Section 9. Miscellaneous.

9.01  **Entire Agreement.** This Agreement, together with Exhibits annexed hereto, constitutes the entire agreement and supersedes all prior agreements and understandings both written and oral, among the parties hereto with respect to the subject matter hereof, and no party shall be liable or bound to the other in any manner, except as specifically set forth herein.

9.02  **Modifications.** Any purported amendment, change or modification of this Agreement shall

SUB_LANDRY_00000441

be void unless in writing and signed by all the parties hereto.

9.03    Governing Law and Venue. This Agreement shall be governed, construed and enforced in accordance with the laws of Florida. Venue shall be Palm Beach County, Florida, in connection with any litigation arising from this Agreement.

Absorbed Entity:

Westport Asset Management, Ltd.,
a Florida limited partnership

BY:  Double L Investment, Inc.,
       a Texas corporation, as general
       partner

BY: _____
Lawrence L. Landry, as President

Surviving Entity:

WESTPORT ASSET MANAGEMENT, L.L.C.
a Florida limited liability company

BY:  Double L Investment, Inc.,
       a Texas corporation, as managing member

BY: _____
Lawrence L. Landry, as President

Page 8
of Plan of Merger

SUB_LANDRY_00000442



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the Certificate of Limited Partnership, as amended to date, of WESTPORT ADVISORS, LTD., a limited partnership organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this limited partnership is A98000000339.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-fifth day of March, 2014



Ken Detzner
Secretary of State

CR2E022 (1-11)

SUB_LANDRY_00000443

CERTIFICATE OF LIMITED PARTNERSHIP
OF
WESTPORT REALTY ADVISORS, LTD.

The undersigned partners, desiring to form a limited partnership pursuant to the laws of the state of Florida certify as follows:

1. **Name of Limited Partnership.** The name of the Limited Partnership is WESTPORT REALTY ADVISORS, LTD.

2. **Office for maintenance of Business Records.** The address of the office at which the records of the Limited Partnership will be kept, as required by Section 620.106 of the Florida Statutes is: 1962 Portage Landing North, N. Palm Beach, FL 33408.

3. **Agent for Service of Process.** The name and address of the Partnership's agent for service of process in Florida is: John W. Gary, III, 701 U.S. Hwy. One, Ste. 402, North Palm Beach, FL 33408.

4. **General Partners.** The name and business address of each General Partner in the Limited Partnership are as follows:

Name A98-337                                          Address

Westport Asset Management, Ltd.,          1962 Portage Landing North
 a Florida limited partnership              N. Palm Beach, FL 33408

5. **Address of Partnership.** The mailing address of the Limited Partnership is: 1962 Portage Landing North, N. Palm Beach, FL 33408.

6. **Date of Dissolution.** The latest date on which the Limited Partnership is to dissolve is: January 16, 2022.

7. **Effective Date.** This Certificate will take effect, and the facts stated in it will be true, on the date it is filed with the Secretary of State, State of Florida.

Dated: _January 22, 1998_

GENERAL PARTNER
Westport Asset Management, Ltd.,
a Florida limited partnership
 BY: Double L Investment,
  Inc., a Texas corp., as
  general partner

BY: _____
Janice Landry, as
Vice President

F:\DOCS\and3063.ltd

STATE OF __FLORIDA__        ]
COUNTY OF __PALM BEACH__    ]

    The foregoing instrument was acknowledged before me this 22ᴺᴰ day of __January__, 199__8__, by __Janice Landry__, as __Vice President__ of Double L Investment, Inc., as general partner of Westport Asset Management, Ltd., a Florida limited partnership, who is personally known to me. ~~or who has produced~~ _____ ~~as identification~~.

                                   _____
                                   Printed Name:
                                   Notary Public, State of Florida

(NOTARY SEAL)

OFFICIAL NOTARY SEAL
FRANCES SUE HUDSON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC491243
MY COMMISSION EXP. AUG. 26,1999

FILED
96 JAN 27 PM 4:30
SEC... OF STATE

## ACCEPTANCE OF REGISTERED/RESIDENT AGENT

Having been designated to accept service of process for the above stated limited partnership, at the place set forth hereinabove, I hereby accept such designation and agree to act in such capacity and hereby state that I am familiar with and accept the duties and responsibilities as registered agent for this limited partnership and agree to comply with the provisions of Section 620.192 of the Florida Statutes.

John W. Gary, III, Registered Agent

Dated: 1-22-98

STATE OF FLORIDA
COUNTY OF PALM BEACH

BEFORE ME, the undersigned officer duly authorized to take acknowledgments, this day, personally appeared John W. Gary, III, to me personally known ~~or who provided~~ ~~as identification~~ and who executed the foregoing, and he acknowledged before me that he executed the same for the purposes herein expressed.

WITNESS my hand and official seal in the State and County aforesaid this 22ᴺᴰ day of January, 1998.

Notary Public
My Commission Expires:
Commission No.

OFFICIAL NOTARY SEAL
FRANCES SUE HUDSON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC491243
MY COMMISSION EXP. AUG. 26,1999.

FILED

3

SUB_LANDRY_00000446

## AFFIDAVIT OF CAPITAL CONTRIBUTIONS

The undersigned, who are all the General Partners of WESTPORT REALTY ADVISORS, LTD., declare that the capital contributions of all the Limited Partners in the Partnership are as follows:

1.   The limited partners have made capital contributions in the following amounts:

| Name of Limited Partner | Amount of Contribution |
|---|---|
| Mahalo Limited, a Texas Limited Partnership | $1,000.00 |

2.   It is anticipated that the Limited Partners listed below will make capital contributions in the future in the following amounts:

| Name of Limited Partner | Amount of Contribution |
|---|---|
| Mahalo Limited, a Texas Limited Partnership | $6,500.00 |

3.   Under the penalties of perjury, the undersigned declares that the undersigned has read the foregoing and knows the contents thereof and that the facts stated herein are true and correct.

Dated: _January 22, 1998_

GENERAL PARTNER
Westport Asset Management, Ltd.,
a Florida limited partnership
BY:  Double L Investment, Inc.,
a Texas corp., as general partner

BY: _____
    Janice Landry,
    as Vice President

4

SUB_LANDRY_00000447

STATE OF __FLORIDA_____    ]
COUNTY OF __PALM BEACH____  ]

The foregoing instrument was acknowledged before me this 22ᴺᴰ day of __January__, 1998, by _Janice Landry_____, as _Vice President___ of Double L Investment, Inc., as general partner of Westport Asset Management, Ltd., a Florida limited partnership, who is personally known to me or who has produced _____ as identification.

_Frances Sue Hudson_____
Printed Name:
Notary Public, State of Florida

(NOTARY SEAL)

OFFICIAL NOTARY SEAL
FRANCES SUE HUDSON
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC491243
MY COMMISSION EXP. AUG. 26,1999

5

SUB_LANDRY_00000448

**CERTIFICATE OF AMENDMENT
TO
CERTIFICATE OF LIMITED PARTNERSHIP
OF**

SECRETARY OF STATE
TALLAHASSEE, FLORIDA
99 FEB 18 PH 4: 16
FILED

_____ Westport Realty Advisors, Ltd. _____

(Insert name currently on file with Florida Dept. of State)

Pursuant to the provisions of section 620.109, Florida Statutes, this Florida limited partnership, whose certificate was filed with the Florida Dept. of State on __January 26, 1998__, adopts the following certificate of amendment to its certificate of limited partnership.

**FIRST:** Amendment(s): (indicate article number(s) being amended, added, or deleted)

Section 4. is hereby modified to change the name and address of the General Partner to the following:

Westport Asset Management, LLC      3801 PGA Boulevard, Suite 805
*L99000000056*                       Palm Beach Gardens, FL  33410

Effective with the December 30, 1998 merger of Westport Asset Management Ltd. into Westport Asset Management LLC.

**SECOND:** This certificate of amendment shall be effective at the time of its filing with the Florida Department of State.

**THIRD:** Signature(s)
Signature of current general partner:

Westport Asset Management, LLC, as successor by merger to Westport Asset Management, Ltd. by: Double L Investment, Inc., a Texas Corporation, as General Partner

_Lawrence L. Landry_

Lawrence L. Landry, President

Signature(s) of new general partner(s), if applicable:

Westport Asset Management, LLC by: Double L Investment, Inc., a Texas Corporation, as Managing Member

_Lawrence L. Landry_

Lawrence L. Landry, President

SUB_LANDRY_00000449

## SUPPLEMENTAL AFFIDAVIT OF CAPITAL CONTRIBUTIONS FOR A FLORIDA LIMITED PARTNERSHIP

The undersigned general partners of ___Westport Realty Advisors, Ltd.___

_____ , a

Florida Limited Partnership, executed this supplemental affidavit filed pursuant to section 620.112, Florida Statutes.

The total amount of the capital contributions of the limited partners is: $ ___348,000___ .

This _____ day of ___June___ x19x ___2000___ .

*FURTHER AFFIANT SAYETH NOT.*

*Under penalties of perjury I declare that I have read the foregoing and that the facts are true, to the best of my knowledge and belief.*

General Partner(s)

Westport Asset Management, LLC

By: _____

_____

| Fees: |
| --- |
| $7 per $1000, based on additional contributions |
| Minimum $ 52.50 |
| Maximum $1750.00 |

FILED
SECRETARY OF STATE
DIVISION OF CORPORATIONS
00 JUL 13 AM 10:36

Make checks payable to Florida Department of State and mail to:
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

INHS20(9/98)

SUB_LANDRY_00000450

CERTIFICATE OF AMENDMENT
TO
CERTIFICATE OF LIMITED PARTNERSHIP
OF
WESTPORT REALTY ADVISORS, LTD.

Pursuant to the provisions of section 620.109, Florida Statutes, this Florida limited partnership, whose certificate was filed with the Florida Dept. of State on January 26, 1998, adopts the following certificate of amendment to its certificate of limited partnership.

FIRST: Amendment: The limited partnership name of WESTPORT REALTY ADVISORS, LTD. as set forth in Paragraph 1. is hereby amended and changed to the following name:

WESTPORT ADVISORS, LTD.

SECOND: This certificate of amendment shall be effective at the time of its filing with the Florida Department of State.

THIRD: Signature(s)
Signature of current general partner:

WESTPORT REALTY ADVISORS, LTD., a Florida limited partnership

BY: WESTPORT ASSET MANAGEMENT, LLC successor by merger to Westport Asset Management, Ltd., as sole general partner

BY: Double L Investment, Inc., as managing member

BY: _____
Lawrence L. Landry, as President

STATE OF FLORIDA    ]
COUNTY OF PALM BEACH ]

The foregoing instrument was acknowledged before me this 22nd day of Sept., 2000, by Lawrence L. Landry, as President of Double L Investment, Inc., as managing member of WESTPORT ASSET MANAGEMENT, LLC successor by merger to Westport Asset Management, Ltd., as sole general partner of WESTPORT REALTY ADVISORS, LTD., a Florida limited partnership, who is personally known to me or who has produced _____ as identification.

OFFICIAL NOTARY SEAL
SUSAN K SKRYCKI
COMMISSION NUMBER
CC841489
MY COMMISSION EXPIRES
JUNE 1, 2003

_____
Notary Public, State of Florida

g:\docs\alys\and-1129.cer

SUB_LANDRY_00000451



# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.L.C." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE NINETEENTH DAY OF OCTOBER, A.D. 2000, AT 11:52 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.L.C.".

Jeffrey W. Bullock, Secretary of State

3300671   8100H

14369446

You may verify this certificate online
at corp.delaware.gov/authver.shtml

AUTHENTICATION: 1232455

DATE: 03-24-14

SUB_LANDRY_00000452

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 11:52 AM 10/19/2000*
*001530188 – 3300671*

## CERTIFICATE OF FORMATION

### OF

### WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.L.C.

This Certificate of Formation of WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.C.C. (the "LLC"), dated as of October *16*, 2000, is being duly executed and filed by Lawrence L. Landry, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, *et seq.*).

FIRST:  The name of the limited liability company formed hereby is:

### WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.L.C.

SECOND:  The name and address of the registered agent for service of process on the LLC in the State of Delaware is:

> **The Corporation Trust Company**
> **(CT Corporation System)**
> **1209 Orange Street**
> **Wilmington, Delaware  19801**

THIRD:  The LLC shall have perpetual existence.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the *16* day of October, 2000.

_____
Lawrence L. Landry, Authorized Person

TAL1 #224622 v4

SUB_LANDRY_00000453



# Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE NINETEENTH DAY OF OCTOBER, A.D. 2000, AT 11:52 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C.".

3305196  8100H

140369465

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 1232467

DATE: 03-24-14

SUB_LANDRY_00000454

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 11:52 AM 10/19/2000*
*001530294 — 3305196*

## CERTIFICATE OF FORMATION

### OF

## WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C.

This Certificate of Formation of WESTPORT HOLDINGS HIDDEN SPRINGS, L.C.C. (the "LLC"), dated as of October /6, 2000, is being duly executed and filed by Lawrence L. Landry, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, *et seq.*).

FIRST:  The name of the limited liability company formed hereby is:

**WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C.**

SECOND:  The name and address of the registered agent for service of process on the LLC in the State of Delaware is:

**The Corporation Trust Company
(CT Corporation System)
1209 Orange Street
Wilmington, Delaware  19801**

THIRD:  The LLC shall have perpetual existence.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the /6 day of October, 2000.

_____
Lawrence L. Landry, Authorized Person

TAL1 #224622 v5

SUB_LANDRY_00000455



## Delaware

### The First State

PAGE   1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF LIMITED PARTNERSHIP, FILED THE NINETEENTH DAY OF OCTOBER, A.D. 2000, AT 11:53 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE TWENTY-SECOND DAY OF DECEMBER, A.D. 2000, AT 9 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2000.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED PARTNERSHIP, "WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP".

Jeffrey W. Bullock, Secretary of State

3301147   8100H

140348650

AUTHENTICATION: 1219279

DATE: 03-19-14

You may verify this certificate online
at corp.delaware.gov/authver.shtml

SUB_LANDRY_00000456

**State of Delaware**
**Certificate of Limited Partnership**

## WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP

**THE UNDERSIGNED,** desiring to form a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act, 6 Delaware Code, Chapter 17, does hereby certify as follows:

**FIRST:** The name of the limited partnership is Westport Holdings Tampa, Limited Partnership

**SECOND:** The address of its registered agent in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801. The name of its Registered Agent at that address is The Corporation Trust Company.

**THIRD:** The name of the general partner is Westport Holdings University Village, L.L.C., a Delaware limited liability company. The mailing address of the general partner is 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410.

In Witness Whereof, the undersigned has executed this Certificate of Limited Partnership of Westport Holdings Tampa, this /6th day of October, 2000.
Limited Partnership

GENERAL PARTNER:

WESTPORT HOLDINGS UNIVERSITY
VILLAGE, L.L.C., by Westport Advisors,
Ltd., as its Manager

By: _____
Name: Lawrence L. Landry, as President of Double
L Investments, Inc., a Texas Corporation, which is
Manager of Westport Asset Management, L.L.C., a
Florida limited liability corporation, which is General
Partner of Westport Advisors, Ltd., a Florida limited
partnership.

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 11:53 AM 10/19/2000*
*001530190 — 3301147*

SUB_LANDRY_00000457

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 12/22/2000
001647931 - 3301147

## CERTIFICATE OF MERGER

Pursuant to Section 17-211 of the Delaware Revised Uniform Limited Partnership Act, Westport Holdings Tampa, Limited Partnership, a Delaware limited partnership, and Westport Housing Tampa, L.L.C., a Florida limited liability company, hereby execute this Certificate of Merger and state as follows:

1.    Names and Jurisdictions. The name and jurisdiction of organization of each limited partnership and other business entity that is to merge are: Westport Holdings Tampa, Limited Partnership, a limited partnership organized under the laws of Delaware; and Westport Housing Tampa, L.L.C., a limited liability company organized under the laws of Florida.

2.    Agreement. An agreement of merger has been approved and executed by each limited partnership and other business entity that is to merge.

3.    Surviving Entity. Westport Holdings Tampa, Limited Partnership, a Delaware limited partnership, shall survive the merger.

4.    Effective Date. The merger will become effective on December 31, 2000.

5.    Access to Agreement. The agreement of merger is on file at the principal office of Westport Holdings Tampa, Limited Partnership, at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410. A copy of the agreement of merger will be furnished by Westport Holdings Tampa, Limited Partnership, on request and without cost, to any partner of Westport Holdings Tampa, Limited Partnership, and any person holding an interest in Westport Housing Tampa, L.L.C.

Executed this 12 day of December, 2000

WESTPORT HOLDINGS TAMPA, Limited Partnership, a Delaware limited partnership, by Westport Holdings University Village, L.L.C., a Delaware limited liability company, as its sole general partner,

Witnesses:

Name: George Gah

Name: Michelle Hares

By: _____
Name: Lawrence L. Lepory
As its: President

SUB_LANDRY_00000458

Name:_____

WESTPORT HOUSING TAMPA, L.C.C., a
Florida limited liability company,

Witnesses:

Name: _____

By: _____
Name: __Lawrence L. Landry__

As its:____President_____

Name: _Michell Harris_

State of Florida
County of __PALM BEACH__

The foregoing instrument was acknowledged before me this __2__ day of
December, 2000, by Lawrence L. Landry, as President of Westport Holdings
University Village, L.L.C., a Delaware limited liability company, as the sole general
partner of Westport Holdings Tampa, Limited Partnership, a Delaware limited
partnership, on behalf of the limited partnership.

_____
Notary Public, State of
Florida, at Large

My Commission Expires:



State of Florida
County of __PALM BEACH__

The foregoing instrument was acknowledged before me this __1__ day of
December, 2000, by Lawrence L. Landry, as President of Westport Housing Tampa,
L.L.C., a Florida limited liability company, on behalf of the limited liability
company.

_____
Notary Public, State of
Florida, at Large

My Commission Expires:

2

SUB_LANDRY_00000459



## Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF LIMITED PARTNERSHIP, FILED THE NINETEENTH DAY OF OCTOBER, A.D. 2000, AT 11:52 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE TWENTY-SECOND DAY OF DECEMBER, A.D. 2000, AT 9 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2000.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED PARTNERSHIP, "WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP".

Jeffrey W. Bullock, Secretary of State

3301154   8100H

140348656

You may verify this certificate online at corp.delaware.gov/authver.shtml

AUTHENTICATION: 1219420

DATE: 03-19-14

SUB_LANDRY_00000460

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 11:52 AM 10/19/2000
001530301 - 3301154

## State of Delaware
## Certificate of Limited Partnership

### WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP

**THE UNDERSIGNED,** desiring to form a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act, 6 Delaware Code, Chapter 17, does hereby certify as follows:

**FIRST:**   The name of the limited partnership is Westport Holdings Tampa II, Ltd.

**SECOND:**   The address of its registered agent in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801. The name of its Registered Agent at that address is The Corporation Trust Company.

**THIRD:** The name of the general partner is Westport Holdings Hidden Springs, L.L.C., a Delaware limited liability company. The mailing address of the general partner is 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410.

In Witness Whereof, the undersigned has executed this Certificate of Limited Partnership of Westport Holdings Tampa II, Ltd. this 16th day of October, 2000.

GENERAL PARTNER:

WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C., by Westport Advisors, Ltd., as its Manager

By: _____
Name: Lawrence L. Landry, as President of Double L Investments, Inc., a Texas Corporation, which is Manager of Westport Asset Management, L.L.C., a Florida limited liability corporation, which is General Partner of Westport Advisors, Ltd., a Florida limited partnership.

SUB_LANDRY_00000461

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 12/22/2000
001647918 - 3301154

## CERTIFICATE OF MERGER

Pursuant to Section 17-211 of the Delaware Revised Uniform Limited Partnership Act, Westport Holdings Tampa II, Limited Partnership, a Delaware limited partnership, and Westport Holdings Tampa II, L.L.C., a Florida limited liability company, hereby execute this Certificate of Merger and state as follows:

1.   Names and Jurisdictions. The name and jurisdiction of organization of each limited partnership and other business entity that is to merge are: Westport Holdings Tampa II, Limited Partnership, a limited partnership organized under the laws of Delaware; and Westport Holdings Tampa II, L.L.C., a limited liability company organized under the laws of Florida.

2.   Agreement. An agreement of merger has been approved and executed by each limited partnership and other business entity that is to merge.

3.   Surviving Entity. Westport Holdings Tampa II, Limited Partnership, a Delaware limited partnership, shall survive the merger.

4.   Effective Date. The merger will become effective on December 31, 2000.

5.   Access to Agreement. The agreement of merger is on file at the principal office of Westport Holdings Tampa II, Limited Partnership, at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410. A copy of the agreement of merger will be furnished by Westport Holdings Tampa II, Limited Partnership, on request and without cost, to any partner of Westport Holdings Tampa II, Limited Partnership, and any person holding an interest in Westport Holdings Tampa II, L.L.C.

Executed this ___ day of December, 2000

WESTPORT HOLDINGS TAMPA II,
Limited Partnership, a Delaware limited partnership, by Westport Holdings Hidden Springs, L.L.C., a Delaware limited liability company, as its sole general partner,

Witnesses:

Name: George Gill

Name: Michelle Harris

By: _____
Name: Lawrence L. Landry

As its:   President

SUB_LANDRY_00000462

WESTPORT HOLDINGS TAMPA II, L.C.C.,
a Florida limited liability company,

Witnesses:

Name: George Gah

Name: Michelle Harris

By
Name: Lawrence L. Landry

As its: President

State of Florida
County of Palm Beach

The foregoing instrument was acknowledged before me this 12th day of December, 2000, by Lawrence L. Landry, as President of Westport Holdings Hidden Springs, L.L.O., a Delaware limited liability company, as the sole general partner of Westport Holdings Tampa II, Limited Partnership, a Delaware limited partnership, on behalf of the limited partnership.

Notary Public, State of
Florida, at Large

My Commission Expires:



State of Florida
County of PALM BEACH

The foregoing instrument was acknowledged before me this 12th day of December, 2000, by Lawrence L. Landry, as President of Westport Holdings Tampa II, L.L.C., a Florida limited liability company, on behalf of the limited liability company.

Notary Public, State of
Florida, at Large

My Commission Expires:

2

SUB_LANDRY_00000463

SUB_LANDRY_00000464

## EXHIBIT B

Operating Agreements, Bylaws and Partnership Agreements

Certificate of Fact - WM Opinion - CPIF Lending, LLC Loan:25145380

04/21/05 THU 09:38    FAX 5615754377 CHRISTENSON-ELMS AUCTION    001/021

# BYLAWS

## OF

## DOUBLE L INVESTMENT, INC.

a Texas corporation

(the "Company")

(Adopted effective as of September 3, 1996)

SUB_LANDRY_00000465

## BYLAWS

### ARTICLE I.

### OFFICES

Section 1.1.   Registered Office. The registered office of the Company within the State of Texas shall be located at either (i) the principal place of business of the Company in the State of Texas or (ii) the office of the corporation or individual acting as the Company's registered agent in Texas.

Section 1.2.   Additional Offices. The Company may, in addition to its registered office in the State of Texas, have such other offices and places of business, both within and without the State of Texas, as the Board of Directors of the Company (the "Board") may from time to time determine or as the business and affairs of the Company may require.

### ARTICLE II.

### SHAREHOLDERS MEETINGS

Section 2.1.   Annual Meetings. Annual meetings of shareholders shall be held at a place and time on any weekday which is not a holiday and which is not more than 120 days after the end of the fiscal year of the Company as shall be designated by the Board and stated in the notice of the meeting, at which the shareholders shall elect the directors of the Company and transact such other business as may properly be brought before the meeting.

Section 2.2.   Special Meetings. Special meetings of the shareholders, for any purpose or purposes, unless otherwise prescribed by law or by the articles of incorporation, (i) may be called by the president and (ii) shall be called by the president or secretary at the request in writing of a majority of the Board or shareholders owning capital stock of the Company representing at least ten percent (10%) of the votes of all capital stock of the Company entitled to vote thereat.  Such request of the Board or the shareholders shall state the purpose or purposes of the proposed meeting.

Section 2.3.   Notices. Written or printed notice of each shareholders' meeting stating the place, date and hour of the meeting shall be given to each shareholder of record entitled to vote thereat by or at the direction of the president, the secretary or the officer or person calling such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting. If said notice is for a shareholders' meeting other than an annual meeting, it shall in addition state the purpose or purposes for which said meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in said notice and any matters reasonably related thereto.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to each shareholder at his address as it appears on the stock transfer books of the Company, with postage thereon prepaid.

SUB_LANDRY_00000466

Section 2.4.  Quorum.  The presence at a shareholders' meeting of the holders, present in person or represented by proxy, of capital stock of the Company representing a majority of the votes of all capital stock of the Company entitled to vote thereat shall constitute a quorum at such meeting for the transaction of business except as otherwise provided by law, the articles of incorporation or these Bylaws.  If a quorum shall not be present or represented at any meeting of the shareholders, a majority of the shareholders entitled to vote thereat and present in person or represented by proxy shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At any such reconvened meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the reconvened meeting, a notice of said reconvened meeting shall be given to each shareholder entitled to vote at said meeting.  The shareholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.

Section 2.5.  Voting of Shares.

Section 2.5.1.  Voting Lists.  The officer or agent who has charge of the stock transfer books of the Company shall prepare, at least ten (10) days before every meeting of shareholders, a complete list of the shareholders entitled to vote thereat arranged in alphabetical order and showing the address and the number of shares registered in the name of each shareholder.  Such list shall be open to the examination of any such shareholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held and at the registered office of the Company.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any shareholder who is present.  The original stock transfer books shall be prima facie evidence as to who are the shareholders entitled to examine such list or transfer books or to vote at any meeting of shareholders.  Failure to comply with the requirements of this section shall not affect the validity of any action taken at said meeting.

Section 2.5.2.  Votes Per Share.  Unless otherwise provided by law or in the articles of incorporation, each shareholder shall be entitled to one vote, in person or by proxy, on each matter submitted to a vote at a meeting of the shareholders, for each share of capital stock held by such shareholder.

Section 2.5.3.  Proxies.  Every shareholder entitled to vote at a meeting or to express consent or dissent without a meeting or a shareholder's duly authorized attorney-in-fact may authorize another person or persons to act for him by proxy.  Each proxy shall be in writing, executed by the shareholder group, the proxy or by his duly authorized attorney.  No proxy shall be voted on or after eleven (11) months from its date, unless the proxy provides for

2

a longer period. Each proxy shall be revocable unless expressly provided therein to be irrevocable and unless otherwise made irrevocable by law.

Section 2.5.4. Required Vote. When a quorum is present at any meeting, the vote of the holders of capital stock of the Company representing a majority of the votes of all capital stock of the Company entitled to vote thereat and present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which, by express provision of law or the articles of incorporation or these Bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 2.6. Consents in Lieu of Meeting. Any action required to be or which may be taken at any meeting of shareholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof. Such signed consent shall have the same force and effect as a unanimous vote of shareholders and shall be filed with the minutes of proceedings of the shareholders.

## ARTICLE III.

## DIRECTORS

Section 3.1. Purpose. The business and affairs of the Company shall be managed by or under the direction of the Board, which may exercise all such powers of the Company and do all such lawful acts and things as are not by law, the articles of incorporation or these Bylaws directed or required to be exercised or done by the shareholders. Directors need not be shareholders or residents of the State of Texas.

Section 3.2. Number. The number of directors constituting the Board shall never be less than one (1) and shall be determined by resolution of the Board, except for the number of directors constituting the initial Board, which number is fixed by the articles of incorporation.

Section 3.3. Election. Directors shall be elected by the shareholders by plurality vote at each annual meeting of shareholders, except as hereinafter provided, and each director so elected shall hold office until his successor has been duly elected and qualified.

Section 3.4. Vacancies and Newly-Created Directorships.

Section 3.4.1. Vacancies. Any vacancy occurring in the Board may be filled in accordance with subsection 3.4.3 or may be filled by the affirmative vote of a majority of the remaining directors though less than a quorum of the Board. A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office.

3

SUB_LANDRY_00000468

Section 3.4.2. Newly-Created Directorships. A directorship to be filled by reason of an increase in the number of directors may be filled in accordance with subsection 3.4.3 or may be filled by the Board for a term of office continuing only until the next election of one or more directors by the shareholders; provided that the Board may not fill more than two such directorships during the period between any two successive annual meetings of shareholders.

Section 3.4.3. Election by Shareholders. Any vacancy occurring in the Board or any directorship to be filled by reason of an increase in the number of directors may be filled by election at an annual or special meeting of shareholders called for that purpose.

Section 3.5. Removal. Unless otherwise restricted by law, the articles of incorporation or these Bylaws, any director or the entire Board may be removed, with or without cause, by a majority vote of the shares then entitled to vote at an election of directors, if notice of the intention to act upon such matter shall have been given in the notice calling such meeting.

Section 3.6. Compensation. Unless otherwise restricted by the articles of incorporation or these Bylaws, the Board shall have the authority to fix the compensation of directors. The directors may be reimbursed for their expenses, if any, of attendance at each meeting of the Board and may be paid either a fixed sum for attendance at each meeting of the Board or a stated salary as director. No such payment shall preclude any director from serving the Company in any other capacity and receiving compensation therefor. Members of committees of the Board may be allowed like compensation for attending committee meetings.

## ARTICLE IV.

## BOARD MEETINGS

Section 4.1. Annual Meetings. The Board shall meet as soon as practicable after the adjournment of each annual shareholders' meeting at the place of such shareholders' meeting. No notice to the directors shall be necessary to legally convene this meeting, provided a quorum is present.

Section 4.2. Regular Meetings. Regularly scheduled, periodic meetings of the Board may be held without notice at such times and places as shall from time to time be determined by resolution of the Board and communicated to all directors.

Section 4.3. Special Meetings. Special meetings of the Board (i) may be called by the president and (ii) shall be called by the president or secretary on the written request of two directors or the sole director, as the case may be. Notice of each special meeting of the Board shall be given, either personally or as hereinafter provided, to each director at least (i) twenty-four (24) hours before the meeting if such notice is delivered personally or by means of telephone, telegram, telex or facsimile transmission delivery; (ii) two days before the meeting

4

04/21/05 THU 09:40   FAX 5615754377 CHRISTENSON-ELMS AUCTION                                    ☒006/021

if such notice is delivered by a recognized express delivery service; and (iii) three days before the meeting if such notice is delivered through the United States mail. Any and all business may be transacted at a special meeting which may be transacted at a regular meeting of the Board. Except as may be otherwise expressly provided by law, the articles of incorporation or these Bylaws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.

Section 4.4.   Quorum, Required Vote.   A majority of the directors shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by law, the articles of incorporation or these Bylaws.   If a quorum shall not be present at any meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

Section 4.5.   Consent In Lieu of Meeting.   Unless otherwise restricted by the articles of incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting, if a consent in writing, setting forth the action so taken, is signed by all the members of the Board or committee, as the case may be.   Such signed consent shall have the same force and effect as a unanimous vote at a meeting and shall be filed with the minutes of proceedings of the Board or committee.

## ARTICLE V.

## COMMITTEES OF DIRECTORS

Section 5.1.   Establishment; Standing Committees.   The Board may by resolution establish, name or dissolve one or more committees, each committee to consist of one or more of the directors.   Each committee shall keep regular minutes of its meetings and report the same to the Board when required.   There shall exist the following standing committees, which committees shall have and may exercise the following powers and authority:

Section 5.1.1.   Finance Committee.   The Finance Committee shall, from time to time, meet to review the Company's consolidated operating and financial affairs, both with respect to the Company and to report its findings and recommendations to the Board for final action.   The Finance Committee shall not be empowered to approve any corporate action, of whatever kind or nature, and the recommendations of the Finance Committee shall not be binding on the Board, except when, pursuant to the provisions of Section 5.2 of these Bylaws, such power and authority have been specifically delegated to such committee by the Board by resolution.   In addition to the foregoing, the specific duties of the Finance Committee shall be determined by the Board by resolution.

5

SUB_LANDRY_00000470

Section 5.1.2. Audit Committee. The Audit Committee shall, from time to time, but no less than two times per year, meet to review and monitor the financial and cost accounting practices and procedures of the Company and to report its findings and recommendations to the Board for final action. The Audit Committee shall not be empowered to approve any corporate action, of whatever kind or nature, and the recommendations of the Audit Committee shall not be binding on the Board, except when, pursuant to the provisions of Section 5.2 of these Bylaws, such power and authority have been specifically delegated to such committee by the Board by resolution. In addition to the foregoing, the specific duties of the Audit Committee shall be determined by the Board by resolution.

Section 5.1.3. Compensation Committee. The Compensation Committee shall, from time to time, meet to review the various compensation plans, policies and practices of the Company and to report its findings and recommendations to the Board for final action. The Compensation Committee shall not be empowered to approve any corporate action, of whatever kind or nature, and the recommendations of the Compensation Committee shall not be binding on the Board, except when, pursuant to the provisions of Section 5.2 of these Bylaws, such power and authority have been specifically delegated to such committee by the Board by resolution. In addition to the foregoing, the specific duties of the Compensation Committee shall be determined by the Board by resolution.

Section 5.2.   Available Powers. Any committee established pursuant to Section 5.1 of these Bylaws, including the Finance Committee, the Audit Committee and the Compensation Committee, but only to the extent provided in the resolution of the Board establishing such committee or otherwise delegating specific power and authority to such committee and as limited by law, the articles of incorporation and these Bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all papers which may require it.

Section 5.3.   Alternate Members. The Board may designate one or more, directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.

Section 5.4.   Procedures. Time, place and notice, if any, of meetings of a committee shall be determined by the members of such committee. At meetings of a committee, a majority of the number of members designated by the Board shall constitute a quorum for the transaction of business. The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by law, the articles of incorporation or these Bylaws. If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.

6

SUB_LANDRY_00000471

## ARTICLE VI.

### OFFICERS

Section 6.1. Elected Officers. The Board shall elect a president and a secretary (collectively, the "Required Officers") having the respective duties enumerated below and may elect such other officers having the titles and duties set forth below which are not reserved for the Required Officers or such other titles and duties as the Board may by resolution from time to time establish:

Section 6.1.1. President. The president shall be the chief executive officer of the Company, shall have general and active management of the business and affairs of the Company and shall see that all orders and resolutions of the Board are carried into effect.

Section 6.1.2. Vice Presidents. In the absence of the president or in the event of his inability or refusal to act, the vice president (or in the event there be more than one vice president, the vice presidents in the order designated by the Board, or in the absence of any designation, then in the order of their election or appointment) shall perform the duties of the president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president. The vice presidents shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 6.1.3. Secretary. The secretary shall attend all meetings of the shareholders, the Board and (as required) committees of the Board and shall record all the proceedings of such meetings in minute books to be kept for that purpose. He shall give, or cause to be given, notice of all meetings of the shareholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board or the president. He shall have custody of the corporate seal of the Company and he, or an assistant secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his signature or by the signature of such assistant secretary. The Board may give general authority to any other officer to affix the seal of the Company and to attest the affixing thereof by his signature.

Section 6.1.4. Assistant Secretaries. The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the Board (or if there be no such determination, then in the order of their election or appointment) shall, in the absence of the secretary or in the event of his inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 6.1.5. Treasurer. Unless the Board by resolution otherwise provides, the treasurer shall be the chief accounting and financial officer of the Company. The Treasurer shall have the custody of the corporate funds and securities, shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys

7

SUB_LANDRY_00000472

and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board.   He shall disburse the funds of the Company as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the president and the Board, at its regular meetings, or when the Board so requires, an account of all his transactions as treasurer and of the financial condition of the Company.

Section 6.1.6. Assistant Treasurers.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the Board (or if there be no such determination, then in the order of their election or appointment) shall, in the absence of the treasurer or in the event of his inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 6.1.7. Divisional Officers.  Each division of the Company, if any, may have a president, secretary, treasurer or controller and one or more vice presidents, assistant secretaries, assistant treasurers and other assistant officers.  Any number of such offices may be held by the same person.  Such divisional officers will be appointed by, report to and serve at the pleasure of the Board and such other officers that the Board may place in authority over them.  The officers of each division shall have such authority with respect to the business and affairs of that division as may be granted from time to time by the Board, and in the regular course of business of such division may sign contracts and other documents in the name of the division where so authorized; provided that in no case and under no circumstances shall an officer of one division have authority to bind any other division of the Company except as necessary in the pursuit of the normal and usual business of the division of which he is an officer.

Section 6.2.   Election.  All elected officers shall serve until their successors are duly elected and qualified or until their earlier death, disqualification, retirement, resignation or removal from office.

Section 6.3.   Appointed Officers.  The Board may also appoint or delegate the power to appoint such other officers, assistant officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary, and the titles and duties of such appointed officers may be as described in Section 6.1 for elected officers; provided that the officers and any officer possessing authority over or responsibility for any functions of the Board shall be elected officers.

Section 6.4.   Multiple Officeholders, Shareholder and Director Officers.  Any number of offices may be held by the same person, unless the articles of incorporation or these Bylaws otherwise provide.   Officers need not be shareholders or residents of the State of Texas. Officers, such as the president, possessing authority over or responsibility for any function of the Board must be directors.

8

Section 6.5. <u>Compensation, Vacancies</u>. The compensation of elected officers shall be set by the Board. The Board shall also fill any vacancy in an elected office. The compensation of appointed officers and the filling of vacancies in appointed offices may be delegated by the Board to the same extent as permitted by these Bylaws for the initial filling of such offices.

Section 6.6. <u>Additional Powers and Duties</u>. In addition to the foregoing especially enumerated powers and duties, the several elected and appointed officers of the Company shall perform such other duties and exercise such further powers as may be provided by law, the articles of incorporation or these Bylaws or as the Board may from time to time determine or as may be assigned to them by any competent committee or superior officer.

Section 6.7. <u>Removal</u>. Any officer or agent or member of a committee elected or appointed by the Board may be removed by the Board whenever in its judgment the best interest of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent or member of a committee shall not of itself create contract rights.

## ARTICLE VII.

### SHARE CERTIFICATES

Section 7.1. <u>Entitlement to Certificates</u>. Every holder of the capital stock of the Company, unless and to the extent the Board by resolution provides that any or all classes or series of stock shall be uncertificated, shall be entitled to have a certificate, in such form as is approved by the Board and conforms with applicable law, certifying the number of shares owned by him. Each certificate representing shares shall state upon the face thereof:

(1) that the corporation is organized under the laws of the State of Texas;

(2) the name of the person to whom issued;

(3) the number and class of shares and the designation of the series, if any, which such certificate represents; and

(4) the par value of each share represented by such certificate, or a statement that the shares are without par value.

Section 7.2. <u>Multiple Classes of Stock; Preemptive Rights</u>. In the event the Company shall be authorized to issue shares of more than one class, each certificate representing shares issued by the Company (1) shall conspicuously set forth on the face or back of the certificate a full statement of (a) all of the designations, preferences, limitations and relative rights of the shares of each class authorized to be issued and, (b) if the Company is authorized to issue shares of any preferred or special class in series, the variations in the relative rights and preferences

9

SUB_LANDRY_00000474

of the shares of each such series to the extent they have been fixed and determined and the authority of the Board to fix and determine the relative rights and preferences of subsequent series; or (2) shall conspicuously state on the face or back of the certificate that (a) such a statement is set forth in the articles of incorporation on file in the office of the Secretary of State of the State of Texas and (b) the Company will furnish a copy of such statement to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office. In the event the Company has by its articles of incorporation limited or denied the preemptive right of shareholders to acquire unissued or treasury shares of the Company, each certificate representing shares issued by the Company (1) shall conspicuously set forth on the face or back of the certificate a full statement of the limitation or denial of preemptive rights contained in the articles of incorporation, or (2) shall conspicuously state on the face or back of the certificate that (a) such a statement is set forth in the articles of incorporation on file in the office of the Secretary of State of the State of Texas and (b) the Company will furnish a copy of such statement to the record holder of the certificate without charge on request to the Company at its principal place of business or registered office.

Section 7.3.   Signatures.  Each certificate representing capital stock of the Company shall be signed by or in the name of the Company by (1) the president or a vice president; and (2) the treasurer, an assistant treasurer, the secretary or an assistant secretary of the Company. The  signatures of the officers of the Company may be facsimiles.  In case any officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to hold such office before such certificate is issued, it may be issued by the Company with the same effect as if he held such office on the date of issue.

Section 7.4.   Issuance and Payment.  Subject to any provision of the Constitution of the State of Texas to the contrary, the Board may authorize shares to be issued for consideration consisting of any tangible or intangible benefit to the Company, including, cash, promissory notes, services performed, contracts for services to be performed, or other securities of the Company.   Shares may not be issued until the full amount of the consideration, fixed as provided by law, has been paid.  When such consideration shall have been paid to the Company or to a corporation of which all the outstanding shares of each class are owned by the Company, the shares shall be deemed to have been issued and the subscriber or shareholder entitled to receive such issue shall be a shareholder with respect to such shares, and the shares shall be considered fully paid and non-assessable.   In the absence of fraud in the transaction, the judgment of the Board or the shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive.

Section 7.5.   Lost Certificates.  The Board may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Company alleged to have been lost, stolen or destroyed upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates, the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or

10

SUB_LANDRY_00000475

to give the Company a bond in such sum as it may direct as indemnity against any claim that may be made against the Company with respect to the certificate alleged to have been lost, stolen or destroyed.

Section 7.6.  Transfer of Stock.  Upon surrender to the Company or its transfer agent, if any, of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer and of the payment of all taxes applicable to the transfer of said shares, the Company shall be obligated to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books; provided, however, that the Company shall not be so obligated unless such transfer was made in compliance with applicable state and federal securities laws.

Section 7.7.  Registered Shareholders.  The Company shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, vote and be held liable for calls and assessments and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any person other than such registered owner, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

## ARTICLE VIII.

## INDEMNIFICATION

Section 8.1.  Definitions.  For purposes of this Article VIII:

(1)     "Corporation" includes any domestic or foreign predecessor entity of the Company in a merger, consolidation, or other transaction in which the liabilities of the predecessor are transferred to the Company by operation of law and in any other transaction in which the Company assumes the liabilities of the predecessor but does not specifically exclude liabilities that are the subject matter of this article;

(2)     "Director" means any person who is or was a director of the Company and any person who, while a director of the Company, is or was serving at the request of the Company as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise;

(3)     "Expenses" include court costs and attorneys' fees;

11

SUB_LANDRY_00000476

04/21/05 THU 09:43 FAX 5615754377 CHRISTENSON-ELMS AUCTION 013/021

(4) "Official

(i) when used with respect to a Director, the office of Director in the Company, but does not include service for any other foreign or domestic corporation or any partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise;

(ii) when used with respect to a person other than a Director, the elective or appointive office in the Company held by the officer or the employment or agency relationship undertaken by the employee or agent on behalf of the Company, but does not include service for any other foreign or domestic corporation or any partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise; and

(5) "Proceeding" means any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, arbitrative, or investigative, any appeal in such an action, suit, or proceeding, and any inquiry or investigation that could lead to such an action, suit, or proceeding.

Section 8.2. Mandatory Indemnification. The Company shall indemnify a person who was, is, or is threatened to be made a named defendant or respondent in a proceeding because the person is or was a Director only if it is determined in accordance with Section 8.6 of this Article VIII that the person:

(1) conducted himself in good faith;

(2) reasonably believed:

(i) in the case of conduct in his official capacity as a Director of the Company, that his conduct was in the Company's best interests; and

(ii) in all other cases, that his conduct was at least not opposed to the Company's best interests; and

(iii) in the case of any criminal proceeding, had no reasonable cause to believe his conduct was unlawful.

12

SUB_LANDRY_00000477

Section 8.3.   Prohibited Indemnification. Except to the extent permitted by Section 8.5 of this Article VIII, a Director may not be indemnified under Section 8.2 of this Article VIII in respect of a proceeding:

(1)   in which the person is found liable on the basis that personal benefit was improperly received by him, whether or not the benefit resulted from an action taken in the person's official capacity; or

(2)   in which the person is found liable to the Company.

Section 8.4.   Termination of Proceedings.   The termination of a proceeding by judgment, order, settlement, or conviction, or on a plea of nolo contendere or its equivalent is not of itself determinative that the person did not meet the requirements set forth in Section 8.2 of this Article VIII. A person shall be deemed to have been found liable in respect of any claim, issue or matter only after the person shall have been so adjudged by a court of competent jurisdiction after exhaustion of all appeals therefrom.

Section 8.5.   Judgments, Expenses, etc. A person may be indemnified under Section 8.2 of this Article VIII against judgments, penalties (including excise and similar taxes), fines, settlements, and reasonable expenses actually incurred by the person in connection with the proceeding; but if the person is found liable to the Company or is found liable on the basis that personal benefit was improperly received by the person, the indemnification (1) is limited to reasonable expenses actually incurred by the person in connection with the proceeding and (2) shall not be made in respect of any proceeding in which the person shall have been found liable for willful or intentional misconduct in the performance of his duty to the Company.

Section 8.6.   Determination of Indemnification.   A determination of indemnification under Section 8.2 of this Article VIII must be made:

(1)   by a majority vote of a quorum consisting of directors who at the time of the vote are not named defendants or respondents in the proceeding;

(2)   if such a quorum cannot be obtained, by a majority vote of a committee of the Board, designated to act in the matter by a majority vote of all directors, consisting solely of two or more directors who at the time of the vote are not named defendants or respondents in the proceeding;

(3)   by special legal counsel selected by the Board or a committee thereof by vote as set forth in subsection (1) or (2) of this Section 8.6, or, if such a quorum cannot be obtained and such a committee cannot be established, by a majority vote of all Directors; or

(4)   by the shareholders of the Company in a vote that excludes the shares held by Directors who are named defendants or respondents in the proceeding.

13

SUB_LANDRY_00000478

Section 8.7. <u>Determination of Reasonableness of Expenses</u>. Determination as to reasonableness of expenses must be made in the same manner as the determination that indemnification is permissible, except that if the determination that indemnification is permissible is made by special legal counsel, determination as to reasonableness of expenses must be made in the manner specified by subsection (3) of Section 8.6 of this Article VIII for the selection of special legal counsel.

Section 8.8. <u>Indemnification Against Reasonable Expenses</u>. The Company shall indemnify a Director against reasonable expenses incurred by him in connection with a proceeding in which he is a named defendant or respondent because he is or was a Director if he has been wholly successful, on the merits or otherwise, in the defense of the proceeding.

Section 8.9. <u>Payments in Advance of Disposition</u>. Reasonable expenses incurred by a Director who was, is, or is threatened to be made a named defendant or respondent in a proceeding shall be paid or reimbursed by the Company, in advance of the final disposition of the proceeding and without any of the determinations specified in Sections 8.6 and 8.7 of this Article VIII, after the Company receives a written affirmation by the Director of his good faith belief that he has met the standard of conduct necessary for indemnification under this Article VIII and a written undertaking by or on behalf of the Director to repay the amount paid or reimbursed if it is ultimately determined that he has not met those requirements.

Section 8.10. <u>Written Undertaking</u>. The written undertaking required by Section 8.9 of this Article VIII must be an unlimited general obligation of the Director but need not be secured. It may be accepted without reference to financial ability to make repayment.

Section 8.11. <u>Consistency with Articles of Incorporation</u>. Any provision for the Company to indemnify or to advance expenses to a Director who was, is, or is threatened to be made a named defendant or respondent in a proceeding, whether contained in the articles of incorporation, these Bylaws, a resolution of shareholders or Directors, an agreement, or otherwise, except in accordance with Section 8.16 of this Article VIII, is valid only to the extent it is consistent with this Article VIII as limited by the articles of incorporation, if such a limitation exists.

Section 8.12. <u>Other Expenses</u>. Notwithstanding any other provision of this Article VIII, the Company may pay or reimburse expenses incurred by a Director in connection with his appearance as a witness or other participation in a proceeding at a time when he is not a named defendant or respondent in the proceeding.

Section 8.13. <u>Officers, Employees and Agents</u>. An officer, employee or agent of the Company shall be indemnified as, and to the same extent, provided by Section 8.8 of this Article VIII for a Director and is entitled to seek indemnification under such section to the same extent as a Director. The Company shall advance expenses to an officer and may advance expenses to an employee or agent of the Company to the same extent that it shall advance expenses to Directors under this Article VIII.

14

SUB_LANDRY_00000479

Section 8.14. Other Capacities. A corporation may indemnify and advance expenses to persons who are not or were not officers, employees, or agents of the Company, but who are or were serving at the request of the Company as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise to the same extent that it shall indemnify and advance expenses to Directors under this Article VIII.

Section 8.15. Further Indemnification. The Company may indemnify and advance expenses to an officer, employee, agent, or person identified in Section 8.14 of this Article VIII and who is not a Director to such further extent, consistent with law, as may be provided by the articles of incorporation, these Bylaws, general or specific action of the Board, or contract or as permitted or required by common law.

Section 8.16. Insurance. The Company may purchase and maintain insurance or another arrangement on behalf of any person who is or was a Director, officer, employee, or agent of the Company or who is or was serving at the request of the Company as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person, whether or not the Company would have the power to indemnify him against that liability under this Article VIII. If the insurance or other arrangement is with a person or entity that is not regularly engaged in the business of providing insurance coverage, the insurance or arrangement may provide for payment of a liability with respect to which the Company would not have the power to indemnify the person only if including coverage for the additional liability has been approved by the shareholders of the Company. Without limiting the power of the Company to procure or maintain any kind of insurance or other arrangement, the Company may, for the benefit of persons indemnified by the Company, (1) create a trust fund; (2) establish any form of self-insurance; (3) secure its indemnity obligation by grant of a security interest or other lien on the assets of the Company; or (4) establish a letter of credit, guaranty, or surety arrangement. The insurance or other arrangement may be procured, maintained, or established within the Company or with any insurer or other person deemed appropriate by the Board regardless of whether all or part of the stock or other securities of the insurer or other person are owned in whole or part by the Company. In the absence of fraud, the judgment of the Board as to the terms and conditions of the insurance or other arrangement and the identity of the insurer or other person participating in an arrangement shall be conclusive and the insurance or arrangement shall not be voidable and shall not subject the Directors approving the insurance or arrangement to liability, on any ground, regardless of whether Directors participating in the approval are beneficiaries of the insurance or arrangement.

Section 8.17. Report To Shareholders. Any indemnification of or advance of expenses to a Director in accordance with this Article VIII shall be reported in writing to the shareholders with or before the notice or waiver of notice of the next shareholders' meeting or with or before

15

SUB_LANDRY_00000480

the next submission to shareholders of a consent to action without a meeting pursuant to Section A, Article 9.10, of the Texas Business Corporation Act and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

Section 8.18. Employee Benefit Plans. For purposes of this Article VIII, the Company is deemed to have requested a Director to serve in capacity in connection with an employee benefit plan whenever the performance by him of his duties to the Company also imposes duties on or otherwise involves services by him to the plan or participants or beneficiaries of the plan. Excise taxes assessed on a Director with respect to an employee benefit plan pursuant to applicable law are deemed fines. Action taken or omitted by him with respect to an employee benefit plan in the performance of his duties for a purpose reasonably believed by him to be in the interest of the participants and beneficiaries of the plan is deemed to be for a purpose which is not opposed to the best interests of the Company.

Section 8.19. Change in Governing Law. In the event of any amendment or addition to Article 2.02-1 of the Texas Business Corporation Act or the addition of any other section to such law which shall limit indemnification rights thereunder, the Company shall, to the extent permitted by the Texas Business Corporation Act, indemnify to the fullest extent authorized or permitted hereunder, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company), by reason of the fact that he is or was a Director, officer, employee or agent of the Company or is or was serving at the request of the Company as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, against all judgments, penalties (including excise and similar taxes), fines, settlements and reasonable expenses (including attorneys' fees and court costs) actually and reasonably incurred by him in connection with such action, suit or proceeding.

## ARTICLE IX.

## INTERESTED DIRECTORS, OFFICERS AND SHAREHOLDERS

Section 9.1. Validity; Disclosure; Approval. No contract or transaction between the Company and one or more of its directors or officers, or between the Company and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, solely because the director or officer is present at or participates in the meeting of the Board or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1)     the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Board or the committee,

16

SUB_LANDRY_00000481

and the Board or committee in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2)    the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3)    the contract or transaction is fair as to the Company as of the time it is authorized, approved, or ratified by the Board, a committee thereof, or the shareholders.

Section 9.2.    Quorum. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or by a committee which authorizes the contract or transaction.

Section 9.3.    Non-exclusive. This Article IX shall not be construed to invalidate any contract or transaction which would be valid in the absence of this Article IX.


ARTICLE X.

MISCELLANEOUS

Section 10.1. Place of Meetings. All shareholders, directors and committee meetings shall be held at such place or places, within or without the State of Texas, as shall be designated from time to time by the Board or such committee and stated in the notices thereof. If no such place is so designated, said meetings shall be held at the principal business office of the Company.

Section 10.2. Fixing Record Dates.

(a)    In order that the Company may determine the shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, to receive payment of any dividend or other distribution or allotment of any rights, to exercise any rights in respect of any change, conversion or exchange of stock or to effect any other lawful action, or to make a determination of shareholders for any other proper purpose (other than determining shareholders entitled to consent to action by shareholders proposed to be taken without a meeting of shareholders), the Board may fix, in advance, a record date for any such determination of shareholders, which shall not be more than sixty (60) nor less than ten (10) days prior to the date on which the particular action requiring such determination of shareholders is to be taken. In the absence of any action by the Board, the date on which a notice of meeting is given, or the date the Board adopts the resolution declaring a dividend or other distribution or allotment

17

or approving any change, conversion or exchange, as the case may be, shall be the record date. A record date validly fixed for any meeting of shareholders and the determination of shareholders entitled to vote at such meeting shall be valid for any adjournment of said meeting except where such determination has been made through the closing of stock transfer books and the stated period of closing has expired.

(b)     In order that the Company may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board. If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is otherwise required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office in the State of Texas, its principal place of business, or an officer or agent of the Company having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Company's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board and prior action by the Board is required, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

Section 10.3. <u>Waiver of Notice</u>. Whenever any notice is required to be given under law, the articles of incorporation or these Bylaws, a written waiver of such notice, signed before or after the date of such meeting by the person or persons entitled to said notice, shall be deemed equivalent to such required notice. All such waivers shall be filed with the corporate records. Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 10.4. <u>Attendance via Communications Equipment</u>. Unless otherwise restricted by law, the articles of incorporation or these Bylaws, members of the Board, members of any committee thereof or the shareholders may hold a meeting by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can effectively communicate with each other. Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 10.5. <u>Dividends</u>. Dividends on the capital stock of the Company, paid in cash, property, or securities of the Company, or any combination thereof, and as may be limited by applicable law and applicable provisions of the articles of incorporation (if any), may be declared by the Board at any regular or special meeting.

18

SUB_LANDRY_00000483

Section 10.6. Reserves. Before payment of any dividend, there may be set aside out of any funds of the Company available for dividends such sum or sums as the Board from time to time, in its absolute discretion, thinks proper as a reserve or reserves to meet contingencies, for equalizing dividends, for repairing or maintaining any property of the Company, or for such other purpose as the Board shall determine to be in the best interest of the Company; and the Board may modify or abolish any such reserve in the manner in which it was created.

Section 10.7. Reports to Shareholders. The Board shall present at each annual meeting of shareholders, and at any special meeting of shareholders when called for by vote of the shareholders, a statement of the business and condition of the Company.

Section 10.8. Contracts and Negotiable Instruments. Except as otherwise provided by law or these Bylaws, any contract or other instrument relative to the business of the Company may be executed and delivered in the name of the Company and on its behalf by the president or any vice president; and the Board may authorize any other officer or agent of the Company to enter into any contract or execute and deliver any contract in the name and on behalf of the Company, and such authority may be general or confined to specific instances as the Board may by resolution determine. All bills, notes, checks or other instruments for the payment of money shall be signed or countersigned by such officer, officers, agent or agents and in such manner as are permitted by these Bylaws and/or as, from time to time, may be prescribed by resolution (whether general or special) of the Board. Unless authorized so to do by these Bylaws or by the Board, no officer, agent or employee shall have any power or authority to bind the Company by any contract or engagement, or to pledge its credit, or to render it liable pecuniarily for any purpose or to any amount.

Section 10.9. Fiscal Year. The fiscal year of the Company shall be fixed by resolution of the Board.

Section 10.10. Seal. The seal of the Company shall be in such form as shall from time to time be adopted by the Board. The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 10.11. Books and Records. The Company shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its shareholders, Board and committees and shall keep at its registered office or principal place of business, or at the office of its transfer agent or registrar, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of the shares held by each.

Section 10.12. Resignation. Any director, committee member, officer or agent may resign by giving written notice to the the president or the secretary. The resignation shall take effect at the time specified therein, or immediately if no time is specified. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

19

SUB_LANDRY_00000484

Section 10.13.  Surety Bonds.  Such officers and agents of the Company (if any) as the president or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Company, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Company, in such amounts and by such surety companies as the president or the Board may determine.  The premiums on such bonds shall be paid by the Company and the bonds so furnished shall be in the custody of the Secretary.

Section 10.14.  Proxies in Respect of Securities of Other Corporations.  The president, any vice president or the secretary may from time to time appoint an attorney or attorneys or an agent or agents for the Company to exercise, in the name and on behalf of the Company, the powers and rights which the Company may have as the holder of stock or other securities in any other corporation to vote or consent in respect of such stock or other securities, and the president, any vice president or the secretary may instruct the person or persons so appointed as to the manner of exercising such powers and rights; and the president, any vice president or the secretary may execute or cause to be executed, in the name and on behalf of the Company and under its corporate seal or otherwise, all such written proxies or other instruments as he may deem necessary or proper in order that the Company may exercise such powers and rights.

Section 10.15.  Amendments.  These Bylaws may be altered, amended, repealed or replaced by the shareholders, or by the Board when such power is conferred upon the Board by the articles of incorporation, at any annual shareholders meeting or annual or regular meeting of the Board, or at any special meeting of the shareholders or of the Board if notice of such alteration, amendment, repeal or replacement is contained in the notice of such special meeting. If the power to adopt, amend, repeal or replace these Bylaws is conferred upon the Board by the articles of incorporation, the power of the shareholders to so adopt, amend, repeal or replace these Bylaws shall not be divested or limited thereby.

DAK\12817\0000DOCS\BYLAWS.TX

20

SUB_LANDRY_00000485

Regulations
for

Westport Asset Management, L.L.C.

a Florida Limited Liability Company

## ARTICLE I
### Name, Registered Office and
### Registered Agent

**Section 1. Name.** The name of this company is <u>Westport Asset Management, L.L.C.</u>.

**Section 2. Registered Office and Registered Agent.** The address of the registered office of this company and the agent at said address is <u>Lawrence L. Landry, 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, FL 33410</u>.

## ARTICLE II
### Seal and Fiscal Year

**Section 1. Seal.** The seal of this company shall have inscribed on it the name of this company, the date of its organization and the words "Limited Liability Company Seal, State of Florida". The words "company seal" or their equivalent may be used as a facsimile of or as the seal.

**Section 2. Fiscal Year.** The fiscal year of this company shall be determined by the managers upon filing the tax return of this company.

## ARTICLE III
### Powers

The company may:

**Section 1.** Sue or be sued, or complain or defend in its name.

**Section 2.** Purchase, take, receive, lease or otherwise acquire, own, hold, improve, or use, or otherwise deal in or with, real or personal property, wherever situated.

**Section 3.** Sell, convey, mortgage, pledge, create a security interest in, lease, exchange, or transfer, or otherwise dispose of, all or any part of its property or assets.

**Section 4.** Purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, or pledge, or otherwise dispose of or otherwise use or deal in or with shares or other interests in or obligations of other foreign or domestic limited liability companies, domestic or foreign corporations, associations, general or limited partnerships, or individuals; or direct or indirect obligations of the United States or any other government, state, territory, governmental district, or municipality or of any instrumentality thereof.

**Section 5.** Make contracts or guarantees or incur liabilities; borrow money at such rates of interest as the limited liability company may determine; issue its notes, bonds, or other obligations; or secure any of its obligations by mortgage or pledge of all or any part of its property, franchises, and income.

**Section 6.** Lend money for any lawful purposes, invest or reinvest its funds, or take and hold real or personal property as security for the payment of funds so loaned or invested.

and3956.reg

SUB_LANDRY_00000486

**Section 7.** Conduct its business, carry on its operations and have offices, and exercise the powers granted by this chapter within or without this state.

**Section 8.** Elect or appoint managers and agents of the limited liability company, define their duties, and fix their compensation.

**Section 9.** Make and alter its regulations, not inconsistent with its articles of organization or with the laws of this state, for the administration and regulation of the affairs of the company.

**Section 10.** Make donations to the public welfare or for charitable, scientific, or educational purposes.

**Section 11.** Indemnify a member or manager or any other person to the same extent as a corporation may indemnify any of the directors, officers, employees, or agents of the company against expenses actually and reasonably incurred by him or it in connection with the defense of an action, suit, or proceeding, whether civil or criminal, in which he or it is made a party.

**Section 12.** Cease its activities and surrender its certificate of organization.

**Section 13.** Have and exercise all powers necessary or convenient to effect any or all of the purposes for which the company is organized.

**Section 14.** Transact any lawful business which the members or the managers find to be in aid of governmental policy.

**Section 15.** Pay pensions and establish pension plans, profit-sharing plans, and other incentive plans for any or all of its managers and employees.

**Section 16.** Be a promoter, incorporator, general partner, limited partner, member associate, or manager of any corporation, partnership, limited partnership, limited liability company, joint venture, trust, or other enterprise.

**Section 17.** Have and exercise all powers necessary or convenient to effect it purposes.

### ARTICLE IV
### Members Meetings

**Section 1. Place of Meetings.** Meetings of the members shall be held at the office of the company or at any other place within or without the State of Florida.

**Section 2. Annual Meeting.** An annual meeting of the members shall be held on the <u>third Tuesday</u> in <u>January</u> of each year, if not a legal holiday, and if a legal holiday, then on the next secular day following that which is not a legal holiday, at 10:00 a.m., and the members shall elect managers and officers and transact other business. If an annual meeting has not been called and held within six (6) months after the time designated for it, any member may call it.

**Section 3. Special Meetings.** Special meetings of the members may be called by the President, by a majority of the managers or by a majority in interest of members in good standing.

**Section 4. Notice of Meetings.** A written or printed notice of members' meetings, stating the place, date and hour of the meeting, and in case of a special meeting, the purpose or purposes of the

SUB_LANDRY_00000487

meeting shall be given by the Secretary of the company, or by the person authorized to call the meeting, to each member of record entitled to vote at the meeting. This notice shall be sent at least ten (10) business days, but not more than sixty (60) business days before the date named for the meeting (unless a greater period of notice is required by law in a particular case) to each member by United States mail, or by telegram, charges prepaid, to his address appearing on the books of the company.

Section 5. Waiver of Notice. A member, either before or after a meeting of members, may waive notice of the meeting, which waiver of notice must be in writing, and his waiver shall be deemed the equivalent of giving notice. Attendance at a members meeting, either in person or by proxy, of a person entitled to notice shall constitute a waiver of notice of the meeting unless he attends for the express purpose of objecting to the transaction of business on the ground that the meeting was not lawfully called or convened.

Section 6. Voting Rights. Subject to the provisions of the laws of the State of Florida, each member of this company shall be entitled to one (1) vote. Assignees of such interest within ten (10) days next preceding the date set for a meeting shall not be entitled to notice of or to vote at the meeting.

Section 7. Quorum. The presence in person of a majority in interest of the members entitled to vote shall constitute a quorum at members meetings. At a duly organized meeting members present can continue to do business until adjournment even though enough members withdraw to leave less than a quorum. The affirmative vote of a majority in interest of the members present and entitled to vote shall be the act of the members unless otherwise specified herein.

Section 8. Adjournments. Any meeting of members may be adjourned. Notice of the adjourned meeting or of the business to be transacted there, other than by announcement at the meeting at which the adjournment is taken shall not be necessary. If, however, after the adjournment the new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given in compliance with Section 4 hereof to each member on the new record date entitled to vote at such meeting. At an adjourned meeting at which a quorum is present, any business may be transacted which could have been transacted at the meeting originally called.

Section 9. Informal Action by Members. Any action that may be taken at a members meeting may be taken without a meeting if a consent in writing, setting forth the action, shall be signed by members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and filed with the Secretary of the company. Within ten (10) days after obtaining such authorization by written consent, notice must be given to those members who have not consented in writing to such action taken.

Section 10. Fixing of Record Date. For the purpose of determining members entitled to notice of, or to vote, at any meeting of members, or any adjournment thereof, or members entitled to receive payment of any dividend, or in order to make a determination of members for any other proper purpose, the managers may fix in advance a date as the record date for any such determination of such members, such date in any case to be not more than sixty (60) days and, in case of a meeting of members, not less than ten (10) days prior to the date on which the particular action requiring such determination of members is to be taken. If no record date is fixed for the determination of members entitled to notice or to vote at a meeting of members, or members entitled to receive payment of a dividend, the date on which notice of the meeting is mailed, or the date on which the resolution of the managers declaring such dividend is adopted, as the case may be, shall be the record date for such determination of members. When a determination of members entitled to vote at any meeting has been made, as provided herein, such determination shall apply to any adjournment thereof, unless the managers fixed a new record date for the meeting.

SUB_LANDRY_00000488

## ARTICLE V
### Managers

**Section 1. Number, Qualification and Term.** The business and affairs of the company shall be managed by one or more managers. The member shall elect the manager or managers annually at the annual meeting of the members, and each manager shall serve at the pleasure of the members. No manager need be a resident in the State of Florida.

**Section 2. Removals and Vacancies.** The members shall replace any manager or managers whom they remove with an interim manager or managers who shall serve until the next annual meeting of members or until a replacement is qualified and elected.

**Section 3. Compensation.** Managers shall not receive a salary for their services but, by resolution of the Board, a fixed sum and expenses of attendance at their meetings may be given. A manager may serve the company in a capacity other than manager and receive compensation for the services rendered in that other capacity.

**Section 4. Place of Meetings.** All meetings of the managers, may be held at the offices of the company or at any place within or without the State of Florida that a majority of the managers may by resolution appoint.

**Section 5. Annual Meeting.** The managers shall meet each year immediately after the annual meeting of the members.

**Section 6. Notice of Meetings.** Notice of the annual meeting of such managers need not be given. Written notice of each special meeting, setting forth the time and place of such meeting, and stating the purpose of such meeting, shall be given to each manager at least twenty-four (24) hours before the meeting. This notice may be given either personally or by sending a copy of the notice through the United States mail or by telegram, charges prepaid, to the address of each manager appearing on the books of the company.

**Section 7. Waiver of Notice.** A manager may waive in writing notice of a special meeting or annual meeting either before or after the meeting, and his waiver shall be deemed the equivalent of giving notice. Attendance of a manager at any meeting shall constitute waiver of notice of that meeting, unless he attends for the express purpose of objecting to the transaction of business because the meeting has not been lawfully called or convened.

**Section 8. Quorum.** Unless otherwise provided for in the Articles of Organization at any meeting of the managers a majority of the managers in office shall be necessary to constitute a quorum for the transaction of business. If a quorum is present, the acts of a majority of the managers in attendance shall be the acts of the management. Managers shall be deemed present at any meeting if a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other is used.

**Section 9. Adjournment.** A meeting of the managers may be adjourned. Notice of the adjourned meeting or of the business to be transacted there, other than by announcement at the meeting at which the adjournment is taken, shall not be necessary. At an adjourned meeting at which a quorum is present, any business may be transacted which could have been transacted at the meeting originally called.

**Section 10. Informal Action.** If all the managers severally or collectively consent in writing to any action taken or to be taken by the company, and the writing or writings evidencing their consent are filed

Regulations for Westport Asset Management, L.L.C.
-Page 4 of 12-

SUB_LANDRY_00000489

with the Secretary of the company, the action shall be as valid as though it had been authorized at a meeting of the managers.

## ARTICLE VI
### Officers, Agents and Employees

**Section 1. Officers.** The officers of the company shall be elected by the members and shall consist of a President, Secretary, and Treasurer. Other officers, such as Vice-Presidents, assistant officers, agents and/or employees that the members from time to time may deem necessary may be elected by the members or be appointed in a manner prescribed. Two or more offices may be held by the same person. Officers shall hold office until their successors are chosen by the members and have qualified, unless they are sooner removed from office.

**Section 2. Vacancies.** When a vacancy occurs in one of the executive offices by death, resignation or otherwise, it shall be filled by the members. The officer so selected shall hold office until his successor is chosen and qualified.

**Section 3. Salaries.** The members shall fix the salaries of the officers of the company. The salaries of other agents and employees of the company may be fixed by the members or by an officer to whom that function has been delegated.

**Section 4. Removal of Officers and Agents.** An officer or agent of the company may be removed by a majority in interest of the members whenever in their judgment the best interests of the company will be served by the removal. The removal shall be without prejudice to the contract rights, if any, of the persons so removed.

**Section 5. President: Powers and Duties.** The President shall be the chief executive officer of the company and shall have general supervision of the business of the company. He shall preside at all meetings of members and managers and discharge the duties of a presiding officer, shall present at each annual meeting of the members a report of the business of the company for the preceding fiscal year, and shall perform whatever other duties the members may from time to time prescribe.

**Section 6. Vice-President: Powers and Duties.** The Vice-President shall, in the absence or disability of the President, perform the duties and exercise the powers of the President. He shall also perform whatever duties and have whatever powers the members may from time to time assign him.

**Section 7. Secretary: Powers and Duties.** The Secretary shall attend all meetings of the members and managers and shall keep or cause to be kept a true and complete record of the proceedings of those meetings. He shall keep the company seal of the company and when directed by the manager, shall affix it to any instrument requiring it. He shall give, or cause to be given, notice of all meetings of the members and managers and shall perform whatever additional duties the managers and the President may from time to time prescribe.

**Section 8. Treasurer: Powers and Duties.** The Treasurer shall have custody of company funds and securities. He shall keep full and accurate accounts of receipts and disbursements and shall deposit all company monies and other valuable effects in the name and to the credit of the company in a depository or depositories designated by the managers. He shall disburse the funds of the company and shall render to the President or the managers, whenever they may require it, an account of his transactions as Treasurer and of the financial condition of the company.

**Section 9. Delegation of Duties.** Whenever an officer is absent or whenever for any reason the

SUB_LANDRY_00000490

Board of Directors may deem it desirable, the managers may delegate the powers and duties of an officer to any other officer or officers or to any manager or managers.

## ARTICLE VII
### Special Company Acts

**Section 1. Execution of Written Instruments.** Unless otherwise stated herein (See Article XIII below), specifically determined by the managers or otherwise required by law, formal contracts of the company and satisfactions and other company instruments or documents, shall be executed, signed or endorsed by the President or any Vice President or chief executive officer and sealed with the common or company seal of this company.

**Section 2. Signing of Checks and Notes.** Checks, notes, drafts and demands for money shall be signed by the officer or officers from time to time designated by the managers.

**Section 3. Voting Shares Held in Other Companys.** In the absence of other arrangements by the managers, shares of stock issued by any other company and owned or controlled by this company may be voted at any meeting of the other company by the President, or if he is not present at the meeting, by the Vice President of this company; and in the event neither the President nor the Vice-President is to be present at a meeting, the shares may be voted by such person as the President and Secretary of the company shall by duly executed proxy designate to represent the company at the meeting.

## ARTICLE VIII
### Amendments to Articles of Organization

**Section 1.** The articles of organization of a limited liability company shall be amended when:

(a) There is a change in the name of the limited liability company or in the amount or character of the contributions to capital.

(b) There is a change in the character of the business of the limited liability company.

(c) There is a false or erroneous statement in the articles of organization.

(d) There is a change in the time as stated in the articles of organization for the dissolution of the limited liability company.

(e) A time is fixed for the dissolution of the limited liability company, if no time is specified in the articles of organization.

(f) The members desire to make a change in any other statement in the articles of organization in order for it to accurately represent the agreement between them.

**Section 2.** The form for evidencing an amendment to the articles of organization of a limited liability company shall be as promulgated by the Department of State and shall contain such terms and provisions consistent with Florida law as shall be determined by the Department of State. The amendment shall be signed and sworn to by all members, and an amendment adding a new member shall be signed also by the member to be added; thereafter the amendment shall be forwarded to the Department of State for filing accompanied by the required filing fee.

SUB_LANDRY_00000491

## ARTICLE IX
### Contributions to Capital

Section 1.   Capital Contributions. The contributions to capital by a member to the limited liability company may consist of cash or other property, but not services.

Section 2.   Loans from Members. In lieu of voting an additional assessment of capital to meet operating expenses or to finance new investments, the company may, as determined by the members, borrow money from one or more of the members or third persons. In the event that a loan agreement is negotiated with a member, such member shall be entitled to receive interest at a rate and upon such terms to be determined by all the members, and said loan shall be repaid to the member, with accrued interest, if any, as soon as the affairs of the company will permit. The loan shall be evidenced by a promissory note obligating the assets of the company and a mortgage if agreed to by the members. Such interest and repayment of the amounts so loaned are to be entitled to priority of payment over the division and distribution of capital contributions and profit among members.

## ARTICLE X
### Unreasonable Compensation

Any payments made to an officer of the company such as a salary, commission, bonus, interest or rent or entertainment expense incurred by him which shall be disallowed in whole or in part as a deductible expense by the Internal Revenue Service shall be reimbursed by such officer to the company to the full extent of such disallowance. It shall be the duty of the directors as a board to enforce payment of each such amount disallowed. In lieu of payment by the officer, subject to the determination of the directors, proportionate amounts may be withheld from his future compensation payments until the amount owed to the company has been recovered.

## ARTICLE XI
### Indemnification

The company may be empowered to indemnify any officer or manager, or any former officer or manager, by the vote of all of the members. If such indemnification is authorized by the members, expenses incurred in defending such civil or criminal action, suit or proceeding may be paid by the company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the director, officer, employee or agent to repay such amount unless he or she is found to be entitled to such indemnification.

## ARTICLE XII
### Contracting Debts

Except as otherwise provided in this chapter or the articles of organization, no debt shall be contracted nor liability incurred by or on behalf of a limited liability company, except by all the managers.

## ARTICLE XIII
### Limited Liability Company Property

Real or personal property owned or purchased by a limited liability company shall be held and owned, and conveyance shall be made, in the name of the limited liability company. Instruments and documents providing for the acquisition, mortgage, or disposition of property of the limited liability company shall be valid and binding upon the company, if they are executed by one or more managers of limited liability company having a manager or managers, or if they are executed by one or more

SUB_LANDRY_00000492

members of a limited liability company in which management has been retained in the members.

## ARTICLES XIV
### Distribution of Property; Impairment of Capital

The limited liability company may, from time to time, distribute its property to the members of the limited liability company upon the basis stipulated in the regulations, provided that, after distribution is made, the assets of the limited liability company are in excess of all liabilities of the limited liability company except liabilities to members on account of their contributions. A distribution shall be deemed a "dividend" under s.316 of the Internal Revenue Code as such code is defined in s.220.03.

## ARTICLES XV
### Withdrawal or Reduction of Members Contributions to Capital

Section 1. A member shall not receive out of limited liability company property any part of his or its contribution to capital until:

(a)     All liabilities of the limited liability company, except liabilities to members on account of their contributions to capital, have been paid or sufficient property of the company remains to pay them.

(b)     The consent of all members is had, unless the return of the contribution to capital may be rightfully demanded as provided in this article.

(c)     The articles of organization are canceled or so amended as to set out the withdrawal reduction.

Section 2. Subject to the provisions of subsection (1), a member may rightfully demand the return of his or its contribution:

(a)     On the dissolution of this limited liability company;

(b)     When the date an event specified in the articles of organization for the return of the contribution has arrived; or

(c)     After the member has given all other members of the limited liability company 6 months' prior notice in writing, if no time is specified in the articles of organization for the dissolution of the limited liability company.

Section 3. In the absence of a statement in the articles of organization to the contrary or the consent of all members of the limited liability company, a member, irrespective of the nature of his or its contribution, has only the right to demand and receive cash in return for his or its contribution to capital.

Section 4. A member of the company may have the limited liability company dissolved and its affairs wound up when:

(a)     The member rightfully but unsuccessfully has demanded the return of his or its contribution; or

(b)     The other liabilities of the limited liability company have not been paid or the limited

SUB_LANDRY_00000493

liability company property is insufficient for their payment, and the member otherwise would be entitled to the return of his or its contribution.

## ARTICLE XVI
### Transferability of Members' Interest

The interest of a member in this company may be transferred or assigned. However, if all of the other members of the limited liability company other than the member proposing to dispose of his or its interest do not approve of the proposed transfer or assignment by unanimous written consent, the transferee of the interest of the member shall have no right to participate in the management of the business and affairs of the company or to become a member. The transferee shall be entitled to receive only the share of profits or other compensation by way of income and the return of contributions to which that member otherwise would be entitled.

## ARTICLE XVII
### Liability of Member to Limited Liability Company

**Section 1.** Members of this limited liability company are liable to the company:

(a)    For the difference between the amount of his or its contributions to capital which have been actually made and the amount which is stated in the articles of organization as having been made; and

(b)    For any unpaid contribution to capital which he or it agreed in the articles of organization to make in the future at the time and on the conditions stated in the articles of organization.

**Section 2.** Members hold as trustees for the limited liability company:

(a)    Specific property which is stated in the articles of organization as having been contributed by such member, but which property was not contributed or which property has been wrongfully or erroneously returned; and

(b)    Money or other property wrongfully paid or conveyed to such member on account of his or its contribution.

**Section 3.** The liabilities of the members as set out in this section may be waived or compromised only by the consent of all members, but a waiver or compromise shall not affect the right of a creditor of the limited liability company who extended credit or whose claim arose after the filing and before a cancellation or amendment of the articles of organization to enforce such liabilities.

**Section 4.** When a contributor has rightfully received the return in whole or in part of the capital of his or its contribution, the contributor is nevertheless liable to the limited liability company for any sum, not in excess of the return with interest, necessary to discharge its liability to all creditors of the limited liability company who extended credit or whose claims arose before such return.

**Section 5.** Neither the members of this limited liability company (nor the managers) are liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the limited liability company.

SUB_LANDRY_00000494

## ARTICLE XVIII
### Dissolution

Section 1. This limited liability company shall be dissolved upon the occurrence of any of the following events:

(a)   When the period fixed for the duration of the limited liability company expires.

(b)   By the unanimous written agreement of all members.

(c)   Upon the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a member or upon the occurrence of any other event which terminates the continued membership of a member in the limited liability company, unless the business of the limited liability company is continued by the consent of all the remaining members or under a right to continue stated in the articles of organization of the limited company.

Section 2.   As soon as possible following the occurrence of any of the events specified in subsection (1) which effects the dissolution of the limited liability company, the limited liability company shall execute a statement of intent to dissolve in the form prescribed by the Department of State.

## ARTICLES XIX
### Articles of Dissolution

A. Articles of Dissolution. When all debts, liabilities, and obligations of the limited liability company have been paid or discharged, or adequate provision has been made therefor, and all of the remaining property and assets of the limited liability company have been distributed to the members, articles of dissolution shall be executed and verified by the person signing the statement, which statement shall set forth:

Section 1. The name of the limited liability company.

Section 2. The fact that the Department of State has theretofore filed a statement of intent to dissolve the company and the date on which such statement was filed.

Section 3. The fact that all debts, obligations, and liabilities have been paid or discharged, or that adequate provision has been made therefor.

Section 4. The fact that all the remaining property and assets have been distributed among its members in accordance with their respective rights and interests.

Section 5. The fact that there are no suits pending against the company in any court or that adequate provision has been made for the satisfaction of any judgment, order, or decree which may be entered against it in any pending suit.

B. Filing of Articles of Dissolution.

Section 1. The articles of dissolution of the limited liability company shall be delivered to the Department of State. If the Department of State finds that such articles of dissolution conform to law, it shall, when all fees and license taxes have been paid as prescribed by Florida law, file the statement of intent to dissolve the company in accordance with Florida law. The Department of State shall then issue a certificate of dissolution.

SUB_LANDRY_00000495

**Section 2.** The certificate of dissolution shall be returned to the representative of the dissolved limited liability company. Upon the issuance of such certificate of dissolution, the existence of the company shall cease, except for the purpose of suits, other proceedings, and appropriate action as provided by Florida law. The manager or managers in office at the time of dissolution, or the survivors of them, or, if none, the members, shall thereafter be trustees for the members and creditors of the dissolved limited liability company; and as such the trustees shall have authority to distribute any company property discovered after dissolution, to convey real estate, and to take such other action as may be necessary on behalf of and in the name of such dissolved limited liability company.

C. Effect of Filing of Statement of Intent to Dissolve; Procedure After Filing Such Statement.

**Section 1.** Upon the filing by the Department of State of a statement of intent to dissolve, the limited liability company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until a certificate of dissolution has been issued by the Department of State or until a decree dissolving the limited liability company has been entered by a court of competent jurisdiction.

**Section 2.** Within 20 days after the Department of State has filed a statement of intent to dissolve, the limited liability company shall immediately cause notice thereof to be mailed to each creditor of, and claimant against, the limited liability company.

**Section 3.** The limited liability company shall proceed to collect its assets; convey and dispose of such of its properties as are not to be distributed in kind to its members; pay, satisfy, or discharge its liability and obligations or make adequate provisions for the payment or discharge thereof; and do all other acts required to liquidate its business and affairs. After paying or discharging all its obligations or making adequate provision for payment or discharge thereof the limited liability company may distribute the remainder of its assets, either in cash or in kind, among its members according to their respective rights and interests.

D. Distribution of Assets Upon Dissolution.

**Section 1.** In settling accounts after dissolution, the liabilities of the limited liability company shall be entitled to payment in the following order:

(a) Those liabilities to creditors, in the order priority as provided by law, except those liabilities to members of the limited liability company on account of their contributions;

(b) Those liabilities to members of the limited liability company in respect of their shares of the profits and other compensation by way of income on the contributions; and

(c) Those liabilities to members of the limited liability company in respect of their contributions to capital.

## ARTICLE XX
### Books and Records

**Section 1. Books and Records.** This company shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members and managers. It shall keep at its registered office or principal place of business a record of its members and giving the names and addresses of all members.

Regulations for Westport Asset Management, L.L.C.
-Page 11 of 13-

SUB_LANDRY_00000496

**Section 2. Financial Information.** Not later than four (4) months after the close of each fiscal or calendar year, this company shall prepare a balance sheet showing in reasonable detail the financial condition of the company as of its fiscal or calendar year, and a profit and loss statement showing the results of the operations of the company during its fiscal or calendar year.

Upon written request of any members, the company shall mail to such member a copy of the most recent such balance sheet and profit and loss statement.

The balance sheets and profit and loss statements shall be filed in the registered office of the company, kept for at least five (5) years, and shall be subject to inspection during business hours by any member, in person or by agent.

## ARTICLE XXI
### Record Date

The managers are authorized, from time to time, to fix in advance a date not more than forty (40) nor less than ten (10) business days before the date of any meeting of members, or not more than forty (40) days prior to the date for the payment of any dividend or the date for the allotment of rights, or a date in connection with the obtaining of the consent of members for any purpose, as record date for the determination of the members entitled to notice of and to vote at any such meeting and any adjournment thereof, or entitled to receive payment of any such dividend, or to give such consent; and in such case such members of record on the date so fixed, shall be entitled to such notice of and to vote at such meeting and any adjournment thereof, or to receive payment of such dividends, or to receive such allotment of rights, or to exercise such rights, or to give such consent, as the case may be, notwithstanding any transfer of any membership interest on the books of the company after any such record date fixed as aforesaid.

## ARTICLE XXII
### Dividends

The managers may from time to time declare, and the company may make distributions or pay dividends in the manner, and upon the terms and conditions provided by the Articles of Organization and these Regulations. Dividends may be paid in cash or in property.

## ARTICLE XXII
### Conflict of Interest

**Section 1.** No contract or other transaction between this company and one (1) or more of its managers, or between this company and any other company, firm, association or other entity in which one or more of its managers are directors or officers, or are financially interested, shall be either void or voidable for this reason alone or by reason alone that such manager or managers are present at the meeting of the managers, or of a committee thereof, which approves such contract or transaction, or that his or their votes are counted for such purposes:

A. If the fact of such common directorship, officership or financial interest is disclosed or known to the Board of Committee, and the Board of Committee approves such contract or transaction by vote sufficient for such purpose without counting the vote or votes of such interested manager or managers.

B. If such common directorship, officership or financial interest is disclosed or known to the manager entitled to vote thereon, and such contract or transaction is approved by a vote of all of the managers; or

SUB_LANDRY_00000497

C. If the contract or transaction is fair and reasonable as to the company at the time it is approved by the managers, or the members.

Section 2.  Common or interested members may be counted in determining the presence of a quorum at a meeting of the managers or of a committee which approves such contract or transaction.

### ARTICLE XXIII
#### Members' Covenants

Section 1.    Member's Personal Debts.  In order to protect the property and assets of the company from any claim against any member for personal debts owed by such member, each member shall promptly pay all debts owed by such member and shall indemnify the company from any claim that might be made to the detriment of the company by any personal creditor of such member.

Section 2.    Alienation of Membership Interest.  No member shall, except as provided in ARTICLE XVI Transferability of Members' Interest sell, assign, mortgage or otherwise encumber such member's membership interest in the company or in its capital assets or property; or enter into any agreement of any kind that will result in any person, firm or other organization becoming interested with such member in the company; or do any act detrimental to the best interests of the company.

The Managing Member hereby confirms that these Regulations have been approved by all the Members.

Double L Investment, Inc.,
a Texas corporation, as
Managing Member

BY: _____
Lawrence L. Landry, Pres.

Dated: _12/30/98_

ard3956.reg

Regulations for Westport Asset Management, L.L.C.
-Page 13 of 13-

SUB_LANDRY_00000498

SUB_LANDRY_00000499

# LIMITED PARTNERSHIP AGREEMENT OF
# WESTPORT REALTY ADVISORS, LTD.

## July 23, 1998

HFNY2: #320951 v22/03842-0001/071698

## TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.1   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE II

FORMATION, NAME, PURPOSES AND OFFICES . . . . . . . . . . . . . . . . . . . . 10
2.1   Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.2   Partnership Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.3   Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.4   Registered Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.5   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.6   Filings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.7   Independent Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE III

PARTNERS' CAPITAL CONTRIBUTIONS . . . . . . . . . . . . . . . . . . . . . . . . . 11
3.1   Capital Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
3.2   Capital Contributions of the Partners . . . . . . . . . . . . . . . . . . . . . . . . 11
3.3   Issuance of Additional Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
3.4   Capital Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
3.5   Other Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE IV

DISTRIBUTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
4.1   Distributions of Available Cash From All Sources . . . . . . . . . . . . . . . 13

ARTICLE V

ALLOCATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.1   Allocations of Profit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.2   Allocations of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
5.3   Special Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
5.4   Curative Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
5.5   Other Allocation Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
5.6   Tax Allocations: Code Section 704(c) . . . . . . . . . . . . . . . . . . . . . . . 18
5.7   Sale of the Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

HFNY2: #320951 v22/03842-0001/072498

SUB_LANDRY_00000500

## ARTICLE VI

MANAGEMENT OF THE PARTNERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
6.1    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
6.2    Restrictions on Authority of General Partner . . . . . . . . . . . . . . . . 21
6.3    Indemnification of the General Partner . . . . . . . . . . . . . . . . . . . . . 21
6.4    Operating Expenditures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
6.5    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
6.6    Partnership Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
6.7    Approval by Limited Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
6.8    Reliance by Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
6.9    Advisory Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
6.10   Limited Partner Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
6.11   Additional Interests in the Partnership . . . . . . . . . . . . . . . . . . . . . 24
6.12   Compensation to Others by Senior Living Ventures . . . . . . . . . . . . . 24
6.13   Covenant-not-to-Compete . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
6.14   Succession Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## ARTICLE VII

BOOKS AND RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
7.1    Books and Records; Periodic Reporting . . . . . . . . . . . . . . . . . . . . 25
7.2    Right to Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
7.3    Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
7.4    Tax Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## ARTICLE VIII

TRANSFERS AND WITHDRAWAL OF PARTNERS . . . . . . . . . . . . . . . . . . 26
8.1    Transfers and Admission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
8.2    Withdrawal of a Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
8.3    Put Events and Call Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## ARTICLE IX

DISSOLUTION OF PARTNERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
9.1    Dissolution Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
9.2    Reconstitution of the Partnership . . . . . . . . . . . . . . . . . . . . . . . . . 29

## ARTICLE X

LIQUIDATION OF THE PARTNERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . 29
10.1   Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

HFNY2: #320951 v22/03842-0001/072498

SUB_LANDRY_00000501

10.2   Deemed Distribution and Reconstitution .......................... 30
10.3   Rights of Limited Partners ........................................ 30

**ARTICLE XI**

REPRESENTATIONS OF LIMITED PARTNERS;
INDEMNIFICATION ................................................. 31
11.1   Representations of Limited Partners ............................ 31
11.2   Representations of Each Partner ............................... 32
11.3   INDEMNIFICATION ........................................... 32

**ARTICLE XII**

LIMITED PARTNER BENEFITS ...................................... 33
12.1   Noncompetition ................................................ 33
12.2   Limited Partner Services ....................................... 33

**ARTICLE XIII**

APPRAISAL METHODS ............................................. 33
13.1   Appraisals ..................................................... 33
13.2   Selection of Appraisers ......................................... 33
13.3   Appointment of Appraisers ..................................... 34
13.4   Costs of Appraisal .............................................. 34
13.5   Qualifications of Appraisers .................................... 34

**ARTICLE XIV**

MISCELLANEOUS .................................................. 34
14.1   Additional Documents and Acts ................................ 35
14.2   Governing Law ................................................. 35
14.3   Severability .................................................... 35
14.4   Binding Effect ................................................. 35
14.5   Agreement Restricted to Partners .............................. 35
14.6   Counterparts ................................................... 35
14.7   Power of Attorney; Amendments .............................. 35
14.8   Notices ........................................................ 36
14.9   Binding Arbitration ............................................ 36

HFNY2: #320951 v22/03842-0001/072498

SUB_LANDRY_00000502

THE INTERESTS DESCRIBED IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS (THE "ACTS"). SUCH INTERESTS ARE BEING OFFERED AND SOLD FOR INVESTMENT AND MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH INTERESTS UNDER THE ACTS OR AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH REGISTRATION IS NOT REQUIRED.

## LIMITED PARTNERSHIP AGREEMENT OF
## WESTPORT REALTY ADVISORS, LTD.

THIS LIMITED PARTNERSHIP AGREEMENT ("Agreement") of Westport Realty Advisors, Ltd. (the "Partnership"), shall be effective as of June __, 1998 (the "Effective Date"), by and among Westport Asset Management, Ltd., a Florida limited partnership (the "General Partner"), Royal Hawaiian Shopping Center, Inc. ("RHSCI"), Mahalo Limited ("Mahalo"), NFP, L.P. ("NFP"), Hunt-Crossroads Inc. ("Hunt") and The Mildred H. McEvoy Foundation ("Foundation") and each other eligible person who becomes a limited partner pursuant to the terms of this Agreement (each such person other than the General Partner and each such other eligible person is referred to herein as a "Limited Partner").

## PRELIMINARY STATEMENTS

NOW, THEREFORE, in consideration of the mutual covenants and on the terms and conditions contained herein, and for other good, valid and binding consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby replace all prior agreements in their entirety and agree as follows:

## ARTICLE I

## DEFINITIONS

1.1   Definitions.   In addition to the defined terms set forth above, the following capitalized terms and lower case terms shall have the following meanings when used in this Agreement:

(a)   "Act" means the Florida Revised Limited Partnership Act, as amended from time to time (or any corresponding provisions of succeeding law).

(b)   "Additional Capital Contribution" means any Capital Contribution by a Partner other than its initial Capital Contributions.

(c)   "Additional Interest" has the meaning set forth in Section 3.3.

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000503

(d)   "Adjusted Capital Account Deficit" means, with respect to any Limited Partner, the deficit balance, if any, in such Limited Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)   Credit to such Capital Account the maximum amount which such Limited Partner could then be obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5);

(ii)   Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(e)   "Affiliate" means, with respect to any Person, any Person controlling, controlled by or under common control with such Person, with the concept of control in such context meaning the possession, directly or indirectly, of the power to direct the management and policies of another, whether through the ownership of voting securities, by contract or otherwise.  An "Affiliate" of a natural person shall also include a spouse, direct lineal ancestors and descendants of a natural Person and others related to such natural Person no more distantly than first cousin.

(f)   "Appraised Value" has the meaning set forth in Section 8.3.

(g)   "Call Event" means the occurrence of the failure of a Supermajority in Interest of the Limited Partners to extend the term of the Partnership upon the request of the General Partner as provided for in Section 2.5.

(h)   "Capital Account" means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

(i)   To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 5.3 or Section 5.4 hereof, and the amount of any Partnership liabilities assumed by such Partner or which are secured by any asset of the Partnership distributed to such Partner;

(ii)   To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership asset distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive

- 2 -

SUB_LANDRY_00000504

share of Loss and any items in the nature of expenses or losses which are specially allocated pursuant to Section 5.3 or Section 5.4, and the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership;

(iii)    In the event all or a portion of an interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest; and

(iv)    In determining the amount of any credit or debit for purposes of subparagraph (i) and (ii) of this definition, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Regulations. In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership or a Partner), are computed in order to comply with such Regulations, the General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to Section 10.1 hereof upon the liquidation of the Partnership. The General Partner may also (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Partners and the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b) and 1.704-2.

(i)    "Capital Contributions" means, with respect to any Partner, the amount of money, in cash or from the proceeds of a draw on a letter of credit, and the initial Gross Asset Value of any property (other than money) contributed to the Partnership with respect to the interest in the Partnership held by such Partner. Loans to the Partnership shall not be considered Capital Contributions or included in the Capital Account of any Partner. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Partnership by the maker of the note (or a Partner related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Account of any Partner until the Partnership makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2).

- 3 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000505

(j)    "Capital Share" shall have the meaning set forth in Section 5.7.

(k)    "Certificate" means the Certificate of Limited Partnership of the Partnership filed in the Office of the Secretary of State of Florida.

(l)    "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(m)    "Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for U.S. federal income tax purposes with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for U.S. federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

(n)    "Distribution" means any distribution pursuant to Article IV (including pursuant to Articles V and X).

(o)    "Fiscal Year" means (i) the period commencing on the Effective Date or any subsequent January 1 and ending on the earlier to occur of (A) the next December 31 or (B) the date on which all assets of the Partnership are distributed pursuant to Section 10.1 hereof and the Certificate has been canceled pursuant to the Act.

(p)    "Excess Priority Allocation" means as to each Partner the amount by which the excess, if any, of (1) the Profit allocated to such Partner pursuant to Sections 5.1 (ii) and (iii) hereof, over the (2) the Loss allocated to such Partner pursuant to Sections 5.2(a) (ii) and (iii) hereof, is greater than the aggregate distributions made and to be made within sixty (60) days of the close of the Partnership's taxable year to such Partner pursuant to Section 4.1(b)(ii) hereof. For purposes of this definition, allocations and distributions to a Partner include allocations and distributions made to a Partner's predecessor-in-interest.

(q)    "Excess Priority Allocation Percentage" means as to each Partner the percentile equivalent of a fraction, the numerator of which is such Partner's Excess Priority Allocation and the denominator of which is the aggregate Excess Priority Allocation of all Partners.

(r)    "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

- 4 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000506

(i)    The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as agreed by he contributing Partner and the Partnership.  The Partners agree that the Gross Asset Value of the assets described in Section 3.2(a) is $148,000.00.

(ii)    The Gross Asset Value of each Partnership asset shall be adjusted to equal its respective gross fair market value, as reasonably determined by the General Partner, as of the following times:  (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership assets in liquidation of its interest in the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership and shall not be made upon the contributions made as of the date hereof or upon the making of Additional Capital Contributions pursuant to Section 3.3;

(iii)    The Gross Asset Value of any Partnership asset distributed to any Partner shall be adjusted to equal the gross fair market value of such asset on the date of distribution as reasonably determined by the General Partner; and

(iv)    The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to forth Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 5.3(g) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the General Partner reasonably determines that an adjustment pursuant to subparagraph (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), subparagraph (ii), or subparagraph (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Loss.

(s)    "Interest" means the ownership interest of a Partner in the Partnership and the obligations attendant thereto all as governed by this Agreement.

- 5 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000507

(t)     "Limited Partners" means RHSCI, Mahalo and Foundation, and each other eligible person who becomes a limited partner pursuant to the terms of this Agreement.

(u)     "Majority of the Limited Partners Percentage Interests" means the holders of more than fifty percent (50%) of the Percentage Interests held by Limited Partners.

(v)     "Net Cash Flow" means the excess of the revenues of the Partnership from all sources over the sum of (i) the Operating Expenditures of the Partnership, (ii) any distributions to the Partners pursuant to Section 4.1(a), and (iii) the amount of any reasonable reserves then established by the General Partner.

(w)     "Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

(x)     "Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

(y)     "Notice Interest" has the meaning set forth in Section 8.3 hereof.

(z)     "Notice Partner" means (x) in the case of a Put Event described in clause (i) of the definition of Put Event, the General Partner and (y) in the case of a Put Event described in clause (ii), the Partner denied the right to transfer its Interest.

(aa)    "Operating Expenditures" means all cash expenses, costs, debts and disbursements of every kind and nature which the Partnership shall pay in connection with the business of the Partnership or the performance of the General Partner's duties and obligations under this Agreement, including, without limitation, the cash portion of the purchase price of any property purchased by the Partnership, debt service, audit and legal expenses and management fees.

(bb)    "Partner Nonrecourse Debt Minimum Gain" means that amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with the principles of Regulations Section 1.704-2(i)(3).

(cc)    "Partners" means the General Partner and the Limited Partners, where no distinction is required by the context in which the term is used herein. "Partner" means any one of the Partners.

(dd)    "Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

(ee)    "Partner Nonrecourse Deductions" means any and all items of loss, deduction or expenditure (including any expenditure described in Sections 705(a)(2)(B) of

- 6 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000508

the Code) that in accordance with the principles of Regulations Sections 1.704- 2(i)(1) and (2), are attributable to a Partner Nonrecourse Debt.

(ff)     "Partnership" means Westport Realty Advisors, Ltd.

(gg)     "Partnership Account(s)" has the meaning assigned to such term in Section 6.6.

(hh)     "Partnership Minimum Gain" has the meaning set forth in Sections 1.704-2(b)(2) and (d) of the Regulations.

(ii)     "Percentage Interest" means the respective percentage interest of a Partner in the Partnership as may be adjusted under the terms hereof.  The Percentage Interests of the Partners as of the date hereof are set forth on Exhibit A.

(jj)     "Person" means any individual, partnership, corporation, limited liability company, trust, or other entity.

(kk)     "Preferred Capital Contribution" means the capital contributions made by Mahalo pursuant to Section 3.2(b) of this Agreement.

(ll)     "Preferred Return Amount" means a preferred return on capital of the Partnership equal to the sum of the annual returns on capital computed at a rate of 10% per annum on a principal balance equal to the sum of the Unrecovered Capital and the Unpaid Preferred Return (as of the first day of such year), compounded as of the last day of each year.

(mm)     "Principals" means Larry Landry and any other person who becomes a Principal by approval of a Supermajority in Interest of the Limited Partners.

(nn)     "Priority Allocation Shortfall" means as to each Partner the amount by which (a) the excess, if any, of (1) the Profit allocated to such Partner pursuant to Section 5.1(iii) hereof, over (2) the Loss allocated to such Partner pursuant to Section 5.2(a)(ii) hereof, is less than (b) the sum of (x) aggregate distributions made to such Partner pursuant to Section 4.1(b)(ii) hereof, and (y) such Partner's Unpaid Preferred Return.  For purposes of this definition, allocations and distributions to a Partner include allocations and distributions to a Partner's predecessor-in-interest

(oo)     "Priority Allocation Shortfall Percentage" means as to each Partner the percentile equivalent of a fraction, the numerator of which is such Partner's Priority Allocation Shortfall and the denominator of which is the aggregate Priority Allocation Shortfall of all Partners.

-7-

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000509

(pp)   "Profit" and "Loss" mean, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)   Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this definition shall be added to such taxable income or loss;

(ii)   Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss pursuant to this definition shall be subtracted from such taxable income or loss;

(iii)   In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss;

(iv)   Gain or loss resulting from any disposition of Partnership assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)   In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation;

(vi)   To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's interest in the Partnership, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Loss; and

- 8 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000510

(vii)   Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 5.3 or Section 5.4 hereof shall not be taken into account in computing Profits or Loss.

(qq)   "Property" means all real and personal property, whether tangible or intangible, acquired by the Partnership.

(rr)   "Put Event" means the occurrence of either of (i) the failure of a Supermajority in Interest of the Limited Partners to agree to a sale of substantially all of the assets of the Partnership as required in Section 6.2(a)(iii), or (ii) the refusal by a Limited Partner to allow a Transfer of an Interest by any Partner as is required by Section 8.1(a) hereof.

(ss)   "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(tt)   "Regulatory Allocations" has the meaning set forth in Section 5.4

(uu)   "Recipient Partner" has the meaning set forth in Section 8.3 hereof.

(vv)   "Revenue Share" shall have the meaning set forth in Section 5.7.

(ww)   "Sale of the Business" means a sale of substantially all of the operating assets of the business, which may include a sale of the operations of the Partnership but a retention of any investment positions of the Partnership.

(xx)   "Shared and Finders Fees" means a fee paid to a person for assistance in marketing efforts to obtain investments from clients.

(yy)   "Supermajority in Interest of the Limited Partners" means Limited Partners holding 66-2/3 % of the Percentage Interests of the Limited Partners.

(zz)   "Tax Matters Partner" shall have the meaning ascribed to such term in Section 7.3.

(aaa)   "Tax Distribution Amount" means the excess of the product of the net items of taxable income allocated to the Partners pursuant to clause (iii) of Section 5.1 and the highest marginal effective tax rate applicable to a Principal or a Partner (as in effect from time-to-time while such items were earned) over the aggregate amount of distributions previously made pursuant to clause (i) of Section 4.1(b).

(bbb)   "Transfer" has the meaning set forth in Section 8.1(a).

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000511

(ccc) "Unpaid Preferred Return" means the excess of (i) the Preferred Return Amount over (ii) the aggregate distributions made pursuant to Sections 4.1(b)(ii).

(ddd) "Unrecovered Capital" means the excess of (i) the aggregate amount of Capital Contributions over (ii) the amount of distributions made by the Partnership pursuant to Section 4.1(b)(iii).

## ARTICLE II

## FORMATION, NAME, PURPOSES AND OFFICES

2.1 Organization. The Partners hereby organize and form the Partnership as a limited partnership pursuant to the provisions of the Act for the limited purposes set forth in Section 2.3 below and upon the terms and conditions set forth in this Agreement.

2.2 Partnership Name. The name of the Partnership shall be Westport Realty Advisors, Ltd., and all business of the Partnership shall be conducted in such name or such other name as the General Partner shall select.

2.3 Purposes. The purposes and business of the Partnership shall be the following which may be pursued directly or indirectly, including through wholly or partially owned entities: (a) to execute, deliver and perform this Agreement, and any and all other agreements, documents, or instruments contemplated hereby or thereby or necessary, appropriate or convenient, in the sole judgment of the General Partner, to effect the purposes hereof or thereof; (b) to develop, acquire and manage senior living real estate projects for senior citizens, and (c) to engage in any and all other lawful activities in furtherance of (a) through (b).

2.4 Registered Office. The registered office of the Partnership in the State of Florida is John W. Gary, III, 701 U.S. Highway One, Suite 402, North Palm Beach, Florida 33408 and the name of the registered agent for service of process is John W. Gary, III. The General Partner may change the registered office of the Partnership to any other place upon ten days written notice to the Limited Partners and the preparation and filing of an amendment of the Certificate of Limited Partnership of the Partnership reflecting such change, if required. The Partnership may maintain other offices at such other locations as the General Partner shall determine from time to time.

2.5 Term. The term of the Partnership commenced on the filing of a Certificate of Limited Partnership in the State of Florida, and shall continue until the earlier of (i) December 31, 2016; or (ii) the winding up and liquidation of the Partnership and its business following an event of dissolution as described in Section 9.1 hereof; provided however, as approved by a Supermajority in Interest of the Limited Partners at the request of the General Partner, the term may be extended for up to two additional ten year periods.

- 10 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000512

2.6    Filings.

(a)  The General Partner shall take any and all actions reasonably necessary to perfect and maintain the status of the Partnership as a limited partnership under the laws of the State of Florida and any other states or jurisdictions in which the Partnership engages in business.  The General Partner shall cause amendments to the Certificate to be filed whenever required by the Act and/or such other laws.  Such amendments may be executed by the General Partner on behalf of the Partnership and the Limited Partners.

(b)    Upon the dissolution of the Partnership, the General Partner shall promptly execute and cause to be filed a certificate of cancellation in accordance with the Act and other filings required under the laws of any other states or jurisdictions in which the Partnership conducts business.

(c)    The General Partner shall promptly deliver copies of all filings made on behalf of the Partnership in accordance with this Section to the Limited Partners.

2.7    Independent Activities.  Subject to Section 12.1, the General Partner and the Principals (and their Affiliates) may, notwithstanding this Agreement, engage in whatever activities they choose without having or incurring any obligation to offer any interest in such activities to the Partnership or any Partner.  Neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Partner from engaging in such activities, or require any Partner to permit the Partnership or any Partner to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Partner, each Partner hereby waives, relinquishes and renounces any such right or claim of participation.


## ARTICLE III

## PARTNERS' CAPITAL CONTRIBUTIONS

3.1    Capital Contributions.  Each Partner hereby commits to contribute to the Partnership the Capital Contributions described in Section 3.2.  No Partner shall be obligated to make any other Capital Contributions at any time.

3.2    Capital Contributions of the Partners.  Each Partner shall make the following Capital Contributions on the date of the closing.

(a)    Mahalo, RHSCI, NFP, Hunt and Foundation will contribute to the Capital of the Partnership their respective interests in the Senior Living R&D, the Insurance Policy, and the Mark (as such terms are defined in that certain Agreement dated as of July __, 1998 pursuant to which such property was distributed by Crossroads Investment Company, L.P. and Crossroads Investment Advisors, L.P.).

- 11 -

SUB_LANDRY_00000513

(b)    The General Partner may cause Mahalo to contribute up to $2.5 Million to the capital of the Partnership (the "Preferred Capital Contribution"). Such contribution shall not result in any increase or other change to the respective Percentage Interests allocated to Mahalo and the other Partners in Exhibit A. There shall be no Percentage Interest attributed to the Preferred Capital Contribution.

(c)    Except as otherwise provided herein, RHSCI, Foundation and Mahalo shall not be required to make any further capital contributions to the Partnership and, subject to Section 3.2(d) below, shall have the initial Percentage Interests as Limited Partners set forth in Exhibit A.

(d)    MBG Trust may purchase up to a 2.802% Percentage Interest in the Partnership from Mahalo. The Percentage Interest allocated to MBG Trust will reduce Mahalo's Percentage Interest as a Limited Partner as set forth in Schedule A.

3.3    Issuance of Additional Interests. Subject to Section 3.2(d), 6.2(a)(vi) and 6.10, the General Partner may cause the Partnership to issue additional Limited Partner Interests ("Additional Interests") from time to time to persons other than Partners (or Affiliates of Partners) on the terms determined by the General Partner for the purpose of causing additional Capital Contributions to be made to the Partnership so that it might carry out one or more activities within the scope of the Partnership purposes set forth in Section 2.3 hereof. The Additional Interests shall be issued subject to the conditions set forth in this Section 3.3.

(a)    Subject to paragraph (b) and Section 6.2(a)(vi), the General Partner shall have the sole right to determine the terms of any Additional Interest to be issued, including, without limitation, (i) the Percentage Interest of the Additional Interest, (ii) any preferential or guaranteed rights to distributions, allocations or rates of return on capital of the Additional Interests, and (iii) any control rights of the Additional Interest; provided however, the General Partner shall not determine such terms prior to discussing the reasons for the proposed issuance of the Additional Interests and the terms of such Additional Interests in good faith with each of the two Limited Partners with the greatest Percentage Interests. The General Partner shall cause this Agreement to be amended to reflect the issuance of and the rights pertaining to the Additional Interest and each Limited Partner agrees to execute such amendment if the issuance has been approved by a Supermajority in Interest of the Limited Partners.

(b)    Prior to the issuance of any Additional Interests, the Partnership shall first offer the right to purchase the Additional Interests to the Partners in proportion to their Percentage Interests at such time. The General Partner shall cause the Partnership to issue a written notice to the Limited Partners specifying the terms upon which such Additional Interests shall be issued. Each Partner shall have sixty (60) days within which to respond by notice to the General Partner of its intention to purchase part or all of its proportionate share of the Additional Interests and to give notice to the General Partner of its commitment, if any, to purchase its pro rata share of those Additional Interests with

- 12 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000514

respect to which other Partners do not exercise their purchase right hereunder (and may specify a maximum amount of the Additional Interests that the Partner commits to purchase). Any Additional Interests not purchased by Partners may be sold on substantially the same terms offered to the Partners to third parties within sixty (60) days of the end of such sixty (60) day period. The closing of the issuance of the Additional Interests shall be held as soon thereafter as is practicable within the judgment of the General Partner.

3.4    Capital Accounts. A separate Capital Account shall be established for each Partner on the books of the Partnership on the dates on which such Partner makes its initial Capital Contributions, as provided herein, and maintained in the manner set out in the definition of "Capital Account" in Section 1.1. The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) and 1.704-2 of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations.

3.5    Other Matters.

(a)    Except as otherwise provided in Sections 4.1 and 10.1 of this Agreement, no Partner shall demand or receive a return of its Capital Contribution. Under circumstances requiring a return of any Capital Contribution, no Partner shall have the right to receive property other than cash except as may be specifically provided herein.

(b)    No Partner shall receive any interest with respect to its Capital Contribution or its Capital Account, except as otherwise provided in this Agreement.

(c)    The Limited Partners shall not be personally liable for the debts, liabilities, contracts or any other obligations of the Partnership. The General Partner shall not have any personal liability for the repayment of the Capital Contribution of any Limited Partner.

# ARTICLE IV

## DISTRIBUTIONS

4.1    Distributions of Available Cash From All Sources. Subject to Sections 5.7 and 10.1, the Partnership shall distribute cash to the Partners as follows:

(a)    The General Partner shall be distributed 50% of the gross revenues of the Partnership no less often than quarterly in advance.

(b)    The Partners shall be distributed the Net Cash Flow of the Partnership quarterly in arrears as follows:

- 13 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000515

       (i)   first, an amount equal to the Tax Distribution Amount, to the Partners in proportion to their Percentage Interests;

       (ii)   second, an amount equal to the Unpaid Preferred Return, to the Limited Partners in the proportion which each Partner's Unpaid Preferred Return bears to the aggregate Unpaid Preferred Return of all Partners.

       (iii)   third, an amount equal to the Unrecovered Capital, to the Limited Partners in the proportion which each Limited Partner's Unrecovered Capital bears to the aggregate Unrecovered Capital of all Limited Partners; and

       (iv)   the balance, if any, to the Partners in proportion to their Percentage Interests.

Notwithstanding the foregoing, no distributions shall be made pursuant to clause (iii) other than to Mahalo with respect to its Preferred Capital Contribution after such time as a sale of an Interest to a non-Affiliate or the issuance of an Additional Interest establishes a value of the Interests of the Limited Partners that is in excess of the amount of the Capital Contributions.

## ARTICLE V

## ALLOCATIONS

5.1   Allocations of Profit. After giving effect to the special allocations set forth in Sections 5.3 and 5.4 hereof, Profit for any Fiscal Year shall be allocated to the Partners as follows:

       (i)   first, to Mahalo up to an amount equal to the excess of (1) the aggregate amount of Loss allocated to Mahalo pursuant to Section 5.2(a)(i), over (2) the aggregate amount of Profit previously allocated to Mahalo pursuant to this clause (i);

       (ii)   second, to the Partners in proportion to their Priority Allocation Shortfall Percentages until the aggregate amount of Profit allocated pursuant to this clause (ii) is equal to the aggregate amount of Loss previously allocated pursuant to clause (iii) of Section 5.2(a); and

       (iii)   the balance, if any, to the Partners in proportion to their Percentage Interests.

- 14 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000516

5.2     Allocations of Loss.

(a)     After giving effect to the special allocations set forth in Sections 5.3 and 5.4 hereof, and subject to the limitations of Section 5.2(b) hereof, Loss for any Fiscal Year shall be allocated to the Partners as follows:

(i)     first, to Mahalo, until the aggregate amount of Loss allocated pursuant to this clause (i) is equal Mahalo's unrecovered Preferred Capital Contribution;

(ii)     second, to the Partners in proportion to their Percentage Interests until the aggregate amount of Loss allocated pursuant to this clause (ii) is equal to the excess of (1) the aggregate amount of Profit previously allocated pursuant to clause (iii) of Section 5.1(a) over (2) the aggregate distributions made pursuant to Sections 4.1(b)(i) and (iv) hereof;

(iii)     third, to the Partners in proportion to their Excess Priority Allocation Percentages, until each Partner's Excess Priority Allocation is reduced to zero; and

(iv)     fourth, the balance, if any, to the Partners in proportion to their Percentage Interests.

(b)     The Loss allocated pursuant to Section 5.2(a) hereof shall not exceed the maximum amount of Loss that can be so allocated without causing any Limited Partner to have an Adjusted Capital Account Deficit (determined after all cash distributions for the Fiscal Year) at the end of the Fiscal Year for which the allocation relates. All Loss in excess of the limitation set forth in the preceding sentence shall be allocated among those Limited Partners which will not have an Adjusted Capital Account Deficit at the end of the Fiscal Year in the ratio of their relative Percentage Interests. In any Fiscal Year in which all the Limited Partners will have an Adjusted Capital Account Deficit, all Loss in excess of the limitations described in the first two sentences of this Section 5.2 shall be allocated to the General Partner.

5.3     Special Allocations. The following special allocations shall be made in the following order:

(a)     Sale of the Business. Upon a Sale of the Business, the General Partner shall be allocated that amount of the gain that is equal to the Revenue Share of the proceeds of the Sale of the Business.

(b)     General Partner Allocation.    The General Partner shall be specially allocated an amount of gross income equal to the amount of distributions to it pursuant to

- 15 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000517

Section 4.1(a); provided such allocation shall not duplicate the allocation of gain pursuant to Section 5.3(a) related to the Revenue Share.

(c)     Minimum Gain Chargeback. Notwithstanding any other provisions of this Article V, except as provided in Regulation Section 1.704-2(f), if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Partner shall be allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 5.3(c) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(d)     Chargeback of Partner Nonrecourse Debt Minimum Gain. Notwithstanding the other provisions of this Article V (other than Section 5.3(c), except as provided in Regulation Section 1.704-2(i)(4)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during any Partnership Fiscal Year, any Partner with a share of Partner Nonrecourse Debt Minimum Gain, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be allocated items of Partnership income and gain for such period (and if necessary, subsequent periods) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 5.3(d) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(e)     Qualified Income Offset. In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Limited Partner as quickly as possible, provided that an allocation pursuant to this Section 5.3(e) shall be made only if and to the extent that such Limited Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been tentatively made as if this Section 5.3(e) were not in the Agreement. This Section 5.3(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations, and shall be interpreted consistently therewith.

- 16 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000518

(f)    Gross Income Allocation. In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Section 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 5.3(f) shall be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article V have been made as if Section 5.3(e) hereof and Section 5.3(f) were not in the Agreement.

(g)    Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partners pursuant to their Percentage Interests.

(h)    Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Regulations.

(i)    Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or (4) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

5.4    Curative Allocations.

The allocations set forth in Sections 5.2(b), 5.3(c), 5.3(d), 5.3(e), 5.3(f), 5.3(g), 5.3(h) and 5.3(i) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss or deduction pursuant to this Section 5.4. Therefore, notwithstanding any other provision of this Article V (other than the Regulatory Allocations and the following sentence), the General Partner shall make such offsetting special allocations of Partnership income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to

- 17 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000519

Sections 5.1, 5.2(a), 5.3(a), 5.3(b) and 5.5 hereof. Notwithstanding the previous sentence, the General Partner shall not be required to make special allocations of income or gain under this Section 5.4 to offset Regulatory Allocations previously made under Sections 5.3(g) and 5.3(h) hereof.

5.5    Other Allocation Rules.

(a)    For purposes of determining the Profit, Loss, or any other items allocable to any period, Profit, Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Tax Matters Partner using any permissible method under Code Section 706 and the Regulations thereunder.

(b)    All allocations to the Limited Partners pursuant to this Article V shall, except as otherwise expressly provided, be divided among them in proportion to the Percentage Interests held by each.

(c)    Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Partners in the same proportions as they share Profits or Loss, as the case may be.

(d)    The Partners are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their shares of Partnership income and loss for income tax purposes.

(e)    Solely for purposes of determining a Partner's proportionate share of the "excess nonrecourse liabilities" of the Partnership within the meaning of Section 1.752-3(a) of the Regulations, the Partners' interests in Partnership profits are in proportion to their Percentage Interests.

(f)    To the extent permitted by Sections 1.704-2(h) and 1.704-2(i)(6) of the Regulations, the Tax Matters Partner shall endeavor to treat distributions as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that any such distribution would cause or increase an Adjusted Capital Account Deficit for any Limited Partner.

(g)    To the extent the Interests change during a Fiscal Year, the Fiscal Year shall be bifurcated into multiple years ending immediately before and beginning upon such change for purposes of applying Article V. The interim closing of the books method shall be used unless otherwise agreed by the General Partner.

5.6    Tax Allocations: Code Section 704(c). In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the

- 18 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000520

Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (i) of the definition of Gross Asset Value) according to the "remedial method" unless the Partners unanimously agree otherwise. In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Allocations pursuant to this Section 5.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Loss, other items, or distributions pursuant to any provision of this Agreement.

5.7  Sale of the Business. The proceeds of a Sale of the Business shall be divided into the Revenue Share and the Capital Share. The "Revenue Share" shall be fifty percent (50%) of the proceeds of a Sale of the Business other than the "Capital Share." The "Capital Share" shall likewise be fifty percent (50%) of proceeds of a sale of the Business; provided however, if the Revenue Share is so large that after allocation pursuant to Section 5.3(a) the Capital Accounts of the Partners are not sufficient so that the Limited Partners would receive upon liquidation of the Partnership aggregate distributions equal to the sum of the Unrecovered Capital and the Unpaid Preferred Return, then the Revenue Share shall be reduced by such amount and the Capital Share shall be increased by such amount that will cause the Capital Accounts of the Limited Partners to be sufficient to cause them to receive aggregate distributions upon liquidation of the Partnership equal to the sum of their proportionate share of Unrecovered Capital and Unpaid Preferred Return.

The Partners also agree that to the extent the General Partner and the Limited Partners are all disposing of their Interests in the Partnership in a single transaction, the aggregate sales proceeds shall be apportioned based upon the Revenue Share and the Capital Share, provided that a portion of the sales proceeds otherwise payable to the General Partner with respect to the General Partner's Interest as such shall be paid to the Limited Partners in proportion to their Percentage Interests to the extent necessary to cause the Limited Partners to receive from the sale payments equal to the sum of the Unrecovered Capital and the Unpaid Preferred Return at such time.

The Revenue Share shall be paid to the General Partner and the Capital Share shall be paid to the Partners in the same manner as Net Cash Flow pursuant to Section 4.1(b).

- 19 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000521

## ARTICLE VI

## MANAGEMENT OF THE PARTNERSHIP

6.1    Management. Except as otherwise expressly set in this Agreement, the management and control of the business and affairs of the Partnership shall be exclusively vested in the General Partner who shall have the sole and exclusive right to manage the business of the Partnership and shall have all of the rights and powers which may be possessed by general partners under the Act. Without limiting the generality of the foregoing, but subject to the other provisions of this Agreement and the General Partner's fiduciary duties to the Limited Partners, the Partners hereby authorize the General Partner to (i) execute, deliver and perform on behalf of the Partnership, this Agreement; (ii) incur indebtedness on behalf of the Partnership; (iii) execute, deliver and perform on behalf of the Partnership any note, mortgage or any other loan documents, and all renewals, modifications, replacements and extensions thereof as the General Partner deems necessary, appropriate or convenient to effect the purposes of the Partnership; (iv) refinance all or substantially all of the indebtedness of the Partnership; (v) prosecute and settle claims by or against the Partnership and to confess a judgment against the Partnership; (vi) possess Partnership Property; (vii) grant consents on behalf of the Partnership; (viii) cause the Partnership to enter into partnerships as a general partner or limited partner; (ix) cause the issuance of Additional Interests pursuant to the terms hereof; and (x) grant powers of attorney to employees of the Partnership to execute documents on behalf of the Partnership in the ordinary course of business.  The General Partner, in its capacity as such, may from time to time:

(a)    Actively participate in investment decisions and participation on investment advisory committees and boards;

(b)    Participate in marketing initiatives and assist in monitoring client services;

(c)    Structure, negotiate, and implement contractual arrangements with third party investment marketing umbrellas for enlisting new clients;

(d)    Provide leadership in determining the investment philosophy and objectives for products offered by the Partnership to clients;

(e)    Manage a focused (analytically and economically-based) consensus strategy that provides the entire organization with a clear view of how the company will continue to succeed based on market fundamentals and industry best demonstrated practices;

(f)    Identify and implement alongside management a clear and prioritized set of actions (with a concentration on marketing) to achieve the strategy and increased profits; and

(g)    Create and maintain financial models that substantiate the integrated strategy and allow for sensitivity analysis that can be used by management.

- 20 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000522

The Partners recognize that because of the formulas for sharing the revenues and expenses generated by the Partnership, in certain cases the General Partner may suffer an economic detriment by generating new business for the Partnership. The Partners agree that in such circumstances the General Partner shall not be obligated to accept such business, but rather that the General Partner and the Limited Partners shall consult to develop an appropriate basis for the acquisition of such new business, which must be approved by the General Partner and a Supermajority in Interest of the Limited Partners prior to the acquisition of such new business.

6.2     Restrictions on Authority of General Partner.

(a)     Notwithstanding Section 6.1, the General Partner shall not have the authority to do any of the following without the prior written consent of a Supermajority in Interest of the Limited Partners:

(i)     do any act in contravention of this Agreement;

(ii)    amend the Agreement;

(iii)   sell or transfer all or substantially all of the assets of the Partnership;

(iv)    perform any act that would subject any Limited Partner to liability as a general partner;

(v)     incur on behalf of the Partnership for borrowed money other than unsecured working capital indebtedness of up to $1,000,000 in the aggregate for the Partnership; and

(vi)    subject to Section 6.11, issue Additional Interests.

(b)     Except as otherwise permitted by this Agreement or applicable law, the Limited Partners acting in their capacity as Limited Partners shall not have any right to participate in the management or control of the Partnership or its business and affairs, to bring an action for partition or sale in connection with the property or assets of the Partnership, whether real or personal, or to act for or bind the Partnership in any way.

6.3     Indemnification of the General Partner.

(a)     THE PARTNERSHIP, ITS RECEIVER, OR ITS TRUSTEE SHALL INDEMNIFY, SAVE HARMLESS, AND PAY ALL JUDGMENTS AND CLAIMS AGAINST THE GENERAL PARTNER (BY ANY PERSON) RELATING TO ANY LIABILITY OR DAMAGE INCURRED BY REASON OF ANY ACT PERFORMED OR OMITTED TO BE PERFORMED BY THE GENERAL PARTNER IN CONNECTION WITH THE BUSINESS OF THE PARTNERSHIP, INCLUDING REASONABLE ATTORNEYS' FEES INCURRED BY THE GENERAL PARTNER IN CONNECTION

- 21 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000523

WITH THE DEFENSE OF ANY ACTION BASED ON SUCH ACT OR OMISSION, INCLUDING ANY ACT OR OMISSION WHICH CONSTITUTES NEGLIGENCE.

(b)      NOTWITHSTANDING THE PROVISIONS OF SECTION 6.3(a) ABOVE, A GENERAL PARTNER SHALL NOT BE INDEMNIFIED FROM ANY LIABILITY, CLAIM, COST OR EXPENSE RESULTING FROM THE FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF SUCH GENERAL PARTNER OR RESULTING FROM ANY BREACH OF ITS FIDUCIARY DUTY TO THE PARTNERSHIP AND LIMITED PARTNERS (WITHOUT LIMITING ITS EXERCISE OF ANY RIGHTS UNDER THIS AGREEMENT).

6.4      Operating Expenditures.

(a)      All reasonable expenses (including capital expenditures, other than capital expenditures associated with the initial acquisition of office equipment and office furniture to set up the office of the General Partner) incurred by the General Partner (or any third party hired by the General Partner) for performing the services described in Article VI hereof shall constitute Operating Expenditures, except that the General Partner (and not the Partnership) shall bear the following costs of performing the General Partner services: (i) the costs paid to joint venture relationships created to obtain any clients or business, (ii) the compensation of the Principals , (iii) all third party Shared and Finders Fees paid on any business ventures, (iv) the costs of travel of the Principals and (v) marketing incentives. All other expenses of the Partnership and the General Partner shall be allocated and borne by the Limited Partners, including the reasonable costs of the office and staff of the General Partner, including health, welfare and pension plans, club memberships, auto allowances and similar expenses of the Principals and staff of the General Partner except that any and all expenses in excess of $100,000 annually (adjusted for the CPI) shall be submitted in a budget to be presented to the Limited Partners for consent (which shall not be unreasonably withheld). It is the intent of the Partnership to build the internal professional staff with several senior investment management professionals who will also contribute to the marketing effort. The General Partner will be reimbursed by the Partnership for out-of-pocket expenses relating to investment advisory or management services or related to a client to the extent the Partnership is to be reimbursed directly or indirectly by such client (through underlying investment partnerships or otherwise). In the event that the General Partner uses its own funds to pay for the Operating Expenditures, the Partnership shall reimburse the General Partner incurring such Operating Expenditures within ten (10) days following receipt of evidence of such expenditure made by the General Partner out of its own funds. The General Partner shall provide annually a statement disclosing the payments made by the Partnership to Affiliates of the General Partner for services provided to the Partnership.

(b)      The Partnership will pay a quarterly fee (in advance) to the General Partner equal to an annual rate of $160,000 (adjusted annually for the CPI). The management fee is intended to be used by the General Partner to satisfy certain expenses, including, but not

- 22 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000524

limited to, travel and entertainment expenses of the Principals. The General Partner shall not be entitled to receive a fee for its services to the Partnership hereunder, except as specifically provided herein. Neither the General Partner nor its Affiliates shall receive any Shared and Finders Fees in connection with the investment of monies managed by the Partnership.

6.5     Insurance. The General Partner shall cause the Partnership to obtain and keep in force, or cause to be obtained and kept in force, during the term hereof, all insurance necessary or appropriate for entities operating in the Partnership's line of business, and the cost thereof shall be considered an Operating Expenditure.

6.6     Partnership Accounts. The General Partner shall establish and maintain one or more depository accounts ("Partnership Accounts") for funds of the Partnership at depositories selected by the General Partner. The Partnership Accounts shall be administered in accordance with any contractual agreements to which the Partnership is a party or by which it is bound, and subject thereto, in accordance with the business judgment of the General Partner. If so requested in writing by any Limited Partner, the General Partner shall notify the Limited Partners in writing of the location of all Partnership Accounts. All funds of the Partnership shall be deposited in one of the Partnership Accounts and used exclusively for Partnership purposes. No Partner shall commingle any other funds with the funds of the Partnership in the Partnership Accounts.

6.7     Approval by Limited Partners. Unless a different percentage vote is expressly indicated, all actions taken or approvals given by Limited Partners shall require the approval of a Supermajority in Interest of the Limited Partners.

6.8     Reliance by Third Parties. Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other person, including any purchaser of Property from the Partnership or any other person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assets or Properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.

6.9     Advisory Committee. Upon the request of a Majority of the Limited Partners Percentage Interests the General Partner shall establish an Advisory Committee which shall include representatives of the General Partner, the two Limited Partners with the greatest Percentage Interests and other independent prominent members of the industry. The purpose of the Advisory Committee is to provide the Partnership with additional insights into strategic issues affecting the Partnership, including business development and marketing. The Advisory Committee shall meet quarterly. To induce such independent industry members to participate, the Partnership may determine to pay a fee to the members of the Advisory Committee.

6.10     Limited Partner Relations. Upon reasonable request, the General Partner shall make itself available from time-to-time at its offices or other mutually agreed location to discuss

- 23 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000525

with a Limited Partner any concerns the Limited Partner has regarding the operations of the Partnership. The General Partner shall have a reasonable period after such meeting or other notice by a Limited Partner of the need for any corrective action by the Partnership or the General Partner necessary to comply with this Agreement, to take any such action that the General Partner believes is appropriate.

6.11    Additional Interests in the Partnership. The Partners acknowledge that it is in the best interest of the Partnership to allow key management personnel to acquire equity interests in the Partnership. Consequently, the General Partner may cause the Partnership to reduce the interest of Mahalo in the Partnership by up to 10% of the aggregate of the initial interest of Mahalo in the Partnership (or such larger amount as consented to by RHSCI) and issue additional interests in the Partnership (in each case, amending this Agreement, as necessary).

6.12    Compensation to Others by Senior Living Ventures. The Partners acknowledge that the Partnership will derive income from fees paid to it by the various real estate ventures ("Senior Living Ventures") to which the Partnership will provide services described in Section 2.3, including its capacity as general partner or manager of such ventures. In connection with such activities, fees may also be paid by the Senior Living Ventures to other persons or entities, including special limited partners of such Senior Living Ventures (which persons may have other business dealings with the General Partner and/or its Affiliates), for services performed on behalf of the Partnership and/or the Senior Living Ventures, which fees may be based upon a share of the fees otherwise payable to the Partnership. It is anticipated that these fees will equal 50% of the fee otherwise payable to the Partnership and 50% of the carried interest otherwise to be granted to the Partnership, which carried interest will be subordinated to a ten percent (10%) preferred return payable to the equity partners or members of the Senior Living Ventures.

6.13    Covenant-not-to-Compete. The Limited Partners expressly declare that they are relying upon the expertise of Lawrence Landry ("Landry") and others who may become Principals hereunder, and that the Limited Partners have, in part, agreed to become partners of the Partnership because Landry and such other Principals will be lending such expertise to the Partnership. Accordingly, Landry and others who may become Principals agree that should he or she transfer his or her interests in the General Partner or cease his or her affiliation with the Partnership (a "Disaffiliation Event") that for a period of one (1) year commencing from the date of occurrence of such Disaffiliation Event, he or she will not, directly or indirectly, (a) solicit any client, partner or customer of the Partnership, the Senior Living Ventures of any other business venture of the Partnership, or otherwise divert or attempt to divert any business away from the Partnership, the Senior Living Ventures or any other business venture of the Partnership, or (b) solicit any employee of the Partnership, the Senior Living Ventures or any other business venture of the Partnership, or otherwise cause or attempt to cause any such employees to terminate his or employment; provided, however, if any such client, partner, customer or employee shall approach Landry without any contact or feelers being made, directly or indirectly, by or for the benefit of Landry, Landry shall not be deemed to have diverted or attempted to divert such business or to have counsel or attempted to cause such employee to terminate employment.

- 24 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000526

6.14   Succession Plan. Within 120 days of the effective date of this Agreement the General Partner will present to the Limited Partners for ratification by a Majority of the Limited Partners Percentage Interests a plan for succession of management of the Partnership should Larry Landry become unable to perform his duties as president and chief operating officer of the General Partner. The plan of succession may be amended from time to time by the General Partner upon consent to such amendment by a Majority of the Limited Partners Percentage Interests.

ARTICLE VII

BOOKS AND RECORDS

7.1   Books and Records; Periodic Reporting.

(a)   The Partnership shall keep accurate and complete books of account and records on an accrual basis using generally accepted accounting principles showing exclusively the assets and liabilities, operations, transactions and financial condition of the Partnership in accordance with the accounting principles used by the Partnership for federal income tax purposes. All financial statements shall be accurate and in all material respects shall present fairly the financial position and results of operation of the Partnership. The books of account and records of the Partnership shall at all times be maintained at the principal office of the Partnership.

(b)   No later than one hundred twenty (120) days after the end of each Fiscal Year, the General Partner shall furnish the Limited Partners with audited annual financial statements. Within forty five (45) days after the end of each quarter, the General Partner shall furnish the Limited Partners with unaudited quarterly reports of the Partnership's operations in a form acceptable to the Limited Partners. The General Partner shall furnish such other reports and material as reasonably requested by the Limited Partners.

(c)   The Partnership's federal, state and local income and other tax returns shall be prepared, at the expense of the Partnership, by a firm of certified public accountants selected by the General Partner (the "Partnership Accountants"). All tax returns shall be signed on behalf of the Partnership and filed by the General Partner.

7.2   Right to Inspection. Each Limited Partner shall have the right at all reasonable times upon reasonable notice to examine and copy at its expense the books and records of the Partnership.

7.3   Tax Matters Partner. The General Partner is hereby designated as the "Tax Matters Partner" of the Partnership, as defined in Section 6231(a)(7) of the Code.

7.4   Tax Elections. The Partnership shall be treated, and shall file its tax returns, as a partnership for federal, state and local income and other tax purposes. If any Partner receives

- 25 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000527

notice of a tax examination of the Partnership by any federal, state or local authority, it shall promptly give notice thereof to the other Partners. All elections permitted to be made by the Partnership under the Code shall be made by the General Partner.

## ARTICLE VIII

### TRANSFERS AND WITHDRAWAL OF PARTNERS

8.1     Transfers and Admission.

(a)     No Partner nor any assignee or successor in interest of a Partner may, without the prior written consent of the General Partner, which may be withheld in its sole discretion, and the prior written consent of a Supermajority in Interest of the Limited Partners, sell or otherwise dispose of its direct beneficial ownership of all or any portion of its Interest or rights and/or obligations hereunder (a "Transfer"), except that a Partner may Transfer its Interest to any Affiliate of such Partner. In the event any Partner proposes to Transfer its Interest as a Limited Partner, the other Limited Partners (in proportion to their Percentage Interests) shall have a right of first refusal to purchase such Interest at the price being offered to such Limited Partner by its potential transferee. At the time any Limited Partner requests a consent to a Transfer, it shall provide a notice to each of the other Partners of its desire for such consent and the terms on which it proposes to Transfer its Interest to the potential transferee. The other Limited Partners shall each have the right within fifteen (15) days thereafter to give notice to each other Partner of (i) whether they consent to such Transfer and (ii) whether they choose to exercise such right of first refusal and, if so, the maximum portion of such Interest they are prepared to purchase. If the other Partners timely grant the necessary consents to the Transfer but do not collectively exercise the right of first refusal for the entire amount of the Interest, then the transferor Limited Partner may effect the proposed Transfer. If the other Partners timely grant the necessary consents to the Transfer and collectively exercise the right of first refusal for the entire amount of the Interest, then the transferor Limited Partner shall sell the Interest to the Partners that exercised the right of first refusal in the appropriate proportions in exchange for the same consideration, in the aggregate, that the proposed transferee would have paid. Subject to Section 8.3, if the other Partners do not grant the necessary consents, then no Transfer shall be allowed.

Without the written consent of the General Partner, which consents may be arbitrarily withheld in the sole discretion of the General Partner, a transferee shall not become a substituted Partner, and, in any event, each transferee shall execute an instrument in form and substance satisfactory to the General Partner agreeing to be bound by this Section 8.1 and any other appropriate provisions of this Agreement. Any transferee who is not admitted to the Partnership shall have only the rights to receive distributions and allocations. Notwithstanding anything contained in this Agreement to the contrary, in no event may a Partner, a transferee of a Partner or a successor in interest of a Partner

- 26 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000528

make a Transfer if such action could with the giving of notice, the passage of time or both, render untrue any representation or warranty made by the Partnership in, or violate the terms of, or constitute a breach of or a default under this Agreement, or any other agreement, document, contract or instrument to which the Partnership is a party, or by which the Partnership, or its assets are bound.  The Partnership may condition any Transfer, on the receipt by the Partnership of opinions of counsel acceptable to the Partnership with respect to compliance by the Partnership and the assigning Partner with securities, tax and other laws and such other matters as the General Partner may deem appropriate.

(b)    Any Partner that has assigned all of its Interest shall cease to be a Partner for purposes of this Agreement; provided, however, that such Partner shall remain liable for its obligations under this Agreement incurred prior to the Assignment of its Interest, and shall remain liable to the Partnership and the other Partners for the actions and omissions of such Partner prior to the Assignment of its Interest.

(c)    Any purported Assignment other than in accordance with the provisions of this Section shall be void ab initio.

8.2    Withdrawal of a Partner.

(a)    Subject to paragraph (c), the General Partner may withdraw from the Partnership only upon the prior written consent of a Supermajority in Interest of the Limited Partners and if a new General Partner succeeds the General Partner as a substitute General Partner hereunder contemporaneous with such withdrawal.

(b)    Subject to paragraph (c), a Limited Partner may withdraw from the Partnership without the written consent of the General Partner.  In such event, the General Partner shall determine (i) the extent, if any, to which such withdrawing Partner shall retain an interest in the Partnership; (ii) the terms and conditions on and timing of the return of such withdrawing Partner's capital; and (iii) the extent, if any, to which such withdrawing Partner shall remain obligated or liable for obligations and liabilities of the Partnership and/or at risk with respect to ongoing Partnership operations.

(c)    No Partner may withdraw from the Partnership if the effect of such withdrawal could, with the giving of notice, the passage of time, or both, render untrue any representation or warranty made by the Partnership in, or violate the terms of or constitute a breach of or a default under this Agreement, any other loan document, or any other agreement, document, contract or instrument to which the Partnership is a party or by which the Partnership or its assets are bound.

(d)    On the withdrawal of a Partner from the Partnership in accordance with this Section, such Partner shall cease to be a Partner for all purposes.

- 27 -

SUB_LANDRY_00000529

8.3     Put Events and Call Events.  Upon the occurrence of a Put Event, the Notice Partner shall have the right to put its Interest to the Limited Partner(s) refusing to consent to the sale of substantially all the assets of the Partnership or the transfer of the Interest of the Notice Partner, as the case may be, (each a "Recipient Partner") at the Appraised Value; provided however, the Recipient Partner will not be required to purchase the Interest of the Notice Partner if the Recipient Partner can establish in an arbitration governed by Section 14.9 that the transfer of the Interest to the proposed transferee of the Notice Partner would more likely than not have been detrimental to the Partnership; provided further, that at any time prior to any such arbitration or during such arbitration, one or more of the Partners other than the Notice Partner may choose to terminate such arbitration proceeding by giving notice to the Notice Partner that such Partner(s) will take the role of Recipient Partner with respect to the transfer by the Notice Partner under this sentence.  Upon the occurrence of a Call Event, the General Partner (the "Notice Partner") shall have the right to purchase the Interests of the non-consenting Partner(s) (each a "Recipient Partner") at the Appraised Value.  To exercise any of the foregoing rights, the Notice Partner must give a notice to the Recipient Partner that the Notice Partner is exercising such right within thirty (30) days after the failure of the Recipient Partner to grant the consent desired by the Notice Partner.  The Notice Partner and the Recipient Partner shall close the transfer of the Interest contemplated by the notice (the "Notice Interest") at the offices of the General Partner no more than fifteen (15) days after the determination of the Appraised Value.  The "Appraised Value" of a Notice Interest, which shall be paid in readily available funds at the closing, shall be the amount determined pursuant to the procedures of Article XIII, provided that the Notice Partner and the Recipient Partner can at any time agree to the Appraised Value and forego the right to have the Appraised Value determined under Article XIII.  The Notice Partner can withdraw its notice at any time, including upon receipt of the results of the appraisal process, but shall be required in such event to pay all reasonable costs of the Recipient Partner incurred in the appraisal process.

ARTICLE IX

DISSOLUTION OF PARTNERSHIP

9.1     Dissolution Events.  The Partnership shall be dissolved upon the occurrence of any of the following events:

(a)     The voluntary agreement of all Partners to dissolve the Partnership;

(b)     The expiration of the term specified in Section 2.5;

(c)     Upon the occurrence of any of the following events by or with respect to the General Partner:

(i)     the General Partner shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under the present

- 28 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000530

or any future bankruptcy act or any other present or future applicable federal, state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of the General Partner; or

(ii)    a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against the General Partner seeking any reorganization, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act, or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency or other relief for debtors, and the General Partner shall acquiesce in the entry of such order, judgment or decree, or such order, judgment or decree shall remain unvacated and unstayed for an aggregate of ninety (90) days from the date of entry thereof, or any trustee, receiver, conservator or liquidator of said Partner or of all or any substantial part of the General Partner's property shall be appointed without the consent or acquiescence of the General Partner and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days; or

(iii)    the General Partner shall admit in writing its inability to pay its debts as they mature; or

(iv)    the General Partner shall make a general assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; and

(d)    A sale of substantially all of the assets of the Partnership.

9.2    Reconstitution of the Partnership. On the occurrence of an event described in Section 9.1(a) or (b), the Partnership shall be liquidated, and the affairs of the Partnership shall be wound up in accordance with the provisions of Article X. On the occurrence of an event described in Section 9.1(c), unless a Supermajority in Interest of the Limited Partners agree within ninety (90) days after such event to reconstitute the Partnership without the General Partner and continue the business of the Partnership without interruption, the Partnership shall be automatically liquidated and be wound up pursuant to Article X.

## ARTICLE X

## LIQUIDATION OF THE PARTNERSHIP

10.1    Liquidation. In the event of dissolution of the Partnership, where the business of the Partnership is not reconstituted, liquidation shall occur. The General Partner shall supervise the liquidation of the Partnership. If the General Partner is unable to supervise the liquidation,

- 29 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000531

the Limited Partners shall elect another person to do so (such person or the General Partner being the "Liquidator").  In the event of any liquidation of the Partnership under this Agreement or the Act, except as otherwise provided herein, the proceeds of liquidating the Partnership shall be applied and distributed in the following order of priority (each item to be satisfied in full in the order listed below before any of such proceeds are allocated to the subsequent item):

(a)    First, to creditors, including Partners who are creditors (to the extent not otherwise prohibited by law), in satisfaction of liabilities of the Partnership (whether by payment or the making of reasonable provision for payment therefor), other than liabilities for which reasonable provision for payment has been made and liabilities for interim distributions to Partners and distributions to Partners on withdrawal; then

(b)    Second, to the setting up of any reserves which the Liquidator determines to be reasonably necessary for any contingent liabilities of the Partnership or of any Partner arising out of, or in connection with, a Partnership liability; then

(c)    Finally, subject to Section 10.2, the balance, if any, to the Partners in accordance with Section 5.7.

The Liquidator shall not receive ordinary and necessary compensation for any services performed pursuant to this Article X.

10.2    Deemed Distribution and Reconstitution.  Notwithstanding any other provision of this Article X, in the event the Partnership is liquidated within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations but the Partnership is not liquidated under this Article X, the property of the Partnership shall not be liquidated, the Partnership's liabilities shall not be paid or discharged, and the Partnership's affairs shall not be wound up.  Instead, the Partnership shall be deemed to have distributed the assets of the Partnership in kind to the Partners, who shall be deemed to have assumed and taken subject to all Partnership liabilities, all in accordance with their respective Capital Accounts.  Immediately thereafter, the Partners shall be deemed to have recontributed the Property in kind to the Partnership, which shall be deemed to have assumed and taken subject to all such liabilities.

10.3    Rights of Limited Partners.  Except as otherwise provided in this Agreement, each Limited Partner shall look solely to the assets of the Partnership for the return of its Capital Contribution and shall have no right or power to demand or receive property other than cash from the Partnership.  No Limited Partner shall have priority over any other Limited Partner as to the return of its Capital Contributions, distributions, or allocations.

- 30 -

HPNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000532

## ARTICLE XI

### REPRESENTATIONS OF LIMITED PARTNERS: INDEMNIFICATION

11.1   Representations of Limited Partners.  Each of the Limited Partners and assignees of an interest of a Limited Partner hereby represents, warrants and acknowledges to the Partnership and the other Partners that:

(a)      the Limited Partner or assignee is acquiring its Interest for its own account for investment and not with a view to, or for resale in connection with, any distribution or public offering thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act"), or other applicable securities law or regulations; and

(b)      each Limited Partner's or assignee's Interest may only be disposed of pursuant to an effective registration statement filed under the Securities Act, or pursuant to an exemption from the registration requirements of the Securities Act; the Partnership has not filed such a registration statement nor has any obligations to do so, nor has agreed to do so, nor contemplates doing so in the future; and in the absence of such a registration statement or such an exemption, the Limited Partner may have to hold its Interest indefinitely and may be unable to liquidate it in case of a financial emergency.

(c)      each Limited Partner is acquiring its interest in the Partnership solely for such Partner's account, for investment, without a view to a distribution thereof within the meaning of the Securities Act, and the Interest of that Limited Partner will not be offered, sold or transferred by such Limited Partner in violation of the Securities Act or the securities laws of any state or other jurisdiction;

(d)      each Limited Partner confirms that the Partnership and the General Partner has made available to such Limited Partner, or to the representative of such Limited Partner, the opportunity to ask questions and to acquire such additional information about the business and financial condition of the Partnership as such Limited Partner has requested or desired;

(e)      such Limited Partner understands and has taken cognizance of all risk factors related to the acquisition of its interest in the Partnership, and its knowledge and experience, and/or that of its authorized representatives, in financial and business matters is such that it is, and/or its authorized representatives are, capable of evaluating the merits and risks of acquiring an interest in the Partnership;

(f)      such Limited Partner has and/or its authorized representative has, (i) knowledge of finance, securities and investments, generally, and (ii) experience and skill in investments based on actual participation;

- 31 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000533

(g)     there are no understandings or agreements among the Limited Partners regarding the pricing or timing of any future disposition of Interests other than as may be specifically provided for in this Agreement;

(h)     each Limited Partner is investing in the partnership for its own account and not as an agent, directly or indirectly, for any other Partner.

11.2    Representations of Each Partner. Each Partner and each assignee of an interest of a Partner hereby represents, warrants and acknowledges to the Partnership and the other Partners that it will observe and comply with the covenants and agreements contained in this Agreement applicable to it, and all other agreements, documents, contracts and instruments to which the Partnership is a party or by which the Partnership or its assets are bound, as they apply to such Partner, or assignee, and will take no action that could, with the giving of notice, the passage of time or both, render untrue any representation or warranty made by the Partnership in, or violate the terms of, or constitute a breach of or a default under this Agreement, or any other agreements, documents, contracts or instruments to which the Partnership is a party or by which the Partnership or its assets are bound.

11.3    INDEMNIFICATION. (a)  EACH PARTNER, AND EACH ASSIGNEE OF AN INTEREST OF A PARTNER, HEREBY AGREES TO INDEMNIFY AND HOLD HARMLESS AND THE OTHER LIMITED PARTNERS FROM AND AGAINST ANY LOSS, COST, DAMAGE, CLAIM, LIABILITY OR EXPENSE, INCLUDING THE COSTS OF DEFENDING ANY ACTION BROUGHT AGAINST THE PARTNERSHIP OR ANY PARTNER TO THE EXTENT, ARISING OUT OF OR RELATING TO A BREACH OF OR A DEFAULT OR A MISREPRESENTATION BY SUCH PARTNER UNDER THIS AGREEMENT, OR ANY OTHER AGREEMENT, DOCUMENT, CONTRACT OR INSTRUMENT TO WHICH THE PARTNERSHIP OR A PARTNER IS BOUND OR BY WHICH THEIR RESPECTIVE ASSETS ARE BOUND, BY SUCH PARTNER OR ASSIGNEE.

(b)     EACH PARTNER, AND EACH ASSIGNEE OF AN INTEREST OF A PARTNER, HEREBY AGREES TO INDEMNIFY AND HOLD HARMLESS THE PARTNERSHIP AND THE GENERAL PARTNER AND ANY FORMER GENERAL PARTNER FROM AND AGAINST ANY LOSS, COST, DAMAGE, CLAIM, LIABILITY OR EXPENSE, INCLUDING THE COSTS OF DEFENDING ANY ACTION BROUGHT AGAINST THE PARTNERSHIP OR ANY PARTNER TO THE EXTENT, ARISING OUT OF OR RELATING TO A BREACH OR ALLEGED BREACH OF OR A DEFAULT OR ALLEGED DEFAULT OR A MISREPRESENTATION OR ALLEGED MISREPRESENTATION BY SUCH PARTNER UNDER THIS AGREEMENT, OR ANY OTHER AGREEMENT, DOCUMENT, CONTRACT OR INSTRUMENT TO WHICH THE PARTNERSHIP OR A PARTNER IS BOUND OR BY WHICH THEIR RESPECTIVE ASSETS ARE BOUND, BY SUCH PARTNER OR ASSIGNEE.

- 32 -

SUB_LANDRY_00000534

## ARTICLE XII

### LIMITED PARTNER BENEFITS

12.1   Noncompetition.   Neither the General Partner nor the Principals (nor their Affiliates) shall actively engage in activities in direct competition with the Partnership during the term of the Partnership; provided however, upon any Principal ceasing to be actively engaged in the business of the Partnership, such Principal and his Affiliates shall no longer be bound by the limitations of this section.

12.2   Limited Partner Services.   Each Limited Partner (on behalf of itself or for the benefit of its Affiliates) shall be entitled to (i) co-investment rights with the Partnership after satisfaction of the needs of the clients of the Partnership, (ii) access to all due diligence and research on all investments reviewed by the Partnership, and (iii) administrative/reporting services by the Partnership on any private investments held by the Limited Partners (including those unrelated to the Partnership).  Each of the foregoing would be provided to the Limited Partner by the Partnership free-of-cost, except for the marginal cost, if any, to the Partnership of providing the service to the Limited Partner.

## ARTICLE XIII

### APPRAISAL METHODS

13.1   Appraisals.  Section 8.3 of this Agreement contemplates the appraisal of Notice Interests pursuant to notices given to exercise put or call rights.  In each case, Sections 13.2 through 13.5 shall control the conduct of the appraisal process.

13.2   Selection of Appraisers.   The Notice Partner shall, in his or its notice to the Partnership, state that the Notice Partner elects to have the fair market value of the Notice Interest determined by the appraisal procedures set forth herein and then the name of its appraiser.  Within five (5) days after his or its receipt of such notice from the Notice Partner, the Recipient Partner shall notify the Notice Partner of the name of his or its appraiser.  Upon appointment, the two appraisers shall be instructed to determine faithfully, fairly and within thirty (30) days of the appointment of the second appraiser the fair market value of the Notice Interest.  The fair market value of the Notice Interest shall be the greater of the amount that would be distributed to the holder of the Notice Interest upon liquidation of the Partnership (a) if all the assets of the Partnership were sold at fair market value, the gain or loss allocated hereunder, and the Partnership liquidated pursuant to Article X or (b) if the value of the Partnership's business were determined on a going concern basis.  The two appraisers shall afford the Notice Partner and the Recipient Partner the right to submit evidence with respect to such determinations in writing and give notice thereof to the Partnership and such Partners.  If the higher of the two appraisals determined by the two appraisers exceeds the lower appraisal by less than five percent (5%), the average of the fair market values so determined shall be controlling and shall be binding upon the

- 33 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000535

Notice Partner and the Recipient Partner.  If the higher of the two appraisals exceeds the lower appraisal by more than five percent, the appraisers, within ten (10) days after both of the appraisers have made their determinations, shall appoint in writing a third appraiser and give written notice of such appointment to the Partnership and such Partners.  If the two appraisers shall fail to timely appoint a third appraiser, then the third appraiser shall be selected by the Notice Partner and the Recipient Partner if they can so agree upon such third appraiser within a further period of ten (10) days.  The third appraiser shall be sworn to determine faithfully and fully, pursuant to the procedures set forth above, the fair market value of the Notice Interest.  The third appraiser's determination of value shall be controlling unless it is higher (or lower) than the higher (or lower) determination of value of the original two appraisers, in which case such previous high (or low) determination shall be controlling and binding upon the Notice Partner and the Recipient Partner.  The decision of the appraisers under this Section shall be final and binding on the Notice Partner and the Recipient Partner and shall be specifically enforceable in a court having jurisdiction.

13.3    Appointment of Appraisers.  If (i) the Recipient fails to appoint an appraiser within ten (10) days after his or its receipt of the notice from the Notice Partner setting forth the name of his or its appraiser, or (ii) a third appraiser is not appointed as provided in Section 13.2 above, or (iii) any Person appointed as an appraiser by or on behalf of either Partner dies, fails to act, resigns, or becomes disqualified and the party by or on behalf of whom such appraiser was appointed shall fail to appoint a substitute appraiser within ten (10) days after being requested to do so by the other party, the appraiser in question shall be appointed by the appropriate Court of the State of Florida, upon application of either the Notice Partner or the Recipient Partner.

13.4    Costs of Appraisal.  Each party shall bear and pay the cost of the appraiser appointed by (or for) such party, and the cost of the third appraiser shall be borne and paid equally by the Notice Partner and the Recipient Partner(s).  All appraisal proceedings shall be held at the offices of the General Partner.  The Notice Partner and the Recipient Partner shall be given reasonable advance notice of the time and place of any appraisal proceedings, and both the Notice Partner and the Recipient Partner shall have the right to be present, heard, and represented by counsel.  The appraisers shall not have the power to add to or subtract from or otherwise change the terms and provisions of this Agreement, and their determination shall be consistent and in accordance with the terms and provisions of this Agreement.  The appraisers shall give prompt notice of their decision to the Partnership and all the Limited Partners.

13.5    Qualifications of Appraisers.  Any appraiser to be appointed hereunder shall be a nationally recognized accounting firm or investment banking firm without other relationships to any Partner (or Affiliate).

ARTICLE XIV

MISCELLANEOUS

- 34 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000536

14.1    Additional Documents and Acts. In connection with this Agreement, as well as all transactions contemplated by this Agreement, each Partner agrees to execute and deliver such additional documents and instruments, and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement, and all such transactions. All approvals of a Partner hereunder shall be in writing.

14.2    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO CONFLICTS OF LAW.

14.3    Severability. If this Agreement or any portion thereof is, or the operations contemplated hereby are, found to be inconsistent with or contrary to any valid applicable laws or official orders, rules and regulations, the inconsistent or contrary provisions of this Agreement shall be null and void and such laws, orders, rules and regulations shall control and, as so modified, shall continue in full force and effect; provided, however, that nothing herein contained shall be construed as a waiver of any right to question or contest any such law, order, rule or regulation in any forum having jurisdiction.

14.4    Binding Effect. Except as herein otherwise expressly stipulated to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, and their respective successors and assigns.

14.5    Agreement Restricted to Partners. This Agreement is solely for the parties hereto and no covenant or other provision herein shall create any rights in, or give rise to any obligation to or any cause of action by, any person not a party hereto.

14.6    Counterparts. This Agreement may be executed in a number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

14.7    Power of Attorney: Amendments. Each of the Limited Partners hereby makes, constitutes and appoints the General Partner as their true and lawful attorney, to make, sign, execute, acknowledge and file with respect to the Partnership:

(a)    such Certificates of Limited Partnership and such amended Certificates of Limited Partnership and such assumed name certificates and amendments thereto as may be required by law or pursuant to the provisions of this Agreement;

(b)    all documents required to qualify the Partnership to do business in other states; and

(c)    all documents required to reflect the dissolution and termination of the Partnership after it has been dissolved or terminated in accordance herewith.

- 35 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000537

The foregoing power of attorney is hereby declared to be irrevocable and is a power coupled with an interest, and it shall survive and not be affected by the subsequent death, incompetency, legal disability, withdrawal, dissolution, bankruptcy, insolvency or termination of any Partner or the transfer of all or any portion of a Percentage Interest, and shall extend to each Partner's heirs, legal representatives, successors and assigns.

Any other amendments to this Agreement may be made only with the written approval of the General Partner and of a Supermajority-in-Interest of the Limited Partners; provided, however, the General Partner may amend the definition of "Limited Partners" set forth in Section 1.1(t), the description of the capital contributions set forth in Section 3.2 and the capital contributions and Percentage Interests set forth in Exhibits A and B to reflect transfers of Partnership Interests and the Issuance of Additional Partnership Interests otherwise permitted under this Agreement.

14.8   Notices.   All notices and demands provided for in this Agreement shall be in writing and shall be given to the other Partners by hand, Federal Express or by United States Registered or Certified Mail, postage prepaid, return receipt requested, to the addresses set forth below or to such other addresses as any Partner hereto may hereafter specify in writing:

(a)   If to a Limited Partner:

To the address
set beneath the Limited Partner's
name on Exhibit A hereto.

(b)   If to a General Partner:

To the address
set beneath the General Partner's
name on Exhibit A hereto

in all events with copies to:

Harvey S. Feuerstein, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

Each notice or demand given by hand shall be effective as of its actual delivery to the other Partners as so provided.  Each notice or demand given by mail shall be deemed delivered and effective on the date of delivery as shown by the return receipt.  Any Partner may change its address for purposes of receiving notices by giving notice thereof to the other Partner as provided in this Article XIII.

14.9   Binding Arbitration.  The Partners agree that all Disputes (as hereinafter defined) shall be resolved by binding arbitration administered by the American Arbitration Association in accordance with the Commercial Arbitration Rules of the American Arbitration Association before

- 36 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000538

a panel of three arbitrators selected thereunder. The term "Disputes" shall mean any action, dispute, claim or controversy of any kind hereafter arising between any of the Partners in any way arising out of, pertaining to or in connection with (1) this Agreement, (2) the transactions contemplated by this Agreement, or (3) any documents, instruments or agreements related to or contemplated by this Agreement. Arbitration pursuant to this Section shall be binding upon the parties thereto. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Any Partner may, by summary proceedings (e.g., a plea in abatement or motion to stay further proceedings), bring an action in court to compel arbitration of any Disputes. All statutes of limitation that would otherwise be applicable to any Disputes shall apply to any arbitration proceeding.

- 37 -

HFNY2: #320951 v22/03842-0001/071698

SUB_LANDRY_00000539

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

WESTPORT REALTY ADVISORS, LTD.
By:    WESTPORT ASSET MANAGEMENT, LTD., its
       General Partner

By: _____
    Name: L. L. LANDRY
    Title: PRES.

ROYAL HAWAIIAN SHOPPING CENTER, INC.

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

MAHALO LIMITED

By: _____
    Name: L. L. LANDRY
    Title:

THE MILDRED H. McEVOY FOUNDATION

By: _____
    Name:
    Title:

NFP, L.P.

By: _____
    Name:
    Title:

HUNT-CROSSROADS, INC.

By: _____
    Name:
    Title:

- 38 -

HFNY2: #520951 v22/03642-0001/072398
PARTNERSHIP AGREEMENT

SUB_LANDRY_00000540

07/23/98   18:34   ☎808 537 1229         KS-BE LEGAL GRP.                              ☐011/013
JUL 23 '98 04:23PM

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

WESTPORT REALTY ADVISORS, LTD.
By:    WESTPORT ASSET MANAGEMENT, LTD., its
       General Partner

       By:_____
            Name:
            Title:

ROYAL HAWAIIAN SHOPPING CENTER, INC.

By:_____
    Name:  Richard S.H. Wong
    Title:  President

By:_____
    Name:  Scott K. Hayashi
    Title:  Assistant Vice President
            Mainland Properties

MAHALO LIMITED

By:_____
    Name:
    Title:

THE MILDRED H. McEVOY FOUNDATION

By: _____
    Name:
    Title:

NFP, L.P

By:_____
    Name:
    Title:

HUNT-CROSSROADS, INC.

By:_____
    Name:
    Title:

- 36 -

HFNY2: #320951 v22/03842-0001/072298

Diane Olczygier - wra prtnrship agmt.wpd                                                                 Page 40

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

WESTPORT REALTY ADVISORS, LTD.
By:   WESTPORT ASSET MANAGEMENT, LTD., its
      General Partner

                                                        By: 
                                                        Name: 
         Title: 

ROYAL HAWAIIAN SHOPPING CENTER, INC.

                                                        By: 
         Name: 
                                                        Title: 

                                                        By: 
         Name: 
                                                        Title: 

MAHALO LIMITED

                                                        By: 
         Name: 
         Title: 

THE MILDRED H. McEVOY FOUNDATION

By: _____
         Name: SUMNER B. TILTON JR
         Title: TRUSTEE

NFP, L.P.

                                                        By: 
         Name: 
         Title: 

HUNT-CROSSROADS, INC.

By:_____
         Name: 

; # vwra prtnrshp agmt.wpd/-J072298                 - 40 -

JUL 23 '98 14:18                                                              PAGE.05

SUB_LANDRY_00000542

JUL 24 '98 14:46 FR HERRICK FEINSTEIN   212 869 7577 TO 19125981941   P.01

**NOYES**
**NFP**

## HERRICK, FEINSTEIN LLP

Two Park Avenue
New York, New York 10016

Telephone #: (212) 592-1400

Fax #: (212) 889-7577

### FAX COVER MEMO

PLEASE DELIVER __7__ PAGES (INCLUDING COVER MEMO)

| TO: | Jim Noyes |
|---|---|
| FIRM NAME: | |
| FAX #: | (912) 598-5911 |
| TELEPHONE #: | |

| FROM: | Belinda G. Schwartz |
|---|---|
| DIRECT DIAL #: | 212-592-1544 |
| CLIENT/MATTER #: | 03842-0001 |
| DATE: | July 23, 1998 |
| COMMENTS: | Re: Westport Realty Advisors, Ltd. |
| | Signature pages from the Partnership Agreement and the Capitalization Agreement. |

IF THERE ARE ANY PROBLEMS CONCERNING THE TRANSMISSION OF THIS
MATERIAL, PLEASE CALL (212) 592-6158.

**CONFIDENTIALITY NOTE**

This facsimile contains privileged information intended only for the use of the individual or entity named above. If the reader of this facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the original facsimile to us at the above address via the U.S. Postal Service. Thank you.

******** << FILM/PAPER SAVE >> TO EXTEND INTO ORIGINAL SIZE, PLEASE USE EXTENSION COPY ********
JUL 23 '98 14:47 FR HERRICK FEINSTEIN   212 869 7577 TO 19125981911   P.02

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date
and year first above written.

WESTPORT REALTY ADVISORS, LTD.
By:   WESTPORT ASSET MANAGEMENT, LTD., its
General Partner

By:_____
   Name:
   Title:

ROYAL HAWAIIAN SHOPPING CENTER, INC.

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

MAHALO LIMITED

By:_____
   Name:
   Title:

THE MILDRED H. McEVOY FOUND—

By:_____
   Name:
   Title:

FP, L.P.

By:_____
   Name:
   Title:   GP

HUNT-CROSSROADS, INC.

By:_____
   Name:
   Title:

- 35 -

**PARTNERSHIP**

SUB_LANDRY_00000543

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

WESTPORT REALTY ADVISORS, LTD.
By:    WESTPORT ASSET MANAGEMENT, LTD., its
       General Partner

By:_____
   Name:
   Title:

ROYAL HAWAIIAN SHOPPING CENTER, INC.

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

MAHALO LIMITED

By:_____
   Name:
   Title:

THE MILDRED H. McEVOY FOUNDATION

By: _____
    Name:
    Title:

NFP, L.P.

By:_____
   Name:
   Title:

HUNT-CROSSROADS, INC.

By: Steven T. Coffey
    Name:  STEVEN T. COFFEY
    Title:  VICE PRESIDENT

- 38 -

i # vers prtnrshp agmt.wpd/-K/72398

SUB_LANDRY_00000544

## EXHIBIT A

|  | Initial Percentage Interest as a Limited Partner | Share of Initial Gross Asset Value |
|---|---|---|
| Mahalo Limited<br>1962 Portage Landing North<br>North Palm Beach, Florida 33408 | 18.053% | $26,718.44 |
| Mildred H. McEvoy Foundation<br>c/o Sumner B. Tilton, Trustee<br>Fletcher, Tilton & Whipple<br>370 Main Street<br>Worcester, Massachusetts 10608 | 4.203% | 6,220.44 |
| Royal Hawaiian Shopping Center, Inc.<br>2201 Kalakaua Avenue<br>Suite A500<br>Honolulu, Hawaii 96815 | 69.179% | 102,384.92 |
| NFP, L.P.<br>9 Back River Circle<br>Skidaway Island<br>Savannah, Georgia 31411 | 4.362% | 6,455.76 |
| Hunt-Crossroads, Inc.<br>c/o Hunt Financial Corporation<br>1445 Ross at Field<br>Dallas, Texas 75202 | 4.203% | 6,220.44 |
|  | 100% | $148,000.00 |

SUB_LANDRY_00000545

CERTIFICATE OF AMENDMENT
TO
CERTIFICATE OF LIMITED PARTNERSHIP
OF
WESTPORT REALTY ADVISORS, LTD.

Pursuant to the provisions of section 620.109, Florida Statutes, this Florida limited partnership, whose certificate was filed with the Florida Dept. of State on January 26, 1998, adopts the following certificate of amendment to its certificate of limited partnership.

FIRST: Amendment: The limited partnership name of WESTPORT REALTY ADVISORS, LTD. as set forth in Paragraph 1. is hereby amended and changed to the following name:

WESTPORT ADVISORS, LTD.

SECOND: This certificate of amendment shall be effective at the time of its filing with the Florida Department of State.

THIRD: Signature(s)
Signature of current general partner:

WESTPORT REALTY ADVISORS, LTD., a Florida limited partnership
BY:  WESTPORT ASSET MANAGEMENT, LLC
successor by merger to Westport Asset Management, Ltd., as sole general partner
BY:  Double L Investment, Inc., as managing member

BY: _____

Lawrence L. Landry, as President

STATE OF FLORIDA      |
COUNTY OF PALM BEACH |

The foregoing instrument was acknowledged before me this 22nd day of Sept., 2000, by Lawrence L. Landry, as President of Double L Investment, Inc., as managing member of WESTPORT ASSET MANAGEMENT, LLC successor by merger to Westport Asset Management, Ltd., as sole general partner of WESTPORT REALTY ADVISORS, LTD., a Florida limited partnership, who is personally known to me or who has produced _____ as identification .

Seal

_____
Notary Public, State of Florida

g:\docs\alysbard 1429.cen

SUB_LANDRY_00000546

# AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## BVM UNIVERSITY VILLAGE, LLC

THIS **AMENDED AND RESTATED OPERATING AGREEMENT** (this "Agreement") is made and entered into this 29th day of March, 2014, on behalf of **BVM University Village, LLC** by **Compliance Concepts, LLC, Venice Avenue Investors, LLC,** and **Eagle One Properties, LLC.**

## RECITAL

**BVM UNIVERSITY VILLAGE, LLC,** a Florida limited liability company (the "Company"), was organized on August 28, 2013 (the "Organization Date") by BVM Management, Inc. as the then sole member of BVM University Village, LLC (the "Organizer") under the laws of the State of Florida by the filing of Articles of Organization (the "Articles") pursuant to Florida law. However, by Resolution BVM Management, Inc. withdrew as the sole member and said Compliance Concepts, LLC, Venice Avenue Investors, LLC and Eagle One Properties, LLC became the members of said Company by entering into that certain Operating Agreement of the Company dated March 17, 2014 (the "Prior Agreement"). Compliance Concepts, LLC, Venice Avenue Investors, LLC and Eagle One Properties, LLC now desire to enter into this agreement to amend and restated the prior agreement in its entirety and to govern certain aspects of the operations of the Company and to set forth the rights and obligations of the Members, any Persons subsequently becoming Member(s), and their respective successors and assigns.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and in consideration of becoming a Member of the Company, the undersigned (including parties who subsequently become parties hereto after the Initial Members have signed this Agreement) agree as follows:

## ARTICLE I
## DEFINITIONS AND GENERAL PROVISIONS

**Section 1.1    Definitions.** Unless the context or rules of grammar otherwise require or unless otherwise expressly provided in this Agreement, the following capitalized terms used in this Agreement (and the respective plural or singular forms thereof) shall have the meanings specified in this Section as follows:

"**1933 Act**" means the Securities Act of 1933, as amended.

"**Act**" means the Florida Act which creates the authority to form the company, as amended, restated and/or replaced from time to time.

"**Affiliate**" means any Person that is, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation, the right to exercise, directly or indirectly, more than 50% of the voting rights of such corporation and, with respect to any other Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies thereof.

"**Agreement**" means this Amended and Restated Operating Agreement, as amended from time to time, including all exhibits and schedules thereto.

Page                              1                         3/29/2014

SUB_LANDRY_00000547

"**Articles**" means the Articles of Organization of the Company filed with the Florida Secretary of State and as amended or restated from time to time.

"**Available Cash**" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Member(s) and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a reasonable working capital reserve, if such reserves are established by a Majority in Interest of the Member(s).

"**Business Plan**" means, at any given time, the business plan currently in effect, including any amendments thereto, as adopted by the Member(s) pursuant to Section 5.1.

"**Capital Account**" means the account established and maintained for each Member in the manner prescribed by Section 3.6 and in the manner provided in Treasury Regulation Section 1. 704-1(b)(2)(iv), as amended from time to time.

"**Capital Contributions**" means the total value of any cash, property, services rendered, or a promissory note or other binding obligation to contribute cash or property or to perform services that a person transfers to the Company in the capacity as a Member, as shown on Exhibit B attached to and made a part of this Agreement, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contributions of a Member shall include all Capital Contributions previously made by any prior Member for the interest of such Member, and shall be reduced by any Distributions to such prior Member in return of the Member's Capital Contributions as contemplated in this Agreement.

"**Class A Member(s)**" means, collectively, all Member(s) listed on **Exhibit B** attached hereto as Class A Member(s) and all Transferees of Class A Member(s) admitted to the Company as Member(s), and when used in the singular form, means any of the Class A Member(s), as the context requires.

"**Class A Units**" means those Units of Interests held by Class A Member(s).

"**Class B Member(s)**" means, collectively, all Member(s) listed on **Exhibit B** attached hereto as Class B Member(s) and all Transferees of Class B Member(s) admitted to the Company as Member(s), and when used in the singular form, means any of the Class B Member(s), as the context requires.

"**Class B Units**" means those Units of Interests held by Class B Member(s).

"**Code**" means the Internal Revenue Code of 1986, as amended. All references in this Agreement to Code Sections shall include any and all corresponding provisions of succeeding law.

"**Company**" means **BVM UNIVERSITY VILLAGE, LLC**.

"**Dissociate**" or "**Dissociation**" means any action as described in **Article 12** that causes a Person to cease to be a Member as a result of that action.

"**Dissociated Member**" means the Member who ceases to be a Member because of a Dissociation event and thereby is a Transferee rather than a Member.

"**Effective Date**" has the meaning assigned to such term in the preamble.

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000548

"**Former Member**" means a Person who previously was, but is no longer, a Member of the Company.

"**Initial Member**" means and includes that person or entity who is a Member of the Company at the time this Agreement is executed, and who is identified as the Initial Member of the Company on the signature page (including counterparts thereof) of this Agreement.

"**Interest**" means the entire ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

"**Losses**" or " losses" means losses, and each item of income, gain, loss, deduction or credit entering into the computation thereof, as determined in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).

"**Majority in Interest of All the Member(s)**" means the Member(s) who, at the time of such vote, consent or approval, have more than fifty percent (50%) of the Percentage Interest in the Company, as set forth in the records of the Company.

"**Majority in Interest of the Other Member(s)**" means the Other Member(s) (as applicable) who, at the time of such vote, consent or approval, have more than fifty percent (50%) of the Percentage Interest in the Company, as set forth in the records of the Company.

"**Majority in Interest of the Member(s)**" means (i) the Member(s) who, at the time of such vote, consent or approval, have more than fifty percent (50%) of the outstanding Units held by all Member(s) together with (ii) the Class A Member(s), who, at the time of such vote, consent or approval, have more than fifty percent (50%) of the outstanding Class A Units held by all Class A Member(s).

"**Manager**" means any Person or Persons designated as a Manager or Managers of the Company pursuant to **Article 6**.

"**Member**" means a Person that (i) owns an Interest in the Company, (ii) has been admitted to Member(s)hip in the Company in accordance with the Act, the Articles and this Agreement, and (iii) has not ceased to be a Member in accordance with the Act, the Articles and/or this Agreement.

"**Other Member(s)**" means all Member(s) other than the Member whose actions or interests are the subject of some vote, consent or approval by the Member(s).

"**Percentage Interest**" of a Member means the percentage of issued and outstanding Units of the Company held by such Member as set forth opposite the name of such Member under the column "Percentage Interest" on Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

"**Person**" means and includes an individual, corporation, general partnership (including a limited liability partnership), limited partnership, association, limited liability company, business trust, or any other legal or commercial entity.

"**Profits**" or "**profits**" means income, and each item of income, gain, losses, deduction or credit entering into the computation thereof, as determined in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).

Page      3      3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000549

"**Tax Matters Manager**" means the "Tax Matters Partner" of the Company as that term is defined in Code Section 6231 and who is designated pursuant to **Section 6.13**.

"**Transfer**" means with respect to all or any portion of a Member's Interest in the Company, any sale, gift, bequest, assignment, conveyance, transfer, pledge, grant of a security interest, collateral assignment or other disposition of all or any portion of such Interest, whether voluntary or involuntary (including, without limitation, an involuntary Transfer in connection with a marital separation or dissolution of marriage), including any of the foregoing that occur by operation of law.

"**Transferee**" has the meaning assigned to such term in **Section 11.2(b)**.

"**Treasury Regulations**" means regulations of the United States Department of the Treasury under the Code, as amended from time to time.

"**Units**" refers to an interest in the Company to be measured in such units as may be established pursuant to Article 3. Whenever reference is made to "Percentage Interest" of a Member, a Member's Units may be converted into the same by dividing the Member's number of Units by the total of all Units outstanding or the total of all Units outstanding held by the applicable group.

**Section 1.2   References to Articles, Sections and Exhibits.** References in this Agreement to numbered or lettered "Article" or "Section" or "subsection" shall unless the context clearly indicates otherwise, be construed as referring to a particular Article, Section or subsection in this Agreement, and references in this Agreement to "this Article" or "this Section" or "this subsection" shall be construed as referring, as applicable, to the Article, Section or subsection in which such reference is located. References in this Agreement to an "Exhibit" are to a document so identified that is attached to, and a part of, this Agreement.

**Section 1.3   Coordination with the Act.** The Act contains a number of provisions that govern various aspects of the conduct of the business and affairs of limited liability companies that can be "overruled", so to speak, by the provisions of a written operating agreement adopted by the Member(s) of the limited liability company or by the articles of organization of such company. In construing this Agreement and the Articles and in coordinating the provisions hereof and thereof with the Act, it is the intent of the Member(s) that whenever this Agreement or the Articles contain provisions addressing a certain subject or matter, those provisions of this Agreement or the Articles will control over the provisions of the Act with respect to that same subject or matter and shall be construed as overruling any confliction or different provisions of the Act with respect thereto even though the provision of this Agreement or the Articles do not specifically state that they are intended to overrule such provisions of the Act. If this Agreement and the Articles are silent as to a subject or matter covered by the Act, the provisions of the Act with respect thereto shall control.

## ARTICLE II

## ORGANIZATION AND TERM

**Section 2.1   Articles of Organization.** The Company was formed by filing the Articles with the Florida Secretary of State pursuant to the Act. The rights and liabilities of the Member(s) shall be as provided under the Act, the Articles, and this Agreement. The Member(s) agree to each of the provisions of the Articles.

**Section 2.2   Name.** The name of the Company is **BVM UNIVERSITY VILLAGE, LLC.**

SUB_LANDRY_00000550

**Section 2.3  Principal Place of Business.** The principal place of business of the Company shall be at **9114 Technology Lane, Fishers, IN 46038** or such other address as may from time to time be established by a Majority in Interest of the Member(s).

**Section 2.4  Registered Office and Registered Agent.** The Company's registered office shall be at its principal place of business set forth in Section 2.3, and the name of its initial registered agent at such address shall be **Buddy D. Ford, 115 North MacDill Avenue, Tampa, Florida 33609.** The Company may designate another registered office or agent at any time by following the procedures set forth in the Act.

**Section 2.5  Purpose.** The Company shall have unlimited power to engage in and do any lawful act concerning any or all lawful businesses for which limited liability companies may be organized according to the laws of the Sate of Florida, including all powers and purposes now and hereafter permitted by law to a limited liability company.

**Section 2.6  Effective Date.** The effective date of this Agreement is the Effective Date (as defined in the preamble).

**Section 2.7  Term.** The term of the Company shall continue in perpetuity and until the Company is dissolved in accordance with the provisions of this Agreement or the Act.

**Section 2.8  Other Instruments.** Each Member hereby agrees, within ten (10) days after receipt of a written request therefore, to execute and deliver such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments, and to take such other actions, as the Company deems necessary, useful, or appropriate to comply with any laws, rules or regulations or as may be necessary to enable the Company to fulfill its responsibilities under this Agreement

## ARTICLE III
## MEMBER(S) AND CAPITAL STRUCTURE

**Section 3.1  Names and Addresses of Member(s).** All Member(s), and their last known business, residence or mailing address shall be listed on **Exhibit A.** The Member(s) shall be required to update **Exhibit A** from time to time as necessary to accurately reflect the information therein.

**Section 3.2  Units Representing Interests.** Interests in the Company shall be represented by the Units (consisting of Class A Units and Class B Units) held by each Member. Each Member's respective Units in the Company shall be set forth on Exhibit B (which shall be updated by the Member(s) from time to time as required to accurately reflect the information therein). The Member(s) hereby agree that each Unit shall entitle the Member possessing such Unit to (a) one vote per Unit on matters on which the Member(s) may vote under the Articles, this Agreement and the Act, and (b) except as otherwise provided in **Article 8** and **Article 13,** the allocation of an equal proportionate share per Unit of the Company's Profits and Losses.

**Section 3.3  Initial Capital Contributions and Percentage Interests of Member(s).** The agreed value of the initial Capital Contributions to the Company and Percentage Interests of each Member are set forth on **Exhibit B.** Any subsequent Capital Contributions shall be in such amounts and in such types of property as may be agreed upon by all of the Member(s), and shall also be reflected on **Exhibit B** (as updated).

**Section 3.4  Cash Contributions Only.** Absent the express prior written agreement of a Majority in Interest of the Member(s), no Capital Contributions may be made other than in cash and the Company shall not be obligated to recognize as a Capital Contribution any transfer to the Corporation of property or item value other than cash.

Page          5          3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000551

**Section 3.5  Capital Calls.**

(a)  <u>Consent by Majority in Interest of the Member(s).</u>  If the Company needs additional operating capital, upon the affirmative vote of a Majority in Interest of the Member(s), the Company may make one or more requests to Member(s) for Capital Contributions (a "Request"), each of which Requests shall specify the type and aggregate amount of additional Capital Contributions requested by the Company ("Requested Capital Contribution Amount"), the date upon which the Additional Capital Contribution Amount is to be remitted to the Company ("Requested Capital Contribution Date") and the number and class of Units to be issued to each Member for the Requested Capital Contribution Amount. The Member(s) shall be given notice of the Request at least thirty (30) days prior to the Requested Capital Contribution Date. No Member shall be required to make any additional Capital Contributions pursuant to a Request, provided however, each Member shall have the right to make additional Capital Contributions pursuant to each Request pro-rata in accordance with such Member's Percentage Interest ("Pro-Rata Share of Requested Capital Contribution") on or before the Requested Capital Contribution Date, in which event each Member making the Requested Capital Contribution shall receive the Units to be issued in exchange therefor. In the event any Member fails to make all or any part of its Pro-Rata Share of Requested Capital Contributions pursuant to a Request, the other Member(s) may make additional Capital Contributions pro-rata in accordance with their respective Percentage Interest to make up all or any part of such shortfall, or, upon the vote of a Majority in Interest of the Member(s) (other than the Member failing to make all or part if its Pro-Rata Share of Requested Capital Contributions), may seek additional Capital Contributions from one or more Additional Member(s) to make up all or any part of such shortfall pursuant to the terms of Section 10.1 of this Agreement, in which event each Member making the Requested Capital Contribution shall receive the Units to be issued in exchange therefor.

(b)  <u>Consent by All of the Member(s).</u>  Without limiting the provisions of **Section 3.5(a)** above, if the Company needs additional operating capital, upon the affirmative vote of all of the Member(s), the Company may make one or more demands for Capital Contributions (a "Demand"), each of which Demand shall specify the type and aggregate amount of additional Capital Contributions required by the Company ("Required Capital Contribution Amount") and the date upon which the Required Capital Contribution Amount is to be remitted to the Company ("Required Capital Contribution Date") and the number of Units to be issued for the Requested Capital Contribution Amount. The Member(s) shall be given notice of the Demand at least thirty (30) days prior to the Required Capital Contribution Date. Each Member shall be required to make Additional Capital Contributions pursuant to a Demand pro-rata in accordance with such Member's Percentage Interest ("Pro-Rata Share of Required Capital Contribution") on or before the Required Capital Contribution Date. In the event any Member fails to make all or any part of its Pro-Rata Share of Required Capital Contributions pursuant to a Demand, the Company may pursue any available remedy provided by the Act, or any other law, regulation or rule, to ensure contribution of such Capital Contributions by the defaulting Member and, in any event, may make additional Capital Contributions pro-rata in accordance with their respective Percentage Interest to make up all or any part of such shortfall, or, upon the affirmative vote of a Majority in Interest of the Member(s) (with such majority vote being determined as if the Member failing to make all or part if its Pro-Rata Share of Required Capital Contribution is not a Member and its Units are not outstanding), may seek additional Capital Contributions from one or more Additional Member(s) to make up all or any part of such shortfall pursuant to the terms of **Section 10.1** of this Agreement, in which event the Member or Member(s) actually making the additional Capital Contribution shall be issued the Units therefor. Execution of this Agreement by a Member shall constitute an enforceable promise to make additional Capital Contributions in accordance with this **Section 3.5 (b).**

**Section 3.6  Capital Accounts.**

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000552

(a)    An individual Capital Account shall be established and maintained on behalf of each Member in the manner provided by Treasury Regulation Section 1.704-(b)(2)(iv). To the extent consistent with Treasury Regulation Section 1.704-(b)(2)(iv), the Capital Account of each Member shall consist of (i) the amount of cash such Member has contributed to the Company, plus (ii) the agreed fair market value of any property such Member has contributed to the Company, net of any liabilities assumed by the Company or to which such property is subject, plus (iii) the agreed fair market value of any services rendered by such Member, which has been contributed to the Company, plus (iv) the amount of Profits (including tax-exempt income) allocated to such Member(s) pursuant to **Section 8.2**, less (v) the amount of Losses allocated to such Member pursuant to **Section 8.2**, less (vi) the amount of all cash distributed to such Member, less (vii) the fair market value of any property distributed to such Member, net of any liability assumed by such Member or to which such property is subject, less (viii) such Member's share of any other expenditures which are not deductible by the Company for federal income tax purposes or which are not allowable as additions to the basis of Company property, and (ix) subject to such other adjustments as may be required under the Code. The Capital Account of a Member shall be increased or decreased, as relevant or applicable, to reflect adjustments to basis made pursuant to the Code or Treasury Regulations.

(b)    Except as may be specifically provided otherwise in this Agreement, no Member shall have any liability or obligation to the Company, or to any Member or any other Person, to restore a negative or deficit balance in such Member's Capital Account.

**Section 3.7  No Redemption Rights.** Except as may otherwise be specifically provided in this Agreement or be determined by a Majority in Interest of the Member(s), no Member or Former Member shall be entitled, at or after the time the Member ceases to be a Member of the Company or at any other time to demand or receive from the Company a return of any of the Member's Capital Contributions or the purchase or redemption of, or other payment for, the Member's Units or Interest.

**Section 3.8  Certificates for Units.** The Units or Interest of a Member in the Company may be represented by such Certificates of Member(s)hip, Unit Certificates or similar instruments, if any, as may from time to time be determined by a Majority in Interest of all the Member(s).

## ARTICLE IV

## MEETINGS OF MEMBER(S)

**Section 4.1  Annual Meeting.**    Annual meetings of the Member(s) shall be held on the **third Tuesday in April** of each year at 9:00 am at the principal offices of the Company, or on such other date or at such other place as may be designated by a Majority in Interest of the Member(s).

**Section 4.2  Special Meetings.**    Special meetings of the Member(s) may be called at any time by a Manager or by any Member or Member(s) holding at least thirty (30%) of the outstanding Units. The Member(s) may designate any place, within the State of Indiana, as the place of meeting for any special meeting of the Member(s). If no designation is made, the place of meeting shall be the principal office of the Company. Special meetings of the Member(s) shall be called upon delivery to the Member(s) of notice of a special meeting of the Member(s) given in accordance with **Section 4.3**, signed and dated by a Manager or a Member or Member(s) authorized to call such meeting as provided in this **Section 4.2**.

**Section 4.3  Notice of Meetings.**    No notice of annual Meetings shall be required unless the date or time of any such meeting is changed from the date and time fixed for such meeting, in which case each Member shall be notified of such change orally or in writing at least five (5) days, but no more than thirty (30) days before such meeting. The Company shall give written or oral notice stating the date, time, place and purpose of

SUB_LANDRY_00000553

any other meeting of the Member(s) to each Member of record entitled to vote at the meeting at least five (5) days but no more than thirty (30) days before the meeting.

**Section 4.4 Waiver of Notice.** A Member may waive notice of any meeting, before or after the date and time of the meeting as stated in the notice, by delivering a signed waiver to the Company for inclusion in the minutes. A Member's attendance at any meeting, in person or by proxy (a) waives objection to lack of notice or defective notice of the meeting unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (b) waives objection to consideration of a particular matter at the meeting that is not within the purposes described in the meeting notice unless the Member objects to considering the matter when it is presented.

**Section 4.5 Voting by Proxy.** A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Secretary or other officer or agent of the Company authorized to tabulate votes. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 11 months unless otherwise expressly stated in the appointment form.

**Section 4.6 Quorum; Conduct of Meetings.** A Majority in Interest of the Member(s) represented in person or by proxy is required at any Member(s)' meeting in order for the meeting to be validly constituted. At any meeting of the Member(s), the Managers shall preside or appoint a person to preside at the meeting and shall appoint a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting, which shall be placed in the minute books of the Company.

**Section 4.7 Action by Member(s).** Except as expressly provided otherwise in this Agreement, all actions of the Member(s) shall be taken by the affirmative vote of a Majority in Interest of the Member(s) at a validly called and constituted meeting.

**Section 4.8 Action by Consent.** Any action required or permitted to be taken at a meeting of the Member(s) may be taken without a meeting if the action is taken in writing by the holders of the Percentage Interests that are not fewer than the minimum Percentage Interests necessary to authorize or take such action at a meeting at which all the Member(s) entitled to vote thereon were present and voted. The action must be evidenced by one or more written consents describing the action taken, signed by the requisite Percentage Interest of Member(s) entitled to vote on the action, and delivered to the Company for inclusion in the minutes.

**Section 4.9 Presence.** Any or all Member(s) may participate in any annual or special meeting of the Member(s) by, or through the use of, any means of communication by which all Member(s) participating may simultaneously hear each other during the meeting. A Member so participating is deemed to be present in person at the meeting.

**Section 4.10 Voting and Attending by Representatives.** Any Member that is a corporation, partnership, limited liability company or any other entity that is not a natural person may attend and vote at meetings of the Board of Member(s) by such representatives as such Member(s) may select from time to time in its sole discretion. No written proxy or other appointment shall be required with respect to any such representatives unless a Majority in Interest of the Member(s) determines otherwise.

## ARTICLE V
## RIGHTS AND OBLIGATIONS OF MEMBER(S)

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000554

**Section 5.1 Rights of Member(s).**   The Member(s) shall have the following rights, except as otherwise provided in the Act, the Articles or this Agreement:

(a)   A Majority in Interest of All the Member(s) shall have the right to appoint and remove the Manager or Managers;

(b)   Except as otherwise provided in **Section 15.2,** a Majority in Interest of the Member(s) shall have the right to amend the Articles and this Agreement, provided that such amendment complies with the Act, the Articles and **Article 15** of this Agreement;

(c)   A Majority in Interest of the Member(s) shall have the right to adopt or amend any Business Plan; provided, however, that Member approval is not required for an deviation or alteration to a previously approved Business Plan if such alterations or deviation, singly or in the aggregate with other deviations or alterations, do not increase the projected expenses or liabilities of the Company by more than $50,000;

(d)   Upon the affirmative vote of all the Member(s), the right to dissolve the Company, provided that such action complies with the Act, the Articles and the Agreement;

(e)   Subject to the terms of **Section 3.5** of this Agreement, a Majority in Interest of the Member(s) shall have the right to approve or disapprove, and to establish the consideration to be paid or other terms and conditions with respect to, the issuance of Units to then existing Member(s) or to Persons who are not, prior to such issuance, Member(s);

(f)   A Majority in Interest of the Member(s) shall have the right to approve a merger of the Company, or the sale, exchange or other disposition of all or substantially all of the Company's assets, whether occurring in a single transaction or part of a plan;

(g)   A Majority in Interest of the Member(s) shall have the right to discontinue any of the Company's business operations;

(h)   A Majority in Interest of the Member(s) shall have the right to approve or disapprove any incurrence of indebtedness (contingent or otherwise); and

(i)   Member(s) shall have such other rights as are reserved to the Member(s) under this Agreement.

**Section 5.2 Waiver of Partition.**   Each Member on behalf of such Member, its successors and its assigns, hereby waives any rights to have any Company property partitioned.

**Section 5.3 Management Fees and Overhead Allocations.**   Member(s) and/or Affiliates may from time to time provide property and assets for use by the Company, and in consideration thereof be entitled to reasonable rents or other compensation or reimbursement as a Majority in Interest of the Other Member(s) (excluding the Member or Member(s) furnishing such property or assets, who shall be disqualified from acting on behalf of the Company) from time to time determines is appropriate. In addition, Member(s) and/or Affiliates may from time to time provide management, administrative or other services for the Company, as Managers or otherwise, and in consideration thereof may be entitled to reasonable management fees, overhead allocations and/or other compensation as from time to time determined by a Majority in Interest of the Other Member(s). In that regard, a Member to whom such sums are payable may not participate as a Member of the Company in making a determination of the amount of any such management fees, overhead allocations, rents, or other compensation or reimbursement payable to the Member by the Company. All such payments made to any Member pursuant to this Section shall be treated as expenses of the Company and shall not be deemed to constitute distributions to the recipient of any Profit, Loss or Capital of the Company.

**Section 5.4 Reimbursement of Expenses.**   Each Member shall be entitled to reimbursement from the Company of all expenses reasonably incurred and paid by such Member on behalf of the Company with the Company's prior authorization and approval except as provided in **Section 5.5.** Any question as to whether a Member is entitled to reimbursement of expenses under this Section shall be determined by a Majority in Interest of the Other Member(s).

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000555

**Section 5.5  Organization Expenses.**  The Company shall pay all expenses incurred in the organization of the Company including those incurred on behalf of the Company by a Member or Manager.

**Section 5.6  Authority of Member(s).**  Member(s) (in their capacities as Member(s)) shall not have authority to act for or to bind the Company except such authority as may form time to time be specifically granted or approved in writing by a Manager.  No Member (in the capacity as a Member) shall have the authority to sign agreements or other instruments or incur indebtedness on behalf of the Company or to otherwise act as an authorized agent or other representative of the Company except as such Member shall have been specifically authorized as provided in this Agreement.

**Section 5.7  Liability.**  Except as provided in this Section 5.7, Member(s) shall not be personally liable for the debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any other Member, agent or employee of the Company.  A Member is not liable for any action taken as a Member, or any failure to take any action, unless the Member has breached or failed to perform the Member's duties to the Company and the breach or failure to perform constitutes willful misconduct or recklessness.  Notwithstanding the foregoing, by execution of this Agreement, each Class A Member agrees to execute such guarantees as may be requested by the Company's bank lenders as necessary to obtain bank financing for the Company.  In no event shall Class B Member(s) be required to guarantee any indebtedness of the Company.

**Section 5.8  Performance of Duties and Reliance on Others.**  A Member who is authorized to perform duties on behalf of the Company shall perform such Member's duties as a Member in good faith, in a manner the Member reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  In performing any such Member's duties, a Member shall be entitled to rely on information, opinions, reports, or statements of the following persons or groups unless the Member has knowledge concerning the matter in question that would cause such reliance to be unwarranted:

(a)    a Manager of the Company or one or more employees or other agents of the Company whom the Member reasonably believes to be reliable and competent in the matters presented;

(b)    any attorney, public accountant, or other person as to matters which the Member reasonably believes to be within such person's professional or expert competence; or

(c)    A committee upon which the Member does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Member reasonably believes to merit competence.

**Section 5.9  Compensation.**  The Company may, but shall not be obligated to pay any Member or other Person salary, bonus and/or other compensation for services rendered to the Company.  Such salaries, bonuses and/or other compensation shall be treated as expenses of the Company and shall not be deemed to constitute distributions to the recipient of any Profit, Loss or capital of the Company, even though such recipient is a Member of the Company.

**Section 5.10  Withdrawal.**  A Class A Member may withdraw upon the consent of all other Class A Member(s). A Class B Member may not withdraw from the Company without the consent of all the Other Member(s), except that a Class B Member may withdraw so long as:

(a)    the Class B Member has contributed the full amount of money or other consideration which constitutes the Class B Member's Capital Contribution as set forth on **Exhibit B** hereto; and

Page          10          3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000556

(b)     following the Class B Member's withdrawal, there will be at least one remaining Member of the Company; and

( c )     concurrently with the withdrawal, the Class B Member assigns and transfers to the Company, free and clear of all liens, security interests and claims of third parties, all of the withdrawing Class B Member's Units, all without further payment or compensation of any kind from the Company; and

(d)     the withdrawing Class B Member executes a general release, in form and substance reasonably satisfactory to the Company, in favor of the Company, its Managers and its remaining Member(s).

The Company may recover damages for breach of this **Section 5.10** and may offset the Company's damages against any amount owed to a Member or Former Member for distribution or otherwise.

### Section 5.11  Non-Competition and Non-Disclosure by Member(s).

(a)     Unless approved by a Majority in Interest of the Other Member(s), no Member shall, for a period commencing with the execution of this Agreement and ending one (1) year after ceasing to be a Member:

(i)     solicit, take away, hire, employ or endeavor to employ any person who is an employee of the Company; or

(ii)     disclose confidential information of the Company regarding techniques or strategies, patient or resident lists, information relating to patients or residents (except that references may be provided to prospective patients or residents in connection with proposals) and their requirements, billing information, or any other information that was obtained by the Member in connection with its involvement as a Member of the Company.

(b)     If a Member is an entity, such Member, by execution of this Agreement, agrees that the restrictions contained in this **Section 5.11** shall be binding upon its directors, officers and shareholders to the same extent as the Member unless otherwise approved by all the Other Member(s).  Upon the request of the Manager, each Member that is an entity shall provide the Company with a statement executed by the directors, officers and shareholders of such Member pursuant to which they agree to be bound to the provisions of this **Section 5.11.**

### ARTICLE VI
### MANAGEMENT

### Section 6.1  Management by Managers.

(a) Except with respect to matters reserved by this Agreement exclusively for decision or action by the Member(s), the business and affairs of the Company shall be managed by, and shall be under the exclusive control and direction of one or more Managers to be appointed by the Members. **COMPLIANCE CONCEPTS, LLC** is hereby appointed by the Members as a Manager.

(b) The Members and Manager hereby appoint **Dane Starbuck**, Attorney at Law, to oversee that distributions occur to the members pursuant to Section 8.6, and oversight of other legal, accounting, and administrative matters not reserved to **COMPLIANCE CONCEPTS, LLC**, the Tax Matters Manager, or the Members.

| Page | 11 | 3/29/2014 |
|---|---|---|

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000557

**Section 6.2  Intentionally Omitted**

**Section 6.3  Authority of Managers.**  Provided that the Managers act in compliance with and subject to the limitations in the Business Plan and except as expressly reserved for approval by the Member(s) or otherwise provided for under this Agreement or by the Act, the Managers shall have authority to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, affairs and properties, including, without limitation, the power:

(a)   to acquire property from any Person (the fact that a Manager or a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Managers from dealing with that Person);

(b)   to borrow money for the Company from banks, other lenders, the Managers, the Member(s) or Affiliates of the Managers or the Member(s) on such terms as the Managers deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(c)   to purchase liability and other insurance to protect the Company's property and business;

(d)   to hold and own any real and/or personal properties in the name of the Company;

(e)   to invest the Company's funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(f)   to execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments, bills of sale. Leases. Partnership agreements; operating agreements of other limited liability companies;

(g)   to employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(h)   to enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Managers may approve;

(i)   to do and perform all other acts as may be necessary or convenient to the conduct of the Company's business; and

(j)   elect or appoint officers and define their function and authority.

**Section 6.4  Vote Required.**  All actions of the Mangers shall be taken by the affirmative vote of a majority of the Managers then appointed and acting.  Such action of the Managers may be taken at a meeting or by written consent of a majority of the Managers.

**Section 6.5  Execution of Instruments.**  All instruments, contracts, agreements and documents of any type whatsoever to be executed on behalf of the Company may be executed by the Manager (singly if more than one)

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000558

and by such officer or officers of the Company as shall have been so authorized by this Agreement or by one or more Managers.

**Section 6.6 Qualifications, Number, Appointment and Vacancies.** Any Person appointed as provided herein, whether or not such Person is a Member, is qualified to serve as a Manager of the Company. The number of Managers shall be determined from time to time by a Majority in Interest of All the Member(s). Managers shall be appointed, and may from time to time be removed and/or replaced (with or without cause), and vacancies in such position shall be filled, by a Majority in Interest of All Member(s).

**Section 6.7 Officers.** The Managers may from time to time establish such offices of the Company, and elect or appoint and grant authority to act to such officers of the Company, as shall be deemed advisable by the Managers for the day-to-day management and conduct of the Company's business and affairs. Any action taken under the preceding sentence shall be recorded in the records of the Company. Officers may, but need not, be Member(s) and/or Managers of the Company. The initial offices and officers of the Company are described and designated in **Article 7.** Officers may be removed (with or without cause) and vacancies in offices may be filled at any time and from time to time by any Manager.

**Section 6.8 Liability.** Managers shall not be personally liable for the debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any Member(s), any predecessor Manager, Co-Manager, if any, agent or employee of the Company. A Manager is not liable for any action taken as a Manager, or for any failure to take any action, unless the Manager has breached or failed to perform the Manager's duties to the Company and the breach or failure to perform constitutes willful misconduct or recklessness.

**Section 6.9 Performance of Duties and Reliance on Others.** A Manager shall perform the Manager's duties in good faith, in a manner such Manager reasonably believes to be in the best interest of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. In performing the Manager's duties, a Manager shall be entitled to rely on information, opinions, reports, or statements of the following persons or groups unless the Manager has knowledge concerning the matter in question that would cause such reliance to be unwarranted:

(a) another Manager in the Company, if any, or one or more employees or other agents in the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

(b) any attorney, public accountant or other person as to matters which the Manager reasonably believes to be within such person's professional or expert competence; or

(c) a committee upon which the Manager does not serve, duly designated in accordance with the provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

**Section 6.10 Compensation.** Managers shall be entitled to such reasonable compensation, if any, as shall from time to time be determined by a Majority in Interest of the Other Member(s). Compensation payable to Managers shall be treated as expenses of the Company and shall not be deemed to constitute distributions to the recipient of any Profit, Loss or capital of the Company, even though the Manager to whom payment is made is also a Member.

**Section 6.11 Reimbursement of Expenses.** Each Manager shall be entitled to reimbursement from the Company of all expenses reasonably incurred and paid by such Manager on behalf of the Company. Any

SUB_LANDRY_00000559

question as to whether a Manager is entitled to reimbursement of expenses under this Section 6.11 shall be determined by a Majority in Interest of the Other Member(s).

**Section 6.12  Affiliate Transactions.**    Except for those agreements listed on Exhibit C attached hereto, a Manager shall not enter into any contract on behalf of the Company with any Member or any Affiliate of a Member without the approval of a Majority in Interest of the Other Member(s).  For the purpose of the preceding sentence, the Member who is to be a party to such contract, or whose Affiliates are to be a party to such contract shall not be entitled to vote on such matter.

**Section 6.13  Appointment of Tax Matters Manager.**    A Majority in Interest of the Member(s) shall designate a Tax Matters Manager (the "TMM").  The TMM shall be responsible for all matters involving Federal, state, local or other taxes of any type.  The TMM shall serve as such until a successor is duly elected by a Majority in Interest of the Member(s) and qualified, or until the earlier withdrawal or retirement of the TMM or removal by a Majority in Interest of the Member(s) until his successor is duly elected and authorized. **JOHN BARTLE** is hereby designated as the initial Tax Matters Manager until such time as his successor is duly elected and qualified.

**ARTICLE VII**

**OFFICERS**

**Section 7.1  Officers.**    Except as may from time to time be determined otherwise by the Managers, the officers of the Company shall be a President, a Vice President, a Secretary and a Treasurer.  The Managers may also choose and appoint additional Vice Presidents, one or more Assistant Secretaries or Assistant Treasurers and such other officers and assistant officers as may be deemed necessary or appropriate by the Manager.  Officers may, but need not, be Member(s) and/or Managers of the Company.

**Section 7.2    President.**    Unless the Managers otherwise provides, the President of the Company shall be the Chief Executive Officer of the Company with such general executive powers and duties of supervision and management as are usually vested in the office of the Chief Executive Officer, shall carry into effect all directions of the Manager, shall sign all notes, agreements or other instruments in writing made and entered into for or on behalf of the Company, shall have general supervision over the business and affairs of the Company, and , unless the Managers otherwise provide, shall preside at all meetings of the Member.

**Section 7.3    Vice President.**    The Vice President of the Company shall report directly to the President, and shall have such powers and duties as the Mangers or the President may from time to time prescribe.

**Section 7.4    Secretary.**    The Secretary of the Company shall keep an accurate record of the proceedings of the meetings of the Member(s) and shall perform such other duties as are usually incident to the office of the Secretary.  Rebecca J. Bartle is hereby appointed as the Secretary of the Company to serve until a successor has been selected and qualified or until her earlier death, resignation or removal.

**Section 7.5  Treasurer.**    The Treasurer of the Company is responsible for (a) keeping correct and complete books of account which show accurately at all times the financial condition of the Company, (b) safeguarding all funds, notes, securities, and other valuables which may from time to time come into the possession of the Company, and (c) depositing all funds of the Company with such depositories as the Managers shall designate. The Treasurer shall furnish at meetings of the Member(s), or when otherwise requested, a statement of the financial condition of the Company.  The Treasurer has such other duties as the Mangers may from time to time prescribe.  The Treasurer shall be entitled to rely and shall be deemed to be acting in good faith in relying upon the advice of counsel or the public accountants of the Company.

Page                    14                    3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000560

## ARTICLE VIII

## ALLOCATIONS and DISTRIBUTIONS

**Section 8.1  Accounting Definitions.**    The following capitalized terms, which are used predominantly in this Article, shall have the following meanings for purposes of this Agreement:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

Debit to such Capital Account the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be applied in a manner consistent with such intent.

"**Company Minimum Gain**" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d) with respect to "partnership minimum gain", substituting the work "member" for "partner" and "company" for "partnership" wherever they appear.

"**Member Nonrecourse Debt**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(4) with respect to "partner nonrecourse debt," substituting the word "member" for "partner" and "company" for "partnership" wherever they appear.

"**Member Nonrecourse Debt Minimum Gain**" means and amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Sections 1.704-2(i)(1) and 1.704-2(i)(2) with respect to "partner nonrecourse deductions", substituting the word "member" for "partner" and "company" for "partnership" wherever they appear.

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulation Section 1.704(b)(3).

**Section 8.2  Allocation of Profits and Losses.**    Except as may be expressly provided otherwise in this Article, and subject to the provisions of Sections 704(b) and 704(c) of the Code, the Profits and Losses of the Company for each fiscal year of the Company shall be allocated to the Member(s) pro-rata in accordance with their respective Percentage Interests.

**Section 8.3  Special Allocations.**    The following special allocations shall be made in the following order:

(a)    Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulation Section 1.704-2(f), notwithstanding any other provision of this Article, if there is a net decrease in Company Minimum

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000561

Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This subsection is intended to comply with the minimum gain chargeback requirements in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Debt Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Article, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(5), shall be specifically allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(j)(2). This subsection is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) that cause such Member to have an Adjusted Capital Account Deficit as of the end of any fiscal year or that increase such Member's Adjusted Capital Account Deficit, items of Company gross income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent and in the manner required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided, however, that an allocation pursuant to this subsection shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section have been tentatively made as if this subsection were not in this Agreement. This subsection is intended to constitute a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

(d)     Avoidance of Adjusted Capital Account Deficit. To the extent feasible no Losses shall be allocated to any Member who, after giving effect to such allocation an other expected allocations then anticipated, would have an Adjusted Capital Account Deficit as of the end of any fiscal year of the Company. Any such Losses that cannot be allocated to a Member by reason of this subsection shall be allocated, to the extent possible, to other Member(s) as to which this subsection is not applicable in proportion to their Interests. In the event that any Member is nevertheless allocated Losses that cause such Member to have, or that increase, an Adjusted Capital Account Deficit, items of Company gross income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent and in the manner required by the Treasury Regulations, the Adjusted Capital Account Deficit of each such Member as quickly as possible. The allocations pursuant to this subsection shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this subsection were not in the Agreement.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any fiscal year shall be specifically allocated amount the Member(s) in proportion to their Percentage Interests.

Page                16                3/29/2014

SUB_LANDRY_00000562

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i)(1).

(g)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of the Member's Interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Member(s) in accordance with their Interests in the Company in the event Treasury Regulation Section 1.704(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

**Section 8.4  Curative Allocations.** The allocations set forth in Section 8.3 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Member(s) that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company Profits or Losses pursuant to this Section. Therefore, notwithstanding any other provision of this Article (other than the Regulatory Allocations), the Member(s) shall make such offsetting special allocations of Company Profits or Losses so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.2.

**Section 8.5  Allocations When Interests Vary.** Allocations of Profits and Losses, or each item thereof, shall be made to or among Member(s) whose Interests vary during any taxable year of the Company, whether such varying Interests are attributable to Transfers of Interests, the issuance of additional Units or otherwise, shall be made in accordance with the applicable provisions of the Code and the Treasury Regulations, using any permitted method or convention selected by the Managers.

**Section 8.6  Monthly Distributions of Available Cash.** The amount allocated to each Member pursuant to Section 8.2 of this Agreement (together with any adjustments attributable to Section 8.3 and Section 8.4 of this Agreement) for each calendar quarter shall be distributed to each Member by the Company (**"Monthly Distribution"**) within fifteen (15) days after the end of the applicable month (**"Distribution Date"**); provided, however, that the aggregate amount of the Monthly Distributions shall be reduced to the extent necessary to prevent the Monthly Distributions from exceeding the Company's Available Cash. Any such reduction in the aggregate amount of a Monthly Distribution shall be allocated among the Member(s) in proportion to the amounts of their respective Monthly Distributions prior to such reduction. The amounts by which any Monthly Distributions are so reduced shall be distributed on the first succeeding Distribution Date on which there is sufficient Available Cash.

**Section 8.7 Distributions of Property.** To the extent that a Member is entitled to a distribution of assets from the Company or to a return of the Member's Capital Contributions, the Member shall have only the right to demand and receive cash in satisfaction thereof. Member(s) shall be entitled to a percentage of all sale proceeds or refinancing proceeds derived from the sale of property or assets in proportion to the Member's Percentage Ownership Interest in the Company.

Page                    17                    3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000563

**Section 8.8  Distributions to Member(s) of Record.** Distributions of Company assets in respect of an Interest shall be made only to the Member(s) who, according to the books and records of the Company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of an Interest.

**ARTICLE IX**

**RECORDS AND ACCOUNTING**

**Section 9.1  Records and Accounting.** The fiscal year of the Company for financial reporting and for Federal income tax purposes shall be the calendar year. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with generally accepted accounting principles. The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business. The Company shall keep the following records and information, and any other records and information required by the Act, at its principal office:

(a)     A list with the full name and last known mailing address of each Person who is or has been a Member or Manager of the Company from the date of the Company's organization.

(b)     A copy of the Articles and all amendments or restatements thereof.

(c )    Copies of the Company's Federal, state and local income tax returns and financial statements for the three (3) most recent years, or if the returns and statements were not prepared, copies of the information and statements provided to, or that should have been provided to the Member(s), to enable them to prepare their Federal, state and local tax returns for the same period.

(d)     Copies of this Agreement and all amendments hereto and copies of any written operating agreements no longer in effect.

(e)     A writing setting out the following:

(i)     The amount of cash, if any, and a statement of the agreed value of any other property or services contributed by each Member and the times at which or events upon the happening of which any additional contributions agreed to be made by each Member are to be made.

(ii)    The events, if any, upon the happening of which the Company is to be dissolved and its affairs wound up.

(iii)   Any other writings required by this Agreement.

**Section 9.2  Access to Accounting Records.** Each Member, and the Member's duly authorized representative, shall have the right, at the Member's own expense, to inspect and copy the records listed in Section 9.1 at the principal office of the Company, upon reasonable request, during ordinary business hours.

**Section 9.3  Annual Financial and Tax Information.** The Member(s) (or Manager(s) if so appointed) shall use their best efforts to cause the Company to deliver to each Member within ninety (90) days after the end of each fiscal year all information necessary for the preparation of such Member's Federal and state income tax returns.

Page          18          3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000564

**Section 9.4 Accounting Decisions.** All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managers. The Managers may rely upon the advice of the Company's public accountants as to whether such decisions are in accordance with generally accepted accounting principles.

**Section 9.5 Federal Income Tax Elections.** The Company may make any and all elections for Federal income tax purposes, including, but not limited to, the following:

(a)     to the extent permitted by applicable law and regulations, an election to use an accelerated depreciation method with respect to any depreciable asset of the Company; and

(b)     in case of a transfer of all or part of the Interest of any Member, an election to adjust the tax basis of the assets of the Company pursuant to Code Sections 734, 743 and 754.

**Section 9.6 Company Expenses.** All of the Company's expenses, including any expenses incurred by the Managers and Member(s) on behalf of the Company (and with respect to Member(s) after obtaining prior written authorization), shall be paid by the Company. The expenses to be paid by the Company in connection with the Company's business shall include, but not be limited to: (a)costs of personnel employed by the Company and involved in the business of the Company; (b) costs of borrowed money, taxes and assessments applicable to the Company; ( c) legal, audit, accounting, appraisal and engineering fees; (d) printing, photocopying and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of Units or in connection with the business of the Company; (e) fees and expenses in connection with the acquisition, sale, exchange, or other disposition or financing of the assets of the Company; (f) the cost of insurance in connection with the business of the Company; (g) expenses of forming or converting, modifying or terminating the Company; (h) the cost of preparing and disseminating to Member(s) the reports contemplated by this Agreement and the cost of preparing and filing reports and tax returns with governmental agencies; and (i) the costs incurred in connection with any litigation or regulatory proceedings in which the Company is involved.

## ARTICLE X

## ADDITIONAL MEMBER(S) AND UNITS

**Section 10.1 Issuance of Additional Units.**   The Company may from time to time issue additional Units by sale or other issuance to existing Member(s) or other Persons for such consideration, and upon such terms and conditions, as a Majority in Interest of the Member(s) shall from time to time determine or pursuant to and in accordance with the terms of Section 3.5.   Any such sales or other issuances of Units shall be made in accordance with the Articles and this Agreement.

**Section 10.2 Conditions to Issuance.** As a condition to such issuances, new Member(s) acquiring such Units shall execute this Agreement and all Member(s) acquiring such Units shall execute all other documents and instruments as the Company may require.

**Section 10.3 Allocations.**   Additional Units shall not be entitled to any retroactive allocation of the Company's Profits, Losses or other matters of any kind; provided that additional Units shall be entitled to their respective share of the Company's Profits, Losses and other matters of any kind arising under contracts entered into before the effective date of the issuance of any additional Units to the extent that such Profits, Losses and other matters of any kind arise after such effective date. The Company's books may be closed at the time additional Units are issued (as though the Company's tax year had ended), or the Company may credit to the additional Units pro rata allocations of the Company's Profits, Losses and other matters of any kind for that

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000565

portion of the Company's fiscal year after the effective date of the issuance of the additional Units, such allocations to be effected in a manner consistent with Section 8.2 of this Agreement.

## ARTICLE XI

## TRANSFER OF UNITS

### Section 11.1  Restrictions on Transfers; Securities Law Compliance.

(a)     Except as provided under Section12.4 and12.5 and other than Transfers to Affiliates, no Class B Member (or Transferee thereof) shall be entitled to Transfer all or any part of its interest (Units) in the Company except with the prior written consent of all of the Other Member(s).  Except as provided under Section12.4 and other than Transfers to Affiliates, no Class A Member (or Transferee thereof) shall be entitled to Transfer all or any part of its Interest (Units) in the Company except with the prior written consent of all of the other Class A Member(s).  Any approval executed by the Member(s) pursuant to this Section 11.1 (a) shall state whether the Transferee of some or all of a Member's Units will be admitted as a Member;

(b)     In addition to any other restrictions applicable to the Transfer of an Interest, and unless such requirement shall be waived in writing by the Company, no Member shall Transfer any Interest in the Company without registration under applicable Federal and state Securities laws unless:

## ARTICLE XIII

## DISSOLUTION AND WINDING UP

**Section 11.1  Dissolution.**    The Company shall be dissolved and its affairs wound up on the first of the following to occur:

(a) At the time or on the occurrence of events specified in the Articles or this Agreement;

(b) All of the Member(s) in writing consent to the dissolution of the Company;

(c) An Event of Dissociation occurs, unless a Regular Majority of the remaining Member(s) elect to continue the business of the Company within 90 days of the date of the Event of Dissociation; or

(d) A Management Deadlock remains unresolved for a period of sixty (60) consecutive days; or

(e) A decree of judicial dissolution is entered pursuant to Florida law.

**Section 11.2  Winding Up.**    Upon dissolution, the Member(s) (or Manager(s) if appointed) shall proceed to wind up and liquidate the business and affairs of the Company, and the Company may only carry on business that is appropriate to wind up and liquidate the business and affairs of the Company, including the following:

(a) collecting the Company's assets;

(b) disposing of properties that will not be distributed in kind to Member(s);

(c) discharging or making provision for discharging liabilities;

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000566

(d) distributing the remaining property among the Member(s); and

(e) doing every other act necessary to wind up and liquidate the business and affairs of the Company.

The Member(s) (or Manager(s) if so appointed) shall follow the procedure for disposing of known claims set forth in Florida statutory law, as amended from time to time.

**Section 11.3  Distribution of Assets.**  Upon the winding up of the Company, the assets shall be distributed as follows:

(a) To creditors, including Member(s) and Managers who are creditors to the extent permitted by law, to satisfy the liabilities of the Company whether by payment or by the establishment of adequate reserves, excluding distributions to Member(s) pursuant to Section 8.4;

(b) To Member(s) and Former Member(s) to satisfy the liabilities for distributions pursuant Section 8.4;

(c) To Member(s) of the Company in respect of their share of the profits and other compensation by way of income on their Capital Contributions to the extent each such Member has a positive balance in his Capital Account as provided in Treasury Regulation §1.704- I (b)(2)(ii)(b)(2); and

(d) To Member(s) of the Company in respect of their Capital Contributions to the extent each such Member has a positive balance in his Capital Account as provided in Treasury Regulation § 1.704- 1 (b)(2)(ii)(b)(2).

**Section 11.4  Deficit Account Balance after Liquidation.**  A deficit balance in a Member's Capital Account after liquidation of the Company shall be repaid to the Company no later than 90 days after the liquidation occurs as provided in Treasury Regulation §1.704-1(b)(2)(ii)(b)(3).

## ARTICLE XII

## INDENMNIFICATION AND ADVANCEMENT OF EXPENSES

(a)  To the greatest extent not inconsistent with the laws and public policies of Indiana, the Company shall indemnify any Member, Organizer or Manager (any such Member, Organizer or Manager, who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Member, Organizer or Manager which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because such individual is or was a Member, Organizer, or Manager as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with paragraph (d) of this Article that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in paragraph (c) of this Article. The Company shall pay for or reimburse the reasonable expenses incurred by a Member, Organizer or Manager in connection with any such proceeding in advance of final disposition thereof if (i) the individual furnishes the Company a written affirmation of the individual's good faith belief that he or she has met the standard of conduct for indemnification described in paragraph (c) of this Article, (ii) the individual furnishes the Company a written undertaking, executed personally, or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct, and (iii) a determination is made in accordance with paragraph (d) that, based upon facts then known to those making the determination, indemnification would not be precluded under this Article. The undertaking described in subparagraph (a)(ii) above must be a general obligation of the individual, subject to such reasonable limitations as the Company may permit but need not be secured and may be accepted without

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000567

reference to financial ability to make repayment. The Company shall indemnify a Member, Organizer or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding, without the requirement of a determination as set forth in paragraph (e) of this Article. Upon demand by a Member, Organizer or Manager for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Member, Organizer or Manager is entitled thereto in accordance with this Article. The indemnification and advancement of expenses provided for under this Article shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Article.

(b)   The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Organizer or Manager.

(c)   Indemnification of an individual is permissible under this Article only if (i) such individual conducted himself or herself in good faith, (ii) such individual reasonably believed that his or her conduct was in, or at least not opposed to, the Company's best interest, and in the case of any criminal proceeding, such individual had no reasonable cause to believe his or her conduct was unlawful. Indemnification is not permissible against liability to the extent such liability is the result of willful misconduct, recklessness, or any improperly obtained financial or other benefit to which the individual was not legally entitled. The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere, or its equivalent, is not, of itself, determinative that the individual did not meet the standard of conduct described in this paragraph (c).

(d)   A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

(i)   By a Regular Majority of the Member(s) (other than Member(s) at the time parties to the proceeding); or

(ii)   By special legal counsel selected by the Member(s) in the manner prescribed in subparagraph (d)(i) above.

(e)   A Member, Organizer or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding, or to another court of competent jurisdiction. On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i)   In a proceeding in which the Member, Organizer or Manager is wholly successful, on the merits or otherwise, the Member, Organizer or Manager is entitled to indemnification under this Article, in which case the court shall order the Company to pay the individual his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii)   The individual is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the individual met the standard of conduct set forth in paragraph (c) of this Article.

(f)   Indemnification shall also be provided for an individuals conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in, and beneficiaries of, the plan.

SUB_LANDRY_00000568

(g)   Nothing contained in this Article shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Organizer or Manager of the Company, or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for-profit or not. Nothing contained in this Article shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual. It is the intent of this Article to provide indemnification to Member(s), Organizers and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Article. If indemnification is permitted under this Article, indemnification shall be provided in accordance with this Article irrespective of the nature of the legal or equitable theory upon which a claim is asserted, including without limitation, breach of duty, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h)   For purposes of this Article:

(i)   The term "expenses" includes all direct and indirect costs, including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Article, applicable law or otherwise.

(ii)   The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii)   The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv)   The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v)   The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Article, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XIII

### INVESTMENT REPRESENTATIONS

By the execution of this Agreement each of the Member(s) acknowledges, agrees, represents and warrants that:

(a)   The Member understands that investment in the Member's Interest (Units) in the Company involves a high degree of risk and is suitable only for sophisticated investors. The Member further understands that Interests (Units) are being offered in reliance upon an exemption from registration provided by the federal Securities Act of 1933, as amended.

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000569

(b)    The Member is purchasing the Member's Interest (Units) for the Member's own investment and not with a view to the distribution or resale thereof to any other Person.

(c)    The Company has disclosed to the undersigned, in writing, and the Member acknowledges, that the transferability of the Interest (Units) is severely limited and that the undersigned must continue to bear the economic risk of this investment for an indefinite period as these securities have not been registered under the Securities Act of 1933 or any state securities laws and therefore cannot be offered or sold unless they are subsequently registered under such acts or an exemption from such registration is available.

(d)    The Member agrees that in addition to other prohibitions of and restrictions on transfer under this Agreement, the Member's Interest (Units) will not be sold without registration under the Securities Act of 1933 and any applicable state securities law, or until the undersigned has obtained an opinion of counsel satisfactory to the Company that such registration is not required in connection with any such transaction, and in no event will any of the Member's Interest (Units) be sold within nine (9) months of the issuance thereof.

(e)    The Member agrees that any certificates representing for the Member's Interest (Units) may contain the following legend: "The Units represented by this certificate were acquired for investment only and not for resale. They have not been registered under the Securities Act of 1933 or any state securities law. These Units may not be sold, transferred, pledged, or hypothecated within nine (9) months of the date hereof and not thereafter unless first registered under such laws, or unless the Company has received an opinion of counsel satisfactory to it that registration under such laws is not required." The Company may issue stop transfer instructions to its transfer agent (if any) or make a notation to such effect on its appropriate records.

(f)    The Member's principal residence is at the address for the Member noted in this Agreement.

(g)    The Member has and has had access to all material facts with respect to the Interest (Units) by reason of active involvement in the organization and/or management of the Company.

(h)    No commission or other remuneration shall be paid to any person in connection with the offer or sale of the Interest (Units).

(i)    The Member understands and agrees that the Member has no right to require the Company to register the Interest (Units) under Federal or state securities laws at any time, or to join in any future registration.

(j)    The Member agrees to hold the Company and its Member(s), Managers and controlling persons (as defined in the Securities Act of 1933, as amended), and any persons affiliated with any of them or with the distribution of the Interest (Units), harmless from all expenses, liabilities, and damages (including reasonable attorneys' fees) deriving from a disposition of the Interest (Units) in a manner in violation of the Securities Act of 1933, as amended, or of any applicable state securities law or which may be suffered by reason of a breach of any of the covenants, representation and warranties contained in this Article XIII.

## ARTICLE XIV

## AMENDMENTS

**Section 14.1 Proposal of Amendments.**   Amendments to the Articles and this Agreement may be proposed in writing by any Member, or by any Manager or Managers. If required by the Company, any such proposed amendment must be accompanied by an opinion of counsel as to the legality and effect on the

SUB_LANDRY_00000570

Member(s). Copies of any amendments proposed to be made pursuant to this Section 14.1 shall be sent to the Member(s).

**Section 14.2  Amendments by Member(s).**   A proposed amendment shall be voted upon at either an annual meeting or a special meeting of the Member(s) duly called for the purpose of voting on the amendment. Any amendment must be approved by a Majority in Interest of the Member(s), except that any amendment that would;

(i) increase the amount of Capital Contributions required of a Member (except as provided in Section 3.5(a) of this Agreement) or accelerate the dates for payment of any required Capital Contribution,

(ii) impose an additional liability on any Member, or

(iii) modify Section 8.2, 11.3 or this Section 14.2

shall require the unanimous consent of the Member(s).

**Section 14.3  Amendments by Manager.**   Notwithstanding any provision of this Agreement, amendments to this Agreement which, in the opinion of counsel to the Company, are necessary to maintain the status of the Company as taxable as a partnership for purposes of Federal or state law or for other tax purposes, may be made by the Manager without the necessity of a vote of the Member(s).

## ARTICLE XV

## MISCELLANEOUS

**Section 15.1  Complete Agreement.**   This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Member(s) with respect to its subject matter. This Agreement and the Articles replace and supersede all prior agreements by and among the Member(s) or any of them. This Agreement and the Articles supersede all prior written and oral statements, and no representation, statement, or condition or warranty not contained in this Agreement or the Articles will be binding on the Member(s) or have any force or effect whatsoever.

**Section 15.2  Governing Law.**   This Agreement and the rights of the, parties under this Agreement will be governed by, interpreted, and enforced in accordance with the laws of the State of Florida.

**Section 15.2  Binding Effect; Conflicts.**   Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Member(s), and their respective distributees, successors and assigns. This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Act or the provisions of the Articles, the provisions of the Act or the Articles, as the case may be, will be controlling.

**Section 15.4  Headings; Interpretation.**   All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement. The singular shall include the plural, and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires.

**Section 15.5  Severability.**   If any provision of this Agreement is held to be illegal, invalid, unreasonable, or unenforceable under the present or future laws effective during the term of this Agreement,

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000571

such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, unreasonable, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, unreasonable, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, unreasonable, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, unreasonable, or unenforceable provision as may be possible and be legal, valid, reasonable, and enforceable.

**Section 15.6 Multiple Counterparts.**   This Agreement may be executed in several counterparts, each of which will be deemed an original, but all of which will constitute one and the same instrument. However, in making proof with respect to this Agreement, it will be necessary to produce only one copy hereof signed by the party to be charged.

**Section 15.7 Additional Documents and Acts.**   Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated by this Agreement.

**Section 15.8 No Third-Party Beneficiary.**   This Agreement is made solely and specifically among and for the benefit of the Member(s) and their respective successors and assigns, subject to the express provisions of this Agreement relating to successors and assigns; and no other person will have any rights, interest, or claims under the Agreement or be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise.

**Section 15.9 Notices.**   Any notice to be given or to be served upon the Company or any Member in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified on Exhibit A. Any Member or the Company may, at any time by giving five days' prior written notice to the other Member(s) and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

**Section 15.10 Amendments.**   All amendments to this Agreement must be in writing and must be approved by a Majority in Interest of the Member(s) who are current Member(s).

**Section 15.11 Title to Company Property.**   Legal title to all property of the Company will be held and conveyed in the name of the Company.

**Section 15.12 Reliance on Authority of Person Signing Agreement.**   In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Person or to determine any fact or circumstance bearing upon the existence of the authority of such individual, or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

**Section 15.13 No Partnership Intended for Nontax Purposes.**   The Member(s) have formed the Company under the Act, and expressly do not intend hereby to form a partnership or a limited partnership. The Member(s) do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

Page                    26                    3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000572

**Section 15.13  No Partnership Intended for Nontax Purposes.**   The Member(s) have formed the Company under the Act, and expressly do not intend hereby to form a partnership or a limited partnership. The Member(s) do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

IN WITNESS WHEREOF, the Member(s) have executed this Agreement on the date set forth opposite their signatures, to be effective, however, as of the date the Articles of Organization of the Company are accepted for filing by the Secretary of State of the State of Florida.

COMPLIANCE CONCEPTS, LLC

03-29-2014
Date Signed

By: _Rebecca J. Bartle_
Rebecca J. Bartle, Managing Member

VENICE AVENUE INVESTORS, LLC

_____
Date Signed

By: _____
Dorothy A. Rynard, Managing Member

EAGLE ONE PROPERTIES, LLC

_____
Date Signed

By: _____
S. Louis Jackson, Managing Member

Page            27            3/29/2014

C:\Users\BBartle\AppData\Local\Microsoft\Windows\Temporary Internet
Files\Content.IE5\FS20MN3Z\BVM_University_Village_LLC_Operating_Agreement_restated_and_amended_03-27-14.docx

SUB_LANDRY_00000573

**IN WITNESS WHEREOF,** the Member(s) have executed this Agreement on the date set forth opposite their signatures, to be effective, however, as of the date the Articles of Organization of the Company are accepted for filing by the Secretary of State of the State of Florida.

COMPLIANCE CONCEPTS, LLC

By: _____

_____
Date Signed

Rebecca J. Bartle, Managing Member

VENICE AVENUE INVESTORS, LLC

3-29-2014

_____
Date Signed

By: _Dorothy a Rynard_

Dorothy A. Rynard, Managing Member

EAGLE ONE PROPERTIES, LLC

By: _____

_____
Date Signed

S. Louis Jackson, Managing Member

Page      27      3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000574

**Section 15.13  No Partnership Intended for Nontax Purposes.**   The Member(s) have formed the Company under the Act, and expressly do not intend hereby to form a partnership or a limited partnership. The Member(s) do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

**IN WITNESS WHEREOF,** the Member(s) have executed this Agreement on the date set forth opposite their signatures, to be effective, however, as of the date the Articles of Organization of the Company are accepted for filing by the Secretary of State of the State of Florida.

COMPLIANCE CONCEPTS, LLC

_____
Date Signed

By: _____
    Rebecca J. Bartle, Managing Member


VENICE AVENUE INVESTORS, LLC

_____
Date Signed

By: _____
    Dorothy A. Rynard, Managing Member


EAGLE ONE PROPERTIES, LLC

3/29/2014
Date Signed

By: _____
    S. Louis Jackson, Managing Member


Page          27          3/29/2014

C:\Users\lue jackson\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\CWGY4C2J\BVM_University_Village_LLC_Operating_Agreement_restated_and_amended_03-27-14[1].docx

SUB_LANDRY_00000575

## EXHIBIT A
## TO AMENDED AND RESTATED OPERATING AGREEMENT

Names and Addresses of Member(s)

COMPLIANCE CONCEPTS, LLC
P.O. Box 501188
Indianapolis, IN 46250

VENICE AVENUE INVESTORS, LLC
6439 Forrest Commons Boulevard
Indianapolis, IN 46227

EAGLE ONE PROPERTIES, LLC
10 Windridge Street
Anderson, IN 46011

---

## EXHIBIT B
## TO AMENDED AND RESTATED OPERATING AGREEMENT

Percentage Interests and Units of Class A Member

| Member (Name and Address) | Percentage Interest | Units |
|---|---|---|
| COMPLIANCE CONCEPTS, LLC<br>P.O. Box 501188<br>Indianapolis, IN 46250 | 34% | 34 |
| VENICE AVENUE INVESTORS, LLC<br>6439 Forrest Commons Boulevard<br>Indianapolis, IN 46227 | 33% | 33 |
| EAGLE ONE PROPERTIES, LLC<br>10 Windridge Street<br>Anderson, IN 46011 | 33% | 33 |
|  | 100% | 100 |

Capital Contributions, Percentage Interests, and Units of Class B Member(s)

None

Page                28                3/29/2014

C:\Users\Dane\Documents\BVM University Village LLC Operating Agreement restated and amended 03-27-14.docx

SUB_LANDRY_00000576

## OPERATING AGREEMENT

## WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C.
### A Delaware Limited Liability Company

THIS OPERATING AGREEMENT is made and entered into effective October ___, 2000, by and between Westport Holdings Hidden Springs, L.L.C., a Delaware limited liability company (the "Company"), and Westport Senior Living Investment Fund, L.P., a Delaware limited partnership (the "Member").

### 1. THE LIMITED LIABILITY COMPANY

1.1   Formation.

A Certificate of Formation of the Company has been filed with the Delaware Secretary of State. The rights and obligations of the Member will be as provided in the Delaware Limited Liability Company Act (the "Act") except as otherwise expressly provided in this Operating Agreement (the "Agreement").

1.2   Name.

The business of the Company will be conducted under the name Westport Holdings Hidden Springs, L.L.C.

1.3   Purpose.

The purpose of the Company is to acquire, own, manage, operate, lease, sell, and otherwise transact business related to real, tangible, and intangible property, specifically including (but not limited to) property related to the management, ownership, leasing, operation, or financing of retirement housing and health care facilities, and to engage in all activities incidental thereto and all other activities for which a limited liability company may be organized under the laws of Delaware and the United States of America.

1.4   Business Office.

The Company maintains its principal business office at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410.

1.5   Registered Agent and Registered Office.

The Corporation Trust Company is the Company's registered agent in Delaware, and the Company's registered office is at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

SUB_LANDRY_00000577

1.6   Term.

The term of the Company commenced on October ___, 2000, and will continue until the Company is dissolved and its affairs are wound up as provided in Article 8 of this Agreement.

1.7   Name and Address of Member.

The Member's name is Westport Senior Living Investment Fund, Ltd. The Member's address is 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410.

1.8   Admission of Additional Members.

No additional members may be admitted to the Company without the prior approval of the Member.

## 2. CAPITAL CONTRIBUTIONS

2.1   Initial Capital Contributions.

The Member has contributed to the Company the assets described on Appendix I to this Agreement.

2.2   Additional Capital Contributions.

Additional Capital Contributions are not required but may be made in such amount as the Member determines is necessary, in its sole discretion.

## 3. ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

3.1   Allocations of Income and Loss.

All items of income, gain, loss, deduction, and credit will be allocated 100% to the Member. For federal income tax purposes, unless otherwise changed by law or Internal Revenue Service regulation, all items of Company income, gain, loss, and deduction will be reported on the Member's tax return.

3.2   Distributions.

No distribution may be made to the Member if, after giving effect to the distribution, in the judgment of the Member, either (a) the Company would not be able to pay its debts as they become due in the ordinary course of business, or (b) the fair value of the total assets of the Company would not at least equal its total liabilities. Subject to the foregoing limitation, the Company will make such distributions to the Member as the Member determines.

2

SUB_LANDRY_00000578

## 4. POWERS AND DUTIES OF MANAGER

### 4.1 Management of Company.

The management and control of the Company and its business and affairs will be vested in Westport Advisors, Ltd, as the manager of the Company (the "Manager"). The Manager will have all the rights and powers that may be possessed by a manager in a limited liability company with managers pursuant to the Act and such rights and powers as are otherwise conferred by law or are necessary, advisable, or convenient to the discharge of the Manager's duties under this Agreement and to the management of the business and affairs of the Company. Without limiting the generality of the foregoing, the Manager will have the following rights and powers (which it may exercise at the cost, expense, and risk of the Company):

a. To expend the funds of the Company in furtherance of the Company's business.

b. To perform all acts necessary to manage and operate the business of the Company, including engaging such persons as the Manager deems advisable to manage the Company.

c. To execute, deliver, and perform on behalf of and in the name of the Company any and all agreements and documents deemed necessary or desirable by the Manager to carry out the business of the Company, including any lease, deed, easement, bill of sale, mortgage, trust deed, security agreement, contract of sale, or other document conveying, leasing, or granting a security interest in the interest of the Company in any of its assets, or any part thereof, whether held in the Company's name, the name of the Manager, or otherwise. No other signature or signatures will be required.

d. To borrow or raise moneys on behalf of the Company in the Company's name or in the name of the Manager or the Member for the benefit of the Company and, from time to time, to draw, make, accept, endorse, execute, and issue promissory notes, drafts, checks, and other negotiable or nonnegotiable instruments and evidences of indebtedness, and to secure the payment thereof by mortgage, security agreement, pledge, or conveyance or assignment in trust of the whole or any part of the assets of the Company, including contract rights.

### 4.2 Limitation on Liability of Manager.

The Manager will not have any liability to the Company or to any Member for any loss suffered by the Company or any Member which arises out of

3

SUB_LANDRY_00000579

any action or inaction of the Manager if the Manager, in good faith, determined that such course of conduct was in the best interest of the Company and such course of conduct did not constitute gross negligence or misconduct of the Manager.

### 4.3    Indemnification of Manager.

The Manager will be indemnified by the Company against any losses, judgments, liabilities, expenses, and amounts paid in settlement of any claims sustained against the Company or against the Manager in connection with the Company. The satisfaction of any indemnification and any saving harmless will be from, and limited to, Company assets, and the Member will not have any personal liability on account thereof.

### 4.4    Dealing with the Company; Resignation of Manager.

The Manager, and affiliates of the Manager, may deal with the Company, by providing or receiving property and services to or from it, and may receive from others or from the Company normal profits, compensation, commissions, or other income incident to such dealings. The Manager may resign as manager of the Company by providing no less than five days prior written notice to the Member. Unless the Member appoints another person to serve as manager, the Member shall act in that capacity.

## 5.  POWERS AND DUTIES OF MEMBER

### 5.1    Limitation on Liability of Member.

#### 5.1.1  Liability to Company.

The Member will not have any liability to the Company for any loss suffered by the Company which arises out of any action or inaction of the Member.

#### 5.1.2   Liability to Third Parties.

Except to the limited extent provided in the Act, the Member will not have any personal liability for any Company obligation, expense, or liability. Notwithstanding anything in this Agreement to the contrary, the Member will be liable only to make its capital contribution. The Member will not, without its consent, be required to make any capital contribution beyond the capital contribution described in Section 2.1.

### 5.2    Indemnification of Member.

The Member will be entitled to indemnification by the Company against any losses, judgments, liabilities, expenses, and amounts paid in settlement

4

SUB_LANDRY_00000580

of any claims sustained against the Company or against the Member in connection with the Company. The satisfaction of any indemnification and any saving harmless will be from, and limited to, Company assets, and the Member will not have any personal liability on account thereof.

5.3    **Dealing with the Company.**

The Member may deal with the Company by providing or receiving property and services to or from it, and may receive from others or the Company normal profits, compensation, commissions, or other income incident to such dealings.

5.4    **Loans.**

The Member may, but will not be obligated to, make loans to the Company to cover the Company's cash requirements and such loans may bear interest at a rate determined by the Manager or may be without interest so long as the Member is the sole member of the Company.

## 6. COMPENSATION AND REIMBURSEMENT OF EXPENSES

6.1    **Organization Expenses.**

The Company will pay all expenses incurred in connection with the organization of the Company.

6.2    **Other Company Expenses.**

The Manager will charge the Company for the Manager's actual out-of-pocket expenses incurred in connection with the Company's business.

6.3    **Compensation.**

The Manager will be paid such compensation as is specifically authorized by the Member.

## 7. BOOKS OF ACCOUNT AND BANKING

7.1    **Books of Account.**

The Company's books and records and this Agreement will be maintained at the principal business office of the Company. The Manager shall keep and maintain books and records of the operations of the Company that are appropriate and adequate for the Company's business and for carrying out this Agreement.

SUB_LANDRY_00000581

**7.2    Banking.**

All funds of the Company are to be deposited in an account of the Company or a separate account of the Member at a bank, savings and loan association, or other financial institution selected by the Manager. Such funds are to be invested or deposited with an institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States Government. Such funds may be withdrawn from such account or accounts upon the signature of such person or persons as are designated by the Manager.

## 8. DISSOLUTION AND WINDING UP OF THE COMPANY

**8.1    Dissolution.**

The Company will be dissolved upon the happening of any of the following events:

Sale, transfer, or other irrevocable disposition of all or substantially all the property of the Company;

The express determination of the Member to dissolve the Company; or

Otherwise by operation of law.

**8.2    Winding Up.**

Upon the dissolution of the Company, the Manager will take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to such liquidation, will be applied and distributed in the following order:

a.    to payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations other than the Member;

b.    To the payment and discharge of any Company debts and liabilities owed to the Member;

c.    To the Member.

6

## 9. GENERAL PROVISIONS

### 9.1   Amendments.

A proposed amendment will be adopted and become effective as an amendment only upon the written approval of the Member.

### 9.2   Governing Law.

This Agreement and the rights of the parties hereunder will be governed by and interpreted in accordance with the laws of the state of Delaware (without regard to principles of conflicts of law).

MEMBER:

WESTPORT SENIOR LIVING
INVESTMENT FUND, L.P.

By: Westport Advisors, Ltd., as its General Partner

By: _____
Name:  Lawrence L. Landry, as President of Double L Investments, Inc., a Texas Corporation, which is Manager of Westport Asset Management, L.L.C., a Florida limited liability corporation, which is General Partner of Westport Advisors, Ltd.

COMPANY:

WESTPORT HOLDINGS
HIDDEN SPRINGS, L.L.C.

By: Westport Advisors, Ltd., as its Manager

By: _____
Name:  Lawrence L. Landry, as President of Double L Investments, Inc., a Texas Corporation, which is Manager of Westport Asset Management, L.L.C., a Florida limited liability corporation, which is General Partner of Westport Advisors, Ltd.

7

SUB_LANDRY_00000583

### *First 2014 Amendment of Limited Partnership Agreement*
### *(Tampa)*

This amendment made as of this 31st day of March, 2014 by and among Westport Holdings University Village, LLC, a Delaware limited liability company ("General Partner"), Westport Senior Living Investment Fund, L.P., a Delaware limited partnership ("Withdrawing Limited Partner"); BVM University Village, LLC, a Florida limited liability company ("BVM"), BHMSILF, LLC, a Delaware limited liability company ("BHMS"); IMH Healthcare, LLC, a Delaware limited liability company ("IMH"); and JF Consultants LLC, a Delaware limited liability company ("JF").

WHEREAS, the General Partner is the general partner of a Delaware limited partnership known as Westport Holdings Tampa Limited Partnership (the "Partnership") established pursuant to a limited partnership agreement dated as of October 23, 2000 (the "Partnership Agreement"), and

WHEREAS, the Withdrawing Limited Partner has sold and conveyed its 99% interest limited partnership interest to BVM, and

WHEREAS, BVM intends to transfer a portion of its 99% interest limited partnership interest to BHMS, IMH and JF (collectively, BVM, BHMS, IMH and JF, the "Substituted Limited Partners"), and

WHEREAS, the parties desire to consent to the Partnership entering into the Loan Agreement (as defined below) and its related documentation (collectively, the "Loan Documents"), and the Withdrawing Limited Partners and Substituted Limited Partners desire to authorize the General Partner to execute the Loan Documents, and

WHEREAS, the parties desire to confirm the admission of the BVM, BHMS and IMH as Substitute Limited Partners of the Partnership and to make other amendments to the Partnership Agreement,

NOW, THEREFORE, the parties agree as follows:

1.      Initially BVM is hereby admitted as a Substitute Limited Partner in accordance with Article 8 of the Partnership Agreement, and then, BHMS, IMH and BVM are each admitted as Substitute Limited Partners in accordance with Article 8 of the Partnership Agreement.

2.      Section 1.06 is hereby amended by replacing the existing definisitions of the defined terms listed below with the following definitions:

"Lender" means CPIF Lending, LLC, a Washington limited liability company.

SUB_LANDRY_00000584

"Loan Agreement" means the Loan Agreement, dated March 31, 2014, between the Partnership and the Lender.

"Loan" means the loan in the principal sum of $9,500,000 made by Lender to the Partnership as of the date hereof.

"Mortgage" means the Mortgage, Assignment of Rents, Security Agreement and Fixture Filing executed by the Partnership for the benefit of Lender.

"Note" means the Promissory Note, dated as of March 31, 2014, in the principal amount of the Loan payable by the Partnership to the order of the Lender.

3.  Section 2.01 of the Partnership Agreement is deleted and there is inserted in place the following new Section 2.01:

"The purpose and business of the Partnership is to acquire, own, manage, operate, lease, sell, and otherwise transaction business related to real, tangible, and intangible property, specifically including (but not limited to) property related to the management, ownership, leasing, operation, or financing of retirement housing and health care facilities, and to engage in all activities incidental thereto and all other activities for which a limited partnership may be organized under the laws of Delaware and the United States of America; provided however, that until the Loan Obligations have been paid in full, the purpose of the Partnership shall be limited to (i) owning, operating and maintaining the Facility; and (ii) activities incidental thereto."

4.  Section 6.01 of the Partnership Agreement is deleted and there is inserted in place the following new Section 6.01:

"Subject to the terms hereof, including without limitation Section 6.02, the General Partner shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs, and shall have all of the rights, powers, and obligations of a general partner of a limited partnership under Delaware law and otherwise as provided by law. Except as expressly provided in this Agreement, the General Partner is hereby granted the right, power, and authority to do on behalf of the Partnership those actions described below, which, in its sole judgment, are necessary or appropriate to manage the Partnership's affairs and to fulfill the purposes of the Partnership:

(a)  To make all expenditures permitted by this Agreement;

2

SUB_LANDRY_00000585

(b)    To maintain one or more bank accounts for the Partnership in such bank or banks that the Partnership has relationships with as of the date hereof or as directed by Limited Partners holding at least 79% of the Partnership Interests (the "Majority-in-Interest of the Partners");

(c)    To the extent that funds of the Partnership are available, to pay all expenses, debts, and obligations of the Partnership;

(d)    To the extent that funds of the Partnership are available, to make distributions periodically to the Partners in accordance with the provisions of Article V;

(e)    To establish and maintain the books and records of the Partnership in accordance with Article XIII; and

(f)    To perform all normal functions, and otherwise operate and manage the business and affairs of the Partnership, in accordance with and as limited by this Agreement."

5.    Section 6.02(a) of the Partnership Agreement is deleted and there is inserted in place the following new Section 6.02(a):

"(a)    Without the written consent or ratification of the Majority-in-Interest of the Partners, the General Partner shall not have the authority to:

(i)    Do any act in contravention of this Agreement;

(ii)    Do any act that would make it impossible to carry on the ordinary business of the Partnership;

(iii)    Confess a judgment against the Partnership;

(iv)    Possess Partnership property or assign its rights in specific Partnership property for other than a Partnership purpose;

(v)    Admit a person as a General Partner, except as provided in this Agreement;

(vi)    Admit a person as a Limited Partner, except as provided in this Agreement;

(vii)    Continue the business of the Partnership or use Partnership property after the removal or Incapacity of the General Partner, except as provided in this Agreement; or

(viii)    Take any of those actions described in Sections 1.05, 3.03(b), 3.04(b), 4.01, 5.01, 6.03(c), 6.03(d), 9.01(a)(v), 9.02, 11.01, or 12.04."

3

25064661_7

SUB_LANDRY_00000586

6.      Section 6.02(c) of the Partnership Agreement is deleted and there is inserted in place the following new Section 6.02(c):

"(c)     Without Lender's prior written consent, the Partnership:

(i)      Shall not engage either directly or indirectly, in any business other than the ownership, management and operation of the Property;

(ii)     Shall not own any asset other than (i) the Property, and (ii) incidental personal property necessary for the operation of the Property;

(iii)    Shall not liquidate or dissolve (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation or acquire by purchase or otherwise all or substantially all the business or assets of, or any stock or other evidence of beneficial ownership of any entity;

(iv)     Shall not incur any debt, secured or unsecured, direct or contingent (including, but not limited to, guaranteeing any obligation), other than: (a) the Loan; (b) advances or trade payables or accrued expenses that will be unsecured; (c) equipment or vehicle financing or lease arrangements where the outstanding balance of any amounts financed thereunder does not at any time exceed $50,000 individually or $100,000 in the aggregate; and (d) loans to Partnership from its partners to meet the working capital needs of the Property, which loans are subordinate to the Loan pursuant to the terms hereof;

(v)      Shall not amend, modify or otherwise change its partnership certificate, partnership agreement, or other formation agreement or document, as applicable, in any material term or manner, or in a manner which adversely affects Partnership's existence as a single purpose entity, nor shall any partner, limited or general, member or shareholder thereof, as applicable take any such action; and

(vi)     Shall not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Partnership, or a substantial part of Partnership's property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due or declare or effectuate a moratorium on payments of its obligation; or take any action in furtherance of any such action;

And the Partnership:

25064661_7

SUB_LANDRY_00000587

(vii)    Shall maintain correct and complete financial statements, accounts, books and records and other entity documents separate from those of any Affiliate or any other person or entity;

(viii)    Shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account;

(ix)    Shall file or cause to be filed its own separate tax returns;

(x)    Shall hold itself out to the public (including any of its Affiliates' creditors) under Partnership's own name and as a separate and distinct entity and not as a department, division or otherwise of any Affiliate of same;

(xi)    Shall observe all customary formalities regarding the existence of Partnership as may be applicable to its partnership agreement, including holding meetings and maintaining current and accurate minute books separate from those of any Affiliate;

(xii)    Shall hold title to its assets in its own name and act solely in its own name and through its own duly authorized officers and agents;

(xiii)    Shall not guarantee, pledge or assume or hold itself out or permit itself to be held out as having guaranteed, pledged or assumed any liabilities or obligations or any partner, member, or shareholder, as applicable, or any Affiliate of Partnership, nor shall it make any loan;

(xiv)    Shall remain solvent at all times;

(xv)    Shall separately identify, maintain and segregate its assets. Partnership's assets shall at all times be held by or on behalf of Partnership and if held on behalf of the Partnership by another entity, shall at all times be kept identifiable (in accordance with customary usages) as assets owned by Partnership. This restriction requires, among other things, that (a) Partnership funds shall be deposited or invested in Partnership's name, (b) Partnership funds shall not be commingled with the funds of any Affiliate or other person or entity, (c) Partnership shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliate or other person or entity, and (d) Partnership funds shall be used only for the business of Partnership;

(xvi)    Shall maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or other person or entity;

5

SUB_LANDRY_00000588

(xvii)  Shall pay or cause to be paid its own liabilities and expenses of any kind, including but not limited to salaries of its employees, only out of its own separate funds and assets

(xviii) Shall at all times be adequately capitalized to engage in the transactions contemplated at its formation;

(xix)   Shall not do any act which would make it impossible to carry on the ordinary business of Partnership;

(xx)    Shall reflect Partnership's ownership interest in all data and records (including computer records) used by Partnership or any Affiliate in the collection and administration of any loan;

(xxi)   Shall not invest any of Partnership's funds in securities issued by, nor shall Partnership acquire the indebtedness or obligation of, any Affiliate;

(xxii)  Shall maintain an arm's length relationship with each of its Affiliates and may enter into contracts or transact business with its Affiliates only on commercially reasonable terms that are no less favorable to Partnership than is obtainable in the market from a person or entity that is not an Affiliate; and

(xxiii) Shall correct any misunderstanding that is known by Partnership regarding its name or separate identity."

7.    Section 6.07(b) of the Partnership Agreement is deleted and there is inserted in place the following new Section 6.07(b):

"(b)    The Limited Partners, With the written consent or ratification of the Majority-in-Interest of the Partners, shall have the following approval rights:

(i)     The right to approve or disapprove the appointment of a successor General Partner, pursuant to Section 7.05; and

(ii)    The right to dissolve the Partnership pursuant to Section 9.01(a)(iii); and

(iii)   The right to amend this Agreement pursuant to Section 10.02."

8.    Section 10.02(a) of the Partnership Agreement is deleted and there is inserted in place the following new Section 10.02(a): "Except as otherwise provided in Section 10.01, this agreement may be amended from time to time only with a

6

25064661_7

SUB_LANDRY_00000589

consent of the Majority-in-Interest of the Partners, provided that no such amendment shall be in contravention of the Delaware limited partnership act or in any way increase the liability of the General Partner."

9.      Article XII of the Partnership Agreement is amended and there is inserted following Section 12.04, the new Section 12.05 as follows:

"12.05 Interests and Certificates.

(a)      Interests. Each partnership interest in the Partnership shall constitute and shall remain a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of Delaware and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del C. § 8-101, et. seq.) (the "UCC"), such provision of Article 8 of the UCC shall be controlling.

(b)      Certificates.

(i)      Upon the issuance of partnership interests in the Partnership to any Person in accordance with the provisions of this Agreement, without any further act, vote or approval of any Partner, or any Person, the Partnership shall issue one or more certificates in the name of such Person substantially in the form of Exhibit A hereto (a "Certificate"), which evidences the ownership of the partnership interests in the Partnership of such Person. Each such Certificate shall be denominated in terms of the percentage of the partnership interests in the Partnership evidenced by such Certificate and shall be signed by the General Partner or an Officer, if any have been appointed on behalf of the Partnership.

(ii)      Without any further act, vote or approval of any Partner or any Person, the Partnership shall issue a new Certificate in place of any Certificate previously issued if the holder of the partnership interests in the Partnership represented by such Certificate, as reflected on the books and records of the Partnership:

(A)      makes proof by affidavit, in form and substance satisfactory to the Partnership, that such previously issued Certificate has been lost, stolen or destroyed;

7

25064661_7

SUB_LANDRY_00000590

(B) requests the issuance of a new Certificate before the Partnership has notice that such previously issued Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(C) if requested by the Partnership, delivers to the Partnership a bond, in form and substance satisfactory to the Partnership, with such surety or sureties as the Partnership may direct, to indemnify the Partnership against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Certificate; and

(D) satisfies any other reasonable requirements imposed by the Partnership.

(iii) Upon a Partner's transfer in accordance with the provisions of this Agreement of any or all partnership interests in the Partnership represented by a Certificate, the transferee of such partnership interests in the Partnership shall deliver such Certificate to the Partnership for cancellation (executed by such transferee on the reverse side thereof), and the Partnership shall thereupon issue a new Certificate to such transferee for the percentage of partnership interests in the Partnership being transferred and, if applicable, cause to be issued to such Partner a new Certificate for that percentage of partnership interests in the Partnership that were represented by the canceled Certificate and that are not being transferred.

(c) Registration of Partnership Interests. The Partnership shall maintain books for the purpose of registering the transfer of partnership interests. Notwithstanding any provision of this Agreement to the contrary, a transfer of partnership interests requires delivery of an endorsed Certificate and shall be effective upon registration of such transfer in the books of the Partnership."

10. The percentages of partnership interest are as follows: (a) 1% General Partner, and (b) 99% Limited Partners proportioned as follows:

| | |
|---|---|
| BVM University Village, LLC | 39.6% |
| BHMSILF, LLC | 26.4% |
| IMH Healthcare, LLC | 19.8% |
| JF Consultants LLC | 13.2%. |

25064661_7

SUB_LANDRY_00000591

11.     The parties hereto have determined that the Loan Documents and the other transactions contemplated thereby are in the best interest and necessary and convenient to the conduct, promotion and attainment of the business and activities of the Company, and are hereby authorized and approved.  By executing this agreement, the Withdrawing Limited Partner and the Substituted Limited Partners hereby authorize the Company to execute, deliver and perform (i) the Loan Documents to which the Company is a party and (ii) any certificates, agreements or any other documents as may be necessary or appropriate to give effect to, or for the Company to perform its obligations under, such Loan Documents.  The General Partner is hereby authorized, empowered and directed to negotiate, execute, deliver and perform, on behalf of the Company, any and all Loan Documents to which the Company is a party (in each case, with such changes thereto as the General Partner deems necessary, desirable or appropriate) and any and all further documents relating to the transactions contemplated in such Loan Documents and to take such further actions on behalf of the Company as the General Partner deems necessary or appropriate in its discretion to carry out the purposes of the foregoing resolutions (such determination being evidenced conclusively, but not exclusively, by any the General Partner's taking of such actions or execution and delivery of such documents).

12.     Except as amended hereby, the Partnership Agreement is hereby ratified and confirmed in full force and effect.

[signature pages to follow]

25064661v7

9

25064661_7

SUB_LANDRY_00000592

## SUBSTITUTED LIMITED PARTNERS:

IMH HEALTHCARE, LLC

By: _Eli Freiden_ (signature)
Name: Eli Freiden
Title: Manager

JF CONSULTANTS, LLC

By: _____
Name: Shabse Fuchs
Title: Manager

BHMSILF, LLC
By: BHMS Investments, LP, its
   managing member

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

BVM UNIVERSITY VILLAGE, LLC

By: _____
Name: Rebecca J. Bartle
Title:   Secretary

*[Additional Signatures Attached]*

[Signature Page to First 2014 Amendment to the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement]

SUB_LANDRY_00000593

SUBSTITUTED LIMITED PARTNERS:

IMH HEALTHCARE, LLC

By: _____
Name: Eli Freiden
Title: Manager

JF CONSULTANTS, LLC

By: _____
Name: Shabse Fuchs
Title: Manager

BHMSILF, LLC
By: BHMS Investments, LP, its
    managing member

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

BVM UNIVERSITY VILLAGE, LLC

By: _____
Name: Rebecca J. Bartle
Title:  Secretary

*[Additional Signatures Attached]*

[Signature Page to First 2014 Amendment to the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement]

SUB_LANDRY_00000594

SUBSTITUTED LIMITED PARTNERS:

IMH HEALTHCARE, LLC

BHMSILF, LLC
By: BHMS Investments, LP, its
    managing member

By: _____
Name: Eli Freiden
Title: Manager

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

JF CONSULTANTS, LLC

BVM UNIVERSITY VILLAGE, LLC

By: _____
Name: Shabse Fuchs
Title: Manager

By: _____
Name: Rebecca J. Bartle
Title:   Secretary

*[Additional Signatures Attached]*

[Signature Page to First 2014 Amendment to the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement]

SUB_LANDRY_00000595

## SUBSTITUTED LIMITED PARTNERS:

IMH HEALTHCARE, LLC

BHMSILF, LLC
By: BHMS Investments, LP, its
    managing member

By: _____
Name: Eli Freiden
Title: Manager

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

JF CONSULTANTS, LLC

BVM UNIVERSITY VILLAGE, LLC

By: _____
Name: Shabse Fuchs
Title: Manager

By: _Rebecca J. Bartle_
Name: Rebecca J. Bartle
Title:   Secretary

*[Additional Signatures Attached]*

[Signature Page to First 2014 Amendment to the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement]

SUB_LANDRY_00000596

WITHDRAWING LIMITED PARTNER:

Westport Senior Living Investment Fund, L.P.,

By: Westport Advisors, Ltd, its General Partner:

By: Westport Asset Management, L.L.C., its
General Partner

By: Double L Investment, Inc., its Manager

By: _____
Lawrence L. Landry, President

GENERAL PARTNER

Westport Holdings University Village, L.L.C.,

By: Westport Advisors, Ltd., as its Manager

By: Westport Asset Management, L.L.C., its
General Partner

By: Double L Investment, Inc., its Manager

By: _____
Lawrence L. Landry, President

[Signature Page to First 2014 Amendment to the Westport Holdings Tampa Limited Partnership Limited Partnership Agreement]

SUB_LANDRY_00000597

## EXHIBIT A

### CERTIFICATE FOR PARTNERSHIP INTERESTS IN
### WESTPORT HOLDINGS TAMPA LIMITED PARTNERSHIP

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY PARTNERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE PARTNERSHIP AGREEMENT (AS DEFINED BELOW).

Certificate Number 001                              ____% Percentage
Interest

        WESTPORT HOLDINGS TAMPA LIMITED PARTNERSHIP, a Delaware limited partnership (the "Partnership"), hereby certifies that _____(together with any assignee of this Certificate, the "Holder"), is the registered owner of _____ percent (___%) of the [limited/general] partnership interests in the Partnership. The rights, powers, preferences, restrictions and limitations of the partnership interests in the Partnership are set forth in, and this Certificate and the partnership interests in the Partnership represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Limited Partnership Agreement of the Partnership, as the same may be further amended or restated from time to time (the "Partnership Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the partnership interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Partnership Agreement. The Partnership will furnish a copy of the Partnership Agreement to the Holder without charge upon written request to the Partnership at its principal place of business. Transfer of any or all of the partnership interests in the Partnership evidenced by this Certificate is subject to certain restrictions in the Partnership Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Partnership of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

        Each partnership interest in the Partnership shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial

SUB_LANDRY_00000598

Code as in effect from time to time in the State of Delaware and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each partnership interest in the Partnership shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the partnership interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Partnership has caused this Certificate to be executed as of the date set forth below.

WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP,
a Delaware limited partnership

GENERAL PARTNER

    Westport Holdings University Village, L.L.C.,

    By: Westport Advisors, Ltd., as its Manager

    By: Westport Asset Management, L.L.C., its General Partner

    By: Double L Investment, Inc., its Manager

By:_____
    Lawrence L. Landry, President

Date: _____

*[PARTNERSHIP INTEREST CERTIFICATE CONTINUES ON NEXT PAGE]*

SUB_LANDRY_00000599

FOR VALUE RECEIVED, the party named below hereby sells, assigns and transfers unto _____ the partnership interests represented by the forgoing Partnership Interest Certificate and do hereby irrevocably constitute and appoint _____ as Attorney to transfer the said partnership interests on the books of the foregoing named Partnership with full power of substitution in the premises.

**Limited Partner:**

_____

By: _____
Name: _____
Title: _____


Dated: _____

SUB_LANDRY_00000600

## WESTPORT HOLDINGS TAMPA LIMITED PARTNERSHIP
## LIMITED PARTNERSHIP AGREEMENT

This LIMITED PARTNERSHIP AGREEMENT ("Agreement") is entered into and shall be effective as of the 23 day of October, 2000, by and between Westport Holdings University Village, L.L.C., a Delaware limited liability company, as the General Partner, and Westport Senior Living Investment Fund, L. P., a Delaware limited partnership, as the Limited Partner, on the following terms and conditions:

### ARTICLE I

### ORGANIZATION AND DEFINITIONS

1.01. Organization.    The parties hereto (jointly the "Partners" and individually a "Partner") have formed a Delaware limited partnership (the "Partnership") for the purposes set forth in this Agreement. The Partnership shall be governed by the limited partnership laws of the State of Delaware. The Partnership shall become qualified to do business in the State of Florida and shall be governed by the laws of the State of Florida that govern foreign limited partnerships conducting business in Florida. The Partners agree to continue the Partnership in accordance with this Agreement.

1.02. Name. The name of the Partnership is:

"Westport Holdings Tampa, Limited Partnership"

1.03. Business Offices; Registered Offices; Registered Agents. The principal business office of the Partnership is at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410, or at such other location as the General Partner determines. The initial registered office of the Partnership in Delaware is at 1209 Orange Street, Wilmington, Delaware 19801, and the name of the initial registered agent at that address is The Corporation Trust Company. The initial registered office of the Partnership in Florida is at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410, and the name of the initial registered agent at that address is Lawrence L. Landry.

1.04. Term. The Partnership commenced as of October ___, 2000, the date of filing of the Partnership's Certificate of Limited Partnership in Delaware. The Partnership will continue until December 31, 2099, or until it is sooner terminated in accordance with Article IX of this Agreement.

1.05. Maintenance of Partnership. The General Partner shall take all actions necessary to perfect and maintain the Partnership as a limited partnership under the laws of Delaware and (if and to the extent required by applicable law) to amend the Certificate of Limited Partnership from time to time. The General Partner shall

SUB_LANDRY_00000601

take all actions necessary to keep the Partnership qualified to do business and in good standing under the laws of Florida and in any other state where the nature of the Partnership's business or activities require qualification.

1.06. Definitions. As used in this Agreement, the following terms have the meanings ascribed to them in this Section 1.06 and include the plural as well as the singular number:

"Agreement" means this Limited Partnership Agreement, as amended from time to time.

"Capital Account" means the account maintained for each Partner in the Partnership's books of account in the manner described in Section 3.04.

"Capital Contribution" means the total amount of cash or other property contributed to the equity of the Partnership by each Partner pursuant to this Agreement. Any reference in this Agreement to the Capital Contribution of either a Partner or any assignee of a Partner includes any Capital Contribution previously made by any prior Partner to whose Partnership Interest the then existing Partner or assignee succeeded.

"Code" means the Internal Revenue Code of 1986, as it may be amended. or any subsequent federal law concerning income tax as enacted in substitution for, or that corresponds with, such Code.

"General Partner" means the person designated in this Agreement as the general partner of the Partnership and any person who becomes a general partner of the Partnership pursuant to this Agreement, in the person's capacity as a general partner of the Partnership.

"General Partnership Interest" means the Partnership Interest of a General Partner, representing its Capital Contribution and its right to receive its share of the Profits and Losses, distributions, and liquidation proceeds of the Partnership, all in accordance with the terms of this Agreement, and excludes Partnership Rights.

"Incapacity" means, as to any Person, the adjudication of bankruptcy, incompetence, or insanity, or the death, dissolution or termination (other than by merger or consolidation), as the case may be, of such Person.

"Limited Partner" means the Person designated in this Agreement as the limited partner of the Partnership and any Person who becomes a limited partner of the Partnership, pursuant to this Agreement, in the Person's capacity as a limited partner of the Partnership.

2

SUB_LANDRY_00000602

"Limited Partnership Interest" means the Partnership Interest of a Limited Partner, representing the Capital Contribution of the Limited Partner and the right to receive its share of the Profits and Losses, distributions, and liquidation proceeds of the Partnership, all in accordance with the terms of this Agreement, and excludes Partnership Rights.

"Partnership Interest" includes only a Partner's Capital Contribution and the right to receive its share of the Profits and Losses, distributions, and liquidation proceeds of the Partnership, all in accordance with the terms of this Agreement, and excludes Partnership Rights.

"Partnership Percentage Interest" means with respect to a Partner, the Partner's percentage interest in the Partnership's allocations of Profits, Losses, and cash and in-kind distributions as provided in this Agreement. Initially, each Partner's Partnership Percentage Interest is as follows:

| Partner | Partnership Percentage Interest |
|---|---|
| General Partner: | |
| Westport Holdings University Village, L.L.C., | One Percent (1%) |
| Limited Partner: | |
| Westport Senior Living Investment Fund, L. P. | Ninety-nine Percent (99%) |

"Partnership Rights" excludes the Partnership Interest of a Partner, and includes, in addition to other rights provided in this Agreement, the rights provided to it under applicable law.

"Person" means a natural person, corporation, trust, partnership, limited liability company, joint venture, association, or other business or other legal entity.

"Profits and Losses" means the taxable income or loss of the Partnership, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (1) any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses hereunder shall be added to such taxable income or loss; and (2) any expenditures of the Partnership described in Code § 705(a)(2)(B) or treated as Code § 705(a)(2)(B) expenditures pursuant to Treasury Regulation § 1.704-

3

SUB_LANDRY_00000603

1(b)(2)(iv)(i). and not otherwise taken into account in computing Profits or Losses hereunder, shall be subtracted from such taxable income or loss.

"Pro Rata" means in the proportion that the item being measured for each Partner bears to the total of all such items for all Partners for whom a contribution, distribution, or allocation is due or being made, shared, or determined.

"Treasury Regulations" means the regulations of the United States Treasury Department pertaining to the income tax, as amended, and any successor provision thereto.

"Unreturned Cash Contribution" means the amount of a Partner's Capital Contribution reduced by the amount of cash distributed to such Partner pursuant to the provisions of Section 5.01(a).

## ARTICLE II

## PURPOSE AND BUSINESS OF THE PARTNERSHIP

2.01. _Purpose of the Partnership_. The purpose and business of the Partnership is to acquire, own, manage, operate, lease, sell, and otherwise transact business related to real, tangible, and intangible property, specifically including (but not limited to) property related to the management, ownership, leasing, operation, or financing of retirement housing and health care facilities, and to engage in all activities incidental thereto and all other activities for which a limited partnership may be organized under the laws of Delaware and the United States of America.

2.02. _Authority of the Partnership_. To carry out its purpose, the Partnership, consistent with and subject to the provisions of this Agreement and all applicable laws, is empowered and authorized to do any and all acts and things incidental to, or necessary, appropriate, proper, advisable, or convenient for, the furtherance and accomplishment of its purposes and the protection and benefit of the Partnership.

## ARTICLE III

## PARTNERS, CAPITAL, DEFAULTS

3.01. _General Partner_. Westport Holdings University Village, L.L.C., a Delaware limited liability company, is the General Partner of the Partnership. The Capital Contribution of the General Partner is set forth on Schedule A to this Agreement. The General Partner is not required to lend any funds to the Partnership or to make any additional Capital Contribution to the Partnership not specifically described in this Article III.

4

SUB_LANDRY_00000604

3.02. Limited Partner. Westport Senior Living Investment Fund, L. P., a Delaware limited partnership, is the Limited Partner of the Partnership. The Capital Contribution of the Limited Partner is set forth on Schedule A to this Agreement. The Limited Partner is not required to lend any funds to the Partnership or to make any additional Capital Contribution to the Partnership not specifically described in this Article III.

3.03. Partnership Capital.

(a)   The Partnership shall not pay interest on any Capital Contribution to the Partnership or on any Partner's Capital Account.

(b)   A Partner shall not receive from the Partnership or out of Partnership property, and the Partnership shall not return to a Partner, any part of its Capital Contribution, except (i) to the extent that a distribution is determined to be a return of a Partner's Capital Contribution, or (ii) pursuant to the dissolution, winding up, and termination of the Partnership, and then in each case only if (1) all liabilities of the Partnership, except liabilities to the Partners on account of their Capital Contributions or any Partner loans, have been paid or there remains property of the Partnership sufficient to pay them, and (2) the Partnership's Certificate of Limited Partnership is cancelled or amended, if necessary, to reflect the withdrawal and reduction.   Under circumstances requiring or permitting a return of its Capital Contribution, a Partner may demand and receive only cash in return for its Capital Contribution, unless the General Partner decides to distribute Partnership property in kind to the Partners.   Each Partner, by signing this Agreement or a counterpart of it, consents to all distributions of cash, property, and capital authorized by this Agreement and releases all other Partners from all liability to both it and the Partnership for all capital distributions made in accordance with this Agreement.

3.04. Capital Accounts.

(a)   A separate Capital Account shall be maintained for each Partner in accordance with the following provisions:

(i)   To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and the amount of any Partnership liabilities that are assumed by such Partner or that are secured by any Partnership property distributed to such Partner.

(ii)   To each Partner's Capital Account there shall be debited the amount of cash and the fair market value of any Partnership property distributed to such Partner pursuant to any provisions of this Agreement, such Partner's distributive share of Losses, and the amount of any liabilities of such Partner that are assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership.

5

SUB_LANDRY_00000605

(b)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the General Partner may make such modification. The General Partner shall adjust the amounts debited or credited to Capital Accounts with respect to (i) any property contributed to the Partnership or distributed to a Partner, and (ii) any liabilities that are secured by such contributed or distributed property or that are assumed by the Partnership or a Partner, in the event the General Partner determines that such adjustments are necessary or appropriate pursuant to Treasury Regulations § 1.704-1(b)(2)(iv). The General Partner also shall make any appropriate modifications to the extent that unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations § 1.704-1(b).

3.05.  Liability of Partners.

(a)    Subject to Section 3.05(b), no Limited Partner shall have any personal liability whatsoever in its capacity as a Limited Partner, whether to the Partnership, to any of the Partners, or to the creditors of the Partnership, for the debts, liabilities, contracts, or any other obligations of the Partnership, or for any losses of the Partnership. A Limited Partner shall be liable only to make its Capital Contribution and shall not be required to lend any funds to the Partnership or, after its Capital Contribution has been paid, subject to Section 3.05(b), to make any further capital contributions to the Partnership or to repay to the Partnership, any Partner, or any creditor of the Partnership all or any fraction of any negative amount of such Limited Partner's Capital Account.

(b)    Under applicable law, a limited partner of a partnership may, under certain circumstances, be required to return to the partnership, for the benefit of partnership creditors, amounts, with interest thereon, previously distributed to such partner as a return of capital. It is the intent of the General Partner that no distribution to any Limited Partner pursuant to Article IV (except as provided in Section 3.03) shall be deemed a return or withdrawal of capital, and that no Limited Partner shall be obligated to pay any such amount to or for the account of the Partnership or any creditor of the Partnership. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Limited Partner is obligated to make any such payment, such obligation shall be the obligation of such Limited Partner and not of the General Partner.

(c)    The General Partner shall not have any personal liability to any Limited Partner for the repayment of any amounts outstanding in the Capital

6

SUB_LANDRY_00000606

Account of a Limited Partner, including, but not limited to, Capital Contributions. Any such payment shall be solely from the assets of the Partnership. The General Partner shall not be liable to any Limited Partner by any reason of any change in the federal income tax laws as they apply to the Partnership and the Limited Partners, whether such change occurs through legislative, judicial, or administrative action, so long as the General Partner has acted in good faith and in a manner reasonably believed to be in the best interests of the Limited Partners.

(d)     The General Partner shall have no personal liability to repay to the Partnership any portion or all of any negative amount of the General Partner's Capital Account, except as otherwise provided in Section 9.02(c).

ARTICLE IV

PROFITS AND LOSSES

4.01. Determination and Allocation of Profits and Losses. Profits and Losses of the Partnership shall be determined for each fiscal year of the Partnership in accordance with the method of accounting used by the Partnership for federal income tax purposes (as determined by the General Partner) and shall be allocated among the Partners in the manner provided for in this Article IV.

4.02. Allocation of Losses. The Partnership's Losses, if any, arising in a fiscal year shall be allocated among the Partners as follows:

(a)     First:   To the extent of the aggregate positive Capital Account balances of the Partners as of the end of the fiscal year, Pro Rata to the Partners in accordance with each such Partner's positive Capital Account balance; and then

(b)     Second:  Ninety-nine percent (99%) to the Limited Partner and one percent (1%) to the General Partner.

4.03. Allocation of profits. Profits arising in a fiscal year shall be allocated among the Partners as follows:

(a)     First: To the Partners Pro Rata in accordance with the amount of Losses allocated to each Partner pursuant to Section 4.02(b) during the term of the Partnership, until the Profits allocated to each such Partner during the term of the Partnership pursuant to this Section 4.03(a) equal the amount of Losses allocated to each such Partner during the term of the Partnership pursuant to Section 4.02(b); and then

(b)     Second: To the Partners Pro Rata in accordance with the amount of Losses allocated to each Partner pursuant to Section 4.02(a) during the term of the Partnership, until the Profits allocated to each such Partner during the term of the Partnership pursuant to this Section 4.03(b) equal the amount of Losses

7

SUB_LANDRY_00000607

allocated to each such Partner during the term of the Partnership pursuant to Section 4.02(a), and then

(c) Third: Ninety-nine percent (99%) to the Limited Partner and one percent (1%) to the General Partner.

4.04. Qualified Income Offset. Notwithstanding any provision hereof to the contrary, if a Partner has a deficit balance in its Capital Account as of the last day of a fiscal year, then all items of income and gain of the Partnership (consisting of a Pro Rata portion of each item of Partnership income and gain) for such fiscal year shall be allocated to that Partner (or ratably among all such Partners based on the respective deficit balances in their Capital Accounts) in the amount and in the proportions required to eliminate such excess as quickly as possible.

ARTICLE V

DISTRIBUTIONS

5.01. Distributions. Not less frequently than annually, all cash that the General Partner does not expect to use in the operation of the Partnership and that is available after the payment of all expenses then due and the creation of a reasonable reserve for expenses shall be distributed by the General Partner to the Partners in the following manner:

(a) First: To the Partners Pro Rata in accordance with each such Partner's Unreturned Cash Contribution, until all Unreturned Cash Contributions have been fully repaid; and then

(b) Second: Ninety-nine percent (99%) to the Limited Partner and one percent (1%) to the General Partner.

5.02. Limitation on Distributions to Partners. The General Partner shall not pay to any Partner any distribution unless, after the distribution is made, the fair value of the Partnership's assets exceeds its total liabilities, excluding liabilities to the Partners on account of their loans and Capital Contributions.

ARTICLE VI

MANAGEMENT

6.01. Management Power of General Partner. Subject to the terms hereof, the General Partner shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs, and shall have all of the rights, powers, and obligations of a general partner of a limited partnership under Delaware law and otherwise as provided by law. Except as otherwise expressly provided in this

8

SUB_LANDRY_00000608

Agreement, the General Partner is hereby granted the right, power, and authority to do on behalf of the Partnership all things which, in its sole judgment, are necessary or appropriate to manage the Partnership's affairs and to fulfill the purposes of the Partnership, including, by way of illustration and not by way of limitation, the power and authority from time to time to do the following:

(a)    To make all expenditures permitted by this Agreement;

(b)    To establish and maintain one or more bank accounts for the Partnership in such bank or banks as the General Partner may, from time to time, designate as depositories of the funds of the Partnership;

(c)    To the extent that funds of the Partnership are available, to pay all expenses, debts, and obligations of the Partnership;

(d)    To the extent that funds of the Partnership are available, to make distributions periodically to the Partners in accordance with the provisions of Article V;

(e)    To establish and maintain the books and records of the Partnership in accordance with Article XIII;

(f)    To borrow money (including from Partners or their affiliates) and to issue evidences of indebtedness and to secure any Partnership indebtedness by mortgage, pledge, security interest, or other lien;

(g)    To cause the Partnership to merge or consolidate with any other limited partnership or any corporation, limited liability company, or other entity, without the approval of the Limited Partner, provided that the Partnership is the surviving entity; and

(h)    To perform all normal business functions, and otherwise operate and manage the business and affairs of the Partnership, in accordance with and as limited by this Agreement.

6.02.  Restrictions on the Authority of the General Partner.

(a)    Without the written consent or ratification of the Limited Partners, the General Partner shall not have the authority to:

(i) Do any act in contravention of this Agreement;

(ii) Do any act that would make it impossible to carry on the ordinary business of the Partnership;

(iii) Confess a judgment against the Partnership;

9

SUB_LANDRY_00000609

(iv) Possess Partnership property or assign its rights in specific Partnership property for other than a Partnership purpose;

(v) Admit a person as a General Partner, except as provided in this Agreement;

(vi) Admit a person as a Limited Partner, except as provided in this Agreement; or

(vii) Continue the business of the Partnership or use Partnership property after the removal or Incapacity of the General Partner, except as provided in this Agreement.

(b)     Without the written consent of all Limited Partners, subject to Section 9.01, the General Partner shall not have the authority to dissolve the Partnership.

6.03. Duties and Obligations of the General Partner.

(a)     The General Partner shall take all action that may be necessary or appropriate for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged.

(b)     The General Partner shall devote to the Partnership such time as it deems to be necessary to conduct the Partnership's business and affairs in an appropriate manner.

(c)     The General Partner shall conduct the affairs of the Partnership in the best interest of the Partnership. The General Partner shall provide for the safekeeping and proper use of all Partnership funds and assets, for the benefit of the Partnership. The General Partner may cause the Partnership to enter into transactions with affiliates of the General Partner or transactions that benefit affiliates of the General Partner, so long as such transactions are entered into principally for the benefit of the Partnership in the ordinary course of the Partnership's business.

(d)     The General Partner shall at all times conduct its affairs and the affairs of the Partnership in such a manner that neither the Partnership nor any Partner will have any personal liability with respect to any Partnership indebtedness unless, in the opinion of the General Partner, it would be in the best interest of the Partners. However, in no event shall the General Partner take any action that shall cause a Limited Partner to have any personal liability with respect to any Partnership indebtedness. The General Partner shall use its best efforts, in

10

SUB_LANDRY_00000610

the conduct of the Partnership's business, to put all Persons with whom the Partnership does business or in whom the Partnership invests on notice that the Limited Partners are not liable for Partnership obligations, and all agreements to which the Partnership is a party shall include a statement to the effect that the Partnership is a limited partnership organized under Delaware law; but the General Partner shall not be liable to the Limited Partners for any failure to give such notice to such Persons or for the failure of any such agreement to contain such a statement.

(e)     The General Partner shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any federal, state, or local tax returns required to be filed by the Partnership. The General Partner shall cause the Partnership to pay any taxes payable by the Partnership (it being understood that the expenses of preparation and filing of such returns, and the amounts of such taxes, are expenses of the Partnership and not of the General Partner); provided, however, that the General Partner shall not be required to cause the Partnership to pay any tax so long as the General Partner or the Partnership are in good faith and by appropriate legal proceeding contesting the validity, applicability, or amount thereof and such contest does not materially endanger any right or interest of the Partnership.

6.04. Other Businesses of Partners. Subject to Section 6.02(a), any Partner and any affiliate of any Partner may engage in or possess any interest in other business ventures of any kind, nature, or description, independently or with others, whether such ventures are competitive with the Partnership or otherwise. Neither the Partnership nor any Partners shall have any rights or obligations by virtue of this Agreement or the Partnership relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Partnership, shall not be deemed wrongful or improper.

6.05. Reimbursement.   The General Partner shall be entitled to receive out of Partnership funds available therefor reimbursement of all amounts reasonably expended by the General Partner on behalf of the Partnership, including expenses incurred in connection with the organization of the Partnership.

6.06. Indemnification of the General Partner by the Partnership. Neither the General Partner nor any of its affiliates shall be liable, responsible, or accountable in damages or otherwise to the Partnership or any Limited Partner for any loss or damage incurred by reason of any act or omission performed or omitted by the General Partner or such affiliates in good faith and in a manner reasonably believed by them to be in the best interests of the Partnership. To the extent provided below, the Partnership shall indemnify and hold harmless the General Partner and any of its affiliates who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether

11

SUB_LANDRY_00000611

civil, criminal, administrative, or investigative (including any action by or in the right of the Partnership), by reason of any acts or omissions or alleged acts or omissions arising out of such Person's activity as the General Partner or as an affiliate of the General Partner (an "Action"). If the activities of the General Partner or its affiliates that give rise to the Action were performed in good faith and in a manner reasonably believed by such Person to be in the best interests of the Partnership, then the Partnership shall indemnify and hold harmless the General Partner and its affiliates against losses, damages, and expenses for which such Person has not otherwise been reimbursed (including attorneys' fees, judgments, fines, and amounts paid in settlement) actually incurred by such Person in connection with the Action, provided that the satisfaction of any indemnification and any holding harmless shall be from and limited to Partnership's assets and no Limited Partner shall have any personal liability on account thereof.

6 07   Rights and Obligations of Limited Partners.

(a)   A Limited Partner shall take no part in the management or control of the Partnership's business, but may exercise the rights and powers of a Limited Partner under this Agreement. A Limited Partner shall have no power to represent, act for, sign for, or bind the General Partner or the Partnership. The Limited Partner hereby consents to the exercise by the General Partner of the powers conferred on it by law and this Agreement.

(b)   The Limited Partner shall have the following approval rights:

(i) The right to approve or disapprove the appointment of a successor General Partner, pursuant to Section 7.05; and

(ii) The right to dissolve the Partnership pursuant to Section 9.01(a)(iii); and

(iii) The right to amend this Agreement pursuant to Section 10.02.

## ARTICLE VII

## TRANSFERABILITY OF GENERAL PARTNER'S INTEREST

7.01   Withdrawal by General Partner.   The General Partner may withdraw from the Partnership by (a) at least sixty (60) days prior to the proposed date of withdrawal, giving written notice to the Limited Partners stating that it proposes to withdraw and requesting that there be substituted in its place a Person designated and described in the notice, and (b) obtaining the consent of all Limited Partners to the withdrawal and the substitution of a new general partner.

12

SUB_LANDRY_00000612

7.02. Incapacity of General Partner.

(a)    In the event of the Incapacity of the General Partner, the Partnership will be dissolved, and must be liquidated and terminated, unless the Partnership is reconstituted in accordance with this Section 7.02.

(b)    Upon the Incapacity of the General Partner, (1) the incapacitated General Partner immediately will cease to be the General Partner and to have any Partnership Rights provided by this Agreement, and (2) the General Partnership Interest of the incapacitated General Partner, including all obligations attendant to it. automatically will become a Limited Partnership Interest, without any Partnership Rights provided by this Agreement.

(c)    If dissolution of the Partnership results from the Incapacity of the General Partner and if a successor General Partner has been selected pursuant to Section 7.03 below, the Partnership automatically will be reconstituted as a successor limited partnership and will continue the business of the Partnership with the Partnership property, and the successor General Partner designated pursuant to Section 7.03 will be admitted as the General Partner. provided the terms and conditions of Section 7.04(a) are satisfied.    The successor limited partnership will be deemed to have acquired the assets and liabilities of the Partnership by contribution from the Partners in accordance with their Partnership Percentage Interests.    The successor limited partnership will be governed by the terms and provisions of this Agreement.

7.03.    Replacement of General Partner.    Upon the withdrawal of the only General Partner in accordance with Section 7.01 or upon the occurrence of other circumstances causing the Partnership to lack a General Partner, the Partnership will be dissolved and must be liquidated unless all Limited Partners elect within 60 days after the occurrence of the vacancy to select a successor General Partner, to reconstitute the Partnership in accordance with Section 7.02 and to continue the business of the Partnership with its property.

7.04.    Admission of a Successor General Partner.

(a)    The admission of any successor General Partner pursuant to this Article VII shall be effective only if and after the following conditions are satisfied:

(i)    The Person has accepted and assumed in writing all the terms and provisions of this Agreement;

(ii)    If the Person is not a natural person. it has provided counsel for the Partnership with a certified copy of a resolution of its Board of Directors or other authorizing action taken under its controlling documents or

13

SUB_LANDRY_00000613

agreements, authorizing it to become a General Partner under the terms and conditions of this Agreement;

(iii) The Person has executed this Agreement as then in effect, an Amended Certificate of Limited Partnership, and such other documents or instruments as may be required or appropriate to effect the admission of that Person as a General Partner, and

(iv)   The Limited Partners have given their approval.

(b)   Notwithstanding anything to the contrary in this Article VII, a General Partnership Interest shall at all times be subject to the restrictions on transfer set forth in Section 8.01.

7.06. Liability of Withdrawing General Partner. A General Partner who withdraws from the Partnership, or who sells, transfers, or assigns its General Partnership Interest, or who ceases to be the General Partner because of its Incapacity shall remain liable for obligations and liabilities incurred by it as General Partner prior to the time such withdrawal, sale, transfer, assignment, or Incapacity becomes effective or occurs, but it shall be free of any obligation or liability incurred on account of the activities of the Partnership from and after the time such withdrawal, sale, transfer, or assignment becomes effective.

## ARTICLE VIII

## TRANSFERABILITY OF A LIMITED PARTNERSHIP INTEREST

8.01. Restrictions on Transfers of Interest.

(a)   Notwithstanding any other provisions of this Section 8.01, no sale, exchange, transfer, or assignment (collectively "Transfer") of a Partnership Interest (General or Limited) may be made unless in the opinion of responsible counsel (who may be counsel for the Partnership), satisfactory in form and substance to the General Partner and counsel for the Partnership (which opinion may be waived, in whole or in part, at the discretion of the General Partner),

(i) Such Transfer, when added to the total of all other Transfers of Partnership Interests within the preceding twelve (12) months, would not result in the Partnership being considered to have terminated within the meaning of Section 708 of the Code;

(ii) Such Transfer would not violate any federal securities laws or any state securities or "Blue Sky" laws (including any investor suitability standards) applicable to the Partnership or the Partnership Interest to be Transferred;

14

(iii) Such Transfer would not cause the Partnership to lose its status as a partnership for federal income tax purposes: and

(iv) Any required opinion of counsel is delivered in writing to the Partnership prior to the date of the Transfer.

(b)  In no event shall all or any part of a Partnership Interest be Transferred to a minor or an incompetent, except in trust or by will or intestate succession.

(c)  A Limited Partner may Transfer all or any part of its Limited Partnership Interest only with the written consent of the General Partner.

8.02. Assignees.

(a)  Unless and until an assignee of a Limited Partnership Interest becomes a Substituted Limited Partner, such assignee shall not be entitled to vote or give consents with respect to such Limited Partnership Interest.

(b)  Any Limited Partner that assigns all of its Partnership Interest shall cease to be a Limited Partner, except that, unless and until a substituted Limited Partner is admitted in its stead, such assigning Limited Partner shall retain the statutory rights of the assignor of a Limited Partnership Interest under Delaware law.

(c)  Anything herein to the contrary notwithstanding, both the Partnership and the General Partner shall be entitled to treat the assignor of a Limited Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions made to it in good faith, until a written assignment that conforms to the requirements of this Article VIII has been received by the Partnership and accepted and approved by the General Partner.

8.03. Substituted Limited Partners.

(a)  A Limited Partner shall not have the right to substitute a purchaser, assignee, transferee, donee, heir, legatee, distributee, or other recipient of any of such Limited Partner's Partnership Interest as a Limited Partner in its place. Any such purchaser, assignee, transferee. donee, heir, legatee, distributee, or other recipient of a Limited Partnership Interest (whether pursuant to a voluntary or involuntary transfer) shall be admitted to the Partnership as a Substituted Limited Partner only (i) with the written consent of the General Partner, which consent shall be granted or withheld in the absolute discretion of the General Partner and may be arbitrarily withheld, and (ii) upon an amendment to this Agreement and, if necessary. the Partnership's Certificate of Limited Partnership recorded in the proper records of each jurisdiction in which such recordation is necessary to qualify the Partnership to conduct business or to preserve the limited

15

SUB_LANDRY_00000615

liability of the Limited Partners. Any such consent by the General Partner may be evidenced by the execution by the General Partner of an amendment to this Agreement evidencing the admission of such Person as a Limited Partner.

(b)     Each Substituted Limited Partner, as a condition to its admission as a Limited Partner, shall execute and acknowledge such instruments, in form and substance satisfactory to the General Partner, as the General Partner deems necessary or desirable to effectuate such admission and to confirm the agreement of the Substituted Limited Partner to be bound by all the terms and provisions of this Agreement with respect to the Partnership Interest acquired. The Substituted Limited Partner shall bear all reasonable expenses, including attorneys' fees, incurred by the Partnership in connection with the substitution.

(c)     Until an assignee is admitted to the Partnership as a Substituted Limited Partner pursuant to Section 8.03(a), the assignee shall be entitled to all of the rights of an assignee of a limited partnership interest under Delaware law.

## ARTICLE IX

### DISSOLUTION, LIQUIDATION AND TERMINATION OF THE PARTNERSHIP

9.01. Dissolution.

(a)     The Partnership shall be dissolved upon the happening of any of the following events:

(i) The expiration of its term;

(ii) The Incapacity of the General Partner, unless the Partnership is reconstituted in accordance with Section 7.02;

(iii) The election to dissolve the Partnership by all of the Partners;

(iv) The withdrawal of the General Partner without the designation of a successor General Partner under Section 7.01, unless the Partnership is reconstituted in accordance with Section 7.02;

(v) The election by the General Partner to dissolve the Partnership following the sale, distribution to the Partners, or other disposition at any one time of all or substantially all of the assets of the Partnership; and

(vi) Termination required by operation of law.

16

SUB_LANDRY_00000616

(b)     Dissolution of the Partnership shall be effective on the day on which the event occurs giving rise to the dissolution. but the Partnership shall not terminate until the Certificate of Limited Partnership of the Partnership has been cancelled and the assets of the Partnership have been distributed as provided in Section 9.02.

9.02. Liquidation.

(a)     Upon dissolution of the Partnership, the General Partner or a liquidating trustee, if one is appointed, shall wind up the affairs of the Partnership and, in its sole discretion, liquidate all or any part of the assets of the Partnership. The General Partner or such liquidating trustee shall. in its absolute discretion, determine the time, manner, and terms of any sale or other disposition of the Partnership's investments for the purpose of obtaining, in its opinion, fair value for such assets.

(b)     Profits and Losses arising from such sales upon liquidation shall be allocated as provided in Article IV.  In settling accounts after dissolution, the assets of the Partnership shall be paid out in the following order:

(i) To creditors, whether by payment or by establishment of reserves, in the order of priority provided by law; and

(ii) To each Partner in an amount equivalent to the positive amount of his Capital Account on the date of distribution or, if the remaining assets in the Partnership are insufficient to return the entire Capital Accounts, Pro Rata to the Partners according to the positive balances in their Capital Accounts.

(c)     Upon dissolution and liquidation of the Partnership, after any allocations of Profits or Losses, but before any distributions to the Partners upon such liquidation, the General Partner shall contribute to the capital of the Partnership an amount equal to the negative amount, if any, of its Capital Account.

(d)     When the General Partner or trustee has complied with the foregoing liquidation plan, the Partners shall execute, acknowledge. and cause to be filed an instrument evidencing the cancellation of the Certificate of Limited Partnership of the Partnership

ARTICLE X

AMENDMENTS

10.01. Amendments Generally. The Partners shall appropriately amend this Agreement to reflect the addition or substitution of a Limited Partner, the admission of a successor General Partner, or the withdrawal of a General Partner, in accordance with the applicable provisions of this Agreement. Within a reasonable

17

SUB_LANDRY_00000617

time after the adoption of any amendment to this Agreement, the General Partner shall make any filings or publications required or desirable to reflect the amendment, including any required filing for recordation of any certificate of limited partnership.

10.02. Adoption of Amendments.

(a)    Except as otherwise provided in Section 10.01, this Agreement may be amended from time to time only with the consent of all of the Partners.

(b)    On the adoption of any amendment to this Agreement, the amendment shall be executed by the General Partner and all of the Limited Partners and shall be recorded in the proper records of each jurisdiction in which recordation is necessary for the Partnership to conduct business or to preserve the limited liability of the Limited Partners. Each Limited Partner hereby irrevocably appoints and constitutes the General Partner as its agent and attorney-in-fact to execute, swear to, and record any and all such amendments. The power of attorney given herewith is irrevocable, is coupled with an interest, and shall survive the Incapacity of a Limited Partner granting it.

10.03. Amendments on Admission or Withdrawal of Partners.    If this Agreement is amended to reflect the admission or substitution of a Partner, the amendment shall be executed by the General Partner, the Person to be substituted or added as a Partner, and the assigning Partner (if applicable).    The General Partner may execute any such amendment on behalf of the Limited Partners, any substituted or added Limited Partner, and any assigning Limited Partner pursuant to the power of attorney granted in Section 11.01. If this Agreement is amended to reflect the withdrawal or Incapacity of the General Partner and the continuation of the business of the Partnership, the amendment shall be executed and sworn to by the successor General Partner and by all of the Limited Partners.

10.04. Amendment of Certificate. If this Agreement is amended pursuant to this Article X, the General Partner shall amend the Certificate of Limited Partnership of the Partnership to reflect the change if it deems such an amendment to be necessary.

ARTICLE XI

POWER OF ATTORNEY

11.01. Power of Attorney.

(a)    Each Limited Partner, by executing this Agreement, makes, constitutes, and appoints the General Partner as its true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in its

18

SUB_LANDRY_00000618

name, place, and stead to make, execute, sign, acknowledge, swear to, record, and file:

(i) this Agreement and any amendments to this Agreement;

(ii) the original Certificate of Limited Partnership of the Partnership and all amendments thereto required or permitted by law or the provisions of this Agreement;

(iii) all certificates and other instruments deemed advisable by the General Partner to carry out the provisions of this Agreement and applicable law or to permit the Partnership to become or to continue as a limited partnership wherein the Limited Partners have limited liability in each jurisdiction where the Partnership may be doing business;

(iv) all instruments that the General Partner deems appropriate to reflect a change or modification of this Agreement or the Partnership in accordance with this Agreement, including, without limitation, the substitution of assignees as Substituted Limited Partners or admission of new Limited Partners;

(v) all conveyances and other instruments or papers deemed advisable by the General Partner to effect the dissolution and termination of the Partnership;

(vi) all fictitious or assumed name certificates required or permitted to be filed on behalf of the Partnership; and

(vii) all other instruments or papers that may be required or permitted by law to be filed on behalf of the Partnership.

(b)     The foregoing power of attorney:

(i) Is coupled with an interest and shall be irrevocable and survive the Incapacity of each Limited Partner;

(ii) May be executed by the General Partner by signing separately as attorney-in-fact for each Limited Partner or, after listing all of the Limited Partners executing an instrument, by a single signature of the General Partner acting as attorney-in-fact for all of them; and

(iii) Shall survive the delivery of an assignment by a Limited Partner of its Partnership Interest; except that, where the assignee of a Limited Partnership Interest has been approved by the General Partner for admission to the Partnership as a Substituted Limited Partner, the power of attorney of the assignor shall survive the delivery of the assignment for the sole purpose of enabling the

19

SUB_LANDRY_00000619

General Partner to execute, swear to, acknowledge, and file any instrument necessary or appropriate to effect the substitution.

## ARTICLE XII

## RECORDS AND ACCOUNTING; REPORTS

12.01. Records and Accounting. The General Partner shall maintain, at the Partnership's principal place of business, proper and complete records and books of account of the business of the Partnership, including a list of the names and addresses and Partnership Percentage Interests of all Limited Partners. Each Limited Partner or its duly authorized representative shall have access to the books and records of the Partnership, upon reasonable notice and for a proper purpose, at all reasonable times during business hours.

12.02. Tax Information. Within a reasonable period of time after the end of each calendar year, the General Partner will cause to be delivered to each Person who was a Partner at any time during such calendar year all information necessary for the preparation of such Partner's federal income tax returns, including a statement showing each Partner's share of Profits or Losses, and the amount of any distribution made to or for the account of such Partner pursuant to this Agreement.

12.03. Partnership Funds. No funds of the Partnership shall be kept in any account other than a Partnership account. Partnership funds shall not be commingled with the funds of any other Person, and the General Partner shall not employ, or permit any other Person to employ, such funds in any manner except for the benefit of the Partnership. The funds of the Partnership not needed in the operation of the business may be deposited in such bank accounts as the General Partner may designate.

12.04. Elections. The General Partner may cause the Partnership to make all elections required or permitted to be made by the Partnership under the Code and not otherwise expressly provided for in this Agreement, in the manner that the General Partner believes is in the best interest of the Partnership.

## ARTICLE XIII

## MISCELLANEOUS

13.01. Notice. Any notice to any Partner required or permitted under this Agreement shall be given in writing to the Partner at the address of the Partner set forth in the Partnership's records. Any notice to the Partnership shall be given in writing to the Partnership at the address of the Partnership's principal office. Any notice shall be deemed to have been duly given if personally delivered or sent by United States mail or by facsimile transmission confirmed by letter and will be deemed given, unless earlier received (i) if sent by certified or registered mail,

20

return receipt requested, two calendar days after being deposited in the United States mails, postage prepaid; (ii) if sent by facsimile transmission, the date sent provided confirmatory notice was sent by first-class mail, postage prepaid; and (iii) if delivered by hand, on the date of receipt.

13.02. Governing Law: Severability of Provisions. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties hereunder shall be governed by the partnership laws of the State of Delaware. If any provision of this Agreement is held to be invalid, the remainder of this Agreement shall not be affected thereby.

13.03. Entire Agreement. This Agreement contains the complete and entire agreement between the parties concerning the subject matter of this Agreement and supersedes any prior agreement or understandings between them, oral or written, concerning that subject matter, all of which are merged in this Agreement.

13.04. Headings, Etc. The headings in this Agreement are inserted for convenience of reference only and shall not affect interpretation of this Agreement. Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine or the neuter gender shall include the masculine, the feminine, and the neuter.

13.05. Binding Provisions. The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and assigns of the respective parties hereto.

13.06. No Waiver. The failure of any Partner to seek redress for any violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not constitute a waiver of that covenant or condition. A waiver of any covenant or condition of this Agreement is effective only if evidenced in writing and signed by the party against which the waiver is sought to be enforced.

13.07. Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

21

SUB_LANDRY_00000621

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL PARTNER

WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.L.C., by Westport Advisors, Ltd., as its Manager

By: _____
Name:   Lawrence L. Landry, as President of Double L Investments, Inc., a Texas Corporation, which is Manager of Westport Asset Management, L.L.C., a Florida limited liability corporation, which is General Partner of Westport Advisors, Ltd.

LIMITED PARTNER

WESTPORT SENIOR LIVING INVESTMENT FUND, L.P., by Westport Advisors, Ltd., its General Partner

By: _____
Name:   Lawrence L. Landry, as President of Double L Investments, Inc., a Texas Corporation, which is Manager of Westport Asset Management, L.L.C., a Florida limited liability corporation, which is General Partner of Westport Advisors, Ltd.

TAL1 #225325 v1

22

**AMENDMENT NO. 1
TO THE LIMITED PARTNERSHIP AGREEMENT
OF WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP**

This Amendment No. 1, dated as of ~~November~~ *December* 21, 2006 (this "Amendment"), amends the Limited Partnership Agreement of Westport Holdings Tampa, Limited Partnership (the "Partnership"), effective as of October 23, 2000 (the "Agreement"), by and between Westport Holdings University Village, L.L.C., a Delaware limited liability company, as the General Partner, and Westport Senior Living Investment Fund, L.P., a Delaware limited partnership, as the Limited Partner (collectively, the "Partners"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

WHEREAS, the undersigned, constituting all of the Partners of the Partnership, hereby desire to amend the Agreement as hereinafter set forth.

NOW THEREFORE, the Agreement is hereby amended as follows:

1.    Section 1.06 is hereby amended by adding the following definitions thereto:

"Affiliate" means, with respect to any Person, (a) each Person that controls, is controlled by or is under common control with such Person, (b) each Person that, directly or indirectly, owns or controls, whether beneficially or as a trustee, guardian or other fiduciary, any of the equity interests of such Person, and (c) each of such Person's officers, directors, members, joint venturers and partners.

"Facility" means the continuing care retirement community located in Tampa, Hillsborough County, Florida, known as "University Village."

"Lender" means Capmark Finance Inc., a California corporation.

"Loan Agreement" means the Loan Agreement, dated ~~November~~ *December* 21, 2006, between the Partnership and the Lender.

"Loan Documents" means, collectively, the Loan Agreement, the Note and the Mortgage, together with any and all other documents executed by the Partnership or others, evidencing, securing or otherwise relating to the Loan.

"Loan Obligations" means the aggregate of all principal and interest owing from time to time under the Note and all expenses, charges and other amounts from time to time owing under the Note, the Loan Agreement or the other Loan Documents and all covenants, agreements and other obligations from time to time owing to, or for the benefit of, Lender pursuant to the Loan Documents.

"Loan" means the Loan in the principal sum of $23,050,000.00 made by Lender to the Partnership as of the date hereof.

ny-68861HF 3386569v.4 #04283/0019

SUB_LANDRY_00000623

"Mortgage" means the Second Amended and Restated Mortgage and Security Agreement, dated as of November 2̶, 2006, by and between the Partnership and the Lender. December

"Mortgaged Property" has the meaning given to that term in the Mortgage.

December "Note" means the Third Amended and Restated Promissory Note, dated as of November 7̶, 2006, in the principal amount of the Loan payable by the Partnership to the order of Lender.

2.    Section 2.01 is hereby amended by adding the following proviso to the end of such section:

;provided however, that until the Loan Obligations have been paid in full, the purpose of the Partnership shall be limited to (i) owning, operating and maintaining the Facility; (ii) owning a membership interest in Westport Nursing Tampa, L.L.C. ("Westport Nursing"); (iii) enter into that certain Master Lease Agreement dated January 8, 2004 between the Partnership, as lessee, and Westport Holdings Tampa II, Limited Partnership, as lessor, with respect to the adjacent development parcel known as the Villas and (iv) activities incidental thereto.

3.    Section 6.02 of the Agreement is hereby amended by adding the following paragraph thereto as Section 6.02(c):

(c)    Notwithstanding anything contained herein to the foregoing, until the Loan Obligations have been paid in full, the General Partner shall have no authority to, and the Partnership shall not, without the consent of the Lender,:

(i)    Acquire or own any material assets other than (A) the Mortgaged Property, (B) its membership interests in Westport Nursing, (C) its leasehold interests in the Villas and (D) such incidental machinery, equipment, fixtures and other personal property as may be necessary for the operation of the Facility;

(ii)    Merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets (except as permitted in the Loan Documents) or change its legal structure;

(iii)    Amend, modify, terminate or fail to comply with the provisions of this Agreement or similar organizational document, as the same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect its status as a single purpose entity or its ability to perform its obligations hereunder, under the Note or any other document evidencing or securing the Loan;

2

HF 3386569v 4 #04283/0019

SUB_LANDRY_00000624

(iv)    Except for the ownership of 100% of the outstanding membership interests in Westport Nursing Tampa, L.L.C., own any subsidiary or make any investment in any Person;

(v)    Commingle its funds or assets with assets of, or pledge its assets with or for, any of its Partners or any other Person;

(vi)    Incur any indebtedness for borrowed money, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Loan and indebtedness permitted under the Loan Documents;

(vii)    Fail to maintain its records, books of account and bank accounts separate and apart from those of its Partners and Affiliates, and any other Person;

(viii)    Enter into any contract or agreement with any of its Partners or Affiliates, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties;

(ix)    Seek its dissolution or winding up in whole, or in part;

(x)    Maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any of its Partners and Affiliates, or any other Person;

(xi)    Hold itself out to be responsible for the debts of another Person or pay another Person's liabilities out of its own funds;

(xii)    Make any loans or advances to any third party, including



SUB_LANDRY_00000625

SUB_LANDRY_00000626

IN WITNESS WHEREOF, the undersigned have hereto caused this Amendment to be duly executed as of the day and year first above written.

**GENERAL PARTNER**

WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.L.C.

By: Westport Advisors, Ltd., its sole Manager
By: Westport Asset Management, L.L.C. its sole General Partner

By: _____
Name: Lawrence L. Landry
Title: President

**LIMITED PARTNER**

WESTPORT SENIOR LIVING INVESTMENT FUND, L.P.

By: Westport Advisors, Ltd., its sole General Partner
By: Westport Asset Management, L.L.C. its sole General Partner

By: _____
Name: Lawrence L. Landry
Title: President

5

HF 3386569v 4 #04283/0019

SUB_LANDRY_00000627

### First 2014 Amendment of Limited Partnership Agreement
### (Tampa II)

This amendment made as of this 31st day of March, 2014 by and among Westport Holdings Hidden Springs, L.L.C., a Delaware limited liability company ("General Partner"), Westport Senior Living Investment Fund, L.P., a Delaware limited partnership ("Withdrawing Limited Partner"); BVM University Village, LLC, a Florida limited liability company ("BVM"), BHMSILF, LLC, a Delaware limited liability company ("BHMS"); IMH Healthcare, LLC, a Delaware limited liability company ("IMH"); and JF Consultants LLC, a Delaware limited liability company ("JF").

WHEREAS, the General Partner is the general partner of a Delaware limited partnership known as Westport Holdings Tampa II Limited Partnership (the "Partnership") established pursuant to a limited partnership agreement dated as of October 23, 2000 (the "Partnership Agreement"), and

WHEREAS, the Withdrawing Limited Partner has sold and conveyed its 99% interest limited partnership interest to BVM, and

WHEREAS, BVM intends to transfer a portion of its 99% interest limited partnership interest to BHMS, IMH and JF (collectively, BVM, BHMS, IMH and JF, the "Substituted Limited Partners"), and

WHEREAS, the parties desire to consent to the Partnership entering into the Loan Agreement (as defined below) and its related documentation (collectively, the "Loan Documents"), and the Withdrawing Limited Partners and Substituted Limited Partners desire to authorize the General Partner to execute the Loan Documents, and

WHEREAS, the parties desire to confirm the admission of the BVM, BHMS and IMH as Substitute Limited Partners of the Partnership and to make other amendments to the Partnership Agreement,

NOW, THEREFORE, the parties agree as follows:

1.      Initially BVM is hereby admitted as a Substitute Limited Partner in accordance with Article 8 of the Partnership Agreement, and then, BHMS, IMH and BVM are each admitted as Substitute Limited Partners in accordance with Article 8 of the Partnership Agreement.

2.      Section 1.06 is hereby amended by replacing the existing definisitions of the defined terms listed below with the following definitions:

"Lender" means CPIF Lending, LLC, a Washington limited liability company.

"Loan Agreement" means the Loan Agreement, dated March 31, 2014, between the Partnership and the Lender.

"Loan" means the loan in the principal sum of $9,500,000 made by Lender to the Partnership as of the date hereof.

"Mortgage" means the Mortgage, Assignment of Rents, Security Agreement and Fixture Filing executed by the Partnership for the benefit of Lender.

"Note" means the Promissory Note, dated as of March 31, 2014, in the principal amount of the Loan payable by the Partnership to the order of the Lender.

3.    Section 2.01 of the Partnership Agreement is deleted and there is inserted in place the following new Section 2.01:

"The purpose and business of the Partnership is to acquire, own, manage, operate, lease, sell, and otherwise transaction business related to real, tangible, and intangible property, specifically including (but not limited to) property related to the management, ownership, leasing, operation, or financing of retirement housing and health care facilities, and to engage in all activities incidental thereto and all other activities for which a limited partnership may be organized under the laws of Delaware and the United States of America; provided however, that until the Loan Obligations have been paid in full, the purpose of the Partnership shall be limited to (i) owning, operating and maintaining the Facility; and (ii) activities incidental thereto."

4.    Section 6.01 of the Partnership Agreement is deleted and there is inserted in place the following new Section 6.01:

"Subject to the terms hereof, including without limitation Section 6.02, the General Partner shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs, and shall have all of the rights, powers, and obligations of a general partner of a limited partnership under Delaware law and otherwise as provided by law.  Except as expressly provided in this Agreement, the General Partner is hereby granted the right, power, and authority to do on behalf of the Partnership those actions described below, which, in its sole judgment, are necessary or appropriate to manage the Partnership's affairs and to fulfill the purposes of the Partnership:

(a)    To make all expenditures permitted by this Agreement;

2

25064663_3

SUB_LANDRY_00000629

(b)     To maintain one or more bank accounts for the Partnership in such bank or banks that the Partnership has relationships with as of the date hereof or as directed by Limited Partners holding at least 79% of the Partnership Interests (the "Majority-in-Interest of the Partners");

(c)     To the extent that funds of the Partnership are available, to pay all expenses, debts, and obligations of the Partnership;

(d)     To the extent that funds of the Partnership are available, to make distributions periodically to the Partners in accordance with the provisions of Article V;

(e)     To establish and maintain the books and records of the Partnership in accordance with Article XIII; and

(f)     To perform all normal functions, and otherwise operate and manage the business and affairs of the Partnership, in accordance with and as limited by this Agreement."

5.     Section 6.02(a) of the Partnership Agreement is deleted and there is inserted in place the following new Section 6.02(a):

"(a)     Without the written consent or ratification of the Majority-in-Interest of the Partners, the General Partner shall not have the authority to:

(i)     Do any act in contravention of this Agreement;

(ii)     Do any act that would make it impossible to carry on the ordinary business of the Partnership;

(iii)     Confess a judgment against the Partnership;

(iv)     Possess Partnership property or assign its rights in specific Partnership property for other than a Partnership purpose;

(v)     Admit a person as a General Partner, except as provided in this Agreement;

(vi)     Admit a person as a Limited Partner, except as provided in this Agreement;

(vii)     Continue the business of the Partnership or use Partnership property after the removal or Incapacity of the General Partner, except as provided in this Agreement; or

(viii)     Take any of those actions described in Sections 1.05, 3.03(b), 3.04(b), 4.01, 5.01, 6.03(c), 6.03(d), 9.01(a)(v), 9.02, 11.01, or 12.04."

25064663_3

SUB_LANDRY_00000630

6.    Section 6.02(c) of the Partnership Agreement is deleted and there is inserted in place the following new Section 6.02(c):

"(c)    Without Lender's prior written consent, the Partnership:

(i)    Shall not engage either directly or indirectly, in any business other than the ownership, management and operation of the Property;

(ii)    Shall not own any asset other than (i) the Property, and (ii) incidental personal property necessary for the operation of the Property;

(iii)    Shall not liquidate or dissolve (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation or acquire by purchase or otherwise all or substantially all the business or assets of, or any stock or other evidence of beneficial ownership of any entity;

(iv)    Shall not incur any debt, secured or unsecured, direct or contingent (including, but not limited to, guaranteeing any obligation), other than: (a) the Loan; (b) advances or trade payables or accrued expenses that will be unsecured; (c) equipment or vehicle financing or lease arrangements where the outstanding balance of any amounts financed thereunder does not at any time exceed $50,000 individually or $100,000 in the aggregate; and (d) loans to Partnership from its partners to meet the working capital needs of the Property, which loans are subordinate to the Loan pursuant to the terms hereof;

(v)    Shall not amend, modify or otherwise change its partnership certificate, partnership agreement, or other formation agreement or document, as applicable, in any material term or manner, or in a manner which adversely affects Partnership's existence as a single purpose entity, nor shall any partner, limited or general, member or shareholder thereof, as applicable take any such action; and

(vi)    Shall not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Partnership, or a substantial part of Partnership's property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due or declare or effectuate a moratorium on payments of its obligation; or take any action in furtherance of any such action;

And the Partnership:

4

25064663_3

SUB_LANDRY_00000631

(vii)   Shall maintain correct and complete financial statements, accounts, books and records and other entity documents separate from those of any Affiliate or any other person or entity;

(viii)   Shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account;

(ix)   Shall file or cause to be filed its own separate tax returns;

(x)   Shall hold itself out to the public (including any of its Affiliates' creditors) under Partnership's own name and as a separate and distinct entity and not as a department, division or otherwise of any Affiliate of same;

(xi)   Shall observe all customary formalities regarding the existence of Partnership as may be applicable to its partnership agreement, including holding meetings and maintaining current and accurate minute books separate from those of any Affiliate;

(xii)   Shall hold title to its assets in its own name and act solely in its own name and through its own duly authorized officers and agents;

(xiii)   Shall not guarantee, pledge or assume or hold itself out or permit itself to be held out as having guaranteed, pledged or assumed any liabilities or obligations or any partner, member, or shareholder, as applicable, or any Affiliate of Partnership, nor shall it make any loan;

(xiv)   Shall remain solvent at all times;

(xv)   Shall separately identify, maintain and segregate its assets. Partnership's assets shall at all times be held by or on behalf of Partnership and if held on behalf of the Partnership by another entity, shall at all times be kept identifiable (in accordance with customary usages) as assets owned by Partnership. This restriction requires, among other things, that (a) Partnership funds shall be deposited or invested in Partnership's name, (b) Partnership funds shall not be commingled with the funds of any Affiliate or other person or entity, (c) Partnership shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliate or other person or entity, and (d) Partnership funds shall be used only for the business of Partnership;

(xvi)   Shall maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or other person or entity;

5

SUB_LANDRY_00000632

(xvii)  Shall pay or cause to be paid its own liabilities and expenses of any kind, including but not limited to salaries of its employees, only out of its own separate funds and assets

(xviii) Shall at all times be adequately capitalized to engage in the transactions contemplated at its formation;

(xix)  Shall not do any act which would make it impossible to carry on the ordinary business of Partnership;

(xx)  Shall reflect Partnership's ownership interest in all data and records (including computer records) used by Partnership or any Affiliate in the collection and administration of any loan;

(xxi)  Shall not invest any of Partnership's funds in securities issued by, nor shall Partnership acquire the indebtedness or obligation of, any Affiliate;

(xxii)  Shall maintain an arm's length relationship with each of its Affiliates and may enter into contracts or transact business with its Affiliates only on commercially reasonable terms that are no less favorable to Partnership than is obtainable in the market from a person or entity that is not an Affiliate; and

(xxiii) Shall correct any misunderstanding that is known by Partnership regarding its name or separate identity."

7.  Section 6.07(b) of the Partnership Agreement is deleted and there is inserted in place the following new Section 6.07(b):

"(b)  The Limited Partners, With the written consent or ratification of the Majority-in-Interest of the Partners, shall have the following approval rights:

(i)  The right to approve or disapprove the appointment of a successor General Partner, pursuant to Section 7.05; and

(ii)  The right to dissolve the Partnership pursuant to Section 9.01(a)(iii); and

(iii)  The right to amend this Agreement pursuant to Section 10.02."

8.  Section 10.02(a) of the Partnership Agreement is deleted and there is inserted in place the following new Section 10.02(a): "Except as otherwise provided in Section 10.01, this agreement may be amended from time to time only with a

25064663_3

SUB_LANDRY_00000633

consent of the Majority-in-Interest of the Partners, provided that no such amendment shall be in contravention of the Delaware limited partnership act or in any way increase the liability of the General Partner."

9.     Article XII of the Partnership Agreement is amended and there is inserted following Section 12.04, the new Section 12.05 as follows:

"12.05 Interests and Certificates.

(a)     Interests. Each partnership interest in the Partnership shall constitute and shall remain a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of Delaware and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del C. § 8-101, et. seq.) (the "UCC"), such provision of Article 8 of the UCC shall be controlling.

(b)     Certificates.

(i)     Upon the issuance of partnership interests in the Partnership to any Person in accordance with the provisions of this Agreement, without any further act, vote or approval of any Partner, or any Person, the Partnership shall issue one or more certificates in the name of such Person substantially in the form of Exhibit A hereto (a "Certificate"), which evidences the ownership of the partnership interests in the Partnership of such Person. Each such Certificate shall be denominated in terms of the percentage of the partnership interests in the Partnership evidenced by such Certificate and shall be signed by the General Partner or an Officer, if any have been appointed on behalf of the Partnership.

(ii)     Without any further act, vote or approval of any Partner or any Person, the Partnership shall issue a new Certificate in place of any Certificate previously issued if the holder of the partnership interests in the Partnership represented by such Certificate, as reflected on the books and records of the Partnership:

(A)     makes proof by affidavit, in form and substance satisfactory to the Partnership, that such previously issued Certificate has been lost, stolen or destroyed;

7

25064663_3

SUB_LANDRY_00000634

(B)     requests the issuance of a new Certificate before the Partnership has notice that such previously issued Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(C)     if requested by the Partnership, delivers to the Partnership a bond, in form and substance satisfactory to the Partnership, with such surety or sureties as the Partnership may direct, to indemnify the Partnership against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Certificate; and

(D)     satisfies any other reasonable requirements imposed by the Partnership.

(iii)   Upon a Partner's transfer in accordance with the provisions of this Agreement of any or all partnership interests in the Partnership represented by a Certificate, the transferee of such partnership interests in the Partnership shall deliver such Certificate to the Partnership for cancellation (executed by such transferee on the reverse side thereof), and the Partnership shall thereupon issue a new Certificate to such transferee for the percentage of partnership interests in the Partnership being transferred and, if applicable, cause to be issued to such Partner a new Certificate for that percentage of partnership interests in the Partnership that were represented by the canceled Certificate and that are not being transferred.

(c)     Registration of Partnership Interests. The Partnership shall maintain books for the purpose of registering the transfer of partnership interests. Notwithstanding any provision of this Agreement to the contrary, a transfer of partnership interests requires delivery of an endorsed Certificate and shall be effective upon registration of such transfer in the books of the Partnership."

10.     The percentages of partnership interest are as follows: (a) 1% General Partner, and (b) 99% Limited Partners proportioned as follows:

| | |
|---|---|
| BVM University Village, LLC | 39.6% |
| BHMSILF, LLC | 26.4% |
| IMH Healthcare, LLC | 19.8% |
| JF Consultants LLC | 13.2%. |

8

25064663_3

SUB_LANDRY_00000635

11.     The parties hereto have determined that the Loan Documents and the other transactions contemplated thereby are in the best interest and necessary and convenient to the conduct, promotion and attainment of the business and activities of the Company, and are hereby authorized and approved.  By executing this agreement, the Withdrawing Limited Partner and the Substituted Limited Partners hereby authorize the Company to execute, deliver and perform (i) the Loan Documents to which the Company is a party and (ii) any certificates, agreements or any other documents as may be necessary or appropriate to give effect to, or for the Company to perform its obligations under, such Loan Documents.  The General Partner is hereby authorized, empowered and directed to negotiate, execute, deliver and perform, on behalf of the Company, any and all Loan Documents to which the Company is a party (in each case, with such changes thereto as the General Partner deems necessary, desirable or appropriate) and any and all further documents relating to the transactions contemplated in such Loan Documents and to take such further actions on behalf of the Company as the General Partner deems necessary or appropriate in its discretion to carry out the purposes of the foregoing resolutions (such determination being evidenced conclusively, but not exclusively, by any the General Partner's taking of such actions or execution and delivery of such documents).

12.     Except as amended hereby, the Partnership Agreement is hereby ratified and confirmed in full force and effect.

[signature pages to follow]

25064663v3

9

25064663_3

SUB_LANDRY_00000636

SUBSTITUTED LIMITED PARTNERS:

IMH HEALTHCARE, LLC

By: _Eli Freiden_ (signature)
Name: Eli Freiden
Title: Manager

BHMSILF, LLC
By: BHMS Investments, LP, its
    managing member

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

JF CONSULTANTS, LLC

By: _____
Name: Shabse Fuchs
Title: Manager

BVM UNIVERSITY VILLAGE, LLC

By: _____
Name: Rebecca J. Bartle
Title:  Secretary

*[Additional Signatures Attached]*

[Signature Page to First 2014 Amendment to the Westport Holdings Tampa II Limited Partnership
Limited Partnership Agreement]

SUB_LANDRY_00000637

SUBSTITUTED LIMITED PARTNERS:

IMH HEALTHCARE, LLC

By: _____
Name: Eli Freiden
Title: Manager

JF CONSULTANTS, LLC

By: _____
Name: Shabse Fuchs
Title: Manager

BHMSILF, LLC
By: BHMS Investments, LP, its
     managing member

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

BVM UNIVERSITY VILLAGE, LLC

By: _____
Name: Rebecca J. Bartle
Title:   Secretary

*[Additional Signatures Attached]*

[Signature Page to First 2014 Amendment to the Westport Holdings Tampa II Limited Partnership
Limited Partnership Agreement]

SUB_LANDRY_00000638

SUBSTITUTED LIMITED PARTNERS:

IMH HEALTHCARE, LLC

By: _____
Name: Eli Freiden
Title: Manager

JF CONSULTANTS, LLC

By: _____
Name: Shabse Fuchs
Title: Manager

BHMSILF, LLC
By: BHMS Investments, LP, its
    managing member

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

BVM UNIVERSITY VILLAGE, LLC

By: _____
Name: Rebecca J. Bartle
Title:  Secretary

*[Additional Signatures Attached]*

*[Signature Page to First 2014 Amendment to the Westport Holdings Tampa II Limited Partnership*
*Limited Partnership Agreement]*

SUB_LANDRY_00000639

SUBSTITUTED LIMITED PARTNERS:

IMH HEALTHCARE, LLC

By: _____
Name: Eli Freiden
Title: Manager

JF CONSULTANTS, LLC

By: _____
Name: Shabse Fuchs
Title: Manager

BHMSILF, LLC
By: BHMS Investments, LP, its
       managing member

By: _____
Name: Kevin L. Angelis
Title: Managing Partner

BVM UNIVERSITY VILLAGE, LLC

By: _____
Name: Rebecca J. Bartle
Title:  Secretary

*[Additional Signatures Attached]*

*[Signature Page to First 2014 Amendment to the Westport Holdings Tampa II Limited Partnership Limited Partnership Agreement]*

SUB_LANDRY_00000640

WITHDRAWING LIMITED PARTNER:

Westport Senior Living Investment Fund, L.P.,

By: Westport Advisors, Ltd, its General Partner:

By: Westport Asset Management, L.L.C., its
General Partner

By: Double L Investment, Inc., its Manager

By: _____
Lawrence L. Landry, President

GENERAL PARTNER

Westport Holdings Hidden Springs, L.L.C.,

By: Westport Advisors, Ltd., as its Manager

By: Westport Asset Management, L.L.C., its
General Partner

By: Double L Investment, Inc., its Manager

By: _____
Lawrence L. Landry, President

[Signature Page to First 2014 Amendment to the Westport Holdings Tampa II Limited Partnership
Limited Partnership Agreement]

SUB_LANDRY_00000641

**EXHIBIT A**

CERTIFICATE FOR PARTNERSHIP INTERESTS IN
WESTPORT HOLDINGS TAMPA II LIMITED PARTNERSHIP

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY PARTNERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE PARTNERSHIP AGREEMENT (AS DEFINED BELOW).

Certificate Number 001                              ____% Percentage
Interest

       WESTPORT HOLDINGS TAMPA II LIMITED PARTNERSHIP, a Delaware limited partnership (the "Partnership"), hereby certifies that _____(together with any assignee of this Certificate, the "Holder"), is the registered owner of _____ percent (___%) of the [limited/general] partnership interests in the Partnership. The rights, powers, preferences, restrictions and limitations of the partnership interests in the Partnership are set forth in, and this Certificate and the partnership interests in the Partnership represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Limited Partnership Agreement of the Partnership, as the same may be further amended or restated from time to time (the "Partnership Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the partnership interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Partnership Agreement. The Partnership will furnish a copy of the Partnership Agreement to the Holder without charge upon written request to the Partnership at its principal place of business. Transfer of any or all of the partnership interests in the Partnership evidenced by this Certificate is subject to certain restrictions in the Partnership Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Partnership of the Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such Transfer, and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such Transfer.

       Each partnership interest in the Partnership shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial

SUB_LANDRY_00000642

Code as in effect from time to time in the State of Delaware and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each partnership interest in the Partnership shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

This Certificate and the partnership interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Partnership has caused this Certificate to be executed as of the date set forth below.

WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP,
a Delaware limited partnership

GENERAL PARTNER

Westport Holdings Hidden Springs, L.L.C.,

By: Westport Advisors, Ltd., as its Manager

By: Westport Asset Management, L.L.C., its General Partner

By: Double L Investment, Inc., its Manager

By:_____
Lawrence L. Landry, President

Date: _____

*[PARTNERSHIP INTEREST CERTIFICATE CONTINUES ON NEXT PAGE]*

SUB_LANDRY_00000643

FOR VALUE RECEIVED, the party named below hereby sells, assigns and transfers unto _____ the partnership interests represented by the forgoing Partnership Interest Certificate and do hereby irrevocably constitute and appoint _____ as Attorney to transfer the said partnership interests on the books of the foregoing named Partnership with full power of substitution in the premises.

**Limited Partner:**

_____

By: _____
Name: _____
Title: _____

Dated: _____

SUB_LANDRY_00000644

## WESTPORT HOLDINGS TAMPA II LIMITED PARTNERSHIP
## LIMITED PARTNERSHIP AGREEMENT

This LIMITED PARTNERSHIP AGREEMENT ("Agreement") is entered into and shall be effective as of the ____ day of October, 2000, by and between Westport Holdings Hidden Springs, L.L.C., a Delaware limited liability company, as the General Partner, and Westport Senior Living Investment Fund, L. P., a Delaware limited partnership, as the Limited Partner, on the following terms and conditions:

### ARTICLE I

### ORGANIZATION AND DEFINITIONS

1.01. Organization. The parties hereto (jointly the "Partners" and individually a "Partner") have formed a Delaware limited partnership (the "Partnership") for the purposes set forth in this Agreement. The Partnership shall be governed by the limited partnership laws of the State of Delaware. The Partnership shall become qualified to do business in the State of Florida and shall be governed by the laws of the State of Florida that govern foreign limited partnerships conducting business in Florida. The Partners agree to continue the Partnership in accordance with this Agreement.

1.02. Name. The name of the Partnership is:

"Westport Holdings Tampa II Limited Partnership"

1.03. Business Offices; Registered Offices; Registered Agents. The principal business office of the Partnership is at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410, or at such other location as the General Partner determines. The initial registered office of the Partnership in Delaware is at 1209 Orange Street, Wilmington, Delaware 19801, and the name of the initial registered agent at that address is The Corporation Trust Company. The initial registered office of the Partnership in Florida is at 3801 PGA Boulevard, Suite 805, Palm Beach Gardens, Florida 33410, and the name of the initial registered agent at that address is Lawrence L. Landry.

1.04. Term. The Partnership commenced as of October ____, 2000, the date of filing of the Partnership's Certificate of Limited Partnership in Delaware. The Partnership will continue until December 31, 2099, or until it is sooner terminated in accordance with Article IX of this Agreement.

1.05. Maintenance of Partnership. The General Partner shall take all actions necessary to perfect and maintain the Partnership as a limited partnership under the laws of Delaware and (if and to the extent required by applicable law) to amend the Certificate of Limited Partnership from time to time. The General Partner shall

*Exhibit "B"*

SUB_LANDRY_00000645

take all actions necessary to keep the Partnership qualified to do business and in good standing under the laws of Florida and in any other state where the nature of the Partnership's business or activities require qualification.

1.06. Definitions. As used in this Agreement, the following terms have the meanings ascribed to them in this Section 1.06 and include the plural as well as the singular number:

"Agreement" means this Limited Partnership Agreement, as amended from time to time.

"Capital Account" means the account maintained for each Partner in the Partnership's books of account in the manner described in Section 3.04.

"Capital Contribution" means the total amount of cash or other property contributed to the equity of the Partnership by each Partner pursuant to this Agreement. Any reference in this Agreement to the Capital Contribution of either a Partner or any assignee of a Partner includes any Capital Contribution previously made by any prior Partner to whose Partnership Interest the then existing Partner or assignee succeeded.

"Code" means the Internal Revenue Code of 1986, as it may be amended, or any subsequent federal law concerning income tax as enacted in substitution for, or that corresponds with, such Code.

"General Partner" means the person designated in this Agreement as the general partner of the Partnership and any person who becomes a general partner of the Partnership pursuant to this Agreement, in the person's capacity as a general partner of the Partnership.

"General Partnership Interest" means the Partnership Interest of a General Partner, representing its Capital Contribution and its right to receive its share of the Profits and Losses, distributions, and liquidation proceeds of the Partnership, all in accordance with the terms of this Agreement, and excludes Partnership Rights.

"Incapacity" means, as to any Person, the adjudication of bankruptcy, incompetence, or insanity, or the death, dissolution or termination (other than by merger or consolidation), as the case may be, of such Person.

"Limited Partner" means the Person designated in this Agreement as the limited partner of the Partnership and any Person who becomes a limited partner of the Partnership, pursuant to this Agreement, in the Person's capacity as a limited partner of the Partnership.

2

SUB_LANDRY_00000646

"Limited Partnership Interest" means the Partnership Interest of a Limited Partner, representing the Capital Contribution of the Limited Partner and the right to receive its share of the Profits and Losses, distributions, and liquidation proceeds of the Partnership, all in accordance with the terms of this Agreement, and excludes Partnership Rights.

"Partnership Interest" includes only a Partner's Capital Contribution and the right to receive its share of the Profits and Losses, distributions, and liquidation proceeds of the Partnership, all in accordance with the terms of this Agreement, and excludes Partnership Rights.

"Partnership Percentage Interest" means with respect to a Partner, the Partner's percentage interest in the Partnership's allocations of Profits, Losses, and cash and in-kind distributions as provided in this Agreement. Initially, each Partner's Partnership Percentage Interest is as follows:

| Partner | Partnership Percentage Interest |
| --- | --- |
| General Partner: | |
| Westport Holdings Hidden Springs, L.L.C., | One Percent (1%) |
| Limited Partner: | |
| Westport Senior Living Investment Fund, L. P. | Ninety-nine Percent (99%) |

"Partnership Rights" excludes the Partnership Interest of a Partner, and includes, in addition to other rights provided in this Agreement, the rights provided to it under applicable law.

"Person" means a natural person, corporation, trust, partnership, limited liability company, joint venture, association, or other business or other legal entity.

"Profits and Losses" means the taxable income or loss of the Partnership, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (1) any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses hereunder shall be added to such taxable income or loss; and (2) any expenditures of the Partnership described in Code § 705(a)(2)(B) or treated as Code § 705(a)(2)(B) expenditures pursuant to Treasury Regulation § 1.704-

3

SUB_LANDRY_00000647

1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses hereunder, shall be subtracted from such taxable income or loss.

"Pro Rata" means in the proportion that the item being measured for each Partner bears to the total of all such items for all Partners for whom a contribution, distribution, or allocation is due or being made, shared, or determined.

"Treasury Regulations" means the regulations of the United States Treasury Department pertaining to the income tax, as amended, and any successor provision thereto.

"Unreturned Cash Contribution" means the amount of a Partner's Capital Contribution reduced by the amount of cash distributed to such Partner pursuant to the provisions of Section 5.01(a).

## ARTICLE II

## PURPOSE AND BUSINESS OF THE PARTNERSHIP

2.01. _Purpose of the Partnership_.  The purpose and business of the Partnership is to acquire, own, manage, operate, lease, sell, and otherwise transact business related to real, tangible, and intangible property, specifically including (but not limited to) property related to the management, ownership, leasing, operation, or financing of retirement housing and health care facilities, and to engage in all activities incidental thereto and all other activities for which a limited partnership may be organized under the laws of Delaware and the United States of America.

2.02. _Authority of the Partnership_.  To carry out its purpose, the Partnership, consistent with and subject to the provisions of this Agreement and all applicable laws, is empowered and authorized to do any and all acts and things incidental to, or necessary, appropriate, proper, advisable, or convenient for, the furtherance and accomplishment of its purposes and the protection and benefit of the Partnership.

## ARTICLE III

## PARTNERS, CAPITAL, DEFAULTS

3.01. _General Partner_. Westport Holdings Hidden Springs, L.L.C., a Delaware limited liability company, is the General Partner of the Partnership. The Capital Contribution of the General Partner is set forth on Schedule A to this Agreement. The General Partner is not required to lend any funds to the Partnership or to make any additional Capital Contribution to the Partnership not specifically described in this Article III.

4

SUB_LANDRY_00000648

3.02. Limited Partner. Westport Senior Living Investment Fund, L. P., a Delaware limited partnership, is the Limited Partner of the Partnership. The Capital Contribution of the Limited Partner is set forth on Schedule A to this Agreement. The Limited Partner is not required to lend any funds to the Partnership or to make any additional Capital Contribution to the Partnership not specifically described in this Article III.

3.03. Partnership Capital.

(a)    The Partnership shall not pay interest on any Capital Contribution to the Partnership or on any Partner's Capital Account.

(b)    A Partner shall not receive from the Partnership or out of Partnership property, and the Partnership shall not return to a Partner, any part of its Capital Contribution, except (i) to the extent that a distribution is determined to be a return of a Partner's Capital Contribution, or (ii) pursuant to the dissolution, winding up, and termination of the Partnership, and then in each case only if (1) all liabilities of the Partnership, except liabilities to the Partners on account of their Capital Contributions or any Partner loans, have been paid or there remains property of the Partnership sufficient to pay them, and (2) the Partnership's Certificate of Limited Partnership is cancelled or amended, if necessary, to reflect the withdrawal and reduction.  Under circumstances requiring or permitting a return of its Capital Contribution, a Partner may demand and receive only cash in return for its Capital Contribution, unless the General Partner decides to distribute Partnership property in kind to the Partners.  Each Partner, by signing this Agreement or a counterpart of it, consents to all distributions of cash, property, and capital authorized by this Agreement and releases all other Partners from all liability to both it and the Partnership for all capital distributions made in accordance with this Agreement.

3.04. Capital Accounts.

(a)    A separate Capital Account shall be maintained for each Partner in accordance with the following provisions:

(i)    To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and the amount of any Partnership liabilities that are assumed by such Partner or that are secured by any Partnership property distributed to such Partner.

(ii)    To each Partner's Capital Account there shall be debited the amount of cash and the fair market value of any Partnership property distributed to such Partner pursuant to any provisions of this Agreement, such Partner's distributive share of Losses, and the amount of any liabilities of such Partner that are assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership.

5

SUB_LANDRY_00000649

(b)   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.   In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the General Partner may make such modification. The General Partner shall adjust the amounts debited or credited to Capital Accounts with respect to (i) any property contributed to the Partnership or distributed to a Partner, and (ii) any liabilities that are secured by such contributed or distributed property or that are assumed by the Partnership or a Partner, in the event the General Partner determines that such adjustments are necessary or appropriate pursuant to Treasury Regulations § 1.704-1(b)(2)(iv).   The General Partner also shall make any appropriate modifications to the extent that unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations § 1.704-1(b).

3.05. Liability of Partners.

(a)   Subject to Section 3.05(b), no Limited Partner shall have any personal liability whatsoever in its capacity as a Limited Partner, whether to the Partnership, to any of the Partners, or to the creditors of the Partnership, for the debts, liabilities, contracts, or any other obligations of the Partnership, or for any losses of the Partnership. A Limited Partner shall be liable only to make its Capital Contribution and shall not be required to lend any funds to the Partnership or, after its Capital Contribution has been paid, subject to Section 3.05(b), to make any further capital contributions to the Partnership or to repay to the Partnership, any Partner, or any creditor of the Partnership all or any fraction of any negative amount of such Limited Partner's Capital Account.

(b)   Under applicable law, a limited partner of a partnership may, under certain circumstances, be required to return to the partnership, for the benefit of partnership creditors, amounts, with interest thereon, previously distributed to such partner as a return of capital. It is the intent of the General Partner that no distribution to any Limited Partner pursuant to Article IV (except as provided in Section 3.03) shall be deemed a return or withdrawal of capital, and that no Limited Partner shall be obligated to pay any such amount to or for the account of the Partnership or any creditor of the Partnership. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Limited Partner is obligated to make any such payment, such obligation shall be the obligation of such Limited Partner and not of the General Partner.

(c)   The General Partner shall not have any personal liability to any Limited Partner for the repayment of any amounts outstanding in the Capital

6

SUB_LANDRY_00000650

Account of a Limited Partner, including, but not limited to, Capital Contributions. Any such payment shall be solely from the assets of the Partnership. The General Partner shall not be liable to any Limited Partner by any reason of any change in the federal income tax laws as they apply to the Partnership and the Limited Partners, whether such change occurs through legislative, judicial, or administrative action, so long as the General Partner has acted in good faith and in a manner reasonably believed to be in the best interests of the Limited Partners.

(d)   The General Partner shall have no personal liability to repay to the Partnership any portion or all of any negative amount of the General Partner's Capital Account, except as otherwise provided in Section 9.02(c).

ARTICLE IV

PROFITS AND LOSSES

4.01. <u>Determination and Allocation of Profits and Losses</u>. Profits and Losses of the Partnership shall be determined for each fiscal year of the Partnership in accordance with the method of accounting used by the Partnership for federal income tax purposes (as determined by the General Partner) and shall be allocated among the Partners in the manner provided for in this Article IV.

4.02. <u>Allocation of Losses</u>. The Partnership's Losses, if any, arising in a fiscal year shall be allocated among the Partners as follows:

(a)   First:  To the extent of the aggregate positive Capital Account balances of the Partners as of the end of the fiscal year, Pro Rata to the Partners in accordance with each such Partner's positive Capital Account balance; and then

(b)   Second: Ninety-nine percent (99%) to the Limited Partner and one percent (1%) to the General Partner.

4.03. <u>Allocation of profits</u>. Profits arising in a fiscal year shall be allocated among the Partners as follows:

(a)   First: To the Partners Pro Rata in accordance with the amount of Losses allocated to each Partner pursuant to Section 4.02(b) during the term of the Partnership, until the Profits allocated to each such Partner during the term of the Partnership pursuant to this Section 4.03(a) equal the amount of Losses allocated to each such Partner during the term of the Partnership pursuant to Section 4.02(b); and then

(b)   Second: To the Partners Pro Rata in accordance with the amount of Losses allocated to each Partner pursuant to Section 4.02(a) during the term of the Partnership, until the Profits allocated to each such Partner during the term of the Partnership pursuant to this Section 4.03(b) equal the amount of Losses

7

SUB_LANDRY_00000651

allocated to each such Partner during the term of the Partnership pursuant to Section 4.02(a); and then

    (c)    Third: Ninety-nine percent (99%) to the Limited Partner and one percent (1%) to the General Partner.

4.04. Qualified Income Offset. Notwithstanding any provision hereof to the contrary, if a Partner has a deficit balance in its Capital Account as of the last day of a fiscal year, then all items of income and gain of the Partnership (consisting of a Pro Rata portion of each item of Partnership income and gain) for such fiscal year shall be allocated to that Partner (or ratably among all such Partners based on the respective deficit balances in their Capital Accounts) in the amount and in the proportions required to eliminate such excess as quickly as possible.

## ARTICLE V

## DISTRIBUTIONS

5.01. Distributions. Not less frequently than annually, all cash that the General Partner does not expect to use in the operation of the Partnership and that is available after the payment of all expenses then due and the creation of a reasonable reserve for expenses shall be distributed by the General Partner to the Partners in the following manner:

    (a) First:  To the Partners Pro Rata in accordance with each such Partner's Unreturned Cash Contribution, until all Unreturned Cash Contributions have been fully repaid; and then

    (b) Second: Ninety-nine percent (99%) to the Limited Partner and one percent (1%) to the General Partner.

5.02. Limitation on Distributions to Partners. The General Partner shall not pay to any Partner any distribution unless, after the distribution is made, the fair value of the Partnership's assets exceeds its total liabilities, excluding liabilities to the Partners on account of their loans and Capital Contributions.

## ARTICLE VI

## MANAGEMENT

6.01. Management Power of General Partner. Subject to the terms hereof, the General Partner shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs, and shall have all of the rights, powers, and obligations of a general partner of a limited partnership under Delaware law and otherwise as provided by law.  Except as otherwise expressly provided in this

8

SUB_LANDRY_00000652

Agreement, the General Partner is hereby granted the right, power, and authority to do on behalf of the Partnership all things which, in its sole judgment, are necessary or appropriate to manage the Partnership's affairs and to fulfill the purposes of the Partnership, including, by way of illustration and not by way of limitation, the power and authority from time to time to do the following:

(a)  To make all expenditures permitted by this Agreement;

(b)  To establish and maintain one or more bank accounts for the Partnership in such bank or banks as the General Partner may, from time to time, designate as depositories of the funds of the Partnership;

(c)  To the extent that funds of the Partnership are available, to pay all expenses, debts, and obligations of the Partnership;

(d)  To the extent that funds of the Partnership are available, to make distributions periodically to the Partners in accordance with the provisions of Article V;

(e)  To establish and maintain the books and records of the Partnership in accordance with Article XIII;

(f)  To borrow money (including from Partners or their affiliates) and to issue evidences of indebtedness and to secure any Partnership indebtedness by mortgage, pledge, security interest, or other lien;

(g)  To cause the Partnership to merge or consolidate with any other limited partnership or any corporation, limited liability company, or other entity, without the approval of the Limited Partner, provided that the Partnership is the surviving entity; and

(h)  To perform all normal business functions, and otherwise operate and manage the business and affairs of the Partnership, in accordance with and as limited by this Agreement.

6.02. Restrictions on the Authority of the General Partner.

(a)  Without the written consent or ratification of the Limited Partners, the General Partner shall not have the authority to:

(i) Do any act in contravention of this Agreement;

(ii) Do any act that would make it impossible to carry on the ordinary business of the Partnership;

(iii) Confess a judgment against the Partnership;

9

SUB_LANDRY_00000653

(iv) Possess Partnership property or assign its rights in specific Partnership property for other than a Partnership purpose;

(v) Admit a person as a General Partner, except as provided in this Agreement;

(vi) Admit a person as a Limited Partner, except as provided in this Agreement; or

(vii) Continue the business of the Partnership or use Partnership property after the removal or Incapacity of the General Partner, except as provided in this Agreement.

(b)     Without the written consent of all Limited Partners, subject to Section 9.01, the General Partner shall not have the authority to dissolve the Partnership.

6.03.  Duties and Obligations of the General Partner.

(a)     The General Partner shall take all action that may be necessary or appropriate for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged.

(b)     The General Partner shall devote to the Partnership such time as it deems to be necessary to conduct the Partnership's business and affairs in an appropriate manner.

(c)     The General Partner shall conduct the affairs of the Partnership in the best interest of the Partnership. The General Partner shall provide for the safekeeping and proper use of all Partnership funds and assets, for the benefit of the Partnership. The General Partner may cause the Partnership to enter into transactions with affiliates of the General Partner or transactions that benefit affiliates of the General Partner, so long as such transactions are entered into principally for the benefit of the Partnership in the ordinary course of the Partnership's business.

(d)     The General Partner shall at all times conduct its affairs and the affairs of the Partnership in such a manner that neither the Partnership nor any Partner will have any personal liability with respect to any Partnership indebtedness unless, in the opinion of the General Partner, it would be in the best interest of the Partners. However, in no event shall the General Partner take any action that shall cause a Limited Partner to have any personal liability with respect to any Partnership indebtedness. The General Partner shall use its best efforts, in

10

SUB_LANDRY_00000654

the conduct of the Partnership's business, to put all Persons with whom the Partnership does business or in whom the Partnership invests on notice that the Limited Partners are not liable for Partnership obligations, and all agreements to which the Partnership is a party shall include a statement to the effect that the Partnership is a limited partnership organized under Delaware law; but the General Partner shall not be liable to the Limited Partners for any failure to give such notice to such Persons or for the failure of any such agreement to contain such a statement.

(e)     The General Partner shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any federal, state, or local tax returns required to be filed by the Partnership. The General Partner shall cause the Partnership to pay any taxes payable by the Partnership (it being understood that the expenses of preparation and filing of such returns, and the amounts of such taxes, are expenses of the Partnership and not of the General Partner); provided, however, that the General Partner shall not be required to cause the Partnership to pay any tax so long as the General Partner or the Partnership are in good faith and by appropriate legal proceeding contesting the validity, applicability, or amount thereof and such contest does not materially endanger any right or interest of the Partnership.

6.04. Other Businesses of Partners. Subject to Section 6.02(a), any·Partner and any affiliate of any Partner may engage in or possess any interest in other business ventures of any kind, nature, or description, independently or with others, whether such ventures are competitive with the Partnership or otherwise. Neither the Partnership nor any Partners shall have any rights or obligations by virtue of this Agreement or the Partnership relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Partnership, shall not be deemed wrongful or improper.

6.05. Reimbursement.    The General Partner shall be entitled to receive out of Partnership funds available therefor reimbursement of all amounts reasonably expended by the General Partner on behalf of the Partnership, including expenses incurred in connection with the organization of the Partnership.

6.06. Indemnification of the General Partner by the Partnership. Neithe the General Partner nor any of its affiliates shall be liable, responsible, c accountable in damages or otherwise to the Partnership or any Limited Partner f any loss or damage incurred by reason of any act or omission performed or omitte by the General Partner or such affiliates in good faith and in a manner reasonab believed by them to be in the best interests of the Partnership.  To the exte provided below, the Partnership shall indemnify and hold harmless the Gene· Partner and any of its affiliates who was or is a party or is threatened to be mad party to any threatened, pending, or completed action, suit, or proceeding, whe

11

SUB_LANDRY_00000655

civil, criminal, administrative, or investigative (including any action by or in the right of the Partnership), by reason of any acts or omissions or alleged acts or omissions arising out of such Person's activity as the General Partner or as an affiliate of the General Partner (an "Action"). If the activities of the General Partner or its affiliates that give rise to the Action were performed in good faith and in a manner reasonably believed by such Person to be in the best interests of the Partnership, then the Partnership shall indemnify and hold harmless the General Partner and its affiliates against losses, damages, and expenses for which such Person has not otherwise been reimbursed (including attorneys' fees, judgments, fines, and amounts paid in settlement) actually incurred by such Person in connection with the Action, provided that the satisfaction of any indemnification and any holding harmless shall be from and limited to Partnership's assets and no Limited Partner shall have any personal liability on account thereof.

6.07. <u>Rights and Obligations of Limited Partners.</u>

(a)    A Limited Partner shall take no part in the management or control of the Partnership's business, but may exercise the rights and powers of a Limited Partner under this Agreement. A Limited Partner shall have no power to represent, act for, sign for, or bind the General Partner or the Partnership. The Limited Partner hereby consents to the exercise by the General Partner of the powers conferred on it by law and this Agreement.

(b)    The Limited Partner shall have the following approval rights:

(i) The right to approve or disapprove the appointment of a successor General Partner, pursuant to Section 7.05; and

(ii) The right to dissolve the Partnership pursuant to Section 9.01(a)(iii); and

(iii) The right to amend this Agreement pursuant to Section 10.02.

ARTICLE VII

TRANSFERABILITY OF GENERAL PARTNER'S INTEREST

7.01. <u>Withdrawal by General Partner.</u>  The General Partner may withdraw from the Partnership by (a) at least sixty (60) days prior to the proposed date of withdrawal, giving written notice to the Limited Partners stating that it proposes to withdraw and requesting that there be substituted in its place a Person designated and described in the notice, and (b) obtaining the consent of all Limited Partners to the withdrawal and the substitution of a new general partner.

12

SUB_LANDRY_00000656

7.02. Incapacity of General Partner.

(a)    In the event of the Incapacity of the General Partner, the Partnership will be dissolved, and must be liquidated and terminated, unless the Partnership is reconstituted in accordance with this Section 7.02.

(b)    Upon the Incapacity of the General Partner, (1) the incapacitated General Partner immediately will cease to be the General Partner and to have any Partnership Rights provided by this Agreement, and (2) the General Partnership Interest of the incapacitated General Partner, including all obligations attendant to it, automatically will become a Limited Partnership Interest, without any Partnership Rights provided by this Agreement.

(c)    If dissolution of the Partnership results from the Incapacity of the General Partner and if a successor General Partner has been selected pursuant to Section 7.03 below, the Partnership automatically will be reconstituted as a successor limited partnership and will continue the business of the Partnership with the Partnership property, and the successor General Partner designated pursuant to Section 7.03 will be admitted as the General Partner, provided the terms and conditions of Section 7.04(a) are satisfied. The successor limited partnership will be deemed to have acquired the assets and liabilities of the Partnership by contribution from the Partners in accordance with their Partnership Percentage Interests. The successor limited partnership will be governed by the terms and provisions of this Agreement.

7.03. Replacement of General Partner. Upon the withdrawal of the only General Partner in accordance with Section 7.01 or upon the occurrence of other circumstances causing the Partnership to lack a General Partner, the Partnership will be dissolved and must be liquidated unless all Limited Partners elect within 60 days after the occurrence of the vacancy to select a successor General Partner, to reconstitute the Partnership in accordance with Section 7.02 and to continue the business of the Partnership with its property.

7.04. Admission of a Successor General Partner.

(a)    The admission of any successor General Partner pursuant to this Article VII shall be effective only if and after the following conditions are satisfied:

(i)    The Person has accepted and assumed in writing all the terms and provisions of this Agreement;

(ii)    If the Person is not a natural person, it has provided counsel for the Partnership with a certified copy of a resolution of its Board of Directors or other authorizing action taken under its controlling documents or

13

SUB_LANDRY_00000657

agreements, authorizing it to become a General Partner under the terms and conditions of this Agreement;

(iii) The Person has executed this Agreement as then in effect, an Amended Certificate of Limited Partnership, and such other documents or instruments as may be required or appropriate to effect the admission of that Person as a General Partner; and

(iv)   The Limited Partners have given their approval.

(b)   Notwithstanding anything to the contrary in this Article VII, a General Partnership Interest shall at all times be subject to the restrictions on transfer set forth in Section 8.01.

7.06. Liability of Withdrawing General Partner. A General Partner who withdraws from the Partnership, or who sells, transfers, or assigns its General Partnership Interest, or who ceases to be the General Partner because of its Incapacity shall remain liable for obligations and liabilities incurred by it as General Partner prior to the time such withdrawal, sale, transfer, assignment, or Incapacity becomes effective or occurs, but it shall be free of any obligation or liability incurred on account of the activities of the Partnership from and after the time such withdrawal, sale, transfer, or assignment becomes effective.

ARTICLE VIII

TRANSFERABILITY OF A LIMITED PARTNERSHIP INTEREST

8.01. Restrictions on Transfers of Interest.

(a)   Notwithstanding any other provisions of this Section 8.01, no sale, exchange, transfer, or assignment (collectively "Transfer") of a Partnership Interest (General or Limited) may be made unless in the opinion of responsible counsel (who may be counsel for the Partnership), satisfactory in form and substance to the General Partner and counsel for the Partnership (which opinion may be waived, in whole or in part, at the discretion of the General Partner),

(i) Such Transfer, when added to the total of all other Transfers of Partnership Interests within the preceding twelve (12) months, would not result in the Partnership being considered to have terminated within the meaning of Section 708 of the Code;

(ii) Such Transfer would not violate any federal securities laws or any state securities or "Blue Sky" laws (including any investor suitability standards) applicable to the Partnership or the Partnership Interest to be Transferred;

14

(iii) Such Transfer would not cause the Partnership to lose its status as a partnership for federal income tax purposes; and

(iv) Any required opinion of counsel is delivered in writing to the Partnership prior to the date of the Transfer.

(b)     In no event shall all or any part of a Partnership Interest be Transferred to a minor or an incompetent, except in trust or by will or intestate succession.

(c)     A Limited Partner may Transfer all or any part of its Limited Partnership Interest only with the written consent of the General Partner.

8.02. Assignees.

(a)     Unless and until an assignee of a Limited Partnership Interest becomes a Substituted Limited Partner, such assignee shall not be entitled to vote or give consents with respect to such Limited Partnership Interest.

(b)     Any Limited Partner that assigns all of its Partnership Interest shall cease to be a Limited Partner, except that, unless and until a substituted Limited Partner is admitted in its stead, such assigning Limited Partner shall retain the statutory rights of the assignor of a Limited Partnership Interest under Delaware law.

(c)     Anything herein to the contrary notwithstanding, both the Partnership and the General Partner shall be entitled to treat the assignor of a Limited Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions made to it in good faith, until a written assignment that conforms to the requirements of this Article VIII has been received by the Partnership and accepted and approved by the General Partner.

8.03. Substituted Limited Partners.

(a)     A Limited Partner shall not have the right to substitute a purchaser, assignee, transferee, donee, heir, legatee, distributee, or other recipient of any of such Limited Partner's Partnership Interest as a Limited Partner in its place. Any such purchaser, assignee, transferee, donee, heir, legatee, distributee, or other recipient of a Limited Partnership Interest (whether pursuant to a voluntary or involuntary transfer) shall be admitted to the Partnership as a Substituted Limited Partner only (i) with the written consent of the General Partner, which consent shall be granted or withheld in the absolute discretion of the General Partner and may be arbitrarily withheld, and (ii) upon an amendment to this Agreement and, if necessary, the Partnership's Certificate of Limited Partnership recorded in the proper records of each jurisdiction in which such recordation is necessary to qualify the Partnership to conduct business or to preserve the limited

15

SUB_LANDRY_00000659

liability of the Limited Partners. Any such consent by the General Partner may be evidenced by the execution by the General Partner of an amendment to this Agreement evidencing the admission of such Person as a Limited Partner.

(b)    Each Substituted Limited Partner, as a condition to its admission as a Limited Partner, shall execute and acknowledge such instruments, in form and substance satisfactory to the General Partner, as the General Partner deems necessary or desirable to effectuate such admission and to confirm the agreement of the Substituted Limited Partner to be bound by all the terms and provisions of this Agreement with respect to the Partnership Interest acquired. The Substituted Limited Partner shall bear all reasonable expenses, including attorneys' fees, incurred by the Partnership in connection with the substitution.

(c)    Until an assignee is admitted to the Partnership as a Substituted Limited Partner pursuant to Section 8.03(a), the assignee shall be entitled to all of the rights of an assignee of a limited partnership interest under Delaware law.

ARTICLE IX

DISSOLUTION, LIQUIDATION AND
TERMINATION OF THE PARTNERSHIP

9.01. Dissolution.

(a)    The Partnership shall be dissolved upon the happening of any of the following events:

(i) The expiration of its term;

(ii) The Incapacity of the General Partner, unless the Partnership is reconstituted in accordance with Section 7.02;

(iii) The election to dissolve the Partnership by all of the Partners;

(iv) The withdrawal of the General Partner without the designation of a successor General Partner under Section 7.01, unless the Partnership is reconstituted in accordance with Section 7.02;

(v) The election by the General Partner to dissolve the Partnership following the sale, distribution to the Partners, or other disposition at any one time of all or substantially all of the assets of the Partnership; and

(vi) Termination required by operation of law.

16

SUB_LANDRY_00000660

(b)    Dissolution of the Partnership shall be effective on the day on which the event occurs giving rise to the dissolution, but the Partnership shall not terminate until the Certificate of Limited Partnership of the Partnership has been cancelled and the assets of the Partnership have been distributed as provided in Section 9.02.

9.02. Liquidation.

(a)    Upon dissolution of the Partnership, the General Partner or a liquidating trustee, if one is appointed, shall wind up the affairs of the Partnership and, in its sole discretion, liquidate all or any part of the assets of the Partnership. The General Partner or such liquidating trustee shall, in its absolute discretion, determine the time, manner, and terms of any sale or other disposition of the Partnership's investments for the purpose of obtaining, in its opinion, fair value for such assets.

(b)    Profits and Losses arising from such sales upon liquidation shall be allocated as provided in Article IV. In settling accounts after dissolution, the assets of the Partnership shall be paid out in the following order:

(i) To creditors, whether by payment or by establishment of reserves, in the order of priority provided by law; and

(ii) To each Partner in an amount equivalent to the positive amount of his Capital Account on the date of distribution or, if the remaining assets in the Partnership are insufficient to return the entire Capital Accounts, Pro Rata to the Partners according to the positive balances in their Capital Accounts.

(c)    Upon dissolution and liquidation of the Partnership, after any allocations of Profits or Losses, but before any distributions to the Partners upon such liquidation, the General Partner shall contribute to the capital of the Partnership an amount equal to the negative amount, if any, of its Capital Account.

(d)    When the General Partner or trustee has complied with the foregoing liquidation plan, the Partners shall execute, acknowledge, and cause to be filed an instrument evidencing the cancellation of the Certificate of Limited Partnership of the Partnership.

ARTICLE X

AMENDMENTS

10.01. Amendments Generally. The Partners shall appropriately amend this Agreement to reflect the addition or substitution of a Limited Partner, the admission of a successor General Partner, or the withdrawal of a General Partner, in accordance with the applicable provisions of this Agreement. Within a reasonable

17

SUB_LANDRY_00000661

time after the adoption of any amendment to this Agreement, the General Partner shall make any filings or publications required or desirable to reflect the amendment, including any required filing for recordation of any certificate of limited partnership.

10.02. Adoption of Amendments.

(a)   Except as otherwise provided in Section 10.01, this Agreement may be amended from time to time only with the consent of all of the Partners.

(b)   On the adoption of any amendment to this Agreement, the amendment shall be executed by the General Partner and all of the Limited Partners and shall be recorded in the proper records of each jurisdiction in which recordation is necessary for the Partnership to conduct business or to preserve the limited liability of the Limited Partners. Each Limited Partner hereby irrevocably appoints and constitutes the General Partner as its agent and attorney-in-fact to execute, swear to, and record any and all such amendments. The power of attorney given herewith is irrevocable, is coupled with an interest, and shall survive the Incapacity of a Limited Partner granting it.

10.03. Amendments on Admission or Withdrawal of Partners.  · If this Agreement is amended to reflect the admission or substitution of a Partner, the amendment shall be executed by the General Partner, the Person to be substituted or added as a Partner, and the assigning Partner (if applicable).   The General Partner may execute any such amendment on behalf of the Limited Partners, any substituted or added Limited Partner, and any assigning Limited Partner pursuant to the power of attorney granted in Section 11.01. If this Agreement is amended to reflect the withdrawal or Incapacity of the General Partner and the continuation of the business of the Partnership, the amendment shall be executed and sworn to by the successor General Partner and by all of the Limited Partners.

10.04. Amendment of Certificate. If this Agreement is amended pursuant to this Article X, the General Partner shall amend the Certificate of Limited Partnership of the Partnership to reflect the change if it deems such an amendment to be necessary.

## ARTICLE XI

### POWER OF ATTORNEY

11.01. Power of Attorney.

(a)   Each Limited Partner, by executing this Agreement, makes, constitutes, and appoints the General Partner as its true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in its

18

SUB_LANDRY_00000662

name, place, and stead to make, execute, sign, acknowledge, swear to, record, and file:

(i) this Agreement and any amendments to this Agreement;

(ii) the original Certificate of Limited Partnership of the Partnership and all amendments thereto required or permitted by law or the provisions of this Agreement;

(iii) all certificates and other instruments deemed advisable by the General Partner to carry out the provisions of this Agreement and applicable law or to permit the Partnership to become or to continue as a limited partnership wherein the Limited Partners have limited liability in each jurisdiction where the Partnership may be doing business;

(iv) all instruments that the General Partner deems appropriate to reflect a change or modification of this Agreement or the Partnership in accordance with this Agreement, including, without limitation, the substitution of assignees as Substituted Limited Partners or admission of new Limited Partners;

(v) all conveyances and other instruments or papers deemed advisable by the General Partner to effect the dissolution and termination of the Partnership;

(vi) all fictitious or assumed name certificates required or permitted to be filed on behalf of the Partnership; and

(vii) all other instruments or papers that may be required or permitted by law to be filed on behalf of the Partnership.

(b)     The foregoing power of attorney:

(i) Is coupled with an interest and shall be irrevocable and survive the Incapacity of each Limited Partner;

(ii) May be executed by the General Partner by signing separately as attorney-in-fact for each Limited Partner or, after listing all of the Limited Partners executing an instrument, by a single signature of the General Partner acting as attorney-in-fact for all of them; and

(iii) Shall survive the delivery of an assignment by a Limited Partner of its Partnership Interest; except that, where the assignee of a Limited Partnership Interest has been approved by the General Partner for admission to the Partnership as a Substituted Limited Partner, the power of attorney of the assignor shall survive the delivery of the assignment for the sole purpose of enabling the

19

SUB_LANDRY_00000663

General Partner to execute, swear to, acknowledge, and file any instrument necessary or appropriate to effect the substitution.

## ARTICLE XII

## RECORDS AND ACCOUNTING; REPORTS

12.01. Records and Accounting. The General Partner shall maintain, at the Partnership's principal place of business, proper and complete records and books of account of the business of the Partnership, including a list of the names and addresses and Partnership Percentage Interests of all Limited Partners. Each Limited Partner or its duly authorized representative shall have access to the books and records of the Partnership, upon reasonable notice and for a proper purpose, at all reasonable times during business hours.

12.02. Tax Information. Within a reasonable period of time after the end of each calendar year, the General Partner will cause to be delivered to each Person who was a Partner at any time during such calendar year all information necessary for the preparation of such Partner's federal income tax returns, including a statement showing each Partner's share of Profits or Losses, and the amount of any distribution made to or for the account of such Partner pursuant to this Agreement.

12.03. Partnership Funds. No funds of the Partnership shall be kept in any account other than a Partnership account. Partnership funds shall not be commingled with the funds of any other Person, and the General Partner shall not employ, or permit any other Person to employ, such funds in any manner except for the benefit of the Partnership. The funds of the Partnership not needed in the operation of the business may be deposited in such bank accounts as the General Partner may designate.

12.04. Elections. The General Partner may cause the Partnership to make all elections required or permitted to be made by the Partnership under the Code and not otherwise expressly provided for in this Agreement, in the manner that the General Partner believes is in the best interest of the Partnership.

## ARTICLE XIII

## MISCELLANEOUS

13.01. Notice. Any notice to any Partner required or permitted under this Agreement shall be given in writing to the Partner at the address of the Partner set forth in the Partnership's records. Any notice to the Partnership shall be given in writing to the Partnership at the address of the Partnership's principal office. Any notice shall be deemed to have been duly given if personally delivered or sent by United States mail or by facsimile transmission confirmed by letter and will be deemed given, unless earlier received (i) if sent by certified or registered mail,

20

SUB_LANDRY_00000664

return receipt requested, two calendar days after being deposited in the United States mails, postage prepaid; (ii) if sent by facsimile transmission, the date sent provided confirmatory notice was sent by first-class mail, postage prepaid; and (iii) if delivered by hand, on the date of receipt.

13.02. Governing Law: Severability of Provisions. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties hereunder shall be governed by the partnership laws of the State of Delaware. If any provision of this Agreement is held to be invalid, the remainder of this Agreement shall not be affected thereby.

13.03. Entire Agreement. This Agreement contains the complete and entire agreement between the parties concerning the subject matter of this Agreement and supersedes any prior agreement or understandings between them, oral or written, concerning that subject matter, all of which are merged in this Agreement.

13.04. Headings, Etc. The headings in this Agreement are inserted for convenience of reference only and shall not affect interpretation of this Agreement. Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine or the neuter gender shall include the masculine, the feminine, and the neuter.

13.05. Binding Provisions. The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and assigns of the respective parties hereto.

13.06. No Waiver. The failure of any Partner to seek redress for any violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not constitute a waiver of that covenant or condition. A waiver of any covenant or condition of this Agreement is effective only if evidenced in writing and signed by the party against which the waiver is sought to be enforced.

13.07. Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

21

SUB_LANDRY_00000665

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL PARTNER

WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C., by Westport Advisors, Ltd., as its Manager

By: _____
Name: Lawrence L. Landry, as President of Double L Investments, Inc., a Texas Corporation, which is Manager of Westport Asset Management, L.L.C., a Florida limited liability corporation, which is General Partner of Westport Advisors, Ltd.

LIMITED PARTNER

WESTPORT SENIOR LIVING INVESTMENT FUND, L. P., by Westport Advisors, Ltd., its General Partner

By: _____
Name: Lawrence L. Landry, as President of Double L Investments, Inc., a Texas Corporation, which is Manager of Westport Asset Management, L.L.C., a Florida limited liability corporation, which is General Partner of Westport Advisors, Ltd.

TAL1 #225326 v1

22

SUB_LANDRY_00000666

TheVilles
1 of 2

EXHIBIT "A"

LEGAL DESCRIPTION

PARCEL 1:

The North 200 feet of the East 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 2:

The South 100.0 feet of the North 200.0 feet of the West 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 3:

The North 100.0 feet of the West 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 4:

The South 80 feet of the North 200 feet of the West 1/2 of Lot 6, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 5:

The North 60 feet of the South 140 feet of the North 200 feet of the West one-half of Lot 6, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 6:

The South 100 feet of the West 1/2 of Lot 6, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31. page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 7:

The South 200 feet of the East 1/2 of Lot 6, LESS the East 196 feet of the North 100 feet thereof AND LESS the East 6 feet of the South 100 feet thereof, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 8:

The North 60 feet of the West 303 feet of Lot 6, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

SUB_LANDRY_00000667

*The Villas*
*2 of 2*

PARCEL 9:

The North 300 feet of the East 106.2 feet of the West 256.2 feet of Lot 5, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 10:

The West 303 feet of the South 70 feet of Lot 5, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 11:

The North 300 feet of the West 150 feet of Lot 5, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 12:

The South 100 Feet of the East 1/2 of Lot 2, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

PARCEL 13:

The East 1/2 of Lot 3, less the South 100.00 feet, HANKINS ACRES, according to the Plat thereof on file in the Office of the Clerk of the Circuit Court in and for Hillsborough County, Florida recorded in Plat Book 31, page 51, said lands situate, lying and being in Hillsborough County, Florida.

*END OF LEGAL DESCRIPTION*

.2 of 2

SUB_LANDRY_00000668

**AMENDMENT NO. 1
TO THE LIMITED PARTNERSHIP AGREEMENT
OF WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP**

This Amendment No. 1, dated as of ~~November~~ DECEMBER ~~2~~, 2006 (this "Amendment"), amends the Limited Partnership Agreement of Westport Holdings Tampa II, Limited Partnership (the "Partnership"), effective as of October __, 2000 (the "Agreement"), by and between Westport Holdings Hidden Springs, L.L.C., a Delaware limited liability company, as the General Partner, and Westport Senior Living Investment Fund, L.P., a Delaware limited partnership, as the Limited Partner. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

WHEREAS, the undersigned, constituting all of the Partners of the Partnership, hereby desire to amend the Agreement as hereinafter set forth.

NOW THEREFORE, the Agreement is hereby amended as follows:

1.      Section 1.06 is hereby amended by adding the following definitions thereto:

"Affiliate" means, with respect to any Person, (a) each Person that controls, is controlled by or is under common control with such Person, (b) each Person that, directly or indirectly, owns or controls, whether beneficially or as a trustee, guardian or other fiduciary, any of the equity interests of such Person, and (c) each of such Person's officers, directors, members, joint venturers and partners.

"Facility" means the continuing care retirement community located in Tampa, Hillsborough County, Florida, known as "University Village."

"Lender" means Capmark Finance Inc., a California corporation.

DECEMBER "Loan Agreement" means, collectively, the Loan Agreement dated ~~November~~ ~~2~~, 2006 between Westport Holdings Tampa, Limited Partnership ("WHT") and the Lender and the Loan Agreement dated ~~November~~ ~~2~~, 2006 between Westport Nursing Tampa, L.L.C. ("WNT") and the Lender. DECEMBER

"Loan Documents" means, collectively, the Loan Agreement, the Note, the Guaranties (as defined in each Mortgage), the Spreader Agreements (as defined in each Mortgage) and the Mortgage, together with any and all other documents executed by WHT, WNT, the Partnership or others, evidencing, securing or otherwise relating to the Loan.

"Loan Obligations" means the aggregate of all principal and interest owing from time to time under the Note and all expenses, charges and other amounts from time to time owing under the Note, the Loan Agreement or the other Loan Documents and all covenants, agreements and other obligations from time to time owing to, or for the benefit of, Lender pursuant to the Loan Documents.

HF 3430245v 3 #04283/0004

SUB_LANDRY_00000669

"Loan" means the loans in the aggregate principal sum of $35,250,000.00 made by Lender to WHT and WNT as of the date hereof.

"Mortgage" means, collectively, the Second Amended and Restated Mortgage and Security Agreement, dated November 21, 2006, by and between WHT and the Lender and the Second Amended and Restated Mortgage and Security Agreement, dated November __, 2006, by and between WNT and the Lender.

"Mortgaged Property" has the meaning given to that term in the Mortgage.

"Note" means, collectively, the Third Amended and Restated Promissory Note dated November 21, 2006 in the principal amount of $23,050,0000 payable by WHT to the order of Lender and the Third Amended and Restated Promissory Note dated November 21, 2006 in the principal amount of $12,200,0000 payable by WNT to the order of Lender.

"Spreader Agreement" means, collectively, the Spreader Agreement, dated November 21, 2006, by and between WHT, the Partnership and the Lender and the Spreader Agreement, dated November 21, 2006, by and between WNT, the Partnership and the Lender

2. Section 2.01 is hereby amended by adding the following proviso to the end of such section:

;provided however, that until the Loan Obligations have been paid in full, the purpose of the Partnership shall be limited to (i) owning, operating, managing, leasing, improving and developing the Mortgaged Property; (ii) entering into that certain Master Lease Agreement dated January 8, 2004 between the Partnership, as lessor, and Westport Holdings Tampa, Limited Partnership, as lessee, and (iii) activities incidental thereto.

3. Section 6.02 of the Agreement is hereby amended by adding the following paragraph thereto as Section 6.02(c):

(c)   Notwithstanding anything contained herein to the foregoing, until the Loan Obligations have been paid in full, the General Partner shall have no authority to, and the Partnership shall not, without the consent of the Lender,:

(i)   Acquire or own any material assets other than (A) the Mortgaged Property, and (B) such incidental machinery, equipment, fixtures and other personal property as may be necessary for the ownership, operation, management, leasing, improvement and development of the Mortgaged Property;

(ii)   Merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets (except as permitted in the Loan Documents) or change its legal structure;

2

HF 3430245v.3 /04283/0004

SUB_LANDRY_00000670

(iii)   Amend, modify, terminate or fail to comply with the provisions of this Agreement or similar organizational document, as the same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect its status as a single purpose entity or its ability to perform its obligations hereunder, under the Note or any other document evidencing or securing the Loan;

(iv)   Own any subsidiary or make any investment in any Person;

(v)   Commingle its funds or assets with assets of, or pledge its assets with or for, any of its Partners or any other Person;

(vi)   Incur any indebtedness for borrowed money, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Guaranty or as otherwise permitted under the Loan Documents;

(vii)   Fail to maintain its records, books of account and bank accounts separate and apart from those of its Partners and Affiliates, and any other Person;

(viii)   Enter into any contract or agreement with any of its Partners or Affiliates, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties;

(ix)   Seek its dissolution or winding up in whole, or in part;

(x)   Maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any of its Partners and Affiliates, or any other Person;

(xi)   Hold itself out to be responsible for the debts of another Person or pay another Person's liabilities out of its own funds;

(xii)   Make any loans or advances to any third party, including any of its Partners or Affiliates, or the Affiliates of any of its general partners;

(xiii)   Fail to have prepared and filed its own tax returns;

(xiv)   Fail either to hold itself out to the public as a legal Person separate and distinct from any other Person or to conduct its business solely in its own name, in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that it is responsible for the debts of any third party (including any of its members or Affiliates, or any general partner, member, principal or Affiliate thereof); or

3

HP 3430245v 3 #04283/0004

SUB_LANDRY_00000671

(xv)   Fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

4.      Section 10.02 of the Agreement is hereby amended by adding the following paragraph thereto as Section 10.02(c):

(c)     Notwithstanding anything to the contrary in this Partnership Agreement, until the Loan Obligations have been paid in full, the Partners shall not, without the consent of the Lender, amend Sections 2.01 or 6.02(c) (the "Special Purpose Provisions") or any other provision of this Partnership Agreement governing the formation, management or operation of the Partnership in a manner that is inconsistent with any of the Special Purpose Provisions,

5.      Except as amended hereby, all of the terms and provisions of the Agreement shall remain in full force and effect.

6.      The validity and interpretation of, and the sufficiency of performance under, this Amendment shall be governed by Delaware law.

7.      This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument

4

HF 3430245v.3 #04283/0004

SUB_LANDRY_00000672

IN WITNESS WHEREOF, the undersigned have hereto caused this Amendment to be duly executed as of the day and year first above written.

**GENERAL PARTNER**

WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C.

By: Westport Advisors, Ltd., its sole Manager
By: Westport Asset Management, L.L.C., its General Partner

By: _____
Name: Lawrence L. Landry
Title: President

**LIMITED PARTNER**

WESTPORT SENIOR LIVING INVESTMENT FUND, L.P.

By: Westport Advisors, Ltd., its sole General Partner
By: Westport Asset Management, L.L.C., its sole General Partner

By: _____
Name: Lawrence L. Landry
Title: President

5

HF 3430245v 3 #04283.0004

SUB_LANDRY_00000673

**EXHIBIT C**

Resolutions

Certificate of Fact - WM Opinion - CPIF Lending, LLC Loan:25145380

SUB_LANDRY_00000674

**WRITTEN CONSENT**
**OF**
**THE GENERAL PARTNER**
**OF BHMS INVESTMENTS, LP**

March 31, 2014

The undersigned, being all of the managing members (collectively, the "Managing Members") of BHMS ICP Holdings, LLC, a Delaware limited liability company (the "General Partner"), as the general partner of BHMS Investments, LP, a Delaware limited partnership (the "Limited Partnership"), on behalf of the General Partner do hereby consent in writing to the adoption of the following resolutions:

WHEREAS, the Limited Partnership is the managing member of BHMSILF, LLC, a Delaware limited liability company ("BHMSILF"), and BHMSILFGP, LLC, a Delaware limited liability company ("BHMSILFGP"); and

WHEREAS, in order to refinance that certain that certain 110-bed assisted living and 120-bed skilled nursing facility located at 12250 N. 22nd St., Tampa, Florida 33612 and certain property related thereto (the "Facility"), it is proposed that Westport Holdings Tampa, Limited Partnership, a Delaware limited partnership, and Westport Holdings Tampa II, Limited Partnership, a Delaware limited partnership (collectively, the "Borrowers"), enter into a loan agreement in the principal amount of $9,500,000 (the "Loan") pursuant to that certain Loan Agreement by and among the Borrowers and CPIF Lending, LLC, a Washington limited liability company (the "Lender") (the "Loan Agreement", and collectively with each promissory note or other evidence of indebtedness and all mortgages, deeds of trust, deeds to secure debt and security agreement, assignments, financing statements, guarantees, pledges, environmental indemnity agreements, collateral security agreements and other documents or instruments required by the Lender and delivered in connection with the Loan, and any replacement, renewal, extension, substitution, addition, supplement, amendment or modification of any of the foregoing, the "Loan Documents"); and

WHEREAS, in order to provide additional security for the Loan, BHMSILFGP desires, and the General Partner, after due consideration, deems it to be advantageous for and in the best interest of the Limited Partnership and BHMSILFGP, for BHMSILFGP to enter into certain of the Loan Documents, including, but not limited to, (i) that certain Unconditional Guaranty of Payment and Performance by BHMSILFGP to and for the benefit of the Lender (the "Guaranty"), (ii) that certain Pledge Agreement by BHMSILFGP in favor of the Lender and approved by BVM University Village, LLC, a Florida limited liability company ("BVM University Village"), IMH Healthcare, LLC, a Delaware limited liability company ("IMH"), JF Consultants, LLC, a Delaware limited liability company ("JF"), and BHMSILF (the "GP Pledge"), and (iii) that certain Environmental Indemnity Agreement by and among the Borrowers, BVM Management, Inc., an Indiana non-profit corporation, and BHMSILFGP (the "Environmental Indemnity"); and

WHEREAS, in order to provide additional security for the Loan, BHMSILF desires, and the General Partner, after due consideration, deems it to be advantageous for and in the best interest of the Limited Partnership and BHMSILF, for BHMSILF to enter into certain of the Loan Documents, including, but not limited to, that certain Pledge Agreement by BVM University Village, IMH, JF and BHMSILF in favor of the Lender and approved by Westport Holdings University Village, L.L.C., a Delaware limited liability company, and Westport Holdings Hidden Springs, L.L.C., a Delaware limited liability company (the "LP Pledge"); and

SUB_LANDRY_00000675

WHEREAS, pursuant to Section 6 of the Amended and Restated Limited Partnership Agreement of the Limited Partnership, dated May 9, 2011, the General Partner has the authority to appoint officers of the Limited Partnership.

NOW, THEREFORE, BE IT RESOLVED, that the General Partner has determined that the Loan Documents, including, but not limited to, the Guaranty, the GP Pledge, the Environmental Indemnity and the LP Pledge, and the other transactions contemplated thereby are in the best interest and necessary and convenient to the conduct, promotion and attainment of the business and activities of the Limited Partnership, and are hereby authorized and approved; and be it

FURTHER RESOLVED, that the General Partner hereby authorizes and approves the execution, delivery and performance by Kevin L. Angelis or Robert L. Salamon, acting individually or together in their capacity as Managing Partners, of the Loan Documents to which BHMSILF or BHMSILFGP are a party, including, but not limited to, the Guaranty, the GP Pledge, the Environmental Indemnity and the LP Pledge; and be it

FURTHER RESOLVED, that the General Partner hereby authorizes and approves either of the Managing Partners to cause each of BHMSILF and BHMSILFGP to execute and deliver the Loan Documents to which such entity is a party and any certificates, agreements or any other documents as may be necessary or appropriate to give effect to, or for BHMSILF or BHMSILFGP, as applicable, to perform its obligations under, the Loan Documents to which such entity is a party; and be it

FURTHER RESOLVED, that the General Partner hereby authorizes either of the Managing Partners to take all action necessary on behalf of the Limited Partnership, to authorize and approve the execution, delivery and performance by each of BHMSILF and BHMSILFGP of the Loan Documents to which such entity is a party; and be it

FURTHER RESOLVED, that the Managing Partners are hereby authorized and directed to execute and deliver on behalf of the Limited Partnership, such further documents and to take such other actions on behalf of the Limited Partnership, as the Managing Partners deem necessary or appropriate in their discretion to carry out the purposes of these resolutions (such determination being evidenced conclusively, but not exclusively, by such Managing Partner's taking of such actions or execution and delivery of such documents); and be it

FURTHER RESOLVED, that all actions heretofore taken by the Managing Partners, in connection with the Loan Documents are hereby confirmed, ratified and approved in all respects as the valid and binding acts of the Limited Partnership; and be it

FURTHER RESOLVED, that this consent in writing (this "Consent in Writing") may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute one Consent in Writing, and any signature delivered by facsimile transmission or by means of some other electronic transmission will be deemed to be an original signature to this Consent in Writing; and be it

FURTHER RESOLVED, that this Consent in Writing is effective as of the date first written above.

*[Signature page follows]*

25168437-1

SUB_LANDRY_00000676

There being no further action to be taken at this time, witness the following signatures, effective as of the date first written above:

**GENERAL PARTNER:**

**BHMS ICP HOLDINGS, LLC**

By its Managing Members:

Name:  Robert Salamon

Name:  Kevin Angelis

*[Signature Page to Written Consent of the Managing Members of BHMS ICP Holdings, LLC as General Partner to BHMS Investments, LP]*

SUB_LANDRY_00000677

**EXHIBIT D**

Certificate of Good Standing

SUB_LANDRY_00000678



Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Nandita Berry
Secretary of State

# Office of the Secretary of State

### Certificate of Fact

The undersigned, as Secretary of State of Texas, does hereby certify that the document, Articles Of Incorporation for DOUBLE L INVESTMENT, INC. (file number 141294100), a Domestic For-Profit Corporation, was filed in this office on August 29, 1996.

It is further certified that the entity status in Texas is in existence.

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on March 26, 2014.



*Nandita Berry*

Nandita Berry
Secretary of State

---

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555
Prepared by: SOS-WEB

Fax: (512) 463-5709
TID: 10264

Dial: 7-1-1 for Relay Services
Document: 535860750003

SUB_LANDRY_00000679

# State of Florida
# Department of State

I certify from the records of this office that WESTPORT ASSET MANAGEMENT, L.L.C., is a limited liability company organized under the laws of the State of Florida, filed on December 3, 1998.

The document number of this company is L99000000056.

I further certify that said company has paid all fees due this office through December 31, 2014, that its most recent annual report was filed on January 24, 2014, and its status is active.

*Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-fourth day of March, 2014*



Ken Detzner

**Secretary of State**

Authentication ID: CU4198862732

To authenticate this certificate, visit the following site, enter this ID, and then follow the instructions displayed.

https://efile.sunbiz.org/certauthver.html

SUB_LANDRY_00000680

# State of Florida
# Department of State

I certify from the records of this office that WESTPORT ADVISORS, LTD. is a Limited Partnership or Limited Liability Limited Partnership organized under the laws of the State of Florida, filed on January 26, 1998.

The document number of this Limited Partnership is A98000000339.

I further certify said Limited Partnership has paid all filing fees due this office through December 31, 2014, and its status is active.

*Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-fourth day of March, 2014*



*Ken Detzner*

**Secretary of State**

Authentication ID: CU8988615409

To authenticate this certificate, visit the following site, enter this ID, and then follow the instructions displayed.

https://efile.sunbiz.org/certauthver.html

SUB_LANDRY_00000681



## Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WESTPORT HOLDINGS UNIVERSITY VILLAGE, L.L.C." IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-FOURTH DAY OF MARCH, A.D. 2014.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 1232454

DATE: 03-24-14

3300671   8300

140369446

You may verify this certificate online at corp.delaware.gov/authver.shtml

SUB_LANDRY_00000682



PAGE  1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WESTPORT HOLDINGS HIDDEN SPRINGS, L.L.C." IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-FOURTH DAY OF MARCH, A.D. 2014.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN PAID TO DATE.

3305196  8300

140369465

You may verify this certificate online at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 1232466

DATE: 03-24-14

SUB_LANDRY_00000683



PAGE   1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE NINETEENTH DAY OF MARCH, A.D. 2014.

3301147   8300

140348650

You may verify this certificate online at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION:  1219280

DATE:  03-19-14

SUB_LANDRY_00000684



*Delaware*                    PAGE  1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "WESTPORT HOLDINGS TAMPA II, LIMITED
PARTNERSHIP" IS DULY FORMED UNDER THE LAWS OF THE STATE OF
DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO
FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE NINETEENTH DAY
OF MARCH, A.D. 2014.

3301154  8300

140348656

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 1219421

DATE: 03-19-14

SUB_LANDRY_00000685