IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| IN RE: | Case No. 8:16-bk-08167-CPM<br>Chapter 11 |
| WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP<br>Debtor | |
| JEFFREY W. WARREN, LIQUIDATING TRUSTEE FOR WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP and WESTPORT HOLDINGS II, LIMITED PARTNERSHIP<br>Plaintiffs,<br>vs. | Adv. No. 8:20-ap-00007-CPM |
| VALLEY NATIONAL BANK, a principal subsidiary to VALLEY NATIONAL BANKCORP, a New Jersey domestic profit corporation, as successor by merger to USAMERIBANK<br>Defendant. | U.S. Courthouse<br>801 North Florida Avenue<br>Tampa, Florida 33602<br>May 3, 2024<br>9:48 A.M. |

**TRANSCRIPT OF HEARING**

(1) Trial on Complaint [Day 5 of 6];

[PROCEEDINGS CONTINUED ON NEXT PAGE]

**BEFORE THE HONORABLE CATHERINE PEEK MCEWEN**
**UNITED STATES BANKRUPTCY JUDGE**

PROCEEDINGS RECORDED BY COURT PERSONNEL
VIA IN-PERSON, ZOOM AND/OR TELEPHONE.
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE
APPROVED BY ADMINISTRATIVE OFFICE OF U.S. COURTS.

SCHULTZ REPORTING OF PASCO, INC.
3350 Chickadee Dr.
Holiday, Florida 34690
(727) 808-1484

[PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]

(2) Plaintiff's Motion for Disqualification and Exclusion of Opinions (Doc. #343);

(3) Defendant's Opposition to Plaintiff's Use of Shaw Stiller Deposition (Doc. #764); Opposition by Plaintiff (Doc. #774)

(4) Defendant's Omnibus Objection to Plaintiff's Declaration Certifying Records (Doc. #765);

(5) Defendant's Amended Objection to Plaintiff's Trial Exhibits (as to Authenticity Only) (Doc. #770);

(6) Plaintiff's Supplemental Opposition to Defendant's Amended Deposition Designations of Richard Scott Ackerman (Doc. #772);

(7) Plaintiff's Opposition to Defendant's Supplemental Deposition Designations of Christopher Struck and Motion to Strike (Doc. #773);

(8) Request for Judicial Notice at Doc. #800;

(9) Request for Judicial Notice at Doc. #467;

(10) Request for Judicial Notice at Doc. #468;

(11) Request for Judicial Notice at Doc. #471.

APPEARANCES
VIA IN-PERSON, ZOOM, AND/OR TELEPHONE

For the Plaintiff:

KEITH APPLEBY, Esquire
Appleby Law P.A.
4916 W. Melrose Avenue South
Tampa, Florida 33629
(813) 435-0396
kappleby@westshoremediation.com

For the Defendant:

KIMBERLY H. ISRAEL, Esquire
McGlinchey Stafford
10407 Centurion Parkway North
Suite 200
Jacksonville, Florida 32256
(904) 224-4449
kisrael@mcglinchey.com

EDMUND S. WHITSON, III, Esquire
McGlinchey Stafford
10407 Centurion Parkway North
Suite 200
Jacksonville, Florida 3225i6
(904) 224-4486
ewhitson@mcglinckey.com

ADINA POLLAN, Esquire
McGlinchey Stafford
10407 Centurion Parkway North
Suite 200
Jacksonville, Florida 32256
(904) 224-4487
apollan@mcglinchey.com

COLIN T. DEAN, Esquire
McGlinchey Stafford
505 20th Street North, Suite 800
Birmingham, Alabama 35203
(205) 725-6406
cdean@mcglinchey.com

[Appearances continued on next page]

APPEARANCES [continued from previous page]

CHANTEL C. WONDER, Esquire
McGlinchey Stafford
101 NE 3rd Street, Suite 1810
Ft. Lauderdale, Florida 33301
(954) 356-2514
cwonder@mcglinckey.com

CHASE STOECKER, Esquire
McGlinchey Stafford
101 NE 3rd Street, Suite 1810
Ft. Lauderdale, Florida 33301
(954) 356-2514
cstoecker@mcglinckey.com

Also present: Jeffrey W. Warren, Liquidating Trustee for Westport Holdings Tampa, Limited Partnership, and Westport Holdings II, Limited Partnership

Mr. Ramos (Trial Consulting Services)

TABLE OF CONTENTS


| | Page |
|---|---|
| Deposition of Kathleen Burkholder, Part 2, read into record by Mr. Appleby | 14 |
| Deposition of Scott Bridgman Read into record by Mr. Appleby | 29 |

| E X H I B I T S | Admitted |
|---|---|
| Plaintiff's Trial: | |
| No. 223 | 31 |
| Defendant's Trial: | |
| No. 191 | 57 |
| No. 380 | 23 |

**P R O C E E D I N G S**

COURTROOM DEPUTY: All rise. The Bankruptcy Court for the Middle District of Florida is now in session. The Honorable Catherine Peek McEwen presiding.

THE COURT: All right. Please have a seat. I understand you all have been doing some actual housekeeping.

COURTROOM DEPUTY: Westport Holdings Tampa Limited Partnership, Case 16-8167, Adversary 20-007.

THE COURT: All right. Anybody on Zoom?

COURTROOM DEPUTY: No, Judge.

THE COURT: No. All right. So go ahead. Plaintiff team, introduce yourselves and then defense team likewise.

MR. APPLEBY: Good morning, Your Honor. May it please the Court. Keith Appleby on behalf of the Plaintiff, Liquidating Trustee Jeffery Warren. Mr. Warren is in the courtroom with us today. Also the Plaintiff's expert Lisl Underholzner and also Eric Ramos with Trial Consulting Services.

THE COURT: All right. Thank you.

MS. ISRAEL: Good morning, Your Honor. Kim Israel on behalf of the Defendant. Our team remains the same, including Chantel Wonder, Chase Stoecker, Colin Dean, Adina Pollan, myself of course, and Ed Whitson. And with

us again this morning is Trey Korhn on behalf of Valley National Bank.

THE COURT: Is Chantel Wonder here?

MS. ISRAEL: Yes, ma'am. She just stepped out of the courtroom. She's sitting on the end.

THE COURT: All right. Thank you.

MS. ISRAEL: I do want to let the Court know that at approximately 4:00 o'clock this afternoon or so, Mr. Dean will be leaving so that he can head to the airport to catch his return flight home, if that's okay. He may just stand up and walk out --

THE COURT: That's fine.

MS. ISRAEL: -- although he'll do it without disruption to the proceedings.

THE COURT: That's fine. Where is home?

MR. DEAN: Birmingham, Alabama.

THE COURT: Birmingham. Okay. Well all the federal judges in the Eleventh Circuit will be in the great state of Alabama next week, albeit not Birmingham.

MS. ISRAEL: Oh. A judicial conference?

THE COURT: Yeah. I wish it were Birmingham. Don't tell the Mobile people that. Okay. All right. That's fine. And then you all have an agreement on when we break today so that you can do what you need to do with stuff you need to take home and sort that from the stuff

you can leave here?

MS. ISRAEL: Yes, ma'am. First, I want to thank the Court for the Court's indulgence in allowing us to jam all those boxes into the corner. Thank you so much for that. That does help us on the pack-up end. I talked to Mr. Appleby this morning about the possibility of breaking around 4:30 to allow us sufficient time to try to make as graceful an exit with the rest of our belongings as is possible before we have to get out at five.

THE COURT: Okay. You okay with that, Mr. Appleby?

MR. APPLEBY: Yes, Your Honor.

THE COURT: All right. So in the meanwhile, if you need to have staff come in and out and get stuff that you want to take to some office, that's fine with me. I'm usually just paying attention to the witness, so as you saw, what goes on behind me I'm not really paying attention to. Ms. Arciola is though. That's what we do.

And then, Ms. Arciola, I don't think we have any preset lunch plans today --

COURTROOM DEPUTY: Uh-uh.

THE COURT: -- so you all -- we can just break at a natural point around the noon hour or we can set something today so you can have your pace be guided by that if you want to tell me what your sense of things is.

MR. APPLEBY: Your Honor, we don't have a preference. We -- I think, again depending on if there's a natural break at lunchtime, that makes perfect sense.

THE COURT: Okay.

MR. WHITSON: We feel the same way, Your Honor.

THE COURT: Okay. All right. Are there any other housekeeping matters that I need to tend to, checklist items? I know that we're still pending agreement on whether the Defendant has made concessions in its answer, it's pleading, and in other discovery papers.

Has that been resolved at this point yet? And if not, when will it be and when should I start paying attention to what those things are?

MS. POLLAN: Yes, Your Honor. Adina Pollan. I have gone through and we have an agreement. I tried to speak with them yesterday. But I can sit at my computer and tell the Court which ones, you know, I have agreed to or we can do that separately behind the scenes, however Mr. Appleby prefers.

MR. APPLEBY: Well I think it makes more sense to have it behind the scenes so we can maybe have a discussion about the specific issues.

THE COURT: That would be good. And then before you rest, the ones that are admissions, either in the pleading or in the discovery, will come in as part of the

evidentiary showing of the Plaintiff. And if there's disagreement, I will look at the source document and see whether that is something that is an admission or not.

MR. APPLEBY: Thank you, Your Honor.

THE COURT: Okay. All right. So we're going to go with a -- we're going to go with what, another deposition?

MR. APPLEBY: Yes, Your Honor. I have two. They're hopefully very, very quick. One is continued. It was the August continuation of the deposition of Ms. Kathleen Burkholder.

THE COURT: You found that?

MR. APPLEBY: Yes, Your Honor. It just somehow didn't make it in my notebook yesterday but we --

THE COURT: Part two, Burkholder. Okay. And then who is the other one?

MR. APPLEBY: His name -- well it's the accounting firm from CliftonLarson.

THE COURT: Oh, yeah. You have a draft -- the draft audit. You wanted to try to pare that down to show some sort of a intent or satisfy some element like that. Okay.

MR. APPLEBY: Yes, Your Honor. And I do want to be clear on that, too, where we talk about intent. I mean the important thing with the -- the -- the draft financial

statements and audit is those are -- those are specifically required under the MLR statutes. That's one aspect. The other --

THE COURT: Drafts are?

MR. APPLEBY: Yes.

THE COURT: Drafts are?

MR. APPLEBY: No, no. I'm sorry, Your Honor. The final version. But --

THE COURT: I know that, but --

MR. APPLEBY: Yes, Your Honor. What I meant to say -- or excuse me, and I appreciate you making me clarify, they're required by the MLR -- Westport is required to have audited financial statements submitted to the OIR each year. This -- it's our position this shows that didn't happen that year or it didn't happen --

THE COURT: Do you really have to prove --

MR. APPLEBY: -- at the time.

THE COURT: -- the absence of activity?

MR. APPLEBY: Well, Your Honor, the rest of it goes to show that the Debtor was insolvent. That was a big crux of --

THE COURT: How can you use a draft?

MR. APPLEBY: Well, Your Honor, the -- the documents are relied on. They're regular business records for --

THE COURT: Oh. Well if they're the same kind of -- the balance sheets and so forth that the other firm reviewed, and those are documents generated by the Debtor, then yeah, that's different. So a draft, I thought you were talking about is a draft opinion letter.

MR. APPLEBY: No, Your Honor. The financial statements that went into the audit.

THE COURT: Oh, okay. Well we don't have a stipulation on that?

MR. APPLEBY: Evidently not. The documents that were referred to in the -- in the deposition were documents that the -- that the Defendant has not agreed for us to submit into evidence.

MR. WHITSON: Because they were never completed. That's --

THE COURT: No, no. Not -- oh, you're saying that the financial statements were not completed?

MR. WHITSON: I was not -- I was not aware from the testimony that I attended at deposition, that these were actually completed financial statements.

THE COURT: Oh, okay.

MR. WHITSON: It was all draft.

THE COURT: All right. Well --

MR. WHITSON: The audit was never completed.

THE COURT: -- if they're drafts then I can't --

MR. APPLEBY: Well, Your Honor, we would --

THE COURT: You better make sure --

MR. APPLEBY: -- ask that we go through it and Your Honor can make the determination, but.

THE COURT: That's fine. But I don't want to waste time on something. If it's not a draft, it's not done. It's subject to revision, it's subject to review, it's not --

MR. APPLEBY: Well --

THE COURT: You can't say that the Debtor embraced that as the final numbers.

MR. APPLEBY: Well, I understand what Your Honor is saying.

THE COURT: Unless you have a --

MR. APPLEBY: I think that's somewhat -- that's the point.

THE COURT: Unless you have Ms. Burkholder saying that's the correct number for this entry.

MR. APPLEBY: Okay.

THE COURT: All right. So we'll go with her deposition first.

MR. APPLEBY: Okay.

THE COURT: Now this is a personalized witness binder. Let the record show I'm showing a very skinny notebook --

MR. APPLEBY: Well, Your Honor, I --

THE COURT: -- that has not even probably a half inch of paperwork in it.

MR. APPLEBY: Trying to get better, Your Honor.

THE COURT: I took a video of the courtroom after you all left. I sent it to some of my sister judges and one of my brother judges. Okay. Let's go.

MR. APPLEBY: Yes. Your Honor, this is -- this is the continued deposition of Kathleen Burkholder. It was continued to August 26, 2023. And where we will pick up begins at page 7, line 18. Or excuse me, line 8.

"Question: Okay. When we refer to reports for the state, who are we talking about?

"Answer: The OIR.

"Question: Okay. Thank you. And OIR is the Office of Insurance Regulation that regulates and manages Continuing Care Retirement Communities or CCRCs?

"Answer: Yes.

"Question: Okay. Was there anyone else that prepared those reports?

"Answer: No."

Moving to page 8, at line 18:

"Question: Do you remember any individuals that you dealt with?

"Answer: I dealt with individuals, but John

Bartle, but he was not a named investor.

"Question: Okay. Did Mr. Bartle play a role?

"Answer: He did.

"Question: Okay. And what was Mr. Bartle's role?

"Answer: He pretty much came in and was running operations.

"Question: Okay. Did Mr. Bartle direct you in any way of how to do your job?

"Answer: Oh, yes.

"Question: And how so?

"Answer: You know, certain bills to pay. He wanted certain things paid, certain other things not paid, things of that nature.

"Question: Okay. Did Mr. Bartle ever talk to you about the reports that would go to the OIR?

"Answer: He did. One time he asked me to sign off on something that I told him I wouldn't do, so.

"Question: Okay. Ms. Burkholder, I'm going to hand you what I've premarked as Plaintiff's Exhibit 211."

And for the record, this has been admitted as Plaintiff's Trial Exhibit 128.

At line 18:

"Question: I have a copy for you. And Ms. Burkholder, if you would just take a moment and read

through that.

"Answer: Okay.

"Question: Do you recall seeing this document before?

"Answer: Yes.

"Question: Okay. And for the record, I'll state this is, it's got the word 'Affidavit' at the top, and it's dated April 14, 2015. It has your name at the bottom, chief financial officer, Westport Holdings Tampa, LP. Do you know who drafted this document?

"Answer: I did.

"Question: Do you recall whether you actually signed this document?

"Answer: I don't recall.

"Question: DO you know why you drafted this document?

"Answer: Yes. I wanted to let the OIR know that they were asking me to include things on the report that I disagreed with.

"Question: Okay. And did you send this affidavit to the OIR?

"Answer: I believe I did."

Moving to page 12, beginning at line 17. By Mr. Appleby:

"Question: So Ms. Burkholder, if you would tell

me again, so going back to this conversation with Mr. Bartle. So Mr. Bartle's direction to you was, you needed to include $3 million in the MLR form, and you felt that that $3 million was not appropriate to be included on the OIR's reporting. Why is that?"

MS. POLLAN: Your Honor, at this point page 12, line 25, we objected. The first is this is compound and -- well, I'll do one at a time, Your Honor.

THE COURT: Sustained. You're asking her two different questions. Why did you need to include the 3 million and why did you feel that 3 million was not appropriate to be included. Why did she feel that $3 million was not appropriate, is a separate question. So I sustain that. But you've already beat this horse to death, Mr. Appleby.

MR. APPLEBY: I'll move on, Your Honor.

At line 9 -- page 13, line 9:

"Question: Okay. When the March 31st, 2014 transaction took place, did that change the corporate structure of University Village? And by 'University Village,' I'm referring to Westport Holdings Tampa Limited Partnership, Westport Holdings Tampa II Limited Partnership and Westport Nursing, LLC. Did the corporate structure change as of that transaction on March 31st, 2014?

"Answer: Yes. To my knowledge, it did change.

I didn't know at the date of the sale, but I knew it later.
"Question: Okay. Prior to that transaction, is it your recollection that Westport Nursing Tampa was a wholly owned subsidiary of Westport Holdings Tampa, LLC --
"Answer: Yes.
"Question: -- excuse me LP?
"Answer: Yes.
"Question: After that transaction, did anything change?
"Answer: Yes, they split Westport Nursing Tampa as its own entity, not part of Westport Holdings Tampa."
And moving to page 15, at line 18:
"Question: Well, how much longer did you work at University Village?
"Answer: Oh, I was let go mid August of 2015."
Moving to page 16 at line 1:
"Question: Okay. What is your understanding or what is your opinion of why you were let go?
"Answer: My understanding is they found out that Tim Parker and myself were whistleblowers to the OIR reports, and we were both let go the same day.
"Question: Okay. And you used the term 'whistleblowers.' What was the situation that you were termed a whistleblower?
"Answer: So the OIR came in and asked if John

Bartle was running operations, and they told them that he had no thing to do with it. So we felt, Tim Parker and myself, felt like John Bartle was deceiving the State, so we called them to let them know what was going on.

"Question: And it was your intention to always act with good faith in dealing with the OIR --

"Answer: Of course."

MS. POLLAN: And, Your Honor, I just -- I want to note for the record that that was an interruption and she seems to conclude on the next line. The series of questioning concludes on lines 18 and 19.

THE COURT: I see. So Mr. Appleby's question was meant to be dealing with the OIR in submitting reports as opposed to good faith generally in dealing with the OIR.

MS. POLLAN: Yes, Your Honor. I just wanted it to be complete.

THE COURT: She didn't hear it that way so I don't know what your -- the point is.

MS. POLLAN: She -- she clarified it. I just wanted to make sure it was clear that they were all on the same page as to what the question was.

THE COURT: Oh, I see. Later on she answers "of course" after he finished his question. Okay.

MS. POLLAN: Yes, Your Honor.

THE COURT: That will come into the record then.

Thank you.

MR. APPLEBY: And moving to page 17, beginning at line 21:

"Question: Do you recall the accounting from CliftonLarson?

"Answer: Yes, that sounds right.

"Question: Do you believe that was the firm that came in after LDK to do accounting work?

"Answer: I believe so, yes.

"Question: Okay. Do you know whether they ever completed an audit of the financial reports for University Village?

"Answer: They had not completed it by the time I was let go.

"Question: Okay. Do you have any knowledge of why they hadn't completed the report?

"Answer: It was something in their report that John Bartle's group did not lie. That's all I know. And they -- so they wouldn't finalize it."

Moving to page 24, at line 16:

"Question: Okay. Do you recall who authorized the transfer of the $3 million from the MLR to USAmeriBank?

"Answer: My recollection would be Larry Landry." At page 25, beginning at line 11:

"Question: Okay. Would Mr. Landry have been the

only person that had that authority?

"Answer: That's what I believe, yes."

Moving to page 37, beginning at line 6:

"Question: Okay. Ms. Burkholder, I'm going to hand you document that I've premarked as Exhibit 210.

"(Thereupon, marked as Plaintiff Exhibit 210.)"

Your Honor, for -- just for clarity in here, this was a document that we have not submitted as evidence. Or we did but we've withdrawn that. So I would indicate that for here it was just marked as -- for reference.

THE COURT: What page are you on?

MR. APPLEBY: I'm sorry, Your Honor. Page 37, beginning at line 6.

THE COURT: Well how are you going to reference something that she's going to talk about if I don't have it in evidence or it won't come -- or if you don't intend to offer it into evidence and it doesn't come in?

MS. POLLAN: And, Your Honor, if this was what I think it is, this was on their exhibit list until this past Saturday when it was withdrawn.

MR. WHITSON: And we have legal argument on that point, Your Honor.

MS. POLLAN: Yes, Your Honor, which we won't waste his time on that, but we do have legal argument to make.

THE COURT: On Exhibit 210 to the depo?

MS. POLLAN: Just -- if I -- yes, Your Honor, because that's one of our exhibits as well and.

THE COURT: Well if it's one of your exhibits, what's your objection?

MS. POLLAN: We don't have an objection. We would like it to come in.

THE COURT: Oh.

MS. POLLAN: He's withdrawn and said he doesn't want it to come in.

MR. APPLEBY: Well, that's fine. Do you have your exhibit number?

THE COURT: I would say pick your poison. Either you want her to talk about it and you offer it or you don't.

MR. APPLEBY: No, we're -- we're okay with them talking about it since we're talking about the same document. So if they want we can --

MS. POLLAN: I'll grab my list, Your Honor. One moment.

THE COURT: Okay. Thanks. That's good. So depo Exhibit 210 to Burkholder Part 2 is Defendant's trial Exhibit number to come, not in evidence, but that Mr. Appleby apparently wants to be in evidence. 400-page-long spreadsheet.

(Discussion off the record between Ms. Pollan and Mr. Appleby.)

MS. POLLAN: Okay, Your Honor. I just conferred with Mr. Appleby and this is their Exhibit No. 152 that was uploaded. It also matches up with our Exhibit 380. But if we want to go by the trial -- I mean, excuse me, by the Plaintiff's trial exhibits, that's 152.

THE COURT: But if he withdrew it, it's not there anymore.

MR. APPLEBY: Yeah. It's withdrawn from us, Your Honor.

MS. POLLAN: That's what we were just talking about, Your Honor, is that he withdrew it on Saturday so -- okay. We'll put it in under ours. 380, Your Honor.

THE COURT: That's right. 380. Okay. And it's stipulated in, right, Mr. Appleby?

MR. APPLEBY: I'm sorry, Your Honor, say that again?

THE COURT: Defense Trial Exhibit 380 is stipulated in?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay.

(Defendant's Trial Exhibit No. 380 received into evidence.)

THE COURT: All right. So now we're at -- we've

marked that exhibit and I think your question picks up on line 12?

MR. APPLEBY: Yes, Your Honor.

"Question: For the record, I'll tell you that this is from a spreadsheet that has many, many tabs. If you were to print this out, it's roughly, at least in native format that it was in, it would be about 400 pages long. It's a very large spreadsheet that includes a lot of -- well, a lot of different aspects of the business. From looking at this, do you recall what this document is?

"Answer: No, I don't recall. It was too long ago.

"Question: Okay. Do you recall whether you would have created this document?

"Answer: Again, I don't recall.

"Question: Okay. For the record, I'll state that in the top left corner of this spreadsheet it says 'University Village Project NPV and Investment Returns.' If you look down to the first brown row across, it starts with year 1 at 2012 and goes to year 10 at 2021. This document has been discussed several times in other contexts of this case, and it's been referred to as a ten-year projection. Again, would anyone else at University Village other than yourself prepare this type of document?

"Answer: It could have been done by the

management company."

And moving to page 39 at line 5:

"Question: Okay. Were you ever asked by management to prepare a proforma projected income statements, balance statements, on a ten-year basis like this?

"Answer: Like I said, I don't think I did this. I think it was done by the management company."

Your Honor, that completed Ms. Burkholder's read --

THE COURT: Do we have a stipulation on who the management company is?

MR. APPLEBY: It -- it did go down in -- well we could read the next question and answer and that would answer for Your Honor.

THE COURT: Is there any prejudice to your team, Ms. Pollan, if we do that?

(Discussion off the record between Ms. Pollan and Mr. Whitson.)

MS. POLLAN: Yeah. I mean -- go ahead.

MR. WHITSON: I don't think it has ever been established or proven who the management company was that she was referring to. I think her testimony was that she didn't really recall, but.

THE COURT: Well she says she recalls it was a

company called Greystone.

MR. WHITSON: There was a management called Greystone but --

THE COURT: She doesn't know who prepared the document, which makes me wonder why I would admit it in but okay. It says that she -- that the Greystone people managed the facility for a while.

MR. WHITSON: And that's true. But I'm not sure the timeframes match up.

THE COURT: But she's referring to something.

MR. WHITSON: Right.

THE COURT: She's referring to a noun. And I'm just trying to put a name to the noun. She's not referring to something she can't recall --

MR. WHITSON: Yes, Your Honor, and I --

THE COURT: -- right?

MR. WHITSON: -- do think that --

THE COURT: In the context, don't you think she's -- if you look at the question on line 11, and the answer on 14, don't you think in context what she's referring to at line 10 is Greystone --

MR. WHITSON: I think she supposes --

THE COURT: -- or does it not matter?

MR. WHITSON: -- it might have been Greystone.

THE COURT: Okay. It doesn't matter then. Okay.

MR. WHITSON: She didn't really say --

THE COURT: It's okay. Y'all are -- it doesn't matter. If y'all are contesting that. I'm just trying to see if I can put some names here with players.

MR. WHITSON: Your Honor, I think it will be clearer once we put our case on if we get to that point, so. THE COURT: Are you going to prove who prepared defense trial Exhibit 380?

MR. WHITSON: Yes, Your Honor.

THE COURT: Okay. And it's not Greystone?

MR. WHITSON: No, Your Honor.

THE COURT: Okay. All right. So it's irrelevant who that management company is that she was referring to. All right. Next we have the drafter company of the draft last annual report.

Do y'all have an empty Bankers box, one that you do not need to put anything in ever again?

(Off the record 10:11 a.m. to 10:15 a.m.)

THE COURT: Y'all are ready?

MR. APPLEBY: Yes, Your Honor.

MS. POLLAN: Yes, Your Honor.

THE COURT: Okay. Go ahead.

MR. APPLEBY: Your Honor, next we would read into the record the designated deposition testimony of Scott Bridgman. Mr. Bridgman was the corporate representative

for CliftonLarsonAllen, LLP which was -- again we've talked about this quite a bit, but the accounting firm that was hired after the March 31st, 2014 transaction.

MR. WHITSON: Your Honor, and we do have one preliminary objection.

THE COURT: Okay.

MR. WHITSON: Mr. Bridgman was not involved in preparing any draft audit. I believe the auditor who actually worked on the project is deceased.

THE COURT: And does the records custodian have to be someone that actually prepared the document?

MR. WHITSON: No, Your Honor. I think if he's the records custodian that, you know, he -- but he can't testify about how the audit was done because he wasn't part of that.

THE COURT: Okay. Well then why don't you wait until the question is asked.

MR. WHITSON: I understand, Your Honor.

THE COURT: Y'all have only heard me tell that story about how opposing counsel gave us the idea for something we hadn't thought of that actually helped us win the case because they didn't wait -- he didn't wait for the question.

MR. WHITSON: Yes, Your Honor.

MR. APPLEBY: Your Honor, on this one I'll try to

short -- there's a couple of designations that aren't on the list, but I think based on conversations yesterday, I think this will speed it up by establishing who Mr. Bridgman is and who he worked for.

THE COURT: Okay. Go ahead.

MR. APPLEBY: Beginning at page 6, line 23:

"Question: And Mr. Bridgman would you state your full name for the record?

"Answer: Scott Thomas Bridgman."

And moving to page 8, beginning at line 4:

"Question: Okay, Mr. Bridgman. What is your job at CliftonLarsonAllen?

"Answer: I'm a principal in the healthcare and life sciences group with CliftonLarsonAllen."

And at line 20:

"Question: Mr. Bridgman, are you here today as the designated corporate representative of the CliftonLarsonAllen?

"Answer: Yes, sir."

And moving to page 10, beginning at line 3:

"Question: Do you know what type of work CLA would have done for Westport Holdings Tampa?

"Answer: Yes.

"Question: Tell me -- tell me what you know about the work that they've done.

"Answer: So we were engaged to perform an audit for the nine months ending 12/31/2024, and so --

"Question: And just for clarification, 2014 or --

"Answer: 2014. I'm sorry.

"Question: I just wanted to make sure it was clear.

"Answer: Sorry. Yes, for 2014, correct. Thank you. That's the one I'm particularly aware of."

Moving to page 16, line 18. And, Your Honor, it starts with the question about a letter so if I could direct Your Honor, the page before it, page 15, at line 20/21, there was an exhibit that was marked as Plaintiff's Exhibit 295. That's Plaintiff's Trial Exhibit 223. And at this time that is not admitted.

THE COURT: Okay.

MR. APPLEBY: Okay. At again page 16, line 18.

THE COURT: Are you hoping to get 223 in through this testimony?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay.

MR. APPLEBY: "Question: Does this letter appear to be what would be a standard engagement letter for CliftonLarsonAllen?"

MS. POLLAN: And Your Honor at page 16, line 20,

we've objected. Obviously, the document speaks for itself.

THE COURT: Overruled.

MR. WARREN: "Answer: Yes.

MR. APPLEBY: "Question: In this letter do you -- can you point me to anywhere on this letter where there's a reference to Westport Nursing?

"Answer: No."

Your Honor, again the -- the relevance of this is it's an engagement for Westport Holdings, not Westport Nursing.

MS. POLLAN: And, Your Honor, that's argumentative, but.

THE COURT: Are you offering it into evidence?

MR. APPLEBY: Yes, Your Honor, we would like to move trial Exhibit 223 --

THE COURT: Okay. Any objection?

MS. POLLAN: No objection, Your Honor.

THE COURT: All right. Then Plaintiff's Trial Exhibit 223 that's been marked for identification is now in evidence.

(Plaintiff's Trial Exhibit No. 223 received into evidence.)

MR. APPLEBY: And moving to page 18 at line 25:

"Question: Do you know whether CLA was paid by Westport for the services it completed?

"Answer: To my knowledge, CLA was not paid for services."

Moving to page 21, beginning at line 12. And actually let me back up, Your Honor. This referenced on page 20 at line 20 and 21, Plaintiff's Exhibit 297. Which 297 is Plaintiff's Trial Exhibit 225, which has not been admitted.

So beginning at page 21, line 12:

"Question: Midway down under there's a chart at the bottom, midway down there's a line that says 'assets limited as to use.' You had mentioned earlier that you were familiar with CCRC, COIR and ML -- I apologize. I don't know if I asked you about MLR or minimum liquid reserve. Are you familiar with that term?

"Answer: Yes, sir.

"Question: Okay. The line midway down where it indicates 'assets limited to use,' do you know what" --

THE COURT: It says "assets limited as to use."

MR. APPLEBY: Yes, Your Honor. Thank you. 'Assets limited as to use.' Do you know what types of -- what types of assets would be limited to use in a CCRC setting?

"Answer: There could be numerous ones that could fit that definition, but 'assets,' that would be -- I won't use completely correct GAAP terminology. This may be more

slang, so forgive me for that. But assets that would be identified or to be used for a specific purpose or held separately from others.

"Question: Okay. A little farther down there's a line referencing deferred revenue from entrance fees. It's like 15 -- 15,837 and -- excuse me, $15,837,829. Do you know what deferred revenue from entrance fees might represent?

"Answer: Yes.

"Question: Could you tell me what your understanding of deferred revenue from entrance fees is?

"Answer: Residents required to give deposits or other forms of payment. And depending on the terms of the contract, some of those deposits and/or entrance fees as commonly referred to are earned over a certain period of time.

"Question: Okay. And the portions that aren't earned -- I guess the next line refers to refundable entrance fees. Can you tell me your understanding of what returnable entrance fees would represent?

"Answer: Again, could vary between resident contracts. But those would be entrance fees that have the ability to be refunded to residents."

Moving to page 24, beginning at line 11. Well, Your Honor, again at that point too I think that we were

referring to Plaintiff's Trial Exhibit 225. I don't believe -- yes, Plaintiff's Exhibit 225, I would move to move that into evidence.

MS. POLLAN: Your Honor, I -- I -- he talks -- he reads off of the document and he says, you know, what the numbers mean, but I don't think it's properly authenticated.

THE COURT: It's not. You're just asking him what those definitions mean to an accountant that's a specialist in the healthcare realm.

MR. APPLEBY: Okay, Your Honor.

THE COURT: Sustained.

MR. APPLEBY: Page 24, beginning at line 11. Again there's a reference here that we're referring to -- to Deposition Exhibit 299, which has been marked as Plaintiff's Proposed Trial Exhibit 227.

"Question: Next, I'll give you what's marked as Plaintiff's Exhibit 299 with Bates No. CLA-190 (tender document to Mr. Whitson and Mr. Bridgman). This appears to be a letter similar to the last one but is -- this particular letter, Mr. Bridgman, do you recall reviewing this letter?

"Answer: Yes, sir.

"Question: And once again, if you wouldn't mind, could you tell me what this letter represents?

"Answer: This is what is commonly known as a governance letter, which communicates the high level results of an audit to the governing body.

"Question: Okay. If you would, flip to the second page that's marked as CLA-191, and the very last bold paragraph at the bottom if you wouldn't mind reading that to me.

"Answer: The entities ability to continue as a going concern?

"Question: Yes, sir. And the paragraph that follows.

"Answer: The following conditions and events when considered in the aggregate and after considering management's plans, caused us to conclude that the substantial doubt about the entities ability to continue as a going concern for a reasonable time remains.

"Question: Thank you. And on the next page after that, there's two bullet points. The first indicates the company incurred significant losses of approximately 2.8 million during the period under the audit."

Well, Your Honor, I think I --

"Question: Do you recall what 'period under the audit' refers to?

"Answer: No."

I'll move on, Your Honor. I'm not sure why I

marked that.

Starting at page 27, at lines 16 through 28. Again there's a reference here to Plaintiff's Exhibit 300, which is marked as Plaintiff's Proposed Trial Exhibit 228.

"Question: Absolutely. What I've just handed you is marked as Plaintiff's Exhibit 300 and the Bates label is CLA-199 (tenders document to Mr. Whitson and Mr. Bridgman). This at the top is titled 'Westport Holdings Tampa, Limited Partnership and subsidiary, d/b/a audit reviewer's summary of significant findings v1' with a footnote reference 1 dated December 31st, 2014. Is this a document that you recall reviewing in preparation for today?

"Answer: Yes, sir.

"Question: The first sentence of this document says, we've completed the audit of Westport Holdings Tampa, Limited Partnership and subsidiary d/b/a for the years ended December 31, 2014 and will be issuing an unqualified opinion, except as noted below in the financial statements. What does the term 'unqualified opinion' mean?

"Answer: Unqualified opinion would mean a standard audit opinion without any qualifications to its opinions.

Then moving down to line 20 on page 28:

"Question: The first bullet indicates: The

company incurred a roughly $2.89 million loss during the nine months ended 12/31/2014. Have you reviewed anything in preparation for today to understand what might have caused or what have been the reason for a $2.8 million loss?

"Answer: No.

"Question: Last bullet -- or excuse me, not the last bullet, the third bullet point. Again it was in February of 2015. The statement is: The OIR opened a financial condition examination with formal examination results are expected to be provided to the affiliated parties by the OIR on or before September 30, 2015. Do you know whether that was completed by September 30, 2015?

"Answer: No.

"Question: The very last sentence of this same bullet point says 'due to uncertainty of the client to be able to continue as a going concern, CLA has determined a disclaimer of opinion is appropriate until such time an opinion could be rendered.' First, if you would, explain for me in layman's terms what does 'going concern' mean?

"Answer: Going concern means that the entity, that there is concern that the entity would not be able to continue in the current future within the next 12 months."

Your Honor, we would move to have Plaintiff's Trial Exhibit 228 entered into evidence.

THE COURT: Any objection?

MS. POLLAN: Your Honor, he talks -- again he talks about the document but he doesn't lay the proper predicate as far as --

THE COURT: No predicate. Sustained. You know, when you -- if you want to get this stuff in, it's incumbent upon you to go through the elements of the hearsay exception. We don't know who prepared it, we don't know who gave it to him. It probably came from his company's files, I would infer that, but I don't know that.

MR. APPLEBY: Yes, Your Honor.

THE COURT: And his expertise is, I guess, helpful in understanding terminology, but the source document can't get in. And I think I told you before I would leave the record open if you could get the kind of declaration that the Federal Rules of Evidence contemplate as a supplement to a live laying of the predicate for the other audit firm. You know, it's a simple task to get these things.

MR. APPLEBY: Yes, Your Honor.

THE COURT: You say, here's a document. I want you to look in your files and I want you to tell me if this is a document that meets these elements. If so, here's an affidavit. We ask that you attach the one from your own files and that you make these averments. So -- and there's

a standard form for that.

MR. APPLEBY: Yes, Your Honor.

THE COURT: We shouldn't have arguments about this basic stuff anymore. All right. Well Plaintiff's Depo 300, which is Trial Exhibit -- you said it was what?

MR. APPLEBY: 228, Your Honor.

THE COURT: 228. If it's not in, it's not coming in at this point.

MR. APPLEBY: Okay. Beginning at page 34, line 3. And this discussion is regarding Plaintiff's Deposition Exhibit 299, which is marked as Plaintiff's Proposed Trial Exhibit 229.

"Question: All right. If you would flip to the next page, what's CLA-69, okay? And at the bottom of that page, could you tell me what -- what's the number for the net loss?

"Answer: 2,300,000 rounded.

"Question: Okay. And again, based on the caption at the top of this, this was just -- that loss represents the loss for the nine-month period ending December 31, 2014; is that correct?

"Answer: Yes."

Moving down page 34 to line 20:

"Question: Okay. At CLA-74, there's the last paragraph there, the last bold caption is 'residency and

care agreements' and it reads: The company operates under residency and care agreements referred to as the resident contracts. That include payment of an entrance fee at the time of occupancy with a portion of the fee refundable at termination. Are those what we discussed briefly a moment ago as it relates to deferred revenue to or refundable fees? Is that" --

MS. POLLAN: And Your Honor, at page 35, line 4, we objected to form. I think it was confusing.

THE COURT: I'll sustain it. It's also repetitive.

MS. POLLAN: Thank you.

MR. APPLEBY: Moving to line 7:

"Question: We discussed a minute ago about refundable -- or excuse me deferred revenue and refundable fee revenue. Would it be your understanding that resident care agreements, that the terms that -- what this paragraph refers to is those same -- excuse me, those same resident contracts and the related refunds that could be available?"

MS. POLLAN: Your Honor, at this point it looks like a Mr. Kerwin made the same objection for the record at line 13.

THE COURT: Are you making it or is Mr. Kerwin with your firm?

MR. WHITSON: He wasn't with our firm. I'm not

sure -- I think he's representing the company itself.

MS. POLLAN: I think he may have been the attorney for the company.

MR. WHITSON: Yeah. For CLA.

MS. POLLAN: Your Honor, I'll go ahead -- just to get through this, I'll make the same objection.

THE COURT: Well, you should have raised it at the time --

MS. POLLAN: Yes, Your Honor.

THE COURT: -- whoever was there. I'm going to overrule that.

MS. POLLAN: Yes, Your Honor.

THE COURT: Although again I think it's repetitive. I don't know why he has to give the same answer. But go ahead, Mr. Warren.

"Answer: Yes."

MR. APPLEBY: Okay. Moving on -- well, Your Honor, again, at this point we would request again that Plaintiff's Trial Exhibit 229 be admitted.

THE COURT: I don't know what it is. I don't know who prepared it. I don't know if it was something that was given to him by the Plaintiff company or whether it was something that his company prepared.

MR. APPLEBY: I understand, Your Honor.

THE COURT: So not in.

MR. APPLEBY: Beginning at page 39, line 4:

"Question: Next at page CLA-86, there's a paragraph entitled 'minimum liquid reserve.' The second paragraph references: Reserved funds set aside to meet the State of Florida minimum liquid reserve requirements and reserve requirements at December 31, 2014 are $5,316,434, which is below the Florida Department of Insurance calculation of the reserve requirement of $5,688,940. In your experience in dealing with CCRCs and MLRs, what is your understanding of what takes place when a CCRC does not meet its MLR requirement?"

MS. POLLAN: And, Your Honor, at page 39, line 14, we've objected. This is a legal conclusion. My understanding is this is an accountant and that seems to be a legal conclusion.

THE COURT: The request is in his experience what happens. What does he know from his experience. It's not a legal conclusion. I've asked you to please stop it. I'm overruling that. However, I can see the answer and it's not helpful whatsoever.

MS. POLLAN: Yes, Your Honor.

THE COURT: Why are we wasting time on things that he doesn't know? You're the one who is complaining about objections that you contend are unnecessary. I'm going to complain about testimony.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Just because he's never had a client before that that has happened to doesn't mean it can't happen. And he doesn't know what would happen anyway. A waste of their time. Come on. Be more judicious in your selection.

MR. APPLEBY: Yes, Your Honor.

MR. WARREN: Publish the answer, Your Honor?

THE COURT: Publish it.

MR. WARREN: "Answer: I don't know. I've never had a client not meet that calculation."

MR. APPLEBY: Mr. Appleby, question at line 18:

"Question: If you could flip then to page CLA-87, and I think you just answered my next question, but the second paragraph says: 'As noted above in note 11, the company did not meet the MLR requirement' --

"Answer: About what page are you on? I'm sorry.

"Question: Oh, I'm sorry. It's labeled CLA-87.

"Answer: Okay.

"Question: Note 13 'subsequent events,' the second paragraph states, 'As noted above, note 11, the company did not meet the MLR requirements as of December 31st, 2014.' And I believe you answered it, but the question is, in your experience in dealing with CCRCs, is it typical for a CCRC not to meet its MLR requirements?"

MS. POLLAN: Your Honor, page 40, line 6, we've objected. I think he answered this on the previous page.

THE COURT: He answered it under the proffer based on the objection that I sustained. So it's not in as an answer in this trial record.

MS. POLLAN: Yes, Your Honor. I understand. I would also like to proffer that it is long and confusing, but that's my last objection.

THE COURT: It's based on his experience and I will -- hold on a minute. Oh. I didn't sustain that other objection. I'm sorry. I'm sorry. I'm tired. Did I -- did I allow in, and maybe Ms. Arciola or Ms. Scotten, on page 39, line 11, in your experience dealing with CCRCs and MLRs, what is your understanding. I did let that in. Okay.

MS. POLLAN: Yes, Your Honor. You overruled.

THE COURT: I'm sorry, Ms. Pollan, for correcting you. All right. So it wasn't a proffered answer, it's the answer. He said, "I don't know, I have never had a client not meet that calculation." Okay.

How is this different, Mr. Appleby, from the previous one?

MR. APPLEBY: I -- I don't know, Your Honor. We can move on.

THE COURT: So you're going to withdraw the

question?

MR. APPLEBY: Yes, Your Honor.

THE COURT: All right. That's fine. And that's the question that begins on page 39 at line 25. Okay. Let's go.

MR. APPLEBY: Moving to page 40 at line 9:

"Question: The next paragraph opens with: In February 2015, the Office of Insurance Regulation, OIR, opened a financial condition examination. In your experience is it a common occurrence for the OIR to have a financial condition examination --"

MS. POLLAN: And, Your Honor, at this point at line 14, it looks like we've objected to form before the question was completed.

THE COURT: Well, assuming that the end of it is, for a CCRC --

MS. POLLAN: Yes, Your Honor.

THE COURT: -- do you object to the form?

MS. POLLAN: You know what? We'll withdraw it, Your Honor. It's a simple answer.

THE COURT: All right. Go ahead, Mr. Warren, line 17.

MR. WARREN: "Answer: No."

MR. APPLEBY: Moving to page 41, beginning at line 9:

"Question: Okay. Next I'm handing you what's Plaintiff's Exhibit 302, Bates label CLA-203 (tendered this document to Mr. Whitson and Mr. Bridgman)."

For reference, Your Honor, Plaintiff's Deposition Exhibit 302 is Plaintiff's Proposed Trial Exhibit 230.

"Mr. Bridgman, do you recall looking at this particular document in preparation for today?

"Answer: Yes, sir.

"Question: Can you tell me what is this document and what's it used for or what does it relate to?"

MS. POLLAN: And, Your Honor, at page 41, line 17, we've objected. That is a compound question.

THE COURT: Well the answer would be yes, but I think "used for" and "relate to" are pretty much substantially equivalents, they're joined by the word "or."

MS. POLLAN: And I was referring to the "and" before that, Your Honor. What is this document "and" what it's used for.

THE COURT: Well that's compound.

MS. POLLAN: Yes, Your Honor. That's what I objected to.

THE COURT: Okay. What is this document and what is it used for. I think those are two simple enough ones that it's not confusing. Hopefully, he kept those straight in his mind in order. I'll overrule it.

MR. WARREN: "Answer: That is our summary of findings and internal control deficiency evaluation form. This summarizes findings or control deficiencies identified during an audit."

MR. APPLEBY: "By Mr. Appleby:

"Question: On the left column what I think might be B-9 from a spreadsheet location with a number 5 next to it, the statement is: 'Tim Parker is very concerned since the transition of the company. He has serious concerns about the management of the company. In his opinion there is a potential for misappropriation and/or fraud in 2014.' Do you know who Mr. Parker or Tim Parker was?

"Answer: No.

"Question: Who would prepare -- excuse me. Who would prepare a summary like this?"

MS. POLLAN: And, Your Honor, at line 8 of page 42 we're objected. I believe it's specula -- a speculation. And hearsay.

THE COURT: Overruled.

MR. WARREN: "Answer: A member of the audit team.

MR. APPLEBY: "By Mr. Appleby:

"Question: And where -- where would they obtain this type of information?"

MS. POLLAN: And, Your Honor, I'm sorry, I was

taking notes. This is line 13. We've objected. I'm going to withdraw that objection.

MR. WARREN: "Answer: During the audit,

MR. APPLEBY: "By Mr. Appleby:

"Question: Would that include interviews with individual staff or personnel?"

MS. POLLAN: And, Your Honor, page 18 we've objected, but that is withdrawn.

THE COURT: All right.

MR. WARREN: "Answer: Maybe."

MR. APPLEBY: Okay. Your Honor again they -- we're referencing here what's been proposed as Plaintiff's Trial Exhibit 230. I would submit to Your Honor that this line of questioning does ask the questions to determine where the document originated and how it was formed.

THE COURT: All right. Response?

MS. POLLAN: Your Honor, he almost gets there. There's the contemporaneousness as far as, you know, and what the record keeping is. There are a couple of things he missed in that line of questioning.

MR. APPLEBY: Your Honor, we could go back to the beginning of the dep -- of this deposition and find that those questions were asked at the beginning.

THE COURT: Well then why didn't you tell me that before?

MR. APPLEBY: Well, Your Honor, I --

THE COURT: You had a blanket -- you had a blanket foundation laid?

MR. APPLEBY: I would have to look and confirm, Your Honor, but that is my recollection.

MS. POLLAN: And, Your Honor, to the extent there's a blanket one, I still believe that the authenticator --

THE COURT: He testifies --

MS. POLLAN: -- has to look at each --

THE COURT: He testifies who would prepare it, a member of the audit team --

MR. APPLEBY: Yeah. And, Your Honor, if I could, this was a deposition *duces tecum* and every single document referenced in this -- in this deposition was Bates labeled by CliftonLarsonAllen. That's the CLA hyphen --

THE COURT: Might have gotten it from his sister who is practicing accounting and he was doing a test on her. You don't know unless you ask the questions.

MR. APPLEBY: I understand, Your Honor.

THE COURT: This is too big of a case with too many documents for y'all to leave these kind of little stones unturned. Big stones, excuse me. He can't testify to circumstances under which the thing was prepared because he doesn't know who it is that gave the information to the

auditors. I can't get it in.

MR. APPLEBY: Thank you, Your Honor.

THE COURT: I said -- I want to be fair. I want to make decisions on the merits and not on gotchas. I said I would let you get a declaration in and if you're going to get them from either of these firms, you better get them and get them in the right form and get them here before the -- the end of this trial, which I guess is now June 14th.

COURTROOM DEPUTY: July.

THE COURT: Well, that's a spillover day. So I can't take any of these in. You haven't met the prerequisites. Unless you show me earlier on where you went one by one and you asked what was the source, who prepared it, where did you get it.

MR. APPLEBY: Your Honor, if I might just review --

THE COURT: You know what? I'm going to get Ms. Sabrina Mallow to give y'all a copy of the litany so you will have it right by your side from Imwinklereid. Would you ask her to come in here and get this thing?

COURTROOM DEPUTY: Yes.

THE COURT: All right. I guess we'll just have to put this on the checklist for housekeeping for later, all these ones that you want to get in from this read in.

MR. APPLEBY: Yes, Your Honor. I'm trying to

review and skip along.

THE COURT: What goes around comes around, defense team.

MS. POLLAN: Absolutely, Your Honor. We understand.

THE COURT: All right. Next page?

MR. APPLEBY: Yes, Your Honor. I'm trying to skip forward so if you'll give me just a moment. I'm trying to save the Court's time.

THE COURT: I don't mean to prejudice your showing, sir, so I don't want to hurry you and make you feel like I'm pressuring you to do something that you wouldn't otherwise do.

MR. APPLEBY: Well, Your Honor, if we might go through it and -- Your Honor, if we could move just to page 51, beginning at line 13.

THE COURT: All right.

MR. APPLEBY: "Question: In your experience in dealing with CCRCs and MLR requirements, can you tell me in your own words who is -- who is subject to OIR's requirements concerning requirement that they have a minimum liquid reserve?"

MS. POLLAN: And, Your Honor, at this point, page 51, line 17, we objected, it was confusing, but we'll withdraw it.

MR. WARREN: "Answer: I believe that that's defined in Chapter 651 of the Florida Statutes.

MR. APPLEBY: "By Mr. Appleby:

"Question: Okay. Do you know why CLA never issued a final audit report?

"Answer: No.

"Question: Do you know how much money was owed at the end -- or, excuse me, let me ask the question differently. I apologize. Do you know how much money was owed to CLA at the time it stopped work on this matter?

"Answer: Approximately, yes.

"Question: Okay. Could you tell me how much approximately?

"Answer: $125,000, I believe."

"Question: Thank you."

That concluded Mr. Bridgman, Your Honor. We'll address the other issues.

THE COURT: Did CLA file a claim in the case?

MR. APPLEBY: I don't know offhand, Your Honor.

THE COURT: Okay. I've been pretty tough on y'all about laying the predicate for authenticity. Did the defense team object to authenticity?

MS. POLLAN: Yes, Your Honor, we did last week in our filed objection on the 24th.

THE COURT: Okay. Well then --

MS. ISRAEL: I think it was April 8th, actually.

MS. POLLAN: I'm sorry. April -- well, there were several of them that we objected to. But, yes, we specifically made sure to encapsulate that objection, Your Honor.

THE COURT: Okay. If it was flagged then that was to enable Mr. Appleby to make sure that he got what he needed before trial. We're still in trial. I'm giving him the leeway to provide some declarations. Okay. And is that it now?

MR. APPLEBY: That's all that we need to read in, Your Honor.

THE COURT: Okay. And so, Mr. Warren you may step down. Do you have any other witnesses, any other offers of documents into evidence?

MR. APPLEBY: We do, Your Honor, with again, the request to take judicial notice.

THE COURT: Okay. So you're going to go through one by one and tell me what it is and you're going to provide me the document.

MR. APPLEBY: Yes, Your Honor. But it may be more efficient at first to have Mr. -- if possible, if I could put Mr. Warren back on the stand there was -- there was some colloquy the other day at the finish regarding how membership interests were transferred back to Mr. Bartle.

And we have filed, at docket number 800 -- I believe at 800, and I think Mr. Warren can clarify the questions that Mr. Whitson asked.

MS. POLLAN: And, Your Honor, just to speed things up, we did go through and review and we didn't have a problem. We just wanted to -- one thing. The -- Exhibit 5 that was attached, we had actually tried to offer that as one of our exhibits, so we would stipulate that that can be an exhibit. The remainder we have no problem with the judicial notice. We would just add that there was one more order, and I think Mr. Warren talked to me about this, but there was an order by Judge Williamson deeming it signed by Mr. Bartle, that needs to be included for completeness.

THE COURT: Okay. So I need a copy of doc -- when was 800 filed?

COURTROOM DEPUTY: Yesterday.

MS. ISRAEL: Yesterday, Judge.

THE COURT: I don't have that. May I have it, please?

COURTROOM DEPUTY: Yes.

THE COURT: And I do have on my housekeeping notes it would be helpful to have a little schematic that shows the ownership interest of the entities and the corporate structure before and after, including Bartle's and Landry's involvement or ownership interest in entities

that owned other entities.

I also had a question on how Nursing was split off. I don't know if there are any documents in the record that show a transfer of an ownership interest. And if it's in one of these voluminous documents, I need to know the exact document.

Ms. Arciola is getting me document 800 now. Is Judge Williamson's order on valuation in this, as well?

MR. APPLEBY: Yes, Your Honor. It's in our request for judicial notice.

THE COURT: In number 800?

MR. WARREN: No. Earlier.

THE COURT: Did I take judicial notice of that?

MR. WARREN: Not yet, Your Honor.

THE COURT: Okay. Okay. So this seems to be a subset. And Ms. Pollan says that largely there's no objection except it needs to be supplemented with two things?

MS. POLLAN: Not two things, Your Honor. I had two different issues I did discuss. Number one was their Exhibit 5 was one of our trial exhibits. And so we would just -- since it's on our exhibit list, we would just like to ask that that go one step further and be admitted as an exhibit.

And the second issue was that for completeness,

Judge Williamson issued an order deeming it signed by Mr. Bartle because he hadn't signed it. And so he proclaimed it signed.

THE COURT: Oh, under the rule where you can just do that?

MS. POLLAN: Yes, Your Honor.

THE COURT: Okay. So what is the trial exhibit number?

MS. POLLAN: If I could grab my --

THE COURT: So the stipulation was deemed signed by Mr. Bartle?

MS. POLLAN: Yes, Your Honor, it was. And I grabbed the wrong --

THE COURT: Should that be -- is that -- is there a separate docket number?

MS. POLLAN: There is, Your Honor. I -- I did not write that down in my haste yesterday, but I will have someone look it up.

THE COURT: So when you get the trial exhibit number, that's item one I need, and then the docket number of the order deeming the signature to exist --

MS. POLLAN: Yes, Your Honor.

THE COURT: -- would be --

MS. POLLAN: I have at least one of those right handy --

THE COURT: Okay.

MS. POLLAN: -- and my team is working on the other. I've just to remember where I put the note to myself so I could tell the Court. Okay. It's our Exhibit No. 191, Your Honor.

THE COURT: Okay. Ms. Arciola, go ahead and mark that ledger -- you're stipulating that in, right, Mr. Appleby?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay.

(Defendant's Exhibit No. 191 received into evidence.)

THE COURT: I have some else for Ms. Arciola -- Ms. Mallow to copy for them.

COURTROOM DEPUTY: Okay.

MS. POLLAN: If Your Honor wants to give us a moment while we're working on this, I think the only other housekeeping issue is we had some outstanding objections to the Struk deposition that we could -- you said we could revisit --

MS. ISRAEL: Stiller.

MS. POLLAN: I'm sorry. Stiller. Shaw Stiller. There were only three objections in that and we had objections to form that we had wanted to make that Your Honor said we could revisit just to buy time.

THE COURT: Yeah. Not objections to form --

MS. POLLAN: Substantive objections, Your Honor.

THE COURT: -- substantive.

MS. POLLAN: Yes, Your Honor.

THE COURT: Let me get Mr. Stiller's deposition transcript. And you're still looking for the docket number that relates to item 5 on document 800; right?

MS. POLLAN: Yes, Your Honor. It's a long docket so it's just taking a little bit of time.

(Discussion off the record between Ms. Pollan and Mr. Warren.)

MS. POLLAN: Okay. I think to speed things up, Your Honor, we only have three objections starting -- one is at page 131.

THE COURT: All right. Let me get there. Okay. I'm on page 131. And this is docket 519.

MS. POLLAN: Okay, Your Honor. Do you need Mr. Appleby to read the question again or how do you want us to do it?

THE COURT: You said line 12?

MS. POLLAN: Starting at line 12, Your Honor, yes.

THE COURT: I do not need him to read that.

MS. POLLAN: Yes, Your Honor.

THE COURT: What's your objection?

MS. POLLAN: The objection is speculation. It asks why someone else would be requesting something.

THE COURT: All right.

MS. POLLAN: It's also hearsay.

THE COURT: No, it doesn't call for what the man said --

MS. POLLAN: Yes, Your Honor.

THE COURT: -- it calls for speculation. I agree with that. I'll sustain it.

MS. POLLAN: Thank --

THE COURT: The answer at line 17 through 22 on page 131, that answer is not part of the record. All right. Next?

MS. POLLAN: All right. There are a couple on 132, Your Honor. It's the same -- line 4. It's the same objection. "Do you know of any other reason."

THE COURT: I'm going to overrule that. He may know a reason.

MS. POLLAN: Okay. Yes, Your Honor.

THE COURT: And it may be because Mr. Bartle told him.

MS. POLLAN: Yes.

THE COURT: But the answer is so harmless to you.

MS. POLLAN: And, Your Honor, forgive me. I haven't had a chance to look at this but -- okay. Yes,

Your Honor, noted. I think there is one more on that page.

THE COURT: Okay.

MS. POLLAN: The question begins at line 18 and we've objected. And the basis to that is -- I mean I think it's --

THE COURT: What's the basis?

MS. POLLAN: I think it's confusing, but it's also speculative. It's asking for a guess.

THE COURT: Well, interest could be used in two ways in that regard. I don't know what I said when I first saw this and there was an objection to the form. Did y'all withdraw the objection to the form?

MS. POLLAN: I honestly can't remember, Your Honor. I just remember --

MS. ISRAEL: I'm so sorry to interrupt. My recollection, Judge, is Ms. Pollan started to say same objection or same objection as previously said after you had made that initial ruling about essentially us not being able to address the objections --

THE COURT: The substantive ones.

MS. ISRAEL: -- one by one, if you will.

MS. POLLAN: Yes, Your Honor.

MS. ISRAEL: Yes, ma'am. I'm sorry. I was struggling to find that word, but that's right.

THE COURT: So I didn't rule on the objection to

the form.

MS. POLLAN: Yes, Your Honor.

THE COURT: I'll sustain that one. It also calls for a legal conclusion. If you look at OIR interest as being a -- a -- a right as opposed to, do I need to or want to know about it for some reason then that would call for a legal conclusion. Now Mr. Stiller is --

MR. APPLEBY: An attorney for the OIR.

THE COURT: Oh, he's an attorney for the OIR?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Oh, okay. Well then I take that back. He would be competent to say that. But it is -- it's a --

MS. POLLAN: I just think it's vague and confusing, Your Honor.

THE COURT: It's -- interest can be used both ways there. And I think with the competency of this witness -- you know what's interesting is that the way he read it, based on his answer is, does the -- does the OIR concern itself with that as opposed to does the OIR have a property interest or property right in it.

May I ask you what you meant?

MR. APPLEBY: Well, Your Honor, I -- this is -- the deposition was taken by Mr. Warren, so.

THE COURT: Mr. Warren, what did you mean by

that?

MR. APPLEBY: Let me --

THE COURT: You mean, does it concern itself or does it have a property interest in it?

MR. WARREN: Your Honor is asking what was the intent of the question to Mr. Stiller --

THE COURT: What did you mean by the word "interest." Are you talking about does the OIR have a property right or interest or some right concerning that, or are you asking if they have concerns or want to know about it.

MR. WARREN: I understand, Your Honor. The -- it actually would be both. The OIR's concern as an interest in MLR was certainly what was being asked. But OIR, as a matter of statute, has interest, property interest, in an MLR --

THE COURT: Okay.

MR. WARREN: -- by virtue of its rights to --

THE COURT: Okay.

MR. WARREN: -- seek from the Court, you know, control of those funds.

THE COURT: Okay. I'll sustain the objection then on the objection to the form.

MS. POLLAN: Thank you, Your Honor. We have one more on page 133.

THE COURT: Yep.

MS. POLLAN: And it is at line 10. And the question is right before it. I think -- you know what? That one is withdrawn.

THE COURT: Okay. So we're done?

MS. POLLAN: Yes, Your Honor.

THE COURT: Okay. So I have excluded two answers. The second answer was the one that is on page 132 from lines 21 to 25. That is not part of the record. Okay. Again, I want to lay the ground rule as a reminder that the court reporter will type it up, the trial testimony, as it was given from the stand, including the read ins. Where there is a material and substantive disconnect with what was read out loud by the person that was playing the witness role, Mr. Warren, or the questioner, Mr. Appleby, those may be pointed out and the transcripts themselves will trump on the substance --

MS. POLLAN: Yes, Your Honor.

THE COURT: -- if there is anything big deal that you detect as a departure from the cold, hard transcripts. All right. So now what? Are we still looking for that docket number that item 5 on document 800 relates to?

(Counsel confer).

MR. WARREN: Your Honor?

THE COURT: Yes.

MR. WARREN: If the Court might help, this order is part of our request for judicial notice at docket 481. And it's at tab 2, so that would put it at item 2 in the record. And it's the Order Granting Liquidating Trustee's Emergency Motion to Compel Execution of Transfer of Membership Interest in Westport Nursing Tampa, LLC --

THE COURT: Okay.

MR. WARREN: -- entered on June 14th, 2018.

THE COURT: Okay. Let me do this. Give me the docket number again and the tab number.

MR. WARREN: Your Honor, this is the problem. What we referenced was the appeal taken by Mr. Bartle of that order. And so I don't have the Bankruptcy Court docket number in this list.

THE COURT: Do you have a pinpoint cite for that particular order?

MR. WARREN: I have a cite to 481 --

THE COURT: Okay.

MR. WARREN: -- dash 2 --

THE COURT: Okay.

MR. WARREN: -- and that would be a copy of that order.

THE COURT: All right. So here's what I'm doing. I'm going to grant number 800 as supplemented by the following: Included in item 5 will also be docket 481-2,

Judge Williamson's order deeming Mr. Bartle to have signed the motion to approve the settlement dated June 14, 2018. I'm also supplementing the -- the request and granting it with this included as admitting Defense Trial Exhibit 191 into evidence.

MS. POLLAN: And, Your Honor, I think we just found the docket number.

THE COURT: Oh. Is that more pinpoint than the appellate reference?

MS. POLLAN: Yeah, I think so. I believe it's 1,035 based off of what Ms. Israel just showed me.

MS. ISRAEL: Let me let Mr. Warren take a look.

(Discussion off the record between Ms. Israel and Mr. Warren.)

MS. ISRAEL: Is that correct?

MR. WARREN: Yes, Your Honor.

MS. ISRAEL: Okay.

THE COURT: Okay. Then let me amend that.

MS. ISRAEL: Judge, it is. It's in the underlying -- in the main case docket entry 1-0-3-5.

THE COURT: Okay. So Ms. Arciola, will you do a little jiffy order for these people who are spending an enormous amount of money, granting number 800 and saying in the other line, item 5 is supplemented with case doc. period 1-0-3-5 period. And we don't need a separate

reference to the trial exhibit because you'll be doing that on your ledger. Defense Trial Exhibit 191 is admitted into evidence without objection. You can do that?

COURTROOM DEPUTY: Yes, ma'am.

THE COURT: Okay. So that takes care of that. What is next?

MR. WARREN: Your Honor, may I make just a comment, because I was a little confused by this. The docket reference to the order by Judge Williamson that was just referenced at docket 1035, was the original transfer by Mr. Bartle's entities to the Debtors that was ordered as a result of the confirmation of the Joint Plan proposed by the Debtors and the Resident Committee.

What is part of the judicial notice request, in connection with docket 800 is the completion for the benefit of the record and for the benefit of the Court, of the retransfer of the ownership interest of Westport Nursing Tampa to certain of the Bartle-related entities based upon a stipulated stipulation approved by Judge Williamson prior to the closing of the actual sale of the facility to --

THE COURT: Okay. So let me get some clarity. The 4/9/2020 order can't possibly relate to the June 14, 2018 order can it, Ms. Pollan?

MS. POLLAN: Yes, Your Honor. And I'm flying

blind here since I didn't participate in these. I just --

THE COURT: So 1-0-3-5 has nothing to do with item 5.

MS. POLLAN: And that's what I thought we just confirmed with Mr. Warren, so I -- I apologize for that. I just --

THE COURT: So you withdraw that request?

MR. WHITSON: Yes, although I am confused. I thought Mr. Warren did confirm that was the correct order so --

MR. WARREN: That was the --

THE COURT: It's the correct order for a different purpose. He's saying it doesn't go with the order that was entered in 2020. The 2018 order was implementing an earlier --

MR. WHITSON: Right.

THE COURT: -- issue.

MR. WHITSON: Right. The -- forcing the conveyance to Mr. Warren. And Mr. Warren giving it back to Mr. Bartle was the second one, so.

THE COURT: Correct.

MR. WHITSON: Right.

THE COURT: But we're still going to admit Defense Trial Exhibit 191 because it's the same thing as item 5.

MS. POLLAN: Yes.

THE COURT: Ms. Arciola, now your jiffy order just got easier. Just say granted.

COURTROOM DEPUTY: Okay.

(Counsel confer).

THE COURT: You've clarified it.

MR. WARREN: That's -- thank you, Your Honor. And just for the record, at docket 481 is the request to take mandatory judicial notice of the membership interest appeal by Mr. Bartle. At tab 2 of that request is this particular order.

THE COURT: But you don't need it. They don't need it, we don't need it, I don't need to know anything else about it.

MR. WARREN: Well, Your Honor, we've asked the Court to take judicial --

THE COURT: We'll go through that one separately. I -- we started with number 800 and I said you can't move it in on -- in *omnibus* fashion. Each one you have to tell me that it is you want me to take judicial notice of. If you do it *omnibus*, I can say, yes, I'll take judicial notice that these things were filed and they are titled this way. But I can't take judicial notice of anything lower than that, more granular.

MR. WARREN: Understood, Your Honor. And --

THE COURT: So that's why we have to go through it. What -- how do you want to use this time, Mr. Appleby?

MR. APPLEBY: Well, I think it may make sense, Your Honor, to go through them in docket order.

THE COURT: So go through 484?

MR. APPLEBY: Well, I believe we start at 467, Your Honor.

THE COURT: Okay. Hold on a minute while I get this oriented.

Ms. Arciola, would you please give these out to the lawyers so that they'll have it? And if you have extras, just leave them outside on the table.

(Discussion off the record between the Court and the parties.)

THE COURT: Okay. I'm at 467 now.

MR. APPLEBY: Okay, Your Honor. Again, by way of a little bit of background just -- again pursuant to Rule 201(b), we would request the Court recognize that the facts here are not subject to reasonable dispute because they're known within the jurisdiction and can be verified from reliable sources.

It's important to note that we're asking that judicial notice be taken within the -- well, excuse me -- to infer the truth of facts contained within the documents but merely -- not for that reason but merely to acknowledge

the existence and the relevance to these cases.

At docket number 467, I'll refer to this as the OIR vs. Westport Holdings Tampa, LP, d/b/a University Village matter. The argument here is that the document -- the documents attached to this outline the regulatory actions taken by the OIR against Westport Holdings. We feel it's crucial to the Court that you recognize these regulatory steps as they provide the context to the governance and oversight failures pertinent in this case, Your Honor.

THE COURT: Well doesn't -- if you're asking for facts where the agency found that the failures occurred, that's the final order. If you're asking me to take judicial notice that the facility was on notice that it was under investigation at certain points in time, I can do that. Taking notice that they were on notice is one thing. Taking as a matter of fact a petitioner's argument or a proposed finding of fact, I cannot do because I can't take it as a fact. Argument is not a fact and a proposed finding of fact is not a fact.

MR. APPLEBY: Well, again, under -- Judge, we're -- it's important to know we are not asking that you take judicial notice to infer the truth of the facts contained in the documents, but to acknowledge the existence and the relevance. And this was -- the citation on this is -- I'll

use back to Judge Williamson's evidence manual. It's *Annis v. First State Bank of Joplin*, 96 B.R. 917 from the Western District of Missouri, 1988, and also *Calder v. Job*, 907 F.2d 953, Tenth Circuit from 1990.

Again, the important part here, Judge, is this is -- it outlines the regulatory actions and it's our position the authenticity and relevance are indisputable.

THE COURT: Again, how does a legal argument have relevance to my findings of fact?

MR. APPLEBY: Well, Your Honor, it's crucial that the -- that it -- what it does is it helps the Court recognize that these regulatory steps took place. This wasn't -- again, I think --

THE COURT: Wait a minute. The steps take place for due process purposes. If you're telling me that I need to sit as an appellate court and say that the final order is bulletproof because the DOHA and Chapter 120 requirements were met, that's one thing. I can say that at these points in time the facility was on notice that it was under investigation, a referral had been filed, an acquisition application had been denied. That's a matter of fact. That's official agency action. I can take judicial notice of that. In fact, it's an exception to the hearsay rule.

That at -- on certain dates the hearing officer

filed the proposed recommended order. There might have been two of them. I can take -- I can take judicial notice that the respondent opposed that and I can take judicial notice for any purpose of the final order, that those agency actions are facts. So that's why I'm asking you to please -- don't just say it's relevant. Would you say that an opponent's legal argument is relevant?

MR. APPLEBY: But, Your Honor, again, the concept here, it's the regulatory steps that took place.

THE COURT: Why are they relevant other than showing the infallibility of the agency action as embodied in the final order?

MR. APPLEBY: Well, Your Honor, I think --

THE COURT: That's notice purposes. They should have known that they were being investigated --

MR. APPLEBY: Right, Your Honor.

THE COURT: -- so X, Y, and Z should have followed from that conclusion. You're just citing it like a blackletter law case. I mean it still has to have relevance to the pleadings.

MR. APPLEBY: Well yes, Your Honor, that's -- that's -- I don't know if maybe I'm just missing something with Your Honor's question, but that's what --

THE COURT: Okay. Let me -- then let me bring it to you. Am I supposed to conclude that the respondent's

memorandum of law is correct as a matter of law?

MR. APPLEBY: No, Your Honor.

THE COURT: Well then why do you want me to take judicial notice of any argument that they made?

MR. APPLEBY: Well, it's to show the -- Your Honor, again, it's the -- the concept here is to show the history that took place, the amount of litigation.

THE COURT: For what purpose?

MR. APPLEBY: (No response.)

THE COURT: Do you want me to say that they had notice of very critical things that were going on and you're going to tell me that that notice fits into something that you pleaded --

MR. APPLEBY: Well --

THE COURT: -- for a reason?

MR. APPLEBY: Well among -- among these pleadings, what they do demonstrate is the specific regulatory actions that took place by the OIR.

THE COURT: What is the regulatory action that took place? There was a referral, there was a denial, and there was a final order.

MR. APPLEBY: That's correct, Your Honor.

THE COURT: Those are all facts that I can find. Those are official agency actions. I'll take judicial notice of all the other things to show that there was steps

along the way that the litigants took in compliance with Chapter 120 and the procedural rules that regulate litigation in front of DOHA. I'll also take judicial notice of the timing -- of the dates of those to the extent that notice is an element or assists with an element of your proof.

Do you have any problem with any of that, Ms. Pollan?

MS. POLLAN: No, Your Honor.

THE COURT: Okay. With those limitations, I'll grant this. Now let me go back and say it clearly. I take judicial notice of tab -- this is in document 467.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Judicial notice of the official agency action that is evidenced by tab 1, tab 2, and tab 9. I take judicial notice of the dates of all of these things as providing notice to the opposing party. I take judicial notice that for the things that are not final agency action or they're not facts evidencing agency action, they at least provide notice to the opposing party and show compliance with Chapter 120 and the procedural rules that DOHA follows. And that -- those are the limits.

MR. APPLEBY: Thank you, Your Honor.

THE COURT: For the transcript purposes, should you need an order, we're at about 11:22. And I'll take a

proposed order on that so you can be -- you know, but a bright line on it from Mr. Appleby.

MR. APPLEBY: Yes, Your Honor.

THE COURT: So Ms. Arciola for the pro memo granted with limitations as to non-agency action.

What's next?

MR. APPLEBY: Your Honor, 468.

THE COURT: Okay. I'll need that, Ms. Arciola.

MR. APPLEBY: And this relates to --

THE COURT: Where there is a conclusion of law by the agency in construing its own statutory and regulatory authority, I adopt that, as well, as agency action. Okay. This is number 468. And we have a couple of cases on here. One in the District Court -- no. This is a Seventh Circuit Court of Appeals --

MR. APPLEBY: Yes, Your Honor.

THE COURT: -- case? What does that have to do with this?

MR. APPLEBY: Well, Your Honor, in this case, these go out to opine where Mr. Bartle's was dismissed from a Chapter 11 first *In re John W. Bartle*, Case --

THE COURT: So what?

MR. APPLEBY: Mr. Bartle was a debtor in a bankruptcy during the 10-year period and not eligible to be affili -- to be an affiliated person for acquisition of a

provider of a CCRC under Florida Statute 628 --

THE COURT: Oh, okay. So you want me to say that -- and when it -- when was the bankruptcy case in play?

MR. APPLEBY: I don't have the -- the order --

MS. POLLAN: I have it for 2009.

MR. APPLEBY: Yeah. March 31st, 2009.

THE COURT: Til when?

MR. APPLEBY: His bankruptcy case was dismissed --

THE COURT: If he couldn't be in bankruptcy, I need to know the times that he was to see how they overlap, if that's the import of this judicial notice.

MR. APPLEBY: I'm sorry, Your Honor. I'm trying to locate that.

MS. SCOTTEN: It's an '07 case number.

THE COURT: It's an '07 case number so it would have started in '07. Thank you, Ms. Scotten.

The dismissal wasn't until 2009, so what are you saying? I thought this transaction was 2014.

MR. APPLEBY: Yes, Your Honor, it was. But the transaction in 2014, he was within the 10-year period and not eligible to be an affiliated person --

THE COURT: Oh.

MR. APPLEBY: -- for the acquisition of a provider.

THE COURT: There's a look back.

MR. APPLEBY: Yeah.

THE COURT: I see.

MR. APPLEBY: And that's referenced again at Florida Statute 628.4615(5).

THE COURT: Say it again? 628 dot --

MR. APPLEBY: Point 4615(5).

THE COURT: Okay. So Ms. Pollan I'm inclined to take judicial notice that Mr. Bartle was in bankruptcy within the 10-year period prior to March 31st, 2014. Any objection to that?

MS. POLLAN: No, that's fine, Your Honor.

THE COURT: All right. I take judicial notice of the appeal opinion for that purpose alone. All right, the second case. What's that one?

MR. APPLEBY: The transcript of testimony, Your Honor, of Mr. Bartle before the Honorable Thomas L. Saladino, United States Bankruptcy Judge. And this was, again, the testimony of Mr. Bartle regarding BVM ownership of the limited partner, and also in April 17, 2014 wire transfer paid on behalf of University Village.

MS. POLLAN: But --

THE COURT: Is Mr. Bartle a witness?

MR. APPLEBY: He is a witness for the defense, yes.

THE COURT: You didn't put him on your list?

MR. APPLEBY: No, Your Honor.

THE COURT: How can I take judicial notice of testimony from a deposition or any other source?

MR. APPLEBY: Well it was a deposition taken in front of a United States Bankruptcy Judge.

THE COURT: And so?

MR. APPLEBY: Well --

THE COURT: Did the other side have -- you know, the hearsay exception says the other side was notice and had the opportunity to participate in the testimony. Did that happen in the District of Nebraska?

MR. APPLEBY: Are you talking about the defendant in this case, Your Honor?

THE COURT: Yeah. That's -- the hearsay exception says if it came from another proceeding and they had the opportunity to be there and cross-examine.

MR. APPLEBY: I -- I don't know, Your Honor.

MS. POLLAN: Valley National Bank I'm pretty --

MR. WHITSON: I know.

MS. POLLAN: -- sure was not there.

MR. WHITSON: Did not.

THE COURT: It's their burden to justify. I'm trying to --

MS. POLLAN: Yes, Your Honor.

THE COURT: I'm trying to cut to the chase here. Just because somebody testified somewhere in the world doesn't mean it's admissible or I can take judicial notice of it.

MR. APPLEBY: I understand, Your Honor. Well, Your Honor, I thought that I had an exhibit at tab 4 under this where there was an order appointing a Chapter 11 trustee. And that order from the bankruptcy court removed Mr. Bartle as the Debtor's chief restructuring officer and appointed the Chapter 11 trustee. I'm looking because I thought that I had that.

THE COURT: And how is that relevant to your pleading?

MR. APPLEBY: Well, again I think, Your Honor, that it goes in and it's central to understanding the managerial and financial instability as it related to Mr. Bartle and --

MS. POLLAN: But, Your Honor --

THE COURT: Hold on.

MR. APPLEBY: -- this is directly pulled from court records which are --

THE COURT: So the debtor was -- hold on. The debtor was a debtor in Nebraska in 2014 and Mr. Bartle was removed from that?

MR. APPLEBY: No, Your Honor. Skyline Manor,

Inc., which is the entity that Mr. Bartle was affiliated with there. But the point is, these were directly pulled from those court records, which are reliable but not reasonably subject to dispute.

THE COURT: So what is -- what do you want me to take notice of, he was removed as a management person in connection with another business?

MR. APPLEBY: Yes, a CCRC, Your Honor. And I believe the text of the order, what's very clear on that, is --

THE COURT: And this is -- and this is -- when is -- what was the date of the order?

MR. APPLEBY: I believe on May 28th, 2014.

THE COURT: That's after the transaction; right?

MR. WHITSON: Yes, Your Honor.

MS. POLLAN: Yes, Your Honor.

MR. APPLEBY: The actual order was entered after, yes, Your Honor.

THE COURT: When was the finding made? I mean, I -- can y'all -- can you link up something to the relevance of your burden of proof in this case?

MR. APPLEBY: Your Honor, I think the relevance here is again going back to Mr. Bartle being involved with CCRCs and there's a history that's relevant in these documents of his mismanagement of CCRCs.

THE COURT: Okay. So he's a bad manager and someone declared him that after the transaction went down.

MR. APPLEBY: Well the case was ongoing at that time, Your Honor.

THE COURT: Did Valley National Bank have notice that Mr. Bartle was involved in this Skyline and did they know about this potential ruling and yet they chose to make a loan to his entity?

MR. APPLEBY: Well yes, Your Honor, that was in Mr. Price's testimony, his deposition testimony yesterday where he talked about other litigation.

MS. POLLAN: Your Honor, that's a huge stretch from what was actually read into the record.

THE COURT: Okay. Is Mr. -- did Mr. Price say that he knew that Bartle -- that they were making a loan to a guy who had been displaced from another CCRC's --

MR. APPLEBY: I think the reference was that he passed along information about litigation that was ongoing.

MS. POLLAN: There was like three words, Your Honor.

THE COURT: Do you have any evidence that shows that they sent this order over to Valley National so that they knew they were dealing with someone who was a bad manager?

MR. APPLEBY: I believe so, Your Honor. If I

could have just a moment?

(Discussion off the record between Mr. Appleby and Mr. Warren.)

MS. ISRAEL: I would ask Mr. Appleby to refer by page and line number to whatever he read into evidence from Mr. Price's deposition --

THE COURT: That's fine.

MS. ISRAEL: -- if that's the statement he's making.

THE COURT: That's fine. You can do that. I think there's a concordance there. Let me get that deposition transcript out.

MR. APPLEBY: Your Honor, again, I'll withdraw as far as the reference yesterday because -- rather than wasting the Court's time at this juncture, but this --

THE COURT: Again, I do not want to be put in a position of being criticized for clamping down on you. If you have an argument to make --

MR. APPLEBY: Well --

THE COURT: -- and it's in good faith, make it. If you want to withdraw it, you can withdraw it.

MR. APPLEBY: I'll withdraw it, Your Honor.

THE COURT: All right. So tab number 2, that's withdrawn. Okay. So --

MR. APPLEBY: Yes, Your Honor. Actually I

misunderstood Your Honor as far as withdrawing. I meant the reference to the testimony.

THE COURT: Okay. Then tell me again how it is relevant for me to take judicial notice that a man was displaced from another facility after March 31st, 2014.

MR. APPLEBY: Well leading up to that, Your Honor, the -- the application made to Valley National Bank indicated -- where Mr. Bartle referenced himself and applied holding himself out to be a chief restructuring officer with CCRCs. And the position we have, and which I think this is relevant, is that -- that the Bank did not do due diligence to review any of this or to verify any of this and moved forward with the loan without conducting the due diligence.

THE COURT: This isn't a 523(a)(2) -- excuse me -- 523(a)(2)(A) or (B) case. Do you have a -- do you have someone that's going to testify that if the background of a borrower is set out on a loan application that there are industry standards that would require you to check with the people that he represents he's doing business with?

MR. APPLEBY: Well, Your Honor, it's -- again, the MLR statutes require all these things. They require Mr. Bartle --

THE COURT: Where does it say that a bank has to investigate an application of a borrower to find out if the

applicant has problems with other business relationships?

MR. APPLEBY: Well, Your Honor, I don't know that that's a statutory requirement that the Bank do that. But the MLR statutes, when he is -- when he is effectively purchasing a CCRC, there is a list of things that have to be done.

THE COURT: And he should have done what he needed to do. Your argument is that the Bank knew about it, did business with them, pushed him forward and promoted him as the best candidate or whatever your argument is. I'm not getting it yet. So that's why I've got to ask you, what does this have to do with your pleading as against Valley National Bank?

MR. APPLEBY: (No response.)

THE COURT: Let's assume I just say he's a bad guy. Where does that get you? And that's a hypothetical. I've never met the man.

MR. APPLEBY: Your Honor, I think again it goes to the background and fitness that the Bank needed to do. By putting their head in the sand, that's --

THE COURT: Says you?

MR. APPLEBY: I'm sorry?

THE COURT: Says you. Do you have an expert that says that their loan underwriting steps were faulty, incomplete, they didn't do what is customary in the

industry to check out the borrower?

MR. APPLEBY: Your Honor, again the issue here is Mr. Bartle's qualification to become a borrower in this case. Statutorily, he could not be --

THE COURT: Again, says you. Do you know how many Chapter 11 principals I have that, you know, you might call a bad guy?

MR. APPLEBY: But the --

THE COURT: And yet they qualified for loans.

MR. APPLEBY: Your Honor, the issue where I'm going with this, and the relevance to this, is how it's connected to Mr. Bartle was ineligible to apply with the --

THE COURT: How did they know that? They're -- they're -- they're relying on the OIR.

MR. APPLEBY: Again, Your Honor, that is the whole point, that they're relying on the OIR and the OIR has its specific requirements.

THE COURT: The OIR has requirements. And the applicant to do business under the OIR's regulatory scheme has the obligation to provide documents that are true and accurate. And if they don't, then the OIR has a problem with them. The OIR never -- I don't even know what the OIR did yet in all of this mess except for what is evidenced in these final agency actions.

MR. APPLEBY: Again, Your Honor, I'm -- what I'm

suggesting is the statutes lay out very clearly what's required in order to be an affiliate or an owner.

THE COURT: I understand it. And so is Valley National Bank guilty of why Mr. Bartle didn't accurately disclose his background?

MR. APPLEBY: (No response.)

THE COURT: How does this information from Nebraska aid your case? I'm asking you that. Are you just asking me to declare that Mr. Bartle is a bad guy and you're going to work it into some other argument?

MR. APPLEBY: No, Your Honor. I'm just asking that Your Honor take notice that the case existed and it sets forth --

THE COURT: Okay. Do you have any objection to my taking judicial notice that a Nebraska Bankruptcy Judge threw Mr. Bartle out as a manager of a debtor-in-possession?

MS. POLLAN: Your Honor, we completely understand and appreciate all you -- what you've just done and I don't want to be difficult, but obviously --

THE COURT: I'm not representing your client, ma'am. I'm just trying to make sure that --

MS. POLLAN: Obviously, yes, we object, Your Honor.

THE COURT: -- my discretion is exercised

correctly --

MS. POLLAN: Yes.

THE COURT: -- under Rule 2000 -- excuse me, 201.

MS. POLLAN: Yes, Your Honor. We have an objection to that based --

THE COURT: What is it?

MS. POLLAN: Based on relevance, Your Honor. There's no relevance. And they -- there's been no conclusive proof to everything that Mr. Appleby just proffered to the Court --

THE COURT: Well, he -- no.

MS. POLLAN: -- over four-and-a-half days.

THE COURT: He says there's an order that unseats Mr. Bartle. He says that somewhere in the record is an application where by Mr. Bartle didn't tell anybody about Skyline.

MS. POLLAN: Yes, Your Honor. And again Mr. Bartle is not the borrower here.

THE COURT: He would be the signer on an application.

MS. POLLAN: He didn't -- not on March 31st, Your Honor. He hadn't even acquired it yet.

MR. WHITSON: Your Honor, they have not linked up anything to do with what they're alleging Mr. Bartle did.

THE COURT: I have been pushing them for that. I

-- the only thing I can see is that he was incompetent to be a manager under bankruptcy rules that got him unseated as management of a DIP. That's all I can do. But I don't see how you can knit that into a -- the tale that you're attempting to spin here, Mr. Appleby.

MR. WHITSON: Your Honor is right. This is --

THE COURT: There's nothing to show that the Bank knew about it, I don't have any expert that says that they should have known about it in the exercise of due diligence that is standard operating procedure for loan underwriting. I'm denying that piece. But I am granting number 468 to the extent of saying that Mr. Bartle was in bankruptcy within the 10 years preceding March 31st, 2014.

Is there a later date that you need me to go out to so that I don't cut you short? I could take judicial notice of the date of the dismissal of his case, and so we can say he was in from a period of time in 2007 up to a date certain. And then whatever is 10 years after that is 10 years after that.

MR. APPLEBY: I understand. Again, Your Honor, the point of that was that he was removed, but.

THE COURT: No. I'm talking about the first case, his individual case.

MR. APPLEBY: Yes, Your Honor. I believe the date --

THE COURT: We'll leave that open for homework. Just give me the date that he -- that his case was dismissed so we can say that he was in from a point in time in 2007 through and including the date of the dismissal. Or up to the date of dismissal. And then we can -- you can put that in your order, run that by Ms. Pollan, and then I'm denying as to the lower part of the page on page 2 of 468. Okay.

MR. APPLEBY: And Your Honor --

THE COURT: What else?

MR. APPLEBY: -- then docket number 471. This was -- related to Defendant's appeal of litigation funding agreement.

THE COURT: Okay. Let's have 471 up, Ms. Arciola.

MR. APPLEBY: Your Honor, we'll skip that one actually. I'll withdraw it.

THE COURT: You don't want any action on document 471?

MR. APPLEBY: (No response.)

THE COURT: Withdrawn in open court?

MR. APPLEBY: Yes, Your Honor.

THE COURT: 471 withdrawn in open court. You can put that in the pro memo, Ms. Arciola.

All right. So now does that leave us where we're

at with the stipulations or is -- I call them stipulations, but I think they're more appropriately called admissions to Mr. Appleby's pleading and admissions or concessions as made in discovery responses. You got all those done?

MS. POLLAN: Yes. I need to look at my computer, Your Honor.

THE COURT: Okay. Do y'all need time to confer?

MS. POLLAN: I think that would be helpful.

MS. ISRAEL: Yes.

THE COURT: And once you confer, is that something y'all can spit out in about five minutes time on the record?

MS. POLLAN: I think so, Your Honor.

THE COURT: All right. Then take -- take 10 to 15 minutes, come back in at 5 of 12. We'll take care of that, then we'll take our lunch break.

MS. POLLAN: Yes, Your Honor.

MS. ISRAEL: Thank you, Judge.

THE COURT: Okay.

(Whereupon, there was a brief recess, 11:42 a.m. to 11:47 a.m.)

THE COURT: Okay. Are y'all ready to go with number 746, which involves number 184, which is the answer, admissions at 113 and 127, and as well again at 465-32?

MS. POLLAN: And, Your Honor, just to let you

know, I'm handling this, but I'm just sitting so I have my computer handy.

THE COURT: You can sit.

MS. POLLAN: Thank you.

COURTROOM DEPUTY: Which document, Judge?

THE COURT: We're at 746.

COURTROOM DEPUTY: All right. Do you have a copy of that?

THE COURT: We're taking objections to the contention by the Plaintiff that these are admitted facts for trial.

COURTROOM DEPUTY: Do you have a copy of that?

THE COURT: Do I?

COURTROOM DEPUTY: Yes.

THE COURT: Yes, I do.

COURTROOM DEPUTY: Oh, okay.

THE COURT: Thank you.

COURTROOM DEPUTY: Uh-huh.

MS. POLLAN: Are you -- are you waiting for me, Your Honor?

THE COURT: Yep. We're taking objections to what the contentions are that there are facts that your client has admitted and you're saying that's not so.

MS. POLLAN: Yes, Your Honor. As far as -- excuse me -- paragraph 2, we only had wanted to ensure that

that was subject to and without waiver of our position as set forth in the motion for summary judgment that we previously filed.

THE COURT: Well, jurisdiction is subject matter jurisdiction, it's not the power to enter a final judgment. Have you contested that this Court has the power to enter final judgment timely?

MR. WHITSON: Your Honor, we have -- you mean in terms of a *Marshall* -- a *Stern v. Marshall* type of objection?

THE COURT: Yeah.

MR. WHITSON: We're not -- we're not raising that issue. We just think that there is a subject matter jurisdictional issue that we're not -- we're not --

THE COURT: What is it?

MR. WHITSON: We raised it in our motion for summary judgment, Your Honor. And Your Honor denied it.

THE COURT: Okay. What is it?

MS. POLLAN: It's the -- I'll just refer to it as the standing argument, Your Honor, that you've denied.

MR. WHITSON: Right.

MS. POLLAN: Mr. Warren's --

THE COURT: And is that jurisdictional?

MR. WHITSON: Well, if these are claims, the damage claims, they don't belong --

THE COURT: No, no. It's a question. Is it jurisdictional?

MR. WHITSON: I believe it is jurisdictional, Your Honor.

MS. POLLAN: I believe --

MR. WHITSON: If it's not property of the estate, the Court has no jurisdiction.

THE COURT: Okay. So it's not an affirmative defense --

MR. WHITSON: Correct.

THE COURT: -- the precludes the remedy. You're saying it precludes my ability to hear anything at all.

MR. WHITSON: Correct.

THE COURT: Okay. All right. Then I don't think that number 2 can be -- it's not a stipulation or a concession. Did they say -- did they say yes?

MR. APPLEBY: That's the exact language from their -- their --

THE COURT: Oh. What in the world are y'all talking about? You admitted it.

MR. APPLEBY: Your Honor, we had asked first -- we had asked that they provide us with what they dispute in this in writing. We didn't get that. We went through the list quickly just now. But every --

THE COURT: Hold on. Let me get their answer.

MR. APPLEBY: Yes, Your Honor.

THE COURT: If you admitted it, then what are you doing?

MR. WHITSON: Well, Your Honor, I mean for the purposes of a pleading and an answer, but it wasn't -- we've raised an issue in our motion for summary judgment.

THE COURT: How can you if you admitted it? I guess you can raise jurisdiction at any time.

MR. WHITSON: We can raise it any time we want to.

MS. POLLAN: Your Honor, at any time. And also the facts change.

THE COURT: Why would you answer it with an admission then?

MR. WHITSON: Well --

MS. POLLAN: The facts change, Your Honor, and --

THE COURT: This says, Valley admits that this Court has jurisdiction over the claims set forth in the amended complaint.

MR. WHITSON: Well, Your Honor, again as discovery progressed and we realized that all of these claims belong --

THE COURT: You don't know what the claims are?

MR. WHITSON: Well, Your Honor, we've made our argument and we raised it again and --

THE COURT: It's fine. Jurisdiction can be raised at any time. I'm -- 2 is not admitted notwithstanding the fact that it's clearly admitted in the answer at doc. 184. Next?

MS. POLLAN: Same with number 3, Your Honor, as far as if the Court lacks subject matter jurisdiction then it may not be a core proceeding.

THE COURT: If the Court lacks subject matter jurisdiction --

MS. POLLAN: If the money isn't flowing back to the estate, per se, then it's not core.

MR. WHITSON: Or that Mr. Warren isn't suing on claims that --

THE COURT: So there's not --

MR. WHITSON: -- are property of the estate.

THE COURT: There's not a fraudulent transfer count here that seeks to recover money for the estate --

MR. WHITSON: Your Honor, but the -- but the --

THE COURT: -- meaning the liquidation trust?

MR. WHITSON: Well, to the extent there is also claims for aiding and abetting, which the damage is all the monies that are owed to the residents or to the administrative claimants or to other unsecured creditors. Those are the three buckets that Mr. Warren identified.

THE COURT: Well, did you make a reservation in

paragraph 3 for the aiding and abetting count?

MR. WHITSON: Well, we can carve that out, Your Honor. I mean --

THE COURT: No, you can't. Mr. Whitson, an answer has meaning. It means that the other side doesn't have to prove anything if you say yes.

MR. WHITSON: Well, I think it goes back to Your Honor's point that it is subject matter jurisdiction and it isn't waived anyway so.

THE COURT: Core proceeding doesn't effect subject matter jurisdiction, it effects who enters a final judgment. That's different from subject matter jurisdiction to entertain the dispute.

MS. POLLAN: And --

THE COURT: You can hear it, you may not be able to enter final judgment on it. That's two different things. That's distinct from subject matter jurisdiction.

MS. POLLAN: And you're right, Your Honor. I think the issue is is that the core versus non-core as far as the money going to benefit claimants that have filed -- and I'm going to say the subordinate notes that's in another bankruptcy, then there may not be any money that flows to this estate.

THE COURT: This estate has creditors. And if there's a surplus, you know that there's a perfectly good

statute that says --

MS. POLLAN: We don't believe there are creditors, Your Honor.

MR. WHITSON: We don't think there are any creditors in this estate, Your Honor.

THE COURT: Okay. I read your -- listen. I read what y'all tried to make out of that order of -- or the amended Plan. I asked you the question I asked you for a reason. Does the modification supplant en masse, the whole plan, and you said no. And I read that plan. And that plan -- the only way to make sense out of the plan is to give effect to all of the provisions.

And if those claims were totally forgiven, there would be no point in having the disbursement -- the collection and disbursement and implementation provisions in a liquidating trust that benefit those specific claims.

MR. WHITSON: Those are mechanisms, those are not claims.

THE COURT: Sir, Class 14 is entitled to money under the trust. Period, end of discussion. There's no way that you can harmonize those two provisions by -- if you suggest that that provision just doesn't exist anymore. Judge Williamson left it in. Apparently nobody said boo about the fact that, well, they get money over here, they might get money over here. Are they getting money both

places? The answer is yes. Judge Williamson approved it and he left in the provisions in the trust that clearly, by class number, they say it by class number, get this money, and it's based on the denominator and some other thing. There's a calculation. The money flows to them under the trust.

MR. WHITSON: Well, Your Honor, I think there's a conflict in the Plan then that may need to be harmonized because the provisions says that all those holders got notes --

THE COURT: You can tell me --

MR. WHITSON: -- in full satisfaction --

THE COURT: It's in full satisfaction of something as against somebody else. But that trust right still exists. It's in there. I am not disturbing Judge Williamson's order saying that the modification is in part not in whole.

MR. WHITSON: Your Honor --

THE COURT: That is what happened.

MR. WHITSON: -- all we're saying is the word "satisfaction" has a legal meaning in the law.

THE COURT: Sir, and it does. And it depends on which party you're being satisfied as to. And so you don't leave in all of those provisions under the trust and leave them meaningless. There would be no purpose for the trust.

We wouldn't even be here today.

MR. WHITSON: There are a lot of trusts that have no purpose.

THE COURT: Sir, I'm telling you that the confirmation -- the order confirming the modified plan and permitting that leaves in place the trust and its functions and its payees and its calculations. So you've lost that one. Rule 52, if that's your only argument --

MR. WHITSON: No. We have others.

THE COURT: Oh, you have arguments --

MR. WHITSON: Yes, Your Honor.

THE COURT: -- on about why that's satisfied? So you're going to have witnesses?

MR. WHITSON: Well, Your Honor, I mean I'll let Ms. Israel make the Rule 52 motion.

THE COURT: Okay. I do not buy that argument on standing. And we're now talking about core and non-core. It says here you can -- you admitted it. Was the aiding and abetting in there at the time?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. Aiding and abetting -- number 3 sticks. What's next?

MS. POLLAN: One moment, Your Honor. As far as 8.b, we wanted to add language after "respectively," that says, until the ILF was sold by the liquidating 20 --

excuse me -- the liquidating trustee on -- and I don't have the date in 2020 -- to Tampa Life Plan Village, which is --

THE COURT: I thought when y'all went out, you were agreeing on these things.

MS. POLLAN: Your Honor, we did agree. There are several we agreed to.

THE COURT: So is this agreed, Mr. -- is this agreed?

MS. POLLAN: No. I'm sorry.

MR. APPLEBY: No, Your Honor.

MS. POLLAN: I misunderstood Your Honor's instruction. I thought you just wanted me to look at the ones I was objecting to. All the other ones we've agreed to.

THE COURT: I wanted you to confer.

MS. POLLAN: We did.

THE COURT: Oh, you did?

MS. POLLAN: Yes, Your Honor.

THE COURT: Okay. So you're still in disagreement on 8.b?

MS. POLLAN: Yes, Your Honor.

THE COURT: Okay. I don't see a source to this supposed admission, Mr. Appleby. You say they admit. Where did they admit that?

MR. APPLEBY: It's -- I believe it's number 8 to

the answer to the complaint.

THE COURT: Oh, there's no -- oh, there's no 8.b demarcation. You've admitted -- you've admitted 8.

MS. POLLAN: Yes, Your Honor. We have no objection to the fact that we admitted 8.

THE COURT: Well then why are you telling me anything about 8.b?

MS. POLLAN: Because they have it on here. This is on their -- they have this listed and we objected. And I was specifying --

THE COURT: Okay. Then is your objection that he has misstated the admissions that were pleaded in paragraph 8 of the amended complaint?

MS. POLLAN: The objection was solely that we wanted it to be complete as far as --

THE COURT: My question to you, ma'am, is as pleaded in paragraph 8, does this fairly represent what was asked and admitted to? If it's not the same wording, I will accept your objection. If it's the same wording, then I cannot because your client admitted it.

MS. POLLAN: Yes, Your Honor. It's the same.

THE COURT: Okay. Then you can't change what your answer is. All right. So 8 is admitted. What's next?

MS. POLLAN: And -- and the ones that we're

skipping over, Your Honor, those have all been agreed to and admitted. So --

THE COURT: Hold on. I didn't look at your third amended answer. I've got to make sure. Yes, it's still the same. Okay.

MS. POLLAN: Okay. We're jumping to 11.

THE COURT: Okay.

MS. POLLAN: I believe it's supposed to say, Valley admits that University Village while it was a CCRC entered into life-care contracts.

THE COURT: And where is that? What is doc. 6-1 at paragraph 15?

MS. POLLAN: I don't have that pulled up, Your Honor. I apologize.

THE COURT: Mr. Appleby?

MR. APPLEBY: Your Honor, I've got to pull it up. My understanding is we put the exact words that were in the answer.

MS. ISRAEL: Judge, it's the amended complaint.

MR. APPLEBY: Yeah. The amended complaint is at 6.1 and paragraph 15.

MS. ISRAEL: I think that's what she was asking.

THE COURT: All right. Let me go to that one.

MS. POLLAN: Well, we didn't draft the amended complaint, Your Honor, so that's -- we're stipulating to a

change --

THE COURT: No. He's telling you what you've admitted to and therefore I may take as a fact.

MR. WHITSON: Then we'll keep his typos in there. That's fine.

THE COURT: If the typos are in there, they're in there.

MS. WONDER [sic]: This is their amended complaint.

MR. WHITSON: Okay, Your Honor. I take it back.

THE COURT: Okay. 11 says, 6-1 at paragraph 15. Oh, at paragraph 15. At paragraph 15 is a pleading that says, University Village is a CCRC that has entered into life-care contracts with senior citizens and retirees in the Tampa Bay area. So they admitted actually more than what 11 says. Do you think it's necessary to put that in there?

MS. POLLAN: No, Your Honor. We'll concede.

THE COURT: Okay. What's next?

MS. POLLAN: 14.

THE COURT: All right. Let me see what paragraph 6 says in document -- paragraph 36 says in document 6-1. 36 says -- now on this one in your answer, in Valley National's answer, part of it is without knowledge and part of it is admitted. What is admitted is that -- let me get

the wording exactly from the answer.

MS. POLLAN: This should be --

THE COURT: -- Valley admits that the MLR was pledged as collateral and states that the loan documents speak for themselves.

MS. POLLAN: This is fine, Your Honor. I'm --

THE COURT: That's fine?

MS. POLLAN: Yes, Your Honor. I withdraw.

THE COURT: Okay. What's next? For the record, I'm looking at docket 184 to find the admissions to the --

MS. POLLAN: Yes, Your Honor, I'm looking at the same one.

THE COURT: -- to Plaintiff's 6-1.

(Counsel confer.)

MS. POLLAN: Your Honor, if we look at paragraph 19.

THE COURT: I'm looking at 19 in 746, which is the assertion of a concession, yes.

MR. APPLEBY: Your Honor, prior to that, though, Ms. Pollan a moment ago indicated that they did not consent to 17.

MS. POLLAN: Yes. That's withdrawn. I apologize for not stating that out loud.

THE COURT: 19 speaks to document 113 at paragraph 12. Do you have that, Mr. Appleby? I do not.

MR. APPLEBY: I don't have the copy in front of me, Your Honor.

THE COURT: Okay. We're not prepared to go through these then.

MR. APPLEBY: Your Honor, that's why we had asked for written responses, but.

MS. POLLAN: Judge --

THE COURT: You don't need a written response if --

MR. APPLEBY: Well, just so that we could understand what the objection was.

THE COURT: You're still going to have pull up document 113, whether she says it out loud or we stop and she puts it in writing.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Somebody has to pull up the documents. Why don't you just do this during the lunch break?

MS. ISRAEL: I was just going to suggest that, Your Honor. We might be able to be far more efficient --

THE COURT: Okay. When do you -- how long do you think it will take you to go through these, pull up the documents that are noted, see if you actually admitted to that in an interrogatory or in a request for admission, and then cut through the -- cut the wheat from the chaff?

MS. ISRAEL: We will utilize as long as it takes during the lunch hour to accomplish that, Judge. I would propose that we return at 1:30.

THE COURT: That's fine. We'll break until 1:30. Thank you all.

MS. ISRAEL: Thank you.

MS. POLLAN: Thank you, Your Honor.

(Whereupon, court in recess, 12:16 p.m.)

(Court reconvened, 1:31 p.m.)

**(1:31 p.m.)**

COURTROOM DEPUTY: All rise. Court is now in session.

THE COURT: All right. Please have a seat everybody.

COURTROOM DEPUTY: Westport Holdings Tampa Limited Partnership, Case 16-8167, Adversary 20-007.

THE COURT: All right. We're back in session in the trial in the adversary proceeding. The attendees look to be about the same except -- well, someone' out of --

MS. ISRAEL: He's just stepped outside, Your Honor.

THE COURT: Okay. And Ellsworth Summers in the back. So we're just missing Colin Dean?

MS. ISRAEL: Yes, Your Honor.

MS. POLLAN: Yes, ma'am.

THE COURT: Okay. All right. And Mr. Summers is in the back. Okay. So Mr. Summers represents a witness. So, is he going to be permitted to listen to what's going on in here?

MR. APPLEBY: Your Honor, Plaintiff does not have an objection for Mr. Summers to be in attendance.

THE COURT: All right. Thank you. We did invoke the Rule. Not "we," Mr. Summers, but --

MR. APPLEBY: Well yes, Your Honor, I mean --

THE COURT: -- so you can't speak to your client with -- about what we're discussing here, Mr. Summers.

MR. SUMMERS: Understood, Your Honor.

THE COURT: Okay. Mr. Appleby and Mr. Warren trust you in effect because they're allowing you to sit in here.

All right. So do we have resolution on the document that we were going over? Number 746. And I think we were somewhere in the early 20's.

MS. POLLAN: Yes, Your Honor. And I conferred with Mr. Appleby. There were only four in the entire document that just needed a little tweaking.

THE COURT: Okay. So what are we going to do about that?

MS. POLLAN: I think he's okay with what I --

MR. APPLEBY: Well, I want to --

MS. POLLAN: Yeah.

MR. APPLEBY: -- for the record I want to make sure I know which four we're talking about --

MS. POLLAN: Yes.

MR. APPLEBY: -- and what the objection is.

THE COURT: Okay.

MS. POLLAN: Number 20. It's supposed to end after the word "loan agreement" to match --

THE COURT: Okay.

MS. POLLAN: -- what we had previously admitted.

THE COURT: That's paragraph 20 on page 5 of 11 of document 746. I'll strike everything after "loan agreement."

MR. APPLEBY: Well, Your Honor, that's what I want to confirm. I hadn't --

THE COURT: Oh, please. I -- I really --

MR. APPLEBY: Well, Your Honor, I just got these four a moment ago. I wasn't sure which --

THE COURT: Okay. Do we have -- will someone please give me docket 113 so I can check the source document. Does anyone have docket 113 in a pleading binder?

MS. ISRAEL: I don't.

MS. POLLAN: I had to pull mine up, Your Honor.

THE COURT: Y'all are just going to spend all day

on this. Mr. Summers has come all the way down here.

MR. APPLEBY: Yes, Your Honor. If I could hand you a copy of 113.

THE COURT: Thank you. I'm looking now at docket 113 at paragraph 14, because that is cited as the source of the admission. That's not what paragraph 14 says, Mr. Appleby. It says, Section 5.17 of the loan agreement prohibits quote "access, withdrawal, or other utilization of such funds." That's not at all what you have here.

MR. APPLEBY: At paragraph 14, Your Honor?

THE COURT: Paragraph 14 says, Section 5.17 of the loan agreement prohibits the quote "access, withdrawal, or other utilization of such funds."

MR. APPLEBY: Well again, Your Honor --

THE COURT: The response is, Defendant does not dispute the language of the loan agreement. Now does that mean the entire loan agreement or what was cited there, Ms. Pollan?

MS. POLLAN: Your Honor, it was admission as to what was cited there as far as the loan agreement. But I was just trying to be accurate as far as what the Court's instruction was previously.

THE COURT: Okay. There is nothing in that request on paragraph 14 that speaks about the cash collateral account at all.

MR. APPLEBY: Well, I understand, Your Honor. Also at paragraph 21, just below that, I think there may be a scrivener error where I inadvertently did too. It might be -- I believe 20 might be referring to paragraph 13 --

THE COURT: All right.

MR. APPLEBY: -- and that's the error.

THE COURT: Let me get to 13. She can't --

MS. POLLAN: I'm going to need to sit at my computer, Your Honor.

THE COURT: -- read your mind. These have been pending since April 16th. They are part of the Plaintiff's case. And there's -- we have mentioned them almost every day of this week.

MS. POLLAN: Yes, Your Honor. But I'm just finding out about a scrivener's error. I went through and I matched --

THE COURT: I understand that. She has -- you have the rely on what he put there. 13 has this very specific language, as well. Sections 2.2 and 4.20 of the loan agreement require Westport Nursing Fund -- excuse me -- Westport Nursing to fund $3 million which shall serve as additional security for Westport Nursing's obligations to USAmeribank.

The -- the response is exactly what is put down in number 20, which says, Defendant does not dispute the

language of the loan agreement or that the cash collateral account was opened, even though 13 said nothing about a cash collateral account. It said funding 3 million.

I'm going to change paragraph 20 to refer to docket 113 at paragraph 13, and I find that that is an admission because that is exactly what it says. But it's got to be refined to include Sections 2.2 and 4.2 -- why would you say things -- I mean -- okay.

Paragraph 13 at document 113 is admitted as it's written. And according to Valley National Bank they consider the $3 million to be cash collateral account. So 13 is admitted wholesale, as written in docket 113. Number 21 --

MS. ISRAEL: Judge, for clarification you mean paragraph 20? I know this is quite confusing but --

THE COURT: Paragraph 20 --

MS. ISRAEL: Thank you.

THE COURT: -- of 746 --

MS. ISRAEL: Thank you.

THE COURT: -- will be deemed to refer to paragraph 13 at docket 113 as written. As written, paragraph 13 of 113 says, Section 2.2 and 4.20 of the loan agreement require Westport Nursing to fund $3 million which shall serve as additional security for Westport Nursing's obligations to USAmeribank. Response: Defendant does not

dispute the language of the loan agreement, which I am going to say, based on Ms. Pollan's discussion, is not to meant -- mean all language but just the quoted language. Additionally, the response apparently, considering the $3 million to be cash collateral account, admits that it was opened. So all of 13 is admitted.

Paragraph 21 of docket 746. Valley does not dispute that the language of the loan agreement and that -- and that Section 5.17 of the loan agreement prohibits the access, withdrawal, or other utilization of such funds, citing docket 113 at paragraph 14. Paragraph 14 does not -- is not a compound request. It doesn't have the first clause that is set out in paragraph 21 of docket 746.

Paragraph 14 of 113 says, Section 5.17 of the loan agreement prohibits the access, withdrawal, or other utilization of such funds. Response: Defendant does not dispute the language of the loan agreement.

Ms. Pollan, that's meant to apply only to the quoted language; is that right?

MS. POLLAN: Yes, Your Honor.

THE COURT: Paragraph 14 is admitted *in toto*. All right. What's the next one?

MS. POLLAN: The only other two, Your Honor, were 24 and 25.

THE COURT: Okay. 24 of document 746 says,

Valley does not dispute the language of the pledge agreement that contains in paragraph 3 that the agreement grants control over the USAmeribank account. Citing document 113 at paragraph 17. Paragraph 17 says, paragraph 3 of the pledge agreement grants control over the USAmeribank account. Response: Defendant does not dispute the language of the pledge agreement.

So I guess you have broadened, Mr. Appleby, maybe what was intended there. No, you've got it confined to that. Valley does not dispute the language of the pledge agreement that Westport -- okay. So what's your issue there?

MS. POLLAN: Your Honor --

THE COURT: Is it the date?

MS. POLLAN: I'm sorry?

THE COURT: Is it the -- are we at -- which one are we on?

MS. POLLAN: I think the problem is -- it's number 17 of 113, Your Honor.

THE COURT: Oh. There's no date on that one. Okay. What -- what's the issue there?

MS. POLLAN: I think -- that's a very broad statement, and so I think our argument is that whatever the pledge agreement says speaks for itself, essentially, Your Honor, which was one of the assertions -- insertions --

THE COURT: This says -- number 17 in 113 specifically just says, paragraph 3 of the pledge agreement grants control over the USAmeribank account.

MS. POLLAN: And our response was, Defendant does not dispute the language of the pledge agreement.

THE COURT: You want the whole pledge agreement or you want the language that it set -- extracted there from paragraph 3?

MS. POLLAN: I think the problem is that how it was --

THE COURT: I don't see a substantive --

MS. POLLAN: -- phrased.

THE COURT: -- difference. Valley does not dispute the language of the pledge agreement that contains in par -- only that language --

MS. POLLAN: Okay. Yes, Your Honor.

THE COURT: -- that Mr. Appleby cited in paragraph 17, you don't dispute.

MS. POLLAN: Yes, Your Honor. We'll withdraw --

THE COURT: But now you're telling me you dispute it.

MS. POLLAN: Your Honor, I had misunderstood our prior response. I will withdraw. Thank you, Your Honor.

THE COURT: All right. What else? That's admitted.

MS. POLLAN: If you can give me one moment to reread this with that same instruction.

THE COURT: When you read a modifier, you read what it modifies. It's clear Mr. Appleby, in 24, was referring you specifically to the language in paragraph 3 that said those very words.

MS. POLLAN: Yes, Your Honor. I understand. Withdrawn. We're good, Your Honor. Thank you.

THE COURT: Nothing else?

MS. POLLAN: Nothing else, Your Honor.

THE COURT: Okay. So the only thing that has been stricken from these admissions is paragraph 2 on the admission to subject matter jurisdiction, recognizing that people can raise that at any time, even after they have admitted it. Okay. Mr. Appleby, here is your document 113 back.

MR. APPLEBY: Thank you, Your Honor.

THE COURT: Do you have anything else in your case, Mr. Appleby, except for little open items like record custodian declarations that you need to promise me that you will get before June 14th?

MR. APPLEBY: Well, Your Honor, we still had several requests for judicial -- for the Court to take judicial notice.

THE COURT: What's left?

MR. APPLEBY: What I was going to suggest, Your Honor, is that -- that -- because the understanding of the questions that Your Honor has asked, if we could have the time, I would put that in written form, basically tidy up the responses so they would be much more clear for you.

THE COURT: What responses? You mean the requests?

MR. APPLEBY: The requests, Your Honor. To make my requests better fit what Your Honor has told us that you're looking for.

THE COURT: Sure, you can do that. But when are you going to rest and when do they get to raise their -- whatever motion they may want to make?

MR. APPLEBY: Well, Your Honor, we're still going to be looking -- I can't rest until I get the declarations or the affidavits from --

THE COURT: I'm assuming that you can get those, okay? And if I have to -- if I deny a Rule 52 motion because of that and later on I have to reverse myself, then it's -- because you don't get the declarations, then that's fine.

MR. APPLEBY: Okay. Well I think -- I think mainly the remaining things are the items that we've requested judicial notice -- for you to take judicial notice.

THE COURT: Where are they? Tell me where they are.

MR. APPLEBY: Oh, I'm sorry, Your Honor. I'm trying to recall which number we got to a moment ago.

THE COURT: We got to four sixty --

MS. POLLAN: He went from 468 to 471. We last talked about 471 and that was withdrawn by the Plaintiff.

THE COURT: Is there any other?

MR. APPLEBY: Yes, Your Honor. I'm just trying to make sure.

(Counsel confer)

MR. APPLEBY: Your Honor, I believe -- again, I don't recall whether we got to -- well --

THE COURT: We dealt with one when we were dealing with the first administrative action that involved IMH. I said I would take the final order there because the final order refers to the recommended order. I have to put that hand in glove. Is there something else from that case you needed? And I don't know the document number. I've got 467-9, so it must be 467 is the operative document.

May I have 467, Ms. Arciola?

How many requests for -- how many separately numbered docket entries are there for request for judicial notice?

MR. APPLEBY: Well, Your Honor, there's docket

number 467, 468. And some you've talked about; 472, 473, 475, 476, 477, 479, 480, 481, 497, and 498. And we did deal with also docket number 800. And I'm sorry. I think -- oh, I did say 477, Your Honor. I'm sorry. I wanted to make sure I didn't skip it.

THE COURT: And the one that you withdrew was 471?

MR. APPLEBY: 472.

MS. ISRAEL: No, ma'am.

MS. POLLAN: I have 471.

COURTROOM DEPUTY: I have 471.

MR. APPLEBY: Okay. I'm sorry.

THE COURT: What do you have, Ms. Arciola?

COURTROOM DEPUTY: 471.

THE COURT: Okay. So 471 is out. So we've done 468, 800. What other ones have we done?

MS. ISRAEL: 467.

COURTROOM DEPUTY: And 468.

THE COURT: The 467 one was the IMH one?

MS. ISRAEL: The document is entitled OIR versus Westport Holdings Tampa, LP, d/b/a University Village.

THE COURT: Right. But it's titled -- it's In re IMH Healthcare, LLC.

MS. ISRAEL: Oh, I'm sorry. I was reading under the request itself because that's how Mr. Appleby

identified it in the record. I apologize, Judge.

THE COURT: Okay. All right. So, Ms. Arciola -- does anyone have a binder with all of the requests in that we haven't dealt with, namely 469, 472, 473, 475, 476, 477, 479, 480, 481, 497, 498?

MS. ISRAEL: Judge, I have four massive binders back here, but this is our working copy for either me or Ms. Pollan to use.

THE COURT: I'll shift to my desktop. We'll have to go through them one at a time. Do you have objections to all of these?

MS. POLLAN: I'm sure we have at least some form of objection, Your Honor, yes.

THE COURT: Are you expecting to get any witnesses in today, anybody?

MS. POLLAN: Well --

MS. ISRAEL: We're not going to -- I'm sorry.

THE COURT: Pardon me?

MS. ISRAEL: We'll let Mr. Appleby speak first.

MS. POLLAN: Yes.

MR. APPLEBY: I have no further witnesses, Your Honor.

THE COURT: Okay. It will take all afternoon for me to get through this many.

MR. APPLEBY: That's --

THE COURT: We have people that came down. So I don't know what to do with your time. You're way over your time. So tell me -- give me a creative solution on how we deal with this, recognizing that you have the burden of proof, they have the right to do something before they put on a single witness.

MR. APPLEBY: Again, Your Honor, I don't know any other way than to go through them or as I suggested we could -- we would supplement with writing that would better articulate what Your Honor has asked of us.

THE COURT: Can we stop the trial here, let you all pack up?

MR. APPLEBY: (No response.)

THE COURT: Do you need all these things?

MR. APPLEBY: Can I speak with my client, Your Honor, for a moment?

THE COURT: Yeah.

(Counsel confer).

THE COURT: Ms. Arciola, print them all out for me. Not the attachments, just the ones. Let me see if I can eyeball them. Here's the list. You don't need to do this one.

(Discussion off the record between The Court and Courtroom Deputy.)

THE COURT: I tell you what. Print me out the

docket, please, between 467 and 800.

MR. APPLEBY: Your Honor, again -- I mean the suggestion is that we clean these up based on what Your Honor's asked. We had this discussion yesterday. I know that Mr. Price came in for this afternoon. We agreed for things to be out of order because he was going to be here only this afternoon, so.

THE COURT: All right. The suggestion is we take a witness out of order and in the defense case.

MS. ISRAEL: No, ma'am, we respectfully decline. We need to have the Plaintiff conclude its case in chief, close its evidence, so that we know -- first, so that we can make the applicable motion as we've previously mentioned we intended to do, as Your Honor has acknowledged, and we have a right to know what we're defending against. We need to know that the Plaintiff's evidence is closed.

THE COURT: Is Mr. Price going to be -- is there anything on any of these requests for judicial notice that Mr. Price could possibly respond to?

MS. ISRAEL: It's very difficult for me to answer that because, again, Mr. Appleby as Your Honor has noted and as was mentioned in our *omnibus* objection that we filed which was carried over with the case, he's got to tell us what it is he is asking the Court to take judicial notice

of. So, for example, if he were asking the Court to take judicial notice of the fact that an appeal was filed, of course Your Honor can do that. But it's not our responsibility to try to decipher. And each --

THE COURT: I understand that. If --

MS. ISRAEL: -- each request has many, many documents.

THE COURT: -- if all he wants me to do is take judicial notice that things were filed and titled as such, would you be able to go forward with Mr. Price?

MS. ISRAEL: No, ma'am. We would need to have the Plaintiff's case closed. And as I understood Your Honor's comments prior to the lunch break, he is entitled to pursue a declaration --

THE COURT: That I can -- listen. That can be supplemented in the record. I'm going to assume that it can be had. And then if it can't be had and I make a decision and I deny a 52 motion on the assumption and the assumption doesn't come through and if that's a critical underpinning, I will reverse my decision on 52. That's an easy thing. I've done it in other trials.

MS. ISRAEL: And I understand and I respect --

THE COURT: It's a ministerial thing.

MS. ISRAEL: -- where the Court --

THE COURT: If you doubt the trustworthiness of

those things, then waive it.

MS. ISRAEL: Judge, it's bigger -- it's broader than that. The problem --

THE COURT: It's not broader.

MS. ISRAEL: It is.

THE COURT: Either the accountants have a cover letter in their files that they created, it was made at the time it was done, or they don't. If you think it's made up, I get it. Stand on ceremony.

MS. ISRAEL: It's not standing on ceremony. I'm not entirely clear what it is the Plaintiff intends to go get a business declaration about.

THE COURT: The cover letters to audited -- auditor created documents. Auditor created documents, not Debtor created documents because they didn't create them.

MS. ISRAEL: I'm not sure that the Plaintiff and the Defendant are of the same mindset as to what the Court has permitted the Plaintiff to do. And perhaps we would -- we would be best served to get some guidance from the Court on that. Because there does seems to be a --

THE COURT: Okay. Whoever -- whoever's --

MS. ISRAEL: -- disagreement there.

THE COURT: Whoever's records of a regularly conducted business activity they are would be the declarant for an attestation meeting the elements that would satisfy

the hearsay exception for records of a regularly conducted business. Those records are ones that were created, maintained, it's their habit, they know who did it. It's not the records of some other company. It's their own records. That's what I'm saying.

MS. ISRAEL: I understand that and I'm sorry if I've confused the Court. I think what I'm saying more broadly is, I don't think that that's what the Plaintiff believes its limitations -- his limitations are in terms of the topics --

THE COURT: Why do you think that?

MS. ISRAEL: -- or scope.

THE COURT: Why do you think so? I said the LKB people or whatever their names are and the -- whatever the other auditor people were --

MR. APPLEBY: CliftonLarsonAllen.

THE COURT: -- for their own work product. Their own work product.

MS. ISRAEL: Did he say -- did you just say the OIR?

MR. APPLEBY: No.

MS. ISRAEL: Oh. What was the second thing you said?

MR. APPLEBY: CliftonLarson.

MS. ISRAEL: Okay. Judge, I believe -- and

again, I -- I respect the Court. I understand that the Court has done an absolutely -- the best job possible to move us forward. But we have a right to make the Rule 52 motion, and frankly, I believe the rule requires us to wait -- and the Court, both of us, me as the movant and you as the finder of fact, to wait for the evidence to be closed.

THE COURT: I understand that. And I can close it conditionally, with the promise and the proffer that the actual document will get here. We're missing a document that is a ministerial act. You do not trust that those letters were created by those companies. That's fine. You have that right to question it. Maybe Mr. Appleby made them up and gave them to his expert witness. I don't know. You don't know. But if they attest to it, then it's going to be -- then the record will be complete.

But I can say that it's conditionally complete but for a ministerial act. If the ministerial act doesn't come in, well then those things aren't in and I cannot take those into consideration in ruling one way or the other on a Rule 52 motion.

MS. ISRAEL: I would like the Plaintiff --

THE COURT: I don't even think they're critical to tell you the truth, ma'am, but somebody does.

MS. ISRAEL: Well, I understand and it's the Plain -- that's fair. That's fair and frankly I'm not

going to argue with you about that, Judge.

THE COURT: Okay.

MS. ISRAEL: But I do think it's incumbent upon the Plaintiff. Mr. Appleby needs to advise the Court what additional evidence -- if -- again, I'm the only one speaking right now.

THE COURT: Here --

MS. ISRAEL: He needs to tell you --

THE COURT: I'll tell you what it is. I'm leaving the record open for only one thing: Record custodian declarations that will meet the requirements of the hearsay exception for documents created, maintained, filed in the office of the auditor's own offices, and created, underscore, in quotes, "created," not accepted and filed from a third party.

Mr. Appleby had the right, and y'all do too for that matter, to give me a case law that says that documents created by a third party that are just received in an office can meet the hearsay exception. I have no such thing yet. So documents that are merely in a file that were received from someone else, those I'm not inviting anything on.

The admissions are in, except for number 2. And now I've got to go through the judicial notice litany for all of these. That's what is left in the Plaintiff's case

as I understand it, right?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. So I can cure the record custodian issue by accepting those on the condition that the record is supplemented. We'll go through all these requests for production, then the Plaintiff will rest. For the witness's convenience and the expense of Valley National Bank in bringing them down here, and maybe they're on their own dime, but then it will be them, I'm willing to take a witness out of order. I'm not a potted plant, I'm not a juror, I can't get confused. If I hear something here that I'm only hearing for the first time, then that's not part of Mr. Appleby's case.

MS. ISRAEL: I understand. I would like Mr. --

THE COURT: I can keep them separate like Bill Clinton. I can put things in compartmentalizations. Not those things though. Evidence.

MS. ISRAEL: I wasn't -- I wasn't sure what to say. I certainly understand the Court's clarification.

THE COURT: Evidence. Compartmentalization.

MS. ISRAEL: I understand, Judge. I was not in any way --

THE COURT: So I'm giving you a chance to get Mr. Ellsworth in and out of here.

MS. ISRAEL: I would like Mr. Appleby to finish.

Whatever he's got here in the courtroom --

THE COURT: Okay.

MS. ISRAEL: -- whoever he's got, whatever he's got, he needs to finish.

THE COURT: All right. Well let's go through then the request for judicial notice. Let's start with --

COURTROOM DEPUTY: I'm almost done, Judge.

THE COURT: Okay. I wrote down, I thought 469, but that's a motion. 471 was withdrawn in open court. Just give me whatever you've got. Let's start with something, Ms. Arciola, and you can finish up the rest.

(Discussion off the record between The Court and Courtroom Deputy.)

MR. APPLEBY: Your Honor, 472 --

THE COURT: I'm at -- I'm at 472. 469 is a motion. So 472.

MR. APPLEBY: This was Defendant's appeal of litigation funding agreement. The position is the appeal concerning the litigation funding agreements, it's a critical element showing the financial arrangements and disputes that impact the case.

THE COURT: Is there a final order finding facts?

MR. APPLEBY: Well, Your Honor, we've talked about many of these issues throughout this case but at -- specifically under -- well under Section I, Roman numeral

I, at what's numbered 16, there is an order dismissing appeal for lack of standing to appeal.

THE COURT: What does that have to do with meeting the elements of your --

MR. APPLEBY: Again, Your Honor, let me --

THE COURT: -- claims?

MR. APPLEBY: Bear with me one moment.

(Counsel confer).

MR. APPLEBY: Your Honor, we're just asking here that Your Honor take judicial notice of the process. I mean there was a litigation funding agreement which I think Your --

THE COURT: Tell me how that -- come on. I'm not going to say this one more time. There are elements for aiding and abetting. There are elements for fraudulent transfer. Tell me how my taking notice of the dates of a legal process fill any of those needs of yours.

MR. APPLEBY: Well, Your Honor, they -- the Defendants continue to argue that Mr. -- that Mr. Warren doesn't have standing to even bring the case. They made it just a few moments ago relating to the --

THE COURT: And they lost that. They lost it on summary judgment. They lost it. It's not an issue you need to worry about anymore. If you already won that, do you want me just, what, gild the lily? I'll say -- if the

appeal says that you have standing -- the Eleventh Circuit said it. It is done, done, done. It's *res judicata*, it's *collateral estoppel*. Done. I'll take notice that if -- is that the upshot of the appeal? There's a holding that Mr. Warren has standing.

(Counsel confer).

THE COURT: I have already ruled it, but if you -- if you think that you would need for me to like appeal my own order and take judicial notice of this, I'm happy to do that.

MR. APPLEBY: No, Your Honor. It's -- again, the intent --

THE COURT: Is it a ruling that he has standing; yes or no?

MR. APPLEBY: That he does and that Valley does not have standing to make the argument they made.

THE COURT: Okay. And that is a ruling by the Eleventh Circuit Court of Appeals?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. Any objection?

MS. POLLAN: Your Honor, I -- without reading it, I just would say that whatever the order says -- I believe the argument was a little bit more nuanced than that, but the Court is welcome to take judicial notice of whatever the order dismissing the lack of appeal states as far as

what the finding was on standing.

THE COURT: Well that would be item 16, right?

MS. POLLAN: Yes, Your Honor. My understanding is that Valley National Bank did not have standing. It was not necessarily about what Your Honor has previously ruled on.

THE COURT: Then give me, Mr. Appleby, a copy of the order you want me to take judicial notice of. I'll read its content.

MR. APPLEBY: Yes, Your Honor. Thank you.

THE COURT: I don't -- and that's the District Court order as far as I can tell. It looks like there's a mandate at item 18.

MR. APPLEBY: Yes, Your Honor. It just -- and I don't have copies of all these -- of all the attachments here in the courtroom with me. That was again my intent for trying to clean this up and provide Your Honor with --

THE COURT: Well then she doesn't want to -- to -- okay. Then I don't know how to use the rest of the time. We'll adjourn. You can do that. 14 days. Witnesses go home. If you want Mr. Price to go ahead and get on the stand and I can take him out of order without prejudice to your Rule 52 motion, you may do that. Otherwise, I'm going to adjourn right now.

You don't know what the order says and yet you're

objecting. He doesn't have the order. This is a ridiculous waste of the Court's time.

MS. POLLAN: Well, Your Honor, to be fair --

THE COURT: Either you read it and you have an objection, or you didn't read it and you just covered it with a big, *omnibus* objection.

MS. POLLAN: We looked at everything, Your Honor. My -- my brain is trying to compartmentalize every day here. I haven't looked at this since this week started, to be honest. I've been trying to keep up with all the other issues the Court wanted us to address.

THE COURT: Y'all have four or five lawyers and Mr. Appleby has himself and I'm going to count Mr. Warren.

MS. POLLAN: I just want the Court to be aware there are five of these binders, that I can't memorize everything in here, Your Honor.

THE COURT: Okay.

MR. APPLEBY: And again, Your Honor, all these were filed last November.

THE COURT: I understand. But I'm asking you to give me the order you want me to adopt as -- with findings and give respect to and you can't -- nobody can give me that. I can stop, we can go to the back and we can start doing some research on all these. I can pull every single one of them, it will take me hours --

MR. APPLEBY: But, Your Honor, that's again why --

THE COURT: -- with Ms. Scotten and everybody else.

MR. APPLEBY: -- I would like to clean it up for Your Honor, to make it much more efficient.

THE COURT: And I'm happy to give you a break and we'll come back on June -- May 14th, is it?

MR. APPLEBY: 13th, Your Honor.

MS. POLLAN: I thought it was May 13th, Your Honor.

THE COURT: May 13th. And if you have everything in there, I might be able to -- but then they're going to have the right to object, so we'll spend another half a day on all these.

UNIDENTIFIED SPEAKER: Your Honor?

THE COURT: Yes, ma'am.

UNIDENTIFIED SPEAKER: Shouldn't they be attached to the docket?

THE COURT: Are they all attached?

MR. APPLEBY: They are in the docket, yes, Your Honor.

THE COURT: Oh, okay. So who wants to print them all out for me? Anybody volunteering? Ms. Scotten, are you volunteering, is that what you're doing?

MR. WARREN: Your Honor, we apologize for this mess, but we will print them and have them for the Court.

THE COURT: No, it's okay if we've got them. It would just -- just know that it will take me time to call them up. And I'm going -- I'll just start now. Tell me how you want to use the rest of the afternoon. I'll do whatever you want that makes sense. I can start reading now and I can start with the 472, and I'll start with the -- looking for the appellate order.

MR. APPLEBY: Your Honor, again, I think the best use of Your Honor's time is that we would prefer to clean it up for you.

THE COURT: Okay. And then they're going to have another opportunity to object. So that's fine. We can do that. You can get them in before the 13th. What do we do with the rest of the afternoon? Do you all want to be respectful to Mr. Summers and his client and take them now? Is it going to take more than a half a day?

MS. POLLAN: Your Honor, if I may, they all stepped outside.

THE COURT: Oh.

MS. POLLAN: I would like to have an opportunity to discuss with them --

THE COURT: They're not even in here.

MS. POLLAN: If you will give us about five

minutes --

THE COURT: Okay.

MS. POLLAN: -- I'll go discuss with them, Your Honor.

THE COURT: That's fine.

MS. POLLAN: Thank you.

THE COURT: At least I can start on this one, 472.

(Brief recess, 2:14 p.m.)

(Back on the record, 2:

MR. APPLEBY: Your Honor, we're back if you --

THE COURT: Yep. Go ahead.

MR. APPLEBY: I'll defer to Ms. Israel.

MS. ISRAEL: Your Honor, excuse me. It was my understanding that while I was not in the courtroom that there was a discussion either on the record and/or off the record about the possibility of Mr. Appleby and Ms. Pollan and I conferring to scale back -- my words, not Mr. Appleby's -- to address these remaining requests for judicial notice to see if we can pare them -- either pare them back or reach agreement on what we will agree can be judicially noticed, et cetera.

I have committed to speaking to Mr. Appleby at the early part of next week so that we can work through that process, because it has been a long week and everyone

is tired and we certainly can make this perhaps more efficient on both sides as a presentation for the Court.

That would mean that, with Your Honor's indulgence, and of course I want Mr. Appleby to clarify or confirm what I'm saying, that at this point we would release Mr. Price and Mr. Summers because at that point we would simply recess the trial where we stand and we would resume on the morning of May 13th with either an announcement on the record with regard to the request for judicial notice, or something that is filed in the intervening week, that addresses what the parties have stipulated to.

THE COURT: Okay. The discussion was that we stand down, we give Mr. Appleby up to the 13th to file something that is more refined in terms of what exactly he wants me to take judicial notice of with respect to each of these things, recognizing he could abandon some of them, like the legal argument that is made by an opponent unless that legal argument might be the stuff of *judicial estoppel*. But a lot of this stuff is extraneous, I think.

And then you all would have the opportunity to object and then we would come back and deal with that first thing on the 13th. I said that in order to salvage some time today, you could take a witness out of order. I am able to compartmentalize what I learn from today from Mr.

Price if it is at all different from what I learned from him during that read in. That wouldn't be part of any consideration in a Rule 52 motion.

I am very mindful of the expense of all of this. I'm shocked by it. No doubt the principals are shocked by it. I always say you've got to bill like you're billing your mother and she's not a millionaire. Just looking at how long it must have taken you to assemble the notebooks and pay for trial consulting services, it's an enormous amount of money. I would like to save the parties money to the extent that that's something I can do by utilizing the next two-and-a-half hours, or two hours because you want to leave at 4:30, with a witness so that they don't have to spend anymore time dealing with this if that's something that can be done. That's what my suggestion was.

MS. ISRAEL: And I sincerely appreciate that and respect the Court's willingness to do that. Upon consultation with Mr. Korhn, the Defendant would like the Plaintiff to finish presenting its case subject to the limitation that Your Honor has already put on the record and made very clear to us --

THE COURT: Okay.

MS. ISRAEL: -- and we would respectfully decline to take --

THE COURT: Then that's fine. Then you'll get

out of here earlier. We had a few other open items on the Plaintiff's exhibit list. I've got Plaintiff's 62, 376, 308. And was there another one, Ms. Arciola?

COURTROOM DEPUTY: Let's see.

THE COURT: And this would be in addition to the auditor cover letters or auditor created content, as referred to in the Larson people's deposition.

MR. APPLEBY: Your Honor, Mr. Summers just stepped in. I think he -- we're just trying to get clarification. He would like to hear from Your Honor that --

THE COURT: You may leave, sir.

MR. SUMMERS: Thank you, Judge. Have a great weekend.

THE COURT: I'm not dismissing you.

MR. SUMMERS: I'm not -- you're not?

THE COURT: You may leave. Your client nor you will be needed this afternoon.

MR. SUMMERS: Okay. Thank you. Understood. Have a great weekend.

THE COURT: It's not my choice.

MR. SUMMERS: Yes, ma'am. Understood.

(At 2:32 p.m., Mr. Summers exited).

THE COURT: Are you still looking?

COURTROOM DEPUTY: I am.

THE COURT: And you don't have to look at really any of the defense exhibits.

(Discussion off the record between The Court and Courtroom Deputy.)

THE COURT: Okay. These are some, I guess, open issues on the Plaintiff's exhibit list. And one of them is a carryover from the first day. Number 308. That had to do with the compilation and the samples that were used to create the compilation.

MR. APPLEBY: Yes, Your Honor.

THE COURT: And we were going to identify where the Defendant received the ones that are used as the samples or examples of the samples. And there was some big flash drive that really wasn't a flash drive in the traditional sense that you all pointed to. So has that been cured?

MR. APPLEBY: Well, Your Honor, at doc -- at docket number 803, I've supplemented the list to -- to include more. What this was, I think, and again I don't want to misstate, but I believe that these were records when Mr. Warren was the examiner or early as the Liquidating Trustee. He compiled these notes. Someone in his office helped put the list together. Subsequently, Matt Hale at Stichter Riedel was the one who I believe created the actual document. But at all times these were

made from records that were kept in the ordinary course through the Debtors.

THE COURT: Okay. All right. So the -- the test for the compilation was that you needed to produce the documents from which the compilation was manufactured. And I mean that in the positive sense, not dummied up. So let's see.

MR. APPLEBY: Your Honor, at docket number 803, there were exhibits that went along with that that I believe, and I'm going to --

THE COURT: So those were within the records of the Debtor that Mr. Warren is a custodian of. And so your proffer is that now that those documents have been supplied to the Defendant, then you've met the requirements for the compilation exception. That's your contention?

MR. APPLEBY: Yes, Your Honor. That -- these again -- what's attached at 803-2 was the original list that -- that is what I think Mr. Hale then took to create the -- the item that was at 308.

THE COURT: Original list or original contracts?

MR. APPLEBY: Well --

THE COURT: The proponent may use a summary chart or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals

or duplicates available for examining -- excuse me -- examination or copying or both by other parties at a reasonable time and place. And the Court may order the proponent to produce them in court.

The chart is a chart of the salient terms of life care contracts. The life care contracts that are being examined or broken down in that chart are themselves identified with reference, I believe, to a last name. Have the life care contracts been uploaded into the record?

MR. APPLEBY: The individual life care contracts, there was a group that I believe that we attached in the exhibit list, but they -- all the life care contracts have been provided to the Defendant.

THE COURT: Okay. The ones that were extracted and abstracted into the chart, are those part of the overall set of life care contracts that were given to the Defendant?

MR. WARREN: Your Honor, they were -- they were produced. If I --

THE COURT: Where? They asked me to ask you where by Bates stamp.

MR. WARREN: And -- because of the volume, that has not been accomplished. But what was accomplished was the origin of Exhibit 308 was identified as having been prepared by Matt Hale of Stichter Riedel. Matt Hale

prepared that document based upon two things. One was --

MS. ISRAEL: Judge, I'm going to object. Mr. Warren is testifying.

MR. WHITSON: Yeah.

MS. ISRAEL: This is not in evidence.

THE COURT: Listen. If you don't want to read the 1006 and meet it, then I'm not going to waste my time. I'll just --

MR. WARREN: No, Your Honor. Our intent was to do this as part of a declaration and to comply fully, but we just haven't had time.

THE COURT: It's not a declaration. Mr. Warren, I've got to tell you I'm going to read this probably now for the third or fourth time. It requires the documents that you abstracted info from in order to put it into chart form be given to the opposing party. The opposing party says you gave a document dump. That's fine. They have them. All they've asked for is can you give the Bates stamps. If it's Mr. Smith's contract from 2011, please give the Bates stamps.

MR. WARREN: Yes, Your Honor. And we've given them the Bates stamps with respect to the document that was used to create that exhibit.

THE COURT: Okay, Mr. Warren, then we're speaking opposite of each other.

MR. WARREN: Yeah.

THE COURT: It wasn't a document. If you're saying that Mr. Hale took a chart and made another chart, that's not what's permitted by this rule.

MR. WARREN: I understand, Your Honor.

THE COURT: The source documents that are summarized are what this rule speaks to. It's supposed to be for the convenience of the Court and the parties, but they need to be able to test the accuracy of them.

MR. WARREN: And -- and that's something that we will accommodate them fully with respect to.

THE COURT: Okay. So that's still an open item then.

MR. WARREN: It's still an open item, Your Honor, and that's -- you know, that's what I wanted to explain to the Court.

THE COURT: Okay. 308 -- well, 803 doesn't do any of that. So 308 is still an open answer. Okay. Or an open question.

MR. WARREN: And that goes to the other forms of contract because they're -- it's the same -- it's the opposite side of the coin because, you know, they'll both be dealt with in the same identification for purposes of the Bates numbers.

THE COURT: That's fine. If they want to

stipulate that most have 40 percent and some have 90 percent, or they range from different percentages but most of them are either 40 or 90 and they stipulate to that, that's fine.

MR. WARREN: As soon as I understood how the -- how this evolved, I provided that information to the defense. But I understand they haven't had a chance to digest it and we need to put the complete package together.

THE COURT: Okay. If they know it because they have internal documents that the Bank got during its due diligence, you could stipulate to that. Isn't it an underpinning in both -- both side's experts reports on calculating liabilities? So if there's a number there that correlates to refunds, I mean --

MR. WARREN: They're both -- both experts are operating from essentially the same sources of --

THE COURT: All right.

MR. WARREN: -- information.

THE COURT: So work on 308. I'm sure a stipulation could be done to overcome having to deal with all this.

Number 62 is an email dated May 14th, 2014. And I don't know that that -- it hasn't come in. It was discussed. So put that on your homework list, Mr. Appleby, in addition to the long-lingering 308. So 62. Was it

denied or was it excluded?

COURTROOM DEPUTY: It says just not -- you're not admitting in.

THE COURT: Oh. Then it's excluded. Okay. That's different. Okay. Never mind. Forget 62. Apparently I resolved that.

118 and 125 were discussed. I think that has to do with the suit -- one of them had to do with the Burkholder suit.

MR. APPLEBY: Um --

THE COURT: Or whistleblower settlement, whatever that was.

MR. APPLEBY: Your Honor, I may need to look back at --

THE COURT: So we'll just deal with these. These are open -- open items on our part, 118 and 125. We had 376. I think that's maybe auditor stuff. There's 452. That's one of the cover letter issues.

MS. ISRAEL: Judge, respectfully, my records reflect that you admitted 452 over Defendant's objection but excluded --

THE COURT: But not the cover letter.

MS. ISRAEL: -- the letters. Yes, ma'am.

THE COURT: But not the cover --

MS. ISRAEL: Yes, ma'am.

THE COURT: The cover letter is an open issue.

MS. ISRAEL: Yes, ma'am.

THE COURT: Only the cover letter.

MS. ISRAEL: Thank you.

THE COURT: And there are some similar reports. I'm not finding where they are.

COURTROOM DEPUTY: 516 through 525.

THE COURT: Oh. 516 through --

MS. POLLAN: That matches with my notes, Your Honor.

THE COURT: -- 525. That's right. And now we have these, the later ones that are -- come from the Larson people. Those exhibits. I don't think we admitted a single Larson referred-to document.

MS. POLLAN: I believe that's correct, Your Honor.

THE COURT: Okay. So those are the things I show that are open, at least according to our notes. And then the judicial notice.

Did Mr. Korhn receive the email where the two attorneys are talking about the impediment to closing that would occur if they sought OI -- at the OIR's opinion or consent?

MR. APPLEBY: I'm sorry, Your Honor? I --

THE COURT: Did Mr. Korhn in real time, not after

the fact, was he included in on the communication between the two lawyers, Radke and Price, where they referenced the impediment to closing that would occur if the OIR opinion or consent were sought.

MR. APPLEBY: I've got to look back at the actual email, Your Honor. Is that -- which number were we on right there? That was 118?

THE COURT: It's not a number.

MR. APPLEBY: Oh.

THE COURT: I'm giving you this -- I'm giving you some information --

MR. APPLEBY: Yes, Your Honor.

THE COURT: -- that you all need to understand for purposes of Rule 52.

MR. APPLEBY: Yes, Your Honor.

THE COURT: My impression of Mr. Korhn's deposition testimony is that he was doing everything that he needed to do; that he was not trying to cut corners, he didn't participate in any cutting corners, and he sought every level of comfort that he could get that his loan would never come back to bite him. If he participated and assented into -- or assented with the attorneys' apparent agreement not to seek OIR consent pre-closing, I may change my tune on that. But I don't see that in the record.

I do see one attorney talking to another

attorney. I see them both being aware of an issue. I see one attorney, the Bank's attorney, apparently not appreciating that the statute says you can use the MLR for three different purposes, not just one, and that some portion of the MLR must be attributable to the other two portions. I look at that as being a failure, but not an intentional blindness, unless there's something in the record to show me otherwise.

I'll need to be apprised of the elements of aiding and abetting, a breach of a statutory duty. Can that be met with mere negligence of the Bank's attorney or does or does it require something more. Those are my initial impressions of the aiding and abetting count. Oh, one more. If this enterprise was doomed to fail regardless of whether the life care contracts were suspended or the acceptance of them or the entering into them was suspended, then the causation element on damages regarding aiding and abetting is questionable. The Plaintiff's burden is more likely than not that a thing happened because of something else.

With regard to the fraudulent transfers. My sense, and you know there are hundreds if not thousands of pages in the record, some have been published to me, most of the pages have no. But my sense sitting here right now is that there was a transfer, it was a transfer made by

Westport to the -- to Valley National in the form of transferring funds to an account that was ostensibly controlled by Valley National, the title company was a mere conduit. You'll have to be talking about mathematics in terms of what was the consideration received for that, received by the Debtor on account of that transfer.

My initial impression is that Ms. Unterholzner has met the Plaintiff's burden to show insolvency and unreasonably small capital after the fact. On some of those elements, therefore, unless you can show me where my initial impression of her testimony and her report are wrong, notwithstanding that she included those deferred expenses on top of the fact that the fair market value took that into account on the income approach, because she did the math there too, my initial impression is that the Plaintiff is not going to get very far with that portion of a Rule 52 motion.

I think it's fair for me to tell you where I'm at so that you can focus your attention, especially on those issues, as well as whatever else you're going to throw at me. If any of that causes you all to talk settlement, then my time in saying these things will be well spent. If any of that causes you to refine your presentation on a Rule 52 motion and response, then my time will be well spent.

MS. ISRAEL: I believe your time to have been

well spent, Judge.

MS. POLLAN: Yes, Your Honor. I agree.

MS. ISRAEL: Thank you.

THE COURT: Good. Then pack up and go away.

MS. POLLAN: Thank you, Your Honor.

MR. WHITSON: Thank you, Your Honor.

THE COURT: I should say pack up --

MS. ISRAEL: And for that I think you, as well.

THE COURT: -- and go away and settle.

MS. POLLAN: Thank you, Your Honor.

THE COURT: You're welcome.

MS. ISRAEL: Judge, may we freely move about and may I remove my jacket because I'm about a thousand degrees right now as we pack up?

THE COURT: Oh. I think I said before y'all can always take your jackets off in here.

MS. ISRAEL: I feel better asking so thank you.

THE COURT: Yes. This trial is now in suspense as it were, we're in recess and we'll be back on the 13th. What time?

COURTROOM DEPUTY: 9:30.

THE COURT: 9:30 a.m. Thank you.

MS. ISRAEL: Thank you, Your Honor.

MR. WHITSON: Thank you, Your Honor.

MR. WARREN: Thank you, Your Honor.

MR. APPLEBY: Thank you, Your Honor.

MS. ISRAEL: Have a good weekend.

MR. WHITSON: Have a good weekend.

THE COURT: One more thing.

COURTROOM DEPUTY: Not yet, Judge.

THE COURT: In terms of my initial impression about mistakes that were made by the Bank's lawyer, number one, not getting an opinion in writing, that's just really bad, I'm not even sure based on the record that he got an opinion because there's a dispute of fact over whether the other attorney gave him one.

Also, and I could -- I could be shaken off of this, but it's my understanding that if you're taking new collateral, you've got to make sure that you're not going to be receiving a fraudulent transfer. And I didn't see anything that was done to assure the Bank's lawyer that the taking of this account would not result in a fraudulent transfer. In fact, I saw many, many, many references to I don't know where it came from, a [sic] title company. So that, too, I think it's fair to mention that.

Okay. Now we're back and we are now clearly in recess and we'll see you on May 13th at 9:30 a.m. Thank you.

MS. POLLAN: Thank you, Your Honor.

MR. WHITSON: Thank you, Your Honor.

(Whereupon, at 2:52 p.m., hearing adjourned).

CERTIFICATE

I, Gretchen L. Schultz, Certified Electronic Reporter, hereby certify that the foregoing is the official transcript, prepared to the best degree possible from the digital audio recording and logs provided by the court.

I further certify that I am neither counsel for, nor related to, nor an employee of any of the parties to the action in which this hearing was taken.

I further certify that I have no personal interest in the outcome of the action.

SIGNED this 14th day of May, 2024.

GRETCHEN L. SCHULTZ, CER 3573
Transcriber