IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| IN RE: | Case No. 8:16-bk-08167-CPM<br>Chapter 11 |
| WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP<br>Debtor | |
| JEFFREY W. WARREN, LIQUIDATING TRUSTEE FOR WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP and WESTPORT HOLDINGS II, LIMITED PARTNERSHIP<br>Plaintiffs, | |
| vs. | Adv. No. 8:20-ap-00007-CPM |
| VALLEY NATIONAL BANK, a principal subsidiary to VALLEY NATIONAL BANKCORP, a New Jersey domestic profit corporation, as successor by merger to USAMERIBANK,<br>Defendant. | U.S. Courthouse<br>801 North Florida Avenue<br>Tampa, Florida 33602<br>May 14, 2024<br>9:47 A.M. |

**TRANSCRIPT OF HEARING**

Day 7 of Bench Trial

No Hearing Proceeding Memo available at the time this hearing was transcribed.

**BEFORE THE HONORABLE CATHERINE PEEK MCEWEN**
**UNITED STATES BANKRUPTCY JUDGE**

PROCEEDINGS RECORDED BY COURT PERSONNEL
VIA IN-PERSON, ZOOM AND/OR TELEPHONE.
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE

SCHULTZ REPORTING OF PASCO, INC.
3350 Chickadee Dr.
Holiday, Florida 34690
(727) 808-1484

APPEARANCES
VIA IN-PERSON, ZOOM, AND/OR TELEPHONE

For the Plaintiff:

KEITH APPLEBY, Esquire
Appleby Law P.A.
4916 W. Melrose Avenue South
Tampa, Florida 33629
(813) 435-0396
kappleby@westshoremediation.com

For the Defendant:

KIMBERLY H. ISRAEL, Esquire
McGlinchey Stafford
10407 Centurion Parkway North
Suite 200
Jacksonville, Florida 32256
(904) 224-4449
kisrael@mcglinchey.com

EDMUND S. WHITSON, III, Esquire
McGlinchey Stafford
10407 Centurion Parkway North
Suite 200
Jacksonville, Florida 3225i6
(904) 224-4486
ewhitson@mcglinckey.com

ADINA POLLAN, Esquire
McGlinchey Stafford
10407 Centurion Parkway North
Suite 200
Jacksonville, Florida 32256
(904) 224-4487
apollan@mcglinchey.com

COLIN T. DEAN, Esquire
McGlinchey Stafford
505 20th Street North, Suite 800
Birmingham, Alabama 35203
(205) 725-6406
cdean@mcglinchey.com

[Appearances continued on next page]

APPEARANCES: [continued from previous page]

CHASE STOECKER, Esquire
McGlinchey Stafford
101 NE 3rd Street, Suite 1810
Ft. Lauderdale, Florida 33301
(954) 356-2514
cstoecker@mcglinckey.com

Also present: Jeffrey W. Warren, Liquidating Trustee for Westport Holdings Tampa, Limited Partnership, and Westport Holdings II, Limited Partnership
Mr. Ramos (Trial Consulting Services)
Lisl Unterholzner
Trey Korhn

TABLE OF CONTENTS


| WITNESS: | Page |
|---|---|
| For the Plaintiffs: | |
| LISL UNTERHOLZNER | |
| Examination by the Court | 27 |
| For the Defendants: | |
| None | |
| Rule 52 Motion by Ms. Israel | 58 |
| Response to Rule 52 Motion by Mr. Appleby | 104 |
| Rebuttal to Response | 145 |
| Ruling by The Court on Rule 52 Motion | 189 |
| Transcriber's Certificate | 205 |


E X H I B I T S


| Plaintiffs: | | Admitted |
|---|---|---|
| No. 308 | Bush Ross compilation of Exhibit 544 | 44 |
| No. 544 | Proffer of source documents | 47 |
| No. 545 | Contracts | 51 |
| No. 546 | Demonstrative aid, ownership changes | - |

**P R O C E E D I N G S**

COURTROOM DEPUTY: All rise. The Bankruptcy Court for the Middle District of Florida is now in session. The Honorable Catherine Peek McEwen presiding.

THE COURT: Please have a seat.

COURTROOM DEPUTY: Westport Holdings Tampa, Limited Partnership, Case 16-8167, Adversary 20-007.

THE COURT: All right. Anybody on Zoom?

COURTROOM DEPUTY: No, Judge.

THE COURT: Nope? All right. Please go ahead and Plaintiff's team introduce everyone that's here for you and then we'll do likewise on the other side of the aisle with the defense team.

MR. APPLEBY: Good morning, Your Honor. Keith Appleby on behalf of the Plaintiff Liquidating Trustee Jeffrey Warren. Mr. Warren is in the courtroom with us today. We also have Eric Ramos with Trial Consulting Services and our expert Lisl Unterholzner.

And, Your Honor, I would just let you know as well that Mr. Warren has to speak at a Bankruptcy Bar luncheon today, and so if we have a break he's going to leave at approximately 10 minutes til noon. If we're still going, he'll sneak out quietly.

THE COURT: On post-confirmation jurisdiction; right?

MR. WARREN: Yes, Your Honor.

THE COURT: Are you mentioning my *Heather Hills* decision?

MR. WARREN: No, Your Honor.

THE COURT: Are you mentioning my *Producers* decision?

MR. WARREN: No, Your Honor.

THE COURT: You missed two good ones. I think *Heather Hills* has been upheld by the Eleventh Circuit. That was Kathy McLeroy's on creditor defense and I can't remember who represented -- Mike Markham represented the Debtor, but he was aligned with Kathy McLeroy's position and it was -- it was some outsiders that were trying to challenge the confirmation order.

MR. WARREN: I would be happy to let Your Honor take my position at lunch.

THE COURT: Nah. Go ahead.

MR. WHITSON: Good morning, Your Honor. Ed Whitson on behalf of Valley National Bank. And with me is Mr. Colin Dean, Chase Stoecker, Adina Pollan, Kim Israel, and client representation Trey Korhn.

THE COURT: All right. Thank you. So what are we doing this morning, Mr. Appleby?

MR. APPLEBY: Well, Your Honor, I think when we left off yesterday we had the summary of contracts at 308,

that hopefully we'll get some agreement. I spoke with Ms. Israel and Ms. Pollan earlier to see if we had some agreement and evidently we don't.

THE COURT: Okay.

MR. APPLEBY: So we either -- I guess our option is --

THE COURT: Do we have Matt Hale here to explain how the compilation was assembled?

MR. APPLEBY: We were unable to coordinate with him to get him here this morning.

THE COURT: Okay. Then you need to upload the contracts.

MR. APPLEBY: Yes, Your Honor.

THE COURT: That will be I guess *omnibus* Plaintiff's Exhibit -- what's your last number here?

MR. APPLEBY: I believe the last one that we've asked for, Your Honor, is maybe 544.

THE COURT: I've got -- okay. Then I'm missing something. I'm missing 543. What was 543, Ms. --

MR. APPLEBY: Well, at docket number 803, we filed a request to have 543 and 544 included in our exhibit list.

MS. POLLAN: Judge, they were filed on May 2nd. They have not be admitted into evidence. So for identification purposes --

THE COURT: Yeah. So I just to need to know. Okay.

MS. POLLAN: They're not it.

THE COURT: So that's why I don't have a note on them --

MS. POLLAN: Right.

THE COURT: -- on my chart; right?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. All right. So whatever they are, they're numbered 543 and 544. So the contracts will be *omnibus* exhibit or multipart exhibit, however you want to call it, with 317 contracts?

MR. APPLEBY: Yes, Your Honor, I think that's the number.

THE COURT: And they're resident contracts. And I don't know if there's personal -- personal identifying information on them, but they need to be redacted.

MR. APPLEBY: Understood, Your Honor.

THE COURT: Okay. And I don't know if you've interviewed Mr. Hale about how he assembled this. I understand the genesis is the data room.

MR. APPLEBY: Yes, Your Honor. Actually in the motion at 803 there's -- I could tell you which paragraph, but it outlines the process that Mr. Hale went through. It originally -- the document that's attached at 803, the

second exhibit, or the -- again the exhibit referenced 544, is a complete summary that was within the regular business records of the Liquidating Trustee when he was at the location. That was the source document that Mr. Hale used.

THE COURT: Okay. And so that satisfies the rules provision that you give over whatever it was -- well whatever was used to construct the chart or the compilation.

MS. ISRAEL: Judge, respectfully, we don't concede that. We don't stipulate that what Mr. Appleby just --

THE COURT: Ma'am, I'm ruling that it is. If he hands you a sheet of paper and it's purported to be the underlying source document --

MS. ISRAEL: It's --

THE COURT: -- the rule says you've got to give it.

MS. ISRAEL: It's not an underlying --

MS. ISRAEL: He's giving it.

MS. ISRAEL: -- source document, Judge. That's what's pre-marked as 544. It's itself a list.

THE COURT: That's fine. But it was used in part along with these contracts apparently, and so it's in the data room, or this chart was in the data room, so it comes from a source that was held out to the public, the

purchasing public; right?

MR. APPLEBY: Um --

THE COURT: Mr. Warren?

MR. WARREN: Yes, Your Honor. The source document was produced to Valley. It's got Liquidating Trustee Bates 0511799. So they've had that document since sometime in November or thereabouts of 2022. We spelled out Mr. Hale's involvement with respect to the creation of what's been marked as Exhibit 308 for identification purposes. We can certainly upload all 317 of the contracts and we will --

THE COURT: Yes, you will.

MR. WARREN: -- be careful to redact them. And, you know, if the Court would like to avoid inconveniencing Mr. Hale, we'll seek a declaration from Mr. Hale, because I obtained this information from Mr. Hale.

THE COURT: Okay. All right. In terms of a supplementary showing about the -- how the chart was constituted, that's sort of an ancillary matter. 1006 requires the provision of the documents. The documents have been provided. It doesn't mean that you have to agree with the documents, it just means you have to be able to use them to test the accuracy of the compilation.

MS. ISRAEL: And that's --

THE COURT: So the fact that you don't like the

documents --

MS. ISRAEL: Yeah, that's --

THE COURT: -- or you don't think they support it, that's --

MS. ISRAEL: They don't, Judge.

THE COURT: -- your showing.

MS. ISRAEL: Respectfully, at least for the sake of the record, I need to -- may I approach the podium?

THE COURT: Sure.

MS. ISRAEL: And I think that's part of the problem.

THE COURT: Ma'am, I just -- that's what they're giving you is the source; okay? Rule 1006 doesn't say that they have to be accurate, they just have to be given to you. And then it's your job to show that the compilation is untrustworthy.

MS. ISRAEL: It's actually -- the burden -- the burden is on the proponent of the summary to show --

THE COURT: The burden is for them give you --

MS. ISRAEL: -- that it's accurate.

THE COURT: Ma'am, it says, give you the documents. That's what they used. If they used a thousand pictures of frogs and they came up with this compilation, they give you the thousand pictures of frogs and then you tell me this can't possibly be a compilation of that,

Judge.

MS. ISRAEL: Yes, ma'am.

THE COURT: That's what they're saying they used. I can't change the facts.

MS. ISRAEL: The burden is on the proponent. It would be the burden on the Plaintiff to provide the source documents --

THE COURT: And they have.

MS. ISRAEL: -- from which the summary -- they've represented through legal argument that they have.

THE COURT: That's right. That's what they're --

MS. ISRAEL: There has not been evidence admitted --

THE COURT: Ma'am, it doesn't require a collateral evidentiary showing. This is what they're telling you is the sum and source of this chart. And if it's a thousand pictures of frogs, tell me that so that I can then disregard and give no weight to the chart. They're giving you what they have. They can't make it up.

MS. ISRAEL: Let --

THE COURT: This is what they said they used.

MS. ISRAEL: This is -- and are we talking about 544, or are we talking about the resident contracts?

THE COURT: I'm talking about 1006, summaries to prove content.

MS. ISRAEL: Understood.

THE COURT: Okay.

MS. ISRAEL: And my question -- and perhaps it's better directed to Mr. Appleby, so that I can be clear and make sure that I make an objection for the record. My understanding was that 308, Plaintiff's 308 for identification purposes, was based on the resident contracts that were provided to us by hard drive yesterday afternoon.

I did a -- I'll say a spot check review of those contracts last night, as I represented to the Court that I would. There are not identical data points for each of the sample contracts.

THE COURT: That's what you can show, ma'am. That is what I'm trying to tell you. They've given the source. You then show me in your case why this is an untrustworthy piece of compilation; okay?

MS. ISRAEL: Okay.

THE COURT: The burden has shifted. I can't tell them to produce something different from what they used. This is what they said they used.

MS. ISRAEL: Then with the Court's permission --

THE COURT: And if the compilation is faulty, point it out.

MS. ISRAEL: Yes, ma'am. With the Court's

permission then I would respectfully request that Plaintiff provide a declaration from Mr. Hale in the event we want to inquire of Mr. Hale regarding the preparation of the document. With him not here this morning, we don't have the opportunity to ask him any questions about it.

Now I'm understanding that Exhibit -- pre-marked Exhibit No. 544, was also prepared by Mr. Hale. I may have misunderstood that, but if --

THE COURT: No.

MR. APPLEBY: No. That's not what --

MS. ISRAEL: -- Mr. Hale relied on that document --

THE COURT: No. Mr. Hale relied on a document --

MS. ISRAEL: -- then we may want the opportunity to ask him questions and I would like him to file a declaration that's verified that attests to what -- the efforts that he went through rather than relying on something that was contained in a notice filed on May 2nd while we were in the middle of this trial.

THE COURT: I'm not going to do that. Show me that the chart is wrong. You just said it's wrong. You said that what you have are -- you may have already had it but didn't appreciate that it was something that would be needed, but -- and we will still see the show and tell with the hard drive because maybe you got it in dump two, but

the flash drive you're telling me does not support the chart.

MS. ISRAEL: There are certain data points that match up, for lack of a better description, and certain data points that don't. And that's what I was trying to articulate.

THE COURT: Maybe there's an extra sample resident contract that's not captured on the chart. So maybe -- maybe there's yet another iteration.

MS. ISRAEL: I'm not sure. And again, I can't -- other than starting to launch into some of the examples, and I understand the Court may not want me to do that right now, that may not be the time -- this may not be the time to do that, but --

THE COURT: I'm satisfied the Plaintiff has met the requirements of Rule 1006. 3,000 -- 308, excuse me, Exhibit 308 for identification is a chart. It fits squarely the plain meaning of Rule 1006. It says the proponent must make the originals or duplicates available for -- excuse me. The chart is of voluminous writings. Yes, check. Number 2, the second box is checked. The proponent must make the originals, meaning of the voluminous writings or duplicates, for examination or copying or both. And they've done that. That's what they say they used.

MS. ISRAEL: Yes, ma'am. And if I may --

THE COURT: And it says, and the Court may order the proponent to produce them in court. I mean, I can have them go to a printing machine and print out 317 contracts.

MS. ISRAEL: I don't think that's necessary. I'm not asking the Court to require them to do that, but I --

THE COURT: Well, I don't see any other -- I don't see any other requirements in here.

MS. ISRAEL: Okay. Judge, they -- I would like to refer the Court to the case of *United States CFTC v. Worth Group, Inc.*, 2015 U.S. District LEXIS 186048. This is an opinion from the Southern District of Florida, July 29, 2015. And in that opinion, which was addressing a summary that a litigant, a party in that case was attempting to admit into evidence, the court said: For a summary exhibit to be admissible under the rule, and it's referring to Rule 1006, its proponent must establish that it is accurate.

It goes on to say that the requirements for -- and it's quoting another case, "The requirements for the admission of an evidentiary summary include that the summary must be accurate." So again, when I made the comment that it was the proponent's burden in this case, the Plaintiff, that's in part what I was relying on, that ultimately they --

THE COURT: They believe it's accurate.

MS. ISRAEL: And respectfully, I would submit -- and I understand where the Court is coming --

THE COURT: Show me -- ma'am --

MS. ISRAEL: Yes, ma'am.

THE COURT: -- I can't -- they told me it's accurate, they gave the contracts. If you want me to stop, ma'am, and look at all 317, I'm happy to do that.

MS. ISRAEL: I don't think that's necessary as long as we have the opportunity --

THE COURT: How are they going to prove --

MS. ISRAEL: -- to address it.

THE COURT: -- something is accurate if they've given the source documents? How else do we do that?

MS. ISRAEL: Well --

THE COURT: How else?

MS. ISRAEL: -- one would be --

THE COURT: Just give me --

MS. ISRAEL: One would be to have Mr. Hale, if he was the preparer of the document --

THE COURT: And then you're going to say he did it, but he did it wrong. It's inaccurate.

MS. ISRAEL: well, I mean, respectfully, Judge, we have to assert --

THE COURT: Did you know about -- time out.

MS. ISRAEL: -- objections.

THE COURT: How long has this 308 been on the books as an exhibit?

MR. APPLEBY: Earlier in the case, Your Honor.

THE COURT: How earlier? Come on.

MR. APPLEBY: Well, Your Honor, I have to pull the document.

THE COURT: Were they on notice that they needed to take discovery about this chart?

MR. APPLEBY: Well yes, Your Honor. If there were any questions or concerns about the contracts, they've been provided and they were notified then of the -- of that summary.

THE COURT: But you don't know when.

MR. APPLEBY: I will look right now, Your Honor.

MS. ISRAEL: Judge, even if the document was on their exhibit list -- and by the way I'm not claiming it wasn't, the summary itself; right? I mean, again, this isn't an issue of a late --

THE COURT: You're challenging the summary. So if you had a question about it, you could have taken discovery if you had it --

MS. ISRAEL: No, ma'am.

THE COURT: -- if you had it early enough. That's what I'm trying to test.

MS. ISRAEL: That's fair. Discovery was closed at the time Mr. Appleby uploaded his exhibit list on January 19. But again, Judge, we have a right to, I'll say assert objections at trial with regard to certain evidence that they're attempting to admit.

THE COURT: You've done it, I've overruled it. Sit down, please.

MS. ISRAEL: Okay. Yes, ma'am.

THE COURT: Mr. Appleby, get the contracts in here. I'm going to look at them. They will have a chance to point out how this chart can't possibly be correct. And we'll have -- when do you want to do the show and tell so that you can show what was in dump number two and then Mr. -- which one of the lawyers is going to be working on that?

(No response.)

THE COURT: Is it Mr. Stoecker?

(No response.)

MR. APPLEBY: Your Honor, I still think it may make more sense --

THE COURT: This is such a sideshow.

MS. ISRAEL: I mean that's fair, Judge. I -- I have --

THE COURT: It's a voluminous case and so I'm sorry it's a terabyte, but if you have it, you have it.

MR. APPLEBY: Yes, Your Honor. I have the hard

drive with me. The thumb drive is easy enough to review and likewise we've offered to put all the -- the contracts in the record.

THE COURT: Mr. Appleby, the contention is that they've had it. It makes a difference on prejudice. If they've had it and it was in document dump two and they just don't know how to open it, I don't know why, then that's a fact point or a data point, to use Ms. Israel's terminology, that I think is important for the record.

MR. APPLEBY: Well --

THE COURT: The flash drive only appeared yesterday.

MR. APPLEBY: Well I have the hard drive, Your Honor. Your Honor indicated --

THE COURT: That's why it's important.

MS. ISRAEL: And, Judge, separately we have an objection to relevance to the document itself that I think we're previously addressed but I'm happy to restate very briefly.

THE COURT: You can restate it. I've overruled it.

MS. ISRAEL: Oh.

THE COURT: I think the income stream was used by both sides. I think that an obligation to refund and in the different amounts at different times is something that

is woven into calculations made by experts about the present value of certain assets and also what the liabilities are.

MS. ISRAEL: That's -- I understand that. And Judge, again, 308 is dated December of 2017 and states in bold that it should not be relied on as an actual reflection of the --

THE COURT: It's a compilation. What do you not understand --

MS. ISRAEL: Understood.

THE COURT: -- about a summary?

MS. ISRAEL: No, I understand what it is.

THE COURT: Are the contracts predating this? Are the three --

MS. ISRAEL: I wouldn't know that because it doesn't --

THE COURT: You don't know it.

MS. ISRAEL: -- it doesn't identify the residents. So the summary itself --

THE COURT: Ma'am, does it -- do the contracts give the date of the contract; yes or no?

MS. ISRAEL: The contracts themselves do.

THE COURT: There you go.

MS. ISRAEL: Not the summary.

THE COURT: That's fine. That predates the

summary. It's a compilation of old contracts. The compilation is new because no one thought to do the compilation until present time. That's what a compilation is. Sometimes it's several weeks before the trial. That doesn't make it faulty.

MS. ISRAEL: Understood, Judge. Our -- the second part of that objection to relevance would be, of course, that Mr. Warren has already testified and has admitted into evidence all of the unsubordinated notes that terminated, had the effect of terminating the resident contracts.

THE COURT: That's according to you, ma'am.

MS. ISRAEL: Yes, ma'am.

THE COURT: Okay.

MS. ISRAEL: I mean that's true, as well.

THE COURT: Two different purposes. The financial people have to use calculations when they're doing their projections or whether they're doing a snapshot and not a projection. Or the balance sheet test. Right? At least. That's relevant. This is one of the three income sources, as I heard it, of this facility. There's this, there's the PIP, there's the rent. Okay?

If you're telling me that your expert shouldn't have relied on the resident contracts at all and that your expert doesn't want to count the liability of the refund at

all, that's your theory. I disagree. I think --
MS. ISRAEL: That's not what I'm telling you.
THE COURT: -- it's relevant. Okay. This is relevant because it provides in a snapshot underlying data for some financial calculations. I don't have and you don't have and we don't have the luxury of going through each contract one-by-one during the trial. Compilations are why Rule 1006 exists; okay?
MS. ISRAEL: I certainly understand the purpose of --
THE COURT: And if your expert --
MS. ISRAEL: -- a summary.
THE COURT: -- didn't use resident contracts at all --
MS. ISRAEL: I didn't say that. And of course --
THE COURT: Okay. Well then they're relevant.
MS. ISRAEL: -- he will testify to what -- he has to testify to what he relied on.
THE COURT: Okay. They're relevant. The resident contracts are relevant. All right. You going to do the show and tell now?
MR. APPLEBY: Again, Your Honor, I would proffer that we would prefer to upload the contracts, but we --
THE COURT: You can upload the contracts, but Mr. Appleby --

MR. APPLEBY: Yes, Your Honor.

THE COURT: -- the rule anticipates due process. Give them time to look to test your compilation. You gave them a flash drive yesterday. But you said that's not really true in terms of when they first got it. Show me when they got it. That's all I'm asking.

MR. APPLEBY: Yes, Your Honor.

THE COURT: I want to make the record. This could be a point on appeal if I rule against the Bank.

(Counsel confer)

THE COURT: While y'all are getting your electronics together, do you all have staff analyses of the initial legislation for the MLR, as well as the amendments, or do I have to order those from Tallahassee?

MR. APPLEBY: I'm not totally positive, Your Honor, but --

MR. WARREN: We don't have the historical legislative --

MR. APPLEBY: What we put in the record, and I've got to remember the docket number, but we filed the 2014 statutes, the relevant statutes, with highlights of the relevant portions.

MR. WARREN: Here it is, Keith.

MR. APPLEBY: And I was --

THE COURT: I thought that -- but doesn't the

statute that talks about the calculations, that dates back to 1977?

MR. APPLEBY: Well yes, Your Honor. There were changes. But what we filed was the relevant 2014 version and the references.

THE COURT: Okay. Well I -- the answer is, no you don't have staff analyses from the original legislation or the amendments and that I do have to get them from Tallahassee?

MR. APPLEBY: Correct, Your Honor.

THE COURT: Okay. Do you have them, Mr. Whitson?

MR. WHITSON: No, Your Honor. We had searched for them and we inquired of the State, but we were not -- we were told there were no available --

THE COURT: They're available. They're in boxes in the basement.

MR. WHITSON: -- committee notes, staff analyses.

THE COURT: You have to pay for them.

MR. WHITSON: We did inquire.

THE COURT: Okay.

MR. WHITSON: And I did a public records request and a subpoena.

THE COURT: Okay.

MR. APPLEBY: Your Honor, Ms. Unterholzner has her laptop with the hard drive plugged in.

COURTROOM DEPUTY: (Indiscernible).

THE COURT: I want it to be on the Zoom.

MS. UNTERHOLZNER: What do I need to do for that? I'm not registered for the Zoom.

(Pause in proceedings, 10:13 a.m. - 10:16 a.m.)

MR. WHITSON: Your Honor, if it pleases the Court, one of our experts is here and I invited him to observe. He's not a fact witness. It's Louis Robichaux and Rujuta Khanderia.

THE COURT: Well, we've invoked the Rule. You're allowed to have a single expert. I mean you haven't -- you haven't asked to have him present to assist you in interpreting the evidence as it comes in, so. We've -- they've invoked the Rule. I can't -- are they non-testifying?

MS. ISRAEL: Right. Mr. --

THE COURT: If they're non-testifying, sure.

MR. WHITSON: No, they are testifying. Mr. Robichaux is going to testify this morning.

THE COURT: Either they are or they're not.

MR. WHITSON: Well, I mean, my understanding of the Rule is that it doesn't apply to experts because experts can listen to anything.

THE COURT: Yes, it does. It -- you can ask for an expert to sit with you during the trial if it's

necessary for you to have assistance and the Court has discretion to make that an exception to the Rule. This gentleman hasn't been sitting next to you and assisting you and you haven't made the case that you need him. Now the non-testifying person can certainly stay in.

MR. WHITSON: All right. Well then we will just do that.

THE COURT: Okay.

MR. WHITSON: All right. Thank you, Your Honor.

THE COURT: Thank you.

COURTROOM DEPUTY: Okay, Judge, I think we're all set.

THE COURT: Okay. So what is this? Go ahead and swear her in since she's doing a walkthrough, Ms. Arciola.

COURTROOM DEPUTY: Okay.

THE COURT: Ms. Unterholzner, we're going to re-swear you in as you walk us through this.

COURTROOM DEPUTY: State your name for the record.

THE WITNESS: Lisl Unterholzner.

(Witness placed under oath by the Courtroom Deputy.)

THE COURT: All right. Ms. Unterholzner, you're up there on the witness stand with a laptop. And plugged into that laptop is a external drive, a hard drive. Where

did you get that?

THE WITNESS: It was delivered to my office from Mr. Warren's office.

THE COURT: All right. And you've plugged it in and you are now screen sharing with the Court through the Zoom platform. Tell us what it is that we're looking at. I see some yellow folders and then there at the bottom is some -- it looks like an "e" icon.

THE WITNESS: So what I have is if you look up at the top it says, this PC and then Toshiba EXT D: And so that is the -- that is the path to the external hard drive. And so these are -- these are all of the contents of the external hard drive. So there's a number of folders here. Litigation hold mailbox, and then a number of directories. And then down at the bottom there is an Excel file which has basically an index of what's on this drive.

THE COURT: Did you create the index or was that provided?

THE WITNESS: I did not. It was present at the time.

THE COURT: Does that index show that there are resident contracts on the hard drive?

THE WITNESS: I'm not certain if it does or doesn't. I think it shows all of the different paths. I can show you the path to the resident contracts.

THE COURT: Let's do that.

THE WITNESS: Okay.

THE COURT: All right. You're watching this, okay, Mr. Stoecker?

THE WITNESS: In directory R, I'm going to double click on that to open that directory.

THE COURT: Are you connected to our WiFi?

THE WITNESS: I am.

THE COURT: Okay. It's very slow. Do I need to get my MiFi in here?

COURTROOM DEPUTY: You might because --

MR. APPLEBY: Your Honor, since it's connected to the hard drive, I think it's direct. But looking at the far right column, it's a 62 roughly megabyte, 63 megabyte zipped -- compressed zipped file, so that's probably the reason it's slow.

THE COURT: I was hoping y'all would have this already set up. I mean, we entered an order, we allowed it all in. This was to be show and tell time. And I'm going to put a new checklist on my pre-trial -- MY final pre-trial list and that is, if 1006 summaries are to be used, I'm going to give a deadline for delivery of the underlying documents. Because the requirement is before trial. That's why it's important for you to show me this today, Mr. Appleby.

MR. APPLEBY: Yes, Your Honor.

THE WITNESS: Yeah. And, Your Honor, I will say that we have -- I wanted to bring it to you the way that we received it, which is compressed and zipped. I have tested this process on this laptop and it will open.

THE COURT: Okay. Thank you.

Ms. Arciola, why don't you ask Mr. Beaubien if he can bring me back my MiFi and with a charger cord. Maybe we can use that just as a backup.

COURTROOM DEPUTY: Does he have yours, Judge?

THE COURT: Yes, he does. Mine was malfunctioning and it's cracked, but maybe he can get it to work.

THE WITNESS: Okay. So the next step is to open this folder. Hopefully, it takes less time.

THE COURT: What's the name of that folder?

THE WITNESS: RUV shared. I'm not sure if it's -- I don't know exactly what it stands for. I assume it's residents of University Village or something like that. It appears to be a shared file that would have been accessible.

THE COURT: Are you finding that so far, Mr. Stoecker?

MR. STOECKER: Your Honor, I have screenshots of what the hard drive looks like when we open it up on our

end.

THE COURT: Okay.

MR. STOECKER: (Indiscernible).

THE COURT: Okay.

MR. STOECKER: (Indiscernible).

THE COURT: All right.

THE WITNESS: And then there are a number of folders here as you can see that deal with different apparently resident matters. And down here is a folder that says, resident contracts. And resident contracts.

THE COURT: There's a subfolder within the resident contracts folder that says resident contracts.

THE WITNESS: Correct. So then you'll see down at the bottom here 763 items. This is where all of the resident contracts that are part of the summary are found. So my office and I went through and compared the resident list, that was the basis for the Plaintiff's Exhibit 308, and we opened up these contracts and we made sure that every resident that was on that list was in this set of information. And then we moved these contracts onto the thumb drive.

THE COURT: All right. Thank you. All right. You may close that out. And then what we'll do is, why don't you continue to sit there and then Mr. Stoecker will bring up I guess a screenshot of what their hard drive

looked like. And then someone is going to have to explain to me why it is that their hard drive looks different, if in fact it does look different.

And is it a device that looks about the same size as what Ms. Unterholzner has?

MR. STOECKER: The device on hard drive [sic]?

THE COURT: Yeah. The one that you all got.

MR. STOECKER: It's a Toshiba hard drive. I don't think Toshiba (indiscernible) external.

THE COURT: Okay. And that's what you have; right?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Mr. Appleby, who prepared those hard drives?

MR. APPLEBY: Well, Your Honor, I don't know a name offhand other than they were prepared in the document room. I'm forgetting the title. But again I would ask Mr. Warren because again this was --

THE COURT: Well the document room didn't have all those contracts in it, did it?

MR. APPLEBY: Well, Your Honor, again I think that for clarification it may be better for Mr. Warren to respond.

THE COURT: Okay. Listen to what Mr. Warren has to say, people. I want to know how the Toshiba hard drives

were prepared. In other words, how were they populated?

MR. WARREN: Yes, Your Honor. There was a second request for production of documents that was received by me as the Plaintiff. And I conferred with Jane Elizabeth, who was discussed yesterday, as being the financial officer post-petition at University Village who I worked with. And Jane Elizabeth had identified that -- that there were computer records. I had Keith Phillips, who is the IT director at Bush Ross, work with Ms. Elizabeth to create the hard drive copies from the servers at University Village.

And then I provided the hard drive to counsel in Atlanta and then I provided a hand delivery of the hard drive to Mr. Whitson, I think it was in September of 2022.

THE COURT: And you -- when did Ms. Unterholzner get her copy?

MR. WARREN: When she was -- when Oscher Consulting was engaged, the first thing that I did was duplicate -- have a duplicate copy of the hard drive provided to Mr. Oscher and Ms. Unterholzner.

THE WITNESS: That was approximately January of '23, Your Honor.

THE COURT: Okay. You didn't keep a copy of the hard drive yourself?

MR. WARREN: I did.

THE COURT: So you have your own little Toshiba hard drive?

MR. WARREN: I -- I don't want to mis --

THE COURT: I'm trying to --

MR. WARREN: No, I understand, Your Honor.

THE COURT: I just want to make sure that the mother of all of the Toshibas is the same data set.

MR. WARREN: To my knowledge, Your Honor, it absolutely is.

THE COURT: Okay.

MR. WARREN: They all came from the same source, which was from the University Village source, you know, that was obtained through Ms. Jane Elizabeth.

THE COURT: Okay. All right. Well let's see what you've got. Mr. Appleby, did you get the hard drive from Atlanta counsel?

MR. APPLEBY: No, Your Honor, I have not reviewed the hard drive personally.

THE COURT: You need to get it --

MR. APPLEBY: I understand, Your Honor.

THE COURT: -- just in case it may be different from what she's showing us.

MR. STOECKER: When you plugged in the hard drive there were two folders. This is a screenshot of one of the folders that (indiscernible). Each folder is listed by the

(indiscernible) number.

THE COURT: And is that part two; volume 1, part two?

MR. STOECKER: It is volume one, part one. I've got volume one, part one, up on my screen. I don't know why it's not showing up on Zoom.

THE COURT: You may have to transition your screen sharing to the other screen, meaning the screen on your laptop that has the other view.

MR. STOECKER: I had it on the same page -- on the same screen. This is volume one, part one, at the very top.

THE COURT: All right. And then what does volume two look like?

MR. STOECKER: I -- that was the first screen I had up.

THE COURT: No, that was volume one, part two.

MR. STOECKER: Well, I -- let me take a step back. These are the two folders that we have, volume one, part one and volume one, part two. There's no volume two --

THE COURT: Okay.

MR. STOECKER: -- on the drive. And then when we open those up --

THE COURT: All right. For the record, that's

Mr. Stoecker talking.

MR. STOECKER: When we open these up --

THE COURT: When you say, "these," you opened?

MR. STOECKER: Either volume one, part one, or volume one, part two folders up. This is -- these are the folders -- the files within each of those folders.

THE COURT: What kind of an image is that? Oh, a text document.

MR. STOECKER: They're labeled L-I-Q underscore T-T underscore with numbers.

THE COURT: Okay. Well I guess my analogy of the different men touching different parts of the elephant might be true here too. Mr. Appleby, they don't look the same.

MR. APPLEBY: Well, Your Honor, the --

THE COURT: I think you need to get from Mr. Mercer what Mr. Mercer has. It may be that a separate -- another different hard drive was prepared for this expert who is on the stand.

MR. WARREN: Your Honor, this document has come through the Bush Ross Relativity system because it has a Bates number. This list of documents. So if you look for document 0511798, that's what has been marked as Exhibit 544. So I'm not sure we're comparing apples to apples in terms of --

THE COURT: That's my problem because if you did give them a resident file it should be apparent. And it's not apparent.

MR. WARREN: And -- and I can't identify that this is the right source except to know that they're using a different production. That's what -- that's what's on this information. But if they'll search for docket 0511798, that should match what's been marked as Exhibit 544, which came from a different circumstance than the hard drive that I provided to Ms. Unterholzner that we delivered to Mr. Whitson in -- I think it was in September of 2022.

THE COURT: Well, then they're different.

MR. WARREN: That's -- that's my point, Your Honor.

THE COURT: Well then why didn't anyone tell me that before I asked the lady to get on the stand? I'm testing the proposition that they didn't get what you say they got. And now I don't know how I can say that they got what you say they got.

MR. WARREN: Well, we didn't know what they were saying they had until 30 seconds ago, but they've had this information. And, you know, am I correct that this litigation Bates number is -- is -- is on this document?

MS. POLLAN: We have not been able to prove that. Again, that was filed on May 2nd and --

THE COURT: That's a screenshot.

MR. WARREN: Oh, I see. You can't see what's behind that.

MS. POLLAN: Right.

THE COURT: Okay. So that's a needle in a haystack. That's my point is, they didn't have an adequate and fair opportunity to inspect these contracts until yesterday. I'll give them a chance to, in whatever manner during this trial that makes sense, to challenge the compilation based on the underlying source documents that they've now received.

But I can't conclude that they got them prior to trial except buried in a dump with a Bates number.

MR. WARREN: And, Your Honor, we will be able to duplicate what we provided. We will get it into their hands tomorrow.

THE COURT: It's too late. You have already given them the flash drive. But the point is, Mr. Appleby is standing up here and saying they got it, they got it, they got it. They don't know what they have. How would you know what they have looking at this list of folders? Now RUV, that makes kind of sense.

MR. WARREN: Yes, Your Honor. And we can -- we'll go back and try to confirm and verify the dates for the hand delivery and the items that were hand delivered

and the creation of the documents that were hand delivered. You know, but no matter what, we will replicate that so there cannot be --

THE COURT: You already have.

MR. WARREN: Well, not the entire hard drive, you know, so if they want to test the -- the summary, then they can have the original source from which the information was derived and therefore they can --

THE COURT: No, no. Theoretically, you're saying it's already on there in some Bates number.

MR. WARREN: The Bates numbers were created as the information went through a Bush Ross document management system.

THE COURT: Then you're saying it's somewhere on the hard drive that they got.

MR. WARREN: I believe we gave them the raw data --

THE COURT: Okay.

MR. WARREN: -- not screened through our Relativity system. I may not be a hundred percent accurate. I will go back and try to confirm exactly, you know, how that was, you know, how that was replicated.

THE COURT: If you want to supplement the record about whether they had it or didn't have it before yesterday, that's fine. You should probably get Mr. Mercer

to send you what he has --

MR. WARREN: I will confer --

THE COURT: -- and see if you can find it.

MR. WARREN: I will confer with Mr. Mercer and --

THE COURT: This is not apples to apples.

MR. WARREN: This is -- this is not. And there's no debate about that, you know, but that doesn't mean that they didn't have an apple.

THE COURT: I understand. It's just that we can't test that, which I thought we were doing this morning.

MR. WARREN: Yes, Your Honor.

THE COURT: And it wasn't until we saw what your expert had that we realized, when we compared it to what they say they have, that they don't have the same things.

MR. WARREN: And that is --

THE COURT: Well at least not in the same format.

MR. WARREN: I would contend they do have it in the same format, but they may have used a different way to deal with the Relativity system production that was made. So there were multiple productions --

THE COURT: So you're saying that the same folders, as configured on Ms. Unterholzner's flash drive, should appear on their flash drive?

MR. WARREN: Yes, Your -- not on the flash drive.

The hard drive --

THE COURT: I'm sorry. The hard drive.

MR. WARREN: The hard drive was duplicated. And we actually went out and acquired the hard drives for that to occur so that they would be the same. And what I delivered to Mr. Mercer, and at Mr. Mercer's request we delivered to Mr. Whitson, should have been identical.

THE COURT: To what Ms. --

MR. WARREN: And then we duplicated --

THE COURT: To what Ms. Unterholzner's has?

MR. WARREN: That's correct, Your Honor, because then we duplicated it for Ms. Unterholzner.

THE COURT: Okay. So --

MR. WARREN: And it --

THE COURT: So what you're saying is inexplicably the yellow folders that appeared when she opened up the program, they're not appearing on the other side's because -- what's your explanation for that?

MR. WARREN: What they're showing, Your Honor, is a production from Relativity which Bates numbered the documents, you know, which is different than the native production of the hard drive --

THE COURT: Okay.

MR. WARREN: -- which is what --

THE COURT: Okay. Time out. Then it's

different.

MR. WARREN: And it could have been a mis --

THE COURT: It's different. It is different.

MR. WARREN: It is. And it --

THE COURT: Okay.

MR. WARREN: -- could have been a mistake, I'm not saying that we don't make mistakes, but the intent was that everybody was getting the same duplicate of the same information because I was not asserting any attorney-client privilege with respect to matters happening prepetition with respect to the operations at Westport.

THE COURT: Okay. Well if you have anything you would like to supplement the record with to show that they got it, you can do that at an appropriate time, just as they can show that these contracts that they, apparently for the first time are able to access or see or appreciate was there, was yesterday on the flash drive. They'll be able to test, or show me that this chart, number 308, is not trustworthy.

MR. WARREN: Yes, Your Honor.

THE COURT: I'm admitting 308. You wanted it in, right, Mr. Appleby?

MR. WARREN: We do. And --

MR. APPLEBY: Yes, Your Honor.

MR. WARREN: -- we want 544 in as well, Your

Honor, because that's the actual source information from which Mr. Hale prepared 308.

THE COURT: They don't need to be in and neither do the contracts, but the contracts are really the source source.

MR. WARREN: Yes, Your Honor. The one thing about 544, however, is that it does have the names and it has the dates of the contracts and it has information, you know, with respect to each category by category.

THE COURT: Okay. So it's an interpretive aid to the chart and the contracts themselves are the source documents?

MR. WARREN: The con -- the contracts are the source documents. 544 is a compilation created by Westport of the contracts from their data system. And from that information, Mr. Hale prepared 308 using a format that was created by one of the attorneys at Bush Ross back in the early appointment of me as the examiner.

THE COURT: Okay. Well, let me -- we'll take those up one at a time. First of all, 308 you want in, right, Mr. Appleby?

MR. APPLEBY: Yes, Your Honor.

THE COURT: All right. Your objections are noted. You think that the compilation is untrustworthy and you say you don't have the documents unless you got them

recently. Over that objection I am going to admit number 308. You will have the opportunity to proffer why it is that the chart is not trustworthy so as with any other evidence that you might hear.

(Plaintiff's Exhibit No. 308 received into evidence.)

THE COURT: All right. So then we have number 544, which is sort of an interim step to getting to 308. Do you have any objection to 544?

MS. ISRAEL: Yes, ma'am.

THE COURT: What's your objection?

MS. ISRAEL: Thank you. First, it was only first disclosed on May 2nd while we were in the middle of trial, so it would be untimely. Second, it was I'll say described, if you will. I mean Mr. Warren is an officer of the court, but he's giving an explanation he was not the preparer. He is asserting that Mr. Hale relied on this document. It is also dated well beyond the applicable or relevant period, so we would object on relevance grounds. It's dated November 29, 2017. And it -- it definitely includes a list --

THE COURT: Again, are you aware of any summary that's created in real time when it's meant to reflect what happened in the past?

MS. ISRAEL: I'm sorry, Judge, I didn't hear the

beginning --

THE COURT: Are you aware of any summary that's dated in real time when it's meant to reflect what happened in the past? I don't understand the date issue.

MS. ISRAEL: Well the date issue, it -- it relates to the relevance, from my perspective.

THE COURT: That's why I'm not getting it. Summaries happened after the fact.

MS. ISRAEL: I agree with that.

THE COURT: Okay.

MS. ISRAEL: I certainly agree with that. I mean that's fair. You could prepare a summary at any time dependent on information that was in a file. I do not dispute that and that's not my point. My point is, I guess if it corresponds with Mr. Hale's summary that he asserts in bold, and I'm taking Mr. Warren at his word, I'm assuming Mr. Hale prepared that summary. If he prepared it and said it is not to be relied on, then certainly we would take issue with it being a document that should be relied on by the Court.

THE COURT: All right.

MS. ISRAEL: And I'm not taking a position on whether the Court is or not. Judge, I do have to say for the sake of the record there are people listed on 544. There are also dates of birth. I do want to put that on

the record. If Your Honor admits it, that must be --

THE COURT: I said PII has to go out.

MS. ISRAEL: -- redacted. Yes, ma'am. But there aren't any refund amounts listed. I don't believe that it aids the Court in its evaluation of the claims but --

THE COURT: Does it give the percentage?

MS. ISRAEL: It gives the percentage of what the refund would be --

THE COURT: Right.

MS. ISRAEL: -- but no dollars for the --

THE COURT: I don't --

MS. ISRAEL: -- Court to assess.

THE COURT: I think the percentage is something that the experts need to account for. So --

MS. ISRAEL: That would be fair.

THE COURT: -- if they took one figure across the board, that would be wrong.

MS. ISRAEL: Yes, ma'am.

THE COURT: So --

MS. ISRAEL: In the for what it's worth category, there are a couple of types of contracts --

THE COURT: Yes, there are.

MS. ISRAEL: -- that do not -- no, that don't actually authorize a refund, for what it's worth, so.

THE COURT: Okay. So -- listen. The underlying

documents, I mean they have to be admissible if they -- if somebody offered them. I think that there's a way that this one could be admissible. I think the resident contracts are admissible. You don't have to admit them, though, in order to admit the chart. So I'll accept 544 as a proffer of one of the source documents. The main source documents are the contracts themselves. So now let's go to 546?

(Plaintiff's Exhibit No. 544 received into evidence.)

MR. APPLEBY: 544.

MR. WARREN: We said 545 --

MR. WHITSON: Your Honor --

MR. WARREN: -- would be the contracts.

THE COURT: 545. Okay. 545.

MR. WHITSON: -- if I could also just be heard. There's another component to this refund issue that I want to note for the record and that is --

THE COURT: Save it for your argument. Man, listen. This is --

MR. WHITSON: We're on the subject now. I just want to -- while we're on the topic, I thought it may be helpful to the Court to at least remind the Court there has been testimony that the refund liability is reduced periodically by health services that are provided at the

health center.

THE COURT: If they have the PIP contract or something like that.

MR. WHITSON: Well the PIP contract is a little bit different.

THE COURT: Listen. When the experts get on and they talk about counting beans, let's get to it then; okay?

MR. WHITSON: That's fine, Your Honor. I just wanted to make sure that while we're on the topic --

THE COURT: We're talking about in broad brush strokes there's a refund liability. There are many iterations of contract that's prescribed the refund liability from zero to 90 percent. That's what this chart stands for. That's all. And to the extent that an expert takes one whack at one percentage, that would be probably an inexact way of dealing with the issue and quantifying the refund liability. So the chart is what it is.

Now let's go to the contracts, 545. They're offering the underlying documents. Any objection?

MR. WHITSON: Your Honor, I'll defer to Ms. Israel on this topic.

THE COURT: Okay.

MS. ISRAEL: Judge, just to make sure, are we referring to the 317 or the sample of the contracts that were given to us --

THE COURT: Whatever is in --

MS. ISRAEL: -- on the flash drive?

THE COURT: Whatever they're saying 545 is.

MR. APPLEBY: Well, I'm confused by what Ms. Israel said. The flash drive should have all the contracts.

THE COURT: Is 545 all the contracts?

MR. APPLEBY: It will be, Your Honor.

MS. ISRAEL: I don't know what it will --

THE COURT: What does that mean? It's either there or it's not.

MR. APPLEBY: Well, we haven't filed it yet.

THE COURT: Well they're not filed yet. They need to do the redaction.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. That's what the proffer is.

MS. ISRAEL: I was simply asking if they were the same contracts that were given to us on the flash drive yesterday. That's --

MR. APPLEBY: Yes. That's --

THE COURT: Okay.

MS. ISRAEL: I would agree that those would constitute business records of the Debtor entity. I would argue that they are not relevant, although I understand where the Court -- the Court's position. But for the

purposes of --

THE COURT: I'm going to strike every expert's opinion then that relies at all on anything to do with those contracts.

MS. ISRAEL: I --

THE COURT: So if that's your position --

MS. ISRAEL: The experts -- I will allow -- the experts have to speak for themselves as to what they relied on. What we were given yesterday --

THE COURT: You don't know what your expert relied on?

MS. ISRAEL: (No response).

THE COURT: You can't have it both ways.

MS. ISRAEL: I'm not trying to have it both ways, Judge. We stipulate --

THE COURT: Yes, you are. You're saying they're not relevant.

MS. ISRAEL: We agree that they are business records. And for the record, I agree they can come into evidence, they can be uploaded, although they may need to be redacted.

THE COURT: They do.

MS. ISRAEL: They are not Bates numbered, Judge. I just want to be -- what we have on the flash drive -- to address Mr. Warren's point, what we were given is not Bates

numbered. So we, at least for last night's purposes, were unable to match that up to anything else.

THE COURT: So we'll have to go by alphabetical last names.

MS. ISRAEL: They are alphabetically. They were provided to us that way.

THE COURT: Are they in searchable form?

MS. ISRAEL: They are. They're in PDF format.

THE COURT: Then that's how we'll have to do it. You can tell me that Mr. and Mrs. Adelman's contract is X or Y and it doesn't match up with 308.

MS. ISRAEL: Yes, ma'am.

THE COURT: I'm making that name up. I don't know any of the residents.

MS. ISRAEL: I don't think there was, but I understand.

THE COURT: All right. I'll allow 545, which is an exhibit for identification in waiting because it hasn't been uploaded yet to be admitted --

MR. APPLEBY: Thank you, Your Honor.

THE COURT: -- as a Plaintiff's exhibit in evidence. 544 is more of a demonstrative.

(Plaintiff's Exhibit No. 545 received into evidence.)

THE COURT: Again, I think the case law does not

require the underlying documents to be admitted so. But 544 is there for a resort to as an interpretive aid.

So what else, Mr. Appleby?

MR. APPLEBY: Your Honor, I think when --

THE COURT: Ms. Unterholzner, you may step down.

THE WITNESS: Thank you.

(Witness excused, 10:52 a.m.)

MR. APPLEBY: I think early in the case, and I don't recall exactly when, there was a discussion about the organizational structure. And I believe Your Honor had asked the Plaintiff to prepare a demonstrative that would show the ownership prior to the transaction after --

THE COURT: The parties, yeah. Just the little schematic.

MR. APPLEBY: Yes, Your Honor. And I have samples of those, if I could approach?

THE COURT: Sure. This is a demonstrative and it would probably be supported by oh, various things in the record.

MR. APPLEBY: Yes, Your Honor. And I tried to reference --

THE COURT: The stipulation of facts, for example, admitted facts, has some of this. Mr. Warren testified to some of this. Not all of it.

MR. APPLEBY: Yes, Your Honor. Then I reference

-- I tried to reference exhibits that -- that indicate where the source of -- well, essentially where in the record shows who was the owner as of and in what percentages as to what dates. There's a few pages on here. The first page is the organizational structure of Westport Holdings Tampa, LP prior to the March 31st, 2014 transaction. We've --

THE COURT: So stop. So SILF, upper right hand, is where the investors were, so to speak?

MR. APPLEBY: Well prior to March 31st, Your Honor -- below I have the little asterisk and a double asterisk that reference the different -- and in this context I could say the Landry-related entities. But it marches through those. So there was the 1 percent general partner that is outlined at the first asterisk and then the 99 percent limited partner. Which the ownership is very similar. There is one change. I think it's the very last one on each of those --

THE COURT: So this -- this was not an investment vehicle, Westport Senior Living Investment Fund, LP, for --

MR. APPLEBY: Well -- yeah, it was an investment vehicle, Your Honor, and we've -- again, we've outlined those different entities at asterisk two for the limited partner.

THE COURT: Okay. Well if Joe Schmoe wanted to

put money into the fund, who would Joe Schmoe go to? Or would that be even allowed?

MR. APPLEBY: I don't know that that would be allowed, Your Honor.

THE COURT: Got it. Okay. That's fine.

MR. APPLEBY: But those are the two owners of Westport Holdings Tampa, LP. And then what we've indicated that middle box is, that was the independent living towers that -- we referred to the Towers quite a few time.

THE COURT: Okay.

MR. APPLEBY: That has also been defined as the provider. That was who had prior to March 31st, 2014, the $4.2 million in MLR funds. And Westport Nursing Tampa, LLC was a hundred percent owned by Westport Holdings Tampa, LP.

THE COURT: Okay.

MR. APPLEBY: The next page is the -- it's after the loan closing on March 31st. The general partner remained -- at least initially remained the same. And again, I have an asterisk there that sort of gives -- gives what happened following, not necessarily the day of the closing but subsequent. But the limited partners did change on March 31st, 2014, so you see those four limited partners; BVM University Village, BHM SILF, LLC, IMH Healthcare, LLC, and JF Consultants, LLC.

THE COURT: And where in the record are -- is

that mix of the limited partners?

MR. APPLEBY: Well, I believe that's Exhibit 207, Your Honor.

THE COURT: Okay. All right. And then what's the third page?

MR. APPLEBY: The third page is the organizational structure of Westport Holdings II Tampa prior to March --

THE COURT: That's the Villas?

MR. APPLEBY: Yes, Your Honor. And you'll see -- I think that the footnotes here for the two partners, the limited partner and the general partner, those are identical to Westport Holdings I, the first page we referred to.

THE COURT: Okay.

MR. APPLEBY: And again there I've referenced this was from Exhibit 207. Or excuse me -- yes, 207.

THE COURT: Okay.

MR. APPLEBY: The next page is -- excuse me. I want to make sure. This is the organizational structure of Westport Holdings II, LP after the loan closing. And here there were some changes, again, following the loan closing. The general partner -- the general partner initially stayed the same as Westport Holdings Hidden Springs, LLC. The limited partners changed. And again as Your Honor

indicated and recognized, this was the independent living villas.

THE COURT: Okay.

MR. APPLEBY: And the final page is the organizational structure of Westport Nursing Tampa, LLC after March 31st -- after the March 31st, 2014 transaction which Westport Nursing Tampa, LLC then became owned by BHM SUNI, LLC.

THE COURT: Taking the place of Westport Holdings Tampa, LP?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. Is there any substantial disagreement with the way these charts present the structure, the corporate structure?

MS. ISRAEL: Judge, this is the first time I'm seeing this chart --

THE COURT: I know that, ma'am.

MS. ISRAEL: -- so I --

THE COURT: You should be really familiar with this. I'm familiar with this from the testimony myself. This confirms to me in visual what I think I heard.

MS. ISRAEL: Understood. But by -- just by way of example, and I'm trying to do this in a scramble, but --

THE COURT: I invited all parties to give it to me, I thought, but whatever. We'll wait until after lunch.

You can --

MS. ISRAEL: May I -- yeah. I mean if I --

THE COURT: That's fine. My intent is to mark this as Plaintiff's Exhibit 46 as a demonstrative aid only and not as direct evidence of the ownership changes, but as an aid to what is -- to interpret what is already in the record. That would be my intent. So I'm going to mark this as Exhibit 546 for identification. And this is Plaintiff's. Here you go, ma'am.

(Plaintiff's Exhibit No. 546 was marked for identification.)

THE COURT: I numbered the pages in the upper lefthand corner with 1, 2, 3, 4, 5. On the first page I wrote "Towers," and on the third page I wrote "Villas," and on the fifth page I wrote "NH," meaning nursing home. That's my handwriting.

All right. What's next, Mr. Appleby?

MR. APPLEBY: Your Honor, that concludes our case. We rest.

THE COURT: Okay. All right. So Plaintiff rests.

(Discussion between The Court and Courtroom Deputy).

THE COURT: Okay. All right. What's next? Who is going to put on a witness or make a motion or what?

MS. ISRAEL: I will be making the motion, Judge.
THE COURT: All right.
MS. ISRAEL: May I have a very -- two-minute recess?
THE COURT: Yes.
MS. ISRAEL: Thank you.
(Recess, 11:00 a.m. to 11:08 a.m.)
THE COURT: And just for the record, the operative complaint is 6-1; right?
MR. APPLEBY: I believe it's 607 --
THE COURT: The complaint?
MS. ISRAEL: The complaint is docket entry 6.
THE COURT: 6-1.
MS. ISRAEL: The amended complaint, Judge. I'm sorry.
THE COURT: 6-1.
MS. ISRAEL: Yes, ma'am.
THE COURT: Let me make sure I have that here.
MS. ISRAEL: Yes, ma'am, that's right, 6-1.
THE COURT: For some reason I'm not finding it. I had it in here on the first day of trial.
Ms. Arciola, would you print me out 6-1?
COURTROOM DEPUTY: Uh-huh.
THE COURT: All right. Go ahead.
MS. ISRAEL: Yes, ma'am. May it please the

Court. Judge, at this point Valley would move pursuant to Rule 52 made applicable to these proceedings by Rule 7052, for a judgment on partial findings. This motion is made solely as to Count I which is the aiding and abetting count, as well as Count IV which is the claim asserted by Mr. Warren for actual fraud. Again, Count I and Count IV from the amended complaint as Your Honor noted is at docket entry 6-1.

This adversary proceeding was filed on January 8, 2020. It has been a long, and at some times, extremely challenging path to get to trial. The Plaintiff has had ample time to conduct discovery and gather evidence needed to support these two claims, and with all due respect to Mr. Warren and Mr. Appleby, we respectfully assert that the Plaintiff has not met its burden in establishing a *prima facie* case as to either of these two counts.

Your Honor is aware, but for the sake of the motion, of course the standard that the Court must employ -- must employ. The Court is not required to weigh the evidence for or against a particular party when considering a partial judgment under Rule 52(c), but rather simply to determine whether the Plaintiff has met its burden of proof in establishing a *prima facie* case.

The Court should resolve any disputed issues on the basis of the preponderance of the evidence without

drawing any special inferences in favor of the Plaintiff.

With regard to Count I in the elements of a cause of action for aiding and abetting a breach of fiduciary duty. There are four elements, Judge, to prove a claim of aiding and abetting a breach of fiduciary duty. And, Your Honor, I want to apologize in advance. I did not bring additional hard copies of the cases that I am going to cite Your Honor to. I am happy to, when we conclude, go obtain those copies and provide them to the Court, but I will at least provide the citations and try to speak as slowly as possible to ensure that they're clear.

THE COURT: Okay.

MS. ISRAEL: The elements of the cause of action for aiding and abetting a breach of fiduciary duty that we are relying on comes from a case entitled *S*-as in Sam, *& B*, as in Boy*, slash Bibb Hines PB 3 Joint Venture v. Progress Energy Florida, Inc.*, at 365 Fed. Appendix 202. That is an Eleventh Circuit case from 2010.

The first element for a cause of action for aiding and abetting a breach of fiduciary duty is that there is a fiduciary duty on the part of the wrongdoer.

THE COURT: Is this limited to -- okay. It is limited to a breach of fiduciary duty?

MS. ISRAEL: Yes, ma'am.

THE COURT: All right.

MS. ISRAEL: Yes, ma'am. Bear with me, Judge.

THE COURT: So you mean a fiduciary duty on the part of the primary wrongdoer as opposed to the aider and abettor?

MS. ISRAEL: Yes, ma'am.

THE COURT: Okay.

MS. ISRAEL: That's correct. I would des -- that's exactly right. The underlying wrongdoer. Primary, I think is --

THE COURT: I'll call that the primary.

MS. ISRAEL: -- also fitting. Yes, ma'am. And in this particular instance, Judge, the evidence is murky at best as to who the Plaintiff was even alleging the primary wrongdoer was. Your Honor has heard some commentary, and I'm careful in my word choice because I don't believe it was evidence. But through the course of the many discussions about the request for judicial notice, it became clear that the Plaintiff was, at least at the beginning, attempting to paint John Bartle as the primary wrongdoer.

Mr. Bartle, of course -- you have not received any evidence identifying Mr. Bartle as a person in a position of authority or decision making for the Debtor entities prior to the loan closing. Respectfully, with regard to Mr. Bartle, not only did he not have a

relationship -- not only was there no evidence of a relationship that Mr. Bartle had with the entities that are -- whether on the chart that we just discussed or previously in evidence.

The evidence does demonstrate that Mr. Bartle was released by Mr. Warren. That came out in cross-examination of Mr. Warren. And I recognize that takes us all the way back to probably the first day of trial. There was a discussion between Mr. Whitson and Mr. Warren about that.

THE COURT: That's -- that's irrelevant to me so you can move on.

MS. ISRAEL: Yes, ma'am. Fair enough.

If you turn your attention to Mr. Landry then, Judge, who was the only other person -- and, Judge, let me say this and I know Your Honor can see it, but paragraph 9(a) through (d), as in Delta, of the amended complaint identifies, at least by allegation in the amended complaint, the organizational and operational structure of the Debtor entities prior to March 31, 2014 and their alleged relationship to those entities.

There was no testimony, Judge, nor any documentary evidence admitted into evidence that demonstrates how -- well, first Mr. Landry's relationship as a fiduciary. If you by extension conclude that Mr. Landry had some relationship to the Debtor entities by

virtue of his managerial status, even if you get past that point, Judge, there is then no evidence that demonstrates how Mr. Landry would have breached a fiduciary duty to either of the Debtor entities.

That is the second element, right? So if we get past the first element, that there is a fiduciary duty on the part of the primary wrongdoer --

THE COURT: Didn't Landry approve the movement of the MLR fund?

MS. ISRAEL: Yes, ma'am. They read in an excerpt that he did upon OIR approval, yes.

MR. APPLEBY: I don't believe our excerpt --

THE COURT: I don't believe it was conditioned on that. I believe that the evidence was that he okayed the movement.

MS. ISRAEL: And, Judge, if I'm thinking of a testimony by Mr. Landry that Your Honor has not heard yet, I'm going to defer to the Court.

THE COURT: Okay.

MS. ISRAEL: I know what Mr. Landry's going to testify to and I'm not trying to blend the two.

THE COURT: Okay.

MS. ISRAEL: I have to defer to the Court on what Your Honor recalls Mr. Landry --

THE COURT: I would say --

MS. ISRAEL: -- those excerpts --

THE COURT: I would say hit more on the first fact that you just mentioned as opposed to the second one. Or the absence of the first fact that you mentioned as opposed to the second one.

MS. ISRAEL: The breach?

THE COURT: No. The breach I think is -- there is evidence. It's his connection, if you will.

MS. ISRAEL: Yes, ma'am. Well, again Judge --

THE COURT: That wasn't one -- that wasn't one of the stipulations of fact that you conceded, paragraph 9(c)?

MS. ISRAEL: We believe that Mr. Landry had a relationship to this Debtor entity --

THE COURT: Okay.

MS. ISRAEL: -- in some way through -- through -- through multiple entities in between, if you will.

THE COURT: Okay.

MS. ISRAEL: I don't take issue with Mr. Landry having a relationship to an entity that had a relationship to the Debtor entities. But the Plaintiff has to demonstrate and provide evidence and testimony as to Mr. Landry's relationship. Respectfully I would submit that no matter what I think Mr. Landry is going to say or may have said through the limited excerpts that they read, ultimately it's the Plaintiff's burden to establish that.

THE COURT: All right. And that wasn't one of the conceded facts, paragraph 9(c)?

MS. ISRAEL: Not to my recollection, Judge, but I would want to go back and look at paragraph 9(c) to be able to say that with a straight face.

THE COURT: Hold on just a second.

MS. ISRAEL: I just don't recall one way or the other.

THE COURT: Let me see something.

MS. ISRAEL: Yes, ma'am.

THE COURT: I don't have that one at my fingertips. What number was that one, Mr. Appleby? We went through it.

MR. APPLEBY: You're looking for the admissions, Your Honor?

THE COURT: Yes. Well, I'll just put a marker there that I need to go back and check that. Okay.

MS. ISRAEL: Yes, ma'am.

THE COURT: Keep going.

MS. ISRAEL: Yes, ma'am. Thank you.

THE COURT: I found it. It's 746.

MS. ISRAEL: I'll make a note to myself as well, Judge.

THE COURT: Okay.

MS. ISRAEL: Thank you.

THE COURT: All right. Go ahead.

MS. ISRAEL: Yes, ma'am.

With regard to Mr. Landry then, and the allegations of breach, respectfully we would submit that the reading in of an excerpt of Mr. Landry's deposition testimony indicating that he authorized the transfer of funds from a Regions Bank escrow account to the closing agent for the purposes of being able close on this loan, while certainly is -- well, Judge, simply from our perspective that does not constitute a breach of his fiduciary duty to whichever entity he may have owed a duty to.

Put simply -- and there was extensive argument -- well in my mind it was extensive, argument about the fact that there has been no evidence put before this Court that Mr. Warren made a demand of Regions Bank, took action, adverse action against Regions Bank, conducted -- no evidence whatsoever to suggest that the movement of that money was either in violation of the Regions Bank escrow agreement or in violation of the applicable OIR statute, that being 651.035.

My recollection is, and again I'm going to defer to the Court. But my recollection is the Court posed the question to Mr. Appleby multiple times, are you going to have someone from the OIR come in and say that, whatever

that proposition was. Your Honor, put simply, there is no testimony that was read into the court -- and again it was only of course by depo excerpt read in, that demonstrated that that transaction, the authorization of the movement of funds from the Regions Bank escrow account to the closing agent at Gary Dietrich, that there was anything improper, unauthorized, or expressly stated to be improper under any governing contract or statute.

I want to remind the Court that at -- and this is Plaintiff's Exhibit 251, which is the Horizon loan extension agreement. At page 4, Section K -- and Judge, again, just for reference purposes, there are actually two Section K's in this document. I'm sure it was a scrivener's error which is why I'm telling Your Honor it's on page 4. In that document, Horizon expressly approved the Debtor entities having the quote "continuing opportunity to sell the collateral," end quote.

This transaction, "this transaction" being this loan transaction that -- between Westport Nursing and the Bank was expressly authorized and approved by Horizon, at least conceptually approved, that the Debtor entities were allowed to continue to sell the collateral, which is what Mr. Landry pursued.

THE COURT: Sell it to another provider.

MS. ISRAEL: What's that?

THE COURT: Sell it to another Provider, capital P.

MS. ISRAEL: That's not what the loan extension agreement says. And I'm not suggesting that the transaction would not need to be in compliance with the statute. I'm focusing on what the evidence is before the Court. So it's a fair comment, but no --

THE COURT: Okay.

MS. ISRAEL: You know, that's not how it's worded, Judge, I guess is the shortest way to say that.

They read in excepts from Mr. Struk, they read in excerpts from Ms. Burkholder, they read in excepts from Mr. Stiller, I believe. In short, Judge, there's simply no evidence to establish that there was in fact a breach of the fiduciary duty if that is what their focus was even on, meaning the transfer of that money, the movement of $3 million from the Regions escrow account to a closing agent.

Element three, Judge, perhaps is the most important in terms of my emphasis. And that is that the requirement that the Plaintiff establish that there is actual knowledge of the breach by the alleged aider and abettor. So in this instance, actual knowledge by the Bank that there was some breach of fiduciary duty on the part of the primary wrongdoer.

Your Honor posed a very pointed question very

early in this trial, at least to my recollection. And that was -- and you've said it again. You've said it a couple of times. Is mere negligence enough? It is not. And that's significant because, again, the Plaintiff has not presented any evidence that this Bank -- and let me be more blunt, that Mr. Korhn, who is the -- to my recollection the only name that Your Honor has seen on these various emails.

THE COURT: No. I've seen the Bank's lawyer.

MS. ISRAEL: Well, Mr. Price. I'm sorry. I meant within the Bank. And I apologize, Judge. I didn't mean to be --

THE COURT: I think I've made my sentiments clear about culpability or recklessness or whatever you want to call it and Mr. Korhn.

MS. ISRAEL: Yes, ma'am. Well, and on that note then, Judge, there's simply no evidence that Mr. Korhn had actual knowledge of anything, much less that there was some sort of breach of fiduciary duty on the part of the primary wrongdoer. In fact, as recently as yesterday, Mr. Appleby said, at least twice, there was lots of confusion. I didn't write down exactly what his quote was, but he used that phrase. Your Honor used that phrase, he used that phrase.

What the -- Your Honor has previously gone back to how many times am I going to hear about the emails. Mr.

Korhn was trying to ask the questions he knew to ask.

THE COURT: The lawyer is an agent of the Bank. Let me just lay that out there.

MS. ISRAEL: Even if you factor --

THE COURT: There is a knew or should have known and a reckless element to this, as well.

MS. ISRAEL: No, ma'am. Mere neg --

THE COURT: I'm not saying anything about Mr. Korhn. Let me be clear.

MS. ISRAEL: Understood.

THE COURT: Okay.

MS. ISRAEL: Understood. But I want -- and again I'm trying to answer a very pointed question that the Court posed. And let me provide Your Honor with the case citations because I did make that statement that mere negligence is not enough and I haven't provided Your Honor with the legal support for that. And if Your Honor may --

THE COURT: I understand mere negligence may not be enough.

MS. ISRAEL: I'm sorry?

THE COURT: I said I understand that mere negligence may not be enough.

MS. ISRAEL: Yes, ma'am. Would you like me to provide the Court with the cite --

THE COURT: Sure.

MS. ISRAEL: Thank you, Your Honor. The first case is *Wiand*, W-I-A-N-D, *v. Wells Fargo Bank*, 938 F. Supp. 2d 1238. That is a Middle District of Florida case out of the Tampa Division --

THE COURT: So Burt Wiand lost that one, huh?

MS. ISRAEL: -- April 2013. Yes. Yes, ma'am. That was a Judge Whittemore holding. That case was cited by the Eleventh Circuit in *Perlman*, and that's P, as in Paul, E-R-L-M-A-N, *v. Wells Fargo Bank,* 559 Fed. Appendix 988. That's a May 2014 case. In addition, *Lawrence v. Bank of America*, 455 Fed. Appendix 904. That's an Eleventh Circuit case from January of 2012. And as a general proposition, Judge, what those cases stand for, in addition to the mere negligence --

THE COURT: Hold on. These are all aiding and abetting cases?

MS. ISRAEL: Yes, ma'am.

THE COURT: Okay.

MS. ISRAEL: Yes, ma'am. And as you can see from the descriptions, they're cases against banks. And in fact even in the *Perlman* case, the court says, quote "While actual knowledge may be shown by circumstantial evidence, the circumstantial evidence must demonstrate that the aider and abettor actually knew of the underlying wrongs committed. It then cites to the *Wiand* case and in the

parenthetical it says, quote, "Evidence establishing negligence, i.e. that a bank" quote 'should have known,' end quote, "will not suffice."

This court goes on -- and the Eleventh Circuit *Perlman* court goes on to say, moreover, Florida does not require banking institutions that conduct routine banking services to investigate transactions involving its demand deposit accounts.

THE COURT: Yeah. That's Ponzi. That's different. This is a different set of facts.

MS. ISRAEL: It's factually -- it is a case related to a Ponzi scheme although, Your Honor, I would respectfully submit that the law applies the same in this instance.

THE COURT: Well the test may, but when you're talking about statutory duties to maintain certain funds for the protection of residents, that's very different from Ponzi scheme and monitoring regular banking activity would then demand deposit accounts.

MS. ISRAEL: Understood, Judge. In short, however, Judge, there's simply no evidence, whether by testimony or documents, that Valley Bank knew of any alleged breach, had actual knowledge of any alleged breach, and there is no evidence whatsoever -- and, Judge, I would -- I would make this same argument whether I were only

talking about Mr. Price, although, frankly, I don't believe there's evidence to demonstrate that either.

In short, Judge, red flags are --

THE COURT: So you're -- you're -- you're concentrating on elements one and three?

MS. ISRAEL: I mean I've addressed all of them, but I think three is a significant --

THE COURT: What's four?

MS. ISRAEL: Four is that the aider and abettors, so in this case the Bank's, substantial assistance, or encouragement of the wrongdoing. Essentially, that the Bank gave substantial assistance or encouragement of the wrongdoing. In this instance, there is no evidence that Valley National Bank provided any encouragement or assistance, much less substantial assistance.

The evidence proves otherwise. The evidence demonstrates that the Bank was posing questions, was trying to understand what Mr. Rabke was saying, trying to understand what he was talking about vis-a-vis use of words that Mr. Price and then by extension Mr. Korhn were not understanding. The email chain between March 21 and March 28 demonstrates confusion, demonstrates both Mr. Korhn and then Mr. Prices's efforts to gain a better understanding.

Whether Mr. Price did it perfectly or not, whether he asked the right questions or not --

THE COURT: Did he fail by not demanding -- this is with regard to prong three. Did he fail by not demanding the opinion from Mr. Rabke and then going forward, you know, damn the torpedoes, full speed ahead.

MS. ISRAEL: It certainly would have been my preference that Mr. Korhn -- Mr. Price pursue that opinion letter, Judge. That is the honest answer. Did he fail? I have to defer to the Court for that finding. But what I can tell Your Honor with a straight face is that I do not believe that either shows actual knowledge or substantial assistance.

We know the loan closed; right? The loan closed because Mr. Korhn relied on Mr. Price's advice. There is -- the evidence is replete on those points.

THE COURT: Yeah. But does that give a person with an independent duty to his client a pass? I don't think so.

MS. ISRAEL: And I can't -- Judge, I don't know that I'm in the position to take a position on that. And I understand the Court's question. Does it rise to the level of substantial assistance with a breach of a duty? That's where I --

THE COURT: Now you're talking about --

MS. ISRAEL: -- take issue.

THE COURT: Now you're talking about prong four.

MS. ISRAEL: Yes, ma'am.

THE COURT: You've gone from actual knowledge --

MS. ISRAEL: Yes, ma'am.

THE COURT: I think recklessness is enough. You argue should have known is not enough.

MS. ISRAEL: That's right. Do I believe Mr. Price acted recklessly? I don't believe there's been any evidence of that, so I have to make a motion based on what the evidence has demonstrated thus far.

THE COURT: That's your interpretation of the evidence. Okay.

MS. ISRAEL: Yes, ma'am. I mean that's fair. Yes, ma'am, it is.

THE COURT: Nobody ever admits they did something recklessly.

MS. ISRAEL: Well, I mean, look. Do I believe --

THE COURT: Okay. So your main -- your main points are -- maybe your strongest point is the substantiality of the assistance or encouragement. That's what you're saying?

MS. ISRAEL: I mean I really think my strong -- my two strongest points are the actual -- or lack of actual knowledge and the lack of evidence demonstrating substantial assistance. There is no content --

THE COURT: Okay. So you -- you're really --

your strong points you believe are the second two elements?

MS. ISRAEL: I have them as prongs three and four.

THE COURT: Three and four. Yep.

MS. ISRAEL: Yeah. I have them as prongs three and four.

THE COURT: Meaning the second -- I'm sorry -- the second set of two elements, three and four. Got it.

MS. ISRAEL: Yes, ma'am.

THE COURT: Okay.

MS. ISRAEL: I just wanted to make sure we were talking the same language.

THE COURT: We are.

MS. ISRAEL: Yes, ma'am. And I do rely on the case law that says red flags aren't enough. I believe -- and look, I mean Mr. Price is an attorney. He's engaged in other loan transactions. But we have to rely on the excerpts, right, not what I know Mr. Price has said that Your Honor hasn't heard yet or hasn't been admitted into evidence. I am only entitled to rely on and can expect the Court only to rely on what has been admitted by the Plaintiff thus far.

THE COURT: Okay. What do you have by way of -- and let me ask this. Is this a federal common law tort, is this a state law tort? What do you have by way of state

law if the latter?

MS. ISRAEL: I have -- the *Bibb* case that I cited to Your Honor I believe is federal common law. But because I don't have that case in front of me, I don't know if the Eleventh Circuit was citing to another state jurisdictional list of elements, if that makes sense.

THE COURT: Okay.

MS. ISRAEL: I am citing from the *Bibb* case, however. And I'm happy to go back and check that if Your Honor would like me to.

THE COURT: All right. Do you want to move on to the other count?

MS. ISRAEL: Well, Judge, and let me -- if I may, and I'm not doing this to inflame the Court. I want to -- I feel like I need to lead by saying that. I do want to address, at least for record purposes, Plaintiff's damages, or lack of evidence thereof. I understand that we've talked about this before, but if Your Honor would just indulge me a few minutes to address it --

THE COURT: Yeah. In terms of the creditor claims, you can make that record. But the fact of the matter is, $3 million left this estate.

MS. ISRAEL: Understood.

THE COURT: And that's damage in and of itself.

MS. ISRAEL: Yes, ma'am. And my understanding,

from the Plaintiff's presentation, is that is not the damages --

THE COURT: That's part of the damages.

MS. ISRAEL: -- that they're seeking with regard to this count --

THE COURT: Okay.

MS. ISRAEL: -- that those were the residents claims and administrative claims.

THE COURT: Okay.

MS. ISRAEL: And certainly Mr. Appleby can correct me if I've misspoken and I'll address that --

THE COURT: Okay.

MS. ISRAEL: -- but --

THE COURT: Go ahead.

MS. ISRAEL: Okay. Yes, ma'am.

Your Honor, and here is what the evidence has shown thus far. Docket entry 1585 in the underlying bankruptcy case was Mr. Warren's motion to modify the confirmed First Amended and Restated Mediated Joint Plan of Liquidation. That was a lot of words, I know. Attached to that document was the proposed Second Amended Plan. Or actually it included -- pardon me. Pardon me. Within that motion, there was excerpted language as to what portions of the Plan were going to be -- were proposed to be modified.

It addressed Section 5.15, which were the Class

13 claims. Those were the allowed unsecured claims of resident parties. It addressed other claims or sections of the -- the First Amended Plan and how they were going to be modified. Mr. Warren himself used language that each holder, and I'm only talking about Class 5.15 now, Judge, although again the same language is contained in each and every applicable class.

THE COURT: Including Class 14.

MS. ISRAEL: Yes, ma'am.

THE COURT: So Classes 13 and 14.

MS. ISRAEL: Yes, ma'am. And in fact you are reading my mind. And if I may, Judge, that class is also modified, just as Class 13 was. And Mr. Warren used the language that -- and again I'm only para -- I'm quoting from Class 13 because I have it printed in front of me. But again, the docket entry speaks for itself.

"Each holder" -- and this is a quote. "Each holder of an allowed resident unsecured claim shall receive from the buyer in full and final satisfaction of such holder's allowed resident unsecured claim a subordinated resident note in the face amount of such holder's allowed resident claim," end quote. The phrase goes on, but that was the operative language.

The case of *Swann*, S-W-A-N-N *v. Dynamic Recovery Solutions*, at 2018 WESTLAW 6198997 --

THE COURT: Repeat those last digits, please.

MS. ISRAEL: Yes, ma'am.

THE COURT: 2018 WESTLAW --

MS. ISRAEL: I'm so sorry. 6198997.

THE COURT: Okay. Got it.

MS. ISRAEL: Yes, ma'am. And I apologize if I said that too quickly. That is a case from the Northern District of Alabama from November 28, 2018. That court addresses the definition of satisfaction. I am not going to bog the Court down with reciting what's in that case.

THE COURT: Is it a bankruptcy case?

MS. ISRAEL: No, ma'am, I don't believe that it is. I believe it's a District Court case, it's not a bankruptcy case.

THE COURT: All right. Okay.

MS. ISRAEL: It -- however though in our search, Judge, that's what I was able to find that addresses the definition of what satisfaction means without even utilizing the modifier full and final in front of that word. I want to respectfully remind the Court that the subordinated notes are in evidence, all of them are to my knowledge, and again that would -- I mean Plaintiff did not provide any testimony that there were not any notes that were not admitted into evidence. Those were at Plaintiff's Exhibits 309 through 312.

At Plaintiff's Exhibit 310, 3-1-0, Bush Ross has two fairly substantial notes. And by "fairly substantial," my words, I mean in dollar amount. There are two for Bush Ross and two for Mr. Warren in his individual capacity. Those are in evidence.

I was -- I was impacted, I will say, Judge, by Your Honor's comment that Judge Williamson would not have made a mistake such as this. And respectfully, Judge, while I understand where you're coming from sincerely, I don't think Judge Williamson made a mistake at all. I think Judge Williamson granted Mr. Warren as a Liquidating Trustee, the relief that Mr. Warren sought through docket entry 1585.

THE COURT: And yet Judge Williamson left intact a trust that had no business to even exist.

MS. ISRAEL: Well, Judge --

THE COURT: I think it's great for claimants to get two pockets to pick. And which -- and especially elderly residents. And that's what I think happened here and I've got to construe the Plan *in pari materia*. I cannot -- the Plan that was confirmed by Court order and left in place includes two components of collection for the claimants. And that's my -- I'm not -- you can make your record but --

MS. ISRAEL: Understood. Understood, Judge. And

I -- again, respectfully, I do believe that Judge Williamson granted Mr. Warren the relief that he sought. Of course we know that the --

THE COURT: Then he should have stricken the trust provisions.

MS. ISRAEL: What's that?

THE COURT: Then his order should have stricken the trust provisions.

MS. ISRAEL: The full Second Amended Plan and Restated Plan of Liquidation is at docket entry 1586 --

THE COURT: In the case?

MS. ISRAEL: -- so the next docket --

THE COURT: In the case, docket number 1586?

MS. ISRAEL: In the main case, yes, ma'am, 1-5-8-6. The Second Amended Plan again repeatedly uses the same language regarding full and final satisfaction. For Your Honor's reference, I think it would be at least helpful to orient Your Honor to the fact that the definition of "buyer," because of course when I cited to Your Honor from Section 5.15, which was the Class 13 treatment, I used the word "buyer" in the quote that I read in. Your Honor can find that buy -- the definition rather of "buyer" on page 8 of the Second Amended Plan at docket entry 1586.

Your Honor can also find the definition of quote "purchased assets," at Section 1.142 on page 20 of the

Second Amended Plan. And as Your Honor noted, and as was I believe discussed during Plaintiff's presentation, I just don't recall if the order itself was admitted, the order granting Mr. Warren's motion was at docket entry 1633 in the main case and that order was entered on February 14, 2020.

THE COURT: Say the docket number again, please?

MS. ISRAEL: Yes, ma'am. 1-6-3-3.

THE COURT: 3-3. Okay. Thank you.

MS. ISRAEL: Yes, ma'am. And, Judge, I just -- to quote from one section of Judge Williamson's order, and this is found I believe on page 5 of the order, it says quote, "Based upon the motion, the supplement, the declaration, the proffers of the Liquidating Trustee and the argument of counsel at the hearing, the Court finds that the plan modifications as incorporated in the Second Amended Plan are reasonable and necessary modifications and accommodations to permit consummation of the sale and the transactions approved and authorized in the final sale order.

"Accordingly, the Court finds that specific circumstances of these cases warrant the Plan modifications." Of course I wasn't at that hearing. I don't --

THE COURT: Have you listened to the transcript

to see whether the trust was even mentioned?

MS. ISRAEL: No, ma'am, I have not. I have not. But frankly we -- certainly as a -- we will review that --

THE COURT: You don't have to.

MS. ISRAEL: -- to the extent applicable.

THE COURT: I'm just asking if you did.

MS. ISRAEL: No, ma'am, I did not. I did not. In the next paragraph of course the motion is granted and the Plan modifications as set forth in the motion and supplement and incorporated in the Second Amended Plan are approved in all respects. And then in the same order the Second Amended Plan is confirmed pursuant to Section 1129 of the Bankruptcy Code.

Mr. Warren closed on the sale of the assets to Tampa Life Plan Village on July 17, 2020. And Your Honor can find Mr. Warren's notice of that sale at docket entry 1829 in the main case.

Your Honor may also recall Mr. Warren's testimony, and this again goes back to very early at the beginning of this trial, that residents had called him following the filing of the Tampa Life Plan Village bankruptcy case and Mr. Warren testified that he had advised them to file claims in the Tampa Life Plan Village case, which as Your Honor knows now having taken judicial notice of the proofs of claim in our request for judicial

notice that we addressed with the Court yesterday, coupled with Mr. Alpert's letter, that of course residents have begun to file proofs of claim in the Tampa Life Plan Village bankruptcy case. And again Judge --

THE COURT: Of course they would. And it was great advice. If you've got two people that owe you money, you don't want to pass by an opportunity.

MS. ISRAEL: Understood, Judge. Understood. I'm simply addressing as a matter of fact that's what the residents have done.

THE COURT: And that was smart of them to do.

MS. ISRAEL: And again, Judge, just to -- as I was mentioning with regard to Mr. Alpert's letter. He mentioned, at least in discussion to the Campbell resident that filed his proof of claim, that Tampa Life Plan Village had assumed the obligations of the terminated resident life care contract.

In short, Judge, respectfully, we do not believe that the Plaintiff has met his *prima facie* case with regard to the aiding and abetting claim which is Count I of the Amended Complaint and we respectfully request that the Court enter a judgment on partial findings with regard to that count.

With regard to Count IV, which is the actual fraud --

THE COURT: Mr. Warren, you need to leave.

MR. WARREN: Thank you, Your Honor.

(Mr. Warren exited, 11:46 a.m.)

THE COURT: Go ahead.

MS. ISRAEL: Yes, ma'am. With regard to Count IV --

THE COURT: And this is state statute, Chapter 726; right?

MS. ISRAEL: Yes, ma'am, that's right.

THE COURT: Okay. Go ahead.

MS. ISRAEL: The -- in this instance, the Trustee Mr. Warren would bear the burden of proof as to each required element of an actually fraudulent transfer claim. And, Your Honor, I am -- I believe is well familiar with the law with regard to how and why and when a transfer becomes -- made by a debtor becomes fraudulent, although I'm prepared to address that with the Court if necessary. And of course Florida Statute 726.105(2) is a non-exhaustive list of the badges of fraud that the Court may consider in determining actual intent.

Our focus, Judge, or my focus rather, with regard to -- bear with me, Judge. I just wanted to look at one thing from the Amended Complaint. Plaintiff's allegations as to what would -- what were the subjects of the alleged fraudulent transfer are found at paragraph 59, which is

within Count IV.

THE COURT: These are the badges that they identified. Not the transfers -- well they talk about --

MS. ISRAEL: That's right.

THE COURT: -- Leveraged Buyout Transaction, writ large.

MS. ISRAEL: That -- that's right. The way it's described, is pled in paragraph 59. You're right, the Plaintiff did not -- it's such a short -- and I'm not trying to be dismissive of it, but there's only three numbered paragraphs within Count IV setting aside the underpinnings which are paragraphs 1 through 41 of the Amended Complaint. But I believe the allegations, at least for the purposes of Count IV, must be evaluated within the context of what was pled.

THE COURT: I think 60 is the MLR fund.

MS. ISRAEL: 60 is the allegation that the Debtors made the transfer and that that is the transfer that is subject to avoidance and recovery. And I would concede, Judge, for the purposes of this argument that what is described as the USAB MLR transfer is the movement of the $3 million from the Regions Bank escrow account to the closing agent.

Judge, and truly my focus in this -- with regard to this count is, again, I harken back to the -- both the

Court's comments about what the exchange of emails from March 20 to March 28 show. And by the exchange of emails, I'm referring to the emails between Mr. Price and Mr. Rabke, sometimes Mr. Angelis, sometimes Mr. Korhn. Essentially those communications leading up to the closing of the transaction on March 31, 2014.

Mr. Appleby himself has acknowledged those emails show lots of confusion. In -- with regard to this claim, Judge, put simply, while the -- there is -- we agree there was lots of confusion. The evidence demonstrates that there were many questions posed. There was an exchange of communications about what was going to happen with modified language in the -- I'm not going to get the full name of the document right, but essentially what I will call the pledge agreement regarding the cash collateral account.

What the evidence demonstrates, Judge, is that consistently the Bank -- and by "the Bank" I'm actually lumping in Mr. Price here -- consistently used the words "cash collateral account."

THE COURT: Also escrow.

MS. ISRAEL: It -- I believe on a rare instance Mr. -- both Mr. Price and Mr. Korhn used the word "escrow." Whether they were using it the same way that Mr. Rabke was using it, I do not believe there is any evidence that there was some grand conspiracy or scheme to trick anyone, much

less the OIR. This was a real estate loan for the Bank. And the evidence bears that out.

Yes, Mr. Price was told -- I think there was some reference to the state, and I am grossly paraphrasing, in an email from Mr. Rabke. There might have even been a reference to regulation or regs or regulator, something like that. There was no evidence on the part of either Mr. Price acting on behalf of the Bank or Mr. Korhn himself that was this ah-ha smoking gun as you said torpedo -- just, you know, darn the torpedoes, we're going to close this thing no matter what the state says. They were trying to get a --

THE COURT: Except there was a decided pivot on the part of Mr. Price demanding things, going out to his firm, and asking for information and then all of a sudden said let's just close it. The documents are fine.

MS. ISRAEL: You're right. He did reach out to his Florida colleagues. You're absolutely right. The emails bear that out.

THE COURT: But the pivot, the cautionary tone that he had at first changed. He pivoted and said, let's just close it.

MS. ISRAEL: He did. And I'm trying not to speak --

THE COURT: I know. He didn't get --

MS. ISRAEL: -- for -- I need to be careful.

THE COURT: He didn't get the opinion --

MS. ISRAEL: He --

THE COURT: -- that he should have gotten and so there is an inference --

MS. ISRAEL: He did not get -- there is no evidence admitted thus far about that opinion.

THE COURT: There is an inference that -- and especially given the colloquy of if we go -- if we go the prudent route, it will be delayed.

MS. ISRAEL: I understand. I totally understand.

THE COURT: There is --

MS. ISRAEL: I can't really deny that.

THE COURT: Mr. Korhn referenced something about fees. So we know that Mr. Price was going to benefit. So there's -- I understand your argument about confusion, not fraud.

MS. ISRAEL: And I think --

THE COURT: But I think in fairness the record has at least an inference that something else may have been going on.

MS. ISRAEL: Well that I can't speak to, Judge, because again I -- ultimately I have to defer to the Court in terms of what inferences --

THE COURT: I'm just --

MS. ISRAEL: -- and you haven't heard from Mr. Price yet.

THE COURT: I'm talking about the emails. I'm talking about the emails that say, let's just go and one lawyer telling the other one, well, you know, if we do it the right way we're going be delayed. Just saying, we can't ignore those emails.

MS. ISRAEL: I'm not asking the Court to ignore them at all.

THE COURT: Now whether they rise --

MS. ISRAEL: But what I can say --

THE COURT: -- to actual fraud, I'm not -- I need to hear the rest of your argument.

MS. ISRAEL: Yeah. Well, I mean, essentially, Judge, that -- and I'm not trying to be glib. But that's my point, is that there is no evidence of a, yes, we know (a). And let's say (a) is somehow that the OIR either doesn't know this or hasn't blessed this. Which again is -- is simply not what the evidence that's been admitted thus far shows. But that does not rise to the level of actual intent to defraud a creditor of the Debtor entities. And in fact, Judge --

THE COURT: But don't the badges of fraud help supply the intent, and so then you would look at badges of fraud and if you get one of them, is that enough?

MS. ISRAEL: I don't --

THE COURT: Do you need ten of them or however many there are?

MS. ISRAEL: I don't have case law to cite to Your Honor, but I believe that the case law stands for the proposition that the more badges that exist, the -- of course the more likely it may be that the Court might find intent. But in this instance, the Plaintiff has not made any kind of coherent argument piecing together what badges exist. Perhaps we'll hear that from Mr. Appleby --

THE COURT: You heard one of them.

MS. ISRAEL: -- in response.

THE COURT: You heard one of them, that there was a suit pending, and so before losing the opportunity to have a different type of a sale, this transfer was made to enable, I'll say a bailout of some sort.

MS. ISRAEL: And you know what? And thank you for bringing that up, Judge, because that suit was dismissed I believe the next day. And again don't hold me to that. I somehow have in my mind April 1 or April 2.

THE COURT: It was.

MS. ISRAEL: I may be blending those --

THE COURT: It was.

MS. ISRAEL: -- and so forgive me if I've misspoken, but --

THE COURT: It was pending and then --

MS. ISRAEL: Yes, ma'am.

THE COURT: -- and the bailout transaction enabled the enterprise to avoid the effect of a lawsuit. So it stands to reason that once you avoid the -- once you do the bailout transaction, you don't need -- nobody needs the suit anymore, so.

MS. ISRAEL: And I don't -- I will -- I will respectfully say to the Court as respectfully as possible, I don't consider it a bailout because again, by virtue of the loan extension agreement, the Debtor entities were permitted to pursue and consummate a sale. That's what they did. Did it happen within the exact span of time that perhaps it needed to? I can't -- I can't weigh in on that. The evidence is what it is. That agreement expressly allowed it.

And by the way, those funds from Valley National Bank then enabled Horizon to be paid and that loan satisfied, which I would submit is a benefit to the Debtor entities. We can -- you know, I guess the Plaintiff can debate that with me, but it ultimately had the effect of eliminating that financial obligation --

THE COURT: It had the effect of eliminating --

MS. ISRAEL: -- from the Debtor entities.

THE COURT: -- the foreclosure and the take back

by Horizon.

MS. ISRAEL: It avoided the lawsuits, all of --

THE COURT: My point is, the pendency of the lawsuit is not something you can take lightly in terms of looking at these badges of fraud.

MS. ISRAEL: I understand. And look, I'm -- as a general proposition, was that a claim that was out there in the -- in the world? Yes. Yes. I don't deny that. I don't believe that it rises to the level of actual intent, because that very claimant was the one that was satisfied in full and then ultimately dismissed its lawsuit as a result.

So in my mind, that was not a negative, that was a positive outcome of the Bank closing its loan and providing the funds by which that satisfaction could happen.

THE COURT: Yes. After the fact it turned out, but the lawsuit was pending and the whole enterprise was going to be lost to Horizon but for that transfer. So that's what the argument is.

MS. ISRAEL: And I under -- I understand.

THE COURT: But that's only one of the badges of fraud.

MS. ISRAEL: I understand. Although -- again, Judge, without going back and even looking at the suits

themselves or the dates that they were filed, I do believe that --

THE COURT: We're going to need to take a break soon.

MS. ISRAEL: Yes, ma'am. Of course. I'm just about done.

THE COURT: Okay.

MS. ISRAEL: I was simply going to say that I believe that the -- that they were -- they were in their infancy. There's no telling how long those suits would have gone on or how they would have played themselves out. We don't need to waste time speculating about it. I'll simply leave it at that, Judge.

The last thing I wanted to say to Your Honor is, again, from a -- from a damages standpoint, and it does not necessarily bear on the elements of the cause of action, but I feel compelled to say it and reiterate it to the Court because Your Honor again has picked up on this quite astutely and you just haven't heard much about it from the Plaintiff and you -- we all know why.

But the fact of the matter is, Judge, that one of the elements, one of the buckets, if you will, and I think Your Honor used that word, one of the buckets that is allowed to be -- I'll say comprises the MLR is the debt service. And Your Honor has in evidence what the Valley

National Bank debt service was as reported by the Debtor Westport Holdings. That is at Plaintiff's Exhibit No. 70. And in very round numbers, Judge, it's just under 1.2 million. My recollection is it was approximately 1,182,000. That is reflected on Plaintiff's Exhibit 70.

So even taking into account the $3 million going from the Regions escrow account to the closing agent and assuming for the sake of the evidence that that money ultimately went to Valley National Bank in its cash collateral account, one of the buckets, the allowable, by statute, buckets is the debt service. That was one point -- again, I'll call it 1.182. I don't need to round up. Even then Plaintiff's damages would be reduced by what was permitted to be held as debt service in that account.

THE COURT: That was retained by the Debtor?

MS. ISRAEL: I beg your pardon?

THE COURT: You're saying 1.2 was retained by the Debtor to service the USAmeriBank loan?

MS. ISRAEL: Not retained by the Debtor. Held by Valley National Bank as the -- the MLR has those three buckets. There are by statute three things that are allowed to be calculated for the --

THE COURT: Right. There's -- subsection 1A --

MS. ISRAEL: -- MLR.

THE COURT: -- is the one you're talking about

debt service. But that's debt service for the provider.

MS. ISRAEL: That's true. They were treated as an umbrella.

THE COURT: No, they weren't. That's not what the statute says.

MS. ISRAEL: It's not about what the statute -- it's about what the evidence is. There has not been --

THE COURT: I don't know what you're talking about, ma'am.

MS. ISRAEL: Okay.

THE COURT: I know that the statute says what it says, that there should be debt service under Part A, there should be the operating expense 15 percent thing under Part B. And I can't remember the rest of it, but it's a separate --

MS. ISRAEL: No, you're right.

THE COURT: -- thing but it was to service the debt on the provider's side.

MS. ISRAEL: And it would be incumbent upon -- I understand and you're right. The word "provider" is used in that statute.

THE COURT: You can't give credit to Valley National for holding a debt service that is for a different loan. It's not the loan of the provider.

MS. ISRAEL: It is for an entity that was part of

the umbrella of the entirety of the CCRC --

THE COURT: That's not what that statute --

MS. ISRAEL: -- known as University Village.

THE COURT: -- means, ma'am. That's -- that's -- that's a stretch. All right. Let me ask this. And this is a softball. On the badges of fraud, 726.105(2)(b), the Debtor retained possession or control of the property transferred after the transfer. The Debtor did not; right?

MS. ISRAEL: The --

THE COURT: The Debtor had no ability to grab that account back from Valley National.

MS. ISRAEL: I do not believe that there has been any evidence presented -- again I'm trying --

THE COURT: So (b) weighs in your favor. This is a softball, I said.

MS. ISRAEL: I understand. I understand.

THE COURT: Maybe Mr. Appleby will disagree with me. I'm trying to figure out how many are still in play.

MS. ISRAEL: How many --

THE COURT: You don't want to agree with me on (b).

MS. ISRAEL: -- badges?

THE COURT: Yeah. You don't --

MS. ISRAEL: And, Judge, again I believe that the loan documents are in evidence. I'm -- it's actually not

trying to evade your -- the answer to your question. I'm trying to address your -- the answer by virtue of what's in evidence. So I'm trying to not give my own take on evidence that perhaps the Court --

THE COURT: Does the evidence suggest that the Debtor had any ability to grab the account back from Valley National given that it is now a cash collateral account that is fully encumbered by a different entity?

MS. ISRAEL: It would depend on whether the Debtor was current in its obligation. So in other words, it's hard to answer it in a direct way. Because the cash collateral account has language -- or the pledge agreement. The pledge agreement says what it says. I am not trying to argue otherwise.

THE COURT: Okay. So Westport was able to go and tell Valley National, give me it back?

MS. ISRAEL: Not necessarily, but perhaps.

THE COURT: All right. Then (b) might be in play. That's fine. If you -- I'm trying to give you a softball. (b) --

MS. ISRAEL: Well, Judge, I'm trying to answer your question the best I can. It -- on its face --

THE COURT: My understanding of the evidence is that the account was transferred for the sole and explicit purpose of being additional cash collateral for the Valley

National Bank loan to a third party. Maybe I missed the evidence that showed that the Debtor has some remaining interest in that account after the transfer.

MS. ISRAEL: The loan was to --

THE COURT: So (b) is still in play. Never mind.

MS. ISRAEL: The loan was to Westport Nursing Tampa.

THE COURT: Okay. Never mind. (b) is still in play, I guess. All right. So (e). The transfer was of substantially all of the Debtor's assets. I don't think --

MS. ISRAEL: There is no evidence of that.

THE COURT: I don't think that (e) counts. Okay. So I'm not going to consider (e) unless Mr. Appleby shakes me off of that. (f) the Debtor absconded.

MS. ISRAEL: No evidence of that.

THE COURT: That's not in play. Let's see.

MS. ISRAEL: There's no evidence of (g), that the Debtor removed or concealed --

THE COURT: Hold on.

MS. ISRAEL: -- assets. The evidence in this case is that they reported it.

THE COURT: (j). The transfer occurred shortly before or shortly after a substantial debt was incurred. Meaning by the Debtor.

MS. ISRAEL: It would -- there was no substantial

debt incurred. There was a substantial debt satisfied.

THE COURT: Okay. So (j) is not in play. And then (k), the Debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider.

MS. ISRAEL: That did not happen.

THE COURT: Nothing. So (e), (f), (j), and (k) you would contend are something I won't be considering?

MS. ISRAEL: I just don't believe there's any evidence to support those badges.

THE COURT: Okay. But you think there might be some for (b). Okay.

MS. ISRAEL: No. What I'm saying, Judge, is -- again the loan was to Westport Nursing Tampa. Going into the loan transaction, those entities were -- again, I'm -- they were part of an umbrella CCRC.

THE COURT: Yes. And then there was a spinoff; okay? My sense of the evidence is (b) wouldn't apply either as a badge of fraud. Okay. What else?

MS. ISRAEL: I mean I -- Judge, unless you have any other questions for me, that would conclude my argument subject to anything that Mr. Appleby would have to say.

THE COURT: Okay. We're going to take a break --

MS. ISRAEL: I mean the short -- again I just --

THE COURT: We'll take a break --

MS. ISRAEL: Okay.

THE COURT: -- and come back at 1:30. Thank you.

MS. ISRAEL: Thank you, Judge.

THE COURT: You're welcome.

MR. WHITSON: Thank you, Your Honor.

(Recess, 12:05 p.m. to 1:48 p.m.)

COURTROOM DEPUTY: All rise. Court is now in session.

THE COURT: All right. Please have a seat.

COURTROOM DEPUTY: Westport Holdings Tampa, Limited Partnership, Case 16-8167, Adversary 20-007.

THE COURT: All right. For the afternoon segment, May 14th in this adversary proceeding, the cast of characters are the same on the Plaintiff side and the defense side. And I believe that Ms. Israel had finished her Rule 52 motion regarding Counts I and IV of the operative complaint which is document 6-1.

Are you ready --

MS. ISRAEL: Judge -- oh, I apologize.

THE COURT: Yes?

MS. ISRAEL: If I may, I wanted to clarify something that I said previously. I clearly was incredibly confused. When Your Honor asked me about Florida Statute Section 726.105(2)(b), I had -- all I can say, Judge, is I was very confused by what you were asking me, and frankly

distracted by my blood sugar and hunger issues. And I apologize for that. That's on me, not you. Let me by very clear because I just do not feel I clearly answered Your Honor's question.

The Debtor in this instance would be the two Debtor entities. They did not retain possession of the funds --

THE COURT: Or control.

MS. ISRAEL: -- from the Regions escrow account.

THE COURT: Or control.

MS. ISRAEL: Or control. I'm sorry for -- all I can say is I was thinking about food and I -- I could not follow what you were asking me. And I'm so sorry because I --

THE COURT: That's okay.

MS. ISRAEL: -- stumbled through it and thought I was answering to the best of my ability, but realized after I ate that I could not at all follow what you were asking me and I'm so sorry for that.

THE COURT: That's okay. I used a sports analogy and I shouldn't have.

MS. ISRAEL: Well if you throw me a sports analogy I may struggle on that no matter what. But in any event, I felt like it was important that I clarify. But now I have some clarity and understanding of what you were

asking me --

THE COURT: Okay.

MS. ISRAEL: -- and the answer is very simply they did not maintain either possession or control of those funds.

THE COURT: Okay.

MS. ISRAEL: And I do not believe that that badge is in play, if you will.

THE COURT: Okay.

MS. ISRAEL: And I'm sorry for any confusion I may have --

THE COURT: That's okay.

MS. ISRAEL: -- called you. Caused you.

THE COURT: All right. Mr. Appleby, do you want to take up the arguments in order of the counts or do you want to go --

MR. APPLEBY: Well, Your Honor, since we've started with this, I was going to start with actual fraud and beginning right where we're leaving off.

THE COURT: Okay. That's fine.

MR. APPLEBY: Okay. As Your Honor has recognized numerous times, this is a very document intensive case. And where I'll go from that is, you know, the Bank -- any confusion that the Bank had of the facts don't negate the claims of fraudulent transfers or questions of whether

those funds were subject to MLR requirements. We believe that these transfers were made for the benefit of Westport Nursing or entities closely related to Westport and controlled by the same group of insiders.

This has been put into evidence at -- the credit authorization request summary at Exhibit 41. Also the Bank's loan closing statements at Exhibit 33 which -- Exhibit 41, the credit authorization.

I mean it's my position that the Bank's documentation clearly shows that the Bank had an understanding of the fiduciary regulatory implications, so they should know.

THE COURT: That's at Exhibit 41?

MR. APPLEBY: Yes, Your Honor.

THE COURT: What was Exhibit 41?

MR. APPLEBY: It's the credit authorization request summary.

THE COURT: All right. Ms. Arciola, you be hunting for that one, okay? Plaintiff's 41.

MR. APPLEBY: And likewise, Your Honor --

THE COURT: And you say that that shows an awareness?

MR. APPLEBY: Well, it shows the awareness of who the -- who the parties were, the background. It's quite an extensive document from the Bank that goes into who all the

parties were, their background, their experience in dealing with CCRCs, Florida -- well, regulatory requirements for CCRCs and MLRs and so forth.

THE COURT: So it mentions the minimum liquid reserve?

MR. APPLEBY: I believe so, Your Honor, in pages that are fairly -- I could look as well and point you to specific places.

THE COURT: That's okay. She's going to pull it out. All right. Go ahead.

MR. APPLEBY: Then what we were just getting at with 2(b). It's my position that despite the formal transfer of the funds, the control over the funds effectively remained, you know, totally by the Bank but -- because they managed that account. But the correspondence between the Bank and Jay Price showed -- it outlined the control retained of the funds post-transfer. That's at Exhibit 374, which I --

THE COURT: Did the Debtor retain possession or control?

MR. APPLEBY: No, Your Honor.

THE COURT: Okay. So that's not a badge of fraud.

MR. APPLEBY: Okay.

THE COURT: That's subsection (b) of 726.105 sub

(2).

MR. APPLEBY: Yes. And at subsection (c), Your Honor, there we've got the transfer -- it's our position that the transfer was concealed as far as the OIR was concerned and other regulatory bodies. Valley -- Valley's actions and the misleading statements they had contributed to the concealment. That's why it took the OIR time to figure out what was going on. And that's Exhibit 374, which is the MLR notice.

It's our position the Defendants actively concealed the nature and intent of the transfer --

THE COURT: Who gave the notice?

MR. APPLEBY: I'm sorry, Your Honor?

THE COURT: Who gave the notice?

MR. APPLEBY: Well, the notice -- that notice came from Nelson Mullins.

THE COURT: Is that the Bank's lawyer?

MR. APPLEBY: No, Your Honor. But the Bank and Mr. Price, the batches of emails that we've gone through, this was the document that was edited time and time again redefining who the provider was and ultimately the --

THE COURT: Okay. So you're saying that Mr. Price's participation in the drafting of that document was part of the concealment?

MR. APPLEBY: Yes, Your Honor.

THE COURT: But basically you don't care who it was, you're just contending it was concealed -- the -- the facts surrounding the MLR and what was really happening to it were concealed from OIR --

MR. APPLEBY: Correct, Your Honor.

THE COURT: -- by somebody.

MR. APPLEBY: Not that it --

THE COURT: By somebody.

MR. APPLEBY: Not that the transfer took place, but who -- whether the funds were subject to MLR or not. The letter indicated that --

THE COURT: Okay. So the concealment was not of the transfer.

MR. APPLEBY: Well, it was concealed in the sense, Your Honor, that they -- the information provided to the OIR was misleading and that the concealment was these funds are still --

THE COURT: Okay. Then the nature -- maybe at best we could say the nature of the transfer was concealed --

MR. APPLEBY: Yes, Your Honor.

THE COURT: -- but the transfer was not concealed.

MR. APPLEBY: That's correct.

THE COURT: So -- all right. So it wasn't a

three pointer on (c). Maybe it's a one pointer.

MR. APPLEBY: Yes, Your Honor. Those are included in that Exhibit 374 also, financial statements at Exhibit 86 and also 33.

We touched on threat of litigation and existing litigation. Prior to the transfer, Westport faced significant financial issues. They had actual litigation, threats of other litigation from various creditors, including Horizon. The deed in lieu agreement, which is at Exhibit 207, shows the pressure that they were under from the existing financial obligations, another threat. And again, this was the things that we discussed on some of the judicial notice that Your Honor took related to other related litigation.

This litigation involved the Bartle entities, the OIR subsequently, and caused delays and disputes. And the Defendant's actions, the Bank's actions further indicate the fraudulent attempt and attempts to confuse and disguise the truth as it related to the transfer of the $3 million. And again it's our position, Your Honor, that indicates an actual intent to hinder, delay, and defraud.

At 726.105(2)(e), the $3 million transfer represented a -- we believe a significant portion of Westport's liquid assets, so it severely impacted their financial stability.

THE COURT: What does substantially all; is it 51 percent? The building didn't go anywhere.

MR. APPLEBY: No, Your Honor, but we're talking about the Debtor --

THE COURT: The Debtor is Westport --

MR. APPLEBY: -- Westport Holdings.

THE COURT: -- and it -- doesn't it own --

MR. APPLEBY: Well yes, Your Honor.

THE COURT: -- living units in the form of real estate?

MR. APPLEBY: It did, Your Honor.

THE COURT: And doesn't the value of that way overshadow a $3 million deposit fund?

MR. APPLEBY: Well, what I indicated though it was their liquid assets.

THE COURT: Is that what this says?

MR. APPLEBY: Um --

THE COURT: What is -- how do I interpret (e)?

MR. APPLEBY: (No response.)

THE COURT: What does the case law say; is it 51 percent?

MR. APPLEBY: (No response.)

THE COURT: Is it liquid?

MR. APPLEBY: I don't have the case law on that with me right at this moment, Your Honor.

THE COURT: On a mathematical basis, I don't think (e) is met.

MR. APPLEBY: At (g), it's our position the transfer effectively --

THE COURT: So wait a minute. You --

MR. APPLEBY: Oh. I'm sorry, Your Honor.

THE COURT: You concede that (f) does not apply, the Debtor absconded?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay.

MR. APPLEBY: Sorry. I thought --

THE COURT: (g), the Debtor removed assets.

MR. APPLEBY: Yes, Your Honor.

THE COURT: You don't need to say anything more about that.

MR. APPLEBY: Okay. We believe also at (j), the insolvency at the time of the transfer. The financial audits, our expert testimony confirmed that West --

THE COURT: What about (h), you skipped (h)?

MR. APPLEBY: Yes, Your Honor. Well, sorry. Let me make sure I've got --

THE COURT: Didn't -- wasn't the Debtor relieved of indebtedness in consideration of transferring the $3 million asset?

MR. APPLEBY: Well, that has been -- that has

been the Defendant's position, but in the whole of the circumstance this took an asset that effectively took it out of the Debtor's control and created a much bigger liability with the residents. Because this money disappeared and because of what ultimately happened with the OIR relating to them being able to continue to sell contracts, both resident contracts and PIP contracts --

THE COURT: Well, no. Let's do dollar for dollar consideration. Did they or did they not get relieved of loan indebtedness? Meaning the two Debtors here, Westport and Westport II.

MR. APPLEBY: Well yes, Your Honor, there were --

THE COURT: Was it in an amount that's more than 3 million?

MR. APPLEBY: I don't believe so, Your Honor. I know that we've had some argument about that on how that calculation should work.

THE COURT: Well then let's come back to that. We won't get bogged down. But you're going to have to come and show me mathematically how that shakes out because that's also going to be a test under the constructive fraud.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. What about -- you were going into (i) before.

MR. APPLEBY: Yes. That's just the insolvency at the time of the transfer. It's -- the financial audits, and our expert's testimony confirm --

THE COURT: You don't have to go beyond that. *Prima facie* that was met.

MR. APPLEBY: Okay. And timing relative to the debt incurrence at (j). We believe the transfer occurred shortly before significant debt obligations were incurred, further indicating fraudulent intent. The deed in lieu agreement which is --

THE COURT: Wait a minute. So the Debtor -- the Debtor -- the Debtor incurred debt shortly before or shortly after the transfer?

MR. APPLEBY: Well, the transfer -- the transfer put Westport Holdings, the provider, effectively in a negative position as it related to the MLR funds. They were transferred to --

THE COURT: Well let's -- hold on. The debt. What debt? Are you saying that now they had a debt to restore the MLR fund?

MR. APPLEBY: Well by the MLR fund leaving, Your Honor, yes, that created a debt. It created a debt to the residents, it created a debt that would replace for the minimum liquid reserves.

THE COURT: I understand that argument. Okay.

MR. APPLEBY: The remainder of this, we believe that Valley -- Valley by imposing the condition that Westport Nursing be segregated and separated, again a different ownership structure no longer as a wholly owned subsidiary, that -- that this stripped also Westport of significant assets, pushing it towards insolvency.

They violated the regulatory requirements pursuant to the CCRC and MLR statutes. We believe again they breached their fiduciary duties and the Bank's complacency in helping doing this is what created the significant harm to the residents and creditors of Westport.

THE COURT: The Debtor sold that asset and in the -- in the sale transaction purchase money was lent.

MR. APPLEBY: Well --

THE COURT: That's what I understood the evidence to show.

MR. APPLEBY: Okay. Well --

THE COURT: If you're talking about the nursing home.

MR. APPLEBY: Yes, Your Honor.

THE COURT: If you're talking about the $3 million fund, I don't know if the $3 million is the essential assets. Again, I need to know what the case law says on what the gloss is on the meaning of the essential

assets.

MR. APPLEBY: Well, I would proffer to Your Honor that the essential asset would -- if it's an asset that causes the Debtor to not be able to continue in business, that would be very essential. And that's ultimately what happened with the orders of suspension which have been included in the -- I'll talk about those with the aiding and abetting, but.

THE COURT: Okay. So you're arguing that the evidence shows that the badges of fraud that are present are (c), (d), possibly (e), (g), possibly (h). You're going to have to do some math for me on there.

MR. APPLEBY: Yes, Your Honor.

THE COURT: (i), (j), and (k). And (k) I think is more with respect to the MLR fund rather than the purchase -- the sale and purchase of the nursing home.

MR. APPLEBY: Yes, Your Honor.

THE COURT: That was a sale. Okay. So talk to me about (e), substantially all, how that can be possibly met. And then (h), reasonably equivalent.

MR. APPLEBY: Bear with me one moment, Your Honor.

THE COURT: How much indebtedness was paid by, I guess, Valley National on the Westport liability?

MR. APPLEBY: Well what ultimately went out was

12 million.

THE COURT: When you say "what went out," you mean --

MR. APPLEBY: Well, it was a $15 million loan. # million came in as the cash collateral and 12 million was extended which did pay towards --

THE COURT: And how much of that 12 paid off liability of Westport and/or Westport II?

MR. APPLEBY: Your Honor, I would have to look at the closing statement which is included in --

THE COURT: Oh. Hold on just a second.

MR. APPLEBY: Yes, Your Honor.

THE COURT: I'll be right back. This will give you time to look at those two subsections.

(Off the record, 2:05 p.m. to 2:

THE COURT: All right. Keep your seats. All right. What did you find me on -- on -- wait a minute, wait a minute -- (e) and (h)?

MR. APPLEBY: Well, Your Honor, as far as the numbers on (e), what occurred here was at the loan closing date, $20 million was there. There was -- I mean $6,400,655 were paid with USAmeriBank A note, $8,056,025 for a USA B note was paid, and then CPIF, the other lender, related to Holdings paid $5,611,740. That total is $20,068,420. But the combination between the two loans

with USAmeriBank, which was 15 million and the CPIF loan was 9.5 million. So essentially started with $20 million in debt and went through the transaction owing $24-1/2 million in debt.

The prior debt that was Horizon, at that point Nursing was just a guarantor, but their debt was paid significantly more, and Nursing walked out with an asset worth more, well more, than $15 million.

THE COURT: What did the Debtors get? Did they get debt relief; yes or no? And it seems to me you're arguing they got debt relief but then they got replacement debt of an increased amount.

MR. APPLEBY: Yes, Your Honor, they did get debt relief and there was replacement debt.

THE COURT: Okay. So you're saying net was minus?

MR. APPLEBY: They owed more -- the Debtor owed less after the loan closing, but Nursing took an asset worth well more than they owed.

THE COURT: Okay. This isn't helping me out.

MR. APPLEBY: Sorry, Your Honor.

THE COURT: Westport gave up 3 million.

MR. APPLEBY: Yes, Your Honor.

THE COURT: What did Westport get? Somebody -- their debt was paid --

MR. APPLEBY: They --

THE COURT: -- in an amount that was more than 3 million?

MR. APPLEBY: Yes, Your Honor, but they --

THE COURT: They owed how much? Before the transactions, how much did they owe?

MR. APPLEBY: That was the --

THE COURT: The Debtor -- the two Debtor entities.

MR. APPLEBY: $20,068,420.

THE COURT: So, they owed 20 million. And was the 20 million fully paid?

MR. APPLEBY: Yes, Your Honor.

THE COURT: What did they owe after the 20 million was fully paid?

MR. APPLEBY: That's where the -- Holdings owed 9.5 million to CPIF. And Nursing owed the 15 million to USAmeriBank, Valley Bank.

THE COURT: Okay. So -- so 20 million got paid, they gave up 3, they ended up with another 9-1/2. So aren't they net to the good debt-wise --

MR. APPLEBY: Well they --

THE COURT: -- $10 million.

MR. APPLEBY: Well they also gave up rental income and the value of the property. This -- actually,

Ms. Unterholzner testified to these things when she was here. She discussed --

THE COURT: Well wasn't the -- but wasn't that paid -- a purchase price was paid for that asset?

MR. APPLEBY: No, Your Honor.

THE COURT: So Nursing -- Nursing was given away?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Nursing was not sold for any fair value?

MR. APPLEBY: No, Your Honor.

THE COURT: The purchaser did not buy the nursing home?

MR. APPLEBY: It's the same individuals. Essentially, yes. They trans --

THE COURT: But don't -- I want to keep with the corporate formalities. Let's just say Joe is the buyer. Did Joe come in and pay for the nursing home?

MR. APPLEBY: No, Your Honor, just the debt. There was no capital infusion in this transaction at all. They did not pay for it.

THE COURT: Did they -- okay, they didn't pay the debt.

MR. APPLEBY: Well they paid -- they were a guarantor on debt that was paid, Your Honor.

THE COURT: Okay. Let's start over again. Did

Joe the purchaser buy the nursing home; yes or no?
MR. APPLEBY: No, Your Honor.
THE COURT: Nobody bought the nursing home?
MR. APPLEBY: No. It was transferred but it --
THE COURT: I don't understand what that means.
MR. APPLEBY: Well they bought the member interest, not the -- essentially just transferred the member interest without buying it and putting money in.
THE COURT: Okay. So the Debtors sold the member interest?
MR. APPLEBY: Yes. Yes, Your Honor.
THE COURT: What did they sell the member interest for?
MR. APPLEBY: Nothing. Zero.
THE COURT: They didn't get debt paid down? That's a form of compensation.
MR. APPLEBY: They were a guarantor on the debt.
THE COURT: Don't say "they." Just say names. The Debtors were guarantors?
MR. APPLEBY: Westport Nursing was a guarantor.
THE COURT: Okay. Westport Nursing is owned by somebody and Joe bought somebody. Joe the theoretical purchaser bought the somebody that owns the nursing home.
MR. APPLEBY: Yes, Your Honor.
THE COURT: What did Joe the theoretical

purchaser pay the owner of the nursing home for that ownership interest?

MR. APPLEBY: Nothing, Your Honor. Zero.

THE COURT: Joe did not pay off the member's obligation on a loan?

MR. APPLEBY: My understanding, Your Honor, is there was no member obligation.

THE COURT: So the owner of the nursing home owed nobody?

MR. APPLEBY: They -- no, Your Honor. It was -- it was a -- it was a guarantor -- the nursing home was a guarantor but the member interest I think had no obligation.

THE COURT: So Joe the theoretical purchaser paid off the nursing home's debt which benefitted the owner of the nursing home?

MR. APPLEBY: Correct. Yes, Your Honor.

THE COURT: Okay. And that owner of the nursing home became Joe --

MR. APPLEBY: Yes, Your Honor.

THE COURT: -- the theoretical purchaser?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. And so Joe's payment of nursing home debt the Debtors were also co-liable on, in that respect Debtors just got a benefit by virtue of the

fact that they got their name on an obligation that coincidentally got paid by somebody else because it's nursing home's obligation?

MR. APPLEBY: I'm sorry, Your Honor.

THE COURT: I'm trying to align consideration here. That's what I'm trying to figure this thing out.

MR. APPLEBY: Well I mean it's our position there was no consideration given. I mean there was nothing transferred for the 3 million, it was just given away.

THE COURT: Nothing was given and there was no debt relief --

MR. APPLEBY: Well the --

THE COURT: -- even as a coincidence?

MR. APPLEBY: Well, no, Your Honor, there was certain debt relief.

THE COURT: Okay. But you're saying as a -- that was just coincidental, it wasn't separate -- it wasn't separate consideration for the 3 million; is that what you're saying?

MR. APPLEBY: No, Your Honor. And what occurred there, when the transfer came --

THE COURT: No. Don't say no. Are you agreeing with me?

MR. APPLEBY: (No answer.)

THE COURT: Coincidentally with the closing of

the transaction between Joe and the owner of the nursing home, the nursing home's debt got paid and dollar for dollar that meant necessarily there was a reduction --

MR. APPLEBY: Yes, Your Honor.

THE COURT: -- at the Debtor level.

MR. APPLEBY: Yes.

THE COURT: The Debtor got nothing separate for the 3 million.

MR. APPLEBY: Correct.

THE COURT: Okay. That one I think I understand. Now how about -- that was (h). So now how about -- which is the other one -- (e)?

MR. APPLEBY: Well, again, in that short time, Your Honor, I don't --

THE COURT: Substantially all.

MR. APPLEBY: -- have an answer on substantially all.

THE COURT: Does anybody? Do you, Ms. Israel? Do you have any case law on what "substantially all" means?

MS. ISRAEL: No, ma'am, I don't.

THE COURT: It's got to be at least a majority, a simple majority; right?

MR. APPLEBY: Yes, Your Honor. And I would be happy to --

THE COURT: And I don't think --

MR. APPLEBY: -- figure it out before the day is over.

THE COURT: And I don't think that they mean in terms of numbers of assets, I think they mean in dollar amount of value of assets.

MR. APPLEBY: I recognize that, Your Honor. I will do what I can to get an answer quickly. I just don't have one as I'm standing here at the moment.

THE COURT: Well my initial reaction is that (e), as it pertains to MLR fund, is not met, it would not be a badge. To the extent it was a transfer of the ownership of the nursing home, it seems like there was consideration for that in the form of debt payment at the nursing home level. Meaning that instead of Joe the hypothetical purchaser acquiring an ownership interest in a debt-laden asset, Joe the hypothetical purchaser ended up with an ownership interest in an asset -- well the nursing home became encumbered again, didn't it?

MR. APPLEBY: Yes, Your Honor.

THE COURT: It became -- okay. So there may not have even been fair consideration at the ownership transfer level. Okay. All right. Go on to the next count, or the earlier count, which is Count I.

MR. APPLEBY: Yes, Your Honor. That was the aiding and abetting, breach of fiduciary duty. It -- it's

the Plaintiff's position that Delaware applies on this issue, Delaware law.

THE COURT: Why?

MR. APPLEBY: Well they're Delaware corporations, the partnership and management agreements are related to the Delaware entities.

THE COURT: Which law does it say those agreements would be construed under?

MR. APPLEBY: I would have to look at -- I believe, Your Honor, it's in the partnership agreement at Exhibit 207 --

THE COURT: What does it say?

MR. APPLEBY: -- and I believe it's Section 6.03.

THE COURT: Has Delaware adopted the restatement position concerning the intent?

MR. APPLEBY: I -- well, I don't know offhand, Your Honor, except I believe the spot that I'm citing may --

THE COURT: I guess knowledge is the better word to use. You're going to go to Exhibit 207, Section 6.03, choice of law?

Ms. Arciola, did you get number 41?

(The Court and Courtroom Deputy confer).

THE COURT: Ms. Arciola is pulling Exhibit 41 for me which relates to the Count IV, but I know you're working

on Count I, Mr. Appleby.

MS. ISRAEL: Judge, would it be okay if Mr. Appleby identifies the title of Exhibit 207? Because it's a very -- it appears to be a substantial document and I'm not able --

THE COURT: I think he said partnership agreement.

(Counsel confer).

MR. APPLEBY: Your Honor, I think I've located it, or specifically what --

THE COURT: Just give me the choice of law, please.

MS. ISRAEL: Would it be okay if Mr. Appleby reads us the Bates number, as well --

THE COURT: Yes.

MS. ISRAEL: -- because I'm still not sure where he's reading -- or where he's referring to.

MR. APPLEBY: I'm trying to locate it, Ms. Israel --

MS. ISRAEL: Understood. Understood.

(Pause).

MR. APPLEBY: -- that's why I haven't told you. Your Honor, what I'm looking at -- or I think to answer Your Honor's question, I'm looking at in Exhibit 207, the particular page is Bates label numbered Sub_Landry_ and

then finishes with 621.

THE COURT: And the choice of law provision says what?

MR. APPLEBY: At Section 13.02, governing law, severability of provisions, the validity of this agreement, the construction of its terms, and the interpretation of its -- of the rights and duties of the parties hereunder shall be governed by the partnership laws of the state of Delaware.

THE COURT: Okay. And then how does that relate to the acts that you're saying constitute the primary act that the Bank aided and abetted?

MR. APPLEBY: Well --

THE COURT: Did they aid and abet the breach of the partnership agreement?

MR. APPLEBY: No, Your Honor. But what we said is that generally under Delaware law that the partner has the fiduciary duty to manage the partnerships in its best interest and -- unless specifically limited by the partnership. There's a case that I would cite. It's *In re Boston Celtics Limited Partnership Shareholders Litigation*. It's a 1999 case, Delaware Chancery, LEXUS 166.

THE COURT: Okay. So you're saying that the duty is -- the fiduciary duty there is within the partnership, each to the other?

MR. APPLEBY: Correct.

THE COURT: Okay.

MR. APPLEBY: They have a duty of loyalty to --

THE COURT: But there's no duty to the State of Florida that you're talking about here?

MR. APPLEBY: Well, I think they -- they -- they have a duty to the State of Florida, as well, to comply with the laws.

THE COURT: Well that's not what I meant. Fiduciary duty to somebody under Florida law.

MR. APPLEBY: It's not -- I don't believe it's spelled out in the --

THE COURT: Okay. So you're going on -- your breach of duty that you're starting with is the partnership's -- the partners' duties *inter se*; okay? There's a duty of loyalty.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. Go -- and that's a -- that's measured by Delaware law.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. So you're citing the *Boston Celtics* case. Anything you would like to share from that case?

MR. APPLEBY: Well, I think, just again that -- that it -- it states that the -- that the partners must do

what's in the best interest of the limited partnership, unless spelled out separately in the partnership agreement. And I don't think that's the case here.

THE COURT: Okay. Ms. Arciola, would you please give me what's been marked as Exhibit 46 for identification, which is a demonstrative aid, little charts?

COURTROOM DEPUTY: Is it 46?

THE COURT: 546. The sheets of paper that I gave you that have the charts of ownership.

Okay. And the limited partnership that you're identifying is Westport Holdings Tampa, LP?

MR. APPLEBY: I'm sorry, Your Honor?

THE COURT: The partnership that you are pointing me to is Westport Holdings Tampa, LP?

MR. APPLEBY: It's the general partner that --

THE COURT: The general partner owes the duty to the limited partner, to the --

MR. APPLEBY: Well, to the entity, Your Honor.

THE COURT: To the entity. Okay. So Westport Holdings University Village, LLC owes a duty under Delaware law to Westport Holdings Tampa, LP, one of our Debtors here?

MR. APPLEBY: Yes, Your Honor.

THE COURT: And that same -- no. A different

entity, Westport Holdings Hidden Springs, LLC, owes a similar duty to Westport Holding Tampa II, LP?

MR. APPLEBY: Yes, Your Honor.

THE COURT: So all of those are Delaware entities?

MR. APPLEBY: Yes, those are, Your Honor.

THE COURT: Okay. So you have --

MR. APPLEBY: And that was --

THE COURT: -- two different actors. You have Westport Holdings and you have -- excuse me. Westport Holdings University Village, LLC and Westport Holdings Hidden Springs, LLC.

MR. APPLEBY: Yes, Your Honor.

THE COURT: But it's only Westport Holdings Tampa, LP that had the MLR requirement?

MR. APPLEBY: Yes. That's the provider, Your Honor.

THE COURT: Okay. So are we only talking about the fiduciary duty regarding the provider?

MR. APPLEBY: Yes, Your Honor.

THE COURT: So not the Villas entity.

MR. APPLEBY: Not in this context, no, Your Honor.

THE COURT: Okay. So Count I is only about Westport Holdings Tampa, LP. Okay. I'm with you now.

MR. APPLEBY: Okay. Thank you, Your Honor.

THE COURT: And you're saying Westport Holdings University Village, LLC owes a fiduciary duty under Delaware law to the limited partnership. Okay. I'm -- I'm -- I'm caught up.

MR. APPLEBY: Yeah. And this is where -- we believe that the Valley closing statement will show the unauthorized transaction. The unauthorized transfer of the 3 million from Westport's minimum liquid reserve failed to comply with -- with the requirements under the OIR. And those failures -- well, included both regulatory and statutory requirements.

The Horizon deal that we've -- or the Horizon deed in lieu that we've referred to, that's spelled out in the requirements to do any transfer, both from the OIR approval for the transfer of the community yet the Bank -- in this scenario, the Bank still moved forward without complying with the OIR requirements. The Bank's -- essentially our position is the Bank's acts --

THE COURT: So you're saying the Bank aided and abetted Westport Holdings University Village, LLC?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. All right. Now, tell me what Delaware law says then about the civil tort of aiding and abetting, now that I know who the primary actors is and

what act the Bank allegedly aided or abetted.

MR. APPLEBY: So under Delaware law, the breach of fiduciary duty are first, the existence of the fiduciary relationship to the fiduciary; the fiduciary breached its duty; three, a defendant who is not a fiduciary knowingly participated in a breach; and, four, damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.

And the case cite on that, Your Honor, is *Gotham Partners, LP v. Hallwood Realty Partners, LP*, 817 A.2d 160, at page 172. And that's a Delaware 2002 case.

THE COURT: Give me the fourth element again.

MR. APPLEBY: Damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.

THE COURT: Okay.

MR. APPLEBY: And, Your Honor, Valley -- Valley has admitted in first the -- Valley National Bank's third amended answer and affirmative defenses to the amended complaint the allegations of the amended complaint at doc. number 184; they've also in the Defendant's response to Plaintiff's statement of undisputed material facts and incorporated statement of undisputed facts at 105; and finally, at Valley's admissions to request for admissions at documents -- or docket numbers 179 and 465.

And those facts that they've admitted have established the violations of the law and when coupled with the documented evidence prove each of the elements.

THE COURT: What facts? Be more specific. You just --

MR. APPLEBY: Well --

THE COURT: They conceded to a lot of things.

MR. APPLEBY: Yes, Your Honor.

THE COURT: I have document 746 in front of me.

MR. APPLEBY: First -- well first, the Bank had awareness of the fiduciary duties and the breach. I had referenced as well Exhibit 41. This was, again, the credit authorization request summary. It shows that Valley understood the -- the position and requirements of the fiduciary in the regulatory context.

THE COURT: I don't see that. I just looked at it. Where?

MR. APPLEBY: Well in -- Your Honor, in the first page I believe there it explicitly states the Bank was only -- was financing the ALF/SNF facility and acknowledged the separation of the operating company from BVM University Village.

THE COURT: There's no sin in separating them.

MR. APPLEBY: I understand, Your Honor, but it basically removed it from --

THE COURT: But where does it say there's an awareness that the $3 million was removed and it should be -- should have stayed with the provider because of a regulation under Florida law?

MR. APPLEBY: I'm sorry, Your Honor, where does which say that?

THE COURT: Exhibit 41.

MR. APPLEBY: Well no, it doesn't, Your Honor. That's part -- that is the issue.

THE COURT: Well then you just said Exhibit 41 exhibits knowledge -- excuse me, an awareness of the breach of the -- of the duty and the breach. Where? I just looked at this whole document.

MR. APPLEBY: That, Your Honor, you're correct. That references the ALF and the SNF, knowing that there were requirements for ACHA. But in the context here, the $3 million, the communications, the letters and things that were sent to OIR specifically, they took the MLR funds and then mislead the OIR on the fact that the funds --

THE COURT: That is a broad argument and conclusory. Show me where.

MR. APPLEBY: Yes, Your Honor.

THE COURT: And then the degree of awareness, you know, there's been some argument that there's mere negligence in appreciating the issue versus intentionality.

And I posited that maybe recklessness could be in there too.

MR. APPLEBY: I understand, Your Honor. May I sit, Your Honor?

THE COURT: Absolutely.

MR. APPLEBY: Thank you.

THE COURT: I kind of previewed that these were issues I would expect to be puzzled by at this juncture.

MR. APPLEBY: I understand, Your Honor. Thank you. Your Honor, the argument I think that I have is that, again, the Bank knew of the statutory requirements for the -- for the -- excuse me, for the general partner that ultimately were violated in connection with the transactions funded by Valley.

THE COURT: Who -- what human person knew those?

MR. APPLEBY: Well, Mr. Korhn knew subject through his attorney Mr. Price.

THE COURT: I don't think Mr. Korhn ever understood that.

MR. APPLEBY: Well, Your Honor, again the --

THE COURT: Mr. Price understood. Is that the argument?

MR. APPLEBY: Well, yes, Your Honor. But what Mr. Price knew and his actions were imputed onto the Bank as the agent for the Bank.

THE COURT: Mr. Korhn is not the Bank. Mr. Korhn is also an agent of the Bank.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay.

MR. APPLEBY: So -- but our position is the Bank had knowledge of these statutory requirements and failed to meet them.

THE COURT: They didn't have the duty to meet them.

MR. APPLEBY: Yes, Your Honor, but the general partner did and the Bank helped the general partner by not complying and misleading the OIR.

THE COURT: Okay. I don't even know if the general -- if you have to prove that the general partner knew. I think that's something that they're charged with. They have the obligation to comply with the law.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Do you have any cases that talk about the degree of culpability of the aider versus the primary actor, in this case the limited partner?

MR. APPLEBY: It's -- Your Honor, it's *In re Radnor Holdings Corporation*, at 353 B.R. 820, at page 844. And from the Bankruptcy Court, District of Delaware from 2006.

THE COURT: What does it say?

MR. APPLEBY: It states that, must establish that the -- in this case the bank acted with knowledge that the conduct advocated or assisted constitutes such a fiduciary breach. Another citation, that's *Malpiede v. Townson*, 780 A.2d 1075, page 1097. It's a Delaware Superior Court 2001.

THE COURT: What does that one say?

MR. APPLEBY: That one, again that was, Your Honor, that they must prove that the knowledge that the conduct advocated or assisted constituted a fiduciary breach.

THE COURT: Okay. And then where -- where in the record, and I recognize that this is deposition testimony, does Mr. Price exhibit actual knowledge as opposed to mere suspicion? I'm not even saying that mere suspicion isn't enough. But if -- maybe it's something more heightened than that, but where do you -- would you take -- where would you -- where do you think your record meets the higher standard of actual knowledge?

MR. APPLEBY: Well, Your Honor, when -- when you look at the numerous email exchanges and communications as a whole, it was very clear that they knew that there was an obligation to comply with Florida Statute --

THE COURT: I need to see that; okay? Don't just say -- because the man went out --

MR. APPLEBY: Yes, Your Honor.

THE COURT: -- to his firm to try to figure out what was required. So I need something that shows that he actually acquired that knowledge and had actual knowledge.

MR. APPLEBY: Yes, Your Honor. I think -- Your Honor, again, I mean I would have to go and look at the specific email exchanges but --

THE COURT: I need that. This is what your --

MR. APPLEBY: Yes, Your Honor.

THE COURT: This is your proof; okay? Because if he has -- he said that he thought debt service reserve met it. That's not actual knowledge that there's a part two with a 15 percent that doesn't meet it, the debt service does not meet that part. So he's, at that point, mistaken, maybe recklessly so. But if you're arguing actual knowledge, I need to know where you can show me in the record that Mr. Price knew that there was a second component for the MLR that was related to this subsection, what is it, 1(b).

MR. APPLEBY: Yes, Your Honor.

(Pause).

MR. APPLEBY: Your Honor, I'm sorry. Without going through each of the exhibits one by one -- I don't have them here in front of me to tell you --

THE COURT: Okay. Listen. This is what I have to do. They're asking me to cut this trial short. You

have elements of proof that you need to prove. You should have a bullet point of every piece of evidence that hits your elements. You've raised the Delaware test for aiding and abetting. An awareness of the duty and breach. You cited me two cases that seem to require actual knowledge. It says knowledge.

MR. APPLEBY: Yes.

THE COURT: Is it imputed knowledge; is it should have known knowledge; is it actual knowledge; is it reckless disregard of something that would be an obvious red flag. That's what I need to know and what provides that piece.

MR. APPLEBY: Yes, Your Honor.

THE COURT: I think to some of those lesser subsets of knowledge, I get a sense from the record that that's there. I'm asking you about actual knowledge.

MR. APPLEBY: Yes, Your Honor. I understand and I --

THE COURT: I don't -- I don't think I saw actual knowledge. I saw a lawyer misreading a statute.

MR. APPLEBY: Well, I understand what Your Honor is saying. Our take on it is different from that. They -- they looked at the statute, they reviewed the statute, they needed to get an opinion, they didn't get an opinion, and they moved forward anyway.

THE COURT: That's not actual knowledge.

MR. APPLEBY: Well, Your Honor --

THE COURT: What does the email say about the -- Mr. Price's receipt of the email from Rabke where Rabke says something? What is it that Price knows from Rabke in that email when Rabke says, if we wait, we're delayed? I mean if we ask, we're delayed.

MR. APPLEBY: (No response.)

THE COURT: What email is that?

MR. APPLEBY: That's the challenge I have, Your Honor, in identifying this with my list. I don't have the level of detail in the list that I'm looking at.

THE COURT: Hold on a minute. Does your Exhibit 32 have it in there? Nope. That's different. Never mind. We went through what seems like an unending stream of emails yesterday. Maybe that starts at Exhibit 62?

MR. APPLEBY: Your Honor, I think the first reference that -- is Exhibit 44. And this is where Mr. Price tells Mr. Korhn that he has no idea about what kind of escrow account Rabke needs to set up.

THE COURT: I see that. What I'm looking for is Mr. Rabke says -- hold on a minute. Let me find the one where he says -- here's one from Rabke to Korhn and Angelis. And this is dated March -- this is within Plaintiff's 385: Portions of that amount are related to

amounts required to be held in escrow by the state to show the cash reserves of the operation. Rabke tells that to Korhn and Angelis.

So they talk about changing the name of a -- of an agreement from one type of a name to a different type of a name.

There's another reference in Exhibit 371, where Will, I guess Rabke, sends to Trey Korhn, copy to Kevin Angelis: I have this document, okay, and I think he's referring to a pledge agreement, but we need to set up an escrow agreement for business operations purposes.

That still doesn't provide Mr. Korhn the knowledge of some statutory requirement. It's the email where Rabke tells Price, we can get -- we can ask for approval from some entity with the state, but that will delay, engender delay. Those are not the exact words, that's a reading -- my reading of it. But apparently that wasn't put in yesterday in the long litany of email -- emails regarding the Bank. I think it was put in the first week we were in trial.

MR. APPLEBY: Your Honor, also at -- beginning at Exhibit 370, there's a question from Mr. Korhn asking Mr. Rabke to specify what the escrow is for. And Mr. Rabke responds to Mr. Korhn with a -- with a -- copying Mr. Price stating -- it goes on to say there is over 4 million at

Regions Bank. But at the bottom of that --

THE COURT: I'm not seeing that in Exhibit 370.

MR. APPLEBY: 371, Your Honor.

THE COURT: Oh, 371. Sorry. It still doesn't show that Mr. Korhn knows about some statutory reference. Now Mr. Rabke told Mr. Price something. That's what I'm trying to see what he said.

MR. APPLEBY: Well it goes -- at the bottom of that, it states: The 3 million that you need under the account control agreement will come into the bank from this escrow at Regions. And we want the separate escrow account to catch the rest. The escrow agreement is where we will address the regulatory references. That's -- and that --

MS. ISRAEL: Which document is that?

MR. APPLEBY: That line comes from Exhibit --

THE COURT: 371.

MR. APPLEBY: Well, that line comes from Exhibit 29.

THE COURT: Okay. Well, I --

MR. APPLEBY: I'm sorry, Your Honor.

THE COURT: And who is that to?

MR. APPLEBY: (No response).

THE COURT: Exhibit 29, who is that to?

MR. APPLEBY: I'm looking, Your Honor. It's from Mr. Rabke to Mr. Korhn, Mr. Angelis, and Mr. Price.

THE COURT: Okay. That's the same email I was reading from that says: Portions of that amount are related to amounts required to be held in escrow by the state to show the cash reserves of the operation.

Of course that's an inartfully drawn sentence because you don't know whether the escrow is required to be held -- actually physically held by the state or the requirement is by the state that someone hold an escrow account. Okay. So Mr. Korhn knows about some regulatory reference.

MR. APPLEBY: Yes, Your Honor. And in this same time window is when the draft of what I'll refer to as the MLR letter, the notice letter, begins. And I think the first exhibit on that is Exhibit 6.

THE COURT: Mr. --

MR. APPLEBY: But the initial --

THE COURT: Mr. Rabke is also in that same email in 29, copying Mr. Price. Okay. So then can you find the email about asking for the OIR? I need to see that one and see what that specifically says.

MR. APPLEBY: I'm sorry, Your Honor, the email --

THE COURT: The email where Rabke tells Price, we can ask for a decision from the OIR but it will -- and I don't remember the rest of it but -- except to note that it will delay everything.

MR. APPLEBY: Yes, Your Honor. Let me --

THE COURT: Exhibit 6 doesn't include the MLR notice letter itself.

MR. APPLEBY: I believe it's Exhibit 21, Your Honor. And this was -- and that's Mr. Rabke responding to Mr. Price stating that the legal opinion effectively would kill the deal because Florida regulatory would need to get plugged in to deliver an opinion same day which we both know is an impossible timing. Client is looking for alternative sources of the 3 million. And I correct that the issue disappears if the 3 million stays where it is and USAB gets the 3 million under the original form of cash collateral account agreement? And again, that's Exhibit 21.

THE COURT: Okay. All right. So the Delaware law that you quoted says that there are three elements, not four? It doesn't talk about the substantiality of the assistance that is required?

MR. APPLEBY: There's -- yes, there's four elements, Your Honor. The first element is existence of a fiduciary relationship; two is the fiduciary breach of the duty; three a defendant who is not a fiduciary knowingly participated in a breach; and, four, damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary. And that was from the

*Gotham Partners* case that's --

THE COURT: That's from *Gotham*. Okay. Thank you.

MR. APPLEBY: Yeah.

THE COURT: It wasn't the *Radnor* or the -- not the two that were on the knowledge issue. Okay. All right. Anything else?

MR. APPLEBY: Let me just confirm, Your Honor.

Well, just back to what Your Honor had -- or what I guess we discussed earlier which was it was only Valley that controlled the funds after the transaction. No one else could touch the funds. It was Valley's cash collateral. They were the only signers available to use it, no one else had access.

THE COURT: Okay. All right. Any rebuttal you would care to make briefly --

MS. ISRAEL: Yes, ma'am.

THE COURT: -- Ms. Israel?

MS. ISRAEL: Yes, ma'am. Thank you. And I will absolutely try to be as brief as possible.

I'm going to I guess try to take it in the order in which Mr. Appleby addressed the Court. So at least with regard to -- because I think he went -- started with Count IV and then went back to Count I.

Of course the amended complaint makes clear that

their fraudulent transfer claims are plead under Florida law, and it may be that Mr. Appleby's focus on Delaware law solely relates to Count IV. But lest there be any doubt, those -- Count IV is plead under Florida law.

Your Honor has already addressed Plaintiff's Exhibit No. 41 so I will not revisit that. I too was unable to find the language that Mr. Appleby alleged was in there. For Your Honor's benefit, Plaintiff's Exhibit No. 33 is the loan closing statements that might aid the Court. I know Mr. Appleby addressed the figures.

And just to move on for efficiency sake, I will refer the Court to the loan closing statement admitted, again, as Plaintiff's Exhibit No. 33. The borrower is listed as Westport Nursing Tampa, LLC. The project itself is described as Westport Nursing Tampa, a 110-bed assisted living and 120-bed skilled nursing facility. It also itemizes, for Your Honor's benefit, the payoff of the various notes that were used with Valley's loaned funds.

Judge, I'm struggling because we -- and again, look, we've described it as a real estate loan. I guess I just have to leave it as we have a fundamental disagreement with the Plaintiff as the nature of this -- as to the nature of this transaction. I believe that the loan closing statement, and frankly Plaintiff's Exhibit No. 41, supports that this was what we've described as a real

estate loan.

I understand Your Honor's questions about the hypothetical, you know, Joe and they bought the membership interest, et cetera, et cetera. What I would submit to the Court is simply that the evidence that's already in, I'm not even sure that it supports what Mr. Appleby described, but if you look at the chart itself that they -- that we admitted -- or Your Honor admitted this morning --

THE COURT: I haven't really admitted it. I was going to give you a chance to look at it.

MS. ISRAEL: Yes, ma'am, and actually we will have some comments on it. I think there was just some language that we would want to clarify in what I'll describe as the footnote or an asterisk. Ms. Pollan went over it and pre-marked, Judge, I'll say that, pre-marked as Plaintiff's 546. What that reflects, at least on its face, is that the general partner did not change prior -- I guess from prior to March 31 to post March 31, the general partner remained the same in both instances.

Westport Nursing Tampa, LLC, Judge, for -- in the for what it's worth category, is in fact a Florida entity, a Florida limited liability company formed in 1999. That's a matter of public record. To the extent that Your Honor would need anything from us from Sunbiz to bear that out, I'm happy to print it.

With regard to --

THE COURT: Isn't there a partnership agreement though that agrees to apply Delaware law?

MS. ISRAEL: Well, so that -- Westport Nursing Tampa I don't believe is party to that agreement. But, Judge, let me address that. The Bank is not a party of that agreement, the residents are not a party of that agreement. And if I -- I'm sorry. I'm going to start jumping around. If I --

THE COURT: I think he cited it as being the source of the duty; that the duty between the partners arises under Delaware law at the Westport Holdings Tampa, LP entity.

MS. ISRAEL: Understood. And that does relate to the aiding and abetting, so may I pause on that and just finish my thoughts with --

THE COURT: Yes.

MS. ISRAEL: -- regard to the fraudulent transfer? Thank you. With regard to --

THE COURT: Yeah. No doubt about it. Count IV is under Chapter 726.

MS. ISRAEL: Yes, ma'am. Yes, ma'am. With regard to (2)(c), which was the allegation that the transaction was actively concealed. First, the only document that Mr. Appleby referred to was Exhibit 374. I'm

-- I'm -- I'm not clear on how that constitutes an active concealment of the transaction, if it was a letter to the OIR. Having said that, Plaintiff's Exhibit No. 63 --

THE COURT: It was the nature -- the nature of the transaction being concealed, not the fact that an asset was being transferred.

MS. ISRAEL: And -- and that would have been a letter that was not sent by or on behalf of the Bank. As I understand what Mr. Appleby said, it came from Nelson Mullins who did not represent --

THE COURT: Right.

MS. ISRAEL: -- and was not an agent of the Bank. Plaintiff's Exhibit No. 63 --

THE COURT: I think 726 contemplates that it's the Debtor that's concealing.

MS. ISRAEL: Well -- and if that's the argument he's making, I did not pick up on that nuance, Judge. My understanding of what he said was that the Bank was actively concealing or participated in the active concealment of the transaction, which is why I was going to refer the Court --

THE COURT: Well, by marking up the letter.

MS. ISRAEL: The fact that Mr. Price gave input on the draft of that letter in no way rises to the level of some sort of actual intent to defraud the OIR. And Exhibit

--

THE COURT: It's a badge, ma'am. It doesn't -- nobody ever comes in and says, I'm going to -- I have fraudulent intent.

MS. ISRAEL: Of course not. I mean, that's fair. That's certainly fair. And I was not suggesting that that would be the only way --

THE COURT: It would have been cleaner had he not commented at all.

MS. ISRAEL: Fair enough. I was simply going to mention, Judge, that Plaintiff's Exhibit No. 63 is -- and that is the May 12, 2014 letter to Desmond Wilson that was signed by the Bank and reported the holding of the approximately $3 million in compliance with the Bank's loan agreement.

THE COURT: Yeah. The problem is that this overlooks subsection -- subsection (c). I might have said in the record (b). Subsection 1(c). As I understand it, 1(b) does not apply to this transaction whatsoever; correct?

MR. APPLEBY: Correct.

THE COURT: So it's 1(a), 1(c) --

MS. ISRAEL: Are you referring to the statute, Judge?

THE COURT: Yeah.

MS. ISRAEL: Okay.

THE COURT: And the letter only refers to 1(b), which doesn't even apply.

MS. ISRAEL: I think, Judge, the point being is that there was a disclosure to the OIR close in time to the transaction in which those funds were --

THE COURT: And -- well, it's a disclosure that covers up, you know -- there is no (b). It doesn't address (c) or (d). (a), it could be partly in (a) if it was a separate fund. Okay.

MS. ISRAEL: Understood. I mean --

THE COURT: You score no points with that one.

MS. ISRAEL: -- it says what it says. That's fair. Mr. Appleby's -- I mean again I'm -- Mr. Appleby has made multiple statements to the Court during his presentation without pointing to specific evidence that supports those accusations. For example, his allegation that by virtue of this Valley loan that that created a much bigger liability for the residents' claims. He did not point the Court to any evidence that supports that.

And I don't need to go on, I've gone on *ad nauseam*, about the unsubordinated notes. But even prior to the entry into the unsubordinated notes, there's simply no evidence to support that type of allegation or accusation at this point. As Your Honor pointed out, he needs to be

providing both the Court and us with the exhibits or evidence that would -- that would establish that.

He also made the statement in passing, but I find it significant, the accusation that Valley imposed the requirement that Westport Nursing Tampa be segregated. Again, there was no pointing the Court to any particular or actual evidence of that requirement. There was not a single thing he read it from Mr. Korhn's deposition that even remotely addressed that or that would have established that.

He did not present any evidence from the OIR that has accused either a fiduciary or the Bank through some -- by extension of a violation of the regulations of the OIR. Again, an accusation that lacks evidentiary support.

One thing that doesn't seem to have come out in all of this, Judge, but, you know, I would point out that under, you know, kind of basic principles and certainly as would be required by virtue of Florida law, presumably Horizon and/or its investors after receiving the money reflected in the loan closing statement at Plaintiff's Exhibit No. 33, would have recorded satisfactions of mortgage following the payoff of the various loans that were reflected in Exhibit 33.

There's certainly been no allegation from the Plaintiff, nor evidence presented, reflecting that those

loans -- that what I'll call the Horizon mortgages were not paid off.

THE COURT: I don't think they contest that at all.

MS. ISRAEL: I beg your pardon?

THE COURT: I don't think that they contest that the loans were paid off.

MS. ISRAEL: Yes, ma'am.

Sorry, Judge. I'm just going through my own notes. I don't want to repeat myself. All right. I think with that, Judge, I'm prepared to just give my final comments with regard to the aiding and abetting claim.

I -- I -- we do not concede nor agree that Delaware law applies. The partnership agreement aside, the claims against the Bank as pled, and that of course would be Count I, beginning at paragraph 42, which incorporates paragraphs 1 through 41; paragraphs 43, 44 -- let me cut to the chase.

Paragraphs 42 through 48. Paragraph 44 of the amended complaint is what sets out the allegations of the Debtor's general and limited partners breaching their fiduciary duties. There's certainly been -- and for what it's worth, Judge, in looking back at this amended complaint, there's no allegation that there was a breach of a duty of loyalty, which is the phrase that Mr. Appleby

used today.

He said that there was a duty of loyalty and a duty to act in the best interest of the partners, and apparently thereby invoking some -- the partnership agreements. Again, the Bank was not a party to that. Certainly, the residents were not parties to that. But perhaps more importantly, that is not the case that we've tried thus far. There is no duty of loyalty, to my reading, of paragraph 44 of the amended complaint. I'm just not sure where that's coming from at this point.

But having said that, there has not been any evidence admitted in this case, whether by testimony or documents, that would even remotely suggest that either a general partner breached its duty of loyalty to the limited partners or to the entity itself.

Mr. Appleby, again, you know -- and certainly again I understand that -- the making of legal argument, I'm making legal argument, but he has got to support it with evidence. So when he says something to the effect of, the transfer of the MLR funds failed to comply, he's got to point to evidence that has been admitted in this case that bears that out, where a witness that's competent and qualified testified to that proposition.

THE COURT: Ma'am, the provider -- I can read the law. If they transferred $3 million away from the

provider, capital P, then that violates the statute. Period, end of discussion. There is evidence that $3 million was taken out of the Debtor, which was the provider, the Westport I, if you will, and it was expatriated somewhere in the hands of a title agent, unavailable, outside the control of the capital P provider. That's what the record shows. So to say that it doesn't show that, you must have been asleep. I'm sorry, the record shows it.

MS. ISRAEL: And I understand what the Court is drawing from there.

THE COURT: Okay.

MS. ISRAEL: Thank you. Mr. Appleby's statement -- and this is towards the end, Judge. I'm almost finished. But Mr. Appleby's statement that the Bank knew of the statutory requirements through Mr. Price, again we can certainly look at Exhibit 21. There was no evidence that -- that -- that demonstrates that Mr. Korhn knew what those statutory requirements were, what the statute was, that he intended to buck the statute, disregard the statute, whether through Mr. Price --

THE COURT: Ma'am, I've already said what I said about Mr. Korhn. I don't think that he appreciated -- I think he maybe knew that there were some regulatory requirements and he certainly pressed his counsel to meet

them. I don't believe that he ever knew the detail behind that. I do believe Mr. Price did.

MS. ISRAEL: I understand, Your Honor, and --

THE COURT: Or he should have, especially when Rabke said what he said to Mr. Price.

MS. ISRAEL: I understand. And in fact I was --

THE COURT: Mr. Price is an agent of the Bank.

MS. ISRAEL: Yes, ma'am. I understand.

THE COURT: Does it matter if it's Mr. Korhn or Mr. Price? No, it doesn't.

MS. ISRAEL: I understand. I was going to point out just two things. Number one, Mr. Korhn isn't copied on that email at the top of Exhibit No. 21. And then farther down that email chain, there is an additional discussion between Mr. Price and Mr. Rabke. And from my reading of it, and of course I'm going to defer to the Court, there is clearly continued confusion and Mr. Price asking questions of Mr. Rabke.

THE COURT: The one that Mr. Korhn is copied on talks about regulations of Florida law. I know that he's not on the kill the deal one.

MS. ISRAEL: Yes, ma'am. That's right. That's right.

THE COURT: But he was copied on the one that says there needs to be an account that satisfies Florida

regulations. I don't think he knew what those regulations were.

MS. ISRAEL: Yes, ma'am. And I --

THE COURT: "He" meaning Mr. Korhn.

MS. ISRAEL: Right. Understood. I think, Judge, the final point I have, and it kind of goes backwards and I apologize for that, with regard to the Delaware law versus Florida law. The only thing that -- well, two things to point out to the Court. First, from the *Lawrence* case, *Lawrence v. Bank of America* that I cited to the Court earlier and again just for record purposes that's 455 Fed. Appendix 904. I'm trying to find a proper page reference, Judge. It's headnote 5 and it's --

THE COURT: He gave --

MS. ISRAEL: -- in --

THE COURT: He gave a pinpoint cite.

MS. ISRAEL: Yes, ma'am.

THE COURT: It was 844.

MS. ISRAEL: Yes. So now I would just direct the Court's attention to headnote 5, which is actually contained within footnote 3. I'm sorry I can't do a better job with the page number. Let me --

THE COURT: Okay. Footnote 3.

MS. ISRAEL: Yes, ma'am. It says in part, federal courts adjudicating state law claims apply the

substantive law of the state where they render decisions. And it cites to *American United Life Insurance Co. v. Martinez*. That's 480 F.3d 1043, page 1059. It's an Eleventh Circuit case from 2007. Respectfully, we would submit that Florida law applies to the aiding and abetting claim. But --

THE COURT: Does that footnote say even where the parties have contracted for choice of law? It can't override that.

MS. ISRAEL: No, no. It does not say that and -- and I would actually agree with the Court. But neither -- the Bank is not a party to those partnership agreements. So if the allegations -- we have to go by what was pled in the complaint. There was no allegation of a violation of the partnership agreement. Again, to my reading --

THE COURT: That's an evidentiary thing. We have a shortened -- in federal court we have rule -- the rule that says you make a short and plain statement of the claim. There's breach of fiduciary duty. The specific duty is not pleaded. I'll give you that.

MS. ISRAEL: Understood. And that's fair. We --

THE COURT: But it's normally -- if that's what you want, a motion for more definite statement would have been helpful and I would have given it to you in a nano second.

MS. ISRAEL: I understand. And we've had that discussion earlier. I'm not trying to beat a dead horse on that, Judge. I just felt like I needed to point it out. The --

THE COURT: Okay. So you're saying although Delaware law may provide the source of the duty, the aiding and abetting elements should be guided by Florida law; that's what you're saying?

MS. ISRAEL: I'm not agreeing that the partnership agreement is the source of the duty. The partnership agreement contains a multitude of contractual terms that may or may not provide --

THE COURT: When you have two partners who chose Delaware law and they're Delaware corporations, it tells me that they are agreeing to be bound by the Delaware panoply of fiduciary duties.

MS. ISRAEL: If they --

THE COURT: That's what it tells me.

MS. ISRAEL: I think that would be a fair interpretation if there were litigation between the partners to that agreement.

THE COURT: Okay. But the source of the duty is where that arises. And you're arguing that when that duty arises, under whatever law, the aiding and abetting elements have to be provided by Florida law.

MS. ISRAEL: That's my interpretation of that footnote in that case.

THE COURT: Okay. Now -- okay. Now your case law that you cited, I asked you a question about whether that's federal common law or whether it construes Florida law. And so you've cited *Wiand v. Wells Fargo*. Was that interpreting Florida --

MS. ISRAEL: That was the *Bibb* case. I'm so sorry.

THE COURT: Oh, the *Bibb* case?

MS. ISRAEL: Yes, ma'am. I think when I answered the Court as to the elements --

THE COURT: That's the *S&B?*

MS. ISRAEL: Yes, ma'am. I believe so.

THE COURT: And does the Eleventh Circuit interpret Florida law there?

MS. ISRAEL: I have not pulled that case back up. I think you asked if I had a copy of it, or asked me that question previously, and I said I didn't have a hard copy.

THE COURT: Okay. And *Wiand v. Wells Fargo* does not provide elements, that just provides gloss on mere negligence not being actionable?

MS. ISRAEL: *Wiand* may address other things. I was citing that case to the Court for the proposition -- or to try to answer the Court's question as to whether mere

negligence is enough.

THE COURT: Okay.

MS. ISRAEL: It may in fact address other things, I just had not used it for that proposition.

THE COURT: Let us get a copy of 365 Federal Appendix 202, Ms. Scotten. 365 Federal Appendix 202, a 2010 case from the Eleventh Circuit, and let's just see whose law they apply.

MS. ISRAEL: Judge, may I continue while she's pulling that up --

THE COURT: Yes.

MS. ISRAEL: -- or would you -- I just had just a couple -- frankly, I was just going to summarize the --

THE COURT: Yes. Go ahead.

MS. ISRAEL: Yes, ma'am. Thank you.

That even if Your Honor were to apply the elements of an aiding and abetting claim under Delaware law, as I understood the elements from Mr. Appleby's argument, the existence of a fiduciary relationship, a breach of fiduciary duties and a defendant's knowingly participating in that breach and then damages, I would respectfully submit that even still the Plaintiff has not met its *prima facie* case.

And the particular issue that we take issue with would be the Defendant knowingly participating in a breach.

I just -- there is not sufficient evidence that would rise to the level of a knowing -- the Bank whether, again, through Mr. Price or otherwise, a knowing participation in a breach of a fiduciary duty. There is no email among the multitude of emails admitted in this case that bears that out.

THE COURT: I disagree. I think Mr. Price knew or should have known. He was told there was a regulatory, he was told that it had to be in escrow. He's a lawyer. He has apparently -- I don't know if he has any -- if his fingerprints are on the document you just referred me to that miscites the statute, but there is record evidence that the Bank at least ignored red flags, if not knew that there was a requirement to have a bank account that was not encumbered for purposes of the 15 percent -- the (c), the subsection (c) piece. I need to see that Federal Appendix case to see whether they're interpreting Florida law.

Do you have any Florida cases inter -- that provide the elements of aiding and abetting?

MS. ISRAEL: I think I do, Judge. Bear with me. Actually -- and, Judge, may I give Your Honor a -- two additional cites? And this relates to elements of aiding and abetting.

THE COURT: Okay.

MS. ISRAEL: And I'm going to try to answer the

Court's immediately prior question. The two additional cites are *In re Fundamental Long Term Care*. That's 527 B.R. 479, at page 496. That is a Middle District of Florida bankruptcy case from 2015. And the excerpt that I have -- I don't have the physical case itself, but I had made a note to myself, quote, "The plaintiff must establish that a defendant acted with a knowledge that the conduct advocated or assisted constitutes such a breach," end quote.

And then also *Lamm*, L-A-M-M, as in Mary Mary *v. State Street Bank & Trust Company*, 889 F. Supp. 2d 1321, at page 1332. That's a Southern District of Florida case from 2012. And the excerpt that I have from that case states, quote, "In order to establish a claim for aiding and abetting, the Plaintiff must establish that the aider and abettor had knowledge of the underlying breach of fiduciary duty or fraud and that the aider and abettor substantially assisted or encouraged commission of the breach or fraud.

"The courts in both *Rosner* and *Citgo Group* found allegations that a bank's disregard of quote 'obvious red flags' end quote, such as atypical and non-routine banking transactions were insufficient to establish the conscious awareness of wrongdoing necessary to maintain an aiding and abetting cause of action."

Now to answer Your Honor's question --

THE COURT: Whose law does *Lamm* construe?

MS. ISRAEL: I will need to pull that up for Your Honor. I'm sorry, I don't have the immediate answer to that and I will either pull it up or ask one of my colleagues to do so.

THE COURT: Okay. I'm looking at *Bibb* now.

MS. ISRAEL: I think you had asked --

THE COURT: I'm looking at *Bibb* now and the -- they were construing Florida law for how to interpret *force majeure*. Let's see what they were construing for the aiding and abetting.

MS. ISRAEL: Yes, ma'am. And I think it's page 207, Judge.

THE COURT: They sure don't give you much discussion, do they? Okay. They're citing *Perlman* so we need to get the slip copy of *Perlman*. Ms. Scotten, would you pull 2009 WESTLAW 3161830, because the Eleventh Circuit in *S&B Bibb* does not cite to a source of law.

MS. ISRAEL: And, Judge, *Wiand* -- the *Wiand v. Wells Fargo Bank* case that I cited earlier at 938 F. Supp. 2d, page 1238, that is that Middle District of Florida Tampa case from 2013. That was an application and interpretation of the elements under Florida law.

THE COURT: Does the --

MS. ISRAEL: That was James -- Judge Whittemore's

opinion.

THE COURT: Okay. Does *Wiand v. Wells Fargo* lay out the elements under Florida law?

MS. ISRAEL: Yes, ma'am, it does.

THE COURT: Well then let's use that one.

MS. ISRAEL: Yes, ma'am.

THE COURT: Because first of all, the *S&B v. Bibb* is not a published decision. It is Eleventh Circuit, but it doesn't tell us much other than there are some elements it's applying and we don't know whose law. Let's see if *Pearlman* tells us something different.

MS. ISRAEL: Yes, ma'am. And for Your Honor's reference, the *Wiand*, it's -- headnote 1 sets out the elements under Florida law.

THE COURT: Ah, here we go. *Pearlman v. Alexis*. And that's not the Ponzi *Perlman*, it's apparently a different *Pearlman*, P-E-A-R-L-M-A-N, *v. Alexis*. This one says it's not reported but it doesn't --

MS. ISRAEL: The *Perlman* I cited -- oh, I'm sorry, Judge. I apologize.

THE COURT: It doesn't say not published. So this is the Southern District District Court.

MS. ISRAEL: The *Perlman* opinion I cited also cites the elements under Florida law.

MR. APPLEBY: I likewise have a case, Your Honor,

that cites the elements.

THE COURT: Okay.

MR. APPLEBY: It's *Grace v. Esker*.

THE COURT: Okay. Wait, wait, wait.

MR. APPLEBY: Yes, Your Honor.

THE COURT: You're giving me overload here. Hold on just a minute. Let me go one at a time.

MR. APPLEBY: Yes, Your Honor.

THE COURT: *Wiand* is a District case. The *Lawrence v. Bank of America* is an Eleventh Circuit case?

MS. ISRAEL: It --

THE COURT: January 2012?

MS. ISRAEL: Yes, ma'am, it is.

THE COURT: And it's got elements and it construes Florida law?

MS. ISRAEL: Yes, ma'am, it does.

THE COURT: Okay. Mr. Appleby, what do you have?

MR. APPLEBY: *Grace v. Esker*, E-S-K-E-R. It's 837 So.2d 348. And at page 352 they -- it spells out Florida for the elements of a breach of fiduciary duty. And that's a Florida Supreme Court case from 2002.

THE COURT: And that's just the breach of fiduciary duty? That's not aiding and abetting?

MR. APPLEBY: Well yes, Your Honor, that's a breach of fiduciary duty.

THE COURT: All right. Let me look at *Wiand* here.

MS. ISRAEL: *Wiand, Perlman, and Lawrence* address the aiding and abetting elements.

LAW CLERK: Excuse me. Can you give me that *Lawrence* citation, please?

MS. ISRAEL: Yes, ma'am, of course. Bear with -- that is 455 Fed. Appendix 904.

LAW CLERK: Thank you.

MS. ISRAEL: Yes, ma'am.

MR. WHITSON: Your Honor?

THE COURT: Yes?

MR. WHITSON: I remembered a case that Judge Covington authored several years ago. The *Hendrix* case. It's 511 F. Supp. 2d --

THE COURT: Wait a minute. Can y'all just give me one Eleventh Circuit case that has the four elements or three elements? I mean --

MR. WHITSON: This actually discusses --

THE COURT: -- how many more do I need?

MR. WHITSON: This is a choice of law case, which choice of law a federal court applies in dealing with contracts or with torts.

THE COURT: Okay. What about the source of the breach of a fiduciary duty; the source of the fiduciary

duty itself? Does it have anything to do with that?

MR. WHITSON: It doesn't discuss fiduciary duty being a tort, Your Honor. I could argue by analogy, according to her discussion which is excellent, about choice of law in federal court is -- the law of where the tort occurred is the law that applies. And here the allegation is that --

THE COURT: The duty -- okay.

MR. WHITSON: -- tort occurred in Florida.

THE COURT: Is there a difference -- okay. Let's go here. Is there a difference in breach of fiduciary duty under Florida law and Delaware law?

MR. WHITSON: That I can't answer, Your Honor.

THE COURT: Well then what are we arguing about? What is the test for breach of fiduciary duty under Florida law that you would like me to apply?

MR. WHITSON: I'm sorry, Your Honor?

THE COURT: The breach of fiduciary duty. What is -- what is the -- what is the duty --

MR. WHITSON: That's the *Wiand* case, Your Honor.

THE COURT: So the duty is discussed in the *Wiand* case.

MR. WHITSON: Yes, Your Honor. Judge Whittemore's opinion.

THE COURT: What is it; where do I find it?

MR. WHITSON: I think Ms. Israel has a copy of the case.

MS. POLLAN: Are you asking for the elements, Your Honor?

THE COURT: Just -- not the aiding and abetting. The fiduciary duty that applies between a limited partner and a general partner, or a general partner to a limited partner, a general partner to the partnership.

MS. ISRAEL: I'm not seeing those elements in *Wiand*, Judge.

THE COURT: Me neither. So --

MS. ISRAEL: I'm seeing elements of other causes of action, including negligence and unjust enrichment, but that would not be applicable here. And of course the aiding and abetting.

THE COURT: Okay.

MS. ISRAEL: But taking us back to the beginning, those three cases do set out the ele --

THE COURT: We need to take a short break.

MS. ISRAEL: Yes, ma'am.

THE COURT: How long do we need? How many are we talking about?

Okay. Why don't y'all do this. Find me the seminal Eleventh Circuit case that applies the elements of aiding and abetting under Florida law. Next, find me a

case that talks about the source of the duty of two Delaware partners, LLCs, general partners, limited partner, and a limited partnership, all under Delaware law and where the partnership agreement applies Delaware law, whose source of the duty applies, Florida's or Delaware's.

MS. ISRAEL: Yes, ma'am. And I do believe that both the *Lawrence* case and the *Perlman* case that I cited lay out as Eleventh Circuit law what the elements of an aiding and abetting a breach of fiduciary claim are. And I'm prepared to point the Court to where I found that in those two opinions if it will be helpful. Both of those are Eleventh Circuit cases.

THE COURT: I can see where the Eleventh Circuit relied on *Perlman*. The *B&B* -- the *S&B* -- the *S&B* case, the Eleventh Circuit non-published decision cites to *Perlman* for the elements. *Perlman* at asterisk 5 --

MS. ISRAEL: Yes, ma'am.

THE COURT: -- provides aiding and abetting elements under Florida law and it cites another District Court applying Florida law, don't know if they did or they didn't, and another District Court applying Florida law, don't know if they did or they didn't. So actually I've not yet seen a case that cites to an actual Florida reported decision.

MS. ISRAEL: In -- in the *Perlman* case at

headnote 5, Judge, and I have not pulled up this case yet, but it does -- the court does cite to *ZP No. 54 Limited Partnership v.* -- and it might be Fidelity & Deposit Co. of Maryland. I'm reading shorthand. 917 So. 2d 368, at page 372. That is a Florida Fifth DCA case.

THE COURT: Okay. I don't have any headnotes in *Pearlman*.

MS. ISRAEL: Okay. Yes, ma'am.

THE COURT: Let me see. You're saying it's --

MS. ISRAEL: I'm so sorry.

THE COURT: *VP*, Victor, Peter?

MS. ISRAEL: Z, as in Zebra, P, as in Paul. And, Judge, I'm happy to give you the rest of that citation.

THE COURT: I don't see the citation in the reported decision.

MS. ISRAEL: Okay. I just want to make sure we're -- and you're reading from *Perlman v. Wells Fargo Bank*?

THE COURT: No. I'm reading from *Pearlman v. Alexis*.

MS. ISRAEL: Oh. That was Mr. Appleby's case. I'm so sorry. That would be -- explain the confusion.

THE COURT: Well, the *S&B* case cites to this *Pearlman* --

MS. ISRAEL: Understood.

THE COURT: -- so I'm trying to hit bottom on finding a case that cites to Florida law.

MS. ISRAEL: And I believe that's my *Perlman*. I'm so sorry. I know it's confusing. That's in *Perlman v. Wells Fargo Bank*.

LAW CLERK: (Indiscernible).

THE COURT: Hold on a minute and I'll get that for you.

MS. ISRAEL: And I'm happy to provide that citation again.

THE COURT: 559 Fed. Appendix 988.

MS. ISRAEL: Yes, ma'am.

THE COURT: And that cites the elements?

MS. ISRAEL: Yes, ma'am, it does. And it also cites to a Florida Fifth District Court of Appeal case as one of its sources.

THE COURT: Okay. Just see if y'all can get on the same page. If we're all talking about the same --

MS. ISRAEL: Yes, ma'am.

THE COURT: -- elements under Florida law for aiding and abetting, I'm going to go that way, Mr. Appleby, for that tort.

MR. APPLEBY: I understood, Your Honor.

THE COURT: The source of the duty I'm inclined to have it be provided by Delaware, based on the fact that

they are Delaware corporations, they're formed under Delaware, they have a partnership agreement that says that they would -- we would apply that law, so I am inclined to do that. But if it's the same duty under Florida law, who gives a rap; right? Okay. See if y'all can get on the same page.

MS. ISRAEL: Yes, ma'am.

THE COURT: By the way, rap, R-A-P, not R-A-T a blank blank.

MS. ISRAEL: I heard you the way that you just spelled it, Judge. Thank you.

THE COURT: Okay. We'll take a break until about four.

MS. ISRAEL: Yes, ma'am. Thank you.

(Recess, 3:48 p.m. to 4:19 p.m.)

(Audio started mid sentence)

THE COURT: -- Court?

COURTROOM DEPUTY: No, not yet.

MR. WHITSON: Your Honor, just briefly. Mr. Robichaux and Ms. Khanderia have been sitting in that little room all day. So I asked if Mr. Warren had an objection to them watching the last part of the hearing today and he did not have an objection, so if that's okay.

THE COURT: That's fine.

MR. WHITSON: Okay.

THE COURT: But he doesn't have anything to do with any of these elements that are part of the Rule 52 motion?

MR. WHITSON: No. This is just a Rule -- yeah, a Rule 52. He's -- he's there -- he is essentially the -- will be testifying as an expert on the -- I guess the duty issues, though.

THE COURT: Fiduciary duty issues of the partner to the partnership?

MR. WHITSON: No, no. Not that. No. This is simply the pledge of the MLR.

MR. APPLEBY: And, Your Honor, just for reference, the Plaintiff still has a pending objection to Mr. Robichaux's report.

THE COURT: Okay. Is he -- so you don't -- you're okay with him listening to what I say in reaction to this Rule 52 motion?

MR. APPLEBY: Yes, Your Honor, we're okay with that.

THE COURT: Okay. So did y'all hit bottom on what the seminal Eleventh Circuit case is that clearly adopts Florida law as opposed to adopting a District Court decision that may or may not adopt Florida law?

(No response.)

THE COURT: It's a yes or no question.

MS. ISRAEL: I --

THE COURT: No. Okay.

MS. ISRAEL: I think we -- no, I think we have.

THE COURT: Here's what I -- oh, okay. What is it?

MS. ISRAEL: I'm sorry. I was -- sorry.

THE COURT: What is it?

MS. ISRAEL: I believe that it's to be the *Perlman* case that --

THE COURT: *P-E-R-L* --

MS. ISRAEL: *P-E-R-L-M-A-N v. Wells Fargo Bank*, 559 Fed. Appendix 988.

THE COURT: Okay. Let me see if we have that one.

MS. ISRAEL: Yes, ma'am.

THE COURT: I have *Lawrence v. Bank of America*, I have *Wiand v. Wells Fargo*, I have *Pearlman v. Alexis*, I have *Gracie v. Ecker*, *Lamm v. State*. I do not believe -- let's see what this one is. I have *S&B v. Progress*. I do not think I have the *Perlman v. Wells Fargo*, 559 Fed. Appendix 988. What does it say?

MS. ISRAEL: The elements of a cause of action for aiding and abetting in Florida are; an underlying violation on the part of the primary wrongdoer, knowledge of the underlying violation by the alleged aider and

abettor, and the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor.

I also have --

THE COURT: Who does it cite?

MS. ISRAEL: It cites to the *Lawrence* case which I previously cited to the Court.

THE COURT: Okay. The *Lawrence* case --

MS. ISRAEL: *Wiand* also addresses the elements.

THE COURT: Hold on a minute.

MS. ISRAEL: Yes, ma'am.

THE COURT: *Lawrence v. Bank of America* is a federal case.

MS. ISRAEL: So it looks like *Lawrence* came out a couple of years before *Perlman*.

THE COURT: That does cite, in addition to a District Court case, federal district, it does cite a Fifth DCA case, *ZP No. 54.*

MS. ISRAEL: Yes, ma'am. I have a more --

THE COURT: Okay. Do you agree with this one, Mr. Appleby?

MR. APPLEBY: Yes, Your Honor, we -- we figured out that we both cited this in our pretrial briefs.

THE COURT: Okay.

MS. ISRAEL: I have another state court case to the extent that -- from 2022.

THE COURT: And what is that one?

MS. ISRAEL: Yes, ma'am.

THE COURT: And does it have three elements or four?

MS. ISRAEL: I'm sorry. I left the page to give you the full citation. Let me go back to it. It has four. And I can read those to the Court.

THE COURT: Okay. Well *Lawrence v. Bank of America* has three.

MS. ISRAEL: Yes, ma'am. They're similar and I'm happy to provide this -- again, I can either publish it or I can start by giving Your Honor the case citation.

THE COURT: Maybe the problem is that *Lawrence* didn't involve a breach of fiduciary duty.

MS. ISRAEL: I -- that seems to be.

THE COURT: Okay. How about this?

MS. ISRAEL: The *Logan* -- the case that I was about to give Your Honor is a --

THE COURT: Is it a fourth -- is it a 2017 case, *Fonseca*?

MS. ISRAEL: It actually cites to that case, but it's from October of 2022 so it's more current.

THE COURT: Okay. And what District Court of Appeal is *Fonseca*?

MS. ISRAEL: *Fonseca* is the Third District Court

of Appeal and the *Logan* case is a Second District Court of Appeal.

THE COURT: Okay. So *Logan* is Second, it cites to *Fonseca*. What does the *Logan* --

MS. ISRAEL: Yes, ma'am.

THE COURT: What is the *Logan* citation?

MS. ISRAEL: Yes, ma'am. *Logan v. Morgan Lewis & Bockius*, and I'm not sure if I'm pronouncing that correctly, but it's B, as in Boy, O-C-K-I-U-S, *LLP*, 350 So. 2d 404. Again, the Second DCA, 2022. And --

THE COURT: Who wrote that, do you know?

MS. ISRAEL: I beg your pardon?

THE COURT: Who wrote it, do you know?

MS. ISRAEL: Yes, ma'am. I'll look that up. Judge Rothstein --

THE COURT: Youakim.

MS. ISRAEL: -- Youakim.

THE COURT: We call her Judge R-Y.

MS. ISRAEL: Yes, ma'am.

THE COURT: All right.

MS. ISRAEL: Thank you for the help with the pronunciation.

THE COURT: That's okay. I'm going to use the Eleventh Circuit case of B-*Smith Enterprises, LP v. Bank of America, N.A.* It is a Eleventh Circuit case, February 16,

2023. Let me see if I can find a cite on this. 2023 US APPELLATE LEXIS 3721. And it provides four elements, different from *Lamm*. *Lamm* was three elements; right?

MS. ISRAEL: I think that's right, Judge. I'm sorry. My cases are all stacked up.

THE COURT: I'm getting them confused. At any rate, this is a four-element test. It says; number one, a fiduciary duty on the part of the primary wrongdoer; number two, a breach of the fiduciary duty; number three, knowledge of the breach by the alleged aider and abettor; number four, the aider and abettor's substantial assistance or encouragement of the wrongdoing. Citing *Fonseca*. And if *Logan v. Morgan*, et cetera cites *Fonseca* then we're hitting bottom on two pretty good DCA decisions then.

Regarding knowledge. Under Florida law, the knowledge element requires a showing that the bank had actual knowledge of the alleged wrongdoing. Citing *Lamm*, the Eleventh Circuit case that we've discussed, 749. F.3d 938, a 2014 case. Allegations that a bank should have known of the alleged breach of fiduciary duty or that a bank disregarded red flags, such as atypical activities on a customer's account, are insufficient to establish knowledge. In that case the issue was knowledge, meaning in the *B-Smith* case.

The Court notes a different case, one that comes

from the Middle District of Florida Bankruptcy Court, Judge Vaughan, *Chambers v. Nixon Peabody LLP, In re Mojo Brands Media, LLC*. That one is 2022 BANKRUPTCY LEXIS 1885. This also talks about aiding and abetting breach of fiduciary duty. It gives the same four elements that we've just gone over under the Eleventh Circuit's test. And Judge Vaughan cites to the *S&B* case. And we've gone through the litany of where that ends up. And she also cites the *Lamm* case for actual knowledge being required. And I'll get to this one -- I'll get to this case in a minute in more detail.

Let me ask Mr. Appleby to -- to tell me whether you all have discussed the fiduciary duty, the source of the fiduciary duty, and have you come to some agreement on whose law provides the duty. And if not, have you come to some agreement as to whether Florida law and Delaware law are the same?

MR. APPLEBY: I don't think we've reached an agreement. I think we should, Your Honor, but I don't have the answer that we've reached an agreement.

THE COURT: Okay. Why don't you tell me this. Who is the primary wrongdoer?

MR. APPLEBY: That begins with Mr. Landry.

THE COURT: And he is the control person of whom?

MR. APPLEBY: Well, the original owner prior to the transaction. And I say "owner" --

THE COURT: The original of what? Be specific. You're saying -- you're invoking a duty of partners *inter se* --

MR. APPLEBY: Yes, Your Honor.

THE COURT: -- so I need to know on -- you know, you can refer to your chart.

MR. APPLEBY: Yes, Your Honor. Mr. Landry was the president of Double L Investment. And this is the asterisk at the bottom when we're referring to the 1 percent general partner.

THE COURT: And that's in the record?

MR. APPLEBY: Yes, Your Honor.

THE COURT: All right. And you're going to be able to tell me where?

(Counsel confer).

MR. APPLEBY: Yes, Your Honor. It's Exhibit 207.

THE COURT: Okay. And so if you follow the bouncing ball, he's the human being, that when you travel up from Westport Holdings University Village, LLC, he's the puppeteer?

MR. APPLEBY: Yes, Your Honor.

THE COURT: The record reflects that?

MR. APPLEBY: I -- yes, Your Honor.

THE COURT: All of these relationships; peeling back the onion going from Westport Holdings University

Village, LLC, up to Westport Advisors Limited, up to Westport Asset Management, LLC, up to Double L Investment?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. So Mr. Landry is the human being that causes Westport Holdings University Village, LLC to breach a duty to the limited partnership?

MR. APPLEBY: Correct, Your Honor.

THE COURT: Okay. And the breach consists of, number one, moving the $3 million out of the entity that owned the Towers and that had the statutory obligation to keep that separate?

MR. APPLEBY: Correct, Your Honor.

THE COURT: And it is -- is it also part of your breach argument that the -- that this entity, Westport Holdings University Village, LLC, had some part in selling Westport -- excuse me -- Nursing Home -- Nursing Tampa, LLC to BHM Suni?

MR. APPLEBY: Yes, Your Honor.

THE COURT: So you're saying that Mr. Landry through Westport Holdings University Village, LLC caused Westport Holdings Tampa, LP to sell the nursing home to BHM Suni, LLC?

MR. APPLEBY: Yes, Your Honor.

THE COURT: And I'm looking at this as a sale of the asset itself, not a sale of the interest in the

partnership.

MR. APPLEBY: Yes. Well again, Your Honor, this was -- the sale was the transfer of the limited partnership interest.

THE COURT: Well, then that would mean that Westport Holdings University Village, LLC would not hold Westport Holdings Tampa, LP after the sale.

MR. APPLEBY: Well the -- the general partner continued to be there after the sale. It was the limited -- the 99 percent limited partnership that transferred as of the March 31st, 2014 date.

THE COURT: Who is in charge of Westport Senior Living Investment Fund?

MR. APPLEBY: That's the -- it's almost identical, but Mr. Landry. There is one change.

THE COURT: Okay. So on that transaction, he's a puppeteer causing Westport SLIF to be sold to --

MR. APPLEBY: That's the second page, Your Honor, with the limited partners with the four names.

THE COURT: Well, we're talking about the transfer of the Westport Nursing.

MR. APPLEBY: Oh. Sorry.

THE COURT: You're saying that the transfer was of the limited partner in Westport. I don't know what you're -- I can't follow what you're saying.

MR. APPLEBY: Well the -- well --

THE COURT: It says here that Westport Holdings Tampa, LP owned the nursing home.

MR. APPLEBY: That's correct, Your Honor. As of -- as of March 31st, 2014, Westport Nursing --

THE COURT: And then afterwards -- afterwards, Westport didn't hold the nursing home?

MR. APPLEBY: No. It was spun off with the transaction.

THE COURT: Okay. But the nursing home was sold as an asset to another party.

MR. APPLEBY: The --

THE COURT: The bricks and mortar were sold.

MR. APPLEBY: Yes, Your Honor.

THE COURT: It wasn't a limited partnership interest.

MR. APPLEBY: No, no. I'm sorry. Your Honor, I'm misstating. I want to make sure I'm clear.

Your Honor, again I apologize. I don't want to misstate. But it's the membership interest that was sold. It was spun off that the membership interest is what was transferred.

THE COURT: The membership interest in Westport Holdings Tampa, LP?

MR. APPLEBY: In Westport Nursing Tampa, LLC.

THE COURT: Okay. Then I can't understand this chart. I'm seeing that Westport, the Debtor, owned the nursing home.

MR. APPLEBY: Yes.

THE COURT: Owned the interest, owned the LLC, owned the LLC. So did Westport Holdings Tampa, LP sell the LLC to BHM Suni?

MR. APPLEBY: Your Honor, may I speak with Mr. Warren?

THE COURT: Yes.

(Counsel confer).

MR. APPLEBY: Again, Your Honor, if I could just point you back to that first page in the center box where it refers to Westport Holdings Tampa, LP.

THE COURT: Yes.

MR. APPLEBY: So the language under there is I guess where I -- I apologize, I get myself turned around. But that's the owner of the Towers. But they are the 100 percent member ownership interest of Westport Nursing.

THE COURT: So they own the Towers and an LLC?

MR. APPLEBY: Yes, Your Honor, the membership --

THE COURT: They sold the LLC to the entity that begins with the letter B?

MR. APPLEBY: Well, the -- they transferred -- they sold the member interest. And Westport Nursing Tampa,

LLC did not -- the entity is still the entity.

THE COURT: I understand that. If I own an LLC, but I don't want to own it anymore, I sell my interest to you --

MR. APPLEBY: Yes.

THE COURT: -- you own the LLC.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Is that what happened here?

MR. APPLEBY: Yes, Your Honor.

THE COURT: And that left Westport Holdings Tampa, LP with the Towers.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. So Mr. Landry orchestrates that through his control of the general partner in Westport Holdings Tampa, LP and the general partner is Westport Holdings University Village, LLC.

MR. APPLEBY: Yes, Your Honor.

THE COURT: So he's the puppeteer up there. Okay. So then Westport Nursing Tampa, LLC leaves. What does -- and your contention is that Westport Holdings Tampa, LP got nothing for that; is that what you're saying?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Not even payment of debt?

MR. APPLEBY: Well there was payment of debt but the asset went away, the potential income streams went

away, it was transferred for no consideration, and they got the $3 million.

THE COURT: Forget the 3 million. That's a separate thing. Those are two different things. Westport was relieved of debt.

MR. APPLEBY: Yes, Your Honor.

THE COURT: And so that's what they got for the LLC.

MR. APPLEBY: Yes, Your Honor.

THE COURT: And you're saying that that's insufficient.

MR. APPLEBY: It -- well --

THE COURT: And it's insufficient because even though they got rid of debt, they acquired replacement debt.

MR. APPLEBY: In a smaller amount. And the Nursing took all the debt. Or took $15 million of the debt, of the 20 million.

THE COURT: Took the debt. Became obligated for the debt.

MR. APPLEBY: Correct, Your Honor.

THE COURT: What was Westport obligated for after having been relieved of debt?

MR. APPLEBY: Then the CPIF loan of the 9-1/2 million.

THE COURT: Okay. So it was relieved of debt with replacement debt coming in. And how does that net out?

MR. APPLEBY: Well that's -- I thought the numbers we went through earlier, Your Honor.

THE COURT: Your proffer is that the record shows that they ended up with more debt than they got relieved of?

MR. APPLEBY: Well Nursing got more debt than they were relieved of.

THE COURT: Westport doesn't -- okay.

MR. APPLEBY: Holdings -- I'm sorry, Your Honor.

THE COURT: The transfer is by Westport. It's giving away its LLC to someone.

MR. APPLEBY: Yes, Your Honor.

THE COURT: In return it gets relief from debt.

MR. APPLEBY: Yes, Your Honor.

THE COURT: But then also you argued that it became a guarantor of some debt or it became obligated on new debt.

MR. APPLEBY: Well, it was -- previous to the transaction, Nursing was the guarantor. After the transaction, Nursing owed the $15 million to USAmeriBank, Valley Bank, and Holdings had less debt at that point but --

THE COURT: How much less debt?

MR. APPLEBY: Well at the beginning Westport Holdings was the primary borrower with the Horizon debt that was roughly $20 million. And subsequently, they were 9-1/2 million with the CPIF loan.

THE COURT: Okay. So they got relieved of about $11 million. That's what the consideration was for Nursing; would you agree with that?

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. And what was Nursing -- is there anywhere in the record that shows what Nursing was worth?

MR. APPLEBY: The --

THE COURT: More or less than $11 million?

MR. APPLEBY: The real estate value, Your Honor, was $16 million plus the additional 3 million that was the MLR money.

THE COURT: I'm looking at that as a separate thing.

MR. APPLEBY: Yes, Your Honor.

THE COURT: Okay. So they got debt relief of 11 in consideration for transferring a nursing home worth 16. All right.

Okay. I'm going to deny the Rule 52 motion and here I'll tell you why.

Let me start with the first count, the aiding and abetting. And this is where I'm going to come back to Judge Vaughan's case. Looking at the four elements, the Plaintiff has met its *prima facie* showing, and this is preponderance, right, we all agree that the burden is preponderance?

MS. ISRAEL: Yes, ma'am.

THE COURT: So -- which means only that at this juncture it's more likely than not that this Larry Landry person breached his duty to -- via his duty -- that is in his capacity as being able to control Westport Holdings University Village, LLC, his duty to Westport Holdings Tampa, LP by doing two things.

He expatriated a fund that needed to be held by Westport Holdings Tampa in fulfillment of Florida statutory duties. And it could only be held by Westport Holdings Tampa and no one else. Number two -- which then meant that Westport Holdings Tampa was, to use, you know, a car dealer term, was out of trust in terms of what the state's requirements were.

Number two, he caused Westport Holdings Tampa to take one of its two major assets, one being the Towers, the other being a nursing home, but the nursing home, sending that -- selling that LLC to this other group for less than fair value. That's what the record says facially. So

that's the breach. There was a fiduciary duty regarding the partner -- treatment of the partners *inter se*, the breach was doing those two things.

Now we come to knowledge of the breach by the alleged aider and abettor. There is evidence in the record that provides an inference that Mr. Price had actual knowledge of the requirements of the -- of the statutory scheme regarding CCRCs and the MLR depository requirements. At this point it's a reasonable inference that he knew. He's a professional, he has been told specifically about a certain kind of account that must be maintained, he's dealing with Mr. Rabke who apparently knew the ins and outs of that. This wasn't just red -- I'm inferring that these weren't just red flags, this was an intentional blinding, putting blinders on.

It's a reasonable inference based on what's in the writing of the emails. Whether an inference is allowable is generally whether it is reasonable or whether it is one that reasonable and fair-minded men in the exercise of impartial judgment might draw from the evidence. And I'm drawing that now, a reasonable inference. That provides the actual knowledge component of aiding and abetting.

Now we come to substantial assistance. There is some restatement law that you might want to look at that

may give some more light to substantiality. In Judge Vaughan's case, the *Chambers v. Nixon Peabody*, she says that substantial assistance occurs when a defendant affirmatively assists, helps, conceals -- excuse me. Let me read that better so that the commas are in the right place.

Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when requires to do so, thereby enabling the breach to occur. And when they're talking about lawyers she says, to substantially assist a breach of fiduciary duty, the lawyer must actively participate in the breach. And she cites some cases there. I won't cite them here, but you can read them.

She goes on to say that merely acting as a scrivener or providing routine legal services to a client is not enough to meet that active participation. Here's where I draw the inference that Mr. Price substantially assisted. When he scrivened the letter that was going to the OIR in the way that it was scrivened that lacked preciseness and precision that a transactional lawyer ought to give, that's -- that's where I'm getting that it's more than just acting as a scrivener, filling in a form, filling in a routine form, providing routine legal services.

This was a special animal, it required special

handling. And a description to the OIR of exactly what was happening by the exact entities and who was going to hold the fund I think is required under the law. And by helping to create a letter that made it fuzzy and not precise, I think there's a reasonable inference there that that could be considered substantial assistance within the meaning of the law.

At this point it's just a tipping of the scales. That's not to say that when the defense puts their case on, and arguably Mr. Price becomes the most important witness in the defense's case, that those scales may not tip the other way or even tip into equilibrium. Because if the scales are exactly equal in terms of it's not more likely than not on either side, then the burden of proof is not met.

Now I turn to Count IV, which is the Florida Chapter 726, actual fraud. As I said earlier, no one ever comes forward and says, you got me, I helped defraud somebody. This actual fraud count is really based on badges of fraud that if you look -- if you look between the lines it's maybe something in between, it's a hybrid of actual fraud and constructive fraud which is just, you know, getting something for less than reasonably equivalent value that rendered the Debtor insolvent.

In fact, the badges of fraud that we looked at

really sort of overlap that same sort of constructive fraud analysis.

There are enough badges of fraud here that under the Florida statutory definition would tip the scales slightly in terms of the claim that is stated in Count IV. Let me go to that count. There was a transfer. The clearest example is the $3 million. I've said what I've said about shedding the nursing home itself for what appears to be less than fair value.

The badges that we looked at -- let me get them out because I put them aside. The badges that we looked like -- looked at, the intent here is measured -- it says we can give consideration, that the Court may give consideration among other factors, meaning this is a non-exclusive list, as to whether the transfer or obligation was to an insider. We didn't talk too much about that. The transfer of the $3 million fund was to a former insider, became owned by somebody else.

In terms of the lien, if it was transferred directly, I'm not sure yet how it was transferred, if it was transferred directly to the Bank, certainly the Bank is not an insider. So on the scoreboard on weight, I give (a) to the defense.

With regard to (b), the Debtor retained possession or control of the property transferred, that one

falls in favor of the defense. The transfer or obligation was disclosed or concealed. Well the transfer was not concealed but the nature of the transfer was obfuscated. I give maybe a half a point on factor 726.105(2)(c) to the Plaintiff.

Subsection (d), before the transfer was made the Debtor had been sued or threatened with suit. Absolutely it had. It -- the whole enterprise was going to be foreclosed. That weighs in favor of the Plaintiff.

The transfer was of substantially all of the Debtor's assets. Nobody could quote to me what I would think would be the test. I'm thinking it has to be dollar amount -- a majority of the dollar amount of value. The Towers have a value that is -- the substantial -- is substantially the most of the Debtor's assets. The Towers were not transferred. (e) falls in favor of the defense.

(f), the Debtor absconded. That's not present. That would fall in favor of the defense. I mean it's neutral so maybe it doesn't fall in anybody's favor and I could have said that to some of the earlier ones.

(g), the Debtor removed or concealed assets. Yes, the Debtor did remove assets; actually both the account and the LLC.

(h), the value of the consideration received by the Debtor was reasonably equivalent to the value of the

asset transferred or the amount of the obligation incurred. Although it was somewhat painstaking for me to try to figure out the exact theory on the nursing home, the value of the consideration, at least for the $3 million transfer, was nothing. And then the value of the consideration given for the LLC was less than its fair market value, which would be the sum of the assets that the LLC owned.

The Debtor was insolvent or became insolvent shortly after the transfer. I accept the expert's testimony of Ms. Unterholzner and so (h) and (i), well (g), (h) and (i) fall in favor of the Plaintiff.

(j), the transfer occurred shortly before or shortly after a substantial debt was incurred. I'm not sure about that one because I still don't understand whether the Debtor itself became indebted for something other than replenishing the $3 million. I guess that's substantial. For me I don't think I've ever had $3 million in my hand. So, okay, I can give (j) to the Plaintiff's side on that.

The Debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider. Well, the 3 million was essential in terms of its fulfillment of a statutory requirement. The lienor didn't transfer the assets to an insider, so I'm not sure how to read (k) so I'm going to do a push on that one, as well.

For all those reasons, I deny the Rule 52 motion. And so the defense can get ready to go, is it tomorrow?

MS. ISRAEL: It's June 14th, Judge, is our next date.

THE COURT: Okay. June 14th then July --

MS. ISRAEL: 26th.

THE COURT: Do you think you'll need more days?

MS. ISRAEL: Yes, ma'am.

THE COURT: Okay.

MS. ISRAEL: And the coordination with our witnesses, obviously, just to make sure that we can --

THE COURT: Ms. Arciola, let's give them some more days.

COURTROOM DEPUTY: How many days, Judge?

THE COURT: Huh?

COURTROOM DEPUTY: How many days?

THE COURT: How many do you need, Ms. Israel?

MS. ISRAEL: I'm sorry. I would estimate at least two additional days.

THE COURT: So four days total.

MS. ISRAEL: Yes.

THE COURT: That's fine.

MS. ISRAEL: I think we can try to be as efficient as possible --

THE COURT: You don't have to apologize for what

you need. You need what you need.

MS. ISRAEL: Do you think that's good or do you think we need more?

MR. WHITSON: I think we need more than that because I think the Plaintiff wants a day for rebuttal. I think we're looking at at least five, maybe six days. They've had seven. We can do ours in probably five, six.

MS. ISRAEL: And I was only answering as to us.

MR. WHITSON: Right. So I'm trying --

THE COURT: And they've had seven with a lot of argument, a lot of argument, a lot of objections. And I'm not saying that you're wrong for making them, but I didn't keep score on who won the better part of the objections, so.

MS. POLLAN: But they're entitled to make those objections as well, Your Honor.

MS. ISRAEL: Yeah.

THE COURT: But they may not.

MS. POLLAN: You're right.

THE COURT: They may see that some aren't so damaging, just let it go. So she's looking.

COURTROOM DEPUTY: I'm not going to be able to pick seven days in five minutes.

THE COURT: Can you do like a -- can you do a bridge of about three and two?

COURTROOM DEPUTY: Well if we come back on June 14th or I can give you -- well and we come back again on July 26th. So you need five more days after that?

MS. ISRAEL: No. June 14th and July 26th would be two of the days. So we would be looking at three --

MR. WHITSON: Three more days.

MS. ISRAEL: -- additional days.

COURTROOM DEPUTY: Okay.

THE COURT: Can you bridge one of those days into the -- into three more?

COURTROOM DEPUTY: Yep.

THE COURT: Did you come down here just for this? Don't you coach your witness.

MR. SUMMERS: Of course I came down just for this. I was here yesterday at noon for this, as was Mr. Price. Neither one of us are available on the 14th of June. That's what I've been waiting to tell you all day.

THE COURT: All you've got to do is raise your hand.

MR. SUMMERS: Are you kidding me? I was not going to get in the way of all that.

THE COURT: I mean --

MR. SUMMERS: I've been asking everybody if we needed to go today and everybody said you should be here. Come on. I -- we are on the 26th, July the 26th, we are

both available.

THE COURT: Okay.

MR. SUMMERS: So can I go now?

THE COURT: Yes.

MR. SUMMERS: Thank you, Judge.

THE COURT: Just in time to reach all that traffic.

MS. POLLAN: We have to get in that traffic, too.

MR. SUMMERS: Just in time to get in all of it. Thank you, Judge. Y'all have a great day.

MS. POLLAN: Bye, Ellsworth.

MR. WHITSON: Thanks, Ellsworth.

COURTROOM DEPUTY: So just two more days; correct?

MS. POLLAN: Three.

THE COURT: Three.

MS. ISRAEL: Three.

THE COURT: Are y'all going to come back tomorrow and pack up in the morning?

MR. APPLEBY: Well whatever Your Honor needs. We were going to move to one of the rooms and --

MR. WARREN: We were going to move out tonight. I mean and I know we need to get out but.

MS. ISRAEL: And we'll move --

MS. POLLAN: We'll start working now.

MS. ISRAEL: We'll move these, as well.

THE COURT: You don't want to come back tomorrow morning and do it?

MS. POLLAN: Well, we won't be here.

THE COURT: Okay.

COURTROOM DEPUTY: I have August the 20th, 22nd, and the 23rd.

THE COURT: Isn't one of those JBBA?

COURTROOM DEPUTY: It's not on --

THE COURT: I guess not.

COURTROOM DEPUTY: -- my calendar here.

THE COURT: Oh, the 23rd is a Friday; right?

MS. ISRAEL: Yes, ma'am.

THE COURT: Okay.

COURTROOM DEPUTY: So the 20th is a Tuesday, the 22nd is a Thursday, and the 23rd is a Friday. Is that okay?

MS. ISRAEL: I'm available on all of those dates.

MS. POLLAN: Yes.

MR. APPLEBY: I will make sure I'm available. I mean if I'm --

THE COURT: I think August 22nd is the day I start my 20th year. That will be fun.

COURTROOM DEPUTY: I thought you were supposed to be on your cruise, but didn't you change that?

THE COURT: I did.

MS. ISRAEL: I'm sure she would much rather be with us.

THE COURT: I would.

COURTROOM DEPUTY: Okay. So let's see.

MS. ISRAEL: May we --

MS. POLLAN: Starting pack up?

MS. ISRAEL: -- use those dates to start coordinating -- I'm sorry. I'm talking about Mr. --

THE COURT: Yes, ma'am.

COURTROOM DEPUTY: You're fine. I'm going to reserve them now.

MS. ISRAEL: Yes, ma'am.

COURTROOM DEPUTY: And it's going to be in the pro memo, too.

MS. ISRAEL: Oh, perfect. Okay.

THE COURT: We're going to reserve them for you.

MS. ISRAEL: Okay. Thank you. Thank you very much.

MR. WHITSON: So 8/20, 8/22, and 8/23?

COURTROOM DEPUTY: 20, 22, and 23.

MR. WHITSON: Thank you.

COURTROOM DEPUTY: Uh-huh. 9:30.

THE COURT: Okay. It's not game over so I think you all need to still talk about settlement.

MS. ISRAEL: Yes, ma'am.
THE COURT: Okay. This ruling is only that the scales got tipped, Mr. Korhn and Mr. Warren.
MS. ISRAEL: Understood, Judge. And thank you for --
MS. POLLAN: Thank you, ma'am.
MS. ISRAEL: -- allowing us the time to work through all those arguments.
THE COURT: It's important.
MS. ISRAEL: Appreciate it. Thank you.
THE COURT: If nothing else, it tests where you need to go.
MS. ISRAEL: Yes, ma'am. Exactly.
THE COURT: A lot of people don't make those motions and I don't know why.
MS. ISRAEL: I find it helpful and I certainly appreciate the Court's time. Are we going to be okay to leave these pushed up against the wall until June 14th?
THE COURT: Yeah. You can leave -- yeah.
MS. ISRAEL: Okay. All right. May we begin to start packing?
THE COURT: Please.
MS. ISRAEL: Thank you.
THE COURT: All right. The record --
MS. ISRAEL: We'll take that as our cue to get

out.

THE COURT: The record is closed for today.

MS. ISRAEL: Yes, ma'am. Thank you.

THE COURT: Thank you.

(Whereupon, proceedings adjourned at 5:00 p.m.)

CERTIFICATE

I, Gretchen L. Schultz, Certified Electronic Reporter, hereby certify that the foregoing is the official transcript, prepared to the best degree possible from the digital audio recording and logs provided by the court.

I further certify that I am neither counsel for, nor related to, nor an employee of any of the parties to the action in which this hearing was taken.

I further certify that I have no personal interest in the outcome of the action.

SIGNED this 20th day of May, 2024.

GRETCHEN L. SCHULTZ, CER 3573
Transcriber